REPORTER'S RECORD

VOLUME 41 OF 84 VOLUMES

**74721**

TRIAL COURT CAUSE NO. F01-00237-T

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| RANDY ETHAN HALPRIN | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JURY TRIAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 0 2003

Troy C. Bennett, Jr., Clerk

    On the 2nd day of June, 2003, morning session, the

following proceedings came on to be heard in the

above-entitled and numbered cause before the Honorable

Vickers L. Cunningham,  Sr., Judge Presiding, held in

Dallas, Dallas County, Texas.

    Proceedings reported by machine shorthand.

ORIGINAL

A P P E A R A N C E S

APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788696
And
Mr. Tom D'Amore
SBOT NO. 05349500
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600

Ms. Lisa Smith
Appellant Division


APPEARING FOR THE DEFENDANT

Mr. George Ashford
SBOT NO. 01374530
325 N. St. Paul Street
Ste. 2475
Dallas, TX 75201
214/922-0212

Mr. Edwin King
SBOT NO. 11472200
2305 Cedar Springs
Ste. 250
Dallas, TX 75201
214/871-8800

1                         WITNESS INDEX

2    WITNESS                    DIRECT        CROSS     VOL.

3    Wesley Ferris              20,62         25,123    41
                                152

4    Jayne Hawkins              54                      41

5    Tim Cassout                162           179       41

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    EXHIBIT INDEX

| EXHIBIT | IDENT. | OFFER | ADMIT | VOL. |
|---------|--------|-------|-------|------|
| DX-22 | LINEUP CARD | 30,144 | 30,144 | 41 |
| DX-23 | FERRIS' STMT. | 31,144 | 31,144 | 41 |
| ST.8 | PHOTO | 58 | 58 | 41 |
| ST.6 | PHOTO | 61 | 61 | 41 |
| ST.7 | PHOTO | 61 | 61 | 41 |
| ST.9 | PHOTO - OSHMANS | 74 | 74 | 41 |
| ST.10 | PHOTO - OSHMANS | 74 | 74 | 41 |
| ST.11 | PHOTO - OSHMANS | 74 | 74 | 41 |
| ST.12 | PHOTO - OSHMANS | 74 | 74 | 41 |
| ST.13 | PHOTO - OSHMANS | 74 | 74 | 41 |
| ST.14 | PHOTO - OSHMANS | 74 | 74 | 41 |
| ST.15 | PHOTO - OSHMANS | 74 | 74 | 41 |
| ST.16 | PHOTO - OSHMANS | 74 | 74 | 41 |
| ST.17 | PHOTO - OSHMANS | 74 | 74 | 41 |
| ST.18 | PHOTO - OSHMANS | 74 | 74 | 41 |
| ST.19 | PHOTO - OSHMANS | 74 | 74 | 41 |
| ST.20 | PHOTO - OSHMANS | 74 | 74 | 41 |
| ST.21 | PHOTO - OSHMANS | 74 | 74 | 41 |
| ST.22 | PHOTO - OSHMANS | 74 | 74 | 41 |
| ST.23 | PHOTO - OSHMANS | 74 | 74 | 41 |
| ST.24 | PHOTO - OSHMANS | 74 | 74 | 41 |
| ST.25 | PHOTO - OSHMANS | 74 | 74 | 41 |
| ST.26 | PHOTO - OSHMANS | 74 | 74 | 41 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | ST.27 | PHOTO - OSHMANS | 74 | 74 | 41 |
| 2 | ST.28 | PHOTO - OSHMANS | 74 | 74 | 41 |
| 3 | ST.29 | PHOTO - OSHMANS | 74 | 74 | 41 |
| 4 | ST.30 | PHOTO - OSHMANS | 74 | 74 | 41 |
| 5 | ST.31 | PHOTO - OSHMANS | 74 | 74 | 41 |
| 6 | ST.32 | PHOTO - OSHMANS | 74 | 74 | 41 |
| 7 | ST.33 | PHOTO - OSHMANS | 74 | 74 | 41 |
| 8 | ST.34 | PHOTO - OSHMANS | 74 | 74 | 41 |
| 9 | ST.35 | PHOTO - OSHMANS | 74 | 74 | 41 |
| 10 | ST.36 | PHOTO - OSHMANS | 74 | 74 | 41 |
| 11 | ST.37 | PHOTO - OSHMANS | 74 | 74 | 41 |
| 12 | ST.38 | PHOTO - OSHMANS | 74 | 74 | 41 |
| 13 | ST.39 | REVOLVER | 74 | 74 | 41 |
| 14 | ST.40 | RADIO | 74 | 74 | 41 |
| 15 | ST.41 | DEF.  LINEUP | 74 | 74 | 41 |
| 16 | ST.43 | DIAGRAM, OSHMANS | 74 | 74 | 41 |
| 17 | ST.44 | PHOTO | 74 | 74 | 41 |
| 18 | ST.45 | LINEUP | 74 | 74 | 41 |
| 19 | ST.46 | POSTER OF GUNS | 74,120 | 74,120 | 41 |
| 20 | ST.47 | POSTER OF GUNS | 74,120 | 74,120 | 41 |
| 21 | ST.48 | POSTER OF GUNS | 74,120 | 74,120 | 41 |
| 22 | ST.50 | PHOTO | 74 | 74 | 41 |
| 23 | ST.51 | PHOTO | 165 | 165 | 41 |
| 24 | ST.52 | PHOTO | 165 | 165 | 41 |
| 25 | ST.53 | PHOTO | 165 | 165 | 41 |

| | | | | |
|---|---|---|---|---|
| 1 | ST.54 | PHOTO | 165 | 165 | 41 |
| 2 | ST.55 | PHOTO | 165 | 165 | 41 |
| 3 | ST.56 | PHOTO | 165 | 165 | 41 |
| 4 | ST.57 | PHOTO | 165 | 165 | 41 |
| 5 | ST.58 | PHOTO | 165 | 165 | 41 |
| 6 | ST.755 | POSTER OF MANAGERS | 65 | 65 | 41 |

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2              THE COURT:  Prior to the jury being sworn

3      this morning, the Court will rule on some motions filed by

4      the defendant.  Motion to Set Aside the Indictment In That

5      It's an Unconstitutional Statute, an eight-page motion.

6      Would you like to argue your motion, Mr. King?

7              MR. KING:  Yes, I would, Your Honor.

8      Would the Court -- I have several motions entitled

9      "unconstitutional".  I'm trying to make sure which one the

10     Court is specifically looking at.

11             THE COURT:  To set aside the indictment.

12             MR. KING:  I think that's -- I think that

13     was one of the first motions that was filed, Judge.  That

14     motion has become an omnibus motion.  I believe Mr. Ashford

15     filed that.  I apologize, Your Honor.  I wanted to make sure

16     I knew which one you were referring to.

17             Your Honor, we would just argue that the

18     statute pertaining to capital punishment in the State of

19     Texas is unconstitutional for a variety of reasons.  And

20     these motions that have been filed on behalf of Mr. Halprin

21     address particulars of the statute in a variety of ways.

22             But the argument in and of itself all boils

23     down to the basic issue that it's a violation of the Eighth

24     and Fourteenth Amendments of the United States Constitution

25     because it's arbitrary and capricious and denies the

1    defendant due process and it's also a violation of the Texas

2    Constitution, Article 1, Sections 10, 13, and 19.

3                In that regard, Your Honor, in regard to the

4    fact that this is an arbitrary and capricious statute, we

5    note for the record that there are no guidelines other than

6    the Penal Code by which the State of Texas chooses which

7    cases are tried for capital murder.  The Penal Code lays out

8    what is defined as capital murder in the State of Texas and

9    there's a lot of cases that obviously fall into that, as the

10   Court well knows.

11               In regards to that, once a case technically

12   becomes a capital murder under the Statutes of the State of

13   Texas, then what occurs is the District Attorney's Office

14   picks and chooses those cases in which it intends to seek

15   the death penalty.  Certainly those are issues that are

16   covered by political reasons, practical reasons, evidentiary

17   reasons, but ultimately the District Attorney's Office in

18   each county in the State of Texas comes up with its own

19   standard or own rationale for which cases that qualify for

20   capital murder should be tried actually for death.

21               Because of that, the frivolous nature and

22   there being no standard across the state or county to

23   county, the statute becomes arbitrary and capricious.  Now,

24   within each particular county the District Attorney's Office

25   may have adopted some kind of standard which he believes

1   qualifies cases for death as opposed to nondeath capital

2   cases.  However, that in and of itself is arbitrary and

3   capricious.

4           And in regard to that in support of our

5   argument, we would like to offer a file State Cause No.

6   F02-00756.  That is a case out of Dallas County that is

7   currently on appeal.  This is the original trial jacket.  I

8   will be glad to get the clerk to sponsor this particular

9   exhibit, unless the State -- they have not had a chance to

10  review this particular document, Judge.  But it is a file.

11          What we intend to do is offer a certified copy

12  of the file.  This case, as I stated, is currently on

13  appeal.  The record of that case is being prepared at this

14  time and is not available at this time for filing since the

15  court reporter hasn't finished it.

16          THE COURT:  What's the style of the case?

17          MR. KING:  Styled the State of Texas

18  versus Vincent Edward Aguirre.  Mr. Aguirre was charged with

19  capital murder in Dallas County on or about for an offense

20  that occurred on or about March 1st, 2002.

21          And the facts of the case, just briefly, are

22  that there are three individuals allegedly murdered by Mr.

23  Aguirre.  There's a man, two pregnant women, and a

24  four-year-old boy that was actually shot, but has not died.

25  The evidence in this case ties by DNA blood samples from the

1    scene from the deceased to Mr. Aguirre.  Allegedly the

2    weapon is found within his possession and is matched

3    ballistically to the individuals at the scene of the

4    offense.  And Mr. Aguirre was tried and convicted in Dallas

5    County.  His case is on appeal for the offense of capital

6    murder.

7              The point of this is that it is alleged that

8    he was the shooter of these three individuals in Dallas

9    County, in and of himself, along with the shooter of the

10   four-year-old boy that was shot.  The State of Texas did not

11   choose to seek death in this case.

12             Now, we have a situation with Mr. Halprin

13   where it's alleged that either acting by himself or as a

14   party and we believe that the evidence is going to show that

15   it would be the best the State can show is acting by a party

16   that he is going to be tried and the State is seeking death

17   for the death of Officer Hawkins.  They're seeking death on

18   behalf of Mr. Halprin.

19             Clearly the -- an individual who intentionally

20   causes the death of three individuals and shoots a

21   four-year-old child on one hand and an individual who is a

22   party to an offense where somebody shoots and kills a police

23   officer during the course or kills an individual during the

24   course of a robbery or shoots a police officer, as alleged

25   in this indictment, clearly three deaths certainly are a

1    persuasive argument that the District Attorney's Office

2    picks and chooses which cases it intends to seek for death.

3    And it's such an arbitrary and capricious manner as to be

4    violative of the Eighth and Fourteenth Amendments of the

5    United States Constitution, Article 1, Section 10, 13, and

6    19 of the Texas Constitution.

7               And that would be our objections in regard to

8    these unconstitutional motions that we have filed in

9    reference to the statute.  And we would offer as -- and,

10   honestly, Judge, I don't know how we're going to mark

11   anything anymore or where we're going to start marking

12   things for purposes of the trial, since this is a hearing

13   outside the presence of the jury.

14               THE COURT:  Ask the Court Reporter to

15   give you the next number up and keep track.

16               COURT REPORTER:  No. 21.

17               MR. KING:  We would mark this exhibit and

18   the contents thereof as Defense Exhibit 21.  Further, we

19   would offer when it is completed the certified record of the

20   trial transcript to flush out the facts of this case and

21   show the standard of evidence that applied in that case,

22   what evidence was available, what the State put on in that

23   case, to show that the seeking of death in Dallas County is

24   arbitrary and capricious in violation of the amendments as

25   we have suggested.

1   THE COURT:  I'm just trying to limit the

2   amount of paper and exhibits that are involved in this case.

3   MR. KING:  I have discussed with the

4   court reporter in that Court, whether or not she can put

5   that on a CD.  It very well may be possible that that can be

6   done, Your Honor.  And if so, that's what we would offer in

7   lieu of the actual physical transcript itself.

8   MS. SMITH:  We have no objection to those

9   exhibits, Your Honor.

10   THE COURT:  Once again, you may not have

11   an objection, but that's hours and days of work for somebody

12   to be able to make the point that you have already outlined

13   on the record.  Isn't it possible simply to offer the

14   judgment and sentence, the indictment, what we would refer

15   to as a blue back information contained in the blue back to

16   make sure the affidavit is in there?  And then because

17   that's a public record, if someone chose to go and review

18   the reporters record or the clerks record, they could do so.

19   MR. KING:  Judge, my concern is that the

20   Court of Criminal Appeals, should there be a conviction in

21   the State of Texas against Randy Halprin, and should Mr.

22   Halprin be sentenced to death, it's going to the Court of

23   Criminal Appeals, my concern would be that since that was

24   not offered into evidence, they would say it couldn't be

25   considered for some particular reason.  So out of an

1    abundance of caution we're making that offer.

2            And we're aware of the burden we're placing on

3    the Court in this matter and we're not trying to overburden

4    the record or overburden the Court of Criminal Appeals.

5    They would have it at their leisure to review it, should

6    they need to review it.

7            We're just making sure that if the issue boils

8    down to how were the facts of that case distinguishable from

9    any other capital murder case?  Maybe -- I don't want to get

10   into an argument where they go, well, if we had the record,

11   we might have seen where there was a lacking of evidence and

12   that's why the State didn't seek death or something along

13   those lines.  And we're trying to avoid that kind of

14   argument to be made in that particular record.

15           So we would offer the record once it is

16   completed.

17           MS. SMITH:  The problem with that is this

18   Judge can't review it before he makes his ruling today.

19           MR. KING:  That is very true.  That is

20   very true.  But the Court can certainly on a motion for new

21   trial in this case reconsider that motion and then grant

22   that motion if it had the benefit of the record at that

23   point in time.  And I anticipate that record is going to be

24   ready within about 30 or 40 days.

25           MS. SMITH:  Why don't you offer it at the

1   motion for new trial, then?

2                     MR. KING:   I wish to offer it now.

3                     THE COURT:   At this point for Defense

4   Exhibit No. 21, I will admit into evidence the indictment,

5   the judgment, the sentence, the affidavit outlining the

6   basis for the indictment, and any other certified documents

7   that are readily attainable today.   If you wish to

8   supplement the record on a motion for new trial, you may do

9   so.   But I'm not going to be chasing the courthouse for a

10  bunch of documents.

11                    MR. KING:   No, I understand, Judge.

12                    THE COURT:   If you wish to have the clerk

13  certify documents contained in the court file today, mark

14  those as 21.   If you wish to supplement the record, do so

15  with something that I have in hand.

16                    MR. KING:   Very good, Your Honor.   I will

17  be glad to do that.

18                    THE COURT:   Response to the argument

19  proposed by the defense.

20                    MS. SMITH:   In addition to your rulings

21  on the confession, the arrest, and the pretrial

22  identifications, are you also going to be ruling on the

23  validity of the search warrant of the RV and the vehicles?

24                    THE COURT:   I knew there was something

25  else.

1    MS. SMITH:  That just came to me in

2    response to the defense's motion to set aside the indictment

3    based upon the unconstitutionality of the death penalty

4    statutes, the plethora of complaints alleged in the motion

5    have been repeatedly addressed by the Court of Criminal

6    Appeals and consistently the statute has been upheld.

7         That's the sum of my argument to that.

8    There's really not much more to offer.

9         As for the defense's complaint that we have

10   arbitrarily decided to seek death against his client,

11   counsel hasn't shown any purposeful discrimination against

12   his client.  The record in the Aguirre case certainly

13   doesn't show -- in one case that we don't seek the death

14   penalty doesn't show in all the other cases that we seek the

15   death penalty that we have been discriminatory.

16        As a matter of fact, in all other Texas Seven

17   cases we have sought the death penalty.  I think that

18   certainly rebuts any claim of discrimination against Mr.

19   Halprin.

20        MR. KING:  We would only respond to the

21   discrimination is that they are seeking the death penalty

22   against Mr. Halprin when they chose not to seek it against

23   other individuals whose conduct would clearly be far more

24   heinous than that of Mr. Halprin's.  You have an individual

25   who is a shooter and has taken three lives and shot a

1   four-year-old child as opposed to someone who is merely a

2   party to a capital murder offense.

3              And clearly the fact that the State seeks not

4   to seek the death penalty against the shooter of three

5   individuals and a four-year-old child and does seek the

6   death in a highly publicized case means they are choosing

7   and picking cases in which to seek death based on other

8   matters other than be the facts of the case in and of

9   themselves.  And that makes it arbitrary and capricious.

10             THE COURT:  Thank you, Mr. King.  Motion

11  to Set Aside the Indictment Because of the Unconstitutional

12  Statute denied.  Motion to Determine Constitutionality of

13  37.071(2)(b)(2), objections to the party's charge.  I

14  believe that you have already touched on this issue.  Motion

15  denied.

16             Motion to hold unconstitutional 37.071,

17  Section (2) (e) and (f), failure to require mitigation to be

18  considered.  You have got two different motions.  Would you

19  like to briefly summarize your issues?

20             MR. KING:  Simply, Judge, that the

21  statute is unconstitutional because it fails to require that

22  mitigation be considered.  And as opposed to the jury is

23  required to consider all the evidence in deciding whether

24  the defendant is guilty or not guilty, this particular

25  statute doesn't require that in the most important phase of

1  a capital murder trial.  So we believe it's

2  unconstitutional.

3              MS. SMITH:  Your Honor, the statute

4  requires that the jury consider all the evidence in

5  determining the mitigation issue.  The statute certainly

6  meets constitutional standards.

7              THE COURT:  Both of those motions are

8  denied.  Next motion just referred to as the penery issue?

9              MR. KING:  Judge, we just feel, once

10  again, the statute doesn't require the State to have a

11  burden of proof on the mitigation matters.  The statute

12  doesn't require the jurors to be convinced beyond a

13  reasonable doubt, and in regard to the punishment issues and

14  feel the statute is unconstitutional.

15              THE COURT:  Motion denied.  Motion in

16  Limine on the photographs.  We have some autopsy photographs

17  that have been offered in previous trials that have been

18  objected to and the Court has sustained those objections.

19              Mr. Shook, does the State intend to continue

20  to try to offer the objectionable photographs of the

21  autopsy?

22              MR. SHOOK:  Well, I think the one that's

23  been sustained I took out of the mix.  If it's still in

24  there, we can take it out, Judge, but I was looking through

25  it and it was there on Friday when I was going through the

1    photographs.  But I believe that's the side head shot where

2    there are two similar ones.  We will take that one out

3    that's been objected to.

4              THE COURT:  Mr. King, if you would like

5    to review the autopsy photographs, not right now, but if you

6    have a specific objection, I will take it up.  So basically

7    your motion in limine is granted, subject to your review.

8    But I don't want you to take the time looking at them in

9    front of the doctor or in front of the jury.  Look at them.

10             Motion in Limine on the character of the

11   complainant and the victim impact.  Obviously, we're going

12   to hear from Ms. Hawkins or Jayne Hawkins?

13             MR. SHOOK:  Jayne Hawkins.

14             THE COURT:  She has testified in the four

15   previous trials at some phase.  She is aware of the bounds

16   that she can stay within.  I will grant this motion.

17             MR. KING:  We ask the Court to instruct

18   the State to instruct their witness.

19             THE COURT:  If it wasn't the fifth time,

20   I would instruct the witness myself.  But she understands

21   where she can go.  Motion granted.  Motion For Discovery of

22   Victim Impact Testimony.  The only issue that's come up on

23   this is the videotape of the officer making a last traffic

24   stop.  The videotape was found in the patrol car.  That's

25   the specific objection in the past.

1    Do you have something that's in addition to
2  that?  The State is offering the videotape simply to show
3  how the officer was dressed.
4                    MR. KING:  No, we have nothing other than
5  that.
6                    THE COURT:  The Court will allow the
7  videotape at the appropriate time to be displayed to the
8  jury with no audio.  Motion denied.
9                    Motion to Define Beyond a Reasonable Doubt.
10 The Court of Criminal Appeals has ruled on this.  It will be
11 denied.
12                    Motion in Limine to Preclude Testimony About
13 the Violent Acts By Others.
14                    MR. KING:  Judge, that's really a
15 punishment motion.  I don't know if the Court wishes to hold
16 it.
17                    THE COURT:  I will hold the last two
18 motions and rule on them.  The bottom line on the arrest,
19 the Court having reviewed all the arrest warrants in this
20 case find that the warrants were valid and legal and the
21 arrest of the defendant was lawful.
22                    The subsequent arrest incident to arrest --
23 search incident to arrest was legal whether or not they had
24 the search warrant.  I find the search warrant was also
25 properly obtained and legal.  After the search warrant was

1  conducted, the detective flew up to Colorado, interviewed

2  Mr. Halprin.  The Court has reviewed the defendant's written

3  voluntary statement.  The Court finds that the defendant

4  knowingly and intentionally waived his rights to counsel

5  prior to making the statement.  It was a long, detailed

6  statement.

7       The issue regarding counsel being on the

8  outside, wanting in, is not relevant in this matter.  The

9  Court will admit the statement.

10      Having made that ruling, there are certain

11  issues contained within the statement the Court has

12  previously excluded from the jury during the first phase of

13  the trial.  Specifically there are some issues regarding

14  extraneous offenses in Harris County.

15      Do you wish to have the Court remain

16  consistent on these 403, 404(b) issues or do you wish to

17  allow the entire -- do you want -- you understand the

18  portion I'm referring to?

19              MR. KING:  Yes, I do, Your Honor.

20              THE COURT:  Knowing that the statement is

21  going to be admitted, do you wish for the entire statement

22  to be admitted or do you wish for the Court to exclude the

23  extraneous offense?

24              MR. KING:  We will let the entire

25  statement in.

1    THE COURT:  The entire statement would be

2    admitted before the jury.  The other issue before the Court

3    is the photo lineup and the way it was arranged and

4    conducted.  The Court has reviewed Dr. Malpass' extensive

5    research in this area and finds those probative, without an

6    overt showing of suggestion -- how many photos were in the

7    lineup?  Fifteen?

8    MR. KING:  Fifteen.

9    THE COURT:  And having heard the

10   testimony of a lot of witnesses, and only from the hindsight

11   in reviewing all the testimony, that the photo lineup was

12   conducted in such a way that there's no two witnesses that

13   identify the same people being in the store.  Each witness

14   identified some, but not all of the participants.

15   Mr. Shook, is that a fair statement under all

16   the trials we've had so far?  There's no one witness that

17   identified the same individuals as any other witness.

18   MR. SHOOK:  No.  Some witnesses did

19   identify the same individual.

20   THE COURT:  They did?

21   MR. SHOOK:  Yes.  Some could identify

22   four, some two, and some three, and some of those

23   overlapping.

24   THE COURT:  There's some overlapping.

25   MR. SHOOK:  Right.

```
1              THE COURT:  But each witness -- it wasn't

2    suggestive in such a way that there was a pattern of conduct

3    that you could look at.

4              MR. SHOOK:  Oh, the same witnesses, no,

5    Judge.

6              THE COURT:  There's no pattern showing

7    there was any suggestive nature of the lineup.  If there

8    was, I would be jumping on this with both hands.

9              MR. KING:  Well, Judge, we only respond

10   in that regard that the lineup is probably -- the problem

11   with the lineup is that it is suggestive and leads to the

12   wrong identifications.  And there are several witnesses who

13   identified individuals as individual A when it's obvious to

14   everybody after the course of four trials here that they

15   misidentified that individual, saying they were that person

16   when they thought they were somebody else.  And that's the

17   issue here.

18              I would note for the record that I believe

19   there's only one individual at the Oshman's that identified

20   Mr. Halprin out of the lineup and that was a Sandra

21   Rodriguez.  I think that's the only -- and I think that's

22   the only witness who actually picked Mr. Halprin out of a

23   lineup.  So in that regard we only have one individual that

24   we're really referring to, Judge, and that we would ask for

25   a hearing outside the presence of the jury on that
```

1   individual when she is called to ascertain whether or not

2   her in-court identification is tainted by the out-of-court

3   presentation of the lineup and any suggestive nature by the

4   officers involved.

5              THE COURT:  We shall hold that issue.

6   Witness Rodriguez, you said?

7              MR. KING:  Sandra Rodriguez.

8              THE COURT:  Sandra Rodriguez.

9              MR. SHOOK:  Judge, Wes Ferris, if you

10  will recall at the Garcia trial and other trials, he has

11  identified four, Rivas, Rodriguez, Garcia, and Newbury and

12  said he was pretty sure of Halprin and Harper.  And I'm sure

13  he will testify to the same at this time.  He said he was

14  not one hundred percent, but was pretty sure of those.

15             MR. KING:  We would include him as well.

16             THE COURT:  Include Mr. Ferris.

17             MR. SHOOK:  He will be testifying No. 2,

18  Judge.

19             THE COURT:  Ask Mr. Ferris to come in,

20  please.

21             MS. SMITH:  Could you -- for record

22  purposes, could you judicially note that we tendered further

23  exhibits to you on the suppression issues.  The State

24  tendered Sheriff Fehn's and Todd Evans' testimony, as well

25  as certified copies of two of the arrest warrants.

```
1          THE COURT:  That is correct.  The stack
2   of exhibits now is about eight inches.
3               [Out of the presence of the jury.]
4               WESLEY FERRIS,
5   having been duly sworn, was examined and testified as
6   follows:
7               DIRECT EXAMINATION
8   BY MR. SHOOK:
9        Q.    Tell us your name, please.
10       A.    Wesley Ferris.
11       Q.    You have testified in some other trials
12  involving this incident; is that correct?
13       A.    Yes, sir.
14       Q.    And at the time of this offense you were one
15  of the managers at the Oshman's store?
16       A.    Yes, sir, I was.
17       Q.    You were present during the robbery of the
18  Oshman's store when several men came in and held the
19  employees at gunpoint; is that correct?
20       A.    Yes, sir.
21       Q.    The Oshman's store at that time, was it well
22  lit?  You could see everyone, what the person's movement
23  was, that sort of thing?
24       A.    Yes, sir.
25       Q.    Did you get a good look at the individuals
```

1    that were robbing the employees?

2         A.    Most of them, yes, sir.

3         Q.    Later that evening did the police take you to

4    the Irving Police Department and show you a photo lineup?

5         A.    Yes, sir, they did.

6         Q.    Okay.  Let me know you what has been marked as

7    State Exhibit 45 are.  These the photographs that you viewed

8    that day?

9         A.    Yes, sir.

10        Q.    Is this how they were arranged?

11        A.    Yes, sir.

12        Q.    Could you tell the Court where you saw the

13   photo lineup?

14        A.    It was on an eight-foot table in the police

15   headquarters.

16        Q.    And what instructions were you given when you

17   viewed the lineup?

18        A.    They told me to take my time, look at the

19   pictures, and look at features that don't change, such as

20   eyes and just take my time and be sure of the ones that I

21   picked.

22        Q.    Were you able to make some selection that day?

23        A.    Yes, sir, I was.

24        Q.    Which ones do you recall selecting that day?

25        A.    I picked out positively No. 4.

```
 1        Q.     Is that whom you later learned was George

 2   Rivas?

 3        A.     Yes, sir, it is.

 4        Q.     Okay.

 5        A.     No. 7.

 6        Q.     No. 7 is actually who you later learned was

 7   Michael Rodriguez?

 8        A.     Yes, sir.

 9        Q.     Who else?

10        A.     No. 9.

11        Q.     No. 9 and you later learned his name to be --

12   was that Larry Harper?

13        A.     I didn't pick out No. 9.  It was 11 and 15.

14        Q.     You learned 11 to be Donald Newbury?

15        A.     Yes, sir.

16        Q.     And 15 was --

17        A.     Joseph Garcia.

18        Q.     No. 9, did you identify him that day?

19        A.     I identified No. 9 as a possible.  They asked

20   me if I would be able to identify him in court and I wasn't

21   sure at the time that I would or not.

22        Q.     Who did you think No. 9 was?

23        A.     I believed it to be Mr. Harper.

24        Q.     Was he one of the individuals dressed as a

25   security guard?
```

```
 1        A.      Yes, sir.

 2        Q.      And did you see any other photographs which

 3   you were pretty sure of, but not positive?

 4        A.      Yes.  No. 2.

 5        Q.      And did you later learn his name to be Randy

 6   Halprin?

 7        A.      Yes, I did.

 8        Q.      Do you believe No. 2 was one of the

 9   individuals in the store?

10        A.      Yes, sir.

11        Q.      Did you make any other IDs at all or was that

12   it?

13        A.      That was it, sir.

14        Q.      And when you said on Mr. Harper, Mr. Halprin

15   you were pretty sure; is that right?  And have you seen the

16   photographs since that time?

17        A.      Yes, sir, I have.

18        Q.      Where was that?

19        A.      I saw him on the news the next day and I've

20   seen him in the courtroom in here and on TV after they were

21   apprehended.

22        Q.      At any time during when you were looking at

23   the photo lineup, did any of the detectives suggest or tell

24   you who to pick out?

25        A.      No, sir, they did not.
```

1      Q.     And were any of the other witnesses there when

2   you made the selections?

3      A.     Not in the room.  They were outside in another

4   room.

5      Q.     Do you see Mr. Halprin here today in court?

6      A.     Yes.  He's sitting right over there.

7      Q.     Is he one of the individuals that you believe

8   or you said you were pretty sure of?

9      A.     Yes, sir.

10                  THE COURT:  Mr. Ashford?

11                  CROSS-EXAMINATION

12  BY MR. KING:

13     Q.     Mr. Ferris, good morning.  My name is Ed King.

14                  MR. SHOOK:  Pardon me, one more question.

15     Q.     (By Mr. Shook)  How close were you to these

16  individuals?

17     A.     At the time when they announced it was a

18  robbery, within five to six feet.

19     Q.     At various times during the robbery were you

20  closer at different --

21     A.     On some of them, yes, sir, but not all of

22  them.

23     Q.     The first time you saw their photographs on

24  TV, was that after the robbery?

25     A.     Actually, no.  I saw it right after they --

1    when they first announced their escape from -- when they

2    escaped from prison.  I didn't give it much thought because

3    of where it happened at.

4         Q.    Did you identify them from the photographs

5    based on what you had seen on TV prior to the robbery or

6    your observations from the robbery itself?

7         A.    Observations from the robbery itself.

8              MR. SHOOK:  That's all we have, Judge.

9                        CROSS-EXAMINATION

10   BY MR. KING:

11        Q.    Good morning, Mr. Ferris.

12        A.    Good morning.

13        Q.    Mr. Ferris, my name is Ed King.  We have never

14   met before, have we?

15        A.    No, sir.

16        Q.    Mr. Ferris, you readily identified Randy

17   Halprin just a second ago just from sitting in there.  You

18   leaned over and pointed right at him.  Is that because you

19   were called here for the Randy Halprin trial?

20        A.    No, sir, because I recognized him from being

21   there that night and then the photo lineup I saw that night.

22        Q.    Okay.  This is your fifth trial to testify in;

23   is that correct?

24        A.    Yes, sir, it is.

25        Q.    You have been asked these same and similar

1    questions in regards to how you recognize people, would that

2    be fair to say, by a variety of the criminal defense lawyers

3    and prosecutors?

4         A.    Yes, sir.

5         Q.    All right.  Can you tell me what it was that

6    you observed about the individual you tentatively have

7    identified as Mr. Halprin in the store that night?  With

8    everything else going on, what was it that you noticed about

9    him, how he was dressed, what he was doing?

10        A.    That night -- are you talking about that night

11   of the robbery?

12        Q.    Yes, sir, please.

13        A.    Okay.  That night when Mr. Rivas announced

14   this was a robbery and I turned around to face him, he told

15   us that the customers were with him.  And I turned and

16   looked over my shoulder and I turned and looked at the other

17   people in the store and I noticed there were six to -- I

18   thought six to eight people in the store at that time.  And

19   I got a good glimpse.  I got a good look at them all because

20   they all had guns.  I knew which ones they were and which

21   ones were my employees.

22        Q.    So everybody had guns, all six, all eight of

23   those individuals had guns?

24        A.    Yes, sir.

25        Q.    You sure about that?

1    A.    Yes, sir.

2    Q.    Okay.  How was Mr. Halprin dressed?

3    A.    The first time I believe I saw him, he was

4 just dressed in regular, I think just dark clothing, maybe a

5 pair of bluejeans on and a dark shirt.  But I don't really

6 recall how he was dressed that night.

7    Q.    Let me ask you this.  You say that you turned

8 around and you saw individuals, six to eight individuals,

9 with guns.  You are saying that the people you thought were

10 customers that all had guns, you are not sure what the

11 number is, but those people had guns?

12    A.    Yes, sir.

13    Q.    It's entirely possible that Mr. Halprin was

14 out of sight doing something else at that point in time.  Is

15 that fair to say?

16    A.    No, he wasn't out of sight because I saw him

17 with a gun.

18    Q.    You are saying you saw six individuals or

19 eight individuals and you got a good look at all of them,

20 just glancing over your shoulder?

21    A.    I turned around and faced them and looked,

22 sir.  And I stood there and then I turned back and faced Mr.

23 Rivas.

24    Q.    Okay.  And turned around and looked and then

25 turned around and faced Mr. Rivas, that doesn't take but a

1    couple of seconds, did it, Mr. Ferris?

2         A.     Probably 15 to 20 seconds.

3         Q.     All right.  And you are not sure the number of

4    people that you saw?

5         A.     No, sir.  At that point I said I thought that

6    night I thought there were six to eight people in the store.

7         Q.     So your perception is whoever you saw, they

8    all had guns?

9         A.     Yes, sir.

10                THE COURT:  Anything further, Mr. King?

11        Q.     (By Mr. King)  In the photographs you were

12   shown, is there any facial hair you noticed that night on

13   Mr. Halprin?

14        A.     I did not notice any facial hair on any of

15   them that night.

16        Q.     All right.  What kind of gun, allegedly, did

17   Mr. Halprin have?

18        A.     I don't know specifically what type of gun

19   because that night, like I said, I only looked for 15 to 20

20   seconds.  I thought some of them had semiautomatics and some

21   of them had revolvers.

22        Q.     Did you initial a card of any kind to reflect

23   which photographs you picked out of the lineup, Mr. Ferris?

24        A.     I initialed a sheet of paper with the ones

25   that I positively identified.

1    MR. KING:  Judge, I have a copy of

2  everybody's signature card except for Mr. Ferris.  And

3  that's why I asked him that particular question.  I was

4  trying to -- Mr. Ashford believes he may have it.  So if the

5  Court will give him a second to make sure.

6                    THE COURT:  We're off the record.

7                    [Off the record]

8                    MR. KING:  Approach the witness, Your

9  Honor?

10                   THE COURT:  You may.

11   Q.    (By Mr. King)  Mr. Ferris, let me show you

12  what is going to be marked Defense Exhibit No. 22.

13                   MR. KING:  Judge, this is the State's

14  copy.  This may be the only copy.  I guess it's a Xerox copy

15  so they have got an original?

16                   MR. SHOOK:  That's my copy.

17                   MR. KING:  This is the State's copy.  We

18  ask to be able to substitute a copy of this.

19                   THE COURT:  Make a xerox of it.

20   Q.    (By Mr. King)  Mr. Ferris, let me show you

21  what has been marked as Defense Exhibit No. 22 and ask you

22  whether or not you recall -- I don't know how it would have

23  looked on that day, but does that look like something that

24  you indicated which photographs you identified that day?

25   A.    Those are the ones that I identified

1    positively, yes, sir.

2           Q.      Okay.  And those would be 4, 9, 11, and 15; is

3    that correct?

4           A.      Yes, sir.

5                   MR. KING:  Offer Defense Exhibit 22 for

6    purposes of this hearing, Your Honor.

7                   THE COURT:  No. 22 shall be admitted.

8                   MR. SHOOK:  No objection.

9           Q.      (By Mr. King)  You did not make a tentative

10   identification and indicate that on that document, did you?

11          A.      Not on that document, no, sir, I did not.

12          Q.      Let me show you what has been marked as

13   Defense Exhibit No. 23, then, which is a typed statement

14   which appears to have a signature at the bottom.  Let me

15   show you the signature at the bottom.  Does that appear to

16   be your signature?

17          A.      Yes, sir, it is.

18          Q.      Do you recall signing your name below a

19   paragraph pertaining to the identification of individuals

20   you saw that night at the store?

21          A.      Yes, sir.

22          Q.      Okay.  And I presume that you read this over

23   before you signed your name to it; is that correct?

24          A.      Yes, sir.

25          Q.      All right.  Now, in -- let me --

1          MR. KING:  We would offer Defense 23 for

2    purposes of this hearing, Your Honor.

3          MR. SHOOK:  No objection.

4          THE COURT:  No. 23 shall be admitted.

5      Q.     (By Mr. King)  Is there anything in 23 that

6    indicates that you tentatively identified Randy Halprin as a

7    gunman that night or at the store that night?

8      A.     No, sir, there is not.

9      Q.     Thank you very much, Mr. Ferris.

10         MR. KING:  Nothing further of this

11   witness.

12         MR. SHOOK:  That's all we have.

13         THE COURT:  Thank you, Mr. Ferris.

14   Mr. King, do you have an objection to his testimony?

15         MR. KING:  We do.  It's pretty clear

16   there is nothing to indicate that at the time Mr. Ferris

17   says he identified tentatively Mr. Halprin that he did so.

18   His immediate identification of Mr. Halprin from the witness

19   stand after he walked in shows that as a result of him

20   testifying in the last four trials that he automatically

21   presumes that there's an individual sitting at counsel

22   table, that is the individual that he believes to be Mr.

23   Halprin and he's just identifying him from something other

24   than what occurred that night.

25             Because of the plethora of news media events

1    and publications, photographs on television, and otherwise,

2    it's obvious that the lineup was highly misleading in the

3    determination of who was at the scene and who was doing what

4    that night.

5             And we feel that his in-court identification

6    of Mr. Halprin is now tainted by matters other than what

7    occurred that night.  There's nothing to show that he

8    identified tentatively for law enforcement in their records

9    Mr. Halprin.  And we object to his in-court identification.

10            MR. SHOOK:  Judge, I think Mr. Ferris' ID

11   is based on obviously what he observed at the Oshman's that

12   day.  He had plenty of time to -- the robbery went on for

13   half an hour.  The Court has seen Mr. Ferris testify a

14   number of times and he's testified generally the same that

15   he identified four and was pretty sure on the other two at

16   the time he looked at the photographs.

17            And as far as the documents that Mr. King has

18   admitted, those are only on obviously what he was positive

19   that day.  But the Court heard his testimony.  He was sure

20   of the others had guns and clearly had an opportunity to see

21   Mr. Halprin.

22            THE COURT:  Mr. King, it's very difficult

23   for any witness to block out any particular segment of time

24   as to how he made the identification and makes the

25   identification here today.  Certainly the jury, I believe,

1   should be allowed to weigh his identification and weigh his

2   opportunity to witness and view the events that occurred in

3   the Oshman's store and you are certainly welcome to

4   cross-examine him on that issue.

5          So defense motion to exclude Mr. Ferris'

6   in-court identification of the defendant is denied.

7          MR. KING:  Your Honor, so I can clarify

8   one other matter for the record and just -- I apologize to

9   the Court.  But in regards to the Court's ruling on the

10  voluntary statement issue, it's my understanding, correct me

11  if I'm wrong, please, Your Honor, the Court believes that

12  the entire statement is voluntary.  Is that correct, Your

13  Honor?

14         THE COURT:  Yes.

15         MR. KING:  And at either the

16  guilt/innocence phase of the trial, the Court would allow

17  some or all of the statement and depending on what

18  objections the defense would make, but at least the Court

19  would allow the State to offer it in at that point; is that

20  correct?

21         THE COURT:  Yes, sir.

22         MR. KING:  And then at the punishment

23  phase of the trial, I anticipate that the Court's ruling

24  would be that the whole of the document is admissible; is

25  that correct?

1            THE COURT:  That's correct.

2            MR. KING:  All right, Your Honor.  Having

3 made our objections to the voluntariness of the statement

4 our -- when the Court inquired as to whether or not we had

5 any objections to what is contained in the statement, we do

6 object to the statement is not voluntary.  And that is still

7 our objection.

8            That being said, we have no objection, since

9 the State intends to offer the statement into evidence and

10 since the Court's ruling is that the statement is

11 admissible, we have no objection to the contents, the whole

12 contents of the statement coming in.  But we still object to

13 the voluntariness issue of it and the denial of right to

14 counsel.

15            THE COURT:  Yes, sir.

16            MR. KING:  I think Mr. Shook and I have

17 discussed that briefly.  I just want to make sure the record

18 is clear on that, Your Honor, that we are preserving that

19 objection.  But since the Court is allowing the majority of

20 the statement to come in, or a big chunk of it to come in,

21 so we feel for the benefit of the jury all of it should come

22 in.  And that's our trial strategy in that regard.

23            THE COURT:  Yes, sir.  Sheriff, bring us

24 a jury.

25            (Jury in)

1       THE COURT:  Good morning.  Everybody else

2   be seated.  I need the jury to remain standing.  I have to

3   give you an oath to be a juror in this particular case.

4   Please raise your right hands.

5                       [At this time the jury was sworn by

6                       the Court.]

7       THE COURT:  Thank you.  You may be

8   seated.  Mr. Shook, would you like to present your

9   indictment.

10      MR. SHOOK:  May it please the Court.

11  Members of the jury, again my name is Toby Shook.  I'm the

12  lead prosecutor assigned to this case.  At this time it's my

13  duty to read to you the true bill of indictment, which reads

14  as follows.

15      "True bill of indictment, in the name and by

16  the authority of the State of Texas, the Grand Jury of

17  Dallas County, State of Texas, duly organized at the January

18  Term AD, 2001, of the 282nd Judicial District Court, Dallas

19  County, in said Court at said term do present that one Randy

20  Ethan Halprin on or about the 24th day of December AD, 2000,

21  in the County of Dallas and said State did unlawfully then

22  and there knowingly and intentionally cause the death of

23  Aubrey Hawkins, an individual, hereinafter called deceased

24  by shooting the said deceased with a firearm, a deadly

25  weapon, and the said deceased was a peace officer, namely, a

1   City of Irving police officer then and there acting in the

2   lawful discharge of an official duty and said defendant then

3   and there knew the said deceased to be a police officer; and

4   further unlawfully then and there intentionally caused the

5   death of Aubrey Hawkins, an individual, hereinafter called

6   deceased by shooting the said deceased with a firearm, a

7   deadly weapon, and the defendant was then and there in the

8   course of committing or attempting to commit the offense of

9   robbery of Wesley Ferris, against the peace and dignity of

10  the State, signed Bill Hill, Criminal District Attorney of

11  Dallas County, Texas, and signed by the Foreman of the Grand

12  Jury."

13                  MR. ASHFORD:  Your Honor, ladies and

14  gentlemen of the jury, Mr. Halprin pleads not guilty.

15                  THE COURT:  Will the State have an

16  opening remark?

17                  MR. SHOOK:  We do, Your Honor.  May it

18  please the Court?

19                  THE COURT:  Mr. Shook.

20                  MR. SHOOK:  Members of the jury, almost

21  two and a half years ago Aubrey Hawkins was a living,

22  breathing human being.  On December 24th, 2000, Christmas

23  Eve, he came on duty as an Irving police officer assigned to

24  the Patrol Division.  Since it was Christmas Eve and he was

25  working the evening shift, he had made arrangements to have

1    christmas Eve dinner with his family on his dinner break
2    that night.
3              At about 5:30 that evening he had arranged to
4    meet his family at the Olive Garden Restaurant, which is
5    located in Irving, Texas, just off Highway 183.  On the
6    other side of the highway is the Oshman's Superstore.
7              At the time he met his mother, Jayne Hawkins,
8    who brought her mother, Aubrey Hawkins' grandmother, who was
9    92 years old.  He met his wife, Lori, there with his
10   nine-year-old son, Andrew.  And sat down to eat.
11             They were able to spend almost an hour
12   together, but calls backed up and around 6:25 that evening
13   Aubrey Hawkins to leave.  He had to go answer calls.  He
14   said goodbye to his family.  They saw him drive off in his
15   squad car, go down the service road next to 183 in the
16   direction of the Oshman's.  That's the last time his little
17   boy, Andrew, would see him alive.
18             Approximately five minutes from that time
19   Aubrey Hawkins would be lying, dying, behind that Oshman's
20   store, shot 11 times, driven over by a car, run over by a
21   car, the victim of an ambush carried out during a robbery of
22   that Oshman's.
23             Over the course of the next several days the
24   State of Texas will prove that this man, Randy Ethan
25   Halprin, is responsible for that crime along with his

1   accomplices.  We will prove that to you by bringing you

2   eyewitnesses to that Oshman's robbery who can tell you how

3   the robbery occurred, the different roles of these

4   individuals.  We will do that by presenting you physical

5   evidence which ties the defendant to this crime, proving it

6   beyond a reasonable doubt.  We would do so by giving you the

7   defendant's own words in a voluntary statement in which he

8   admits being there at the Oshman's, participating in that

9   crime, and we do so by scientific evidence.  You will hear

10  from a firearms examiner who will tell you that a minimum of

11  five different weapons were used in that ambush.

12          The evidence will show that on December 13th,

13  2000, the defendant, Mr. Halprin, along with his

14  accomplices, George Rivas, Michael Rodriguez, Donald

15  Newbury, Patrick Murphy, Joseph Garcia, and Larry Harper,

16  escaped from the Connally prison unit which is located about

17  60 miles southeast of San Antonio.

18          When they escaped they took with them 16

19  weapons, a .12 gauge pump shotgun, an AR-15 assault rifle,

20  and fourteen .357 revolvers with ammunition.  These are the

21  weapons used to murder Aubrey Hawkins.

22          They left that area.  They went to Houston.

23  They eventually come to the Dallas area.  Their goal in

24  coming here was to find a large store to rob.  Their target

25  would be guns, money, ammunition, and clothes.  The evidence

1   will show that their target became the Oshman's located

2   right there on Highway 183.

3           It will become clear to you from our voir dire

4   with you why we spent so much time on the law of parties and

5   about conspiracy, why the law holds groups of individuals

6   responsible when they actively participate in a crime.

7   Because you will learn from the evidence that this was not a

8   robbery done on a whim, just on a spur of a moment, but one

9   that was planned out over days in great detail.

10          It was so complex and so large in its scope,

11  that it would take all seven of these individuals acting as

12  a team, each one with an individual role to pull off.  Take

13  several days to plan.  The evidence will show that Randy

14  Halprin went in several days before the robbery to get a

15  layout of the Oshman's, he along with Michael Rodriguez.

16          The plan was so detailed that it would call

17  for them to secure security guard uniforms for two of the

18  individuals, complete with badges and hats, to go in

19  undercover as security officers.  George Rivas and Larry

20  Harper would fill those roles.  They would all have

21  walkie-talkies with which to communicate with one another.

22  They would use code names.

23          They would have a police scanner they would

24  have tuned in to the Irving Police Department.  One as a

25  lookout.  They would think of every alternative that would

1  happen and anticipated that the police would arrive and

2  wanted to be prepared for that.

3            They would have two vehicles.  One would be an

4  escape vehicle that they parked before the robbery behind

5  the Oshman's across a field.  Their plan called for if

6  something went wrong, they could run by foot across that

7  field to that vehicle.  If everything went right, they would

8  simply steal one of the employees' vehicles after the

9  robbery, load the items that they had stolen, and meet

10  Patrick Murphy, their lookout, at the rendezvous vehicle

11  after the robbery.

12            They wanted to execute this plan on Christmas

13  Eve at closing time at 6:00 p.m.  The plan was so vast that

14  they would need all seven to control 17 employees to take

15  down, pointing the .357 revolvers with them at them.  It

16  would take a half hour to complete.

17            Around 5:30 p.m. on Christmas Eve they began

18  to execute their plans as they drove and dropped off their

19  Honda car in that apartment complex.  They then drove to the

20  Oshman's, all in one Suburban, and at that time Randy

21  Halprin, along with Michael Rodriguez, entered the store.

22  They were dressed in civilian clothes.  They were each armed

23  with a loaded .357 revolver.  They had walkie-talkies.  They

24  started gathering clothes and acted as if they were

25  shoppers.

1        Shortly after that, Donald Newbury, along with

2   Joseph Garcia, also entered the store.  Joseph Garcia goes

3   to the shoe section.  Donald Newbury goes for the gun

4   section, again, posing as customers.  Both of them armed

5   with .357s.

6        Around ten to 6:00 while Aubrey Hawkins is

7   having his last meal with his family, George Rivas and Larry

8   Harper then enter the store and they are dressed as security

9   guards.  They have their guns outside in holsters and they

10  find Wes Ferris, who you will be hearing from, the manager.

11       The story they tell him is they are looking

12  for a grab-and-run gang, a gang that will grab items and run

13  out of the store.  They have some photo lineups with them.

14  They want to know if the employees may have seen some of

15  these individuals in the store.

16       George Rivas appears to be the man in charge.

17  He asks Wes Ferris if he has any videotapes, security

18  cameras.  Wes Ferris takes him, suspecting nothing at the

19  time, to the video area where he shows him what tapes he

20  has, what cameras are working.  At the time George Rivas

21  asked him if they can show these photo lineups when the

22  store closes to all the employees and he agrees to do that.

23       Waiting outside is Patrick Murphy, who is

24  listening to a police scanner and has walkie-talkies and can

25  be in communication.  The employees gather up at the cash

registers once the store is closed, along with who they

think are the last shoppers, all of whom are in this gang.

At that time Wes Ferris announces over the intercom that the

store is closed, please, if you want to make some purchases,

come forward.

And it's at that point that George Rivas pulls

his weapon out, raises it in the air, and tells everyone

this is a robbery.  He points it at Wes Ferris, tells him

not to try anything.  He tells them all that if they shoot

one, they are going to kill everyone, that everyone in the

store, all the shoppers, are with him.

At that time the men, Randy Halprin and the

others, have their weapons out.  They are in a semicircle

around the employees and are pointing weapons at them.  They

have them put their hands on the front counter and they are

searched.  One employee is brought from the back with

thumbties on.  After they are searched, they are lined up

and are taken to the back of the store.

You will hear from another individual who was

waiting outside to pick her fiance up at that time.  She was

able to look in the store and she saw the individuals being

searched.  She became obviously somewhat concerned.  She was

nine months pregnant, shouldn't have been out that day, but

had to pick her fiance up.  She knew something was wrong,

but wasn't sure and went to call her best friend to meet her

1    up at the store at that time.

2              At that same time the employees are put in the

3    back breakroom where they are searched, threatened, their

4    property is taken.  Wes Ferris is told to come out with

5    George Rivas.  Everyone involved in this gang has an

6    individual role.  Some are searching employees; others are

7    gathering weapons; others are gathering property.

8              George Rivas takes Wes Ferris to the front and

9    has him empty the cash register, has him grab the videotape,

10   takes him to the safe and has him open the safe where he

11   gets over $70,000 worth of cash from three days receipts.

12             He then has Wes Ferris take him to the gun

13   safe that was located back in the storage area.  Open that

14   safe where the handguns are held.  He then has him go to the

15   gun section and unlock where the shotguns and rifles are.

16   He then takes him to the back, takes his keys for his car,

17   his truck, turns him over to Michael Rodriguez where he's

18   thrown against the wall, forced to his knees and searched.

19             At that time George Rivas then goes outside

20   and talks to an individual who is waiting on an employee,

21   seen by the other women who have -- the girl's friend has

22   arrived.  They become suspicious of him when he tries to

23   talk to them and they drive off and call the police.

24             They call in a suspicious activity call,

25   something going on at the Oshman's.  And this is the call

1    that Aubrey Hawkins is summoned to at that time.

2                George Rivas drives around to the back.  They

3    see that and they tell the 911 operator that.  He goes to

4    the back and parks.  He tells everyone to come load the

5    stuff out in the back.  At that time Randy Halprin gathers

6    the money.  He starts making his way back there.  Aubrey

7    Hawkins, being so close, arrives very quickly at the front

8    of that Oshman's.  Patrick Murphy does his job.  He gets on

9    the walkie-talkie and lets everyone know that a police

10   officer is out front.

11               They do not abort the mission at that time.

12   They don't run across the field.  They continue with the

13   robbery.  Patrick Murphy tells them that the officer is

14   coming around to the back.  At that time they are loading up

15   their equipment.  Randy Halprin actually goes back in the

16   store to get the rifles.

17               You will learn from the evidence that the

18   Officer Hawkins drives around and parks directly behind the

19   Ford Explorer which is being used by the robbers which

20   belongs to Wes Ferris.  When he drives and parks behind that

21   Ford Explorer, he drives right into an ambush and he doesn't

22   have a chance.  Gunfire begins immediately.

23               It is rapid and it is continuous and it was

24   without mercy.  It comes from all sides.  Officer Hawkins

25   does not have a chance to remove his service revolver from

his holster to defend himself.  You will know from the

physical evidence that he was able to get his arm up,

because three bullets penetrate that arm.  He has it up in a

defensive posture.   In all 11 bullets will penetrate his

body, six bullets to the head, his left eye is shot out,

he's shot in the cheek, the neck, the ear, the chest cavity,

he's shot in the arm three times, he's shot in the back of

the shoulder, and he's shot in the back, a bullet which

penetrates his aorta.

You will hear from an expert who will tell you

that he looks at firearms, trace evidence, and can tell you

that the gunshot to the back in his opinion was within six

inches.  His body is thrown and drug out from the car,

thrown to the ground.  And as they make their escape, they

drive over him and drag him ten feet.  They take the time to

take his service handgun from his holster and take that with

them.

You will learn from the evidence that the car

was surrounded, that there's gunfire into the hood of the

car, two shots coming from different angles on the driver's

side, that there are two more shots coming into the driver

windshield.  There are four more shots coming into the

windshield from the passenger side.  The drivers window is

shot out.  There's evidence that some bullets ricocheted off

the side of that window.  There's a bullet that penetrates

his computer, coming in the direction of the drivers window.

There are trailers in the back of the Oshman's that are hit bullets, gunfire, three separate bullets. The Ford Explorer, itself, is hit twice. That car was surrounded in an ambush.

Randy Halprin and his accomplices then make their escape. They drive off. In their frenzy and so close and intense, two of them are wounded, George Rivas, who is shot through his stomach and a flesh wound in the thigh, and Randy Halprin, himself, who is wounded in the toe.

They are able to make off with 44 weapons; 34 handguns, 7 shotguns, and 3 rifles. They are able to take $70,000 in cash, along with clothing and lots of ammunition. They leave behind one of their guns, which has been fired once, a screwdriver, and a walkie-talkie, and Aubrey Hawkins.

Police arrive soon as backup. There's not much they can do for Aubrey Hawkins. He's taken to the hospital. For all practical purposes he's dead right there in the back of that parking lot. Crime Scene comes and meticulously goes over that. They gather all kinds of bullet fragments from Aubrey Hawkins' car, from various portions of the back loading dock area. They collect that because they know they can submit that to a crime lab and a firearms expert can look at that and tell how many different

1  weapons are used.  And if weapons are found, he may be able

2  to match those up, if there are sufficient toolmarks.  They

3  gather up that evidence and save it in case they are able to

4  locate those murder weapons.

5          There's a nationwide hunt for these

6  individuals.  They eventually make their way to Colorado.

7  On the way they now have an RV, a recreational vehicle, that

8  they stay in and they also purchase a van and a Jeep.  They

9  make their way to Woodland Park, Colorado, which is a small

10  town about 18 miles northwest of Colorado Springs.  They

11  stay in an RV park.  They arrive there on New Years Eve.

12          There are under the guise that they -- the

13  tale they are telling is that they are Christian

14  missionaries.  They stay to themselves, except for one,

15  Larry Harper, who attends a Bible meeting there in the park.

16  They stay there through the month of January.

17          You will hear from a woman who also lived in

18  that RV park.  Her name is a Jeanie Bartholomew.  She went

19  to those Bible studies.  She also watched the show,

20  "America's Most Wanted."  She had followed this crime story

21  that occurred out of the shooting in Irving.  She had seen

22  photographs of the suspects.  The first time she saw Larry

23  Harper at that Bible study, she thought he looked familiar,

24  thought he looked like one of those individuals, but she

25  thought he couldn't possibly be the one involved in that

1    story.

2              Three weeks later on January 21st, a Sunday,

3    he went to church with them.  After the services he asked

4    them if he could take them to lunch, her and another friend.

5    They agreed to do that.  They drove back to the RV park and

6    he said that he had to check in with his brothers.  They

7    drove to the campsite and at that time Ms. Bartholomew was

8    introduced to George Rivas, who was going by the name of

9    Brother Luke and Michael Rodriguez.  She had just seen

10   another episode of the "America's Most Wanted" the night

11   before.  When she saw George Rivas, she instantly knew who

12   he was, that he was the George Rivas involved in that crime.

13   She then recognized Michael Rodriguez, and then she realized

14   that Larry Harper was, indeed, the individual that she first

15   thought he was.

16             She was able to keep her composure, went to

17   lunch and as soon as they dropped him off, went to the

18   manager of the RV park and they went -- eventually went to

19   the Sheriff of Teller County.

20             Sheriff Fehn called in the El Paso deputies,

21   the adjoining county.  They called in the FBI.  And they

22   came up with a plan.  The next morning they would try to

23   catch these individuals separately.  They had their law

24   enforcement teams divided up.

25             Around 10:00 that morning three individuals

leave in a Jeep, George Rivas, Michael Rodriguez, and Joseph

Garcia.  As they were going down the highway, they pull into

a gas station and a SWAT team takes them down.  They are

arrested without incident.  Thirteen weapons, including

Aubrey Hawkins' handgun, are taken into custody at that

time.

After they are taken into custody, Sheriff

Fehn moves in with the FBI SWAT team and they surround the

RV.  They make demands for those individuals to come out and

after forty-five minutes the defendant, Randy Halprin,

emerges and surrenders.  The other individual in that RV at

the time is Larry Harper who does not come out and

eventually takes his own life.  His body is recovered later.

You would learn from the search of the RV that

there were numerous weapons taken from the Oshman's and

property taken found in the RV.  The other two individuals,

Donald Newbury and Patrick Murphy, were not at the RV and

were captured two days later in Colorado Springs in a hotel

room where the rest of the weapons were recovered.

You will learn that in the search of the RV

underneath, officers found a large bag taped up and inside

that were the .357 revolvers disassembled.  They took those

back to Texas.  A firearms expert was able to assembled

those again and test fire them.  He will come in and tell

you in this courtroom that by a minimum five different

1  weapons, five different revolvers were used or fired

2  projectiles that were recovered from the crime scene, either

3  from Aubrey Hawkins' body, from his car, or projectiles

4  found there in the parking lot itself.

5           At the close of the evidence, the State of

6  Texas will have proven its case beyond all doubt that Randy

7  Halprin is guilty of capital murder.  Thank you.

8                THE MR. ASHFORD:  May it please the Court?

9                THE COURT:  You may.

10                MR. ASHFORD:  Good morning, ladies and

11  gentlemen.  Once again, I'm George Ashford.  I'm the lead

12  attorney representing Mr. Halprin, along with Ed King.

13           We believe the evidence will show you that at

14  18 years old Randy Halprin was charged with the offense of

15  injury to a child.  By far the most serious thing he had

16  ever been accused of in his young life.  He went to jail in

17  Tarrant County, never bonded out of jail.  The next year at

18  age 19, he pled guilty, went to the Connally Unit of the

19  Texas Department of Corrections.

20           You will learn the Connally Unit is a pretty

21  serious unit.  By classification of crimes committed, the

22  inmates that are sent there have had some fairly serious

23  cases.  Not the kind of place that you want to go, 19 years

24  old, and never been to prison before.

25           You will learn that consistent with his

1    character, consistent with his personality, he stayed pretty

2    much to himself.  Didn't get in any trouble.  Didn't join

3    any gangs.  But you will learn that in order to help him get

4    through the system, in order to help him learn how to

5    survive in such a tough place, he had kind of a mentor, kind

6    of a big brother, and that individual was George Rivas.

7              You are going to learn that George Rivas was

8    very bright, very charismatic individual.  You are going to

9    learn that most of what Mr. Shook told you about the State

10   is going to try to prove to you was planned, executed,

11   individuals were handpicked by George Rivas.

12             You are going to learn that after being in

13   prison, in jail, for five years, Mr. Halprin had no visits

14   and very little correspondence.  And when presented with the

15   opportunity to leave prison and start a new life, start

16   over, by Mr. George Rivas, naively he went along with this.

17             He did end up in Dallas.  He did end up inside

18   that Oshman's.  You are going to learn that naively they are

19   going to take the money from the Oshman's.  They were also

20   going to take guns because guns are easily sold, same as

21   cash.  They were going to be converted to cash.  Everybody

22   was going to split up, go their separate ways, and naively

23   Randy Halprin was going to end up in Seattle under a new

24   name, with a new life, and never get in trouble anymore.

25             You are going to learn that, yes, everybody

1  had a role to play in the Oshman's robbery.  But consistent

2  with his character, consistent with his personality, he had

3  the goffer role.  Get this.  Gather that.  His role was to

4  gather clothing from the outdoor section that would be used

5  to go to Colorado.

6           You are going to learn that during the course

7  of the robbery, Rivas, Rodriguez, they had the roles that

8  dealt with brandishing weapons.  They had the roles that

9  dealt with being in front of people and confronting people.

10  Mr. Halprin's role was to gather property.  You are going to

11  learn that Mr. Halprin carried a weapon into the Oshman's

12  because he was told by the others that they would not go

13  unless he did.  And that weapon went into his pocket and

14  remained there the entire time.

15           You are going to learn that, yes, there was

16  planning to this particular Oshman's robbery, but more so

17  planning as to this particular location in this particular

18  time because the over-all scheme and how it was to be done

19  had been done before.  It had been done several times by Mr.

20  Rivas.  Many times.  That's what he had been to prison for

21  and he had also done it prior to the Oshman's robbery, but

22  after the escape.  And you are going to learn in those

23  robberies nobody ever got shot.  Nobody ever got killed.

24           Part of the planning was minimizing the amount

25  of people that had to be involved, entering the store at

1    closing time when there would be no customers there.  Part

2    of the planning was having someone to watch out for the

3    police, so a getaway could be made, so there would be no

4    confrontations.  Part of the planning was going outside to

5    make sure and ask any employees, is there anybody coming to

6    pick you up, so there would be no confrontations, so there

7    would be no surprises.  Part of the planning was creating

8    diversions, so there could be a smooth getaway.  All this

9    planning by George Rivas and he had been successful with it

10   before.

11            You are going to learn that because of that

12   planning, Mr. Halprin and the others did not anticipate that

13   anybody would be killed.  You are going to learn that the

14   killing of Officer Hawkins was probably the only thing that

15   was not planned.

16            You are going to learn that going to Colorado,

17   the plan was to stay there a few days, get IDs, naively go

18   their separate ways, Mr. Halprin to Seattle to start a new

19   life.  And you are going to learn that as these other

20   individuals went out into the community, interfaced with

21   people, consistent with his character and personality, Mr.

22   Halprin stayed isolated in that trailer, avoiding any kind

23   of confrontation, avoiding any type of potential danger.

24            When the police came, he was there where he

25   had been the entire time and surrendered without incident.

```
1    The evidence is going to show you that Mr. Halprin

2    participated in an aggravated robbery, but did not

3    participate in the capital murder, in the death of Officer

4    Hawkins.

5                    THE COURT:  Counsel, please approach.

6                         (Bench conference)

7                    MR. SHOOK:  We'll call Jayne Hawkins.

8                    JAYNE HAWKINS,

9    having been duly sworn, was examined and testified as

10   follows:

11                   DIRECT EXAMINATION

12   BY MR. SHOOK:

13        Q.    Would you tell us your name, please.

14        A.    Jayne Hawkins.

15        Q.    Are you the mother of Aubrey Hawkins?

16        A.    Yes.

17        Q.    How old was Aubrey at the time of his murder?

18        A.    Twenty-nine.

19        Q.    And where was he born and raised?

20        A.    He was born in Dallas and reared here, too.

21        Q.    Did he have a family?

22        A.    Yes, his little boy and a wife.

23        Q.    What's his name?

24        A.    Andrew Hawkins.

25        Q.    At the time of Aubrey's murder, how old was
```

1   Andrew?

2        A.     Andrew was nine.

3        Q.     And his wife was Lori Hawkins?

4        A.     Yes.

5        Q.     Is that Andrew's natural mother?

6        A.     No.

7        Q.     Had Aubrey been --

8        A.     Married before.

9        Q.     Okay.  And how was your son employed?

10       A.     Aubrey was a police officer with the Irving

11 Department.

12       Q.     And about how long had he been with the Irving

13 Department?

14       A.     I think about 16, 18 months, something like

15 that.

16       Q.     Did he enjoy being a police officer?

17       A.     Oh, yes.  It was absolutely his life's dream

18 to become a police officer with a big department.

19       Q.     Had he been a police officer at other

20 departments?

21       A.     Yes.  He was at Saint Paul and he was at -- I

22 think he was the head of the Police Department at Harris

23 Medical and then he was with the Kaufman Department as well.

24       Q.     And was his plan and part of his goal to join

25 a larger police force?

1      A.      Yes, yes.  He wanted to be with a big
2  department and he did it.
3      Q.      Now, let me turn your attention to Christmas
4  Eve of 2000.  Had you made some plans with your son?
5      A.      (Witness nods head.)
6      Q.      What were those?
7      A.      Well, I had told Aubrey that -- I'm just tired
8  of doing this -- that my mother was coming and so he said
9  knowing, of course, we were coming from DFW and he would be
10 working in Irving, he said, could we have Christmas Eve
11 dinner because we were going to spend Christmas day at his
12 house.  And he wanted to see my mom.  And so I said, oh,
13 that would be great, because, you know, normally I didn't
14 get to see Aubrey when he was working.
15          And so we -- my mom and I came from the
16 airport to meet Aubrey, but mother's plane was late, so we
17 were a little bit late and Lori had chosen Olive Garden.
18 And so --
19     Q.      Is that the Olive Garden located right there
20 on Highway 183?
21     A.      Yes.  So when we walked in, Andrew and Aubrey
22 was sitting there and Lori was sitting there waiting on us
23 and --
24     Q.      How old was your mother at that time?
25     A.      Ninety-two.

1   Q.   After y'all arrived, did you sit down at the

2   table and have Christmas Eve dinner?

3   A.   Yes.

4   Q.   How was your son dressed?

5   A.   Aubrey had his uniform on.  It was only the

6   second time I had ever seen him in it.

7   Q.   And was he in good spirits at that time?

8   A.   Very good spirits.  He had just had a health

9   checkup and he said, "Mom, my triglicerides are down", and

10  he was, uh-huh, happy, and looked very well, you know.

11  Q.   At some point in time did your son have to

12  leave?

13  A.   Yes, he did.  We ate -- I knew we didn't have

14  much time because we were late.  And so his radio kept

15  calling and he looked across the table at me and he said,

16  "Mom, I'm going to have to go."  So we, you know, finished

17  quickly and got the check and stood up and walked to the

18  parking lot.  And Aubrey scooped up Andrew, you know, I love

19  you.  He never left me or Andrew or got off the phone

20  without saying I love you, ever.  And he said -- he hugged

21  Andrew and said, you know, "I love you.  See you in the

22  morning."  And, "Bye, Daddy" and same with Lori.  He put

23  them in the car and they went away.

24        And then we got my mom in the car and Aubrey

25  said, "I want to show you how to get back on the freeway."

1    He always sort of took care of things that way.  So I was in

2    the car with my mom and we were behind him and he pulled out

3    of the parking lot and turned right onto 183 service road

4    and we followed him and he turned left on the Esters

5    overpass and left onto the service road, going back toward

6    Dallas.  And I followed him and then I got on the freeway

7    and we were parallel for a while and he waved like this in

8    his rearview mirror and I sped ahead.

9             And then Oshman's, you know, was just right

10   down the street.

11        Q.    Let me show you a photograph which has been

12   marked as State Exhibit 8.  Is that -- does that show kind

13   of an overview of the Olive Garden Restaurant that was off

14   183?

15        A.    Yes.

16        Q.    Is that the Oshman's located there --

17        A.    Yes.

18        Q.    -- in the upper corner?

19        A.    Yes.

20             MR. SHOOK:  Your Honor, at this time

21   we'll offer State Exhibit 8.

22             MR. ASHFORD:  No objections.

23             THE COURT:  No. 8 shall be admitted.

24        Q.    (By Mr. Shook)  Ms. Hawkins, I want to turn

25   your attention to the monitor.  We'll go over what we just

1    did with ourselves at the witness stand in regards to this

2    photograph.   The Olive Garden, is that located right there?

3         A.      Yes.

4         Q.      Is this Highway 183?

5         A.      Yes.

6         Q.      And then this area up here, is this where the

7    Oshman's is located?

8         A.      Yes.

9         Q.      You last saw your son driving down this

10   service road?

11        A.      Yes.

12        Q.      Okay.   Now, later that evening did you go back

13   to your home?

14        A.      Actually, I went to Eatsi's to get creme

15   brulee for Andrew.   I asked him what he wanted for dessert

16   and that's what he wanted.   And we were there.   And my mom

17   and I -- first of all, you know, Aubrey said, "I love you,

18   Mom," is the last thing he said.   And anyway so --

19        Q.      Let me turn your attention to when you were

20   home that evening.   Did someone come to your home?

21        A.      We went -- mother and I went home and we

22   opened our gifts that we had given each other because I had

23   so much to take to Aubrey's.   And so mother and I opened our

24   gifts and put our gowns on.   We were getting ready for bed

25   and it was after 9:00 or so.   And I gathered up all the

1  presents and put them in shopping bags and put them by my

2  front door.

3              And then the doorman called upstairs and he

4  said, "There's some nut down here."  He said, "Somebody

5  flashing a badge and some woman named Rose."  And I said, "I

6  don't want to let somebody up here like that," because I had

7  no idea.  I did not think about it at all who that would be.

8  And as it turned out, Rose was Chief Canaday's wife, who I

9  had never met.

10     Q.     Chief Canaday, was he the Irving Police Chief?

11     A.     Yes.  And the badge, of course, we know what

12  it was.  So they really banged on the door, didn't ring the

13  doorbell, just banged and banged.  And I went to the door

14  and looked through the peephole and I could see four people

15  standing there, two, I think, in uniform and then like a, I

16  think a chaplain, and so I knew.

17     Q.     You knew at that time?

18     A.     And I just said, "Has something happened to

19  Aubrey?"  And they yelled at me and said, "Well, if you will

20  let us in, we'll tell you."  And I opened --

21     Q.     Did they come in at that time?

22     A.     I'm sorry?

23     Q.     Did they come into your home at that time?

24     A.     Uh-huh.  And I don't know what they said.  I

25  don't remember what they said.

1      Q.     I want to show you what has been marked as

2    State Exhibit 6.  Is this a photograph of your son in his

3    police officer's uniform?

4      A.     Yes.

5      Q.     Is this also a photograph, State Exhibit 7,

6    your son with his boy?

7      A.     Uh-huh.

8      Q.     Okay.

9                   MR. SHOOK:  Your Honor, at this time we

10   offer State Exhibit 6 and 7.

11                  MR. ASHFORD:  No objections.

12                  THE COURT:  Nos. 6 and 7 shall be

13   admitted.

14     Q.     (By Mr. Shook)  This is Aubrey and --

15     A.     Aubrey and Andrew, uh-huh, at my house.  I

16   took it.

17                  MR. SHOOK:  Judge, that's all the

18   questions we have.

19                  MR. ASHFORD:  No questions of this

20   witness, Your Honor.

21                  THE COURT:  Thank you, ma'am.  You may

22   stand down.

23                  MR. SHOOK:  May this witness be excused?

24                  MR. ASHFORD:  No objections, Your Honor.

25                  THE COURT:  She may.  Members of the

1   jury, we need to take a break at this time.  If you will, go

2   with the Sheriff.

3                          (Jury out)

4                          [Recess]

5                          (Jury in)

6                          THE COURT:  Thank you.  You may be

7   seated.  Mr. Shook?

8                          MR. SHOOK:  Call Wes Ferris.

9                          THE COURT:  Let the record reflect this

10  witness has been previously sworn.

11                         WESLEY FERRIS,

12  having been duly sworn, was examined and testified as

13  follows:

14                    DIRECT EXAMINATION

15  BY MR. SHOOK:

16       Q.    Would you tell us your name, please.

17       A.    Wesley Ferris.

18       Q.    And how are you employed, sir?

19       A.    I'm currently employed by Dodson's Grand

20  Rental Station in Burleson, Texas.

21       Q.    Do you have a family?

22       A.    Yes, sir, I do.  A wife, six children, three

23  grandchildren.

24       Q.    Prior to your current job, did you work for

25  the Oshman's Corporation?

1    A.    Yes, sir.  I was a department manager at the

2  Oshman's Supersports Store in Irving, Texas.

3    Q.    And prior to that, how were you employed?

4    A.    I was in the United States Marine Corp for 20

5  years.

6    Q.    What was your rank in the Marine Corp?

7    A.    I retired as a gunnery Sergeant, E-7.

8    Q.    When did you first begin working for Oshman's?

9    A.    About a year after I retired from the Marine

10  Corp.

11    Q.    And you work there at the Oshman's Super Store

12  located in Irving, Texas?

13    A.    Yes, sir, I did.

14    Q.    Is that right off Highway 183?

15    A.    Yes, sir, it is.

16    Q.    What were your duties there at the store?

17    A.    I was -- my primary duty was department

18  manager for the field and stream department in charge of all

19  the hunting and fishing and camping areas.

20    Q.    As a manager did you have other duties, other

21  than the specific section you were assigned to?

22    A.    Yes, sir.  I was to help anywhere else in the

23  store that I was needed.

24    Q.    Let me turn your attention now to December 24,

25  2000, and ask if you were working that day?

1     A.     Yes, sir, I was.

2     Q.     About what time did you come to work?

3     A.     I got to work about 6:30 that morning.

4     Q.     What were your hours going to be on Christmas

5 Eve?

6     A.     We were going to open from 7:00 until 6:00

7 p.m.

8     Q.     And about how many employees did you have

9 working that day?

10    A.     We had 22 scheduled to work throughout the

11 day.

12    Q.     At closing time at 6:00 -- let me ask you

13 this.  What time were you scheduled to get off that day?

14    A.     I was scheduled to leave around 5:30.

15    Q.     Did you stay later than that?

16    A.     I stayed later because I wanted to help and

17 get the registers closed down and get the employees out of

18 there for the holidays.

19    Q.     At closing time how many employees did you

20 have there?

21    A.     I believe there was myself, three other

22 managers, and, I believe, 11 or 12 associates.

23    Q.     Okay.  Let me show you an exhibit which has

24 been marked as State Exhibit 755.  Is this a list of the

25 managers on duty at that time, as well as the sales

1   associates?

2          A.     Yes, sir, it is.

3                 MR. SHOOK:  Your Honor, at this time we

4   offer State Exhibit 755.

5                 MR. ASHFORD:  No objections, Your Honor.

6                 THE COURT:  No. 755 shall be admitted.

7          Q.     (By Mr. Shook)  Mr. Ferris, the list that we

8   have here at the top, we have your name at the very top,

9   along with three others as the managers; is that right?

10         A.     Yes, sir.

11         Q.     Was there one manager that had -- was in

12  charge of the store over the other managers?

13         A.     Yes, sir.  That would be Darrin Ojeda.

14         Q.     But you-all would help each other out with

15  each other's duties?

16         A.     Yes, sir.

17         Q.     Okay.  And then the sales associates, are

18  these the names here listed of everyone that was working

19  until 6:00 p.m. that day?

20         A.     Yes.  Those were the ones that were still in

21  the store.

22         Q.     And what's the average age of most of these

23  people?

24         A.     At that time most of those were 18, 17, 18

25  years of age.

1      Q.  Are they full-time employees?  Part-time?

2      A.  The majority of them were part-time, high

3   school students.

4      Q.  Most of them high school students?

5      A.  Yes, sir.

6      Q.  All right.  And where did they work throughout

7   the store?

8      A.  In the various departments, cash registers,

9   shoe department, a couple worked back in the hunting

10  department, athletic department, throughout the store.

11     Q.  What was the store like that day?  Was there a

12  lot of customers?

13     A.  There were a lot of customers, but not as much

14  as we had been planning.  That's why we had sent several

15  associates home early during the day.

16     Q.  Let me -- and let me ask you to describe that

17  store.  What, is this a large store?  Smaller store?

18     A.  It's about the third or fourth largest store

19  in the area that we had.

20     Q.  Okay.  About 5:30 p.m. that day, did one of

21  the managers make an announcement?

22     A.  Yes, sir.  Darrin made an announcement that it

23  was 5:30 and we would be closing the store at 6:00 and asked

24  all the customers to make their final selections and proceed

25  to the front of the store to the cash register.

1     Q.     Do you have a PA system that these

2  announcements can be made on?

3     A.     Yes, sir.

4     Q.     Okay.  Let me show you what has been marked as

5  State Exhibit 43.  Does this show kind of a blueprint or

6  diagram of how the store was laid out back at that time?

7     A.     Yes, sir, it does.

8     Q.     And would it help you explain your testimony

9  to the jury?

10    A.     Yes, sir, it would.

11               MR. SHOOK:  Your Honor, at this time we

12  offer State Exhibit 43 for all purposes.

13               THE COURT:  State 43 --

14               MR. ASHFORD:  No objections.

15               THE COURT:  -- shall be admitted.

16               MR. SHOOK:  May I have the witness step

17  down for a moment?

18               THE COURT:  You may.

19    Q.     (By Mr. Shook)  Mr. Ferris, I'll ask you,

20  when we're pointing things out, be wary that there are some

21  jurors that may not be able to see over your shoulder.

22               Does this show a diagram of how the Oshman's

23  is laid out?

24    A.     Yes, sir, it did at that time.

25    Q.     Let's start at the top.  Where would the

1  entrance be?

2        A.      The entrance is right here, two doors, one

3  outside the building, and one over here.

4        Q.      Okay.  Now, do you have windows that you can

5  look in through the store at the front?

6        A.      Only at this area right here.

7        Q.      So the only way a person can see into the

8  store would be in the front doors?

9        A.      Yes, sir.

10       Q.      And as you come through the entrance, where

11 are the cash registers located?

12       A.      Cash registers are located here.  Come in the

13 entrance and take a left.  There are three registers here,

14 and customer service back here with two cash registers.

15       Q.      What goes on at customer service?

16       A.      Customer service is where the customer comes

17 in, they have merchandise they want to return, not a proper

18 fit, take it there and get the returns on it.

19       Q.      Is that where the PA system is located?

20       A.      The PA system is located right next to this

21 counter.

22       Q.      Are there some offices located here just down

23 from the service center?

24       A.      Yes, sir.  There's the general manager's

25 office, assistant general manager's office, video room, and

1    the cash office area back here.

2          Q.    Tell the jury what the video room is.

3          A.    The video room is where we kept all our

4    surveillance cameras that were recording devices for the

5    cameras that were located throughout the store.

6          Q.    Okay.  Now, you have had cameras throughout

7    the store; is that right?

8          A.    Yes, sir.

9          Q.    On that particular day how many cameras were

10   actually operating?

11         A.    They were all operating, but they were only

12   recording on the one here on the entrance and exit to the

13   store.

14         Q.    So the only recordings were made were a person

15   entering and leaving the store?

16         A.    Yes, sir.

17         Q.    Okay.  Then the safe, is that located back

18   near the store safe?

19         A.    Yes, sir, it is.

20         Q.    Now, as you come in and we look, as we're

21   looking at the diagram to the left, what is this area right

22   here?

23         A.    This is the shoe department where we had all

24   our shoes that we had in the store there for the customers

25   to look at and pick out the ones to best fit them and then

1    we move around back here to the exercise mat where we had

2    displays of all the treadmills and exercise machines that we

3    carry in the store.

4         Q.    Okay.

5         A.    These shelves here is where we -- these are

6    shelves that we display different merchandise on.   For

7    example, this one had athletic bags on baseball, softball,

8    basketball, volleyball.

9         Q.    What are these areas of items here?

10        A.    These areas in the center are apparel

11   departments.   We had at the time women's department,

12   children's department, and men's department.

13        Q.    Okay.   And then this area here which is titled

14   "field and stream"?

15        A.    That was my department, field and stream

16   department, the fishing department.   This is all fishing.

17   The hunting department was back in here where the guns were

18   kept.   And this is all camping and water sports there.

19        Q.    Now, in this section of the store did you sell

20   handguns?

21        A.    Yes, sir, we did.

22        Q.    What type of handguns?

23        A.    Semiautomatic and revolver handguns.

24        Q.    Where were they displayed?

25        A.    They were displayed in these cases.   These are

1  display cases.  They were displayed in these cases.

2      Q.    When the store closed, did the guns stay there

3  in the display cases?

4      A.    No, sir.  We took them out and locked them up

5  in a safe back here.

6      Q.    And then you also sell rifles and shotguns?

7      A.    Yes, we did.

8      Q.    Where were those kept?

9      A.    Those were kept in a rack on the wall behind

10  the counter.

11      Q.    Okay.  And did you have various types of

12  ammunition for all those types of weapons?

13      A.    Yes, sir, we did.  It was on the shelves

14  immediately below the rifle right here behind the counter.

15      Q.    Okay.  And, now, what do we have back here in

16  this area towards the rear of the store?

17      A.    Right in this area right here was the bicycle

18  department.  This was the golf and tennis department.  Back

19  through here went back to the restrooms and the employee

20  breakroom.

21      Q.    Where is the employee breakroom located?

22      A.    Employee breakroom is down here.

23      Q.    Finally, what is this area here?

24      A.    That was the warehouse area where we received

25  all our merchandise in and shipped out merchandise.

1      Q.    Okay.  Now, the area behind the store where

2  you would receive merchandise, there was a loading dock

3  area; is that right?

4      A.    Yes, sir, that's right here.

5      Q.    And the exit doors which would lead to that

6  loading dock area, where are they located?

7      A.    There was one here, here, and one right here,

8  and there were two bay doors right here where the trucks

9  backed up to.

10      Q.    So the -- some 17 or so employees, the sales

11  associates, they were assigned to different areas of the

12  store?

13      A.    Yes, sir.

14      Q.    And the managers had a different section,

15  also?

16      A.    Yes, sir.

17      Q.    Now, you said around 5:30 p.m., I believe, it

18  was Darrin Ojeda made the announcement that the store would

19  be closing soon?

20      A.    Yes, sir, he did.

21      Q.    And what did you do at that time?

22      A.    When he made that announcement, we were both

23  standing up here by customer service and I told him that I

24  was going to walk the store and see how many customers were

25  in it.  And I proceeded this way and walked around,

1  basically around this track, and getting an idea as to how

2  many customers were still in the store, see if anybody

3  needed any help.

4       Q.    Were there a lot of customers in the store?

5       A.    There were not a lot of customers in the

6  store.

7       Q.    Did you go to your particular area, the field

8  and stream section?

9       A.    Yes, sir.  I got back to the field and stream

10  area back there and two associates back there.  I told them

11  to go ahead and put the guns away because there was nobody

12  back there.  And while they put the guns away, I closed down

13  the cash register back here, counted the money down in that

14  register.

15       Q.    And after you counted the money, what did you

16  do?

17       A.    I picked up -- I told them after they put the

18  guns away and I counted the money, I told them to get a good

19  recovery on the area and I took the money with the intention

20  of putting it in the safe.

21       Q.    Did you ever put it in the safe?

22       A.    No, sir, I did not.

23       Q.    Where did you put it at that time?

24       A.    When I got back about here, I received a page

25  that I was needed back over by the exercise mat.  So I took

1    the money and put it in a bin behind customer service that

2    we had there.

3         Q.     When you say "a page," is that over the PA

4    system?

5         A.     Yes, sir.

6         Q.     Okay.  You may take your seat.  I want to show

7    you some photographs that you have seen outside the presence

8    of the jury.  They have been marked State Exhibits 9 through

9    50.  Do they show aerial views of the Oshman's store, also

10   interior views of the Oshman's store, as well as a

11   photograph of your vehicle?

12        A.     Yes, sir, they do.

13               MR. SHOOK:  Your Honor, at this time we

14   offer State Exhibit 9 through 50.

15               MR. ASHFORD:  No objections.

16               THE COURT:  Nos. 9 through 50 shall be

17   admitted.

18        Q.     (By Mr. Shook)  First of all, looking at the

19   photograph that is on the monitor now, that shows Highway

20   183, I believe, the other side of the highway; is that

21   correct?  The Oshman's store is located up here?

22        A.     Yes, sir, it is.

23        Q.     Okay.  Let me show you State Exhibit 9.  Is

24   this another angle that shows the parking lot of the

25   Oshman's store?

1        A.      Yes, sir, it does.

2        Q.      And the store is located here on the corner;

3   is that right?

4        A.      Yes, sir.

5        Q.      What's this behind the store?

6        A.      It's just an open field back there, sir.

7        Q.      And these buildings behind the open field?

8        A.      I believe there is some apartment complexes

9   back there.

10       Q.      Okay.  Let me show you State Exhibit 10.  Is

11   that a closer view of the Oshman's?

12       A.      Yes, sir, it is.

13       Q.      What are these other stores located in this

14   shopping area?

15       A.      The one immediately where you have the dot

16   there is Staples and Comp USA is down here at the end and

17   Party City was there in the middle.

18       Q.      What about the other group of buildings?

19       A.      Over there the first one is Hobby Lobby and

20   the one next to that is K-Mart.

21       Q.      And State Exhibit No. 11 shows the front door

22   of the Oshman's?  Is that the front door area?

23       A.      Yes, sir, it is.

24       Q.      Give you a little bit of a closeup on that.

25   There's no windows along the Oshman's building?

1     A.     No, sir, there's not.

2     Q.     Okay.  Now, what type of vehicle were you

3 driving at that time?

4     A.     A 1996 Ford Explorer.

5     Q.     And where did you park it that day?

6     A.     When I first came to work that morning, I

7 parked in about the third row out, just to the right back

8 over in that area.

9     Q.     All right.  And around 6:00 p.m. where was it

10 parked?

11    A.     It was parked over by the light standard right

12 there.

13    Q.     This one here?

14    A.     Yes, sir.

15    Q.     Okay.  Now, let me show you State Exhibit 12.

16 Does this show the back loading dock area of the Oshman's?

17    A.     Up in the top, right corner, yes, sir.

18    Q.     And you talked about the exit doors.  Are

19 those located here and here?

20    A.     That's one in the corner and one by the truck

21 right there and one down to the left behind the other truck,

22 the trailer.

23    Q.     And this trailer here, is that there all the

24 time?

25    A.     No, sir, they are not.

1    Q.    But this trailer was parked there in this

2  position that evening?

3    A.    Yes, sir.

4    Q.    And these other two trailers, were they also

5  parked in that position?

6    A.    Yes, sir.

7    Q.    This parking lot here, what type of parking

8  lot is that?

9    A.    That was for the car dealership.

10   Q.    Now, you said that you had gone to the field

11 and stream section.  You had taken the money from that cash

12 register.  You were about to put that up in the safe when

13 you were given a page to go to the exercise mat area?

14   A.    Yes, sir.

15   Q.    Is that right?

16   A.    Yes, sir.

17   Q.    Let me show you State Exhibit 13.  That the

18 exercise mat area?

19   A.    Yes.  The exercise mat is just to the right of

20 those boxes right there.

21   Q.    Right in there?  When you came to that area,

22 who was there?

23   A.    Tim Moore was there talking to an individual

24 dressed wearing a -- pretty well dressed, wearing dark

25 pants, windbreaker-type jacket, had a ballcap on that said

1  ADT on it.

2        Q.    Okay.  And Tim Moore, is he another one of the

3  managers?

4        A     He was the department manager for the athletic

5  department.

6        Q.    And did this person that was dressed in the --

7  what is ADT?

8        A.    It's a security system that provide -- at the

9  time they provided the alarm system for the store.

10       Q.    Okay.  So you were familiar with them?

11       A.    Yes, sir.

12       Q.    All right.  Did it appear to you he was

13  dressed in some type of security guard uniform?

14       A.    Yes, sir, it did.

15       Q.    And did he have a weapon?

16       A.    I did not see a weapon.

17       Q.    Okay.  Once you were introduced to him, what

18  did he want with you at that time?

19       A.    He told me that him and his partner were

20  investigating a grab-and-run ring that had been operating in

21  the area.

22       Q.    Tell the jury what a grab-and-run gang is.

23       A.    A grab-and-run gang is a group of individuals

24  that come into a store and they grab merchandise and will

25  run out any number of the exits without paying for the

1    merchandise.

2         Q.    Now, at a later time you were able to identify

3    this man who was talking to you; is that correct?

4         A.    Yes, sir, I was.

5         Q.    Looking -- let me show you an exhibit which

6    has been marked State Exhibit 44 to your right.  Do you

7    recognize this exhibit?

8         A.    Yes, sir.

9         Q.    Does this exhibit have photos of some of the

10   men or the men that you identified involved in the robbery

11   that night?

12        A.    Yes, sir, it does.

13             MR. SHOOK:  Your Honor, at this time we

14   will offer State Exhibit 44.

15             MR. ASHFORD:  No objections, Your Honor.

16             THE COURT:  No. 44 shall be admitted.

17        Q.    (By Mr. Shook)  Looking at State Exhibit 44,

18   which of the individuals was there in the security guard

19   uniform?

20        A.    George Rivas.

21        Q.    Up here in the left-hand corner?

22        A.    Yes.

23        Q.    Did he look like this when you were talking to

24   him back on Christmas Eve 2000?

25        A.    No, sir, he did not.

```
1        Q.      How did he look different?

2        A.      He had no facial hair.  His hair was black and

3   he wore wire rim glasses.

4        Q.      And he talked to you about this grab-and-run

5   gang; is that right?

6        A.      Yes, sir.

7        Q.      What else did he say to you at that time?

8        A.      He had a sheet of paper that had -- 8-by-10

9   sheet of paper and it had six photographs on it.  And he

10  asked if I could have the employees look at these

11  photographs to see if they recognized any of those people

12  being in the store earlier in the day.

13       Q.      Did you bring some employees over at that

14  time?

15       A.      There were two back in that area, Sandra

16  Rodriguez and Tony Coronado.  I called them over to have

17  them look at the pictures right there.

18       Q.      Did he ask about video cameras, anything like

19  that?

20       A.      After Sandra identified two of them as

21  possibly being in the store earlier that day, he asked if we

22  had a video system and I told him we did.

23       Q.      So she said -- she identified two as possibly

24  being in the store?

25       A.      Yes, sir.
```

1    Q.    And then you told him -- did he want to know

2    if you had captured them on video camera?

3    A.    Yes, sir.

4    Q.    Where did you take him at that time?

5    A.    I took him and Sandra and we went up to the

6    video room.  And I got up there and I opened the door and as

7    I went in the room, I looked to see where it was recording.

8    And I told him -- I sat down at the chair and I stopped the

9    machine from recording and I asked Sandra about what time it

10   was she saw these individuals in the store.  And she told me

11   and I told him that, well, it was only recording the

12   entrances and exits to the door and he told me it wouldn't

13   do him any good.  It was okay.

14   Q.    Is this what we're seeing, the video room that

15   you went to?

16   A.    Yes, sir.

17   Q.    That's located at the front of the store near

18   the -- down from the service counter area in that group of

19   offices; is that right?

20   A.    Yes, sir.

21   Q.    How was Mr. Rivas acting at that time?  How

22   was his demeanor?

23   A.    Real calm and not panicky or anything, real

24   calm and quiet.

25   Q.    You weren't suspicious of him at all at that

1   time?

2           A.      No, sir, I was not.

3           Q.      After you saw that it was only recording the

4   entrances and exits, what did you do then?

5           A.      We left the room.  I closed the door behind me

6   and we went back up to customer service.

7           Q.      Did he have any requests of you regarding the

8   other employees looking at his photo lineup?

9           A.      He just asked if all the associates could

10  gather and look at the photographs.

11          Q.      Where were all the other sales associates at,

12  at that time?

13          A.      By the time we got back out to the customer

14  service area, most of them were already up to the front of

15  the store.

16          Q.      What area did they gather in?

17          A.      They were right around the register areas.

18          Q.      Let me show you State Exhibit 15.  Does that

19  show the cash registers?

20          A.      Yes, sir, it does.

21          Q.      Right in this area here?

22          A.      Yes.

23          Q.      And then the counter here behind that, is that

24  the service area?

25          A.      Yes, sir.

1    Q.    Okay.  Let me show you State Exhibit 16 and

2    17.  On the counter there, do we see the actual photo

3    lineup's that Mr. Rivas had?

4    A.    Yes, sir.

5    Q.    Get a little closer view of that, please.

6    That's the type of black and white photos that he was

7    showing the employees?

8    A.    Yes, sir, it is.

9    Q.    Did he have someone else in a uniform that was

10   helping him?

11   A.    He had somebody else.  At that time he did

12   come up to the front of the store.  He was up there talking

13   to a couple of the associates.

14   Q.    But your dealings up to that time had all been

15   with Mr. Rivas?

16   A.    Yes, sir.

17   Q.    Had the store closed at that time?

18   A.    We had not closed yet.  I looked at my watch

19   and it was just after 6:00.  I walked over to the phone with

20   the PA system on it and I made an announcement that it was

21   now after 6:00.  Oshman's was closed and asked the customers

22   to bring all their final selections up to the front of the

23   store and thanked them for shopping at Oshman's and to have

24   a Merry Christmas.

25   Q.    State Exhibit No. 18, does this again show a

1  closer view of the service counter area?

2          A.      Yes, sir, it does.

3          Q.      And 19, is that a side view?

4          A.      Yes, sir, it is.

5          Q.      You were behind the service counter area when

6  you made that announcement?

7          A.      No, sir, I was right out in front.

8          Q.      Right out in front here?

9          A.      Right in that area right there.

10         Q.      Where was George Rivas?

11         A.      He was -- when I made the announcement, he

12  moved back over to this corner down here.

13         Q.      Right here?

14         A.      Right in that area right there, sir.

15         Q.      And after you made that announcement, what

16  happened then?

17         A.      I turned around to look and see if there were

18  any customers up there in that area to direct them to a cash

19  register.

20         Q.      Did you see some customers?

21         A.      I saw several customers in the store and there

22  were a couple up there near that area with baskets.

23         Q.      Near the cash register area?

24         A.      Yes, sir.

25         Q.      Did it look as if they were moving up to make

1    some purchases?

2         A.    Yes, sir.

3         Q.    What's the next thing that happened?

4         A.    Mr. Rivas said -- he was behind me and in this

5    corner and he said, "Listen up.  This is a robbery."

6         Q.    How did he say that?

7         A.    Direct, but not threatening.

8         Q.    Okay.  Did you turn your attention to him once

9    he said that?

10        A.    I turned around and faced him.

11        Q.    What was he doing at that time?

12        A.    He had a gun, facing it, holding it up in the

13   air.

14        Q.    What type of gun was that?

15        A.    It was a Smith and Wesson .357 revolver.

16        Q.    What is the next thing that he said and did?

17        A.    He told me -- he lowered the gun and pointed

18   it at my chest and he said, "Don't try it, Wes.  If you do.

19   I would have to shoot you.  If I shoot you, I would have to

20   shoot everyone."

21        Q.    Was he saying this loud enough for all the

22   employees to hear?

23        A.    Yes, sir, he was.

24        Q.    Did he have everyone's attention at that time?

25        A.    Yes, sir, he did.

1      Q.     Did you take his threats seriously?

2      A.     Very seriously.

3      Q.     What is the next thing he told you at that

4  time?

5      A.     He said all the customers were with him and to

6  do what we were told and we would go home for Christmas.

7      Q.     Once he said all the customers were with him,

8  did you look out and in the area where you had just seen

9  somewhat you thought at that time were customers coming

10  toward the cash registers?

11      A.     Yes, sir, I did.  I turned to my left and I

12  looked over and I saw -- I believe -- I thought it was six

13  to eight gentlemen and they were all armed.

14      Q.     Okay.  Where were they located in the store?

15      A.     They were right around that area in a

16  semicircle-type deal around the employees, starting from one

17  end, that end of the customer service down to this.

18      Q.     All right.  So they were kind of behind the

19  employees?

20      A.     Yes, sir.

21      Q.     Let me show you the diagram here.  If you can

22  point out for the jury the area where you saw the men who

23  you had thought were shoppers?

24      A.     All the associates were up against the

25  customer service area and they were back in this area.

1        Q.      Kind of in a semicircle?

2        A.      Yes, sir.

3        Q.      And your memory was you thought maybe six to

4    eight men?

5        A.      Yes, sir.

6        Q.      Were these the persons that you had seen

7    earlier that you had assumed were customers?

8        A.      Yes, sir.

9        Q.      And they had guns out?

10       A.      Yes, sir, they did.

11       Q.      What types of guns did they have?

12       A.      I thought at that time with a quick glance

13   some of them had semiautomatics and some of them had

14   revolvers.

15       Q.      What were you and the employees directed to do

16   at that time?

17       A.      We were directed to put our hands on the

18   counter in front of us.

19       Q.      Did you do that?

20       A.      Yes, sir, we did.  And as I did, I had a set

21   of keys from the gun department in my hand with a sensor tag

22   on it and I was right by the sensor machine and it started

23   beeping.  And I just tossed it back to show them that it was

24   nothing, I didn't have anything.  It wasn't doing anything.

25       Q.      Did all the employees gather along that

1  service counter at that time?

2      A.      Yes, sir, they did.

3      Q.      Was it pretty crowded?

4      A.      Yes, sir, it is.

5      Q.      What happened once they were gathered and had

6  their hands placed on the service counter?

7      A.      Several of the men started going through

8  pockets and taking personal items, wallets, Leatherman

9  tools, anything they considered might be used as a weapon, I

10 guess.

11     Q.      Was George Rivas continuing to tell you things

12 and issue orders?

13     A.      He was just standing right there, telling

14 everybody just to do as they were told and they wouldn't be

15 hurt.

16     Q.      Did he say anything about any individuals

17 being outside of the store?

18     A.      He told me that there were others outside the

19 store, watching.

20     Q.      Okay.  Did he seem to be able to communicate

21 with someone outside?

22     A.      He had a little walkie-talkie type radio on

23 with a microphone in his ear, an ear button microphone, and

24 he talked to somebody, asked how it looked outside.

25 Somebody responded and said that the police were tied up

1    with an accident on 183.

2          Q.     Did you believe at that time, then, there was

3    actually someone outside watching the store?

4          A.     Yes, sir, I did.

5          Q.     What's the next thing that happened at that

6    front counter?  Was there -- were all the employees present

7    at that time?

8          A.     I believe all but one were present at that

9    time and they brought one of the female employees up shortly

10   thereafter.

11         Q.     Do you recall who that was?

12         A.     That was Laura Fernandez they brought up.

13         Q.     Do you remember who brought her up to the

14   front?

15         A.     I don't remember who it was.

16         Q.     When she was brought up to the front, what was

17   her condition?

18         A.     She had her hands ziptied around her thumbs

19   and she was crying.

20         Q.     Once she was brought up, what happened?

21         A.     As I said, they were going through our pockets

22   and one of the other gentlemen was just about three or four

23   associates down from me got behind one of the managers, John

24   Lindley.  I don't know what John did, but the individual

25   said, "Look, we have a tough boy here.  Wants to try

1    something.  Go ahead, I want you to try something."

2         Q.     How far was John Lindley from you when that

3   was said?

4         A.     He was about four associates down from me,

5   four or five feet.

6         Q.     So he was pretty close to you?

7         A.     Yes, sir.

8         Q.     And did you see the man that said that to him?

9         A.     I took a step back and looked down that way

10   and, yes, sir, I did.

11        Q.     Did that remark concern you?

12        A.     Yes, sir, it did.

13        Q.     Which one of the men made that remark to John

14   Lindley?

15        A.     Joseph Garcia.

16        Q.     He's the man located there at the bottom left

17   hand?

18        A.     Bottom left, yes, sir.

19        Q.     And, again, can you tell the jury the remark

20   he made?

21        A.     He said, Looks like we have a tough guy here.

22   "Go ahead, tough guy, try something.  I want you to try

23   something."

24        Q.     In what manner did he say that?

25        A.     He gave me the impression with the tone of

1    voice he had that he was looking for an excuse to hurt

2    somebody and he wouldn't hesitate to hurt somebody.

3         Q.    And that concerned you a lot at that time?

4         A.    Yes, sir, it did.

5         Q.    After all the employees were searched and

6    Laura Fernandez was brought to the front, did George Rivas

7    ask you where all the employees could be placed at that

8    time?

9         A.    He asked me if there was a room large enough

10   to put all the employees in.  And I started to tell him the

11   general manager's office up there at the front of the store,

12   but I thought different because of the window.  And I told

13   him the employee breakroom at the back of the store.

14        Q.    And after you told him that, what happened?

15        A.    He told everybody to turn to the right, put

16   your hands out in front of you, everybody follow me and I

17   would lead the way back to the breakroom.

18        Q.    So you were led in one line with your hands on

19   each other's shoulders?

20        A.    Pretty much, yes, sir.

21        Q.    Who was leading you?

22        A.    George Rivas.

23        Q.    Did he have his weapon out at that time?

24        A.    Yes, sir, he did.

25        Q.    I want to show you a diagram again and just

1  kind of show the jury the path that you took through the

2  store on your way back to the breakroom.

3        A.     We started up here at customer service.  We

4  came down through here.  We got back over here to the golf

5  and tennis department.

6        Q.     Once you got to the golf and tennis

7  department, what happened?

8        A.     Sandra asked if we could cut the zipties off

9  Laura's thumbs because her thumbs were starting to turn

10 blue.

11       Q.     Is Sandra another one of the employees?

12       A.     Yes, sir, she was.

13       Q.     That's Sandra Rodriguez?

14       A.     Yes, sir.

15       Q.     Were you allowed to cut the ties off of her

16 thumbs at that time?

17       A.     Rivas asked me what we would use to cut them

18 with and I told him there was a pair of wire cutters over on

19 the tennis stringing machine.  He went and got them, handed

20 them to Sandra.  She started to cut the ties off of Laura's

21 thumbs.  I was afraid she would cut Laura's thumbs, so I

22 took the cutters and cut the ties off and handed the cutters

23 back to George Rivas.

24       Q.     Was she very nervous?

25       A.     She was very nervous.

1      Q.      And you are able to take the cutters from her

2   and you cut the ties off?

3      A.      Yes, sir.

4      Q.      After the ties were cut, was anything else

5   done in that area?

6      A.      They took the red shirt from Darrin Ojeda and

7   had one of the other guys put it on.

8      Q.      A red Oshman's shirt?

9      A.      Yes, sir.

10     Q.      Were any of the other individuals with guns,

11  were they near you at that time or was this just George

12  Rivas you were dealing with?

13     A.      I know George Rivas was there.  I believe

14  there were at least two others.

15     Q.      Your attention was on George Rivas at that

16  time?

17     A.      Yes, sir.

18     Q.      After you cut those ties off and the shirts

19  were taken, where did you go next?

20     A.      We went back to the breakroom.  As we entered

21  the breakroom, I went in around the Coke machine, was

22  standing there with my back to the Coke machine, and

23  everybody else came in the room.

24     Q.      Okay.  Once they were in the room, what were

25  they ordered to do?

1      A.      Everybody was ordered to get up against the

2   wall and get on the floor.

3      Q.      And did they start to comply with those

4   wishes?

5      A.      The associates did to the best of their

6   ability, but there were tables and chairs up against the

7   wall and they were trying to move stuff away from the wall

8   so they could get up against the wall and get down.

9      Q.      Did you stay in the room or were you taken

10  out?

11     A.      George Rivas told me to go with him and we

12  left the room.

13     Q.      How long were you in the room before you were

14  taken out?

15     A.      About 30 or 40 seconds.

16     Q.      Did you leave with George Rivas at that time?

17     A.      Yes, I did.

18     Q.      Where did he take you?

19     A.      He took me back to customer service.

20     Q.      Do you know who was left in the back room with

21  the other employees?

22     A.      Michael Rodriguez and Joseph Garcia.

23     Q.      Okay.  You have already identified Joseph

24  Garcia as the man making the previous threat.  Was Michael

25  Rodriguez the man with the beard there at the top?

1        A.      Yes, sir.

2        Q.      Now, did he look like that that particular

3    day?

4        A.      No, sir.

5        Q.      How did he look?

6        A.      He didn't have any facial hair, either.  He

7    was clean shaven.

8        Q.      He didn't have that beard?

9        A.      No, sir.

10       Q.      What about Joseph Garcia?  Did he look

11   different?

12       A.      He looked pretty similar to that.

13       Q.      Okay.  Now, where did George Rivas first take

14   you once you left the breakroom?

15       A.      We started back up to customer service.

16       Q.      Once you got to customer service, what did you

17   do?

18       A.      Just before we got all the way back up there,

19   he asked me if there was a bag large enough in the store to

20   put all the money in.

21       Q.      Did you tell him there was?

22       A.      I told him there was and they had them back on

23   the bag wall next to the exercise mat.

24       Q.      I'll show you State Exhibit 20.  Does that

25   show the area where you retrieved the bag from?

1     A.     Yes, sir, it does.

2     Q.     We see some bags there on the floor.  Was that

3  the area that you took the bag from or --

4     A.     He took it off the shelf, a couple of shelves

5  up from there.

6     Q.     And these other bags, were they -- usually you

7  don't keep them laying around on the floor, do you?

8     A.     No, sir, we do not.

9     Q.     Also, State Exhibit 21, do we see some

10  merchandise there, some type of ties there on the display

11  case?

12     A.     Yes.  These are black straps that we sold at

13  the store used to attach sleeping bags to backpacks and to

14  compression bags.

15     Q.     Were those used in the back room at all?

16     A.     Some were, yes, sir.

17     Q.     What were they used for?

18     A.     To tie the associates up.

19     Q.     After you retrieved that blue Adidas bag,

20  where did you go then?

21     A.     Went back up to customer service.

22     Q.     And what happened there?

23     A.     We went up to the first register there.  He

24  asked me if I opened up the register, would it set off an

25  alarm.  I told him no.  And he said to open up the register.

1      Q.      Did you see anyone else up in that area near

2  the customer service?

3      A.      When we -- the first time we started back up

4  there, there was another gentleman up there.  He had on one

5  of the red Oshman's shirts.  As he saw Wes coming up, he

6  left the area.

7      Q.      So at that time it was just you and Mr. Rivas?

8      A.      Yes, sir.

9      Q.      After you emptied the first register, where

10 did you go then?

11     A.      He told me to empty all the registers up there

12 and put all the money in the bag.

13     Q.      Did you comply with all his demands?

14     A.      I did.  And while I was doing that, he asked

15 me for my car keys.

16     Q.      Did he tell you why he wanted your car keys?

17     A.      I asked him why, was he going to take my

18 vehicle?  And he said, "Yes, I'm going to take it, but you

19 will it get back.  I will only take it a couple of blocks or

20 so."

21     Q.      Did he ask what type of vehicle you had?

22     A.      Yes, sir, he did.  And asked where it was

23 parked and how to deactivate the alarm.

24     Q.      Did you turn over your keys at that time?

25     A.      Yes, sir, I did.

1    Q.    Does he have his weapon out at this time?

2    A.    At that time, no, sir, he did not.

3    Q.    Did he stay pretty close to you at all times?

4    A.    Yes, sir, he did.

5    Q.    After you took the money out of the cash

6   register drawers, where did he have you go then?

7    A.    He told me he wanted the videotape.

8    Q.    Did you go to the videotape room?

9    A.    We walked back to the video room, as I got my

10  key out to unlock the door, he noticed the other door down

11  at the end of the hallway and asked me what was behind that

12  door.

13   Q.    State Exhibit 22, does that show the hallway

14  that you were in at that time?

15   A.    Yes, sir.

16   Q.    And he was asking about these other doors down

17  here?

18   A.    The first door there is the door to the

19  general manager's office.  The second spot down there is the

20  door to the video room.  And the third one is the one he

21  asked me about.

22   Q.    Okay.  And did you take him to the third door?

23   A.    I told him it was just a storeroom for pens

24  and papers and paperclips and he said, "Open the door."

25   Q.    So you told him it was just a storeroom and he

1    said, "Open it up"?

2         A.     Yes, sir.

3         Q.     And when he did, what was inside there?

4         A.     When I opened up the door, there was another

5    door leading into the cash office.

6         Q.     Did he ask you to open that door, also?

7         A.     He told me to open that door and he saw the

8    safe.

9         Q.     Let me show you State Exhibit 23.  Is that

10   after you open that second door, is that how the safe

11   appears?

12        A.     Yes, sir, that's the safe there in the corner.

13        Q.     Once he saw the safe, what did he say to you?

14        A.     He said, "Nice try, Wes, open the safe."

15        Q.     Did you open the safe?

16        A.     I opened up the safe and he saw the money in

17   the safe.

18        Q.     Now, about how much money did you have in the

19   safe at that time?

20        A.     Total in that safe at that time was about

21   $70,000 in cash.

22        Q.     How many days of receipts were there?

23        A.     Three days.

24        Q.     Did he take all that?

25        A.     He took all of that.  There was one little box

1   in there that said, "Employee fund" on it and he said,

2   "Don't take that."

3        Q.     Did he say why he didn't want you to take

4   that?

5        A.     He says, "I'm not stealing from the employees.

6   I'm stealing from Oshman's."

7        Q.     What did you say to him?

8        A.     "You're taking my truck."

9        Q.     What did he tell you?

10       A.     He said, "I told you, you were going to get it

11   back."

12       Q.     After he took the cash, did he put that in the

13   Adidas bag?

14       A.     Put that in the bag and we left the room and

15   he again said he wanted the videotape.

16       Q.     Okay.  Did you go and retrieve the videotape?

17       A.     I opened the door to the video room and he

18   went in and took the tape out of the recorder.

19       Q.     After he took the tape, where did you go then?

20       A.     Said, "Let's go back to the gun department,"

21   and we started back to the gun department.

22       Q.     Let me show you State Exhibit No. 24.  Does

23   that show the area of the store where you first come out and

24   down the aisle that leads to the gun department?

25       A.     Yes, sir, it does.

1      Q.      And State Exhibit 25, is that a closer view of

2  the gun department?

3      A.      Yes, sir, it is.

4      Q.      These are the shotguns and rifles here in the

5  back behind the counter?

6      A.      Yes, sir.

7      Q.      Once you got to the gun department, what

8  happened?

9      A.      As we approached the gun department, it was a

10 gentleman back there.  He told Mr. Rivas that the handguns

11 were gone.

12     Q.      Is this another one of the robbers?

13     A.      Yes, sir.

14     Q.      And where was he located when he told Mr.

15 Rivas that?

16     A.      He was behind the counter, standing right in

17 front of the rifles and shotguns.

18     Q.      Let me show you the next photograph.  Is that

19 a closer view of the counter, showing the area where he was

20 standing?

21     A.      Yes, sir.

22     Q.      And did you later recognize him or identify

23 him from some photographs?

24     A.      Yes, sir, I did.

25     Q.      Who was that?

```
 1          A.     That was Donald Newbury.

 2          Q.     That's the man at the top there with the kind

 3   of goatee?

 4          A.     Yes, sir.

 5          Q.     Was he wearing the goatee that day?

 6          A.     No, sir, he was not.

 7          Q.     What did he tell George Rivas at that time?

 8          A.     He told him the handguns were missing.

 9          Q.     What was said to you then?

10          A.     He asked me -- George Rivas asked me where the

11   guns were and I told him they were locked up in the gun

12   safe.

13          Q.     Then what happened?

14          A.     He said, "Let's go to the gunroom."  And I

15   went back there and opened the door and he saw the safe

16   there and he told me to open the safe.

17          Q.     Okay.  That's where all the handguns were

18   kept?

19          A.     Yes, sir.  When they are not on display, they

20   are locked up in that safe.

21          Q.     Let me show you State Exhibit 30.  Is that a

22   photograph of the gun safe?

23          A.     Yes, sir.

24          Q.     And these wooden platforms that we see in

25   State Exhibit 32, what are those?
```

1    A.    When we took the guns out of the display

2    cases, we put them on these boards in order of the way they

3    came out of the display case on the floor.  That way the

4    next morning whoever opened up, they just go and pull that

5    up and they know which guns go where.

6         Q.    State Exhibit 31, does that show the gun safe?

7         A.    With the exception of the ones on top, yes,

8    sir.

9         Q.    Now, had -- when you opened it, had it been

10   full of handguns on these wooden platforms?

11        A.    Yes, sir, it was.

12        Q.    What types of handguns are we talking about?

13        A.    Semiautomatic pistols and revolvers.

14        Q.    After you opened the gun safe, where did you

15   go then?

16        A.    Opened up the gun safe and he said, "Let's go

17   out to the gun counter."  And we went out to the gun counter

18   and he told Mr. Newbury that the guns were in the safe, to

19   go get them.

20        Q.    Okay.  Was there any other talk about the long

21   guns behind the counter?

22        A.    Mr. Newbury asked him what about the locks,

23   what about the key for the rifle and shotguns.

24        Q.    And did Mr. Rivas make another demand of you?

25        A.    He asked me for the key and I pulled the key

1    out and showed him which one it was and handed it to him.

2           Q.     Let me show you State Exhibit 27, which is a

3    closer view of that counter back there.   Is that -- are

4    these the keys that you handed to him?

5           A.     Yes, sir, it is.

6           Q.     What are these boxes here behind the counter?

7           A.     That's the ammunition for the guns.

8           Q.     All the handguns, as well as the rifles and

9    shotguns?

10          A.     Yes, sir.

11          Q.     Let me show you State Exhibit 28.   What do we

12   see there?

13          A.     That's the racks for the rifles and shotguns.

14          Q.     And does it appear that some of the rifles and

15   shotguns had been taken?

16          A.     Yes.   The arms are up on the racks, showing

17   they have been unlocked.

18          Q.     State Exhibit No. 29, does that show a closer

19   view of the many different types of ammo that you had there

20   behind the counter?

21          A.     Yes, sir.

22          Q.     After you handed those keys over, where did

23   Mr. Rivas take you next?

24          A.     He said, "Let's go back to the breakroom."

25   And we immediately went back for the breakroom.

```
 1        Q.     What was going on in the breakroom when you
 2   got back there?
 3        A.     When I went back in the breakroom, I stood --
 4   I was standing next to the refrigerator and Mr. Garcia and
 5   Rodriguez were going through associates' pockets and tying
 6   them up.
 7        Q.     Were most of the associates on their knees on
 8   the ground
 9        A.     They were either laying on the floor or up
10   against the wall on their knees.
11        Q.     Did he turn you over to someone specifically
12   at that time?
13        A.     Not specifically.  He just told them to get
14   everybody tied up, they were running out of time.
15        Q.     What was done with you at that time?
16        A.     Mr. Rodriguez came up to me.  I had my back to
17   the refrigerator.  He grabbed me on the shoulder, turned me
18   around, kicked me behind my knee, and told me to get on the
19   floor and put my head down.
20              MR. SHOOK:  May I have the witness step
21   down for a moment, Judge?
22              THE COURT:  You may.
23        Q.     (By Mr. Shook)  If you would kind of
24   demonstrate exactly how that was done to you.  You be
25   Mr. Rodriguez.  I'll be yourself, okay?
```

1      A.      Okay.   (Demonstrating) He came up to me and he

2  grabbed me by the shoulder and spun me around and kicked me

3  behind my knee and told me to, "Get down and put your hands

4  behind your back."

5      Q.      And that forced you down to your knees?

6      A.      Yes, he did.

7      Q.      Was he gentle when he did that?

8      A.      No, sir, he was not.

9      Q.      Once you were down on your knees, what

10 happened next?

11     A.      I believe it was him, because he's the one

12 that kicked me.  He went through my pockets, took my wallet,

13 my keys to my house, and any -- I had a couple of dollars in

14 cash in my front pocket and he took all of that out.

15     Q.      What was the emotional state of the employees

16 back there?

17     A.      I could hear the -- I could hear the three

18 girls were crying.  A couple of the younger male associates

19 were sniffling.  Everybody was scared.

20     Q.      Everybody was pretty scared.  Were any other

21 threats made while you were back there?

22     A.      Not that I can recall.

23     Q.      Okay.  Did you hear some communication over

24 the radio at some point in time?

25     A.      While they were still tying us up, I heard

1    over the radio saying, "Hurry up.  Let's go.  We're running

2    out of time.  Let's go now."  And one of them responded they

3    didn't have everybody tied up yet and they said, "Hurry up.

4    We've got company."

5         Q.    Once you heard, "Hurry up.  We've got

6    company," what happened then?

7         A.    One of them told us not to move for 10 minutes

8    or they would be back.

9         Q.    Did they leave the room at that time?

10        A.    They left the room.  I heard the door close.

11        Q.    Okay.  After they left the room, what's the

12   next thing that you heard?

13        A.    Next thing I heard was a -- about 35, 40

14   seconds later was a rapid succession of gunfire.

15        Q.    So there was 35, maybe 45 seconds, and then

16   you heard gunfire?

17        A.    Yes, sir.

18        Q.    You said it was a rapid succession of gunfire?

19        A.    Yes, sir.

20        Q.    Once the gunfire started, could you describe

21   to the jury how rapidly it was?

22        A.    It was just pop, pop, pop, pop, pop, pop,

23   short pause, and then another pop, pop, pop, pop, pop, pop.

24        Q.    So it started up and it was basically one

25   right after the other except for a short pause?

1    A.    Yes, sir.

2    Q.    And when we're talking about a short pause,

3 are we talking about seconds or just a brief time?

4    A.    Just seconds.

5    Q.    Okay.  Do you know how many shots were fired?

6    A.    I estimated between 27 and 30 shots.

7    Q.    Could you tell what area the shots were coming

8 from?

9    A.    Sounded like the back of the store area.

10    Q.    Once y'all heard the gunshots going off, what

11 happened in the room?  Did everyone get -- as far as emotion

12 goes?

13    A.    Some of the employees started to get real

14 panicky.  One of them asked me what it was.  And I told them

15 it was gunfire.  I didn't know what they were shooting at.

16 For all I knew they could be just shooting into the air,

17 trying to draw attention.  Maybe they thought they had got

18 away with it and they were just trying to draw attention to

19 the building.

20    Q.    Did you try to keep everyone calmed down?

21    A.    I told everybody just to be calm and stay

22 still.

23    Q.    What's the next thing that happened?

24    A.    I waited a few more seconds and I asked -- I

25 told everybody that I wasn't tied up.  They didn't tie me

1  up.

2  Q.  Okay.  Let me show you State Exhibit 35 and

3  36.  Is this the employee breakroom that you and the other

4  employees were left in?

5  A.  Yes, sir, it is.

6  Q.  And everyone was kind of up against the walls

7  there all around the room; is that right?

8  A.  Yes, sir.

9  Q.  You can see the next photo.  Does that show

10  the floor area and some of the ties we were talking about

11  earlier?

12  A.  Yes, sir, it does.

13  Q.  And that was what was used to tie up the

14  employees?

15  A.  That, along with some of our belts and

16  zipties.

17  Q.  But for whatever reason you had not been tied

18  up?

19  A.  No, sir, I was not.

20  Q.  What did you do after you told everyone that

21  you had been tied up?

22  A.  Told them I hadn't been tied up and one of the

23  girls told me -- asked me not to leave and I told them I

24  wasn't going nowhere.  I rolled over and sat down off my

25  knees and I asked the other managers if any of them still

1    had their keys to the store.

2           Q.     And were you able to get some keys?

3           A.     Tim told me his were still in his left front

4    pocket.

5           Q.     What did you do then?

6           A.     I reached into his left front pocket and took

7    his keys and I went into the regional loss prevention

8    office, which was right there next to the breakroom and

9    picked up a secure line to -- and called the police.

10          Q.     When you say "a secure line", what do you

11   mean?

12          A.     There were two phones in that office.  One of

13   them was a store line.  If I had picked up on it, it would

14   have lit up on the other phones throughout the store,

15   showing somebody was on the phone.  The secure line was not

16   -- was his own private line.  It wasn't connected to the

17   stores lines, so they couldn't detect that I was on the

18   phone.

19          Q.     Once you got on the secure line, what did you

20   do?

21          A.     I called 911.  The operator answered the phone

22   and I told her who I was and what had happened.

23          Q.     Okay.  What did you do then?

24          A.     I then hung up and went back out and started

25   untying the other employees.

1    Q.    Did you make another call sometime later?

2    A.    After I untied some of the employees, I told

3    them to untie the rest of them, stay there in the room and

4    be quiet.  And I went back in and called back to 911.

5    Q.    Did you talk to the operator again at that

6    time?

7    A.    Yes, sir, I did.

8    Q.    Eventually were instructions given to you

9    about how to -- how you were going to get out of the store?

10   A.    Yes, sir.  The 911 operator eventually told me

11   to bring all the associates into that office and have them

12   get on the floor and put their hands behind their heads.

13   Q.    Let me show you State Exhibit 37.  Does this

14   show that office?

15   A.    Yes, sir, it does.

16   Q.    And did you bring all the employees into that

17   room pursuant to your instructions?

18   A.    It was a tight fit, but, yes, sir, we did.

19   Q.    Once they were in there, did you notify the

20   police?

21   A.    I was on the phone constantly at that time

22   with the 911 operator and told them that everybody was in

23   the room.

24   Q.    Okay.  How were you taken out of that room?

25   A.    The SWAT team finally came back there.  I

1    could see them, the reflection off the tile underneath the

2    door in the hallway and I could hear them coming and they

3    opened the door.  And the first one through the door kept

4    yelling, "Where is Wes?  Where is Wes"?

5         Q.    Did you identify yourself?

6         A.    I was back behind the desk.  I stood up and I

7    said, "Here I am."  I stood up real slowly and said, "Here I

8    am."  And they asked two or three times were there any bad

9    guys here, "Are there any bad guys here?  And I said, "No,

10   they have all left."

11        Q.    Then what happened?

12        A.    He told everybody else, all the employees, to

13   stand up, keep their hands behind their head, and he patted

14   them down and led them out of that room and out of the store

15   one by one in a single file.

16        Q.    Where did they take you out of the store,

17   which exit?

18        A.    We went out the fire escape exit at the rear

19   end of the back of the exercise department.

20        Q.    Okay.  Let me show you State Exhibit 38.  Does

21   that show the back of the store?

22        A.    Yes.  We came out underneath that light there

23   on the left.

24        Q.    This light right here?

25        A.    Yes, sir.

1    Q.    And what direction did you go then?

2    A.    We came out through the drive there and around

3  the back end of the fire truck and stood beside the fire

4  truck.

5    Q.    Beside the fire truck right here?

6    A.    Yes, sir.

7    Q.    Now, you see this police car located here?

8    A.    Yes, sir.

9    Q.    Did you see it there that evening when you

10 came out?

11   A.    Honestly, didn't notice it.

12   Q.    But this is the back loading dock area you

13 talked about earlier?

14   A.    Yes, sir.

15   Q.    Okay.  Once you were brought out by that fire

16 truck, what was done with you?

17   A.    We were -- we stood out there for about

18 forty-five minutes to an hour.  I was told that they were

19 bringing a bus down to take us all to the police

20 headquarters.

21   Q.    It was pretty cold out there?

22   A.    It was cold.  It was drizzling.  They tried to

23 separate me from the rest of the associates and put me in

24 the squad car.  I asked if I could put the female associates

25 in the car and stand out with the male employees and they

1    said that was okay.   Then the van showed up and took

2    everybody else down to police headquarters and I was there

3    at the scene.

4            Q.     What did you do there at the scene?

5            A.     While I was there at the scene, I was in the

6    back of the detective's car and I dictated a statement to

7    the detective.

8            Q.     Was that Detective Johnson?

9            A.     Yes, sir, it was.

10           Q.     Did you write the statement out or did he?

11           A.     I dictated it and he wrote it out.

12           Q.     So you are just kind of telling him what

13   happened and he writes that down?

14           A.     Yes.

15           Q.     At some point in time were you taken down to

16   the Irving Police Department?

17           A.     Around midnight, yes, sir.

18           Q.     Were you shown a photo lineup?

19           A.     Yes, sir, I was.

20           Q.     And where was that?

21           A.     It was in the police headquarters.   It was 15

22   photographs on an eight-foot long table.

23           Q.     Let me show you State Exhibit 41.   Is that how

24   the photo lineup looked that evening?

25           A.     Yes, sir.

115

1    Q.    You saw these 15 black and white photos?

2    A.    Yes, sir.

3    Q.    And then let me show you what has been marked

4  as State Exhibit 45.  Are these the same photographs and how

5  they were arranged?

6    A.    Yes, sir, it is.

7            MR. SHOOK:  Your Honor, at this time we

8  offer State Exhibit 45 for all purposes.

9            MR. KING:  Judge, we renew our objection

10  made previously outside the presence of the jury.  Do you

11  recall our objection?

12            THE COURT:  I do.

13            MR. KING:  I presume the Court's ruling

14  is the same?

15            THE COURT:  Consistent.  Overruled.

16  State 45 shall be admitted.

17    Q.    (By Mr. Shook)  This is how the photographs

18  were arranged as far as the order; is that correct?

19    A.    Yes, sir.

20    Q.    And were any suggestions made to you about who

21  you should choose or anything like that?

22    A.    The only thing they told me to do was to take

23  my time, look at the photographs, do not look at things that

24  could change, for example, hair, but just look at eyes and

25  stuff like that and take my time and pick out if I could

1    pick out anybody that was in the store that evening.

2         Q.    Were you able to make some selections that

3    night?

4         A.    I made four positive identifications and two

5    possibles.

6         Q.    Four positives and the two possibles?

7         A.    Yes, sir.

8         Q.    When you say positives, what did that mean to

9    you?

10        A.    I know those four were in the store.

11        Q.    Let's start at the top, who did you positively

12   identify that night from the photo lineup?

13        A.    No. 4.

14        Q.    Is that George Rivas?

15        A.    George Rivas.

16        Q.    And he was the one that you dealt with the

17   most?

18        A.    Yes, sir.

19        Q.    Who else?

20        A.    No. 7, Michael Rodriguez.

21        Q.    That's the man who kicked you from behind and

22   was in the back room?

23        A.    Yes, sir.

24        Q.    And you -- the other photograph had him with a

25   beard.  Is he more this clean shaven that night?

1    A.    Yes, sir.

2    Q.    Who else on the second one?

3    A.    Nobody on the second line was a positive

4  identification.  No. 11, Donald Newbury.

5    Q.    That's the man you saw back at the gun rack

6  near the gun rack?

7    A.    Yes, sir.

8    Q.    And who else?

9    A.    No. 15, Joseph Garcia.

10    Q.    Joseph Garcia.  He was the one nearest you

11  that you heard make the threat to Mr. Lindley?

12    A.    Yes, sir.

13    Q.    You also said that you had two others that you

14  were pretty sure of?

15    A.    I had two others that I possibly, but they

16  said -- they asked me if I could identify them in court and

17  I said, "I don't know."  And they said, "Don't worry about

18  those."

19    Q.    Okay.  Who were those two?

20    A.    No. 2 and No. 9.

21    Q.    No. 9, did you later come to find out his name

22  was Larry Harper?

23    A.    Yes, sir.

24    Q.    Which individual was he that you had seen?

25    A.    He was the other one dressed in the security

1    guard uniform.

2         Q.    And No. 2, did you later come to find his name

3    to be Randy Halprin?

4         A.    Yes, sir, I did.

5         Q.    What area of the store did you see him in?

6         A.    I believe up at the front after he announced

7    this is a robbery.  And then when Mr. Rivas and I came back

8    up to customer service, I believe he was the gentleman that

9    was behind customer service and as he saw us coming up, he

10   left that part of the store.

11        Q.    When you talk about at the beginning of the

12   robbery, you talking about when Mr. Rivas said, "All the

13   individuals are with me"?

14        A.    Yes, sir.

15        Q.    And you saw everyone in a semicircle with guns

16   out?

17        A.    Yes, sir.

18        Q.    All the -- you had previously thought they

19   were all in the store shopping; is that right?

20        A.    Yes, sir.

21        Q.    And turned out all the shoppers turned out to

22   be with Mr. Rivas and actively participated in that robbery?

23        A.    Yes, sir.

24        Q.    And you recall all of them had some type of

25   handguns out at that time?

1       A.      Yes, sir.

2       Q.      Do you see Mr. Halprin in the courtroom today?

3       A.      I believe he's sitting over here, sir.

4       Q.      Here at the end in the blue shirt and coat and

5   tie?

6       A.      Yes, sir.

7               MR. SHOOK:  Your Honor, let the record

8   reflect the witness has identified the defendant.

9       Q.      (By Mr. Shook)  The gun that Mr. Rivas pointed

10  at you, you said that was a .357 revolver?

11      A.      Yes, sir.

12      Q.      Let me show you State Exhibit No. 39.  Is that

13  what the gun looked like?

14      A.      Yes, sir, it is.

15      Q.      And then he also had a little radio.  Let me

16  show you State Exhibit 40.  Is that what the radio looked

17  like?

18      A.      Yes, sir.

19      Q.      If we could see 39 for the jury.  That's the

20  type of revolver that Mr. Rivas had?

21      A.      Yes, sir, it is.

22      Q.      And State Exhibit 40 is the type of radio he

23  was communicating with?

24      A.      Yes, sir.

25      Q.      Were you asked to try to get a list of the

1    types of weapons that were taken in the robbery?

2         A.    That night they asked me if I could get them a

3    list of everything that was taken.  I didn't think that I

4    could at that time, but Monday after Christmas I was back at

5    the store early and I did get a complete list.

6         Q.    Okay.  And did that list -- were you able to

7    determine through your inventory exactly which weapons had

8    been stolen?

9         A.    Yes, sir.

10        Q.    Let me show you State Exhibits 46, 47, and 48.

11   Are these lists that contain the information of the weapons

12   that were taken, along with the type and serial numbers?

13        A.    Yes, sir.

14              MR. SHOOK:  Your Honor, at this time we

15   offer State Exhibits 46, 47, and 48.

16              MR. ASHFORD:  No objections.

17              THE COURT:  Nos. 46, 47, and 48 shall be

18   admitted.

19        Q.    (By Mr. Shook)  Looking at State Exhibit 46,

20   this lists -- what's the first name we see here?  What does

21   that represent?

22        A.    On the first one that's a Beretta.  That's the

23   manufacturer of the gun.

24        Q.    What's this information here?

25        A.    The next in black is the model number and

1    caliber of that specific weapon.  In that case that's a

2    Model 92-FS 9 millimeter pistol.

3         Q.    The information in the blue lettering, what is

4    that?

5         A.    That's the serial number for that specific

6    gun.

7         Q.    So each specific weapon has an individual

8    serial number; is that right?

9         A.    Yes, sir.

10        Q.    And the other exhibits track all the handguns,

11   as well as the long guns that were taken; is that right?

12        A.    Yes, sir.

13        Q.    A total of 44 weapons were taken?

14        A.    Yes, sir.

15        Q.    Thirty-four handguns?

16        A.    Yes, sir, it was.

17        Q.    Okay.  Were you also able to determine what

18   types of ammunition were taken?

19        A.    Yes.  After I completed the gun inventory, I

20   did an inventory of the rest of the merchandise back there

21   and I determined that there were several boxes of .357

22   Magnum nine millimeter and .45 caliber ammunition missing.

23        Q.    Was there other types of inventory or

24   merchandise taken from the store during the robbery?

25        A.    Yes, sir.  Specifically from my department,

1    there was some -- I believe a couple of pair of binoculars

2    and a couple more radios.  And from other departments there

3    was some clothing, winter clothing, and some sleeping bags.

4         Q.    Do you have night vision equipment there?

5         A.    Yes, sir, we do.

6         Q.    Do you know if any of that was missing?

7         A.    I believe one night vision scope was taken.

8         Q.    And you said the amount of cash over the three

9    days taken was about $71,000?

10        A.    Yes, sir.

11        Q.    Was anything else taken to your knowledge?

12        A.    Not that I can recall, no, sir.

13        Q.    Now, State Exhibit 49 and 50, are these your

14   photographs of your car?

15        A.    Yes, sir.

16        Q.    Did you go by -- or was your car eventually

17   returned to you from the police?

18        A.    About 30 days later, yes, sir.

19        Q.    Was there some damage done to the car?

20        A.    Yes, sir, to the right rear of the vehicle.

21        Q.    What type of damage was it?

22        A.    There was some damage when they -- apparently

23   when they backed out where they had it parked behind the

24   store, they used it to push the patrol car out of the way.

25   Did some damage to the right rear fender and bumper and

1    there were also two bullet holes on the inside of the

2    driver's side door and the passenger door front, the window

3    was -- the glass was either broken out or shot out.

4         Q.    The statement that Detective -- you dictated

5    to Detective Johnson, you have gone into more detail today;

6    is that right?

7         A.    Yes, sir.

8         Q.    Was everyone -- who did it appear was in

9    charge of the operation that night?

10        A.    George Rivas.

11        Q.    Did it appear everyone there, all the robbers

12   in the store, were they acting as a team?

13        A.    Yes, sir.

14        Q.    Were they acting together?

15        A.    They were acting together as a team.

16        Q.    Did you fear for your life, as well as the

17   life of the other employees?

18        A.    Yes, sir, I did.

19        Q.    And for the record, is that Oshman's store

20   located in Dallas County and the State of Texas?

21        A.    Yes, sir, it is.

22                    MR. SHOOK:  We'll pass the witness.

23                    CROSS-EXAMINATION

24   BY MR. ASHFORD:

25        Q.    Mr. Ferris, my name is George Ashford.  We

1  have never met, have we?

2        A.      No, sir.

3        Q.      All right.  I'm representing Mr. Halprin and

4  I'm going to be asking you a few questions.

5                You said a second ago your vehicle was used to

6  push the patrol car out of the way, correct?

7        A.      Yes, sir.

8        Q.      Okay.  Now, you don't know that?

9        A.      I don't know that, but I was told.

10        Q.      So you have been told things about what

11  happened in this case, obviously, correct?

12        A.      Yes, sir.

13        Q.      And who might have told you how your vehicle

14  was used?

15        A.      I believe it was one of the detectives from

16  the Irving Police Department.

17        Q.      Okay.  Now, fair enough to say you have been

18  dealing with this for two years, correct?

19        A.      Yes, sir.

20        Q.      This is the fifth trial you have testified in?

21        A.      Yes, sir.

22        Q.      Okay.  There's a lot of information that you

23  received that came from other sources, correct?

24        A.      Some, yes, sir.

25        Q.      Okay.  You looked at news accounts of this

1    event or had to be weeks after this happened, correct?

2         A.     Yes, sir.

3         Q.     And when those news accounts occurred, they

4    had those pictures that are behind you there, correct?

5         A.     Similar pictures, yes, sir.

6         Q.     And you have testified previously that

7    actually you had seen pictures of those individuals before

8    the Oshman's robbery; is that correct?

9         A.     After they escaped there was one or two news

10   blurbs on the local news about the escape and they showed

11   pictures then.  But I didn't pay much attention to it

12   because it was down south of San Antonio.

13        Q.     But you did see those?

14        A.     Yes, sir.

15        Q.     Okay.  Now, you just said George Rivas

16   appeared to be in charge; is that correct?

17        A.     Yes, sir.

18        Q.     He spent, it sounds like, the entire time this

19   robbery took place, he pretty much spent with you; is that

20   correct?

21        A.     Yes, sir.

22        Q.     Now, did he ever lose that calm demeanor at

23   any time?

24        A.     George Rivas never gave me the impression at

25   any time that he wanted to hurt anybody, but he also gave me

1    the impression that he wouldn't hesitate, if it became

2    necessary.

3         Q.    Okay.  So that's a different question than

4    what I asked you, but that's a good point.  He made you feel

5    confident that it was not his desire to hurt anybody,

6    correct?

7         A.    Yes, sir.

8         Q.    Now, what I asked you was, as far as his

9    demeanor, did he ever lose that calm demeanor?

10        A.    No.

11        Q.    Who was it that appeared to be a little edgy

12   that you testified about that said somebody would jump you

13   and they were looking to do something?

14        A.    Joseph Garcia.

15        Q.    Joseph Garcia.  Okay.  Rivas never acted like

16   that at all?

17        A.    No, sir.

18        Q.    Did you -- was there a point where you ever

19   heard or saw Rivas give anybody else instructions or orders?

20        A.    Only what I heard over the radio.

21        Q.    Okay.  You heard him talking to whoever was on

22   the radio?

23        A.    Yes, sir.

24        Q.    And, I mean, that being a person outside?

25   That being one of the people inside?  Or what?

1    A.    I don't know.  They all had radios, so I don't

2  know who he was specifically talking to.

3    Q.    Okay.  Well, did it appear that he was giving

4  people orders over the radio?

5    A.    Yes, sir.

6    Q.    Okay.  Who actually had on security uniforms?

7    A.    It was George Rivas and I believe it was Larry

8  Harper.

9    Q.    Rodriguez or Garcia have uniforms on?

10    A.    No, sir.

11    Q.    So where was Harper when you first encountered

12  Rivas and Rivas was asking you to gather up people to look

13  at the lineup?

14    A.    When I first encountered Rivas back by the

15  exercise department, he mentioned to me that his partner had

16  gone to the restroom.

17    Q.    Okay.  And when is the first time you saw him?

18    A.    After we came back out of the video room the

19  first time when I told him the cameras were just recording

20  on the entrances and exits and we went back up to customer

21  service, he was up there in that area again.

22    Q.    Now, isn't it true that they actually had

23  holstered guns?  They walked in wearing guns, those two?

24    A.    I did not see a handgun -- I did not see a gun

25  on anybody.

1    Q.      So you didn't notice that?

2    A.      No, sir.

3    Q.      So the first time you saw guns was when?

4    A.      After Rivas announced this is a robbery and I

5  turned around and he was holding a gun up in the air.

6    Q.      And then what did you see as far as

7  individuals goes?

8    A.      He lowered his gun and pointed it to me at my

9  chest and said, "Don't try it, Wes.  If you do, I'll have to

10 shoot you and if I shoot you, I'll have to shoot everybody.

11 All the customers are with me."  I turned and looked back

12 and I saw what I believed was six to eight individuals, all

13 males, and they all had handguns.

14   Q.      Okay.  Is that six to eight, counting Rivas?

15   A.      Six to eight in addition to Rivas.

16   Q.      In addition to Rivas?

17   A.      Because they were behind us.

18   Q.      So with Rivas that would have been seven to

19 nine individuals that had guns; is that correct?

20   A.      Yes, sir.

21   Q.      Okay.  Now, did someone make the statement,

22 "I've got six or eight guys in here with me?"

23   A.      No.

24   Q.      Okay.  You don't recall Rivas saying, "I have

25 six or eight guys in here with me"?

1    A.    No, I do not.  The only thing I recall Rivas

2  saying is all the customers were with him.

3    Q.    Okay.  So you don't think that you are getting

4  your six to eight figure from something that was said by

5  Rivas?

6    A.    No, sir.

7    Q.    Now, you have testified in four previous

8  trials; is that correct?

9    A.    Yes, sir.

10    Q.    Now, in Mr. Rivas' trial, do you recall how

11  many individuals you said had guns?

12    A.    I believe I said the same thing, sir.

13    Q.    Okay.  Would it surprise you to know that your

14  response was different?

15    A.    It may have been, sir, I don't know.

16    Q.    How long did you have to look and focus on

17  these individuals before you moved on to the next task Mr.

18  Rivas asked you to do?

19    A.    When he told me they were all with him, I

20  stepped back and turned and looked and I looked around the

21  room and I saw what I thought was six to eight people.  All

22  of them had guns and I turned back to Mr. Rivas.

23    Q.    Would it surprise you that you said five or

24  six people in the Rivas trial?

25    A.    I don't recall what I said, sir.

1    Q.    Okay.  If I told you that's what you said,

2    would you dispute that?

3    A.    No, sir.

4    Q.    If I told you in the Newbury trial that you

5    said there were several men with guns out, but you didn't

6    name how many, would that surprise you?

7    A.    No, sir.

8    Q.    Okay.  If I told you in the Rodriguez trial

9    that you said three or four other men, would that surprise

10   you?

11   A.    No, sir.

12   Q.    Okay.  Well, if including Mr. Rivas you had

13   three men, that's four men total.  Including Mr. Rivas, you

14   had nine men, that's 10 men total, correct?

15   A.    You are adding Rivas twice there.

16   Q.    I'm saying in one example, if it's Rivas plus

17   three guys, that would total four guys, right?

18   A.    Yes, sir.

19   Q.    And in the other instance, if it's Rivas plus

20   nine guys, then you have got ten people there, right?

21   A.    I said six to eight, sir.  That would be nine,

22   counting Rivas.

23   Q.    Okay.  So there is a big difference between

24   four and nine, correct?

25   A.    Yes, sir.

1    Q.    Okay.  Now, you are telling the jury today

2    that you tentatively identified one of those people as being

3    Mr. Halprin that had his gun out?

4    A.    Yes, sir.

5    Q.    Well, there were six people altogether.  And

6    you turned around and you saw three people in addition to

7    Mr. Rivas with guns.

8                   MR. SHOOK:  Judge, I object to him

9    mischaracterizing his testimony.  He didn't say there were

10   three people.

11                  THE COURT:  Overruled.

12   Q.    (By Mr. Ashford)  If you saw three people in

13   addition to Mr. Rivas with guns, that would leave the

14   possibility that there were two other people floating around

15   in the store somewhere, correct?

16   A.    That would leave a possibility.  But what I

17   said was six to eight with guns.

18   Q.    Okay.  But in Mr. Rodriguez's trial you said

19   three people plus -- you said three or four other people

20   with guns, correct?

21   A.    Yes, sir.

22   Q.    So in that scenario, if we stick to that,

23   knowing that there were six individuals, that would leave

24   the potential for two other people to be out of sight in the

25   store somewhere, correct?

```
 1        A.      Yes, sir.

 2        Q.      Okay.  Now, if you up that number to five or

 3   six, then that places everybody right there in the front of

 4   the store with the gun, correct?

 5        A.      Yes, sir.

 6        Q.      And that's what you are doing here today,

 7   correct?

 8        A.      Yes, sir.

 9        Q.      And you are doing that because it's Mr.

10   Halprin's trial and that would include him in that number,

11   correct?

12        A.      No, sir.  I'm telling you what happened that

13   night.

14        Q.      Okay.  How long did you get to look over your

15   shoulder and see these three, four, five, or six men?

16        A.      I had about -- I looked back there for about

17   25 or 30 seconds.

18        Q.      Okay.  Well, I believe just about an hour ago

19   you said about 15 seconds, right?

20        A.      I said 15 or 20, maybe.

21        Q.      Can you see how these details are important

22   whether it's 15 seconds or 25 seconds or whether it's three

23   men or eight men?

24        A.      Yes, sir.

25        Q.      Okay.  Now, after you had this glance and
```

1   turned around and saw these men with guns, what's the next

2   thing that you had to do?

3        A.    He told us to turn to the right and he asked

4   me where to -- where I could put -- where there was a room

5   big enough to put all the associates in.

6        Q.    So your attention turned back to Mr. Rivas?

7        A.    Yes.

8        Q.    So when you look around and you see, as you

9   say, Mr. Halprin with a gun, what do you notice about him?

10  Tell the jury what you see.

11       A.    Well, like I said, that night when I

12  identified the photographs, it was a possible

13  identification, a probable identification.  It wasn't a

14  positive identification on him.  But when I turned around

15  and I saw these other individuals with the guns, I see six

16  to eight individuals, all of them with guns out, standing

17  behind the associates in a sort of a semicircle.

18       Q.    What you are telling the jury is everybody

19  that you turned around and saw that wasn't an Oshman's

20  employee, you realized was with Mr. Rivas, correct?

21       A.    Yes, sir.

22       Q.    And today you are putting a gun in everybody's

23  hand?

24       A.    They all had guns in their hand, yes, sir.

25       Q.    Tell me specifically what you recognized about

1   the person that you thought was Mr. Halprin?  What was he

2   wearing?

3        A.    I don't remember what he was wearing that

4   night, sir.

5        Q.    Okay.  Well, you just testified about an hour

6   ago, okay, and you had some kind of idea then what you

7   thought he was wearing, correct?

8        A.    I said it was possible identification.  They

9   didn't list it on my identification because they asked me if

10  I could identify him in court.  I didn't know.

11       Q.    Well, certainly December 24th, 25th, of 2000,

12  the image would have been clearer in your mind than two and

13  a half or three years later, correct?

14       A.    Yes, sir.

15       Q.    Okay.  And Mr. Shook asked you, do you see him

16  in the courtroom?  And you looked over there and you said,

17  yeah, that's him right there, correct?

18       A.    Yes, sir.

19       Q.    Okay.  So if you weren't sure that you can

20  identify him, you are telling us that you can identify him

21  that easily now, but you couldn't then?

22       A.    After that night when I made that possible

23  identification, I made the identification that night, the

24  next day on the news they brought up the photographs on

25  there and I told -- and I knew immediately then that they

1   were there.  And I told the DA's Office about that later.

2        Q.      So your identification was aided by the

3   pictures that you saw on the news?

4        A.      The next day, yes, sir.

5        Q.      And that aids your identification here,

6   correct?

7        A.      Based off what I saw that night, yes, sir.

8        Q.      As well as the fact that five previous times

9   you have come into court and looked at that board that's

10  behind you with all those pictures on it, correct?

11       A.      Yes, sir.

12       Q.      But what I'm asking you is, if you look back

13  on December 24th of 2000 and you say Randy Halprin was one

14  of the guys that had a gun, tell me something specific that

15  makes you remember him, the clothing he was wearing, facial

16  features, what hand he had the gun in, what type of gun it

17  was, tell me any of that.

18       A.      If I remember correctly, he was standing back

19  by one of the registers and I believe the gun was in his

20  right hand.

21       Q.      Okay.  Now, this morning you said that he had

22  on dark clothing, maybe a dark shirt and bluejeans.

23       A.      Possibly that night, yes, sir.

24       Q.      Possibly?

25       A.      I don't remember what they all had on.

```
1        Q.      Just remember their faces.   Now, you testified
2   in Mr. Rivas' trial, you testified in Mr. Rodriguez's trial,
3   Mr. Newbury's trial, and Mr. Garcia's trial, I believe, in
4   that order; is that correct?
5        A.      Yes, sir.
6        Q.      Okay.  And you didn't mention this potential,
7   possible ID of Mr. Halprin until the fourth trial; is that
8   correct?
9        A.      I believe so, yes, sir.
10       Q.      Okay.  This didn't come up in the other three?
11       A.      No, sir.
12       Q.      Nobody asked you what you saw in detail and
13  who you saw or anything like that?
14       A.      No, sir.
15       Q.      Okay.  So you testified a minute ago you saw
16  him holding this gun in his right hand?
17       A.      I believe so, yes, sir.
18       Q.      You believe so?
19       A.      Yes, sir.
20       Q.      Are you sure about that today?
21       A.      This was two and a half years ago, sir.
22       Q.      Well, is that a yes or no?
23       A.      Yes.
24       Q.      Are you sure about that today?
25       A.      I'm sure he had a gun, yes, sir.
```

1    Q.    Okay.  All right.  So you don't know any

2    details, you don't really remember, you are not sure about

3    whether it was in his right hand, you are not sure about the

4    clothes, you are sure he had a gun, correct?

5    A.    Yes, sir.

6    Q.    And you know it's important for the State to

7    place a gun in his hand, don't you, sir?

8    A.    I believe it is important, yes, sir.

9    Q.    And you want to help them with that?

10   A.    I'm telling the truth, sir.

11   Q.    Okay.  Now, you remember Mr. Rivas

12   specifically because he did everything in this robbery,

13   correct?

14   A.    He was the leader, yes, sir.

15   Q.    All right.  Do you remember Mr. Rodriguez

16   specifically because of what?

17   A.    He kicked me.

18   Q.    He kicked you.  All right.  That's something

19   pretty significant, right?

20   A.    Yes.

21   Q.    And he spun you around, so he saw you face to

22   face and then he kicked you, so you had a good look at him,

23   right?

24   A.    Yes, sir.

25   Q.    Do you remember Mr. Newbury specifically

1    because of what?

2         A.    He was back at the gun department.

3         Q.    Okay.  Anything else that you remember him

4    specifically about?

5         A.    He was back there when we went back there when

6    Mr. Rivas and I went back there he was back there and he's

7    the one that asked about the guns.

8         Q.    He made a specific question.  He was talking

9    about the guns?

10        A.    Yes, sir.

11        Q.    Okay.  He was the one that said the pistols

12   were gone?

13        A.    Yes, sir.

14        Q.    Okay.  So he was -- obviously had been looking

15   and searching for them.  That was his job to get the guns,

16   it would appear, correct?

17        A.    Yes, sir.

18        Q.    You remember Mr. Garcia specifically for what

19   reason?

20        A.    Because of his, I would say his threatening

21   gestures toward one of the other employees.

22        Q.    And that would be something pretty significant

23   that would catch your attention, correct?

24        A.    Yes, sir.

25        Q.    Okay.  All right.  And you remember Mr. Harper

1   specifically for what?

2          A.     I believe he was the other one with the

3   uniform, the security guard uniform on.

4          Q.     Okay.  So all those people did specific things

5   that you remember, correct?

6          A.     Yes, sir.

7          Q.     Okay.  And your testimony was that you believe

8   Mr. Halprin was up in the front of the store when you walk

9   up there with Rivas, but he turned and went away?

10         A.     Yes.

11         Q.     Okay.  Nothing really significant about that,

12   no violence, no conversation, no leading role, correct?

13         A.     No, sir.

14         Q.     And you believe he was one of the ones up

15   there with the gun, although you are not sure whether it was

16   four people or nine people?

17         A.     I'm not sure.  I'm sure it was six to eight

18   people.

19         Q.     Okay.  Do you remember Mr. Halprin for

20   anything else?

21         A.     No, sir.

22         Q.     Okay.  You started out before you encountered

23   Mr. Rivas, you took a real long walk around the store to

24   look around to see what customers were there and start

25   clearing people out.  Did you see him then?

1          A.      Not that I can recall, no, sir.

2          Q.      Okay.  Did you see him over in the field and

3    stream section, which is the area you managed?

4          A.      No, sir.

5          Q.      Did you see him back in the breakroom when

6    they first took you back there or any time that they were

7    leading you back there?

8          A.      No, sir.

9          Q.      Okay.  Did you see him back in the breakroom

10   when people were being tied up and pushed back in the

11   corner?

12         A.      No, sir.

13         Q.      Okay.  Did you see him over in the gun section

14   with Newbury?

15         A.      No, sir.

16         Q.      You're pretty sure Garcia and Rodriguez were

17   the people back there that were tying people up and going

18   through their pockets, correct?

19         A.      Yes, sir.

20         Q.      Did you see Mr. Halprin back there?

21         A.      No, sir, I did not.

22         Q.      Now, did Rivas order a couple of the guys to

23   change into Oshman's shirts so they would look like they

24   were employees?

25         A.      He told the employees -- he said, take two of

1  the employees' shirts off and told two of his -- two of the

2  men with him to put them on.

3          Q.    Was Mr. Halprin one of them?

4          A.    I don't know for sure if he was or not.

5          Q.    Okay.  If he was, you don't remember that?

6          A.    No, sir.

7          Q.    Okay.  And you haven't mentioned that in any

8  previous testimony in four other trials nor in your

9  statement, have you?

10         A.    No, sir.

11         Q.    You stated that when Rivas said, "This is a

12  robbery," you turned around and all these guys had guns, you

13  said pretty much the employees were up at the front of the

14  store, correct?

15         A.    Most of them were, yes, sir.

16         Q.    Most of them.  So you testified, also, that

17  somebody brought Laura from the back up to the front,

18  correct?

19         A.    Yes, sir.

20         Q.    So all of the employees weren't up at the

21  front?

22         A.    Yes, sir, that's what I said.

23         Q.    Mr. Halprin, also, was not one of the ones who

24  gave -- who wore a uniform, correct?

25         A.    No, sir.

1    Q.    Okay.  Now, you said when they showed you the

2  photo ID, they told you to look at things that -- look at

3  things that won't change, not at things that could change;

4  is that correct?

5    A.    Yes, sir.

6    Q.    Okay.  Did that suggest to you in any way that

7  maybe some things had changed, maybe these weren't current

8  pictures?

9    A.    It doesn't suggest to me that.  It just told

10 me they were giving me an indication that people do change.

11   Q.    All right.  Now, on that day when you gave

12 your -- you gave a statement on the 24th of December 2000,

13 correct?

14   A.    Yes, sir.

15   Q.    Okay.  Did you do the lineup that very same

16 day late into those morning hours or did you come back and

17 do that later?

18   A.    That same night, that same evening.

19   Q.    Okay.  I'm sure in preparation for the trials

20 you came and probably talked to Mr. Shook and maybe talked

21 to some other detectives, correct?

22   A.    I talked to Mr. Shook.

23   Q.    Before you met Mr. Shook, did you do other

24 followup?  For instance, you testified you went that Monday

25 and gave the gun inventory, correct?

1     A.     Yes, sir.

2     Q.     Did you go any other time and talk to

3  detectives and give more investigation about what you saw,

4  correct?  Did you do that?

5     A.     No, sir.

6     Q.     Okay.  All right.  So the first time you

7  talked to anybody after updating your information with the

8  guns, was that somebody in the DA's Office?

9     A.     That was Mr. Shook in the DA's Office.

10     Q.     All right.  And did you know that you know you

11  had the opportunity to supplement and add to whatever

12  statements you had made, whatever things that you remembered

13  at any time?

14     A.     I didn't know that, no, sir.

15     Q.     Okay.  Is there anywhere that you can think of

16  that you ever mentioned in a statement, in some kind of

17  writing, that back on December 24th you made a potential ID

18  of Randy Halprin?

19     A.     Not in writing, no, sir.

20          MR. ASHFORD:  May I approach the witness,

21  Your Honor?

22          THE COURT:  You may.

23     Q.     (By Mr. Ashford)  I'm going to show you what

24  has been marked as Defendant's Exhibits No. 22 and 23 and do

25  you recognize those?

1    A.      Yes, sir, I do.

2    Q.      Okay.  And are those -- are those your

3  initialed -- initials as to which pictures you identified

4  and a little statement that explains that?

5    A.      Yes, sir.

6    Q.      Does that contain your signature?

7    A.      Yes, sir, it does.

8              MR. ASHFORD:  Your Honor, at this time I

9  offer Defendant's 22 and 23 for all purposes.

10              MR. SHOOK:  No objection.

11              THE COURT:  No. 22 and 23 shall be

12  admitted.

13    Q.      (By Mr. Ashford)  Mr. Ferris, what they asked

14  you to do was to go along and look at these pictures and

15  identify who you could.  And you identified No. 4, No. 9,

16  and No. 11 and No. 15; is that correct?

17    A.      Yes, sir.

18    Q.      And you were looking at the pictures that are

19  so numbered on State Exhibit No. 45, this big board here,

20  correct?

21    A.      Yes, sir.

22    Q.      Those are the pictures that are on the table?

23    A.      Yes, sir.

24    Q.      Anywhere does it say on there that you

25  tentatively identified, you thought you might have

1    recognized No. 2?

2            A.     No, sir.

3            Q.     Okay.

4                   MR. ASHFORD:   Publish those to the jury,

5    Your Honor?

6                   THE COURT:   You may.

7            Q.     (By Mr. Ashford)   Now, when the -- when Rivas

8    came into the store, he showed you photos that are depicted

9    on State Exhibit No. 17, correct?

10           A.     Yes, sir.

11           Q.     And those are the photos on the counter of

12   people lined up and that's what he asked you to look at,

13   correct?

14           A.     Yes, sir.

15           Q.     And that's really basically the same type of

16   thing that the State asked -- that the Irving police asked

17   you to do with these pictures here; is that correct?

18           A.     Yes, sir.

19           Q.     And these are the pictures on State Exhibit

20   No. 45, correct?

21           A.     Yes, sir.

22           Q.     Okay.  And you brought some employees up there

23   to look at them, correct?

24           A.     Yes, sir.

25           Q.     And Sandra Rodriguez picked two people out of

1  that lineup, did she not?

2       A.     She said she thought at least two of these

3  people had been in the store earlier that day.

4       Q.     And a minute ago you said or a few minutes ago

5  you said she possibly identified somebody, but she actually

6  did identify somebody.  It's more than a possible, correct?

7       A.     I don't know if she -- she said she identified

8  two of those people had possibly been in the store there

9  that day.

10      Q.     Well, in your statement you said Sandra said

11  she had seen two of the people in the store that day,

12  correct?

13      A.     Yes, sir.

14      Q.     Okay.  And she had been positive enough that

15  she saw two people in the store for you to ask her what time

16  of day they had been in the store, correct?

17      A.     Yes, sir.

18      Q.     Okay.  You know now that Rivas and Harper were

19  not real security people, correct?

20      A.     That's correct.

21      Q.     All right.  You know the pictures that they

22  brought in there were probably some kind of bogus pictures

23  they copied out of a magazine or newspaper or something,

24  correct?

25      A.     Yes, sir.

1    Q.    Okay.  What does that tell you about

2    Ms. Rodriguez's identification skills?

3              MR. SHOOK:  Judge, we'll object to that.

4    It's trying to impeach a witness who hasn't testified yet.

5    I don't think that's relevant.

6              THE COURT:  Sustained.

7    Q.    (By Mr. Ashford)  We'll take you back, again,

8    to when Mr. Rivas pulls out the gun and he says, "This is a

9    robbery," correct?

10   A.    Yes, sir.

11   Q.    Okay.  And at that point in time you say you

12   turn around and you see other individuals and they all had

13   guns; is that correct?

14   A.    Yes, sir.

15   Q.    Okay.  Now, was Laura the one that had been in

16   the restroom or was there another individual who had been in

17   the restroom?

18   A.    She was brought up from the back from that

19   area.  I don't know if she was in the restroom or not.

20   Q.    Who brought her up?

21   A.    I don't know which one of them brought her up.

22   Q.    Okay.  And when she was brought up, were her

23   thumbs ziptied?

24   A.    Her thumbs were ziptied together.

25   Q.    So do you think that one of the robbers

1    ziptied her thumbs and left her in the back and then walked

2    up to the front with the other robbers and Mr. Rivas and

3    then went back and got her?

4         A.    I believe one of them brought her up there,

5    sir.  I don't -- it was after it was announced it was a

6    robbery.

7         Q.    So there had to be somebody in the back?

8         A.    Yes, sir.

9         Q.    Okay.  And there were people on the radio?

10        A.    Yes, sir.

11        Q.    Okay.  Mr. Rivas was talking on the radio in

12   the front to somebody who was obviously not in the front,

13   correct?

14        A.    Yes, sir.

15        Q.    Okay.  And so obviously all of the robbers

16   were not in the front at the time Mr. Rivas pulled his gun.

17   Would that be a fair statement, sir?

18        A.    Yes, sir.

19        Q.    All right.  Now, you know now from everything

20   that you have been through, the trials, that only seven

21   people were involved in this, correct?

22        A.    Yes, sir.

23        Q.    You know now, do you not, that one person was

24   outside, correct?

25        A.    Yes, sir.

1    Q.    Okay.   That leaves six, correct?

2    A.    Yes, sir.

3    Q.    All right.   Not counting Mr. Rivas, that

4    leaves five; is that correct?

5    A.    Yes, sir.

6    Q.    Okay.   And there was at least one person in

7    the back.   There couldn't have been but four additional

8    individuals in the front, correct?

9    A.    Yes, sir.

10   Q.    Okay.   And if there was more than one

11   individual in the back, then it's more likely there was only

12   two or three people in the front, correct?

13   A.    It's possible, yes, sir, but I know what I

14   saw.

15   Q.    Okay.   Well, when you testified in one of the

16   trials, there was three or four other people in the front

17   and then you are testifying in this trial that there were

18   five or six, six or eight other people.   Do you see the

19   significance there?

20   A.    Yes, sir.

21   Q.    All right.   That means somebody couldn't have

22   possibly been up front.   The numbers just don't work out,

23   would you agree?

24   A.    Yes, sir.

25   Q.    Okay.   But once again, you recognize Rivas,

1    because he was with you the whole time.  You recognize

2    Rodriguez because he did something to you.  You recognize

3    Newbury because he had a specific conversation about the

4    guns.  You recognize Garcia because, what, he kicked you?

5    Is he the one?

6         A.    No.  Garcia I recognized because he's the one

7    that made the threatening gestures.

8         Q.    He's the one that made the threat, okay.  And

9    you recognize Harper because he had a uniform, also?

10        A.    Yes, sir.

11        Q.    Okay.  All significant actions, would you not

12   agree?

13        A.    Yes, sir.

14        Q.    Where is the apparel section and where are the

15   clothing, the fitting rooms, in relation to the front?  If I

16   can come back up there and look at that exhibit again.

17   Where would the apparel be?

18        A.    That center section right there, yes, sir.

19        Q.    Center.  Okay?

20        A.    And fitting rooms are right there above your

21   hand to your left a little bit, sir, across the aisle up a

22   little higher.

23        Q.    Okay.  Now, when Rivas pulled the guns up here

24   by customer service --

25        A.    Yes, sir, we were up there at customer

1    service.

2         Q.      -- right?  All right.  You testified that you

3    looked over your shoulder 15 or 20 seconds, 20 or 25

4    seconds, and I reminded you that about an hour or so you

5    said about 15 seconds.  Do you remember that?

6         A.      Yes, sir.

7         Q.      All right.  If I told you that in the Rivas

8    trial you said that you glanced over your shoulder, would

9    you dispute me on that?

10        A.      No, sir.

11        Q.      Okay.  Do you see the significance in the

12   difference in time from glancing over your shoulder, as

13   opposed to looking over your shoulder for 15 or 20 seconds

14   when we're talking about seeing somebody and identifying

15   somebody?  Do you see the significance there?

16        A.      Yes, sir.

17        Q.      Okay.  All right.  So which do you think it

18   is?  You glanced over your shoulder or you looked for 15 or

19   20 seconds?

20        A.      I looked over my shoulder for 15 or 20

21   seconds.

22        Q.      Okay.  I want to ask you to go when my

23   secondhand hits the nine here and say the word "stop" 15

24   seconds later and see if you think that's how long you

25   looked.  Okay?

1      A.      Okay.

2      Q.      I'm up here sooner than I thought I was, so

3 let's start on 8.  Okay?  All right.  We're on 8.  Go now.

4      A.      [Witness complies.]  Okay, stop.

5      Q.      Well, that was about 17 seconds exactly.  Were

6 you counting or were you trying --

7      A.      No.

8      Q.      You were trying to see how long it was that

9 you thought you looked over your shoulder?

10      A.      Yes, sir.

11      Q.      Okay.  And so that's what you think you did?

12      A.      Yes, sir.

13      Q.      Okay.  And you did that with Rivas right in

14 your face with a gun?

15      A.      He pointed -- he said, "All the customers are

16 with me," and I turned and looked.

17      Q.      So he's got the gun in front of you and he's

18 telling you all the customers are with him?

19      A.      Yes, sir.

20      Q.      Okay.  And he's standing how far away from

21 you?

22      A.      Probably less than five feet.

23      Q.      Okay.  And you turn your head away from his

24 gun and that's how long you turned around and looked?

25      A.      Yes, sir.

1          MR. ASHFORD:  I'll pass the witness.

2                   REDIRECT EXAMINATION

3  BY MR. SHOOK:

4          Q.    Mr. Ferris, first of all, were you timing how

5  long you were looking at people that night?

6          A.    No, sir, I was not.

7          Q.    When you give these estimates of time, that's

8  what it is, an estimate; is that right?

9          A.    Yes, sir.

10         Q.    Okay.  And you gave -- you said you dictated a

11 statement to Detective Johnson that very night; is that

12 right?

13         A.    Yes, sir.

14         Q.    While you were in the police car?

15         A.    Yes, sir.

16         Q.    Was that before you went down and looked at

17 any photographs?

18         A.    Before.

19         Q.    Let me show you a page of your statement.  Do

20 you recognize this being a page taken from your statement?

21         A.    Yes, sir.

22         Q.    And is this the portion where you are

23 describing how the robbery started?

24         A.    Just afterwards, yes, sir.

25         Q.    And is this where -- let me ask you.  You said

1   in the statement, "I turned and looked and everyone had

2   guns."

3          A.     Yes, sir.

4          Q.     And when you say everyone had guns, you are

5   talking about all the -- let me back up a minute.  Did Mr.

6   Rivas, did you talk in the statement about him saying there

7   are other people in the store with him?

8          A.     Yes, sir.

9          Q.     At that time at midnight with Detective

10  Johnson, did he say, did you tell Detective Johnson,

11  "There's eight of us in the store.  The customers are with

12  me.  If I shoot you, I have to shoot everyone.  It's not

13  personal.  I turned and looked and everyone had guns.  Some

14  had automatics, some had revolvers.  I saw at least six,

15  maybe eight, all males, all white, but two Hispanics.  And

16  they were telling everyone to be quiet and to put their

17  hands on the counter."

18         At that time you said six, maybe eight.  But

19  you made the statement, "everyone had guns."  Any doubt in

20  your mind about that, that everyone in there had their guns

21  trained on the employees?

22         A.     No, sir, no doubt.

23         Q.     Okay.  You weren't sitting there and timing

24  how long you were looking at them; is that right?

25         A.     No, sir.

1    Q.    You weren't counting them by hand, were you?

2    A.    No, sir.

3    Q.    You estimated that night there were six, maybe

4  eight?

5    A.    Yes, sir.

6    Q.    But no doubt in your mind what you told

7  Detective Johnson that night is they all had guns?

8    A.    Yes, sir.

9    Q.    You have never wavered from that, have you?

10   A.    No, sir.

11   Q.    As far as these photos, that night when you

12 made your positive IDs, what you told the officers those

13 were the ones you were positive of in your heart that night;

14 is that right?

15   A.    Yes, sir.

16   Q.    And then you also identified two others or two

17 others you thought participated in the robbery; is that

18 right?

19   A.    Yes, sir.

20   Q.    That was Mr. Halprin and Mr. Harper?

21   A.    Yes, sir.

22   Q.    Did you ever pick out anyone else that was not

23 involved in the robbery at all?

24   A.    No, sir, I did not.

25   Q.    All your identifications turned out to be

1  people involved in that robbery; is that right?

2       A.    Yes, sir.

3       Q.    The photograph here of Mr. Halprin, did that

4  appear a little bit different than what he looked like that

5  night?

6       A.    A little bit, not much.

7       Q.    Okay.  The photograph you saw the next day on

8  the show did that appear to be a more accurate photograph of

9  him as he appeared that night?

10      A.    Yes, sir.

11      Q.    And then this photograph that we see in this

12  exhibit, is that a more accurate appearance of how his

13  facial expressions were back during the robbery?

14      A.    Yes, sir.

15      Q.    Did he have this little goatee at that time?

16      A.    I don't believe he did at that time.

17      Q.    Okay.  But you didn't make your identification

18  here in the courtroom or what you saw on the photo lineup

19  based on anything you had seen on TV, did you?

20      A.    No, sir.

21      Q.    And as far as the other employee that was in

22  the back, she was brought up to the front sometime after the

23  robbery started; is that right?

24      A.    Yes, sir.

25      Q.    She was not brought up until after everyone

157

1    had been searched at the counter?

2          A.     No, sir.

3          Q.     So it didn't happen all at once during the

4    robbery someone is back there with her?

5          A.     No, sir.  They brought her up shortly after he

6    announced this was a robbery after -- when I was turning and

7    looking.

8          Q.     Okay.  Now, how long did this robbery take

9    place from start to finish?

10         A.     I made the announcement, it was just after

11   6:00 and it was about 30, 35 minutes total time.

12         Q.     Okay.  Did you -- when you heard the rapid

13   gunfire at the end, did you happen to look at your watch at

14   that time?

15         A.     I looked at my watch and I believe it said

16   6:35.

17         Q.     Just a little after 6:30?

18         A.     Yes, sir.

19         Q.     So approximately half an hour?

20         A.     Yes, sir.

21         Q.     Now, I spoke to you not long after this event

22   occurred; is that right?

23         A.     Yes, sir.

24         Q.     Came out to the store?

25         A.     Yes, sir.

1    Q.    You went over these events with me?

2    A.    Yes, sir.

3    Q.    We've met on several times since then, have we

4    not?

5    A.    Yes, sir.

6    Q.    We've never asked you to change your testimony

7    or perjure yourself or anything like that, have we?

8    A.    No, sir.

9    Q.    Never asked you we really need to put it on

10   Randy Halprin at this trial, have I?

11   A.    No, sir.

12   Q.    As far as questions, when we were at George

13   Rivas' trial, most of my questions were directed as to what

14   George Rivas was doing; is that right?

15   A.    That's correct, sir.

16   Q.    Same on the others?

17   A.    Yes, sir.

18   Q.    Because in their trial, that's what we

19   emphasized?

20   A.    Yes, sir.

21   Q.    Okay.

22            MR. SHOOK:   That's all we have.

23                 RECROSS EXAMINATION

24   BY MR. ASHFORD:

25   Q.    Well, in those others trials you were asked

1    who you identified; is that correct?

2         A.    Yes, sir.

3         Q.    And in those others trials when you were asked

4    who you identified, you mentioned people that you have

5    identified marked there numbered on State Exhibit No. 22 and

6    23; is that correct?

7         A.    I identified -- I mentioned the people that I

8    positively identified, yes, sir.

9         Q.    Okay.  And what you are trying to tell the

10   jury now is that you didn't mention these tentative IDs,

11   because in that trial you just weren't asked that specific

12   question?

13        A.    That's correct, yes, sir.

14        Q.    Okay.  If Mr. Halprin didn't have facial hair

15   the night of the robbery, what is so more representative of

16   him on that picture behind you than the picture that's on

17   the floor down here?

18        A.    His face is a little fuller like it was the

19   night of the robbery.

20        Q.    You believe his face is fuller on that picture

21   down there than it is on the floor?

22        A.    I believe so, yes, sir.

23        Q.    What do you think about it as he sits here

24   today?

25        A.    I think it's a little thinner than what it

1    was.

2         Q.    But you didn't have any problem recognizing

3    him today?

4         A.    No, sir.

5         Q.    Now, Mr. Shook just asked you in your

6    statement and just read for you where you said he said, "I'm

7    serious.  There's eight of us in the store," correct?

8         A.    Yes, sir.

9         Q.    Okay.  I asked you on cross-examination, did

10   anybody make the statement that there's six or eight of us

11   in the store?  Did Mr. Rivas ever say that?  And you said

12   no.  Do you recall that?

13        A.    No, sir, I don't, I don't.

14        Q.    I asked you, if you were coming up with the

15   six or eight figure because it had been suggested to you

16   that they had six or eight people in the store.  Do you

17   recall me asking you that?

18        A.    I recall you asking me that, yes, sir.

19        Q.    Okay.  So did somebody make that statement or

20   not?

21        A.    I made the statement to the detective when I

22   gave him my statement.  When I gave my statement.

23        Q.    All right.  Did Mr. Rivas make that statement

24   that there's six or eight of us or something to that effect?

25        A.    Something to that effect, yes, sir.

1    Q.    Okay.  So I'm going to ask you again.  Do you

2  think that affected the number that you ended up stating

3  here in your testimony here today?

4    A.    No, sir.

5    Q.    Okay.  When you say you turned around and

6  everyone had guns, what you are saying is everyone that you

7  saw when you turned around had a gun, correct?

8    A.    Yes, sir.

9    Q.    But you will agree with me that the numbers in

10 terms of numbers of people that were known to have

11 participated in the robbery and the numbers that you state

12 don't match up, correct?

13   A.    Correct.

14   Q.    Okay.  Everyone could have -- could not have

15 potentially been in the front if somebody was in the back

16 with Laura Fernandez, talking on that radio, correct?

17   A.    Correct.

18   Q.    It wasn't fifteen minutes later when they

19 walked up with Laura.  It was right after somebody said --

20 after Mr. Rivas said this is a robbery, correct?

21   A.    Yes, sir.

22   Q.    Okay.  I mean, how long are we talking about?

23 Thirty seconds?

24   A.    About that, maybe, if that long.

25   Q.    And she was -- already had her fingers

1   ziptied?

2       A.      Yes, sir.

3       Q.      So, obviously, everybody involved was not at

4   the front at the time that Mr. Rivas said, "This is a

5   robbery"?

6       A.      Yes, sir.

7       Q.      All right.

8               MR. ASHFORD:  That's all I have, Judge.

9               MR. SHOOK:  Nothing further, Judge.

10              THE COURT:  Thank you, sir.  You may

11  stand down.           .

12              MR. SHOOK:  May this witness be excused?

13              MR. ASHFORD:  Subject to recall, Judge.

14              THE COURT:  Subject to recall.

15              MR. SHOOK:  We'll call Officer Cassout.

16              THE COURT:  Let the record reflect this

17  witness has been sworn.

18                      TIM CASSOUT,

19  having been duly sworn, was examined and testified as

20  follows:

21                  DIRECT EXAMINATION

22  BY MR. SHOOK:

23      Q.      Would you tell us your name, please.

24      A.      Timothy Cassout.

25      Q.      How are you employed?

1    A.    As a police officer for the City of Irving.

2    Q.    How long have you worked with the City of

3    Irving?

4    A.    This June will be five years.

5    Q.    Now, at the present time are you on active

6    duty with the United States Army?

7    A.    Yes, sir, I am.

8    Q.    Where are you stationed?

9    A.    Fort Hood, Texas.

10   Q.    Let me turn your attention back to December

11   24th of 2000.  Did you come on duty that day?

12   A.    Yes, sir, I did.

13   Q.    About what time?

14   A.    3:45.

15   Q.    And what division did you work?

16   A.    Patrol Division in 42 beat.

17   Q.    Okay.  How long had you been with the Irving

18   Police Department at that time?

19   A.    About two years, I believe.

20   Q.    As a patrol officer what were your duties?

21   A.    Respond to calls and enforce state laws and

22   local regulations and things like that.

23   Q.    You were wearing a uniform and in a marked

24   police car?

25   A.    Yes, sir, I was.

1    Q.    And did you know another officer by the name

2  of Aubrey Hawkins?

3    A.    Yes, I did.

4    Q.    Looking at the photograph, I believe it's

5  marked State Exhibit 6, is that a photograph of Aubrey

6  Hawkins?

7    A.    Yes, it is.

8    Q.    And did he come on patrol that same shift as

9  you did?

10   A.    Yes, he did.

11   Q.    You said that you worked the 42 beat; is that

12 right?

13   A.    Yes, sir.

14   Q.    Is the City of Irving divided up into

15 different beats by the police department?

16   A.    Yes, sir, it is.

17   Q.    And when you were assigned 42 beat, what

18 exactly does that entail, as far as your patrol duties?

19   A.    42 beat is located north of Highway 183

20 between Beltline and the west city limits.

21   Q.    Okay.  Now, do you have to stay in that

22 particular area or can you roam or go answer calls in other

23 areas?

24   A.    Yes, sir, you can roam.

25   Q.    And let me turn your attention to about 6:30

1  that evening.  Where were you patrolling at that time?

2       A.    I was in the Irving Mall parking lot at that

3  time.

4       Q.    Is the Irving Mall parking lot located right

5  by Highway 183?

6       A.    Yes, sir, it is.

7       Q.    And is it across the highway from the shopping

8  center where the Oshman's Superstore is located?

9       A.    Yes, sir, it is.

10      Q.    I want to show you some photographs, which

11 have been marked as State Exhibit 51 through 58.  Some of

12 these are aerial views of that area.  Also, is there some

13 photos of the back parking lot of the Oshman's as it

14 appeared that night?

15      A.    Yes, sir.

16      Q.    And do these photographs accurately reflect

17 the layout of where the Oshman's was and how it was

18 situated?

19      A.    Yes, sir, it is.

20            MR. SHOOK:  At this time we offer State

21 Exhibits 51 through 58.

22            THE COURT:  Hearing no objection, Nos. 51

23 through 58 shall be admitted.

24            MR. KING:  We have no objection, Your

25 Honor.

1          Q.      (By Mr. Shook)  Let me first show you State

2    Exhibit 51, shows an aerial view.  Is this the Oshman's

3    store located here?

4          A.      Yes, sir.

5          Q.      Is this Highway 183?

6          A.      Yes, it is.

7          Q.      And these buildings over here, what are they?

8          A.      That would be the Irving Mall.

9          Q.      If we could get a close in of this Irving Mall

10   area.  Where were you parked at that time?

11         A.      In the parking lot just to the left side of

12   the screen, sir.

13         Q.      To the left?

14         A.      Left, yes, sir.

15         Q.      Over here?

16         A.      No, the left, west side.

17         Q.      Somewhere in here?

18         A.      Around that area, sir.

19         Q.      All right.  And was the mall open or closed at

20   that time?

21         A.      It was closed.

22         Q.      Any other cars in the parking lot?

23         A.      Not that I recall.

24         Q.      Okay.  Were you answering a call at that time

25   or just sitting your patrol car?

```
1        A.      I was sitting in my patrol car.

2        Q.      Window up or down?

3        A.      Down.

4        Q.      And what were you doing at that time?

5        A.      I was talking on the telephone.

6        Q.      Did you hear anything unusual around 6:30 or

7   so that evening which drew your attention?

8        A.      Yes, I did.

9        Q.      What was that?

10       A.      I thought I heard a bunch of firecrackers

11  being lit off.

12       Q.      Okay.  When you say a bunch of firecrackers,

13  what do you mean exactly?

14       A.      Like a package of the fireworks, Black Cats or

15  something like that being lit.

16       Q.      And lit a string of firecrackers?

17       A.      Yes, sir.

18       Q.      Did it sound like they were going off one

19  right after the other?

20       A.      Yes, sir, they did.

21       Q.      Were they in rapid succession?

22       A.      Yes, sir.

23       Q.      And that was a little unusual for Christmas

24  Eve?

25       A.      Yes, sir.
```

1    Q.    After you heard that, did you do anything else

2  in response to that?

3    A.    Not -- no, sir.

4    Q.    Okay.  Now, shortly after that -- well, let me

5  ask you this.  You are in your patrol car.  You have your

6  radio on at all times; is that right?

7    A.    Yes, sir.

8    Q.    Are you monitoring calls, as far as the

9  dispatcher dispatching you to specific areas, as well as

10  other units?

11    A.    Yes, sir.

12    Q.    You were working 42 beat that evening, right?

13    A.    Yes, sir, that's correct.

14    Q.    If the dispatcher wanted to get a hold of you,

15  how would she do that?  How would she address you?

16    A.    She would address me as 242.

17    Q.    What did the 2 stand for?

18    A.    Two stands for the second shift or evening

19  shift.

20    Q.    And 42 is?

21    A.    The beat.

22    Q.    What beat was Officer Hawkins working that

23  evening.

24    A.    He was working 34 beat.

25    Q.    And so if she wanted to dispatch or speak with

Officer Hawkins, how would she do that?

A.     She would call him 234.

Q.     And shortly after you -- or shortly before you heard those fireworks, had Officer Hawkins and another officer been dispatched to that area?

A.     Yes, sir.

Q.     What type of call was that?

A.     It was a suspicious persons call.

Q.     Okay.  And shortly after you heard the fireworks or so, were you -- somewhere around that time, were you also dispatched to that area?

A.     Yes, sir, I was.

Q.     And who dispatched you?

A.     Dispatch.

Q.     Okay.  And what did they ask you to do or request you to do at that time?

A.     Told me to be en route to Oshman's to back up 34 and another unit, which I can't remember who it was.

Q.     And did you do that at that time?

A.     Yes, sir, I did.

Q.     Did it take you a long time to get to the Oshman's?

A.     No, sir, it didn't.

Q.     You were just kind of across the highway; is that right?

1      A.      Yes, sir.

2      Q.      What route did you take?

3      A.      I took the service road west to Esthers,

4  crossed the highway on Esthers, and came back down the south

5  service road to Willow Creek.

6      Q.      We see a street that goes behind the Oshman's;

7  is that right?

8      A.      Yes, sir.

9      Q.      And is that the route that you took when you

10 were coming to the Oshman's?

11     A.      Yes, sir, it is.

12     Q.      Why did you decide to go toward the back of

13 the Oshman's?

14     A.      When I was dispatched to the call they said

15 three to four males had gone around to the back of the

16 store.

17     Q.      Then you came down this street to check out

18 the situation; is that right?

19     A.      Yes, sir.

20     Q.      And was it your understanding that Officer

21 Hawkins had already arrived back there?

22     A.      Yes, sir.

23     Q.      When you first arrived on the scene, did you

24 -- were you a little suspicious as to what was going on or

25 somewhat cautious?

1    A.    Yes, sir, I was.

2    Q.    Why was that?

3    A.    They kept trying to check his status or

4  Officer Hawkins' status on the radio and he wasn't answering

5  his radio.

6    Q.    What do you mean by "checking his status"?

7    A.    When you get to a certain situation or certain

8  time limit, the dispatcher will call and ask you how you are

9  doing and if everything is all right.  And you are supposed

10  to respond Code 4 if everything was okay and he wasn't

11  answering at all.

12    Q.    When you step outside your patrol car, do you

13  also have a radio with you?

14    A.    Yes, sir, we do.

15    Q.    So you can keep in constant communication with

16  dispatch?

17    A.    Yes, sir.

18    Q.    While on the way to the scene, then, you

19  noticed that he was not answering?

20    A.    Yes, sir, I did.

21    Q.    Let me show you State Exhibit 53.  That's kind

22  of a side view of the back of the Oshman's; is that right?

23    A.    Yes, sir, it is.

24    Q.    Were you coming from this direction?

25    A.    Yes, I was.

```
1        Q.      What is this area here which would have been

2   to your right here in the lower part of the screen?

3        A.      It's a used car lot.

4        Q.      Is this the angle that you arrived there at

5   the back of the Oshman's?

6        A.      Yes, sir, it is.

7        Q.      What's the first thing that you noticed

8   unusual as you came down Willow Creek?

9        A.      The first thing I noticed was all the debris

10  laying in the roadway.

11       Q.      What was that laying?

12       A.      I'm sorry?

13       Q.      What area of the roadway was that laying?

14       A.      About where the fire engine is parked.

15       Q.      Somewhere in this area?

16       A.      Yes, sir.

17       Q.      Once you saw the debris in the roadway, what

18  did you do?

19       A.      I started slowing down and I turned on my

20  spotlight and started looking in the used car lot area in

21  the open field to see if somebody had checked into a chase

22  that way or ran that way.

23       Q.      Did you see anything at that time?

24       A.      No, sir, I did not.

25       Q.      What was the next thing that you saw?
```

1        A.        I noticed a patrol car backed up into the

2   trailer.

3        Q.        Okay.  And that's what we see right here, the

4   way the patrol car is backed into the trailer?

5        A.        Yes, sir, it is.

6        Q.        Was that a pretty unusual situation to see a

7   patrol car parked like that?

8        A.        Yes, sir, it was.

9        Q.        Where did you park your car?

10       A.        I started to pull into the parking lot right

11  where that fire truck is at.

12       Q.        This area here?

13       A.        Yes, sir.

14       Q.        And then what did you do?

15       A.        I started pulling in and I stopped when I saw

16  something.

17       Q.        When you get out, is there anyone else around

18  at that time?

19       A.        No, sir.

20       Q.        And when you saw something, what is it that

21  you saw?

22       A.        I saw a body laying on the ground.

23       Q.        Okay.  And what area of the loading dock area

24  was the body?

25       A.        From my car or --

1          Q.      From this photograph.

2          A.      It's kind of hard to tell from that

3     photograph, sir.

4          Q.      Okay.  Let me show you State Exhibit 58.  Does

5     this show a closer view of the loading dock area?

6          A.      Yes, sir, it does.

7          Q.      Does that show the area where you saw the body

8     lying?

9          A.      Yes, it is.

10         Q.      And would that be generally in this area here?

11         A.      Yes, sir, it is.

12         Q.      Could you tell who it was when you first saw

13    the body?

14         A.      No, I couldn't.

15         Q.      And was the body face down or face up?

16         A.      It was face down.

17         Q.      Once you saw the body, what did you do?

18         A.      I called dispatch and told them I had a person

19    down in the back of the Oshman's.

20         Q.      And were you doing that over your radio that

21    you carried with you?

22         A.      Yes, sir.

23         Q.      Did you begin to walk towards the body?

24         A.      Yes, sir, I did.

25         Q.      Once you walked towards the body, did you get

1  a better view of it?

2          A.      Yes, I did.

3          Q.      What did you notice about it at that time?

4          A.      The patch on his shoulder.

5          Q.      And what did the patch tell you?

6          A.      It was an Irving police officer that was down.

7          Q.      What did you do at that time?

8          A.      I made a quick check or I actually got on the

9  radio first and told them that we had an officer down and

10  made a quick check of his pulse and then I took cover.

11          Q.      When you checked his pulse, what area of his

12  body did you check?

13          A.      I believe it was his wrist.

14          Q.      Okay.  Were you able to get a pulse at all?

15          A.      No, sir.

16          Q.      You said that you took cover.  Why did you

17  take cover at that time?

18          A.      Because I was by myself and there was an open

19  door back there and there was a lot of places I couldn't

20  see.  It was not safe.

21          Q.      So you were the first to arrive on the scene?

22          A.      Yes, sir, I was.

23          Q.      And you had no idea, whoever had done this to

24  the officer, you had no idea where they were at that time?

25          A.      Exactly.

1    Q.    Did other officers arrive quickly on the

2    scene?

3    A.    Yes, sir.

4    Q.    Once they arrived, what did you do with them?

5    A.    We set up a quick perimeter in the back and I

6    went and checked his pulse again to make sure I didn't miss

7    anything.

8    Q.    Any pulse at that time?

9    A.    No, sir.

10   Q.    What did you do with him at that point in

11   time?

12   A.    We just maintained a perimeter until we had

13   more units back there to cover everything.

14   Q.    Was Sergeant Norton one of the officers that

15   arrived soon after?

16   A.    Yes, sir.

17   Q.    Did you and Sergeant Norton, were you able to

18   turn the officer over?

19   A.    Yes, sir, we were.

20   Q.    Did you see who the officer was at that time?

21   A.    Yes, I did.

22   Q.    Who was that?

23   A.    It was Aubrey Hawkins.

24   Q.    Could you tell what type of trauma had

25   occurred to him?

1      A.      He seemed to have some sort of head trauma.  I

2  didn't see any actual entry or exit wounds, but his head

3  seemed to be swollen?

4      Q.      Was there a lot of blood?

5      A.      Yes, sir.  There was quite a bit of blood.

6      Q.      After he was turned on his back, did you

7  attempt to resuscitate him in any way?

8      A.      Yes, sir, we performed CPR.

9      Q.      What role did you take in that?

10     A.      I was doing the breathing.

11     Q.      Who was doing the compressions?

12     A.      Sergeant Norton was.

13     Q.      At any point in time could you tell if he was

14  responding at all?

15     A.      No, sir.

16     Q.      Did paramedics arrive soon afterwards?

17     A.      Yes, sir, they did.

18     Q.      Did they take over the lifesaving attempts at

19  that time?

20     A.      Yes, sir, they did.

21     Q.      And take Officer Hawkins away?

22     A.      Yes, sir, they did.

23     Q.      Now, while you were waiting for backup

24  officers, you were checking the scene right around Officer

25  Hawkins' body?

1    A.    Yes, sir, I did.

2    Q.    Okay.  Did you see any weapons on the ground?

3    A.    Yes, I did.

4    Q.    What type of weapon was that?

5    A.    It was a revolver.

6    Q.    Where was that located?

7    A.    Not far from where his body is near the trash
8 compactor, I believe.

9    Q.    Let me show you State Exhibit No. 39.  Does
10 that appear how it was laying in the parking lot?

11   A.    Yes, sir.

12   Q.    Did you ever move or touch that weapon?

13   A.    No, I did not.

14   Q.    Did you also look at -- at Officer Hawkins'
15 holster where he carried his handgun?

16   A.    Yes, I did.

17   Q.    Did he have his handgun with him?

18   A.    No, he didn't.

19   Q.    Did you make note of that and put that on
20 here?

21   A.    Yes, I did.

22   Q.    After Officer Hawkins was taken away, what
23 were you assigned to do then?

24   A.    I was assigned perimeter duties.

25   Q.    Around the Oshman's itself?

1      A.      Yes, sir.

2      Q.      How long did you stay there that night?

3      A.      Quite a while.  I don't know exactly how long,

4  but it was well after the end of my shift.

5      Q.      You were never asked to interview witnesses or

6  anything like that?

7      A.      No, sir.

8      Q.      You never touched that gun or any other

9  evidence in the back?

10     A.      No, sir.

11     Q.      Were you careful not to disturb any evidence?

12     A.      Yes, sir, I was very careful.

13     Q.      And for the record did this crime scene

14  location, was it in Dallas County, State of Texas?

15     A.      Yes, sir, it was.

16             MR. SHOOK:  That's all we have, Judge.

17                     CROSS-EXAMINATION

18  BY MR. ASHFORD:

19     Q.      Officer, did you get the same call as Officer

20  Hawkins or did you get called to back him up or --

21     A.      I believe my call was updated a little more

22  than what he originally received because they were still

23  gathering information at the time.

24     Q.      So you heard what appeared to be fireworks

25  before you got anything on the radio or --

1      A.      Before I was dispatched, sir.

2      Q.      Before you were dispatched?

3      A.      Yes, sir.

4      Q.      Did you hear Officer Hawkins' dispatch?

5      A.      Yes, I did.

6      Q.      Okay.  And how soon before the fireworks did

7  you hear that dispatch?

8      A.      I really couldn't give you a time frame, sir.

9  I wasn't paying attention to it.  I just thought it was odd

10  that I would hear fireworks on Christmas Eve.

11      Q.      Okay.  Well, after you heard the fireworks,

12  were you dispatched there kind of immediately thereafter?

13      A.      Yes, sir.

14      Q.      How long did it take you to get there?

15      A.      Between three to five minutes, I guess.

16      Q.      Okay.  Now, you said you were to back up 34

17  and another unit; is that correct?

18      A.      Yes, sir.

19      Q.      Okay.  So you were being called out to back up

20  a suspicious person's call at the Oshman's, not shots being

21  fired at Oshman's or not an officer down at Oshman's,

22  correct?

23      A.      That's correct, sir.

24      Q.      So you and Officer Hawkins, 34, and another

25  squad car would have been going all to the same call; is

1   that correct?

2          A.     Yes, sir.

3          Q.     Now, is that pretty common that they would

4   call three officers just to a suspicious persons call?

5          A.     Yes, it is.  When you have more than one

6   person there were three to four persons, according to

7   dispatch, so that would be normal.

8          Q.     And your dispatch was specifically three to

9   four males?

10         A.     Yes, sir, I believe so.

11         Q.     Do you know if it was three or four males in

12  the front of the Oshman's, three or four males behind the

13  Oshman's?

14         A.     When I was dispatched, sir, they said that the

15  person -- the people involved had gone around to the rear of

16  the Oshman's.

17         Q.     So you were -- well, as far as you could

18  expect from the dispatch, you were expecting to find

19  potentially three or four males in the back of the Oshman's?

20         A.     Yes, sir.

21         Q.     You had no idea that a robbery had occurred?

22         A.     No, sir.

23         Q.     Okay.  That wasn't the nature of the call?

24         A.     No, sir.

25         Q.     Had no idea that there were potentially six to

1    seven people actually involved, correct?

2         A.    No idea at all, sir.

3         Q.    But you did have the specific number of people

4    that went around the back and that was three or four?

5         A.    Yes, sir.

6         Q.    Do you know where that three to four

7    information came from?

8         A.    No, sir, I don't.

9         Q.    Okay.  Now, you said it's not unusual for

10   three or four units to be called out when there's three or

11   four people reported being involved.  Is there a policy as

12   to how you respond and how you proceed on a suspicious

13   persons call?  What I'm getting at is, are you supposed to

14   wait for the backup to get there?  Are you supposed to go

15   ahead and approach?  Or what is the scenario?

16        A.    There's not a set policy, sir.

17        Q.    Okay.  When you approached, though, you

18   approached with caution and you kind of stopped away from

19   the Oshman's before you got there, correct?

20        A.    Yes, sir.

21        Q.    Was that just because you saw the debris or

22   were you waiting for backup or what was the reason for that?

23        A.    Well, when I'm en route --while I was en route

24   to the Oshman's, dispatch was continuously updating the call

25   and I recall hearing something to the effect that they can't

1   get a hold of anybody inside the Oshman's.  And the fact

2   that Aubrey wasn't answering his radio at all made me more

3   suspicious and cautious.

4          Q.      And how long was it after you pulled up until

5   that third unit got there?

6          A.      He got there pretty quick, sir.  It probably

7   wasn't more than a minute, if that.

8          Q.      Okay.  So is it safe to say within two or

9   three minutes of the call all three of y'all could have been

10  there?

11         A.      I can't answer that question, sir.

12         Q.      Okay.  The gun depicted on State Exhibit No.

13  39, you say you saw that out there lying on the ground?

14         A.      Yes, sir.

15         Q.      Pretty much out there in plain view?

16         A.      Yes, sir, it was.

17         Q.      Could you tell whether it had been discharged

18  or not?

19         A.      I didn't examine it that close, sir.

20         Q.      You have, basically, physical evidence persons

21  that are responsible for doing that type of activity; is

22  that correct?

23         A.      Yes, sir, we do.

24                 MR. ASHFORD:  I'll pass the witness, Your

25  Honor.

```
 1                    MR. SHOOK:  Nothing further, Judge.

 2                    THE COURT:  Thank you, Officer Cassout.

 3  You may stand down.

 4                    MR. SHOOK:  May this witness be excused?

 5                    MR. ASHFORD:  No objections, Your Honor.

 6                    THE COURT:  He may be excused.  We'll

 7  take our lunch break and stand in recess until 1:15.

 8                    [End of Volume]

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    STATE OF TEXAS          *

2    COUNTY OF DALLAS            *

3        I, NANCY BREWER, Official Court Reporter for the 283rd

4    Judicial District Court, do hereby certify that the above

5    and foregoing constitutes a true and correct transcription

6    of all portions of evidence and other proceedings requested

7    in writing by counsel for the parties to be included in this

8    volume of the Reporter's Record, in the above-styled and

9    numbered cause, all of which occurred in open court or in

10   chambers and were reported by me.

11       WITNESS MY OFFICIAL HAND on this the 29 day of

12   _____, 2003.

13

14

15       _____
         NANCY BREWER, CSR, NO. 5759
16       Expiration Date:  12-31-04
         Official Reporter, 283rd JDC
17       Frank Crowley Crts. Bldg. LB33
         133 No. Industrial Blvd.
18       Dallas, TX 75207
         (214)653-5863
19

20

21

22

23

24

25