REPORTER'S RECORD

**74721**

VOLUME 48 OF _84_ VOLUMES

TRIAL COURT CAUSE NO. F01-00237-T

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| RANDY ETHAN HALPRIN | * | 283RD DISTRICT COURT |

*********************

JURY TRIAL

*********************

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 0 2003

Troy C. Bennett, Jr., Clerk

On the 5th day of June, 2003, afternoon session, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Vickers L. Cunningham,  Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

ORIGINAL

A P P E A R A N C E S

APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00788969
And
Mr. Tom D'Amore
SBOT NO. 05349500
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600

Ms. Lisa Smith
Appellate Division

APPEARING FOR THE DEFENDANT

Mr. George Ashford
SBOT NO. 01374530
325 N. St. Paul Street
Ste. 2475
Dallas, TX 75201
214/922-0212

Mr. Edwin King
SBOT NO. 11472200
2305 Cedar Springs
Ste. 250
Dallas, TX 75201
214/871-8800



1                         WITNESS JUROR INDEX

2    WITNESS                    DIRECT        CROSS      VOL.

3    Randy Halprin               3            58         48

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT INDEX

| EXHIBIT | IDENT. | OFFER | aADMIT | VOL. |
|---------|--------|-------|--------|------|
| ST.938 | LETTER | 65 | 65 | 48 |
| ST.939 | LETTER | 70 | 70 | 48 |
| ST.940 | LETTER | 71 | 71 | 48 |
| ST.941 | PHOTO | 91 | 91 | 48 |
| ST.942 | PHOTO | 91 | 91 | 48 |
| ST.943 | PHOTO | 91 | 91 | 48 |
| ST.944 | PHOTO | 91 | 91 | 48 |
| ST.945 | PHOTO | 91 | 91 | 48 |
| ST.946 | PHOTO | 91 | 91 | 48 |
| ST.947 | PHOTO | 91 | 91 | 48 |
| ST.948 | CONFESSION | 82 | 82 | 48 |
| ST.949 | AFFIDAVIT | 82 | 82 | 48 |
| ST.950 | LETTER | 94 | 94 | 48 |
| ST.952 | LETTER | 100 | 100 | 48 |
| ST.953 | LETTER | 102 | 102 | 48 |
| ST.954 | LETTER | 106 | 106 | 48 |
| ST.955 | LETTER | 122 | 122 | 48 |
| ST.956 | LETTER | 125 | 125 | 48 |
| ST.959 | VIDEO INTERVIEW | 164 | 164 | 48 |
| ST.960 | LETTER | 167 | 167 | 48 |

1                    P R O C E E D I N G S

2                         [Jury in]

3                    THE COURT:   Thank you.   You may be

4    seated.

5                 DIRECT EXAMINATION CONTINUED

6    BY MR. KING:

7         Q.    Mr. Halprin, before we broke for lunch we were

8    talking about how you met George Rivas and the events

9    leading up to the escape.   The six other individuals with

10   which you escaped from prison, were they, as best you know,

11   involved in any gang activity there at the prison?   Were

12   they part of -- were they part of a gang at all that you are

13   aware of?

14        A.    Not that I know of, no, sir.

15        Q.    And did you see them all, once you began

16   working in maintenance, on a regular basis?

17        A.    Most of the guys in the back.   The guys in the

18   front I didn't see too much.

19        Q.    Okay.   When you started discussing this escape

20   situation with Mr. Rivas, were there occasions when

21   everybody would get together and discuss the escape

22   situation?

23        A.    With Rivas and the people in the warehouse,

24   yes.   With the guys in the front, not until the end, no.

25        Q.    Okay.   And who did -- who did the planning --

1    who did the majority of the planning of the escape?

2         A.    George Rivas.

3         Q.    Did you aid or assist in the planning of the

4    escape?

5         A.    Not really, not on the big stuff, no, sir.

6         Q.    All right.  Now, y'all were working in

7    maintenance and that's where the escape began; is that

8    correct?

9         A.    Yes, sir.

10         Q.    And you were able to overpower, on some

11    occasions some of the individuals were struck with objects

12    over the head; is that correct?

13         A.    Yes, sir.

14         Q.    Some of the other escapees had prison-made

15    weapons; is that correct?

16         A.    Yes, sir.

17         Q.    Some type of shank or some type of metal

18    object; is that correct?

19         A.    Yes, sir.

20         Q.    All right.  And those individuals that were

21    overpowered, they were civilian employees of the Texas

22    Department of Corrections for the most part; is that

23    correct?

24         A.    Yes, sir.

25         Q.    All right.  At the end there was also a couple

1    of other inmates that were overpowered and everybody was put

2    into an electrical room of some kind or some type of utility

3    room; is that correct?

4           A.     Yes, sir.

5           Q.     Some of those individuals had been tied up or

6    bound; is that correct?

7           A.     Yes, sir.

8           Q.     Clothing was taken from some of those

9    individuals?

10          A.     Yes, sir.

11          Q.     Part of the escape plan was to move from the

12   maintenance building location to one of the towers so that

13   the gates could be opened and y'all could get out; is that

14   right?

15          A.     Yes, sir.

16                 MR. SHOOK:   Judge, we'll object to

17   leading questions.

18                 MR. KING:   I apologize for leading, Your

19   Honor.  I'm just trying to cover some basic ground.  I'm

20   sure Mr. Shook will have an opportunity to flush it out.

21                 THE COURT:   Still leading.  Sustained.

22          Q.     (By Mr. King)  Were you one of the individuals

23   that went up into the tower?

24          A.     No, sir.

25          Q.     Who were those individuals that went up into

1   the tower?

2       A.      George Rivas, Larry Harper, Patrick Murphy,

3   and Donald Newbury.

4       Q.      And did you ever go up into the tower?

5       A.      No, sir.

6       Q.      Where were you at that point in time?

7       A.      I was in the maintenance shop.

8       Q.      Okay.  At some point in time did y'all leave

9   the prison?

10      A.      Yes, sir.

11      Q.      And how did you leave the prison?

12      A.      In a white pickup truck.

13      Q.      And where were you located in the pickup

14  truck?

15      A.      I was under a board in the back of the bed of

16  the pickup truck.

17      Q.      And was there anybody else under the board

18  with you?

19      A.      Yes, sir.

20      Q.      Who?

21      A.      That was Patrick Murphy, Mike Rodriguez, and

22  Donald Newbury.

23      Q.      Would it be safe to say that y'all were hidden

24  underneath this board and the other members were either on

25  top of the board or in the truck?

1    A.    I believe they were in the truck.

2    Q.    So the truck would have appeared to whomever

3  was in the tower who might be observing this as having three

4  individuals with uniforms of some kind?

5    A.    Yes, sir.

6    Q.    Driving a State vehicle off the property?

7    A.    Yes, sir.

8    Q.    Now, were any shots fired during the escape?

9    A.    No, sir.

10    Q.    Was anybody stabbed during the escape --

11    A.    No, sir.

12    Q.    -- during the escape?  Okay.  Once y'all left

13  the prison, where did you go?

14    A.    We went to -- actually, we went into the town

15  to a Wal-Mart.

16    Q.    And what was the purpose of doing that?

17    A.    To pick up a vehicle that had been left there

18  for us.

19    Q.    All right.  Did you have anything to do with

20  arranging the vehicle to be there?

21    A.    No, sir.

22    Q.    Presuming that you took that vehicle, did you

23  leave the truck or keep the truck?

24    A.    We left the white pickup truck there.

25    Q.    And where did y'all proceed from that point?

1        A.      Went to San Antonio.

2        Q.      Did y'all stay there long?

3        A       Just the night.

4        Q.      Now, in between that point in time and the

5   Oshman's, were there any robberies committed?

6        A.      Yes, sir.

7        Q.      Where was the first one?

8        A.      Radio Shack in Houston.

9        Q.      And did you participate in that robbery?

10       A.      Yes, sir.

11       Q.      And did you carry a gun in that robbery?

12       A.      No, sir.

13       Q.      What was your role in that robbery?

14       A.      Just to go in and grab stuff.

15       Q.      Who did carry weapons in that robbery?

16       A.      The only two that I'm aware of were Donald

17   Newbury and George Rivas.

18       Q.      And did they go into the Radio Shack and

19   secure the employees?

20       A.      Yes, sir.

21       Q.      Did y'all take -- what did you take?

22       A.      Went in there and grabbed some -- a couple of

23   DVD players, some junk, I believe some phone cards, radios,

24   two-way radios, some scanners, glue, different electronical

25   (sic) components, things like that.

1    Q.    Now, were any shots fired at that location?

2    A.    No, sir.

3    Q.    Were there any confrontations between

4  employees, customers, and Mr. Rivas or anybody else who had

5  a weapon?

6    A.    There was actually before we had gone in,

7  somebody had droven up in a van while Rivas was in the

8  process of taking care of the robbery or the employees and

9  putting them in the back.  And I just noticed they went into

10  the store with them.  And then, you know, later he called us

11  in.  When we went in another person showed up at the door

12  and just out of the blue and he told him to go to the back.

13  That was it.

14    Q.    All right.  So there were some surprises

15  during the course of the robbery, but they resolved in a

16  manner where no one was shot and no one was hurt?

17    A.    Yes, sir.

18    Q.    Whose idea was it to rob the Radio Shack?

19    A.    That was George Rivas'.

20    Q.    There's another robbery, is that correct,

21  after that point in time?

22    A.    There was a Western Auto.

23    Q.    Did you participate in that robbery?

24    A.    No, sir.

25    Q.    Did you go and help carry anything out of that

1    one?

2         A.    No, sir.

3         Q.    Who went and did that robbery?

4         A.    It was Patrick Murphy, Donald Newbury, Joseph

5    Garcia, Larry Harper, and George Rivas.

6         Q.    All right.  And who did not go?

7         A.    Michael Rodriguez and myself.

8         Q.    Why didn't you participate in that robbery?

9         A.    Because I told them I wasn't going to rob any

10   more.

11        Q.    Did they -- were you left by yourself?

12        A.    No.

13        Q.    And nobody forced you to go along with these

14   guys, did they?

15        A.    No, sir.

16        Q.    Why did you want to escape from prison?

17        A.    I wanted a chance at a new life.

18        Q.    Now, did y'all leave that area after that

19   second robbery?

20        A.    We left.  I'm not sure of the time period, but

21   we did go to Dallas after that.

22        Q.    Okay.  Did you -- whose idea was it to rob the

23   Oshman's?

24        A.    George Rivas'.

25        Q.    Now, I want to talk about the Oshman's.  I

1  want to start with going into the store, going into the

2  Oshman's.  Who goes into the Oshman's first?

3          A.      As best as I can remember, it would have been

4  Donald Newbury and Joseph Garcia.

5          Q.      And what were their roles to be?

6          A.      I believe Donald Newbury's role was to go to

7  the gun section and Joseph Garcia's role was supposed to go

8  and gather shoes in the shoe section.

9          Q.      Who went in next?

10         A.      That would have been Michael Rodriguez and

11 myself.

12         Q.      And what were y'all's roles?

13         A.      To go in and act like we were shopping and

14 fill up a shopping cart.

15         Q.      Who went in after that?

16         A.      That would have been Larry Harper and George

17 Rivas.

18         Q.      And what were their roles?

19         A.      Their roles were to act like security guards.

20         Q.      Did you have a weapon?

21         A.      Yes, sir.

22         Q.      What kind of weapon were you carrying?

23         A.      I was carrying one of the revolvers from

24 prison.

25         Q.      And was there a color coding system?

1      A.      Yes, sir.

2      Q.      All right.  And whose idea was that?

3      A.      That was George Rivas'.

4      Q.      And did you have tape on your gun?

5      A.      I believe, yes, sir.

6      Q.      And whose idea was it to put the tape on the

7  guns?

8      A.      That was George Rivas'.

9      Q.      Once Mr. Rivas and Mr. Harper entered the

10  store, was there at some point in time when there was some

11  indication that the robbery was going down?

12      A.      Can you repeat the question again?

13      Q.      Sure.  Once everybody was in the store, at

14  some point in time the robbery went down, correct?

15      A.      Yes, sir.

16      Q.      All right.  Where were you right before the

17  robbery went down?  Where were you?  What part of the store

18  were you in?

19      A.      I was in the apparel section.

20      Q.      All right.  And where was Mr. Rivas?

21      A.      As the robbery was going down, right?

22      Q.      Correct.

23      A.      He was up at the front, I think, at the cash

24  registers.

25      Q.      And who did he have with him up there?

1          A.      The best that I can remember, it was Larry

2     Harper, Joseph Garcia, and Donald Newbury.

3          Q.      Now, where was Rodriguez?

4          A.      Rodriguez was with me.

5          Q.      And what were y'all still doing?

6          A.      We were loading up a shopping cart.

7          Q.      How did you know the robbery was going down?

8          A.      I could hear them, you know.  He was within

9     hearing distance and I could hear him from where he was.

10         Q.      Now, was everybody also carrying radios?

11         A.      Yes, sir.

12         Q.      And did all the radios have the ear things or

13    not?

14         A.      No, sir.

15         Q.      Okay.  Just some of the radios?

16         A.      Yes, sir.

17         Q.      But the radios -- could you hear somebody

18    talking on the radio?

19         A.      At the time there was a lot of different

20    chatter.  There was just chatter coming from somewhere else.

21    I guess somebody else had some two-way radios and there was

22    some like normal family chatter.  And then there was also

23    Rivas who would check in every once in a while and Patrick

24    Murphy would, also.

25         Q.      Now, you had a gun?

1    A.    Yes, sir.

2    Q.    Why did you take a gun in there?

3    A.    I felt that I didn't have a choice.

4    Q.    What do you mean?

5    A.    You know, I, before the robbery, I even told

6  them, I'm not going to go in and carry a gun and there was a

7  little argument and they made it very clear that, you know,

8  it was, you know, their way or the highway.  And so I told

9  them I wasn't going to pull a gun and they said, fine, just

10  gather clothes, grab a shopping cart, and gather clothes.

11    Q.    Is that what you did?

12    A.    Yes, sir.

13    Q.    And you heard Wes Ferris testify?

14    A.    Yes, sir.

15    Q.    Were you one of the individuals up there that

16  made a semicircle and pulled a gun on anybody?

17    A.    No, sir, I was not.

18    Q.    Once Mr. Rivas had gotten all those

19  individuals corralled, what happened next?  What was your

20  role?  What happened next?

21    A.    As far as that was going down, my role was

22  still where I was, to load the shopping cart up and, you

23  know, stay in that area.

24    Q.    What were you looking for?

25    A.    I was looking for jackets and, you know,

15

1   T-shirts, whatever was around that would help us out.

2        Q.      Were you -- is that -- were those instructions

3   or were you just grabbing stuff that was attractive to you?

4        A.      No.   There was specific instructions to grab

5   jackets, you know, T-shirts, long sleeved shirts, you know.

6        Q.      Were you doing that just for yourself, though,

7   grabbing clothes just for yourself?

8        A.      No sir, no sir.

9        Q.      Who were you grabbing clothes for?

10       A.      For everybody.

11       Q.      All right.   The robbery is going down.   They

12  have got most of the employees.   What happens next?

13       A.      Um, I remember hearing on the radio that

14  somebody had somebody -- there was a person in the back

15  because actually during that time Rodriguez had taken off.

16  I don't know where he went at the time, but then he said

17  that he had somebody in the back and they said bring them to

18  the front.   I was still where I was and Rodriguez had

19  brought Laura Fernandez by the aisle in front of us and

20  brought them up to the front and then shortly after that he

21  marched -- Rivas marched everybody down the aisle to the

22  back with their hands in front of each other, past me.

23       Q.      What happened next?

24       A.      At that time, then, there was a call for me to

25  come to the back to grab an employee's T-shirt.

```
1        Q.      To the back, where are you talking about?
2    Where did you go?

3        A.      The breakroom.

4        Q.      All right.  And who was asking you to do that?

5        A.      George Rivas.

6        Q.      Did you go back there?

7        A.      Yes, sir.

8        Q.      And what did he give you, if anything?

9        A.      He gave me a red employee T-shirt.

10       Q.      Did you receive any instructions?

11       A.      He said, "Put it on and go to the front and

12   act like you are cleaning up."

13       Q.      And what did you do?

14       A.      I put it on and went to the front.

15       Q.      What was the next thing that happened of

16   significance?

17       A.      At that point Rivas came up later with Wes

18   Ferris and took him to the security room where the cameras

19   were.  I turned my back as they were walking by and he

20   walked in.  And shortly after walked out and dropped off a

21   gym bag and said, "Keep your eye on that," and took off.

22       Q.      What happened after that?

23       A.      I stayed -- well, the phone rang, the

24   telephone rang.  And I called George and I asked him, I

25   said, "There's a phone ringing up here.  What do you want me
```

1   to do"?  And he said, "Answer it."

2        Q.     So something happens.  You are calling Rivas

3   and asking for instructions?

4        A.     Yes, sir.

5        Q.     Did you answer the phone call?

6        A.     Yes, sir.

7        Q.     Was there anybody on the line?

8        A.     I couldn't hear anything.

9        Q.     Did you hang up?

10       A.     Yes, sir.

11       Q.     What happened next?

12       A.     At that point things started to get a little

13 excited and I heard on the radio, "Get out, get out."  And,

14 you know, "Go, leave, leave now."

15       Q.     What did you do?

16       A.     So I grabbed the bag and I grabbed another bag

17 and the bag that George Rivas had placed on the ground and

18 told me, you know, keep your eye on, and I grabbed that and

19 another bag and I ran to the back.

20       Q.     Now, when you say you ran to the back, what

21 are you referring to?

22       A.     The fire exit at this time.

23       Q.     Were you the first one there?  The last one

24 there?

25       A.     At that time I was the first one at the back.

1     Q.     Okay.  And did you leave out the fire exit at

2  that point in time?

3     A.     I pushed the door open and then Larry Harper

4  came out and he said, "Go grab the long sleeping bag," or

5  ordered me to.

6     Q.     Long sleeping bag?

7     A.     Right.

8     Q.     Where did you go?

9     A.     I went and grabbed the sleeping bag and there

10  was a bunch of rifles in it.

11     Q.     Where was that?  Where was the sleeping bag?

12     A.     That was up -- I want to say close, it would

13  be the hunting section or near the -- near where they kept

14  the guns.  I'm not sure of that area.

15     Q.     Okay.  And where was the sleeping bag?

16     A.     It was just lying out in the middle of the

17  aisle.

18     Q.     Okay.  And was it unfolded like a long

19  sleeping bag?

20     A.     Right.  It was fully out.

21     Q.     Okay.  And was it zipped up?

22     A.     It was zipped up on the side.  It had all the

23  guns pushed up in it.

24     Q.     Okay.  And when you are talking guns, what

25  kind of guns are we talking about?

1     A.     I'm not sure of everything that was in there

2  at the time.  I know that there were some rifles.

3     Q.     Was it white or heavy?

4     A.     It was very heavy.

5     Q.     Okay.  Were you able to pick it up?

6     A.     No, I had to drag it.

7     Q.     All right.  And what did you do?  Where did

8  you go with it?

9     A.     I ran.  I went back to the back.

10    Q.     Okay.  And did you have the sleeping bag with

11 you?

12    A.     Yes.

13    Q.     All right.  Now, once you got back -- you say

14 back, you talking about the fire exit?

15    A.     The fire exit, excuse me.

16    Q.     Once you get there, what happens?

17    A.     I went down the stairs, the fire exit stairs,

18 and I dragged the bag and I opened up the Ford Explorer

19 door.

20    Q.     Where was the Explorer?

21    A.     It was almost right in front of the fire exit

22 door.

23    Q.     Now, you talking about the exit you came out

24 of?

25    A.     Yes.

1    Q.    And as you came out, tell us what happened.

2    A.    There were a couple of others out at that time

3  and they were bringing stuff out and I was just -- my main

4  concern was just pushing the bag in the car.

5    Q.    Now, at that point that you came out, was

6  Officer Hawkins or his vehicle in view?

7    A.    No, not at the time.

8    Q.    All right.  You came -- you come down the

9  stairs and you get to the Ford Explorer; is that right?

10   A.    Yes, sir.

11   Q.    All right.  What door are you at?

12   A.    I'm at the left side, actually the driver's

13  side rear door.

14   Q.    And what are you doing -- what have you got?

15  What are you trying to put in there?

16   A.    I'm trying to shove the sleeping bag with the

17  rifles in.

18   Q.    Where are you trying to shove it?

19   A.    Into the back seat.

20   Q.    Are you talking about the back seat where the

21  passengers sit?

22   A.    Yeah, the passenger seats.

23   Q.    Okay.  Where is -- who's around you at this

24  point in time?

25   A.    Um, if I remember correctly, it was -- Joseph

1  Garcia was out, Larry Harper was out, I want to say Michael

2  Rodriguez was outside.

3      Q.   Okay.  Anybody else?

4      A.   George Rivas, also.

5      Q.   All right.  Where was Rivas?

6      A.   Um, this was before the patrol car?

7      Q.   Right.

8      A.   He was still -- I think he was in the front

9  driver's seat with the door open.

10     Q.   Okay.  When is the first time you see the

11 patrol car?

12     A.   As it was pulling up.

13     Q.   And what happens as Officer Hawkins pulls up

14 in the car?

15     A.   George Rivas told me to stay put.

16     Q.   And what did you do?

17     A.   I stayed put.

18     Q.   What did George Rivas do?

19     A.   He walked up to the patrol car.

20     Q.   Now, did the patrol car -- was it still

21 moving?  Is that what is happening?  Or did it come to a

22 stop?

23     A.   At that time I think it was at a full -- it

24 was completely stopped.

25     Q.   What's the next thing that happened?

1       A.      I remember seeing George Rivas reach for

2   something.

3       Q.      What did you think he was reaching for?

4       A.      I thought he was reaching for his ID, his

5   security badge.

6       Q.      What did you think was going to happen at this

7   point in time?

8       A.      I thought that he was going to say, hey, you

9   know, I'm a security guard or something to take him

10  off-guard.

11      Q.      Okay.  What did you think might happen after

12  that?

13      A.      That he would just, you know, say, hey, kind

14  of pretty much what had happened in the previous robberies,

15  that you know, you came at us at a bad time, you know,

16  handcuff him or whatever he's going to do and we were going

17  to go on our way.

18      Q.      What ended up happening?

19      A.      He ended up firing some shots.

20      Q.      All right.  What happens -- what do you do

21  when George Rivas -- when you say "firing shots", tell the

22  jury how that happened.  What's George Rivas doing?

23      A.      He walked up to the car where the patrol car

24  was and he reached back.  I saw him reach back for his, what

25  I thought was his security badge.  And then at that time he

1    had said something, I can't remember what he said, and then

2    the next thing you know I just heard gunshots.

3         Q.    What did you do?

4         A.    I freaked out and started running around the

5    car.  I ran around the Ford Explorer.  The first thing in my

6    mind was get across the field.

7         Q.    Okay.  Now, had y'all left a car someplace?

8         A.    There was a blue Honda across the field at the

9    apartment complex.

10        Q.    And why had y'all left a car there?

11        A.    In case we had to take off on foot.

12        Q.    So is that where you were headed?

13        A.    Yes, sir.

14        Q.    And as you ran off, what happened?

15        A.    I heard somebody call my name.  I turned

16   around and that's when I felt my foot go numb.

17        Q.    Did you know at that point you had been shot?

18        A.    I felt like I had been shot, yes, sir.

19        Q.    All right.  What happened after that?  What's

20   the next thing that happened?

21        A.    I had gone down those, like there was like a

22   grassy embankment and I remember going by them.  By then, I

23   believe, a lot of people had filed into the car because the

24   car was already moving.  I remember Joseph Garcia and

25   Rodriguez doing something and the car, the patrol car,

1  moving back and the car, the Explorer, backing out.  And

2  then I heard somebody tell me to, "Get in the car.  Get in

3  the car."  And I jumped into the front, the right side of

4  the front seat in Newbury's lap.

5      Q.     Is that -- that's the front seat of the

6  passenger side?

7      A.     Passenger side, yes, sir.

8      Q.     Passenger side front seat?

9      A.     Right.

10     Q.     Now, was there any other gunshots that you

11  heard, other than Rivas?

12     A.     Um, everybody that was out there was firing.

13  I mean, it was -- as soon as Rivas had shot, there was a

14  brief pause and then it was just like just nonstop shots.

15     Q.     Did you pull your gun and shoot your gun?

16     A.     No, sir.

17     Q.     Where was your gun?

18     A.     At some point in time it fell down my pants.

19     Q.     What do you mean?

20     A.     It actually -- because I was just holding it

21  like in the jeans belt area, the waist of the jeans, and

22  that's all I had to -- you know, I didn't have a holster or

23  anything.  And at some time during all that incident, it had

24  fallen down my pants leg.

25     Q.     What kind of pants did you have on?

1      A.      I had some bluejeans.

2      Q.      Were they bellbottoms or --

3      A.      No.  They were like, just, you know, like

4  straight leg Levi's or something.  I don't know what style

5  you would call them.

6      Q.      So you didn't lose your gun, did you?

7      A.      No.

8      Q.      Where did y'all -- once you jumped in the Ford

9  Explorer, what happened after you jumped in the Ford

10  Explorer?

11      A.      Um, I think somebody had said something like,

12  we're missing somebody and everybody turned and looked

13  around and Rodriguez was still outside.  And I'm not sure

14  what he was doing, but it looked like he was lost and they

15  told him to get into the car and, you know, I'm not sure

16  where he got in at, but that's when they drove off.

17      Q.      Were there any shots fired as y'all drove off?

18      A.      When I got into Newbury's -- when I jumped

19  into Newbury's lap, there were a couple more shots, yes,

20  sir.

21      Q.      Who fired those?

22      A.      Newbury.

23      Q.      When he fired those, what happened?

24      A.      I yelled, "Oh, shit."  I didn't know what was

25  going on.

1      Q.      All right.  When you were sitting on top of

2  him and he was shooting a gun?

3      A.      Yes, sir.

4      Q.      Out of the car?

5      A.      Yes, sir.

6      Q.      Did it affect any part of the car?

7      A.      It blew out the window.

8      Q.      So he was shooting through a closed window?

9      A.      Yes, sir.

10      Q.      Where did y'all go from there?

11      A.      We drove -- I'm not sure of the directions or

12  anything like that.  All I know is we drove straight to the

13  apartment complex.

14      Q.      Is there a lot of confusion at this point,

15  obviously?

16      A.      Yes, sir.

17      Q.      You in any pain at this point?

18      A.      Yes, sir.

19      Q.      And where did y'all go after you left

20  Oshman's?  Who was driving?

21      A.      At that time in the Ford Explorer George Rivas

22  was driving it.

23      Q.      And where did y'all go?

24      A.      We went to the apartment complex.

25      Q.      Which one?

27

1      A.     The one across the field.  I'm not sure the

2  exact area because George Rivas had actually dropped us off

3  and told us to get out.  There was like a white trailer that

4  he dropped us off and we piled out and kicked some bags out

5  and that's where we stayed until -- to wait for the

6  Suburban.

7      Q.     When you are talking about his apartment, is

8  this where the car had been left?

9      A.     The blue Honda, yes, sir.

10     Q.     Okay.  Now, who left in the Honda?

11     A.     Um, I believe Joseph Garcia, Donald Newbury,

12  and George Rivas.

13     Q.     All right.  What happened to the Ford

14  Explorer?

15     A.     I guess, it was just left there.

16     Q.     Who came and picked you up?

17     A.     Patrick Murphy.

18     Q.     What was he driving?

19     A.     The blue Suburban.

20     Q.     Did you get in the Suburban and leave with

21  them?

22     A.     Yes, sir.

23     Q.     Where did y'all go?

24     A.     We went to the Econo Lodge where we were

25  staying in.

1    Q.    Now, when you got to the -- when you were

2  waiting for Murphy to show up, had you retrieve your gun

3  yet?

4    A.    No.  In fact, in the parking lot of the

5  apartment complex while we were waiting, I pulled it out of

6  my pants and stuck it in a bag, out of the --

7    Q.    So you pulled it out of your pants?

8    A.    I pulled it out from the bottom where it had

9  fallen down the leg of the pants and put it in a bag.

10   Q.    All right.  A bag of what?

11   A.    I'm not exactly sure of everything that was in

12 there.  I remember a T-shirt and I put it in a T-shirt and

13 put it in the bag.

14   Q.    Y'all went to the Econo Lodge?

15   A.    Yes.

16   Q.    And what happens when you get to the Econo

17 Lodge?

18   A.    Somebody helped me upstairs, I can't remember

19 who, and takes me to the bathroom and turns on the faucet

20 and I rinse my foot.

21   Q.    All right.  Now, did you take off your shoe

22 and your sock?

23   A.    In the Suburban on the way over.

24   Q.    Okay.  Once you were back at the Econo Lodge,

25 what transpired there?

1    A.    Um --

2    Q.    You are washing your foot?

3    A.    Washing my foot and Donald Newbury came in and

4 he said, "What's wrong with you"? And I said, "I've been

5 shot in the foot." And he told me to stop whining and stop

6 crying and he said that George Rivas had been shot and, you

7 know, because I remember him saying he was shot in the car,

8 but I wasn't sure where he was shot at and I asked him where

9 and he goes, "You know where because you did it."

10    Q.    What did you say?

11    A.    I said, "What are you talking about?"

12    Q.    What did he say?

13    A.    And he said -- he goes, "You were firing

14 crazy." And I said, "I never shot my gun."

15    Q.    What happened then?

16    A.    And he said, "Well, we'll see. Where's your

17 gun"? And I said, "It's in a bag somewhere." I was telling

18 him to, "Check the gun, check the gun."

19    Q.    Did they go check the gun?

20    A.    Yes, sir.

21    Q.    And had it been fired?

22    A.    No, sir.

23    Q.    Now, that took the heat off of you?

24    A.    Yes, sir.

25    Q.    And what was happening after that, once they

1   figured out it wasn't your gun?

2        A.     Um, everybody was trying to shift the blame.

3   Nobody would really give -- nobody said, you know, said it

4   could have been me or maybe I did it or, you know, it was

5   pretty much, you know, they just said what exactly they did.

6        Q.     We're in a nice, calm courtroom and you're up

7   on the witness stand and you are answering these questions

8   in kind of a calm manner.  Is that what was happening there

9   in the Econo Lodge?

10       A.     No, it was very tense.  I guess you can say

11  everybody was real excited.

12       Q.     Well, when you say "excited", you talking

13  about excited happy?

14       A.     No, absolutely not.

15       Q.     What was being said about the officer?

16       A.     Um, I remember saying something like, you

17  know, what exactly happened?  Were y'all -- what were y'all

18  shooting at and everybody was saying, I don't know, I don't

19  know what I was shooting.  I was just shooting.  And George

20  Rivas said, "I think I killed him."  And that's when

21  everybody kind of sat quiet.

22       Q.     Did anybody else say they shot at him?

23       A.     No, not until later.

24       Q.     How long did y'all stay there?  Y'all didn't

25  have any medical supplies?

1     A.     No.

2     Q.     Somebody go get some?

3     A.     Yes, sir.

4     Q.     Who was that?

5     A.     Larry Harper and Donald Newbury.

6     Q.     How long did y'all stay there at the Econo

7  Lodge?

8     A.     We left the next day.

9     Q.     Where did you go?

10     A.     We went straight on to Colorado.

11     Q.     And did you end up -- were you with anybody

12  when -- were you with them when the RV was purchased?

13     A.     No.

14     Q.     Did you go to purchase the Honda down in

15  Houston or San Antonio wherever it was purchased?

16     A.     No.  It was -- I think it was actually

17  purchased -- they said somewhere near Galveston.  I'm not

18  sure exactly, but I was at the mall at the time they had

19  gone to purchase the Honda.

20     Q.     All right.  On the road to Colorado and up in

21  Colorado, did you ever go with them and purchase any

22  vehicles?

23     A.     No, sir.

24     Q.     Where did you spend most of your time?

25     A.     In Pueblo all of my time was spent inside the

```
1   motel room.
2           Q.    And how long did y'all stay in Pueblo?
3           A.    A couple of days.  I'm not sure how many days
4   exactly.
5           Q.    Where did y'all go from Pueblo?
6           A.    They had said that they had found an RV --
7   they wanted to actually drive around an RV park and they
8   were like searching and everything and they found a place in
9   Woodland Park.
10          Q.    All right.  And did they at some point
11  purchase the RV?
12          A.    Yes, sir.
13          Q.    And did all of y'all stay up there in the RV?
14          A.    Yes.
15          Q.    Was there ever any discussions -- before the
16  Oshman's, was there ever any discussions about breaking up
17  and y'all going your separate ways?
18          A.    Um, I had -- there was like no really verbal
19  -- nobody, you know, said anything at that time.  I had in
20  my mind what I was going to do later on.
21          Q.    Which was what?
22          A.    Which was the first chance I get, go, you
23  know.
24          Q.    You probably could have run off at some point,
25  couldn't you?
```

1      A.      Yes, sir.

2      Q.      And you didn't?

3      A.      No, sir.

4      Q.      Had you talked with George Rivas about, before

5  the escape from prison, about the robberies he had been

6  involved in previously?

7      A.      He had mentioned them.  It was never a --

8  during the escape or the planning of the escape, he was --

9  basically he would talk about them as kind of reassurance

10 like, hey, you know, I know how to put together a plan and

11 make it work.

12     Q.      What about once after the escape?  Was there

13 -- was the Oshman's or something similar to that, was that

14 part of the plan?

15     A.      He talked about Toys R Us.  As far as

16 something big like the Oshman's, he talked about a Toys R Us

17 that he had done something big before.

18     Q.      All right.  And did you know much about that

19 particular offense?

20     A.      I knew that was the one that he got caught on.

21     Q.      Was there some general feeling among the group

22 that y'all ought to split up into smaller sections?  I mean,

23 you are seven guys that had broke out of prison.

24     A.      They talked about whenever they would go into

25 the city or wherever they would go, they talked about, you

1  know, actually having smaller groups.

2      Q.    What was it about this Oshman's?

3      A.    Um, George Rivas just said he could do it.  I

4  mean, is there a more specific question?

5      Q.    Well, what was it about George Rivas?  I mean,

6  what was the -- surely you could have gone some place with

7  less people?

8      A.    Well, I had originally thought that there were

9  going to be less people that night.  That's the way he had

10  talked it up.

11      Q.    So you were surprised at the number of people

12  that were there?

13      A.    Yeah, I was very surprised.  I didn't think it

14  was going to happen when I saw how many people were in

15  there.

16      Q.    Was there any conversation among any of y'all

17  in the planning of this Oshman's that if there was a serious

18  confrontation, you were going to kill anybody?

19      A.    No, sir.

20      Q.    Had there been confrontations between Rivas

21  and individuals and Newbury and individuals in the previous

22  two robberies before the Oshman's?

23      A.    There had been confrontations.

24      Q.    Had those been resolved without firing a shot,

25  the best you understood?

1   A.      Yes, sir.

2   Q.      Now, once you are up in Colorado and you are

3   staying in the RV, did you go much of any place?  Did you go

4   to any massage parlors?

5   A.      No, I did not go to a massage parlor.

6   Q.      Did you go any place?  Where did you go?

7   A.      I went to Wal-Mart.  Went to a CD store.  It

8   was called -- I can't remember -- the Independent Records or

9   something.  And I went there a couple of times.

10   Q.      Did you go by yourself?

11   A.      No.

12   Q.      Who went with you?

13   A.      Rodriguez.

14   Q.      You went to the CD store.  Did you go by

15   yourself?

16   A.      No.

17   Q.      Who went with you?

18   A.      Rodriguez.

19   Q.      Did you ever go anyplace by yourself?

20   A.      No place by myself.

21   Q.      Were you ever given access or asked to borrow

22   the car so you could go drive down to the store and pick up

23   milk or ice or food or --

24   A.      No, I knew that was pointless.

25   Q.      What do you mean?

```
1        A.      Rivas wouldn't trust me to do something like

2   that.  He would probably think I would take off with the

3   car.

4        Q.      No honor among thieves?

5        A.      Pretty much.

6        Q.      How did you spend the majority of your time,

7   Mr. Halprin, there in Colorado?

8        A.      In Colorado?

9        Q.      Yes, sir.

10       A.      Mostly listening to CDs and watching movies in

11  the RV.

12       Q.      You understand what this jury's role is in

13  this trial?

14       A.      Yes, sir.

15       Q.      You gave a statement to Detective Spivey; is

16  that right?

17       A.      Yes, sir.

18       Q.      Did you -- other -- and you have heard me read

19  the statement that you gave in court.  Were there other

20  things that you talked to Mr. Spivey or Detective Spivey

21  about that weren't included in the statement?

22       A.      Yes, sir.

23       Q.      Like what?

24       A.      I gave him the color codes.  There were, you

25  know, some different parts of the statement where, you know,
```

1  I would be dictating a statement and he would pause and say,

2  okay, well, what exactly happened at this part and I would

3  go into a little, you know, greater detail of what I could

4  remember.  And then he would move on and discuss things and

5  I remember showing him how I had gone around the car and do

6  -- or where the car was at.

7      Q.    Which car are you talking about?

8      A.    The Explorer and how I moved around the car

9  and there was a little sketch or something.

10     Q.    All right.  Now, did he ever ask you if you

11 fired your gun?

12     A.    Yes.

13     Q.    What did you tell him?

14     A.    I told him I didn't fire my gun.

15     Q.    Now, did he trick you into giving a statement

16 or anything like that?

17     A.    No, sir.

18     Q.    And did he, as he testified to, did he read

19 you your Miranda rights and tell you that you had a right to

20 have a lawyer and you didn't have to talk to him and they

21 would appoint a lawyer to represent you?

22     A.    Yes, sir.

23     Q.    And ultimately you did have a Colorado lawyer

24 appointed to represent you at some point, did you not?

25     A.    Yes, sir.

1    Q.    Did -- after you were interviewed by Mr. -- or

2    Detective Spivey, did -- were there a lot of news people up

3    there?

4         A.    Yes, sir.  But before that I was actually

5    interviewed by TDC and their investigation or whatever.

6         Q.    They got there before Detective Spivey did?

7         A.    No, that was after.

8         Q.    All right.  So Detective Spivey, was he the

9    first law enforcement officer that actually takes a

10   statement from you of some kind?

11        A.    Yes, sir.

12        Q.    And then there's somebody from the Texas

13   Department of Corrections that takes some kind of statement

14   from you?

15        A.    Yes, sir.

16        Q.    And did you just handwrite something for them

17   or did they just -- how did that go?

18        A.    They only asked me -- I had the lawyer.  It

19   was actually the following day, the lawyer that had been

20   given to represent me at the time was there and so they --

21   they didn't even ask me any questions.  And I told them I

22   would cooperate and they only asked a couple of things like

23   if any guards helped out or anything like that.  And then

24   they just said that was it.

25        Q.    Okay.  So apparently their focus was wanting

1   to know if y'all had had some aid or assistance from inside

2   to break you out?

3          A.     Yes, sir.

4          Q.     Then did you talk to the news media?

5          A.     Yes, sir.

6          Q.     And did they, the new media, videotape some

7   interviews with you?

8          A.     Yes, sir.

9          Q.     And you also talked to them on the telephone,

10  did you not?

11         A.     Yes, sir.

12         Q.     And did they always tell you that they were

13  going to record the conversation?

14         A.     Yes, sir.

15         Q.     What statements, if any, did you give the news

16  media about whether or not you had discharged a firearm or

17  shot Officer Hawkins?

18         A.     I told every single one that I did not ever

19  pull a gun and I didn't ever fire the gun.

20         Q.     Now, you are in the RV with Larry Harper; is

21  that right?

22         A.     Yes, sir.

23         Q.     Rivas and -- Rivas, Garcia, and Rodriguez had

24  left and gone towards town, apparently?

25         A.     Yes, sir.

1        Q.     Where were Newbury and Murphy at that point?

2        A.     They had actually gone to Colorado Springs.

3        Q.     How long had they been gone?

4        A.     They had been gone over the weekend, that

5  weekend.

6        Q.     What car were they traveling in?

7        A.     It was a van.

8        Q.     So a van had been purchased, a Jeep had been

9  purchased, and an RV had been purchased?

10       A.     Yes, sir.

11       Q.     And who normally was using the van?

12       A.     That was primarily Patrick Murphy and Donald

13  Newbury.  When I would go into town to Wal-Mart or whatever,

14  Rodriguez was driving.

15       Q.     When did you first figure out that there was

16  police outside the RV?

17       A.     Actually heard some chatter on the

18  walkie-talkie, but I didn't know that they were actually

19  outside of the RV.

20       Q.     What kind of chatter did you hear?

21       A.     There were some people on the highway.  There

22  was a roadblock and there was a lot of confusion and

23  everybody was, you know, saying, you know, "What's the road

24  block for?"  And somebody said, "I think it's them boys from

25  Texas."

1       Q.      What did you do?

2       A.      And that's when I looked out the window and I

3   started looking out the window and I went to the bathroom

4   and I looked out the bathroom window and I could see at an

5   angle from where I was there was a white van and I could see

6   somebody hiding behind the van with a gun.

7       Q.      While you are around the camp and you are

8   inside the van, are you carrying, physically carrying a

9   weapon on your person?

10      A.      No, sir.

11      Q.      Had you been given a weapon?

12      A.      Yes, sir.

13      Q.      And what weapon had you been given?

14      A       It was -- I'm not sure of the model.  It was

15  like a .22 gun, had a real long barrel on it.

16      Q.      And where was that?

17      A.      It was in my backpack.

18      Q.      Was there some type of color designation on

19  your stuff?

20      A.      Yes, sir, it was green.

21      Q.      Was there any tape on your backpack?

22      A.      Yes, it was a strip of green tape.

23      Q.      When you look out the windows, what did you

24  see and what's the next thing you did?

25      A.      The only thing that I could actually

1  physically see was somebody hiding behind a white van.  I

2  could see their silhouette and I thought I saw the barrel of

3  a rifle or some kind of gun.

4        Q.    What did you think?

5        A.    I told Larry, I said, "They got us."

6        Q.    What happened next?

7        A.    And he said, "Well, what are you going to do"?

8  And I said, "I'm going to surrender."  And he said, "That's

9  okay."  And I said, "Is there anything you want me to tell

10  them"?  And he said, "Tell them I want to talk to my

11  father."

12        Q.    Did you leave the van?

13        A.    I walked out the RV, yes, sir.

14        Q.    Did you surrender?

15        A.    Yes, sir.

16        Q.    Did you relay that information to law

17  enforcement?

18        A.    Yes, sir.

19        Q.    Now, what was the state of your foot at that

20  point in time?

21        A.    It was still pretty bad.  It was had, it was

22  bandaged up and I was keeping a sock over it to hold the

23  bandages in place and I was wearing a sandal because I

24  wouldn't put on a shoe.

25        Q.    There are some photographs that have been

1   introduced and you are aware of the medical record.  Where

2   did you get hit in the foot?

3           A.    I got hit -- it was actually the first four

4   toes.  It went through on the side, went clear through,

5   and messed this toe up completely.  And then it kind of

6   grazed under the second toe like this (demonstrating) and it

7   broke, it snapped the bone, and then it started going out

8   like this, and it came out like that on the third toe and

9   just nicked the fourth toe.

10          Q.    They took you to the hospital there in

11  Colorado?

12          A.    Yes, sir.

13          Q.    A little medical center.  And the doctor saw

14  you there --

15          A.    Yes, sir.

16          Q.    -- and took an x-ray and made you a little

17  chart; is that correct?

18          A.    Yes, sir.

19          Q.    Did he give you some antibiotics or give you a

20  shot or anything?

21          A.    They gave me -- they took some blood and I

22  remember them giving an antibiotic shot and putting me on

23  antibiotic medicine.

24          Q.    When did you first find out for sure that

25  Officer Hawkins was dead?

1    A.    That following morning.

2    Q    What thoughts were you having at that point?

3    A.    I was just wondering how something like that

4    could happen.  I mean, I felt awful.  In fact, Larry and I

5    cried.

6    Q.    Why?  What was he to you?

7    A.    Because it was a life.

8    Q.    What did you think was going to happen?

9    A.    Happen with what?

10   Q.    Once you realized Officer Hawkins had been

11   killed, what did you think was going to happen at that

12   point?

13   A.    My mind was kind of numb.  When Rivas said,

14   go, everybody -- we left.  I mean, I wasn't -- my mind

15   wasn't on anything else but that, the incident.  And whether

16   we would get caught or anything, that wasn't on my mind.

17   Q.    What did you think was going to happen, if you

18   got caught?

19   A.    I thought we'd come back, you know, and be

20   tried for capital murder.

21   Q.    Before you got charged in Ft. Worth and while

22   you were living in -- where was it?  I'm sorry, Kentucky?

23   Tennessee?

24   A.    Kentucky.

25   Q.    Kentucky.  You got in some trouble there on

1  some theft; is that right?

2       A.     Right, fraudulent use of a credit card.

3       Q.     You also stole some checks or something; is

4  that right?

5       A.     Batteries when I was 17.

6       Q.     And you got put on a misdemeanor probation for

7  that; is that right?

8       A.     For the fraudulent use of a credit card, yes,

9  sir.

10       Q.     And that was the first time you had ever gone

11  to court?

12       A.     Yes, sir.

13       Q.     And then you went to the -- ultimately to the

14  Arlington Shelter; is that right?

15       A.     Right.  The summer, during the summer.

16       Q.     What made you think that somebody wasn't going

17  to get shot and killed during this robbery?

18       A.     Basically from the first two robberies.  There

19  were known conflicts and nothing happened.

20       Q.     What was Murphy's role in the Oshman's

21  robbery?

22       A.     He was basically a lookout to monitor the

23  scanners and radios and watch the parking lot to see if

24  there were any, you know, patrol cars patrolling through or

25  anything like that.

1      Q.      To the best of your knowledge, is that what he

2   did?

3      A.      To the best of my knowledge.

4      Q.      To the best of your knowledge, did he shoot at

5   anybody?

6      A.      No, sir.

7      Q.      Were you ever told that he was supposed to act

8   as a sniper or get into a fire fight with anybody?

9      A.      No, sir, not in front of my presence that was

10  never discussed.

11     Q.      Did George Rivas have an ego?

12     A.      Yes, sir.

13     Q.      Why do you think he wanted to do this Oshman's

14  robbery?

15     A.      My personal opinion?

16     Q.      Yes, sir.

17     A.      To prove that he could do it.

18     Q.      Prove he could do it and get away with it?

19     A.      Yes, sir.

20     Q.      What were y'all looking for to get out of the

21  this Oshman's robbery?

22     A.      Clothes, camping gear, radios, and guns.

23     Q.      So it provided -- this is wintertime, right?

24     A.      Yes, sir.

25     Q.      It provided everything that you could think of

1    -- was there already a plan to go someplace after the

2    Oshman's robbery?

3        A.    Not to my knowledge.  Everything was Rivas

4    kind of made it up as he went along.  There was no exact

5    spot that we were supposed to go after that, no, sir.

6        Q.    So it wasn't a game plan that you were going

7    to rob the Oshman's and then go to Colorado?  That hadn't

8    been discussed?

9        A.    No, it hadn't been discussed.  In fact,

10   Colorado didn't come up until, you know, when they -- the

11   night after the incident happened, that's when they said,

12   where are we going to go, and I think New Mexico came up and

13   Nevada and Colorado and a couple of other states.

14       Q.    Where was it that you wanted to go?

15       A.    When I decided to break away from the group, I

16   wanted to go to Seattle.

17       Q.    When did you decide that you wanted to break

18   away from the group?

19       A.    Actually in Houston at the Western Auto after

20   they did the Western Auto.  I had it in my mind that that's

21   where I was going to go.

22       Q.    If you could get away when the smoke cleared?

23       A.    Yes, sir.

24       Q.    Now, did you have some type of agreement with

25   Rivas that you would stay with him any length of time?

1     A.     He had told me when I started discussing

2   about, you know, what my intentions were, he said, "Well,

3   you owe me six months."

4     Q.     "You owe me six months," what did he mean?

5     A.     He meant for getting me out of prison.

6     Q.     Yeah, but what did he mean that you owed him

7   six months?

8     A.     I owed -- I guess six months of active duty or

9   six months of robbing or whatever his plans were.

10    Q.     That was in exchange for having helped you

11  escape?

12    A.     Yes.

13    Q.     And including you in there?

14    A.     Yes, sir.

15    Q.     Did you have any particular skills?  Had you

16  ever been in the military before?

17    A.     No, sir.

18    Q.     Had you ever owned any firearms?

19    A.     No, sir.

20    Q.     Had you ever gone bird hunting or anything

21  like that?

22    A.     No, sir.

23    Q.     Had you ever owned a pistol before?

24    A.     No, sir.

25    Q.     How about your dad?  Did he own any guns?

1        A.      No, sir.  There were no guns in our house.

2        Q.      You didn't graduate from high school, did you?

3        A.      No, sir.

4        Q.      Did you attend any classes while in custody?

5        A.      I got my GED in Tarrant County Jail.

6        Q.      Did you have any building skills?  Had you

7   been a carpenter?  A plumber?  Had you been a ham radio

8   operator?  I mean, did you have any actual skill with this

9   -- that this group would utilize?

10       A.      No, sir.

11       Q.      I mean, once Rivas started talking about

12  giving you a job in maintenance, did you have any skills in

13  maintenance?

14       A.      No, I had no maintenance skills.

15       Q.      Had you held any kind of jobs once you were

16  expelled from Oneida?  Did you hold any kind of jobs?

17       A.      Just fast food and temporary labor.

18       Q.      When you say "fast food", what did you do?

19       A.      I worked at Subway for a little while, a place

20  called Steak Fest and mainly when I stopped working there

21  when I realized that I could just get money in a day, Labor

22  World or Labor Ready.

23       Q.      What did they have you do?

24       A.      Send me out wherever they needed somebody to

25  pick up trash or whatever.

1     Q.     Just typical day labor stuff?

2     A.     Yes, sir.

3     Q.     Just manual labor?

4     A.     Yes, sir.

5     Q.     Do you realize that as a result of the

6  robbery, Officer Hawkins is dead?  You realize that?

7     A.     Yes, sir.

8     Q.     Did you ever have any intention, yourself, of

9  shooting somebody or killing anyone?

10     A.     No, sir, never in my life.

11     Q.     Best of your knowledge, was there any

12  discussion by anyone else of shooting anybody or killing

13  anybody during the course of any robbery?

14     A.     No, sir.

15     Q.     But you knew everybody was armed?

16     A.     Yes, sir.

17     Q.     And your gun -- you had bullets in your gun?

18     A.     Yes, sir.

19     Q.     And you voluntarily took the gun in there?

20     A.     Yes, sir.

21     Q.     And you participated in the aggravated

22  robbery?

23     A.     Yes, sir.

24     Q.     And you enjoyed the proceeds from that

25  robbery.  You got some money?

1    A.    Yes, sir.

2    Q.    They split up the money and gave you an equal

3 share; is that right?

4    A.    Yes, sir.

5    Q.    How much was that?

6    A.    About five thousand.

7    Q.    Now, this case in Ft. Worth, this injury to a

8 child, did you hire an attorney or did you get one appointed

9 to represent you?

10    A.    One was appointed to me.

11    Q.    And from the time you got arrested until the

12 time you entered a plea, how much time passed?

13    A.    Um, I want to say eight or nine months.  It

14 was from September to May, so.

15    Q.    All right.  Did you have any family members or

16 anybody show up at your sentencing?

17    A.    No, sir.

18    Q.    Or the day you did the plea?

19    A.    No, sir.

20    Q.    Had you given your lawyer the names of your

21 family for the lawyer to contact?

22    A.    Yes, sir.

23    Q.    And you were 18 years old at the time?

24    A.    I was 19 when I pled, but I was 18 when I went

25 into jail, yes.

1      Q.      So the only person helping you make any

2  decisions as to whether or not you should have a trial or

3  whether or not you should try to fight charges or whether or

4  not you should enter a plea would be your attorney?

5      A.      Yes, sir.

6      Q.      And that was Mr. Mark Perez?

7      A.      Yes, sir.

8      Q.      Did Mr. Perez seem to be trying to do the best

9  he could for you?

10     A.      Not really, no.

11     Q.      Were any witnesses called at your sentencing

12  by your lawyer?

13     A.      No, sir.

14     Q.      Once again, though, you did do -- slap this

15  child, hit this child on the head, and kick this child and

16  grab this child and shook it, didn't you?

17     A.      Yes, sir.

18     Q.      You are aware that that certainly caused some

19  of the damages, if not all of the damages?

20     A.      Yes, sir.

21     Q.      Do you recall whether Mr. Perez ever sat down

22  with you and discussed the medical records of the child with

23  you?

24     A.      He was very vague about it.

25     Q.      But you knew what you had done?

1   A.   Yes, sir.

2   Q.   And he told you what the injuries were to the

3   child?

4   A.   Yes, sir.

5   Q.   And they were pretty bad, weren't they?

6   A.   Yes, sir.

7   Q.   He told you this was a first-degree felony?

8   A.   Yes, sir.

9   Q.   And that you could receive anywhere from five

10  years to 99 years or life in prison?

11  A.   Yes, sir.

12  Q.   If you had a trial?

13  A.   Yes, sir.

14  Q.   Had you stayed in prison when would you have

15  become eligible for parole; do you recall?

16  A.   Thirty-four, thirty-three, or thirty-four.

17  Q.   What do you mean?

18  A.   I had to do half of it, 15 years, so.

19  Q.   So you would have been 33 or 34?

20  A.   When I was eligible for parole, yes, sir.

21  Q.   Now, you had been in prison five years at that

22  point?

23  A.   Yes, sir.

24  Q.   Did you know very many people that had been

25  paroled?

54

1     A.    No, not really.

2     Q.    And did you have any personal opinion of the

3 percentage of people around you how much of a sentence were

4 they serving, what percentage of their sentences were they

5 serving?

6     A.    Eighty-five to ninety percent.

7     Q.    Is that whether it was aggravated or

8 unaggravated?

9     A.    Yes, sir.

10     Q.    So even though they became eligible for

11 parole, people weren't necessarily getting paroled?

12     A.    No, sir.

13     Q.    What did that mean to you?

14     A.    That meant that when my time came up, whether

15 I showed that I was rehabilitated or good behavior or

16 anything like that, that they weren't even going to look at

17 that.  They were going to close my file and pass it on for

18 another couple of years, open it up, and pass it on another

19 couple of years, just review me every couple of years, but

20 keep setting me off.

21     Q.    What did you think about that?

22     A.    It didn't settle with me.

23     Q.    Do you think that you needed to be punished

24 for what you did to the child?

25     A.    Yes, sir.

55

Q.     What sense did it make to try to escape, then?

A.     I wanted a second chance.  I knew that I would never do something like that again.

Q.     You've had a chance to look back now. Anything you can tell this jury about what happened there at the Oshman's?  Anything at all that you can say?

A.     I can tell all of y'all that I did not intend the death of the officer.  I didn't shoot him.  I didn't pull my gun.  I didn't (phonetic) want to rob the people. Obviously I did, but I didn't anticipate anybody being killed.  I didn't know that anybody was going to be killed and then, you know, I live with it every day.  Every time I look at my foot I think back to that night and it's something I live with.  And I understand the consequences, but I didn't kill him.  I didn't want anybody to die or anybody to be hurt.

Q.     Anything that you can do to bring him back?

A.     No, sir.

Q.     You understand that this is the guilt and innocence phase of your trial.  You understand that?

A.     Yes, sir.

Q.     You understand that the jury has to decide what they believe the evidence to show in this case?

A.     Yes, sir.

Q.     We've talked about what that standard of

1    evidence is in regard to you being a party or not being a

2    party to capital murder.  You understand that?

3         A.    Yes, sir.

4         Q.    And each of these jurors sitting over here,

5    they were part of the voir dire and we sat with them for a

6    better part of an hour and a half, talking about the law,

7    didn't we?

8         A.    Yes, sir.

9         Q.    Now, have you been in general population here

10   in custody in Dallas County?

11        A.    No, sir.

12        Q.    And where have you been kept?

13        A.    They have kept me in a single cell, isolated.

14        Q.    And you get out for recreation?

15        A.    No recreation.

16        Q.    You've lost some weight since you've been in

17   here, haven't you?

18        A.    Yes, sir.

19        Q.    How much weight have you lost?

20        A.    I guess about at the most 25 pounds.

21        Q.    When you went to prison originally, did you

22   end up gaining weight while you were in prison?

23        A.    Yes, sir.

24        Q.    Is that because you were outside being on

25   physical labor on a regular basis and eating and doing all

1    that stuff?

2          A.     Yes, sir.

3          Q.     Did you have commissary privileges?

4          A.     Yes, sir.

5          Q.     To buy snack food and that kind of stuff?

6          A.     I never did, but I had access to it, yes, sir.

7          Q.     Did you have anybody putting money on your

8    books while you were down there in prison?

9          A.     No, sir.

10         Q.     Did you have to have money to buy commissary?

11         A.     Yes, sir.

12         Q.     Was your situation in prison better before you

13   escaped than it is the way they've got you locked up now?

14         A.     Yes, sir.

15         Q.     You had a lot more freedom?

16         A.     Yes, sir.

17         Q.     I believe Mr. Shook is going to have some

18   questions for you.

19         A.     Okay.

20                     MR. KING:  Pass the witness, Your Honor.

21                     THE COURT:  Do you want a break now?

22                     MR. SHOOK:  Yes, sir.

23                     THE COURT:  We'll take our afternoon

24   break.  Fifteen minutes.

25                          [Jury out]

1                          (Recess)

2                          [Jury in]

3                 THE COURT:   Thank you, you may be seated.

4                       <u>CROSS-EXAMINATION</u>

5    <u>BY MR. SHOOK:</u>

6         Q.     Mr. Halprin, you realize, of course, this jury

7    is judging your credibility as a witness, do you not?

8         A.     Yes, sir.

9         Q.     They have to.  Obviously Aubrey Hawkins is not

10   going to come in here and tell us what happened in that

11   loading dock area, is he?

12        A.     Yes, sir.

13        Q.     I'm sorry?

14        A.     You're right, sir.

15        Q.     And you are a convicted felon.  You pled

16   guilty; is that right?

17        A.     Yes, sir.

18        Q.     Didn't have a trial.  You entered a plea of

19   guilty?

20        A.     Yes, sir.

21        Q.     Received a 30-year sentence?

22        A.     Yes, sir.

23        Q.     As part of a plea bargain agreement?

24        A.     Yes, sir.

25        Q.     For the first-degree felony offense of injury

1    to a child?

2          A.      Yes, sir.

3          Q.      And when you were arrested for that offense

4    was in September of 1996?

5          A.      Yes, sir.

6          Q.      How old were you at that time?

7          A.      I was 18.

8          Q.      When did you turn 19?

9          A.      I turned 19 September 13th.

10         Q.      So you had been in jail about a week before

11   you turned 19 years old?

12         A.      I believe I went to jail on September 5th, so,

13   yes, sir.

14         Q.      Okay.  So you were almost 19 when you

15   committed the offense?

16         A.      Yes, sir.

17         Q.      Now, you have had a long history of lying,

18   have you not?

19         A.      During my drug years, yes, sir.

20         Q.      Well, during your entire life, haven't you

21   always lied?

22         A.      I don't believe so, sir, no.

23         Q.      Wasn't that one of the major problems?  You

24   were always lying to your parents?

25         A.      Only when I started doing drugs, sir.

1      Q.    And when was that?

2      A.    It was about when I was 16.

3      Q.    Have you quit lying?

4      A.    I mean -- I don't just lie to lie.

5      Q.    Well, did you used to lie just to lie?

6      A.    I used to lie, yes, sir.

7      Q.    Well, when was the last -- when did you quit

8   lying?

9      A.    I'm not exactly sure, sir.

10      Q.    Do you still lie when the situation calls for

11   it?

12      A.    I've lied, yes, sir.

13      Q.    Okay.  When was the last time you lied?

14      A.    Could have been a day ago.  It could have been

15   a week ago.  I'm not sure.

16      Q.    Do you lie on a weekly basis?

17      A.    I'm not sure, sir.

18      Q.    What do you lie about?

19      A.    You would have to ask me a specific question.

20   I'm not --

21      Q.    Can you not remember what you lie about?

22      A.    I mean, I know I've lied.

23      Q.    Well, are you telling this jury you really --

24   you lie a lot and you are not sure what you may have lied

25   about in the last week or two, for instance?

1     A.     You would have to give me a specific thing, a

2   specific question of what I've lied about.

3     Q.     Let me ask you this, Mr. Halprin, is that your

4   character that you lie a lot?

5     A.     I've lied, yes, sir.

6     Q.     Do you lie a lot?

7     A.     I've lied a lot, yes, sir.

8     Q.     Would you describe yourself as a pathological

9   liar?

10    A.     I've been a pathological liar, yes, sir.

11    Q.     When did you quit being a pathological liar?

12    A.     I'm not sure.

13    Q.     Have you quit being a pathological liar?

14    A.     I don't just lie constantly.  Everybody lies.

15    Q.     But you still lie on occasion?

16    A.     I've lied, yes, sir.

17    Q.     It's part of your character?

18    A.     I've lied.

19    Q.     Well, when you got arrested and put in jail,

20   you tried to contact your parents; is that right?

21    A.     Yes, sir.

22    Q.     Do you remember writing a letter to them on

23   September 13th of 1996?

24    A.     Yes, sir.

25    Q.     Telling them, "This week has been such an

1  eye-opener to me.  I know what you both are probably

2  thinking right now, oh, great, Randy is feeding us his

3  regular bull and lies.  Y'all have every right in the world

4  to believe that.  In fact, I don't expect y'all to believe.

5  Sometimes I don't even believe myself."

6          Is that an example of the type of lying that

7  you have?

8          A.      Yes, sir.

9          Q.      Obviously, then, you have lied to your parents

10  in the past?

11          A.      Yes, I have lied to them.

12          Q.      Prior to this offense in 1996?

13          A.      Yes, sir.

14          Q.      Do you have a long history of lying to your

15  parents in the past?

16          A.      During my drug years.  And I believe that was

17  during my drug years.

18          Q.      "I never even thought I could even hit a

19  little kid, an infant at that.  I never thought I would be a

20  victim of drugs.  I never thought I'd end up standing --" is

21  that standing?

22          A.      Stealing.

23          Q.      "-- stealing from people who tried to help me

24  out, ruining every chance to start over."

25          You have been given a lot of chances in life,

1    haven't you, Mr. Halprin?

2         A.    Yes, sir.

3         Q.    And you have blown all those chances, haven't

4    you?

5         A.    Yes, sir.

6         Q.    Your parents gave you a whole lot of chances

7    when you were growing up?

8         A.    Yes, sir.

9         Q.    I'll show you another letter which is marked

10   December 18th, 1996.  Start that one off saying, "I know my

11   word didn't mean, doesn't account for much of anything."

12        A.    Yes, sir.

13        Q.    That was back in your pathological lying

14   days?

15        A.    Yes, sir.

16        Q.    And then on 11-2 of '98, this letter would

17   have been from prison, I guess?

18        A.    1998, yes, sir.

19        Q.    You tell them, "The Randy you knew a couple of

20   years ago was a drug induced pathological liar.  I was much

21   more concerned about finding something to ease my boredom

22   and depression and I gave up the only true thing that I ever

23   loved was you."

24              Now, your parents, they worked with you a lot,

25   didn't they?

1        A.      Yes.

2        Q.      And you didn't talk about them much on direct,

3   but I almost got the impression that it was like they just

4   abandoned you or shoved you off to Kentucky.  That wasn't

5   the case, was it?

6        A.      No, sir.

7        Q.      They did all types of things.  They -- first

8   of all, they provided you with a loving home when you grew

9   up, didn't they?

10       A.      Yes, sir.

11       Q.      They -- you went to good schools?

12       A.      Yes, sir.

13       Q.      Went on good vacations?

14       A.      Yes, sir.

15       Q.      When you had problems in school, they provided

16  tutors for you?

17       A.      Yes, sir.

18       Q.      They even took you to a psychologist?

19       A.      Yes, sir.

20       Q.      Of course, you had problems -- how old were

21  you when you went to see a psychologist?

22       A.      I think 12, somewhere around that.

23       Q.      You had problems with lying back then, didn't

24  you?

25       A.      I had lied before.  I don't think that I had

1    problems with lying.

2         Q.     One of the reasons that you left and went up

3    to Kentucky, you did that without permission on one

4    occasion; is that right?

5         A.     Um, in '95, yes, sir.

6         Q.     It was because you couldn't get away with

7    things at home.

8         A.     No, sir.

9         Q.     That's why you left is they would catch you

10   and punish you and hold you accountable?

11        A.     Can you give me a specific incident?

12        Q.     Let me show you in your letter.  "I gave up

13   everything --"

14             MR. KING:  Excuse me, Mr. Shook, but we

15   would object to Mr. Shook reading from something that's not

16   in evidence.

17             THE COURT:  Sustained.

18        Q.     (By Mr. Shook)  Let me show you State Exhibit

19   938.  This is the letter I showed you earlier dated 11-2-98;

20   is that right?

21        A.     Yes, sir.

22             MR. SHOOK:  Your Honor, at this time we

23   offer State Exhibit 938.

24             MR. KING:  No objection.

25             THE COURT:  No. 938 shall be admitted.

1    Q.    (By Mr. Shook)  "I gave up everything for a

2 girl and drugs.  Theresa wasn't the only reason I left home.

3 Maybe you realize it by now, but I could never get away from

4 things at home."

5         So that was one of the reasons you left home?

6    A.    I don't think that it was like get away with

7 any things that were bad.  I can't -- I can't remember what

8 --

9    Q.    Well, you had to leave because you couldn't

10 get away with things that were good?

11   A.    I mean -- I don't know what I was talking

12 about.  I can't remember this letter.

13   Q.    Let's read further.  "I had to leave.  I stole

14 from you, I lied to you, I did everything in the world to

15 defy you, and I even blamed you.  I blamed you for sending

16 me away.  I blamed you for not allowing me to come home when

17 Oneida kicked me out.  But it wasn't your fault.  You guys

18 constantly dug me out of holes.  Bought me an apartment,

19 sent me money every week, did everything you could possibly

20 to save your son.  And I think that now that's how it always

21 has been.  Ever since the day you adopted me.  Save Randy

22 from destroying himself.  Never too bright, a little too

23 slow, and I changed for the worse.  I met Theresa, fell into

24 a different group, and thought she had so much like I --

25 thought she was so much like I.  I was just trying to find

1  my place, trying to fit in.

2          "So we took drugs together.  We started

3  smoking weed, and then acid, and that's when I started to

4  change my behavior, everything.  But you never saw the

5  signs.  It was the typical, I know my son's doing drugs.

6  But you didn't see.  I was too conniving and I lied all the

7  time, to you, to my brothers.

8          "I got kicked out of school, went back, got

9  kicked out again.  Yes, I stole a credit card.  I needed the

10  money.  I had to support my lifestyle, drugs, and sex.  I

11  was caught up on Theresa.  Theresa was never my first,

12  though, and wasn't my last, either.  I was getting to the

13  point that nothing mattered.  I struggled with myself and I

14  ended up eventually losing Theresa because of my lies were

15  getting out of control.

16          "I was on my own again.  I screwed over

17  friends, stole from the neighbors in Louisville, and came

18  back to Lexington, used another friend, ended up in a

19  shelter.  I played on several people's emotions who worked

20  there, making up stories as to why I had no home.  It

21  worked.  I was offered a place to stay.  I got a job.  I got

22  a GED.  I really did.

23          "I tried to change around, but my new hobbies

24  had a hold of me.  I felt like you hated me, so I made up

25  the story about the Air Force to see if your thoughts would

1   change about me.  They did.  You sounded proud of me, but

2   the fantasy could only last for so long.  Ronny got tired of

3   supporting me and put me back in the shelter.  I had to come

4   back to Texas, start over, and make things right.

5          "So I charmed my way into getting a ride back

6   to Arlington and that's when you cut me off completely.  I

7   could only blame myself.  Once again, I'm back in a shelter.

8   So I go back to my old ways, playing on people, using drugs,

9   happy, happy, happy.

10          I even almost played on the Sternblitz family,

11   but couldn't accept anything from them.  I realize I could

12   never hopefully change, but then it all happened.  I met the

13   Plummers.  Moved in with them, smoked weed, dropped acid,

14   met a girl named Charity, had sex with her, and, well, the

15   rest is a nightmare.

16          "I'm not here telling you that I'm innocent.

17   Believe what you want to.  If only you could look in my

18   eyes.  That's so much to tell you.  But I can't because on

19   paper it all sounds like a fairy tale.  It does.  I'm sorry

20   it all happened this way.  I'm sorry I tore us apart.  I can

21   only blame myself.  But you have to believe me when I tell

22   you I'm sorry.

23          "I'm two and a half years clean and I'm not

24   the Randy I once was when this all happened.  I miss my mom

25   and I miss my dad and hopefully someday I will get them

1  back."

2           So you did have a long history of lying and

3  getting into trouble and they would always help you out?

4       A.    Yes, during those years, yes, sir.

5       Q.    So it wasn't as if they shoved you off,

6  shipped you off to Kentucky because you were a problem?

7       A.    No, sir.

8       Q.    They tried to do that because they wanted to

9  help you?

10      A.    Because I had bad grades.

11      Q.    I'm sorry?

12      A.    I had bad grades, yes, sir.

13      Q.    There were a lot of kids up at that school

14  that had similar problems growing up; is that right?

15      A.    Yes.

16      Q.    And that school gave you special attention?

17      A.    Yes.

18      Q.    Your grades improved?

19      A.    Yes, sir.

20      Q.    Now, you pled guilty what time?

21      A.    I believe it was around May.

22      Q.    Okay.  When you were first confronted with

23  this offense, you denied it, right?

24      A.    The first time, yes, sir.

25      Q.    And then you pled guilty?

1     A.    Yes, sir.

2     Q.    When you pled guilty, you were pleading guilty

3 because you were actually guilty of the offense, were you

4 not?

5     A.    Yes, sir.

6     Q.    Okay.  Let me show you your letter which has

7 been marked April 11, '97.  Let me show you what has been

8 marked State Exhibit 939.  Do you recognize this letter to

9 your brother Wesley?

10     A.    Yes, sir.

11     Q.    Okay.

12          MR. SHOOK:  Your Honor, at this time we

13 offer State Exhibit 939.

14          MR. SHOOK:  No objection.

15          THE COURT:  No. 939 is admitted.

16     Q.    (By Mr.Shook)  On the back page you write, "No

17 matter what --"  Well, "I've lied to you about a lot of

18 things, but my lying days are over."  Do you remember

19 writing that?

20     A.    Yes, sir.

21     Q.    Were your lying days over at that point in

22 time?

23     A.    No, sir.

24     Q.    You continued to lie after that?

25     A.    Yes, sir.

1    Q.    In fact, you told your brother Wesley that you

2  -- that you did not commit this offense, didn't you?

3    A.    Yes, sir.

4    Q.    And you lied to him about that repeatedly,

5  didn't you?

6    A.    You referring to the injury of a child?

7    Q.    Yes.

8    A.    Yes, sir.

9    Q.    Let me show you what has been marked as State

10 Exhibit 940.  Do you recognize that as a letter to your

11 brother?

12   A.    Yes, sir.

13        MR. SHOOK:  Your Honor, at this time

14 we'll offer State Exhibit 940.

15        MR. KING:  Can we tie that down as to

16 time and space, please?

17        MR. SHOOK:  Dated 1-26-97.

18        MR. KING:  No objection, Your Honor.

19        THE COURT:  State's 940 shall be

20 admitted.

21   Q.    (By Mr. Shook)  This is when you are in the

22 Tarrant County Jail.  You still haven't pled guilty; is that

23 right?

24   A.    Yes, sir.

25   Q.    This is after, though, you had confessed to

1    the police of your crime?

2          A.     Yes, sir.

3          Q.     "Right now I'm at the point in which I don't

4    care what anybody thinks, how they view me.  I know who I

5    am.  I know what kind of person I am.  You, mom or dad,

6    knows what really went on.  You guys don't know if I did it

7    or not.  You have heard what the police want you to hear.

8    I'm not saying I didn't do it, because in actuality I did

9    hit the kid.  Hit and that's it."  What's that?

10         A.     Um, "hit like in spank."

11         Q.     "Hit like in spank.  You're bad.  But that's

12   bullshit that I beat the hell out of it."  Now, were you

13   lying then?

14         A.     Yes, sir, I was lying.

15         Q.     Okay.  Because you did, as you say, beat the

16   hell out of "it"?

17         A.     Yes, sir, but --

18         Q.     And that's what you referred to the boy as, an

19   "it"?

20         A.     I didn't -- not sure my state of mind at that

21   time.  I don't know how -- I don't think I was just

22   intentionally calling it an "it."

23         Q.     You did beat the hell out of it.  That's what

24   you write there, isn't it?

25         A.     I did beat the hell out of the baby, yes, sir,

1    I did.

2          Q.    But you used the word "it" at that point in

3    time, whatever your state of mind was?

4          A.    Yes, sir.

5          Q.    Okay.  Now, you are a little mad in this

6    letter because you are not getting the right support from

7    these parents that have supported you in the past; is that

8    right?

9          A.    Yes, sir.

10         Q     Your parents, after they found out what you

11   had done to that child, they didn't want to talk to you

12   anymore?

13         A.    No, sir.

14         Q.    You couldn't blame them for that, could you?

15         A.    No, sir.

16         Q.    Especially because of all the things you had

17   done in your past?

18         A.    I didn't think they were that bad to be pushed

19   out by people, parents.

20         Q.    You felt they should be supporting you?

21         A.    I thought they should at least -- I didn't

22   want anything but letters from them, to talk to them.

23         Q.    You say here.  "I got problems, but they're

24   only getting worse.  What the fuck happened to support?  All

25   I want to know is somebody loves me and that somebody cares

1    for me."

2              Did you -- a few more lines down you say,

3    "Honestly, do you think that I could have hurt a child so

4    badly?"

5         A.    I was lying then.

6         Q.    You were lying?

7         A.    Yes, sir.

8         Q.    Are you pretty good at conning people and

9    manipulating them when you have to?

10        A.    I have been, yes, sir.

11        Q.    How long have you been doing that?

12        A.    I can't really recall.

13        Q.    I mean, you can get people to believe your

14   lies pretty good.  You have in the past, haven't you?

15        A.    I have in the past, yes, sir.

16        Q.    One of these letters refers to you talked or

17   manipulated someone into driving you all the way down from

18   Kentucky?

19        A.    Yes, sir.

20        Q.    You talk about your old ways of conning people

21   and playing people, that sort of thing?

22        A.    Yes, sir.

23        Q.    That is manipulating them, isn't it?

24        A.    Yes, sir.

25        Q.    Is this just a natural skill you acquired over

1  the years?

2          A.      I don't consider it a skill.

3          Q.      You were pretty good at it at one point in

4  time, weren't you?

5          A.      I have manipulated people.

6          Q.      Were you pretty good at it?

7          A.      I don't know if I was good at it or not.

8          Q.      Were you successful at it?

9          A.      I've been successful, yes, sir.

10         Q.      Do you think that you are still pretty good at

11 manipulating people?

12         A.      Not really, sir.

13         Q.      Now, let's talk about this crime that happened

14 to the child, Jared Smith.  How old was the baby when you

15 assaulted him?

16         A.      Sixteen months.

17         Q.      And how long had you known him?

18         A.      I think from about June.

19         Q.      Where did you meet him?

20         A.      I met him and Charity at the Night Shelter,

21 Arlington Night Shelter.

22         Q.      When is it that you moved in with the

23 Plummers?

24         A.      I want to say late July, September of '96 --

25 or, I mean, excuse me, summer of '96.

1   Q.    Who was living with the Plummers first?

2   Charity or yourself?

3       A.    I was.

4       Q.    And how long had you lived there?

5       A.    I can't really recall.

6       Q.    A few days?  A week?  A month?

7       A.    A few days to a week possibly.

8       Q.    And then Charity Smith came to live with you?

9       A.    Yes, sir.

10      Q.    And were you working back then?

11      A.    No, sir.

12      Q.    Didn't have a job when you were at the

13  homeless shelter?

14      A.    No, sir.  Well, I actually worked at

15  Burlington Coat Factory setting up before it was actually

16  opened up, yes, sir.

17      Q.    Did you ever work when you went to live with

18  the Plummers in Ft. Worth?

19      A.    No, sir.

20      Q.    Were you looking for a job?

21      A.    No, sir.

22      Q.    So you were just hanging out at the Plummers?

23      A.    Yes, sir.

24      Q.    Did you ever work for the Plummers?

25      A.    I watched their kids.

```
 1        Q.      Was that the reason they were letting you stay

 2   there?

 3        A.      Yes, sir.

 4        Q.      That was their arrangement with you?

 5        A.      Yes, sir.

 6        Q.      Was to watch their children?

 7        A.      Yes, sir.

 8        Q.      Now -- and then Charity, how long was she

 9   living there before you assaulted her child?

10        A.      Maybe three, four weeks.  I can't really

11   recall the time period.

12        Q.      How many times had you assaulted him?

13        A.      Just that once.

14        Q.      Tell us how that happened.  Was it during the

15   day or during the night?

16        A.      It was at night.

17        Q.      And was everyone at the apartment?

18        A.      Um, to the best that I remember there were

19   just the two children.  And I think it was Kyle -- I can't

20   remember the girl's name.  I don't recall anybody else being

21   in there.

22        Q.      So none of the adults were home?

23        A.      No, sir.

24        Q.      Where were they?

25        A.      I believe they were out.
```

```
1        Q.    What were they out doing?

2        A.    I think they went to a bar or some place.

3        Q.    How was it that you stayed behind?

4        A.    I was watching the children.

5        Q.    Okay.  Did you volunteer to do that?

6        A.    Yes, sir.

7        Q.    Why did you volunteer to do that?

8        A.    I felt like I was kind of pressured into it.

9        Q.    Okay.  Tell us how that happened.

10       A.    On what I remember it was Charity wanted to go

11   out and Charity and Todd had a thing going on at the time

12   and Ramie didn't really trust them.  She didn't suspect

13   anything at the time, but she wasn't going to let them go

14   out together.  And Charity and I, we had already been

15   starting to argue and everything and not really been getting

16   along at the time anyways, and, you know, I was upset at

17   that and they ended up leaving and I said, "Okay, I'll watch

18   the kids."

19       Q.    So you agreed to watch the children?

20       A.    Yes, sir.

21       Q.    But you were mad?

22       A.    Yes, sir, I was upset.

23       Q.    Were you on drugs?

24       A.    I was on LSD at the time, yes, sir.

25       Q.    Okay.  And do you think that was a good idea
```

1   to watch the children when you are on drugs?

2        A.    No.

3        Q.    And then what happened later that night to

4   cause you to assault Jared?

5        A.    Jared was crying.

6        Q.    How long did he cry?

7        A.    He had been crying for weeks.

8        Q.    So what did you do to him when he cried?

9        A.    I first tried to calm him down.

10       Q.    Then what happened?

11       A.    Then I hit him.

12       Q.    How did you hit him?

13       A.    I can't remember the first hit, but I pushed

14  him and hit him in the head and --

15       Q.    What did you hit him with?

16       A.    My hands.

17       Q.    Open hand or fist?

18       A.    Um, I don't think it was -- I can't remember

19  if it was -- I think probably a combination of both.

20       Q.    Where did you hit him?

21       A.    I hit him in the head, side of the face.

22       Q.    How hard did you hit him?

23       A.    Fairly hard for my size.

24       Q.    What did he do when you started hitting him?

25       A.    He was crying for his mom.

1    Q.    Started calling for his mother?

2    A.    Yes, sir.

3    Q.    Did he sound like he was in pain?

4    A.    Yes, sir.

5    Q.    Sound scared?

6    A.    Yes, sir.

7    Q.    Did you keep hitting him?

8    A.    Yes, sir.

9    Q.    What did you do to him after you hit him with

10   your fist?

11   A.    I remember pushing him down and kicking him

12   and pushing him again, pushed him against some kind of chest

13   or something.

14   Q.    And he's 16 months old?

15   A.    Yes, sir.

16   Q.    He didn't have much of a chance against you,

17   did he?

18   A.    No, sir.

19   Q.    Did he try to get away from you?

20   A.    I can't remember.

21   Q.    Do you remember him trying to hop away from

22   you?

23   A.    I can't remember.

24   Q.    When you kicked him, where did you kick him?

25   A.    I can't remember where I kicked him at.

1    Q.    Did you kick him hard?

2    A.    Yes, sir.

3    Q.    When you pushed him down, how hard did you

4 push him down?

5    A.    I can't remember.

6    Q.    You knew you had hurt him pretty badly, didn't

7 you?

8    A.    Yes, sir.

9    Q.    Did you call an ambulance?

10    A.    No, sir.

11    Q.    Why not?

12    A.    Because at that time he stopped crying.

13    Q.    Could you tell the next day that he was hurt?

14    A.    Yes, he was limping.

15    Q.    He was too young to tell his mother what you

16 had done to him, wasn't he?

17    A.    Yes, sir.

18    Q.    Can you tell he was in pain?

19    A.    Yes, sir.

20    Q.    Did you say, we need to take him to the

21 doctor.  I hurt him?

22    A.    No.  But I told them -- I told Todd that he

23 needed to get looked at.

24    Q.    Did they take him to the hospital then?

25    A.    Yes, sir.

1      Q.      Did they find out what was wrong with him?

2      A.      Yes, sir.

3      Q.      Let me show you first a two-page document that

4   has been marked State Exhibit 948.  Do you recognize that as

5   being the typed confession you signed in this case of the

6   injury to a child?

7      A.      Yes, sir, I do.

8      Q.      And State Exhibit 949, is that a copy of the

9   first affidavit that you gave the police?

10     A.      Yes, sir.

11             MR. SHOOK:  Your Honor, at this time

12  we'll offer State Exhibit 948 and 949.

13             MR. KING:  No objection.

14             THE COURT:  Nos. 948 and 949 shall be

15  admitted.

16             MR. SHOOK:  May I publish these to the

17  jury?

18             THE COURT:  You may.

19     Q.      (By Mr. Shook)  State Exhibit 949, I'll read

20  at this time.  It's the first affidavit which was given at

21  what time, Mr. Halprin?

22     A.      It was sometime at night, I believe, I'm not

23  sure of the exact day or time.

24     Q.      This was after Jared with taken to the

25  hospital?

1    A.    The hospital, yes, sir.

2    Q.    Was this the starting time?  Says 8:29:96?

3    A.    Yes, sir.

4    Q.    And was this down at the police station?

5    A.    Yes, sir.

6    Q.    All right.  "My name is Randy Ethan Halprin.

7  I am 18 years of age.  My date of birth is 9-13-77.  I am

8  staying at 3000 Las Vegas Trail Apartments 1233, Ft. Worth,

9  Texas, 76116.  My telephone number is 817/560-3192.  I have

10 completed 11 years of schooling.  I can read and write the

11 English language.

12          "I got to know Charity Smith about six and a

13 half weeks ago at the night shelter while we were both

14 staying there.  I also got to know Todd and Ramie Plummer at

15 the night shelter.  They moved out of the shelter about a

16 month ago.  I moved out with them about a week and a half

17 ago.

18          "While at the shelter, I kept Charity's son,

19 Jared, about four hours while Charity went to the hospital

20 because she had chickenpox.  After the Plummers moved into

21 their own apartment, I kept in touch by telephone.  About a

22 week and a half ago they offered to let me move in, so I

23 went to stay with them.  I kept Jared and the Plummer's two

24 kids on Tuesday for about three and a half hours.  This is

25 the only time I have kept any of the kids myself.

1    The first thing I noticed about Jared was his

2  leg that was bruised on Thursday.  Charity noticed it first.

3  Jared was limping.  On the weekend Jared woke up and there

4  was blood coming out of his ear.  Randy said it might have

5  been an ear infection and they took him to the hospital.

6  They said it was an ear infection and prescribed some

7  Amoxicillin.

8    "About a day later some bruises started

9  showing up by his ear and up to his forehead.  After that I

10  really didn't notice anything.  It was either Monday or

11  Tuesday his eye started getting red and she said it was

12  pinkeye because Tom had pinkeye and I was getting a red eye.

13  They just kind of left it at that.  And then today I noticed

14  the blood vessels popped in his eye.

15    Todd told her she needed to take him to the

16  hospital and she said she didn't want to.  She said that

17  Cooks Hospital was going to call CPS because they thought

18  she hit her kid.  She said this several times.  Then she

19  just basically -- Ramie said she was taking him and so she

20  put some clothes on and they left.

21    "I have seen Charity jerk Jared up by the

22  forearm near the wrist and left him up off the floor several

23  times while I've been staying with Todd and Ramie.  Charity

24  yells at him a lot.  Sometimes Charity will take Jared and

25  put him in a room and close the door.  I've seen her do that

```
 1    a lot, nearly every day.  She will lay him down or sometimes

 2    he will crawl to the door.  He will just sit there and

 3    whimper.  I've never hit Jared.  "

 4               Of course, you were lying when you said you

 5    had never hit Jared?

 6         A.    I was lying, yes, sir.

 7         Q.    Looks like you were trying to kind of shift

 8    the focus on Charity.  Were you trying to do that?

 9         A.    Yes, sir.

10         Q.    They were looking at her, naturally because

11    she was the mother; is that right?

12         A.    Yes, sir.

13         Q.    You didn't turn yourself in, did you?

14         A.    No, sir.

15         Q.    Okay.  Now, your confession actually occurred

16    on September 4th of 1996; is that right?

17         A.    Yes, sir.

18         Q.    And that was given at the Ft. Worth Police

19    Department?

20         A.    Yes, sir.

21         Q.    They didn't threaten you or coerce you in any

22    way, did they?

23         A.    No, sir.

24         Q.    Do you remember the lady that took the

25    confession?
```

1    A.    No, not really.

2    Q.    Sergeant --

3    A.    It was done on a computer.

4    Q.    You read it over and signed it?

5    A.    I didn't -- I signed it the first time, but

6  then they called me back because I made a change and I

7  initialled it.

8    Q.    And that's what we see there, your initials

9  next to the change?

10   A.    Yes, sir.

11   Q.    That was on the date when this happened?

12   A.    I believe so, yes, sir.

13   Q.    State Exhibit 948.  "Starting time September

14  4, 1996, 17:11 hours.  My name is Randy Ethan Halprin.  I'm

15  18 years old and my date of birth is 9-13-77.  I live at

16  3000 Las Vegas Trail, Apartment 1233 Ft. Worth, Texas, and

17  my telephone number is 560-3192.  I have completed 11 and a

18  half years of schooling and I can read and write the English

19  language.

20         "About 7 weeks ago I was staying at the

21  Arlington Night Shelter and I got to know Charity Smith and

22  her son Jared, who is 16 months, and Todd and Ramie Plummer

23  and their two kids.

24         About a month ago Todd and Ramie got their own

25  apartment and about two weeks I went to stay with them.

1    Charity and Jared moved in the day before I did.  Jared

2    cried all the time.

3         "On Thursday, August 22, 1996, I was in the

4    back bedroom probably about 8:00 at night with Jared.

5    Everyone else in the living room.  The TV was real loud and

6    they couldn't hear.  Jared has been back there with me about

7    ten minutes and the door was closed.

8         "He had been crying the whole week and I had

9    been thinking the whole week that I was getting really

10   frustrated.  Just everything crashed down and Jared was the

11   closest thing to take my anger out on.

12        "I told him to be quiet a couple of times.  I

13   wanted to at first to hit him, but I didn't.  But I just

14   crashed down, kind of flipped out.  The first time I hit

15   Jared, he was sitting up on the bed and I hit him up side

16   the left side of his head, just a slap.  I hit him about

17   five, six times.  I didn't realize how hard I was hitting

18   him.  He lay back down and I pulled him back up and he was

19   saying, 'mama'.  And I said, 'Do you want to go to mama?'

20   And I put him down and then I kicked on his real hurt knee

21   and then he fell down.

22        "He got back up.  I pushed him back down and

23   he hit the floor real hard.  I pulled him back up real hard

24   by the wrist and I was telling him to stop crying.  I didn't

25   realize that I was hurting him, but I think that I could

1   have broken his arms then.  I could have hurt his other leg

2   when I was pushing him back down because he was trying to

3   stay off his hurt leg and he was twisting, trying to get

4   away and I was shoving him back down.  I guess I hurt his eye

5   when I slapped him because I was slapping him hard enough to

6   bruise his face.  I wasn't aiming for any particular place.

7   I was just slapping aim.

8          "I got scared and I put him down on the bed

9   and kept saying, 'I'm sorry.  I'm sorry.'  He fell asleep

10  and I just left the room.  I never hit him after that.  I

11  slapped him on the hand once before while in the shelter and

12  Charity saw it and asked me not to do it.  I don't know

13  anything about the injuries to Jared's mouth.  I just

14  assumed it was from him biting his tongue.

15         "The next morning when the blood started

16  coming out, I got really scared about everything I did to

17  him the night before.  I made -- I didn't say anything first

18  about the injuries.  I made sure someone else commented

19  first before I said anything.

20         "I lied to the police when I gave my first

21  statement because I was scared and didn't want to believe

22  that I did that."

23         So according to the statement, you actually --

24  it was Charity Smith that lived there first?

25         A.    Um, to my knowledge -- I know what I said in

1  there, but from what I remember, it was the other way

2  around.  I could be wrong.

3       Q.    I don't see any mention of being on acid or

4  drugs of any sort in this statement.

5       A.    No, sir, but I told them about it.

6       Q.    You told the police that?

7       A.    Yes, sir.

8       Q.    And they left it out?

9       A.    I thought it was in the statement.

10       Q.    Did you read the statement over?

11       A.    Not when I reinitialed it, no, sir.

12       Q.    But there's no mention of drugs in here at

13  all?

14       A.    No, sir.

15       Q.    Now, there is a mention of -- was his ear

16  bleeding?

17       A.    Yes, sir.

18       Q.    Did you learn later that you had busted his

19  eardrum?

20       A.    That's what they said I did, yes, sir.

21       Q.    And blood was coming out?  And then there's

22  one line in the last paragraph.  "I don't know anything

23  about the injuries to Jared's mouth.  I assumed it was from

24  him biting his tongue."

25                 Do you know what they're talking about there?

1        A.      Not really, no, sir.

2        Q.      You don't remember the sergeant asking you

3   about the blisters on his tongue and mouth?

4        A.      I remember him asking about some injuries to

5   the mouth.

6        Q.      They were described as cigarette burns,

7   weren't they?

8        A.      I'm not a smoker.

9        Q.      Well, there are cigarettes in that house,

10  weren't there?

11       A.      I didn't do that.

12       Q.      The Plummers smoked, didn't they?

13       A.      I didn't do that.

14       Q.      You deny doing that?

15       A.      I didn't do it.

16       Q.      You didn't burn that child on the tongue?

17       A.      No, sir, absolutely not.

18       Q.      You did hit him beside the head, kick him in

19  the legs.  Did you just do this once or was there more than

20  one occasion?

21       A.      That night, I can't -- obviously there was a

22  series of blows, but that's -- that was it.

23       Q.      Let me show you what has been marked as State

24  Exhibit 941, 942, 943, 944, 945, and 946, 947.  Do you

25  recognize those photos of Jared Smith and his injuries?

1        A.     Yes, sir.

2                      MR. SHOOK:  Your Honor, at this time

3    we'll offer State Exhibits 941 through 947.

4                      MR. KING:  No objection, Your Honor.

5                      THE COURT:  Nos. 941 through 947 shall be

6    admitted.

7        Q.     (By Mr. Shook)  We know at least from this

8    case, you are capable of great violence, don't we, Mr.

9    Halprin?

10       A.     One incident.

11       Q.     I'm sorry?

12       A.     One incident, yes, sir.

13       Q.     We see here this is Jared smith; is that

14   right?

15       A.     Yes, sir.

16       Q.     Bruises here to his forehead, around his

17   mouth, you cause those?

18       A.     Yes, sir.

19       Q.     State Exhibit 242 --

20                      THE COURT:  No. 942.

21       Q.     (By Mr. Shook)  No. 942, the forehead injury,

22   you caused that?

23       A.     Yes, sir.

24       Q.     See the blood in the left eye?  Is that from

25   you hitting him?

1       A.      Yes, sir.

2       Q.      Let me show you State Exhibit 943.  See that

3  large bruise by his ear?  Is that --

4       A.      Yes, sir.

5       Q.      -- where you slapped him beside his head?

6       A.      I remember slapping him on the side of the

7  head.  But I also remember him being treated for ruptured

8  eardrum before that incident happened.  So I'm not sure if I

9  caused that or not.

10       Q.      Did you see blood coming out of his ear the

11  day after you hit him?

12       A.      I did notice some blood, yes, sir.

13       Q.      Let me show you State Exhibit 944.  This

14  broken arm here that we see in a cast, did you cause that

15  injury?

16       A.      Yes, sir.

17       Q.      Was that when you were kicking him or hitting

18  him?

19       A.      I don't recall.

20       Q.      See how his legs are restrained here?  When

21  did you break his legs?

22       A.      I don't recall.

23       Q.      How long did this assault go on?

24       A.      A couple of minutes.

25       Q.      Do you remember if you -- that bone was broken

1    in the middle of the forearm?

2         A.     I'm not sure.

3         Q.     Let me show you State Exhibit 946.  See the

4    large bruise to the chin?  Do you remember causing that?

5         A.     I know I hit him, so if I hit him, I could

6    have caused that, yes.

7         Q.     Could Jared walk at this time?

8         A.     He was limping.

9         Q.     Let me show you State Exhibit 947.  See those

10   blisters to his tongue?

11        A.     I see them, but I did not cause those.

12        Q.     You are denying that?

13        A.     I'm denying that.

14        Q.     For someone that would actually burn a child's

15   tongue like that, they would have to think about doing that

16   type of offense, wouldn't they?

17        A.     Excuse me?

18        Q.     They would have to think about that.  That

19   takes some planning?

20        A.     Obviously.

21        Q.     Now, you talk about, Mr. Halprin, that you in

22   the past have been good at manipulating people; is that

23   right?

24        A.     Yes, sir.

25        Q.     You have been successful at it?

1      A.      Yes, sir.

2      Q.      I want to show you State Exhibit 950, a letter

3 you sent to a lady named Debbie Toner on 3-6-02.

4      A.      Yes, sir.

5      Q.      Do you recall writing a letter to her?

6      A.      Yes, sir.

7      Q.      Okay.

8              MR. SHOOK:  Your Honor, at this time we

9 offer State Exhibit 950.

10             MR. KING:  No objection.

11             THE COURT:  No. 950 shall be admitted.

12     Q.      (By Mr. Shook)  I noticed on the first day of

13 trial you were wearing glasses?

14     A.      Yes, sir.

15     Q.      And during jury selection you were wearing

16 glasses some days?

17     A.      Off and on, yes, sir.

18     Q.      And do you wear glasses?  You need glasses to

19 read or see?

20     A.      Yes, sir.

21     Q.      How long have you worn glasses?

22     A.      I have worn -- I've been prescribed glasses

23 before when I was young, but mainly just to read or look at

24 something.

25     Q.      So how long have you been wearing glasses?

1    A.     Off and on.

2    Q.     All through your school years?

3    A.     Yeah, I did -- I was prescribed when I was

4  younger, yes, sir.

5    Q.     Because I was looking at your pen record.

6    A.     No, I had no records of wearing glasses in

7  prison.

8    Q.     I know.  They show you to have 20/20 vision.

9    A.     Yes, sir.  But I'm sure if you had me tested

10  now -- I'm sure if you had me tested now, I would not have

11  perfect eyesight.

12    Q.     Well, let me show you your records.  First

13  time tested --

14            MR. KING:  Excuse me.  If Mr. Shook

15  intends to offer certified copies of prison records, we

16  would like to be notified that they are certified copies of

17  prison records.  And if he intends to offer the prison

18  records in, we would like to have them marked as an exhibit

19  and I would like to see them.

20            MR. SHOOK:  I would just like to ask him

21  if he remembers getting his eyes examined first.

22            MR. KING:  That was the question he asked

23  him, but now he's showing him a document.  If he's going to

24  show him a document, we would like it to be marked as an

25  exhibit and ask if it can be identified as part of the

1   prison records.  We would like to have Mr. Shook mark it so

2   we can know what part of the prison records, if any,

3   Mr. Shook thinks are relevant in this trial.

4                    THE COURT:  Mr. King, can you please mark

5   exhibits.

6                    MR. KING:  I will for the moment.

7        Q.    (By Mr. Shook)  Do you remember checking your

8   eyes in prison?

9        A.    I don't remember an exact eye exam.

10        Q.    You don't remember ever getting an eye exam?

11        A.    I'm not saying I haven'.  But I just don't

12   remember it.

13        Q.    So you have forgotten it if you had an eye

14   exam?

15        A.    I don't remember.

16        Q.    You just have no memory?

17        A.    I don't recall --

18        Q.    On June 2, 1997, you wouldn't have been

19   checked for eyes and shown to have 20/20 vision?

20        A.    I don't recall.

21        Q.    You don't recall that?

22        A.    No, sir.

23        Q.    Okay.  Let me ask you this.  On June 1st of

24   1999, do you recall getting an eye exam and having 20/20

25   vision?

1      A.      I don't recall.

2      Q.      Could that have happened?

3      A.      It could have happened, yes, sir.

4      Q.      But you are saying that you need glasses now?

5      A.      I'm just saying that sometimes I need them,

6  yes, sir.

7      Q.      When is it that you need them?

8      A.      Whenever I need them, whenever I feel like I

9  need to read something, if things are getting blurred.  It's

10  my right eye that is actually --

11      Q.      Let me show you this.  You wrote Ms. Toner, "I

12  want the potential jurors to see me in different outfits.

13  It shows a personality other than wearing the same suit over

14  and over.  I was thinking about some Dockers, khakis, and

15  Navy blue pants with a couple of different dress shirts,

16  then in my trial, wearing a few different suits, ties, and

17  shirts.  I got the idea from the O. J. trial.  It's crazy, I

18  know, but the lawyers did different dress schemes to

19  distract the jurors.  The shit works."

20              Is that what your -- then you say, "Like one

21  day I'll wear glasses and one day I won't.  One day I'll

22  have a different tie on or a suit."

23      A.      I did say that, yes, sir.

24      Q.      Is that what you are attempting to do with

25  wearing glasses, things like that?  You wanted to distract

1    the jurors?

2         A.    Not really, no, sir.  I don't think that they

3    are paying attention to me.  I think that they are paying

4    attention to the evidence.

5         Q.    Then why did you write this to Ms. Toner about

6    --

7         A.    I just wanted to show --

8         Q.    "It's crazy, I know, but the lawyers did it,

9    different dress schemes, to distract the jurors.  The shit

10   works."

11        A.    Who knows what I was thinking at the time.

12        Q.    Now, we talked about your lying.  And I asked

13   if you continued to lie you were a little vague on that.

14   You wanted me to give you a specific reference, I think?

15        A.    Well, I mean, I know that I've lied.  I'm not

16   denying that I haven't lied.  But --

17        Q.    You have a friend named Jennifer, I think,

18   that has been in the courtroom the past couple of days,

19   Jennifer Roe?

20        A.    Jennifer Roe and Saline.  If you ask them,

21   they both know about each other.

22        Q.    Okay.  Well, Saline is here, but Jennifer you

23   met -- when did you meet her?

24        A.    Back at the beginning of March when I came to

25   Dallas County.

```
 1          Q.     After you were here in the Dallas County Jail?

 2          A.     Yes.

 3          Q.     Does she live here in Dallas County?

 4          A.     She lives in Duncanville, yes, sir.

 5          Q.     Okay.  But you didn't know her before then?

 6          A.     No, sir.

 7          Q.     She -- how did you meet her?

 8          A.     Through the mail.

 9          Q.     Did y'all develop a relationship after that?

10          A.     Yes, sir.

11          Q.     What type of relationship?

12          A.     A love relationship, whatever you want to call

13    it.

14          Q.     Does she have some children?

15          A.     Yes.

16          Q.     How old are they?

17          A.     She's got -- she just had a kid.  He's about a

18    year old now and she also has Austin.

19          Q.     Austin?  Okay.  And Jennifer and Saline, they

20    know about each other?

21          A.     Yes, they know.

22          Q.     Let me show you a letter that has been marked

23    State Exhibit 952 to a woman named Dawn Amos, written on

24    August 15, 2001.  Do you remember that --

25          A.     Yes, sir.
```

1          Q.      -- writing to Dawn Amos?

2                      MR. SHOOK:  Your Honor, at this time we

3     offer State Exhibit 952.

4                      MR. KING:  No objection.

5                      THE COURT:  No. 952 small be admitted.

6          Q.      (By Mr. Shook)  Ms. Amos is a woman that --

7     she's in a Colorado prison?

8          A.      Yes, sir.

9          Q.      You began writing her, too?

10         A.      Yes, she was pen pals.

11         Q.      Yes.  Do you remember telling her in this

12     letter explaining to her who Jennifer was?

13         A.      Yes.

14         Q.      And you lied to her, didn't you?

15         A.      Yes.

16         Q.      You told her that Jennifer was actually a

17     school friend of yours --

18         A.      From Kentucky.

19         Q.      -- from Kentucky?

20         A.      Yes.

21         Q.      That y'all had slept together?

22         A.      Yes, sir.

23         Q.      And then you took off to Texas?

24         A.      Yes, sir.

25         Q.      Came back, went to prison?

```
 1          A.      Yes, sir.

 2          Q.      And lo and behold, she showed up in Dallas?

 3          A.      Yes, sir.

 4          Q.      And came to see you at the jail?

 5          A.      Yes, sir.

 6          Q.      And turns out she had been impregnated by you

 7   several years before?

 8          A.      Yes, sir.

 9          Q.      And that your son was Austin?

10          A.      Yes, sir.

11          Q.      And you were -- why were you -- that's a big

12   lie, right?

13          A.      Yes, sir.

14          Q.      Why were you telling this woman up in Colorado

15   this lie?

16          A.      I don't know.

17          Q.      You don't know?

18          A.      No.

19          Q.      That lying just come back naturally to you?

20          A.      Not naturally, it just --

21          Q.      Do you remember a reason to lie to her about

22   that?

23          A.      No.

24          Q.      Pretty insignificant, isn't it?

25          A.      Yes, sir.
```

1       Q.    So if you would lie about something that

2   insignificant, don't you think you might lie about something

3   real significant like about what happened behind that

4   Oshman's?

5       A.    Sir.  I did not shoot the officer.  I did not

6   pull a gun and I think the evidence shows that, sir.

7       Q.    But you lied about something that

8   insignificant?

9       A.    Yes, sir.

10      Q.    Big, elaborate story.  Let me show you what

11  has been marked as State Exhibit 953, another letter to Dawn

12  Amos, dated April 8, 2001.  Do you recognize that as a

13  letter you sent to her?

14      A.    Yes, sir.

15          MR. SHOOK:  Your Honor, at this time we

16  will offer State Exhibit 953.

17          MR. KING:  No objection.

18          THE COURT:  No. 953 shall be admitted.

19      Q.    (By Mr. Shook)  Now, like we talked before,

20  you are good at manipulating people or been successful in

21  the past; is that right?

22      A.    Yes, sir.

23      Q.    Okay.  Do you remember writing this?  "If I

24  get a chance to tell my side of the story, that will be

25  great, because I know that I can reach a couple of jurors.

1    It's just something I know."

2          A.      I'm telling the truth.

3          Q.      You think that you can reach one or two?

4          A.      Yes, sir.

5          Q.      Wouldn't be because you have been pretty

6    skilled at manipulating people in the past?

7          A.      No, sir.

8          Q.      Telling lies?

9          A.      No, sir.

10         Q.      Getting people to feel sorry for you?

11         A.      No, sir.

12         Q.      Because that's one of the things that you have

13   done in the past, isn't it?

14         A.      Yes, sir.

15         Q.      You talked about in your letter to your

16   parents, a big lie to Theresa.   That was one of your

17   girlfriends back in Kentucky?

18         A.      Yes, sir.

19         Q.      Do you remember convincing her and others that

20   you had cancer?

21         A.      Yes, sir.

22         Q.      They believed you?

23         A.      Yes, sir.

24         Q.      Her mother even believed you?

25         A.      Yes, sir.

1    Q.    Of course, you didn't have cancer?

2    A.    No, sir.

3    Q.    And then the -- right when you were finishing

4 your testimony, Mr. King talked about your theft case in

5 Kentucky.  That's when you stole from some former teachers

6 of yours?

7    A.    Yes, sir.

8    Q.    You talked your way into their home, didn't

9 you?

10   A.    Yes, sir, I didn't talk, actually.  I was --

11 we were actually friends.

12   Q.    Made them feel sorry for you?

13   A.    You talking about the teachers in Kentucky,

14 right?

15   Q.    The Kernels?

16   A.    The Kernels, yes, sir.

17   Q.    They let you come stay in their home?

18   A.    Yes, sir, they did.

19   Q.    And while you were there you stole from them?

20   A.    I stole their credit card.

21   Q.    And even actually had them drive you to pick

22 up some money you had ordered off of it; is that right?

23   A.    Yes, they actually dropped me off in

24 Louisville where I had the money wired, yes, sir.

25   Q.    So you deceived them?

1          A.        Yes, sir.

2          Q.        Now, this offense that you went to prison for,

3    you got 30 years.  How long had you been in prison before

4    you met George Rivas?

5          A.        Um, at that time possibly three and a half,

6    maybe four.

7          Q.        Okay.  You already knew your way around the

8    prison system pretty well, didn't you?

9          A.        Yes, sir.

10         Q.        George Rivas was not your mentor in prison,

11   was he?

12         A.        Um, not to that time, no, sir.  I was pretty

13   much independent or by myself.

14         Q.        You told the jury on direct that you never had

15   any serious incidents in prison?

16         A.        No, sir.

17         Q.        Weren't violent?

18         A.        No, sir.

19         Q.        Are you telling the jury that you never had

20   any fights?

21         A.        I'm not saying I've never been in a fight.

22   Prison is prison.  You are going to fight in prison.

23         Q.        You have been in several fights in prison,

24   haven't you?

25         A.        I've been in a couple, yes.

1    Q.    You never got in trouble for that, did you?

2    A.    No, sir.

3    Q.    Because the guards don't see a lot that goes

4    on down there?

5    A.    Yes, sir.

6    Q.    You fought to get respect; is that right?

7    A.    I fought so nobody would run me over, yes,

8    sir.

9    Q.    Do you remember starting a riot in closed

10   custody?

11   A.    No, sir.

12   Q.    Let me show you a letter which has been marked

13   State Exhibit 954?

14   A.    If it's a letter to Dawn, then it's a lie.  I

15   was trying to impress her.

16   Q.    It's a letter to Dawn.

17   A.    Yes, sir.

18   Q.    And this is the letter we're talking about,

19   April 4, 2001?

20   A.    Yes, sir.

21              MR. SHOOK:  Offer State Exhibit 954.

22              MR. KING:  No objection.

23              THE COURT:  No. 954 shall be admitted.

24   Q.    (By Mr. Shook)  You talk about, I think,

25   getting checked.  And then you said, "Though I did get into

1  a few hairy situations, I started that riot in close custody

2  kitchen.  I thought, oh, shit, I'm dead, you know.  I threw

3  a pitcher of juice on that Mexican."

4           Were you telling the truth or lying about

5  that?

6           A.    I was lying.

7           Q.    So that was a lie?

8           A.    Yes, sir.

9           Q.    You also talked about in this letter that you

10 were -- had dealings with the leader of the Arian

11 Brotherhood.  Do you remember that?

12          A.    I don't recall it, but it's probably a lie.

13          Q.    Calling him Batman?

14          A.    Batman, yes, sir.

15          Q.    Y'all had this little deal going where you

16 would sell cookies.  He was a baker?

17          A.    Yes, sir.

18          Q.    Did you make up a lie about him checking with

19 you if there was any trouble between the Arian gangs?

20          A.    You mean as far as what he had told me, as far

21 as if I had any trouble, we were cool, because I'm jewish,

22 you know, I could go to him and he would take care of me.

23          Q.    And he knew that you were with the whites, if

24 anything went down?

25          A.    Yes, sir.

1    Q.    You told him that?

2    A.    Yes, sir.  That's to survive, sir.

3    Q.    So that wasn't a lie?

4    A.    No, sir.  That part was not, no, sir.

5    Q.    Let's talk about this escape for a minute.

6    A.    Yes, sir.

7    Q.    You said that George Rivas approached you?

8    A.    Yes, sir.

9    Q.    And y'all -- or he did most of the planning?

10   A.    Yes, sir.

11   Q.    Did you ever meet with him about the planning?

12   A.    I talked to him, yes, sir.

13   Q.    You knew what the plan was, didn't you?

14   A.    Yes, sir.

15   Q.    What was the plan?  How was the escape going

16   to go down?

17   A.    Um, you mean just as a whole?

18   Q.    Right.

19   A.    We were to take down the maintenance shop

20   supervisors, use a white truck to get out.  George Rivas was

21   supposed to take over the tower and they were supposed to

22   come down, get in the truck, and we were supposed to leave.

23   Q.    How were you going to take down the

24   supervisors?

25   A.    By wrestling them to the ground.

1        Q.     And now you had some weapons ready; is that

2 right?

3        A.     Yes, sir.  There were weapons, yes, sir.

4        Q.     And who were you close friends with?

5        A.     I was close to Joseph Garcia, Larry Harper,

6 and George Rivas.

7        Q.     You knew Joseph Garcia was serving 50 years

8 for murder?

9        A.     Yes, sir.

10        Q.     And you knew George Rivas was serving, what

11 was it, 17 life sentences?

12        A.     Yes, sir.

13        Q.     For aggravated robbery?

14        A.     Yes, sir.

15        Q.     That means he pulled guns on people?

16        A.     Yes, sir.

17        Q.     And Larry Harper, that was your other one you

18 were close to?

19        A.     Yes, sir.

20        Q.     You worked with Garcia and Harper in the

21 warehouse; is that right?

22        A.     Yes, sir.

23        Q.     Larry Harper was actually serving three

24 sentences, 50 years, for rape.

25        A.     I was not aware of that until we escaped.

1    Q.    What did he tell you his charge was?

2    A.    He had never even said anything and I never

3    asked him anything.

4    Q.    How did you become aware of it?

5    A.    Actually, watching "America's Most Wanted".

6    Q.    Were you shocked by that?

7    A.    I was surprised, yes.

8    Q.    You liked to watch "America's Most Wanted,"

9    didn't you?

10   A.    Only to see what was being said.

11   Q.    You never missed an episode while you were

12   out, did you?

13   A.    That's not true.

14   Q.    So you were friends with Garcia.  You knew he

15   was capable of murder?

16   A.    Yes, sir, he was in for murder.

17   Q.    You knew George Rivas was capable of

18   threatening people and committing crimes?

19   A.    Yes, sir.

20   Q.    Did you think anyone might get hurt in this

21   escape?

22   A.    No, sir.

23   Q.    Why not?

24   A.    Because the whole idea that it was designed

25   for was so nobody would get hurt.

1    Q.    You had weapons there; is that right?

2    A.    For intimidation, yes, sir.

3    Q.    Shanks?

4    A.    Yes, sir.

5    Q.    Did they kill someone?

6    A.    I'm not sure.

7    Q.    In actuality when this escape started, you --

8    the first person you took down was the assistant supervisor

9    Pat Moczygemba, wasn't it?

10   A.    I didn't take him down, but, yes, sir, he was

11   the first person tooken down.

12   Q.    You were there when it happened?

13   A.    Yes, sir.

14   Q.    In fact, you were the ones that you and Rivas

15   coaxed him into the back of the warehouse; is that right?

16   A.    Rivas did coax him into the warehouse, yes,

17   sir.

18   Q.    And you were there with the others?

19   A.    I was on the lookout, yes, sir.

20   Q.    Did you ask him or point and say, "Look at

21   this motor under a table --"

22   A.    No, sir.

23   Q.    Were you there when that happened?

24   A.    I don't remember it like that.  I remember

25   being -- I was in the warehouse room, if that's what you

1   mean.  But --

2         Q.     What happened to Mr. Moczygemba when he bent

3   over?

4         A.     He was hit by Rivas.

5         Q.     What did he hit him with?

6         A.     With his hand.

7         Q.     With his hand?

8         A.     With his hand.

9         Q.     Do you remember his ear getting ripped half

10  way off?

11        A.     Yes, sir.

12        Q.     He did that just with his hand?

13        A.     He did not hit him -- he wasn't the one that

14  caused the injury to his ear.

15        Q.     Who caused the injury to his ear?

16        A.     Michael Rodriguez.

17        Q.     That was Michael Rodriguez?

18        A.     Yes, sir.

19        Q.     So obviously some injuries did occur in this

20  escape?

21        A.     Yes, sir.

22        Q.     Do you remember them all fighting and hitting

23  him?

24        A.     Um, Moczygemba?

25        Q.     Yes.

1    A.    I don't recall everything that happened to

2   him.  I know that he was the biggest man and probably the

3   hardest and it took a couple of guys to get him down, but

4   that's --

5    Q.    So he did get hit?

6    A.    Yes, sir.

7    Q.    Do you remember threats being made to his

8   life?

9    A.    Not that I'm aware of, no, sir.

10    Q.    Do you remember him being gagged?

11    A.    Yes, sir.

12    Q.    That was part of the plan?

13    A.    I know that he was gagged, yes, sir.

14    Q.    Y'all had gags, right?

15    A.    Yes, sir.

16    Q.    Y'all worked this out ahead of time?

17    A.    Yes, sir.

18    Q.    Now, you knew he was going to be on this

19   escape team, didn't you, ahead of time?

20    A.    Yes, sir.

21    Q.    Rivas talked to you, selected you, and you

22   agreed to go?

23    A.    After consideration, yes, sir.

24    Q.    No one forced you to, right?

25    A.    No, sir.

1    Q.    You said on direct that, you know, usually you

2  were pretty impulsive?

3    A.    Yes, sir.

4    Q.    When you have gotten in trouble in the past or

5  done things that have gotten you in trouble, it was because

6  you had been impulsive?

7    A.    Yes.

8    Q.    This time you decided not to be impulsive?

9    A.    Yes, sir.

10   Q.    Thought about it?

11   A.    Yes, sir.

12   Q.    And then decided to commit a crime?

13   A.    Yes, sir.

14   Q.    So whether its impulsive or think about it,

15  you were willing to commit these types of crimes?

16   A.    Yes, I did.

17   Q.    And you had -- the seven of you had to trust

18  each other, didn't you?

19   A.    There was a level of trust, yes.

20   Q.    I mean, how was this going to work if you

21  didn't trust each other?

22   A.    I'm not really sure.  All I can say is there

23  was trust to a degree.

24   Q.    You had to work together as a team to get out

25  of the there, didn't you?

1          A.     Yes, sir.

2          Q.     And you worked very well as a team together,

3   didn't you?

4          A.     Yes, sir.

5          Q.     Y'all had planned a long time?

6          A.     Yes, sir.

7          Q.     And there was a lot of violence done to those

8   people?

9          A.     From later reports that I heard, yes, sir.

10          Q.     Do you believe those reports?

11          A.     Um, obviously they are true.

12          Q.     You were there?

13          A.     Yes, sir.

14          Q.     Do you remember a man by the name of Burgess?

15          A.     Yes, sir.

16          Q.     And a guard by the name of Marroquin?

17          A.     Yes, sir.

18          Q.     Mr. Camber?

19          A.     Yes, sir.

20                 MR. SHOOK:  If I may have some people

21   step in the courtroom, I won't ask any questions while they

22   are in here.

23                        [At this time four people stepped in

24                         and back out of the courtroom.]

25          Q.     (By Mr. Shook)  Can you see these men?

```
 1          A.      Yes, sir.

 2          Q.      Do you remember Mr. Camber, the littlest guy,

 3  there?

 4          A.      Was that Camber?

 5          Q.      Yes, sir.

 6          A.      I wasn't sure who was in the middle.

 7          Q.      Do you remember jumping him from behind and

 8  smashing his head on the ground?

 9          A.      No, sir.

10          Q.      You didn't do that?

11          A.      No, sir.

12          Q.      Do you remember Mr. Burgess, didn't you?

13          A.      Yes, sir, I remember Burgess.

14          Q.      Do you remember you and Rivas starting to

15  carry him to the electrical room --

16          A.      No, sir, I did not do that.

17          Q.      You didn't carry him back to the electrical

18  room?

19          A.      No, sir.

20          Q.      Do you remember saying to Mr. Burgess, "You

21  thought I liked you, Burgess, but I hate your fucking guts

22  --"

23          A.      I never said that.

24          Q.      "-- I would just as soon kill you right now"?

25          A.      No, I did not ever say that to him.
```

1      Q.      Do you say that to him?

2      A.      In fact, when that was -- when that happened,

3   I was in the maintenance shop with Murphy watching Gilley --

4   I'm not sure of his first name.  But I just remember his

5   last name, Gilley.

6      Q.      Then what happened?

7      A.      When they took Mr. Burgess down.

8      Q.      Do you didn't make that threat to Mr. Burgess?

9      A.      No, sir.

10      Q.      Didn't happen at all?

11      A.      No, sir.

12      Q.      You weren't even there?

13      A.      No, sir.

14      Q.      Did you get along with Mr. Burgess?

15      A.      Yes, sir.

16      Q.      Never had a problem with him?

17      A.      No, sir.

18      Q.      Okay.  How many people were finally taken in

19   that electrical room?

20      A.      I would say 14.

21      Q.      Were you ever in there when the shanks were

22   placed in their ears --

23      A.      No, sir.

24      Q.      -- and threatened to be shoved into their

25   brains?

1          A.     No, sir.

2          Q.     These people, no doubt, were very scared of

3     their lives?

4          A.     Yes, sir.

5          Q.     If they had kept resisting, would they have

6     been killed?

7          A.     No, sir.

8          Q.     Then would y'all have just given up?

9          A.     Possibly.

10         Q.     You would have?

11         A.     I would have, yes, sir.

12         Q.     You would have?

13         A.     Yes, sir.

14         Q.     But you were able to get out of prison?

15         A.     Yes, sir.

16         Q.     And when you were in prison, you knew what was

17    going to happen when you got out, didn't you?

18         A.     I knew that there were planned robberies, yes,

19    sir.

20         Q.     And you were going to be a part of that?

21         A.     I didn't want to be a part, but I knew it was

22    going to happen and I tried to take the less, you know, I

23    didn't, you know, put up the biggest argument.

24         Q.     So you knew while even when you were planning

25    this escape that you were going to be committing robberies

1   with these men?

2       A.      Yes, sir.  It had been discussed, yes, sir.

3       Q.      You knew one of the men that would be

4   committing the robbery was Joseph Garcia, who was a

5   murderer?

6       A.      Yes, sir.

7       Q.      You knew Michael Rodriguez who would be

8   committing these crimes, you knew he was a murderer?

9       A.      Yes, sir.

10      Q.      Did he tell you about his crime?

11      A.      Not in any great length, no.  But I didn't

12  know all the details until the news report in San Antonio.

13      Q.      Had his wife murdered?

14      A.      Yes, sir.

15      Q.      Was serving a life sentence?

16      A.      Yes, sir.

17      Q.      Of course, you knew he was violent from the

18  escape.  You saw him hit Mr. Moczygemba real hard.

19      A.      Yes, sir.

20      Q.      What did he hit him with?

21      A.      It was a spout of a pot or some kind of valve.

22      Q.      Caused a lot of damage to his ear?

23      A.      Yes, sir.  I'm not aware of -- I don't know

24  what kind of damage it caused, but I remember seeing blood,

25  yes, sir.

1      Q.    In fact, you were the one that wiped the blood

2   up, aren't you?

3      A.    No, sir.

4      Q.    So you knew Michael Rodriguez was a convicted

5   capital murderer.  You knew he was capable of violence?

6      A.    Yes, sir.

7      Q.    You saw that firsthand?

8      A.    Yes, sir.

9      Q.    You knew Mr. Newbury had been to the pen,

10  what, three times?

11     A.    I wasn't aware of how many times he had been

12  to prison.

13     Q.    But he had been for aggravated robbery?

14     A.    I knew he was in for robbery, but he said it

15  was -- I don't know, he said something.  I can't remember

16  what he said, but --

17     Q.    You knew he was pretty violent, though, prone

18  to violence, didn't you?

19     A.    From the escape?

20     Q.    His character.

21     A.    His character?

22     Q.    Just what you knew about him?

23     A.    Not really, no, sir.  He always showed a real

24  calm demeanor in prison.

25     Q.    Did you know Mr. Murphy was a convicted

1    rapist?

2         A.    I didn't know until after the escape.

3         Q.    After y'all watched "America's Most Wanted"?

4         A.    Yes, sir.

5         Q.    But after that, after you got out, then you

6    knew what all their charges were?

7         A.    Yes, sir.

8         Q.    It didn't come as a big surprise that they

9    were all violent felons?

10        A.    No, sir.

11        Q.    So you know that they had been capable of

12   violence in the past?

13        A.    Yes, sir.

14        Q.    And they certainly were capable of violence

15   during that escape?

16        A.    Yes, sir.

17        Q.    And yet you agreed to go through these

18   robberies, agreed to do these robberies with them, anyway?

19        A.    Yes, sir.  I participated, yes, sir.

20        Q.    You knew they were all taking loaded guns in?

21        A.    Yes, sir.

22        Q.    When you went with them to help rob the Radio

23   Shack, you wanted to hit that Radio Shack so you could get

24   that electronic equipment?

25        A.    That's what Rivas wanted, yes, sir.

1      Q.     Because you knew you were going to do bigger

2   robberies after that?

3      A.     That is what Rivas had talked about,

4   discussed, yes, sir.

5      Q.     And you were going to partake in that?

6      A.     I was going to try not to.

7             That's why I didn't participate in the Auto

8   Western (sic).

9      Q.     Mr. Halprin, I want to show you a document

10  marked State Exhibit 955.  It's a letter.  Do you recognize

11  the letter?

12     A.     Can I have a chance to read it?

13     Q.     Sure.

14     A.     Yes, sir.  This is the letter that I wrote

15  when I escaped from prison.

16     Q.     Left it there at your bunk?

17     A.     Yes, sir.

18     Q.     Okay.

19            MR. SHOOK:  State will offer State

20  Exhibit 955.

21            MR. KING:  No objection.

22            THE COURT:  No. 955 shall be admitted.

23     Q.     (By Mr. Shook)  This is a letter that you

24  wrote and left in your living space area?

25     A.     It was in a book in the living space area,

1   yes, sir.

2                    MR. SHOOK:  May I publish to the jury?

3                    THE COURT:  You may.

4        Q.      (By Mr. Shook)  "Some might be confused as to

5   why I did this.  Some might.  May even shock --"  I want to

6   make sure I get this word right.

7        A.      Snap.

8        Q.      "Snap.  It may even snap into people's heads

9   as to why I hung out with the people I was around.  This

10  wasn't the only reason why I did it to show that race nor

11  creed nor religion, people, or better yet, prisoners, could

12  unite in one common goal against the system.  People always

13  bitched, complained, about what they would do.  We got

14  together and acted upon our thoughts.  I can say that God

15  blessed me well enough that I have had a comfortable prison

16  life.  Content, yes.  Happy, no.  I could do my sentence,

17  but I refuse to live under the tyranny of the system and the

18  ignorance or the prisoners.  I'm not talking of revolution,

19  but change for people to see eye to eye.  Maybe it's a

20  dream, maybe I will fail.  But my faith in God is stronger

21  and I have no doubt that we will succeed.

22                  "Remember the famous words, 'one nation under

23  God.'  We are people, humans, society.  Society sees us

24  otherwise.  Let us show them different.  Believe me, you

25  have not heard the last of us.  God bless all.  Keep your

1   faith and heart.  Keep hate out and dreams alive.  Randy

2   Halprin."

3                 This is the letter you left in a book?

4       A.    Yes, sir.

5       Q.    And your last line was, "Believe me, you have

6   not heard the last of us."

7       A.    Yes, sir.

8       Q.    That turned out to be true, didn't it?

9       A.    I guess, yeah.  But it wasn't written in that

10  context as, you know, something is going to happen that, you

11  know.

12      Q.    What context is it written in when you say,

13  "Believe me, you have not heard the last of us"?

14      A.    If I'm correct, there's no proof of this,

15  obviously, but Larry Harper had talked about writing a

16  manifesto.

17      Q.    Well, this is your writing?

18      A.    Yes, sir, that's my writing.

19      Q.    So you could understand why someone who might

20  read this and say you have not heard the last of us might

21  think you were planning something?

22      A.    Yes, sir.

23      Q.    Like revenge?

24      A.    No, sir.

25      Q.    Now, you have denied or you have lied about

1    this letter, haven't you?

2         A.      I didn't deny the letter.  I denied writing

3    anything like, you haven't heard the last of us, because I

4    didn't remember writing that, no, sir.

5         Q.      Let me show you what has been marked as State

6    Exhibit 956, a letter to Dawn Amos.

7         A.      Yes, sir.

8         Q.      Dated March 20, 2001.

9         A.      Yes, sir.

10        Q.      That's a letter you wrote to Dawn?

11        A.      Yes, sir.

12               MR. SHOOK:  Your Honor, at this time we

13   offer State Exhibit 956.

14               MR. KING:  No objection.

15               THE COURT:  No. 956 shall be admitted.

16        Q.      (By Mr. Shook)  Let me start here.  "I was

17   real close to Rivas and Garcia, also.  Rivas was a good guy.

18   He just loved doing the work to get money.  I always got

19   onto him about that.  I blamed him for the Christmas Eve

20   incident because I told him it was wrong, too many kids and

21   all that.  But he insisted and he was the great mind of the

22   group, so he got the final say.  The other three guys I

23   couldn't give a rat's ass about.  They were trash,

24   unchanged, and just wanted to make money, get hookers and

25   all that.

1          "In fact, one of those dumb nuts is the one

2    that left that note saying, 'You haven't heard the last of

3    us.'  What an idiot.  Like we were out to get revenge on

4    society or something.  When they tried to say I was the one

5    that wrote that letter on AMW, I felt like busting the guy

6    in his nose.  He was all laughing about it and all that

7    shit."

8          Now, those are your words?

9    A.     Yes, sir.

10   Q.     And you wrote that?

11   A.     Yes, sir.

12   Q.     You told the jury that you planned on just

13   fading away up in Seattle; is that right?

14   A.     Yes, sir.

15   Q.     Can't really fade away when you are going to

16   "not heard the last of us", can you?  You understand what

17   those --

18   A.     I understand what you saying.

19   Q.     -- fading away --

20   A.     I understand what you're saying, but I'm

21   saying the letter is being taken out of context.

22   Q.     Obviously, you did remember what was written

23   about "you haven't heard the last of us", because you told

24   Dawn Amos that was an idiot who would write that?

25   A.     Yes, sir.

1    Q.    So you were lying about it then, weren't you?

2    A.    Excuse me?  Can you repeat what you had said

3 previously?  About --

4    Q.    About, "You haven't heard the last of us, what

5 an idiot.  Like we were planning revenge on society or

6 something."

7    A.    Right.

8    Q.    You were lying about you being the author of

9 that letter?

10   A.    Well, I didn't have any recollection of saying

11 anything or writing in anything like that.  I never wrote

12 anything -- and I believe that at the time that I also had

13 challenged the press to produce the letter and it hadn't

14 come out at the time, so it confirmed my belief in that I

15 hadn't written that line.

16   Q.    And now you are telling the jury you did write

17 it?

18   A.    Yes, sir, I did write it.

19   Q.    Let me show you.  Do you remember interviewing

20 with -- a phone interview with Razuuk, Channel 8?

21   A.    On the telephone?

22   Q.    Right.

23   A.    Yes.

24   Q.    Mr.  Halprin, I want to show you what has been

25 marked as State Exhibit 957, which is -- you haven't seen it

1   yet.  It's a copy of that interview.  I want to plug it in

2   to the part where she asks you that question.  And if you

3   don't think that's you, just let me know and I'll take it

4   off.

5        A.      I believe that I just stated, though, that I

6   did tell the press that I didn't write it.

7        Q.      I just want to make sure we're talking about

8   the same interview.

9        A.      All right.

10                        [At this time the tape was played by

11                        Mr. Shook.]

12        Q.      (By Mr. Shook)  You sound pretty sure in that

13   interview that you never wrote that statement.

14        A.      Yes, sir.  I was pretty sure until I just read

15   it with my own eyes, yes, sir.

16        Q.      So you had just forgotten it?

17        A.      Yes, sir.

18        Q.      And you -- you know, you agreed to that

19   30-year sentence.  You said that you had to do half of that

20   by law; is that right?

21        A.      Yes, 15 years.

22        Q.      Before you would be eligible for parole?

23        A.      Yes, sir.

24        Q.      But you -- did you not think that you deserved

25   a 30-year sentence for what you did to Jared smith?

1    A.    My thinking, I deserved -- I think I deserved

2  punishment, yes, sir.

3    Q.    But not 30 years?

4    A.    I can't say 30 years.  I mean, I can't say

5  that I didn't deserve 30 years, but I felt that when my time

6  came up, that if, you know, I've shown that I have gone

7  through the system and showed a change and rehabilitated

8  myself and done everything that was necessary to make

9  parole, and if I have shown that, then I should be able to

10  get parole and they weren't doing that.

11    Q.    Well, that was going to be ten years down the

12  line, wasn't it?

13    A.    Yes, sir.

14    Q.    So you just thought you would free yourself

15  ahead of time?

16    A.    Yes, sir.

17    Q.    So you think that you have served enough time

18  for beating Jared smith and breaking his bones, what, five

19  years?

20    A.    I felt that I could change myself.  I felt

21  that I was a changed person.

22    Q.    Why do you think that you felt like you were a

23  changed person?

24    A.    I felt that I would never hurt somebody again.

25    Q.    Okay.  And then people are hurt during the

130

1  escape?

2         A.      I never hurt anybody.

3         Q.      But you partook in that escape where other

4  inmates hurt people, didn't you?

5         A.      Yes, sir.

6         Q.      And then you get with a group of guys whose

7  plan is to go out and stick guns in people's faces?

8         A.      Yes, sir.

9         Q.      For up to six months as far as you knew,

10  right?

11         A.      Yes, sir.

12         Q.      How can you say that you had changed, if you

13  are going to agree to commit those types of felony offenses?

14         A.      I can't say.  I can just say what I believe is

15  in my heart.

16         Q.      Wasn't in your heart, but you went along with

17  it?

18         A.      Yes, sir.

19         Q.      These people that got guns put in their faces,

20  they obviously were very frightened?

21         A.      Yes, sir.

22         Q.      Probably had a lot of emotional trauma on

23  them?

24         A.      Yes, sir.

25         Q.      They didn't know if they were going to live or

1  die?

2          A.     Yes, sir.

3          Q.     And you helped commit those offenses?

4          A.     Yes, sir.

5          Q.     But you tell this jury you have changed?

6          A.     I feel that I'm not a monster or a threat to

7  society or a violent person, no, sir.

8          Q.     Well, you continue to lie?

9          A.     Yes, sir, I lie.

10         Q.     And you continue that while you've been in the

11 Dallas County Jail?

12         A.     Yes, sir.

13         Q.     So after you escaped, you took part in the

14 first robbery, is that right, the Radio Shack?

15         A.     The Radio Shack.

16         Q.     And I think you told Mr. King on direct that

17 after that you told the group you weren't doing that

18 anymore?

19         A.     Yes, sir.

20         Q.     Tell us about that.  How did that come up?

21         A.     The -- they hadn't got enough money from the

22 Radio Shack and Rivas was upset at the items that were

23 grabbed from the Radio Shack.  So he said we're going to do

24 another one here in this area and I told him how I felt.  I

25 said, "I don't like this.  I feel very uncomfortable with

```
 1   this.  I'm not going to do it."

 2           Q.      And who did you tell that to?

 3           A.      I told Rivas that.

 4           Q.      And what did he say?

 5           A.      And we argued about it.  He said, "You are

 6   part of the group and you need to do your share."  And I

 7   said, "I'm not going to do it."  And he kind of just passed

 8   it off like, "Well, it's something small.  We don't have to

 9   worry about it.  We don't need him."

10           Q.      So then they need -- did need you on the

11   Oshman's robbery?

12           A.      Yes, sir.

13           Q.      And how come you agreed to do that?

14           A.      But not without argument.

15           Q.      Well, what did you say to them?

16           A.      That was said before the Oshman's robbery?

17           Q.      Right.

18           A.      I basically asked why he was so intent on

19   doing something large like this.

20           Q.      Then how come you agreed to do it?

21           A.      I felt like I didn't have a choice.

22           Q.      You say you are not a violent person, but when

23   you get pushed to a limit, you can become a totally

24   different person, can't you?

25           A.      It takes a lot to push me to that limit, but
```

1    yes, I can lose my temper.  It doesn't necessary mean I'm

2    going to be violent.

3          Q.    Okay.  You weren't forced into committing this

4    robbery of the Oshman's, were you?

5          A.    No, sir, I was not forced.

6          Q.    No one threatened you?

7          A.    No, sir.

8          Q.    And you helped plan it, didn't you?

9          A.    I was in the listening of the plans.  I didn't

10   have any direct say in what would be done or anything like

11   that.

12         Q.    They sent you in to --

13         A.    Yes.

14         Q.    -- scout out the floor plan, didn't they?

15         A.    Yes.

16         Q.    Obviously they trusted you to do that?

17         A.    With Rodriguez.

18         Q.    Okay.  But you were a valuable member of this

19   team, aren't you?

20         A.    I wouldn't say I was very valuable.

21         Q.    Why did they take you out of there, then?

22         A.    Take me out of where?

23         Q.    The Connally Unit?

24         A.    Because Rivas and I were like brothers.

25         Q.    So you were like brothers with Rivas?

1      A.      Yes, sir.

2      Q.      And you are cooperating and helping?

3      A.      Yes, sir.

4      Q.      But was Rodriguez -- are you trying to say

5  Rodriguez was your guard?  He had to keep an eye on you?

6      A.      That's who they always put in charge of me.  I

7  guess you can say in charge.

8      Q.      But he wasn't watching you like you were going

9  to run off, right?

10     A.      Pretty much, yes, sir.

11     Q.      So you were held as a hostage?

12     A.      No.  They were afraid -- no, not hostage.

13  They were afraid that I might try to leave with the vehicle

14  or something like that.

15     Q.      Why were they afraid of that?

16     A.      Because they knew how I felt about everything.

17     Q.      Had you threatened to leave them?

18     A.      I talked about it.

19     Q.      Would you have been able to leave them?

20     A.      I could have, yes, sir.

21     Q.      How come you didn't?

22     A.      I can't say.

23     Q.      You can't say?

24     A.      No, sir.

25     Q.      So you are saying these guys thought you might

1  run off or they were scared, so they had someone with you

2  all the time?

3           A.      Yes, sir.

4           Q.      Why would they go in and commit a robbery like

5  the Oshman's robbery and have someone like you along that

6  they couldn't depend on?

7           A.      They just had me get clothes.

8           Q.      That would be pretty foolish, wouldn't it?

9           A.      Foolish for what?

10          Q.      Someone who is reluctant to go along on this?

11          A.      I'm not understanding the question.

12          Q.      Why would -- now, you said Rivas was pretty

13  smart, right?

14          A.      Yes, sir.

15          Q.      He planned out all those robberies?

16          A.      Yes, sir.

17          Q.      Why would he take someone along that he had to

18  keep a watch over, afraid he was going to run off with one

19  of the cars?

20          A.      They wouldn't ever let me go out alone.  They

21  wouldn't ever leave me alone in a motel.  I mean, that's the

22  only conclusion that I can come to.

23          Q.      But you were not a hostage?

24          A.      No, I was not -- no one ever held a gun and

25  said, "You are going to stay here."

1    Q.    And you did commit this robbery voluntarily?

2    A.    Yes, sir.

3    Q.    And you took a gun?

4    A.    Yes, sir.

5    Q.    A loaded gun?

6    A.    Yes, sir.

7    Q.    Why did you take a loaded gun?

8    A.    I felt like I had no choice.  The guns were

9    loaded, you know.

10    Q.    You could have unloaded it, couldn't you?

11    A.    I could have, yes, sir.

12    Q.    But you chose not to?

13    A.    It wasn't a choice.  I just didn't.

14    Q.    In fact, prior to the robbery some of these

15    guys had gone out and bought extra ammunition?

16    A.    They had done that way earlier.  I'm not sure

17    when they did that.

18    Q.    Who is that?

19    A.    I really don't know who went and got the

20    ammunition or not.

21    Q.    You don't remember?

22    A.    I can't recall.

23    Q.    You mentioned that in your confession, that

24    someone else bought ammunition.  Do you remember that?

25    A.    I know that there was ammunition bought, but

1    I'm not sure -- I can't recall who did it or not.

2         Q.    Well --

3         A.    The ones who always went out were Rivas and

4    Harper and Newbury.

5         Q.    Okay.  Why would they need extra ammunition?

6         A.    I really don't know.

7         Q.    Why --

8         A.    They like guns and they like ammo, is the only

9    thing I can say.

10        Q.    Do you think that they might have thought

11   about using some of that ammunition?

12        A.    Absolutely not.

13        Q.    Then why would they need extra ammunition?

14        A.    I don't know.  I can't say what was in their

15   mind.

16        Q.    Well, can you give us any reason or common

17   sense why you would need extra ammunition, other than you

18   might use it?

19        A.    They could be using it for target practice.  I

20   don't know.

21        Q.    Did you ever see them use it for target

22   practice?

23        A.    No, sir.

24        Q.    What would they want target practice for?

25        A.    I don't know.  They have several gun buffs in

1    the group.  I don't know.

2         Q.    You were with a bunch of guys that are violent

3    felons.  You know they like guns.

4         A.    Yes, sir.

5         Q.    And you know now they are buying extra

6    ammunition?

7         A.    Yes, sir.

8         Q.    And you said there was some incidents earlier;

9    is that right?

10        A.    An incident pertaining to --

11        Q.    In one of the other robberies?

12        A.    A confrontation, you mean?

13        Q.    Yes.

14        A.    I know about the Radio Shack for sure.  The

15   only thing I don't know about is the Auto Western.  I can

16   only go by what Newbury had talked about.

17        Q.    But nobody got killed?

18        A.    Nobody got hurt or killed.

19        Q.    I guess from seeing the Radio Shack, you knew

20   someone might try to resist, though.

21        A.    I saw that, you know, people had come in and

22   surprised them and that nobody overreacted or did anything

23   foolishly.

24        Q.    You mentioned in one of the letters that we

25   were looking at earlier that you said when Rivas planned out

1   this Oshman's that you argued against it because there were

2   all those kids involved.

3        A.    Yes, sir.

4        Q.    You were afraid something might go wrong in

5   there?

6        A.    No, sir.  I was just worried about their state

7   of mind.  You know, you have a bunch of teenagers in there

8   and they are obviously going to be scared.

9        Q.    Right.  And might do something foolish?

10        A.    Not necessarily, no.

11        Q.    Might get shot?

12        A.    Not necessarily.

13        Q.    How come -- well, the target actually of the

14   Oshman's was to get guns, wasn't it?

15        A.    That was just one of the things that George

16   Rivas had included with everything else.

17        Q.    I mean, you got 44 guns out of there?

18        A.    Yes, sir.

19        Q.    Why did they want so many guns?

20        A.    Some of them were going to be sold, some of

21   the guys kept some for personal, whatever, I don't know what

22   they planned to use it for or --

23        Q.    Why did they need these extra guns?  They

24   already had guns?

25        A.    I really can't say what was in their minds.

1    Q.    Do you think they were planning on using them?

2    A.    No, sir.

3    Q.    You even got a gun out of it.

4    A.    I was issued a gun, yes, sir.

5    Q.    Issued a gun?

6    A.    Yes, sir.

7    Q.    You didn't want the gun?

8    A.    Not really.

9    Q.    But you had it in your pack?

10   A.    It was in my backpack.

11   Q.    And it was loaded?

12   A.    Yes, sir.

13   Q.    So you go to the Oshman's.  It's been planned

14   out.  You planned it for what, three days?

15   A.    I'm not sure exactly how many days it was

16   planned for.  I can't really remember.

17   Q.    But part of the plan was to have an escape

18   car; is that right?

19   A.    Yes, sir.

20   Q.    And what were you going to need an escape car

21   for?

22   A.    Basically if we needed to take off on foot, we

23   could run across the field and get to the car.

24   Q.    So you talked about that?

25   A.    Yes, sir.

1    Q.    And thought something might happen where you

2  may have to do that?

3    A.    If Rivas couldn't get a car or anything like

4  that.

5    Q.    Well, what were the other scenarios that were

6  talked about that might come up?

7    A.    There were no other scenarios talked about.

8    Q.    So if he couldn't get a car, y'all were all

9  going to run across the field?

10    A.    Yes, sir.

11    Q.    Abandon your property?

12    A.    Not necessarily abandon all the property, but

13  some of it, yes, sir.

14    Q.    You had police monitors?

15    A.    Yes, sir.

16    Q.    And Murphy's role was to sit out there and

17  monitor the police channels?

18    A.    Yes, sir.

19    Q.    Why did you need him to do that?

20    A.    So we would know if anybody was coming, so we

21  could get out of there.

22    Q.    So you obviously thought about the situation

23  where the police might be coming?

24    A.    To leave, yes, sir.

25    Q.    But you knew that was a possibility?

```
1        A.      Yes, sir.

2        Q.      And that's why you wanted him to listen to the

3   radio?

4        A.      I didn't want him to listen, but, yes, sir.

5        Q.      You knew that was part of the plan?

6        A.      Yes, sir.

7        Q.      You were in on that part?

8        A.      Yes, sir.

9        Q.      Were you there when Rivas would tell you how

10  this was going to go down?

11       A.      Listening to the parts and the roles of

12  everybody, yes, sir.

13       Q.      But you weren't doing the planning yourself?

14       A.      No, sir.

15       Q.      Did you miss that meeting where Mr. Murphy was

16  issued that AR-15 and was going to be a sniper --

17       A.      That was never discussed in my presence.

18       Q.      -- and was to initiate a fire fight?  Well,

19  the statement has been introduced.  You have heard it read?

20       A.      Yes, sir.

21       Q.      That's the first time you have ever heard

22  that?

23       A.      I had read it previously.  But, yes, sir, that

24  -- I had no recollection that that was what he said he was

25  going to do or anything like that.
```

1    Q.    So if that was discussed, you just missed that

2    particular meeting?

3    A.    It was never discussed.  Those guys went into

4    town all the time during those days.  So, I mean, that could

5    have been discussed during that.

6    Q.    Apparently Mr. Murphy was anticipating some

7    trouble with the police, wasn't he?

8    A.    I can't say what he was or what he wasn't.

9    Q.    If you believe his statement where he says, "I

10   was to initiate the fire fight with pursuing police", that

11   --

12   A.    If that's what he says, then he must have.

13   Q.    But you didn't know about that?

14   A.    I did not.

15   Q.    What was the plan if the police were going to

16   come?

17   A.    As far as I know, Rivas said that he was going

18   to show them the security badge or something to take them

19   offguard.

20   Q.    Is that what he talked about?

21   A.    Yeah.  He said that he was going to do that,

22   something to take them offguard and they were going to try

23   to subdue them.

24   Q.    And how was he going to subdue the police?

25   A.    Use the handcuffs.

1    Q.    So it had been talked about if the police did

2    arrive, they were going to be subdued?

3    A.    In a nonlethal way, yes, sir.

4    Q.    You are telling this jury you didn't think

5    anything bad would happen?

6    A.    I didn't believe anything bad would happen.

7    Q.    Mr. Halprin, you do have common sense, don't

8    you?

9    A.    Yes, sir.

10    Q.    You are trying to tell this jury that you

11    didn't think anything bad would happen when you were going

12    to go into an Oshman's with six other men, all are convicted

13    violent felons, some with murder, they are all armed, and

14    they know the police might come.  You know that they are

15    capable of great violence?

16    A.    Based on the previous robberies, I had no

17    reason to believe that they couldn't handle a situation

18    without violence erupting.

19    Q.    You didn't think that was a possibility at

20    all, that someone might get hurt?

21    A.    I didn't think anybody would get hurt.

22    Q.    With that many men running around with guns?

23    A.    No, sir.  No, sir.

24    Q.    So you go into the Oshman's and you start

25    gathering up clothes.  That's part of your role?

```
1      A.      Yes, sir.

2      Q.      And you took a loaded gun in?

3      A.      Yes, sir.

4      Q.      And why is it you decided to take a loaded

5  weapon?

6      A.      I felt I didn't have a choice.

7      Q.      Someone force you to do that?

8      A.      No, nobody forced me.

9      Q.      But you could have unloaded it?

10     A.      I could have, yes, sir.

11     Q.      But you didn't?

12     A.      No, sir.

13     Q.      You know, when -- you are saying that you

14 weren't up there when the guns were pulled on the employees?

15     A.      No, sir.

16     Q.      You were with Mr. Rodriguez?

17     A.      I was in the apparel section.

18     Q.      But you were with Mr. Rodriguez?

19     A.      Yes, sir.

20     Q.      So that didn't happen?  You didn't pull your

21 gun out then?

22     A.      No, sir.

23     Q.      But during the middle of this robbery you were

24 doing things like picking up clothes and also carrying the

25 guns to the back; is that right?
```

1    A.    Yes, sir.  I was told to go get the guns, yes,

2  sir, or the sleeping bag.

3    Q.    And you knew while you were in the store that

4  the police were out front?

5    A.    I knew that there was a suspicious call or

6  whatever and they said that somebody could possibly be

7  coming, yes, sir.

8    Q.    Well, Murphy got on the radio and told all of

9  you that a police officer was out front, didn't he?

10    A.    No, he said, "Get out, get out.  This is a

11  suspicious call."

12    Q.    Okay.  Now, you are saying you heard Murphy

13  say what?

14    A.    He said something about there was a suspicious

15  call and somebody was coming around or somebody was coming

16  -- something to that extent.

17    Q.    Didn't say the police was there?

18    A.    He could have.

19    Q.    Well, let me show you your confession.  It

20  says, "Murphy was on the radio saying there was a patrol car

21  out front and that a call had been made and the police had

22  been notified."  Okay, is that the truth?

23    A.    Yes, sir.  I believe that's what I just said.

24    Q.    Okay.  Well, when you testified earlier you

25  said he only said, "Get out, get out."

1   A.   Well, when I -- Rivas is the one that actually

2   said, "Get out, get out."

3   Q.   So you knew while you were inside the store

4   that a police officer had pulled up outside the Oshman's?

5   A.   I knew that a policeman was coming.  I didn't

6   know that he had pulled up or pulled in or anything like

7   that.  I didn't know where he was.

8   Q.   Well, let me -- is that what -- Murphy told

9   you one was outside, didn't he?

10   A.   He said one was coming around, yes, sir.

11   Q.   "Murphy was on the radio saying there was a

12   patrol car in the front."

13   A.   Okay.  But you just said he just pulled up.

14   Q.   Okay.  You knew there was a patrol car in the

15   front?

16   A.   I knew there was a patrol car near, yes, sir.

17   Q.   That's what your language says right there,

18   right?

19   A.   Yes, sir.

20   Q.   So you knew there was a patrol car in the

21   front?

22   A.   Yes, sir.

23   Q.   And that's while you were in the store?

24   A.   Yes, sir.

25   Q.   Now you know there's a problem, right?

1   A.   I know that somebody is coming, yes, sir, and
2   we need to get out.

3   Q.   Not coming.  He's out front.

4   A.   Yes, sir.

5   Q.   So you know he's there, right?

6   A.   Yes, sir.

7   Q.   Okay.  So you are inside with the gun.  You
8   are robbing people.  And now you know a police officer is
9   out front?

10   A.   Okay.

11   Q.   Now, Mr. Halprin, you know there's a great
12   potential for violence now, don't you?

13   A.   If Murphy said he was going to initiate a fire
14   fight, why didn't he do that in the front?

15   Q.   But you know there is great potential for
16   violence now, don't you?

17   A.   I know that somebody is coming.  That doesn't
18   mean the situation can be disposed of.

19   Q.   There's a lawman out there, right?

20   A.   We could have gotten out.  We could have all
21   gotten into the car and drove away.

22   Q.   There's a lawman out front.

23   A.   Okay.

24   Q.   His job is to catch outlaws.

25   A.   Yes, sir.

1    Q.    Such as yourself.

2    A.    Yes, sir.

3    Q.    And you are in there with your six friends

4  with guns.

5    A.    Yes, sir.

6    Q.    So you know there's a great chance something

7  bad is going to happen, don't you?

8    A.    No, sir.

9    Q.    You didn't think anything bad was going to

10  happen?

11    A.    Not deadly.

12    Q.    So Murphy tells you while you are in the store

13  that there's a police officer out front.  You didn't leave

14  then, did you?

15    A.    No, sir.

16    Q.    You could have run out the back door, couldn't

17  you?

18    A.    Yes, sir.

19    Q.    Could have taken off across that field?

20    A.    Yes, sir.

21    Q.    But you didn't do that?

22    A.    No, sir.

23    Q.    Y'all continued to try to get your guns and

24  money out of there?

25    A.    Yes, sir.

1   Q.   In fact, at that time you are the one that
2   grabbed the money?

3   A.   Yes, sir.

4   Q.   They obviously trusted you to grab that
5   $70,000?

6   A.   That was the bag that Rivas put down by the
7   counter and told me to watch.

8   Q.   You go to the back now; is that right?

9   A.   Yes, sir.

10   Q.   When you go to the back, you know the police
11   -- he's out front?

12   A.   Yes, sir.

13   Q.   And then later on you knew he was coming
14   around?

15   A.   Yes, sir.

16   Q.   Because Murphy told you he was coming around?

17   A.   Yes, sir.

18   Q.   So y'all were ready for him?

19   A.   No, sir, not in the readiness that you are
20   implying, because when he pulled up behind us, it was still
21   a shock.

22   Q.   It was a shock?

23   A.   Yes, sir.

24   Q.   You didn't think the police would come around?

25   A.   I didn't think they were going to drive up.   I

1    thought we were going to be able to get away before he came

2    around.   When he said the car was in the front, there's no

3    telling where he could have gone.

4         Q.    You just said Murphy told you that he's coming

5    around.

6         A.    Okay.  But where?  Which way?  Coming around

7    where, though?

8         Q.    When he's coming around, you didn't figure he

9    was coming to the back where you were?

10        A.    I didn't know where he was going.

11        Q.    Who was out there when the police officer

12   drove up?

13        A.    Rivas, Joseph Garcia, Harper was out there and

14   Rodriguez was out there.

15        Q.    Okay.  And where were they?

16        A.    They were all out, piling stuff into the car.

17        Q.    Why don't you stand up and kind of draw how

18   everything was going on out there.

19        A.    I was loading.

20        Q.    If you would, why don't you draw a rectangle

21   where the Explorer was.

22        A.    (Witness complies.)

23        Q.    And where?

24        A.    Two doors are open.

25        Q.    Two doors are open?

1    A.    You have the rectangle with the two doors open

2    and then the staircase is right here, if I remember

3    correctly.  And everybody was just putting stuff, putting

4    stuff into the car loading it in.

5    Q.    Hold it right there.  Now, Officer Hawkins

6    drives up?

7    A.    Yes.

8    Q.    Draw on the diagram where he parked.  If you

9    would put initials where everyone is when Officer Hawkins

10   drove up.

11   A.    Where everybody was?  Initials of the people?

12   Q.    Right.

13   A.    Rivas --

14   Q.    Put a G before that.

15   A.    Sorry.  Larry was trying to get the smoke

16   grenade lit or whatever.  He was still in the doorway of the

17   -- but this is the doorway right here.  He was trying to

18   light the smoke bomb and a couple of guys were --

19   Q.    So is Larry Harper here?

20   A.    He was on the staircase, fire exit door.

21   Q.    If you would put an LH there.

22   A.    Okay.

23   Q.    And you said Garcia was out there?

24   A.    Garcia was out there.

25   Q.    Where was Garcia?

1    A.    I can't remember exactly where he was.  I just
2  know he was out there.

3    Q.    Do you know the general vicinity?

4    A.    Around the Explorer.

5    Q.    Like on this side?

6    A.    I can't say.  I can't recall.

7    Q.    Do you know what he was doing?

8    A.    Putting stuff in the car, also.

9    Q.    Same place you were?

10    A.    We were, you know, some were moving.

11    Q.    But are you on the same side of the car?

12    A.    Yes, sir.  On the same side of the car.

13    Q.    So he's in here?

14    A.    Yes, sir.

15    Q.    Put his initials in here.  You said Michael
16  Rodriguez was out there, too?

17    A.    Yes, sir.

18    Q.    Where was he?

19    A.    He was somewhere in the area.  I don't know
20  where he was at.  I remember him being out there.

21    Q.    Was he loading stuff, too?

22    A.    Yes, sir.  Every once in a while before he
23  pulled up somebody would run upstairs and grab bags and run
24  back down.

25    Q.    At the time he pulled up, was he loading stuff

1   with you and Garcia?

2          A.    Yes, sir.

3          Q.    So he was on the same side?

4          A.    Yes.

5          Q.    Put MR.  So we've got George Rivas here by the

6   front of the Explorer and you and Garcia and Michael

7   Rodriguez all loading equipment in?

8          A.    Yes.  And I believe Newbury was still at the

9   time before the officer showed up, he was still tying people

10  up in the breakroom.

11         Q.    Okay.  And when the officer showed up, where

12  was Newbury?

13         A.    He just came running out.  I don't know where

14  he came from.

15         Q.    Was that after the shooting started?

16         A.    That was after the shooting started.

17         Q.    And then -- okay.  So then the officer drives

18  up and George Rivas then walks up to him?

19         A.    He told me -- he said, "Stay put."

20         Q.    Told you to stay put?

21         A.    Yes, sir.

22         Q.    Did everyone else stay put?

23         A.    I was not aware of what they were doing at

24  that time.

25         Q.    Did you see them move?

1    A.    I don't recall.

2    Q.    Do you know if they moved?

3    A.    I can't recall.

4    Q.    Go ahead and have a seat.  So George Rivas

5  pulls up -- I mean, the Officer Hawkins pulls up and George

6  Rivas tells you, "I'll take care of him"?

7    A.    No, he says, "Stay put."

8    Q.    "Stay put"?

9    A.    Yes, sir.

10   Q.    Did he ever say, "I'll take care of him"?

11   A.    No, sir.

12   Q.    And he started walking toward Officer Hawkins'

13  car?

14   A.    He started walking toward the officer's car

15  and reaching for something that I assumed at the time was

16  his ID badge.

17   Q.    Now, at this point in time you have got a

18  bunch of guys with guns out in the back; is that right?

19   A.    Yes, sir.

20   Q.    You have got George Rivas walking to a police

21  car?

22   A.    Yes, sir.

23   Q.    You have got him outnumbered?

24   A.    Yes, sir.

25   Q.    But he's got you blocked in?

156

```
 1          A.      Yes, sir.

 2          Q.      You got to get that car out of the way or you

 3   are not going to be able to get out of there?

 4          A.      Yes, sir.

 5          Q.      Now, at this point in time, Mr. Halprin, you

 6   know something bad is about to happen?

 7          A.      No, because there was nothing to tell me that

 8   Rivas couldn't have handled the problem.

 9          Q.      Do you think Aubrey Hawkins was just going to

10   give up?  Say, hey --

11          A.      I don't know what was in his mind.  I don't

12   know --

13          Q.      That was an armed lawman.  Any doubt about

14   that in your mind?

15          A.      No doubt about that, no, sir.

16          Q.      His sworn duty is to stop people like you.

17          A.      Yes, sir.

18          Q.      And he's parked behind you?

19          A.      But when somebody is scared, they can do

20   anything.

21          Q.      He's parked behind you?

22          A.      Yes, sir.

23          Q.      And you don't think there is any potential for

24   violence out there?

25          A.      Not in my mind at the time.
```

1    Q.    Not at all?

2    A.    No, sir.

3    Q.    And then when George Rivas walks up to the

4  car, he doesn't hesitate?

5    A.    He reached for something and then the next

6  thing I know -- I just hear gunshots.

7    Q.    How many shots do you hear?

8    A.    I heard a series.  I thought -- I believed it

9  was four at the time.

10   Q.    Now, you didn't raise a finger to stop Rivas,

11 did you?

12   A.    No.  I took off running when he started firing

13 the shots.

14   Q.    But before that, you didn't try to stop him,

15 did you?

16   A.    No, sir.  Because I didn't believe that he was

17 going to fire the shots.

18   Q.    And you didn't -- when you saw that police

19 officer pull up, you didn't run across the field, did you?

20   A.    No, sir.

21   Q.    You could have, couldn't you?

22   A.    Yes, sir.

23   Q.    Could have avoided this whole thing and taken

24 off?

25   A.    Yes, sir.

Q.    But you didn't do that?

A.    No, sir.

Q.    You say you didn't start running until Rivas started firing shots?

A.    When the first initial gunshots were fired, that's when I took off running around the Explorer.

Q.    And which way did you run?

A.    I went behind and I was heading for -- there's a green or grass embankment of some sort, kind of goes down at an angle and that's what I was heading for it, because there's the road and then there's a field.  And then as I was taking off running, somebody called my name and I turned around and that's when I felt my foot go numb, as I was coming around the --

Q.    There's nothing but solid gunshots going off, isn't it?

A.    There was -- it was a series.  There was a pause and somewhere in it was like pop, pop, pop, and then a pop, pop, pop, pop, and then, you know, another series of gunshots.

Q.    So you heard the witnesses describe virtually one right after the other, isn't it?

A.    If that's what they say it is.  I can't recall exactly how it was at that time.  I just know I heard somebody called my name and I turned around and that's when

1    I felt my foot go numb.

2         Q.    Would you show us on the diagram the path you

3    took?

4         A.    Yes, sir.  Where is the -- where would the car

5    be?

6         Q.    The car would be in this area.

7         A.    It would be in this area right here.  When

8    somebody fires a shot, that's when I took off this way.  And

9    if I'm correct, this would be a little green embankment or

10   some kind of little hill or grass.

11        Q.    Did you make it over the embankment?

12        A     No, sir.

13        Q.    How far did you get?

14        A.    I didn't even really get to the grass when

15   someone called my name and I felt my foot go numb.

16        Q.    So you never made it this far?

17        A.    No, sir.

18        Q.    And then you heard someone calling your name?

19        A.    I heard somebody say, "Randy."

20        Q.    Why did they say that?

21        A.    I have no idea.

22        Q.    Then your foot went numb?

23        A.    And then my foot went numb.

24        Q.    Were you running away when your foot went

25   numb?

1    A.    When my foot went numb, it caught me -- as I

2    turned it caught me and I felt it and I go, "Oh, shit," like

3    that.  And then I took off running again and I actually got

4    to the grass.  By then the car was already backing up.

5    There was movement back here and the car was coming out.

6    And somebody said, "Get in, get in."  And that's when I

7    hopped into Newbury's lap and --

8    Q.    So you never made it across --

9    A.    No, I never made it across there.  I had

10   actually touched grass that time.

11   Q.    All right.  You never made it across this

12   street?

13   A.    No, sir.

14   Q.    You never made it into the field that --

15   A.    No, sir.

16   Q.    Never made it to the field?

17   A.    No, sir.

18   Q.    Okay.  And that's where you got into the car?

19   A.    Yes, sir.  It was coming out.  It was coming

20   out like this and somewhere in this area, I would say that's

21   -- the car came in this area and that's where I got into the

22   car.

23   Q.    And where did Michael Rodriguez --

24   A.    He got in somewhere.  I want to say the car

25   was already starting to pull off when he got in.

```
 1        Q.    So you never ran across the street or into the
 2   field?
 3        A.    No, sir.
 4        Q.    And you said the only person you saw shooting
 5   was George Rivas; is that right?
 6        A.    Originally.  Those were the first shots fired,
 7   but gunshots were erupting everywhere and I assumed that
 8   everybody else was firing.  And then the stories when they
 9   talked about it later everybody was, who did what?
10        Q.    Who took credit for doing what?
11        A.    Everybody, everybody but me.  They were
12   blaming me at first and I said, "Find the gun in the bag.
13   The gun's in a bag somewhere."
14        Q.    No, I want to know who took credit for
15   shooting Aubrey Hawkins?
16        A.    Rivas took -- he said, "If anything happens, I
17   shot him.  I'm the one that killed him.  I think I killed
18   him."
19        Q.    What about the others?  Did they say they shot
20   him?
21        A.    No.  They said that they were firing their
22   gun.  At the time Rodriguez said he believed that he had
23   shot him in the head.
24        Q.    What did he say about that?
25        A.    He said that he had fired two shots at the
```

1   time.

2          Q.    And how did that happen?

3          A.    I can't recall.  He just -- they were talking

4   about it and that's what he said he had done.

5          Q.    So Michael Rodriguez says he shot him twice in

6   the head?

7          A.    That's what he had said at first, yes.

8          Q.    And Rivas said he shot him how many times?

9          A.    He initially said four times.

10         Q.    Obviously, Officer Hawkins was shot a lot more

11  than that, wasn't he?

12         A.    Yes, sir.

13         Q.    The intent out there, obviously, was to kill

14  Aubrey Hawkins, wasn't it?

15         A.    Yes, sir.

16         Q.    Shot 11 times?

17         A.    Yes, sir.

18         Q.    His bulletproof vest was hit?

19         A.    Yes, sir.

20         Q.    His car was surrounded and fired at from

21  several angles?

22         A.    Yes, sir.

23         Q.    And the intent was clear to murder him?

24         A.    Yes, sir.

25         Q.    Because he was in the way?

1        A.      Yes, sir.

2        Q.      The only way you could get away is if he was

3   dead and you could get him out of the way?

4        A.      I don't know why they started firing on him.

5   But I know when you shoot a gun, it's usually to kill

6   somebody, yes, sir.

7        Q.      Usually when you bring a loaded gun to a

8   robbery, you plan on using it or at least the potential,

9   don't you?

10       A.      Not necessarily, no, sir.

11       Q.      Why else would you bring a loaded gun to a

12  robbery?

13       A.      To intimidate, to get somebody to cooperate

14  easier.

15       Q.      Do you remember giving an interview to a guy

16  named Jason Bromley?

17       A.      Yes, sir.  Is it Jason or Jay?

18       Q.      It may be Jay.  Do you remember talking about

19  the shooting and how it occurred with him?

20       A.      Yes, sir.  I remember going over it in an

21  interview, yes, sir.

22       Q.      I want to show you what has been marked as

23  State Exhibit 959, which, I believe, is going to be that

24  interview.  I want to play that portion of the interview

25  where you talk about the shooting.  If that's not you, let

164

```
 1    us know and we'll turn it off.

 2                        MR. SHOOK:  Your Honor, at this time we

 3    offer State Exhibit 959.

 4                        MR. KING:  No objection.

 5                        THE COURT:  No. 959 is admitted.

 6                            [At this time the tape was played

 7                            for the jury.]

 8         Q.    (By Mr. Shook)  You talking about Michael

 9    Rodriguez?

10         A.    Michael Rodriguez, yes, sir.  When I said

11    field --

12         Q.    You said, "I had taken across the field --"

13         A.    -- I meant the grassy bank.

14         Q.    Oh, that's what you meant?  The grassy bank?

15         A.    Yes, sir.

16         Q.    But you said, "field".

17         A.    I wasn't aware that it was actually a grassy

18    bank until I saw the diagrams and everything now.

19         Q.    Well, how big is the grassy bank?

20         A.    I can't recall how large it was.  All I know

21    is I was shot in the foot and I was trying to get away.

22         Q.    Is that the embankment you are talking about?

23         A.    That is the embankment, yes, sir.

24         Q.    You could hardly confuse that as a field,

25    could you?
```

1      A.      At the time I was calling it a field.  I don't

2  -- really can't give any other explanation.

3      Q.      That's obviously not more than, what?  How

4  many feet would you say that is?

5      A.      Um, it appears to probably be about five or

6  six feet.

7      Q.      State Exhibit 57, that's the field that you

8  have to get across to your car?

9      A.      Yes, sir.

10      Q.      Right?

11      A.      Yes, sir.

12      Q.      You are grinning there, saying, "I'm limping

13  across the field"?

14      A.      Yes, sir.  I don't think that I was grinning,

15  but --

16      Q.      Well, we can look at it again.  You weren't

17  grinning there?

18      A.      I'm was saying I'm limping with a flutter of

19  the eyes.

20      Q.      You are saying now that you were confused and

21  --

22      A.      Yes, sir.  At the time I was confused, yes,

23  sir.

24      Q.      You were just confused in that interview?

25      A.      Yes, sir.

1      Q.     And what you really mean is embankment?

2      A.     Grass.

3      Q.     Of course, at the time you gave that

4  interview, you didn't know we had this security tape and

5  could see if anyone crossed that street.

6      A.     No, sir.

7      Q.     But you have viewed the tape here in court,

8  haven't you?

9      A.     I've seen the tape, but I can't make anything

10  out of it.

11      Q.     Well, you can see the Explorer going down

12  street, couldn't you?

13      A.     I couldn't see an Explorer.

14      Q.     But today your story is what you meant by

15  limping across the field was just that embankment?

16      A.     That grass and I don't think that changes.

17      Q.     You said that you feel really bad about what

18  happened; is that right?

19      A.     Yes, sir.

20      Q.     Every time you look at your foot, you think --

21  you think of what happened out there?

22      A.     I do.

23      Q.     You plan on making some money off of this?

24      A.     Was I?  I had tried to make some money, yes,

25  sir.

1    Q.    You wanted to get a book deal to tell your

2  story, right?

3    A.    I believe I also said that a certain

4  percentage would be used for victim rights.  But that was

5  basically to survive in prison.

6    Q.    Let me show you what has been marked as State

7  Exhibit 960, a letter to Jennifer Roe.

8    A.    Yes, sir.

9    Q.    May 10, 2001.  Is that a letter you sent to

10  her?

11    A.    Yes, sir.

12          MR. SHOOK:  Offer State Exhibit 960.

13          MR. KING:  No objection.

14          THE COURT:  No. 960 shall be admitted.

15    Q.    (By Mr. Shook)  "I do plan on eventually

16  writing a book about my life and the whole Texas Seven

17  incident.  I thought about giving certain percentages of the

18  money to different organizations.  I thought about Hawkins'

19  son and also the child I hurt and when I was on acid.  I

20  would probably go for 30 or 40 percent for me and split the

21  rest up among the ones I mentioned.  Maybe I would give a

22  little to a victims right advocates, also."

23    A.    Yes, sir.

24    Q.    So you thought maybe you would write a book on

25  there and you could take 30 or 40 percent of the profits for

1    yourself?

2         A.      That was to get by in prison, yes, sir.

3         Q.      So you thought you might earn money off of

4    this whole deal?

5         A.      Not as a cashing in on telling my story or

6    anything like that.

7         Q.      That's what you would be doing, wouldn't you?

8         A.      It's to survive in prison.  I also said I

9    would give more, more than half, to other things besides

10   myself.

11        Q.      But you would take some of that cash?

12        A.      Yes, sir.

13               THE COURT:  Thank you, Mr. Shook.  That

14   will be enough for today.  Folks, it's been a long day.

15   Obviously, again, I'm going to leave you with the same

16   instructions.  Media coverage.  Do not, do not, do not watch

17   the media.  Don't read the paper, talk to friends, spouses

18   or anyone else.  Don't let anyone else tell you what your

19   opinion should be about what you heard from this witness.

20               With that we shall stand in recess until 8:30

21   tomorrow morning.

22                    [End of Volume]

23

24

25

169

1   STATE OF TEXAS          *

2   COUNTY OF DALLAS        *

3        I, NANCY BREWER, Official Court Reporter for the 283rd

4   Judicial District Court, do hereby certify that the above

5   and foregoing constitutes a true and correct transcription

6   of all portions of evidence and other proceedings requested

7   in writing by counsel for the parties to be included in this

8   volume of the Reporter's Record, in the above-styled and

9   numbered cause, all of which occurred in open court or in

10  chambers and were reported by me.

11       WITNESS MY OFFICIAL HAND on this the _29_ day of

12  _____9_____, 2003.

13

14

15                      _Nancy Brewer_
                        NANCY BREWER, CSR, NO. 5759
16                      Expiration Date:  12-31-04
                        Official Reporter, 283rd JDC
17                      Frank Crowley Crts. Bldg. LB33
                        133 No. Industrial Blvd.
18                      Dallas, TX 75207
                        (214)653-5863
19

20

21

22

23

24

25