REPORTER'S RECORD

**747721**

VOLUME 49 OF 84 VOLUMES

TRIAL COURT CAUSE NO. F01-00237-T

| | | |
|---|---|---|
| STATE OF TEXAS | * | IN THE DISTRICT COURT |
| VS. | * | DALLAS COUNTY, TEXAS |
| RANDY ETHAN HALPRIN | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JURY TRIAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 0 2003

Troy C. Bennett, Jr., Clerk

On the 6th day of June, 2003, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable Vickers L. Cunningham,

Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

Proceedings reported by machine shorthand.

ORIGINAL

```
 1                    A P P E A R A N C E S

 2   APPEARING FOR THE STATE

 3   Mr. Toby Shook
     SBOT NO. 18293250
 4   And
     Mr. Bill Wirskye
 5   SBOT NO. 00788696
     And
 6   Mr. Tom D'Amore
     SBOT NO. 05349500
 7   Assistant District Attorneys
     133 No. Industrial Blvd.
 8   Dallas, Texas 75207
     Phone:  214/653-3600
 9
     Ms. Lisa Smith
10   Appellate Division

11   APPEARING FOR THE DEFENDANT

12   Mr. George Ashford
     SBOT NO. 01374530
13   325 N. St. Paul Street
     Ste. 2475
14   Dallas, TX 75201
     214/922-0212
15
     Mr. Edwin King
16   SBOT NO. 11472200
     2305 Cedar Springs
17   Ste. 250
     Dallas, TX 75201
18   214/871-8800

19

20

21

22

23

24

25
```

i

```
 1                    WITNESS INDEX

 2   WITNESS              DIRECT      CROSS          VOL.

 3   Randy Halprin                    3              49

 4   Patrick Moczygemba  54          94             49

 5   Alejandro Marroquin 118         131            49

 6   Allen Camber        146,161     155,161        49

 7   Mark Burgess        163,190     179,192        49

 8   Frank McGehee       196         201            49

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT INDEX

| EXHIBIT | IDENT. | OFFER | ADMIT | VOL. |
|---------|--------|-------|-------|------|
| ST.334 | ITEM FROM JEEP | 8 | NO ADMIT | 49 |
| ST.342-A | ITEM FROM RV | 8 | 13 | 49 |
| ST.344-A | TEN COMMANDMENTS | 8 | 13 | 49 |
| ST.500 | PHOTO | 63 | 63 | 49 |
| ST.501 | PHOTO | 63 | 63 | 49 |
| ST.502 | PHOTO | 63 | 63 | 49 |
| ST.503 | PHOTO | 63 | 63 | 49 |
| ST.504 | PHOTO | 63 | 63 | 49 |
| ST.505 | PHOTO | 63 | 63 | 49 |
| ST.506 | PHOTO | 63 | 63 | 49 |
| ST.507 | PHOTO | 63 | 63 | 49 |
| ST.508 | PHOTO | 63 | 63 | 49 |
| ST.509 | PHOTO | 63 | 63 | 49 |
| ST.510 | PHOTO | 63 | 63 | 49 |
| ST.511 | PHOTO | 63 | 63 | 49 |
| ST.511-A | PHOTO | 63 | 63 | 49 |
| ST.512 | PHOTO | 63 | 63 | 49 |
| ST.512-A | PHOTO | 63 | 63 | 49 |
| ST.513 | PHOTO | 63 | 63 | 49 |
| ST.514 | PHOTO | 63 | 63 | 49 |
| ST.515 | PHOTO | 63 | 63 | 49 |
| ST.516 | PHOTO | 63 | 63 | 49 |
| ST.517 | PHOTO | 63 | 63 | 49 |

| | | | | |
|---|---|---|---|---|
| 1 | ST.518 | PHOTO | 63 | 63 | 49 |
| 2 | ST.519 | PHOTO | 63 | 63 | 49 |
| 3 | ST.520 | PHOTO | 63 | 63 | 49 |
| 4 | ST.521 | PHOTO | 63 | 63 | 49 |
| 5 | ST.522 | PHOTO | 63 | 63 | 49 |
| 6 | ST.523 | PHOTO | 63 | 63 | 49 |
| 7 | ST.524 | PHOTO | 63 | 63 | 49 |
| 8 | ST.525 | PHOTO | 63 | 63 | 49 |
| 9 | ST.526 | PHOTO | 63 | 63 | 49 |
| 10 | ST.529 | PHOTO | 63 | 63 | 49 |
| 11 | ST.530 | PHOTO | 63 | 63 | 49 |
| 12 | ST.531 | PHOTO | 63 | 63 | 49 |
| 13 | ST.532 | PHOTO | 63 | 63 | 49 |
| 14 | ST.533 | PHOTO | 63 | 63 | 49 |
| 15 | ST.534 | PHOTO | 63 | 63 | 49 |
| 16 | ST.535 | PHOTO | 63 | 63 | 49 |
| 17 | ST.536 | PHOTO | 63 | 63 | 49 |
| 18 | ST.537 | PHOTO | 63 | 63 | 49 |
| 19 | ST.538 | PHOTO | 63 | 63 | 49 |
| 20 | ST.539 | PHOTO | 63 | 63 | 49 |
| 21 | ST.540 | PHOTO | 63 | 63 | 49 |
| 22 | ST.541 | PHOTO | 63 | 63 | 49 |
| 23 | ST.542 | PHOTO | 63 | 63 | 49 |
| 24 | ST.543 | DIAGRAM | 63 | 63 | 49 |
| 25 | | | | | |

| | | | | |
|---|---|---|---|---|
| 1 | ST.545 | PHOTO | 63 | 63 | 49 |
| 2 | ST.547 | WEAPON | 63 | 63 | 49 |
| 3 | ST.548 | WEAPON | 63 | 63 | 49 |
| 4 | ST.549 | WEAPON | 63 | 63 | 49 |
| 5 | ST.550 | WEAPON | 63 | 63 | 49 |
| 6 | ST.582 | POSTER | 62 | 62 | 49 |
| 7 | ST.583 | PHOTO | 129 | 129 | 49 |
| 8 | ST.615 | BALLISTIC VEST RECEIPT | 8 | 13 | 49 |
| 9 | ST.951 | | 210 | 210(REC) | 49 |
| 10 11 | ST.961 | LETTER | 3 | 3 | 49 |
| 12 | ST.963 | LETTER | 6 | 6 | 49 |
| 13 | ST.964 | LETTER | 7 50 | 7(REC) 51(ALL) | 49 49 |
| 14 15 | ST.965 | DIAGRAM | 18 | 18 | 49 |
| 16 | ST.966 | BURGESS' STMT. | 190 | 190 | 49 |
| 17 | DX-34 | BOOK OF LETTERS | 40 | 40 | 49 |
| 18 | DX-35 | BOOK OF LETTERS | 40 | 40 | 49 |
| 19 | DX-36 | BOOK OF LETTERS | 40 | 40 | 49 |
| 20 | DX-37 | BOOK OF LETTERS | 40 | 40 | 49 |
| 21 | DX-38 | PHYSICAL DESCRIP. | 111 | 111 | 49 |
| 22 | DX-39 | DESCRIP.EVAL. | 114 | NO ADMIT | 49 |
| 23 | DX-40 | MARROQUIN'S STMT. | 133 | 133 | 49 |
| 24 | DX-41 | MARROQUIN'S STMT. | 133 | 133 | 49 |
| 25 | DX-42 | BURGESS' STMT. | 188 | 188 | 49 |
| 26 | | | | | |

3

```
 1                    P R O C E E D I N G S

 2                 THE COURT:  Thank you.  You may be

 3     seated.  Good morning.

 4                 CROSS-EXAMINATION CONTINUED

 5     BY MR. SHOOK:

 6          Q.    Mr. Halprin, let me show you another letter

 7     which has been marked as State Exhibit 961, a letter to

 8     Jennifer Roe, dated 6-1-2001.  Do you recognize that as

 9     letter to her?

10          A.    Yes, sir.

11                 MR. SHOOK:  At this time we offer 961.

12                 MR. KING:  No objection.

13                 THE COURT:  No. 961 shall be admitted.

14          Q.    (By Mr.Shook)  We talked about, I think, as we

15     left off yesterday that you had had a plan of writing a

16     book?

17          A.    Yes, sir.

18          Q.    You talk about that some in this letter.

19     "Hopefully a deal will come through.  I swear to you I'm

20     going to break you off something."  You wanted her to get a

21     little share of that?

22          A.    Could you please read the next line?

23          Q.    Spend it on her kids?

24          A.    Yes, sir.

25          Q.    You wanted some of it to survive in prison?
```

1     A.     Yes, sir.

2     Q.     And if that didn't go through, your next plan

3 was to sell an exclusive to the "National Inquirer"; is that

4 right?

5     A.     Yes, sir.

6     Q.     You wanted her to go to the "National

7 Inquirer"?

8     A.     And say that she had known me, and we had met.

9 And basically that way --

10    Q.     Did that deal ever go through?

11    A.     No, sir.

12    Q.     Did you ever get her to give you money?

13    A.     Yes, sir.

14    Q.     And I think you assure her now that you are

15 not going to use the money to write other girls to feed your

16 ego?

17    A.     Yes, sir.

18    Q.     "It's nice to be called cute, fine, sexy, and

19 dishy, but I don't need it"?

20    A.     Yes, sir.

21    Q.     Did a lot of women write you?

22    A.     Yes, sir.

23    Q.     All right.  And were you proud of that prison

24 break, that you were able to get out of the prison?

25    A.     Was I proud of it?

1     Q.    Yes.

2     A.    I mean, I can't say that I was boastful.  I

3 was happy that it was successful.  I mean, I wasn't proud

4 that anybody was hurt.  I mean, but it was -- I mean,

5 something that obviously you are going to be happy that you

6 were successful in that.

7     Q.    And you get a lot of respect from the prison

8 population being able to pull something like that off, don't

9 you?

10    A.    Yes, sir.

11    Q.    And you have gotten a lot of respect just here

12 in the Dallas County Jail being a part of the Texas Seven,

13 haven't you?

14    A.    Yes, sir.

15    Q.    That's just part of being in prison.

16 Prisoners give you respect if you can do things like that?

17    A.    Yes, sir.

18    Q.    Were you in on any of the planning for the

19 escape?

20    A.    The planning of the escape?

21    Q.    Yes.

22    A.    I've come up with a few ideas, yes, sir.

23    Q.    And we talked about how intelligent George

24 Rivas was?

25    A.    Yes, sir.

1       Q.      Do you consider him more intelligent than you?

2       A.      Obviously, yes, sir.

3       Q.      Let me show you State Exhibit 963, a letter to

4    Dawn Amos, dated March 26, 2001.  Do you recognize that as

5    being a letter to her?

6       A.      Yes, sir.

7               MR. SHOOK:  Your Honor, at this time we

8    will offer State Exhibit 963.

9               MR. KING:  No objection.

10              THE COURT:  No. 963 shall be admitted.

11      Q.      (By Mr.Shook)  On this letter you talk about

12   -- you talk about, I think you suspected she might have

13   written George Rivas.  And you asked her, "It's just Rivas

14   and I being like the two brightest of the T-7 group, always

15   had this competition thing going, you know, the typical male

16   thing.  I loved him like a brother.  I get jealous of him

17   sometimes.  He does me, also.  It's kind of funny to see us

18   go at it at times.  But, anyway, I apologize for being so

19   ignorant and superficial."  So did you consider yourself and

20   George Rivas the two most intelligent of the group?

21      A.      I was just blowing myself up.

22      Q.      Let me show you State Exhibits 964?

23      A.      Yes, sir.

24      Q.      A letter to Jennifer Roe, dated July 3, 2002?

25      A.      Yes, sir.

1    Q.    Do you recognize that as a letter --

2    A.    Yes, sir.

3    Q.    -- that you sent to her?

4          MR. SHOOK:  Your Honor, at this time we

5    offer State Exhibit 964.

6          MR. KING:  No objection.

7          MR. SHOOK:  For record purposes.

8          THE COURT:  No. 964 for record purposes

9    only.

10   Q.    (By Mr. Shook)  The gun -- you had a gun issued

11   to you and had that in your pack in Colorado?

12   A.    Yes, sir.

13   Q.    And you had $5,000.  That was your end of it?

14   A.    Yes, sir.

15   Q.    This -- is that the pack that you were going

16   to take when you left the group?

17   A.    It was the backpack that I had, yes, sir.

18   Q.    This cartoon --

19   A.    Yes, sir.

20   Q.    -- is that yours?

21   A.    Yes, sir.

22   Q.    What does that say on it?

23   A.    "Stick to the Lord."

24   Q.    Stick to the Lord?  Or does it say, "Sick to

25   the end"?

1     A.    Sick to the end -- I'm not --

2     Q.    It's your writing, is it not?

3     A.    Yes, sir.  But I'm not sure what it says.

4     Q.    Could it say, "Sick to the end"?

5     A.    It could, but I'm not sure what I was

6 referring to at that time.

7     Q.    Can you tell us what the cartoon figure is

8 doing?

9     A.    Looks like he's just holding a hand out like

10 that.

11     Q.    Okay.  The -- there was a thorough search of

12 that RV --

13               MR. SHOOK:  Your Honor, at this time I

14 would like to introduce State Exhibits 344-A 334, 342-A, and

15 615 which has been in for record purposes for all purposes

16 at this time.

17               MR. KING:  Judge, we renew our objection

18 previously made with additional objections we need to make

19 in regards to relevance and matters not tied to this

20 particular trial, so we would object.  If we need to have a

21 hearing outside the presence, we will be glad to do that,

22 but I think that the Court might be aware of the nature of

23 those types of objections.  And if the Court hadn't had an

24 opportunity to review these documents being offered by the

25 State, once again, I think that the Court in a previous

1   hearing may be aware of some of those items.

2                    THE COURT:  Sheriff, I need to have a

3   brief hearing.

4                          [Jury out]

5                    THE COURT:  Let the record reflect the

6   jury has been retired for the purposes of a hearing on the

7   admissibility of State Exhibit 334, 344, 342-A, and 615.

8   For the record 334 appears to be a page ripped out of a book

9   of the title "Near Christianity" and with a personal note on

10  the back.

11                   Specifically what are your objections to 334?

12                   MR. KING:  Well, our objections to all of

13  those in one group are they are the result of an illegal

14  search and seizure and an illegal search and illegal arrest

15  and illegal detention.  We have previously covered those

16  particular constitutional points in motions previously

17  denied by the Court.

18                   However, if that is -- purports to be a note

19  left by Larry Harper in regard to that, we would object to

20  it.  That's not the same as a statement taken by law

21  enforcement from one of the other individuals.  There's no

22  showing when that letter was written as to time and date, so

23  as to show whether or not it was written a month previous

24  and was just lying around in anticipation of some action or

25  if it was written close to the time Mr. Harper took his own

1    life.

2              The probative value outweighs the prejudicial

3    value -- or the prejudicial effect outweighs the probative

4    value under balancing and there's no way for us to verify

5    the veracity.  We object.

6              THE COURT:  My impression is this appears

7    to be his suicide note, so I'm not worried about the

8    veracity of an individual at that point.  But I am concerned

9    with the relevance to this defendant.

10             Madam prosecutrix, how is 334 relevant to this

11   trial?

12             MS. SMITH:  I think it's relevant as to

13   who fired shots.  I think there's been a lot of testimony as

14   to people shooting and not shooting and that's certainly got

15   evidence in that letter about whether or not one of the

16   seven actually fired a shot or not.  I think that is

17   certainly relevant at guilt/innocence.

18             THE COURT:  The statement in the note

19   reads the --

20             MR. KING:  I object also that it's

21   hearsay.

22             THE COURT:  Certainly a statement against

23   interest, but the --

24             MR. KING:  How is it a statement against

25   interest if he says he didn't do anything?  He said he

1  didn't shoot.  How is that a statement against interest?

2  The defense has previously offered statements against

3  interest where somebody admitted that they shot or that

4  indicated if they had shot and they found a bullet in the

5  police officer, that caused the death of the police officer,

6  that they must have shot the police officer.  And the Court

7  has ruled that wasn't a statement against interest.

8          So how is the statement, "I was present, but I

9  didn't cause his death," how is that a statement against

10  interest at this point?  It seems to me what is good for the

11  goose is good for the gander.  If the Court lets that in,

12  then we would feel that the previous offers that the defense

13  has made, that would open the door to them, certainly, under

14  106 and 107.  It would effectively flush out that particular

15  issue.

16          THE COURT:  Anything further from the

17  State?

18          MR. SHOOK:  Let me see it, Judge.

19          THE COURT:  I don't see enough relevance

20  there to admit that.

21          MR. SHOOK:  All right.

22          THE COURT:  Moving on to State Exhibit

23  342 and 344, which are two copies in different conditions,

24  entitled "The Ten Commandments of Spec Wars".  Now, for my

25  benefit to be sure I'm correct, one of these was found in

1    the trash outside the RV labeled on State 342-A.  The one

2    marked 344-A was found in the black bag on site No. 1 inside

3    the RV in the rear bedroom.  I also recall the defendants

4    DNA was also found in the trash can outside the RV; is that

5    correct?

6                    MR. SHOOK:  You know, Judge, I don't know

7    if that was correct or not from what Dr. Sliter was saying.

8    I think that might have been the motel room in Carrollton.

9    I know the defendant was obviously there.  He has testified

10   he was in the RV for days on end, stayed there.  So I don't

11   think there's a question of his presence.

12                    Our argument is he's put himself in the RV,

13   that's found outside the RV and inside the RV, and obviously

14   the relevance is obvious from the material, especially when

15   we talk about the law of parties and what was going on after

16   they -- during the escape and also after the escape.

17                    THE COURT:  Mr. King, your objections to

18   these two exhibits?

19                    MR. KING:  Nothing to tie them to the

20   defendant and not found in any bag that appeared to be

21   marked with his color or anything else, Judge.  Certainly

22   finding something in the trash doesn't indicate any desire

23   to keep something and so much that they can tie the

24   defendant.  There's no telling how long the document in the

25   trash had been there or who threw it there or how it got

1    there.  These may have been documents that were at the

2    location.  This is Colorado and this is an area that is full

3    of individuals who believe in certain unusual freedoms in

4    that part of the country.  They have a lot of --

5                        THE COURT:  Thank you, Mr. King, for your

6    comments on Colorado.  Nos. 342-A and 344-A shall be

7    admitted.

8                     What is the nature of State Exhibit 615?

9    Where was this receipt from the City Surplus and Paint

10   Company found?

11                       MR. SHOOK:  That was found in the RV and

12   is a receipt for a bulletproof vest.

13                       MR. KING:  We would like to know where in

14   the RV it was specifically found.

15                       THE COURT:  Has a bulletproof vest been

16   offered by the State?

17                       MR. SHOOK:  No.  Purchased and waiting on

18   the order.

19                       THE COURT:  Waiting on the order.

20                       MR. KING:  I think that the State is

21   aware that there's no evidence to show that Mr. Halprin was

22   present at the time any vests were purchased.  And I don't

23   believe any evidence to show he had any personal knowledge

24   of any of that.

25                       THE COURT:  Well, ask him.

1    MR. SHOOK:  Judge, that's what I want to

2    ask him, is if he had personal knowledge, because I think

3    that the weight goes to the parties, if he's committing

4    crimes with people who want ballistic vests.

5    THE COURT:  Ask him.

6    MR. SHOOK:  I was going to ask him after

7    it was admitted.  I mean, I don't think the admission goes

8    to whether he admits he knows about it or not.

9    THE COURT:  Where was it found in the RV?

10   MR. SHOOK:  I think the officer just

11   testified it was in the RV.

12   MR. KING:  I don't know where they found

13   it.  It doesn't appear to be in plain view.  If you go back,

14   the only -- there was only a couple of items that appeared

15   to be in plain view and that's not reflected in any

16   photograph that the State appears to have of the search.

17   And maybe they do have a photograph of where that particular

18   item was found, but I think that they need to tie that up.

19   First of all, they can certainly ask Mr.

20   Halprin outside the presence if he has any knowledge of

21   that.  But that is certainly some action and I make a

22   proffer to the Court that the evidence is going to show that

23   Mr. Rivas and one or two of the others were the individuals

24   that engaged in the purchase or the attempted purchase or

25   ordering of those vests.  Those vests were never delivered.

1   But there is nothing to show that Mr. Halprin was ever

2   present at that time and there's nothing to show that Mr.

3   Halprin has any personal knowledge of that.

4               MS. SMITH:  We don't have to link it to

5   him.  The mindset of the parties is also in issue.  And some

6   of the parties made that purchase.  It think it's certainly

7   relevant at this stage.

8               THE COURT:  It's relevant.  It goes to

9   the weight.  I will admit 615.

10              MR. KING:  It's also an extraneous

11   offense that we would specifically object to and the

12   probative value of it outweighs the prejudicial effect

13   (sic).  There hasn't been any testimony on direct

14   examination in regards that would open the door to that

15   particular extraneous offense.  We object to that as well.

16              THE COURT:  Overruled.  Bring us a jury.

17              [Jury in]

18              THE COURT:  Thank you.  You may be

19   seated.

20      Q.    (By Mr. Shook)  Mr. Halprin, let me show you

21   some exhibits, 344-A and 342-A, which have been admitted for

22   all purposes.  Special Agent Mahoney testified he found one

23   of these -- one of these was recovered from the trash can

24   outside the RV and the other inside the RV in a black bag.

25   Do you recognize this document?

1     A.     No, sir, I do not.

2     Q.     Have you ever seen it before --

3     A.     No, sir.

4     Q.     -- in the RV?

5     A.     No, sir.

6     Q.     Do you know if any of your friends there, if

7 this was their document?

8     A.     No, sir.  May I see the back of one of those,

9 though, real quick?  Were you able to find out whose

10 handwriting that is?

11     Q.     No.  I haven't looked into -- "children's home

12 anywhere in Colorado"?

13     A.     I don't know.  I was just wondering if you had

14 a hand analysis done on it or anything.

15               MR. SHOOK:  May I publish to the jury,

16 Your Honor?

17               THE COURT:  You may.

18     Q.     (By Mr.Shook)  "The Ten Commandments of Spec

19 War, according to Richard Marcinko.  I am the War Lord and

20 the wrathful God of Combat and I will always lead you from

21 the front, not the rear.  I will teach you all alike--just

22 like shit.  Thou shalt do nothing I will not do first, and

23 thus will you be created Warriors in My deadly image.  I

24 shall punish they bodies because the more thou sweatest in

25 training, the less thou bleedest in combat.  Indeed, if thou

1    hurtest in thy efforts and thou suffer painful dings, then

2    thou art Doing It Right.  Thou hast not to like it--thou

3    hast just to do it.  Thou shalt Keep It Simple, Stupid.

4    Thou shalt never assume.  Verily, thou art not paid for thy

5    methods, but for thy results, by which meaneth thou shalt

6    kill thine enemy before he killeth you by any means possible

7    (sic).  Thou shalt, in thy Warrior's Mind and Soul, always

8    remember My ultimate and final Commandment:  There Are No

9    Rules--thou Shalt Win at All cost."

10              Mr. Halprin, were you aware that George Rivas

11   had put in an order and paid for four ballistic vests?

12        A.    No, sir, I was not.

13        Q.    Did you ever hear him discuss that?

14        A.    No, sir.

15        Q.    Did you ever see the receipt for the ballistic

16   vest that we see here in State Exhibit 615?

17        A.    No, sir.  I have never seen that receipt.

18        Q.    Never heard them talk about ordering ballistic

19   vests?

20        A.    No, sir.

21        Q.    Were they discussing other robberies or

22   planning to do other robberies in Colorado?

23        A.    Not to my knowledge.

24        Q.    Do you know why he would have scanners in the

25   Jeep with him and all those weapons?

18

```
 1        A.    I really don't know.

 2        Q.    Why did y'all have loaded weapons all over the

 3   RV and in the Jeep?

 4        A.    You would have to ask those individuals.  I

 5   don't know.

 6        Q.    Well, you had a loaded gun in your pack.

 7        A.    Because I was issued one, yes, sir.

 8        Q.    And what were you supposed to do with the gun?

 9        A.    They wanted me to carry it around.  I just

10   kept it in my backpack.

11        Q.    For what reason?

12        A.    I guess for protection.  I don't know.

13        Q.    Protection from who?

14        A.    I don't know.

15        Q.    Let me show you State Exhibit 965.  Is this

16   the diagram that you did yesterday?

17        A.    Yes, sir.

18        Q.    Okay.

19              MR. SHOOK:  At this time we will offer

20   State Exhibit 965?

21              MR. KING:  No objection, Your Honor.

22              THE COURT:  No. 965 shall be admitted.

23        Q.    (By Mr. Shook)  This is a diagram I had you

24   draw.  You have got the fire exit here, Ford Explorer here,

25   and Mr. Hawkins -- Officer Hawkins' car behind it; is that
```

1    right?

2         A.     Yes, sir.

3         Q.     You were loading the stolen items into the

4    back seat; is that right?

5         A.     Yes, sir.

6         Q.     You put George Rivas at the front, Michael

7    Rodriguez, Joseph Garcia, and yourself loading equipment in

8    and I believe Larry Harper up here?

9         A.     Yes, sir.

10        Q.     And Larry Harper was trying to set off --

11        A.     At the time he was trying to set the smoke

12   bomb off.

13        Q.     Was that inside the store?

14        A.     That was at the fire exit door.  I'm not sure

15   exactly where.

16        Q.     Then when the shooting began, what was the

17   path you took?

18        A.     I went around the Ford Explorer.

19        Q.     This way or this way?

20        A.     I went behind.

21             MR. SHOOK:  Can I have him step down so

22   we can make sure which way?

23        A.     I went behind.

24        Q.     (By Mr. Shook)  Right here?

25        A.     Yes.

1    Q.    Then where did you go?

2    A.    I ran down the embankment that was right here.

3    Q.    Did you go in a straight path when you took

4    off behind the Explorer?

5    A.    I don't remember exactly how I ran.  I just

6    know I came around.

7    Q.    Did you come this way or this way or --

8    A.    I never went this way.

9    Q.    You never went up here?

10   A.    No, sir.

11   Q.    So --

12   A.    I came this way to the embankment where the

13   embankment was and that's when somebody called my name.

14   Q.    Did you make it to the embankment when someone

15   called your name?

16   A.    I was near it.  I'm not sure if I was exactly

17   on the grass or not.

18   Q.    That's when you were shot?

19   A.    That's when I was shot, yes.

20   Q.    Were you shot before the embankment or after?

21   A.    Before I reached the embankment.

22   Q.    And then you started going down the embankment

23   after you were shot?

24   A.    After I was shot I hopped up and down and

25   yelled I was shot said, "Oh, shit, I'm shot."  And I ran

1  down the embankment and by then the car was already pulling

2  out.

3          Q.     And you were definitely on the embankment --

4          A.     I was on the grass, yes, sir.

5          Q.     -- after you were shot?

6          A.     Yes, sir.

7          Q.     Do you know how far you made it?

8          A.     I'm not really sure how far I made it.  I just

9  remember somebody yelling, "Get in the car."

10         Q.     What was the path you took back to get into

11 the car?

12         A.     I'm not exactly sure.  I just remember hopping

13 into the car.

14         Q.     Definitely went straight across and straight

15 this way or this way, but not up here?

16         A.     Yes, sir.

17         Q.     All right.  Now, let me show you your written

18 confession and you talk about everyone's position?

19         A.     Yes, sir.

20         Q.     You said, "By the time I got back outside,

21 Rodriguez and Harper were out by the Explorer and Rivas was

22 standing at the front of the Explorer, telling us to hurry

23 up.  I brought the bag of guns out and then put them behind

24 the driver's seat.  That's when the cop showed up and I was

25 still at the back door and Rivas told me to stay there.

1   Rivas then went up and shot the cop four times.  Harper was

2   shooting at the car, too.  And then he went and got Garcia

3   and Newbury."

4       A.      Yes, sir.

5       Q.      In this statement you have got George Rivas

6   out front, Harper and Rodriguez out here, also?

7       A.      Right.  But Harper was coming -- at the time

8   when they were throwing bags in -- I mean, before he was

9   smoking the -- when he told him to smoke it or whatever.

10      Q.      But he's in this area then?

11      A.      Yes, sir.

12      Q.      And you say after the shooting began is when

13  he went in and got Newbury and Garcia?

14      A.      I believe Garcia was out.  I'm not sure

15  exactly because he was running back in and out to get the

16  bags.  So at that time he could have actually been inside

17  when Newbury came out.  I'm not -- I'm not sure.

18      Q.      But in the statement you have got as the

19  shooting began Garcia and Newbury were inside and then they

20  come out?

21      A.      Well, you have to realize that as I was

22  dictating the statement that Sergeant Spivey was stopping

23  and explaining things and asking me questions and he would

24  go back on, so --

25      Q.      But you admit that?

1    A.    Yes, sir.

2    Q.    Okay.  What I want to show you, Mr. Halprin,

3    is there's a retaining wall, cement retaining wall, all

4    along this embankment.

5    A.    Okay.

6    Q.    Now, after you were shot, did you -- I guess

7    you had to jump over the retaining wall to get to the --

8    A.    I don't remember the retaining wall.  I don't

9    remember.

10   Q.    The retaining wall obviously is there in the

11   photograph?

12   A.    I just remember running through grass.

13   Q.    You do see the retaining wall there, don't

14   you?

15   A.    Yes, sir.

16   Q.    Goes all the way to the curb?

17   A.    Yes, sir.

18   Q.    So if you were shot, as you just described in

19   your diagram, you would have to jump over the retaining wall

20   to get to this grass, wouldn't you?

21   A.    I remember touching grass.

22   Q.    But that's what you would have to do.  You

23   would have to jump over the retaining wall to get there?

24   A.    Yes, sir.  I'm not sure.  I don't remember

25   jumping over anything, but I know I was on grass.

24

1    Q.    And to get back, if you are on this side of

2    the retaining wall, you would have to jump back over,

3    wouldn't you?

4    A.    Yes, sir.

5             MR. SHOOK:  That's all the questions we

6    have, Judge.

7                   REDIRECT EXAMINATION

8    BY MR. KING:

9    Q.    Well, certainly wouldn't have to jump over the

10   retaining wall if you ended up running over on this grass

11   over here, would you?

12   A.    I could have been there, but I'm not sure

13   where I exactly was at the time.

14   Q.    The truth of the matter is, once the shooting

15   started, it was pretty hard to figure -- there was a lot of

16   confusion at that point; is that right?

17   A.    Yes, sir.

18            MR. KING:  Do we have all the exhibits

19   out in the courtroom or are some still in there?

20            COURT REPORTER:  Some are still in there.

21            MR. KING:  Judge, may I have one of the

22   bailiffs to try to pull some of the other stuff out?

23            THE COURT:  You need the assistance of

24   Ms. Brewer.

25            MR. KING:  May I have her as well, for

1    just a moment, then, Judge?

2                        THE COURT:  Yes.

3                        MR. KING:  She has care and custody?

4                        THE COURT:  Yes.

5                        [Recess]

6         Q.    (By Mr. King)  Randy -- Mr. Halprin, when

7    George Rivas pulled up and you came out of the stairs, which

8    stairs you talking about?  These stairs?  Or these stairs up

9    here?

10        A.    I can't really remember how everything was set

11   up back there.  I just can't say.

12        Q.    When you came out of the door that y'all came

13   out of, could you see the Ford Explorer?

14        A.    Yes, sir, it was almost --

15        Q.    It wasn't hidden from view, was it?

16        A.    No, sir.

17        Q.    That wouldn't make much sense in this robbery

18   to hide the getaway car from the view of the people coming

19   out, now, would it?

20        A.    No, sir.

21        Q.    So the Ford Explorer had to be parked in some

22   type of position where somebody could see it --

23        A.    Yes, sir.

24        Q.    -- from the stairs, right?

25        A.    Yes, sir.

1    Q.    Now, you know, I don't know that because y'all

2   weren't coming out and going, gee, I wonder where George is?

3    A.    No, it was already waiting there.  It was

4   already parked.

5    Q.    Okay.  Was it bright light out there?

6    A.    No.  There was -- it was completely dark

7   outside.  There was a little drizzle and then it was only

8   illuminated by the lights that were on the store or wherever

9   there was a light.

10    Q.    Okay.  And when the shooting started, you just

11   broke and ran?

12    A.    Yes, sir.

13    Q.    Let's see, the State's got a receipt for four

14   bulletproof vests.  I'm sorry, but how many were there

15   originally in the group that was up there in the RV?

16    A.    Seven people.

17    Q.    Seven?

18    A.    Yes, sir.

19    Q.    So somebody is buying four vests, but there's

20   seven of y'all, correct?

21    A.    Yes, sir.

22    Q.    And when the State talks in terms of you being

23   -- you and George Rivas being the two smartest ones, did you

24   ever get accepted to the Naval Academy?

25    A.    No, sir.

1    Q.    Did you ever get accepted to the United States

2    Military Academy?

3    A.    No, sir.

4    Q.    Were you an honor student at the University of

5    Texas at El Paso?

6    A.    No, sir

7    Q.    Were you aware that Larry Harper apparently

8    according to the Texas Department of --

9    MR. SHOOK:  We'll object to hearsay, Your

10   Honor.  Assuming facts not in evidence and the form of the

11   question.

12   Q.    (By Mr. King)   Well, Mr. Halprin, you said --

13   MR. SHOOK:  Judge, can I get a ruling on

14   my objection?

15   THE COURT:  I sustained it.

16   MR. SHOOK:  Sorry, I didn't hear.

17   Q.    (By Mr. King)   You have seen Mr. Shook in

18   action before this jury in the last couple of days, haven't

19   you?

20   A.    Yes, sir.

21   Q.    He's a very thorough and meticulous

22   individual, isn't he?

23   A.    Yes, sir.

24   Q.    You know for a fact, just from the letters

25   that he's offered in before you that he has certainly read

1    every letter that you have ever written.

2                     MR. SHOOK:   We object to the leading

3    nature of the question.

4                     THE COURT:   Sustained.

5         Q.     (By Mr. King)   You were aware, were you not,

6    that they were copying your mail?

7         A.     Yes, sir.

8         Q.     And you still were writing letters?

9         A.     Yes, sir.

10        Q.     You didn't get any letters while you were in

11   prison?

12        A.     No, sir.

13        Q.     You got a couple?

14        A.     Couple.

15        Q.     Didn't have any visitors?

16        A.     No visitors.

17                     MR. SHOOK:   We'll object to leading, Your

18   Honor.

19                     THE COURT:   Sustained.

20        Q.     (By Mr. King)   Since you've been in custody,

21   have you been in a single cell or not?

22        A.     I've been isolated, yes, sir.

23        Q.     Have you been allowed out for recreation?

24        A.     No recreation.

25        Q.     So what do you do to pass the time?

1        A.      I write letters and read.

2        Q.      Now, a lot of the people that wrote you

3   letters, did you know them before?

4        A.      No, sir.

5        Q.      And it gives you something to do, doesn't it?

6        A.      Yes, sir.

7        Q.      And had you had any contact with -- in the

8   five years you were in prison with any women?

9        A.      No contact.  I mean, I have had a pen pal, but

10   it never turned into anything.  Wrote a couple of times and,

11   you know.

12        Q.      What do you mean never turned into anything?

13        A.      It was just, you know.

14        Q.      You really can't have a relationship with

15   somebody --

16        A.      Right.

17        Q.      -- a physical relationship, certainly, while

18   you are in prison, can you?

19        A.      Yes, sir.

20        Q.      So any kind of relationship you have with a

21   woman has got to be --

22        A.      On paper or --

23        Q.      -- on paper?

24        A.      Yeah.

25        Q.      You ever fantasize on paper about being with

1    somebody?

2         A.    Yeah.

3         Q.    Do you ever write those kind of letters?

4         A.    Yes, sir.

5         Q.    And certainly you might have made yourself

6    appear to be something that you aren't --

7         A.    Yes, sir.

8         Q.    -- in some of those letters to some of these

9    people?

10        A.    Yes, sir.

11        Q.    Were you a part of the red team?

12        A.    No, sir.

13        Q.    Were you a part of the blue team?

14        A.    No, sir.

15        Q.    Did you ever get to drive one of the vehicles?

16        A.    No, sir.

17        Q.    Never?

18        A.    Never.

19        Q.    Did you ever go out with George Rivas and any

20   of the other guys in Colorado and go to any of the Army/Navy

21   stores they apparently went to?

22        A.    No, sir.

23        Q.    Never?

24        A.    I went to -- there was a -- I can't remember

25   what it was called in Colorado Springs, that they had went

1  one time and I went with them.  And basically I was looking

2  for some kind of different sandals, some Dock Martin sandals

3  that they had, but I never purchased anything there.

4          Q.     Let me show you what has been marked as

5  Defense Exhibits 34, 35, 36, and 37.  Let me show you 37

6  first.  And scoot this out of the way.  And these appear to

7  be --

8          A.     Copies of letters I've written.

9          Q.     -- copies of letters?

10         A.     Yes, sir.

11         Q.     And 36, once again, these appear to be copies

12  of letters?

13         A.     Yes, sir.

14         Q.     Now, you had written some letters to me, had

15  you not?

16         A.     I had written George, I believe.

17         Q.     And do you know whether all those letters were

18  received by George -- Mr. Ashford, I mean?

19         A.     I believe -- I was told some of them were

20  never received, yes, sir.

21         Q.     As a matter of fact, in order to mail a letter

22  from -- and this is Defense Exhibit 35.  There's not a

23  little mail box or --

24         A.     No, sir.

25         Q.     -- post office box -- listen to me.  Don't

1    talk over me.

2            A.      Yes, sir.

3            Q.      There's not a mail box or post office box up

4    there in the county jail or in prison, is there?

5            A.      No, sir.

6            Q.      There is not a box you get to go and drop your

7    mail in which says, you know, nobody else can violate this

8    face and take this mail.  You have got to turn it over to a

9    guard, right?

10           A.      Yes, sir.

11           Q.      Now, you have had stuff that was supposedly

12   sent to you in the form of pictures or other kinds of things

13   that never actually -- and magazines and some mail that you

14   never actually got?

15           A.      Yes, sir.

16           Q.      And, of course, did you ever have a

17   conversation with Sergeant Greg Porter in that regard?

18           A.      Yes, sir.

19           Q.      And did you ever ask Mr. Ashford or I to have

20   a conversation with individuals about those types of things?

21           A.      Yes, sir.

22           Q.      Now, there's a lot in these letters, isn't

23   there?

24           A.      Yes, sir.

25           Q.      A lot of letters to women, letters to your

1    brother?

2           A.     Yes, sir.

3           Q.     Is there a letter in here to Wesley, your

4    brother, where you tell him you were sorry you lied to him?

5           A.     Yes, sir.

6           Q.     What did you lie to him about?

7           A.     About saying that I had not caused injury to a

8    child.

9           Q.     And Mr. Shook introduced some letters that you

10   first wrote when you first got down to prison while you were

11   in the Tarrant County Jail; is that right?

12          A.     Yes, sir.

13          Q.     You had been on the street living -- you had

14   been living on the street.  You weren't welcome to come

15   home?

16          A.     Yes, sir.

17          Q.     Been living apart from your family since the

18   seventh grade?

19          A.     Yes, sir.

20          Q.     Since you were 14 years old?

21          A.     Yes, sir.

22          Q.     You had -- once you started using drugs, had

23   you lied to your parents about that?

24          A.     All the time.

25          Q.     And you wrote them a letter and said, you

1    know, I have been lying to you?

2         A.    Yes, sir.

3         Q.    And you told them that you were sorry about

4    that, that you had lied to them about a lot of stuff?

5         A.    Yes, sir.

6         Q.    Were you lying to them when you told them you

7    had lied to them?

8         A.    No, sir.

9         Q.    You were telling them the truth when you told

10   them you were lying to them, right?

11        A.    Yes, sir.

12        Q.    So you were trying to own up for some of the

13   things you had done?

14        A.    Yes, sir.

15        Q.    Now, who sent you money while you were in

16   prison?

17        A.    In prison I never received any money.

18        Q.    How do you buy things from commissary with no

19   money?

20        A.    I've got to hustle.

21        Q.    What do you mean hustle?

22        A.    I mean, I have to do something, you know,

23   either -- you know some people do crafts and arts, do

24   drawings.  When I was working in the kitchen, I was selling

25   hamburgers and cookies and stuff.

1    Q.    Okay.  It's kind of a cottage industry inside
2  the prison system, isn't it?

3    A.    Yes, sir.

4    Q.    This fellow, Batman, the guy that was -- was
5  he a leader of one of the Arian groups?

6    A.    The Arian Brotherhood, yes, sir.

7    Q.    Arian Brotherhood.  Now, what religious sector
8  are you with?

9    A.    I'm jewish.

10    Q.    What jewish prison gang is there in TDC?

11    A.    There's no jewish prison gang.

12    Q.    There's no jewish prison gang?

13    A.    No, sir.

14    Q.    Well, now, the Arian Brotherhood, they are not
15  particularly fond of blacks or jews, are they?

16    A.    No.

17    Q.    Or Mexicans for that matter, are they?

18    A.    No, sir.

19    Q.    And in the letter that Mr. Shook introduced in
20  that letter, you actually, when you are talking about this
21  Batman guy who is working, cooking, making cookies, you are
22  talking about your relationship with him, don't you?

23    A.    Yes, sir.

24            MR. SHOOK:  Judge, we object to the
25  continuing leading questions.

1          THE COURT:  Sustained.

2          Q.     (By Mr. King)  Can you tell me whether or not

3     -- whether or not you had a working relationship with that

4     man?

5          A.     It was business, yes, sir.

6          Q.     All right.  Did you make a statement -- and

7     I'm looking for the exhibit, since Mr. Shook offered it,

8     although in the same letter that Mr. Shook offered where you

9     are talking about that individual, do you make a statement

10    in regards to, "I don't like him.  He doesn't like me.  But

11    here's the deal with us"?

12         A.     I can't really remember what I wrote exactly

13    in the letter.

14              MR. SHOOK:  I believe it's No. 954.

15         Q.     (By Mr. King)  All right.  The letter is in

16    evidence.  Certainly the letter will speak for itself.  And

17    it may be back in the room with some of the other evidence,

18    Mr. Halprin, but certainly it's been offered into evidence

19    and that issue can certainly be checked by the jury --

20              MR. KING:  Was 954 previously offered?

21              MR. SHOOK:  Yes.

22         Q.     (By Mr. King)  Let me show you what has been

23    marked as 954, which was the letter that was introduced by

24    the State.  And, once again, this is a letter you wrote; is

25    that correct?

1   A.   Yes, sir.

2   Q.   You wrote it to Dawn and in here it says --

3   you talking about being in prison and being scared and in

4   regard to the Blacks and the Mexicans and, "They just pick

5   the jews to blame everything on.  They never tried that crap

6   with me.  I had a lot of respect from one of the leaders of

7   one of the Arian gangs over there named Batman who didn't

8   really like me, so to speak, and I didn't like him.  He knew

9   I didn't put up with that antisemitic crap."

10   So you might have been picked on because you

11   were jewish, but you at least tried to stand up for yourself

12   being jewish?

13   A.   Yes, sir.

14   Q.   It talks about you having a working

15   relationship.  He was a baker and he would bake the cookies

16   and you would help sell them?

17   A.   Yes, sir.

18   Q.   And you split the money 50/50?

19   A.   Yes, sir.

20   Q.   What did you do with the money that you made

21   doing that kind of stuff in prison?

22   A.   Mainly it was to take care of myself as far as

23   hygiene.

24   Q.   What do you mean?

25   A.   Deodorant, toothpaste, shampoo.  I got myself

1   a radio.

2        Q.    Well, do you have to buy deodorant in prison?

3        A.    That's the only way you are going to get it,

4   yes, sir.

5        Q.    What about shampoo?  Do you have to buy

6   shampoo in prison?

7        A.    Yes, sir.

8        Q.    The prison doesn't give it to you?

9        A.    No, sir.

10       Q.    You have to buy toothpaste in prison?

11       A.    Yes, sir.

12       Q.    Prison didn't give that to you?

13       A.    No, sir.  They give you some baking soda.

14       Q.    Okay.  So if you don't have money on your

15  books, if there's not somebody that comes in who is involved

16  in your life somehow, some family or somebody else that

17  wants to try to show just a little bit of support and put

18  twenty bucks on your books every month so you can have a few

19  little things just to try to stay clean and have some

20  semblance of what it might be to have some own personal

21  self-respect, you have got to do something inside of prison

22  to try to make some money to try to figure out how to buy

23  that stuff?

24       A.    Yes, sir.

25       Q.    Now, did you have your teeth examined when you

1   went into prison?

2        A.      Yes, sir.

3        Q.      Are your teeth in the same shape that they

4   were when you first went into prison?

5        A.      No, sir.  They are in real bad shape now.

6        Q.      Prison doesn't have the best health plan, does

7   it?

8        A.      No, sir.

9        Q.      Of course, that's to be expected because it a

10  prison, after all?

11       A.      Yes, sir.

12              MR. SHOOK:   Judge, we'll object to the

13  leading questions.

14              THE COURT:   Sustained.

15       Q.      (By Mr. King)  You are there to be punished,

16  aren't you?

17       A.      Yes, sir.

18       Q.      In regard to Ms. Roe, Ms. Roe has had a child

19  recently, has she not?

20       A.      Yes, sir.

21       Q.      And how many children does she have?

22       A.      She has two children now.

23       Q.      You have letters, do you not, that you have

24  written where you describe yourself as the father of the

25  children, so to speak?

1      A.      Yes, sir.

2      Q.      And the reality of that is you are not the

3  father of any of her children, are you?

4      A.      No, sir.

5      Q.      That doesn't keep you from having some type of

6  fantasy in that regard or trying to describe yourself in

7  those terms, does it?

8      A.      No, sir.

9              MR. SHOOK:   Judge, we'll object to the

10  leading questions.

11             THE COURT:   Sustained.

12             MR. KING:   We'll offer 34, 35, 36, and

13  37.

14             MR. SHOOK:   No objection.

15             THE COURT:   Defense Nos. 34, 35, 36, and

16  37 shall be admitted.

17      Q.      (By Mr. King)   You know, Mr. Halprin, I'm sure

18  the jury will be glad to hear that I'm not going to sit here

19  and read every one of these letters.   Would it be fair to

20  say that if the jury wants to have some idea of what you

21  are, who you are, what your life may be like, as opposed to

22  buying a book and taking the middle page or two and reading

23  that and then closing the book and say, well, I have read

24  the book, and now I know what the book is all about.   I know

25  what the characters are all about.   They would really have

1  to go through and read all those letters, just to get some

2  idea, wouldn't they?

3       A.    Yes, sir.

4       Q.    When you were leaving the Oshman's, y'all were

5  trying to get out of there in a hurry?

6       A.    Yes, sir.

7       Q.    People were running up and down the stairs

8  trying to get the stuff?

9       A.    Yes, sir.

10      Q.    As a matter of fact, although you were the

11 first one at the door, did you previously testify that you

12 were sent back to get the sleeping bag?

13      A.    Yes, sir.

14      Q.    Now, you are aware from sitting here in court

15 that the testimony is that apparently some bags were

16 actually left on the ground out there during the course of

17 trying to get away from the Oshman's?

18      A.    I was aware there was a lot of stuff left

19 behind, yes, sir.

20      Q.    Okay.  There was a bag full of guns or clips,

21 I believe, there was a bag full of ammo that's been talked

22 about by detective -- one of the officers who picked up the

23 crime scene material; is that correct?

24      A.    Yes, sir.

25      Q.    And certainly there's been photographs of that

1   introduced in front of the jury.  And that is reflected that

2   y'all weren't accomplishing everything that you wanted to

3   accomplish.

4                    MR. SHOOK:   Judge, we'll object to his

5   continued leading questions.

6                    THE COURT:   Sustained.

7                    MR. SHOOK:   We'll ask you to instruct

8   counsel not to continue to lead the defendant.

9                    THE COURT:   Mr. King, you know how to ask

10  the proper questions.

11                   MR. KING:   Thank you, Your Honor.

12       Q     (By Mr. King)  Well, Mr. Halprin, tell the

13  jury why it is that somebody left a bag out there?

14       A.    Because we were trying -- everybody was trying

15  to get out of there.

16       Q.    Tell the jury why it is somebody dropped a gun

17  out there?

18       A.    From what I understand he was pulling the

19  officer out of the car and that's how he dropped his gun.

20  That was what was told to us.

21       Q.    Why didn't he stop and pick it up?

22       A.    Because he was trying to leave.

23       Q.    Tell the jury why, supposedly, somebody shot

24  somebody else out there?

25       A.    Excuse me?

Q.      Tell the jury how Mr. Rivas got shot.

A.      He was in the middle of it while everybody else was shooting.

Q.      Tell the jury how you got shot.

A.      I was trying to get away and somebody -- somebody called my name and when I turned, I felt my foot go numb.

Q.      Tell the jury how the windows of the Ford Explorer got shot out.

A.      Donald Newbury shot the window out when I was in his lap.

Q.      What sense does that make?

A.      I have no idea why he did it.

Q.      You're not up to -- tell -- Mr. Halprin, do you -- do you understand that this jury, their job is to decide whether you are guilty of capital murder and then if you are guilty of capital murder, somehow, they have to decide the answers to special issues?  You understand that?

A.      Yes, sir.

Q.      Do you understand that they can believe or disbelieve anything you say?

A.      Yes, sir.

Q.      Have you ever made any statement to anybody in any of the letters to law enforcement or to the media that you fired a weapon that night?

1      A.      Never.

2      Q.      Your statement doesn't say that you ran over

3  and jumped in -- well, your statement is in evidence.  I've

4  got a copy here.  But part of the statement -- on State

5  Exhibit 931, of course, Mr. Spivey is writing this for you,

6  correct?

7      A.      Yes, sir.

8      Q.      You are dictating it and you are talking about

9  what happened and he's writing it down; is that correct?

10     A.      Yes, sir.

11     Q.      And you are talking about the shooting, you

12 are talking in terms of the shooting, "That's when the cop

13 showed up.  I was still at the back door.  Rivas told me to

14 stay there.  Rivas went up and shot the cop.  Harper was

15 shooting at the car and then he went and got Garcia.  They

16 came out and there was more gunfire."

17             See, when you look at this statement, there

18 are parts of it where you are talking about specific types

19 of things like who was shooting?

20     A.      Yes, sir.

21     Q.      Okay.  And then you are talking about -- when

22 you talk about yourself, you go, at some point in all this

23 shooting you got shot in the foot.  You took off running.

24 "I didn't get far before I was able to get in the Explorer.

25 I was yelling, 'I got shot in the foot.'  Rivas said he got

1    shot, too.  I was sitting on the lap of Newbury in the front

2    seat.  And as we were leaving, Newbury shot out the

3    passenger window of the Explorer," right?

4         A.    Yes, sir.

5         Q.    Now, there's nothing in there about what

6    particular colors were assigned to everybody, is there?

7         A.    No, sir.

8         Q.    Did you talk to Detective Spivey about that?

9         A.    Yes.  I gave him the complete code.

10        Q.    Did you make any drawings for Detective

11   Spivey?

12        A.    I did a couple of diagrams, yes, sir.

13        Q.    They are not attached to that, are they?

14        A.    No, sir.

15        Q.    Was there another police officer there when

16   you took the statement?

17        A.    Yes, sir.

18        Q.    Do you know whether or not he was taking

19   notes?

20        A.    He was taking notes on a yellow tablet.

21        Q.    Who were you getting letters from?

22        A.    Letters?

23        Q.    While you are here in the jail, who are you

24   getting letters from?  Who is writing you?

25        A.    A lot of people.  A lot of people have kind of

1  fallen off, not writing anymore.

2      Q.    Are these people you knew before you got

3  arrested?

4      A.    No, sir.

5      Q.    These are people that just read about you in

6  the newspaper and they just wrote you a letter?

7      A.    Yes, sir.

8      Q.    Did you end up writing them back?

9      A.    Yes, sir.

10      Q.    Do you have any idea who Richard Marcinko is?

11      A.    No, sir.

12      Q.    I'm mispronouncing that.  Richard Marcinko?

13      A.    No, sir.

14      Q.    You don't know whether or not he's some author

15  of a series of books describing his life as a Navy Seal?

16      A.    I believe I'm familiar with the book series,

17  but I'm not sure.

18      Q.    It's called red something, red team, red

19  something?

20      A.    Yes.  George Rivas has talked about it.  It's

21  something about Navy Seals, yes, sir.

22      Q.    Those are books you can buy at the grocery

23  store?

24      A.    Yes, sir.

25      Q.    Now, were you in the military?

1     A.     No, sir.

2     Q.     Do you know if Mr. Harper had been in the

3     military?

4     A.     He said he had been in the military, yes, sir.

5     Q.     Do you know if he came from a military family?

6     A.     Yes, sir.  His father was a Special Forces.

7     That's what he said, his father was in Special Forces.

8     Q.     Who came up with the nickname of Junior for

9     you?

10    A.     That was just -- usually the one who used it

11    the most was Donald Newbury.

12    Q.     You weren't -- you weren't the CO, were you?

13    A.     No, sir.

14    Q.     You weren't the XO, were you?

15    A.     No, sir.

16    Q.     There's some individuals that were walking in

17    the courtroom yesterday afternoon.  Do you recall who those

18    individuals are?

19    A.     Yes, sir.  I wasn't sure of the middle person

20    at first.  I thought it was somebody else, but, yes, sir.

21    Q.     Are those individuals from the Texas

22    Department of Corrections?

23    A.     Yes, sir.

24    Q.     Now, in that regard you are aware of being the

25    thorough man that Mr. Shook truly is that he certainly would

1   have gone and combed through all information that he could

2   get about the prison break, would he not?

3        A.     Yes, sir.

4        Q.     You would think that, wouldn't you?

5        A.     Yes, sir.

6        Q.     So if there's something to indicate that you

7   were involved in a riot down in TDC, certainly we can expect

8   to be able to see that kind of documentation from very

9   thorough Mr. Shook, can't we?

10        A.     Yes, sir.  There would be some kind of --

11                    MR. SHOOK:  We'll object to leading and

12   sidebar.

13                    THE COURT:  Sustained, just leading.

14        Q.     (By Mr. King)  And certainly if there is

15   somebody that's going to come down and testify that you

16   pulled a weapon on them yourself during the prison break, we

17   can certainly expect to hear that?

18                    MR. SHOOK:  Same objection, leading.

19                    THE COURT:  Sustained.

20        Q.     (By Mr. King)  Why did you write people that

21   you didn't know?

22        A.     Pass my time.

23        Q.     Now, since you have been in the Dallas County

24   Jail you haven't mingled with any of the other inmates, have

25   you?

1        A.      No.  I've talked to some inmates before, but

2   not like on a personal deal.

3        Q.      There's just people?

4        A.      Just people down the hall, yes, sir.

5        Q.      All right.  And are there always guards around

6   there?

7        A.      Yes, sir.

8        Q.      You are not talking about some type of

9   private, quiet conversation?

10        A.      No, sir.

11        Q.      In regard to the planning of the Oshman's, was

12   it the plan that if something unusual happened, somebody

13   walked in, that -- what was Mr. Rivas going to do in that

14   regard?

15        A.      That would be to subdue them.

16        Q.      Okay.  And how was he going to get close

17   enough to subdue them?

18        A.      He was going to, you know, take them off-guard

19   and then, you know, try to tie them up, if he could.

20        Q.      And how would he take them offguard?

21        A.      Either talking or however he does it.  He's

22   good.  He's --

23        Q.      He had the security badge, right?

24        A.      Yes, sir.

25        Q.      And that's what he had done to the employees

1  at Oshman's.  He had taken them offguard by showing them the

2  security badge?

3          A.      Yes, sir.

4          Q.      And that was essentially the game plan, wasn't

5  it?

6          A.      Yes, sir.

7          Q.      And you have heard testimony of how he

8  apparently walked outside and did exactly the same thing to

9  people outside, showed them a badge, and tried to allay

10 their fears that he was some type of security guy, right?

11         A.      Yes, sir.

12         Q.      And when you saw him approaching the officer,

13 what did you think he was getting ready to do?

14         A.      I thought he was grabbing for his security

15 badge.

16         Q.      Was that in some kind of a wallet like type of

17 thing?

18         A.      Yeah.  I'm not sure exactly what -- I can't

19 remember what it looked like, but, yes, it was some kind of

20 identification holder.

21                 MR. KING:  I have no further questions.

22 Pass the witness.

23                 MR. SHOOK:  Your Honor, I will now offer

24 what's been entered for record purposes as 964 for all

25 purposes.

1          MR. KING:  No objection.

2          THE COURT:  No. 964 will be admitted for

3  all purposes.

4          MR. SHOOK:  May I publish a portion of

5  this letter?

6          THE COURT:  You may.

7                    CROSS-EXAMINATION

8  BY MR. SHOOK:

9     Q.     "Sweetie --" This is a letter to Jennifer Roe

10  dated 7-3-02.

11          "Sweetie, TDC doesn't do conjugals.  What I

12  was saying, in some states make you pay for your conjugal

13  visits, whether with money or good time.  Don't worry,

14  people are trying to get conjugals for Texas.  That's why I

15  want you to join TIFA."

16          What's TIFA, Mr. Halprin?

17     A.     Texas Inmate Families -- I can't remember it

18  exactly.

19     Q.     "Because they are working for better prison

20  conditions, rights, conjugal visits, etc.  The more people

21  who get involved the more chances of better things like

22  conjugals will happen.  You are a taxpayer.  You have a

23  right to speak up about the way prisons are run.  That's

24  what TIFA is about.  They need to get TVs allowed in cells,

25  too!"  Exclamation point.  "To be sold on the commissary.  I

1  could do my time real easy.  Listen to the radio, watch TV,

2  see you on weekends, have wild, freaky sex, a piece of

3  cake."

4                    MR. SHOOK:  That's all we have, Judge.

5                    REDIRECT EXAMINATION

6  BY MR. KING:

7        Q.     Are you having wild, freaky sex up in the jail

8  here in Dallas?

9        A.     No, sir.

10       Q.     Are you listening to a radio here in Dallas?

11       A.     No, sir.

12       Q.     Watching a TV here in Dallas?

13       A.     No, sir.

14       Q.     Do you suspect that you return to prison that

15  you are going to be in general population?

16       A.     I know I won't be in general population.

17       Q.     Have you been notified of a classification

18  hearing in your particular case by the Texas Department of

19  Corrections which took place after the escape?

20       A.     I can't remember anything.

21       Q.     Is it possible that in your absence from the

22  Texas Department of Corrections, based on your knowledge of

23  how things work there, that they may have reclassified as to

24  how they are going to house you should you be returned?

25       A.     Yes, sir.  I've heard rumors and stuff.

1    Q.    You certainly have charges pending against you

2    as a result of the escape, do you not?

3    A.    Yes, sir.

4    Q.    And we don't have conjugal visits here in the

5    State of Texas, do we?

6    A.    No, sir.

7    Q.    Once again, that's a fantasy, isn't it?

8    A.    Yes, sir.

9    MR. KING:  I have no further questions,

10   Your Honor.

11   MR. SHOOK:  We have nothing further,

12   Judge.

13   THE COURT:  Thank you, Mr. Halprin.

14   MR. ASHFORD:  Your Honor, at this time,

15   ladies and gentlemen, the defense would rest its case in

16   chief.

17   THE COURT:  Defense rests.

18   MR. SHOOK:  Can we have a minute, Judge?

19   THE COURT:  We'll take a break at this

20   time.  We will take our morning break, 10:00.

21   [Jury out]

22   (Recess)

23   [Jury in]

24   THE COURT:  Thank you.  You may be

25   seated.  Mr. Shook, the defense having rested, what says the

54

1    State?

2                    MR. SHOOK:   State will call Patrick

3    Moczygemba.

4                    PATRICK MOCZYGEMBA,

5    having been duly sworn, was examined and testified as

6    follows:

7                    DIRECT EXAMINATION

8    BY MR. SHOOK:

9         Q.    Would you tell us your name, please.

10        A.    My name is Patrick Moczygemba.

11        Q.    And where do you live, sir?

12        A.    I live in a little town called Panta Maria.

13        Q.    Let me turn your attention -- let me ask you

14   this.  Are you employed at this time?

15        A.    I'm unemployed.

16        Q.    Okay.  Back in December of 2000 where were you

17   working?

18        A.    I was working in the Connally Unit in Kenedy,

19   Texas.

20        Q.    Could you tell the jury where the Connally

21   Unit is located?

22        A.    The Connally Unit is located approximately 50

23   miles south of San Antonio on Highway 181, halfway between

24   Corpus and San Antonio.

25        Q.    Were you born and raised in that area where

1   the Connally Unit is?

2        A.      Yes, sir, I was.

3        Q.      And are you married and have a family?

4        A.      Yes, I do.

5        Q.      Back in December of 2000, what was your job at

6   the Connally Unit?

7        A.      I was the Assistant Maintenance Supervisor at

8   the Connally Unit.

9        Q.      How long has the Connally Unit been down

10  there?

11       A.      Approximately -- at the time -- right now it's

12  probably about eight years.

13       Q.      What type of prison unit is it?

14       A.      It's a maximum.

15       Q.      About how many inmates are there?

16       A.      About 2800.

17       Q.      The maintenance department, what do you do

18  there at the maintenance department?

19       A.      At the maintenance department we basically

20  take care of all the repairs of everything that goes on in

21  the maintenance of a prison.

22       Q.      What type of repairs are you talking about?

23       A.      We're talking about repairing doors, repairing

24  air conditioning, doing plumbing, repairing any broken trim

25  of doors, or anything else that we need to do.  Basically

1   like you would in repairing a house.  It's the same thing.

2        Q.      Are prison units in Texas, are they pretty

3   self-sufficient?

4        A.      Yes, sir, they are.

5        Q.      What -- how are they self-sufficient?

6        A.      All the maintenance is basically from the

7   inside.  The food is cooked on the inside.  All the cleaning

8   is done by the offenders.  It's all basically -- everything

9   is done from the inside.  Nothing is brought in from the

10  outside.

11       Q.      In the maintenance department, do you have

12  inmates that assist you in your work there?

13       A.      Yes, sir, they do.

14       Q.      Now, do you have civilian employees that work

15  the maintenance department?

16       A.      Yes, sir.  We have one of basically every

17  field that is out in the free world and we have basically

18  like air conditioning and heating, we have two, plumbing we

19  have two, and lock techs we have two, and so on down the

20  line.

21       Q.      Those are civilian employees?

22       A.      Yes, sir, they are.

23       Q.      And do they have inmates that would work under

24  them?

25       A.      Yes, sir, they do.

57

1      Q.      If they are able to, are all inmates in the

2  prison system in Texas required to have a job?

3      A.      Yes, sir, they are.

4      Q.      And why is that?

5      A.      It seems to keep them out of trouble.  They

6  have to either go to education or they have a job somewhere

7  on the unit.

8      Q.      Are they actually paid money for the job?

9      A.      No, sir, they are not.

10      Q.      What hours do they work?

11      A.      Usually they can work as long as they are

12  needed.

13      Q.      Now, the maintenance department, how many

14  inmates would work out of that unit?

15      A.      Usually anywhere from 60 to 70.

16      Q.      Okay.  Now, you, as the assistant supervisor,

17  did you supervise those craftsmen?

18      A.      Yes, sir, I did.

19      Q.      And also those inmates?

20      A.      Yes, sir, I did.

21      Q.      Were there some specific inmates there that

22  were under your direct supervision?

23      A.      Yes, they were.

24      Q.      Let me show you what has been marked State

25  Exhibit 44.  Do you recognize these photos?

1    A.    Yes, I do.

2    Q.    Were these inmates working in the maintenance

3    department in December of 2000?

4    A.    They all worked except for one.

5    Q.    Which one was that?

6    A.    That was Michael Rodriguez.

7    Q.    Do you know what his job was in the prison?

8    A.    He was on the inside yard.

9    Q.    What do you do on the inside yard?

10   A.    The inside yard they basically mow all the

11   grass and tend all the flowerbeds inside the perimeter of

12   the fence.

13   Q.    Now, these individuals in the photograph,

14   which ones had been in the maintenance department the

15   longest from what you recall?

16   A.    George Rivas and Murphy and Newbury were the

17   longest there.

18   Q.    What did George Rivas do in the maintenance

19   department?

20   A.    George Rivas was basically like a clerk.

21   Q.    Okay.  And where did he work there?

22   A.    He worked in the office.

23   Q.    Is that where you worked, also?

24   A.    Yes.

25   Q.    What were his duties?

1    A.    His duties were to take orders, make orders,

2    and when the parts came in, he classified them and put them

3    through -- then we put them in the warehouse.

4    Q.    How about Murphy and Newbury?

5    A.    Patrick Murphy was a carpenter.  He worked in

6    the carpenter shop with Mark Burgess.

7    Q.    So he was under the supervision of Mark

8    Burgess?

9    A.    That's correct.

10   Q.    And Donald Newbury?

11   A.    Donald Newbury worked as a lock tech.  He

12   worked under the supervision of either Ronnie Hahn or Terry

13   Schmidt.

14   Q.    What does a lock tech do?

15   A     Lock tech, they work on all detention locks in

16   the prison system.

17   Q.    And then Joseph Garcia and Randy Halprin and

18   Larry Harper, what did they do?

19   A.    They worked in the warehouse.

20   Q.    Where was the warehouse located?

21   A.    The warehouse was located on the back side of

22   the office in the maintenance building.

23   Q.    And what was kept in the warehouse?

24   A.    We kept a stock of, you know, filters for air

25   conditioners, plumbing parts, nails, bolts, a little bit of

1   everything.

2          Q.     And what was Randy Halprin's duties in the

3   warehouse?

4          A.     Randy Halprin's duties were -- he was the tool

5   person.  He took care of all the nonsensitive tools.

6          Q.     And do you see Mr. Halprin here in the

7   courtroom today?

8          A.     Yes, I do.

9          Q.     Would you point him out for us?

10         A.     He's sitting right at the end of the table

11  right there.

12         Q.     Pointing to the man at the end of the table

13  with the suit and tie on?

14         A.     Yes, sir.

15                MR. SHOOK:  Let the record reflect the

16  witness has identified the defendant.

17         Q.     (By Mr. Shook)  Now, if inmates have a serious

18  discipline problem, are they able to work in the maintenance

19  department?

20         A.     No, they don't.

21         Q.     You say Rivas and Newbury and Murphy had

22  worked there the longest?

23         A.     Yes, sir, that's correct.

24         Q.     Do you remember when Mr. Garcia and Mr. Harper

25  and Mr. Halprin were brought in there?

1     A.     I think they were brought in approximately a

2  year before the actual -- when they escaped.

3     Q.     How is an inmate brought into the maintenance

4  department?  How does he get a job there?

5     A.     What he does is, they usually send an IOC to

6  the maintenance supervisor and we kind of screen them or

7  they, by their qualifications.  They are brought in by their

8  qualifications.

9     Q.     Okay.  Did George Rivas request any of these

10 individuals?

11    A.     He had talked -- he recommended a few of them.

12    Q.     How would that come about?

13    A.     Well, basically they sent an IOC in to us and

14 we look at their qualification and if they fit what we need,

15 we hire them.

16    Q.     Up until December 13th of 2000, had you had

17 any discipline problems with any of these individuals?

18    A.     None.

19    Q.     Had you got along with them all?

20    A.     Yes, I did.

21    Q.     Had they performed -- well, had -- they hadn't

22 been a discipline to you or any of the other supervisors,

23 either?

24    A.     That's correct.

25    Q.     Let me show you some posters which have been

1  marked State Exhibit 582, which contains some names.  Are

2  these names of individuals, maintenance workers, craftsmen,

3  guards, and also some inmates that were taken hostage on

4  December 13th?

5       A.    Yes, sir, that's correct.

6            MR. SHOOK:  We'll offer State Exhibit

7  582.

8            MR. ASHFORD:  No objection, Your Honor.

9            THE COURT:  No. 582 shall be admitted.

10      Q.    (By Mr. Shook)  Let me show you State Exhibit

11 543.  Does this show a blueprint of part of the maintenance

12 unit, which includes the warehouse, your office, and the

13 electrical room?

14      A.    That's correct.

15            MR. SHOOK:  We'll offer State Exhibit

16 543.

17            MR. ASHFORD:  No objections.

18            THE COURT:  No. 543 shall be admitted.

19      Q.    (By Mr. Shook)  I want to show you some

20 photographs which has been marked State Exhibits 500 through

21 550.  Do you recognize these as being aerial photographs as

22 well as photographs of the interior and exterior of the

23 maintenance unit, as well as some weapons that were used

24 during that escape and injuries to yourself?

25      A.    Yes, sir, that's correct.

63

1    MR. SHOOK:  At this time we offer State

2    Exhibits 500 through 550.

3    MR. ASHFORD: ·No objections.

4    THE COURT:  Nos. 500 through 550 shall be

5    admitted.

6    Q.    (By Mr. Shook)  Looking at the monitor, is

7    this an aerial view of what the Connally Unit looked like?

8    A.    Yes, sir, that's correct.

9    Q.    How many gates go into the Connally Unit?

10   A.    We have one entrance gate to where the

11   employees and the -- come into.  And then we have the back

12   gate, which is where the vehicles come in for deliveries.

13   Q.    Is this the back gate here?

14   A.    Yes, sir.

15   Q.    And are there three guard towers on the unit?

16   A.    Yes, sir.

17   Q.    All right.  This is where the employees park?

18   A.    Yes, sir.

19   Q.    And the nearest town is what?

20   A.    The nearest town is Kenedy.

21   Q.    How far away is it?

22   A.    It's probably about three miles away.

23   Q.    Let me show you State Exhibit 501.  Does this

24   show a view from kind of the back part of the prison?

25   A.    Yes, sir, that's correct.

64

1    Q.    Is this the back gate where vehicles come in

2  and out?

3    A.    Yes, sir.

4    Q.    And this building here, is that the

5  maintenance department?

6    A.    Yes, sir, it is.

7    Q.    State Exhibit 502 kind of shows another angle.

8  Again, the back gate is here?

9    A.    Yes, sir.

10   Q.    And is this the maintenance building?

11   A.    Yes, sir, it is.

12   Q.    There is where your offices were and where the

13 warehouse was?

14   A.    That's correct.

15   Q.    What are these units that we see here in the

16 foreground?

17   A.    Those are the building -- those are the

18 regular buildings right there.   There's 3 and 4 building

19 right there.

20   Q.    And who would stay in those buildings?

21   A.    It's -- they are at a higher custody level and

22 they stay in those buildings.

23   Q.    And then these large buildings here, what are

24 they?

25   A.    Those are the dorms.

```
1        Q.     And what types of inmates stay in the dorm?

2        A.     They are basically where they are not an

3   escape risk or anything like that.  They have a good record

4   and that's where they stay.

5        Q.     Is that where most of the inmates that worked

6   under you in the maintenance office, is that where they were

7   housed?

8        A.     Yes, sir, that's correct.

9        Q.     Was George Rivas housed there?

10       A.     No, he wasn't.

11       Q.     Where was he at?

12       A.     He was in 3 building, that building right

13  there.

14       Q.     Were the others, Mr. Halprin, Mr. Harper,

15  Garcia, Newbury, and Murphy, were they housed in the dorm?

16       A.     They were either in 18 -- either 18 or 19

17  building, either one.

18       Q.     Did you have a vehicle that, a truck, that you

19  could bring supplies in with?

20       A.     Yes, sir, we did.

21       Q.     What was the procedure for that vehicle?

22       A.     We brought the truck to the back gate.  The

23  back gate shook the truck down.  They made sure there was

24  nothing in it or under it or anywhere inside, any contraband

25  or anything that may be brought inside the gate, just drove
```

1    it and parked it in front of the maintenance shop.

2          Q.    Was the truck usually kept there, then, at the

3    maintenance shop?

4          A.    No, sir, we didn't.

5          Q.    It would only be brought in when?

6          A.    We brought it in when we needed to either drop

7    off supplies or go get supplies.

8          Q.    Here we see kind of a side view of the

9    maintenance area; is that correct?

10         A.    Yes, sir, that's correct.

11         Q.    Where would the truck be parked when you bring

12   it in?

13         A.    It would be parked between the maintenance

14   shop and the other side, which that is the education

15   building right there and it would be parked between those

16   two buildings.

17         Q.    If you were going to drive from the

18   maintenance department, would you take this road this way?

19         A.    Yes, sir, that's correct.

20         Q.    And have to go through this gate?

21         A.    Through that gate right there, yes, sir.

22         Q.    Now, did the inmates inside the maintenance

23   department know when the truck was going to be brought in?

24         A.    Oh, yes, sir, they did.

25         Q.    How would they know that?

1      A.    Just hearing us talking inside the office.

2      Q.    Okay.  Just, we need to bring the truck in --

3      A.    Right.

4      Q.    -- we need supplies, that sort of thing?

5      A.    Yes, sir.

6      Q.    How did these inmates -- what time did they

7  arrive for work in the morning?

8      A.    They usually arrive for work just a little

9  after 7:00.

10     Q.    How would they get there?

11     A.    They are escorted in from A-turnout to our

12  work area.

13     Q.    By a guard?

14     A.    By a guard, yes, sir.

15     Q.    How many guards would escort those inmates?

16     A.    Usually one.

17     Q.    One for how many inmates?

18     A.    Well, we usually brought in about 30 or so at

19  a time.

20     Q.    Anything unusual about that?

21     A.    No, sir, not at all.

22     Q.    The guards, when they escort or -- the inmates

23  or work with the ones inside the yard, do they have weapons?

24     A.    No, sir, they don't.

25     Q.    Which guards have weapons?

1       A.     Just the ones in the towers.

2       Q.     And what time did the inmates arrive at work?

3       A.     About 7:00.

4       Q.     Was the routine about the same every day as

5 far as arriving?

6       A.     Yes, sir.

7       Q.     And the lunch break?

8       A.     Yes, sir.

9       Q.     Where would the inmates eat lunch?

10      A.     They eat lunch in 6 building in the cafeteria.

11 Basically, they are dining rooms.

12      Q.     What was the procedure for that?

13      A.     We usually took them back up -- they were

14 escorted -- they were stripped down.  After they left the

15 maintenance shop they were stripped down and they put their

16 clothes back on and they were escorted back to A-turnout and

17 they were fed with the rest of the offenders.

18      Q.     Basically the same time every day?

19      A.     Yes, sir, same time every day.

20      Q.     If they didn't want to eat in the inmate

21 cafeteria, where did they go?

22      A.     They went to their dorms or back to their

23 house.

24      Q.     Would you ever -- did a guard have to escort

25 them back or could you as a supervisor?

1      A.      Yes, sir.  I escorted them back a number of

2  times.

3      Q.      Now, let me turn your attention to December

4  13th of 2000.  When you arrived at work that day, were you

5  the person in charge?

6      A.      Yes, I was.

7      Q.      Where was the supervisor?

8      A.      She was at in-service training in Beeville.

9      Q.      Had the six inmates that worked there at the

10  maintenance department, did they all arrive at work that day

11  at the usual time?

12      A.      Yes, they did.

13      Q.      Did anything unusual happen in the morning?

14      A.      No, sir, it didn't.

15      Q.      At some point in the morning did you make a

16  decision to bring the truck in?

17      A.      Yes, I did.

18      Q.      What was the reason for that?

19      A.      I was going to town to pick up some supplies.

20      Q.      And about what time was the truck brought in?

21      A.      Probably about 11:00 or so.

22      Q.      What time did the -- what time did all the

23  other craftsmen begin to take their lunch break?

24      A.      We usually start stripping down about 11:20.

25  We start stripping all the offenders down.  And then at

1  11:30 we close the doors and they escort them up to the

2  dining room, dining halls.

3       Q.    Had Donald Newbury and Patrick Murphy been out

4  on assignments earlier in the morning?

5       A.    Yes, they were.

6       Q.    Had they been brought back into the

7  maintenance department for their lunch?

8       A.    Right, yes, sir.

9       Q.    Did you have some different plans or some

10  plans to go -- concerning the six that worked under your

11  supervision that day?

12       A.    That day -- we had recently gone through an

13  ACA inspection and we had planned on sealing the floors in

14  the warehouse.  And that morning we had some ice and so I

15  was -- I had a short crew and so I was going to keep back

16  some of these offenders.  We were going to seal the floor,

17  being it was a slow day.

18       Q.    Seal the floor back in the warehouse?

19       A.    Yes, sir.

20       Q.    Which inmates were going to stay back and help

21  you do that?

22       A.    Those six right there.

23       Q.    George Rivas, Donald Newbury --

24       A.    Yes, sir.

25       Q.    Patrick Murphy, Joseph Garcia, and Randy

1    Halprin and Larry Harper?

2         A.    Yes, sir.

3         Q.    And were you going to supervise them while

4    that was going on?

5         A.    Yes, sir.

6         Q.    Did the other craftsmen and guards, did they

7    take their lunch break at the usual time?

8         A.    Yes, sir, they did.

9         Q.    And when you -- a supervisor takes a lunch

10   break, where can they go eat lunch?

11        A.    We either go to the officers' dining room or

12   we do to town.

13        Q.    Do they generally come back about the same

14   time every day?

15        A.    Yes, sir, they do.

16        Q.    After they left, then, were you just

17   supervising those six inmates?

18        A.    Yes, sir, I was.

19        Q.    Let me -- well, at some point in time did

20   George Rivas come and ask you to come back to the warehouse?

21        A.    Yes, he did.

22        Q.    Do you recall about what time that was?

23        A.    I think it was approximately about 11:40 in

24   the morning.

25        Q.    Let me show you State Exhibit 508.  Is this a

1    photograph of part of your offices?

2         A.    Yes, sir, it is.

3         Q.    The door here, where does that door lead?

4         A.    That leads to the warehouse.

5         Q.    Let me show you 543.  Does this show kind of a

6    blueprint of the office and the warehouse?

7         A.    Yes, it does.

8         Q.    Can you --

9                   MR. SHOOK:  Can I have the witness stand

10   up for a moment, Your Honor?

11                  THE COURT:  You may.

12        Q.    (By Mr. Shook)  If you could, just point out

13   where your offices were located on this.

14        A.    My office is right here.

15        Q.    And where would George Rivas have worked?

16        A.    He worked in this area right here.

17        Q.    What about Randy Halprin and Harper and

18   Garcia?

19        A.    He worked in the toolroom.  There was a

20   toolroom right in this area right here and he worked in this

21   area.

22        Q.    And the warehouse, who worked there?

23        A.    Halprin worked the toolroom.  Randy -- Larry

24   Harper and Joseph Garcia worked inside the warehouse.  They

25   issued parts and things like that.

1      Q.      About the time George Rivas came to get you,

2   where were these inmates located?

3      A.      They were all in this area right here.

4      Q.      Okay.  Did you come through the door then and

5   into the warehouse?

6      A.      Yes, I did.

7      Q.      What did George Rivas ask you to come do?

8      A.      He wanted me to identify a motor that was

9   laying on the floor.  He wanted to know what to do with it.

10  We were moving everything off the floor so we can seal the

11  floor.

12     Q.      Okay.  When you went back into the warehouse

13  area, did you see some of the other inmates?

14     A.      Yes, I did.

15     Q.      Which inmates do you recall seeing?

16     A.      I saw Halprin and Harper and Newbury.  Newbury

17  was laying on the floor below the shelves, taking the

18  shelves apart and Harper and Halprin were standing around

19  that motor.

20     Q.      Was the motor sitting out or was it under

21  anything?

22     A.      It was under a table.

23     Q.      Let me show you 516.  Does this show a picture

24  of the warehouse if you came out -- came through the door?

25     A.      Yes, sir, I did.

1    Q.    The door would be located --

2    A.    Just

3    Q.    -- on the other side of these file cabinets?

4    A.    Just to the right of those file cabinets.

5    Q.    Now, this area here, is this where the table

6    was?

7    A.    Yes, sir

8    Q.    What is around this corner?

9    A.    The electrical room and the toolroom, issue

10   room, is right there.

11   Q.    I see some type of shelving here.  What's on

12   these shelves?

13   A.    Those are parts, parts, bolts, are stacked on

14   those shelves.

15   Q.    So the tables here with the motor under it and

16   is it George Rivas that asks you he wants you to look at

17   this motor?

18   A.    Yes, sir.

19   Q.    And when you went over to the table, what

20   happened?  What did you do?

21   A.    I leaned over to look at the motor and then

22   when I did, just like, I just like I was knocked out.  I was

23   -- all the lights went out.

24   Q.    Could you tell where the blow came from?

25   A.    I couldn't tell you.

1    Q.    Do you know how long you were knocked out?

2    A.    I don't have any idea.

3    Q.    When you regained consciousness, what was

4    going on?

5    A.    I was laying on George Rivas' stomach.  He had

6    his arms around me and I was struggling.  Where I was laying

7    on the floor, there was a pool of blood.

8    Q.    Okay.  And as you struggled there, did -- do

9    you remember some other inmates struggling with you?

10   A.    Yes.  There was -- Newbury was trying to hold

11   my legs down and he was like he was punching me in the

12   stomach and trying to get me to calm down and Halprin was

13   standing over to the right of me.

14   Q.    Okay.  Was there a point in time that you did

15   calm down?

16   A.    Yes, I did.  I was -- I calmed down after they

17   put a shank to my neck and told me to calm down or they

18   would end it right there.

19   Q.    Tell the jury what a shank is.

20   A.    A shank is a piece of metal that they sharpen

21   up to an extreme point and they make it -- it actually looks

22   just like a knife.  They sharpen it up to a point.  It's

23   pinpoint sharp.

24   Q.    And you know who put this shank up to you?

25   A.    It was Garcia.

1      Q.    Where did he put it next to you?

2      A.    Right up to my throat.

3      Q.    And did he make a threat to you at that time?

4      A.    Yes.  He said, "You can stop fighting now or

5  we can end it right now.  Whatever happens to you will

6  happen to the rest of them."

7      Q.    Did you take his threats seriously?

8      A.    Yes, I did.

9      Q.    When he said, "Whatever happens to you,

10 happens to the rest of them," what did you take that to

11 mean?

12     A.    I thought to me it meant if they killed me,

13 they are going to continue on with the rest of them with

14 killing all the other people that walked in.

15     Q.    What was the next thing that they did to you?

16     A.    They started to bind my hands up behind my

17 back and they started taking my clothes off.  And then they

18 realized that they needed my shirt, so they unbound my hands

19 and took my shirt off and they were taking my pants off and

20 took my boots and my -- everything else off, everything that

21 I had, my keys, and everything.  They took everything from

22 me.

23     Q.    After they got your clothes off, what did they

24 do to you?

25     A.    They bound my hands in front of me, bound my

1   feet up, gagged me, and put a pillowcase over my head.

2          Q.      Was this all happening --

3                  MR. ASHFORD:   Excuse me, Your Honor,

4   could we just ask for a clarification as to when he's

5   speaking of what they did, who did what, as to the form of

6   the question.

7                  THE COURT:   Overruled.   You can clear up

8   anything on cross.

9          Q.      (By Mr. Shook)   Was this going on pretty

10  quickly?

11         A.      Yes, sir, it was.

12         Q.      Who all do you remember tying you up and

13  gagging you?

14         A.      Garcia put the gag in my mouth, I believe, and

15  it's not clear who did what, but they were all working as a

16  team.

17         Q.      Were you still bleeding?

18         A.      Yes, I was.

19         Q.      Did everyone seem to have a role in this?

20         A.      Yes, sir, they did.

21         Q.      And who seemed to be in charge?

22         A.      Rivas.

23         Q.      What kind of gag was placed in your mouth?

24         A.      It was a large piece of like a pillowcase

25  wrapped with duct tape.

1   Q. And let me digress for one moment and show you

2 State Exhibit 524.  Is that a photograph of the prison

3 truck?

4   A. Yes, sir, it is.

5   Q. After the -- you said it was a large gag?

6   A. Yes, sir, it was.

7   Q. And that was shoved in your mouth?

8   A. Yes, sir, it was.

9   Q. Was it difficult to breath?

10   A. Yes, sir, real difficult.

11   Q. After they put the gag in your mouth, Garcia

12 put the gag in your mouth, what did you do?  What happened

13 to you then?

14   A. When they put the pillowcase over my head and

15 they carried me into the electric room.

16   Q. The electric room is this room that's inside

17 the warehouse?

18   A. Yes, sir, it is.

19   Q. Is it a very large room?

20   A. It's not a very large room at all.  It's

21 pretty small.

22   Q. Okay.  And that's located right here; is that

23 right?

24   A. Yes, sir, that's correct.

25   Q. Once you went inside the electrical room, what

1  was done to you?

2       A.     They basically -- they basically kind of

3  dropped me or I slipped out of their hands and they put me

4  up against the wall and told me to be quiet.

5       Q.     Let me show you State Exhibit 525.  Does that

6  show the electrical room when the door has been opened?

7       A.     Yes, sir.

8       Q.     Now, after you were placed in there, were

9  there more threats made to you?

10      A.     Yes, sir, they did.

11      Q.     What type of threat was that?

12      A.     They kept on threatening that if I make any

13 noise, that they were going to end it right there.

14      Q.     Okay.  Now, after some time, did you hear

15 something happening outside the electrical room?

16      A.     Yes, I did.

17      Q.     What was that?

18      A.     I heard some more struggling and fighting

19 going on.

20      Q.     Okay.  Were you able to see out of your

21 pillowcase at that time at all?

22      A.     No, sir, I didn't.

23      Q.     After you heard some struggling, what did you

24 hear then?

25      A.     Next thing I know that they had brought

1    somebody in and laid them down next to me.

2         Q.    Did they make any threats to that person?

3         A.    Yes, they did.

4         Q.    What type of threats did they make?

5         A.    They did the same thing to me.  They told them

6    to be quiet, otherwise they would end it right there, too.

7         Q.    Could you tell who was making those threats?

8         A.    It sounded to me like Garcia.

9         Q.    Do you remember specifically what types of

10   threats he made?

11        A.    He was threatening them.  He was apparently

12   putting something to their ear and he said, "Two pounds of

13   pressure -- one pound of pressure do something and

14   everything else if I run this through you, you know, it

15   would end it right now."

16        Q.    Let me show you State Exhibit 537.  This show

17   part of the floor of the electrical room?

18        A.    Yes, sir, that's correct.

19        Q.    This object here, is that one of the gags or

20   is this the type of gag that was placed in your mouth?

21        A.    Yes, sir, that's correct.

22        Q.    What's the next thing that you remember

23   happening?

24        A.    They just kept on bringing in people one after

25   another and there was continuous struggling going on outside

1    and they just kept bringing people in.

2          Q.    As people were brought in, where were they

3    placed?

4          A.    They were just kind of lined up like cord

5    wood, right next to each other, until it got really tight.

6          Q.    Was it the habit of the craftsmen to come in

7    kind of one at a time back from their lunch?

8          A.    Yes, sir.

9          Q.    They didn't come in back in one big group?

10         A.    No, sir, they didn't.

11         Q.    Could you tell which craftsmen were being

12   brought into the room?

13         A.    No, sir, I didn't.

14         Q.    Were more threats made to the individuals as

15   they were brought in?

16         A.    They were threatening everybody.  As they were

17   brought in, they were being threatened by the same person.

18         Q.    Did you hear anyone else besides Mr. Garcia

19   make threats?

20         A.    No, I didn't.

21         Q.    Now, after some time did you hear them bring

22   in actual inmates?

23         A.    Yes, sir, we did.

24         Q.    Were these other inmates that worked in the

25   maintenance department?

1      A.      Yes, sir, they were.

2      Q.      How did they treat those inmates?

3      A.      They were -- they were calling them heros and

4  everything else and they were threatening them even worse

5  than they did us.  You know, they were kicking them and

6  beating them a lot worse than they did us.

7      Q.      You could hear that?

8      A.      Yes, sir.

9      Q.      Did that room get pretty crowded?

10     A.      Yes, it got real crowded.

11     Q.      After some point in time did the -- was the

12  light on this whole time?

13     A.      The light was on the whole time.

14     Q.      At some point in time did the inmates shut the

15  door and turn out the lights?

16     A.      Yes, they did.

17     Q.      Did they say anything when they did that?

18     A.      They didn't say anything.

19     Q.      How long had this been going on?  You were the

20  first person taken hostage.

21     A.      I think I probably went in there about 11:45

22  and I think this was going on until -- at this time I think

23  it might have been about an hour to hour and a half or so.

24  That's my estimation.

25     Q.      Do sometimes if someone in the prison, will

1    they call out your unit to see if everything is going okay

2    or if the inmates are accounted for?

3         A.     Yes, sir.  We have what they call count time.

4    We have count time morning and in the afternoon and then

5    several times at the night, also.  But it's called count

6    time.

7         Q.     And they will call in the morning and what do

8    they do when they call in the count?

9         A.     We do a roster count to identify every

10   offender that's in the prison.  Everyone is actually

11   accounted for person by person.

12        Q.     Would a count -- did it already come on in the

13   morning?

14        A.     Yes, sir.  It had gone on in the morning and

15   it had passed and then in the afternoon and apparently had

16   done the same thing.

17        Q.     So a count was -- a count would have been

18   called in at some point during this hostage situation?

19        A.     Yes, sir, that's correct.

20        Q.     Now, after the door was closed finally and the

21   lights turn off, what happened then?

22        A.     It was one of the officers.  He got his hands

23   out of his jacket.  They tied his hands up inside his jacket

24   and he pulled his hands out of the restraints.

25        Q.     Was he able to get the light on?

1    A.    Yes, sir, he did.

2    Q.    Once he got the light on, were you able -- did

3  he take that pillowcase off your head?

4    A.    What I did, I pulled it back myself because I

5  realized that we might have a chance then.

6    Q.    So you were able -- your hands were tied in

7  front of you?

8    A.    Yes, sir, they were.

9    Q.    And you got the pillowcase off?

10    A.    I didn't take it off.  I just pulled it back

11  above my eyes where I could see.

12    Q.    What was the name of the man who had gotten

13  his hands free?

14    A.    Terry Schmidt.

15    Q.    Was he located right by the door?

16    A.    Yes, sir.  He was right by the door.

17    Q.    After you could see, about how many people

18  were crammed in there?

19    A.    There were a lot of people in that room.

20  There were some people that were laying right across our

21  feet.  They started laying people right across our feet.

22  That's how crowded it was.

23    Q.    There's -- were there -- looking at the names

24  1 through 14 down to Mr. Martinez, were those the names of

25  the individuals that were back there with you?

1    A.    Yes, sir, that's correct.

2    Q.    So 14 total were crowded in the room?

3    A.    Yes, sir, that's correct.

4    Q.    Was everyone, other than Mr. Schmidt tied up

5    at that time?

6    A.    Everybody else was still tied up.

7    Q.    Once he got his hands free, what happened

8    then?

9    A.    We started discussing, asking if anybody had a

10   knife and one of the people next to me, which was Mr. Garza,

11   said he had a knife in his pocket that they had missed

12   somehow.  So I reached over there and retrieved the knife

13   from his pocket.

14   Q.    After you got the knife out of his pocket,

15   what happened then?

16   A.    I started to cut people loose.

17   Q.    Okay.  And were you able to get cut loose

18   yourself?

19   A.    Yes, sir, I did.

20   Q.    How many people did you get cut loose?

21   A.    Approximately two or three and then I just

22   handed the knife to some of the other people that had their

23   hands free and they started cutting other people loose.

24   Q.    Now, during the process that y'all were

25   getting cut loose, did something happen with the door?

1    A.    Yes, sir, they did.  They realized that we

2  were coming loose, so they tried to come back in on us.

3    Q.    Did the door come open?

4    A.    They tried to open it up, but Terry Schmidt

5  and the offenders by the door, they pushed it back closed.

6    Q.    Was one of the inmates trying to get in there

7  inside the room?

8    A.    Yes, he was.

9    Q.    Could you see him from your vantage point?

10   A.    Yes, I did.

11   Q.    Who was that?

12   A.    It was Newbury.

13   Q.    Donald Newbury?

14   A.    Yes, sir.

15   Q.    Could you see any of the other inmates behind

16 him?

17   A.    Shortly after that I saw Rivas and Rodriguez

18 standing at the door.

19   Q.    As he came through the door, then, is that

20 when Mr. Schmidt and two of the hostage inmates pushed back?

21   A.    Yes, sir.

22   Q.    What happened to Mr. Newbury then?

23   A.    His -- basically what -- he had himself in

24 there part of the way and they trapped his shoulder and his

25 -- part of his body in the door, they were pushing so hard.

1  Q. Was he wedged in there, then?

2  A. He was wedged in there real good.  He was

3  waving a shank, trying to stab anybody by the door to get

4  them to turn loose of the door.

5  Q. So he had half of his body in and half out?

6  A. Yes, sir, that's correct.

7  Q. And inside he had some type of shank or

8  weapon?

9  A. Yes, sir, that's correct.

10  Q. What was he doing with that weapon?

11  A. He was just flailing it up in the air, trying

12  to stab anybody close to the door.

13  Q. Did it appear that the inmates outside were

14  trying to push the door open?

15  A. Yes, sir, they were.

16  Q. What did you think was going to happen, if

17  they were able to make it in there?

18  A. We figured if they came in there, they were

19  going to kill us all.

20  Q. How did Mr. Newbury get out of that door?

21  A. Halprin was prying with a pry bar.  I could

22  see him.  He was prying with a pry bar, trying to open the

23  door up to get Newbury out of the door.

24  Q. And did they get Newbury out?

25  A. Yes, they did.

1   Q.   Did the door shut then?

2   A.   The door was shut, right.

3   Q.   After that, what did you do once the door was

4   shut?

5   A.   We started tearing some wires off the wall

6   after shutting some circuits down and we tore some wires off

7   the wall and anything we used we tried to tie the doors shut

8   so they couldn't come in on us.

9   Q.   Were you trying to get someone else's

10   attention there in the prison to come to your aid?

11   A.   Yes, sir, we did.

12   Q.   What did you try to do to do that?

13   A.   We set the fire alarm off to try to get

14   Central Control's attention.

15   Q.   What do we see there in State Exhibit 533?

16   A.   That's the fire alarm control panel.

17   Q.   Is that where you had torn it open and tried

18   to set it off?

19   A.   Yes, sir, we did.

20   Q.   Then the doorknob, is that the effort you made

21   to try to keep them from coming back in?

22   A.   Yes, sir, that's correct.

23   Q.   Were you able to fashion any weapons inside

24   there?

25   A.   We broke some conduit off the wall and there

1  were some nails laying on the floor and we took some of the

2  pillow cases and poured some nails in the bags and broke

3  short pieces of conduit off the wall to use as weapons.

4       Q.     This shows the floor.  Does this show some of

5  the gags and tape that was used to tape the hostages' hands

6  together?

7       A.     Yes, sir, that's correct.

8       Q.     State Exhibit 536, that shows some bloody

9  cloth or Kleenex?

10      A.     Yes, sir.

11      Q.     Were people bleeding back there?

12      A.     Quite a few of us were bleeding.

13      Q.     You, yourself, were bleeding?

14      A.     Yes, sir, I was.

15      Q.     What kind of damage had been done to your head

16 or ear?

17      A.     My ear was basically cut in half and I had two

18 large gashes on the back of my head.

19      Q.     Again, we see some blood or rag used to try to

20 stop some of the blood?

21      A.     Yes, sir.

22      Q.     Could you hear the inmates doing anything

23 after you had the door shut?

24      A.     Yes, sir.  It sounded like they were trying to

25 weld the door shut is what it sounded like.

1     Q.    What kind of sounds did you hear?

2     A.    The sounds of rustling tools and like a torch

3 was hissing outside.

4     Q.    Let me show you State Exhibit 545.  Is that a

5 photograph of the back part of your ear?

6     A.    Yes, sir, that's correct.

7     Q.    Now, at some point in time did you quit

8 hearing noises outside that the inmates were making?

9     A.    Yes, sir, we did.

10    Q.    Did y'all attempt to go out the door at all?

11    A.    No, sir, we didn't.

12    Q.    How long were you back there until someone

13 came to your aid?

14    A.    I would say at least two and a half hours or

15 so.

16    Q.    Were there a couple of guards back there with

17 you?

18    A.    Yes, sir, they were.

19    Q.    Do you remember their names?

20    A.    Randy Albert and Alex Marroquin were the two

21 guards that were with us.

22    Q.    Did Randy Albert, did he work back there with

23 y'all in the maintenance department?

24    A.    He was working outside yard, I believe, and he

25 came in for some tools, I believe.

1     Q.     He was brought in as a hostage?

2     A.     Yes, sir, he was.

3     Q.     Was he having some physical problems?

4     A.     Yes, he was.  When they -- they used his

5 handcuffs on him and they didn't use a lock mechanism.  They

6 just tightened up the handcuffs as tight as they would go.

7     Q.     And was that cutting off the circulation in

8 his hands?

9     A.     Yes, sir, it was.

10     Q.     Did you get a look at his hands?

11     A.     Yes, I did.  I looked at his hands to see if

12 there was anything we could do and his hands were turning

13 blue.  And so we were trying to put ice water and paper

14 towels around his wrists to get the swelling to go down.

15     Q.     Was there a water cooler that had been placed

16 back there?

17     A.     Yes, there was.

18     Q.     You, yourself, hadn't placed that back there?

19     A.     No, sir, I didn't.

20     Q.     Did you try to use that water to get him some

21 relief?

22     A.     Yes, sir, we did.

23     Q.     Did he appear to be in quite a bit of pain?

24     A.     He was in extreme pain.

25     Q.     How were you taken out of that room?

1      A.      Basically what they did, they brought the team

2  that usually goes in, the sort team, and they bring them in

3  there.  And they told us all to kneel down on the floor and

4  face forward and then they opened the door up and escorted

5  us out.  They handcuffed us and took us out one by one.  As

6  they identified us, they took our handcuffs off.

7      Q.      Did you give a statement at that time or did

8  you go to the Medical Center?

9      A.      We were taken -- I was -- we were taken to the

10  infirmary.

11      Q.      What was done with your ear?

12      A.      They looked at our wounds and everything else

13  and then they decided to transport us to the hospital.

14      Q.      What happened at the hospital with your ear?

15      A.      At the hospital I was treated by a physician.

16  He was at the emergency room and he treated me for my

17  wounds.

18      Q.      Okay.  Was the ear -- did you get some

19  stitches in your ear?

20      A.      Yes, sir, they did.

21      Q.      All right.  Let me show you State Exhibit 547.

22  What do we see in that photograph?

23      A.      That's a shank.

24      Q.      Does that look like one of the shanks that was

25  used in the attack?

1    A.    Yes, sir.

2    Q.    No. 548, what are those?

3    A.    It's a pieces of strap that looks like it was

4  sharpened up to make a cutting weapon.

5    Q.    Okay.  And then 549?

6    A.    That looks like a piece of rebar or something

7  with black tape on it.

8    Q.    Okay.  And State Exhibit 550?

9    A.    That's a small shank made from a piece of wire

10  wrapped with a handle made on it.

11    Q.    Now, since this time have you still

12  experienced pain from the blow to your head?

13    A.    Yes, sir, I do.

14    Q.    What type of pain have you experienced?

15    A.    I have vertigo problems.  I stay dizzy quite a

16  bit of the time.  I have to take medication to keep my

17  equilibrium where I don't stagger and I still have constant

18  headaches and loose feelings to my hands and legs every once

19  in a while.

20    Q.    Did you quit the prison system after this

21  incident?

22    A.    Yes, sir, I did.

23    Q.    Did you try to go in some other line of

24  employment?

25    A.    Yes, sir, I did.

1    Q.    What was that?

2    A.    I was a tractor salesman for a local tractor

3    equipment company.

4    Q.    Have you been able to continue that work?

5    A.    No, sir, I've been unable to.

6    Q.    Why is that?

7    A.    Because the doctors won't let me drive for a

8    long period of time.

9    Q.    Is that because of your vertigo?

10   A.    Yes, sir, that's correct.

11   Q.    Back when this incident happened during the

12   entire process, were those seven inmates working together as

13   a team?

14   A.    Yes, sir, they were.

15   Q.    Any doubt in your mind that -- well, did you

16   feel that your life was in danger during that incident?

17   A.    Yes, sir, it was.

18              MR. SHOOK:  Pass the witness.

19                    CROSS-EXAMINATION

20   BY MR. ASHFORD:

21   Q.    Good morning, Mr. Moczygemba.  You testified

22   in all of these trials so far?

23   A.    Yes, sir, that's correct.

24   Q.    This would be number five?

25   A.    Yes, sir.

1      Q.    Okay.  And you have got -- some of the people

2  you have testified about that work with you are here today,

3  correct?

4      A.    Yes, sir.

5      Q.    And have those same people testified in all

6  the trials?

7      A.    Yes, sir, basically.

8      Q.    Okay.  So been anybody else that has testified

9  in other trials that's not here today?

10      A.    Yes, sir, there are.

11      Q.    How many that you can recall?

12      A.    I really can't recall.  I know that some of us

13  are pretty regular, but there are other ones that they use

14  occasionally.

15      Q.    Anybody here today that hadn't testified

16  before?

17      A.    I can't recall.

18      Q.    You say the Connally Unit is a maximum

19  security unit?

20      A.    Yes, sir, that's correct.

21      Q.    Okay.  And do you know if that's just a

22  classification made by the types of offenses that the

23  offenders have?

24      A.    That's the way the unit is classified by TDC.

25      Q.    Okay.  Not going to have anybody down there

for drugs and that kind of thing, correct?

     A.     I can't tell you that, sir.

     Q.     Okay.  But despite that entire unit being a maximum security unit, you still have different levels of security in that unit, as you have described, correct?

     A.     Yes, sir, that's correct.

     Q.     Okay.  And you got two big dorm-type units and then you have the three that are more secure; is that correct?

     A.     Yes, sir, that's correct.

     Q.     And despite the fact that it's a prison, you work there, the inmates work there, everybody has lunch every day, I mean, it functions as a society within itself, correct?

     A.     Yes, sir, that's correct.

     Q.     Okay.  And there's problems, naturally, because it's a prison, correct?

     A.     Yes, sir.

     Q.     But, I mean, you couldn't function, work down there, if you had problems with everybody every day; is that correct?

     A.     That's correct.

     Q.     Now, you testified that the only person that was in that more secure area was George Rivas; is that correct?

1     A.     Yes, sir.

2     Q.     Okay.  And is that at the time of the incident

3  you testified about or is that all the time or what?

4     A.     They had a small reclassification at the time

5  and they were going through there and checking his records,

6  I guess, and it came up that he may have not -- may not have

7  supposed to have been in the dorms and they moved him to 3

8  building.

9     Q.     Okay.  So he had been in the dorms at some

10  point in time?

11     A.     Yes, sir, he was.

12     Q.     Do you know how long he had been in that more

13  secure unit?

14     A.     I can't tell you, sir.

15     Q.     Your understanding that he got put in that

16  more secure unit because he had done anything down there at

17  the penitentiary to cause him to go there or was it because

18  they looked and did their classifications, they said, hey,

19  based on what kind of offenses this guy has coming in, he

20  should have been reclassified?

21     A.     That's correct.

22     Q.     Okay.  Who had the shortest tenure there in

23  the maintenance department?

24     A.     Probably Murphy.

25     Q.     Murphy?  Okay.  How does Mr. Halprin rate

1    there in terms of tenure?

2         A.    Oh, as far as working for me?

3         Q.    Right.

4         A.    I must have misunderstood you, then, because I

5    meant -- Murphy was there, really, the longest.  He was one

6    of the first ones that was there.  When I came in five years

7    ago, Murphy was working there and he was there approximately

8    only a year.

9         Q.    Okay.  Was that the shortest amount of time of

10   any of the guys there?

11        A.    The last -- well, we had some people that

12   worked with the craftsmen that were there probably only just

13   a couple of weeks at the time.

14        Q.    I mean, among those seven, among those six?

15        A.    Right.  They were about the same.

16        Q.    Okay.  You say he worked with nonsensitive

17   tools.  What does that mean?

18        A.    What that means is we have a sensitive

19   toolroom and that classifies everything that is able to cut

20   and cut any kind of wire or any kind of metal.  The

21   nonsensitive tools are like sockets and screwdrivers, stuff

22   that you can't cut with.

23        Q.    Okay.  Do you have inmates that work with

24   sensitive tools or was that restricted?

25        A.    That was restricted.  And that was restricted

1   to the supervisors.

2        Q.    And his job was pretty much just to hand out

3   stuff when somebody came in and requested it?

4        A.    That's correct.

5        Q.    Okay.  Clerk-type job?

6        A.    Somewhat.  All he was required to do was just

7   to hand out tools.

8        Q.    Okay.  So what would he have to know?  What

9   kind of skills would he have to have to do that particular

10  job?

11       A.    Just to be able to read and identify tools.

12       Q.    Okay.  Did he have to go through and kind of

13  learn different tools or could he go to a list and see

14  pliers are in slot 582 or what?

15       A.    Yes, sir.  That's basically correct.  All the

16  tools were numbered and he had to make sure that they go

17  back in the same slots that he got them from.

18       Q.    So he wouldn't really have to necessarily have

19  a whole lot of familiarity with tools and what tools did

20  what and what tools looked like?

21       A.    That's correct.

22       Q.    Okay.  As long as he could read?

23       A.    Exactly.

24       Q.    Now, State Exhibit 582 there, sitting here,

25  all these people were people that were taken hostage; is

1  that correct?

2          A.      Yes, sir, that's correct.

3          Q.      Okay.  Nobody suffered any life threatening

4  injury, as far as you know?

5          A.      What do you mean life threatening?

6          Q.      Something that going in the hospital that they

7  might have died from?

8          A.      I was the one that spent the most time in the

9  hospital.  I spent two days in the hospital from my head

10 injury.  I had a concussion.

11         Q.      Okay.  Nobody was killed?

12         A.      Nobody was killed.

13         Q.      So you say there was a water cooler back there

14 that you had put back there?  Was it always back there?

15         A.      I didn't put that cooler back there.

16         Q.      Was that something that was usually back

17 there?

18         A.      It was back in the warehouse, yes.

19         Q.      I mean, back in the electrical room there?

20         A.      No, sir.  A water cooler is not a good place

21 -- an electrical room is not a good place to put a water

22 cooler.

23         Q.      Appear somebody might have just placed that

24 back there?

25         A.      That's correct.

1    Q.    Everything in the prison is done -- you

2    testified everything is done the same time all the time?

3    A.    Yes, sir.

4    Q.    Okay.  That's just basic regimen of prison,

5    correct?

6    A.    Procedure.

7    Q.    Okay.  Guys got to get up, go to their jobs,

8    meals are the same time, the counts are at the same time

9    every day, correct?

10    A.    No.  The counts were changed, you know, just

11    to keep it not regular.  That was a procedure.  But they

12    were basically within a certain time span every day.

13    Q.    Now, how about the comings and goings of the

14    employees, the workers like yourself?  You said y'all

15    wouldn't go to lunch and come back at the same time.  You

16    came back kind of staggered.  Is that a policy or is that

17    just kind of the way you did it?

18    A.    That's just the way it works out, usually.

19    Q.    Okay.  And from reading reports, correct me if

20    I'm wrong, but it seems like two people would come back

21    every fifteen minutes or so and then they would get

22    confronted and taken down and put in the electrical room,

23    correct?

24    A.    Yes, sir, that's correct.

25    Q.    Okay.  And was that just because two people

1  would go to lunch together and just happened to come back

2  and another two people would go to lunch together?

3      A.     Yes, sir, that's correct.

4      Q.     You all didn't necessarily, of course, have to

5  go and eat lunch at the same time?

6      A.     We -- my employees, they usually went at the

7  same time because we tried to start work at the same time

8  every day.

9      Q.     Okay.  Well, you have a certain amount of time

10 before lunch?

11     A.     Yes, sir, we have an hour.

12     Q.     Well, is it that just everybody didn't take

13 their hour?  They just kind of came back to the area or how

14 does it work out that, you know, two people are coming back

15 every fifteen minutes or so?

16     A.     Well, what happens, we have some people that

17 live in Kenedy, so they go to their house to eat.  You have

18 some people that do not like to eat on the unit, so they go

19 to their vehicle to eat.  You have some people that like to

20 go to town, so they go to Kenedy to eat.  And then you have

21 some of us that go to the officers dining room and we eat

22 over there.

23     Q.     Okay.  And thinking back on it, leading up to

24 that day, is that pretty much the way it always happened?

25     A.     Yes, sir.

1   Q.   Be rare that everybody go to lunch and come

2   back all at the same time or come back in groups of five or

3   six?

4   A.   That was the way it was from day one since I

5   was there.

6   Q.   Okay.  And that's kind of a pattern or

7   practice that could have possibly been observed by the

8   inmates, correct?

9   A.   It's possible.

10  Q.   Okay.  Now, as this whole thing was happening,

11  you said it appeared that George Rivas was the leader of

12  this whole thing?

13  A.   Yes, sir.

14  Q.   Okay.  And why would you say that?

15  A.   Because people were looking to him for further

16  instructions.

17  Q.   Okay.  For example?

18  A.   Whenever they had me where I finally settled

19  down, they all looked at him and said, okay, what do we do

20  now?  And he would say, start tying him up or whatever else

21  have you or clean up the blood on the floor or whatever else

22  have you, you know.  He was basically giving the orders.

23  Q.   Was Rivas responsible for getting a lot of

24  these people on at the maintenance department?

25  A.   He recommended some of them, but it was our

1   ultimate choice.  If they appeared to be a good worker with

2   a good record, we pulled them in.

3          Q.      As an inmate, he couldn't say Mr. Moczygemba,

4   I want you to hire this person, but he certainly made

5   recommendations, correct?

6          A.      He just made recommendations and we took those

7   with a grain of salt and we looked through their records.

8          Q.      Okay.  Had there been other individuals that

9   he had recommended in the past that you decided not to hire?

10         A.      He tried to get Rodriguez in there.  A couple

11  of times he recommended him.  And he sent his IOC to us and

12  we didn't see anything that the man could do that would fit

13  our needs, so we didn't hire him.

14         Q.      Okay.  That's Karnes County down there?

15         A.      Yes, sir, that's correct.

16         Q.      Have you testified down there about these

17  events at the Karnes County Grand Jury?

18         A.      No, sir, I haven't.

19         Q.      Do you know if there are other pending cases

20  down there for the escape itself, for the assaults

21  themselves for these inmates?

22         A.      The only other one I testified was for Ronald

23  Rodriguez.  I testified there Tuesday.

24         Q.      It was down in --

25         A.      In Floresville.

1        Q.     Now, you gave a voluntary written statement to

2   the Internal Affairs Division of the TDC Connally Unit,

3   correct?

4        A.     That's correct.

5        Q.     Okay.  And I assume you gave that pretty soon

6   after the events; is that correct?

7        A.     It was the following day.

8        Q.     Okay.  The 14th of December?

9        A.     Yes, sir, that's correct.

10        Q.     And you handwrote that and --

11        A.     No, sir, I -- somebody else wrote that.  I

12   just dictated.  I was not able to hold an ink pen at the

13   time.

14        Q.     Okay.  So someone else handwrote --

15        A.     It was that internal --

16        Q.     -- three and a half pages?

17        A.     Yes, sir.  It was that Internal Affairs

18   officer.  His name is Simon on there.  He was the one that

19   wrote it.

20        Q.     And have you had a chance to look at it?

21        A.     Yes, sir, I have.

22        Q.     Okay.  And I don't know if you are -- a lot of

23   these statements also were, even though you may have given a

24   written one, was typed up and then signed.  Do you recall

25   having a typed-up statement signed also?

1      A.      No, sir.   That's the only statement I made.

2   That's the way it is.   That's the way it's always been.

3      Q.      Okay.   Were you ever asked to supplement a

4   statement and add anything else to a statement?

5      A.      No, sir.

6      Q.      Okay.   As far as you know, out of these 16

7   people, were at least the 12 employees asked to do the same

8   or similar type things?

9      A.      Yes, sir.

10      Q.      Okay.   Now, when they ask you to give a

11   statement, of course they want you to just tell the story

12   and tell what happened, correct?

13      A.      Yes, sir.

14      Q.      And when you give a statement, you want to

15   tell the most important things, correct?

16      A.      Yes, sir.

17      Q.      Okay.   You want to tell who hit you and who

18   said something bad, correct?

19      A.      That's correct.

20      Q.      Who threatened you, correct?

21      A.      As close as you can remember at the time.

22      Q.      As opposed to when, I went into the electrical

23   room I turned left, as opposed to turned right, or I slipped

24   on some water and almost fell, you want to tell the events

25   so that the investigators know what happened and what

1    particular inmates did, correct?

2         A.     Yes, sir, that's correct.

3         Q.     Okay.  Now, I want to ask you, you said a lot

4    of "theys" in there.  Okay?

5         A.     I said a lot of what?

6         Q.     Theys.  In your direct testimony --

7         A.     Yes, sir.

8         Q.     -- you said they did this, they did that.  I

9    want to ask you specifically what you remember Mr. Halprin

10   doing.  Okay?  I want to stop.  I want to ask you question

11   by question.

12        A.     Okay.

13        Q.     All right.  So I believe the first thing you

14   said about Mr. Halprin was that when you woke up, he was

15   standing over to the right of you; is that correct?

16        A.     Yes, sir, I think so.

17        Q.     Okay.  And how far away?

18        A.     Probably about four feet away.

19        Q.     Okay.  And any shank in his hand?

20        A.     No.  I think all he had in his hand was a mop.

21        Q.     A mop?  Okay.  Was he cleaning up while this

22   was going on?

23        A.     Yes, sir.

24        Q.     Actually using the mop?

25        A.     Well, he was -- they didn't want to make

1   anything obvious, I guess, so they were cleaning the blood

2   off the floor as it --

3        Q.    Okay.  So he was actually cleaning up blood?

4        A.    Yes, sir.

5        Q.    Okay.  Did you ever see him hit anybody?

6        A.    I didn't.

7        Q.    Okay.  And you said they were making threats.

8   Later on you said that you didn't really hear anybody make

9   threats but Garcia.  Is that fair?

10        A.    Well, Garcia was making a lot of the threats,

11   too, was making most of the threats at the time.  He was the

12   one that was most vocal.

13        Q.    Okay.  Well, you knew these inmates?  You know

14   their voices?

15        A.    Yes, sir, I do.

16        Q.    Okay.  I'll ask you specifically, did you ever

17   hear Mr. Halprin make any threats?

18        A.    I didn't.

19        Q.    Okay.  You testified when the door was closed

20   you could hear them yelling and them making statements,

21   correct?

22        A.    Yes, sir.

23        Q.    I want to ask you specifically, did you hear

24   Mr. Halprin say anything when the door was closed?

25        A.    No, sir, I didn't.

1   Q.    Okay.  You said when the door was closed, you

2   could hear the inmates getting kicked and beat it sounded

3   like?

4   A.    Yes, sir.

5   Q.    You said it sounded like they were getting it

6   a whole lot rougher than you guys did?

7   A.    Yes, sir.

8   Q.    And in speaking of the inmates who

9   participated in the escape, you said they were treating them

10  a whole lot worse?

11  A.    Right.

12  Q.    Is there anything that you heard that

13  indicated to you that Mr. Halprin was beating any of these

14  inmates?

15  A.    Well, it appeared to me that they were -- they

16  all were working as a team and so that's the reason I made

17  that statement.

18  Q.    Okay.  I understand that.  But I'm talking

19  about specific actions.

20  A.    I can't -- I can't break it down one by one.

21  Q.    Okay.  Now, you saw him basically trying to

22  pry Mr. Newbury out of the door?

23  A.    Yes, sir.

24  Q.    Okay.  And that's because Mr. Newbury was

25  caught in that door and kind of stuck there and couldn't get

1    out one way or the other, correct?

2        A.    Yes, sir.

3        Q.    And the action he's taking is actually prying

4    the door open, correct?

5        A.    Yes, sir.

6        Q.    Not swinging the pry bar at anybody or hitting

7    anybody with it, correct?

8        A.    No, sir.

9        Q.    In addition to giving your statement, were you

10   asked to compile information that would assist law

11   enforcement in trying to catch these individuals?

12       A.    Yes, sir, we did.

13       Q.    Okay.  And what types of information were you

14   asked to provide?

15       A.    We were providing them with current

16   descriptions and some of their habits and mannerisms that

17   they did basically while they were working for us and how

18   they acted and stuff like that.  Basically they wanted an

19   updated description of what they looked like.

20       Q.    Did you provide that to your chief?  Bill

21   Lazenby (phonetic)?

22       A.    I can't recall who I gave it to.

23       Q.    I'll show you Defense Exhibit No. 38 and ask

24   you if you can identify that.

25       A.    Yes, sir, that's correct.

1      Q.      And what is that?

2      A.      That is basically a description of their --

3  the way he was at the time and their physical and mental

4  attributes, I guess.

5      Q.      As provided by you?

6      A.      Yes, sir.

7      Q.      About Mr. Halprin?

8      A.      Yes, sir.

9              MR. KING:  Offer Defense Exhibit 38 at

10  this time.

11             THE COURT:  Any objection to Defense 38?

12             MR. SHOOK:  No objection.

13             THE COURT:  Defense 38 shall be admitted.

14     Q.      (By Mr. Ashford)  Sir, they first asked you

15  his physical description.  You gave that, correct?

16     A.      Yes, sir.

17     Q.      They asked you his tattoos, scars, or marks

18  and you said none that you were aware of, correct?

19     A.      Correct.

20     Q.      They asked you his job skills and you said

21  none, correct?

22     A.      That's correct.

23     Q.      All right.  And they asked you his mannerisms

24  and including in that is temperament, correct?

25     A.      Yes, sir.

1    Q.    And you said Halprin was dumb as a bag of

2    rocks, had to be told time after time how to complete a

3    task; is that correct?

4    A.    That's correct.

5    Q.    And that was your honest opinion of Mr.

6    Halprin's mental capabilities --

7    A.    That's correct.

8    Q.    -- at that time, correct?

9    A.    That's correct.

10    Q.    Do you think he's smart enough to plan an

11    escape like that?

12    A.    Follow orders.

13    Q.    Follow orders?

14    A.    Basically.

15    Q.    Do you think that's pretty much what his role

16    was?

17    A.    Well, that is basically all I told him to do.

18    All he could do is follow orders every time I told him

19    something and you know how that goes.

20    Q.    Were you asked to participate or were you

21    aware at any time that information that you provided might

22    have been used to create a profile of the seven offenders

23    and rank them in terms of dangerous to least dangerous, most

24    likely to be a leader to least likely to be a leader?

25    A.    I don't know the procedures on that.

1    Q.    Okay.  Well, were you ever asked those types

2    of questions?

3    A.    I can't recall.

4    Q.    Okay.  And so do you know if the information

5    that you provided and that others provided was used in that

6    way?

7    A.    I can't tell you that, sir.

8    Q.    Okay.  Now, you said that you were aware that

9    other individuals gave statements possibly supplements to

10   statements just like you did, correct?

11   A.    It's possible.

12   Q.    Are you aware that other individuals also gave

13   these kinds of profiles that I just showed you and was

14   introduced as Defendant's Exhibit 38?

15   A.    I can't tell you.  I have no idea.

16   Q.    Okay.  I'll show you what is marked as Defense

17   Exhibit 39 and ask you to take a look at it.

18   A.    Yes, sir.

19   Q.    Recognize the names on that?

20   A.    Yes, sir, I do.

21   Q.    The names of the offenders?

22   A.    Yes, sir.

23   Q.    Appear to be from the Connally Unit?

24              MR. SHOOK:  Judge, we'll object if

25   they're going to discuss documents not in evidence.  We'll

1    object to that.

2                    THE COURT:  Overruled.

3         Q.    (By Mr. Ashford)  Does it appear to be making

4    similar evaluations and judgments just like State Exhibit

5    38?

6                    MR. SHOOK:  Judge, he's referring to a

7    document not in evidence and he's even characterizing what

8    it says and we'll object to that.

9                    THE COURT:  Sustained.

10                   MR. ASHFORD:  Offer defense Exhibit 39 at

11   this time.

12                   MR. SHOOK:  May I take the witness on

13   voir dire?

14                   THE COURT:  You may.

15                   VOIR DIRE EXAMINATION

16   BY MR. SHOOK:

17        Q.    Is this your document?

18        A.    No, sir, it's not.

19        Q.    Did you put it together?

20        A.    No, sir, I didn't.

21                   MR. SHOOK:  I object to hearsay.

22                   THE COURT:  Sustained.

23        Q.    (By Mr. Ashford)  You said that Mr. Halprin

24   just followed orders, okay --

25        A.    Yes, sir.

115

```
1     Q.      -- is that correct?  Okay.  And that's about
2   the best he could do?
3     A.      Yes, sir.
4     Q.      Okay.  Now, what about Mr. Rivas?
5     A.      He had a lot of leadership qualities.
6     Q.      Okay.  Appear to be pretty smart?
7     A.      Yes, sir.
8     Q.      And you worked with everybody pretty much
9   except Rodriguez, correct?
10    A.      That's correct.
11    Q.      Okay.  What about Mr. Harper?
12    A.      Mr. Harper was fairly intelligent, hard
13  worker.
14    Q.      What about Mr. Newbury?
15    A.      He was very intelligent and a hard worker.
16    Q.      What about Mr. Garcia?
17    A.      He was hard -- they were all hard workers.
18    Q.      Okay.  Well, I'm not talking about hardworking
19  right now.  I'm talking about intelligence and leadership
20  qualities, okay?
21    A.      Well, I never asked them to display that, just
22  to follow orders.
23    Q.      Okay.  How about Mr. Murphy?
24    A.      Murphy, he was very intelligent and was very
25  talented.
```

1   Q.    If I asked you based on your opinion to rank

2   Mr. Halprin in terms of intelligence with all the rest of

3   those people I just asked you about, what would you say?

4   A.    He was right at the very bottom.

5   Q.    Okay.  And I'll ask you again, did TDC ask you

6   that type of information?  Did they ask you to do that type

7   of qualification?

8   A.    They basically asked us to give them their --

9   how would you say, their physical and mental

10  characteristics.

11  Q.    Okay.  Did they use terms such as leadership?

12  A.    Oh, not really, not that I can recall.

13  Q.    But no doubt in your mind that Rivas was the

14  leader?

15  A.    Yes, sir.

16  Q.    And those were -- that was consistent with his

17  intelligence and his character as you knew him?

18  A.    Yes, sir, that's correct.

19  Q.    And Randy Halprin you saw mopping up the

20  floor?

21  A.    Yes, sir.

22  Q.    And that's pretty much consistent with what

23  you knew about him?

24  A.    Yes, sir.

25  Q.    Did Halprin put a bandage on your head?

1      A.      I don't know.  I think he tried to dab it or

2   swab it.  I don't recall who did that.  I wasn't turning

3   around much.

4      Q.      But when you got hit on the head, you don't

5   know who hit you on the head, first of all?

6      A.      I don't have no idea.

7      Q.      You didn't come in and try to pick any of

8   these guys and say that guy hit me on the head.  You are

9   answering honestly, correct?

10     A.      Yes, sir, that's correct.

11     Q.      You don't know who, but it felt like somebody

12   might have tried to put a bandage on your head?

13     A.      I can't recall.

14     Q.      Do you remember after getting the pillowcase

15   off your head and seeing any type of bandage or anything,

16   sir?

17     A.      Excuse me?

18     Q.      Do you remember seeing any type of bandage

19   after you got the pillowcase off your head?

20     A.      No, sir, I didn't.

21              MR. ASHFORD:  I pass the witness.

22              MR. SHOOK:  We have no further questions.

23              THE COURT:  Thank you, sir.  You may

24   stand down.

25              MR. SHOOK:  May this witness be excused?

1           MR. ASHFORD:  No objections, Your Honor.

2           THE COURT:  He may.

3           MR. D'AMORE:  Call Alejandro Marroquin.

4                ALEJANDRO MARROQUIN,

5    having been duly sworn, was examined and testified as

6    follows:

7                DIRECT EXAMINATION

8    BY MR. D'AMORE:

9         Q.    Would you state your name, please.

10        A.    Alejandro Marroquin, Jr.

11        Q.    Sir, how old a man are you?

12        A.    Twenty-five years.

13        Q.    Direct your attention back to December of 2000

14   and ask you to tell the jury where you were working at that

15   time?

16        A.    I was working in the Connally maintenance

17   room.

18        Q.    And what was your job at that time?

19        A.    I was the maintenance paint supervisor.

20        Q.    Your job was to work within the prison system;

21   is that right?

22        A.    Yes, it was.

23        Q.    What was your job title?

24        A.    Correction officer 3.

25        Q.    How long had you been with the prison system?

1    A.    Roughly four years.

2    Q.    And your job that day was to do what?

3    A.    Pull the inmates out for work and basically

4  detail and brush up on the unit paint as needed.

5    Q.    All right.  That day there was an escape from

6  that unit; is that right?

7    A.    Yes.

8    Q.    There were seven people who escaped?

9    A.    Yes.

10    Q.    Did you know these seven people?

11    A.    Yes, I did.

12    Q.    And how do you know them?

13    A.    Basically officer/inmate contact.

14    Q.    Had you supervised any of those seven people?

15    A.    Yes, I did.

16    Q.    How many of them?

17    A.    Six of them.

18    Q.    Which one did you not supervise?

19    A.    Michael Rodriguez.

20    Q.    The other six, did that include Randy Halprin?

21    A.    Yes.

22    Q.    Do you see him in court today?

23    A.    Yes, I do.

24    Q.    Would you identify where he is?

25    A.    To the far left.

1    Q.    At the end of the table?

2    A.    Yes, sir.

3              MR. D'AMORE:   Let the record reflect that

4    this witness has identified the defendant in open court.

5    Q.    (By Mr. D'Amore)  At what point did you become

6    involved in being a hostage or assaulted as part of the

7    escape?

8    A.    Time wise?

9    Q.    Yes, sir.

10   A.    Roughly about 11:45 that afternoon.

11   Q.    All right.  Right before noon?

12   A.    Right.

13   Q.    What had you been doing right before that?

14   A.    Doing my paperwork.

15   Q.    And where were you located?

16   A.    Right inside the maintenance office.

17   Q.    Who else was in that maintenance office at

18   that time?

19   A.    Supervisor Camber.

20   Q.    All right.  Were there any of those seven

21   people in there?

22   A.    At that time when we were in there, the only

23   offender that walked in was offender Murphy.

24   Q.    All right.  Did some of the other prisoners

25   come in there?

1      A.      Roughly a few minutes offender Halprin,

2   Garcia, and Harper and Newbury came in.

3      Q.      Did you know someone by the name of George

4   Rivas?

5      A.      Yes, I did.

6      Q.      Was he around that day, also?

7      A.      Yes, he was.

8      Q.      Did he come into that office, also?

9      A.      He came in roughly about two or three minutes

10  after the other offenders had positioned themselves.

11     Q.      All right.  Within that office you said you

12  were at a desk?

13     A.      Right.

14     Q.      And you were doing some paperwork?

15     A.      Right.

16     Q.      What happened when they were all in there?

17     A.      After they were all in there offender Rivas

18  came, placed himself in front of me, picked me up out of my

19  chair.  At that point I was struck from behind.

20     Q.      Do you know who struck you from behind?

21     A.      No, I don't.

22     Q.      All right.  And how was it that he picked you

23  up out of your chair?

24     A.      He got me in a bear hug and just lifted me out

25  of my chair.

1     Q.     Did he say anything to you?

2     A.     At that time he didn't say anything.

3     Q.     What did you think was going on?

4     A.     I thought they were -- I tried to down play it

5  to avoid confrontation, but I saw that, you know, it was

6  serious.  At that time, you know, I started to struggle with

7  them and that's when I was hit from behind.

8     Q.     Okay.  Did you get knocked unconscious as a

9  result?

10    A.     No.

11    Q.     Did you get knocked down onto the floor?

12    A.     Yes, I did.

13    Q.     What happened at that point?

14    A.     At that point when I was on the floor,

15  offender Newbury had a knife to my throat and told me not to

16  move.  At that time I looked towards my feet where

17  supervisor Camber was being subdued by offender Halprin and

18  Garcia.

19    Q.     Now, you said he had a knife to you?

20    A.     Right.

21    Q.     What type of knife was it?

22    A.     It was a 12-inch homemade shank.

23    Q.     All right.  And did you take what he said

24  seriously?

25    A.     Very.

123

1      Q.    All right.  You could look over and you could

2  see Mr. Camber within a few feet from you?

3      A.    Right.

4      Q.    And who was with him at that point?

5      A.    Offender Halprin was basically by his head and

6  offender Garcia was on top of him.

7      Q.    What were they doing with him?

8      A.    They were slamming his head down and at that

9  time offender Garcia moved towards to tie supervisor Camber

10  and at that time Halprin took over the top part of his body

11  and from what I saw he was slamming his head into the

12  ground.

13      Q.    Mr. Camber, what was his job back then?

14      A.    He was HVAC technician.

15      Q.    He worked in the maintenance unit?

16      A.    Right.

17      Q.    All right.  Was he struggling as those two,

18  Halprin and Mr. Garcia, were with him initially?

19      A.    He was struggling to a point.  Eventually,

20  after being struck on the ground a few times, he complied

21  with what they started to tell him.

22      Q.    All right.  And so you saw, then, Mr. Garcia

23  and Mr. Halprin subdue him after they put his head into the

24  floor several times?

25      A.    Right.

124

1    Q.    What happened then?

2    A.    At that time when they had him subdued, Garcia

3    then came to help offender Newbury and offender Halprin -- I

4    mean, Harper, to subdue me.

5    Q.    All right.  Were they able to subdue you?

6    A.    At that point they were just -- they took off

7    my uniform.

8    Q.    What happened then?

9    A.    At that point I looked at Rivas and Rivas then

10   looked down at me and told me if I hesitated any more, he

11   wouldn't hesitate to kill me.  I was placed on my belly and

12   made to crawl to the back to the electrical room.  At that

13   point they continued to tie me with zipties and the first

14   couple of sets I broke.  After they figured out, they

15   started putting more zipties, more duct tape around my legs,

16   my arms.

17         At that time I was drug into the electrical

18   room where I was placed next to supervisor Moczygemba and

19   with all the blood that I saw in there, I thought he was

20   dead.

21   Q.    All right.  Had you been struck, then, several

22   times before you were put into that electrical room?

23   A.    Right.  They tried to put a gag in my mouth.

24   I wouldn't let them.  And offender Newbury grabbed me by my

25   hair and struck me seven or eight times.  I don't know

1    exactly.  I was knocked out and broke my nose.

2         Q.     You had a broken nose as a result of what

3    Newbury did?

4         A.     Right.

5         Q.     Did you take the threats that they said to you

6    seriously?

7         A.     Yes.

8         Q.     And you got put back in the electrical room,

9    Mr. Moczygemba was there?

10        A.     Right.

11        Q.     Was someone else brought in there after you?

12        A.     After I was placed in there, supervisor Camber

13   was then placed in there.

14        Q.     All right.  And were you guys talking at all

15   to each other at that point or --

16        A.     We were told to keep quiet.  They put a hood

17   on me and I really couldn't talk or breath with that hood

18   on.

19        Q.     Could you see out of it?

20        A.     As first I couldn't, but when they

21   repositioned us and they tied our hood with duct tape, my

22   hood came up over one of my eyes and I could see.  But I

23   tried not to make it too obvious, because I was afraid they

24   were either going to strike me more or end up killing me.

25        Q.     After that was there a process where other

1  people were brought back and put in that room where you

2  were?

3       A.    Yes.

4       Q.    Could you hear any threats being made as these

5  people were being brought in there?

6       A.    There was threats made towards some of the

7  other supervisors.  Regarding I'm not sure, but they kept

8  threatening to kill them and if they moved or if they

9  fought, that they would get struck or get, you know, get a

10 shank in them or whatever.

11      Q.    Okay.  Did the people in the room take those

12 threats seriously?

13      A.    They took them very seriously.  After a while

14 it was very quiet in there until all the inmates left.

15      Q.    What happened at that point when the people

16 were put into the room and the door closed?

17      A.    After the inmates had left and I guess they

18 locked the door or closed it, at that point one of the

19 supervisors had a pocketknife.  We all tried to get it out

20 of his pocket and being as I had my shoulder separated, I

21 was the only one that could reach that far.  I grabbed it

22 and we passed it on to another one that had his hand already

23 loose.  We continued to untie everybody.

24            One of the guys that was in there, another

25 officer, Randy Albert, had a pair of handcuffs put on him,

1  but they were on so tight, I couldn't pick none of the

2  locks.

3           We then were all free except for Randy Albert.

4  He was placed in the back, seeing how he was defenseless.

5  The inmates found out we were loose.  They tried to get back

6  in.

7      Q.    Let me ask you this.  Did you do anything to

8  try to help his hands?

9      A.    I told three of the inmates that were in there

10 with us, there was a bucket of water.  I told them to put

11 his hands in there and massage them because his hands were,

12 you know, two or three times their size.  I told them to try

13 and get as much blood flow as possible.  And I kept him in

14 the back, seeing how the inmates were trying to get back in

15 all I kept hearing was that they were going to kill us.  I

16 told him, you know, stay to the back.  If they come through

17 me, they're going to kill you, too.

18     Q.    Did they -- those people, those escapees, try

19 to get back through that door?

20     A.    Right.

21     Q.    And could you see that happen?

22     A.    Right.

23     Q.    What did you and the other people, those

24 hostages, do in preparation or, I guess, in case they came

25 back in?

1      A.      We started ripping conduit, electrical panels.

2  We found a bag of nails.  We started filling socks with them

3  and I told them it was do or die.  If they come back in, you

4  are either going to die or you are going to fight, one or

5  the other.

6      Q.      At some point did one of them try to come back

7  through that door?

8      A.      Right, offender Newbury.

9      Q.      And tell the jury what you saw happen there.

10     A.      At that time they opened up the door with a

11 pry bar.  Offender Newbury stuck his -- I'm thinking his

12 left arm in.  At that time everybody was kind of at a -- it

13 was kind of crazy at that time.  I told one of them to give

14 me a knife, seeing as they were going to come in.  I was

15 going to try to cut his arm off, just so we could close the

16 door back.

17         At that time when he heard me say that, he

18 took his arm out.  At that time some of the supervisors

19 began to tie the door closed so they couldn't reenter and at

20 that time the inmates, I guess, tried to booby trap it

21 somehow on the outside.  And at that time they left.  They

22 tried to reenter at that time.

23     Q.      You could hear them doing something out there.

24 You are not sure what it was?

25     A.      Right.

1    Q.    Got quiet outside after that?

2    A.    Yes.

3    Q.    How long do you think you and the other

4  hostages were in there before you were rescued?  Was it a

5  while?

6    A.    Three to four hours.  I'm not too sure on the

7  time.

8    Q.    And when you were brought out of there, was

9  there a procedure that was used?

10    A.    They suited up an extraction team, basically a

11  riot team.  Since none of us had IDs, we were all placed on

12  the ground on our knees.  We were all handcuffed, brought

13  out and identified by somebody that knew us.

14         At that time we were -- they took the

15  handcuffs off of us, if they knew us.  The inmates that were

16  in there with us stayed handcuffed and taken to solitary

17  confinement.  At that time they proceeded to get our names,

18  social security numbers.  They tried to -- they took us to

19  an infirmary for medical attention.

20    Q.    All right.  Was a picture taken of you?

21    A.    Yes.

22    Q.    I'll show you what is marked State Exhibit 583

23  and ask you if you recognize that photo?

24    A.    Yes.

25    Q.    Was that taken of you that day afterwards?

```
1        A.      Yes.
2                        MR. D'AMORE:  We'd offer State Exhibit
3   583.
4                        MR. ASHFORD:  No objections, Your Honor.
5                        THE COURT:  No. 583 shall be admitted.
6        Q.      (By Mr. Shook)  As a result of what happened
7   that day, you said already you had a broken nose?
8        A.      Yes.
9        Q.      You had some cuts and abrasions on your face,
10  also?
11       A.      Yes.
12       Q.      And any other injuries?
13       A.      I had a separated shoulder, some shattered
14  bone in my right eye, and I still have the scars on my
15  wrists.
16       Q.      All right.  Prior to that day, did you ever
17  have any conflict or trouble with any of those seven people?
18       A.      At that time, no.
19       Q.      Did you prepare sometime later that day a
20  statement as to some of the details as to what happened?
21       A.      Yes.  The Internal Affairs, I guess, officer
22  wrote it for me because I could not use my hands.  And he
23  wrote my statement down and he pretty much wrote basic
24  stuff.  He really didn't go into detail with it.
25                       MR. D'AMORE:  That's all I have.  Pass
```

1   the witness.

2                        CROSS-EXAMINATION

3   BY MR. ASHFORD:

4        Q.    Mr. Marroquin, I note that your right eye is

5   slightly closed?

6        A.    Right.

7        Q.    Okay.  Is that a result of this or was it --

8        A.    Yes.

9        Q.    -- or was it always that way?

10       A.    It was like this.  I had plastic surgery and

11   at that time they broke the vein on top that was

12   reconstructed.

13       Q.    Okay.  But what I'm saying, that slight

14   closure of your right eye, was it like that before this

15   escape?

16       A.    Not fully the way it is now.

17       Q.    But to some extent?

18       A.    Yes, sir.

19       Q.    Did you do some TV interviews about the way

20   TDC was treating you as a result of this escape?

21       A.    Yes, I did.

22       Q     Okay.  Did you get fired?

23       A.    I got terminated, yes.

24       Q.    You got terminated?  Okay.  Why did they

25   terminate you?

1    A.    They didn't give me a reason.

2    Q.    They didn't give you a reason?

3    A.    No.

4    Q.    Why do you think they terminated you?

5    A.    I don't know.

6    Q.    Okay.  Well, when you were on TV, you were

7  saying that basically TDC was trying to blame you and the

8  other guards for what happened; is that correct?

9    A.    Right.

10    Q.    Okay.  Do you think that's why they terminated

11  you?

12    A.    I couldn't say if that's true or not.

13    Q.    Okay.  Well, you gave this voluntary written

14  statement December 13th.  That would have been almost a

15  couple of weeks after it happened, correct?

16    A.    December 13th, I think that's the day it

17  happened.

18    Q.    The day that it happened, I'm sorry.  And

19  that's one that you say the investigator wrote?

20    A.    Right.  I gave him the story and he wrote it.

21    Q.    All right.  Then are you aware that there's a

22  typed version?

23    A.    Right.

24    Q.    Okay.  And that's dated the next day.

25    A.    Right.

1      Q.     Okay.  So have you had an opportunity to go

2  over it again, correct?

3      A.     The typed statement, I never saw it until I

4  came to court.

5      Q.     Okay.  That's not your signature on the bottom

6  of the typed statement?

7      A.     I would have to see it.

8      Q.     I'll show you what I have marked as Defense

9  Exhibits 40 and 41 and ask you, first of all, does 40 appear

10 to be the handwritten statement?

11     A.     Yes, it is.

12     Q.     Is that your signature?

13     A.     Yes.

14     Q.     Okay.  And 41, does that appear to be the

15 typed statement?

16     A.     Yeah.  This is the one that they got our

17 personal belongings, right.

18     Q.     And is that your signature?

19     A.     Yes.

20     Q.     And it's the very next day?

21     A.     Right.  I don't (phonetic) remember that one.

22                MR. ASHFORD:  Offer 40 and 41 at this

23 time.

24                MR. D'AMORE:  No objection.

25                THE COURT:  Defense Exhibits 40 and 41

1    shall be admitted.

2         Q.    (By Mr. Ashford)   Now, at this time you are

3    giving information about what happened for Internal Affairs

4    as accurately as you can, correct?

5         A.    Right.

6         Q.    They asked you to give accurate information?

7         A.    Yes, they did.

8         Q.    They asked you to tell the important stuff?

9         A.    Yes, they did.

10        Q.    They wanted to know who hit who and who yelled

11   at who, as opposed to what color the paint on the wall was

12   in the electrical room, right?

13        A.    Yes, sir.

14        Q.    Okay.  And you speak to that kind of stuff in

15   your statement.  You talk about Rivas putting you in a

16   bearhug, correct?

17        A.    Yes.

18        Q.    Okay.  And so you are telling the jury it was

19   just kind of a short statement and he didn't ask much

20   detail?

21        A.    I gave him detail and he just pretty much just

22   wrote.  I guess he broke it up, just put the significance of

23   it.  He didn't really go into detail as I told it.

24        Q.    So you are telling the jury when you are

25   explaining an event and you are giving lots of detail, it

1  didn't happen where everything you say doesn't end up in the

2  statement?

3      A.    Right.

4      Q.    Okay.  All right.  Any particular reason why

5  you are bringing that up that everything that you said is

6  not in the statement?

7      A.    No.

8      Q.    Okay.  Well, you didn't say in your statement

9  that Randy Halprin was banging Mr. Camber's head on the

10  ground, did you?

11      A.    Yes, I did.  They didn't put it in the

12  statement.

13      Q.    They didn't put it in?

14      A.    Right.

15      Q.    Okay.  So what's written here in either 40 or

16  41 doesn't reflect that?

17      A.    No.

18      Q.    Okay.  No. 40 was given on the 13th and 41 was

19  given on the 14th of December, correct?

20      A.    The statement on the 13th, they revised it for

21  the 14th.  The statement on the 14th, I didn't give it.

22  They just retyped it for, I guess, for evidence and I just

23  signed it.  I didn't read over it or anything.  At the time

24  I didn't feel like reading over it.

25      Q.    So you just signed it?

1    A.    Right.

2    Q.    Okay.  So you wouldn't have had opportunity to

3  look at it and say, hey, man, this doesn't say everything

4  that I need to say.  This is not detailed enough.

5    A.    I didn't care at that time.  I wanted to get

6  off the prison unit.

7    Q.    And the day before when you did the

8  handwritten deal, I mean, I think actually as it ends, he Xs

9  out the bottom to make sure --

10   A.    Nothing is added to it.

11   Q.    -- nothing is added, right?

12   A.    No.

13   Q.    So certainly something could have been,

14  correct?

15   A.    Right.

16   Q.    Are you aware that when other people thought

17  of other things, they had an opportunity to supplement their

18  statements and add other details?

19   A.    I was not aware of that.

20   Q.    But that's not unreasonable, correct?

21   A.    No, it's not unreasonable.

22   Q.    And what was going on while you were giving

23  this information in terms of how TDC was treating you and

24  what they were doing to you?  You have got one investigation

25  of what did the inmates do, okay, and then I assume you are

1   also being asked what did you do and what's your lack of

2   responsibility or fault might have been in this; is that

3   correct?

4        A.      Not to my recollection.  I don't remember them

5   asking me any questions like that.

6        Q.      Okay.  Well, how long after this happened did

7   they say you are terminated?

8        A.      July 17, 2002.

9        Q.      Six months?

10       A.      Or 2001, probably two years.

11       Q.      Okay.  So you weren't necessarily terminated

12   as a result of this event?

13       A.      No.

14       Q.      Okay.  So when you are on TV and you are upset

15   and you are saying, we're being blamed for this and it was

16   not our fault or whatever, where is that coming from?

17       A.      Anger.

18       Q.      Okay.  Well, evidently, though, somebody had

19   suggested that you might have been to blame, okay?  Who had?

20   Superiors --

21       A.      Superiors.

22       Q.      -- coming from the news or what?

23       A.      It was superiors.

24       Q.      And fair enough to say nobody wants to be

25   treated like y'all were treated that day, correct?

1      A.      Correct.

2      Q.      You were angry about that?

3      A.      Yeah.

4      Q.      Okay.  The fact that, you know, it was guys

5   that hadn't given you any problem before might even be worse

6   than if it was somebody that you knew was just a bad apple,

7   right?

8      A.      Yeah.

9      Q.      Okay.  But then you also got the fact that you

10  are getting blamed for the deal?

11     A.      Right.

12     Q.      Okay.  And every time you come down here and

13  testify, you got to kind of relive it again, correct?

14     A.      Yeah.

15     Q.      Okay.  And how many times have you testified

16  so far?

17     A.      Four or five, I'm not sure.  I don't really

18  care about this trial.

19     Q.      Don't really care about it?

20     A.      Nope, I want to get it over with.

21     Q.      All right.  Well, you talked about in your

22  statements, Mr. Halprin and Mr. Garcia commandeering or

23  taking down Mr. Camber, correct?

24     A.      Right.

25     Q.      But, once again, you didn't put any detail in

1  there about Mr. Halprin slamming Mr. Camber's head down, did

2  you?

3      A.     No.

4      Q.     Okay.  And the first time you started talking

5  about that kind of thing was when you came up and you

6  started testifying; is that correct?

7      A.     Right, for the Rivas trial.

8      Q.     Okay.  Now, in Mr. Garcia's trial when you

9  have a lawyer here and lawyer here and Mr. Garcia sitting

10  there, you said it was Mr. Garcia that was slamming

11  Mr. Camber's head down on the pavement; is that correct?

12      A.     Yes, that's what they asked about.

13      Q.     But what do you mean that's what they asked

14  about?

15      A.     They asked me if Garcia was the one that was

16  slamming him and I said yes.  They didn't ask me if Halprin

17  was.

18      Q.     Do you remember exactly what the sequence of

19  questions was?

20      A.     No.

21      Q.     Okay.  Would it refresh your memory if you had

22  a chance to look at the questions?

23      A.     Yeah.

24      Q.     The question is, "Tell the jury what

25  happened," correct?

1      A.     Right.

2      Q.     Okay.  And then you go into a narrative

3  describing what happened, correct?

4      A.     Right.

5      Q.     Okay.  What's the last thing you say there?

6      A.     It says, "I saw Garcia slamming Mr. Camber's

7  head into the ground."

8      Q.     The last word?

9      A.     While.

10      Q.     "I saw Mr. Garcia slamming Mr. Camber's head

11  into the ground while --" correct?

12      A.     Yes.

13      Q.     You stop right in the middle of your question,

14  apparently, correct?

15      A.     Correct.

16      Q.     It says, "Was that Halprin?"  That was the

17  question asked to you?

18      A.     Yes.

19      Q.     What's your answer?

20      A.     "No.  That was Garcia.  Halprin was holding

21  Mr. Camber down while Garcia was on top of him."

22      Q.     Okay.  Then the question was, "Well, they were

23  both over there?"

24      A.     Yes.

25      Q.     Okay.  All right.  Now, Mr. Garcia's lawyer

1  checked you on that, correct?

2      A.   Yeah.

3      Q.   He said, well, you know, in another trial you

4  said it was Mr. Halprin?

5      A.   It was both of them.

6      Q.   Well, the question was and he checked you in

7  another trial and you said that was Mr. Halprin, correct?

8      A.   Correct.

9      Q.   And apparently in that trial you kind of told

10  the story just like that, but you made the person slamming

11  the head exclusively Mr. Halprin, correct?

12      A.   Right.

13      Q.   Okay.  But right there in the Garcia trial,

14  you said, no, Mr. Halprin was holding him down and it was

15  Garcia slamming the head down, right?

16      A.   Until Garcia started tying him.

17      Q.   And when the lawyer checked you on it, that's

18  when you came up with the version that it was both of them?

19      A.   It was both of them from the start.

20      Q.   All right.  You didn't say that in your

21  statements, though?  Correct?

22      A.   Right.

23      Q.   Okay.  You were testifying under oath in the

24  Rivas trial?

25      A.   Right.

1    Q.    Correct?

2    A.    Right.

3    Q.    You were testifying under oath in the Garcia

4  trial?

5    A.    Right.

6    Q.    Okay.  You said a lot of theys.  They did

7  this, they did that.  Let me just ask you, go ahead and tell

8  us specifically what you remember Mr. Halprin doing?

9    A.    He was holding Mr. Camber while offender

10  Garcia was slamming his head.  Then when Garcia went to tie

11  Mr. Camber, the roles changed.  Halprin held his head while

12  he slammed it and at that time when Mr. Camber was then

13  subdued at that time he was in full control, offender Garcia

14  then went to help the other offenders hold me down.

15    Q.    Was Mr. Camber's head hooded at that time?

16    A.    No.

17    Q.    Okay.  So he could see what was going on with

18  him?

19    A.    No, his glasses were off.

20    Q.    His glasses were off.  He knows these inmates

21  just like you knew them?

22    A.    I would think so.

23    Q.    He knows their voices?

24    A.    I wouldn't know about that.

25    Q.    Is he here today?

1      A.      Yes, he is.

2      Q.      Okay.  You said you're back in the electrical

3  room and you are back there preparing the weapons.  You are

4  talking about fighting because you think they are going to

5  come back in and kill you?

6      A.      They were trying to come back in and kill us.

7      Q.      How do you know that?

8      A.      Because they tried to open the door and had

9  shanks in their hands, saying, "We're going to kill you if

10 we get in."

11     Q.      Okay.  Who is saying that?

12     A.      It was a matter of -- I couldn't pick for sure

13 exactly who was saying it, but there was a few out there

14 saying it.

15     Q.      Okay.  You work with these guys.  You know

16 their voices?

17     A.      I worked with them for about five months.  I

18 wouldn't say that I knew them personally.

19     Q.      Did it make much sense that they would take

20 everybody down, tie them up, put them back in the electric

21 room alive, and then go back in there and kill them?

22     A.      Not really.

23     Q.      No.  Some shanks were used to actually get

24 people bound and get them under control to get them tied up

25 and get them back there in the room, correct?

1    A.    Right.

2    Q.    So clearly if they wanted to kill anybody,

3 they could have killed them and threw the bodies back in the

4 electrical room?

5    A.    Right.

6    Q.    Okay.  Now, Mr. Garcia was the one making most

7 of the threats with the shank; is that correct?

8    A.    I don't -- I don't remember hearing him.

9    Q.    Okay.  You don't remember the one pound of

10 pressure and two pounds --

11    A.    Yes.  He had the ice pick.

12    Q.    Okay.  You didn't hear Mr. Halprin make any

13 threat like that?

14    A.    Not that I know of.

15    Q.    You didn't see any weapon in Mr. Halprin's

16 hand?

17    A.    No, I didn't.

18    Q.    Okay.  Did you ever see him with a mop?

19    A.    No.

20    Q.    Okay.  Did you ever see him standing back away

21 from everybody like he was looking out?

22    A.    No.

23    Q.    Were you ever asked to participate?  Were you

24 ever asked to do a form like this that asked you to explain

25 the characteristics of the inmates?

1        A.     No, I didn't.

2        Q.     Okay.  Were you ever asked that type of

3   information?

4        A.     No.

5        Q.     Nobody ever asked you who you thought the

6   leader was and who you thought was the smartest and who you

7   thought was the weakest?

8        A.     No.

9        Q.     Okay.  Did there appear to be a leader there?

10       A.     Yes.

11       Q.     Who was that?

12       A.     Rivas.

13       Q.     Did there appear to be an enforcer type of guy

14  who was being the toughest and, you know, making all the

15  threats?

16       A.     They were pretty much all the same to me.

17              MR. ASHFORD:  I pass the witness.

18              MR. D'AMORE:  We have no further

19  questions.

20              THE COURT:  Thank you, sir.  You may

21  stand down.

22              MR. D'AMORE:  May he be excused?

23              MR. ASHFORD:  No objections.

24              THE COURT:  He may.

25              MR. D'AMORE:  Call Mr. Camber.

ALLEN CAMBER,

having been duly sworn, was examined and testified as

follows:

DIRECT EXAMINATION

BY MR. D'AMORE:

Q.    Would you state your name, please.

A.    Allen Camber.

Q.    Mr. Camber, where do you work currently?

A.    I work at the Connally Unit in Kenedy, Texas.

Q.    How long have you worked there?

A.    It is 93 months as of today.

Q.    And tell the jury what type of work you do

there?

A.    I'm working in the maintenance department and

I take care of all the heating, ventilation, and air

conditioning equipment on the unit.

Q.    And in doing that you have inmates that work

with you?

A.    Yes, sir, I do.

Q.    And direct your attention back to December of

2000 and ask you did you have some inmates you were

supervising at that time?

A.    Yes, I did.

Q.    And were any of these people the inmates that

escaped on the 13th of December that day?

1     A.     No, they weren't.

2     Q.     Did you know those seven people or any of them

3  that escaped?

4     A.     Yes, I did.

5     Q.     And how many of them did you know?

6     A.     I knew all seven of them.

7     Q.     Had you ever supervised any of those seven?

8     A.     No, I hadn't.

9     Q.     How do you know them or have contact with

10  them?

11     A.     Most of them worked inside the office and

12  warehouse and just, you know, daily contact, you know, just

13  by getting parts and everything like that, or tools that's

14  how I had contact with them.

15     Q.     So you had contact with them for a period of

16  time up to the escape?

17     A.     Yes.

18     Q.     Included in that group was someone by the name

19  of Randy Halprin.  Did you know him?

20     A.     Yes.

21     Q.     Do you see him in the court today?

22     A.     Yes, I do.

23     Q.     Would you identify him, please.

24     A.     He's at the end of the table.

25     Q.     All right.  What time did you get to work on

1    the 13th of December that day?

2         A.    It was shortly -- about 6:30 in the morning or

3    so.

4         Q.    Was that your normal time to start?

5         A.    Yes 6:45, something like that.

6         Q.    What time did you normally leave?

7         A.    For lunch, about almost 11:25 or something

8    like that when we left for lunch.

9         Q.    Where did you go for lunch that day?

10        A.    We went to the officers' dining room.

11        Q.    And after lunch where did you go?

12        A.    Myself and Officer Marroquin went back to the

13   maintenance shop.

14        Q.    What were you going to do there?

15        A.    I was going to go through paperwork and, you

16   know, just get all my stuff in line for the afternoon job.

17        Q.    And when you -- did you go back to the office

18   there?

19        A.    Yes.

20        Q.    And as you were in the office doing your

21   paperwork, tell the jury what happened.

22        A.    Well, I was inside and Officer Marroquin was

23   in there, too, and all of a sudden Murphy, he walked up and

24   he asked me about a part for a vacuum cleaner and I said --

25   he was showing me in a book and I said, yes, that looks like

1  the part and all of a sudden they started attacking myself

2  and Marroquin at the same time.

3       Q.      How many people were in the office doing that?

4  Do you recall roughly?

5       A.      It was approximately five to six of them.

6       Q.      All right.  And what happened to yourself?

7  What did they do to you first?

8       A.      Well, they grabbed me and they threw me down

9  to the ground and, you know, they started -- they were

10 holding me down and they removed my, you know, shirt, my

11 pants and they tied my hands and my feet.

12      Q.      Were you struggling at first?

13      A.      Yes, I was.

14      Q.      And how were you struggling?

15      A.      I was trying, you know, to get away, you know.

16      Q.      All right.  Could you see Officer Marroquin?

17 Was he being attacked, also?

18      A.      Yes.  At first I did.  But then they threw me

19 down and I couldn't really see anything after that.

20      Q.      As they throw you down on the ground, you are

21 struggling at that point.  Did they do something with your

22 head?

23      A.      Yes.  Someone went and they were grabbing my

24 head and they were just banging it, you know, real hard

25 against the concrete, just one after the other.

150

1    Q.    Could you tell who was doing that to yourself?

2    A.    Not at the time.  I could not tell because my

3 head was facing and I was facing straight towards the

4 concrete.

5    Q.    How many times do you think your head was

6 smashed into the ground?

7    A.    At least eight to ten times.

8    Q.    Did you eventually stop struggling?

9    A.    Yes, I did.

10   Q.    Did anybody say anything to you?

11   A.    Yes, it was Garcia.  He pointed a shank in my

12 ear and he said, "It's one pound of pressure, now two to

13 three more pounds and you will be dead."

14   Q.    Could you feel the shank at your head?

15   A.    Yes.

16   Q.    It actually touched your skin?

17   A.    Yes.

18   Q.    And did you stop struggling --

19   A.    Yes, I did.

20   Q.    -- when he said that?  All right.  Where did

21 they -- you said they took your clothes off?

22   A.    Yes.

23   Q.    And did they take you somewhere?

24   A.    Yes.  They took me to the -- it's the

25 electrical room.

1    Q.    And did they have you tied up when they took

2  you there?

3    A.    Yes.

4    Q.    And how did they do that?

5    A.    They hog-tied me.  They just tied me from

6  behind and, you know, tied my legs up.

7    Q.    Now, were you in some pain after what they had

8  done to your head?

9    A.    Yes.

10    Q.    When you got put into the electrical room at

11  some point, did they do anything else with you?

12    A.    Yes.  They threw me -- when they got me to the

13  electrical room, they threw me head first into the conduits.

14    Q.    Had they put a hood or anything over your

15  head?

16    A.    Yes.  They did do it after that.  Right before

17  they got me in there, they put a hood over my head.

18    Q.    And did they place anything in your mouth?

19    A.    Yes.  They put a gag in my mouth.

20    Q.    When they put the hood over your eyes, could

21  you see anything at all?

22    A.    I could see very little.

23    Q.    And how was that?

24    A.    Because it wasn't quite over my eyes all the

25  way.

1    Q.    All right.  Were there other people in that

2  electrical room when you got in there?

3    A.    Yes.  Mr. Moczygemba was in there.

4    Q.    And did the other person in the office come in

5  with you, also?  Marroquin?

6    A.    Yes, they brought both of us in

7  simultaneously.

8    Q.    After that, were there a series of other

9  people brought into that room?

10   A.    Yes.

11   Q.    And were there -- was there anything being

12 said as these other people were brought in there?

13   A.    Yes.  Rodriguez stated one thing that, you

14 know, that there would be a little lady showing up that

15 don't worry about it, that he's not in for, you know, sexual

16 offender or whatever.  He's just in for, you know, murder.

17 They won't harm her.

18   Q.    All right.  Did any females get put into that

19 room?

20   A.    No.

21   Q.    Were there any other threats that you recall?

22   A.    Yes.  I heard one thing about that Rodriguez

23 also said that when he was in overseas in war that they took

24 ears for souvenirs.

25   Q.    Did you know whether that was true or not?

1   A.      Yes, I do.  I did hear this.

2   Q.      You heard him say that?

3   A.      Yes.

4   Q.      But whether or not he was in the war and cut

5   an ear off --

6   A.      No.  I didn't know if he did that or not.

7   Q.      But you took the threats seriously?

8   A.      Yes.

9   Q.      As did, apparently, everyone else in that

10  room?

11  A.      Yes.

12  Q.      At some point were some of the people in there

13  able to get free?

14  A.      Yes.

15  Q.      And what happened at that point?

16  A.      Well, they -- when we started getting free, I

17  guess they heard the commotion inside the room because they

18  had it -- closed the door and they tried getting in on us.

19  Q.      And what had you and the other hostages done

20  at that point to protect yourselves?

21  A.      We started, you know, we were breaking

22  conduits loose off the wall, you know, so we could have some

23  sort of weapon and also I went and I triggered the fire

24  alarm in the building.

25  Q.      Where was that located?

1      A.     Inside that electrical room.

2      Q.     And did anyone respond to that?

3      A.     Not right away, no, sir.

4      Q.     At some point did one of the escapees try to

5  come back in that room?

6      A.     Yes.   That's when we start breaking loose and

7  it was Newbury.   He tried coming in.

8      Q.     And was the door jammed?

9      A.     Yes.

10      Q.     And was he able to come through fully?

11      A.     No.

12      Q.     Did the inmates in that room help keep -- try

13  to keep that door closed?

14      A.     Yes, they did.

15      Q.     As well as the maintenance workers and some of

16  the guards?

17      A.     Yes.

18      Q.     You were in there for a period of time before

19  a team was able to get you and the other hostages out; is

20  that correct?

21      A.     Yes, sir.

22      Q.     What injuries did you have as a result of that

23  day?

24      A.     I had a lot of bruises and lacerations and my

25  eyes, I had a hemorrhaging inside my eyes that caused my

1  eyes to turn red.

2     Q.    Did you ever get any of your property back

3  that was taken?

4     A.    No, sir.

5     Q.    What type of things were taken from you that

6  day?

7     A.    My clothes, my boots, my wallet, with money

8  there it, keys.

9     Q.    Identification cards?

10    A.    Yes, identification.

11    Q.    All right.  And you still work in that same

12  unit; is that right?

13    A.    Yes.

14    Q.    Thank you, sir.

15          MR. D'AMORE:  I pass the witness.

16                CROSS-EXAMINATION

17  BY MR. ASHFORD:

18    Q.    Mr. Camber, you still work there at that unit?

19    A.    Yes, sir.

20    Q.    And you and Mr. Marroquin, y'all were actually

21  corrections officers?

22    A.    No.  He was the correction officer.  I'm in

23  the maintenance department.

24    Q.    Okay.  You and Mr. Moczygemba are maintenance

25  worker civilians?

1     A.     Yes.

2     Q.     He told us he had a title of maintenance paint

3  supervisor, but then he was also a corrections officer?

4     A.     Yes.

5     Q.     Is that kind of the way they do it?

6     A.     Yes.

7     Q.     The correction officer still is over a certain

8  department or whatever?

9     A.     Yes.

10     Q.     You gave a statement to Internal Affairs about

11  what happened; is that correct?

12     A.     Yes.

13     Q.     About three typed pages long and signed?

14     A.     Yes.

15     Q.     Do you recall that?

16     A.     Yes.

17     Q.     Are there any more that you are aware of?  Any

18  that were handwritten before they typed it out?  Any

19  supplements that they asked you to do after or anything like

20  that?

21     A.     Not that I'm aware of.

22     Q.     Okay.  And you told everything as best you

23  could remember, correct?

24     A.     Yes.

25     Q.     Okay.  And you have also testified a few

1  times, correct?

2       A.      Yes, sir.

3       Q.      Okay.  Now.  If Mr. Marroquin was to say you

4  couldn't see because you lost your glasses, would that be a

5  fair characterization?

6       A.      You -- what do you mean, I couldn't see what

7  was going on there or --

8       Q.      Well, if he implied that your vision without

9  your glasses was not very good, would that be correct or

10  would that be incorrect?

11       A.      I have 20/60 vision without my glasses, so I

12  can still see fairly good.

13       Q.      Okay.  So the only time you wouldn't have been

14  able to see is when you actually had that hood over your

15  head, correct?

16       A.      When I wasn't able to see?  I saw -- yes, I

17  could see when I had the hood over my head.

18       Q.      You could see when you had the hood over your

19  head?

20       A.      Yes.

21       Q.      Now, at some point you testified that you got

22  hit from behind pretty hard and you were asked if you lost

23  consciousness and you said no not at that time, correct?

24       A.      Yes.

25       Q.      And at that point you were wrestled down to

1    the ground?

2         A.    Yes.

3         Q.    Okay.  Did you see what was going on at that

4    time?

5         A.    I did not.  I could not see what was going on,

6    because my head -- they were forcing my head into the floor.

7         Q.    Okay.  So you had the -- you had your vision,

8    it was just because your head was going down in the floor

9    that you could not see?

10        A.    Yes.

11        Q.    Okay.  You could hear?

12        A.    Yes.

13        Q.    And you could feel?

14        A.    Yes.

15        Q.    All right.  And at the time that you were --

16   had your head pushed down into the ground, what did you

17   feel?  You feel somebody with your arms, somebody straddling

18   your back?

19        A.    Yes, they were on top of me, just trying to

20   hold me down.

21        Q.    Okay.  I'm asking you as specifically as you

22   can get, you know, was there one person like maybe

23   straddling your back, laying on your back, sitting across

24   your back and another person in front of you, holding your

25   arms or specifically as you can remember what was happening?

1      A.      They had me in back and there was someone they

2   had their knees or whatever right in the back and actually

3   caused me -- I couldn't even breath when they were doing

4   that.  They were actually holding me down real hard.

5      Q.      You felt one knee?

6      A.      It felt like two, but it was, you know, two

7   knees and someone else had me cross the legs, too.  They

8   were holding my legs.

9      Q.      Across the legs -- okay.  So on the back of

10  your legs?

11     A.      Yes.

12     Q.      Okay.  And when you say they pushed your head

13  down, is that when you mean they were pushing your head down

14  --

15     A.      Yes.

16     Q.      -- the seven or eight times?

17     A.      Eight to ten times at least.

18     Q.      And you basically testified before that they

19  pushed your head down and all of a sudden Garcia stuck the

20  shank in your ear?

21     A.      Yes.

22     Q.      Like that happened right after --

23     A.      Yes.

24     Q.      -- your head got banged down?

25     A.      Yes, after he banged my head.

1   Q.    And right after your head got banged down, the

2   shank was in your ear?

3   A.    Yes.

4   Q.    Okay.  Which is on the side of your head?

5   A.    Yes.

6   Q.    Okay.  And you clearly recognize Garcia's

7   voice?

8   A.    Yes.

9   Q.    Okay.  And he's the one that made that comment

10  that, "One pound of pressure now and two or three more and

11  you will be dead"?

12  A.    Yes.

13  Q.    Okay.  You recognized that voice?

14  A.    Yes, I recognized it.

15  Q.    Did you recognize Mr. Halprin's voice at any

16  time?

17  A.    No, I did not.

18  Q.    Okay.  Now, when you say that, do you mean he

19  might have said something and you didn't hear it clearly or

20  --

21  A.    Yes.  He might have said something.  You know,

22  it's just that I did not hear it.

23  Q.    Okay.  But he made no threat to you that you

24  can recall?

25  A.    No.

1    Q.    No threat that you have ever testified about?

2    No?

3    A.    No.

4    Q.    And no threat that you ever put in your

5    statement?

6    A.    Yes.

7                MR. ASHFORD:  I'll pass the witness.

8                REDIRECT EXAMINATION

9    BY MR. D'AMORE:

10   Q.    But there's no doubt your head was slammed

11   into that floor several times?

12   A.    Yes.

13   Q.    Although you didn't see who did it, did you

14   ever talk to Mr. Marroquin about what he saw?

15   A.    Yes, I did.

16   Q.    Did he tell you who he saw do it?

17   A.    Yes, he did.

18   Q.    And did he say he saw Halprin do that, Mr.

19   Halprin?

20   A.    Yes.

21   Q.    As well as Mr. Garcia?

22   A.    Yes.

23                MR. D'AMORE:  I believe that's all I

24   have.

25                RECROSS EXAMINATION

1   BY MR. ASHFORD:

2        Q.   Well, did he tell you he saw Halprin do it or

3   did he tell you he saw Garcia do it?

4        A.   He said he seen both of them.  That's what he

5   told me.

6        Q.   But it felt like to you -- I mean, it wasn't

7   1, 2, 3, 4, switch positions, a couple of seconds later 1,

8   2, 3, 4, somebody pushed your head down seven or eight times

9   in a row, correct?

10       A.   Yes, at least eight to ten.  But, you know, it

11  was at least eight to ten times that they pushed it down.

12       Q.   Immediately after that Garcia has got the

13  shank in your ear?

14       A.   Yes.

15       Q.   Okay.  And is that the way Mr. Marroquin

16  described seeing it to you?

17       A.   He just said that they were both, you know,

18  pounding my head down.  That's what he told me.

19       Q.   Okay.

20            MR. ASHFORD:  I'll pass the witness.

21            MR. D'AMORE:  I have no further

22  questions.

23            THE COURT:  Thank you, Mr. Camber.

24            MR. D'AMORE:  May he be excused, also?

25            MR. ASHFORD:  No objections, Your Honor.

1    THE COURT:  He may.  Members of the jury,

2    it's noon.  I have a few other matters to take care of.  I

3    need about 1:30.  Go with the Sheriff.

4                        [Recess]

5                    THE COURT:  Thank you, you may be seated.

6    Mr. Shook, call your next witness.

7                    MR. D'AMORE:  Call Mark Burgess.

8                    MARK BURGESS,

9    having been duly sworn, was examined and testified as

10   follows:

11                   DIRECT EXAMINATION

12   BY MR. D'AMORE:

13       Q.    Would you state your name, please.

14       A.    Mark Burgess.

15       Q.    And, Mr. Burgess, how old a man are you?

16       A.    I'm 45.

17       Q.    Back in December of the year 2000, were you

18   working at that time?

19       A.    Yes, sir, I was.

20       Q.    Would you tell the jury where you were

21   working.

22       A.    I was working at the John B. Connally Unit,

23   Texas Department of Criminal Justice in the maintenance

24   department as a carpenter/painter supervisor.

25       Q.    How long had you worked in that maintenance

1   department in that capacity?

2          A.      Approximately two years.

3          Q.      And did you supervise some inmates as part of

4   your responsibility there in the maintenance department?

5          A.      Yes, sir, I did.

6          Q.      And for what purpose?  What did they do for

7   you?

8          A.      They did various carpentry jobs that were sent

9   to the shop and maintenance jobs in the buildings and

10  painting.

11         Q.      The seven people who escaped on December 13th

12  of the year 2000, did you know any of those seven people?

13         A.      Yes, sir, I knew them all.

14         Q.      And did you ever have direct supervision over

15  any of those seven people?

16         A.      Yes, all but one.

17         Q.      Which one did you not supervise?

18         A.      That would have been Rodriguez.

19         Q.      Michael Rodriguez?

20         A.      Yes, sir.

21         Q.      The other six at some point you supervised

22  within your work responsibility?

23         A.      No, sir.  But in the shop, generally, I could,

24  you know, I had day-to-day dealings with them.

25         Q.      So they worked in that maintenance department,

1   then?

2          A.     Yes, sir.

3          Q.     About how long had you known those people?

4          A.     Ever since I went to the maintenance shop.

5          Q.     All right.  And about when had -- you been in

6   there for how long in the maintenance department?

7          A.     About two years.

8          Q.     And one of them by the name of Randy Halprin?

9          A.     Yes, sir.

10         Q.     Do you see him in the courtroom today?

11         A.     Yes, sir, I do.

12         Q.     Would you identify where he is, please.

13         A.     He's the man sitting at the end of the table

14   right there.

15         Q.     All right.  Going to December 13, 2000, did

16   you go to work in the morning hours?

17         A.     Yes, sir, I did.

18         Q.     What were you doing in the morning?

19         A.     I had just come back from vacation and I was

20   doing a lot of clerical work, catching up on paperwork,

21   helping Mr. Moczygemba do some errands around the unit.

22         Q.     Had you been in the maintenance office that

23   morning?

24         A.     Yes, sir, I had.

25         Q.     Up on the screen, State Exhibit 530, is that a

1    photograph showing the entrance to the maintenance

2    department office?

3         A.    Yes, sir.

4         Q.    Okay.  So behind that door would be where the

5    office and the desks were; is that correct?

6         A.    That's correct.

7         Q.    And then there's another door that leads you

8    to the back warehouse area?

9         A.    Yes, sir.

10        Q.    What time did something start with you that

11   lead to your involvement in being a hostage?

12        A.    I came back from lunch at approximately 12:00,

13   somewhere around there.  And when I entered the room, that's

14   basically when it all started for me.

15        Q.    Do you recall who you saw in the room when you

16   came in about that time?

17        A.    Yes, sir, I do.

18        Q.    Who was that?

19        A.    Offender Halprin and George Rivas and Murphy,

20   Patrick Murphy.

21        Q.    And when you went into the office and saw

22   those people there, did any of them say anything to you?

23        A.    Yes, sir.  George Rivas was standing at the

24   door by the warehouse and he told me that Mr. Moczygemba was

25   in the warehouse and wanted to see me.

Q.     All right.  What did you do then?

A.     I went into the warehouse door and at that
time offender Halprin had gone in about the same time I did
and that's when I noticed, you know, something was going on.

Q.     Did you get through the door to the warehouse
area?

A.     Sir?

Q.     Did you actually get through --

A.     Yes, sir, I did.

Q.     What happened inside the warehouse area?

A.     When I was got there, I was standing there and
I noticed the lights were out in the warehouse where the
shelves were and where we keep the parts supplies.  And
offender Halprin was kneeling in front of me to the side and
he had a box with a motor in it and he was trying to get my
attention.  He says, "Check this motor out," or take a look
at this -- look at this motor.  And there was an electric
motor in the box.

Q.     Was there anybody else near him at that time?

A.     At that time, not in front of us, no, sir.

Q.     Did you look over where he asked to you look?

A.     I glanced down at it, but I didn't pay it any
attention.  I more walked kind of even with him because I
was wanting to see what was going on in the warehouse area
and that's when they took me down.

1    Q.    Do you see who took you down?

2    A.    No, sir.

3    Q.    And how did they take you down?

4    A.    Struck me in the back of the head with a hard

5    object, knocked me out.

6    Q.    Was it a hand or fist or something harder?

7    A.    It was harder.  It knocked me completely out.

8    Q.    You were unconscious?

9    A.    Yes, sir.

10   Q.    So basically the last thing you saw was Mr.

11   Halprin kneeling over a box?

12   A.    That's correct.

13   Q.    Do you know how long you were out?

14   A.    No, sir, I don't.

15   Q.    When you came to, what was going on?

16   A.    I was on top of George Rivas.  We were -- he

17   was on his back on the ground.  I was on top of him and we

18   were in a struggle.  I'm not sure if I was just flopping

19   around from getting hit in the head or if I was actually

20   struggling with him.  But the moment I came to, he told me

21   to stop and that's when I felt the knives come into my body.

22   Q.    Where was that?

23   A.    The location in the warehouse?

24   Q.    The knives to your body?

25   A.    They were in my back, my neck, and on the

1    side.

2           Q.     And where inside the warehouse was this?

3           A.     Right in front of the door, just inside the

4    door.

5           Q.     Door to the office?

6           A.     Yes, sir.

7           Q.     And could you tell who had the knives on you

8    or the shanks or whatever they were?

9           A.     No.  The only one I saw at that time when

10   Rivas -- I got up from our -- he got up from under me, they

11   rolled me over and offender Newbury had his knee in my chest

12   and had a long shank pointed here and he was waiting

13   instructions from Rivas.

14          Q.     All right.  What was said to you at that point

15   after they, I guess, turned you over and Newbury had that to

16   your throat?

17          A.     That's when I was told that.  "We're going

18   home.  You can go home, too, or not.  It's up to you."  And

19   then that's when they had me down and at that point Rivas

20   says, "Get his clothes."  And they started taking all my

21   clothes off.

22          Q.     Who was at your feet at that time?

23          A.     I saw Randy Halprin and Rivas and that was

24   really the only two that I saw.  There were others there.  I

25   could feel hands and hear bodies moving, but I couldn't --

1      Q.    Did they remove your clothes, then?

2      A.    Yes, sir.

3      Q.    All right.  And was Newbury, Mr. Newbury,

4  still there with a shank towards you or had he backed off?

5      A.    They had backed off because they couldn't get

6  my clothes off with him on top of me with his knee on me.

7      Q.    Did they remove all your clothes?

8      A.    I had my underwear and my socks on.

9      Q.    What did they do with you after -- when they

10  had you in that condition?

11      A.    That's when they started tying me up, duct

12  tape and zipties.  They put a gag in my mouth and took duct

13  tape and wrapped my eyes.

14      Q.    How were they able to tie your arms up?  How

15  did that happen?

16      A.    They had finally turned me around and Rivas

17  and offender Halprin were getting my arms behind me and

18  that's when Halprin -- I remember Halprin grabbing my arms

19  and because I couldn't get them close enough behind me.  And

20  excuse my wording, but this is the way he said.  He said,

21  "Get your fucking hands behind you."  And just ratchetting

22  them.

23      Q.    Behind you?

24      A.    Yes, sir.

25      Q.    Were they able, then, to tie your arms then?

1   A.   Yes, sir.  That's when he ziptied my wrists

2   behind me like this.

3   Q.   That was Mr. Halprin that said that?

4   A.   Yes.

5   Q.   All right.  Did they secure your legs at all?

6   A.   Yes, sir.  They started at the ankles and at

7   the knees and just below the waist.

8   Q.   All right.  What did they do at that point?

9   A.   That's when they picked me up and took me back

10  to the electrical room.

11  Q.   Now, at that point had they -- you said they

12  had put duct tape and a hood?  Had they done that yet?

13  A.   No.  They had duct tape -- I could see out of

14  this eye, but this one was closed.  And then they -- that's

15  -- they hadn't put the pillowcase, or whatever it was, over

16  my head yet.

17  Q.   Did they take you where then?

18  A.   Back to the electrical room.  It's a room just

19  off down the hall in the warehouse area, the supply area,

20  where there's a lot of wires on the walls, switches, and

21  just things like that.

22  Q.   Was there any conversation or anything said to

23  you on the way to that room?

24  A.   Yes, sir.

25  Q.   What was that?

1     A.     At that point offender Halprin made a

2  statement to me.  He says, "Burgess, you may think I always

3  liked you, but I hate you.  And if you give us any problem.

4  I'll just kill your fucking ass."

5     Q.     How were they carrying you at that point when

6  they were --

7     A.     At that time Rivas had my feet and Halprin had

8  grabbed me by the head like this and was carrying me like

9  this (demonstrating).  And I had -- I had spinal surgery and

10 I pleaded, "Don't pick me up by the head, please."  And they

11 just dropped me and picked me up under the shoulders.

12    Q.     So who would have been carrying you under your

13 shoulders at that point?

14    A.     That would be offender Halprin.

15    Q.     And Rivas was carrying you by your feet?

16    A.     By the feet.

17    Q.     Did they put you inside, then, that electrical

18 room?

19    A.     Yes, sir.

20    Q.     And were there other people in there?

21    A.     Yes, sir.  There was -- I saw three bodies

22 laying down, basically in the same shape I was, tied up,

23 stripped clothes.

24    Q.     All right.  You could see out of partially one

25 of your eyes?

1          A.      Yes, sir.

2          Q.      Did you see any of the other inmates in there

3     at that time?

4          A.      There was offender Garcia was keeping watch

5     over the people in the room.

6          Q.      Did he say anything to you when you were

7     placed in there?

8          A.      Yes, sir.  He stuck a knife in my ear and he

9     told me, he said, "That's one pound of pressure."  He said,

10    "Two more pounds of pressure it's in your brain and you are

11    dead."  And he made a statement, then, he says, "If anything

12    goes wrong, we'll both get the needle.  You'll get yours

13    right now and I'll get my in about five years, because the

14    year 2050 does not come soon enough."

15         Q.      Did you believe what he was telling you?

16         A.      Yes, sir, I did.

17         Q.      Did you resist or struggle at all?

18         A.      No, sir.

19         Q.      Could you tell if there were any other inmates

20    in there at that point?

21         A.      In and out.  They came in and out.  As they

22    bring people in, there would be a mix in and then they would

23    go out and wait for the next victim to come in and take them

24    down.

25         Q.      Did you ever hear or see the defendant Halprin

174

1    any more inside that room?

2         A.    Yes, sir.  He had made a statement to -- I

3    believe it was Marroquin.  We had -- his hands were numb and

4    he said something about, "What is wrong with you"?  And

5    Marroquin --

6         Q.    Who said that?

7         A.    I believe that was Marroquin.  There again, it

8    was dark in there, but it was one of the victims made the

9    statement.  And he says, "You know what?  When they brought

10   me in the chain bus here, they had me in handcuffs for

11   several hours."  I forgot the exact -- 10 hours, 18 hours,

12   14 hours, or something.  And he says, "They had me in

13   handcuffs the whole time, so fuck you."  And --

14        Q.    You are saying Mr. Halprin made that remark?

15        A.    Yes, sir.

16        Q.    In response to Marroquin or someone else

17   complaining about their hands?

18        A.    Yes, sir.

19        Q.    There was a number of people brought into that

20   room over the course of time?

21        A.    Yes, sir.

22        Q.    And at some point did some of you or the

23   people in there, were they able to get untied?

24        A.    Yes, sir.  When they had finally gotten all

25   the maintenance workers and they had one extra guy that they

1  weren't counting on, a security officer, they left the room
2  and turned out the light and they figured, you know, we were
3  locked in there.  We were closed up.  So they had the keys
4  and they locked the door.
5        I looked around and I saw Terry Schmidt,
6  maintenance door tech.  He's a door tech supervisor.  And
7  his hands were behind him and he pulled them out
8  (demonstrating) he came up -- I think that he was duct taped
9  is the reason why he didn't have the ziptie on him.  And
10 from that moment on we saw a glimmer of hope of getting out
11 of there.
12       Q.    Someone had a pocket knife that was passed
13 around?
14       A.    Yes, sir.  That was Mark Garza.  They did not
15 take his pants.  And when Terry Schmidt released his hands,
16 he stood in front of the doorway and there were two inmates
17 that were with us as prisoners.  They put their feet against
18 the transformer -- or their backs against the transformer
19 and their feet against the door and Schmidt was holding the
20 top.
21       And that's when Patrick Moczygemba sat up and
22 his hands were tied in front of him with a rope and he could
23 get into the pants to get the pocket knife and cut himself
24 loose and then he subsequently started cutting our hands
25 loose.

1    Q.    At some point when some of the people were

2  free, then, did you and other hostages in that room arm

3  yourselves?

4    A.    Yes, sir, we did.

5    Q.    And was there an attempt made by one of those

6  escapees to come back into the room?

7    A.    We had not gotten loose yet.  I think Terry

8  was loose, I think maybe Pat had his hands loose, but that

9  was Newbury, offender Newbury, was -- pushed on the door and

10  he said what was going on and he hollered, "They're getting

11  out."  Or, "They're getting loose."  And there was a big

12  struggle.  The inmates, the escapees, on the other side of

13  the door trying to get in and the few that were loose.  We

14  were all still tied up and totally helpless, but the ones

15  that were loose were trying to push the door closed.

16        And Newbury got half of his body like this

17  inside the door and he had a knife in his hand and he's

18  (demonstrating) trying to hit anything he can.  And the

19  other inmates were using tools, trying to pry the door open,

20  trying to break it.  They had knives -- you can see knife

21  blades coming through it and pry bars.

22        Offender Halprin looked up and he had a large

23  (demonstrating) pry bar that he had was trying to force the

24  door open.  It's a big, strong door that, you know, just

25  wouldn't budge.

1        Q.      Did they ultimately get Mr. Newbury out?

2        A.      Yes, sir.

3        Q.      And then the door closed?

4        A.      Closed, yes.

5        Q.      Did you and the other people when you got free

6   take steps, then, to try to defend yourself, if they came

7   back?

8        A.      Yes, sir.  There was a bag of nails in the

9   corner.  I took the pillowcase that they had put on our head

10  and I put a hand full of nails in the pillowcase and tied a

11  knot and made a weapon with that.  Other people were tearing

12  electrical conduit off the wall.  We were -- Allen Camber

13  was trying to -- was setting a fire alarm off.  We were

14  doing everything we could to prepare ourselves.

15       Q.      Okay.  At some point several hours later, you

16  were freed from the room?

17       A.      Yes, sir.

18       Q.      And did you receive medical attention when you

19  were taken out?

20       A.      They took me to the unit infirmary and I guess

21  the word for it -- they did a quick check on us just to make

22  sure that nobody was in serious condition, you know, I mean

23  critical condition or anything, nobody was going to die at

24  the moment.  So then they started picking the worst people

25  and putting them in an ambulance and sending them to the

1  hospital in order of seriousness.

2       Q.     What injuries did you sustain as a result of

3  that day?

4       A.     I have -- I've had three surgeries on my arms,

5  two on my each -- one on each elbow, one on my wrist, from

6  being tied up, from having my hands jerked behind my back.

7  From the blow to the head I have -- there's a long term for

8  it, but it's fluid on your inner ear.  So I'll be on

9  medication forever.  And I've had spinal steroid injections,

10  plus the psychological problems that go along with this.

11       Q.     Again, before this happened, what type of work

12  did you do?

13       A.     I was a carpenter.

14       Q.     Have you been able to continue in that line of

15  work?

16       A.     No, sir, and I never will.

17       Q.     When you held your arms up, are there actually

18  scars on your arms?

19       A.     Yes, sir.  There's one on each elbow right

20  here (demonstrating).

21       Q.     Did you lose any property that day as a result

22  of when they took your clothes off?

23       A.     Yes, sir, everything.

24       Q.     What --

25       A.     Wallet, clothes, jacket, boots, brand-new

1  boots, I lost it all.

2       Q.    Did you ever get any of that back?

3       A.    No, sir.  My glasses.

4       Q.    Thank you, sir.

5            MR. D'AMORE:  That's all I have, Judge.

6                        CROSS-EXAMINATION

7  BY MR. ASHFORD:

8       Q.    Mr. Burgess, you were asked to give a

9  statement about what happened on December 13th of 2000,

10 correct?

11      A.    Yes, sir.

12      Q.    You wrote about 13 pages, correct?

13      A.    I didn't write those.  I was giving that to

14 the Internal Affairs --

15      Q.    Okay.

16      A.    -- and they wrote it.

17      Q.    And then do you know if they just typed up

18 what you had written or did they just do a typed summary the

19 next day or how do you --

20      A.    Okay.  Right after we got back from the

21 hospital they took a -- that's the handwriting part of it.

22 They asked us what happened and he wrote it down.  And that

23 was right after the incident.  The next morning we had to

24 come back at 7:00 and then that's when they typed it up.

25 They did the same thing again.  They asked us what happened,

1    asked us questions, and they typed what we said.

2         Q.    And on each page of each statement you had to

3    initial it, correct?

4         A.    Yes, sir.

5         Q.    Okay.  And did that on 13 pages of the

6    handwritten one, correct?

7         A.    Yes, sir.

8         Q.    And then on the typed one, it was four pages

9    you had to initial each page and sign the bottom of each

10   page, correct?

11        A.    Yes, sir.

12        Q.    Did you come back from lunch with a particular

13   co-worker?

14        A.    No, sir.

15        Q.    Okay.  So if the offense report stated that

16   about 12:00 you returned to the maintenance shop with

17   Mr. Segura, that would be incorrect?

18        A.    That would not -- that's the one I don't know

19   why that was there, but he was -- there was a few minutes

20   space between us.  I think -- I'm not sure if he came in

21   before me or right after me, but it was just a real close

22   time.

23        Q.    Were you aware that seems like two people were

24   coming in just about every fifteen minutes and getting taken

25   down by the escapees?

```
 1        A.     You could hear -- you could hear the
 2   struggling.  The sound of commotion going on, but that's all
 3   you knew.
 4        Q.     Okay.  And you could hear some other
 5   struggling when you were getting taken down?
 6        A.     Just the struggling that was going on with me,
 7   yes, and, you know, the sound of footsteps and people around
 8   us, yes, sir.
 9        Q.     Okay.  There was nobody else being taken down
10   when you are being taken down, is what you are saying?
11        A.     That's correct.
12        Q.     Okay.  Mr. Garcia made the remark about the
13   one pound of pressure?
14        A.     Yes, sir.
15        Q.     Okay.  You heard him say that?
16        A.     Yes, sir, I did.
17        Q.     He said that to you?
18        A.     Yes, sir, he did, and to everybody else.
19        Q.     Okay.  And you didn't hear him say that to
20   everybody else?
21        A.     I heard it over and over, sir.  He made a
22   point to do that to everybody that was brought in.  He would
23   do that same little thing over and over to them.
24        Q.     So you actually heard him tell other
25   individuals that?
```

1      A.      Yes.

2      Q.      Okay.  And at what point was that?

3      A.      After I was taken down and put in the room,

4  everybody else that came in after me -- and he may not have

5  told every one of them, but he told the majority of them.

6      Q.      So what you are saying is he was in the

7  electrical room and he was kind of in there watching the

8  people that had already been subdued?

9      A.      Yes, sir.

10     Q.      Okay.  And when you got in there, when the

11 person is first brought in there, that's pretty much what he

12 would tell them?

13     A.      I don't know about the first person, because I

14 wasn't there at that time.  Everybody after me, I would hear

15 -- or most everybody.

16     Q.      So a lot of people heard what was going on

17 with the other people?

18     A.      Yes, sir.

19     Q.      Okay.  Now, when you are being taken down, how

20 far away from you from the door to the electrical closet --

21 let me say if you are sitting right there on the witness

22 stand where you are, if the very front of it right there

23 where that flag is right in front of you, if that's the door

24 to the electrical closet coming back this way, how far away

25 are you when you are being taken down?

1    A.    Where I was taken down?

2    Q.    Yes.

3    A.    Probably where either you or that officer

4  behind you, in that general direction.   It's about 25, 30

5  feet.

6    Q.    Okay.

7    A.    Around the corner.

8    Q.    Okay.  I take it when you are being ordered to

9  get your hands behind your back and get down and not

10 struggle and whatever else is being said to you, it's being

11 said there a loud and forceful voice?

12   A.    Not really.  They weren't hollering.  They

13 were very calm.  Rivas was especially calm, I remember.  His

14 instructions were precise and short.  You know, he didn't

15 mix any words.  He let you know exactly what was going on.

16   Q.    And so where were you when Mr. Halprin

17 allegedly made this comment that he never liked you?

18   A.    We were between the point where I was taken

19 down and the door to the utility room, the electrical room.

20   Q.    Okay.  And somewhere between where I'm sitting

21 now and where you're sitting?

22   A.    Yes, sir.

23   Q.    Okay.  Maybe as close as the other side --

24 maybe as far as the other side of this table, maybe as close

25 as to where those guns are?

184

1      A.      Yes, sir.

2      Q.      Do you know of anybody else who told you that

3   they heard that statement?

4      A.      No, I don't.

5      Q.      No?  Did that make any sense?

6      A.      Well, he was talking to me.  I don't know what

7   the other guys were doing.  It was a pretty strange

8   situation being completely trussed up.  Like I say, when you

9   are inside that room, things are going on.  I could hear

10   movement, but, you know, I could hear -- you could hear

11   voices, but you don't know what they are saying.

12      Q.      Okay.  Was there any particular relationship

13   between you and Mr. Halprin that made that comment make any

14   sense one way or the other?

15      A.      I've thought about that.  I believe the fact

16   that -- I always try to treat them fairly, but the fact that

17   I was raised in TDC and I treated them -- I treated them as

18   an inmate.  And -- but I was not unfair with them.  I was

19   not mean to them.  And a lot of inmates did not like that

20   attitude, because -- or they just don't like being treated

21   like inmates.

22      Q.      Can you point to something and say, well, you

23   know, six months ago I wrote him up, got him in trouble,

24   but, you know, he never acted like a problem.  As a matter

25   of fact, he was always grinning in my face and acting like I

1   was a nice guy and now it makes sense that he really didn't

2   like me or he hates me?

3        A.      That made sense, yes, sir.  I never wrote him

4   up.  And I was always fairly polite with him, I thought.

5   You know, and we did joke around at the tool room window.  I

6   would joke with him.  He would joke with me.  I never had a

7   reason to think until that moment that he hated me and he

8   wanted -- that he would kill me.

9        Q.      Were you -- they had already got your hands

10  bound and your feet bound at that time, correct?

11       A.      Yes, sir.

12       Q.      Okay.  And that was something that Mr. Halprin

13  participated in doing?

14       A.      Yes, sir.

15       Q.      And you testified you weren't struggling any

16  more at that point?

17       A.      No, sir.

18       Q.      So there was certainly no need for him to

19  threaten you?

20       A.      No.

21       Q.      Okay.  And you said, well, that makes sense,

22  the kind of example that I made up.  But can you think of

23  any circumstance like that?  Can you think back and think of

24  something that you might have done to offend him and he just

25  didn't let you know about it?

1   A.      It's always possible, if I don't know about

2   it.

3   Q.      Right.  Segura was no where around when you

4   were being taken down?

5   A.      Uh-huh, not at that moment, no.

6   Q.      Did you come in with Gilley?

7   A.      No.

8   Q.      Do you know where Gilley was?

9   A.      No.

10   Q.      When you were put in the electrical room, how

11   many people were already in there?

12   A.      From what I could see, I knew for a fact there

13   were three people when I went in.

14   Q.      And later on, after talking about it, do you

15   know who those people were?

16   A.      Not for sure.  I knew that it was Pat

17   Moczygemba, because he's such a big guy.  I did know that.

18   And he was there with them the whole time, so I just knew

19   that he was one of them.  And there was a point to where the

20   room got full.  Offender Garcia told Rivas that, "The room

21   is getting full.  We don't have any room for them."  And

22   because we were laying all on the floor and at that time

23   Rivas told him, "Well, we're going to have to stand them up

24   or sit them up back to back and rearrange them."

25   And that's when he made the statement --

1    Marroquin, set Marroquin up facing the wall and put Burgess

2    and him back to back and that's when I knew that Marroquin

3    was in there.  Other than that, I didn't know who.

4        Q.    When Mr. Halprin supposedly made this comment,

5    was the door to the electrical room open or was it closed?

6        A.    I don't know.  I wasn't looking.

7        Q.    Okay.  Was it pretty clear who was running

8    this?

9        A.    Pretty clear, yes, sir.

10       Q.    Who was that?

11       A.    George Rivas.

12       Q.    And now when Mr. Halprin picked you up by your

13   head, you said you pleaded with him not to pick you up by

14   your head, right?

15       A.    Yes.

16       Q.    Because of your previous back problems?

17       A.    Right.

18       Q.    Okay.  And actually at that point Mr. Rivas

19   ordered them, "Don't pick him up by his head.  Pick him up

20   under his arms", correct?

21       A.    He made the statement, you know, don't pick

22   him up by the head and that's -- that's just what he said.

23       Q.    All right.  And then that's what Mr. Halprin

24   did?

25       A.    Yes.

1    Q.     Now, was it Mr. Halprin or Mr. Rivas that

2  said, "Get your fucking hands behind your back"?

3    A.     That was offender Halprin.

4    Q.     Okay.  I'll show you what has been marked as

5  Defense Exhibit No. 42 and ask you, does that appear to be

6  your statement?

7    A.     Yes.

8    Q.     That was the one that was written out for you?

9    A.     Yes.

10                  MR. D'AMORE:  No objection.

11                  THE COURT:  Are you offering Defense 42?

12                  MR. ASHFORD:  I am, Your Honor.

13                  THE COURT:  Defense 42 shall be admitted.

14    Q.     (By Mr. Ashford)  And the way this is written,

15  it says, "Halprin was the one who tied me up.  Rivas was

16  holding my hands."  And then immediately after that it says,

17  "Get your fucking hands together"?

18    A.     Yes, sir.  But the other statement, it's more

19  clear.  Rivas and Halprin were working to tie my hands and

20  my hands wouldn't go.  They are struggling and that's when

21  offender Halprin grabbed my wrists and jacked them together

22  and made that statement.

23    Q.     The fact that on that statement it appears

24  right after you are talking about Rivas, that's just not

25  significant?  That's not the way it happened?

1    A.    Well, on that statement you have to understand

2    this is right directly after the incident and we were in

3    shock.  I may not have been clear.  The next morning, as I

4    said before, on the typed statement it clarifies it a little

5    bit better.

6          Q.    Had you talked to any of the other employees

7    in the infirmary between the time you originally made the

8    statement and the time you made the second statement?

9          A.    We talked, but it wasn't -- we didn't have --

10   we weren't sitting there going into the details because they

11   had told us to not talk to anyone, don't even talk among

12   yourselves about the escape, because Internal Affairs had to

13   come in and do their part.

14         Q.    Well, you sure y'all weren't comparing notes

15   and saying this is what I'm going to say and this is what

16   you are going to say --

17         A.    Right.

18         Q.    -- because it's kind of hard not to talk about

19   the event, correct?

20         A.    Yes, sir, it is.

21         Q.    Now, did you and Mr. Harper have a kind of

22   thing where y'all kind of wisecracked back and forth between

23   each other?

24         A.    Harper?

25         Q.    Harper.

1    A.    We wisecracked with all of them.

2    Q.    I'm specifically asking you if you had a kind

3  of little tense thing, relationship, with Mr. Harper?

4    A.    Yes, sir.  Up until the moment of the escape,

5  I got along with all of them -- or so I thought.

6    Q.    But there was something significant with

7  Mr. Harper?

8    A.    We weren't friends, no, sir.

9    Q.    And you sure it's not Mr. Harper who

10  threatened you?

11    A.    I'm positive.

12              MR. ASHFORD:  I'll pass the witness.

13              REDIRECT EXAMINATION

14  BY MR. D'AMORE:

15    Q.    Mr. Burgess, I'll show you State Exhibit 966

16  and ask you, is that a copy of the second statement you were

17  asked about?

18    A.    Yes, sir.  This is the one that was done the

19  next morning.

20    Q.    All right.

21              MR. D'AMORE:  We'll offer State Exhibit

22  966.

23              MR. ASHFORD:  No objections, Your Honor.

24              THE COURT:  No. 966 shall be admitted.

25    Q.    (By Mr. D'Amore)  Just so the jury is clear

1   what you were talking about, in this State's 966 on the

2   second page where they talk about where you were describing

3   when -- you said, "My hands were forcibly pulled behind my

4   back by Rivas and Halprin, restrained them with tie straps

5   and duct tape.  They were having a hard time and Halprin

6   said, quote, 'Get your fucking hands together'"?

7        A.    Yes, sir.

8        Q.    Okay.  Defense Exhibit 42, Mr. Ashford put in

9   -- in here, basically what you told the jury today, the

10  statements and the threats by Mr. Halprin; is that correct?

11       A.    Yes, sir.

12       Q.    You start out on the second page where he

13  walks into the warehouse with you and says, "Check out the

14  motor"?

15       A.    Yes, sir.

16       Q.    The statement is in there about getting your

17  hands together?

18       A.    Yes, sir.

19       Q.    "Halprin was down at my legs", strapping your

20  legs together?

21       A.    Yes, sir.

22       Q.    The next page it talks about, "Halprin said,

23  Burgess, you think I always liked you, but I don't.  I hate

24  your fucking ass.  Give us any problem and I swear I'll kill

25  you."  That's in here, also?

```
 1        A.    Yes, sir, it is.

 2        Q.    A couple of pages further, where I believe you

 3   said, "Marroquin said, 'I can't feel my hands.'  Halprin

 4   told him, 'Well, they put me on a chain for 14 hours and

 5   they kept my cuffs on the whole time, so fuck you'"?

 6        A.    Yes.

 7        Q.    That's in here from what you said Halprin

 8   said?

 9        A.    Yes, sir.

10        Q.    And that one that was handwritten was done on

11   December 13th, that evening?

12        A.    Yes, sir, very late at night.

13        Q.    And then the next one, the typed one, was done

14   about 10:00 a.m. the next morning?

15        A.    Yes, sir.

16        Q.    All right.

17              MR. D'AMORE:  I believe that's all I

18   have.  Thank you, sir.  Pass the witness.

19                    RECROSS EXAMINATION

20   BY MR. ASHFORD:

21        Q.    How much longer did you work at the prison?

22        A.    I was there -- I was out for a month on

23   workman's comp, came back for a month on light duty, and

24   then it became apparent that I needed surgery and I've been

25   out ever since.
```

1      Q.    In addition to being asked by Internal Affairs

2    just to give those statements to detail exactly what

3    happened with the escape, were you asked to give any other

4    information concerning the offenders?

5      A.    A few days later they called us in and asked

6    us to give physical descriptions.

7      Q.    I want to show you what's already in evidence

8    as Defendant Exhibit No. 38 and ask you if you ever did a

9    form like that?

10     A.    It was something like that, yeah.

11     Q.    Okay.  You see this one is asking physical

12   description.  It's asking mannerisms, job skills?

13     A.    Yes, sir.

14     Q.    What did they look like?  How often they have

15   to shave.  Were you asked those kinds of questions?

16     A.    Yes, sir.  That's Internal Affairs asks us

17   that, yes.

18     Q.    Were you asked to give an opinion on their

19   intelligence and how smart you thought they were?

20     A.    I don't remember that.  I don't remember that

21   one, no, sir.

22     Q.    Were you asked to give any opinion as to their

23   leadership ability?

24     A.    I believe they did ask that one, yes, sir.

25     Q.    Okay.  And do you remember what your comments

1    were?

2         A.    No, sir, I don't.

3         Q.    I'll show you what has been marked as Defense

4    Exhibit No. 39 and ask you if you have ever seen that?

5         A.    I don't believe I've ever seen this particular

6    paper here.

7         Q.    But --

8         A.    But it may be compiled from the information

9    that we gave them.

10        Q.    Okay.  Well, I'll ask you to look at it and

11   ask you if you think that it is.

12        A.    Like I said, I don't see my signature on here

13   or initials.  They asked us these questions and they may

14   have compiled this particular -- these questions have been

15   asked of me.  But as far as this particular paper, I don't

16   know.  I haven't --

17                    MR. ASHFORD:  Based on him being asked

18   these questions, I would offer Defense Exhibit No. 39 again,

19   Your Honor.

20                    MR. D'AMORE:  May I take him on voir

21   dire?

22                    THE COURT:  You may.

23                    VOIR DIRE EXAMINATION

24   BY MR. D'AMORE:

25        Q.    You don't know if these are your answers or

1    not on here?

2            A.      No, sir.

3            Q.      You didn't generate this piece of paper, did

4    you?

5            A.      Sir?

6            Q.      You didn't generate this piece of paper, did

7    you?

8            A.      No.

9                    MR. D'AMORE:  We'll object, then.  The

10   predicate hasn't been laid and it's hearsay.

11                   THE COURT:  Sustained.

12                   <u>RECROSS EXAMINATION CONTINUED</u>

13   <u>BY MR. ASHFORD</u>:

14           Q.      What questions were you asked, sir?

15           A.      Height, weight, things like that.  And if I

16   remember right -- at that time, going from memory, it was a

17   pretty poor description I gave on his weight.  I probably

18   guessed it pretty wrong.  His height was wrong, I'm sure.

19           Q.      Did you give an opinion based on your

20   experience with these offenders as to who was most likely to

21   be the leader and who was most likely to be the weakest of

22   the bunch?

23           A.      I was asked those questions.  I don't remember

24   what I -- at that time I don't remember what I said.  I --

25   that was a long time ago for those specific questions like

1   that.

2          Q.      Do you have an opinion now?

3          A.      Yes, sir.

4          Q.      Okay.  What is that opinion?

5          A.      Not very good.  He was -- just in my opinion

6   he was not a leader type, just that's my opinion.

7          Q.      Who was not a leader type?

8          A.      The offender.

9          Q.      You referring to Mr. Halprin?

10         A.      Yes.

11                 MR. ASHFORD:  I'll pass the witness.

12                 MR. D'AMORE:  Nothing else.

13                 THE COURT:  Thank you, sir.  You may

14  stand down.

15                 MR. D'AMORE:  May he be excused?

16                 MR. ASHFORD:  No objections, Your Honor.

17                 THE COURT:  Yes, he may.

18                 MR. SHOOK:  Call Dr. McGehee.

19                 FRANK MCGEHEE,

20  having been duly sworn, was examined and testified as

21  follows:

22                 DIRECT EXAMINATION

23  BY MR. SHOOK:

24         Q.      Would you tell us your name, sir.

25         A.      Frank McGehee.

1     Q.     Would you spell your last name for the Court

2   Reporter?

3     A.     M-C-G-E-H-E-E.

4     Q.     And how are you employed?

5     A.     I'm a pediatrician.

6     Q.     And how long have you been a pediatrician?

7     A.     Since I did my residency in Dallas in 1977.

8     Q.     Could you give the jury a brief background of

9   your professional and educational background for the

10  position you hold?

11    A.     Yes, sir.  I did a pediatric residency at --

12  well, I went to medical school at Emory University in

13  Atlanta and I went to do my residency at Children's Medical

14  Center in Dallas.  And I practiced in Denton for 13 years

15  and then I moved to Ft. Worth in 1993 and worked at Cook

16  Children's Hospital taking care of patients in the hospital

17  until 1998.  And then I started a private practice in Ft.

18  Worth, which is where I work now.

19    Q.     Let me turn your attention to August 28th of

20  1996 to the late evening hours.  Were you called in or were

21  part of your duties, would you, if there was an injured

22  child brought into the emergency room, were you one of the

23  physicians that would attend to it?

24    A.     Yes, sir.

25    Q.     On August 28th of '96, did you attend to an

1  approximately 16, 17-month-old infant by the name of Jared

2  Smith?

3      A.    Yes, sir.

4      Q.    If you would, would you describe the types of

5  injuries that you found on Jerrod Smith that evening?

6      A.    Yes, sir.  He had multiple bruises to his

7  face, to his ear, to his side.  He had -- previously had

8  x-rays done before I arrived to take care of him, which

9  showed broken bones in both of his legs, both of his arms,

10  and his skull.

11          He also had round burns in his mouth, which I

12  assumed was cigarette burns.  And he had a black eye on the

13  left side, a bruised eye, on the left side.

14      Q.    And where were the burns in his mouth?

15      A.    They were on his tongue and the inside surface

16  of his cheek.

17      Q.    You have seen those types of injuries before?

18      A.    Yes, sir.

19      Q.    And you said you assumed they were caused by

20  cigarettes?

21      A.    Yes, sir.

22      Q.    Has that been the method that you have seen

23  that has caused these injuries in the past?

24      A.    Yes, sir.

25      Q.    What type -- how did you treat Jerrod Smith at

1   that time?

2       A.      He had an ear infection, which was treated

3   with antibiotics.  He received pain medication.  An

4   orthopedic surgeon treated his fractures by basically

5   putting a splint on his legs to hold the bones still until

6   they healed.

7               His -- he was also iron deficient and his

8   anemia was treated.  And he didn't -- he apparently hadn't

9   had immunizations at that time, so those were administered

10  while he was in the hospital.

11      Q.      Now, on the monitor we have a photograph of

12  the baby here on a table.  Is this -- he had broken legs.

13  What device is being used on his legs here?

14      A.      That's similar to a pablic (phonetic) harness,

15  shoulder straps which go like suspenders, basically, down

16  into his lowers legs which holds the bone between his hip

17  and his knee or the bones that are broken.

18      Q.      State Exhibit 945, does that show a closer

19  picture?  Is that a cast on his left arm?

20      A.      Yes, sir.

21      Q.      State Exhibit 942, does that show some

22  bruising to his face, as well as the bleeding in his left

23  eye?

24      A.      Yes, sir.

25      Q.      Was the baby in, I guess it's pretty obvious,

1   but he was in pretty much a lot of pain at that time?

2        A.    Yes.

3        Q.    State Exhibit 947, is this a photograph of

4   some of the evidence of the burning to the tongue that you

5   saw?

6        A.    Yes, sir.

7        Q.    When you see a child in the emergency room, is

8   it sometimes a close call on whether you think this might be

9   an accident or an intentional act?

10       A.    Yes, sir, sometimes.

11       Q.    Was there any question in your mind on this

12  day whether this was an accident or an intentional act?

13       A.    I think it was clearly an intentional act,

14  yes.

15       Q.    Were the police notified immediately?

16       A.    Yes, sir.

17       Q.    You said that x-rays had been done prior to

18  you treating the child?

19       A.    Yes, sir.

20       Q.    Are there radiologists on staff there that

21  take those x-rays and also examine them to see exactly what

22  has happened?

23       A.    Yes, sir.

24       Q.    You didn't handle that part of the

25  examination?

1    A.    No.   I think that the x-rays had already been

2  interpreted by the time I was consulted.

3              MR. SHOOK:   That's all we have, Judge,

4  we'll pass the witness.

5                    <u>CROSS-EXAMINATION</u>

6  <u>BY MR. KING</u>:

7    Q.    Is it Dr. McGee or McGehee?

8    A.    McGehee.

9    Q.    Doctor, let me ask you something.   This type

10  of ear infection this child had, presuming you received the

11  child and seen no other injuries, was that a severe ear

12  infection; do you recall?

13    A.    Well, it was clearly an ear infection, yes.

14    Q.    On a child that age, if you have a substantial

15  ear infection like that, that would cause that child some

16  pretty bad discomfort, would it not?

17    A.    It could, yes, sir.

18    Q.    A child like that would be probably very prone

19  to crying a lot.   Would that be fair to say?

20    A.    It's possible, yes.

21    Q.    That kind of ear infection also can result in

22  a ruptured eardrum, can it not?

23    A.    Yes, sir.

24    Q.    That's not uncommon among children of that age

25  or children, period, to have that kind of scenario?

1      A.      As a complication of an ear infection, that's

2  a possibility, yes.

3      Q.      Okay.  And did you review the medical records

4  of Jerrod Smith before you came to testify today?

5      A.      I reviewed the record that I created regarding

6  his care in August of 199 -- the year that's involved in

7  this case.

8      Q.      All right.  Were you specifically tendered

9  something to review or did you go to -- where was Jerrod,

10  the child, treated?

11      A.      This occurred at Cook Children's Medical

12  Center.

13      Q.      Did you obtain, yourself, since you are a

14  doctor at that location, all the medical records of the

15  child?

16      A.      I talked to the hospital attorney and I read

17  the chart and I was also provided with excerpts by the

18  district attorney.

19      Q.      I guess my question is, did you review the

20  whole medical file that they had there?

21      A.      I didn't review the whole file, no.

22      Q.      So if the child had an additional ear

23  infection six months to a year later and was brought in with

24  a ruptured eardrum, you don't notice it?

25      A.      I haven't prepared that for this testimony,

1     no, sir.

2          Q.     Very well.  You reviewed x-rays in this case,

3     did you not?

4          A.     I reviewed x-ray reports to be accurate, yes.

5          Q.     Is an x-ray report different than looking at

6     the physical x-ray?

7          A.     Yes, sir.

8          Q.     So an x-ray report would be a summary of what

9     was shown on the x-ray?

10         A.     An x-ray report is an analysis by another

11    physician of what the x-ray showed, that's correct.

12         Q.     I hate to be a layman on this deal, but what

13    you are saying is that you didn't take the film and hold it

14    up and look at it yourself, you just read the report of

15    whoever did that activity?

16         A.     Yes, sir.

17         Q.     There was indicated, was there not, somebody

18    brings a child in like that to the hospital, they get a

19    little bit of history, do they not?

20         A.     Usually, yes.

21         Q.     All right.  And it was reflected in the

22    history that the child had been taken a couple of days

23    earlier to Columbia Medical Plaza?

24         A.     Yes, sir.

25         Q.     And the child had been -- specifically had

1    x-rayed the child's leg, particularly the knee area, and had

2    not seen any breaks or fractures?

3         A.      That's correct.

4         Q.      And do you recall that being documented?

5         A.      Yes, sir.

6         Q.      Now, from what you read in the synopsis of

7    viewing the x-rays, did that seem to you to be unusual or

8    did you give that any thought that at some point they were

9    looking at some particular thing, couldn't see it, and then

10   a couple of days later a child is brought in and they do see

11   something?

12        A.      Actually, in the culture where this child was

13   treated, that's pretty common.  The hospital at Medical City

14   didn't have pediatrics routinely.  And I think they just

15   misinterpreted the film, basically.  We were, at the time

16   this occurred, pretty used to that happening.  So it wasn't

17   unusual.

18        Q.      So that's something they might have just

19   misread the films themselves?

20        A.      That was my analysis at the time and I think

21   that was a common occurrence at the time and I think that

22   it's a reflection of the excellent care at Cooks, not

23   necessarily a bad care at the other hospital.

24        Q.      If you rupture your eardrum, it will bleed,

25   will it not?

1      A.      It can, yes.

2      Q.      Once again, you have seen that in children

3  that have a severe earache?

4      A.      Yes, sir.

5      Q.      And you don't have to hit a child, if a child

6  has an earache like that, to make that ear bleed, do you?

7      A.      A child can have an earache that bleeds

8  without being hit.

9      Q.      Did you actually physically see the child when

10 it was brought in initially?

11     A.      Um, I saw the child probably within hours

12 after it arrived in the emergency room.

13     Q.      And by looking at the child, could you tell

14 the child had a broken arm or broken leg?

15     A.      It was obvious that the child was in exquisite

16 pain and the child wasn't moving his legs.  So, yes, that

17 was obvious.

18     Q.      Was that obvious because you were a doctor?

19     A.      No.  I think any layperson would have seen

20 this child looked like he had been tortured.  I think that

21 would have been obvious to anybody in the room.

22     Q.      I guess what I'm saying is, by looking at the

23 child's arm or leg, was it distorted in such a fashion it

24 was obvious it was broken or are we just talking about a

25 child acting like it's in pain?

1      A.      Not moving arm and leg.  This is a

2  17-month-old child, which should be able to walk ordinarily

3  and should be able to at least run away from a doctor.  And

4  this baby was laying there unable, really, to move.

5      Q.      I appreciate that response.  I guess my -- try

6  to get it clear in my mind, did the arm appear deformed,

7  bent in an odd angle, so you looked at it and say, man,

8  that's a broke arm?

9      A.      No.  But that's -- my answer is trying to

10 address the fact that's not how I would expect it to look,

11 if it was broken.

12     Q.      And I understand you are a pediatrician and

13 I'm not and neither is the jury is not a pediatrician.  And

14 my question is just trying to figure out what if somebody

15 saw what they actually would see and then take the x-rays to

16 clarify that for the laypeople that brought the child in, so

17 to speak.

18     A.      No, I don't think so.  I think that they knew

19 the child had been injured, too.  The paramedics knew that,

20 because the child wasn't acting like a normal 17 month old.

21     Q.      All right.  Does a child ever get ulcers in

22 their mouth?

23     A.      They can, yes.

24     Q.      But the items you saw, you believed to be

25 burns as opposed to ulcers?

1    A.    Yes.

2    Q.    And can you say that with a hundred percent

3  medical certainty?

4    A.    I don't think there's any such thing as a

5  hundred percent medical certainty.

6    Q.    Well, is it possible that the child could have

7  had an ulcerated mouth and have some kind of ulcers as a

8  result of the condition the child was living in?

9    A.    That's possible.

10    Q.    And child had not had any immunizations.  Is

11  that unusual for a child at that age?

12    A.    Yes.

13    Q.    The child was anemic, indicating some type of

14  poor diet?

15    A.    I don't really make any assessment.  He was

16  and he was treated.  I'm not trying to say that that's a

17  problem, necessarily, or any indication of poor care.

18    Q.    Of course, the child had injuries, correct?

19    A.    Yes.

20    Q.    And the child had bruising?

21    A.    Yes, sir.

22    Q.    And it wouldn't take a pediatrician to say,

23  well, that child has been abused?

24    A.    That was my assessment, correct.

25                    MR. KING:  I have no further questions.

1    Pass the witness.

2                    MR. SHOOK:  That's all the questions we

3    have, Judge.

4                    THE COURT:  Thank you, Doctor.

5                    MR. SHOOK:  May this witnesses be

6    excused?

7                    MR. KING:  We have no objection, Your

8    Honor.

9                    THE COURT:  He may.

10                   MR. SHOOK:  Your Honor, the State will

11   close.

12                   MR. ASHFORD:  Defense would close, Your

13   Honor.

14                   THE COURT:  Members of the jury, both

15   sides now have rested and closed their case in chief.  It's

16   2:30 in the afternoon.  By the time we take a break -- it

17   takes a pretty good while for me to get the charge together.

18   You will find it will take me about 20 minutes, maybe 30

19   minutes, to read the charge, which is the law involved in

20   this case for you.  Then the attorneys will have about an

21   hour apiece to argue.

22                   Assuming that you don't want to start

23   deliberations at 6:00 on Friday night -- I see some heads

24   shaking -- we shall stand in recess until Monday morning.

25                   I think you have found that when I said when

1  we started this trial I would use your time wisely and we

2  wouldn't waste.  I've been pushing, haven't I, almost to the

3  point of give me a little more time.  But I wanted to make

4  sure that you understood why we're quitting early on Friday

5  afternoon.

6            Because the next step is for me to present the

7  charge to you and the attorneys to argue and nobody wants to

8  be here Friday night.  So with that we will call it a day.

9  You get six dollars for the whole day.

10           I can't stress enough now that you have heard

11 all the evidence, again, no media, don't discuss this with

12 spouse, friends, family, coworkers.  I anticipate some of

13 you will probably go to the office or wherever and try to

14 pick up the pieces from this week as far as your normal

15 routine.  They are going to be interested.  What did you

16 hear in trial this week?  Why didn't you argue tonight?  Why

17 didn't you deliberate?  And the answer is, I can't talk

18 about it and leave it alone.

19           So Monday morning, first thing, we will have

20 the charge and then, like I said, the attorneys will follow

21 up with their arguments and then you shall retire to

22 deliberate.  So with those instructions, both written and

23 oral, we shall stand in recess until 8:30 Monday morning.

24                        [Jury out]

25                 THE COURT:  Mr. Shook, Mr. Ashford I take

1  notes.  On exhibits 500 to 550, you are asking me who that

2  might have been.  I think it's Mr. Mocygemba.  If you will

3  review those, you have pictures -- because later you offer

4  500 to 550 as photographs.  You have one exhibit marked 543

5  that's a chart.  But then I don't have a couple of those.

6  So if you will look and state for the record what 500 to 550

7  is, you will find that the record is incomplete.

8                    MR. KING:  To which we object.

9                    MR. SHOOK:  What number was it, Judge?

10                   THE COURT:  I show 543 as the diagram of

11 the view of building 14.  I show 544 as a diagram of,

12 schematic of the entire penitentiary unit.  Okay.

13                   MR. ASHFORD:  That's what 543 is.

14                   THE COURT:  Okay.  See, he offered 500 to

15 550 as being pictures and that's incorrect.  I don't have a

16 546.  So if you will line up those photographs so we can

17 make an accurate record, I would appreciate it.

18                   MR. SHOOK:  We would like to offer 951 in

19 for record purposes.

20                   THE COURT:  No. 951 for record only.

21                   MR. ASHFORD:  No objection.

22                   THE COURT:  Mr. Shook, have you figured

23 out exactly what --

24                   MR. SHOOK:  Yes.

25                   THE COURT:  -- you offered?

1    MR. SHOOK:  Judge, on the exhibits, to be

2    precise, 500 through 511 and then actually 511-A, 512,

3    512-A, then 513 through 526 and then 529 through 542.  No.

4    543, I believe, is a diagram?

5    THE COURT:  No. 544 is a diagram.

6    MR. SHOOK:  I don't have 543.  No. 545,

7    547, 548, and 549 and then 550.

8    THE COURT:  Mr. King, are you in

9    agreement with the record what was originally offered as 500

10   to 550 being the numbers that he just read into the record?

11   He initially identified this stack of photographs as 500 to

12   550 and --

13   MR. KING:  It's now being identified as?

14   THE COURT:  The numbers he just --

15   MR. KING:  We have no objection to those

16   photographs that were offered in that sequence, unless we

17   have previously objected to them on the record, at which

18   time we renew our objection and presume the Court's ruling

19   is the same.

20   THE COURT:  There were no objections to

21   that group of photographs identified initially as 500 to

22   550.  They have been properly identified for the record and

23   the Court will admit the same.

24   MR. KING:  Very well.

25   THE COURT:  Off the record.

1                     [Off the record]

2            THE COURT:  Let the record reflect both

3  sides having rested and closed their case in chief, the

4  Court has prepared the charge.  State have any objections to

5  the Court's charge?

6            MS. SMITH:  No, Your Honor.

7            THE COURT:  Defense?

8            MR. KING:  Yes, we do, Your Honor.  We

9  would ask the charge include the lesser included offense of

10  attempted capital murder.  We feel that's been raised by the

11  evidence.  We would further ask for a lesser included

12  offense of attempted murder as well.  We would ask for

13  a lesser included offense of aggravated assault as included

14  in the indictment.

15            We believe those charges are raised by the

16  evidence, in particular the voluntary statements that have

17  been admitted by the other -- the voluntary statements of

18  the other individuals charged and the evidence presented

19  before this jury.  We would ask that they be included.

20            THE COURT:  State's response?

21            MS. SMITH:  None of those lessers are

22  raised by the evidence, Your Honor.  There's no evidence

23  that he was guilty only of any of those lessers.  He's also

24  responsible as a party and there's absolutely no evidence to

25  negate that fact, in response to capital murder.

1          THE COURT:  I can charge him with

2    shoplifting and UUMV and a bunch of other things through the

3    course of this trial, but as far as the evidence has been

4    shown to link this individual as a party or co-conspirator,

5    it's either all or nothing in the way I see the evidence

6    coming in.  Motion for an instructed charge for attempted

7    capital murder, attempted murder, and aggravated assault

8    will be denied.

9          MR. KING:  We would object to the

10   application paragraphs alleging conspiracy, alleging that

11   the individual engaged in a conspiracy.  We note that the

12   indictment in this case does not have any language

13   pertaining to conspiracy.  There's not a conspiracy alleged

14   in the indictment and we object to it

15          MR. SMITH:  This Court is well aware, we

16   don't have to allege parties in the indictment and the

17   evidence supports both the regular parties and parties

18   conspiracy charges on both paragraphs of the indictment.

19          THE COURT:  Mr. King, as you know,

20   conspiracy is a separate indictable criminal offense.

21          MR. KING:  I would think it is.

22          THE COURT:  Motion denied.  Here are two

23   copies of the charge for the parties.  Anything further,

24   Mr. King?

25          MR. KING:  Nothing further, Judge.

1      THE COURT:  How much time do the parties

2 need to argue your case?

3      MR. SHOOK:  An hour, I guess, would be

4 fine.

5      MR. ASHFORD:  I can handle an hour.

6      MR. KING:  An hour a side, Your Honor?

7      THE COURT:  Can you manage that?

8      MR. KING:  I believe so.

9      THE COURT:  Very good.  I will present

10 the charge at 8:30 and it gives me about 20 minutes to get

11 through this charge and each side will have an hour for

12 argument.  See you Monday morning.

13       [End of Volume]

14

15

16

17

18

19

20

21

22

23

24

25

1   STATE OF TEXAS       *

2   COUNTY OF DALLAS      *

3     I, NANCY BREWER, Official Court Reporter for the 283rd

4   Judicial District Court, do hereby certify that the above

5   and foregoing constitutes a true and correct transcription

6   of all portions of evidence and other proceedings requested

7   in writing by counsel for the parties to be included in this

8   volume of the Reporter's Record, in the above-styled and

9   numbered cause, all of which occurred in open court or in

10   chambers and were reported by me.

11     WITNESS MY OFFICIAL HAND on this the 29 day of

12   _____, 2003.

13

14

15                            *Nancy Brewer*

16                           NANCY BREWER, CSR, NO. 5759
                              Expiration Date:  12-31-04

17                           Official Reporter, 283rd JDC
                              Frank Crowley Crts. Bldg. LB33

18                           133 No. Industrial Blvd.
                              Dallas, TX 75207

19                           (214)653-5863

20

21

22

23

24

25