REPORTER'S RECORD

VOLUME 50 OF 84 VOLUMES

*74721*

TRIAL COURT CAUSE NO. F01-00237-T

| STATE OF TEXAS | * | IN THE DISTRICT COURT |
|---|---|---|
| VS. | * | DALLAS COUNTY, TEXAS |
| RANDY ETHAN HALPRIN | * | 283RD DISTRICT COURT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JURY TRIAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 0 2003

Troy C. Bennett, Jr., Clerk

     On the 9th day of June, 2003, the following
proceedings came on to be heard in the above-entitled and
numbered cause before the Honorable Vickers L. Cunningham,
Sr., Judge Presiding, held in Dallas, Dallas County, Texas.

     Proceedings reported by machine shorthand.

ORIGINAL

A P P E A R A N C E S

APPEARING FOR THE STATE

Mr. Toby Shook
SBOT NO. 18293250
And
Mr. Bill Wirskye
SBOT NO. 00799696
And
Mr. Tom D'Amore
SBOT NO. 05349500
Assistant District Attorneys
133 No. Industrial Blvd.
Dallas, Texas 75207
Phone:  214/653-3600

Ms. Lisa Smith
Appellate Division

APPEARING FOR THE DEFENDANT

Mr. George Ashford
SBOT NO. 01374530
325 N. St. Paul Street
Ste. 2475
Dallas, TX 75201
214/922-0212

Mr. Edwin King
SBOT NO. 11472200
2305 Cedar Springs
Ste. 250
Dallas, TX 75201
214/871-8800

WITNESS INDEX

| WITNESS | DIRECT | CROSS | VOL. |
|---|---|---|---|
| Susan Wagner | 80,121 | 96 | 50 |
| Renee Camper | 122 | 131 | 50 |

EXHIBIT INDEX

| EXHIBIT | IDENT. | OFFER | ADMIT | VOL. |
|---------|--------|-------|-------|------|
| ST.967 | TIMELINE POSTER | 85 | 85 | 50 |
| DX-43 | CPS RECORD | 100 | 100 | 50 |
| DX-44 | CPS RECORD | 102 | 102 | 50 |
| DX-45 | CPS RECORD | 103 | 103 | 50 |
| DX-46 | PLUMMERS' AFFIDAVIT | 105 | 105 | 50 |
| DX-47 | CPS RECORD | 108 | 108 | 50 |
| DX-49 | CHARITY SMITH'S AFFIDAVIT | 112 | 112 | 50 |

1                  P R O C E E D I N G S

2                    [Jury out]

3            THE COURT: Since Friday, the State has

4 made additional recommendations to the charge. The bottom

5 line is the Court is reluctant to add the extraneous offense

6 conviction language in the charge. I did so on Friday.

7 What's the State's position today?

8            MS. SMITH: The State's position is that

9 it should be removed and that the extraneous offense beyond

10 a reasonable doubt instruction should be included. We had

11 omitted that on Friday.

12            THE COURT: Mr. Ashford? Mr. King?

13            MR. KING: I'm not sure what the State

14 has said. They are saying that the extraneous offense

15 instruction should be excluded?

16            MS. SMITH: No, I'm sorry. That should

17 be substituted in and the prior conviction credibility

18 charge should be omitted.

19            MR. KING: We ask for the credibility

20 instruction that is currently in the Court's charge. We

21 believe that is the appropriate instruction to give under

22 the circumstances. And we object to the State's request.

23            THE COURT: I'm going to go back to my

24 original logic position. The defense offered such

25 testimony. I'm not going to limit the jury on the use of

1   your evidence.

2               MR. KING:  Does that mean the Court is

3   not going to include either the State's requested

4   instruction or the defense requested instruction?

5               THE COURT:  No.  I'm going to include the

6   instruction that any other offenses or bad acts be proved

7   beyond a reasonable doubt.

8               MR. KING:  So the Court is granting the

9   request of the State --

10              THE COURT:  Yes.

11              MR. KING:  -- to exchange their

12   instruction and adding the burden of proof of beyond a

13   reasonable doubt on that?

14              THE COURT:  Yes, sir.

15              MR. KING:  We have no objection if the

16   Court is changing that over our objection.  We have no

17   objection to the reasonable doubt being added to the

18   extraneous, so it's clear in the record.  We just object --

19   we think that the other charge is the most appropriate under

20   the circumstances.

21              THE COURT:  One hour a side.  I'll ask

22   the jury -- is the State going to split your time?  Are you

23   going to open?

24              MR. WIRSKYE:  Yes, sir.

25              THE COURT:  How much time do you want up

1    front?

2                    MR. WIRSKYE:  Let me know after I've used

3    30.

4                    MR. KING:  Judge, we're going to split

5    our time, as well, and if the Court would give me a

6    20-minute warning, I would appreciate it.

7                         [Jury in]

8                    THE COURT:  Thank you.  You may be

9    seated.  Good Monday morning.  As advertised I'm going to

10   read to you the Court's charge, then the attorneys for each

11   side will have their final summations.

12                   If you will, listen carefully.  You will

13   receive a written copy, but I'm going to read it to you at

14   this time.

15                        [At this time the jury charge was read to

16                         the jury by the Court.]

17                   THE COURT:  With that we will have final

18   summations.  Who will open for the State?

19                   MR. WIRSKYE:  May it please the Court.

20   Folks, let me thank you for your patience and attention.  I

21   know it was a long week last week, but sometimes in crimes

22   this bad, sometimes with criminals this bad, it takes a

23   while with the overwhelming evidence to kind of paint or

24   complete a full and accurate portrait of all the evil that

25   occurred out there behind that Oshman's on Christmas Eve.

1    I'm going to spend a little bit of time

2 talking to you.  When I sit down, the defense will have a

3 chance to visit with you and finally Mr. Shook, you will

4 hear from last from the State, I want to talk to you a

5 little bit about the crime.  I want to talk to you a little

6 bit about the criminal and his mindset.  And finally,

7 because the defense has put it in issue, I want to visit

8 with you about his character and some of the choices he's

9 made in his short and violent life.

10    One thing I will appeal to you as we go

11 throughout this process, I'm going to appeal to your reason

12 and common sense.  Okay?  So many times down here we have

13 jurors who come in and I don't know if it's because they

14 spend all this time around lawyers or criminals or what, but

15 for some reason they leave their common sense at the

16 courthouse door.  Okay?

17    Don't be fooled.  That's what he's banking on

18 with his lies and his manipulation, his spin.  He's hoping

19 that just one of you, because that's all it takes, one of

20 you will lose your reason, lose your common sense, and not

21 see the forest for the trees.  So I'll just beg you up

22 front, folks, you know, things don't change just because you

23 become a juror.  Go back to the reason and the common sense

24 you had before you came down here to serve as a juror.

25    Let's talk a little bit about the Court's

1  charge.  I will start where you should end, the back page,

2  verdict form, find him guilty of capital murder.  Your

3  foreman signs the top line.

4           Recalling back to jury selection, I don't know

5  if you guys remember, but we talked with some of you guys

6  about this concept of lesser included offenses.  And in this

7  case in that charge there is a lesser included offense.  It's

8  aggravated robbery.  The law is that if there is any

9  evidence, no matter how slight, no matter how uncredible, no

10  matter how incredible, the defendant, if he's guilty is only

11  guilty of the lesser offense, then the Judge by law is

12  required to put that lesser included offense in the charge,

13  and it's in there in this case.

14           If you follow your oath, you look at the

15  facts, and you look at the law, you are never even going to

16  reach aggravated robbery, and here's why.  The only way that

17  you twelve reach aggravated robbery in your deliberations is

18  if all twelve of you, each and every one of you, find him

19  not guilty of capital murder.  If all twelve of you acquit

20  him of capital murder, that's the only point at which you

21  consider --

22           MR. KING:  Your Honor, I object to

23  Mr. Wirskye's argument.  It's a misstatement of the law.

24  The law requires that you have a reasonable doubt as to

25  whether or not he committed capital murder and the law does

1    not require them to all vote not guilty.  It's a question as

2    to whether they have a reasonable doubt as to that.  Then if

3    they have a reasonable doubt, then they can go on to a

4    lesser included.

5              THE COURT:  Overruled.  The jury has the

6    law before them in the charge.

7              MR. WIRSKYE:  With this overwhelming

8    evidence, you are never going to find him not guilty of

9    capital murder, so you shouldn't even be concerned with that

10   lesser included offense.  You will never reach it.

11             We also told you in jury selection, that

12   criminal cases in Texas usually break down into two

13   different phases, the first phase where you are usually

14   concerned about just the facts of the crime and then the

15   second phase, where you hear a little more about the

16   character and background of the defendant.

17             Because they have chosen to put his character

18   in issue, because they have chosen to make the argument that

19   Randy Halprin is of such a character, is such an upstanding

20   person that he wouldn't commit a capital murder, you got to

21   hear a lot of that evidence about character and background

22   up in the first part of the trial.  So in that sense, this

23   trial is unique.

24             It's a good opportunity for you, because as

25   you face the decisions you are going to have to make, okay,

1   you know exactly who is sitting over here, a violent,

2   violent, criminal.  It's a good thing for y'all that you got

3   to hear all that extra evidence and we're going to talk

4   about it in a little bit.

5           The Judge also talked to you, you know, he

6   read those six paragraphs on capital murder.  You recall

7   back to jury selection what that is.  We alleged in our

8   indictment that capital murder has been committed two

9   different ways.  Okay?  The murder of a police officer on

10  duty, the intentional murder during the course of a robbery.

11  Okay?  And those are the two different ways we've alleged

12  it.

13          Also recalling back to jury selection, there's

14  three different ways the law allows us to prove that.  Okay?

15  Either he's a principal, he's a party, or he's a

16  conspirator.  Okay.  So when you have three different ways

17  to prove the two different ways that's alleged, you get the

18  six paragraphs.

19          If you think that he shot and killed Aubrey

20  Hawkins, you will find him guilty as a principle.  If you

21  think he aided, assisted, or abetted or encouraged some of

22  these others to kill Aubrey Hawkins, you are going to find

23  him guilty as a party.  And, of course, if you believe he

24  entered into a conspiracy to commit aggravated robbery and

25  in the course and in furtherance of that robbery Aubrey

1   Hawkins was murdered and he should have anticipated it, you

2   you will find him guilty as a conspirator.

3           You know, that last way, folks, there should

4   be absolutely no doubt in your mind that he should have

5   anticipated what would happen out there.  And just as the

6   evidence is overwhelming on that point, the evidence is

7   similarly overwhelming and would allow you to infer his

8   guilt as a principle and as a party.  Okay?

9           That's what's in the charge.  Again, I say

10  it's pretty much everything we've talked about in jury

11  selection.  The evidence in this case is overwhelming.

12          Let's talk a little bit about the actual

13  crime.  What did the evidence show us?  The evidence showed

14  us one piece of evidence that is so important that you can

15  just consider that piece of evidence and make up your mind

16  and call it a day, find him guilty of capital murder.

17          What is that piece of evidence?  The loaded

18  gun.  They all had loaded guns.  What's the importance of

19  that?  As so many of you told us on jury selection, the only

20  reason to take a loaded gun to a robbery is because you

21  anticipate, you actually anticipate using it, you anticipate

22  trouble, you anticipate violence, you anticipate the police

23  responding to a call.

24          The fact that his gun was loaded and lethal,

25  tells you what his mindset was.  And he had that lethal

1    mindset when he went into that robbery.  That fact alone,

2    the loaded gun, is enough to decide this case and find him

3    guilty of capital murder, folks.  Case closed.

4              But, of course, you have more evidence.  You

5    have the evidence of the planning, the preparation, the

6    teamwork, the cooperation, all these things that went into

7    this crime.  Each of them had a role.  Each of them had a

8    gun.  They started planning an Oshman's robbery before they

9    even broke out of prison.  Okay?  And it's just defies

10   reason and common sense that these violent, convicted felons

11   who had violently broken out of a maximum security prison in

12   Texas did not anticipate that the police may show up when

13   they decide to pull a robbery.  It just defies reason,

14   folks.  It's a completely ridiculous thing to argue anything

15   otherwise.

16             You know, Wes Ferris told us, you know, a

17   former gunnery sergeant in the Marine Corp.  What did he

18   tell us?  He said there was no doubt in his mind these

19   people would not hesitate to harm them, if they interfered

20   with his plans.  And tragically, now, we know that was true.

21   They did not hesitate.  Okay?  They gunned down Aubrey

22   Hawkins.  And just as surely as they would not be deterred

23   from executing their plan, they would not be deterred from

24   executing Aubrey Hawkins.  Nothing was going to get in their

25   way.  So it's that simple, folks.

1    You know, if they didn't want a violent

2    confrontation, they had plenty of opportunities to abort

3    this crime, to run off and flee.  They had the backup car in

4    the apartments.  They could have taken off running across

5    the field.  Murphy is on the radio out front saying, hey, I

6    heard a call from Oshman's, suspicious person.  On the radio

7    again, here comes the car.  I see the cop.  He's coming

8    around to the back.

9    They had every opportunity, if they didn't

10   want a confrontation, if they hadn't anticipated it, to run

11   off, but they didn't.  They calmly and coolly moved to the

12   back of the store to where the threat was.  Of course, they

13   weren't going to leave their guns, the object of their

14   criminal desires.  They move back to where the threat was

15   and they took care of the threat in a deadly, deadly way,

16   and left a widow and a fatherless child.  That's how they

17   chose to respond.

18   You know, the argument that these violent

19   criminals didn't anticipate this, is just beyond belief.

20   You know, somehow Randy Halprin would have you believe that

21   I guess he missed all those meetings where they talked about

22   planning this crime, that he just wasn't in the room when

23   they talked about it.  Or perhaps he had you believe that

24   these violent criminals were silent on that point, that no

25   one talked about it.  They just silently armed themselves,

1    prepared their ammunition, scored the bullets to make them

2    even more deadly, but no one ever mentioned, hey, what do we

3    do if the cops show up?

4            I mean, you know from Murphy's statement that

5    he was real familiar with the Irving Police Department and

6    their response time.  But, again, folks, they didn't try to

7    avoid the confrontation.  They started the confrontation.

8            You know, this issue of whether he's a party

9    or principle or shooter, think back to what you heard.  By

10   his own testimony back at the Oshman's in those fatal

11   seconds of Christmas Eve, he puts four of them, okay?

12   You've got Murphy out front, he puts Newbury in the store,

13   he puts Harper up on the steps with the smoke bomb, when

14   Hawkins shows up.  There are four people out there.

15           Ballistics tell us at least five weapons were

16   used, maybe more.  Plenty of evidence to infer that he

17   pulled a trigger, that he lead directly to the death of

18   Aubrey Hawkins.

19           You know, he again wants you to believe the

20   story that somehow he didn't pull a trigger, he never fired

21   a shot, he never anticipated this would happen.  We've heard

22   this talk about, gee, you know, Randy Halprin when he talked

23   to the police and he's talked to the media, he's always been

24   consistent about one thing, I didn't pull a trigger, I

25   didn't fire a shot, I never anticipated anyone would get

14

1    hurt.

2            And then they argue to you that this

3    consistency is a sign of his honesty and it's not.  His

4    consistency on this point is a sign of his constant fear of

5    the ultimate penalty.  Okay?  His consistency is a sign of

6    his constant fear of the ultimate penalty, because there are

7    some things, some actions, he could never admit.  He can't

8    admit to pulling the trigger.  He cannot admit to firing a

9    shot.  He can't admit to actual anticipation.  Because if he

10   does, he faces the ultimate penalty.  His life's literally

11   on the line.  It's not a sign of honesty.  It's a sign of

12   fear.

13           They may say when you look in his statement,

14   he admits certain things he doesn't have to.  Okay.  He

15   tells us things that make him look bad.  Why would he do

16   that if he's being dishonest?  You folks know better than

17   that.  You know how liars work.  You know how pathological

18   liars work.  They tell these little half-truths, okay, that

19   may make them look bad.  And they tell you these half-truths

20   to bolster their credibility, to gain credibility in your

21   eyes so you will believe them when they tell the ultimate

22   big lie.

23           And that's exactly what he did in the

24   statement.  Okay?  He admitted to the aggravated robbery

25   part, but he's never going to admit to the big lie, the

1  capital murder.  That's why that's in there, folks,

2  criminals never ever understand the law of parties.  And

3  because they don't, they think they can admit to an

4  aggravated robbery and somehow not face capital murder.

5  That's exactly what was going on with this pathological liar

6  in his statement.

7          Let's talk a little bit about Randy Halprin,

8  what we've learned about him, what his mindset was.  And you

9  folks have really had a unique opportunity.  You got to see

10  him testify.  You got a glimpse into his mind, you got a

11  glimpse into his reasoning, and you see how a criminal's

12  mind works.  And it ought to chill you to the bone because

13  they are just different than us, folks.  They think

14  differently.

15          He doesn't look bad.  He looks almost

16  harmless.  He looks nice.  But you know he's not.  You know

17  he's deceitful, you know he's dangerous, and you know he's

18  deadly.  And you know he's different than us and just like

19  any criminal, they can't help but show their true colors,

20  their true nature, when they talk on the stand.

21          When Mr. Shook had him on cross-examination.

22  They have a lack of empathy for their victims, they blame

23  shift, they minimize, they try to manipulate, and they feel

24  sorry for themselves.  They think they are the victim in all

25  this.

1    I mean, let's look at all the lies he told on

2    cross-examination.  And then it would almost be laughable,

3    but for the fact that we have a tortured child, terrorized

4    hostages and workers at Oshman's, and a dead police officer.

5    It would almost be laughable, but for that fact.

6              And I'll tell you his best lie that shows you

7    this criminal mindset, okay, that shows you this

8    psychopathic criminal.  And you folks didn't get a chance to

9    see this.  Mr. Shook took this yellow pad up there.  This

10   yellow pad, as you recall, was found in his backpack in the

11   RV.  Had it loaded up with the gun, had it loaded up with

12   the weapon.

13             Mr. Shook asked him about this.  What do these

14   words mean?  He hesitated for a while and you could almost

15   see the wheels turning.  And he said, "Stick to the Lord".

16   I know it's hard for each of you to get a good look right

17   now.  What it really says is, "Sick to the end."  Okay?

18   That's a little glimpse into his reasoning.  Sick to the

19   end.

20             Mr. Shook asked him about the little cartoon

21   figure.  What is that?  That's just a man with his hand out.

22   That's a man with his penis out who is masturbating.  That's

23   a little glimpse into the sick, criminal mind of Randy

24   Halprin.  It was so telling.

25             This was probably the one thing he was

1    truthful about on cross-examination.  Mr. Shook asked him
2    when did you stop lying?  And because he's different from
3    us, because he's a criminal, he couldn't even comprehend
4    that question.  He couldn't conceive what Mr. Shook was
5    asking him.  I don't know what you mean.  I don't know,
6    yesterday, last week.  Ask me something specific, Mr. Shook,
7    because everybody lies.  That is a criminal mindset.  That
8    tells you so much about him.  Because he's different than
9    us.  He always lies.  We don't.  Good law-abiding people
10   don't always lie.  There's just a little glimpse into the
11   sick mind, the sick-to-the-end mind of Randy Halprin.
12          Let's talk about his lack of empathy for the
13   victim.  Mr. Shook read you those letters.  How hard has
14   this man worked to cash in on what happened out there, to
15   cash in on that murder, to cash in on the death of Aubrey
16   Hawkins?  Book deals, "National Inquirer", blood money.
17   That's what he wants.
18          Oh, and like a typical criminal with a lack of
19   empathy, he says, gee, Mr. Shook, I was going to give some
20   of it to the victims.  And he thinks somehow that makes it
21   okay, because he was going to give some of it to the
22   victims.  And I'm just going to keep the rest to survive in
23   prison.  Again, he's feeling sorry for himself.  He's the
24   victim.
25          Does he blame shift?  Does he minimize?  Of

course he does.  Listen to his words very carefully.  When asked about the gun, he said, "I was issued that gun.  It was loaded."  He always takes himself out of the equation.  He always shifts blame, always minimizes.  "I was issued that gun," almost like it wasn't a voluntary volitional act on his part.  He got that gun and loaded it and took it into that Oshman's and took it on their spree up to Colorado.

What else did he say?  Well, I felt like I had no choice.  Gee, I felt like I owed George Rivas six months.  I didn't know what that means, folks.  Other than an attempt to shift blame and minimize his actions.  He would have you believe -- he said he wasn't against his will, but I guess he would have you believe that George Rivas had some hold over him, had hypnotized him, had cast a spell on him that puts a magic dust in his cereal.  I don't know what that means, other than it's a criminal's attempt to shift blame.

All the excuses he had.  Gee, that was during my drug phase, when he talked about what he did to that infant.  He said, well, I'm not going to blame drugs, but, gee, I was on LSD and I just snapped.  I kind of felt pressured into watching that child.  Excuses.

Talking about the parole system, he basically blamed the parole and prison system for his breakout.  If you can conceive of that twisted logic in his mind.  And somehow he wants you to feel sorry for himself because his

1  adoptive parents who gave him every opportunity and every

2  chance since five years old, for some reason just cut out

3  contact with him after he tortured the child.  He's feeling

4  sorry for himself.  He doesn't understand how regular

5  people, people like us, would not want anything to do with a

6  man who would torture a child.

7          Wants you to feel sorry for him about the time

8  he spent in prison.  Gee, I was out working the hoe squad in

9  the hot sun.  That was before they gave me sunblock.  Come

10  on, folks.  I didn't get many visitors, very little mail.  I

11  didn't have any money for commissary.  Again, shows you a

12  glimpse into his criminal mind that he is always the victim.

13  That's how he is always going to feel.

14          He's trying to manipulate you folks just like

15  he's tried to manipulate everyone and everything in his

16  life.  Remember the O. J. remark?  Mr. Shook caught him on

17  that, didn't he?  Going to try a different change of

18  clothes, going to try the glasses.  Remember what he said,

19  quote, "You know, I got this from O. J.  This shit works".

20  Okay?

21          Well, you are going to be the ultimate judge

22  of whether that stuff works, folks.  By you finding him

23  guilty of capital murder you are going to tell him it

24  doesn't.  His cheap transparent attempts to manipulate his

25  way out of the responsibility for the death of Officer

1   Hawkins.

2         You know, again, what makes him so dangerous

3   is he doesn't look like he's dangerous.  He looks harmless.

4   You know, violent criminals don't come with a warning label.

5   There's nothing to tell you if you walk up to him on the

6   street, gee, I tortured a child, I broke out of a maximum

7   security prison, I've gunned down an officer and I'm on the

8   run.  You know?  They are just different, folks.  They just

9   really are.

10        Let's look at his character.  What does his

11  character boil down to?  It's basically I guess you can say

12  your character is the sum total of the choices that you make

13  in your life.

14        Look at the choices he's made.  Everywhere he

15  goes he is surrounded by violence, surrounded by this aura

16  of evil.  He leaves a trail of deceit, destruction,

17  devastation, and death everywhere he goes.  He leaves a wake

18  of broken bones and broken lives.  That's his character,

19  folks.  That's his character.

20        You know, they say he's not the baddest of the

21  bad.  We've heard that, heard some of it.  You know, how

22  would you describe the baddest of the bad?  Someone who

23  tortures children?  Someone who breaks out of prison?

24  Someone who guns down police officers during the course of a

25  robbery?

1    I'll submit to you that he is the baddest of

2  the bad, you know?  They may say, you know, he's not as mean

3  or as dangerous as the other six people.  Don't be fooled by

4  that argument.  Keep your common sense, okay?  If you are

5  walking along outside and you walked up on a nest of rattle

6  snakes, it's just useless to try to figure out which one of

7  them is the most dangerous.  Because if you get close

8  enough, they will all bite you with their lethal venom and

9  kill you.

10    And that's exactly what is going on here.

11  They are bad, they are dangerous, they are mean

12  individually, and when they get together as the seven, they

13  have this kind of, I don't know, evil, synergistic effect,

14  okay?  The sum is greater than the total of the parts.  They

15  can commit more evil.  They are all the baddest of the bad.

16    He says he's not a monster.  Remember him

17  saying that?  He's not a monster.  Remember Jared Smith, the

18  infant he tortured?  Somewhere today probably, he's five,

19  six, seven years old and hopefully he's living a life like a

20  normal child.  And like a normal child, he probably has a

21  normal child's nightmares.  There's a monster under the bed,

22  there's a monster in the close --

23    MR. KING:  Your Honor, we're going to

24  object to that being outside the record.

25    THE COURT:  Overruled.  The jury will

1    recall the evidence they heard from the witness stand.

2                    MR. WIRSKYE:  But unlike normal children,

3    when Jerrod Smith has that nightmare about monsters, his

4    monster has a face and it's the face of Randy Halprin.

5    Don't buy off on he's not a monster.  Think about what he

6    did to that child.  Think about what he did.  A fractured

7    skull, two broken arms, broken legs, the child can't even

8    get away from him and he's crying for his mother.  And then

9    to shut him up because he's sick of hearing him cry, he

10   takes a lit cigarette and tortures the child on the inside

11   of his mouth.  That's who you are dealing with.

12                   You don't think a person that's capable of

13   that is a person that is capable of this?  Of course they

14   are.  That's why character is so important.

15                   Eleven shots, six to the head, three or so to

16   the back, almost point blank range.  Of course they are

17   capable of that.

18                   They may say, well, he's not very smart.  They

19   may say, well, he's not very courageous.  He's a coward.

20   And I will gladly stipulate to you right now that you are

21   looking at an ignorant coward.  Intelligence is not a

22   prerequisite for dangerousness.  Courage is not a

23   prerequisite for dangerousness.

24                   These seven, they are a pack of predators.

25   And, like a pack of predators, they pray upon those that are

1   young, weak, defenseless, those that are isolated, those

2   that have been caught by surprise.  That has nothing to do

3   with intelligence.  It's an innate instinct that predators

4   possess.  They have an innate instinct to ambush people and

5   that's exactly what they did.

6          These people don't want any part of a fair

7   fight.  When they are surrounded, they will come out with

8   their hands up and beg for their life, just like the cowards

9   they are.  But when they have you surrounded and they have

10   you caught off-guard, you end up like Aubrey Hawkins.  Don't

11   buy into that argument, that somehow he's naive or not

12   smart.

13          They said he didn't have a skill for George

14   Rivas to take him out of the prison with him.  He didn't

15   need much of a skill, folks.  All he needed was that evil

16   mind, the predisposition for violence, and a trigger finger

17   that worked.  That's what he brought to the group.  That's

18   the only skill that he need to be a member of the Texas

19   Seven.

20          They said, well, in prison he didn't really

21   have any major infractions.  He wasn't a member of a gang.

22   What he did in prison was manipulate the system.  He worked

23   himself into a job in that maintenance shop that would allow

24   him access to escape, just like the others did.  You don't

25   give him credit for that manipulation.

1    Maybe he wasn't in the Arian Brotherhood or

2  some other prison gang, but I'll submit to you he was in a

3  gang.  The Texas Seven are just as bad as any gang we've

4  seen, any prison gang, probably worse, because they know how

5  to break out of our prisons.  Don't buy into that argument,

6  folks.  It just doesn't make sense.

7    You know, he said when he broke out, again

8  going back to his twisted logic, well, gee, I knew that if I

9  made parole in 15 years, even if I was rehabilitated, I

10  wouldn't get parole, so that's why I broke out.  If you can

11  follow that contorted, twisted psychopathic logic.  I didn't

12  have any intent of anything violent happening.  I just

13  wanted to go to the Pacific northwest and retire in

14  anonymity in Seattle.  That's what he says.

15    You have the prison letter, folks, that tells

16  you what his state of mind is when he broke out.  And that

17  sort of mix of theology and threats, what's the last thing

18  he says?  He says, "Believe me, you haven't heard the last

19  of me -- you haven't heard the last of us."  That is a

20  threat that tells you exactly what his intentions were when

21  he broke out of the prison, tells you exactly what his

22  mindset was.  If he wanted to fade away to Seattle, he would

23  have said, gee, folks, you have heard the last of me.  That

24  would have been the note he left in his cell.  But he

25  didn't.

1        What is so important about his mindset, as we

2   look back to Christmas Eve?  Look at what happened after the

3   crime.  They didn't break up.  If you want to evade capture,

4   you break up, go your separate ways, to try to lessen your

5   chances of getting captured.  Or if you want to go to

6   Seattle, you take the first chance and hightail it up to the

7   Pacific northwest, but he didn't.  By his own admission he

8   had opportunity, chance after chance, and he didn't take it.

9   And the reason, very simply, is because he wanted to be a

10  member of this gang.  This gang had not finished, you know,

11  its criminal purpose.  They had not fulfilled their criminal

12  goal.  They stayed together because, again, the evil sum of

13  the total was greater than the parts.

14       Look at what they took.  I mean, it looks like

15  a National Guard armory, folks.  Why do you think they took

16  those weapons?  What do you think they had planned for the

17  future?  Why do you think he stuck with that gang?  He stuck

18  with it because his lust for money, his lust for violence,

19  and his lust for other things was not satisfied.  That's why

20  he was still with those seven, ordering bulletproof vests.

21  You heard about that.  They may say, well, there's only an

22  order for four.  Randy obviously wasn't one of the ones with

23  the ballistic vests.

24       I'll ask you to remember back to the early

25  part of 2001.  Do you think it might have sent up some red

flags when an order came in for seven bulletproof vests?  Do you think so, folks?

Anyway, again, reason and common sense you know why they stuck together and you know what kind of gang they were.  You know what they are capable of.  He's not the nonviolent, naive person they would make him out who really had no active involvement in this crime.

Think of the prison break, the violence there. What did Marroquin tell you?  What you did Mr. Burgess tell you?  Slamming the head on the pavement.  Of course he lied about it.  Pulling the arms back, making that threat to Mr. Burgess.  "You thought I liked you.  Give me any trouble, I won't hesitate to kill you."  Didn't -- you know, and that's the truth, folks.  That's the glimpse into his mind.  They didn't hesitate.  If anyone gave them any problems, they ended up like Aubrey Hawkins.

He's not naive.  You know, the only person that can tell us exactly what happened back there behind the Oshman's is Aubrey Hawkins.  They shot and killed the eyewitness.  They shot and killed the police officer that could have apprehended them.  Because of that, we have no eyewitness.

But when you sit through this trial, you hear his lies, you hear the evidence, you see his character, you see his other actions, those all speak as loudly in this

1   courtroom as probably any eyewitness could with respect to

2   what part he played, what role he played, what his active

3   involvement was on Christmas Eve.  You know he's a liar.

4   You know he's violent.  You know he's trying to escape

5   capital murder.  Don't let him manipulate you.  Don't let

6   him get away with it.

7          I mean, you folks ought to be tired, tired of

8   violent criminals like this in our society.  Even when you

9   get them behind bars, they don't stay there, they are so

10  violent.  And when they get out, they murder a police

11  officer.

12         And I'll submit to you at this point Randy

13  Halprin needs to be held accountable for his character, for

14  his choices, for his actions out there behind the Oshman's.

15  And your finding him guilty of capital murder is the first

16  step in holding him responsible.  Okay?

17         You have every right to come together, find

18  him guilty of capital murder, and exercise the sort of

19  communal right to self-defense that all of us regular

20  citizens have.  This communal right to self-defense to say

21  enough is enough, Randy Halprin, stop the violence, stop the

22  killing, stop the death.

23         And when you go back there and find him guilty

24  of capital murder and make justice swift and make justice

25  sure, when you go back there and find him guilty of capital

1  murder, the one and only inescapable verdict in this case,

2  you will start the process of holding him accountable for

3  his actions.  Thank you, folks.

4              THE COURT:  Mr. King?

5              MR. KING:  May it please the Court,

6  Mr. Wirskye, Mr. D'Amore, Mr. Shook.

7              Ladies and gentlemen, you know it's been a

8  long week.  And when you've been doing this as long as I

9  have and you listen to the State open up their argument and

10 you listen to everything they say, you come back to the

11 conclusion, I didn't hear Mr. Wirskye say, folks, we've

12 proved it to you beyond a reasonable doubt that this man

13 right here shot Aubrey Hawkins.

14              And the reason why you didn't hear that from

15 Mr. Wirskye is because there is no proof beyond a reasonable

16 doubt that he shot Aubrey Hawkins.  And Mr. Wirskye is a

17 great lawyer, Mr. Shook is an excellent lawyer, and Mr.

18 D'Amore is an excellent lawyer.  They've had three years to

19 go and scour the countryside, which you know they have.

20 They have gone to the far reaches of the corners of Colorado

21 and Texas to bring you witnesses, run down witnesses.  You

22 know Detective Spivey went to great lengths to go take

23 statements.  We had the FBI, the ATF, the Colorado Springs

24 Police Department, the Pueblo City Police Department, the

25 Teller County Sheriff's Office, the El Paso County Sheriff's

Office, and all the king's horses and all the kings's men,

and what did they bring you?

They want you to infer.  That's what they want

you to do.  They want you to guess.  That's what they want

you to do.  And that's what you do when you can't prove

something.  You try to stampede a group of folks into

guessing and inferring something from the evidence when it's

not there.

You know, this is a horrible crime.  And on

voir dire we asked you, what do you know about this case?

And there wasn't anybody here that didn't say, you know, I

heard they escaped from prison.  What's that tell you?

They've been convicted of something.  And if they're in

prison, it's got to be pretty bad.

What else did you hear?  I heard they were

robbing an Oshman's.  That come as a surprise to you in the

last eight days?  What else did you hear?  I heard that they

shot and killed a police officer.  What else did you hear?

I heard they ran to Colorado and that's where they were

arrested.

Well, you seem to feel pretty strongly about

all that stuff.  Are you telling us that you can still

consider the evidence and be fair in a trial of this kind?

Yes, I can.  I can raise my hand, I can take an oath, and I

can say, you know what?  Even armed with all that

1    information, I'll make these people right here prove this

2    case to me beyond a reasonable doubt, because that's what

3    I'm telling you that oath means to me.

4            So let's start at prison.  You know, they

5    brought you a couple of people from the prison break.

6    What's the sum total of Randy Halprin's involvement in the

7    prison break?  Well, is he the guy with the shank?  No.

8    He's the guy with the mop.  That's point No. 1.

9            All those people, what, we have 14?  Fourteen

10   people.  Not a one of them can put any kind of real weapon

11   in his hand during the course of the prison break.

12   Mr. Burgess can put a mop in his hand.  You know, when you

13   look at Mr. Burgess and you say, well, here's your statement

14   you gave that day and the following day.  And you look at

15   them, what's he talking about?  Rivas or Garcia or somebody

16   else is pounding heads.  He's added as an afterthought.

17           When you look at Marroquin, what's he say?

18   He's added as an afterthought in the statements.  And what's

19   he doing?  He's following George Rivas' instructions.  Well,

20   any question about that, Mr. Burgess?  Mr. Marroquin?  No,

21   no, he would do that.  Rivas would tell him to go do

22   something, he would go do that.  Rivas tell him to do

23   something else, he would go do that.  Rivas told him to do

24   this, he would go do that.  That's the kind of guy this is.

25           Now they've got an opportunity to go down and

bring you from prison the horrible criminal or prison record

of Randy Halprin to show you that he spit on guards or he's

been engaged in assaultive conduct on guards.  We put him on

the witness stand, knowing full well after we pass him that

Mr. Shook who -- Mr. Shook could make the Pope look bad on

the witness stand.

And that was a classic law school example of

how you take somebody who you are smarter than and you twist

them and you turn them and you make them look bad on the

witness stand.  You ever lie?  What do you say?  Yes or no?

You say no, oh, are you telling us you have never lied?  You

say yes, then what are you?  You are a liar.  And it's a

game you can't win.  You can't win that game.  You can't win

that game when you write your parents from prison and go,

you know what, I know I did this bad thing.  Would you write

me?

You can't win that game when you live in

prison five years and you got no visitors.  And you know

what?  Tough.  That's tough.  Some people get no visitors in

prison.  Some people get no letters in prison.  Some

people's parents, I guess, write them off at some point in

their lives and say, you know what, we adopted you, things

haven't worked out exactly the way we think, so we're going

to push you out of sight, out of mind, because that's a

whole lot easier than trying to come to grips with the

situation.

And, yeah, yeah, as opposed to George Rivas, Michael Rodriguez, Donald Newbury, Patrick Murphy, Larry Harper, Joseph Garcia, whose conduct that leads them to prison is a series of planned, thought out escapades, not some spur of the moment snap, loss of judgment, of an 18-year-old kid. That's not what it is.

He gets a 30-year sentence that he pleads guilty to for injury to a child. And you will notice that Mr. Shook even wanted to relay the ear infection at Randy Halprin's door. And they bring the good doctor and the good doctor has reviewed his medical records, but you know what, he doesn't review all the records in the file.

And this thing about the ear bleeding, you know, it doesn't take a brain surgeon to figure this part of the deal out. The kid had a bad earache. The kid had an earache bad enough where it ruptured the child's eardrum. They treat it in the medical record with Amoxicillin and penicillin or whatever they do to fight that earache.

But you know, if you have got children, a child that age who has a severe earache, what are they doing? They are crying all the time, because they are in pain. They are in pain from the earache. But no, no, no, that sounds bad, so why not, why not, lay it at his door? Why not?

1          Oh, well, he opened his mouth and burned him

2   with cigarettes.  And then you get the doctor on the stand.

3   And what does the doctor say?  Well, no, I can't honestly

4   tell you medically it's a cigarette and, yeah, you can have

5   ulcers in your mouth.  Yeah, that could happen, too.  But

6   they brought the child down and the child had been tortured.

7   He had broken bones and broken legs.

8          And I guess if I hadn't asked him the question

9   about the earache, you would have been left with the

10  impression that, you know, that child didn't have any ear

11  problems and Randy caused his ear to bleed.  And you know

12  what?  That's not the truth.  That's not the truth.

13         Now, he gets arrested in Colorado and he gives

14  a statement to the police and what does he tell them?  We

15  get out of the prison and we rob one store and then I don't

16  go with them on the second robbery, because I don't want to

17  go and they leave Rodriguez with me.

18         Maybe the State will bring you some evidence

19  about the particulars of those two cases and maybe, maybe,

20  since they have got that ability to bring witnesses that you

21  have seen and put them on, either they will have somebody

22  that can say, you know what, we saw him there or they would

23  have nobody who can say they saw him there.

24         Who is this guy?  This is the guy who's not

25  part of the red team, he's not part of the blue team, he's

1    not really part of it.

2            You know, Mr. Wirskye talks about these four

3    bulletproof vests.  At what point in time did they buy these

4    bulletproof vests?  Did he go?  No.  And they know this.

5    They know this.  Because at this point in time, what's

6    happened up in Colorado?  At the point in time they are

7    talking about these bulletproof vests, Murphy and Newbury

8    have pretty much split off from the group.

9            What's the testimony when Halprin and Rivas,

10   Garcia, and Rodriguez that day all get arrested?  Those

11   other guys had been gone for a day or two.  They are gone.

12   The money is split up.  They have split up guns and those

13   guys are arrested days later in Colorado Springs with their

14   money, with their guns.

15           What's that leave?  Well, it leaves five

16   people, right?  It leaves Halprin, Harper, Garcia,

17   Rodriguez, and Rivas, four vests.  Four vests, not five.

18   Four.  The party was over.  Everybody was breaking up.

19   Randy wasn't going to be included, one way or the another.

20   You know why?  Because he can't be depended on in a crunch.

21           Now, we offered in all these statements of all

22   the other fellas that the police took and offered in those

23   statements for a reason.  Because if you read through those

24   statements, you get a feeling of what is consistent among

25   what they say.  What are we talking about?  We're talking

1    about an 18-second period of time, a 30-second period of

2    time and a 46, 47-second period of time.

3              When they enter the store, Randy Halprin is

4    doing what he said he was doing.  If you read the

5    statements, what you see is that he and Rodriguez go in

6    first to act as shoppers.  Garcia and Newbury go in second.

7    And Harper, the executive officer, and Rivas, the CO, they

8    go in.  They are the security guys.

9              We have the people that are getting the

10   clothing, which is Rodriguez and Halprin.  We've got the

11   gatherers.  And who are the gatherers?  They are the ones

12   who are going to gather up the employees.  You look at

13   Newbury's statement and when he's talking, he says, look, I

14   loaded some stuff in a cart, I got the gun manager to go up

15   to the front.  Rivas had everybody else up there.  And when

16   he said it was a robbery, a couple of those guys started to

17   do something, I had my gun out poking them in the back and

18   keeping them from pushing a panic button.

19             ·I'm sorry, how many employees did we have in

20   Oshman's, 16, 16 employees?  And who did we hear from?  We

21   heard from Wes Ferris.  Who says what?  He says, well, you

22   know, we got up there, there was six to eight guys behind us

23   with guns, two guys here in front of us.  That's either ten

24   -- we know that number is not right, don't we?  We know that

25   the number is not right.  Or it was three to four guys with

1  guns.

2         And you know what, Mr. Ferris, he's -- people

3  don't carry watches and look at them and try to time an

4  event when it's going down.  They don't time it.  But what's

5  he tell you?  He says, you know what?  Rivas is standing in

6  front of me with a gun and I turned around and I looked

7  behind me for 20 seconds.  Go.  That's 20.  That's -- you

8  know, think about that.  Do you really think that's

9  reasonable?  Do you really think Mr. Ferris, being the

10  Marine that he is, took his eyes off the guy who has a gun

11  in his chest or in his face for that length of time?  No.

12  He did a quick look, saw people behind him with guns, turned

13  back around.  Keep his eye on the ball.  He's dealing with

14  the guy who is doing the talking.  He's trying to keep

15  everybody else safe.  That's what his objective is and

16  that's what he accomplished.

17         The guy would throw Randy in there with a gun

18  somewhere.  But, see, Randy has already done this.  In the

19  statement he said, look, I had a gun and it was loaded.  I

20  took a gun in there.  You know, he could have put in his

21  statement, no, I didn't take a gun in there.  But he tells

22  you.  I took a gun in there.

23         But what's he doing?  You read through the

24  statements and what you see is while the other guys are

25  herding everybody to the back, what's going on?  Well,

Rodriguez finds this other employee, because he's over there
with the shopping cart and the area where Randy is.   Randy
is in the ski coat area.   Rodriguez is in the other area.
And over by the fitting rooms he finds Laura Fernandez and
he gets her.   That's happening after they have got everybody
up at the front.

Because, you know, Rivas has already started
this robbery.   It's going down.   That's why they are
starting to look.   They have to wait for that to happen.
And then they go look.   So they are back off behind
everybody.   They are not part of the gatherers, pushing
everybody up.

What does Randy do?   He does what he's told to
do.   He's told to go over and do this.   They give him a
shirt.   Go stand at the front and look busy.   The phone
rings.   What do I do?   Answer it.   You know, he's not doing
nothing without somebody telling him the simplest thing.

What did Burgess tell you?   Well, he's dumb as
a bag of rocks.   You have to tell him to do everything
twice.   He's fine.   You tell him to do something and he does
that thing.   And then you have to tell him to do the next
thing.

They are leaving the store.   They are hearing
on the radio that Murphy is saying there's a police officer
there and Rivas is telling him to get out, get out.   Rivas

1    has already gone outside, gotten the Explorer, and swung it

2    around back.  He's trying to get everybody to the back.

3    They're not hiding out of sight.  They're -- looking at the

4    statements, they're all out there loading clothes.

5              You know what's interesting is, when you look

6    at the statements, Randy in his statement says, I got there

7    first.  I got to the back door first.  I was ready to get

8    out.  And then Harper tells me go back and get the sleeping

9    bag.

10             You look at the other statements of Newbury

11   and Newbury says Harper sent somebody back to get something.

12   And when he started to come back into view, we're out.

13   Rodriguez says, you know, Harper was the first one out.  I

14   was like second or third.  Harper fell on the stairs and I

15   bowled him over.

16             You get the picture of what's going on out

17   there?  Newbury says, I'm out there, other guys are out

18   there, and everybody is trying to pile stuff in.  The hatch

19   on the back they can't figure how to open it.  They are

20   having to load stuff through the back passenger seats over

21   the back into the cargo area.

22             And what are we talking about?  Eighteen

23   seconds, 30 seconds.  This is happening pretty dang quick.

24   You know, Harper is outside.  Harper is also trying to run

25   up and light the smoke grenade also.  And in Rivas'

1    statement, he says, I don't know when Harper -- all I know

2    is during the gunfight, Harper got in the car.  During the

3    gunfight.

4              These guys were all loading stuff and what

5    happens?  Officer Hawkins pulls up.  Rivas starts walking

6    forward.  And what is Rivas' gig?  Rivas is the con.  I'm

7    going to pull out my badge.  I'm going to get everybody

8    focused on that and convince them I'm security and then I

9    can diffuse whatever situation.

10             What does Randy say?  Well, that's what I

11   thought he was going to do.  And I'm standing there.  He

12   told me to stay where I was, so I stayed where I was.  He

13   walked over and he started to shoot.  He shot four times.

14   And you look at the description in the other statements, all

15   that is consistent.  Rivas is on the driver's side.  Rivas

16   says he walks up to the window and shoots Officer Hawkins.

17             You know, the ballistics, what they found in

18   the body of Officer Hawkins comes from two separate guns.

19   They say that there's five guns fired out there, but they

20   say there's two separate guns.  Everybody supposedly had two

21   guns.  And if you read through the statements, supposedly

22   everybody only took one gun.  Of course, Murphy says he's

23   got two guns in his statement.

24             The shooting starts.  Everybody panics.  He

25   runs.  And you see all these nice looking dowels here?  This

1   is a horrible event.  You take one of these dowels and you

2   line it up with Defense Exhibit 32 and Defense Exhibit 25.

3   Because, you see, nobody really wanted to know what kind of

4   injury Randy Halprin really had.  That's why they don't

5   really go and get any medical records and see what the

6   doctor's initial statement is and see whether or not there's

7   a hole on the side of the toe that leads over and goes

8   across.  Because, see, if you do that, then you didn't shoot

9   yourself.  Somebody else shot you, you know.  If you put

10   your foot up and you have a hole over here and it exits on

11   the other side and hits your other toe, then the bullet came

12   from over here, right?  That's what Brett Mills explained to

13   us about trajectory and straight line.  That's why Dr.

14   Barnard and go and say here's how we know you can put the

15   dowels through because it shows bullets travel and unless

16   they hit something and ricochet, a straight line.

17          But, see, this doesn't lend itself to the

18   State's theory, because the State's theory is what?  Randy

19   must have shot Rivas.  He shot himself.  He was discharging

20   a gun, you see.

21          They get back and they are loading people up.

22   Newbury and Murphy, Joseph Garcia, and Larry Harper have

23   eyesight problems.  Newbury says, you know, I'm sitting in

24   the front seat of the car.  Halprin comes running up.  He's

25   in the car.  He's screaming he's shot.  He's sitting on my

1    lap at this point and we're driving off.  Apparently we've

2    left a couple of people out there.  If you look at Rivas'

3    statement, it's Garcia and Rodriguez.  Newbury said, I was

4    shooting at somebody over in a car over there at this point

5    in time.  I thought it was a police officer.  I'm shooting

6    through the windows of the Explorer, mind you, with Halprin

7    sitting on my lap.  So you can picture this weapon being

8    fired inside the car busting out all the glass, shooting at

9    somebody they can't tell who it is.  That's Newbury.

10           And what does Newbury tell you?  They get back

11   to the drop-off spot and he and Rivas and Garcia all leave

12   in a car.  And Newbury is reloading.  That's what Newbury is

13   doing.  Newbury is reloading.  Harper and everybody else,

14   they go out in the Suburban.

15           Harper's blood is found on the rear passenger

16   door, placing him at least in that spot.  How he got cut,

17   flying glass, reaching in a police car, whatever.  Rodriguez

18   says he's the one who pulls the officer out of the car and

19   backs the car up 20 or 30 feet.  Did he get out and leave

20   the car in reverse and the car just rolled on back by

21   itself?  Newbury says, you know, Garcia was the one coming

22   from the car over there by the trailer.  That's how the

23   shots get in the trailer.

24           Murphy says he's crying so bad, I got to slap

25   him.  We thought he shot Rivas.  We get back -- and can't

1   you picture this?  They get back and the blame game starts.

2   You stupid so and so.  You shot him.  You shot yourself and

3   you shot him.  Rodriguez says Randy Halprin didn't shoot,

4   didn't fire his gun.  And Rodriguez in his statement says

5   his gun had fallen down his pants leg.  Randy Halprin gets

6   on the witness stand and says, you know, when we got dropped

7   off, I had to get my gun out of my pants leg and I stuck it

8   in a bag.  Who is with him?  Rodriguez is with him, because

9   they leave in the Suburban, him and Murphy and Harper.

10          They go back.  The blame game starts.  Who did

11  what?  Rodriguez, well, I dropped my gun.  Who did what?

12  Well, Rodriguez, I left the ammo.  I left an ammo bag.

13  Halprin, you must have shot everybody.  That's not it.

14  That's not it because you know what they do?  They check the

15  gun.

16          And what does Murphy say in his statement?

17  Murphy, you know, he's not there.  He doesn't see.  He's on

18  the other side.  But what's he say?  When I get back to the

19  place and we're talking about what happened, there's a

20  combined report.  It's either Rivas or Harper killed the

21  officer.  Rodriguez or Garcia, the one that pulled him out.

22  Kind of confused there, but you are grouping people up.

23  Because I checked the guns.  He didn't shoot.  Harper shot,

24  Garcia shot, and Rivas shot.  They know that.

25          Who else do we know shot?  We know Newbury

1   shot.  Who else do we know shot?  Rodriguez shot.  How do we

2   know that?  They find his gun, they find the bullet in the

3   dash of the squad car, and they match it up.

4           Folks, that's five.  They can't make a case on

5   Randy Halprin for being a shooter.  That's why you are to

6   infer.  That's why you are to infer that he is one.  You

7   see, the only way they can get there is conspiracy.  That's

8   the only way they can get there is say, you know what?  He

9   agreed to commit an aggravated robbery.  And you know what?

10  He dang sure did.  And he broke out of prison.  He sure did.

11  And he had a gun.  He sure did.  But he didn't shoot this

12  good man.  He didn't do that.

13          And they can call him a liar and they can say

14  he's a child beater and they can say all that kind of stuff,

15  but that don't make this true.  And your job here is not to

16  guess him into something.  It is to be convinced beyond a

17  reasonable doubt that he either shot this man or had the

18  same intent to shoot this man or if it was a conspiracy and

19  he agreed to commit an aggravated robbery, that he should

20  have anticipated this man would be shot.

21          That's their burden.  That's what they told

22  you they would do in this case.  And they haven't done that.

23  Thank you for your time.

24              MR. ASHFORD:  May it please the Court?

25              THE COURT:  You have 33 minutes.

1          MR. ASHFORD:  Counsel, ladies and

2    gentlemen of the jury.

3          If I overlap a little bit with Mr. King, I'm

4    going to apologize there, but we're both used to being lead

5    counsel and I didn't want to say, Mr. King, you just get up

6    and talk about this exclusively and leave everything else to

7    me.  Because I, of course, value his input.  So we may

8    overlap a little bit.

9          You know, when the State decides that they

10   want to try a case for death, capital murder, these types of

11   cases, they go all out.  They get their best lawyers.  They

12   bring everything.  They bring overhead.  They bring TV.  Not

13   only TV, but big screen TV.  All the people they bring you

14   are supervisors.  They bring you evidence and they bring you

15   pictures of the evidence.  They bring you FBI charts and all

16   kinds of things.  You know, they bring you diagrams of the

17   scene.  Then they bring you metallic diagrams with magnets.

18   They bring you charts, blown up.  They even bring you a

19   chart just for Officer Hawkins' gun and what model it was.

20          They bring you Dr. Barnard, not just anybody

21   from the Medical Examiner's Office, they bring you Dr.

22   Barnard himself.  Rather than just his report that shows the

23   injuries, you know, they bring you this.  They bring you the

24   dowels.  And, oh, yes, the guns.  They bring you the guns.

25   They bring you the pictures of the guns.  You know, you

45

1   think about it.  Nobody actually saw all of these guns, but

2   you.  Some of these we know were used in the robbery.  These

3   were stolen and were in the RV with Rivas and the others

4   when they got arrested.

5           That's all for effect.  It's all for effect.

6   You get up and you get a powerful argument and you hear the

7   word "evil," "liar," "pathological," "criminal."  How many

8   times did you hear that?  It's for effect.  It's for effect.

9           Keeping in mind we started out this case from

10  voir dire, as Mr. King told you, but certainly on opening

11  statement telling you that Randy Halprin participated in an

12  aggravated robbery, that Randy Halprin broke out of prison.

13  All of this is for effect and it's to keep you off of the

14  main issues.

15          No. 1, did Randy Halprin fire a shot at this

16  officer?  In fact, did he even take his gun out?  Did he

17  anticipate that something like this would happen?  Now,

18  those are the issues.  Now, on voir dire we talked about

19  mental discipline.  Were you going to have the type of

20  mental discipline to know everything that you know, but

21  still concentrate on the issues, not be overwhelmed by the

22  evidence, because you know he actually used the word "the

23  evidence is overwhelming".  Well, certainly the exhibits and

24  number of exhibits are overwhelming.  It's meant that way.

25  It's contrived to be that way.

1    But you have to exercise the type of mental

2    discipline that we've talked about in order for you to reach

3    these decisions.  And I will agree with Mr. King one hundred

4    percent.  It's whether or not they have proved to you beyond

5    a reasonable doubt those issues.

6        Let's talk about that, whether or not he fired

7    his gun or not.  Mr. King talked about all the people at the

8    Oshman's.  Here they are.  This is all of them.  Who told

9    you that Randy Halprin had a gun besides Randy Halprin?

10   One.  I don't want to go over it again, but you know, 20

11   seconds, you got a gun in your face, it's just been pulled,

12   you are going to turn around for 20 seconds?  Huh-huh.

13       They got to put him with that gun in his hand.

14   More importantly he gave a statement, folks.  He wrote out a

15   statement.  It's in evidence as a Defense Exhibit of

16   everything that he saw.  And then he did another one and he

17   pointed out on the big chart, another big exhibit we got,

18   who he could identify and he didn't identify Randy Halprin.

19   He did not identify him.

20       And then he comes in here two years later,

21   more than two years later, and says, well, I identified him,

22   but I just didn't write it down.  With all the mounds of the

23   evidence that we've had, with all the reports that we've

24   had, you know, don't you find it unusual that didn't one

25   officer come in maybe to back him up and say, I have here in

1   my notes where, you know, being the standup guy that he was,

2   he didn't want to put his initials by anybody that he wasn't

3   sure about, but he at least said, well, yeah, this guy looks

4   familiar.

5           Every one of these people, you know, did the

6   same thing.  Every one of these people gave a sworn

7   statement and looked at that lineup to see if there was

8   anybody that they could identify.  Not anybody that they

9   could see with a gun in their hand, but that they could

10  identify as even being there.  And common sense tells you,

11  folks, that if any credible individual could come in here

12  and say on this night, that identify Randy Halprin as being

13  there, they would have testified.

14          Why am I saying that?  He admitted he was

15  there.  He wrote it in his statement he was there.  Folks,

16  it goes to the fact of whether he pulled out his gun.  It

17  goes to the fact whether he carried a weapon, because I told

18  you consistent with his character and with the role that he

19  played, he was staying out of all that controversy and all

20  the confrontation.

21          You know, it's kind of like, you know, when

22  your kids, you tell them not to get the cookies out of the

23  cookie jar and you put it up high.  One of them goes up

24  there and climbs up there and gets it out.  He may be

25  handing it down to the others, but you know the person at

1    the bottom of the line in that naive mentality is thinking,

2    well, as long as I'm not the one up there getting them, I'm

3    not in it.  And that's naive, okay?  But that's just the

4    mentality of who you are dealing with.  Okay?

5             Somebody ties you up, treats you roughly,

6    turns you around, ties your thumbs together, you are going

7    to get a good look at them and you are going to remember.

8    If somebody pulls out a gun and puts it in your face or

9    holds it in the air, you are going to remember.  If somebody

10   pushes you, shoves you, cusses you, does something

11   confrontational like that, you are going to remember it.

12             Now, Wes said at one point Rivas was walking

13   him around and there was somebody up in the front of the

14   store and the guy kind of hurried up and walked off the

15   other way.  And Randy Halprin told you that when Rivas

16   walked up there with Wes, he turned his head.  That's

17   consistent.  That's consistent with the guy who is not doing

18   anything confrontational.  That's why nobody can identify

19   him as even being there.

20             Now, consistent with that is going to be not

21   pulling your weapon.  May sound stupid.  He had it.  He

22   never pulled it out.  He never confronted anybody.  What did

23   he do?  He put on a shirt, went up to the front with the

24   broom, acting like he was doing something.  Everybody can't

25   may be the shooter on the basketball team.  Everybody can't

1  be the pitcher on the baseball team.  Everybody can't be the

2  lead attorney in a big case.  Everybody has a role.  You

3  kind of wonder, why do they have this guy?  Because they

4  need this kind of guy.  They need a gofer guy.  They need a

5  guy just to do the dumb stuff.  And it's consistent with

6  everything that you have heard.

7           Mr. King says, you know, the State hasn't

8  proved to you beyond a reasonable doubt Randy Halprin fired

9  a shot and I agree with him one hundred percent.  You know,

10  what's the evidence that they have?  Well, you have got

11  Detective Spivey saying, well, I think he did.  Why do you

12  think he did?  Because they said so in the statement.

13           You don't realize until you really listen and

14  absorb all this evidence and think about this evidence, why

15  they're saying that.  They are not saying that because

16  anybody is saying, I saw him pull it out.  They're not

17  saying that because they say, I saw his arm raised.  They

18  are saying that because they think he's the kind of buffoon

19  that's going to get all nervous and pull out his gun and

20  shoot hisself in the foot and shoot one of them.  That's why

21  they are saying that and that's the only reason they're

22  saying that.  And that's consistent with everything that you

23  heard.

24           I told you in opening statement he's kind of

25  like Rivas' little brother.  He told you that.  You know,

1  you may wonder why they have him along.  But that's

2  consistent.  In their statements they called him Junior.

3  Mr. King said that Murphy said they thought he shot Rivas.

4  If you read it, what Murphy said was, we thought he shot one

5  of our buddies.  That's making Murphy and whoever he's

6  including as we, thinking that Halprin has shot one of their

7  buddies, which is everybody else.  That's excluding Halprin

8  from the equation.  The only reason they think he shot

9  somebody is because that's what they think about him.

10         And with that exhibit Mr. King just showed

11 you, you see how that's inconsistent?  If he had one of

12 those big ole revolvers, .357s out there at the scene, he

13 shot hisself in the foot, he wouldn't have a toe now.  The

14 entry wound is from the side, consistent with somebody else

15 shooting.  It's consistent, folks.  It's consistent with who

16 he is.

17         Do you think he's smart enough, you know, they

18 want him to be smart and manipulative on one hand, but then

19 Mr. Wirskye tells you he admits that he's a dumb criminal on

20 the other hand.  Do you think he's smart enough to

21 manipulate Detective Spivey?  Do you think he's going to sit

22 there and, you know, decide what to put in his statement and

23 whatnot?

24         As I recall, the first day Detective Spivey

25 testified, Mr. King got him up there and they went through

1   that statement line by line.  And everything in that

2   statement was consistent.  There was nothing in there that

3   was self-serving.  Do you think he's that smart?

4          What do they tell you when he came out?  He

5   came out of the RV, he came out without incident, he came

6   out unarmed, and he came out afraid.  That's consistent with

7   everything that you have heard.  He's not a part of the red

8   team.  He's not a part of the blue team.  He's not

9   ex-military, he doesn't know anything about military

10  operations.  He told you he's not a gun person.  They've

11  never had guns in their family.

12         It's all consistent, folks.  They have not

13  proved the main thing that they want to prove to you beyond

14  a reasonable doubt.  They want you to look at dowel rods,

15  they want you to look at guns, they want you to look at

16  exhibit, upon exhibit, upon exhibit, they want you to feast

17  on words like "evil" and "pathological" and not look at the

18  facts.

19         Sixteen, sixteen people taken down in that

20  escape.  We're not saying it didn't happen.  We never did.

21  We're not saying people weren't roughed up.  We never did.

22  Okay.  But once again, sixteen people had an opportunity to

23  give statements.

24         Marroquin tells you at worst Randy Halprin

25  roughed up Mr. Camber.  Then you know at Garcia's trial he

1   said that was Garcia, so I don't know how much weight you

2   can give that.  So where does that leave you?  At worst he

3   cussed and threatened somebody.  At worst.  I'm not excusing

4   that, not minimizing that.  Okay?

5           But for comparison purposes, is he different

6   than the rest of those guys?  Sure.  Sixteen people.  Now,

7   you know if anybody else heard him make a threat, if he beat

8   up anybody else, if he had been one of the ones with the

9   shank, threatening people, you know, you would have heard

10  from him.  So that's consistent, folks, that he is different

11  from them.

12          I agree if you had seven rattle snakes down

13  there, you couldn't pick which one was not dangerous.  But

14  if you had six rattle snakes and a garden snake, then you

15  could.  Everything that you heard in this case is consistent

16  with the fact that he's not like them.  He is on a different

17  level than these ex-military men, this trained Navy seal,

18  who repeatedly confronts people and handles the situation.

19          What evidence does he have that something like

20  this won't happen?  Because he's got evidence, folks.

21  First, he's got this breakout.  Now, this was amazing.  It

22  was planned.  Wasn't planned by him.  You know that.  You

23  know he's not capable of that from what Moczygemba and the

24  other people have told you about his leadership, about his

25  mental ability.  But, yeah, it was planned.  It probably

1    impressed him a whole lot.  And because of the planning, it

2    was effectuated very well.  It was done without anyone

3    getting killed, without anybody getting lifethreatening

4    injuries.

5          Not only did they have to get the people in

6    that particular area, but Rivas and whoever else had to go

7    to the tower, you know, where guys have got guns, where

8    their soul purpose is to shoot people who are trying to

9    escape, you know.  They took those guys down, so they took

10   their guns and they could have shot them right there, I

11   assume.  They didn't do that.  They got out.  You know,

12   that's evidence to him.  That's something he can look at

13   directly and say, well, this didn't work -- I mean, this

14   worked.  Nobody got hurt.

15         One of the witnesses told you, I believe it

16   was Mr. Burgess, somebody came up on them that they didn't

17   expect, one of these people they didn't expect to be there.

18   They were taken down and they weren't hurt.

19         They do the Auto Zone robbery to get cash.

20   They do the Radio Shack robbery to get the radios, the

21   scanners.  Nobody is hurt.  Nobody is killed.  He knows

22   Rivas has done 17 aggravated robberies.

23         Now, aggravated, folks, means a weapon was

24   used.  It's an aggravated robbery.  That's evidence to him.

25   He's heard Rivas talk about how he planned them and what

1   happened with them.  But they're not attempted murders.

2   They are not murders.  They are not capital murders.  That's

3   evidence to him that, although he might get caught, he's

4   really successful in doing these without somebody getting

5   hurt.

6          And the planning that went into this one was

7   planned the same way.  The only intent to confront the

8   police are you have scanners to hear where they are.  You

9   don't intend anybody in the store to get hurt, if part of

10  the planning is waiting until the traffic has died down,

11  until everybody is out of there.  You don't plan for anybody

12  to get hurt if you can get everybody rounded up together and

13  so there's no loose ends and everybody is within a small

14  area that can be controlled.  That's part of the plan to

15  keep everybody from getting hurt.

16         And that's why you have a security guard

17  uniform and the fake photo IDs and all that.  The planning.

18  The car, you have got an escape route.  Everything is

19  planned.  And that's evidence to him that this could work,

20  because it's worked so many times before.

21         I'm not excusing all of that.  I'm not saying

22  this is a good thing.  Everybody should go out and do this,

23  you know?  I'm just saying what's in his mind that you have

24  to look at when you consider whether or not he anticipated

25  something like this would happen.

1    I told you on opening statement and I think

2    it's been shown that what happened outside, the shooting of

3    Officer Hawkins, was probably the only thing that wasn't

4    planned for.  I mean, you can see just what a big mess that

5    was out there.  The officer getting shot, them shooting

6    Randy, shooting Rivas, Harper shooting up into the trailer,

7    shooting through a window, that was all just a big frenzy.

8         But when you look at what he had to, what

9    evidence he had in making his decision as to whether

10   something like this would happen, he had a lot to look at.

11   George Rivas, a master plan.

12        There's a lot of stuff.  There's a lot of

13   exhibits.  There's pictures of the exhibits.  There's

14   charts.  There's diagrams.  Most of that goes to what we've

15   already admitted in this case.  Most of that goes to what

16   you already said you knew about this case before you even

17   walked in here.

18        The main issues, the issues that the State

19   needs to prove this case beyond a reasonable doubt, they

20   just haven't done it, folks.  As Mr. King says, they want

21   you to look at all of this and all the rest of it that's

22   back there.  They want you to hear inflammatory terms like

23   "evil" and "diabolical" and "pathological" and then they

24   want you to just ride that into a capital murder conviction.

25        And that's what you said that you had the

1  mental discipline not to do.  I'm going to remind you of

2  that and I'm going to ask you to exercise that mental

3  discipline.  It may not be fun.  It may not be popular.  It

4  may not be what they want.  But in a court of law, it is the

5  right thing to do.  Thank you.

6                    THE COURT:  Members of the jury,

7  Mr. Shook has 30 more minutes on his argument.  Can you hold

8  out 30 more minutes?  Mr. Shook.

9                    MR. SHOOK:  May it please the Court?

10 Members of the jury, I want to answer a few things that the

11 defense counsel has brought up and leave you with a few

12 thoughts of my own and then let you make your decision.

13                    I want to talk a little bit about the law.

14 The Judge read very carefully the Court's charge to you.

15 You will never, ever get to the lesser included offense of

16 aggravated robbery.  He's guilty of it, yes.  He's guilty of

17 a lot of things.

18                    But the Court's instructions are quite clear.

19 You must first consider the charges of capital murder.  If

20 you do not believe the State of Texas has proven this case

21 beyond a reasonable doubt under all three theories, then you

22 would acquit him and move on.  You will never get that far,

23 folks.

24                    We went over the different theories.  We can

25 prove him as a principle, a party, or as a co-conspirator.

1    And, in fact, under the law you don't have to agree, the

2    twelve of you, on which theory to convict him of.  Four of

3    you might think we have proven him as a principle; four

4    might think we may have proven it as party; and four of you

5    might think, well, they have proven him as a co-conspirator,

6    and you can all find him guilty, a unanimous verdict.

7              Or you might all think, you know what?

8    They've proven him all three ways, because that's how strong

9    the evidence is in this case.  So you will never get to the

10   lesser included, because this is an overwhelming case.

11             And we didn't present all this evidence for

12   effect.  I would hope as twelve citizens of this county, you

13   would require and want the prosecutors to give you the full

14   picture and talk about that.  This isn't for effect.  This

15   is the evidence in this case.

16             And let me talk about one thing Mr. Ashford

17   brought up.  You heard a lot of evidence.  George Rivas,

18   there is not one witness, not one piece of evidence that

19   said he was a Navy Seal.  He was never a Navy Seal.  I don't

20   know where he got that from.  There's absolutely no evidence

21   of that.

22             The only evidence was that Mr. Harper had some

23   interest in the military, National Guard.  Mr. Murphy may

24   have done some military time.  But there's no evidence that

25   George Rivas was any Navy Seal or in the military in any way

whatsoever.

Now, the State of Texas with this evidence, I submit to you, has proven this case all three ways. You can believe from the evidence and reasonable deduction from the evidence, that he is a principle. You see, we don't have an eyewitness. We have to use circumstantial evidence. Circumstantial evidence is any evidence other than an eyewitness that can connect the defendant to a crime. The law does not reward the criminal when they murder the eyewitness. He can still be held accountable.

What you do is you bring in every other piece of evidence that connects him to the crime and you as jurors can make what is called reasonable deductions from the evidence. And all that is, is common sense, your most valuable tool, your most valuable weapon as a juror, your common sense.

And using your common sense in all this evidence, yes, the State has proven this case in all three ways.

We know that Randy Halprin was along in this gang. That by his own admission, he had a loaded gun and that tells you all you need to know about his intent. You know that he was in that store. And we've talked about Wes Ferris. Wes Ferris with very clear in his statement that night when this robbery happened. He didn't know the exact

1   amount.  He said in his written statement six to eight men,

2   but basically what he told you is everyone he saw had a gun

3   out.  That makes perfect sense.

4            He was in that store and was actively

5   participating in that robbery and he was out back when

6   Officer Hawkins was coming and he knew Officer Hawkins was

7   coming around.  He had been informed of that by the lookout,

8   Patrick Murphy.  And he was back there close enough, just

9   like George Rivas was close enough, to get hit in the cross

10  fire.

11           And you also know that from what Mr.

12  Halprin has told us, even on his own, because I had him draw

13  this diagram out.  By his own testimony he puts himself,

14  Joseph Garcia, Michael Rodriguez, and Larry Harper out here,

15  puts George Rivas at this front.  But he puts everyone on

16  this side of the car.

17           In his confession it was a little different.

18  In his confession he put George Rivas out front with himself

19  and Michael Rodriguez and Larry Harper.  He put Donald

20  Newbury and Joseph Garcia inside.  And he said when the

21  shooting began, he thinks Larry Harper did some shooting and

22  he ran in to get Donald Newbury and Joseph Garcia.  And they

23  came out and then there was more shooting.  But, again, he

24  puts everyone on this side of the car.

25           And then he told us, I ran this way when the

1 shooting started.  This way.  And I didn't lead him in that.

2 I wanted him to tell us where he went.  I asked him, did you

3 go this way?  No.  I didn't go this way.  He went this way

4 or down this way.  Went out to that embankment as he called

5 it.

6          So he is the only one, by his own admission,

7 that puts himself on the passenger side of that car.  And we

8 know from looking at the photos, that there are four bullets

9 going in on that side of the car, coming from that side of

10 the vehicle.  You can look at these diagrams and you can see

11 the angles.  All going in this way.  One makes it all the

12 way through.  One hits the police scanner.  They are coming

13 in from this side of the vehicle.  And by his own testimony,

14 he is the only person that puts himself on that side of the

15 car.

16          Now, we know it's not Michael Rodriguez,

17 because everyone seems to agree that Michael Rodriguez

18 dropped this gun and it was only fired once, and that bullet

19 went right in behind the speedometer.  He obviously wanted

20 to kill Officer Hawkins.  And he dropped the gun.

21          Donald Newbury by Mr. Halprin's statement and

22 his own, he's the one that apparently fired, fired in that

23 trailer.  That's three shots.  So he couldn't have fired

24 those four shots originating from that side.  These guns

25 only hold six bullets.

1    George Rivas apparently fired from the side at

2  some point in time.  By his own admissions he's over there.

3  Now, did one of those shots hit Officer Hawkins?  I don't

4  know, because the medical examiner told you he just takes

5  out the bullet fragments.  The firearms examiner said these

6  ones that don't have the bullet cores, are

7  through-and-through shots, he can't match them to anything.

8    Mr. King said, well, the medical examiner said

9  only two weapons were used in shooting Officer Hawkins.  No,

10  he could only identify two.  There are a lot of bullets,

11  such as the one that goes to his heart, that's a lead core.

12  They don't know which gun that went to.  This one is a

13  through-and-through shot.  They don't know which gun that

14  went to.  This is a through-and-through shot here.  They

15  don't know which gun that went to.  A few they could.  That

16  doesn't mean that only two guns were used to hit Officer

17  Hawkins.  We know a minimum of five and it could have been

18  more.

19    But Randy Halprin by his own admission puts

20  himself on the side of that car where four shots come.  So

21  his intent is clear.  Maybe it was one of these shots.  I

22  don't know, because Officer Hawkins can't come in and tell

23  us.

24    The evidence back there puts you, using your

25  common sense that he can be one of the principles.  But that

1    doesn't matter, because, you remember, they spent most of

2    their time, most of the their argument that the State of

3    Texas didn't proof he's the actual gunman.  But you will

4    remember the majority of our voir dire time we talked about

5    the law of parties with each and every one of you, because

6    we knew the state of the evidence.  And that a person could

7    be held just as accountable for capital murder as a party as

8    he would be a principle.

9              And we gave examples of that and each and

10   every one of you agreed with it.  From people actively

11   participating in these offenses where groups of individuals

12   commit crimes.  And they all must be held responsible.

13             We can prove him a party.  He's there.  From

14   the escape he knows there's going to be robberies when they

15   get out.  He gets and makes himself a part of this group, an

16   outlaw gang.  He actively participates in that breakout.  He

17   commits two -- he's with them -- he admits to at least maybe

18   one robbery with them and he knows they're committing

19   another.

20             These are murderers, rapists, and robbers he's

21   with.  He knows their disposition.  They're violent men.

22   And he goes to the Oshman's.  He's a big part of that plan

23   because we know by his own admission he's the one that goes

24   in to get the layout of the store.  And he's just as

25   actively involved as the others.

1    And he's back there in the back and they are

2  ready.  They have -- they have planned for every possible

3  alternative that could come up.  That's why they had the

4  scanner out there, because they know the police may come.

5  That's why they're in constant radio communication.  That's

6  why they have the escape car, because they planned every

7  possible alternative that could come up.

8    And what do we know?  We know that they all

9  know Officer Hawkins has arrived and he's coming around to

10  the back and they are waiting.  And it's like precision.

11  It's not a panic out there.  I didn't say they are accurate

12  shooters, but they all began shooting Officer Hawkins,

13  because he's caught in an ambush.

14    And they get out of there within 47 seconds,

15  because they know exactly what they are doing.  They load up

16  their loot, they get Officer Hawkins out of the way, they

17  run over him, and they are gone.

18    And you remember how Mr. Washington told you

19  how they drove off in a slow steady manner?  That shows it

20  was no panic.  They didn't just fly out of there.  They

21  didn't want to attract attention.  This was after the

22  shootout.

23    And what else let's you know they weren't in a

24  panic out there?  They murder Officer Hawkins, they drive

25  over him, but they take his gun.  Why do you think they took

1  this?  The 44 weapons they stole, was that not enough?  No,

2  they wanted a trophy.  They wanted a trophy.  They liked

3  doing this sort of thing, makes them proud.  That's why they

4  write -- Randy Halprin writes letters like this, this

5  taunting letter he left behind in his cell, "Believe me.

6  You haven't heard the last of us."

7          He was so right.  This is the man they say was

8  so naive, he didn't know what was going to happen.  He's

9  predicting something bad is going to happen with this note.

10          And then, of course, you have the law with the

11  co-conspirators.  If people agree to commit a robbery, do

12  the facts show that they should have anticipated someone

13  might die.  It can't be clearer than this.

14          You can go all the way back to his

15  disposition.  First of all, we know he's a very violent

16  disposition and these are the people he chooses to work with

17  now.

18          Now, no, he didn't have a violent record in

19  the pen.  That's how he manipulated his way into a position

20  that he can get in a car and escape, just like the rest of

21  these men did.  They can't work in that maintenance

22  department if they have been spitting on guards and

23  assaulting guards.

24          See, they watch and they bided their time for

25  their opportunity.  Now, they are all violent men,

1    obviously, but they positioned themselves in the pen.  And

2    they get together and they plan this thing for several

3    months.  And Randy Halprin would have you believe by the way

4    he testifies that he didn't think anyone was going to get

5    hurt and this was kind of they just kind of got out.

6              Common sense will tell you this, folks, they

7    are only going to take people they can depend on.  They are

8    only going to take people they could trust.  He wasn't

9    brought along as a mascot.  He was brought along because he

10   was their friend and they knew they could depend on him.

11             And they act as a team.  That's what this

12   whole thing is, is a team.  They are very efficient when

13   they break out of that prison.  They are taking people down

14   one by one.  And Mr. Burgess gets on the stand and he tells

15   you Randy Halprin is the one that lured him in the back,

16   look at this motor, look at this motor, and then he gets

17   hit.  And it's Randy Halprin that's making the death threat

18   back there to him and he means it, when he's tied up,

19   trussed up.  Tells him what he thinks of him.

20             And it's Randy Halprin that is actively

21   participating in this with violent men and he can see by his

22   own eyes that people are being threatened.  And don't you

23   think for a minute if someone was going to prevent them, if

24   they would have thought one of those craftsmen was about to

25   actually stop them, they wouldn't hesitate to murder them?

1    What do you think Donald Newbury was trying to

2 do when he saw that everyone was getting loose and they had

3 that big battle with the door and he had the shank out

4 swinging it around?  Do you think that he was going in there

5 just to settle everyone down or do you think he was going

6 back there to try to kill somebody?  But, thank goodness, he

7 didn't get back there and they fought him off.

8    But he knew very well the type of people he

9 was dealing with.  And they knew from the beginning, back

10 when they were in prison, that they were going to break out

11 and go on this string of robberies.

12    Now, how can you sit there with a straight

13 face and say, I didn't know violence would happen when you

14 are going to commit those types of crimes?  When you get

15 with violent men, you form a gang, and you know they are

16 going to take loaded weapons and put them in the faces of

17 honest, hardworking citizens, and you don't anticipate some

18 violence may not happen?  That doesn't make sense, folks,

19 just because no one got murdered in George Rivas' other

20 robbery.

21    You talk about him being the big planner, I

22 submit to you, folks, he's no criminal genius.  If he was,

23 he wouldn't be in the penitentiary.  There's a reason he's

24 serving 17 life sentences.  This plan, Oshman's plan, was

25 destined to fail.  They can plan all they want.

1    But when you are going to take down 17 people

2  on Christmas Eve, one night you know the families are

3  expecting them to be home, they may have plans going to pick

4  them up.  I mean, it was ludicrous to think they were going

5  to get away with something for half an hour and someone

6  wasn't going to take notice that something bad was going to

7  happen.

8    And he knows the plan.  He knows that they are

9  all going to go in with loaded weapons.  Why are you going

10  in with loaded guns?  It's a common sense thing.  Most of

11  you brought it up on your own when you talk about what would

12  be important to you under the law of parties and

13  co-conspirators.  Because you are anticipating using them.

14  He even admits in his statement that some of them brought

15  extra ammunition.  Why would you want extra ammunition?

16  Because it's obvious.  It was your plan you were going to

17  use it and you would need more.

18    Now, his explanation on the stand was, well,

19  maybe they wanted it for target practice or something like

20  that.  You can't get away from that, folks.  It's common

21  sense stuff.

22    And then you go in and you are planning and

23  you know the police patrol that area.  They made note of

24  that.  And they have a guy with a scanner out there and he's

25  got an AR-15, which I think he characterizes as a sniper.

1   And even Patrick Murphy said in this statement, once I

2   rendezvoused, I got in the back to initiate a fire fight

3   with pursuing police.

4             Randy Halprin, he didn't remember that.  He

5   must have missed that meeting when they talked about that,

6   although he admits being in on the plan.

7             And then Randy Halprin in the way that he's

8   described by defense counsel, he's just this reluctive

9   buffoon that's there.  Don't believe that for a second.

10  He's just as valuable a member of his team as anyone else.

11            You know, the way Randy Halprin described his

12  behavior is, I didn't want to do these robberies.  I just

13  wanted to get out.  I was always objecting to it.  They had

14  to keep someone to watch him.  He wouldn't come out and say

15  he was a hostage, but they always had to keep Rodriguez,

16  they were always afraid I would drive off, that sort of

17  thing.  Don't believe that, folks.  That doesn't make any

18  sense.

19            Why would they bring someone along that they

20  had to keep watch on?  Why would you bring him -- if you

21  didn't trust him, why would you even bring him to this

22  Oshman's robbery?  They could trust him as much as anyone

23  else.  He was as big a member of the team as anyone else out

24  there.

25            Let's talk a minute about Randy Halprin.  You

1  did get a unique glimpse in the mind of a criminal.  You

2  will never understand him.  You folks have a conscience.

3  You obey the law.  You go about and work, raise your

4  families.  Randy Halprin doesn't think like you.  You will

5  never understand the way he thinks, the way his mind

6  operates.

7          I don't think he even realized some of the

8  things he said, because he thinks so alien, you know.

9  Remorse, being held responsible for things, those don't

10  enter his mind.

11          When you ask him about have you stopped lying,

12  that's not a law school trick, folks.  But his response is

13  amazing.  Well, you are just going to have to give me an

14  example.  You know, everyone lies.  He thinks everyone lies.

15  He thinks everyone thinks like him.  You are just going to

16  have to give me an example.

17          Or another example of that would be when he

18  said, you know, I usually got in trouble in my past because

19  I'm impulsive, but George Rivas told me about his escape

20  plans, I thought about it for a few days.  Then I decided to

21  join.  He wanted some credit for that, I think, that he

22  thought about it before he committed a first-degree felony.

23          And you know he has no remorse.  And he agreed

24  in a plea bargain to 30 years and he wanted out.  And in

25  that twisted logic of, well, 15 years from now I don't think

1   they would parole me, so I had to get out.   I needed a

2   little bit of punishment for what I did, but, you know.

3                They want to portray him as this bumbling

4   buffoon, but parts of his letters were read.   I think that

5   you can realize from that, that he's no idiot.   He's no

6   bumbling buffoon.   He's a manipulative, pathological liar.

7                Mr. King characterized his adoptive parents

8   as, well, you were a few problems.   We will ship you off and

9   we won't want to hear about you anymore.   That's why I read

10  that one letter, almost all of it that he had written to his

11  parents, where he gave you the story of what happened to

12  that family.   "You gave me chance, after chance, after

13  chance.   You dug me out of hole, after hole.   But I have

14  constantly lied and manipulated.   I left home because you

15  would never let me get away from anything.   I have been a

16  pathological liar."

17               And you can understand why they finally cut

18  him off.   There obviously had been a very long history of

19  lying and manipulation on his part.   Of course, that's why

20  he fits in so well with these guys.   And finally they had to

21  cut him off.   They didn't just abandon him.   They didn't

22  shove him off.   He had a long history of chances.   But he

23  always stole from people he knew, he lied to them, he conned

24  them, he manipulated them.   He told you, he admitted himself

25  that he's been successful at manipulating people.

1    And this whole act he had on the stand was a
2    further attempt of his manipulation.  I'm meek.  I'm mild.
3    I'm Randy.  I didn't want anything bad to happen.  I just
4    wanted to go away to Seattle.  Of course, it contradicts the
5    bold faced evidence of, you haven't heard the last of us.

6    Anytime you confront him with a lie he can't
7    get out of, it's just you took that out of context, that's
8    all.  You know, he went to great lengths with reporters.
9    You know, he interviewed with reporters.  "I want TDC to
10   produce that letter because I never said that."

11   Remember the other letter that he wrote to the
12   friend?  "I like George Rivas and I like Larry Harper and
13   Garcia.  I didn't like the other guys.  They were trash.
14   One of those idiots wrote a letter that said, 'You haven't
15   heard the last of us,' like we are looking for revenge.  Can
16   you imagine that?"

17   When you catch him in that lie and say, you
18   know, I just forgot about that part of the letter.  That's
19   what that was.  He's one of these people that you can tell
20   he's lying.  It's an old joke.  You can tell he's lying
21   because when he speaks, if his lips are moving, you know
22   Randy Halprin is lying.  You can't trust a thing he says.

23   And this -- Mr. King talked about this was
24   just a one-time episode when he's 18.  Well, he's almost 19.
25   You can ask him, one week later after he's arrested, he

1    turns 19.  This episode with the child.

2              His confession, he doesn't have he's on acid.

3    A very detailed confession.  But now, it's, well, that was

4    my drug years.  I was on acid at the time.  That was his

5    excuse for it.

6              And then you heard from Dr. Megehee who said,

7    no, in his opinion those are burns to the mouth.  Of course,

8    Mr. Halprin doesn't want to admit to that because he can't

9    blame that on an episode.  That's very calculating to take a

10   match or cigarette and burn a child's tongue inside of his

11   mouth.

12             The doctor didn't say, oh, well, maybe it was

13   ulcers.  Mr. King asked him could that be an explanation,

14   are ulcers also caused by malnutrition?  And he said, yes.

15   But he seemed quite clear in his opinion those were burns,

16   cigarette burns.  And he has seen this type of thing a lot.

17   It's very a calculating, cruel, evil mind on the part of

18   Randy Halprin.

19             And then there's explanation that, well, the

20   gun fell down.  The gun fell down his pants.  He said he was

21   just wearing regular bluejeans.  This is a pretty big gun.

22   I don't know how that's going to slip down your pants legs,

23   folks.  He wasn't wearing trousers or slacks.  He was

24   wearing bluejeans.

25             Now, we heard all these confessions read.  Not

1   a one of them really admits to shooting Officer Hawkins,

2   except George Rivas.  And his explanation was a complete lie

3   that he was aiming at his bulletproof vest, shot him twice,

4   and then pulled the trigger three more times, but didn't

5   know whether he hit him or not.  None of these guys wants to

6   take responsibility.  They all lie through their statements.

7   They all shift blame, just like Randy Halprin.  They all

8   want too minimize their roles.

9         And if you take the defense arguments about

10   why Randy Halprin shouldn't be found guilty of capital

11   murder, they apply to each and every one of those

12   individuals.  And under their theory, how they view the

13   evidence, not a one of them, including George Rivas, would

14   be guilty of capital murder.

15         Now, Randy Halprin made some choices.  He's

16   made choices his whole life.  They are usually bad choices,

17   usually go down a wicked path.  He made a choice to lie and

18   manipulate his parents his entire life.  He's made choices

19   to steal by his own admissions from his closest friends and

20   to play on people as he said.

21         He made choices back in 1996 to assault this

22   child, to hurt him, to break his arms and his legs, fracture

23   his skull.  The assault that didn't stop in just one moment,

24   one slap.  The child tried to get away from him, called for

25   his mother.

1    He made a choice to plead guilty, take 30

2  years.  And then he didn't like it down there in prison.

3  You notice the letter didn't say he had been abused or

4  anything.  In fact, it says, you know, his prison sentence

5  had been somewhat comfortable, had a comfortable prison

6  life.  "Content?  Yes.  Happy, no."  He just didn't want to

7  be in there any more, folks, because he doesn't take

8  responsibility for his crimes.

9    So he made a choice to join this band of

10  criminals, these outlaws.  And he participated with them as

11  much as anyone else.  And he threatened and they beat

12  people.  He threatened craftsmen in that prison.  And they

13  were going to do anything, including murder people, if they

14  had to, to get out of there.

15    And they got out and he knew what the plan was

16  all along.  And he had choices and he went along with them

17  on these robberies, knowing what they were going to do,

18  knowing what they were going after with these guns.  And he

19  told us all about his intent.  Even when he's captured, in

20  the pack where his five grand is located and his, "sick to

21  the end", it's very clear, folks.  You can read it.  "Sick

22  to the end," not "stick to the Lord".  Is a gun, a loaded

23  gun.  And that tells y'all about his intent.

24    Maybe that's the one time he was telling the

25  truth.  He's sick to the end.  But he's made choices out

1  there and during that Oshman's robbery he knew and his own

2  confession says it, a police officer was out front.  And he

3  could have run out that back door.  He could have just given

4  up, I guess, and stayed inside.  He could have run out the

5  front door.  He could have run across that field.

6         But he didn't.  He stayed out in that back

7  loading dock area.  And when Officer Hawkins drove up to the

8  back, he could have left then.  He didn't have to stand

9  there.  He could have run as fast as he could to get away,

10  because you know anyone out there knew something real bad

11  was about to happen.

12         You have got seven ex-convicts on the run with

13  weapons, all convicted of violent crimes, you know something

14  bad is about to happen.  They are not going to trick Officer

15  Hawkins.  He's the one man standing between them and

16  freedom.  He's the one man standing between them and their

17  money and their guns.  And they weren't about to let him get

18  in the way.

19         And he made a choice to stay there.  Officer

20  Hawkins didn't have a chance, because he didn't know he was

21  coming in an ambush.  He drove up there and they all acted

22  as a team, just like they had been for the last month.

23  Acted as a team and they swarmed all over him.

24         And we know that Aubrey Hawkins knew what was

25  about to happen to him, because this arm was up.  Common

1    sense will tell you that, in a defense posture.  He was

2    trying to block some shots coming in at him.  So he was

3    conscious.  And his last thought, his last vision, was of

4    this man and his friends swarming on him in a murderous

5    fury.  And he was outnumbered and they had the jump on him

6    and he died.  He died alone in that cold pavement.  Maybe he

7    had some final thoughts.  Maybe he thought of his family

8    that he had just left.  I hope he did.

9            Randy Halprin must be held accountable for his

10   crime, which is capital murder.  On Christmas Eve most men,

11   most fathers are home.  They have dinner with their family.

12   Maybe after dinner they sit down and they read a traditional

13   Christmas story to their children.  After their children are

14   put to bed, perhaps they build their little boy's bicycle or

15   other toys.

16           But Aubrey Hawkins couldn't do that because he

17   was on duty.  He was out there guarding me.  He was out

18   there guarding you.  And he answered his call.  And they had

19   the drop on him that day.

20           But they have been captured and they have been

21   brought back.  And he's going to be held accountable.

22   There's only one crime he is guilty of and there's

23   overwhelming evidence and that's guilty of capital murder.

24   We'll ask you for that verdict.  Thank you.

25                   THE COURT:  Members of the jury, if you

1    will retire and consider your verdict.

2                         [At this time the jury retired to

3                         deliberate their verdict.]

4                 MR. KING:  May we approach the bench?

5                 THE COURT:  Uh-huh.

6                         (Bench conference)

7                 THE COURT:  Let the record reflect the

8    jury has been retired at 10:48.  Thank you.  You may be

9    seated.

10                Do I have a motion to discharge the alternate

11   jurors?

12                MR. KING:  So move, Your Honor.

13                MR. SHOOK:  No objections.

14                THE COURT:  Sheriff, discharge those

15   jurors.  And we shall wait.

16                         [Recess]

17                         [Jury in]

18                THE COURT:  Thank you.  You may be

19   seated.  Mr. Halprin, if you will remain standing.  Let the

20   record reflect the jury indicated they reached a verdict at

21   approximately 12:50.

22                Mr. French, are you the foreman?

23                THE FOREMAN:  Yes, sir.

24                THE COURT:  Has your jury reached a

25   verdict?

1      THE FOREMAN:  Yes, Your Honor, we have.

2      THE COURT:  Would you please read your

3 verdict to the Court.

4      THE FOREMAN:  "We, the jury, find the

5 defendant guilty of capital murder as charged in the

6 indictment."

7      THE COURT:  Members of the jury, if

8 that's each and every one's individual verdict, would you

9 please signify by raising your right hand?  We have a

10 unanimous verdict.  Do you wish to have the jury polled?

11      MR. ASHFORD:  No, Your Honor.

12      THE COURT:  Thank you.  You may be

13 seated.  Members of the jury, you know as a result of the

14 verdict that you have now reached and returned to this

15 Court, the Court will now begin the punishment phase of this

16 trial.

17      If you would, go with the Sheriff for a brief

18 recess and we'll be back and start the evidence in a few

19 minutes.

20                    [Jury out]

21      THE COURT:  Thank you.  You may be

22 seated, Mr. King?

23      MR. KING:  Your Honor, we request a

24 hearing on any extraneous offenses the State intends to

25 offer.  We wish to have a hearing outside the presence of

1   the jury on those to determine their admissibility.

2                    THE COURT:  Yes, sir.

3                    MR. SHOOK:  Judge, the only witnesses

4   that we have today are going to go into the child abuse

5   case.  Do you want a hearing on those?  It's already --

6                    MR. KING:  Unless they are going to bring

7   some additional bad act or something else, I'm not sure the

8   extent of that.

9                    MR. SHOOK:  It's just going to cover the

10  incident.  It's -- one of them is the sergeant who took the

11  confession and then the CPS investigator.

12                    MR. KING:  All right.

13                    THE COURT:  Two witnesses this is

14  afternoon; is that correct?

15                    MR. SHOOK:  Yes, Your Honor.

16                    [Recess]

17                    MR. KING:  We would also reinvoke the

18  rule, Your Honor.

19                    [Jury in]

20                    THE COURT:  Thank you.  You may be

21  seated.

22                    MR. SHOOK:  I have two witnesses at this

23  time.

24                    THE COURT:  Come forward and let me swear

25  you in.

1          [At this time the witnesses

2              present were sworn by the Court.]

3          THE COURT:  Who will the State call

4  first?

5          MR. SHOOK:  Susan Wagner.

6          THE COURT:  You may wait outside and

7  don't discuss this case until you are called to testify.

8  Ma'am, have a seat on the stand.

9          SUSAN WAGNER,

10  having been duly sworn, was examined and testified as

11  follows:

12          DIRECT EXAMINATION

13  BY MR. SHOOK:

14      Q.     Would you tell us your name, please.

15      A.     My name is Susan Wagner.

16      Q.     How are you employed?

17      A.     I work for the Texas Department of Protective

18  and Regulatory Services and that would be the Child

19  Protective Services Agency underneath that.

20      Q.     What division are you assigned?

21      A.     I'm currently assigned to our placement

22  program.

23      Q.     How long have you been with them?

24      A.     With the agency I've been there 13 and a half

25  years.

1        Q.      And let me turn your attention back to 1996.
2   What division were you assigned at that time?

3        A.      At that time I was in a unit where I was an
4   investigator housed with the Ft. Worth Police Department.

5        Q.      Do you have any special training for your
6   duties as an investigator with CPS?

7        A.      Yes.  I was an investigator with the agency
8   for ten years and at the beginning, of course, coming to the
9   agency, you go through normal new worker training.  But then
10  I went to a lot of specialized training because of the types
11  of cases that I did, dealing with a lot of physical abuse
12  and sexual abuse injuries.

13       Q.      And could you tell the jury what your duties
14  were when you were acting as an investigator?

15       A.      Well, my job would be to receive referrals and
16  then go out and conduct an investigation which, of course,
17  would entail interviewing and different parties, examining
18  injuries, things like that.

19       Q.      Let me turn your attention to August of 1996
20  and ask if you went out to Cooks Children's Hospital --
21  well, actually either the late evening hours or the early
22  morning hours of the 28th of August?

23       A.      Yes, I did.  I actually arrived in the morning
24  of the 29th shortly after midnight.

25       Q.      Okay.  What was your reason for going to the

1   hospital that -- in those early morning hours?

2        A.      I was contacted after a referral had been

3   received by both CPS and by the police, regarding injuries

4   to a child named Jerrod Smith.

5        Q.      And when you arrived at the hospital, what was

6   going on at that time?

7        A.      When I arrived Jerrod was still being examined

8   and monitored.  His grandparents were there and I spoke with

9   them and the doctor.

10       Q.      Okay.  Now, when you were called out to scenes

11  like a hospital, do you work hand in hand with the police

12  detective that is working on the case, also?

13       A.      Yes.  Because of the specialized unit that I

14  was in, we actually teamed investigations together.  So I

15  did work -- the detective and the sergeant were both on the

16  scene and we all worked together on the case.

17       Q.      And what police officers were involved in this

18  particular case?

19       A.      Well, I don't recall which patrol officer was

20  there, but the detective that I was working the case with

21  was Detective Camper.

22       Q.      And now you said that the child was still

23  there and was he being treated at the time?

24       A.      Yes.

25       Q.      And you spoke with his grandparents who were

1  there at the hospital?

2          A.      Yes, I did.

3          Q.      And you also spoke with the doctors?

4          A.      Yes.

5          Q.      Did you -- but you had a chance to observe

6  Jerrod Smith?

7          A.      Yes, I did.  I observed him and took some

8  pictures.

9          Q.      All right.  And let me show you what's been

10  already entered into evidence as State Exhibit 945 and 942

11  and 947 and 941 and 944, 943, 946.  Are those all photos of

12  Jerrod Smith and the types of injuries that you observed at

13  that time?

14          A.      Yes.

15          Q.      Had the child already gone and had x-rays and

16  was being treated at the time you arrived?

17          A.      Yes.

18          Q.      Okay.  Was he in physical pain that you could

19  observe?

20          A.      Well, he appeared to be to me.

21          Q.      Okay.  And that was something you would expect

22  with these types of injuries, of course?

23          A.      Correct.

24          Q.      Now, when you get -- you start an

25  investigation like this, who are the persons that you focus

1  in on in trying to determine the cause of the injuries?

2       A.     I would look at any caretakers who had access

3  to him.

4       Q.     And did you speak with the people that you

5  believed to be the caretakers of him at or near the time

6  these injuries had occurred?

7       A.     Yes.

8       Q.     And who would that be?

9       A.     I spoke -- initially spoke with the mother.

10 Charity Smith, the lady that she lived with at that time,

11 Ramie Plummer.  Those were the first two people because they

12 were the first ones that I was able to contact.  And then

13 Randy Halprin and then Ramie's husband, Todd Plummer.

14      Q.     Okay.  Did you determine they had all been

15 living in an apartment together?

16      A.     Yes.

17      Q.     During the course of your investigation were

18 you able to determine when she had moved there, when all the

19 parties had gotten together and were at the apartment?

20      A.     Yes.

21      Q.     As part of your investigation, did you put

22 together a timeline for August of 1996?

23      A.     Yes, I did.

24      Q.     What was your purpose in doing that?

25      A.     Well, as an investigative tool, that kind of

1    helps me just put all the facts together that I've been

2    gathering, so I can visually look at it and it would

3    hopefully help guide me through the case.

4         Q.    Let me show you State Exhibit 967.  The

5    timeline you put together were handwritten notes on a

6    calendar for August of '96 --

7         A.    Correct.

8         Q.    -- is that right?  Does this exhibit reflect

9    the timeline you have put together?  It's just that we typed

10   out the handwritten notes so they are legible?

11        A.    Yes, sir.

12        Q.    Would it help you explain your testimony to

13   the jury?

14        A.    Yes.

15                    MR. SHOOK:  We'll offer State Exhibit

16   967.

17                    MR. ASHFORD:  No objections, Your Honor.

18                    THE COURT:  No. 967 shall be admitted.

19        Q.    (By Mr.Shook)  I'll try to hold the exhibit up

20   and hopefully everyone can see it.  We're talking about the

21   events that occurred in August of '96; is that right?

22        A.    Correct.

23        Q.    Now, you spoke with Charity Smith, as well as

24   Ramie Plummer.

25        A.    Yes.

1    Q.    Did your investigation, during the course of

2  your investigation also talk with Randy Halprin?

3    A.    Yes.

4    Q.    And where did you speak to him?

5    A.    In my office.

6    Q.    And what about -- what time period are we

7  talking about?  When was that?

8    A.    That was during the early morning hours of the

9  29th.

10    Q.    Okay.  And Todd Plummer, did you also speak

11  with him?

12    A.    Yes.

13    Q.    And August, this -- you said you also spoke to

14  the doctors that treated the child?

15    A.    Yes, I did.  I talked with doctors at the

16  hospital the first night I was there and then I consulted

17  with them during the case about a week into it.

18    Q.    All right.  Let me show you first -- your

19  first entry would be the 18th of August.  And we see the

20  first writing is, "Charity at hospital for chickenpox."

21  What did that reflect?

22    A.    Well, Charity had been living at the Arlington

23  Night Shelter and she had had a sore on her face and gone to

24  the hospital and they determined it was chickenpox and

25  that's when she was asked to leave the shelter and that's

1    why I documented that.

2         Q.    The last entry is, "Charity and Jerrod moved

3    to the Plummer's"?

4         A.    Correct.

5         Q.    Did they move in with the Plummers because of

6    that, that she was diagnosed?

7         A.    Yes.

8         Q.    And in between you had, "Randy babysat in the

9    shelter".  Why was that important to you?

10        A.    Well, because Mr. Halprin babysat while she

11   had gone to the hospital to be examined.  And it was

12   important for me to document when individuals had access to

13   the child, especially by themselves.

14        Q.    So the next date is the 19th.  You have

15   written in, "Randy moves to the Plummer's"?

16        A.    Correct.

17        Q.    Does that reflect that he left the shelter and

18   moved in with the Plummer's, also?

19        A.    Yes.

20        Q.    So it was Charity Smith that moved in first

21   and then Randy?

22        A.    Correct.

23        Q.    Then on the 20th you have, "Randy babysits all

24   kids."  What does that note reflect?

25        A.    Well, the Plummers also had two children in

1    the home.  And by the statements and information that I

2    gathered during the investigation, it all kind of came

3    together that that was the date that he was alone with all

4    of the children, the adult alone with all of the children.

5         Q.    Your next entry is on the 22nd.  And you have

6    written, "Jerrod limping, bruise on leg."  What did that

7    reflect?

8         A.    Well, the adults that I had talked to,

9    especially Charity, had said that he had begun limping and

10   he had a bruise on his knee.

11        Q.    Okay.  The second entry, "Randy says he caused

12   injuries."  Is that a reflection of what Randy Halprin later

13   -- when he gave a voluntary statement to the Ft. Worth

14   Police Department?

15        A.    Correct.

16        Q.    On the 22nd he didn't admit to that?

17        A.    That's correct.

18        Q.    Okay.  You're using the 22nd because that's

19   the date he said it actually happened?

20        A.    Yes.

21        Q.    Let me show you State Exhibits 948 and 949.

22   Is 949 an affidavit that Randy Halprin gave concerning the

23   events, the first affidavit that he gave?

24        A.    Yes.

25        Q.    And then 948, is that the confession that was

1   taken, actually, on September 4th of '96?

2        A.      Yes.

3        Q.      But in this confession, it relates that the

4   date was the 22nd when he says these events occurred?

5        A.      Yes.

6        Q.      All right.  It also says, "Randy says he

7   caused the injuries.  Everyone home."  Was that also -- you

8   got that information from the voluntary statement?

9        A.      Yes.  He stated that everyone was in the home

10  when that occurred and he was alone in the room with Jerrod.

11       Q.      Okay.  The next entry is the 23rd.  "Jerrod,

12  pus and bleeding from ear."  You have got, "Columbia Med."

13  What does that stand for?

14       A.      Well, they had determined -- I'm sorry.

15  Charity had observed Jerrod to have some pus and some

16  bleeding coming out of one of his ears and because of that

17  and the injury to what seemed to be an injury to his leg,

18  she decided to take him to the hospital and they went to the

19  Columbia Medical Center.

20       Q.      What type of hospital is Columbia Medical

21  Center?

22       A.      It's a hospital in Ft. Worth that just sees

23  any number of people.  It's a private hospital.

24       Q.      All right.  And you noted, "ruptured eardrum

25  in one x-ray and dash nothing."  What does that represent?

1     A.     Well, the hospital said that he had a ruptured

2  eardrum and gave a prescription and they took one x-ray of

3  the leg and said that there was not any injury to his leg

4  that they could see.

5     Q.     Based on your experience as a CPS

6  investigator, was that unusual for a hospital, such as

7  Columbia Medical to miss fractures in children, in infants?

8     A.     I've seen that happen a number of times where

9  they get a second opinion or they get diagnosed later at a

10  Children's Hospital and injuries are found, yes.

11     Q.     All right.  Looking down now on the 25th,

12  which is the Sunday, you have entered, "Jerrod, leg swollen

13  and not walking on it.  Penis swollen, Columbia Med."  What

14  does all that represent?

15     A.     Well, the leg that we were talking about up

16  here was worse and he wasn't walking on it.  She had said

17  that he had started to crawl instead of walk.  And then they

18  had seen that his penis was swollen up and they went back to

19  Columbia Medical Center.

20     Q.     Under that is, "ant bite slash

21  anti-inflammatory"?

22     A.     The hospital diagnosed the penis swelling as

23  an ant bite and gave him an anti-inflammatory medicine and

24  they didn't give any further information about the leg.

25     Q.     And that's the same hospital that he had been

1    taken to on the Friday the 23rd?

2         A.    Right.

3         Q.    Then on Monday the 26th, it says, "Jerrod,

4    bruising on Jerrod's face, eye pink, saw tongue sores and

5    diarrhea"?

6         A.    And these are all further injuries that the

7    adults in the home are seeing then on the 26th that

8    appeared.

9         Q.    Did you actually see the tongue sores

10   yourself?

11        A.    I saw pictures of those when I was -- after we

12   had been to the hospital, yes.

13        Q     Then on the 27th, Tuesday, you have, "MO and

14   Ramie donate plasma"?

15        A.    MO stand for mother, of course, we do

16   abbreviations.

17        Q.    That's Charity Smith?

18        A.    That's Charity Smith.  And they went to donate

19   plasma so that they could have money to pay for

20   prescriptions.

21        Q.    And under that you had Todd babysat?

22        A.    Yes.  And that's Ramie's husband and he

23   babysat the children while they were doing that.

24        Q.    On the 28th you have, "Cook's Children's, more

25   bruising."  Does that reflect the date that you got involved

1   when they took the baby to Children's, Cook's Children's?

2       A.    Yes.  And the reason I added more bruising is

3   they had decided to go there after more bruising was

4   observed on the face.

5       Q.    Your next notation says, "X-rays, right leg

6   dash one week to ten days," and then, "arms, head, and left

7   leg less than one week, same incident."  What does that

8   mean?

9       A.    The x-rays that were taken at Cook's that

10   night were found to have those injuries and the doctors were

11   saying that those injuries all occurred at one time.  The

12   right leg was a one week to ten days old and the other

13   injuries, I'm sorry, all occurred at one time.  So the two

14   arm fractures, the skull fracture, and then the break in the

15   left leg all occurred during one time and they said that

16   happened within one week.

17       Q.    Okay.  So the two arms, the left leg, and the

18   skull fracture occurred in the same incident?

19       A.    Yes.

20       Q.    Which is what you have written at the bottom?

21       A.    Correct.

22       Q.    And that was from less than one week?

23       A.    Yes.

24       Q.    From this date?  The 28th?

25       A.    Yes.  From the time he was seen in the

1    hospital, yes, in Cook's.

2        Q.    And then the right leg is a week to ten days

3    old?

4        A.    Yes.

5        Q.    Is that based on your discussions with the

6    doctors?

7        A.    Yes.

8        Q.    So we're talking about two different incidents

9    with where the legs were broken --

10       A.    Yes.

11       Q.    -- during this time period?

12       A.    Yes.

13       Q.    This is why the timeline is valuable to you?

14       A.    Correct.

15       Q.    Now, after you had had these initial

16   conversations, when you were called in the 29th, who were

17   the people you were looking at from an investigative

18   standpoint of view who might have been the abuser here?

19       A.    Well, after -- during the first night when we

20   were talking to all of the adults, a lot of the focus was on

21   Ms. Smith and on Mr. Halprin based on the accounts and their

22   access to Jerrod.  During the interview that I had with Ms.

23   Smith, the very first interview, I went out to the sergeant

24   there from the Ft. Worth Police Department who I was working

25   with, and suggested to him that we probably needed to talk

1   to Mr. Halprin pretty quick, because it was looking as

2   though he had had quite a bit of access to Jerrod by

3   himself.

4        Q.    And is that when you went to the apartment

5   later that morning to -- or the police officers went there

6   later that morning and brought him back?

7        A.    Yes.  They went and brought him in.

8        Q.    Now, after a case had -- after Mr. Halprin had

9   confessed and a case was filed on him, a few months down the

10  line, CPS -- let me back up there.

11             Did Charity Smith get to keep custody of

12  Jerrod Smith that night after she had brought him to the

13  hospital?

14       A.    She had actual legal custody, but she did not

15  have access to Jerrod.  We did what we call a safety plan.

16  Child Protective Services does that in the high-risk cases,

17  because I did not feel she could take care of him at the

18  time.  And so he was placed with grandparents.

19       Q.    Okay.  Eventually was custody of Jerrod Smith

20  taken away from Charity Smith?

21       A.    Yes, it was.

22       Q.    What kind of mother would you describe Charity

23  Smith to be?

24       A.    She would be what I would describe as a

25  neglectful mother, one that -- she tends to leave her

1    children with people, with caretakers, who may not

2    necessarily be appropriate caretakers.  She -- she -- she

3    just -- she is just basically a kind of a neglectful mom.

4    It's kind of hard to put that into words.  When you look at

5    cases that I deal with every day and see people who aren't

6    necessarily abusive people, who just don't know how to

7    provide the proper care.  They have children that they leave

8    with individuals or they can't take care of them or they --

9    for example, she has another child who she had given custody

10   to the grandmother because she couldn't take care of her.

11   So it's kind of a pattern with some of those moms.

12        Q.     And that was prior to this?

13        A.     Yes.

14        Q.     There was another child that she had given

15   custody away to?

16        A.     Yes.

17        Q.     Were you satisfied, then, in this case that

18   you had the right person who was the actual abuser, the

19   physical abuser?

20        A.     Yes.

21        Q.     And that was Randy Halprin?

22        A.     Yes.

23        Q.     Charity Smith, obviously, wasn't going to win

24   any mother of the year awards, either?

25        A.     Right.

1    Q.    And eventually Jerrod was taken out of her

2   custody?

3    A.    Yes.

4              MR. SHOOK:   That's all the questions we

5   have.  We pass the witness.

6                      CROSS-EXAMINATION

7   BY MR. ASHFORD:

8    Q.    Ms. Wagner, tell us about the previous child

9   removed.  What happened in that case?

10   A.    I wasn't the caseworker involved and I don't

11  know all the details.  She had some CPS involvement which I

12  can't seem to get access to these days and I guess it's

13  because of the way our cases are on our computer.

14             But from my contacts with individuals,

15  including her and the grandparents, she -- she -- CPS was

16  involved with that child and then she voluntarily let the

17  grandparents have her in their care and she was not able to

18  get her back for whatever reason.  I don't know.

19   Q.    Well, you may not be able to find it now, but,

20  in fact, back in 1996, do you recall any more about the

21  previous case at that time?  Did you have access to that

22  information at that time?

23   A.    Um, I had --I had documented in my records

24  that there had been previous -- if you will give me just a

25  second, I can look.  Okay.  There was a case involving a

1   child who was another -- some other family member child that

2   she was investigated for medical neglect on.  That was found

3   to be reason, I believe.  And there was two ruled out cases

4   involving Jerrod in '95.  In '93 there was a

5   reason-to-believe case -- do I need to tell the jury what

6   reason to believe means?

7         Q.     I'll ask you that, but go ahead.

8         A.     For physical neglect in '93 of Carissa, which

9   was the older child.

10        Q.     Okay.  And CPS designates cases ruled out,

11   reason to believe, you have several designations, correct?

12        A.     Correct.

13        Q.     Ruled out means didn't happen or just couldn't

14   prove it?

15        A.     Either/or.  It could be either one of them.

16        Q.     Either one?

17        A.     Uh-huh.

18        Q.     And the reason to believe means what?

19        A.     It means based on the evidence, we do find

20   reason to believe that whatever it is, physical abuse or

21   physical neglect, that it did occur.

22        Q.     Okay.  And you get a little bit higher than

23   reason to believe is what?

24        A.     No.  That is -- there's one in between that's

25   unable to determine.

1      Q.     Unable to determine?

2      A.     Uh-huh.

3      Q.     Okay.  All right.  Now, medical neglect would

4  be the child needs medical care, but the parent is not

5  taking care of it as they should; is that correct?

6      A.     That's a good example, yes.

7      Q.     Okay.  There's some other circumstances that

8  that might encompass would be what?

9      A.     Medical negligent?  That could entail both

10  like physical needs, psychological needs, any kind of thing

11  that we would put under the medical category where they did

12  not, even though they had the opportunity, did not take care

13  of those needs.

14      Q.     Okay.  You also said as to the other child,

15  the girl, she had a physical negligent and there was reason

16  to believe there, correct?

17      A.     Yes.

18      Q.     Okay.  What do you know about that?

19      A.     I do not have any more information on that.

20      Q.     Okay.  Physical negligent would be an actual

21  -- some type of injuries, some type of beating, or something

22  of that nature?

23      A.     Physical neglect is not usually going to

24  encompass any injuries.  It's going to be that their

25  physical needs were not being taken care of.

1      Q.     Now, those were to the other child.  What did

2   you say as to Jerrod?

3      A.     There had been two previous medical negligent

4   cases in '95 that were ruled out.

5      Q.     And what do you know about those?

6      A.     I can't find those.  Those are on the

7   computer.  I'm assuming that these have been purged off of

8   our system by now.

9      Q.     Okay.  And you say purged off of your system,

10  how would you go about finding those particular records?

11     A.     Ruled out cases, they only stay on the system

12  for a certain amount of time and there probably isn't any

13  record of those.

14     Q.     So is that on paper or computer or what?

15     A.     Both.

16     Q.     Okay.  CPS does regularly keep records,

17  though, do they not?

18     A.     Yes.

19     Q.     And day to day, week to week, month to month,

20  they keep records; is that correct?

21     A.     Yes.

22     Q.     And they try to accurately record events as

23  they are taking place?

24     A.     During cases?

25     Q.     Yes.

1    A.    Yes.

2    Q.    And the records that CPS takes are usually

3  taken by someone that has personal knowledge of the event,

4  correct?

5    A.    Yes.

6    Q.    Okay.  And CPS records are all fairly

7  standard-looking forms, correct?

8    A.    Um, you mean the way we document on our

9  narratives?  Is that --

10    Q.    Yes.

11    A.    Yes.

12    Q.    Let me show you what I've marked as Defense

13  Exhibit No. 43 and ask you if you can identify it as a CPS

14  record.

15    A.    Okay.  Yes, this is an old form.

16    Q.    Okay.  Appear to be for Charity Smith and

17  Jerrod Smith?

18    A.    Yes.

19    Q.    Looking at the date, would that possibly be

20  one of the events that you are talking about?

21    A.    Yes.

22                MR. ASHFORD:  I offer Defense Exhibit No.

23  43 at this time.

24                MR. SHOOK:  No objection.

25                THE COURT:  Defense 43 shall be admitted.

1    Q.    (By Mr. Ashford)  Looking at Defense Exhibit

2    43, perhaps refresh your recollection as to what happened

3    with Jerrod Smith in '95?

4    A.    Well, I didn't investigate this case.

5    Q.    What does it appear, based on Defense Exhibit

6    No. 43?

7    A.    Well, just at a glance -- and this is a form

8    that we used at the time for ruled-out cases -- this was one

9    of those that I was referring to in '95 that was ruled out.

10   And it says that there was no risk at the time.

11   Q.    Okay.  What was the reason for the

12   investigation?

13   A.    I don't know exactly the reason, because

14   there's not -- the intake is not on here.  But it looks like

15   it had something to do with him being at the hospital.  And

16   I'm just kind of glancing here and she had gone back for

17   followup.

18   Q.    Okay.  I'll show you what has been marked as

19   Defense Exhibit 44 and ask you if you recognize that as a

20   CPS document?  An old CPS document?

21   A.    Okay.  This is a document we use, yes.

22   Q.    Appear to be referring to Jerrod Smith?

23   A.    Yes.

24   Q.    Okay.  I want to go back to 43.  And is there

25   some concern that Ms. Smith would not follow through with

1    giving Jerrod his medicines?

2         A.    Yes.

3                   MR. ASHFORD:   Offer Defendant's 44 at

4    this time.

5                   MR. SHOOK:   No objection.

6                   THE COURT:   Defense No. 44 shall be

7    admitted.

8         Q.    (By Mr. Ashford)   Somebody is getting paid for

9    taking Jerrod to the doctor; is that correct?

10        A.    This is -- the date is 12 of '96 and so that

11   was after he had come into foster care after my

12   investigation.

13        Q.    Okay.

14        A.    And this was the foster home.   And we do help

15   provide medications and things to foster homes.   So this was

16   a request for a special payment that we do out of Tarrant

17   County.

18        Q.    He had an ear infection at that time and

19   pinkeye?

20        A.    Uh-huh.

21        Q.    Is that correct?

22        A.    Yes.

23        Q.    Did he continue to have problems with his ears

24   and ear infections even after he was in foster care?

25        A.    I can't answer that.   I was the investigator

1  and I wasn't involved with him after the investigation was

2  closed.

3         Q.    Okay.  Have you reviewed any records to that

4  effect?

5         A.    I have not reviewed the records for throughout

6  the time he was in foster care.

7         Q.    I'll come back and show you Defense Exhibit

8  No. 45 and ask you if that appears to be an old 1995 CPS

9  record?

10        A.    Okay.  Yes.

11        Q.    Okay.  Appear to be talking also about Jerrod

12 Smith?

13        A.    This is the one that I was referring to with

14 the child by the name of Jason where she was with some other

15 family members.

16        Q.    Okay.  See Charity Smith's name in there?

17        A.    Yes.

18        Q.    Okay.

19        A.    Yes, I do.

20              MR. ASHFORD:  Offer Defense 45 at this

21 time.

22              MR. SHOOK:  No objection.

23              THE COURT:  Defense No. 45 shall be

24 admitted.

25        Q.    (By Mr. Ashford)  To save time I'll try to

1    point you to some things.

2         A.    Okay.

3         Q.    Here it's talking about Charity smoked in the

4    house?

5         A.    Uh-huh.

6         Q.    They asked her not to do so due to some

7    child's respiratory problems?

8         A.    Uh-huh.

9         Q.    Okay.  Do you see in here Jason reported that

10   he also found bruises on Jerrod?

11        A.    Yes.

12        Q.    And that he saw Charity spanking him?

13        A.    Yes.

14        Q.    Okay.  During the course of your

15   investigation, did you talk to anybody who suggested that at

16   times Charity Smith might have been physically abusive to

17   Jerrod?

18        A.    I didn't have any indication from people that

19   I spoke to that Charity was physically abusive.

20        Q.    Do you remember speaking to Ramie Plummer?

21        A.    Yes.

22        Q.    Do you remember Ramie Plummer giving you an

23   affidavit?

24        A.    She gave Detective Camper an affidavit, yes.

25        Q.    Okay.  And that affidavit is included and is a

1  part of CPS records, is it not?

2        A.      Yes, I have a copy of it.

3        Q.      Okay.  I'm going to show you what I have

4  marked as Defense Exhibit No. 46 and ask you, is that a copy

5  of Ms. Plummer's affidavit which is also a part of your CPS

6  records?

7        A.      Yes, it is.

8                MR. ASHFORD:  Offer Defense 46 at this

9  time.

10               MR. SHOOK:  No objections.

11               THE COURT:  Defense 46 shall be admitted.

12       Q.      (By Mr. Ashford)  In No. 46 does she talk

13  about things such as being in the Arlington Night Shelter

14  and seeing Charity Smith give Jerrod medicines just to make

15  him go to sleep when there was nothing really wrong with

16  him?

17       A.      Yes, she did talk about that.

18       Q.      By the way did you rule out Ramie Plummer and

19  Todd Plummer for any of these injuries or any abuse to

20  Jerrod?

21       A.      Yes.

22       Q.      Did you find Ramie and Todd Plummer to be

23  credible?  Believable?

24       A.      Did I -- I'm sorry, will you ask me that

25  again?

```
 1        Q.     Did you find Ramie Plummer and Todd Plummer to

 2   be credible, believable people?

 3        A.     Um, I found them to be important parts of the

 4   investigation.  I can't -- I don't know that I can make that

 5   judgment.  I certainly found what they had to say was valid

 6   information.

 7        Q.     But you ruled them out as being a part of any

 8   of this abuse?

 9        A.     Correct.

10        Q.     Okay.  You see in here where she says that,

11   "Jerrod would never want to stay down and she tried to keep

12   him down, which would aggravate her and she would pull him

13   by the arm to make him stay in bed"?

14        A.     Yes.

15        Q.     And that's when she talks about just pouring

16   medicine in his mouth to shut him up and get him to go to

17   sleep, correct?

18        A.     Right, yes.

19        Q.     Todd Plummer give you similar accounts about

20   Charity Smith's treatment of Jerrod?

21        A.     Um, you are going to have to refresh me on his

22   statement because I did not have a copy of that and I have

23   not been able to review that lately.  I did talk to him, but

24   my conversation with him was a lot shorter than my

25   conversation with Ms. Plummer.
```

1    Q.    You did hear from everybody in the house that
2  Randy was not a smoker, didn't smoke cigarettes?
3    A.    That doesn't even ring a bell with me.   I
4  don't remember talking about him smoking.
5    Q.    Okay.   I want to go back to Ms. Plummer's
6  affidavit again --
7    A.    Okay.
8    Q.    -- Defense Exhibit No. 46 and point out some
9  other things to you.   Now, down here she's talking about
10 Jerrod having bruising on his arms and legs, correct?
11   A.    Yes.
12   Q.    And she says she doesn't know how they got
13 there, correct?
14   A.    In here she says she didn't know how they got
15 there?   I'm not sure where you are pointing to.
16   Q.    Let me ask you this.   Does she say in there
17 Jerrod was coming home from day care with a different bump
18 or bruise all the time?
19   A.    She told us that Charity told her that, yes.
20   Q.    And that her son attended the same day care
21 and they didn't have that problem?
22   A.    Correct.
23   Q.    It appears she's talking about over a period
24 of time, is she not?
25   A.    While they were in the shelter, yes.

1    Q.    Okay.  I'll show you Defendant's Exhibit No.

2  47.  Does that also appear to be another CPS record

3  pertaining to Charity Smith?

4    A.    Yes.

5              MR. ASHFORD:  Offer 47 at this time.

6              MR. SHOOK:  No objection.

7              THE COURT:  Defense 47 shall be admitted.

8    Q.    (By Mr. Ashford)  "I asked who was smoking in

9  the home when Jerrod was being abused and she said she did

10  and her roommate Todd.  Randy Halprin did not smoke."

11  Correct?

12    A.    That's what it says, yes.

13    Q.    Would that have been you asking those

14  questions?

15    A.    No, sir.

16    Q.    Would that have been another caseworker?

17    A.    Yes.

18    Q.    Okay.  There's an investigator like yourself

19  who's involved in the initial -- well, in CPS's initial

20  involvement that usually works close with law enforcement

21  and then there is a caseworker that takes over the case and

22  stays with the child through adoption or placement or

23  whatever; is that correct?

24    A.    Yes.

25    Q.    Okay.  So there are going to be records of

1   CPS's involvement with Jerrod that span a long period of
2   time, correct?
3           A.      Correct.
4           Q.      And you are going to have many different
5   people that are going to have contact with him and everybody
6   involved in his life; is that correct?
7           A.      Yes.
8           Q.      To the best of your knowledge, after CPS took
9   Jerrod and put him in foster care, did Charity Smith express
10  desire to get him back?
11          A.      In a way she did.  During the time that I
12  still had the case, which would have been within a month's
13  time, we -- she was not visiting regularly.  And I had to
14  confront her on that.  After that period of time, I don't
15  know.
16          Q.      Okay.  So she verbally said that she did, but
17  she really didn't follow through.  Is that what you are
18  trying to say?
19          A.      Yes.
20          Q.      Parents were given a service plan that tells
21  them what they need to do to at least try to get the courts
22  and CPS to agree to give their child back, correct?
23          A.      Yes.
24          Q.      And expresses the needs of the child and what
25  the child needs from that point, correct?

1     A.     Yes.

2     Q.     Now, one of the things that you often ask a

3   mother or father to do is to give a psychological, correct?

4     A.     Yes.

5     Q.     Okay.  And you do a risk assessment, determine

6   what the risk is from that point on, correct?

7     A.     Yes.

8     Q.     Okay.  And part of that you are going to look

9   at the history of the mother, correct?

10    A.     Yes.

11    Q.     Now, Charity Smith already had a history of

12  either neglectful or abusive situations with her children,

13  correct?

14    A.     Neglect, yes.

15    Q.     CPS gets involved with children when there are

16  allegations of abuse or negligent, correct?

17    A.     Yes.

18    Q.     And CPS had already been involved with Charity

19  Smith before this incident?

20    A.     Yes.

21    Q.     Okay.  Charity Smith reported a history of

22  abuse in her past, correct?

23    A.     Yes.

24    Q.     Okay.  Charity Smith was also someone who had

25  drug and alcohol problems, correct?

```
 1         A.    Yes.

 2         Q.    And in terms of her relationships, her

 3   lifestyle, she was quite unstable, correct?

 4         A.    Yes.

 5         Q.    How old was Charity Smith at this time,

 6   roughly?

 7         A.    I apologize, I don't know that one off the top

 8   of my head.  You are going to have to help me.

 9         Q.    About 20 years old sound about right?

10         A.    About 20?  Is that what you said?  Probably.

11   Yes, she was 20.

12         Q.    Did you also take an affidavit from Charity

13   Smith?

14         A.    Detective Camper did, yes.

15         Q.    Okay.  That was a part of the CPS file, also,

16   correct?

17         A.    Correct.

18         Q.    But you talked to her initially before an

19   affidavit was taken, correct?

20         A.    Yes.

21         Q.    And she said the only person that took care of

22   her child was her; is that correct?

23         A.    Within -- are you talking about within a time

24   period?

25         Q.    When she was brought in and asked, "Well,
```

1   what's the potential for injury to your child during the

2   short time period?" She said, "I don't think anything could

3   have happened to my child because I'm the only one that

4   takes care of my child." Isn't that what she initially

5   said?

6        A.     She told me the other individuals that did

7   have -- had been taking care of Jerrod during that initial

8   interview.

9        Q.     Do you know what she said when she got to the

10  hospital as to who had access to her child?

11       A.     I don't know what her initial statement at the

12  hospital was, no.

13       Q.     Okay.  And do you know she later expanded and

14  said, "Well, it's me and the people at the day care who have

15  access to my child"?

16       A.     That's not the information she gave to me.

17       Q.     Okay.  I'll show you what's been marked as

18  Defense Exhibit No. 49 now and ask you if you recognize that

19  as being the affidavit of Charity Smith?

20       A.     Yes, it is.

21              MR. ASHFORD:  Offer Defense Exhibit 49 at

22  this time.

23              MR. SHOOK:  No objection.

24              THE COURT:  Defense No. 49 shall be

25  admitted.

1      Q.      (By Mr. Ashford)   Okay.   I will direct your

2   attention to when he woke up from his nap, okay?

3      A.      Uh-huh.

4      Q.      She said he was trying to turn around and put

5   pressure on his knee and it collapsed, correct?

6      A.      Yes.

7      Q.      That might have been the knee that she was

8   talking about, the leg that was injured?

9      A.      The leg that was already injured, that's my

10  assumption, yes.

11     Q.      And she said, "It collapsed and he hit the

12  side of his head on the corner of the dresser," correct?

13     A.      Yes.

14     Q.      Okay.   And she said, "It caused a knot and a

15  scrape on his forehead"?

16     A.      Yes.

17     Q.      Okay.   Now, this timeline, I think you said

18  the doctor said the injuries occurred within this period of

19  time and then Mr. Shook asked the question as if the doctor

20  said the injuries all occurred at the same time or on the

21  same day.

22             Were the doctors that specific or did they

23  just say they occurred during that week period of time?

24     A.      No.   The first injury, the leg injury and

25  other injuries occurred at different times.   And the other

1   ones occurred in that one -- in that one week period.  The

2   other one was a week to ten days.

3          Q.     Okay.

4          A.     So they didn't pinpoint a date to me.

5          Q.     Were there other individuals who had exclusive

6   custody or would have been alone with Jerrod during that

7   one-week period of time other than Randy Halprin?

8          A.     Yes.

9          Q.     That would have been who?

10         A.     That would have been Charity Smith and the

11  Plummers.

12         Q.     Okay.  If you refer back to Ms. Plummer's

13  affidavit up there, the one with the dark print on it.

14         A.     Okay.

15         Q.     Okay.  Not Ms. Smith's, but Ms. Plummer's.

16  Second page, one short paragraph, one medium paragraph,

17  third paragraph is the big long one?

18         A.     I'm not sure that I have two pages of that.

19  Let's see.  One moment.  It's here.

20         Q.     While I'm doing this, if you will just read

21  from I to yourself to about this part here?

22         A.     Okay.

23         Q.     Okay.  She's explaining about Jerrod having

24  pinkeye the week before?

25         A.     She said -- she said that her husband had the

1    pinkeye.

2         Q.    Okay.  And --

3         A.    And Jerrod's eye was pink.

4         Q.    And Jerrod's eye was pink the week before.

5    And she's also talking about Charity looking in Jerrod's

6    mouth and giving an explanation about the blisters; is that

7    correct?

8         A.    Yes.

9         Q.    And she says when she got sick, she got

10   blisters on her tongue.  Is that what Charity was saying?

11        A.    Yes.

12        Q.    So it appears Charity is trying to give an

13   explanation for the blisters?

14        A.    Yes.

15        Q.    Correct?

16        A.    Yes.

17        Q.    Okay.  The Plummers had kids, also?

18        A.    Yes, they did.

19        Q.    Randy had baby-sitted them?

20        A.    Yes, that's my understanding.

21        Q.    I mean, the Plummers told you that?

22        A.    Yes.

23        Q.    They were having problems with their kids?

24        A.    Not that was reported to me.

25        Q.    Okay.  Well, seeing as that you were

1  investigating what happened to Jerrod and who might have

2  been the perpetrator, it's pretty relevant that he also

3  might have baby-sat their kids; is that correct?

4      A.    Correct.

5      Q.    Do you know if that was on few or many

6  occasions?

7      A.    I mean, I would have to look back through

8  notes.  I know that they talked about one occasion that I

9  can recall that he baby-sat all the children together.

10      Q.    Okay.  Did you investigate their kids for any

11  injuries?

12      A.    Yes.

13      Q.    The morning of the 29th I went to the

14  apartment and talked to those children and examined them.

15      Q.    They were old enough for you to talk to them,

16  some of them at least?

17      A.    Yes.  They were very sleepy that morning and

18  pretty much I was wanting to make sure they were safe and

19  they were free from injury at the time.

20      Q.    And that's pretty standard, if a child is able

21  to tell you something, you want to hear from them, correct?

22      A.    Yes.

23      Q.    And you ask them if anybody's beat you or

24  spanked you and you asked them specifically did Randy do

25  anything to them or what did you ask them?

1     A.   I'm sorry, I don't know exactly.  That's been

2   a lot of years ago and I don't remember exactly what I said

3   to them at the time.  As I said, it was very early in the

4   morning hours.  Our concern was their immediate safety and

5   we did want to look at them and make sure they did not have

6   any injuries.  I did talk to them very briefly, but these

7   children were tired.  We woke them up from their sleep.

8     Q.   You are not telling the jury that you would

9   have let them be in danger just because they were tired,

10   correct?

11     A.   Correct.

12     Q.   If you had thought there was anything there,

13   you would have certainly followed up for their safety?

14     A.   Correct.

15     Q.   Now, if you had a perpetrator in mind, even

16   though you might not remember specifically, would you have

17   normally asked, hey, did this guy do anything to you or

18   would you have been more subtle and asked them has anybody

19   spanked you or anybody hurt you?

20     A.   I would have -- yes.  We try not to do --ask

21   leading questions.  So I would have asked a more subtle

22   question.

23     Q.   Okay.  And, actually, if you got people who

24   believe in corporal punishment, as opposed to people who

25   don't, I mean, if you asked a little kid did anybody beat

1  you or did anybody hit you or something like that, they may

2  be talking about a spanking, correct?

3       A.    If you ask it that way, correct, yes.

4       Q.    All right.  Some kids will report what a

5  parent might think is a spanking in response to a question

6  that you might ask to determine if they have been abused,

7  correct?

8       A.    Well, I guess my short answer would be yes.

9       Q.    I'm not trying to say you believe it at that

10  point.  You have to follow up and see what the case may be.

11  But that's a potential situation where a kid would answer

12  positively to your question as to whether anybody had

13  spanked them or hit them or anything like that, correct?

14       A.    Yes.

15       Q.    And you didn't come up with anything to

16  suggest that Randy had injured any of those kids?

17       A.    Not that they had been injured at all, no.

18       Q.    The Plummers didn't seem to have that concern?

19       A.    No.

20       Q.    Okay.  How far did you follow this case?

21       A.    Through the investigation stage.

22       Q.    Okay.  And that would have been approximately

23  when?

24       A.    Investigations take approximately 30 days.

25       Q.    Were you present when Randy Halprin gave a

1    statement?

2         A.    No, I was not.

3         Q.    Okay.  Did you have information that he

4    eventually entered a guilty plea for a 30-year sentence?

5         A.    Yes.

6         Q.    Did you follow the case at least that long?

7         A.    I was aware that that happened, but I can't

8    follow all the cases through.  I mean, I wasn't aware of

9    what was going on in the child's life and all the

10   individuals, no.

11        Q.    Have you been present when investigators took

12   statements from alleged perpetrators before in CPS cases?

13        A.    When the detectives?

14        Q.    Yes.

15        A.    Yes.

16        Q.    Okay, what's that scenario like?

17        A.    When they take a statement from them?

18        Q.    Yes.

19        A.    They normally in cases that I've been involved

20   in, we've both done interviewing of the individual and at

21   the time the statement is being given and put on paper, they

22   are telling the story of what they've already reported and

23   it's being typed out.

24        Q.    Usually done in pretty close quarters?

25        A.    It depends on where it's being done.  We have

1    different locations.

2         Q.     All right.  Usually the detective, the

3    defendant, and maybe another detective or in some cases an

4    investigator such as yourself, correct?

5         A.     Yes.

6         Q.     Okay.  Usually not a lawyer there?

7         A.     Not usually.  I suppose there could be.

8         Q.     Is there anybody there for the defendant to

9    hold their hand, give support?

10                    MR. SHOOK:  Judge, we'll object to the

11   relevance.

12                    THE COURT:  Sustained.

13        Q.     (By Mr. Ashford)  Did Ms. Smith also have a

14   lack of education and training skills?

15        A.     Um, I don't recall what her education level

16   is.  Let's see.  Yes, she had eight years of schooling.

17        Q.     Do your records reflect that she had a history

18   of expressing angry feelings in an inappropriate manner?

19        A.     Are you asking me a question?

20        Q.     Do your records reflect that Ms. Smith had a

21   history of expressing angry feelings in an inappropriate

22   manner?

23        A.     I don't know where that is in the records.

24        Q.     Okay.  If I showed it to you, would it refresh

25   your memory?

1        A.      Yes.

2        Q.      Okay.

3        A.      Okay.   Those aren't my records.

4        Q.      Okay.   Is that a CPS record, though?

5        A.      Yes.

6        Q.      Expressing angry feelings in inappropriate

7    manner, would probably be -- mean what?

8        A.      Well, I mean, I can only assume that she's

9    talking about information that she had gathered throughout

10   the CPS history that we had.  But I don't know specifically

11   what she meant by that.

12       Q.      Could it mean taking anger out on her

13   children?

14       A.      It could.

15               MR. ASHFORD:   I'll pass the witness.

16               REDIRECT EXAMINATION

17   BY MR. SHOOK:

18       Q.      Your investigation didn't show her to be the

19   abuser of Jerrod Smith, did it?

20       A.      No, it did not.

21               MR. SHOOK:   That's all we have, Judge.

22               MR. ASHFORD:   Nothing further.

23               THE COURT:   Thank you, ma'am, you may

24   stand down.

25               MR. SHOOK:   May this witness be excused?

1            MR. ASHFORD:  No objections, Your Honor.

2            THE COURT:  She may.

3            MR. SHOOK:  Call Sergeant Camper.

4                        RENEE CAMPER,

5    having been duly sworn, was examined and testified as

6    follows:

7                     DIRECT EXAMINATION

8    BY MR. SHOOK:

9        Q.    Would you tell us your name, please.

10       A.    Yes.  It's Renee Camper.

11       Q.    And how are you employed?

12       A.    I'm a Sergeant with the Ft. Worth Police

13   Department.

14       Q.    How long have you been with the Ft. Worth

15   Police Department?

16       A.    Thirteen years.

17       Q.    And what division are you assigned?

18       A.    Major crimes.

19       Q.    What are your duties in major crimes?

20       A.    I supervise the major case detectives, the

21   fraud detectives, court liaison, and missing persons.

22       Q.    Okay.  I want to turn your attention back to

23   August 28 of 1996 and ask you what division you were

24   assigned at that time?

25       A.    I was assigned to the Crimes Against Children

1    Unit.

2            Q.      What were your duties there?

3            A.      I was a detective.

4            Q.      Were you summoned out to Cook's Children's

5    Hospital on that day?

6            A.      Yes.

7            Q.      What was the purpose of your call on that day?

8            A.      They had an injured child.

9            Q.      And when you got to the hospital, did you see

10   the child?

11           A.      Yes, I did.

12           Q.      Let me show you a photograph marked State

13   Exhibit 941.  Is that Jerrod Smith, the child that was

14   injured?

15           A.      It is.

16           Q.      What was going on with Jerrod when you got

17   there?

18           A.      He was being treated by the medical personnel.

19           Q.      Did you speak with the physicians that were

20   working with him?

21           A.      Yes, sir.

22           Q.      And did you also interview any civilians that

23   were there?

24           A.      Yes, sir.

25           Q.      Who was that if you recall?

```
1        A.      Medical personnel, CPS.

2        Q.      Now, the civilian employees -- I mean, the

3   civilians -- the mother?

4        A.      The mother, yes.

5        Q.      Okay.  Was there a friend of the mother's

6   there, also?

7        A.      Yes.

8        Q.      Was that a woman by the name of Ramie Plummer?

9        A.      Yes, it was.

10        Q.      And did you get some affidavits from them?

11        A.      Yes, we did.

12        Q.      Did you also get an affidavit from a man by

13   the name of Randy Halprin?

14        A.      Yes, I did.

15        Q.      Do you see Mr. Halprin here in the courtroom

16   today?

17        A.      Yes, I do.

18        Q.      Where is he sitting?

19        A.      He's right there.

20        Q.      The man seated at the end with the coat and

21   tie at the end of the table?

22        A.      Yes, sir.

23              MR. SHOOK:  Your Honor, let the record

24   reflect the witness has identified the defendant.

25        Q.      (By Mr. Shook)  Now, did he give you an
```

1  affidavit that day?

2       A.    He did.

3       Q.    Where did that take place?

4       A.    At the Crimes Against Children's Office.

5       Q.    Let me show you State Exhibit 949.  Is that

6  the affidavit that Mr. Halprin gave?

7       A.    Yes.

8       Q.    Now, the words contained in here, are they --

9  how were they placed here?  Is this him dictating to

10  someone?

11      A.    Yes, sir.

12      Q.    Who does he dictate that segment to?

13      A.    There's a secretary.

14      Q.    Are you present at that time?

15      A.    Yes, sir.

16      Q.    The words contained in State Exhibit 949, are

17  they what his version of what he wants to put down in the

18  affidavit?

19      A.    Yes, sir.

20      Q.    All right.  And you were the investigating

21  officer on this case; is that right?

22      A.    That's correct.

23      Q.    When you started looking at this case, who

24  were you looking at as the possible suspects that caused

25  these injuries to Jerrod Smith?

1    A.    Initially we looked at all adult caretakers in

2    the home.

3    Q    Did you narrow your suspects down to two?

4    A.    Yes.

5    Q.    Who was that?

6    A.    The mother, the child's mother.  I believe her

7    name is Charity.  And Mr. Halprin.

8    Q.    Okay.  Now, I want to turn your attention to

9    September 4 of 1996 and ask on that day did you interview

10   Mr. Halprin?

11   A.    I did.

12   Q.    And this was a follow-up interview from the

13   first interview with him?

14   A.    That's correct.

15   Q.    During that interview did he admit to causing

16   the injuries to Jerrod Smith?

17   A.    Yes, he did.

18   Q.    Did he agree to give you a voluntary statement

19   at that time?

20   A.    Yes, he did.

21   Q.    Is that what we see in State Exhibit 948?

22   A.    Yes, sir.

23   Q.    Where did that statement -- where did you take

24   that statement?

25   A.    At our downtown office.

1    Q.    Okay.  Prior to him giving you that statement,

2  did you go over the Miranda warnings with him?

3    A.    Yes, sir, I did.

4    Q.    And they are contained there on the statement;

5  is that right?

6    A.    That's correct.

7    Q.    And how was the statement taken?

8    A.    Um, the same way.  He dictates it to a

9  secretary who is present.

10    Q.    Had he gone through the statement with you

11  before it was dictated?

12    A.    Yes, sir.  We had a brief interview.

13    Q.    And then the statement was dictated?

14    A.    That's correct.

15    Q.    Now, I want to -- there's one part that's

16  written in.  Originally it looked like the typed statement

17  said Thursday, August 29, 1996.  That's scratched out and 22

18  REH is there written in?

19    A.    That's correct.

20    Q.    What does that indicate?

21    A.    That indicates that he changed the date and

22  initialed it.

23    Q.    Now, we're talking about he said in his

24  voluntary statement that the 22nd of August would be the

25  date that this happened; is that right?

```
 1          A.     That's correct.

 2          Q.     Which would be here?

 3          A.     That's correct.

 4          Q.     When you take a voluntary statement, do you

 5   just put in it what the suspect tells you?

 6          A.     That's correct.

 7          Q.     If you think he's lying or minimizing in any

 8   way, do you try to change the statement?

 9          A.     No, sir.

10          Q.     This is his version?

11          A.     That's correct.

12          Q.     All right.  Now, he talks and goes in some

13   detail about how these injuries occurred.  Let me turn your

14   attention here to when he talks about hitting Jerrod.  "The

15   first time I hit Jerrod he was sitting up on the bed and I

16   hit him up side the left side of his head, just a slap.  I

17   hit him about five or six times.  I didn't realize how hard

18   I was hitting him.  He laid back down and I pulled him back

19   up and he was saying, 'mama'.  And I said, 'Do you want to

20   go to mama,' and put him down.  And then I kicked him on his

21   real hurt knee and then he fell down.  I got back up and I

22   pushed him back down and he hit the floor real hard.  I

23   pulled him back up right hard by the wrist and I was telling

24   him to stop crying.  I didn't realize that was hurting him,

25   but I think that I could have broken his arms then.  I could
```

1   have hurt his other leg when I was pushing him back down

2   because he was trying to stay off his hurt leg and he was

3   twisting, trying to get away, and I was shoving him back

4   down.  I guess I hurt his eye when I slapped him because I

5   was slapping him hard enough to bruise his face.  I wasn't

6   aiming for any particular place.  I was just slapping him.

7   I got scared and I put him down on the bed and kept saying,

8   'I'm sorry, I'm sorry.'"

9              Now, do you recall when he went through that

10  sequence with you?

11       A.    Yes, I do.

12       Q.    And why is it that is something that you

13  recall?

14       A.    Well, Mr. Halprin probably gave one of the

15  most animated interviews or confessions that I ever took

16  when he was describing that.

17       Q.    When you say "animated," what do you mean?

18       A.    He showed me.  He described to me exactly what

19  he was doing.  And like when he said he was slapping the

20  child, I mean, he went through saying he slapped him

21  repeatedly (demonstrating) and the part about where he says

22  "mama", he said the little boy was asking for his mama

23  saying, "I want my mama."  And he was mocking him, saying,

24  "You want your mama?"  And knocked him off of the bed and

25  got up.  And, I mean, he got up out of the chair and

1    physically showed me how he was kicking the child. So I

2    will probably never forget that.

3                    MR. SHOOK:  Your Honor, can I have the

4    witness step down for a moment?

5                    THE COURT:  She may.

6         Q.    (By Mr. Shook)  Sergeant Camper, if you could,

7    just demonstrate the way Randy Halprin demonstrated to you

8    how he caused these injuries.

9         A.    When I asked him how he slapped the child, he

10   repeatedly did like this (demonstrating) and then he made

11   the mocking face, saying, "You want your mama?"  So then he

12   pushes the child off of there and then went to

13   (demonstrating) do like this where he was kicking the baby

14   on the floor.

15        Q.    Did he demonstrate how the child was trying to

16   twist away from him?

17        A.    Yes, he did.  He said that the little boy on

18   his bad leg was twisting, trying to get away from him and as

19   he was doing that, he was kicking the child in the legs and

20   knocked him down to the floor.

21        Q.    All right.  Now, the statement does not

22   contain any information about him being under the influence

23   of acid or any other drug; is that right?

24        A.    That's correct.

25        Q.    Did he ever tell you that?

1    A.    Never.

2    Q.    If he had told you that he was under the

3  influence of acid or on acid or LSD at the time, would you

4  have put that in the statement?

5    A.    Yes, sir.

6    Q.    So at no time during the interview or while he

7  was dictating the statement did he ever mention that fact to

8  you?

9    A.    No, never.

10    Q.    Did you see any signs of remorse when he was

11  describing how he committed these injuries?

12    A.    No, sir, he was rather matter of fact.

13              MR. SHOOK:  We'll pass the witness.

14              CROSS-EXAMINATION

15  BY MR. KING:

16    Q.    Detective, you talked with Mr. Plummer, did

17  you not?

18    A.    I did.

19    Q.    That was during the course of your

20  investigation?

21    A.    I did.

22    Q.    Mr. Plummer told you that everybody there at

23  the apartment had been doing some drugs, smoking some dope

24  and doing some acid, hadn't they?

25    A.    No, sir, I don't recall that.

1      Q.      You don't recall that at all?

2      A.      No, sir.

3      Q.      But if that's in an offense report some place,

4  that would just be some aberration?

5      A.      I don't know what to tell you.  I don't recall

6  that at all.

7      Q.      Did you bring your notes of the interview that

8  you had with Mr. Halprin today?

9      A.      Um, yes, just what I turned in.

10      Q.      Do you have any handwritten notes that you

11  made back on that day?

12      A.      No, sir.

13      Q.      Was this videotaped or audio recorded?

14      A.      No, sir.

15      Q.      You were aware, were you not, that the child

16  had a severe earache.  You were aware of that?

17      A.      I was told that.

18      Q.      Were you aware that also that the Plummers,

19  Mr. Plummer specifically, had pinkeye and they were

20  suffering from some pinkeye as well?

21      A.      I do recall that, yes.

22      Q.      Are you familiar with the fact that the child

23  sometime in December, once again, being treat for a severe

24  ear infection and pinkeye?

25      A.      I don't recall about December, specifically.

1    Q.    Very well.  Do you recall from the statements

2    you took from the Plummers and from Ms. Smith that Ms. Smith

3    specifically told you the child had fallen and hit its face

4    on a dresser while it was trying to stand up one day?

5    A.    I do recall that about her statement, yes.

6    Q.    All right.  It resulted in some of the

7    bruising that we see in the photographs and a cut on the

8    child's face; is that right?

9    A.    I can't say.  I can only tell you what she

10   told me.

11   Q.    But that's in the statements, right?

12   A.    That's in her statement, yes.

13   Q.    Okay.  She's talking about a bump on the

14   child's head and some type of cut and bruising on the

15   child's head that resulted not from Randy Halprin hitting

16   the child, but from the child having struck its head on a

17   drawer?

18   A.    I can only tell you what she reported to me

19   and not conclusively what caused what injury.  But, yes, she

20   did report that to me.

21   Q.    All right.  I understand.  She also reported

22   that she got some type of blisters or ulcers in her mouth

23   when she was sick, did she not?

24   A.    I don't recall.

25   Q.    All right.  Well, if that was in the statement

1  that Ms. Plummer gave that memorialized that particular

2  conversation, you just haven't refreshed your memory from

3  that particular document before you testified today?

4       A.     I don't recall that about blisters, no.

5       Q.     Okay.  Now, you specifically asked Mr. Halprin

6  about whether or not he burned the child with a cigarette,

7  correct?

8       A.     I did.

9       Q.     Mr. Halprin was telling you that he flipped

10 out and started wailing on this kid, right?

11      A.     That's correct.

12      Q.     And how long had you been with CPS at that

13 point in time -- I'm sorry, with Ft. Worth and with the

14 child investigations?

15      A.     Um, this was in August -- probably about a

16 year.

17      Q.     Okay.  But he admits striking and kicking the

18 child, just as he described to you; is that correct?

19      A.     That's correct.

20      Q.     But he said, no, I didn't burn the child with

21 anything.

22      A.     That's what he said.

23      Q.     Now, did you -- were you present at the time

24 of sentencing for Mr. Halprin?

25      A.     No, sir.

1    Q.    Did you follow the case through the court

2  since you were the officer that filed the case?

3    A.    I did find out later that he had pled out.  Is

4  that what you are asking me?

5    Q.    Partially.  I just want to try to find out --

6    A.    I do check up on my cases, yes, to find out

7  what happened to them.

8    Q.    Did you stay in touch with the District

9  Attorney or the Assistant District Attorney assigned to the

10  case to see what information was received at sentencing of

11  any kind?

12    A.    No, sir.

13    Q.    Now, did you explain to Mr. Halprin what

14  injuries the child had?

15    A.    Um, I don't recall, honestly.

16    Q.    Well, it appears -- I'm sorry, I didn't mean

17  to interrupt.  Go ahead.

18    A.    I'm sure that we discussed that, yes.

19    Q.    All right.  Because he's trying to explain how

20  what he might have done to cause the injuries to the arms,

21  correct?

22    A.    That's correct.

23    Q.    And he said, well, I grabbed the arms and that

24  might have been when I did that?

25    A.    That's correct.

1    Q.    So you were telling him, well, this kid has

2  two broken arms and two broken legs.  Tell me what happened.

3    A.    Right.

4    Q.    Okay.  Did you investigate or talk to any of

5  the people at the shelter in regard to Ms. Smith and her

6  child going to day care at the shelter?

7    A.    That was included in the CPS investigation.

8    Q.    That would not have been your particular

9  aspect of the investigation.  Would that be a fair

10 assessment?

11   A.    That's correct.

12   Q.    So CPS might have looked at something like

13 that, but you didn't do that to see if the child had been

14 receiving some bruising on a regular basis or something?

15   A.    They did do that.  I know that for a fact,

16 yes.

17   Q.    So you are aware that there was something to

18 indicate from Mrs. Plummer, possibly, the child was coming

19 back from day care with bruises?

20   A.    I can't tell you the specifics.

21   Q     All right.  I presume you have investigated a

22 lot of child abuse cases?

23   A.    Yes, sir.

24   Q.    You have investigated a lot of child abuse

25 cases with parents that have drug or alcohol or substance

1    abuse problems?

2         A.    That's -- yes, that's true.

3         Q.    And you have investigated a lot of cases where

4    children live in squalid conditions?

5         A.    That's correct.

6         Q.    Families don't have much education?

7         A.    That's correct.

8         Q.    All right.  And I'm sure that you have

9    investigated cases where people just snap for some reason

10   and do something very, very bad?

11        A.    Yes, I have investigated those cases.

12             MR. KING:  I don't have anything further,

13   Your Honor.  Thank you, ma'am.  Pass the witness.

14             MR. SHOOK:  Nothing further.

15             THE COURT:  Thank you, Sergeant.

16             MR. SHOOK:  May this witness be excused?

17             MR. KING:  We have no objection.

18             THE COURT:  She may.

19             MR. SHOOK:  May we approach, Judge?

20             THE COURT:  Yes.

21                  (Bench conference)

22             THE COURT:  Members of the jury, it's

23   only 3:00 in the afternoon and we have to balance the number

24   of witnesses that are available against -- we never know how

25   long a jury may be out deliberating.

1    At this time we are at conclusion for today's

2 testimony.  We have a full day tomorrow.  If you will, once

3 again, all the previous instructions still apply.  Don't

4 talk about this case.  Don't let anybody else share their

5 opinions, you know, everything else is still -- just because

6 we're in the second phase of the trial, all the previous

7 instructions remain.

8    If you would, be back tomorrow morning at 8:30

9 for continuation of this punishment phase of the trial.

10 I'll see you at that time.

11                    [End of Volume]

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF TEXAS          *

2    COUNTY OF DALLAS        *

3        I, NANCY BREWER, Official Court Reporter for the 283rd

4    Judicial District Court, do hereby certify that the above

5    and foregoing constitutes a true and correct transcription

6    of all portions of evidence and other proceedings requested

7    in writing by counsel for the parties to be included in this

8    volume of the Reporter's Record, in the above-styled and

9    numbered cause, all of which occurred in open court or in

10   chambers and were reported by me.

11       WITNESS MY OFFICIAL HAND on this the _29_ day of

12   _____O_____, 2003.

13

14

15                           _Nancy Brewer_
                             NANCY BREWER, CSR, NO. 5759
16                           Expiration Date:  12-31-04
                             Official Reporter, 283rd JDC
17                           Frank Crowley Crts. Bldg. LB33
                             133 No. Industrial Blvd.
18                           Dallas, TX 75207
                             (214)653-5863
19

20

21

22

23

24

25