ORIGINAL

CAUSE NO.   W01-00327-S(A)

EX PARTE                          )       IN THE 283rd JUDICIAL

                                  )

                                  )       DISTRICT COURT OF

                                  )

RANDY ETHAN HALPRIN               )       DALLAS COUNTY, TEXAS


REPORTER'S RECORD


VOLUME 2 OF 4 VOLUMES


On August 20, 2010, came on to be heard before the
HONORABLE RICK MAGNIS, Judge of the 283rd Judicial
District Court of Dallas County, Texas, the above
entitled and numbered cause.


Proceedings reported by computerized stenotype
machine; Reporter's Record produced by computer-assisted
transcription.

1              A P P E A R A N C E S

2

3   MS. LISA SMITH
    State Bar No. 00787131
4   MS. KIM SCHAEFER
    State Bar No. 00784910
5   Assistant District Attorneys
    Frank Crowley Courts Building
6   133 N. Riverfront Blvd.
    Dallas, Texas 75207
7   (214) 653-3600

8                        FOR THE STATE OF TEXAS

9   MR. BRUCE ANTON
    State Bar No. 01274700
10  MR. GARY UDASHEN
    State Bar No. 20369590
11  Attorneys at Law
    Suite 400
12  2301 Cedar Springs Road
    Dallas, Texas 75201
13  (214) 468-8100

14                       FOR THE APPLICANT

15

16

17

18

19

20

21

22

23

24

25

CHRONOLOGICAL INDEX

VOLUME 2

August 20, 2010

WITNESSES CALLED IN WRIT HEARING

| | DIRECT | CROSS | COURT | VOL. |
|---|---|---|---|---|
| APPLICANT'S WITNESSES | | | | |
| George Ashford | 6,161 | 82 | | 2 |
| Edwin V. King | 176 | 213 | 250 | 2 |
| REPORTER'S CERTIFICATE | | | 257 | 2 |
| ALPHABETICAL INDEX | | | | |
| George Ashford | 6,161 | 82 | | 2 |
| Edwin V. King | 176 | 213 | 250 | 2 |

1 | EXHIBIT INDEX

2 | DFNDNT DESCRIPTION    OFFERED         ADMITTED      VOL.

| DFNDNT | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 1 | Goodness report | | 12 | 2 |
| 2 | adoption records | 28 | 28 | 2 |

| STATE | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| M | research | 92 | | 2 |
| N | research | 92 | | 2 |
| O | note | 114 | 114 | 2 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S

 2              (The following proceedings were had

 3              on August 20, 2010:)

 4              THE COURT:  This is Cause Number

 5    WO1-00327-SA, Ex Parte Randy Ethan Halprin.  This is a

 6    hearing -- evidentiary hearing regarding the writ filed

 7    on Mr. Halprin's behalf.

 8              Are both sides ready to proceed?

 9              MR. UDASHEN:  We're ready.

10              MS. SMITH:  State is ready.

11              THE COURT:  Are there any matters that we

12    need to take up before we start calling witnesses?

13              MR. UDASHEN:  I filed a few things this

14    morning but they don't need to be taken up before we

15    call witnesses.

16              THE COURT:  Does the State have anything to

17    take up at this time?

18              MS. SMITH:  We want to state for the record

19    there have been multiple pleadings in these writ

20    proceedings.  We have an original writ file, amended

21    writ file.  We have had a supplemental brief filed.  We

22    have got additional arguments.  To the extent that any

23    of the pleadings after the original writ raise any new

24    claim, the State is not waiving any procedural bar

25    arguments.
```

09:19AM 1          It's the State's position that any new

09:19AM 2 claims should be designated and forwarded to the CCA.  I

09:19AM 3 understand the Judge is of the mind we should litigate

09:19AM 4 things now and get this on the road.  For future

09:19AM 5 reference, the State is not waiving its procedural

09:19AM 6 arguments.

09:19AM 7          THE COURT:  Okay.  Does the defense -- the

09:19AM 8 Applicant have any witnesses it wishes to call at this

09:20AM 9 time?

09:20AM 10          MR. ANTON:  Call Mr. Ashford, Your Honor.

09:20AM 11          THE COURT:  Mr. Ashford present?

09:20AM 12          Mr. Ashford, you've been called as a

09:20AM 13 witness.

09:20AM 14          Either side wish to have Mr. Ashford sworn?

09:20AM 15          MR. ANTON:  No, Your Honor.

09:20AM 16          THE COURT:  You're an officer of the court

09:20AM 17 and should conduct yourself appropriately.

09:20AM 18          THE WITNESS:  Yes, sir.

09:20AM 19          GEORGE ASHFORD,

09:20AM 20 was called as a witness by the Applicant, testified as

09:20AM 21 follows:

09:20AM 22          DIRECT EXAMINATION

09:20AM 23 BY MR. ANTON:

09:20AM 24    Q.   State your name for the record.

09:20AM 25    A.   George Ashford.

09:20AM  1      Q.   What role did you play in the trial of Randy

09:20AM  2   Halprin?

09:20AM  3      A.   I was lead counsel.

09:20AM  4      Q.   You've been subpoenaed to appear here today at

09:20AM  5   the hearing?

09:20AM  6      A.   That's correct.

09:20AM  7      Q.   I think the subpoena was duces tecum for your

09:21AM  8   file as well.

09:21AM  9      A.   I believe the Court has my file.

09:21AM 10           THE COURT:  For the record it is the

09:21AM 11   Court's belief -- and counsel can correct me if I'm

09:21AM 12   wrong -- that Mr. Ashford's file is in the Court's

09:21AM 13   library and has been so for several years.

09:21AM 14           Is that correct?

09:21AM 15           MS. SMITH:  I believe that's correct.  I

09:21AM 16   think couple of years ago we had him bring his files to

09:21AM 17   the Court.  I think they were given to defense counsel

09:21AM 18   for them to review before you okayed me having access to

09:21AM 19   them.

09:21AM 20           THE COURT:  That's correct.

09:21AM 21           THE WITNESS:  Wouldn't have been several

09:21AM 22   years.  I think it's been several months.

09:21AM 23           THE COURT:  I stand corrected.  Thank you.

09:21AM 24      Q.   (By Mr. Anton) Sir, you understand the purpose

09:21AM 25   of today's hearing is to discuss actions and conduct in

09:22AM  1  regard to representation of Mr. Halprin at trial?

09:22AM  2      A.   Yes.

09:22AM  3      Q.   I believe at the trial were you designated as

09:22AM  4  lead counsel?

09:22AM  5      A.   Yes.

09:22AM  6      Q.   And co-counsel was?

09:22AM  7      A.   Edwin, Bubba, King.

09:22AM  8      Q.   Now, in regard to the trial was there any

09:22AM  9  understanding in advance between you and Mr. King in

09:22AM  10  terms of division of labor, division of issues,

09:22AM  11  presentation of witnesses?

09:22AM  12      A.   Yes.  I can't tell you exactly what it was but

09:22AM  13  I know Mr. King was responsible for all the pretrial

09:22AM  14  matters.  Mr. King was responsible for presentation of

09:22AM  15  Randy as a witness.  How we divided the witnesses, some

09:23AM  16  of that stuff was not really specific.  We kind of did

09:23AM  17  it as we went along.

09:23AM  18      Q.   Specifically in regards --

09:23AM  19          THE COURT:  Mr. Anton, before we proceed,

09:23AM  20  just as a procedural matter, I did adopt the State's

09:23AM  21  proposed order designating issues for this writ hearing.

09:23AM  22  And the order is broken into three grounds:  ground

09:23AM  23  four, five and six.  Ground six regards ineffective

09:23AM  24  assistance of counsel on appeal.  We did not have

09:23AM  25  appellate counsel testify today; is that correct?

09:23AM  1             MS. SMITH:  Mr. Ashford was also appellate

09:23AM  2  counsel.

09:24AM  3             THE COURT:  You were appellate counsel as

09:24AM  4  well?

09:24AM  5             THE WITNESS:  I was appellate counsel, Your

09:24AM  6  Honor, but I designated the appellate work to another

09:24AM  7  attorney, Mr. Michael Muhammed.

09:24AM  8             THE COURT:  You and Mr. Muhammed were the

09:24AM  9  attorneys of record on appeal?

09:24AM 10             THE WITNESS:  Correct.

09:24AM 11             THE COURT:  Thank you.  I wanted to clarify

09:24AM 12  that.

09:24AM 13       Q.   (By Mr. Anton) I'm sorry.  Specifically in

09:24AM 14  regard to the presentation of evidence at the punishment

09:24AM 15  phase of trial, was that primarily your responsibility?

09:24AM 16       A.   Yes.

09:24AM 17       Q.   And dealing with Kelly Goodness, the mitigation

09:24AM 18  expert?

09:24AM 19       A.   Yes.

09:24AM 20       Q.   Have you had an opportunity to review the writ

09:24AM 21  that was filed?

09:24AM 22       A.   Briefly at the time it was filed.

09:24AM 23       Q.   And have you had an opportunity to review any

09:24AM 24  part of the trial record, your file in preparation for

09:24AM 25  this hearing?

BRIDGET BARNHILL, OFFICIAL REPORTER

09:24AM  1          A.   No.

09:24AM  2          Q.   I believe we have got the transcript here.  I

09:25AM  3     think your file is in the office.  If there's anything

09:25AM  4     we ask you that you think you'd want to look at

09:25AM  5     additional materials to help you answer, just let us

09:25AM  6     know.  We would like to have as complete an explanation

09:25AM  7     as we could.  All right?

09:25AM  8          A.   Okay.

09:25AM  9          Q.   Starting out with the punishment phase of

09:25AM  10    trial, you employed Dr. Kelly Goodness; is that right?

09:25AM  11         A.   Correct.

09:25AM  12         Q.   She was to be your mitigation expert?

09:25AM  13         A.   Yes.

09:25AM  14         Q.   Had you worked with her in the past?

09:25AM  15         A.   No.

09:25AM  16         Q.   When you got with her I assume that you

09:25AM  17    discussed a list of materials that she would need for

09:25AM  18    her presentation; is that right?

09:25AM  19         A.   I pretty much listened to her as to what she

09:25AM  20    had done in the past, the general way she would try to

09:26AM  21    conduct a mitigation.  My input to her would have been

09:26AM  22    trying to locate witnesses, those types of things.

09:26AM  23         Q.   And my understanding is that she didn't do any

09:26AM  24    independent investigation herself but relied upon the

09:26AM  25    defense team to provide her the materials necessary for

09:26AM 1    her to do her evaluation; is that right?

09:26AM 2        A.   No.   Actually I think she did quite a bit of

09:26AM 3    investigation herself.

09:26AM 4        Q.   Okay.   Do you recall what materials were

09:26AM 5    provided?

09:26AM 6        A.   What materials were provided to who from who?

09:26AM 7        Q.   Ms. Goodness.

09:26AM 8        A.   What I provided to her?

09:26AM 9        Q.   Yes.

09:26AM 10       A.   Specifically, no.   I know I had talked to a

09:27AM 11   group of students from SMU and a professor at SMU who

09:27AM 12   volunteered to help on the case.   They had some Internet

09:27AM 13   communications that were written about Randy that were

09:27AM 14   reduced to print.   And some of those people indicated

09:27AM 15   that they knew Randy when he was a teenager.

09:27AM 16            And I gave all that to her so she could try

09:27AM 17   to locate some of those people which I think that she

09:27AM 18   did.   I'm sure I gave her offense reports, those types

09:27AM 19   of things, the names of Randy's adoptive parents, the

09:27AM 20   name of Randy's actual brother, the name of Randy's

09:28AM 21   birth mother.   Those types of things she was

09:28AM 22   investigating for us.

09:28AM 23       Q.   Did she provide you a written report and

09:28AM 24   evaluation of your client?

09:28AM 25       A.   She did.

| | | |
|---|---|---|
| 09:28AM | 1 | MR. ANTON:  May I approach the witness, |
| 09:28AM | 2 | Your Honor? |
| 09:28AM | 3 | THE COURT:  You may. |
| 09:28AM | 4 | MR. ANTON:  Mark this as hearing -- |
| 09:28AM | 5 | Defendant's Hearing Exhibit Number 1 if I could. |
| 09:28AM | 6 | Q.   (By Mr. Anton) Let me show you what's been |
| 09:28AM | 7 | marked Defendant's Hearing Exhibit Number 1.  Is that a |
| 09:29AM | 8 | copy of the report? |
| 09:29AM | 9 | A.   I believe it is. |
| 09:29AM | 10 | MS. SMITH:  No objection. |
| 09:29AM | 11 | THE COURT:  Admitted. |
| 09:29AM | 12 | (Defendant's Hearing Exhibit 1 admitted |
| 09:29AM | 13 | into evidence and is attached to this |
| 09:29AM | 14 | transcript.) |
| 09:29AM | 15 | Q.   (By Mr. Anton) Now, going back, there's an |
| 09:29AM | 16 | attachment A that says "case materials reviewed." |
| 09:29AM | 17 | That's on page 18 of the report, 18 and 19.  Would you |
| 09:29AM | 18 | take a look at that?  Does that seem to correctly |
| 09:29AM | 19 | reflect what was provided to her? |
| 09:29AM | 20 | A.   Yes, it does.  It looks like probably pretty |
| 09:29AM | 21 | much everything that we had. |
| 09:29AM | 22 | Q.   I would like to ask about a couple of these |
| 09:29AM | 23 | things if you can recall.  Some of the material -- the |
| 09:30AM | 24 | investigation research were a couple of binders prepared |
| 09:30AM | 25 | by the SMU death penalty clinic regarding background; is |

| | | |
|---|---|---|
| 09:30AM | 1 | that right? |
| 09:30AM | 2 | A.   Correct. |
| 09:30AM | 3 | Q.   Then there were materials regarding the Oneida |
| 09:30AM | 4 | Baptist Institute academic records and school records. |
| 09:30AM | 5 | Do you know if those were something that you obtained in |
| 09:30AM | 6 | discovery from the State or did you get those |
| 09:30AM | 7 | independently to provide to her? |
| 09:30AM | 8 | A.   Of course, the SMU material I gave her and to |
| 09:30AM | 9 | the best of my recollection I believe -- well, it says |
| 09:30AM | 10 | that she was provided it so I was about to say she got |
| 09:30AM | 11 | all of that herself but I don't remember getting any of |
| 09:30AM | 12 | that from the State.  I don't remember us finding it.  I |
| 09:30AM | 13 | can't answer that. |
| 09:31AM | 14 | Q.   Okay.  A lot of these materials you can see are |
| 09:31AM | 15 | police reports and autopsy reports and so on.  I assume |
| 09:31AM | 16 | many of these would be things you got from the State in |
| 09:31AM | 17 | the course of discovery. |
| 09:31AM | 18 | A.   Correct. |
| 09:31AM | 19 | Q.   Another section regards the adoption records |
| 09:31AM | 20 | and related documents.  There were apparently a couple |
| 09:31AM | 21 | of binders related to the adoption records both in court |
| 09:31AM | 22 | and in the social study.  Do you recall that? |
| 09:31AM | 23 | A.   Correct. |
| 09:31AM | 24 | Q.   Do you recall if that was something you got |
| 09:31AM | 25 | from the State or if that was something that you through |

09:31AM 1 your investigator got independently?

09:31AM 2     A.   I don't recall but I don't remember instructing

09:31AM 3 an investigator to do any of that.  My memory of that is

09:31AM 4 that Dr. Goodness got all of that herself.  So if it

09:31AM 5 says that it was provided to her, then it had to have

09:32AM 6 come from the State.

09:32AM 7     Q.   In regard to obtaining those records -- and I'm

09:32AM 8 primarily concerned with the adoption records and the

09:32AM 9 school records -- do you know if when they were obtained

09:32AM 10 they were obtained with a business records affidavit or

09:32AM 11 some other sponsoring witness where they would have met

09:32AM 12 the predicate for admission?

09:32AM 13     A.   No.

09:32AM 14     Q.   You're saying you don't recall or they weren't

09:32AM 15 done that way?

09:32AM 16     A.   I don't recall.

09:32AM 17     Q.   Would there have been a reason for not wanting

09:32AM 18 them with an accompanying affidavit or in a manner that

09:32AM 19 could have made them admissible in court?

09:33AM 20     A.   Not that I know of.

09:33AM 21     Q.   Was there any strategy not to get a business

09:33AM 22 records or sponsoring witness for them?

09:33AM 23     A.   No.

09:33AM 24     Q.   And I assume that you reviewed those materials

09:33AM 25 and you talked with Dr. Goodness several times before

09:33AM 1   her presentation; is that right?

09:33AM 2        A.   Yes.

09:33AM 3        Q.   Now, would it be fair to say that the bulk of

09:33AM 4   the punishment presentation or the primary evidence that

09:33AM 5   you intended to present at punishment dealt with Dr.

09:33AM 6   Goodness' presentation?

09:33AM 7        A.   Correct.

09:33AM 8        Q.   Aside from Dr. Goodness' presentation, what

09:33AM 9   other -- was there any other independent mitigating

09:33AM 10  evidence that you can recall presenting?

09:34AM 11       A.   Presented or that we wanted to present?

09:34AM 12       Q.   Let's go to wanted to present.  I'm asking

09:34AM 13  about your general strategy.  What was your approach at

09:34AM 14  punishment?

09:34AM 15       A.   Our theory of the case was that Randy had been

09:34AM 16  adopted by a family who once they adopted he and his

09:34AM 17  brother Wesley found out they weren't the optimum kids.

09:34AM 18  They weren't doing well in school.  They had poor

09:34AM 19  behavior.

09:34AM 20            So when they were unsatisfied with them,

09:34AM 21  they basically abandoned them and adopted some new kids.

09:34AM 22  And they were treated poorly.  They were pretty much out

09:34AM 23  there on their own as kids.  They were emotionally

09:34AM 24  unsupported.  They were financially unsupported.

09:35AM 25            And that pretty much led to Randy getting

BRIDGET BARNHILL, OFFICIAL REPORTER

09:35AM 1  involved with the wrong people, going to prison and then

09:35AM 2  eventually getting involved with the Texas Seven.

09:35AM 3      Q.   Okay.  Would it be fair to say that your

09:35AM 4  punishment presentation rested mainly on Dr. Goodness'

09:35AM 5  presentation?

09:35AM 6      A.   As it ended up, yes.

09:35AM 7      Q.   Well, I mean assuming that you had gotten

09:35AM 8  everything through her that you wanted to get in

09:35AM 9  evidence, that was your major punishment presentation;

09:35AM 10  is that correct?

09:35AM 11      A.   Correct.

09:35AM 12      Q.   If she had -- aside from her testimony -- aside

09:35AM 13  from her report, what other -- what other mitigating

09:35AM 14  evidence in your strategy would you have presented?

09:35AM 15      A.   Well, we were actively looking for

09:35AM 16  individuals -- excuse me -- live bodies, persons who

09:35AM 17  could come and testify to basically what I just said.

09:36AM 18  We were able to locate his brother.  We were able to

09:36AM 19  locate his birth mother.  We thought we had them on

09:36AM 20  board for a moment until they what I would call flaked

09:36AM 21  out on us.

09:36AM 22          We did call -- we did find one witness that

09:36AM 23  was in the service in Shreveport.  He came and basically

09:36AM 24  testified to say, you know, our theory.  And Dr.

09:36AM 25  Goodness was looking -- I believe our investigator Bill

| | | |
|---|---|---|
| 09:36AM | 1 | Hunt was looking for other people who Randy would give |
| 09:36AM | 2 | us a name of or who we identified through that SMU |
| 09:36AM | 3 | Internet data that we had. |
| 09:36AM | 4 | But we just couldn't find the people.  We |
| 09:37AM | 5 | couldn't locate live bodies.  Passage of time, lack of |
| 09:37AM | 6 | addresses, phone numbers, Internet.  Email addresses had |
| 09:37AM | 7 | changed.  We just couldn't find live bodies except for |
| 09:37AM | 8 | the one. |
| 09:37AM | 9 | Q.   You talked about contacting Anna Lester, the |
| 09:37AM | 10 | natural mother. |
| 09:37AM | 11 | A.   Correct. |
| 09:37AM | 12 | Q.   And you talked about contacting Wesley Halprin, |
| 09:37AM | 13 | the brother. |
| 09:37AM | 14 | A.   Correct. |
| 09:37AM | 15 | Q.   Did you contact the natural father? |
| 09:37AM | 16 | A.   No. |
| 09:37AM | 17 | Q.   There were -- I believe in Dr. Goodness' report |
| 09:37AM | 18 | she lists a number of witnesses that she spoke to. |
| 09:37AM | 19 | THE COURT:  Excuse me, Mr. Anton. |
| 09:37AM | 20 | Just to be clear, did you attempt to find |
| 09:37AM | 21 | the natural father and was unable to or did you not |
| 09:37AM | 22 | attempt to? |
| 09:37AM | 23 | THE WITNESS:  Judge, I don't recall ever |
| 09:37AM | 24 | any conversation about the natural father. |
| 09:37AM | 25 | THE COURT:  Thank you.  Go ahead, Mr. |

09:37AM  1  Anton.

09:37AM  2      Q.   (By Mr. Anton) For the ones that you were able

09:38AM  3  to contact, Wesley Halprin and Anna Lester, did you

09:38AM  4  subpoena them?

09:38AM  5      A.   No.

09:38AM  6      Q.   Was there a reason that they were not

09:38AM  7  subpoenaed?

09:38AM  8      A.   Yes.

09:38AM  9      Q.   What is that?

09:38AM  10      A.   After Dr. Goodness had spoken at length on

09:38AM  11  several occasions with Wesley and Anna Lester and they

09:38AM  12  were very positive and they were very ready to go on

09:38AM  13  board and help us, at least in her opinion, I think the

09:38AM  14  State paid them a visit.  I think it was Toby Shook and

09:38AM  15  at least a couple of investigators.

09:38AM  16          It was Dr. Goodness' opinion that they had

09:39AM  17  been somewhat intimidated and I don't mean physically

09:39AM  18  intimidated, "If you come to court we're going to do

09:39AM  19  something to you," but just made to feel small, made to

09:39AM  20  feel inadequate, made to feel like they wouldn't help.

09:39AM  21          And then they started, as I described,

09:39AM  22  flaking out on us.  They stopped returning Dr. Goodness'

09:39AM  23  calls.  They kind of hid out from us when we went to try

09:39AM  24  to see them.  And in my opinion one of the worst

09:39AM  25  witnesses that you could have is a punishment witness

BRIDGET BARNHILL, OFFICIAL REPORTER

09:39AM  1    that is not really familiar with the defendant, is not

09:39AM  2    really familiar with the crimes that the defendant has

09:39AM  3    been convicted of or in any way is reluctant in their

09:39AM  4    testimony, they're not confident, they're not feeling

09:40AM  5    helpful.

09:40AM  6            That's just my opinion.  And when they

09:40AM  7    totally switched on us and totally switched their

09:40AM  8    position, then I decided not to call them.

09:40AM  9            MR. ANTON:  May I approach briefly, Your

09:40AM  10    Honor?

09:40AM  11        Q.    (By Mr. Anton) If you look at page 3 of her

09:40AM  12    report and the top of page 4 she lists a number of

09:40AM  13    witnesses and categorized them in two groups:  those

09:40AM  14    contacted and those in which unsuccessful attempts were

09:40AM  15    made.  You recognize that list?

09:40AM  16        A.    Yes.

09:40AM  17        Q.    Does that seem to be a complete list of the

09:40AM  18    witnesses that you had discussed with her about

09:40AM  19    contacting?

09:40AM  20        A.    It's more thorough than I remember.

09:40AM  21        Q.    Okay.  For the ones it says "third party

09:41AM  22    contacted," did you contact those witnesses

09:41AM  23    independently or do you know if she made contact or you

09:41AM  24    both made contact?

09:41AM  25        A.    Dr. Goodness made all contacts with those

BRIDGET BARNHILL, OFFICIAL REPORTER

09:41AM 1  witnesses other than the individual that we eventually

09:41AM 2  called.  And I believe I talked to Wesley Halprin's

09:41AM 3  girlfriend.  I don't think I ever actually talked to

09:41AM 4  Wesley myself.  And I know I didn't talk to any of the

09:41AM 5  other witnesses.

09:41AM 6       Q.  Okay.  In preparation for your presentation at

09:41AM 7  the mitigation stage then what was the strategic

09:41AM 8  thinking in having the contact of the witnesses, the

09:41AM 9  initial screening, however you want to call it,

09:41AM 10 originally done exclusively by Dr. Goodness?

09:41AM 11      A.  Well, that's kind of what we hired her for and

09:42AM 12 that's what she did.  And so we left it to her to find

09:42AM 13 people who we thought would help us and we make the

09:42AM 14 decision as to whether we would call them or not.

09:42AM 15      Q.  I guess my question was was there any

09:42AM 16 second-guessing of any of her decisions?  When she would

09:42AM 17 say to you -- let me rephrase that.

09:42AM 18           Based on your previous answers I'm assuming

09:42AM 19 that she told you at some point that she felt that Anna

09:42AM 20 Lester was flaking out, to use your term.

09:42AM 21      A.  Correct.

09:42AM 22      Q.  Was there -- what was the thinking about, you

09:42AM 23 know, just accepting that or saying, "Well, I need to go

09:42AM 24 contact her myself, make an independent determination"?

09:42AM 25      A.  Well, I trusted her.  I mean, as I said, she

09:42AM   1   had talked to either Wesley or Wesley's girlfriend and

09:42AM   2   Anna Lester more than once.  She had talked with them at

09:43AM   3   length.  She was very positive about -- well, she was

09:43AM   4   positive about Anna Lester.

09:43AM   5            Wesley was always somewhat apprehensive.  I

09:43AM   6   believe Wesley was on probation out of another county

09:43AM   7   and he was afraid that coming to court might somehow

09:43AM   8   jeopardize his probation.  He thought the State might

09:43AM   9   lean on him, revoke his probation in the other county.

09:43AM   10  So he was always reluctant.

09:43AM   11           But we were positive about the aspects of

09:43AM   12  calling them until this episode with the State and they

09:43AM   13  just totally shifted their attitude on us at that point

09:43AM   14  in time.

09:43AM   15      Q.   Okay.  I want to be clear about this when we

09:43AM   16  say exclusive contact through Dr. Goodness.  You have an

09:44AM   17  investigator, Bill Hunt, I believe, helping you.

09:44AM   18      A.   Correct.

09:44AM   19      Q.   He didn't contact these people directly either?

09:44AM   20      A.   You know, I don't remember but in actually

09:44AM   21  talking to Bill this week, I think Bill said that he did

09:44AM   22  go out there.  I don't know if he went out there with

09:44AM   23  Dr. Goodness or he helped Dr. Goodness to make contact

09:44AM   24  or he went out there on his own.  I assume he probably

09:44AM   25  did it with Dr. Goodness.  I didn't remember him going

09:44AM  1   out there but he said he did.

09:44AM  2                  THE COURT:  Out where?

09:44AM  3                  THE WITNESS:  To make contact with Randy's

09:44AM  4   mother and brother.

09:44AM  5                  THE COURT:  Where were they located?

09:44AM  6                  THE WITNESS:  I don't recall.  It wasn't

09:44AM  7   far, in Dallas County or the metroplex somewhere, I

09:44AM  8   believe.

09:44AM  9       Q.   (By Mr. Anton) There's also -- if you want to

09:44AM  10  look at the list again, there's a number of witnesses

09:44AM  11  that she was unable to locate.  Do you know if Mr. Hunt

09:44AM  12  made an independent effort to locate these witnesses?

09:45AM  13      A.   I don't believe so.  I think if you looked at a

09:45AM  14  lot of those witnesses, those would have been names from

09:45AM  15  that Internet communication or names that Randy gave us

09:45AM  16  that he was giving us at that time which would have

09:45AM  17  included people that he hasn't had any contact with for

09:45AM  18  10, 15 years.

09:45AM  19      Q.   Now, as lead chair in a death penalty case

09:45AM  20  obviously you've had experience in other death penalty

09:45AM  21  litigation; is that right?

09:45AM  22      A.   In one.  This was my second.

09:45AM  23      Q.   This was your second one?

09:45AM  24      A.   Yes.

09:45AM  25      Q.   Okay.  And I assume that you have gone -- I

BRIDGET BARNHILL, OFFICIAL REPORTER

09:45AM 1  think you're required to go to a lot of CLE and training

09:45AM 2  in death penalty.

09:45AM 3      A.   Correct.

09:45AM 4      Q.   A lot of that training is also centered on

09:46AM 5  presentation of mitigation defense.

09:46AM 6      A.   Correct.

09:46AM 7      Q.   And do you agree with the proposition that a

09:46AM 8  lot of punishment evidence, particularly in the

09:46AM 9  mitigation phase of a death penalty, is a two-edged

09:46AM 10 sword?

09:46AM 11     A.   Could help you; could hurt you.

09:46AM 12     Q.   Most of the witnesses -- the person's on Death

09:46AM 13 Row usually primarily because they have a criminal past;

09:46AM 14 is that correct?

09:46AM 15     A.   Correct.

09:46AM 16     Q.   They have mental, emotional problems, correct?

09:46AM 17     A.   Correct.

09:46AM 18     Q.   They have drug abuse problems?

09:46AM 19     A.   Correct.

09:46AM 20     Q.   And so a lot of the people that have known them

09:46AM 21 in their past, a lot of people would talk about that

09:46AM 22 background.  If they presented it, it's not going to be

09:46AM 23 favorable in some regard to the defense; is that right?

09:46AM 24     A.   I understand what you're saying.

09:46AM 25     Q.   Right.  How do you feel about that?

09:46AM 1        A.   Didn't apply to the witnesses I was just

09:46AM 2   talking about.  Okay?  I wasn't calling a psychiatrist

09:47AM 3   to say that, you know, Randy had mental issues that

09:47AM 4   caused him to do what he did.  I wasn't calling someone

09:47AM 5   to say that he was abused as a child.

09:47AM 6             Actually, I was looking for somebody to say

09:47AM 7   that he might have been emotionally abused in the way he

09:47AM 8   was dealt with in terms of his adoptive parents but I

09:47AM 9   wouldn't have been calling those family members for that

09:47AM 10  particular purpose.

09:47AM 11            I would have been calling those family

09:47AM 12  members primarily for emotional support.  His brother

09:47AM 13  would have just been backing up, you know, how they were

09:47AM 14  treated, so forth and so on.  And it wasn't that they

09:47AM 15  were going to say something negative that, you know,

09:47AM 16  Randy killed cats when he was a kid and I was afraid of

09:48AM 17  that.

09:48AM 18            I didn't want a family member, somebody

09:48AM 19  that I am calling to support this person, to get up

09:48AM 20  there and be wavering and be cowering under Toby Shook's

09:48AM 21  cross-examination.  I just think that has a bad, bad

09:48AM 22  effect as far as the jury is concerned when you call

09:48AM 23  somebody to support somebody and they get up there and

09:48AM 24  they do the exact opposite or they act like they're not

09:48AM 25  confident in their support of the person.

09:48AM 1      Q.   And it's a strategic decision not to call

09:48AM 2  somebody that's going to undermine your case or

09:48AM 3  presentation.

09:48AM 4      A.   Correct.

09:48AM 5      Q.   Dr. Goodness' role as a mitigation expert was

09:48AM 6  to cobble together the witnesses and the documents

09:48AM 7  necessary to present a background showing the abuse and

09:48AM 8  drug abuse and history that he had; is that right?

09:49AM 9      A.   Partially, yes.

09:49AM 10      Q.   Her role wasn't actually witness preparation,

09:49AM 11  was it?

09:49AM 12      A.   No.

09:49AM 13      Q.   Okay.   Whose role should witness preparation

09:49AM 14  be?

09:49AM 15      A.   Counsel.

09:49AM 16      Q.   At the mitigation seminars that are taught they

09:49AM 17  teach, don't they, that dealing with mitigation

09:49AM 18  witnesses is a process that you have to have numerous

09:49AM 19  contact with them and build an attitude of trust and

09:49AM 20  work with them in order to get them shaped up?   You

09:49AM 21  agree with that?

09:49AM 22      A.   I don't know that I have heard that

09:49AM 23  specifically but I wouldn't disagree with that.

09:49AM 24      Q.   Particularly in a death penalty case if you

09:49AM 25  have somebody that's going to be -- initially appears to

09:50AM 1   be a bad witness, would you agree there's some

09:50AM 2   obligation to -- well, first of all, in terms of them

09:50AM 3   being a bad witness, would you agree the proposition

09:50AM 4   that many witnesses are distrustful of the process at

09:50AM 5   the start?

09:50AM 6       A.   Absolutely.

09:50AM 7       Q.   Would you agree that it takes some work to get

09:50AM 8   them beyond that?

09:50AM 9       A.   Possibly.

09:50AM 10      Q.   How much, if you can recall, if it's reflected

09:50AM 11  in your notes or time sheets or pay sheets, whatever --

09:50AM 12  is there anything to show how many times you had contact

09:50AM 13  with Anna Lester as a potential witness?

09:50AM 14      A.   I could tell you I never spoke to Anna Lester.

09:50AM 15  I could tell you I never spoke to Wesley Halprin.  I

09:50AM 16  believe I spoke to Wesley Halprin's girlfriend who was

09:50AM 17  the person who was always calling and speaking on his

09:51AM 18  behalf and the person I was always trying to convince to

09:51AM 19  get him to come and talk to us.

09:51AM 20      Q.   Was there any effort to work with Wesley

09:51AM 21  Halprin as a witness?

09:51AM 22      A.   We trusted Dr. Goodness.  As I testified, when

09:51AM 23  that broke down I didn't personally make any effort to

09:51AM 24  talk to those individuals.

09:51AM 25      Q.   Do you think it was communicated to Dr.

09:51AM 1    Goodness that part of her role was to prepare these

09:51AM 2    people as witnesses, that she would be the one making

09:51AM 3    the decision about who to call or not to call?

09:51AM 4        A.    No.

09:51AM 5        Q.    Now, in putting the defense mitigation case

09:51AM 6    together, if I understood previously, a lot of focus was

09:52AM 7    going to be upon their interaction with their natural

09:52AM 8    parents before they were adopted and what happened to

09:52AM 9    them in that home before they were adopted; is that

09:52AM 10   right?

09:52AM 11       A.    From Wesley.  I believe truly all that Anna

09:52AM 12   Lester was going to do for us was come in and say that,

09:52AM 13   you know, "Our circumstances were really bad.  I gave my

09:52AM 14   kids up for adoption.  You know, I was in a real bad way

09:52AM 15   in terms of my situation at the time but I love my son.

09:52AM 16   Spare his life."

09:52AM 17            Wesley would have been able to more develop

09:52AM 18   the theory of how poorly they were treated by the

09:52AM 19   adoptive parents emotionally, kind of adopted and then

09:53AM 20   basically thrown out and -- like some unwanted pets and

09:53AM 21   the family actually adopted some new, better,

09:53AM 22   super-improved kids.

09:53AM 23            MR. ANTON:  May I approach the witness,

09:53AM 24   Your Honor?  Got one big binder here I'm going to call

09:53AM 25   Defendant's Hearing Exhibit Number 2.

09:53AM  1      Q.   (By Mr. Anton) These purport to be all the

09:53AM  2   records related to the adoption.

09:54AM  3      A.   Okay.

09:54AM  4            MR. ANTON:   We offer these.

09:54AM  5            MS. SMITH:   No objection.

09:54AM  6            THE COURT:   They're admitted.

09:54AM  7            (Defendant's Exhibit 2 admitted into

09:54AM  8             evidence and is attached to this

09:54AM  9             transcript.)

09:54AM  10     Q.   (By Mr. Anton) Did you have an opportunity to

09:54AM  11  review these prior to the trial?

09:54AM  12     A.   Yes.  And based on the number stamped on the

09:54AM  13  bottom of them I can further answer your question that

09:54AM  14  we received them from the State rather than us getting

09:54AM  15  them ourselves.

09:54AM  16     Q.   Would you agree that in the adoption records

09:54AM  17  that have been presented before the Court that there's a

09:55AM  18  number of specific incidents alleged of the abuse that

09:55AM  19  the children suffered, the drugs consumed by the

09:55AM  20  parents, that they bounced around between homes, issues

09:55AM  21  to that effect?

09:55AM  22     A.   I don't remember specifically but I wouldn't

09:55AM  23  dispute that.

09:55AM  24     Q.   Okay.  Well, do you recall getting the

09:55AM  25  information contained in those adoption records before

09:55AM  1    the Court was part of your strategy at mitigation?

09:55AM  2         A.    Yes.

09:55AM  3         Q.    The witnesses that would have known about that

09:55AM  4    or could have testified about that at the time would

09:55AM  5    include the natural mother and the natural father and

09:55AM  6    Wesley to some extent; is that right?

09:55AM  7         A.    Correct.

09:55AM  8         Q.    And there would be additional family members

09:55AM  9    listed in the adoption records and the police reports

09:56AM  10   that are contained within the adoption records regarding

09:56AM  11   the abuse that took place; is that right?

09:56AM  12        A.    If those are in there.  I don't remember but --

09:56AM  13        Q.    Well, I understand it's been a long time.  I

09:56AM  14   guess the question is looking back, was getting the

09:56AM  15   information contained in those adoption records, was

09:56AM  16   that a key part of the strategy or just additional

09:56AM  17   information that's not what you were focusing on?

09:56AM  18        A.    I don't know how to answer that.  I mean if any

09:56AM  19   witness contained in there could have helped advance the

09:56AM  20   strategy, then it would be a key part of the strategy.

09:56AM  21        Q.    Now, if the witnesses themselves were not going

09:56AM  22   to be called at trial to testify about the events

09:56AM  23   contained in the adoption records, alternatively that

09:57AM  24   information could have gotten before the jury by

09:57AM  25   introducing the adoption records themselves; is that

09:57AM 1  correct?

09:57AM 2      A.   That's correct.

09:57AM 3      Q.   Okay.  But the adoption records were never

09:57AM 4  actually offered; is that correct?

09:57AM 5      A.   That's correct.

09:57AM 6      Q.   What was the reason for that?

09:57AM 7      A.   Probably only thing that I can tell you is that

09:57AM 8  the fact that he had been adopted was not disputed and

09:57AM 9  so we didn't offer them to prove that he had in fact

09:57AM 10 been adopted and therefore that would have been the only

09:57AM 11 reason we didn't offer them.

09:57AM 12     Q.   Okay.  But would you agree that other than the

09:57AM 13 fact of the adoption, those documents, including the

09:57AM 14 social studies, contain detailed histories and family

09:57AM 15 accounts of the abuse that Randy was subjected to -- Mr.

09:58AM 16 Halprin was subjected to at an early age?

09:58AM 17     A.   I don't remember but I don't dispute that they

09:58AM 18 probably do.

09:58AM 19     Q.   Would it have enhanced your mitigation

09:58AM 20 presentation to get that information before the jury?

09:58AM 21     A.   Yes.

09:58AM 22     Q.   And was there a reason that those documents

09:58AM 23 were not admitted?

09:58AM 24     A.   No.

09:58AM 25     Q.   Was there a strategic reason those documents

09:58AM  1   were not offered?

09:58AM  2       A.   No.

09:58AM  3       Q.   Now, essentially then Dr. Goodness'

09:58AM  4   presentation -- once the decision is made not to call

09:58AM  5   some of the other members because they might be flaky

09:58AM  6   witnesses, then the information is going to come through

09:58AM  7   Dr. Goodness' report or not at all; is that right?

09:58AM  8       A.   Yes.

09:58AM  9       Q.   And in regard to making her presentation she

09:59AM 10   brought -- the records that she relied on were available

09:59AM 11   in court at the time of the hearing?

09:59AM 12       A.   Correct.

09:59AM 13       Q.   And in addition to that, she had prepared a

09:59AM 14   Power Point presentation?

09:59AM 15       A.   Correct.

09:59AM 16       Q.   Now, I assume that you had -- had you studied

09:59AM 17   the law regarding the necessary predicates for admission

09:59AM 18   of her report and underlying information?

09:59AM 19       A.   I believe so.

09:59AM 20       Q.   What was your understanding of what it would

09:59AM 21   take for Dr. Goodness to be able to give her report,

09:59AM 22   including specifications of the underlying data that she

09:59AM 23   used to formulate her opinions?

09:59AM 24       A.   I don't really recall.

09:59AM 25       Q.   Based on your experience were you assuming that

09:59AM   1   if you proved up Dr. Goodness as the mitigation expert

10:00AM   2   and you established the documents that she had reviewed

10:00AM   3   that she would be able to testify and refer to specific

10:00AM   4   incidents contained in those documents?

10:00AM   5       A.   I don't recall what I -- what I thought at the

10:00AM   6   time.  Probably so.

10:00AM   7       Q.   And I want you to understand I'm not trying to

10:00AM   8   trick you or trap you into anything.  If you don't

10:00AM   9   understand what I am asking, let me know.

10:00AM  10       A.   I understand what you are asking.  I can't

10:00AM  11   answer your question as to what preparation I had done

10:00AM  12   at the time in terms of admissibility of her report.

10:00AM  13       Q.   Let me jump ahead and we'll come back.

10:00AM  14   Ultimately at trial when she attempted to be in a sub

10:00AM  15   rosa hearing before she testified Judge Cunningham

10:00AM  16   precluded her from referencing any specific conduct.

10:01AM  17   She could give her opinions but she couldn't tell --

10:01AM  18   relate to the specific evidence that she was relying on

10:01AM  19   to support those opinions.  Do you recall that?

10:01AM  20       A.   I do.

10:01AM  21       Q.   Were you expecting that or did that take you

10:01AM  22   back?

10:01AM  23       A.   I'm sure it took me aback.

10:01AM  24       Q.   And did you feel that Judge Cunningham was

10:01AM  25   wrong on the law in that regard?

10:01AM 1    A.   I don't recall but I'm sure I probably did at

10:01AM 2  the time.

10:01AM 3    Q.   And if he was in fact wrong it would have been

10:01AM 4  important to make objections to that ruling?

10:01AM 5    A.   Yes.

10:01AM 6    Q.   That would have been an issue that would have

10:01AM 7  been on appeal?

10:01AM 8    A.   Correct.

10:01AM 9    Q.   And would you agree that Dr. Goodness'

10:01AM 10 inability to present her report significantly damaged

10:01AM 11 your mitigation presentation?

10:02AM 12   A.   I would.

10:02AM 13   Q.   Would you agree that was prejudicial to Mr.

10:02AM 14 Halprin's punishment presentation?

10:02AM 15   A.   I believe so.

10:02AM 16   Q.   At the point in time where -- again if I am not

10:02AM 17 stating this correctly, let me know.  By the time you

10:02AM 18 arrive at trial the defense presentation is to get Dr.

10:02AM 19 Goodness' report and underlying data before the jury.

10:02AM 20 That's plan A?

10:02AM 21   A.   Correct.

10:02AM 22   Q.   Just before she testifies the Judge rules that

10:02AM 23 plan A is not going to work, right?

10:02AM 24   A.   As far as I can remember.  I thought it was

10:02AM 25 actually during her testimony but you mean at a sub rosa

| | | |
|---|---|---|
| 10:02AM | 1 | hearing? |
| 10:02AM | 2 | Q.   Yeah. |
| 10:02AM | 3 | A.   Okay. |
| 10:02AM | 4 | Q.   Was there a plan B? |
| 10:03AM | 5 | A.   Plan B was the live witness that we actually |
| 10:03AM | 6 | called and got to come up here from Shreveport. |
| 10:03AM | 7 | Q.   Okay. |
| 10:03AM | 8 | A.   I also believe that through the course of the |
| 10:03AM | 9 | trial a lot of things that came in or attempted to come |
| 10:03AM | 10 | in got across to the jury.  I would also add that part |
| 10:03AM | 11 | of our mitigation was not just what happened to Randy in |
| 10:03AM | 12 | the past, but his limited role in the actual capital |
| 10:03AM | 13 | murder that he was charged with. |
| 10:03AM | 14 | Q.   Okay. |
| 10:03AM | 15 | A.   That came in during the course of the trial. |
| 10:03AM | 16 | Q.   So I mean -- so back to the previous question, |
| 10:03AM | 17 | given all of the circumstances of the trial, are you |
| 10:04AM | 18 | saying in your opinion the failure to get her mitigation |
| 10:04AM | 19 | report in front of the jury was not ultimately |
| 10:04AM | 20 | prejudicial to Randy? |
| 10:04AM | 21 | A.   It hurt. |
| 10:04AM | 22 | Q.   At the point in time -- did you understand a |
| 10:04AM | 23 | point in time where the State is objecting -- I think |
| 10:04AM | 24 | specifically Ms. Smith is objecting that if you are |
| 10:04AM | 25 | going to let Kelly Goodness, Dr. Goodness, testify about |

10:04AM  1  the abuse, that you have to call the witness who told

10:04AM  2  her about the witness so we can confront that witness.

10:04AM  3  Did you understand that essentially to be her objection?

10:04AM  4       A.   Correct.

10:04AM  5       Q.   At that point as an alternative to get Dr.

10:04AM  6  Goodness' report in front of the jury it would have been

10:04AM  7  necessary to call the witnesses then in order to salvage

10:04AM  8  the report, right?

10:04AM  9       A.   Correct.

10:04AM  10      Q.   Was there a reason -- I understand that was not

10:04AM  11 your primary strategy.  This was a fall-back position,

10:05AM  12 right?  Have to say yes or no.

10:05AM  13      A.   Yes.

10:05AM  14      Q.   Is there a reason that you didn't go to that

10:05AM  15 fall-back position then and put those witnesses on the

10:05AM  16 stand?

10:05AM  17      A.   Specifically Anna Lester or Wesley Halprin?

10:05AM  18      Q.   The witnesses to who could have testified to

10:05AM  19 the contents of the adoption records.

10:05AM  20      A.   As to Anna Lester or Wesley Halprin I would say

10:05AM  21 the same.  Strategically, I guess we could have called

10:05AM  22 them to cure Dr. Goodness' problem but I still would

10:05AM  23 have felt uncomfortable with the way they had changed

10:05AM  24 their stance, the way I felt they had been intimidated

10:05AM  25 by Toby Shook.

10:05AM 1      I think Toby Shook actually told me the

10:05AM 2 specific conversations he had with them and how they

10:05AM 3 reacted and how inadequate I felt that they would have

10:06AM 4 felt as witnesses and how that would have hurt us more

10:06AM 5 than helped us.  And as to any of the other witnesses, I

10:06AM 6 couldn't say because I don't really think we were really

10:06AM 7 successful in locating a lot of those other individuals.

10:06AM 8      Q.   Obviously, Dr. Goodness had contacted them in

10:06AM 9 order to include some of these materials in her report,

10:06AM 10 correct?

10:06AM 11     A.   Well, either she had contacted them or she had

10:06AM 12 read the reports.  I'm not sure.

10:06AM 13     Q.   As a third alternative to calling the live

10:06AM 14 witnesses, the adoption records could have come into

10:06AM 15 evidence with a sponsoring witness from the various

10:06AM 16 agencies.  Is that a possibility?

10:06AM 17     A.   Yes.

10:06AM 18     Q.   Was there a reason that that wasn't done?

10:06AM 19     A.   No.

10:07AM 20          THE COURT:  Let me ask a question because

10:07AM 21 both you lawyers -- all you lawyers know more about

10:07AM 22 appellate matters than I do regarding that.  Was this

10:07AM 23 trial before or after Crawford?

10:07AM 24          MR. ANTON:  I believe this trial was before

10:07AM 25 Crawford.

10:07AM 1          MS. SMITH:  I think that's accurate.

10:07AM 2          THE COURT:  Go ahead.

10:07AM 3          THE WITNESS:  No doubt it was before

10:07AM 4  Crawford.

10:07AM 5      Q.    (By Mr. Anton) Now, going back to Judge

10:07AM 6  Cunningham's ruling, did you understand the law to be

10:07AM 7  the punishment phase of a death penalty case in

10:07AM 8  mitigation that the constitutional right to present a

10:08AM 9  defense may in some circumstances supersede Rules of

10:08AM 10 Evidence?

10:08AM 11     A.    Absolutely.

10:08AM 12     Q.    And did you attempt to make that argument to

10:08AM 13 the Court about why these -- her testimony should be

10:08AM 14 admitted?

10:08AM 15     A.    I think I attempted -- I know that I made that

10:08AM 16 argument as to the document that we were trying to get

10:08AM 17 into evidence that he kept denying.  Whether I made it

10:08AM 18 as to Dr. Goodness' presentation or not, I don't recall.

10:08AM 19 But I'm sure you looked at the record and if I did make

10:08AM 20 it, I did make it.

10:08AM 21     Q.    Did you play any role in the selection of

10:08AM 22 issues to be pursued on appeal?

10:09AM 23     A.    No.

10:09AM 24     Q.    You understand that the decision -- that Judge

10:09AM 25 Cunningham's decision not to admit this evidence at the

10:09AM  1   punishment phase of trial, that that issue was not

10:09AM  2   pursued on appeal?

10:09AM  3        A.   Yes.

10:09AM  4        Q.   What was the reason, if you know, that that

10:09AM  5   issue was rejected as an appellate issue?

10:09AM  6        A.   I don't believe it was rejected.  Mr. Muhammed

10:09AM  7   informed me prior to working on the brief that he had

10:09AM  8   read several capital briefs.  His approach was going to

10:09AM  9   be to raise issues that were presented by the evidence,

10:09AM  10  that he wasn't going to do a whole bunch of the same

10:10AM  11  constitutional arguments that he read that lawyers do

10:10AM  12  over and over and over and get denied and denied and

10:10AM  13  denied.

10:10AM  14            And so the first part of his brief wasn't

10:10AM  15  going to be 10, 12 constitutional issues.  His brief was

10:10AM  16  going to be probably those types of issues.  Now, once

10:10AM  17  he started working on the brief he started at the

10:10AM  18  beginning.  He started with the jury selection and he

10:10AM  19  raised all of the issues that he thought he could raise

10:10AM  20  as to the jury selection.

10:10AM  21            And then he kept getting notices from the

10:10AM  22  Court of Criminal Appeals to submit the brief before he

10:10AM  23  was ready to submit the brief.  He submitted the issues

10:10AM  24  that he had prepared.  He tried to get an extension of

10:11AM  25  time to submit additional issues.  He tried to

10:11AM 1  supplement the brief with additional issues and he was

10:11AM 2  denied at the Court of Criminal Appeals.

10:11AM 3      Q.   So again if you don't know the answer to this

10:11AM 4  question that's fine but the fact that that issue didn't

10:11AM 5  then get into the brief, is that because Mr. Muhammed

10:11AM 6  got so busy that he just didn't have time to include it?

10:11AM 7      A.   I think he got forced to file a brief before he

10:11AM 8  was fully prepared to submit the brief as to all of the

10:11AM 9  issues that he would have liked to have raised.

10:11AM 10     Q.   Well, if you were right on the law that Judge

10:12AM 11 Cunningham erred in not letting Kelly Goodness present

10:12AM 12 the data and the facts supporting her mitigation

10:12AM 13 conclusions, if you were right that the Judge erred in

10:12AM 14 excluding that, then that would have been a good

10:12AM 15 appellate issue, don't you think?

10:12AM 16     A.   Absolutely.

10:12AM 17     Q.   Mitigation being one of the hot topics that

10:12AM 18 both the state and federal courts look at in evaluating

10:12AM 19 death penalty review?

10:12AM 20     A.   Absolutely.

10:12AM 21     Q.   And so as you sit here there's no strategic

10:12AM 22 reason why that was left out?

10:12AM 23     A.   No.

10:12AM 24     Q.   And it's been a long time since you personally

10:12AM 25 reviewed the record but in your opinion do you think

10:12AM 1  that issue was validly prepared and raised and preserved

10:12AM 2  for appeal?

10:12AM 3      A.   Like I say, I don't remember my objection.  As

10:13AM 4  to the other issue of the document, Mr. Udashen provided

10:13AM 5  me a copy of my objection which was single spaced about

10:13AM 6  a page long.  And I remember at that point I believe I

10:13AM 7  was telling the Judge, you know, anything in punishment

10:13AM 8  in a capital murder case should be admitted despite the

10:13AM 9  Rules of Evidence.  But I don't know if I was that

10:13AM 10 specific as to Dr. Goodness' presentation.

10:13AM 11     Q.   Would you agree as the trial attorney that that

10:13AM 12 was an issue in which it would be necessary to make a

10:13AM 13 proper objection -- preservation of that particular

10:13AM 14 issue for appeal would have been tantamount -- paramount

10:13AM 15 importance?

10:13AM 16     A.   I believe so but I believe the Judge's improper

10:14AM 17 ruling in and of itself probably was sufficient to

10:14AM 18 preserve that issue on appeal.  I believe the law was

10:14AM 19 clear on that.

10:14AM 20     Q.   If the Judge ruled wrongly based on a valid

10:14AM 21 objection, that would have been appellate error?

10:14AM 22     A.   Correct.

10:14AM 23     Q.   And again -- I know what you said, that you

10:14AM 24 designated Mr. Muhammed to do the appeal but did you

10:14AM 25 ever have an opportunity as lead counsel to sit down

10:14AM 1   with him and say, "This issue on the Judge's mitigation

10:14AM 2   ruling really needs to go in the brief"?

10:14AM 3       A.   I know I discussed with him the fact that in a

10:14AM 4   capital murder case mitigation evidence should be

10:14AM 5   admitted even if sometimes the Rules of Evidence have to

10:14AM 6   be scurried.  I had read that and researched that and

10:15AM 7   told him that was a primary issue for our appeal.

10:15AM 8       Q.   Let me ask you this if you can put yourself

10:15AM 9   back in time.  But at the time that you were getting

10:15AM 10  ready to put Kelly Goodness on as a witness had you

10:15AM 11  anticipated that the State would make any kind of

10:15AM 12  argument like that, that this is hearsay and it's not

10:15AM 13  coming in without the witnesses?

10:15AM 14      A.   I don't recall.

10:15AM 15      Q.   I mean -- you don't recall.  I mean when you

10:15AM 16  say that, that means to me you hadn't necessarily

10:15AM 17  briefed that issue in advance or it wasn't uppermost in

10:15AM 18  your mind.  Would you have been saying, "I know this is

10:15AM 19  coming"?

10:15AM 20      A.   I don't recall.  I don't think so.

10:15AM 21           THE COURT:  Excuse me, Mr. Anton.

10:15AM 22           Mr. Ashford, I'm assuming that in

10:15AM 23  preparation for this trial you read the transcripts of

10:15AM 24  the four previous Texas Seven trials; is that correct?

10:16AM 25           THE WITNESS:  Yes.

10:16AM 1        THE COURT:  Do you recall whether this

10:16AM 2   issue came up in any of the previous four trials?

10:16AM 3        THE WITNESS:  I don't.

10:16AM 4        THE COURT:  Do you remember or do you think

10:16AM 5   it --

10:16AM 6        THE WITNESS:  I don't remember at all.  I

10:16AM 7   remember in reading the previous transcripts I mainly

10:16AM 8   concentrated, of course, more on the facts of the

10:16AM 9   offense than I did the other individuals' mitigation.

10:16AM 10       THE COURT:  So you can't tell me one way or

10:16AM 11  the other whether it came up in any of the previous

10:16AM 12  trials?

10:16AM 13       THE WITNESS:  Correct.

10:16AM 14       THE COURT:  Or whether you knew it came --

10:16AM 15       THE WITNESS:  Correct.

10:16AM 16  Q.   (By Mr. Anton) We're confused at this table.

10:16AM 17  Re-ask this question.  You were appointed as the lead

10:16AM 18  appellate attorney; is that right?

10:16AM 19  A.   Correct.

10:16AM 20  Q.   I would like to move on to the charge issues

10:17AM 21  regarding anticipation.  What's -- what's your

10:17AM 22  understanding of what the State must prove for a

10:17AM 23  non-shooter to be assessed the death penalty in Texas?

10:17AM 24  A.   I'm not sure I understand the question.

10:17AM 25  Q.   You're familiar with the Edmonds and Tyson

10:17AM   1   cases from the Supreme Court about anticipation.

10:17AM   2       A.   Yes.

10:17AM   3       Q.   As a general statement, in order to answer the

10:17AM   4   special issues at the punishment phase it's not enough

10:17AM   5   to show that the accused could have anticipated, that

10:18AM   6   there's some burden of showing that he in fact did

10:18AM   7   anticipate?

10:18AM   8       A.   My understanding was that he could have

10:18AM   9   anticipated, not that he did anticipate.

10:18AM  10       Q.   There's also a distinction between the shooter

10:18AM  11   and a non-shooter; is that right?

10:18AM  12       A.   Correct.

10:18AM  13       Q.   In your presentation of the case were you

10:18AM  14   concerned with showing that Mr. Halprin was not a

10:18AM  15   shooter?

10:18AM  16       A.   Yes.

10:18AM  17       Q.   Now, in that regard I think you previously

10:18AM  18   answered some interrogatories.  Do you recall that?

10:18AM  19       A.   Yes.

10:18AM  20       Q.   I think that your answer to the interrogatories

10:19AM  21   as to his role in the offense -- you stated Mr. King had

10:19AM  22   advised you that Mr. Halprin had shot himself in the

10:19AM  23   foot?

10:19AM  24       A.   Correct.

10:19AM  25       Q.   I assume that in presentation of the case and

10:19AM  1   discussions with counsel, as well as with the witnesses,

10:19AM  2   that Mr. Halprin's role in the shooting would have been

10:19AM  3   a topic of a lot of discussion.

10:19AM  4       A.   Yes.

10:19AM  5       Q.   And whether he fired a gun would have been a

10:19AM  6   topic of a lot of discussion.

10:19AM  7       A.   Yes.

10:19AM  8       Q.   Did you specifically address that with Mr.

10:19AM  9   Halprin?

10:19AM  10      A.   If I can specifically remember having any

10:19AM  11  conversation with him, no, but I would almost certainly

10:20AM  12  think that I did.

10:20AM  13      Q.   Okay.  Was that primarily because, as you

10:20AM  14  stated, Mr. King was the one who was responsible for

10:20AM  15  preparation of Mr. Halprin as a witness?

10:20AM  16      A.   Correct.

10:20AM  17      Q.   Did you take notes about your conversations

10:20AM  18  with Mr. King -- with Mr. King about Mr. Halprin's role

10:20AM  19  in the shooting?

10:20AM  20      A.   No.

10:20AM  21      Q.   But you're certain your recollection is that

10:20AM  22  Mr. King told you that Randy had admitted -- Randy

10:20AM  23  Halprin had admitted shooting himself in the foot?

10:20AM  24      A.   That is my recollection after Mr. King came

10:20AM  25  back from visiting Mr. Halprin in Colorado.

BRIDGET BARNHILL, OFFICIAL REPORTER

10:20AM  1      Q.   How did that affect this subsequent preparation

10:20AM  2  and presentation of the defense?

10:21AM  3      A.   I don't know what you are asking me.

10:21AM  4      Q.   Well, did it change your strategy at all in

10:21AM  5  terms of how you argue and present evidence to the jury?

10:21AM  6  Did you more or less give up on the non-shooter

10:21AM  7  argument?  What was the overall strategy at that point

10:21AM  8  in terms of Mr. Halprin's role in the offense?

10:21AM  9      A.   Our strategy was Mr. Halprin didn't shoot

10:21AM 10  Officer Hawkins, didn't shoot at Officer Hawkins, didn't

10:21AM 11  play a major role in intimidating Oshman's employees,

10:21AM 12  placing guns on Oshman's employees, et cetera.

10:21AM 13      Q.   Would it have strengthened that presentation if

10:21AM 14  a factual showing could be made that Randy Halprin did

10:21AM 15  not discharge his gun in any fashion?

10:21AM 16      A.   Well, that would have been a different strategy

10:21AM 17  but that would have --

10:22AM 18      Q.   How is that different?

10:22AM 19      A.   If he didn't discharge his gun in any way,

10:22AM 20  that's better than if he discharged it accidentally and

10:22AM 21  shot himself in the foot but it's totally different.

10:22AM 22      Q.   All right.  Okay.  Now, were you familiar with

10:22AM 23  the medical records of the treatment of Randy Halprin's

10:22AM 24  foot in Colorado?

10:22AM 25      A.   Yes.

10:22AM  1    Q.   Do you recall the angle of entry in that wound

10:22AM  2  as depicted in those medical reports?

10:22AM  3    A.   I don't.

10:22AM  4    Q.   Do you recall in conversations with Mr. King if

10:22AM  5  it appears that the bullet instead of going down into

10:22AM  6  the foot went across the foot?

10:22AM  7    A.   I know we discussed it.  I know Mr. King had a

10:22AM  8  strong opinion as to that whole foot situation.  We

10:22AM  9  didn't necessarily agree on that.

10:22AM 10    Q.   I don't mean to interrupt you.  Can you

10:23AM 11  elaborate on the difference between you and Mr. King's

10:23AM 12  opinion?

10:23AM 13    A.   I didn't think it was really important one way

10:23AM 14  or the other.  I didn't think it was a big deal that he

10:23AM 15  shot hisself in the foot or that someone else shot him

10:23AM 16  in the foot.  I just didn't think it was that big of a

10:23AM 17  deal.  My deal was he didn't shoot Officer Hawkins.

10:23AM 18    Q.   Is there -- was there any discussion about

10:23AM 19  calling -- a decision to call the treating physician in

10:23AM 20  Colorado as a witness in regard to Mr. Halprin's wound?

10:23AM 21    A.   I know, you know, from the transcript we tried

10:23AM 22  to get that thing admitted and we couldn't because we

10:23AM 23  didn't have the sponsoring witness.  I don't remember

10:24AM 24  what our conversations were about calling the treating

10:24AM 25  physician or not.

10:24AM  1      Q.   In other words, you couldn't get the medical

10:24AM  2   records in independently because there wasn't a business

10:24AM  3   records affidavit or sponsoring witness.

10:24AM  4      A.   Correct.

10:24AM  5      Q.   Was that a matter of strategy not to get the

10:24AM  6   sponsoring witness?

10:24AM  7      A.   I can't say that it was, no.

10:24AM  8      Q.   Just in division of labor between you and Mr.

10:24AM  9   King in regard to that would that primarily have been

10:24AM  10  your responsibility or Mr. King's to get Randy Halprin's

10:24AM  11  medical records into evidence?

10:24AM  12     A.   To get his records in evidence?

10:24AM  13     Q.   Those specific medical records we're talking

10:24AM  14  about regarding the injury to the foot.

10:25AM  15     A.   Not to throw Mr. King under the bus, that would

10:25AM  16  have been part of Randy's testimony but I don't recall

10:25AM  17  our specific conversations about it.

10:25AM  18     Q.   So was part of the punishment presentation --

10:25AM  19  you said part of the mitigation defense was to show

10:25AM  20  Randy's role in the offense and I guess part of that

10:25AM  21  presentation was that he was not a shooter; is that

10:25AM  22  right?

10:25AM  23     A.   Not a shooter of Officer Hawkins.

10:25AM  24     Q.   Exactly.  Did not discharge a weapon with any

10:25AM  25  kind of felonious criminal intent.

10:25AM  1      A.   Correct.

10:25AM  2      Q.   That would have been argued in regard to the

10:26AM  3  special issues regarding his culpability; is that right?

10:26AM  4  I mean would that have played any role in he didn't

10:26AM  5  anticipate the death, he didn't shoot, he didn't pull

10:26AM  6  his gun?

10:26AM  7      A.   You mean special issues that we would have

10:26AM  8  asked to be submitted to the jury other than special

10:26AM  9  issue 1 and 2?

10:26AM  10     Q.   I'm talking about in regard to special issues 1

10:26AM  11 and 2.

10:26AM  12     A.   Ask your question again.

10:26AM  13     Q.   Do you think that -- was part of your strategy

10:26AM  14 in saying, "Don't give Mr. Halprin the death penalty" --

10:26AM  15 was part of that in how the jury evaluates special

10:26AM  16 issues number 1 and 2, "Hey, he didn't shoot"?

10:26AM  17     A.   Yes.

10:26AM  18     Q.   Was that an important part of the argument?

10:26AM  19     A.   I believe it was.

10:27AM  20     Q.   And do you recall what was your strategy

10:27AM  21 generally in terms of saying that Randy Halprin did not

10:27AM  22 anticipate the shooting?

10:27AM  23     A.   I don't know that I argued that he didn't

10:27AM  24 anticipate the shooting.  I mean I -- in terms of

10:27AM  25 argument, presentation of the evidence -- I'm not sure I

10:27AM   1   understand the question.

10:27AM   2       Q.    Okay.   You understand that in assessing the

10:27AM   3   death penalty there has to be an individualized

10:27AM   4   assessment of culpability in the offense, moral

10:27AM   5   responsibility for the killing?

10:27AM   6       A.    Correct.

10:27AM   7       Q.    And that just because you're a party to the

10:27AM   8   offense doesn't mean that everybody involved gets the

10:28AM   9   death penalty?

10:28AM  10       A.    Correct.

10:28AM  11       Q.    And part of those -- do you understand part of

10:28AM  12   that decision that the jury has to make regards the

10:28AM  13   extent to which the person on trial anticipated that a

10:28AM  14   killing would occur?

10:28AM  15       A.    Okay.

10:28AM  16       Q.    Do you agree with that?

10:28AM  17       A.    Anticipated or could have anticipated.

10:28AM  18       Q.    What's your understanding?   Just that they

10:28AM  19   could have anticipated?

10:28AM  20       A.    Could have anticipated.

10:28AM  21       Q.    Your understanding is if the State shows that

10:28AM  22   he could have anticipated, that would be sufficient

10:28AM  23   under Tyson and Edmonds to warrant a death penalty?

10:28AM  24       A.    Okay.   I may be confusing as to whether

10:29AM  25   anticipated or could have anticipated warrants the death

10:29AM 1    penalty or warrants him being a party to capital murder.

10:29AM 2        Q.   Okay.  Obviously, there's two phases to the

10:29AM 3    death penalty trial.  The first phase there's an issue

10:29AM 4    about anticipation, correct?  And then the second phase

10:29AM 5    there's a second set of issues regarding anticipation.

10:29AM 6        A.   Okay.

10:29AM 7        Q.   They're not the same.  Is that your

10:29AM 8    understanding?

10:29AM 9        A.   I'm seeing that now.  I think I had that

10:29AM 10   confused in my mind.

10:29AM 11       Q.   You're attempting to show -- were you

10:29AM 12   attempting to show that he didn't have the necessary

10:29AM 13   degree of anticipation that would justify imposition of

10:29AM 14   the death penalty?

10:29AM 15       A.   Okay.

10:29AM 16       Q.   Was that part of the strategy?

10:29AM 17       A.   I believe it was, just through everything that

10:30AM 18   went on in the trial, the cross-examination of the

10:30AM 19   witnesses, the argument, so forth.

10:30AM 20       Q.   Are you familiar with something called an

10:30AM 21   anti-parties charge?

10:30AM 22       A.   Not as I sit here.

10:30AM 23       Q.   Are you familiar with any charges that have

10:30AM 24   been given, any cases relating to instructing the jury

10:30AM 25   in a death penalty case to the effect that they can't

| | | |
|---|---|---|
| 10:30AM | 1 | simply impose the death penalty because he's a party? |
| 10:30AM | 2 | You can be guilty as a party but that |
| 10:30AM | 3 | doesn't necessarily mean you get the death penalty |
| 10:30AM | 4 | imposed as a party.  Are you familiar with any cases at |
| 10:30AM | 5 | all regarding that? |
| 10:30AM | 6 | A.   I'm not. |
| 10:30AM | 7 | Q.   Okay.  Who was responsible for reviewing and |
| 10:30AM | 8 | objecting to the charge? |
| 10:30AM | 9 | A.   Mr. King and I kind of did that together. |
| 10:31AM | 10 | Q.   Now, a lot of times the current practice, I |
| 10:31AM | 11 | think, is to have a third appellate attorney appointed; |
| 10:31AM | 12 | is that right? |
| 10:31AM | 13 | A.   Correct. |
| 10:31AM | 14 | Q.   Do you remember if you had a third appellate |
| 10:31AM | 15 | attorney appointed to assist you at that trial? |
| 10:31AM | 16 | A.   No.  That wasn't the practice at that time. |
| 10:31AM | 17 | Q.   Was there a strategic reason not to request an |
| 10:31AM | 18 | anti-parties charge? |
| 10:31AM | 19 | A.   No. |
| 10:31AM | 20 | MR. ANTON:  Is it appropriate to take a |
| 10:31AM | 21 | break right now? |
| 10:32AM | 22 | THE COURT:  Let's take a ten-minute break. |
| 10:43AM | 23 | (A brief recess was taken.) |
| 10:43AM | 24 | THE COURT:  Go ahead. |
| 10:44AM | 25 | Q.   (By Mr. Anton) Mr. Ashford -- |

BRIDGET BARNHILL, OFFICIAL REPORTER

10:44AM  1        A.   Yes, sir.

10:44AM  2        Q.   -- I think that maybe before the break there

10:44AM  3   was some confusion.  I want to make sure I understand.

10:44AM  4   Do you understand that at the guilt-innocence phase the

10:44AM  5   jury must find that the defendant should have

10:44AM  6   anticipated a death, correct?

10:44AM  7        A.   Yes.  I'm sorry.

10:44AM  8        Q.   And then the wording of the charge in the

10:44AM  9   second phase is "did anticipate"?

10:44AM 10        A.   Correct.

10:44AM 11        Q.   You understood those distinctions at the time

10:44AM 12   of trial?

10:44AM 13        A.   Yes.

10:44AM 14        Q.   Concerning the did anticipate, what evidence or

10:44AM 15   what was your strategy showing that that answer should

10:44AM 16   be he did not anticipate?

10:44AM 17        A.   I don't remember that we had a specific

10:44AM 18   strategy.  I think it's just the way that we attacked

10:44AM 19   the case through cross-examination and through Randy's

10:45AM 20   testimony, everything we tried to do in terms of just

10:45AM 21   trying the case.

10:45AM 22             I mean I don't think we could have shown

10:45AM 23   that he did not anticipate other than through his

10:45AM 24   testimony, just like it was almost impossible to figure

10:45AM 25   out who fired what shots which is what the jury told us

10:45AM  1  they tried to do after we talked to them after the

10:45AM  2  verdict.

10:45AM  3       Q.   Whose job was it to object to improper

10:45AM  4  arguments made at the punishment phase?  A lot of times

10:46AM  5  in court there is multiple attorneys and one makes an

10:46AM  6  objection.  They both don't stand up and make

10:46AM  7  objections.

10:46AM  8       A.   Yes.  Judge Cunningham was very clear on that,

10:46AM  9  that he wasn't going to have both attorneys objecting.

10:46AM  10  You're talking about argument?

10:46AM  11       Q.   Particularly punishment argument.

10:46AM  12       A.   Probably been me.

10:46AM  13       Q.   And so had the State argued that the evidence

10:46AM  14  showed that he should have anticipated, would it have

10:46AM  15  been your obligation to make an objection that they

10:46AM  16  hadn't shown did anticipate or they weren't stating the

10:46AM  17  law correctly?

10:46AM  18       A.   Yes.

10:47AM  19       Q.   Was there any strategic reason for not

10:47AM  20  objecting at punishment argument?

10:47AM  21       A.   No.

10:47AM  22       Q.   There are several other issues I would like to

10:47AM  23  run through briefly with you.  Some of the discussion --

10:47AM  24  you know that at various times various of the

10:47AM  25  co-defendants had made written statements and had

10:47AM 1   testified regarding their role in the offense?

10:47AM 2       A.   Yes.

10:47AM 3       Q.   And they had testified to some extent regarding

10:47AM 4   Mr. Halprin's role in the offense; is that right?

10:47AM 5       A.   Yes.

10:47AM 6       Q.   You were aware that, for example, Donald

10:47AM 7   Newbury testified that I think after examining the

10:47AM 8   records that he determined that Halprin did not shoot.

10:47AM 9       A.   I don't remember that specifically but I'm sure

10:47AM 10  I read it at the time.

10:47AM 11      Q.   There are several like that.  Let me ask you

10:48AM 12  about the co-defendants.  Was there ever any discussion

10:48AM 13  that you had with Mr. King about calling or not calling

10:48AM 14  or attempting to call the co-defendants as witnesses in

10:48AM 15  Mr. Halprin's trial?

10:48AM 16      A.   Yes.

10:48AM 17      Q.   What were those discussions?

10:48AM 18      A.   Just whether we should call them or not, the

10:48AM 19  pluses or minuses, whether they would be believable,

10:48AM 20  whether they would hurt us because these seven or six

10:48AM 21  guys were like the most hated men in America at the time

10:48AM 22  and we just decided not to.

10:48AM 23      Q.   Okay.  Because they would not have made good

10:48AM 24  witnesses or they could have damaged your credibility?

10:48AM 25      A.   You know, when you are trying cases it's more

10:49AM 1    just about presentation to the jury, what -- when the

10:49AM 2    jury looks at them, what do they feel?  Does it anger

10:49AM 3    them?  It's not strategically so much what you are going

10:49AM 4    to get out of it or not except for the impression they

10:49AM 5    leave with the jury and whether that's good for you or

10:49AM 6    bad for you.

10:49AM 7          We didn't think that despite the fact that

10:49AM 8    they were going to say that he fired or didn't fire,

10:49AM 9    that they just weren't going to leave a good impression.

10:49AM 10   It wasn't going to help us.

10:49AM 11      Q.   Okay.  Aside from calling the witnesses

10:49AM 12   individually, under some circumstances it's also

10:49AM 13   permissible to introduce statements against penal

10:49AM 14   interests.  You understand that?

10:49AM 15      A.   Yes.

10:49AM 16      Q.   These people, Newbury, Rodriguez, Murphy had

10:49AM 17   all given statements against their penal interests.  Did

10:49AM 18   you understand that?

10:49AM 19      A.   Yes.

10:50AM 20      Q.   And, for example, in Rodriguez and Murphy's

10:50AM 21   statements I think I said Newbury before.  In Rodriguez

10:50AM 22   and Murphy's statements I believe that part of their

10:50AM 23   statement was that Halprin did not fire the gun.  Do you

10:50AM 24   recall that?

10:50AM 25      A.   Not specifically but I'm sure we reviewed it at

10:50AM 1   the time.

10:50AM 2       Q.   And was there a reason not to try to introduce

10:50AM 3   their written statements as statements against penal

10:50AM 4   interests?

10:50AM 5       A.   I know we discussed it.  There might have been

10:50AM 6   some inconsistency in what they were saying even though

10:50AM 7   they were consistent in saying that he didn't fire his

10:50AM 8   weapon.  It might have been what we thought Toby Shook

10:50AM 9   would do with it with all the inconsistencies in their

10:51AM 10  statements.  We discussed it.  We decided not to do it.

10:51AM 11      Q.   Would you agree that there was -- a large part

10:51AM 12  of the State's presentation was taking parts of the

10:51AM 13  statements of the other escapees where they initially

10:51AM 14  say, "We thought Randy fired his guns," and introducing

10:51AM 15  that as evidence that Randy had fired and then the

10:51AM 16  defense attempting to impeach those recollections of the

10:51AM 17  law enforcement officers?

10:51AM 18      A.   I actually don't really even recall that.

10:51AM 19      Q.   Okay.  In your mind again -- I think you stated

10:51AM 20  this before but if I understand what you're saying, your

10:51AM 21  primary defense strategy wasn't dependent on whether or

10:51AM 22  not Halprin had actually fired -- his gun had actually

10:52AM 23  discharged; is that right?

10:52AM 24      A.   Did I say that?  I mean I said --

10:52AM 25           THE COURT:  I think what the witness said

10:52AM  1  was one scenario, he shot himself in the foot.  Other

10:52AM  2  scenario was he didn't shoot at all and that the overall

10:52AM  3  strategy, he was trying to minimize Mr. Halprin's

10:52AM  4  participation in the offense.

10:52AM  5            Is that pretty accurate?

10:52AM  6            THE WITNESS:  Correct.  If he did fire,

10:52AM  7  didn't fire at the officer.

10:52AM  8       Q.   (By Mr. Anton) So would it have been helpful to

10:52AM  9  the defense if the statements of Rodriguez and Murphy

10:52AM 10  that Halprin did not fire the weapon -- would that have

10:52AM 11  been consistent with the defense as being presented?

10:53AM 12       A.   Yeah.  Taken in a vacuum, it would have been.

10:53AM 13       Q.   In the context of the others, their statements

10:53AM 14  would sufficiently prejudice that you decided not to

10:53AM 15  introduce them?

10:53AM 16       A.   I didn't remember why we did but we discussed

10:53AM 17  it and we decided not to.

10:53AM 18       Q.   Do you recall that the -- I believe the wife of

10:53AM 19  the officer, the family of Mr. Hawkins testified and

10:53AM 20  there was a lot of victim impact testimony in the

10:53AM 21  guilt-innocence phase of trial about the effects that

10:53AM 22  the death had?

10:53AM 23            THE COURT:  Are you referring to the first

10:53AM 24  witness, the mother?

10:53AM 25            THE WITNESS:  Jane Hawkins, I believe.

| | | |
|---|---|---|
| 10:53AM | 1 | THE COURT:  Is that the mother or the wife? |
| 10:53AM | 2 | MS. SMITH:  The mother. |
| 10:54AM | 3 | A.   In the guilt-innocence phase? |
| 10:54AM | 4 | Q.   (By Mr. Anton) Yeah. |
| 10:54AM | 5 | A.   I recall her testifying -- I do believe she |
| 10:54AM | 6 | testified as some of the impact on the family.  Yeah, I |
| 10:54AM | 7 | guess you could call that victim impact testimony. |
| 10:54AM | 8 | Q.   Was there a strategic decision made not to |
| 10:54AM | 9 | object to that testimony at the guilt-innocence phase? |
| 10:54AM | 10 | A.   I don't know if it was my witness or Mr. King's |
| 10:54AM | 11 | witness but I certainly don't object under those |
| 10:55AM | 12 | circumstances as a strategy.  I mean I have objected.  I |
| 10:55AM | 13 | had a case two weeks ago where I cut a witness off and I |
| 10:55AM | 14 | thought she was going a little bit too far.  In this |
| 10:55AM | 15 | case definitely as a strategy I wasn't going to cut her |
| 10:55AM | 16 | off. |
| 10:55AM | 17 | Q.   What's the basis for that strategic decision? |
| 10:55AM | 18 | A.   Well, you know, you have to look at the way |
| 10:55AM | 19 | things look to the jury and there wasn't a whole lot |
| 10:55AM | 20 | of -- there wasn't a whole lot of controversy about, you |
| 10:55AM | 21 | know, what happened in this case. |
| 10:55AM | 22 | Everybody knew who she was.  Everybody knew |
| 10:55AM | 23 | her feelings.  And, you know, we could have cut her off |
| 10:55AM | 24 | but the impression in front of the jury I don't think |
| 10:56AM | 25 | would have been very good.  I think it's just best to go |

10:56AM 1    ahead and let her say her peace.  That's my opinion in

10:56AM 2    trying cases for several years.

10:56AM 3         Q.   When Mr. Halprin took the stand he was

10:56AM 4    impeached with a lot of letters that he had written from

10:56AM 5    the jail, statements that he had made, drawings that he

10:56AM 6    had done.  Do you recall that?

10:56AM 7         A.   Yes.

10:56AM 8         Q.   Now, if I understand the division of labor,

10:56AM 9    that was Mr. King's witness?

10:56AM 10        A.   Correct.

10:56AM 11        Q.   So the obligation to object to any kind of

10:56AM 12   improper impeachment would have been Mr. King's?

10:56AM 13        A.   Correct.

10:56AM 14        Q.   Was there any discussion in advance of Mr.

10:56AM 15   Halprin testifying about how to handle that or did you

10:56AM 16   anticipate that those, the letters and so on, would be

10:57AM 17   used for impeachment?

10:57AM 18        A.   To tell you the truth, I don't remember but I

10:57AM 19   don't think we did anticipate that.  We had hundreds of

10:57AM 20   pages of documents and we didn't have the time that Toby

10:57AM 21   Shook would have, you know, trying one case as opposed

10:57AM 22   to our however many to, you know, anticipate that he's

10:57AM 23   going to go through the one letter that Randy writes

10:57AM 24   that says he's a liar, you know.

10:57AM 25                   One of the first things I did was send

| | |
|---|---|
| 10:57AM | 1 |
| 10:57AM | 2 |
| 10:57AM | 3 |
| 10:57AM | 4 |
| 10:57AM | 5 |
| 10:58AM | 6 |
| 10:58AM | 7 |
| 10:58AM | 8 |
| 10:58AM | 9 |
| 10:58AM | 10 |
| 10:58AM | 11 |
| 10:58AM | 12 |
| 10:58AM | 13 |
| 10:58AM | 14 |
| 10:58AM | 15 |
| 10:58AM | 16 |
| 10:58AM | 17 |
| 10:58AM | 18 |
| 10:58AM | 19 |
| 10:58AM | 20 |
| 10:58AM | 21 |
| 10:58AM | 22 |
| 10:58AM | 23 |
| 10:58AM | 24 |
| 10:58AM | 25 |

Randy a letter when I first got appointed when he was
still in Colorado advising him not to talk to
individuals, not to give news conferences.  When Mr.
King visited Randy in Colorado he advised him the same.
            We were telling him the same the whole
time.  And when we got our discovery we had hundreds of
pages of letters he wrote to people all over everywhere.
It just blew us away.

Q.    It's common knowledge, isn't it, that everybody
knows that they copied the letters and they listened to
the phone calls and if you say the wrong thing, it's
going to come up?

A.    Exactly.

Q.    Diligent attorneys advise their clients, "Don't
do those kind of things.  It's going to come back to
you"?

A.    Correct.

Q.    It always does?

A.    Correct.

Q.    You tell them to be on watch for that?

A.    Correct.

Q.    During Mr. Halprin's testimony -- I don't know
if there was a break or lunch break.  Did you ever have
a conversation with Mr. King about, "All of this still
is coming in?  We need to object to it while -- on the

10:58AM 1 fly when the trial is going on"?

10:58AM 2     A.  I want to say that I did.  But to be honest, I

10:58AM 3 really can't say that I did.  I don't remember.

10:58AM 4     Q.  Do you remember what the strategy would have

10:58AM 5 been or what the objections could have been to try and

10:59AM 6 limit that damage?

10:59AM 7     A.  Well, I mean impeaching him by non-legal

10:59AM 8 impeachment, not inconsistent prior statements, not

10:59AM 9 prior convictions.

10:59AM 10     Q.  Regard to the victim impact, I mean you made a

10:59AM 11 decision based on the context of the trial that based on

10:59AM 12 your trial strategy it was important to object to that

10:59AM 13 at that time, right?

10:59AM 14     A.  Correct.

10:59AM 15     Q.  Was any kind of discussion or decision made

10:59AM 16 regarding the improper impeachment that "Given the

10:59AM 17 context of trial, maybe we should just let this go"?

10:59AM 18     A.  I can't tell you that I remember that

10:59AM 19 conversation.  I can tell you that if I had been the

10:59AM 20 lawyer, it probably might have been 50-50.  I could see

10:59AM 21 reasons why to just let it go.  I can see reasons why to

10:59AM 22 object to it.  I don't remember any specific

10:59AM 23 conversation I had with Mr. King.

11:00AM 24     Q.  Would it be fair to say based on your

11:00AM 25 recollection and -- I know you haven't reviewed the

11:00AM  1  transcript recently.  Would it be fair to say that the

11:00AM  2  bulk of the cross-examination of Mr. Halprin related to

11:00AM  3  all of these letters and drawings and this other

11:00AM  4  impeachment material?

11:00AM  5      A.   It was pretty damaging, along with the way that

11:00AM  6  Randy reacted to it and kind of failed to defend

11:00AM  7  himself.

11:00AM  8      Q.   In that context would there have been a good

11:00AM  9  reason for not objecting?

11:00AM 10      A.   Well, strategy-wise, yeah, I could think of a

11:00AM 11  couple of reasons.

11:00AM 12      Q.   Why?  Just for example.

11:00AM 13      A.   Once again, you have to look at how everything

11:00AM 14  looks to a jury and, you know, when you put a guy up

11:00AM 15  there, you know, you can't totally defend him.  To a

11:00AM 16  certain extent he's got to defend himself.

11:00AM 17          If you try to object, you know -- if you

11:01AM 18  put a guy up there and he's going on and on on direct

11:01AM 19  and at cross you try to object to everything the State

11:01AM 20  says and does it look like you're protecting him, it

11:01AM 21  doesn't help you.  To a certain extent guy has got to

11:01AM 22  get up there and defend himself.

11:01AM 23          Sometimes as a strategy, even though it may

11:01AM 24  be hurting you, you think it's going to be worse if you

11:01AM 25  get up there and try to cut it off and try to help.  I

11:01AM  1   don't know what Mr. King was thinking.  I don't remember

11:01AM  2   the conversations that we had but ...

11:01AM  3       Q.   In order to limit that prior to trial the

11:01AM  4   defense did request 404(b) material and a 404(b)

11:01AM  5   request.  An answer was given by the State.  Do you

11:01AM  6   recall that?

11:01AM  7       A.   Not really.

11:01AM  8       Q.   Do you know if any of these -- all these

11:02AM  9   letters and previous misstatements were listed in the

11:02AM 10   404(b) notice?

11:02AM 11       A.   No, I don't remember.

11:02AM 12       Q.   If they weren't, could there have been an

11:02AM 13   objection outside the jury's presence that "Hey, we

11:02AM 14   weren't given notice of this under 404(b)"?

11:02AM 15       A.   Sure could have made that objection.  I mean we

11:02AM 16   had it.  It was part of our discovery but we could have

11:02AM 17   made that objection.

11:02AM 18       Q.   Do you know if there's a strategic reason not

11:02AM 19   to have made that objection?

11:02AM 20       A.   I don't know.

11:02AM 21       Q.   When the 404(b) -- when that impeachment comes

11:02AM 22   in, if these bad acts are offered for impeachment

11:03AM 23   purposes and not just general attacks on character, you

11:03AM 24   can get a limiting instruction, can't you?

11:03AM 25       A.   Yes.

64

11:03AM  1      Q.   Was there ever a discussion about making a
11:03AM  2  limiting instruction?
11:03AM  3      A.   I don't recall.  From what I remember -- I
11:03AM  4  don't know if the letters would have even qualified as
11:03AM  5  bad acts.  They certainly weren't offenses.  They were
11:03AM  6  just stupid stuff that made him look bad.  I don't know
11:03AM  7  if it reached the level of requesting a limiting
11:03AM  8  instruction for it.  I guess we could have.
11:03AM  9      Q.   Well, I mean do you think a cross-examination
11:03AM 10  of the State -- under what theory can the State read
11:03AM 11  your jail letters?
11:04AM 12      A.   I don't know if there's any specific theory for
11:04AM 13  them to read your jail letters unless they're for
11:04AM 14  impeachment or they're relevant to some matter.
11:04AM 15      Q.   Right.  If he had opened the door to the
11:04AM 16  content of some of those letters the portions could have
11:04AM 17  been introduced for impeachment?
11:04AM 18      A.   Correct.
11:04AM 19      Q.   And if -- aside from that, you're not allowed
11:04AM 20  to prove character through specific misacts, misconduct,
11:04AM 21  right?
11:04AM 22      A.   Correct.
11:04AM 23      Q.   In your mind looking back on it, if you can
11:04AM 24  recall, were these materials objectionable?
11:04AM 25      A.   Yes, I thought they were objectionable at the

11:04AM 1 | time.

11:04AM 2 |     Q.   Do you think that the voluminous

11:05AM 3 | cross-examination of Mr. Halprin regarding all of these

11:05AM 4 | letters and drawings damaged his credibility?

11:05AM 5 |     A.   Yes.

11:05AM 6 |     Q.   Do you think it was prejudicial to the defense?

11:05AM 7 |     A.   Yes.

11:05AM 8 |           MR. ANTON:  Your Honor, I'm finished with

11:05AM 9 | that issue.  Mr. Udashen has prepared the presentation

11:05AM 10 | on the ranking document.

11:05AM 11 |           MR. UDASHEN:  Your Honor, I'll be asking

11:05AM 12 | the questions about that.  I'm ready to move forward on

11:05AM 13 | that.

11:05AM 14 |     Q.   (By Mr. Udashen) Mr. Ashford, you know what

11:05AM 15 | we're talking about when we say the "ranking document"?

11:05AM 16 |     A.   Absolutely.

11:05AM 17 |           THE COURT:  You can be seated.

11:05AM 18 |           MR. UDASHEN:  Thank you, Your Honor.

11:05AM 19 |     Q.   (By Mr. Udashen) Just so we're all clear, the

11:05AM 20 | ranking document that was offered in evidence but not

11:05AM 21 | accepted but it was Defendant's Exhibit Number 39,

11:06AM 22 | right?

11:06AM 23 |     A.   Correct.

11:06AM 24 |     Q.   What's the first time you ever saw that

11:06AM 25 | document?

11:06AM  1      A.   When I got the boxes of discovery, numbered

11:06AM  2   discovery, that the State presented us which I can't

11:06AM  3   tell you when that was but early on in the case.  As I

11:06AM  4   went through it, that was one of the documents that was

11:06AM  5   contained in that discovery from the State.

11:06AM  6            THE COURT:  Excuse me, Mr. Udashen.  Ask a

11:06AM  7   question before I forget.

11:06AM  8            Do you recall in your review of the

11:06AM  9   transcripts of the previous trials whether that ranking

11:06AM 10   document was ever discussed?

11:06AM 11            THE WITNESS:  Do I recall it in my review?

11:06AM 12   No.

11:06AM 13            THE COURT:  Go ahead, Mr. Udashen.

11:06AM 14      Q.   (By Mr. Udashen) Mr. Ashford, the ranking

11:07AM 15   document that you offered into evidence has a Bates

11:07AM 16   stamp number on it of 1550.  Did you put that Bates

11:07AM 17   stamp on it or was it on there when you got it from the

11:07AM 18   State?

11:07AM 19      A.   All of the stamps on the documents were there

11:07AM 20   when we got them from the State.  Those are their

11:07AM 21   stampings.

11:07AM 22      Q.   Have you heard or has anybody ever said to you

11:07AM 23   yourself a claim by any of the prosecutors that they did

11:07AM 24   not give you this document, that in fact you and Mr.

11:07AM 25   King had produced it to them?

11:07AM 1      A.   No, I don't recall that at all.

11:07AM 2      Q.   You've never heard that they have made that

11:07AM 3   claim?

11:07AM 4      A.   No.

11:07AM 5      Q.   Is that claim -- is there validity to that

11:07AM 6   claim at all?

11:07AM 7      A.   No.

11:07AM 8      Q.   Now, you got a box of discovery or several

11:07AM 9   boxes of discovery that had that document in it,

11:07AM 10  correct?

11:07AM 11     A.   Correct.

11:07AM 12     Q.   From your review of that document were you able

11:07AM 13  to tell where that document came from and who wrote it?

11:08AM 14     A.   No.  And that was a big issue of contention in

11:08AM 15  the trial.

11:08AM 16     Q.   How far in advance approximately of the trial

11:08AM 17  do you think it was when you received that document?

11:08AM 18     A.   I really can't tell you, Mr. Udashen.

11:08AM 19     Q.   What efforts did you and the defense team make

11:08AM 20  to try to determine who wrote that document?

11:08AM 21     A.   Once we figured out that that was going to be

11:08AM 22  an issue of contention, which actually I really -- I

11:08AM 23  think it was during the course of the trial -- we hired

11:08AM 24  S. O. Woods, former custodian of records from TDC, to go

11:08AM 25  down to Huntsville and go through all the records that

| | | |
|---|---|---|
| 11:09AM | 1 | he could find that were related to this case and try to |
| 11:09AM | 2 | figure it out for us. |
| 11:09AM | 3 | THE COURT:  Excuse me.  Was that during the |
| 11:09AM | 4 | pendency of the trial? |
| 11:09AM | 5 | THE WITNESS:  I believe that it was. |
| 11:09AM | 6 | Q.   (By Mr. Udashen) You mean while the trial was |
| 11:09AM | 7 | going on in the courtroom? |
| 11:09AM | 8 | A.   Correct. |
| 11:09AM | 9 | THE COURT:  Just a minute.  Another |
| 11:09AM | 10 | question. |
| 11:09AM | 11 | To your recollection was that ranking |
| 11:09AM | 12 | document something that you or Mr. King provided to Ms. |
| 11:09AM | 13 | Goodness during preparation of the trial? |
| 11:09AM | 14 | THE WITNESS:  I'm almost certain that Dr. |
| 11:09AM | 15 | Goodness had every single document that we had. |
| 11:09AM | 16 | THE COURT:  Is that a yes? |
| 11:09AM | 17 | THE WITNESS:  That's a yes. |
| 11:09AM | 18 | THE COURT:  Go ahead, Mr. Udashen. |
| 11:09AM | 19 | MR. UDASHEN:  Thank you, Your Honor. |
| 11:09AM | 20 | Q.   (By Mr. Udashen) So you had the document prior |
| 11:10AM | 21 | to trial? |
| 11:10AM | 22 | A.   Correct. |
| 11:10AM | 23 | Q.   Had you -- did you and Mr. King make a decision |
| 11:10AM | 24 | that you were going to offer that document into |
| 11:10AM | 25 | evidence? |

11:10AM 1      A.   Yes.

11:10AM 2      Q.   And when you intended to offer it into evidence

11:10AM 3  what was your plan on how to get it in evidence?  What

11:10AM 4  would be the witness and the strategy to actually get

11:10AM 5  the document into evidence?

11:10AM 6      A.   We assumed that that document was a Texas

11:10AM 7  Department of Corrections document and we assumed that

11:10AM 8  because we had several other documents where TDC

11:10AM 9  employees, either guards or civilian employees, were

11:10AM 10  asked to basically do the same thing, rank these

11:10AM 11  individuals to say whether they thought they were smart,

11:10AM 12  dumb, violent, non-violent, so forth and so on.

11:11AM 13          And we actually called those witnesses at

11:11AM 14  trial and we offered their sponsoring documents to

11:11AM 15  support that.  And we assumed that basically all those

11:11AM 16  were together, the ranking document and the individual

11:11AM 17  documents from these individuals, were all TDC documents

11:11AM 18  because they were the same subject matter.  And it just

11:11AM 19  basically -- the ranking documents seem to be a

11:11AM 20  compilation of what these individuals had done on an

11:11AM 21  individual basis.

11:11AM 22          So we didn't anticipate that the State was

11:11AM 23  going to all of a sudden pretend they didn't know where

11:11AM 24  this document came from.  We assumed either from one of

11:11AM 25  the individual witnesses or some TDC official that was

| | | |
|---|---|---|
| 11:12AM | 1 | called during the course of the trial we were going to |
| 11:12AM | 2 | be able to get that document in. |
| 11:12AM | 3 | Q.    You assumed that you would have some witness |
| 11:12AM | 4 | who would admit to familiarity with this document? |
| 11:12AM | 5 | A.    Correct. |
| 11:12AM | 6 | Q.    What efforts did you make prior to trial to |
| 11:12AM | 7 | determine who the author of this document was? |
| 11:12AM | 8 | A.    I don't recall if we made any efforts prior to |
| 11:12AM | 9 | trial to find out who the document of the author (sic) |
| 11:12AM | 10 | was because we didn't anticipate that they were going to |
| 11:12AM | 11 | object to it like they did.  We might have but I don't |
| 11:12AM | 12 | recall. |
| 11:12AM | 13 | Q.    Did you know who the author of the document |
| 11:12AM | 14 | was? |
| 11:12AM | 15 | A.    No. |
| 11:12AM | 16 | Q.    Did you have any personal discussions with any |
| 11:12AM | 17 | of the prosecutors about this document prior to or |
| 11:12AM | 18 | during the trial? |
| 11:12AM | 19 | A.    During the trial.  Prior to trial I can't say. |
| 11:12AM | 20 | Q.    During the trial did you talk to any of the |
| 11:12AM | 21 | prosecutors and ask them who the author of this document |
| 11:12AM | 22 | was? |
| 11:13AM | 23 | A.    Yes. |
| 11:13AM | 24 | Q.    Who did you talk to? |
| 11:13AM | 25 | A.    I can't say specifically but it would had to |

11:13AM   1    have been Toby Shook, Tom D'Amore, if not both.

11:13AM   2         Q.   What did they tell you?

11:13AM   3         A.   They kept saying they didn't know where the

11:13AM   4    document came from.

11:13AM   5         Q.   Did they say they had never seen it before?

11:13AM   6         A.   I can't be that specific.

11:13AM   7         Q.   They said they didn't know where it came from?

11:13AM   8         A.   Correct.

11:13AM   9         Q.   Did you ask them to find out where it came

11:13AM  10    from?

11:13AM  11         A.   I'm sure I did.

11:13AM  12         Q.   What was their response?

11:13AM  13         A.   Just denying that they knew where it came from.

11:13AM  14         Q.   Did you point out to them that you had gotten

11:13AM  15    it from them?

11:13AM  16         A.   Absolutely.  I think I pointed that out to

11:13AM  17    them.  I pointed it out during objections, during the

11:13AM  18    course of the trial.  The big telling factor is that it

11:13AM  19    has the big stamp on it that all the rest of our

11:14AM  20    discovery has on it as to a numbered document.

11:14AM  21         Q.   And is it fair to say that they refused to find

11:14AM  22    out where the document came from?

11:14AM  23         A.   Yes.

11:14AM  24         Q.   Is it fair to say that it was easily within

11:14AM  25    their ability to find out and tell you who wrote the

11:14AM   1   document?

11:14AM   2        A.   I believe.

11:14AM   3             MS. SMITH:   Objection, Your Honor.  It's

11:14AM   4   not within his knowledge about what --

11:14AM   5             THE COURT:   Sustained.

11:14AM   6        Q.   (By Mr. Udashen) Was this the fourth or fifth

11:14AM   7   trial of the Texas Seven?  What number was this?

11:14AM   8        A.   I don't recall but I believe it was at least --

11:14AM   9             THE COURT:   Can the parties stipulate this

11:14AM  10   was the fifth trial?

11:14AM  11             MS. SMITH:   State will stipulate.

11:14AM  12        Q.   (By Mr. Udashen) From your investigation and

11:14AM  13   preparation for this trial was there one or more of the

11:14AM  14   prosecutors who had been involved in all of the previous

11:14AM  15   trials?

11:15AM  16        A.   I know Toby Shook had been involved in at least

11:15AM  17   all of them, I thought.  I don't remember who else was

11:15AM  18   involved but I think most of the same prosecutors were

11:15AM  19   involved in all of them.

11:15AM  20        Q.   You made a reference earlier to Mr. Shook

11:15AM  21   basically working on this one case for a period of time.

11:15AM  22   Was that your understanding?

11:15AM  23        A.   Well, I mean I know that's the way super chiefs

11:15AM  24   operate.  They take a capital or two and they work those

11:15AM  25   cases.

11:15AM 1      Q.   Based upon your knowledge of Mr. Shook's

11:15AM 2  involvement in the Texas Seven cases did it surprise you

11:15AM 3  that there was a document that he had no knowledge of

11:15AM 4  that was related to this case?

11:15AM 5      A.   Absolutely.

11:15AM 6      Q.   Tell us -- tell us how -- what you thought

11:15AM 7  about that when he told you that.

11:15AM 8           THE COURT:  Mr. Udashen, let me interrupt

11:15AM 9  you.  I don't know that what Mr. Ashford thought is

11:16AM 10 particularly helpful to me regarding Mr. Shook's

11:16AM 11 ignorance of the document.

11:16AM 12           Let me ask you, Mr. Ashford, did you and

11:16AM 13 Mr. King discuss whether or not to request a continuance

11:16AM 14 to try and ascertain the authorship of that document?

11:16AM 15           THE WITNESS:  Specifically I don't recall,

11:16AM 16 Judge.

11:16AM 17           THE COURT:  Did you ask for a continuance?

11:16AM 18           THE WITNESS:  I don't recall.

11:16AM 19           MR. UDASHEN:  May I approach the witness?

11:16AM 20           THE COURT:  You may.

11:17AM 21           (Off-the-record discussion)

11:17AM 22           MR. UDASHEN:  Can I proceed, Your Honor?

11:17AM 23           THE COURT:  You may.

11:17AM 24      Q.   (By Mr. Udashen) Mr. Ashford, let me show you

11:17AM 25 some documents that are filed in the Court's records on

11:17AM  1   this case.  It's filed as part of the record excerpts

11:17AM  2   that we filed on behalf of Mr. Halprin.

11:17AM  3       A.   Okay.

11:17AM  4       Q.   Under tab B -- and just so we're clear on what

11:17AM  5   we're talking about, it's a letter and documents from

11:17AM  6   the Texas Department of Criminal Justice.  Okay?

11:17AM  7       A.   Okay.

11:17AM  8       Q.   Contained within here if you would just look --

11:17AM  9   first of all, let me show this to the prosecutor and

11:17AM  10  I'll bring it back to you.

11:17AM  11              I'm going to show you a fax from the Irving

11:18AM  12  Police Department that makes reference to profiles done

11:18AM  13  by Sgt.  Hank Whitman.  Do you see that?

11:18AM  14      A.   Uh-huh.

11:18AM  15      Q.   Have you ever heard of Sgt -- Investigator Hank

11:18AM  16  Whitman prior to or during this trial?

11:18AM  17      A.   I can't say that I did or I didn't.  I don't

11:18AM  18  remember.

11:18AM  19      Q.   This fax cover sheet I'm showing you here, did

11:18AM  20  you ever see this in relation to the ranking document?

11:18AM  21      A.   In looking at the fact that it doesn't have

11:18AM  22  that stamp number on the bottom right-hand corner, I'd

11:18AM  23  have to say no.

11:18AM  24      Q.   So if this document makes reference to Sgt.

11:18AM  25  Whitman, you saw nothing that connected Sgt.  Whitman to

11:18AM  1  the ranking document?

11:18AM  2      A.   Correct.

11:19AM  3      Q.   Now, what else could you and Mr. King have done

11:19AM  4  that you didn't do in order to find out who the author

11:19AM  5  of this document was?

11:19AM  6      A.   I can't tell you.  We had so many documents.  I

11:19AM  7  mean that's just such an open-ended question, going to

11:19AM  8  find something and you don't know where it comes from.

11:19AM  9  Our whole point was the statement, where it came from.

11:19AM  10  They gave it to us.  It was part of their discovery.

11:19AM  11  They could have found it.

11:19AM  12          I mean we could have hired an investigator

11:19AM  13  to go ask everybody in law enforcement, "Did you have

11:19AM  14  anything to do with this document?"  But I mean we were

11:19AM  15  asking everybody that we came across.  We asked every

11:20AM  16  law enforcement officer that testified.  We asked all

11:20AM  17  the individual TDC employees and we couldn't get an

11:20AM  18  answer.

11:20AM  19      Q.   Was it -- did you have a strategic reason not

11:20AM  20  to present the author of the document as a witness?

11:20AM  21      A.   No.

11:20AM  22      Q.   Had you known who the author of the document

11:20AM  23  was would you have called him as a witness?

11:20AM  24      A.   If we had known who the author of the document

11:20AM  25  was we would have called him as a witness if we weren't

11:20AM  1  otherwise able to get the document admitted which we

11:20AM  2  weren't so we would have.

11:20AM  3       Q.   This document was something that your strategy

11:20AM  4  was to get it admitted?

11:20AM  5       A.   Absolutely.

11:20AM  6       Q.   During the -- during the outside the presence

11:20AM  7  of the jury discussion of the document with the Court

11:21AM  8  Mr. D'Amore, one of the prosecutors, said, "We didn't

11:21AM  9  know who made it either."  Do you remember that?

11:21AM 10       A.   Yes.

11:21AM 11       Q.   Who all from the prosecution team was present

11:21AM 12  in court at the time that statement was made?

11:21AM 13       A.   I can't tell you.  I would assume it was at

11:21AM 14  least he and Mr. Shook.

11:21AM 15       Q.   Now, you said that y'all had during the trial

11:21AM 16  hired S. O. Woods.

11:21AM 17       A.   I believe it was during the trial.  Mr. King --

11:21AM 18  Mr. King took care of handling S. O. Woods.  The only

11:21AM 19  reason I say it was during the trial is because I don't

11:21AM 20  really recall it being an issue that we were going to be

11:21AM 21  able to get it in until we started trying to get it in.

11:21AM 22  I may be wrong but that's just my recollection.

11:21AM 23       Q.   And is it your understanding that Mr. Woods was

11:22AM 24  unable to tell you and Mr. King who the author of the

11:22AM 25  document was?

11:22AM  1      A.   Correct.

11:22AM  2      Q.   Although he was able to verify that it was in

11:22AM  3  the TDC records on this case?

11:22AM  4      A.   I believe so.

11:22AM  5      Q.   The document itself makes reference to

11:22AM  6  interviews with civilian workers, correction officers

11:22AM  7  and several inmates.  Do you recall that?

11:22AM  8      A.   Yes.

11:22AM  9      Q.   Did you -- did you have any information as to

11:22AM 10  who these people were that were interviewed in

11:22AM 11  preparation of this document?

11:22AM 12      A.   Not specifically.  The actual TDC employees

11:22AM 13  that were called that we had the corresponding documents

11:22AM 14  to back up, of course, we assumed those were some of the

11:22AM 15  people.  Who else that might have been included other

11:23AM 16  than those specific individuals we didn't know.

11:23AM 17      Q.   What type of investigation did you do to

11:23AM 18  determine who those individuals were that went into the

11:23AM 19  preparation of this document?

11:23AM 20      A.   Specifically I don't remember if we tried to

11:23AM 21  find anybody other than those individuals or not.

11:23AM 22      Q.   Whether you tried to find anybody other than

11:23AM 23  the ones you already knew about?

11:23AM 24      A.   Correct.

11:23AM 25      Q.   Would you agree with me that the information in

11:23AM  1    this document concerning Mr. Halprin was mitigating

11:23AM  2    evidence as to Mr. Halprin?

11:23AM  3         A.    Absolutely.

11:23AM  4         Q.    Very well may have affected the jury's decision

11:23AM  5    on whether to give him the death penalty, that that was

11:23AM  6    the purpose of it?

11:23AM  7         A.    That was the purpose of it.

11:23AM  8         Q.    And if there were witnesses who were

11:23AM  9    interviewed that gave this information, would that

11:23AM  10   indicate that there are potential exculpatory witnesses

11:24AM  11   out there that have given information about Mr. Halprin?

11:24AM  12        A.    Correct.

11:24AM  13        Q.    In light -- in light of that do you feel like

11:24AM  14   some effort should have been made to locate and

11:24AM  15   determine who those people were?

11:24AM  16        A.    I honestly can't say.  I believe that we got

11:24AM  17   the value out of the witnesses that we did have.  I know

11:24AM  18   it was somewhere in the area of four or five witnesses

11:24AM  19   and whether any additional witnesses would have helped

11:24AM  20   any more, I honestly can't say.  I thought we got the

11:24AM  21   value out of what we had.

11:24AM  22             MR. UDASHEN:  Can I approach just a moment?

11:24AM  23        Q.    (By Mr. Udashen) I'm going to show you a

11:24AM  24   document that I filed this morning and it's entitled

11:25AM  25   List of Persons Who Provided Information or Assisted in

11:25AM 1   Preparation of Ranking Document as Determined by Writ

11:25AM 2   Counsel upon Open File Review of District Attorneys

11:25AM 3   Files on Texas Seven.

11:25AM 4         I'm going to represent to you that this is

11:25AM 5   a document I have prepared based upon our review of the

11:25AM 6   files of people that it appears may have been

11:25AM 7   interviewed in preparation of this document.  Just ask

11:25AM 8   you if you can just look at that and tell me were you

11:25AM 9   aware of those people?

11:25AM 10         Other than the people that actually

11:25AM 11   testified that are on that list, were you aware of these

11:25AM 12   people and their potential involvement in this case or

11:25AM 13   as potential witnesses concerning Mr. Halprin?

11:25AM 14     A.   Absolutely not, Mr. Udashen.  I see 67 people

11:25AM 15   on this list.  Even if you add in Wesley Halprin, a few

11:25AM 16   other people that we might have talked to, I had no idea

11:26AM 17   that there were this many people involved in that

11:26AM 18   ranking document.

11:26AM 19     Q.   Okay.  Thank you.  Let me ask you about a few

11:26AM 20   particular inmates who have provided affidavits that

11:26AM 21   have been filed in this case concerning Mr. Halprin and

11:26AM 22   ask you if you ever spoke to these inmates or if you

11:26AM 23   ever heard of them or if the State ever made you aware

11:26AM 24   of them.  Timothy Alan Black?

11:26AM 25     A.   I can tell you right now.  I never spoke to any

| | | |
|---|---|---|
| 11:26AM | 1 | inmate.  I don't know if the State made me aware of any |
| 11:26AM | 2 | inmate and I don't remember if there was anything that I |
| 11:26AM | 3 | could have gotten from the discovery that I had that |
| 11:27AM | 4 | would point me to any particular inmate. |
| 11:27AM | 5 | Q.   Let me read off the names and ask you a couple |
| 11:27AM | 6 | of questions. |
| 11:27AM | 7 | THE COURT:  Excuse me, Mr. Udashen. |
| 11:27AM | 8 | You received the ranking document; is that |
| 11:27AM | 9 | correct? |
| 11:27AM | 10 | THE WITNESS:  That's correct. |
| 11:27AM | 11 | THE COURT:  You were uncertain of the |
| 11:27AM | 12 | source? |
| 11:27AM | 13 | THE WITNESS:  Correct. |
| 11:27AM | 14 | THE COURT:  You inquired of the State and |
| 11:27AM | 15 | the State indicated that it was uncertain of the source; |
| 11:27AM | 16 | is that correct? |
| 11:27AM | 17 | THE WITNESS:  Correct. |
| 11:27AM | 18 | THE COURT:  You retained S. O. Woods, |
| 11:27AM | 19 | former director, I believe, of the Institutional |
| 11:27AM | 20 | Division to investigate and see if he could find out the |
| 11:27AM | 21 | source of the documents; is that correct? |
| 11:27AM | 22 | THE WITNESS:  Correct. |
| 11:27AM | 23 | THE COURT:  The information you received |
| 11:27AM | 24 | from him was that the document did exist in TDC records |
| 11:27AM | 25 | but he was unable to identify the source or author; is |

11:27AM  1   that correct?

11:27AM  2              THE WITNESS:  The last question I'm not as

11:27AM  3   sure of in terms of specifics but that is my

11:28AM  4   recollection.

11:28AM  5              THE COURT:  On the face of the document

11:28AM  6   itself does it identify any of the source material, any

11:28AM  7   of the sources of the information?

11:28AM  8              THE WITNESS:  It's been a while since I

11:28AM  9   looked at it but I don't think so.

11:28AM  10             THE COURT:  Would you like to look at it

11:28AM  11   now?

11:28AM  12             THE WITNESS:  Sure.

11:28AM  13             THE COURT:  Take your time.

11:28AM  14             Let the record reflect the defense has

11:28AM  15   tendered a copy of the ranking document to the witness

11:28AM  16   or I should say the Applicant.

11:28AM  17             THE WITNESS:  No, sir.  Only sources of

11:28AM  18   information would have been civilian workers,

11:28AM  19   correctional officers, several inmates that worked

11:28AM  20   closely with the escapees.

11:28AM  21             THE COURT:  No one was named?

11:28AM  22             THE WITNESS:  No.

11:29AM  23             THE COURT:  Then it would be safe to say

11:29AM  24   this document filed by the Applicant listing 67

11:29AM  25   witnesses, you didn't contact any of them because you

11:29AM 1    didn't know who they were?

11:29AM 2            THE WITNESS:  Those 67 witnesses also

11:29AM 3    include, in looking at it briefly, the defendant's

11:29AM 4    brother and there are a few law enforcement names on

11:29AM 5    there that I am sure we probably talked to.  But the

11:29AM 6    vast majority of them we would have no way of knowing

11:29AM 7    anything about them.

11:29AM 8            THE COURT:  You didn't speak to any inmates

11:29AM 9    that may have provided information that led to the

11:29AM 10   creation of that ranking document; is that correct?

11:29AM 11           THE WITNESS:  That's correct.

11:29AM 12           THE COURT:  Mr. Udashen, let's move on.

11:29AM 13           MR. UDASHEN:  Pass the witness, Your Honor.

11:29AM 14           MS. SMITH:  How long do you want to go

11:29AM 15   before we break for lunch?

11:29AM 16           THE COURT:  Off the record.

11:29AM 17           (Off-the-record discussion)

11:29AM 18                  CROSS-EXAMINATION

11:30AM 19   BY MS. SMITH:

11:30AM 20       Q.  Good morning, Mr. Ashford.

11:30AM 21       A.  Good morning.

11:30AM 22       Q.  This isn't the first time you have answered

11:30AM 23   questions about your performance in this trial.  You

11:30AM 24   answered some interrogatories.

11:30AM 25       A.  Correct.

| | | |
|---|---|---|
| 11:30AM | 1 | Q.   You did that in September of '08.  Does that |
| 11:30AM | 2 | sound right? |
| 11:30AM | 3 | A.   I didn't realize it was that long ago. |
| 11:30AM | 4 | Q.   We had to file a few copies of it because the |
| 11:30AM | 5 | first one we couldn't find a signed copy in the Court's |
| 11:30AM | 6 | file. |
| 11:30AM | 7 | A.   Correct. |
| 11:30AM | 8 | Q.   It's been a long time since this trial. |
| 11:30AM | 9 | A.   Yes. |
| 11:30AM | 10 | Q.   This trial started in 2001, correct? |
| 11:30AM | 11 | A.   Correct. |
| 11:30AM | 12 | Q.   I'm sorry.  2003.  The offense was in 01. |
| 11:30AM | 13 | A.   I couldn't tell you. |
| 11:30AM | 14 | Q.   Really it's been a long time.  This writ was |
| 11:30AM | 15 | filed in 2005.  So we're looking at basically almost a |
| 11:30AM | 16 | decade here, right? |
| 11:31AM | 17 | A.   Correct. |
| 11:31AM | 18 | Q.   Would you say the passage of time has probably |
| 11:31AM | 19 | taken a toll on your memory of how you handled this |
| 11:31AM | 20 | case? |
| 11:31AM | 21 | A.   Absolutely. |
| 11:31AM | 22 | Q.   You mentioned a little bit about what you did |
| 11:31AM | 23 | or didn't review in preparing for your testimony today. |
| 11:31AM | 24 | Did you review anything before you answered the |
| 11:31AM | 25 | interrogatories that the defense submitted to you? |

BRIDGET BARNHILL, OFFICIAL REPORTER

11:31AM  1    A.    Not very much.  I pretty much did it from

11:31AM  2  memory.

11:31AM  3    Q.    Have you seen the affidavit of Dr. Goodness

11:31AM  4  that she gave writ counsel?

11:31AM  5    A.    No.

11:31AM  6    Q.    Or how about the affidavit of Hank Whitman?

11:31AM  7    A.    No.

11:31AM  8    Q.    What about the biological mother and brother of

11:31AM  9  Mr. Halprin?

11:31AM  10    A.    No.

11:31AM  11    Q.    Safe to say you hadn't seen the D. A.

11:31AM  12  affidavits in this case either, right?

11:31AM  13    A.    No.

11:31AM  14    Q.    Based on what you can recall, what do you think

11:31AM  15  of your performance in this case?  We're here today

11:31AM  16  because writ counsel has accused you of 21 different

11:32AM  17  acts of ineffective assistance.  You tell me.  How do

11:32AM  18  you rate your performance?

11:32AM  19    A.    I don't think I was deficit.  I don't think we

11:32AM  20  were deficit.  There's always things you can do better

11:32AM  21  in a trial.  There's a lot of things in looking at

11:32AM  22  hindsight you say -- not that you say but that writ

11:32AM  23  attorneys say, "This would have worked, that would have

11:32AM  24  worked."

11:32AM  25            And that's just -- that's impossible.  I

| | | |
|---|---|---|
| 11:32AM | 1 | mean my thought is there was a guy who was across the |
| 11:32AM | 2 | street with a radio who wasn't even a half a mile from |
| 11:32AM | 3 | where the shooting occurred, no question never fired a |
| 11:32AM | 4 | shot and he got the death penalty, too. |
| 11:32AM | 5 | Q.   You're talking about Patrick Murphy? |
| 11:32AM | 6 | A.   Correct. |
| 11:32AM | 7 | Q.   He was tried after Mr. Halprin? |
| 11:33AM | 8 | A.   Correct. |
| 11:33AM | 9 | Q.   I want to briefly discuss your qualifications |
| 11:33AM | 10 | just for the record.  You've been licensed since 1985. |
| 11:33AM | 11 | A.   Correct. |
| 11:33AM | 12 | Q.   You're licensed to practice both in federal |
| 11:33AM | 13 | court and state court. |
| 11:33AM | 14 | A.   Correct. |
| 11:33AM | 15 | Q.   At the time of Mr. Halprin's trial you had been |
| 11:33AM | 16 | licensed for 18 years. |
| 11:33AM | 17 | A.   Correct. |
| 11:33AM | 18 | Q.   When you were appointed weren't you on the list |
| 11:33AM | 19 | for the First Administrative Judicial Region's qualified |
| 11:33AM | 20 | death penalty defense counsel? |
| 11:33AM | 21 | A.   Yes. |
| 11:33AM | 22 | Q.   You have to meet certain retirements to be on |
| 11:33AM | 23 | that list, correct? |
| 11:33AM | 24 | A.   Yes. |
| 11:33AM | 25 | Q.   You can't be first chair in a death penalty |

11:33AM  1    case in Dallas County or in the state if you have been

11:33AM  2    found ineffective on a death penalty case in the past,

11:33AM  3    correct?

11:33AM  4        A.   I didn't know that.

11:33AM  5             THE COURT:  Has that ruled changed

11:33AM  6    recently?

11:33AM  7             MS. SMITH:  Not to my knowledge.

11:33AM  8             MR. UDASHEN:  I don't think it's changed.

11:33AM  9    I'm not aware if it changed.

11:34AM  10            MS. SMITH:  I think it might be in the

11:34AM  11   requirements list.

11:34AM  12       Q.   (By Ms. Smith) You're not on the list anymore,

11:34AM  13   correct?

11:34AM  14       A.   Correct.

11:34AM  15       Q.   That was by choice, right?

11:34AM  16       A.   Correct.

11:34AM  17       Q.   Why did you decide not to stay on the list?

11:34AM  18       A.   These cases are just too long and drawn-out.  I

11:34AM  19   don't think you could ever be prepared the way you need

11:34AM  20   to be unless you can do it like the State does where

11:34AM  21   it's the only case or two that you are going to try for

11:34AM  22   a year and even then maybe not.

11:34AM  23            After you complete the case it's about six

11:34AM  24   months before your practice gets back to where it should

11:34AM  25   be because you devoted so much time to one case.

| | | |
|---|---|---|
| 11:34AM | 1 | There's this aspect. |
| 11:34AM | 2 | Q.   Having your papers graded, right? |
| 11:34AM | 3 | A.   Correct. |
| 11:35AM | 4 | Q.   Did that sour your experience any? |
| 11:35AM | 5 | A.   No. |
| 11:35AM | 6 | Q.   Halprin wasn't your first death penalty case? |
| 11:35AM | 7 | A.   Second. |
| 11:35AM | 8 | Q.   First one was William Rayford. |
| 11:35AM | 9 | A.   Correct. |
| 11:35AM | 10 | Q.   You handled that with Paul Brauchle? |
| 11:35AM | 11 | A.   Correct. |
| 11:35AM | 12 | Q.   That was one year before you got appointed to |
| 11:35AM | 13 | Halprin's case. |
| 11:35AM | 14 | A.   Correct. |
| 11:35AM | 15 | Q.   You weren't found ineffective on Mr. Rayford's |
| 11:35AM | 16 | case. |
| 11:35AM | 17 | A.   Not to my knowledge. |
| 11:35AM | 18 | Q.   Have you spoken at all to Mr. Halprin in letter |
| 11:35AM | 19 | or any other way since the trial? |
| 11:35AM | 20 | A.   No. |
| 11:35AM | 21 | Q.   When was the last time you spoke to him? |
| 11:35AM | 22 | A.   Probably immediately after the trial to kind of |
| 11:35AM | 23 | explain the appeals process to him and that would be it. |
| 11:35AM | 24 | Q.   Once he was extradited back to Dallas from |
| 11:35AM | 25 | Colorado you and Mr. King met with him, correct? |

11:36AM  1      A.   Correct.

11:36AM  2      Q.   You continued to meet with him throughout the

11:36AM  3  pending proceeding?

11:36AM  4      A.   Correct.

11:36AM  5      Q.   Did you discuss your strategy with him?

11:36AM  6      A.   Yes.

11:36AM  7      Q.   Did he help in the formation of the strategy?

11:36AM  8      A.   He helped a lot in mitigation and punishment;

11:36AM  9  as to guilt-innocence, not as much but some.

11:36AM 10      Q.   He had already spoken to the media before you

11:36AM 11  got appointed on the case; is that correct?

11:36AM 12      A.   Yes.

11:36AM 13      Q.   He had already told his story to basically the

11:36AM 14  nation.

11:36AM 15      A.   Yes.

11:36AM 16      Q.   Stuck you with a story then, didn't it?

11:36AM 17      A.   Yes.

11:36AM 18      Q.   Was Mr. Halprin ever dissatisfied or upset with

11:36AM 19  you or Mr. King in your representation of him?

11:36AM 20      A.   No, not that he made us aware of -- not that he

11:37AM 21  made me aware.

11:37AM 22      Q.   Okay.  You mentioned you were first chair and

11:37AM 23  Mr. King was second chair, correct?

11:37AM 24      A.   Correct.

11:37AM 25      Q.   Was that really an actual distinction or were

11:37AM 1  the responsibilities pretty equally divided?

11:37AM 2      A.   No.   They were equally divided.   I was first

11:37AM 3  chair because Judge Lenoir appointed me.   And I called

11:37AM 4  Mr. King, asked him if he would assist me in the

11:37AM 5  handling of the case.   And so because I was the one

11:37AM 6  appointed, I was the first chair.

11:37AM 7          But we really didn't have any ranking as to

11:37AM 8  who was number one and number two.   Mr. King's far more

11:37AM 9  experienced than me.   One of the reasons I chose him is

11:37AM 10 because he had just been on the bench as a district

11:37AM 11 judge and I was sure during that time he probably had

11:37AM 12 tried a capital or two and so I asked him to work with

11:38AM 13 me.   But I was just designated first because I was the

11:38AM 14 one that was appointed originally.

11:38AM 15     Q.   I think you said before you were primarily in

11:38AM 16 charge of mitigation and Mr. King was primarily in

11:38AM 17 charge of the pretrial motions and Mr. Halprin and a lot

11:38AM 18 of the witnesses in the guilt phase.

11:38AM 19     A.   Yes.   I specifically remember mitigation myself

11:38AM 20 because I contacted Dr. Goodness after getting a

11:38AM 21 referral from Texas Criminal Defense Lawyers

11:38AM 22 Association.   I remember him specifically dealing with

11:38AM 23 Mr. Halprin and everybody else.   We just kind of divided

11:38AM 24 up as we went along.

11:38AM 25     Q.   Dr. Goodness came highly recommended.

11:38AM   1     A.    She did.

11:38AM   2     Q.    She's fairly experienced, isn't she?

11:38AM   3     A.    Yes.

11:38AM   4     Q.    She's been involved in several death penalty

11:39AM   5   trials in Dallas County since she assisted you.

11:39AM   6     A.    Correct.

11:39AM   7     Q.    In addition to Dr. Goodness, you had the help

11:39AM   8   of the Death Penalty Project Clinic at SMU law school.

11:39AM   9     A.    Correct.

11:39AM  10     Q.    The students who were supervised by a

11:39AM  11   professor, right?

11:39AM  12     A.    Yes, they were.

11:39AM  13     Q.    They conducted some research for you.

11:39AM  14     A.    Well, actually they conducted a lot of research

11:39AM  15   on their own.  They took on this project and were

11:39AM  16   working on things before they ever contacted me.  The

11:39AM  17   professor contacted me and told me, "If you need our

11:39AM  18   help, let us know."  It was very, very early on.  I

11:39AM  19   don't think I had ever met Mr. Halprin.

11:39AM  20         I don't think I had gotten any discovery or

11:39AM  21   anything when they originally contacted me.  And then

11:39AM  22   once the case kind of got rolling I decided, you know,

11:40AM  23   what could it hurt to have some extra help.  And then I

11:40AM  24   went and talked with them and gave them some of my

11:40AM  25   ideas, what I was going to try to do.

| | | |
|---|---|---|
| 11:40AM | 1 | They had already done a lot of stuff on |
| 11:40AM | 2 | their own that I wasn't interested in.  But they were |
| 11:40AM | 3 | the ones that had done a lot of the -- scouring the |
| 11:40AM | 4 | Internet to find what people had said about the case and |
| 11:40AM | 5 | finding these names of people who said, "I knew Randy |
| 11:40AM | 6 | Halprin and he was a good guy," or bad guy or whatever. |
| 11:40AM | 7 | And we submitted a lot of that to Dr. Goodness to follow |
| 11:40AM | 8 | up on. |
| 11:40AM | 9 | Q.   They didn't just do legal research.  They did a |
| 11:40AM | 10 | little investigating, didn't they? |
| 11:40AM | 11 | A.   Yes. |
| 11:40AM | 12 | Q.   They were able to get some location information |
| 11:40AM | 13 | for some of your witnesses. |
| 11:40AM | 14 | A.   I believe they did. |
| 11:40AM | 15 | Q.   They did a pretty good job, right? |
| 11:40AM | 16 | A.   I think so. |
| 11:40AM | 17 | MS. SMITH:  May I approach? |
| 11:41AM | 18 | Q.   (By Ms. Smith) Show you what's marked State's |
| 11:41AM | 19 | Writ Hearing Exhibit M and N. |
| 11:41AM | 20 | A.   N I recognize right away.  This is the research |
| 11:41AM | 21 | from the SMU class. |
| 11:41AM | 22 | Q.   There were two different sessions of students |
| 11:41AM | 23 | that worked on this for you, Fall 2001 session and |
| 11:41AM | 24 | Spring 2002 session.  Does that sound right? |
| 11:41AM | 25 | A.   You know what?  I didn't actually recall that. |

11:41AM  1   But as I earlier testified, they had done a lot of stuff

11:41AM  2   beforehand.  And so I guess the first group would have

11:41AM  3   done all of that and the second group focused more on

11:41AM  4   what they asked them to do.

11:41AM  5        Q.   Okay.

11:41AM  6             MS. SMITH:  Offer State's Writ Hearing

11:41AM  7   Exhibit Number M and N.

11:41AM  8             MR. ANTON:  No objection.

11:41AM  9             (State's Writ Hearing Exhibit M, N

11:41AM  10            admitted into evidence and are attached to

11:42AM  11            this transcript.)

11:42AM  12       Q.   (By Ms. Smith) You have talked a little bit

11:42AM  13  about the discovery that you received from the State.

11:42AM  14  Do you recall how many pages of discovery you received?

11:42AM  15  Is it safe to say thousands of pages?

11:42AM  16       A.   Thousands of pages.  We had at least two of

11:42AM  17  those boxes that copy paper comes in filled with

11:42AM  18  documents.  I say two.  It was probably ten of those.

11:42AM  19       Q.   You wouldn't be surprised if I told you you

11:42AM  20  received over 6000 pages of discovery?

11:42AM  21       A.   Not at all.

11:42AM  22       Q.   I think the Judge has mentioned this.  Your

11:42AM  23  client Mr. Halprin was the fifth of the defendants to be

11:42AM  24  tried.

11:42AM  25       A.   Correct.

11:42AM   1      Q.   You had the transcripts from the other trials.

11:42AM   2      A.   Yes.

11:42AM   3      Q.   So you had a preview of the State's case before

11:42AM   4  you got into the courtroom, correct?

11:42AM   5      A.   Correct.

11:42AM   6      Q.   What was your opinion of the State's case?

11:43AM   7      A.   It's pretty open-ended.

11:43AM   8      Q.   Was it a pretty strong case?

11:43AM   9           THE COURT:   Excuse me.   I think it might be

11:43AM   10  more helpful if you broke it down into the two different

11:43AM   11  stages.

11:43AM   12           MS. SMITH:   Okay.

11:43AM   13      Q.   (By Ms. Smith) On the issue of guilt how strong

11:43AM   14  would you rate the State's case?

11:43AM   15      A.   Nine and a half out of ten.

11:43AM   16      Q.   You've practiced in Dallas County for quite a

11:43AM   17  while, correct?

11:43AM   18      A.   Correct.

11:43AM   19      Q.   Dallas County D. A.'s office doesn't go for the

11:43AM   20  death penalty a lot, do they?

11:43AM   21      A.   Percentage-wise, no.

11:43AM   22      Q.   They're pretty selective, correct?

11:43AM   23      A.   Yes.

11:43AM   24      Q.   Typically the cases we choose to seek death on

11:43AM   25  are pretty strong, correct?

11:43AM 1      A.   I would agree.

11:43AM 2      Q.   The facts in this case were probably even more

11:43AM 3  powerful than the cases that we tried in the past for

11:44AM 4  death.  Would you agree with that?

11:44AM 5      A.   Yes.

11:44AM 6      Q.   Mr. Shook who was lead prosecutor on these

11:44AM 7  cases, all six cases, was a seasoned prosecutor at the

11:44AM 8  time he was assigned to these cases, correct?

11:44AM 9      A.   Correct.

11:44AM 10     Q.   What's your opinion of Mr. Shook?

11:44AM 11     A.   I think he's one of the best prosecutors I have

11:44AM 12  ever seen.

11:44AM 13     Q.   So you respect him.

11:44AM 14     A.   Yes.

11:44AM 15     Q.   At the point you walked into the courtroom to

11:44AM 16  represent Mr. Halprin Mr. Shook had gotten convictions

11:44AM 17  in the death penalty on four of the Texas Seven.

11:44AM 18     A.   Yes.

11:44AM 19     Q.   Eventually went on to get the death penalty for

11:44AM 20  Patrick Murphy who was undisputedly a non-shooter,

11:44AM 21  correct?

11:44AM 22     A.   Correct.

11:44AM 23     Q.   Your job of defending a Texas Seven defendant,

11:44AM 24  in particular even Mr. Halprin, was not going to be an

11:44AM 25  easy one, correct?

11:44AM   1       A.   Correct.

11:44AM   2       Q.   You talked a little bit about your strategy.

11:45AM   3   Would you say -- correct me if I'm wrong but would you

11:45AM   4   say your strategy was that you were going to present him

11:45AM   5   as a non-shooter, that he was basically a follower, not

11:45AM   6   a leader, that he wasn't very bright, that he was young

11:45AM   7   and that generally speaking he wasn't a violent

11:45AM   8   individual?  Would that be an accurate statement of how

11:45AM   9   you theorized your defense?

11:45AM   10      A.   Well, I don't think I could have said that he

11:45AM   11  wasn't a violent individual because of his prior but as

11:45AM   12  to everything else, yes.

11:45AM   13      Q.   Now, on direct examination Mr. Anton asked you

11:45AM   14  about how Mr. Halprin got shot in the foot and what your

11:45AM   15  theory was for trial.  And I believe you said that the

11:45AM   16  theory you went forward with in trial was Mr. Halprin

11:45AM   17  shot himself in the foot.

11:45AM   18      A.   Correct.

11:45AM   19      Q.   Would it surprise you to find that actually

11:45AM   20  your theory at trial was that he was shot in the

11:46AM   21  crossfire and that it was the State's theory he got shot

11:46AM   22  in the foot?  It's been a long time.  I know.

11:46AM   23      A.   I don't remember but I remember it was pretty

11:46AM   24  tough for us for actually present the shot in the foot

11:46AM   25  theory because we didn't have the sponsoring witness for

11:46AM  1  the document.  And as the evidence came out, as we

11:46AM  2  always do in trials, we kind of work with it as it comes

11:46AM  3  out.

11:46AM  4           The fact that he got shot in the crossfire

11:46AM  5  would be just as beneficial to us because once again, it

11:46AM  6  backs the fact that he didn't shoot or he didn't shoot

11:46AM  7  at the officer.

11:46AM  8      Q.  Actually it's better than him shooting himself

11:46AM  9  in the foot.  That means he had his gun in his hand,

11:46AM 10  correct?

11:46AM 11      A.  Yes.

11:47AM 12      Q.  You chose the better of the two theories to go

11:47AM 13  forward, at least with respect to his foot, correct?

11:47AM 14      A.  I don't recall it but that would be better,

11:47AM 15  yes.

11:47AM 16      Q.  Would you agree the longer a jury deliberates a

11:47AM 17  trial, the better it usually is for the defense?

11:47AM 18      A.  Yes.

11:47AM 19      Q.  At a minimum, it probably suggests defense

11:47AM 20  counsel gave the jury something to think about, right?

11:47AM 21      A.  Correct.

11:47AM 22      Q.  Do you recall how long the jury deliberated in

11:47AM 23  Halprin's trial in guilt and punishment?

11:47AM 24      A.  I don't.  I just remember everybody always

11:47AM 25  saying that they deliberated longer than any of the

| | | |
|---|---|---|
| 11:47AM | 1 | previous trials. |
| 11:47AM | 2 | Q.   That's correct, both -- both phases.  Would you |
| 11:47AM | 3 | be surprised to hear that at punishment they actually |
| 11:47AM | 4 | deliberated six hours which was about four hours longer |
| 11:48AM | 5 | than any other jury of the Texas Seven defendants that |
| 11:48AM | 6 | had been tried before and deliberated on the issue of |
| 11:48AM | 7 | punishment? |
| 11:48AM | 8 | A.   I wouldn't be surprised because once again, I |
| 11:48AM | 9 | kept hearing that.  It didn't matter to me.  I wasn't |
| 11:48AM | 10 | going back and comparing everybody else's, how long |
| 11:48AM | 11 | their jury was out compared to ours.  But I heard that |
| 11:48AM | 12 | several times. |
| 11:48AM | 13 | Q.   They were out overnight, weren't they? |
| 11:48AM | 14 | A.   Yes. |
| 11:48AM | 15 | Q.   That's pretty impressive in a Texas Seven case, |
| 11:48AM | 16 | wouldn't you say? |
| 11:48AM | 17 | A.   I can't say.  Who knows what juries are |
| 11:48AM | 18 | thinking? |
| 11:48AM | 19 | Q.   The only jury that deliberated longer was |
| 11:48AM | 20 | Patrick Murphy on punishment and that was only seven and |
| 11:48AM | 21 | a half hours and we know he wasn't a shooter. |
| 11:48AM | 22 | A.   Correct. |
| 11:48AM | 23 | Q.   Now, let's talk a little bit about the |
| 11:48AM | 24 | mitigation which as you said was your primary area of |
| 11:48AM | 25 | responsibility at the trial. |

| | | |
|---|---|---|
| 11:48AM | 1 | A.   Correct. |
| 11:48AM | 2 | Q.   You planned to present part of your mitigation |
| 11:48AM | 3 | case through Dr. Goodness, right? |
| 11:49AM | 4 | A.   Correct. |
| 11:49AM | 5 | Q.   And she did a battery of tests on Mr. Halprin. |
| 11:49AM | 6 | A.   Yes. |
| 11:49AM | 7 | Q.   She investigated his past, talked to a lot of |
| 11:49AM | 8 | people, right? |
| 11:49AM | 9 | A.   Yes. |
| 11:49AM | 10 | Q.   Tried to talk to a lot more, correct? |
| 11:49AM | 11 | A.   Correct. |
| 11:49AM | 12 | Q.   Was it always the plan for her to testify? |
| 11:49AM | 13 | A.   Yes. |
| 11:49AM | 14 | Q.   She helped cultivate quite a few witnesses for |
| 11:49AM | 15 | you, didn't she? |
| 11:49AM | 16 | A.   She did. |
| 11:49AM | 17 | Q.   She still does that for defense counsel in |
| 11:49AM | 18 | death cases, doesn't she? |
| 11:49AM | 19 | A.   Yes. |
| 11:49AM | 20 | Q.   Because she's good at it, right? |
| 11:49AM | 21 | A.   Yes.  She's very personable.  I have used her |
| 11:49AM | 22 | in other types of cases since the Texas Seven case. |
| 11:49AM | 23 | Q.   Now, there were a lot of people that she |
| 11:49AM | 24 | contacted that didn't want to testify, right? |
| 11:49AM | 25 | A.   Yes. |

11:49AM  1      Q.    People did not want to come in here to help Mr.

11:49AM  2   Halprin.  Would that be safe to say?

11:49AM  3      A.    That was very common.

11:49AM  4      Q.    But you did have some witnesses come testify in

11:49AM  5   addition to Dr. Goodness, didn't you?

11:50AM  6      A.    I just remember the one big witness that we had

11:50AM  7   that we were very happy that we got and very happy with

11:50AM  8   what he testified to.

11:50AM  9      Q.    Would that be Jason Goldberg?

11:50AM  10     A.    Yes.

11:50AM  11     Q.    His mother testified.  Do you remember that?

11:50AM  12     A.    As you say, I remember it.

11:50AM  13     Q.    Mindi Sternblitz?

11:50AM  14     A.    I'm just remembering them as you say them.

11:50AM  15     Q.    And we have discussed already that you had

11:50AM  16  planned to call Mr. Halprin's biological mother and

11:50AM  17  brother Wesley Halprin.

11:50AM  18     A.    That's correct.

11:50AM  19     Q.    They had been in contact with Dr. Goodness and

11:50AM  20  were appearing cooperative all the way up until 2003,

11:50AM  21  weren't they?

11:50AM  22     A.    Correct.

11:50AM  23     Q.    Right before trial, correct?

11:50AM  24     A.    Correct.

11:50AM  25     Q.    But was Wesley ever really keen on testifying

11:51AM 1   for Randy to your recollection?

11:51AM 2       A.   No, not at all.

11:51AM 3       Q.   In fact, didn't he tell a couple of SMU law

11:51AM 4   students who interviewed him he felt like he was being

11:51AM 5   put in a very awkward position?

11:51AM 6       A.   I don't remember who he told it to but I

11:51AM 7   remember that was kind of his position.  He was very

11:51AM 8   much worried about the perception of him.  He was

11:51AM 9   worried about the fact that he was still in trouble and

11:51AM 10  that, you know, Dallas County D. A. might have been able

11:51AM 11  to contact the D. A. in another county and get him

11:51AM 12  revoked or cause him such hardships.  And he -- he

11:51AM 13  wasn't very --

11:51AM 14              THE COURT:  Just a minute.  Let's go off

11:51AM 15  the record.

11:52AM 16              (Off-the-record discussion)

11:52AM 17      Q.   (By Ms. Smith) Did you try to cultivate Mr.

11:52AM 18  Halprin's adoptive parents to come testify?

11:52AM 19      A.   We could never locate the adoptive parents and

11:52AM 20  we tried very hard.  I didn't think from all that I had

11:52AM 21  heard about them and the opinion I had formed about them

11:52AM 22  that they would be helpful to us but we did want at

11:52AM 23  least to talk to them.

11:52AM 24              I don't remember us being able to ever find

11:52AM 25  them.  Seems like they had moved to Florida or something

11:52AM 1   and we weren't very successful in finding them, my

11:52AM 2   recollection.

11:52AM 3        Q.   I believe you told me they didn't want to be

11:52AM 4   found, did they?

11:52AM 5        A.   That was my perception, that they didn't want

11:52AM 6   to be found.

11:52AM 7        Q.   Not putting them on actually was consistent

11:52AM 8   with your theory because wasn't your theory he was

11:52AM 9   basically abandoned by his adoptive parents?

11:52AM 10       A.   That wasn't theory.  That was the truth.

11:53AM 11       Q.   While Randy Halprin's mother and brother could

11:53AM 12  have testified to some mitigating evidence, they also

11:53AM 13  had damaging information about him, didn't they?

11:53AM 14       A.   I'm sure that they could have had damaging

11:53AM 15  information about him.  I think that's what part of

11:53AM 16  their cause of concern was once they met with

11:53AM 17  investigators from the State, but sure.

11:53AM 18       Q.   They would also have minimized some of the

11:53AM 19  abuse that Randy had reported to Dr. Goodness, wouldn't

11:53AM 20  they?

11:53AM 21       A.   Potentially.

11:53AM 22       Q.   His mother would have minimized the story about

11:53AM 23  how he fell out of a window.  Do you recall that?

11:53AM 24       A.   No.

11:53AM 25       Q.   Randy -- did not Randy report to Dr. Goodness

11:53AM 1  that he had a scar on his wrist that was the result of

11:53AM 2  some abuse from his early years?  Do you remember that?

11:54AM 3      A.   I don't remember.  I'm sure that he did.  It's

11:54AM 4  in Dr. Goodness' report but I don't recall.

11:54AM 5      Q.   Were you aware his mother told both the

11:54AM 6  prosecutors and an investigator that that incident was

11:54AM 7  not the product of abuse?

11:54AM 8      A.   I don't remember.

11:54AM 9      Q.   She also had a story about how Mr. Halprin set

11:54AM 10 his aunt's couch on fire.  Do you remember that?

11:54AM 11     A.   Vaguely.  I remember something to that effect.

11:54AM 12     Q.   She had a story about how he shoved pennies

11:54AM 13 down his little brother's throat.

11:54AM 14     A.   I remember Mr. Shook talking about that.  I

11:54AM 15 remember that pretty well.  That was one of the things

11:54AM 16 that I think, you know, he kind of checked them on that

11:54AM 17 and then they felt like, "Okay.  If we come up and

11:54AM 18 testify, we're going to look stupid."

11:54AM 19     Q.   Not just look stupid.  They might be giving

11:55AM 20 some damaging testimony, correct?

11:55AM 21     A.   I don't know how they perceived it.  I remember

11:55AM 22 the penny story was pretty strong.  Mr. Shook couldn't

11:55AM 23 wait to talk about the penny story.

11:55AM 24     Q.   It showed that Mr. Halprin had a violent

11:55AM 25 tendency even before the age of five, didn't it?

11:55AM 1      A.   I don't remember much about it, the details of

11:55AM 2  it.  I remember that Mr. Shook talked about it a lot and

11:55AM 3  couldn't wait to talk about it.

11:55AM 4      Q.   Wesley Halprin, he was close with his adoptive

11:55AM 5  parents still, wasn't he?

11:55AM 6      A.   That I'm not sure of.  I don't recall it that

11:55AM 7  way but I can't remember.

11:55AM 8      Q.   He wasn't going to say they were bad parents,

11:55AM 9  was he?

11:55AM 10     A.   I don't remember.

11:55AM 11     Q.   Undoubtedly, Mr. Shook would have elicited any

11:55AM 12 damaging information from Mr. Halprin's biological

11:55AM 13 mother and brother.

11:55AM 14     A.   Yes.

11:55AM 15     Q.   He would have made the most of it, wouldn't he?

11:56AM 16     A.   Definitely.

11:56AM 17     Q.   You mentioned earlier that Mr. Shook told you

11:56AM 18 about what they said.  Did that happen during trial or

11:56AM 19 after trial or before?

11:56AM 20     A.   It was before or during.  I want to say before

11:56AM 21 because the decision to not call them was made before

11:56AM 22 based on their change in their demeanor and their

11:56AM 23 cooperation.

11:56AM 24     Q.   When they, as you say, flaked on you and you

11:56AM 25 made the strategic decision not to call them for fear

11:56AM 1   they might not do well on the stand because they were

11:56AM 2   reluctant you tried to get the information about his

11:56AM 3   earliest years in through Dr. Goodness, correct?

11:56AM 4        A.   Correct.

11:56AM 5        Q.   Part of that was through records she reviewed?

11:56AM 6        A.   Correct.

11:56AM 7        Q.   And statements people had made to her in

11:56AM 8   interviews?

11:56AM 9        A.   Correct.

11:56AM 10       Q.   Isn't it true that statements made to her or

11:57AM 11  statements made by other people that are recorded in

11:57AM 12  documents that are out of court statements, they're

11:57AM 13  hearsay, aren't they?

11:57AM 14       A.   Yes.

11:57AM 15       Q.   And getting a business records affidavit for

11:57AM 16  adoption records is not going to take care of all the

11:57AM 17  multiple levels of hearsay that were probably contained

11:57AM 18  in the records, correct?

11:57AM 19       A.   Would certainly be objectionable.  The best

11:57AM 20  lawyers in Dallas County are going to make those

11:57AM 21  objections.

11:57AM 22       Q.   So you tried to get it in, right?

11:57AM 23       A.   Well, we tried to get it in through the

11:57AM 24  additional witnesses that I called that testified.  We

11:57AM 25  tried to get it in through Randy himself.  We tried to

| 11:57AM | 1 | get it in. |

11:57AM 1  get it in.

11:57AM 2       Q.   Well, the letters came in, right?  You offered

11:57AM 3  the letters, right, that Mr. Halprin wrote?

11:57AM 4       A.   I don't even remember.

11:57AM 5       Q.   You don't recall Mr. King walking to the center

11:57AM 6  of the courtroom and stacking up all of those bound

11:57AM 7  volumes of letters that he received in discovery?

11:57AM 8       A.   No.  I'm sorry.

11:57AM 9       Q.   That's okay.  I know it's been a long time.

11:58AM 10  Even though the Court didn't let you admit the hearsay

11:58AM 11  evidence through Dr. Goodness, you still got a lot of

11:58AM 12  mitigating information before the jury through her,

11:58AM 13  didn't you?

11:58AM 14       A.   Yes.

11:58AM 15       Q.   She actually injected some hearsay into her

11:58AM 16  testimony, didn't she?

11:58AM 17       A.   I don't remember but knowing her, she probably

11:58AM 18  did.

11:58AM 19       Q.   She wasn't real happy with the Court's order,

11:58AM 20  was she?

11:58AM 21       A.   No.

11:58AM 22       Q.   Would you be surprised if I told you Mr. Shook

11:58AM 23  had to object five different times during her testimony

11:58AM 24  as to hearsay?

11:58AM 25       A.   No, I wouldn't be surprised.

11:58AM 1     Q.   That was after the Court had specifically

11:58AM 2  instructed Dr. Goodness not to do it; isn't that

11:58AM 3  correct?

11:58AM 4     A.   Yes.

11:58AM 5     Q.   Nonetheless, she got out at trial that abuse

11:58AM 6  and neglect adversely affected Mr. Halprin's early

11:58AM 7  environment.  Do you remember that?

11:58AM 8     A.   Not really.

11:58AM 9     Q.   Okay.  That Mr. Halprin and his brother didn't

11:58AM 10  come from a good home.  You don't get placed up for

11:59AM 11  adoption when you were five years old if you are from a

11:59AM 12  good home.  Do you remember her saying that?

11:59AM 13     A.   I don't.

11:59AM 14     Q.   Do you remember her saying that Randy learned

11:59AM 15  abusive behavior from witnessing it as a child?

11:59AM 16     A.   Not specifically, no.  I don't doubt that she

11:59AM 17  said all of that, though.

11:59AM 18     Q.   She did a good job, didn't she?

11:59AM 19     A.   I think she did.

11:59AM 20     Q.   That Mr. Halprin was genetically predisposed to

11:59AM 21  substance abuse because his biological mother and father

11:59AM 22  were drug addicts and Halprin's only drug abuse led him

11:59AM 23  to make bad decisions.

11:59AM 24     A.   I recall that.

11:59AM 25     Q.   How about the fact that Mr. Halprin suffered

BRIDGET BARNHILL, OFFICIAL REPORTER

11:59AM 1  from certain learning disorders, ADHD and depression.

11:59AM 2  And these disorders went untreated in his childhood and

11:59AM 3  adolescence and that depression disrupted the

11:59AM 4  development of his social skills?

11:59AM 5       A.   I do recall that.

11:59AM 6       Q.   How about his adoptive parents failed to meet

11:59AM 7  his psychological and emotional needs or adequately

11:59AM 8  treat his learning disorders and ADHD?

12:00PM 9       A.   Not specifically.  I don't doubt it's in there.

12:00PM 10      Q.   His adoptive parents -- that his adoptive

12:00PM 11  parents were rigid in their parenting of him and that

12:00PM 12  they overreacted to his, quote, curve balls.  Do you

12:00PM 13  remember that?

12:00PM 14      A.   Not specifically.

12:00PM 15      Q.   How about that Mr. Halprin didn't receive the

12:00PM 16  necessary guidance in his childhood?

12:00PM 17      A.   Yes, I remember that.

12:00PM 18      Q.   How about he suffers from avoidant personality

12:00PM 19  disorder and he has a strong need to belong and that he

12:00PM 20  is socially inept and fears social rejection?

12:00PM 21      A.   I wish I remember that but I don't remember

12:00PM 22  that specifically.

12:00PM 23      Q.   She gave a lot of good testimony, didn't she?

12:00PM 24      A.   I believe that she did.

12:00PM 25      Q.   In addition to all of that, she injected

12:00PM 1   hearsay even though she was instructed not to, didn't

12:00PM 2   she?

12:00PM 3       A.   Correct.  She knew the game.  She knew what was

12:01PM 4   at stake.  She knew what they were trying to keep out.

12:01PM 5   She tried to get it in.

12:01PM 6       Q.   You had a good mitigation expert, didn't you?

12:01PM 7       A.   I believe so.

12:01PM 8       Q.   In addition to Goodness' testimony, you

12:01PM 9   introduced the Goldbergs, Jason Goldberg and his mother.

12:01PM 10      A.   Yes.

12:01PM 11      Q.   Mindi Sternblitz?

12:01PM 12      A.   Yes.

12:01PM 13      Q.   Through them they testified that -- tell me if

12:01PM 14  you recall that -- that Halprin's adoptive father was

12:01PM 15  unyielding and reactionary.

12:01PM 16      A.   Yes.

12:01PM 17      Q.   That Mr. Halprin struggled to win his adoptive

12:01PM 18  father's approval.

12:01PM 19      A.   Yes.

12:01PM 20      Q.   His adoptive parents and the Goldbergs refused

12:01PM 21  to let him stay with them after his expulsion from

12:01PM 22  Oneida Baptist University.

12:01PM 23      A.   Yes.

12:01PM 24      Q.   In addition to all of that that came out at

12:01PM 25  punishment, Mr. King also elicited mitigating evidence

BRIDGET BARNHILL, OFFICIAL REPORTER

| | | |
|---|---|---|
| 12:01PM | 1 | from your client himself during direct examination in |
| 12:01PM | 2 | the guilt phase.  Do you remember that? |
| 12:01PM | 3 | A.   I'm sure that was the whole point. |
| 12:02PM | 4 | Q.   He testified to his adoption at the age of |
| 12:02PM | 5 | five. |
| 12:02PM | 6 | A.   Correct. |
| 12:02PM | 7 | Q.   That he had academic struggles. |
| 12:02PM | 8 | A.   Yes. |
| 12:02PM | 9 | Q.   He was sent away to boarding school by his |
| 12:02PM | 10 | adoptive parents. |
| 12:02PM | 11 | A.   Correct. |
| 12:02PM | 12 | Q.   Talked about his subsequent expulsion from |
| 12:02PM | 13 | Oneida University for writing a suicide note on the |
| 12:02PM | 14 | bench. |
| 12:02PM | 15 | A.   Correct. |
| 12:02PM | 16 | Q.   Really while Dr. Goodness wasn't allowed to |
| 12:02PM | 17 | give her testimony in the narrative form with her Power |
| 12:02PM | 18 | Point presentation, you still got all of the mitigating |
| 12:02PM | 19 | information about Randy's life before this jury. |
| 12:02PM | 20 | A.   I would agree.  She wasn't allowed to give it |
| 12:02PM | 21 | exactly like she wanted to give it but I think the jury |
| 12:02PM | 22 | got everything that we were trying to offer. |
| 12:02PM | 23 | Q.   If she had been allowed to testify to the |
| 12:02PM | 24 | hearsay statements that your client Mr. Halprin made to |
| 12:02PM | 25 | her during her evaluations of him, then would not the |

12:02PM 1   State also have been able to offer the hearsay

12:02PM 2   statements he made to the State's doctor in rebuttal?

12:03PM 3       A.   Correct.

12:03PM 4       Q.   There's a good chance that what Mr. Halprin

12:03PM 5   said to the State's doctor, Mr. Allen, was probably

12:03PM 6   going to be prejudicial, wasn't it?

12:03PM 7       A.   I think so.  You know, I'm just remembering all

12:03PM 8   of this now as you're asking it but, yeah, those were

12:03PM 9   issues that we talked about, the balance of what we got

12:03PM 10  in versus what the State would be able to go into if we

12:03PM 11  did.

12:03PM 12      Q.   A byproduct of you not -- Dr. Goodness not

12:03PM 13  being able to stand up there and saying, "So and so told

12:03PM 14  me such and such," you kept out prejudicial testimony

12:03PM 15  from one of the State's experts, didn't you?

12:03PM 16      A.   Potentially, yes.

12:03PM 17      Q.   If you had succeeded in putting on even more

12:03PM 18  damaging or helpful testimony through Dr. Goodness,

12:03PM 19  could the State not have responded in rebuttal with

12:04PM 20  additional witnesses?

12:04PM 21      A.   Yes.

12:04PM 22      Q.   Do you recall a woman by the name of Theresa

12:04PM 23  Dancy?

12:04PM 24              THE COURT:  Spell that last name.

12:04PM 25              MS. SMITH:  D A N C Y.

BRIDGET BARNHILL, OFFICIAL REPORTER

12:04PM 1     A.   Not just by her name, no.

12:04PM 2     Q.   (By Ms. Smith) If I told you she was a former

12:04PM 3  girlfriend of Mr. Halprin's, would that help you

12:04PM 4  remember?

12:04PM 5     A.   Actually, no.

12:04PM 6     Q.   There's been some additional evidence filed in

12:04PM 7  this writ proceeding which I don't think you've been

12:04PM 8  made privy to.  Were you aware that Mr. Bosillo, an

12:04PM 9  investigator for the D. A.'s office, interviewed

12:04PM 10 witnesses for the State in preparation of trial?

12:04PM 11    A.   That he back then in 2003 interviewed witnesses

12:04PM 12 in preparation for trial?

12:04PM 13    Q.   In preparation for Mr. Halprin's trial.  Were

12:05PM 14 you aware that he was assisting Mr. Shook?

12:05PM 15    A.   Specifically I don't remember but generally

12:05PM 16 as -- I mean I know they had investigators that were

12:05PM 17 going out talking to lots of people.

12:05PM 18    Q.   Were you aware of an extraneous offense

12:05PM 19 involving Mr. Halprin and Ms. Dancy?

12:05PM 20    A.   Not that I recall.

12:05PM 21    Q.   You were unfamiliar with the fact that during

12:05PM 22 an argument at a bus stop that he grabbed her, held her

12:05PM 23 out into oncoming traffic and threatened, "Die, bitch."

12:05PM 24 You never heard that story?

12:05PM 25    A.   I don't remember that.  I think I probably

12:05PM   1   would have remembered that.

12:05PM   2        Q.   It didn't come out at trial, did it?

12:05PM   3        A.   No.

12:05PM   4        Q.   Mr. Shook didn't feel the need to put it on,

12:05PM   5   correct?

12:05PM   6        A.   I guess.

12:05PM   7        Q.   Safe to say if you put on additional evidence,

12:05PM   8   he might have put on more damaging evidence like that?

12:05PM   9        A.   I'm sure he would have.

12:05PM  10             THE COURT:  Okay.  It's noon.  Let's take a

12:05PM  11   break.  Mark your place.  We'll start back up in one

12:06PM  12   hour.

12:06PM  13             (The noon recess was taken after which

01:03PM  14             the following proceedings continued:)

01:04PM  15             THE COURT:  I believe this witness was on

01:04PM  16   cross-examination.

01:04PM  17        Q.   (By Ms. Smith) Mr. Ashford, on direct

01:04PM  18   examination I think Mr. Anton was talking to you about

01:05PM  19   some records related to the Oneida Baptist University

01:05PM  20   and where they came from.  Do you recall where those

01:05PM  21   documents came from that Dr. Goodness had?

01:05PM  22        A.   After looking at the exhibits that you offered

01:05PM  23   from the SMU students, I remember now that that was

01:05PM  24   research that they had done into his background as well

01:05PM  25   as the Internet stuff.  They had looked at where he went

01:05PM  1   to school and the school -- the boarding school and they

01:05PM  2   had combined all of that and given to it me and I gave

01:05PM  3   it to Dr. Goodness.

01:05PM  4       Q.   After the trial was over did Dr. Goodness speak

01:05PM  5   with you and/or Mr. King about your performance at the

01:06PM  6   trial, in particular the mitigation case that you put

01:06PM  7   on?

01:06PM  8       A.   You know, seems like she said she thought we

01:06PM  9   did a good job.  I don't remember very much.

01:06PM  10       Q.   You're aware she's given an affidavit that was

01:06PM  11   filed by writ counsel in support of his writ

01:06PM  12   application.  Are you aware of that?

01:06PM  13       A.   No.

01:06PM  14            MS. SMITH:  May I approach?

01:06PM  15       Q.   (By Ms. Smith) You haven't seen her affidavit?

01:06PM  16       A.   No.

01:06PM  17       Q.   I'm showing you what's marked as State's

01:06PM  18   Exhibit O. Actually it's the original.  I have a copy

01:06PM  19   that's labeled State's Exhibit O. Do you recognize this?

01:07PM  20       A.   I do not recognize it.  Of course, it looks

01:07PM  21   like it was sent to Bubba.

01:07PM  22       Q.   Note from Dr. Goodness to Bubba.

01:07PM  23       A.   Correct.

01:07PM  24       Q.   Didn't show it to you?

01:07PM  25       A.   I don't remember Bubba showing to it me.  In

01:07PM  1  reading what it says, she may have sent me one also.  I

01:07PM  2  don't recall.

01:07PM  3          MS. SMITH:  State offers State's Exhibit O

01:07PM  4  and ask that a copy be substituted for record purposes

01:07PM  5  so this can be returned to the defense trial files.

01:07PM  6          MR. ANTON:  No objection.

01:07PM  7          THE COURT:  Admitted.

01:07PM  8          (State's Exhibit O admitted into

01:07PM  9          evidence and is attached to this

01:07PM  10          transcript.)

01:07PM  11      Q.  (By Ms. Smith) Would you read the letter?

01:07PM  12      A.  June 16th, 2003.

01:07PM  13      Q.  Let me stop you there.  Four days after trial,

01:07PM  14  correct?

01:08PM  15      A.  I can't tell you yes.  Probably so.  "Dear

01:08PM  16  Bubba, capital death case work is hard, hard work with

01:08PM  17  all too little recognition.  Thus, I wanted to be sure

01:08PM  18  to let you know how impressed I was with you and George

01:08PM  19  on the Halprin case.  Your skill, dedication to your

01:08PM  20  work and your legal acumen was apparent as I watched you

01:08PM  21  work in the courtroom.  If only all lawyers had your

01:08PM  22  traits ...  I hope you take time to rest as this work is

01:08PM  23  draining.  Warm regards, Kelly Goodness, Ph.d.

01:08PM  24      Q.  Right after trial she thought you did an

01:08PM  25  excellent job, didn't she?

01:08PM 1    A.   Apparently.

01:08PM 2    Q.   Let's talk for just a moment about Mr.

01:08PM 3  Halprin's decision to testify.  You testified earlier, I

01:08PM 4  believe, that Mr. King was primarily responsible for

01:09PM 5  representing Mr. Halprin as a witness at trial.

01:09PM 6    A.   Correct.

01:09PM 7    Q.   Testified at guilt, right?

01:09PM 8    A.   Yes.

01:09PM 9    Q.   Was there ever a plan for him to testify at

01:09PM 10 punishment?

01:09PM 11   A.   Plan, no.  I think in my experience the

01:09PM 12 defendant's decision to testify or not testify is always

01:09PM 13 based on how the evidence is coming out, what factors he

01:09PM 14 has to weigh as to the positives and negatives.  And in

01:09PM 15 this case it would have been a lot based on how poorly I

01:09PM 16 felt he performed at guilt-innocence.

01:09PM 17   Q.   So he was aware of his right to testify at

01:09PM 18 punishment.

01:09PM 19   A.   Yes.

01:10PM 20   Q.   You informed him of that or Bubba did?

01:10PM 21   A.   We both did.

01:10PM 22   Q.   Whose idea was it for Halprin to testify at

01:10PM 23 guilt?

01:10PM 24   A.   I don't know if it was any of our ideas.  I

01:10PM 25 think we all discussed it.  He was aware that he had the

01:10PM  1  right to testify or not testify.  I believe he wanted to

01:10PM  2  testify.  So he was allowed to testify.

01:10PM  3      Q.  Why did he want to testify?

01:10PM  4      A.  I think he wanted to tell his side of the

01:10PM  5  story.

01:10PM  6      Q.  That decision was his alone to make, wasn't it?

01:10PM  7      A.  Yes.

01:10PM  8      Q.  You let him make that decision, correct?

01:10PM  9      A.  Yes.

01:10PM  10      Q.  You didn't force him to testify.

01:10PM  11      A.  No.

01:10PM  12      Q.  When did he decide that he was going to testify

01:10PM  13  at guilt?

01:10PM  14      A.  I don't think there was a final decision made

01:10PM  15  until the State rested its case.  I don't know -- I

01:11PM  16  don't remember whether we went right into punishment or

01:11PM  17  we went into punishment the next day or what but nothing

01:11PM  18  was definite until the State rested its case.

01:11PM  19      Q.  Did you have any feelings about whether or not

01:11PM  20  it would be better for him to testify in guilt or just

01:11PM  21  in punishment?  Did you think it was a good idea?

01:11PM  22      A.  I don't know if we ever broke it down that way

01:11PM  23  as to whether we wanted to save him for punishment or

01:11PM  24  not.  I really don't remember.

01:11PM  25      Q.  Did you have any concerns about him testifying?

01:11PM  1          A.    I mean the usual concerns.  We know he has a

01:11PM  2   prior that's going to come out.  We know that he's going

01:12PM  3   to be cross-examined by Toby Shook.  We know by all

01:12PM  4   indications, you know, he's not the smartest guy in the

01:12PM  5   world and Toby Shook is a pretty good prosecutor, the

01:12PM  6   normal concerns.  But I don't remember anything

01:12PM  7   specific.

01:12PM  8          Q.    Did you express those concerns to him?

01:12PM  9          A.    I'm sure we did.

01:12PM  10         Q.    Did he think he was pretty smart?

01:12PM  11         A.    I think so.

01:12PM  12         Q.    He thought he could handle Toby Shook?

01:12PM  13         A.    I don't know that it came down to that but

01:12PM  14   Randy -- we had one TDC witness whose document in

01:12PM  15   ranking Randy said that he thought Randy was as dumb as

01:12PM  16   a rock.

01:13PM  17               I tried to make a lot out of that with that

01:13PM  18   particular witness and I could look over and see Randy

01:13PM  19   just upset, getting his feelings hurt that, you know, I

01:13PM  20   was making that point rather than seeing the reason I

01:13PM  21   was making that point.  So I mean, yeah, there was some

01:13PM  22   ego involved.

01:13PM  23         Q.    Didn't like you presenting him as stupid, did

01:13PM  24   he?

01:13PM  25         A.    No.

01:13PM  1      Q.   Well, do you recall what yours and Mr. King's

01:13PM  2   strategy was in presenting him as a witness?  What was

01:13PM  3   your game plan?

01:13PM  4      A.   Well, just to further, number one, his role in

01:13PM  5   the offense being minimal, the fact that he was the

01:13PM  6   leader Rivas' little brother and kind of just Rivas took

01:13PM  7   care of him in TDC because his parents had abandoned

01:13PM  8   him.

01:14PM  9            He didn't have anything.  He didn't have

01:14PM 10   anybody that ever visited him.  He didn't have anybody

01:14PM 11   to ever put money on his books.  And so, you know, this

01:14PM 12   whole escape was an opportunity for him, the fact that

01:14PM 13   he didn't fire any shots and as much mitigation in terms

01:14PM 14   of his background as we could get in at guilt-innocence.

01:14PM 15      Q.   So would it be accurate to say that you wanted

01:14PM 16   on his direct examination to present him as being

01:14PM 17   non-violent, maybe kind of meek, lonely, follower, maybe

01:14PM 18   not as smart as he thought he was?  Is that a fair

01:14PM 19   characterization of what you planned to do with him?

01:14PM 20      A.   Once again, I can't say non-violent because of

01:14PM 21   his prior.  But even his prior, there was, we thought,

01:15PM 22   an explanation and mitigating factors; non-violent and

01:15PM 23   not a leader and a follower, surely in terms of this

01:15PM 24   offense.

01:15PM 25      Q.   Also didn't you try to show that he was the

01:15PM 1    least culpable of all of the co-defendants?

01:15PM 2        A.   Absolutely.

01:15PM 3        Q.   And the least of a threat?

01:15PM 4        A.   Yes.

01:15PM 5        Q.   Is it fair to say that if that was your

01:15PM 6    strategy, then Mr. Halprin's character and given his

01:15PM 7    decision to testify, his veracity were central to your

01:15PM 8    strategy in using him as a witness?  Does that make

01:15PM 9    sense?

01:15PM 10       A.   Yeah.  I mean I think anybody's character and

01:15PM 11   veracity is essential once they decide to testify.

01:15PM 12       Q.   I think you have already mentioned it.  By

01:15PM 13   choosing to testify he was going to be confronted with

01:15PM 14   his prior conviction, right?

01:15PM 15       A.   Yes.

01:15PM 16       Q.   Was it a strategic decision on your part to

01:16PM 17   bring that out instead of letting the State do that on

01:16PM 18   cross?

01:16PM 19       A.   I don't remember what we did but that's

01:16PM 20   normally the strategy.  If you know it's there, bring it

01:16PM 21   out firsthand.

01:16PM 22       Q.   And did you not also -- actually Mr. King --

01:16PM 23   strategize to bring out a little bit about the escape

01:16PM 24   and what happened while he had Randy on the stand?

01:16PM 25       A.   Yes.

01:16PM  1      Q.   All in an effort to portray him as one of the

01:16PM  2  least violent and least culpable of the Texas Seven?

01:16PM  3      A.   Yes.

01:16PM  4      Q.   Mr. King also brought out some mitigating

01:16PM  5  evidence through Mr. Halprin while he was on the stand

01:16PM  6  about his adoption and things of that nature.

01:16PM  7      A.   Correct.

01:16PM  8      Q.   That stuff wasn't really relevant to guilt.

01:16PM  9      A.   No.

01:16PM 10      Q.   But he got that out from Halprin, did he not?

01:16PM 11      A.   Yes.

01:16PM 12      Q.   There's been some discussion about some

01:16PM 13  extraneous offenses that have come out through Mr.

01:17PM 14  Halprin's cross-examination.  You weren't really shocked

01:17PM 15  or surprised that he was being cross-examined as to

01:17PM 16  prior bad acts, were you?

01:17PM 17      A.   As I recall, they weren't even bad acts.  It

01:17PM 18  was just dumb stuff that he said in letters.

01:17PM 19      Q.   It really related to his credibility, correct?

01:17PM 20      A.   Correct.

01:17PM 21      Q.   He had a problem with the truth, didn't he?

01:17PM 22      A.   Yes.

01:17PM 23      Q.   He was a pathological liar?

01:17PM 24      A.   That's what he said in his letter.  That was

01:17PM 25  the problem.

01:17PM 1      Q.   He took the opportunity to try to explain the

01:17PM 2   prior injury to a child conviction, didn't he?

01:17PM 3      A.   Yes.

01:17PM 4      Q.   Do you remember what he said about the prior

01:17PM 5   offense?

01:17PM 6      A.   No.  I mean not specifically what he said.  I

01:17PM 7   know what he had said in the past.

01:18PM 8      Q.   Did he try to excuse the offense?

01:18PM 9      A.   I don't remember him really trying to minimize

01:18PM 10  it or excuse it.  I don't really recall his testimony

01:18PM 11  specifically.

01:18PM 12     Q.   Let me read you something in the record and see

01:18PM 13  if this refreshes your recollection.  See if you

01:18PM 14  remember him saying that.

01:18PM 15          Obviously there's no excuse for that injury

01:18PM 16  to a child.  At the time I was going through a lot of

01:18PM 17  things.  I had a lot of problems and I'm not going to

01:18PM 18  blame it on the drugs and say it was the drugs or

01:18PM 19  anything like that.  But I was under the influence of

01:18PM 20  LSD and, you know, he had been crying for days, really

01:18PM 21  weeks.  I tried to handle it the best I could and

01:18PM 22  everything just kept on building up and frustration, I

01:18PM 23  guess, agitation and, you know, I just snapped.

01:18PM 24          You're nodding your head up and down.  You

01:18PM 25  remember that?

BRIDGET BARNHILL, OFFICIAL REPORTER

01:18PM 1     A.   I remember that.

01:18PM 2     Q.   He -- also in his testimony he minimized his

01:18PM 3  role not only in the murder of Officer Hawkins, but in

01:19PM 4  the escape, the escape assault and in the extraneous

01:19PM 5  robberies that the Texas Seven committed when they were

01:19PM 6  traveling towards Dallas.  Do you remember that?

01:19PM 7     A.   Well, I mean you're a prosecutor.  I'm a

01:19PM 8  defense lawyer.  We don't think he was minimizing.  We

01:19PM 9  thought he was accurately telling the truth that he was,

01:19PM 10 well, less involved than the other guys and that was our

01:19PM 11 strategy.

01:19PM 12    Q.   Right.  He had helped your strategy, correct?

01:19PM 13    A.   Yes.

01:19PM 14    Q.   Said he didn't hurt anyone in the escape, in

01:19PM 15 the robberies or the Oshman's?

01:19PM 16    A.   That's correct.

01:19PM 17    Q.   Never pulled a shank on anyone or threatened

01:19PM 18 anybody in the escape?

01:19PM 19    A.   Correct.

01:19PM 20    Q.   He never drew a gun in the Oshman's robbery,

01:19PM 21 much less shot Officer Hawkins.  Isn't that what he

01:19PM 22 testified to?

01:19PM 23    A.   I believe so.

01:19PM 24    Q.   How well did Mr. Halprin perform as a witness?

01:19PM 25    A.   Well, he did great on direct.  He was terrible

01:19PM  1    on cross.

01:19PM  2         Q.   Did you expect him to do better on cross?

01:20PM  3         A.   In that he did terrible, yes, I expected him to

01:20PM  4    do better.

01:20PM  5         Q.   How good was Mr. Shook's cross-examination?

01:20PM  6         A.   Again it wasn't so much how good Mr. Shook's

01:20PM  7    examination was but it was just how poorly he responded.

01:20PM  8    Some things Mr. Shook asked him I felt like could have

01:20PM  9    been easily explained or whatever.  He just clammed up.

01:20PM  10   He didn't say anything.

01:20PM  11             His body language was bad.  He put his head

01:20PM  12   down.  He was defeated like, "You got me."  And that

01:20PM  13   just was -- that is just what kills you in front of a

01:20PM  14   jury.

01:20PM  15        Q.   That was unexpected to you that he performed

01:20PM  16   that badly?

01:20PM  17        A.   Yes.

01:21PM  18        Q.   Your strategy was to portray Mr. Halprin as

01:21PM  19   basically non-violent, meek, not very smart, lonely, a

01:21PM  20   follower, then wasn't it Mr. Shook's strategy to show

01:21PM  21   that he was violent, he was a full-fledged member of the

01:21PM  22   Texas Seven, that he was a mass manipulator and that he

01:21PM  23   was a pathological liar?

01:21PM  24        A.   Yes.

01:21PM  25        Q.   And in keeping with that strategy, Mr. Shook

BRIDGET BARNHILL, OFFICIAL REPORTER

01:21PM  1  confronted Halprin with statements he made in numerous

01:21PM  2  letters that he had written since his capture, correct?

01:21PM  3      A.   Correct.

01:21PM  4      Q.   When I say "numerous" I mean a lot, lot, lot,

01:21PM  5  lot, right?

01:21PM  6      A.   Yes.

01:21PM  7      Q.   Wrote a lot of letters.

01:21PM  8      A.   He wrote a lot of letters.  It blew us away

01:21PM  9  when we looked in that box and saw that he wrote all of

01:21PM  10  those letters after both of us together and separately

01:21PM  11  told him not to do that.

01:21PM  12      Q.   And it's not news to you that sometimes the

01:21PM  13  State uses letters or sometimes even phone calls

01:21PM  14  nowadays to impeach defendants on the stand, don't they?

01:22PM  15      A.   All the time.

01:22PM  16      Q.   So that wasn't unexpected, right?

01:22PM  17      A.   No.

01:22PM  18      Q.   But the degree to which your client had

01:22PM  19  committed himself on paper in untruths was a bit of a

01:22PM  20  surprise to you.

01:22PM  21      A.   Yes.  And again, you know, it wasn't like he

01:22PM  22  said, you know, "I did this but I'm kind of lying about

01:22PM  23  it," or -- I don't remember him speaking to the offense

01:22PM  24  or to his prior offense.  It was just dumb stuff that

01:22PM  25  shouldn't have been said that Mr. Shook hit him with and

01:22PM  1    he just reacted poorly instead of just relating on past

01:22PM  2    it.

01:22PM  3        Q.   Do you remember him actually inviting or

01:22PM  4    challenging Mr. Shook to present him with specific

01:22PM  5    instances of lies?

01:23PM  6        A.   I don't.

01:23PM  7        Q.   Be surprised if there were several instances of

01:23PM  8    that in the record?

01:23PM  9        A.   No.

01:23PM  10       Q.   And given that they were Mr. Halprin's own

01:23PM  11   statements, they weren't hearsay, were they?

01:23PM  12       A.   No.

01:23PM  13       Q.   And Mr. Shook used Mr. Halprin's admissions

01:23PM  14   that he caused his parents trouble, he told lots of lies

01:23PM  15   in his lifetime.  There's nothing wrong with Mr. Shook

01:23PM  16   confronting Mr. Halprin with that kind of information,

01:23PM  17   was there?

01:23PM  18       A.   No.

01:23PM  19       Q.   After all, your client put his credibility at

01:23PM  20   issue the minute he took the stand, didn't he?

01:23PM  21       A.   Yes.

01:23PM  22       Q.   Didn't just put his credibility in issue, put

01:23PM  23   his character at issue, too, didn't, he?

01:23PM  24       A.   Yes.

01:23PM  25       Q.   Do you remember Mr. Halprin representing

01:23PM 1   himself to Mr. Shook as a reformed pathological liar?

01:23PM 2       A.   No.

01:24PM 3            THE COURT:   Where are we going with this?

01:24PM 4            MS. SMITH:   I'm almost done.

01:24PM 5       Q.   (By Ms. Smith) To the extent that Mr. Shook

01:24PM 6   confronted Mr. Halprin with any lies and to the extent

01:24PM 7   those lies were bad acts, he did that on

01:24PM 8   cross-examination, right?

01:24PM 9       A.   Yes.

01:24PM 10      Q.   The State's obligation to give notice to the

01:24PM 11  defense of extraneous offenses under Rule 404 only

01:24PM 12  applies to the State's case in chief, doesn't it?

01:24PM 13      A.   Yes.

01:24PM 14      Q.   So Mr. Shook didn't have the obligation to tell

01:24PM 15  you in advance that he was going to be crossing Mr.

01:24PM 16  Halprin with those acts, did he?  Was not required to

01:24PM 17  give you notice of those under the rules, was he?

01:24PM 18      A.   Technically probably not.  I just don't --

01:24PM 19            THE COURT:   Which acts?

01:24PM 20      Q.   (By Ms. Smith) Well, for instance, that he

01:24PM 21  claimed he fathered a child with another woman.  Do you

01:24PM 22  remember that allegation?

01:24PM 23      A.   I don't and again, you know, I don't remember

01:25PM 24  specifics but this stuff that I remember, it's

01:25PM 25  questionable what the Code talks about when they talk

BRIDGET BARNHILL, OFFICIAL REPORTER

01:25PM 1  about bad acts.

01:25PM 2      Q.    You didn't think they were bad acts?

01:25PM 3      A.    They weren't crimes.  They weren't specific

01:25PM 4  lies where he said one thing under oath one time.  It

01:25PM 5  was just dumb stuff.  And he just used it to shake and

01:25PM 6  rattle him and he didn't handle it very well.

01:25PM 7      Q.    Even though the State didn't have a legal

01:25PM 8  obligation to give you notice of those acts, you did

01:25PM 9  have copies of all of the letters that Halprin wrote,

01:25PM 10 didn't you?

01:25PM 11     A.    Yes.

01:25PM 12     Q.    You did have notice, didn't you?

01:25PM 13     A.    Yes.

01:25PM 14     Q.    Did you have any reason not to object to Mr.

01:25PM 15 Shook's cross of your client with these lies, any

01:25PM 16 strategic reason for not objecting?

01:26PM 17     A.    Again that was Mr. King's witness but, you

01:26PM 18 know, when you try cases and a defendant takes the

01:26PM 19 stand --

01:26PM 20              THE COURT:  Excuse me.

01:26PM 21              Mr. Ashford, during cross-examination of

01:26PM 22 Mr. Halprin if you had stood up and objected what would

01:26PM 23 the trial judge at the time done?

01:26PM 24              THE WITNESS:  I believe he would have

01:26PM 25 instructed me that that was Mr. King's witness and

BRIDGET BARNHILL, OFFICIAL REPORTER

01:26PM  1   therefore I wouldn't be able to make an objection.

01:26PM  2              THE COURT:  Let's move on.

01:26PM  3        Q.   (By Ms. Smith) Mr. King did make several

01:26PM  4   objections, handful of objections during Mr. Halprin's

01:26PM  5   cross-examination, didn't he?

01:26PM  6        A.   I don't recall specifically but I'm sure he

01:26PM  7   did.

01:26PM  8        Q.   Didn't just sit on his hands throughout that,

01:26PM  9   did he?

01:26PM 10        A.   I don't think so.

01:26PM 11        Q.   Do you recall him objecting to Mr. Shook

01:26PM 12   reading from documents not in evidence, namely, the

01:26PM 13   letters?

01:26PM 14        A.   Specifically, no.

01:26PM 15        Q.   Do you remember him objecting to Mr. Shook's

01:27PM 16   offering certain documents on cross like suicide note by

01:27PM 17   Mr. Harper or the Spec war commandments?

01:27PM 18        A.   The last one I remember.

01:27PM 19        Q.   When Mr. Halprin didn't do well on cross Mr.

01:27PM 20   King tried to turn that to his advantage, didn't he?

01:27PM 21        A.   Yes.

01:27PM 22        Q.   He's the one that offered several binders full

01:27PM 23   of the letters that Mr. Halprin had written?

01:27PM 24        A.   Yes.

01:27PM 25        Q.   And he used those letters and you basically

01:27PM 1    characterized those inconsequential lies to portray Mr.

01:27PM 2    Halprin as some sort of pathetic, lonely individual who

01:27PM 3    is writing everybody who will take an envelope and stamp

01:27PM 4    on it?

01:27PM 5        A.   Tried to make lemonade out of the lemons he

01:27PM 6    got.

01:27PM 7        Q.   Also used it to support your theory that Mr.

01:28PM 8    Halprin wasn't very bright.

01:28PM 9        A.   Correct.

01:28PM 10       Q.   Tried to take on a seasoned prosecutor and

01:28PM 11   reaped the consequences.

01:28PM 12       A.   Correct.

01:28PM 13       Q.   Mr. Halprin did try to portray himself as meek

01:28PM 14   on the stand.  Do you recall that?  Do you recall a

01:28PM 15   moment when he actually interrupted the proceedings

01:28PM 16   during direct examination and asked the Judge to

01:28PM 17   instruct the prosecutors to stop looking at him?

01:28PM 18       A.   Not until you said it but, yes, I think so.

01:28PM 19       Q.   He did this in front of the jury, too, didn't

01:28PM 20   he?

01:28PM 21       A.   Yes.

01:28PM 22       Q.   Put the Judge in a very awkward position,

01:28PM 23   didn't he?

01:28PM 24       A.   Yes.

01:28PM 25       Q.   The Judge admonished him outside the presence

01:28PM 1   of the jury later.

01:28PM 2        A.   I don't recall.

01:28PM 3        Q.   Made himself look a little pitiful in that

01:28PM 4   moment, didn't he?

01:28PM 5        A.   As I recall it.

01:28PM 6        Q.   Let's move on and talk about the ranking

01:28PM 7   document.  You made numerous attempts, you and Mr. King,

01:29PM 8   to get this document in evidence, didn't you?

01:29PM 9        A.   Yes.

01:29PM 10       Q.   Were you aware that since trial the author, Mr.

01:29PM 11  Hank Whitman, has given an affidavit about the document?

01:29PM 12       A.   No.

01:29PM 13       Q.   You are aware, however, the document is based

01:29PM 14  on hearsay statements related to Mr. Whitman, correct?

01:29PM 15       A.   Yes.

01:29PM 16       Q.   The document is hearsay in that it's Mr.

01:29PM 17  Whitman's statements but it's hearsay on top of that

01:29PM 18  because it's hearsay statements of other people, not Mr.

01:29PM 19  Whitman, right?

01:29PM 20       A.   Yes.

01:29PM 21       Q.   There's multiple levels of the hearsay in this

01:29PM 22  document, correct?

01:29PM 23       A.   Yes.

01:29PM 24            MS. SMITH:  May I approach?

01:29PM 25       Q.   (By Ms. Smith) I'm showing you what's Mr. Hank

BRIDGET BARNHILL, OFFICIAL REPORTER

01:29PM 1   Whitman's affidavit in these writ proceedings.  I want

01:30PM 2   you to read if you would the highlighted portion.

01:30PM 3        A.   Aloud?

01:30PM 4        Q.   If you would.

01:30PM 5        A.   The document was meant to indicate solely who

01:30PM 6   was the most likely to have led the group, not who would

01:30PM 7   have been the best leader but who was the actual leader.

01:30PM 8   It was not a reflection of most to least dangerous.  All

01:30PM 9   of the Texas Seven are dangerous and in my opinion Rivas

01:30PM 10  is the most dangerous.

01:30PM 11              The last three defendants in the ranking

01:30PM 12  document, Garcia, Murphy and Halprin, were equal in

01:30PM 13  leadership qualities and are interchangeable in rank.

01:30PM 14  Halprin was likely a late addition to the Texas Seven

01:30PM 15  and only got a involved a week or two before the escape.

01:30PM 16       Q.   So according to Mr. Whitman, the document

01:31PM 17  doesn't rank the Texas Seven from the most to least

01:31PM 18  dangerous, does it?

01:31PM 19       A.   According to him.

01:31PM 20       Q.   It actually also doesn't rank Mr. Halprin dead

01:31PM 21  last, does it?

01:31PM 22       A.   According to that document.

01:31PM 23       Q.   Is it safe to say that if you had located Mr.

01:31PM 24  Whitman and you had succeeded in presenting him as a

01:31PM 25  witness and a sponsor to the document that the State

| | | |
|---|---|---|
| 01:31PM | 1 | would have brought these facts out on cross-examination? |
| 01:31PM | 2 | A.   Probably so. |
| 01:31PM | 3 | Q.   Mr. Shook probably would have figured that out? |
| 01:31PM | 4 | A.   Yeah.  He would have used that particular |
| 01:31PM | 5 | testimony to turn that around in his favor. |
| 01:31PM | 6 | Q.   I think you mentioned this already.  You |
| 01:31PM | 7 | basically got the value out of that document anyway, |
| 01:31PM | 8 | didn't you? |
| 01:31PM | 9 | A.   Yes.  I asked every single witness who |
| 01:31PM | 10 | testified individually as to the accounts they had given |
| 01:32PM | 11 | if they had been asked to do a ranking, I believe.  I |
| 01:32PM | 12 | started asking each one of them or tried to introduce it |
| 01:32PM | 13 | through each one of them and in the end the jury told us |
| 01:32PM | 14 | they got it.  They knew what the deal was. |
| 01:32PM | 15 | THE COURT:  When did the jury tell you |
| 01:32PM | 16 | that? |
| 01:32PM | 17 | THE WITNESS:  We spoke to the jury after |
| 01:32PM | 18 | the final verdict in the jury room. |
| 01:32PM | 19 | THE COURT:  Who did? |
| 01:32PM | 20 | THE WITNESS:  Myself and Mr. King. |
| 01:32PM | 21 | THE COURT:  Who else was present? |
| 01:32PM | 22 | THE WITNESS:  Myself, Mr. King and |
| 01:32PM | 23 | basically all of the jurors.  I don't think we were back |
| 01:32PM | 24 | there at the same time as the prosecutor or the Judge. |
| 01:32PM | 25 | THE COURT:  Go ahead. |

01:32PM 1     Q.  (By Ms. Smith) You brought out the fact that

01:32PM 2  there was such a document through Mr. Woods, didn't you?

01:33PM 3  He was a witness at trial.

01:33PM 4     A.  Yes.

01:33PM 5     Q.  You also located overnight a witness Elizabeth

01:33PM 6  Mullin from TDC in the Office of Inspector General and

01:33PM 7  you used her to try to sponsor the document, didn't you?

01:33PM 8     A.  I didn't remember that we had done that.

01:33PM 9     Q.  But that happened, didn't it?

01:33PM 10     A.  Yes.

01:33PM 11     Q.  You elicited information similar to what's

01:33PM 12  contained in the document from witnesses that testified

01:33PM 13  at punishment, right?

01:33PM 14     A.  Correct.

01:33PM 15     Q.  I think you did it at guilt, too.

01:33PM 16     A.  Yes.

01:33PM 17     Q.  Patrick Moczygemba -- I think you alluded to

01:33PM 18  this testimony earlier but he testified that he was

01:33PM 19  interviewed by the escapees and in his opinion Halprin

01:33PM 20  was as dumb as a bag of rocks, just a follower and if

01:34PM 21  Mr. Moczygemba had to rank him, he would rank him as the

01:34PM 22  least intelligent of the Texas Seven.  Do you remember

01:34PM 23  that?

01:34PM 24     A.  Yes.

01:34PM 25     Q.  There was another TDC employee, Mark Burgess.

01:34PM 1   Do you remember him testifying that Halprin was not the

01:34PM 2   leader type?

01:34PM 3       A.   Yes.

01:34PM 4       Q.   You and Mr. King got all of the confessions of

01:34PM 5   the Texas Seven co-defendants admitted at trial, didn't

01:34PM 6   you?

01:34PM 7       A.   Yes, I believe we did that -- well, yes, we

01:34PM 8   did.

01:34PM 9       Q.   Of those that gave confessions, right?

01:34PM 10      A.   Yes.

01:34PM 11      Q.   Did any other defensive team?

01:34PM 12              THE COURT:   When you say "all of the

01:34PM 13  confessions" are you referring to all written

01:34PM 14  statements?

01:34PM 15              MS. SMITH:   I'm referring to the

01:34PM 16  confessions they gave to law enforcement upon their

01:34PM 17  capture.

01:34PM 18              THE COURT:   Written?

01:34PM 19              MS. SMITH:   Yes, written.

01:34PM 20      Q.   (By Ms. Smith) Some of those confessions

01:34PM 21  characterized Halprin as a follower rather than a

01:34PM 22  leader, didn't they?

01:34PM 23      A.   I believe they did.

01:35PM 24      Q.   So the testimony that you did get in that you

01:35PM 25  did elicit was cumulative of what was purportedly within

01:35PM  1  this ranking document, wasn't it?

01:35PM  2      A.   Correct.  Even though we couldn't get the

01:35PM  3  ranking document in, through the testimony of all the

01:35PM  4  other witnesses we had and by me laying the predicate

01:35PM  5  with those witnesses to get the ranking document in

01:35PM  6  every time I offered it, it was pretty clear what it

01:35PM  7  was.  And, like I said, the jury told us that they

01:35PM  8  understood what it was.

01:35PM  9      Q.   Yeah.  You kind of left the impression, didn't

01:35PM  10 you, that the State was trying to keep something good

01:35PM  11 out?

01:35PM  12     A.   Exactly.

01:35PM  13     Q.   That was an advantage to your --

01:35PM  14     A.   I don't think we left that impression.  I think

01:35PM  15 the State did that to themselves but that definitely was

01:35PM  16 there.

01:35PM  17     Q.   When this issue was raised on direct appeal by

01:35PM  18 yourself and Mr. Muhammed the CCA found that it was

01:35PM  19 harmless because you presented a significant amount of

01:36PM  20 mitigating evidence that was cumulative of that.  Do you

01:36PM  21 remember that?

01:36PM  22     A.   I don't remember that but I could see that

01:36PM  23 point.

01:36PM  24     Q.   Let's talk a little bit about your decision not

01:36PM  25 to call Mr. Rivas or any of the other co-defendants to

01:36PM 1  testify for your client.  I believe you said you

01:36PM 2  considered it with Mr. King.  You two discussed it?

01:36PM 3      A.   Yes.

01:36PM 4      Q.   You never asked him to testify, Mr. Rivas.

01:36PM 5      A.   No.

01:36PM 6      Q.   Didn't ask any of the co-defendants to testify,

01:36PM 7  right?

01:36PM 8      A.   No.

01:36PM 9      Q.   You did that because?

01:36PM 10     A.   As I testified, the six Texas Seven members

01:36PM 11 were in my opinion six of the most hated men in America.

01:36PM 12 People were talking about them all the time.  It was on

01:36PM 13 national news.  It was on local news, just lawyers

01:37PM 14 talking about it in the courthouse.

01:37PM 15          Just got the feeling that nobody wanted to

01:37PM 16 hear from any of them.  Their credibility just wasn't

01:37PM 17 going to be very good and it wasn't just going to leave

01:37PM 18 a good impression with the jury.

01:37PM 19     Q.   Plus, wasn't it your theory to distance your

01:37PM 20 client from his co-defendants as much as possible?

01:37PM 21     A.   Well, yeah.  I don't know if that factored into

01:37PM 22 it but that certainly was a consideration, could be a

01:37PM 23 consideration.

01:37PM 24     Q.   You had the records of the trial.  Were you

01:37PM 25 familiar with Mr. Rivas' testimony at his own trial?

01:37PM  1      A.    Yes.

01:37PM  2      Q.    How do you think he performed at that trial?

01:37PM  3      A.    Just the real liar, the real very just icy guy

01:38PM  4  who is just very icy and impersonal and just robbing

01:38PM  5  people and it's not even that big of a deal.  And I

01:38PM  6  thought that would have come across.

01:38PM  7            The little bit that we would have got from

01:38PM  8  him from trying to help Mr. Halprin, the bad impression

01:38PM  9  that he left otherwise and probably what Mr. Shook would

01:38PM  10  have done with him just wasn't worth it.

01:38PM  11      Q.    Mr. Rivas did testify in Mr. Murphy's trial,

01:38PM  12  didn't he?

01:38PM  13      A.    I don't remember.

01:38PM  14      Q.    Didn't do him any good, did it?

01:38PM  15      A.    Apparently not.

01:38PM  16      Q.    Were you aware that Mr. Rivas and co-defendants

01:38PM  17  Michael Rodriguez and Patrick Murphy testified in a

01:38PM  18  hearing in these writ proceedings in May 2008?

01:39PM  19      A.    No.

01:39PM  20      Q.    You haven't seen their testimony?

01:39PM  21      A.    No.

01:39PM  22      Q.    Were you -- would you be surprised to hear that

01:39PM  23  some of their testimony wasn't exactly helpful to your

01:39PM  24  client?

01:39PM  25            THE COURT:  Excuse me, Ms. Smith.

01:39PM 1          MS. SMITH:  Would you like me to move on?

01:39PM 2          THE COURT:  Yeah.  Please move on.

01:39PM 3     Q.  (By Ms. Smith) One of the claims in these

01:39PM 4  proceedings is you should have put on oral statements

01:39PM 5  made by some of the co-defendants, Mr. Murphy, Mr.

01:39PM 6  Rodriguez, Mr. Rivas to law enforcement after they were

01:39PM 7  captured.

01:39PM 8          These are oral statements, not written

01:39PM 9  statements that relate to whether or not Mr. Halprin

01:39PM 10 fired a weapon at the Oshman's.  Are you familiar with

01:39PM 11 those claims?  I know it's been a while.

01:40PM 12    A.  I can't really say that I remember.

01:40PM 13    Q.  Okay.  To the extent that a co-defendant made a

01:40PM 14 statement, an oral statement to law enforcement, that

01:40PM 15 would have been hearsay, wouldn't it?

01:40PM 16    A.  Could be hearsay, could be a statement against

01:40PM 17 interests.

01:40PM 18    Q.  To be a statement against interests it has to

01:40PM 19 be indicia of reliability, doesn't it?

01:40PM 20    A.  Yes.

01:40PM 21    Q.  Would you agree that all of the co-defendants

01:40PM 22 gave statements that were at times helpful to their

01:40PM 23 future prosecution but also hurt -- I mean they gave

01:40PM 24 statements that tried to minimize what they did and they

01:40PM 25 gave statements that acknowledged what they did, didn't

| | |
|---|---|
|01:40PM|1|they?
|01:40PM|2|    A.   Yes.

01:40PM 1  they?

01:40PM 2      A.   Yes.

01:41PM 3      Q.   To some extent they were blame-shifting,

01:41PM 4  weren't they?

01:41PM 5      A.   I think so.

01:41PM 6      Q.   Wouldn't that have been a hurdle to you getting

01:41PM 7  them in as a statement against interests?

01:41PM 8      A.   I think so.  I think we looked at the

01:41PM 9  statements and even though there were some statements

01:41PM 10 that might have been helpful, when you put them all

01:41PM 11 together nobody was telling a consistent story.  And Mr.

01:41PM 12 Shook would have just been able to go through, "This

01:41PM 13 statement says this but this statement says that.  This

01:41PM 14 statement says this.  This is inconsistent with that."

01:41PM 15 And for the little bit we would have been able to gain,

01:41PM 16 it might have just opened up more damage.

01:41PM 17     Q.   Mr. Newbury made a statement to a Colorado

01:42PM 18 Springs detective that he shot Rivas.  Does that ring a

01:42PM 19 bell that's one of the oral statements at issue?

01:42PM 20     A.   No.

01:42PM 21     Q.   The fact of the matter is Rivas was shot twice,

01:42PM 22 wasn't he?

01:42PM 23     A.   I don't recall.

01:42PM 24     Q.   If you had offered these statements in these

01:42PM 25 statements that the co-defendants made to law

01:42PM 1   enforcement about who fired what shots, if you had

01:42PM 2   offered them in through the notes that the officers

01:42PM 3   created or from the officers themselves, then is it safe

01:42PM 4   to say the State probably would have sought the

01:42PM 5   admission of the entirety of the officers' notes of

01:42PM 6   those conversations with the co-defendants?

01:42PM 7        A.   They very well could have.

01:42PM 8        Q.   Probably under the Rule of Optional

01:42PM 9   Completeness?

01:42PM 10       A.   Yes.

01:42PM 11       Q.   And they probably would have cross-examined the

01:42PM 12  officers who interviewed the co-defendants, right?

01:42PM 13       A.   I would think so.

01:42PM 14       Q.   And at a minimum, as you pointed out, Mr. Shook

01:43PM 15  would have brought out the inaccuracy between the

01:43PM 16  various statements the co-defendants made?

01:43PM 17       A.   Correct.

01:43PM 18       Q.   Might have elicited other harmful information

01:43PM 19  to your client, wouldn't he?

01:43PM 20       A.   Yes.  If it was there, I'm sure he would have.

01:43PM 21       Q.   Exactly.  Instead of calling these officers and

01:43PM 22  trying to put on their notes, Mr. King still got the

01:43PM 23  content of those statements before the jury.  Do you

01:43PM 24  remember this?

01:43PM 25       A.   Specifically right now, no.  You might be able

01:43PM 1    to refresh my memory.

01:43PM 2        Q.   Didn't Mr. King repeatedly inject those

01:43PM 3    statements into the very questions he was asking the

01:43PM 4    witnesses?

01:43PM 5        A.   I don't remember.

01:43PM 6             THE COURT:  We can move on.

01:43PM 7             MS. SMITH:  Okay.

01:43PM 8        Q.   (By Ms. Smith) You've been asked a little bit

01:43PM 9    about the foot wound evidence, about whether or not you

01:43PM 10   were able to get in the medical records related to the

01:44PM 11   wound on Mr. Halprin's foot.

01:44PM 12       A.   Correct.

01:44PM 13       Q.   Do you remember Mr. King offering medical

01:44PM 14   documents, medical records related to that wound into

01:44PM 15   evidence?

01:44PM 16       A.   I remember me offering them into evidence or at

01:44PM 17   least trying to offer them in evidence and objections

01:44PM 18   being made by the State.  Once again, it's one of those

01:44PM 19   where it didn't come in but they got the point.  Whether

01:44PM 20   Mr. King actually got them in evidence later on, I don't

01:44PM 21   remember.

01:44PM 22       Q.   That's correct.  He got them in later on.  So

01:44PM 23   they did come into evidence, didn't they?

01:44PM 24       A.   I don't recall but if you say so.

01:44PM 25       Q.   All right.  Well, he also brought out the fact

BRIDGET BARNHILL, OFFICIAL REPORTER

01:44PM 1    that he was shot through the toes rather than from above

01:44PM 2    through his cross-examination of Detective Spivey,

01:44PM 3    didn't he?  Do you remember that?

01:44PM 4        A.   I don't.

01:44PM 5        Q.   Do you remember the D. A. conceding at closing

01:45PM 6    argument, "Okay.  Halprin didn't shoot himself in the

01:45PM 7    foot.  He got shot in the crossfire"?

01:45PM 8        A.   Actually no.

01:45PM 9        Q.   Let's talk just a second about Janie Hawkins'

01:45PM 10   testimony.  Janie Hawkins was Officer Aubrey Hawkins'

01:45PM 11   mother.

01:45PM 12       A.   Correct.

01:45PM 13       Q.   She testified at guilt.

01:45PM 14       A.   Yes.

01:45PM 15       Q.   The State didn't put her on at punishment, did

01:45PM 16   they?

01:45PM 17       A.   I don't believe so.  I think she testified,

01:45PM 18   maybe the official victim impact testimony after the

01:45PM 19   verdict.

01:45PM 20       Q.   She's a pretty memorable witness, isn't she?

01:45PM 21       A.   Yes.

01:45PM 22       Q.   Are you familiar with the practice in the

01:45PM 23   D. A.'s office of offering victims, family members as

01:45PM 24   witnesses at guilt and then not re-offering them at

01:45PM 25   punishment for victim impact if they can get a little

01:45PM 1    bit out at guilt?

01:45PM 2         A.   I can't say that I am aware of that as a

01:46PM 3    strategy of the D. A.'s office, no.

01:46PM 4         Q.   Do you remember Mr. King filing a motion in

01:46PM 5    limine to keep out any improper victim impact testimony

01:46PM 6    through Ms. Hawkins?

01:46PM 7         A.   No, I don't.

01:46PM 8         Q.   You don't remember the Court granting that

01:46PM 9    motion?

01:46PM 10        A.   No.

01:46PM 11        Q.   Do you remember what testimony -- the nature of

01:46PM 12   the testimony that she gave, though?

01:46PM 13        A.   Standard type of stuff, her son was a good son.

01:46PM 14        Q.   Did she testify to that?

01:46PM 15        A.   Well, I could be confusing guilt-innocence with

01:46PM 16   victim impact but, you know, it's all the same.  It was

01:46PM 17   Christmas.  They were expecting to have dinner.  It all

01:46PM 18   blurred together, the kind of thing that everybody in

01:46PM 19   the nation knew, the basic facts.

01:46PM 20             The robbery wasn't being contested by

01:46PM 21   anybody.  This was the grieving mother.  She wanted to

01:47PM 22   say what she wanted to say.  We could have objected,

01:47PM 23   tried to cut her off.  It might have created an

01:47PM 24   impression of us being gruff or obstructionists or not

01:47PM 25   very good guys in front of the jury.  And so we let her

01:47PM 1   go.  Strategic decision.

01:47PM 2       Q.  When you think of victim impact evidence what

01:47PM 3   type of evidence is it that you think I'm talking about?

01:47PM 4       A.  The close of testimony after verdict, family

01:47PM 5   members making their point specifically to the defendant

01:47PM 6   as to --

01:47PM 7               THE COURT:  Excuse me.  There was clearly a

01:47PM 8   narrative that she gave of the events during the trial

01:48PM 9   before the jury, the event that occurred, he responded

01:48PM 10  to the call, leading up to him offering to show her how

01:48PM 11  to get back to the highway if I recall but it's this

01:48PM 12  Court's opinion that these attorneys, Mr. King and Mr.

01:48PM 13  Ashford, would have considered a life sentence a win,

01:48PM 14  that they were focusing from the very moment they

01:48PM 15  started this trial on avoiding the death penalty and

01:48PM 16  were not really expecting a not guilty.

01:48PM 17               So I'm not concerned that they didn't

01:48PM 18  object to questions asked of the decedent's mother

01:48PM 19  during the guilt-innocence portion.  Is that helpful and

01:48PM 20  can we move on?

01:48PM 21               MS. SMITH:  If I could get Mr. Ashford to

01:49PM 22  confirm the accuracy of what you just stated.

01:49PM 23      Q.  (By Ms. Smith) He's basically said that your

01:49PM 24  real goal here was not to get an acquittal but a life

01:49PM 25  sentence.  Is that accurate?

01:49PM  1      A.   One hundred percent accurate.

01:49PM  2              MS. SMITH:  I'm okay with that.

01:49PM  3      Q.   (By Ms. Smith) I have two very brief areas to

01:49PM  4  cover and I'm going to talk to you a little bit about

01:49PM  5  the appeal process.  There were a couple of issues

01:49PM  6  raised about the jury instructions and your involvement

01:49PM  7  in requesting certain instructions, in particular a

01:49PM  8  felony murder instruction.

01:49PM  9              And I believe you have answered your

01:49PM  10  interrogatories that you didn't think you were entitled

01:49PM  11  to felony murder; is that correct?

01:49PM  12      A.   I didn't think it applied under the

01:49PM  13  circumstances.  Everybody was in agreement that this was

01:49PM  14  an aggravated robbery that all participants were

01:49PM  15  voluntary -- all defendants were voluntarily

01:49PM  16  participating in.

01:49PM  17      Q.   Your theory was he never shot anybody, never

01:49PM  18  hurt anybody, right?

01:50PM  19      A.   Other than potentially himself.

01:50PM  20      Q.   Your argument was if he is guilty of anything,

01:50PM  21  it's just ag robbery, right?

01:50PM  22      A.   Correct.

01:50PM  23      Q.   You didn't really want an instruction that said

01:50PM  24  he was guilty of murder, did you?

01:50PM  25      A.   No.

01:50PM 1      Q.   You spoke early on direct about why you may or

01:50PM 2  may not have objected to any arguments that the

01:50PM 3  prosecutor made about the anticipation special issues.

01:50PM 4  Do you recall that testimony?

01:50PM 5      A.   Yes.

01:50PM 6      Q.   I think you indicated earlier you got a little

01:50PM 7  confused about whether they were talking about the guilt

01:50PM 8  issue which is should he have anticipated and the

01:50PM 9  punishment issue which is did he anticipate.

01:50PM 10      A.   Correct.

01:50PM 11      Q.   You got that straightened out now?

01:50PM 12      A.   Yes.

01:50PM 13      Q.   Do you recall Mr. King actually arguing to the

01:50PM 14  jury that they had to believe to a certainty that Mr.

01:51PM 15  Halprin had anticipated Mr. Hawkins' death?

01:51PM 16      A.   I don't recall that but if he did, he did.

01:51PM 17      Q.   Would you be surprised Mr. Shook didn't object

01:51PM 18  to that misstatement of the law?

01:51PM 19      A.   I wouldn't be surprised because, you know,

01:51PM 20  argument is another area where it's often ripe for

01:51PM 21  objection but you don't make it unless it's really

01:51PM 22  something critical.  And there are -- you know, it's a

01:51PM 23  strategy whether you want to object during argument or

01:51PM 24  not.

01:51PM 25           It depends on how clearly blatant the

01:51PM  1  prosecution's comment is or whatever.  I don't remember

01:51PM  2  at the time what our thoughts might have been but you

01:51PM  3  don't always object in argument is what I believe.

01:52PM  4      Q.  To your knowledge Mr. Shook didn't correct that

01:52PM  5  misstatement of the law, did he?

01:52PM  6      A.  I'm just saying in general we might not have

01:52PM  7  objected to some things that were objectionable and he

01:52PM  8  might not have objected to some things that were

01:52PM  9  objectionable also.

01:52PM  10      Q.  If Mr. King argued to the jury that they had to

01:52PM  11  find by a certainty that Mr. Halprin had anticipated

01:52PM  12  Officer Hawkins' death and they went back there without

01:52PM  13  that being corrected, that put the State to a higher

01:52PM  14  burden of proof if the jury remembered that and believed

01:52PM  15  that; isn't that true?

01:52PM  16      A.  Yes.

01:52PM  17      Q.  You didn't object but you actually accomplished

01:52PM  18  something better than that, didn't you?

01:52PM  19      A.  Well, I mean I'm sure I might have not said it

01:52PM  20  specifically but I'm sure I argued that, you know, Mr.

01:52PM  21  Halprin wasn't out there intending to kill that officer.

01:52PM  22  Nobody even knew that officer was going to show up.  I'm

01:52PM  23  arguing that.  I may not be saying those words

01:52PM  24  specifically in terms of anticipation but that's what

01:53PM  25  I'm saying.

01:53PM 1      Q.   I want to move into the appeal ineffectiveness

01:53PM 2  claims with you.  When you were assigned to this appeal

01:53PM 3  you were approved to do death penalty appellate work,

01:53PM 4  weren't you?

01:53PM 5      A.   Yes.

01:53PM 6      Q.   Mr. Halprin wasn't opposed to you handling his

01:53PM 7  appeal.

01:53PM 8      A.   No.

01:53PM 9      Q.   Mr. Muhammed who has been mentioned in here

01:53PM 10  already, Michael Muhammed, what is your opinion of him

01:53PM 11  as an appellate defense lawyer?

01:53PM 12      A.   Very, very pleased with the work that Mr.

01:53PM 13  Muhammed had done for me in the past.  Mr. Muhammed and

01:53PM 14  his wife who is a public defender in Dallas County,

01:53PM 15  Pamela Muhammed, both went to SMU together, both

01:53PM 16  graduated at the same time, both clerked for me when

01:53PM 17  they were in law school.

01:53PM 18           I believe Mrs. Muhammed's first job out of

01:53PM 19  SMU was working for some capital defense project in

01:54PM 20  Huntsville where they actually wrote death penalty

01:54PM 21  appeals and Mr. Muhammed worked with her on a bunch of

01:54PM 22  those.

01:54PM 23           Mr. Muhammed is very bright.  Mr. Muhammed

01:54PM 24  had done a bunch of appeals for me and actually had

01:54PM 25  gotten several reversals which is not all that common in

01:54PM  1    the Fifth District of Dallas.  Mr. Muhammed discussed

01:54PM  2    with me prior to beginning on Halprin that he read a lot

01:54PM  3    of other death penalty briefs written by defense lawyers

01:54PM  4    which showed me he was preparing and trying to get a

01:54PM  5    background to start this brief.

01:55PM  6              And then he told me that he thought that a

01:55PM  7    lot of the constitutional issues raised over and over

01:55PM  8    and denied over and over were a waste of time, that he

01:55PM  9    wanted to concentrate on a lot of other issues.  He had

01:55PM 10    been pretty good in the past.

01:55PM 11              We had records that anybody else might have

01:55PM 12    filed an Anders brief.  He would always tell me, "No.  I

01:55PM 13    want to find an issue for this guy."  He would raise an

01:55PM 14    issue.  I had a lot of confidence in him.  I just think

01:55PM 15    that the Court of Appeals did not allow him time to do

01:55PM 16    the brief that he would like to have done.

01:55PM 17        Q.   The Court of Criminal Appeals, they knew Mr.

01:55PM 18    Muhammed was working -- that he himself, as well as you,

01:55PM 19    were counsel on the direct appeal, didn't they?

01:55PM 20        A.   Yes.  Usually -- not usually.  He would always

01:55PM 21    list himself as of counsel.

01:55PM 22        Q.   He filed a notice of appearance in the Court of

01:56PM 23    Criminal Appeals, didn't he?

01:56PM 24        A.   He did.

01:56PM 25        Q.   The Court of Criminal Appeals had no problem

01:56PM 1   with Michael Muhammed working on this direct appeal, did

01:56PM 2   they?

01:56PM 3       A.   As far as I know.

01:56PM 4       Q.   While he did the writing you were involved in

01:56PM 5   discussing the issues that he would raise --

01:56PM 6       A.   Yes.

01:56PM 7       Q.   -- in that appeal?  And you discussed those

01:56PM 8   beforehand, before he wrote it, didn't you?

01:56PM 9       A.   Yes.  Number one issue being the fact that in a

01:56PM 10  death penalty case any evidence that tends to show

01:56PM 11  mitigating factors, any evidence that goes to mitigation

01:56PM 12  should be widely considered for admission despite it

01:56PM 13  might not meet all of the requirements to get in through

01:56PM 14  the Rules of Evidence.

01:56PM 15      Q.   You certainly considered more claims than what

01:56PM 16  was ultimately filed in the CCA, didn't you?

01:57PM 17      A.   Definitely.  Like I say, he just didn't get a

01:57PM 18  chance to complete the brief as he would liked to have

01:57PM 19  done it.  He started with what comes first which is jury

01:57PM 20  selection and --

01:57PM 21      Q.   I'm sorry.

01:57PM 22      A.   -- he just didn't get to finish.

01:57PM 23      Q.   Didn't you decide together which claims would

01:57PM 24  be the strongest and didn't you reject some claims?  In

01:57PM 25  other words, he didn't just run out of time.  You

01:57PM 1  considered a lot of claims.  You didn't file all of

01:57PM 2  them.  You chose the strongest.

01:57PM 3      A.   I don't remember a lot of specifics.  I

01:57PM 4  remember him coming to me with a lot of points that he

01:57PM 5  thought, you know, were the strongest and that he was

01:57PM 6  going to try to put forward.  And ultimately I don't

01:58PM 7  know if those are the ones that, you know, that he did

01:58PM 8  other than jury selection or those are the ones that he

01:58PM 9  didn't get a chance to do.

01:58PM 10     Q.   Do you recall him filing 19 points of error in

01:58PM 11 the direct appeal?

01:58PM 12     A.   I don't.

01:58PM 13     Q.   In addition to discussing with Mr. Muhammed the

01:58PM 14 claims that would be raised, didn't you present oral

01:58PM 15 argument on the brief in the Court of Criminal Appeals?

01:58PM 16     A.   No.

01:58PM 17     Q.   Did Mr. Muhammed argue it?

01:58PM 18     A.   I think he did.

01:58PM 19     Q.   Mr. Muhammed timely filed every pleading

01:58PM 20 including extension motions, the brief and the motion

01:58PM 21 for rehearing, didn't he?

01:58PM 22     A.   Yes.

01:58PM 23     Q.   I don't know if you remember this.  CCA gave

01:58PM 24 you a total of about five and a half months to file the

01:58PM 25 direct appeal brief.  Does that sound familiar?

01:59PM  1      A.   Yes.

01:59PM  2      Q.   Are you aware that standard practice is about

01:59PM  3  six months?

01:59PM  4      A.   No, I'm not.

01:59PM  5      Q.   So they might have cut you off maybe by a

01:59PM  6  couple of weeks.  Is that your recollection?

01:59PM  7      A.   I had never done a death penalty appeal, relied

01:59PM  8  heavily on Mr. Muhammed.  So I didn't know but I just

01:59PM  9  know that he just kept telling me they weren't giving

01:59PM 10  him time to do what he wanted to do.

01:59PM 11      Q.   I think you mentioned this earlier but Mr.

01:59PM 12  Muhammed filed an amended brief in the Court of Criminal

01:59PM 13  Appeals, didn't he?

01:59PM 14      A.   Yes.

01:59PM 15      Q.   In that brief he raised the remaining claims

01:59PM 16  that he had run out of time initially on, didn't he?

01:59PM 17      A.   Yes.

01:59PM 18      Q.   There were four more points of error that he

01:59PM 19  filed, correct?

01:59PM 20      A.   I don't remember how many there were but I know

01:59PM 21  he did file additional points of error.

01:59PM 22      Q.   Do you know whether along with that amended

02:00PM 23  brief he filed a motion for leave to file the amended

02:00PM 24  brief?

02:00PM 25      A.   Yes.

02:00PM 1     Q.   Are you aware under the Rules of Appellate

02:00PM 2  Procedure you can file an amended brief in the Court of

02:00PM 3  Appeals?

02:00PM 4     A.   Yes.

02:00PM 5     Q.   And that the rule allows it whether justice

02:00PM 6  requires, quote, unquote.  Are you familiar with that

02:00PM 7  phrase?

02:00PM 8     A.   Not particularly, no.

02:00PM 9     Q.   The Court of Criminal Appeals refused to accept

02:00PM 10  the amended brief in the end, didn't they?

02:00PM 11     A.   Yes.

02:00PM 12     Q.   They did so after having the claims before them

02:00PM 13  and reviewing them, didn't they?

02:00PM 14     A.   I believe so.

02:00PM 15     Q.   So they had a chance to look at those claims

02:00PM 16  and they decided, didn't they, that justice didn't

02:00PM 17  require disposition of them on the direct, didn't they?

02:00PM 18     A.   On a death penalty case -- sounds kind of

02:00PM 19  ridiculous but, yes, I guess that's what they decided.

02:00PM 20     Q.   By making the ruling they basically said they

02:00PM 21  didn't think those points of error had any merit.

02:00PM 22     A.   I guess.

02:00PM 23     Q.   Mr. Muhammed filed a motion for rehearing

02:01PM 24  without an extension, didn't he?

02:01PM 25     A.   I don't remember but my recollection is that he

02:01PM 1   filed everything that he could have filed timely.

02:01PM 2       Q.   He definitely raised that ranking document

02:01PM 3   issue, didn't he?

02:01PM 4       A.   Yes.

02:01PM 5       Q.   That to you was basically the most important

02:01PM 6   issue on the direct appeal, wasn't it?

02:01PM 7       A.   I believe that it was, yes.

02:01PM 8       Q.   The Court of Criminal Appeals found it

02:01PM 9   harmless, didn't they?

02:01PM 10      A.   They did.

02:01PM 11      Q.   Before you and Mr. Muhammed filed the brief on

02:01PM 12  direct appeal did writ counsel, Mr. Udashen or Mr.

02:01PM 13  Anton, contact you to discuss what issues they thought

02:01PM 14  should be raised on the direct appeal?

02:01PM 15      A.   Not that I am aware.

02:01PM 16      Q.   Would you have entertained their ideas or

02:01PM 17  suggestions for the direct appeal?

02:01PM 18      A.   Sure.

02:01PM 19      Q.   Do you recall about a month after you filed

02:01PM 20  your brief writ counsel contacted the State, myself and

02:02PM 21  Ms. Ardolf and said they were going to go to Judge

02:02PM 22  Cunningham who was the judge of this court and ask to

02:02PM 23  remove you from the direct appeal?

02:02PM 24      A.   Yes.

02:02PM 25      Q.   Did they call you or complain to you or Mr.

02:02PM 1  Muhammed personally about the brief?

02:02PM 2      A.  No.

02:02PM 3      Q.  You found out about this from the State, didn't

02:02PM 4  you?

02:02PM 5      A.  Yes.

02:02PM 6          THE COURT:  Can you spell Ardolf, please?

02:02PM 7          MS. SMITH:  A R D O L F, Tammy.

02:02PM 8      Q.  (By Ms. Smith) After writ counsel complained

02:02PM 9  about your brief Mr. Muhammed filed the amended brief

02:02PM 10 after that?

02:02PM 11     A.  I don't recall but maybe so.

02:02PM 12     Q.  Mr. Muhammed didn't file that amended brief

02:02PM 13 just because writ counsel complained about the quality

02:02PM 14 of the brief that had been filed, did he?

02:02PM 15     A.  No.  He had always intended on presenting more

02:02PM 16 issues but he was forced to file what he had at the

02:03PM 17 deadline that they gave him.

02:03PM 18     Q.  In that interim from the time he filed the

02:03PM 19 brief to the time he filed the amended brief did they

02:03PM 20 ever contact you or Mr. Muhammed and ask you to add an

02:03PM 21 additional point of error of their suggestion?

02:03PM 22     A.  No.

02:03PM 23     Q.  How about on the motion for rehearing?  Did

02:03PM 24 they call you and contact you about suggestions or

02:03PM 25 ideas?

02:03PM 1      A.   No.

02:03PM 2      Q.   Do you know if they actually did go to Judge

02:03PM 3 Cunningham and try to get you removed from the appeal?

02:03PM 4      A.   I remember being pretty hot about it and going

02:03PM 5 and talking to Judge Cunningham about it and I think he

02:03PM 6 said he didn't know what I was talking about but I don't

02:03PM 7 know.

02:03PM 8      Q.   Were you aware that the State had asked Mr.

02:03PM 9 Udashen and Mr. Anton to let the State know if they were

02:03PM 10 going to have such meeting and to include both the State

02:03PM 11 and yourself?

02:03PM 12     A.   You might have told me.   Otherwise I didn't

02:04PM 13 know.

02:04PM 14     Q.   To your knowledge there was never any such

02:04PM 15 meeting, was there?

02:04PM 16     A.   No.

02:04PM 17     Q.   You certainly weren't there for any such

02:04PM 18 meeting, were you?

02:04PM 19     A.   No.

02:04PM 20     Q.   The Judge never removed you, did he?

02:04PM 21     A.   No.

02:04PM 22     Q.   He thought you did a good job.

02:04PM 23     A.   I assume so.

02:04PM 24     Q.   Since this writ has been filed you have

02:04PM 25 complied with all the orders of the Court, haven't you?

02:04PM 1      A.   Yes.

02:04PM 2      Q.   You have turned your files over to the Court,

02:04PM 3  correct?

02:04PM 4      A.   Yes.

02:04PM 5      Q.   You were given a release executed by Mr.

02:04PM 6  Halprin saying, "You can release my files to writ

02:04PM 7  counsel," weren't you?

02:04PM 8      A.   Yes.

02:04PM 9      Q.   Did writ counsel contact you for the files

02:04PM 10 after you got that release?

02:04PM 11     A.   No.   I got that letter with the release, looked

02:04PM 12 at it, sat it on my desk, said, "Okay.   I'll get to it."

02:04PM 13 Pretty much forgot about it and then, you know, got

02:05PM 14 calls from you or the Court or somebody saying that, you

02:05PM 15 know, I never turned over my file, that I was trying to

02:05PM 16 hide my file.   And nobody had ever just picked up the

02:05PM 17 phone and said, "Hey, bring me the file."

02:05PM 18     Q.   In fact you actually not sent them to storage

02:05PM 19 because you anticipated turning them over, didn't you?

02:05PM 20     A.   Yes.

02:05PM 21          THE COURT:   Someone tell you that they

02:05PM 22 thought you were trying to hide your file?

02:05PM 23          THE WITNESS:   Yeah.

02:05PM 24          THE COURT:   Did I tell you that?

02:05PM 25          THE WITNESS:   I think you did.

02:05PM  1      Q.   (By Ms. Smith) It's not true, is it?

02:05PM  2      A.   No.

02:05PM  3      Q.   You would have been happy to turn over the

02:05PM  4  files before now, wouldn't you?

02:05PM  5      A.   Sure.

02:05PM  6      Q.   Mr. Muhammed, he's been cooperative as well?

02:05PM  7      A.   Yes.

02:05PM  8      Q.   He's turned over his appellate files to the

02:05PM  9  Court, right?

02:05PM 10      A.   I believe so.

02:05PM 11      Q.   He timely filed his answers to the defense

02:05PM 12  interrogatories, didn't he?

02:05PM 13      A.   I believe so.

02:05PM 14      Q.   You're not saying you couldn't have raised more

02:05PM 15  claims on the direct appeal, are you?

02:06PM 16      A.   No.

02:06PM 17      Q.   You started out with more than 19 probably,

02:06PM 18  didn't you?

02:06PM 19      A.   I believe so.

02:06PM 20      Q.   Between the two of you you whittled it down; is

02:06PM 21  that accurate?

02:06PM 22      A.   Primarily Mr. Muhammed -- you know, we engaged

02:06PM 23  in discussion after the trial.  As best I could

02:06PM 24  recollect at the time, I went over everything that I

02:06PM 25  thought should be raised.  I had better, sharper

02:06PM  1   recollection at that point in time about some of the

02:06PM  2   jurors and some of the issues at jury selection.

02:06PM  3              There was the issue of the ranking

02:06PM  4   document.  I gave him some of the research I had done as

02:06PM  5   to letting mitigation evidence in, even if it was

02:06PM  6   hearsay or whatever.  As he was writing he was

02:07PM  7   discussing issues with me.

02:07PM  8              I don't know what we weeded out or did not

02:07PM  9   weed out.  That was pretty much up to him.  I trusted

02:07PM 10   him on that but he did tell me, you know, "Well, I could

02:07PM 11   raise them but I'm not going to raise that.  I'm going

02:07PM 12   to try to do something different."  Specifics I don't

02:07PM 13   remember.

02:07PM 14       Q.   Raising more claims isn't necessarily better,

02:07PM 15   is it?

02:07PM 16       A.   No.  That's pretty much the whole point he was

02:07PM 17   making to me.  "There are things that have been raised

02:07PM 18   for years and years, day in, day out by top respected

02:07PM 19   appellate attorneys and they're denied over and over and

02:07PM 20   over and I want to try to do something different."

02:07PM 21       Q.   Is there any such thing as a case with 20, 30,

02:07PM 22   40 points of reversible error, not just error but

02:08PM 23   reversible?

02:08PM 24       A.   I think realistically when you go to seminars

02:08PM 25   what they will tell you is put your strongest stuff

02:08PM 1   there because the Court is not going to go through that

02:08PM 2   many issues, you know, on a capital case.  How much is

02:08PM 3   too many?  I don't know but there's certainly something

02:08PM 4   that would go to -- it's not going to benefit you just

02:08PM 5   to raise more and more issues as long as you raise your

02:08PM 6   strongest issues.

02:08PM 7       Q.   And when an allegation is made that you are

02:08PM 8   ineffective on appeal isn't it really the ultimate test

02:08PM 9   whether the claim you fail to raise would be reversible

02:08PM 10  error?

02:08PM 11      A.   Yes.

02:08PM 12      Q.   Do you think you failed to raise a claim of

02:08PM 13  reversible error?

02:09PM 14      A.   No.

02:09PM 15      Q.   Certainly this Court has before it the very

02:09PM 16  claims that writ counsel claims you should have raised

02:09PM 17  and didn't.  So the Court can look at those claims and

02:09PM 18  make that evaluation, can't it?

02:09PM 19      A.   Yes.

02:09PM 20      Q.   The CCA will ultimately do the same thing,

02:09PM 21  won't it?

02:09PM 22      A.   Yes.

02:09PM 23      Q.   Thank you, Mr. Ashford.

02:09PM 24           MS. SMITH:  Pass the witness.

02:09PM 25

<u>REDIRECT EXAMINATION</u>

02:09PM  1

02:09PM  2   <u>BY MR. ANTON:</u>

02:09PM  3        Q.   Mr. Ashford, there's several areas that I think

02:09PM  4   I need clarification.  I don't want to be redundant.

02:09PM  5   Let's talk, first of all, about extraneous offenses.

02:09PM  6   When you were being cross-examined before lunch the

02:09PM  7   State alluded to a number of other extraneous matters

02:09PM  8   that they could have brought in punishment had you put

02:09PM  9   on a more vigorous punishment presentation, I guess, and

02:09PM  10  the State chose not to.  Is that what you understood it

02:09PM  11  to be?

02:09PM  12       A.   Her question to be?

02:09PM  13       Q.   Yes.

02:09PM  14       A.   Yes.

02:09PM  15       Q.   Now, I assume -- I guess that you would have

02:09PM  16  already knew about all of the extraneous offenses from

02:10PM  17  the notice that you would have filed, right?

02:10PM  18       A.   It's hard to say because I don't recall

02:10PM  19  specifically what responses they gave us to the

02:10PM  20  extraneouses at this time.

02:10PM  21       Q.   I'm trying to understand.  Was there some issue

02:10PM  22  that the State could have brought up an extraneous

02:10PM  23  offense on that they chose not to if you had put on the

02:10PM  24  hearsay in mitigation?  Was there something out there

02:10PM  25  that they could only do it if you had gotten in some

02:10PM  1    more details from Kelly Goodness?

02:10PM  2        A.   No.

02:10PM  3        Q.   Anything that they wanted to use, is it your

02:10PM  4    understanding they could have used it anyway?

02:10PM  5        A.   Yes.

02:10PM  6        Q.   So basically at the punishment phase they had

02:10PM  7    other bullets they could have shot but they chose not to

02:11PM  8    shoot them?

02:11PM  9        A.   I was answering her question in general.  I

02:11PM  10   don't specifically remember if there was anything else

02:11PM  11   that they had that they could have used, wanted to use,

02:11PM  12   held back on or whatever.

02:11PM  13       Q.   If -- apparently if they had additional

02:11PM  14   extraneous matters in punishment they could have brought

02:11PM  15   up, I guess for strategic reasons they decided they

02:11PM  16   didn't need them to get the verdict they wanted; is that

02:11PM  17   fair?

02:11PM  18       A.   That's fair.

02:11PM  19       Q.   Let's go into mitigation and we have got Dr.

02:11PM  20   Goodness' testimony.  We can go through this in detail,

02:11PM  21   I suppose, but in your mind is it the same if Dr.

02:11PM  22   Goodness says Randy was abused as a child?  Does that

02:11PM  23   carry the same impact as her saying that there was an

02:11PM  24   instant, for example, where he was -- he basically had

02:12PM  25   his teeth knocked out in child abuse?  Do you think that

BRIDGET BARNHILL, OFFICIAL REPORTER

02:12PM  1  carries the same impact to the jury?

02:12PM  2      A.   No.

02:12PM  3      Q.   Do you think it's the same thing to inform the

02:12PM  4  jury in general terms that your parents are a drug user

02:12PM  5  as opposed to details about them intravenously shooting

02:12PM  6  drugs and being gone and leaving you without food when

02:12PM  7  they're on drug binges?

02:12PM  8      A.   No.

02:12PM  9      Q.   The devil is in some of the details.  You agree

02:12PM  10  with that?

02:12PM  11      A.   Yes.

02:12PM  12      Q.   This is why I want to clarify and, you know,

02:12PM  13  your opinion is your opinion but I just want to make

02:12PM  14  sure, some are inconsistency.  When we first talked you

02:12PM  15  said yes, you thought the fact Dr. Goodness could not

02:12PM  16  get into the details prejudiced her presentation.  Do

02:12PM  17  you remember that?

02:12PM  18      A.   Yes.

02:12PM  19      Q.   When the State asked you about it you said

02:12PM  20  since they found out generally that he had ADHD and he

02:12PM  21  had been abused and he had been adopted, that all of

02:12PM  22  that came in anyway so it was all to the same effect --

02:13PM  23  okay.  Yes or no?

02:13PM  24      A.   Yes.

02:13PM  25      Q.   So bottom line, in your opinion which is it?

02:13PM 1  Was the truncated presentation by Dr. Goodness and her

02:13PM 2  failure to get into the details prejudicial to the

02:13PM 3  mitigation presentation?

02:13PM 4     A.   I think that everything we wanted to get in

02:13PM 5  came in but specific details in my opinion would have

02:13PM 6  been better.

02:13PM 7     Q.   As was pointed out, the jury deliberated a long

02:13PM 8  time without those details.

02:13PM 9     A.   Correct

02:13PM 10    Q.   Had they had the details, do you think it would

02:13PM 11 have made a difference, could have made a difference?

02:13PM 12    A.   It potentially could have.

02:13PM 13    Q.   Now then, is it your understanding of the law

02:13PM 14 that when a person testifies it automatically puts their

02:13PM 15 character and veracity in issue such that anything can

02:13PM 16 be used for impeachment?

02:13PM 17    A.   No.

02:13PM 18    Q.   If a person testifies, then there are

02:14PM 19 impeachment matters that are governed by the Rules of

02:14PM 20 Evidence; is that right?

02:14PM 21    A.   That's correct.

02:14PM 22    Q.   Does that to your understanding include prior

02:14PM 23 statements and in letters and news interviews without

02:14PM 24 more?

02:14PM 25    A.   No.

02:14PM 1      Q.   Now then -- the bottom line -- this was Mr.

02:14PM 2  King's witness and he made those decisions because that

02:14PM 3  was his witness, correct?

02:14PM 4      A.   Correct.

02:14PM 5      Q.   The discussion was also -- was there any

02:14PM 6  discussion between you all in preparation for putting

02:14PM 7  Randy on the stand about the nature of impeachment?

02:14PM 8      A.   I don't believe there was any preparation

02:14PM 9  before putting Randy on the stand.  I do believe that

02:14PM 10 whether I'm whispering to him during the actual

02:14PM 11 cross-examination or on a break or something I'm, you

02:14PM 12 know -- I might have mentioned to him -- I think I

02:15PM 13 mentioned to him that this is improper impeachment but I

02:15PM 14 can't say a hundred percent.

02:15PM 15     Q.   Well, I think per the Judge's -- whatever

02:15PM 16 strategic decision was made to object or not object at

02:15PM 17 that time, that was Mr. King's?

02:15PM 18     A.   Yes.

02:15PM 19     Q.   Now then, in your presentation, the defense

02:15PM 20 presentation of the case, five of the other

02:15PM 21 co-defendants -- five of the other escapees' statements

02:15PM 22 were introduced by you, by the defense team ultimately;

02:15PM 23 is that right?

02:15PM 24     A.   I forgot that we even did it but based on what

02:15PM 25 y'all are telling me, yes.

02:15PM 1      Q.   Now, you expressed some concerns that these

02:15PM 2  people weren't credible, that most of society would

02:16PM 3  abhor them and that may have played a role in your

02:16PM 4  decision about what evidence to present or not present,

02:16PM 5  correct?

02:16PM 6      A.   Correct.  Definitely as far as calling them

02:16PM 7  directly.

02:16PM 8      Q.   If the decision is made to introduce their

02:16PM 9  confessions, warts and all, as part of your case, what

02:16PM 10 was the difference strategically between that and the

02:16PM 11 decision to introduce the oral statements they made to

02:16PM 12 investigators such as Spivey?

02:16PM 13     A.   I can't tell you because I don't remember what

02:16PM 14 our discussions were or were not as to the oral

02:16PM 15 statements.

02:16PM 16     Q.   Okay.  Do you know if there was a strategic

02:16PM 17 decision made about that?

02:16PM 18     A.   No.

02:16PM 19     Q.   Now then, certainly in final argument when

02:17PM 20 there are misstatements made strategy decision is you're

02:17PM 21 not going to object to any old thing but important

02:17PM 22 issues, correct?

02:17PM 23     A.   Correct.

02:17PM 24     Q.   Given that the anticipation is directly in the

02:17PM 25 second issue, one of the things the jury must decide,

02:17PM   1   would you agree that that because it's a charge issue is

02:17PM   2   a crucial issue?

02:17PM   3       A.   Yes.

02:17PM   4       Q.   So if there was a misstatement of the law

02:17PM   5   directly related to the burden of proof in terms of

02:17PM   6   anticipation, in your mind is that the kind of argument

02:17PM   7   that would merit an objection?

02:17PM   8       A.   Yes.

02:17PM   9       Q.   Would there be a strategic reason not to object

02:17PM  10   to a misstatement of the burden of proof on one of the

02:17PM  11   charge issues?

02:17PM  12       A.   In general, in looking at the flow of the

02:18PM  13   argument, how the jury is paying attention to it, what

02:18PM  14   kind of reaction that you think you get from

02:18PM  15   interrupting, whether you call something to the jury's

02:18PM  16   attention, "Hey.  That's important.  We're objecting to

02:18PM  17   it," so now they emphasize on it more, those can be

02:18PM  18   strategic reasons not to object to something.  Whether

02:18PM  19   that was what we did in this case or not, I can't tell

02:18PM  20   you.

02:18PM  21       Q.   Okay.  Now then, regarding the appeal, I think

02:18PM  22   that you indicated that you thought that the Judge's

02:18PM  23   decision to limit Dr. Goodness' presentation of the

02:18PM  24   mitigation evidence was something that you thought

02:18PM  25   should go in the appeal?

02:19PM 1      A.   Correct.

02:19PM 2      Q.   And you thought that was a solid issue?

02:19PM 3      A.   Yes.

02:19PM 4      Q.   And I believe that you also stated that you

02:19PM 5  told Mr. Muhammed at some point or there were

02:19PM 6  discussions you said, "This is one of the reasons that

02:19PM 7  should be raised"?

02:19PM 8      A.   I just kept emphasizing the fact that anything

02:19PM 9  mitigating in a death penalty should come in regardless

02:19PM 10 of the Rules of Evidence.  So whether I said that

02:19PM 11 specifically as to the excluded testimony from Dr.

02:19PM 12 Goodness or not, I don't remember.  I just don't

02:19PM 13 remember.

02:19PM 14     Q.   Well, in your opinion now that issue, just one

02:19PM 15 of the -- not one of the primary issues, something that

02:19PM 16 could have been raised in his discretion or something

02:19PM 17 that really should have gone in there?

02:19PM 18     A.   Yeah, it should have gone in there.

02:20PM 19     Q.   Finally -- if you don't know, you don't know.

02:20PM 20 Is it your understanding that if counsel files a

02:20PM 21 supplemental brief and the Court doesn't accept it, that

02:20PM 22 that issue is preserved for review so those issues

02:20PM 23 contained in the supplemental brief can be pursued in a

02:20PM 24 writ of certiori to the Supreme Court?

02:20PM 25     A.   That I don't know.

02:20PM 1          MR. ANTON:  I'm finished.

02:20PM 2          MR. UDASHEN:  I have a few questions.

02:20PM 3     Q.   (By Mr. Udashen) Mr. Ashford, when the State

02:20PM 4  told you and Mr. King off the record that they didn't

02:20PM 5  know who wrote the ranking document do you think they

02:20PM 6  were telling you the truth?

02:20PM 7          MS. SMITH:  Objection, Your Honor.  This is

02:20PM 8  going into a claim that is not before this hearing.

02:20PM 9  It's a Brady allegation.  It's not an ineffectiveness

02:20PM 10 claim.

02:20PM 11         THE COURT:  Sustained.

02:20PM 12    Q.   (By Mr. Udashen) Now, do you agree with me that

02:20PM 13 the State apparently went to great efforts to have this

02:21PM 14 ranking document excluded from the evidence?

02:21PM 15    A.   Yes.

02:21PM 16         THE COURT:  Mr. Udashen, do you have

02:21PM 17 anything new?

02:21PM 18         MR. UDASHEN:  I do, Your Honor.

02:21PM 19         THE COURT:  Let's get to the new stuff.

02:21PM 20    Q.   (By Mr. Udashen) Your defense -- is it a fair

02:21PM 21 statement that your defense is basically what is from a

02:21PM 22 mitigation standpoint for the death penalty question is

02:21PM 23 basically what was summarized in the ranking document?

02:21PM 24    A.   Yes, that was part of it.

02:21PM 25    Q.   What I mean by that is the argument you were

02:21PM 1  trying to make are the same things that the ranking

02:21PM 2  document says?

02:21PM 3      A.   Yes.

02:21PM 4      Q.   You didn't have a law enforcement officer who

02:21PM 5  testified to any of these facts that are in the ranking

02:21PM 6  document?

02:21PM 7      A.   Not that I recall.

02:21PM 8      Q.   And so as the trial attorney do you feel like

02:21PM 9  having a law enforcement officer testify in support of

02:21PM 10 the facts you were presenting as far as mitigation of

02:22PM 11 punishment would have been a significant factor for the

02:22PM 12 jury?

02:22PM 13     A.   I think so.

02:22PM 14     Q.   Even though you made efforts to get the ranking

02:22PM 15 document in front of the jury and the jury became aware

02:22PM 16 that there was something out there, the fact is they

02:22PM 17 didn't ever have this information that was in this

02:22PM 18 document, correct?

02:22PM 19     A.   Correct.  There again is the pitfall.  If I

02:22PM 20 call the law enforcement officer that was responsible

02:22PM 21 for that document, that he would then turn it around and

02:22PM 22 try to explain it away like the affidavit that I just

02:22PM 23 saw.

02:22PM 24          THE COURT:  You didn't know who that was

02:22PM 25 until after the trial, correct?

02:22PM  1          THE WITNESS:  Correct.

02:22PM  2          THE COURT:  So you couldn't have called him

02:22PM  3  with the information you had leading up to and during

02:22PM  4  the trial.  You had no one to call because you didn't

02:23PM  5  know who authored the document; is that correct?

02:23PM  6          THE WITNESS:  That's correct.

02:23PM  7          MR. UDASHEN:  Can I proceed, Your Honor?

02:23PM  8      Q.  (By Mr. Udashen) Mr. Ashford, there was -- Ms.

02:23PM  9  Smith asked you or showed you an affidavit from Sgt.

02:23PM  10  Whitman where he says essentially that he wrote the

02:23PM  11  ranking document but number five, six and seven, Garcia,

02:23PM  12  Murphy and Halprin were really equal even though in the

02:23PM  13  document he lists Halprin as seven.  Do you recall

02:23PM  14  seeing that?

02:23PM  15      A.  Yes.

02:23PM  16      Q.  Do you think that would have looked kind of

02:23PM  17  silly in the jury for him to say that after having

02:23PM  18  written the document?

02:23PM  19      A.  Yes.

02:23PM  20      Q.  So you think that would have been effective to

02:23PM  21  the jury to say, "I know I said Halprin seven but that's

02:23PM  22  not really what I meant"?

02:23PM  23      A.  Without knowing that witness, I don't know.  I

02:23PM  24  mean --

02:23PM  25          THE COURT:  Mr. Udashen, the purpose of

02:23PM  1   this hearing is to determine facts.  And the reason why

02:24PM  2   you and your counsel convinced me to have an evidentiary

02:24PM  3   hearing was so I could see the witness testify and

02:24PM  4   determine the credibility.  He's testifying that --

02:24PM  5   whether or not that mitigation document could have

02:24PM  6   changed the outcome of the trial is my call, isn't it?

02:24PM  7              MR. UDASHEN:  Yes, sir.

02:24PM  8              THE COURT:  My recommendation to make and

02:24PM  9   then ultimately the Court of Criminal Appeals' call.

02:24PM 10              MR. UDASHEN:  That's right.  I'm just

02:24PM 11   responding to the cross-examination.

02:24PM 12              THE COURT:  I understand.  Can we move on?

02:24PM 13              MR. UDASHEN:  Yes.

02:24PM 14       Q.   (By Mr. Udashen) To your recollection of the

02:24PM 15   evidence that was presented to the jury was there any

02:24PM 16   evidence presented to the jury that ever said that Randy

02:24PM 17   Halprin had a very submissive characteristic?

02:25PM 18       A.   Specifically I can't say that I remember

02:25PM 19   anything specifically but --

02:25PM 20              THE COURT:  Excuse me.  That can be

02:25PM 21   developed from the record.  That can be developed from

02:25PM 22   the transcript.  Ultimately the question that you have

02:25PM 23   before us regarding Mr. Ashford is why he conducted the

02:25PM 24   trial the way he conducted it, what were his strategic

02:25PM 25   reasons for making the call, not what could have or

02:25PM 1  might have, should have happened if he had done it

02:25PM 2  differently but why he made the calls he made.

02:25PM 3           Mr. Ashford, you told me -- you said in

02:25PM 4  fact when you first met with Mr. Muhammed on preparing

02:25PM 5  for the appeal that the primary issue you raised and had

02:25PM 6  actually begun researching was the mitigation issue.

02:25PM 7           THE WITNESS:  That's correct.

02:25PM 8           THE COURT:  And the Court not allowing

02:26PM 9  evidence in, whether it was hearsay or for some other

02:26PM 10  reason inadmissible.  You had some law done, some

02:26PM 11  research that had shown the Court should have exercised

02:26PM 12  more leeway in allowing mitigation evidence.

02:26PM 13           THE WITNESS:  That's correct.

02:26PM 14           THE COURT:  The mitigation evidence I

02:26PM 15  suspect you're referring to -- tell me if I am wrong --

02:26PM 16  is the ranking document.

02:26PM 17           THE WITNESS:  Correct.

02:26PM 18           THE COURT:  The basis for Dr. Goodness'

02:26PM 19  opinions.

02:26PM 20           THE WITNESS:  Correct.

02:26PM 21           THE COURT:  The school records.

02:26PM 22           THE WITNESS:  Correct.

02:26PM 23           THE COURT:  The adoption records.

02:26PM 24           THE WITNESS:  Correct.

02:26PM 25           THE COURT:  And the question is -- the

02:26PM  1   question for this Court is why you weren't prepared to

02:26PM  2   get that evidence admitted.  That's question number one.

02:26PM  3              Question number two is why when the State

02:27PM  4   told you they had no idea where this ranking document

02:27PM  5   came from you didn't ask for a continuance so you could

02:27PM  6   investigate it.

02:27PM  7              THE WITNESS:  Realistically we thought the

02:27PM  8   State knew where it came from all along and that, you

02:27PM  9   know, we were just being sandbagged.  And I mean we

02:27PM 10   could have asked for a continuance but it would have

02:27PM 11   disrupted the trial and we really didn't have any

02:27PM 12   realistic area to point to, go to, to say, "We'll go ask

02:27PM 13   this person, ask this person, ask this person."  We

02:27PM 14   hired S. O. Woods.  We did some other things.  We didn't

02:27PM 15   know where to go.

02:27PM 16              THE COURT:  You have read four transcripts

02:27PM 17   of trials on the same set of facts conducted by Judge

02:27PM 18   Cunningham.  Do you think he would have given you a

02:27PM 19   mistrial -- I mean given you a continuation?

02:28PM 20              THE WITNESS:  No.

02:28PM 21              THE COURT:  Do we have any more facts that

02:28PM 22   we need to determine from this witness that can't be

02:28PM 23   otherwise ascertained from the record or other documents

02:28PM 24   or files?

02:28PM 25              MR. UDASHEN:  No, sir.

| | | |
|---|---|---|
| 02:28PM | 1 | THE COURT:  Does the State? |
| 02:28PM | 2 | MS. SMITH:  No, Your Honor. |
| 02:28PM | 3 | THE COURT:  You may step down. |
| 02:28PM | 4 | (The witness left the courtroom.) |
| 02:28PM | 5 | THE COURT:  Call your next witness |
| 02:41PM | 6 | (A brief recess was taken.) |
| 02:41PM | 7 | THE COURT:  The defense has called Edwin |
| 02:41PM | 8 | King, Edwin Bubba King.  Does either side wish to have |
| 02:41PM | 9 | Judge King sworn? |
| 02:41PM | 10 | MR. ANTON:  No, Your Honor. |
| 02:41PM | 11 | MS. SMITH:  No, Your Honor. |
| | 12 | MR. ANTON:  Before we get started we would |
| | 13 | like to for the record introduce or have the Court take |
| | 14 | notice of the trial transcripts and the court reporter's |
| | 15 | record of the underlying case. |
| | 16 | MS. SMITH:  No objection to judicially |
| | 17 | noticing. |
| | 18 | THE COURT:  It's already as far as I know |
| | 19 | part of the record for this proceeding.  I'm happy to |
| | 20 | take judicial notice of it for purposes of this hearing, |
| | 21 | that which I can remember. |
| | 22 | MR. ANTON:  We want to make the Reporter's |
| | 23 | Record and Court's record part of that record. |
| | 24 | May I proceed? |
| | 25 | THE COURT:  Yes. |

```
 1                    EDWIN V. KING
 2  was called as a witness by the Applicant, testified as
 3  follows:
 4                  DIRECT EXAMINATION
 5  BY MR. ANTON:
 6      Q.   State your name for the record.
 7      A.   Edwin V. King.
 8      Q.   What was your role in the trial of Randy
 9  Halprin?
10      A.   I was second chair.
11      Q.   In that capacity did you have anything to do
12  with the appeal?
13      A.   No.
14      Q.   What specifically -- if there was a division of
15  labor, what was it between you and Mr. Ashford, your
16  co-counsel?
17      A.   It wasn't a delineated division too much.  He
18  handled -- he selected the investigator.  He selected
19  the mitigation expert.  He was handling all the
20  mitigation.  We kind of split up -- the ballistics I
21  handled.  We shared voir dire selection and rotated on
22  that.
23      Q.   Let me ask you about one other matter if you
24  can recall.  In many instances the judges don't like
25  both attorneys to object.  They like one attorney to do
```

The time stamps in the left margin are:
02:41PM (line 5), 02:41PM (line 6), 02:42PM (lines 7-25).

02:43PM 1    it.  Was there a rule understanding who would object

02:43PM 2    various portions in the trial or among you and Mr.

02:43PM 3    Ashford and the Court?

02:43PM 4        A.   As I recall Judge Cunningham, whoever had the

02:43PM 5    witness, was either doing the direct or cross-examining

02:43PM 6    of the witness, they would object at that point as I

02:43PM 7    recall.  I don't think that it was just a free-for-all

02:43PM 8    of different people objecting, although I don't have a

02:43PM 9    clear recollection of it.

02:43PM 10       Q.   What about in argument like punishment argument

02:43PM 11   or guilt-innocence argument?  Who would have had the

02:43PM 12   duty to object?

02:43PM 13       A.   I don't know.  I think if we're talking about

02:43PM 14   punishment argument, then it would have been either one

02:43PM 15   of us probably.  I don't think that's as delineated as

02:43PM 16   having a witness.

02:43PM 17       Q.   What about the guilt-innocence argument?

02:43PM 18       A.   I would think that would be the same, probably

02:44PM 19   either one of us.

02:44PM 20       Q.   In preparation for testimony today you turned

02:44PM 21   over your file to discovery; is that right?

02:44PM 22       A.   That's correct.

02:44PM 23       Q.   Have you reviewed anything since the trial?

02:44PM 24       A.   I have read over the amended writ, the exhibits

02:44PM 25   of the amended writ.  I have looked over -- I didn't

02:44PM  1  bring them.  They're down in the car.  The other day you

02:44PM  2  made me Xerox copies of handwritten notes.

02:44PM  3              And I have looked over a list of

02:44PM  4  individuals.  I brought that list with me that was

02:44PM  5  tendered to me of people -- list of persons who provided

02:44PM  6  information or assisted in preparation of ranking

02:44PM  7  document.  I have looked that over.

02:44PM  8              I haven't looked over the transcript of the

02:44PM  9  trial.  I haven't re-read the trial at any point in

02:45PM 10  time.  I never saw the appeal or the record on appeal.

02:45PM 11      Q.   Did you read the writ?

02:45PM 12      A.   I read the amended writ.

02:45PM 13      Q.   The amended writ.  Okay.  Let me ask you a

02:45PM 14  couple of questions.  In regard to the preparation and

02:45PM 15  the testimony of Dr. Kelly Goodness, did you play any

02:45PM 16  role in that?

02:45PM 17      A.   No.

02:45PM 18      Q.   Even though you did not intend to present her

02:45PM 19  as a witness yourself, did you have discussions with Mr.

02:45PM 20  Ashford --

02:45PM 21              THE COURT:  Just a minute

02:45PM 22              (Brief pause)

02:46PM 23              THE COURT:  I'm sorry.  Thank you.  You can

02:46PM 24  go back.  You can proceed.

02:46PM 25      Q.   (By Mr. Anton) Even though you didn't -- it

02:46PM 1   wasn't your responsibility to put on Ms. Goodness as a

02:46PM 2   witness, did you have any discussions with George about

02:46PM 3   her witness preparation and the evidence she was to

02:46PM 4   give?

02:46PM 5        A.   Yes.

02:46PM 6        Q.   Can you remember what those were?

02:46PM 7        A.   You know, during the course of preparing for

02:46PM 8   trial from initially being appointed I would ask George

02:46PM 9   certain things about what he was doing.  He would ask me

02:46PM 10  about what I was doing.  We would try to make sure that

02:46PM 11  whatever aspects of the trial that we were both trying

02:46PM 12  to split up and cover -- I don't have a clear

02:46PM 13  delineation of exactly what that was but he handled Ms.

02:46PM 14  Goodness.

02:46PM 15            He selected Ms. Goodness.  I would ask him

02:46PM 16  how it was going, what she was getting.  He would tell

02:46PM 17  me the information she had garnered.  I know he had a

02:47PM 18  box load of records, you know, and that he had sat down

02:47PM 19  with her and gone over her reports and that sort of

02:47PM 20  thing.

02:47PM 21            He sat down and told me what she had found

02:47PM 22  and what her position was going to be and how he was

02:47PM 23  going to present it to the jury.

02:47PM 24       Q.   Okay.  Would it be fair to say that that was

02:47PM 25  going -- that Dr. Goodness' testimony was going to be

02:47PM 1  the keystone of the punishment issues?

02:47PM 2      A.   I don't know if it was to be the keystone.

02:47PM 3  Important?  Yeah, just as any mitigation evidence is

02:47PM 4  important.  The trouble with the case was the uniqueness

02:47PM 5  of the fact scenario.  That was one of the prevailing

02:47PM 6  problems.

02:48PM 7           I mean if hypothetically everything in the

02:48PM 8  writ was a non-factor, by that I mean it had all been

02:48PM 9  accomplished pursuant to the writ, would the result have

02:48PM 10 been different?  I don't know.  I can't honestly say

02:48PM 11 yes, it would.  I can't honestly say no, it wouldn't.

02:48PM 12          That's only based on the fact that this was

02:48PM 13 a case involving escaping from prison, committing a

02:48PM 14 series of armed robberies and then the death of a police

02:48PM 15 officer during a shoot-out.  So would that mitigation

02:48PM 16 have changed it?  Very well might have.  Would it not

02:48PM 17 have changed it?  Very well might have.  I don't think

02:48PM 18 anybody can honestly say yes or no.

02:48PM 19     Q.   Okay.  But going into the punishment phase

02:48PM 20 would you agree that Dr. Goodness would have been an

02:48PM 21 important witness?

02:48PM 22     A.   Absolutely.

02:49PM 23     Q.   As you were sitting second chair and realized

02:49PM 24 that the Judge was not going to allow her to make a full

02:49PM 25 presentation did you have discussions at that time with

02:49PM 1  Mr. Ashford about, "How can we repair this or can we get

02:49PM 2  it in?"

02:49PM 3     A.  I'm sure I did.  I mean we were trying to -- I

02:49PM 4  mean I know we sat down and huddled at one point about

02:49PM 5  trying to get the records in but I think what George

02:49PM 6  said is he was going to get them in in a different vein

02:49PM 7  and not through her somehow.

02:49PM 8          I think that's where he decided he was

02:49PM 9  going to go.  I mean I don't remember clearly how he was

02:49PM 10  going to go there.  I don't know that -- I just don't

02:50PM 11  know the answer to that.

02:50PM 12     Q.  Let me ask you a couple of preliminary

02:50PM 13  questions about some other matters.  Between you and Mr.

02:50PM 14  Ashford who had responsibility for objecting to the

02:50PM 15  various jury charges?

02:50PM 16     A.  I think we both objected on the record to the

02:50PM 17  jury charges.  It wasn't designated either one.  Both of

02:50PM 18  us had a responsibility to object to the charge.

02:50PM 19     Q.  Are you familiar with something called the

02:50PM 20  anti-parties charge?

02:50PM 21     A.  Yes.

02:50PM 22     Q.  Is there a reason that that charge was not

02:50PM 23  requested?

02:50PM 24     A.  Well, I mean the jury had to find whether or

02:50PM 25  not he anticipated -- as I recall the vein of how we

02:51PM 1   approached that, Randy's testimony was that he hadn't

02:51PM 2   shot, never fired his weapon, that he didn't want to

02:51PM 3   carry a weapon, that he was kind of intimidated into

02:51PM 4   having to carry the weapon, that he participated in one

02:51PM 5   of the aggravated robberies in Houston or some place but

02:51PM 6   had told them he didn't want to participate in the

02:51PM 7   other.

02:51PM 8           No one had gotten hurt in those robberies

02:51PM 9   and so the fact scenario -- nobody had gotten killed in

02:51PM 10  the prison escape.  And so the fact scenario of that

02:51PM 11  sequence of events I think is what we argued as far as

02:51PM 12  his not being able to anticipate that someone would get

02:51PM 13  killed.

02:51PM 14       Q.   Was there a reason to not request a specific

02:51PM 15  anti-parties charge?

02:51PM 16       A.   I can't recall right off the top of my head at

02:51PM 17  this point in time.  I honestly can't.  I don't know.

02:51PM 18       Q.   Okay.  Now, also in preparation for the trial

02:51PM 19  how Randy got his foot injury, was there a topic of

02:52PM 20  discussion between you and Mr. Ashford?

02:52PM 21       A.   Certainly.

02:52PM 22       Q.   Do you recall telling Mr. Ashford that Randy

02:52PM 23  had told you that he shot himself in the foot?

02:52PM 24       A.   No.  Randy never told me he shot himself in the

02:52PM 25  foot.

02:52PM  1      Q.   In preparation for this hearing have you

02:52PM  2  reviewed the contemporaneous notes you took of that

02:52PM  3  interview?

02:52PM  4      A.   Correct.

02:52PM  5      Q.   Based on the review of those notes is your

02:52PM  6  recollection that conversation never took place?

02:52PM  7      A.   No.  Randy never told me, as far as I'm aware

02:52PM  8  of never told anybody, that he shot himself in the foot.

02:52PM  9  The shot in the foot was always allegedly from one --

02:52PM  10  some flying bullet.  It's a shot in the toe and it's

02:52PM  11  obviously some type of ricochet.  And entry wound on the

02:52PM  12  toe appears to be from the side.  I don't think that was

02:52PM  13  ever disputed by anybody.

02:52PM  14      Q.   In regard to that there was a medical report

02:52PM  15  that was obtained, I think, from the physician in

02:53PM  16  Colorado that treated him; is that right?

02:53PM  17      A.   Correct.

02:53PM  18      Q.   Was there an effort to get that medical report

02:53PM  19  into evidence?

02:53PM  20      A.   I tried to get to offer it in through a variety

02:53PM  21  of different witnesses, specifically asking questions

02:53PM  22  about it to the different investigators.  I'm trying to

02:53PM  23  remember if it was the FBI or who it was.  Randy talked

02:53PM  24  about it when he testified on the witness stand.  The

02:53PM  25  issue of entry of the bullet really, I don't think, was

02:53PM 1  an issue that even the State contested.

02:53PM 2          Now, if the question becomes, "All right.

02:53PM 3  Is that injury as a result of a gun going off pointed

02:53PM 4  straight down that ricochets left and right and injures

02:53PM 5  his toe that way or a bullet firing from another

02:53PM 6  direction fired by one of the other individuals or the

02:53PM 7  officer or somebody else that ricochets and hits his

02:54PM 8  foot," I don't think anybody can tell you the answer to

02:54PM 9  that.  Randy's position was that he never fired his gun

02:54PM 10  and he certainly never shot himself.

02:54PM 11     Q.  As a matter of fact, a lot of the discussions,

02:54PM 12  cross-examinations of the various investigating

02:54PM 13  officers, as well as some of the expert testimony had to

02:54PM 14  deal with whether or not Randy had ever fired his gun,

02:54PM 15  correct?

02:54PM 16     A.  That's correct.

02:54PM 17     Q.  And that was an important issue in the trial

02:54PM 18  from your perspective?

02:54PM 19     A.  Yeah, that was an important issue.

02:54PM 20     Q.  Now, part of that -- part of the case in chief,

02:54PM 21  I believe, that you introduced the statements of the

02:54PM 22  other co-defendants, five of the other co-defendants; is

02:54PM 23  that correct?

02:54PM 24     A.  I honestly don't recall.  I mean we tried to

02:54PM 25  get in a lot of stuff a lot of different ways.  So I

02:54PM 1    honestly don't recall how or who I offered at this

02:54PM 2    point.

02:54PM 3        Q.    And you're aware that in witness interviews

02:55PM 4    some of the other co-defendants had indicated that --

02:55PM 5    told the investigating officers that Randy Halprin had

02:55PM 6    not fired his weapon.

02:55PM 7        A.    That's correct.  I was aware of that.

02:55PM 8        Q.    A decision was made not to call those

02:55PM 9    co-defendants as witnesses, correct?

02:55PM 10       A.    That's correct.

02:55PM 11       Q.    The reason for that was?

02:55PM 12       A.    Well, I didn't think they had any veracity,

02:55PM 13   number one.  They had horrible records, number two.

02:55PM 14   They would have been impeached with prior inconsistent

02:55PM 15   statements, number three.  They were -- it would be

02:55PM 16   giving the State an additional opportunity to retry the

02:55PM 17   activities of the other guys and be able to

02:56PM 18   cross-examine them.

02:56PM 19            I just didn't see that there was any value

02:56PM 20   in calling any of them.  I had watched the George Rivas

02:56PM 21   trial.  I sat in on some of his testimony.  I saw how he

02:56PM 22   testified.  I certainly didn't believe it was in Randy's

02:56PM 23   best interest to call him as a witness.

02:56PM 24            It was obvious to me, watching him on the

02:56PM 25   witness stand, that he did not appear to be a truthful

02:56PM 1  individual and he didn't come across with credibility.

02:56PM 2  And I didn't see any value in Randy's case in that

02:56PM 3  regard.

02:56PM 4      Q.   Aside from the decision to actually call them,

02:56PM 5  their statements could have possibly been available as

02:56PM 6  statements against penal interests through the

02:56PM 7  investigating officer.  Did you consider that?

02:56PM 8      A.   Yes.

02:56PM 9      Q.   Is there a reason you did not pursue that?

02:56PM 10     A.   Well, I think we did pursue it.  I'm not -- I'm

02:56PM 11 trying to remember what parts of -- I haven't read the

02:57PM 12 trial transcripts.  I don't recall what was offered,

02:57PM 13 what was actually got in the presence of the jury and

02:57PM 14 what Judge Cunningham wouldn't allow in.  I just don't

02:57PM 15 recall.

02:57PM 16          In regards to the statements against

02:57PM 17 interests, I know that there was some indication --

02:57PM 18 there was -- some people thought -- some of the

02:57PM 19 co-defendants thought Randy had shot.  That's what they

02:57PM 20 initially told law enforcement.  Then they changed their

02:57PM 21 minds, said hadn't shot and his gun hadn't been fired.

02:57PM 22     Q.   Let me specifically direct your attention --

02:57PM 23     A.   Sure.

02:57PM 24     Q.   -- if you can recall that Rodriguez and Murphy

02:57PM 25 in their statements said after they got back or after

02:57PM 1   the shooting had occurred and they got back to the motel

02:57PM 2   room that they inspected Randy's gun and it had not been

02:57PM 3   fired.

02:57PM 4        A.   Correct.

02:57PM 5        Q.   That was part of the statement, the interview

02:58PM 6   they gave to the police; is that right?

02:58PM 7        A.   Correct.

02:58PM 8        Q.   Now, I guess there's some concerns about under

02:58PM 9   the Rule of Optional Completeness opening up the door to

02:58PM 10  other things they might have told law enforcement but

02:58PM 11  was there a strategic decision made not to try to elicit

02:58PM 12  that testimony, that they had inspected the gun and

02:58PM 13  determined it had not been fired?

02:58PM 14       A.   I want to say that Murphy had made a statement

02:58PM 15  about Newbury, that Newbury's gun hadn't been fired and

02:58PM 16  it turned out it had been fired.  Newbury said he had

02:58PM 17  shot.

02:58PM 18            There was conflicting -- Mr. Rodriguez --

02:58PM 19  other than the fact that he had been a major planner of

02:58PM 20  the escape, if I am correct in recalling his

02:58PM 21  participation, his family's participation, getting the

02:58PM 22  Suburban, you know, once again I don't -- I mean clearly

02:59PM 23  when you try to offer part of somebody's statement into

02:59PM 24  evidence you run a big risk of opening the door to a lot

02:59PM 25  of other stuff.

BRIDGET BARNHILL, OFFICIAL REPORTER

02:59PM 1      I think that's probably why we tried to get

02:59PM 2  it in the way we did just so the jury would hear about

02:59PM 3  it, try to get it in, put the skunk in the jury box, so

02:59PM 4  to speak, in some respects.

02:59PM 5      I'll tell you that I recall trying to get

02:59PM 6  some of the officers -- I know specifically some FBI

02:59PM 7  agents, trying to get a subpoena served on them.  I know

02:59PM 8  that we got stonewalled by their location, by the FBI

02:59PM 9  themselves telling us that they were out of the country

02:59PM 10 or they were on special assignment.

02:59PM 11     I remember having an argument with some

03:00PM 12 field agent out of Atlanta or some place, might have

03:00PM 13 been D.C -- telling him -- I can't remember which agent

03:00PM 14 it is.  I remember having conversations like that.  Law

03:00PM 15 enforcement was not forthcoming, not very helpful.

03:00PM 16     And, you know, other than that, I can't

03:00PM 17 think of any other reason why we didn't try to offer

03:00PM 18 those things in, outside of just being afraid of opening

03:00PM 19 the door.

03:00PM 20     Q.   Okay.  You did the primary -- the examination

03:00PM 21 of Randy Halprin in the guilt-innocence phase.

03:00PM 22     A.   Yes, sir.

03:00PM 23     Q.   Would you agree a lot of that cross-examination

03:00PM 24 was based upon a review of the letters that he had

03:00PM 25 written, phone calls he had made, drawings and cartoons

03:00PM  1  that he had published?

03:00PM  2       A.    Yeah.   I think Mr. Shook spent a lot of time

03:00PM  3  calling him a liar.

03:00PM  4       Q.    And is it -- would you agree that just when a

03:01PM  5  person takes the stand that that doesn't necessarily put

03:01PM  6  his character or his veracity at issue such that it

03:01PM  7  would allow the State to introduce any kind of document

03:01PM  8  whatsoever?

03:01PM  9       A.    Well, we were aware of the letters and I don't

03:01PM 10  recall if on direct examination I made some attempt to

03:01PM 11  diffuse that by bringing that up in direct examination.

03:01PM 12  I honestly -- without having to read that, I don't

03:01PM 13  recall whether or not I said, "Randy, in the letter you

03:01PM 14  talked about doing something.  Why did you do that,"

03:01PM 15  just so I could jump it out there first before the State

03:01PM 16  got to do it on cross.

03:01PM 17              I don't recall.  I think that when somebody

03:02PM 18  writes a letter and says they're planning on doing

03:02PM 19  something in the form of manipulation, I think that's

03:02PM 20  admissible.

03:02PM 21       Q.    Admissible --

03:02PM 22       A.    For purposes of cross-examination, to go to

03:02PM 23  their veracity.  I think that's admissible.  I think if

03:02PM 24  they admit being a liar, then I think that's something

03:02PM 25  that on cross-examination can be explored.  I don't

03:02PM 1    think that either side under those circumstances -- I

03:02PM 2    wouldn't think defense counsel would be hamstrung if

03:02PM 3    they had a letter or something like that and could show

03:02PM 4    that somebody described themselves as a liar or

03:02PM 5    something else.

03:02PM 6                I mean I think all of us as defense lawyers

03:02PM 7    would be gleeful with the opportunity and I think that

03:02PM 8    would be fair game and it's admissible.

03:02PM 9    Q.    You think it's admissible to bring up a laundry

03:02PM 10   list of specific instances in which the person had lied

03:03PM 11   in the past?

03:03PM 12   A.    Well, you run the risk in trial of trying to

03:03PM 13   decide whether or not you're making an objection that's

03:03PM 14   going to get something reversed down the line or making

03:03PM 15   an objection that's not going to get something reversed

03:03PM 16   and the Court of Criminal Appeals or the Supreme Court

03:03PM 17   is going to say is harmless error and alienating the

03:03PM 18   jury by having them think you're hiding something if you

03:03PM 19   make an objection on something that is already out

03:03PM 20   there.

03:03PM 21               Whether or not the State is beating a dead

03:03PM 22   horse on the issue of him lying or not, there's some

03:03PM 23   value for the defense in saying, "So what?  They have

03:03PM 24   already brought that out.  He's already admitted to

03:03PM 25   that.  That's not anything.  He's trying to tell you the

03:04PM  1  truth now.  He's never told anybody -- he's always told
03:04PM  2  everybody he never shot his gun."
03:04PM  3        That's an issue.  You know, I just don't
03:04PM  4  think necessarily simply because there's an objection
03:04PM  5  that can be made that it's always the best trial
03:04PM  6  strategy to make the objection.  It depends on what you
03:04PM  7  are going to gain from that objection down the line.
03:04PM  8     Q.   Was your strategy when Randy Halprin was put on
03:04PM  9  the stand to keep his direct examination somewhat brief
03:04PM 10  in terms of the topics covered?
03:04PM 11     A.   From interviewing Randy I knew he didn't hold
03:04PM 12  attention well, had some problems staying on topic, had
03:04PM 13  a tendency to drift off on something, tried to make it
03:04PM 14  short and sweet to keep it a little simplified.
03:05PM 15        We had discussed whether or not Randy
03:05PM 16  should testify or not.  You know, certainly talked to
03:05PM 17  Randy about whether or not he wanted to testify, went
03:05PM 18  through all the litanies of "If you don't want to
03:05PM 19  testify, nobody can make you," that sort of thing.
03:05PM 20        I think in this type of case it's a damned
03:05PM 21  if you do, damned if you don't.  If you don't testify,
03:05PM 22  you got problems.  If you do testify, you got problems.
03:05PM 23  And I don't think that it was necessarily to shorten it
03:05PM 24  up but to try to make it more manageable.
03:05PM 25     Q.   When he was on the stand I think you asked him

03:05PM 1 about whether or not he fired the shot.  You covered

03:05PM 2 that topic.

03:05PM 3     A.  I presume I did.  Once again, Mr. Anton, I

03:05PM 4 haven't read the transcript of the trial and it's been

03:06PM 5 since June of -- what -- 03?

03:06PM 6     Q.  Let me ask you this:  do you recall on the

03:06PM 7 stand -- when he was on the stand if you ever opened the

03:06PM 8 door to his honesty like asking him, "Have you ever lied

03:06PM 9 in the past or have you ever manipulated or conned

03:06PM 10 people?"

03:06PM 11     A.  I don't know.  If I thought that was coming

03:06PM 12 from the State, I probably would.  I probably would have

03:06PM 13 done that.  But that's -- so you have got a defendant on

03:06PM 14 the stand and you know he's got an admissible

03:06PM 15 conviction.

03:06PM 16          Typically you're going to bring it out so

03:06PM 17 the State doesn't bring it out so you can deal with it.

03:06PM 18 That's basic trial strategy.  If there's something in

03:06PM 19 the letters that's going to hurt him -- I don't recall

03:06PM 20 whether or not I asked that question or not -- that

03:06PM 21 would have been, I think, a prudent thing to do, to

03:06PM 22 bring it out ourselves to try to show that we're being

03:06PM 23 upright and truthful with the jury and not trying to

03:06PM 24 hide the ball from them because this is certainly the

03:06PM 25 type of case -- capital murder cases, you don't want to

03:07PM 1  try to hide something from the jury.

03:07PM 2          That kind of goes back to your issue about

03:07PM 3  the objections.  If it's not of constitutional

03:07PM 4  proportion such it's going to get you a new trial, even

03:07PM 5  with cumulative error, from what I understand from those

03:07PM 6  learned individuals on the Court of Criminal Appeals,

03:07PM 7  it's probably going to be held as harmless error.

03:07PM 8      Q.   You received, I think, in advance of trial

03:07PM 9  several boxes, I think, of letters that he had written.

03:07PM 10     A.   Yes.

03:07PM 11     Q.   I assume to some extent those were reviewed.

03:07PM 12     A.   Yes.

03:07PM 13     Q.   There was some anticipation he's written too

03:07PM 14  many letters and got a lot to answer for.

03:07PM 15     A.   Well, you know, when I first got appointed and

03:08PM 16  talked with Randy and I went up to Colorado he had

03:08PM 17  already given at least one interview by that time and

03:08PM 18  certainly talked to law enforcement.  I told him -- I

03:08PM 19  said, "Anything you say, anything you write, they're

03:08PM 20  going to make a copy of."

03:08PM 21          When he got here to Dallas County told him

03:08PM 22  again.  "Anything you say, anything you write, any phone

03:08PM 23  calls you make it's not to one of the lawyers, it's not

03:08PM 24  privileged and anything you do is going -- they're going

03:08PM 25  to maybe come back and hurt you."

03:08PM 1        Those issues had been discussed with Randy.

03:08PM 2   Randy wrote letters.  We tried to deal with them best we

03:08PM 3   could.

03:08PM 4        Q.   Well, if I told you that you on your direct at

03:08PM 5   least, not that I can find you did not open the door to

03:08PM 6   whether or not he lied before or manipulated before but

03:08PM 7   the State started out their cross-examination basically

03:08PM 8   with, "Have you ever lied?"  If I understand what you're

03:09PM 9   saying, there's a couple of strategies in play here.

03:09PM 10       One, you don't want to object too much in

03:09PM 11  front of the jury because you don't want to appear to be

03:09PM 12  hiding things, right?

03:09PM 13       A.   Right.

03:09PM 14       Q.   Second is if it's a problem, it's sometimes

03:09PM 15  best to deal with it by letting the State have their

03:09PM 16  shot.

03:09PM 17       A.   Sometimes.

03:09PM 18       Q.   But obviously -- would you agree that having

03:09PM 19  the prosecutor detail a long list of alleged

03:09PM 20  misrepresentation, con jobs and lies was damaging to Mr.

03:09PM 21  Halprin's credibility?

03:09PM 22       A.   Certainly didn't help his credibility, no.

03:09PM 23       Q.   Do you think that an objection or request to

03:09PM 24  approach the bench and put a limit on that

03:10PM 25  cross-examination could have ameliorated some of the

03:10PM  1    damage?

03:10PM  2        A.   Maybe.  I don't know.

03:10PM  3        Q.   Bottom line is when you are in charge --

03:10PM  4        A.   I don't know.  I'm sorry.  I don't mean to

03:10PM  5    interrupt.  If you have got a letter from a defendant or

03:10PM  6    a letter from anyone where they admit that they're lying

03:10PM  7    or they're manipulating and they testify on the witness

03:10PM  8    stand on cross-examination, I think that's permissible

03:10PM  9    and I think it's something that can be admitted into

03:10PM  10   evidence.

03:10PM  11            I don't think it goes necessarily to

03:10PM  12   character for lying.  I think if you are talking about a

03:10PM  13   specific instance where somebody admits it, then I think

03:10PM  14   you're entitled to do it.  Veracity of any witness

03:10PM  15   becomes an issue in a trial, whether it's a State or

03:10PM  16   defense witness.

03:10PM  17       Q.   Part of the reason was that you didn't perceive

03:10PM  18   that that was necessarily objectionable?

03:10PM  19       A.   I would have liked to have kept it out but when

03:10PM  20   somebody says, "I'm going to wear glasses and try to

03:11PM  21   manipulate it, wear this type of clothes," I think --

03:11PM  22   that kind of stuff, I don't think you can necessarily

03:11PM  23   keep that out.

03:11PM  24            That goes to the veracity of the individual

03:11PM  25   on the witness stand.  If they have made a prior

03:11PM  1    statement that indicates that you have got a problem if

03:11PM  2    they take the stand.

03:11PM  3        Q.   So I guess the bottom line in terms of

03:11PM  4    supervising the cross-examination of Randy Halprin is

03:11PM  5    that while it was on-going you thought that the topics

03:11PM  6    raised by the State were generally within fair game for

03:11PM  7    cross-examination?

03:11PM  8        A.   I would have preferred they didn't go that

03:11PM  9    route but I didn't expect Mr. Shook not to try to show

03:11PM  10   Randy not to be a truthful individual.  That's the goal

03:11PM  11   of essentially everybody who is trying to cross-examine

03:11PM  12   any witness in any criminal court if they're giving

03:11PM  13   testimony that hurts you.

03:12PM  14            The purpose of cross-examination is to try

03:12PM  15   to show they're not a truthful individual if you can if

03:12PM  16   that testimony is damaging to your case.  Is that

03:12PM  17   inadmissible evidence?  I'm not sure that is.  Once

03:12PM  18   again, you run the risk standing up and objecting to

03:12PM  19   every little tiny thing in front of the jury.

03:12PM  20            And after you have done that you have lost

03:12PM  21   all credibility to them as a lawyer.  When you stand up

03:12PM  22   and make your final argument my experience of 31 years

03:12PM  23   tells me if you hadn't been honest with them in front of

03:12PM  24   them, you have got problems when you're trying to

03:12PM  25   finalize it all.

03:12PM 1      Q.   Let me move on to the final argument.  You

03:12PM 2  understand in the first phase of a death penalty case,

03:12PM 3  the guilt-innocence phase, the issue is a person can be

03:12PM 4  convicted of capital murder if they should have

03:12PM 5  anticipated a killing and acted as a party, correct?

03:12PM 6      A.   Yes.

03:12PM 7      Q.   At the punishment phase it's did they

03:12PM 8  anticipate?

03:12PM 9      A.   Yes.

03:12PM 10     Q.   I think that a lot of the voir dire or

03:13PM 11  presentation was an explanation of how the law of

03:13PM 12  parties interacts with the special issues, right?

03:13PM 13     A.   Yes.

03:13PM 14     Q.   Your understanding of the law is just because a

03:13PM 15  person brings a gun to a robbery doesn't necessarily

03:13PM 16  mean that the answer to the second special issue is yes

03:13PM 17  just merely being present with a gun?

03:13PM 18     A.   Certainly.  That's correct.

03:13PM 19     Q.   That goes to the burden of proof that the State

03:13PM 20  has in answering that special issue?

03:13PM 21     A.   Certainly.

03:13PM 22     Q.   If the State misstates the burden of proof in

03:13PM 23  the final argument as to that special issue, is that the

03:13PM 24  kind of argument that should be objected to?

03:13PM 25     A.   I would think so, yes.

03:13PM  1      Q.   Between you and Mr. Ashford, if you can recall,

03:13PM  2  at the punishment phase who would have had the

03:13PM  3  obligation to object or would it have been both of you?

03:13PM  4      A.   I think both of us.

03:13PM  5      Q.   Do you recall the State arguing --

03:14PM  6           MR. ANTON:   I can approach the witness --

03:14PM  7  may I approach?

03:14PM  8      Q.   (By Mr. Anton) Let me show you an excerpt from

03:14PM  9  the trial record, Volume 53, page 82.  If you would read

03:14PM  10  that portion right there.

03:14PM  11      A.   Yes, sir.

03:14PM  12      Q.   Where the prosecutor argues, "Most of you told

03:14PM  13  us that taking a loaded gun into a store, robbery, that

03:14PM  14  by itself, you learned that he knew or anticipated,

03:14PM  15  someone in that circumstance, they would have to use it

03:14PM  16  and, you know, you can use that fact by itself to answer

03:14PM  17  the issue."

03:14PM  18           Do you think that's an objectionable

03:14PM  19  argument?

03:14PM  20      A.   No, I don't.

03:14PM  21      Q.   Why?

03:14PM  22      A.   Because it uses the word "anticipate."  It's a

03:15PM  23  reasonable deduction from the evidence based on how the

03:15PM  24  State presented it.  Now, is that an objection that

03:15PM  25  that's a misstatement of the law?

03:15PM 1      I'm not sure that when you -- say when you

03:15PM 2  are talking about that he anticipated it, once they say

03:15PM 3  that, I don't think that that makes it an objectionable

03:15PM 4  argument.  I mean the issue as to whether or not he had

03:15PM 5  a weapon, does that make them answer that special issue

03:15PM 6  no, the simple possession of a weapon?

03:15PM 7      Neither does the simple possession of a

03:15PM 8  weapon answer whether or not it's an intentional killing

03:15PM 9  or that he should have anticipated.  Those issues are

03:15PM 10  for the jury to decide and they're not per se --

03:15PM 11  possession of a firearm, a loaded firearm or taking a

03:15PM 12  loaded firearm does not per se answer those for the

03:15PM 13  jury.

03:15PM 14      Q.   When the prosecutor said, "And, you know, you

03:15PM 15  can use that fact by itself to answer that question,"

03:15PM 16  they can't use that fact by itself, can they?

03:16PM 17      A.   What?  Anticipate?

03:16PM 18      Q.   Yeah.  They can't use the fact that he brought

03:16PM 19  a gun to the robbery by itself to show that he

03:16PM 20  anticipated the killing would occur for the second

03:16PM 21  special issue.

03:16PM 22      A.   No.  I think you're right under Edmond.

03:16PM 23      Q.   Would that have been appropriate to object to?

03:16PM 24      A.   Probably would have been appropriate to object

03:16PM 25  to.

03:16PM 1     Q.   And then later on they argue their intent is

03:16PM 2   clear, all the different guns used.  If anybody got in

03:16PM 3   the way they're going to take them -- from all the

03:16PM 4   evidence these men, the weapons they were using, you're

03:16PM 5   referring to the fact that there are several people

03:16PM 6   using guns.

03:16PM 7               Maybe his gun misfired.  Maybe someone

03:16PM 8   murdered the victim before him, an example of that.  The

03:16PM 9   fact that he brought the weapon to the scene even though

03:16PM 10  he didn't necessarily fire it, do you think that reduced

03:16PM 11  their burden of proof?

03:16PM 12    A.   No.

03:16PM 13    Q.   You don't think that argument was objectionable

03:17PM 14  under Tyson?

03:17PM 15    A.   I didn't say that.  Not sure -- I'm not sure

03:17PM 16  that it's objectionable.  I don't think that necessarily

03:17PM 17  reduced their burden of proof either.

03:17PM 18               MR. ANTON:  That's all the questions I

03:17PM 19  have, Your Honor.

03:17PM 20    Q.   (By Mr. Udashen) Mr. King, let me ask you some

03:17PM 21  questions about the ranking document.

03:17PM 22    A.   Sure.

03:17PM 23    Q.   Exhibit -- I believe is Defendant's Exhibit

03:17PM 24  Number 39 which everybody calls the ranking document.

03:17PM 25  When is the first time you ever saw that?

BRIDGET BARNHILL, OFFICIAL REPORTER

03:17PM  1        A.   First time ever saw that was when I was busting

03:17PM  2   out the boxes of discovery.  George had picked up the

03:17PM  3   discovery from the D. A.'s office.  He had taken it to a

03:17PM  4   printer down here off of -- what was then Industrial, I

03:17PM  5   guess is now Riverside, whatever they're calling it.

03:17PM  6        THE COURT:  I think it's Riverfront.

03:17PM  7        THE WITNESS:  Thank you, Your Honor.

03:17PM  8        A.   I went over and picked up my boxes of evidence

03:17PM  9   from there, took those boxes to my office, proceeded to

03:18PM 10   break them out into sections.  For example, the Colorado

03:18PM 11   parts -- trying to remember the county.  It starts with

03:18PM 12   a "T."  But whatever county that was the Sheriff's

03:18PM 13   Office.

03:18PM 14        Those reports, broke it out into sections

03:18PM 15   for purposes of reviewing it and trying to figure out

03:18PM 16   what was useable and review the discovery.  In the

03:18PM 17   process of that, started coming across these packages

03:18PM 18   that didn't seem to fit with the other parts of the

03:18PM 19   report.

03:18PM 20        And it turned out that that ranking

03:18PM 21   document, pages had been interspersed throughout the

03:18PM 22   box.  There wasn't any other documents that were out of

03:18PM 23   sequence, out of order.  There wasn't an extra page from

03:19PM 24   the Irving Police Department that had ended up in the

03:19PM 25   Colorado investigation, anything like that.  But the

03:19PM 1    pages of the ranking document were not together.

03:19PM 2              THE COURT:  How many pages were there?

03:19PM 3              THE WITNESS:  I don't recall, Judge.  I

03:19PM 4    know there was a couple.  Can't remember if it was four,

03:19PM 5    five, ten.  I just don't recall.

03:19PM 6       A.   I just know that during the course of pulling

03:19PM 7    it all out and rolling through it George and I both

03:19PM 8    ended up with this one document that just didn't

03:19PM 9    appear -- didn't appear to have any sponsoring

03:19PM 10   individual, no signatures.

03:19PM 11             It was kind of a unique document.

03:19PM 12   Everything else there, you could tell who had done it,

03:19PM 13   you know, which police officer, which FBI agent,

03:19PM 14   everything else.  That thing nobody knew about and

03:19PM 15   nobody ever admitted knowing about.

03:19PM 16             THE COURT:  Did you read the transcripts of

03:20PM 17   the previous four trials in preparation for this trial?

03:20PM 18             THE WITNESS:  No.  I think I got -- I take

03:20PM 19   that back.  I think I got copies of the transcripts and

03:20PM 20   read over the direct and cross-examination of most of

03:20PM 21   the State's witnesses.  I know Rivas was the first one

03:20PM 22   to go to trial and we got that out pretty quick.

03:20PM 23             I know that everybody else that was

03:20PM 24   representing one of the seven got copies of it because

03:20PM 25   it was on disk.  I'm trying to remember whether or not I

03:20PM 1  matched everybody's direct up.  I know on

03:20PM 2  cross-examination in Randy's trial I remember

03:20PM 3  contrasting the testimony that had changed from one

03:21PM 4  witness to another during the course of the different

03:21PM 5  trials.

03:21PM 6          I'm thinking of the sporting goods people

03:21PM 7  out in Irving that had testified in one trial this

03:21PM 8  happened and in a different trial they testified

03:21PM 9  something else happened.  I remember doing that.  Every

03:21PM 10 word of it I couldn't tell you now.

03:21PM 11         THE COURT:  Any hints of a ranking document

03:21PM 12 in anything you read prior to discovering it in the

03:21PM 13 boxes?

03:21PM 14         THE WITNESS:  The first discovery we did

03:21PM 15 was the box of information.  That's when we found the

03:21PM 16 ranking document.

03:21PM 17         THE COURT:  Was there any hint of a ranking

03:21PM 18 document in anything you read in any of the other

03:21PM 19 trials?

03:21PM 20         THE WITNESS:  I don't recall.  I don't

03:21PM 21 think so but I don't recall.  I don't recall the ranking

03:21PM 22 document being mentioned in any other document that was

03:21PM 23 tendered to us.  It wasn't any reference in the TDCJ, in

03:22PM 24 their investigative notes that might have been given

03:22PM 25 that referred to the ranking document, I don't believe.

03:22PM  1       THE COURT:  So when you first, as you said,

03:22PM  2  busted out these boxes and came across these ranking

03:22PM  3  documents how much time expired from that period of time

03:22PM  4  until the time you started the guilt-innocence portion

03:22PM  5  of the trial?

03:22PM  6       THE WITNESS:  I don't recall when we --

03:22PM  7       THE COURT:  Would it be months?

03:22PM  8       THE WITNESS:  Certainly.

03:22PM  9       THE COURT:  A year maybe?

03:22PM  10       THE WITNESS:  Could be.

03:22PM  11       THE COURT:  Go ahead, Mr. Udashen.

03:22PM  12       Q.  (By Mr. Udashen) Mr. King, when you saw the

03:22PM  13  ranking document you said there was no supporting

03:22PM  14  documents attached to it or in sequence with it?

03:22PM  15       A.  No.

03:22PM  16       Q.  And you have reviewed the writ we filed and all

03:22PM  17  the documents we filed in connection with the writ?

03:23PM  18       A.  Correct.

03:23PM  19       Q.  Have you seen in there that there are documents

03:23PM  20  that go with the ranking document?

03:23PM  21       A.  Yes.

03:23PM  22       Q.  Those documents actually identify who the

03:23PM  23  author is?

03:23PM  24       A.  Yes.

03:23PM  25       Q.  At the time you saw the ranking document in the

03:23PM 1  State's discovery you had no idea who wrote it; is that

03:23PM 2  right?

03:23PM 3       A.   That's correct.

03:23PM 4       Q.   Have you heard that different members of the

03:23PM 5  State's prosecution team had actually said at different

03:23PM 6  times that they had never seen the document until you

03:23PM 7  produced it in court?

03:23PM 8       A.   I have heard that being said.

03:23PM 9       Q.   Is that true?

03:23PM 10      A.   No.

03:23PM 11      Q.   Why do you say that isn't true?

03:23PM 12      A.   We asked them about it and everybody said they

03:23PM 13  didn't know where it came from or what it was.  Nobody,

03:23PM 14  not TDCJ, not the Office of the Inspector General,

03:23PM 15  whoever those people are.  Everybody denied ever seeing

03:23PM 16  this document.  I mean everybody.

03:23PM 17      Q.   You're not the one that gave it to the State.

03:23PM 18  The State gave it to you.

03:23PM 19      A.   No.  We got it in the discovery but, once

03:23PM 20  again, it was interspersed in the discovery.  Whoever --

03:24PM 21  whoever put the box of discovery together and gave it to

03:24PM 22  George Ashford, whether either intentionally or

03:24PM 23  recklessly or unintentionally, took that document apart

03:24PM 24  and spread it through there or it was already apart and

03:24PM 25  spread it through there.

03:24PM 1        And when they came across it, I guess --

03:24PM 2  because surely my experience is when the State gives you

03:24PM 3  discovery they have gone through it because they have

03:24PM 4  culled out a hell of a lot of stuff because they're not

03:24PM 5  giving you everything they got.

03:24PM 6        THE COURT:  Do you recall if it was Bates

03:24PM 7  stamped when you saw it?

03:24PM 8        THE WITNESS:  It was Bates stamped when I

03:24PM 9  got it but I don't know if George had it Bates stamped

03:24PM 10 at the printer or if it was Bates stamped before by the

03:24PM 11 D. A.'s office and then tendered to us.  I want to say

03:24PM 12 the Bates stamps on the document itself, on the pages

03:24PM 13 was not sequential.

03:24PM 14       In other words, whoever Bates stamped it --

03:25PM 15 you had one page be 51.  Then another page might be 62

03:25PM 16 which would be the second page belonging to the

03:25PM 17 document.  Fifty-one was the first page and 62 was the

03:25PM 18 second page, should have been 51, 52, 53 in the Bates

03:25PM 19 stamp system.  I don't think that they were Bates

03:25PM 20 stamped in sequential order when you put them together.

03:25PM 21    Q.   (By Mr. Udashen) Are you trying to say that you

03:25PM 22 think somebody intentionally pulled this apart to

03:25PM 23 mislead you?

03:25PM 24    A.   Yeah, I think so.

03:25PM 25    Q.   What do you think happened?  What are you

03:25PM 1    saying?

03:25PM 2        A.   I'll tell you.   I have told you this before.

03:25PM 3    There's an old movie out.   Gene Hackman is a civil

03:25PM 4    lawyer in the case.   He has got a daughter on the other

03:25PM 5    side, big car blow-up case, you know, wrongful death

03:25PM 6    scenario.   And the defense, the insurance defense, they

03:25PM 7    have got this engineer's document and they know that's

03:25PM 8    what Gene Hackman is looking for.

03:26PM 9             What happens is they decide what they're

03:26PM 10   going to do is take the document apart put it in about

03:26PM 11   200 different boxes of all different types of discovery

03:26PM 12   and submit it to them and make them dig through it in

03:26PM 13   hopes they won't be able to put it together in time for

03:26PM 14   trial.

03:26PM 15            I'm not saying that anybody on the State's

03:26PM 16   side knows about that movie but I can tell you this:   it

03:26PM 17   wasn't together in the box of evidence.   The State gave

03:26PM 18   it to us.   We got it.   It's obvious now that they had it

03:26PM 19   before.   It's obvious now that the Texas Rangers are the

03:26PM 20   ones -- Mr. Whitman is the one that put that document

03:26PM 21   together.

03:26PM 22            And to say the State didn't know that

03:26PM 23   during the course of this investigation, during the

03:26PM 24   course of this trial is not the truth.   I could use

03:26PM 25   stronger language than that and I would but it's not my

BRIDGET BARNHILL, OFFICIAL REPORTER

03:26PM 1   court.

03:26PM 2       Q.   Did you talk to Toby Shook about this document

03:26PM 3   before trial?

03:26PM 4       A.   I recall talking to Toby and talking to Tom and

03:27PM 5   everybody said they didn't know where it came from.   I

03:27PM 6   recall talking to the Office of Inspector General.   They

03:27PM 7   said they didn't know where it came from.   Hell, it was

03:27PM 8   in their box when S. O. Woods went back up there and

03:27PM 9   looked.

03:27PM 10              And they had it in their box and still they

03:27PM 11  said they didn't have it.   You're going to tell me that

03:27PM 12  the Texas Rangers doing the investigation of an escape

03:27PM 13  of seven people that results in the death of a law

03:27PM 14  enforcement officer and TDCJ doesn't have a copy of it?

03:27PM 15              Office of Inspector General doesn't have a

03:27PM 16  copy of it and nobody in the D. A.'s office has a copy

03:27PM 17  of it.   And everybody that goes on the witness stand

03:27PM 18  says, "By golly, we have never seen that before."   If

03:27PM 19  that's the truth, I'll eat this microphone.

03:27PM 20      Q.   What efforts did you make prior to or during

03:27PM 21  trial to determine who the author of that document was?

03:27PM 22      A.   We asked the State.   They said on the record

03:27PM 23  they didn't know where that document came from.   We

03:27PM 24  asked TDCJ.   They said it wasn't their document; they

03:27PM 25  didn't know.   We got the custodian of records for the

03:28PM  1  Office of Inspector General.

03:28PM  2          They said it wasn't their document.  They

03:28PM  3  had never seen it.  They didn't know where it came from.

03:28PM  4  We didn't know where it came from.  We didn't have a

03:28PM  5  clue.

03:28PM  6      Q.   Had you discovered who the author was, would

03:28PM  7  you have gotten him to testify?

03:28PM  8      A.   Certainly if I known it was the Texas Rangers

03:28PM  9  and Whitman in particular, I would have issued a

03:28PM  10  subpoena for him.  We would have issued a subpoena for

03:28PM  11  anybody that prepared that document.  That document, I'm

03:28PM  12  still confused.

03:28PM  13          It's a business document under TDCJ which

03:28PM  14  is not a business as any other normal business.  It's

03:28PM  15  the business of keeping prisoners.  When you keep

03:28PM  16  prisoners, the damn diagram depends on the circumstances

03:28PM  17  that take place at a prison and when you have an escape,

03:28PM  18  then it's that business record, that type of

03:28PM  19  investigation that constitutes a business record because

03:28PM  20  that's what they do.

03:28PM  21          That's the business they're in is trying to

03:28PM  22  figure out how the escape took place, who was high and

03:28PM  23  low man.  And to say that's not a business record is

03:29PM  24  ridiculous and to say that you don't know who sponsored

03:29PM  25  it, that's ridiculous.  I don't believe it for a minute.

03:29PM 1    Q.   But did you make -- you made every effort you

03:29PM 2    could think of to find some way to get that in evidence.

03:29PM 3    A.   Absolutely did.

03:29PM 4    Q.   There was no strategy decision to forego some

03:29PM 5    possibility of getting that in evidence?

03:29PM 6    A.   No.   Everybody denied it and there was some

03:29PM 7    insinuation that somehow we created it or some crazy

03:29PM 8    crap like that and that's all it was was crap.

03:29PM 9              THE COURT:   Excuse me.

03:29PM 10             THE WITNESS:   Excuse me, Your Honor.   I

03:29PM 11   apologize to the Court.

03:29PM 12   A.   It was a load of bahooey (sic).

03:29PM 13   Q.   (By Mr. Udashen) I sent you a couple days ago a

03:29PM 14   list of people who I think you referred to from our

03:29PM 15   review of the State's files may have participated in the

03:29PM 16   preparation of this document either being interviewed by

03:29PM 17   investigators or being investigators who participated in

03:29PM 18   it.

03:29PM 19   A.   Yes.

03:29PM 20   Q.   You have reviewed that list?

03:29PM 21   A.   Yes.

03:29PM 22   Q.   Let me talk to you specifically about the

03:30PM 23   inmates on that list, the non-prison employees and

03:30PM 24   non-prison investigators.   Those people -- were you ever

03:30PM 25   made aware that any of those people had been interviewed

03:30PM 1 by any state official as part of this investigation, in

03:30PM 2 particular as part of this preparation of this ranking

03:30PM 3 document?                    .

03:30PM 4      A.   Some of them, yes.   Those individuals who have

03:30PM 5 been -- those individuals involved as either witnesses

03:30PM 6 to the break-out itself or who became victims during the

03:30PM 7 course of the break-out.   In other words, they were in

03:30PM 8 the maintenance room or they came back from lunch and

03:30PM 9 they got tied up.

03:30PM 10           I know David Lee Cook was one of them.   We

03:30PM 11 were tendered some statement by David Lee Cook.   I don't

03:30PM 12 know that we were tendered all the statements by him.

03:30PM 13 Whatever is in my file on David Lee Cook is in my file.

03:30PM 14      Q.   What about Michael Carter?

03:30PM 15      A.   No.

03:30PM 16      Q.   What about Timothy Black?

03:31PM 17      A.   No.

03:31PM 18      Q.   Charles David?

03:31PM 19      A.   No.

03:31PM 20      Q.   David Slocum?

03:31PM 21      A.   No.

03:31PM 22      Q.   George Reams Rogers?

03:31PM 23      A.   No.

03:31PM 24      Q.   Were you given the names of anybody who had

03:31PM 25 given exculpatory statements to any investigator that

03:31PM  1  went into the preparation of this document?

03:31PM  2      A.   No.   Certainly didn't get -- none of these

03:31PM  3  Texas Rangers appeared -- I didn't see -- I don't recall

03:31PM  4  seeing their names on any document.   Certainly Mr.

03:31PM  5  Whitman's name is not on any document that was tendered

03:31PM  6  to us in discovery.

03:31PM  7            I can't imagine -- I haven't -- I'm trying

03:32PM  8  to recall the complete -- I haven't seen the official

03:32PM  9  complete document that Ranger Whitman would have

03:32PM 10  prepared.   I don't know if there's a cover letter.   I

03:32PM 11  don't know if there's something he signed.

03:32PM 12            I just don't know what's there.   I know

03:32PM 13  what we received which was something that you couldn't

03:32PM 14  figure out where it belonged, what report it was part

03:32PM 15  of.

03:32PM 16      Q.   But you understand now everybody agrees that

03:32PM 17  Sgt.   Whitman prepared it?

03:32PM 18      A.   That's what I have been told.

03:33PM 19            MR. UDASHEN:   Pass the witness, Your Honor.

03:33PM 20            MS. SMITH:   Did you pass the witness?

03:34PM 21            MR. UDASHEN:   Yes.

03:34PM 22            THE COURT:   Don't act so surprised.

03:34PM 23            MS. SMITH:   We have been here for a while.

03:34PM 24

25

CROSS-EXAMINATION

BY MS. SMITH:

Q.   Good afternoon, Mr. King.

A.   Ms. Smith.

Q.   You mentioned earlier that you reviewed a few things before you came here to testify today.  Did you happen to review the State's response to the writ application?

A.   No, I did not.

Q.   Have you seen the affidavits of any of the witnesses such as Dr. Goodness or the author of the ranking document, Mr. Whitman?

A.   I have not seen the affidavit of Mr. Whitman. I have seen the affidavit of Dr. Goodness.  I think that's in the adjoining volume if it's the same affidavit.  I don't know if there's a separate affidavit from Dr. Goodness.  If it's the same one, I have seen an affidavit that Dr. Goodness did.

MS. SMITH:  May I approach, Judge?

A.   I don't know if that's here in front of me.

Q.   (By Ms. Smith) What I am about to show you is already in evidence.  Since it's addressed to you I would like to have you confirm --

A.   Yes.

Q.   I believe this is State's Writ Exhibit O.

03:35PM 1    A.   Yeah, I recognize that.

03:35PM 2    Q.   That's a letter you received from Dr. Goodness?

03:35PM 3    A.   Yes, it is.

03:35PM 4    Q.   Dated four days after trial?

03:35PM 5    A.   Yes, ma'am.

03:35PM 6    Q.   She thought very highly of your representation

03:35PM 7  as well as George's?

03:35PM 8    A.   That's what she said.

03:35PM 9    Q.   Did she ever say anything else?

03:35PM 10   A.   No.

03:35PM 11   Q.   Nothing contrary to that?

03:35PM 12   A.   Well, I don't know.

03:35PM 13   Q.   Well, to you?

03:35PM 14   A.   There's a lot that can be said behind your

03:35PM 15  back.

03:35PM 16   Q.   Did she complain to you?

03:35PM 17   A.   No, she didn't complain to me.

03:35PM 18   Q.   You have spoken with writ counsel before this

03:35PM 19  hearing today.

03:35PM 20   A.   Yes.  I spoke with them this week.  I went by

03:35PM 21  their office to look at -- to see what questions they

03:36PM 22  were going to ask.  I was aware -- I'm aware -- having

03:36PM 23  had a copy of the amended writ, I knew what I was going

03:36PM 24  to get grilled on.

03:36PM 25            Mr. Anton and I went to law school

BRIDGET BARNHILL, OFFICIAL REPORTER

03:36PM 1  together, graduated in the same class.  We know each

03:36PM 2  other.  That being said, I told him I understood he was

03:36PM 3  going to come at me with hammers and tongs.  I told him

03:36PM 4  do what he had to do.  I would deal with it as it came.

03:36PM 5              This is a writ hearing.  I don't have

03:36PM 6  anything to hide and I understand how he's trying to

03:36PM 7  present things.  And I'm the trial lawyer.  I understand

03:36PM 8  how that goes and I understand what your job is.  I

03:36PM 9  understand what everybody's job is.

03:36PM 10             I told him there wasn't going to be any

03:36PM 11 hard feelings or mad at anybody asking me hard questions

03:36PM 12 or telling me what I was supposed to do or should have

03:36PM 13 done or would have done.  That being said, I asked to

03:36PM 14 see a copy of the medical report from the doctor in

03:37PM 15 Colorado because I couldn't recall whether or not there

03:37PM 16 was something in the medical report that we were shy

03:37PM 17 about as defense counsel.

03:37PM 18             I asked -- he asked me whether or not I had

03:37PM 19 any handwritten notes of my initial interview in

03:37PM 20 Colorado with Mr. Halprin, Randy.  I told him I did.  He

03:37PM 21 had his secretary go down and start digging through and

03:37PM 22 brought up some Xerox copies of my file.

03:37PM 23             I can't remember who got my file first, if

03:37PM 24 it was the defense or the State.  Anyway, I turned my

03:37PM 25 file over, looked through that to refresh my

03:37PM 1  recollection.  I didn't really need to refresh it.

03:38PM 2       That issue was whether or not Randy ever

03:38PM 3  said he had shot himself.  I didn't need to look through

03:38PM 4  there to refresh my recollection on that.  What else was

03:38PM 5  there?  Other than that, other than review what was in

03:38PM 6  my file, I was tendered this list by Mr. Udashen.

03:38PM 7       I was tendered a response that was filed in

03:38PM 8  court of some document and I can't remember.  It was

03:38PM 9  multi pages.  I don't remember what the name of it was.

03:38PM 10 I have got it in the car and would be glad to run down

03:38PM 11 and get it.

03:38PM 12      Q.   That's okay.

03:38PM 13      A.   Mr. Anton asked me questions pertaining to the

03:38PM 14 writ.  "Why did you do this?"  I essentially answered

03:38PM 15 them the same way I have today.  Or "What was your

03:38PM 16 thinking," or asked me specifically -- I think he

03:38PM 17 specifically asked me did George and I ever have any

03:38PM 18 conversation or did I ever tell George that Randy said

03:39PM 19 he shot himself and I told him no, we never had that

03:39PM 20 conversation.  I was probably there 30, 40 minutes.

03:39PM 21      Q.   Okay.  You gave an affidavit to writ counsel

03:39PM 22 back in 2005, didn't you, in support of the writ claim?

03:39PM 23      A.   Yes.

03:39PM 24      Q.   In support of one of the claims, the Brady

03:39PM 25 claims; is that correct?

BRIDGET BARNHILL, OFFICIAL REPORTER

03:39PM 1    A.   That's correct.

03:39PM 2    Q.   You didn't address the ineffectiveness

03:39PM 3 allegations back then?

03:39PM 4    A.   No.

03:39PM 5    Q.   Why was that?

03:39PM 6    A.   I don't know.

03:39PM 7    Q.   You didn't want to respond to them or they

03:39PM 8 didn't ask you?

03:39PM 9    A.   Well, I'm sure everybody wanted me to respond

03:39PM 10 to something.  I probably shoved it off on something

03:39PM 11 else until I had time to get to it.

03:39PM 12            THE COURT:  Let me ask you a question.  If

03:39PM 13 this Court were to make conclusions of law and

03:39PM 14 recommendations that you were ineffective and the Court

03:40PM 15 of Criminal Appeals were to follow that recommendation

03:40PM 16 and made a determination that you were ineffective what

03:40PM 17 impact would that have on you?

03:40PM 18            THE WITNESS:  Well, Judge --

03:40PM 19            THE COURT:  Other than hurting your

03:40PM 20 feelings.

03:40PM 21            THE WITNESS:  It would remove me from the

03:40PM 22 list of individuals who can represent death penalty --

03:40PM 23 people facing the death penalty is my understanding of

03:40PM 24 how that would be treated.

03:40PM 25            THE COURT:  What percent of your practice

03:40PM  1    do you think that's been in the last five years?

03:40PM  2                THE WITNESS:  Well, I have got two pending

03:40PM  3    right now but I haven't had a -- other than Randy's

03:40PM  4    case, I haven't had a capital murder case be tried for

03:41PM  5    death since Mr. Halprin, I don't think.  I'm trying to

03:41PM  6    remember.  That would be 2003.  I think everybody else

03:41PM  7    they forewent the death penalty and tried them as a mini

03:41PM  8    cap.

03:41PM  9                THE COURT:  But you wouldn't have been able

03:41PM  10   to be appointed on those cases?

03:41PM  11               THE WITNESS:  I'm not clear --

03:41PM  12               THE COURT:  Is that your understanding?

03:41PM  13               THE WITNESS:  I'm not clear as to that.  I

03:41PM  14   don't know what that means.  I don't know if that means

03:41PM  15   I'm completely removed from the appointment list of

03:41PM  16   Dallas County.  I don't know if that means I'm

03:41PM  17   removed -- I know it means I'm removed from any death

03:41PM  18   case.  I don't know if that means I'm removed from any

03:41PM  19   non-death case.  I don't know.

03:41PM  20               THE COURT:  It's a bad thing, isn't it?

03:41PM  21               THE WITNESS:  It's not a good thing.

03:41PM  22   Nobody wants to be held ineffective.

03:41PM  23               THE COURT:  Go ahead.

03:41PM  24       Q.   (By Ms. Smith) Do you remember coming up to the

03:41PM  25   appellate section a few years ago and speaking very

03:41PM  1   briefly with myself and a co-worker Libby Lane?

03:41PM  2        A.   Yes, ma'am.  I recall that.  I recall that,

03:42PM  3   yeah.

03:42PM  4        Q.   We didn't discuss the specifics of the

03:42PM  5   allegations in the writ.  We briefly met and spoke.

03:42PM  6        A.   That's correct.

03:42PM  7        Q.   You asked me for a copy of the record.  Do you

03:42PM  8   remember that?

03:42PM  9        A.   Might have.  I don't recall that but that

03:42PM 10   doesn't mean I didn't ask for it.

03:42PM 11        Q.   You don't remember getting a disk from me in

03:42PM 12   the mail with the record on it?

03:42PM 13        A.   I very well may have.  I probably did.

03:42PM 14        Q.   Since then we have spoken in passing just here

03:42PM 15   and there and we have talked about you come in and talk

03:42PM 16   and you said yeah.  We have never sat down and talked,

03:42PM 17   have we?

03:42PM 18        A.   No, ma'am.

03:42PM 19        Q.   Your request last year, I made the D. A. trial

03:42PM 20   files available to you for review.

03:42PM 21        A.   Yes, ma'am.

03:42PM 22        Q.   You haven't been upstairs to look at them.

03:42PM 23        A.   No, ma'am.  I didn't go back and dig through

03:42PM 24   them.

03:42PM 25        Q.   September of '09 we made an appointment for you

03:42PM   1   to come upstairs and do that very thing and you

03:42PM   2   cancelled on me the morning of, didn't you?

03:42PM   3       A.   Yes.

03:42PM   4       Q.   The Court has ordered you not once, but twice

03:43PM   5   to answer interrogatories filed by the defense.   Were

03:43PM   6   you aware of that?

03:43PM   7       A.   Yes.

03:43PM   8       Q.   But you haven't answered the interrogatories.

03:43PM   9   Can you tell me why?

03:43PM  10       A.   I thought this was -- the purpose of the

03:43PM  11   interrogatories were having the live hearing.

03:43PM  12       Q.   You preferred the live hearing rather than

03:43PM  13   answering the questions?

03:43PM  14       A.   No, no.   My understanding was that there was

03:43PM  15   going to be an evidentiary hearing.

03:43PM  16       Q.   No point in answering them?

03:43PM  17       A.   Yeah, essentially.

03:43PM  18       Q.   Okay.   Just briefly --

03:43PM  19            THE COURT:   Now, Judge, would you have let

03:43PM  20   me get away with that?

03:43PM  21            THE WITNESS:   Probably.

03:43PM  22       Q.   (By Ms. Smith) Now, let's just briefly go over

03:43PM  23   your qualifications.   I don't want to belabor the point.

03:43PM  24   You've been licensed since 1979.

03:43PM  25       A.   Yes, ma'am.

03:43PM  1       Q.   You're licensed to practice in federal court as
03:44PM  2   well.
03:44PM  3       A.   Yes, ma'am, in the Northern, Eastern, Western
03:44PM  4   district courts and United States District Court of
03:44PM  5   Appeals in New Orleans.
03:44PM  6       Q.   At the time of Mr. Halprin's trial you had been
03:44PM  7   licensed to practice for 24 years?
03:44PM  8       A.   Yes, ma'am.
03:44PM  9       Q.   You're board certified in criminal law and have
03:44PM 10   been since 1985.
03:44PM 11       A.   Yes, ma'am.
03:44PM 12       Q.   You're a former district court judge in Dallas
03:44PM 13   County.
03:44PM 14       A.   Yes, ma'am.
03:44PM 15       Q.   Did you preside over any death penalty trials
03:44PM 16   when you were a judge?
03:44PM 17       A.   Yes, ma'am.
03:44PM 18       Q.   Do you recall which ones?
03:44PM 19       A.   Yes.  I can recall the face.  Julius Whittier
03:44PM 20   was the defense lawyer, Bruce Anton either second chair
03:44PM 21   on that case or --
03:44PM 22       Q.   Kenneth Wayne Thomas?
03:44PM 23       A.   Yes, ma'am, I believe it was.
03:44PM 24            MR. ANTON:  Robert Newton.
03:44PM 25       A.   I apologize.  That was the car wash shooting

BRIDGET BARNHILL, OFFICIAL REPORTER

03:44PM 1  with the piece of jewelry.

03:44PM 2      Q.   (By Ms. Smith) You have presided over other

03:44PM 3  death penalty related proceedings, haven't you, ordered

03:45PM 4  an execution?

03:45PM 5      A.   Yes, ma'am.  I have ordered an execution of an

03:45PM 6  inmate.

03:45PM 7      Q.   And you were at the time of Mr. Halprin's trial

03:45PM 8  and you still are on the list of attorneys approved to

03:45PM 9  represent death penalty defendants in Dallas County,

03:45PM 10 aren't you?

03:45PM 11     A.   Yes, ma'am.  I currently have two death penalty

03:45PM 12 cases pending.

03:45PM 13          THE COURT:  One is in this court, I

03:45PM 14 believe; is that correct?

03:45PM 15          THE WITNESS:  That's correct, Your Honor.

03:45PM 16     Q.   (By Ms. Smith) As you have noted, there are

03:45PM 17 certain requirements for you to be on that list.

03:45PM 18     A.   Yes, ma'am.

03:45PM 19     Q.   You haven't been found ineffective is one of

03:45PM 20 them.

03:45PM 21     A.   That's one.

03:45PM 22     Q.   You got to keep up certain CLE hours.

03:45PM 23     A.   Yes, ma'am.

03:45PM 24     Q.   You have never been found ineffective before,

03:45PM 25 correct, in a death penalty case?

03:45PM  1      A.   Not in a death penalty case.  The only time

03:45PM  2   I've been found ineffective is when I went through my

03:45PM  3   first divorce.  I missed a notice of appeal deadline.  I

03:45PM  4   filed a motion with the court telling them I missed a

03:45PM  5   deadline; it was my fault.

03:45PM  6           The Court granted an extension for us to

03:45PM  7   file notice of appeal and said I was ineffective.  That

03:46PM  8   was probably in 1981 or 82 or somewhere in there.  I

03:46PM  9   can't remember which divorce that was.

03:46PM  10     Q.   I won't go there if you don't mind.  In any

03:46PM  11  event, Mr. Halprin was not your first death penalty

03:46PM  12  client, was he?

03:46PM  13     A.   No, no.  Matter of fact, I had represented

03:46PM  14  Gaylon Bradford with Paul Brauchle, death penalty case

03:46PM  15  that he had video of the shooting where Mr. Bradford

03:46PM  16  walks in and shoots him in the back and leans over and

03:46PM  17  shoots him again.

03:46PM  18     Q.   Did that get reversed based on error you

03:46PM  19  preserved?

03:46PM  20     A.   That's correct.

03:46PM  21          THE COURT:  Let the record reflect although

03:46PM  22  this witness may not recall, that's when I met this

03:46PM  23  witness was when I was observing that trial in Keith

03:46PM  24  Dean's court.

03:46PM  25     A.   I also suspect they're not going to be able to

BRIDGET BARNHILL, OFFICIAL REPORTER

03:46PM  1   execute him.  We established he was mentally retarded.

03:46PM  2   Under the IQ guidelines that the Supreme Court has now

03:47PM  3   says that you can't execute.  He was a 68 or 69.  That's

03:47PM  4   in the record and has been for some period of time.

03:47PM  5        Q.   (By Ms. Smith) Litigated the MR claim and

03:47PM  6   decided against him and he's set for execution.  Let's

03:47PM  7   move on to Paul Emilien.  That was back in 2007,

03:47PM  8   correct?

03:47PM  9        A.   That's correct.

03:47PM 10        Q.   Then you -- didn't you negotiate that case from

03:47PM 11   a death penalty to a life sentence?

03:47PM 12        A.   That's correct.  I forgot about that.

03:47PM 13        Q.   Ms. Schaefer, my co-counsel, worked with you on

03:47PM 14   that, didn't she?

03:47PM 15        A.   Yes.

03:47PM 16        Q.   Charles -- you're currently on Charles Payne,

03:47PM 17   Charles Payne who killed a police officer.

03:47PM 18             THE COURT:  Allegedly.

03:47PM 19        Q.   (By Ms. Smith) And Michael Turner?

03:47PM 20        A.   Allegedly.

03:47PM 21        Q.   You were appointed on Mr. Halprin's case right

03:47PM 22   after he got captured; is that correct?

03:47PM 23        A.   That's correct.

03:48PM 24        Q.   Technically you were second chair.  You said

03:48PM 25   you guys divided the responsibilities pretty evenly,

03:48PM 1    right?

03:48PM 2         A.    Yeah.   I mean I don't know that they were

03:48PM 3    divided evenly but they were kind of divided up.

03:48PM 4         Q.    You shared the load?

03:48PM 5         A.    Yes.   We shared it.   We tried to split it up so

03:48PM 6    we weren't somebody -- my experience is when you do

03:48PM 7    death penalty you try to split up the obligations or

03:48PM 8    what you are trying to do.

03:48PM 9         Q.    Didn't you go to Colorado right after the

03:48PM 10   capture to interview Mr. Halprin?

03:48PM 11        A.    Certainly did.   I saw Mr. Halprin in Colorado

03:48PM 12   when they still had him incarcerated up there before the

03:48PM 13   extradition hearing.

03:48PM 14        Q.    You got his story from him then?

03:48PM 15        A.    Yes, ma'am.

03:48PM 16        Q.    Hadn't he talked to some media by the time you

03:48PM 17   got there?

03:48PM 18        A.    Yes, ma'am.   He had given a televised

03:48PM 19   interview.   I forget what -- to whom.   CBS, ABC, CNN.   I

03:49PM 20   don't remember who it was.   They had allowed media

03:49PM 21   access up there.   Taylor County Sheriff's Office that

03:49PM 22   allowed the media access, something which always

03:49PM 23   surprises me.

03:49PM 24        Q.    You advised him not to make statements to the

03:49PM 25   media when you saw him.

03:49PM 1      A.   Certainly did.

03:49PM 2      Q.   Did he take your advice?

03:49PM 3      A.   Well, I don't know.  I'm trying to remember if

03:49PM 4  he gave any other media interviews after that point in

03:49PM 5  time.

03:49PM 6      Q.   Didn't he have an interview with Jay Bromley,

03:49PM 7  one of the local reporters in Dallas?

03:49PM 8      A.   He may have.  I don't recall.

03:49PM 9      Q.   Recall a Newsweek article?

03:49PM 10     A.   He may have.  I don't recall.

03:49PM 11     Q.   You said that you got access to all the records

03:49PM 12  from the co-defendants cases that had already been

03:49PM 13  tried.

03:49PM 14     A.   I believe so.

03:49PM 15     Q.   And you handled the pretrial motions in this

03:49PM 16  case, didn't you?

03:49PM 17     A.   I believe I did.

03:49PM 18     Q.   You incorporated all the pretrial motions that

03:49PM 19  had been filed by all the other defense attorneys in all

03:49PM 20  the other trials, didn't you?

03:50PM 21     A.   I believe I did.

03:50PM 22     Q.   I believe I met you in the clerk's office when

03:50PM 23  you were making copies of those.  Do you remember that?

03:50PM 24     A.   I believe that happened.

03:50PM 25     Q.   By the time Mr. Halprin's trial came around you

BRIDGET BARNHILL, OFFICIAL REPORTER

03:50PM  1    had a preview of the State's case, didn't you?

03:50PM  2        A.   Oh, yeah.

03:50PM  3        Q.   What was your opinion of that case?

03:50PM  4             THE COURT:  Can you be more specific?

03:50PM  5        Q.   (By Ms. Smith) On the issue of guilt what was

03:50PM  6    your opinion of the State's case?

03:50PM  7        A.   On the issue of guilt -- I'm not sure I can

03:50PM  8    answer that question just succinctly on the issue of

03:50PM  9    guilt.  Was it bad facts?  Yeah, it was bad facts.

03:50PM  10   Seven guys escaping from prison, holding handmade

03:50PM  11   weapons to people, taking guns, disappearing, committing

03:50PM  12   armed robberies while they're out and then ultimately

03:50PM  13   winding up in Irving and killing a police officer.

03:50PM  14   Those are not good facts.

03:50PM  15       Q.   Not for you?

03:50PM  16       A.   Not for any defense lawyer.  That being said,

03:51PM  17   whether or not that made Randy guilty of capital murder,

03:51PM  18   I don't think all of those facts make him guilty of

03:51PM  19   capital murder.  That's what the issues are for.  That's

03:51PM  20   what the burden of proof is for.

03:51PM  21            Certainly, certainly the issues pertaining

03:51PM  22   to did he have a weapon at the time, did that help him

03:51PM  23   or hurt him?  It certainly didn't help him.  It

03:51PM  24   certainly hurt him.  Being a part of this group, did it

03:51PM  25   help him or hurt him?  It certainly hurt him.

03:51PM  1    Escaping from police, did that help or hurt

03:51PM  2  him?  It hurt him.  Committing other aggravated

03:51PM  3  robberies while in the course of trying to flee, did

03:51PM  4  that help him or hurt him?  Certainly it hurt him.

03:51PM  5  There weren't very many good facts to be gleaned, any of

03:51PM  6  this.

03:51PM  7    Randy's prior criminal history wasn't -- it

03:51PM  8  wasn't lengthy and long with a long history of violence

03:52PM  9  but he had one case that was a bad case, the child case

03:52PM 10  out of Tarrant County.  That wasn't good.

03:52PM 11    Q.   You had your work cut out for you, didn't you?

03:52PM 12    A.   Certainly.

03:52PM 13    Q.   Wasn't going to be easy.  You thought you had

03:52PM 14  something to work with, right?

03:52PM 15    A.   You always think you have something to work

03:52PM 16  with.

03:52PM 17    THE COURT:  Let's move on.  I might as well

03:52PM 18  state I was in this building working along with all of

03:52PM 19  y'all when these cases were going on and there was no

03:52PM 20  question.  It was the talk of the building and the fact

03:52PM 21  these guys were, quote, poster children for the death

03:52PM 22  penalty, unquote.  That's pretty much what the

03:52PM 23  atmosphere was.  I get it.

03:52PM 24    Q.   (By Ms. Smith) I'll move on.

03:52PM 25    A.   Did I think we had a shot at winning it?  I

BRIDGET BARNHILL, OFFICIAL REPORTER

03:52PM 1    think I have a shot at winning every case.

03:52PM 2        Q.   You kept them deliberating for six hours on

03:52PM 3    punishment, didn't you?

03:52PM 4        A.   Yeah.

03:53PM 5        Q.   Overnight?

03:53PM 6        A.   I thought we had a shot of hanging them up on

03:53PM 7    that.

03:53PM 8        Q.   You said that Mr. Halprin was primarily your

03:53PM 9    responsibility as far as developing him as a witness; is

03:53PM 10   that correct?

03:53PM 11       A.   I put him on.

03:53PM 12       Q.   He testified at guilt, right?

03:53PM 13       A.   Right.

03:53PM 14       Q.   Was there a plan for him to testify at

03:53PM 15   punishment?

03:53PM 16       A.   Well, I never make that decision prior to the

03:53PM 17   trial.  I don't make that decision necessarily on the

03:53PM 18   guilt-innocence phase until I get to that point in time

03:53PM 19   where you don't have anybody else to put on and you're

03:53PM 20   trying to decide your defendant is going to put on.  You

03:53PM 21   prepare people for it but you may do it; you may not do

03:53PM 22   it.

03:53PM 23              Now, we discussed testifying with Randy.

03:53PM 24   Randy decided he wanted to testify in his own behalf.

03:53PM 25   We put him on the witness stand.  He testified.

03:53PM  1  Punishment phase came up.  I think the general consensus

03:53PM  2  between George and I was he didn't do well on the

03:54PM  3  witness stand during guilt.  Don't give Toby another

03:54PM  4  shot at him on punishment.  We discussed that with Randy

03:54PM  5  and Randy advised us he didn't want to testify in

03:54PM  6  punishment.

03:54PM  7      Q.   He knew he had a right to testify in

03:54PM  8  punishment?

03:54PM  9      A.   Yeah.

03:54PM 10      Q.   There's no doubt about that?

03:54PM 11      A.   There's not any doubt about that, no.

03:54PM 12      Q.   The decision to testify was his alone, wasn't

03:54PM 13  it?

03:54PM 14      A.   It's always the defendant's decision.

03:54PM 15           THE COURT:  Can we move on?

03:54PM 16      Q.   (By Ms. Smith) You've been asked about why you

03:54PM 17  didn't object to Mr. Shook's cross-examination of Randy.

03:54PM 18  Wasn't your strategy when you put him on on direct to

03:54PM 19  portray him as somebody who wouldn't have killed

03:54PM 20  anybody, just got in with the wrong crowd, he's a sad,

03:54PM 21  pitiful character who is not very bright?  Am I being

03:55PM 22  inaccurate in any way?

03:55PM 23      A.   No.  We were certainly trying to portray him as

03:55PM 24  the least culpable of any of the individuals.  He wasn't

03:55PM 25  down there for -- he was down there for engaging in some

03:55PM 1  conduct that by all purposes he was under the influence

03:55PM 2  of LSD at the time it took place which was an injury to

03:55PM 3  a child case.

03:55PM 4         The injuries was bad.  He was very young at

03:55PM 5  the time.  I believe he was 18 when that offense took

03:55PM 6  place.  He was living in a homeless shelter for a while.

03:55PM 7  His parents kicked him out.  There was all kinds of

03:55PM 8  other things.

03:55PM 9         The problems -- Randy -- certainly Randy

03:55PM 10 was and still is in my opinion the least culpable of any

03:55PM 11 of the individuals that escaped from prison.  That's how

03:55PM 12 we tried to present it.

03:55PM 13    Q.   Clearly, it wasn't just his character as a

03:55PM 14 truthteller that was at issue in his testimony.  It was

03:56PM 15 also whether or not he was the kind of person that would

03:56PM 16 have murdered anybody, correct?

03:56PM 17    A.   Certainly.

03:56PM 18    Q.   There were aspects to his testimony that

03:56PM 19 related to his character specifically, didn't they?

03:56PM 20    A.   Oh, you know what?  I don't know without

03:56PM 21 reading the whole transcript of my direct of him.  I

03:56PM 22 honestly don't remember.

03:56PM 23    Q.   You brought out one of the -- one of the issues

03:56PM 24 that came up during cross, he wrote the letter writing

03:56PM 25 about how he was trying to manipulate the jury about

03:56PM 1   wearing glasses and how he was dressed.

03:56PM 2       A.   I believe he did that.  I don't have a clear

03:56PM 3   reaction.  That's something I would do to diffuse

03:56PM 4   something.

03:56PM 5       Q.   Mr. Shook brought it out on cross.  You

03:56PM 6   mentioned it earlier today.

03:56PM 7       A.   Right.

03:56PM 8       Q.   Clearly, Mr. Shook was trying to not only

03:56PM 9   attack his credibility as a witness, he was also trying

03:57PM 10  to refute the character that you had tried to portray

03:57PM 11  him as on direct, wasn't he?

03:57PM 12      A.   I don't know what Mr. Shook was doing.  Is that

03:57PM 13  a reasonable explanation of what he was doing?  Sure.

03:57PM 14  I'm sure it is.

03:57PM 15      Q.   Didn't you on direct try to establish that

03:57PM 16  there was a reason for the prior conviction, the prior

03:57PM 17  injury to a child case, that Randy was on drugs, he

03:57PM 18  flipped out?

03:57PM 19      A.   Yeah, I recall doing that.

03:57PM 20      Q.   You brought out through Randy that he had been

03:57PM 21  adopted and lived with these adoptive parents, sent off

03:57PM 22  to school.  You brought all of that out on direct.

03:57PM 23      A.   Yes, ma'am.  I believe I did.

03:57PM 24      Q.   You injected mitigation into the guilt phase of

03:57PM 25  trial, didn't you?

| | | |
|---|---|---|
| 03:57PM | 1 | A.   Tried to. |
| 03:57PM | 2 | Q.   Those weren't relevant to guilt, were they? |
| 03:57PM | 3 | A.   I don't know.  They might be. |
| 03:57PM | 4 | Q.   You were trying to head it off at the pass, |
| 03:57PM | 5 | weren't you? |
| 03:57PM | 6 | A.   Trying to win. |
| 03:57PM | 7 | Q.   Okay. |
| 03:57PM | 8 | A.   Trying to put him in the best light possible |
| 03:57PM | 9 | based on the facts and circumstances. |
| 03:57PM | 10 | Q.   When Mr. Shook started cross-examining him with |
| 03:58PM | 11 | the letters and continued to cross-examine him with the |
| 03:58PM | 12 | letters were you surprised that Mr. Shook had read every |
| 03:58PM | 13 | single one of those letters? |
| 03:58PM | 14 | A.   No.  I know Mr. Shook.  I have dealt with Mr. |
| 03:58PM | 15 | Shook over a number of years.  He's got a great memory. |
| 03:58PM | 16 | He's got a great mind. |
| 03:58PM | 17 | Q.   He read every single one of those letters, not |
| 03:58PM | 18 | knowing if Mr. Halprin was going to testify, didn't he? |
| 03:58PM | 19 | A.   I don't know what he did.  I don't know if Mr. |
| 03:58PM | 20 | Shook read every one of the letters.  I don't have |
| 03:58PM | 21 | personal knowledge of that.  If he did that, that |
| 03:58PM | 22 | wouldn't surprise me. |
| 03:58PM | 23 | Q.   Appeared to have a very good grasp of what was |
| 03:58PM | 24 | in the letters, didn't he? |
| 03:58PM | 25 | A.   Oh, yes. |

03:58PM  1      Q.   Do you recall how you tried to deal with how

03:58PM  2  badly Mr. Halprin did on cross when you got him back on

03:58PM  3  redirect?

03:58PM  4      A.   Not without reading the transcript, honestly,

03:58PM  5  no.  I'm sure I tried to patch it up somehow.

03:59PM  6      Q.   You remember offering all sort of letters he

03:59PM  7  wrote?

03:59PM  8      A.   Yeah, I do.  I remember that.

03:59PM  9      Q.   You made a big show of them, stacked them up in

03:59PM 10  the middle of the courtroom?

03:59PM 11      A.   Yes, ma'am, I did.  I remember that now.  Sure

03:59PM 12  did.  Had them in binders, separated out in binders and

03:59PM 13  offered them all.

03:59PM 14      Q.   Correct me if I'm wrong.  It's been a while.

03:59PM 15  Maybe four, five, six of those big binders?

03:59PM 16      A.   Yes, ma'am, quite a few letters.

03:59PM 17      Q.   You used his poor performance on cross to

03:59PM 18  further your defensive theory this guy wasn't very

03:59PM 19  bright.

03:59PM 20      A.   That's true.  Trying to portray him as the low

03:59PM 21  man on the totem pole.

03:59PM 22      Q.   You even argued that Mr. Shook -- Mr. Halprin

03:59PM 23  thought he could take on Mr. Shook, the seasoned

03:59PM 24  prosecutor.  That shows you exactly how dumb he really

03:59PM 25  is.  Do you recall that?

03:59PM  1      A.   I don't recall that.  I may have said that.  I

03:59PM  2  have to go back through the transcript of the record,

04:00PM  3  the statement of facts to see what I said.  I honestly

04:00PM  4  don't recall.

04:00PM  5      Q.   Were you surprised by how poorly he performed

04:00PM  6  on cross?

04:00PM  7      A.   No, I'm not surprised.  I'm not surprised when

04:00PM  8  any defendant does poorly on cross.  It's one thing to

04:00PM  9  go over testimony in a jail cell and do that.  It's

04:00PM  10  another thing to hit the witness stand and watch

04:00PM  11  somebody go off on some tangent you haven't heard about

04:00PM  12  yet.

04:00PM  13      Q.   You tried to prepare him for cross.

04:00PM  14      A.   Certainly you prepare people for cross.  That

04:00PM  15  doesn't mean they do what they have done in the past.

04:00PM  16  You take it as it comes.  Sometimes it's completely

04:00PM  17  removed from what you have been planning.

04:00PM  18      Q.   Do you remember during your direct examination

04:00PM  19  of him when he asked the Judge to tell the prosecutors

04:01PM  20  to stop looking at him?

04:01PM  21      A.   I remember him asking the Judge that.

04:01PM  22      Q.   Were you a little taken aback by that?

04:01PM  23      A.   I didn't think it was helpful.

04:01PM  24      Q.   How do you think it made him look?

04:01PM  25      A.   Childish.

04:01PM 1   Q.   In that sense didn't it sort of help your

04:01PM 2   defensive theory?

04:01PM 3   A.   Well, I don't know.  Might have.  Once again,

04:01PM 4   you try to take what occurs and explain it in the light

04:01PM 5   most favorable to your position.  I would have described

04:01PM 6   it as being naive, unsophisticated.

04:01PM 7   Q.   Let's talk a little bit about your strategy in

04:01PM 8   dealing with evidence you couldn't get in, namely, some

04:02PM 9   oral statements by the co-defendants that you were asked

04:02PM 10  about on direct examination here today, in particular

04:02PM 11  statements that Newbury, Rodriguez and Murphy told law

04:02PM 12  enforcement, oral statements that you didn't offer in

04:02PM 13  guilt.

04:02PM 14          Now, do you recall Rodriguez and Murphy

04:02PM 15  telling a couple of FBI agents that Halprin didn't fire

04:02PM 16  a gun at the offense?

04:02PM 17  A.   I recall that.

04:02PM 18  Q.   It came in through Rodriguez' and Murphy's

04:02PM 19  confessions which you admitted, didn't it?

04:02PM 20  A.   Without seeing them, I can't tell you that.

04:02PM 21  That very well may have been.  Once again, I don't

04:02PM 22  recall.  I don't have a clear recollection of the

04:02PM 23  specifics of what was in the confessions.

04:02PM 24  Q.   It's been a long, long time, hasn't it?

04:02PM 25  A.   Seven years.

04:02PM 1     Q.   That affected your memory on this a little bit?

04:02PM 2     A.   It reflects -- yeah, my recollection of

04:03PM 3  specific pieces of evidence.  I don't have Toby's

04:03PM 4  photographic memory, I guess.

04:03PM 5     Q.   So I hear about Toby, not you.  Toby's --

04:03PM 6     A.   I guess that doesn't say much for me.

04:03PM 7     Q.   Do you recall by chance cross-examining

04:03PM 8  Detective Spivey who was the lead detective on this case

04:03PM 9  about Murphy's statement and getting it in through him?

04:03PM 10    A.   I recall that.  I don't know -- once again, I'm

04:03PM 11 trying to recall the substance of Murphy's statement

04:03PM 12 through Spivey.  Without reading it specifically, I

04:03PM 13 can't remember the specifics of it.  I know I attempted

04:03PM 14 to get that information out in the presence of the jury

04:03PM 15 through a variety of witnesses.

04:03PM 16    Q.   You didn't get these oral statements in through

04:03PM 17 the notes of the officers who took them or the officers

04:03PM 18 themselves but you did get the statements in, just

04:03PM 19 another way, right?

04:03PM 20         THE COURT:  Did he?

04:03PM 21    A.   If I did, I did.  If I didn't, I didn't.

04:04PM 22    Q.   (By Ms. Smith) I'll move on.

04:04PM 23    A.   Just tell you.  I don't remember.  I apologize

04:04PM 24 for not having re-read the entire trial transcript

04:04PM 25 before coming here.

04:04PM 1    Q.   That's okay.  I'll move on.

04:04PM 2              THE COURT:  It's a long read.

04:04PM 3              THE WITNESS:  Yes, Your Honor.  I'm sure it

04:04PM 4    is.

04:04PM 5       Q.   (By Ms. Smith) Not being able to offer, say,

04:04PM 6    the co-defendants' statement in or the ranking document

04:04PM 7    in itself really didn't stop you from putting that in

04:04PM 8    front of the jury, did it?

04:04PM 9       A.   Well, you know, the co-defendants' statements

04:04PM 10   are one thing.  The co-defendants' statements are not

04:04PM 11   necessarily of the same weight and value of a ranking

04:04PM 12   document.  I got to tell you that putting on -- calling

04:04PM 13   Newbury or Murphy or Rivas or any of the other guys had

04:04PM 14   no real value in the defense of Randy just because they

04:04PM 15   were subject to so much cross-examination and damage.

04:04PM 16              I mean you just -- you're trying to

04:05PM 17   separate Randy from that group, not tie him to that

04:05PM 18   group.  And by them wanting to help him by testifying or

04:05PM 19   whatever, first of all, you know, truthtellers they

04:05PM 20   weren't.  The ranking document is different.

04:05PM 21              The ranking document is law enforcement's

04:05PM 22   perception of who Randy Halprin is.  That's completely

04:05PM 23   different.  That's of different value.

04:05PM 24      Q.   We'll get to that.

04:05PM 25      A.   All right.

BRIDGET BARNHILL, OFFICIAL REPORTER

04:05PM 1    Q.   You throughout trial injected information into

04:05PM 2  your questions, two questions that you were otherwise

04:05PM 3  unable to get into evidence, didn't you?

04:05PM 4    A.   I'm known to do that.  Yes, ma'am.

04:05PM 5    Q.   Just a little?

04:05PM 6    A.   Just a little.

04:05PM 7    Q.   In fact Mr. Shook repeatedly objected to you

04:05PM 8  doing that throughout the trial, didn't he?

04:05PM 9    A.   I recall Mr. Shook making some objections, yes,

04:05PM 10 ma'am.

04:05PM 11   Q.   Didn't he ask the Judge to instruct you to stop

04:05PM 12 doing it at one point?

04:06PM 13   A.   I'm sure that was helpful and I'm sure he did.

04:06PM 14   Q.   Didn't stop you?

04:06PM 15   A.   I don't remember.  I would have obeyed any

04:06PM 16 instruction from the Court.

04:06PM 17   Q.   Do you recall having a bench conference after

04:06PM 18 that at which Mr. Shook turned to you and asked you

04:06PM 19 please to stop doing it?

04:06PM 20   A.   Well, that might have happened.  I don't recall

04:06PM 21 somebody asking me "please."

04:06PM 22   Q.   You think if he went to that length he was

04:06PM 23 probably enormously frustrated with his efforts to stop

04:06PM 24 you?

04:06PM 25   A.   I can't answer.

04:06PM  1          THE COURT:  Is Mr. Shook not known for

04:06PM  2   saying "please"?

04:06PM  3          MS. SMITH:  No.  It's just that normally an

04:06PM  4   objection suffices.  It did not with Mr. King.

04:06PM  5      A.  I must not have understood the specifics of the

04:06PM  6   objection.

04:06PM  7          THE COURT:  Mr. King and I have discussed

04:06PM  8   this matter in the past.  Let's move on.

04:06PM  9      Q.  (By Ms. Smith) Regard to the foot wound

04:06PM 10   evidence, I read the record, too.  It looked to me like

04:07PM 11   you got the medical records in related to Randy's foot.

04:07PM 12   Do you not remember that?

04:07PM 13      A.  Not really.  I don't recall.  I don't think

04:07PM 14   that the entry wound was the issue.  Once again, I have

04:07PM 15   not seen the actual -- I have seen the doctor's

04:07PM 16   affidavit.  I'm familiar with what happened with the

04:07PM 17   wound and I don't recall whether or not -- quite

04:07PM 18   frankly, the wound happened one of two ways.

04:07PM 19          Either Randy actually discharges a weapon

04:07PM 20   intentionally or it falls out of his pants.  And Randy

04:07PM 21   had told law enforcement the gun slipped down his pants.

04:07PM 22   It could have hit the ground.  It was a revolver.  Could

04:07PM 23   have hit the ground, shot sideways, blown through his

04:07PM 24   toe.

04:07PM 25          He could have shot straight down, the

04:07PM 1   bullet fragmented, went through his toe.  The bullet

04:08PM 2   could have come from some other direction, hit the

04:08PM 3   ground or gone through his toe.  Either one is possible

04:08PM 4   and there is no way to tell other than there wasn't any

04:08PM 5   stippling on his foot to show it was a close contact

04:08PM 6   wound, within a couple of feet.

04:08PM 7            That kind of removes Randy shooting himself

04:08PM 8   but I think that was in the presentation of the jury.

04:09PM 9     Q.   You brought out the fact that Halprin was shot

04:09PM 10   in the crossfire through Detective Spivey's testimony

04:09PM 11   and also through Halprin himself on direct examination.

04:09PM 12   Do you recall that?

04:09PM 13     A.   I'm sure I discussed that with Spivey.  I know

04:09PM 14   I brought that out with Randy.  Yes, ma'am.

04:10PM 15     Q.   You argued it in closing that he got shot in

04:10PM 16   the crossfire.

04:10PM 17     A.   Yes, ma'am.

04:10PM 18     Q.   Didn't Mr. Shook concede that in his closing

04:10PM 19   argument?

04:10PM 20     A.   I don't recall.  He may have.  I honestly don't

04:10PM 21   recall.  The record will reflect whatever the final

04:10PM 22   argument is.  Once again, I don't have a clear

04:10PM 23   recollection.

04:10PM 24     Q.   Was it really a big bone of contention at trial

04:10PM 25   whether he shot himself in the foot or shot in the

04:10PM  1   crossfire?

04:10PM  2       A.   Well, shooting himself would indicate that he

04:10PM  3   had pulled the trigger possibly.  That's a little

04:10PM  4   different than getting shot in the crossfire.  The entry

04:10PM  5   wound -- I'm trying to recall -- I don't recall what the

04:10PM  6   medical report says, whether there was any debris from

04:10PM  7   the road that was found inside the toe that made me

04:10PM  8   nervous.

04:10PM  9       Q.   It wasn't hotly contested by the State, was it?

04:10PM 10       A.   Not the entry wound itself, no.  It was clearly

04:10PM 11   on the side of the toe, not the top.  You would think if

04:11PM 12   he shot himself in the toe, it would come from the top.

04:11PM 13   I think I argued that.

04:11PM 14       Q.   I want to talk to you briefly about this

04:11PM 15   anti-parties instruction.  When Mr. Anton is asking you

04:11PM 16   why you didn't ask for an anti-parties instruction what

04:11PM 17   kind of instruction do you think he's asking you about?

04:11PM 18       A.   Oh, well, that he is asking me that -- under a

04:11PM 19   parties charge if you agree to commit one felony and

04:11PM 20   somebody else commits another felony in the course of

04:11PM 21   committing a felony that should have been anticipated,

04:11PM 22   then that individual can get found guilty of capital

04:11PM 23   murder.

04:11PM 24            So a person in the guilt-innocence phase --

04:11PM 25   a person that knows his co-defendant is going in a store

BRIDGET BARNHILL, OFFICIAL REPORTER

04:11PM 1   with a gun and the gun is loaded and the person has said

04:12PM 2   something to the effect of "If anybody gets in my way

04:12PM 3   I'm going to kill them," can certainly get found guilty

04:12PM 4   of capital murder if they're just sitting in the car,

04:12PM 5   even though they didn't intend to kill anybody.  And

04:12PM 6   sometimes even the facts may be less than that as far as

04:12PM 7   should have anticipated.

04:12PM 8           Now, that being said, I suspect what he was

04:12PM 9   referring to is some type of charge, "Now, in the

04:12PM 10  event -- unless you believe beyond a reasonable doubt

04:12PM 11  that Randy Halprin intended or did know that shooting or

04:12PM 12  taking a life was part of this" -- I'm not phrasing it

04:12PM 13  very well.

04:12PM 14          I haven't thought about it before walking

04:12PM 15  in here today -- some charge -- I'm sure there's

04:12PM 16  something in McClung's that's there.

04:12PM 17      Q.   Did you think he was asking about why you

04:13PM 18  didn't ask for some sort of converse instruction to the

04:13PM 19  application paragraph in the guilt charge?

04:13PM 20      A.   Yeah, I think so.

04:13PM 21      Q.   What if he is talking about an instruction at

04:13PM 22  punishment?  Do you know what he might be referring to?

04:13PM 23      A.   Then he would be referring to actual

04:13PM 24  anticipation.

04:13PM 25      Q.   Isn't the second special issue an anti-parties

04:13PM 1  instruction?

04:13PM 2      A.   In some aspects it is.  When you are talking

04:13PM 3  about did he -- did he take the life or did he

04:13PM 4  anticipate that a life would be taken.

04:13PM 5      Q.   The jury got an anti-parties instruction?

04:13PM 6      A.   The burden of proof is on the State to prove

04:13PM 7  that he did anticipate.  That's a burden of proof beyond

04:13PM 8  a reasonable doubt.

04:13PM 9      Q.   There's no need to ask for a second instruction

04:13PM 10 that's already in the charge, right?

04:13PM 11     A.   I don't know that I have asked for one in the

04:13PM 12 past.  I don't know that it's not a good practice to do

04:14PM 13 that.  There wasn't one in the Court's charge.  I don't

04:14PM 14 think that we thought it was necessary at the time.

04:14PM 15 Otherwise, we probably would have asked for it.

04:14PM 16     Q.   You've been asked why you didn't object to some

04:14PM 17 closing argument by the prosecutor about telling the

04:14PM 18 jury they should find him -- should answer the parties

04:14PM 19 issue yes because he took a gun to the robbery.  Is it

04:14PM 20 possible that that argument they have referred you to is

04:14PM 21 being taken out of context?

04:14PM 22     A.   I don't know.  I'd have to go back and re-read

04:14PM 23 the whole argument.  I mean once again --

04:14PM 24     Q.   Wasn't asking the jury to disregard all the

04:14PM 25 other facts that showed anticipation like the fact that

04:15PM  1    he is an escapee on the lam with six other guys

04:15PM  2    committing robberies.  He didn't say, "Disregard that.

04:15PM  3    All you have to look for is he has got a gun and going

04:15PM  4    to a robbery," did he?

04:15PM  5        A.   I don't recall.  I don't recall.  He may not

04:15PM  6    have.

04:15PM  7        Q.   Probably didn't?

04:15PM  8        A.   I don't know.  Without re-reading it myself, I

04:15PM  9    don't know.

04:15PM  10        Q.   All right.  Let's talk about the ranking

04:15PM  11    document.  You clearly have some strong feelings about

04:15PM  12    it.  Is that accurate?

04:15PM  13        A.   Yeah.

04:15PM  14        Q.   A little hot about it?

04:15PM  15        A.   No.

04:15PM  16        Q.   No?  Really?

04:15PM  17        A.   When I am hot you know I'm hot.  This isn't

04:15PM  18    hot.

04:15PM  19        Q.   Okay.

04:15PM  20        A.   Hot is after my wife chews on me.  That's hot.

04:15PM  21        Q.   You said that you hadn't seen Hank Whitman's

04:15PM  22    affidavit about the ranking document.

04:15PM  23        A.   No, I haven't.  I don't recall seeing it.  I

04:15PM  24    don't think it was in anything that I saw.  Is it in any

04:16PM  25    of the writ documents?

BRIDGET BARNHILL, OFFICIAL REPORTER

| | | |
|---|---|---|
| 04:16PM | 1 | Q.   No, sir. |
| 04:16PM | 2 | A.   I should have taken the time to review the |
| 04:16PM | 3 | State's side of it but I didn't.  Sorry. |
| 04:16PM | 4 | Q.   That's okay.  My feelings aren't hurt. |
| 04:16PM | 5 | A.   They shouldn't be. |
| 04:16PM | 6 | Q.   Would you read the highlighted portion? |
| 04:16PM | 7 | A.   (Examines document). |
| 04:17PM | 8 | Q.   Having read the affidavit about what the |
| 04:17PM | 9 | document -- what information the document was supposed |
| 04:17PM | 10 | to relay, it wasn't exactly what you thought it was, was |
| 04:17PM | 11 | it? |
| 04:17PM | 12 | A.   No.  I think it's exactly what I think it is. |
| 04:17PM | 13 | I'll tell you something.  I got appointed as a special |
| 04:17PM | 14 | prosecutor down in El Paso back in 2006 -- 2006.  At |
| 04:17PM | 15 | that time since I was on this court inquiry down there, |
| 04:17PM | 16 | I had all the powers of the El Paso assistant district |
| 04:17PM | 17 | attorneys. |
| 04:17PM | 18 | Ranger Whitman -- I went and contacted him. |
| 04:17PM | 19 | I didn't -- I mean I went and talked to him, never |
| 04:17PM | 20 | talked to him about the Texas Seven, quiet frankly, |
| 04:17PM | 21 | although I think that came up in passing because I was |
| 04:18PM | 22 | asking him for assistance because I was investigating |
| 04:18PM | 23 | the El Paso Police Department.  That's not a friendly |
| 04:18PM | 24 | thing to be doing in that part of the country. |
| 04:18PM | 25 | I don't think -- I think the value of that |

04:18PM  1   document is that if you know who has been interviewed
04:18PM  2   and you know that they're giving information, there's
04:18PM  3   exculpatory information, there's mitigating information
04:18PM  4   in the reports that are being generated to make that
04:18PM  5   document.
04:18PM  6              And, yes, I think that document
04:18PM  7   specifically shows -- I understand what Mr. Whitman is
04:18PM  8   saying in 2008 and I am sure he thinks everybody down in
04:18PM  9   TDC is dangerous.  That wouldn't surprise me.  Certainly
04:18PM  10  putting Mr. Halprin at that low end certainly is
04:18PM  11  something that is helpful in a capital murder case.
04:18PM  12       Q.   Certainly is but in reality --
04:19PM  13       A.   That's not how Mr. Halprin was portrayed during
04:19PM  14  the course of the trial.  He was portrayed as clever and
04:19PM  15  all this other stuff.  And from what I garner from this
04:19PM  16  report now, there was people saying he was dumb as a bag
04:19PM  17  of hammers and those were TDCJ people.  We got some of
04:19PM  18  that in but it would have been nice to have more of that
04:19PM  19  in.
04:19PM  20       Q.   The document really doesn't place Randy dead
04:19PM  21  last, does it?
04:19PM  22       A.   I thought he did, yeah.
04:19PM  23       Q.   He said the last three defendants in the
04:19PM  24  ranking document, Garcia, Murphy and Halprin, were equal
04:19PM  25  in leadership and --

BRIDGET BARNHILL, OFFICIAL REPORTER

04:19PM 1          THE COURT:  Excuse me.  Excuse me.  We're

04:19PM 2  getting into semantics.  The document put him dead last.

04:19PM 3  Another document generated on behalf of the State after

04:19PM 4  the trial put him as the bottom three.

04:20PM 5      A.  Ms. Smith, I'll tell you.  Part of the

04:20PM 6  problem --

04:20PM 7          THE COURT:  Excuse me.  Wait until the next

04:20PM 8  question.

04:20PM 9          THE WITNESS:  Thank you, Your Honor.

04:20PM 10         THE COURT:  You may ask your next question.

04:20PM 11     Q.  (By Ms. Smith) Do you think that Mr. Shook lied

04:20PM 12 to you about he knew where the document came from?

04:20PM 13     A.  I have a hard time understanding how nobody in

04:20PM 14 the D. A.'s office has any knowledge of a document

04:20PM 15 that's in a box of discovery that's separated.  I don't

04:20PM 16 know whose responsibility that was in the D. A.'s

04:20PM 17 office.

04:20PM 18     Q.  Mr. King --

04:20PM 19     A.  But I tell you right now I don't believe for

04:20PM 20 one minute that people weren't aware of who generated

04:20PM 21 that document or where it came from.

04:20PM 22     Q.  You keep saying "people in the D. A.'s office."

04:20PM 23 Are you referring to Mr. Shook?

04:20PM 24     A.  I'm referring to anybody in the D. A.'s office.

04:21PM 25         THE COURT:  Excuse me.  I think you need to

BRIDGET BARNHILL, OFFICIAL REPORTER

04:21PM  1   stand when you address the Court.

04:21PM  2              MR. ANTON:  I don't care what kind of

04:21PM  3   proceeding it is.  No witness can pass upon the veracity

04:21PM  4   of any witness.

04:21PM  5              THE COURT:  Are you objecting to the

04:21PM  6   question?

04:21PM  7              MR. ANTON:  Yes.

04:21PM  8              THE COURT:  Sustained.

04:21PM  9       A.   I don't know whose responsibility --

04:21PM 10              THE COURT:  Excuse me.  I sustained the

04:21PM 11   objection.

04:21PM 12              MR. KING:  Apologize.  I don't do well

04:21PM 13   under pressure.

04:21PM 14       Q.   (By Ms. Smith) Would it surprise you to find

04:21PM 15   Mr. Whitman was never in contact with anybody from this

04:21PM 16   D. A.'s office?

04:21PM 17       A.   Oh, I find that surprising.

04:21PM 18       Q.   Would you be surprised to find he was upset

04:21PM 19   that nobody contacted him from this office?

04:21PM 20       A.   I wouldn't find that surprising.

04:22PM 21       Q.   Thank you, Mr. King.

04:22PM 22              MS. SMITH:  Pass the witness.

04:22PM 23       A.   Yes, ma'am.

04:22PM 24              MR. ANTON:  We have no further questions.

04:22PM 25              THE COURT:  Mr. King, I have some

04:22PM   1   questions.

04:22PM   2              THE WITNESS:  Yes, sir.

04:22PM   3                     EXAMINATION

04:22PM   4   BY THE COURT:

04:22PM   5        Q.   Regarding the ranking document, you became

04:22PM   6   aware of the ranking document prior to the commencement

04:22PM   7   of the guilt-innocence phase; is that correct?

04:22PM   8        A.   Yes, sir.

04:22PM   9        Q.   What was your theory for admission of the

04:22PM  10   ranking document at the guilt-innocence phase or

04:22PM  11   punishment phase, for that matter?

04:22PM  12        A.   We believed it to be part of the business

04:22PM  13   records of the Texas Department of Criminal Justice.  We

04:22PM  14   believed it had been generated during the course of the

04:22PM  15   investigation by law enforcement.  We believed that it

04:23PM  16   had been obviously separated.

04:23PM  17              We believed that the D. A.'s office had

04:23PM  18   knowledge of or law enforcement had knowledge of this

04:23PM  19   document and the ranking contained therein and it had

04:23PM  20   been done as a result --

04:23PM  21        Q.   What's the theory for its admission?  It's

04:23PM  22   clearly a document that's written that says what someone

04:23PM  23   else said and actually said what someone else said,

04:23PM  24   other people said.  What was your theory of

04:23PM  25   admissibility?

04:23PM 1      A.   We thought it was a business record under the

04:23PM 2 business record exception.  If we had known that it

04:23PM 3 was -- the specific officer who generated the report,

04:23PM 4 would have issued a subpoena for him, asked him if he

04:23PM 5 prepared that document, what the purpose of the document

04:23PM 6 was and ask him whether or not Mr. Halprin was the last

04:23PM 7 name on the ranking document of leadership.

04:23PM 8           That's how we would have gotten it in

04:23PM 9 evidence.  Not knowing -- once you don't know who did

04:24PM 10 that document and everybody denies even seeing the

04:24PM 11 document before, even though it's in your stack of

04:24PM 12 discovery, you know that's not the truth.

04:24PM 13      Q.   Okay.  Did you prior to the trial -- when I say

04:24PM 14 "the trial" I'm talking about anything after the voir

04:24PM 15 dire stage.  Did you have any discussion with anyone

04:24PM 16 from the State about the source of that document?

04:24PM 17      A.   Yes, sir.

04:24PM 18      Q.   Do you recall who?

04:24PM 19      A.   I know we did with Tom D'Amore and I know I did

04:24PM 20 with Toby.  Everybody that was involved on that, we kept

04:24PM 21 asking them where it was and everybody said, "We don't

04:24PM 22 know what it is," hadn't seen that before, don't have a

04:24PM 23 clue.

04:24PM 24      Q.   This occurred before the jury is in the box,

04:24PM 25 these discussions?

04:24PM 1      A.   Yes, sir.  I believe so.  I think that was an

04:24PM 2  on-going during the course of the trial.

04:24PM 3      Q.   Did you or Mr. Ashford ask for a continuance to

04:25PM 4  determine that information?

04:25PM 5      A.   I don't believe so.  All the witnesses

04:25PM 6  denied -- all the record custodians denied having any

04:25PM 7  knowledge and that it wasn't their document.  Now, it

04:25PM 8  ended up later being, I understand, being found in the

04:25PM 9  Office of the Inspector General in their file.

04:25PM 10     Q.   The answer is you did not?

04:25PM 11     A.   We did not move for a continuance at that time,

04:25PM 12 no.

04:25PM 13     Q.   When you offered it during the trial once the

04:25PM 14 jury is in the box did you have a good faith belief that

04:25PM 15 it would become admissible -- that it would be

04:25PM 16 admissible as a business records -- as a business

04:25PM 17 record?

04:25PM 18     A.   Yes, sir.

04:25PM 19     Q.   And when the Judge shot you down did you ask

04:26PM 20 for a continuance?

04:26PM 21     A.   No, sir.

04:26PM 22     Q.   Why not?  Do you know?

04:26PM 23     A.   Well, I'm trying to recall if we had asked for

04:26PM 24 a continuance previously from Judge Cunningham and that

04:26PM 25 he either -- I can't remember if it was on the record or

04:26PM  1   off the record about something else.

04:26PM  2        Q.   Was he known for being particularly patient on

04:26PM  3   trying these cases?

04:26PM  4        A.   Oh, you know how judges are, Your Honor.  They

04:26PM  5   try to be patient.

04:26PM  6        Q.   We do.

04:26PM  7        A.   Trials try patience.  We did not -- I don't

04:26PM  8   believe we asked -- moved for a continuance based on

04:26PM  9   that.

04:26PM  10       Q.   Would it be a fair assessment that when you

04:26PM  11  were unable to get the ranking document in you were

04:27PM  12  blind-sided or felt blind-sided?

04:27PM  13       A.   My opinion is that it is Brady.

04:27PM  14       Q.   The question is did you feel like you got

04:27PM  15  ambushed?

04:27PM  16       A.   Feel like they withheld -- that evidence,

04:27PM  17  helpful evidence to Mr. Halprin was being withheld.  As

04:27PM  18  far as being ambushed --

04:27PM  19       Q.   You discussed the document -- according to your

04:27PM  20  recollection, you discussed the document prior to

04:27PM  21  swearing in the jury.

04:27PM  22       A.   Right.

04:27PM  23       Q.   The State knew you were going to try and get

04:27PM  24  the document in evidence.

04:27PM  25       A.   Right.  I don't think there's any doubt about

04:27PM 1   that.

04:27PM 2       Q.   You indicated to the State that you thought it

04:27PM 3   was important mitigating evidence.

04:27PM 4       A.   Yes, sir.

04:27PM 5       Q.   At trial you can't get it in and no one knows

04:28PM 6   who sponsored it.

04:28PM 7       A.   That was what we were led to believe.

04:28PM 8       Q.   And you didn't ask for a continuance.

04:28PM 9       A.   We did not ask for a continuance as I recall.

04:28PM 10      Q.   And really the same scenario is true on the --

04:28PM 11  some of the underlying facts that you would have liked

04:28PM 12  to have gotten in through Dr. Goodness; is that correct?

04:28PM 13  Did you anticipate that you were going to get shot down

04:28PM 14  in the way in which you did in trying to admit that

04:28PM 15  evidence?

04:28PM 16      A.   No.

04:28PM 17      Q.   You kind of saw that coming?

04:28PM 18      A.   No, no.  I don't think George saw that coming,

04:28PM 19  no.  I didn't believe that was going to happen or didn't

04:28PM 20  anticipate that to happen in the trial.  When it did

04:28PM 21  happen, once again I'm trying to recall what happened at

04:29PM 22  that point.

04:29PM 23      Q.   That was really George's issue?

04:29PM 24      A.   George was handling the mitigation.

04:29PM 25           THE COURT:   Either side have any other

04:29PM 1   questions?

04:29PM 2              MR. ANTON:  No, Your Honor.

04:29PM 3              MS. SMITH:  No, Your Honor.

04:29PM 4              THE COURT:  You may step down.

04:29PM 5              (The witness left the stand.)

04:29PM 6              THE COURT:  Do you have any more witnesses

04:29PM 7   today?

04:29PM 8              MR. ANTON:  No, we don't.

04:29PM 9              MR. UDASHEN:  While we're on the record,

04:29PM 10  the only thing that we may need -- we don't need to

04:29PM 11  discuss it today.  This motion I filed for an additional

04:29PM 12  evidentiary hearing, I guess, is going to be the next

04:29PM 13  thing we're going to ask the Court to make a decision

04:29PM 14  on.  And if you want to have us come back next week or

04:29PM 15  come back another time so you have time to review my

04:29PM 16  motion, that's fine.

04:30PM 17             THE COURT:  Who is it that you want?

04:30PM 18             MR. UDASHEN:  It was for Toby Shook, Tom

04:30PM 19  D'Amore, Bill Wirskye and Sgt.  Whitman.

04:30PM 20             THE COURT:  When can we meet next week?  I

04:30PM 21  think it would be appropriate to discuss your motion on

04:30PM 22  the record in court sometime next week if both parties

04:30PM 23  can be ready.

04:30PM 24             MS. SMITH:  Are we talking about this

04:30PM 25  motion for additional evidentiary hearing?

BRIDGET BARNHILL, OFFICIAL REPORTER

04:30PM  1              THE COURT:  Yes.

04:30PM  2              MR. ANTON:  I have a hearing in Denton

04:30PM  3   Tuesday morning.  Other than that, I'm free all week.

04:31PM  4              MR. UDASHEN:  Can we do it Thursday?

04:31PM  5              THE COURT:  I think we're better off doing

04:31PM  6   it Friday.

04:31PM  7              Does that work for the State.

04:31PM  8              MR. UDASHEN:  I'm going to be with Judge

04:31PM  9   McBride in Fort Worth.  If you want to call him and tell

04:31PM  10  him I can't make it.

04:31PM  11             THE COURT:  He's known for his

04:31PM  12  congeniality, never appeared before him.

04:31PM  13             MR. UDASHEN:  I was supposed to be there

04:31PM  14  today.

04:31PM  15             THE COURT:  Let's make it 1:00 Thursday.

04:31PM  16  Will one of you guys do me a favor and make a note to

04:31PM  17  tell me to put it on the calendar, one, Thursday?

04:31PM  18

         19

         20              (End of Proceedings)

         21

         22

         23

         24

         25

1  STATE OF TEXAS      )

2  COUNTY OF DALLAS   )

3       I, Bridget Barnhill, Official Court Reporter in and

4  for the 283rd Judicial District Court of Dallas County,

5  Texas do hereby certify that the above and foregoing

6  contains a true and correct transcription of all

7  portions of evidence and other proceedings requested in

8  writing by counsel for the parties to be included in the

9  reporter's record in the above-styled and numbered

10  cause, all of which occurred in open court or in

11  chambers and were reported by me.

12       I further certify that this transcription of the

13  proceedings truly and correctly reflects the exhibits,

14  if any, admitted by the respective parties.

15       I further certify that the total cost for the

16  preparation of this Reporter's Record is included on

17  original certificate in final volume and will be paid by

18  Dallas County.

19       WITNESS MY HAND this the 3rd day of September,

20  2010.

21                          Bridget Barnhill, CSR No. 3199
                            Official Court Reporter
22                          283rd Judicial District Court
                            Dallas County, Texas
23  Date of Expiration of Current
    Certification:  12-31-10
24  Address:   133 N. Riverfront Blvd.
                    Dallas, Texas 75207
25  Telephone Number:  (214) 653-5863