# CCA Scanning Cover Sheet



2476697

CaseNumber: WR-77,175-01

EventDate: 10/26/2010

Style 1: HALPRIN, RANDY ETHAN

Style 2:

Event code: RR ADD'L VOLUME

EventID: 2476697

Applicant first name: RANDY ETHAN

Applicant last name: HALPRIN

Offense: 19.03

Offense code: Capital Murder

Trial court case number: W01-00327-Y(A)

Trial court name: Criminal District Court 7 of Dallas County

Trial court number: 330570007

County: Dallas

Trial court ID: 1462

Event map code: GENERIC

Event description:

Event description code:

Remarks: VOL. 4 OF 4 VOLS. FOR AUGUST 20, 2010 -- STATE'S EXHIBITS

☐ *Document Scanned*                              ☐ *Created or*
                                                 ☐ *Appended*

_____        _____        _____
*Scanned by*              *date*          *Image ID*

*Comment*
_____
_____
_____

1              CAUSE NO.   W01-00327-S(A)

2

3    EX PARTE              )    IN THE 283rd JUDICIAL

4                          )

5                          )    DISTRICT COURT OF

6                          )

7    RANDY ETHAN HALPRIN   )    DALLAS COUNTY, TEXAS

8

9

10                  REPORTER'S RECORD

11

12               VOLUME 4 OF 4 VOLUMES

13

14                  STATE'S EXHIBITS

15

16

17       On August 20, 2010, came on to be heard before the

18   HONORABLE RICK MAGNIS, Judge of the 283rd Judicial

19   District Court of Dallas County, Texas, the above

20   entitled and numbered cause.

21

22       Proceedings reported by computerized stenotype

23   machine; Reporter's Record produced by computer-assisted

24   transcription.

25

2

```
1              A P P E A R A N C E S

2

3  MS. LISA SMITH
   State Bar No. 00787131
4  MS. KIM SCHAEFER
   State Bar No. 00784910
5  Assistant District Attorneys
   Frank Crowley Courts Building
6  133 N. Riverfront Blvd.
   Dallas, Texas 75207
7  (214) 653-3600

8                      FOR THE STATE OF TEXAS

9  MR. BRUCE ANTON
   State Bar No. 01274700
10 MR. GARY UDASHEN
   State Bar No. 20369590
11 Attorneys at Law
   Suite 400
12 2301 Cedar Springs Road
   Dallas, Texas 75201
13 (214) 468-8100

14                     FOR THE APPLICANT

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| CHRONOLOGICAL INDEX | | |
| VOLUME 4 | | |
| STATE'S EXHIBITS | 4 | 4 |
| EXHIBIT CERTIFICATE | 7 | 4 |
| REPORTER'S CERTIFICATE | 8 | 4 |

BRIDGET BARNHILL, OFFICIAL REPORTER

```
 1                    State's Exhibit M

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15          (research document, attached hereto)

16

17

18

19

20

21

22

23

24

25
```

# DEATH PENALTY PROJECT
## Professor Roark Reed
## George Ashford, Esq.
## Ed King, Esq.

# Research and Investigation
# RANDY HALPRIN CASE

## Fall 2001

| | |
|---|---|
| Bertram Vandenberg<br>Robert Guerra | THE FIRST FIVE YEARS: MITIGATION AND RANDY HALPRIN |
| Aaron Raynish<br>Jason Hermus | CONDITIONS WITHIN CONNALLY UNIT PRISON |
| Michael Lang<br>Regan Williams | EXCLUSION OF MEXICAN-AMERICANS FROM DALLAS COUNTY GRAND JURIES |
| Alan Rosenberg<br>Kevin Wright | THE EFFECTS ADOPTION HAD ON RANDY HALPRIN |
| Jennifer Jackson<br>Amanda Sotak | PARTIES LIABILITY AND THE SPECIFIC INTENT REQUIREMENT FOR CAPITAL MURDER CONVICTION |
| Kristin Bliss<br>Cindy Casey | RANDY HALPRIN MITIGATION: YEARS AT ONEIDA |



STATE'S EXHIBIT
m
8-20-10
PENGAD 800-631-6989

Bertram Vandenberg
Robert Guerra

To:    Spring 2002 DPP Students
       Professor Reed
       Ed King
       George Ashford

From:  Fall 2001 DPP Students
       Robert Guerra
       Bertram Vandenberg

Re: The First Five Years, Mitigation and Randy Halperin

      Randy is a remarkably polite and astute young man. He is quick to figure out where your

questions are going and to provide you with the answers that you want to hear, or that he thinks

you want to hear, or what he wants to hear. Perhaps a little of all three. We did not have multiple

discussions with Mr. Halperin. Nor did we have a long and in-depth conversation with him,

where we sought to explore his make-up as a human being. What we did chose instead, was to

ask him questions that might lead us somewhere in trying to piece together his pre adoption life.

      Randy Halperin was born on September 13, 1977 in McKinney, Texas. While he did not

know the surname of his biological parents, he believed that their first names were Anna and

Randall Sr. Randy was taken from his parents and placed into foster care at the age of four or

five. His younger brother Wesley, born two years after Randy, was taken from their biological

parents at about 9 months of age. While we do not know much about Randy's biological

parents, it appears, at least from documents provided by the Gladney House, that Randy's mother

was 23 years old when the adoption process took place. Randy is unsure about the mechanics of

his adoption although he does remember that his departure from his natural parents involved a

goodbye party. Randy was adopted by Daniel and Patricia Halperin, who at the time lived in

Arlington, and his surname was soon changed to Halperin. Additionally, Randy's original

middle name was Lee, but was later changed to Ethan when he was adopted by the Halperins.

Regarding his biological parents he has nothing positive to say, in fact he has little to say about

them at all, other than the fact that he was removed from their care after it was determined that they were keeping the money that should have gone towards his care and well being.

By the time of his adoption he was five. At that time he was not unable to count nor could he repeat the alphabet. His adoptive parents began his education. More important, to Randy the child, he learned to swim. Like most children he wanted to show off for his (adoptive) parents, swimming was his medium. All children want someone to notice them and to be impressed; praise and positive attention are universal desires. Randy went for too long with too little, if any at all. There might be a vacuum within him, something that appeared when he was so young might be depthless and might never be filled, despite constant trying. He claims that when he was 16 he almost tried to find his natural mother, but decided not to. He also claims he's never wanted to find his natural father.

Randy does not know much regarding the situation that led to his being taken from his biological parents, although he does believe that physical abuse did play a part in it. He described several incidents that he remembered, age three +/-, when he was subjected to the violent and abusive whims of his biological parents. The first occurred when he was sitting on a window ledge, of uncertain though no doubt great, height. Without warning or provocation he was pushed off. His right hand retains a scar from that event. The second incident, what we think of as a "traumatic occurrence" more than an abusive act, was when his parents left him for (he believes) five hours at a laundromat. This created a great fear in young Randy. What the long-term consequences might be is open to speculation. The need or desire to be noticed, or to be part of. Perhaps more accurately young Randy wanted to be unique and to be cared about on an individual basis. That hypothesis might be borne out when his later romantic relationships became all important and all consuming. He, himself, attributes many of his negative behavioral

changes to at least one particular girl from later in life. Someone who is desperate to acquire the affection and attention of another by any and every means would certainly not hesitate to alter their behavior. The final incident, which he can recall, occurred around the time of his brother, Wesley's birth, as he was walking down the stairs in front of their apartment, with his hands full, his father unexpectedly shoved him down the flight of stairs. He lost a tooth. Obviously, in those first few years the young Mr. Halperin had the unfortunate opportunity to develop some fears, insecurities and (though he seems not to show it) some intense and overwhelming resentment and anger.

He cares deeply for his natural brother as well as his two Korean-born adopted brothers. No doubt he places a great deal of importance on loving intra family relationships. The illusion of stability must go a long way in constructing a safe place within his soul, where the damaged child can find refuge. This desire to belong, the need to be cared for and cared about plus his need to reciprocate those feelings can be traced, with effort, to the utter lack of those things during his initial life experiences. Those fundamental needs are inherent in us all. No doubt an early dearth will create a desire or need that almost resembles addiction.

**Documentation**

His social worker, who made sure that he was adopted along with his brother, gave the Halperin's a scrapbook that held pieces of his pre-adoptive life, pictures and who knows what else. This is a crucial item to acquire. It promises to shed a great deal of light onto his early years.

The next acquisition of importance pertaining to Randy's first five years is his birth parent's names. We have submitted a document request to the Gladney House, but it's sparse. The documents procured from the Gladney House contain medical records resulting from their

physical examinations of him when he was first placed in Gladney's care. These documents detail that Randy was in good health when turned over to the Gladney House. Furthermore, they detail Randy's birth and formative years. Randy was delivered through use of anesthesia and forceps, weighing 7 pounds at birth. He was not breast-fed; rather, he was fed formula through a bottle. Randy first sat up at 7 months, began standing at 11 months, and first walked at 14 months. Randy's first words came at approximately 7 months of age, and his first short sentence at about 13 months. This indicates a normal early development for Randy, and it is quite striking to learn that he did not learn the alphabet until after the adoption by the Halperins. Most of the pertinent records (i.e., psychological, abuse records) are with The Texas Department of Protective and Regulatory Services. However, those records cannot be accessed without the names of his biological parents. The Gladney House does have copies of these records, however, they cannot release these records unless the TPRS grants them permission to do so. The names in the Gladney documents, per statute have been censored, so that provides few, if any, leads. However, we have submitted a subpoena to get the Gladney records uncensored, or at the very least, discover the names of his biological parents. For the subpoena to be of any use, an evidentiary hearing must be scheduled. As nothing is scheduled at all, as of right now, the subpoena is useless, but it's prepared and ready.

We checked birth records in McKinney, hoping that the names of his birth parents would be on Mr. Halperin's birth certificate. However, upon adoption by the Halperins, the names of the parents on the birth certificate were changed, thus providing no clues. Furthermore, a check of the local McKinney newspaper for any birth announcement at the time of Randy's birth did not produce any conclusive leads. Our intent was that by obtaining his birth parent's names, we

could then access police reports and not only uncover any documented instances of abuse, but also to determine any prior criminal history, if any, of his birth parents.

**Some Final Facts:**

• He attended Kee Elementary. His brother attended daycare during that time.

•He claims to have really enjoyed the big brother role for his Korean adoptive brothers and for Wesley.

• He was placed in two foster homes, neither was a positive experience.

• According to the Gladney House, Randy's adoption was handled by the Denton County Court, 16th Judicial District

A psychological study of Randy (even the most superficial and cursory one) would find a lot of important and no doubt critical information contained in his perceptions of his early life. A lot of damage was done, and he is far from being healed and whole even now.

A lot of his later behavior has roots in his early, unfulfilled, desires and needs and the roots must also extend into those places where instead of a void he received affirmatively evil treatment. Pain and fear do not provide the basis for a strong and holistically well-rounded young man. Sadly, for Randy, he got what he was given, and nothing more. He started the race a lap or two behind the rest of us.

**Relevant Information**

   **• Contact Person at the Gladney House**

      Pattye Hicks
      Director – Post Adoption Department
      817-922-6046
      email: Pattye@Gladney.org

Bertram Vandenberg
Robert Guerra

**Attachments**

- Medical Records procured from the Gladney House
- Receipt for Records Processing from the Gladney House
- A certified copy of Randy's birth certificate from McKinney, Texas

Aaron Raynish & Jason Hermus
Death Penalty Project - Memo
November 7, 2001

## Issue Presented

Whether, and to what extent, the conditions within the Connally Unit[1] of the Texas Department of Criminal Justice Institutional Division, a maximum-security prison, contributed to the desire of offender Randy Halprin to successfully escape this incarceration on December 13, 2000.

## Brief Answer

Notwithstanding the abhorrent and violent conditions in the Connally Unit at the time of his incarceration, and in all Texas prison units in general, in a personal and confidential interview[2], Mr. Halprin expressed explicitly that these conditions played little to no role in his desire to escape the Connally Unit on December 13, 2000 with six other offenders. While Mr. Halprin graphically described the conditions within the unit, including the occurrences of inmate-on-inmate violence, corrections officer-on-inmate violence, and inmate-on-corrections officer violence, he stated that he was relatively removed from these

---

[1] The Texas Department of Criminal Justice, Institutional Division, Connally Unit, is a maximum security state penitentiary located in Kenedy, Texas.

[2] Jason Hermus and Aaron Raynish interviewed Mr. Halprin on Monday, October 8, 2001, at the Dallas County Jail.  The interview lasted approximately two hours.

violent occurrences and felt no fear to his personal safety from any other inmates or corrections officers.

Instead, Mr. Halprin expressed that the unlikely chances of securing his first chance of parole in the year 2012, and the likelihood that he would serve the majority of his 30-year sentence[3], constituted the primary motivation for his involvement in the successful escape effort.  Mr. Halprin also expressed a desire to "start a new life for myself"[4] as another motivation for his participation.

## Discussion

## A. Conditions within the Connally Unit, and similar units, at the time of Mr. Halprin's incarceration.

*"The current, violent conditions within the Texas prison system are but another incarnation of a vicious, historical cycle of extreme violence, public scrutiny which temporarily curbs the violence, and a reduction of public scrutiny after which the violence returns."*[5]

---

[3]  Mr. Halprin was serving a 30 year sentence for the offense of Injury to a Child, occurring in August, 1996, when he escaped.

[4]  Mr. Halprin gave a similar response in an interview he granted with a local television station.  In an interview with Mary-Ann Razzuk, television reporter with WFAA Channel 8 on January 28, 2001, Mr. Halprin was asked "What was your motivation then for escaping?" and responded "Just to start a new life."
[5]   Officer Aubrey Hawkins Website:
http://www.aubreyhawkins.com/content.php?menu=11&page_id=4.

The Texas Department of Criminal Justice (hereinafter "TDCJ") is one of the most autonomous agencies of state government. In a comprehensive report on the TDCJ, former State Comptroller John Sharp stated that "[t]hroughout it's long history, TDCJ has maintained a culture of autonomy, autocracy and secrecy. This tradition runs deep and changing it will be a long and strenuous task."[6] As a consequence of this autonomy and secrecy, the internal conditions of Texas prisons are largely removed from public disclosure. What is known however, is that inside the walls of Texas prisons is a very violent sub-culture consisting of dangerous offenders and a severe shortage of correctional officers.

As of December 31, 2000, shortly after Mr. Halprin's escape, there were 23,622 guards working for the TDCJ. A total of 2,595 correctional officer positions remained unfilled.[7] The starting pay for a prison guard was approximately $18,000. Turnover is rampant and correctional guards are placed on duty without adequate training or instruction.[8] The TDCJ allows security positions to remain unfilled because the practice grants the agency greater de facto budget flexibility. Money appropriated for salaries that go unfilled can be used in other ways.[9] In fact, in March 1997, the TDCJ was found to have 1063

---

[6]  Sharp:  Behind the Walls, 1993.
[7]  http://www.click2houston.com/sh/news/stories/nat-news-20010111-060133.html

[8]  *Id. See also* An Audit Report on Correctional Officer Staffing at the Department of Criminal Justice, February 2001, State Auditor of Texas.

[9]  Sharp:  Gaining Ground, 1994.
http://www.aubreyhawkins.com/content.php?menu=11&page_id=4

"phantom" staff positions – positions that were left unfilled so the appropriate funds could be spent for other purposes.[10]

As a consequence of the staff shortages of correctional officers, the lack of adequate training and pay for existing correctional officers, and the increasing prison population, the violence within the Texas prison system is increasing at an alarming rate. The number of inmate attacks on fellow offenders has escalated from 182 in 1988 to 1,704 in 1999.[11] The number of assaults by inmates against TDCJ employees increased from 132 in 1988 to 2,044 in 1999.[12] The Connally Unit, in particular, has had more attacks against guards and staff members in the past six years than any other Texas prison.[13]

The prevalence of violent and dangerous conditions in Texas' prisons, for both inmates and guards alike, is best illustrated by a case-by-case synopsis. From the internet site "Life on the Line"[14], the following violent incidents were published to correctional officers employed by the TDCJ, however, it should be noted that these reported incidents represent only a fraction of the nearly 2000 violent incidents in Texas prisons in the year 2000:

---

[10]  *Id.*
[11]  TDCJ Emergency Action Center:  Select Statistics, 1999.
http://www.aubreyhawkins.com/content.php?menu=11&page_id=4

[12]  *Id.*

[13]  http://www.click2houston.com/sh/news/stories/nat-news-20010110-070146.html.

[14]  http://www.geocities.com/tdcj_id/2000.htm

- 12/22/2000 (Stiles Unit):  Officer seriously sliced with razor blade by offender from wrist to fingertips, requiring numerous stitches.
- 12/18/2000 (Stiles Unit):  Officer attacked by offender requiring blast of chemical spray.
- 12/13/2000 (Connally Unit):  Seven inmates escape by overpowering guards and staff.  Two TDCJ employees were treated for injuries and released.  One TDCJ employee was held overnight at hospital.
- 11/18/2000 (Stiles Unit):  Officer beaten by offender.
- 11/10/2000 (Telford Unit):  Officer assaulted by offender causing the officer to receive a broken jaw, missing teeth, and numerous cuts.
- 11/10/2000 (McConnell Unit):  Officer struck in the face and had his ear bitten by offender.
- 11//10/2000 (Torres Unit):  Officer received lacerations to his scalp requiring sutures in an assault by an offender.
- 11/10/2000 (Skyview Unit):  Officer punched in nose by offender.
- 10/2000 (Jester Unit):  Officer struck by food tray held by offender.
- 10/2000 (Clements Unit):  Officer struck with a chair held by an offender.
- 10/2000 (Ferguson Unit):  Officer struck in stomach by offender.
- 10/12/2000 (Clements Unit):  Officer stabbed with a two-foot spear.  The weapon was never found.
- 10/11/2000 (Montford Unit):  Offender commits suicide by hanging himself with sheet.
- 10/2000 (Michael Unit):  Gang violence.  An offender is assaulted by five other offenders in the recreation yard.
- 10/2000 (Beto Unit):  Inmate seriously injured by two other offenders.  The inmate was struck with a can of food and possible fan motor contained in a foot sock.
- 10/2000 (Telford Unit):  Inmate struck with a rod by another offender.  The weapon was never found.
- 10/2000 (Allred Unit):  Inmate assaulted by several other inmates armed with razorblades attached to toothbrushes and food cans stuffed in a pillow case, in the dining room.
- 10/2000 (Smith Unit):  A number of offenders stabbed.  A "Lockdown" and "Shakedown" were executed and several weapons were found in the possession of inmates.
- 10/2000 (Connally Unit):  Inmate escaped after stabbing another inmate 20 times.
- 10/2/2000 (Hobby Unit):  Two inmates stabbed by other offenders who convinced a new guard that they were allowed to be in a restricted area.

5

- 9/28/2000 (Gatesville):  An inmate created a disturbance during the evening meal. She began thrashing a pitcher of cool-aid at another offender.  Four other inmates received minor injuries by the aggressive offender.
- 9/22/2000 (Wynne):  An inmate attempted to escape but was located on the roof. The minimum custody inmate was missing at 6:45pm during count. Unit Administrators didn't put out an escape notice until 8:30pm, approximately 2 hours after he was first reported missing. He was not located until 11:45pm. (The Huntsville Item)
- 9/22/2000 (McConnell):  42 year old inmate was found dead in his cell Friday morning after an apparent suicide. A sheet was tied around his neck and then tied to an air vent.
- 9/19/2000 (Moore):  An inmate escaped and was missing for about five hours. He was caught as he was walking back towards the unit. He claimed he was lost.
- 9/8/2000 (Hughes):  An inmate stabbed another inmate during the breakfast meal. The unit was placed on partial lockdown. Some reports indicate possible gang violence.
- 8/27/2000 (Coffield):  A Hispanic inmate stabbed another Hispanic inmate.
- 8/24/2000 (Hightower):  Hispanic male was severely stabbed while in his cell. The inmate was transported by Careflight to the hospital after being stabbed about 20 times.
- 8/18/2000 (Gatesville):  A hostage situation was reported in which an offender was holding another offender hostage. One of the offenders was cut and/or stabbed.
- 8/14/2000 (Robertson):  A female employee was sexually assaulted by a prison gym orderly. The inmate who was serving a life sentence apparently committed suicide shortly after the attack.
- 8/8/2000 (Wynne):  An inmate escaped driving tractor-trailer cab while avoiding gunshots from prison guards and smashed through a prison fence, then left the truck on an airport runway before fleeing in another vehicle believed driven by his wife.  The Wynne Unit escapee and his wife were located by officers using tracking dogs under a tree near Lost Indian Camp Road in northern Walker County. The inmate reportedly had to be taken by force while his wife willingly surrendered to authorities.
- 8/5/2000 (Gatesville):  Female inmate stabbed after an argument with another. One of the offenders removed a pin from the recreation yard weight lifting equipment and stabbed the other offender several times in the head.

- 7/2000 (Garza East):  Female officer was assaulted as she came out of an officer's restroom. The officer had a massive heart attack during the assault and has not been able to return to work.
- 7/20/2000 (Coffield):  A fight erupted between inmates after a fire was started by one of those groups. An attempt to get them stop failed after the 37mm gas gun would not discharge. Guards then threw a hand grenade and order was restored.
- 7/18/2000 (Hobby):  Sergeant struck with drinking pitcher while pat searching closed custody offenders during a meal turnout. The female SGT was assisting other officers with the feeding of these offenders when one inmate grabbed a pitcher and hit the SGT several times in the head. Reported a number staple type sutures were required to close the injury sustained by the SGT.
- 7/17/2000 (Terrell):  A Texas prison inmate found dead in his cell Monday night is believed to have been killed by another inmate. The body of a 27-year-old inmate was found lying on the floor of his cell by correctional officers who were making a routine cell check at about 9:30 p.m. Monday. A shoestring was tied around his neck.
- 7/17/2000 (Coffield):  A large gang fight on the Recreation Yard between members of two black gangs. Reportedly no officers were hurt but several inmates were hurt pretty bad. The unit is said to be about 200 officers short.
- 7/6/2000 (McConnell):  Four prison gang members were injured, one with 14 stab wounds, when inmates from a rival gang jumped them in a planned attack. After the attack, guards locked all of the prison's inmates in their cells and, during an initial search, found two homemade knives, 7 and 8 inches long.
- 7/3/2000 (Walls):  A correctional officer was injured by an inmate who attempted to sexually assault her at the Huntsville (Walls) Unit. The female officer was forced into a unit utility closet by an inmate who attempted to sexually assault her while threatening to cut her with a single-edged razor blade. The CO began to yell and struggle with the inmate and eventually he grabbed her by the throat and began choking her. The two fell to the ground where he began to knock the officer's head against the floor. Another inmate entered the cell block and saw the two fighting. That inmate was able to distract the aggressive inmate long enough for the officer to get away.  On Tuesday, the 4th, the officer was taken by family members to a Bryan area hospital after she complained of blurred vision and uncontrollable shaking. (The Huntsville Item)
- 7/3/2000 (Telford): Corrections officer assaulted while searching an offender's cell while he showered. The inmate returned to the cell,

entered, and struck the officer. The officer fought back, but his knee gave out. He fell, but tried to get up. The inmate rushed him causing his knee to give again. The officer was pinned down and the inmate worked him over. A sergeant helped rescue the officer. Both were taken to the hospital with injuries.

- 6/30/2000 (Stiles): A female officer was assaulted in the hall of 8 Bldg. She was handing out ID's to incoming inmates. An offender walked up to her, got in her face, she put her arm out to regain her space and he grabbed her arm. She hit him several times in the torso and face, he then hit her several times in the face. She now has a fractured arm, and blurry vision.
- 6/30/2000 (Telford): Two corrections officers were injured after being assaulted by an inmate Friday at the Barry Telford Unit. One of the officers was taken to a local hospital with non-life-threatening injuries, while the other officer was treated for minor injuries at the unit's infirmary.
- 6/20/2000 (Stiles): An officer walking the hallway, from 4 bldg, when several offenders assaulted him. He wasn't seriously hurt but was bruised up.
- 6/15/2000 (Eastham): Taken hostage were Texas Department of Criminal Justice employees: a disciplinary hearing officer; a counsel substitute; and correctional officer. An inmate restrained the men using his state-issued pants and a raincoat he found hanging in the disciplinary office. He then left the room to head into an adjacent office and at that time, the officer shut the door separating the two rooms. A cell extraction team quickly moved in to remove the hostages and secure the inmate, who was described by TDCJ officials as "very combative" during the incident.
- 6/13/2000 (Connally): A prison inmate using a piece of metal ripped from a door and sharpened to a point stabbed a correctional officer six times Tuesday, the second attack on an officer at the prison in Kenedy in less than a week. The officer was leading several inmates to lunch in the cafeteria of the Connally Unit when an inmate serving a 65-year sentence for aggravated robbery, struck the CO from behind. When he turned to defend himself, the CO was stabbed several times with a nine-inch metal rod before six other officers responded to the commotion.
- 6/11/2000 (Neal): A 43 year old inmate pronounced (dead?) at hospital. He showed no outward signs of trauma and was not complaining of medical problems.
- 6/9/2000 (Terrell): A 78 year old volunteer chaplain, was assaulted when his arm was nearly cut off by a death row inmate. A prison spokesman says the inmate pulled chaplain's arm into the cell, tied a sheet around it and began cutting with razor blades.

8

- 6/7/2000 (Connally):  A female officer is attacked by an inmate during a cell search in the Connally Unit.  The officer, who was transported to an area hospital, suffered facial fractures, swelling around her brain and had most of her teeth knocked out in the attack.  A subsequent search of his cell, however, turned up a 6-inch shank — a homemade knife — hidden inside a plastic baby powder bottle.
- 5/30/2000 (Hobby):  Female offender escapes from Hobby Unit in Marlin when she walked away from the dog kennel where she worked as a handler. Offender claimed she got lost.
- 5/28/2000 (Telford):  An inmate-on-inmate murder at the Telford Unit occurred when a 40 year old inmate died after he was allegedly beaten and stabbed by a 28 year old inmate, in the prison's dayroom. The assailant apparently used a 6-inch sharp instrument and a 4-inch rock to assault his victim.
- 5/24/2000 (Clemens):  Eighteen-year-old inmate was fatally stabbed. He was repeatedly [stabbed] with a sharpened eight-inch metal rod.
- 5/19/2000 (Estelle):  A correctional officer was stabbed in the shoulder with a nine-inch metal rod at the Estelle Unit near Huntsville.
- 5/13/2000 (Robertson):  An inmate was killed in an apparent fight with another inmate. The inmate was taken to the prison infirmary after he was hit by his cellmate and stopped breathing. He was struck either in the head or upper body and collapsed in his cell.
- 4/28/2000 (Dominguez State Jail):  Two offenders escaped from work detail 15 miles northwest of the jail. Shortly after running from the work site they were spotted being picked up by an accomplice in a vehicle.
- 4/2000 (Connally)  The Connally Unit was locked down after eight inmates assaulted three officers. Two officers were treated for minor injuries; none of the inmates was injured.
- 4/26/2000 (Montford):  Two inmates jumped two prison guards while being escorted back to their cell from their morning showers. They took a nurse hostage, holding her for about 10 hrs. She was released unharmed. Both officers were cut with shanks, or handcrafted knives, and taken to a local hospital with non-life threatening injuries.
- 4/25/2000 (Smith):  While an audit is underway at the prison to redress complaints about understaffing problems, a melee between two inmates at the Smith Unit leads to a riot among 300 black and Hispanic inmates. One inmate was killed when he was struck with a pickax. The riot began after a fight in the unit's mess hall between a black inmate and a Hispanic inmate when one of the two fondled himself in front of a female guard. Prisoners broke into utility and equipment closets to grab weapons, and set small fires using cereal boxes. They used broken broom sticks,

garden hoes, glass shards and metal pieces from a fence to attack each another. A number of inmates suffered severe cuts when they tried to escape and got tangled in razor wire. Three guards were injured. One was hit over the head with a shovel, another burned his hand when a gas grenade exploded and another was hit in the arm by an inmate wielding a hoe. One of the prison's kitchens was gutted by fire in the melee. A total of 300 correctional officers helped end the fight.

- 4/22/2000 (Hughes): An inmate holds a nurse hostage at the Alfred Hughes Unit. The nurse was beaten. The offender walked into the nurses' station, grabbed the female nurse and slammed her head against the floor. After a 30-minute standoff, prison guards shot the inmate with a rubber ball grenade. The nurse received cuts to her head, and complained of pain in her neck and back.
- 4/22/2000 (Hughes): Unofficial reports indicate that an officer was stabbed with a pencil.
- 4/14/2000 (Clements): An inmate holds a corrections officer hostage for seven hours in a room in the kitchen area at the William P. Clements Jr. Unit before surrendering. The guard was not hurt. It was the second time in as many months that a female corrections officer was held hostage in a Texas prison.
- 4/12/2000 (Telford): Inmate killed by fellow inmate after the two reportedly began fighting during a morning shower. Prison officials recovered a 7-inch homemade knife, or shank, they believe was used to kill the inmate as he left the shower area. The inmate suffered puncture wounds to the left arm and chest as well as a stab wound to the neck that severed his carotid artery. The inmate also appeared to have been beaten on the head.
- 3/16/2000 (Coffield): An inmate was stabbed to death at the Coffield Unit near Palestine. Texas prison officials say dental floss helped an inmate escape from his cell. They say he used the floss or some other plastic-coated string to painstakingly cut through the bars of his cell. Once free, officials say one inmate killed another inmate. They say he crawled out from under his cell bars and stabbed the victim as he was being escorted to the shower by guards.
- 3/14/2000 (Walls): Before convicted death row inmate Ponchai Wilkerson is executed, he spit out a handcuff key as lethal drugs started to take effect in the death chamber.
- 3/5/2000 (Stiles): An inmate takes a female psychologist and a female clerk hostage. The assistant warden was stabbed or sliced while aiding in the rescue of the psychologist. The inmate had a shank and pulled the

women into an exam room.  The Asst. Warden was stabbed in the arm and abdomen, while the Captain was cut on the arm.

- 2/28/2000 (McConnell):  An inmate was asked to leave the GED class the instructor discovered him masturbating during the class. A correctional officer took the inmate from the class. As a correctional officer began to write up the paperwork on the incident, he returned to the class. When the instructor refused to readmit him, he pushed her to the ground.
- 2/22/2000 (Telford):  Two inmates escaped from their locked cell and assaulted another inmate with a can inside a sock.
- 2/21/2000 (Terrell):  Two death-row inmates hold a female corrections officer hostage for more than 12 hours at the Terrell Unit before surrendering.
- 1/26/2000 (Robertson): Two offenders at Robertson Unit broke out of their cells and began fighting.
- 1/15/2000 (Byrd):  A corrections officer is stabbed with a pencil in the stomach with a sharpened pencil during breakfast at the Byrd Unit.
- 1/4/2000 (Neal):  Three correctional officers were sent to a hospital with minor injuries after breathing smoke Tuesday from a laundry room fire. The fire appears to have originated in one of the dryers.

## B. The Interview with Mr. Halprin and, in his own words, the motivation for his participation in the successful escape of December 13, 2000. The interview took place October 8, 2001.

Despite the violent and dangerous conditions in Texas prisons, and in particular, the Connally Unit, Mr. Halprin avers that these conditions played little or no role in his motivation to escape.

Our reason for interviewing Randy was to link the oppressive jail conditions as the main motivating factor for his jailbreak.  Randy told us about his prison experience in the Connally Unit, his involvement in the jailbreak plan, and the aftermath.

Randy was transferred from the Choice Moore Jail to the Connally Prison Unit.  The Choice Moore Jail offered "no risk" and Randy never saw any fighting or abuse taking place there.  A guy in the county jail gave Randy the "heads up" on what life would be like for him when he transferred to Connally. He told Randy to mind his own business, don't get involved in a prison gang, and to stick up for himself and people would respect him.

The initiation for a new inmate was called "checking."  Once transferred to Connally, Randy went about 2 weeks before being

confronted by gang members.  They asked Randy, "Who are you down with?"  They wanted to know which gang Randy was a part of. He stated that he was not part of a gang and had no intention of being in one. Randy was a nonviolent person and did not believe in the racist attitude publicized by each gang. This is when he had his only fight in prison. He said there was a guarded place where him and another inmate went and fought (only with fists) for about 3 minutes.  **After this fight, Randy never feared for his own safety.** He knew that he had to stick up for himself or he would be forced to pay for protection like many other inmates.  The inmates paid for protection through commissary or sexual favors. After the fight, Randy was left alone and never confronted by any gangs or other inmates again.  He said that being Jewish was a good thing because he did not fit into any social group – Blacks/Whites/Mexicans.  He pretty much minded his own business and stuck to himself.  Randy was reprimanded once for his conduct in Connally when he was caught with an extra sheet on his bed.

Randy talked about the gangs basically running the prison and not the guards.  The gangs were broken up into: the Aryan Circle/Aryan Brotherhood, Crypts/Bloods and the "Mexican Mafia" which was the most feared gang and consisted of Mexicans mostly from the San Antonio area. One reason the Mexican Mafia had so much power within the prison is

13

because Randy believed that there were prison guards who were actually in the gang. He said that most fights were between gangs of the same racial make-up and rarely between different races. The "Mexican War – 1999" was between rival Mexican gangs and Randy witnessed 2 people beaten to death. The gangs would put canned goods in socks or towels and use them as weapons to beat the person. He said that everyone was "locked down" for about 3 months for this incident. During lockdown, a prisoner was only allowed to leave his cell for about 5 minutes to take a supervised shower in shackles.

Randy made sure he never talked with other prisoners or guards about his reason for being in prison. He also chose not to speak about his childhood or the wealth of his parents. Randy feared that people would think he had money if they knew of his upper-class background. He also did not want someone alerting a friend on the outside – resulting in harm against his family. If asked what he was in for, Randy would just say, "I don't talk about it," and the guy would leave him alone. He did talk to a few people in prison and one of the men was Rivas' cellmate Turtle.

The connection between Randy and George Rivas was through Rivas' cellmate Brain Calhoun – a.k.a "Turtle." Randy and Turtle used to talk a lot and Rivas took an interest in Randy when he found out that Randy believed in the Jewish faith. This intrigued Rivas because he was a strict Christian. They

14

constantly discussed religion and what they would do different and change about their lives if given the opportunity. Randy enjoyed these intellectual conversations because it gave him a chance to "wander" from the reality of his prison sentence.

Rivas came first to Randy about plans for a jailbreak. The jailbreak plan took about 6 ½ months to come to complete. The most important aspects were getting the right people involved who knew the jail system and the way it worked. Rivas would come to Randy and ask him about each individual and what knowledge they could add to the jailbreak. The only guy Randy knew prior to Rivas' introduction was Rodriguez. They were both Jewish and often attended the same services during the religious holidays. Newbury seemed to be the main cog because he knew the ins/outs of the prison. He knew exactly when/where/how all the activities of the prison were managed. None of the men were in gangs, which made it easy for them to trust each other. Randy did not want a person involved who was in a gang because he believed their plan would be leaked. Therefore, not being involved in a prison gang was a criterion for being involved in the plan.

Rivas "pulled strings" to get Randy and the other guys maintenance jobs. These jobs were more laid back and coveted then Randy's kitchen detail job. The maintenance jobs allowed the "gang" to discuss plans about their jailbreak and spend more time getting to trust each other. Pat Mochogama (TDC

Employee) was Randy's supervisor in maintenance and he claims to have had a good working relationship with him.

They tried getting "shanks" to use against the cards, but found it difficult in procuring one for each man. Randy also claimed he was against a violent attack on the guards and did not want anyone being hurt. They mostly worked on holding techniques and other forms of hand-to-hand combat should they run into any trouble with the guards during the escape. Randy claims that during the jailbreak he was always in the office and the only thing he did was tie up one of the guards legs with rope. He adamantly states that he was not the one who took over the tower.

Randy struggled with the jailbreak plan because he was worried about "other" people getting hurt, and knew the risks he would be taking. He stayed in his cell about 3-4 days just weighing the positives and negatives about another 25 years in prison. Randy believes that he did not have any chance of parole. He figured that his violent crime against a child would keep him locked up for the duration of his sentence. The final straw was the he was "fed up with the system." He did not agree with the way the prison system conducted itself. He also thought that he would be too old to "start life" when he finally was free.

Randy challenges any reporter or news service to produce the letter stating, " You haven't seen the last of us," which he has been charged with

## EXCLUSION OF MEXICAN-AMERICANS FROM DALLAS COUNTY GRAND JURIES

### FAIR CROSS SECTIONS AND DISTINCTIVE GROUPS:

The equal protection clause of the United States Constitution guarantees every defendant the right to be tried by a jury consisting of a fair cross section of their community.  The decision in *Glasser v. United States*,[1] read the Sixth Amendment as requiring that every jury be composed of a representative cross section of the community in which they reside.  This right was extended to stated in *Duncan v. Louisiana*,[2] and seven years later in *Taylor v. Louisiana*,[3] the United States Supreme Court recognized the "fair cross section" requirement as "fundamental to the jury trial guaranteed by the Sixth Amendment."[4]

Only two years after *Taylor*, the United States Supreme Court decided in *Castaneda v. Partida*,[5] that Mexican Americans were an identifiable class and were thus entitled to protection under the equal protection clause regarding their representation on juries.  Although the Supreme Court proscribed discrimination based on race in cases like *Castenada*, potential juries in Dallas county are drastically unrepresentative of Mexican American Jurors.

To prove a prima facie case of discrimination under the Equal Protection Clause, a defendant must prove the following:

1)      the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or applied;

---

[1] *Glasser v. United States,* 315 U.S. 60 (1942)
[2] *Duncan v. Louisiana,* 301 U.S. 145 (1968)
[3] *Taylor v. Louisiana,* 419 U.S. 522 (1975)
[4] *Id.*
[5] *Castaneda v. Partida,*  430 U.S 482 (1977),

2)      the degree of underrepresentation must be proved, by comparing the proportion of

the group in the total population called to serve as grand jurors, over a significant

period of time; and

3)      a selection procedure that is susceptible of abuse or is not racially neutral supports

the presumption of discrimination raised by the statistical showing.[6]

Federal courts have held that disparities greater than 10 percent is sufficient to meet the

test for underrepresentation, and, therefore, are in violation of the Sixth Amendment.  The

statistics for Dallas County show that of the 2,218,899 residents, 29.9 percent of those are of

Hispanic or Latino origin.[7]  A two year review of the Dallas County Grand Jury reveals that of

_____ grand jurors, only _____ are Hispanic, or _____ percent.  (Note: we have the

information on the grand jury that indicted Randy Halprin and it does not reveal any names that

appear Hispanic; however, we have subpoenaed the records going back two years and are

waiting for this these records to be produced).

Case law established that Mexican Americans are a recognizable class and the survey

done shows that in relation to population statistics, Hispanics are wholly underrepresented in

Dallas County Grand Jury pools.  The third factor that must be proven to show a prima facie case

of discrimination is that the election procedure is susceptible to abuse or is not racially neutral.

The survey certainly shows that the current selection system is not adequately drawing Hispanics

to serve on grand juries in Dallas County.

The United States Supreme Court has proscribed discrimination based on race when

drawing a jury pool.[8]  Even with Sixth Amendment protections, Hispanics in the Dallas area are

---

[6] *Hernandez v. State of Texas*, 24 S.W.3d 846, 849 (Tex.App.—El Paso 2000).

[7] United States Census Bureau 2000.

[8] *Taylor*, 419 U.S. at 527.

being deprived of both the chance to sit on grand juries as well as the right to be judged by a fair cross section of their peers.   The system, although racially neutral on its face, provides no protections for Hispanic residents in Dallas County.

Michael Lang
Regan Williams

## GRAND JURY SERVICE IN TEXAS and DALLAS COUNTY.

Under Texas law, grand juries operate as units of the district court and the district judges have responsibility for initiating and supervising the procedure by which grand juries are formed.

The Dallas County grand jury is selected by one of two methods: (1) the "commissioner method"[9]; or (2) prospective grand jurors may be selected and summoned in the same manner as is used for panels of prospective jurors for the trial of civil cases.[10]

If the grand jury "commission method" is used, the district judge selects and swears in three to five commissioners, after assuring that they meet the statutory qualifications for the position. Among those qualifications are that the commissioners "[b]e residents of different portions of the county"[11] and that service as a commissioner will not result in the person acting as a grand jury commissioner more than once in the same year.[12]

The Commissioners are to select not less than 15 nor more than 20 persons to be summoned for grand jury service, with the objective – insofar as possible – of assuring a grand jury that represents a broad cross-section of the population of the county, considering race, sex and age.[13] The written list of prospective grand jurors is to be certified and signed by the commissioners, place in a sealed envelope and delivered to the district judge,[14] who is to in turn deliver it unopened to the clerk.[15] Before the delivery, the judge is to administer an oath in open court to the clerk and each of his deputies, obligating them not to open the envelope or to converse with those selected about cases that may come before the court or the jury.[16]

---

[9] Vernon's Ann. C. Cr. P. art. 19.01(a)
[10] Vernon's Ann. C.Cr. P. art. 19.01(b).
[11] Vernon's Ann. C. Cr. P. art 19.01(a)(4).
[12] Vernon's Ann. C. Cr. P. art 19.01(a)(5).
[13] Vernon's Ann. C. Cr. P. art. 19.06.
[14] Vernon's Ann. C. Cr. P. art. 19.09.
[15] Vernon's Ann. C. Cr. P. art. 19.10.
[16] Vernon's Ann. C. Cr. P. art. 19.11.

The judge is to notify the clerk of a date, upon or after the first day of the term, for impaneling the grand jury.[17] Within thirty days of that date, the clerk is to open the envelope and provide the sheriff with a copy of the list certified with the court seal.[18] The sheriff is then to summon the persons listed.[19]

On the day set for impaneling the grand jury, if less than twelve persons appear, the court may order the sheriff to summon additional persons to complete the twelve required.[20] When twelve or more are present, the court is to test their qualifications as grand jurors.[21] The judge may also excuse for certain hardship reasons qualified jurors.[22] Jurors are not to be accepted if they are found not to be qualified, or if they are shown not to be of sound mind or of good moral character.[23]

When twelve acceptable grand jurors are identified – unless there has been a challenge – the court is to impanel them as a grand jury.[24] There is no specific requirement that the judge take the first twelve acceptable persons on the list, but the Court of Criminal Appeals has observed that such a requirement has, "by custom and tradition," become "a part of the Texas statutory grand jury system."[25] Failure to follow this, however, is "only an irregularity," which –

---

[17] Vernon's Ann. C. Cr. P. art. 19.13.
[18] Vernon's Ann. C. Cr. P. art. 19.13.
[19] Vernon's Ann. C. Cr. P. art. 19.14.
[20] Vernon's Ann. C. Cr. P. art. 19.18.
[21] To be qualified, a person must meet the following:
    1.   be a citizen of the state and county;
    2.   be qualified to vote in the county;
    3.   be able to read and write;
    4.   never have been convicted of a felon; and
    5.   not be under indictment "or other legal accusation" for theft or a felony.
Vernon's Ann. C. Cr. P. art. 19.08.
[22] See Vernon's Ann. C. Cr. P. art. 19.25.
[23] Vernon's Ann. C. Cr. P. art. 19.24.
[24] Vernon's Ann. C. Cr. P. art. 19.26.
[25] *Ex Parte Becker*, 459 S.W.2d 442, 444 (Tex.Crim.App. 1970).

at lease in the absence of a showing of harm or prejudice – will not render resulting indictments "void ipso facto."[26]

## CHALLENGES DUE TO DISCRIMINATION IN SELECTION OF THE GRAND JURY

A defendant's claim that discrimination prohibited by the federal constitution was used in selection of the indicting grand jury must, as a general rule, be raised by a challenge to the array. A defendant seeking to raise such a claim by a motion to set aside the indictment must bring himself within the rule that a challenge to the array is not necessary if the defendant did not have a fair opportunity to raise such a challenge.

In *Muniz v. State*[27] the Court of Criminal Appeals held that a claim of systematic exclusion of Mexican-Americans from the indicting grand jury must be raised by a challenge to the array. Where it is not and the defendant fails to show lack of an opportunity to challenge the array, a defendant is barred from raising the matter by a motion to set aside.[28] *Muniz* did not explain the implications of article 19.30's plain language – that a challenge to the array does not lie on the ground that racial or other protected groups were excluded from the grand jury.

*Muniz* remains controlling law.[29] A motion to set aside on selection discrimination grounds, then, requires that the defendant establish lack of an opportunity to raise the matter by a challenge to the array.

In *Cerda v. Texas,*[30] however, the defendant challenged the Hale county grand jury on the basis that it denied him equal protection of the law. The defendant established a prima facie case that there had been a substantial underrepresentation of Mexican-Americans, that went unrebutted. In *Cerda* the court of appeals acknowledged that Mexican-Americans were an

---

[26] 459 S.W.2d at 445.
[27] 573 S.W.2d 792 (Tex.Crim.App. 1978).
[28] 573 S.W.2d at 795-96.

identifiable class.  The Court of Appeals accepted the defendant's evidence the population of

Hale County was 38.03%, that the venire for grand jury service was 25% Mexican-American,

but only 16.67% of the grand jurors selected were Mexican-American.  Based on the figures the

Court of Appeals concluded that the State had a burden to rebut the evidence of apparent

discrimination.  Because the State failed to do so, the Court of Appeals reversed the conviction

and ordered the indictment dismissed.

---

[29] *Bird v. State*, 692 S.W.2d 65, 76 (Tex.Crim.App. 1985); *Rodriquez v. State*, 597 S.W.2d 917, 918-19
(Tex.Crim.App. 1980). *Muniz v. State*, 672 S.W.2d 804, 807-808 (Tex.Crim.App. 1984).
[30] 644 S.W.2d 875 (Tx. Ct. App. Amarillo 1982).

DALLAS COUNTY GRAND JURY B-2
JANUARY TERM, 2001
282ND JUDICIAL DISTRICT COURT
JUDGE KAREN GREENE

| | |
|---|---|
| MRS. MARGARET BATES | 2516 EARLCOVE DRIVE<br>DALLAS, TX 75227 |
| SANDRA SEIDENFELD | 5017 SWISS AVENUE<br>DALLAS, TX 75214 |
| MR. RUDOLPH EPPLER, JR. | 13640 WILLOW BEND ROAD<br>DALLAS, TX 75240 |
| MR. LARRY L. GREEN<br>(FOREMAN) | 1501 NORTHRIDGE DRIVE<br>CARROLLTON, TX 75006 |
| MRS. JANICE MARQUEZ<br>(ASST. FOREMAN) | 2207 CROCKETT DRIVE<br>CARROLLTON, TX 75006 |
| ANITA YVONNE BELL | 3225 CANTURA DRIVE<br>MESQUITE, TX 75181 |
| MRS. SHANNON BURK | 7217 ASHINGTON DRIVE<br>DALLAS, TX 75225 |
| MRS. KAREN HARMS | 1510 ARCHERY LANE<br>GARLAND, TX 75044 |
| MR. BILLY RAY BELL | 2638 BRADY LANE<br>GRAND PRAIRIE, TX 75052 |
| MS. ANN M. GILBERT | 7236 MEADOW LAKE AVENUE<br>DALLAS, TX 75214 |
| MRS. LILIA E. DYESS | 1705 QUAIL DRIVE<br>GARLAND, TX 75040 |
| MS. PAULINE WILLIAMS | 7150 E. GRAND AVE. #1312<br>DALLAS, TX 75223 |
| MS. JOYCE WILLIAMS<br>(ALT) | 1562 CHAPMAN DRIVE<br>LANCASTER, TX 75134 |
| ODESSA WARFIELD<br>(ALT) | 7406 KENWELL STREET<br>DALLAS, TX 75209 |

**Table DP-1. Profile of General Demographic Characteristics: 2000**

Geographic Area: Dallas County, Texas

[For information on confidentiality protection, nonsampling error, and definitions, see text]

| Subject | Number | Percent | Subject | Number | Percent |
|---|---|---|---|---|---|
| Total population......................... | 2,218,899 | 100.0 | **HISPANIC OR LATINO AND RACE** | | |
| | | | Total population......................... | 2,218,899 | 100.0 |
| **SEX AND AGE** | | | Hispanic or Latino (of any race)............... | 662,729 | 29.9 |
| Male.............................................. | 1,108,200 | 49.9 | Mexican................................... | 531,115 | 23.9 |
| Female........................................... | 1,110,699 | 50.1 | Puerto Rican.............................. | 5,534 | 0.2 |
| | | | Cuban..................................... | 3,624 | 0.2 |
| Under 5 years ................................. | 181,951 | 8.2 | Other Hispanic or Latino ................. | 122,456 | 5.5 |
| 5 to 9 years ................................... | 175,763 | 7.9 | Not Hispanic or Latino ........................ | 1,556,170 | 70.1 |
| 10 to 14 years ................................ | 165,025 | 7.4 | White alone .............................. | 983,317 | 44.3 |
| 15 to 19 years ................................ | 161,126 | 7.3 | | | |
| 20 to 24 years ................................ | 172,678 | 7.8 | **RELATIONSHIP** | | |
| 25 to 34 years ................................ | 399,345 | 18.0 | Total population......................... | 2,218,899 | 100.0 |
| 35 to 44 years ................................ | 364,860 | 16.4 | In households................................. | 2,185,429 | 98.5 |
| 45 to 54 years ................................ | 265,493 | 12.0 | Householder.............................. | 807,621 | 36.4 |
| 55 to 59 years ................................ | 88,600 | 4.0 | Spouse ................................... | 378,411 | 17.1 |
| 60 to 64 years ................................ | 65,186 | 2.9 | Child..................................... | 675,774 | 30.5 |
| 65 to 74 years ................................ | 98,454 | 4.4 | Own child under 18 years ................. | 534,505 | 24.1 |
| 75 to 84 years ................................ | 60,064 | 2.7 | Other relatives .......................... | 192,865 | 8.7 |
| 85 years and over ............................ | 20,354 | 0.9 | Under 18 years ........................... | 71,189 | 3.2 |
| Median age (years)............................ | 31.1 | (X) | Nonrelatives.............................. | 130,758 | 5.9 |
| | | | Unmarried partner........................ | 40,759 | 1.8 |
| 18 years and over............................. | 1,599,868 | 72.1 | In group quarters............................. | 33,470 | 1.5 |
| Male............................................. | 791,709 | 35.7 | Institutionalized population................ | 23,633 | 1.1 |
| Female........................................... | 808,159 | 36.4 | Noninstitutionalized population .............. | 9,837 | 0.4 |
| 21 years and over............................. | 1,502,511 | 67.7 | | | |
| 62 years and over............................. | 215,722 | 9.7 | **HOUSEHOLD BY TYPE** | | |
| 65 years and over............................. | 178,872 | 8.1 | Total households......................... | 807,621 | 100.0 |
| Male............................................. | 70,961 | 3.2 | Family households (families)................... | 533,613 | 66.1 |
| Female........................................... | 107,911 | 4.9 | With own children under 18 years ......... | 283,142 | 35.1 |
| | | | Married-couple family .................... | 378,411 | 46.9 |
| **RACE** | | | With own children under 18 years ......... | 196,493 | 24.3 |
| One race...................................... | 2,158,975 | 97.3 | Female householder, no husband present..... | 113,881 | 14.1 |
| White ...................................... | 1,294,769 | 58.4 | With own children under 18 years ......... | 68,766 | 8.5 |
| Black or African American .................. | 450,557 | 20.3 | Nonfamily households ........................ | 274,008 | 33.9 |
| American Indian and Alaska Native........... | 12,499 | 0.6 | Householder living alone ................. | 220,183 | 27.3 |
| Asian....................................... | 88,369 | 4.0 | Householder 65 years and over............ | 47,782 | 5.9 |
| Asian Indian ............................. | 23,752 | 1.1 | | | |
| Chinese .................................. | 12,094 | 0.5 | Households with individuals under 18 years ..... | 318,008 | 39.4 |
| Filipino .................................. | 6,617 | 0.3 | Households with individuals 65 years and over .. | 129,119 | 16.0 |
| Japanese.................................. | 2,193 | 0.1 | | | |
| Korean.................................... | 9,303 | 0.4 | Average household size....................... | 2.71 | (X) |
| Vietnamese................................ | 21,355 | 1.0 | Average family size.......................... | 3.34 | (X) |
| Other Asian [1] ........................... | 13,055 | 0.6 | | | |
| Native Hawaiian and Other Pacific Islander.... | 1,277 | 0.1 | **HOUSING OCCUPANCY** | | |
| Native Hawaiian............................ | 302 | - | Total housing units ..................... | 854,119 | 100.0 |
| Guamanian or Chamorro................... | 308 | - | Occupied housing units ...................... | 807,621 | 94.6 |
| Samoan.................................... | 233 | - | Vacant housing units ........................ | 46,498 | 5.4 |
| Other Pacific Islander [2] ................. | 434 | - | For seasonal, recreational, or | | |
| Some other race ........................... | 311,504 | 14.0 | occasional use.......................... | 2,564 | 0.3 |
| Two or more races .......................... | 59,924 | 2.7 | | | |
| | | | Homeowner vacancy rate (percent)............ | 1.3 | (X) |
| *Race alone or in combination with one* | | | Rental vacancy rate (percent)................ | 6.3 | (X) |
| *or more other races:* [3] | | | | | |
| White ........................................ | 1,343,900 | 60.6 | **HOUSING TENURE** | | |
| Black or African American ..................... | 462,609 | 20.8 | Occupied housing units ................. | 807,621 | 100.0 |
| American Indian and Alaska Native............. | 22,777 | 1.0 | Owner-occupied housing units ................ | 424,847 | 52.6 |
| Asian ........................................ | 98,563 | 4.4 | Renter-occupied housing units ............... | 382,774 | 47.4 |
| Native Hawaiian and Other Pacific Islander...... | 2,920 | 0.1 | | | |
| Some other race ............................. | 350,798 | 15.8 | Average household size of owner-occupied units. | 2.86 | (X) |
| | | | Average household size of renter-occupied units. | 2.54 | (X) |

- Represents zero or rounds to zero.    (X) Not applicable.

[1] Other Asian alone, or two or more Asian categories.

[2] Other Pacific Islander alone, or two or more Native Hawaiian and Other Pacific Islander categories.

[3] In combination with one or more of the other races listed. The six numbers may add to more than the total population and the six percentages may add to more than 100 percent because individuals may report more than one race.

Source: U.S. Census Bureau, Census 2000.

58

In Memoriam:
September 11, 2001





# U.S. Census Bureau

United States Department of Commerce

**Subjects A to Z**
A B C D E F G H I
J K L M N O P Q
R S T U V W X Y Z

**New on the Site**

**Search**

**American FactFinder**

**Access Tools**

**Catalog**

**Publications (PDF)**

**Jobs@Census**

**About the Bureau**

**Related Sites**

| Census 2000 Data Now Available | Click Here |

**United States Census 2000**

State and National Data (C2SS) • Detailed Tables (SF1) • Housing Units • Rankings, Comparisons & Summaries • Release Schedule • Profiles • Count Question Resolution • More

**People**
Estimates • Projections • International • Income • Poverty • Genealogy • State Profiles • Housing • More

**Business**
Economic Census • Government • E-Stats • NAICS • Foreign Trade • More

**Geography**
Maps • TIGER • Gazetteer • More

**News**
Releases • Minority Links • Radio/TV/Photo Services • More

**Special Topics**
Conversations with America • For Teachers • American Community Survey • Statistical Abstract • FedStats

Live Webcast    Wednesd
Oct. 17,
11 a.m. E

**Population Clocks**

U.S. 285,366,35
World 6,180,103,7
15:54 EDT Oct 16, 200

**State & County QuickFacts**

Select a state

*Go!*

**Latest Economic Indicators**

Total Business Sales

FOIA | Privacy Statement | Confidentiality | Quality | Accessibility | Contact Us | Doing business with us

**U S C E N S U S B U R E A U**
*Helping You Make Informed Decisions*

# Profiles of General Demographic Characteristics

## 2000

Issued May 2001

*2000 Census of Population and Housing*

**Texas**



**U.S. Department of Commerce**
**Donald L. Evans,**
Secretary

**Economics
and Statistics
Administration
J. Lee Price,**
Acting Under Secretary for
Economic Affairs

**U.S. CENSUS BUREAU**
**William G. Barron, Jr.,**
Acting Director

## U.S. Census Bureau

### United States Census 2000   2000 Census of Population and Housing

Reports are listed in the Portable Document Format (PDF). In order to view these files, you will need the Adobe(R) Acrobat(R) Reader which is available for free from the Adobe web site.

```
Select Series_____
DP-1. Profiles of General Demographic Characteristics
Technical Documentation
Census Briefs
Other
```

```
Select Document_____
```

Last Revised: Thursday, 04-Oct-01 13:10:16

Census 2000  |  Subjects A to Z  |  Search  |  Product Catalog  |  Data Access Tools  |  FOIA  |  Privacy • Policies  |  Contact Us  |  Home

### USCENSUSBUREAU
*Helping You Make Informed Decisions*

MEMORANDUM

TO:        PROFESSOR REED

FROM:    ALAN ROSENBERG AND KEVIN WRIGHT

DATE:    NOVEMBER 14, 2001

RE:        THE EFFECTS ADOPTION HAD ON RANDY HALPRIN

---

## I.

### ISSUE

Many individuals who are adopted at birth or at an early age experience difficulties throughout their adolescent and adult years.  These types of problems can effect attachment, attribution, and various forms of cognitive development.  Randy Halprin was adopted at the age of 5.  A possible mitigating factor for his case is whether his adoption created these types of psychological effects on Randy.

## II.

### ANSWER

Unfortunately for his case, Randy Halprin's adoptive family was described as being loving, caring, and supportive during his adolescence.  Randy did not have difficulty connecting with anyone, and in fact, had a great relationship with his adoptive father and even a neighbor.  While this, of course, is good to hear, it is not beneficial to Randy's defense.

## III.

## OTHER CONSIDERATIONS

The factual background provided in this memorandum was obtained by interviewing Randy himself. He, of course, did not know exactly what we were hoping to hear in relation to the effects of his adoption. Randy seemed as though he was attempting to be as positive as he could about his past, especially about the relationships he had with various individuals.

## IV.

## FACTS

In our time with Randy, we probed very deeply into his upbringing and his feelings resulting from it. Randy informed us that he has very few memories of his biological parents, all of which are traumatic in nature. Aside from these memories, all he has is a photo album, which was put together by his adoption caseworker. In this photo album he is smiling only in the pictures with his biological mother, which leads him to believe that he did not like his biological father.

Randy had a quite different relationship with his adoptive family. Randy and his father were very close, they had a great relationship. He confided in his father and felt very comfortable and close to him. He and his father would sit for at least an hour everyday when Randy came home from school and talk about what was going on in each other's lives. Later on, Randy's drug use began to put a strain on his relationship with his father. Randy was too ashamed to tell his father for fear of disappointing him. They continued to remain close, however, even after Randy moved to Kentucky for school.

At school, Randy excelled in his courses and became involved in music. He had plans of one day becoming a high school music teacher. However, Randy's drug use eventually led to him being expelled from school. Upon returning home, Randy's father informed him that he was no longer welcome in the family home because he was too much trouble. At the time, his father was having heart problems, which Randy believes contributed to his father's decision not to allow him back. Randy then began roaming from home to home and living in various homeless shelters.

After the incident with the child occurred, Randy went to prison. He was scared to death. While he managed to keep to himself in prison, his friend Turtle was considering joining a prison gang. While trying to convince Turtle not to join the gang, Randy became friends with Turtle's cellmate Rivas, who too, was trying to convince Turtle not to join the gang.

Rivas and Randy soon became close friends. They sat and talked for hours, sharing one another's religious views and beliefs. They achieved a mutual respect for one another and, according to Randy, viewed one other as equals. It was Rivas who approached Randy with the escape plan in its infant stage. The two then spent hours discussing plans for escape. In fact, Rivas came to Randy with names of other inmates whom he believed would be beneficial to bring along, asking Randy's opinion of each of the escapees.

After the escape, Randy began to disagree with Rivas and the other inmates about their plans and views on how to handle things. The before-discussed plans of getting on the right track and starting a new life no longer existed for the others. Greed set in and the others, with the exception of Harper, began planning to commit further robberies in

3

order to get more money.  Randy, however, was waiting for falsified identification documents so that he could travel to Seattle and enroll in college, with hopes of becoming a music teacher.

Randy claims he did not participate in any of the robberies, with the exception of Oshman's, which he claims he tried to convince Rivas not to rob.  After being shot in the foot during the Oshman's robbery, Randy chose to sit in the RV and listen to music through headphones, trying to ignore the discussions of future bank robberies and the killing of officer Hawkins.

Randy informed us that he has spent countless hours thinking, trying to find some type of subconscious grief or feelings that resulted from his adoption.  He, however, believes he had a good childhood and was fortunate to have such loving and caring adoptive parents.

## V.

## DISCUSSION

Researchers have studied the effects of adoption for decades.  Studies have found various forms of psychological effects on adopted children ranging widely from personality trait disorders to adolescent adjustment reaction.  Research suggests that adopted children are referred for psychological treatment two to four times as frequently as their non-adopted peers.  They typically exhibited behavior characterized as impulsive, provocative, aggressive, and antisocial.  Several different theories for these types of behavior exist, including, but not limited to, attachment theories, attribution theories, and cognitive-developmental theories.

## A. ATTACHMENT THEORY

### 1. Psychological Research

An attachment may be defined as an affectional tie that one person forms between himself and another specific person – a tie that binds them together in space and endures over time.[1] Attachment provides a frame of reference and the security necessary for a child to learn. It also provides a major incentive in the acquisition of socially appropriate behavior. The desire to gain the approval of significant adults is a powerful motivation in learning to control equally powerful but less desirable urges.[2] One study found that attachment helps a child in the following ways: attain full intellectual potential; sort out what he or she perceives; think logically; develop a conscience; become self-reliant; cope with stress and frustration; handle fear and worry; develop future relationships; and reduce jealousy.[3]

Attachment relationships develop gradually over the first six to eight months of life.[4] According to studies, the roots of secure attachment lie in the caregiver's responsiveness to the needs of the infant. These attachment relationships in infancy have long-term consequences for the psychological and relational functioning of the individual child. "The implications of attachment theory for the study of adoption are profound, especially for infants who were adopted when they were 'older.'" *Id.* The theory is that since the attachment relationship develops gradually over the first six to eight months,

---

[1] DAVID M. BRODZINSKY ET AL., THE PSYCHOLOGY OF ADOPTION, 167-186 at 170 (1990).

[2] Nicola Atwool, *Attachment as a Context for Development: Challenges and Issues* (last modified Sept. 19, 2001) http://www.otago.ac.nz/Web_menus/Dept_Homepages/CIC/papers/Atwool.html.

[3] *Fahlberg, V. Fitting the Pieces Together, British Agencies for Adoption & Fostering,* London, p. 14 (1988).

[4] BRODZINSKY, at 171.

any child placed after that age would be at risk for developmental difficulties to the extent that disruptions or variations in parental responsiveness occurred.

Consistency in the response of the caregiver is an important factor in building secure attachments. "Where the environment is chaotic and the primary caregiver is not available to the child, secure attachment will not be possible." *Id.* at 170. A study of six-year-olds indicated that securely attached children were more able to cope with parental absence and related to unfamiliar adults more readily.[5] On the other hand, insecurely attached children were anxious, tongue-tied and rejecting of their parents. In addition, other researchers have identified a link between insecure attachments and conduct problems and long-term consequences of avoidance.[6]

Because children can develop multiple attachments, attachment to a birth parent should not preclude later relationships with adoptive parents. However, abuse or neglect during the first year could have strongly negative consequences in terms of the child's ability to establish a sense of basic trust.

## 2. Effects on Randy

Randy Halprin's first five years put him at risk for experiencing various forms of problems associated with attachment. He moved from an allegedly abusive home into a more stable environment. While this may seem to be a completely positive experience for a five-year-old, research indicates that this may have lasting effects on someone. That is why it is rather surprising that Randy has not had problems with his personal attachment to his adoptive parents and other role-model types throughout his life. As he

---

[5] Bretherton, I. & Waters, E. (ed.) *Growing Points of Attachment Theory and Research, Monograph of the Society for Research in Child Development*, Vol. 50 No. 1 & 2 (1985).

described it during his interview, Randy seemed to not have a problem getting close to people, including his father and neighbor.

One theory to support Randy's defense was whether Rivas took advantage of Randy and his loyalty to Rivas. On the contrary, Randy described their relationship as one consisting of mutual respect. Rivas respected Randy's opinion on issues related to the escape and would not follow through on ideas without Randy's approval.

## B. ATTRIBUTION THEORY

### 1. Psychological Research

Attribution theory refers to a family of theories that are concerned with how individuals ascribe meaning to their observations about responsibility for the behavior of others and themselves.[7] The attribution process includes three steps: observation of an action, judgment of presence or absence of intention, and formation of a causal attribution of responsibility. The goal of the attribution process is to be able to explain current and past behavior and to predict future behavior. The focus of the theory is on the processes impinging on perceivers that affect their explanation and prediction of events.

What makes this theory so strong is that the child is affected in an adverse way when he or she has difficulties with the attribution process or when the parent has difficulties with the attribution process. Many parents, especially adoptive parents, will assign responsibility for their child's behavior. If the parent is wrong, it could damage the child. For instance, studies show that adoptive parents prefer to attribute the behavior

---

[6] Belsky, J. & Nezworski, T. (ed.) *Clinical Implications of Attachment, Lawrence Erlbaum Assoc.,* Hillsdale, New Jersey (1988).

[7] BRODZINSKY, at 171.

to a disposition of the child (because he is adopted) rather than to situational factors influencing the behavior (e.g., family dynamics).[8]

Another example of an attributional error committed by adoptive parents is that parents may be affected by the self-serving bias, which holds that in an intimate relationship, members have an investment in one another and parents are motivated to perceive their children's behavior in ways that make both the parents and the child feel and look good. What results when parents are affected by this is that the parent may believe that she is a good parent but the problems her adopted child has are a direct result of his genes.[9]

Attribution errors made by an adoptive parent can adversely affect the adopted child because of the way the parent reacts to the child and the way she treats the child. While this may seem to be particularly damaging to a child, attribution errors made by an adopted child may be more damaging to the child than those made by the adoptive parents. If a child makes such errors at a young age and is unable to explain or predict events around them, the child may be unable to know the difference between right and wrong or may be unable to understand the consequences of his actions.

### 2. Effects on Randy

It does not appear that Randy or his adoptive parents had any problems with their attribution processes. Randy appears to be an intelligent person. He made every indication that he understands the difference between right and wrong, and he is fully aware of the consequences of his actions. In fact, according to Randy, it was his idea to

---

[8] Dix, T.H., & Grusec, J.E. *Parent attribution processes in the socialization of children.* Hillsdale, NJ: Erlbaum (1986).

[9] Heider, F. *The psychology of interpersonal relations.* New York: Wiley (1958).

schedule the escape at a time when the least number of guards would get hurt and the least number of women would be working.  All of the escapees practiced wrestling moves and tying knots in an effort to get out of prison causing few injuries, if any.  This indicates the escapees' attentiveness to the foreseeable consequences of their actions.

## C. COGNITIVE-DEVELOPMENTAL THEORY

### 1. Psychological Research

Instances of learning disabilities and attention deficit hyperactivity disorder are especially high among adopted children.  One study found that problems with cognitive development in adopted children were substantially influenced by the adoptive parents' reasons, motivations and attitudes towards adoption.[10]  This is especially important during the time the child finds out the truth about her parents.  How the adoptive parents react to this, as well as the way the child discovers the truth, are both relevant factors in an adopted child's cognitive development.[11]

Experts tend to agree that adopted children are at the greatest risk for developmental and psychological problems when they reach early adolescence.[12]  The reason for this is that is when the child is first able to cognitively understand the meaning of "adoption."  Once a child realized she has been "given away," an overwhelming sense of rejection can overtake her and disable her ability to reason with the situation.

Adopted children who have not yet reached this phase of their lives are often labeled as "at-risk," which is a child who is at risk of developing learning, emotional,

---

[10] *Adoption's Effects on Cognitive Development in Children* (visited Sept. 19, 2001)
http://scsc.essortment.com/adoptionchildre_ryea.htm.

[11] BRODZINSKY, at 174.

[12] *Id.*

behavioral or physical disabilities in the future. Babies exposed to drugs, abuse, neglect, and those with genetic pre-dispositions to mental illness and physical disabilities are deemed "at-risk" before the adoptive parents even come into the picture. Thus, before a child even gets adopted, he may already be predicted to have difficulties.

For a child who is at-risk for future cognitive difficulties, informing the child that he was adopted combined with the child experiencing the identity crisis that almost always follows this discovery are definitely the ingredients for potential serious cognitive difficulties. It is thus imperative that the adoptive parents begin talking with their child about adoption at an early age and to have an ongoing discussion over time to help the child develop a mature concept of the meaning of adoption. In terms of the cognitive-developmental theory, the timing and content of adoption revelation has a major impact on the child's emerging concept of adoption as well as on the child's concept of self-as-adopted-child.

## 2. Effects on Randy

Randy's adoptive parents were both patient and attentive in discussing and explaining Randy's adoption. Randy was five when he was adopted. From that point forward, Randy had an excellent relationship with his adoptive father and discussed the adoption throughout his adolescence.

Nothing indicates that Randy suffers from any cognitive-developmental disorders. Randy is an extremely intelligent person. He gained the respect of Rivas because of his intellect, and Rivas trusted Randy enough to include him in the decision-making process regarding the escape throughout the time they planned and carried it out.

# VI.

## CONCLUSION

For a child to be born into an abusive home, move from various different foster homes, and be adopted at the age of five, Randy has developed into a very healthy individual. Psychological research indicates that it is common for people to have a difficult time in several different aspects of their lives if they experience what Randy experienced during the first few years of his life. No evidence exists to show that Randy became attached to Rivas in a way that allowed Rivas to manipulate him. Randy does not appear to have difficulty with his attribution processes. And finally, Randy shows no sign of problems with his cognitive development. While, of course, this is nice to hear, it does not help his case.

## MEMORANDUM

TO:      Professor Roark Reed
             Mr. George Ashford

FROM:    Jennifer Jackson
             Amanda Sotak

DATE:    January 7, 2002

RE:       Parties Liability and the Specific Intent Requirement for Capital Murder
             Conviction

### Question Presented

Does the law of parties, which allows a defendant to be held criminally responsible for the conduct of another, conflict with the specific intent requirement for a capital murder conviction?

### Brief Answer

Probably not. Although conceptually the law of parties appears inconsistent with a finding specific intent, the Texas Court of Criminal Appeals has repeatedly held that the law of parties applies to the capital murder statute. Moreover, both the Fifth Circuit and the Texas Court of Criminal Appeals have upheld death sentences for capital murder convictions based on the law of parties against constitutional challenges under the United States Supreme Court's decisions in *Enmund* and *Tison*.

### Analysis

I.      **The Texas Court of Criminal Appeals has held that the law of parties instruction is applicable to the capital murder statute.**

In Texas, a conviction for capital murder requires evidence showing that the defendant intentionally caused the death of another.[1] The trial court will instruct a jury however that they may find the defendant guilty of capital murder based on parties liability.[2] The law of parties provides "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for

---

[1] TEX. PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a) (Vernon 1994).
[2] *See id.* §§ 7.01(a); 7.02 (Vernon 2001).

1

which he is criminally responsible, or both."[3]   A defendant is "criminally responsible" for

the conduct of another if:

> acting with intent to promote or assist the commission of the offense, he solicits,
> encourages, directs, aids or attempts to aid the other person to commit the
> offense... [or] ... If, in the attempt to carry out a conspiracy to commit one
> felony, another felony is committed by one of the conspirators, all conspirators
> are guilty of the felony actually committed, *though having no intent to commit it,*
> if the offense was committed in furtherance of the unlawful purpose and was one
> that should have been anticipated as a result of the carrying out the conspiracy.[4]

The jury will be given both of these instructions, known and collectively referred as the

"law of parties instruction," which may only be given during the guilt-innocence portion

of the trial.[5]

Although the law of parties instruction appears inconsistent with the capital

murder specific intent requirement, the Texas Court of Criminal Appeals has repeatedly

held the instruction applicable to the capital murder statute.[6]   In *Livingston v. Texas,*[7] the

Court of Criminal Appeals noted that a defendant could be convicted of capital murder

despite the fact that it was a codefendant that killed the deceased in the course of a

robbery by operation of the law of principals then in effect under Article 1257, the

immediate predecessor of section 19.03 of the Texas Penal Code.[8]   The court did not

believe the newly enacted sections 7.01 and 7.02 required a different result.[9]   In later

cases, the court has applied the law of parties to the capital murder statute without

---

[3] *Id.* § 7.01(a).
[4] *Id.* § 7.02(a)(2), (b) (emphasis added).
[5] *E.g., Green v. State,* 682 S.W.2d 271 (Tex. Crim. App. 1984), *cert. denied,* 470 U.S. 1034 (1985).  *See also Meanes v. State,* 668 S.W.2d 366, 376-78 (Tex. Crim. App. 1983) (en banc) (Clinton, J. concurring).
[6] *E.g., Johnson v. State,* 853 S.W.2d 527, 534 (Tex. Crim. App. 1992) (en banc) (citing *Crank v. State,* 761 S.W.2d 328, 351 (Tex. Crim. App. 1988), *cert. denied,* 493 U.S. 874 (1989); *English v. State,* 592 S.W.2d 949, 955 (Tex. Crim. App. 1980) (en banc), *cert. denied,* 449 U.S. 891 (1980); *Ruiz v. State,* 579 S.W.2d 206, 209 (Tex. Crim. App. 1979) (panel opinion); *Pitts v. State,* 569 S.W.2d 898 (Tex. Crim. App. 1978) (en banc); *Rector v. Texas,* 738 S.W.2d 235, 240 (Tex. Crim. App. 1986) (en banc) (citing *Green v. State,* 682 S.W.2d 271 (Tex. Crim. App. 1984)).
[7] 542 S.W.2d 655 (Tex. Crim. App. 1976)
[8] *Id.* at 660 (citing *Thompson v. State,* 514 S.W.2d 275 (Tex. Crim. App. 1974)).
[9] *Id.*

explaining its reasoning or reconciling the seeming inconsistency between the specific intent requirement and parties liability.[10]  In addition, the United States Supreme Court has refused to address the issue, denying certiorari in cases that have been appealed.[11] Accordingly, an argument that a capital murder conviction under the law of parties is unconstitutional will most likely fail.

II.   **A death penalty sentence based on a defendant's conviction of capital murder under the law of parties probably does not violate the minimum culpability requirement set forth in *Enmund v. Florida* and *Tison v. Arizona*.**

Arguments that a capital murder conviction based on the law of parties is unconstitutional under *Enmund v. Florida*[12] and *Tison v. Arizona*[13] have also failed.[14]  In *Enmund*, the United States Supreme Court held that the Eighth Amendment forbids the imposition of the death penalty to punish a defendant "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed."[15]  Later in *Tison* the Court reduced the *Enmund* culpability requirement by holding that "major

---

[10] *E.g., English*, 579 S.W.2d at 209 (noting that the essential elements of the theory are "(1) the [defendant] conspired with others to commit an aggravated robbery and (2) one of the coconspirators (3) intentionally or knowingly (4) caused the death of an individual (5) in the course of committing or attempting to commit the aggravated robbery (6) in furtherance of the unlawful purpose of the conspiracy and (which should have been anticipated as a result of carrying out the conspiracy .... [Furthermore,] [s]ection 7.02(b) eliminates any necessity on the part of the State to prove the [defendant] had any intent to kill the [decedent]."). *See also Gravis v. State*, 982 S.W.2d 933, 938 (Tex. App.—Austin 1998, pet. ref'd) (finding section 7.02(b) rather than excusing the State from showing a culpable mental state, actually "requires the State to show that the defendant had *both* a mens rea to engage in a conspiracy and the culpable mental state to commit the underlying, i.e., the intended felony.").
[11] *Crank v. State*, 761 S.W.2d 328, 351 (Tex. Crim. App. 1988), *cert. denied*, 493 U.S. 874 (1989); *English v. State*, 592 S.W.2d 949, 955 (Tex. Crim. App.), *cert. denied*, 449 U.S. 891 (1980).
[12] 458 U.S. 782 (1982).
[13] 481 U.S. 137 (1987).
[14] *E.g., Johnson*, 853 S.W.2d at 535.
[15] *Enmund*, 458 U.S. at 788.

3

participation in the felony committed, combined with reckless indifference to human life" was constitutionally sufficient to execute a defendant for felony-murder.[16]

Both the Fifth Circuit and the Texas Court of Criminal Appeals have repeatedly held challenges of death sentences for capital murder convictions based on the law of parties under *Enmund* and *Tison* are misplaced.[17]   The courts reason that a jury's affirmative answer to special issue one, which requires the jury to find the defendant's conduct causing the death was committed intentionally or knowingly and with the reasonable expectation that death would result, satisfies the constitutional culpability requirements of *Enmund* and *Tison*.[18]   According to the courts, special issue number one requires that the jury consider the *individual* defendant's culpable conduct that contributed to the deceased's death and decide whether that conduct was committed deliberately or intentionally and with reasonable expectation that death would result.[19] Consequently, the courts reason that the Texas capital murder scheme does not allow a defendant to be put to death for merely being a party to a murder.[20]

Moreover, the courts emphasize that even though a non-triggerman defendant may be convicted of capital murder under the law of parties, the jury may only sentence the capital defendant to death *if* the jury answers affirmatively to special issue number one.[21]   Because the jury may not apply the law of parties in determining whether a capital defendant's conduct was committed intentionally or knowingly and with the reasonable

---

[16] *Tison*, 481 U.S. at 140.
[17] *E.g., Skillern v. Estelle*, 720 F.2d 839, 847-48 (5th Cir. 1983), *cert. denied*, 469 U.S. 873 (1984); *Johnson v. McCotter*, 804 F.2d 300, 302 (5th Cir. 1986) (following *Skillern*), *cert. denied*, 481 U.S. 1042 (1987); *Johnson v. State*, 853 S.W.2d 527 ( Tex. Crim. App. 1993).
[18] *E.g., Andrews v. State*, 21 F.3d 612, 630-31(5th Cir. 1994) (citing cases); *Johnson*, 853 S.W.2d at 535.
[19] *E.g., Meanes v. State*, 668 S.W.2d 366, 379 (Tex. Crim. App. 1983).
[20] *E.g., Johnson*, 853 S.W.2d at 535; *Green*, 682 S.W.2d at 287 (for the imposition of death, the State may not rely on evidence that another with whom the defendant was acting acted deliberately and with a reasonable expectation that death would result).
[21] *Johnson*, 853 S.W.2d at 535.

4

expectation death would result, courts have held that special issue one sufficiently limits the death sentence to those capital defendants having the requisite culpability under *Enmund* and *Tison*.[22]

Additionally, the capital defendant may request that the trial court give the so called "anti-parties" instruction[23] to the jury during the punishment phase to rebut the law of parties instruction in the guilt-innocence phase.[24] The anti-parties instruction ensures that a defendant is not given the death penalty after being convicted on the basis of a parties liability theory unless the jury also finds that the defendant intended the death or anticipated that a human life would be taken.[25] Absent an objection or request by the defendant at the punishment phase, however, the trial court's failure to give the anti-parties charge is not reversible error because the instruction is not required by statute or by the Texas Constitution.[26]

In this case, the jury will have to determine whether Randy Halprin's conduct of promoting or assisting in the robbery of the store was committed intentionally or knowingly and with the reasonable expectation that the death of the deceased would

---

[22] *E.g.*, *Skillern*, 720 F.2d at 848 ("We cannot say that the sentencing instructions themselves permitted the jury to find that the requisite deliberate intent or contemplation to kill could be based solely upon [his accomplice's] killing of the victim."). *See also Andrews v. State*, 744 S.W.2d 40, 51 (Tex. Crim. App. 1987) (en banc) (quoting *Meanes v. State*, 668 S.W.2d 366, 377-78 (Tex. Crim. App. 1983) (en banc), and stating "the determinations in answering the special issues ... must be made solely upon consideration of the particularized conduct of the individual defendant ....") (internal quotations omitted).

[23] An anti-parties charge might read, for example, as follows:
> You are further instructed that before you may answer "yes" to Special Issue No. 1, you must find from the evidence beyond a reasonable doubt that the defendant intended or contemplated that the life of [deceased] would be taken either by his own acts or the acts of another or others in his presence who were acting with him in the commission of the offense. If you do not so find, or if you have a reasonable doubt thereof, you will answer "no" to Special Issue No. 1

*Rector v. Texas*, 738 S.W.2d 235, 244 (Tex. Crim. App. 1986) (en banc) (internal quotations omitted).

[24] *Belyeu v. State*, 791 S.W.2d 66, 73 (Tex. Crim. App. 1989), *cert. denied*, 499 U.S. 931 (1991); *Webb v. State*, 760 S.W.2d 263, 268 (Tex. Crim. App. 1988).

[25] *Prystash v. State*, 3 S.W.3d 522, 540 (Tex. Crim. App. 1999) (en banc).

[26] *Johnson*, 853 S.W.2d at 536 (citing *Belyeu v. State*, 791 S.W.2d 73, *Green v. State*, 682 S.W.2d 271 (Tex. Crim. App. 1984), *cert. denied*, 470 U.S. 1034 (1985)).

result.[27]   If the jury concludes Halprin's conduct satisfies both parts of special issue number one, a death sentence will likely be upheld against constitutional attack.  This is well settled jurisprudence in Texas and the United States Supreme Court has yet to rule on the constitutionality of the law of parties instruction in capital cases.

Dissenting to the U.S. Supreme Court's denial of certiorari of *Stewart v. Texas*,[28] Justice Marshall argued that the law of parties was inconsistent both with the specific intent requirement of the Texas capital murder statute and with the culpability requirements of *Enmund*.[29]  According to Marshall, the law of parties as applied to capital cases allows a defendant to be death-eligible without the "'personal responsibility and moral guilt,' without which a defendant cannot be held accountable with his life."[30]  Nor did Marshall believe that the jury's affirmative answer to special issue number one cured the defect.[31]  Finally, although the Court upheld the Texas capital scheme in *Jurek v. Texas*,[32] Marshall believed the statute must be measured against a different standard when the State seeks to execute one convicted of felony murder under the law of parties.[33]  Halprin may borrow arguments from Justice Marshall, but it is unlikely these arguments will succeed in light of the settled law of Texas unless the United States Supreme Court decides to intervene.

---

[27] This assumes, of course, that the State does not proceed under section 19.03(a)(1), murder of a peace officer acting in the lawful discharge of an official duty.  *See* TEX. PEN. CODE ANN. §19.03(a)(1) (Vernon 2001).  Under that theory, the jury would still have to consider whether Randy Halprin's conduct was intended to kill the police officer and committed with a reasonable expectation that death would result.

[28] 686 S.W.2d 118 (Tex. Crim. App. 1984) (upholding death sentence of a capital defendant convicted under the law of parties).

[29] *See Stewart v. Texas*, 474 U.S. 866, 867-68 (1985) (mem.) (Marshall, J., dissenting).

[30] *Id.* (quoting *Enmund*, 458 U.S. at 801).

[31] *Id.* (stating the culpable intent requirement cannot be satisfied by the jury's finding that there was a reasonable expectation that the death would result).

[32] 428 U.S. 262 (1976).

[33] *See id.* at 194.

6

## Conclusion

In Texas jurisprudence, it is firmly established that the law of parties applies to the capital murder statute. A diligent search revealed no cases reconciling the theory of parties liability with the specific intent requirement in the statute, however, countless cases reject defendants' challenges to the constitutionality of sections 7.01 and 7.02 based on the irreconcilability of the concepts. Moreover, state and federal courts repeatedly have held the U.S. Supreme Court's decisions in *Enmund* and *Tison* do not preclude the application of the law of parties to the guilt-innocence phase of Texas' bifurcated capital murder trial scheme. Accordingly, it is unlikely that a constitutional challenge to a capital murder conviction based on the law of parties will succeed.

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

## MEMORANDUM

TO:  George Alford and Ed King

FROM:  Kristin Bliss and Cindy Casey

RE:  Randy Halprin Mitigation: Years at Oneida

DATE:  December 5, 2001

---

I.  <u>Overview</u>

    Our assignment was to get an overview and details on the time that Randy spent at Oneida, and the times surrounding this period. We met with Randy a number of times, and also obtained records from the school, and contacted students and teachers that knew him.

    The details on this time period show that Randy is not the person that the media has created. He had success in school, has always been involved in extra-curricular activities, and has interests that make it hard to believe that he is in the position that he is in. Randy's real "crime" is bad decision-making. He does not come off as someone who is threatening or a threat to society. He comes across as a well-spoken, well-rounded, educated individual. Randy has an incredible memory for details and was able to provide us with all of the details on dates, and his experiences surrounding this time period. He is incredibly intelligent, and seems to make a very positive impact on people, including us.

    In our opinion, he will be one of the best assets for his case. We say this because in class we have all spent a lot of time talking about our research and interviews with Randy. After talking with him, the one thing every student kept saying was that you cannot get him off your mind. He is the type of person that each one of us has known at some point in our lives – someone that we could have been in school with, been in activities with, and most importantly someone that we would be friends with. After hearing his stories and spending time with him he has had this effect on us, his simply comes across as "one of us."

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

He has made some bad choices in his life, and each one of us knows someone who has made similar choices during high school and college.   The difference has been that the other people we have known have had a solid support system to fall back on.  When they were following the things that others got involved in (particularly drugs), they had parents who pulled them out of it, got them help, and did not abandon them.  It is important to note that the class discussions have not been anti-Randy's parents.  We know that he made his own decisions.  The feeling that we have gotten about Randy in our discussions is that he reflects on the things that he did and notes turning points in his life taking responsibility for the things that he did wrong. It is because of this that we are all able to relate to him so well.

Another thing that makes it easy to relate to Randy is that he very modest.  Instead of being "hyper" about offering details on his life, like you would expect someone on trial for their life to be, you have to probe him for information and question him about it.

That said, we think that the information here will be helpful to his case, as it sheds some light on his choices that he has made leading up to the present events.


## II.   Before Oneida

Randy attended Gunn Junior High from _____ to_____.  When his parents found out that Gunn wanted Randy to repeat his 7th grade year, they sent him to Oneida in January of 1992. Randy started Oneida in the second semester of his 7th grade year, a decision his parents made since he would be able to catch up and "do seventh and eighth grade at the same time." (Oneida allowed Randy to attend summer sessions to make up for the time he would miss having to repeat 7th grade.  By attending these summer sessions he was able to catch up and graduate with his class.)

Randy said that he was not unhappy about going to boarding school, but that he did feel like his parents were sending him away because they did not want to deal with his academic

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

problems. Randy stated that he adjusted to life at Oneida, and after his second year he loved it. He said that he enjoyed being on his own and being independent.

## III.    Oneida

### Description of Oneida

Oneida is located in Oneida, Kentucky. Randy said that the school had a pretty landscape (i.e. mountains), with a 60's type pre-fab architecture. He described the school as not very strict and manageable. For example, when Randy was attending Oneida the only dress code was that in the cafeteria and at school the boys could wear jeans and the girls could not wear short skirts. Boys and girls had to wear nice clothes to church. The main regulations dealt with music that you could and could not listen to. Relationships between male and female students at Oneida were closely regulated by the school. There were rules regarding physical contact (hand-holding and nothing more allowed). If you were caught doing more than holding hands you were given a "social campus" (cannot leave campus). If you violated this you were not allowed to have contact for three days, if you violated that it was two weeks, if you violated that it was two more weeks, and if you violated that you were suspended from school for three days (during suspension the girls worked in the kitchen and the boys worked at the farm).

The best thing about Oneida for Randy was the closeness that he enjoyed with his friends and faculty. He said that since you were with everyone "24-7" they became like your family. Unlike a regular non-boarding school, you were with people for eating, studying, sleeping, and all of your activities, therefore the bond with these people was closer than in another non-boarding atmosphere.

Randy said that there were lots of activities going on, and there was always something to do. While other students missed going to the mall and the like, he said that there were always games to watch, people to spend time with, and teachers who might take you into town for a pizza or a movie.

3

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

Some of the views at Oneida were a bit conservative religiously, specifically some students that were know to be homosexual were kicked out, and some kids were forced to change the way they dressed or looked.   Overall Randy said that once he got involved in the school activities and got the hang of the lifestyle at boarding school, he loved being there. Randy said he never got tired of school.

**Holidays**

For shorter holidays (i.e. Thanksgiving) Randy would go to a friend's home that was close by, i.e. Ohio. Randy enjoyed traveling during this time and meeting his friend's families. For longer holidays (i.e. Christmas Break or Summer break when he was not in summer school) Randy would come back to Texas. For example, Randy's parents flew him and his brother to San Antonio from Kentucky, so that he could spend the holiday with his family. Randy's father would come up for "Family Day" in October to visit him and his brother, Wesley.

**Summer Break**

During the summer Oneida had a summer work program for students from low-income families to work to pay their tuition.  The school also had a summer academic program, which Randy participated in so that he could catch up on his school hours.  Since he had to repeat 7th grade, he worked in the summers to make up those hours so that he could graduate with his class on time.  He did this after his 7th, 8th, 9th, and 10th grade years.  After this extra academic work he was "bumped up" to be a junior, so all of the summer work paid off.

**Dorms**

The dorms at Oneida were made up of large rooms.  There were 10 students per room and a Room Monitor.  Randy lived in Baker Hall in 7th and 8th grade.  During 9th through 12th grades Randy lived in both of the high-school dorms, Carnaghan and Martin Wheeler.  Each dorm also had a Hall Monitor.

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

Although the Hall Monitors had always been older students, during an assembly at the beginning of his 9th grade year, Randy volunteered to be the Hall Monitor for the Baker Hall dorm. As a 9th grader, Randy was the youngest Hall Monitor that Oneida had ever had. The students at Oneida were required to work. Randy explained that Oneida looked for students that had natural leadership to put into leadership positions, and being the Hall Monitor was a job that recognized that ability. As a Hall Monitor, he was in charge students in Baker Hall. One Hall Monitor was in charge of one of the four floors in Baker Hall. His duties included "bed check" – from 10:30 p.m. to 12:00 a.m. He was to ensure that students were where they were supposed to be – i.e. in bed or working, and was allowed to give discipline warnings and take away free time for students that were not following the rules. During both his 9th and 10th grade years, Randy was given the award of "Most Outstanding Worker as Hall Monitor."

## IV.   Randy's Girlfriend at Oneida

Randy dated Theresa Dancy while he attended Oneida from ages 16 to 17. Randy does not think that Teresa Dancy will have anything negative to say about him, he does not think that she would side with the DA, but does not think she would really help his case either. They were described as the "couple of the school" and did everything together. They were eventually engaged.

She can be described as "really liberal" and as an "amazing writer." She was part of the Beta Club, which Randy was not allowed to join because she was in it (the school would not allow boyfriend and girlfriend to do activities like this together for the most part). Later he was not allowed to be in Honors English because she was in that class already as well, and had an incredible writing ability that the teacher did not want to have distracted by her boyfriend being in the class. Later however, Professor Shelby, the head of the creative writing class, made Randy

5

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

and Theresa co-editors of the Creative Writing Class Magazine (11th grade, was asked to do it again in 12th but was then expelled).

Randy was never violent with her, and was never verbally abusive. Randy and Theresa were involved in drugs separately before they met each other. At this time Randy was smoking marijuana occasionally. In 1995 at Thanksgiving Theresa exposed Randy to acid for the first time. When they first started dating Theresa was more involved into drugs than Randy, and he confronted her about it at one point. She denied any problem with it, and so he never mentioned it again. Theresa's parents like Randy until he got into trouble.

He said that they broke up because he was lying to her, noting that he lied to everyone when he got into drugs. Specifically he made up things, and had stolen some money from one of her friends. He admitted this to her when he was expelled from school (12th grade first semester) and this caused their break up. The last time he spoke to her she called him to "scream and yell" about how angry she was about the stolen money. They had been engaged and he told her to give the ring and his things back to his brother Wesley (who was still at Oneida). He did not ever get these things back from Theresa.

Something that could be helpful that Randy gave Theresa was a video of him playing the piano and playing with his younger brothers. He gave it to her as a Christmas present during their 11th grade year.

We have tried to make contact with Theresa but have not been able to. From the emails that Randy gave us (friends print them out and send them to him to show that people are supportive of him) it sounds like the FBI and the media contacted Theresa heavily during the period after Randy's escape. Therefore it is possible that she has changed her information and become unlisted in order to avoid further contact from people about the case.

6

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

**V.    Events Leading up to Randy Getting Expelled from Oneida**

During the summer of 1995 (after 11th grade) Randy was home for a brief period before returning to school for the summer academic session.  He and his father had an argument and his father took away his car privileges.  He wanted to go and visit his friend Chad Jones, and since he was not allowed to use the car he borrowed his father's mountain bike out of the garage.  When Randy returned home that evening he and his father had another argument, this time about Randy using the mountain bike without asking.

Randy then called Theresa to tell her that he was coming back to Kentucky early (because of the arguments with his father), and asked her to find a place for him to stay in Louisville.  She asked him how he was going to get there and he told her that he would take care of that, but wanted her help to find a place to stay.  He then took his father's checkbook and cashed a $200 check on his father's account.  He bought a bus ticket and then went home to pack his things.  He told Wesley he was going back to Kentucky and got ready to leave.  His father then came into his room and apologized for the argument and for being so hard on Randy, then gave him the keys to the suburban and told him that he could go out and use the car.

Randy said that he gave the keys back to his father, describing this as the "turning point in his life."  He said that if he had taken the keys and made up with his father he does not think the events that followed would have happened.

That evening he took the bus to Kentucky.  Wesley called Randy where he was staying to tell him that their parents were upset, his mother was crying about Randy leaving without saying goodbye, and that he thought that he should come home.  Randy realized the mistake he had made, and said that he started to get depressed about his decisions.  Since the summer session was starting shortly thereafter, he decided to stay in Kentucky.  Randy noted that during this time those around him in Kentucky were worried about him.  Once school started he said that he mainly kept to himself, was not involved in summer activities, and spent his free time just

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

walking around campus listening to his headphones.   Mr. Garret, his dorm supervisor for the summer, was particularly worried about him.

One afternoon that summer when he was wandering around the campus, he wrote a poem / letter on a bench at school about he and his girlfriend, Theresa.  It was basically a "love letter" to Theresa, and stated in the end of the poem that he hoped that he and Theresa would come back in five years together to find the poem still there. Feeling that Randy was suicidal and having emotional problems, the school suspended him for the summer session.  Randy thinks that part of the reason the school was so upset was because the benches were brand new and outside the chapel.

Because of his leaving Dallas in the way that he did and because of his suspension, Randy's parents did not want him to come home for the summer.  His parents told him to rent an apartment, saying that he could do so anywhere except Texas or Louisville, they did not want him around.  His father told him that he could even go to Seattle, a place that he had always wanted to go, and live there for the summer.  Randy was 17 at the time, and rented an apartment in Lexington (he had a roommate during part of the summer named Ronnie Brussel).  He worked briefly at Subway, but his parents started sending him money to live on, so he quit working.  His girlfriend was living at her home in Louisville, and so he spent a lot of time visiting her there.

Randy said that this was a hard time for him because he realized the mistakes that he had made. He knew that he needed to finish his schooling, especially after working so hard during the summers to graduate with his class and make up his hours, he wanted to finish with them and graduate from Oneida.  Because of this Randy wrote a letter to the President of the school expressing this, apologized for the incident on the benches, and asked if he could come back to school for his senior year.  The President called Randy and said that he could come back to school after the fall break.  Randy spent the rest of the summer and early Fall in his apartment. Randy's father came up to Kentucky for Family Day in October of 1995 (Wesley was in school),

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

right before Randy was to re-enter school.  Randy met his father at the Lexington airport, and they spent the day together in Kentucky visiting the horse farms and other tourist attractions.

After the fall break and the visit with his father, Randy returned to school to begin his senior year.  Randy said that he and his parents were on good terms and he felt like everything was getting back on track.  However, the second turning point for Randy came over the Holiday Break in December.

Randy was staying in Lexington over the holidays and spending time with Theresa.  While staying with some friends of Theresa, he stole a credit card from them.  Randy said that it was an impulsive thing to do, and he did not need the money.  He called Western Union and had $200 transferred to himself from the card.  He spent the money on Theresa (hotel together for the weekend).  The people that he was staying with called the police, he was arrested and went to jail.  He got a "slap on the wrist" and was out of jail shortly after the incident.  After he got out of jail he went to Louisville to stay in a hotel, planning to remain there until the semester started in January.  Given this theft incident, and the writing on the bench, the President of Oneida called Randy at his hotel to tell him that the school decided to expel him, therefore Randy could not finish his last semester of his 12th grade year, and would not be able to graduate with his class.


## VI.  Post-Oneida

After his expulsion Randy's parents did not want to have anything to do with him.  He stayed with a friend, Emma Opdahl, and her family for a week.  After a week Emma's father said that Randy had to leave, since it was not appropriate for a boy to be staying in a house with a girl.

After leaving Emma's house, Randy went to the Hope Center in Lexington, a homeless shelter.  He stayed at the Hope Center from January 1997 through July 1997.  While he was staying at the Hope Center he was not working.  He donated plasma for money, and spent most of his money buying acid.  He hung out at Kentucky University, and said that the students would buy him food and spend time with him at the local hangouts (he said they felt bad for him).

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

During this time he called his parents a few times to tell them where he was staying, but did not have much contact with them. He spoke with his father once and his father asked him if it was true that he was doing drugs. Randy suspects that Emma (whom he stayed with for one week prior to going to the Hope Center) may have told his parents about his drug use.

He made appointments with the Army and with the Air Force, but was required to have a high-school diploma to join, which he did not have. He did not keep these appointments because of this. Randy got along with the people at the Hope Center well, they liked him a lot and took an interest in him. He would do things for other residents to help them out, like passing out the hygiene supplies in the evening. Because of their strong feelings toward Randy and their feelings that he could get out of this situation, the people at the Hope Center arranged transportation back to Texas for him so that he could reunite with his parents.

## VII.    Post-Hope Center
• This information is discussed by other students in more detail.

Randy got back to Texas and went to his parent's house in Dal Worthington Gardens. He said that he wanted to ask his parents for help, and said that he thought that if he showed up on their doorstep asking for it, they could not refuse him. He was going to tell them that if they would let him live there, he would get help for the drug problems, get a job, and pay them rent – under their conditions. When his parents did not answer the door he went to the neighbor's house to ask if they were on vacation. Shortly after, a police car arrived (the police chief who spoke about Randy on television) and told him to get off of their property or he would be arrested for trespassing.

Not knowing what to do, Randy went to his friend Jason Goldberg's house. Since he was having problems with his parents Jason's family would not let Randy stay with them. That evening he went to the Arlington Night Shelter. He stayed at the Arlington Night Shelter from July 1997 to August 1997 – until going to Fort Worth.

10

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

## VIII.   The Internet Monk – Michael Spencer

A teacher at Oneida wrote an article on his web page about Randy. (See article attached). Randy told us that Mr. Spencer taught Advanced Bible Class, that his brother was on the chess team with Mr. Spencer, and that Randy spent time with him during the first semester of his senior year when he regularly visited the Campus Ministry Center.

The article has a "religious" tone in that it discusses the work done at Oneida and the effect that he thinks it did and could have had on Randy.  The article does state that Randy is "likely to be convicted and executed for capital murder," but notes that he could not find one staff person that had anything negative to say about Randy.  Mr. Spencer does state that he does not think Randy is scum or a monster, but "[h]e is what we all are, a sinner."  Overall the tone of the article is sorrowful.

In speaking with Randy we found that some of the details in the article were not entirely accurate.  Randy stated that he did not understand why Spencer said that Randy was not involved in the school and activities, given the abundance of activities that he was involved in while he attended Oneida.  Also, Randy stated that he wrote a poem into on the bench at Oneida, which got him suspended, Mr. Spencer stated that Randy had written the initials of he and his girlfriend into the bench.

Mr. Spencer says that there are two things that he remembers most about Randy: first was his relationship with his girlfriend (details on this in another section of this memo), and the other is an evening when Randy had decided to become a Christian at a Sunday evening prayer session. Randy does remember this but stated that in the end he decided not to go through with it as he was raised in the Jewish faith and did not think it was the right thing for him after all.

CONFIDENTIAL

PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

Case 3:13-cv-01535-L    Document 17-116    Filed 08/21/14    Page 70 of 535    PageID 13957

## IX.  Randy's Brother – Wesley Halprin

Randy and his natural brother, Wesley, were adopted into the Halprin family when Randy was five. Wesley went to Oneida with Randy, but did not graduate from Oneida. Although Randy has not spoken to his brother in six years, he said that they do have a close relationship. (Randy was not allowed to call home when he came back to Dallas after being expelled from school and was not allowed to write home from prison. Wesley was at home during this time.)

Wesley will be 21 years old in November, and is currently in a Drug Rehabilitation Program in Texas. Randy stated that they have not spoken recently because Wesley is not supposed to have any contact with convicts while he is in the program, and Randy respects that.

Randy thinks that Wesley does have contact with their parents and suspects that they have a good relationship.

## X.  Friends from Oneida

- Mindi Sternblitz – Arlington, Texas
  - Information appears later
  - Tried contacting her by mail. I am still waiting for a response.

- Wayne Evans (250 in US – 10 in Ohio)
  - Best friend until 11th grade.
  - Preppy guy.
  - Falling out because Randy went from being a preppy kid to doing drugs.
  - Eagle Wood, Ohio.

- Jeremy Weiner – Arlington?
  - Sunday school, Hebrew school classmate. Last talked to in summer of '96.

- Chad Jones – Birmingham, Alabama
  - Best friend of Randy's growing up. Last talked to him in summer of '94.

- Courtney Samuels – New York?
  - Class of '97
  - Good Oneida friend

- Demetrius Moxley – Frankfurt, Kentucky?
  - Roommate in '94 and good friend

- Jason Goldberg – Arlington, Texas

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

- Family loved Randy and were close Jewish friends growing up.

- Amy Hall – Huber Heights, Ohio  (16 in Ohio)
  - Ex girl friend and friend.

- Jason Kuhns - Pevlington, Kentucky (none – check spelling)

- Chris Wood - Lexington, Kentucky (11 in Ohio) –
  - Tried contacting Chris in Lexington. There was only one Chris Wood listed that was not a student at Oneida.

- Tommy Helmers – Randy was his Hall Monitor – said that Randy stuck up for him.

## XI.    Friends from Texas

- Chad Jones – Randy wanted to go and see him when he was home between school sessions the summer of 1995.

## XII.    Misc.

- Further Education

- Got GED in the Tarrant County Jail.

- On waiting list to be able to start college in the Connelly Unit.

- Mindi Sternblitz – friend who wrote to Randy while in jail in Dallas.

- While staying at the Arlington Night Shelter Randy went to Six Flags one day.  He saw his friend Mindi, who was working there.  Mindi was getting ready to start college at Texas A & M.  He spent time with Mindi and said that he did not do drugs for the two weeks that he spent with her.  Mindi was going to college and Randy got an offer to move to Fort Worth.  He later found out from Mindi that one week after he had left for Fort Worth her parents had gone to the Arlington Night Shelter to look for Randy to see if he would come and stay with them to he could help them.

13

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

- Ms. Jensen – guard in Colorado jail – loved Randy and hugged him when he left – she talked to him for 15 minutes each day.

- Interviews
- Prime Time – Chris Wallace.
- 60 minutes – Ed Bradley – talked with Randy for 15-minute interview after they talked to George Rivas.  Randy is not sure if this interview ever aired.
- Channel 11 telephone interview – Mary Ann Razzuk

## Teachers at Oneida  - *Quotes by Randy Halprin

- Ms. Dunaway – 7th and 8th  → "Science teacher and 10th grade Biology teacher. I believe she has a videotape of some classmates and I dissecting a frog and goofing off just having a good time. She recorded it."

- Mr. Robinson – later the vice principle → "High school vice principle, often gave me advice. On real good terms."

- Mr. Day – history teacher – left after Randy's 8th grade year

- Ms. Knight – 8th grade History teacher → "When I went to high school, I still stopped by her classroom to say hello."

- Mr. Mike Gibson – "Was the Dean of the middle school dormitory. Often invited my friend Wayne Evans and I into "town" for pizza, etc… Also would spend some weekend nights at his apartment watching movies… Was on very good terms."

- Mr. Heffelfinger (sp?) – "Was the Dean of the high school dormitories. Often gave me advice on different things, would sometimes take me into town also for a movie or Wal-Mart. Helped me pick out a dozen roses for Theresa for her last performance in a play. Also cut my hair often. Was on very good terms."

14

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

- Mr. Lawson – "Nighttime Dean and in charge overall of the middle school dorms. Took me to a restaurant in London, KY for my 16th birthday. Also my "boss" and picked me for my room monitor job and hall monitor job in middle school."

- Mr. Shelby – "My English III teacher and creative writing teacher. Pushed to get me in advanced English, but Theresa, my ex, was in that class, so the advanced teacher wouldn't let me in."

- Mr. "Harold" Underwood – "Soccer coach and head of the high school dorms. Often sat down to chat with me. My "boss" for the hall monitor job. Awarded me the most outstanding worker award for hall monitoring in 94-95.

- Mrs. Winters – "Ran the student "grill" where I always hung out after school. Knew me well."

- Mr. Nichols – "Substitute teacher. Often played with his five-year-old son during baseball games while running the concession stand. Was on good terms. Sometimes ate at his house. And when I had an apartment in Lexington, he stopped by once."

- Mrs. Gordan – "School counselor. Promoted me to my graduating class of 96 because I caught up on the year. I lost my first 7th grade year. Had taken extra classes to catch up on credits."

## Activities and Awards – Pre-Oneida

Fort Worth YMCA Summer Camp        1992
    Broken Arrow Award
    Based on leadership, skills, and participation

## Awards – Oneida

Most Outstanding Worker        1992, 1993, 1994, 1995

Most Outstanding Worker as a Hall Monitor
of Middle School Dorms        1994

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

Highest GPA Awards
    Biology                                     1994

Most Outstanding Pianist                  8th Grade
- Randy played piano at Oneida from 1993-1994

Cleanest Room Awards

A & B Honor Roll

Letters in the Arts Program for Piano

**Activities – Oneida**

Hall Monitor of Middle School and Upper School Dorm

Track and Field (shot put)                7th and 8th Grades

Co-Editor of Creative Writing Class and Magazine    11th Grade
- Asked to do it in 12th grade but got expelled before class started.

Certified in CPR

Life Guard Program
- Never obtained certification because was expelled in summer 1995.

Piano Program

Chosen for "Advanced Bible Class" with Professor Mike Spencer
- Bible class is required, but for this advanced class you either have to be chosen or approved, only a small group of students are admitted to this class, and Randy was chosen.
- Professor Mike Spencer is "The Internet Monk" who wrote an article about Randy on his website.

Set up and escorted Year Book Pageant         1995-1996
- Similar to the Homecoming Queen.

Child Development Program
- Worked with faculty and children in tutoring and study skills.

Performed Piano for Holiday Events

"White House" cleaning volunteer
- The White House is the oldest building on the Oneida campus and was reserved for housing of special guests.

"Friendship House" Volunteer

16

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

- The Friendship House is a Salvation Army like charity in Kentucky which helps low income families.
- Randy would sort clothing and assist with sorting donations.

Concession Stand Volunteer
- Set up and worked concession stands during school sporting events.

### Activities – Hope Center (Lexington, Kentucky)

Volunteered in the evenings to pass out hygiene supplies.

### Activities – Texas

B'Nai B'rith Youth Organization of Temple Beth Shalom (Arlington, Texas)

Received GED while in Tarrant County Jail.

### Activities – Choice Moore Unit
- Randy spent two years at the Choice Moore unit, a holding unit, before going to the Connelly Unit for three years.

Bilingual Choir Pianist

### Activities – Connelly Unit

Jewish Study Group
- Headed by Rabbi Block and Rabbi Marrus of the Chabad Labuuitch of South Texas (San Antonio) and the Connelly Unit.

Business and Economics Course
- College course taken on the Choice Moore Unit.

### Piano

Randy first learned to play the piano when he came to the Halprin's home at a young age. They had a stand-up piano in the living room, and he used to play with it and bang on the keys when he was little. By the time he was 8 he could hear a song once and play it without music. His parents thought he had a "good ear" and got him lessons from ages 8-10 year. At this point he was playing two hours per day for his father, and decided to quit.

17

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

Oneida offered a piano course (practice 1 hour per day) and Randy took it. When he had picked it back up he came home for the holiday and played for his father. His father bought him a keyboard to take back to school with him because he was so proud that he was playing so well.

## Classes

| | | |
|---|---|---|
| 7th Grade | January 1992 (Spring semester) | |
| 8th Grade | 1992-1993 | |
| 9th Grade | 1993-1994 | |
| 10th Grade | 1994-1995 | |
| 11th Grade | 1995-1996 | |
| 12th Grade | 1996 (Fall Semester) (????????????) | |

## Schedule at Oneida

| | | |
|---|---|---|
| Breakfast | 6:00 – 7:00 a.m. | |
| Classes | 1992 – 1994 | Classes from 7:30 – 2:30 p.m. |
| | 1994 – 1997 | Classes from 8:05 – 3:05 p.m. |
| Free Time | End of Classes – 4:30 p.m. Hangout with friends, snack, homework. | |
| Dinner | 4:30 p.m. | |
| Free Time | 4:30 – 8:30 p.m. Hangout in "the Grill" with friends and girlfriend, homework. Volunteer work (listed), attend sporting events, set up and run concession stand during sporting events. | |
| Study Hall | 8:15 – 9:15 p.m. This is a mandatory study hall time at Oneida, since Randy was on honor roll he was not required to attend. He would spend this time in the dorm (since it was quiet because few people were not in study hall) and do homework. | |

18

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

<u>ASK PARENTS FOR</u>
- Videos of Randy playing the piano (Theresa also has this).
- Video of Randy's bat-mitzvah

<u>ASKED FRIENDS FOR</u>
- Yearbooks
- Photos of Randy or any videos (perhaps lawyers could make a video of him with these things).
- Mindi Sternblitz – Gunn Junior High Yearbook 90-91

19

L. LEIDA AWARDS AND ACTIVITIES:

AWARDS:

FT. WORTH YMCA Texas, Summer of 92 CAMP CARTER, I recieved the "BROKEN ARROW AWARD" FOR outstanding camper BASED on leadership skills, participation etc.

Most outstanding worker 92-95, in '94 I recieved special recognition for Hall monitor of the high school dorms.

I've recieved a couple highest GPA AWARDS, but I can only remember Biology '94

Most outstanding pianist 8th grade 83-94

Several Cleanest Room AWARDS

A + B HONOR ROLL RECOGNITION SEVERAL TIMES

SEVERAL LETTERS IN THE ARTS PROGRAM FOR PIANO.

ACTIVITIES:

7th and 8th grade track and Field Team (Shot put)

Was temporarily on the Soccer team but had to drop because of Conflicting class schedules.

Co-EDITOR of the Creative writing class and magazine. 11th grade was asked to follow up in 12th but was expelled before class started again.

PARTICIPATED IN THE LIFE GUARD PROGRAM, but was temporarily expelled Summer of 95 and was never Certified. But was Certified for C.P.R.)

I ILL MONITER OF MIDDLE SCHOOL DORM AND HIGH SCHOOL DORM

PIANO PROGRAM

LEGAL

## POSSIBLE FRIEND CONTACTS:

MINDI STEINBLITZ - Arlington (Childhood and up Friend)

JEREMY WEINER - Arlington (?) (Sunday school, Hebrew school class mate last talked to Summer of '96)

CHAD JONES - Best Friend growing up moved to Birmingham Alabama in 94 last talked to I think Summer of '94. His family loved me to death also.

JENNY HALL - Huber Heights, Ohio (?) (Ex Girl Friend, and Friend) c/o 96

WAYNE EVANS - Englewood, Ohio (?) (Best Friend at Oneida until '94, But still remained friends. Family liked me and often invited me for Thanksgiving and Summer break stays) c/o 94

TIFFANY ? (?) - (Good Oneida Friend) c/o 96

MAGIC B? ? (?) (Good Oneida Friend) c/o 97

VERONICA ? (New York ? (Good Oneida Friend) c/o 96

COURTNEY SAMUELS New York (?) (Good Oneida Friend) c/o 97

? ?, STAC ? ? (?) (Good Friend Oneida Left 9th grade)

TIM ? (?) (Oneida Friend) c/o 96

ANGIE BROWN (?) (Oneida Friend) c/o 95

DEMETRIUS MOXLEY? Frankfort Ky (Room mate 94 and Friend) c/o 95

KELLY SPARKS, New York (?) (Ex Girl Friend and Friend Oneida)

CASEY AUSTIN Michigan ? (Good Oneida Friend) c/o 96

TRAVIS DUCKWALL Louisville, Ky (?) (Oneida Friend) c/o 95

Possible Friend contacts Continued...

~eresa Raney, maybe she still has it?
My parents also have my Bar Mitzvah on tape and other
things that show me playing around with kids, my brothers
etc. I don't know how hard it would be to obtain
some of those. I'm just thinking of things that would
humanize me.

Also, getting a hold of a Gunn Jr High 90-91 yearbook
+ point out people. you could ask mindi Sternblitz for this.
~~T~~ ~~~~

while in Colorado An old Elementary school friend wrote
~om California to offer his support. Johoan Masterson
~e Sent a picture of us together as kids. Edwin King
~ould have that and his address.

There is also An Oneida Alumni group on YaHoo! you
~ Check on that.

MARIAN FELD - Arlington, Tx (Sunday school teacher 5, 6, 7th grade
Also taught me hebrew)

Rabbi KEITH STERN Boston, MASS. (FORMER (?) RABBI of TEMPLE
BETH SHALOM of Arlington.)

## ADDRESSES :

WESLEY, D. HALPRIN # 1026653
B - 1 - 826
4176 FM 1800
BRECKEN RIDGE, TX 76424
(I will probably have to send anything pertaining to me 'Certified
mail' to ensure that he recieves it. )

MINDI STERNALITZ
P.O. Box 152805
ARLINGTON, TX 76015

Internet Research on Randy's friends
(plus information provided by Randy)

 **search the web!** [        ] [Fetch]

Yellow Pages
White Pages
Classifieds
Shopping





# Detail

### TRY PUBLIC RECORDS!

**Result 1 of 1**                              update/remove | add listin

🌷 Send flowers        🎁 Send a Gift        💳 Send Cards
✈ Book Flights         🏨 Book Hotel         📱 People Search Online

**Theresa Dancy**
1107 Rogers St                              **Phone: 502-589-5566**
Louisville, KY 40204

ADD TO 📖        BUY LONG 📞        PURCHASE 📲
ADDRESS BOOK     DISTANCE          WIRELESS

**More for Theresa Dancy:**
• **Map**  • **Directions**  • **Email Search**  • **Find Neighbors**  •

────────────────────────────────────────────────

• **Theresa Dancy is in our Database! Click Here**
• Find Theresa Dancy at ClassMates.com

• **Business Nearby**                       • **Find a Gift**
  Restaurants                                 Search for Products
  Automotive
  Entertainment                             • **Websites**
  Family
  Medical                                   • **City Guide**
  Retail & Community                          Weather
  All Categories...                           Concerts
                                              Schools & Colleges
• **Classifieds**                             More...
  Apartments
  Autos                                     • **Kentucky**
  Employment                                  Lottery Results
  Home Listings
  Personals
  More...

• **Messages**
  Local Talk
  Looking for Someone
  Events & Announcements
  Messages by Topic...

• **Government Directory**

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 84 of 535   PageID 13971

  search the web!   Yellow Pages
White Pages
Classifieds
Shopping




**First Name** Chris   **Last Name** Wood   Search

# Detail

## TRY PUBLIC RECORDS!

**Result 3 of 11**                          update/remove | add listin

🌷 Send flowers     🎁 Send a Gift     📇 Send Cards
✈ Book Flights      🏨 Book Hotel      🔍 People Search Online

**Chris Wood**
2249 Valencia Dr                    **Phone:** 606-224-7723 — *busy signal*
Lexington, KY 40513
ADD TO ADDRESSBOOK    BUY LONG DISTANCE    PURCHASE WIRELESS

**More for Chris Wood:**
• Map • Directions • Email Search • Find Neighbors •

• **Chris Wood is in our Database! Click Here**
• Find Chris Wood at ClassMates.com

• **Business Nearby**          • **Find a Gift**
  Restaurants                    Search for Products
  Automotive
  Entertainment               • **Websites**
  Family
  Medical                     • **City Guide**
  Retail & Community            Weather
  All Categories...             Concerts
                                Schools & Colleges
• **Classifieds**               More...
  Apartments
  Autos                       • **Kentucky**
  Employment                    Lottery Results
  Home Listings
  Personals
  More...

• **Messages**
  Local Talk
  Looking for Someone
  Events & Announcements
  Messages by Topic...

• **Government Directory**

LEGAL



**MSN Home   Hotmail   Web Search   Shopping   Money   People & Chat**   Passport sign out

**Hotmail**® *reality7001@hotmail.com*

Inbox    Compose    Address Book    Folders    Options                    Messenger    Calendar    Help

**Folder: Inbox**

**From:**    Kelly and Chris Hanshaw <ckahanshaw@yahoo.com> Save Address - Block Sender
**To:**      reality7001@hotmail.com Save Address
**Subject:** Randy Halprin
**Date:**    Fri, 22 Jun 2001 22:16:42 -0700 (PDT)

Reply            Reply All          Forward          Delete          Previous          Next          Close

Hey reality,

    Yeah I know not to believe everything I read.  I
for one feel sorry for randy and wish I could get in
touch with him by mail and see how's doing and offer
some encouragement.  I didn't talk to Randy but maybe
4 times in High school but he still seemed like a very
nice guy and you really had to go to our highschool to
understand the bond with people even if you weren't
their best friends.  Do you know how to get in touch
with him?  Is he back in texas? How did you know him?
Before he went to OBI or After?  Just wondering?
Talk to you later.  Kelly

=====
You guys want to make a little extra money for 5 minutes of your time?  Go to:
http://www.SurveyPayday.com/index.cfm?referrer=ckahanshaw just highlight the
link and paste it and sign up, as soon as you do enough surveys to have $15.00
they will send you a check.

_____

Do You Yahoo!?
Get personalized email addresses from Yahoo! Mail
http://personal.mail.yahoo.com/

Reply            Reply All          Forward          Delete          Previous          Next          Close

 (Move to Selected Folder) 

Inbox    Compose    Address Book    Folders    Options                    Messenger    Calendar    Help

Get notified when you have new Hotmail or when your friends are online, send instant messages, listen to music and
more. Try the new browsing software from Microsoft that makes it easy to get more from the Web. Get your FREE
download of MSN Explorer at http://explorer.msn.com



**Other Links:**          **Special Features:**
Buy Music                eShop: great stores, great deals
Download Music           Are your friends online?
Buy Books                The Web's best personal finance site
Free Games               Keep your car running longer
Pharmacy                 Get on your soap box
More...                  More...

© 2001 Microsoft Corporation. All rights reserved. TERMS OF USE   TRUSTe Approved Privacy Statement

 **Hotmail®**   reality7001@hotmail.com       Inbox  |  Previous Page

**From :** Kelly and Chris Hanshaw <ckahanshaw@yahoo.com>
**To :** "...Jennifer ..." <reality7001@hotmail.com>
**Subject :** Re: Randy Halprin
**Date :** Tue, 17 Jul 2001 22:59:21 -0700 (PDT)

*[handwritten: NAME NAME KELLY DZNCU CLASS OF 95(?)]*

I can't believe he remembered me? Wow! Yeah my mom
married lexy's adopted dad. He was close in that my
mom worked at our boarding school, and lexy went there
and her adopted father met my mother that way! Can
you please ask him if we can write him? Tell him that
we are all wondering about him and if it was ok or
possible we would like to write him. I heard he is
still in Colorado? I hope so! Ask him if it was
wayne franklin who we went to the concert with! I
also wanted to let him know if anyone told him Dylan
anderson said anything bad about him it was a lie and
I have his interview on tape. The media seeked a lot
of us out to do interviews and Lexy and I both were on
the news. Just let him know that we both were very
ositive and never said anything at all! we wish we
hadn't been pulled into the whole thing but they would
not stop calling us! please find out if we can
write....thanks Kelly
ps i'll send you pics when i can get a chance i have a
4 yr old and 8 month old and they are a hand full! so
sometimes it takes a while for me to get a chance.
Thanks for writing me back and try to get back to me
about this when you can! Thanks again!

=====
You guys want to make a little extra money for 5 minutes of your time? Go to:
http://www.SurveyPayday.com/index.cfm?referrer=ckahanshaw just highlight the
link and paste it and sign up, as soon as you do enough surveys to have $15.00
they will send you a check.

Do You Yahoo!?
Get personalized email addresses from Yahoo! Mail
http://personal.mail.yahoo.com/

 © 2001 Microsoft Corporation. All rights reserved. TERMS OF USE   TRUSTe Approved Privacy Statement

Oneida website

# Oneida Baptist Institute

P.O. Box 67 Oneida, Ken
1-606-847-4111
Dr. W.F. Underwood, Pre

**The On-Line Home of Traditional, Affordable, Christian Education
for Students in Grades 6-12**

## What other schools are looking for.....
## .... We've Never Lost.

For over 100 years, young people from all over the world have found success, direction, hope and new beginnings at the Oneida Baptist Institute.

As we enter our second century of ministry, we invite you to learn about how someone you care about can find their way to Oneida.



### ENTER THE OBI WEB SITE



*Education for time and eternity*

# The Oneida Baptist Institute Web Site

Box 67 Oneida Ky 40972

606-847-4111

**General Information**
Who We Are
How We Are Different
Campus Tour
Frequently Asked Questions

**Admissions**
Admissions Overview
Applications

**On Campus**
News
This is Oneida
Student Q&A
Upcoming Events
Calendar

**Resources**
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

OBI Farm Program
Yahoo!'s OBI Alumni Club

Webmaster



*OBI's Track Team competed for state honors this year. All students willing to abide by our rules may compete on the sport of their choice. No one is cut because of ability.*

*Take a walk around OBI on our new "CAMPUS TOUR" site.*

*We have updated the Administrative Contacts page.*

*Read the latest news about State Honors for OBI FFA, Track and Bridge Builders.*

*We have updated the 2001-2002 Calendar.*

*Interested in working at OBI? For more information, go to Employment or contact President Underwood.*

*Many alumni have asked for a meeting place. We now have a link to Yahoo's OBI ALumni Club. (This is not run by OBI or the webmaster.)*



Liza Disavoia finishes up "face-painting" at the OBI Fall Festival.

*We now have a special section just for the questions most frequently asked by students coming to OBI. Visit the Student Q&A page.*

*International Student Admissions now has an e-mail address. You may contact Kay Underwood directly at international@oneidaschool.org.*

Oneida Baptist Institute is a Christian Boarding school for students in grades 6-12. We were established in 1899 and are accredited by the Kentucky Department of Education. OBI offers a world of unique. positive differences from any other public or private school.

Our special mission is to help students who need a new beginning in academics, relationships and life. We accept students throughout the year. Any student who is emotionally and physically able to live away from home in a boarding school environment is probably appropriate for Oneida.

This web site gives you the opportunity to learn about OBI, its educational opportunities, unique program and Christian vision. You may request an informational and admissions packet in the admissions section.

You may also keep up with Campus news and upcoming events, plan a visit to tour or volunteer, and contact our staff with questions or information.

The OBI WebSite is  hosted by our friends at www.adgrafix.com. The webmeister is Michael Spencer, always available at digcry1@yahoo.com. If you have a web site problem, drop me a line. It's all copyright 2000-01. Oneida Baptist Institute.



*Education for time and eternity*

# Who We Are

**Home**

**General Information**
Who We Are
How We Are Different
Frequently Asked Questions

**Admissions**
Admissions Overview
Applications

**On Campus**
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

**Resources**
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

**OBI.Net**
Contact Us
Department Pages
Time with God
Links
OBI Discussion Forum

Oneida Baptist Institute opened its doors January 1st, 1900 as a school for children of the mountains of Eastern Kentucky. OBI was the vision of Professor James Anderson Burns, a converted feudist who believed that the Christian Gospel and education were the answers to the cycle of violence between families in the mountains. God blessed Burns' vision and the school was established and prospered. We continue to have a vital mission to the children of Eastern Kentucky.

Through the years, mountain boarding schools found their mission increasingly difficult. Public schools became available and financial support became a challenge. While most other mountain schools closed, OBI survived this era, but saw many difficult days. God preserved our school with many demonstrations of his providence and guidance. Along the way, OBI became part of the Kentucky Baptist Convention family and began enrolling international students.

In the early 1970's Dr. Barkley Moore became President of Oneida. A six year veteran of the Peace Corps in Iran and a person with unusual energy and passion for OBI, Dr. Moore recast Oneida's vision. Under his leadership, OBI became a school of new beginnings for students all over America and the world. Believing in the unlimited potential of every boy and girl who came to Oneida, Dr. Moore expanded Oneida's program, support and facilities. By the time of his death in 1994, Oneida had multiplied in size and finances several times over. We continue to look to Dr. Moore's example every day that we work, believing that Oneida holds a unique place in God's kingdom.

Today Oneida is a unique school. We combine the values of a traditional Christian school with openness to non-Christians and students with all kinds of needs and backgrounds. OBI is diverse in cultures, but rich in the tolerance and respect for differences modeled by Jesus Christ. Oneida staff live and work as part of a Christian community carrying out the original mission of education and evangelism. We are grateful for our heritage and always mindful that the God who brought us this far will see us through.

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 92 of 535   PageID 13979



*Education for time and eternity*

# How We Are Different

**Home**

**General Information**
Who We Are
How We Are Different
Frequently Asked Questions

**Admissions**
Admissions Overview
Applications

**On Campus**
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

**Resources**
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers

**OBI.Net**
Contact Us
Department Pages
Time with God
Links
OBI Discussion Forum

Webmaster

A teacher spending his evenings tutoring in study hall. girl playing basketball. A boy driving a tractor. Four students in a Calculus class. A whole school singing together. A boy wins a wrestling match. A girl supervi after-dinner clean up. All are part of Oneida and all are of why we are different from any other Christian schoo

The reasons we've made such a difference in the lives students are the reasons Oneida is unique in its progra values. Take a tour of the four major areas of Oneida's program and learn how Oneida can be the difference f your student.

## Academics at OBI

## Spiritual Life at OBI

## Co-Curriculars at OBI

## Work at OBI

# Academics at OBI

**Home**

**General Information**
Who We Are
How We Are Different
Frequently Asked Questions

**Admissions**
Admissions Overview
Applications

**On Campus**
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

**Resources**
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

**OBI.Net**
Contact Us
Department Pages
Time with God
Links
Site Search



"The education here is really good... I probably wouldn't have graduated if I'd stayed at home."

Middle school students study English, literature, Bible, social studies, math, science and health. They are also able to choose from a number of electives, including band, drama, academic team and 4-H.

High school students are required to take 4 years of English, 3 years of math, 2 years of science, 3 years of social studies, 1 year of health/physical education, 1 year of Bible, 1 year of computer literacy and 6 electives. Our Bible requirement is in addition to the state requirements for graduation.



Seniors may graduate with either a standard diploma or an advanced diploma. Of our 55 1997 graduates, 25 earned advanced diplomas. One of these received the Commonwealth Diploma, the highest diploma awarded by the state of Kentucky. About 60% of Oneida graduates go on to college or other institutions of higher learning.

Oneida has a "Tutoring Lab" program for students who struggle with low reading and/or math skills. We also provide "English as a Second Language" for international students, and developmental English for students who need assistance with high school English skills.

Work is an Oneida value and job skills are integrated into the Oneida curriculum. Many of our students learn work skills while earning credits in

classes like welding and agriculture. Others have a supervised work experience in the print shop, maintenance, tutoring, publications or library.

Boarding students not on the academic honor roll (B average or above) are required to attend study hall each evening, Monday through Thursday. Students who receive one or more progress reports (D or lower) have an extra study hall on these nights. All OBI teachers take their turn assisting students in study hall. Most of our students significantly raise their grades while they are at Oneida and credit the involvement of teachers as a key factor.

# Spiritual Life at OBI

**Home**

**General Information**
Who We Are
How We Are Different
Frequently Asked Questions

**Admissions**
Admissions Overview
Applications

**On Campus**
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

**Resources**
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

**OBI.Net**
Contact Us
Department Pages
Time with God
Links
Site Search



## "I have really grown a lot as a Christian... I feel so secure in who I am in Christ."

All Oneida students are required to attend a 30 minute chapel service each school day. Boarding students are additionally required to attend two worship services on Sundays. Optional Bible study groups for all ages are available on Sundays and at other times. Friday Praise and Worship is the most popular time of the week at OBI.

Parents are often concerned about what kind of religion their child will be exposed to while they are at boarding school. We have a denominationally diverse faculty and student body, but our worship and approach reflect our Southern Baptist heritage and values. Evangelism is a priority for us, but we respect the various backgrounds and churches that are represented in our school. We do not allow manipulation or pressure tactics in presenting Christianity to our students. Most students who attend OBI do express a personal faith in Christ at some time. We encourage new Christians to become active in their home churches.

While we do not have mandatory counseling of any kind, the OBI staff will approach student problems with Biblical counseling as a tool. Voluntary Pastoral counseling is available for problems related to the student's school and personal experience.

We have the only middle school/high school Baptist Student Union in Kentucky. Older Christian youth can develop leadership skills as BSU small group leaders. Our BSU hosts a weekly prayer time and weekly meetings, plus special events during the year. Students are frequently involved in creative ministries through drama, music, trips, concerts and recreation. Our Salt and Light group ministers to the community. Groups such as Experiencing God and the Tom Jenkin (Missions) Fellowship are also available to students.

Questions about spiritual life at OBI can be addressed to chaplain@oneidaschool.org.

# Cocurriculars at OBI

Home

**General Information**
Who We Are
How We Are Different
Frequently Asked Questions

**Admissions**
Admissions Overview
Applications

**On Campus**
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

**Resources**
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

**OBI.Net**
Contact Us
Department Pages
Time with God
Links
OBI Discussion Forum



## "I like the way they let everybody get involved."

Oneida Baptist Institute is distinctive in allowing any student to participate in athletics regardless of ability. Any student may try out for a team, and no one is "cut" because of lack of ability. The only limitations are KHSAA rules, OBI rules and health considerations. Every year, many of our students participate in a sport or cocurricular activity for the very first time. This "open participation" policy is a key difference between OBI and other schools and one of the reasons we succeed with many students who have failed elsewhere.

Athletic possibilities include: volleyball, cheerleading and softball for girls; golf, wrestling and baseball for boys; cross country, basketball, swimming, tennis, track and field, and soccer for both boys and girls.

Other cocurricular programs are: FFA, Academic team, drama, choir band, chess club, BETA Club and Baptist Student Union. Students publish a monthly newspaper and an annual yearbook.



# Work Program at OBI

Home

**General Information**
Who We Are
How We Are Different
Frequently Asked Questions

**Admissions**
Admissions Overview
Applications

**On Campus**
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

**Resources**
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

**OBI.Net**
Contact Us
Department Pages
Time with God
Links
Site Search



## "I've learned maturity... I've learned how to live."

An important Oneida difference is maintaining a strong tradition of work for every member of our school family. Every boarding student is required to have some type of job. Many cocurricular activities count as jobs in our work program. Students not involved in such activities can choose from a variety of chores. Boys clean our school and administrative buildings and do campus yard work. Girls work in the girl's dorm, dining hall and dishroom. Other jobs for boys and girls include a variety of farm work, dormitory cleaning, working in the OBI grill and serving as dorm hall monitors.



Students who excel at their jobs may be promoted to supervisory positions. Good and outstanding workers are rewarded throughout the year. Through the Oneida work program, our young people learn to value being on time, perfecting job skills, following directions and taking pride in a job well done. For many students, self respect and a new beginning start with a simple job done well.

# The OBI FAQ

**Home**

**General Information**
Who We Are
How We Are Different
Frequently Asked Questions

**Admissions**
Admissions Overview
Applications

**On Campus**
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

**Resources**
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

**OBI.Net**
Contact Us
Department Pages
Time with God
Links

## Frequently Asked Questions About OBI

1. **Why do students come to OBI?**
   - They want a Christian education and Christian influences.
   - They enjoy the independence boarding school gives in preparation for college.
   - Some may be struggling academically in public schools.
   - Some need our Tutoring Lab or our 1:15 teacher/student ratio.
   - Others may be experiencing social or family problems.
2. **Where do our students come from?**
   Approximately 50% of our student population comes from Kentucky. Another 40% comes from other states in the U.S. The last 10% of our students come to us from other countries. OBI is one of the most diverse high schools in the world.
3. **How do people hear about Oneida Baptist Institute?**
   Most of our publicity happens the old-fashioned way: word of mouth. Students and their families share the news of our ministry with others who need to know. Many people in the helping professions recommend us. Our alumni are our best advertisement.
4. **OBI is for students in what grades?**
   We enroll young people in grades 6-12.
5. **Is Oneida a school for "problem kids?"**
   No. We are a Christian school that takes Jesus words and example as our mission. We are a "Good Samaritan" school, trying to share love and truth with young people who need hope and help.

   We are not a reform school, and we do not focus exclusively on students who have problems. We do, however, often accept students who provide challenges for us. We do not accept any student who is not physically and emotionally able to be away from home. During our evaluation process, we seriously assess any behaviors that could hurt others and do not accept every student who applies. If you have questions about whether your child is appropriate, contact admissions@oneidaschool.org.

   Many of our students immediately show that they simply needed adults to become involved with them as positive examples, a consistently caring environment and a more structured schedule.

6. **What percentage of OBI graduates go on to higher education?**
   Approximately 60% of our graduates go on to some form of higher education.
7. **When does the Oneida school accept students?**

We realize that a young person may need what we have to offer at any time during the year. Since we believe in meeting needs when they arise, we do accept students year-round, though not every day. Our Admission's process goes on throughout the year and students are interviewed and accepted every Sunday )except within 3 weeks of a major break.) For more information, see our "Admissions" page.

8. **What can Oneida Baptist Institute offer my child that another school does not provide?**
   - a structured environment
   - small class sizes
   - nightly study hall
   - a Tutoring Lab for students with low reading or math skills
   - boarding facilities
   - a distinctive Christian approach
   - a unique student work program
   - friends from other countries and cultures

9. **What activities can my child be involved in at OBI?**
   Through elective courses in school, students may experience many diverse subjects from the arts to welding. After school, our young people can participate in a variety of cocurricular activities. (For more information, see our "How We Are Different" page or go directly to "Cocurriculars".)

10. **How does the Oneida school maintain its distinctive Christian approach?**
    - Christian faculty and staff
    - daily chapel services Monday-Friday (required of all students)
    - one year of Bible required to graduate
    - an optional advanced Bible class
    - the only middle school/high school Baptist Student Union in Kentucky
    - Worship on Sundays (required of boarding students)
    - Optional Bible Studies and other activities.

    (For more information, go to "Spiritual Life".)

11. **What if we're not Baptists? (or not even Christians?)**
    We have never required that students or their families be Baptist or even Christian. In fact, most of our students do not profess to be Christians when they enroll. We respect the right of each young person to make his/her own decisions. Every year, many do respond and put their faith in Christ. See the information at spiritual life.

12. **What kind of success rate does Oneida Baptist Institute have?**
    Our definition of success is Biblical. We often discover God has a different plan for a young person than anyone ever anticipated. Part of the reward of our ministry is seeing the excitement of a new discovery in the lives of kids who were experiencing failure and frustration prior to coming to OBI.

    Do all of our students go on to college? No! But many go who may have been drop-outs if they had not come to OBI. Do all become Christians? Again, no. However, each year many young people come to understand their need of Christ-centered lives. Many students have told us that it was not only what they accomplished while students here, but

also the life-lessons they learned which helped them long after
graduation. While we are not always successful, we have been able to
motivate and encourage many who were destined for failure.

13. **What kind of financial assistance is available for students?**
Oneida provides financial assistance for virtually every student. Our
fees for room and board are very modest by any standards. The average
boarding school in America charges about $20,000 per year. many are
much more. The average cost to attend OBI is about $4,000 per year.
Additionally, many schools require the fees for each semester to be
paid in advance, but our fees are paid monthly. Oneida students pay far
less than one-half the actual cost of their academic instruction and daily
care. For students with legitimate financial needs, we will go the
second mile by trying to provide additional assistance.

14. **What kinds of discipline are used with students at OBI?**
Minor school infractions will earn a student an after-school detention.
Teachers and deans may also assign essays to students. We do use
limited corporal punishment in some instances, but only the school
principal, Dean of Girls and Dean of Boys are allowed to administer
this. A common form of discipline is the use of assigning work duties
to young people who break the rules. The consistency and predictability
of rules is a major reason many of our students turn their behavior
patterns around and experience success.

Students may also be "campused" for the evening. This means they
cannot go to "free time" or to the computer lab that night.

Boys and girls can also be "social campused" from one another in cases
of inappropriate behavior. Students who are "socialed" can have no
form of contact with each other for a specified number of days.

Oneida students who are suspended on campus are required to work
during the school day. Suspensions may last anywhere from one to ten
days. An average suspension is three days.

Boys generally work on the farm, yard crew or by doing supervised
jobs on campus. Girls may be assigned to the greenhouses or the
kitchen area.

15. **How often may boarding students go home for a visit?**
Dormitory students may have one weekend home per month, provided
they live close enough for this to be feasible. Additionally, one other
weekend a month the family may come to visit with the student on
campus. (Go to Visit OBI for information on campus housing and
lodging nearby.)

Our school schedule provides plenty of time for our young people to
also enjoy extended periods of time with their families: fall break,
Thanksgiving break, Christmas break, spring break, plus several long
weekends. Because we do not normally cancel school for any reason,

the school year passes quickly. Our students are often out 2-3 weeks
before public systems. (For more information, go to our "School
calendar".)

# *An Overview of OBI Admissions*

"Every Student is a unique person with unique needs that are carefully and prayerfully considered. The ministry of our Admissions Counselors is to be sure that every student who enrolls is a student we can help."

Admissions is a process that begins with an extensive phone interview with the parent/guardian of the potential student. When the interview is completed and the completed application and forms are received and reviewed, we can say if the student is appropriate for OBI. Families should know that financial information, counseling records, psychiatric evaluations and school discipline records are frequently requested and reviewed during this part of the process..

"The family has to know why they are choosing a boarding school; and the student needs to be committed to reachable, realistic goals that are worth the effort. Admissions is the process of bringing school, family and student together to agree on what we all want to achieve."

When the application process is completed and approved, a campus visit is scheduled. This visit will be on a Sunday and will include an extensive orientation for student and family, a campus tour, and interviews with the family and with the student alone. Students must consent to be a student at OBI during a private interview without their family present in order to enroll. Often, the student will stay at OBI and immediately enroll. Sometimes there is a short period of further consideration before the student is invited to stay.

Case 3:13-cv-02535-L   Document 17-116   Filed 08/21/14   Page 103 of 535   PageID #3990

Move on to Cost and Other Admissions
Information

New Page 2                                                                                                          Page 1 of 1



*Education for time and eternity*

# Come Visit Oneida Baptist Institute

P.O. Box 67    Oneida,
Kentucky 40972 606-847-
4111

**Home**

**General Information**
Who We Are
How We Are Different
Frequently Asked Questions

**Admissions**
Admissions Overview
Applications

**On Campus**
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

**Resources**
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

**OBI.Net**
Contact Us
Department Pages
Time with God
Links
OBI Discussion Forum

An important part of our ministry is welcoming guests to our campus. Each year, hundreds of guests from all over the world visit OBI to learn about our ministry.

While we welcome anyone at anytime, we prefer advance notice of all visits so that tours and meals can be planned. Groups anticipating eating in the dining hall should give us at least a week's notice (or more) to guarantee enough food is prepared.

On campus accommodations are available, but are limited and frequently booked months in advance. These accomodations are appropriate for couples and small groups, but not for larger groups. Please contact Dr. W.F. Underwood (extension 202) or Mrs. Kay Underwood (extension 203) to plan your visit.

Visits to boarding students must be under guidelines of the student manual. This primarily affects students who are in their first 30 days at OBI, have discipline problems or job responsibilities. Please notify the dean of students, boys or girls if you plan to visit a student.

We only interview and orient new students on Sundays. If you would like to visit OBI to gather information with or for a prospective student, please notify the admissions office so that we can be sure you receive the information you need.

Accommodations are also available in Manchester (17 miles from campus) and London (40 miles from campus).



*Education for time and eternity*

Home

General Information
Who We Are
How We Are Different
Frequently Asked Questions

Admissions
Admissions Overview
Applications

On Campus
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

Resources
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

OBI.Net
Contact Us
Department Pages
Time with God
Links
OBI Discussion Forum

# Contact Us

This directory will assist you in contacting staff at Oneida Bap
sure and contact the right person with your question or reques

**OBI MAILING ADDRESS: Box 67 Oneida, KY 40972-0067** T
for ALL Student mail.

**Telephone: 606-847-4111** This is an automated switchboard. If you do
extension you want to reach, press zero and a receptionist will answer duri

**Fax Machine: 606-847-4496**

**Dormitory Phones (Available only at designated hours): Girls:
4321/4213, Big Boys: 606-847-4512/4412, Baker Hall: 606-847-**

**Extensions: Many staff have voice mail boxes on their extensio
party does not answer, please leave a message at the voice mail**

**Admissions: It is unlikely that you will get a phone call throug
during the school day. You are encouraged to use e-mail or voi
possible.**

President W.F Underwood: president@oneidaschool.org, Ext. 202. Conta
about all employment questions, volunteer opportunities and mission trip i
Underwood schedules all OBI choir performances in churches. Please do n
Underwood about routine student concerns. Contact the dean of students.

Administrative Assistant Kay Underwood: Ext. 203. Call here regarding In
students and campus visits by groups or individuals.

Dean of Students Harold Underwood: harold@oneidaschool.org, Ext. 219.
students is responsible for all aspects of student life, particularly discipline.

Assistant Dean of Students Erma Smith: obi@kih.net, Ext. 217. The assist
is responsible for travel arrangements and medical concerns.

Dean of Girls Billie Hoover: deanofgirls@oneidaschool.org. Voice Mail b
of girls is responsible for all aspects of girls' life outside of school.

Dean of Boys John Saldaris: Ext. 308. johnthebaptist7@juno.com. The dea

responsible for all aspects of boys' life outside of school.

Admissions Director Bill Mock: admissions@oneidaschool.org, Ext. 233. address for your questions about admissions.

High School Principal Dr. Ed Lowdenback: Ext 214.

Middle School Assistant Sharon Lowdenback: Ext. 230

Tutoring Lab Director Charmaine Nichols: Ext. 227

Guidance Counselor Myrtle Cooke: Ext. 216. This is the extension for all q classes, grades and schedules.

Office for transcript and academic records requests for previous students o Jaspersen Ext. 215 Fax Ext. 258

Business Manager Jerry Pierce: Ext. 205

Student Billing and Accounts Betty Hasty: Ext. 206

Campus Minister Michael Spencer: campusminister@msn.com. This is the information about campus ministry and religious life at OBI.

Publications/Print Shop Denise Spencer: denise@oneidaschool.org, Ext. 2

Athletic Director Larry Allen Gritton: Ext. 224

Farm Manager Ken Martin: obifarm@kih.net, Ext. 238.

Alumni Questions- Clara Alexander: Ext. 201

Music Department Chair Tim Cochran: trc3j@juno.com.

Senior Sponsor/English Department Chair Dan Stockton: the_captain_01

OBI Daycare- Ext. 239

Home

General Information
Who We Are
How We Are Different
Frequently Asked Questions

**Admissions**
Admissions Overview
Applications

**On Campus**
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

**Resources**
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

**OBI.Net**
Contact
Us
Department Pages
Time with God
Links

Webmaster





# FFA Brings Home State Honors

It was the realization of a goal when two of our students brought home first-place trophies from the Kentucky FFA convention. Jennifer Martin won the FFA creed contest, while Becky Moore placed first in the swine proficiency placement area.

Farm manager Ken Martin stated that in January, 1997, he and the assistant farm managers set a five-year goal to have a student win a state contest in something. The June 7 victories occurred four years and six months later.

Our sales team came in second in the state. Jennifer Martin was the second high individual and Elizabeth Mischler was third high individual in the sales competition. Other members of the team included Bailey Pinson and Jon Colliver.

Adam Clemons and Becky Moore received their state FFA degrees, and were the first students from OBI to ever receive that honor.

Justin Whitworth and Becky Moore served as OBI's two voting delegates at the convention. Becky became chairman of the Earnings and Savings Committee for next year. Mr. Martin noted that this was definitely an honor.

Becky and Jennifer also participated in the state FFA chorus and served one evening shift as part of the "courtesy corps" in the hotel.

# Track and Field Competes at State Level

The OBI track/field team went to state with best personal times of the season, regional wins, and top state rankings in several events.

Jonathan Moore won the third place state medal in the 100-meter dash. Going into regional competition, Jonathan's season record had him ranked third overall of Class A runners in the state, and first in the region. He qualified for state with a first place regional win in the 100-meter dash, and a second place finish in the 200-meter dash.

Aaron Gebrehiwot earned sixth place in the 200-meter run. At regionals, Aaron had cut 57 seconds off his season's best time to place second. OBI track coach, Ms. Michelle Mau, called it the race of the day and commented, "It was amazing. I still can't believe it. He ran such an awesome race."

The men's 4x100 meter relay team just missed a state medal with their ninth-place finish. The team included Zach Zamudio, Aaron Gebrehiwot, Eujay Dueh, and Jonathan Moore.

# Drafting Students Claim State Prizes

Oneida advanced drafting students claimed four of the five prizes available at the state-wied balsa wood model bridge building competition held in Louisville, Kentucky.

Brandon Roundtree (pictured) won first place in efficiency and strength. His 3.632-ounce bridge held 480 pounds. Zach Thomas placed second in efficiency with his 3.280-ounce bridge, which held 256 pounds. Josh Turner took third place in efficiency, and Adam Dulin finished fourth.

## Home

**General Information**
Who We Are
How We Are Different
Frequently Asked Questions

**Admissions**
Admissions Overview
Applications

**On Campus**
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

**Resources**
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

**OBI.Net**
Contact
Us
Department Pages
Time with God
Links
OBI Discussion Forum

Webmaster



Each week President W.F. "Bud" Underwood writes a column for our Kentucky Baptist State newspaper. "This is Oneida" is a good way to learn about our school. Click to Read the latest column here. Selected past columns are included here in the archives.

- Burying Baby Pigs in the Cornfield
- One Hundred Years later and a world away
- Thanksgiving and More

- Don't Forget the Gifts
- How Do You Come Up With The Names For Your Buildings?
- Can You Save Me Real Fast?

Second week of August, 2000

This is the weekend that students return for
the new school year. It is always the most
exciting time of the year for those of us who
work at OBI. The next few days will be filled
with happy reunions and new friendships.
Students will feel overwhelmed and teachers
will try not to appear to be overwhelmed.

At this time of year, we are very aware of the
sovereign plan of God in which we are just a
small part. Hundreds of different paths from
all over the world will converge in this small
Eastern Kentucky community. Many will
wonder how they ever came to be here. That
is one question with an obvious answer: God
brought us all here.

Scripture says that God is determined to do
far more than any of us can ask of think. We
never know what God is going to do in a
given school year, but we can glimpse some
of his wonderful plans as we join together in
starting the process of caring, teaching,
worshipping and sharing.

At this time of year, we sometimes feel a
kind of temporary sense of adequacy. It will
quickly pass. We will be thrown back on the
resources of the Father almost before the first
day has passed. This is good. It is one of the
ways we are blessed. A single days work is
far beyond our human resources.

Oneida is a planting ministry more than a
harvest ministry. We will see some of the
harvest, but most of our work is in the
planting, weeding and cultivating of God's
garden. Because each person is an individual
who will bring unique needs and challenges,
our approach to each person will be different.
These beginning days are times of coming to
value our students as individuals.

Thank you, Father, that along with thousands
of partners in your Kingdom, we are here at a
crucial juncture of your wonderful plan for
hundreds of students. Sustain and help us,
empower and change us, equip and bless us,
all in your Spirit and your Son. Amen



*Time With God*

*At the center of our life as a
school family is a daily time
of worship. We invite you to
join with us in prayer, praise
and hearing God's Word.*




ARCHIVE
Michael's E-mail
My Philosophy
Michael's Resume

The Truth about
Michael

## A Webjournal Edited by Michael Spencer

**A nation attacked is a nation tested. Do we have the courage to tell the truth and act with justice?**

**Truth**
Drudge
Washington Times
National Review
Frontpage Mag
Fox News
Jewish World Review
World
Rush Limbaugh
Michael Reagan
WSJ Opinion Journal
WorldNetDaily
Town Hall

**Life**
Obscure Reading
Room
Reference Desk
Britannica
Weather Underground
Washington Post
Google

**Poetry**
Noel Spencer

### This Is What Happens...
by Michael Spencer



A Nation attacked is a nation tested. In 1941, the Pearl Harbor Invasion mobilized a nation and brought out a depth of national character against a clear enemy. The evasive face of terror brings a different kind of test to Americans; a test that begins with telling ourselves the truth. Any thinking person knows that we have been playing the odds with terrorists for a quarter century and on 9/11/01, we lost in a stunning way. Here's my list of where truth telling begins. **(MORE)**

### The Two Faces of Pa Involvement
by Steve McFarland



Liberals lov the rest of u guilty. It's es effective if y the guilt pro tactic to so ill that has little or no relation to the produced. Case in point: the long s crusade for more parental involvem public schools. Steve McFarland p what real parental involvement is, a the lie to the guilt tactic. Steve will detention for this one. Read on. (M

### Condit/Levy: Our National Train Wreck
by Michael Spencer



Gary Condit. He's like one of those words you've said for years- like kumquat- and suddenly you just say to yourself, "WHAT IS THAT?" respect to the Levy family, I think we can all benefit from taking a lo at this difficult episode, and asking ourselves what this indicates ab political culture in America. While I'm not one of those who think Co murderer, I am one of those who think he deserves the contempt of voters in Modesto. Hey, you guys could elect a conservative Republ who would at least be embarrassed by his behavior. (Right, Newt?)

## Talk About It on the Message Board (or just post a comm

### Michael Spencer's Most Popular Features

**Why Conservatives Should Reconsider the Death Penalty** Limited governm human fallibility are conservative issues that still matter.

**Respectashockability** Marilyn Manson and James Dobson: gagging all the way bank.

**To Clone or Not To Clone.** Not a joke, just a bad idea.

**Why I Love the Bard.** Shakespeare rescued me from a white trash existence.

**Mariah in Oz.** On the verge of a nervous breakthrough. You go girl.

**Zero Tolerance Follies.** Saving America from wayward youth like the Bush girl

**Singing Praise Choruses With Barbarians at the Gates** Our most complime article so far. And all because someone said I WAS TOO OPINIONATED!

**Why I Am A Christian: A Ten Point Argument** I'm as out front about my be can be in a short space. Attack, agree or be amused.

**Beware the Class of 2001** Why liberals and conservatives need to attend grad and shake a few hands.

**Why do Conservatives Love Standardized Tests?** Get out your pencils and g to mark those circles.

**Trashing the Moral ABCs** The problem isn't Eminem; It's the silence of those should know better.

(They're all in the archives)

## Steve McFarland's Dispatches From Our Public Schoo

**Hugs For Mrs. Hardesty** Lessons in Life that you will never hear in class.

**What Our Children Know** Anyone who says kids need to know more about drugs m some.

**A Hero To Remember** The great Willie Stargell recalls a better, more decent America

**The Kids Are Watching** The NFL (of all places) shows signs of understanding why thi been getting worse.

**P.E., Paddles, and Putty: A Few Things Misplaced in Schools** When somethi changed for the worst, why not take a look at what's changed to make it worse?

**Is There a "Big Fix" For Public Education?** Go ahead. Admit it. Anyone who say have the answer must not know the question.

## Eric Rigney's "CultureWatch" Features

**The Good Spell of Harry Potter** It's a cultural mega-phenomenon. Why are so many Christians missing the magic?

**Flea Market Anthropology (Stupidity Rant II)** Our CultureWatch Editor venture flea market... with predictable results.

**Christian Propaganda is Better Left Behind** Our most controversial article. Eric's opinionated look at "Left Behind" and the fact of evangelical propagandizing.

**John Lennon** The left's Patron Saint reminds us that the search for meaning is universa

## Noel Spencer's "My Opinion " Column

**Brittney Spears: Role Model of What?** From Mouseketeer to stripper-in-train

Michael Highly Recommends the Books (and prices) at Discerning Reader

### Avoid the dumbing down of today's Christian culture



## Special Articles

**My Final Visit To A Christian Bookstore** In the spirit of keeping a good Lent, Mic gives up his primary vice.

**Evangelical Skunks** Michael's response to Eric's Left Behind article, with a few points cultural victory of Evangelical tackiness.

**Randy As We Knew Him** My brief relationship with one of the Texas Seven is food fo thought.

**A Little Rebellion Now and Then** Why the Anarchist movement isn't a rerun of the

**The NRO Review of "Left Behind"** that seems to annoy some readers Hope on the web. It could have vanished by now ;-)



Christian CounterCulture is a great e-newsletter. Subscribe!



[ Previous 5 Sites | Skip Previous | Previous | Next | Skip Next | Next 5 Sites | Random Site |



This RingSurf Defeat the Liberal Media Net Ring
owned by The Internet Monk.
[Next | Skip Next | Next 5 Sites | Random Site | List Sites ]



# The Internet Monk

"the power of opinion, the phenomenon of speech, the impact of tru
A Webjournal and News Review by Michael Spencer
Updated 2/6/01

### Our CultureWatch Editor takes on the demise of the serious re

### Truth
Drudge
Washington Times
National Review
Frontpage Mag
Newsmax
Fox News
Jewish World Review
World
Rush Limbaugh
Michael Reagan
WSJ Opinion Journal
WorldNetDaily
Town Hall
SmarterTimes

### Life
Obscure Reading Room
George
CBS Marketwatch
Reference Desk
Britannica
Weather Underground
Washington Post
First Headlines
Google
Commentators

**In a post-literate culture, the very act of reading is revolutionary.**

"To elect McAuliffe party chairman is an exercise in the art of living dangerously. Bill Clinton perfected that art, and Washington real-estate and financial millionaire McAuliffe is his protege, as well as handpicked chairman of the

## Special Feature: Randy As We Knew Him
### by Michael Spencer



Randy Halprin, one of the Texas Seven, a convicted child beater and now quite likely to be convicted and executed for capital murder in the death of a police officer, attended the school where I teach. For parts of three years, he was a familiar face on our campus. As I've watched his journey into criminal notoriety with curiosity and sadness, its made me think about the realities of American life his case represents so well.

Randy, and his brother, both adopted, came to our school from Texas. Whatever problems he'd experienced before coming were relatively minor, but like millions of American young people, he wasn't connecting. Not with school, or family or community or with the right people. So he came to us for a new start. In that, he was fortunate, since millions of kids just fall through the cracks. (MORE)

## The Reading Room 2.6.01
The Internet Monk is well known among his Evangelical brethren as an undeter the "Left Behind" phenomenon. The on-target review of the film at the NR Online W makes me proud to have declared my colors early. I encourage my Christian friends long look at what Christians believed for two thousand years and compare it to this What's wrong with this picture? It's American sci-fi, not Bible.
    Charles Murray is brilliant, and this culture-wise piece on the decline of America i trash heap will give you plenty to think about. The downhill slope is truly made up of little steps that finally take us over the edge. And every one of us can do something haven't read anything this prophetic in a long time.
    My advice on the Congressional version of the Patient's Bill of Rights: Don't look pawn of the insurance industry. There is a lot to be commended in this legislation, e it has its flaws. The President should make it clear he will sign something, but not ev I'm looking for President Bush to show how skillfully he can assess the expenditure capital and work with his adversaries. Americans are strongly bothered by the outra

## CultureWatch: The Boo Many; The Readers ar
### by Eric Rigney



If you ar this, you abnorma get past sentenc just plain Why are here?! TV or so

There. we've go non-rea among u about th anyone else bothered by the fact th reads anymore? I know, I know, so point out that the New York Times list proves otherwise, that the millio dollars authors reel in every year in people are reading books by the gr in a society of books, someone will literate than any other generation b (MORE)

Democratic National Committee (DNC). Even as DNC members obeyed orders from the former president and Sen. Hillary Clinton to elect McAuliffe, they worried about Republicans taking over federal investigative machinery. "Bring them on!" McAuliffe said on National Public Radio last week, adding: "Who cares? So what?" (Bob Novak)

HMO system. We've been through four in the nine years I've been at my current em they've all been ridiculously insensitive. Compassionate conservatism must be savv conservatism as well.

The possibility of a major airline strike in the spring and summer is a story that b watching. The airline industry is starting to take on the appearance of a black hole f the U.S. economy. The President has some clout here and needs to let the parties k won't be afraid to use it. I can't imagine there is much political capital at stake in sidi consumers, but at base, this is about airline safety and the health of an entire indust

We have discovered that the $100,000 fee to rent Bill Clinton as an after dinner also includes a cadre of protestors. Best chant: "Buy a trailer. It's so you!" The prote the bad taste to show up at Morgan Stanley Dean Witter affair where the ex-prez wa eloquent on spending money on diseases. Just think- they could have gotten the sa for a couple of pieces of furniture.

At one time, conservatives had a lot of good things to say about a cut in payroll t it seems to be the Democrats who mention it the most. This is a tax cut that every w family would appreciate and it is good politics. Makes a great speech line. Great vis that. If the White House needs some negotiating room to get the tax cut through, the tax cut should be part of the package.

A great article on the formative years and culture of President Lincoln. As a nativ Kentuckian, it is good to remember the virtues of one of our greatest Americans was strength of family and rural communities.

 

[ Previous 5 Sites | Skip Previous | Previous | Next | Skip Next | Next 5 Sites | Random Site |

 The page cannot be displayed

The page you are looking for is currently unavailable. The Web site
Banneradsforfree.Com



This RingSurf Defeat the Liberal Media Net Ring
owned by The Internet Monk.
[Next | Skip Next | Next 5 Sites | Random Site | List Sites ]



# The Internet Monk

"the power of opinion, the phenomenon of speech, the impact of truth"

### A Webjournal and News Review by Michael Spencer
Updated 2/3/01

## Special Feature: Randy As We Knew Him
### by Michael Spencer


Our school is one of those "faith-based" organizations that has a
of accepting students who are not connecting with family, school
community. We have a strong academic program, special help fo
struggling students, extra-curriculars, a work program for every st
and, appropriate to our tradition, religious education and an appe
make a personal commitment to Jesus Christ. (Relax, liberals. W
get any government funds.) Every student who comes to us is br
their family, so we're working with families to find success for their children.

Randy Halprin's family was unusually supportive of what we were doing. Everyone who
with Randy and his brother recalls the story of his Jewish father bringing his boys to us,
he would rather his boys be good Christians than bad anything else. But we could also s
pain this family was experiencing. Something wasn't going right. Like so many adoptive
experiencing problems with teenagers, there seemed to be a sense of desperation. This
to work.

Randy was a very well-behaved and pleasant young person. He made a good impressio
those who worked with him. I can't find a single staff member with a bad memory of Ran
Randy didn't fully take advantage of what we had to offer. He made friends, he passed h
classes, but he didn't get involved in activities or sports, he didn't excel at anything, and
ever show the insight into his own life that is the basis of real change.

Two things about Randy stay in my mind. One was his relationship with a girl. Randy an
young lady were one of those couples that everyone thought would never break up. She
bright and flamboyant; he was quiet and utterly taken with her. They took up residence i
school grill and spent every available hour together, gazing at one another with total dev
When I think of "a young man in love," I always think of Randy.

The other was a Sunday evening when the preacher gave a public invitation to our stude
come forward and indicate their desire to receive Jesus Christ as Lord and Master. In ou
tradition, this is an adult step, a life-changing step, and the most serious single commitm
person can make in life. Randy came to me, weeping and sincere, wanting to become a
Christian. I talked with him, we prayed together and Randy went back to his room with a
faith in Jesus.

My tradition also says that everyone who walks forward, cries and prays is not necessari
genuinely converted. It is the beginning of a journey that reveals true faith and nurtures
faith. It is a journey that may include terrible mistakes and seasons of darkness. In the e
leave the results up to God. But we remember Jesus said it is not the healthy who need
physician, but the sick.

Randy got in trouble at our school. At first, it was pranks like sneaking in a girl's restroo
going out his window after bedcheck. Then he carved his name- and his girlfriend's nam
bench on campus. For these problems, he was briefly suspended from school. Then, in

Randy went to a city nearby for a weekend with friends of his family. While there, he got trouble with the law for theft. When he returned, we determined we were no longer appr for Randy and we expelled him.

Then Randy's story becomes the story of millions of young people in America. His family refused to take him back home. Now legally an adult, they gave him money and put him on his he was on the streets. In 1996, Randy had returned to Texas, and was living in a homel shelter, where he was befriended by a young mother. He moved in with her and her chil few months later, under the influence of drugs, Randy brutally beat her infant son, inflicti many serious wounds including a fractured skull. He was sentenced to 30 years in priso (Randy's brother, who was much more of a problem for us, was also incarcerated during time, and is today.)

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

On one of the many television shows about the Texas Seven, an official of the Texas pri system kept referring to Randy as "scum." John Walsh said that he hated Randy the mo because he had attacked a child. In his ABC interview, Randy said he broke out becaus thought he would have a chance to be a different person, not this "monster" he'd becom eyes of the public. Another official said that the fact these men were prisoners made any comment about the abuses in the Texas prison system meaningless.

I'm sorry, but as hard as I could ever try, I will never be able to think of Randy in this one dimensional way. Now don't think I'm a laying aside my conservative values. Randy will charged with capital murder, and even though I'm personally convinced he didn't pull the he is as guilty as those who did. He'll be charged, likely convicted and should be execut found guilty. I would say this to Randy. And I would say it with a broken heart.

Randy Halprin isn't scum. He isn't a monster. He is what we all are- a sinner.  A rebel ag God and a person utterly committed to selfishness, not love. In his heart, and in all of ou is every evil from lying to murder to genocide. I've been to prisons and I didn't feel like I visiting aliens from another universe. I recognized all these prisoners as very much like There but for the grace of God, go I.

Randy made terrible choices. He increasingly made choices based on his own survival a expense of others welfare and lives. The further down this road he traveled, the more pa and dangerous these choices became. It's a long way from stealing a credit card to killin but its not as far as some of us think.

But we, all of us who knew him, failed Randy as well. He behaved in such a way that his couldn't help him any more, but all of us with children know that something is very wrong American family life. Something that is tearing children away from their families, and into violent and empty. Too many young people are divided from their families by divorce, dr materialism and rebellion. Schools, counselors, the community: all of these had a chanc impact Randy's life. The choice of how to respond was his, but the opportunity was ours.

Our school had its opportunity. I know I could have done more for Randy and thousands others like him, but I routinely say that what I am doing is enough. Now I can wonder if o invested in that young man, one more effort at friendship and mentoring, one trip to the or out to eat, would have changed his life. I'll never know.

At the Republican National Convention, George W. Bush said something interesting. List

"A couple of years ago, I visited a juvenile jail in Marlin, Texas, and talked with a group o inmates. They were angry, wary kids. All had committed grown-up crimes. Yet when I lo

their eyes, I realized some of them were still little boys."

"Toward the end of the conversation, one young man, about 15 years old, raised his han asked a haunting question, ``What do you think of me?" He seemed to be asking, like m Americans who struggle: Is their hope for me? Do I have a chance? And, frankly, do you white man in a suit, really care about what happens to me?"

"A small voice, but it speaks for so many: single moms struggling to feed the kids and pa rent; immigrants starting a hard life in a new world; children without fathers in neighborh where gangs seem like friendship or drugs promise peace, and where sex sadly seems t closest thing to belong. We are their country too. And each of us must share in its promi the promise is diminished for all."

"If that boy in Marlin believes he's trapped and worthless and hopeless, if he believes his no value, then other lives have no value to him, and we're all diminished."

"When these problems are not confronted, it builds a wall within our nation. On one side wealth, technology, education and ambition. On the other side of that wall are poverty an prison, addiction and despair. And my fellow Americans, we must tear down that wall."

What I hear in that recollection is the truth that we accomplish nothing by demonizing th whose problems and behavior tell us something important about all of us, and somethin important about our country and our political culture. By simply saying that everyone in p a deviant and the rest of us are all right, we are building bricks in a wall that is dividing A in ways we cannot afford to be divided.

It is time for conservatives to develop an approach to every social issue that doesn't just but creates results. We can be for excellence without leaving majorities of minority childr behind. We can be for law and order and still work for non-prison justice alternatives. W and must, take a look at our "drug war" and see it is a failure for America and for its you people. There are alternatives: faith-based, humanistic, effective alternatives that are tou possible. It is time we invest in literacy, job training and entrepreneurship for all America especially those at risk and who need to start over.

And it is time we looked and listened to our young people, rather than seeing them as m These are our children, and God will ask us about what we did with them.

I will write Randy and tell him we remember him. We know he is not a monster. He is pa what we do right. He is part of what we do wrong. He is a predator, and he is a victim. H challenge of compassion and conservativism for a new generation of conservatives.

Michael@internetmonk.com

Box 313 Oneida, Kentucky
40972

Phone 606-847-4111 (ext 231)

Fax 606-847-4496

E-mail:
Michael@Internetmonk.com

# Michael Spencer

| | | |
|---|---|---|
| **Education** | 1974 - 1975<br>Williamsburg, Ky | Cumberland College<br> Religion/Philosophy major |
| | 1975-1978<br>Owensboro, Ky<br>Religion/Philosophy | Kentucky Wesleyan College<br>**Bachelor of Arts** |
| | 1979/ 1982-1984<br>Louisville, Ky | Southern Baptist Theological Seminary<br>**Master of Divinity** |
| | 1986-1987<br>Louisville, Ky | Southern Baptist Theological Seminary<br>**Post-Graduate Study** |
| **Professional experience** | 1976 - 1978<br>Owensboro, Ky | Buena Vista Baptist Church<br>**Minister of Youth** |
| | 1979-1982<br>Owensboro, Ky | Bellvue Baptist Church<br>**Minister of Youth** |
| | 1982-1984<br>Owensboro, Ky | Highland Baptist Church<br>**Minister of Youth** |
| | 1984-1988<br>Somerset, Ky | First Baptist Church<br>**Associate Minister** |
| | 1988-1992<br>Shepherdsville, Ky | Bullitt Lick Baptist Church<br>**Pastor** |
| | 1992-present<br>Oneida, Ky | Oneida Baptist Institute<br>**Campus Minister, Teacher** |
| | Currently<br>Manchester, Ky | Manchester Presbyterian Church<br>**Minister** |
| | 2000-Present<br>Oneida, Ky | Internet Monk Publications<br>**Editor** |
| **Personal** | | Married to Denise Spencer for 23 years. Two children: Noel, age 16 and Clay age 13. |

Box 67

Records from Oneida

April 13, 9:13

Randy Halprin          "Why I want to become a genius"

As a child in school I was very slow. I started kindergarten not knowing my alphabet or how to count. My parents pushed and pushed me to try harder, but I did not. Eventually I learned the necessary, but still did not try very hard.

I continued on with the lackadaisical efforts on school. I didn't care. I thought to myself, "what is school? Why am I waisting all this time on nothing?" Soon I would regret having not cared for school.

It was the seventh grade, and nothing was going to stop me now. I was a "big man." I didn't have to listen to anybody. My grades became worse than they had previously been. My parents grew worried, not knowing what had happened to their son. That year I failed the seventh grade. Then came Oneida.

I arrived at Oneida with a different attitude on school. The only reason for that was so I could get out of that place. I began to think, why am I doing this, is it for me or is

## Affidavit

Before me, the undersigned authority, personally appeared <u>Kathryn J. Jaspersen</u>, who, being by me duly sworn, says as follows:

My name is <u>Kathryn J. Jaspersen</u>, I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated: I am the custodian of the records of Oneida Baptist Institute. Attached hereto are <u>23</u> pages of records from Oneida Baptist Institute. These said pages are kept by Oneida Baptist Institute in the regular course of business, and it was the regular course of business of Oneida Baptist Institute for an employee or representative of Oneida Baptist Institute with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the records or to transmit information thereof to be included in such records; and the records were made at or near the time or reasonably soon thereafter. The records attached hereto are the originals or exact duplicates (i.e. photocopies) of the originals.

Custodian of Records for Oneida Baptist Institute

SWORN TO AND SUBSCRIBED before me on the <u>23 RD</u> day of <u>OCT</u>, 2001.

<u>Harold S Underwood</u>
Signature of Notary Public

<u>HAROLD S UNDERWOOD</u>
Notary's Printed Name

My commission expires: <u>2-5-2004</u>



# ONEIDA BAPTIST INSTITUTE

## Dr. W. F. Underwood, President

*Education for time and eternity*

P.O. Box 67
Oneida, Kentucky
40972-0067
(606) 847-4111
Fax (606) 847-4496

Founded in 1899

NAME **HALPRIN, RANDY**   SEX M X F   DATE OF BIRTH **9-13-77**

GRADE SCHOOL GRADUATED FROM

ATTENDED OTHER   DATE ENTERED THIS SCHOOL **1-20-92**

SECONDARY SCHOOLS   W **1-8-96**

**1993-94 — 9th**

| SUBJECTS | 1ST | 2ND | 3RD | 4TH | WK | CR |
|---|---|---|---|---|---|---|
| Auto Maint. | | | | | | .25 |
| Alg.I/Pre-Alg | F | F/C | B | | | .5 |
| Biology | D | B | B | A | | 1 |
| P.E./Health | C | C | B | | | .75 |
| Computer | C | | | | | .25 |
| English I | C | | | | | .25 |
| English II | D | D | C | C | | 1 |
| Drivers Ed. | | | B | B | | .5 |
| Piano | A | A | A | A | | 1 |
| World Hist. | D | C | A | B | | 1 |

DAYS ABSENT   TOTAL **6.5**

**1994/95 — 10th/11th**

| SUBJECTS | 1ST | 2ND | 3RD | 4TH | WK | CR |
|---|---|---|---|---|---|---|
| Chem/Int.Chem | F/ | C | C | C | | .75 |
| Geom/Inf.Geom. | F/ | C | D | C | | .75 |
| Child Dev. | A | A | | | | .5 |
| Creat.Writ. | | | A | A | | .5 |
| Eng. III | B | A | B | B | | 1 |
| French I | D | | | | | .25 |
| Piano | A | A | A | C | | 1 |
| Typing I | | A | C | | | .5 |
| U.S. History | A | B | C | B | | 1 |

DAYS ABSENT   TOTAL **6.25**

**1995-96**

| SUBJECTS | 1ST | 2ND | 3RD | 4TH | WK | CR |
|---|---|---|---|---|---|---|
| Adv. Bible | | A | | | | |
| Anatomy | | D | | | | |
| English IV | | B | | | | |
| Geography | | B | | | | |
| Intro.Ch/Ph. | | D | | | | |
| Piano | | A | | | | |

not in school

DAYS ABSENT   TOTAL

| SUBJECTS | 1ST | 2ND | 3RD | 4TH | WK | CR |
|---|---|---|---|---|---|---|
| SUMMER '93 | | | | | | |
| P.E. | B | | | | | .25 |
| English I | | B | B | B | | .75 |
| SUMMER '94 | | | | | | |
| Algebra I | B | C | B | B | | 1 |
| SUMMER '95 | | | | | | |
| Bus. Math | D | C | | | | .50 |

DAYS ABSENT   TOTAL

GRADING SCALE

A- 90-100
B- 80-89
C- 70-79
D- 60-69
F- 0-59

CREDITS REQUIRED TO GRADUATE:

STANDARD DIPLOMA   20

ADVANCED DIPLOMA   23

*Kathryn J. Jaspersen*
Kathryn J. Jaspersen
Guidance Secretary

**10-9-01**
Date

ACCREDITED BY THE KY DEPARTMENT OF EDUCATION

# ONEIDA BAPTIST INSTITUTE

## Dr. W. F. Underwood, President

*Education for time and eternity*

P.O. Box 67
Oneida, Kentucky
40972-0067
(606) 847-4111
Fax (606) 847-4496

———— Founded in 1899 ————

NAME
LAST          FIRST          MIDDLE                    SOCIAL SECURITY NO.

HOME ADDRESS
STREET          TOWN     STATE     ZIP CODE                    HOME PHONE
                                                              AREA CODE          NUMBER

FATHER'S NAME                                        NATIONALITY          RELIGION          LIVING

MOTHER'S NAME
FIRST          MAIDEN          LAST          NATIONALITY          RELIGION          LIVING

FATHER'S OCCUPATION

MOTHER'S OCCUPATION

GUARDIAN'S NAME                              ADDRESS                              PHONE

NO. OF BROTHERS          NO. OF SISTERS          LANGUAGE SPOKEN IN HOME

### TEST SCORES

| NAME OF STUDENT | SOCIAL SECURITY NUMBER | TEST DATE | |
|---|---|---|---|
| HALPRIN RANDY E | 453770592 | MONTH 04 | YEAR 95 |

| ACT | ENGLISH | MATHEMATICS | | READING | SCI. REAS. | COMPOSITE | TYP (T2) |
|---|---|---|---|---|---|---|---|
| TEST SCORES: | 16 | 12 | | 15 | 16 | 15 | N |

| SUBSCORES: | 08 | 08 | 04 | 10 | 02 | 08 | 07 | | 13 |
|---|---|---|---|---|---|---|---|---|---|
| | USE./TCH. | RHET. | ELEM./ALG. | ALG./GEOM | GEOM./TRE | SOC. SCI. | ARTS/LIT. | % AT OR BELOW NAT'L COMP. | |

DATE OF GRADUATION                    NO. IN CLASS               RANK          GPA

GRADE COMPLETED(IF NOT GRADUATED)

WITHDRAWAL          REASON                              DATE

TRANSCRIPT OF CREDITS SENT TO                              DATE

| GRADING SCALE | CREDITS REQUIRED TO GRADUATE: | |
|---|---|---|
| A– 90–100 | STANDARD DIPLOMA | 20 |
| B– 80–89 | | |
| C– 70–79 | ADVANCED DIPLOMA | 23 |
| D– 60–69 | | |
| F– 0–59 | | |

*Kathryn J. Jaspersen*
Kathryn J. Jaspersen
Guidance Secretary

10-9-01
Date

ACCREDITED BY THE KY DEPARTMENT OF EDUCATION

DATE: 1/3/92

Age? 14   Grade? 7

NAME OF STUDENT   Randy Ethan Halprin

NAME OF PARENTS   90  Dan Halprin

oldest of 4

ADDRESS OF STUDENT   2906 Oak Trail Ct

Arlington, TX 76016

(Zip Code)

TELEPHONE NUMBER OF STUDENT   817-265-7725 home

(Area Code)

NAME OF REFERRAL AGENT   friends

(DHR) How did y hear of Cmdx

ADDRESS OF REFERRAL AGENT

(Zip Code)

parents Together

Telephone Number of Refferal Agent

(area code)

Have any relatives or friends attended?  Yes? ✓  NO?

If "yes", WHO?   Shawn Gregg

(1) Why are you thinking of a boarding school for your child? family is
Jewish, can't get him motivated
works as volunteer at police dept,
never thinks through his actions

(2) What special interests? Sports? Music? Mechanics? Art?
wants to be a policeman, choir,
perhaps piano,

(3) Any medical problems? NO

(4) How does child do academically? failing but capable

(5) Ever suspended or expelled? arguing w/ friend over religion

(6) Any trouble with law? NO

(7) Ever runaway from home? NO

(8) Any problems with: marijuana? drinking? etc.
no       no

(9) When can you come to visit?   12:30, 1/19 to stay

Not a trouble maker
clean cut guy.
when going gets tough he backs off
main problem in School

Those were all things that I were very proud of.

Oneida, was my highland, my home. I miss it very much. Too much. Never have I wanted something back so badly. I would do Any thing For another chance. I want to be the Randy I was For so many years. I want to be the person everybody could depend on, Everybody trusted. I miss Oneida.

Ever since I was removed From the Oneida Family, I've been lonely. Yes I know it is my Fault, but I want another chance. I'm not suicidal in any way. I'm not Emotionally unstable. I've always had a good out look on life. Times were getting ruff for me, but never would I killed myself over anything!

Now, I am 17 years old going on 18. I've been working at Subway It's okay there. I get paid enough to live off of. My apartment is nice, but honestly I miss the dorm rooms of Oneida. My problem is no school will accept me. I can't go to public school without my Parents Sighing me in. It takes a year to get the G.E.D and honestly I want a high school diploma. I had it all worked out For Oneida next year. I only need 4.5 credits. I want Oneida on my diploma.

What would it take For me to come back? I'm willing to give up everything. My breaks, I'll work both work programs. Please, Oneida is where I belong. I won't steal, I won't graff, to Oneida's Property. And you don't have to worry about my Emotional State, because I am just Fine.

where I feel comfortable. I can say I love Oneida, because I've experienced so much about life there.

Please, IF there is anything I can do to get back into Oneida tell me. Don't think this letter is of "Brown nosing." I mean everything I wrote. I really want to come Back "home!"

Thank you for taking the time to read this. My address is 1521 Continental Sqr. Apt. 27 Lexington, Ky 40505 (606)299 - 3328. Once again thanks for your time.

In christ,

[signature]

Letters sent to Randy's friends/brother

October 18, 2001

Mr. Wesley D. Halprin
# 1026653
B-1-B26
4176 FM 1800
Breckon Ridge, Texas 76424


Dear Mr. Halprin,

My name is Kristin Bliss. I am a third year law student at Southern Methodist University. One of my classes is working with defense attorneys George Ashford and Ed King in the defense of your brother Randy Halprin. I am writing to you on his behalf.

My class partner, Cindy Casey, and I have visited with Randy on a few occasions and were able to obtain your address through him. If you have already been contacted by Mr. Ashford or Mr. King, I apologize for any repetitiveness.

We are aware of your close relationship with Randy and are anxious to speak with you concerning all of the favorable information, stories and memories you have about Randy that you may be willing to share. Anything we may be able to learn from you will assist us in our defense of Randy.

We have been talking with Randy about the time he spent at Oneida Baptist Institute and the friends and memories he has from those five and half years. We are also aware that you began attending Oneida a few years after Randy. We are specifically interested in finding a yearbook from any year Randy attended. This information would assist us in finding former friends and teachers who may lend complimentary testimony at Randy's trial. If you have one of these yearbooks and are able to send it to us, would you be willing to lend it to us for the purpose of his defense?

We are also interested in obtaining any pictures or videos of Randy with family or friends that might be used as evidence of Randy's character and personality.

Please email me at your earliest convenience at kbliss@mail.smu.edu. so that we may continue to build our defense. You may also call Ed King at 214-871-8800.

Thank you for your assistance.

Sincerely,



Kristin M. Bliss

October 18, 2001

Miss Mindi Sternblitz
P.O. Box 152805
Arlington, Texas 76015

Dear Miss Sternblitz,

My name is Kristin Bliss. I am a third year law student at Southern Methodist University. One of my classes is working with defense attorneys George Ashford and Ed King in the defense of Randy Halprin. I am writing to you on his behalf.

My class partner, Cindy Casey, and I have visited with Randy on a few occasions and were able to obtain your address through him. If you have already been contacted by Mr. Ashford or Mr. King, I apologize for any repetitiveness.

We are aware of your long friendship with Randy and are anxious to speak with you about any favorable information, stories or memories you have about Randy that you may be willing to share. Anything we may be able to learn from you will assist us in our defense of Randy.

Please email me at your earliest convenience at kbliss@mail.smu.edu. so that we may continue to build our defense. You may also call Ed King at 214-871-8800.

Thank you for your assistance.

Sincerely,

Kristin M. Bliss

# EMERGENCY INFORMATION

Significant Medical Problems _____

Allergies _____

Drug Sensitivities _____

Other _____

## GROWTH RECORD

| Age | Date | Height | Weight | Head Circ. |
|-----|------|--------|--------|------------|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## KAISER PERMANENTE

### MEDICAL CARE PROGRAM

PERMANENT RECORD
OF
IMMUNIZATIONS AND TESTS

Child's Name _Halsin Hardy_

Address _____

Birth Date _9-13-77_      Sex _M_

Parent's Name _____

THIS BOOK IS A VALUABLE PERMANENT RECORD. BRING
IT WITH YOU WHENEVER YOU VISIT YOUR DOCTOR.

KEEP THIS BOOK IN A SAFE PLACE

THIS INFORMATION WILL BE NEEDED
WHEN YOUR CHILD ENTERS SCHOOL.

010220

# BOYS 2 TO 18 YEARS
## PHYSICAL GROWTH
## NCHS PERCENTILES*

Arlington Memorial Hospital
800 W. Randol Mill Road
Arlington, Texas 76012

**Emergency Medical Recor**

| Account number 9138600042 | Medical record number 0000503395 | Admission date and time 10/13/91 10:56 | Health care plan ☐ MC ☐ HMO ☐ PPO ☐ PP |
|---|---|---|---|

| Name (Last) ALFRIN, RANDY E | (First) | (Middle initial) | Birth date 09/13/77 | Age 14Y | Sex M | Allergies ☐ NKA |
|---|---|---|---|---|---|---|

| Time | B/P | Pulse | Resp | Temp ☐ Oral ☐ Rectal | |
|---|---|---|---|---|---|

Private physician _Chiarello_ ☐ Office ☐ Ans service ☐ Home Time 1015  Response time 1125 — Reg Ange X Cons 12  Exam time  Current medications

ES physician _Torgerson_ 1012  Consulting physician ☐ Office ☐ Ans service ☐ Home

Physician history & exam  History from: ___  Wt ___

| Chief complaint | Time | Physician's Orders | Time | Physician's Orders |
|---|---|---|---|---|
| Hx Bicycle accident. Thrown over handlebars. Denies LOC. Hit face first on ground. c/o chest + upper abdominal pain. Walked home from accident and "collapsed" on living room floor. Vomited repeatedly. Felt SOB. Arrives by ambulance. | 1114 | ☐ CBC w/o diff ELT-8 <br> ☒ CBC w diff ✓ <br> ☐ Lytes <br> ☐ BUN ☐ Creat <br> ☐ Gluc ___ | | ☐ UA <br> ☐ Amylase <br> ☐ Card enz <br> ☐ Chem profile |
| PE Alert NAD. head NC/AT <br> Face: multiple abrasions facial bones intact. <br> neck: non tender no deformity or step off. <br> chest wall: tender over Ⓛ lateral chest - large abrasion, no crepitance or subq air. <br> Mild tenderness to deep palp LUQ <br> BS ⊕. <br> lungs clear. <br> extremities: scattered abrasions over hands. Good ROM at all joints. <br> Back: nontender. | 1117 | ☐ ABG <br> ☐ EKG <br> ☐ Monitor | 1117 | ☒ CXR ☐ Port <br> ☐ C-spine ☐ Port <br> ☐ CT: |
| @ 1200 noon pt back from xray. breathing fine / no N or V <br> Dr. Chiarello will be in to finish evaluating patient. | | Medications / Treatments <br> 1117 Ⓛ shoulder | | → to adm <br> No spleneny <br> need Rev <br> Abd ( abdom ⊕ ✓ |
| Test results   H/H 14.5/45.3 | | | | |

Discharge instructions / prescriptions / conferences    No PE Activity for 1 week
Rest                                 Dictated PO Dr Chiarello / K Roduneseley
Compresses
ASA / odin

| Notify | Dischg Cond | Disposition | Diagnosis (tentative) _Abrasion & Contusion_ |
|---|---|---|---|
| ☐ Coroner <br> ☐ Animal Control <br> ☐ ___ive <br> ☐ ___py <br> ☐ Police <br> ☐ Child Welfare <br> ☐ Organ donor | ☒ Improved <br> ☐ No change <br> ☐ Expired | ☐ Admitted to ___ Via ___ <br> ☐ Transferred to ___ <br> ☒ Home with ___ <br> ☐ AMA <br> ☐ MD office ___ <br> Discharge time 1255 | Physician's signature _Tага ____ |

ER1100-1/91

# Emergency Services Nursing Assessment

ER105-610

| | | | | | |
|---|---|---|---|---|---|
| Admission date 10-12-91 | Triage time AM / PM | Method of arrival ☑EMS ☐Ambulatory ☐Carried ☐W/chair | Sex M | Date of birth 9-13-77 | Comment | Priority I II III IV |

Name: Helprin, Randy E.
Address/City/Sate/Zip code: 2906 Oak Trail Ct. Dalworthington

Chief complaint: Bike accident — face and chest

Nurses' signature: S. Ernfinger, RN

## Assessment

**Treatment — PTA**
☐None ☐C. collar/B. board ☐IV ☐O2 ☐Drsg ☐Splint ☐Other

**Inital Vital Signs**
Time: 1055
B/P 141/73 ☐sitting ☐standing ☑lying
Temp 97.5 ☑oral ☐rectal
Pulse 67 ☑reg ☐weak ☐irreg ☑strong
Resp 16 ☐labored ☑unlabored

Pt. fell on bike...

Nurses' signature: S. Ernfinger, RN

### Private physician: Chiarello ☐HMO

### Previous Medical History
Medical History: ☑no chronic
☐Diabetes ☐Seizure ☐Hypertension
☐Lung ☐Heart
☐Surgery
☐Other
Current medications:

### Neurological
Orientation: ☑time ☑place ☑person
Loss of consciousness ☑no ☐yes Duration
Pupils PERL
Neuro Flow Sheet ☑yes ☐no

### Skin
Skin temp: ☐hot ☑warm ☐cool
Hydration: ☑dry ☐moist ☐diaphoretic
Color: ☑norm ☐pale ☐flushed ☐cyanotic

### Clothes/Valuables Check List
☐Underwear ☐Shoes/Boots
☐Pants/Jeans ☐Socks/Stockings
☐Skirt/Dress ☐Shirt/Blouse
☐Coat/Jacket
☐Cash total $
☐Jewelry
☐Other
☐Valuables envelope #
Signature #1
Signature #2

### Allergies:
☑NKA
LMP —  Ht. ☑stated 5-10 ☐actual  Last tetanus
Pregnant ☐yes ☑no  Wt. ☑stated 170 ☐actual  Smoker ☐yes ☑no

### Flow Sheets: ☐Continuation/Flow Sheet ☐Transfer form ☐MET

### Procedure Times
O2 — Foley
Intubation — Lavage
NG tube — CPR
Chest tube R — L

| Time | Temp | Pulse | Resp | B/P | Nurse Documentation |
|---|---|---|---|---|---|
| | | | | | = (R) & (L) lower rib section. c/o 5th finger (R) hand painful - swelling. abrasions (R) hand (R) hand upper lip and chin. Sm amt of edema (R) hand. |
| 1225 | 66 | 18 | 13½/57 | | Pt alert oriented, MAEW. c/o being cold, blanket given. Abrasions cleansed w/ Shur cleans N.S. 4x4's. Neosporin Ointment applied. Pt dschg'd per w/c to father. Dscha instructions given to father and signed. Pt in stable condition. Kadwise, RN |

| Initial | Signature |
|---|---|

Randy
Halprin

8/3/95

Dr. Underwood,

I've always enjoyed being at Oneida. Ever since my
first day my eye's have been opened into the power Oneida
has. Sure, it was a new place, and yes it was scared.
I mean things were different. I missed my family, and
my friends, but over the weeks I often forgot about
them because my mind was on school and my new
friends. My grades went from O's to A's and B's.
For once my parents were proud of me. Oh, besides
when I would come home they would say, "Oh Randy,
your attitude is so much better now, Oh Randy, you
clean so well." It made me feel good.

Four and a half years. That's how long I had been
there. I had my ups and downs, but those were
about the best four years I can remember. Never
was I an extreme trouble maker or threat to the
school. I never had excessive hours or licks. Yes of
course I would do something stupid every once in
a while, but it wasn't like I got in trouble every day.

I became a Room monitor after only being at Oneida
for one quarter. The following year I became Room
monitor and hall monitor. I kept the position of
hall monitor for three years serving time in both
Baker Hall and The Carnahan, Marvin Wheeler dorms. I also
joined Track (middle school, highschool), played soccer in the
summers. I had the highest G.P.A. in Biology, History,
and in P.E./Health. I was the most outstanding Fresh-
man Pianist. And all four years I was there I was

just to leave this place? Then it hit me
I realized that without school, I would be
a nobody just as my parents had said

The following quarter my grades
shot up like a rocket. I began to feel
better about myself. I made honor roll
for the first time in my life.

Now it's the year 1995 and
I have the opportunity to become
a junior in high school. There are
many reasons why I want to be placed
in this grade. The first reason is so
that I will graduate in the class of '96,
instead of being a year behind in the class of '97.
The second reason is that I believe my
grades, and attitude on school have changed
tremendously. The third reason is
so that I may tell my parents and myself
that I knew I could do it, and that I'm
going to be somebody. And the last reason
is so that I may continue on with a positive
attitude.

I would greatly appreciate the
moving of my classes. I feel confident
I can do a good job if not better

in the junior class. I thank you for
the cooperation I have recieved in becoming
a junior. Thank you, I know I can
make it.

Halbleib, Randy Lunah

j219-92      7th

1-28-92 (8:05 a.m.) Incident report from Ms Mehmel--No homework for math.
    1 swat

5-13-92 (1:17 p.m.) Incident report from Mr Adams---Dumping chocolate milk in another students food.
    1 swat

2-24-93 Incident report from Mrs Dunaway---Will not cooperate in class; wants to talk continuously; class is a joke for him. Ignores warnings and other punishments.
    ALC

4-2-93 Incident report from Mrs Dunaway---Cannot keep his mouth shut. Thinks out loud too much. Very disturbing when having class discussion. Warnings have no effect, continues to ignore me.

4-21-93 Suspended to the farm for being in the girls bathroom in the Chapel building during free time with his girlfriend, Daphne Williams and another girl.

5-4-93 Suspended to the farm for climbing out 2nd floor window of Baker Hall using a sheet.

10-16-93 Suspended to Mr Underwood for not following orders and coming back on the Taxi with 3 other OBI students from Lexington to the wrong Burger King in London and then getting the police involved because we weren't there to pick them up.

8-24-94 (5th period) Incident report from MR. Crow---Excessive talking in class. Given after school detention--didn't show.
    Going today-Mr. Robinson

4/5/95 - 4/7/95 Suspended to Joe Cushman for stealing VCR from Ms Beyers classroom.

Picked up for shoplifting in Lexington by the Police over the Spring Break. Got into it with his Dad at home and he left and spent time in Louisville with Teresa Dancy.

07-10-95 Carved a note to Teresa Dancy in the brand new benches that the volunteers just made for the CMC building.
    Dr Underwood called his Dad and made arrangements for him to leave.
    Dad called me and he said Randy could not go home. He may go to any city he wants to go to and he will pay for his bus ticket and housing for 6 months. Randy will have to get a job.
    Randy chose to go to Lexington. We took him to the bus.
    W-10

10-08-95          12th.

01-04-96  Went home with Charles & Terri Kernell from Lexington for the
break.  Stole 2 of their Christmas checks amounting to $275.00.  They took
him to Louisville to visit friends and while there, he used their credit card
number and had Western Union wire him $200.00.  Police picked him up and
arrested him at Kernells' after they went back to Louisville to bring him
back to their home.  They were not aware of the Western Union transaction
until Discovery called them.   Dr Underwood said not to let him return.
          W-10

# CONTRACT

I, _Randy Helping_ am grateful to

be allowed to return to Oneida.  I **was not** brought back to Oneida, **I am here**

**because I wrote a letter requesting permission to return.**  I understand I

am under a strict 90 day probation.  <u>**During that time I will make passing**</u>

<u>**grades in all of my classes; if I accumulate excessive hours and/or licks,**</u>

<u>**if I do the same things that caused me to be expelled before, if I do not**</u>

<u>**show proper respect to faculty, staff and peers, or if I do anything**</u>

<u>**to be suspended, *I will be sent home and will not be allowed to return!*** </u>

After my probation is over, I will still make every effort to be a responsible

and productive student.  I will also continue to show progress in every area of

my life.

I also want to **apologize** to all of those I have offended.  I understand that

being at Oneida is a      *PRIVILEGE   NOT   A   RIGHT!*

Signed _____
                                    Student

Signed _____
                                    Parent or Guardian

Date _____



# TEXAS ASSESSMENT OF ACADEMIC SKILLS
## CONFIDENTIAL STUDENT REPORT

STUDENT: HALPRIN    RANDY    E

DATE OF BIRTH: 09/13/77

STUDENT-ID (PEIMS): 64103665 3

DISTRICT: 220-901 ARLINGTON ISD
CAMPUS: 047 GUNN J H
CLASS GROUP:
LOCAL-STUDENT-ID:
TEACHER

REPORT DATE: DECEMBER 1991

DATE OF TESTING: OCTOBER 1991

GRADE: 07

## PERFORMANCE REQUIREMEN

### WRITING

| WRITTEN COMMUNICATION | OBJECTIVE MASTERY | ITEMS CORRECT/TESTED |
|---|---|---|
| 1. PROCESS WRITING ("HOW-TO") | | |
| COMPOSITION RATING: | | |
| ANALYTIC INFORMATION: | | |
| 2. SENTENCE CONSTRUCTION | YES | 10/12 |
| 3. ENGLISH USAGE | YES | 9/12 |
| 7. USE OF SPELLING, CAPITALIZATION, AND PUNCTUATION | NO | 7/12 |

TOTAL MULTIPLE-CHOICE OBJECTIVES MASTERED: 2    TOTAL ITEMS: 26/36    SCALE SCORE: 1490

MET MINIMUM EXPECTATIONS ON
WRITING COMPETENCIES:
NO

MINIMUM EXPECTATIONS:
2 ON COMPOSITION + 27/36
3 ON COMPOSITION + 18/36
4 ON COMPOSITION + 9/36
(SCALE SCORE: 1500)

OBJECTIVE MASTERY:
(3 OR 4 ON COMPOSITION REQUIRED        9/12

### READING

| READING | OBJECTIVE MASTERY | ITEMS CORRECT/TESTED |
|---|---|---|
| READING COMPREHENSION | | |
| 1. WORD MEANING | YES | 3/4 |
| 2. SUPPORTING IDEAS | NO | 2/4 |
| 3. SUMMARIZATION | NO | 4/6 |
| 4. RELATIONSHIPS AND OUTCOMES | YES | 3/6 |
| 5. INFERENCES AND GENERALIZATIONS | YES | 11/14 |
| 6. POINT OF VIEW, PROPAGANDA, AND FACT AND NONFACT | YES | 5/6 |

TOTAL OBJECTIVES MASTERED: 3    TOTAL ITEMS: 28/40    SCALE SCORE: 1510

MET MINIMUM EXPECTATIONS ON
READING COMPETENCIES:
YES

MINIMUM EXPECTATIONS: 28/40
(SCALE SCORE:1500)

OBJECTIVE MASTERY:                3/4
or:                5/6
or:                11/14
(SCALE SCORE: 1500)

### MATHEMATICS

| MATHEMATICS | OBJECTIVE MASTERY | ITEMS CORRECT/TESTED |
|---|---|---|
| CONCEPTS | | |
| NUMBER CONCEPTS | YES | 3/4 |
| ALGEBRAIC/MATHEMATICAL RELATIONS AND FUNCTIONS | YES | 3/4 |
| GEOMETRIC PROPERTIES AND RELATIONSHIPS | YES | 4/4 |
| 4. MEASUREMENT CONCEPTS | NO | 2/4 |
| 5. PROBABILITY AND STATISTICS | YES | 3/4 |
| OPERATIONS | | |
| USE OF ADDITION TO SOLVE PROBLEMS | NO | 2/4 |
| USE OF SUBTRACTION TO SOLVE PROBLEMS | YES | 3/4 |
| USE OF MULTIPLICATION TO SOLVE PROBLEMS | NO | 2/4 |
| 9. USE OF DIVISION TO SOLVE PROBLEMS | NO | 1/4 |
| PROBLEM SOLVING | | |
| 10. PROBLEM SOLVING USING ESTIMATION | YES | 3/4 |
| 11. PROBLEM SOLVING USING SOLUTION STRATEGIES | NO | 2/6 |
| 12. PROBLEM SOLVING USING MATHEMATICAL REPRESENTATION | NO | 3/6 |
| 13. EVALUATION OF THE REASONABLENESS OF A SOLUTION | NO | 1/4 |

TOTAL OBJECTIVES MASTERED: 6    TOTAL ITEMS: 32/56    SCALE SCORE: 1410

MET MINIMUM EXPECTATIONS ON
MATHEMATICS COMPETENCIES:
NO

MINIMUM EXPECTATIONS: 39/56
(SCALE SCORE:1500)

OBJECTIVE MASTERY:                3/4
OR:                5/6

FORM NO.
7038-02024-24121

# ARLINGTON INDEPENDENT SCHOOL DISTRICT
Gunn Junior High School
3000 S. Fielder
Arlington, Texas 76015
(817) 465-6381

### NOTICE OF WITHDRAWAL FROM SCHOOL

Student's Legal Name: **Halprin**     Randy     E.     Date: 1-21-92 ~~1-17-92~~

Last     First     Middle

Generation: _____     Sex: M _X_ F___     Date of Birth: 9-13-77     Current Grade: 07
Jr., Sr., II, III, IV, V

Ethnicity: American Ind/Alaskan_____ Asian/Pacific Islander_____ Black_____ Hispanic_____ White/Not Hispanic X

Date Enrolled: 8-29-91     Local Student I.D. #: 86966     County District # 220-901 Campus # 047

Social Security #: _____     PEIMS Alt. I.D. #: S22511521

I.D # Last Reported to PEIMS: S22511521     Reason for Withdrawal: (03) Ky

Method of Verification: _____     Locker #: _____

**TEACHERS:** Fill out the form below, giving each six weeks' grade to date. If the books are checked in, sign the BOOKS IN column. If the books are not checked in, give the book number in the BOOKS OUT column and indicate the price of the book. A student must have a numeric grade in each subject at time of withdrawal. Arlington's grading scale:
A (90-100) Excellent, B (80-89) Good, C (70-79) Fair, or (below 70) Failing.

Semester: Fall _x_     Spring_____

| Per | Subject | Teacher | Room | Six Weeks Grade | | | Exam Grade | Sem Grade | ✓ | Books In Signature | Books Out Book # | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 1st | 2nd | 3rd | | | | | | |
| 0 | | | | | | | | | | | | |
| 1 | Life Sci | McElwee | 125 | 67 | 57 | 73 | 72 | 67 | | J. McElwee | | |
| 2 | Conc Chr | Johnson | 137 | 94 | 94 | 96 | 67 | | ✓ | | | |
| 3 | Tex Hist | Austin | 257 | 83 | 97 | 94 | 91 | 91 | | Austin | | |
| 4 | Lunch/HR | Weber | 148 | | | | | | | | | |
| 5 | PE | Nix | Gym | 98 | 94 | 98 | | | | | | |
| 6 | English | Stanley | 242 | 50 | 55 | 55 | 40 | 63 | | CS | | |
| 7 | Math | Castellano | 224 | 70 | 59 | 66 | 40 | 61 | | N Castellano | | |

* Failure due to absentee policy.

LIBRARIAN: Donna Woodward
COUNSELOR: _____
CLINIC AIDE: D Mazur
Immunizations:
DPT 8-83 POLIO 8-83 MEASLES 6-82 MUMPS 6-82
Booster___ Booster___ Booster___ Booster___
DATA CLERK: Mary Bea    Rubella 6-82
Attendance:
Total Days Present 90     Total Days Absent 2
REGISTRAR: Jenny Carpenter

White - Student
Yellow - Assistant Principal
Pink - Registrar/Folder
Goldenrod - Counselor

OTHER OUTSTANDING FINES

| AMT. | DESCRIPTION | TEACHER SIGNATURE |
|---|---|---|
| | | |

...TOTAL DUE

D. P. Lyly
Principal or Assistant Principal

A-060-91

Full Legal Name: HALPRIN          RANDY          ETHAN
Student ID Number: 86566     Ethnicity: WHITE, NOT HISPAN.
Social Security Number: _____   Sex: MALE
Date of Birth: 9/13/77   Place of Birth: _____
Former Name: HALPRIN          DANIEL     N
Current Address: 2900 OAK TRAIL CT
City: ARLINGTON   State: TX   Zip Code: 76016

Most Recent Former Address: _____
Home Phone: 467-5221   Business Phone: 461-9494

Name of High School: CODE JUNIOR HIGH SCHOOL
Phone: 817-465-5381   Proposed Date of Graduation: 1991
High School Address: 10000 S. FIELDER
State: TX   Zip Code: 76015

High School Program: _____
Advanced High School Program: _____
Advanced High School Honors Program: _____
Date of Entry in 9th Grade: _____

District Name: ARLINGTON INDEPENDENT SCHOOL DISTRICT
TEA County/District/Campus Number: 220 901 042
Rank: _____   No. in Class: _____
Grade Point Average: .00000   Date of Ranking: _____
Last District/High School Attended: _____   Date Calculated: _____

ROBERT VIGNAM
Signature and Title of School Official          PRINCIPAL

| Generic Course Name | GRADE 07 — Abbreviated Course Name | 1990 – 91 | | | GRADE — Abbreviated Course Name | 19 – | | |
|---|---|---|---|---|---|---|---|---|
| | | 1st Sem Gr | 2nd Sem Gr | Cr | | 1st Sem Gr | 2nd Sem Gr | Cr |
| ENGLISH LANGUAGE ARTS | ENG 7 | 56 | | | | | | |
| MATHEMATICS | MATH 7 | 61 | | | | | | |
| SCIENCE | I SCI 7 | 68 | | | | | | |
| SOCIAL STUDIES | TX HST 7 | 65 | | | | | | |
| ECONOMICS / FREE ENTERPRISE | | | | | | | | |
| HEALTH | | | | | | | | |
| PHYSICAL ED / EQUIVALENT | ATH 7-B | 95 | | | | | | |
| | LUN/AR 7 | 0 | | | | | | |
| OTHER LANGUAGES | | | | | | | | |
| FINE ARTS | ART 7 | 79 | | | | | | |
| COMPUTER SCIENCE | | | | | | | | |
| VOCATIONAL EDUCATION | | | | | | | | |
| BUSINESS EDUCATION | | | | | | | | |
| OTHER ELECTIVES | | | | | | | | |
| LOCAL CREDIT | | | | | | | | |

Total Credits for Year: _____

ABSENCES
Regular School Year: 1.0     1st Sem 3.0   2nd Sem   Total
8/27/90 – MO     W/D _____
Entry _____
Reason _____

A PASSING GRADE IS 70 OR ABOVE

| VALUES | BASIC | REGULAR | HONORS |
|---|---|---|---|
| 97-100 | 1 | 12 | 15 |
| 87- 96 | 1 | 11 | 14 |
| 90- 92 | 1 | 11 | 14 |
| 85- 86 | 1 | 12 | 13 |
| 83- 84 | 1 | 10 | 13 |
| 82- 82 | 1 | 10 | 12 |
| 80- 82 | 1 | 9 | 12 |
| 77- 79 | 1 | 9 | 11 |
| 72- 78 | 1 | 8 | 11 |
| 70- 71 | 1 | 7 | 10 |
| BELOW – 70 | 0 | 0 | 0 |

CERTIFIED BY A.I.S.D.
RECORDS CLERK: _____

Note: The "Abbreviated Course Name" column, where space is provided to the right of the desired fee for H = Honors Course; P = Advanced Placement Course; I = International Baccalaureate Course; A = Advanced School Course; S = Special Education Course taken with modified content or mastery levels as a result of an ARD decision. Other

DATE: _____

ACCREDITED BY:
Southern Association
of Colleges and Schools

Texas Education Agency
X Yes ___ No

X Yes ___ No

# ARLINGTON PUBLIC SCHOOLS
## Pupil's Cumulative Record — Elementary School

**LEGAL GUARDIAN** Parents

| Code | | |
|---|---|---|
| School Year | | |
| Date of Entrance | | |
| Date Ending | | |
| Code | | |
| Days Absent | | |
| Total Present | | |
| Reading | | |
| English | | |
| Spelling | | |
| Math | | |
| Social Studies | | |
| Science | | |
| Art | | |
| Handwriting | | |
| P. E. | | |
| Music | | |
| Orchestra | | |
| Special Education | | |
| R I P | | |
| Speech | | |

| School Year | Date of Entrance | Date Ending | Code | Days Absent | Total Present | English Language Arts | Reading Level | Reading * Performance Level | Math | Math * Performance Level | Social Studies | Social Studies * Modified | Science | Science * Modified | Health | Physical Education | Music | Orchestra | Art | Retained or Placed or Promoted | Name of Teacher |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 83-84 | 9-2 | 5-31 | K | 0 | 164 | S | | | S | | S | | | | E | E | | | S | 1st | S. Hague Clark |

**REQUIRED COURSES**

| School Year | Date of Entrance | Sem Ending | Grade | Days Absent | Total Present | Language Arts | Reading | Math | Science | Social Studies | Physical Ed. | Music | Art | Band | Orchestra | Speech | Spanish | Homemaking | Industrial Arts |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 5 | | | | | | | | | | | | | | | | |
| | | | J | | | | | | | | | | | | | | | | |

**ELECTIVE COURSES**

**ACADEMICS, ATTENDANCE, AND RESIDENCE — GRADES 5 - 8**

Notes on Transportation

Retained or Promoted or Promoted to:

Gunn Gunn

# ARLINGTON PUBLIC SCHOOLS
## Pupil's Cumulative Record — High School

* ACCREDITED BY TEXAS EDUCATION AGENCY AND SOUTHERN ASSOCIATION OF COLLEGES AND SCHOOLS

NAME OF

ADDRESS  4015 Glenbrook Drive

PHONE  467-5221

FATHER  Daniel Halpern

MOTHER  Patricia Halpern

LEGAL GUARDIAN  Parents

Occupation of
Parent or Guardian

Salesman  John State Med.

Comp. Programmer - Wesson Co.

Birthplace  McKinney  Texas
City  State

Birthdate  9 / 13 / 72
Month  Day  Year

GRADUATION DATE                    RANK IN CLASS                    OF                    QUARTILE RANK                    OR POINT AVG.

| SCHOOL | | | | |
|---|---|---|---|---|
| YEAR SUBJECTS | 1st Sem. | 2nd Sem. | Sum. Sch. | Sum. Cr. |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| TOTAL CREDITS EARNED | | | | |

| SCHOOL | | | | |
|---|---|---|---|---|
| YEAR SUBJECTS | 1st Sem. | 2nd Sem. | Sum. Sch. | Sum. Cr. |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| TOTAL CREDITS EARNED | | | | |

| SCHOOL | | | | |
|---|---|---|---|---|
| YEAR SUBJECTS | 1st Sem. | 2nd Sem. | Sum. Sch. | Sum. Cr. |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| TOTAL CREDITS EARNED | | | | |

| SCHOOL | | | | |
|---|---|---|---|---|
| YEAR SUBJECTS | 1st Sem. | 2nd Sem. | Sum. Sch. | Sum. Cr. |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| TOTAL CREDITS EARNED | | | | |

Transcript to ____

COLLEGE ENTRANCE SCORES

Immunization Record
DPT
Polio
Measles  6-10-82
Rubella  6-10-82
Mumps  6-10-82

AT END OF 7th SEMES.

| Year School Building | Residence of Student Street Name and No. or District | Entrance | | Attendance | |
|---|---|---|---|---|---|
| | | Date of Entry Code | Days Present | Days Absent | W. days Day E. Semes |
| | | | | | |
| | | | | | |
| | | | | | |

_Karly Helper (Randy Helper)_

| VACCINES | | DATE GIVEN | VALIDATION DOCTOR OR CLINIC | DATE DOSE DUE |
|---|---|---|---|---|
| DTP or Td | 1 | 6-10-82 | DCCHD | |
| | 2 | 6-14-83 | DCCHD | |
| | 3 | AUG 25 '83 | DCCHD | |
| | 4 | 1-15-92 | LS/RAC | |
| | 5 | | | |
| | 6 | | | |
| | 7 | | | |
| Polio ☐ Oral ☐ IPV | 1 | 6-10-82 | DCCHD | |
| | 2 | 6-16-83 | DCCHD | |
| | 3 | AUG 25 '83 | DCCHD | |
| | 4 | | | |
| | 5 | | | |
| Measles | | 6-10-82 | | |
| Mumps | | 6-10-82 | DCCHD | |
| Rubella | | 6-10-82 | | |
| Other MMR | | 1-15-92 | LS/RAC | |
| TB TEST DATE | | RESULT | | |

**PHYSICIAN'S VERIFICATION OF MEASLES/MUMPS ILLNESS**
This is to verify that the person for whom this card was issued had:

☐ measles illness on or about _____
month and year

☐ mumps illness on or about _____
month and year

and does not need the vaccine/s.

_____        _____
Date                Physician's Signature

RICHARD A. CHIARELLO, M.D.P.A., F.A.A.P.
717 NORTH FIELDER ROAD
ARLINGTON, TEXAS 76012

_Karly Helper_

5

1                       State's Exhibit N

2

3

4

5

6

7

8

9

10

11

12

13

14

15            (research document, attached hereto)

16

17

18

19

20

21

22

23

24

25



**DEATH PENALTY PROJECT**
**Professor Roark Reed**
Spring 2002

**Research and Investigation**
**RANDY HALPRIN CASE**
**George Ashford, Esq.**
**Ed King, Esq.**

# *Confidential*

| | | |
|---|---|---|
| **TEAM #1** | Joanna Tollenaere<br>Kim Kyoung | Randy Halprin Mitigation:  Years at Oneida |
| **TEAM #2** | Brad Keeler<br>Cynthia Lowery | Randy Halprin's Life Prior to Adoption<br>   at Age 5 |
| **TEAM #3** | Blake Riordan<br>Chris Fuller | Conditions in the Connally Prison Unit |
| **TEAM #4** | Joseph Henderson | Specific Intent and the Felony Murder Doctrine |
| **TEAM #5** | Macy Jaggers<br>Sheryl Kao | Motion to Quash Indictment |
| | Macy Jaggers | Report on Research of Randy Halprin's<br>   Underlying Offense |
| **TEAM #6** | Jessica Aman Brown<br>Kristen Mistretta | Randy's Life with The Halprins |

LWU 47
01016935



STATE'S
EXHIBIT
*N*
8-20-10

PENGAD 800-631-6989

# TEAM #1

## Joanna Tollenaere
## Kim Kyoung

# RANDY HALPRIN MITIGATION:
# YEARS AT ONEIDA

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

## MEMORANDUM

TO:          George ~~Alford~~ *Ashford* and Ed King

FROM:       Kyoung Kim and Joanna Tollenaere

RE:          Randy Halprin Mitigation:  Years at Oneida

DATE:       ~~December 5, 2001~~  *May 9, 2002*

Randy Halprin entered Oneida Baptist Institute ("Oneida") in 1992 at the insistence of his parents.  At that time, he was attending Gunn Junior High School and had to repeat seventh (7th) grade.  His parents opted for Oneida Baptist Institute because its program allowed Randy to catch up with his 7th grade through summer school.  Their hope was for Randy to graduate on time and with his class.

There was another reason why his parents sent him to Oneida.  Oneida is a boarding school located in Oneida, Kentucky.  It boasts of its' conservative Christian values more than its' education.  Oneida is not an exclusive boarding school available mainly for privileged children; its main focus is to "rehabilitate" students who are having problems with school and home.  At that time when Randy entered Oneida in 1992, he was not only on academic probation, but also having difficulties at home with his parents.  His parents had also hoped that Oneida would "rehabilitate" Randy and enable him to be more focused on school.

There were many incidents during his Oneida years that foreshadowed Randy's later life.  For instance, Randy states that if his parents had been more accepting of him, he would not have left home and done what he did.  In other words, his parents' rejection led to a series of (chain) of events that eventually resulted in his incarceration.  Furthermore, if the school did not expel him, he would have graduated with a high school

1

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

diploma.  His parents would have been proud of him and his life path could have been different.

However, Randy acknowledges this only slightly.  He seems to be in denial about his past.  Throughout our interviews, he gave us hints of how his parents could have been more supportive and how the school could have been more lenient.  However, once we focused on his regrets, he expressed to us that he really did not have regrets and did not blame anyone but himself.  Throughout the interviews, he was focused on conveying to us what a nice guy he was, how sorry he was about the crimes he committed and how much he has changed over time.

Randy Halprin was overall, very easygoing and affable.  He seems to be very positive and overly optimistic.  Too optimistic that we were inclined to think that he was either living in a fantasy land or in denial about his painful past.

**Oneida**

His parents according to Randy sent him to Oneida because he was not focused on school, and he needed a more disciplined environment.  They also sent him because he had to repeat his 7th grade at Gunn Junior High School.  He stated that he was not a delinquent; he was merely not focused on school and was more into having fun.  This hurt him because he felt that his parents merely wanted to get rid of him because they considered him a problem child.

He seems overall happy with his experiences at Oneida.  He said he spent his most productive years there, and it showed in the first two years at Oneida.  He was on the honor roll (his school transcript is hereby attached to the memorandum), he was voted

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

as the hall monitor, and he loved his piano class.  He remembers his piano class fondly because of his passion for music.

However, he said the school was too strict.  There had dress code prohibiting boys from wearing jeans and girls from wearing short skirts.  There was segregation between the sexes.  Physical contact between the opposite sexes was strictly regulated.  Students were suspended if you engaged in physical contact that involved more than holding hands.  The students had to attend regular religious service and take a course in Biblical history and study.  These were all required as part of the school's curriculum.  Furthermore, the parents had to sign a disclaimer regarding "corporal punishment."  Randy mentioned how the usual "corporal punishment" by the school consisted of paddling behind the buttocks.

During Thanksgiving, Randy would spend time with his friends and his friends' families.  For Christmas, he would come visit his parents in Texas.  Randy's father also visited him during "Family Day" at Oneida.  During the summer, Randy made up his credit hours after his 7th, 8th, 9th and 10th grade years.  He was also the Hall Monitor in his 9th grade.  He was in charge of one of the halls, ensuring that all the students abided by the school rules, mainly, being in bed by bedtime.

Overall, the first two years at Oneida to Randy were enjoyable.  He made friends, his relationship with his parents improved, he was voted the most outstanding pianist, and was elected as a Room Monitor.  Most of all, he met the love of his life, Theresa Dancy.  They were known as the star couple on campus.  They were nearly inseparable.  His continuous and intense relationship with his girlfriend could have very well resulted in his constrained relationship with his parents.  He described Theresa Dancy as being

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

"really pretty" and "a great, amazing writer." He could not take honors English with her because the instructor, Professor Shelby, thought Randy being a boyfriend of Theresa, would distract her from her writing. Later, they were allowed to be co-editors of the Creative Writing Class Magazine.

It was at this time that Theresa introduced Randy to drugs. They did acid and marijuana. He also became more focused on Theresa rather than on school. He was either spending majority of his time talking to her on the phone or just spending time with her on campus. His parents began to notice this and threatened Randy that if he did not get in shape, they would take away his financial privileges.

In many ways, fighting over Theresa with his parents revealed deeper tensions between Randy and his parents. Randy felt that Theresa was the only one who truly understood him and he felt alienated by his parents. Randy wanted to become a musician, he loved piano, he loved the arts and he loved history. Most of all, he wanted to become famous. His parents did not understand his passions for music. They were more academic-oriented. They wanted Randy to excel in school and eventually become a professional. This, Randy did not want to do. Aside from academic differences, his parents disapproved of his drug use. It was in 1995 that they discovered that Randy was smoking marijuana. Randy promised them that he would kick the habit, but he never did.

The first significant rift with his parents occurred in May of 1995 when he was visiting his parents in Dallas. He had an argument with his father over Theresa and as a result, Randy's father refused to lend him the family's car. Thus, Randy took his father's mountain bike. Upon Randy's return, his father admonished him for using the bike without the father's permission.

CONFIDENTIAL

PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

Soon after his argument with his father, Randy cashed his father's check in the amount of $200 and hoped to return to Kentucky. His father soon apologized, and handed Randy the keys to the car. However, Randy returned to Kentucky despite his father's apologies. While in Kentucky, Randy started his summer school and felt increasingly depressed over his decision over having left his parents. He said at this point in his life, he felt increasingly bewildered and trapped. Coupled with his drug use, his faltering relationship with his parents and the school's restrictive atmosphere, he became more and more of an introvert. Mr. Garrett, his dorm supervisor, began to see a change in Randy Halprin and began worrying about him.

While Randy was wandering around campus listening to music in his headphones, he wrote a poem on the school bench about his love for Theresa. For some reason, the school interpreted the poem as Randy's suicide note. The President called Randy to his office and temporarily expelled him because at that point the "school was not capable of understanding him." When he called his parents, his parents told him not to come back to Texas. Their offer was that they would continue to support him financially, but they no longer wanted him in Texas. Randy rented an apartment in Lexington, Kentucky (his roommate at that time was Ronnie Brussel). He lived basically on his parents' money. He often visited his girlfriend Theresa often at her apartment in Lexington.

Soon after, Randy wrote an apologetic letter to the President of the school asking to be readmitted. Since he had worked so hard in working throughout the summers to make up his credit hours, Randy desperately wanted to finish his senior year. The school readmitted Randy and he was to resume his senior year at Oneida.

5

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

Throughout this time, he was continually doing drugs: marijuana, ecstasy and added acid to his senior year. In 1996, Randy stole a credit card from Theresa's friend. Randy said that he needed the money at that time since his parents had reduced their financial contribution to him. His parents feared Randy was spending too much time having "fun" and not focused on school. He was taken to jail and officially expelled from school.

After this incident, his relationship with Theresa went downhill. After being expelled in 1996, his parents ceased supporting him. No longer with Theresa, Randy stayed with a friend, Emma Opdahl in Lexington for a week. Her parents thought it inappropriate for their daughter to be spending time with a boy, so Randy on the request of Emma's parents left for the Hope Center.

## Post-Oneida

Randy stayed at the Hope Center from January 1997 to July 1997. He was not working but whatever money he could find through odd jobs, he spent it on drugs, mainly acid. He worked part-time at Steakfest preparing food, but that job stint did not last long. At this time, he was still communicating with his parents, but very seldom. He was running out of money, and officially separated with Theresa. In the midst of all these difficulties, he managed to finish his GED at the Hope Center.

His parents also discovered that Randy was still abusing drugs. Randy, in order to salvage his relationship with his parents, enlisted in the army. However, the army rejected him because he needed college hours but lied to his father that he had enlisted anyway. His father became more accepting towards Randy after Randy's supposed

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

"recruitment." However, once his parents found out the truth, the incident broke them further apart.

His counselor at Hope Center, Rebecca _____ (Randy does not remember her last name) encouraged him to return to Dallas to his parents. Hope Center helped raised funds for his transportation. When he arrived in his parents' home, he found the door locked. No one answered the door, so he went next door to his neighbor's house and asked if his parents left the keys to the house with them: "I know my parents leave a key with you all." A police car pulled up and threatened Randy with trespassing. Randy soon left the property and stayed with his friend, Jason Goldberg.

Jason's mother told Randy to go to the Arlington Night Shelter because she saw Randy as a bad influence over her son. While at the shelter, Randy spoke to his mother and she told him that they were taking him out of the will. At this point, Randy realized that his parents were "finished with him." His mother told him that he not only was unfocused and troublesome, but most of all, he had lied to them about his drugs use and his army recruitment.

He stayed at the Arlington Night Shelter from July 1997 to August 1997, until he left for Fort Worth. While at the Arlington Night Shelter, he met a woman by the name of Mindi Sternblitz, who still retains contact with him. He was also heavily into drugs and alcohol. At this point, his relationship with his parents ceased to exist.

## Analysis

Although Randy did not openly blame Oneida, he did cite some problems he had with the school. He acknowledged that the school system contributed to his later behavior, meaning the school somewhat caused the chain of events to occur, which

7

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

eventually landed him in jail. He stated that the first couple of years at Oneida were perfect. He scored A's and B's. He was able to take piano classes, he made friends easily, and he fell in love. His relationship with his parents improved during this period. However, he said that the situation for him would have been better if the school was not so restrictive. He made references to the fact that if the school had not taken the things so seriously by not expelling him, things would have been different.

He had issues with the school forcing religion on him. Furthermore, he blamed the school for being hypocritical. For instance, there were drugs everywhere, and many school officials pretended ignorance to the rampant use of drugs on campus. He also stated that it was at Oneida that saw to the demise of his relationship with his parents. His parents, having raised Randy in the Jewish faith found it unbearable that Randy was flirting with Christianity at Oneida. Basically, Oneida and his parents wanted to mold him into someone whom he was not and could never be. Nevertheless, Randy at the end of the day, blamed himself and refused to admit that his parents and Oneida bore some responsibility for his actions. He spoke very lovingly about his parents, stating that although he is adopted, those are the only parents he knew. Furthermore, he reminisced fondly of his days at Oneida, calling them the "best years of his life." We however felt that he was masking his true emotions and in denial about the whole thing. There was something insincere about his "loving" portrayal of his parents or the school system. He did not want to go into detail about the "bad things" that happened to him. He usually waved them off with a smile, stating only the positive. We however, sensed a lot of repressed anger in him.

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

**Miscellaneous**

The previous research and contacts by Kristin Bliss and Cindy Casey remains unaltered.  We have tried to contact Theresa Dancy, Randy's teachers at Oneida (Mr. Stockton- Senior English Teacher, Mr. Shelby – Senior Creative Writing Teacher, and Mr. Robinson- Vice President of School), however Theresa Dancy and some of the teachers did not reply.  Furthermore, we could not find contact address for some of the teachers.  Randy's parents remain elusive, and our attempts to contact his brother Wesley Halprin failed.

We did get in touch with Michael Spencer, Randy's Advanced Bible Study Teacher.  He wrote an article on Internet monk regarding Randy. The article basically focuses on Randy's failed attempts with the Christian faith. The article neither indicates nor vindicates Randy but states that Randy was a nice guy who got along well with everyone at Oneida.

His correspondences are attached with the memorandum, and he basically states that Randy got along well with everyone at Oneida.

9

Case 3:13-cv-01535-L    Document 17-116    Filed 08/21/14    Page 161 of 535    PageID 14048



MSN 홈 | My MSN | Hotmail | 검색 | 쇼핑 | 채팅 | 커뮤니티

**Hotmail**   Hotmail 홈   편지 읽기   편지 쓰기   주소록   환경 설정   도움말

kkim35@hotmail.com

[주소 저장] [수신 거부]                            이전 다음 | 닫기

보낸 사람 : "Internet Monk" <michael@internetmonk.com>
받는 사람 : "kime kyoung" <kkim35@hotmail.com>
제목 : Re: Randy Helpern
보낸 날짜 : Tue, 7 May 2002 10:11:57 -0400

[답장] [모두 답장] [전달] [삭제] [[□□ □□□□□ □□□] ▼]         인쇄 화면 보기

While at OBI, Randy was very pleasant and I do not recall any mention of strained relationship with parents. We were aware such strains existed, particularly with Wes, but Randy was not a shiner or a complainer.


----- Original Message -----
**From:** kime kyoung
**To:** michael@internetmonk.com
**Sent:** Monday, May 06, 2002 9:08 PM
**Subject:** Re: Randy Helpern


Mr. Spencer,

I just need few more information.  I very much appreciate your kindness in answering my email.

Has Randy ever expressed his constrained relationship with his parents to you?

He seems to be in this fantasy that everything in the world is just rosy and sweet.  He hasn't expressed any grudges or bad feelings towards his past.

Was he an angry man at Oneida?

Sorry for bothering you.  Thank you for your patience.

Yours truly,

Kyoung Kim

>From: "internetmonk"
>To: "kime kyoung"
>Subject: Re: Randy Helpern
>Date: Mon, 1 Apr 2002 23:03:28 -0500
>
>I think Randy described himself accurately. Randy's younger brother was much more of a
problem than Randy ever was for us. He was very polite, and rarely got in trouble that was
anything even marginally serious. His on-campus problems were all simply boyish pranks, not
anything that harmed anyone else. His expulsion was a result of off campus behavior. Our main
memory of Randy was his romance with a young lady. They spent most of their time staring at
one another in the campus grill. He was very average and certainly gave no indications of his

later trajectory in life.
>
> ----- Original Message -----
> From: kime kyoung
> To: Michael@internetmonk.com
> Sent: Tuesday, April 02, 2002 2:38 AM
> Subject: RE: Randy Halpern
>
>
> Mr. Spencer,
>
> My name is Kyoung Kim and I am currently at SMU School of Law at Dallas, Texas. I am
currently assisting the Public Defenders Office regarding Randy Halpern.
>
> I have read your article on internetmonk.com on Randy Halpern and must write that I found it
quite fascinating.
>
> Will you be able to give me some input of Randy Halpern's Oneida days? I met him personally
and found him to be very nice. He doesn't seem to blame his later days on Oneida, but can you
describe to me other than his issue of faith, how he was at Oneida?
>
> Randy Halpern painted himself to me as a disciplined, well-mannered and hard-working student
who occasionally got into trouble. He also expressed his strained relationship with his parents. Is
this the Randy that you knew back at Oneida?
>
> Whatever info you can possibly provide me whether it be succint and lengthy will be greatly
appreciated. However, if you feel that your article is sufficient, that is fine as well.
>
> Thank you for your time.
>
> Yours truly,
> Kyoung Kim
>
>
>--------------------------------------------------------------------
> 전세계인이 함께하는 무료 웹 메일 서비스인 MSN Hotmail을 사용하세요.
>
>
>
> ---
> Outgoing mail is certified Virus Free.
> Checked by AVG anti-virus system (http://www.grisoft.com).
> Version: 6.0.343 / Virus Database: 190 - Release Date: 3/22/2002

MSN Explorer가 있으면 Hotmail 사용이 훨씬 편리해 집니다. 지금 http://explorer.msn.co.kr에서
무료로 다운로드하세요.

[ 답장 ]  [ 모두 답장 ]  [ 전달 ]  [ 삭제 ]  [|□□ □□□□□ □□□|    ▼]              이전   다음 | 닫기

MSN 홈     |    My MSN     |    Hotmail     |   검색   |   쇼핑   |   채팅   |     커뮤니티
© 2002 Microsoft Corporation. All rights reserved. 사용 약관  개인 정보 보호 정책



kkim35@hotmail.com
주소 저장 | 수신 거부                                        이전 다음 | 닫기

보낸 사람 : "internetmonk" <michael@internetmonk.com>
받는 사람 : "kime kyoung" <kkim35@hotmail.com>
제목 : Re: Randy Helpern
보낸 날짜 : Mon, 1 Apr 2002 23:03:28 -0500

답장 | 모두 답장 | 전달 | 삭제 |[□□ □□□□□ □□□]         인쇄 화면 보기

I think Randy described himself accurately. Randy's younger brother was much more of a problem than Randy ever was for us. He was very polite, and rarely got in trouble that was anything even marginally serious. His on-campus problems were all simply boyish pranks, not anything that harmed anyone else. His expulsion was a result of off campus behavior. Our main memory of Randy was his romance with a young lady. They spent most of their time staring at one another in the campus grill. He was very average and certainly gave no indications of his later trajectory in life.

----- Original Message -----
From: kime kyoung
To: Michael@internetmonk.com
Sent: Tuesday, April 02, 2002 2:38 AM
Subject: RE: Randy Helpern

Mr. Spencer,

My name is Kyoung Kim and I am currently at SMU School of Law at Dallas, Texas. I am currently assisting the Public Defenders Office regarding Randy Halpern.

I have read your article on internetmonk.com on Randy Halpern and must write that I found it quite fascinating.

Will you be able to give me some input of Randy Halpern's Oneida days? I met him personally and found him to be very nice. He doesn't seem to blame his later days on Oneida, but can you describe to me other than his issue of faith, how he was at Oneida?

Randy Halpern painted himself to me as a disciplined, well-mannered and hard-working student who occasionally got into trouble. He also expressed his strained relationship with his parents. Is this the Randy that you knew back at Oneida?

Whatever info you can possibly provide me whether it be succint and lengthy will be greatly appreciated. However, if you feel that your article is sufficient, that is fine as well.

Thank you for your time.

Yours truly,
Kyoung Kim

전세계인이 함께하는 무료 웹 메일 서비스인 MSN Hotmail을 사용하세요.

---
Outgoing mail is certified Virus Free.
Checked by AVG anti-virus system (http://www.grisoft.com).

*Typed Notes that We took during our interviews w/ Randy*

**Randy Halpern**

Oneida, Kentucky: Baptist, Private School

<u>Why did they send you to Oneida?</u>
1. Not focused on school
2. Well-disciplined environment
3. More into fun; not a delinquent

<u>Oneida:</u> Year 14: Middle of 1996: Senior year.

<u>School Okay:</u> Strict between sexes.
<u>Corporal Punishment:</u> Parents sign disclaimer/Paddle behind ass.

AB honor roll
Relationship with Parents improved: Most Outstanding Pianist: 9th Grade.
Room Monitor.

One of his girlfriends: Theresa Langford: Known as the "star couple."

Problem with my family: May 1995
Argument with father: Bike: wouldn't let him take his car: Why did you take my bike? Teresa in Louisville: $200: Summer School (Oneida catch up at 7th grade. Failed in Oneida was suppose to graduate in 1996. 1995: Made up requirements to graduate in 1996.

He had every intention to graduate.
Louisville: They were upset. Her parents upset. Parents: Go straight back to school: Deal: Dad brought bus ticket back to Oneida:
1. Experimenting with drugs: Marijuana for fun: Acid, Ecstasy (senior)

1996: Found out about drugs. Kicked out for stealing credit cards. Parents not helping financially: He was according to them, having too much fun.

BARRICADE BETWEEN FATHER AND I: Lying to him a lot more.

Parents relationship horrible: Oneida 1992-1996
1. Spend time with girlfriend
2. Talked on the phone away from the house
3. Girlfriend: the only one who understood him.

He wanted to be a musician. Enjoy classes, loved piano class; loved history.

<u>After 1996:</u>
After they kicked you out, relationship with girlfriend soured.

Engaged: Teresa author. Both wanted to be famous.

Expelled in 1996: Looking for a job, stayed with Emma Opdhal: Friend in Lexington, Kentucky Looking for a job.
Teresa parents thought that he was a bad influence.

Opdhal's father: Kicked Randy out.

Hope Center:  Homeless Shelter:  Did drugs and Acid
   1.     They were disappointed:  Still talking.
   2.     Working at Steakfest/ preparing food
   3.     Roomate Ronnie Russle moved in.
   4.     Looking to hook up with a band:  Joined a band.
   5.     Teresa and him failing out.

1995 Summer School:  Temporarily expelled: "emotionally unstable".
Came back for 1996.

   1.     At that time, upset about girlfriend.  MR. Garrett:  Dean of Dorm.  You looked depressed
         about girlfriends and parents.  Walk around campus with headphones and talked a lot.
   2.     Wrote poem on a bench: "Me and my love."
   3.     Poem as a suicide note.
   4.     President called me into office.  We are not capable of understanding you right now.
   5.     Parents pushing me away:  Parents say:  couldn't come back home:  Brought him an
         apartment in Louisville.  Went back to Oneida.
   6.     Oneida accepted back:  Pled with President.

Summer of July 1996:
   1.     Stayed in Lexington:  1/96-6/96
   2.     Steakfest
   3.     Emma
   4.     Homeless
   5.     Band

End up back in the Hope Center.  Drugs:  Parents:  They didn't talk a lot.
GED at Hope Center.
Wanted to have FUN.

Army:  Needed College hours.
Lied to Dad about recruitment.  Wanted him to be proud.  Found out he was lying:  Incident broke them
further apart.

Hope Center:  Lost Theresa, Parents, Drugs, No Money.
   1.     Showed up on the doorstep
   2.     Counselor at the Hope Center:  Rebecca:  Doorstep
   3.     Showed up at Parents' house:  Nobody was answering:  Next door neighbor's house:  Were his
         parents home?:  "I know my parents leave key with you all."
   4.     Police car pulled up :  he just left:  Went to a friend's house:  Jason Goldberg:  Goldberg's mom
         told him to got Arlington Night Shelter.
   5.     Arlington Night Shelter:  Stayed for a month.
   6.     2 weeks after he left Kentucky.  No drugs.
   7.     Whatever it takes, let me back in.
   8.     Need Positive Environment.
   9.     Talked with Mother:  Trying to straighten out: but you lied to us.
  10.    "They were talking me out of the will." They were finished with me.
  11.    Drugs/ Shelter:  Drugs/Acid
  12.    Stayed with Mindy:  Ready to go to Texas A&M.
  13.    Fort Worth:  Incident Happened:  Injury to child.
  14.    Lost contact with Kentucky friend.
  15.    Professor:  Mr. Stockton:  Senior English teacher:  Teresa to be an author.
  16.    Mr. Shelby:  Senior Creative Writing Teacher.
  17.    Mr. Robinson:  VP of school.

Psychological:  Entered 14
Caused behavior on Oneida?
1.  Blame Oneida on Drug use.  But there was drugs everywhere:  They grow apart everywhere.
2.  Teachers knew thy were giving it on drugs:  President would chase the drug dealers off with a shotgun.
3.  Drugs:  Change outlook on things:  Could have more disciplined relationship with parents better.
4.  Years I was there, best time of my life.
5.  Don't blame the school:  but temporarily kicked out:  Hypocrites.
6.  Relationship with Parents crumbled during Oneida
7.  Questioning faith of Judaism:  Hard on Dad.
8.  Went back home:  Parents had accepted you:  Would have been different.
9.  But usually blames himself, but at that point, needed parents to help him out.
10.  Needed help:  Was 100% sincere.
11.  Were always loving towards his parents.

Why couldn't Oneida help you?
1.  First couple of years, perfect:  A/B.
2.  What went wrong?  Too conservative:  If a person was really bright:  They were so overflown with philosophical:  Too narrow minded and too provincial.
3.  It would have been better if they weren't too restrictive.
4.  Piano teacher knew music was my love.
5.  Oneida and Parents:  Rebellion:  Parents and Oneida wanted him to be someone whom he wasn't.
6.  Discovering who he was:  They didn't like it.
7.  Parents:  They weren't understanding.  Nonsecular:  Didn't embrace theology.



*Education for time and eternity*

# The Oneida Baptist Institute Web Site

Box 67 Oneida Ky 40972

606-847-4111

**General Information**
Who We Are
How We Are Different
Campus Tour
Frequently Asked Questions

**Admissions**
Admissions Overview
Applications

**On Campus**
News
This is Oneida
Student Q&A
Upcoming Events
Calendar

**Resources**
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

OBI Farm Program
Yahoo!'s OBI Alumni Club

Webmaster



*OBI's Track Team competed for state honors this year. All students willing to abide by our rules may compete on the sport of their choice. No one is cut because of ability.*

*Take a walk around OBI on our new "CAMPUS TOUR" site.*

*We have updated the Administrative Contacts page.*

*Read the latest news about State Honors for OBI FFA, Track and Bridge Builders.*

*We have updated the 2001-2002 Calendar.*

*Interested in working at OBI?  For more information, go to Employment or contact President Underwood.*

*Many alumni have asked for a meeting place. We now have a link to Yahoo's OBI ALumni Club. (This is not run by OBI or the webmaster.)*

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 168 of 535   PageID 14055



Liza Disavoia finishes up "face-painting" at the OBI Fall Festival.

*We now have a special section just for the questions most frequently asked by students coming to OBI. Visit the Student Q&A page.*

*International Student Admissions now has an e-mail address. You may contact Kay Underwood directly at international@oneidaschool.org.*

Oneida Baptist Institute is a Christian Boarding school for students in grades 6-12. We were established in 1899 and are accredited by the Kentucky Department of Education. OBI offers a world of unique, positive differences from any other public or private school.

Our special mission is to help students who need a new beginning in academics, relationships and life. We accept students throughout the year. Any student who is emotionally and physically able to live away from home in a boarding school environment is probably appropriate for Oneida.

This web site gives you the opportunity to learn about OBI, its educational opportunities, unique program and Christian vision. You may request an informational and admissions packet in the admissions section.

You may also keep up with Campus news and upcoming events, plan a visit to tour or volunteer, and contact our staff with questions or information.

The OBI WebSite is  hosted by our friends at www.adgrafix.com. The webmeister is Michael Spencer, always available at digory1@yahoo.com. If you have a web site problem, drop me a line. It's all copyright 2000-01. Oneida Baptist Institute.



*Education for time and eternity*

# Who We Are

Home

General Information
Who We Are
How We Are Different
Frequently Asked Questions

Admissions
Admissions Overview
Applications

On Campus
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

Resources
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

OBI.Net
Contact Us
Department Pages
Time with God
Links
OBI Discussion Forum

Oneida Baptist Institute opened its doors January 1st, 1900 as a school for children of the mountains of Eastern Kentucky. OBI was the vision of Professor James Anderson Burns, a converted feudist who believed that the Christian Gospel and education were the answers to the cycle of violence between families in the mountains. God blessed Burns' vision and the school was established and prospered. We continue to have a vital mission to the children of Eastern Kentucky.

Through the years, mountain boarding schools found their mission increasingly difficult. Public schools became available and financial support became a challenge. While most other mountain schools closed, OBI survived this era, but saw many difficult days. God preserved our school with many demonstrations of his providence and guidance. Along the way, OBI became part of the Kentucky Baptist Convention family and began enrolling international students.

In the early 1970's Dr. Barkley Moore became President of Oneida. A six year veteran of the Peace Corps in Iran and a person with unusual energy and passion for OBI, Dr. Moore recast Oneida's vision. Under his leadership, OBI became a school of new beginnings for students all over America and the world. Believing in the unlimited potential of every boy and girl who came to Oneida, Dr. Moore expanded Oneida's program, support and facilities. By the time of his death in 1994, Oneida had multiplied in size and finances several times over. We continue to look to Dr. Moore's example every day that we work, believing that Oneida holds a unique place in God's kingdom.

Today Oneida is a unique school. We combine the values of a traditional Christian school with openness to non-Christians and students with all kinds of needs and backgrounds. OBI is diverse in cultures, but rich in the tolerance and respect for differences modeled by Jesus Christ. Oneida staff live and work as part of a Christian community carrying out the original mission of education and evangelism. We are grateful for our heritage and always mindful that the God who brought us this far will see us through.



*Education for time and eternity*

# How We Are Different

**Home**

General Information
Who We Are
How We Are Different
Frequently Asked Questions

**Admissions**
Admissions Overview
Applications

**On Campus**
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

**Resources**
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers

**OBI.Net**
Contact Us
Department Pages
Time with God
Links
OBI Discussion Forum

Webmaster

A teacher spending his evenings tutoring in study hall. girl playing basketball. A boy driving a tractor. Four students in a Calculus class. A whole school singing together. A boy wins a wrestling match. A girl supervi after-dinner clean up. All are part of Oneida and all are of why we are different from any other Christian schoo

The reasons we've made such a difference in the lives students are the reasons Oneida is unique in its progra values. Take a tour of the four major areas of Oneida's program and learn how Oneida can be the difference f your student.

## Academics at OBI

## Spiritual Life at OBI

## Co-Curriculars at OBI

## Work at OBI

http://www.oneidaschool.org/howdifferent.htm                                    9/14/01

# Guidelines For Parents of Applicants and New Students

Box 67 Oneida
Ky 40972
606-847-4111
President W.F.
Underwood

**OBI is Accredited
by the Kentucky
Non-Public School
Commission and
the Southern
Association of
Colleges and
Schools**

**General
Information**
Who We Are
How We Are
Different
Frequently Asked
Questions

**Admissions**
Admissions
Overview
Applications
Financial Information

**On Campus**
News
This is Oneida
Stories
Student Q&A
Campus Tour
Upcoming Events
Calendar

**Resources**
Contact Us
E-Mail Directory
Summer School
Advice for Parents
Employment

It is important for parents and families to remember their part in the success of any OBI student. Experience has taught us that your attitude and actions often are the difference between success and failure.

## ADMISSIONS

**Tell the truth**. During the admissions process, we ask for many different kinds of information. Please be candid, honest and forthright with us. If we discover that important information has not been provided, particularly information about the appropriateness of the student for OBI's program, it decreases the chances of the child being admitted. Also, please do not minimize or distort your child's situation.

**It is your responsibility to secure all records/information**. The admissions staff at OBI will not be involved in mailing for or asking for records or other information requested during admissions. That is the responsibility of the family.

**Keep us informed of changes or problems**. We understand that the process of getting information together may take more time than you would wish. If you are having problems securing information, please keep us informed. Also, please tell us of any important changes in the life or situation of your student that may affect their admission to OBI.

**Be Patient**. The process takes time. We want your student to be enrolled at the time that is best for the student and for us. Sometimes parents want students enrolled sooner than we can enroll them. Be patient and we will work on admissions as quickly as is prudent and possible.

## ORIENTATION/INTERVIEWS

On campus orientation for families and students is very important. **You cannot miss this and be enrolled at OBI**. Special orientations and interviews are only scheduled for the most exceptional cases of international students.

Visit OBI
Volunteers

**OBI.Net**
Daily My Utmost
OBI Farm Program
Yahoo!'s OBI Alumni
Club
Class of '85

Webmaster

When you are here for orientation, it is important that **all family members and the prospective student be present for all sessions** and all information. This information is vital to success at OBI.

During the interview process, **we are making many important judgments** and evaluations. Please be candid and honest, and **help us to understand your situation and your child's needs**. Some questions may be about situations where families and students disagree, and we want to hear all points of view.

During the orientation day, there is an interview of the student without any family present. During this solo interview, **the student is asked if they agree to enroll at OBI**. If the student absolutely refuses to enroll at OBI, we will not enroll a student against their will. This does not mean we do not enroll students with serious reservations! But absolute refusal is a problem that we feel must be worked out by the family.

**Occasionally, the student/family interview alone will result in a student not being enrolled**. This is rare, but does happen, and you should understand that this usually occurs when an interview with a student reveals a much different person than we were considering in the applications process.

**DURING ADJUSTMENT**

**The first few weeks of boarding school are a tough adjustment for everyone** involved. Homesickness is real, and parents miss their kids more than they anticipated. We limit phone calls during the first 30 days, and this can be frustrating for everyone. Please support us in this and understand that too much phone contact with family during the early period of adjustment usually destroys any chances of actually adjusting to OBI and getting down to the business of school, new friends, new activities, etc. Students may write during this time as much as they choose, and, with permission, they may use the phone during emergencies.

**Don't present OBI as a punishment, but as an opportunity**. Be complimentary of your child in coming this far in a new and difficult adventure. Remind them of the rewards of accomplishment. Don't lose your temper if your child becomes ugly or frustrating over the phone. Remember your goals. Help your child understand what the real situation is and not just their frustrated feelings of the moment.

**Please send food and other packages**. This helps immensely in the adjustment process.

**When you do talk to or hear from your student**, please be moderately skeptical of outlandish claims of mistreatment and conditions. We are not perfect, but we are not remotely similar to the way a homesick child can describe us! (The dorm houseparents will be happy to talk with you about any problems your child reports.) Be sympathetic, but don't say "If you don't feel better, I will come and get you." Instead, be supportive, but firmly committed to your child adjusting and succeeding as thousands of others have done. Encourage your child to solve problems by going to adults here, and stay with the plan for your child to be here and succeed here.

**Remember that we are telling your child to do the basics**: Get up on time, go to school, do their work, get a job or sport, be involved in activities, make new friends, solve problems quickly, stay out of trouble. Help us reinforce these proven goals.

We would recommend that **campus visits not include friends or girl/boyfriends** during the early weeks here. Again, this tends to undermine the adjustment process.

For more information, write the <u>Dean of Students</u>

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 174 of 535   PageID 14061

# Academics at OBI

Home

General Information
Who We Are
How We Are Different
Frequently Asked Questions

Admissions
Admissions Overview
Applications

On Campus
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

Resources
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

OBI.Net
Contact Us
Department Pages
Time with God
Links
Site Search



"The education here is really good... I probably wouldn't have graduated if I'd stayed at home."

Middle school students study English, literature, Bible, social studies, math, science and health. They are also able to choose from a number of electives, including band, drama, academic team and 4-H.

High school students are required to take 4 years of English, 3 years of math, 2 years of science, 3 years of social studies, 1 year of health/physical education, 1 year of Bible, 1 year of computer literacy and 6 electives. Our Bible requirement is in addition to the state requirements for graduation.



Seniors may graduate with either a standard diploma or an advanced diploma. Of our 55 1997 graduates, 25 earned advanced diplomas. One of these received the Commonwealth Diploma, the highest diploma awarded by the state of Kentucky. About 60% of Oneida graduates go on to college or other institutions of higher learning.

Oneida has a "Tutoring Lab" program for students who struggle with low reading and/or math skills. We also provide "English as a Second Language" for international students, and developmental English for students who need assistance with high school English skills.

Work is an Oneida value and job skills are integrated into the Oneida curriculum. Many of our students learn work skills while earning credits in

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 175 of 535   PageID 14062

classes like welding and agriculture. Others have a supervised work experience in the print shop, maintenance, tutoring, publications or library.

Boarding students not on the academic honor roll (B average or above) are required to attend study hall each evening, Monday through Thursday. Students who receive one or more progress reports (D or lower) have an extra study hall on these nights. All OBI teachers take their turn assisting students in study hall. Most of our students significantly raise their grades while they are at Oneida and credit the involvement of teachers as a key factor.

# Spiritual Life at OBI

Home

General Information
Who We Are
How We Are Different
Frequently Asked Questions

Admissions
Admissions Overview
Applications

On Campus
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

Resources
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

OBI.Net
Contact Us
Department Pages
Time with God
Links
Site Search



## "I have really grown a lot as a Christian... I feel so secure in who I am in Christ."

All Oneida students are required to attend a 30 minute chapel service each school day. Boarding students are additionally required to attend two worship services on Sundays. Optional Bible study groups for all ages are available on Sundays and at other times. Friday Praise and Worship is the most popular time of the week at OBI.

Parents are often concerned about what kind of religion their child will be exposed to while they are at boarding school. We have a denominationally diverse faculty and student body, but our worship and approach reflect our Southern Baptist heritage and values. Evangelism is a priority for us, but we respect the various backgrounds and churches that are represented in our school. We do not allow manipulation or pressure tactics in presenting Christianity to our students. Most students who attend OBI do express a personal faith in Christ at some time. We encourage new Christians to become active in their home churches.

While we do not have mandatory counseling of any kind, the OBI staff will approach student problems with Biblical counseling as a tool. Voluntary Pastoral counseling is available for problems related to the student's school and personal experience.

We have the only middle school/high school Baptist Student Union in Kentucky. Older Christian youth can develop leadership skills as BSU small group leaders. Our BSU hosts a weekly prayer time and weekly meetings, plus special events during the year. Students are frequently involved in creative ministries through drama, music, trips, concerts and recreation. Our Salt and Light group ministers to the community. Groups such as Experiencing God and the Tom Jenkin (Missions) Fellowship are also available to students.

Questions about spiritual life at OBI can be addressed to chaplain@oneidaschool.org.

# Cocurriculars at OBI

Home

General Information
Who We Are
How We Are Different
Frequently Asked Questions

Admissions
Admissions Overview
Applications

On Campus
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

Resources
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

OBI.Net
Contact Us
Department Pages
Time with God
Links
OBI Discussion Forum



## "I like the way they let everybody get involved."

Oneida Baptist Institute is distinctive in allowing any student to participate in athletics regardless of ability. Any student may try out for a team, and no one is "cut" because of lack of ability. The only limitations are KHSAA rules, OBI rules and health considerations. Every year, many of our students participate in a sport or cocurricular activity for the very first time. This "open participation" policy is a key difference between OBI and other schools and one of the reasons we succeed with many students who have failed elsewhere.

Athletic possibilities include: volleyball, cheerleading and softball for girls; golf, wrestling and baseball for boys; cross country, basketball, swimming, tennis, track and field, and soccer for both boys and girls.

Other cocurricular programs are: FFA, Academic team, drama, choir band, chess club, BETA Club and Baptist Student Union. Students publish a monthly newspaper and an annual yearbook.



# Work Program at OBI

Home

General Information
Who We Are
How We Are Different
Frequently Asked Questions

Admissions
Admissions Overview
Applications

On Campus
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

Resources
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

OBI.Net
Contact Us
Department Pages
Time with God
Links
Site Search



## "I've learned maturity... I've learned how to live."

An important Oneida difference is maintaining a strong tradition of work for every member of our school family. Every boarding student is required to have some type of job. Many cocurricular activities count as jobs in our work program. Students not involved in such activities can choose from a variety of chores. Boys clean our school and administrative buildings and do campus yard work. Girls work in the girl's dorm, dining hall and dishroom. Other jobs for boys and girls include a variety of farm work, dormitory cleaning, working in the OBI grill and serving as dorm hall monitors.



Students who excel at their jobs may be promoted to supervisory positions. Good and outstanding workers are rewarded throughout the year. Through the Oneida work program, our young people learn to value being on time, perfecting job skills, following directions and taking pride in a job well done. For many students, self respect and a new beginning start with a simple job done well,

# The OBI FAQ

**Home**

General Information
Who We Are
How We Are Different
Frequently Asked Questions

Admissions
Admissions Overview
Applications

On Campus
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

Resources
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

OBI.Net
Contact Us
Department Pages
Time with God
Links

## Frequently Asked Questions About OBI

1. **Why do students come to OBI?**
   o They want a Christian education and Christian influences.
   o They enjoy the independence boarding school gives in preparation for college.
   o Some may be struggling academically in public schools.
   o Some need our Tutoring Lab or our 1:15 teacher/student ratio.
   o Others may be experiencing social or family problems.
2. **Where do our students come from?**
   Approximately 50% of our student population comes from Kentucky. Another 40% comes from other states in the U.S. The last 10% of our students come to us from other countries. OBI is one of the most diverse high schools in the world.
3. **How do people hear about Oneida Baptist Institute?**
   Most of our publicity happens the old-fashioned way: word of mouth. Students and their families share the news of our ministry with others who need to know. Many people in the helping professions recommend us. Our alumni are our best advertisement.
4. **OBI is for students in what grades?**
   We enroll young people in grades 6-12.
5. **Is Oneida a school for "problem kids?"**
   No. We are a Christian school that takes Jesus words and example as our mission. We are a "Good Samaritan" school, trying to share love and truth with young people who need hope and help.

   We are not a reform school, and we do not focus exclusively on students who have problems. We do, however, often accept students who provide challenges for us. We do not accept any student who is not physically and emotionally able to be away from home. During our evaluation process, we seriously assess any behaviors that could hurt others and do not accept every student who applies. If you have questions about whether your child is appropriate, contact admissions@oneidaschool.org.

   Many of our students immediately show that they simply needed adults to become involved with them as positive examples, a consistently caring environment and a more structured schedule.

6. **What percentage of OBI graduates go on to higher education?**
   Approximately 60% of our graduates go on to some form of higher education.
7. **When does the Oneida school accept students?**

We realize that a young person may need what we have to offer at any time during the year. Since we believe in meeting needs when they arise, we do accept students year-round, though not every day. Our Admission's process goes on throughout the year and students are interviewed and accepted every Sunday )except within 3 weeks of a major break.) For more information, see our "Admissions" page.

8. **What can Oneida Baptist Institute offer my child that another school does not provide?**
   - a structured environment
   - small class sizes
   - nightly study hall
   - a Tutoring Lab for students with low reading or math skills
   - boarding facilities
   - a distinctive Christian approach
   - a unique student work program
   - friends from other countries and cultures

9. **What activities can my child be involved in at OBI?**
   Through elective courses in school, students may experience many diverse subjects from the arts to welding. After school, our young people can participate in a variety of cocurricular activities. (For more information, see our "How We Are Different" page or go directly to "Cocurriculars".)

10. **How does the Oneida school maintain its distinctive Christian approach?**
    - Christian faculty and staff
    - daily chapel services Monday-Friday (required of all students)
    - one year of Bible required to graduate
    - an optional advanced Bible class
    - the only middle school/high school Baptist Student Union in Kentucky
    - Worship on Sundays (required of boarding students)
    - Optional Bible Studies and other activities.
    (For more information, go to "Spiritual Life".)

11. **What if we're not Baptists? (or not even Christians?)**
    We have never required that students or their families be Baptist or even Christian. In fact, most of our students do not profess to be Christians when they enroll. We respect the right of each young person to make his/her own decisions. Every year, many do respond and put their faith in Christ. See the information at spiritual life.

12. **What kind of success rate does Oneida Baptist Institute have?**
    Our definition of success is Biblical. We often discover God has a different plan for a young person than anyone ever anticipated. Part of the reward of our ministry is seeing the excitement of a new discovery in the lives of kids who were experiencing failure and frustration prior to coming to OBI.

    Do all of our students go on to college? No! But many go who may have been drop-outs if they had not come to OBI. Do all become Christians? Again, no. However, each year many young people come to understand their need of Christ-centered lives. Many students have told us that it was not only what they accomplished while students here, but

also the life-lessons they learned which helped them long after
graduation. While we are not always successful, we have been able to
motivate and encourage many who were destined for failure.

13.  **What kind of financial assistance is available for students?**
Oneida provides financial assistance for virtually every student. Our
fees for room and board are very modest by any standards. The average
boarding school in America charges about $20,000 per year, many are
much more. The average cost to attend OBI is about $4,000 per year.
Additionally, many schools require the fees for each semester to be
paid in advance, but our fees are paid monthly. Oneida students pay far
less than one-half the actual cost of their academic instruction and daily
care. For students with legitimate financial needs, we will go the
second mile by trying to provide additional assistance.

14.  **What kinds of discipline are used with students at OBI?**
Minor school infractions will earn a student an after-school detention.
Teachers and deans may also assign essays to students. We do use
limited corporal punishment in some instances, but only the school
principal, Dean of Girls and Dean of Boys are allowed to administer
this. A common form of discipline is the use of assigning work duties
to young people who break the rules. The consistency and predictability
of rules is a major reason many of our students turn their behavior
patterns around and experience success.

Students may also be "campused" for the evening. This means they
cannot go to "free time" or to the computer lab that night.

Boys and girls can also be "social campused" from one another in cases
of inappropriate behavior. Students who are "socialed" can have no
form of contact with each other for a specified number of days.

Oneida students who are suspended on campus are required to work
during the school day. Suspensions may last anywhere from one to ten
days. An average suspension is three days.

Boys generally work on the farm, yard crew or by doing supervised
jobs on campus. Girls may be assigned to the greenhouses or the
kitchen area.

15.  **How often may boarding students go home for a visit?**
Dormitory students may have one weekend home per month, provided
they live close enough for this to be feasible. Additionally, one other
weekend a month the family may come to visit with the student on
campus. (Go to Visit OBI for information on campus housing and
lodging nearby.)

Our school schedule provides plenty of time for our young people to
also enjoy extended periods of time with their families: fall break,
Thanksgiving break, Christmas break, spring break, plus several long
weekends. Because we do not normally cancel school for any reason,

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 182 of 535   PageID 14069

the school year passes quickly. Our students are often out 2-3 weeks before public systems. (For more information, go to our "School calendar".)

---

# *An Overview of OBI Admissions*

Admissions is a process that begins with an extensive phone interview with the parent/guardian of the potential student. When the interview is completed and the completed application and forms are received and reviewed, we can say if the student is appropriate for OBI. Families should know that financial information, counseling records, psychiatric evaluations and school discipline records are frequently requested and reviewed during this part of the process..

"Every Student is a unique person with unique needs that are carefully and prayerfully considered. The ministry of our Admissions Counselors is to be sure that every student who enrolls is a student we can help."

"The family has to know why they are choosing a boarding school; and the student needs to be committed to reachable, realistic goals that are worth the effort. Admissions is the process of bringing school, family and student together to agree on what we all want to achieve."

When the application process is completed and approved, a campus visit is scheduled. This visit will be on a Sunday and will include an extensive orientation for student and family, a campus tour, and interviews with the family and with the student alone. Students must consent to be a student at OBI during a private interview without their family present in order to enroll. Often, the student will stay at OBI and immediately enroll. Sometimes there is a short period of further consideration before the student is invited to stay.

Move on to Cost and Other Admissions
Information



*Education for time and eternity*

# Come Visit Oneida Baptist Institute

P.O. Box 67   Oneida,
Kentucky 40972 606-847-
4111

Home

General Information
Who We Are
How We Are Different
Frequently Asked Questions

Admissions
Admissions Overview
Applications

On Campus
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

Resources
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

OBI.Net
Contact Us
Department Pages
Time with God
Links
OBI Discussion Forum

An important part of our ministry is welcoming guests to our campus. Each year, hundreds of guests from all over the world visit OBI to learn about our ministry.

While we welcome anyone at anytime, we prefer advance notice of all visits so that tours and meals can be planned. Groups anticipating eating in the dining hall should give us at least a week's notice (or more) to guarantee enough food is prepared.

On campus accommodations are available, but are limited and frequently booked months in advance. These accomodations are appropriate for couples and small groups, but not for larger groups. Please contact Dr. W.F. Underwood (extension 202) or Mrs. Kay Underwood (extension 203) to plan your visit.

Visits to boarding students must be under guidelines of the student manual. This primarily affects students who are in their first 30 days at OBI, have discipline problems or job responsibilities. Please notify the dean of students, boys or girls if you plan to visit a student.

We only interview and orient new students on Sundays. If you would like to visit OBI to gather information with or for a prospective student, please notify the admissions office so that we can be sure you receive the information you need.

Accommodations are also available in Manchester (17 miles from campus) and London (40 miles from campus).



*Education for time and eternity*

## Home

General Information
Who We Are
How We Are Different
Frequently Asked Questions

Admissions
Admissions Overview
Applications

On Campus
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

Resources
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

OBI.Net
Contact Us
Department Pages
Time with God
Links
OBI Discussion Forum



This directory will assist you in contacting staff at Oneida Bap
sure and contact the right person with your question or reques

**OBI MAILING ADDRESS: Box 67 Oneida, KY 40972-0067 T**
for ALL Student mail.

**Telephone: 606-847-4111** This is an automated switchboard. If you do
extension you want to reach, press zero and a receptionist will answer duri

**Fax Machine: 606-847-4496**

**Dormitory Phones (Available only at designated hours): Girls:**
**4321/4213, Big Boys: 606-847-4512/4412, Baker Hall: 606-847-**

**Extensions: Many staff have voice mail boxes on their extensio**
**party does not answer, please leave a message at the voice mail**

**Admissions: It is unlikely that you will get a phone call throug**
**during the school day. You are encouraged to use e-mail or voi**
**possible.**

President W.F Underwood: president@oneidaschool.org, Ext. 202. Conta
about all employment questions, volunteer opportunities and mission trip i
Underwood schedules all OBI choir performances in churches. Please do n
Underwood about routine student concerns. Contact the dean of students.

Administrative Assistant Kay Underwood: Ext. 203. Call here regarding In
students and campus visits by groups or individuals.

Dean of Students Harold Underwood: harold@oneidaschool.org, Ext. 219.
students is responsible for all aspects of student life, particularly discipline.

Assistant Dean of Students Erma Smith: obi@kih.net, Ext. 217. The assist
is responsible for travel arrangements and medical concerns.

Dean of Girls Billie Hoover: deanofgirls@oneidaschool.org. Voice Mail b
of girls is responsible for all aspects of girls' life outside of school.

Dean of Boys John Saldaris: Ext. 308. johnthebaptist7@juno.com. The dea

responsible for all aspects of boys' life outside of school.

Admissions Director Bill Mock: admissions@oneidaschool.org, Ext. 233. address for your questions about admissions.

High School Principal Dr. Ed Lowdenback: Ext 214.

Middle School Assistant Sharon Lowdenback: Ext. 230

Tutoring Lab Director Charmaine Nichols: Ext. 227

Guidance Counselor Myrtle Cooke: Ext. 216. This is the extension for all q classes, grades and schedules.

Office for transcript and academic records requests for previous students o Jaspersen Ext. 215 Fax Ext. 258

Business Manager Jerry Pierce: Ext. 205

Student Billing and Accounts Betty Hasty: Ext. 206

Campus Minister Michael Spencer: campusminister@msn.com. This is the information about campus ministry and religious life at OBI.

Publications/Print Shop Denise Spencer: denise@oneidaschool.org, Ext. 2

Athletic Director Larry Allen Gritton: Ext. 224

Farm Manager Ken Martin: obifarm@kih.net, Ext. 238.

Alumni Questions- Clara Alexander: Ext. 201

Music Department Chair Tim Cochran: trc3j@juno.com.

Senior Sponsor/English Department Chair Dan Stockton: the_captain_01

OBI Daycare- Ext. 239

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 189 of 535   PageID 14076

Home

General Information
Who We Are
How We Are Different
Frequently Asked Questions

Admissions
Admissions Overview
Applications

On Campus
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

Resources
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

OBI.Net
Contact
Us
Department Pages
Time with God
Links

Webmaster





# FFA Brings Home State Honors

It was the realization of a goal when two of our students brought home first-place trophies from the Kentucky FFA convention. Jennifer Martin won the FFA creed contest, while Becky Moore placed first in the swine proficiency placement area.

Farm manager Ken Martin stated that in January, 1997, he and the assistant farm managers set a five-year goal to have a student win a state contest in something. The June 7 victories occurred four years and six months later.

Our sales team came in second in the state. Jennifer Martin was the second high individual and Elizabeth Mischler was third high individual in the sales competition. Other members of the team included Bailey Pinson and Jon Colliver.

Adam Clemons and Becky Moore received their state FFA degrees, and were the first students from OBI to ever receive that honor.

Justin Whitworth and Becky Moore served as OBI's two v    ɔ delegates at the convention. Becky became chairman of the Earnings and Savings Committee for next year. Mr. Martin noted that this was definitel, an honor.

Becky and Jennifer also participated in the state FFA chorus and served one evening shift as part of the "courtesy corps" in the hotel.

## Track and Field Competes at State Level

The OBI track/field team went to state with best personal times c the season, regional wins, and top state rankings in several events.

Jonathan Moore won the third place state medal in the 100-mete dash. Going into regional competition, Jonathan's season record had him ranked third overall of Class A runners in the state, and first in the region. He qualified for state with a first place regional win in the 100-meter dash and a second place finish in the 200-meter dash.

Aaron Gebrehiwot earned sixth place in the 200-meter run. A regionals, Aaron had cut 57 seconds off his season's best time to plac second. OBI track coach, Ms. Michelle Mau, called it the race of the day and commented, "It was amazing. I still can't believe it. He ran such a awesome race."

The men's 4x100 meter relay team just missed a state medal wit their ninth-place finish. The team included Zach Zamudio, Aaro Gebrehiwot, Eujay Dueh, and Jonathan Moore.

## Drafting Students Claim State Prizes

Oneida advanced drafting students claimed four of the five prize available at the state-wied balsa wood model bridge building competitio held in Louisville, Kentucky.

Brandon Roundtree (pictured) won first place in efficiency an strength. His 3.632-ounce bridge held 480 pounds. Zach Thomas placed second in efficiency with his 3.280-ounce bridge, which held 256 pound Josh Turner took third place in efficiency, and Adam Dulin finished fourth.

Our President

Home

**General Information**
Who We Are
How We Are Different
Frequently Asked Questions

Admissions
Admissions Overview
Applications

**On Campus**
News
This is Oneida
Student Profiles
Upcoming Events
Calendar

**Resources**
Contact Us
Employment
Books/Videos
Visit OBI
Volunteers
Friendship House

**OBI.Net**
Contact
Us
Department Pages
Time with God
Links
OBI Discussion Forum

Webmaster



Each week President W.F. "Bud" Underwood writes a column for our Kentucky Baptist State newspaper. "This is Oneida" is a good way to learn about our school. Click to Read the latest column here. Selected past columns are included here in the archives.

- Burying Baby Pigs in the Cornfield
- One Hundred Years later and a world away
- Thanksgiving and More

- Don't Forget the Gifts
- How Do You Come Up With The Names For Your Buildings?
- Can You Save Me Real Fast?

Second week of August, 2000

This is the weekend that students return for the new school year. It is always the most exciting time of the year for those of us who work at OBI. The next few days will be filled with happy reunions and new friendships. Students will feel overwhelmed and teachers will try not to appear to be overwhelmed.

At this time of year, we are very aware of the sovereign plan of God in which we are just a small part. Hundreds of different paths from all over the world will converge in this small Eastern Kentucky community. Many will wonder how they ever came to be here. That is one question with an obvious answer: God brought us all here.

Scripture says that God is determined to do far more than any of us can ask of think. We never know what God is going to do in a given school year, but we can glimpse some of his wonderful plans as we join together in starting the process of caring, teaching, worshipping and sharing.

At this time of year, we sometimes feel a kind of temporary sense of adequacy. It will quickly pass. We will be thrown back on the resources of the Father almost before the first day has passed. This is good. It is one of the ways we are blessed. A single days work is far beyond our human resources.

Oneida is a planting ministry more than a harvest ministry. We will see some of the harvest, but most of our work is in the planting, weeding and cultivating of God's garden. Because each person is an individual who will bring unique needs and challenges, our approach to each person will be different. These beginning days are times of coming to value our students as individuals.

Thank you, Father, that along with thousands of partners in your Kingdom, we are here at a crucial juncture of your wonderful plan for hundreds of students. Sustain and help us, empower and change us, equip and bless us, all in your Spirit and your Son. Amen



*Time With God*

*At the center of our life as a school family is a daily time of worship. We invite you to join with us in prayer, praise and hearing God's Word.*

**ARCHIVE**
Michael's E-mail
My Philosophy
Michael's Resume

The Truth about
Michael





# The Internet Monk

## A Webjournal Edited by Michael Spencer

**A nation attacked is a nation tested. Do we have the courage to tell the truth and act with justice?**

**Truth**
Drudge
Washington Times
National Review
Frontpage Mag
Fox News
Jewish World Review
World
Rush Limbaugh
Michael Reagan
WSJ Opinion Journal
WorldNetDaily
Town Hall

**Life**
Obscure Reading
Room
Reference Desk
Britannica
Weather Underground
Washington Post
Google

**Poetry**
Noel Spencer

## This Is What Happens...
### by Michael Spencer



A Nation attacked is a nation tested. In 1941, the Pearl Harbor Invasion mobilized a nation and brought out a depth of national character against a clear enemy. The evasive face of terror brings a different kind of test to Americans; a test that begins with telling ourselves the truth. Any thinking person knows that we have been playing the odds with terrorists for a quarter century and on 9/11/01, we lost in a stunning way. Here's my list of where truth telling begins. (MORE)

## The Two Faces of Pa Involvement
### by Steve McFarland



Liberals lov the rest of u guilty. It's es effective if y the guilt pro tactic to so ill that has little or no relation to the produced. Case in point: the long s crusade for more parental involvem public schools. Steve McFarland p what real parental involvement is, a the lie to the guilt tactic. Steve will detention for this one. Read on. (M

## Condit/Levy: Our National Train Wreck
### by Michael Spencer



Gary Condit. He's like one of those words you've said for years- like kumquat- and suddenly you just say to yourself, "WHAT IS THAT?" respect to the Levy family, I think we can all benefit from taking a lo at this difficult episode, and asking ourselves what this indicates ab political culture in America. While I'm not one of those who think Co murderer, I am one of those who think he deserves the contempt of voters in Modesto. Hey, you guys could elect a conservative Republ who would at least be embarrassed by his behavior. (Right, Newt?)

## Talk About It on the Message Board (or just post a comm

## Michael Spencer's Most Popular Features

Why Conservatives Should Reconsider the Death Penalty Limited governm human fallibility are conservative issues that still matter.
Respectashockability Marilyn Manson and James Dobson: gagging all the way bank.
To Clone or Not To Clone. Not a joke, just a bad idea.
Why I Love the Bard. Shakespeare rescued me from a white trash existence.
Mariah in Oz. On the verge of a nervous breakthrough. You go girl.
Zero Tolerance Follies. Saving America from wayward youth like the Bush girl
Singing Praise Choruses With Barbarians at the Gates Our most complime article so far. And all because someone said I WAS TOO OPINIONATED!

**Why I Am A Christian: A Ten Point Argument** I'm out front about my be can be in a short space. Attack, agree or be amused.

**Beware the Class of 2001** Why liberals and conservatives need to attend grad and shake a few hands.

**Why do Conservatives Love Standardized Tests?** Get out your pencils and g to mark those circles.

**Trashing the Moral ABCs** The problem isn't Eminem; It's the silence of those should know better.

(They're all in the archives)

## Steve McFarland's Dispatches From Our Public Schoo

**Hugs For Mrs. Hardesty** Lessons in Life that you will never hear in class.

**What Our Children Know** Anyone who says kids need to know more about drugs m some.

**A Hero To Remember** The great Willie Stargell recalls a better, more decent America

**The Kids Are Watching** The NFL (of all places) shows signs of understanding why thi been getting worse.

**P.E., Paddles, and Putty: A Few Things Misplaced in Schools** When somethi changed for the worst, why not take a look at what's changed to make it worse?

**Is There a "Big Fix" For Public Education?** Go ahead. Admit it. Anyone who say have the answer must not know the question.

## Eric Rigney's "CultureWatch" Features

**The Good Spell of Harry Potter** It's a cultural mega-phenomenon. Why are so many Christians missing the magic?

**Flea Market Anthropology (Stupidity Rant II)** Our CultureWatch Editor venture flea market... with predictable results.

**Christian Propaganda is Better Left Behind** Our most controversial article. Eric's opinionated look at "Left Behind" and the fact of evangelical propagandizing.

**John Lennon** The left's Patron Saint reminds us that the search for meaning is universa

## Noel Spencer's "My Opinion " Column

**Brittney Spears: Role Model of What?** From Mouseketeer to stripper-in-train

Michael Highly Recommends the Books (and prices) at Discerning Reader

## Avoid the dumbing down of today's Christian culture

## Special Articles

**My Final Visit To A Christian Bookstore** In the spirit of keeping a good Lent, Mic gives up his primary vice.

**Evangelical Skunks** Michael's response to Eric's Left Behind article, with a few points cultural victory of Evangelical tackiness.

**Randy As We Knew Him** My brief relationship with one of the Texas Seven is food fo thought.

**A Little Rebellion Now and Then** Why the Anarchist movement isn't a rerun of the

**The NRO Review of "Left Behind"** that seems to annoy some readers Hope on the web. It could have vanished by now ;-)



Christian CounterCulture is a great e-newsletter. Subscribe!



[ Previous 5 Sites | Skip Previous | Previous | Next | Skip Next | Next 5 Sites | Random Site |

This RingSurf Defeat the Liberal Media Net Ring
owned by The Internet Monk.
[Next | Skip Next | Next 5 Sites | Random Site | List Sites ]



# The Internet Monk

"the power of opinion, the phenomenon of speech, the impact of tru
A Webjournal and News Review by Michael Spencer

Updated 2/6/01

### Our CultureWatch Editor takes on the demise of the serious re

## Truth
Drudge
Washington Times
National Review
Frontpage Mag
Newsmax
Fox News
Jewish World Review
World
Rush Limbaugh
Michael Reagan
WSJ Opinion Journal
WorldNetDaily
Town Hall
SmarterTimes

## Life
Obscure Reading Room
George
CBS Marketwatch
Reference Desk
Britannica
Weather Underground
Washington Post
First Headlines
Google
Commentators

In a post-literate
culture, the very act of
reading is
revolutionary.

"To elect McAuliffe party
chairman is an exercise
in the art of living
dangerously. Bill Clinton
perfected that art, and
Washington real-estate
and financial millionaire
Auliffe is his protege,
as well as handpicked
chairman of the

## Special Feature: Randy As We Knew Him
### by Michael Spencer



Randy Halprin, one of the Texas Seven, a convicted child beater and now quite likely to be convicted and executed for capital murder in the death of a police officer, attended the school where I teach. For parts of three years, he was a familiar face on our campus. As I've watched his journey into criminal notoriety with curiosity and sadness, its made me think about the realities of American life his case represents so well.

Randy, and his brother, both adopted, came to our school from Texas. Whatever problems he'd experienced before coming were relatively minor, but like millions of American young people, he wasn't connecting. Not with school, or family or community or with the right people. So he came to us for a new start. In that, he was fortunate, since millions of kids just fall through the cracks. (MORE)

## CultureWatch: The Boo Many; The Readers ar
### by Eric Rigney



If you ar
this, you
abnorma
get past
sentenc
just plain
Why are
here?!
TV or so

There.
we've go
non-rea
among u
about th
anyone else bothered by the fact th
reads anymore?  I know, so
point out that the New York Times
list proves otherwise, that the millio
dollars authors reel in every year in
people are reading books by the gr
in a society of books, someone will
literate than any other generation b
(MORE)

## The Reading Room 2.6.01
   The Internet Monk is well known among his Evangelical brethren as an undeter
the "Left Behind" phenomenon. The on-target review of the film at the NR Online W
makes me proud to have declared my colors early. I encourage my Christian friends
long look at what Christians believed for two thousand years and compare it to this
What's wrong with this picture? It's American sci-fi, not Bible.
   Charles Murray is brilliant, and this culture-wise piece on the decline of America i
trash heap will give you plenty to think about. The downhill slope is truly made up of
little steps that finally take us over the edge. And every one of us can do something
haven't read anything this prophetic in a long time.
   My advice on the Congressional version of the Patient's Bill of Rights: Don't look
pawn of the insurance industry. There is a lot to be commended in this legislation, e
it has its flaws. The President should make it clear he will sign something, but not ev
I'm looking for President Bush to show how skillfully he can assess the expenditure
capital and work with his adversaries. Americans are strongly bothered by the outra

Democratic National Committee (DNC). Even as DNC members obeyed orders from the former president and Sen. Hillary Clinton to elect McAuliffe, they worried about Republicans taking over federal investigative machinery. "Bring them on!" McAuliffe said on National Public Radio last week, adding: "Who cares? So what?" (Bob Novak)

HMO system. We've been through four in the nine years I've been at my current em they've all been ridiculously insensitive. Compassionate conservatism must be savv conservatism as well.

The possibility of a major airline strike in the spring and summer is a story that b watching. The airline industry is starting to take on the appearance of a black hole f the U.S. economy. The President has some clout here and needs to let the parties k won't be afraid to use it. I can't imagine there is much political capital at stake in sidi consumers, but at base, this is about airline safety and the health of an entire indust

We have discovered that the $100,000 fee to rent Bill Clinton as an after dinner also includes a cadre of protestors. Best chant: "Buy a trailer. It's so you!" The prote the bad taste to show up at Morgan Stanley Dean Witter affair where the ex-prez wa eloquent on spending money on diseases. Just think- they could have gotten the sa for a couple of pieces of furniture.

At one time, conservatives had a lot of good things to say about a cut in payroll t it seems to be the Democrats who mention it the most. This is a tax cut that every w family would appreciate and it is good politics. Makes a great speech line. Great vis that. If the White House needs some negotiating room to get the tax cut through, the tax cut should be part of the package.

A great article on the formative years and culture of President Lincoln. As a nativ Kentucklan, it is good to remember the virtues of one of our greatest Americans was strength of family and rural communities.

 

[ Previous 5 Sites | Skip Previous | Previous | Next | Skip Next | Next 5 Sites | Random Site |



**i** The page cannot be displayed

The page you are looking for is currently unavailable. The Web site
Banneradsforfree.Com



This RingSurf Defeat the Liberal Media Net Ring
owned by The Internet Monk.
[Next | Skip Next | Next 5 Sites | Random Site | List Sites ]



# The Internet Monk
"the power of opinion, the phenomenon of speech, the impact of truth"

### A Webjournal and News Review by Michael Spencer
Updated 2/3/01

## Special Feature: Randy As We Knew Him
### by Michael Spencer



Our school is one of those "faith-based" organizations that has a
of accepting students who are not connecting with family, school
community. We have a strong academic program, special help fo
struggling students, extra-curriculars, a work program for every st
and, appropriate to our tradition, religious education and an appe
make a personal commitment to Jesus Christ. (Relax, liberals. W
get any government funds.) Every student who comes to us is br
their family, so we're working with families to find success for their children.

Randy Halprin's family was unusually supportive of what we were doing. Everyone who
with Randy and his brother recalls the story of his Jewish father bringing his boys to us,
he would rather his boys be good Christians than bad anything else. But we could also s
pain this family was experiencing. Something wasn't going right. Like so many adoptive
experiencing problems with teenagers, there seemed to be a sense of desperation. This
to work.

Randy was a very well-behaved and pleasant young person. He made a good impressio
those who worked with him. I can't find a single staff member with a bad memory of Ran
Randy didn't fully take advantage of what we had to offer. He made friends, he passed h
classes, but he didn't get involved in activities or sports, he didn't excel at anything, and
ever show the insight into his own life that is the basis of real change.

Two things about Randy stay in my mind. One was his relationship with a girl, Randy an
young lady were one of those couples that everyone thought would never break up. She
bright and flamboyant; he was quiet and utterly taken with her. They took up residence i
school grill and spent every available hour together, gazing at one another with total dev
When I think of "a young man in love," I always think of Randy.

The other was a Sunday evening when the preacher gave a public invitation to our stude
come forward and indicate their desire to receive Jesus Christ as Lord and Master. In ou
tradition, this is an adult step, a life-changing step, and the most serious single commitm
person can make in life. Randy came to me, weeping and sincere, wanting to become a
Christian. I talked with him, we prayed together and Randy went back to his room with a
faith in Jesus.

My tradition also says that everyone who walks forward, cries and prays is not necessari
genuinely converted. It is the beginning of a journey that reveals true faith and nurtures
faith. It is a journey that may include terrible mistakes and seasons of darkness. In the e
leave the results up to God. But we remember Jesus said it is not the healthy who need
physician, but the sick.

Randy got in trouble at our school. At first, it was pranks like sneaking in a girl's restroo
going out his window after bedcheck. Then he carved his name and his girlfriend's nam
bench on campus. For these problems, he was briefly suspended from school. Then, in

Randy went to a city nearby for a weekend with friends of his family. While there, he got trouble with the law for theft. When he returned, we determined we were no longer appr for Randy and we expelled him.

Then Randy's story becomes the story of millions of young people in America. His family refused to take him back. Now legally an adult, they gave him money and put him on his he was on the streets. In 1996, Randy had returned to Texas, and was living in a homel shelter, where he was befriended by a young mother. He moved in with her and her chil few months later, under the influence of drugs, Randy brutally beat her infant son, inflicti many serious wounds including a fractured skull. He was sentenced to 30 years in priso (Randy's brother, who was much more of a problem for us, was also incarcerated during time, and is today.)

* * * * * * * * * * * * *

On one of the many television shows about the Texas Seven, an official of the Texas pri system kept referring to Randy as "scum." John Walsh said that he hated Randy the mo because he had attacked a child. In his ABC interview, Randy said he broke out becaus thought he would have a chance to be a different person, not this "monster" he'd becom eyes of the public. Another official said that the fact these men were prisoners made any comment about the abuses in the Texas prison system meaningless.

I'm sorry, but as hard as I could ever try, I will never be able to think of Randy in this one dimensional way. Now don't think I'm a laying aside my conservative values. Randy will charged with capital murder, and even though I'm personally convinced he didn't pull the he is as guilty as those who did. He'll be charged, likely convicted and should be execut found guilty. I would say this to Randy. And I would say it with a broken heart.

Randy Halprin isn't scum. He isn't a monster. He is what we all are- a sinner.  A rebel ag God and a person utterly committed to selfishness, not love. In his heart, and in all of ou is every evil from lying to murder to genocide. I've been to prisons and I didn't feel like I visiting aliens from another universe. I recognized all these prisoners as very much like There but for the grace of God, go I.

Randy made terrible choices. He increasingly made choices based on his own survival a expense of others welfare and lives. The further down this road he traveled, the more pa and dangerous these choices became. It's a long way from stealing a credit card to killin but its not as far as some of us think.

But we, all of us who knew him, failed Randy as well. He behaved in such a way that his couldn't help him any more, but all of us with children know that something is very wrong American family life. Something that is tearing children away from their families, and into violent and empty. Too many young people are divided from their families by divorce, dr materialism and rebellion. Schools, counselors, the community: all of these had a chanc impact Randy's life. The choice of how to respond was his, but the opportunity was ours.

Our school had its opportunity. I know I could have done more for Randy and thousands others like him, but I routinely say that what I am doing is enough. Now I can wonder if o invested in that young man, one more effort at friendship and mentoring, one trip to the or out to eat, would have changed his life. I'll never know.

At the Republican National Convention, George W. Bush said something interesting. List

"A couple of years ago, I visited a juvenile jail in Marlin, Texas, and talked with a group o inmates. They were angry, wary kids. All had committed grown-up crimes. Yet when I lo

their eyes, I realized some of them were still little boys."

"Toward the end of the conversation, one young man, about 15 years old, raised his han
asked a haunting question, ``What do you think of me?" He seemed to be asking, like m
Americans who struggle: Is their hope for me? Do I have a chance? And, frankly, do you
white man in a suit, really care about what happens to me?"

"A small voice, but it speaks for so many: single moms struggling to feed the kids and pa
rent; immigrants starting a hard life in a new world; children without fathers in neighborh
where gangs seem like friendship or drugs promise peace, and where sex sadly seems t
closest thing to belong. We are their country too. And each of us must share in its promi
the promise is diminished for all."

"If that boy in Marlin believes he's trapped and worthless and hopeless, if he believes his
no value, then other lives have no value to him, and we're all diminished."

"When these problems are not confronted, it builds a wall within our nation. On one side
wealth, technology, education and ambition. On the other side of that wall are poverty an
prison, addiction and despair. And my fellow Americans, we must tear down that wall."

What I hear in that recollection is the truth that we accomplish nothing by demonizing th
whose problems and behavior tell us something important about all of us, and somethin
important about our country and our political culture. By simply saying that everyone in p
a deviant and the rest of us are all right, we are building bricks in a wall that is dividing A
in ways we cannot afford to be divided.

It is time for conservatives to develop an approach to every social issue that doesn't just
but creates results. We can be for excellence without leaving majorities of minority childr
behind. We can be for law and order and still work for non-prison justice alternatives. W
and must, take a look at our "drug war" and see it is a failure for America and for its you
people. There are alternatives: faith-based, humanistic, effective alternatives that are tou
possible. It is time we invest in literacy, job training and entrepreneurship for all America
especially those at risk and who need to start over.

And it is time we looked and listened to our young people, rather than seeing them as m
These are our children, and God will ask us about what we did with them.

I will write Randy and tell him we remember him. We know he is not a monster. He is pa
what we do right. He is part of what we do wrong. He is a predator, and he is a victim. H
challenge of compassion and conservativism for a new generation of conservatives.

Michael@internetmonk.com

Box 313 Oneida, Kentucky 40972

Phone 606-847-4111 (ext 231)

Fax 606-847-4496

E-mail:
Michael@Internetmonk.com

# Michael Spencer

| | | |
|---|---|---|
| **Education** | 1974 - 1975 Williamsburg, Ky | Cumberland College Religion/Philosophy major |
| | 1975-1978 Owensboro, Ky Religion/Philosophy | Kentucky Wesleyan College **Bachelor of Arts** |
| | 1979/ 1982-1984 Louisville, Ky | Southern Baptist Theological Seminary **Master of Divinity** |
| | 1986-1987 Louisville, Ky | Southern Baptist Theological Seminary **Post-Graduate Study** |
| **Professional experience** | 1976 - 1978 Owensboro, Ky | Buena Vista Baptist Church **Minister of Youth** |
| | 1979-1982 Owensboro, Ky | Bellvue Baptist Church **Minister of Youth** |
| | 1982-1984 Owensboro, Ky | Highland Baptist Church **Minister of Youth** |
| | 1984-1988 Somerset, Ky | First Baptist Church **Associate Minister** |
| | 1988-1992 Shepherdsville, Ky | Bullitt Lick Baptist Church **Pastor** |
| | 1992-present Oneida, Ky | Oneida Baptist Institute **Campus Minister, Teacher** |
| | Currently Manchester, Ky | Manchester Presbyterian Church **Minister** |
| | 2000-Present Oneida, Ky | Internet Monk Publications **Editor** |
| **Personal** | | Married to Denise Spencer for 23 years. Two children: Noel, age 16 and Clay age 13. |

Records from Oneida

# Affidavit

Before me, the undersigned authority, personally appeared   Kathryn J. Jaspersen   ,
who, being by me duly sworn, says as follows:

My name is   Kathryn J. Jaspersen   , I am of sound mind, capable of making
this affidavit, and personally acquainted with the facts herein stated:  I am the custodian
of the records of Oneida Baptist Institute.  Attached hereto are   23   pages of records
from Oneida Baptist Institute.  These said pages are kept by Oneida Baptist Institute in
the regular course of business, and it was the regular course of business of Oneida Baptist
Institute for an employee or representative of Oneida Baptist Institute with knowledge of
the act, event, condition, opinion, or diagnosis, recorded to make the records or to
transmit information thereof to be included in such records; and the records were made at
or near the time or reasonably soon thereafter. The records attached hereto are the
originals or exact duplicates (i.e. photocopies) of the originals.

_Kathryn J. Jaspersen_
Custodian of Records for Oneida Baptist Institute

SWORN TO AND SUBSCRIBED before me on the   23ʳᵈ day of   OCT   ,
2001.

_Harold S Underwood_
Signature of Notary Public

_Harold S Underwood_
Notary's Printed Name

My commission expires:   2-5-2004



# ONEIDA BAPTIST INSTITUTE

## Dr. W. F. Underwood, President

*Education for time and eternity*

P.O. Box 67
Oneida, Kentucky
40972-0067
(606) 847-4111
Fax (606) 847-4496

———— Founded in 1899 ————

| NAME | HALPRIN, RANDY | SEX M x F | DATE OF BIRTH 9-13-77 |
|---|---|---|---|
| | LAST   FIRST   MIDDLE | | MONTH  DAY  YEAR   BIRTHPLACE |

GRADE SCHOOL GRADUATED FROM                              DATE ENTERED THIS SCHOOL  1-20-92

ATTENDED OTHER
SECONDARY SCHOOLS                                                          W 1-8-96

**1993-94**

| 9th SUBJECTS | MARKS 1 ST | 2 ND | 3 RD | 4 TH | WK | CR |
|---|---|---|---|---|---|---|
| Auto Main | | | A | | | .25 |
| Alg.I/Pre-Alg | F | F | C | B | | .5 |
| Biology | D | B | B | A | | 1 |
| P.E./Health | C | C | B | | | .75 |
| Computer | C | | | | | .25 |
| English I | C | | | | | .25 |
| English II | D | D | C | C | | 1 |
| Drivers Ed. | | | B | B | | .5 |
| Piano | A | A | A | A | | 1 |
| World Hist. | D | C | A | B | | 1 |
| DAYS ABSENT | | | | | TOTAL | 6.5 |

**1994/95**

| 10th/11th SUBJECTS | MARKS 1 ST | 2 ND | 3 RD | 4 TH | WK | CR |
|---|---|---|---|---|---|---|
| Chem/Int.Chem | F | C | C | C | | .75 |
| Geom/Inf.Geom | F | C | D | C | | .75 |
| Child Dev. | A | A | | | | .5 |
| Creat.Writ. | | | A | A | | .5 |
| Eng. III | B | A | B | B | | 1 |
| French I | D | | | | | .25 |
| Piano | A | A | A | C | | 1 |
| Typing I | | A | C | | | .5 |
| U.S. History | A | B | C | B | | 1 |
| DAYS ABSENT | | | | | TOTAL | 6.25 |

**1995-96**

| SUBJECTS | MARKS 1 ST | 2 ND | 3 RD | 4 TH | WK | CR |
|---|---|---|---|---|---|---|
| Adv. Bible | | A | | | | |
| Anatomy | | D | | | | |
| English IV | | B | | | | |
| Geography | | B | | | | |
| Intro.Ch/Ph | | D | | | | |
| Piano | | A | | | | |
| DAYS ABSENT | | | | | TOTAL | |

*(No. in School 01-8-96)*

| SUBJECTS | MARKS 1 ST | 2 ND | 3 RD | 4 TH | WK | CR |
|---|---|---|---|---|---|---|
| SUMMER '93 | | | | | | |
| P.E. | B | | | | | .25 |
| English I | | B | B | B | | .75 |
| SUMMER '94 | | | | | | |
| Algebra I | B | C | B | B | | 1 |
| SUMMER '95 | | | | | | |
| Bus. Math | D | C | | | | .50 |
| DAYS ABSENT | | | | | TOTAL | |

| | |
|---|---|
| **GRADING SCALE** | **CREDITS REQUIRED TO GRADUATE:** |
| A- 90-100 | STANDARD DIPLOMA  20 |
| B- 80-89 | |
| C- 70-79 | ADVANCED DIPLOMA  23 |
| D- 60-69 | |
| F- 0-59 | |

*Kathryn J. Jaspersen*
Kathryn J. Jaspersen
Guidance Secretary

ACCREDITED BY THE KY DEPARTMENT OF EDUCATION          10-9-01

Date



# ONEIDA BAPTIST INSTITUTE

## Dr. W. F. Underwood, President

*Education for time and eternity*

P.O. Box 67
Oneida, Kentucky
40972-0067
(606) 847-4111
Fax (606) 847-4496

Founded in 1899

NAME _____   SOCIAL SECURITY NO. _____
        LAST            FIRST          MIDDLE

HOME ADDRESS _____   HOME PHONE _____
            STREET      TOWN    STATE    ZIP CODE           AREA CODE    NUMBER

FATHER'S NAME _____   NATIONALITY _____   RELIGION _____   LIVING _____

MOTHER'S NAME _____   NATIONALITY _____   RELIGION _____   LIVING _____
            FIRST   MAIDEN   LAST

FATHER'S OCCUPATION _____

MOTHER'S OCCUPATION _____

GUARDIAN'S NAME _____   ADDRESS _____   PHONE _____

NO. OF BROTHERS _____   NO. OF SISTERS _____   LANGUAGE SPOKEN IN HOME _____

## TEST SCORES

| NAME OF STUDENT | SOCIAL SECURITY NUMBER | TEST DATE |
|---|---|---|
| HALPRIN RANDY E | 453770592 | 04 95 |

| | ENGLISH | MATHEMATICS | | NAT/NUMG | SOL/PRES. | COMPOSITE | |
|---|---|---|---|---|---|---|---|
| **ACT** TEST SCORES: | 16 | 12 | | 15 | 16 | 15 | N |
| | | | | | MONTH | YEAR | |
| SUBSCORES: | 08 08 | 04 10 02 | 08 07 | | | 13 | |
| | USE/INVOL | RHET. | ELEM./ALG. ALG./GEOM | GEOM./TRIG | SOC. SCI. | ARTS/LIT. | % AT OR BELOW NAT'L COMP. |

DATE OF GRADUATION _____   NO. IN CLASS _____   RANK _____   GPA _____

GRADE COMPLETED (IF NOT GRADUATED) _____

WITHDRAWAL _____   REASON _____   DATE _____

TRANSCRIPT OF CREDITS SENT TO _____   DATE _____

GRADING SCALE

A - 90-100
B - 80-89
C - 70-79
D - 60-69
F - 0-59

CREDITS REQUIRED TO GRADUATE:

STANDARD DIPLOMA   20

ADVANCED DIPLOMA   23

*Kathryn J. Jaspersen*
Kathryn J. Jaspersen
Guidance Secretary

10-9-01
Date

ACCREDITED BY THE KY DEPARTMENT OF EDUCATION

Age? 14  Grade? 7

NAME OF STUDENT  Randy Ethan Halprin

NAME OF PARENTS  Jo   Dan Halprin

oldest of 4

ADDRESS OF STUDENT  2906 Oak Trail Ct

Arlington  TX  76016

(Zip Code)

TELEPHONE NUMBER OF STUDENT  817 - 265 - 7725 home
(Area Code)

NAME OF REFERRAL AGENT  friends

(DHR) How did
hear of? Consider.

ADDRESS OF REFERRAL AGENT

(Zip Code)

parents
together

Telephone Number of Refferal Agent

(area code)

Have any relatives or friends attended?  Yes? ✓  NO?

If "yes", WHO?  Shawn Gregg

(1)  Why are you thinking of a boarding school for your child?  family is
Jewish, can't get him motivated
[works] as volunteer at police dept,
never thinks through his actions

(2)  What special interests?  Sports?  Music?  Mechanics?  Art?
wants to be a policeman, choir,
perhaps piano,

(3)  Any medical problems?  no

(4)  How does child do academically?  failing but capable

(5)  Ever suspended or expelled?  Arguing w/ friend over religion

(6)  Any trouble with law?  no

(7)  Ever runaway from home?  no

(8)  Any problems with:  marijuana?  drinking?  etc.
no           no

(9)  When can you come to visit?  12:30  1/19 to stay

Not a trouble maker
clean cut guy.
when going gets tough he backs off
Main problem in School

Age 13
9

Randy Halprin          "Why I want to become a genius"

As a child in school I was very slow. I started kindergarten not knowing my alphabet or how to count. My parents pushed and pushed me to try harder, but I did not. Eventually I learned the necessary, but still did not try very hard.

I continued on with the lackadaisical efforts in school. I didn't care. I thought to myself, "what is school? Why am I waiting all this time on nothing? Soon I would regret having not cared for school.

It was the seventh grade, and nothing was going to stop me now. I was a "big man". I didn't have to listen to anybody. My grades became worse than they had previously been. My parents grew worried, not knowing what had happened to their son. That year I failed the seventh grade. Then came Oneida.

I arrived at Oneida with a different attitude on school. The only reason for that was so I could get out of that place. I began to think, why am I doing this, is it for me or is

just to leave this place? Then it hit me
I realized that without school, I would be
a nobody just as my parents had said
   The following quarter, my grades
shot up like a rocket. I began to feel
better about myself. I made honor roll
for the first time in my life.
   Now it's the year 1995 and
I have the opportunity to become
a junior in high school. There are
many reasons why I want to be placed
in this grade. The first reason is so
that I will graduate in the class of '96,
instead of being a year behind in the class of '97.
The second reason is that I believe my
grades, and attitude on school have changed
tremendously. The third reason is
so that I may tell my parents and myself
that I knew I could do it, and that I'm
going to be somebody. And the last reason
is so that I may continue on with a positive
attitude.
   I would greatly appreciate the
moving of my classes. I feel confident
I can do a good job if not better

in the junior class. I thank you for
the cooperation I have recieved in becoming
a junior. Thank you, I know I can
make it.

1-19-92        7th

1-28-92 (8:05 a.m.) Incident report from Ms Mehmel--No homework for math.
        1 swat

5-13-92 (1:17 p.m.) Incident report from Mr Adams---Dumping chocolate milk in another students food.
        1 swat

2-24-93 Incident report from Mrs Dunaway---Will not cooperate in class; wants to talk continuously; class is a joke for him. Ignores warnings and other punishments.
        ALC

4-2-93 Incident report from Mrs Dunaway---Cannot keep his mouth shut. Thinks out loud too much. Very disturbing when having class discussion. Warnings have no effect, continues to ignore me.

**4-21-93  Suspended** to the farm for being in the girls bathroom in the Chapel building during free time with his girlfriend, Daphne Williams and another girl.

**5-4-93  Suspended** to the farm for climbing out 2nd floor window of Baker Hall using a sheet.

**10-16-93  Suspended** to Mr Underwood for not following orders and coming back on the Taxi with 3 other OBI students from Lexington to the wrong Burger King in London and then getting the police involved because we weren't there to pick them up.

8-24-94 (5th period) Incident report from MR. Crow---Excessive talking in class. Given after school detention--didn't show.
        Going today-Mr. Robinson

**4/5/95 - 4/7/95  Suspended** to Joe Cushman for stealing VCR from Ms Beyers classroom.

Picked up for shoplifting in Lexington by the Police over the Spring Break. Got into it with his Dad at home and he left and spent time in Louisville with Teresa Dancy.

07-10-95 Carved a note to Teresa Dancy in the brand new benches that the volunteers just made for the CMC building.
        Dr Underwood called his Dad and made arrangements for him to leave.
        Dad called me and he said Randy could not go home. He may go to any city he wants to go to and he will pay for his bus ticket and housing for 6 months.  Randy will have to get a job.
        Randy chose to go to Lexington.  We took him to the bus.
        W-10

Halprin, Randy Ethan
10-08-95          12th.

01-04-96  Went home with Charles & Terri Kernell from Lexington for the
break.  Stole 2 of their Christmas checks amounting to $275.00.  They took
him to Louisville to visit friends and while there, he used their credit card
number and had Western Union wire him $200.00.  Police picked him up and
arrested him at Kernells' after they went back to Louisville to bring him
back to their home.  They were not aware of the Western Union transaction
until Discovery called them.   Dr Underwood said not to let him return.
          W-10

# CONTRACT

I, *Randy Halprin* _____ am grateful to

be allowed to return to Oneida.  I **was not** brought back to Oneida, **I am here**

**because I wrote a letter requesting permission to return.**  I understand I

am under a strict 90 day probation.  <u>During that time I will make passing</u>

<u>grades in all of my classes; if I accumulate excessive hours and/or licks,</u>

<u>if I do the same things that caused me to be expelled before, if I do not</u>

<u>show proper respect to faculty, staff and peers, or if I do anything</u>

<u>to be suspended, *I will be sent home and will not be allowed to return!*</u>

After my probation is over, I will still make every effort to be a responsible

and productive student.  I will also continue to show progress in every area of

my life.

I also want to **apologize** to all of those I have offended.  I understand that

being at Oneida is a       *PRIVILEGE   NOT   A   RIGHT!*

Signed _____
                              Student

Signed _____
                         Parent or Guardian

Date ___10 - 8 - 95____

# TEXAS ASSESSMENT OF ACADEMIC SKILLS
## CONFIDENTIAL STUDENT REPORT

STUDENT: HALPRIN    RANDY    E

ATE OF BIRTH: 09/13/77

TUDENT-ID (PEIMS): 641036653

DISTRICT: 220-901 ARLINGTON ISD
CAMPUS: 047 GUNN J H

CLASS GROUP:    TEACHER
LOCAL-STUDENT-ID:

REPORT DATE: DECEMBER 1991

DATE OF TESTING: OCTOBER 1991

GRADE: 07

## PERFORMANCE REQUIREMENTS

### WRITING

WRITTEN COMMUNICATION
4. PROCESS WRITING ("HOW-TO")
COMPOSITION RATING: 2
ANALYTIC INFORMATION:

MET MINIMUM EXPECTATIONS ON WRITING COMPETENCIES: NO

MINIMUM EXPECTATIONS:
2 ON COMPOSITION + 27/36
3 ON COMPOSITION + 18/36
4 ON COMPOSITION + 9/36
(SCALE SCORE: 1500)

OBJECTIVE MASTERY: 9/12

(3 OR 4 ON COMPOSITION REQUIRED)

| | OBJECTIVE MASTERY | ITEMS CORRECT/TESTED |
|---|---|---|
| 5. SENTENCE CONSTRUCTION | YES | 10/12 |
| 8. ENGLISH USAGE | YES | 9/12 |
| 7. USE OF SPELLING, CAPITALIZATION AND PUNCTUATION | NO | 7/12 |

TOTAL MULTIPLE-CHOICE OBJECTIVES MASTERED: 2    TOTAL ITEMS: 26/36

SCALE SCORE: 1490

### READING

MET MINIMUM EXPECTATIONS ON READING COMPETENCIES: YES

MINIMUM EXPECTATIONS: 28/40 (SCALE SCORE:1500)

OBJECTIVE MASTERY: 3/4    or: 5/6    or: 11/14

| READING COMPREHENSION | OBJECTIVE MASTERY | ITEMS CORRECT/TESTED |
|---|---|---|
| WORD MEANING | YES | 3/9 |
| SUPPORTING IDEAS | NO | 2/4 |
| SUMMARIZATION | NO | 4/6 |
| RELATIONSHIPS AND OUTCOMES | NO | 3/6 |
| INFERENCES AND GENERALIZATIONS | YES | 11/14 |
| POINT OF VIEW, PROPAGANDA, AND FACT AND NONFACT | YES | 5/6 |

TOTAL OBJECTIVES MASTERED: 3    TOTAL ITEMS: 28/40

SCALE SCORE: 1510

### MATHEMATICS

MET MINIMUM EXPECTATIONS ON MATHEMATICS COMPETENCIES: NO

MINIMUM EXPECTATIONS: 39/56 (SCALE SCORE:1500)

OBJECTIVE MASTERY: 3/4    OR: 5/6

| CONCEPTS | OBJECTIVE MASTERY | ITEMS CORRECT/TESTED |
|---|---|---|
| NUMBER CONCEPTS | YES | 3/4 |
| ALGEBRAIC/MATHEMATICAL RELATIONS AND FUNCTIONS | YES | 3/4 |
| GEOMETRIC PROPERTIES AND RELATIONSHIPS | YES | 4/4 |
| MEASUREMENT CONCEPTS | NO | 2/4 |
| PROBABILITY AND STATISTICS | YES | 3/4 |
| PERATIONS | | |
| USE OF ADDITION TO SOLVE PROBLEMS | NO | 2/4 |
| USE OF SUBTRACTION TO SOLVE PROBLEMS | YES | 3/4 |
| USE OF MULTIPLICATION TO SOLVE PROBLEMS | NO | 2/4 |
| USE OF DIVISION TO SOLVE PROBLEMS | NO | 1/4 |
| PROBLEM SOLVING | | |
| PROBLEM SOLVING USING ESTIMATION | YES | 3/4 |
| PROBLEM SOLVING USING SOLUTION STRATEGIES | NO | 2/6 |
| PROBLEM SOLVING USING MATHEMATICAL REPRESENTATION | NO | 3/6 |
| EVALUATION OF THE REASONABLENESS OF A SOLUTION | NO | 1/4 |

TOTAL OBJECTIVES MASTERED: 6    TOTAL ITEMS: 32/56

SCALE SCORE: 1410

LE NO.
138-02024-24121

# ARLINGTON INDEPENDENT SCHOOL DISTRICT
Gunn Junior High School
3000 S. Fielder
Arlington, Texas 76015
(817) 465-6381

## NOTICE OF WITHDRAWAL FROM SCHOOL

Date: 1-21-92 (1-17-92)

Student's Legal Name: Halprin (Last)   Randy (First)   E. (Middle)

Generation: _____ Jr., Sr., II, III, IV, V   Sex: M _X_ F ___   Date of Birth: 9-13-77   Current Grade: 07

Ethnicity: American Ind/Alaskan ___ Asian/Pacific Islander ___ Black ___ Hispanic ___ White/Not Hispanic X

Date Enrolled: 8-29-91   Local Student I.D. #: 86966   County District # 220-901   Campus # 047

Social Security #: _____   PEIMS Alt. I.D. #: S22511521

I.D # Last Reported to PEIMS: S22511521   Reason for Withdrawal: (03) Ky

Method of Verification: _____   Locker #: _____

TEACHERS: Fill out the form below, giving each six weeks' grade to date. If the books are checked in, sign the BOOKS IN column. If the books are not checked in, give the book number in the BOOKS OUT column and indicate the price of the book. A student must have a numeric grade in each subject at time of withdrawal. Arlington's grading scale:
A (90-100) Excellent, B (80-89) Good, C (70-79) Fair, or (below 70) Failing.

Semester: Fall _x_   Spring ___

| Per | Subject | Teacher | Room | 1st | 2nd | 3rd | Exam Grade | Sem Grade | ✓ | Books In Signature | Books Out Book # | Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | | | | | | | | | | | | |
| 1 | Life Sci | McElwee | 125 | 67 | 57 | 73 | 72 | 67 | | McElwee | | |
| 2 | Conc Chr | Johnson | 137 | 94 | 94 | 96 | 67 | | | ✓ | | |
| 3 | Tex Hist | Austin | 257 | 83 | 97 | 94 | 91 | 91 | | Ausk | | |
| 4 | Lunch/HR | Weber | 148 | | | | | | | | | |
| 5 | PE | Nix | Gym | 98 | 94 | 98 | | | | | | |
| 6 | English | Stanley | 242 | 50 | 55 | 55 | 40 | 63 | | CS | | |
| 7 | Math | Castellano | 224 | 70 | 59 | 66 | 40 | 61 | | N Castellano | | |

* Failure due to absentee policy.

LIBRARIAN: Donna Woodward
COUNSELOR: _____
CLINIC AIDE: W Mayne
Immunizations:
DPT 8-83   POLIO 8-83   MEASLES 6-82   MUMPS 6-82
Booster ___ Booster ___ Booster ___ Booster ___
Rubella 6-82
DATA CLERK: _____
Attendance:
Total Days Present 90   Total Days Absent 2
REGISTRAR: Peggy Carpenter

White - Student
Yellow - Assistant Principal
Pink - Registrar/Folder
Goldenrod - Counselor

OTHER OUTSTANDING FINES

| AMT. | DESCRIPTION | TEACHER SIGNATURE |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

...TOTAL DUE

Principal or Assistant Principal

A-060-91

School A: ARLINGTON
City: ARLINGTON TX
817-465-0181

District Name: ARLINGTON INDEPENDENT SCHOOL DISTRICT
Tel County/District/Campus Number: 220 901 047
Projected Date of Graduation: 1991
DPR
No. In Class: 00000
Grade Point Average:
Last District/High School Attended:

Date of Birth: 5/12/77
Place of Birth:
Current Address: 7906 OAK TRAIL ST
City: ARLINGTON  State: TX  Zip Code: 76016

Most Recent Former Address:
Home Phone: 457-5221  Business Phone: 861-9894

ROBERT WINDHAM
Signature and Title of School Official
PRINCIPAL

| Generic Course Name | GRADE 07 | 1990 - 91 | | | GRADE 19 | | | | GRADE 19 | | | | GRADE 19 | | | | GRADE 19 | | | | GRADE 19 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Abbreviated Course Name | 1st Sem Gr. | 2nd Sem Gr. | Cr. | Abbreviated Course Name | | | | Abbreviated Course Name | | | | Abbreviated Course Name | | | | Abbreviated Course Name | | | | Abbreviated Course Name | | | |
| ENGLISH LANGUAGE ARTS | ENG 7 | 56 | | | | | | | | | | | | | | | | | | | | | | |
| MATHEMATICS | MATH 7 | 61 | | | | | | | | | | | | | | | | | | | | | | |
| SCIENCE | L SCI 7 | 68 | | | | | | | | | | | | | | | | | | | | | | |
| SOCIAL STUDIES | TX HST 7 | 65 | | | | | | | | | | | | | | | | | | | | | | |
| ECONOMICS / FREE ENTERPRISE | | | | | | | | | | | | | | | | | | | | | | | | |
| HEALTH | | | | | | | | | | | | | | | | | | | | | | | | |
| PHYSICAL ED / EQUIVALENT | ATH 7-B | 96 | | | | | | | | | | | | | | | | | | | | | | |
| OTHER LANGUAGES | LBN/BR 7 | 0 | | | | | | | | | | | | | | | | | | | | | | |
| FINE ARTS | ART 7 | 79 | | | | | | | | | | | | | | | | | | | | | | |
| COMPUTER SCIENCE | | | | | | | | | | | | | | | | | | | | | | | | |
| VOCATIONAL EDUCATION | | | | | | | | | | | | | | | | | | | | | | | | |
| BUSINESS EDUCATION | | | | | | | | | | | | | | | | | | | | | | | | |
| OTHER ELECTIVES | | | | | | | | | | | | | | | | | | | | | | | | |
| LOCAL CREDIT | | | | | | | | | | | | | | | | | | | | | | | | |

Total Credits for Year

ABSENCES 1st Sem 2nd Sem Total
Regular School Year: 1.0  1.0
Entry: 8/27/90 W/D
Reason:
Entry: W/D
Reason:
Reason:

A PASSING GRADE IS 70 OR ABOVE

| VALUES | BASIC | REGULAR | HONORS |
|---|---|---|---|
| 97 - 100 | 8 | 13 | 15 |
| 93 - 96 | | 11 | 14 |
| 90 - 92 | | 10 | 13 |
| 87 - 89 | 7 | 9 | 12 |
| 83 - 86 | | 8 | 11 |
| 80 - 82 | | 7 | 10 |
| 77 - 79 | | 5 | 8 |
| 73 - 76 | | 5 | 8 |
| 70 - 72 | | 4 | 7 |
| BELOW - 70 | 0 | 0 | 0 |

CERTIFIED BY ALED
RECORDS CLERK:

NOTE: a is the "Abbreviated Course Name" column, space is provided at the right of the dashed line for H = Honors Courses; P = Advanced Placement Courses; I = International Baccalaureate Courses; R = Summer School Courses; S = Special Education Courses taken with modified content or material; lower levels as a result of an ARD decision. Other

DATE:

ACCREDITED BY:
Southern Association of Colleges and Schools
X Yes __ No

Texas Education Agency
X Yes __ No

HALPRIN RANDY

HALPRIN RANDY

81715-1736
016-001

CONFIDENTIAL

**ITBS** GRADE 3    TEST DATE 10/87

STUDENT: HALPRIN RANDY L
ID NO.: 00000696b [DISTRICT]
DISTRICT: 22C-901 ARLINGTON ISD
CAMPUS: 128 KEY EL

CONFIDENTIAL

**ITBS** GRADE 5    TEST DATE 02/89

STUDENT: HALPRIN RANDY L
ID NO.: 00C00696966 [DISTRICT]
DISTRICT: 22C-901 ARLINGTON ISD
CAMPUS: 128 KEY EL

## Iowa Test of Basic Skills

## Cognitive Abilities Test

## Iowa Tests of Basic Skills

## Cognitive Abilities Test

MAXIMUM OF THREE ACTIVE EDUCATIONAL AND PHYSICAL DEFECTS

ARLINGTON PUBLIC SCHOOLS
Pupil's Cumulative Record — Elementary School

LEGAL GUARDIAN Parents

| School Year | Date of Entrance | Date Ending | Grade | Days Absent | Days Present | | Name of Teacher | Retained or Promoted to | Withdrawn Date and |
|---|---|---|---|---|---|---|---|---|---|
| 83-84 | 9/2 | 5/30 | K | 11 | 164 | S | S. Hague Rd | 1st | |
| 84-85 | 9/2 | 3/13 | 1 | 8 | 170 | S | Clark | 2nd | |
| 85-86 | | | 2 | | | | Stone | 3rd | Key |
| 86-87 | | | 3 | | | | Jones | 4th | Key |
| 87-88 | | | 4 | | | | Leggett | 5th | Key |
| 88-89 | | | 5 | | | | Richardson | 6th | Key |
| | | | 6 | | | | Baldwin | | |

ARLINGTON PUBLIC SCHOOLS
Pupil's Cumulative Record — High School

• ACCREDITED BY TEXAS EDUCATION AGENCY AND SOUTHERN ASSOCIATION OF COLLEGES AND SCHOOLS •

NAME OF

ADDRESS 4015 Glenbrook Drive.    PHONE 467-5231

FATHER Daniel Halpern

MOTHER Patricia Halpern

LEGAL GUARDIAN Parents

GRADUATION DATE

RANK IN CLASS ____ OF ____ QUARTILE RANK ____ (OR FIRST AVG.) ____

**SCHOOL**

| SUBJECTS | YEAR | | |
|---|---|---|---|
| | 1st Sem. | 2nd Sem. | Sum. Sch. | Cr. |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| TOTAL CREDITS EARNED | | | |

**SCHOOL**

| SUBJECTS | YEAR | | |
|---|---|---|---|
| | 1st Sem. | 2nd Sem. | Sum. Sch. | Cr. |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| TOTAL CREDITS EARNED | | | |

**SCHOOL**

| SUBJECTS | YEAR | | |
|---|---|---|---|
| | 1st Sem. | 2nd Sem. | Sum. Sch. | Cr. |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| TOTAL CREDITS EARNED | | | |

**SCHOOL**

| SUBJECTS | YEAR | | |
|---|---|---|---|
| | 1st Sem. | 2nd Sem. | Sum. Sch. | Cr. |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| TOTAL CREDITS EARNED | | | |

Occupation of Parents or Guardian Salesman John Blake Mnf.
Comp. Programer - Western.

Birthplace McKinney, Texas
City          State

Date 9 / 8 / 77
Month  Day  Year

Immunization Record
DPT ____
Polio ____
Measles 6 · ¡0 · 83
Rubella 6 · ¡0 · 83
Mumps 6 · · 83

AT END OF THIS SEMESTER

Residence of Student

| Year | School or Building | Street Name and No. or District |
|---|---|---|
| | | |
| | | |

Attendance

| Year | Entrance | | Days Present | Days Absent | W's on Date & Reason |
|---|---|---|---|---|---|
| | Entry Code | Date of | | | |
| | | | | | |

COLLEGE ENTRANCE SCORES

Transcript to:

| VACCINES | | DATE GIVEN | VALIDATION DOCTOR OR CLINIC | DATE DOSE DUE |
|---|---|---|---|---|
| DTP or Td | 1 | 6-10-82 | DCCHD | |
| | 2 | 6-14-83 | DCCHD | |
| | 3 | AUG 25 '83 | DCCHD | |
| | 4 | 1-15-92 | LS/RAC | |
| | 5 | | | |
| | 6 | | | |
| | 7 | | | |
| Polio ☐ Oral ☐ IPV | 1 | 6-10-82 | DCCHD | |
| | 2 | 6-14-83 | DCCHD | |
| | 3 | AUG 25 '83 | DCCHD | |
| | 4 | | | |
| | 5 | | | |
| Measles | | 6-10-82 | DCCHD | |
| Mumps | | 6-10-82 | | |
| Rubella | | 6-10-82 | | |
| Other MMR | | 1-15-92 | LS/RAC | |

| TEST | DATE | RESULT |
|---|---|---|
| | | |

**PHYSICIAN'S VERIFICATION OF MEASLES/MUMPS ILLNESS**
This is to verify that the person for whom this card was issued had:

☐ measles illness on or about _____
month and year

☐ mumps illness on or about _____
month and year

and does not need the vaccine/s.

_____    _____
Date                        Physician's Signature

RICHARD A. CHIARELLO, M.D.P.A., F.A.A.P.
717 NORTH FIELDER ROAD
ARLINGTON, TEXAS 76012

KAISER PERMANENTE

**MEDICAL CARE PROGRAM**

PERMANENT RECORD
OF
IMMUNIZATIONS AND TESTS

Child's Name _Halyson Hawly_

Address _____

Birth Date _9-13- 77_  Sex _M_

Parent's Name _____

THIS BOOK IS A VALUABLE PERMANENT RECORD. BRING
IT WITH YOU WHENEVER YOU VISIT YOUR DOCTOR.

| KEEP THIS BOOK IN A SAFE PLACE |
| --- |

THIS INFORMATION WILL BE NEEDED
WHEN YOUR CHILD ENTERS SCHOOL      010220

---

**EMERGENCY INFORMATION**

Significant Medical Problems _____

Allergies _____

Drug Sensitivities _____

Other _____

**GROWTH RECORD**

| Age | Date | Height | Weight | Head Circ. |
| --- | --- | --- | --- | --- |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Arlington Memorial Hospital**
800 West Randol Mill Road
Arlington, Texas 76012

**Emergency Medical Record**

| Account number | Medical record number | Admission date and time | Health care plan |
|---|---|---|---|
| 9138600042 | 0000503895 | 10/13/91 10:56 | ☐MC ☐HMO ☐PPO ☐PP |

| Name (Last) | (First) | (Middle initial) | Birth date | Age | Sex | Allergies ☐NKA |
|---|---|---|---|---|---|---|
| HALFRIN, RANDY | E | | 09/13/77 | 14Y | M | |

| B/P | Pulse | Resp | Temp ☐Oral ☐Rectal | |

Private physician: Chiarello
ER physician: Torgerson

Time 1015 ... 1125 - Reg Assmt - K. Care-12

Time 1012

☐Office ☐Ans service ☐Home  Response time  Exam time  Current medications

☐Office ☐Ans service ☐Home
Physician history & exam    History from                Wt

**Chief complaint**

Hx Bicycle accident. Thrown over handlebars. Denies LOC. Hit face first on ground. c/o chest + upper abdominal pain. Walked home from accident and "collapsed" on living room floor. Vomited repeatedly. Felt SOB. Arrives by ambulance.

PE. Alert + NAD. head NC/AT
Face: multiple abrasions  facial bones intact
neck: non tender  no deformity or step off.
chest wall - tender over (L) lateral
Chest - large abrasion, no crepitance or
Mild tenderness to deep palp LUQ
BS (+)
lungs clear.
extremities: scattered abrasions over hands. Good ROM at all joints
Back non tender.
@ 12:00 noon pt back from X ray. breathing fine / no N or V
Dr. Chiarello will be in to finish evaluating patient.

Test results  H/H  14.5/45.3

| Time | Physician's Orders | Time | Physician's Orders |
|---|---|---|---|
| | ☐CBC w/o diff ELT-8 | | ☐UA |
| 1114 | ☒CBC w diff | | ☐Amylase |
| | ☐Lytes | | ☐Card enz |
| | ☐BUN ☐Creat | | ☐Chem profile |
| | ☐Gluc | | |
| | | | ☒2 view abd w CXR |
| 1117 | ☐ABG | | ☒CXR ☐Pon |
| | ☐EKG | | |
| | ☐Monitor | | ☐C-spine ☐Por |
| | | | ☐CT: |

**Medications / Treatments**
1117  (L) shoulder

... ice arm
... no splinting
... head firm
...

**Discharge instructions / prescriptions / conferences**

No PE Activity for 1 week
Rest
Compresses
...

Dictated PO Dr Chiarello / K Roduseale/

| Notify | Dischg Cond | Disposition | Diagnosis |
|---|---|---|---|
| ☐Coroner | ☒Improved | ☐Admitted to ____ Via ____ | Abrasion + Contusion |
| ☐Animal Control | | ☐Transferred to ____ | |
| ☐Relative | ☐No change | ☐Home with ____ | |
| ☐ | | ☐AMA | |
| Child Welfare | ☐Expired | ☐MD office | |
| ☐Organ donor | | Discharge time 1055 | Physician's signature |

# BOYS: 2 TO 18 YEARS
## PHYSICAL GROWTH
## NCHS PERCENTILES*

NAME _____ RECORD # _____



| DATE | AGE | STATURE | WEIGHT | COMMENT |
|------|-----|---------|--------|---------|
|      |     |         |        |         |
|      |     |         |        |         |
|      |     |         |        |         |
|      |     |         |        |         |
|      |     |         |        |         |
|      |     |         |        |         |

# Emergency Services Nursing Assessment

**Arlington Memorial Hospital**
Bob W. Randol Mill Road
Arlington, Texas

**Admission date:** 10-12-91
**Triage time:** AM/PM
**Method of arrival:** ☑EMS ☐Ambulatory ☐Carried ☐W/chair
**Sex:** M
**Date of birth:** 9-13-77
**Comment:**
**Priority:** I II III IV

**Name:** Kelsey, Randy E.
**Address/City/State/Zip code:** 2906 Oak Trail Ct. Dalworthington

**Chief complaint:** Bike accident — face and chest
**Nurses' signature:** S. Essinger, RN

## Assessment

**Treatment — PTA:** ☐None ☐C. collar/B. board ☐IV ☐O₂ ☐Drsg ☐Splint ☐Other

**Initial Vital Signs**
Time: 1855
B/P 141/73
Temp 97.5 ☑oral ☐rectal
Pulse 67 ☑reg ☐irreg ☑strong ☐weak
Resp n/a ☐labored ☑unlabored

Pt. states on bike, took a corner too fast, lost control, fell forward, pain to fell forward in to face and chest. No LOC. No loss of consciousness, vomited x1. No pain accident.
Nurses' signature: S. Essinger, RN

**Private physician:** Chiarelli  ☐HMO

### Previous Medical History
No chronic
Medical History: ☐Diabetes ☐Seizure ☐Hypertension ☐Lung ☐Heart ☐Surgery ☐Other
Current medications: Ⓝ

### Neurological
**Orientation:** ☑time ☑place ☑person
**Loss of consciousness:** ☑no ☐yes Duration
**Pupils:** PERL
**Neuro Flow Sheet:** ☑yes ☐no
**Visual acuity:** OD ___ OS ___ OU ___

### Clothes/Valuables Check List
☐Underwear ☐Shoes/Boots ☐Pants/Jeans ☐Socks/Stockings ☐Skirt/Dress ☐Shirt/Blouse ☐Coat/Jacket ☐Cash total $ ☐Jewelry ☐Other
☐Valuables envelope #
Signature #1
Signature #2

### Allergies
☑NKA
LMP
Pregnant ☐yes ☐no
Ht. 5-10 ☑stated ☐actual
Wt. 170 ☑stated ☐actual
Last tetanus: recent
Smoker ☐yes ☑no
**Flow Sheets:** ☐Continuation/Flow Sheet ☐Transfer form ☐MET

### Skin
**Skin temp:** ☑hot ☐warm ☐cool
**Hydration:** ☑dry ☐moist ☐diaphoretic
**Color:** ☑norm ☐pale ☐flushed ☐cyanotic

**Procedure Times:** O₂ ___ Intubation ___ NG tube ___ Chest tube R ___ L ___ IV ___ Foley ___ Lavage ___ CPR ___

| Time | Temp | Pulse | Resp | B/P | Nurse Documentation |
|------|------|-------|------|-----|----------------------|
| | | | | | ® & ℗ lower rib section. c/o 5th finger ® hand painful. Multiple abrasions ® hand ® forehead, upper lip and chin. Small cut off l knee ℗ ® hand. |
| 1225 | 66 | 18 | 131/57 | Pt alert, oriented, MAEW. c/o being cold, blanket given. Abrasions cleaned w/ Shur clens NS 4x4's. Neosporin ointment applied. Pt dschg'd per w/c to father. Dschg instructions given to father and signed. Pt in stable condition. ⎯⎯ Klamecan RN |

**Initial** | **Signature**

Randy
Halprin

8/3/95

Dr. Underwood,

I've always enjoyed being at Oneida. Ever since my
first day my eye's have been opened to the power Oneida
has. Sure, it was a new place, and yes it was scared.
I mean things were different. I missed my family, and
my friends, but even the weeks I would often forget about
them because my mind was on school and my new
friends. My grades went from 0's to A's and B's.
For once my parents were proud of me. Oh bleats
when I would come home they would say "Oh Randy
your attitude is so much better now, Oh Randy you
clean so well." It made me feel good.

Four and a half years. That's how long I had been
there. I had my ups and downs, but those were
about the best four years I can remember. Never
was I an extreme trouble maker or threat to the
school. I never had excessive hours or licks. Yes of
course I would do something stupid every once in
a while, but it wasn't like I got in trouble everyday.

I became a Roommonitor after only being at Oneida
for a quarter. The following year I became a room
monitor and hall monitor. I kept the position of
hall monitor for three years serving time in both
Baka Hall and the Carnahan, Marvin Wheeler dorms. I also
joined track (middle school, high school), played soccer in the
summers. I had the highest G.P.A. in Biology, History,
and in P.E./Health. I was the most outstanding freshman
pianist. And all four years I was there I
recieved the O standing worker award.

Those were all things that I were very proud of.

Oneida, was my highland, My home. I miss it very much. Too much. Never have I wanted something back so badly. I would do anything for another chance. I want to be the Randy I was for so many years. I want to be the Person everybody could depend on, Everybody trusted. I miss Oneida.

Ever since I was removed from the Oneida Family, Ive been lonely. Yes I know it is my fault, but I want another chance. Im not suicidal in any way. Im not Emotionally unstable. I've always had a good out look on life. Times were getting tuff for me, but never would I kill myself over anything!

Now, I am 17 years old going on 18. I've been working at Subway. It's okay there. I get paid enough to live off of. My apartment is nice, but honestly I miss the dorm Rooms of Oneida. My problem is no school will accept me. I can't go to public school without my parents Sishing me in. It takes a year to get the G.E.D and honestly I want a high school diploma. I had it all worked out for Oneida next year. I only needed 4.5 credits. I want Oneida on my diploma.

What would it take for me to come back? Im willing to give up everything. My breaks, I'll work both work programs. Please, Oneida is where I belong. I wont steal, I wont graffiti Oneida Propr. And you don't have to worry about My Emotional state, because I am just FINE.

Dr. Underwood, One a is where I belong. It's

where I feel comfortable. I can say I love Oneida, because Ive experienced so much about life there.

Please, IF there is anything I can do to get back into Oneida tell me. Don't think this letter is of ~~any~~ "brown nosing" I mean everything I wrote. I really want to come Back "home!"

Thank you for taking the time to read this. My address is 1521 Continental Sq Dr. Apt 27 Lexington, Ky 40505 (606) 299 - 3328. Once again thanks for your time.

In christ,

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

Highest GPA Awards
    Biology                                           1994

Most Outstanding Pianist                        8th Grade
- Randy played piano at Oneida from 1993-1994

Cleanest Room Awards

A & B Honor Roll

Letters in the Arts Program for Piano

**Activities – Oneida**

Hall Monitor of Middle School and Upper School Dorm

Track and Field (shot put)                   7th and 8th Grades

Co-Editor of Creative Writing Class and Magazine     11th Grade
- Asked to do it in 12th grade but got expelled before class started.

Certified in CPR

Life Guard Program
- Never obtained certification because was expelled in summer 1995.

Piano Program

Chosen for "Advanced Bible Class" with Professor Mike Spencer
- Bible class is required, but for this advanced class you either have to be chosen or approved, only a small group of students are admitted to this class, and Randy was chosen.
- Professor Mike Spencer is "The Internet Monk" who wrote an article about Randy on his website.

Set up and escorted Year Book Pageant           1995-1996
- Similar to the Homecoming Queen.

Child Development Program
- Worked with faculty and children in tutoring and study skills.

Performed Piano for Holiday Events

"White House" cleaning volunteer
- The White House is the oldest building on the Oneida campus and was reserved for housing of special guests.

"Friendship House" Volunteer

16

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

- The Friendship House is a Salvation Army like charity in Kentucky which helps low income families.
- Randy would sort clothing and assist with sorting donations.

Concession Stand Volunteer
- Set up and worked concession stands during school sporting events.

## Activities – Hope Center (Lexington, Kentucky)

Volunteered in the evenings to pass out hygiene supplies.

## Activities – Texas

B'Nai B'rith Youth Organization of Temple Beth Shalom (Arlington, Texas)

Received GED while in Tarrant County Jail.

## Activities – Choice Moore Unit
- Randy spent two years at the Choice Moore unit, a holding unit, before going to the Connelly Unit for three years.

Bilingual Choir Pianist

## Activities – Connelly Unit

Jewish Study Group
- Headed by Rabbi Block and Rabbi Marrus of the Chabad Labuuitch of South Texas (San Antonio) and the Connelly Unit.

Business and Economics Course
- College course taken on the Choice Moore Unit.

## Piano

Randy first learned to play the piano when he came to the Halprin's home at a young age. They had a stand-up piano in the living room, and he used to play with it and bang on the keys when he was little. By the time he was 8 he could hear a song once and play it without music. His parents thought he had a "good ear" and got him lessons from ages 8-10 year. At this point he was playing two hours per day for his father, and decided to quit.

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

Oneida offered a piano course (practice 1 hour per day) and Randy took it. When he had picked it back up he came home for the holiday and played for his father. His father bought him a keyboard to take back to school with him because he was so proud that he was playing so well.

## Classes

| | | |
|---|---|---|
| 7th Grade | January 1992 (Spring semester) | |
| 8th Grade | 1992-1993 | |
| 9th Grade | 1993-1994 | |
| 10th Grade | 1994-1995 | |
| 11th Grade | 1995-1996 | |
| 12th Grade | 1996 (Fall Semester) (????????????) | |

## Schedule at Oneida

| | | |
|---|---|---|
| Breakfast | 6:00 – 7:00 a.m. | |
| Classes | 1992 – 1994 | Classes from 7:30 – 2:30 p.m. |
| | 1994 – 1997 | Classes from 8:05 – 3:05 p.m. |
| Free Time | End of Classes – 4:30 p.m. Hangout with friends, snack, homework. | |
| Dinner | 4:30 p.m. | |
| Free Time | 4:30 – 8:30 p.m. Hangout in "the Grill" with friends and girlfriend, homework. Volunteer work (listed), attend sporting events, set up and run concession stand during sporting events. | |
| Study Hall | 8:15 – 9:15 p.m. This is a mandatory study hall time at Oneida, since Randy was on honor roll he was not required to attend. He would spend this time in the dorm (since it was quiet because few people were not in study hall) and do homework. | |

18

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

## ASK PARENTS FOR
- Videos of Randy playing the piano (Theresa also has this).
- Video of Randy's bat-mitzvah

## ASKED FRIENDS FOR
- Yearbooks
- Photos of Randy or any videos (perhaps lawyers could make a video of him with these things).
- Mindi Sternblitz – Gunn Junior High Yearbook 90-91

PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

<u>ADRESSES</u>

Wesley D. Halprin
#1026653
B-1-B26
4147 FM 1800
Breckon Ridge, Texas 76424
- Send certified mail to ensure he receives it.
- Copy of letter included in this packet.

Mindi Sternblitz
PO Box 152805
Arlington, Texas 76015
- Copy of letter included in this packet.

Kelly (and Chris) Hanshaw – ckahanshaw@yahoo.com
- Maiden Name – Kelly Dillon

Oneida Website Address – <u>reality7001@hotmail.com</u>

Randy's notes
(originals lost)

LEGAL

FACULTY MEMBERS OF ONEIDA WHOM I WAS ON GOOD TERMS WITH:

MR. MIKE GIBSON - Was the Daytime Dean of the middle school Dormitories. He invited My friend Wayne Evans and I into "town" for pizza ... Also would spend some weekend nights at his Apartment watching movies... We on very good terms.

MR. HEFFELFINGER (SP?) - Was the Dean of the high school Dormitories. He gave me advice on different things, would sometimes take me into town also for a movie or Wal-mart. Helped me ... out a dozen roses for Theresa for her last performance in play. Also cut my hair often. Was on very good terms.

... LAWSON - Night time Dean and in charge, overall of the middle school Dorms. Took me to ........ a Restaurant in Corbin ... for my 16th Birthday. Also My "Boss" and picked me for my ... monitor job and Hall monitor job in middle school.

MR. SHELBY - My English III teacher and creative writing teacher. ... tried to get me in advanced english but Theresa m... was in that class so the Advanced teacher wouldn't let me in.

... DAY - 7th grade History teacher.

MS Dingwang - 7th & 8th Science teacher and 10th grade Biology Teacher. I believe she has a video tape of science class notes and I dissecting a frog and getting off just ... a good time. She televised it.

MR. HAROLD Underwood - Soccer Coach and Head of the high school ...s. Often Sat down to chat with me, my "Boss" for ... hall monitor job. Awarded me the most outstanding worker award for hall monitoring in 94-95.

____?____ ) - Senior Piano Teacher who ... me to ... ... actually picked for me to ... for a musical Scholarship ... E.K.U. (Eastern Kentucky university)

FT. WORTH
YMCA

ONEIDA AWARDS AND ACTIVITIES:

Texas, Summer of 92 Camp Carter, I recieved the "Big Arrow Award" for outstanding camper based on leadership skills, participation etc.

AWARDS:

Most outstanding worker 92-95, in '94 I recieved special recognition for Hall moniter of the high school dorms

I've recieved a couple highest GPA awards, but I can only remember Biology '94

Most outstanding pianist 8th grade 93-94

Several Cleanest Room Awards

A+B Honor Roll Recognition several times

Several letters in the arts program for piano.

ACTIVITIES:

7th and 8th grade track and Field Team (Shot put)

Was temporarily on the Soccer team but had to drop because of Conflicting Class Schedules

Co-Editor of the Creative writing class and magazine. 11th grade Was asked to follow up in 12th but was expelled before class started again.

Participated in the Life Guard Program, but was temporarily expelled Summer of 95 and was never Certified. But was Certified for C.P.R.)

Hall moniter of middle school dorm and high school dorm

Piano Program

LEGAL

## POSSIBLE FRIEND CONTACTS:

WINDI STEINBLITZ - Arlington (childhood salt up friend)

JEREMY WEINER - Arlington?) (Sunday school, hebrew school classmate last talked to Summer of '96)

CHAD JONES - Best Friend growing up moved to Birmingham Alabama in '94 last talked to I think Summer of '94. His family loved me to death also.

TORY HALL - Huber Heights ohio(?) (Ex Girl Friend, and Friend)

JAYNE EVANS - Englewood, ohio(?) (Best Friend at oneida until '94, But still remained friends. Family liked me and often invited me for Thanksgiving and Summer break Stays)

TIFFANY ? (?) - (Good oneida Friend)

MAGIC ? ? (?) (Good Oneida Friend)

VERUNICA ? New York ? (Good oneida Friend)

COURTNEY SAMUELS New york(?) (Good oneida friend)

NILYSTAC ? (?) (Good Friend oneida left 9th grade)

TIM ? (?) (oneida Friend)

ANGIE BROWN (?) (oneida Friend)

DEMETRIUS MOXLEY? Frankfort Ky (Roommate and Friend '94)

KELLY SPARKS, New York(?) (Ex Girl Friend and Friend oneida

CASEY AUSTIN Michigan ?) (Good oneida Friend)

TRAVIS Duckwall Louisville, Ky (?) (oneida Friend)

Possible

Theresa Pincay, maybe she still has it?

My parents also have my Bar Mitzvah on tape and other things that show me playing around with kids, my brothers etc. I don't know how hard it would be to obtain some of those. I'm just thinking of things that would unnerve me.

Also, getting a hold of a Gunn Jr. High school yearbook to point out people. You could ask mindi Sternglitz for this. ~~Brian Maukonen~~ ~~Joshua, Jordan~~

While in Colorado an old Elementary school friend wrote from California to offer his support. Jordan Masterson to sent a picture of us together as kids. Edwin King would have that and his address.

There is also An Oneida Alumni group on Yahoo! You could check on that.

MARIAN FELD - Arlington, TX (Sunday school teacher 5,6, 7th grade also taught me hebrew)

Rabbi KEITH STERN. Boston, MASS. (former (?) RABBI of TEMPLE BETH SHALOM of Arlington)

Internet Research on Randy's friends
(plus information provided by Randy)

Oneida website

# Oneida Baptist Institute

P.O. Box 67 Oneida, Ken
1-606-847-4111
Dr. W.F. Underwood, Pre

**The On-Line Home of Traditional, Affordable, Christian Education**

**for Students in Grades 6-12**

## What other schools are looking for.....
## .... We've Never Lost.

For over 100 years, young people from all over the world have found success, direction, hope and new beginnings at the Oneida Baptist Institute.



As we enter our second century of ministry, we invite you to learn about how someone you care about can find their way to Oneida.

### ENTER THE OBI WEB SITE

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

- Family loved Randy and were close Jewish friends growing up.

- Amy Hall – Huber Heights, Ohio  (16 in Ohio)
  - Ex girl friend and friend.

- Jason Kuhns - Pevlington, Kentucky (none – check spelling)

- Chris Wood - Lexington, Kentucky (11 in Ohio) –
  - Tried contacting Chris in Lexington. There was only one Chris Wood listed that was not a student at Oneida.

- Tommy Helmers – Randy was his Hall Monitor – said that Randy stuck up for him.

## XI.  Friends from Texas

- Chad Jones – Randy wanted to go and see him when he was home between school sessions the summer of 1995.

## XII.  Misc.

- Further Education

- Got GED in the Tarrant County Jail.

- On waiting list to be able to start college in the Connelly Unit.

- Mindi Sternblitz – friend who wrote to Randy while in jail in Dallas.

- While staying at the Arlington Night Shelter Randy went to Six Flags one day.  He saw his friend Mindi, who was working there.  Mindi was getting ready to start college at Texas A & M.  He spent time with Mindi and said that he did not do drugs for the two weeks that he spent with her.  Mindi was going to college and Randy got an offer to move to Fort Worth.  He later found out from Mindi that one week after he had left for Fort Worth her parents had gone to the Arlington Night Shelter to look for Randy to see if he would come and stay with them to he could help them.

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

## IX.    Randy's Brother – Wesley Halprin

Randy and his natural brother, Wesley, were adopted into the Halprin family when Randy was five. Wesley went to Oneida with Randy, but did not graduate from Oneida. Although Randy has not spoken to his brother in six years, he said that they do have a close relationship. (Randy was not allowed to call home when he came back to Dallas after being expelled from school and was not allowed to write home from prison.  Wesley was at home during this time.)

Wesley will be 21 years old in November, and is currently in a Drug Rehabilitation Program in Texas.  Randy stated that they have not spoken recently because Wesley is not supposed to have any contact with convicts while he is in the program, and Randy respects that.

Randy thinks that Wesley does have contact with their parents and suspects that they have a good relationship.

## X.    Friends from Oneida

- Mindi Sternblitz – Arlington, Texas
  - Information appears later
  - Tried contacting her by mail. I am still waiting for a response.

- Wayne Evans (250 in US – 10 in Ohio)
  - Best friend until 11th grade.
  - Preppy guy.
  - Falling out because Randy went from being a preppy kid to doing drugs.
  - Eagle Wood, Ohio.

- Jeremy Weiner – Arlington?
  - Sunday school, Hebrew school classmate. Last talked to in summer of '96.

- Chad Jones – Birmingham, Alabama
  - Best friend of Randy's growing up. Last talked to him in summer of '94.

- Courtney Samuels – New York?
  - Class of '97
  - Good Oneida friend

- Demetrius Moxley – Frankfurt, Kentucky?
  - Roommate in '94 and good friend

- Jason Goldberg – Arlington, Texas

12

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

- Mr. Lawson – "Nighttime Dean and in charge overall of the middle school dorms. Took me to a restaurant in London, KY for my 16th birthday. Also my "boss" and picked me for my room monitor job and hall monitor job in middle school."

- Mr. Shelby – "My English III teacher and creative writing teacher. Pushed to get me in advanced English, but Theresa, my ex, was in that class, so the advanced teacher wouldn't let me in."

- Mr. "Harold" Underwood – "Soccer coach and head of the high school dorms. Often sat down to chat with me. My "boss" for the hall monitor job. Awarded me the most outstanding worker award for hall monitoring in 94-95.

- Mrs. Winters – "Ran the student "grill" where I always hung out after school. Knew me well."

- Mr. Nichols – "Substitute teacher. Often played with his five-year-old son during baseball games while running the concession stand. Was on good terms. Sometimes ate at his house. And when I had an apartment in Lexington, he stopped by once."

- Mrs. Gordan – "School counselor. Promoted me to my graduating class of 96 because I caught up on the year. I lost my first 7th grade year. Had taken extra classes to catch up on credits."


**Activities and Awards – Pre-Oneida**

Fort Worth YMCA Summer Camp                                    1992
    Broken Arrow Award
    Based on leadership, skills, and participation


**Awards – Oneida**

Most Outstanding Worker                                    1992, 1993, 1994, 1995

Most Outstanding Worker as a Hall Monitor
of Middle School Dorms                                    1994

15

CONFIDENTIAL
PROTECTED BY THE ATTORNEY-CLIENT RELATIONSHIP

- Ms. Jensen – guard in Colorado jail – loved Randy and hugged him when he left – she talked to him for 15 minutes each day.

- Interviews
- Prime Time – Chris Wallace.
- 60 minutes – Ed Bradley – talked with Randy for 15-minute interview after they talked to George Rivas.  Randy is not sure if this interview ever aired.
- Channel 11 telephone interview – Mary Ann Razzuk

### Teachers at Oneida  - *Quotes by Randy Halprin

- Ms. Dunaway – 7th and 8th → "Science teacher and 10th grade Biology teacher. I believe she has a videotape of some classmates and I dissecting a frog and goofing off just having a good time. She recorded it."
- Mr. Robinson – later the vice principle → "High school vice principle, often gave me advice. On real good terms."
- Mr. Day – history teacher – left after Randy's 8th grade year
- Ms. Knight – 8th grade History teacher → "When I went to high school, I still stopped by her classroom to say hello."
- Mr. Mike Gibson – "Was the Dean of the middle school dormitory. Often invited my friend Wayne Evans and I into "town" for pizza, etc… Also would spend some weekend nights at his apartment watching movies… Was on very good terms."
- Mr. Heffelfinger (sp?) – "Was the Dean of the high school dormitories. Often gave me advice on different things, would sometimes take me into town also for a movie or Wal-Mart. Helped me pick out a dozen roses for Theresa for her last performance in a play. Also cut my hair often. Was on very good terms."

14





.Hotmail® *reality7001@hotmail.com*

Inbox    Compose    Address Book    Folders    Options          Messenger    Calendar    Help

## Folder: Inbox

**From:** Kelly and Chris Hanshaw <ckahanshaw@yahoo.com> Save Address - Block Sender
**To:** reality7001@hotmail.com Save Address
**Subject:** Randy Halprin
**Date:** Fri, 22 Jun 2001 22:16:42 -0700 (PDT)

Reply          Reply All          Forward          Delete          Previous          Next          Close

```
Hey reality,

   Yeah I know not to believe everything I read.  I
for one feel sorry for randy and wish I could get in
touch with him by mail and see how's doing and offer
some encouragement.  I didn't talk to Randy but maybe
4 times in High school but he still seemed like a very
nice guy and you really had to go to our highschool to
understand the bond with people even if you weren't
their best friends.  Do you know how to get in touch
with him?  Is he back in texas?  How did you know him?
 Before he went to OBI or After?  Just wondering?
Talk to you later.  Kelly

=====
You guys want to make a little extra money for 5 minutes of your time?  Go to:
ttp://www.SurveyPayday.com/index.cfm?referrer=ckahanshaw just highlight the
link and paste it and sign up, as soon as you do enough surveys to have $15.00
they will send you a check.
```
----
```
Do You Yahoo!?
Get personalized email addresses from Yahoo! Mail
http://personal.mail.yahoo.com/
```

Reply          Reply All          Forward          Delete          Previous          Next          Close

Move To    (Move to Selected Folder)

Inbox    Compose    Address Book    Folders    Options          Messenger    Calendar    Help

Get notified when you have new Hotmail or when your friends are online, send instant messages, listen to music and more. Try the new browsing software from Microsoft that makes it easy to get more from the Web. Get your FREE download of MSN Explorer at http://explorer.msn.com



**Other Links:**
Buy Music
Download Music
Buy Books
Free Games
Pharmacy
More...

**Special Features:**
eShop: great stores, great deals
Are your friends online?
The Web's best personal finance site
Keep your car running longer
Get on your soap box
More...

© 2001 Microsoft Corporation. All rights reserved. TERMS OF USE    TRUSTe Approved Privacy Statement

 **Hotmail**®  reality7001@hotmail.com          <u>Inbox</u> | <u>Previous Page</u>

From : Kelly and Chris Hanshaw <ckahanshaw@yahoo.com>
To : "...Jennifer ..." <reality7001@hotmail.com>
Subject : Re: Randy Halprin
Date : Tue, 17 Jul 2001 22:59:21 -0700 (PDT)

*[handwritten annotations: NAME / NAME / KELLY DILLEY / CLOSSOF 95(?)]*

I can't believe he remembered me? Wow! Yeah my mom
married lexy's adopted dad. He was close in that my
mom worked at our boarding school, and lexy went there
and her adopted father met my mother that way! Can
you please ask him if we can write him? Tell him that
we are all wondering about him and if it was ok or
possible we would like to write him. I heard he is
still in Colorado? I hope so! Ask him if it was
wayne franklin who we went to the concert with! I
also wanted to let him know if anyone told him Dylan
anderson said anything bad about him it was a lie and
I have his interview on tape. The media seeked a lot
of us out to do interviews and Lexy and I both were on
the news. Just let him know that we both were very
ositive and never said anything at all! we wish we
hadn't been pulled into the whole thing but they would
not stop calling us! please find out if we can
write....thanks Kelly
ps i'll send you pics when i can get a chance i have a
4 yr old and 8 month old and they are a hand full! so
sometimes it takes a while for me to get a chance.
Thanks for writing me back and try to get back to me
about this when you can! Thanks again!


=====
You guys want to make a little extra money for 5 minutes of your time? Go to:
http://www.SurveyPayday.com/index.cfm?referrer=ckahanshaw just highlight the
link and paste it and sign up, as soon as you do enough surveys to have $15.00
they will send you a check.

_____

Do You Yahoo!?
Get personalized email addresses from Yahoo! Mail
http://personal.mail.yahoo.com/

  © 2001 Microsoft Corporation. All rights reserved. <u>TERMS OF USE</u>   <u>TRUSTe Approved Privacy Statement</u>

MSN Home | Hotmail | Web Search | Shopping | Money | People & Chat    sign out

Check out the
Top 10 Cars!

Hotmail   Home | Inbox | Compose | Address Book | Options | Help

Search tl

Calendar

Hotmail
Free New
Special O
Pop Mail
Find Mess
Reminder
Directorie

reality7001@hotmail.com

Previous   Next | Close

From : Kelly and Chris Hanshaw <ckahanshaw@yahoo.com>
To : "...Jennifer ..." <reality7001@hotmail.com>
Subject : Re: Randy Halprin
Date : Wed, 1 Aug 2001 18:42:04 -0700 (PDT)

Reply | Reply All | Forward | Delete | Put in Folder...    Printer Friendly Version

MSN Cha
Chat Roo
Find Frien
Free Gam
My Photo:
Personals
Send Mor
Shopping
Travel
WomenCe
More...

I know that the FBI was grilling her pretty hard about
wether or not she knew where he      Just about the
whole time he was out. Lexy and I talked to the press
but I don't know if anyone besides us and Dylan
Anderson. Who know's everyone from OBI is so spread
around it's not even funny. So who know's I do know
they hounded the hell out of Mr. Underwood (my Uncle)
at OBI and the press was camped out there for weeks.
Just let him know that nothing that was said was
negitive. The news around her found me by going to
the OBI web site then linking to the yahoo! club and
looking through member profiles! So they went to crazy
links. I think maybe Kristi Skeens might have? I
don't know? Tell him I'll write. Thanks for keeping
me updated when did they move him back to Texas? Kelly

*[handwritten: I'm thinking she
was in my Biology
class and asked me
to ask her, but I turned
her down (?)]*

=====
You guys want to make a little extra money for 5 minutes of your time? Go to:
http://www.SurveyPayday.com/index.cfm?referrer=ckahanshaw just highlight the
link and paste it and sign up, as soon as you do enough surveys to have $15.00
they will send you a check.

Do You Yahoo!?
Make international calls for as low as $.04/minute with Yahoo! Messenger
http://phonecard.yahoo.com/

Reply | Reply All | Forward | Delete | Put in Folder...    Printer Friendly Version

MSN Home | Hotmail | Web Search | Shopping | Money | People & Chat    sign out
© 2001 Microsoft Corporation. All rights reserved. TERMS OF USE   TRUSTe Approved Privacy Statement

*[handwritten: Sorry
about
that]*

  

search the web!   Yellow Pages
                  White Pages
Fetch             Classifieds
                  Shopping



# Public Records Search

First Name [Chris]      Last Name [Wood]      Search

# Detail

**TRY PUBLIC RECORDS!**

Result 3 of 11                          update/remove | add listin

🖋 Send flowers        📠 Send a Gift         ⚲ Send Cards
✈ Book Flights        🏢 Book Hotel          👥 People Search Online

**Chris Wood**
2249 Valencia Dr                    Phone: 606-224-7723  — busy signal
Lexington, KY 40513

ADD TO          BUY LONG         PURCHASE
ADDRESSBOOK     DISTANCE         WIRELESS.

**More for Chris Wood:**
• Map  • Directions  • Email Search  • Find Neighbors  •

• Chris Wood is in our Database! Click Here
• Find Chris Wood at ClassMates.com

• **Business Nearby**              • **Find a Gift**
  Restaurants                        Search for Products
  Automotive
  Entertainment                    • **Websites**
  Family
  Medical                          • **City Guide**
  Retail & Community                 Weather
  All Categories...                  Concerts
                                     Schools & Colleges
                                     More...
• **Classifieds**
  Apartments
  Autos                            • **Kentucky**
  Employment                         Lottery Results
  Home Listings
  Personals
  More...


• **Messages**
  Local Talk
  Looking for Someone
  Events & Announcements
  Messages by Topic...


• **Government Directory**

 **search the web!** [          ] [Fetch]   Yellow Pages
White Pages
Classifieds
Shopping 



# Detail

### TRY PUBLIC RECORDS!

**Result 1 of 1**                              update/remove | add listin

🌷 Send flowers      🎁 Send a Gift      🎴 Send Cards
✈ Book Flights       🏨 Book Hotel       🔍 People Search Online

**Theresa Dancy**
1107 Rogers St                          **Phone: 502-589-5566**
Louisville, KY 40204
ADD TO          BUY LONG        PURCHASE
ADDRESS BOOK    DISTANCE        WIRELESS

**More for Theresa Dancy:**
• **Map**  • **Directions**  • **Email Search**  • **Find Neighbors** •
————————————————————————————————————
• **Theresa Dancy is in our Database! Click Here**
• Find Theresa Dancy at ClassMates.com

• **Business Nearby**                    • **Find a Gift**
  Restaurants                              Search for Products'
  Automotive
  Entertainment                         • **Websites**
  Family
  Medical                               • **City Guide**
  Retail & Community                      Weather
  All Categories...                       Concerts
                                          Schools & Colleges
• **Classifieds**                         More...
  Apartments
  Autos
  Employment                            • **Kentucky**
  Home Listings                           Lottery Results
  Personals
  More...


• **Messages**
  Local Talk
  Looking for Someone
  Events & Announcements
  Messages by Topic...

• **Government Directory**

LEGAL

# ADDRESSES :

WESLEY, D. HALPRIN # 1026653
B-1- 826
4176 FM 1800
BRECKEN RIDGE, TX 76424
    ( You'll probably have to send anything pertaining to me 'Certified
    mail' to ensure that he recieves it. )

MINDI STERNBLITZ
P.O. Box 152805
ARLINGTON, TX 76015

# TEAM #2

## Brad Keeler
## Cynthia Lowery

# RANDY HALPRIN'S LIFE PRIOR TO ADOPTION AT AGE 5

# EXHIBIT
# 1

**Exhibit 16:**    Neuropsychological Function in Children With Maltreatment-Related

Posttraumatic Stress Disorder, By Sue R. Beers, Ph.D. and Michael D. De

Bellis, M.D, M.P.H.


**Exhibit 17:**    Childhood Abuse and Lifetime Psychopathology in a Community Sample,

By Harriet L. MacMillan, M.D., F.R.C.P.(C); Jan E. Fleming, M.D.,

F.R.C.P.(C); David L. Streiner, Ph.D.; Elizabeth Lin, Ph.D.; Michael H.

Boyle, Ph.D.; Ellen Jamieson, M.Ed.; Eric K. Duku, M.Sc.; Christine A.

Walsh, M.S.W; Maria Y.-Y. Wong, M.Sc.; and William R. Beardslee,

M.D.


**Exhibit 18:**    The Relationship of Childhood Abuse to Impulsivity and Suicidal

Behavior in Adults With Major Depression, By Beth S. Brodsky, Ph.D.;

Maria Oquendo, M.D.; Steven P. Ellis, Ph.D.; Gretchen L. Haas, Ph.D.;

Kevin M. Malone, M.D.; and J. John Mann, M.D.


**Exhibit 19:**    Betrayal Trauma: The Logic of Forgetting Childhood Abuse, By Jennifer

J. Freyd.


**Exhibit 20:**    Understanding the Effects of Maltreatment on Early Brain Development,

By The National Clearinghouse on Child Abuse and Neglect Information

of the United States.

To:     Spring 2002 DPP Students
        Professor Reed
        Ed King
        George Ashford

From:   Fall 2001 DPP Students
        Robert Guerra
        Bertram Vandenberg

Re: The First Five Years, Mitigation and Randy Halperin

       Randy is a remarkably polite and astute young man. He is quick to figure out where your questions are going and to provide you with the answers that you want to hear, or that he thinks you want to hear, or what he wants to hear. Perhaps a little of all three. We did not have multiple discussions with Mr. Halperin. Nor did we have a long and in-depth conversation with him, where we sought to explore his make-up as a human being. What we did chose instead, was to ask him questions that might lead us somewhere in trying to piece together his pre adoption life.

       Randy Halperin was born on September 13, 1977 in McKinney, Texas. While he did not know the surname of his biological parents, he believed that their first names were Anna and Randall Sr. Randy was taken from his parents and placed into foster care at the age of four or five. His younger brother Wesley, born two years after Randy, was taken from their biological parents at about 9 months of age. While we do not know much about Randy's biological parents, it appears, at least from documents provided by the Gladney House, that Randy's mother was 23 years old when the adoption process took place. Randy is unsure about the mechanics of his adoption although he does remember that his departure from his natural parents involved a goodbye party. Randy was adopted by Daniel and Patricia Halperin, who at the time lived in Arlington, and his surname was soon changed to Halperin. Additionally, Randy's original middle name was Lee, but was later changed to Ethan when he was adopted by the Halperins. Regarding his biological parents he has nothing positive to say, in fact he has little to say about

them at all, other than the fact that he was removed from their care after it was determined that they were keeping the money that should have gone towards his care and well being.

By the time of his adoption he was five. At that time he was not unable to count nor could he repeat the alphabet. His adoptive parents began his education. More important, to Randy the child, he learned to swim. Like most children he wanted to show off for his (adoptive) parents, swimming was his medium. All children want someone to notice them and to be impressed; praise and positive attention are universal desires. Randy went for too long with too little, if any at all. There might be a vacuum within him, something that appeared when he was so young might be depthless and might never be filled, despite constant trying. He claims that when he was 16 he almost tried to find his natural mother, but decided not to. He also claims he's never wanted to find his natural father.

Randy does not know much regarding the situation that led to his being taken from his biological parents, although he does believe that physical abuse did play a part in it. He described several incidents that he remembered, age three +/-, when he was subjected to the violent and abusive whims of his biological parents. The first occurred when he was sitting on a window ledge, of uncertain though no doubt great, height. Without warning or provocation he was pushed off. His right hand retains a scar from that event. The second incident, what we think of as a "traumatic occurrence" more than an abusive act, was when his parents left him for (he believes) five hours at a laundromat. This created a great fear in young Randy. What the long-term consequences might be is open to speculation. The need or desire to be noticed, or to be part of. Perhaps more accurately young Randy wanted to be unique and to be cared about on an individual basis. That hypothesis might be borne out when his later romantic relationships became all important and all consuming. He, himself, attributes many of his negative behavioral

changes to at least one particular girl from later in life. Someone who is desperate to acquire the affection and attention of another by any and every means would certainly not hesitate to alter their behavior. The final incident, which he can recall, occurred around the time of his brother, Wesley's birth, as he was walking down the stairs in front of their apartment, with his hands full, his father unexpectedly shoved him down the flight of stairs. He lost a tooth. Obviously, in those first few years the young Mr. Halperin had the unfortunate opportunity to develop some fears, insecurities and (though he seems not to show it) some intense and overwhelming resentment and anger.

He cares deeply for his natural brother as well as his two Korean-born adopted brothers. No doubt he places a great deal of importance on loving intra family relationships. The illusion of stability must go a long way in constructing a safe place within his soul, where the damaged child can find refuge. This desire to belong, the need to be cared for and cared about plus his need to reciprocate those feelings can be traced, with effort, to the utter lack of those things during his initial life experiences. Those fundamental needs are inherent in us all. No doubt an early dearth will create a desire or need that almost resembles addiction.

**Documentation**

His social worker, who made sure that he was adopted along with his brother, gave the Halperin's a scrapbook that held pieces of his pre-adoptive life, pictures and who knows what else. This is a crucial item to acquire. It promises to shed a great deal of light onto his early years.

The next acquisition of importance pertaining to Randy's first five years is his birth parent's names. We have submitted a document request to the Gladney House, but it's sparse. The documents procured from the Gladney House contain medical records resulting from their

physical examinations of him when he was first placed in Gladney's care.  These documents detail that Randy was in good health when turned over to the Gladney House.  Furthermore, they detail Randy's birth and formative years.  Randy was delivered through use of anesthesia and forceps, weighing 7 pounds at birth.  He was not breast-fed; rather, he was fed formula through a bottle.  Randy first sat up at 7 months, began standing at 11 months, and first walked at 14 months.  Randy's first words came at approximately 7 months of age, and his first short sentence at about 13 months.  This indicates a normal early development for Randy, and it is quite striking to learn that he did not learn the alphabet until after the adoption by the Halperins.  Most of the pertinent records (i.e., psychological, abuse records) are with The Texas Department of Protective and Regulatory Services.  However, those records cannot be accessed without the names of his biological parents.  The Gladney House does have copies of these records, however, they cannot release these records unless the TPRS grants them permission to do so.  The names in the Gladney documents, per statute have been censored, so that provides few, if any, leads.  However, we have submitted a subpoena to get the Gladney records uncensored, or at the very least, discover the names of his biological parents.  For the subpoena to be of any use, an evidentiary hearing must be scheduled.  As nothing is scheduled at all, as of right now, the subpoena is useless, but it's prepared and ready.

We checked birth records in McKinney, hoping that the names of his birth parents would be on Mr. Halperin's birth certificate.  However, upon adoption by the Halperins, the names of the parents on the birth certificate were changed, thus providing no clues.  Furthermore, a check of the local McKinney newspaper for any birth announcement at the time of Randy's birth did not produce any conclusive leads.  Our intent was that by obtaining his birth parent's names, we

could then access police reports and not only uncover any documented instances of abuse, but also to determine any prior criminal history, if any, of his birth parents.

**Some Final Facts:**

• He attended Kee Elementary. His brother attended daycare during that time.

•He claims to have really enjoyed the big brother role for his Korean adoptive brothers and for Wesley.

• He was placed in two foster homes, neither was a positive experience.

• According to the Gladney House, Randy's adoption was handled by the Denton County Court, 16th Judicial District

A psychological study of Randy (even the most superficial and cursory one) would find a lot of important and no doubt critical information contained in his perceptions of his early life. A lot of damage was done, and he is far from being healed and whole even now.

A lot of his later behavior has roots in his early, unfulfilled, desires and needs and the roots must also extend into those places where instead of a void he received affirmatively evil treatment. Pain and fear do not provide the basis for a strong and holistically well-rounded young man. Sadly, for Randy, he got what he was given, and nothing more. He started the race a lap or two behind the rest of us.

**Relevant Information**

• **Contact Person at the Gladney House**

Pattye Hicks
Director – Post Adoption Department
817-922-6046
email: Pattye@Gladney.org

2300 Hemphill St.
Ftworth 76110

Bertram Vandenberg
Robert Guerra

**Attachments**

- Medical Records procured from the Gladney House
- Receipt for Records Processing from the Gladney House
- A certified copy of Randy's birth certificate from McKinney, Texas

# EXHIBIT
# 2

  

Select another
search type

Refine this
search

**In the 16th Judicial District Court**
**Denton County, Texas**
**Cause No. F-2000-0097-A**

**STATE OF TEXAS VS. ANNA MARIE LESTER**

**Defendant**     Lester, Anna Marie
P.O.Box 314
Argyle, Tx 76226
White Female 5' 3" 170 01/09/1959
DL# TX

**Defense**     Welch, Russell L (Bar # 21126500)
**Attorneys**

**Case**     Filed on 02/03/2000
**Information** 03/17/99-DRIVING WHILE INTOXICATED 3RD
OR MORE
**3rd Degree Felony**
Current Status: Disposed/Confinement

Capias Issued on 02/07/2000
Warrant Status: Closed Warrant

$5,000.00 Bond Posted on 02/11/2000 by Cagle
Bail Bonds
Current Status of Bond: Sufficient as of
02/18/2000

**Disposition** 10/31/2000 - Guilty Plea / Confinement
**Information** Presiding Judge: NARSUTIS, JOHN
Confinement: Texas Dept Corrections - 5 Years
Assessed         Due

|  |  |  |  |
|---|---|---|---|
| Court Costs | $314.50 $314.50 | | |

| Hearings | | | |
|---|---|---|---|
| | 03/10/2000 Friday | 8:30am | * ARRAIGNMENT * |
| | 03/31/2000 Friday | 8:30am | * ARRAIGNMENT * |
| | 04/28/2000 Friday | 8:30am | * ARRAIGNMENT * |
| | 05/12/2000 Friday | 8:30am | * ARRAIGNMENT * |
| | 05/26/2000 Friday | 8:30am | * ARRAIGNMENT * |
| | 06/23/2000 Friday | 8:30am | * ARRAIGNMENT * |
| | 07/18/2000 Tuesday | 8:00am | * ANNOUNCEMENT HEARING * |
| | 08/18/2000 Friday | 8:30am | * DOCKET CALL * |
| | 08/28/2000 Monday | 8:30am | * JURY TRIAL HEARING * |
| | 10/02/2000 Monday | 8:30am | * JURY TRIAL HEARING * |
| | 11/06/2000 Monday | 8:00am | * JURY TRIAL HEARING * |
| | 09/22/2000 Friday | 8:30am | * DOCKET CALL * |
| | 10/27/2000 Friday | 8:30am | * DOCKET CALL * |
| | 10/31/2000 Tuesday | 8:00am | * PLEA HEARING * |

**Events and Orders of the Court**

02/03/2000 FILE/DOCKET 5,000
02/03/2000 CONDITION OF BOND
02/07/2000 CAPIAS/PRECEPT
02/15/2000 RETURN CAPIAS/PRECEPT
05/30/2000 AFFIDAVIT OF INCOME EXPENSE SHEET
06/26/2000 WAIVER OF RIGHTS AT ARRAIGN
07/10/2000 LETTER OF REPRESENTATION RUSSELL L.WELCH
11/01/2000 COURT'S ADMONITION
11/01/2000 WAIVER OF JURY
11/01/2000 PLEA BARGAIN AGREEMENT

## 02/21/2002 NOTICE OF PAROLE ELIGIBILITY

Copyright © 1997 The Software Group. All rights reserved.





**In the County Criminal Court #3**
**Denton County, Texas**
**Cause No. CR-2000-00729-C**

**STATE OF TEXAS VS. ANNA MARIE LESTER**

| | |
|---|---|
| **Defendant** | Lester, Anna Marie<br>P.O.Box 314<br>Argyle, Tx 76226<br>White Female 5' 3" 170 01/09/1959<br>DL# TX |
| **Defense Attorneys** | Welch, Russell L (Bar # 21126500) |
| **Case Information** | Filed on 02/02/2000<br>**03/17/99-DRIVING WHILE LIC SUSPENDED/SR**<br>**Misdemeanor B**<br>Current Status: Disposed/Confinement<br><br>$200.00 Bond Posted on 08/14/1999 by Cagle Bail Bonds<br>Current Status of Bond: A as of 02/02/2000 |
| **Disposition Information** | 11/03/2000 - No Contest<br>Presiding Judge: GARCIA, DAVID D<br>Confinement: County Jail - 120 Days |

|  | Assessed | Due |
|---|---|---|
| Fine | $100.00 | $0.00 |
| Court Costs | $196.50 | $0.00 |
| Attorney Fees | $300.00 | $0.00 |

| Hearings | 02/28/2000 Monday | 8:30am | * ARRAIGNMENT * |
|---|---|---|---|
| | 03/20/2000 Monday | 9:30am | * ANNOUNCEMENT HEARING * |
| | 04/13/2000 Thursday | 9:30am | * ANNOUNCEMENT HEARING * |
| | 06/01/2000 Thursday | 9:30am | * ANNOUNCEMENT HEARING * |
| | 07/21/2000 Friday | 8:25am | JURY TRIAL ANNOUNCEMENT |
| | 07/27/2000 Thursday | 1:30pm | * JURY TRIAL * |
| | 09/21/2000 Thursday | 10:00am | * PLEA HEARING * |
| | 11/03/2000 Friday | 8:20am | JURY TRIAL ANNOUNCEMENT |
| | 11/07/2000 Tuesday | 1:30pm | * JURY TRIAL * |

**Events and Orders of the Court**

02/02/2000 STATE'S PLEA RECOMMENDATION
02/02/2000 AFFIDAVIT FOR ARREST WARRANT
02/02/2000 COMPLAINT AND INFORMATION
02/08/2000 DOCKET NOTICE
DEF. AND CAGLE BAIL BONDS 2-28-00
02/28/2000 REQUEST FOR APPOINTMENT OF COUNSEL
RUSSELL WELCH
02/29/2000 DOCKET NOTICE
CAGLE BAIL BONDS 3-20-00.
03/21/2000 DOCKET NOTICE
CAGLE BAIL BONDS 4-13-00.
04/13/2000 DOCKET NOTICE
CAGLE BAIL BONDS; 6-1-2000
06/06/2000 DOCKET NOTICE
FOR 7/21/00, 7/27/00---DEF, ATTY, BOND
07/21/2000 DOCKET NOTICE
CAGLE BAIL BONDS 9-21-00.
10/02/2000 DOCKET NOTICE
DEF. RUSSELL WELCH AND CAGLE BAIL BONDS 11-3-00 AND 11-7-00.

11/03/2000 WAIVER OF IND/ARR/SERV/&
READING

11/03/2000 ADMONISHMENTS

11/03/2000 CERTIFICATE OF ATTORNEY
RUSSELL WELCH $350.00

11/03/2000 CERTIFICATE OF COURT
$350.00 TO RUSSELL WELCH.

11/03/2000 ORDER OF SUSPENSION

12/19/2000 LAY OUT: JAIL TIME SERVED
REC.95906

Copyright © 1997 The Software Group. All rights reserved.

# EXHIBIT

# 3

 

Select another
search type

Refine this
search

## In the PROBATE COURT
## Denton County, Texas
## Cause No. GC-2000-01091

### KEVIN GILBERT VS. ANNA MARIA LESTER AKA ANNA MARIA EISENBRANDT AND BRUCE ALLEN EISENBRANDT

Filed on 09/15/2000

Case Type: Damage - Motor Vehicles - County Clerk

Court Costs Paid: $240.00   Due: $0.00

Current Status: Disposed

**Disposition: 02/05/2001 - ORDER GRANTING DISMISSAL**

| Defendants | Defendant Attorneys |
|---|---|
| Lester, Anna Maria - ROUTE 2, BOX 314 ARGYLE, TEXAS 76266 | |
| Eisenbrandt, Bruce Allen - ROUTE 2, BOX 314 ARGYLE, TEXAS 76266 | |

| Plaintiffs | Plaintiff Attorneys |
|---|---|
| Gilbert, Kevin | Dickman, Dale A - 13140 COIT RD STE 200, DALLAS, TX 75240 |

| Disposition | Party Name |
|---|---|
| 02/05/2001 - ORDER GRANTING DISMISSAL | GILBERT, KEVIN |

| Judgment | Party Name |
|---|---|
| 02/05/2001 - Plaintiff | GILBERT, KEVIN |

## Events and Orders of the Court

01/29/2001 PLAINTIFF'S MOTION
      TO NON-SUIT AND PROPOSED ORDER

09/15/2000 Citation Issued
      BOTH DEFENDANTS - SERVICE BY
      CONSTABLE PCT 4

09/15/2000 PLAINTIFF'S ORIGINAL PETITION

_____

Copyright © 1997 The Software Group. All rights reserved.

# EXHIBIT
# 4





Select another
search type

Refine this
search

# Denton County, Texas
**Jail ID 249963**
**Denton County Sheriff**
**Confined 02/11/2000 05:15am**
**Released 02/11/2000 10:19am**

**Defendant** Lester, Anna Marie
P.O.Box 314
Argyle, Tx 76226
White Female 5' 3" 170 01/09/1959
Hair Brown
Eyes Green
DL# TX
SO# 94732

**Alias**      Anna Marie Lester Eisenbrandt;
Willingham, Anna Marie; Willingham,
Anna Whitfield; Whitfield, Anna Marie;
Whitfield, Anna Hammons; Hammons,
Anna Marie

| Cause | Charge | Disposition | Bond |
|---|---|---|---|
| F-2000-0097-A | DWI 3RD OR MORE | 02/11/2000 - Held | $5000.00 |

Copyright © 1997 The Software Group. All rights reserved.



# EXHIBIT
# 5



Select another
search type

Refine this
search

### In the 16th Judicial District Court
### Denton County, Texas
Cause No. F-89-378-A

### STATE OF TEXAS VS. BOB WHITFIELD

**Defendant**

Whitfield, Bob
715 Gober St
Denton, Texas 76201
White Male 5' 7" 140 07/27/1957
DL# TX-15022436

**Case Information**

Filed on 04/13/1989
**02/15/89-FORGERY GOVT FINANCIAL INSTRUMENT**
**2nd Degree Felony**
Current Status: Converted

$2,500.00 Bond Posted on 03/19/1989 by Across Country Bail Bonds
Current Status of Bond: Surty as of

**Disposition Information**

12/08/1989 - Deferred Adjudication
Presiding Judge: NARSUTIS, JOHN

|  | Assessed | Due |
|---|---|---|
| Fine | $300.00 | $0.00 |
| Court Costs | $94.50 | $0.00 |
| Restitution | $937.00 | $0.00 |
| Other Fees | $1,680.00 | $0.00 |

**Events and Orders of the Court**

| 03/17/1989 | DEFENDANT'S APPLICATION FOR DEFERRED ADJUDICATION |
|---|---|

| | | |
|---|---|---|
| 04/13/1989 | WAIVER OF SPEEDY TRIAL ACT | |
| 04/13/1989 | WAIVER OF IND/ARR/SERV/& READING | |

Copyright © 1997 The Software Group. All rights reserved.

# EXHIBIT
# 6





Select another
search type

Refine this
search

### In the 367th Judicial District Court
### Denton County, Texas
### Cause No. 91-50132-367

**IN THE MATTER OF THE MARRIAGE OF
CHERYL LYNNE WHITFIELD AND BOB
RANDALL WHITFIELD**

Filed on 03/04/1991
Case Type: Divorce - District Clerk
Court Costs Paid: $134.00   Due: $0.00
Current Status: Disposed
**Disposition: 05/15/1991 - FINAL-NON-JURY**

| **Defendants** | **Defendant Attorneys** |
|---|---|
| Whitfield, Bob Randall | |

| **Plaintiffs** | **Plaintiff Attorneys** |
|---|---|
| Whitfield, Cheryl Lynne | Orsburn, Keith - 4234 I-35 NORTH GREENWAY PLAZA, DENTON, TEXAS 76207-3408 |

| **Disposition** | **Party Name** |
|---|---|
| 05/15/1991 - FINAL-NON-JURY | WHITFIELD, CHERYL LYNNE |

| **Judgment** | **Party Name** |
|---|---|
| 05/15/1991 - Plaintiff | WHITFIELD, CHERYL LYNNE |

### Events and Orders of the Court
05/15/1991 CERTIFICATE OF LAST KNOWN ADDRESS
05/15/1991 CERTIFIED COPY

OF DECREE MAILED TO LAST KNOWN
ADDRESS OF RESPONDENT
(COPYüRETURNED "NOT AT THIS ADDRESS")

05/15/1991 REPORT OF DIVORCE OR ANNULMENT
05/07/1991 AMENDED
ORIGINAL PETITION FOR DIVORCE
03/05/1991 AFFIDAVIT
FOR CITATION BY POSTING
03/04/1991 PETITION
SUPPORTING AFFIDAVIT
03/04/1991 ORIGINAL PETITION FOR DIVORCE

Copyright © 1997 The Software Group. All rights reserved.

# EXHIBIT

# 7

# The Untouched Key

## By Alice Miller

Translated from the German by Hildegarde and Hunter Hannum

[CIRP presents a small excerpt from *The Untouched Key* by Alice Miller. Alice Miller is a Swiss psychoanalyst. Her books include *The Drama of the Gifted Child: The Search for the True Self*, *Thou Shalt Not Be Aware: Society's Betrayal of the Child*, *Banished Knowledge: Facing Childhood Injuries*, and *For Your Own Good: Hidden Cruelty in Child-rearing and Roots of Violence*.]

APPENDIX

## *The Newly Recognized, Shattering Effects of Child Abuse*

For some years now there has been proof that the devastating effects of the traumatization of children take their inevitable toll on society. This knowledge concerns every single one of us, and--if disseminated widely enough--should lead to fundamental changes in society, above all to a halt in the blind escalation of violence. The following points are intended to amplify my meaning:

1. All children are born to grow, to develop, to live, to love, and to articulate their needs and feelings for their self-protection.

2. For their development children need the respect and protection of adults who take them seriously, love them, and honestly help them to become oriented in the world.

3. When these vital needs are frustrated and children are instead abused for the sake of adults' needs by being exploited, beaten, punished, take advantage of, manipulated, neglected, or deceived without the intervention of any witness, then their integrity will be lastingly impaired.

4. The normal reactions to such injury should be anger and pain; since children in this hurtful kind of environment, however, are forbidden to express their anger and since it would be unbearable to experience their pain all alone, they are compelled to suppress their feelings, repress all memory of the trauma, and idealize those guilty of the abuse. Later they will have *no memory of what was done to them*.

5. Disassociated from the original cause, their feelings of anger, helplessness, despair, longing, anxiety, and pain will find expression in destructive acts against others (criminal behavior, mass murder) or against themselves (drug addiction, alcoholism, prostitution, psychic disorders, suicide).

6. If those people become parents, they will then often direct acts of revenge for their mistreatment in childhood against their own children, whom they use as scapegoats. Child abuse is still sanctioned--indeed, held in high regard--in our society as long as it is defined as child-rearing. It is a tragic fact that parents beat their children in order to escape from

emotions stemming from how they were treated by their own parents.

7. If mistreated children are not to become criminals or mentally ill, it is essential that *at least once in their life* they come in contact with a person who knows without any doubt that the environment, not the helpless battered child is at fault. In this regard, knowledge or ignorance. on the part of society can be instrumental in either saving or destroying a life. Here lies the great opportunity for relatives, social workers, therapists, teachers, doctors, psychiatrists, officials, and nurses *to support the child and to believe her or him.*

8. Till now, society has protected the adult and blamed the victim. It has been abetted in its blindness by theories, still in keeping with the pedagogical principles of our great-grandparents, according to which children are viewed as crafty creatures, dominated by wicked drives, who invent stories and attack their innocent parents or desire them sexually. In reality, children tend to blame themselves for their parents' cruelty and to absolve the parents, whom they invariably love, of all responsibility.

9. For some years now, it has been possible to prove, thanks to the use of new therapeutic methods, that repressed traumatic experiences in childhood are stored up in the body and, although remaining unconscious, exert their influence even in adulthood. In addition, electronic testing of the fetus has revealed a fact previously unknown to most adults: *a child responds to and learns both tenderness and cruelty from the very beginning*.

10. In the light of this new knowledge, even the most absurd behavior reveals its formerly hidden logic once the traumatic experiences of childhood no longer must remain shrouded in darkness.

11. Our sensitization to the cruelty with which children are treated, until now commonly denied, and to the consequences of such treatment will as a matter of course bring to an end the perpetuation of violence from generation to generation.

12. People whose integrity has not been damaged in childhood, who were protected, respected, and treated with honesty by their parents, will be--both in their youth and adulthood--intelligent, responsive, empathetic, and highly sensitive. They will take pleasure in life and will not feel any need to hurt otherss or themselves. They will use their power to defend themselves but not to attack others. They will not be able to do otherwiss than to respect and protect those weaker than themselves, including their children, because this is what they have learned from their own experience and because it is *this* knowledge (and not the experience of cruelty) that has been stored up inside them from the beginning. Such people will be incapable of understanding why earlier generations had to build up a gigantic war industry in order to feel at ease and safe in this world. Since it will not have to be their unconscious life-task to ward off intimidation experienced at a very early age, they will be able to deal with attempts at intimidation in their adult life more rationally and more creatively.

---

Cite as:

- Miller A. Appendix: The Newly Recognized, Shattering Effects of Child Abuse. In: *The Untouched Key: Tracing Childhood Trauma in Creativity and Destructiveness.* Anchor Books (Doubleday) New York, 1991. (Originally published as *Der gemiedene Schlüssel* by Suhrkampt

# EXHIBIT
# 8

Verlag am Main, 1988).

---

(File prepared 12 May 1999)

<u>Return to CIRP library</u>

http://www.cirp.org/library/psych/miller1/

# Violence and Childhood:

## How Persisting Fear Can Alter the Developing Child's Brain

A Special ChildTrauma Academy WebSite version of:
The Neurodevelopmental Impact of Violence in Childhood

**Bruce D. Perry, M.D., Ph.D.**

The ChildTrauma Academy
www.ChildTrauma.org

Web Version DRAFT

Perry, B.D. (2001b). The neurodevelopmental impact of violence in childhood. In Schetky D & Benedek, E. (Eds.) Textbook of child andadolescent forensic psychiatry. Washington, D.C.: American Psychiatric Press, Inc. (221-238)

Acknowledgments

The clinical and clinical research work related to this paper has been supported, in part, by the Child Protective Services Fund Board of Harris County, the Fondren Foundation, the Hogg Foundation for Mental Health and Maconda Brown O'Connor.

## Introduction

### Neurodevelopment and Adaptation to a Violent World

*Cortical Modulation and the Use-dependent Development of the Brain*

*The Child's Response to Threat*

The Hyperarousal Continuum: 'Fight or Flight' Responses

*Neural Systems Regulating the Neurobiological Response to Threat*

Reticular Activating System (RAS)

Locus Coeruleus

Hippocampus

Amygdala and Emotional Memory

Hypothalamic-Pituitary-Adrenal Axis (HPA)

**The Dissociative Continuum**

*Neurobiology of dissociation*

**States become Traits: The Clinical Presentation of Children Exposed to Violence**

**Altered Neurobiology in Children Exposed to Violence**

**Clinical Implications**

*A. Use-dependent Learning: State Dependent Storage and Recall*

**The Future: Impediments to Problem-Solving and Prevention**

**References**

**Tables and Figures**

---

## Introduction

We humans are the most complex and puzzling of living creatures. We can create, nurture, protect, educate and enrich. Yet we also degrade, humiliate, enslave, hate, destroy and kill. A man can tenderly hold his newborn and moments later beat the baby's mother. Violence permeates our history. In all societies and in each culture, past and present, violence has played a role in shaping our sociocultural evolution. While no society has been able to break free from violence, there is tremendous variation in the type and degree of violence across cultures and time. In some cultures, random street violence has been suppressed with oppressive institutional violence, in others, inter-familial violence is rare but intra-familial violence – violence to wives and children – is rampant.

Today, in the United States, despite remarkable advances in technology, social justice, and education, violence continues to be a permeating and pervasive element of American society. We are bathed in violent images. Violence fascinates *and* repulses us. Whether journalist, producer, politician or scholar, we consider,

comment on and analyze violence. We have academic conferences, Congressional hearings, special documentaries - we issue opinions, create task forces, start programs, blame guns, blame Hollywood, blame parents. Yet no simple solutions emerge. We continue to be shocked, enraged and confused by the horrors of violence in our homes, schools and streets.

How can we truly begin to understand the heterogeneity and complexity of the violence that surrounds us – random violence and institutionalized violence, the violence in behaviors, the violence in ideas, the violence in words? Can we ever understand the detached adolescent killing his classmates in school, mothers killing their infants, husbands killing wives, children and themselves? Can we understand random bombing of civilians in the name of God? Can we understand systematic or institutionalized rape, torture, slavery, and genocide?

Violence and its associated factors are complex and multidimensional. The present chapter will consider only one of many perspectives from which to examine violence: the impact of violence and fear on the development of the child. More specifically, violence-related neurodevelopmental changes and functional consequences of these alterations in the brain will be reviewed. This view is presented with the hope that some of devastating cost of violence to the individual child, family, community and society can be illustrated from a neurodevelopmental perspective.

## Violence in Childhood: Scope of the Problem

*Violence in the Home*

Childhood is a dangerous time. For infants and children, survival is dependent upon adults, most typically, the nuclear family. It is in the family setting that the child is fed, clothed, sheltered, nurtured and educated. Unfortunately, it is in the familial incubator that children are most frequently manipulated, coerced, degraded, inoculated with destructive beliefs and exposed to violence.

The home is the most violent place in America (Straus, 1974). In 1995, the FBI reported that 27% of all violent crime involves family on family violence, 48% involved acquaintances with the violence often occurring in the home (National Incident-Based Reporting System, Uniform Crime Reporting Program, 1999). Children are often the witnesses to, or victims of, these violent crimes.

Violent crime statistics, however, grossly underestimate the prevalence of violence in the home. It is likely that less than 5% of all domestic violence results in a criminal report. Intra-familial abuse and domestic battery account for the majority of physical and emotional violence suffered by children in this country (see Koop et al., 1992; Horowitz et al., 1995; Carnegie Council on Adolescent Development, 1995). This violence takes many forms. The child may witness the assault of her mother by father or boyfriend. The child may be the direct victim of violence - physical or emotional - from father, mother or even older siblings. Straus and Gelles (1996) have estimated that over 29 million children commit an act of violence against a sibling each year. The child may become the direct victim of the adult male if he or she tries to intervene and protect mother or sibling. While these all cause physical violence, an additional destructive element of this intra-familial toxicity is emotional violence - humiliation, coercion, degradation, and threat of abandonment or physical assault.

*Media Violence*

In homes where no physical or emotional violence is present, children are still bathed in violent images; the average child spends more than three hours a day watching television. Television, videogames, music and film have become increasingly violent (Donnerstein et al., 1995). Huston and colleagues have estimated that the average 18 year old will have viewed 200,000 acts of violence on television (Huston, et al., 1992). Even with solid emotional, behavioral, cognitive and social anchors provided by a healthy home and community, this pervasive media violence increases aggression and antisocial behavior (Lewis et al., 1989; Myers et al., 1995; Mones, 1991; Hickey, 1991; Loeber et al., 1993; O'Keefe, 1995), contributes to a sense that the world is more dangerous than it is (Gerbner, 1992) and desensitizes children to future violence (Comstock and Paik, 1991). In children exposed to violence in the home, these media images of power and violence are major sources of 'cultural' values, reinforcing what they have seen modeled at home.

*Community and School Violence*

There has been a dramatic increase in juvenile violence over the last 10 years. From 1986 to 1996 there was a 60% increase with juveniles now accounting for 19% of all violent crime (Snyder, 1997). Much of this is youth on youth violence. The violence in communities witnessed by youth has become so pervasive in some communities that in some studies, over half of all children surveyed had witnessed some form of violence in the year prior to the survey (Taylor et al., 1992; Richters & Martinez, 1993; Horowitz et al., 1995). The most heinous violence in schools has been widely publicized with the series of school shootings from 1992 to 1999. Yet the more common forms of school violence are intimidation, threat and simple assault. For thousands of children, school is not safe. It has been estimated that more than 250,000 students are attacked in school each month (Garrity, et al., 1994). For too many, school is a place of fear, dominated by the potential for harm and a sense of pervasive threat.

# Neurodevelopment and Adaptation to a Violent World

Millions of children are victims of, or witness to, violence in the home, community or school (see Perry, 1997; Chapters 21 and 22, this volume). While the majority of homes, communities and schools are safe, far too many children experience violence in one or more of these settings. For some children, a safe community and school may help buffer the impact of violence in the home. The highest-risk children, however, are safe no where; their home is chaotic and episodically abusive, their community is fragmented and plagued by gang violence and the schools are barely capable of providing structure and safety from intimidation and threat, let alone education. These children must learn and grow despite a pervasive sense of threat. These children must adapt to this atmosphere of fear. Persisting fear and the neurophysiological adaptations to this fear can alter the development of the child's brain, resulting in changes in physiological, emotional, behavioral, cognitive and social functioning. The core principles of neurodevelopment provide important clues about the mechanisms underlying the observed functional changes in children exposed to violence.

*Cortical Modulation and the Use-dependent Development of the Brain*

As the brain grows and organizes from the "inside-out" and the "bottom-up" the higher, more complex areas begin to control and modulate the more reactive, primitive functioning of the lower parts of the brain (see Figure 1). The person becomes less reactive, less impulsive, more 'thoughtful.' The brain's impulse-mediating capacity is related to the ratio between the excitatory activity of the lower, more-primitive portions of the brain (brainstem and diencephalon; see Figure 1) and the modulating activity of higher, sub-cortical and cortical areas. Any factors that increase the activity or reactivity of the brainstem (e.g., chronic traumatic stress) or decrease the moderating capacity of the limbic or cortical areas (e.g., neglect, brain

injury, mental retardation, Alzheimer's, alcohol intoxication) will increase an individual's aggression, impulsivity and capacity to be violent (see below).

A key neurodevelopmental factor determining this moderating capacity is the brain's amazing capacity to organize in a 'use-dependent' fashion. Meaning that the more any neural system is activated, the more it will change. The more a child practices piano, the more she will "build in" the motor-vestibular neural systems mediating this behavior, and, of course, the better she will become at playing piano. When an infant or toddler is spoken to as an infant and toddler, the neural systems responsible for speech and language will be "activated." Frequent and repetitive talking or singing will help the child's brain develop the capacity for language; the infant or toddler living in a setting where no one speaks or sings to them will develop language slower and may even have profound communication delays. During development, repetitive and patterned sensory experiences result in corresponding neural system organization and, thereby functioning (Courchesne et al., 1994). The brain develops functions and capacities that reflect the patterned repetitive experiences of childhood. This is true for a host of functions associated with violent behaviors.

The capacity to moderate frustration, impulsivity, aggression and violent behavior is age-related. With a set of sufficient motor, sensory, emotional, cognitive and social experiences during infancy and childhood, the mature brain develops - in a use-dependent fashion --a mature, humane capacity to tolerate frustration, contain impulsivity and channel aggressive urges. A frustrated three year old (with a relatively unorganized cortex) will have a difficult time modulating the reactive, brainstem-mediated state of arousal and will scream, kick, bite, throw and hit. However, the older child when frustrated may feel like kicking, biting and spiting, but has 'built in' the capacity to modulate and inhibit those urges. All theoretical frameworks in developmental psychology describe this sequential development of ego-functions and super-ego which are, simply, cortically-mediated, inhibitory capabilities which modulate the more primitive, less mature, reactive impulses of the human brain. Loss of cortical function through any variety of pathological process (e.g., stroke, dementia) results in 'regression' -- simply, a loss of cortical modulation of arousal, impulsivity, motor hyperactivity, and aggressivity -- all mediated by lower portions of the central nervous system (brainstem, midbrain). Conversely, any deprivation of optimal developmental experiences which leads to underdevelopment of cortical, sub-cortical and limbic areas will necessarily result in persistence of primitive, immature behavioral reactivity and, predispose to violent behavior.

A growing body of evidence suggests that exposure to violence or trauma alters the developing brain by altering normal neurodevelopmental processes. Trauma influences the pattern, intensity and nature of sensory perceptual and affective experience of events during childhood (see Perry, 1994; Perry et al., 1995; Perry, 1997; Perry, 1999). Threat activates the brain's stress-response neurobiology. This activation, in turn, can affect the development of the brain by altering neurogenesis, migration, synaptogenesis, and neurochemical differentiation (Lauder, 1988; McAllister et al., 1999). Indeed, the developing brain is exquisitely sensitive to stress. For example, rats exposed to perinatal handling stress show major alterations in their stress response later in life (Plotsky and Meany, 1993; Vaid et al., 1997; Valee et al., 1997). These animal models suggest that early exposure to consistent, moderate stress can result in resilience, while exposure to unpredictable or chronic stress results in functional deficits and vulnerability to future stressors.

The human brain develops and, once developed, changes in a 'use-dependent' fashion (for review see Perry et al., 1995; Perry & Pollard, 1998; Perry, 1999). Neural systems that are activated in a repetitive fashion can change in permanent ways, altering synaptic number and micro-architecture, dendritic density, and the expression of a host of important structural and functional cellular constituents such as enzymes or neurotransmitter receptors (Brown, 1994; Courchesne et al., 1994; McAllister et al., 1999). The more any neural system is activated, the more it will modify and 'build' in the functional capacities associated with that activation. The more someone practices the piano, the more the motor-vestibular neural systems involved in that behavior become 'engrained.' The more someone is exposed to a second language, the more the

neurobiological networks allowing that language to be perceived and spoken will modify. And the more threat-related neural systems are activated during development, the more they will become 'built in.'

In summary, then, exposure to violence activates a set of threat-responses in the child's developing brain; in turn, excess activation of the neural systems involved in the threat responses can alter the developing brain; finally, these alterations may manifest as functional changes in emotional, behavioral and cognitive functioning. The roots of violence-related problems, therefore, can be found in the adaptive responses to threat present during the violent experiences. The specific changes in neurodevelopment and function will depend upon the child's response to the threat, the specific nature of the violent experience(s) and a host of factors associated with the child, their family and community (see Perry & Azad, 1999).

*The Child's Response to Threat*

When the child perceives threat (e.g., anticipating an assault on self or loved one), their brain will orchestrate a total-body mobilization to adapt to the challenge. Their emotional, behavioral, cognitive, social and physiological functioning will change. These responses to threat are heterogeneous and graded. The degree and nature of a specific response will vary from individual to individual in any single event and across events for any given individual. In animals and in humans, two primary but interactive response patterns, hyperarousal and dissociative, have been described (Perry et al., 1995; Perry, 1999). Most individuals use various combinations of these two distinct response patterns during any given traumatic event. The predominant response patterns and combinations of these primary 'styles' appear to shift from dissociative (common in babies and young children) to hyperarousal during development.

## The Hyperarousal Continuum: 'Fight or Flight' Responses

*Neural Systems Regulating the Neurobiological Response to Threat*

Reticular Activating System (RAS): The initial phase of the hyperarousal continuum is an alarm reaction that begins to activate the central and peripheral nervous system. A network of ascending arousal-related neural systems in the brain consisting of locus coeruleus noradrenergic neurons, dorsal raphe serotonin neurons, cholinergic neurons from the lateral dorsal tegmentum, mesolimbic and mesocortical dopaminergic neurons, among others, form the reticular activating system (RAS). Much of the original research on arousal, fear, response to stress and threat was carried out using various lesion models of the RAS (Moore & Bloom, 1979). The RAS is an important, multi-system network involved in arousal, anxiety and modulation of limbic and cortical processing (Munk, et al., 1996). These key brainstem and midbrain monoamine systems, working together, provide the flexible and diverse functions necessary to modulate the variety of functions related to anxiety regulation.

Locus Coeruleus: A key component of the RAS network is the locus coeruleus (Murberg et al., 1990; Aston-Jones et al., 1996). This bilateral nuclei of norepinephrine-containing neurons originates in the pons and sends diverse axonal projections to virtually all major brain regions, enabling its function as a general regulator of noradrenergic tone and activity (see Aston-Jones et al., 1996). The LC plays a major role in determining the 'valence' or value of incoming sensory information, increasing in activity if the information is novel or potentially threatening (Abercrombie & Jacobs. 1987b; Abercrombie & Jacobs. 1987b). The ventral tegmental nucleus (VTN) also plays a part in regulating the sympathetic nuclei in the pons/medulla (Moore & Bloom. 1979). Acute stress results in an increase in LC and VTN activity and release of norepinephrine that influences the brain and the rest of the body. These brainstem catecholamine systems (LC and VTN) projecting to all key areas of the brain, then, play a critical role in regulating arousal,

vigilance, affect, behavioral irritability, locomotion, attention, the response to stress, sleep and the startle response.

Activity of the LC mirrors the degree of arousal (i.e., sleep, calm-alert, alarm-vigilant, fear and terror) related to stress or distress in the environment (internal and external). Fear increases LC and VTN activity, increasing the release of norepinephrine in all of the LC and VTN terminal fields throughout the brain. The LC tunes out non-critical information and mediates hypervigilance. This nucleus orchestrates the complex interactive process that includes activation of autonomic nervous system tone, the immune system, the hypothalamic-pituitary-adrenal (HPA) axis with resulting release in adrenocorticotropin and cortisol. The sympathetic nervous system activation can be regulated by the LC, resulting in changes in heart rate, blood pressure, respiratory rate, glucose mobilization and muscle tone. All of these actions prepare the body for defense - to fight with or run away from the potential threat.

<u>Hippocampus:</u> Another key system linked with the RAS and playing a central role in the fear response is the hippocampus, located at the interface between the cortex and the lower diencephalic areas. It plays a major role in memory and learning. In addition it plays a key role in various activities of the autonomic nervous and neuroendocrine systems. Stress hormones and stress-related neurotransmitter systems (i.e., those from the locus coeruleus and other key brainstem nuclei) have the hippocampus as a target. In animal models, various hormones (e.g., cortisol) appear to alter hippocampus synapse formation and dendritic structure, thereby causing actual changes in gross structure and hippocampal volume as defined using various brain imaging techniques (see McEwen, 1999 for review). Repeated stress appears to inhibit the development of neurons in the dentate gyrus (part of the hippocampus) and atrophy of dendrites in the CA3 region of the hippocampus (Sapolsky & Plotsky, 1990; Sapolsky et al., 1990). These neurobiological changes are likely related to some of the observed functional problems with memory and learning that accompany stress-related neuropsychiatric syndromes, including post-traumatic stress disorder (PTSD: see Perry & Azad, 1999).

<u>Amygdala and Emotional Memory:</u> In the recent past, the amygdala has emerged as the key brain region in the processing, interpreting and integration of emotional functioning (Davis, 1992b). In the same fashion that the LC plays the central role in orchestrating arousal, the amygdala plays the central role in the CNS in processing afferent and efferent connections related to emotional functioning (Sapolsky, et al., 1984; Phillips & LeDoux, 1992). The amygdala receives input directly from sensory thalamus, hippocampus (via multiple projections), entorhinal cortex, sensory association areas of cortex, polymodal sensory association areas of cortex, and from various midbrain and brainstem arousal systems via the RAS (Selden et al., 1991). The amygdala processes and determines the emotional 'value' of simple sensory input, complex multisensory perceptions and complex cognitive abstractions, even responding specifically to complex, socially relevant stimuli. In turn, the amygdala orchestrates the response to this emotional information by sending projections to brain areas involved in motor (behavioral), autonomic nervous system and neuroendocrine area of the CNS (Davis. 1992a; Davis. 1992a; LeDoux et al, 1988a). In a series of landmark studies, LeDoux and colleagues have demonstrated the key role of amygdala in 'emotional' memory (LeDoux et al., 1990; LeDoux et al., 1989). In the response to threat, therefore, the amygdala and its related neural systems will have alterations in activity relative to the non-threat state.

<u>Hypothalamic-Pituitary-Adrenal Axis (HPA):</u> As with central neurobiological systems, stress, threat and fear influence HPA regulation. Abnormalities of the HPA axis have been noted in adults with PTSD (Murberg et al., 1990). Chronic activation of the HPA system in response to stress has negative consequences. The 'homeostatic' state associated with chronic HPA activation wears the body out (Sapolsky & Plotsky, 1990; Sapolsky et al., 1990). Hippocampal damage, impaired glucose utilization and vulnerability to metabolic insults may all result from chronic stress (see McEwen, 1999 for review).

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 291 of 535   PageID 14178

## The Dissociative Continuum

Infants and young children are not capable of effectively fighting or fleeing. In the initial stages of distress an infant will manifest a precursor form of a hyperarousal response. In these early alarm stages, the infant will use his limited behavioral repertoire to attract the attention of a caregiver. These behaviors include changes in facial expression, body movements and, most important, vocalization, i.e., crying. This is a successful adaptive strategy if the caretaker comes to feed, warm, and sooth, fight for, or flee with, the infant.

Unfortunately, for many infants and children these strategies are not effective. In the absence of an appropriate caregiver reaction to the initial alarm outcry, the child will abandon the early alarm response. The converse of use-dependent development occurs – disuse related extinction of a behavior. This defeat response is well characterized in animal models of stress reactivity and 'learned helplessness' (Miczek et al., 1990). This defeat reaction is a common element of the presenting emotional and behavioral phenomenology of many neglected and abused children (Spitz, 1945; George & Main, 1979; Carlson et al., 1994; Chisholm et al., 1995). Indeed, adults, professional or not, often puzzle over the emotional non-reactivity, passivity, 'compliance' and hypalgesia of many abused children.

In the face of persisting threat, the infant or young child will activate other neurophysiological and functional responses. This involves activation of dissociative adaptations. Dissociation is a broad descriptive term that includes a variety of mental mechanism involved in disengaging from the external world and attending to stimuli in the internal world. This can involve distraction, avoidance, numbing, daydreaming, fugue, fantasy, derealization, depersonalization and, in the extreme, fainting or catatonia. In our experiences with young children and infants, the predominant adaptive responses during the trauma are dissociative.

Children exposed to chronic violence may report a variety of dissociative experiences. Children describe going to a 'different place', assuming the persona of superheroes or animals, a sense of 'watching a movie that I was in' or 'just floating' - classic depersonalization and derealization responses. Observers will report these children as numb, robotic, non-reactive, "day dreaming", "acting like he was not there", staring off in a glazed look. Younger children are more likely to use dissociative adaptations. Immobilization, inescapability or pain will increase the dissociative components of the stress response patterns at any age.

*Neurobiology of dissociation*

In animals, the 'defeat' response is mediated by different neurobiological mechanism than the 'fight or flight' response. What little is known about the neurobiology and phenomenology of dissociative-like conditions appears to most approximate the 'defeat' reaction described in animals (Blanchard et al, 1993; Henry et al., 1986; Miczek et al., 1990). As with the hyperarousal response, there is brainstem mediated CNS activation that results in increases in circulating epinephrine and associated stress steroids. A major difference in the CNS, however, is that vagal tone increases dramatically, decreasing blood pressure and heart rate (occasionally resulting in fainting) despite increases in circulating epinephrine.

Dopaminergic systems, primarily mesolimbic and mesocortical, play an important role in defeat reaction models in animals. These dopaminergic systems are intimately involved in the 'reward' systems, affect modulation (e.g., cocaine-induced euphoria) and, in some cases, are co-localized with endogenous opioids mediating pain or other sensory processing. The opioid systems are clearly involved in altering perception of painful stimuli, sense of time, place and 'reality'. Opioids appear to be major mediators of the 'defeat' reaction's dissociative behaviors (e.g., Abercrombie & Jacobs, 1988). Indeed, most opiate agonists can

induce dissociative responses in humans.

The capacity to dissociate in the midst of terror appears to be a differentially available adaptive response - some people dissociate early in the arousal continuum, some only in a state of complete terror (see Table 1). The determinants of individual differences in the specific stress response to threat have yet to be well characterized. In its most common form, however, the child and adult response to trauma is an admixture of these two primary adaptive patterns, arousal and dissociation.

## States become Traits: The Clinical Presentation of Children Exposed to Violence

A current working hypothesis regarding the effects of traumatic events on the neurobiology of the developing child posits that the specific symptoms a child develops will be related to the intensity and duration of the adaptive style (or combination of adaptive responses) present during the threat. If the neurobiology of the specific response (hyperarousal or dissociation) is activated long enough, there will be molecular, structural and functional changes in those systems (Perry, 1994; Perry et al., 1995; Perry, 1997; Perry & Pollard, 1998). Any factors that prolong the original threat response will increase the likelihood of long-term symptoms, while any factors that decrease the threat response will decrease risk for long-term problems.

If a child dissociates in response to a severe trauma and stays in that dissociative state for a sufficient period of time, she will alter the homeostasis of the systems mediating the dissociative response (i.e., opioid, dopaminergic, HPA axis). A sensitized neurobiology of dissociation will result and she may develop prominent dissociative-related symptoms (e.g., withdrawal, somatic complaints, dissociation, anxiety, helplessness, dependence) and related disorders (e.g., dissociative disorders, somatoform disorder, anxiety disorders, major depression).

If the child exposed to violence uses a predominately hyperarousal response, the altered homeostasis will be in different neurochemical systems (i.e., adrenergic, noradrenergic, HPA axis). This child will be vulnerable to developing persisting hyperarousal related symptoms and related disorders (e.g., PTSD, ADHD, conduct disorder). These children are characterized by persisting physiological hyperarousal and hyperactivity (Perry, 1995a; Perry, et al., 1995). They are observed to have increased muscle tone, frequently a low grade increase in temperature, an increased startle response, profound sleep disturbances, affect regulation problems and generalized (or specific) anxiety (Kaufman, 1991; Ornitz et al., 1989; Perry, 1994a). In addition, our studies indicate that a significant portion of these children have abnormalities in cardiovascular regulation (Perry, 1994; Perry et al., 1995b; see Figure 2).

The specific symptoms a child develops following exposure to violence, then, can vary depending upon the nature, frequency, pattern and intensity of the violence, the adaptive style of the child and the presence of attenuating factors such as a stable, safe and supportive home. Within this heterogeneity, however, certain trends emerge. Observations from clinical work suggest that there are marked gender differences in the response to violence (Perry et al., 1995b; Perry et al., 1995). Females are more likely to dissociate and males more likely to display a classic "fight or flight" response. As a result, more males will develop the aggressive, impulsive, reactive and hyperactive symptom presentation (more externalizing), while females will be more anxious, dissociative and dysphoric (more internalizing).

Children raised with persisting violence are much more likely to be violent (e.g., Loeber et al., 1993; Lewis et al., 1989; Koop et al., 1992; Hickey, 1991; Halperin et al., 1995). This can be explained, in part, by the persistence of this "fight or flight" state -- and by the profound cognitive distortions that can accompany a

persisting state of fear. A young man with these characteristics may misinterpret a behavior as threatening and will, being more reactive, respond in a more impulsive and violent fashion. Literally, using the original (childhood) adaptive "fight or flight" response in a new context but, now, later in life, in a maladaptive fashion.

## Altered Neurobiology in Children Exposed to Violence

Few studies have examined the neurobiological impact of trauma and violence in children. Several studies have utilized brain-regulated peripheral measures including psychophysiology (e.g., startle, heart rate regulation) or peripheral measures related to catecholamine or neuroendocrine functioning. In all of these studies, the findings have suggested a dysregulated, sensitized stress-response neurobiology in children and adolescents following exposure to trauma or violence (for review see Perry & Pollard, 1998; Perry & Azad, 1999). These findings are consistent with the hypothesis that the original adaptive neurophysiological states associated with the response to threat become, over time, in a use-dependent fashion, traits (Perry et al., 1995).

In one of the first studies to examine brain-related physiological responses in traumatized children, Ornitz and Pynoos (1989) demonstrated increased startle response, a finding suggesting sensitized brainstem and midbrain catecholamines (Davis, 1992). Similar altered brainstem catecholamine and neuroendocrine functioning was suggested by a pilot study in sexual abused girls. Following abuse girls exhibited greater total catecholamine synthesis as measured by the sum of the urinary concentration of epinephrine, norepinephrine and dopamine when compared with matched controls (DeBellis et al., 1994a; 1994b). In our laboratory, altered platelet alpha-2 adrenergic receptor number and cardiovascular functioning was demonstrated in children exposed to traumatic violence, suggesting chronic and abnormal activation of the sympathetic nervous system (Perry, 1994; Perry et al., 1995b). In our clinic populations, evidence of brain-mediated alterations of cardiovascular functioning have been demonstrated in various ways (Figures 1 and 2). In both the acute and chronic post-traumatic period, resting heart rate is different from comparison populations. In other studies, clonidine, an alpha2 adrenergic receptor partial agonist has been demonstrated to be an effective pharmacotherapeutic agent (Perry, 1994), further suggesting altered LC functioning in children exposed to violence.

Little research on the neurobiology of dissociation in children exists. In our preliminary studies, traumatized children with dissociative symptoms demonstrated lower heart rates than comparison-traumatized children with hyperarousal symptoms. Using continuous heart rate monitoring during clinical interviews, male, pre-adolescent children exposed to violence exhibited a mild tachycardia during non-intrusive interview and a marked tachycardia during interviews about specific exposure to trauma (n = 83; resting heart rate = 104; interview heart rate = 122). In comparison, females exposed to traumatic events tended to have normal or mild tachycardia that, during interviews about the traumatic event decreased (n =24; resting heart rate = 98; interview heart rate = 82). This gender difference was associated by differences in emotional and behavioral symptoms, with males exhibiting more 'externalizing' and females more 'internalizing' symptoms (Perry, et al., 1995b; see Figure 3). In a recent case series with ten children suffering from severe dissociative symptoms (e.g., fainting, catatonia, bradycardia) naltrexone, an opioid antagonist, improved dissociative symptoms (Perry et al., in preparation). The hypothesized therapeutic site of action is the opioid receptors regulating LC activity (Abercrombie and Jacobs, 1998).

These indirect studies all support the hypotheses of use-dependent alterations in the key neural systems of the brain related to the stress-response following exposure to violence in childhood. More recently, using newer methods allowing more direct examination of the brain supports the notion that prolonged threat

alters the developing brain. Preliminary studies by Teicher and colleagues have demonstrated altered EEG findings in a sample of abused children suggest hippocampal/limbic and cortical abnormalities (Ito et al., 1993; Teicher et al., 1997). DeBellis in a series of landmark studies (1999a; 1999b) demonstrated altered cortical development in children with PTSD. In 44 PTSD subjects (1999a), the intracranial and cerebral volumes were smaller than matched controls. These differences were related to the severity and onset of symptoms.

Clearly more research is indicated, however, all studies to date suggest that exposure to violence in childhood alters brain development and that the abnormalities are more prominent if the traumatic exposure is early in life, severe and chronic.

## Clinical Implications

There are profound clinical implications of the persisting fear states in children. These children will have impaired capacities to benefit from social, emotional and cognitive experiences. This is explained by three key principles of brain functioning: 1) the brain changes in response to experience in a 'use-dependent' fashion; 2) the brain internalizes and stores information from any experience in a 'state-dependent' fashion and 3) the brain retrieves stored information in a state-dependent fashion.

*Use-dependent Learning: State Dependent Storage and Recall*

As described above, the brain changes in a use-dependent fashion. All parts of the brain can modify their functioning in response to specific patterns of activation. These use-dependent changes in the brain result in changes in cognition (this, of course, is the basis for cognitive learning), emotional functioning (social learning), motor-vestibular functioning (e.g., the ability to write, type, ride a bike) and state-regulation capacity (e.g., resting heart rate). No part of the brain can change without being activated -- you can't teach someone French while they are asleep or teach a child to ride a bike by talking with him.

One of the most important elements of understanding children exposed to violence is that all humans process, store, retrieve and respond to the world in a state-dependent fashion (see Table 1). When a child is in a persisting state of low-level fear that results from exposure to violence, the primary areas of the brain that are processing information are different from those in a child from a safe environment. The calm child may sit in the same classroom next to the child in an alarm state, both hearing the same lecture by the teacher. Even if they have identical IQs, the child that is calm can focus on the words of the teacher and, using neocortex, engage in abstract cognition. The child in an alarm state will be less efficient at processing and storing the verbal information the teacher is providing. This child's cognition will be dominated by sub-cortical and limbic areas, focusing on non-verbal information - the teacher's facial expressions, hand gestures, when she seems distracted. And, because the brain internalizes (i.e., learns) in a 'use-dependent' fashion, this child will have more selective development of non-verbal cognitive capacities. The children raised in the vortex of violence have learned that non-verbal information is more important than verbal.

This means that hypervigilant children from chronic violence settings frequently develop remarkable non-verbal skills in proportion to their verbal skills (street smarts). Indeed, often they over-read (misinterpret) non-verbal cues; eye contact means threat, a friendly touch is interpreted as an antecedent to seduction and rape, accurate in the world they came from but now, hopefully, out of context. During development, these children spent so much time in a low-level state of fear (mediated by brainstem and midbrain areas) that they were focusing consistently on non-verbal cues. In our clinic population, children raised in chronically traumatic environments demonstrate a prominent V-P split on IQ testing (n = 108; WISC Verbal = 8.2;

WISC Performance = 10.4, Perry, in preparation). In a separate study of 400 children removed from their parents by child protective services, IQ testing demonstrated that only 2 % of the children had a significant Verbal>Performance split (V score 12 points greater than P score) while 39 % demonstrated a significant P>V split (P score 12 points greater than V score) (Perry et al. in preparation).

This is consistent with the observations of teachers that many of the maltreated or traumatized children they work with are often judged to be bright but can't learn easily. Often these children are labeled as learning disabled. These difficulties with cognitive organization contribute to a more primitive, less mature style of problem solving - with aggression often being employed as a "tool".

This principle is critically important in understanding why a traumatized child - in a persisting state of arousal - can sit in a classroom and not learn. The brain of this child has different parts of the brain 'controlling' his functioning than a child that is calm. The capacity to internalize new verbal cognitive information depends upon having portions of the frontal and related cortical areas being activated. This, in turn, requires a state of attentive calm. A state the traumatized child rarely achieves.

Children in a state of fear retrieve information from the world differently than children that feel calm (see Table 1). As a child moves along the continuum of arousal (see Table 1), the part of the brain that is 'orchestrating' functioning shifts. An important reflection of this is how the sense of time is altered in alarm states. Sense of future is foreshortened; the critical time period for the individual shrinks. The threatened child is not thinking (nor should she think) about months from now. This has profound implications for understanding the cognition of the traumatized child. Immediate reward is most reinforcing. Delayed gratification is impossible. Consequences of behavior become almost inconceivable to the threatened child. Reflection on behavior -including violent behavior - is impossible for the child in an alarm state. Cut adrift from internal regulating capabilities of the brain, the brainstem acts reflexively, impulsively, and aggressively to any perceived threat. Eye contact for too long becomes a life-threatening signal. Wearing the wrong colors - a hand gesture - cues that to the calm adult reading about another 'senseless' murder in the paper are insignificant but to the hypervigilant, armed adolescent born and raised in the vortex of violence, enough to trigger a 'kill or be killed' response.

## The Future: Impediments to Problem-Solving and Prevention

There are many important and effective treatment approaches to the child traumatized by violence. Yet even with optimal clinical 'techniques', treatment of maltreated children would overwhelm the entire mental health and child welfare community in this country. Today the number of children that would benefit from intervention far outstrips the meager resources our society has dedicated to children exposed to violence. Even as we develop more effective and accessible intervention models, we must focus on prevention.

A society functions as a reflection of its childrearing practices. If children are ignored, poorly educated and not protected from violence they will grow into adults that create a reactive, non-creative and violent society. In a brilliant analysis of this very process, Hellie (1996) describes a dark age in Russia (1600 to 1700) characterized by excessive brutality, violence and pervasive fear that for generations inhibited creativity, abstraction, literacy and the other elements of humanity. All societies reap what they have sown.

Today, in the United States, despite the well-documented adverse effects of domestic, community, school and media violence, we continue to seek short-term and simplistic answers. In order to minimize the many destructive pathways that come from violence in childhood, we need to dedicate resources of time, energy and money to these complex problems. And we need to help provide the resource-predictable, safe and

resource rich environments our problem-solvers require. Too often the academic, public and non-for-profit systems asked to address these problems are resource-depleted yet have a mandate to "do something." Unfortunately, the solutions that arise from this reactive approach to complex problems are very limited and, typically, short-sighted (see Table 2).

Our problem-solvers must understand the indelible relationship between early life experiences and cognitive, social, emotional, and physical health. Providing enriching cognitive, emotional, social and physical experiences in childhood could transform our culture. But before our society can choose to provide these experiences, it must be educated about what we now know about child development. Education of the public must be coupled with the continuing research into the impact of positive and negative experiences on the development of children. All of this must be paired with the implementation and testing of programs that can enrich the lives of children and families and programs to provide early identification of, and proactive intervention for, at-risk children and families.

The problems related to violence are complex and they have complex impact on our society. Yet there are solutions to these problems. The choice to find solutions is up to us. If we choose, we have some control of our future. If we, as a society, continue to ignore the laws of biology, and the inevitable neurodevelopmental consequences of chronic exposure to violence in childhood, our potential as a humane society will remain unrealized. The future will hold sociocultural devolution - the inevitable consequence of the competition for limited resources and the implementation of reactive, one-dimensional and short-term solutions. This need not be. Parents, caregivers, professionals, public officials and policy makers do have the capacity to make decisions that will increase or decrease violence in our children's lives. Hopefully, an appreciation of the devastating impact of violence on the developing child will help all of us make the good decisions and difficult choices that will create a safer, more predictable and enriching world for children.

# References

Abercrombie ED, Jacobs BL: Single-unit response of noradrenergic neurons in the locus coeruleus of freely moving cats . I. Acutely presented stressful and non-stressful stimuli. J Neurosci 7:2837-2843, 1987a

Abercrombie ED, Jacobs BL: Single-unit response of noradrenergic neurons in the locus coeruleus of freely moving cats. II. Adaptation to chronically presented stressful stimuli. J Neurosci 7:2844-2848, 1987b

Abercrombie ED, Jacobs BL: Systemic naloxone administration potentiates locus coeruleus noradrenergic neuronal activity under stressful but not non-stressful conditions. Brain Research 441:362-366, 1988

Aston-Jones G, Valentino RJ, Van Bockstaele EJ, et al: Locus coeruleus, stress and post traumatic stress disorder: neurobiological and clinical parallels. In M. Murberg (Ed.), Catecholamine function in post traumatic stress disorder: emerging concepts. Washington D.C. American Psychiatric Press, 1996

Belmore MF, Quinsey VL: Correlates of psychopathy in a noninstitutional sample. Journal of Interpersonal Violence 9(3):339-349, 1994

Blanchard DC, Sakai RR, McEwen B, et al: Subordination stress: behavioral, brain and neuroendocrine correlates. Behavioral Brain Research 58:113-121, 1993

Brown JW: Morphogenesis and mental process. Development and Psychopathology 6:551-563, 1994

Burton J, Foy D, Bwanausi C, et al: The relationship between the traumatic exposure, family dysfunction and post-traumatic stress symptoms in male juvenile offenders. Journal of Traumatic Stress 7:83-93, 1994

Carlson V, Cicchetti D, Barnett D, et al: Disorganized/disoriented attachment relationships in maltreated infants. Developmental Psychology 25:525-531, 1989

Carnegie Council on Adolescent Development. Great Transitions: Preparing Adolescents for a New Century. New York: Carnegie Corporation of New York, 1995

Chisholm K, Carter MC, Ames EW, et al: Attachment security and indiscriminately friendly behavior in children adopted from Romanian orphanages. Development and Psychopathology 7:283-294, 1995

Comstock GA, Paik HJ: Television and the American Child. Academic Press San Diego, CA, 1991

Courchesne E, Chisum H, Townsend J: Neural activity-dependent brain changes in development: implications for psychopathology. Development and Psychopathology 6(4):697-722, 1994

Davis M: The role of the amygdala is fear-potentiated startle: implications for animal models of anxiety. Trends Pharmacol Sci 13:35-41, 1992a

Davis M: The role of the amygdala in conditioned fear. In J.P. Aggleton (Ed.), The amygdala: neurobiological aspects of emotion, memory, and mental dysfunction. New York: Wiley-Liss, 1992b, pp 255-306

De Bellis MD, Chrousos GP, Dorn LD, et al: Hypothalamic-pituitary-adrenal axis dysregulation in sexually abused girls. Journal of Clinical Endocrinology and Metabolism 78:249-255, 1994

De Bellis MD, Lefter L, Trickett PK, et al: Urinary catecholamine excretion in sexually abused girls. Journal of the American Academy of Child and Adolescent Psychiatry 33:320-327, 1994

DeBellis MD, Baum AS, Birmaher B, et al: Developmental traumatology part I: biological stress symptoms. Biological Psychiatry 45:1259-1270, 1999

DeBellis MD, Keshavan MS, Clark DB, et al: Developmental traumatology part II: brain development. Biological Psychiatry 45:1271-1284, 1999

Dodge KA, Bates JE, Pettit GS: Mechanisms in the cycle of violence. Science 250:1678-1683, 1991

Donnerstein E, Slaby R, Eron L: The mass media and youth aggression. In L. Eron, J. Gentry, & P. Schlegel (Eds.), Reason to Hope: a psychosocial perspective on violence and youth. Washington, D.C. American Psychological Association, 1995

Garbarino J: Children's response to community violence: what do we know? Infant Mental Health Journal 14:103-115, 1993

Garrity C, et al: Bully-proofing Your School: A Comprehensive Approach for Elementary School. Sopris West Press, Longmont, CO, 1995

George C, Main M: Social interactions of young abused children: approach, avoidance and aggression. Child

Development 50:306-318, 1979

Gerbner G: Society's storyteller: How television creates the myths by which we live. Media & Values 59:8-9, 1992

Green AH, Voeller K, Gaines RW, et.al: Neurological impairment in maltreated children. Child Abuse and Neglect 5:129-134, 1981

Greenberg MT, Speltz ML, DeKlyen M: The role of attachment in the early development of disruptive behavior problems. Development and Psychopathology 5:191-213, 1993

Halperin JM, Newcorn JH, Matier K: Impulsivity and the initiation of fights in children with disruptive behavioral disorders. J Child Psychol Psychiat 36(7):1199-1211, 1995

Hellie R: Interpreting violence in late Muscovy from the perspective of modern neuroscience. Presented paper, 28th National Covention of the AAAS, Boston, 1996

Henry JP, Liu YY, Nadra WE, et al: Psychosocial stress can induce chronic hypertension in normotensive strains of rats. Hypertension 21:714-723, 1993

Hickey E: Serial Murderers and Their Victims. Belmont, CA: Wadsworth Publishing, 1991

Horowitz K, Weine S, Jekel J: PTSD symptoms in urban adolescent girls: compounded community trauma. Journal of the American Academy of Child and Adolescent Psychiatry 34(10):1353-1361, 1995

Huston AC, Donnerstein E, Fairchild H, et al: Big World, Small Screen: The Role of Television in American Society. Lincoln, NE: University of Nebraska Press, 1992.

Ito Y, Teicher MH, Glod CA, et.al: Increased prevalence of electrophysiological abnormalities in children with psychological, physical, and sexual abuse. Journal of Neuropsychiatry 5:401-408, 1993

Kaufman J: Depressive disorders in maltreated children. Journal of the American Academy of Child and Adolescent Psychiatry 30(2):257-265, 1991

Koop CE, Lundberg G: Violence in America: a public health emergency. Journal of the American Medical Association 22:3075-3076, 1992

Lauder JM: Neurotransmitters as morphogens. Progress in Brain Research 73:365-388, 1988

LeDoux JE, Cicchetti P, Xagoraris A, et al: The lateral amygdaloid nucleus: sensory interface of the amygdala in fear conditioning. J Neurosci 10:1062-1069, 1990

LeDoux JE, Romanski L, Xagoraris A: Indelibility of subcortical emotional memories. Journal of Cognitive Neuroscience 1:238-243, 1989

Lewis DO, Mallouh C, Webb V: Child abuse, delinquency, and violent criminality. In D. Chiccetti & V. Carlson (Eds.), Child Maltreatment: theory and research on the causes and consequences of child abuse and neglect. Cambridge: Cambridge University Press, 1989

Loeber R, Wung P, Keenan K, et al: Developmental pathways in disruptive child behavior. Development and Psychopathology 5:103-133, 1993

McAllister AK, Katz LC, Lo DC: Neurotrophins and synaptic plasticity. Annu Rev Neurosci 22:295-318, 1999

McEwen BS: Stress and hippocampal plasticity. Annu Rev Neurosci 22:105-122, 1999

Miczek KA, Thompson ML, Tornatzky W: Subordinate animals: Behavioral and physiological adaptations and opioid tolerance. In Stress: Neurobiology and Neuroendocrinology. Edited by MR Brown, GF Koob, C Rivier, New York, Marcel Dekker, 1990, pp 323-357

Mones P: When a Child Kills: abused children who kill their parents. New York: Pocket Books, 1991

Moore RY, Bloom FE: Central catecholamine neuron systems: anatomy and physiology of the norepinephrine and epinephrine systems. Annual Reviews of Neuroscience 2:113-153, 1979

Munk MHJ, Roelfsema PR, Konig P, et al: Role of Reticular Activation in the Modulation of Intracortical Synchronization. Science 272:271-273, 1996

Murberg MM, McFall ME, Veith RC: Catecholamines, stress and post-traumatic stress disorder. In E.L. Giller (Ed.), Biological Assessment and Treatment of Post-traumatic Stress Disorder. Washington, D.C. American Psychiatric Press, Inc., 1990, pp 27-65

Myers WC, Scott K, Burgess AW, et al: Psychopathology, biopsychosocial factors, crime characteristics and classification of 25 homicidal youths. Journal of the American Academy of Child and Adolescent Psychiatry 34(11):1483-1489, 1995

O'Keefe M: Predictors of child abuse in maritally violent families. Journal of Interpersonal Violence 10(1):3-25, 1995

Ornitz EM, Pynoos RS: Startle modulation in children with post-traumatic stress disorder. American Journal of Psychiatry 147:866-870, 1989

Perry BD: Neurobiological sequelae of childhood trauma: post-traumatic stress disorders in children. In M. Murberg (Ed.), Catecholamines in Post-traumatic Stress Disorder: Emerging Concepts. Washington, D.C. American Psychiatric Press, 1994a, pp 253-276

Perry BD, Pollard RA, Baker WL, et al: Continuous heartrate monitoring in maltreated children [Abstract]. Annual Meeting of the American Academy of Child and Adolescent Psychiatry, New Research, 1995

Perry BD, Pollard R, Blakely T, et al: Childhood trauma, the neurobiology of adaptation and 'use-dependent' development of the brain: how "states" become "traits"'. Infant Mental Health Journal 16(4):271-291, 1995

Perry BD: Incubated in terror: neurodevelopmental factors in the 'cycle of violence' In: Children, Youth and Violence: The Search for Solutions (J Osofsky, Ed.). Guilford Press, New York, 1997, pp 124-148

Perry BD: Memories of fear: how the brain stores and retrieves physiologic states, feelings, behaviors and thoughts from traumatic events: In: Splintered Reflections: Images of the Body in Trauma (JM Goodwin

and R. Attias, Ed.). Basic Books, 1999, pp 26-47

Perry BD, Pollard R: Homeostasis, stress, trauma, and adaptation: a neurodevelopmental view of childhood trauma. Child and Adolescent Psychiatric Clinics of North America 7(1):33-51, 1998

Perry BD, Azad I: Post-traumatic stress disorders in children and adolescents. Current Opinion in Pediatrics 11:121-132, 1999

Phillips RG, LeDoux JE: Differential contribution of amygdala and hippocampus to cued and contextual fear conditioning. Behav Neurosci 106:274-285, 1992

Richters J, Martinez P: Violent communities, family choices and children's chances: an algorithm for improving the odds. Development and Psychopathology 5:609-627, 1993

Sapolsky RM, Plotsky PM: Hypercortisolism and its possible neural bases. Biological Psychiatry 27:937-952, 1990

Sapolsky RM, Uno H, Rebert CS, et.al.: Hippocampal damage associated with prolonged glucocorticoid exposure in primates. Journal of Neuroscience 10:2897-2902, 1990

Selden NRW, Everitt BJ, Jarrard LE: Complementary roles for the amygdala and hippocampus in aversive conditioning to explicit and contextual cues. Neuroscience 42:335-350, 1991

Spitz R: Hospitalism: an inquiry into the genesis of psychiatric conditions in early childhood. Psychoanalytic Study of the Child I:53-74, 1945

Straus M: Cultural and organizational influences on violence between family members. In R. Prince & D. Barried (Eds.), Configurations: Biological and Cultural Factors in Sexuality and Family Life. Washington,D.C. Health, 1974

Straus M, Gelles R: How violent are American families: estimates from the national family violence survey and other studies. In: Family Abuse and Its Consequences: New Directions in Research (G. Hotaling et al., Eds) Sage Press, Newbury Park, CA, 1998

Synder H: Juvenile arrests 1996: Juvenile Justice Bulletin Office of Juvenile Justice and Delinquency Prevention, US Department of Justice, Washington DC, 1997, pp 1-12

Taylor L, Zuckerman B, Harik V, et al: Exposure to violence among inner city parents and young children. American Journal of Diseases of Children, 146:487, 1992

Teicher M, Ito Y, Glod CA, et al: Preliminary evidence for abnormal cortical development in physically and sexually abused children using EEG coherence and MRI. In: Yehuda, R.M. (Ed.) Psychobiology of Post-traumatic Stress Disorder. Vol 821; Annals of the New York Academy of Science, New York, NY, 1997, pp 160-175

Vaid RR, Yee BK, Shalev U, et al: Neonatal nonhandling and In Utero prenatal stress reduce the density of NADPH-diaphorase-reactive neurons in the fascia denata and Ammon's Horn of rats. The Journal of Neuroscience 17:5599-5609, 1997

Vallee M, Mayo W, Dellu F, et al: Prenatal stress induces high anxiety and postnatal handling induces low anxiety in adult offspring: correlation with stress-inducing corticosterone secretion. The Journal of Neuroscience 17:2626-2636, 1997



Figure 1. Cortical Modulation: As the brain develops in this sequential and hierarchical fashion, and the more complex limbic, sub-cortical and cortical areas organize, they begin to modulate, moderate and 'control' the more primitive and 'reactive' lower portions of the brain( DC: diencephalon; BS: brainstem). These various brain areas develop, organize and become fully functional at different times during childhood. At birth, for example, the brainstem areas responsible for regulating cardiovascular and respiratory function must be intact while the cortical areas responsible for abstract cognition have years before they will be fully functional.



BD Perry MD, PhD

<u>Figure 2. Hyperarousal symptoms following a life-threatening event:</u> In the three days following the ATF assault on the Branch Davidian's Ranch Apocalypse compound, twenty one children were released. Each of these children were in harm's way during the assault. Following release, a clinical team led by ChildTrauma Program personnel lived and worked with these children for the next six weeks. These children had various PTSD-related symptoms. Re-enactment behaviors and cue-specific increases in anxiety were observed in the presence of cues associated with the assault, including white vans and a helicopter. The physiological hyperarousal was illustrated by the profound increases in resting heart rate observed in all of the children throughout the six weeks of the standoff. Five days after the original raid, the group average resting heart rate was 134 (the group average should have been approximately 80). In the middle of the stand off, many of these children visited with a parent released from the compound. These visits resulted in dramatic changes in the children's behavior (e.g., return of bed-wetting, hiding under beds, aggressive behavior) and in their resting heart rates, indicating that these visits were, in some regard, distressing to the children. During these visits, the children were reminded by their parent that they were 'in the hands of the Babylonians', inducing fear and confusion. When these visits stopped, the children improved. When the chidlren were told about the fire, as one would expect, their distress increased dramatically. It should be noted that the normal resting heart rate for a group of comparison children is approximately 90 beats per minute -- the Davidian children for the entire period of the stand off and beyond never had resting heart rates below 100.



Figure 3. Resting heart rate in traumatized children. Over a five year period, each child referred to the ChildTrauma Clinic specializing in working with traumatized or maltreated children had a resting heart rate taken at first presentation. These resting rates were plotted by age and gender (total n=526; traumatized males are the grey diamonds +/- SEM, n=320; traumatized females are the black squares +/- SEM, n=206). The yellow diamonds are values from normal pediatric population norms in which there are no observed gender differences. In young children, there do not appear to be any gender differences; by age five, however, gender differences emerge with males having higher resting heart rate (consistent with persisting hyperarousal) and females having somewhat lower resting heart rate (consistent with persisting dissociative adaptations). These resting rates are pre-treatment.

| Sense of Time | Extended Future | Days Hours | Hours Minutes | Minutes Seconds | No Sens Of Tim |
|---|---|---|---|---|---|
| Arousal Continuum | REST | VIGILANCE | RESISTANCE Crying | DEFIANCE Tantrums | AGGRESS |
| Dissociative Continuum | REST | AVOIDANCE | COMPLIANCE Robotic | DISSOCIATION Fetal Rocking | FAINTI |
| Regulating Brain Region | NEOCORTEX Cortex | CORTEX Limbic | LIMBIC Midbrain | MIDBRAIN Brainstem | BRAINST Autonom |
| | | | | | |

Violence and Childhood
Page 19 of 22

| Cognitive Style | ABSTRACT | CONCRETE | EMOTIONAL | REACTIVE | REFLEX] |
|---|---|---|---|---|---|
| Internal State | CALM | AROUSAL | ALARM | FEAR | TERRC |

Table 1. The continuum of adaptive responses to threat. Different children have different styles of adaptation to threat. Some children use a primary hyperarousal response, others a primary dissociative response. Most use some combination of these two adaptive styles. In the fearful child, a defiant stance is often seen. This is typically interpreted as a willful and controlling child. Rather than understanding the behavior as related to fear, adults often respond to the 'oppositional' behavior by becoming angry and more demanding. The child, over-reading the non-verbal cues of the frustrated and angry adult, feels more threatened and moves from alarm to fear to terror. These children may end up in a primitive "mini-psychotic" regression or in a very combative state. The behavior of the child reflects their attempts to adapt and respond to a perceived (or misperceived) threat.

When threatened a child is likely to act in an 'immature' fashion. Regression, a 'retreat' to a less mature style of functioning and behavior, is commonly observed in all of us when we are physically ill, sleep-deprived, hungry, fatigued or threatened. During the regressive response to the real or perceived threat, less-complex brain areas mediate our behaviors. If a child has been raised in an environment of persisting threat, the child will have an altered baseline such that the internal state of calm is rarely obtained (or only artificially obtained via alcohol or drug use). In addition, the traumatized child will have a 'sensitized' alarm response, over-reading verbal and non-verbal cues as threatening. This increased reactivity will result in dramatic changes in behavior in the face of seemingly minor provocative cues. All too often, this over-reading of threat will lead to a 'fight' or 'flight' reaction - and increase the probability of impulsive aggression. This hyper-reactivity to threat can, as the child becomes older, contribute to the transgenerational cycle of violence.

| Social-Environmental Pressures | Resource-surplus Predictable Stable/Safe | Resource-limited Unpredictable Novel | Resource-p Inconsiste Threatenir |
|---|---|---|---|
| Prevailing Cognitive Style | Abstract Creative | Concrete Superstitious | Reactive Regressive |
| Prevailing Affective 'Tone' | CALM | ANXIETY | TERROR |
| Systemic Solutions | INNOVATIVE | SIMPLISTIC | REACTION/ |
| Focus of Solution | FUTURE | Immediate FUTURE | PRESENT |
| Rules, Regulations and Laws | Abstract Conceptual | Superstitious Intrusive | Restrictive Punitive |
| Childrearing | Nurturing | Ambivalent | Apathetic |

| Practices | Flexible Enriching | Obsessive Controlling | Oppressive Harsh |
|-----------|--------------------|-----------------------|--------------------|

Table 3. The continuum of adaptive responses to threat in a living group (family, organization, community or society). In the same fashion as an individual, living groups experience threat and challenges to their survival. Similar to an individual, the 'cognition' of a group moves down a gradient under threat. When there are no external threats and resources are plentiful and predictable (Column 1), the group has the luxury of thinking in abstract ways to solve any of its current problems (e.g., Bell Labs from 1940 to 1965). The focus of the solution can be the future and the least powerful members of the living group (e.g., children and women) can be treated with the most flexible, nurturing and enriching approaches. When resources become limited and there are economic, environmental or social threats (Column 2), the group, organization or society become less capable of complex, abstract problems solving. The solutions tend to reflect the immediate future (e.g., the next funding cycle, the next election cycle) and all aspects of functioning in the group become more regressed. The least powerful are ignored or controlled to minimize any excessive drain on the most powerful. In a group, organization or society under direct threat (Column 3), the focus of all problem solving becomes the moment. The solutions tend to be reactive and regressive. The least powerful are ignored and, if they get in the way, they are harshly dealt with. The more out of control the external situation is, the more controlling, reactive and oppressive the internally focused actions of this group will become. In each of these situations, the prevailing childrearing styles will create children that will reinforce that group or society's structure: in a safe and abstract-thinking group the children will be more likely to receive and benefit from enrichment and education, thereby optimizing their potential for creativity, abstraction and productivity. In contrast, children raised in groups or societies under threat will be more likely to be raised with harsh or distant caregiving. The result will be impulsive, concrete and reactive adults, perfectly positioned to fit in and contribute to a reactive, oppressive and aggressive group or society.

# EXHIBIT
# 9

# Relationships between Early Experiences and Long Term Functioning: The Role of Affect Development in Adjudicated Adolescent Males.

Maconda Brown O'Connor, PhD, Duane Runyan, PhD,
Gretchen Walter, MA, LPC, Jana Rubenstein, MEd, LPC,
and Bruce D Perry, MD, PhD

The ChildTrauma Academy
www.ChildTrauma.org

## Background

Each year in the United States hundreds of thousands of adolescents will be adjudicated "delinquent" by virtue of any combination of anti-social behaviors. The juvenile justice systems have had difficulty evaluating and intervening with these youth. Conflicts arise when competing views of the youth struggle for program and policy control – is the youth immature with neuropsychiatric and psychosocial problems or an anti-social criminal. Each perspective will result in very different allocation of intervention resources.

The present study focuses on affective development and management in adolescent males who have been adjudicated "delinquent." This study examines the development in areas relating to affect management processes, seeking to determine whether impulsivity, aggression and mood problems pervasive in the adjudicated youth are related to interruption or delay of affect development. Healthy affect development allows an adolescent to better understanding and use of their emotions. In order to examine affect development in adolescents, this study translated Carol Jensen's typology of affect development into a tool for assessing the youth's stage of affect management.

Key Hypotheses:

*Affect as a Mediator of Neuropsychiatric Symptoms*

Children with higher developmental capacity for affect management were expected to:

- report lower levels of post-traumatic stress symptoms.
- exhibit lower levels of delinquent behavior.
- exhibit lower levels of aggressive behavior.
- report lower levels of depressive symptoms.

## Methods

### Sample

The study site was the Burnett-Bayland Home (BBH), a residential placement facility operated by Harris County Juvenile Probation. Each of the 86 young men had committed at least one felony. The lengths of stay range from three months to one year.

<u>Evaluation</u>

The evaluation was comprised of two major components. Affect management and developmental staging of affect management was determined using extensive structured and semi-structured clinical interviews and use of a newly developed measurement tool (see Tables). The second component was a modification of the CIVITAS Core Assessment Process. This process uses a combination of subjective and objective data (standardized instruments) to determine strengths and vulnerabilities in six main domains: (1) physical/medical; (2) family/social; (3) life history/traumatic life events; (4) emotional/behavioral; (5) cognitive/academic and (6) developmental  (see figure below).

| A.<br><br>Toward Empathy | Can only use self affect state "I am the world"<br><br>Awareness develops that there are facial cues to emotional states in others<br><br>Has no concern about effect on others | Pushes for others to understand his/her emotions and agree that others would have same feelings in same context (confirmation)<br><br>Sharpens sensitivity for negative cues, looks for danger | Can express sympathy for another, uses more thinking to understand feelings in others<br><br>Becomes sensitive to motives and intentions of others | Can accept or tolerate others' actions and feelings<br><br>Self & others can coexist in different feeling states | Can empa unde othe state sepa emot existi self<br><br>Sees emot state aspe & oth |
| --- | --- | --- | --- | --- | --- |
| B.<br><br>Use of others/ environment | Unaware of emotional states, uses facial expressions (startle, surprise, interest, anger, shame, fear, anguish, disgust, etc.) to signal need of intervention of environment | Creates situations where others will become involved instead of asking for involvement<br><br>Uses familiar objects, places/ others to aid in soothing self, changing affect states | Able to seek help to intervene in a specific stressful situation to bring about change<br><br>Uses others to distract self from experiencing strong affects.<br><br>Uses environmental expectation to | Realizes own internal feeling state is distinct from others and can choose to share or not<br><br>Aware that interpersonal/ relationship status are aspects of situations & can be causes of emotional | Crea humo wisdo used enha daily<br><br>Orga envir order enha expe of aff |

| | | | | | |
|---|---|---|---|---|---|
| | Needs others to label affect states<br><br>Demanding quality in interactions | (baths, music, etc.)<br><br>Dependent on physical regulation by environment to contain emotional states | aid in behavior regulation<br><br>Reading | states | |
| C.<br><br>Emerging self-reliance | Uses simple actions for self regulation (head banging, cutting, rocking)<br><br>Self mutilation, biting occurs in order to alleviate inner tensions<br><br>Unable to predict upsetting events | Uses labeled body tension to understand emotion states such as aggressive behaviors<br><br>(Heart rate, muscle tensions, etc.)<br><br>Unable to accept responsibility for behavior ("you made me do it", "you made me feel this way")<br><br>Uses premonitions instead of predictions<br><br>to understand moods<br><br>Uses action oriented activities to reduce intense feeling states | Develops awareness that changes in situations effect emotions<br><br>Can predict simple feeling states in response to a provocative situation<br><br>Uses direct communication with other to express emotional state<br><br>Realizes a constellation of events has an impact on affect state<br><br>Uses more thinking about emotional state | Able to identify inner emotional life as being separate from external events<br><br>Can think more about internal emotions prior to taking action in provocative situations<br><br>Can conceal or disguise emotions<br><br>Uses prediction of forthcoming emotional events as an aid experiencing affect states<br><br>Able to experience emotional states without taking any actions | Actio aware how react tied t perso perso histor exper<br><br>Uses intros thinki integ state<br><br>Plans creat and exper of aff<br><br>Able know one's impe |

Case 3:13-cv-01535-L  Document 17-116  Filed 08/21/14  Page 310 of 535  PageID 14197

| | | (jogging, basketball, sex, masturbation) | | | |
|---|---|---|---|---|---|
| D. Verbal | Unable to verbalize affects except through laughter and crying /screaming  Primitive use of language | Uses simple labeling to understand affect states (mad, glad, sad, etc.)  Can ascribe emotions to characters in symbolic play  Uses aggressive language to express internal emotional state | Able to use narrative about emotional experiences.  Can talk about wishes & fantasies that could change emotional state | Can describe two or more feelings in one situation which are not necessarily conflicting feelings  Can use input from interpersonal communications to aid in evaluation of emotion | Able comm affecc and s main persp them  Can self d abou emot (caus react respo think decis surro these dialog |
| E. Non-verbal | Uses body ailments to express upset states (asthma, stomach aches)  Uses aggressive activities to reduce emotional state (fighting, hitting, temper tantrums, fire setting, rape )  Irrational fears such as phobias used to alleviate anxiety | Body language projects internal feeling state.  Use of sleep, drugs, alcohol to blunt emotional state  Withdrawal | Aware strong affects are being expressed through bodily changes.  Can choose to keep affective state to oneself.  Can use fantasies to change emotional state  (Art, writing, music, etc.) | Uses more thinking toward understanding feelings, behavior.  Awareness develops that changes in situations can affect emotions. | Show awar simul prese dissir confli emot abou speci situat  Deve great appre and k of the (beco exper enter |

The instruments and questionnaires used for screening and personal history purposes in this broader study included (1) Achenbach's Child Behavior Checklist (Achenbach, 1991), (2) Conners' Parent and Teacher Rating Scales (Conners, 1989), (3) Self Esteem Index (Coppersmith, 1990), (4) Child Dissociative Checklist (Putman, 1985), (5) Family Index of Life Events Scale (McCubbin, 1981), (6) Family Adaptability and Cohesion Scale (Olson, 1985), (7) Stress Response Scale (Psychological Assessment Resources, Inc., 1993), (8) State Trait Anxiety Inventory, (9) Visual Motor Integration Test (Berry, 1997), (10) Youth Self Report for ages 4 -18 (Achenbach, 1991), (11) Trauma Symptom Checklist for Children (Briere, 1992), (12) Children's Perceptual Alteration Scale (Evers-Szostak, 1990), (13) Kaufman Brief Intelligence Test (Kaufman and Kaufman, 1990), (14) Wide Range Achievement Test (Wilkinson, 1993), (15) Post Traumatic Stress Reaction Index (Pynoos, 1992), (16) The Comprehensive Child and Adolescent History Form, and (17) Jensen's Structured Interview (1990).

**Results**

Key Findings

- 100 % had been exposed to significant childhood trauma.
- 85 % had been exposed to significant traumatic violence.
- 46 % had been removed from their families in childhood due to neglect and abuse.
- 41 % had a significant Verbal/Performance split (P>V) suggesting altered cognitive processing.
- 64 % had moderate or severe Post-traumatic Stress symptoms.
- 80 % had evidence of delayed or interrupted affect development.
- There was a significant positive relationship between level of affect development and total IQ.
- There was a significant positive relationship between level of affect development and self esteem.

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 312 of 535   PageID 14199

## Family Structure



☐ Single Parent/Grandparent 58.1%
☐ Single Family Member (nonparent)  3.5%
☐ Both Parents  16.3%
■ Parent/Step Parent Combination  14%
▨ Outside Family Placement  8.1%

# Sample Ethnicity



| ▨ Caucasian 25.7% | ▨ African American 45.3% |
|---|---|
| ▨ Latino 26.7% | ▨ Other 2.3% |

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 314 of 535   PageID 14201



## History of Trauma

☐ Trauma  100%
▨ Exposure to Violence  84.4%
☐ Significant Loss  95%
☐ Prior Removal from the Home by CPS  46.5%



## Socioeconomic Status

Poverty Level 74.4% · Disadvantaged 18.6% · Middle Class 7%

# AFFECT DEVELOPMENT IN DELINQUENT ADOLESCENTS

<u>Hypothesis 1</u>: Children with higher levels of affect management were expected to exhibit lower levels of aggressive behavior

- Mean CBCL-AGG score = 61.80
- $r = .2449$ ($p < .023$)

Case 3:13-cv-01535-L  Document 17-116  Filed 08/21/14  Page 316 of 535  PageID 14203

- This finding was supported in this investigation

## Hypothesis 2: Children with higher levels of affect management were expected to report lower levels of depressive symptoms

- Mean CDI score = 49.73
- $r = -.2683$ ($p < .013$)
- This finding was supported in this investigation

## Hypothesis 3: Children with higher levels of affect management were expected to report lower levels of post-traumatic stress symptoms

- Mean RI score = 12.90
- $r = -.1225$ ($p < .261$)
- This finding was not supported in this investigation

## Hypothesis 4: Children with higher levels of affect management were expected to exhibit lower levels of delinquent behavior

- Mean CBCL-DEL score = 68.74
- $r = -.0980$ ($p < .370$)
- This finding was not supported in this investigation

**Discussion**

By developing and testing the Affect Management Grid, this study made a significant contribution towards understanding progressive stages of youths ability to manage their affects. Although the study found no direct correlation between levels of affect management and delinquency, the relationship between affect management and aggression is compelling. Finding more appropriate alternatives to use of force should influence some criminal activity.

The scale was devised to be helpful in ascertaining how to take advantage of an opportunity to help these adolescents through more effective use of placement time in residential facilities. Ideally this should be a time to think, work, and plan for their future. Too many have never done more than react. When operating in a constant state of alertness, living only in the moment, the community becomes smaller and options fewer. Basic concerns for safety and survival are paramount. With limited ability to manage their affects, youth are susceptible to responding to the moment, unable to understand or restrain the waves of emotions that may overwhelm them. The consistent flaw in these subjects' management skills is an inability to handle their aggressive, angry feelings. Anger that may well be misplaced onto others, anger that has a global nature, anger that is ancient in its origins. Creating awareness of these issues is a first step towards solutions.

Many have a general inability to self-sooth and while some might disguise their internal

emotional state, few are able to predict potential emotionally laden incidents. It is easier to simply react without acknowledging any responsibility for an incident getting out of hand.

Through an infusion of services, residential placement officials seek to help youth gain control over their affects and their lives and set a foundation for becoming productive citizens. In so doing, officials seek to provide the most effective treatment at the least expense. We believe that the affect management grid, if validated on other samples, could have a role in this effort. The object is to devise precise interventions instead of using a scatter shot method.

## Affect Regulation:  Modes and Examples

| Mode | Definition/Example |
|---|---|
| Toward Empathy | "Empathy is (1) a mode of perception and (2) an understanding of the comp perceive and comprehend the other accurately" (Noy, 1994). "Toward empa describes an evolutionary process of understanding others. It blends acknowledgement of and ability to understand others.<br><br>Example: "One reason that I don't like to fight is because after I beat them u sorry for them, and bad for how I know I made them feel." (#35) |
| Use of Environment and Others | Use of environment/others is the ability to connect oneself to others as a wa personal meaning to affects. It follows the progress of interactional needs fc an external environment.<br><br>Example: "When I'm real mad, I go to my room and crank up the radio real l to my homeboys." (#27) |
| Emerging Self Reliance | "Emerging self reliance" focuses on changes occurring internally. It reflects emotions are organized from within, and evolving from the newborn's total c toward a young adult's emotional and material self-reliance. (Freud, 1965).<br><br>Example: "It's my deal, I should have gone home that night. I did the crime, the time. Nobody made me do that stuff." (#17) |
| Verbal | "Verbal" is the capacity to verbally express thoughts, feelings and ideas. It c as developmental in language skills used to express internal emotional stat others/environment.<br><br>Example: "The words? No tell, it's goin' to be loud. It's goin' to be some wor made...I felt like...I was just mad"; "I told her, 'I'll kill you. I don't care about knife. This bullet going to hit you before that knife hit me.' You know what sl scared, she started 'I'll call the police!' I said, 'I'll shoot you before you get th thought about it and went into my room and got my clothes and took my clip gun and left." (#48) |
| Non-Verbal | "Non-verbal" is the demonstration of one's emotions, feelings, attitudes, wh positive or negative, through actions. It is basically used to follow non-verba communicative behaviors as they mature in the individual.<br><br>Example: "My heart felt like it was going to pop out"; "In my ears I just be ma smoke a little and it relaxes me"; "I don't hit nobody, I just hit the wall"; "The way I could do anything to him so I wanted to set a fire. I took a bath, and th |

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 318 of 535   PageID 14205

grabbed me a towel and set it on fire". (#80)

## For More Information
Visit: www.ChildTrauma.org for more information about the ChildTrauma Academy.

## References

Achenbach, T. M. (1991). Youth Self Report for Ages 11-18 (YSR), University of Vermont. USA.

Achenbach, T.M. (1991). Child Behavior Checklist for Ages 4-18 (CBCL), University of Vermont Press. USA.

Berry, K. E., and Buktenica, N. A. (1997). The Berry-Buktenica Developmental Test of Visual-Motor Integration (VMI), Modern Curriculum Press. USA.

Briere, J. (1995). Trauma Symptom Checklist for Children (TSCC), Psychological Assessment Resources, Inc. USA.

Chandler, L. (1993). Stress Response Scale (SRS), Psychological Assessment Resources, Inc. USA.

Connors, C.K. (1989). Connors' Parent Rating Scales (CPRS), Multi-Health Systems, Inc.. USA.

Coopersmith, I. (1990). Self-Esteem Index (SEI), PRO-ED, Inc. USA.

Evers-Szostak, M., and Sanders, S. (1990). Children's Perceptual Alteration Scale (CPAS), Durham Pediatrics. USA.

Jensen, C. J. (1990). Affect Development Status in Adolescents with Emotional Disorders. Unpublished Dissertation, Smith College, Northampton, MA.

Kaufman, A. S., and Kaufman, N. (1990). Kaufman Brief Intelligence Test (K-BIT), American Guidance Service, Inc. USA.

McCubbin, H.I., Patterson, J.M., and Wilson, L.R. (1981). Family Inventory of Life Events and Changes (FILE), University of Wisconsin Press. USA.

Olson, D., Portner, J., Lavee, Y. (1985) Family Adaptability and Cohension Evaluation Scales (FACES III), University of Minnesota Press. USA.

Putman, F. W. (1985). Child Dissociative Checklist (CDC), National Institute of Mental Health. USA.

Pynoos, R. R., Frederick, C. and Nadar, K. (1992) Post Traumatic Stress Disorder Reaction Index (PTSD-RI), Institute Press. USA.

Spielberger, C. D., Edwards, C. D., Montouri, J. and Lushene, R. (1970). The State-Trait Anxiety Inventory for Children, <u>Consulting Psychologists Press, Inc.</u> USA.

Wilkinson, G. S. (1993). Wide Range Achievement Test 3 (WRAT-3), <u>Wide Range, Inc.</u> USA.

# EXHIBIT

# 10

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 321 of 535   PageID 14208

THE AMERICAN JOURNAL
OF PSYCHIATRY

Master the Art of Diagnosis

HOME HELP FEEDBACK SUBSCRIPTIONS ALL ISSUES SEARCH TABLE OF CONTENTS

**Institution: SOUTHERN METHODIST LIBRARY UNDERWOOD LAW LIBRARY ||**
Sign In as Member/Non-member || Contact Subscription Administrator at your institution || **FAQ**

Am J Psychiatry 156:749-755, May 1999
© 1999 American Psychiatric Association

**Regular Article**

# Memories of Childhood Abuse: Dissociation, Amnesia, and Corroboration

**James A. Chu, M.D., Lisa M. Frey, Psy.D.,
Barbara L. Ganzel, Ed.M., M.A., and
Julia A. Matthews, Ph.D., M.D.**

- ▸ Abstract of this Article
- ▸ **Reprint (PDF) Version of this Article**
- ▸ Similar articles found in:
  AJP Online
  PubMed
- ▸ PubMed Citation
- ▸ This Article has been cited by:
  other online articles
- ▸ Search Medline for articles by:
  Chu, J. A. || Matthews, J. A.
- ▸ Alert me when:
  new articles cite this article
- ▸ Download to Citation Manager

- ▸ Collections under which this article appears:
  **Dissociative Disorders**
  **Child Abuse**

▸ ## ABSTRACT

- ▲ TOP
- • ABSTRACT
- ▼ INTRODUCTION
- ▼ METHOD
- ▼ RESULTS
- ▼ DISCUSSION AND CONCLUSIONS
- ▼ REFERENCES

**OBJECTIVE:** This study investigated the relationship between self-reported childhood abuse and dissociative symptoms and amnesia. The presence or absence of corroboration of recovered memories of childhood abuse was also studied. **METHOD:** Participants were 90 female patients admitted to a unit specializing in the treatment of trauma-related disorders. Participants completed instruments that measured dissociative symptoms and elicited details concerning childhood physical abuse, sexual abuse, and witnessing abuse. Participants also underwent a structured interview that asked about amnesia for traumatic experiences, the circumstances of recovered memory, the role of suggestion in recovered memories, and independent corroboration of the memories. **RESULTS:** Participants reporting any type of childhood abuse demonstrated elevated levels of dissociative symptoms that were significantly higher than those in subjects not reporting abuse. Higher dissociative symptoms were correlated with early age at onset of physical and sexual abuse and more frequent sexual abuse. A substantial proportion of participants with all types of abuse reported partial or complete amnesia for abuse memories. For physical and sexual abuse, early age at onset was correlated with greater levels of amnesia. Participants who reported recovering memories of abuse generally recalled these experiences while at home, alone, or with family or friends. Although some participants were in treatment at the time, very few were in therapy sessions during their first memory recovery. Suggestion was generally denied as a factor in memory recovery. A majority of participants were able to find strong corroboration of their recovered memories. **CONCLUSIONS:** Childhood abuse, particularly chronic abuse beginning at early ages, is related to the development of high levels of dissociative symptoms including amnesia for abuse memories. This study strongly suggests that psychotherapy usually is not associated with memory

recovery and that independent corroboration of recovered memories of abuse is often present.

# ▶ INTRODUCTION

In recent years, the explosion of reports of childhood abuse has
raised questions about the nature of memory for traumatic
events, the occurrence of amnesia for childhood abuse, and the
validity and accuracy of recovered memories. Many clinicians
accept recovered memories of childhood abuse as essentially

▲ TOP
▲ ABSTRACT
• INTRODUCTION
▼ METHOD
▼ RESULTS
▼ DISCUSSION AND CONCLUSIONS
▼ REFERENCES

valid reports of early experiences, and clinical work with recovered memories has proved to be useful in
some patients. Recently, however, a number of investigators have questioned the validity of recovered
memory of childhood abuse, arguing that many clinicians may be colluding in the creation of
pseudomemories. A heated debate has emerged regarding therapists' role in the retrieval of previously
unremembered memories of childhood abuse.

Recent studies in cognitive psychology have shown that memories can be inaccurate. For example,
investigators studying the impact of stressful experiences on memory have tested college students under
demanding conditions (1–3) or exposed study participants to shocking photographic material (4, 5).
Study participants are often remarkably inaccurate in recounting details of their experience (4–7). The
role of suggestion in the malleability of memory also has been well established in laboratory studies (8–
11). In some protocols, participants are shown pictures, slides, or videotapes of an event and then are
asked to recall the event. When given cues or suggestions, they often make errors concerning peripheral
details of the events. However, despite evidence that memory content can be influenced by suggestion,
emotional arousal, and personal meaning, the bulk of memory research actually supports the accuracy of
memory for the central components of significant events (12).

There also is evidence of memory for events that did not occur. One well-known personal
pseudomemory was described by Piaget, the well-known Swiss theorist of childhood cognitive
development (13). For many years during his childhood, Piaget had a clear visual memory of someone
trying to kidnap him from his pram when he was 2 years old. The memory also involved his nanny
chasing away the potential kidnapper and then going home and telling the family about the incident.
Years later, when Piaget was 15, the nanny returned to the Piaget family and confessed that the incident
had never occurred. Her motive had been to enhance her position in the household, but she subsequently
suffered guilt about the fabrication and about the watch she had received as a reward.

Piaget's experience suggests that persons may create pseudomemories of events that never actually
occurred, especially after being told of such "events" by trusted individuals. The memories may seem
valid, and persons may not recall the true source of the information (so-called source amnesia). In
experimental protocols with college students, researchers have given cues about both real events (from
information supplied by parents) and false childhood events and have asked participants to describe
these events (14). Over three interviews, approximately 6% of participants developed vivid
pseudomemories of false events. In a similar protocol, up to 25% of participants developed vivid

Case 3:13-cv-01535-L  Document 17-116  Filed 08/21/14  Page 323 of 535  PageID 14210

pseudomemories if they were asked to imagine the false events in detail (15). These studies support the contention that pseudomemories can be induced, particularly with repeated suggestion, rehearsal, and the use of imagery. It should be noted, however, that only a minority of participants responded to the cues to remember false events, suggesting that certain individuals may have more vulnerability than others to creating pseudomemories. Or, from the reverse perspective, 75% to 94% of participants appeared to be resistant to the development of pseudomemories.

In contrast to the malleability of memory demonstrated in experimental protocols, some investigators have hypothesized that memory of actual traumatic events is different from memory of ordinary or laboratory experiences. For example, investigators (16–19) have suggested that traumatic memories are segregated and stored apart from ordinary narrative memory and thereby are less subject to ongoing modification in response to new experiences. In contrast to narrative memories that are integrative, malleable, and fitted into the individual's personal cognitive schemas, traumatic memories are said to be inflexible, nonnarrative, automatic, triggered, and disconnected from ordinary experience. This nonintegration is considered the basis for remembering through behavioral reenactment, somatic sensation, or intrusive images that are disconnected from conscious verbal memory. Because the memories are unassimilated, they retain their original force—"unremembered and therefore unforgettable" (19). While ordinary narrative memory is dynamic and both changes and degrades over time, traumatic memory has been described as "indelible" (20).

Clinical research generally has supported the concepts of dissociative amnesia and recovered memory in relation to traumatic events. Clinical investigators have found relatively high rates of self-reported amnesia for childhood sexual abuse (19%–62%) in clinical populations being treated for trauma-related conditions (21–24). Moreover, these studies suggest that the incidence of amnesia is highly correlated with early onset of abuse, chronicity of abuse, and severity of abuse (e.g., violence, multiple perpetrators, physical injury, fear of death). Terr's investigations with traumatized children also have demonstrated that there are differential effects depending on the chronicity of abuse (25–27). Children who have experienced limited, circumscribed trauma have hypermnesia—"clear, detailed accounts of their experiences [that] makes one conclude that these memories stay alive in a very special way" (27, p. 14). In contrast, chronically traumatized children demonstrate extensive amnesia. Terr notes that this kind of chronic traumatization results in a variety of symptoms—"massive denial, repression, dissociation, self-anesthesia, self-hypnosis, identification with the aggressor, and aggression turned against the self" (27, p. 15)—that may significantly alter subsequent recall. Thus, chronically traumatized patients are most likely to suffer amnesia, but, given their levels of denial and dissociative defenses, these patients may also be most vulnerable to distortions and errors in recall.

The present study investigated both the nature and the validity of traumatic memory of childhood abuse. Self-reported physical abuse, sexual abuse, and witnessing violence and the parameters of abuse experiences were examined in relation to dissociative symptoms and amnesia. We sought to replicate the findings that childhood physical and sexual abuse would be related to high levels of dissociative symptoms (28–30) and hypothesized that early age at onset and higher frequency of abuse would be correlated with higher levels of dissociative symptoms, including amnesia. We examined recovered

memory following amnesia for abuse, particularly in relation to the circumstances of memory recovery, the role of suggestion in recall, and the existence of physical evidence or verbal confirmation to validate the accuracy of the memories.

# ▶  METHOD

The participants for this study were recruited from female inpatients, 18–60 years old, in a psychiatric teaching hospital. All patients consecutively admitted to a unit specializing in the treatment of posttraumatic and dissociative disorders were considered for participation. Reasons for admission were varied; although some patients were admitted with high levels of

▲ TOP
▲ ABSTRACT
▲ INTRODUCTION
· METHOD
▼ RESULTS
▼ DISCUSSION AND CONCLUSIONS
▼ REFERENCES

posttraumatic or dissociative symptoms, others had nonspecific difficulties such as suicidal impulses or inability to function. Patients with the diagnosis of a psychotic illness (e.g., schizophrenia or mood disorder with psychotic features) or an organic brain syndrome were excluded from this study. Of 179 patients meeting inclusion criteria, 31 were discharged before being approached for the study. Of the remaining 148, 109 (74%) agreed to participate, 21 (14%) refused, and 18 (12%) were felt by their treating clinicians to have symptoms that would have made it clinically inappropriate for them to participate. Patients who refused to participate typically indicated that they would find the subject matter of the study upsetting. The clinicians treating those deemed inappropriate generally cited unstable symptoms, such as severe posttraumatic or dissociative symptoms, or tenuous control of impulses. After a complete description of the study procedures to prospective participants, written informed consent was obtained. Of the 109 potential participants, 13 were unable to complete the research protocol and six had very incomplete data and were dropped from the study, leaving 90 participants. Not all participants responded to every research question. Where this was the case, percentages are reported relative to the number of participants who responded to that particular question.

The participants' mean age was 34.9 years (SD=8.8). Seventy-nine (88%) were Caucasian. Forty-five (50%) had never married, 19 (21%) were married or living with a partner, and 26 (29%) were separated, divorced, or widowed. Most (73%; 51 of 70 responses) had annual household incomes under $20,000. Sixty-six (73%) reported some form of education beyond high school, and nearly all (94%; 84 of 89 responses) listed their usual occupation as work, work in the past, or student. However, a majority (64%) reported that they were currently disabled or unemployed.

Participants completed two self-report instruments: the Dissociative Experiences Scale (31–33), a 28-item questionnaire with established validity and reliability that measures the current prevalence of dissociative symptoms, and a revision of the Life Experiences Questionnaire (28, 29, 34) that gathers detailed information about traumatic experiences in childhood. Responses to the Life Experiences Questionnaire were considered indicative of childhood abuse if participants reported that before age 16 years they had been "hit really hard, kicked, punched, stabbed, or thrown down" (physical abuse); had been "pressured against your will into forced contact with the sexual parts of your body or his/her body" (sexual abuse); or had seen "anyone hurt in a physical conflict or forced sexual

activity" (witnessing abuse).

Each participant underwent a structured interview that asked if she experienced amnesia for currently recalled traumatic experiences that occurred in childhood. The interviewer (B.L.G. or L.M.F.) was not involved in the study patients' clinical care. Participants were considered to have had complete amnesia if there was a period during which they "did not remember that this [traumatic] experience happened" and were considered to have had partial amnesia if there was a period during which they "did not remember significant parts of this [traumatic] experience." Participants who reported a period of complete amnesia were asked about the circumstances of first recovered memory, including where (e.g., home, work, therapy), with whom (e.g., alone or with others), in what state of consciousness (e.g., awake, dreaming, hypnotized), and whether they were in psychotherapy or counseling during that period of their lives. Participants were asked whether the possibility of abuse had been suggested to them before the first recovered memory ("Prior to recalling being hurt/seeing others hurt, did anyone suggest to you that this may have occurred?"). Participants also were asked whether they had sought or obtained verbal information ("Have you had anyone confirm these events?") or had physical evidence (e.g., scars from injuries, medical records, or other documentation such as photos, diaries, letters) that validated the occurrence of abuse that was previously "forgotten" and subsequently recalled.

Participants' self-report responses to the Life Experiences Questionnaire were analyzed for the rates of each type of abuse, the age at onset, and frequency of abuse. For most analyses of data, nonparametric statistics were used, given the type of data and the nonnormal distribution of Dissociative Experiences Scale scores. Kruskal-Wallis analyses were used to compare Dissociative Experiences Scale scores across levels of amnesia for each type of abuse. Further, the Mann-Whitney U Wilcoxon rank sum W test was used to test differences in Dissociative Experiences Scale scores (across types of abuse) between levels of frequency of abuse and levels of amnesia. Spearman correlation coefficients (two-tailed) were used to evaluate whether age at onset of abuse was correlated with the degree of amnesia and to examine the relationship between onset of abuse and Dissociative Experiences Scale scores.

## ▶  RESULTS

### Self-Reported Childhood Abuse in Relation to Dissociative Symptoms and Amnesia

| ▲ TOP |
| ▲ ABSTRACT |
| ▲ INTRODUCTION |
| ▲ METHOD |
| • RESULTS |
| ▼ DISCUSSION AND CONCLUSIONS |
| ▼ REFERENCES |

Because this participant group (N=90) was drawn from a posttraumatic stress and dissociative disorders treatment unit, the majority of participants reported a high level of childhood abuse experiences. Seventy-five (83%) reported physical abuse, 74 (82%) reported sexual abuse, and 64 (71%) reported witnessing violence. Participants reporting any kind of abuse also reported a substantial rate of both partial and complete amnesia and elevated Dissociative Experiences Scale scores in a range consistent with PTSD (median scores above 31.3 found for PTSD patients by Bernstein and Putnam [31]) (table 1). Among participants reporting physical abuse, analysis showed significant differences in Dissociative Experiences Scale scores across levels of amnesia for the traumatic events ($x^2$=11.50, df=2, p=0.003). Significant differences were also obtained

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 326 of 535   PageID 14213

for the groups reporting sexual abuse ($x^2$=9.18, df=2, p=0.01) and witnessing abuse ($x^2$=19.15, df=2, p=0.0001).

**View this table:**   TABLE 1
[in this window]
[in a new window]

The mean age at onset of physical abuse, sexual abuse, and witnessing violence was generally early in childhood, before adolescence (table 2). Earlier age at onset was correlated with a higher degree of amnesia for physical abuse (Spearman r=–0.39, N=73, p=0.001) and sexual abuse (Spearman r=–0.55, N=73, p<0.001) but showed only a trend for witnessing abuse (Spearman r=–0.08, N=62, p=0.55, n.s.). Early age at onset was also correlated with higher Dissociative Experiences Scale scores for physical abuse (Spearman r=–0.27, N=68, p=0.03) and sexual abuse (Spearman r=–0.48, N=67, p<0.001) but was only weakly associated with witnessing abuse (Spearman r=–0.09, N=56, p=0.53, n.s.).

**View this table:**   TABLE 2
[in this window]
[in a new window]

Analysis of mean Dissociative Experiences Scale scores in relation to frequency of childhood abuse showed a clear trend of higher scores with more frequent episodes of abuse (table 3), although not all differences were statistically significant. Only participants with very frequent sexual abuse (more than 100 episodes) had significantly higher levels of dissociation than participants with infrequent or no abuse (fewer than 10 episodes) (Mann-Whitney z=–2.13, N=42, p=0.03).

**View this table:**   TABLE 3
[in this window]
[in a new window]

**Circumstances Concerning Recovered Memory, Suggestion, and Corroboration of Childhood Abuse**

Most of the participants reporting complete amnesia for physical abuse and sexual abuse had their first recollection of the abuse while at home and alone (table 4). Few participants (only one or two for each type of abuse) reported being in a therapy session when they first remembered the abuse. Nearly all were awake, and hypnosis was a factor for only one participant. Many of the participants (at least 45% for sexual abuse, 48% for physical abuse, and 15% for witnessing abuse) were not involved in any kind of psychological treatment or counseling when they first recovered memories of traumatic experiences.

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 327 of 535   PageID 14214

**View this table:**   TABLE 4
[in this window]
[in a new window]

Participants who reported a period of complete amnesia for episodes of childhood abuse were asked about the role of suggestion in memory recovery. As shown in table 5, the vast majority of participants with all types of abuse did not recall any overt suggestion before the first recovered memory.

**View this table:**   TABLE 5
[in this window]
[in a new window]

A majority of participants who reported a period of complete amnesia for episodes of childhood abuse made some attempt to corroborate their recovered memories. As shown in table 6, of those who attempted corroboration, more than half found physical evidence of the abuse (e.g., scars from physical injury, medical records). The rates of verbal confirmation for the group of participants with complete amnesia who attempted corroboration were strikingly high for physical abuse (93%) and for sexual abuse (89%). Half of the participants with complete amnesia who sought confirmation of witnessing abuse were able to find corroboration.

# ▶ DISCUSSION AND CONCLUSIONS

The high rates of physical and sexual abuse in this study are similar to other reports of clinical populations with posttraumatic and dissociative disorders (21, 22, 29). Childhood abuse experiences were related to higher levels of dissociation. Early age at onset was correlated with higher dissociative symptoms and greater levels of amnesia for physical and sexual abuse. More frequent sexual abuse was correlated with higher levels of dissociation. These findings have considerable face validity as dissociative capacity is thought to be greater in younger children (35, 36), and chronic abuse may result in the persistent utilization of dissociative defenses—including amnesia—into adulthood. Many of the findings from this study are consistent with other studies concerning dissociation related to physical and sexual abuse (28, 30), dissociation related to parameters of sexual abuse (29), and amnesia in persons with childhood sexual abuse (21, 22).

▲ TOP
▲ ABSTRACT
▲ INTRODUCTION
▲ METHOD
▲ RESULTS
• DISCUSSION AND CONCLUSIONS
▼ REFERENCES

There appears to be a particular subset of severely and chronically abused patients with high rates of amnesia. Of note are the anecdotal descriptions of amnestic experiences reported by many of our participants. For the most part, these participants lost memory for whole periods of their lives—recollecting neither traumatic events nor neutral or positive experiences. These descriptions are strikingly similar to Terr's observation that chronically traumatized children "may forget whole segments

of childhood—from birth to age 9, for instance" (27, p. 17). These reports also suggest that the underlying mechanism for this kind of amnesia may not be repression of overwhelming experiences or selective inattention to noxious events. The massive failure to integrate entire periods of childhood is consistent with the hypothesis that intense and chronic traumatic experiences may lead to pervasive changes in the mechanisms for processing and storing information. Thus, traumatic memory may be different from ordinary memory. This model is also consistent with the concept of dissociation in which various mental contents exist in different states held separately from each other.

There were a number of participants who reported childhood abuse—including multiple kinds of abuse, frequent abuse, and abuse with early age at onset—yet had relatively low levels of dissociative experiences and little amnesia. It is possible that this group of participants actually had amnesia but had yet to recover memories of more abuse. However, a recent analysis by Putnam et al. (37) suggests that in traumatized clinical populations there are subsets of high dissociators and low dissociators. Thus, the subset of participants with significant abuse, relatively little dissociative symptoms, and no amnesia may represent a group with low dissociative capacity. The differential susceptibility toward the development of dissociative symptoms may also explain the large standard deviations on the Dissociative Experiences Scale that we found in many categories. Further research is needed to help determine factors associated with dissociative capacity, such as innate characteristics or environmental circumstances.

Our findings concerning the recollection of abuse experiences suggest that memory recovery usually is not directly related to participation in psychotherapy. A substantial number of our participants were in some kind of treatment during the period that they began recalling their abuse—as would be expected by their high levels of symptoms. If the therapy was a primary causal factor in production of these memories, it would be expected that many would have actually been in therapy sessions during their first recollections. However, most participants reported that they first began to remember at home when alone or with family or friends, and not in therapy sessions. Most participants also denied that abuse had been suggested, although subtle suggestion (e.g., emphasis on certain subjects, tone of voice, nods, etc.) might not have been perceived as such.

Many of the participants who had complete amnesia had made attempts to corroborate their recovered memories. Nearly all participants who reported physical and sexual abuse and who attempted corroboration were able to find some kind of verification. Our corroboration rate (89%) of participants with complete amnesia for sexual abuse and who attempted to confirm the abuse is similar to that reported by Herman and Schatzhow (83%) (22) in a clinical population of patients being treated for abuse-related difficulties. It should be noted, however, that although participants in this study were asked about corroboration of recovered memory, some may have reported about their attempts to validate experiences that they had always remembered. Nonetheless, this level of corroboration is strikingly high given that much abuse leaves no physical scars and that child abuse almost always occurs in great secrecy. At a minimum, our data support the validity of some reports of recovered memory for childhood abuse. In particular, our criteria for confirmation were relatively stringent, asking for actual independent confirmation rather than just that someone else believed that the abuse might have happened.

The findings of this study argue against the notion that many or most reports of childhood abuse are pseudomemories. Moreover, abuse memories that are recovered in therapy are not necessarily suspect. In Kluft's study of 34 dissociative identity disorder patients (38), 68% of the 19 patients who were able to confirm abuse memories first recalled these experiences in therapy. Moreover, many of these patients recovered memories in therapy using hypnotic techniques. Three patients were also able to disconfirm memories, and two patients had both validated memories of abuse and pseudomemories. These findings suggest that neither psychotherapy nor hypnosis, per se, are treatments that encourage pseudomemories and that all memories should be viewed critically in the therapeutic setting and subject to clinical evaluation as to their validity. However, our findings do not rule out the possibility of wholesale creation of pseudomemories resulting from grossly improper therapeutic practices. Of interest are a very small number of participants in our study who recalled abuse while in therapy sessions, who had used hypnosis, who had been recipients of suggestion, and/or who could not find any corroboration of their memories of abuse. Some of the participants in this group might be patients who developed pseudomemories of their trauma. Unfortunately, in this study, this group was too small to analyze. However, similar populations should be further investigated as to whether they differ in any other ways from those with apparently valid recovered memories of abuse.

There are limitations to this study worth noting. The major methodological limitation is the use of retrospective self-report for memories of childhood abuse, episodes of amnesia, and the circumstances of recovered memory. These self-reports were potentially subject to distortion and inaccuracies (e.g., difficulties in distinguishing between different levels of amnesia, inability to accurately recall the number of episodes of abuse, errors in recalling when and how memories were recovered). The results are also limited by the participant pool of primarily Caucasian women. In addition, the use of a participant pool of predominantly disabled patients being treated for trauma-related difficulties limits the applicability of our findings to other less traumatized and more functional clinical and general population groups. In our analyses, the multiple types of abuse reported by many participants makes it difficult to draw conclusions concerning the effects of any particular type of abuse in comparison to another. Similarly, this study did not examine the role of severe neglect—which is known to be ubiquitous among maltreated children (39)—in the development of dissociative symptoms.

The results of this study should be interpreted somewhat narrowly, as it investigates only the relationship between early trauma and subsequent dissociative symptoms and amnesia. In the clinical arena, patients with childhood abuse may present with other primary difficulties—some may have abuse-related difficulties such as poor ego functioning or substance abuse, and others may have difficulties that are entirely independent of childhood experiences. In addition, this study recruited participation from psychiatric inpatients and hence does not elucidate the mechanisms whereby persons who have been traumatized in childhood have been able to overcome or compensate for those experiences and have fewer or no dissociative or posttraumatic difficulties. Given the limitations of this study, the conclusions cannot be considered definitive. Nonetheless, in the context of continuing controversy concerning amnesia and recovered memory, this study does provide further evidence supporting the occurrence of amnesia for childhood traumatic experiences and the subsequent recovery of memory.

The participants in this study reported high levels of amnesia, and many of their subsequently recovered memories could be independently corroborated. Nonetheless, our results do not obviate the possible role of psychotherapy and suggestion in the creation of pseudomemory in some patients. Although there is little evidence that direct questioning about abuse, per se, results in false memories, clinicians must be careful not to inquire about possible abuse in a way that is suggestive of any particular responses. Especially when memories are fragmentary, clinicians must support the psychological validity of the memories but avoid coming to premature conclusions about the occurrence of trauma without sufficient evidence. When recovered memory begins to replace amnesia, clinicians must be open to the possibility of real abuse but must allow patients to reconstruct—without suggestion—a credible personal history that is consistent with past and current symptoms.

▶   # FOOTNOTES

Presented in part at Trauma and Memory: An International Research Conference, Durham, N.H., July 28, 1996. Received Jan. 5, 1998; revision received Sept. 14, 1998; accepted Nov. 19, 1998. From the Dissociative Disorders and Trauma Program, McLean Hospital, and the Department of Psychiatry, Harvard Medical School, Boston. Address reprint requests to Dr. Chu, McLean Hospital, 115 Mill St., Belmont, MA 02478

▶   # REFERENCES

```
▲ TOP
▲ ABSTRACT
▲ INTRODUCTION
▲ METHOD
▲ RESULTS
▲ DISCUSSION AND CONCLUSIONS
• REFERENCES
```

1.  Eriksen C: Defense against ego threat in memory and perception. J Abnorm Soc Psychol 1952; 3:253–256
2.  Eriksen C: Individual differences in defensive forgetting. J Exp Psychol 1953; 44:442–443
3.  Tudor TG, Holmes DS: Differential recall of successes and failures. J Res Personality 1973; 7:208–224
4.  Christianson S-Å, Loftus EF: Memory for traumatic events. Applied Cognitive Psychol 1987; 1:225–239
5.  Kramer TH, Buckhout R, Fox P, Widman E, Tusche B: Effects of stress on recall. Applied Cognitive Psychol 1991; 5:483–488
6.  Christianson S-Å, Loftus EF: Remembering emotional events: the fate of detailed information. Mem Cognit 1991; 5:81–108
7.  Holmes DS: Evidence for repression: an examination of 60 years of research, in Repression and Dissociation: Implications for Personality Theory, Psychopathology, and Health. Edited by Singer J. Chicago, University of Chicago Press, 1990, pp 85–102
8.  Loftus EF, Korf NL, Schooler JW: Misguided memories: sincere distortions of reality, in Credibility Assessment. Edited by Yuille JC. Norwell, Mass, Kluwer Academic, 1989, pp 155–173
9.  Loftus E: Reacting to blatantly contradictory information. Mem Cognit 1979; 7:368–374
10. Schooler J, Gerhard E, Loftus E: Qualities of the unreal. J Exp Psychol 1986; 12:171–181
11. Schumaker JF (ed): Human Suggestibility: Advances in Theory, Research, and Application. New York, Routledge, 1991
12. Chu JA, Matthews JA, Frey LM, Ganzel B: The nature of traumatic memories of childhood abuse.

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 331 of 535   PageID 14218

Dissociation 1996; 9:2–17

13. Piaget J: Plays, Dreams and Imitation in Childhood. New York, WW Norton, 1962

14. Hyman IE, Pentland J: The role of mental imagery in the creation of false childhood memories. J Memory and Language 1992; 35:101–117

15. Hyman IE, Troy TH, Billings FJ: False memories of childhood experiences. Applied Cognitive Psychol 1995; 9:181–197

16. Crabtree A: Dissociation and memory: a two hundred year perspective. Dissociation 1992; 5:150–154

17. Kolb LC: A neuropsychological hypothesis explaining posttraumatic stress disorders. Am J Psychiatry 1987; 144:989–995[Abstract]

18. van der Kolk BA, Ducey CP: The psychological processing of traumatic experience: Rorschach patterns in PTSD. J Trauma Stress 1989; 2:259–274

19. van der Kolk BA, van der Hart O: The intrusive past: the flexibility of memory and the engraving of trauma. Am Imago 1991; 48:425–454

20. LeDoux JE: Emotion as memory: anatomical systems underlying indelible neural traces, in The Handbook of Emotion and Memory. Edited by Christianson S-Å. Hillsdale, NJ, Lawrence Erlbaum Associates, 1992, pp 289–297

21. Briere J, Conte J: Self-reported amnesia in adults molested as children. J Trauma Stress 1993; 6:21–31

22. Herman JL, Schatzhow E: Recovery and verification of memories of childhood sexual trauma. Psychoanal Psychol 1987; 4:1–4

23. Loftus EF, Polonsky S, Fullilove MT: Memories of childhood sexual abuse. Psychol Women Q 1994; 18:64–84

24. Williams LM: Recall of childhood trauma: a prospective study of women's memories of child sexual abuse. J Consult Clin Psychol 1994; 62:1167–1176[Medline]

25. Terr L: Remembered images of psychic trauma. Psychoanal Study Child 1985; 40:493–533 [Medline]

26. Terr L: What happens to memories of early childhood trauma? J Am Acad Child Adolesc Psychiatry 1988; 27:96–104[Medline]

27. Terr LC: Childhood traumas: an outline and overview. Am J Psychiatry 1991; 148:10–20 [Abstract]

28. Chu JA, Dill DL: Dissociative symptoms in relation to childhood physical and sexual abuse. Am J Psychiatry 1990; 147:887–892[Abstract]

29. Kirby JS, Chu JA, Dill DL: Correlates of dissociative symptomatology in patients with physical and sexual abuse histories. Compr Psychiatry 1993; 34:250–263

30. Saxe GN, van der Kolk BA, Berkowitz R, Chinman G, Hall K, Lieberg G, Schwartz J: Dissociative disorders in psychiatric inpatients. Am J Psychiatry 1993; 150:1037–1042[Abstract]

31. Bernstein EM, Putnam FW: Development, reliability, and validity of a dissociation scale. J Nerv Ment Dis 1986; 174:727–735[Medline]

32. Loewenstein RJ, Putnam FW: A comparison study of dissociative symptoms in patients with complex partial seizures, MPD, and post-traumatic stress disorder. Dissociation 1988; 1:17–23

33. Ross CA, Norton GR, Anderson G: The Dissociative Experiences Scale: a replication study. Dissociation 1988; 1:21–32

34. Bryer JB, Nelson BA, Miller JB, Krol PA: Childhood sexual and physical abuse as factors in adult psychiatric illness. Am J Psychiatry 1987; 144:1426–1430[Abstract]

35. Ross CA, Ryan L, Anderson G, Ross D, Hardy L: Dissociative experiences in adolescents and college students. Dissociation 1989; 2:239–242

36. Ross CA, Joshi S, Currie R: Dissociative experiences in the general population. Am J Psychiatry 1990; 147:1547–1552[Abstract]

37. Putnam FW, Carlson EB, Ross CA, Anderson G, Clark P, Torem M, Bowman ES, Coons P, Chu JA, Dill DL, Loewenstein RJ, Braun BG: Patterns of dissociation in clinical and nonclinical

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 332 of 535   PageID 14219

samples. J Nerv Ment Dis 1996; 184:673–679[Medline]
38.  Kluft RP: The confirmation and disconfirmation of memories of abuse in dissociative identity disorder patients: a naturalistic study. Dissociation 1995; 4:253–258
39.  US Department of Public Health, Administration for Children and Families, National Center on Child Abuse and Neglect: The Third National Incidence Study of Child Abuse and Neglect. Washington, DC, US Government Printing Office, 1996

# This article has been cited by other articles:

- (1999). Remembering and Corroborating Memories of Childhood Abuse. *Journal Watch of Psychiatry* 1999: 7-7 [Full Text]
- Kisiel, C. L., Lyons, J. S. (2001). Dissociation as a Mediator of Psychopathology Among Sexually Abused Children and Adolescents. *Am. J. Psychiatry* 158: 1034-1039 [Abstract] [Full Text]
- CHU, J. A. (2000). Psychological Defense Styles and Childhood Sexual Abuse. *Am. J. Psychiatry* 157: 1707-1707 [Full Text]
- GOOD, M. I. (2000). More Questions About Recovered Memories. *Am. J. Psychiatry* 157: 1345--1346 [Full Text]

> ▶ Abstract of this Article
> ▶ **Reprint (PDF) Version of this Article**
> ▶ Similar articles found in:
>      AJP Online
>      PubMed
> ▶ PubMed Citation
> ▶ This Article has been cited by:
> ▶ Search Medline for articles by:
>      Chu, J. A. || Matthews, J. A.
> ▶ Alert me when:
>      new articles cite this article
> ▶ Download to Citation Manager

> ▶ Collections under which this article appears:
>      **Dissociative Disorders**
>      **Child Abuse**

# EXHIBIT
# 11

THE AMERICAN JOURNAL
OF PSYCHIATRY



HOME  HELP  FEEDBACK  SUBSCRIPTIONS  ALL ISSUES  SEARCH  TABLE OF CONTENTS

Institution: SOUTHERN METHODIST LIBRARY UNDERWOOD LAW LIBRARY ||
Sign In as Member/Non-member || Contact Subscription Administrator at your institution || FAQ

Am J Psychiatry 156:1223-1229, August 1999
© 1999 American Psychiatric Association

**Regular Article**

# Posttraumatic Stress Disorder in Abused and Neglected Children Grown Up

Cathy Spatz Widom, Ph.D.

▸ Abstract of this Article
▸ Reprint (PDF) Version of this Article
▸ Similar articles found in:
  AJP Online
  PubMed
▸ PubMed Citation
▸ This Article has been cited by:
  other online articles
▸ Search Medline for articles by:
  Widom, C. S.
▸ Alert me when:
  new articles cite this article
▸ Download to Citation Manager

▸ Collections under which this article appears:
  **Posttraumatic Stress Disorder**
  **Child Abuse**

## ▸ ABSTRACT

▲ TOP
· ABSTRACT
▼ INTRODUCTION
▼ METHOD
▼ RESULTS
▼ DISCUSSION
▼ REFERENCES

**OBJECTIVE:** The purpose of this study was to describe the extent to which childhood abuse and neglect increase a person's risk for subsequent posttraumatic stress disorder (PTSD) and to determine whether the relationship to PTSD persists despite controls for family, individual, and lifestyle characteristics associated with both childhood victimization and PTSD. **METHOD:** Victims of substantiated child abuse and neglect from 1967 to 1971 in a Midwestern metropolitan county area were matched on the basis of age, race, sex, and approximate family socioeconomic class with a group of nonabused and nonneglected children and followed prospectively into young adulthood. Subjects (N=1,196) were located and administered a 2-hour interview that included the National Institute of Mental Health Diagnostic Interview Schedule to assess PTSD. **RESULTS:** Childhood victimization was associated with increased risk for lifetime and current PTSD. Slightly more than a third of the childhood victims of sexual abuse (37.5%), 32.7% of those physically abused, and 30.6% of victims of childhood neglect met DSM-III-R criteria for lifetime PTSD. The relationship between childhood victimization and number of PTSD symptoms persisted despite the introduction of covariates associated with risk for both. **CONCLUSIONS:** Victims of child abuse (sexual and physical) and neglect are at increased risk for developing PTSD, but childhood victimization is not a sufficient condition. Family, individual, and lifestyle variables also place individuals at risk and contribute to the symptoms of PTSD.

## ▸ INTRODUCTION

▲ TOP
▲ ABSTRACT

An increasing literature has implicated childhood victimization (particularly

physical and sexual abuse) in the etiology of posttraumatic stress disorder (PTSD) (1–3). Studies of physically or sexually abused children have also reported high rates of PTSD (4–7).

- INTRODUCTION
▼ METHOD
▼ RESULTS
▼ DISCUSSION
▼ REFERENCES

At present, three general types of empirical studies relate childhood trauma to PTSD: 1) relatively short-term assessments of clinically referred, in treatment, or psychiatrically hospitalized sexually or physically abused children; 2) studies of adult survivors (victims) or adults with PTSD; and 3) cross-sectional studies reporting the extent of PTSD in community samples of adolescents or adults that retrospectively obtain information about prior childhood victimization. Most studies focus on the impact of sexual abuse (8–11) and often involve female hospital patients (12, 13). It is of interest that not all studies report significant relationships between childhood victimization and PTSD (14–16).

Besides the obvious explanation that childhood victimization experiences represent the traumas from which posttraumatic stress symptoms develop, there are other possible explanations for the relationship between childhood maltreatment and PTSD. For example, one question is whether child abuse and neglect represent part of a constellation of disadvantage and dysfunctional behaviors that are pathogenic. Since much childhood victimization occurs in the context of multiproblem homes, child abuse and neglect may be only one of the family's problems. Childhood abuse and neglect may be markers for other factors that have an impact on the developing child or may share with PTSD a common origin in a disrupted and disorganized childhood. Thus, the general effects of other family variables (such as poverty, parental alcoholism or drug problems, or other inadequate social and family functioning) need to be disentangled from specific sequelae associated with childhood abuse or neglect (17).

A second concern is that previous research has suggested that abused and neglected children are at increased risk for early behavior problems and conduct disorder (18–20). Behavior problems in childhood or adolescence may be associated with increased risk for engaging in risky behaviors. In turn, such behaviors may lead to increased risk of exposure to traumatic events and to subsequent PTSD (21).

A third possibility is that childhood victimization may be associated with PTSD through its effect on a person's lifestyle, which places the person more or less at risk for exposure to traumatic events and, ultimately, PTSD. For example, Breslau et al. (22) have identified a set of risk factors for PTSD, such as low levels of education and extroversion, that serve to expose individuals to social roles and environments associated with high risk for victimization.

The present examination of PTSD is part of a prospective study of the long-term consequences of early childhood victimization (23, 24) that used documented and substantiated cases. Thus, it offers an opportunity to determine whether PTSD is one of the sequelae of early childhood maltreatment (physical and sexual abuse and neglect). This article presents findings from a cohorts design study in which abused and neglected children were followed up into adulthood and compared to a matched group. The aims of this study were threefold: 1) to determine whether individuals who experienced abuse and/or neglect as young children are more likely to be diagnosed with PTSD as adults than individuals in a matched comparison group, 2) to examine the prevalence of exposure to specific types of traumatic events, and 3) to determine the extent to which the linkage between childhood abuse and neglect and

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 336 of 535   PageID 14223

PTSD is a function of other risk factors often associated with childhood victimization. Since family, individual child, and lifestyle risk factors have been associated with increased risk for PTSD, the purpose of the third goal is to test the hypothesis that the relationship between childhood victimization and PTSD will persist even when the contributions of family, individual child, and lifestyle risk factors are controlled.

# ▶ METHOD

▲ TOP
▲ ABSTRACT
▲ INTRODUCTION
· METHOD
▼ RESULTS
▼ DISCUSSION
▼ REFERENCES

## Subjects
The data for the present article are from a large research project based on a prospective cohorts design study (25, 26). Abused and/or neglected children were matched with nonvictimized children and followed prospectively into young adulthood. The prospective nature of this study allows some issues of causality to be examined and helps to disentangle the effects of childhood victimization from other potentially confounding effects. Because of the matching procedure, the subjects are assumed to differ in the risk factor (that is, having experienced childhood sexual or physical abuse and/or neglect). Since it is not possible to randomly assign subjects to groups (and obviously, this could not be done), the assumption of equivalency for the groups is an approximation. For complete details of the study design and subject selection criteria, see Widom (27).

In the first phase of this research, a large group of children who were abused and/or neglected approximately 20 years earlier were followed up through an examination of official criminal records and compared with a matched group of children (28). The abused and/or neglected group was composed of victims of substantiated childhood physical and sexual abuse and/or neglect whose cases were processed during the years 1967 through 1971 in the county juvenile or adult criminal court (situated in a metropolitan area in the Midwest). These are cases of early child abuse and/or neglect, restricted to children who were 11 years of age or less at the time of the abuse or neglect incident.

Physical abuse cases included injuries such as bruises, welts, burns, abrasions, lacerations, wounds, cuts, bone and skull fractures, and other evidence of physical injury. Sexual abuse cases varied from those involving relatively nonspecific charges of "assault and battery with intent to gratify sexual desires" to more specific ones of "fondling or touching in an obscene manner," sodomy, incest, and so forth. Neglect cases reflected a judgment that the parents' deficiencies in child care were beyond those found acceptable by community and professional standards at the time. These cases represented extreme failure to provide adequate food, clothing, shelter, and medical attention to children.

A matched comparison group was established. Children who were under school age at the time of the abuse and/or neglect incident were matched with children of the same sex, race, date of birth (within 1 week), and hospital of birth through the use of county birth records. For children of school age, records of more than 100 elementary schools for the same time period were used to find matches with children of the same sex, race, date of birth (within 6 months), same class in same elementary school during the years 1967 through 1971, and home address. Overall, there were matches for 74% of the abused and

neglected children.

The second phase of the research involved the tracing, locating, and interviewing of the abused and/or neglected individuals (20 years after their childhood victimization) and comparison subjects. Two-hour follow-up interviews were conducted between 1989 and 1995. The interview consisted of a series of structured and semistructured questions and rating scales, measures of IQ and reading ability, and a psychiatric assessment.

Interviewers were blind to the purpose of the study, to the inclusion of an abused and/or neglected group, and to the participants' group membership. Similarly, the subjects were blind to the purpose of the study. Subjects were told that they had been selected to participate as part of a large group of individuals who grew up in the late 1960s and early 1970s. Subjects who participated signed a consent form acknowledging that they were participating voluntarily.

Of the original group of 1,575, 1,307 subjects (83%) have been located and 1,196 (76%) interviewed. Of the people not interviewed, 43 were deceased (before interview), eight were incapable of being interviewed, 268 were not found, and 60 refused to participate (a refusal rate of 3.8%). The findings reported here are based on 1,196 subjects (676 abused and/or neglected and 520 comparison subjects).

Comparison of the current follow-up group with the original group indicated no significant differences in terms of percent male, white, abused and/or neglected, poverty in childhood census tract, or mean current age. The interviewed group (follow-up group) was significantly more likely to have an official criminal arrest record than the original group of 1,575 (50% in the current group versus 45% in the original group; z=3.9, p<0.01). However, this is not surprising, since people with a criminal history are generally easier to find, in part because they have more "institutional footprints" to assist in locating them.

Approximately half the group (48.7%) were women, and about two-thirds (62.9%) were white. At the time of interview, the average age of the participants was 28.72 years (SD=3.84, range=18–40). There were no differences between the abused and neglected group and comparison subjects in terms of gender, race/ethnicity, or age. The average highest grade of school completed for the group was 11.47 (SD=2.19, range=5–26). The group is skewed toward the lower end of the socioeconomic spectrum. The median occupational level (29) for the group was semiskilled workers, and less than 7% were in levels 7–9 (managers through professionals).

## Diagnostic Assessment

The National Institute of Mental Health Diagnostic Interview Schedule (DIS) (30) was used to assess PTSD. The DIS section on PTSD begins with a question in which several typical PTSD events are mentioned and respondents are asked whether any of these events has ever happened to them. The description of traumatic events follows closely the DSM-III-R text and uses examples from that definition. A report of an event that does not fit the stressor definition (e.g., illness, divorce) is excluded from further inquiry, and the respondent is asked whether he or she has experienced another event of the sort described in the question. A respondent's report of a PTSD-type event is followed by questions

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 338 of 535   PageID 14225

about the occurrence of PTSD symptoms after the event. Up to three qualifying events are investigated as to their PTSD sequelae. "Lifetime" prevalence is the proportion of the group who ever experienced PTSD, and "current" refers to the proportion who experienced PTSD sometime within 12 months before the interview. An earlier version of the DIS PTSD module was reported to have acceptable reliability (31) and construct validity (32). In a group of psychiatric inpatient veterans, Breslau and Davis (31) reported fairly strong interjudge agreement (laypersons and psychiatrists) for subjects who did and did not receive diagnoses of PTSD.

### Statistical Analyses

Categorical variables were tested for significance with chi-square analyses and, when appropriate, Fisher's exact tests. Odds ratios (and 95% confidence intervals [CIs]) are reported for univariate analyses. Logistic regression is an appropriate statistical technique for examining the effects of a predictor variable on a dichotomous dependent variable (e.g., PTSD diagnosis). Ordinary least squares regression analysis was used to estimate the adjusted risk for the number of lifetime PTSD symptoms; family, individual child, and lifestyle risk factors were controlled. The number of subjects varied slightly in each analysis because of missing data. Statistical significance was set at 0.05.

# ▶  RESULTS

### Childhood Abuse and Neglect and PTSD

Lifetime and current prevalence rates for DSM-III-R PTSD are presented in Table 1 for the abused and neglected group as a whole, separately for individuals who experienced physical abuse, sexual abuse, or neglect, and for comparison subjects. As a group, significantly more of those who had been abused or

▲ TOP
▲ ABSTRACT
▲ INTRODUCTION
▲ METHOD
· RESULTS
▼ DISCUSSION
▼ REFERENCES

neglected in childhood met the criteria for lifetime and current PTSD than those in the comparison group. The odds of an abused and neglected child developing PTSD were 1.75 times higher than the odds for a matched comparison subject. Increased risk for lifetime PTSD was also manifest for subjects who experienced the three specific types of abuse and neglect: any physical abuse (odds ratio=1.90), any sexual abuse (odds ratio=2.34), and any neglect (odds ratio=1.72). (Since abused and neglected children may have experienced more than one form of abuse or neglect, these categories are not mutually exclusive, and the numbers reflecting the individual types of abuse and neglect do not add up to the total number of abused and neglected children.) As adults, abused and neglected children are also at increased risk for current PTSD. For the purposes of this article, however, subsequent results are reported for lifetime PTSD only.

View this table:   TABLE 1
[in this window]
[in a new window]

### Exposure to Traumatic Events

These results have shown that childhood victimization increases a person's risk for PTSD. A critical

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 339 of 535   PageID 14226

question is whether the qualifying event that was the basis for the development of PTSD was the original documented case of child abuse or neglect or a subsequent event or events. Table 2 displays the prevalence of exposure to specific types of traumatic events. Of the people who reported exposure to any traumatic event, 55.7% (N=397) reported one event, 26.2% (N=187) reported two events, and 18.1% (N=129) reported three events. Of these, almost half the abused and neglected children (48.9%, N=211) reported exposure to two or more qualifying events, in contrast to 37.3% (N=105) of the comparison subjects. Victims of childhood sexual abuse (74.0%, N=71) and physical abuse (71.8%, N=79) reported the highest rates of exposure to traumatic events, although neglected children also reported significantly higher rates of exposure (62.8%, N=341) than comparison subjects (54.0%, N=281). Overall, the most common traumatic events were seeing someone hurt or killed (16.6%, N=198), physical assault (12.6%, N=151), and rape (12.0%, N=143). However, the distribution of exposure to traumatic events differed for childhood victims and comparison subjects and across types of childhood victimization. It is of interest that victims of all three specific types of abuse (physical and sexual abuse and neglect) reported significantly higher lifetime exposure to rape than comparison subjects.

**View this table:** TABLE 2
[in this window]
[in a new window]

Table 2 does not show the extent of qualifying events that were reported to occur in childhood (that is, during the period in which these abuse and neglect cases were processed and documented); however, these analyses were performed, and details are available from the author. Briefly, only 36.4% (N=40) of those physically abused and 35.4% (N=34) of those sexually abused reported a qualifying event in childhood (before age 13), in contrast to less than a quarter of the neglected children (22.7%, N=123) and 10.4% (N=54) of the comparison subjects. The most frequent traumatic event reported to have occurred before age 13 was rape, and this was reported by 9.0% (N=61) of the abuse and neglect group overall, 20.8% (N=20) of those sexually abused, 15.5% (N=17) of those physically abused, and 7.6% (N=41) of those neglected, in contrast to less than 1.9% (N=10) of the comparison subjects.

**Factors Associated With Childhood Victimization**
Abused and neglected children may also be at increased risk for PTSD because of factors other than exposure to childhood victimization, since abuse and/or neglect in childhood is often associated with increased risk for family, individual child, and lifestyle risk factors. Indeed, abused and neglected children were significantly more likely to come from families with problems (having parents who had been arrested [odds ratio=2.4] or had alcohol or drug problems [odds ratio=2.3]), families who had received welfare during the subject's childhood (odds ratio=2.7), or large families (five or more children; odds ratio=2.2). Childhood victims were also more likely to have had early behavior problems (odds ratio=1.9) and to engage in lifestyles characterized by marital disruption (separated, divorced, or widowed; odds ratio=1.8), low levels of education (less than a college degree; odds ratio=4.7), and substance abuse problems (DSM-III-R diagnosis of either alcohol or drug abuse/dependence; odds ratio=1.3). Further analyses revealed that these family, individual, and lifestyle factors were also

Case 3:13-cv-01535-L  Document 17-116  Filed 08/21/14  Page 340 of 535  PageID 14227

independently associated with increased risk for PTSD. Interactions between childhood victimization and each factor were tested; none was significant in predicting PTSD.

**Adjustment of Risk for PTSD**

To begin to disentangle the effects of childhood victimization from these other characteristics, the next set of analyses focused on the extent to which the association between childhood victimization and PTSD might be due to the effects of family, individual child, or lifestyle characteristics. Here, the effect of childhood victimization (abuse/neglect) as a predictor of PTSD was assessed; the other factors were controlled. The critical prediction is that if there is an independent effect of childhood victimization, then childhood abuse/neglect should remain a significant predictor of PTSD symptoms despite the introduction of covariates. Two types of analyses were undertaken: a logistic regression predicting lifetime PTSD diagnosis and an ordinary least squares regression predicting the number of lifetime PTSD symptoms.

The first part of Table 3 shows the adjusted risk of child abuse and neglect as a predictor of lifetime PTSD diagnosis with eight covariates. It is striking that the significance of the childhood victimization variable disappears in this adjusted model (compare with Table 1). Significant predictors of lifetime PTSD diagnosis were behavior problems, marital disruption, and an alcohol/drug diagnosis. The variable of less than a college degree approached significance as a predictor but did not reach customary levels, suggesting that among these individuals, having a college degree may be important in lowering risk for PTSD.

**View this table:** TABLE 3
[in this window]
[in a new window]

The second set of results in Table 3 shows the effect of child abuse/neglect and the eight covariates on the number of PTSD symptoms. Overall, this model explains about 9% of the variation. In the ordinary least squares analysis predicting PTSD symptoms, childhood abuse/neglect remained significant despite the introduction of family, individual child, and lifestyle risk factors. On average, in the adjusted model, abuse/neglect was associated with an increase of two PTSD symptoms, holding constant the other risk factors and control variables. The following five additional covariates were significant at the <0.05 level: having a parent who was arrested or had alcohol or drug problems, having early behavior problems, having experienced marital disruption (separated, divorced, or widowed), and having a DSM-III-R diagnosis of alcohol or drug abuse/dependence. These findings suggest that certain types of environments (having criminal parents) may be especially conducive to development of subsequent PTSD symptoms, perhaps through exposure to traumatic events (22). In contrast, these results indicate that growing up in homes characterized by poverty (parents receiving welfare payments) or in a large family does not appear to be associated with increased risk for PTSD.

One final ordinary least squares regression was performed by using the specific types of childhood

victimization (any physical abuse, any sexual abuse, and any neglect) plus the eight covariates to predict the number of lifetime PTSD symptoms. Sexual abuse remained highly significant ($p < 0.001$) in predicting PTSD symptoms, whereas physical abuse ($p = 0.05$) and neglect ($p = 0.07$) were only marginally significant.

# ▶  DISCUSSION

This prospective cohorts design study has documented a significant increase in risk for PTSD for abused and neglected children who were followed up into young adulthood, in contrast to a matched comparison group. The increase in risk for PTSD was found not only in physically abused or sexually abused children, but also in those neglected. Furthermore, childhood experiences of abuse and

▲ TOP
▲ ABSTRACT
▲ INTRODUCTION
▲ METHOD
▲ RESULTS
• DISCUSSION
▼ REFERENCES

neglect also contributed independently to a person's risk of PTSD, even when known risk factors were controlled. Unexpectedly, childhood abuse/neglect did not remain significant in the adjusted equations predicting PTSD diagnosis, whereas childhood victimization remained significant in predicting the number of PTSD symptoms. No simple explanation presents itself for these provocative findings, except that the continuous measure of PTSD symptoms provided a more fine-grained and sensitive analysis of these relationships than the dichotomous measure (diagnosis). However, one implication of these findings is whether it would be of value to reconsider the threshold for making a diagnosis of PTSD.

Abused and neglected children often come from multiple-problem families, and these results reinforce the need to begin to disentangle consequences specifically associated with childhood victimization from other risk factors. Other forms of family dysfunction (33, 34), environmental vulnerability through exposure to events and people (22), and genetic vulnerability (35) may contribute substantially to increased risk for PTSD.

These findings are consistent with some previous studies. For example, Boney-McCoy and Finkelhor (36) found increased PTSD-related symptoms in abused adolescents, even after control for parent-child relationships. Boney-McCoy and Finkelhor found that prior psychopathology related to the emergence of PTSD but not parent-child relationship problems. It is of interest that the current results indicate that childhood behavior problems (an indicator of prior psychopathology) were a significant and robust risk factor for the development of PTSD (both diagnosis and symptoms).

One especially noteworthy finding was that neglected children were also at increased risk for PTSD. Perhaps because their injuries are not as immediately apparent as in physical or sexual abuse, neglected children may be overlooked in the provision of mental health treatment services. However, neglected children represent the largest component of official cases of child maltreatment confronting our child protective service systems today (37). Assuming that these trends continue, neglected children will also represent a substantial group of individuals manifesting PTSD in the future. Given that neglected children are also at increased risk for violent criminal behavior (24, 28), multiple pathways to PTSD are likely and warrant further investigation.

The findings in the current study indicate that about one-third of abused and neglected individuals in the group identified a traumatic (qualifying) event from childhood. Thus, another important issue is the extent to which these individuals developed PTSD subsequent to the original event (childhood abuse/neglect) or to later trauma. Although this is clearly an important question, it cannot be answered fully here, since it requires data that are not available at present. The PTSD assessment used here (DIS) asked about up to three qualifying events and did not specifically ask respondents to recollect as far back as early childhood. For many of the abused and neglected individuals in this group, the present results most likely do not represent a complete trauma history but, rather, lower-bound estimates of PTSD. Future research is planned to address this limitation.

An obvious (but intentional) omission from this article is discussion of potential gender differences in the relationship between childhood victimization and PTSD. Since examination of gender differences in consequences of childhood victimization is complicated by gender differences in the distribution of types of childhood victimization experiences and types of psychopathology and psychiatric diagnoses (38), future research will examine gender and type of childhood victimization in relation to risk for traumatic events and for the development of PTSD. Studies have also shown that sexual abuse, perhaps more than other forms of childhood trauma, leads to dissociative problems (39). The role of intervening dissociation in the later emergence of PTSD will be examined as well.

Finally, these PTSD findings represent only part of the picture of the long-term psychiatric sequelae associated with early childhood victimization. Several articles from this project have described consequences of antisocial personality disorder (23), alcohol abuse (40), and other forms of psychopathology (41). Future work will examine the extent of comorbidity of psychiatric disorders in these abused and neglected children and comparison subjects, including an analysis of the temporal ordering of the symptoms of the disorders. Abused and neglected children appear to be at risk to develop multiple problems (39), and it is possible that other disorders, such as antisocial personality disorder, are associated with increased likelihood of PTSD (21, 22, 39, 42, 43).

## ▶ FOOTNOTES

Received Aug. 21, 1997; revision received Sept. 28, 1998; accepted Feb. 8, 1999. From The University at Albany. Address reprint requests to Dr. Widom, School of Criminal Justice, The University at Albany, 135 Western Ave., Albany, NY 12222 Supported by grants from NIMH (MH-49467) and the National Institute of Justice (86-IJ-CX-0033 and 89-IJ-CX-0007). The author thanks Patricia Glynn, Peter Lambert, and Barbara Luntz Weiler for statistical assistance and Chris Brewin, Ronald Kessler, Susan Solomon, and Susan Roth for comments on earlier drafts of this article. Points of view are those of the author and do not necessarily represent the position of the U.S. Department of Justice.

## ▶ REFERENCES

▲ TOP

1. Deblinger E, McLeer SV, Atkins MS, Ralphe D, Foa E: Post-traumatic stress in sexually abused, physically abused, and nonabused children. Child Abuse Negl 1989; 13:403–408[Medline]
2. Kiser LJ, Heston J, Millsap PA, Pruitt DB: Physical and sexual abuse in childhood: relationship with post-traumatic stress disorder. J Am Acad Child Adolesc Psychiatry 1991; 30:776–783[Medline]
3. Rowan AB, Foy DW: Post-traumatic stress disorder in child sexual abuse survivors: a literature review. J Trauma Stress 1993; 6:3–20
4. Adam BS, Everett BL, O'Neal E: PTSD in physically and sexually abused psychiatrically hospitalized children. Child Psychiatry Hum Dev 1992; 23:3–8[Medline]
5. Famularo R, Kinscherff R, Fenton T: Psychiatric diagnoses of maltreated children: preliminary findings. J Am Acad Child Adolesc Psychiatry 1992; 31:863–867[Medline]
6. Kinzie JD, Sack W, Angell R, Clarke G, Roth B: A three-year follow-up of Cambodian young people traumatized as children. J Am Acad Child Adolesc Psychiatry 1989; 28:501–504[Medline]
7. Merry SN, Andrews LK: Psychiatric status of sexually abused children 12 months after disclosure of abuse. J Am Acad Child Adolesc Psychiatry 1994; 33:939–944[Medline]
8. Kendall-Tackett KA, Williams LM, Finkelhor DJ: The impact of sexual abuse on children: a review and synthesis of recent empirical studies. Psychol Bull 1993; 113:164–180[Medline]
9. McLeer SV, Deblinger EB, Henry D, Orvaschel H: Sexually abused children at high risk for post-traumatic stress disorder. J Am Acad Child Adolesc Psychiatry 1992; 31:875–879[Medline]
10. McLeer SV, Callaghan M, Henry D, Wallen J: Psychiatric disorders in sexually abused children. J Am Acad Child Adolesc Psychiatry 1994; 33:313–319[Medline]
11. Rowan AB, Foy DW, Rodriguez N, Ryan S: Posttraumatic stress disorder in a clinical sample of adults sexually abused as children. Child Abuse Negl 1994; 18:51–61[Medline]
12. Craine LS, Henson CE, Colliver JA, MacLean DG: Prevalence of a history of sexual abuse among female psychiatric patients in a state hospital system. Hosp Community Psychiatry 1988; 39:300–304[Medline]
13. Gregg GR, Parks ED: Selected Minnesota Multiphasic Personality Inventory-2 scales for identifying women with a history of sexual abuse. J Nerv Ment Dis 1995; 183:53–56[Medline]
14. Hillary BE, Schare ML: Sexually and physically abused adolescents: an empirical search for PTSD. J Clin Psychol 1993; 49:161–165[Medline]
15. Livingston R, Lawson L, Jones JG: Predictors of self-reported psychopathology in children abused repeatedly by a parent. J Am Acad Child Adolesc Psychiatry 1993; 32:948–953[Medline]
16. Pelcovitz D, Kaplan S, Goldenberg B, Mandel F, Lehane J, Guarrera J: Post-traumatic stress disorder in physically abused adolescents. J Am Acad Child Adolesc Psychiatry 1994; 33:305–312[Medline]
17. Widom CS: Does violence beget violence? a critical examination of the literature. Psychol Bull 1989; 106:3–28[Medline]
18. Friedrich WH, Luecke WJ: Young school-age sexually aggressive children. Professional Psychol Res Practice 1988; 19:155–164
19. Graybill D, MacKie DJ, House AE: Aggression in college students who were abused as children. J College Student Personnel 1985; 26:492–495
20. Kolko DJ, Moser JT, Weldy SR: Medical/health histories and physical evaluation of physically and sexually abused child psychiatric patients: a controlled study. J Family Violence 1990; 5:249–267
21. Helzer JE, Robins LN, McEvoy LT: Post-traumatic stress disorder in the general population. N Engl J Med 1987; 317:1630–1634[Abstract]
22. Breslau N, Davis GC, Andreski P, Peterson, E: Traumatic events and posttraumatic stress in an urban population of young adults. Arch Gen Psychiatry 1991; 48:216–222[Medline]
23. Luntz BK, Widom CS: Antisocial personality disorder in abused and neglected children grown up. Am J Psychiatry 1994; 151:670–674[Abstract]

- ABSTRACT
- INTRODUCTION
- METHOD
- RESULTS
- DISCUSSION
- REFERENCES

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 344 of 535   PageID 14231

24. Maxfield MG, Widom CS: The cycle of violence: revisited six years later. Arch Pediatr Adolesc Med 1996; 150:390–395[Medline]

25. Leventhal JM: Research strategies and methodologic standards in studies of risk factors for child abuse. Child Abuse Negl 1982; 6:113–123[Medline]

26. Schulsinger F, Mednick SA, Knop J: Longitudinal Research: Methods and Uses in Behavioral Sciences. Boston, Martinus Nijhoff, 1981

27. Widom CS: Child abuse, neglect and adult behavior: research design and findings on criminality, violence, and child abuse. Am J Orthopsychiatry 1989; 59:355–367[Medline]

28. Widom CS: The cycle of violence. Science 1989; 244:160–166[Medline]

29. Hollingshead AB: Four-Factor Index of Social Status. New Haven, Conn, Yale University, Department of Sociology, 1975

30. Robins LN, Helzer JE, Cottler L, Golding E: National Institute of Mental Health Diagnostic Interview Schedule, version III, revised. St Louis, Washington University, Department of Psychiatry, 1989

31. Breslau N, Davis GC: Posttraumatic stress disorder: the etiologic specificity of wartime stressors. Am J Psychiatry 1987; 144:578–583[Abstract]

32. Sutker PB, Uddo-Crane M, Allain ANJ: Clinical and research assessment of posttraumatic stress disorder: a conceptual overview. Psychol Assess 1991; 3:520–530

33. Briere J: Controlling for family variables in abuse effects research. J Interpersonal Violence 1988; 3:80–89

34. Mullen PE, Martin JL, Anderson JC, Romans SE, Herbison PE: Childhood sexual abuse and mental health in adult life. Br J Psychiatry 1993; 163:721–732[Abstract]

35. Yehuda R, McFarlane AC: Conflict between current knowledge about posttraumatic stress disorder and its original conceptual basis. Am J Psychiatry 1995; 152:1705–1713[Abstract]

36. Boney-McCoy S, Finkelhor D: Is youth victimization related to trauma symptoms and depression after controlling for prior symptoms and family relationships? a longitudinal, prospective study. J Consult Clin Psychol 1996; 64:1406–1416[Medline]

37. Wiese D, Daro D: Current Trends in Child Abuse Reporting and Fatalities: The Results of the 1994 Annual Fifty State Survey. Chicago, National Committee for the Prevention of Child Abuse, 1995

38. Widom CS: Understanding the consequences of childhood victimization, in The Treatment of Child Abuse. Edited by Reece RM. Baltimore, Johns Hopkins University Press (in press)

39. Putnam FW Jr: Dissociation as a response to extreme trauma, in The Childhood Antecedents of Multiple Personality. Edited by Kluft RP. Washington, DC, American Psychiatric Press, 1985, pp 65–97

40. Widom CS, Ireland TO, Glynn PG: Alcohol abuse in abused and neglected children followed-up: are they at increased risk? J Stud Alcohol 1995; 56:207–217[Medline]

41. Widom CS: Childhood victimization: early adversity and subsequent psychopathology, in Adversity, Stress, and Psychopathology. Edited by Dohrenwend BP. New York, Oxford University Press, 1998, pp 81–95

42. Kessler RC, Sonnega A, Bromet E, Hughes M, Nelson CB: Posttraumatic stress disorder in the National Comorbidity Survey. Arch Gen Psychiatry 1995; 52:1048–1060[Medline]

43. Keane TM, Wolfe J: Comorbidity in post-traumatic stress disorder: an analysis of community and clinical studies. J Appl Soc Psychol 1990; 20:1776–1788

# This article has been cited by other articles:

> ▸ Abstract of this Article
> ▸ **Reprint (PDF) Version of this Article**
> ▸ Similar articles found in:
>   AJP Online
>   PubMed

- Estes, L. S, Tidwell, R. (2002). Sexually abused

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 345 of 535   PageID 14232

children's behaviours: impact of gender and mother's experience of intra- and extra-familial sexual abuse. *Fam. Pract.* 19: 36-44 [Abstract] [Full Text]

- (1999). Childhood Influences on Adult PTSD. *Journal Watch of Psychiatry* 1999: 5-5 [Full Text]
- Dubowitz, H., Black, M. M., Kerr, M. A., Hussey, J. M., Morrel, T. M., Everson, M. D., Starr Jr, R. H. (2001). Type and Timing of Mothers' Victimization: Effects on Mothers and Children. *Pediatrics* 107: 728-735 [Abstract] [Full Text]
- (2000). Other articles noted. *Evid Based Nurs* 3: 106-112 [Full Text]
- (2000). OTHER ARTICLES NOTED. *Evid Based Ment Health* 3: 8-8 [Full Text]

▸ PubMed Citation
▸ This Article has been cited by:
▸ Search Medline for articles by:
   Widom, C. S.
▸ Alert me when:
   new articles cite this article
▸ Download to Citation Manager

▸ Collections under which this article appears:
  **Posttraumatic Stress Disorder**
  **Child Abuse**

HOME   HELP   FEEDBACK   SUBSCRIPTIONS   ALL ISSUES   SEARCH   TABLE OF CONTENTS

# EXHIBIT
# 12

THE AMERICAN JOURNAL
OF PSYCHIATRY



HOME  HELP  FEEDBACK  SUBSCRIPTIONS  ALL ISSUES  SEARCH  TABLE OF CONTENTS

**Institution: SOUTHERN METHODIST LIBRARY UNDERWOOD LAW LIBRARY ||**
Sign In as Member/Non-member || Contact Subscription Administrator at your institution || **FAQ**

Am J Psychiatry 155:1746-1752, December 1998
©Copyright 1998 American Psychiatric Association

**Regular Article**

# Major Depression in Individuals With a History of Childhood Physical or Sexual Abuse: Relationship to Neurovegetative Features, Mania, and Gender

**Robert D. Levitan, M.D., Sagar V. Parjkh, M.D.,
Alain D. Lesage, M.D., Kathleen M. Hegadoren, Ph.D.,
Martha Adams, M.D., Sidney H. Kennedy, M.D., and
Paula N. Goering, Ph.D.**

- ▸ Abstract of this Article
- ▸ **Reprint (PDF) Version of this Article**
- ▸ Similar articles found in:
    - AJP Online
    - PubMed
- ▸ **PubMed Citation**
- ▸ This Article has been cited by:
    - other online articles
- ▸ Search Medline for articles by:
    - Levitan, R. D. || Goering, P. N.
- ▸ Alert me when:
    - new articles cite this article
- ▸ Download to Citation Manager

▸ Collections under which this article appears:
    **Bipolar Disorder**
    **Depression**
    **Child Abuse**

▸ # ABSTRACT

- ▲ **TOP**
- • **ABSTRACT**
- ▼ **INTRODUCTION**
- ▼ **METHOD**
- ▼ **RESULTS**
- ▼ **DISCUSSION**
- ▼ **APPENDIX 1. Physical and...**
- ▼ **REFERENCES**

**Objective:** Numerous studies have linked childhood trauma with depressive symptoms over the life span. However, it is not known whether particular neurovegetative symptom clusters or affective disorders are more closely linked with early abuse than are others. In a large community sample from Ontario, the authors examined whether a history of physical or sexual abuse in childhood was associated with particular neurovegetative symptom clusters of depression, with mania, or with both. **Method:** The World Health Organization Composite International Diagnostic Interview was used to assess 8,116 individuals aged 15–64 years. Each subject was asked about early physical and sexual abuse experiences on a structured supplement to the interview. Six hundred fifty-three cases of major depression were identified. Rates of physical and sexual abuse in depressive subgroups defined by typical and reversed neurovegetative symptom clusters (i.e., decreased appetite, weight loss, and insomnia versus increased appetite, weight gain, and hypersomnia, respectively) and by the presence or absence of lifetime mania were compared by gender. **Results:** A history of physical or sexual abuse in childhood was associated with major depression with reversed neurovegetative features, whether or not manic subjects were included in the analysis. A strong relationship between mania and childhood physical abuse was found. Across analyses there was a significant main effect of female gender on risk of early sexual abuse; however, none of the group-by-gender interactions predicted early abuse. **Conclusions:** These results suggest an association between early traumatic experiences and particular symptom clusters of

depression, mania, or both in adults. **Am J Psychiatry 1998; 155: 1746-1752**

# ▶   INTRODUCTION

Major depression is a significant health problem with very high
prevalence rates, high rates of chronicity, and substantial morbidity and
mortality (1–5). Research on the etiology of depression is hampered by
the heterogeneous nature of this disorder. The myriad of research
approaches used to study depression has also been problematic, with a
tendency to separate psychosocial/life events research from biological
research. The development of models that link life experiences, neurodevelopment, and
psychopathology (6, 7) has been a major step forward in this regard.

▲ TOP
▲ ABSTRACT
· INTRODUCTION
▼ METHOD
▼ RESULTS
▼ DISCUSSION
▼ APPENDIX 1. Physical and...
▼ REFERENCES

To further assess and refine etiological models of mood disorders that integrate life events and
neurodevelopment, it would be important to examine whether particular experiences in early
development lead to unique expressions of psychopathology over the life span. While there is now a
large body of evidence that childhood physical and sexual abuse are significant risk factors for
depression in all age groups (8–24), it is not known whether particular symptom clusters or subtypes of
depression are more closely linked with early abuse than are others. It might be that early trauma
produces adaptive changes in the CNS in a way that promotes some but not all depressive subtypes.
Given the heterogeneity of major depression, linking early trauma to particular expressions of this
disorder would be a substantial step forward, helping to refine our theoretical understanding of how
psychosocial stress might be translated into affective disturbance, helping to identify high-risk
individuals, and thus improving our ability to treat depression over time.

The overall goal of the current project was to use a large community epidemiological study to explore
whether childhood physical and/or sexual abuse is associated with particular symptom clusters of major
depression, with mania, or with both in individuals aged 15–64 years. We chose to focus on
neurovegetative symptoms related to eating behavior and sleep and on manic depression, as there is
considerable evidence that these dimensions have theoretical and clinical relevance and may reflect
unique biological processes based on epidemiology, course of illness, and treatment response (25dash;27
and DSM-IV). The particular depressive subgroups we examined were defined by typical
neurovegetative symptoms (decreased appetite, weight loss, insomnia) or reversed neurovegetative
symptoms (increased appetite, weight gain, hypersomnia) and by the presence or absence of lifetime
mania. The specific questions we sought to examine were as follows. 1) Is childhood physical and/or
sexual abuse associated with a particular neurovegetative pattern, or patterns, of depression in later
years? 2) Does having one or more lifetime episodes of depression with typical features predict a history
of childhood abuse? 3) Does having one or more lifetime episodes of depression with reversed features
predict a history of childhood abuse? 4) Is bipolar depression associated with childhood abuse?

On the basis of the higher prevalence rates of depression in females (28) and the different patterns of
both depression and early abuse in females compared with males (28,29), gender was used as a grouping

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 349 of 535   PageID 14236

variable throughout the study.

# ▶ METHOD

This study was a secondary analysis of data from the Mental Health
Supplement to the Ontario Health Survey, a community survey of 9,953
residents of Ontario, Canada, conducted in 1990–1991. This
supplement was designed to assess the prevalence of major psychiatric
disorders and associated risk factors, health care utilization, and
disability. A stratified, multistage sampling design was used (30). The

▲ TOP
▲ ABSTRACT
▲ INTRODUCTION
• METHOD
▼ RESULTS
▼ DISCUSSION
▼ APPENDIX 1. Physical and...
▼ REFERENCES

province was divided into a number of enumeration areas, and households were sampled from each area.
One individual, aged 15 years or older, was randomly selected from each household to be the
respondent. Individuals living in institutions or on native reserves were excluded. A response rate of
76.5% was achieved. Because subjects over the age of 64 were administered a shortened version of the
original questionnaire, they were not included in the current study. The overall sample from which our
subjects were identified thus included 8,116 respondents aged 15–64 years.

Because this was a project funded by the provincial government and implemented by Statistics Canada
(equivalent to the U.S. Census Bureau), standard provincial and federal procedures were followed for
informing participants about the study. Before interviewer contact, an official letter was sent to each
prospective respondent that described the nature of the project, the fact that participation was voluntary,
and the federal legislation which protected confidentiality.

The Mental Health Supplement questionnaire has a number of components, including a diagnostic
instrument, a series of measures to assess disability, a set of questions to measure service utilization, and
basic demographic information. Individuals were interviewed face-to-face for 1–2 hours by specially
trained lay interviewers. The diagnostic instrument we used, the World Health Organization Composite
International Diagnostic Interview, is a structured interview based on the National Institute of Mental
Health Diagnostic Interview Schedule and the Present State Examination and has good reliability and
validity (31). The version used here, the UM-Composite International Diagnostic Interview, had been
modified and further field tested (32). Major diagnoses surveyed included anxiety disorders, affective
disorders, eating disorders, psychotic disorders, substance abuse, and antisocial personality disorder,
according to the DSM-III-R criteria. The Composite International Diagnostic Interview systematically
records the symptoms of each potential disorder, and both current and lifetime diagnoses are delineated.

Childhood abuse was assessed with the use of a self-report questionnaire developed specifically for the
Mental Health Supplement (29). The questionnaire consisted of seven questions related to physical
abuse and four related to sexual abuse (appendix 1). The sexual abuse questions were derived from the
National Population Survey, a Canadian survey on sexual abuse described elsewhere (33). During the
administration of the Composite International Diagnostic Interview, respondents were asked to complete
the self-report questionnaire and place it in a sealed envelope coded with only an identification number
for confidentiality.

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 350 of 535   PageID 14237

**Analysis**

Only subjects in the 15- to 64-year age range who met the criteria for current or lifetime major depression were included in the current analysis. As an initial step to examine possible associations between neurovegetative patterns of depression and childhood abuse, each depressed subject was assigned to one of four neurovegetative groups as follows (34).

1. Subjects in the typical-symptom group positively endorsed each of the three items "decreased appetite," "weight loss," and "insomnia (initial, middle, or late)" on the Composite International Diagnostic Interview section for major depression (current or lifetime).

2. Subjects in the reversed-symptom group positively endorsed each of the three items "increased appetite," "weight gain," and "hypersomnia" on the Composite International Diagnostic Interview section for major depression (current or lifetime).

3. Subjects in the neither-symptom group had major depressive episodes, current or lifetime, but did not meet the criteria for either the typical- or the reversed-symptom group.

4. Subjects in the fluctuating-symptom group experienced both typical and reversed major depressive episodes over time and met the criteria for both the typical- and reversed-symptom groups.

The rationale for including four as opposed to two depressive subgroups based on neurovegetative symptoms was our recent finding that in this community sample, many of the differences across these four groups were due to the unique characteristics of the neither-symptom and fluctuating-symptom groups (34). The fluctuating-symptom group accounted for one-third of all individuals with a lifetime history of depression with reversed features and had particularly high levels of mania, panic attacks, substance abuse, bulimia, antisocial features, and health care utilization, consistent with a high degree of mood dysregulation and overall psychopathology in this group. The neither-symptom group was the largest of the four groups and had the lowest rate of serious psychopathology.

To limit the number of independent variables in the analysis, the item asking whether the subject had ever been slapped or spanked was eliminated on the basis of extremely high positive endorsement rates in all identified subgroups. The item asking whether the subject had ever been choked, burned, or scalded was endorsed extremely rarely and was excluded on this basis. This left five physical abuse and four sexual abuse variables for subsequent analyses. For the five physical abuse variables, each item was scored 3 (often) to 0 (never), and a physical abuse total score of 0–15 was calculated by summing the scores across the five items. The sexual abuse items were dichotomized into responses of yes (score=1) or no (score=0) on the questionnaire itself, creating a sexual abuse total score ranging from 0 to 4 for a given subject. For each analysis, when incomplete data made it impossible to assign a group for a given subject, the subject's data were removed from this step. This led to some differences in sample sizes across analyses.

**Statistical Procedures**

To assess possible associations between subtypes of depression and childhood abuse experiences, the four key study questions were analyzed as described below. For each question, two main analyses were completed, one in which the physical abuse total scores were used as the dependent variable and another

in which the sexual abuse total scores were used. Gender was used as a grouping variable for all analyses.

1. Do the four depressive subgroups, as defined by neurovegetative symptoms, exhibit different rates of childhood physical and/or sexual abuse? Subjects in each of the four neurovegetative subgroups of depression were compared by using a 4 (neurovegetative group) by 2 (gender) analysis of variance (ANOVA). Post hoc tests were done by using Tukey's test of honestly significant difference.

2. Does having one or more episodes of depression with typical features over the lifetime predict a history of childhood abuse? Subjects in the typical-symptom and fluctuating-symptom groups were combined (group with typical episodes) and compared with individuals in the reversed-symptom and neither-symptom groups combined (group without typical episodes) by means of a 2 (group) by 2 (gender) ANOVA.

3. Does having one or more episodes of depression with reversed features over the lifetime predict a history of childhood abuse? Subjects in the reversed-symptom and fluctuating-symptom groups were combined (group with reversed episodes) and compared with individuals in the typical-symptom and neither-symptom groups combined (group without reversed episodes) by means of a 2 (group) by 2 (gender) ANOVA.

4. Is bipolar depression associated with early abuse? For this step, subjects were designated as with or without mania (current or lifetime) and compared by means of a 2 (group) by 2 (gender) ANOVA; the four neurovegetative groups were not differentiated at this step.

To correct for multiple comparisons, the level of significance for all analyses was set at $p < 0.01$.

▶ **RESULTS**

**Patient Characteristics**

Of the total sample of 8,116 individuals, 653 (8.0%) met the criteria for major depression, current or lifetime. With respect to neurovegetative subgroups, 346 (53.0%) were classified as having neither typical nor reversed symptoms, 195 (29.9%) as having typical symptoms only, 74 (11.3%) as having reversed symptoms only, and 38 (5.8%) as having

▲ TOP
▲ ABSTRACT
▲ INTRODUCTION
▲ METHOD
· RESULTS
▼ DISCUSSION
▼ APPENDIX 1. Physical and...
▼ REFERENCES

both types of symptoms (fluctuating) (34). Table 1 summarizes the demographic characteristics of the four neurovegetative subgroups by gender. The only significant difference across the neurovegetative subgroups was in the marital status of female subjects. A detailed summary of the characteristics of each of the four subgroups with respect to demographics, comorbidity, disability, and health care utilization, is available in a previous report (34).

Case 3:13-cv-01535-L  Document 17-116  Filed 08/21/14  Page 352 of 535  PageID 14239

**View this table:**   TABLE 1
  [in this window]
  [in a new window]


Sixty-three subjects with a history of depression also met the criteria for an episode of mania, 562 did not, and 28 had incomplete or missing data for this section of the Composite International Diagnostic Interview.

**Early Abuse and Neurovegetative Patterns of Depression**
On question 1 (table 2), for physical abuse, the main effect of neurovegetative group was significant, while the main effect of gender and the group-by-gender interaction were nonsignificant. Post hoc tests comparing the individual groups revealed significant differences between the reversed-symptom and neither-symptom groups and between the fluctuating-symptom and neither-symptom groups. For sexual abuse, there was a significant main effect of female gender.


**View this table:**   TABLE 2
  [in this window]
  [in a new window]


On question 2 regarding typical depressive episodes (table 3), for both physical abuse and sexual abuse, the main effect of group and the group-by-gender interaction were nonsignificant. There was a significant main effect of female gender for sexual abuse.


**View this table:**   TABLE 3
  [in this window]
  [in a new window]


On question 3 regarding reversed depressive episodes (table 4), a significant main effect of group was found for both physical and sexual abuse; the data indicate higher abuse scores among individuals with a history of a reversed-symptom depressive episode. There was a main effect of female gender for sexual abuse. Both of the group-by-gender interactions were nonsignificant.


**View this table:**  TABLE 4
  [in this window]
  [in a new window]


**Early Abuse in Bipolar Depression**
On question 4 (table 5), for physical abuse, the results indicate a strong main effect of group, but not of

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 353 of 535   PageID 14240

gender, suggesting that individuals with a lifetime history of major depression and mania have a significantly greater rate of childhood physical abuse than do other depressed subjects. The interaction of group and gender was nonsignificant. For sexual abuse, the main effect of female gender was significant.

View this table:   TABLE 5
[in this window]
[in a new window]

### Early Abuse in Nonmanic Depression With Reversed Features

To extend the results described above, we decided to add a fifth question post hoc, i.e., when only depressed subjects without a history of a manic episode are considered, is having one or more episodes of depression with reversed features associated with childhood abuse? We hoped to remove the data of subjects with probable anergic bipolar depression (35) in this analysis, creating a more homogeneous "nonmanic" group with reversed features.

With respect to physical abuse, a strong main effect of group was once again found (F=15.74, df=1, 534, p<0.001), indicating that depression with reversed features is associated with early traumatic experiences independent of lifetime mania. For sexual abuse, removal of manic patients' data accentuated the differences between the groups with and without reversed-symptom episodes (F=15.72, df=1, 526, p<0.001) despite the decrease in sample size. The main effect of female gender was significant for sexual abuse (F=20.21, df=1, 526, p<0.001); the group-by-gender interactions were nonsignificant.

## ▶ DISCUSSION

▲ TOP
▲ ABSTRACT
▲ INTRODUCTION
▲ METHOD
▲ RESULTS
• DISCUSSION
▼ APPENDIX 1. Physical and...
▼ REFERENCES

The current study is the first to assess the relationship between childhood abuse and particular expressions of major depression in later years. We found that for both men and women, having a childhood history of either physical or sexual abuse was associated with a higher risk of depressive episodes with reversed neurovegetative features, whether or not individuals with mania were considered. A strong relationship between mania and childhood physical abuse was also found. These are novel findings and suggest a potential focus for future work on the transduction of early stress into affective disturbances over the life span. Clinically, the current findings validate the subtyping of depression based on symptom profiles and help to identify a subgroup of individuals who are more likely to require a multifaceted treatment approach. The results may also help explain why many depressed patients with reversed symptoms have a particularly chronic course (27, 36–38). Given the personal and societal costs of affective disorders (1–5), these results emphasize the need for early identification and intervention for children and adolescents at high risk for abuse.

Case 3:13-cv-01535-L  Document 17-116  Filed 08/21/14  Page 354 of 535  PageID 14241

### Reversed Neurovegetative Features of Depression and Early Trauma

The most striking finding in this study was a strong relationship between early traumatic experiences and depression with reversed neurovegetative features. This finding was not simply attributable to reversed symptoms in the context of manic depression, since removal of data on manic subjects actually accentuated this association. This finding was also not solely attributable to severity of psychopathology, since having an episode of typical depressive symptoms was not associated with increased rates of abuse, even in comparison with the neither-symptom group; typical symptoms of depression are generally associated with a high degree of psychiatric morbidity (27).

Understanding the long-term vulnerability factors that promote depression over the life span is a high priority for both researchers and clinicians. Models of affective disorders that link stressful life experiences, neurodevelopment, and psychopathology (6, 7) have been a major step forward in this regard. The current findings, by linking a set of early experiences to particular expressions of psychopathology in later years, provide at least preliminary support for such models. Prior research showing that depression with reversed features had an early age at onset (37–42) and frequent exacerbations (27, 36–38) is also highly congruent with these models.

Why might early trauma predispose more to reversed neurovegetative symptoms than to other expressions of depression? While it is premature to speculate pending further research, there is a large body of work with animals indicating that early experience can have a profound effect on the development and expression of neurobiological systems and the behaviors they mediate (43–46). This work may extend to human psychiatric populations, including individuals with a history of child abuse (47). More research is needed to explore the possible links between early trauma, particular biological and/or psychological markers, and the clinical expression of depression over the life span.

### Manic Depression and Early Trauma

In trying to understand the nature of the relationship between early trauma and manic depression in particular, a number of sociological and pathophysiological issues must be considered. In families with one or more parents with bipolar disorder, one must consider the combined effects of genetic loading for psychopathology and the likelihood of abuse based on parental illness and/or a disruptive family environment. In light of recent reports of very high comorbidity rates for attention deficit disorder with hyperactivity and adolescent mania (25, 48–51), one possible interpretation of the current data is that many children who later develop bipolar disorder act in an impulsive manner that could promote harsh discipline and physical abuse from caregivers (52, 53). It is possible that early trauma is associated with exaggerated cycles of high and low arousal that contribute to mood instability over time by permanently changing brain physiology (6, 54–56). Whatever the direction of causality linking physical abuse to mania, the current results strongly support the need for early identification and intervention in this high-risk group.

### Limitations of the Study

A number of methodological limitations merit consideration. While our use of a community-based sample may have helped avoid the bias inherent in clinic-based research, all of the information gathered was based on retrospective reporting, a potential problem for lifetime diagnoses and for the disclosure of

Case 3:13-cv-01535-L  Document 17-116  Filed 08/21/14  Page 355 of 535  PageID 14242

information regarding abuse. However, a recent review by Rutter and Maughan (57) suggests that retrospective self-reports regarding abuse are more likely to be biased toward underreporting than exaggeration.

The choice of diagnostic instrument may be problematic. Of particular relevance to the current study, the Composite International Diagnostic Interview is limited by its failure to diagnose either bipolar II disorder or cyclothymia. If many individuals with reversed neurovegetative symptoms do in fact fall into this "soft bipolar" subcategory (58), the current data would likely underestimate the link between early trauma and bipolar-spectrum mood disorders.

Notwithstanding these potential limitations, the current project is the first to link early abusive experiences to particular neurovegetative symptoms of depression and/or mania in adults. Much work is needed to replicate these findings and to work out the developmental pathways that connect early traumatic experiences to particular symptom patterns over time. In future work in this area, it will be important to consider intervening variables, such as social class and support systems, and whether particular types of abuse lead to unique expressions of depression.

At a clinical level, our data emphasize the importance of routine inquiry regarding early trauma and specific neurovegetative symptom clusters in the assessment of depressive illness. This approach may help clinicians identify patients more likely to require multimodal treatment strategies and thus help decrease the morbidity associated with mood disorders over the life span.

# APPENDIX 1. Physical and Sexual Abuse Items on the Self-Report Questionnaire Addendum to the Ontario Health Survey

When you were growing up, how often did any adult do *any* of the things on this list to you?

Pushed, grabbed, or shoved you

Threw something at you

Slapped or spanked you

Kicked, bit, or punched you

Hit you with something

Choked, burned, or scalded you

Physically attacked you in some other way

▲ TOP
▲ ABSTRACT
▲ INTRODUCTION
▲ METHOD
▲ RESULTS
▲ DISCUSSION
• APPENDIX 1. Physical and...
▼ REFERENCES

When you were growing up, did any adult ever do any of these things to you against your will?

Exposed themselves to you more than once

Threatened to have sex with you

Touched the sex parts of your body

Tried to have sex with you or sexually attacked you

Answer: often, sometimes, rarely, or never.

Answer: yes or no.

## ▶ FOOTNOTES

Received Sept. 9, 1997; revisions received April 8 and May 28, 1998; accepted June 26, 1998. From the Clarke Division of the Centre for Addiction and Mental Health and the Department of Psychiatry, University of Toronto; and the Centre de Recherche Fernand-Seguin, Hôpital Louis-H. Lafontaine, Department of Psychiatry, University of Montreal. Address reprint requests to Dr. Levitan, Clarke Division of CAMH, Room 1135, 250 College St., Toronto, Ont., Canada M5T 1R8.

## ▶ REFERENCES

▲ TOP
▲ ABSTRACT
▲ INTRODUCTION
▲ METHOD
▲ RESULTS
▲ DISCUSSION
▲ APPENDIX 1. Physical and...
• REFERENCES

1. Regier DA, Boyd JH, Burke JD Jr, Rae DS, Myers JK, Kramer M, Robins LN, George LK, Karno M, Locke BZ: One-month prevalence of mental disorders in the United States: based on five Epidemiologic Catchment Area sites. Arch Gen Psychiatry 1988; 45:977–986[Medline]
2. Wells KB, Stewart A, Hays RD, Burnam MA, Rogers W, Daniels M, Berry S, Greenfield S, Ware J: The functioning and well-being of depressed patients: results from the Medical Outcomes Study. JAMA 1989; 262:914–919[Medline]
3. Fawcett J, Scheftner W, Clark D, Hedeker D, Gibbons R, Coryell W: Clinical predictors of suicide in patients with major affective disorders: a controlled prospective study. Am J Psychiatry 1987; 144:35–40[Abstract]
4. Klerman GL, Weissman MM: The course, morbidity, and costs of depression. Arch Gen Psychiatry 1992; 49:831–834[Medline]
5. Keller MB, Lavori PW, Mueller TI, Endicott J, Coryell W, Hirschfeld RMA, Shea MT: Time to recovery, chronicity, and levels of psychopathology in major depression: a five-year prospective follow-up of 431 subjects. Arch Gen Psychiatry 1992; 49:809–816[Medline]
6. Post RM: Transduction of psychosocial stress into the neurobiology of recurrent affective disorder. Am J Psychiatry 1992; 149:999–1010[Abstract]
7. Duman RS, Heninger, GR, Nestler EJ: A molecular and cellular theory of depression. Arch Gen Psychiatry 1997; 54:597–606[Medline]

Case 3:13-cv-01535-L Document 17-116 Filed 08/21/14 Page 357 of 535 PageID #4244

8. Green A: Core affective disturbance in abused children. J Am Acad Psychoanal 1981; 9:435–446 [Medline]

9. Kazdin AE, Moser J, Colbus D, Bell R: Depressive symptoms among physically abused and psychiatrically disturbed children. J Abnorm Psychol 1985; 94:298–307[Medline]

10. Browne A, Finkelhor D: Impact of child sexual abuse: a review of the research. Psychol Bull 1986; 99:66–77[Medline]

11. Allen DM, Tarnowski KJ: Depressive characteristics of physically abused children. J Abnorm Child Psychol 1989; 17:1–11[Medline]

12. Briere JN: Child Abuse Trauma. London, Sage Publications, 1992, pp 17–78

13. Rosenthal PA, Rosenthal S: Suicidal behavior by preschool children. Am J Psychiatry 1984; 141:520–525[Abstract]

14. Kashani JH, Carlson GA: Seriously depressed preschoolers. Am J Psychiatry 1987; 144:348–350 [Abstract]

15. Sedney MA, Brooks B: Factors associated with a history of childhood sexual experience in a non-clinical female population. J Am Acad Psychiatry 1984; 23:215–218

16. Bryer JB, Nelson BA, Miller JB, Krol PA: Childhood sexual and physical abuse as factors in adult psychiatric illness. Am J Psychiatry 1987; 144:1426–1430[Abstract]

17. Mullen PE, Romans-Clarkson SE, Walton VA, Herbison CP: Impact of sexual and physical abuse on women's mental health. Lancet 1988; 1:841–845[Medline]

18. Brown BE, Garrison CJ: Patterns of symptomatology of adult women incest survivors. West J Nurs Res 1990; 12:587–600[Medline]

19. Bifulco A, Brown GW, Adler Z: Early sexual abuse and clinical depression in adult life. Br J Psychiatry 1991; 159:115–122[Abstract]

20. Brown GR, Anderson B: Psychiatric morbidity in adult inpatients with childhood histories of sexual and physical abuse. Am J Psychiatry 1991; 148:55–61[Abstract]

21. Pribor EF, Dinwiddie SH: Psychiatric correlates of incest in childhood. Am J Psychiatry 1992; 149:52–56[Abstract]

22. Glod CA: Long-term consequences of childhood physical and sexual abuse: Arch Psychiatr Nurs 1993; 7:163–173[Medline]

23. Hall LA, Sachs B, Rayens MK, Lutenbacher M: Childhood physical and sexual abuse: their relationship with depressive symptoms in adulthood. Image 1993; 25:317–323

24. Boudewyn AC, Liem JH: Childhood sexual abuse as a precursor to depression and self-destructive behavior in adulthood. J Trauma Stress 1995; 8:445–459[Medline]

25. Winokur G, Coryell W, Endicott J, Akiskal H: Further distinctions between manic-depressive illness (bipolar disorder) and primary depressive disorder (unipolar depression). Am J Psychiatry 1993; 150:1176–1181[Abstract]

26. Quitkin FM, Stewart JW, McGrath PJ, Liebowitz MR, Harrison WM, Tricamo E, Klein DF, Rabkin JG, Markowitz JS, Wager SG: Phenelzine versus imipramine in the treatment of probable atypical depression: defining symptom boundaries of selective MAOI responders. Am J Psychiatry 1988; 145:306–311[Abstract]

27. Kendler KS, Eaves LJ, Walters EE, Neale MC, Heath AC, Kessler RC: The identification and validation of distinct depressive syndromes in a population-based sample of female twins. Arch Gen Psychiatry 1996; 53:391–399[Medline]

28. Weissman MM, Klerman GL: Sex differences and the epidemiology of depression. Arch Gen Psychiatry 1977; 34:98–111[Medline]

29. MacMillan HL, Fleming JE, Trocme N, Boyle MH, Wong M, Racine YA, Beardslee WR, Offord DR: Prevalence of child physical and sexual abuse in the community. JAMA 1997; 275:131–135

30. Boyle MH, Offord DR, Campbell D, Catlin G, Goering P, Lin E, Racine YA: Mental Health Supplement to the Ontario Health Survey: methodology. Can J Psychiatry 1996; 41:549–558 [Medline]

31. Wittchen H-U: Reliability and validity studies of the WHO Composite International Diagnostic

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 358 of 535   PageID 14245

Interview (CIDI): a critical review. J Psychiatr Res 1994; 28:57–84[Medline]

32. Kessler RC, McGonagle KA, Zhao S, Nelson CB, Hughes M, Eshleman S, Wittchen H-U, Kendler KS: Lifetime and 12-month prevalence of DSM-III-R psychiatric disorders in the United States: results from the National Comorbidity Survey. Arch Gen Psychiatry 1994; 51:8–19 [Medline]

33. Bagley C: Prevalence and correlates of unwanted sexual acts in childhood in a national Canadian sample. Can J Public Health 1989; 80:295–296[Medline]

34. Levitan RD, Lesage A, Parikh SV, Goering P, Kennedy SH: Reversed neurovegetative symptoms of depression: a community study of Ontario. Am J Psychiatry 1997; 154:934–940[Abstract]

35. Thase ME, Himmelhoch JM, Mallinger AG, Jarrett DB, Kupfer DJ: Sleep EEG and DST findings in anergic bipolar depression. Am J Psychiatry 1989; 146:329–333[Abstract]

36. Asnis GM, McGinn LK, Sanderson WC: Atypical depression: clinical aspects and noradrenergic function. Am J Psychiatry 1995; 152:31–36[Abstract]

37. Davidson J, Zisook S, Giller E, Helms M: Symptoms of interpersonal sensitivity in depression. Compr Psychiatry 1989; 30:357–368[Medline]

38. Stewart JW, McGrath PJ, Rabkin JG, Quitkin FM: Atypical depression: a valid clinical entity? Psychiatr Clin North Am 1993; 16:479–495[Medline]

39. Klein DF, Gittelman R, Quitkin FM, Rifkin A: Diagnosis and Drug Treatment of Psychiatric Disorders: Adults and Children. Baltimore, Williams & Wilkins, 1980, pp 243–246

40. Davidson JRT, Miller RD, Turnbull CD, Sullivan JL: Atypical depression. Arch Gen Psychiatry 1982; 39:527–534[Medline]

41. Horwath E, Johnson J, Weissman MM, Hornig CD: The validity of major depression with atypical features based on a community sample. J Affect Disord 1992; 26:117–126[Medline]

42. Pollitt J, Young J: Anxiety or masked depression? a study based on the action of monoamine oxidase inhibitors. Br J Psychiatry 1971; 119:143–149[Medline]

43. McKinney WT Jr, Suomi SJ, Harlow HF: Depression in primates. Am J Psychiatry 1971; 127:1313–1320[Medline]

44. Post RM, Weiss SR: Emergent properties of neural systems: how focal molecular neurobiological alterations can affect behavior. Development and Psychopathology 1997; 9:907–929[Medline]

45. Liu D, Diorio J, Tannenbaum B, Caldji C, Francis D, Freedman A, Sharma S, Pearson D, Plotsky PM, Meaney MJ: Maternal care, hippocampal glucocorticoid receptors, and hypothalamic-pituitary-adrenal responses to stress. Science 1997; 277:1659–1662[Abstract/Full Text]

46. Zaharia MD, Kulczycki J, Shanks N, Meaney MJ, Anisman H: The effects of early post-natal stimulation on Morris water-maze acquisition in adult mice: genetic and maternal factors. Psychopharmacology (Berl) 1996; 128:227–239[Medline]

47. Stein MB, Yehuda R, Koverola C, Hanna C: Enhanced dexamethasone suppression of plasma cortisol in adult women traumatized by childhood sexual abuse. Biol Psychiatry 1997; 42:680–686[Medline]

48. Strober M, Morrell W, Burroughs J, Lampert C, Danforth H, Freeman R: A family study of bipolar I disorder in adolescence: early onset of symptoms linked to increased familial loading and lithium resistance. J Affect Disord 1988; 15:255–268[Medline]

49. West SA, McElroy SL, Strakowski SM, Keck PE Jr, McConville BJ: Attention deficit hyperactivity disorder in adolescent mania. Am J Psychiatry 1995; 152:271–273[Abstract]

50. Wozniak J, Biederman J, Kiely K, Ablon JS, Faraone SV, Mundy E, Mennin D: Mania-like symptoms suggestive of childhood-onset bipolar disorder in clinically referred children. J Am Acad Child Adolesc Psychiatry 1995; 34:867–876[Medline]

51. Wozniak J, Biederman J, Mundy E, Mennin D, Faraone SV: A pilot family study of childhood-onset mania. J Am Acad Child Adolesc Psychiatry 1995; 34:1577–1583[Medline]

52. Friedrich WN, Boriskin JA: The role of the child in abuse: a review of the literature. Am J Orthopsychiatry 1976; 46:580–590[Medline]

53. Engfer A, Schneewind KA: Causes and consequences of harsh parental punishment: an empirical

Cynthia Lowery
Brad Keeler
DP Paper – Randy Halperin
May 5, 2002

## I. Introduction

The focus of this paper is on Randy Halperin's life prior to his adoption at age five. We met with Randy twice, once to obtain his perspective on his life prior adoption, and once to explain to him our findings. When we met with Randy, he informed us of some of the things that had happened to him since last semester's students met with him. For example, Randy has come into contact with his biological mother, Annie Lester. He and Ms. Lester have corresponded via mail for approximately the last few months. Ms. Lester is currently married and is domiciled in Argyle, Texas. However, Ms. Lester resides at a drug rehabilitation center in Euless, Texas called the American Indian Center. Her parole officer's name is Beverly Ennis.

After a recollection of the facts of Randy's life prior to his adoption at age five, this paper will discuss what further research is needed. Finally, this paper will include a brief discussion of the research done on the behavioral and mental status of abused children as they grow into adulthood. There is also a list of contact information including all relevant addresses and phone numbers for persons contacted in connection with this paper.

## II. Randy's Facts

Randy is not sure of where his family resided during all of his young years but is sure that his brother, Wesley, was born in Denton and that the family lived there at that time and afterwards until the boys were adopted.

1

Randy remembers some aspects of abuse as a child.  He remembers his biological father, whose full name is Bob Randall Whitfield, abusing him frequently.  For example, Randy remembers being pushed out of a window by his father and Randy remembers an incident with a glass baby bottle.  This incident with the baby bottle caused the scar on Randy's right wrist.  During this time, Randy also remembers being left alone at a laundry mat for what seemed like a long time.  However, he did not recall the exact length of time he was there alone.

After Wesley's birth, Bob Randall Whitfield and Annie Lester (at that time her last name was Whitfield) separated and divorced.  Randy remembers his mother moving in with a guy named Jimbo.  Jimbo was also extremely violent.  For example, Randy remembers Jimbo pushing him down the stairs at their home.  Randy also remembers that Jimbo often physically abused Randy's biological mother.  One time during this rash of abuse, Randy threw a block at Jimbo and sprayed Jimbo with bug spray.

After Randy was removed from his mother's care, he recalled living in two foster homes but could not recall the names of the families whose care he was entrusted to.  Randy did remember that the second foster home was in Dallas and that, while living there, he visited a Dallas elementary school.

### III. Annie Lester's Facts

As you can see, Randy, understandably, has limited memory regarding his life prior to adoption.  Therefore, we contacted Ms. Lester at the American Indian Center.  Ms. Lester agreed to meet with us and we went to visit her there.  While she currently resides at the Center, Ms. Lester is employed at the local Whataburger and is planning on being released to return home to Argyle, Texas during the month of April.

2

Ms. Lester's maiden name is Hammons.  She has been married at least twice, once to Mr. Whitfield and once to her current husband.  Ms. Lester was contacted in June of 2001 by an investigator for the district attorney's office named KD Adley.  This was how she came to realize that she was Randy Halperin's mother and, subsequently, she contacted Randy.

Ms. Lester attempted to recall some of the events from Randy's childhood.  She stated however, that while she was married to Randy's biological father, Bob Randall Whitfield, she worked and Mr. Whitfield stayed at home with Randy.  At that time, Ms. Lester claims that she was clean from drugs and alcohol.  After Mr. Whitfield and Ms. Lester divorced, they had joint custody of the kids.  We got the impression however that this custody arrangement was not based on a formal court order but was more by agreement between the parties.  Ms. Lester said that while their custody was joint, Mr. Whitfield took care of the kids more than she did.

Ms. Lester did not speak of any abuse of Randy on her part.  However, she recalled the following specific circumstances with respect to abuse by Mr. Whitfield:  1) When Randy was 9 months old, he was left in a dark room during the day while Ms. Lester worked.  He had bruises all over his body when Ms. Lester found him, 2) Randy was often beaten and burned with cigarettes, 3) When Randy was 1 year old, his grandparents on his father's side were visiting (Bob and Shirley Whitfield, deceased).  His grandfather threw him from the kitchen into the living room bouncing Randy off the wall, 4) When Randy was 3, he and his father lived upstairs in an apartment building and Randy fell out of the window.  While Mr. Whitfield claimed Randy fell out of the

3

window, Ms. Lester said that Randy recalled that his father pushed him out of the window.

The family never lived in Collin County or in McKinney, Texas. Randy was born in a clinic in McKinney, Texas and was delivered by a physician by the name of Dr. Michaels. However, Randy and his biological parents did not reside in McKinney before or after his birth. They resided in Denton County, Texas at least until his adoption at age five. Randy's scar on his wrist was caused from a glass baby bottle but it was an accident and was not abuse. He fell and broke the bottle and cut his wrist. This injury required attention at the hospital which was, at that time, Westgate Hospital. The hospital is now called Denton Regional Medical Center. Randy got stitches for the cut.

Randy's injuries from the abuse were never serious enough to warrant medical attention but Wesley's were one time. Ms. Lester took Wesley to the Denton County Health Clinic and that is when CPS became involved with the children. Ms. Lester was also abused by the men. She recalled that Jimbo (whose name is Jim Willingham) threatened to kill her and once time shot a gun at her but the bullet hit the mattress next to her instead. Jim Willingham also abused Randy and when the case went to CPS, he threatened to kill Ms. Lester unless she lied and said she abused the kids.

Ms. Lester's brother and his wife had custody of both children for awhile. Their names are Johnny and Mary Hammons. The Hammons wanted to adopt the kids but they were in danger due to Jim Willingham's line of work. Jim Willingham was a dope dealer (Brad got the impression it was crystal methamphetamine). Mr. Willingham was killed while in prison for ratting out some dealer friends. These people were after Ms. Lester and the kids as well so Ms. Lester decided that she had to put the kids up for adoption to

4

an unknown family so that the kids would be safe.  The Halperins did not want Randy but Ms. Lester would not sign the adoption papers until they agreed to keep the boys together.

Ms. Lester was physically abused by both Bob Randall Whitfield and by Jim Willingham.  Ms. Lester said that, if necessary, she would be willing to testify on Randy's behalf.  She said she would do anything necessary to help Randy – she seems genuine in feeling guilty and bad for the treatment of Randy when he was a child in her care.  Ms. Lester knows that Mr. Whitfield has remarried but does not know his wife's name nor if they are still married.  However, she knows he lives in or near Argyle, Texas.

We spoke to Mr. and Mrs. Hammons during our research.  However, the Hammons felt somewhat conflicted about discussing Randy with us because they have a son who is a Denton County police officer.  However, Mrs. Hammons did tell us that her son saw Randy's biological father at a local Wal-Mart in Denton.  In addition, her son was contacted by Mr. Adley, the prosecutor's investigator.  Mr. Adley informed him that Bob Randall Whitfield currently resides in Roanoke, Texas.  However, we have not been able to find Mr. Whitfield there as of yet.  Mrs. Hammons did tell us that she never eye-witnessed any abuse of Randy or of Wesley and that she nor her husband knew of any abuse by Ms. Lester.

Finally, we spoke with the prosecutor's investigator, KD Adley.  Mr. Adley was not very forthcoming with any information about the case, as was expected.  However, Mr. Adley offered to contact Randy's biological father and give him our contact information so that Mr. Whitfield could contact us if he wished.  We have not heard from Mr. Whitfield as of yet.

## IV. What we need to do

1) Get the CPS files. We thought we might be able to get these but had no luck.

2) Get Gladney House files. We have contacted the Gladney House and are awaiting a

return call.

3) Get DA's pre-adoption files.

4) Get medical records from birth and from visit to Denton Regional Medical Center.

6) Talk to Bob Randall Whitfield.

7) Get police records on Jim Willingham and on Bob Randall Whitfield (may not exist

for Mr. Whitfield). We tried to find these using Denton County's web site and other

resources but had no luck.

## V. Contact Information

Gladney House Attorney
Heidi Cox
(817) 922-6043
Main Number (817) 922-5955


Wesley Halperin
(817) 571-8853


Denton Regional Medical Center Medical Records
(940) 384-3350


Collin County Health Care Services (in order to find doctor who delivered Randy)
825 N. McDonald Street
McKinney, Texas 75069
(972) 548-5500


K.D. Adley
District Attorney Investigator
(214) 653-3776

6

Annie Lester
P.O. Box 314
Argyle, Texas 76226
(940) 464-0033

American Indian Center
2219 Euless Blvd.
Euless, Texas 76040
(817) 545-9555 (front desk – cannot take messages for the person and cannot confirm or
deny if the person is a resident there)
(817) 283-9979 (pay phone – usually residents answer but they are pretty good about
getting messages to the other residents)

Bill Waybourn
Chief – Dalworthington Gardens
2600 Roosevelt Drive
Dalworthington Gardens, Texas 76016
(817) 274-7368

Beverly Ennis
Annie Lester's parole officer
(817) 831-3404

Johnny and Mary Hammons
(940) 387-9998

## VI. Research on Abused Children

Several studies have attempted to determine the effects of abuse on children as
they grow into young adults. According to the Federal Bureau of Investigations, twenty-
seven percent of violent crime occurs between family members and forty-eight percent of
violent crime occurs between acquaintances. It is speculated that a majority of this
violence occurs in the home where children may be the target or may be a witness.

There is substantial evidence in the world of child psychology that abused and
neglected children often grow up to have a host of psychological problems as a result of
the abuse when they were children. For example, there are various sources that explain

7

that often children who are abused later forget what has happened to them.  While this may be the result of some type of splitting of the psyche, it is more often than not, a result of the stunted growth of the mind and feelings about the abuse.

One author suggests that since the child's normal reactions to injury are stunted due to lack of parental response or a negative parental response, the child often associates abuse with normal behavior and does not recollect these events as being atrocious or even offensive.

However, this author points out that when the feelings of pain and anger are not allowed to be expressed during the action that causes the anger, children often later, as young adults, express these feelings in other destructive acts, including acts against other people as well as self-destructive acts.  In addition, it is often suggested that children who are abused are more likely to become child abusers when they are placed in the care-giving role later in their lives.

### VII. Attachments

The following research and documents are attached as exhibits to this paper for the reader's viewing:

**Exhibit 1:**    Fall 2001 DPP Students' Memorandum on the first five years of Randy Halperin's life.

**Exhibit 2:**    Denton criminal court records on Anna Marie Lester, Randy's biological mother.

8

**Exhibit 3:**     Denton probate court records on Anna Marie Lester.

**Exhibit 4:**     Denton jail records for Anna Marie Lester accompanied by a mug shot of Ms. Lester.

**Exhibit 5:**     Denton criminal court records for Bob Whitfield (searched this name – do not know if this is Randy's biological father).

**Exhibit 6:**     Denton civil court records for Bob Whitfield (searched this name – do not know if this is Randy's biological father).

**Exhibit 7:**     The Untouched Key, By Alice Miller.

**Exhibit 8:**     Violence and Childhood: How Persisting Fear Can Alter the Developing Child's Brain, By Bruce D. Perry, M.D., Ph.D.

**Exhibit 9:**     Relationships between Early Experiences and Long Term Functioning: The Role of Affect Development in Adjudicated Adolescent Males, By Maconda Brown O'Connor, Ph.D.; Duane Runyah, Ph.D; Gretchen Walter, MA, LPC; Jana Rubenstein, Med, LPC; and Bruce D. Perry, M.D., Ph.D.

9

**Exhibit 10:**   Memories of Childhood Abuse: Dissociation, Amnesia, and Corroboration, By James A. Chu, M.D.; Lisa M. Frey, Psy.D.; Barbara L. Ganzel, Ed.M., M.A., and Julia A. Matthews, Ph.D., M.D.

**Exhibit 11:**   Posttraumatic Stress Disorder in Abused and Neglected Children Grown Up, By Cathy Spatz Widom, Ph.D.

**Exhibit 12:**   Major Depression in Individuals With a History of Childhood Physical or Sexual Abuse: Relationship to Neurovegetative Features, Mania, and Gender, By Robert D. Leviathan, M.D.; Sagar V. Parikh, M.D.; Alain D. Lesage, M.D.; Kathleen M. Hegadoren, Ph.D.; Martha Adams, M.D.; Sidney H. Kennedy, M.D.; and Paula N. Goering, Ph.D.

**Exhibit 13:**   The Consequences of Child Maltreatment: A Reference Guide for Health Practitioners, By The National Clearinghouse on Family Violence for Canada.

**Exhibit 14:**   Child Abuse and Neglect, By The National Clearinghouse on Family Violence for Canada.

**Exhibit 15:**   The Role of Childhood Interpersonal Trauma in Depersonalization Disorder, By Daphne Simeon, M.D.; Orna Guralnik, Psy.D.; James Schmeidler, Ph.D.; Beth Sirof, M.A.; and Margaret Knutelska, M.A.

investigation in a representative sample of 570 German families. Child Abuse Negl 1982; 6:129–139[Medline]

54. Field T: Attachment as psychobiological attunement: being on the same wavelength, in Psychobiology of Attachment and Separation. Edited by Reite M, Field T. Orlando, Fla, Academic Press, 1985, pp 431–432

55. van der Kolk BA: The trauma spectrum: the interaction of biological and social events in the genesis of the trauma response. J Trauma Stress 1988; 1:272–290

56. Green AH: Child abuse, neglect and depression, in Depression in Children and Adolescents: Monographs in Clinical Pediatrics, vol 6. Edited by Koplewicz HS, Klass E. Philadelphia, Harwood Academic/Gordon and Breach, 1993, pp 55–62

57. Rutter M, Maughan B: Retrospective reporting of childhood adversity: issues in assessing long-term recall. J Personality Disorders 1997; 11:19–33[Medline]

58. Perugi G, Akiskal HS, Lattenzi L, Ceeconi C, Mastrocinque A, Patronelli S, Vignoli S, Bemi E: The high prevalence of "soft" bipolar (II) features in atypical depression. Compr Psychiatry 1998; 39:63–71[Medline]

## This article has been cited by other articles:

- Brodsky, B. S., Oquendo, M., Ellis, S. P., Haas, G. L., Malone, K. M., Mann, J. J. (2001). The Relationship of Childhood Abuse to Impulsivity and Suicidal Behavior in Adults With Major Depression. *Am. J. Psychiatry* 158: 1871-1877 [Abstract] [Full Text]
- Lysaker, P. H., Meyer, P. S., Evans, J. D., Clements, C. A., Marks, K. A. (2001). Childhood Sexual Trauma and Psychosocial Functioning in Adults With Schizophrenia. *PS* 52: 1485-1488 [Abstract] [Full Text]

▸ Abstract of this Article
▸ Reprint (PDF) Version of this Article
▸ Similar articles found in:
    AJP Online
    PubMed
▸ PubMed Citation
▸ This Article has been cited by:
▸ Search Medline for articles by:
    Levitan, R. D. || Goering, P. N.
▸ Alert me when:
    new articles cite this article
▸ Download to Citation Manager

▸ Collections under which this article appears:
    **Bipolar Disorder**
    **Depression**
    **Child Abuse**

# EXHIBIT
# 13

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 372 of 535   PageID 14259

  



# The Consequences of Child Maltreatment:
## A Reference Guide for Health Practitioners

**Home**

**Introduction**

**An Overview of Child Maltreatment**

**Consequences of Child Maltreatment**

**Reporting Issues for Health Practitioners**

**Conclusion**

**Notes**

**Bibliography**

**Appendix A: Additional Resources**

## Consequences of Child Maltreatment*

There is a tendency for people to view the effects of maltreatment as less serious if th[e] impact appears to be temporary and disappears in the course of a child's developmen[t] Browne and Finklehor (1986) make a strong argument against this perception of maltreatment.

> *Adult traumas such as rape are not assessed ultimately in terms of whether or not they will have an impact on old age. They are acknowledged to be painful and alarming events whether their impact lasts for one year or ten. Similarly, childhood trauma should not be dismissed because no long-term effects can be demonstrated... abuse needs to be recognized as a serious problem of childhoo[d] **if only for the immediate pain, confusion and upset that can ensue** (emphasis added; p. 22).*

Child maltreatment is not, however, a short-term crisis in a child's life. Although chi[ldren are] removed from violent homes or leave home to live on their own, the effects of experi[encing] abuse in their childhood follow them through life. Child maltreatment can affect all a[reas] of a child's life, including the following:

- Psychological
- Physical
- Behavioural
- Academic
- Sexual
- Interpersonal
- Self-perceptual
- Spiritual
- Subsequent Violence

---

*For simplicity, the consequences of physical, sexual and emotional abuse, neglect and witnessing fam[ily] violence will be presented together as one category.

## Psychological Consequences

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 373 of 535   PageID 14260

Child maltreatment may permanently alter the psychological well-being of a child. F
maltreatment, children are known to display the following problems:

- extreme and repetitive nightmares[20]

- anxiety[21]

- unusually high levels of anger and aggression[22]

- feelings of guilt and shame — for sexually abused victims this can be quite seve
  especially if the victim experienced some degree of pleasure during part of the

- sudden phobias, such as a fear of darkness or water[24]

- psychosomatic complaints, including stomach aches, headaches, hypochondria
  faecal soiling, bed wetting and excessive blinking[25]

- general fearfulness and a specific fear of others of the same gender as the abus

- depressive symptoms, long bouts of sadness, social withdrawal[27]

- self-reported social isolation and feelings of stigmatization.[28]

After continued exposure to maltreatment, children may develop further psychologic
complications:

- significant increase in rates of psychiatric disorders[29]

- dissociation, intrusive thoughts, suicidal ideation and more acute phobias[30]

- more serious levels of anxiety, fear, depression, loneliness, anger, hostility and

- distorted cognition, such as chronic perceptions of danger and confusion, illogi
  thinking, inaccurate images of the world, shattered assumptions about the worl
  difficulty determining what is real[32]

- decreased effectiveness in comprehending complex roles[33]

- difficulty in thinking through or resolving social problems.[34]

Despite the growing interest in the effects of child maltreatment, few studies have ex
the long-term psychological consequences in the general population. However, it is k
that adolescents and adults with a history of maltreatment are over-represented in the
population and that they tend to display more psychiatric problems in adulthood, sucl
*Traumatic Stress Disorder* and *Major Depression*.[35] Additionally, such specific psy
disorders as *Multiple Personality Disorder* and *Borderline Personality Disorder* have
linked to child maltreatment.[36]

## Physical Consequences

In addition to the obvious physical injuries, such as broken bones, bruises and scarrin maltreatment is also related to several additional physical complications for children, including the following:

- children who have suffered serious and chronic neglect are more likely to be sr and lighter than non-maltreated children, which has been shown to affect long-health[37]

- children who are physically abused (or shaken in the case of very young childr suffer permanent neurological damage, dramatically affecting their future development[38]

- weight problems – often emerging as eating disorders[39]

- serious sleep disturbances and bouts of dizziness when awake[40]

- other stress-related symptoms, such as gastrointestinal problems, migraine hea difficulty breathing, hypertension, aches, pains and rashes which defy diagnosi treatment[41]

- poor overall health.[42]

## Behavioural Consequences

Maltreated children are known to display the following behavioural problems:

- developmental delays[43]

- clinging behaviour, extreme shyness and fear of strangers[44]

- troubled socialization with peers – constant fighting or socially undesirable bel such as bullying, teasing or not sharing[45]

- poor school adjustment and disruptive classroom behaviour.[46]

There is a growing understanding among researchers that child maltreatment is assoc with a host of behavioural problems that manifest themselves in adolescence:

- school-age pregnancy[47]

- self-destructive behaviours such as self-mutilation or burning[48]

- truancy and running away behaviour[49]

- delinquency and prostitution[50]

- early use of drugs/alcohol and substance abuse/dependence[51]

- eating disorders, such as anorexia, bulimia or obesity – primarily among femal

victims[52]

- suicide and suicide attempts.[53]

Evidence suggests that many of these problems continue into adulthood and become ingrained patterns of behaviour. It is believed that in order to deal with the trauma of abused and neglected, children and youth develop such behaviours as coping strategi although these behaviours eventually become self-destructive, they are often extreme difficult to abandon. Additional behavioural difficulties may continue into adulthood

- increased aggression and violence[54]

- homelessness[55]

- criminal offending – crimes which are sexual in nature are often associated wit abuse while violent crimes are more often linked to physical abuse[56]

- chronic substance abuse/dependence.[57]

## Academic Consequences

One of the most destructive consequences of child maltreatment may be the detrimen effect on a child's school performance. Over and over again, research indicates that p maltreated children demonstrate reduced intellectual functioning and perform very p school. And poor school performance can have serious long-term consequences. Aca failure has been associated with antisocial behaviour and quitting school. These beha in turn increase the risk of long-term decreased productivity, long-term economic dependence and generally lower levels of satisfaction with life as adults.[58] Maltreate children may display the following:

- lower overall school performance test scores and lower language, reading and scores[59]

- grade repetitions, disciplinary referrals and a high number of suspensions[60]

- working and learning at below average levels (as reported by teachers)[61]

- weaker orientation to future vocational and educational goals compared to non maltreated children.[62]

It is understandable that maltreated children will perform poorly in school. Not only face the obvious complications associated with a violent home life, but neglectful anc abusive parents are less likely to provide an intellectually stimulating environment fo child, read to the child, supervise homework and generally become involved in their academic life.

## Sexual Consequences

In general, maltreatment adversely affects a child's concept of sexuality, reduces his

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 376 of 535   PageID 14263

ability to set appropriate boundaries and often instills a fear or negative perception of
While the majority of sexual consequences are the result of sexual abuse, other forms
maltreatment can also be sexually destructive. For example, a neglected child may se
sexual intimacy very early in life in order to fulfil an unmet need for parental intimac
creates a risk for teenage pregnancy or sexually transmitted diseases. The following a
major sexual consequences of maltreatment reported in the literature:

- engaging in open or excessive masturbation, excessive sexual curiosity and fre
  exposure of the genitals[63]

- simulated sexual acts with siblings and friends, inappropriate sexual behaviour
  breast or genital grabbing[64]

- premature sexual knowledge, sexualized kissing in friendships and with parent

In adolescence and adulthood, maltreated children continue to display sexually malac
behaviour:

- orgasmic disorders and painful intercourse[66]

- promiscuity[67]

- dissatisfaction with sex and negative attitudes about sex.[68]

These problems are often the result of introducing a sexual component into a parent-c
relationship which affected the child's sense of sexuality and intimacy. In essence, a
who has suffered sexual abuse can, as a result, have difficulty distinguishing between
sexual and a non-sexual relationship and therefore introduce a sexual element into all
relationships.

## Interpersonal Consequences

Child maltreatment can interfere with a person's ability to develop meaningful and
appropriate relationships from childhood through to adulthood. Abused and neglected
children are consistently rated by their peers as demonstrating socially undesirable
behaviour.[69] Children displaying multiple psychological and behavioural problems c
have a difficult time both developing and maintaining healthy relationships. Victimiz
reduces social competence and limits empathic ability, both of which are necessary to
establish satisfying relationships with others. Maltreated children have been known to
display the following interpersonal problems:

- insecure attachments to parents and caregivers[70]

- a loss of close friends[71]

- difficulty in trusting others[72]

- relationship problems, such as overly sexualized or overly conflicted relationsh

- chronic dissatisfaction with adult relationships and fear of intimacy.[74]

## Self-perceptual Consequences

Parental abuse undoubtedly affects the self-esteem of a child. A lack of interest in a c
violent attack on a child, for example, will likely lead the child to develop a sense of
unworthiness. Maltreatment has been associated with distorted or extremely negative
images starting in childhood and continuing throughout one's life. Maltreated childre
typically view themselves as bad, worthless or unlovable and may develop the follow
problems:

- extremely low levels of self-esteem[75]

- feelings of being "out of control"[76]

- inaccurate body images which often lead to eating disorders[77]

- overwhelming sense of guilt or self-blame for the abuse[78]

- impairment of a cohesive sense of identity[79]

- self-disgust, self-denigration, self-hatred.[80]

## Spiritual Consequences

Often, children who have been abused and neglected report having lost their sense of
not just a religious belief in a divine being, but also their faith in themselves, other p
and the world around them. It is common for maltreated children to display what som
authors have called a shattered soul or soul pain.[81] Moreover, adults who have exper
maltreatment display less interest and participation in organized religion. Systematic
battering, sexual abuse, emotional attacks or the long-term neglect of a child is likely
destroy his or her spirit or enthusiasm for life. While often overlooked in the literatur
shattered soul may prove to be an extremely significant long-term consequence of ch
maltreatment.

## Subsequent Violence

Victims of child maltreatment often become further victimized as adolescents and ad
and/or become violent themselves toward their own children and in intimate relations
According to studies on the intergenerational transmission of child maltreatment, one
all victims grow up to continue a pattern of seriously inept, neglectful or abusive chil
rearing as parents; one third do not; and one-third remain vulnerable to the effects of
maltreatment depending upon social stressors in their life.[82] Adults and adolescents
report a history of child maltreatment may demonstrate the following:

- maltreatment of their own children[83]

- a history of being a victim of a violent assault by a non-family member during
  adolescence[84]

- perpetrating dating violence in adolescence and/or spousal violence in adulthoo

- becoming a victim of an assaultive partner (most often a male abuser) and/or th of additional sexual assaults.[86]

## Generalized Consequences

While the consequences of maltreatment were discussed collectively, one can genera link between certain consequences and specific forms of maltreatment (Figure 3). It c be generalized that females tend to display more inward consequences, such as suicic ideation, eating disorders, low self-esteem and psychological disorders, while males t display more outward consequences, such as increased aggression, delinquency and s abuse.

**Figure 3.    Generalized Consequences and Forms of Maltreatment**



## Factors Influencing the Consequences of Maltreatment

It has been suggested that the severity of the consequences a child experiences as a re maltreatment are related, in part, to the following factors:

- the length of the abuse
- the severity of the abuse
- the relationship of the abuser to the victim.

Therefore, long-term severe abuse perpetrated by a parent tends to produce more detr effects than shorter-term, less severe abuse by a stranger. But, this is not always the c Studies have found high rates of emotional and behavioural problems in abused child

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 379 of 535   PageID 14266

when the abuse was characterized as "not serious enough" to warrant intervention by welfare authorities.[87] While maltreatment may be less severe, it is often endured ove period of time. The chronic and pervasive nature of this form of abuse may impact a development far more than the immediate visible harm. This would suggest that fami experiencing less severe maltreatment still require intervention.

> **Child maltreatment, regardless of the severity,
> can pose serious risks to the immediate and
> long-term physical, psychological and
> spiritual health of children.
> Indeed, in some instances, it can be life-threatening.**

## Family and Social Context

It is also often argued that the consequences of maltreatment are related more to the f and social context in which a child grows up than to the abuse itself. For example, re shows that a large proportion of maltreated children live in families experiencing pov is thought that the poverty, rather than the maltreatment, is more of a factor in the development of an abused child's problems. However, when controlling for such var maternal age, socioeconomic status and family type, a significant relationship still ex between maltreatment and serious consequences, such as aggression, school maladju attempted suicide, substance abuse and delinquency.[88]

## Resiliency

The potential consequences of child maltreatment are often overwhelming. It is rema that so many children are able to "recover" from chronic child abuse and neglect and maintain functional lives. This notion of child resiliency, whereby children from dist violent homes sometimes rise above adversity and develop effective coping skills and strategies, is often considered in the literature.[89] Introducing the term "resiliency" is intended to minimize the suffering of children, nor justify criticism of those who are resilient. However, the concept can have those unfortunate effects. Furthermore, as B and Finklehor (1986) argue, viewing the abuse of a child in terms of future consequel lead us to ignore the immediate pain and trauma a child experiences during the abuse while children may appear to be resilient, it is impossible to know the full potential o child. Their lives may appear to be functional, but we do not see what has been lost to abuse. We often miss the hidden effects – the silent emotional pain, the terror-filled nightmares or the sudden overwhelming fear of darkness.

> **What remains clear is that the effects
> of child maltreatment
> can last a lifetime and greatly diminish a child's
> chances for optimum achievement in life.**

---

[PREVIOUS]    [TOP]    [NEXT]






# The Consequences of Child Maltreatment:
## A Reference Guide for Health Practitioners

**Home**

**Introduction**

**An Overview of Child Maltreatment**

**Consequences of Child Maltreatment**

**Reporting Issues for Health Practitioners**

**Conclusion**

**Notes**

**Bibliography**

**Appendix A: Additional Resources**

## Bibliography

American Psychological Association. (1995). Twenty-four questions (and answers) about professional practice in the area of child abuse. *Professional Psychology: Research and Practice, 26,* 377-385.

Armitage, A. (1993). The policy and legislative context. In Wharf, B. (Ed.), *Rethinking Child Welfare*. Toronto: McClelland and Stewart, Inc.

Badgley, R. (1984). *Sexual offenses against children and youth*. Ottawa: Supply and Services Canada.

Bass, E., & Davis, L. (1988). *The courage to heal: A guide for women survivors of child sexual abuse*. New York: Harper.

Beck, K. A., & Olgoff, J. R. P. (1995). Child abuse reporting in British Columbia: Psychologists' knowledge of and compliance with the reporting law. *Professional Psychology: Research and Practice, 26,* 245-251.

Begin, P. (1996). *Child Abuse*. Ottawa: Political and Social Affairs Division, Research Branch, Library of Parliament.

Biesenthal, L., & Clement, J. (1992). *Canadian statistics on child sexual abuse*. Ottawa: Research and Statistics Directorate, Corporate Management, Policy and Programs Sector, Department of Justice.

Briere, J. (1989) *Therapy for adults molested as children: Beyond survival*. New York: Springer.

Brodeur, A. E., & Monteleone, J. A. (1994). *Child maltreatment: A clinical guide and reference*. St. Louis: GW Medical Publishing Inc.

Browne, A., & Finkelhor, D. (1986). Impact of child sexual abuse: A review of the research. Ottawa: Minister of Supply and Services.

(Reprinted from *Psychological Bulletin, 99*, 66-77).

Cicchetti, D., & Toth, S. L. (1995). A developmental psychopathology perspective on child abuse and neglect. *Journal of American Academy of Child and Adolescent Psychiatry, 34*, 541-565.

Chandy, J. M., Blum, R. Wm., & Resnick, M. D. (1996). Gender-specific out- comes for sexually abused adolescents. *Child Abuse & Neglect, 20*, 1219-1231.

Crittenden, P. (1988). Family and dyadic patterns of functioning in maltreating families. In Browne, K., Davis, C., & Stratton, P. (Eds.), *Early prediction and prevention of child abuse*. New York: John Wiley and Sons.

Department of Multiculturalism and Citizenship, Human Rights Directorate. (1991). *Convention on the Rights of the Child*. Ottawa: Supply and Services Canada.

de Paúl, J., & Arruabarrena, M. I. (1995). Behaviour problems in school-aged physically abused and neglected children in Spain. *Child Abuse & Neglect, 19*, 409-418.

Dinsmore, C. (1991). *From surviving to thriving: Incest, feminism, and recovery*. New York: State University of New York.

Downs, W. R., Smyth, N. J., & Miller, B. A. (1996). The relationship between childhood violence and alcohol problems among men who batter: An empirical review and synthesis. *Aggression and Violent Behaviour, 1*, 327-344.

Dukes, R. L., & Kean, R. B. (1989). An experimental study of gender and situation in the perception and reporting of child abuse. *Child Abuse & Neglect, 13*, 351-360.

Durrant, J. E., & Rose-Krasnor, L. (1995). *Spanking: Should I or Shouldn't I*. Winnipeg: Department of Family Studies, University of Manitoba.

Dutton, D. G., & Hart, S. D. (1992). Evidence of long-term, specific effects of childhood abuse on criminal behaviour in men. *International Journal of Offender Therapy and Comparative Criminology, 36*, 129-137.

Federal Provincial Working Group on Child and Family Services Information. (1994). *Child Welfare in Canada: The Role of Provincial and Territorial Authorities in Cases of Child Abuse*. Ottawa: Supply and Services Canada.

Fedorowycz, O. (1997). Homicide in Canada – 1996. *Juristat, 17*. Canadian Centre for Justice Statistics, Statistics Canada.

Feldman, R. S., Salzinger, S., Rosario, M., Alvarado, L., Caraballo L., & Hammer, M. (1995). Parent, teacher, and peer ratings of physically abused and nonmaltreated children's behaviour. *Journal of Abnormal Psychology, 23*, 317-334.

Fergusson, D. M., & Lynskey, M. T. (1997). Physical punishment/maltreatment during childhood and adjustment in young adulthood. *Child Abuse & Neglect, 21*, 617-630.

Friedrich, W. N., & Luecke, W. J. (1988). Young school-age sexually aggressive children. *Professional Psychology: Research and Practice, 19*, 155-164.

Garbino, J., Guttman, E., & Seeley, J. W. (1986). *The psychologically battered child.* California: Jossey-Bass.

Gauthier, L., Stollak, G., Messé, L., & Aronoff, J. (1996). Recall of childhood neglect and physical abuse as differential predictors of current psychological functioning. *Child Abuse & Neglect, 20*, 549-559.

Gilmartin, P. (1994). *Rape, incest, and child sexual abuse: Consequences and recovery.* New York: Garland Publishing Inc.

Gove, T. J. (1995). *Report of the Gove Inquiry into child protection in British Columbia.* British Columbia: Gove Inquiry into Child Protection.

Gracia, E. (1995). Visible but unreported: A case for the "not serious enough" cases of child maltreatment. *Child Abuse & Neglect, 19*, 1083-1093.

Hampton, R. L., & Newberger, E. (1985). Child abuse incidence and reporting by hospitals: Significance of severity, class and race. *American Journal of Public Health, 75*, 56-68.

Hendry, E. (1997). Engaging general practitioners in child protection training. *Child Abuse Review, 6*, 60-64.

Howe, A. C., Herzberger, S., & Tennen, H. (1988). The influence of personal history of abuse and gender on clinician's judgements of child abuse. *Journal of Family Violence, 3*, 105-119.

Howing, P. T., Wodarski, J. S., Kurtz, P. D., & Gaudin, Jr., J. M. (1993). *Maltreatment and the school-aged child: Developmental outcomes and system issues.* New York: The Haworth Press.

Janus, M. D., McCormack, A., Wolbert Burgess, A., & Hartman, C. (1987). *Adolescent runaways: Causes and consequences*. Toronto: D.C. Heath and Co.

Kendall-Tacket, K. A., & Eckenrode, J. (1996). The effects of neglect on academic achievement and disciplinary problems: A developmental perspective. *Child Abuse & Neglect, 20*, 161-169.

Kennel, R. G., & Agresti, A. A. (1995). Effects of gender and age on psychologists' reporting of child sexual abuse. *Professional Psychology: Research and Practice, 26*, 612-615.

Kurtz, P. D., Gaudin, Jr., J. M., Wodarski, J. S., & Howing, P. T. (1993). Maltreatment and the school-aged child: School performance consequences. *Child Abuse & Neglect, 17*, 581-589.

Loos, M. E., & Alexander, P. C. (1997). Differential effects associated with self-reported histories of abuse and neglect in a college sample. *Journal of Interpersonal Violence, 12*, 340-360.

Ludwig, S., & Kornberg, A. E. (1992). *Child abuse: A medical reference*. New York: Churchill Livingstone.

Malinosky-Rummell, R., & Hansen, D. J. (1993). Long-term consequences of childhood physical abuse. *Psychological Bulletin*, 114, 68-79.

Manion, I. G., & Wilson, S. K. (1995). *An Examination of the Association Between Histories of Maltreatment and Adolescent Risk Behaviours*. Ottawa: Supply and Services Canada.

Manitoba Family Services. (1993). *Child protection and child abuse: A handbook for nurses*. Winnipeg: Author.

Mathews, F. (1996). *The Invisible Boy: Revisioning the Victimization of Male Children and Teens*. Ottawa: National Clearinghouse on Family Violence, Health Canada.

Meston, J. (1993). *Child abuse prevention programs*. Ottawa: Vanier Institute of the Family.

Mian, M., Marton, P., & LeBaron, D. (1996). The effects of sexual abuse on 3- to 5-year-old girls. *Child Abuse & Neglect, 20*, 731-745.

Middleton-Moz, J. (1992). *Will to survive: Affirming the positive power of the human spirit*. Florida: Health Communications, Inc.

Miller, A. (1984). *Thou shall not be aware: Society's betrayal of the child*. New York: Meridian.

National Crime Prevention Council. (1997). *Young people say: Report from the Youth Consultation Initiative*. Ottawa: Author.

Newson, J., & Newson, E. (1990). *The extent of physical punishment in the U.K.* London: Approach.

Oates, R. K. (1996). *The spectrum of child abuse: Assessment, treatment, and prevention*. New York: Brunner/Mazel, Inc.

Oliver, J. E. (1993). Intergenerational transmission of child abuse: Rates, research, and clinical implications. *American Journal of Psychiatry, 150*, 1315-1325.

Pelton, L. H. (1994). Is poverty a key contributor to child maltreatment: Yes. In Gambril, E., & Stein, E. (Eds.), *Controversial Issues in Child Welfare*. Massachusetts: Allyn & Bacon.

Reese, R. M. (1994). *Child abuse: Medical diagnosis and management*. Pennsylvania: Lea & Febiger.

Rivera, M. (1991). *Multiple Personality: An outcome of child abuse*. Toronto: Education/Dissociation.

Shengold, L. (1989). *Soul murder: The effects of childhood abuse and deprivation*. New Haven: Yale University.

Silverman, A. B., Reinherz, H. Z., & Giaconia, R. M. (1996). The long-term sequelae of child and adolescent abuse: A longitudinal community study. *Child Abuse & Neglect, 20*, 709-723.

Simons, R. L., Johnson, C., & Conger, R. D. (1995). Harsh corporal punishment versus quality of parental involvement as an explanation of adolescent maladjustment. *Journal of Marriage and the Family, 56*, 591-607.

Singer, K. I. (1989). Group work with men who experienced incest in childhood. *American Journal of Orthopsychiatry, 59*, 468-472.

Smith, C. (1996). The link between childhood maltreatment and teenage pregnancy. *Social Work Research, 20*, 131-141.

Standing Committee on Social Development. (1994). *Children at risk*. Toronto: Ontario Legislative Assembly.

Steele, K. (1987). Sitting with shattered soul. *Pilgrimage: Journal of Exploration & Psychotherapy, 15*, 19-25.

Steinberg, K. L., Levine, M., & Doueck, H. J. (1997). Effects of legally mandated child-abuse reports on the therapeutic relationship: A survey

of psychotherapists. *American Journal of Orthopsychiatry, 67*, 112-122.

Steinhauer, P. D. (1996). *The primary needs of children: A blueprint for effective health promotion at the community level*. Ottawa: Caledon Institute of Social Policy.

Stone, M. H. (1990). Incest in the borderline patient. In Kluft, R. P. (Ed.), *Incest-related syndrome in adult psychopathology*. Washington, DC: American Psychiatric Association.

Strauss, M. A. (1991). Discipline and deviance: Physical punishment of children and violence and other crime in adulthood. *Social Problems, 38*, 133-154.

Sundelin Wahlsten, V. (1994). Development and survival: A study of children at risk living in adverse psychological milieu. *Child Abuse & Neglect, 18*, 715-723.

Trocmé, N., McPhee, D., Tam, K. K., & Hay, T. (1994). *Ontario incidence study of reported child abuse & neglect*. Toronto: The Institute for the Prevention of Child Abuse.

Varia, R., Abidin, R. R., & Dass, P. (1996). Perceptions of abuse: Effects on adult psychological and social adjustment. *Child Abuse & Neglect, 20*, 511-526.

Warner, J. E., & Hansen, D. J. (1994). The identification and reporting of physical abuse by physicians: A review and implications for research. *Child Abuse & Neglect, 18*, 11-25.

Webber, M. (1991). *Street kids: The tragedy of Canada's runaways*. Toronto: University of Toronto Press.

Wolin, S., & Wolin, S. (1993). *The resilient self: How survivors of troubled families rise above adversity*. New York: Villiard Books (Random House).

Yawney, D. (1996). Resiliency: A strategy for survival of childhood trauma. In Russell, M., Hightower, J., Gutman, G. (Eds.), *Stopping the violence: Changing families, changing futures*. Canada: Benwell Atkins Limited.

[PREVIOUS]   [TOP]   [NEXT]

# EXHIBIT
# 14





# Child Abuse and Neglect

## What Is Child Abuse?

Child abuse occurs when a parent, guardian or caregiver mistreats or neglects a child, resulting in

- injury, or
- significant emotional or psychological harm, or
- serious risk of harm to the child.

Child abuse entails the betrayal of a caregiver's position of trust and authority over a child. It can take many different forms.

Physical abuse is the deliberate application of force to any part of a child's body, which results or may result in a non-accidental injury. It may involve hitting a child a single time, or it may involve a pattern of incidents. Physical abuse also includes behaviour such as shaking, choking, biting, kicking, burning or poisoning a child, holding a child under water, or any other harmful or dangerous use of force or restraint. Child physical abuse is usually connected to physical punishment or is confused with child discipline.

Child sexual abuse occurs when a child is used for sexual purposes by an adult or adolescent. It involves exposing a child to any sexual activity or behaviour. Sexual abuse most often involves fondling and may include inviting a child to touch or be touched sexually. Other forms of sexual abuse include sexual intercourse, juvenile prostitution and sexual exploitation through pornography. Sexual abuse is inherently abusive emotionally and is often accompanied by separate and more direct forms of psychological abuse or other forms of mistreatment. Child sexual abuse is not further addressed in this fact sheet. A separate fact sheet dealing exclusively with child sexual abuse is available from the National Clearinghouse on Family Violence.

Neglect occurs when a child's parents or other caregivers are not providing essential requisites to a child's emotional, psychological and physical development. Physical neglect occurs when a child's needs for food, clothing, shelter, cleanliness, medical care and protection from harm are not adequately met. Emotional neglect occurs when a child's need to feel loved, wanted, safe and worthy is not met. Emotional neglect can range from the context of the abuser simply being unavailable to that in which the abuser openly rejects the child. While a case of physical assault is more likely to come to the attention of public authorities, neglect can represent an equally serious risk to a child.

Emotional abuse involves an attack on a child's sense of self. Emotional abuse is usually found in the context of a long-term problem in a parent's treatment of a child. It is often part of a pattern of family stress and dysfunctional parenting. Emotional abuse frequently co-exists with other types of abuse.

Constantly insulting, humiliating or rejecting a child, or saying that a child is ``stupid'' or ``bad'', can harm a child's sense of worth and self-confidence.

Other forms of emotionally abusive treatment include forcing a child into social isolation, intimidating, exploiting, terrorizing or routinely making unreasonable demands on a child. Some provinces in Canada now include exposure of a child to violence between the parents as a form of emotional abuse. A recent study of wife assault found that children witness violence against their mothers in almost 40 percent of violent marriages.

## How Does Society Respond to Child Abuse?

Canadian society's primary formal response to child abuse and neglect is through its provincial child protection systems. The provincial laws on child welfare require that all cases of suspected child abuse and neglect be investigated. A variety of actions can be taken if the investigation indicates the child is in need of protection. Responses range from providing counselling and support services to the family, to temporarily or permanently removing the child from the home, to removing the abuser or abusers from the home. In the most serious cases, abusers may be convicted of a crime if the abuse can be proven under the *Criminal Code of Canada*.

In addition, many intervention and education programs are aimed at preventing child abuse and neglect. Prevention programs range from intensive help for families exhibiting a high risk of abuse, to general education programs for school students and the public. Everyone has a role to play in responding to and preventing child abuse and neglect.

## How Widespread Is the Problem?

It is difficult to attain a reliable measure of the number of people who are abused at some time in their childhood (the *prevalence* of child abuse). It is also difficult to estimate the number of children who are abused in a single year (the annual *incidence* of child abuse). There is increasingly reliable information on the number of child abuse cases handled by child protection agencies and police, but the number of children suffering from undiscovered and unreported abuse can only be estimated.

Over the last decade, there has been a dramatic increase in both the reports of suspected abuse and neglect, and the number of children found to be in need of protection. However, it is clear that many cases of child abuse, even some serious ones, are not reported. Individuals and professionals working with children may fail to report because they do not recognize the signs and symptoms of child abuse. In some instances, they may tend to resist admitting to themselves that it is really happening or that it is serious enough to report.

Several other factors inhibit voluntary reporting:

- the nature of family problems related to child abuse and neglect,
- the sense of secrecy and shame surrounding child maltreatment,
- the possible consequences of intervention by child protection authorities or police, and
- many of the victims are young and relatively dependent.

Children may want to disclose their abuse so it can be stopped, but they are often afraid that no one will believe or help them. They may be afraid of what will happen. Abusive parents frequently warn their children not to tell anyone. They may convince the child that the abuse is the child's fault, and that telling someone will only get them into more trouble.

There are no national statistics on the prevalence or incidence of child abuse in Canada. Each province and territory compiles its own figures, using its own definitions. A 1994 report, *Child Welfare in Canada: The Role of Provincial and Territorial Authorities in Cases of Child Abuse*, describes the provincial laws, definitions and child welfare systems that deal with child abuse. A 1996 report, *Child and Family Services Annual Statistical Report 1992-93 to 1994-95*, presents statistical data on child welfare services in Canada. The available data cannot be directly or easily compared among provinces because the information is collected according to different definitions and parameters in each jurisdiction. Nonetheless, the following facts provide some insight into how widespread the problems of child abuse and neglect really are.

In Canada in 1992, approximately 40 000 children were living in foster care or other settings away from their home of origin because of the intervention of child protection authorities. In Ontario, the number of Children's Aid Society investigations for child physical abuse increased from 3 546 in 1983 to an estimated 13 236 in 1993. The number of investigations increased by a yearly average of 27 percent over this 10-year period.

Child abuse and neglect occur in every province and territory, in large cities, small towns and rural areas. While children of all ages are at risk, those 3 years old or less are most frequently investigated for neglect, and children 12 to 15 years old are most frequently investigated for physical abuse.

**Facts to Consider**

*Family Factors*

• Child abuse is not confined to any one social class or sector of the population; it cuts across all ethnic, religious, social and economic backgrounds. However, economic disadvantage is a major contributor to child neglect. Poverty also appears to be a risk factor for physical abuse, though not for emotional abuse.
• There is evidence that the prevalence of child neglect is significantly lower in Canada than in the United States, possibly because of the lower rates of child poverty in Canada.
• Causes of stress on families, such as unemployment, can contribute to child maltreatment.

*The Victim*

• The most potentially serious cases of child abuse involve preschoolers and infants. Younger children are at greater risk of severe injury or death as a result of child abuse.
• ``Failure to thrive'' in infants is sometimes the result of neglect. In extreme cases, it leads to developmental delays and even death. Many of the mothers of these infants were themselves abused as children.
• A child can be harmed by events that occur before he or she is born. If a pregnant woman uses alcohol or drugs, especially in the first two months of pregnancy, it can cause the child to be born with birth defects or developmental delays.
• The effects of child abuse are profound. Children who are abused tend to experience more social problems and perform less well in school than non-abused children. This can have lasting effects on their social adjustment and success in life.
• Children who are both emotionally and physically abused exhibit the greatest degree of

aggression, delinquency and interpersonal problems. Physical abuse inherently conveys a message that is psychologically harmful to the child, but psychological or emotional abuse that is explicit and systematic has more negative consequences for the child than physical abuse.

• Victims of childhood abuse are at greater risk of becoming violent criminals. A study of men in Canadian prisons showed that those who were abused as children were three times more likely than non-abused men to be violent as adults.

• Women who were abused in childhood are more likely to suffer from depression, low self-esteem and suicidal thoughts.

*The Abuser*

• Abusive parents frequently receive little enjoyment from parenting and are more isolated from the community than non-abusive parents. They have unrealistic expectations of their child and try to control the child through negative and authoritarian means.

• Abusive parents are often afraid of, or emotionally unable to ask for help from, sources of support in their community.

• Most abusive parents have themselves been abused or neglected as children. However, not all victims of abuse go on to assault children. Parents with a history of abuse who do not abuse their children are generally the ones who have developed supportive relations with others.

• Many abusers view themselves as victims in life generally or in the parent-child relationship in particular. They feel that they have lost control of their children and their own lives. When their children behave in a manner the parents perceive as disrespectful, they lash out in an effort to establish control.

• Because abusive parents often have unrealistic expectations about their child's development and abilities, they demand a level of physical, social and emotional maturity which is not appropriate for the age of the child.

**Reporting Child Abuse**

Sometimes people think that child abuse is a private family matter. It is not. If you have reasonable grounds to suspect that a child is being abused or neglected, promptly report your concerns to the child welfare agency, provincial or territorial social services department or police force in your community. If necessary, a report can be made anonymously.

Reporting is not difficult or time consuming. In all cases, the person reporting is protected from any kind of legal action, provided the report is not falsely made and motivated by malice.

**Where to Go for Services**

Contact your local

> – child welfare agency,
> – social service agency,
> – police department,
> – hospital,
> – mental health centre,

– distress centre, or
– other community service organization that provides counselling and support to children and families.

Many of these organizations are listed among the emergency telephone numbers on or near the first page of your local telephone directory.

Children who want help can also call the Kids' Help Phone at 1-800-668-6868.

## What Can Be Done to Prevent Child Abuse?

Most abusive parents do not consciously set out to harm their children. If there are more and better efforts to assist troubled families, parents at risk of abusing may be reached and helped before they resort to violence. Prevention is a good investment, in terms of both the personal and social costs that can be saved.

• Parenting education can help parents to better understand normal child development and to have a more nurturing and enjoyable relationship with their children. Positive approaches to parenting can help parents with children of any age.

• Encourage your local school board to develop and implement child abuse prevention programs. Abused children tend to repeat the pattern of abuse, and prevention is one of the most effective means to stop the cycle of violence.

• If a child tells you about an abusive situation or experience, be supportive. Show the child that he or she is believed, and ensure that the occurrence is promptly reported to the appropriate authorities.

• You can assist by teaching children how to recognize and say no to abusive or exploitative behaviour. Children should know that they have the right to be free from abuse and exploitation.

• You can help the children and adults in your life find information and assistance to prevent an abusive or neglectful pattern from developing.

## Suggested Reading

Nanci Burns, *Literature Review of Issues Related to the Use of Corrective Force Against Children*, Ottawa: Department of Justice, June 1993.

Joan E. Durrant and Linda Rose-Krasnor, *Spanking: Should I or Shouldn't I?*, Winnipeg: Department of Family Studies, University of Manitoba, 1995.

National Clearinghouse on Family Violence, Fact Sheets on Child Sexual Abuse, Wife Abuse, Dating Violence, Abuse of Seniors, etc., Ottawa: Health Canada.

Thomas Gordon, Ph.D., *Discipline That Works: Promoting Self-Discipline in Children*, New York: Plume Books, 1991.

United Nations General Assembly, *Convention on the Rights of the Child*, Ottawa: Supply and

Services Canada, 1991.

Audiovisual:

The Family Violence Prevention Division of Health Canada has compiled a collection of more than 90 films and videos on forms of family violence prevention, including child abuse prevention. These can be borrowed from the partner libraries of the National Film Board of Canada.

## References and Notes

1. E.E. Whipple and C. Webster-Stratton, ``The role of parental stress in physically abusive families,'' *Child Abuse and Neglect*, 15(3), 1991, pp. 279-291.

2. K. Rodgers, ``Wife assault: The findings of a national survey,'' *Juristat Service Bulletin*, Canadian Centre for Justice Statistics, March 1994, p. 14.

3. Federal-Provincial Working Group on Child and Family Services Information, *Child Welfare in Canada: The Role of Provincial and Territorial Authorities in Cases of Child Abuse*, Ottawa: Supply and Services Canada, 1994.

4. Federal-Provincial Working Group on Child and Family Services Information, *Child and Family Services Annual Statistical Report 1992-93 to 1994-95*, Hull: Working Group on Child and Family Services Information, 1996.

5. Ibid. The number is based on provincial/territorial data for ``children in care,'' with Quebec figures for ``intermediate and institutional interventions.''

6. Ontario Association of Children's Aid Societies Annual Survey, 1983.

7. N. Trocme, D.McPhee, K.K. Tam and T. Hay, *Ontario Incidence Study of Reported Child Abuse & Neglect*, Toronto: The Institute for the Prevention of Child Abuse, 1994.

8. Ontario Association of Children's Aid Societies Annual Surveys, 1983 to 1992. 1993 data from Trocme et al., supra note 6.

9. Trocme et al., supra note 6, p. xi.

10. Trocme et al., supra note 6, pp. 94-98.

11. E.D. Jones and K. McCurdy, ``The links between types of maltreatment and demographic characteristics of children,'' *Child Abuse and Neglect*, 16(2), 1992, pp. 201-215.

12. Trocme et al., supra note 6, p. 122.

13. V. Krishnan and K.B. Morrison, ``An ecological model of child maltreatment in a Canadian province,'' *Child Abuse and Neglect*, 19(1), 1995, pp. 101-113.

14. R.L. Hegar, S.J. Zuravin and J.G. Orme, ``Factors predicting severity of physical child abuse injury,'' *Journal of Interpersonal Violence*, 9(2), 1994, pp. 170-183.

**15.** J.A. Weston, M. Colloton, S. Halsey, S. Covington, J. Gilbert, L. Sorrentino-Kelly and S.S. Renoud, ``A legacy of violence in nonorganic failure to thrive,'' *Child Abuse and Neglect*, 17(6), 1993, pp. 709-714.

**16.** Canadian Medical Association, ``CMA Policy Summary: Fetal Alcohol Syndrome,'' *Canadian Medical Association Journal*, 148(4), 1993, p. 640a.

**17.** J.M. Soby, *Prenatal Exposure to Drugs and Alcohol: Characteristics and Educational Implication of Fetal Alcohol Syndrome and Cocaine-Polydrug Effects*, Springfield, Il., Charles C. Thomas, 1994.

**18.** S. Salzinger, R.S. Feldman, M. Hammer and M. Rosario, ``The effects of physical abuse on children's social relationships, *Child Development*, 64(1), 1993, pp. 169-187. R.H. Starr Jr. and D.A. Wolfe (editors), *The Effects of Child Abuse and Neglect: Issues and Research*, London, Guildford Press, 1991.

**19.** Y.M. Vissing, M.A. Straus, R.J. Gelles and J.W. Harrop, ``Verbal aggression by parents and psychosocial problems of children,'' *Child Abuse and Neglect*, 15(3), 1991, pp. 223-238.

**20.** A.H. Claussen and P.M. Critenden, ``Physical and psychological maltreatment: Relations among types of maltreatment,'' *Child Abuse and Neglect*, 15(1), 1991, pp. 5-18.

**21.** D.G. Dutton and S.D. Hart, ``Evidence of long-term, specific effects of childhood abuse on criminal behaviour in men,'' *International Journal of Offender Therapy and Comparative Criminology*, 36(2), 1992, pp. 129-137.

**22.** The Commonwealth Fund, *The Commonwealth Fund Survey of Women's Health*, New York: The Fund, July 14, 1993, p. 4.

**23.** J.A. Caliso and J.S. Milner, ``Childhood physical abuse, childhood social support and adult child abuse potential,'' *Journal of Interpersonal Violence*, 9(1), 1994, pp. 27-44.

**24.** L. Gordon, *Heroes of Their Own Lives: The Politics and History of Family Violence*, New York: Viking Penguin, 1989.

This fact sheet was revised by Tom Hay, Ph.D., A2B Consulting, under contract, with assistance from David Allen, Childhood and Youth Division, Health Canada.

For further information on family violence prevention issues, please contact:

**National Clearinghouse on Family Violence**
Address Locator: 1907D1
Family Violence Prevention Division
Health Promotion and Programs Branch
Health Canada
Ottawa, Ontario K1A 1B4

Telephone: (613) 957-2938 or call this toll-free number: 1-800-267-1291

Fax: (613) 941-8930
FaxLink: (613) 941-7285 or toll-free: 1-888-267-1233

TTY/TDD users, (613) 952-6396

 or toll-free: 1-800-561-5643

This publication can be made available in/on computer diskette/large print/audio-cassette/braille, upon request.

September 1990

February 1997 (revised)

Our mission is to help the people of Canada maintain and improve their health. *Health Canada*

# EXHIBIT
# 15

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 396 of 535   PageID 14283

THE AMERICAN JOURNAL OF PSYCHIATRY     EMAIL CONTENT DELIVERY e-toc

HOME HELP FEEDBACK SUBSCRIPTIONS ALL ISSUES SEARCH TABLE OF CONTENTS

**Institution: SOUTHERN METHODIST LIBRARY UNDERWOOD LAW LIBRARY ||**
Sign In as Member/Non-member || Contact Subscription Administrator at your institution || **FAQ**

Am J Psychiatry 158:1027-1033, July 2001
© 2001 American Psychiatric Association

Article

# The Role of Childhood Interpersonal Trauma in Depersonalization Disorder

**Daphne Simeon, M.D., Orna Guralnik, Psy.D.,
James Schmeidler, Ph.D., Beth Sirof, M.A., and
Margaret Knutelska, M.A.**

- ▸ **Full Text of this Article**
- ▸ Reprint (PDF) Version of this Article
- ▸ Similar articles found in:
  - AJP Online
  - PubMed
- ▸ PubMed Citation
- ▸ Search Medline for articles by:
  - Simeon, D. || Knutelska, M.
- ▸ Alert me when:
  - new articles cite this article
- ▸ Download to Citation Manager

- ▸ Collections under which this article appears:
  - **Child/Adolescent Psychiatry**
  - **Dissociative Disorders**
  - **Stress**
  - **Child Abuse**

**OBJECTIVE:** In contrast to trauma's relationship with the other dissociative disorders, the relationship of trauma to depersonalization disorder is unknown. The purpose of this study was to systematically investigate the role of childhood interpersonal trauma in depersonalization disorder. **METHOD:** Forty-nine subjects with DSM-IV depersonalization disorder and 26 healthy comparison subjects who were free of lifetime axis I and II disorders and of comparable age and gender were administered the Dissociative Experiences Scale and the Childhood Trauma Interview, which measures separation or loss, physical neglect, emotional abuse, physical abuse, witnessing of violence, and sexual abuse. **RESULTS:** Childhood interpersonal trauma as a whole was highly predictive of both a diagnosis of depersonalization disorder and of scores denoting dissociation, pathological dissociation, and depersonalization. Emotional abuse, both in total score and in maximum severity, emerged as the most significant predictor both of a diagnosis of depersonalization disorder and of scores denoting depersonalization but not of general dissociation scores, which were better predicted by combined emotional and sexual abuse. The majority of the perpetrators of emotional abuse were either or both parents. Although different types of trauma were modestly correlated, only a few of these relationships were statistically significant, underscoring the importance of comprehensively considering different types of trauma in research studies. **CONCLUSIONS:** Childhood interpersonal trauma and, in particular, emotional abuse may play a role in the pathogenesis of depersonalization disorder. Compared to other types of childhood trauma, emotional maltreatment is a relatively neglected entity in psychiatric research and merits more attention.

# This article has been cited by other articles:

- Simeon, D., Guralnik, O., Knutelska, M., Schmeidler, J. (2002). Personality Factors Associated With Dissociation: Temperament, Defenses, and Cognitive Schemata. *Am. J. Psychiatry* 159: 489-491 [Abstract] [Full Text]

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 397 of 535   PageID 14284

HOME  HELP  FEEDBACK  SUBSCRIPTIONS  ALL ISSUES  SEARCH  TABLE OF CONTENTS

Copyright © 2001 by American Psychiatric Association, Inc..

# EXHIBIT
# 16

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 399 of 535   PageID 14286



THE AMERICAN JOURNAL OF PSYCHIATRY

EMAIL CONTENT DELIVERY e-toc

HOME  HELP  FEEDBACK  SUBSCRIPTIONS  ALL ISSUES  SEARCH  TABLE OF CONTENTS

Institution: SOUTHERN METHODIST LIBRARY UNDERWOOD LAW LIBRARY ||
Sign In as Member/Non-member || Contact Subscription Administrator at your institution || FAQ

Am J Psychiatry 159:483-486, March 2002
© 2002 American Psychiatric Association

**Brief Report**

# Neuropsychological Function in Children With Maltreatment-Related Posttraumatic Stress Disorder

Sue R. Beers, Ph.D., and
Michael D. De Bellis, M.D., M.P.H.

> Abstract of this Article
> **Reprint (PDF) Version of this Article**
> Similar articles found in:
>  AJP Online
>  PubMed
> PubMed Citation
> Search Medline for articles by:
>  Beers, S. R. || De Bellis, M. D.
> Alert me when:
>  new articles cite this article
> Download to Citation Manager

> Collections under which this article appears:
>  **Neuropsychology**
>  **Child/Adolescent Psychiatry**
>  **Posttraumatic Stress Disorder**
>  **Child Abuse**
>  **Cognition**

## ▶ Abstract

**OBJECTIVE:** Studies in adults have reported changes in concentration, learning, and memory in individuals with posttraumatic stress disorder (PTSD). However, there are few studies of cognitive function in children with PTSD. The goal of the current study was to evaluate cognition in children with PTSD. **METHOD:** The cognitive status of 14 pediatric psychiatric outpatients with maltreatment-related PTSD and 15 sociodemographically similar children who were healthy and had not been maltreated was examined. Neuropsychological instruments measured language, attention, abstract reasoning/executive function, learning and memory, visual-spatial processing, and psychomotor function. **RESULTS:** The children with PTSD performed more poorly on measures of attention and abstract reasoning/executive function. **CONCLUSIONS:** Although based on a small number of subjects, these results support cognitive differences between children with and without maltreatment-related PTSD.

- ▲ TOP
- • Abstract
- ▼ Introduction
- ▼ Method
- ▼ Results
- ▼ Discussion
- ▼ References

## ▶ Introduction

Posttraumatic stress disorder (PTSD) is now widely recognized in children. Although findings are equivocal (1), studies of adults have reported cognitive problems in individuals with PTSD, particularly in the areas of concentration, learning, and memory (2). In contrast, cognitive function indexed by performance on standardized neuropsychological instruments has not been extensively evaluated in children with PTSD. It is particularly important to characterize the neuropsychological deficits associated with childhood PTSD because they are likely to have broad developmental ramifications, affecting both

- ▲ TOP
- ▲ Abstract
- • Introduction
- ▼ Method
- ▼ Results
- ▼ Discussion
- ▼ References

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 400 of 535   PageID 14287

response to therapy and school performance.

Unlike studies in adults with PTSD, neuroimaging studies indicate that PTSD in children is associated with diffuse CNS effects (i.e., smaller cerebral volumes and corpus callosum areas) but no anatomical changes in limbic structures (3). Functional imaging procedures indicate that medial prefrontal cortical dysfunction may be associated with both adult and pediatric PTSD (4). The neuropsychological consequences of these brain alterations have not been extensively studied.

In this pilot study, we examined cognitive functioning using a battery of neuropsychological instruments measuring language, attention, abstract reasoning/executive function, learning and memory, visual-spatial processing, and psychomotor functioning in maltreated children with PTSD and sociodemographically similar comparison children who had not been maltreated and who did not have PTSD. The tests, described by Spreen and Strauss (5), are listed in Table 1. On the basis of neuroimaging research (3, 4), we hypothesized that the children with PTSD would perform more poorly on cognitive measures, particularly in the domains mediated by the prefrontal cortex.

View this table:   TABLE 1
[in this window]
[in a new window]

## ▶   Method

We recruited 14 medication-naive children with PTSD secondary to maltreatment who were psychiatric outpatients and 15 healthy comparison children who had not been maltreated and who were similar to the PTSD patients in age, race, socioeconomic status, and IQ. The mean age of the PTSD patients was 11.38 years (SD=2.60) and that of the comparison children was 12.17 (SD=1.75). Six of the PTSD patients were girls and eight were boys; seven of the comparison subjects were girls and eight were boys. In the PTSD group, 10 patients were white, two were African American, and two were biracial (white and African American); in the comparison group, 12 subjects were white, one was African American, and two were biracial. In the PTSD group, the mean socioeconomic level according to the Hollingshead Four-Factor Index of Socioeconomic Status (6) was 39.21 (SD=11.28); in the comparison group the mean was 39.60 (SD=7.69). The mean full-scale IQ (estimated by the WISC-III four-factor score [7]) was 105.71 (SD=11.89) in the PTSD group and 113.20 (SD=11.69) in the comparison group.

After complete description of the study was given to the children and their parents, written informed consent was obtained. All of the children assented to their participation. Subjects received monetary compensation for participation.

A board-certified child psychiatrist (M.D.D.) conducted psychiatric interviews of all subjects and their

▲ TOP
▲ Abstract
▲ Introduction
• Method
▼ Results
▼ Discussion
▼ References

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 401 of 535   PageID 14288

legal guardians using a detailed trauma interview described elsewhere (8). A master's-level clinician, blind to clinical status, completed a modified version of the Schedule for Affective Disorders and Schizophrenia for School-Age Children—Present and Lifetime Version (9). The diagnosis of the children with chronic PTSD was based on DSM-IV. The traumata they experienced included sexual abuse (N=7), physical abuse (N=2), and witnessing domestic violence (N=5). Comorbid disorders included major depressive disorder (N=5), dysthymic disorder (N=2), separation anxiety disorder (N=2), oppositional defiant disorder (N=6), and attention deficit hyperactivity disorder (inattentive subtype) (N=1). Comparison subjects had no lifetime history of any axis I diagnosis.

Inclusion criteria for the PTSD group were "reported and indicated" child maltreatment experiences noted by child protective services before this investigation, the availability of one nonabusing caregiver who could cooperate with this protocol, and a stable home environment (i.e., the child had not been in danger from the perpetrator[s] for at least the previous 3 months). Exclusion criteria for all subjects included birth complications; substantial medical illness; head injury associated with wounds requiring sutures, emergency room treatment, or loss of consciousness; gross obesity (i.e., weight greater than 150% of ideal body weight) or growth failure (i.e., height less than the third percentile); Wechsler full-scale IQ less than 80; history of treatment with psychotropic medications; anorexia nervosa, pervasive developmental disorder, schizophrenia, adolescent-onset alcohol or substance abuse or dependence; prenatal exposure to alcohol and/or other substance use greater than twice a month during the 3 months before discovery of pregnancy; and mother's use of controlled substances during the known period of pregnancy.

Subjects completed a comprehensive neuropsychological battery administered blind to whether the child did or did not have PTSD. Instruments are described in Spreen and Strauss (5) and listed in Table 1.

We evaluated the distribution of our data for normality using Shapiro and Wilks's W statistics. When no transformation normalized the data, we applied nonparametric tests. Student's t test or Wilcoxon/Kruskal-Wallis rank sums were used to assess between-group differences on cognitive results. Two-tailed alpha equaled 0.05; analyses were completed with Statistical Discovery Software (SAS Institute, Cary, N.C.).

## ▶ Results

Children with PTSD performed more poorly on measures in four of the six cognitive domains (Table 1). In the domain of attention, PTSD subjects performed more poorly on two measures of freedom from distractibility, Stroop Color and Word Test color/word and interference. The PTSD group made significantly more omission errors on a measure of sustained visual attention (Digit Vigilance Test).

▲ TOP
▲ Abstract
▲ Introduction
▲ Method
• Results
▼ Discussion
▼ References

On measures of problem solving and abstract reasoning/executive function, PTSD subjects completed fewer categories on the Wisconsin Card Sorting Test. On two measures of semantic organization, the Controlled Oral Word Association Test Animal Naming and the Total Words, children with PTSD

generated fewer category members and named fewer words beginning with target letters (i.e., F, A, S). Significant differences were also identified on WISC-III Similarities; again, the children with PTSD scored lower than the comparison subjects.

Children with PTSD performed more poorly on one test of learning and memory, the California Verbal Learning Test long delay free recall. Finally, on measures of visual-spatial function, children with PTSD completed a poorer copy of the Rey-Osterrieth Complex Figure and made more errors on the Judgment of Line Orientation.

No significant differences between groups were found on any tests of language or psychomotor speed. After a Bonferroni correction for multiple comparisons was applied within each of the cognitive domains, only results within the domains of attention (i.e., Stroop color/word and Digit Vigilance Test omission errors) and abstract reasoning/executive function (i.e., Wisconsin Card Sorting Test categories and Controlled Oral Word Association test Animal Naming) remained significant.

In the PTSD group, variables that remained significant between groups were correlated with the number of clinical symptoms grouped by PTSD clusters (i.e., cluster B, intrusive symptoms; cluster C, avoidant symptoms; and cluster D, increased arousal symptoms) by applying Spearman's rank-order correlation. After Bonferroni corrections for multiple correlations, no significant correlations were seen between clinical symptoms and cognitive variables.

## ▶ Discussion

Children with maltreatment-related PTSD demonstrated significant deficits within the domains of attention and abstract reasoning/executive function when compared with sociodemographically similar healthy children who had not been maltreated. The children with PTSD were more susceptible to distraction and demonstrated greater impulsivity, making more errors on a task of sustained attention. Children with PTSD also demonstrated deficits on two tests designed to measure frontal lobe function (10)—the Wisconsin Card Sorting Test, an instrument requiring hypothesis testing and problem solving, and the Controlled Oral Word Association Test, a measure of semantic organization. These findings are consistent with neuroimaging studies showing CNS changes in the frontal cortex in PTSD (4). In contrast, after corrections to protect from experiment-wise error, PTSD children did not perform differently from comparison children on measures of language, memory and learning, visual-spatial abilities, or psychomotor skills.

▲ TOP
▲ Abstract
▲ Introduction
▲ Method
▲ Results
· Discussion
▼ References

Memory problems associated with PTSD are commonly identified in adults (2). We were unable to replicate the findings of Moradi et al. (11) of general memory deficits associated with childhood PTSD. However, the small number of subjects in our study may have obscured significant findings in this domain. Our findings suggest deficits in long-term memory for verbal information.

The study reported here must be considered preliminary because of the lack of a comparison group of

children who had been maltreated but did not have PTSD. Therefore, we do not know if our results are related to maltreatment or the presence of an anxiety disorder. Additionally, these findings may be explained by the presence of comorbid psychiatric disorders, particularly mood disorders, in the children with PTSD. Although it is tempting to assert that psychiatric symptoms may account for neuropsychological deficits, further research is necessary to ascertain how psychiatric symptoms interact with neuropsychological deficits.

## ▶ Footnotes

Received May 11, 2001; revision received Aug. 21, 2001; accepted Oct. 9, 2001. From the Department of Psychiatry and the Developmental Traumatology Neuroimaging Laboratory, Western Psychiatric Institute and Clinic, University of Pittsburgh School of Medicine. Address reprint requests to Dr. Beers, Western Psychiatric Institute and Clinic, 3811 O'Hara St., Pittsburgh, PA 15213; BeersSR@msx.upmc.edu (e-mail). Supported in part by NIMH grant MH-01324-02 (Dr. De Bellis) and 1995 and 1998 National Alliance for Research on Schizophrenia and Depression Young Investigator Awards. The authors thank Grace Moritz, M.S.W., and Julie Hall, B.A., for their assistance in this work.

## ▶ References

1.  Barrett DH, Green ML, Morris R, Giles WH, Croft JB: Cognitive functioning and posttraumatic stress disorder. Am J Psychiatry 1996; 153:1492-1494 [Abstract]
2.  McNally RJ: Experimental approaches to cognitive abnormality in posttraumatic stress disorder. Clin Psychol Rev 1998; 18:971-982[Medline]
3.  De Bellis MD, Keshavan M, Clark DB, Casey BJ, Giedd J, Boring AM, Frustaci K, Ryan ND: AE Bennett Research Award: developmental traumatology, part II: brain development. Biol Psychiatry 1999; 45:1271-1284[Medline]
4.  De Bellis MD, Keshavan MS, Spencer S, Hall J: N-Acetylaspartate concentration in the anterior cingulate of maltreated children and adolescents with PTSD. Am J Psychiatry 2000; 157:1175-1177[Abstract/Full Text]
5.  Spreen O, Strauss E: A Compendium of Neuropsychological Tests, 2nd ed. New York, Oxford University Press, 1998
6.  Hollingshead AB: Four-Factor Index of Social Status. New Haven, Conn, Yale University, Department of Sociology, 1975
7.  Sattler JM: Assessment of Young Children, 3rd ed, revised. San Diego, JM Sattler, 1992
8.  De Bellis MD: Posttraumatic stress disorder and acute stress disorder, in Handbook of Prevention and Treatment With Children and Adolescents. Edited by Ammerman RT, Hersen M. New York, John Wiley & Sons, 1997, pp 455-494
9.  Kaufman J, Birmaher B, Brent D, Rao U, Flynn C, Moreci P, Williamson D, Ryan N: Schedule for Affective Disorders and Schizophrenia for School-Age Children—Present and Lifetime Version (K-SADS-PL): initial reliability and validity data. J Am Acad Child Adolesc Psychiatry 1997; 36:980-988[Medline]
10. Levin HS, Culhane KA, Hartman J, Evankovich K, Mattson AJ: Developmental changes in performance on tests of purported frontal lobe functioning. Dev Neuropsychol 1991; 12:377-395

Navigation box:
- TOP
- Abstract
- Introduction
- Method
- Results
- Discussion
- References

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 404 of 535   PageID 14291

11.  Moradi AR, Doost HTN, Taghavi MR, Yule W, Dalgleish T: Everyday memory deficits in
     children and adolescents with PTSD: performance on the Rivermead Behavioral Memory test. J
     Child Psychol Psychiatry 1999; 40:357-361[Medline]

▸ Abstract of this Article
▸ **Reprint (PDF) Version of this Article**
▸ Similar articles found in:
    AJP Online
    PubMed
▸ PubMed Citation
▸ Search Medline for articles by:
    Beers, S. R. || De Bellis, M. D.
▸ Alert me when:
    new articles cite this article
▸ Download to Citation Manager

▸ Collections under which this article appears:
    **Neuropsychology**
    **Child/Adolescent Psychiatry**
    **Posttraumatic Stress Disorder**
    **Child Abuse**
    **Cognition**

# EXHIBIT 17

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 407 of 535   PageID 14294

THE AMERICAN JOURNAL
OF PSYCHIATRY



HOME  HELP  FEEDBACK  SUBSCRIPTIONS  ALL ISSUES  SEARCH  TABLE OF CONTENTS

**Institution: SOUTHERN METHODIST LIBRARY UNDERWOOD LAW LIBRARY ||**
Sign In as Member/Non-member || Contact Subscription Administrator at your institution || **FAQ**

Am J Psychiatry 158:1878-1883, November 2001
© 2001 American Psychiatric Association

Article

# Childhood Abuse and Lifetime Psychopathology in a Community Sample

**Harriet L. MacMillan, M.D., F.R.C.P.(C),**
**Jan E. Fleming, M.D., F.R.C.P.(C),**
**David L. Streiner, Ph.D., Elizabeth Lin, Ph.D.,**
**Michael H. Boyle, Ph.D., Ellen Jamieson, M.Ed.,**
**Eric K. Duku, M.Sc., Christine A. Walsh, M.S.W., Maria Y.-Y. Wong, M.Sc., and**
**William R. Beardslee, M.D.**

Sidebar links:
- Abstract of this Article
- **Reprint (PDF) Version of this Article**
- Similar articles found in:
  - AJP Online
  - PubMed
- PubMed Citation
- Search Medline for articles by:
  - MacMillan, H. L. || Beardslee, W. R.
- Alert me when:
  - new articles cite this article
- Download to Citation Manager

- Collections under which this article appears:
  - **Child Abuse**
  - **Epidemiology**

▶ **Abstract**

Sidebar:
- ▲ **TOP**
- · Abstract
- ▼ **Introduction**
- ▼ **Method**
- ▼ **Results**
- ▼ **Discussion**
- ▼ **References**

**OBJECTIVE:** The authors assessed lifetime psychopathology in a general population sample and compared the rates of five psychiatric disorder categories between those who reported a childhood history of either physical or sexual abuse and those who did not. **METHOD:** A modified version of the Composite International Diagnostic Interview and a self-completed questionnaire on child abuse were administered to a probability sample (N=7,016) of Ontario residents 15 to 64 years of age. **RESULTS:** Those reporting a history of childhood physical abuse had significantly higher lifetime rates of anxiety disorders, alcohol abuse/dependence, and antisocial behavior and were more likely to have one or more disorders than were those without such a history. Women, but not men, with a history of physical abuse had significantly higher lifetime rates of major depression and illicit drug abuse/dependence than did women with no such history. A history of childhood sexual abuse was also associated with higher rates of all disorders considered in women. In men, the prevalence of disorders tended to be higher among those who reported exposure to sexual abuse, but only the associations with alcohol abuse/dependence and the category of one or more disorders reached statistical significance. The relationship between a childhood history of physical abuse and lifetime psychopathology varied significantly by gender for all categories except for anxiety disorders. Although not statistically significant, a similar relationship was seen between childhood history of sexual abuse and lifetime psychopathology. **CONCLUSIONS:** A history of abuse in childhood increases the likelihood of lifetime psychopathology; this association appears stronger for women than men.

▶ ## Introduction

▲ TOP
▲ Abstract
• Introduction
▼ Method
▼ Results
▼ Discussion
▼ References

The relationship between a history of maltreatment during childhood and adult psychopathology has been well recognized in clinical populations (1, 2). Although fewer in number than clinical studies, several population-based community surveys have been carried out to examine the relationship between retrospective reports of child abuse and lifetime psychiatric morbidity in the community. The focus of these surveys has been primarily to assess the association between sexual abuse in childhood and adult emotional disorders, predominantly in women (3, 4). Previous studies (4–7), which include a meta-analysis comprising both clinical and community studies (4), indicate a relationship in women between exposure to sexual abuse during childhood and a wide range of psychiatric disorders, including depression, substance abuse, anxiety disorders, and suicidal behavior. A second meta-analysis that included both men and women concluded that there was a relationship between exposure to sexual abuse during childhood and both depression and general impairment in psychological adjustment (3). Fergusson et al. (8) assessed the relationship between a history of childhood sexual abuse and psychiatric morbidity in both male and female subjects, but the study consisted exclusively of 18-year-olds. One of the few surveys to include a representative sample of adult men was a supplement to the Los Angeles Epidemiologic Catchment Area (ECA) study (9, 10); sexual abuse during childhood was found to be a nonspecific correlate that increased vulnerability for a variety of emotional disorders, including major depressive episodes, anxiety disorders, and substance use disorders (9, 10).

Much less attention has been given to measuring the association between physical abuse and psychiatric morbidity. Duncan and colleagues (11) examined the relationship between a childhood history of serious physical assault and emotional impairment in a national sample of women. They found that those who reported such victimization experienced higher rates of depression, posttraumatic stress disorder (PTSD), and substance abuse. Similarly, Mullen and colleagues (12) found an association between childhood exposure to physical abuse and psychopathology in their community sample of women. One study considered childhood exposure to physical abuse in a group of subjects from upstate New York (13), but the focus was adolescents and young adults. One of the few surveys to explore the relationship between a childhood history of physical and sexual abuse in a representative sample of both men and women was the National Comorbidity Survey (14). Kessler and colleagues found that being "physically attacked" (the only act of physical abuse considered) was associated with a broad range of psychiatric disorders, including mood, anxiety, and addictive disorders.

This article presents findings from the Mental Health Supplement to the Ontario Health Survey about the relationship between a history of childhood physical and sexual abuse and five major psychiatric disorder categories. A previous article showed that a childhood history of physical or sexual abuse was common among Ontario residents (15). This report assesses the strength of reported childhood maltreatment as a correlate of psychiatric morbidity among those 15 years of age and older while controlling for age, sex, parental education, and current family income. The diagnostic categories considered in this article were those that had a sample size sufficient for examining their relationship

with presence or absence of physical and sexual abuse.

▶  ## Method

▲ TOP
▲ Abstract
▲ Introduction
• Method
▼ Results
▼ Discussion
▼ References

### Sample

In 1990, the Ontario Ministry of Health sponsored the Ontario Health Survey, a comprehensive survey to gather information about the physical health of provincial residents. For the Mental Health Supplement, one respondent within a household participating in the Ontario Health Survey was randomly selected for participation; he or she was interviewed between November 1990 and March 1991. Excluded from the survey were homeless persons, people in institutions, foreign service personnel, First Nations people living on reserves, and persons residing in extremely remote locations. A detailed description of the survey design has been previously published (16). The data reported here are for the 15–64-year-old subjects in the sample, since respondents older than 64 were given a shortened diagnostic interview because of concern about interview burden (17).

### Measures

The Composite International Diagnostic Interview (18) was used to determine the lifetime prevalence of psychiatric disorders. This measure is a standardized interviewer-administered questionnaire for the evaluation of mental disorders from DSM-III-R and ICD-10. The specific instrument used was the University of Michigan version of the Composite International Diagnostic Interview, which includes modifications to improve its usefulness in a general population survey (17, 19). For example, a diagnostic screening evaluation preceded the Composite International Diagnostic Interview so that respondents answered these questions before learning that a "no" response reduced the number of follow-up questions. Field trials of this interview have shown good interrater reliability, test-retest reliability, and validity for the majority of psychiatric diagnoses with the exception of psychosis (17, 20).

This article examines five major categories of psychiatric illness: 1) anxiety disorders (social phobia, simple phobia, agoraphobia, panic disorder, or generalized anxiety disorder); 2) major depressive disorder; 3) alcohol abuse/dependence; 4) illicit drug abuse/dependence; and 5) antisocial behavior (i.e., conduct disorder for those 15 to 17 years of age and antisocial personality disorder for those 18 to 64 years of age). Presence of a disorder from one or more of these five categories comprised the sixth category, "any psychiatric disorder."

The Child Maltreatment History Self-Report (15), a self-administered questionnaire, was used to assess the childhood history of physical and sexual abuse. Respondents were asked about their experiences when they were "growing up" of physical and sexual abuse committed by an adult. The definition of physical abuse included six categories: being pushed, grabbed, or shoved; having something thrown at them; being kicked, bitten, or punched; getting hit with something; being choked, burned, or scalded; or being physically attacked in some other way. Slapping or spanking, even if it occurred often, was not included in the definition of physical abuse. Sexual abuse was defined as unwanted experiences

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 410 of 535   PageID 14297

committed by an adult that fell within four categories: repeated indecent exposure, sexual threats, touching of the child's sex parts, and attempting sex with or sexually attacking the child. The definitions for both types of abuse include a broad range of exposures in terms of severity. The Child Maltreatment History Self-Report is described in detail in a separate publication (15). The physical abuse questions were based on several of the violence items included in the Conflict Tactics Scales (21), an instrument that has been shown to have acceptable psychometric properties. The questions dealing with sexual abuse were based on the instrument used for the National Population Survey (22), a Canadian survey of sexual abuse (often referred to as the "Badgley Report"). The bulk of the Mental Health Supplement to the Ontario Health Survey interview was conducted face-to-face. However, the Child Maltreatment History Self-Report was completed by respondents in private and returned to the interviewer in a sealed envelope.

The correlates considered included age, sex, and socioeconomic status. Socioeconomic status was measured by 1) education level (complete versus incomplete secondary school education) of the parent who provided the family's major financial support during the respondent's childhood and 2) current family income (above or below the poverty line as derived from income, urban/rural residence, and household size).

**Statistical Procedures**

Individual responses to the Mental Health Supplement to the Ontario Health Survey were weighted to obtain unbiased point estimates, based on the probability of selection in the sample (16). Weighting procedures were used to account for patterns of nonresponse. Poststratification weighting was applied to bring the age and sex distribution of the sample into agreement with that of the Ontario population in 1990 (16).

The statistical analyses were carried out by using Survey Data Analysis Software (SUDAAN for Windows, release 7.5.3, Research Triangle Institute, Research Triangle Park, N.C.), which makes statistical adjustments for survey design effects (23). Bivariate analyses compared respondents who reported a childhood history of physical abuse to those without a history of physical abuse; these analyses were repeated for childhood history of sexual abuse. Logistic regression models with forced entry of relevant variables were used to derive crude odds ratios and odds ratios adjusted for age, sex, parental education, and current family income as well as odds ratios for the interaction of childhood history of physical or sexual abuse and gender in predicting psychiatric morbidity.

It should be noted that for the separate analyses of childhood physical and sexual abuse, the group of respondents who reported exposure to abuse did not exclude those who had experienced both types of maltreatment. Similarly, the comparison group in each case was only free of the type of child abuse considered within each analysis; those who did not report a history of physical abuse may still have reported a history of sexual abuse and vice versa. This analysis was selected because despite the large size of the overall sample, eliminating those respondents with a history of physical abuse from the sexual abuse analyses would have resulted in insufficient power to detect between-group differences.

▶   # Results

Of the 14,758 households eligible for the Ontario Health Survey, 13,002 (88.1%) participated. Of those, 9,953 (76.5%) took part in the Mental Health Supplement for an overall response rate of 67.4%. Nonparticipation was primarily due to inability to contact the occupant, followed by unwillingness to participate. A detailed description of the sample is provided elsewhere (16). Of the 8,116 individuals 15 to 64 years of age, data were analyzed for 7,016 respondents after excluding those with missing information on the relevant variables. Briefly, of these remaining respondents, 47.6% (N=3,338) were male, 62.7% (N=4,399) reported being married or in a common law union, 61.7% (N=4,329) described their main activity as working, and 13.6% (N=954) indicated that their family income was below the poverty line.

▲ TOP
▲ Abstract
▲ Introduction
▲ Method
• Results
▼ Discussion
▼ References

The age of the male (mean=36.1 years, 95% confidence interval [CI]=35.2–36.9) and female (mean=36.0 years, 95% CI=35.3–36.6) survey respondents was similar. Table 1 outlines the prevalence by gender of lifetime psychopathology, history of childhood physical and sexual abuse, and socioeconomic status. The lifetime prevalence of the five psychiatric disorder categories for male and female survey respondents with and without a history of physical abuse are summarized in Table 2; findings for sexual abuse are provided in Table 3.

> **View this table:**   TABLE 1
> [in this window]
> [in a new window]

> **View this table:**   TABLE 2
> [in this window]
> [in a new window]

> **View this table:**   TABLE 3
> [in this window]
> [in a new window]

For both male and female respondents, the likelihood of lifetime prevalence of the specified major psychiatric disorders was increased by a history of childhood physical or sexual abuse. Among female subjects, the association with childhood physical and sexual abuse was statistically significant for all disorders, including the sixth category of "any psychiatric disorder." Two disorders did not show a statistically significant effect among male respondents with a childhood history of physical abuse compared to those without such a history: major depressive disorder and illicit drug abuse/dependence, although the former approached statistical significance. While men who reported childhood exposure to

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 412 of 535   PageID 14299

sexual abuse had higher rates of psychiatric disorder, only the association with alcohol abuse/dependence reached statistical significance.

Table 4 presents the crude and adjusted odds ratios from the logistic regression analyses. Adjusting for respondent age, sex, and socioeconomic status had little appreciable impact on the strength of association between exposure to abuse and psychiatric disorder. In every instance the strength of association (odds ratio) between a history of child abuse and psychiatric disorder was larger in magnitude for women than men. For all categories of psychiatric illness except for anxiety disorders, there was a significant interaction with gender for childhood history of both physical abuse and any abuse. Only in the prediction of lifetime anxiety disorders was there a significant interaction with gender for childhood history of sexual abuse, although the interaction approached statistical significance for major depressive disorder and antisocial behavior (Table 4).

> **View this table:**   TABLE 4
> [in this window]
> [in a new window]

## ▶ Discussion

This article highlights three main findings from the Mental Health Supplement to the Ontario Health Survey: 1) a history of physical or sexual abuse during childhood is strongly associated with lifetime psychopathology; 2) physical abuse is at least as important a correlate for psychiatric morbidity as sexual abuse; and 3) the relationship between psychiatric illness and history of childhood maltreatment tends to be stronger for women than for men. This survey cannot provide information about cause and effect relationships. As other authors have emphasized, it may not be the history of abuse itself that leads to greater vulnerability for psychiatric illness but rather confounding social and familial factors associated with both the experience of child abuse and greater risk of disorder (8, 12). These include dysfunctional family environments (associated with both physical and sexual abuse) and poverty (associated with physical abuse) (24). (While the Mental Health Supplement to the Ontario Health Survey assessed parental education and current family income, it was not possible to assess childhood history of poverty.) A longitudinal study that uses nonabused siblings as control subjects and begins in early childhood before the onset of disorder is a study design that could address these issues.

▲ TOP
▲ Abstract
▲ Introduction
▲ Method
▲ Results
• Discussion
▼ References

The Mental Health Supplement to the Ontario Health Survey relied on retrospective reports to assess the prevalence of a childhood history of physical and sexual abuse. While some suggest that the presence of emotional impairment may influence memory of events, there is little scientific evidence to support the claim that recall of experiences in childhood is altered by psychiatric symptoms or disorder (25, 26).

The survey findings suggest that childhood physical and sexual abuse are nonspecific correlates of

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 413 of 535   PageID 14300

psychiatric illness; there does not appear to be a specific association between either of these subcategories of child maltreatment and one particular psychiatric disorder category. However, one of the most important findings of this study is that the association between a history of child abuse and psychopathology varies by gender. With the exception of anxiety disorders, the relationship between childhood exposure to physical abuse and psychopathology was stronger for women than for men. The relationship between childhood exposure to sexual abuse and psychopathology followed a similar pattern but did not achieve the same patterns of statistical significance because of limited power.

Since many community surveys that have collected information about child maltreatment and psychiatric morbidity have focused exclusively on women (27), few comparisons are possible. In the supplement to the Los Angeles ECA Study (9), relative to nonabused subjects, women with a history of childhood sexual abuse experienced higher lifetime rates of all psychiatric disorders except antisocial personality disorder, while abused men had higher rates of substance abuse/dependence. The authors hypothesized that gender differences could be due to the small number of men in the sample or to variations in circumstances of abuse.

Using data from the National Comorbidity Survey (28), Kessler and colleagues found, among a subsample of respondents who had been exposed to at least one trauma, that women had much higher odds of developing PTSD than men (odds ratio=6.13). Conversely, in a separate article (14), Kessler and colleagues concluded that there was no systematic sex difference in the associations between childhood adversities (which included such interpersonal traumas as being physically attacked and sexual molestation) and a range of psychiatric disorders (excluding PTSD). These DSM-III-R diagnoses included those examined in the Mental Health Supplement to the Ontario Health Survey.

It is possible that the nature and duration of the reported abuse are dissimilar for men and women. Cutler and Nolen-Hoeksema (29) suggested that women experience more severe forms of abuse than do men. In the Mental Health Supplement to the Ontario Health Survey, although female and male respondents reported similar rates of severe physical abuse in childhood (9.2% and 10.7%, respectively) (15), physical abuse was still a stronger predictor of psychiatric illness in women than in men. The survey's definition of severe physical abuse took likelihood of injury and frequency into account but did not include duration, age at onset of abuse, or relationship with perpetrator, which are some of the factors considered in the sexual abuse literature (5).

A related issue is the overlap between reports of child physical and sexual abuse. Among female respondents who reported childhood physical abuse, 33% also had a history of sexual abuse, while the corresponding figure for male respondents was only 8%. In contrast, 56% of male and 56% of female respondents who reported childhood sexual abuse also gave a history of physical abuse. Perhaps differences in the degree of overlap between men and women led to differences in the association with psychiatric disorders. Unfortunately, the survey sample was not of sufficient size to examine this issue more closely.

Gender differences in reporting retrospective information about abuse in childhood may have contributed to this effect. An article by Widom and Morris (30) suggested that among individuals with a

history of documented sexual abuse in childhood, far fewer men than women considered their early childhood experiences as sexual abuse.

It is well documented in the literature that both physical and sexual abuse are associated with a range of adverse circumstances (12). It may be that history of physical or sexual abuse is a marker for other adverse experiences in childhood that are more common among women than men. Since the Mental Health Supplement to the Ontario Health Survey involved retrospective collection of data, detailed information about factors such as family dysfunction or income level while growing up was not available.

Perhaps the experience of physical or sexual abuse in childhood affects women differently from men because of the biological and psychological mechanisms involved in the trauma. Studies examining the impact of child maltreatment suggest that dysfunction of the hypothalamic-pituitary-adrenal axis may contribute to the development of negative outcomes such as depressive symptoms following exposure to trauma (31, 32). However, samples to date have generally involved female subjects only (31) or too few male subjects (32) to examine the effect of gender. As for psychological mechanisms that may operate differently among men and women, Cutler and Nolen-Hoeksema (29) suggest that women may be more likely to blame themselves for the abuse or may have a type of affect regulation that increases their vulnerability to negative circumstances. These areas merit further investigation, since understanding differences in risk may assist in developing effective treatments.

Since the Mental Health Supplement to the Ontario Health Survey was a cross-sectional survey, we cannot draw any conclusions about the causal role of childhood maltreatment in the development of psychiatric disorders from these findings. Nevertheless, on the basis of this community survey of more than 7,000 residents of Ontario, both physical and sexual abuse appear to be important markers for a higher likelihood of a range of psychiatric disorders in both men and women.

## ▶  Footnotes

Received July 7, 2000; revision received Feb. 6, 2001; accepted April 19, 2001. From the Canadian Centre for Studies of Children at Risk; the Department of Psychiatry, University of Toronto, Toronto; and the Department of Psychiatry, Harvard Medical School, Boston. Address reprint requests to Dr. MacMillan, Canadian Centre for Studies of Children at Risk, McMaster University, 1200 Main St. West, Patterson Bldg., Box 2000, Hamilton, Ontario, L8N 3Z5 Canada; macmilnh@mcmaster.ca (e-mail). Supported in part by the Ontario Ministries of Health; Ontario Community and Social Services; the Ontario Mental Health Foundation; Wyeth-Ayerst Canada Inc. Canadian Institutes of Health Research (CIHR) Clinical Research Chair in Women's Mental Health; a William T. Grant Faculty Scholar Award (Dr. MacMillan); and a CIHR Scientist Award (Dr. Boyle). The authors thank the Family Violence Research Seminar Group at the Family Research Laboratory, University of New Hampshire, for their comments on earlier drafts of this article.

# ▶ **References**

▲ **TOP**
▲ **Abstract**
▲ **Introduction**
▲ **Method**
▲ **Results**
▲ **Discussion**
• **References**

1. McCauley J, Kern DE, Kolodner K, Dill L, Schroeder AF, DeChant HK, Ryden J, Derogatis LR, Bass EB: Clinical characteristics of women with a history of childhood abuse: unhealed wounds. JAMA 1997; 277:1362-1368[Medline]
2. Brown GR, Anderson B: Psychiatric morbidity in adult inpatients with childhood histories of sexual and physical abuse. Am J Psychiatry 1991; 148:55-61[Abstract]
3. Jumper SA: A meta-analysis of the relationship of child sexual abuse to adult psychological adjustment. Child Abuse Negl 1995; 19:715-728[Medline]
4. Neumann DA, Houskamp BM, Pollack VE, Briere J: The long-term sequelae of childhood sexual abuse in women: a meta-analytic review. Child Maltreat 1996; 1:6-16
5. Weiss EL, Longhurst JG, Mazure CM: Childhood sexual abuse as a risk factor for depression in women: psychosocial and neurobiological correlates. Am J Psychiatry 1999; 156:816-828 [Abstract/Full Text]
6. Kendler KS, Bulik CM, Silberg J, Hettema JM, Myers J, Prescott CA: Childhood sexual abuse and adult psychiatric and substance use disorders in women: an epidemiological and cotwin control analysis. Arch Gen Psychiatry 2000; 57:953-959[Medline]
7. Mullen PE, Martin JL, Anderson JC, Romans SE, Herbison GP: Childhood sexual abuse and mental health in adult life. Br J Psychiatry 1993; 163:721-732[Abstract]
8. Fergusson DM, Horwood LJ, Lynskey MT: Childhood sexual abuse and psychiatric disorder in young adulthood, II: psychiatric outcomes of childhood sexual abuse. J Am Acad Child Adolesc Psychiatry 1996; 35:1365-1374[Medline]
9. Stein JA, Golding JM, Siegel JM, Burnam MA, Sorenson SB: Long-term psychological sequelae of child sexual abuse, in Lasting Effects of Child Sexual Abuse. Edited by Wyatt GE, Powell GJ. Newbury Park, Calif, Sage Publications, 1988, pp 135-154
10. Burnam MA, Stein JA, Golding JM, Siegel JM, Sorenson SB, Forsythe AB, Telles CA: Sexual assault and mental disorders in a community population. J Consult Clin Psychol 1988; 56:843-850 [Medline]
11. Duncan RD, Saunders BE, Kilpatrick DG, Hanson RF, Resnick HS: Childhood physical assault as a risk factor for PTSD, depression, and substance abuse: findings from a national survey. Am J Orthopsychiatry 1996; 66:437-448[Medline]
12. Mullen PE, Martin JC, Romans SE, Herbison GP: The long-term impact of the physical, emotional, and sexual abuse of children: a community study. Child Abuse Negl 1996; 20:7-21 [Medline]
13. Johnson JG, Cohen P, Brown J, Smailes EM, Bernstein DP: Childhood maltreatment increases risk for personality disorders during early adulthood. Arch Gen Psychiatry 1999; 56:600-606 [Medline]
14. Kessler RC, Davis CG, Kendler KS: Childhood adversity and adult psychiatric disorder in the US National Comorbidity Survey. Psychol Med 1997; 27:1101-1119[Medline]
15. MacMillan HL, Fleming JE, Trocmé N, Boyle MH, Wong M, Racine YA, Beardslee WR, Offord DR: Prevalence of child physical and sexual abuse in the community: results from the Ontario Health Supplement. JAMA 1997; 278:131-135[Medline]
16. Boyle MH, Offord DR, Campbell D, Catlin G, Goering P, Lin E, Racine YA: Mental Health Supplement to the Ontario Health Survey: methodology: Can J Psychiatry 1996; 41:549-558
17. Offord DR, Boyle MH, Campbell D, Goering P, Lin E, Wong M, Racine YA: One-year prevalence of psychiatric disorder in Ontarians 15 to 64 years of age. Can J Psychiatry 1996; 41:559-563[Medline]
18. World Health Organization: Composite International Diagnostic Interview (CIDI), version 1.0.

Geneva, WHO, 1990

19. Kessler RC, McGonagle KA, Zhao S, Nelson CB, Hughes M, Eshleman S, Wittchen H-U, Kendler KS: Lifetime and 12-month prevalence of DSM-III-R psychiatric disorders in the United States: results from the National Comorbidity Survey. Arch Gen Psychiatry 1994; 51:8-19 [Medline]

20. Wittchen HU: Reliability and validity studies of the WHO—Composite International Diagnostic Interview (CIDI): a critical review. J Psychiatr Res 1994; 28:57-84[Medline]

21. Straus MA: The Conflict Tactics Scales and its critics: an evaluation and new data on validity and reliability, in Physical Violence in American Families: Risk Factors and Adaptations to Violence in 8,145 Families. Edited by Straus MA, Gelles RJ. New Brunswick, NJ, Transaction, 1990, pp 49-73

22. Badgley RF, Allard HA, McCormick N, Proudfoot PM, Fortin D, Ogilvie D, Rae-Grant Q, Gélinas P-M, Pépin L, Sutherland S: Sexual Offences Against Children: Catalogue Number J2-50/1984E. Ottawa, Department of Supply and Services, 1984

23. Levy PS, Lemeshow S: Sampling of Populations: Methods and Applications. New York, John Wiley & Sons, 1999

24. MacMillan HL, Niec AC, Offord DR: Child physical abuse: risk indicators and prevention, in Recent Advances in Pediatrics, vol 14. Edited by David TJ. Edinburgh, Churchill Livingstone, 1995, pp 53-68

25. Brewin CR, Andrews B, Gotlib IH: Psychopathology and early experience: a reappraisal of retrospective reports. Psychol Bull 1993; 113:82-98[Medline]

26. Robins L, Schoenberg SP, Holmes SJ, Ratcliff KS, Benham A, Works J: Early home environment and retrospective recall: a test for concordance between siblings with and without psychiatric disorders. Am J Orthopsychiatry 1985; 55:27-41[Medline]

27. Finkelhor D: Current information on the scope and nature of child sexual abuse. Future Child 1994; 4:31-53[Medline]

28. Kessler RC, Sonnega A, Bromet E, Hughes M, Nelson CB: Posttraumatic stress disorder in the National Comorbidity Survey. Arch Gen Psychiatry 1995; 52:1048-1060[Medline]

29. Cutler SE, Nolen-Hoeksema S: Accounting for sex differences in depression through female victimization: childhood sexual abuse. Sex Roles 1991; 24:425-438

30. Widom CS, Morris S: Accuracy of adult recollections of childhood victimization, part 2: childhood sexual abuse. Psychol Assess 1997; 9:34-46

31. De Bellis MD, Chrousos GP, Dorn LD, Burke L, Helmers K, Kling MA, Trickett PK, Putnam FW: Hypothalamic-pituitary-adrenal axis dysregulation in sexually abused girls. J Clin Endocrinol Metab 1994; 78:249-255[Abstract]

32. Kaufman J, Birmaher B, Perel J, Dahl RE, Moreci P, Nelson B, Wells W, Ryan ND: The corticotropin-releasing hormone challenge in depressed abused, depressed nonabused, and normal control children. Biol Psychiatry 1997; 42:669-679[Medline]

▸ Abstract of this Article
▸ **Reprint (PDF) Version of this Article**
▸ Similar articles found in:
   AJP Online
   PubMed
▸ PubMed Citation
▸ Search Medline for articles by:
   MacMillan, H. L. || Beardslee, W. R.
▸ Alert me when:
   new articles cite this article
▸ Download to Citation Manager

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 417 of 535   PageID 14304

▶ Collections under which this article appears:
 **Child Abuse**
 **Epidemiology**

HOME   HELP   FEEDBACK   SUBSCRIPTIONS   ALL ISSUES   SEARCH   TABLE OF CONTENTS

# EXHIBIT
# 18

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 420 of 535   PageID 14307

THE AMERICAN JOURNAL OF PSYCHIATRY



EMAIL CONTENT DELIVERY

HOME HELP FEEDBACK SUBSCRIPTIONS ALL ISSUES SEARCH TABLE OF CONTENTS

**Institution: SOUTHERN METHODIST LIBRARY UNDERWOOD LAW LIBRARY** ‖
Sign In as Member/Non-member ‖ Contact Subscription Administrator at your institution ‖ **FAQ**

Am J Psychiatry 158:1871-1877, November 2001
© 2001 American Psychiatric Association

**Article**

# The Relationship of Childhood Abuse to Impulsivity and Suicidal Behavior in Adults With Major Depression

**Beth S. Brodsky, Ph.D., Maria Oquendo, M.D.,
Steven P. Ellis, Ph.D., Gretchen L. Haas, Ph.D.,
Kevin M. Malone, M.D., and J. John Mann, M.D.**

- Abstract of this Article
- **Reprint (PDF) Version of this Article**
- Similar articles found in:
    AJP Online
    PubMed
- PubMed Citation
- Search Medline for articles by:
    Brodsky, B. S. ‖ Mann, J. J.
- Alert me when:
    new articles cite this article
- Download to Citation Manager

- Collections under which this article appears:
    **Depression
    Symptoms/Dimensions
    Suicide
    Child Abuse**

## ▶ Abstract

▲ TOP
· Abstract
▼ Introduction
▼ Method
▼ Results
▼ Discussion
▼ References

**OBJECTIVE:** This study investigated whether a higher frequency of reported childhood trauma would be found in depressed adults with higher levels of trait impulsivity, aggression, and suicidal behavior. **METHOD:** In 136 depressed adult inpatients, the authors assessed trait impulsivity, aggression history, and number of lifetime suicide attempts as well as the medical lethality and the intent to die associated with the most lethal attempt. These variables were then compared between those with and those without a reported history of childhood physical or sexual abuse. **RESULTS:** Subjects who reported an abuse history were more likely to have made a suicide attempt and had significantly higher impulsivity and aggression scores than those who did not report an abuse history. Impulsivity and aggression scores were significantly higher in subjects with a history of at least one suicide attempt. A logistic regression analysis revealed that abuse history remained significantly associated with suicide attempt status after adjustment for impulsivity, aggression history, and presence of borderline personality disorder. Among those who attempted suicide, there were no significant differences in severity of suicidal behavior between those with and without a childhood history of abuse. **CONCLUSIONS:** Abuse in childhood may constitute an environmental risk factor for the development of trait impulsivity and aggression as well as suicide attempts in depressed adults. Alternatively, impulsivity and aggression may be inherited traits underlying both childhood abuse and suicidal behavior in adulthood disorders. Additional research is needed to estimate the relative contributions of heredity and environmental experience to the development of impulsivity, aggression, and suicidal behavior.

▶    # Introduction

▲ TOP
▲ Abstract
• Introduction
▼ Method
▼ Results
▼ Discussion
▼ References

Major depression is the most common psychiatric disorder associated with suicide and attempted suicide (1). The presence of depression may be necessary but is insufficient to explain suicidal behavior in individuals who have major depression, since most patients with major depression never make a suicide attempt. Studies have identified impulsivity and aggression as correlates of a history of suicide attempts (2–4). Impulsivity is regarded as a trait that predisposes an individual to engage in self-destructive behavior in response to suicidal thoughts. A diathesis-stress model of suicide has been proposed in which an impulsivity/aggression factor is part of the diathesis that interacts with stressors that trigger the person to act (2).

The term "impulsivity" has been used in relation to a variety of loosely defined constructs, such as 1) a personality trait or cognitive style characterized by disinhibition, 2) a tendency to act quickly on urges or to stimuli, and 3) a class of psychiatric disorders characterized by behavioral dyscontrol. Impulsivity has been found to be associated with suicidal and self-destructive behaviors within various adult psychiatric populations (3, 4). In individuals with borderline personality disorder, impulsivity is the personality trait most predictive of suicidal behavior (3). Moreover, Herpertz and Favazza (4) found that clinical and biological measures of trait impulsivity were higher in individuals with a history of self-mutilation than in those without such a history. Suicidal behavior has been found in association with impulse control disorders such as compulsive gambling (5). Low serotonergic activity, a biological correlate of impulsive aggression toward person or property (6–8), has also been associated with suicidal behavior (9–12). Such studies suggest a common psychopathologic and biologic substrate for impulsivity, impulsive aggression, and suicidal acts.

Early childhood trauma has been associated with self-destructive and suicidal behavior later in life (13–15). Although the reason for this association is unclear, the high prevalence of a childhood abuse history among populations with a borderline personality (characterized by impulsivity and self-injury) has stimulated investigation into the mechanism whereby childhood abuse influences personality development (16–19). The association between childhood trauma and self-destructive behavior in adulthood may be mediated in part by a relationship between abuse history and the development of the biological underpinnings and the psychological aspects of the trait of impulsivity. Impulsivity and aggression may be personality traits that develop or are more pronounced in response to early childhood experiences of trauma and loss. For example, there is evidence of a relationship between maternal deprivation, low serotonin levels, and aggression in monkeys (20). However, the relationship between childhood abuse, impulsivity/aggression, and suicidal behavior has received very little study in human psychiatric populations.

This study investigated the relationship of reported childhood trauma to impulsivity, aggression, and suicidal behavior in depressed adults. We hypothesized that impulsivity and aggression would be related to a reported history of childhood abuse and thereby mediate the relationship between childhood abuse and suicidal behavior in adulthood. We hypothesized that a higher frequency of childhood trauma would

Case 3:13-cv-01535-L    Document 17-116    Filed 08/21/14    Page 422 of 535    PageID 14309

be reported by depressed adults with higher levels of adult trait impulsivity, aggression, and suicidal behavior. We measured trait impulsivity, aggression history, number of previous suicide attempts, and the medical lethality and intent to die associated with the most lethal attempt in a group of depressed adult inpatients; these variables were then compared between subjects with and those without a reported history of childhood physical or sexual abuse.

# ▶ Method

## Subjects

Patients (N=136) who met DSM-III-R criteria for major depressive episode according to the Structured Clinical Interview for DSM-III-R (SCID) were entered into the study. After complete description of the study to the subjects, written informed consent was obtained. The study protocol was approved by our institutional review board.

▲ TOP
▲ Abstract
▲ Introduction
• Method
▼ Results
▼ Discussion
▼ References

Exclusion criteria were current substance or alcohol abuse, neurological illness, or other active medical conditions. The presence or absence of physical or sexual abuse before the age of 15 was determined by responses to three direct questions from the Columbia Demographic and Treatment History Interview; lifetime history of suicide attempts was obtained with the Columbia Suicide History Form (both instruments available from J.J.M.). The Columbia Suicide History Form is a semistructured instrument that elicits information about lifetime suicide attempts, the method employed, medical lethality, precipitants, and surrounding circumstances. A suicide attempt was defined as a deliberate self-destructive act with some degree of intent to end one's life. Lethality was measured by the Suicide Lethality Scale (21), which assesses objective medical damage and treatment. Suicidal intent at the time of the most lethal suicide attempt was assessed by using the Suicide Intent Scale (21). Rater reliability (intraclass correlation coefficients [ICCs]) on suicide interview measures was high (ICC=0.94–0.99). Depressive symptoms immediately before admission to the hospital were assessed with the Hamilton Depression Rating Scale (22). Rater reliability for the Hamilton depression scale was also high (ICC=0.97). Impulsivity was measured with the Barratt Impulsivity Scale (23), a self-report instrument that has validity and reliability in the measurement of trait impulsivity. Aggression history was assessed with the Brown-Goodwin Aggression Inventory (24) (reliability ICC=0.96). The Hopelessness Scale (25) is a self-report scale that was administered to measure state levels of hopelessness. The presence or absence of borderline personality disorder was determined by assessing axis II personality disorder pathology with the Structured Clinical Interview for DSM-III-R Personality Disorders (SCID-II). Rater reliability on diagnostic interview measures was adequate (SCID: ICC=0.80; SCID-II: ICC=0.70).

The subjects were recruited at two university hospital sites, one in New York City (N=47) and the other in Pittsburgh (N=89). The study groups from the two sites were comparable in all variables except for a modest difference in age: the New York subjects (mean age=39.5 years, SD=12.9) were 4.6 years older than the Pittsburgh subjects (mean=34.9, SD=11.1) (t=–2.2, df=134, p=0.03).

## Data Analysis

Student's t tests compared demographic, suicide, impulsivity, aggression, and depression measures between abused and nonabused groups. Chi-square analyses compared groups with respect to

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 423 of 535   PageID 14310

dichotomous variables.

Analyses were also conducted to estimate effects of a comorbid borderline personality disorder diagnosis. Univariate analyses compared differences in impulsivity, aggression history, reported abuse history, and suicide attempt status between depressed subjects who met criteria for borderline personality disorder and those who did not.

A logistic regression analysis was performed for the dichotomous variable of suicide attempt status, with abuse history, impulsivity, and three other covariates of abuse history (sex, race, and borderline personality disorder diagnosis) as predictor variables. Among the subgroup of patients who had a previous suicide attempt (N=73), a linear regression analysis was performed for the number of previous suicide attempts, with abuse history and impulsivity scores as predictor variables. In order to use parametric tests, the number of previous suicide attempts was transformed by taking the square root to normalize the distribution.

## ▶  Results

Of the 136 subjects, 52 (38%) reported a history of physical or sexual abuse before the age of 15 years, and 84 (62%) reported no childhood abuse. There was no difference in age between the abused (mean=35.4 years, SD=11.4) and nonabused (mean=37.2 years, SD=11.9) subjects (t=–0.88, df=134, p=0.37). Other demographic characteristics of the abused and nonabused groups are reported in Table 1. There was no difference in marital status or educational level between abused and nonabused subjects. Subjects reporting a history of childhood abuse were more likely to be female and were more likely to be African American or Hispanic than were those who did not report childhood abuse.

▲ TOP
▲ Abstract
▲ Introduction
▲ Method
• Results
▼ Discussion
▼ References

**View this table:**   TABLE 1
[in this window]
[in a new window]

Subjects who reported abuse were more likely to have a comorbid diagnosis of borderline personality disorder than those who did not report abuse and were also more likely to have made a suicide attempt (Table 1). Table 2 lists the differences between abused and nonabused groups on clinical characteristics and other suicidal history variables. Subjects who reported a history of childhood physical or sexual abuse had significantly higher impulsivity and aggression scores than did those with no history of abuse. There was no significant difference in severity of depression or levels of hopelessness at the time of admission between those who reported a history of abuse and those who did not.

**View this table:**   TABLE 2

[in this window]
[in a new window]

Barratt Impulsivity Scale scores were significantly higher in subjects who had a history of at least one suicide attempt (mean=52.3, SD=16.8) than in those who had never attempted suicide (mean=45.7, SD=17.8) (t=-2.17, df=104, p=0.05). Brown-Goodwin Aggression Inventory scores were significantly higher in subjects who had a history of at least one suicide attempt (mean=19.8, SD=6.2) than in those who had never attempted suicide (mean=16.3, SD=5.2) (t=3.30, df=104, p=0.001).

Among the subgroup of patients with a previous suicide attempt (N=73), the number of previous attempts and the lethality and intent to die associated with the most lethal attempt did not differ between those with a history of abuse in childhood and those without (Table 2). In a linear regression analysis among subjects with previous suicide attempts, the square root of number of previous suicide attempts was not predicted by abuse history (beta [ß]=0.13, SE=0.16; t=0.88, df=47, p=0.38), impulsivity (ß=0.17, SE=0.005; t=1.09, df=47, p=0.28), or aggression (ß=0.00, SE=0.01; t=0.01, df=47, p=0.99). The mean age of the first suicide attempt was lower in the abused group (mean age=22.7 years, SD=11.4) than in the nonabused group (mean=28.7, SD=12.7) (t=-2.1, df=72, p=0.04). Of the 37 suicide attempters who reported a history of childhood abuse, 17 (46%) made their first suicide attempt before the age of 18. Of the 36 suicide attempters without a history of childhood abuse, seven (19%) made their first attempt before age 18 (Yates's correction for continuity: $x^2$=4.67, df=1, p<0.03).

In analyses that compared subjects with and without a comorbid diagnosis of borderline personality disorder, abuse history ($x^2$=5.15, df=1, p=0.02) and attempt status ($x^2$=17.83, df=1, p<0.0001) were significantly related to a comorbid borderline personality disorder diagnosis. In a subset of 108 subjects for whom we had measures of borderline personality disorder and impulsivity, Barratt Impulsivity Scale scores were higher among those with borderline personality disorder (mean=55.33, SD=18.12) than in those without the comorbid diagnosis (mean=46.0, SD=16.5) (t=-2.64, df=104, p=0.01). Brown-Goodwin Aggression Inventory scores were higher among those with borderline personality disorder (mean=17.4, SD=6.1) than in those without the comorbid diagnosis (mean=20.1, SD=5.6) (t=-2.34, df=118, p=0.02).

A univariate analysis was performed to examine the relationship between abuse history and suicide attempt status after we controlled for the presence of borderline personality disorder. In the subgroup of depressed subjects that did not meet criteria for comorbid borderline personality disorder (N=88), those who reported a history of abuse were significantly more likely to have made a previous suicide attempt (46%, N=16 of 35) than those without a history of abuse (21%, N=11 of 53) (Yates's correction for continuity: $x^2$=5.01, df=1, p=0.03). There was no difference in suicide attempt status between the 25 borderline personality disorder subjects who reported a history of abuse (84%, N=21) and the 23 borderline personality disorder subjects who reported no history of abuse (74%, N=17) (p=0.49, Fisher's exact test).

In a logistic regression analysis of abuse history, impulsivity, aggression history, and borderline

Case 3:13-cv-01535-L  Document 17-116  Filed 08/21/14   Page 425 of 535   PageID 14312

personality disorder in the prediction of suicide attempt status, we found that after we adjusted for borderline personality disorder, impulsivity, and aggression history, abuse history remained significantly associated with attempter status (Table 3). Demographic covariates of abuse history (sex and race) did not affect the relationship of abuse history to suicide attempt status. In testing for second-order interactions between abuse history and borderline personality disorder, abuse history and sex, and borderline personality disorder and sex, we found no significant interactions in relation to suicide attempt status. Similarly, no third-order interaction was found among abuse history, borderline personality disorder, and sex in relation to suicide attempt status.

**View this table:**   TABLE 3
[in this window]
[in a new window]

## ▶ Discussion

Our main finding was that depressed adults who reported a history of either physical or sexual abuse in childhood were more likely to have made a previous suicide attempt than those who did not report a history of abuse. They also had higher levels of trait impulsivity, higher levels of aggression, and a higher rate of comorbid borderline personality disorder. Thus, a childhood abuse history is associated with both suicidal behavior and impulsivity in depressed adults. These findings are comparable to those of other studies that have found associations between childhood abuse history and adult psychopathology (26–29) in general and between childhood abuse history and self-destructive behavior (such as self-mutilation) and suicidal ideation, gestures, and attempts in particular (13, 30, 31).

▲ TOP
▲ Abstract
▲ Introduction
▲ Method
▲ Results
• Discussion
▼ References

In addition, our findings indicate that, after we adjusted for impulsivity and aggression, abuse history is still significantly associated with suicide attempt status. Therefore, the presence of impulsivity and aggression do not seem to mediate the relationship between abuse history and suicidal behavior. It is possible that the experience of physical or sexual abuse in childhood constitutes an environmental factor that influences the development of both trait impulsivity/aggression and suicidality.

There is also evidence from this study that childhood abuse contributes to an earlier age at onset of suicidal behavior and that it is related to suicidal behavior beginning in childhood and adolescence. This is similar to findings of Kaplan et al. (32), who found that victims of abuse were more likely than nonvictim comparison subjects to have been suicidal at a younger age.

Alternatively, there is a possibility that impulsivity is mainly an inherited trait underlying both the childhood abuse (perhaps at the hands of a first-degree relative with trait impulsivity and aggression) as well as the manifestation of adult trait impulsivity and aggression (33, 34). Despite the fact that impulsivity and aggression levels are higher in depressed adults who report childhood abuse, abuse

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 426 of 535   PageID 14313

history is likely to be only one factor contributing to trait impulsivity and aggression. For example, there is evidence from nonhuman primate studies (20) that both genetic transmission as well as environmental factors such as maternal deprivation contribute to the presence of biological correlates of impulsivity. Peer-raised monkeys reset their CSF 5-hydroxyindoleacetic acid levels at a lower level compared to maternally raised monkeys, and this effect endures for years and is associated with impulsive and aggressive behaviors. Therefore, impulsivity may be an inherited trait that is worsened by environmental experiences of abuse. Along these lines, recent studies of the relationship of hypothalamic-pituitary-adrenal axis dysfunction to posttraumatic stress disorder in psychiatric populations indicate that traumatic experience may have long-lasting neurobiological effects on humans that contribute to psychopathology (35).

Additionally, abuse history and impulsivity are two of a number of risk factors for suicidal behavior. A history of childhood abuse is possibly associated with other risk factors, such as vulnerability to certain environmental triggers. Furthermore, there is evidence that postabuse protective factors such as the presence of a caring adult (13) as well as involvement in sports throughout childhood/adolescence and high quality of adult relationships (36) can mediate between abuse history and adult psychopathology. Thus, a comprehensive approach should view suicidal behavior within a framework of concurrent psychological and biological lines of development (16, 37).

Another related finding of this study is that level of trait impulsivity and aggression, and not the objective severity of depression, is significantly associated with suicide attempt status. This is consistent with our previous finding that objective severity and duration of depressed mood is not associated with higher risk for suicide among depressed inpatients (38). Brent et al. (39) also found that, while psychopathology in first-degree relatives of adolescent suicide victims does not fully account for the familial transmission of suicidal behavior, higher levels of aggression are associated with higher familial loading for suicidal behavior. These findings lend support to a stress-diathesis model of suicidal behavior that considers the biological and personality traits that might lower an individual's threshold for acting on mood states, suicidal ideation, or other state or environmental triggers (2).

Although abuse history and impulsivity were predictive of suicide attempt status, they were not associated with differences in severity of suicidal behavior, such as the number of previous suicide attempts or level of intent associated with the most lethal attempt in this group of depressed inpatients. This differs from another report that found a relationship between childhood abuse and multiple suicide attempts in a general outpatient psychiatric population (32). This difference might be due to the fact that we controlled for the effects of major depression by limiting our study group to depressed inpatients.

Comorbid borderline personality disorder, while strongly associated with both abuse history and suicide attempt status, does not completely account for the relationship between abuse history and suicide attempt status. However, the presence of a comorbid diagnosis of borderline personality disorder does seem to be associated with higher levels of impulsivity and aggression. Thus, as we have found previously (3), impulsivity is a characteristic of borderline personality disorder that is associated with the risk to attempt suicide.

One weakness of the present study is its reliance on a broadly defined, retrospective report of abuse history that was not validated by other sources. However, two prospective studies of a birth cohort of New Zealand children studied to the age of 16 support the reliability of the retrospective reporting in th present study. In one, early disadvantageous childhood and family circumstances were identified longitudinally as a common pathway to suicidal behavior in adolescence (40). In the other, when these same subjects were requestioned at age 18–21 about their childhood exposure to physical and sexual abuse, it was found that there was a 50% false negative rate of reporting in those whose abuse had been documented. These inconsistencies were unrelated to the subjects' psychiatric state. Among those who were not abused, there were no false positive reports (41). In addition to documenting the childhood trauma closer to the time that it takes place, prospective studies can consider other observable sequelae of abuse that might contribute to suicidal behavior, such as greater vulnerability to environmental events that might trigger memories of abuse and dissociative states that might impair judgment and cognitive processing. However, such studies take years to complete because the cohort must pass through a major part of the age of risk for suicidal behavior.

Although the present study was unable to explore more detailed dimensions of abuse history such as type, perpetrator, duration, or age at onset of abuse, several studies show that sexual abuse and emotional neglect, more than physical abuse, seem to be associated with suicidal behavior (42–44). The specific characteristics of abuse history and their relationship to suicidal behavior warrants further study.

Another weakness of this study is that all of the subjects were clinically referred and were therefore more likely to have a history of abuse or suicidal behavior. However, studies of college students (44–46), patients in primary care settings (44), and other nonclinical populations (47) have also documented a relationship between abuse history in childhood and suicidal behavior later in life.

These findings suggest that clinicians should be aware of the possibility of a history of childhood abuse in depressed patients with a history of suicide attempts and other impulsive behaviors. Additional research is needed to further identify the relative contributions of heredity and environmental experience to the development of impulsivity, aggression, and suicidal behavior.

▶   **Footnotes**

Received Oct. 7, 1999; revisions received Aug. 17, 2000, and March 2, 2001; accepted May 10, 2001. From the Conte Center for the Study of Suicidal Behavior, Department of Psychiatry, Columbia University College of Physicians and Surgeons; the Department of Neuroscience, New York State Psychiatric Institute, New York; and the Western Psychiatric Institute and Clinic, Pittsburgh. Address reprint requests to Dr. Brodsky, Department of Psychiatry, Columbia University College of Physicians and Surgeons, 1051 Riverside Dr., Box 42, New York, NY 10032. Supported by NIMH grants MH-48514 and MH-46745. The authors thank Ainsley Burke, Elizabeth Nelson, Sara Oppenheim, Donna Abbondanza, and Thomas Kelly for completing the clinical ratings.

# ▶ References

▲ TOP
▲ Abstract
▲ Introduction
▲ Method
▲ Results
▲ Discussion
• References

1. Henriksson MM, Aro HM, Marttunen MJ, Heikkinen ME, Isometsä ET, Kuoppasalmi KI, Lonnqvist JK: Mental disorders and comorbidity in suicide. Am J Psychiatry 1993; 150:935-940[Abstract]

2. Mann JJ, Waternaux C, Haas GL, Malone KM: Toward a clinical model of suicidal behavior in psychiatric patients. Am J Psychiatry 1999; 156:181-189 [Abstract/Full Text]

3. Brodsky BS, Malone KM, Ellis SP, Dulit RA, Mann JJ: Characteristics of borderline personality disorder associated with suicidal behavior. Am J Psychiatry 1997; 154:1715-1719[Abstract/Full Text]

4. Herpertz S, Favazza A: Impulsivity in self-mutilative behavior: psychometric and biological findings. J Psychiatr Res 1997; 31:451-465[Medline]

5. Phillips DP, Welty WR, Smith MM: Elevated suicide levels associated with legalized gambling. Suicide Life Threat Behav 1997; 27:373-378[Medline]

6. Coccaro EF, Silverman JM, Klar HM, Horvath TB, Siever LJ: Familial correlates of reduced central serotonergic system function in patients with personality disorders. Arch Gen Psychiatry 1994; 51:318-324[Medline]

7. Roy A, Linnoila M: Suicidal behavior, impulsiveness and serotonin. Acta Psychiatr Scand 1988; 78:529-535[Medline]

8. Linnoila M, Virkunnen M: Biologic correlates of suicidal risk and aggressive behavioral traits. J Clin Psychopharmacol 1992; 12(April suppl):19S-20S

9. Mann JJ, Malone KM: Cerebrospinal fluid amines and higher lethality suicide attempts in depressed inpatients. Biol Psychiatry 1997; 41:162-171[Medline]

10. Mann JJ, Malone KM, Sweeney JA, Brown RP, Linnoila M, Stanley B, Stanley M: Attempted suicide characteristics and cerebrospinal fluid amine metabolites in depressed inpatients. Neuropsychopharmacology 1996; 15:576-586[Medline]

11. Nordstrom P, Asberg M: Suicide risk and serotonin. Int Clin Psychopharmacol 1992; 6(suppl 6):12-21

12. Traskman-Bendz L, Åsberg M, Nordstrom B, Stanley M: Biochemical aspects of suicidal behavior. Prog Neuropsychopharmacol Biol Psychiatry 1989; 13(suppl):S35-S44

13. van der Kolk BA, Perry JC, Herman JL: Childhood origins of self-destructive behavior. Am J Psychiatry 1991; 148:1665-1671[Abstract]

14. Boudewyn AC, Liem JH: Psychological, interpersonal, and behavior correlates of chronic self-destructiveness: an exploratory study. Psychol Rep 1995; 77(3, part 2):1283-1297

15. Briere J, Runtz M: Differential adult symptomatology associated with three types of child abuse histories. Child Abuse Negl 1990; 14:357-364[Medline]

16. Cole P, Putnam FW: Effect of incest on self and social functioning: a developmental psychopathology perspective. J Consult Clin Psychol 1992; 60:174-184[Medline]

17. Zanarini MC, Frankenburg FR: Pathways to the development of borderline personality disorder. J Personal Disord 1997; 11:93-104[Medline]

18. Sabo AN: Etiological significance of associations between childhood trauma and borderline personality disorder: conceptual and clinical implications. J Personal Disord 1997; 11:50-70 [Medline]

19. Johnson JG, Cohen P, Brown J, Smailes EM, Bernstein DP: Childhood maltreatment increases risk for personality disorders during early adulthood. Arch Gen Psychiatry 1999; 56:600-606 [Medline]

20. Higley JD, Thompson WW, Champoux M, Goldman D, Hasert MF, Kraemer GW, Scanlan JM, Suomi SJ, Linnoila M: Paternal and maternal genetic and environmental contributions to

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 429 of 535   PageID 14316

cerebrospinal fluid monoamine metabolites in rhesus monkeys. Arch Gen Psychiatry 1993; 50:615-623[Medline]

21. Beck AT, Beck R, Kovacs M: Classification of suicidal behaviors, I: quantifying intent and medical lethality. Am J Psychiatry 1975; 132:285-287[Abstract]

22. Hamilton M: A rating scale for depression. J Neurol Neurosurg Psychiatry 1960; 23:56-62

23. Barratt ES: Factor analysis of some psychometric measures of impulsiveness and anxiety. Psychol Rep 1965; 16:547-554

24. Brown GL, Goodwin FK, Ballenger JC, Goyer PF, Major LF: Aggression in humans correlates with cerebrospinal fluid amine metabolites. Psychiatry Res 1979; 1:131-139[Medline]

25. Beck AT, Weissman A, Lester D, Trexler L: The measurement of pessimism: the Hopelessness Scale. J Consult Clin Psychol 1974; 42:861-865[Medline]

26. Levitan RD, Parikh SV, Lesage AD, Hegadoren KM, Adams M, Kennedy SH, Goering PN: Major depression in individuals with a history of childhood physical or sexual abuse: relationship to neurovegetative features, mania, and gender. Am J Psychiatry 1998; 155:1746-1752 [Abstract/Full Text]

27. Bryer JB, Nelson BA, Miller JB, Krol PA: Childhood sexual and physical abuse as factors in adult psychiatric illness. Am J Psychiatry 1987; 144:1426-1430[Abstract]

28. Brown GR, Anderson B: Psychiatric morbidity in adult inpatients with childhood histories of sexual and physical abuse. Am J Psychiatry 1991; 148:55-61[Abstract]

29. Hall LA, Sachs B, Rayens MK, Lutenbacher M: Childhood physical and sexual abuse: their relationship with depressive symptoms in adulthood. Image 1993; 25:317-323

30. Boudewyn AC, Liem JH: Childhood sexual abuse as a precursor to depression and self-destructive behavior in adulthood. J Trauma Stress 1995; 8:445-459[Medline]

31. Romans SE, Martin JL, Anderson JC, Herbison GP, Mullen PE: Sexual abuse in childhood and deliberate self-harm. Am J Psychiatry 1995; 152:1336-1342[Abstract]

32. Kaplan ML, Asnis GM, Lipschitz DS, Chorney P: Suicidal behavior and abuse in psychiatric outpatients. Compr Psychiatry 1995; 36:229-235[Medline]

33. Roberts J, Hawton K: Child abuse and attempted suicide. Br J Psychiatry 1980; 137:319-323 [Abstract]

34. Kaplan SJ, Pelcovitz D, Salzinger S, Ganeles D: Psychopathology of abused and neglected children and adolescents. J Am Acad Child Psychiatry 1983; 22:238-244[Medline]

35. Yehuda R, Boisoneau D, Lowy MT, Giller EL Jr: Dose-response changes in plasma cortisol and lymphocyte glucocorticoid receptors following dexamethasone administration in combat veterans with and without posttraumatic stress disorder. Arch Gen Psychiatry 1995; 52:583-593[Medline]

36. Romans SE, Martin JL, Anderson JC, O'Shea ML, Mullen PE: Factors that mediate between child sexual abuse and adult psychological outcome. Psychol Med 1995; 25:127-142[Medline]

37. Post RM: Transduction of psychosocial stress into the neurobiology of recurrent affective disorder. Am J Psychiatry 1992; 149:999-1010[Abstract]

38. Malone KM, Haas GL, Sweeney JA, Mann JJ: Major depression and the risk of attempted suicide. J Affect Disord 1995; 34:173-185[Medline]

39. Brent DA, Bridge J, Johnson BA, Connolly J: Suicidal behavior runs in families: a controlled family study of adolescent suicide victims. Arch Gen Psychiatry 1996; 53:1145-1152[Medline]

40. Fergusson DM, Lynskey MT: Childhood circumstances, adolescent adjustment and suicide attempts in a New Zealand birth cohort. J Am Acad Child Adolesc Psychiatry 1995; 34:612-622 [Medline]

41. Fergusson DM, Horwood LJ, Woodward LJ: The stability of child abuse reports: a longitudinal study of the reporting behaviour of young adults. Psychol Med 2000; 30:529-544[Medline]

42. Brown J, Cohen P, Johnson JG, Smailes EM: Childhood abuse and neglect: specificity of effects on adolescent and young adult depression and suicidality. J Am Acad Child Adolesc Psychiatry 1999; 38:1490-1496[Medline]

43. Lipschitz DS, Winegar RK, Nicolaou AL, Hartnick E, Wolfson M, Southwick SM: Perceived

abuse and neglect as risk factors for suicidal behavior in adolescent inpatients. J Nerv Ment Dis 1999; 187:32-39[Medline]

44. Gould DA, Stevens NG, Ward NG, Carlin AS, Sowell HE, Gustafson B: Self-reported childhood abuse in an adult population in a primary care setting: prevalence, correlates, and associated suicide attempts. Arch Fam Med 1994; 3:252-256[Medline]

45. Bryant SL, Range LM: Type and severity of child abuse and college students' lifetime suicidality. Child Abuse Negl 1997; 21:1169-1176[Medline]

46. Stepakoff S: Effects of sexual victimization on suicidal ideation and behavior in US college women. Suicide Life Threat Behav 1998; 28:107-126[Medline]

47. Davidson JR, Hughes DC, George LK, Blazer DG: The association of sexual assault and attempted suicide within the community. Arch Gen Psychiatry 1996; 53:550-555[Medline]

- Abstract of this Article
- **Reprint (PDF) Version of this Article**
- Similar articles found in:
  AJP Online
  PubMed
- PubMed Citation
- Search Medline for articles by:
  Brodsky, B. S. || Mann, J. J.
- Alert me when:
  new articles cite this article
- Download to Citation Manager

- Collections under which this article appears:
  **Depression**
  **Symptoms/Dimensions**
  **Suicide**
  **Child Abuse**

# EXHIBIT
# 19



THE AMERICAN JOURNAL
OF PSYCHIATRY

HOME HELP FEEDBACK SUBSCRIPTIONS ALL ISSUES SEARCH TABLE OF CONTENTS

**Institution: SOUTHERN METHODIST LIBRARY UNDERWOOD LAW LIBRARY ||**
Sign In as Member/Non-member || Contact Subscription Administrator at your institution || **FAQ**

Am J Psychiatry 156:794-795, May 1999
© 1999 American Psychiatric Association

▸ **Reprint (PDF) Version of this Article**
▸ Similar articles found in:
   AJP Online
▸ Search Medline for articles by:
   HERMAN, M.D., J. L.
▸ Alert me when:
   new articles cite this article
▸ Download to Citation Manager

▸ Collections under which this article appears:
   **Child Abuse**

**Book Forum:**
**PSYCHOLOGICAL TRAUMA**

# Betrayal Trauma: The Logic of Forgetting Childhood Abuse

**by Jennifer J. Freyd. Cambridge, Mass., Harvard University Press, 1997, 221 pp., $24.95.**

**JUDITH LEWIS HERMAN, M.D.**
*Cambridge, Mass.*

Of all the curious phenomena associated with psychological trauma, none has caused more controversy than the issue of recovered memory. It seems to defy logic that people who have survived rape, combat, torture, or incest might not remember what happened to them. Common sense predicts that such horrible experiences would be indelibly engraved in memory, and for many survivors this is indeed the case. However, a century of clinical observation leaves no doubt that some traumatized people develop amnesia for the event and may not recall their experiences until months or even years later. How can we understand this?

Jennifer Freyd, a professor and researcher in cognitive psychology, proposes the theory that amnesia might be an adaptive response to trauma in circumstances where the victim is dependent on the perpetrator for survival. Other investigators have thought that amnesia might be correlated with some aspect of the trauma, such as the degree of violence, physical injury, or life threat. Freyd calls attention instead to the social context in which the trauma occurs. The relationship between victim and perpetrator is central to her theory. "In order to survive in cases of core betrayals (abuse by a trusted caregiver on a dependent victim) some amount of information blockage is likely to be required. The probability of amnesia is a function of the degree of betrayal" (p. 75).

In one of the most ingenious and original sections of the book, Freyd puts her hypothesis to the test by reanalyzing data from four recently published studies of adults with histories of childhood sexual abuse. In each case, she finds that those who were abused by close relatives were more likely to have forgotten the abuse for a time but that those who were not related to their abusers were more likely to have continuous memory. She finds the highest rates of amnesia in those who reported abuse by a parent.

*Betrayal Trauma* ranges widely, from the arcana of laboratory studies of memory to the personal stories

of survivors who remembered childhood abuse after long periods of amnesia and whose accounts were later corroborated by independent witnesses. Freyd's style ranges, too, from anecdotal to academic. She seems most comfortable when she is explaining complicated cognitive experiments, and one can easily imagine her lecturing in front of an enthralled class of beginning psychology students. One can also imagine how uncomfortable this thoroughly professional and private woman must feel about publicly disclosing her own history of childhood abuse.

In a poignant afterword, Freyd makes it clear that she lost the option of privacy when her parents, who are founders of an advocacy organization called the False Memory Syndrome Foundation, mounted a highly visible attack on her credibility. With great dignity and restraint, Freyd describes the relentless harassment and personal vilification that she has endured from her parents and their organization, a campaign that included letters to her professional colleagues, demeaning allegations in the popular media, and, at one point, a picketer in front of her office. Rather than complaining, Freyd pleads for a return to the discourse of scientific inquiry. "My own history does not argue for or against betrayal trauma theory," she writes. "The theory must stand or fall on its own evidence and logic." Readers looking for gossip and sensational detail will be disappointed; they will find instead a thoughtful and impassioned treatise by a survivor who has transformed her own betrayal trauma into an investigation of the psychology of memory.

▶ **Reprint (PDF) Version of this Article**
▶ Similar articles found in:
  AJP Online
▶ Search Medline for articles by:
  HERMAN, M.D., J. L.
▶ Alert me when:
  new articles cite this article
▶ Download to Citation Manager

▶ Collections under which this article appears:
  **Child Abuse**

Understanding the Effects of Maltreatment on Early Brain Development
Page 1 of 20
Case 3:13-cv-01535-L    Document 17-116    Filed 08/21/14    Page 434 of 535    PageID 14321



cip Navigation

What's New

Funding Sources

Prevention

State Statutes

Statistics

Calendar

Catalog

Databases

lications

Search:

[go]

ïeed tips?



*U.S. Department of Health and Human Services*    ACF Home  Search  Questions?  Privacy  Site Index

*The Administration for Children and Families*

Programs    Contacts    Grants & Contracts    State & Local    Research & Publications    Budget & Policy

## National Clearinghouse on Child Abuse and Neglect Information

Home    About Us    FAQs    Site Map    Links    Feedback

## Publications

## *IN FOCUS:*

# Understanding the Effects of Maltreatment on Early Brain Development
### October 2001

- How the Brain Develops
- Effects of Maltreatment on Brain Development
- Implications for Practice and Policy
- Summary and Research Recommendations
- References

*"Our brains are sculpted by our early experiences. Maltreatment is a chisel that shapes a brain to contend with strife, but at the cost of deep, enduring wounds."*
        --Teicher, 2000, p.67

In recent years, there has been a surge of research into early brain development. As recently as the 1980s, many professionals thought that by the time babies are born, the structure of their brains was already genetically determined. The role of experience on the developing brain structure was under-appreciated, as was the active role of babies in their own brain development through interaction with their environment (Shore, 1997). While much of the research examining brain functioning has been done with animals, new technologies are enabling more non-invasive research to be done with humans. Although there is still much to learn, we now know much more about the brain's development and functioning.

One area that has been receiving increasing research attention involves the effects of abuse and neglect on the developing brain during infancy and early childhood. Much of this research is providing biological explanations for what practitioners have been describing in psychological, emotional, and behavioral terms. We are beginning to see the scientific "evidence" of altered brain functioning as a result of early abuse and neglect. This emerging body of knowledge has many implications for the prevention and treatment of child abuse and neglect.

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 435 of 535   PageID 14322

## HOW THE BRAIN DEVELOPS

What we have learned about the process of brain development has helped us understand more about the influence of genetics and environment on our total development--the "nature versus nurture" debate. It appears that genetics predispose us to develop in certain ways. But our interactions with our environment have a significant impact on how our predispositions will be expressed; these interactions organize our brain's development and, therefore, shape the person we become (Shore, 1997).

### Forming the Structure

The raw material of the brain is the nerve cell, called the *neuron*. When babies are born, they have almost all of the neurons they will ever have, more than 100 billion of them. Although there is research that indicates some neurons are developed after birth and well into adulthood (Shonkoff & Phillips, 2000), the neurons babies have at birth are primarily what they have to work with as they develop into children, adolescents, and adults.

During fetal development, the neurons that are created migrate to form the various parts of the brain. While the basic structure is intact at birth, much of the brain's growth occurs during the first few years after birth. This process of growth, or development, occurs sequentially from the "bottom up" (Perry, Pollard, Blakely, Baker & Vigilante, 1995; Perry 2000a).

The first areas of the brain to fully develop are the brainstem and midbrain; they govern the bodily functions necessary for life, called the autonomic functions. The last regions of the brain to fully develop are the limbic system, involved in regulating emotions, and the cortex, involved in abstract thought. (See Exhibit 1.) Each region manages its assigned functions through complex processes, often using chemical messengers (such as neurotransmitters and hormones) to help transmit information to other parts of the brain and body (Perry, Pollard, Blakely, Baker & Vigilante, 1995; Perry 2000a).



**Exhibit 1**

As the brain develops, it grows larger and more dense. By the age of 3, a baby's brain has

reached almost 90 percent of its adult size (Perry, 2000c). The growth in each region of the brain largely depends on receiving stimulation, which spurs activity in that region. This stimulation provides the foundation for learning.

---

**Prenatal Exposure to Alcohol and Other Drugs**

Exposure to alcohol and other drugs in utero can disrupt and significantly impair the way a baby's brain is formed (Shore, 1997).

Studies have shown that exposure to alcohol or other drugs, especially early in pregnancy, can alter the development of the cortex, reduce the number of neurons that are created, and affect the way in which chemical messengers are used (Shore, 1997). Although not all children who are exposed develop neurobiological problems, many do. These problems include difficulties with attention, memory, problem-solving, and abstract thinking. Many children born with Fetal Alcohol Syndrome are mentally retarded (Shonkoff & Phillips, 2000).

---

**Organizing the Structure**

Brain development, or learning, is actually the process of creating, strengthening, and discarding connections among the neurons; these connections are called synapses. Synapses organize the brain by forming neuronal pathways that connect the parts of the brain governing everything we do-from breathing and sleeping to thinking and feeling. This is the essence of post-natal development, because at birth, very few synapses have been formed. The synapses present at birth are primarily those that govern our bodily functions such as heart rate, breathing, eating, and sleeping. Almost all other functions are developed as babies grow up into children and adults (Shore, 1997).

The development of synapses occurs at an astounding rate during children's early years. By the time children are 3, their brains have approximately 1,000 trillion synapses, many more than they will ever need. Some of these synapses are strengthened and remain intact, but many are discarded. By the time children have reached adolescence, about half of their synapses have been discarded, leaving about 500 trillion, the number they will have for most of the rest of their lives (Shore, 1997).

*Plasticity*--**The Influence of Environment**

*"Plasticity is a double-edged sword that leads to both adaptation and vulnerability."*
--Shonkoff & Phillips, 2000, p. 94

Researchers use the term *plasticity* to describe the way the brain creates, strengthens, and discards synapses and neuronal pathways in response to the environment (Ounce of Prevention Fund, 1996). The brain's "plasticity" is the reason that environment plays a vital role in brain development.

The early over-production of synapses appears to be the result of evolution that has led our brains to expect certain experiences (Greenough, Black & Wallace, 1987). Our brains

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 437 of 535   PageID 14324

prepare us for these experiences by forming the pathways needed to respond to those experiences. For example, our brains are "wired" to respond to the sound of speech; this is how we learn to talk. But these early synapses are weak; we must be repeatedly exposed to the expected experiences within a certain time period to activate and strengthen them. If this does not happen, the pathways developed in anticipation of those experiences may be discarded, and the development of the related functions will not occur as expected. This is often referred to as the "use it or lose it" principle (Greenough, Black & Wallace, 1987).

In addition to strengthening or discarding existing synapses, researchers theorize that some synapses may be newly developed in response to unique environmental conditions (Greenough, Black & Wallace, 1987). It is through these processes of creating, strengthening, and discarding synapses that our brains adapt each of us to our unique environment.

The ability to adapt to our environment is a part of normal development. Children growing up in cold climates or rural farms or large sibling groups learn how to function in those environments. But regardless of the general environment, all children need stimulation and nurturance for healthy development. If these are lacking-if a child's caretakers are indifferent or hostile-the child's brain development may be impaired. Because the brain adapts to its environment, it will adapt to a negative environment just as readily as it will adapt to a positive environment.

## Sensitive Periods

*"It is now clear that what a child experiences in the first few years of life largely determines how his brain will develop and how he will interact with the world throughout his life."*
--Ounce of Prevention Fund, 1996

Researchers believe that during these years there may be "sensitive periods" for development of certain capabilities (Greenough, Black & Wallace, 1987). Because synapses are being formed at such an intense pace during this time, the opportunities for learning are almost limitless. But as the process of pruning synapses starts to increase, especially after age 3, these opportunities begin to decrease (Shore, 1997). If certain synapses and neuronal pathways are not repeatedly activated, they may be discarded, and the capabilities they promised may be diminished. For example, all infants have the capacity, indeed the genetic predisposition, to form strong attachments to their primary caregivers. But if a child's caregivers are unresponsive or threatening, and the attachment process is disrupted, the child's ability to form any healthy relationships during his or her life may be impaired (Perry, 2001a).

Although the first few years may be the "prime time" for learning, children and adults can learn later in life, but it is more difficult. This is especially true if a young child was deprived of certain stimulation, which resulted in the pruning of synapses and the loss of neuronal pathways. Helgeson (1997) offers the analogy of a country that has a dense network of branching streets; a traveler can go anywhere he wants, even unfamiliar places, by following the roads. If there are few roads, the traveler can still go places, but he has to travel "cross-country" and break new ground. It is doable, but much harder. As children progress through each developmental stage, they will learn and master each step more easily if their brains have built an efficient network of pathways.

---

**Malnutrition**

Malnutrition, both before and during the first few years after birth, has been shown to result in stunted brain growth and slower passage of electrical signals in the brain (Pollitt & Gorman, 1994; Shonkoff & Phillips, 2000). These effects on the brain are linked to cognitive, social, and behavioral deficits with possible long-term consequences (Karr-Morse & Wiley, 1997).

For example, iron deficiency (the most common form of malnutrition in the United States) can result in cognitive and motor delays, anxiety, depression, social problems, and problems with attention (Shonkoff & Phillips, 2000). Protein deficiency can result in motor and cognitive delays and impulsive behavior (Pollitt & Gorman, 1994). The social and behavioral impairments may be more difficult to "repair" than the cognitive impairments, even if the nutritional problems are corrected (Karr-Morse & Wiley, 1997).

---

While research has shown that the brain is more malleable in the first few years than at any other time in life, researchers disagree on how flexible or rigid the sensitive periods are. But they do agree that the experiences of the first few years form the foundation for children's future functioning. "While experiences may alter and change the functioning of an adult, experience literally provides the organizing framework for an infant and child" (Perry, Pollard, Blakely, Baker & Vigilante, 1995).

**Memories**

The "organizing framework" for children's development is based on the creation of "memories." When repeated experiences strengthen a neuronal pathway, the pathway becomes "sensitized," and, at some point, it becomes a memory. Memories are an indelible impression of the world (Perry, 1999); they are the way in which the brain stores information for easy retrieval.

There are different types of memories, such as motor, cognitive, and emotional memories. Memories help us to navigate our world without having to really think about it (Perry, 1999). Children learn to put one foot in front of the other to walk. They learn words to express themselves. And they learn that a smile usually brings a smile in return. At some point, they no longer have to think much about these processes-their brains manage these experiences with little effort because the memories that have been created allow for a smooth, efficient flow of information.

The creation of memories is part of our adaptation to our environment. Our brains attempt to understand the world around us and fashion our interactions with that world in a way that promotes our survival and, hopefully, our growth. But if the early environment is abusive or neglectful, our brains will create memories of these experiences that may adversely color our view of the world throughout our life.

## *EFFECTS OF MALTREATMENT ON BRAIN DEVELOPMENT*

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 439 of 535   PageID 14326

*"Harry Chugani observes '... We can have individuals who, based on early experiences, are in effect "hard-wired" for negative behaviors.' Some neuroscientists consider this an overstatement; others find it too mild"*
--Shore, 1997, p. 40

Babies' brains grow and develop as they interact with their environment and learn how to function within that environment. When babies' cries bring food or comfort, they are strengthening the neuronal pathways that help them learn how to get their needs met, both physically and emotionally. But babies who do not get responses to their cries, and babies whose cries are met with abuse, learn different lessons. The neuronal pathways that are developed and strengthened under negative conditions prepare children to cope in that negative environment, and their ability to respond to nurturing and kindness may be impaired (Shonkoff & Phillips, 2000).

**Stress**
Brief periods of moderate, predictable stress are not problematic; in fact, they prepare the child to cope with the general world. The body's survival actually depends upon the ability to mount a response to stress (Shonkoff & Phillips, 2000). But prolonged, severe, or unpredictable stress-including abuse and neglect-during a child's early years is problematic. The brain's development can literally be altered by these experiences, resulting in negative impacts on the child's physical, cognitive, emotional, and social growth.

Chronic stress sensitizes neural pathways and over-develops certain regions of the brain involved in anxiety and fear responses, and often results in the under-development of other neural pathways and other regions of the brain (Shore, 1997). Children who experience the stress of physical or sexual abuse will focus their brains' resources on survival and responding to threats in their environment. Children who experience the chronic stress of neglect-e.g., remaining hungry, cold, scared, or in pain-will also focus their brains' resources on survival. This chronic stimulation of the brain's fear response means that the regions of the brain involved in this response are frequently activated. When they are, other regions of the brain, such as those involved in complex thought, can not also be activated and are therefore not "available" to the child for learning (Shore, 1997).

Because the brain ultimately controls all bodily functions, experiences that alter brain development also alter our bodies' responses. Studies have shown that "... the overwhelming stress of maltreatment experiences in childhood is associated with alterations of biological stress systems and with adverse influences on brain development" (DeBellis, et al., 1999). One example of the effects of early maltreatment on brain and body functions involves the chemical cortisol. Cortisol is a hormone that helps the body prepare to cope with stress through its effects on metabolism and the immune system (Hart, Gunnar & Cicchetti, 1995). Studies have shown that many infants and children who have been maltreated have abnormal secretions of cortisol, indicating that their bodies' responses to stress have been impaired (Hart, Gunnar & Cicchetti, 1995; Lott, 1998, citing Main, 1996). More research is needed to understand why this occurs and what effects this may have on the children's emotional and social development, but this information provides some evidence of altered brain activity in maltreated children.

A key issue in understanding altered brain development in children who have been maltreated is that the way in which their brains develop is often a very adaptive response to their negative environment, but it is maladaptive in other environments (Hart, Gunnar &

Cicchetii, 1996). If a child lives in a threatening, chaotic world, his brain will be hyper-alert for danger; his survival may depend on it. But if this environment persists, and the child's brain is focused on developing and strengthening its strategies for survival, other strategies may not develop as fully. If a child lives in a world that ignores him, if he is not provided with appropriate stimulation for growth, his brain will focus on survival from day to day and may not fully develop healthy cognitive and social skills (Ounce of Prevention Fund, 1996, citing Lieberman & Zeanah, 1995). The result may be a child who has great difficulty functioning when presented with a world of kindness, nurturing, and stimulation. It is an unfamiliar world to him; his brain has not developed the pathways and the memories to adapt to this new world.

**Persistent Fear Response**

Fear is necessary to our basic survival. We must be able to detect threats and respond. Indeed, the brain is uniquely designed to sense, process, and store threatening information and to mobilize the body in response to threats. All parts of the brain and body are used in this response. "This total neurobiological participation in the threat response is important in understanding how a traumatic experience can impact and alter functioning in such a pervasive fashion" (Perry, 1999, p.3).

Chronic stress or repeated traumas can result in a number of biological reactions. Neurochemical systems are affected which can cause a cascade of changes in attention, impulse control, sleep, and fine motor control (Perry, 2000a; 2000c). Chronic activation of certain parts of the brain involved in the fear response (such as the hypothalamic-pituitary-adrenal [HPA] axis) can "wear out" other parts of the brain such as the hippocampus, which is involved in cognition and memory (Perry, 2000c). Early experiences of trauma can also interfere with the development of the subcortical and limbic systems which can result in extreme anxiety, depression, and difficulty forming attachments to other people (Shore, 1997). And chronic activation of the neural pathways involved in the fear response can create permanent "memories" which shape the child's perception of and response to his environment. While this adaptation may be necessary for survival in a hostile world, it can become a way of life that is difficult to change, even if the environment improves.

---

**Dissociative and Hyper-arousal Responses**

*Dr. Bruce Perry, former head of the Child Trauma Academy at Baylor College of Medicine in Houston, Texas, offers this example of dissociative and hyper-arousal responses in the same child for different events.*

"T is a twelve year old girl. From birth until age five she lived in a household characterized by domestic violence. During this time, she was noted to be quiet, compliant, "tuned out," daydreamed and generally "a good little girl." She reports little memory of the fighting but her mother describes finding her in her bed, rocking, with covers over her head after some of the fights in the home. At age 12, her mother re-married but unfortunately, episodes of domestic violence resumed in this household. This time, however, T was loud, combative, angry and would run away from the home each time these events took place. She was noted to have "attention" problems at

---

> school that turned out to be hypervigilance. Rather than "tuning out"
> and withdrawing into a dissociative shell, this child was sensitized to
> fighting and had dramatic and pronounced hyperarousal during
> conflict."
> 
> *--Perry, 2000b, p.8*

**Hyper-arousal**

When a child is exposed to chronic, traumatic stress, his brain sensitizes the pathways for the fear response and literally creates memories such that his fear response becomes almost automatic; he doesn't really think about it. This is called a state of "hyper-arousal." His brain has adapted to a world that is unpredictable and dangerous; it is hyper-vigilant, focused on non-verbal cues that may be threatening (Perry, 1996). The regions of the brain involved in the hyper-arousal response are always "on," and because of this, the child may frequently experience hyperactivity, anxiety, impulsivity, and sleep problems (Perry, Pollard, Blakely, Baker & Vigilante, 1995). Hyper-arousal is most common in older children and in males (Perry, Pollard, Blakely, Baker & Vigilante, 1995).

In the state of hyper-arousal, similar to Post Traumatic Stress Disorder (PTSD), the brain's alarm system becomes particularly sensitive to "threatening" environmental cues, and the child may respond anxiously or aggressively. The regions of the brain involved in the hyper-arousal response become re-activated when the child is exposed to a reminder of the earlier trauma (such as thinking or dreaming about it), to perceived threats (which may not seem threatening to others), and sometimes to generalized reminders (signals) (Perry, Pollard, Blakely, Baker & Vigilante, 1995). Perry (1997) presents an example of an 8-year old boy who became extremely agitated-sobbing and hysterical-when the staff at his group home refused to cut up his hot dog before he ate it. The child had been sexually abused by his father and other men. Foods such as hot dogs, bananas, and popsicles evoked his brain's fear response, and until the "signal" was removed or altered, his brain experienced it as a threat. Another example is that of a child who had committed an impulsive, violent act and explained it by saying "I could tell he was going to jump me-he looked me in the eyes" (Perry, 1997, p. 6). In his mind, his brain, the simple act of looking him in the eye was perceived as a threat that required a defensive response.

Not only may children in a state of hyper-arousal react anxiously or aggressively to perceived threats, they may actually provoke threatening behavior from others in order to have some control over it. Predictability of threat is important (Perry, 1997). Children who have been victims of unpredictable physical or sexual abuse learn (consciously or unconsciously) that if abuse is going to happen, it is better to control when it happens. They may engage in aggressive, provocative behavior to elicit a predictable response (Perry, 1997). For example, a girl who has suffered repeated sexual abuse from her father may attempt to seduce a male teacher. She may believe that men will invariably try to have sex with her, so she tries to control when and with whom.

**Dissociation**

While hyper-arousal is more common in older children and males, dissociation is more common in younger children and in females-children who often feel or are immobile or powerless (Perry, Pollard, Blakely, Baker & Vigilante, 1995). Dissociation is characterize by first attempting to bring caretakers to help, and if this is unsuccessful, becoming motionless (freezing) and compliant and eventually dissociating; this is often called the

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 442 of 535   PageID 14329

"surrender" response (Perry, Pollard, Blakely, Baker & Vigilante, 1995). People describe children in a dissociative state as numb, non-reactive, or "acting like they aren't there."

Just as children in a state of hyper-arousal have sensitized neural pathways controlling their response to a threatening environment, children in a state of dissociation have sensitized neural pathways that elicit a different response. A child in a dissociative state, when presented with a threat, may "freeze," both physically and cognitively (Perry, Pollard, Blakely, Baker & Vigilante, 1995). When an adult asks or tells them to do something, they don't respond. If the adult becomes angry and more threatening, the child becomes even more anxious and moves further into full dissociation (Perry, Pollard, Blakely, Baker & Vigilante, 1995).

## Disrupted Attachment Process
At the foundation of much of our development is the concept of "attachment" which refers to the emotional relationships we have with other people. One of the first priorities of an infant is to form an attachment to his primary caregiver (Kraemer, 1992). This relationship not only provides the foundation for future emotional relationships, it also provides the base for other learning, because babies and children learn best when they feel safe, calm, protected, and nurtured by their caregivers. If the attachment process is disrupted, as can occur with abusive and neglectful caretakers, the child's brain will be more focused on meeting his day-to-day needs for survival rather than building the foundation for future growth.

Much of a child's emotional development is rooted in his relationships with his early primary caregivers. For example, it appears that aggressive, submissive, and frustration behaviors may be genetically encoded (Kraemer, 1992). If relationships with the caregivers are positive, the child's cognitive structures learn to regulate these emotions and behaviors. If the relationships are negative or weak, the lower-brain responses become dominant and the cognitive regulating structures do not develop to their full capacity-the young child may not fully develop the cognitive ability to control his emotions, nor develop an awareness of others' emotions (Kraemer, 1992).

One example of a potential effect of poor early attachments is impaired "social cognition" (Kraemer, 1992). Social cognition involves an awareness of oneself in relation to others and an awareness of the emotions of others. If these abilities are poorly developed, many types of social interactions may be experienced as stressful-unfamiliar, strange situations that are difficult for the child to incorporate because he does not have a strong internal representation (memory) of what is happening and how to respond (Kraemer, 1992). Children who have been abused and neglected often lack empathy and truly do not understand what others feel like when they do something hurtful.

## Neglect-Lack of Stimulation
While chronic abuse or neglect can result in sensitized fear response patterns, neglect alone also can result in other problems. Although neglect often is thought of as a failure to meet a child's physical needs for food, shelter, and safety, neglect also can be a failure to meet a child's cognitive, emotional, or social needs. For children to master developmental tasks in these areas, they need opportunities, encouragement, and acknowledgement from their caregivers. If this stimulation is lacking during children's early years, the weak neuronal pathways that had been developed in expectation of these experiences may wither and die-the children may not achieve the usual developmental milestones.

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 443 of 535   PageID 14330

For example, babies need to experience face-to-face baby talk and hear countless repetitions of sounds in order to build the brain circuitry that will enable them to start making sounds and eventually say words and form sentences (Helgeson, 1997). If babies are ignored, if their caregivers do not provide this type of intense verbal interaction, their language development may be delayed. If a child does not receive kindness as an infant, he may not know how to show kindness as an adult. If a child's cries for attention are ignored as a toddler, he may not know how to interact positively with others later. These capacities may not fully develop because the required neuronal pathways were not activated enough to form the "memories" needed for future learning (Greenough, Black & Wallace, 1987).

## Global Neglect

The term "global neglect" is used when a child has experienced deprivations in more than one domain, i.e., language, touch, and social interaction (Perry & Pollard, 1997). Children who were adopted from Romanian orphanages in the early 1990s are often considered to be globally neglected; they had little contact with caregivers and little to no stimulation from their environment-little of anything required for healthy development. One study found that these children had significantly smaller brains than the norm, suggesting decreased brain growth. (Perry & Pollard, 1997). (See Exhibit 2.)

This type of severe, global neglect can have devastating consequences. The extreme lack of stimulation may result in fewer neuronal pathways available for learning; genetically normal children may be at a permanent intellectual disadvantage (Greenough, Black & Wallace, 1987). The lack of opportunity to form an attachment with a nurturing caregiver during infancy may mean that some of these children will always have difficulties forming meaningful relationships with others (Perry, 2001a). But these studies also found that time played a factor-children who were adopted as young infants have shown more recovery than children who were adopted as toddlers (Rutter, et al., 2000).



"These images illustrate the negative impact of neglect on the developing brain. In the CT scan on the left is an image from a healthy three year old with an average head size. The image on the right is from a three year old child suffering from severe sensory-deprivation neglect. This child's brain is significantly smaller than average and has abnormal

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 444 of 535   PageID 14331

development of cortex." These images are from studies conducted by a team of researchers from the Child Trauma Academy (www.ChildTrauma.org) led by Bruce D. Perry, M.D., Ph.D.

**Pervasive and Long-term Effects**

Maltreatment during infancy and early childhood has been shown to negatively affect early brain development and can have enduring repercussions into adolescence and adulthood. As mentioned earlier, the experiences of infancy and early childhood literally provide the organizing framework for the expression of children's intelligence, emotions, and personalities. When those experiences are primarily negative, children may develop emotional, behavioral, and learning problems that persist throughout their lifetime, especially in the absence of targeted interventions.

While some children seem unaffected or minimally affected by their traumatic experiences, in reality, it is often the adults around them who are misreading their cues. These children are communicating non-verbally with us, and we need to learn the language and educate others who work with children who have been maltreated about this language (Perry, 1999). Children do not just "get over it." As they attempt to cope, as their brains adapt to the negative environments, their true emotional, behavioral, cognitive, and social potential may be diminished (Perry, Pollard, Blakely, Baker & Vigilante, 1995).

Children who have experienced chronic abuse and neglect during their first few years may live in a persistent state of hyper-arousal or dissociation, anticipating threats around every corner, and their ability to benefit from social, emotional, and cognitive experiences may be impaired (Perry, 1996). The various regions of the brain can not grow without being activated, and certain regions can not be activated when others are. To learn and incorporate new information, whether it be a lesson in the classroom or a new social experience, the child's brain must be in a state of "attentive calm," a state the traumatized child rarely achieves. It is not uncommon for teachers who work with traumatized children to observe that the children are really smart, but they do not learn easily; they are often diagnosed with learning disabilities (Perry, 1996). Children who have not been able to develop healthy attachments with their caregivers, and whose early emotional experiences have not laid the necessary groundwork for healthy emotional development, may have a limited capacity for empathy (Perry, 1997). The ability to feel remorse and empathy are built on experience. In the extreme, if a child feels no emotional attachment to any human being, he can not be expected to feel remorse for hurting or even killing someone. Perry (1997) offers the example of a 15-year-old boy who felt no remorse for having committed murder. The boy had been neglected and humiliated by his primary caretakers as a child. "He is literally emotionally retarded. The part of his brain which would have allowed him to feel connected to other human beings-empathy-simply did not develop" (Perry, 1997, p. 4).

The effects of abuse and neglect on the developing brain during children's first few years can result in various mental health problems. For example:

- Dimished growth in the left hemisphere may increase the risk for depression (Teicher, 2000).
- Irritability in the limbic system can set the stage for the emergence of panic disorder and post-traumatic stress disorder (PTSD) (Teicher, 2000).
- Smaller growth in the hippocampus and limbic abnormalities can increase the risk for

dissociative disorders and memory impairments (Teicher, 2000).

- Impairment in the connection between the two brain hemispheres has been linked to symptoms of attention-deficit/hyperactivity disorder (ADHD) (Teicher, 2000).
- Severely neglected children who have been deprived of sensory stimulation-including touch, movement, and sound-may be at risk for Sensory Integration Disorder (SID) (Parent Network for the Post-Institutionalized Child, 1995).
- Children who have been raised in environments that totally disregarded their needs for comfort, stimulation, and affection may be at risk for Reactive Attachment Disorder (Parent Network for the Post-Institutionalized Child, 1995).

We are learning more about the serious, long-term consequences of abuse and neglect on brain development, and subsequent physical, cognitive, emotional, and social growth. What do we do with this information? What does it mean for biological parents, foster and adoptive parents, professionals, the child welfare system, and for society? How can we use this knowledge to improve our interventions with children who have been abused and neglected, and, most importantly, to prevent abuse and neglect from occurring? While these questions may be challenging, this growing body of knowledge compels us to work towards finding the answers.

## IMPLICATIONS FOR PRACTICE AND POLICY

"The new developments in brain research show us what children need; our challenge is to ensure that every child receives it."
--Ounce of Prevention Fund, 1996

The knowledge we have gained from research examining the effects of maltreatment on brain development can be helpful in many ways. With this information, we are better able to understand what is happening within the brains of children who have been abused and neglected. In fact, much of this research is providing further, solid evidence for what professionals and caregivers have been describing in behavioral, emotional, and psychological terms. We can use this information to improve our systems of care, and to strengthen our prevention efforts.

There has been some encouraging progress in States' recognition of early brain development research and how this information can be used to improve services. In a survey conducted by the Child Welfare League of America in 2000, 31 States reported that they had reviewed relevant research findings (CWLA, n.d.). Many also reported that they had engaged in efforts to increase awareness about early brain development, and that both legislative and policy changes had occurred to enhance prevention, early intervention, and healthy child development programs (CWLA, n.d.).

### The Child Welfare System
While the goal of the child welfare system is to protect children, many child welfare interventions-such as investigation, appearance in court, removal from home, placement in a foster home, etc.-may actually reinforce the child's view that the world is unknown, uncontrollable, and frightening. These experiences can actually contribute to the traumatized child's "catalog" of fearful situations (Wolff & Brandt, 1998). In addition, many child welfare systems in the United States do not provide comprehensive assessmen to all children in their care, and therefore the treatments provided may not be the most effective-they may not accurately target each child's unique experience.

As much as possible, the child welfare system needs to address these deficits and reform practice to provide consistency, repetition, nurturance, predictability, and control (returned to the child) to diminish the fearful nature of the interventions (Wolff & Brandt, 1998). In addition, child welfare systems should provide comprehensive assessments for all children as soon as possible to examine their physical, cognitive, emotional, and social development (Committee on Early Childhood, Adoption and Dependent Care, 2000; Shonkoff & Phillips, 2000). Accomplishing these objectives will require the participation of all stakeholders including policymakers; family court judges; managers; child welfare workers; medical, mental health, and education professionals; kinship, foster, and adoptive parents; and the parents and children themselves. Every group must examine its contribution to the development of the children served by the child welfare system, and strive to provide that contribution in a manner that will promote healthy development for each child.

### The Role of Professionals

One of the first tasks for professionals who work with children who have been maltreated is to educate themselves about the effects of maltreatment on early brain development, as well as interventions likely to be effective. For example, "talk" therapy must do more than talk if the child is in a persistent hyper-arousal state; the child's brain may well be unresponsive to verbal interactions (Lott, 1998; Perry, 1999). According to Dr. Schore, "What will get through is tone of voice, demeanor, facial expressions and a sense of empathy that is rooted in the early psychobiological attunement between mother and infant" (Lott, 1998, p. 3).

Professionals who are knowledgeable about this issue need to educate others who work with and care for the children (Comfort, 1997; Committee on Early Childhood, Adoption and Dependent Care, 2000; Perry, 1996). Information can be provided to foster parents and other caregivers to help them understand the effects of maltreatment on children's brain development, how those early experiences may influence current behavior and functioning, and what can be done to help the children recover their lost potential. CPS workers, judges, and teachers also may not be knowledgeable about these issues; they can benefit from opportunities to understand the importance of their contributions to the child's environment. By working in a coordinated manner, professionals and caregivers can help to minimize unpredictable, unknown, and frightening experiences and assist the child's movement along a path of healthy development.

Human service professionals are increasingly receptive to new knowledge about human brain development (Shore, 1997). Professionals across disciplines are engaged in exciting new efforts to rethink the brain and apply the knowledge and ideas to support the healthy development and well-being of children (Shore, 1997). As these efforts begin to offer meaningful information, it must be translated into policies and practices for the front-line workers and caregivers in order to have the most impact on improving child well-being in child welfare systems.

### The Role of Caregivers

Many children who have suffered abuse and neglect are removed from their homes by the child welfare system for their safety. These children may be temporarily cared for by extended family, foster parents, or group home staff, and some will be adopted. While many caregivers have an innate sense about how to raise children, familiarity with the effects of maltreatment on brain development and the possible manifestations of those effects are not likely to be "common knowledge."

It is important for caregivers to have realistic expectations for the children in their care. Children who have been abused or neglected may not be functioning at their chronological age in terms of their physical, social, emotional, and cognitive skills. They may also be displaying unusual and/or difficult coping behaviors. For example, abused or neglected children may:

- Be unable to control their emotions and have frequent outbursts
- Be quiet and submissive
- Have difficulties learning in school
- Have difficulties getting along with siblings or classmates
- Have unusual eating or sleeping behaviors
- Attempt to provoke fights or solicit sexual experiences
- Be socially or emotionally inappropriate for their age
- Be unresponsive to affection.

"It is easy for foster parents to become confused, frustrated, and sometimes devastated from the lack of response and reciprocity to the love, affection, attention, and care they offer" (Comfort, 1997, p. 29). Even caregivers with the best of intentions can misunderstand a child's behavior, fashion their response based on that misunderstanding, and then wonder why their response was not effective.

To be more effective in their roles, caregivers who serve abused and neglected children could benefit from training and support related to the effects of maltreatment on early brain development. Understanding some basic information about the neurobiology underlying many challenging behaviors may help caregivers shape their responses more effectively. But while a general understanding is helpful, foster parents and other caregivers need to know the history of their particular foster children's experiences in order to tailor their approaches (Comfort, 1997). They may need to develop some special skills to cope with the children's special needs.

In general, children who have been abused or neglected need nurturance, stability, predictability, understanding, and support (Committee on Early Childhood, Adoption and Dependent Care, 2000). They may need frequent, repeated experiences of these kinds to begin altering their view of the world from one that is uncaring or hostile to one that is caring and supportive. Until that view begins to take hold in the child's mind, the child may not be able to truly engage in a positive relationship. And the longer the child lived in the abusive or neglectful environment, the harder it will be to convince his brain that his world can change. But one thing we have learned from research is that environment does make a difference. Consistent nurturing from caregivers who receive training and support may offer the best hope for the children who need it most.

### Intensive, Early Intervention

*"The brain itself can be altered . . . with appropriately timed, intensive interventions"*
--Shore, 1997, p. 36

Intensive, early interventions are key to minimizing the long-term effects of early trauma on children's brain development (Committee on Early Childhood, Adoption and Dependent Care, 2000). Two studies that have shown this impact include the following:

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 448 of 535   PageID 14335

- Craig Ramey of the University of Alabama at Birmingham reported that vulnerable children who received services from 4 months to 5 years old showed better cognitive development than those receiving services from age 5 to age 8; the difference was even more pronounced at age 12 than at age 8 (Shore, 1997).
- Rutter, et al. (2000) studied the development of children adopted from Romanian orphanages. When each child was 6 years old, the researchers assessed what proportion of the adopted children were functioning "normally." They found that 69 percent of the children adopted before the age of 6 months were functioning normally, 43 percent of the children adopted between the ages of 7 months and 2 years, and 22 percent of the children adopted between the ages of 2 years and 3½ years.

Indeed, many studies have shown the effectiveness of early intervention, but we now have a better understanding of why early intervention makes a difference. And taking a neuro-developmental approach in early intervention can decrease the "intensity and severity of the response to trauma [which] will decrease the probability of developing . . . sensitized neural systems resulting in a persisting hyper-arousal or dissociative symptoms or both" (Perry, Pollard, Blakely, Baker & Vigilante, 1995).

In order to heal a "damaged" or altered brain, interventions must activate those portions of the brain that have been altered (Perry, 2000c). Because brain functioning is altered by repeated experiences that strengthen and sensitize neuronal pathways, interventions can not be constrained to weekly therapy appointments. Interventions must address the totality of the child's life, providing frequent, consistent "replacement" experiences so that the child's brain can begin to incorporate a new environment-one that is safe, predictable and nurturing.

Although early interventions show the most promise for significant recovery from abuse and neglect, later interventions are not futile. However, as children get older, recovery from lost or altered brain functioning may be slower and less complete than recovery attempted earlier in the children's lives (Shore, 1997). But some recovery is certainly possible; while a negative environment may contribute to deficits, a positive environment can contribute to growth (Teicher, 2000).

## Prevention

While early intervention with maltreated children can minimize the effects of abuse and neglect, it is equally or even more important to prevent problems before they start. "Clearly,... the costs (in human suffering, loss of potential, and real money) of trying to repair, remediate, or heal these children is far greater than the costs of preventing these problems by promoting healthy development of the brain during the first few years of life" (Ounce of Prevention Fund, 1996, p. 3).

Prevention efforts can target the general population ("primary" or "universal" prevention), educating the public and changing policies to promote healthy brain development. For example, one prevention strategy might involve expanding education efforts that target women who may become pregnant about the effects of alcohol on the developing brain of the fetus. An example of a policy change might involve expanding family leave to allow more parents time off from work to care for and build an attachment to a newborn or adopted child.

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 449 of 535   PageID 14336

Prevention efforts also can target children and families considered to be "at-risk" of developing problems before problems develop ("secondary" or "selected" prevention). By the time a child who has been abused or neglected comes to the attention of professionals, is likely that some damage already has been done. Secondary prevention efforts must reach out to at-risk families before this point. There are many home visitation programs that provide services to at-risk families before and after the birth of a child-services that support children's healthy development-that have proven to be successful in preventing future problems (Ounce of Prevention Fund, 1996, citing MacMillan, 1994).

Many researchers examining the effects of maltreatment on early brain development agree that this knowledge should be used to expand and strengthen prevention efforts (Ounce of Prevention Fund, 1996; Perry, 1996; Shonkoff & Phillips, 2000; Teicher, 2000). Without expanded prevention, our society will continue to fight an uphill battle to "repair" the damage that has been done to thousands of children who have been abused and neglected. Society can not continue to ignore the laws of biology (Perry, 1996); the more we learn about early brain development, the more responsibility we have to act on that knowledge.

## *SUMMARY AND RESEARCH RECOMMENDATIONS*

In 1999, approximately 826,000 children were determined to be victims of abuse and/or neglect (U.S. Department of Health and Human Services, 2001), but it is likely that many more children are actually suffering under adverse conditions. Each one of these children already may have suffered damage to their growing brains. Their brains may be locked into perceiving the world as a cold or dangerous place. They may have great difficulties responding to the caring concern of others. Because their brains' energies have been focused on survival, on meeting their own needs, these children may not have developed the physical, cognitive, social, and emotional capabilities one would expect of them. But their future, and the futures of countless others to come, need not be so bleak.

One lesson we have learned from the research on brain development is that environment has a powerful influence on development. Stable, nurturing caregivers and knowledgeable, supportive professionals can have a significant impact on these children's development. And using this growing body of knowledge in prevention efforts can potentially reduce the number of children who will require "reparative" work. There is still much to learn, however. Some of the recommendations from the National Academy of Sciences, Committee on Integrating the Science of Early Childhood Development include:

- Bring together biological and psychosocial researchers to bridge the divide between these fields.
- Understand more about the contribution of genetics to the development process that may explain susceptibility to risk and capacity for resilience.
- Understand more about how biological processes interact with the environment to affect behavior.
- Fund collaborative research projects to study the effect of environment on brain development to learn more about what are deprived, sufficient, and enriched environments.
- Direct program-based research and evaluation to document and test interventions to ensure full effectiveness, and use knowledge from ineffective programs to spur more experimentation (Shonkoff & Phillips, 2000).

While we continue to study and learn more about the effects of maltreatment on early brain development, we can begin to use the knowledge that is already available. We can use this knowledge to strengthen our prevention and intervention strategies, our support of caregivers, and our commitment to provide all children with the nurturance and stimulation they need to grow up healthy and happy.

## REFERENCES

Child Welfare League of America. (n.d.). Methodology and results. Retrieved 7/3/01 from http://www.cwla.org/programs/familypractice/famsurveymethod.htm.

Comfort, R.L. (1997). When nature didn't nurture, what's a foster/ adoptive family to do? *Infants and Young Children, 10(2)*, 27-35.

Committee on Early Childhood, Adoption and Dependent Care. (2000). Developmental issues for young children in foster care. *Pediatrics, 106(5)*, 1145-1150.

DeBellis, M.D., Keshavan, M.S., Clark, D.B., Casey, B.J., Giedd, J.N., Boring, A.M., Frustaci, K. & Ryan, N.D. (1999). Developmental traumatology part II: Brain development. *Society of Biological Psychiatry, 45*, 1271-1284.

Greenough, W.T., Black, J.E. & Wallace, C.S. (1987). Experience and brain development. *Child Development, 58*, 539-559.

Hart, J., Gunnar, M. & Cicchetti, D. (1995). Salivary cortisol in maltreated children: Evidence of relations between neuroendocrine activity and social competence. *Development and Psychopathology*, 7, 11-26.

Hart, J., Gunnar, M. & Cicchetti, D. (1996). Altered neuroendocrine activity in maltreated children related to symptoms of depression. *Development and Psychopathology*, 8, 201-214.

Helgeson, R. (1997). The brain game. *Adoptive Families, July/August 1997*, 26-31.

Karr-Morse, R. & Wiley, M.S. (1997). *Ghosts from the nursery: Tracing the roots of violence.* New York: The Atlantic Monthly Press.

Kraemer, G.W. (1992). A psychobiological theory of attachment. *Behavioral and Brain Sciences, 15(3)*, 493-511.

Lott, D. (1998). Brain development, attachment and impact on psychic vulnerability. *Psychiatric Times, 15(5)*, 1-5.

Ounce of Prevention Fund. (1996). *Starting smart: How early experiences affect brain development.* Chicago, IL: Ounce of Prevention Fund.

The Parent Network for the Post Institutionalized Child. (Spring, 1995). Overview of the post-institutionalized child. *The Post, 1.* Retrieved 5/31/01 from www.pnpic.org/news.

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 451 of 535   PageID 14538

**Perry, B.D.** (1996). Neurodevelopmental adaptations to violence: How children survive the intragenerational vortex of violence [online]. Retrieved 7/10/01 from http://www.childtrauma.org/vortex_violence.htm.

Also in *Violence and Childhood Trauma: Understanding and Responding to the Effects of Violence on Young Children*. Cleveland, OH: Gund Foundation. 1996.

**Perry, B.D.** (1997). Incubated in terror: Neurodevelopmental factors in the 'cycle of violence' [online]. Retrieved 7/10/01 from http://www.childtrauma.org/incubated1.htm.

Also in Osofsky, J.D. (Ed.) *Children, youth, and violence: The search for solutions*. New York: The Guilford Press, 1997.

**Perry, B.D.** (1999). Memories of fear: How the brain stores and retrieves physiologic states, feelings, behaviors and thoughts from traumatic events [online]. Retrieved 7/10/01 from http://www.childtrauma.org/Memories.htm.

Also in Goodwin, J. & Attia, R. (Eds.) *Splintered reflections: Images of the body in* Boulder, CO: Basic Books, 1999.

**Perry, B.D.** (2000a). The neuroarcheology of childhood maltreatment: The neurodevelopmental costs of adverse childhood events [online]. Retrieved 7/10/01 from http://www.childtrauma.org/Neuroarcheology.htm.

Also in Franey, K., Geffner, R., Falconer, R. (Eds.) *The cost of child maltreatment: Who pays? We all do*. San Diego, CA: Family Violence and Sexual Assault Institute Press, in press.

Perry, B.D. (2000b). Trauma and terror in childhood: The neuropsychiatric impact of childhood trauma [online]. Retrieved 7/10/01 from http://www.childtrauma.org/trauma_and_terror.htm.

Also in Schulz, I., Carella, S. & Brady, D.O. (Eds.) *Handbook of psychological injuries: Evaluation, treatment and compensable damages*. Chicago, IL: American Bar Association Publishing, in press.

**Perry, B.D.** (2000c). Traumatized children: How childhood trauma influences brain development [online]. Retrieved 7/10/01 from http://www.childtrauma.org/trau_CAMI.htm.

Also in *The Journal of the California Alliance for the Mentally Ill, 2000, 11(1)*.

**Perry, B.D.** (2001a). Violence and childhood: How persisting fear can alter the developing child's brain [online]. Retrieved 7/10/01 from http://www.childtrauma.org/Vio_child.htm.

Also in Perry, B.D. (2001). The neurodevelopmental impact of violence in childhood. In Schetky D & Benedek, E. (Eds.) *Textbook of child and adolescent forensic psychiatry*. Washington, D.C.: American Psychiatric Press, Inc., 2001.

**Perry, B.D.** (2001b). Bonding and attachment in maltreated children: Consequences of

emotional neglect in childhood [online]. Retrieved 7/10/01 from http://www.childtrauma.org/Attach_ca.htm. Retrieved 7/10/01.

Also in *The WisKids Journal, 2000, Mar/April, 5-10, and The WisKids Journal, 2000, Jan/Feb, 5-8.*

**Perry, B.D. & Pollard, R.** (1997). *Altered brain development following global neglect in early childhood.* Proceedings from the Annual Meeting of the Society for Neuroscience, New Orleans.

**Perry, B.D., Pollard, R., Blakely, T., Baker, W. & Vigilante, D.** (1995). Childhood trauma, the neurobiology of adaptation and "use-dependent" development of the brain: How "states" become "traits" [online]. Retrieved 7/10/01 from http://www.childtrauma.org/states_traits.htm.

Also in *Infant Mental Health Journal, 16(4)*, 271-291, 1995.

**Perry, B.D., Runyan, D. & Sturges, C.** (1998). Bonding and attachment in maltreated children: How abuse and neglect in childhood impact social and emotional development. *Caregiver Education Series, 1(5)*, 1-12.

**Pollitt, E. & Gorman, K.S.** (1994). Nutritional deficiencies as developmental risk factors. In Nelson, C.A. (Ed.) *Threats to optimal development: Integrating biological, psychological, and social risk factors.* Hillsdale, NJ: Lawrence Erlbaum Associates, Publishers. 121-144.

**Rutter, M., O'Connor, T., Beckett, C., Castle, J., Croft, C., Dunn, J., Groothues, C. & Kreppner, J.** (2000). Recovery and deficit following profound early deprivation. In Selman, P. (Ed.) *Intercountry adoption: Developments, trends and perspectives.* London, England: British Agencies for Adoption & Fostering.

**Shonkoff, J.P. & Phillips, D.A.** (2000). *From neurons to neighborhoods: The science of early childhood development.* Washington, D.C.: National Academy Press.

**Shore, R.** (1997). *Rethinking the brain.* New York: Families and Work Institute.

**Teicher, M.D.** (2000). Wounds that time won't heal: The neurobiology of child abuse. *Cerebrum: The Dana Forum on brain science, 2(4)*, 50-67.

U.S. Department of Health and Human Services. (2001). *Child maltreatment, 1999.* Washington, D.C.: Government Printing Office.

**Wolfe, P. & Brandt, R.** (1998). What do we know from brain research? *Educational Leadership, 11/98*, 8-13.

[Home] [Back] [Top]

Case 3:13-cv-01535-L   Document 17-116   Filed 08/21/14   Page 453 of 535   PageID 14340

For more information, contact the National Clearinghouse on Child Abuse and Neglect Information at *nccanch@calib.com*.

Updated on February 5, 2002, by *webmaster_nccanch@calib.com*.

# EXHIBIT
# 20

# TEAM #3

## Blake Riordan
## Chris Fuller

# CONDITIONS IN THE
# CONNALLY
# PRISON UNIT

## MEMORANDUM

**TO:**       Professor Roark Reed & George Ashford

**FROM:**    Chris Fuller & Blake Riordan

**DATE:**    May 9, 2002

**RE:**       Randy Halprin--Conditions in the Connally Prison Unit

### ISSUE

Whether the conditions in the Connally Prison Unit were a motivating factor in Randy Halprin's decision to escape the unit on December 13, 2000.

### BRIEF ANSWER

Although the Texas prison system has a well-documented history of forcing its inmates to live in violent and inhumane conditions, it has made significant improvements in recent years. Yet many problems still remain, including the daily occurrence of extreme acts of violence, gang intimidation, and the lack of adequately trained and experienced security personnel.

Despite the fact that these problems and many others are present in the Connally Unit, Randy feels that they had no influence on his decision to escape. In fact, Randy was able to serve his time without any major incidents by maintaining a low profile each day. He claims that the motivating factors behind his decision to escape were the strict parole rules and procedures and his desire to start a new life in Seattle.

## DISCUSSION

### A.  Brief History of the Texas Prison System

The Texas prison system has a recent history of forcing its inmates to live in truly horrendous conditions.  In fact, the living conditions in prisons became so terrible and inhumane that the federal government assumed control of the operation of Texas prisons in 1980.[1]  In *Ruiz v. Estelle*, several inmates brought a class action alleging unconstitutional practices and conditions in the Texas prison system.[2]  A grueling 159-day trial allowed the District Court for the Southern District of Texas to provide detailed findings of fact describing the horrendous and inhumane living conditions experienced by inmates inside the many Texas prisons.[3]  Specifically, the court found that all of the prisons were extremely overcrowded and that the sanitation facilities, recreational facilities, health care services, disciplinary procedures, and procedures relating to court access were all completely inadequate.[4]  In addition, the court found that fire safety and sanitation standards were in violation of state law and the U.S. Constitution.[5]

---

[1] See generally *Ruiz v. Estelle*, 503 F. Supp. 1265 (S.D. Tex. 1980).

[2] Id.

[3] See generally id.

[4] See id. at 1277-1383.

[5] See id.

As a result, the court held that the Texas prison system's conditions and practices violated the Eighth and Fourteenth Amendments to the Constitution.[6] To remedy the situation, the court issued a consent decree, which granted comprehensive injunctive relief in numerous areas of the prison system.   In addition, the court appointed a special federal master to monitor provisions of the consent decree and to ensure that court orders were followed.[7]

Due to the embarrassment and humiliation of more than twenty years of federal intervention, Texas has continuously made efforts to regain control of its prisons.   Subsequent appellate decisions have diminished much of the original *Ruiz* decision, but the federal government has retained exclusive control in three areas.   Currently, the special federal master oversees all standards and conditions dealing with solitary confinement, inmate assault and abuse, and correctional officer excessive use of force.[8]   Judge William Justice, who issued both the original and the latest *Ruiz* opinion, has also made it clear that until Texas drastically improves its standards in these three areas, federal intervention will continue.[9]

**The Current Texas Prison System**

The Texas Department of Criminal Justice (hereinafter "TDCJ") operates all of the state prison units.   The TDCJ's Institutional Division (hereinafter "ID")

---

[6] Id. at 1391.

[7] Id. at 1389-90.

[8] Ruiz v. Johnson, 154 F. Supp. 2d 975, 1001 (S.D. Tex. 2001).

[9] Id. ("So long as these conditions persist, this civil action will remain alive.").

3

supervises and operates all units responsible for the confinement of adult felony offenders.[10]   The ID's mission is to "provide safe and appropriate confinement, supervision, rehabilitation and reintegration of adult felons, and to effectively manage or administer correctional facilities based on constitutional and statutory standards."[11]   To accomplish this mission throughout the state, the Connally Unit and other units supervised by the ID provide the same basic living conditions, follow many of the same disciplinary procedures, and offer similar educational, religious, and health services.

*Basic Prison Living Conditions*

ID units are only responsible for providing the essential survival items to their inmates, such as food, clothing, and personal hygiene products.[12] However, inmates may use money deposited in their trust fund accounts to purchase luxury items from the unit commissary.[13]   A typical inmate meal is usually a pork, chicken or beef dish.[14]

In general, inmates do not enjoy lavish living conditions, and their access to entertainment is limited.   For example, individual inmate cells are not air-conditioned during hot Texas summer months.[15]   Instead, a forced air system

---

[10] TDCJ Homepage, http://www.tdcj.state.tx.us/id/id-home.htm.

[11] Id.

[12] http://www.tdcj.state.tx.us/faq/faq-id.htm.

[13] Id. Unit commissaries sell special items such as snack foods, toiletries and approved magazines and books. Id. Inmates can receive money to purchase these items from friends and family through deposits in their trust fund accounts. Id.

[14] Id.

[15] Id.

keeps inside air moving and fresh air coming in.[16] In addition, inmates are not allowed to have televisions in their cells.[17] Inmates with television privileges may view programs in the recreation area, but a correctional officer dictates which programs may be viewed.[18]

Inmates also follow a strict daily routine consisting of early hours and intense work. They wake up at 3:30 a.m., and they can only eat breakfast at the designated 4:30 a.m. time slot.[19] At 6:00 a.m. inmates must report to their individual work assignments. ID units do not force inmates to work on a "chain gang."[20] Rather, most inmates are assigned to work in prison support jobs such as laundry, cooking, cleaning, and general building maintenance.[21] In addition, many inmates work in various unit agricultural jobs.[22] Good work does not go unnoticed in ID units. Inmates who exhibit strong work habits can earn various privileges and learn valuable job skills.[23]

*Disciplinary Procedures*

All ID units enforce strict rules and impose various disciplinary sanctions when such rules are violated. The TDCJ requires inmates to follow certain

---

[16] Id.

[17] Id.

[18] Id.

[19] Id.

[20] Id.

[21] Id.

[22] Id.

[23] Id.

5

statewide rules, and individual units may require inmates to follow unit-specific rules as well.[24]   Inmates receive information concerning the unit's general rules soon after their arrival, and various other rules are posted throughout the unit.[25] All punishable rules must be "in written form, must provide adequate notice of the conduct prohibited, and must be adequately distributed or posted."[26]

Inmates may be subject to various disciplinary sanctions when they violate a written or posted rule.[27]   The severity of a disciplinary sanction depends on the seriousness of the particular violation.[28]   For example, minor rules violations can be handled rather informally, usually by counseling or an assertive verbal reprimand.[29]   However, more serious violations are handled formally through either a minor or major disciplinary hearing.[30]   An inmate found guilty in a minor hearing may be subject to a range of punishments, including restricted visitation, suspension of recreation, restriction to living quarters, or extra work duty.[31]   But in a major disciplinary hearing, the more severe sanctions available include loss

---

[24] http://www.tdcj.state.tx.us/id/id-discipline.htm.

[25] Id.

[26] http://www.tdcj.state.tx.us/faq/faq-id.htm.

[27] http://www.tdcj.state.tx.us/id/id-discipline.htm.

[28] Id.

[29] Id.

[30] Id.

[31] Id.

of accumulated good conduct time, solitary confinement, or a monetary judgment when the violation results in the destruction of state property.[32]

*Educational Services*

Inmates who have earned educational privileges may take advantage of a large selection of educational opportunities. First, inmates can learn basic literacy skills and prepare for a GED examination.[33] Second, local colleges and universities provide several academic and vocational programs to inmates with a high school diploma or GED.[34] Third, inmates can learn valuable job skills by participating in over 50 vocational training programs.[35] Finally, inmates can enroll in the "CHANGES"[36] program, which teaches inmates basic life skills, and social values that help them reintegrate into society.[37]

*Religious Services*

ID inmates can also take advantage of several religious services and are encouraged to do so. All ID units have at least one full-time chaplain who addresses the religious needs of the entire unit.[38] Several faiths are

---

[32] Id.

[33] http://www.tdcj.state.tx.us/id/id-education.htm.

[34] Id.

[35] Id.

[36] Changing Habits and Achieving New Goals to Empower Success.

[37] Id.

[38] http://www.tdcj.state.tx.us/id/id-religion.htm.

represented, including Protestant, Catholic, Jewish, Muslim, and other religions that can be handled by volunteers.[39]

*Health Services*

ID unit inmates also have access to a wide variety of health care services. The University of Texas Medical Branch provides health care to units in south and east Texas,[40] and the Texas Tech University Health Sciences Center is responsible for west Texas units.[41] Inmates can receive treatment for simple and special illnesses, and local hospitals can provide emergency services when necessary.[42] Inmates with mental health problems can receive both inpatient and outpatient care, and mentally impaired or physically handicapped inmates have access to several special programs.[43]

## Two Major Problems in the Texas Prison System

### *Correctional Officers*

One of the most serious problems faced by the TDCJ is the shortage of adequately trained and experienced correctional officers. In 2000, 2,300 officers understaffed the ID, and almost half of the correctional officers actually working for the ID had less than three years of experience.[44] Under these conditions,

---

[39] Id.

[40] The University of Texas Medical Branch provides the Connally Unit's health services.

[41] http://www.tdcj.state.tx.us/id/id-healthsvcs.htm.

[42] Id.

[43] Id.

[44] http://www.geocities.com/tdcj_id/officer.htm. Of the 24,181 correctional officers in 2000, 3,620 had less than one year of experience, 3,026 had one to two years of experience, and 4,943 had two to three years of experience. Id.

many officers must work double shifts and remain on call when officers fail to attend work as scheduled.[45]   Unfortunately, inmates know when their unit is understaffed or staffed with inexperienced officers, and they are more likely to commit acts of violence when these situations arise.[46]

No one is more concerned about the lack of experienced security personnel and the danger it presents than the correctional officers themselves. Former TDCJ correctional officer, M.L. Brown, described his former job as a daily battle with unbelievable fear and gruesome violence:

> Each day we walk where few people desire to walk.  We pass from an unrestricted world of choices to a world behind a wall of eight-foot fences and razor wire.  We walk among, stand beside, and are surrounded by murderers, sex offenders, burglars and thieves, joy riders and car jackers, hot check writers, alcoholics and drug users, and the list goes on.  These men and women housed in the numerous prison units in the State of Texas.  Inside the fences, we are the minority.  Offenders outnumber us many times.  It is not uncommon for one corrections officer to provide security to over 80 plus offenders.   For this, we are throwed upon, spit on, beat, stabbed and even murdered.[47]

Due to the understaffing, high assault rates, below average salary, and overall unsafe working environment, many correctional officers quit their jobs to escape the dangerous environment for higher paying jobs.[48]   Those who remain are

---

[45] Id.

[46] Id.

[47] Id.

[48] Id.

happy to end their shifts each day without injury, only to return the next day and face the same fear and danger again.[49]

### Violence

The most serious problem within ID units is the daily occurrence of inmate on inmate violence, inmate on correctional officer violence, and correctional officer on inmate violence. Nearly 1,300 reported injuries occurred in all of the ID units during the months leading up to Randy's escape in 2000, several of which occurred in the Connally Unit.[50] To fully appreciate the severity of prison violence, a few specific year 2000 examples from the Connally Unit and other ID units is helpful.

Other ID Units:

- 10/00 (Beto Unit): One inmate was assaulted by two other inmates and received serious injuries when he was struck by a sock containing a fan motor and a food can filled with wet toilet paper.[51]

- 7/00 (Walls Unit): A female officer was forced into a unit utility closet by an inmate who threatened to cut her with a single-edged razor blade while attempting to sexually assault her. The officer began to yell and struggle with the inmate, and he eventually grabbed her by the throat and began choking her. The two fell to the ground where he began to knock the officer's head against the floor.[52]

---

[49] Id.

[50] http://www.geocities.com/tdcj_id/2000.htm.

[51] Id.

[52] Id.

- 6/00 (Terrell Unit):   A 78-year-old volunteer chaplain was assaulted when his arm was nearly cut off by a death row inmate.  The inmate pulled the chaplain's arm into his cell, tied a sheet around it, and began cutting it with a razor blade.[53]

Connally Unit:

- 10/00: An inmate escaped from his cell after stabbing another inmate more than 20 times.[54]

- 6/00:  An inmate used a nine-inch metal rod sharpened to a point to stab a correctional officer six times.  The officer was leading several inmates to lunch in the cafeteria when the inmate (serving 65 years for aggravated robbery) struck the officer from behind.  When the officer turned to defend himself, the inmate began stabbing him.[55]

- 6/00:  A female officer was attacked by an inmate during a cell search.  The officer, who was transported to an area hospital, suffered facial fractures, experienced swelling around her brain, and had most of her teeth knocked out in the attack.   A subsequent search of the inmate's cell turned up a six-inch shank--a homemade knife--hidden in a plastic baby powder bottle.[56]

## Connally Unit Facts

The Connally Unit is located two miles south of Kenedy, Texas in Karnes County.   It was established in July 1995, and it covers approximately 813 acres.[57]  Around the time of Randy's incarceration, the unit had 722 employees,

---

[53] Id.

[54] Id.

[55] Id.

[56] Id.

[57] http://www.tdcj.state.tx.us/directory/unit-profiles/dir-units-connally.htm.

including 535 security employees, 105 non-security employees, 20 education employees, and 62 contract medical employees.[58]  The unit offers medical and educational programs common to all ID units, and it offers some additional programs as well.[59]  For example, it has substance abuse education and support groups, spiritual growth programs, and a crime stoppers program.[60]  In addition, the unit is involved in several community work projects that provide services to city and county agencies, local non-profit organizations, area school districts, the Texas Department of Transportation, and the Texas Parks and Wildlife program.[61]

## B. Interview with Randy Halprin

We interviewed Randy in an effort to obtain some additional information about the Connally Unit and its impact on Randy's decision to escape.  Although it is clearly present that the conditions at the Connally Unit are very dangerous, Randy contends the prison system had little to no effect on his decision to break out.

Prior to entering the Connally Unit, Randy was detained in the Choice Moore Prison.  Randy briefly discussed his time there with us and basically stated that Choice Moore Jail more closely resembled  "army barracks" than a prison system.  He was able to participate in recreational activities and read quite

---

[58] Id.

[59] Id.

[60] Id.

[61] Id.

12

often. In addition, Randy completed a college level course. He also mentioned that he was able to become friends with other inmates at Choice Moore. Some of these inmates had attended Connally in the past. By making these friends, Randy was able to get the "heads up" on what to expect at Connally. This allowed Randy to get an idea of what he was to expect in the days to come at Connally. Specifically, how the prison operated, how to behave, what to do and not to do, respect others, and avoid joining any gangs.

When Randy arrived at Connally he claims that all aspects previously discussed with Randy regarding the prison were accurate. Consequently, Randy explained that there were not really any surprises awaiting him. The initiation procedure for any new inmate at Connally is something called "checking." Checking is a procedure that involves getting into a fight with another inmate. The other inmate is more or less designated by other inmates as the individual responsible for all new inmate "checking." Randy informed us that this inmate's name was "Ox."

First, the process involves going into an area of the showers that is somewhat cornered off from any guard's view. Interestingly, Randy claims that hiding the fight from the guards is pointless. Meaning, the checking process is known by everyone, including the prison staff, and no one makes any effort to deter the activity. Next, once the inmates are in the cornered off section, other inmates surround them and watch the fight. Basically the two inmates, Randy and "Ox", begin to engage in a somewhat "controlled fight." If one of the inmates appears to have had enough the other prisoners will pull him off. According to

Randy, this is not the case with most fights in the Connally Unit.  Most fights involve serious injuries that are sometimes fatal.

The purpose behind the checking process is to get an idea of the new inmate's ability to take up for himself.  According to Randy, he was able to demonstrate that he could fend for himself.  We believe that Randy may be bending the truth a bit here.  Specifically, after viewing Randy's physical appearance he does not have much of an intimidating presence. He claims that after the fight, he gained respect.  Respect that allowed him to choose whether or not he would join a gang or remain "independent."  Again, viewing Randy's size it is difficult to believe Randy was able to hold his ground to a point that allowed him to decide his "status," but Randy contends otherwise.

Following the fight, two to three gangs approached Randy and asked basically asked if he would care to join.  Randy, heeding the advice of the Choice Moore inmates, respectfully declined and decided he would remain an "independent."  Meaning he would not participate in any gang activity.  Randy explained that if you prove yourself during the checking process, as he claims he did, you could decide not to join.  But it is still highly important to maintain respect for the gangs, member or not.  In addition, Randy stated that his Jewish background allowed him to avoid gangs as well, since he did not really "fit" in any particular group.

We asked Randy if he was ever involved in any fights, other than the checking process, while at Connally and he mentioned an altercation with his cellmate.  Specifically, he claimed that he borrowed a magazine from an inmate

14

and when he returned it, the inmate informed him that there were pages ripped out of it.  The inmate told him that it was "no big deal" but was curious as to what happened.  Randy, aware that his cellmate liked to rip pages out of magazines and make collages, confronted him and asked him to explain.  When Randy approached his cellmate, the cellmate became very outraged and denied doing anything to the magazine.  Both of them argued for a while, exchanging derogatory comments.

Subsequent to the argument, another inmate who witnessed the argument asked Randy when he and his cellmate were going to fight.  Randy claims that he never intended to fight his cellmate, but that it was the only way to maintain his "status" as an independent.  Therefore, Randy went back to his cell, approached his cellmate and began to fight.  Randy made sure that other inmates were watching and the fight lasted for a few minutes.  No one was seriously injured and both Randy and his cellmate were able to keep the respect they previously earned.

We asked Randy to discuss what the conditions were like on a day-to-day basis in Connally.  He basically repeated what our research exposes.  The Connally Unit is an extremely violent and dangerous place, but he never felt threatened.  Randy claims that so long as you abide by the basic prison rules, written and unwritten alike, one is at little risk.  Again, we find Randy's conclusion hard to believe.  The Connally Unit is not a friendly place and Randy is not a threatening individual.  Although Randy never discussed being abused, sexually, mentally, or physically, we believe that some sort of abuse was inevitable.

We also asked Randy what his personal life was like at Connally.  He explained that in the beginning he would get up around 3:30 a.m. so that he could eat breakfast, which the prison served at 4:00 a.m.  He would eat and then go back to sleep for thirty minutes or so and then get back up to get ready for work at 5:00 a.m.  He would work most of the day and then go back to his cell and read or relax around 4:00 or 5:00 p.m.  With the exception of Randy deciding to skip breakfast in the interest of obtaining more sleep, he basically kept this same schedule the entire time in Connally.

Continuing with the jail conditions at Connally, Randy explained that the guards are more or less there for "damage control."  He told us that rather than take preemptive measures to deter certain activities, e.g., fights, rapes, drug use, the guards would basically remain on "stand-by" only trying to stop a fight before it ended in an inmate's death.

Randy briefly discussed a time when a Mexican gang fight broke out.  He mentioned that he witnessed two guards and another higher ranked staff member sit back and watch two other gang members put canned goods in the bottom of a sock and beat another inmate to death.  The guards made no efforts to stop the activity until it was too late.

In addition, Randy informed us that a lot of times the guards themselves get involved in the activities.  Specifically, the guards would serve as middlemen for filtrating in drugs.  The process is somewhat simple.  The inmates will approach a guard that appears vulnerable and offer to pay him in exchange for bringing in drugs.  The guards obtain the drugs on the outside and have the

inmate's family or friends pay for them.  The guards generally charge prices that run in excess of nine to ten times the actual street value of the drugs.  Once the guard gets in the routine of obtaining drugs for the inmates, his own life eventually becomes threatened.  Meaning that if the guard were to choose to cease filtrating in the drugs, the inmates will threaten to kill him.

We briefly discussed the break out with Randy and how it evolved.  He mentioned that he and George Rivas became friends by discussing religion on a daily basis.  Other student's research indicates that Rivas and Randy possibly had a sexual relationship as well.  These statements, however, are not proven as of now and Randy never discussed such a relationship.

Randy explained that the break out took about six months to plan.  He told us that each member of the break out was carefully chosen.  Each member had a special quality they could contribute, e.g., knowing the prison system in and out, creating I.D.s, robbing small stores, etc.  Interestingly, when we asked Randy what his specific role in the break out was he was speechless.  He claims that he really did not have a role.  As we continued to talk with Randy about the break out, he told us that Rivas would ask for Randy's approval on the inmates involved.  Rivas trusted Randy and wanted to make sure that Randy had a "good feeling" about the other inmate's chosen to participate in the break out.  Consequently, no inmate chosen was a member of a gang.  Randy felt that gang related inmates had a stronger probability of violating the trust within the group and could potentially expose the plan.

17

Randy claimed to be somewhat reluctant to follow through with the break out, since he knew there would be some violence involved. He informed us that he thought about it for days and eventually weighed his options. More than anything, Randy claims he just wanted to start a "new life" and he knew that based on the parole system in place at that time, he would serve almost all of his thirty year sentence.

Randy concluded his interview with us by discussing the last days of the escape and how they were eventually caught. We asked Randy whether or not he would do it again knowing what he knows now and he never really gave us a straight answer. He mentioned that he made several efforts, while in Connally, to get involved with college courses but that his request kept getting postponed. He explained that participating in college courses might have changed his view on breaking out. Specifically, he might have had an easier time getting through the possible thirty years of his sentence.

In the end, we asked Randy if in his personal opinion he felt the prison conditions at Connally affected his decision to break out and he adamantly denied that they did. He did tell us, however, that his decision to break out was a combination of a couple of things. First and foremost, Randy claims he just wanted to start all over again and knowing that he was going to potentially serve all of his time, he did not think he could wait it out. In addition, Randy did say that the jail conditions were a small part of his decision to participate in the break out but that those conditions alone were somewhat insignificant.

18

## Conclusion

We believe that Randy is an intelligent and well-spoken individual that knows he has made some very bad decisions.  Randy appears to be sincerely remorseful about his actions.  We also believe, however, that Randy is highly capable of manipulating people and situations into believing what he wants them to believe. Unfortunately, based on the notoriety of the "Texas Seven", Randy's chances of mitigating his sentence to life in prison are doubtful.  His participation in the break out seems minimal, but that will be difficult to prove to a jury.  We believe that it is important to emphasize to the jury the abhorrent prison conditions at Connally, however, we are uncertain that these conditions are enough to overcome the jury's strong feelings about the "Texas Seven."

TEAM #4

Joseph Henderson

# SPECIFIC INTENT AND THE
# FELONY MURDER DOCTRINE

**TO: PROFESSOR REED**

**FROM: JOSEPH HENDERSON**

**DATE: 05/09/02**

**RE: SPECIFIC INTENT AND THE FELONY MURDER DOCTRINE**

**ISSUE:**

A member of the Texas Seven participates in a joint-robbery of a sporting goods store in Texas. During this robbery an unidentified member of the party shot and killed a police officer. Under the Texas capital punishment scheme may R.H. receive the death penalty based on his non-triggerman involvement in this incident and what are the possible arguments against such an application of the felony murder rule.

**DISCUSSION:**

INTRODUCTION

This paper is an extension of last semester's research concerning the felony murder doctrine in Texas. It evaluates the doctrine in three parts to give a comprehensive evaluation and identify potential avenues of appeal for felony murder convictions in Texas. First, this doctrine is placed in its historical context to lay the ground work for expanding the research beyond Texas jurisprudence. Then an evaluation is made of Texas law to expand last semester's paper. Finally, this paper will use the law of two other jurisdictions to exam potential avenues of attacking the validity of the doctrine in Texas.

HISTORICAL PERSPECTIVE

1

The criminal justice system in the United States resonates with doctrines from the English legal system. One of the doctrines crossing from England to the United States was the felony murder doctrine. Under this doctrine, every criminal act classified as a felony carried the possibility of punishment by death. This broad application of death-possible sentences was accepted as an important way to achieve the goals of the common law system. The English did not want an individual to escape the death penalty by participation in a crime where lack of mental intent or non-triggerman status could result in no felony conviction.[1]

At the time, the traditional criminal defendant needed to have a criminal act and the mental intent behind the act before a felony conviction was possible. However, in the above-referenced circumstances a traditional conviction was impossible. If a criminal did not hold the requisite intent, then the courts could not sustain a conviction due to the lack of a fundamental element of criminal law. The courts formulated a new doctrine to defeat the result of this undeniable logic of a person escaping punishment for unintended crimes.[2]

A theory of criminal liability known as the felony murder rule developed. Under the old system, if a defendant was attempting a crime and an unintentional felony resulted, then that defendant could still face a felony conviction. During the time that this doctrine developed, capital punishment was a possibility in all felony convictions. Therefore, whether or not the doctrine was too harsh was not specifically addressed by the English or American courts. It was more a legal fiction

---

[1] *See* James W. Hilliard, <u>Felony Murder in Illinois The Agency Theory vs. The Proximate Cause Theory: The Debate Continues</u>, 25 S. Ill. L. J. 331 (2001).

[2] *See id.*

used to fix a perceived problem in the logical application of the system. It should be noted that England abandoned practicing this theory in the last century due to its incompatibility with the current goals and principles of the English criminal system.[3]

The rationale behind the abandonment of the felony murder doctrine is attributable to a larger category of felonies developing in the English system, and a contemporaneous belief that death and similar punishments should not be unilaterally applied within that system. The English courts felt that a more compassionate view towards unintentional crimes was important and decided to punish criminals based on the traditional concept of their intent coupled with their actions.[4]

The colonies and the eventual states carried the doctrine into their criminal justice systems. However, despite the fact the doctrine is codified in many jurisdictions a hard, bright-line rule to cover the felony-murder rule never developed. Instead, every jurisdiction treats the doctrine differently and with wide disparity throughout the United States. This disparity is not limited to jurisdictions by death penalty. Some non-death penalty jurisdictions do enforce a version of the felony murder rule. Others, where capital punishment is possible, do not recognize the felony murder rule in adjudicating death penalty cases.[5]

SUPREME COURT PRECEDENCE

---

[3] See Richard W. Garnett, NOTE: Depravity Thrice Removed: Using the "Heinous, Cruel, or Depraved" Factor to Aggravate Convictions of Non-Triggermen Accomplices in Capital Cases, 103 Yale L. J. 2471 (1994).

[4] See id.

[5] See http://www.deathpenaltyinfo.org/firstpage.html (last visited on 05-05-02)

3

The only uniform certainty regarding this doctrine is its rejection as cruel and unusual punishment by the Supreme Court.[6] In the early 1980's the Supreme Court did find the doctrine to be cruel and unusual.[7] However, within a few years it limited that holding to minor participants and allowing the doctrine's application to major participants.[8] These two cases are important because they set the minimum level of intent a felony murder jurisdiction must have in order to constitutionally uphold convictions under the Eighth Amendment.

The first case involved Florida's capital punishment scheme and how it interacted with the felony murder doctrine. In 1982 the court decided <u>Enmund v. Florida</u>, which held the application of capital punishment to non-triggerman participants in a robbery was cruel and unusual punishment.[9] Enmund was the father-in-law of two individuals who attempted to rob an elderly couple and wound up shooting them. The Florida courts held that Enmund's status as the get-away driver for the robbers was enough to sentence him to death under the felony murder doctrine. The Florida Supreme Court supported this by stating it didn't matter what his level of participation was as long as he assisted in the commission of the robbery.[10]

---

[6] *See* Peter A. Barta, <u>NOTE: Between Death and a Hard Place: Hopkins v. Reeves and the Stark choice Between Capital Conviction and Outright Acquittal</u>, 37 Am. Crim. L. Rev. 1429 (2000).

[7] *See Enmund v. Florida*, 458 US 782 (1982).

[8] *See Tison v. Arizona*, 481 US 137 (1987).

[9] *See Enmund* at 785.

[10] *See id.*

To reverse the Florida courts, the Supreme Court looked to all the jurisdictions around the country to support statistically and logically the holding. The court noted that only 8 of the 36 death penalty jurisdictions allowed a defendant to be executed solely on the basis of their participation in the robbery. The remaining states either rejected the doctrine out-right or called for additional, aggravating circumstances in order sustain such a severe penalty. Finding such a punishment to be too severe for the level of participation and intent reflected in the record, the court overturned the conviction on the grounds of cruel and unusual punishment.[11]

In 1987, the Supreme Court limited its Enmund holding in Tison v. Arizona. In this case the court affirmed the capital sentences of two brothers who helped their father escape from prison. The brothers had brought guns into the prison and assisted their father in his escape by brandishing weapons and helping to kidnap a family. The family was later slaughtered by the father and a co-escapee without the brothers' knowledge or participation.[12]

This case was distinguished from Enmund because of the level of participation displayed by the brothers. The Supreme Court noted that they were not mere get-away drivers. Rather, they focused on the actions of the brothers and found that the brothers did display the intent to kill someone beyond a reasonable doubt. Based on that finding and their level of participation in the escape, the

---

[11] See Enmund at 792-798.

[12] See Tison at 138 – 145.

Death Penalty Project – Spring 2002
Specific Intent and Capital Punishment

Supreme Court, again, conducted a proportionality review based on the accepted standards of the country.[13]

Finding that major participants in felony murder situations were distinct from minor participants, the court further addressed the issue of mens rea. The court found that a state could limit the doctrine to situations where the defendant held a specific intent to murder the victim who dies, or could apply the doctrine to those with a reckless indifference for human life. The support for this holding was based on the notion that a sociopath could never really form a specific intent, because they would probably never care enough about their victims to intend them to die. So, in situations where the participant displays a reckless indifference to human life by intending someone to die, then the death penalty is proportional and not cruel and unusual.[14]

A simpler way to think about this is that the question is evaluating the level of violence the participant intended. If they know an individual is carrying a gun and has used it in the past, then they know a death will probably result and are displaying enough mens rea to support a cruel and unusual constitutional challenge. It is important to remember that if the jurisdiction requires an individual to show specific intent, then that will be a higher standard than the one found in Tison.[15]

Since 1987, there have been no further Supreme Court cases dealing with the felony murder doctrine. However, there have been other cases regarding the

---

[13] See id.

[14] See id.

[15] See State v. Gerald, 549 A.2d 792 (NJ Sup. Ct. 1988).

cruel and unusual aspect of capital punishment. In a recent case the Supreme Court found that the issue has become more a question of federalism than anything else.[16] In phrasing the issue in this manner, the Supreme Court shows a marked lack of desire to overturn any of the existing death penalty schemes. Therefore, any challenge to a felony murder charge as cruel and unusual punishment will probably fail, unless the facts are similar to those enumerated in Enmund.[17]

The best chance of sustaining a constitutional challenge to any capital punishment case resides with raising a new issue. Fortunately, there is precedence among the jurisdictions to raise a new argument regarding the felony murder rule. A strong argument could be made by applying Apprendi to the felony murder scheme.[18] This will attack the procedural requirements of a capital punishment scheme and not focus on the broad social policies the current bench of the Supreme Court does not like to address. However, a deeper examination of Texas law is required before that potential issue is addressed.

TEXAS JURISPRUDENCE

Traditionally, Texas allows capital punishment whenever the state proves beyond a reasonable doubt that the defendant specifically intended the death of the victim. However, there is a statutory exception to that requirement. In Texas law, a

---

[16] See Hopkins v. Reeves, 521 US 1151 (1997).

[17] See State v. Johnson, 699 A.2 57 (Conn. 1997).

[18] See Apprendi v. New Jersey, 530 US 466 (2000).

defendant's capital sentence is sustainable if it is given under the "law of parties instruction" during the guilt innocence phase of the trial.[19]

This instruction states that "a person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both." In order to meet this exception the person must first be criminally responsible for the other person's actions. That happens when a defendant is "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense… [or] … If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, *though having no intent to commit it*, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy."[20]

On its face, the language of the statute completely contradicts the Supreme Court's decisions enumerated in Tison and Enmund. The reason for this is that the law was codified before those cases were decided.[21] In the pre-Tison/Enmund era it was acceptable for a defendant to receive a death sentence for being the get-away driver for a robbery that results in murder.[22] However, after Tison there is a shift in

---

[19] *See Generally* Fall 2001 Death Penalty Project Memorandum.

[20] *See* TEX. PEN. CODE ANN. §§ 7.01, 7.02 (VERNON 2002).

[21] *See id.*

[22] *See Gonzales v. State*, 350 S.W.2d 553 (Cr. App. 1986).

8

the interpretation of this statute. The criminal courts now read the statute to require intent and a substantial step to assist in the facilitation of the actual murder and not just the underlying felony.[23]

It is no longer enough that the defendant was merely present for the robbery. In order to sustain a capital conviction for felony murder, the state must prove beyond a reasonable doubt that the defendant either intentionally promoted or assisted in the commission of murder, or that the defendant anticipated a murder might occur as a result of the anticipated violence of the intended crime.[24]  The courts have interpreted this requirement to mean that a defendant cannot be guilty of capital murder under parties liability without a showing that the defendant acted with intent to promote or assist in the intentional murder.[25] Mere presence at the scene of a crime is no longer enough to warrant capital punishment.[26]

The only other way a conviction may be secured is if the defendant should know murder might result from the underlying offense.[27] These cases are more of a factual question and usually upheld when the defendant is on notice that murder might result from the offense. Usually the courts will look towards the defendant's subjective knowledge of the surrounding circumstances.[28] Such as did they know others were carrying guns, or that the co-conspirators held a propensity for killing. In

---

[23] See *Tippitt v. State*, 41 S.W.3d 316 (Tex. App. – Ft. Worth 2001).

[24] See *Tippitt*, 41 S.W.3d at 323.

[25] See *Martinez v. State*, 763 S.W.2d 413, 425 (Tex. Cr. App. 1988).

[26] See *Tippitt*, 41 S.W.3d at 324

[27] See *id.*

[28] See *id.*

Death Penalty Project – Spring 2002
Specific Intent and Capital Punishment

situations where the defendant has some amount of notice it is usually enough to sustain a capital conviction against them based on the alternate of §7.02.[29]

Therefore, the question to ask when evaluating a parties liability charge is what level of violence did the defendant anticipate when they joined the conspiracy. If the offense is of such a nature that potential murder is inherent, then the defendant might be convicted under §7.02. However, a mere armed-robbery does not meet this requirement. A defendant must be on notice that a death might result from the crime or have taken steps to facilitate an intentional murder before the state can secure a death sentence.

One recent case takes this one step further, and states that the defendant must either assist in the intentional murder, or be on notice that an intentional murder is about to transpire.[30] The state is required to prove at least one of these elements beyond a reasonable doubt.[31] If neither of these elements is proven to a jury beyond a reasonable doubt, then a capital sentence through a parties liability theory is improper.[32]

Seemingly, the capital scheme that Texas employs requires a specific intent for murder in all situations, except those involving the felony murder doctrine. This conflicting state of the law is further muddled by the statute itself which is out of compliance with the constitutional interpretations of the United States Supreme

---

[29] See id

[30] See Tippitt, 41 S.W.3d at 326.

[31] See Queen v. State, 940 S.W.2d 781, 787 (Tex. App. – Austin 1997).

[32] See Tippitt at 326.

10

Court. However, a resolution is reached under Texas law, where there is a growing trend to require a finding of specific intent in order to uphold a death sentence.[33]

Knowing this, the question remains as to what the proper instructions are for jury to answer in determining a felony murder conviction. As covered last semester, it is important to request the anti-parties instruction. This device, if worded carefully, enables the defense to argue specific intent to the jury and possibly win the case at the trial level. A properly-worded instruction requires a finding of specific intent above and beyond the requirements of the current statute.[34]

When taken as a whole, it is plain that law in Texas is growing narrower with regards to the application of this doctrine. Yet, it is important to note that because the statute uses such broad language it still possible for a conviction to be sustainable under a lesser standard if the attorney is not quick in their requests to the judge.

OTHER STATES TREATMENT OF FELONY MURDER CONVICTIONS

Currently, there are 38 jurisdictions that employ the death penalty.[35] Of those jurisdictions, Maryland and Illinois suspended the execution of these sentences pending examinations of the other aspects of the process. As noted in Enmund, all of these jurisdictions have a different approach to the treatment of the felony murder doctrine. The reason for the discrepancy mainly lies in the history of the doctrine. As

[33] See id.

[34] See Rector v. Texas, 738 S.W.2d 235, 244 (Tex. Crim. App. 1999).

[35] See http://www.deathpenaltyinfo.org/firstpage.html (last visited on 05-05-02)

11

it developed, the rule is more of a judicial construction where the intent is a legal fiction allowed by the courts to secure a jurisdiction.[36]

This means that while almost every jurisdiction has a statute dealing with felony murder, not all of the courts interpret the statute on its face. Texas is a great example of this trend. While the statute itself allows for felony murder convictions in any situation, the courts have limited this, unofficially, through case decisions and jury instructions as to require a showing of specific intent.[37]

Every jurisdiction has similar treatment of this doctrine making it next to impossible to find any broad, unified trends. The only sureties regarding the law surrounding this doctrine are 1) that is not cruel and unusual punishment to impose capital punishment in the situations discussed in Tison and Enmund , 2) that this doctrine is heavily criticized within jurisdictions, and 3) is inconsistently applied within many states due to the judicial constructions of that jurisdiction.[38] However, there are a few states that provide persuasive arguments to be made in appealing a conviction under this doctrine.

NEW JERSEY'S APPROACH –

New Jersey is one of the jurisdictions that allows capital punishment, but statutorily bars the felony murder doctrine from applying to such convictions.[39] In Gerald, the New Jersey Supreme Court explains the rationale behind the statute.

---

[36] See State v. Ortega, 817 P.2d 1196 (NM 1991).

[37] See Tippitt v. State, 41 S.W.3d 316 (Tex. App. – Ft. Worth 2001).

[38] See State v. Ortega, 817 P.2d 1196 (NM 1991).

[39] See State v. Gerald, 549 A.2d 792 (NJ Sup. Ct. 1988).

Citing an agreement with the US Supreme Court, the court felt that deeply ingrained in our legal tradition is the idea that the more purposeful the conduct, the more serious the offense, and, therefore, the more severely it ought to be punished.[40] The legislature felt the same, and drafted a death penalty scheme reserving capital punishment for defendants who acted knowingly and purposely with respect to every element.[41]

Such an approach does not offer many arguments in the jurisdiction of Texas. The legislature drafted a completely different capital punishment scheme, silencing the felony murder doctrine. No prosecutors have made arguments to the courts that this scheme is cruel and unusual. Therefore, it does not offer guidance in terms of legal support. Rather, this jurisdiction is an example of the growing wariness of jurisdictions to this doctrine in the capital punishment context.

CONNECTICUT'S APPROACH

In Connecticut (hereinafter Conn.) the State Supreme Court rejects the notion of felony murder in a jurisdiction where the statutes could allow the doctrine to continue.[42] The court accomplishes this through statutory interpretation of the felony murder doctrine. More specifically, the court holds that murder within the meaning of the statutes cannot include unintentional killings. The court uses this to

---

[40] *See id* at 811.

[41] *See id.*

[42] *See State v. Johnson*, 699 A.2 57 (Conn. 1997).

state that felony murders can never be intentional killings because the non-triggerman does not participate in the actual commission of the offense.[43]

For a similar result to occur in the instant case, the Texas Court of Criminal Appeals would have to reverse a long held contention that the felony murder scheme properly allows capital convictions.[44] Therefore, it might be important to raise the issue of statutory definition to preserve an error on appeal, but to win on this point seems like a very unlikely occurrence.  Again, the most support jurisdictions like Conn. Can offer is to show the generally disfavored status of the doctrine due to its logical contradiction regarding mens rea. This is particularly true in Johnson because the facts surrounding the case are very similar to the present one.

NEW MEXICO'S APPROACH

New Mexico's Supreme Court handed down a very instructive decision in 1991, which eliminated the use of the states felony murder doctrine to secure capital sentences.[45] This opinion is important to the present case because of its scope and the rationale the court uses to reach its holding. It presents a unique viewpoint on the felony murder doctrine that is not seen in any other jurisdiction.

The unique viewpoint the court takes address the burden shifting effect such a rule has and denies it constitutionality under the 6th and 14th Amendments. Noting that few doctrines are maligned, yet as long lived in the US as the felony murder

---

[43] See id.

[44] See Tippitt v. State, 41 S.W.3d 316 (Tex. App. – Ft. Worth 2001).

[45] See State v. Ortega, 817 P.2d 1196 (NM 1991).

doctrine, the court begins its evaluation with a review of first degree murder. In New Mexico, the capital punishment scheme requires specific intent be shown before a defendant may receive the death penalty.[46] Finding this to be the plain text of the law, the court holds that to apply felony murder to any underlying felonies that are not first degree felonies is a proposition they cannot support.[47]

The rationale behind such a holding is that the presumption of intent is too much of a legal fiction. Whenever a jury receives a charge where the intent is presumed through the acts of others, then the jury doesn't have to decide on that element beyond a reasonable doubt.[48] This violates the due process requirement that the state must prove every element beyond a reasonable doubt.[49] Also, the notion of Due Process is violated by allowing the prosecution to secure a conviction in which they have not proved every element beyond a reasonable doubt.[50]

The Supreme Court of New Mexico further attacks the felony murder doctrine based on the fact it no longer is really a legal fiction.[51] In allowing a strict liability crime the court worries that due process is violated by allowing the presumption of innocence to be shifted without proof.[52] Therefore, they limit the application of

---

[46] See id at 1202.

[47] See id.

[48] See Sandstrom v. Montana, 442 US 510 (1979).

[49] See id.

[50] See id at 520.

[51] See Ortega at 1203.

[52] See Ortega at 1204.

felony murder to situations where the prosecution is able to prove that the

defendant acted with intent to commit the act themselves.[53]

      This decision is very good because it presents so many original arguments to

attack the felony murder doctrine. While Texas courts have addressed the cruel and

unusual aspect of felony murder, they have not addressed whether or not it illegally

shifts the presumption of innocence. If properly tailored to this jurisdiction, this case

provides the best ground work for defeating a capital sentence under the felony

murder doctrine.

## CONCLUSION

      The felony murder doctrine has a long history and is haphazardly applied

throughout the various jurisdictions of the United States today. In Texas, the statute

authorizing the use of the doctrine is worded in such a way that it is possible to be

convicted of felony murder while never exhibiting intent or assistance in the

commission of the offense. Such language clearly contradicts the Supreme Court's

holdings in Enmund and Tison. It is true that the courts have limited the application

of the statute through jurisprudence, but they have never limited the statute

thorough its language in Texas the way that states like Connecticut have, which

leaves open this possibility.

      Furthermore, the old language of the statute leaves open an option to attack

it based on violations of due process. Such arguments have not been ruled on in

the Supreme Court before. These could prove to be the best possible arguments in

---

[53] *See id.*

light of the court's recent decision in Apprendi.[54] However, the conclusion reached in the prior paper remains essentially correct. While strong arguments can be made to attack the doctrine of felony murder, the courts in Texas have shown little inclination to change the existing scope in such a manner that would help the defendant's case very much. Also, the facts of the case could show that he held the specific intent to assist in the murder of the victim clearly nullifying all of these arguments.

---

[54] *See Apprendi v. New Jersey*, 530 US 466 (2000). – holding that a defendant is entitled to have every element of a crime proven beyond a reasonable doubt to a jury of their peers.

17

A State Analysis

Death Penalty Project - 2002
Joe Henderson
for Prof. Reed

| State | Capital Punishment for Felony Murder? | If Not - Justification | Applicable Authority |
|---|---|---|---|
| Alabama | Yes | | |
| Arizona | Yes | | Tison v. Arizona |
| Arkansas | Yes | | Ark. Sec. 5-10-101(a)(1) |
| California | Yes | Specific Intent Req'd | Cal. Pen. Sec. 189,109.2 |
| Colorado | Yes | | Col. Rev. S. Sec. 18-3-102(1)(b) |
| Connecticut | Limited | Specific Intent Req'd | Conn. v. Johnson |
| Delaware | Limited | Specific Intent Req'd | Del. Code 11 Sec. 636(a)(2) |
| Florida | Yes | | |
| Georgia | Yes | | Ga. Code Sec. 16-5-1© |
| Idaho | Yes | | Idaho Code Sec. 18-4003(d) |
| Illinois | Yes | | 720 ILCS 5/9-1(a)(6) |
| Indiana | Yes | | Ind. Code Sec. 35-42-1-1(2),(3) |
| Kansas | No | None found | |
| Kentucky | Limited | Practiced - No Official Recognition | KY Rev. S. Sec. 507.020.(1)(b) |
| Louisiana | No | None Found | |
| Maryland | No | None Found | |
| Mississippi | | | |
| Missouri | No | None Found | |
| Montana | Yes | | Mont. Code Sec. 45-5-102(1)(b) |
| Nebraska | Yes | | Neb. Rev. S. Sec. 28-303(2) |
| Nevada | Yes | | Nev. Rev. S. Sec. 200.303(1)(b) |
| N. Hampshire | No | None Found | |
| New Jersey | No | Unconsitutional | |
| New Mexico | No | Unconsitutional | New Mexico v. Ortega |
| New York | Limited | Specific Intent Req'd | |
| N. Carolina | Yes | | N.C. Gen. S. Sec. 14-17 |
| Ohio | No | None Found | |
| Oklahoma | Yes | | OK S. 21 Sec. 701.7(B) |
| Oregon | No | None Found | |
| Pennsylvania | No | Not Recognized | |
| S. Carolina | Yes | Judicial Construction | SC Code Ann. Sec. 16-3-10 |
| S. Dakota | Yes | | SD Code Sec. 22-16-4 |
| Tennessee | Yes | | Tenn. Code Sec. 39-13-202(a)(2) |
| Texas | Yes | Specific Intent Req'd | |
| Utah | No | None Found | |
| Virginia | No | None Found | |
| Washington | No | None Found | |
| Wyoming | Yes | | Wyo. S. Sec. 6-2-101(a) |

* Thirteen Jurisdictions Without Death Penalty

Alaska, Maine, Minnesota, Vermont, Hawaii, Massachusetts, N. Dakota, W. Virginia, Iowa, Michigan
Rhode Island, Wisconsin, District of Columbia

## TEAM #5

## Macy Jaggers
## Sheryl Kao

# MOTION TO QUASH INDICTMENT

# Death Penalty Project

## Professor R. Reed
Spring 2002

## State v. Randy Halprin
## Motion to Quash Indictment

Sheryl Kao
Macy Jaggers

Cause No. F01-00327-T

| | | |
|---|---|---|
| The State of Texas | § | Criminal District Court |
| | § | |
| v. | § | 283rd Judicial District |
| | § | |
| Randy Halprin | § | Dallas County, Texas |

## MOTION TO QUASH INDICTMENT

To the Honorable Judge of Said Court:

Now comes Randy Halprin, defendant in the above entitled and numbered cause by and through his attorney of record, and files this his Motion to Quash and set aside the indictment under authority of the Fifth, Sixth, and Fourteenth Amendments of the Constitution of the United States; Article I, Sections 10 and 19 of the Texas Constitution; and Chapter 21 of the Texas Code of Criminal Procedure, for the following reasons:

I.

The indictment was obtained in violation of the provision of the Fourteenth Amendment to the Constitution of the United States that "no statute shall ... deny to any person within its jurisdiction the equal protection of the laws," by reason of the following facts: Dallas County has systematically excluded Hispanic Americans from its grand juries.

"Before a grand jury is impaneled, any person may challenge the array of jurors or any person presented as a grand juror." TEX. CODE CRIM. PROC. ANN. art. 19.27 (Vernon Supp. 2001). Ordinarily a challenge to the array must be made when the grand jury is impaneled. *Muniz v. State*, 573 S.W.2d 792, 796 (Tex. Crim. App. 1978) (en banc). There are times, however, when it is impossible to challenge the array when the grand

jury is impaneled. *Id*. In such a case, "the array can be attacked in a motion to quash the indictment before trial commences." *Id*.

Defendant Halprin did not have the opportunity to challenge the array when the grand jury was impaneled, therefore he is entitled to attack the array in this motion to quash the indictment. Defendant Halprin was not in the jurisdiction when the grand jury was impaneled nor was he in custody at the time. [need to include statement of dates here - what are they?] Furthermore, Defendant Halprin was not represented by counsel when the grand jury was impaneled. When a defendant is not represented by counsel at when the grand jury is impaneled, a challenge to the grand jury array may be made by a motion to quash the indictment. *Muniz v. State*, 672 S.W.2d 804, 807-08 (Tex. Crim. App. 1984) (en banc).

[ The grand jury was selected on _____ and impaneled on _____. The grand jury returned the indictment against Defendant Halprin on _____. Defendant Halprin was extradited to Dallas County on _____. Defendant Halprin was not represented by counsel until _____. As such, Defendant Halprin did not have the opportunity to challenge the array. A challenge to the array of the grand jury is appropriate in this motion to quash.]

The grand jury that indicted Defendant Halprin was selected in violation of the federal constitutional requirement of equal protection. As such, the indictment should be quashed. A prima facie case of discrimination in the selection of the grand jury requires that a defendant prove: first "that the group is a recognizable, distinct class, singled out for different treatment under the laws as written or applied[;] ... [second] the degree of underrepresentation [as determined] by comparing the proportion of the group

in the total population to the proportion called to serve as grand jurors, over a significant period of time[;] ... [and finally] a selection procedure that is susceptible of abuse or is not racially neutral." *Castaneda v. Partida*, 430 U.S. 482, 494 (1977).

### A. Hispanics Are a Recognizable, Distinct Class, Singled Out for Different Treatment.

A defendant must first prove that a group is "a recognizable, distinct class, singled out for different treatment under the laws as written or applied." *Id.* The United States Supreme Court held that Mexican-Americans are an identifiable class and thus entitled to protection under the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 495. Mexican-Americans comprise a subset of Hispanic Americans and, as such, Hispanics are an identifiable class and thus entitled to protection under the Equal Protection Clause of the Fourteenth Amendment.

### B. Hispanics Are Underrepresented as Grand Jurors in Dallas County.

After the defendant has shown that the group is a recognizable distinct class, he must next show "the degree of underrepresentation [as determined] by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time." *Id.* at 494.

According to the 2000 Census, Dallas County has 2,218,899 residents. *See* 2000 Census of Population and Housing, attached hereto as Exhibit 1. Of those, 1,294,769, or 58.4% are White. *Id.* Blacks comprise 20.3% of the Dallas County population, or 450,557 residents. *Id.* Hispanics of any race in Dallas County constitute 29.9% of the

population, or 662,729 residents. *Id.* Among those Hispanics, 531,115 are Mexican (or 23.9% of the total population). *Id.*

Of the total 2,218,899 residents in Dallas County, 1,599,868 are over the age of 18 (and thus satisfy one of the qualifications to be a grand juror). *See* 2000 Over-18 Population by Voting Precinct, Dallas County Elections Department website, http://dalcoelections.org/, attached hereto as Exhibit 2. Among the over-18 population, 783,669, or 48.98% are White. *Id.* Blacks comprise 18.94% or 302,967 residents. *Id.* And Hispanics constitute 26.37% of the over-18 population, or 421,900 residents. *Id.*

The grand jury that indicted Defendant Halprin, Dallas County Grand Jury B-2, January Term, 2001, 282nd Judicial District Court, Judge Karen Greene, contained only one Hispanic grand juror. Of the twelve grand jurors, only Mrs. Lilia E. Dyess is Hispanic.

|  | Total Pop | % | Voting Pop | % | Indicting Grand Jury | % | Dallas Co. Grand Juries Years | % |
|---|---|---|---|---|---|---|---|---|
| **White** | 1,294,769 | 58.4 | 783,669 | 48.98 | 7 | 58.33 |  |  |
| **Black** | 450,557 | 20.3 | 302,967 | 18.94 | 4 | 33.33 |  |  |
| **Hispanic [Mexican]** | 662,729 [531,115] | 29.9 [23.9] | 421,900 | 26.37 | 1 | 8.33 | — | — |
| **Total** | 2,218,899 |  | 1,599,868 |  | 12 |  | — | — |

Over the past _____ years, only \_\_\_\_ of the grand jurors who served in Dallas County had Hispanic surnames. Of the _____ grand jurors impaneled, a mere \_\_\_\_% selected had Hispanic surnames. With nearly one-third of the Dallas County population

being Hispanic, a mere _____ % serving as grand jurors demonstrates a serious underrepresentation by Hispanics on Dallas County's grand juries.

### C. Dallas County's Commissioner-Based Grand Jury Selection System is Susceptible of Abuse.

Having proved that Hispanics are a recognizable, distinct class, singled out for different treatment under the laws and that they are proportionately underrepresented as grand jurors, a defendant must show that the "selection procedure ... is susceptible of abuse or is not racially neutral." *Partida*, 430 U.S. at 494.

Dallas County uses the commissioner-based system to select its grand jurors. The United States Supreme Court found this system to be "highly subjective ... and susceptible of abuse." *Id.* at 497; *see also, Ovalle v. State*, 13 S.W.3d 774, 778 (Tex. Crim. App. 2000) (en banc). "The key-man [commissioner-based] selection system used is not racially neutral with respect to Mexican-Americans because the Spanish surnames are easily identifiable, providing a discernable opportunity for purposeful discrimination." *Cerda v. State*, 644 U.S. 875, 876 (Tex. App.-- Amarillo 1982, no writ) citing *Partida*, 430 U.S. at 497.

Because Hispanics are a recognizable, distinct class, singled out for different treatment under the laws as applied, are underrepresented as grand jurors in Dallas County, and because Dallas County's commissioner-based grand jury selection system is susceptible of abuse, Defendant Halprin has proved a prima facie case of discrimination. As a result, the indictment should be quashed.

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully requests that the information in the above cause be set aside and quashed pursuant to the due

process and equal protection clauses of the Fourteenth Amendment and the due course of law provision of Article I, Section 19, of the Texas Constitution.

Respectfully Submitted,

_____
ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion was mailed to the Dallas County District Attorney's Office, Dallas, Dallas County, Texas, on this _____ day of _____, 2002.

_____
ATTORNEY

6

Cause No. F01-00327-T

| | | |
|---|---|---|
| The State of Texas | § | Criminal District Court |
| | § | |
| v. | § | 283rd Judicial District |
| | § | |
| Randy Halprin | § | Dallas County, Texas |

## **ORDER**

On this _____ day of _____, 2002, the foregoing Motion to Quash Indictment came on to be heard by the Court and, the Court having considered the same, it is hereby ORDERED that this request is GRANTED/DENIED.

_____
JUDGE PRESIDING

# Exhibit 1

## 2000 Census
(See Fall 2001 packet for original)



**UNITED STATES DEPARTMENT OF COMMERCE**
**Economics and Statistics Administration**
**U.S. Census Bureau**
Washington, DC 20233-0001
OFFICE OF THE DIRECTOR

Suitland, Maryland, October 17, 2001

I HEREBY CERTIFY that the attached is a true copy of the 2000 Census of Population and Housing, *Profiles of General Demographic Characteristics*, Table DP-1, "Profile of General Demographic Characteristics:  2000," for Dallas County, Texas, as compiled by the Bureau of the Census.

William G. Barron, Jr.
Acting Director
Bureau of the Census

I HEREBY CERTIFY that William G. Barron, Jr., who signed the foregoing certificate, is now, and was at the time of signing, Acting Director, Bureau of the Census, and that full faith and credit should be given his certificate as such.

IN WITNESS WHEREOF, I have hereunto subscribed my name and caused the seal of the Bureau of the Census to be affixed to the aforesaid document, judicial notice of which shall be taken under 13 U.S.C. 3, this _17th_ day of _October_, two thousand and one.

Nancy M. Gordon
Associate Director for
    Demographic Programs
Bureau of the Census

**Table DP-1. Profile of General Demographic Characteristics: 2000**

Geographic Area: Dallas County, Texas

[For information on confidentiality protection, nonsampling error, and definitions, see text]

| Subject | Number | Percent | Subject | Number | Percent |
|---|---|---|---|---|---|
| Total population......................... | 2,218,899 | 100.0 | **HISPANIC OR LATINO AND RACE** | | |
| | | | Total population......................... | 2,218,899 | 100.0 |
| **SEX AND AGE** | | | Hispanic or Latino (of any race)................ | 662,729 | 29.9 |
| Male........................................ | 1,108,200 | 49.9 | Mexican................................... | 531,115 | 23.9 |
| Female..................................... | 1,110,699 | 50.1 | Puerto Rican.............................. | 5,534 | 0.2 |
| | | | Cuban.................................... | 3,624 | 0.2 |
| Under 5 years ............................. | 181,951 | 8.2 | Other Hispanic or Latino ................. | 122,456 | 5.5 |
| 5 to 9 years ............................... | 175,763 | 7.9 | Not Hispanic or Latino ..................... | 1,556,170 | 70.1 |
| 10 to 14 years ............................. | 165,025 | 7.4 | White alone............................... | 983,317 | 44.3 |
| 15 to 19 years ............................. | 161,126 | 7.3 | | | |
| 20 to 24 years ............................. | 172,678 | 7.8 | **RELATIONSHIP** | | |
| 25 to 34 years ............................. | 399,345 | 18.0 | Total population......................... | 2,218,899 | 100.0 |
| 35 to 44 years ............................. | 364,860 | 16.4 | In households............................... | 2,185,429 | 98.5 |
| 45 to 54 years ............................. | 265,493 | 12.0 | Householder............................. | 807,621 | 36.4 |
| 55 to 59 years ............................. | 88,600 | 4.0 | Spouse ................................. | 378,411 | 17.1 |
| 60 to 64 years ............................. | 65,186 | 2.9 | Child.................................... | 675,774 | 30.5 |
| 65 to 74 years ............................. | 98,454 | 4.4 | Own child under 18 years ........... | 534,505 | 24.1 |
| 75 to 84 years ............................. | 60,064 | 2.7 | Other relatives .......................... | 192,865 | 8.7 |
| 85 years and over.......................... | 20,354 | 0.9 | Under 18 years ....................... | 71,189 | 3.2 |
| Median age (years)......................... | 31.1 | (X) | Nonrelatives ............................. | 130,758 | 5.9 |
| | | | Unmarried partner.................... | 40,759 | 1.8 |
| 18 years and over.......................... | 1,599,868 | 72.1 | In group quarters .......................... | 33,470 | 1.5 |
| Male........................................ | 791,709 | 35.7 | Institutionalized population............... | 23,633 | 1.1 |
| Female..................................... | 808,159 | 36.4 | Noninstitutionalized population ............ | 9,837 | 0.4 |
| 21 years and over.......................... | 1,502,511 | 67.7 | | | |
| 62 years and over.......................... | 215,722 | 9.7 | **HOUSEHOLD BY TYPE** | | |
| 65 years and over.......................... | 178,872 | 8.1 | Total households......................... | 807,621 | 100.0 |
| Male........................................ | 70,961 | 3.2 | Family households (families)................. | 533,613 | 66.1 |
| Female..................................... | 107,911 | 4.9 | With own children under 18 years ......... | 283,142 | 35.1 |
| | | | Married-couple family ................... | 378,411 | 46.9 |
| | | | With own children under 18 years ......... | 196,493 | 24.3 |
| **RACE** | | | Female householder, no husband present..... | 113,881 | 14.1 |
| One race ................................... | 2,158,975 | 97.3 | With own children under 18 years ........ | 68,766 | 8.5 |
| White ..................................... | 1,294,769 | 58.4 | Nonfamily households ...................... | 274,008 | 33.9 |
| Black or African American ................. | 450,557 | 20.3 | Householder living alone ................. | 220,183 | 27.3 |
| American Indian and Alaska Native......... | 12,499 | 0.6 | Householder 65 years and over........... | 47,782 | 5.9 |
| Asian ..................................... | 88,369 | 4.0 | | | |
| Asian Indian ........................... | 23,752 | 1.1 | Households with individuals under 18 years ... | 318,008 | 39.4 |
| Chinese ............................... | 12,094 | 0.5 | Households with individuals 65 years and over .. | 129,119 | 16.0 |
| Filipino ................................ | 6,617 | 0.3 | | | |
| Japanese.............................. | 2,193 | 0.1 | Average household size...................... | 2.71 | (X) |
| Korean................................ | 9,303 | 0.4 | Average family size......................... | 3.34 | (X) |
| Vietnamese............................ | 21,355 | 1.0 | | | |
| Other Asian ¹ .......................... | 13,055 | 0.6 | **HOUSING OCCUPANCY** | | |
| Native Hawaiian and Other Pacific Islander.... | 1,277 | 0.1 | Total housing units...................... | 854,119 | 100.0 |
| Native Hawaiian........................ | 302 | - | Occupied housing units.................... | 807,621 | 94.6 |
| Guamanian or Chamorro................. | 308 | - | Vacant housing units...................... | 46,498 | 5.4 |
| Samoan................................ | 233 | - | For seasonal, recreational, or | | |
| Other Pacific Islander ² ................. | 434 | - | occasional use......................... | 2,564 | 0.3 |
| Some other race ......................... | 311,504 | 14.0 | | | |
| Two or more races ........................ | 59,924 | 2.7 | Homeowner vacancy rate (percent)............. | 1.3 | (X) |
| | | | Rental vacancy rate (percent)................. | 6.3 | (X) |
| *Race alone or in combination with one* | | | | | |
| *or more other races:* ³ | | | **HOUSING TENURE** | | |
| White ..................................... | 1,343,900 | 60.6 | Occupied housing units.................. | 807,621 | 100.0 |
| Black or African American ................. | 462,609 | 20.8 | Owner-occupied housing units .............. | 424,847 | 52.6 |
| American Indian and Alaska Native............. | 22,777 | 1.0 | Renter-occupied housing units .............. | 382,774 | 47.4 |
| Asian ..................................... | 98,563 | 4.4 | | | |
| Native Hawaiian and Other Pacific Islander...... | 2,920 | 0.1 | Average household size of owner-occupied units. | 2.86 | (X) |
| Some other race ......................... | 350,798 | 15.8 | Average household size of renter-occupied units. | 2.54 | (X) |

- Represents zero or rounds to zero.    (X) Not applicable.

¹ Other Asian alone, or two or more Asian categories.

² Other Pacific Islander alone, or two or more Native Hawaiian and Other Pacific Islander categories.

³ In combination with one or more of the other races listed. The six numbers may add to more than the total population and the six percentages may add to more than 100 percent because individuals may report more than one race.

Source: U.S. Census Bureau, Census 2000.

58

In Memoriam:
September 11, 2001





# U.S. Census Bureau

United States Department of Commerce

**Census 2000 Data Now Available** Click Here

Subjects A to Z
A B C D E F G H I
J K L M N O P Q
R S T U V W X Y Z

New on the Site

Search

American FactFinder

Access Tools

Catalog

Publications (PDF)

Jobs@Census

About the Bureau

Related Sites

**United States Census 2000**

State and National Data (C2SS) • Detailed Tables (SF1) • Housing Units • Rankings, Comparisons & Summaries • Release Schedule • Profiles • Count Question Resolution • More

**People**
Estimates • Projections • International • Income • Poverty • Genealogy • State Profiles • Housing • More

**Business**
Economic Census • Government • E-Stats • NAICS • Foreign Trade • More

**Geography**
Maps • TIGER • Gazetteer • More

**News**
Releases • Minority Links • Radio/TV/Photo Services • More

**Special Topics**
Conversations with America • For Teachers • American Community Survey • Statistical Abstract • FedStats

Live Webcast! Wednesd:
Oct. 17,
11 a.m. ET

Population Clocks

U.S. 285,366,35
World 6,180,103,7
15:54 EDT Oct 16, 200

State&County QuickFacts

Select a state

Go!

Latest Economic Indicators



FOIA | Privacy Statement | Confidentiality | Quality | Accessibility | Contact Us | Doing business with us

## U S C E N S U S B U R E A U

*Helping You Make Informed Decisions*

10/16/01

# Profiles of General Demographic Characteristics

## 2000

Issued May 2001

*2000 Census of Population and Housing*

**Texas**



**U.S. Department of Commerce**
**Donald L. Evans,**
Secretary

**Economics**
**and Statistics**
**Administration**
**J. Lee Price,**
Acting Under Secretary for
Economic Affairs

**U.S. CENSUS BUREAU**
**William G. Barron, Jr.,**
Acting Director

**U.S. Census Bureau**

# 2000 Census of Population and Housing

Reports are listed in the Portable Document Format (PDF). In order to view these files, you will need the Adobe(R) Acrobat(R) Reader which is available for free from the Adobe web site.

```
Select Series_____
DP-1. Profiles of General Demographic Characteristics
Technical Documentation
Census Briefs
Other
```

```
Select Document_____
```

Last Revised: Thursday, 04-Oct-01 13:10:16

Census 2000 I Subjects A to Z I Search I Product Catalog I Data Access Tools I FOIA I Privacy • Policies I Contact Us I Home

## USCENSUSBUREAU
*Helping You Make Informed Decisions*

10/16/01

# Exhibit 2

# Dallas County Elections
# Department Website

## 2000 Over-18 Population

2000 Over-18 Population by Voting Precinct - Dallas County

| 2002 Precinct | Total population | White | Black | Amer Indian | Asian | Pacific Islander | Other race | Two or more races | Hispanic |
|---|---|---|---|---|---|---|---|---|---|
| 1100 | 2,173 | 411 | 721 | 15 | 61 | 1 | 15 | 116 | 833 |
| 1101 | 975 | 214 | 83 | 1 | 253 | 0 | 0 | 26 | 398 |
| 1102 | 3,270 | 1,009 | 845 | 25 | 105 | 2 | | 78 | 1,203 |
| 1103 | 1,372 | 196 | 73 | 2 | 32 | 0 | 0 | 3 | 1,066 |
| 1104 | 8,172 | 1,416 | 1,649 | 20 | 102 | 8 | 150 | | 4,808 |
| 1105 | 1,993 | 1,245 | 78 | 6 | 41 | 0 | 0 | 14 | 609 |
| 1106 | 3,646 | 1,282 | 301 | 1 | 101 | 0 | 0 | 20 | 2,941 |
| 1107 | 2,428 | 1,340 | 172 | 10 | 124 | 1 | 4 | 23 | 754 |
| 1108 | 2,227 | 1,155 | 151 | 8 | 174 | 3 | 3 | 40 | 693 |
| 1109 | 1,522 | 1,083 | 86 | 2 | 50 | 1 | 0 | 13 | 287 |
| 1110 | 3,436 | 2,186 | 267 | 7 | 183 | 0 | 0 | 71 | 720 |
| 1111 | 2,244 | 1,980 | 55 | 3 | 62 | 0 | 0 | 18 | 126 |
| 1112 | 1,820 | 1,414 | 40 | 6 | 38 | | | | 312 |
| 1113 | 987 | 850 | 21 | 2 | 13 | 0 | 1 | 8 | 92 |
| 1114 | 2,247 | 2,077 | | 7 | | 0 | | 11 | 115 |
| 1115 | 1,802 | 1,708 | 11 | 0 | 35 | 0 | 2 | 10 | 36 |
| 1116 | 1,280 | 1,175 | 14 | 2 | 23 | 0 | 1 | 11 | 54 |
| 1117 | 2,300 | 1,972 | 67 | 6 | 26 | 0 | 0 | 17 | 212 |
| 1118 | 1,793 | 1,625 | 8 | 1 | 34 | 1 | 1 | 10 | 113 |
| 1119 | 1,485 | 1,323 | 6 | 6 | 26 | 2 | 0 | 3 | 119 |
| 1120 | 4,639 | 1,528 | 1,984 | 12 | 393 | 4 | 5 | 95 | 2,618 |
| 1121 | 2,249 | 1,281 | 541 | 5 | 63 | 0 | 4 | 22 | 333 |
| 1122 | 3,646 | 1,024 | 798 | | | 3 | 31 | | 6,705 |
| 1123 | 3,161 | 1,921 | 829 | 19 | 81 | 0 | 0 | 32 | 279 |
| 1124 | 1,577 | 1,470 | 19 | | 30 | | 0 | 9 | |
| 1125 | | | | | | 10 | 0 | 0 | 9 | 2,596 |
| 1126 | | | | | | | | | |
| 1127 | | | | | | | | | |
| 1128 | | | | | | | | | |
| 1129 | | | | | | | | | |
| 1130 | | | | | | | | | |
| 1131 | | | | | | | | | |
| 1132 | | | | | | | | | |
| 1133 | | | | | | | | | |
| 1134 | | | | | | | | | |
| 1135 | | | | | | | | | |
| 1136 | | | | | | | | | |
| 1137 | | | | | | | | | |
| 1138 | | | | | | | | | |
| 1139 | | | | | | | | | |
| 1140 | | | | | | | | | |
| 1141 | | | | | | | | | |
| 1142 | | | | | | | | | |
| 1143 | | | | | | | | | |
| 1144 | | | | | | | | | |
| 1145 | | | | | | | | | |
| 1146 | 2,216 | 2,144 | 6 | 4 | | | | | 35 |
| 1147 | 1,455 | 1,372 | 8 | 2 | 19 | 0 | 0 | 4 | 50 |
| 1148 | 2,271 | 2,165 | 0 | 0 | 20 | 0 | 0 | 12 | 54 |
| 1149 | 3 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 1 |
| 1150 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1151 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1200 | 402 | 375 | 1 | 1 | 2 | 0 | 0 | 9 | 14 |
| 1201 | 2,887 | 2,365 | 108 | 1 | 57 | 0 | | 13 | 343 |
| 1202 | 3,735 | 3,079 | 204 | 16 | 119 | 5 | 5 | 43 | 264 |
| 1203 | 2,295 | 1,725 | 62 | 7 | 76 | 2 | 1 | 18 | 404 |
| 1204 | 4,623 | 749 | 276 | 20 | 157 | 0 | 2 | 32 | 3,387 |
| 1205 | 1,611 | 1,540 | 5 | 1 | 14 | 0 | 2 | 4 | 45 |
| 1206 | 1,389 | 1,358 | 3 | 2 | 8 | 0 | 0 | 0 | 18 |
| 1207 | 2,701 | 2,627 | 6 | 1 | 26 | 0 | 1 | 3 | 37 |
| 1208 | 2,311 | 2,245 | 3 | 3 | 20 | 0 | 0 | 8 | 32 |

Handwritten annotations (overlaying precincts 1126–1145):

Voting (over 18)   Pop. by Voting Precinct | Census

Hisp.   $\dfrac{421,900}{1,599,868}$   24.37   2009 30

$\dfrac{1}{12} = 8.33\%$

White:   $\dfrac{783,669}{1,599,868}$   48.98   4984 58

$\dfrac{7}{12} = 58.3\%$

Black:   $\dfrac{302,967}{1,599,868}$   18.94   1803 20

$\dfrac{4}{12} = 33.33\%$

Better to Use Census

2000 Over-18 Population by Voting Precinct - Dallas County

| 2002 Precinct | Total population | White | Black | Amer Indian | Asian | Pacific Islander | Other race | Two or more races | Hispanic |
|---|---|---|---|---|---|---|---|---|---|
| 1209 | 1,860 | 1,776 | 13 | 1 | 17 | 0 | 3 | 2 | 48 |
| 1210 | 5,245 | 3,735 | 323 | 20 | 387 | 0 | 18 | 121 | 641 |
| 1211 | 3,613 | 2,566 | 195 | 11 | 392 | 0 | 6 | 56 | 387 |
| 1212 | 4,516 | 509 | 143 | 11 | 51 | 2 | 0 | 10 | 3,790 |
| 1213 | 2,648 | 1,858 | 261 | 17 | 113 | 0 | 7 | 54 | 338 |
| 1214 | 1,636 | 1,487 | 21 | 2 | 28 | 0 | 0 | 12 | 86 |
| 1215 | 2,498 | 2,402 | 6 | 7 | 23 | 0 | 0 | 12 | 48 |
| 1216 | 1,674 | 1,551 | 33 | 0 | 19 | 0 | 0 | 12 | 59 |
| 1217 | 4,134 | 3,390 | 222 | 10 | 158 | 1 | 3 | 63 | 287 |
| 1218 | 2,047 | 1,741 | 33 | 9 | 167 | 3 | 3 | 17 | 74 |
| 1219 | 1,961 | 1,549 | 81 | 9 | 77 | 1 | 6 | 17 | 221 |
| 1220 | 2,906 | 2,006 | 163 | 9 | 46 | 0 | 2 | 35 | 645 |
| 1221 | 2,177 | 773 | 42 | 3 | 6 | 4 | 2 | 15 | 1,332 |
| 1222 | 1,601 | 1,548 | 8 | 2 | 10 | 0 | 0 | 1 | 32 |
| 1223 | 1,747 | 1,195 | 35 | 15 | 19 | 1 | 5 | 15 | 462 |
| 1224 | 2,930 | 1,972 | 93 | 18 | 40 | 1 | 3 | 40 | 763 |
| 1225 | 1,560 | 1,487 | 4 | 1 | 9 | 0 | 0 | 6 | 53 |
| 1226 | 1,703 | 1,632 | 2 | 1 | 23 | 1 | 0 | 4 | 40 |
| 1227 | 1,544 | 1,476 | 2 | 3 | 10 | 0 | 0 | 6 | 47 |
| 1228 | 2,843 | 2,165 | 62 | 5 | 40 | 3 | 6 | 21 | 541 |
| 1229 | 3,272 | 2,755 | 109 | 11 | 51 | 1 | 4 | 24 | 317 |
| 1230 | 2,935 | 2,564 | 27 | 13 | 35 | 0 | 3 | 25 | 268 |
| 1231 | 1,443 | 1,338 | 9 | 0 | 10 | 1 | 1 | 8 | 76 |
| 1232 | 1,679 | 1,457 | 19 | 3 | 42 | 0 | 4 | 20 | 134 |
| 1233 | 3,892 | 2,866 | 162 | 16 | 173 | 1 | 2 | 48 | 624 |
| 1234 | 1,907 | 1,612 | 35 | 6 | 30 | 1 | 2 | 34 | 187 |
| 1235 | 1,854 | 1,560 | 31 | 9 | 20 | 2 | 1 | 20 | 211 |
| 1236 | 147 | 110 | 8 | 3 | 5 | 0 | 0 | 5 | 16 |
| 1237 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1238 | 241 | 120 | 67 | 0 | 7 | 0 | 1 | 2 | 44 |
| 1239 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1240 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1241 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1242 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1243 | 26 | 25 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1244 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1400 | 888 | 653 | 17 | 0 | 102 | 1 | 0 | 34 | 81 |
| 1401 | 3,698 | 2,987 | 179 | 18 | 149 | 0 | 2 | 37 | 326 |
| 1402 | 3,358 | 2,041 | 157 | 13 | 773 | 2 | 9 | 56 | 307 |
| 1403 | 3,025 | 1,978 | 350 | 8 | 241 | 0 | 3 | 58 | 387 |
| 1404 | 2,998 | 1,767 | 211 | 12 | 253 | 2 | 8 | 46 | 699 |
| 1405 | 3,699 | 2,790 | 194 | 16 | 376 | 0 | 0 | 32 | 298 |
| 1406 | 3,297 | 2,281 | 326 | 16 | 333 | 2 | 5 | 38 | 296 |
| 1407 | 5,732 | 2,931 | 235 | 18 | 661 | 0 | 3 | 48 | 1,836 |
| 1408 | 6,537 | 1,547 | 170 | 15 | 523 | 0 | 0 | 83 | 4,199 |
| 1409 | 3,341 | 1,590 | 101 | 14 | 270 | 1 | 5 | 54 | 1,306 |
| 1410 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1500 | 3,958 | 1,198 | 47 | 17 | 104 | 0 | 2 | 31 | 2,559 |
| 1501 | 2,540 | 2,250 | 53 | 11 | 71 | 0 | 1 | 27 | 127 |
| 1502 | 2,299 | 859 | 31 | 20 | 36 | 0 | 0 | 15 | 1,338 |
| 1503 | 3,137 | 2,248 | 62 | 7 | 41 | 3 | 0 | 26 | 750 |
| 1504 | 148 | 120 | 1 | 1 | 0 | 0 | 0 | 5 | 21 |
| 1505 | 2,773 | 1,921 | 64 | 16 | 101 | 1 | 4 | 26 | 640 |
| 1506 | 3,113 | 2,280 | 71 | 8 | 170 | 2 | 4 | 30 | 1,548 |
| 1507 | 1,433 | 1,077 | 27 | 1 | 45 | 0 | 1 | 39 | 243 |
| 1508 | 988 | 611 | 66 | 4 | 48 | 1 | 2 | 27 | 229 |
| 1509 | 63 | 41 | 7 | 0 | 0 | 0 | 0 | 3 | 12 |
| 1510 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1511 | 3 | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 |
| 1600 | 3,448 | 2,578 | 152 | 15 | 232 | 1 | 2 | 64 | 404 |
| 1601 | 4,164 | 1,349 | 541 | 15 | 453 | 4 | 24 | 85 | 1,693 |

2000 Over-18 Population by Voting Precinct - Dallas County

| 2002 Precinct | Total population | White | Black | Amer Indian | Asian | Pacific Islander | Other race | Two or more races | Hispanic |
|---|---|---|---|---|---|---|---|---|---|
| 1602 | 4,290 | 3,334 | 282 | 17 | 242 | 3 | 9 | 76 | 327 |
| 1700 | 3,779 | 2,522 | 114 | 5 | 853 | 3 | 6 | 52 | 224 |
| 1701 | 1,296 | 1,200 | 21 | 6 | 22 | 1 | 0 | 11 | 35 |
| 1702 | 1,562 | 1,482 | 2 | 1 | 31 | 0 | 0 | 8 | 38 |
| 1703 | 2,440 | 2,235 | 10 | 7 | 119 | 0 | 0 | 21 | 48 |
| 1704 | 1,663 | 1,422 | 19 | 4 | 74 | 0 | 1 | 11 | 132 |
| 1705 | 3,660 | 2,914 | 146 | 19 | 197 | 1 | 0 | 32 | 351 |
| 1706 | 2,156 | 1,900 | 40 | 6 | 34 | 0 | 4 | 14 | 158 |
| 1707 | 2,336 | 2,036 | 43 | 4 | 50 | 0 | 0 | 17 | 186 |
| 1708 | 4,665 | 2,024 | 501 | 10 | 557 | 0 | 6 | 168 | 1,399 |
| 1709 | 3,532 | 2,073 | 328 | 10 | 186 | 0 | 3 | 57 | 875 |
| 1710 | 2,933 | 1,946 | 194 | 10 | 357 | 3 | 3 | 34 | 386 |
| 1711 | 2,965 | 2,373 | 115 | 7 | 275 | 1 | 2 | 41 | 151 |
| 1712 | 2,041 | 1,445 | 126 | 2 | 280 | 5 | 2 | 35 | 146 |
| 1713 | 1,753 | 1,426 | 53 | 4 | 196 | 0 | 0 | 20 | 54 |
| 1714 | 1,607 | 1,325 | 28 | 5 | 149 | 0 | 0 | 23 | 75 |
| 1715 | 3,143 | 1,974 | 300 | 12 | 613 | 0 | 2 | 62 | 180 |
| 1716 | 3,438 | 2,154 | 199 | 8 | 404 | 0 | 4 | 63 | 606 |
| 1717 | 3,567 | 2,401 | 296 | 16 | 533 | 6 | 2 | 90 | 223 |
| 1718 | 644 | 523 | 53 | 4 | 34 | 0 | 0 | 5 | 25 |
| 1719 | 6,063 | 2,457 | 1,311 | 17 | 1,417 | 7 | 9 | 168 | 677 |
| 1720 | 2,499 | 1,109 | 656 | 9 | 356 | 3 | 2 | 57 | 307 |
| 1721 | 2,832 | 1,643 | 264 | 13 | 597 | 0 | 5 | 104 | 204 |
| 1722 | 2,059 | 1,628 | 188 | 8 | 154 | 0 | 1 | 20 | 60 |
| 1723 | 3,751 | 1,092 | 1,034 | 8 | 661 | 0 | 10 | 168 | 778 |
| 1724 | 4,819 | 2,027 | 1,482 | 15 | 499 | 3 | 10 | 109 | 674 |
| 1800 | 4,560 | 3,845 | 211 | 15 | 203 | 0 | 4 | 57 | 224 |
| 1801 | 391 | 251 | 37 | 1 | 38 | 0 | 0 | 5 | 59 |
| 1802 | 3,035 | 2,654 | 66 | 5 | 165 | 0 | 2 | 25 | 118 |
| 1803 | 2,147 | 1,856 | 35 | 5 | 123 | 1 | 0 | 32 | 95 |
| 1804 | 1,110 | 926 | 25 | 3 | 122 | 0 | 0 | 5 | 29 |
| 1805 | 2,010 | 1,710 | 42 | 4 | 147 | 1 | 0 | 22 | 84 |
| 1806 | 1,666 | 1,505 | 21 | 12 | 77 | 0 | 0 | 17 | 34 |
| 1807 | 2,436 | 2,098 | 35 | 9 | 115 | 1 | 1 | 31 | 146 |
| 1808 | 5,267 | 3,780 | 374 | 17 | 357 | 4 | 7 | 95 | 633 |
| 1809 | 2,097 | 1,659 | 103 | 10 | 125 | 0 | 2 | 20 | 178 |
| 1810 | 2,145 | 1,556 | 113 | 8 | 152 | 0 | 7 | 51 | 258 |
| 1811 | 2,548 | 2,252 | 57 | 6 | 84 | 1 | 7 | 43 | 98 |
| 1812 | 2,656 | 1,832 | 262 | 7 | 131 | 0 | 13 | 29 | 382 |
| 1813 | 7,285 | 4,055 | 644 | 16 | 489 | 8 | 10 | 108 | 1,955 |
| 1814 | 5,560 | 3,222 | 595 | 16 | 431 | 4 | 15 | 103 | 1,174 |
| 1815 | 4,114 | 1,634 | 513 | 10 | 248 | 1 | 3 | 85 | 1,620 |
| 1816 | 1,240 | 1,136 | 23 | 1 | 41 | 0 | 0 | 6 | 31 |
| 1817 | 2,259 | 1,634 | 133 | 7 | 112 | 0 | 0 | 31 | 342 |
| 1818 | 84 | 40 | 27 | 1 | 2 | 0 | 0 | 0 | 14 |
| 1819 | 2,084 | 1,059 | 162 | 7 | 58 | 0 | 6 | 26 | 766 |
| 1820 | 4,165 | 1,144 | 519 | 14 | 187 | 6 | 5 | 45 | 2,245 |
| 1821 | 6,686 | 1,113 | 393 | 4 | 129 | 1 | 4 | 100 | 4,942 |
| 2100 | 3,472 | 2,348 | 308 | 11 | 440 | 2 | 10 | 66 | 287 |
| 2101 | 3,145 | 2,542 | 149 | 4 | 259 | 0 | 0 | 53 | 138 |
| 2102 | 4,151 | 3,361 | 248 | 10 | 279 | 0 | 4 | 26 | 223 |
| 2103 | 1,713 | 958 | 205 | 11 | 268 | 0 | 1 | 29 | 241 |
| 2104 | 3,757 | 2,164 | 468 | 14 | 710 | 2 | 3 | 63 | 333 |
| 2105 | 2,641 | 1,505 | 315 | 16 | 429 | 0 | 10 | 37 | 329 |
| 2106 | 3,954 | 2,640 | 241 | 14 | 685 | 3 | 11 | 43 | 317 |
| 2107 | 4,829 | 3,047 | 381 | 20 | 587 | 4 | 4 | 101 | 685 |
| 2108 | 2,836 | 2,209 | 206 | 11 | 222 | 2 | 0 | 44 | 142 |
| 2109 | 1,413 | 1,103 | 91 | 2 | 46 | 0 | 2 | 15 | 154 |
| 2110 | 3,304 | 1,887 | 463 | 14 | 628 | 1 | 2 | 38 | 271 |
| 2111 | 2,913 | 1,983 | 312 | 18 | 150 | 1 | 0 | 41 | 408 |
| 2112 | 1,742 | 1,014 | 224 | 3 | 377 | 0 | 3 | 18 | 103 |

2000 Over-18 Population by Voting Precinct - Dallas County

| 2002 Precinct | Total population | White | Black | Amer Indian | Asian | Pacific Islander | Other race | Two or more races | Hispanic |
|---|---|---|---|---|---|---|---|---|---|
| 2113 | 6,055 | 3,440 | 878 | 38 | 362 | 7 | 7 | 55 | 1,268 |
| 2114 | 3,397 | 1,743 | 267 | 17 | 43 | 0 | 4 | 31 | 1,292 |
| 2115 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2116 | 2,919 | 1,801 | 207 | 19 | 194 | 0 | 2 | 32 | 664 |
| 2117 | 4,282 | 2,192 | 344 | 18 | 553 | 1 | 1 | 68 | 1,105 |
| 2118 | 4,639 | 2,110 | 490 | 20 | 843 | 0 | 4 | 66 | 1,106 |
| 2119 | 1,916 | 1,131 | 150 | 7 | 272 | 0 | 1 | 56 | 299 |
| 2120 | 2,611 | 1,569 | 191 | 12 | 426 | 4 | 0 | 24 | 385 |
| 2121 | 6,051 | 2,224 | 303 | 24 | 1,014 | 1 | 4 | 95 | 2,386 |
| 2122 | 4,605 | 313 | 159 | 8 | 709 | 0 | 3 | 49 | 3,364 |
| 2123 | 556 | 339 | 62 | 4 | 4 | 1 | 2 | 4 | 140 |
| 2124 | 4,324 | 1,176 | 1,091 | 22 | 203 | 6 | 3 | 44 | 1,779 |
| 2125 | 2,673 | 169 | 929 | 0 | 7 | 1 | 0 | 13 | 1,554 |
| 2126 | 4,347 | 1,930 | 132 | 18 | 10 | 0 | 3 | 25 | 2,227 |
| 2127 | 2,638 | 2,158 | 66 | 14 | 35 | 0 | 1 | 25 | 339 |
| 2128 | 2,431 | 1,628 | 133 | 9 | 54 | 0 | 3 | 20 | 584 |
| 2129 | 1,670 | 1,192 | 56 | 7 | 5 | 0 | 1 | 9 | 400 |
| 2130 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2131 | 3,465 | 2,017 | 191 | 16 | 27 | 2 | 1 | 32 | 1,179 |
| 2132 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2133 | 5,670 | 2,276 | 584 | 26 | 110 | 2 | 1 | 56 | 2,615 |
| 2134 | 1,565 | 1,452 | 32 | 1 | 21 | 0 | 0 | 10 | 46 |
| 2135 | 2,634 | 2,364 | 116 | 11 | 37 | 0 | 0 | 23 | 83 |
| 2136 | 4,113 | 2,568 | 595 | 16 | 88 | 2 | 4 | 54 | 786 |
| 2137 | 2,355 | 1,766 | 115 | 10 | 23 | 0 | 3 | 15 | 423 |
| 2138 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2139 | 3,230 | 2,030 | 331 | 22 | 79 | 4 | 1 | 45 | 718 |
| 2140 | 3,238 | 2,447 | 296 | 14 | 57 | 6 | 2 | 30 | 386 |
| 2141 | 2,312 | 1,845 | 151 | 16 | 90 | 1 | 2 | 18 | 189 |
| 2142 | 3,970 | 2,145 | 786 | 13 | 195 | 0 | 4 | 51 | 776 |
| 2143 | 3,997 | 2,525 | 589 | 22 | 191 | 2 | 5 | 62 | 601 |
| 2144 | 4,953 | 3,312 | 820 | 28 | 185 | 2 | 1 | 66 | 535 |
| 2145 | 4,369 | 3,035 | 558 | 18 | 254 | 0 | 6 | 69 | 429 |
| 2146 | 4,318 | 3,079 | 545 | 41 | 103 | 6 | 7 | 57 | 480 |
| 2147 | 240 | 154 | 51 | 0 | 3 | 0 | 0 | 4 | 28 |
| 2148 | 488 | 455 | 4 | 2 | 1 | 0 | 0 | 0 | 15 |
| 2149 | 5,716 | 2,508 | 881 | 14 | 71 | 0 | 2 | 58 | 2,182 |
| 2150 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| 2200 | 4,876 | 1,570 | 2,155 | 16 | 307 | 2 | 24 | 135 | 667 |
| 2201 | 1,414 | 1,074 | 160 | 1 | 23 | 0 | 1 | 13 | 142 |
| 2202 | 1,750 | 1,078 | 471 | 6 | 24 | 1 | 1 | 19 | 150 |
| 2203 | 4,575 | 1,631 | 2,007 | 18 | 123 | 4 | 5 | 120 | 667 |
| 2204 | 1,702 | 668 | 793 | 2 | 45 | 0 | 6 | 25 | 163 |
| 2205 | 4,046 | 1,062 | 1,886 | 18 | 306 | 14 | 9 | 100 | 651 |
| 2206 | 3,165 | 1,757 | 770 | 6 | 81 | 0 | 0 | 29 | 522 |
| 2207 | 3,700 | 2,373 | 800 | 10 | 90 | 1 | 4 | 54 | 368 |
| 2208 | 2,859 | 2,215 | 289 | 14 | 29 | 1 | 2 | 32 | 277 |
| 2209 | 3,063 | 2,357 | 381 | 7 | 39 | 1 | 4 | 19 | 255 |
| 2210 | 2,774 | 1,806 | 539 | 6 | 53 | 4 | 5 | 95 | 266 |
| 2211 | 732 | 684 | 0 | 0 | 4 | 1 | 0 | 7 | 36 |
| 2212 | 2,506 | 1,609 | 384 | 13 | 55 | 0 | 3 | 36 | 406 |
| 2213 | 5,927 | 2,051 | 1,958 | 21 | 94 | 4 | 6 | 57 | 1,736 |
| 2214 | 369 | 244 | 39 | 3 | 4 | 0 | 0 | 5 | 74 |
| 2215 | 1,938 | 1,253 | 74 | 20 | 23 | 0 | 1 | 25 | 542 |
| 2216 | 2,496 | 2,242 | 25 | 6 | 22 | 0 | 2 | 17 | 182 |
| 2217 | 2,767 | 2,391 | 99 | 10 | 23 | 1 | 0 | 22 | 221 |
| 2218 | 1,503 | 1,411 | 19 | 6 | 7 | 0 | 0 | 6 | 54 |
| 2219 | 3,478 | 1,566 | 892 | 13 | 55 | 2 | 3 | 36 | 911 |
| 2220 | 1,176 | 1,084 | 17 | 0 | 17 | 0 | 0 | 9 | 49 |
| 2221 | 3,164 | 2,107 | 258 | 8 | 35 | 0 | 2 | 28 | 726 |
| 2222 | 3,053 | 2,870 | 17 | 5 | 24 | 0 | 2 | 13 | 122 |

2000 Over-18 Population by Voting Precinct - Dallas County

| 2002 Precinct | Total population | White | Black | Amer Indian | Asian | Pacific Islander | Other race | Two or more races | Hispanic |
|---|---|---|---|---|---|---|---|---|---|
| 2223 | 1,240 | 1,184 | 2 | 2 | 1 | 0 | 3 | 8 | 40 |
| 2224 | 1,765 | 1,642 | 13 | 4 | 17 | 0 | 0 | 12 | 77 |
| 2225 | 1,177 | 935 | 46 | 4 | 14 | 0 | 0 | 15 | 163 |
| 2226 | 2,784 | 2,550 | 52 | 8 | 40 | 0 | 2 | 14 | 118 |
| 2227 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2228 | 3,449 | 3,092 | 29 | 17 | 32 | 0 | 3 | 20 | 256 |
| 2229 | 1,007 | 929 | 6 | 5 | 9 | 0 | 0 | 8 | 50 |
| 2230 | 2,324 | 2,077 | 51 | 6 | 30 | 0 | 0 | 21 | 139 |
| 2231 | 2,444 | 928 | 433 | 14 | 13 | 0 | 0 | 50 | 1,006 |
| 2232 | 1,470 | 776 | 70 | 12 | 7 | 4 | 2 | 16 | 583 |
| 2233 | 2,882 | 1,675 | 132 | 21 | 173 | 3 | 0 | 29 | 849 |
| 2234 | 3,939 | 1,052 | 942 | 8 | 664 | 0 | 1 | 56 | 1,216 |
| 2235 | 4,058 | 1,708 | 1,520 | 19 | 113 | 2 | 0 | 40 | 656 |
| 2236 | 1,282 | 921 | 64 | 10 | 8 | 1 | 0 | 7 | 271 |
| 2237 | 1,908 | 1,098 | 120 | 19 | 51 | 0 | 0 | 10 | 610 |
| 2238 | 1,962 | 1,102 | 98 | 23 | 18 | 0 | 1 | 12 | 708 |
| 2239 | 2,526 | 1,687 | 106 | 10 | 18 | 0 | 3 | 27 | 675 |
| 2240 | 983 | 889 | 10 | 5 | 4 | 1 | 0 | 13 | 61 |
| 2241 | 814 | 738 | 12 | 4 | 4 | 0 | 0 | 4 | 52 |
| 2242 | 1,411 | 1,244 | 30 | 5 | 11 | 0 | 0 | 10 | 111 |
| 2243 | 3,075 | 1,717 | 162 | 18 | 50 | 2 | 0 | 27 | 1,099 |
| 2244 | 2,373 | 1,313 | 175 | 9 | 50 | 7 | 0 | 27 | 792 |
| 2245 | 311 | 51 | 163 | 1 | 0 | 0 | 0 | 2 | 94 |
| 2246 | 3,533 | 709 | 1,168 | 17 | 418 | 1 | 10 | 58 | 1,152 |
| 2247 | 799 | 328 | 276 | 11 | 54 | 0 | 0 | 7 | 133 |
| 2248 | 18 | 14 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| 2249 | 97 | 75 | 0 | 1 | 0 | 0 | 0 | 1 | 20 |
| 2300 | 3,639 | 2,808 | 106 | 21 | 62 | 2 | 5 | 35 | 600 |
| 2301 | 3,883 | 2,705 | 420 | 15 | 91 | 4 | 1 | 45 | 602 |
| 2302 | 2,745 | 1,970 | 405 | 12 | 71 | 1 | 1 | 27 | 258 |
| 2303 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2304 | 2,613 | 2,038 | 221 | 12 | 142 | 0 | 0 | 32 | 168 |
| 2305 | 3,027 | 2,337 | 165 | 16 | 258 | 1 | 2 | 27 | 221 |
| 2306 | 1,724 | 1,190 | 153 | 7 | 189 | 1 | 0 | 30 | 154 |
| 2307 | 3,970 | 2,726 | 439 | 17 | 72 | 2 | 0 | 44 | 668 |
| 2308 | 2,610 | 1,917 | 106 | 21 | 19 | 0 | 2 | 18 | 527 |
| 2309 | 449 | 140 | 236 | 4 | 4 | 1 | 1 | 4 | 59 |
| 2310 | 4,162 | 2,687 | 645 | 28 | 50 | 6 | 2 | 46 | 698 |
| 2311 | 2,907 | 1,677 | 403 | 15 | 19 | 0 | 0 | 32 | 761 |
| 2312 | 1,402 | 1,218 | 58 | 4 | 16 | 0 | 0 | 16 | 90 |
| 2313 | 4,613 | 2,815 | 670 | 22 | 354 | 5 | 7 | 78 | 662 |
| 2314 | 3,175 | 2,313 | 250 | 13 | 238 | 0 | 5 | 48 | 308 |
| 2315 | 4,465 | 3,094 | 567 | 20 | 329 | 2 | 4 | 31 | 418 |
| 2316 | 3,073 | 1,965 | 304 | 18 | 127 | 0 | 2 | 36 | 621 |
| 2317 | 2,444 | 1,581 | 306 | 22 | 146 | 2 | 8 | 41 | 338 |
| 2318 | 2,964 | 1,931 | 280 | 16 | 46 | 1 | 0 | 27 | 663 |
| 2319 | 2,780 | 2,184 | 172 | 13 | 61 | 0 | 3 | 36 | 311 |
| 2320 | 1,367 | 1,047 | 86 | 4 | 5 | 0 | 0 | 9 | 216 |
| 2321 | 821 | 572 | 66 | 10 | 6 | 0 | 0 | 7 | 160 |
| 2322 | 2,513 | 1,403 | 417 | 19 | 106 | 4 | 5 | 23 | 536 |
| 2323 | 3,243 | 2,113 | 417 | 14 | 23 | 1 | 1 | 35 | 639 |
| 2324 | 2,606 | 1,761 | 455 | 10 | 36 | 6 | 3 | 21 | 314 |
| 2325 | 3,912 | 2,973 | 334 | 30 | 38 | 2 | 0 | 50 | 485 |
| 2326 | 1,870 | 1,551 | 63 | 9 | 21 | 0 | 0 | 8 | 218 |
| 2327 | 4,136 | 2,773 | 731 | 21 | 183 | 1 | 3 | 54 | 370 |
| 2328 | 3,565 | 2,298 | 587 | 13 | 305 | 0 | 10 | 31 | 321 |
| 2329 | 3,353 | 2,324 | 571 | 11 | 135 | 2 | 0 | 30 | 280 |
| 2330 | 3,248 | 2,295 | 423 | 24 | 52 | 2 | 3 | 31 | 418 |
| 2331 | 27 | 21 | 0 | 0 | 4 | 0 | 0 | 0 | 2 |
| 2332 | 33 | 31 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| 2333 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

2000 Over-18 Population by Voting Precinct - Dallas County

| 2002 Precinct | Total population | White | Black | Amer Indian | Asian | Pacific Islander | Other race | Two or more races | Hispanic |
|---|---|---|---|---|---|---|---|---|---|
| 2400 | 1,895 | 1,671 | 43 | 11 | 85 | 0 | 0 | 14 | 71 |
| 2500 | 3,446 | 2,663 | 312 | 12 | 113 | 0 | 5 | 33 | 308 |
| 2501 | 3,407 | 2,581 | 346 | 7 | 144 | 4 | 2 | 32 | 291 |
| 2502 | 4,719 | 3,735 | 404 | 27 | 107 | 1 | 3 | 42 | 400 |
| 2503 | 3,764 | 2,866 | 399 | 10 | 127 | 7 | 1 | 38 | 316 |
| 2504 | 2,513 | 1,975 | 144 | 16 | 50 | 1 | 1 | 15 | 311 |
| 2505 | 4,929 | 4,036 | 266 | 15 | 289 | 2 | 8 | 35 | 278 |
| 2506 | 2,346 | 1,749 | 319 | 16 | 68 | 0 | 4 | 36 | 154 |
| 2600 | 1,524 | 1,337 | 49 | 2 | 33 | 0 | 0 | 14 | 89 |
| 2601 | 4,650 | 3,903 | 201 | 29 | 87 | 0 | 2 | 44 | 384 |
| 3000 | 2,204 | 332 | 1,237 | 3 | 17 | 0 | 2 | 18 | 595 |
| 3001 | 1,523 | 140 | 1,145 | 0 | 51 | 0 | 2 | 12 | 173 |
| 3002 | 591 | 391 | 69 | 3 | 9 | 1 | 1 | 6 | 111 |
| 3003 | 1,649 | 653 | 96 | 6 | 14 | 0 | 2 | 7 | 869 |
| 3004 | 114 | 24 | 11 | 2 | 3 | 0 | 0 | 1 | 73 |
| 3005 | 2,904 | 174 | 202 | 7 | 73 | 1 | 6 | 30 | 2,411 |
| 3006 | 6,924 | 2,581 | 783 | 25 | 518 | 4 | 14 | 83 | 2,916 |
| 3007 | 4,405 | 846 | 432 | 28 | 403 | 0 | 2 | 51 | 2,643 |
| 3008 | 826 | 77 | 645 | 0 | 5 | 0 | 1 | 6 | 92 |
| 3009 | 1,019 | 7 | 747 | 3 | 3 | 0 | 2 | 5 | 252 |
| 3010 | 561 | 1 | 358 | 0 | 0 | 0 | 0 | 0 | 202 |
| 3011 | 423 | 6 | 268 | 0 | 0 | 0 | 0 | 2 | 147 |
| 3012 | 473 | 35 | 1 | 2 | 0 | 0 | 1 | 1 | 433 |
| 3013 | 690 | 4 | 538 | 0 | 0 | 0 | 0 | 2 | 146 |
| 3014 | 623 | 5 | 533 | 0 | 5 | 0 | 0 | 6 | 74 |
| 3015 | 51 | 0 | 4 | 0 | 0 | 0 | 0 | 0 | 47 |
| 3016 | 2,033 | 7 | 1,555 | 1 | 1 | 0 | 2 | 10 | 457 |
| 3100 | 857 | 70 | 730 | 1 | 7 | 0 | 1 | 4 | 45 |
| 3101 | 1,480 | 288 | 908 | 1 | 20 | 3 | 8 | 8 | 244 |
| 3102 | 1,821 | 259 | 1,380 | 7 | 6 | 0 | 1 | 17 | 151 |
| 3103 | 2,067 | 828 | 832 | 4 | 8 | 0 | 1 | 19 | 375 |
| 3200 | 4,249 | 1,325 | 279 | 25 | 295 | 0 | 4 | 48 | 2,273 |
| 3201 | 8,313 | 3,494 | 3,103 | 66 | 22 | 5 | 0 | 130 | 1,493 |
| 3202 | 1,335 | 1,092 | 82 | 3 | 50 | 2 | 4 | 17 | 86 |
| 3203 | 448 | 355 | 9 | 0 | 16 | 0 | 0 | 5 | 63 |
| 3204 | 1,962 | 1,233 | 378 | 11 | 28 | 1 | 2 | 39 | 270 |
| 3205 | 569 | 17 | 463 | 5 | 13 | 0 | 0 | 5 | 66 |
| 3206 | 1,499 | 1,028 | 258 | 14 | 24 | 0 | 1 | 13 | 161 |
| 3207 | 995 | 450 | 196 | 7 | 61 | 1 | 0 | 19 | 261 |
| 3208 | 10,107 | 1,795 | 816 | 33 | 449 | 1 | 4 | 99 | 6,910 |
| 3209 | 3,431 | 2,093 | 194 | 27 | 57 | 1 | 4 | 32 | 1,023 |
| 3210 | 1,768 | 1,230 | 336 | 12 | 36 | 1 | 0 | 28 | 125 |
| 3211 | 5,273 | 1,194 | 295 | 16 | 64 | 7 | 0 | 25 | 3,672 |
| 3212 | 2,529 | 258 | 39 | 7 | 11 | 0 | 1 | 13 | 2,200 |
| 3213 | 2,234 | 1,248 | 349 | 9 | 53 | 0 | 0 | 22 | 553 |
| 3214 | 1,286 | 761 | 250 | 10 | 16 | 0 | 4 | 5 | 240 |
| 3215 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3216 | 2,040 | 160 | 442 | 3 | 5 | 0 | 3 | 4 | 1,423 |
| 3217 | 863 | 176 | 289 | 4 | 175 | 0 | 0 | 20 | 199 |
| 3218 | 2,998 | 1,371 | 793 | 17 | 34 | 2 | 0 | 26 | 755 |
| 3219 | 1,878 | 226 | 1,225 | 5 | 5 | 0 | 3 | 9 | 405 |
| 3220 | 3,676 | 1,994 | 756 | 13 | 84 | 0 | 1 | 48 | 780 |
| 3300 | 760 | 202 | 73 | 2 | 4 | 0 | 0 | 3 | 476 |
| 3301 | 3,258 | 853 | 267 | 18 | 17 | 0 | 0 | 8 | 2,095 |
| 3302 | 3,328 | 1,325 | 1,523 | 5 | 41 | 2 | 5 | 7 | 420 |
| 3303 | 2,555 | 690 | 179 | 6 | 7 | 0 | 2 | 20 | 1,651 |
| 3304 | 1,766 | 132 | 1,240 | 3 | 14 | 0 | 0 | 13 | 364 |
| 3305 | 875 | 283 | 396 | 0 | 44 | 0 | 0 | 2 | 150 |
| 3306 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3307 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3308 | 4,401 | 530 | 2,552 | 6 | 191 | 4 | 0 | 24 | 1,094 |

2000 Over-18 Population by Voting Precinct - Dallas County

| 2002 Precinct | Total population | White | Black | Amer Indian | Asian | Pacific Islander | Other race | Two or more races | Hispanic |
|---|---|---|---|---|---|---|---|---|---|
| 3309 | 4,413 | 1,366 | 985 | 17 | 19 | 0 | 1 | 20 | 2,005 |
| 3310 | 2,838 | 375 | 1,410 | 8 | 118 | 0 | 0 | 17 | 910 |
| 3311 | 2,890 | 680 | 907 | 5 | 10 | 2 | 0 | 26 | 1,260 |
| 3312 | 3,233 | 1,036 | 939 | 15 | 16 | 0 | 0 | 23 | 1,204 |
| 3313 | 4,152 | 715 | 2,201 | 19 | 8 | 0 | 0 | 33 | 1,176 |
| 3314 | 2,207 | 226 | 1,101 | 1 | 38 | 2 | 0 | 9 | 830 |
| 3315 | 1,906 | 187 | 863 | 2 | 9 | 0 | 1 | 13 | 831 |
| 3316 | 2,176 | 476 | 628 | 4 | 10 | 0 | 0 | 9 | 1,049 |
| 3317 | 2,309 | 508 | 449 | 4 | 12 | 1 | 2 | 12 | 1,321 |
| 3318 | 4,163 | 1,386 | 1,076 | 9 | 12 | 0 | 4 | 38 | 1,638 |
| 3319 | 5,015 | 729 | 2,236 | 9 | 22 | 0 | 0 | 59 | 1,960 |
| 3320 | 83 | 32 | 20 | 1 | 0 | 1 | 0 | 0 | 29 |
| 3321 | 4,546 | 275 | 1,806 | 6 | 10 | 2 | 2 | 20 | 2,425 |
| 3322 | 2,784 | 697 | 381 | 5 | 6 | 0 | 2 | 22 | 1,671 |
| 3323 | 3,397 | 1,059 | 518 | 16 | 10 | 3 | 0 | 29 | 1,762 |
| 3324 | 735 | 257 | 124 | 6 | 3 | 0 | 0 | 1 | 344 |
| 3325 | 3,582 | 616 | 1,632 | 13 | 12 | 0 | 2 | 25 | 1,282 |
| 3326 | 39 | 13 | 6 | 0 | 2 | 0 | 0 | 0 | 18 |
| 3327 | 361 | 83 | 108 | 0 | 1 | 0 | 0 | 3 | 166 |
| 3328 | 849 | 267 | 191 | 5 | 11 | 0 | 0 | 15 | 360 |
| 3329 | 3,769 | 838 | 1,346 | 8 | 18 | 0 | 8 | 22 | 1,529 |
| 3330 | 1,416 | 359 | 113 | 6 | 6 | 0 | 3 | 19 | 910 |
| 3331 | 4,013 | 402 | 2,589 | 6 | 7 | 0 | 2 | 21 | 986 |
| 3332 | 472 | 277 | 27 | 4 | 1 | 0 | 0 | 4 | 159 |
| 3333 | 99 | 73 | 2 | 2 | 0 | 0 | 0 | 0 | 22 |
| 3334 | 1,545 | 966 | 86 | 15 | 3 | 0 | 0 | 16 | 459 |
| 3335 | 1,993 | 922 | 624 | 7 | 11 | 1 | 6 | 24 | 398 |
| 3336 | 1,846 | 1,415 | 72 | 15 | 8 | 0 | 4 | 38 | 294 |
| 3337 | 6,038 | 4,039 | 530 | 61 | 17 | 1 | 2 | 52 | 1,336 |
| 3338 | 437 | 311 | 2 | 5 | 0 | 0 | 0 | 7 | 112 |
| 3339 | 1,341 | 906 | 109 | 4 | 10 | 0 | 1 | 9 | 302 |
| 3340 | 1,277 | 212 | 249 | 12 | 14 | 0 | 0 | 10 | 780 |
| 3341 | 1,071 | 178 | 754 | 2 | 6 | 0 | 0 | 8 | 123 |
| 3342 | 2,388 | 67 | 2,202 | 3 | 9 | 0 | 0 | 21 | 86 |
| 3343 | 1,970 | 11 | 935 | 0 | 1 | 0 | 1 | 5 | 17 |
| 3344 | 1,200 | 150 | 473 | 4 | 4 | 0 | 0 | 3 | 566 |
| 3345 | 2,878 | 102 | 1,387 | 11 | 5 | 0 | 2 | 25 | 1,346 |
| 3346 | 1,422 | 13 | 1,363 | 1 | 2 | 0 | 0 | 9 | 34 |
| 3347 | 2,554 | 21 | 2,411 | 1 | 6 | 2 | 0 | 13 | 100 |
| 3348 | 1,388 | 4 | 1,345 | 1 | 0 | 0 | 0 | 11 | 27 |
| 3349 | 1,544 | 17 | 1,461 | 0 | 5 | 1 | 0 | 8 | 52 |
| 3350 | 1,485 | 23 | 718 | 1 | 0 | 0 | 0 | 10 | 733 |
| 3351 | 1,179 | 22 | 1,020 | 0 | 0 | 0 | 0 | 9 | 128 |
| 3352 | 1,802 | 15 | 1,733 | 0 | 7 | 0 | 1 | 13 | 33 |
| 3353 | 1,507 | 12 | 1,327 | 4 | 0 | 0 | 0 | 6 | 158 |
| 3354 | 1,342 | 36 | 1,129 | 1 | 2 | 0 | 0 | 8 | 166 |
| 3400 | 406 | 258 | 7 | 4 | 0 | 0 | 0 | 2 | 135 |
| 3401 | 786 | 410 | 192 | 6 | 1 | 0 | 0 | 17 | 160 |
| 3402 | 943 | 571 | 20 | 8 | 2 | 0 | 0 | 13 | 329 |
| 3403 | 4,085 | 2,152 | 844 | 33 | 40 | 1 | 4 | 65 | 946 |
| 3404 | 2,533 | 1,362 | 398 | 22 | 23 | 3 | 6 | 41 | 678 |
| 3405 | 460 | 357 | 34 | 1 | 0 | 0 | 0 | 5 | 63 |
| 3406 | 3,043 | 2,085 | 321 | 26 | 20 | 0 | 1 | 32 | 558 |
| 3407 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3408 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3409 | 521 | 224 | 180 | 2 | 11 | 0 | 2 | 5 | 97 |
| 3500 | 214 | 8 | 26 | 1 | 3 | 0 | 0 | 0 | 176 |
| 3501 | 4,655 | 322 | 545 | 19 | 11 | 0 | 1 | 16 | 3,741 |
| 3502 | 960 | 14 | 739 | 3 | 3 | 1 | 1 | 5 | 194 |
| 3503 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3504 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

2000 Over-18 Population by Voting Precinct - Dallas County

| 2002 Precinct | Total population | White | Black | Amer Indian | Asian | Pacific Islander | Other race | Two or more races | Hispanic |
|---|---|---|---|---|---|---|---|---|---|
| 3505 | 1,579 | 38 | 1,206 | 5 | 2 | 0 | 0 | 9 | 319 |
| 3506 | 2,046 | 16 | 1,761 | 7 | 3 | 2 | 0 | 14 | 243 |
| 3507 | 471 | 6 | 50 | 0 | 0 | 1 | 0 | 0 | 414 |
| 3508 | 86 | 71 | 1 | 0 | 0 | 0 | 0 | 0 | 14 |
| 3509 | 721 | 43 | 573 | 4 | 2 | 0 | 0 | 6 | 93 |
| 3510 | 1,339 | 115 | 562 | 0 | 3 | 0 | 0 | 5 | 654 |
| 3511 | 245 | 36 | 79 | 1 | 0 | 0 | 0 | 1 | 128 |
| 3512 | 2,685 | 201 | 1,466 | 10 | 11 | 0 | 5 | 31 | 961 |
| 3513 | 1,526 | 40 | 980 | 1 | 5 | 1 | 1 | 4 | 494 |
| 3514 | 1,279 | 31 | 1,096 | 1 | 0 | 0 | 1 | 5 | 145 |
| 3515 | 1,955 | 45 | 1,641 | 1 | 10 | 0 | 2 | 11 | 245 |
| 3516 | 2,446 | 18 | 2,292 | 3 | 4 | 2 | 0 | 17 | 110 |
| 3517 | 1,963 | 35 | 1,603 | 7 | 3 | 0 | 0 | 5 | 310 |
| 3518 | 2,865 | 174 | 1,093 | 9 | 9 | 1 | 0 | 11 | 1,577 |
| 3519 | 2,081 | 41 | 748 | 10 | 5 | 0 | 0 | 3 | 1,274 |
| 3520 | 955 | 24 | 551 | 1 | 0 | 0 | 0 | 11 | 368 |
| 3521 | 2,374 | 57 | 1,466 | 4 | 0 | 0 | 1 | 4 | 842 |
| 3522 | 1,176 | 8 | 881 | 1 | 0 | 0 | 0 | 10 | 276 |
| 3523 | 1,827 | 13 | 1,634 | 3 | 0 | 0 | 0 | 16 | 161 |
| 3524 | 2,544 | 23 | 2,373 | 3 | 2 | 1 | 0 | 23 | 119 |
| 3525 | 3,133 | 35 | 2,662 | 8 | 2 | 0 | 0 | 22 | 404 |
| 3526 | 544 | 30 | 463 | 6 | 0 | 0 | 2 | 2 | 41 |
| 3527 | 3,067 | 534 | 1,849 | 4 | 19 | 0 | 0 | 26 | 635 |
| 3528 | 2,884 | 1,077 | 1,308 | 8 | 138 | 5 | 7 | 62 | 279 |
| 3529 | 2,758 | 288 | 2,329 | 3 | 1 | 0 | 0 | 17 | 120 |
| 3530 | 2,298 | 15 | 2,121 | 1 | 1 | 0 | 1 | 8 | 151 |
| 3531 | 2,548 | 60 | 1,984 | 2 | 3 | 1 | 0 | 21 | 477 |
| 3532 | 1,150 | 73 | 995 | 2 | 0 | 0 | 0 | 7 | 73 |
| 3533 | 2,335 | 33 | 2,231 | 5 | 2 | 0 | 0 | 10 | 54 |
| 3534 | 5,614 | 417 | 4,518 | 8 | 16 | 0 | 4 | 44 | 607 |
| 3535 | 2,336 | 317 | 1,943 | 2 | 5 | 0 | 0 | 8 | 61 |
| 3536 | 2,133 | 344 | 1,726 | 4 | 1 | 0 | 0 | 14 | 44 |
| 3537 | 2,122 | 332 | 1,730 | 7 | 7 | 0 | 0 | 10 | 36 |
| 3538 | 2,958 | 424 | 1,662 | 2 | 4 | 1 | 5 | 15 | 845 |
| 3539 | 2,139 | 52 | 1,822 | 2 | 8 | 0 | 4 | 26 | 225 |
| 3540 | 1,290 | 42 | 1,216 | 3 | 0 | 0 | 3 | 2 | 19 |
| 3541 | 1,412 | 7 | 1,378 | 2 | 0 | 0 | 1 | 7 | 17 |
| 3542 | 1,780 | 19 | 1,602 | 2 | 2 | 0 | 1 | 5 | 149 |
| 3543 | 2,605 | 37 | 2,465 | 2 | 6 | 0 | 0 | 21 | 74 |
| 3544 | 3,518 | 124 | 3,168 | 4 | 8 | 1 | 3 | 21 | 189 |
| 3545 | 1,958 | 49 | 1,860 | 3 | 1 | 0 | 0 | 7 | 38 |
| 3546 | 2,789 | 110 | 2,509 | 4 | 0 | 1 | 0 | 7 | 158 |
| 3547 | 2,800 | 57 | 2,591 | 1 | 0 | 1 | 0 | 11 | 139 |
| 3548 | 3,014 | 177 | 2,425 | 3 | 19 | 0 | 1 | 24 | 365 |
| 3549 | 1,265 | 114 | 1,065 | 4 | 2 | 0 | 0 | 1 | 79 |
| 3550 | 1,619 | 25 | 1,553 | 3 | 2 | 0 | 1 | 0 | 26 |
| 3551 | 2,239 | 16 | 2,179 | 3 | 0 | 1 | 0 | 8 | 32 |
| 3552 | 1,564 | 6 | 1,527 | 2 | 3 | 0 | 0 | 6 | 20 |
| 3553 | 1,211 | 28 | 1,134 | 5 | 0 | 0 | 2 | 10 | 32 |
| 3554 | 224 | 30 | 138 | 0 | 1 | 0 | 0 | 0 | 55 |
| 3555 | 899 | 220 | 33 | 5 | 2 | 0 | 0 | 5 | 634 |
| 3556 | 84 | 51 | 24 | 1 | 1 | 0 | 0 | 1 | 6 |
| 3600 | 1,928 | 1,007 | 522 | 10 | 31 | 2 | 0 | 16 | 340 |
| 3601 | 1,174 | 768 | 304 | 1 | 46 | 0 | 3 | 7 | 45 |
| 3602 | 416 | 209 | 162 | 0 | 32 | 0 | 0 | 0 | 13 |
| 3603 | 195 | 120 | 65 | 0 | 4 | 0 | 0 | 0 | 6 |
| 3604 | 2,993 | 1,703 | 1,066 | 6 | 23 | 1 | 6 | 38 | 150 |
| 3605 | 3,109 | 1,320 | 1,425 | 16 | 19 | 2 | 1 | 25 | 301 |
| 3606 | 2,702 | 620 | 1,889 | 4 | 17 | 0 | 0 | 27 | 145 |
| 3607 | 1,537 | 734 | 659 | 5 | 34 | 0 | 0 | 19 | 86 |
| 3608 | 1,273 | 579 | 573 | 2 | 25 | 0 | 2 | 10 | 82 |

2000 Over-18 Population by Voting Precinct - Dallas County

| 2002 Precinct | Total population | White | Black | Amer Indian | Asian | Pacific Islander | Other race | Two or more races | Hispanic |
|---|---|---|---|---|---|---|---|---|---|
| 3609 | 2,241 | 1,282 | 791 | 3 | 25 | 0 | 2 | 12 | 126 |
| 3610 | 572 | 408 | 120 | 1 | 4 | 0 | 0 | 3 | 36 |
| 3611 | 1,100 | 807 | 195 | 2 | 7 | 0 | 0 | 8 | 81 |
| 3612 | 2,630 | 1,123 | 1,311 | 7 | 43 | 0 | 3 | 14 | 129 |
| 3613 | 799 | 592 | 137 | 2 | 0 | 1 | 0 | 5 | 62 |
| 3614 | 856 | 316 | 454 | 4 | 6 | 1 | 1 | 5 | 69 |
| 3615 | 1,549 | 658 | 754 | 4 | 32 | 0 | 0 | 6 | 95 |
| 3616 | 641 | 326 | 250 | 0 | 5 | 0 | 0 | 11 | 49 |
| 3617 | 967 | 358 | 543 | 5 | 5 | 1 | 0 | 8 | 47 |
| 3618 | 111 | 69 | 21 | 0 | 1 | 0 | 0 | 1 | 19 |
| 3619 | 596 | 404 | 85 | 4 | 0 | 0 | 0 | 11 | 92 |
| 3620 | 112 | 76 | 11 | 1 | 0 | 0 | 0 | 0 | 24 |
| 3700 | 3,630 | 2,113 | 893 | 28 | 16 | 4 | 0 | 27 | 549 |
| 3800 | 1,025 | 554 | 188 | 7 | 1 | 0 | 1 | 16 | 258 |
| 3801 | 907 | 340 | 173 | 5 | 0 | 0 | 0 | 4 | 364 |
| 3802 | 2,922 | 629 | 2,025 | 6 | 14 | 4 | 2 | 18 | 224 |
| 3803 | 3,338 | 879 | 2,187 | 12 | 10 | 2 | 4 | 37 | 207 |
| 3804 | 137 | 89 | 25 | 0 | 3 | 0 | 0 | 5 | 15 |
| 3805 | 455 | 248 | 164 | 1 | 1 | 0 | 0 | 2 | 39 |
| 3806 | 3,932 | 715 | 2,888 | 8 | 33 | 3 | 3 | 51 | 231 |
| 3807 | 382 | 84 | 264 | 0 | 5 | 0 | 0 | 4 | 25 |
| 3808 | 1,606 | 1,057 | 470 | 8 | 1 | 0 | 0 | 4 | 66 |
| 3809 | 3,670 | 2,759 | 450 | 27 | 9 | 3 | 5 | 50 | 367 |
| 3810 | 31 | 16 | 9 | 0 | 0 | 0 | 0 | 0 | 6 |
| 3900 | 4,671 | 3,770 | 230 | 32 | 18 | 2 | 12 | 37 | 570 |
| 3901 | 4,263 | 2,648 | 532 | 31 | 35 | 3 | 6 | 49 | 959 |
| 3902 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3903 | 3,087 | 1,341 | 662 | 21 | 2 | 0 | 1 | 29 | 1,031 |
| 3904 | 4,065 | 1,418 | 1,837 | 22 | 8 | 0 | 8 | 57 | 715 |
| 3905 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4100 | 2,173 | 1,838 | 117 | 5 | 51 | 3 | 1 | 15 | 143 |
| 4101 | 3,665 | 2,085 | 950 | 19 | 57 | 4 | 0 | 36 | 514 |
| 4102 | 217 | 183 | 7 | 0 | 0 | 1 | 0 | 2 | 24 |
| 4103 | 5,756 | 2,430 | 2,421 | 22 | 148 | 5 | 8 | 58 | 664 |
| 4104 | 2,233 | 1,853 | 150 | 17 | 21 | 0 | 0 | 22 | 168 |
| 4105 | 2,300 | 1,212 | 798 | 7 | 29 | 0 | 0 | 23 | 231 |
| 4106 | 3,436 | 1,432 | 1,486 | 6 | 104 | 1 | 2 | 36 | 369 |
| 4107 | 1,979 | 1,075 | 671 | 6 | 28 | 2 | 0 | 17 | 180 |
| 4108 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4200 | 2,100 | 1,525 | 339 | 10 | 68 | 0 | 4 | 22 | 132 |
| 4201 | 1,743 | 1,252 | 279 | 4 | 16 | 0 | 1 | 15 | 176 |
| 4202 | 1,971 | 1,073 | 607 | 4 | 54 | 0 | 4 | 14 | 215 |
| 4203 | 2,012 | 1,321 | 420 | 7 | 51 | 2 | 0 | 21 | 190 |
| 4204 | 3,200 | 2,145 | 532 | 13 | 73 | 5 | 7 | 30 | 395 |
| 4205 | 1,655 | 234 | 1,155 | 0 | 21 | 0 | 0 | 9 | 235 |
| 4206 | 2,394 | 1,861 | 254 | 8 | 67 | 1 | 0 | 24 | 179 |
| 4207 | 3,362 | 2,307 | 622 | 7 | 54 | 9 | 0 | 29 | 334 |
| 4208 | 2,792 | 1,508 | 596 | 7 | 40 | 9 | 0 | 24 | 608 |
| 4209 | 208 | 172 | 15 | 1 | 2 | 1 | 0 | 1 | 16 |
| 4210 | 2,547 | 1,587 | 530 | 4 | 79 | 1 | 6 | 18 | 322 |
| 4211 | 1,900 | 1,056 | 214 | 5 | 18 | 0 | 1 | 26 | 580 |
| 4212 | 57 | 2 | 43 | 0 | 0 | 0 | 0 | 0 | 12 |
| 4213 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4300 | 2,819 | 500 | 38 | 18 | 8 | 1 | 0 | 12 | 2,242 |
| 4400 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4401 | 3,119 | 1,220 | 1,304 | 6 | 112 | 0 | 1 | 46 | 430 |
| 4402 | 2,954 | 675 | 1,707 | 9 | 57 | 0 | 4 | 28 | 474 |
| 4403 | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4404 | 3,794 | 1,711 | 844 | 26 | 265 | 0 | 11 | 54 | 883 |
| 4405 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4406 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

2000 Over-18 Population by Voting Precinct - Dallas County

| 2002 Precinct | Total population | White | Black | Amer Indian | Asian | Pacific Islander | Other race | Two or more races | Hispanic |
|---|---|---|---|---|---|---|---|---|---|
| 4407 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4408 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4409 | 663 | 476 | 39 | 1 | 98 | 0 | 0 | 10 | 39 |
| 4410 | 3,661 | 649 | 1,034 | 7 | 170 | 0 | 0 | 53 | 1,748 |
| 4411 | 4,754 | 456 | 820 | 7 | 6 | 0 | 1 | 25 | 3,439 |
| 4412 | 2,274 | 423 | 467 | 7 | 1 | 0 | 0 | 9 | 1,367 |
| 4413 | 1,495 | 320 | 145 | 8 | 0 | 1 | 0 | 11 | 1,010 |
| 4414 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4415 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4416 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4417 | 3,408 | 372 | 714 | 13 | 96 | 0 | 0 | 26 | 2,187 |
| 4418 | 6,755 | 1,182 | 222 | 43 | 37 | 1 | 3 | 7 | 5,260 |
| 4419 | 6,405 | 848 | 152 | 23 | 15 | 1 | 8 | 36 | 5,322 |
| 4420 | 2,898 | 916 | 150 | 15 | 5 | 0 | 2 | 16 | 1,794 |
| 4421 | 1,551 | 427 | 214 | 11 | 13 | 1 | 0 | 8 | 877 |
| 4422 | 2,188 | 543 | 30 | 15 | 4 | 0 | 0 | 10 | 1,586 |
| 4423 | 2,886 | 302 | 50 | 22 | 18 | 0 | 2 | 16 | 2,476 |
| 4424 | 3,573 | 565 | 70 | 12 | 13 | 0 | 1 | 17 | 2,895 |
| 4425 | 2,870 | 554 | 43 | 15 | 4 | 1 | 0 | 10 | 2,243 |
| 4426 | 4,841 | 827 | 107 | 23 | 6 | 1 | 7 | 25 | 3,845 |
| 4427 | 3,018 | 364 | 279 | 25 | 2 | 0 | 2 | 21 | 2,325 |
| 4428 | 2,383 | 60 | 95 | 12 | 7 | 0 | 0 | 8 | 2,201 |
| 4429 | 591 | 71 | 72 | 1 | 4 | 0 | 0 | 4 | 439 |
| 4430 | 2,985 | 784 | 98 | 13 | 5 | 0 | 1 | 13 | 2,071 |
| 4431 | 3,910 | 1,254 | 137 | 29 | 16 | 3 | 3 | 45 | 2,423 |
| 4432 | 2,776 | 260 | 64 | 4 | 1 | 1 | 3 | 5 | 2,438 |
| 4433 | 6,362 | 1,316 | 907 | 45 | 28 | 2 | 10 | 52 | 4,002 |
| 4434 | 2,870 | 863 | 211 | 8 | 8 | 0 | 1 | 28 | 1,751 |
| 4435 | 3,226 | 721 | 190 | 7 | 17 | 0 | 1 | 22 | 2,268 |
| 4436 | 2,416 | 1,969 | 94 | 8 | 11 | 0 | 1 | 38 | 295 |
| 4437 | 623 | 548 | 11 | 6 | 5 | 0 | 0 | 1 | 52 |
| 4438 | 4,444 | 204 | 325 | 16 | 95 | 0 | 2 | 18 | 3,784 |
| 4439 | 665 | 38 | 158 | 2 | 20 | 0 | 0 | 7 | 440 |
| 4440 | 1,169 | 185 | 68 | 2 | 44 | 0 | 3 | 6 | 861 |
| 4441 | 1,191 | 6 | 322 | 2 | 0 | 0 | 0 | 3 | 858 |
| 4442 | 1,687 | 80 | 30 | 8 | 1 | 0 | 0 | 0 | 1,568 |
| 4443 | 4,349 | 507 | 202 | 11 | 31 | 1 | 5 | 14 | 3,578 |
| 4444 | 11,913 | 434 | 477 | 19 | 36 | 1 | 5 | 26 | 10,913 |
| 4445 | 4,084 | 125 | 161 | 3 | 16 | 0 | 2 | 11 | 3,766 |
| 4446 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4500 | 57 | 46 | 5 | 0 | 2 | 0 | 0 | 0 | 4 |
| 4501 | 3,280 | 2,038 | 397 | 8 | 121 | 1 | 9 | 48 | 658 |
| 4502 | 2,222 | 1,451 | 322 | 9 | 80 | 3 | 0 | 34 | 323 |
| 4503 | 4,501 | 2,736 | 881 | 15 | 303 | 3 | 5 | 69 | 489 |
| 4504 | 4,822 | 2,147 | 732 | 24 | 370 | 3 | 5 | 37 | 1,504 |
| 4505 | 2,130 | 1,113 | 339 | 14 | 184 | 0 | 0 | 44 | 436 |
| 4506 | 4,416 | 2,517 | 598 | 26 | 376 | 0 | 1 | 59 | 839 |
| 4507 | 2,725 | 1,631 | 278 | 24 | 93 | 6 | 1 | 21 | 671 |
| 4508 | 4,552 | 1,782 | 567 | 27 | 231 | 0 | 7 | 63 | 1,875 |
| 4509 | 2,165 | 799 | 153 | 13 | 98 | 0 | 0 | 12 | 1,090 |
| 4510 | 874 | 34 | 676 | 0 | 5 | 0 | 0 | 14 | 145 |
| 4511 | 3,693 | 2,360 | 175 | 17 | 86 | 3 | 5 | 46 | 1,001 |
| 4512 | 2,415 | 1,454 | 122 | 10 | 116 | 0 | 2 | 27 | 684 |
| 4513 | 2,254 | 726 | 125 | 13 | 122 | 1 | 1 | 35 | 1,231 |
| 4514 | 2,598 | 1,353 | 81 | 14 | 19 | 2 | 2 | 29 | 1,098 |
| 4515 | 3,651 | 1,759 | 212 | 31 | 46 | 2 | 0 | 45 | 1,556 |
| 4516 | 5,137 | 2,390 | 534 | 35 | 90 | 4 | 6 | 43 | 2,035 |
| 4517 | 2,891 | 1,402 | 245 | 14 | 52 | 1 | 0 | 24 | 1,153 |
| 4518 | 3,365 | 1,184 | 52 | 21 | 26 | 1 | 3 | 23 | 2,055 |
| 4519 | 1,193 | 372 | 8 | 6 | 11 | 0 | 0 | 6 | 790 |
| 4520 | 3,788 | 2,965 | 280 | 18 | 86 | 1 | 7 | 47 | 384 |

2000 Over-18 Population by Voting Precinct - Dallas County

| 2002 Precinct | Total population | White | Black | Amer Indian | Asian | Pacific Islander | Other race | Two or more races | Hispanic |
|---|---|---|---|---|---|---|---|---|---|
| 4521 | 548 | 282 | 131 | 6 | 25 | 0 | 0 | 3 | 101 |
| 4522 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4523 | 2,019 | 979 | 37 | 12 | 18 | 2 | 1 | 19 | 951 |
| 4524 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4525 | 3,313 | 2,239 | 196 | 30 | 77 | 0 | 2 | 38 | 729 |
| 4526 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4600 | 2,105 | 1,443 | 105 | 7 | 154 | 0 | 2 | 31 | 362 |
| 4601 | 5,033 | 3,330 | 184 | 24 | 406 | 5 | 10 | 74 | 1,000 |
| 4602 | 3,976 | 2,135 | 160 | 24 | 252 | 1 | 0 | 41 | 1,363 |
| 4603 | 274 | 103 | 5 | 8 | 29 | 0 | 0 | 1 | 128 |
| 4604 | 4,728 | 2,637 | 186 | 43 | 265 | 1 | 1 | 42 | 1,553 |
| 4605 | 3,568 | 2,306 | 263 | 29 | 80 | 4 | 4 | 25 | 857 |
| 4606 | 5,450 | 2,882 | 299 | 31 | 241 | 5 | 2 | 67 | 1,923 |
| 4607 | 5,603 | 1,670 | 268 | 29 | 196 | 0 | 6 | 45 | 3,389 |
| 4608 | 1,754 | 838 | 61 | 5 | 46 | 0 | 1 | 16 | 787 |
| 4609 | 5,013 | 2,467 | 1,130 | 24 | 534 | 7 | 14 | 97 | 740 |
| 4610 | 4,861 | 1,866 | 941 | 41 | 299 | 4 | 6 | 63 | 1,641 |
| 4611 | 4,341 | 2,289 | 132 | 21 | 68 | 4 | 1 | 43 | 1,783 |
| 4612 | 3,684 | 1,395 | 86 | 21 | 32 | 2 | 2 | 43 | 2,103 |
| 4613 | 3,169 | 1,589 | 153 | 23 | 73 | 6 | 6 | 21 | 1,298 |
| 4614 | 2,196 | 689 | 122 | 6 | 74 | 11 | 0 | 58 | 1,236 |
| 4615 | 1,048 | 766 | 34 | 8 | 18 | 0 | 1 | 5 | 216 |
| 4616 | 3,097 | 1,054 | 238 | 15 | 171 | 3 | 1 | 59 | 1,556 |
| 4617 | 209 | 168 | 3 | 1 | 17 | 0 | 0 | 1 | 19 |
| 4618 | 1,082 | 660 | 30 | 10 | 20 | 0 | 1 | 5 | 356 |
| 4619 | 1,574 | 1,322 | 25 | 9 | 28 | 0 | 0 | 11 | 179 |
| 4620 | 6,461 | 2,015 | 290 | 23 | 257 | 7 | 1 | 48 | 3,820 |
| 4621 | 5 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| 4622 | 5,277 | 2,529 | 1,048 | 32 | 532 | 12 | 7 | 105 | 1,012 |
| 4623 | 2,548 | 1,640 | 195 | 16 | 119 | 5 | 0 | 33 | 540 |
| 4624 | 3,755 | 2,134 | 191 | 18 | 113 | 13 | 6 | 43 | 1,237 |
| 4625 | 3,035 | 1,615 | 133 | 13 | 60 | 2 | 1 | 13 | 1,198 |
| 4626 | 4,811 | 2,586 | 298 | 23 | 472 | 3 | 4 | 61 | 1,364 |
| 4627 | 2,031 | 1,392 | 132 | 10 | 84 | 9 | 5 | 19 | 380 |
| 4628 | 4,265 | 2,896 | 173 | 8 | 611 | 9 | 4 | 115 | 449 |
| 4629 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4630 | 8,217 | 3,490 | 2,213 | 42 | 952 | 7 | 16 | 171 | 1,326 |
| 4631 | 5,695 | 2,256 | 1,076 | 29 | 612 | 6 | 19 | 139 | 1,558 |
| 4632 | 2,522 | 1,767 | 149 | 12 | 212 | 0 | 5 | 43 | 334 |
| 4633 | 1,944 | 1,441 | 69 | 4 | 109 | 0 | 2 | 13 | 306 |
| 4634 | 3,056 | 890 | 906 | 19 | 348 | 0 | 8 | 51 | 834 |
| 4635 | 3,006 | 1,517 | 268 | 10 | 863 | 0 | 7 | 71 | 270 |
| 4636 | 2,464 | 1,723 | 152 | 9 | 327 | 2 | 3 | 20 | 228 |
| 4637 | 2,906 | 1,835 | 163 | 15 | 607 | 2 | 5 | 39 | 240 |
| 4638 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4639 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4640 | 4,358 | 2,681 | 331 | 16 | 924 | 1 | 8 | 48 | 349 |
| 4641 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4642 | 5,534 | 3,841 | 431 | 15 | 744 | 3 | 4 | 85 | 411 |
| 4643 | 6,776 | 4,491 | 736 | 30 | 887 | 2 | 3 | 92 | 535 |
| 4644 | 1,966 | 1,349 | 126 | 2 | 329 | 0 | 2 | 28 | 130 |
| 4645 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4700 | 10 | 4 | 1 | 0 | 0 | 0 | 0 | 0 | 5 |
| 4701 | 2,980 | 2,509 | 49 | 10 | 173 | 0 | 3 | 38 | 198 |
| 4702 | 5,627 | 4,548 | 177 | 10 | 480 | 3 | 7 | 45 | 357 |
| 4703 | 1,151 | 1,066 | 7 | 0 | 30 | 0 | 1 | 8 | 39 |
| 4704 | 4,974 | 3,721 | 252 | 15 | 510 | 2 | 6 | 62 | 406 |
| 4705 | 3,556 | 2,833 | 82 | 11 | 380 | 0 | 2 | 37 | 211 |
| 4706 | 2,848 | 2,195 | 105 | 12 | 311 | 1 | 1 | 57 | 166 |
| 4707 | 2,161 | 1,683 | 67 | 2 | 241 | 0 | 1 | 23 | 144 |
| Total | 1,599,868 | 783,669 | 302,967 | 6,119 | 65,608 | 680 | 1,396 | 17,529 | 421,900 |

# DALLAS COUNTY
# ELECTIONS

## FEB. 16, 2002 ELECTION - RESULTS

Early Voting Results as of 7:03 PM

Updated Results as of 11:00 PM

Precinct by Precinct Results as of 11:00 PM

**NOTE:** ELECTION RESULTS WILL BE UPDATED APPROXIMATELY EVERY HALF HOUR. PLEASE REFRESH PAGE TO SEE NEW RESULTS.



## 2002 VOTING PRECINCT NEWS

· 2002 Voting Precinct Maps

· Census 2000 Population by 2002 Voting Precinct (PDF)

· Census 2000 Over 18 Population by 2002 Voting Precinct (PDF)

· 1998 Voting Precinct Information

2002 Precincts Approved December 18, 2001

## NEXT ELECTION

**Tuesday March 12, 2002:**
**Primary Election**
Sample Republican Primary Ballot
· Sample Democratic Primary Ballot

Early Voting Starts February 25, 2002
Early Voting Locations
Election Day Voting Locations(complete list)

★2002 Voter Registration Information & March 12, 2002 Primary Ballot and Voting Location Lookup

· Texas Secretary of State - Candidates for 2002 Primary Election ✉

· Dallas County Democratic Party - 2002 Candidates ✉

· Dallas County Republican Party - Election 2002 Candidates Filings ✉

*For additional election & voter registration information call (214) 637-7937*

### Quick Connections

· Who are my federal and state officials? ✉

· Upcoming election dates ✉

· How do I update my voter registration?

· Voting for disabled voters ✉

· Early voting information

· Instructions for election judges video

· Election Judge Training

· Archived Election Results

Dallas County Health and Human Resources Bldg.
2377 N. Stemmons Frwy. Suite 820
Dallas, Texas 75207
Phone : (214) 819-6300
Acc:3516

# Other Information

# FYI

# 2000 Census Information
By Zip Code

# Dallas County Zip Codes
(2000 Census Zip Code Tabulation Areas)

## 2000 Census Hispanic Population

| Zip | Count | % | | Zip | Count | % |
|---|---|---|---|---|---|---|
| 75001 | 987 | 11.95% | | 75205 | 1,491 | 6.18% |
| 75006* | 14,794 | 31.62% | | 75206 | 14,531 | 36.57% |
| 75007 | 5,607 | 11.23% | | 75207 | 1,456 | 17.94% |
| 75019 | 2,473 | 6.92% | | 75208 | 25,626 | 71.52% |
| 75028 | 1,981 | 5.54% | | 75209 | 3,636 | 24.42% |
| 75038 | 4,787 | 18.91% | | 75210 | 1,442 | 15.43% |
| 75039 | 234 | 8.31% | | 75211 | 52,808 | 76.88% |
| 75040* | 17,066 | 30.72% | | 75212 | 13,776 | 62.13% |
| 75041 | 12,347 | 39.02% | | 75214 | 9,520 | 26.77% |
| 75042 | 14,305 | 36.79% | | 75215 | 2,211 | 11.80% |
| 75043 | 7,682 | 14.40% | | 75216 | 9,421 | 18.96% |
| 75044 | 3,725 | 10.31% | | 75217 | 33,783 | 46.35% |
| 75048 | 808 | 8.21% | | 75218 | 3,673 | 16.92% |
| 75050 | 14,877 | 39.29% | | 75219 | 9,344 | 41.23% |
| 75051 | 14,417 | 46.06% | | 75220 | 38,919 | 77.31% |
| 75052 | 12,476 | 22.18% | | 75223 | 10,036 | 64.12% |
| 75060 | 17,327 | 38.27% | | 75224 | 16,004 | 49.10% |
| 75061 | 24,404 | 45.89% | | 75225 | 420 | 2.07% |
| 75062 | 11,191 | 26.92% | | 75226 | 1,548 | 51.93% |
| 75063 | 2,075 | 8.49% | | 75227* | 21,150 | 43.11% |
| 75067 | 8,166 | 16.54% | | 75228 | 21,151 | 32.20% |
| 75080 | 5,606 | 12.95% | | 75229 | 10,193 | 32.76% |
| 75081 | 3,081 | 9.43% | | 75230 | 3,084 | 11.16% |
| 75082 | 717 | 4.61% | | 75231 | 21,219 | 40.55% |
| 75088 | 2,042 | 8.22% | | 75232 | 3,998 | 13.85% |
| 75089 | 1,763 | 9.56% | | 75233 | 6,268 | 45.82% |
| 75098 | 2,153 | 10.30% | | 75234 | 10,980 | 38.03% |
| 75104 | 3,802 | 11.87% | | 75235 | 12,201 | 70.27% |
| 75115 | 2,784 | 7.37% | | 75236 | 2,126 | 20.55% |
| 75116 | 3,403 | 18.71% | | 75237 | 918 | 7.32% |
| 75119 | 6,617 | 27.96% | | 75238 | 5,135 | 16.39% |
| 75125 | 1,717 | 29.10% | | 75240 | 20,215 | 40.43% |
| 75126 | 745 | 6.97% | | 75241 | 1,073 | 4.52% |
| 75134 | 1,735 | 15.00% | | 75243 | 8,585 | 14.42% |
| 75137 | 2,100 | 11.79% | | 75244 | 4,592 | 26.26% |
| 75141 | 639 | 22.62% | | 75246 | 2,444 | 54.32% |
| 75146 | 1,578 | 10.22% | | 75247 | 49 | 79.29% |
| 75149 | 9,189 | 16.80% | | 75248 | 2,206 | 6.68% |
| 75150 | 8,909 | 16.08% | | 75249 | 1,566 | 17.05% |
| 75154 | 3,754 | 13.57% | | 75251 | 106 | 7.96% |
| 75159 | 2,122 | 14.76% | | 75252 | 1,522 | 6.98% |
| 75172 | 1,499 | 41.52% | | 75253 | 3,700 | 24.08% |
| 75180 | 4,962 | 25.66% | | 75287 | 4,956 | 10.94% |
| 75181* | 1,752 | 10.80% | | 76002 | 1,012 | 13.76% |
| 75182 | 118 | 4.37% | | 76051 | 4,842 | 11.58% |
| 75201 | 332 | 9.92% | | 76063 | 4,190 | 12.82% |
| 75202 | 228 | 17.04% | | 76065 | 1,692 | 10.24% |
| 75203 | 11,976 | 61.44% | | 76155 | 389 | 14.81% |
| 75204 | 9,185 | 44.29% | | | | |

 

| ‖ 👤 | 👤 | 📧 | 📧 | 📑 | ✕ | ▲ ▼ | ? |

**From:**      DFWinfo.com webmaster [SMTP:webmaster@dfwinfo.com]

**To:**        Sheryl Kao

**Cc:**

**Subject:**   Re: Census Information

**Sent:**      2/28/02 1:10 PM                                        **Importance:**    Normal

---

The attached file summarizes Hispanic population by Zip code for Dallas County.
Note that the Census Bureau does not collect data by Zip code; the areas-
represented on the map are Zip Code Tabulation Areas, geographic areas that
approximate the delivery area for a five-digit ZIP Code. ZCTAs do not precisely
depict the area within which mail deliveries associated with that ZIP Code
occur.  Additional information is available on our web site at
http://census.dfwinfo.com/searchzip.asp .


Sheryl Kao wrote:

> I need to know the #/% of Hispanics in Dallas County broken down by zip code
> and a map of that if possible.  Is this listed anywhere?
>
> Sheryl Kao
> Southern Methodist University School of Law
> Dallas, Texas

📄 DallasHispanicZip.pdf

# Maps of Indicting Grand Jurors' Residences

(Per Mrs. Shannon Burk, an Indicting Grand Juror)



**YAHOO! Maps** 

Yahoo! - Yellow Pages - Help

Powered by Mapquest.com (tm)

**Buy Stocks for $4**
**No Minimums**
**FREE Money 2002**

Save up to 65% on airfares
Flights   From: [ ]  To: [ ]  [Get]   Travelocity.com

Welcome, sheryl_kao

Edit/Create My Locations - Sign Out

## Yahoo! Maps

⭐ **1501 Northridge Plc, Carrollton, TX 75006**

Save This Address





Zoom In
[ 1 ]
[ 2 ]
[ 3 ]
[ 4 ]
[ 5 ]
6

©2000 MapQuest.com, Inc.

### Driving Directions
· To this location
· From this location

### Map New Location
[ ] Edit

Address, Intersection or Airport Code
[1501 Northridge Plc]

City, State or Zip
[...006]



Larry Green—
foreman

White

**Business Locator** - Click on business name to view th...

Hilton   State Farm Insurance   7-Eleven®   H...

ADVERTISEMENT

### Special Offers
· Subscribe to USA TODAY and get a FREE Atlas
· Buy Stocks for $4 - No Minimums - FREE Money 2002
· Get your tax refund - fast! - using TurboTax® on Yahoo! Finance
· Get The New York Times delivered right to your door

Yahoo! Weather

### Inside Yahoo!
· Yahoo! Autos
· Yahoo! Classifieds
· Yahoo! Careers

Yahoo! Maps and Driving Directions



# YAHOO! Maps

Yahoo! - Yellow Pages - Help

Powered by Mapquest.com (tm)

Get The New York Times delivered right to your door

Flights · Save up to 65% on airfares. · From: ___ To: ___ · Go! · Travelocity.com

Welcome, sheryl_kao

Edit/Create My Locations - Sign Out

## Yahoo! Maps

★ 13640 Willow Bend Blvd, Dallas, TX 75240-3733

Save This Address



© 2000 MapQuest.com, Inc. · © 2000 Navigation

**Zoom In**
[ 1 ]
[ 2 ]
[ 3 ]
[ 4 ]
5
[ 6 ]
[ 7 ]
[ 8 ]

### Driving Directions
· To this location
· From this location

### Map New Location
[_____] Edit

Address, Intersection or Airport Code
13640 Willow Bend Bl

City, State or Zip
Dallas, TX 75240-373

United States




Add Maps to My Yahoo!

### Find Nearby Services
Nearby Businesses
· Car Rentals
· Gas Stations
· Hotels and Motels
· Restaurants

City Guide

Yahoo! Travel

Yahoo! Weather

### Inside Yahoo!
· Yahoo! Autos
· Yahoo! Classifieds
· Yahoo! Careers
· Yahoo! Shopping

**Business Locator** - Click on bus

State Farm Insurance | 7-Eleven® |

ADVE

## Special Offers
· FREE credit report & trial member
· Subscribe to USA TODAY and get a FREE Atlas
· 50% off Subscription Rate to The New York Times
· Buy Stocks for $4 - No Minimums - FREE Money 2002
· Rates Are Still Low, Refinance Today And Save!



Yahoo! - Yellow Pages - Help

Powered by Mapquest.com (tm)

Access Your PC from Anywhere - Free Download


Save up to 65% on airfares.
Flights   From: [            ]   To: [            ] [Go!]   Travelocity.com

**Welcome, sheryl_kao**

Edit/Create My Locations - Sign Out

# Yahoo! Maps

⭐ **7217 Ashington Dr, Dallas, TX 75225-1704**

Save This Address



Zoom In
[ 1 ]
[ 2 ]
[ 3 ]
[ 4 ]
5
[ 6 ]
[ 7 ]
[ 8 ]
[ 9 ]

*Shannon Buck — White*

© 2000 MapQuest.com, Inc. ; © 2000 Naviga...

## Driving Directions

· To this location

· From this location

## Map New Location

[............] Edit

Address, Intersection or Airport Code

[ 7217 Ashington Dr ]

City, State or Zip

[ Dallas, TX 75225-170 ]

[ United States ]



 Add Maps to My Yahoo!

## Find Nearby Services

Nearby Businesses
· Car Rentals
· Gas Stations
· Hotels and Motels
· Restaurants

City Guide

Yahoo! Travel

Yahoo! Weather

## Inside Yahoo!

· Yahoo! Autos

· Yahoo! Classifieds

· Yahoo! Careers

· Yahoo! Shopping

**Business Locator** - Click on b...

State Farm Insurance®   Hilton

A...

## Special Offers

· Buy Stocks for $4 - No Minimum

· FREE credit report & trial memb...

· Get The New York Times delivered right to your door

· Rates Are Still Low. Refinance Today And Save!

· Access Your PC from Anywhere - Free Download



# YAHOO! Maps

Yahoo! - Yellow Pages - Help

Powered by Mapquest.com (tm)

Subscribe to USA TODAY Get a FREE 3x5 foot American Flag

**Save up to 65% on airfares**
Flights   From: [            ]  To: [            ] [Go!]   Travelocity.com

**Welcome, sheryl_kao**

Edit/Create My Locations - Sign Out

## Yahoo! Maps

★ 1510 Archery Ln, Garland, TX 75044-7238

Save This Address



©2000 MapQuest.com, Inc.; ©2000 Navigation Te

### Driving Directions
· To this location
· From this location

### Map New Location

[            ] Edit

Address, Intersection or Airport Code

1510 Archery Ln

City, State or Zip

Garland, TX 75044-72

United States



Add Maps to My Yahoo!

### Find Nearby Services

Nearby Businesses
· Car Rentals
· Gas Stations
· Hotels and Motels
· Restaurants

City Guide

Yahoo! Travel

Yahoo! Weather

### Inside Yahoo!
· Yahoo! Autos
· Yahoo! Classifieds
· Yahoo! Careers
· Yahoo! Shopping

**Business Locator** - Click on busin

State Farm Insurance®   Hilton

ADVE

## Special Offers
· Give the gift of USA TODAY and s
· Buy Stocks for $4 - No Minimums - FREE Money 2002
· Get your tax refund - fast! - using TurboTax® on Yahoo! Finance
· Access Your PC from Anywhere - Free Download
· Get The New York Times delivered right to your door

Yahoo! Maps and Driving Directions

Page 1 of 2

 **YAHOO! Maps**

Yahoo! - Yellow Pages - Help

Powered by Mapquest.com (tm)

50% off
Subscription Rate
to The New York
Times

Flights    **Save up to 65% on airfares.**    Travelocity.com
From: [          ]    To: [          ]    [Go!]

Welcome, sheryl_kao                    Edit/Create My Locations - Sign Out

# Yahoo! Maps

⭐ **2638 Brady Ln, Grand Prairie, TX 75052-5013**          Save This Address



© 2000 MapQuest.com, Inc.; © 2000 Navigation Te

**Business Locator** - Click on busine

[ HYATT ]  [ 7-Eleven® ]  [ Sta ]

ADVERT

## Special Offers

· Get your tax refund - fast! - using Tu
· Subscribe to USA TODAY and get a
· Access Your PC from Anywhere - Free Download
· Rates Are Still Low. Refinance Today And Save!
· FREE credit report & trial membership!

Zoom In
[ 1 ]
[ 2 ]
[ 3 ]
[ 4 ]
  5
[ 6 ]
[ 7 ]
[ 8 ]
[ 9 ]
[ 10 ]

## Driving Directions

· To this location
· From this location

## Map New Location

[----------]  Edit

Address, Intersection or Airport
Code
[ 2638 Brady Ln ]

City, State or Zip
[ Grand Prairie, TX 750 ]

[ United States ]

 [ Get Map ]

🌎 Add Maps to My Yahoo!

## Find Nearby Services

Nearby Businesses
· Car Rentals
· Gas Stations
· Hotels and Motels
· Restaurants
City Guide
Yahoo! Travel
Yahoo! Weather

## Inside Yahoo!

· Yahoo! Autos
· Yahoo! Classifieds
· Yahoo! Careers
· Yahoo! Shopping



# YAHOO! Maps

Yahoo! - Yellow Pages - Help

Powered by Mapquest.com (tm)

50% off Subscription Rate to The New York Times



Welcome, sheryl_kao

Edit/Create My Locations · Sign Out

## Yahoo! Maps

★ 7236 Meadow Lake Ave, Dallas, TX 75214-3526

Save This Address



Ann Gilbert White

**Driving Directions**

· To this location

this location

ew Location

Edit

tersection or Airport

eadow Lake Av

r Zip

TX 75214-3526

States

Map

Email Map

©2000 MapQuest.com, Inc. ©2000 Navigation Technologies

s to My Yahoo!

**Business Locator** - Click on business name to view the locations on map



**Find Nearby Services**

Nearby Businesses
· Car Rentals
· Gas Stations
· Hotels and Motels
· Restaurants

City Guide

Yahoo! Travel

Yahoo! Weather

ADVERTISEMENT

## Special Offers

· Rates Are Still Low. Refinance Today And Save!
· Get your tax refund - fast! - using TurboTax® on Yahoo! Finance
· Buy Stocks for $4 - No Minimums - FREE Money 2002
· FREE credit report & trial membership!
· Subscribe to USA TODAY and get a FREE 3x5 foot American Flag

## Inside Yahoo!

· Yahoo! Autos
· Yahoo! Classifieds
· Yahoo! Careers
· Yahoo! Shopping



# YAHOO! Maps

Yahoo! - Yellow Pages - Help

Powered by Mapquest.com (tm)

**Buy Stocks for $4**
**No Minimums**
**FREE Money 2002**

Save up to 65% on airfares.

**Flights**   From: [            ] To: [            ] [Go!]   Travelocity.com

Welcome, sheryl_kao                                    Edit/Create My Locations - Sign Out

## Yahoo! Maps

★ **5017 Swiss Ave, Dallas, TX 75214-5237**                    Save This Address



©2000 MapQuest.com, Inc.; ©2000 Naviga

*Sandra Seidenfeld - white*

### Driving Directions
· To this location
· From this location

### Map New Location

[............] ✏ Edit

Address, Intersection or Airport Code
5017 Swiss Ave

City, State or Zip
Dallas, TX 75214-523

United States

 

🌐 Add Maps to My Yahoo!

### Find Nearby Services

Nearby Businesses
· Car Rentals
· Gas Stations
· Hotels and Motels
· Restaurants

City Guide

Yahoo! Travel

Yahoo! Weather

### Inside Yahoo!
· Yahoo! Autos
· Yahoo! Classifieds
· Yahoo! Careers

**Business Locator** - Click on b

State Farm Insurance®   HYATT

Al

## Special Offers
· Rates Are Still Low. Refinance Today And Save!
· FREE credit report & trial membership!
· Give the gift of USA TODAY and save 33%
· Buy Stocks for $4 - No Minimums - FREE Money 2002



**YAHOO!** Maps —————————————————— Yahoo! - Yellow Pages - Help

Powered by Mapquest.com (tm)

Get The New
York Times
delivered right to
your door



Start your job search: enter keyword    --Select State--    Search

**Welcome, sheryl_kao**                        Edit/Create My Locations - Sign Out

# Yahoo! Maps

★ 7150 E Grand Ave, Dallas, TX 75223-1000              Save This Address



Zoom In
[ 1 ]
[ 2 ]
[ 3 ]
[ 4 ]
5
[ 6 ]
[ 7 ]
[ 8 ]
[ 9 ]
[ 10 ]
Zoom Out

**Driving Directions**
· To this location
· From this location

**Map New Location**

[_____] 🔍 Edit

Address, Intersection or Airport
Code
7150 E Grand Ave

City, State or Zip
Dallas, TX 75223-1000

United States

Get Map

©2000 MapQuest.com, Inc.; ©2000 Navigation Technologies

*Pauline Williams - Black*

**Business Locator** - Click on business name to vie...

HYATT    7-Eleven®    State Farm Insurance

ADVERTISEMENT

**Special Offers**
· Buy Stocks for $4 - No Minimums - FREE Money ...
· FREE credit report & trial membership!
· Get The New York Times delivered right to your d...
· Get your tax refund - fast! - using TurboTax® on Yahoo! Finance
· Subscribe to USA TODAY and get a FREE Atlas

Yahoo! Classifieds
Yahoo! Careers
Yahoo! Shopping

Yahoo! - Yellow Pages - Help

Powered by Mapquest.com (tm)

50% off Subscription Rate to The New York Times



Lose 10 Pounds by Apr. 2nd! eDiets

Height 5 ft 7 in Weight go

Welcome, sheryl_kao

Edit/Create My Locations - Sign Out

## Yahoo! Maps

2516 Earlcove Dr, Dallas, TX 75227-7817

Save This Address




Margaret Bates - Black

Business Locator - Click on b

HYATT 7-Eleven®

## Driving Directions

- To this location
- From this location

## Map New Location

 Edit

Address, Intersection or Airport Code

2516 Earlcove Dr

City, State or Zip

Dallas, TX 75227-781



United States

Get Map

 Add Maps to My Yahoo!

## Find Nearby Services

Nearby Businesses

- Car Rentals
- Gas Stations
- Hotels and Motels
- Restaurants

City Guide

Yahoo! Travel

Yahoo! Weather

Al

## Special Offers


- Get your tax refund - fast! - using TurboTax® on Yahoo! Finance
- Access Your PC from Anywhere - Free Download
- 50% off Subscription Rate to The New York Times
- Buy Stocks for $4 - No Minimums - FREE Money 2002
- Subscribe to USA TODAY and get a FREE 3x5 foot American Flag


## Inside Yahoo!

- Yahoo! Autos
- Yahoo! Classifieds
- Yahoo! Careers
- Yahoo! Shopping