

*COA Scanning Cover Sheet*

```
2475023
```

CaseNumber: WR-77,175-01
EventDate: 02/13/2012
Style 1: HALPRIN, RANDY ETHAN
Style 2:
Event code: 11.071 ADD'L VOLUME

EventID: 2475023
Applicant first name: RANDY ETHAN
Applicant last name: HALPRIN
Offense: 19.03
Offense code: Capital Murder
Trial court case number: W01-00327-Y(A)
Trial court name: Criminal District Court 7 of Dallas County
Trial court number: 330570007
County: Dallas
Trial court ID: 1462
Event map code: GENERIC
Event description: Habeas Corpus - Capital Death
Event description code: 11.071
Remarks: VOL. 5 OF 7 VOLS. OF CR

☐ *Document Scanned*                              ☐ Created or
                                                  ☐ Appended
_____          _____
*Scanned by*          date        *Image ID*

*Comment*
_____
_____
_____

EX PARTE:

RANDY ETHAN HALPRIN
Applicant

CAUSE NO.:          W01-00327-Y (A)

IN THE CRIMINAL DISTRICT COURT

NO. 7 OF DALLAS COUNTY, TEXAS


\* \* \* \* \*    DEATH  PENALTY    \* \* \* \* \*


Volume  5

---

## POST CONVICTION WRIT OF HABEAS CORPUS
### (ART. 11.07, V. A. C. C. P. )

---

ATTORNEY FOR APPLICANT:

Gary Udashen

2301 Cedar Spring Road, #400

Dallas, TX  75201

ATTORNEY FOR STATE:

Honorable Craig Watkins

Frank Crowley Courthouse

Dallas, Texas    75207-4313


GARY FITZSIMMONS
District Clerk
Frank Crowley Courthouse
133 N. Riverfront Blvd., LB 12
Dallas, TX  75207

RANDY ETHAN HALPRIN                                                      PAGE  1

W01-00327-Y (A)

===================================================  ==========

Waiver of Right to Appear   (14 Apr 11)                        Vol. 5-2094

Order on Waiver of Appearance    (14 Jan 11)                   Vol. 5-2097

Order on Motion to Recuse Honorable Rick Magnis               Vol. 5-2098

First Administrative Judicial Region Order of                 Vol. 5-2099
Assignment by the Presiding Judge    (31 Jan 11)

Brief in Support of Argument Concerning Officer's Knowledge   Vol. 5-2100
Of Exculpatory Evidence    (22 Feb 11)

List of Documents on Disc    (28 Feb 11)                      Vol. 5-2110

State's Proposed Findings of Fact and Conclusions of Law      Vol. 5-2111
(07 Apr 11)

Correspondence from Attorney – Suggest a manner and order     Vol. 5-2300
of review of the claims in Randy Halprin's writ application
(07 Sep 11)

Applicant's Corrected Proposed Findings of Fact               Vol. 5-2302
(08 Sep 11)

Correspondence from Attorney Regarding Mitigating Evidence    Vol. 5-2493
(13 Sep 11)

Supplemental Authority in Support of Argument in Ineffective  Vol. 5-2495
Assistance of Counsel on Appeal in Application for Writ of
Habeas Corpus    (13 Sep 11)

Time Line of Activity on Application for Writ of Habeas Corpus  Vol. 5-2517
(29 Sep 11)

Correspondence from Assistant District Attorney – Not deprived  Vol. 5-2520
of the opportunity to present mitigating evidence

Applicant's Alternative Proposed Findings of Fact Concerning    Vol. 5-2522
Ineffective Assistance of Counsel on Appeal    (04 Oct 11)

1  RANDY ETHAN HALPRIN                                        PAGE   2

2  W01-00327-Y (A)

3  ================================================  ==========

4  Applicant's Supplemental Authority Concerning Ineffective     Vol. 5-2546
   Assistance of Counsel on Appeal    (04 Oct 11)
5

6  Clerk's Certificate                                          Vol. 5-2557

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

01/13/2011 10:55 FAX 2144660100   Sorrels Udashen & Anton

NO. W01-00237-T(A)

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | **283RD JUDICIAL DISTRICT** |
| | § | |
| **RANDY ETHAN HALPRIN** | § | **DALLAS COUNTY, TEXAS** |

## WAIVER OF RIGHT TO APPEAR

NOW COMES **RANDY ETHAN HALPRIN**, Applicant ("Halprin") in the above entitled and numbered cause, together with his attorneys Bruce Anton and Gary Udashen, and waives all rights of appearance in connection with said cause as follows:

1. Halprin has been advised that an evidentiary hearing on the Motion to Recuse has been set for January 14, 2011, in Dallas County, Texas.

2. Halprin has been advised that the subject matter of the hearing concerns matters set out in the Motion to Recuse and the Amended Motion to Recuse which have been previously provided by undersigned counsel to Halprin.

3. Halprin understands that, if he demands to appear, that request will be granted

4. Halprin understands that he is waiving, forfeiting and giving up the right to be heard at the aforesaid hearing if he declines to appear.

5. Halprin understands that he is waiving, forfeiting and giving up his right to consult with counsel about evidence adduced during the hearing while the hearing is being conducted if he declines to appear.

2094

6.    By signing this waiver, Halprin acknowledges that his decision not to appear

is made freely, voluntarily and knowingly.

7.    By signing this waiver, Halprin acknowledges that his decision, though based

on advice from counsel, is not the result of any coercion, promise or threat.

Dated this the _____14_____ day of January, 2011.

Respectfully submitted,

GARY A. UDASHEN
State Bar of Texas No. 20369590

BRUCE ANTON
State Bar of Texas No. 01274700

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas  75201
214-468-8100
214-468-8104 fax

## CERTIFICATE OF SERVICE

On this ____14____ day of January 2011, a true and correct copy of the foregoing Motion

for Recusal was delivered to Lisa Smith, Assistant District Attorney, 133 N. Industrial Blvd.,

L.B. 19, Dallas, Texas 75207.

GARY A. UDASHEN

2095

# INMATE'S DECLARATION

I, RANDY HALPRIN, BEING PRESENTLY INCARCERATED IN THE POWLUNSKY UNIT, DECLARE UNDER PENALTY OF PERJURY THAT, ACCORDING TO MY BELIEF, THE FACTS STATED IN THE WAIVER OF APPERANCE ARE TRUE AND CORRECT.

SIGNED ON 1/13/11

RANDY HALPRIN
Signature of Applicant

2096

NO. W01-00237-T(A)

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | **283RD JUDICIAL DISTRICT** |
| | § | |
| **RANDY ETHAN HALPRIN** | § | **DALLAS COUNTY, TEXAS** |

## ORDER ON WAIVER OF APPEARANCE

On this day came on to be considered the written Waiver of Appearance by Applicant Randy Halprin in this cause. The court, having considered the written Waiver, as well as the statements of counsel find the Waiver to be knowlingly, intelligently and voluntarily waived. IT IS THEREFORE ORDERED that Applicant's Appearance at the hearing on the Motion to Recuse is hearby granted and Applicant's Appearance is hereby waived for January 14, 2011.

This 14 day of Jan. 2011

Judge Pat McDowell
Judicial District
Dallas County, Texas

2097

## NO. WO-1-00237-T (A)

| | | |
|---|---|---|
| **EX PARTE** | )( | **IN THE 283RD** |
| **RANDY ETHAN** | )( | **DISTRICT COURT OF** |
| **HALPRIN** | )( | **DALLAS COUNTY, TEXAS** |

## ORDER ON MOTION TO RECUSE
## HONORABLE RICK MAGNIS

Counsel for Petitioner has filed an original Motion and an amended Motion to Recuse the trial Judge, the Honorable Rick Magnis, from conducting any further proceedings in the above and styled and numbered cause, an Article 11.071 C.C.P. Post Conviction Writ of Habeas Corpus. On January 14, 2011 the matter was heard and evidence taken by this Court. The matter was taken under advisement.

## GROUNDS

!. Counsel alleges that the receipt of ex parte extrajudicial information and Judge Magnis ' statements show his inability to be fair and impartial in deciding the Writ of Habeas Corpus issues.

2. That if he decides that Mr. King , Petitioner's trial counsel, was not ineffective in his representation of Halprin , that his decision would be viewed as a decision made to preserve the integrity of the Payne case, where Mr. King is lead counsel, and would not be made fairly and impartially.

## FINDINGS AND CONCLUSIONS

1. The Court finds from all the evidence that Judge Magnis would be fair and impartial in deciding Petitioner's Writ of Habeas Corpus.
2. The Court further finds, however, that a member of the public at large, knowing all the facts in the public domain would harbor a reasonable doubt that the judge is actually impartial.

## CONCLUSION

The Court concludes from all the evidence that the Motion to Recuse Judge Magnis should be, and hereby is, **Granted.**

Entered this 20 day of January, 2011.

PAT MCDOWELL
**Senior District Judge**

2098

# THE STATE OF TEXAS
## FIRST ADMINISTRATIVE JUDICIAL REGION
### ORDER OF ASSIGNMENT BY THE PRESIDING JUDGE

Pursuant to Chapter 74, Texas Government Code, I hearby assign the:

Honorable Mike Snipes

Active Judge of The Criminal District Court # 7 - Dallas

to the

283rd District Court of Dallas County, Texas

This assignment is for the cause(s) and style(s) as stated in the conditions of assignment from this date until plenary jurisdiction has expired or the undersigned Presiding Judge has terminated this assignment in writing, whichever occurs first.

## CONDITION(S) OF ASSIGNMENT

This assigment is to hear Cause No. WQ-1-00237-T(A): Ex Parte: Randy Ethan Halprin.

In addition, whenever the assigned Judge is present in the county of assignment for a hearing in the above cause(s), the Judge is also assigned and empowered to hear, at that time, any other matters presented for hearing.

It is ordered that the Clerk of the court to which this assignment is made, if it is reasonable and practicable and if time permits, give notice of this assignment to each attorney representing a party to a case that is to be heard in whole or in part by the assigned Judge.

It is further ordered that the Clerk, upon receipt hereof, shall post a copy of this order in a public area of the Clerk's office or courthouse in order that attorneys and parties may be advised of this assignment.

SIGNED: _____ , 20 11
                    Date

_____
John Ovard, Presiding Judge
First Administrative Judicial Region of Texas

ATTEST: _____
Administrative Assistant

Assign# 21841

2099

## NO. W01-00237-T(A)

2011 FEB 22  AM 10: 09

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE DISTRICT COURT** |
| | § | DISTRICT OF |
| | § | DALLAS CO. TEXAS |
| | § | **283RD JUDICIAL DISTRICT** |
| | § | DEPUTY |
| **RANDY ETHAN HALPRIN** | § | **DALLAS COUNTY, TEXAS** |

### BRIEF IN SUPPORT OF ARGUMENT
### CONCERNING OFFICER'S KNOWLEDGE
### OF EXCULPATORY EVIDENCE

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES** the Applicant, RANDY ETHAN HALPRIN, and submits this Brief

in support of the Argument that the State Withheld Exculpatory Information, namely Defense

Exhibit 39, "Ranking of Offenders by Leadership/Personality Characteristics."

At trial, Halprin unsuccessfully attempted to admit into evidence a critical piece of

evidence–Exhibit 39, "Ranking of Offenders by Leadership/Personality Characteristics." [1]

The State objected to the admission of Exhibit 39 as hearsay, arguing that defense counsel

had not established the author of the document. [RR 53, pp. 13-16]. Further, the State

disclaimed knowledge of the source of the document, who prepared it, or why it was

prepared despite having provided defense counsel with the document during discovery. The

trial court, therefore, excluded this document. [RR 53, p. 15].

---

[1] Exhibit 39 states, "After conducting interviews with civilian workers, correctional officers, and several inmates who worked closely with the escapees, a consensus was developed of which offender was the leader and which one may be the weakest." Exhibit 39, continued on to maintain that "it was the unanimous decision that RIVAS was the leader and the weakest was determined to be HALPRIN." [Def. Ex. 39]. Specifically, the document noted Halprin was "quiet and never exhibited leadership qualitites. Was consistently worried about whether his work was acceptable to the civilian workers. Very submissive characteristic. This worrisome attitude was seen to escalate a month before the escape. One civilian worker speculated whether HALPRIN was undergoing some type of depression." [Def Ex. 39].

2100

Brief in Support of Argument Concerning Officer's Knowledge of Exculpatory Evidence - Page 1

During its investigation, writ counsel discovered the location and author of the document. The document was stored in the files of the Texas Department of Criminal Justice–Inspector General and its author was Sergeant Investigator Hank Whitman of the Texas Department of Public Safety Special Crimes Division. [See Cert. Rec. TDCJ–Off. Insp. Gen.]. At a hearing on September 30, 2010, Whitman testified as to his knowledge, concerning the creation of the Ranking Document and the ease of determining his authorship. [Writ Hrg., Sept. 30, 2010, Vol. 3, pp. 18-85].

Whitman's testimony highlighted the importance of this document as exculpatory evidence. He stated that six law enforcement personnel, primarily Texas Rangers and members of Internal Affairs participated in the creation of the Ranking Document[2] in the immediate aftermath of the escape. [Writ Hrg., Sept. 30, 2010, Vol. 3, at 28, 32, 47]. He further testified that the Ranking Document represented a "consensus" of this group – Halprin was the weakest, never exhibited leadership qualties, was submissive, and consistently worried about whether his work was acceptable to civilian workers. [Id. at 28, 30-32].[3] The purpose of the document was for gathering intelligence" and tactical reasons

---

[2]These persons included Ranger Lt. Ray Cano, Ranger Sgt. Andy Lopez, John Davis, Mike Scotten, Charles Mann, and Chris Koenig. [Writ Hrg., Sept. 30, 2010, Vol. 3, at 47].

[3]Specifically, the following exchange occurred:
Q.   Your document says a consensus was developed as to which was the leader and which was the weakest. The consensus – just to be clear, the consensus is exactly what's in the document, correct?
A.   Correct.
Q.   Concerning Mr. Halprin the document says he was quiet, never exhibited leadership qualities. I assume you got that from your interviews with all of these people.
A.   That's correct.
Q.   All of the officers involved in this agreed that that's a characteristic of Randy Halprin?
A.   Yes, sir.
Q.   And that it says he was consistently worried about whether his work was acceptable to the civilian workers. I assume you heard that from the civilian workers.

2101

for hostage negotiations when they captured the individuals. [*Id.* at 25]. Indeed, he stated they wanted "to know everything there was about these individuals." [*Id.* at 25].

The document was given to persons within the Department of Public Safety, the Texas Rangers, prison officials, the FBI, and the Irving Police Department. [*Id.* at 33, 35]. Whitman testified that shortly after the murder of Officer Aubrey Hawkins, he attended a meeting in Irving Texas, concerning the Irving Police Department's investigation. [*Id.* at 35]. At this meeting, he personally gave a copy of the Ranking Document to a homicide detective from the Irving Police Department investigating the crime. [*Id.* at 35-36]. His captain had directed him to provide the Irving Police Department with this information. He stated that other persons at the meeting, such as Chief Bill Lazenby and Deputy Inspector John Moriante, and his Assistant Terry Cobb knew about the Ranking Document. [*Id.* at 37].

Whitman testified that it would have been easy to determine his authorship. He agreed that every officer or agency that he sent the document to personally knew he was the author. At the hearing on September 30, 2010, the following exchange occurred:

> Q.     So would you agree with me there would be a limited universe of

---

> A.     That's correct.
> Q.     That was a consensus that was a true fact?
> A.     Yes.
> Q.     It says Halprin had a very submissive characteristic. I assume that came from these same interviews with all of these people you interviewed.
> A.     That's correct.
> Q.     The consensus among all of these officers was he had a submissive characteristic?
> A.     Yes, sir.
> Q.     This worrisome attitude was seen to escalate a month before the escape and one civilian worker speculated as to whether he was undergoing some type of depression. Sounds like statements particular people told you.
> A.     That's correct.
> Q.     Your put them in the document because your consensus among you and the officers was this was information that was likely correct.
> A.     Yes, it is.

[Writ Hrg., Sept. 30, 2010, Vol. 3, at 30-32].

2102

people who could have written these documents that wound up in these law enforcement files?

A.    There would have been a limited amount. However, there was quite a few people that knew I authored that that are still working for the system. Ultimately that's why I'm sitting here today. That's how it was identified.

Q.    Somebody called the Department of Public Safety to the division that handled criminal investigations where you worked, would they have been able to find someone that said Hank Whitman wrote that document.

A.    Yes, sir.

Q.    If somebody called the Office of Inspector General and said, "Who wrote this document," there are people there that would have said, "Hank Whitman wrote this document."

A.    Yes, sir.

[Writ Hearing, Sept. 30, 2010, Vol. 3, at 49-50]. Moreover when asked if it would be "pretty easy to find out who wrote [Exhibit 39]," Whitman replied, "It would have been easy, yes." [*Id.* at 50]. Further, the records at the Texas Department of Criminal Justice Office of Inspector General, which contained Exhibit 39, included a fax cover sheet from the Irving Police Department that states "profiles done by Sgt. Investigator Hank Whitman." [*Id.* at 45].

Under the Due Process Clause of the Fourteenth Amendment, the State has an affirmative duty to turn over all material exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963); *Ex parte Kimes*, 872 S.W.2d 700, 702 (Tex. Crim. App. 1993). This duty to disclose is ongoing. *Flores v. State*, 940 S.W.2d 189, 191 (Tex. App.–San Antonio, 1996, no pet.). The State's duty to disclose includes information known to the police or other branches of law enforcement. *Kyles v. Whitley*, 514 U.S. 419, 433 (1995); *Ex Parte Adams*,

2103

768 S.W.2d 281, 292 (Tex. Crim. App. 1989) ("It is of no consequence that the facts pointed to may support only knowledge of the police because such knowledge will be imputed to state prosecutors." (quotation omitted)); *see also United States v. Thornton*, 1 F.3d 149, 158 (3d Cir. 1993) (noting that "prosecutors have an obligation to make a through inquiry of all enforcement agencies" that have "a potential connection" with the case); *Williams v. Whitley*, 940 F.2d 132, 133 (5th Cir. 1991) ("[T]he prosecution is deemed to have knowledge of information readily available to it."); *Martinez v. Wainwright*, 621 F.2d 184, 186-87 (5th Cir. 1980) (finding no suggestion in Brady "that different arms of the government are severable entities").

Here, Whitman participated in the investigation of the Texas Seven. He worked for the Texas Department of Criminal Justice, an essential component of investigative and prosecution team in this case. He also gave the Ranking Document to the Irving Police Department during its investigation of the case. Therefore, Whitman's knowledge concerning Exhibit 39 can be imputed to the State. Additionally, the knowledge of the Irving Police Department Detective that Whitman gave the document to can be imputed to the State. It does not matter whether the prosecution knew or did not know he was the author of Exhibit 39. *Zule v. State*, 802 S.W.2d 28, 33 (Tex. App.–Corpus Christi 1990, pet. den'd) ("The State is responsible for disclosing favorable evidence known by its agents, including police officers, even if the particular evidence is not known to the prosecuting attorney.").

The First Circuit Court of Appeals reasoning in *United States v. Osorio* is instructive here as to when a law enforcement officer's knowledge should be imputed to the State.

2104

*United States v. Osorio*, 929 F.2d 753, 758 (1st Cir. 1991). In *Osorio*, the First Circuit stated

that   "The government is not a congery of independent hermetically sealed compartments;

. . . the prosecution of criminal activity is a joint enterprise." *Id.* at 760.  The First Circuit

continued on to reason:

> The prosecutor charged with discovery obligations cannot avoid finding out
> what 'the government' knows, simply by declining to make reasonable inquiry
> of those in a position to have relevant knowledge.  The criminal responsibility
> of a corporation can be founded on the collective knowledge of its individual
> employees and agents. There is no reason why similar principles of
> institutional responsibility should not be used to analyze the actions of
> individual government attorneys called upon to represent the government as
> an institution in matters of court-ordered disclosure obligations.

*Id.* at 761. Just as the FBI and the U.S. Attorney's Offices are not "independent hermetically

sealed compartments," neither are the Irving Police Department, the Texas Department of

Criminal Justice, Office of Inspector General, the Texas Department of Public Safety Special

Crimes Division and the District Attorney's Office.  This is particularly true when all three

offices were deeply involved in the investigation and prosecution of this case.

Texas courts have recognized similar reasoning. In *O'Rarden v. State*, the Fifth Court

of Appeals held that the prosecution included both "investigative and prosecutorial" persons

assigned to the case, including a person who investigated claims of sexual abuse with the

Department of Human Resource. *O'Rarden v. State*, 777 S.W.2d 455, 457 (Ct. App.–Dallas

1989, pet. rev. refused).   This person knew that a medical doctor had examined the

complainant and found that no signs of sexual abuse existed.  *Id.*  The Court imputed this

knowledge to the prosecution team and reversed and remanded the case for a new trial. *Id.*

at 457, 460.  Similarly, here, knowledge of the authorship of Exhibit 39 should be imputed

2105

to the State. The prosecution worked in concert with Whitman's agency and the Irving Police Department to prosecute the case. The Irving Police Department knew the author of Exhibit 39, because it sent a fax that stated "profiles done by Sgt. Investigator Hank Whitman." [Writ Hrg. Sept. 30, 2010, Vol. 3 at 45].

The Fifth Circuit's opinion in *United States v. Deutsch,* is also informative. *United States v. Deutsch,* 475 F.2d 55 (5th Cir. 1973), *overruled on other grounds by, U.S. v. Henry,* 749 F.2d 203 (5th Cir. 1984). In *Deutsch,* the Fifth Circuit addressed the implications of *Brady* where a postal employee who allegedly had accepted payment from the defendant in exchange for credit cards stolen from the mail was the government's key witness. *Deutsch,* 475 F.2d at 56-57. When the defense requested the employee's personnel file, the prosecutor responded that id did not possess the file. *Id.* The *Deutsch* Court, however, held that "there is no suggestion in *Brady* that different 'arms" of the government, particularly when so closely connected as this one for the purpose of the case, are severable entities." *Id.* at 57. It stands to reason that if knowledge possessed by the post office can be imputed to the prosecution so can the law enforcement agencies involved in the investigation and prosecution of the case here. Moreover, Whitman testified that a number of persons in the Criminal Investigations section of the Department of Public Safety and the Office of Inspector General would have known he authored Exhibit 39 if a call was placed to these sections. The Irving Police Department also received the Exhibit. His authorship was "readily available" to prosecutors. *Williams,* 940 F.2d at 133. Indeed, he agreed that "[i]t would have been easy" to trace his authorship.

2106

Finally, the item sought was particular in nature – the author of Exhibit 39 so that defense counsel could introduce the exhibit into evidence. The State was more than aware that Halprin sought the author of this document in order to introduce it during the punishment stage of trial. The U.S. Supreme Court has suggested that the more specific the request, the broader the State has an obligation to respond. *United States v. Agurs*, 427 U.S. 97, 106 (1976); *United States v. Brooks*, 966 F.2d 1500, 1504 (D.C. Cir. 1992) (noting that where "there is an explicit request for an apparently very easy examination, and a non-trivial prospect that the examination might yield material exculpatory information, we think the prosecution should make the inquiry"). Therefore, the State had a heightened duty to search for the author of Exhibit 39 in order that defense counsel could introduce Exhibit 39 at trial.

Accordingly, the knowledge of Whitman's authorship can be imputed to State prosecutors. Under *Brady*, it did not matter whether the prosecutors knew or did not know the authorship of Exhibit 39. The author of Exhibit 39, Whitman, was a member of the investigative and prosecution team in the Texas Seven case. Further, as Whitman testified his authorship and knowledge were "readily available." Moreover, the Irving Police Department, which was intimately involved in this prosecution, had direct knowledge and possession of the document and this knowledge is imputed to the State.

It is unconscionable that the prosecution pursued and achieved a death sentence by not providing the authorship of Exhibit 39 in order for defense counsel to present the Ranking Document during the punishment stage of the trial. As a result, the jury never had the opportunity to view this critical document that would likely have caused the jury to refuse

2107

to impose a sentence of death on Halprin.

Respectfully submitted,


GARY A. UDASHEN
State Bar of Texas No. 20369590


BRUCE ANTON
State Bar of Texas No. 01274700

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas  75201
214-468-8100
214-468-8104 fax

ATTORNEYS FOR APPLICANT


## CERTIFICATE OF SERVICE

On this _____ day of February, 2011, a true and correct copy of the foregoing Brief in Support of Argument was delivered to Lisa Smith, Assistant District Attorney, 133 N. Industrial Blvd., L.B. 19, Dallas, Texas 75207.


GARY A. UDASHEN


2108

15. Brief on Mitigating Evidence Jury Did Not Hear filed October 21, 2010

16. Brief in Support of Argument that Exclusion of the Ranking Document Was Harmful to Halprin's Mitigation Defense filed September 27, 2010

17. Brief in Support of Argument Concerning Exculpatory Evidence filed November 3, 2010

18. Brief in Support of Argument on Ineffective Assistance of Counsel on Appeal in Application for Writ of Habeas Corpus filed September 14, 2010

19. Applicant's Proposed Findings of Fact filed December 13, 2010

20. Applicant's Proposed Findings No. 2 filed December 13, 2010

21. Applicant's Proposed Findings No. 3 filed December 13, 2010

22. Applicant's Proposed Findings No. 4 filed December 13, 2010

23. Applicant's Proposed Findings No. 5 filed December 13, 2010

24. Applicant's Objections to State's Late Filing of Its Proposed Findings of Fact

25. Additional Arguments in Support of Ineffective Assistance of Counsel and Suppression of Exculpatory Evidence Arguments in Application for Writ of Habeas Corpus

26. Brief in Support of Argument Concerning Ineffective Assistance of Counsel for Failure to Present Mitigating Evidence

2109

W01-00327-Y(A)

In the Criminal District Court No. 7
of Dallas County, Texas

GARY ... FILED
DISTRICT CLERK  2011 APR -7  PM 2: 06
DALLAS CO. TEXAS
_____DEPUTY

# Ex parte Randy Ethan Halprin

**STATE'S PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Craig Watkins
Criminal District Attorney
Dallas County, Texas

Lisa Smith (00787131)
Assistant District Attorney
Frank Crowley Courts Bldg.
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3630 (office)
(214) 653-3643 (fax)
lbsmith@dallascounty.org

ORIGINAL
2111

## TABLE OF CONTENTS

BACKGROUND FACTS ........................................................................................... 1

PROCEDURAL HISTORY ...................................................................................... 2

SUBSEQUENT WRITS ........................................................................................... 2

Grounds 1 & 30:  Enmund/Tison ........................................................................... 4
 I. Claims Procedurally Barred ............................................................................ 4
  A. Claims Not Raised at Trial ...................................................................... 4
  B. Claims Not Raised on Direct Appeal ...................................................... 5
 II. Applicant is Death Eligible Under the Eighth Amendment ......................... 5
  A. Evidence Sufficient to Prove Requisite Culpability ............................ 6
  B. The Jury Found Applicant Acted with Reckless Indifference ......................... 10
  C. Trial Court Can Find Applicant Possessed Requisite Culpability ..................... 14

Ground 2:  Actual Innocence ................................................................................ 16

Ground 3:  *Brady* Claim ...................................................................................... 18
 I. State's Knowledge of Evidence .................................................................... 19
  A. Author of Ranking Document & Rivas/Dunning Interview Statements ......... 19
  B. Statements of Former Fellow Inmates ..................................................... 20
 II. TDCJ-OIG Disclosed Documents to Applicant's Expert Before Trial ................... 21
 III. Evidence is Immaterial ................................................................................ 22
  A. Evidence Not Admissible ........................................................................ 22
  B. Evidence is Insignificant and Cumulative ................................................ 25

Grounds 4 & 5:  Effective Assistance of Trial Counsel ........................................ 27
 I. Qualifications of Trial Counsel .................................................................... 28
 II. Counsel Rendered Effective Assistance in Guilt Phase ............................... 30
  A. Codefendants' Oral Statements to Other Law Enforcement Agencies ........... 30
  B. Evidence of Applicant's Foot Wound ...................................................... 41
  C. Victim Impact Evidence ........................................................................... 46
  D. Felony-Murder Instruction ...................................................................... 53
  E. Impeachment and Character Evidence ..................................................... 64
  F. General Verdict ........................................................................................ 78
 III. Counsel Rendered Effective Assistance in Punishment Phase ......................... 84
  A. Prosecutors' Voir Dire Remarks .............................................................. 84
  B. Dr. Kelly Goodness ................................................................................. 87
  C. Codefendants' Testimony ........................................................................ 99
  D. Sponsoring Witness for Ranking Document ........................................... 103

i

2112

E. Anti-Parties Instruction ................................................................ 105
F. Prosecutor's Closing Argument ...................................................... 106
G. Advice on Applicant's Right to Testify ........................................... 111

Ground 6:  Effective Assistance of Appellate Counsel ......................... 115
I. Qualifications of Appellate Counsel ................................................ 116
II. Counsel Rendered Effective Assistance on Appeal .......................... 117
A. Exclusion of Rodriguez's Letter ................................................. 120
B. Suppression Claims ................................................................... 134
C. Instruction Defining "Anticipate" ................................................. 135
D. Evidence of Other Prison Escapes .............................................. 138
E. "The Ten Commandments of Spec War" Exhibit ............................ 140
F. Exclusion of Dr. Goodness's Hearsay Testimony .......................... 142
G. Admissibility of Defense Exhibit 39 ............................................ 144
H. Enmund/Tison & Second Special Issue Sufficiency Claims ............. 144

Grounds 7 & 8: "False Impression" & Contradictory Theories ............... 145
I. Claims Procedurally Barred ......................................................... 145
A. Claims Not Raised at Trial .......................................................... 146
B. Claims Not Raised on Direct Appeal ............................................ 146
II. No Constitutional Violation ......................................................... 146
A. No False Impression Created ...................................................... 149
B. Conflicting Theories of Prosecution ............................................. 

Grounds 9-12:  Fair Cross-Section ...................................................... 152
I. Claims Procedurally Barred ......................................................... 152
A. Claims Not Raised at Trial .......................................................... 154
B. Claims Not Raised on Direct Appeal ............................................ 154
C. Applicant Fails to Allege Facts that Entitle Him to Relief ............... 155
II. No Violation of Right to Fair Cross-Section .................................... 156
A. No Showing Hispanics are Underrepresented on Venires ............... 157
B. No Showing of Systematic Exclusion of Hispanics ........................ 160
III. Counsel Rendered Effective Assistance ........................................ 161

Grounds 13 & 14:  Burden of Proof on Mitigation Special Issue ............ 162
I. Claims Procedurally Barred ......................................................... 162
A. Sixth Amendment Claim Not Raised at Trial ................................. 162
B. None of the Claims Raised on Direct Appeal ................................ 163
II. Mitigation Issue Does Not Violate Any Constitutional Right ............ 

Grounds 15 & 16:  10/12 Rule........................................................... 164
I. Claims Procedurally Barred ......................................................... 164

2113

II.  No Constitutional Violation ........................................................................ 165

Ground 17:  Proportionality Review of Death Penalty ........................................ 166
    I.  Claims Procedurally Barred ...................................................................... 166
        A.  Claim Not Raised at Trial ................................................................. 167
        B.  Claim Not Raised on Appeal............................................................. 167
        C.  Claim Fails to Allege Facts Entitling Applicant to Relief...................... 168
    II.  No Constitutional Violation ..................................................................... 169

Ground 18:  Definition of Mitigating Evidence ................................................... 169
    I.  Claims Procedurally Barred ...................................................................... 169
    II.  No Constitutional Violation ..................................................................... 170
    III.  No Harm ............................................................................................ 170

Ground 20:  Undefined Punishment Terms ........................................................ 170
    I.  Claims Procedurally Barred ...................................................................... 170
        A.  Claims Not Raised at Trial ............................................................... 171
        B.  Claims Not Raised on Direct Appeal ................................................. 171
    II.  No Constitutional violation ..................................................................... 172

Grounds 19, 21-22 & 24-25:  Callins v. Collins .................................................. 172
    I.  Claims Procedurally Barred ...................................................................... 173
    II.  Death-Penalty Scheme Constitutional ...................................................... 173

Ground 23:  Appellate Review of Death Penalty ................................................ 174
    I.  Claim Procedurally Barred........................................................................ 174
    II.  No Constitutional Violation ..................................................................... 174

Grounds 26-29:  Penry II Claim ....................................................................... 175
    I.  Claims Procedurally Barred ...................................................................... 175
        A.  Claims Not Raised at Trial ............................................................... 176
        B.  Claims Not Raised on Direct Appeal ................................................. 176
    II.  No Constitutional Violation ..................................................................... 178

Ground 31:  Cumulative Constitutional Error ..................................................... 178
    I.  Claims Procedurally Barred ...................................................................... 178
        A.  Claims Not Raised at Trial ............................................................... 178
        B.  Claims Not Raised on Direct Appeal ................................................. 179
    II.  No Constitutional Violation ..................................................................... 179

2114

Having considered (1) the original application for writ of habeas corpus, (2) the "amended" application for writ of habeas corpus, (3) numerous supplemental defense pleadings, (4) the State's response to the original application, (5) the State's objection to the amended application for writ of habeas corpus, (6) affidavits and interrogatory answers of numerous individuals, (7) testimony and documentary evidence offered at writ hearings conducted on May 22-23, 2008, August 20, 2010, September 30, 2010, November 12, 2010, and January 14, 2011, (8) official court documents and records, and (9) the Court's personal experience and knowledge, the Court makes the following findings of fact and conclusions of law:

## BACKGROUND FACTS

(1)     The Court finds that applicant escaped from the Connally Prison Unit on December 13, 2000 with six other inmates: George Rivas, Donald Newbury, Michael Rodriguez, Joseph Garcia, and Patrick Murphy. In the escape, the group assaulted several guards and civilian prison employees, stole numerous firearms, and fled to Dallas, Texas, committing two armed robberies along the way to finance their flight. (RR44: 118-23; RR48: 7-10).

(2)     The Court finds that, on Christmas Eve 2000, applicant and his fellow escapees robbed the employees of the Oshman's store in Irving, Texas, stealing a plethora of firearms, ammunition, and other merchandise, as well as $70,000 in cash. While fleeing from the Oshman's robbery, the escapees shot and killed Irving Police Officer Aubrey Hawkins in a barrage of gunfire, stole his firearm, pulled him from his squad car, and then ran him over as they fled in a Ford Explorer they stole from one of the store's employees. (RR41: 63-123, 163-79; RR43: 3-19; RR44: 34-60).

(3)     The Court finds that, nearly a month later, all seven escapees were discovered in Colorado. Six of them, including applicant, were apprehended; the seventh escapee committed suicide to avoid recapture. Applicant and four of the other surviving escapees gave written statements to police upon capture. (RR42: 28-43, 84-85; RR45: 7-19, 47-62).

(4)     At the time of the escape, applicant was serving a 30-year sentence for the offense of injury to a child. Applicant savagely beat the toddler son of a woman he was dating, fracturing the boy's skull, arms, and legs, and burning his tongue with a cigarette. (RR 47: 100-02, 105, 108; RR 48: 78-83; RR 49: 197-98, 205; RR 50: 126-29; State's Exs. 941-949).

2115

## PROCEDURAL HISTORY

(5)     The Court finds that, on June 12, 2003, applicant was sentenced to death for the December 24, 2000 capital murder of Irving Police Officer Aubrey Hawkins. (CR: 48).[1] On June 29, 2005, the Court of Criminal Appeals affirmed applicant's conviction and sentence on direct appeal. *Halprin v. State*, 170 S.W.3d 111 (Tex. Crim. App. 2005). On September 14, 2005, the Court denied applicant's motion for rehearing, and on September 21, 2005, the Court issued its mandate.

(6)     The Court finds that, on April 6, 2005, applicant timely filed his original application for writ of habeas corpus. This Court granted the State one statutorily authorized 90-day extension of time, and the State timely filed its answer on October 3, 2005.

(7)     In the fall of 2007, the Court determined that some controverted, previously unresolved factual issues material to the legality of applicant's confinement existed. Between the fall of 2007 and October 2010, the Court ordered additional evidence gathered on applicant's *Brady* and ineffective assistance claims by way of written interrogatories of numerous individuals and testimony from three of applicant's codefendants, his trial and appellate counsel, the trial prosecutors, and a Texas Ranger.[2]

(8)     The Court incorporates into these findings an inventory of the extrinsic evidence presented to the Court in the course of these writ proceedings. *See* Appendix A.

## SUBSEQUENT WRITS

(9)     The Court finds that applicant filed a pleading entitled, "Amended Application for Writ of Habeas Corpus Pursuant to Art. 11.071 Tex. Code Crim. Proc. (Supersedes Previous Application)" on April 27, 2005.

(10)    The Court finds that applicant also filed numerous other pleadings, including the following:

(a)    "Supplemental Authority in Support of Application for Writ of Habeas Corpus" (filed 6/24/05);

---

[1] Former Presiding Court Judge Vickers Cunningham presided over applicant's trial and these writ proceedings until 2006, when he left the bench.

[2] Current Presiding Judge Rick Magnis presided over these writ proceedings from 2007 until his recusal in January 2011. *See* (1/14/11 Hrg) RR: 4-148; Recusal Order (dated 1/20/11).

2

2115-A

(b)   "Supplemental Brief in Support of Amended Application for Writ of Habeas Corpus Pursuant to Art. 11.071 Tex. Code Crim. Proc." (filed 10/7/05);

(c)   "Additional Arguments in Support of Ineffective Assistance of Counsel and Suppression of Exculpatory Evidence Arguments in Application for Writ of Habeas Corpus" (filed 8/20/10);

(d)   "Brief in Support of Argument on Ineffective Assistance of Counsel on Appeal in Application for Writ of Habeas Corpus" (filed 9/14/10);

(e)   "Brief in Support of Argument that Exclusion of the Ranking Document Was Harmful to Halprin's Mitigation Defense" (filed 9/27/10);

(f)   "Brief in Support of Argument Concerning Ineffective Assistance of Counsel for Failure to Present Mitigating Evidence" (filed 9/30/10);

(g)   "Applicant's Additional Brief on Mitigating Evidence Jury Did Not Hear" (filed 10/21/10);

(h)   "Brief in Support of Argument Concerning Exculpatory Evidence" (filed 11/3/10); and

(i)   "Brief in Support of Argument Concerning Officer's Knowledge of Exculpatory Evidence" (filed 2/22/11).

(11)   Under article 11.071, section 5(f), any amended or supplemental application not filed by the due date for the original writ application must be treated as a subsequent writ application. TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5(f) (Vernon Supp. 2010).

(12)   The Court finds that any amendment or supplement to applicant's original application was due by April 7, 2005, the deadline for filing the original application.

(13)   To the extent applicant's "Amended Application" and other supplemental pleadings raise a claim not alleged in the original writ application filed on April 7, 2005, the Court finds and notes that those pleadings constitute a subsequent application under article 11.071, section 5, and the Court forwards the same to the Court of Criminal Appeals for its determination of whether applicant has

3

2116

met section 5's requirements for issuance of a subsequent writ. TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5(a) & (b) (Vernon Supp. 2010).

### Grounds 1 & 30: Enmund/Tison

(14)   Relying on *Enmund v. Florida*, 458 U.S. 782 (1982) and *Tison v. Arizona*, 481 U.S. 137 (1987), applicant claims his death sentence is disproportionate to his crime and, thus, violates his Eighth Amendment right against cruel and unusual punishment because no reasonable juror could find he possessed a culpable mental state sufficient to render him death eligible. Specifically, he claims the evidence did not support a finding that he either intended Officer Hawkins's death or exhibited a reckless disregard for human life and played a major role in the crime. Furthermore, he claims a finding by the jury on the second special issue[3] that he anticipated a human life would be taken does not constitute a finding that he acted with a reckless disregard for human life. Therefore, applicant claims he is not eligible for the death penalty.

## I. CLAIMS PROCEDURALLY BARRED

### A. Claims Not Raised at Trial

(15)   The Court finds that applicant failed to present these claims to the Court at trial.

(16)   Under Texas law, the failure to object at trial generally waives the error for collateral review. *Ex parte Pena*, 71 S.W.3d 336, 338, n.7 (Tex. Crim. App. 2002); *Ex parte Bagley*, 509 S.W.2d 332, 333-334 (Tex. Crim. App. 1974) (holding that the appellate rule requiring a trial objection also applies in habeas cases).

(17)   The Court finds that, at trial, applicant only facially challenged the constitutionality of the anti-parties special issue, arguing that a finding that an accused anticipated the taking of a human life was not a mental state sufficient to warrant a death sentence. Applicant never raised the claim that the evidence is insufficient to show that *he* possessed the requisite mental state to render him death eligible under the Eighth Amendment. Nor did he ever raise the claim that the anti-parties special issue was unconstitutional as applied to him. Applicant could have raised both of these claims in a motion for new trial, but

---

[3]   The second or "anti-parties" special issue, as set out in article 37.071, § 2(b)(2) in the criminal procedure code, reads as follows: "whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken." TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(b)(2) (Vernon Supp. 2010).

2117

did not. (CR: 60).

(18)   Because applicant did not avail himself of the prior opportunity to present his claims to this Court, the Court concludes that collateral review of applicant's first and thirtieth grounds for relief are procedurally barred and should be dismissed.

## B. Claims Not Raised on Direct Appeal

(19)   The Court finds that applicant also failed to raise these claims on direct appeal.

(20)   Habeas corpus will not lie as a substitute for direct appeal. *Ex parte Townsend*, 137 S.W.3d 79, 81 (Tex. Crim. App. 2004). Even a constitutional claim is forfeited if applicant had the opportunity to raise it on appeal and did not. The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id.*

(21)   The Court finds that nothing prevented applicant from raising these claims on direct appeal, and that applicant presents no evidence in support of these claims that was not already part of the appellate record.

(22)   The Court finds that applicant's first and thirtieth grounds for relief are an improper attempt to use the writ as a substitute for appeal.

(23)   Therefore, the Court concludes applicant's first and thirtieth grounds for relief are procedurally barred and should be dismissed. *Id.*

## II. Applicant is Death Eligible Under the Eighth Amendment

(24)   Alternatively, the Court finds that applicant's contentions are meritless and should be denied.

(25)   The Court finds that applicant's death sentence is not disproportionate to his crime. Thus, the Court concludes applicant's sentence does not constitute cruel and unusual punishment.

(26)   Furthermore, the Court finds that, by their affirmative answer to the second special issue, the jury found that applicant possessed a culpable mental state sufficient to render him death eligible.

(27)   Under the Eighth Amendment, a party to a felony during which a murder is committed is eligible for the death penalty if he himself killed, attempted to kill, intended to kill or intended that lethal force be used, or acted with a reckless

2118

indifference to human life and was a major participant in the underlying felony. *Tison*, 481 U.S. at 158; *Enmund*, 458 U.S. at 797.

(28)    Applicant contends a reasonable juror could only conclude from the evidence that he had no involvement in the shooting of Officer Hawkins, that he played a minor role in the Oshman's robbery, and that he justifiably believed no one would be hurt. The Court disagrees with applicant's characterization of the evidence.

(29)    In particular, the Court finds the evidence shows that applicant was a major participant in the robbery and the murder. Furthermore, the record is replete with evidence that reflects applicant's intent to kill and, at the very least his reckless indifference to Officer Hawkins's life. There is even evidence from which the jury could conclude that applicant himself fired a lethal shot.

### A. Evidence Sufficient to Prove Requisite Culpability

(30)    The Court finds the evidence shows that a lethal confrontation with Officer Hawkins in the loading dock behind the Oshman's was fully expected and planned for by every member of the Texas Seven, including applicant. When applicant escaped from prison, he and the other escapees became the subject of a massive police manhunt, making a future confrontation with police virtually inevitable. (RR42: 27; RR44: 119: RR48: 3-6). They prepared for such confrontation before they even left the Connally Unit by stealing a small arsenal of firearms and ammunition. (RR44: 119-23; Defense Exs. 24-27). By arming themselves in this manner and by using physical violence and threatening to kill their prison hostages, all of them, including applicant, evinced their willingness to use lethal force to avoid recapture. Moreover, by his own admission, applicant left a threatening note on his prison bunk ("Believe me, you have not heard the last of us."), indicating that he personally planned to commit some future act of violence. (RR48: 123-27; State's Ex. 955).

(31)    The Court finds that applicant and the others also tactically prepared for a confrontation with police by equipping themselves with two-way radios, a police scanner, and police frequency publications. They used this equipment during the Oshman's robbery to monitor the response of the Irving Police Department and warn each other of the arrival of Officer Hawkins, giving themselves a lethal advantage. (RR46: 27-30, 45-46; RR48: 8, 13, 16-17; State's Ex. 341-A; Defense Exs. 24-27). And the use of lethal force during the robbery was clearly contemplated by everyone. Applicant and five of his fellow escapees entered the store, each carrying a loaded gun, and drew them on the

2119

employees. (RR41: 86-87; RR48: 14, 136).  Murphy, the group's lookout, did not enter the store, but was armed with several weapons and planned to initiate a firefight if necessary. (Defense Ex. 24). Moreover, they all loaded their weapons with ammunition that they had modified so that it would inflict greater injury. (RR46: 86-89).

(32)   At trial and in his application, applicant insists that none of the escapees wanted or planned for anyone's death. He claims their preparations were intended to prevent a lethal confrontation, not guarantee one. He notes that no one was injured or killed by any of them in the two robberies they committed before the Oshman's robbery. He also notes that, before his incarceration, Rivas had committed numerous robberies in which he injured no one.

(33)   Alternatively, applicant attempts to set himself aside from the other escapees. He denied violently assaulting and threatening prison employees Allen Camber and Mark Burgess and maintained the note he left behind was not a threat of future violence. He also denies any lethal intent behind carrying the loaded gun into the Oshman's, claiming he reluctantly armed himself on the night of the shooting, that the lethal force used against Officer Hawkins was unforeseen by him, and that he never pulled his weapon, much less fired it at Hawkins.

(34)   The Court finds applicant's assertions are not credible. They are predicated in large part on his own trial testimony, the credibility of which was severely impeached on cross-examination. (RR48: 58-168; RR49: 3-24, 50-52). Moreover, other facts and circumstances also significantly impugn applicant's denials of an intent to kill and knowledge that lethal force would be used.

(35)   The record reflects that all of the escapees were convicted felons, most of whom had no aversion to violence. Rodriguez and Garcia were convicted murderers, Rivas and Newbury were convicted robbers, and Harper and Murphy were convicted rapists. Applicant admits he was aware of the criminal history of some of these men before the escape, and learned of the others afterwards. (RR48: 109-10, 119-21). Moreover, he witnessed them violently assault several prison employees during the escape. (RR48: 114-15, 119-20). Thus, if applicant had any doubts about their violent nature before the escape, he could have had none afterwards. Yet, he voluntarily stayed with them and participated in the Radio Shack and Oshman's robberies. (RR48: 118-19, 134-36).

(36)   The record also reflects applicant's own capacity to use lethal force. Although he denied assaulting anyone during the escape, a fact other witnesses refute, applicant was an admitted child abuser who viciously kicked and beat a toddler, breaking both his arms and legs, fracturing his skull, rupturing his eardrum,

2120

severely bruising his eye, and burning his tongue with a cigarette. (RR48: 77-93; RR49: 123, 134-35, 161, 168-72; State's Exs. 941-947).

(37) Applicant suggests this prior violence was an anomaly and did not portend future violence against an adult. The Court finds, however, that it shows only that applicant chooses victims over whom he has the advantage. Furthermore, the note applicant left behind belies his claim that he no longer posed a threat to anyone. (State's Ex. 955).

(38) Even if the prior conduct of applicant and the other escapees could be interpreted as supporting applicant's denials of lethal intent, the Court finds that their conduct following Officer Hawkins's arrival in the loading dock can only be subject to one interpretation. The escapees killed Hawkins in a barrage of gunfire, firing at least five, maybe more, guns at him and inflicting eleven gunshot wounds, several of which were lethal. (RR44: 42-53, 59-60). As applicant acknowledged during his trial testimony, the clear intent of the shooting was to kill Hawkins. (RR48: 162-63).

(39) The Court finds applicant did nothing to disassociate himself with the killing. Although the opportunity arose, he did not flee before Hawkins's arrival in the loading dock. Instead, he remained with the other escapees for three more weeks, during which time he took his share of the proceeds from the robbery and continued to arm himself. At trial, applicant testified that the others kept watch over him after the shooting, never leaving him alone. But he denied that he was kept against his will and insisted that he planned to leave once he obtained a fake I.D., demonstrating that he voluntarily stayed with the group because it was still benefiting him.

(40) The Court finds that applicant did not attempt to surrender without a fight. (RR48: 149). And although armed and present in the loading dock when Hawkins arrived, he did not say or do anything to prevent the shooting. (RR48: 21-22, 154). Instead, he joined in Hawkins's execution.

(41) Applicant maintains he never drew his weapon, much less fired it, but the Court finds the evidence shows otherwise.

(42) The Court finds the physical evidence definitively linked five of the stolen TDCJ guns to the shooting. However, the escapees stole several other guns from TDCJ, and the police recovered numerous unidentifiable bullet fragments at the scene, any one of which could have been fired from a sixth gun. (RR46: 94-95, 99, 126). None of the six escapees present in the loading dock was armed with more than one gun, and Officer Hawkins never fired a shot. (RR42: 26-27; RR43:

2121

66-67; RR47: 59). Thus, fragments from a sixth gun would mean applicant had to have fired his own weapon during the shooting.

(43) The Court finds that even if only five guns were fired during the shooting, the evidence supports the conclusion that applicant fired one of them. In particular, the evidence shows it was applicant who fired the handful of shots into the passenger side of Hawkins's patrol car. By his own testimony, applicant put himself on the passenger side of the patrol car during the shooting. At trial, applicant drew a diagram depicting the location of the patrol car in relation to the stolen Ford Explorer and the stairs to the store's rear exit. (State's Ex. 965). Using this diagram to explain his and his codefendants' movements, applicant testified that, once the shooting started, he ran around or behind the Explorer and headed for the field behind the store, stopping at a "grassy embankment" where he was shot in the foot. (RR47: 19-24; RR48: 154-60). Applicant could not have run around or behind the Explorer and into the "grassy embankment" he described without also running to the passenger side of the patrol car.

(44) Applicant claims such an interpretation of his testimony can only be accomplished by taking liberties with the trial record, which he claims is ambiguous. While a live record of applicant's testimony may depict his location during the shooting with greater clarity, the Court finds that the record is not ambiguous on this point.

(45) The record reflects that Officer Stephen Hazard documented the location of Hawkins's patrol car, the Explorer, and the grassy areas behind the store. Although there is more than one grassy area behind the store, Hazard's photographs and diagram of the scene clearly show that all of these grassy areas were located on the passenger side of the patrol car. (State's Exs. 56-57, 73, 173). Furthermore, as Hazard documented, the patrol car and Explorer were facing the same direction. (RR43: 37-46; State's Exs. 174, 174-B, 187, 864). Thus, if as applicant testified, he was initially standing on the driver's side of the Explorer and then ran around or behind it – i.e., ran to the passenger side of the Explorer – then he necessarily ran to the passenger side of the patrol car as well. (RR47: 20-23).

(46) The Court finds that, at the moment he fired into the passenger compartment of the patrol car, applicant evinced his intent to kill Officer Hawkins. And by firing directly into the patrol car where Hawkins sat, applicant significantly increased his odds of wounding and possibly killing him.

(47) While the evidence does not definitively establish who fired the shots that killed Officer Hawkins, the Court finds it does demonstrate that applicant, like the

2122

other escapees, expected and intended to use lethal force and did use it. Applicant's claims to the contrary lack any credibility.

(48)   Thus, the Court finds that applicant fails to prove the evidence of his culpability is insufficient to satisfy the Eighth Amendment.

### B. The Jury Found Applicant Acted with Reckless Indifference

(49)   Applicant contends that even if the evidence is sufficient to prove he acted with reckless indifference to Officer Hawkins's life, his jury never made this finding. Applicant acknowledges that by their affirmative answer to the second special issue, the jurors found that he "anticipated that a human life would be taken." (CR: 43). But he claims this finding does not satisfy the dictates of *Tison* because in their deliberations on this special issue (1) the jury did not limit its consideration to applicant's conduct and (2) they probably interpreted the term "anticipated" to mean the "mere possibility" that someone would be killed.

(50)   The Court finds that applicant fails to prove either of these allegations.

### (1) Answer to Special Issue Based on Applicant's Individual Liability

(51)   "While the law of parties can apply to *convict* an accused of capital murder, the death penalty may be imposed only by examination of the mitigating and aggravating circumstances concerning the *individual* defendant." *Green v. State*, 682 S.W.2d 271, 287 (Tex. Crim. App. 1984) (emphasis in original). Consequently, the punishment special issues must focus the jury's deliberations on the conduct of the individual defendant. *Id.*

(52)   Applicant maintains the Court's punishment instructions allowed the jury to answer the second special issue based on evidence of the conduct of his "cohorts" because the Court generally instructed the jury to "consider all evidence admitted during the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty." (CR: 38).

(53)   The Court finds that, on its face, this instruction does not tell the jury to consider evidence of the conduct of other parties to the crime. Moreover, the second special issue equated to an "anti-parties" instruction because it required the jury to base its answer on applicant's individual liability.

(54)   In particular, the instruction asked, "[D]o you find from the evidence beyond a reasonable doubt that *the defendant, Randy Ethan Halprin*, actually caused the

10

2123

death of the deceased, Aubrey Hawkins, or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken?" (CR: 43) (emphasis added).

(55)   The Court finds that this instruction plainly instructed the jury to consider applicant's behavior alone. Thus, in answering this issue, the jury made a finding about applicant's individual liability for Officer Hawkins's death. *See Ramirez v. Dretke*, 398 F.3d 691, 696-97 (5th Cir. 2005) (holding that trial court's general punishment instruction to "consider all evidence submitted . . . in whole trial" did not permit jury to impose death on Ramirez based on other party's conduct because second special-issue instruction explicitly limited jury's consideration to Ramirez's individual liability); *see also McFarland v. State*, 928 S.W.2d 482, 516-17 (Tex. Crim. App. 1996) (holding that statutorily required second special issue specifically instructs jury to consider the defendant's behavior alone).

### (2) The Jury Correctly Interpreted the Term "Anticipate"

(56)   In addition, the Court finds the jury found that applicant possessed a culpable mental state high enough to satisfy the Eighth Amendment's proportionality requirement. By affirmatively answering the second special issue, the jury found that applicant actually caused Officer Hawkins's death, intended to kill him or another, or anticipated that a human life would be taken. (CR: 43).

(57)   Assuming the jury found only that he anticipated a human life would be taken, applicant contends the jury's answer to this special issue does not satisfy the Eighth Amendment because the jury probably misconstrued the term "anticipate" to mean the "mere possibility" that someone would be killed. According to applicant, a finding that he anticipated someone would be killed satisfies the dictates of *Tison* only if the jury construed "anticipate" to mean "expect to happen with certainty."

(58)   The Court finds that applicant misinterprets *Tison*. In *Tison*, the Supreme Court equated the mental state of reckless indifference to a subjective appreciation that one's acts were *likely* to result in the taking of innocent life. *Tison*, 481 U.S. at 152. Thus, contrary to applicant's contention, *Tison* only requires that applicant was aware of a likelihood or probability, not the certainty, that someone would die.[4]

---

[4] Elsewhere in this ground and other grounds in his application, applicant apparently concedes that this is the correct interpretation of *Tison*. (Application, pp. 32-33, 248).

11

2124

(59)   The Court finds that, by finding under the second special issue that applicant "anticipated that a human life would be taken," the jury necessarily made a finding that applicant was aware of the probability or likelihood that someone would die.

(60)   Contrary to applicant's contention, the term "anticipate" denotes an expectation that something will likely or probably occur, not that it is merely possible. *See* ENCARTA® WORLD ENGLISH DICTIONARY© (2009), HTTP://UK.ENCARTA.MSN.COM/ENCNET/FEATURES/DICTIONARY/DICTIONARYRESULTS.ASPX?L EXTYPE=3&SEARCH=ANTICIPATE;[5] DICTIONARY.COM UNABRIDGED. Random House, Inc. (2011), http://dictionary.reference.com/browse/anticipation.[6] And the manner in which the term is used in the second special issue does not suggest otherwise. *See Walker v. Scott*, 123 F.Supp. 1034, 1043-44 (E.D. Tex. 2000) (adopting holding of Court of Criminal Appeals in unpublished opinion on Walker's direct appeal that anticipation that a life would be taken suggests to a rational juror, at the very least, a probability, not just the theoretical possibility, that a life would be taken); *Ladd v. State*, 3 S.W.3d 547, 573 (Tex. Crim. App. 1999) (holding that a finding under the second special issue that the accused anticipated a human life would be taken equates to a finding of reckless indifference to human life under *Tison*).

(61)   Applicant nonetheless contends that his jury misconstrued the term and cites the note the jury sent out during its punishment deliberations as proof. (CR: 45).

(62)   The Court finds, however, that the note does not reflect that any juror believed "anticipate that a human life would be taken" to mean something less than an awareness of the *likelihood* that someone would be killed. On its face, the note reflects only a disagreement about the meaning of "anticipated" versus "should have anticipated."[7] In other words, the jurors were discussing the difference

---

[5] Defining "anticipate" to mean to "expect something: to think or be fairly sure that something will happen," or to "look forward to something: to feel excited, hopeful, or eager about something that is going to happen."

[6] Defining "anticipation" to mean *"expectation* or hope" and defining "expect" to mean "to . . . regard as *likely* to happen . . ." (http://dictionary.reference.com/browse/expect) (emphasis added). *See also* BLACK'S LAW DICTIONARY 93 (6th ed. 1990) (noting that in the law of negligence, anticipation "means probability, not possibility, as applied to duty to anticipate consequences of conduct attacked as negligent").

[7] The note reads:  "Evidence: We are in disagreement on the definitional difference between 'anticipated that a human life would be taken' and 'should have anticipated.' We recall this from closing statements – definition of 'anticipate.'" (CR: 45).

12

2125

between the subjective use of the term, i.e., whether applicant actually anticipated someone's death, and the objective use of the term, i.e., whether a reasonable person in applicant's position would have anticipated someone's death.

(63) Furthermore, the Court finds that the State did nothing to encourage the jury to construe "anticipate" to mean anything less than a probability. In fact, only defense counsel discussed the meaning of the term during closing arguments, and he told the jury to construe the term to mean "expect with a certainty."[8] As

---

[8] Defense counsel argued as follows:

Special Issue No. 2, did he actually cause the death beyond a reasonable doubt? No. The State hasn't proved that to you. If he didn't do that, did he actually cause the death of the deceased, but intended to kill the deceased? No, they didn't prove that to you either, not him.

And that's why we spent so much time talking to you about anticipated. That's why they spent so much time about parties and conspiracy and anticipated. The question is, what does that mean? Anticipated that a life would be taken.

And, you know, we live in a world of advertising and people try to sell us stuff all the time. And I'm sitting at home last night and I'm trying to think about how I can get this to you, how I can get you to understand what it really means.

And then it dawned on me. And I thought, that's just so stupid, you can't hardly say that. And it's the Heinz Ketchup commercial. It's the person sitting there with a plate of food and a ketchup bottle that's full, turned upside down. And the ketchup is in the bottle, they know it's there, and they are going to enjoy it. And they are going to get it on the plate.

Now, what's the sales pitch? Anticipation of something that you *expect to happen with a degree of certainty*. What's the proof beyond a reasonable doubt that he *expected with certainty* that Officer Hawkins or any other police officer would be killed? They didn't try to kill any of the employees, even though there were some attempts apparently made by some people to act brave. They tied them up. They did the same consistent thing over and over again.

And while it's certainly -- you are able to say, yeah, he should have thought that through and should have been able to see that probably or possibly somebody might get hurt ultimately, can you say beyond a reasonable doubt that he actually anticipated, he expected a life that night to be taken? And the answer to that is no, not with the evidence that you have. Not beyond a reasonable doubt.

(RR53: 105-06) (emphasis added).

13

2126

previously discussed, *Tison* does not require such a finding. *Tison*, 481 U.S. at 152.

(64)     The Court finds that defense counsel made this improper argument to the jury without objection or rebuttal by the State, effectively increasing the State's burden of proof on the second special issue. Thus, if anything, the jury probably construed the term to mean something more than required by *Tison*.

## C. Trial Court Can Find Applicant Possessed Requisite Culpability

(65)     Even if the jury had not found that applicant was a major participant who acted with reckless indifference (i.e., was aware of the likelihood or probability that a life would be taken), this Court could make that finding in this habeas proceeding. In *Cabana v. Bullock*, 474 U.S. 376 (1986), the Supreme Court held that the culpability finding required by *Enmund* and *Tison* may be made by a trial court or an appellate court. *Id.* at 389; *see also Hopkins v. Reeves*, 524 U.S. 88, 99-100 (1998) (applying holding in *Cabana v. Bullock* that state can comply with *Enmund*'s requirement at sentencing or on appeal); *Foster v. Quarterman*, 466 F.3d 359, 369-71 (5th Cir. 2006) (holding Texas Court of Criminal Appeals's findings on direct appeal that showed that Foster was at least a major participant who acted with reckless indifference to human life satisfied *Enmund*'s requirements); *Clark v. Johnson*, 227 F.3d 273, 280-81 (5th Cir. 2000) (holding findings by Texas Court of Criminal Appeals on direct appeal satisfied *Enmund*'s requirements).

(66)     As discussed above, the Court finds that the evidence overwhelmingly proves that applicant possessed the culpability required for imposition of the death penalty.

(67)     Applicant claims this Court is precluded from making such a finding by *Ring v. Arizona*, 536 U.S. 584 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000).[9] In *Apprendi,* the Supreme Court held a New Jersey hate crime statute violated the Due Process Clause of the Fourteenth Amendment because it provided for an enhanced sentence based upon the judge's fact finding of racial motivation by a preponderance of the evidence. The Supreme Court held any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury, and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490. Subsequently,

---

[9] Applicant presents this argument twice in his application. He incorporates it into his first ground for relief and argues it separately in his thirtieth ground for relief. (Application, pp. 33, 247-48).

*Ring* extended *Apprendi* to capital cases, holding that aggravating factors necessary for the imposition of a death sentence must also be submitted to a jury and proved beyond a reasonable doubt. *Ring*, 536 U.S. at 577.

(68)    Appellant reads *Ring* and *Apprendi* too broadly. Neither applies to Texas death penalty cases. *Apprendi* only applies to facts that increase the penalty beyond the "prescribed statutory maximum." *Apprendi*, 530 U.S. at 490. Under the Texas Penal Code, the prescribed statutory maximum for capital murder is fixed at death. TEX. PENAL CODE ANN. §§ 12.31 & 19.03 (Vernon Supp. 2010). Nothing a jury or judge decides during the punishment phase could enhance an appellant's sentence beyond the prescribed range. *See Allen v. State*, 108 S.W.3d 281, 285 (Tex. Crim. App. 2003). There are no statutory enhancements. *Resendiz v. State*, 112 S.W.3d 541, 549-50 (Tex. Crim. App. 2003).

(69)    Moreover, the heightened culpability required by *Enmund* and *Tison* is not an element of capital murder or an aggravating factor that increases applicant's authorized punishment beyond that allowed by the jury's verdict. Rather, *Enmund* and *Tison* imposed a categorical rule that was intended to be a substantive limitation on death sentences. *Cabana*, 474 U.S. at 386. *Enmund* and *Tison* do not require that a jury enforce this limitation. In fact, they impose no particular form of procedure on the States for complying with their dictates.

(70)    The Eighth Amendment is satisfied as long as the death penalty is not imposed upon an ineligible defendant and an Eighth Amendment violation can be adequately remedied by any court with the power to find facts and vacate a sentence. *Cabana*, 474 U.S. at 386. If this Court has the power to find facts establishing a violation, as applicant asks it to do, then it also has the power to find facts establishing that no violation exists. *See Palmer v. Clarke*, 408 F.3d. 423, 441-42 (8th Cir. 2005), *reh'g denied*, 2005 U.S. App. LEXIS 13114 (June 30, 2005) (relying on *Cabana* and holding Nebraska Supreme Court's determination that the trial record showed Palmer alone killed victim established constitutionality of his death sentence under *Enmund*). *But cf. Gongora v. Quarterman*, 2008 U.S. App. Lexis 22164, at * 20-22 n.4 (5th Cir. 2008) (noting that the Fifth Circuit has yet to consider issue of whether the jury rather than a judge "must make the factual determinations under *Tison*").

(71)    In light of all the foregoing, the Court finds applicant has failed to prove his death sentence violates the Eighth Amendment.

(72)    Furthermore, the Court finds and concludes that applicant's death sentence does not violate the Eighth Amendment and recommends denial of applicant's first and thirtieth grounds for relief.

15

2128

## GROUND 2:  ACTUAL INNOCENCE

(73)   Relying on *Schlup v. Delo*, 513 U.S. 298 (1995), applicant contends he is actually innocent. Specifically, he contends that, "in light of all the evidence . . . it is more likely than not that no reasonable juror would have convicted him." (Application, p. 36).

(74)   The Court finds that applicant misplaces his reliance on *Schlup* and, thus, misrepresents the burden of proof on his actual innocence claim.

(75)   Moreover, the Court finds that applicant fails to allege facts that would entitle him to relief.

(76)   There are two types of actual innocence claims cognizable on collateral review: (1) procedural or "*Schlup*" claims and (2) substantive or "*Herrera*" claims. Unlike a substantive innocence claim, procedural claims do not alone constitute a basis for relief. Procedural claims are "gateway" claims that are used to reach the merits of constitutional claims otherwise barred from collateral review. *Schlup*, 513 U.S. at 315 (citing *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

(77)   The Court finds that applicant does not assert his actual innocence claim to bypass a procedural bar to collateral review of some constitutional claim. He asserts actual innocence in itself as a basis for habeas relief. Thus, his claim is substantive in nature and governed by a higher burden of proof. Specifically, applicant must show by clear and convincing evidence that no reasonable juror would have convicted him in light of new or previously unavailable evidence. *Ex parte Thompson*, 153 S.W.3d 416, 417 (Tex. Crim. App. 2005) (citing *Ex parte Elizondo*, 947 S.W.2d 202, 205 (Tex. Crim. App. 1996)). In other words, he must show that some newly discovered evidence unquestionably establishes his innocence. *Thompson*, 153 S.W.3d at 417.

(78)   The Court finds that applicant fails to meet this burden of proof.

(79)   In his first ground for relief, which applicant purportedly briefed together with his innocence claim, he makes a reference in a footnote to evidence "not before the jury." The Court finds, however, that applicant does not specifically identify any new piece of evidence, a requisite of both procedural and substantive actual innocence claims. *See Schlup*, 513 U.S. at 314 (claim that constitutional error at trial prevented defendant from presenting fact finder with critical evidence of innocence); *Herrera*, 506 U.S. 390 (bare claim of innocence based on newly discovered or previously unavailable evidence); *Elizondo*, 947 S.W.2d at 208.

16

2129

(80)   Consequently, applicant fails to state specific, particularized facts that, if proven true, would entitle him to habeas relief. *Ex parte Staley*, 160 S.W.3d 56, 63 (Tex. Crim. App. 2005) (holding applicant must allege facts sufficient to enable a court to determine, from the face of the application itself, whether the application merits further inquiry).

(81)   The Court finds that applicant's second ground for relief is nothing more than a thinly veiled legal insufficiency claim, which is not cognizable on state habeas review. *See Ex parte Cantrell*, 112 S.W.3d 753, 755 (Tex. App. – Beaumont 2003, pet. ref'd) (noting that a claim that merely challenges the sufficiency of the evidence at trial is not an actual innocence claim and, thus, not cognizable on collateral review).

(82)   Thus, the Court concludes that applicant's second ground for relief is procedurally barred and should be dismissed.

(83)   In his "amended" application, applicant adds that his actual innocence claim is based on "external evidence," and in footnotes 7, 8, and 9, he refers generally to the evidence which is the subject of his *Brady* claim in Ground Three. "Amended Application for Writ of Habeas Corpus Pursuant to 11.071 Tex. Code Crim. Proc.," pp. 11-12, 16, 35) (filed 4/25/05).

(84)   The Court finds this *Brady* related "actual innocence" claim constitutes a subsequent writ application and should be dismissed as procedurally barred. *See* TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5.

(85)   Alternatively, the Court finds that this claim is meritless.

(86)   First, the Court finds that applicant presents no new evidence to support this claim.

(87)   As set out below in the Court's findings on applicant's related *Brady* claim, the State gave applicant's prison expert, S.O. Woods, access to the purported "new evidence" on May 19, 2003. Thus, the evidence applicant characterizes as new was actually available to the defense team before trial.

(88)   Second, the Court finds that the evidence applicant presents does not establish his innocence on the capital murder or the death penalty. More specifically, he fails to show that he would not have been convicted or assessed a death sentence but for a *Brady* violation. As set out below in the Court's findings on the *Brady* claim, there was no *Brady* violation.

17

2130

(89)   The Court notes that applicant also altered his actual innocence allegation in his "amended" application for habeas relief by inserting the following italicized language, "For the reasons set out above *and below*, no reasonable juror could deny that Halprin is actually innocent of the charged offense." *See* "Amended Application for Writ of Habeas Corpus Pursuant to 11.071 Tex. Code Crim. Proc.," p. 35 (filed 4/25/05) (emphasis added).

(90)   If by this additional language applicant intended to allege that he is actually innocent because of a constitutional violation alleged in any and/or all of the grounds for relief that followed, i.e., a *Schlup* innocence claim based on Grounds 3-31, then the Court finds these claims procedurally barred as a subsequent writ application. *See* TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5.

(91)   Alternatively, the Court finds applicant fails to prove he is actually innocent under *Schlup* because, as reflected in the findings below, he fails to prove any constitutional violation.

(92)   For all the foregoing reasons, the Court concludes applicant is not actually innocent under *Herrera* or *Schlup*.

## GROUND 3: *BRADY* CLAIM

(93)   In his original application, applicant contends the State violated his constitutional right to due process by failing to disclose exculpatory evidence. *See* U.S. CONST. amend. XIV; *Brady v. Maryland*, 373 U.S. 83 (1963). In particular, he claims the State withheld (1) evidence of the identity of the person who prepared Defense Exhibit 39, a document entitled, "Ranking of Offenders by Leadership/Personality Characteristics" (hereinafter referred to as the "ranking document"), (2) statements by his codefendant George Rivas, and (3) statements by a former fellow inmate named Johnnie Dunning. *See* Application, pp. 37-54.

(94)   In a pleading filed after the deadline for his original application, applicant claims the State also withheld exculpatory information given to law enforcement after the escape by five fellow inmates: (1) Michael W. Carter, (2) Timothy Alan Black, (3) Charles Eugene David, (4) David Slocomb, and (5) George Reames Rogers. *See* "Additional Argument in Support of Ineffective Assistance of Counsel and Suppression of Exculpatory Evidence Arguments in Application for Writ of Habeas Corpus," pp. 2-3 (filed 8/20/10).

(95)   The Court finds these untimely filed *Brady* claims constitute a subsequent writ

18

2131

application that should be dismissed as procedurally barred. *See* TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5(a) (Vernon Supp. 2010).

(96)    Alternatively, the Court finds that all of applicant's *Brady* claims, including those not timely filed, are meritless.

(97)    Applicant's due process right prohibits the State from withholding material, favorable evidence from him. *Brady*, 373 U.S. at 87. As previously noted, a habeas applicant bears the burden of proving facts that would entitle him to relief. *Chappell*, 959 S.W.2d at 628.

(98)    Thus, to prevail on his due process claim, applicant must establish the following by a preponderance of the evidence: (1) the prosecution failed to disclose evidence; (2) the evidence was favorable to him; and (3) the evidence was material. *Lagrone v. State*, 942 S.W.2d 602, 615 (Tex. Crim. App. 1997) (holding that the burden of showing materiality rests on the defendant); *see also Spence v. Johnson*, 80 F.3d 989, 994 (5th Cir. 1996).

(99)    The Court finds that applicant fails to sustain this burden of proof.

### I. STATE'S KNOWLEDGE OF EVIDENCE

### A. Author of Ranking Document & Rivas/Dunning Interview Statements

(100)   The Court finds the former DPS Special Crimes Investigator Hank Whitman prepared the ranking document on December 13 or 14, 2000, the day of or the day after the escape, with the assistance of a handful of other law enforcement agents employed by DPS and TDCJ's Internal Affairs Division (now known as the Office of Inspector General or OIG). (9/30/10 Hrg) RR: 18-24, 32-33, 47, 63-69, 71, 82-83; Whitman Affidavit; Whitman Interrogatory Answers.

(101)   The Court finds that the ranking document reflects the opinions of those law enforcement agents. It also reflects information obtained (1) from the prison "travel files" of applicant and the other escapees, (2) from interviews of the individuals taken hostage during the escape, and (3) from interviews of others who interacted with applicant and the other escapees while they were incarcerated. (9/30/10 Hrg) RR: 26-29, 63-66.

(102)   The Court finds that the ranking document does not reflect any information obtained by law enforcement later than a day or two after the escape. (9/30/10 Hrg) RR: 32, 71.

(103)   The Court finds that, until these writ proceedings, none of the prosecutors who

2132

participated in Halprin's trial knew that Whitman participated in preparing the ranking document nor did they try to hide his identity from Halprin's trial counsel. (5/22/08 Hrg) RR: 216-17; (9/30/10 Hrg) RR: 92-93, 99-104, 114-55; Whitman Affidavit; Shook Affidavit; D'Amore Affidavit; Wirskye Affidavit.

(104)   Therefore, to the extent applicant is alleging prosecutorial misconduct in the State's alleged failure to disclose Whitman's identity as the drafter of the ranking document, the Court finds that his claim is unsubstantiated and meritless.

(105)   The Court finds that S.O. Woods, applicant's prison expert at trial and in these writ proceedings, deduced Whitman's identity from Woods's review of records in possession of TDCJ's Office of Inspector General (OIG). S.O. Woods Interrogatory Answers (filed 10/26/10).

(106)   Nevertheless, the State is responsible for disclosing favorable evidence known by its agents, including law enforcement officials and others working on their behalf, even if the particular evidence is not known to the prosecuting attorney. *See Kyles v. Whitley*, 514 U.S. 419, 437-438 (1995).

(107)   The Court finds that those law enforcement officers who participated in the preparation of the ranking document and obtained the complained-of interview statements of Rivas and Dunning were agents of the State and part of the prosecution team. *See, e.g., Ex parte Mitchell*, 853 S.W.2d 1, 4 (Tex. Crim. App. 1993) (noting that members of Sheriff's office are agents of the State).

(108)   Therefore, the Court finds those officers' knowledge about who participated in the preparation of the ranking document and what Rivas and Dunning said in the complained-of interviews is imputed to the State.

## B. Statements of Former Fellow Inmates

(109)   The Court finds applicant fails to prove that the State possessed knowledge of the information provided by his former fellow inmates Michael Carter, Timothy Alan Black, Charles Eugene David, David Slocomb, or George Reames Rogers.

(110)   In support of this claim, applicant presents an affidavit from each respective inmate. Carter Affidavit, Black Affidavit, David Affidavit, Slocomb Affidavit, and Rogers Affidavit.

(111)   While applicant claims the information contained in these affidavits was relayed by these inmates to agents of the State during interviews conducted after the escape, the Court finds that the affidavits do not substantiate that allegation.

20

2133

*See* "Additional Arguments in Support of Ineffective Assistance of Counsel and Suppression of Exculpatory Evidence Arguments in Application for Writ of Habeas Corpus," p. 3.

(112)    The Court finds that, with the exception of Slocomb, none of the inmates aver that they relayed the information in their affidavit to any law enforcement official or other agent of the State. Carter, Black, and David make no mention of speaking to any officials. Indeed, Rogers stated that he did not want to talk to investigators. Carter Affidavit, Black Affidavit, David Affidavit, Rogers Affidavit.

(113)    Thus, with the exception of Slocomb, the Court finds applicant fails to show that any of these inmates relayed the information in their affidavits to anyone, much less an agent of the State and member of the prosecution team.

(114)    Even if the Court were to assume these inmates did relay information to a law enforcement official, none of the inmates, including Slocomb, indicates when, if ever, they did so. Carter Affidavit; Black Affidavit, David Affidavit, Slocomb Affidavit, and Rogers Affidavit.

(115)    Thus, the Court finds that applicant fails to show that, if any of these inmates relayed the complained-of information to a state agent, they did so before applicant's trial.

## II. TDCJ-OIG Disclosed Documents to Applicant's Expert Before Trial

(116)    The Court finds that the Rivas interview transcript, the Dunning interview summary, and the documents from which applicant's expert, S.O. Woods, deduced Whitman's identity were all in the possession of TDCJ-OIG (formerly the Internal Affairs Division of TDCJ) before applicant's trial.

(117)    The Court finds that, in May 2003, Woods reviewed over twenty boxes of TDCJ-OIG records related to applicant. At trial, Woods identified the ranking document as a TDCJ-OIG record. He recalled seeing it during his review of TDCJ-OIG records and bringing it to trial defense counsel's attention before trial. (RR51: 48-50, 120); (8/20/10 Hrg) RR: 67-68, 76-77, 80-81, 208); Woods's Interrogatory Answers & Attachments.

(118)    The Court finds that Woods re-examined the same TDCJ-OIG records in 2005, at the request of applicant's writ counsel, to determine who authored the ranking document. During this re-examination, Woods located and requested certified copies of the documents in TDCJ-OIG's records from which he identified Whitman, as well as copies of the Rivas transcript and the Dunning interview

21

summary. Applicant's Writ Ex. A; Woods's Interrogatory Answers & Attachments.

(119) The Court finds that applicant presents no evidence that the documentation used to identify Whitman, as well as the Rivas transcript and the Dunning interview summary, were not among the TDCJ-OIG records disclosed to Woods back in May 2003.

(120) Although Woods may not have identified Whitman as the drafter of the ranking document until 2005, the Court finds that TDCJ-OIG first disclosed the documentation from which he gleaned that information, as well as the Rivas transcript and the Dunning interview summary, back in May 2003.

(121) Thus, the Court finds the State disclosed the complained-of documentation to applicant before trial. *See Jackson v. State* 552 S.W.2d 798, 804 (Tex. Crim. App. 1976) (holding affidavits in social welfare caseworker's file were not "undisclosed" in violation of *Brady* where caseworker testified defendant subpoenaed her entire file and if he had taken advantage of his subpoena, he would have obtained them).

### III. EVIDENCE IS IMMATERIAL

(122) The Court also finds applicant fails to prove that the identity of the document's author or that the statements Rivas, Dunning, Carter, Black, Slocomb, David, and Rogers made about applicant constitute material evidence.

(123) Evidence is material if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Ex parte Adams*, 768 S.W.2d 281, 290 (Tex. Crim. App. 1989). A reasonable probability that a different result would have occurred is shown when the suppression of evidence undermines confidence in the verdict. *Id.* To make this determination, the alleged suppression must be examined in the context of the entire record and considering the overall strength of the State's case. *Thomas v. State*, 841 S.W.2d 399, 404-05 (Tex. Crim. App. 1992).

### A. Evidence Not Admissible

(124) Evidence that is inadmissible can not affect the outcome of trial and, thus, is immaterial. *Ex parte Kimes*, 872 S.W.2d 700, 703 (Tex. Crim. App. 1993) (citing *Iness v. State*, 606 S.W.2d 306, 310 (Tex. Crim. App. 1980)). To prove the materiality of the documents he claims the State withheld, applicant must first

2135

demonstrate their admissibility.

(125)   The Court finds that applicant fails to prove their admissibility.

### (1) Ranking Document

(126)   The Court finds that applicant received the ranking document before trial from the State in response to his discovery request. It was admitted for record purposes at trial as Defense Exhibit 39.

(127)   The Court finds that the ranking document constituted hearsay, a fact applicant does not dispute. At trial, applicant offered the document under the business records exception to the hearsay rule. (RR53: 12-16); *See* TEX. R. EVID. 803(6).

(128)   At trial, this Court found that applicant failed to establish that the ranking document qualified for admission under the business records exception.

(129)   On direct appeal, the Court of Criminal Appeals upheld that ruling, stating, "There is no evidence showing who prepared the document or whether it is a record of regularly conducted business." *Halprin v. State*, 170 S.W.3d 111, 116 (Tex. Crim. App. 2005).

(130)   Applicant contends the identity of the author of the ranking document was material because it would have rendered the document admissible. He claims the document itself is material because it shows he was "a minor participant in the robbery" and "the most passive and, therefore, the least likely to have used a weapon."

(131)   Applicant contends he could have used Whitman to demonstrate the document's admissibility under both the business and public records exceptions to the hearsay rule. TEX. R. EVID. 803(6) & (8).

(132)   Even assuming the State had a duty to disclose evidence that would render other evidence admissible, the Court finds applicant fails to prove that identifying Whitman would have rendered the ranking document admissible under the business or public records exception to the hearsay rule.

(133)   "When a business receives information from a person who is outside the business and who has no business duty to report or to report accurately, those statements are not covered by the business records exception." *Garcia v. State*, 126 S.W.3d 921, 926 (Tex. Crim. App. 2004). The admissibility of such a document depends on a showing that each statement contained within it qualifies for admission under its own hearsay exception. *See, e.g., Id.* (holding

23

2136

hearsay statements made by defendant's wife to employee of battered women's shelter not admissible under business records exception just because employee had a business duty to record wife's statements accurately).

(134)   Likewise, under the public records exception, hearsay statements contained within a public record are not rendered admissible merely because they are included in the record. *See Kratz v. Exxon Corp.*, 890 S.W.2d 899, 905-06 (Tex. App. – El Paso 1994, no writ) (upholding exclusion of eyewitness statements contained in police report under Rule 803(8)).

(135)   On its face, the ranking document states that the information it contains was obtained from interviews with "civilian workers, correctional officers, and several inmates who worked closely with the escapees . . ." (Defense Ex. 39; Applicant's Ex. B). Thus, the document is composed largely of the hearsay statements of several unidentified individuals.

(136)   Applicant contends the State's trial files show that sixty-seven individuals contributed to the ranking document. *See* "List of Persons Who Provided Information or Assisted in Preparation of Ranking Document as Determined by Writ Counsel Upon Open File Review of District Attorney's Files on Texas Seven" (filed 8/20/10).[10]

(137)   The Court finds that only a fraction of those individuals on applicant's list may have contributed anything to the document. *See* (9/30/10 Hrg) RR: 61-63; State's Ex. Q.

(138)   The Court finds that although afforded every opportunity, applicant fails to show definitively who contributed to the document, much less which individuals provided which information in the ranking document.

(139)   Moreover, the Court finds that at least some of that information was received from inmates who had no business duty to report what they knew, much less report it accurately.

(140)   The Court finds that even if Whitman's opinion about applicant's rank was admissible, the interviewee's hearsay statements contained within the ranking document were inadmissible. Consequently, at a minimum, the Court would have excluded a significant portion of the document.

---

[10] The Court rejects any suggestion that the State failed to disclose the identity of these sixty-seven individuals as incredible and unsubstantiated. (8/20/10 Hrg) RR: 79-80, 210-11.

2137

### (2) Statements of Rivas, Dunning, and Fellow Inmates

(141)   The Court finds that any statements Rivas, Dunning, Carter, Black, Slocomb, David, or Rogers made to law enforcement officials about applicant also constitute inadmissible hearsay.

(142)   The Court finds that the complained-of statements, if made, were made out-of-court and, clearly, applicant desired to offer them for the truth of what they asserted, i.e., that he was the weakest member of the Texas Seven. They do not qualify under any hearsay exception, a fact applicant makes no effort to dispute.

(143)   Moreover, applicant fails to demonstrate that Dunning, Carter, Black, Slocomb, David, or Rogers would have testified to the same information if called to the stand. In fact, he fails to prove they would have testified at all.

(144)   Thus, the Court finds applicant fails to prove that the Rivas interview transcript, the Dunning interview summary, or any statements made by Carter, Black, Slocomb, David, or Rogers were material.

## B.  Evidence is Insignificant and Cumulative

(145)   Even if admissible, the Court finds that all of the complained-of evidence (the ranking document, the Rivas interview transcript, the Dunning interview summary, and the statements of applicant's former fellow inmates) is cumulative of other evidence admitted at trial.

(146)   Applicant argues that the complained-of evidence shows he is a weak-willed follower and the least intelligent of the group and, thus, his culpability was insufficient to warrant the death penalty.

(147)   The Court finds that the qualitative and quantitative value of the complained-of evidence is not significant. Furthermore, a plethora of other, similar evidence came before the jury.

(148)   On direct appeal, the Court of Criminal Appeals found the exclusion of the ranking document harmless because the information it contained was already before the jury by other means. *Halprin*, 117 S.W.3d at 116 (holding applicant "presented from other sources a significant amount of mitigating evidence that was cumulative of the mitigating evidence contained in the document"). The record supports that determination.

(149)   In particular, the record reflects that Patrick Moczygemba, one of the civilian employees who worked with applicant in the Connally Unit Maintenance

25

2138

department, testified that applicant was the least intelligent of the escapees and that his role was to follow orders. (RR49: 112, 116). Moreover, he described applicant as "dumb as a box of rocks" and as a person who "had to be told time after time how to complete a task." (RR49: 112; Defense Ex. 38). Similarly, Mark Burgess, another TDCJ civilian employee familiar with applicant, testified that applicant "was not a leader type." (RR49: 195).

(150)   The Court finds these civilian prison employees were more credible witnesses than Rivas, Dunning, Carter, Black, Slocomb, David, and Rogers, and that their testimony carried greater weight than any statements applicant's codefendant and fellow inmates may have made.

(151)   The Court also finds applicant testified at length that he was a follower and that his participation in the escape and the victim's murder was minimal. (RR48: 4-55; 131-45; RR49: 17-22, 30-31). And in their confessions, some of applicant's codefendants characterized him as a follower, rather than a leader. (Defense Exs. 24-27).

(152)   Moreover, throughout punishment closing arguments, defense counsel emphasized applicant's lower intelligence, follower mentality, and diminished role in the offense. (RR53: 91, 95-98, 104-118).

(153)   Thus, the Court finds that the jurors did not convict applicant and assess the death penalty without the benefit of knowing others generally regarded him as weaker willed and weaker minded than his codefendants. The jury was presented with a substantial amount of evidence attesting to the same.

(154)   The Court also finds that, even though the ranking document itself was not admitted into evidence, the jury was aware of its nature and contents. During his numerous attempts to offer the document through a variety of witnesses, applicant's trial counsel repeatedly injected this information into his questions before the jury. (8/2/10 Hrg) RR: 132-33, 239; (9/30/10 Hrg) RR: 96, 125, 128-29.

(155)   The Court finds the jury verified to applicant's counsel after trial that they had gleaned this information during the proceedings despite the document's exclusion. Specifically, applicant's trial counsel testified, "I asked every single witness who testified individually as to the accounts they had given if they had been asked to do a ranking, I believe. I started asking each one of them or tried to introduce it through each one of them and in the end the jury told us they got it. They knew what the deal was." (8/20/10 Hrg) RR: 132.

26

2139

(156)   The Court finds that, notwithstanding the exclusion of the document itself, the jurors believed law enforcement had ranked applicant as the least dangerous, weakest, and least intelligent of the Texas Seven escapees.

(157)   Indeed, the Court finds that the information applicant's trial counsel injected through its repeated attempts to admit the ranking document was actually more beneficial to applicant than the document itself. In particular, counsel left the jury with the misimpression that law enforcement had ranked applicant as the least dangerous, rather than merely the least likely to lead. Defense Ex. 39; Whitman Affidavit; Whitman Interrogatory Answers; (9/30/10 Hrg) RR: 54-55, 69-70, 87-88.

(158)   Moreover, the Court finds that if the document had been admitted with Whitman's sponsorship, Whitman would have testified that he and the other law enforcement officers who contributed to the ranking document considered the last three on the list (Garcia, Murphy, and applicant) "interchangeable." Thus, in actuality, none of the officers who contributed to the document opined or believed that, among all seven escapees, Halprin was distinguishable as the very weakest. Whitman Affidavit; Whitman Interrogatory Answers; (9/30/10 Hrg) RR: 54-55, 69-70, 87-88.

(159)   The Court finds that the jury's guilty verdict and its answers to the special issues are strongly supported by the record.

(160)   The Court finds that the lack of additional evidence of the same character traits and law enforcement's leadership ranking of the escapees is insufficient to undermine confidence in the jury's verdict at guilt or punishment.

(161)   In light of all the foregoing, the Court concludes there was no constitutional violation.

(162)   Consequently, this Court recommends the denial of applicant's third ground for relief. And if not dismissed, the Court also recommends the denial of the due process allegation alleged in the subsequent writ application applicant filed on August 20, 2010.

## GROUNDS 4 & 5: EFFECTIVE ASSISTANCE OF TRIAL COUNSEL

(163)   Applicant contends his trial counsel rendered ineffective assistance in both the guilt and punishment phases of his trial.

(164)   Counsel may be deemed ineffective only if applicant demonstrates by a

27

2140

preponderance of the evidence some deficiency in counsel's performance that prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Thompson v. State*, 9 S.W.3d 808, 812-13 (Tex. Crim. App. 1999). To prove counsel was deficient, applicant must rebut the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Thompson*, 9 S.W.3d at 812-13. To prove prejudice, applicant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.*

(165)  Ineffectiveness claims may not be built on retrospective speculation; the record must affirmatively demonstrate the alleged ineffectiveness. *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002). Moreover, in a habeas proceeding, the applicant bears the burden of proving his factual allegations by a preponderance of the evidence. *Ex parte Morrow*, 952 S.W.2d 530, 534 (Tex. Crim. App. 1997).

(166)  When the record is silent on the motivations underlying counsel's tactical decisions, an applicant alleging ineffective assistance usually cannot overcome the strong presumption that counsel's conduct was reasonable. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001). In the absence of direct evidence of counsel's reasons for the challenged conduct, an appellate court will assume a strategic motivation, if one can be imagined. *Garcia v. State*, 57 S.W.3d 432, 441 (Tex. Crim. App. 2001).

(167)  Moreover, if a reviewing court can speculate about the existence of further mitigating evidence, then it just as logically might speculate about the existence of further aggravating evidence. *Bone*, 77 S.W.3d at 835-36.

(168)  The Court finds applicant fails to rebut the presumption that his trial counsel acted consistent with reasonable trial strategy.

(169)  The Court finds that applicant also fails to prove that any alleged deficiency prejudiced his defense.

(170)  Therefore, the Court finds that applicant fails prove his trial counsel rendered ineffective assistance.

### I. QUALIFICATIONS OF TRIAL COUNSEL

(171)  The Court finds that applicant is contesting the strategic choices of two highly qualified death-penalty counsel, Edwin King and George Ashford.

2141

(172)   The Court finds that, at the time of applicant's trial, both counsel were qualified and approved for first-chair appointment to death penalty cases in the First Administrative Judicial District as required by article 26.052 of the criminal procedure code. TEX. CODE CRIM. PROC. ANN. art. 26.052 (Vernon Supp. 2010-11). (8/20/10 Hrg) RR: 85, 222.

(173)   To qualify for appointment to a death penalty case at the time of applicant's trial, counsel had to meet the following standards:

> (1) both first and second chair counsel must be members of the State Bar of Texas;
>
> (2) the first chair counsel must exhibit proficiency and commitment to providing quality representation to defendants in death penalty cases, including five years experience in litigation of serious felony matters and experience in at least one capital case;
>
> (3) the second chair counsel must have experience in felony matters;
>
> (4) the first chair counsel must have tried to a verdict as lead defense counsel a significant number of felony cases, including homicide trials and other trials for offenses punishable as first or second degree felonies or capital felonies;
>
> (5) the first chair counsel must have trial experience in the use of and challenge to mental health or forensic expert witnesses and in investigating and presenting mitigating evidence at the penalty stage of a death penalty trial; and
>
> (6) counsel must have successfully completed the minimum continuing legal education requirements of the State Bar of Texas and must have participated in courses or other training relating to criminal defense in death penalty cases.

(State's Writ Ex. I).

(174)   The Court finds that Edwin King is an experienced and highly qualified criminal trial attorney. He has been licensed since 1979 and has been board certified in

29

2142

criminal law since 1985. He is admitted to practice in the Fifth Circuit Court of Appeals, the Texas Eastern District Court, and the Texas Northern District Court. He served four years as the presiding judge of Criminal District Court No. 2 of Dallas County, Texas, during which he presided over one death penalty trial. During his career, Mr. King has tried numerous criminal cases. Before applicant's trial, he represented one other defendant (Gayland Bradford) in a death-penalty trial, preserving error that resulted in a subsequent reversal. After applicant's trial, he represented another capital murder defendant (Paul Emilien) facing a death-penalty prosecution and successfully negotiated a life sentence for him. He currently represents two other defendants (Michael Turner and Charles Payne) against whom the State is seeking the death penalty. (State's Writ Ex. H); (8/20/10 Hrg) RR: 220-23.

(175)   The Court finds that George Ashford is also an experienced and highly qualified criminal trial attorney. He has been licensed since 1985 and has tried numerous criminal cases and has also handled numerous criminal appeals. In 2000, a year before he was appointed to represent applicant, Mr. Ashford represented William Rayford in a death-penalty trial. (State's Writ Ex. K); (8/20/10 Hrg) RR: 22-23, 85-87.

(176)   The Court finds that based on their extensive experience, Mr. Ashford and Mr. King were qualified to formulate and execute an effective trial strategy.

(177)   The Court finds that Mr. Ashford and Mr. King were appointed to represent applicant at trial shortly after his capture in January 2001 and immediately began working on the case. Furthermore, over the next two and half years, Mr. Ashford and Mr. King devoted a significant amount of time and effort to developing a defense. Moreover, they ably presented that defense throughout both phases of applicant's trial.

## II. COUNSEL RENDERED EFFECTIVE ASSISTANCE IN GUILT PHASE

### A. Codefendants' Oral Statements to Other Law Enforcement Agencies

(178)   Applicant argues that trial counsel were ineffective for failing to call certain law enforcement officers who took "statements from the co-indictees that, viewed from Halprin's defense perspective, were exculpatory and would have gainsaid Halprin's role in the shooting." (Application, p. 59).

(179)   The Court finds that applicant's trial counsel introduced the written confessions of codefendants Patrick Murphy (Defense Ex. 24), Donald Newbury (Defense Ex. 25), George Rivas (Defense Ex. 26), and Michael Rodriguez (Defense Ex. 27)

30

2143

through lead detective Jeff Spivey. Codefendant Joseph Garcia did not give a written statement.

(180)   Applicant argues that defense counsel should also have called: (1) Detective Graham of the Colorado Springs police department to testify (in accordance with his interview notes) that Newbury told him he accidentally shot Rivas; (2) FBI agent Moen or Aker to testify (in accordance with their interview notes) that Rodriguez told them that Halprin did not fire his weapon at Oshman's; and (3) Detective Spivey to testify that his handwritten notes of his interview with Rivas provide: "Newbury reloaded Rivas gun 5 rounds."[11]

(181)   Applicant asserts that evidence of the oral statements made by applicant's codefendants would have been admitted under Rule of Evidence 803(24) if his trial counsel had "properly pursue[d] presentation of this evidence." (Application, p. 71). In particular, applicant argues that the challenged statements would have been admissible if his trial counsel had tried to introduce the statements through different sponsoring witnesses.

(182)   The Court finds that applicant offers no analysis or argument in support of this bare assertion.

(183)   Furthermore, the Court finds that although Detective Graham or the FBI agents would have been able to authenticate the exhibits and eliminate one layer of hearsay, the challenged statements still would have been inadmissible hearsay.

(184)   Alternatively, applicant argues that even if the statements were technically inadmissible under Rule 803(24), they should have been admitted into evidence because "[i]mportantly, the court must keep in mind what was at stake in this trial. In asking a jury to make a death determination, it is highly improper to deny relevant important evidence." (Application, p. 71). Applicant advocates that the rules of evidence are more relaxed in death penalty cases. (Application, p. 70-71 n. 16).

(185)   The Court finds that the cases applicant relies on to support this argument discuss the balance between state rules of evidence and any mitigating evidence that a defendant might introduce in the *punishment* phase of his trial.

---

[11] Applicant does not specify what statement of Rivas's to which he is referring. The Court has looked through the related documents and surmises that this is the relevant statement. (Defense Ex. 29 at 0170). Additionally, the Court assumes that applicant misspeaks when he argues that "[t]he defense attempted to show that Newbury only reloaded Halprin's gun" and that he meant to say that Newbury only reloaded Rivas's gun. (Application, p. 65).

31

2144

Clearly, these cases have no affect on the issue of the admissibility of hearsay evidence in the *guilt* phase.

(186)  Rule 803(24) provides that a statement against a declarant's penal interest may be admissible if corroborating circumstances clearly indicate the statement's reliability. TEX. R. EVID. 803(24). In order for a declaration against interest to be admissible under Rule 803(24), the statement must be self-inculpatory with corroborating circumstances to indicate the trustworthiness of the statements. *Dewberry v. State*, 4 S.W.3d 735, 751 (Tex. Crim. App. 1999); *Davis v. State*, 872 S.W.2d 743, 747 (Tex. Crim. App. 1994). There is no definitive test for assessing reliability, but when such a statement is offered to exculpate an accused, the following factors may be considered: whether the guilt of the declarant is inconsistent with the guilt of the accused; whether the declarant was so situated that he might have committed the crime; the timing of the statement and its spontaneity; the relationship between the declarant and the party to whom the statement was made; and the existence of independent corroborating facts. *Davis*, 872 S.W.2d at 749.

(187)  Even *assuming arguendo* that each of the three statements applicant wanted his trial counsel to introduce is seemingly self-inculpatory standing on its own, each statement must be examined in the broader context of the statement. *Mendez*, 56 S.W.3d at 887, 889 ("A statement that is broadly self-inculpatory may nevertheless be inadmissible if it is blame shifting).

(188)  The Court finds that the overall purpose of Newbury's, Rivas's, and Murphy's verbal and written statements was to shift blame and minimize their involvement. (8/20/10 Hrg) RR: 138-39.

(189)  Thus, the Court finds applicant fails to prove that the three statements are self-inculpatory.

(190)  The Court also finds that the circumstances surrounding the statements do not clearly indicate their trustworthiness.

(191)  Statements are considered more trustworthy if made (1) spontaneously; (2) in a non-custodial setting; or (3) to a person who is not engaged in law enforcement. *Mendez v. State*, 56 S.W.3d 880, 887 (Tex. App.—Austin 2001, pet. ref'd) (citing *Dewberry*, 4 S.W.3d at 751-52). In the instant case, none of these conditions existed.

(192)  The Court finds that the statements made by applicant and his codefendants to the various law enforcement agencies were made in custody after they had

2145

escaped and fled prison, robbed two Auto Zones, committed capital murder, and been captured. The statements were the product of interrogation and made with the knowledge that they were possibly facing the death penalty; thus, the timing and the spontaneity of the statements are questionable at best.

(193) The Court finds, as Detective Spivey emphasized several times during trial, that each of the codefendants' written statements minimized their involvement, contained lies about certain facts, and/or were self-serving in varying degrees. (RR42: 96; RR47: 14, 63-64; RR49: 14-15).

(194) The Court finds that each of the escapees had motives other than the truth for many of the statements they made to law enforcement. For instance, evidence was adduced at trial that Newbury and Murphy were good friends and that Murphy was covering for Newbury by claiming in his written statement that Newbury's weapon was unfired (when Newbury himself admitted to firing three times). (RR48: 65; Defense Exs. 24, 25).

(195) Thus, the Court finds that the codefendants' written statements were shown to be unreliable, as were the codefendants' statements to other agencies, such as the Colorado Springs detectives and the FBI.

(196) The Court finds that applicant fails to prove the codefendant's statements were admissible. Thus, he fails to prove his trial counsel were deficient for not offering them into evidence.

(197) Moreover, the Court finds trial counsel's decision not to call additional law enforcement agents constituted reasonable trial strategy.

(198) The Court finds that trial counsel's strategy was to pluck out one or two sentences from certain codefendants' statements to other law enforcement agencies (that supported applicant's defensive theory) and get them in front of the jury without offering the entire statements (which in their entirety did not necessarily support the defensive theory). Defense counsel accomplished this by asking leading and artfully worded questions. (8/20/10 Hrg) RR: 188, 238-40.

(199) For example, even though defense counsel did not call Detective Graham to testify to Newbury's alleged admission to shooting Rivas, he nonetheless asked: "[I]n the police reports, isn't it true, that there's an indication that one of these individuals [Rodriguez or Garcia] shot Mr. Rivas?" (RR42: 87). The State immediately objected, defense counsel moved on to the next question, and Detective Spivey never answered the question.

(200)   Likewise, defense counsel elicited the following testimony:

> [DEFENSE COUNSEL]: All right. Now, did you have any information in regard to who Mr. Newbury may have shot out there at the scene?
>
> STATE:   Judge, we'll object to hearsay, if he's going outside the statements that are in evidence.
>
> COURT: Please rephrase your question.
>
> Q.   Well, would it be a correct statement to say that when interviewed by law enforcement, Mr. Newbury consistently – gave a consistent statement as to who he thought he was shooting at?
>
> A. [SPIVEY]: A. He never wavered in his statement to me at who he thought he was shooting at.
>
> Q.   Okay.   During your review of the Colorado Springs Police Department report of that interview, do you recall any information pertaining to that particular subject matter?
>
> A.  No, not today, I don't.
>
> * * *
>
> Q.  [W]hat I marked as Defense 31, does that refresh your memory at all from just your review of the material of the other interviews of the suspects, in particular Mr. Newbury?
>
> A. Yes, it does.
>
> Q.  *And Mr. Newbury indicates, does he not, that he may have shot George Rivas?*
>
> STATE:  Judge, I object to hearsay.
>
> COURT:  Sustained.

(RR47: 9-81) (emphasis added).

(201)   And although defense counsel did not call FBI agents Moen or Aker to testify to Rodriguez's statement to them that Halprin's weapon was not fired, defense

34

2147

counsel elicited the following testimony:

> [DEFENSE COUNSEL]: Q. [I]n Mr. Murphy's statement he goes back and checks and says that, hey, Randy Halprin's weapon wasn't fired.
>
> [SPIVEY]: A. He does. He also states that Mr. Newbury's weapon wasn't fired.
>
> Q. Isn't it also true that Mr. Murphy told the FBI and other law enforcement individuals and . . . others, Mr. Rivas and the other individuals, stated that Randy Halprin never fired or discharged a weapon?
>
> [The Court sustains the State's hearsay objection.]

(RR42: 88).

(202) The Court finds that by the above methods, defense counsel got the intended information in front of the jury, but the State was unable to introduce the remaining portion of the statements and was unable to impeach the information. This tactic allowed applicant to receive the best of both worlds— getting the defensive theory (and thought process) in front of the jury while disallowing the State an opportunity to discredit the witnesses through cross-examination.

(203) The Court finds that if defense counsel had called these suggested agents to testify to these isolated statements by the codefendants, the State would have been allowed to introduce the entire report or statement under the rule of optional completeness. TEX. R. EVID. 107 (permitting the introduction of otherwise inadmissible evidence when that evidence is necessary to fully and fairly explain a matter "opened up" by the adverse party). (8/20/10 Hrg) RR: 140, 187.

(204) Applicant fails to acknowledge that if applicant's trial counsel had called Detective Graham to testify, he *may* have testified to what was written in his report, but he may also have testified to its inaccuracies. Additionally, the State most likely would have elicited on cross-examination much testimony that would have been detrimental to applicant. (8/20/10 Hrg) RR: 139, 187.

(205) The Court finds that defense counsel asked leading questions that elicited hearsay objections from the State and yet conveyed to the jury that, if

2148

permitted to respond, the witness's answer would aid the defense. (8/20/10 Hrg) RR: 187, 237-40). This is especially true in light of the fact that defense counsel got Detective Spivey to agree that if defense counsel said "something in the form of a statement or question that's not correct, I trust that you are going to correct me on it." (RR47: 7).

(206)   In fact, defense counsel was so skilled at this tactic that the State lodged objections and tried to curb this practice.  After one specific instance in which this Court found a defense exhibit inadmissible, the State pleaded, "Judge, can we—we want a Motion in Limine or at least ask that [defense counsel] not be allowed to ask those questions, since it's not going to be admissible in front of the jury." (RR47: 68).

(207)   The State similarly objected at another point: "We'll ask the Court to instruct counsel not to go and try to elicit hearsay questions or put hearsay in his questions, which is inadmissible." (RR47: 81).

(208)   The purposefulness of defense counsel's questions is borne out by this Court's warning to counsel, "[Y]ou know how to properly phrase your questions." (RR47: 81).

(209)   Moreover, by not calling any law enforcement agents to testify regarding the escapee's statements, the Court finds that defense counsel also created the impression that the State had something to hide. Defense counsel achieved the intended effect when the State would vehemently object to the questions, thereby leaving the impression that the answer to defense counsel's question would have been favorable to applicant. For instance:

> [DEFENSE COUNSEL]: Q.  [A]s the jury is probably aware by now and you are certainly aware, [the Colorado Springs Police Department, the FBI, and the Teller County Sheriff's Office] produce reports in regards to their activities and their responsibilities and generate those reports for purposes of review should the cases come to trial so they do not have to keep in their memories everything that happened, since they investigate a variety of cases over long periods of time?
>
> [SPIVEY]: A.  That's correct.
>
> * * *
>
> Q. All right. Now, certainly when law enforcement individuals from a variety of agencies, such as the FBI or Colorado Springs Police Department, if they have interviewed one of the Texas Seven, then

36

2149

they certainly would have memorialized that in a report?

A. Yes, sir.

Q. Okay. And that is essentially standard procedure for virtually everybody that's in law enforcement, correct?

A. Correct.

(RR47: 8-10).

(210)   Defense counsel similarly elicited the following testimony from FBI agent James Mahoney:

> [DEFENSE COUNSEL]: Q. Okay. Are you familiar with Special Agent Dean Aker and Special Agent Robert Moen?
>
> [Mahoney]: A. Yes, I am.
>
> Q. Who are they?
>
> A. They are assigned to our Colorado Springs office.
>            * * *
> Q. You know if Special Agent Dean Aker or Special Agent Robert Moen had been asked to come down by the Dallas County District Attorney's Office to testify in this trial regarding the facts and circumstances surrounding the shooting of Officer Aubrey Hawkins at the Oshman's store in Dallas, Texas?
>
> A. I personally am not aware that they've been coming down for the trial.
>
> Q. Well, what trials have you testified in?
>
> A. I testified in the trials of Mr. Rivas, Mr. Rodriguez, Mr. Newbury, and Mr. Garcia.
>
> Q. Well, if law enforcement interviewed one of those suspects and obtained a statement from them, do you think that might be relevant to their role in the offense?

37

2150

STATE:  Judge, we'll object.  The question calls for a legal conclusion and it is also irrelevant with this particular witness.

COURT:  Sustained.

(RR46: 58-62).

(211)  Defense counsel made many similar references to the involvement of these other agencies in the investigation and prosecution of the escapees and the absence from the trial of other law enforcement agents. (RR42: 45, 94). Thus, the Court finds that defense counsel capitalized on the fact that Detective Spivey was the only law enforcement agent to testify for the State regarding the escapees' statements and used that to suggest to the jury that the State was hiding other statements that were more favorable to applicant.

(212)  Furthermore, by not calling any additional law enforcement agents to testify besides Detective Spivey, defense counsel was able to argue in closing statements:

> [The State has] had three years to go and scour the countryside, which you know they have.  They have gone to the far reaches of the corners of Colorado and Texas to bring you witnesses, run down witnesses.  You know Detective Spivey went to great lengths to go take statements.  We had the FBI, the ATF, the Colorado Springs Police Department, the Pueblo City Police Department, the Teller County Sheriff's Office, the El Paso County Sheriff's Office, and all the king's horses and all the king's men, and what did they bring you?
>
> They want you to infer.  That's what they want you to do.  They want you to guess.  That's what they want you to do.  And that's what you do when you can't prove something.  You try to stampede a group of folks into guessing and inferring something from the evidence when it's not there.

(RR50: 28-29).

(213)  Thus, the Court finds that defense counsel effectively wove a consistent theme throughout the guilt phase that hinted at beneficial codefendants' statements to other law enforcement agencies that were concealed by the State.

2151

(214) Nonetheless, applicant argues that his trial counsel's decision not to admit the suggested statements prejudiced his case because it allowed the jury "to make the death decision without access to this highly probative evidence showing that Halprin did not shoot." (Application, p. 72).

(215) The Court finds this allegation is specious. In addition to the fact that the omitted testimony was cumulative of other evidence that was introduced to the jury, applicant misrepresents the impact the omitted testimony would have had on his case.

(216) For example, applicant asserts that his trial counsel should have called Detective Graham to testify that his interview notes reflect that, when he interviewed Newbury, Newbury told him that he accidentally shot Rivas because he thought Rivas was a cop. (Applicant's Record Excerpt K). Applicant argues that this would have counterbalanced the State's argument that Halprin shot Rivas (which applicant alleges was based on Newbury's written statement in which he stated he thought *Garcia* was a cop and that he fired three rounds at him). (Defense Ex. 25). This distinction is without merit because Rivas was shot twice, "the first time in the stomach and then the second time he's back up actually getting into the vehicle and he gets shot from behind." (RR42: 107-08).

(217) Likewise, Patrick Murphy's written statement provides: "Rivas was shot twice. Once in the stomach and once in the leg." (RR47: 75; Defense Ex. 24).

(218) Thus, the Court finds that just because Newbury says in one statement he shot Rivas does not mean that applicant did not also shoot Rivas.

(219) Furthermore, although applicant argues that his defense counsel should have called FBI agents to testify that Rodriguez and Murphy told them that Halprin's weapon was not fired, he also admits that Rodriguez's and Murphy's written statements containing the same information were introduced into evidence and read to the jury. (Application, p. 65).

(220) Indeed, defense counsel specifically questions Detective Spivey on this exact subject:

> [DEFENSE COUNSEL]: Q.  Do you recall during the course of your investigation in reviewing the statements, that Randy Halprin's weapon was checked by the other individuals and it was still fully loaded, the revolver that he was supposedly carrying?
>
> [SPIVEY]:A. I believe Mr. Murphy makes reference to that.

39

2152

Q. And his weapon was fully loaded, right?

A. That's correct.

Q. And hadn't been discharged?

A. According to Mr. Murphy, that's correct.

(RR42: 91-92).

(221)   Spivey also acknowledged on cross-examination that Rodriguez's written statement similarly provides: "Halprin did not shoot." (Defense Ex. 27). Defense counsel specifically pointed out this statement to the jury. (RR47:58). Yet, applicant argues that his counsel were ineffective for not calling "corroborating witnesses." (Application, p. 65).

(222)   The Court finds that the fact Rodriguez and Murphy told an additional law enforcement agents that Halprin did not shoot would not have affected the jury's verdict. The questionable reliability of any of the escapees' statements regarding this issue would have paled in light of the extensive physical evidence and applicant's own testimony which allowed the State to argue during closing arguments that applicant was "the only one, by his own admission, that puts himself on the passenger side of that car. And we know from looking at the photos, that there are four bullets going in on that side of the car, coming from that side of the vehicle." (RR50: 60)

(223)   Likewise, applicant claims that his defense counsel failed to elicit testimony from Detective Spivey that Rivas told him orally that Newbury reloaded *only* Rivas's weapon. Applicant argues that this would have countered a portion of Newbury's written statement in which Newbury stated he reloaded *everyone's* gun, thereby suggesting he loaded applicant's gun and, consequently, that applicant shot his gun.

(224)   As far as the Court can determine from applicant's imprecise argument, applicant is relying on Spivey's handwritten notes of his interview with Rivas, which contain the notation: "Newbury reloaded Rivas gun 5 rounds." (Defense Trial Exhibit 29).   Notably, applicant provides no evidence to support his argument that the "defense attempted to show that Newbury only reloaded Halprin's gun." (Application, p. 65).

40

2153

(225)   Because the statement at issue does not say that Newbury reloaded *only* Rivas's gun, this statement would not have changed the outcome of the trial. Rivas's statement to Spivey that Newbury reloaded *Rivas's* gun does not mean that Newbury did not reload applicant's gun.

(226)   For all of the above reasons, the Court finds applicant fails to prove that the result of the proceeding would have been different if these statements had been admitted.  *Strickland*, 466 U.S. at 687.

(227)   The Court finds that counsel was not deficient for not offering the codefendant's statements and that the omission of the statements was not prejudicial to applicant's defense.

(228)   Therefore, the Court concludes counsel's decision not to offer the codefendant's statements did not violate applicant's constitutional right to effective assistance of counsel.

## B. Evidence of Applicant's Foot Wound

(229)   Applicant asserts that his trial counsel were ineffective for failing to introduce medical evidence that he did not shoot himself. (Application, p. 72). In support of this argument, applicant presents this Court with an affidavit from Dr. Carey Thomas Pelto, the Colorado physician who evaluated applicant and the wound to his left foot after applicant was arrested. (Applicant's Record Excerpt S).

(230)   Dr. Pelto states in part:

> As I testified to the FBI officers on January 29, 2001, I asked Mr. Halprin whether the gunshot wound of his foot was self-inflicted. He replied that it was not; he said that he was shot by a handgun during a cross-fire involving his group and unnamed others. The direction of the wound, with a low transverse entrance wound through the great toe, exiting through the second toe, is, in my opinion, consistent with this scenario. A self-inflicted shooing would be difficult to achieve at the angle of this specific wound. Furthermore, there were no powder burns in the surrounding skin.

> (Applicant's Record Excerpt S).

(231)   Applicant argues, "Had the defense presented this testimony, the State would not have been able to insist that Halprin fired his weapon—the main fact the State relies upon to prove lethal intent." (Application, p. 72).

41

2154

(232)   The Court finds that defense counsel did introduce evidence regarding this issue.

(233)   After the Teller County Sheriff, Frank Fehn, testified to his involvement in the capture of the Texas Seven, defense counsel cross-examined him as follows:

> [DEFENSE COUNSEL]: Q.   Now you testified that you pretty much have an obligation to see to a prisoner's medical needs once he's in your custody?
>
> [FEHN]: A.  Correct.
>
> Q. Okay. And for that reason you allowed Mr. Halprin to be treated?
>
> A. That's correct.
>
> Q. And where was he taken?
>
> A. Langstaff Brown, which is a local emergency center which is affiliated with the Penrose Hospital in Colorado Springs.
>
> * * *
>
> Q. Okay. Have you seen the FBI summary of his medical information?
>
> A. No, sir, I have not.
>
> Q. I'll show you this exhibit marked as Defense Exhibit No. 25 and ask you to take a look at it, and looking at it, can you identify what it appears to be?
>
> A. It's a patient report from Langstaff Brown.
>
> Q. All right. Is there a picture on it?
>
> A. There's a drawing of two toes on the foot.
>
> Q. And Langstaff Brown is the hospital that you said Randy Halprin was taken to?
>
> A. It's a medical center affiliated with the hospital.

2155

Q. Okay. You see Mr. Halprin's name on these anywhere?

A. Yes, sir, I do.

(RR45: 24-25).

(234)   This Court admitted Defense Exhibit 25[12], and defense counsel published it to the jury. (RR45: 25); (State's Writ Ex. J). This exhibit contains notes and a drawing of applicant's injuries. The drawing is of applicant's toes and depicts an entrance wound on the great toe, which could be described as being on the side of the toe rather than on the top.

(235)   Additionally, defense counsel elicited the following information from lead detective Spivey on cross-examination:

[DEFENSE COUNSEL]: Q.  You took photographs of Randy Halprin's foot, did you not?

[SPIVEY]: A.  Yes, I did.

* * *

Q. Okay. You don't have those photographs that you took at a later date, once he was returned to the state of Texas, you don't have those with you today, do you?

A. No, sir, I don't.

Q. Okay. And I know I've asked you just today, I saw you in passing asked you when you had an opportunity to bring those to the courtroom with you and you told me you would be glad to do that; is that correct?

A. Certainly.

(RR42: 95).

(236)   Later in trial, defense counsel cross-examined Detective Spivey about the photographs:

---

[12] Two exhibits were numbered as Defense Exhibit 25: Donald Newbury's written statement and applicant's medical record regarding his foot.

43

2156

* * *

> But, see, this doesn't lend itself to the State's theory, because the State's theory is what? Randy must have shot Rivas. He shot himself. He was discharging a gun, you see.

(RR50: 40).

(239)   Co-counsel George Ashford expounded on this during his portion of the argument:

> If [Applicant] had had one of those big ole revolvers, .357s out there at the scene, he shot hisself in the foot, he wouldn't have a toe now. The entry wound is from the side, consistent with somebody else shooting. It's consistent, folks.

(RR50: 50).

(240)   Thus, the Court finds that trial counsel thoroughly discounted any argument by the State that Halprin's foot wound indicated that he shot his gun.

(241)   Additionally, the Court finds that defense counsel more directly addressed this issue by asking Detective Spivey on cross-examination:  "[D]o you have any direct evidence that shows this jury beyond a reasonable doubt that Randy Halprin discharged a firearm that night?" To which Detective Spivey replied, "No." (RR42: 82).

(242)   The Court finds that even without the aid of Dr. Pelto's testimony, applicant's trial counsel made it clear to the jury that the State failed to prove applicant's wound was self-inflicted.

(243)   The fact that another attorney might have made a different choice in addressing this issue does not suffice to prove ineffective assistance of counsel. *Miniel v. State*, 831 S.W.2d 310, 325 (Tex. Crim. App. 1992).

(244)   The Court finds that the way in which defense counsel addressed this issue prevented the State from questioning or impeaching its theory that applicant did not shoot himself.

(245)   Thus, the Court finds that applicant fails in his burden of rebutting the presumption that his trial counsel acted reasonably.

(246)   Furthermore, the Court finds applicant fails to prove that he was prejudiced by

45

2157

his trial counsel's decisions regarding this issue.

(247) The Court finds whether applicant shot himself or not was not a hotly contested fact issue. (8/20/10 Hrg) RR: 183-84, 241-42.

(248) The Court finds the State's theory that applicant was a shooter was not dependent on whether applicant shot himself in the foot. Instead, the State relied on the extensive physical evidence and applicant's own testimony to argue during closing arguments that applicant was "the only one, by his own admission, that puts himself on the passenger side of that car. And we know from looking at the photos, that there are four bullets going in on that side of the car, coming from that side of the vehicle." (RR50: 60).

(249) More significantly, the Court finds that defense counsel's tactic influenced lead prosecutor Toby Shook to seemingly concede this issue during closing arguments:

> [Applicant] was in that store and was actively participating in that robbery and he was out back when Officer Hawkins was coming and he knew Officer Hawkins was coming around. He had been informed of that by the lookout, Patrick Murphy. And he was back there close enough, just like George Rivas was close enough, *to get hit in the cross fire.*

(RR50: 59) (emphasis added).

(250) Thus, applicant fails to prove that, but for his trial counsel's actions, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687.

(251) The Court finds that counsel's decision not to present Dr. Pelto's testimony was not deficient and did not prejudice applicant's defense.

(252) Therefore, the Court concludes counsel's decision not to present Dr. Pelto's testimony did not violate applicant's constitutional right to effective assistance of counsel.

### C. Victim Impact Evidence

(253) Applicant asserts that his trial counsel rendered ineffective assistance of counsel when they failed to object to what applicant characterizes as victim-impact testimony elicited by the State during the guilt-phase testimony of Officer Hawkins's mother, Jayne Hawkins.

46

2158

(254)   In *Payne v. Tennessee*, 501 U.S. 808 (1991), the United States Supreme Court rejected a per se rule excluding victim character and impact evidence from the punishment phase of a capital murder trial. In *Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998), the Court of Criminal Appeals held that "[b]oth victim impact and victim character evidence are admissible, in the context of the mitigation special issue, to show the uniqueness of the victim, the harm caused by the defendant, and as rebuttal to the defendant's mitigating evidence." The Court of Criminal Appeals discussed the meaning of "victim impact" and "victim character." *Mosley*, 983 S.W.2d at 261. The Court explained that "victim impact evidence" is evidence that is "generally recognized as evidence concerning the effect that the victim's death will have on others, particularly the victim's family members." *Mosley*, 983 S.W.2d at 261. The Court defined "victim character" as evidence that is "generally recognized as evidence concerning good qualities possessed by the victim." *Id*.

(255)   Jayne Hawkins was the State's first guilt-phase witness, and she testified: that Aubrey Hawkins was her son; that he was a police officer with the Irving Police Department; that it was her son's "life's dream" to become a police officer with a big department; that on Christmas Eve of 2000, she and her mother met Aubrey and his wife and son for dinner; that Aubrey was wearing his uniform at the restaurant because he was on duty; that Aubrey was in good spirits that evening; and that when dinner was over, Aubrey hugged his son and said, "I love you. See you in the morning." (RR41: 54-58).

(256)   Jayne Hawkins also testified about returning home that evening and having the Chief of the Irving Police Department come to her house around 9:00 p.m. to tell her that something had happened to her son. (RR41: 58-62).

(257)   The Court finds that applicant fails to specify which portion of Ms. Hawkins's testimony was objectionable. Instead, he argues globally that "none of [the eight pages of testimony] was relevant to any issue in the case." (Application, p. 79). Applicant argues that the "testimony had no probative value on any issue and was introduced solely so that the jury would weigh the relative value of Halprin's life and Hawkins's life." (Application, p. 80).

(258)   The Court finds applicant fails to prove that Jayne Hawkins's guilt-phase testimony constituted impact or victim character evidence.

(259)   The Court finds that through Jayne Hawkins's testimony, the State established certain elements of the offense, including the identification of Aubrey Hawkins as being born alive and as the murder victim. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2003) (a person commits an offense if he intentionally or

47

2159

knowingly causes the death of an individual); TEX. PENAL CODE ANN. § 1.07(26) (Vernon 2003) (defining "individual" at time of trial as a human being who has been born and is alive).

(260)   Furthermore, the Court finds that Ms. Hawkins established that Aubrey was a peace officer who was acting in the lawful discharge of his official duty at the time he was killed, one of the manner and means alleged in the indictment. (CR: 65); TEX. PENAL CODE ANN. § 19.03(a)(1) (Vernon Supp. 2010). Indeed, the State introduced a map showing the short distance between the restaurant where the Hawkins family ate dinner and the Oshman's Sporting Goods store where Aubrey drove immediately and directly after leaving dinner. (RR41: 59).

(261)   The Court finds that Ms. Hawkins also properly testified to some general background information about her son, including that he had a wife named Lori and a nine-year-old son named Andrew. (RR41: 54-55).

(262)   The Court of Criminal Appeals has held that evidence of the victim's personal background in a murder case does not amount to victim impact evidence. *Matchett v. State*, 941 S.W.2d 922, 931 (Tex. Crim. App. 1996) (holding that a widow's identification of the victim, her husband, in a photograph with friends and her testimony that she had been married to him for twenty-five years, that they had five children, and that the victim was home alone on the night of his murder during the guilt phase of trial did not constitute victim impact evidence); *Washington v. State*, 771 S.W.2d 537, 539 (Tex. Crim. App. 1989); *see Delarue v. State*, 102 S.W.3d 388, 402-04 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (holding that recitation of basic facts surrounding how victim's mother learned of her daughter's death did not constitute victim-impact testimony).

(263)   Applicant acknowledges *Matchett* but argues that it "overlooked the still existing prohibition against character and background evidence of the deceased." (Application, p. 75). The Court finds, however, that applicant fails to cite any case law or authority in support of his assertion.

(264)   The Court finds that Jayne Hawkins did not testify about the crime or its emotional impact on her. *See Lane v. State*, 822 S.W.2d 35, 41 (Tex. Crim. App. 1991) (no victim impact testimony where no evidence given regarding the physical, psychological, or physical effect of the crime on victims or their families); *cf. Ford v. State*, 919 S.W.2d 107, 112-13 (Tex. Crim. App. 1996) (holding relevant and admissible victim's father's punishment-phase testimony, "I miss my boy a lot, and it's affected me in many ways . . . .").

(265)   Likewise, the Court finds that Jayne Hawkins did not testify about her son's

2160

character. *Cf. Armstrong v. State*, 718 S.W.2d 686, 695 (Tex. Crim. App. 1985) (holding it was error for the victim's widow to testify that the deceased was peaceable and inoffensive). The fact that her son enjoyed being a police officer is not a direct reflection of his character.

(266) Because Jayne Hawkins's testimony was proper, the Court finds that applicant's trial counsel had no basis to object.

(267) A failure to object to admissible evidence does not constitute ineffective assistance of counsel. *Ortiz v. State*, 93 S.W.3d 79, 93 (Tex. Crim. App. 2002); *Vaughn v. State*, 931 S.W.2d 564, 566 (Tex. Crim. App. 1996) (holding that, to show counsel was ineffective for failing to lodge an objection, applicant must show the trial court would have erred in overruling such objection).

(268) Additionally, the Court finds that defense counsel made a strategic decision not to object because objecting to the testimony of the victim's mother might offend the jurors and counsel did not want to risk alienating them. (8/20/10 Hrg) RR: 58-59, 61, 143-45.

(269) The Court finds that consistent with that strategy, trial counsel broached the topic with the State and this Court before Ms. Hawkins testified and outside the presence of the jury. (RR41: 14—where defense counsel asked for a motion in limine on the character of the complainant and the victim impact, which the trial court granted).

(270) The Court finds the strategic decision not to object to Ms. Hawkins's testimony constituted reasonable professional judgment. *See Hathorn v. State*, 848 S.W.2d 101, 119-120 (Tex. Crim. App. 1992) (holding that trial counsel can decide to forego objecting to evidence in the exercise of reasonable trial strategy).

(271) Additionally, the Court finds that trial counsel could have reasonably concluded from this Court's comments in granting the motion in limine that the Court would most likely overrule any objection from defense counsel. (RR41: 14— where trial court stated: "If it wasn't the fifth time, I would instruct the witness myself. But she understands where she can go").

(272) It is reasonable trial strategy not to object where the objection would ultimately be futile. *Hathorn*, 848 S.W.2d at 119.

(273) Therefore, the Court finds applicant fails to rebut the presumption that counsel's actions were reasonable.

(274) Moreover, applicant fails to prove that, but for his trial counsel's omission, the

49

outcome of the proceeding would have been different.

(275)    Jayne Hawkins was the very first witness to testify in the week-long guilt-phase of the trial, in which twenty-seven witnesses testified, and her testimony occupied merely eight pages of the 1400-page transcript of the guilt phase. (RR41: 54-61). cf. *Cantu v. State*, 939 S.W.2d 627, 637-38 (Tex. Crim. App. 1997) (improperly admitted victim impact evidence was harmless where it occupied only a few pages in the record).

(276)    Applicant argues that he was prejudiced by his counsel's failure to object to the testimony because it allowed the State to improperly rely on such testimony in its closing argument:

> [Officer Hawkins's] last thought, his last vision, was of this man and his friends swarming on him in a murderous fury. And he was outnumbered and they had the jump on him and he died. He died alone in [sic] that cold pavement. Maybe he had some final thoughts. Maybe he thought of his family that he had just left. I hope he did.
>
> Randy Halprin must be held accountable for his crime, which is capital murder. On Christmas Eve most men, most fathers are home. They have dinner with their family. Maybe after dinner they sit down and they read a traditional Christmas story to their children. After their children are put to bed, perhaps they build their little boy's bicycle or other toys.
>
> But Aubrey Hawkins couldn't do that because he was on duty. He was out there guarding me. He was out there guarding you. And he answered his call. And they had the drop on him that day.

(RR50: 76).

(277)    The Court finds, however, that the above argument could also have been based on Detective Spivey's testimony about the written statement of codefendant Donald Newbury. As Spivey testified, Newbury's statement included the following sentiment: "My heart goes out to the little boy who lost his dad on Christmas Eve and his wife and his mother. They are the ones that got the loss." (RR47: 43; Defense Ex. 25).

(278)    Thus, applicant fails in his burden of proving that his trial counsel's failure to

50

2162

object to Ms. Hawkins's testimony prejudiced his case.

(279)   Moreover, the Court finds that the State's jury argument was proper.

(280)   Proper jury argument includes four areas:   (1) summation of the evidence presented at trial, (2) reasonable deduction drawn from the evidence, (3) answer to the opposing counsel's argument, or (4) a plea for law enforcement. *Jackson v. State*, 17 S.W.3d 664, 673 (Tex. Crim. App. 2000). To constitute reversible error, the argument must be manifestly improper or inject new, harmful facts into the case. *Id*. Common knowledge is an exception to the prohibition against arguing facts outside the record. *Nenno v. State*, 970 S.W.2d 549, 559 (Tex. Crim. App. 1998), *overruled in part on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999).

(281)   The Court finds that the indictment in applicant's case reflected that this offense occurred on December 24, 2000. It is common knowledge that this date is Christmas Eve. It is also common knowledge that people spend time with their families during the Christmas holiday. The defendants in this case had to have reasonably known that if they robbed a store on Christmas Eve, that this holiday would forever be tied to the circumstances of the offense. Even Halprin acknowledges this in one of his letters to a friend: "I blamed [Rivas] for the Christmas Eve incident because I told him it was wrong, too many kids and all that." (RR48: 125; State's Ex. 956).

(282)   Additionally, the Court finds that by its argument, the State was not (as applicant asserts) trying to get the jury to "weigh the relative value of Halprin's life and Hawkins's life." Instead, the State was merely emphasizing that Aubrey Hawkins was working as a police officer on Christmas Eve (instead of being home with his family) when he was gunned down by applicant and his cohorts. This was a reasonable deduction from the evidence. *See generally Black v. State*, 26 S.W.3d 895, 901 (Tex. Crim. App. 2000) (Meyers, J., concurring) (stating that peace officers are rendered vulnerable to a criminal offender when they are acting in the lawful discharge of their official duty); *Rodriguez v. State*, 146 S.W.3d 674, 676 (Tex. Crim. App. 2004) (explaining that the Legislature's inclusion of the elements of section 19.02(b)(1) in the capital murder statute by reference was an expression of the Legislature's desire to limit capital murder only to intentional and knowing murders that are committed in circumstances that the legislature found particularly egregious).

(283)   The Court finds that the State's references to Christmas and Aubrey Hawkins's status as a peace officer were not new and harmful facts that caused the jury to abandon their objectivity. The State's argument did not influence the jury to

2163

determine applicant's guilt in an irrational way. The State's evidence overwhelmingly proved that, at the very least, applicant was guilty as a party conspirator to capital murder:

> We know that Randy Halprin was along in this gang. That by his own admission, he had a loaded gun and that tells you all you need to know about his intent. You know that he was in that store.
>
> * * *
>
> [Halprin] was in that store and was actively participating in that robbery and he was out back when Officer Hawkins was coming and he knew Officer Hawkins was coming around. He had been informed of that by the lookout, Patrick Murphy. And he was back there close enough, just like George Rivas was close enough, to get hit in the cross fire.
>
> * * *
>
> But Randy Halprin by his own admission puts himself on the side of the car where four shots come. So his intent is clear. Maybe it was one of these shots. I don't know, because Officer Hawkins can't come in and tell us.
>
> * * *
>
> The evidence back there puts you, using your common sense that he can be one of the principles . . . .
>
> . . . And then, of course, you have the law with the co-conspirators. If people agree to commit a robbery, do the facts show that they should have anticipated someone might die. It can't be clearer than this.
>
> * * *
>
> You have got seven ex-convicts on the run with weapons, all convicted of violent crimes, you know something bad is about to happen. They are not going to trick Officer Hawkins. He's the one man standing between them and freedom. He's the one man standing between them and their money and their guns. And they weren't about to let him get in the way.

(RR50: 58-59, 61, 64, 75). *This* is the argument that would have left an indelible impression on the jurors' minds.

(284)   Based on the foregoing, the Court finds that applicant was not prejudiced by trial counsel's decision not to object to Ms. Hawkins's testimony. *See Wilson v. State,* 15 S.W.3d 544, 554-55 (Tex. App.—Dallas 1999, no pet.) (holding that

2164

Wilson failed to show prejudice from his lawyer's failure to object to inadmissible victim impact testimony where the evidence establishing his guilt was overwhelming); *Marci v. State*, 12 S.W.3d 505, 509 (Tex. App.—San Antonio 1999, pet. ref'd) (holding that Marci failed to show prejudice from his counsel's failure to object to inadmissible victim impact testimony where the jury would naturally know of the negative effects of the crime on one of the victims).

(285)   Therefore, the Court concludes counsel's decision not to object to Ms. Hawkins's testimony did not violate applicant's constitutional right to effective assistance of counsel.

### D. Felony-Murder Instruction

(286)   Applicant asserts that his trial counsel were ineffective for failing to request a charge on the lesser-included offense of felony murder. Applicant argues that, because there was evidence in codefendant George Rivas's written statement that Rivas did not intend to kill Officer Hawkins, and because "the intent of a party is inexorably tied to the intent of the shooter," applicant was entitled to a felony-murder instruction. (Application, pp. 81-82).

(287)   Foregoing a charge on a lesser-included offense can be a reasonable trial strategy. *Davis v. State*, 930 S.W.2d at 768; *Wood v. State*, 4 S.W.3d 85, 87 (Tex. App.—Fort Worth 1999, pet. ref'd). Applicant bears the burden of overcoming the presumption that counsel's decision not to request the instruction could be considered sound trial strategy. *See Jackson v. State*, 877 S.W.2d 768, 771-72 (Tex. Crim. App. 1994). Applicant may not build ineffective assistance claims on retrospective speculation. *Bone*, 77 S.W.3d at 835-36. The standard under which the Court of Criminal Appeals has evaluated trial strategy requires only "'the possibility that the conduct could have been legitimate trial strategy.'" *Murphy v. State*, 112 S.W.3d 592, 601 (Tex. Crim. App. 2003).

(288)   The Court finds that applicant fails to rebut the presumption that his counsel's decision not to request a lesser-included offense instruction on felony-murder constituted sound trial strategy.

(289)   Although provided with the opportunity, applicant provided the Court with no evidence as to why one of his trial counsel, Mr. King, chose not to request a felony-murder instruction. Thus, the record is silent as to Mr. King's reasons for this omission.

(290)   In his answer to an interrogatory on the issue, applicant's other trial counsel, Mr. Ashford, stated that he did not request such an instruction because he "did

2165

not believe that felony murder applied when all involved admitted that they intended to commit an aggravated robbery." Ashford Interrogatory Answers, p. 2. Furthermore, during a hearing in these writ proceedings, Mr. Ashford testified that requesting such an instruction would have been inconsistent with the defensive theory that applicant was guilty only of aggravated robbery. (8/20/10 Hrg) RR: 145.

(291)  In asserting that his trial counsel should have asked for a felony-murder instruction, applicant ignores his counsel's defensive tactic of minimizing his involvement with Hawkins's death and arguing that, if applicant were guilty of any offense, it was aggravated robbery.

(292)  Defense counsel argued in opening statements to the jury: "The evidence is going to show you that Mr. Halprin participated in an aggravated robbery, but did not participate in the capital murder, in the death of Officer Hawkins." (RR41: 54). Defense counsel reiterated this argument in closing arguments, saying: "[W]e started out this case from voir dire . . . but certainly on opening statement telling you that Randy Halprin participated in an aggravated robbery." (RR50: 45).

(293)  Thus, the Court finds applicant's defensive theory emphasized that he only conspired to commit an aggravated robbery at the Oshman's, that he reluctantly took a gun, that he never drew or shot his gun, and that he could not have anticipated that anyone would be killed.

(294)  The Court finds a felony-murder instruction, by contrast, would have emphasized that applicant was active in causing the death of the victim.

(295)  Specifically, a person commits felony murder if he:

> . . . commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE ANN. § 19.02(b)(3) (Vernon 2003).

(296)  Thus, the Court finds that the felony-murder language would have been disadvantageous to applicant.

(297)  Applicant testified at trial that the only reason he even carried a gun into

54

2166

Oshman's was because he did not have a choice. Specifically, applicant testified:

> You know, I, before the robbery, I even told them, I'm not going to go in and carry a gun and there was a little argument and they made it very clear that, you know, it was, you know, their way or the highway. And so I told them I wasn't going to pull a gun and they said, fine, just gather clothes, grab a shopping cart, and gather clothes.

(RR48: 14).

(298)   Regarding the offense, applicant testified that, once he heard one of his cohorts repeating "get out" over the radio, he headed toward the back exit and opened the back door when Larry Harper ordered him to "grab the long sleeping bag" that had "a bunch of rifles" in it. (RR48: 17-18). Applicant testified that he dragged the bag and began trying to load it into the backseat of the Ford Explorer they were using to escape. George Rivas was in the front driver's seat with the door open when applicant saw the patrol car pull up. (RR48: 21). As Rivas approached the patrol car, he told applicant to "stay put." Applicant testified that he stayed put and that:

> A. [Rivas] walked up to the car where the patrol car was and he reached back. I saw him reach back for his, what I thought was his security badge. And then at that time he had said something, I can't remember what he said, and then the next thing you know I just heard gunshots.

> [DEFENSE COUNSEL]. Q. What did you do?

> A. I freaked out and started running around the car. I ran around the Ford Explorer. The first thing in my mind was get across the field.

> * * *

> Q. All right. What happened after that? What's the next thing that happened?

> A. I had gone down those, like there was like a grassy embankment and I remember going by them. By then, I believe a lot of people had filed into the car because the car was already moving. I remember Joseph Garcia and Rodriguez doing something and the car, the patrol car, moving back and the car, the Explorer, backing

2167

out. And then I heard somebody tell me to, "Get in the car. Get in the car." And I jumped into the front, the right side of the front seat in Newbury's lap.

\* \* \*

Q.  Now, was there any other gunshots that you heard, other than Rivas?

A.  Um, everybody that was out there was firing. I mean, it was – as soon as Rivas had shot, there was a brief pause and then it was just like just nonstop shots.

Q.  Did you pull your gun and shoot your gun?

A.  No, sir.

Q.  Where was your gun?

A.  At some point in time it fell down my pants.

\* \* \*

Q.  Were there any shots fired as y'all drove off?

A.  When I got into Newbury's – when I jumped into Newbury's lap, there were a couple more shots, yes, sir.

Q.  Who fired those shots?

A.  Newbury.

(RR48: 22-25).

(299)   The Court finds that the absence of a felony-murder instruction did not preclude applicant from presenting a viable defense.

(300)   Furthermore, the Court finds that the inclusion of the instruction would have contradicted his defensive theory.

(301)   The Court finds that applicant received jury instructions on the lesser-included offense of aggravated robbery, and the second application paragraph of that lesser-included offense embodies completely applicant's defensive theory. (CR: 32).

56

2168

(302)    Moreover, applicant's trial counsel requested (but was denied) instructions on attempted capital murder and attempted murder, which would have better fit with their theory than a felony murder instruction. (RR49: 212). *See* TEX. PENAL CODE ANN. § 15.01 (Vernon 2003) (defining criminal attempt as doing "an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended").

(303)    Based on the foregoing, the Court finds that defense counsel's decision not to request a lesser-included offense instruction on felony murder constituted a sound strategic decision. *Posey v. State*, 966 S.W.2d 57, 66 n. 3 (Tex. Crim. App. 1998) (Mansfield, J., concurring) (explaining that often counsel may not request certain defensive issues for strategic reasons such as that the jury may be confused by the instructions).

(304)    In any event, in order to show that his counsel were ineffective in failing to request a lesser-included offense instruction, applicant must establish that he was entitled to the instruction. *Cardenas v. State*, 30 S.W.3d 384, 392 (Tex. Crim. App. 2000).

(305)    The Court finds that applicant fails to prove he was entitled to a lesser-included offense instruction on felony murder.

(306)    An offense is a lesser-included offense if:

> (1)  it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

> (2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

> (3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

> (4)  it consists of an attempt to commit the offense charged or an otherwise included offense.

TEX. CODE CRIM. PROC. ANN. art. 37.09 (Vernon 2006).

(307)    A lesser-included-offense instruction should be given if there is some evidence that would permit the jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser-included offense. *See Moore v. State*, 969 S.W.2d 4, 8

2169

(Tex. Crim. App. 1998). In other words, there must be some evidence from which a rational jury could acquit the defendant of the greater offense while still convicting him of the lesser-included offense. *Threadgill v. State*, 146 S.W.3d 654, 665 (Tex. Crim. App. 2004).

(308)   The indictment in this case charged applicant with the capital murder of Officer Hawkins under two different theories: (1) the intentional or knowing murder of a peace officer who was acting in the lawful discharge of an official duty; and (2) an intentional murder committed in the course of committing or attempting to commit a robbery. (CR: 65). *See* TEX. PENAL CODE ANN. § 19.03(a)(1)-(2) (Vernon Supp. 2010).

(309)   Felony murder is a lesser-included offense of capital murder committed in the course of a robbery. *See e.g., Salinas v. State*, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005). The two offenses differ only in the culpable mental state of the offender: capital murder requires the existence of an intent to cause death, while in felony murder, the culpable mental state for the act of murder is supplied by the mental state accompanying the underlying felony. *Salinas*, 163 S.W.2d at 741 (citing *Rodriquez v. State*, 548 S.W.2d 26, 29 (Tex. Crim. App. 1977)).

(310)   But the inquiry does not end with the determination that felony murder is a lesser-included offense under one of the theories of capital murder charged in applicant's case. The jury returned a general verdict of guilty after being instructed on both theories of capital murder alleged in the indictment. (CR: 36). When an indictment alleges alternative theories of capital murder, "the defendant is entitled to a requested lesser-included offense charge if a rational jury could convict him only on the lesser-included offense after considering *each* of the alternative theories of commission." *Feldman v. State*, 71 S.W.3d 738, 752 (Tex. Crim. App. 2002) (op. on reh'g) (citing *Arevalo v. State*, 970 S.W.2d 547, 548-49 (Tex. Crim. App. 1998)). In other words, there must be some evidence negating the defendant's guilt under every theory of capital murder alleged in the indictment.

(311)   Thus, applicant's contention that he was entitled to a jury instruction on felony murder if there was evidence that he did not intend to kill Officer Hawkins is not entirely accurate. The Court finds that under the indictment in this case, the jury could still convict applicant of capital murder if it found that he, either as a principal or a party, *knowingly* killed the officer. (CR: 65). Accordingly, applicant was not entitled to a jury instruction on felony murder unless there was some evidence that he and the other escapees did not knowingly cause Officer

58

2170

Hawkins's death.

(312)   The Court finds that applicant does not point to a single piece of evidence in the record showing that he and his cohorts were not at least aware that, by unleashing a hail of gunfire on Officer Hawkins as he sat helplessly trapped in his patrol car, they were reasonably certain to cause his death. *See* TEX. PENAL CODE ANN. § 6.03(b) (Vernon 2003) (defining "knowingly").

(313)   Because applicant fails to identify evidence that could negate both theories of capital murder alleged in the indictment, the Court finds that he was not entitled to a lesser-included offense instruction on murder. *See Feldman*, 71 S.W.3d 752-53 (holding *Feldman* not entitled to lesser-included offense instruction on murder where did not negate both alternative theories of capital murder alleged in the indictment).

(314)   The Court finds that even if murder in the course of robbery was the only indicted theory, applicant was not entitled to an instruction on the lesser-included offense of felony murder.

(315)   Applicant asserts that "the intent of a party is inexorably tied to the intent of the shooter" and that "if the shooter did not 'intend to kill,' then a charge on felony murder is appropriate." Applicant then argues that evidence was introduced during his trial that Rivas did not intend to kill the officer. (Application, pp. 81-82). Specifically, he relies on Rivas's written statement in which he says: "I never intended to hurt anyone . . . ." (Defense Ex. 26).

(316)   The Court finds that applicant fails to acknowledge the parties and co-conspirator application paragraphs in the jury charge on capital murder and that there were five other men at the scene of the crime besides Rivas and applicant. If the State's evidence demonstrated an intent to kill the officer by any of the accomplices, then applicant was not entitled to an instruction on felony-murder.

(317)   The Court finds that applicant's own testimony establishes the intent of his cohorts:

> [DEFENSE COUNSEL]: Q. So Michael Rodriguez says he shot [the officer] twice in the head?
>
> A. That's what he had said at first, yes.
>
> Q. And Rivas said he shot him how many times?

2171

A. He initially said four times.

Q. Obviously, Officer Hawkins was shot a lot more than that, wasn't he?

A. Yes, sir.

Q. *The intent out there, obviously, was to kill Aubrey Hawkins, wasn't it?*

A. *Yes, sir.*

Q. Shot 11 times?

A. Yes, sir.

Q. His bulletproof vest was hit?

A. Yes, sir.

Q. His car was surrounded and fired at from several angles?

A. Yes, sir.

Q. And the intent was clear to murder him?

A. Yes, sir.

(RR48: 161-62) (emphasis added).

(318)   Indeed, the Court finds that the evidence shows nothing less than an intentional murder: the escapees ambushed the officer, shooting him eleven times with several different guns. (RR47: 98-99, 119-20, 131, 139-40).

(319)   As the State noted during opening statements:

In all 11 bullets will penetrate his body, six bullets to the head, his left eye is shot out, he's shot in the cheek, the neck, the ear, the chest cavity, he's shot in the arm three times, he's shot in the back of the shoulder, and he's shot in the back, a bullet which penetrates

60

2172

his aorta.

> You will hear from an expert who will tell you that he looks at firearms, trace evidence, and can tell you that the gunshot to the back in his opinion was within six inches. His body is thrown and drug out from the car, thrown to the ground. And as they make their escape, they drive over him and drag him ten feet. They take the time to take his service handgun from his holster and take that with them.

(RR41: 45).

(320)   The Court finds no rational juror could conclude that at the moment they started shooting, it was not the escapees' conscious objective and desire to kill Officer Hawkins. *See* TEX. PENAL CODE ANN. § 6.03(a) (Vernon 2003) (defining "intentionally"); *Rousseau*, 855 S.W.2d at 672 (holding "the possibility that initially or at some point during the commission of the robbery the offender did not have an intent to cause death does not amount to evidence that the offender did not intend to cause the victim's death when the murder was committed).

(321)   Thus, the Court finds that applicant was not entitled to an instruction on felony-murder. *Salinas*, 163 S.W.3d at 742 (holding that the evidence did not raise any issue of felony murder when it showed that the defendant dragged the victim from the car and shot him in the head at close range with a shotgun); *Threadgill*, 146 S.W.3d at 665-66 (holding that there was no evidence that would permit a jury to rationally find that the defendant did not intend to cause the victim's death when he leaned into the car in which the victim was sitting and fired two shots); *Fuentes*, 991 S.W.2d at 273 (holding that there was no evidence that the defendant lacked intent to kill when he ran up to the victim, shot him twice in the chest, and fled as the victim fell into a ditch and died).

(322)   Because applicant was not entitled to a felony-murder instruction, the Court finds that his trial counsel did not render a deficient performance by not requesting it. *Cardenas*, 30 S.W.3d at 392.

(323)   The Court also finds that applicant fails to prove he was prejudiced by counsel's decision not to request a lesser-included offense instruction on felony murder.

(324)   The Court finds that applicant's jury did not find itself in a *Beck v. Alabama*, 447 U.S. 625 (1980) dilemma. That is, the jury did not have to decide "whether to

2173

convict on the greater inclusive offense about which it harbors a reasonable doubt, or to acquit a defendant it does not believe to be wholly innocent." *See Saunders v. State*, 913 S.W.2d 564, 571, 573 (Tex. Crim. App. 1995).

(325)    The Court finds that applicant's jury had a logically valid alternative to capital murder—aggravated robbery, a first-degree felony with a punishment range from 5 to 99 years to life. *See* TEX. PENAL CODE Ann. § 29.03 (Vernon 2003). If the jury had a reasonable doubt about the first six theories, they had a viable out. The jury's deliberation was quick, and they had an alternative choice. (CR: 17—demonstrating that the jury retired to deliberate at 10:48 a.m. and returned a verdict at 12:50 p.m.).

(326)    Relying on the following jury note, applicant argues that "[g]iven the jury's concern expressed in the note sent out in deliberations . . . harm is manifest."

Evidence:                                       6/11/03

We are in disagreement on the definitional difference between 'anticipated that a human life would be taken' and 'should have anticipated.'

We recall this from closing statements – definition of 'anticipate.'

Larry G. French

(CR: 45; Applicant's Writ Ex. G).

(327)    The Court finds that applicant's reliance on this jury note is misleading. The jury sent this note out during their *punishment* deliberations, not their guilt deliberations.

(328)    Additionally, as acknowledged by the note, the Court finds that the jury's question was prompted by the following punishment-phase argument by defense counsel:

That's why they spent so much time about parties and conspiracy and anticipated. The question is, *what does that mean? Anticipated that a life would be taken.*

. . . And I'm sitting at home last night and I'm trying to think about how I can get this to you, how I can get you to understand what it really means.

62

2174

And then it dawned on me . . . . it's the Heinz Ketchup commercial. It's the person sitting there with a plate of food and a ketchup bottle that's full, turned upside down. And the ketchup is in the bottle, they know it's there, and they are going to enjoy it. And they are going to get it on the plate.

Now, what's the sales pitch? Anticipation of something that you expect to happen with a degree of certainty. What's the proof beyond a reasonable doubt that he expected with certainty that Officer Hawkins or any other police officer would be killed? They didn't try to kill any of the employees, even though there were some attempts apparently made by some people to act brave. They tied them up. They did the same consistent thing over and over again.

And while it's certainly — you are able to say, yeah, he should have thought that through and should have been able to see that probably or possibly somebody might get hurt ultimately, can you say beyond a reasonable doubt that he actually anticipated, he expected a life that night to be taken? And the answer to that is no, not with the evidence that you have. Not beyond a reasonable doubt.

(RR53: 105-06) (emphasis added).

(329)   Further, the Court finds that the note merely shows that the jurors were paying attention to the difference between the culpability of a co-conspirator (requiring that the unintended felony "should have been anticipated" as a result of the carrying out of the conspiracy) and the language of the second special issue ("anticipated that a life would be taken"). *Compare* TEX. PENAL CODE ANN. § 7.02(b) (Vernon 2003) *with* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(b)(2) (Vernon Supp. 2010).

(330)   The Court finds that applicant fails to demonstrate how this note has anything to do with the exclusion of a felony-murder instruction ("commits an act clearly dangerous clearly dangerous to human life that causes the death of an individual").

(331)   The Court finds that applicant fails in his burden of proving his assertion that "[i]t is highly likely . . . given the rational alternative of a felony murder verdict,

2175

the jury would have chosen that route." (Application, p. 87).

(332)   Thus, the Court finds that applicant was not prejudiced by his counsel's decision not to request a lesser-included offense instruction on felony murder.

(333)   Based on the foregoing, the Court concludes counsel's decision not to request a lesser-included offense instruction on felony murder did not violate applicant's constitutional right to effective assistance of counsel.

### E. Impeachment and Character Evidence

(334)   Applicant asserts his trial counsel were ineffective in failing to object to the State's use of—and arguments regarding—certain impeachment and character evidence.

(335)   In that regard, applicant initially argues that his trial counsel were ineffective for failing to object to the introduction of "numerous incidents of bad acts that were not disclosed in the State's 404(b) notice." (Application, p. 87). Although it is not entirely clear, applicant seems to argue that the State failed to give notice of its intent to introduce certain jail correspondence of applicant (and, according to applicant, the letters raised "misconduct"). Applicant argues, therefore, that his trial counsel should have objected to the State's use of the letters at trial. (Application, p. 102).

(336)   The Court finds that applicant fails to prove counsel was deficient for not objecting to the State's use of applicant's letters.

(337)   The Court finds that the State introduced the challenged letters during its cross-examination of applicant.

(338)   A defendant is not entitled to notice by the State of its intent to use extraneous bad acts that are introduced during cross-examination. *Jaubert v. State*, 74 S.W.3d 1, 3-4 (Tex. Crim. App. 2002); Tex. R. Evid. 404(b).

(339)   Also, the Court finds that the State *did* give notice of the letters. Included in the discovery documents that the State provided the defense were copies of letters obtained by the State that applicant had either written or received. (8/20/10 Hrg) RR: 126-27, 193. Thus, *assuming arguendo* that the State had a duty to provide notice, the State satisfied the notice requirement. *See Hayden v. State*, 66 S.W.3d 269, 271-73 (Tex. Crim. App. 2001) (holding that delivery to the defense of witness statements detailing extraneous offense may satisfy the notice requirements of 404(b)).

2176

(340)   For these reasons, the Court finds that an objection based on lack of notice would have been meritless. Applicant's trial counsel cannot be ineffective for failing to make a frivolous objection. *See Vaughn v. State*, 931 S.W.2d 564, 567 (Tex. Crim. App. 1996).

(341)   Applicant also alleges that his trial counsel were ineffective for failing to object to the State's "improper impeachment" of him during his testimony. (Application, pp. 87, 102). Specifically, applicant contends that his trial counsel should have objected to the State's questioning of him regarding his character for veracity, his "character for manipulation," certain letters he wrote to family and friends, and his conviction for injury to a child. (RR49: 59-61).

(342)   The Court finds that trial counsel's decision not to object to these various aspects of the State's questioning of applicant constituted reasonable trial strategy. (8/20/10 Hrg) RR: 61-62, 119-20, 190-93, 196, 230-36.

(343)   As set out in more detail below, the Court finds that applicant put his general character into issue in the guilt phase of trial in order to advance his defensive theory that he was weaker willed and weaker minded than his codefendants and that he played a diminished role in the offense. Defense counsel wanted the jury to see applicant as a pathetic and sympathetic person, who was forthright in admitting to his past transgressions, but who was completely incapable of shooting or intending to shoot a police officer. (8/20/10 Hrg) RR: 119-20, 123-25, 230-36.

(344)   In furtherance of this theory, defense counsel elicited evidence throughout trial that applicant was a coward, a buffoon, and a braggart. In fact, the State pointed out this tactic to the jury: "And then Randy Halprin in the way that he's described by defense counsel, he's just this reluc[tant] buffoon that's there. Don't believe that for a second. He's just as valuable a member of his team as anyone else." (RR50: 68, 70).

(345)   The Court finds that in addition to placing his general character in issue, applicant placed his character for veracity in issue when he decided to testify. *Davis v. State*, 961 S.W.2d 156, 160 (Tex. Crim. App. 1998) (Baird, J., concurring); *Hammett v. State*, 713 S.W.2d 102, 105 (Tex. Crim. App. 1986); *Turner v. State*, 4 S.W.3d 74, 78 (Tex. App.—Waco 1999, no pet.).

(346)   Once a defendant voluntarily takes the witness stand, he may be cross-examined, impeached, contradicted, made to give evidence against himself, and treated in every respect as any other witness except where there are overriding constitutional or statutory provisions. *Sanchez v. State*, 707 S.W.2d 575, 577

2177

(Tex. Crim. App. 1986). Thus, the Court finds that the State could properly question applicant's veracity.

(347)   Although applicant admits that "a prosecutor may bring in evidence as to the truth and veracity of a defendant upon cross-examination," he argues that the State should not have been allowed to ask him if he "had a long history of lying," and that, once applicant admitted to being a liar, the questioning on this topic should have ended. (Application, pp. 99, 101).

(348)   The Court finds that applicant fails to cite any authority or case law that prohibits the State from questioning applicant about his own opinion of his own character for truthfulness. *See* TEX. R. EVID. 608(a).

(349)   Further, the Court finds applicant is incorrect in suggesting that he "admitted to being a liar." In fact, applicant gave equivocal and contradictory answers during the State's questioning. (RR48: 59-61).

(350)   Thus, the Court finds that it would have overruled defense objections to the State's questions regarding applicant's veracity.

(351)   Furthermore, the Court finds that counsel made a sound and reasonable strategic decision not to object in order to avoid the appearance that the defense was trying to hide something. (8/20/10 Hrg) RR: 62, 190-91.

(352)   Additionally, applicant had already testified on direct examination that he had lied to his family and law enforcement officials in the past (mostly due to being a teenager and the use of drugs). (RR47: 106, 108).

(353)   Thus, the Court finds that evidence elicited from the State that applicant lied and manipulated people would not have unfairly prejudiced applicant's defense.

(354)   The Court finds applicant's argument that his trial counsel should have objected to the State's cross-examination about some of his jail mail is similarly without merit.

(355)   To the extent applicant's testimony on direct examination created a false impression about his character for truthfulness and non-violence, the law permitted the State's use of prior specific instances of conduct to rebut that impression. *See Pyles v. State*, 755 S.W.2d 98, 115 (Tex. Crim. App. 1988) (upholding admission of defendant's writings showing ha tred of and violent tendencies toward police to rebut impression, created by defendant's testimony, that he harbored no animosity toward police and had only acted in

66

2178

self-defense). *See also* Cathy Cochran, *Texas Rules of Evidence Handbook* at 598 (7th Ed. 2007-08) ("[W]hen a witness affirmatively creates a false impression about some aspect of his character, other rules may permit the opponent to use prior specific instances of conduct to rebut that false impression.").

(356)   The Court finds that counsel was not deficient for not objecting to the State's use of specific instances of conduct to the extent they rebutted false impressions created by applicant.

(357)   Moreover, the Court finds that counsel had a reasonable strategic motive for not objecting to the State's questioning about applicant's jail mail.

(358)   The Court finds that trial counsel reasonably concluded that objecting to questioning about the letters might leave a bad impression with the jury, namely, that the defense was trying to hide something. (8/20/10 Hrg) RR: 62, 190.

(359)   Furthermore, the Court finds that trial counsel employed a sound alternative to objecting to the State's questioning about the letters. Indeed, counsel used the letters to further the defensive theory that applicant was a harmless buffoon and braggart. (8/20/10 Hrg) RR: 190-91, 234.

(360)   Specifically, defense counsel introduced *all* the letters written and received by applicant that the State turned over in discovery to illustrate this point. (RR49: 40; Defense Exs. 34-37, each a "Book of Letters").

(361)   For instance, regarding the State's cross-examination of applicant regarding issues of lying and certain letters he wrote, applicant's trial counsel elicited the following testimony from applicant:

> [DEFENSE COUNSEL]: Q. [Since you've been in custody] what do you do to pass the time?
>
> [APPLICANT]: A. I write letters and read.
> * * *
> Q. And it gives you something to do, doesn't it?
>
> A. Yes, sir.
>
> Q. And had you had any contact with – in the five years you were in prison with any woman?

2179

A. No contact. I mean, I have had a pen pal, but it never turned into anything. Wrote a couple of times and, you know.

* * *

Q. You ever fantasize on paper about being with somebody?

A. Yeah.

Q. Do you ever write those kind of letters?

A. Yes, sir.

Q. *And certainly you might have made yourself appear to be something that you aren't –*

A. *Yes, sir.*

(RR49: 28, 29).

(362)   The Court finds that, in this way, applicant's trial counsel minimized the prejudicial impact of the letters by explaining them away as the creation of a bored and lonely inmate who expressed his fantasies and wishful thinking in letters.

(363)   Moreover, the Court finds that applicant's trial counsel dealt effectively with the extraneous offense evidence through direct and re-direct examination (rather than objecting). This is a valid trial strategy. *See Timmons v. State*, No. 05-93-012942-CR, 1996 Tex. App. LEXIS 469 (Tex. App.—Dallas, pet. ref'd) (not designated for publication) (citing *Ashcraft v. State*, 900 S.W.2d 817, 835 (Tex. App.—Corpus Christi 1995, pet. ref'd)).

(364)   The Court finds that defense counsel skillfully addressed and neutralized the issues on his redirect examination of applicant. In that regard, defense counsel elicited the following testimony from applicant:

[DEFENSE COUNSEL]: Q. Let me show you what has been marked as 954, which was the letter that was introduced by the State. And, once again, this is a letter you wrote; is that correct?

[APPLICANT]: A. Yes, sir.

Q. You wrote it to Dawn and in here it says – you talking about

68

2180

being in prison and being scared and in regard to the Blacks and the Mexicans and, "The just pick the jews [sic] to blame everything on. They never tried that crap with me. I had a lot of respect from one of the leaders of one of the Arian gangs over there named Batman who didn't really like me, so to speak, and I didn't like him. *He knew I didn't put up with that antisemitic* [sic] *crap*."

So you might have been picked on because you were jewish [sic], but you at least tried to stand up for yourself being jewish [sic]?

A. Yes, sir.

(RR49: 46-47).

(365)    The Court finds that, in this way, applicant's trial counsel effectively fostered the defensive theory that applicant was a pathetic figure who overcompensated for his cowardice with stories and delusions of grandeur.

(366)    Regarding applicant's assertion that his trial counsel should have objected when the State began questioning him about "a letter to a girlfriend in which he claimed to have fathered a child by another girl," the Court finds that trial counsel more effectively addressed the issue on redirect as follows:

[DEFENSE COUNSEL]. Q. In regard to Ms. Roe, Ms. Roe has had a child recently, has she not?

[APPLICANT]: A. Yes, sir.

Q. How many children does she have?

A. She has two children now.

Q. You have letters, do you not, that you have written where you describe yourself as the father of the children, so to speak?

A. Yes, sir.

Q. And the reality of that is you are not the father of any of her children, are you?

A. No, sir.

69

2181

Q. That doesn't keep you from having some type of fantasy in that regard or trying to describe yourself in those terms, does it?

A. No, sir.

(RR49: 39-40).

(367)   The Court finds applicant's claim that his trial counsel should have objected to the State's detailed questioning of him regarding his injury to a child case also lacks merit.

(368)   The Court finds that once applicant took the stand, the fact that he had been convicted for injury to a child would have been admissible against him on cross-examination. *See* TEX. R. EVID. 609.

(369)   The Court finds that defense counsel gained a tactical advantage by eliciting testimony on direct examination about the circumstances surrounding the prior offense.

(370)   The Court finds that, consistent with the defensive strategy of appearing forthright, trial counsel immediately asked applicant on direct examination about this conviction. In this way, trial counsel strategically elicited from applicant that he was only 18 at the time of the offense and that he had been homeless and on drugs at the time. (RR47: 101, 108).

(371)   The Court finds that trial counsel's intent was to minimize the significance of the offense by blaming it on age and drugs, and thereby demonstrating that the injury to a child conviction was so dissimilar from the charged offense as to be irrelevant. Once the State began questioning applicant about the offense, any objection from applicant's trial counsel would have given the jury the wrong impression (i.e., that the defense had something to hide) and given the conviction more credence. (8/20/10 Hrg) RR: 119-22, 232-33.

(372)   The Court finds that this strategic decision constituted sound, reasonable professional judgment.

(373)   The Court finds that, although the State's cross-examination of applicant regarding the offense elicited unpleasant details, the jury had already heard applicant admit on direct that he had been convicted of striking and kicking an 18-month-old child and that the child had received numerous injuries, including two broken arms, two broken legs, and a fractured skull. (RR47: 101, 108).

70

2182

(374) Thus, the Court finds that the impact of the State's cross-examination would not have affected the jury's verdict.

(375) Applicant also asserts that his trial counsel were ineffective for failing to object to what he characterizes as the State's improper closing arguments that applicant "be convicted for acting in conformity with proof of prior bad acts." (Application, pp. 86, 102).

(376) Applicant's argument is based on the flawed premise that "the defense never put Halprin's character into issue." (Application, p. 101).

(377) As the record reveals, the Court finds that in addition to putting his character for veracity in issue by testifying, applicant put his general character for specific pertinent character traits in issue at both phases of the trial.

(378) Thus, the Court finds applicant's assertion that "[t]he State initiated virtually all the topics involving prior acts of misconduct and without justification" is untrue. (Application, p. 101).

(379) Rule 404(a) of the Rules of Evidence provides in part:

(a) Character Evidence Generally.  Evidence of a person's character or a trait of his character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

*(1) Character of accused.*  Evidence of a pertinent trait of his character offered:

(A) by an accused in a criminal case, or by the prosecution to rebut the same . . . .

Tex. R. Evid. 404(a)(1)(A).

(380) Thus, under this rule, a criminal defendant may "put his character in issue" by offering evidence of his general good character for a specific pertinent character trait.

(381) "Character" as used in rules 404 and 405 is a generalized personal trait or a propensity to behave in a certain manner. *Wheeler v. State,* 67 S.W.3d 879, 882 n. 2 (Tex. Crim. App. 2002) (defining character as "'a generalized description of a person's disposition, or of the disposition in respect to a general trait, such as honesty, temperance or peacefulness'") (citing Charles McCormick, Evidence §

2183

195 (4th ed. 1992); *see also* 1A  John Wigmore, Evidence § 52, at 1148 (Tillers rev. 1983)). This type of character evidence is offered as indirect proof that the character trait is inconsistent with the offense charged and therefore makes it more probable that he did not commit the crime. Cathy Cochran, *Texas Rules of Evidence Handbook* at 237 (7th Ed. 2007-08).

(382)   The Court finds that applicant's general character was an integral part of the defensive theory.

(383)   Applicant suggests that his character was never put into issue because "[t]he general character of a defendant is put in issue only when he calls witnesses to testify to his reputation in general." (Application, p. 99).

(384)   The Court notes, however, that a defensive theory can be raised in an opening statement and on cross-examination. *Powell v. State*, 63 S.W.3d 435, 439 (Tex. Crim. App. 2001).

(385)   Furthermore, it cannot be the case that a defendant's improper introduction of character evidence precludes the State from rebutting such evidence. Indeed, the Court finds that applicant benefited from his counsel's tactics because, by not calling his own character witnesses, he was less exposed to damaging cross-examination of those witnesses by the State.

(386)   The Court finds that defense counsel immediately placed applicant's general character into issue during opening statements. Specifically, applicant's defense argued in opening statements to the jury:

> *You will learn that consistent with his character, consistent with his personality, he stayed pretty much to himself. Didn't get in any trouble.* Didn't join any gangs. But you will learn that in order to help him get through the system, in order to help him learn how to survive in such a tough place, he had kind of a mentor, kind of big brother, and that individual was George Rivas.
>
> * * *
>
> [E]verybody had a role to play in the Oshman's robbery. But *consistent with his character, consistent with his personality, he had the gofer role.* Get this. Gather that. His role was to gather clothing from the outdoor section that would be used to go to Colorado.
>
> * * *
>
> You are going to learn that going to Colorado, the plan was to stay there a few days, get IDs, naively go their separate ways . . . And

2184

you are going to learn that as these other individuals went out into the community, interfaced with people, *consistent with his character and personality,* Mr. Halprin stayed isolated in that trailer, *avoiding any kind of confrontation, avoiding any type of potential danger.*

(RR41: 51-53) (emphasis added).

(387)   The Court finds that applicant also put his character into issue through his trial counsel's cross-examination of many of the State's witnesses. For instance, defense counsel elicited on cross-examination of Detective Spivey that applicant was the youngest of the group by at least 10 years and that he had been in penitentiary on much less serious charges when compared, for example, to Rivas's ten life sentences for eighteen aggravated robberies and Rodriguez's 99 year sentence for capital murder. (RR42: 52-54).

(388)   Applicant himself testified at length that he was a follower and that his participation in the escape and the victim's murder was minimal. (RR48: 4-55, 131-45; RR49: 17-22, 30-31). Specifically, applicant testified on direct examination by defense counsel that at the time of the offense, he did not have any particular skills, he had never been in the military, he had never owned a firearm or a pistol, he had never even gone hunting, there were no guns in his home growing up, he did not graduate from high school, and the only jobs he had ever held were at fast food restaurants. (RR48: 48-49).

(389)   Applicant further testified that, unlike a couple of his codefendants, he was never accepted to the Naval Academy or the United States military, and he was never an honor student like Rivas. (RR49: 26-27). Applicant testified that his nickname was "Junior," and Detective Spivey had previously testified that Rivas's nickname was "CO" for commanding officer and that Harper's nickname was "XO" for executive officer. (RR42: 52; RR49: 47).

(390)   Moreover, in their confessions, some of applicant's codefendants also characterized him as a follower rather than a leader. (Defense Ex. 24-27). For example, in his statement, Rodriguez states: "Blue team bought the RV. Blue team was XO, that's Harper; CO, that's Rivas, and Newbury. Red team was Garcia—me, Garcia, and Murphy. Halprin was floater." (RR47: 60; Defense Ex. 27).

(391)   Likewise, Texas Department of Criminal Justice (TDCJ) personnel familiar with the escapees testified regarding applicant's personality and intelligence. (RR49:

2185

111-13, 115, 195). Assistant maintenance supervisor Patrick Moczygemba testified on cross-examination by the defense that applicant was "dumb as a box of rocks and had to be told time after time how to complete a task." (RR49: 111; Defense Trial Ex. 38). Moczygemba testified that applicant was a follower, and his role was "to follow orders." (RR49: 112, 116). Moczygemba further testified that, if he were to rank applicant "in terms of intelligence with all the rest of the [codefendants], he would rank applicant "right at the very bottom." (RR49: 116). Moczygemba testified that Rivas was clearly the leader of the group during the prison escape and that applicant's part was merely to mop up the floor, which was "pretty consistent" with what Moczygemba knew about him. (RR49: 116). Defense counsel elicited from Mark Burgess, a carpenter supervisor employed by TDCJ, that applicant "was not a leader type." (RR49: 195).

(392)    In closing argument, defense counsel argued:

> [Regarding the prison escape], Rivas would tell [Applicant] to go do something, he would go do that. Rivas [would] tell him to do something else, he would go do that. Rivas told him to do this, he would go do that. *That's the kind of guy this is.*
> * * *
> Who is this guy? This is the guy who's not part of the red team, he's not part of the blue team, he's not really part of it.
> * * *
> [Regarding the events inside the Oshman's] . . . . You know, he's not doing nothing without somebody telling him the simplest thing.
>
> What did Burgess tell you? Well, he's dumb as a bag of rocks. You have to tell him to do everything twice. He's fine. You tell him to do something and he does that thing. And then you have to tell him to do the next thing.

(RR50: 30, 33, 37).

(393)    After pointing out that none of the Oshman's employees picked applicant out of a photo lineup, defense counsel further argued:

> [I] told you *consistent with his character and with the role that he played, he was staying out of all that controversy and all the confrontation.*

2186

You know, it's kind of like, you know, when your kids, you tell them not to get the cookies out of the cookie jar and you put it up high. One of them goes up there and climbs up there and gets it out. He may be handing it down to the others, but you know the person at the bottom of the line in that naïve mentality is thinking, well, as long as I'm not the one up there getting them, I'm not in it. And that's naïve, okay? *But that's just the mentality of who you are dealing with.* Okay?

               * * *

Now, consistent with that is going to be not pulling your weapon. May sound stupid. He had it. He never pulled it out. He never confronted anybody. What did he do? He put on a shirt, went up to the front with the broom, acting like he was doing something. Everybody can't be the shooter on the basketball team. Everybody can't be the pitcher on the baseball team. Everybody can't be the lead attorney in a big case. Everybody has a role. You kind of wonder, why do they have this guy? Because they need this kind of guy. They need a gofer guy. They need a guy just to do the dumb stuff. And it's consistent with everything that you have heard.

               * * *

[Applicant] came out of the RV [in Colorado], he came out without incident, he came out unarmed, and he came out afraid. That's consistent with everything that you have heard. He's not part of the red team. He's not part of the blue team. He's not ex-military, he doesn't know anything about military operations. He told you he's not a gun person. They've never had guns in their family.

               * * *

[F]or comparison purposes, is [applicant] different than the rest of those guys? Sure. . . .

. . . I agree if you had seven rattle snakes down there, you couldn't pick which one was not dangerous. But if you had six rattle snakes and a garden snake, then you could. Everything that you heard in this case is consistent with the fact that he's not like them.

(RR50: 47-49, 52).

(394)    Thus, the Court finds that applicant put his general character into issue in the guilt phase by portraying himself as weaker willed and weaker minded than his codefendants and as having lower intelligence, fewer skills, a non-

2187

confrontational personality, a follower mentality, and a diminished role in the offense.

(395)    Because applicant placed his general character into issue, the State could (and did) properly offer evidence to rebut this evidence. Cathy Cochran, *Texas Rules of Evidence Handbook* at 238 & 598 (7th Ed. 2007-08).

(396)    Because applicant's general character was an integral part of the guilt phase of trial, because both the State and the defense elicited testimony regarding such, and because applicant put his character for veracity in issue by testifying, the Court finds that applicant fails to prove that any of the State's closing arguments were improper.

(397)    Although applicant sets out lengthy portions of the State's closing statements, he italicizes the following portion: "You don't think a person that's capable of [brutally injuring a child] is a person that is capable of this? Of course they are. That's why character is so important." (RR50: 22).

(398)    The Court finds that this argument is proper because applicant put into issue his character as being non-confrontational and non-violent, and therefore, the State could properly rebut that theory, which it did through its questioning of applicant regarding his conviction for injury to child.

(399)    Thus, because the State's arguments were proper, the Court finds applicant's trial counsel were not ineffective for not objecting to them.

(400)    Applicant further asserts that his trial counsel were ineffective for failing to request a limiting instruction.

(401)    The Court finds a limiting instruction would have been inconsistent with the defensive strategy. Defense counsel wanted the jury to feel free to consider applicant's character; to feel sorry for this pathetic liar and manipulator, who is completely incapable of shooting or intending to shoot a police officer.

(402)    Also, the Court finds that to the extent that the evidence did not fit in with the defense strategy, it was more effective for the defense to forego the instruction so as not to highlight the evidence to the jury.

(403)    Moreover, the Court finds that applicant was not prejudiced by the omission of a limiting instruction because his prior conviction for injury to a child and bad acts of lying and manipulating others were dissimilar enough from the charged offense so as not to encourage the jury to convict applicant "on the perception of a past pattern of conduct, instead of on the facts of the charged offense."

2188

*Theus v. State*, 845 S.W.2d 874, 881 (Tex. Crim. App. 1992); *cf. Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996) (holding that an extremely similar extraneous offense always carries the potential to impress upon the jury a defendant's character conformity).

(404)   The Court finds that the extraneous acts were not related to the pivotal issue at trial—whether applicant was a shooter, or whether he should have anticipated that someone would get killed.

(405)   Thus, the Court finds applicant fails to prove that the jury would have used the unrelated prior conviction or bad act evidence to prove an element of the offense.

(406)   In fact, the Court finds defense counsel ably used these facts to claim that the State could *not* prove the only contested issue at guilt, whether applicant was liable for capital murder. As defense counsel explained to the jury:

> [Applicant] broke out of prison. He sure did. And he had a gun. He sure did. But he didn't shoot this good man. He didn't do that.
>
> And they can call him a liar and they can say he's a child beater and they can say all that kind of stuff, but that don't make this true. And your job here is not to guess him into something. It is to be convinced beyond a reasonable doubt that he either shot this man or had the same intent to shoot this man or if it was a conspiracy and he agreed to commit an aggravated robbery, that he should have anticipated this man would be shot.
>
> That's their burden. That's what they told you they would do in this case. And they haven't done that.

(RR50: 43).

(407)   Thus, the Court finds applicant's counsel were not deficient for not requesting a limiting instruction and the absence of such an instruction did not prejudice applicant's defense.

(408)   Overall, the Court finds defense counsel's response to the State's impeachment of applicant on cross-examination was not deficient.

(409)   The Court finds, and the record demonstrates, that defense counsel acted strategically in their handling of the letters and the impeachment evidence and

2189

that the strategy counsel employed was sound and within reasonable professional judgment.

(410) The Court finds that, at most, applicant has shown that other defense counsel might have handled the issue differently.

(411) Furthermore, the Court finds that the battles regarding this aspect of the guilt case were far removed from the central issue of applicant's guilt, and the evidence establishing his guilt of capital murder was ironclad and overwhelming.

(412) The Court finds that applicant fails to prove that, but for his trial counsel's actions, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687.

(413) Thus, the Court concludes that applicant's constitutional right to effective assistance of counsel was not violated by the manner in which defense counsel chose to respond to the State's efforts to impeach applicant on cross-examination.

## F. General Verdict

(414) Applicant asserts that his trial counsel were ineffective for failing to recognize that the Court's jury instructions and a portion of the State's closing jury argument violated his constitutional rights to a unanimous jury verdict.

(415) The State indicted applicant for the capital murder of Aubrey Hawkins under two nonexclusive theories: the murder of a peace officer and murder in the course of robbery. *See* TEX. PENAL CODE ANN. §§ 19.03(a)(1)-(2) (Vernon Supp. 2010); (CR: 65).

(416) The Court's charge instructed the jurors that they could find applicant guilty under either theory as a principal, party, or party-conspirator. (CR: 29-31). The jury returned a general verdict of guilty of capital murder. (CR: 36).

(417) Applicant insists that the general verdict was improper because "[t]he jury was allowed, without any objection from defense counsel, to find Halprin guilty without unanimous agreement on the act of which he was guilty." In this regard, applicant argues:

> [T]he [jury charge] submission in applicant's trial was equivalent to a submission of two offenses because two distinct ways of committing the capital murder of Hawkins existed. The first manner

2190

and means . . . the murder of a peace officer, which does not require an intentional murder . . . That is, the murder may be committed with the lesser mens rea of knowingly causing the death. The second manner and means . . . which specifically requires a mens rea of intentionally causing the death . . . .

(Application, p. 103).

(418)   Applicant complains that the jury was also improperly allowed to find him guilty as a principal, party, or party-conspirator because these theories contain two different criminal acts: shooter and non-shooter. (Application, p. 104).

(419)   Applicant insists, therefore, that his trial counsel rendered ineffective assistance by failing to object to the court's charge and by failing to object to the State's closing argument to the jurors that "[f]our of you might think we have proven him as a principal; four might think we may have proven it as a party; and four of you might think, well, they have proven him as a co-conspirator, and you can all find him guilty, a unanimous verdict." (RR50: 57).

(420)   Applicant relies on *Ngo v. State*, 175 S.W.3d 738 (Tex. Crim. App. 2005) and *Richardson v. United States*, 526 U.S. 813 (1999) in support of his arguments.

(421)   The *Ngo* opinion was issued almost two years *after* Applicant's trial.

(422)   The Court finds that, at the time of applicant's trial, the settled and applicable law governing general verdicts was *Kitchens v. State*, 823 S.W.2d 256, 257-58 (Tex. Crim. App. 1991). In *Kitchens*, the indictment alleged two alternative means of committing capital murder, namely, that Kitchens committed murder in the course of aggravated sexual assault and murder in the course of robbery. The trial court submitted these alternative means of committing capital murder in the disjunctive and provided a general verdict form. Kitchens complained that the verdict would not be unanimous because some jurors could have found him guilty of murder in the course of aggravated sexual assault and others could have found him guilty of murder in the course of robbery. The Court rejected this argument, holding that a trial court does not err in submitting to the jury alternative theories of committing capital murder, which had been alleged in separate paragraphs of the indictment, without requiring the verdict to be unanimous on a single theory.

(423)   The Court finds that both the jury charge and the State's arguments were proper under *Kitchens* and, thus, counsel was not deficient for choosing not to object to either. *See Ybarra v. State*, 890 S.W.2d 98, 113 (Tex. App.--San Antonio

79

2191

1994, pet. ref'd) (citing *McFarland v. State*, 845 S.W.2d 824, 844 (Tex. Crim. App. 1992)).

(424)  Applicant's trial counsel cannot be found ineffective for following the settled and applicable law at the time of trial. *See Vaughn v. State*, 931 S.W.2d 564, 567 (Tex. Crim. App. 1996).

(425)  Furthermore, the Court finds that *Ngo* did not change the law regarding general verdicts in Texas, and it did not overrule the well-established *Kitchens* case. *Kitchens*, 823 S.W.2d at 257-58. In fact, the *Ngo* court specifically referred to *Kitchens* in footnote 27 of the opinion, thereby dispelling any notion that *Ngo* affected *Kitchens* or its progeny. *Ngo*, 175 S.W.3d at 746 n. 27. Thus, *Kitchens* is still the applicable law, and applicant's reliance on the *Ngo* case is misplaced. *See also David v. State*, 313 S.W.3d 317, 342 (Tex. Crim. App. 2010) ("For capital murder prosecutions in particular, we have held that a jury charge may disjunctively allege different capital murder theories with respect to the same victim").

(426)  In *Ngo*, the Court of Criminal Appeals addressed the requirement of unanimity in jury verdicts under state and federal law. The State prosecuted Ngo for credit card abuse. The single count indictment contained three paragraphs, alleging three separate criminal acts: stealing a credit card, receiving a stolen credit card, and fraudulently presenting a credit card to pay for goods or services. The three application paragraphs in the jury charge permitted the jury to convict Ngo if some of the jurors found he stole the credit card, others believed he received a stolen credit card, and still others thought he used it. *Ngo*, 175 S.W.3d at 744.

(427)  The Court of Criminal Appeals held that error existed in the jury charge because it allowed for a non-unanimous jury verdict. *Ngo*, 175 S.W.3d at 749. Specifically, the Court explained:

> Stealing a credit card on Monday is not the same specific criminal offense as receiving a stolen credit card on Tuesday or presenting a stolen credit card to a bartender on Wednesday. Indeed, stealing a credit card at 9:00 a.m. on Monday is not the same specific criminal offense as receiving a stolen credit card at 9:00 a.m. on Monday. These are all credit card abuse offenses, to be sure, but they are not the same, specific credit card abuse criminal acts committed at the same time or with the same *mens rea* and the same *actus reus*.

*Ngo*, 175 S.W.3d at 745.

80

2192

(428)    The Court held that unanimity means that each and every juror agrees that the defendant committed the same, single, specific criminal act. *Id.*

(429)    In *Ngo*, the State alleged three different criminal acts, occurring at three different times, and in three different ways. Additionally, the three acts alleged conflicting theories of commission.

(430)    In contrast, the Court finds that the State indicted applicant for only one criminal act—the capital murder of Aubrey Hawkins. The alternative paragraphs in the jury charge simply alleged different theories for the commission of that one capital murder.

(431)    The penal code requires that a defendant commit murder as defined under section 19.02(b)(1) as a predicate to capital murder. *Graham*, 19 S.W.3d at 853 (citing Tex. Penal Code Ann. § 19.03(a) (Vernon Supp. 2010)). The predicate murder is aggravated to capital murder where any one of eight additional circumstances are present. *Graham*, 19 S.W.3d at 853 (citing Tex. Penal Code Ann. §§ 19.03(a)(1)-(8)).

(432)    The Court of Criminal Appeals has further explained that the legislature's inclusion of the elements of section 19.02(b)(1) in the capital murder statute by reference was an expression of the legislature's desire to limit capital murder to only intentional and knowing murders that are committed in circumstances that the legislature found particularly egregious. *Rodriguez v. State*, 146 S.W.3d 674 (Tex. Crim. App. 2004).

(433)    In *Rodriguez*, the Court also quoted the following language from one of its earlier cases:

> In proving capital murder, the State must prove that the accused intentionally or knowingly caused the death of an individual and also that the accused engaged in other criminal conduct (i.e., kidnapping, robbery, aggravated sexual assault, escape from a penal institution) or had knowledge of certain circumstances (i.e., that the victim was a peace officer).

*Rodriguez*, 146 S.W.2d at 674 (quoting *Patrick v. State*, 906 S.W.2d 481 (Tex. Crim. App. 1995)).

(434)    In *Ngo*, the Court held that "[t]he crucial distinction is thus between a fact that is a specific *actus reus* element of the crime and one that is 'but the means' to

81

2193

the commission of a specific actus reus element." *Ngo*, 175 S.W.3d at 747.

(435)  The Court finds that the *actus reus* of applicant's offense was the murder of Officer Hawkins. As long as applicant's jurors unanimously agreed that he knowingly or intentionally committed murder under section 19.02(b)(1) of the penal code, it is irrelevant which one (or more) of the eight enumerated aggravated factors they found under section 19.03. The jurors did not have to agree on the statutory means by which Hawkins's murder was aggravated to capital murder. *Kitchens*, 823 S.W.2d at 257-58.

(436)  Further, the Court finds that, unlike in *Ngo*, the alternative theories submitted to the jury regarding how the instant capital murder was committed are not mutually exclusive and do not conflict with one another.

(437)  Finally, the Court finds that, unlike in *Ngo*, the indictment ultimately alleges only one offense of capital murder because there is only one victim, while *Ngo* involved three separate offenses improperly alleged in one count.

(438)  Regarding applicant's argument that the trial court should have required the jury to specify unanimity in finding him guilty as a principal, party, or party conspirator, a jury charge that allows the jury to find a defendant guilty based on either his own actions or the actions of another (liability as a party) does not violate the law regarding jury unanimity. *Goff v. State*, 931 S.W.2d 537, 544-45 (Tex. Crim. App. 1995); *see Hanson v. State*, 55 S.W.3d 681, 694 (Tex. App.— Austin 2001, pet. ref'd). The *Ngo* case neither discussed these cases nor overruled them.

(439)  The Court finds that applicant's reliance on the Supreme Court's *Richardson* case is also misplaced. *See Richardson v. United States*, 526 U.S. 813 (1999).

(440)  First, applicant fails to even discuss *Richardson* or explain how it applies in this case.

(441)  Second, the question faced by the *Richardson* court was whether a federal statute—not the United States Constitution—required juror unanimity. *See Kessro v. State*, No. 14-99-01325-CR, 2001 Tex. App. LEXIS 4353 (Tex. App.— Houston [14th Dist.] 2001, pet. ref'd) (not designated for publication) (citing *Richardson*, 526 U.S. at 817-18).

(442)  Third, the Court of Criminal Appeals's interpretation of *Richardson* supports the State's general verdict and closing argument in applicant's case. Specifically, the Court has concluded that *Richardson* stands for the proposition that "'jury

82

2194

unanimity is required on the essential elements of the offense' but is 'generally not required on the alternate modes or means of commission.'" *Pizzo v. State*, 235 S.W.3d 711, 714 n. 12 (Tex. Crim. App. 2007); *see also Bagheri v. State*, 119 S.W.3d 755, 762 n. 5 (Tex. Crim. App. 2003); *Sanchez v. State*, 23 S.W.3d 30, 39 n. 29 (Tex. Crim. App. 2000).

(443)   Moreover, the Supreme Court has expressly rejected applicant's argument that a jury must agree unanimously on the means by which a defendant committed a particular crime. *See, e.g., Schad v. Arizona*, 501 U.S. 624, 633 (1991) (plurality op.) (criticizing dissent's "inflexible rule of maximum verdict specificity" which would require a jury to indicate on which alternative means it based the defendant's guilt whenever a statute provided more than one means of committing a crime).

(444)   For all of the above reasons, the Court finds that the jury charge was not erroneous for failure to instruct the jury that it must agree unanimously on the manner of Hawkins's murder.

(445)   Moreover, the Court finds that the State's jury argument was proper.

(446)   The Court finds that it would have properly overruled the suggested objections to the jury charge and the State's argument.

(447)   Thus, applicant has failed to prove by a preponderance of the evidence that his trial counsel were deficient for failing to object to the court's proper jury instructions or for failing to object to the State's proper jury argument regarding the unanimity of the jury's verdict. *See Vaughn*, 931 S.W.2d at 566 (holding that counsel is not ineffective for failing to lodge a meritless objection).

(448)   Further, applicant fails to prove that the result of the proceeding would have been different if defense counsel had objected to the jury charge and the State's argument. *Strickland*, 466 U.S. at 687.

(449)   The Court finds that counsel was not deficient for not objecting to the jury charge and the State's closing argument.

(450)   Also, the Court finds that applicant's defense was not prejudiced by counsel's decision not to object to the jury charge and the closing argument.

(451)   Based on the foregoing, the Court concludes counsel's decision not to object to the jury charge and the State's closing argument did not violate applicant's constitutional right to effective assistance of counsel.

2195

### III. COUNSEL RENDERED EFFECTIVE ASSISTANCE IN PUNISHMENT PHASE

(452)   Applicant contends his trial counsel rendered ineffective assistance in the punishment phase based on numerous deficiencies.   In particular, he claims trial counsel should have (1) objected to the prosecutor's voir dire remarks concerning a party conspirator's eligibility for the death penalty; (2) prevented the exclusion of the data Dr. Kelly Goodness relied on in forming her expert opinion; (3) called applicant's codefendant George Rivas to testify on his behalf; (4) presented a sponsoring witness for the TDCJ "Ranking" document (Defense Ex. 39); (5) requested an "anti-parties" instruction; (6) objected to the prosecutor's closing argument about applicant's guilt as a party conspirator; and (7) advised applicant of his right to testify in the punishment phase.

(453)   Counsel's performance in the punishment phase was not constitutionally deficient for any of the reasons applicant alleges.   As in his attack on counsel's performance in the guilt phase, applicant fails to prove any deficiency in counsel's representation, much less a deficiency that altered the outcome of his trial.

## A. Prosecutors' Voir Dire Remarks

(454)   Applicant claims that, throughout the voir dire examination of all twelve jurors, the prosecution "continually suggested" that a non-triggerman who was armed and helped plan a robbery could be sentenced to death. Citing *Enmund* and *Tison*, applicant argues the Eighth Amendment prohibits imposing the death penalty on a person based on these facts alone and, thus, his trial counsel should have objected that the prosecutor was misstating the law.

(455)   The Court finds that applicant fails to substantiate this attack on his trial counsel because, even assuming he has correctly interpreted *Enmund* and *Tison*, he fails to prove the prosecutor misstated the law.

(456)   Applicant cites the Court to portions[13] of the voir dire examination of eleven of the twelve jurors.[14] But the Court finds that applicant either misinterprets or misrepresents the prosecutor's remarks.

---

[13] In addition to the record excerpts actually set out in his application, applicant occasionally cites generally to several other pages of voir dire testimony. Applicant does not identify with any particularity what, if any, remarks on these other pages he finds objectionable. Furthermore, in four of the excerpts he sets out in his application, he fails to identify omissions. *See* Excerpts for Jurors 1, 2, 8, & 11.

[14] Apparently, applicant found no objectionable remarks in the voir dire examination of the fourth juror.

2196

(457)   The Court finds that all of the cited remarks generally relate to the concept of party conspiracy,[15] but they do not all relate to a conspirator's eligibility for the death penalty. Some of the remarks relate only to the issue of a conspirator's guilt (i.e., should the defendant have anticipated someone would die). Indeed, the excerpts from the examination of jurors nine and twelve relate entirely to the issue of guilt. *See* (RR9: 75-76, 87; RR12: 22; RR22: 101; RR27: 126; RR30: 56; RR35: 194; RR38: 171). In this respect, the cited remarks provide no support for applicant's contention.

(458)   Furthermore, to the extent the prosecutor's remarks did relate to a party conspirator's eligibility for the death penalty, the Court finds that applicant misconstrues them.

(459)   The Court finds that in the excerpted remarks about the concept of "actual anticipation," the prosecutors were merely identifying examples of facts from which a juror might infer that a defendant actually anticipated that someone would die. These examples neither explicitly nor implicitly told the jurors that the evidence a conspirator was armed and helped plan the robbery was, by itself, sufficient to prove actual anticipation.

(460)   In fact, the Court finds that throughout their examinations of the jurors on the matter, the prosecutors referred to several other factors from which the jurors might infer anticipation, such as how many others were armed, how detailed the plan was, how actively involved the defendant was in the robbery, whether he was present during murder or down the street in a getaway vehicle, whether he was prepared to use his weapon, and whether he committed the offense with others who had a criminal history.[16]

---

[15] Applicant erroneously sets out the exact same excerpt for the sixth and seventh jurors. The excerpt actually pertains to the sixth juror. For the seventh juror, applicant apparently intended to refer to the prosecutor's remarks found at (RR24: 156).

[16] Prosecutor to juror two: "Or maybe the degree of planning that went into it. I mean, there's a number of different things that could come about. Maybe there's circumstances, circumstantial evidence, that you look at. The totality of the crime that leads you to believe that." (RR12: 24)

Prosecutor to juror three: "That maybe how detailed the plan was, how actively involved, were there — how many weapons were involved, that sort of thing . . ." (RR14: 109).

Prosecutor to juror five: "Did he fire the gun and miss? Was he armed? Was he unarmed? Was he right there at the murder or was he down the street doing something, but involved in it?" (RR19: 88).

Prosecutor to juror six: "But of course, if he knew about it, the level of planning, maybe whether he had

2197

(461)   The Court finds that most of these references to additional factors are evinced in the very excerpts applicant sets out in his application. Others were omitted from the cited excerpts without notifying the Court of their absence, thus, misleading the Court as to the context of the prosecutor's remarks. In either case, applicant fails to acknowledge the true nature of the prosecutors' remarks.

(462)   The Court finds that the prosecutors' remarks were clearly a proper explanation of the law.

(463)   Thus, the Court finds that applicant's trial counsel was not deficient for not objecting to them.

(464)   Likewise, the Court finds that counsel's failure to object to the remarks did not prejudice applicant's defense.

(465)   Consequently, the Court concludes applicant's constitutional right to effective assistance of counsel was not violated by defense counsel's decision not to

---

a gun, prepared to use it, something like that." (RR22: 100).

Prosecutor to juror seven: "And you can go back and look at the facts and circumstances of the offense, you know, who had a gun, was it planned. Or you may have heard about that criminal history or something in the punishment phase." (RR24: 156).

Prosecutor to juror eight: "Now, that means, I guess, to some people, obviously, he was part of the robbery, and maybe, whether or not he was carrying a weapon, maybe he knew I had a gun when I went in there. Maybe there was other evidence that shows you what he thought was going to happen one way or the other." (RR27: 126). And, "And again, that's just probably requires you to look at the crime again, to see what his role was, what he did. Maybe some of the things we discussed earlier helping that, was he armed, was he not armed, his background, if he was with other people, what about them do you know?" (RR27: 135).

Prosecutor to juror nine: "You know, maybe Mr. D'Amore should have anticipated it because he knew I went there with a loaded gun. You know, if the evidence shows that he told me before we went in, hey, if something goes wrong, take care of business, just shoot them and kill them, then obviously, that would be a situation where he actually anticipated it." (RR30: 56).

Prosecutor to juror ten: "And, again, you can go back and look at the facts of the crime. You know, who has a gun? Where were they? You may look at, you know in our example you may hear Mr. D'Amore has been involved in something like this before. That may help you answer the question." (RR35: 122).

Prosecutor to juror eleven: "Would it be important to you if, let's say, they both had a gun . . . Or what they may be planning or the preparation that went into it . . . . Would their background be helpful, if they had been in trouble before?" (RR35: 192-93).

86

2198

object to the complained-of remarks by prosecutors during voir dire.

## B. Dr. Kelly Goodness

(466)   Applicant contends trial counsel presented the testimony of his expert, Dr. Kelly Goodness, Ph.D., in an incompetent and unprofessional manner resulting in the exclusion of mitigating evidence that would have warranted a life sentence.

(467)   First, applicant intimates that counsel was deficient for not providing the doctor with the equipment necessary to present her PowerPoint presentation.

(468)   The Court finds that applicant fails to establish this "equipment failure" was the fault of counsel. Moreover, the record reflects that the doctor effectively modified her presentation into a slide show using other available equipment. (RR53: 26-40; Applicant's Ex. D). Thus, applicant fails to demonstrate any prejudice either.

(469)   Second, applicant contends counsel failed to prevent a limitation on the scope of Dr. Goodness's testimony.

(470)   Dr. Goodness, a clinical and forensic psychologist, personally evaluated applicant, reviewed a plethora of documents and interviewed some of applicant's relatives and friends. (Applicant's Ex. D). Based on this data, Dr. Goodness formulated an opinion on "how [applicant] has come to be before the Court today." (RR53: 19). The Court allowed Dr. Goodness to testify to that opinion but limited her testimony about the data underlying it. In particular, under evidence rule 705(d), which governs the admission of the facts or data underlying an expert's opinion, the Court prohibited Dr. Goodness from testifying to any inadmissible hearsay communications upon which her opinion was based. (RR53: 3-12).

(471)   Applicant alleges the Court erroneously limited Dr. Goodness's testimony and that his trial counsel failed to properly object or remedy the Court's exclusion of the data she relied upon. As a result, applicant claims, information about the abuse and neglect he suffered as a young child while in the care of his biological parents, his placement in foster care, his psychological problems, his learning disabilities, and the child-rearing mistakes made by his adoptive parents were kept from the jury. (Application, pp. 119-20).

(472)   The Court finds applicant fails to prove that his counsel's efforts to present the doctor's hearsay testimony to the jury were deficient or that the omission of the hearsay testimony had any bearing on the outcome of his trial.

2199

(473) Applicant insists trial counsel should have argued that the Eighth Amendment required admission of the doctor's hearsay testimony because it was mitigating. U.S. CONST. VIII.

(474) While the Eighth Amendment ensures applicant's right to present mitigating evidence, it does not exempt him from compliance with the rules of evidence. If applicant wishes to present a mitigating fact to the jury, he must offer it in an admissible form. *See Smith v. State*, AP-75,793, 2010 Tex. Crim. App. LEXIS 582, at *69 (Tex. Crim. App. Sept. 29, 2010) ("[T]he United States Constitution does not require admission of mitigating evidence when it is inadmissible under state law, even when the evidence meets the test of "constitutional relevancy.") (not designated for publication); *Lewis v. State*, 815 S.W.2d 560, 568 (Tex. Crim. App. 1991) (holding Eighth Amendment may entitle Lewis to present evidence of his remorse over killing, but "it must be presented in a form acceptable to the law of evidence before he is entitled to insist that it be received over objection."); *see also Romano v. Oklahoma*, 512 U.S. 1, 10-12 (1994) (holding Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules in capital sentencing proceedings); *but see Green v. Georgia*, 442 U.S. 95 (1979) (per curiam) (holding that exclusion of proffered testimony at sentencing phase under state hearsay rule violated due process because testimony went to critical issue and substantial reasons existed to assume its reliability).

(475) The Court finds that applicant was not precluded from offering testimony about abuse and neglect he suffered as a young child while in the care of his biological parents, his placement in foster care, his psychological problems, his learning disabilities, and child-rearing mistakes made by his adoptive parents. He was simply prohibited from offering it in the form of inadmissible hearsay.

(476) Applicant does not dispute that the "data" about which the doctor planned to testify constituted inadmissible hearsay. The record reflects and applicant acknowledges that Dr. Goodness would have testified to the substance of out-of-court oral and written communications, including statements made to the doctor by applicant, his friends, and his family members, and statements contained in CPS records, academic records, adoption records, criminal records, and letters authored by applicant.

(477) Moreover, the Court finds that the doctor planned to offer these statements for the truth of the matters they asserted, i.e., that applicant was abused, had psychological problems, etc. TEX. R. EVID. 801(d) (defining hearsay).

(478) The Court finds that these communications constituted hearsay for which

2200

applicant identifies no exception. Tex. R. Evid. 802 (general rule that hearsay is inadmissible absent an exception). Thus, they were excludable under evidence rule 705(d) if the danger that they would be used for a purpose other than as explanation or support for Dr. Goodness's opinion outweighed their value as explanation or support or they were unfairly prejudicial. Tex. R. Evid. 705(d).

(479)   Applicant argues trial counsel should have complained that the Court excluded any and all hearsay testimony without conducting this balancing test, but the Court finds that such a complaint would have been groundless.

(480)   As the excerpts applicant sets out in his application show, the State objected to the admission of any inadmissible hearsay statements, informed the Court that it was required to conduct the balancing test found in rule 705(d), and argued that, under that test, any inadmissible hearsay statements should be excluded. In the lengthy exchange that followed, the Court explicitly acknowledged the balancing test, even reading it aloud to Dr. Goodness. (RR52: 140-42; RR53: 3-6).

(481)   The record also shows that the Court conducted a lengthy hearing over a two-day period during which Dr. Goodness detailed her opinions and the hearsay information on which it was based. Thus, the Court had an opportunity to preview all of the hearsay that the defense might elicit from her.

(482)   Moreover, the Court did not, as applicant alleges, foreclose the possibility that some hearsay evidence might become admissible during the course of the doctor's testimony. After deliberating the issue overnight, the Court instructed the doctor to refrain from offering hearsay testimony before the jury unless it was elicited by defense counsel and the Court ruled that it was admissible. (RR52: 89-122; RR 53: 3-16). Clearly, the Court was aware of its duty to conduct the balancing test and did not shirk it.

(483)   Alternatively, applicant argues that trial counsel should have challenged the Court's application of the balancing test, arguing that the Court should have concluded the probative value of the hearsay far outweighed any prejudicial effect. The Court finds that such a complaint would also have been meritless.

(484)   From the doctor's testimony at the hearing and before the jury, the Court found a danger existed that the jury would consider the hearsay statements about applicant's purported abuse, psychological problems, etc. as substantive evidence.

(485)   The Court also found that applicant did not have a strong need to present any

89

2201

hearsay evidence to the jury.

(486)   As the doctor's trial testimony shows, she was allowed to testify with particularity that she formed her opinion in large part on information relayed to her by certain friends, family members, records, and letters. In particular, Dr. Goodness testified before the jury that her opinion was based on: (1) her conversations with Jason and Terri Goldberg (childhood family friends), Rabbi Stern (his childhood rabbi), Rhonda Halprin (his aunt), Mindi, Steven, and Shelly Sternblitz (childhood family friends), Anna Lester (applicant's biological mother), Wesley Halprin (applicant's biological brother), and applicant, and (2) her review of three boxes of documents which included adoption records, CPS records, school records, a childhood psychological evaluation of applicant, criminal records, and letters authored by applicant. (RR53: 22-23, 29-31, 35, 37-40, 42-46).

(487)   Thus, the Court finds that even without the excluded hearsay evidence, Dr. Goodness was able to demonstrate a basis for her opinion about applicant.

(488)   Because the probative value of any hearsay was negligible while the risk that it would be improperly used as substantive evidence was substantial, the Court acted within its discretion in excluding otherwise inadmissible hearsay through Dr. Goodness. *See Valle v. State*, 109 S.W.3d 500, 506 (Tex. Crim. App. 2003) (holding trial court acted within its discretion in excluding Valle's mother's hearsay statements to defense expert regarding her medical problems, Valle's difficulties in TYC, his desire to leave Cuba, his lack of legal difficulties in Cuba, and abuse he suffered at hands of his stepfather); *Walck v. State*, 943 S.W.2d 544, 545-46 (Tex. App. – Eastland 1997, pet. ref'd) (holding trial court acted within its discretion in excluding Walck's self-serving hearsay statements to defense's psychological expert about circumstances of murder).

(489)   Applicant contends that, at the very least, trial counsel should have asked the Court to give the jury a limiting instruction instead of excluding the hearsay testimony.

(490)   Rule 705(d) requires the Court to give a limiting instruction upon request, but the instruction is not provided as an alternative to exclusion. TEX. R. EVID. 705(d) ("If otherwise inadmissible facts or data are disclosed before the jury, a limiting instruction by the court shall be given upon request."). The rule only contemplates such an instruction when the Court has concluded that exclusion of the evidence is unwarranted, i.e., that the danger it will be used improperly is insufficient to warrant its exclusion.

90

2202

(491) As noted above, the Court found that the danger Dr. Goodness's hearsay testimony would be used improperly was sufficient to warrant its exclusion. Thus, the Court found that the danger posed by the testimony was too great for a limiting instruction to overcome, making any request for a limiting instruction pointless.

(492) Finally, applicant proposes that trial counsel could have rendered the doctor's hearsay testimony admissible if they had (1) introduced the records she reviewed and (2) called applicant's mother and other, unidentified family members to testify on his behalf. The Court finds that applicant fails to substantiate either of these allegations.

(493) The Court finds that applicant's letters were already in evidence, so counsel did not fail to introduce them as applicant alleges. (Defense Exs. 34-37). Moreover, applicant fails to show that his CPS, adoption, or school records would have been admissible.

(494) In support of this claim, applicant presented some documentation to the Court for its review at the August 20, 2010 writ hearing. (8/20/10 Hrg) RR: Defense Ex. 2. Applicant claims these documents would have been admissible as business records, but he presents no sponsoring witness or business record affidavit with any of these records.

(495) Even if sponsored, however, the Court finds that the records would not have been admissible in their entirety. (8/20/10 Hrg) RR: 104.

(496) "When a business receives information from a person who is outside the business and who has no business duty to report or to report accurately, those statements are not covered by the business records exception." *Garcia*, 126 S.W.3d at 926. The admissibility of such a document depends on a showing that each statement contained within it qualifies for admission under its own hearsay exception. *See, e.g., id.* (holding hearsay statements made by defendant's wife to employee of battered women's shelter not admissible under business records exception just because employee had a business duty to record wife's statements accurately).

(497) The Court finds that much, if not all, of the information applicant cites to in these records was properly excluded hearsay. *See* "Applicant's Additional Briefing on Mitigating Evidence Jury Did Not Hear" (filed 10/21/10).

(498) More importantly, the records and applicant's letters would not, as applicant claims, have tipped the scales in favor of admitting Dr. Goodness's testimony.

2203

The letters and records posed the same danger as her testimony would have; they would have presented the jury with otherwise inadmissible hearsay which the jury would likely have considered as substantive evidence. Thus, the Court finds that admission of the letters and records would have compounded, not eradicated, the prejudice to the State.

(499) In support of his claim that counsel should have subpoenaed family members to testify to the information relied on by Dr. Goodness, applicant presents the affidavits of his biological mother, Anna Lester, and his brother, Wesley Halprin. (Applicant's Exs. C, E); Wesley Halprin Affidavit (filed 7/30/10).

(500) There is no evidence that any other family member would corroborate the information relied on by Dr. Goodness. The Court finds that applicant's adoptive family refused to assist in his defense. (RR53: 22-23); (8/20/10 Hrg) RR: 100-01.

(501) The Court finds Ms. Lester's affidavit confirms that applicant was physically abused, but it does not unquestionably establish Ms. Lester's availability as a witness at applicant's trial. In the affidavit, Ms. Lester states that she was not subpoenaed to testify and that she would *now* be willing to testify if called. She does not state, however, that she would have appeared at applicant's trial if subpoenaed. (Applicant's Ex. C).

(502) Wesley Halprin states in his recent affidavit that he was available and would have testified if subpoenaed, but the Court finds this statement incredible.

(503) The Court finds that both Ms. Lester and Wesley Halprin purposely avoided testifying at trial. Although both were cultivated as witnesses, they became uncooperative right before trial, avoiding contact with the defense. (Applicant's Ex. D, p. 5); (8/20/10 Hrg) RR: 21, 99. Moreover, in his recent affidavit, Wesley Halprin states that he is currently "unsure of [his] willingness to testify on Randy's behalf." Wesley Halprin Affidavit (filed 7/30/10).

(504) Thus, the Court finds that neither Ms. Lester nor Wesley Halprin were available to testify on applicant's behalf at trial.

(505) Even assuming counsel could have secured their testimony, the Court finds applicant fails to rebut the presumption that counsel's decision not to call them constituted reasonable trial strategy.

(506) The Court finds that presenting Ms. Lester and Wesley Halprin as witnesses posed certain risks. Defense counsel had good reason to believe that both were reluctant to testify and, consequently, made a strategic choice not to subpoena

2204

them. The Court finds that counsel reasonably concluded that, given their reluctance, Ms. Lester and Wesley Halprin would not make good defense witnesses. (8/20/10 Hrg) RR: 24-25, 35-36, 99-100.

(507)   Moreover, the Court finds that Ms. Lester would likely have disputed some accounts of abuse. For example, she wrote a letter to applicant while he was awaiting trial in which she states that the scar on his wrist was the result of a fall he took while carrying his infant brother, not physical abuse as applicant avers in his own affidavit (i.e., "I was shoved down some steps as I was carrying a glass baby bottle . . ."). (State's Writ Exs. D & E; Applicant's Ex. Q); (8/20/10 Hrg) RR: 101-03.

(508)   The Court finds, at the very least, Ms. Lester would likely have minimized some of the abuse. She informed the prosecutor before trial that applicant was pushed out of a window, but he suffered no serious injury because the window was on the ground floor, not higher as applicant's affidavit suggests, i.e., "I remember being shoved out a window at age three or four. I am not sure how far I fell, but I do remember laying on hard grass writhing from having the wind knocked out of me." (State's Writ Ex. F; Applicant's Ex. Q); (8/20/10 Hrg) RR: 101-03.

(509)   Also, the Court finds that Ms. Lester would likely have testified to bad acts committed by applicant as a very young child. During her interview with the prosecutor, she reported that during the time applicant was in her care, he "became meaner and harder to control," he set his aunt's couch on fire with matches, and she caught him "shoving pennies down Wesley's throat." (State's Writ Ex. F); (8/20/10 Hrg) RR: 101-03.

(510)   The Court finds that, at most, presenting Ms. Lester as a witness might have resulted in the admission of her own hearsay statements to Dr. Goodness. While at the same time, her testimony would have resulted in the contradiction of some mitigating evidence and, possibly, the admission of aggravating facts not already before the jury. Thus, counsel reasonably concluded that any benefit from calling Ms. Lester did not outweigh the risks.

(511)   The Court finds that counsel reasonably reached the same conclusion about calling applicant's biological brother, Wesley, as a witness. As Investigator Bosillo attests, Wesley reported to the State before trial that his and applicant's adoptive parents did everything possible to support both of them and that his and applicant's troubles were their own fault and not the result of any failing of their adoptive parents. (State's Writ Ex. D). Wesley Halprin attests to the same in his recent affidavit. Wesley Halprin Affidavit (filed 7/30/10).

93

2205

(512)   The Court finds that this testimony would have directly contradicted Dr. Goodness's opinion that applicant's adoptive parents failed to adequately address his needs and provide him with proper emotional support.

(513)   In light of the foregoing, the Court also finds that the strategic decision not to present Ms. Lester's and Wesley Halprin's testimony was not prejudicial to applicant's defense.

(514)   The Court notes that applicant has also presented the affidavit of Dalworthington Gardens Police Chief Bill Waybourn. Waybourn Affidavit (filed 7/30/10). Applicant did not allege in his original writ application that counsel should have called Waybourn.

(515)   To the extent applicant intended to incorporate such a claim into his ineffective assistance grounds for relief, the Court finds that it is procedurally barred as a subsequent writ application. TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5.

(516)   Alternatively, the Court finds the failure to present Chief Waybourn's testimony was not deficient or prejudicial to applicant's defense.

(517)   The Court notes that applicant presents no evidence of counsel's reasons for not calling Waybourn to testify. Thus, he fails to rebut the presumption that the decision constituted reasonable trial strategy.

(518)   The Court finds Waybourn's testimony would have corroborated aggravating evidence elicited by the State, i.e., stealing, forging, expulsion from school, etc. Thus, counsel could have decided not to present Waybourn's testimony because it would be more prejudicial than helpful to the defensive theory, a sound strategic choice.

(519)   To the extent Waybourn's testimony may have supported the defensive theory, the court finds that it was cumulative of other evidence before the jury. Thus, it would not have altered the trial's outcome.

(520)   Likewise, the Court finds that the exclusion of hearsay testimony through Dr. Goodness was not prejudicial to applicant's defense.

(521)   Applicant maintains that the Court's limitation on Dr. Goodness's testimony kept the following "critical information" about him from the jury:

> (1) his assault on Jerrod Smith mirrored the abuse he suffered at the hands of his biological parents and his mother's boyfriend;

2206

(2) he was emotionally abused as well as beaten, thrown down stairs, and pushed out of a window;

(3) he was abandoned and put in foster care;

(4) he had a learning disability when adopted at six years of age;

(5) he has had psychological problems, including depression, ADHD, and avoidant personality;

(6) his adoptive parents were "overly rigid" and did not address his needs, including his learning disabilities; and

(7) he was "expelled" from his home at an early age and lacked guidance in his teenage years, making him vulnerable to individuals like Rivas.

(Application, pp. 119-20).

(522)   The Court finds, however, that this information was not kept from the jury. Indeed, most of it came in through Dr. Goodness's testimony.

(523)   During her testimony before the jury, Dr. Goodness opined that "abuse and neglect adversely affected [applicant's] early environment." In particular, she testified that applicant and his brother Wesley "did not come from a good home. You do not get placed up for adoption when you are 5 years old, if you come from a good home." (RR53: 28-30).

(524)   Furthermore, Dr. Goodness opined that applicant learned abusive behavior from witnessing it as a child, intimating that the assault on Jerrod Smith was a byproduct of applicant's own earlier abuse. (RR53: 29).

(525)   Dr. Goodness also stated her opinion that applicant was genetically predisposed to substance abuse because his biological mother and father were "drug addicts," and that applicant's own drug abuse led him to make "bad decisions." (RR53: 30-31, 39).

(526)   Dr. Goodness then stated her opinion that applicant suffered from certain learning disorders, ADHD, and depression. She testified that these disorders went untreated in his childhood and adolescence and that his depression disrupted the development of his social skills. (RR53: 31-32). She then criticized

2207

the efforts of applicant's adoptive parents, stating that they failed to meet his psychological and emotional needs or adequately treat his learning disorders and ADHD. (RR53: 33-35).

(527)   Dr. Goodness further criticized applicant's adoptive parents, opining that they were "rigid" in their parenting of him and that they overreacted to his "curve balls." (RR53: 38-39). At the same time, the doctor testified that applicant did not receive the necessary guidance in his childhood and that he was expelled from boarding school just before his eighteenth birthday. Lastly, she opined that applicant suffers from avoidant personality disorder, explaining that he has a strong need to belong, is socially inept, and fears social rejection. (RR53: 39-41).

(528)   In addition to Dr. Goodness's testimony, the Court finds that much of the purportedly omitted evidence came in through other testimony. (8/20/10 Hrg) RR: 104-09, 179-81.

(529)   Terri Goldberg characterized applicant's adoptive father as unyielding and reactionary. (RR52: 53-71). She, her son Jason, and Mindi Sternblitz all testified that applicant struggled to win his adoptive father's approval. (RR52: 8-10, 41-42, 53-55). Applicant, himself, testified to his adoption at the age of five, his academic struggles, being sent away to boarding school, and his subsequent expulsion. (RR47: 103-05). Moreover, applicant, Terri Goldberg, and Mindi Sternblitz all testified that applicant's adoptive parents and Ms. Goldberg refused to let him stay with them after his expulsion. (RR47: 105-07; RR52: 13-14, 64-66).

(530)   In addition, counsel elicited evidence from several witnesses that, in contrast to his codefendants, applicant was not a leader and not very intelligent. (RR49: 103-04, 112-13, 116, 144-45, 187, 196). Applicant, himself, testified that Rivas was in charge and that he just followed the orders of his codefendants. (RR47: 4-36, 47-48; RR48: 131-36; RR49: 30-31, 41). And counsel introduced the confessions of applicant's codefendants which also characterize Rivas as the leader and applicant as a follower. (Defense Exs. 24-27).

(531)   The Court finds that, all told, the only information the jury did not receive concerned the specific nature of some of the abuse applicant suffered and the fact that he was abandoned and placed in foster care before his adoption. Assuming there was some admissible evidence of these facts that could have been presented, applicant fails to show that their admission would have altered his sentence.

(532)   As previously noted, the jury was told, without dispute from the State, that

96

2208

applicant suffered abuse and neglect in the first five years of his life and that he was adopted when he was five or six years old. Furthermore, Dr. Goodness repeatedly referred to the existence of applicant's CPS records. The Court finds from this evidence, the jury must have inferred that the abuse and neglect applicant suffered was so severe that state officials permanently removed him from his biological parents' custody.

(533)   The Court finds that the details of the abuse applicant suffered, i.e., being beaten by his father and stepfather and pushed out of a window, would have lent little additional mitigating value to this evidence. At most, it would have been cumulative of other evidence already before the jury and, thus, would not have altered the jury's punishment verdict.

(534)   The Court finds this fact distinguishes applicant's case from those cases he cites in comparison. *See Williams v. Taylor*, 529 U.S. 362, 395-99 (2000) (jury heard no evidence of defendant's abusive childhood, borderline intelligence, or good prison record); *Canaan v. McBride*, 395 F.3d 376, 385 (7th Cir. 2005) (defendant's "attorneys presented *no* mitigating evidence at the sentencing hearing")(emphasis in original); *Coleman v. Mitchell*, 268 F.3d 417, 444-53 (2001) (mitigation case limited to defendant's unsworn statement); *Ex parte Gonzales*, 204 S.W.3d 391, 398-400 (Tex. Crim. App. 2006) (jury heard no evidence of defendant's extensive sexual and physical abuse by father and no evidence of defendant's borderline intelligence, PTSD, and chemical dependence). *See* "Brief in Support of Argument Concerning Ineffective Assistance of Counsel for Failure to Present Mitigating Evidence" (filed 9/30/10).

(535)   The Court also finds that the admission of applicant's own hearsay statements to Dr. Goodness may have resulted in the admission of other, possibly harmful, statements made by him to the State's psychological expert, Dr. Thomas Allen, who evaluated applicant before trial. (8/20/10 Hrg) RR: 109-10. *See Lagrone v. State*, 942 S.W.2d 602, 611 (Tex. Crim. App. 1997) (holding a defendant executes a limited waiver of the Fifth Amendment's protection by constructively testifying through an expert on the issue of future dangerousness, the trial court may order that defendant to submit to a state-sponsored future dangerousness examination and admit into evidence his statements to the state's expert).

(536)   The Court ordered Dr. Allen's report sealed, its release to the State contingent on whether applicant subsequently waived his Fifth Amendment right by presenting the statements he made to his own expert, Dr. Goodness. (RR40: 20-27; CR: 212-16, 350). Thus, the Court finds that whatever benefit applicant

2209

derived from the admission of his own hearsay statements would have been negated by the admission of other detrimental evidence.

(537)   In fact, the Court finds that the more evidence of abuse, etc. the defense presented, the more likely the State would have elected to present additional aggravating evidence. (8/20/10 Hrg) RR: 110-11.

(538)   In particular, the State would have called applicant's ex-girlfriend, Theresa Dancy, to testify to his mistreatment of her. As the transcript of Investigator Mike Bosillo's telephone interviews of Ms. Dancy shows, she was available and willing to testify (1) that applicant was a convincing and accomplished pathological liar, (2) that as their relationship deteriorated, he sent her a drawing of a cartoon character saying he "wanted her dead," and (3) during an argument at the bus stop, applicant grabbed her, held her out into oncoming traffic, and threatened, "Die, bitch." (State's Writ Exs. D & G). Also, Ms. Dancy described applicant's poor treatment of his brother Wesley while they were both away at boarding school. (State's Writ Exs. D & G).

(539)   Furthermore, the Court finds that if the CPS records had been admissible, the State would have introduced evidence they contained refuting applicant's attack on his adoptive parents' treatment of him and his brother. The records would have shown the lengths to which applicant's adoptive parents went to provide for all of applicant's needs, both physical and emotional. (8/20/10 Hrg) RR: Defense Ex. 2 (see pages stamped 5491-5535 & 5753-5756).

(540)   In sum, the Court finds that the State would have countered any additional evidence of abuse applicant might have offered with evidence of equal or greater aggravating value. To the extent this additional evidence related to applicant's more recent, adult behavior, its influence would have been especially significant.

(541)   Based on the foregoing, the Court finds that trial counsel's presentation of mitigating evidence through Dr. Goodness was not deficient and did not prejudice applicant's defense. Rather, it was a laudable effort to portray applicant as a victim himself. Additional efforts in that regard would have likely been fruitless or would have afforded applicant little, if any, benefit; in fact, ultimately, they probably would have proved detrimental.

(542)   Thus, the Court concludes that trial counsel's presentation of mitigating evidence in applicant's case was not constitutionally deficient.

2210

## C. Codefendants' Testimony

(543)    In his original application, applicant contends his trial counsel should have called his codefendant George Rivas to testify on his behalf. Applicant maintains Rivas was willing to testify and would have "given credence to [applicant's] claims that he was left out of the planning of the offense and therefore had no anticipation of the violence." (Application, p. 135).

(544)    In a subsequent application, applicant contends his trial counsel should also have called his codefendants Patrick Murphy and Michael Rodriguez. *See* Defense's "Additional Arguments in Support of Ineffective Assistance of Counsel and Suppression of Exculpatory Evidence Arguments in Application for Writ of Habeas Corpus," p. 2. Applicant does not specify in which phase of his trial counsel should have presented Murphy and Rodriguez.

(545)    In support of these contentions, applicant presents an affidavit from each codefendant. In addition, this Court conducted a hearing on May 22 and 23, 2008 at which each of the three codefendants testified. (5/22/08 Hrg) RR: Defense Exs. 1-3).

(546)    The Court finds that applicant's contentions about counsel's failure to call Murphy and Rodriguez are procedurally barred and should be dismissed. *See* TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5 (Vernon Supp. 2010).

(547)    Alternatively, the Court finds applicant fails to prove that counsel was deficient for not calling these three codefendants to testify. Nor does he prove that the omission of their testimony prejudiced his defense.

(548)    The Court finds Rivas demonstrated a willingness to testify at his codefendants' trials by testifying at Murphy's trial. However, Murphy and Rodriguez showed no such willingness before these writ proceedings. They did not even testify at their own trials, much less anyone else's trial.

(549)    Furthermore, at the time of applicant's trial, both Murphy and Rodriguez had strong incentives not to take the stand and waive their constitutional right against self-incrimination. Murphy had yet to be tried for the capital murder, and Rodriguez was appealing his conviction and sentence to the Court of Criminal Appeals. (5/22/08 Hrg) RR: 95, 184-85.

(550)    Also, the Court finds that the "religious conversion" Rodriguez claims ultimately motivated his decision to testify on Halprin's behalf did not occur until after applicant's trial. (5/22/08 Hrg) RR: 50.

2211

(551)  Consequently, the Court finds Murphy's and Rodriguez's assertions that they would have testified in Halprin's trial on his behalf are incredible.

(552)  Because Murphy and Rodriguez would not have testified for applicant, the Court finds that defense counsel was not deficient for not calling them as witnesses.

(553)  Even if they had been willing, the Court finds that trial counsel made a strategic decision not to ask any of applicant's codefendants to testify on his behalf because they believed it would be detrimental to applicant's defense. That decision constituted reasonable professional judgment.

(554)  In particular, counsel believed that calling the codefendants would leave a bad impression on the jurors and might anger them. At the time of applicant's trial, the "Texas Seven" were "the most hated men in America," and they each had "horrible" criminal records. Ashford Interrogatory Answers, p. 2; (8/20/10 Hrg) RR: 54-55, 135-36, 185.

(555)  Counsel also believed that the codefendants lacked credibility. There was a strong likelihood that the State would impeach them with prior inconsistent statements. And having personally observed Rivas testify at his own trial, counsel saw firsthand that he did not perform well on the stand and would not be a credible witness. (8/20/10 Hrg) RR: 54-55, 135-37, 185-86, 238.

(556)  Also, the Court finds that calling the codefendants would have been inconsistent with counsel's trial strategy of distancing applicant from his codefendants. (8/20/10 Hrg) RR: 136, 238.

(557)  The Court finds counsel's concerns were legitimate and valid.

(558)  The record supports counsel's negative opinion of Rivas's, Murphy's, and Rodriguez's testimony.

(559)  The Court judicially notices Rivas's testimony from his own trial and Murphy's trial. See TEX. R. EVID. 201.

(560)  The Court finds that Rivas's credibility was severely impugned in both his own and Murphy's trials, and both juries rejected his account of the offense.

(561)  The testimony from both of those trials shows that Rivas is an acknowledged career criminal and pathological liar. Moreover, Rivas gave conflicting testimony at his own and Murphy's trials, materially altering his account of the offense (i.e., whether Officer Hawkins fired any shots, whether Murphy's assigned role

100

2212

was to act as a sniper, etc.). (Rivas RR42: 11-113; RR43: 6-172; RR44: 6-37); (Murphy RR48: 6-98).

(562)   In addition, the Court finds that the credibility of Rivas, Rodriguez, and Murphy was impeached during the May 2008 writ hearing.

(563)   The Court finds that each had a bias and motive to testify untruthfully on applicant's behalf. All four remained friends and continued to communicate in person on death row, and by agreeing to testify, Rivas, Rodriguez, and Murphy got a trip away from the restrictive and monotonous death row environment. Furthermore, Rivas admittedly felt responsibility for applicant's death sentence, and Murphy was applicant's father-in-law at the time of the writ hearing. (5/22/08 Hrg) RR: 85-89, 142, 152-53, 188-90.

(564)   Thus, the Court finds Rivas, Rodriguez, and Murphy were not credible witnesses.

(565)   Even if Rivas, Murphy, and Rodriguez were credible witnesses, the Court finds that the testimony they gave in the May 2008 writ hearing would not have altered the jury's verdict on guilt or punishment.

(566)   The Court finds any testimony from Rivas, Murphy, and Rodriguez that applicant was regarded by his codefendants as a "weak link" who played a minor role in the offense would have been cumulative of other evidence admitted at trial.

(567)   As reflected in the Court's previous findings, the jury had already heard an inordinate amount of evidence that applicant played a diminished role in the offense and was regarded as weak-willed and weak-minded by others, including Rivas and the other codefendants.

(568)   Moreover, the Court finds that the testimony of these three codefendants was not weighty or persuasive evidence of applicant's purported weak nature. In particular, their testimony showed applicant was more trustworthy than some of his codefendants and more valuable to the group than others.

(569)   According to the codefendant's testimony, Rivas handpicked applicant for the escape long before many of the others. And unlike his codefendants, Halprin never leaked news of the escape in prison; nor was it his actions that led to their detection and capture. (5/22/08 Hrg) RR: 55, 59, 79-80, 125-26, 134, 169-70. During the escape, applicant acted as a lookout and he tackled at least one of the guards. (5/22/08 Hrg) RR: 60-61, 65, 171. During the extraneous robberies, applicant was either unarmed or relegated to menial tasks, but he was not alone in that regard; some of his codefendants were treated similarly. (5/22/08

2213

Hrg) RR: 68-69. By contrast, during the Oshman's robbery, it was Murphy that Rivas assigned as lookout in the parking lot. Applicant was inside the store and armed like everyone else, and Rivas trusted him with important tasks, such as handling the weapons and answering the store phone. (5/22/08 Hrg) RR: 71-73, 130-35, 139. Lastly, the codefendants' testimony showed that there was general dissension among all the escapees, rather than a group animosity aimed entirely at applicant. (5/22/08 Hrg) RR: 81, 184.

(570)   In addition, the Court finds all three codefendants gave testimony that would have damaged applicant's defensive theory at trial.

(571)   In the May 2008 writ hearing, Rodriguez testified that applicant thought someone would get hurt if he carried a gun during the Radio Shack and Oshman's robberies. (5/22/08 Hrg) RR: 25-26, 34. The Court finds this testimony supports the State's theory that applicant actually anticipated Officer Hawkins's murder. It also shows applicant contemplated that he, personally, might shoot someone.

(572)   Also, all three codefendants testified that after the Oshman's robbery, Rivas and other codefendants thought it was applicant who shot Rivas. And Murphy confirmed that everyone thought Halprin capable of shooting Rivas. (5/22/08 Hrg) RR: 37, 114, 164, 182. The Court finds that, contrary to applicant's trial testimony, this testimony supported the State's theory that applicant fired his weapon during the shooting in the loading dock behind the Oshman's.

(573)   And lastly, the Court finds that Rivas's and Murphy's testimony shows applicant was carrying extra ammunition in his pockets during the Oshman's robbery and that there may have been extra ammunition in the Honda. (5/22/08 Hrg) RR: 149, 179-81, 193-94. This testimony would have provided the State with an alternative explanation for why applicant's weapon was fully loaded when checked by his codefendants at the hotel after the murder, i.e., applicant reloaded after firing his weapon in the loading dock.

(574)   For all the foregoing reasons, the Court finds counsel was not deficient for not calling Rivas, Murphy, or Rodriguez to testify in either phase of trial, and applicant's defense was not prejudiced by its absence.

(575)   Thus, the Court concludes that trial counsel did not violate applicant's constitutional right to effective assistance by not calling Rivas, Murphy, or Rodriguez to testify at trial.

2214

## D. Sponsoring Witness for Ranking Document

(576)   Referring back to his third ground for relief, applicant contends his trial counsel should have ascertained the identity of the person who prepared the ranking document (Defense Ex. 39) and that the failure to do so kept material, favorable evidence from the jury. He claims counsel should have asked their expert S.O. Woods to help them determine the author's identity and that the failure to "take even this simple step" constituted ineffective assistance.

(577)   The Court finds that trial counsel went to great pains to convince the Court to allow the document into evidence. Counsel repeatedly challenged the document's exclusion and attempted to establish a predicate for its admission through several different witnesses. Then, in the middle of trial, counsel subpoenaed additional records from TDCJ-OIG and called the office's records custodian as a witness, all in an effort to establish the document's authenticity and admissibility under the business records exception. (RR49: 112-14; RR51: 118-20; RR52: 75-88; RR53: 12-16); Ashford Interrogatory Answers; Woods Interrogatory Answers; (8/20/10 Hrg) RR: 65-70, 78, 132-35, 201-10, 239, 247.

(578)   The Court finds that counsel did not identify Whitman as the drafter of the document before or at the time of trial. As previously found in response to applicant's related *Brady* claim, applicant's prison expert, S.O. Woods, identified Sergeant Whitman as the drafter of the ranking document after trial, when he re-examined TDCJ-OIG's records at the request of writ counsel. Woods Interrogatory Answers; (Applicant's Exs. A & B).

(579)   Nevertheless, the Court finds applicant fails to prove counsel was deficient for not identifying Whitman as the drafter of the document.

(580)   As previously found in response to applicant's related *Brady* claim, the ranking document would not have been admissible in its entirety even if Whitman had been identified and subpoenaed to testify.

(581)   The Court finds that the ranking document reflects information Whitman and his colleagues obtained from other individuals, including inmates. The out-of-court statements of these individuals constitute hearsay for which there is no exception to exclusion. *See Garcia*, 126 S.W.3d at 926 (holding hearsay statements made by defendant's wife to employee of battered women's shelter not admissible under business records exception just because employee had a business duty to record wife's statements accurately); *Kratz*, 890 S.W.2d at 905-06 (upholding exclusion of eyewitness statements contained in police report under Rule 803(8)).

103

2215

(582)   Thus, even if portions of the document would have been admissible, the Court would still have excluded much of the hearsay contained in the document.

(583)   Because Whitman was not the key to the ranking document's admissibility, counsel was not deficient for failing to identify and subpoena him as its sponsoring witness.

(584)   The Court also finds that applicant fails to prove the exclusion of the ranking document prejudiced his defense.

(585)   As previously found in response to applicant's related *Brady* claim, counsel repeatedly injected information about the document into their questions to several witnesses and through these efforts, succeeded in conveying to the jury the nature and content of the document. (8/20/10 Hrg) RR: 132-35, 239.

(586)   Moreover, as set out more specifically in the findings on applicant's related *Brady* claim, the ranking document was cumulative of other evidence before the jury.

(587)   Lastly, if Whitman had testified and the document had been admitted in part or in its entirety, the State would have responded with additional, damaging evidence.

(588)   In particular, the Court finds the State would have elicited Whitman's testimony that the law enforcement officers who contributed to the ranking document actually considered the last three on the list – Garcia, Murphy, and applicant – interchangeable in rank. Whitman also would have testified that he was trained as a hostage negotiator, not a criminal profiler, and that he had never before prepared a criminal profile. Furthermore, Whitman would have testified that he would not have ranked applicant at the bottom if he had been aware of Texas Ranger G.W. Hilderbrand's subsequent profile of applicant. Whitman Affidavit; Whitman Interrogatory Answers; (9/30/10 Hrg) RR: 54-55, 64, 72, 75, 81-83, 131-32.

(589)   The Court finds that the State would also have offered Hilderbrand's damaging profile of applicant. Unlike Whitman and the other officers who contributed to the ranking document, Hilderbrand was trained and experienced in profiling. Moreover, his profile was based on information about applicant that was unavailable to Whitman and his colleagues. Hilderbrand's profile was significantly prejudicial to applicant and would have effectively neutralized whatever benefit applicant might have obtained from the admission of the ranking document. (9/30/10 Hrg) RR: 75-82; 144-45 (Defense Ex. 56.)

2216

(590)   Based on the foregoing, the Court finds that counsel was not deficient for failing to identify and subpoena Whitman and that the document's exclusion did not prejudice applicant's defense.

(591)   Therefore, the Court concludes that applicant's trial counsel did not violate his constitutional right to effective assistance by not identifying and presenting Whitman as the ranking document's sponsoring witness.

### E. Anti-Parties Instruction

(592)   Applicant contends his trial counsel should have asked the Court to include an "anti-parties" instruction in the punishment charge. Specifically, he claims counsel should have asked the Court to instruct the jury to limit their deliberations on the second special issue to evidence of "the conduct and acts of the defendant standing alone." (Application, p. 136). Applicant argues that the failure to request this limiting instruction "enhanced the possibility that the jury convicted [him] because other members of the group anticipated death." (Application, p. 138).

(593)   The Court finds that applicant fails to prove counsel was deficient for not requesting the complained-of instruction or that the failure to make the request prejudiced his defense.

(594)   The Court finds that counsel reasonably concluded that such a request was unnecessary. (8/20/10 Hrg) RR: 244.

(595)   The Court finds that while trial counsel did not request an instruction such as the one applicant now proposes, the Court did instruct the jury as mandated by article 37.071, section 2(b)(2) of the code of criminal procedure.[17]

(596)   The Court of Criminal Appeals has held that the instruction mandated by section 2(b)(2) requires the jury to focus exclusively on the defendant's conduct and, thus, essentially, is an "anti-parties" charge. See Ladd v. State, 3 S.W.3d 547, 570 (Tex. Crim. App. 1999)(citing McFarland v. State, 928 S.W.2d 482, 516-17 (Tex. Crim. App. 1996))(both holding second special issue is an "anti-parties" instruction); see also Wood v. State, 18 S.W.3d 642, 649 (Tex. Crim. App. 2000) (describing second special issue as an "anti-parties" issue and holding that it is

---

[17] The second special issue reads:  Do you find from the evidence beyond a reasonable doubt that the defendant, RANDY ETHAN HALPRIN, actually caused the death of the deceased, Aubrey Hawkins, or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken? (CR: 43).

2217

constitutional because it specifically instructs the jury to consider the defendant's behavior alone).

(597)   The Fifth Circuit Court of Appeals has held the same. *See Ramirez v. Dretke*, 398 F.3d 691, 696-97 (5th Cir. 2005) (holding that trial court's general punishment instruction to "consider all evidence submitted . . . in whole trial" did not permit jury to impose death on Ramirez based on other party's conduct because second special-issue instruction explicitly limited jury's consideration to Ramirez's individual liability).

(598)   Because the Court's instruction already contained an anti-parties charge, the Court finds that trial counsel was not deficient and could not have prejudiced applicant's defense by not requesting one. *See Ladd*, 3 S.W.3d at 570 (rejecting ineffectiveness claim based on decision not to request "anti-parties" charge in second special issue instructions).

(599)   Based on the foregoing, the Court concludes that applicant's trial counsel did not violate his constitutional right to effective assistance by not requesting another anti-parties instruction.

### F. Prosecutor's Closing Argument

(600)   Applicant contends his trial counsel should have objected to the prosecutors' closing punishment arguments. More specifically, he claims the prosecutors made arguments contrary to *Enmund* and *Tison* that misled the jury "about the quality and quantity of proof necessary to answer special issue number two affirmatively."

### First Argument

(601)   Citing the argument below, applicant alleges the prosecutor argued contrary to *Enmund* that "merely bringing a gun to a robbery" was sufficient to prove anticipation of death:

> Special Issue No. 2, did he cause the death? Did he intend that someone die? Did he anticipate that a human life would be taken? *Most of you told us taking a loaded gun into a store, a robbery, that by itself told you that he knew or anticipated or someone would in that circumstance, they would have to use it. And, you know, you can use that fact by itself to answer that question* or you could go back to what Mr. Shook argued earlier about as he went around that car and those gunshots into that squad car from the left front,

106

2218

there's only one person from the evidence who was there. Mr. Halprin.

Why else do you take loaded weapons? Why else do you have a sniper out front? Why else do you have the police band frequency on? And why else do you take that gun and shoot it?

See, the simple fact, I believe, from the evidence from what you all heard that they all had this plan, they all were armed, they had a sniper out front that was going to engage the police in a fire fight, tells you Mr. Halprin anticipated, he intended, and it's quite likely he caused the death or participated in that. No. 2, yes, beyond a reasonable doubt, overwhelmingly. Your common sense tells you that.

(RR53: 82) (emphasis supplied by applicant).

(602)   The Court finds that applicant fails to prove counsel was deficient for not objecting to this argument or that the lack of an objection prejudiced his defense.

(603)   The Court finds that the argument was not improper.

(604)   The Court disagrees with applicant's suggestion that the prosecutor was arguing the law, i.e., *Enmund*. The prosecutor was arguing what the jury could deduce from the evidence in applicant's case, a proper area of jury argument. *See Jackson v. State*, 17 S.W.3d 664, 673 (Tex. Crim. App. 2000) (noting that proper jury argument includes four areas: summation of evidence presented at trial, reasonable deduction drawn from that evidence, answer to opposing counsel's argument, and plea for law enforcement).

(605)   Moreover, the Court finds the prosecutor was not arguing that every person who walks into a store with a loaded gun to commit robbery anticipates that a life will be taken. He was arguing that such conduct was sufficient to prove that under the circumstances of this case, applicant, in particular, expected someone would be killed. He did not ask the jury to disregard the fact that applicant was a convicted felon who escaped from a maximum security prison with six other convicted felons and who, despite a massive police manhunt, armed himself with a loaded firearm stolen from the prison and walked into the Oshman's with his six cohorts on Christmas Eve to rob a store full of employees. In fact, he was counting on the jury to consider the circumstances surrounding applicant's

2219

conduct when they assessed his mental state. This is evinced by the prosecutor's remarks immediately following the complained-of argument: "[F]rom what you all heard that they all had this plan, they all were armed, they had a sniper out front that was going to engage the police in a fire fight, tells you [applicant] anticipated . . . ." (RR53: 82).

(606)  The Court finds that even if the prosecutor's argument could be construed as applicant suggests, no law holds that taking a loaded gun into a store to commit a robbery is insufficient to prove anticipation that a life would be taken.

(607)  Applicant contends *Enmund* stands for this proposition, but he is wrong. *Enmund* only defined the level of culpability required to impose the death penalty, not what evidence is required to prove that culpability. *Tison*, 481 U.S. at 158; *Enmund*, 458 U.S. 797.

(608)  Also, *Enmund* did not address whether anticipation is a sufficiently culpable mental state to warrant death. *Enmund*, 458 U.S. at 797 (holding a party to a felony in the course of which a murder is committed is ineligible for the death penalty unless he himself killed, attempted to kill, or intended to kill or that lethal force be used).

(609)  Furthermore, Enmund did not carry a loaded gun into a store to commit robbery; he was parked outside while his two codefendants robbed and killed an elderly couple in their farmhouse nearby. *Enmund*, 458 U.S. at 784. Thus, *Enmund* does not explicitly or implicitly address whether taking a loaded gun inside a store to commit robbery is sufficient to prove anticipation.

(610)  Consequently, the Court finds applicant's trial counsel could have reasonably concluded that an objection to this argument would have been fruitless. (8/20/10 Hrg) RR: 146-47, 167, 198-200, 245.

(611)  But even if a valid objection to the argument existed, the Court finds that applicant was not prejudiced by counsel's decision not to object.

(612)  The Court finds that there was a multitude of other facts surrounding applicant's conduct from which his expectation that someone would die could be inferred, including the violent nature of the escape, the violent criminal histories of applicant and his codefendants, the threatening note applicant left behind in prison, the concerted efforts made to detect and respond to the arrival of police at the Oshman's, and applicant's continued participation in the gang after the murder. It would test the bounds of reason to conclude that the jury considered none of this substantial and persuasive evidence of applicant's

2220

"anticipation" in answering the second special issue.

### Second Argument

(613)   Applicant also argues the State improperly told the jury that it could answer the special issues "by referring to what the group did, not focusing just on the conduct of [applicant]." In support of this contention, applicant cites the following argument:

> Question No. 2, looking at all the evidence, I think it's clear the State has proven that. We've talked about that at great length. We can prove that he actually caused the death. It's actually very similar to some of the issues we talked about in guilt/innocence. Or if he didn't actually cause the death, but he intended to kill someone.
>
> A few examples we gave, maybe there were several people using guns, maybe he wanted to shoot, maybe his gun misfired, maybe someone murdered the victim before him, as examples of that. What is important is the intent.
>
> And I think the intent is clear from the way Aubrey Hawkins was murdered, that every last one of those individuals, including Patrick Murphy who was out front, wanted Aubrey Hawkins dead. The 47 seconds, how they ambushed him when he came around, how they drug him out of his car, how they were able to get away so quickly.
>
> Their intent was clear. All the different guns used. If anyone got in their way, they were going to take care of them, folks. Remember his letter, "You haven't heard the last from us."
>
> Now, clearly from all the evidence from their escape, these violent men, the weapons they are using, from how they murdered Aubrey Hawkins, Special Issue No. 2 should be answered yes. I don't know how you could write a better scenario about anticipating someone might die by the facts of this case.

(RR53: 135-36).

(614)   The Court finds that applicant fails to prove counsel was deficient for not objecting to this argument or that the lack of an objection prejudiced his

109

2221

defense.

(615)   The Court finds that the argument was not improper.

(616)   The Court finds that applicant mischaracterizes the State's argument. It is undisputed that the punishment issues focus the jury's deliberations on the conduct of the individual. *Green*, 682 S.W.2d at 287. But the above argument did not ask the jury to answer the second special issue affirmatively based on the actions of applicant's codefendants. The prosecutor argued that applicant, like his codefendants, was an escaped violent felon who exhibited an intent to kill Officer Hawkins by ambushing him and shooting to kill. Moreover, he referenced the ominous threat applicant made in the note he left behind in prison. Thus, the argument focused on applicant's own, individual culpability for the murder.

(617)   Applicant suggests that no mention whatsoever of his cohorts may be made by the State in punishment phase arguments, but the law does not preclude the State from placing applicant's conduct in context. Thus, to the extent the actions of applicant's codefendants put his own conduct in context, the State may comment on it.

(618)   Furthermore, the Court finds defense counsel invited the above argument when he asked the jury to compare applicant to his codefendants and argued that he was one of the last of the "Texas Seven" to be tried because he was less "complicit" than his codefendants. (RR53: 90-91, 107). The above argument characterizing applicant and his codefendants as equally culpable merely responded to this defense argument. *See Ripkowski v. State*, 61 S.W.3d 378, 393 (Tex. Crim. App. 2001) (holding that defendant cannot complain of improper prosecutorial argument if he invited the argument).

(619)   Taken in context, the Court finds that the preceding argument was not an attempt to persuade the jury that applicant deserved death because of the conduct of his codefendants.

(620)   Moreover, the Court finds counsel's decision not to object to this argument was consistent with reasonable trial strategy. (8/20/10 Hrg) RR: 146-47, 167, 198-200, 245.

(621)   The Court finds that the second special issue, which equates to an "anti-parties" instruction, focused the jury on applicant's conduct alone.

(622)   The Court finds counsel could have reasonably concluded that the jury would, in

110

2222

keeping with their oath, follow this instruction, and, thus, an objection was unnecessary.

(623)  Indeed, the law presumes the jury followed the Court's instructions. *See Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998) (holding that jury is presumed to have followed trial court's instructions as given).

(624)  Absent any evidence that the jury did not follow the "anti-parties" instruction, the Court finds applicant fails to prove counsel's decision not to object to the second argument was unsound or prejudicial to his defense.

(625)  In sum, the Court finds that neither of the prosecutor's arguments were contrary to *Enmund* and *Tison*; nor did they mislead the jury "about the quality and quantity of proof necessary to answer special issue number two affirmatively."

(626)  Based on the foregoing, the Court finds that counsel was not deficient for not objecting to these two arguments and that the decision not to object did not prejudice applicant's defense.

(627)  Thus, the Court concludes that applicant's trial counsel did not violate his constitutional right to effective assistance by not objecting to the preceding two arguments.

## G. Advice on Applicant's Right to Testify

(628)  Applicant contends his trial counsel failed to inform him of his right to testify in the punishment phase. As a result, applicant claims he was prevented from testifying about his abusive biological parents, their drug and alcohol abuse, and his learning problems.

(629)  In support of this contention, applicant offers his own affidavit in which he states that counsel did not tell him he had a right to testify in the punishment phase and that he would have testified in that phase if he had known he could. (Applicant's Ex. Q).

(630)  The Court finds that applicant fails to prove counsel did not properly admonish him or that the alleged failure prejudiced his defense.

(631)  The Court finds that applicant is not a credible witness. (RR48: 59-168; RR49: 3-24, 50-52); (11/12/11 Hrg) RR: 4-7; (State's Hrg Exs. 1-2).

(632)  Furthermore, the Court specifically finds applicant's sworn assertion that he was

2223

not advised of his right to testify at punishment is incredible.

(633)   During their testimony in these habeas proceedings, both of applicant's trial counsel testified that they advised applicant of his right to testify at punishment and that applicant chose not to testify in that phase. (8/20/10 Hrg) RR: 115, 191, 229-30.

(634)   The Court finds counsel's testimony on this matter true and credible.

(635)   The Court finds the record supports counsel's assertions that applicant was properly admonished about his right to testify at punishment.

(636)   Applicant testified in the guilt phase of his trial and, before taking the stand, he acknowledged on the record that he had been fully admonished by trial counsel regarding his right to testify:

> THE COURT: Let the record reflect the jury has been retired for a brief hearing. Mr. King, do you have anything you wish to put on the record?
>
> MR. KING: Your Honor, we have discussed with Mr. Halprin his rights in regards to testifying in his own behalf. We have explained to him that he has a right to testify, if he wishes to do so and no one can keep him from the witness stand. We have explained to him he has the right not to testify and if he chooses not to do so, then the jury will be instructed that the fact that he did not testify cannot be considered as any evidence against him whatsoever.
>
> We have discussed with him the pro's [sic] and con's [sic] of testifying in this case and it is the wishes of Mr. Halprin to testify in his own behalf. And we intend to call him as our next witness.
>
> But, if I may, Your Honor, Mr. Halprin, would that be a correct representation of what I have just talked about, about your understanding of the law and your rights?
>
> THE DEFENDANT: Yes, sir.
>
> MR. KING: You understand that you don't have to testify, if you don't want to?
>
> THE DEFENDANT: Yes, sir.

112

2224

MR. KING:  And you wish to testify in your behalf; is that correct?

THE DEFENDANT:  Yes, sir

MR. KING:  We'll be calling Randy Halprin, Your Honor.

(RR47: 93-94).

(637)   The Court finds the above exchange shows that trial counsel conscientiously advised applicant of his constitutional right to testify and its attendant risks. These efforts render applicant's assertion that counsel failed to fully admonish him, i.e., inform him that his right to testify extended to the punishment phase, inherently suspect.

(638)   Furthermore, the Court finds applicant's assertion that he was unaware he had a right to testify in the punishment phase, when he knowingly and voluntarily exercised that right in the guilt phase, strains the bounds of reason.

(639)   The Court finds applicant elected not to retake the stand in the punishment phase for strategic and personal reasons. (8/20/10 Hrg) RR: 115, 230.

(640)   As his testimony in the guilt phase shows, applicant did not perform well on the stand. The prosecutor subjected to him to withering cross-examination. He confronted applicant with a plethora of lies and several extraneous bad acts, including his assault on toddler Jerrod Smith. He also attacked applicant's account of the escape, robbery, and murder, severely impugning his claims that he was a minor participant who never intended or anticipated that anyone would be injured or killed. (RR48: 58-168; RR49: 3-8, 15-24, 52-53).

(641)   And as the following exchange from applicant's direct examination shows, applicant found the experience of facing the prosecution discomfiting:

THE DEFENDANT:  Your Honor, can you please tell them to stop staring at me like that? The DAs?

THE COURT:  They're just listening to the testimony.

THE DEFENDANT:  I understand, but they're making strange faces and things like that and it's making me uncomfortable and nervous.

2225

(RR47: 117).[18]

(642)   In any event, the Court finds that applicant's absence from the witness stand did not alter the punishment verdict. *See Johnson v. State*, 169 S.W.3d 223, 239-41 (Tex. Crim. App. 2005) (holding defense counsel not ineffective for denying Johnson the right to testify where his testimony would have been cumulative of other evidence already before jury, he could have been impeached with other incriminating or inconsistent statements he made, with his prior convictions, and with his continued refusal to share any blame for what happened); *Moreno v. State*, No. 13-04-195-CR, 2005 Tex. App. LEXIS 5202, at * 15 (Tex. App. – Corpus Christi 2005, no pet.) (not designated for publication) (holding counsel not ineffective even if he did deny Moreno the opportunity to testify where his testimony would have been duplicitous and would have resulted in the admission of his extraneous criminal conduct).

(643)   Applicant claims he would have testified about his parents' abusive nature, their drug and alcohol abuse, and his own learning disabilities. (Application, p. 141). According to his affidavit, applicant could have testified about his recollection of particular acts of physical abuse and neglect, his placement in foster care, his "visual" exposure to drugs and alcohol, and the fact that he did not learn his ABC's or how to count until he was five-and-a-half years old. (Applicant's Ex. Q).

(644)   The Court finds that this testimony would have had little impact on the jury's punishment deliberations.

(645)   As previously addressed, evidence that applicant was abused and neglected by his biological parents and put up for adoption at the age of five was already before the jury through Dr. Goodness. (RR53: 28). Moreover, Dr. Goodness testified to the deleterious effect this "poor" environment had on applicant's development and character. (RR53: 29-30). Testimony that applicant's parents were drug addicts also came in through Dr. Goodness. (RR53: 30-31). And Dr. Goodness, Mindi Sternblitz, and the Goldbergs all testified to applicant's academic struggles. (RR52: 6, 48-49, 67; RR53: 31-35). In fact, Dr. Goodness testified that, as a child, applicant suffered from learning disabilities, ADHD, and depression, none of which were adequately treated. (RR53: 31-32). Clearly, testimony from applicant on these matters would not have been novel.

(646)   In addition, the Court finds that because applicant's credibility had already been

---

[18] In a hearing outside of the jury's presence, the Court found that none of the prosecutor's were "making faces" at applicant. (RR47: 119-20).

2226

severely impugned in the guilt phase, the jury was likely to question the veracity of any additional testimony he offered at punishment.

(647)    Also, the Court finds that the State could have impeached the credibility of at least one account of the abuse applicant claimed to recall, i.e., being shoved down the steps while carrying a baby bottle and cutting his wrist on the broken bottle. As previously discussed, applicant's biological mother, Anna Lester, wrote applicant a letter in which she explained that the scar on his wrist was the result of an accidental fall he took while trying to help carry his infant brother, Wesley. (State's Writ Ex. E).

(648)    Furthermore, the Court finds that if applicant had put specific examples of abuse and neglect before the jury, the State could and would have countered with additional aggravating evidence, such as evidence of applicant's mistreatment of his ex-girlfriend, Theresa Dancy, and his biological mother's claims that he became meaner and harder to control, that he set fire to her sister's couch, and that she caught him shoving pennies down his brother Wesley's throat. (State's Writ Ex. E, F, G).

(649)    In short, the Court finds that the State's response to applicant's testimony would have negated whatever negligible benefit applicant could have gained from it.

(650)    Consequently, the Court finds that counsel's advice regarding applicant's right to testify was sound and did not prejudice applicant's defense.

(651)    Based on the foregoing, the Court concludes applicant's constitutional right to effective assistance of counsel was not violated by trial counsel's advice to applicant about his right to testify at punishment.

### GROUND 6:  EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

(652)    Applicant contends his appellate counsel rendered ineffective assistance because he failed to raise numerous claims on direct appeal.

(653)    On appeal, as at trial, applicant has a constitutional right to effective assistance of counsel. A complaint that appellate counsel was constitutional deficient is governed by the standard enunciated in *Strickland v. Washington*. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Ex parte Butler*, 884 S.W.2d 782, 783 (Tex. Crim. App. 1994). The decision about which claims to raise on direct appeal is a strategic one, and under *Strickland*, appellate counsel is afforded the presumption that his representation is consistent with reasonable trial strategy.

115

2227

(654)  Thus, where counsel's decision not to raise a particular complaint on appeal is at issue, it must be determined (1) whether reasonable appellate counsel would have raised it, i.e., whether it was available and meritorious, and (2) whether there is a reasonable probability that raising the issue would have led to a different outcome in the appeal, i.e., reversal. *Butler*, 884 S.W.2d at 783.

(655)  As with any ineffectiveness claim, applicant bears the burden of proving counsel's ineffectiveness by a preponderance of the evidence. *Strickland*, 466 U.S. at 687. Moreover, as applicant is seeking habeas relief, he bears the burden of proving his factual allegations by a preponderance of the evidence. *Ex parte Morrow*, 952 S.W.2d 530, 534 (Tex. Crim. App. 1997).

(656)  The Court finds applicant fails to prove that any of the claims discussed below had merit or would have resulted in reversal. Consequently, he fails to prove that his appellate counsel was constitutionally deficient.

## I. QUALIFICATIONS OF APPELLATE COUNSEL

(657)  The Court finds applicant was represented on appeal by George Ashford, and Michael Muhammad, both of whom were and are experienced appellate attorneys.

(658)  Mr. Ashford's experience is set out in the Court's findings above. Mr. Muhammad was licensed in 1993. At the time of applicant's direct appeal, Mr. Muhammad had handled numerous criminal appeals, and he had won appellate relief for several of his clients. Furthermore, he had prior experience working on death penalty appeals in affiliation with a Texas university's capital defense project. He is licensed to practice in the Fifth Circuit Court of Appeals, the Texas Northern District Court, and the Texas Southern District Court/Bankruptcy Court. (8/20/10 Hrg) RR: 148-49; Ashford Interrogatory Answers.

(659)  The Court finds that Mr. Ashford was lead appellate counsel. He delegated most of the research and all of the writing responsibilities to Mr. Muhammad. Mr. Ashford and Mr. Muhammad discussed which issues should be raised and strategically selected those they believed had the greatest likelihood of success on appeal. (8/20/10 Hrg) RR: 8-9, 38, 42, 149-51, 154, 157-59, 173; Ashford Interrogatory Answers; Muhammad Interrogatory Answers.

(660)  The Court finds that Mr. Muhammad promptly notified the Court of Criminal Appeals of his representation of applicant on the appeal. Moreover, Mr. Muhammad filed a brief on direct appeal, an amended brief, a motion for rehearing, and an amended motion for rehearing. Mr. Muhammad timely filed

116

2228

all of these pleadings and where necessary, properly requested leave to file. (8/20/10 Hrg) RR: 149-53; Ashford Interrogatory Answers; Muhammad Interrogatory Answers.

(661)    The Court finds that, at the time of appointment, applicant had no objection to Mr. Ashford or Mr. Muhammad representing him on appeal.

(662)    Applicant voiced no complaint until the summer of 2004, when his writ counsel complained about the quality of the direct appeal brief to this Court. Satisfied with appellate counsel's performance, this Court rejected the complaint. (8/20/10 Hrg) RR: 154-56.

(663)    This Court finds that in the fall of 2004, applicant and his writ counsel wrote the Court of Criminal Appeals asking the Court to remove Mr. Ashford from the direct appeal.[19] (State's Writ Ex. P). The Court apparently denied the request.

## II. Counsel Rendered Effective Assistance on Appeal

### A. Exclusion of Rodriguez's Letter

(664)    Applicant contends appellate counsel should have complained about the Court's exclusion of Defense Exhibit 30, a letter applicant's codefendant, Michael Rodriguez, wrote to his brother. Applicant claims exclusion of the letter constituted reversible error because it was admissible under evidence rule 803(24) as a statement against penal interest and it refuted the State's theory of prosecution.

(665)    The Court finds that applicant fails to prove either of these allegations.

(666)    Rule 803(24) provides for the admission of statements that would subject the declarant to criminal liability, but in criminal cases, such statements are inadmissible "unless corroborating circumstances *clearly* indicate the trustworthiness of the statement." Tex. R. Evid. 803(24) (emphasis added).

(667)    The burden of presenting evidence that clearly indicates trustworthiness is a difficult one, and it fell to applicant because he was party offering the statement into evidence. *Davis v. State*, 872 S.W.2d 743, 749 (Tex. Crim. App. 1994).

(668)    The Court finds that applicant failed to meet this burden.

---

[19] The Court finds that applicant never served the State with this complaint.

117

2229

(669)   There is no definitive test for assessing trustworthiness, but when such a statement is offered to exculpate an accused, there are several factors that may be considered, including the following:  (1) whether the guilt of the declarant is inconsistent with the guilt of the accused; (2) whether the declarant was so situated that he might have committed the crime; (3) the timing of the statement and its spontaneity; (4) the relationship between the declarant and the party to whom the statement was made; and (5) the existence of independent corroborating facts. *Davis*, 872 S.W.2d at 749.

(670)   Applicant argues these factors weighed in favor of admitting Rodriguez's letter; the Court finds that they do not.

(671)   Applicant claims the letter is inconsistent with his guilt because Rodriguez admits, "I fired once but I don't know if my shot was any good." (RR47: 66-68; Defense Ex. 30).

(672)   The Court finds this claim is premised on the false assumption that applicant's guilt hinged on whether he himself fired any shots. Proof of applicant's guilt did not depend on whether he fired a shot. The evidence showed his guilt as a party whether he fired or not.

(673)   Even if applicant's guilt hinged on whether he fired his gun, the Court finds that Rodriguez's statement does not negate the possibility that he did fire it. As previously discussed, the evidence shows that both Rodriguez and applicant fired shots at the officer. The State theorized that applicant fired the four shots into the passenger side of the patrol car's windshield because, by his own testimony, applicant was on that side of the car. In furtherance of this theory, the State did not argue, as applicant alleges, that Rodriguez never fired a shot at the officer.  Rather, the State argued that Rodriguez only fired the one shot that struck behind the speedometer and, thus, he could not have been the person who fired the passenger side shots. Thus, Rodriguez's statement admitting that he "fired once" actually supports the State's theory of the case.

(674)   The Court finds that applicant misrepresents the State's theory and the impact Rodriguez's statement that "he fired once" would have had. He also fails to acknowledge the remaining contents of the letter, which he offered into evidence in its entirety. Throughout the letter, Rodriguez attempts to minimize his own conduct and that of his codefendants. He repeatedly denies he wanted to hurt anyone, and he suggests the shooting was simply the product of bad timing rather than a pre-planned assault. He also states that he does not know if his shot "did any good." Thus, overall, the letter was self-serving.

2230

(675)   Rodriguez made these statements to his brother, but he did so while he was incarcerated and knew he would be returning to Texas to face a capital murder charge and the death penalty. Thus, the Court finds that he had an obvious motive to deny culpability and minimize his role in the offense.

(676)   In light of the foregoing, the Court acted within its discretion in excluding the letter. *See Clark v. State*, 947 S.W.2d 650, 653-54 (Tex. App. – Fort Worth 1997, no pet.) (holding trial court acted within its discretion in refusing to admit codefendant's written confession, which Clark offered to support his defense that shooting was unintentional because codefendant's statement regarding lack of intent were not against penal interest); *Jefferson v. State*, 909 S.W.2d 247, 251-52 (Tex. App. – Texarkana 1995, pet. ref'd) (holding trial court did not abuse its discretion in refusing to admit codefendant's hearsay statements under rule 803(24) where statements regarding robbery were made to an investigator with the district attorney's office while codefendant was in jail facing charges for his involvement in the robbery and they tended to improve his situation, not worsen his predicament).

(677)   Moreover, even if the letter should have been admitted, the Court finds that its exclusion was harmless. TEX. R. APP. P. 44.2(b) (harmless error standard for trial error).

(678)   Applicant claims its exclusion denied him of evidence refuting the State's theory about whether Rodriguez fired his weapon. But as explained above, Rodriguez's statement that he "fired once" actually supported the State's theory.

(679)   Thus, the Court finds that, if anything, its exclusion was beneficial to applicant.

(680)   Moreover, as the Court noted at trial, there was already other evidence before the jury that the revolver left at the scene belonged to Rodriguez, that it had only been fired once, and that the bullet was found lodged behind the patrol car's speedometer. (RR47: 66-67). Consequently, the Court finds that the letter would have been cumulative of other evidence showing he fired a shot.

(681)   The Court finds that given the propriety of the Court's ruling and the likelihood that its exclusion was harmless, counsel's decision not to raise this claim was reasonable and did not alter the outcome of the appeal.

(682)   Based on the foregoing, the Court concludes that appellate counsel did not violate applicant's right to effective assistance by not raising this claim on direct appeal.

119

2231

## B. Suppression Claims

(683)   Applicant contends appellate counsel should have complained about the Court's refusal to suppress his confession and the evidence seized in the search of the Jeep Cherokee. At trial, applicant presented both his own and Rodriguez's motions to suppress. (CR: 82-85; Defense Exs. 5, 7). Applicant claims appellate counsel should have made the arguments raised on direct appeal by his codefendant Michael Rodriguez. Applicant sets out the arguments from Rodriguez's direct appeal brief verbatim. (Application, pp. 150-72).

(684)   Rodriguez argued that his confession was taken in violation of his right to counsel. He also argued that his confession and the fruits of the search of the Jeep were the product of an illegal arrest.

(685)   The Court finds that these arguments had no merit in Rodriguez's appeal and that applicant fails to prove they would have been meritorious in his own.

### (1) No Violation of Right to Counsel

(686)   Applicant alleges that his confession was the product of an illegal arrest because it was obtained in violation of his right to counsel. In particular, he claims Sergeant Spivey failed to inform him during his interview that public defender Deborah Grohs was attempting to meet with him.

(687)   The Court finds that, at trial, applicant presented no evidence of any efforts by Ms. Grohs to meet with him.

(688)   Applicant and the State offered testimony from Rivas's trial as a joint exhibit, and applicant presented testimony from the trials of Rodriguez and Newbury. But none of these records reflected anything about Ms. Grohs's or any other public defender's attempts to meet with applicant. In addition, applicant presented Sergeant Spivey's testimony denying any knowledge that a public defender was attempting to meet with applicant.

(689)   The Court finds that, if the appellate record failed to substantiate the factual allegations upon which this claim was based, i.e., it did not show that Ms. Grohs tried to meet with applicant before or during his interview with Sergeant Spivey, the claim could not have succeeded on appeal, regardless of its merits.

(690)   Moreover, even if the record had substantiated the factual allegations upon which this claim was based, the Court finds that the claim still would have failed on appeal.

2232

(691)  Under both the United States and Texas Constitutions, the police had to inform applicant of his right to counsel and his right to appointed counsel if he was indigent. If applicant requested counsel, the police had to cease interviewing him until counsel was provided or applicant reinitiated a conversation. But as long as applicant knowingly and voluntarily waived his right to counsel, his confession was admissible. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *Dinkins v. State*, 894 S.W.2d 330, 350-51 (Tex. Crim. App. 1995).

(692)  The Court finds that applicant received the requisite warnings and agreed to speak to officers without counsel. (RR33: 11-15; State's Ex. 931). Even applicant acknowledges these facts. (Application, p. 153).

(693)  Under both federal and state law, events occurring outside of the suspect's presence and entirely unknown to him can have no bearing on his capacity to comprehend and knowingly waive that right. A suspect's waiver is valid so long as he voluntarily decides to waive his right to counsel, and he is fully aware of and comprehends the information conveyed to him in the *Miranda* warnings. Thus, the State may interview a suspect once he waives his right to counsel even though, unknown to him, an attorney, retained or appointed, was seeking access to him. *Moran v. Burbine*, 475 U.S. 412, 418-20 (1986); *Goodwin v. State*, 799 S.W.2d 719, 729-30 (Tex. Crim. App. 1990).

(694)  The Court finds that because applicant received the requisite warnings, comprehended them, and voluntarily waived his rights, his confession was admissible notwithstanding any unsuccessful attempts by Ms. Grohs to meet with him before he confessed. *See Goodwin*, 799 S.W.2d at 729-30 (holding Texas murder confession admissible despite failure to inform defendant during interview that Iowa counsel appointed to represent him on Iowa charges was waiting to meet with him).

(695)  Applicant acknowledges that federal jurisprudence is not in his favor. Nonetheless, he argues the Texas Constitution affords him greater protection. In support of this contention, applicant cites *Dunn v. State*, 696 S.W.2d 561 (Tex. Crim. App. 1985).

(696)  In *Dunn*, the Court of Criminal Appeals held that a defendant's constitutional rights to counsel under the Fifth Amendment and article I, section 10 of the Texas Constitution were violated because he was not informed that attorneys hired by his wife to represent him were at the police station and trying to meet with him during his interrogation by police. *Dunn*, 696 S.W.2d at 569-70.

(697)  *Dunn*'s interpretation of the Fifth Amendment right to counsel has been

121

2233

overturned. *See Goodwin*, 799 S.W.2d at 729-30.

(698)   Moreover, contrary to applicant's contention, *Dunn* does not support his proposition that his state right to counsel is broader than his federal right.

(699)   In *Dunn*, the Court of Criminal Appeals did not separately address the state constitutional right to counsel. The Court centered its analysis on federal precedent. Thus, as the Court of Criminal Appeals has since noted, the holding in *Dunn* "does not represent an independent and adequate state ground." *Goodwin*, 799 S.W.2d at 729. Furthermore, the Court of Criminal Appeals has more recently held that the state constitutional right to counsel affords no more protection than its federal counterpart. *Hernandez v. State*, 988 S.W.2d 770, 772 (Tex. Crim. App. 1999).

(700)   The Court finds that, consistent with its own authority, the Court of Criminal Appeals would have overruled applicant's claimed deprivation of his right to counsel and upheld the trial court's admission of his confession.

(701)   Thus, the Court finds that appellate counsel did not violate applicant's constitutional right to effective assistance of counsel by not raising this claim on direct appeal.

### (2) Legality of Arrest

(702)   Applicant contends, as Rodriguez argued, that his confession and the evidence recovered in the search of the Jeep Cherokee were the product of his illegal arrest. (Application, pp. 150-72).

(703)   The Court notes that applicant makes no argument regarding the fruits of the search of the RV, although the findings presented here would apply equally to that evidence.

(704)   Applicant specifically claims his arrest was not predicated on a valid warrant that had any force and effect in Colorado. He claims the federal warrant for flight from prosecution and the Texas warrant for capital murder were not based on probable cause and, thus, invalid. (State's Exs. 928, 929).

(705)   The Court finds that these were not the only warrants issued for applicant's arrest, however.   The State presented two additional arrest warrants in response to his suppression motion:   a federal warrant for possession of firearms by a convicted felon and a Texas warrant for escape. (State's Exs. 927, 930).

2234

(706)   Thus, the Court finds that even if the attacks on the Texas capital murder warrant and the federal flight from prosecution warrant had merit, there were other warrants upon which applicant's arrest could have been made.

(707)   The Court finds that applicant never questioned, much less disproved, the validity of either of these warrants. Moreover, regardless of whether or not the Texas escape warrant had any force and effect in Colorado, as applicant concedes, the federal warrant clearly did.

(708)   The Court finds that even if these additional warrants did not exist, applicant fails to prove that his arrest was illegal.

(709)   The Court finds that applicant does not prove the capital murder and flight from prosecution warrants were not based on probable cause, that the warrants lacked force and effect in Colorado, or that his warrantless arrest would have been illegal.

(710)   Also, the Court finds applicant fails to disprove the attenuation of any taint from an illegal arrest.

(711)   Consequently, the Court finds applicant fails to prove his attack on the legality of his arrest would have succeeded on direct appeal.

(a) Warrants Based on Probable Cause

(712)   The Fourth Amendment requires probable cause to arrest.  U.S. CONST. amend. IV.

(713)   Applicant perfunctorily cites article I, section nine of the Texas Constitution in support of his illegal arrest claim and presents this Court with no separate argument or authorities supporting it. Thus, the Court finds that applicant is not contending that the Texas Constitution affords him any greater protection than the federal constitution.

(714)   An arrest warrant affidavit must set out sufficient facts to permit the magistrate to make an independent judgment that probable cause for arrest exists. *Knox v. State*, 586 S.W.2d 504, 505-06 (Tex. Crim. App. 1979). Probable cause exists where the police have reasonably trustworthy information sufficient to warrant a prudent person to believe a particular person has committed or is committing an offense. *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Guzman*, 955 S.W.2d at 87. Probable cause deals with probabilities; it requires more than mere suspicion but far less evidence than that needed to support a conviction or even that

123

2235

needed to support a finding by a preponderance of the evidence. *Guzman*, 955 S.W.2d at 87. It contemplates "a fair probability." *Illinois v. Gates*, 462 U.S. 213, 246 (1983).

(715)  Whether an affidavit underlying a warrant establishes probable cause is determined by reviewing the information contained within the affidavit's four corners. *Jones v. State*, 833 S.W.2d 118, 123 (Tex. Crim. App. 1992). The test is whether, under the totality of the circumstances, the affidavit provided the issuing magistrate with a substantial basis for concluding that probable cause existed. *Illinois v. Gates*, 462 U.S. at 236; *Ramos v. State*, 934 S.W.2d 358, 362-63 (Tex. Crim. App. 1996).

(716)  A substantial basis may be established through the affiant's direct personal observations or hearsay information. *Jones v. State*, 568 S.W.2d 847, 854 (Tex. Crim. App. 1978). The magistrate is permitted to draw reasonable inferences from the facts and circumstances alleged, and a magistrate's determination that probable cause exists is entitled to great deference. *Gates*, 462 U.S. at 236; *Ramos*, 934 S.W.2d at 362-63.

(717)  When reviewed, an affidavit should be interpreted in a commonsense, not hypertechnical, manner. *Gates*, 462 U.S. at 236. The informant's credibility and the basis of his knowledge are highly relevant factors. It is not imperative, however, that the affidavit reveal both that the informant is credible and that he has a substantive basis for his assertions. Compelling evidence of one prong will make up for a deficiency in the other, and a magistrate is not required to find both before finding probable cause. *Id.* at 233.

### (i) Texas Capital Murder Warrant

(718)  The Court finds that the affidavit underlying the Texas capital murder warrant established probable cause, i.e., it provided the issuing magistrate with a substantial basis for concluding a fair probability existed that applicant participated in the capital murder of Officer Hawkins.

(719)  The affiant, Irving Police Detective Randal Johnson, stated his belief that Applicant committed capital murder on Christmas Eve 2000 based on the following information that: (1) Wesley Ferris, a manager of the Oshman's store in Irving, was robbed at gunpoint by George Rivas, (2) applicant, along with Rivas, Donald Newbury, Randy Halprin, Patrick Murphy, Larry Harper, and Joseph Garcia, produced handguns and robbed the employees, including Mr. Ferris, (3) Officer Hawkins responded to the back of the store while applicant, Rivas, and the others were fleeing, (4) other officers found Officer Hawkins at

124

2236

the scene and the Irving Fire Department transported him to the hospital were he was pronounced dead from gunshot wounds, and (5) employees positively identified applicant, Rivas, and the others in a photographic lineup. (State's Ex. 929).

(720)   Applicant suggests that Detective Johnson's affidavit does not demonstrate the basis of his knowledge of these facts.

(721)   The Court finds that this suggestion is supported only by a hypertechnical interpretation of the affidavit. A commonsense interpretation indicates otherwise.

(722)   The Court finds the magistrate could have reasonably inferred from Detective Johnson's sworn statements that he had obtained the information about the robbery and applicant's participation in it from Wesley Ferris and the other employees. Furthermore, the magistrate could have reasonably inferred that Detective Johnson learned from other Irving police officers and Irving firemen the information regarding Officer Hawkins's response to the scene and subsequent death.

(723)   Therefore, the Court finds that Detective Johnson's sworn statements do support the magistrate's probable cause determination. *Cf. Jones*, 568 S.W.2d at 855 (holding affidavit for arrest warrant sufficient for magistrate to infer affiant's personal knowledge that defendant's prints matched to prints on evidence found at murder scene, and affidavit obviously based on the statements of the victim of an offense to the affiant as well as the affiant's personal knowledge of offense as investigating officer).

(724)   Applicant also claims Detective Johnson's affidavit is deficient because it is predicated on an unconstitutional lineup.

(725)   The Court finds that such an attack goes beyond the four corners of the affidavit.

(726)   A defendant may attack the accuracy of the underlying affidavit only by establishing that the affiant intentionally, knowingly, or recklessly made false statements that were material to the probable cause determination. *See Franks v. Delaware*, 438 U.S. 154, 156 (1978).

(727)   The Court finds that the constitutionality of the lineup has no bearing on the veracity of Detective Johnson's sworn statements. Thus, it has no bearing on the validity of the capital murder warrant either.

2237

*(ii) Federal Flight-From-Prosecution Warrant*

(728)   As for the federal warrant, the Court finds that the sworn statements of FBI Agent Laurie Gibbs established probable cause, i.e., it provided the federal magistrate with a substantial basis for concluding a fair probability existed that applicant had fled from prosecution.

(729)   The federal offense of flight to avoid prosecution is codified at 18 U.S.C.A. § 1073 (West 2011). A person commits this offense if he "moves or travels in interstate or foreign commerce with intent either (1) to avoid prosecution, or custody or confinement after conviction, under the laws of the place from which he flees, for a crime, or an attempt to commit a crime, punishable by death or which is a felony under the law of the place from which the fugitive flees . . . ."

(730)   Agent Gibbs stated that she had personally reviewed the Texas arrest warrants issued for applicant, Rivas, Newbury, Halprin, Harper, Murphy, and Garcia and determined that they were charged with capital murder. She also averred that on December 27, 2000, TDCJ Investigator Bruce Tony told her he had received information from a confidential source that applicant, Garcia, Rivas, Newbury, Halprin, Murphy, and Harper had fled from Texas to Mexico. (State's Exhibit 1).

(731)   Agent Gibbs also stated that Michael Carnes, First Assistant District Attorney in the Dallas County District Attorney's Office, wrote Assistant U.S. Attorney Lynn Hastings asking for the FBI's assistance under the Unlawful Flight to Avoid Prosecution, Title 18, Section 1073 of the United States Code. (State's Exhibit 1).

(732)   The Court finds that the affidavit sets out the underlying basis for the confidential source's information, i.e., his personal knowledge. The affidavit states that the source told Investigator Tony he spent the night with Halprin and Newbury on December 26, 2000. The source asserted that, during this visit, Halprin admitted to the source his involvement in the Christmas Eve robbery of the Oshman's store and the shooting, and that "the group" was fleeing to Mexico via El Paso. Furthermore, the affidavit reflects that the source advised Halprin "the group" should flee to Mexico via Arizona and settle in Puerto Penasco.

(733)   Applicant does not dispute that Agent Gibbs possessed personal knowledge of the facts sworn to in the affidavit. He claims the sworn facts do not establish probable cause because they do not state a basis for concluding that the confidential source was credible.

126

2238

(734)    Rodriguez also argued that the affidavit did not establish probable cause because applicant's statements to the source do not identify Rodriguez as a member of "the group" to which he referred. Although applicant recites this argument in his application, it is clearly inapplicable to an attack on the federal flight from prosecution warrant issued for his own arrest. The Court finds that, if anything, the fact that the confidential informant specifically mentions applicant helps establish the validity of this warrant.

(735)    Since *Illinois v. Gates*, an affidavit need not specifically show why an informant is credible if the underlying basis of the informant's information sets out probable cause.

(736)    The Court finds that the confidential source's statements to Investigator Tony were not conclusory assertions. Rather, they reflected specific information based on personal knowledge, namely, that only two days after Officer Hawkins's murder, the source obtained information from applicant himself about the Oshman's robbery, the shooting, and future interstate flight plans.

(737)    The Court finds that because the basis of the information provided by the confidential source was identified with specificity, the affidavit established a substantial basis for crediting the source's hearsay statements. *See Gates*, 462 U.S. at 233 (informant's explicit and detailed description of alleged wrongdoing, along with a statement that event was observed firsthand, entitles his tip to greater weight than might otherwise be the case).

(738)    Thus, the Court finds that Agent Gibbs's sworn statements support the federal magistrate's probable cause determination and, applicant's arrest on the federal warrant, like the Irving warrant, was legally justified.

### (b) Authority to Arrest Applicant Outside of Texas

#### (i) On Federal Warrant

(739)    The Court finds that the authorities could have arrested applicant in Colorado based on the federal warrant alone. It had full force and effect in every state in the Union. *See United States v. Bowdach*, 561 F.2d 1160, 1167-68 (5th Cir. 1977) (federal warrant may be issued anywhere in United States and may be executed by state officers).

#### (ii) Under Uniform Criminal Extradition Act

(740)    Furthermore, the Court finds that the authorities in Colorado could have

2239

arrested applicant without a warrant under the Uniform Criminal Extradition Act. This act has been adopted by both Texas and Colorado. See TEX. CODE CRIM. PROC. ANN. art. 51.13 (Vernon 2006); COLO. REV. STAT. §§ 16-19-101 through 16-19-132 (West 2010). It authorizes the arrest of a fugitive "without a warrant, upon reasonable information that the accused stands charged in the courts of a State with a crime punishable by death or imprisonment for a term exceeding one year." TEX. CODE CRIM. PROC. art. 51.13, § 14; COLO. REV. STAT. § 16-19-1151.

(741)   The record reflects that the officers who arrested applicant in Colorado had reasonable information that he was charged in another state with a crime punishable by death or a prison term of more than a year.

(742)   The testimony of Sheriff Frank Fehn and Sergeant Todd Evans, which was offered by the State at the suppression hearing, shows that applicant and the other escapees were the subjects of a nationwide manhunt. The media widely publicized their offenses and identities. (State's Ex. 932, pp. 221-22, 239, 258).

(743)   Furthermore, while they were at large, nationwide bolos ("be on the lookout" notices) for applicant and the other escapees were broadcast to law enforcement authorities; the bolos contained the names, descriptions, and offenses of each escapee. (RR42: 221-22, 239-40).

(744)   On the evening of January 21, 2001, about a month after Officer Hawkins's murder, some "citizens," including Wade Holder, the owner of the Coachlight Motel and RV Park located in Woodland Park, Colorado, told Sheriff Fehn that they had seen applicant and some of the other escapees in the Coachlight Motel & RV Park located in Woodland Park, Colorado. That night, Sheriff Frank Fehn and one of his deputies drove through the park in Sheriff Fehn's RV and from a distance surveilled the campsite where the escapees had been seen. He then returned to his office and contacted the El Paso County Sheriff's Office, the Colorado Springs Police Department, and the FBI for assistance. Working together, these agencies captured applicant and the other escapees the next morning, January 22, 2001. Applicant surrendered himself at the RV park. (State's Ex. 932, pp. 220-59).

(745)   All of the deputies who participated in applicant's arrest knew he was an escaped convict charged with capital murder in Texas. In addition to the media bulletins publicizing applicant's photograph and crimes, they received information in the form of bolos and in department briefings long before the day of applicant's capture. (State's Ex. 932, pp. 239-40, 259).

(746)   In addition, Sergeant Evans, one of the team leaders, confirmed that the SWAT

128

2240

team and the federal agents acted on information that had been confirmed through proper channels by Texas authorities. (State's Ex. 932, pp. 255-56, 259). He also specifically noted their knowledge of the existence of the flight from justice warrant and an escape warrant. (State's Ex. 932, p. 254).

(747)   The Court finds that the information the arresting officers received from federal and Texas authorities was sufficient to justify applicant's arrest under the Extradition Act. *See Morales v. State*, 513 S.W.2d 869, 870 (Tex. Crim. App. 1974)(holding officers' warrantless arrest of defendant justified under section 14 of extradition act where officers acted on information obtained from NCIC computer that there was an outstanding warrant for defendant's arrest in California for murder and attempted robbery); *Maestas v. State*, 963 S.W.2d 151, 158 (Tex. App. – Corpus Christi 1998), *aff'd*, 987 S.W.2d 59 (Tex. Crim. App. 1999) (holding faxed wanted notice to Texas officer from Colorado probation officer indicating defendant was wanted on felony escape warrant in Colorado constituted reasonable basis for defendant's warrantless arrest in Texas under section 14 of extradition act); *see also People v. Thompson*, 793 P.2d 1173 (Colo. 1990); *compare with Roeder v. State*, 768 S.W.2d 745, 751 (Tex. App. – Houston [1st Dist.] 1988, no pet.)(holding warrantless arrest for Colorado offense unjustified under section 14 of extradition act where Houston police officer knew no charges had been filed and no arrest warrant issued).

*(iii) Under Colorado Statute § 16-3-102*

(748)   The Court finds that even if no valid arrest warrant existed at the time of applicant's arrest, the authorities in Colorado could have arrested him under Section 16-3-102 of the Colorado Revised Statutes.

(749)   This statute authorizes a Colorado peace officer to arrest without a warrant where he "has probable cause to believe that an offense was committed and has probable cause to believe that the offense was committed by the person to be arrested." COLO. REV. STAT. § 16-3-102 (West 2010).

(750)   In effecting an arrest under this provision, an officer may rely on the information relayed to him by fellow officers provided that the other officer or department as a whole has information sufficient to constitute probable cause to make the arrest. *People v. Nanes*, 483 P.2d 958, 962 (1971).

(751)   As previously noted, the record reflects that the authorities in Colorado acted upon the information furnished to them by Texas authorities.

(752)   The Court finds the record also establishes that, notwithstanding the validity of

2241

the Texas warrant, the Texas authorities had probable cause to believe applicant had committed robbery and capital murder.

(753)  The police report prepared by Irving Police Department Investigator Randal Johnson, which was introduced into evidence at the pretrial proceeding by the defense, shows that on the night of December 24, 2000, seven escaped convicts, including applicant, robbed the Oshman's employees at gunpoint and, while fleeing, shot and killed Officer Hawkins in the loading dock behind the store. In the hours immediately following the robbery and murder, some of the Oshman's employees gave statements to the police that they were robbed at gunpoint by several men. At least one of the employees identified applicant in a photographic lineup as one of robbers. Mr. Ferris personally related his account of the offense to Irving Police Detective Randal Johnson, dictating his statement to the detective at the scene and giving him a guided account in the store later that same night. Armed with this information, Detective Johnson obtained a warrant for applicant's arrest for capital murder on Christmas Day. (Defense Exhibit 2).

(754)  Given that Texas authorities had probable cause to believe applicant had committed both robbery and capital murder, applicant's arrest by Colorado authorities was legal under section 16-3-102. *See, e.g., Nanes*, 483 P.2d at 962 (upholding legality of defendant's arrest by Golden police officer based on radio dispatches where Boulder police possessed information sufficient to constitute probable cause to arrest defendant for robbery).

### *(iv) Under Article 14.04 of Texas Criminal Procedure Code*

(755)  Applicant argues that Colorado law does not govern the legality of his arrest.

(756)  The Court finds, however, that even under Texas law, applicant's warrantless arrest would have been justified.

(757)  Notwithstanding Texas's general warrant requirement, article 14.04 of the Texas Code of Criminal Procedure authorizes a warrantless arrest where "it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape . . . ." TEX. CODE CRIM. PROC. ANN. art. 14.04 (Vernon 2005).

(758)  Communications from fellow officers, even those from out-of-state, may provide a basis for arrest under article 14.04. *Crane v. State*, 786 S.W.2d 338, 346 (Tex. Crim. App. 1990). As under Colorado law, probable cause for an arrest under this statute is determined by the information in possession of the officer

2242

who made the broadcast or otherwise communicated with the arresting officer. *Crane*, 786 S.W.2d at 346.

(759)   Again, the Court finds that the Texas authorities possessed information establishing probable cause for applicant's arrest for robbery and capital murder. *Id.* at 346 (holding information in possession of Texas officer who responded to murder scene and spoke with eyewitness to murder established probable cause for defendant's warrantless arrest by Oklahoma authorities under article 14.04).

(760)   Furthermore, the Court finds that the information Colorado authorities had constituted satisfactory proof that applicant was about to escape.

(761)   Article 14.04 does not require a showing the offender was, in fact, about to escape or that, in fact, there was no time to procure a warrant. It only requires credible representations of such. *Id.* at 347.

(762)   The Court finds that information from Texas authorities that applicant was an escaped convict satisfied article 14.04. *See Fry v. State*, 639 S.W.2d 463, 476 (Tex. Crim. App. 1982) (holding victim's report to police that defendant and others who robbed him stated intent to flee to California was sufficient to constitute representations by a credible person that defendant was about to escape and there was no time to procure a warrant).

(763)   Thus, regardless of which state's law applied, the Court finds that applicant's arrest was legal even without a valid warrant.

### (c) Any Taint Of Illegality Attenuated

(764)   The Court finds that even if applicant's arrest was illegal, his confession and the evidence seized from the RV and Jeep were still admissible.

(765)   The Court finds that the confession and search were so attenuated from the arrest that the taint from any illegality was dissipated. *See Brown v. Illinois*, 422 U.S. 590, 603-04 (1975); *Johnson v. State*, 871 S.W.2d 744, 751 (Tex. Crim. App. 1994). Therefore, exclusion of this evidence was unwarranted. *See Johnson*, 871 S.W.2d at 750 (evidence sufficiently attenuated from violation of law not considered to be obtained in violation of law under article 38.23); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.23 (Vernon 2005) (Texas statutory exclusionary rule).

(766)   Determining whether a confession is sufficiently attenuated from an illegal

131

2243

arrest requires a four-part inquiry: (1) whether *Miranda* warnings were given, (2) the temporal proximity of the arrest and the confession, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct. *Id.* The purpose of this four-part analysis is to determine whether the causal chain between an illegal detention or arrest and the statement at issue has been broken so that the confession is shown to be the product of free will. *Bell v. State*, 724 S.W.2d 780, 788 (Tex. Crim. App. 1986) (adopting four-part analysis enunciated in *Brown v. Illinois*).

(767)  Major consideration should be given to the extent to which the officers' conduct violated the law and the extent to which their purpose in doing so was to obtain the confession. *See* 40 GEORGE E. DIX & ROBERT O. DAWSON, TEXAS PRACTICE: CRIMINAL PROCEDURE AND PRACTICE § 4.103, p. 240 (2nd ed. 2001).

(768)  The Court finds that the four factors weigh strongly in favor of the admission of applicant's confession.

(769)  Before he confessed, applicant was repeatedly given *Miranda* warnings, orally and in writing, by Sergeant Spivey. He demonstrated a full understanding of his rights and voluntarily waived them on each occasion. (RR33: 11-15, 28). Thereafter, he dictated his confession to Detective Spivey, never once halting the interview or invoking his right to silence or counsel. (RR33: 13-15).

(770)  The temporal proximity of applicant's confession to his arrest was about twelve hours. The Court finds that this was not an insignificant delay. Applicant surrendered to authorities shortly after Rivas, Garcia, and Rodriguez were captured at 11:30 a.m. Applicant confessed during an interview that began shortly after 12:50 a.m., when Rivas confessed. (RR33: 7-9; Defense Ex. 26). Spivey's testimony and applicant's confession indicated that the interview with applicant lasted only a couple of hours. (RR33: 13; State's Ex. 931).

(771)  Although an illegal custody becomes more oppressive as it continues uninterrupted, generally, the longer the time between an arrest and confession, the more likely any taint would be attenuated. *Juarez v. State*, 758 S.W.2d 772, 781 (Tex. Crim. App. 1988).

(772)  Although there were no intervening circumstances, the Court finds that there was no flagrant misconduct by the officers. They did not arrest applicant knowing they had no legal basis for doing so or for the sole purpose of obtaining inculpatory evidence. *See Miller v. State*, 736 S.W.2d 643, 651 (Tex. Crim. App. 1987) (upholding consent to search obtained after illegal arrest where arrest was not a subterfuge to achieve consent).

2244

(773)   The Court finds that the officers made the arrest believing it was proper, namely that multiple valid warrants for applicant's arrest existed. *See id.* at 650 (holding officers arrest pursuant to warrant they believed to be valid "cannot be classified as misconduct").

(774)   Furthermore, the Court again finds that, notwithstanding the validity of the warrants, applicant's arrest was premised on probable cause that he had committed an offense in Texas. *Compare with Vicioso v. State*, 54 S.W.3d 104, 111 (Tex. App. – Waco 2001, pet. ref'd) (holding misconduct flagrant where officers had no warrant or probable cause for arrest or even reasonable suspicion for detention).

(775)   The Court finds that overall, any illegality was statutory, not constitutional, and the officers had no illicit purpose in making the arrest.

(776)   Thus, notwithstanding any illegality, the Court acted within its discretion in admitting the confession. *See Self v. State*, 709 S.W.2d 662, 665-67 (Tex. Crim. App. 1986) (holding any taint attenuated from illegal arrest where defendant repeatedly given *Miranda* warnings orally and in writing and voluntarily waived rights, two-hour lapse between arrest and confession, and arrest based on probable cause and not for sole purpose of obtaining evidence against defendant).

(777)   Likewise, the Court finds the evidence seized from the Jeep was sufficiently attenuated from any illegality. This search was not conducted incident to applicant's arrest. Rather, it was authorized by a search warrant applied for and issued after applicant's arrest. (Defense Ex. 3, Defense Ex. 4, p. 7; State's Ex. 288).

(778)   At trial, the court properly overruled applicant's attacks on the validity of this warrant. (RR41: 15-16). Given the existence of this valid search warrant, the Court acted within its discretion in admitting the evidence seized from the Jeep. *See Christian v. State*, 592 S.W.2d 625, 631 (Tex. Crim. App. 1980) (holding evidence seized from defendant's car attenuated from illegal stop where evidence seized pursuant to valid search warrant).

(779)   In light of all the foregoing, the Court finds that the Court of Criminal Appeals would have upheld the Court's admission of his confession and the evidence seized from the Jeep.

(780)   Consequently, the Court finds that appellate counsel was not deficient for not raising these suppression claims on direct appeal; nor did their omission alter

2245

the outcome of applicant's appeal.

(781)   Based on the foregoing, the Court concludes that appellate counsel did not violate applicant's constitutional right to effective assistance by not raising these suppression claims on direct appeal.

## C. Instruction Defining "Anticipate"

(782)   Applicant contends appellate counsel should have complained about the Court's refusal to define "anticipate" for the jury in the punishment instructions.

(783)   As applicant notes, trial counsel asked the Court to instruct the jury that the term anticipate meant "expected a circumstance to happen with a certainty," and the Court refused. (CR: 98; RR53: 68).

(784)   The Court finds applicant fails to prove that this refusal constituted reversible error.

(785)   As a general rule, terms need not be defined in the charge if they are not statutorily defined. *Middleton v. State*, 125 S.W.3d 450, 454 (Tex. Crim. App. 2003).

(786)   Applicant contends, however, that the Court should have defined "anticipate" as he requested because a reasonable likelihood existed that his jury would misunderstand or misinterpret the term to mean the "possibility" rather than "probability" that an event would occur.

(787)   The Court finds that, by this argument, applicant acknowledges that, if an instruction regarding the meaning of anticipate were required, it should be defined in terms of a "probability" or "likelihood." Thus, applicant apparently concedes that his requested instruction defining "anticipate" in terms of "certainty" was erroneous and, consequently, properly overruled by the Court.

(788)   Furthermore, the Court finds applicant does not demonstrate that absent an instruction defining "anticipate," the jury would have interpreted it to mean a "mere possibility."

(789)   As previously discussed, the common meaning or understanding of "anticipate" suggests a probability or likelihood, rather than a mere possibility. *See* Encarta World English Dictionary (North American Ed. 2005); The American Heritage Dictionary of the English Language (4th ed. 2000).

(790)   The Court finds that the State did nothing to suggest otherwise. Only defense

134

2246

counsel discussed the meaning of the term during closing arguments, and he told the jury to construe the term to mean "expect with a certainty." (RR53: 105-06). Defense counsel made this argument to the jury without objection or rebuttal by the State, effectively increasing the State's burden of proof on the second special issue. (8/20/10 Hrg) RR: 147.

(791) Thus, that Court finds that, if anything, the jury probably construed the term to mean something more than required by *Tison*, rendering the Court's refusal to submit applicant's requested definition harmless.

(792) The Court finds that appellate counsel was not deficient for not raising this claim on direct appeal and that its omission did not alter the outcome of applicant's appeal.

(793) Based on the foregoing, the Court concludes that appellate counsel did not violate applicant's constitutional right to effective assistance by not raising this claim on direct appeal.

### D. EVIDENCE OF OTHER PRISON ESCAPES

(794) Applicant contends appellate counsel should have complained about the admission of evidence of the escapes of other TDCJ prisoners. Applicant claims the evidence was inadmissible because it was irrelevant and highly prejudicial.

(795) The Court finds applicant fails to prove that raising this claim on direct appeal would have resulted in a reversal.

(796) The Court finds applicant fails to prove that evidence of prison escapes by other inmates was inadmissible.

(797) Applicant does not cite to or otherwise specifically identify the testimony about which he is complaining, but it appears he is referring to the following information the State elicited from his prison expert, S.O. Woods, on cross-examination:

> – in September of 2001, inmate Harold Laird, who was serving a life sentence for capital murder, escaped from administrative segregation (RR51: 105-06);

> – in February of 2001, an inmate named Nelson, who was housed in administrative segregation, faked an illness and when taken to the hospital for treatment, took two nurses hostage and sexually

2247

assaulted them; moreover, he had committed a similar act once before (RR51: 106);

— on March 16, 2000, inmate Antonio Lara, who was housed in administrative segregation, got out of his cell and murdered another inmate (RR51: 106);

— on February 17, 2002, an inmate named Roland, who was serving a life sentence for capital murder, beat a guard, stole his uniform, and escaped (RR51: 106-07);

— an inmate named Russell has escaped once and made numerous other attempts to escape, conning his jailers and either defeating or taking advantage of failures in the prison security systems (RR51: 107-08);

— in 1998, several inmates attempted to escape, one of whom made it over the wire fencing but was found dead of a gunshot wound (RR51: 109).

(798)   The State also elicited the following evidence of violence, but not escape, by death-row inmates:

— on January 21, 2000, two death-row inmates held a fifty-seven year-old female guard hostage (RR51: 109);

— on June 9, 2000, a death-row inmate nearly severed the arm of a seventy-eight year-old chaplain (RR51: 109); and

— in February of 2003, a general population inmate murdered a prison shop superintendent.  (RR51: 109).

(799)   The Court finds that whether appellate counsel had limited his complaint to evidence of escapes by other inmates or had challenged the admission of all of the above evidence, his claim would have failed on the merits.

(800)   The Court finds that all of the above evidence was relevant. As the prosecutor argued to the Court at trial, this evidence was probative of whether administrative segregation was secure enough to prevent any escape or future violence by applicant.  (RR51: 96).

2248

(801)   Applicant claims that, on direct examination, Woods did not address the issue of escape or intimate that applicant was not a flight risk.

(802)   The record reflects, however, that applicant made considerable efforts to convince the jury that if he were incarcerated in administrative segregation, he would not be a future danger to anyone.

(803)   On direct examination of Woods, applicant elicited extensive testimony from Woods portraying the security measures in administrative segregation as modern, more restrictive, and more difficult to circumvent than the security measures used in general population and in the former death-row unit.

(804)   Applicant also established through Mr. Woods that security measures in administrative segregation had been further improved since applicant's escape. (RR51: 56-63, 66-67, 71-94; Defense Ex. 54).

(805)   The Court finds that evidence of the escapes and violent acts of other inmates, most of whom were housed in administrative segregation, established that no security measures, even the most modern and restrictive, are foolproof against inmates who have nothing to do but watch and wait for a human mistake or system failure.

(806)   Because this evidence helped refute applicant's suggestion that he would pose no future danger if housed in administrative segregation, the Court finds that it was probative of a fact at issue in the punishment phase and, thus, admissible. *See* TEX. R. EVID. 401 (defining relevant evidence).

(807)   Indeed, the admission of similar evidence has been upheld by the Court of Criminal Appeals. *See, e.g., Canales v. State*, 98 S.W.3d 690, 699 (Tex. Crim. App. 2003) (holding that testimony about other inmates defeating locking mechanisms on prison doors was relevant and not unfairly prejudicial where testimony, admitted at punishment phase during State's cross-examination of defense witness, responded to defensive theory that a life-sentenced Canales might not be dangerous if housed in "administrative segregation" and showed that he could still commit violent acts).

(808)   Applicant claims that even if evidence of escapes by other inmates is relevant, its probative value was minimal and it was highly prejudicial.

(809)   The Court finds that applicant fails to prove either of these assertions.

(810)   The Court finds that the probative value of all of the evidence of escapes and violent acts by other inmates directly and affirmatively refutes the defensive

2249

theory that applicant would not pose a future danger in administrative segregation. Thus, its probative value was substantial, not minimal.

(811)  Furthermore, the Court finds that there was no danger of unfair prejudice from the admission of this evidence. There was no risk that it would inflame the minds of the jury or be used for any improper purpose. It pertained directly to a defensive theory raised by applicant on direct examination of Woods. *See Canales*, 98 S.W.3d at 699. Moreover, it did not relate to applicant personally, but to other inmates.

(812)  The Court finds that applicant's own infamous escape, during which he violently assaulted one hostage and threatened others, was far more detrimental to his case than evidence of escapes and violence committed by other inmates. Several witnesses, including applicant, testified in great detail regarding applicant's violent escape, and the State presented the letter applicant left behind on his bunk in which he threatened future violence. (RR47: 112-19; RR48: 3-10, 108-19, 122-27, 129-31; RR49: 69-87, 121-28, 148-54, 167-72; State's Ex. 955).

(813)  The Court finds that this evidence was so substantial and compelling that it rendered any error in the admission of Mr. Woods's testimony about the acts of other inmates harmless. *See* TEX. R. APP. P. 44.2(a).

(814)  Thus, the Court finds that appellate counsel was not deficient for not raising this claim on appeal and that omission of the claim did not alter the outcome of the appeal.

(815)  Based on the foregoing, the Court concludes that appellate counsel did not violate applicant's constitutional right to effective assistance by not raising this complaint on direct appeal.

## E. "THE TEN COMMANDMENTS OF SPEC WAR" EXHIBIT

(816)  Applicant contends his appellate counsel should have argued on direct appeal that the trial court erroneously admitted copies of a document entitled "The Ten Commandments of Spec War." (State's Exs. 342-A & 344-A).

(817)  One copy of the document was found in the trash outside of the RV and the other copy was found inside the RV. The State offered the documents into evidence in the guilt phase during applicant's testimony and confronted applicant with them.  Applicant's trial counsel objected to their admission, arguing that they had not been linked to applicant. (RR49: 11-13, 15-17).

138

2250

(818)   The document reads as follows:

### THE TEN COMMANDMENTS
### OF SPEC WAR

#### According to Richard Marcinko

I am the War Lord and the wrathful God of Combat and I will always lead you from the front, not the rear.

I will treat you all alike – just like shit.

Thou shalt do nothing I will not do first, and thus will you be created Warriors in My deadly image.

I shall punish thy bodies because the more thou sweatest in training, the less thou bleedest in combat.

Indeed, if thou hurteth in thy efforts and thou suffer painful dings, then thou art Doing It Right.

Thou hast not to like it – thou hast just to do it.

Thou shalt Keep It Simple, Stupid.

Thou shalt never assume.

Verily, thou art not paid for thy methods, but for thy results, by which meaneth thou shalt kill thine enemy before he killeth you by any means available.

Thou shalt, in thy Warrior's Mind and Soul, always remember My ultimate and final Commandment:  There Are No Rules – Thou Shalt Win at All Cost.

(State's Exs. 342-A, 344-A).

(819)   Applicant contends appellate counsel failed to present trial counsel's objection as a point of error on direct appeal. He argues the State used the document to prove his homicidal intent without ever linking it to him or demonstrating that he had adopted the beliefs and attitudes expressed in it.

139

2251

(820)   Applicant's contention seems to be that the document was irrelevant, but the Court finds its relevance was plain even if neither copy belonged to applicant.

(821)   The Court finds that applicant's intent was not the only intent in issue at his trial. He was not prosecuted solely as a principle, but as a party and a party conspirator as well. (CR: 22-35). Thus, the intent of the other members of the Texas Seven was also in issue.

(822)   The Court finds it was undisputed that the document belonged to someone in the group, and one could reasonably infer that the person it belonged to shared the beliefs and attitudes expressed in it. To the extent those beliefs and attitudes supported an inference of homicidal intent of at least one of the group's members, the document was certainly probative of a fact in issue. *See* TEX. R. EVID. 401 & 402. Thus, the document was properly admitted.

(823)   Moreover, the Court finds appellate counsel could not have demonstrated that admission of the document affected any substantial right of applicant's. *See* TEX. R. APP. P. 44.2(b) (harmless error standard).

(824)   The Court finds little, if any, mention of the document was made after its admission.

(825)   Moreover, the Court finds that there was a great deal of evidence, outside of the document, from which the requisite intent could be inferred, the most striking of which was the fact that Officer Hawkins was shot eleven times. Thus, it could hardly be said that but for the document the jury would have rendered a different verdict.

(826)   Based on the foregoing, the Court finds that applicant fails to prove that appellate counsel was deficient for not raising this complaint on direct appeal. Nor does he prove that raising this complaint would have altered the outcome of the appeal.

(827)   The Court finds that appellate counsel was not deficient for not raising this claim and that its omission did not alter the outcome of the appeal.

(828)   Thus, this Court concludes appellate counsel did not violate applicant's constitutional right to effective assistance by omitting this claim on direct appeal.

## F. EXCLUSION OF DR. GOODNESS'S HEARSAY TESTIMONY

(829)   Applicant contends his appellate counsel should have argued on direct appeal

2252

that the exclusion of Dr. Goodness's hearsay testimony violated his Eighth Amendment right to present mitigation evidence.

(830)   The Court finds that applicant fails to prove appellate counsel's performance was deficient or that it affected the outcome of his appeal.

(831)   As previously noted in relation to applicant's attack on his trial counsel's presentation of Dr. Goodness's testimony, the Eighth Amendment requires that applicant be afforded the opportunity to present mitigating evidence, but it does not relieve him of the obligation of presenting it in an admissible form. *See Smith*, 2010 Tex. Crim. App. LEXIS 582, at *69; *Lewis*, 815 S.W.2d at 568; *see also Romano*, 512 U.S. at 10-12; *but see Green*, 442 U.S. 95.

(832)   Moreover, as this Court found on applicant's related claim attacking trial counsel's performance, applicant was not precluded from offering evidence of his abuse, psychological problems, etc. He was simply prohibited from offering it in the form of inadmissible hearsay through the doctor.

(833)   Appellate counsel cannot be deemed ineffective for failing to raise a claim that has no merit.

(834)   In his recently filed "Brief in Support of Argument on Ineffective Assistance of Counsel on Appeal in Application for Writ of Habeas Corpus," applicant asserts that appellate counsel should have complained that exclusion of hearsay testimony from Dr. Goodness violated evidence rule 705. Specifically, applicant claims counsel should have argued on appeal that the trial court failed to conduct the requisite balancing test, failed to make specific fact findings on the record, and should have admitted the evidence under the balancing test.

(835)   The Court finds that these allegations constitute a subsequent writ application that should be dismissed as procedurally barred. *See* Tex. Code Crim. Proc. Ann. art. 11.071, § 5.

(836)   Alternatively, the Court finds that applicant fails to show these allegations would have been meritorious on appeal.

(837)   Applicant's trial counsel did not object that the Court failed to conduct the balancing test or dictate its findings on the record. Thus, these allegations were not preserved for appeal.

(838)   Even if preserved, however, the allegation would have failed. As set out in the Court's findings on applicant's related challenge to trial counsel's handling of the limitation on Dr. Goodness's testimony, these allegations have no merit.

2253

(839)   In particular, the Court did conduct the balancing test and had no duty to state its findings on the record with any greater particularity than it did.

(840)   Moreover, the Court acted within its discretion under rule 705 in excluding Dr. Goodness's testimony about hearsay statements made to her and contained in the documentation she reviewed.

(841)   Plus, the Court finds that any error in the exclusion of such testimony was harmless given its cumulative nature.

(842)   Based on the foregoing, the Court finds that counsel was not deficient for not raising any of the above claims on appeal.

(843)   Thus, the Court concludes that appellate counsel's performance was not rendered constitutionally deficient for not raising any of the above claims on appeal.

### G. ADMISSIBILITY OF DEFENSE EXHIBIT 39

(844)   Applicant contends his appellate counsel failed to adequately brief the point of error regarding the exclusion of the ranking document (Defense Ex. 39).

(845)   More specifically, applicant claims counsel should have argued that a "relaxed view of the rules of evidence" was warranted because the exhibit was being offered in the punishment phase of a capital murder trial. Also, he claims appellate counsel should have argued that the exhibit's exclusion was harmful because it was pivotal to his theory that he was less culpable than his codefendants.

(846)   In pleadings filed after the deadline for his original writ application, applicant claims his appellate counsel should have argued on appeal that the document was admissible under both the business record and public record exceptions to the hearsay rule. Also, he claims appellate counsel should have filed a reply brief responding to the State's harmless error argument. See "Brief in Support of Argument that Exclusion of the Ranking Document Was Harmful to Halprin's Mitigation Defense" (Filed 9/27/10).

(847)   The Court finds that the claims raised in applicant's "Brief in Support of Argument that Exclusion of the Ranking Document Was Harmful to Halprin's Mitigation Defense" constitute a subsequent writ and should be dismissed as procedurally barred. See TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5.

(848)   In any event, the Court finds applicant fails to prove that appellate counsel's

2254

challenge to the exclusion of the ranking document was deficient in any way or that additional or different briefing would have altered the outcome of the appeal.

(849) As previously noted, the Eighth Amendment only ensures applicant's right to present mitigating evidence, it does not relieve him of the obligation of presenting that evidence in an admissible form. *See Lewis*, 815 S.W.2d at 568; *see also Romano*, 512 U.S. at 10-12. *But cf. Green v. Georgia*, 442 U.S. at 97. Thus, the Court finds that such an argument would have failed.

(850) Furthermore, the Court finds that in the direct appeal brief and motion for rehearing, appellate counsel clearly attempted to persuade the appellate court that the exhibit was significant to the defensive theory. Muhammad Interrogatory Answers, p. 3.

(851) Appellate counsel contended that the exhibit "gave weight and credence" to applicant's mitigation theory that "he was not the leader of the Texas Seven; he was not a principal in the decision to break out of prison, and he was not a principal in the decision to robb [sic] Oshmans." (Direct Appeal Brief, p. 8).

(852) Moreover, appellate counsel framed his complaint as an Eighth Amendment violation, arguing that the exhibit constituted mitigating evidence which applicant had a constitutional right to present. (Direct Appeal Brief, pp. 8-10).

(853) The Court finds that the claim did not fail because appellate counsel's arguments were deficient or lacking in any way. It failed because, even if the exhibit supported the defensive theory, it was cumulative.

(854) As the Court of Criminal Appeals held on direct appeal, the Court finds that applicant was able to present "from other sources a significant amount of mitigating evidence that was cumulative of the mitigating evidence contained in the document." *See Halprin*, 170 S.W.3d at 116. The ranking document simply was not crucial to applicant's defense.

(855) The Court also finds any argument that the document was admissible under the business record or public record exceptions to the hearsay rule would have failed on appeal.

(856) First, the Court of Criminal Appeals considered and rejected the document's admissibility under the business record exception. *Halprin*, 170 S.W.3d 114-16.

(857) Second, the Court finds that trial counsel did not proffer the document under the public record exception and, thus, did not preserve this contention for

2255

appeal.

(858)   Moreover, the record did not support the admission of the document in its entirety under either hearsay exception. Given that the document contained multiple levels of hearsay, at best, appellate counsel could have shown that a portion or redacted version of the document was admissible. *See Garcia*, 126 S.W.3d at 926 (holding hearsay statements made by defendant's wife to employee of battered women's shelter not admissible under business records exception just because employee had a business duty to record wife's statements accurately); *Kratz*, 890 S.W.2d at 905-06 (upholding exclusion of eyewitness statements contained in police report under Rule 803(8)). And any contention that the Court should have admitted a redacted version of the document would have failed on appeal because defense counsel never attempted to offer only part of the document.

(859)   Based on the foregoing, the Court finds that appellate counsel did adequately brief the claim and that additional briefing would not have altered the outcome of the appeal.

(860)   Thus, this Court concludes applicant's constitutional right to effective assistance of counsel on appeal was not violated by the omission of additional briefing on this claim.

## H. ENMUND/TISON & SECOND SPECIAL ISSUE SUFFICIENCY CLAIMS

(861)   Finally, applicant contends appellate counsel should have complained (1) that the evidence is insufficient to prove applicant's death eligibility under *Enmund* and *Tison* and (2) that the evidence is legally and factually insufficient to support the jury's finding that applicant anticipated a human life would be taken. By reference to his first ground for relief, applicant argues that both of these contentions were meritorious and would have resulted in reversal.

(862)   As set out in the findings on applicant's first ground for relief, the Court finds the evidence is sufficient to prove that applicant actually killed the officer, intended to kill him, and anticipated that a human life would be taken.

(863)   Thus, the Court finds that the evidence is sufficient to support the jury's affirmative answer to the second special issue and demonstrate applicant's eligibility for the death penalty under *Enmund* and *Tison*.

(864)   The Court finds that appellate counsel could not have successfully demonstrated otherwise, which makes his decision not to raise either of these

144

2256

claims a sound one. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983) (holding appellate counsel not ineffective for making professional judgment to forgo weak claims on appeal).

(865)   Thus, the Court finds that applicant fails to prove his appellate counsel was deficient for not raising these complaints on appeal, much less that they would have altered the outcome of his appeal.

(866)   The Court finds that counsel was not deficient for not raising these complaints on appeal and that their omission did not alter the outcome of applicant's appeal.

(867)   This Court concludes applicant's constitutional right to effective assistance of counsel on appeal was not violated by the omission of these claims on appeal.

## GROUNDS 7 & 8: "FALSE IMPRESSION" & CONTRADICTORY THEORIES

(868)   Applicant contends the State violated his federal and state constitutional rights to due process by knowingly presenting testimony in a false light and by pursuing contradictory theories in his trial and the trial of his codefendant Michael Rodriguez. U.S. CONST. amends. V & XIV; TEX. CONST. art. I, § 19. Specifically, applicant claims the State misled his jury to believe that Rodriguez did not shoot at Officer Hawkins, when the State had previously prosecuted Rodriguez on the theory that he did shoot at the officer.

### I. CLAIMS PROCEDURALLY BARRED

### A. Claims Not Raised at Trial

(869)   The Court finds that applicant failed to present these claims to this Court at trial.

(870)   Under Texas law, the failure to object at trial generally waives the error for collateral review. *Ex parte Pena*, 71 S.W.3d 336, 338, n.7 (Tex. Crim. App. 2002); *Ex parte Bagley*, 509 S.W.2d 332, 333-334 (Tex. Crim. App. 1974) (holding that the appellate rule requiring a trial objection also applies in habeas cases).

(871)   Thus, the Court concludes that grounds seven and eight are procedurally barred and should be dismissed.

2257

## B. Claims Not Raised on Direct Appeal

(872)   The Court finds that applicant also failed to raise these claims on direct appeal.

(873)   It is well settled that habeas corpus will not lie as a substitute for direct appeal. *Townsend*, 137 S.W.3d at 81. Even a constitutional claim is forfeited if applicant had the opportunity to raise it on appeal and did not. The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id.*

(874)   The Court finds that nothing prevented applicant from raising these claims on direct appeal, and he presents no evidence in support of his writ that was not already part of the appellate record.

(875)   The Court finds that grounds seven and eight are an improper attempt to use the writ as a substitute for appeal.

(876)   Therefore, the Court concludes grounds seven and eight are procedurally barred and should be dismissed. *Id.*

## II. NO CONSTITUTIONAL VIOLATION

(877)   Alternatively, the Court concludes there was no constitutional violation.

(878)   Applicant does not allege or prove that his state constitutional right to due process affords him any greater protection than his federal constitutional right to due process.

(879)   The Court concludes applicant's state due process right is coextensive with its federal counterpart.

## A. No False Impression Created

(880)   Due process prohibits the State from knowingly using testimony that leaves a false impression. *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (citing *Mooney v. Holohan*, 294 U.S. 103 (1935) and *Pyle v. Kansas*, 317 U.S. 213 (1942)); *Burkhalter v. State*, 493 S.W.2d 214, 218 (Tex. Crim. App. 1973) (holding due process prohibits use of both false testimony and testimony that leaves a false impression). To successfully establish a violation of that right, applicant must prove 1) that the prosecution actually left a false impression; 2) that the prosecution knew it left a false impression; and 3) that the false impression was material. *See Tucker v. Johnson*, 242 F.3d 617 626 (5th Cir. 2001); *see also Vasquez v. State*, 67 S.W.3d 229, 239 (Tex. Crim. App. 2002); *Duggan v. State*,

146

2258

778 S.W.2d 465, 468 (Tex. Crim. App. 1989).

(881)  Because applicant raises this claim on collateral review, he bears the burden of proving these factors by a preponderance of the evidence. *Ex parte Morrow*, 952 S.W.2d 530, 534-35 (Tex. Crim. App. 1997).

(882)  The Court finds applicant makes no showing that the State left the jury with the impression that Rodriguez did not shoot at Officer Hawkins.

(883)  Applicant claims the State left such an impression through Sergeant Jeff Spivey's testimony that Rodriguez did not admit in his written confession to firing any shots. (RR42: 103-05).

(884)  The Court notes that the absence of such an admission from Rodriguez is not evidence that Rodriguez did not fire any shots at Hawkins.

(885)  Moreover, whether Rodriguez omitted such an admission from his confession was a fact evidenced by the confession itself, which applicant, not the State, had previously offered into evidence. (RR42: 83-85). Thus, if a false impression was left by Rodriguez's confession, the Court finds that impression was generated by applicant himself.

(886)  Furthermore, the Court finds that applicant misrepresents Sergeant Spivey's testimony on the matter by not presenting that testimony in its entirety:

Q.  [PROSECUTOR] Michael Rodriguez, he gave a statement, also. He didn't admit in his confession to shooting a weapon at Officer Hawkins, did he?

A.  [SPIVEY] No, he did not.

Q.  *Now, the gun left at the scene, that was fired one time?*

A.  *Yes, it was.*

Q.  *And you believe it was Michael Rodriguez that dropped that weapon?*

A.  *Yes, I do.*

(RR42: 103).

(887)  The Court finds that the highlighted portions of the above excerpt, which applicant conveniently omits from his application, show that Sergeant Spivey

147

2259

actually told the jury that he believed Rodriguez did shoot at Officer Hawkins.

(888)   Thus, the Court finds that the State refuted any false impression left by the confession that applicant himself had put before the jury.

(889)   In further support of his claim, applicant cites the following excerpt from the prosecutor's closing argument at guilt:

> Now, we know it's not Michael Rodriguez, because everyone seems to agree that Michael Rodriguez dropped this gun and it only fired once, and that bullet went right in behind the speedometer. He obviously wanted to kill Officer Hawkins. And he dropped the gun.

(RR50: 60). Applicant claims this argument "perpetuated the deception" that Rodriguez fired no shots at Officer Hawkins.

(890)   The Court finds that, if anything, the prosecutor's argument helped dispel such a notion. On its face, the argument reflects the State's belief that Rodriguez fired a shot at Officer Hawkins in an effort to kill him and then dropped his gun at the scene.

(891)   The Court finds that the argument was also part of a broader argument that applicant, not one of his codefendants, fired the four shots into the passenger side of the patrol car:

> So [applicant] is the only one, by his own admission, that puts himself on the passenger side of that car. And we know from looking at the photos, that there are four bullets going in on that side of the car, coming from that side of the vehicle. You can look at these diagrams and you can see the angles. All going in this way. One makes it all the way through. One hits the police scanner. They are coming in from this side of the vehicle. And by his own testimony, he is the only person that puts himself on that side of the car.

> *Now, we know it's not Michael Rodriguez, because everyone seems to agree that Michael Rodriguez dropped this gun and it was only fired once, and that bullet went right in behind the speedometer. He obviously wanted to kill Officer Hawkins. And he dropped the gun.*

> Donald Newbury by [applicant's] statement and his own, he's the one that apparently fired, fired in that trailer. That's three shots. So

148

2260

he couldn't have fired those four shots originating from that side. These guns only hold six bullets.

George Rivas apparently fired from the side at some point in time. By his own admissions he's over there. Now, did one of those shots hit Officer Hawkins? I don't know, because the medical examiner told you he just takes out the bullet fragments. The firearms examiner said these ones that don't have the bullet cores, are through-and-through shots, he can't match them to anything.

Mr. King said, well, the medical examiner said only two weapons were used in shooting Officer Hawkins. No, he could only identify two. There are a lot of bullets, such as the one that goes to his heart, that's a lead core. They don't know which gun that went to. This one is a through-and-through shot. They don't know which gun that went to. This is a through-and-through shot here. They don't know which gun that went to. A few they could. That doesn't mean that only two guns were used to hit Officer Hawkins. We know a minimum of five and it could have been more.

But [applicant] by his own admission puts himself on the side of that car where four shots come. So his intent is clear. Maybe it was one of these shots. I don't know, because Officer Hawkins can't come in and tell us.

(RR50: 60-61) (emphasis added).

(892)    The Court finds that, from the context in which the argument was made, it is clear that the State never intimated that Rodriguez did not shoot at Officer Hawkins.

(893)    The Court finds that both Spivey's testimony and the prosecutor's closing argument reflect that the State's theory of prosecution actually rested in part on Rodriguez having fired a shot at Officer Hawkins.

(894)    Thus, the Court finds applicant's claim that the State left a contrary impression is completely unfounded.

## B. Conflicting Theories of Prosecution

(895)    The Court also finds no merit to applicant's contention that the State violated his due process rights by advancing conflicting theories in his and Rodriguez's trials.

149

2261

(896)   In substance, applicant claims the State is collaterally estopped from prosecuting him as a shooter because it had already prosecuted and convicted Rodriguez on that theory.

(897)   Contrary to applicant's contention, due process does not proscribe the State's prosecution of codefendants based on conflicting theories. No Texas court has addressed the issue, much less recognized such a right. The Supreme Court has acknowledged the issue but expressly declined to address whether pursuit of conflicting prosecution theories amounts to a due process violation. *Bradshaw v. Stumpf*, 125 S.Ct. 2398, 2408 (2005) (holding "it would be premature for this Court to resolve the merits of Stumpf's sentencing claim, and we therefore express no opinion on whether the prosecutor's actions amounted to a due process violation . . . ."). Moreover, those concurring Justices who did confront the issue (Thomas and Scalia) insist no such right exists, "This Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories." *Stumpf*, 125 S.Ct. at 2409-10.

(898)   The Fifth Circuit Court of Appeals has decided the issue against applicant's position. The Court has held that the only constitutionally based right of collateral estoppel is founded in the Double Jeopardy Clause, not due process. *Nichols v. Scott*, 69 F.3d 1255, 1269-72 (5th Cir. 1995). This jeopardy-based estoppel right only bars relitigation of an ultimate fact between "the same parties." Thus, a determination of fact in the State's earlier prosecution of one defendant will not estop the State in its subsequent prosecution of a different defendant because the cases do not involve the same parties. *Id.* at 1270 (citing *United States v. Mollier*, 853 F.2d 1169, 1176 (5th Cir. 1988)).

(899)   Applicant argues that several federal circuit courts of appeals have "found, or implied" a due process right against the State's use of factually contradictory theories in the prosecution of separately tried codefendants. In support of this contention, applicant cites the following cases: *Stumpf v. Mitchell*, 367 F.3d 594 (6th Cir. 2004); *United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003); *Smith v. Groose*, 205 F.3d 1045 (8th Cir. 2000); *Thompson v. Calderon*, 120 F.3d 1045 (9th Cir. 1997); *Drake v. Kemp*, 762 F.2d 1449 (11th Cir. 1985) (Clark, J., concurring).

(900)   Federal circuit court opinions are at most persuasive, not controlling authority, in applicant's case. *See Moseley v. State*, 983 S.W.2d 249, 256 n.13 (Tex. Crim. App. 1999) (noting that federal circuit cases may be persuasive, but are not binding authority). Furthermore, these opinion do not have the persuasive value

150

2262

applicant ascribes to them.

(901) Thus far, only a plurality of the Ninth Circuit Court of Appeals has recognized such a right. *See Thompson*, 120 F.3d at 1070 (Kozinski, J., dissenting) (noting that portion of opinion addressing prosecutorial misconduct "does not command a majority" and "is more in the nature of ruminations by some of our judges"). And only one judge on the Eleventh Circuit Court of Appeals has opined that such a right exists. *See Drake*, 762 F.2d at 1472 (Clark, J., concurring).

(902) Furthermore, to the extent that any circuit courts of appeals have recognized such a right, they have held that it precludes only the pursuit of *fundamentally* inconsistent theories. *See Smith*, 205 F.3d at 1052 ("To violate due process, an inconsistency must exist at the core of the prosecutor's cases against defendants for the same crime."); *Haynes v. Cupp*, 827 F.2d 435, 438-39 (9th Cir. 1987). Only the underlying theory of the case must remain consistent throughout each trial. The fact that certain details may come into evidence differently at each codefendant's trial does not implicate a violation. *See Nguyen v. Lindsey*, 232 F3d 1236, 1240-41 (9th Cir. 2000).

(903) Applicant claims the State inconsistently prosecuted him and Rodriguez as shooters.

(904) The Court finds that applicant fails to present this Court with any evidence of the theory on which the State prosecuted Rodriguez at his trial. He does not present any record evidence from that trial. Nor does applicant ask this Court to take judicial notice of those proceedings. Because applicant makes no demonstration of what theory the State advanced at Rodriguez's trial, he fails to prove the existence of any conflict, much less the particular conflict he alleges.

(905) Alternatively, this Court sua sponte judicially notices the Rodriguez proceedings and finds no conflict between the two trials. The Court recalls from Rodriguez's trial that the State argued Rodriguez did shoot at Officer Hawkins. As discussed above in response to applicant's "false impression" claim, the State did not argue otherwise in applicant's trial.

(906) Indeed, the Court finds that the State prosecuted applicant and all of his codefendants on the same underlying theory. At the State's request, the Court judicially notices the records of all the codefendants' trials and finds that the State theorized that all seven escapees were guilty of capital murder, all seven intended to kill Officer Hawkins, six of them – applicant, Rivas, Rodriguez, Newbury, Harper and Garcia – fired shots at Hawkins when he drove into the

2263

loading dock behind the Oshman's store, and one or more of them fired the shots that killed him. *See Nguyen*, 232 F.3d at 1240-41 (holding no fundamental conflict existed in theories between codefendants' trials where main thrust of prosecution's argument was that both defendants were equally responsible for death of innocent bystander); *Haynes*, 827 F.2d at 439-39 (holding no fundamental conflict existed in prosecution's theory in trials of three codefendants where underlying theory throughout trials was that all three defendants were equally culpable); *see also Nichols*, 69 F.3d at 1270-71 (holding no conflict on an ultimate issue of fact existed where evidence at each trial showed that both codefendants acted together to rob victim, that both fired at victim, and that it is unclear which bullet killed victim).

(907)  Based on the foregoing, the Court finds that applicant fails to establish any violation of his due process rights.

(908)  Because there was no constitutional violation, the Court recommends denial of grounds seven and eight.

## GROUNDS 9-12:  FAIR CROSS-SECTION

(909)  Applicant contends Dallas County's venire selection process violated his federal and state constitutional rights to a venire consisting of a fair cross-section of the community. U.S. CONST. amend. VI; TEX. CONST., art. I, § 10. Particularly, he claims the venire from which his jury was selected did not adequately represent the Hispanic population of Dallas County. Alternatively, applicant argues that, should this Court find his fair cross-section complaint procedurally barred, counsel's failure to object to the venire's composition at trial constituted ineffective assistance.

### I.  CLAIMS PROCEDURALLY BARRED

### A.  Claims Not Raised at Trial

(910)  The Court finds that applicant did not raise his venire selection complaint at trial.

(911)  Under Texas law, the failure to object at trial generally waives the error for collateral review. *Pena*, 71 S.W.3d at 338, n.7; *Bagley*, 509 S.W.2d at 333-34 (holding that the appellate rule requiring a trial objection also applies in habeas cases).

(912)  Applicant acknowledges that his right to a fair cross-section existed at the time of his trial, but he suggests that counsel did not have sufficient time to

152

2264

determine the merits of asserting a violation of that right.

(913) Assuming such a fact constitutes an exception to the contemporaneous objection rule, the Court finds that applicant presents no evidence to substantiate it. This claim is based entirely upon applicant's suppositions that counsel needed more time to study his venire and confirm an infirmity.

(914) Citing article 34.04 of the Texas Code of Criminal Procedure, applicant supposes that he could not have obtained the list of persons summoned for his trial until two days before trial began and that no one could confirm an infirmity in that amount of time. *See* TEX. CODE CRIM. PROC. ANN. art. 34.04 (Vernon 2006) (requiring defense receive notice of list of persons summoned for his venire).

(915) The Court finds, however, that applicant received his venire list on December 31, 2002, more than two weeks before the special venire was summoned to appear and much sooner than the statutorily mandated deadline. (CR: 357).

(916) In addition, the Court finds that applicant presents no evidence of how long it would have taken to compile the statistics related to his venire. Thus, applicant fails to establish that whatever amount of time counsel did have to review the list was insufficient to conduct the necessary analysis of his own venire.

(917) Moreover, the Court finds that applicant's counsel certainly had access to the results of the Dallas Morning News (DMN) study. The results of that study were published almost two years before applicant's trial began. *See* Ted M. Eades, *Revisiting the Jury System in Texas: A Study of the Jury Pool in Dallas County*, 54 SMU L. Rev. 1813, 1821 (2001) (Application, pp. 202-03, 208-09). Around that same time, another article claiming the Dallas County venires did not constitute a fair cross-section of the community was also published in a criminal defense magazine. Mick Mickelsen, *A Jury of Your Peers?* VOICE FOR THE DEFENSE 24, 25 (March 2001).

(918) The Court finds that the publicity generated by the DMN study and the Mickleson article makes it likely that defense counsel was on notice, long before applicant's trial, that the constitutionality of Dallas County's venire selection procedure was being challenged. Moreover, the data and conclusions from the DMN study would have been readily available for applicant's use before his own trial.

(919) In short, the Court finds applicant fails to demonstrate that his fair cross-section complaint was unavailable to him at the time of his trial for any reason.

153

2265

(920) Therefore, the Court concludes that applicant's attack on the constitutionality of the Dallas County venire selection process is procedurally barred and should be dismissed.

## B. Claims Not Raised on Direct Appeal

(921) The Court finds that applicant also failed to raise these claims on direct appeal.

(922) It is well settled that habeas corpus will not lie as a substitute for direct appeal. *Townsend*, 137 S.W.3d at 81. Even a constitutional claim is forfeited if applicant had the opportunity to raise it on appeal and did not. The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id.*

(923) The Court finds that nothing prevented applicant from raising these claims on direct appeal, and he presents no evidence in support of these claims that was not already part of the appellate record. In fact, as discussed below, applicant presents no evidence in support of these claims.

(924) The Court concludes grounds nine through twelve are an improper attempt to use the writ as a substitute for appeal.

(925) Therefore, the Court concludes grounds nine through twelve are procedurally barred and should be dismissed. *Id.*

## C. Applicant Fails to Allege Facts that Entitle Him to Relief

(926) The Court also finds that applicant's fair cross-section claim and related ineffective assistance claim fail to state specific, particularized facts that, if proven true, would entitle him to habeas relief.

(927) The facts alleged must be sufficient to enable a court to determine, from the face of the application itself, whether the application merits further inquiry. *Staley*, 160 S.W.3d 63.

(928) The Court finds that applicant fails to allege any facts from which this Court could determine that his venire was not constitutionally composed. Applicant's fair cross-section claim depends on whether the percentage of Hispanics in his venire was not fair and reasonable in relation to the number of Hispanics in the community. *See Duren v. Missouri*, 439 U.S. 357, 364 (1979). But applicant fails to allege any facts regarding the composition of his own venire. Applicant predicates his claim entirely on factual assertions related to the venire of one of his codefendants, Michael Rodriguez. In particular, he presents this Court with

154

2266

arguments purportedly taken from "the brief of Michael Rodriguez," and he simply asserts that the facts from Rodriguez's trial are "similar" to the facts of his own trial. (Application, p. 199).

(929)   The Court finds that Rodriguez did not raise a fair-cross section claim on direct appeal or in his original application for writ of habeas corpus. Thus, the actual source of the arguments and facts applicant presents are unknown.

(930)   However, the Court finds that, even if correctly attributed, the facts applicant alleges fail to establish any right of relief personal to applicant. While the composition of other Dallas County venires is certainly pertinent to applicant's claim of systematic exclusion, applicant, himself, would only be entitled to relief if Hispanics were underrepresented on his own venire. Applicant alleges no such facts related to his own venire.

(931)   Thus, the Court concludes that applicant's attack on the constitutionality of the Dallas County venire selection process and his related ineffective assistance claim are barred for failure to allege sufficient facts that, if true, would entitle him to habeas relief. *Staley*, 160 S.W.3d at 66.

(932)   For this reason, the Court recommends dismissal of grounds nine through twelve.

## II. NO VIOLATION OF RIGHT TO FAIR CROSS-SECTION

(933)   Alternatively, the Court finds that applicant's fair cross-section claim fails on the merits.

(934)   In a writ of habeas corpus, applicant bears the burden to prove his factual allegations by a preponderance of the evidence. *Ex parte Adams*, 768 S.W.2d 281, 287-88 (Tex. Crim. App. 1989). Applicant falls woefully short of meeting this burden.

(935)   The Court finds that applicant offers no evidence whatsoever related to the composition of his own or any other venire. He presents no documentation pertaining to the race of those summoned for jury service, no expert analysis of a venire, and no testimony or affidavit from the Dallas County Jury Services Manager. He does not even present the study conducted by the Dallas Morning News and SMU Professor Ted Eades on Dallas County venires during the first week of March 2000. In short, applicant's claim is entirely unsubstantiated by any record or extrinsic evidence. It is simply an adoption of a claim that was supposedly made in another case.

2267

(936) But even if the factual allegations applicant makes had been related to his own venire and had been accompanied by some evidentiary support, the Court finds that he still fails to prove a violation of his right to a fair cross-section.

(937) The Sixth Amendment requires that the panel from which a petit jury is selected represent a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 528-29 (1975). To establish a prima facie violation of this fair cross-section requirement, a defendant must show the following: (1) the group allegedly excluded is a "distinctive group" in the community, (2) the group is not fairly represented on jury panels from which the petit juries are chosen, and (3) the underrepresentation results from a systematic exclusion of the group in the jury selection process. *Duren*, 439 U.S. at 364.

(938) Applicant neither alleges nor demonstrates that his state constitutional right to a fair cross-section varies from his federal constitutional right. Consequently, the Court assumes applicant's state and federal constitutional rights are coextensive.

(939) Assuming the factual allegations pertaining to the Rodriguez venire pertained to applicant's venire and were supported by some evidence, the Court finds that they do not establish a prima facie violation.

## A. No Showing Hispanics are Underrepresented on Venires

(940) Hispanics are undisputedly a distinctive group in Dallas County. *See Aldrich v. State*, 928 S.W.2d 558, 560 (Tex. Crim. App. 1996).

(941) But the Court finds that applicant does not demonstrate that Hispanics are underrepresented on Dallas County venires.

(942) To prove Hispanics are underrepresented, applicant must show that the number of Hispanics on the venires is not fairly and reasonably related to the number of Hispanics in the community *who are qualified to sit on a jury. See Pondexter v. State*, 942 S.W.2d 577, 580-81 (Tex. Crim. App. 1996) (explaining that the reasonableness of distinctive group's representation on venire is determined by comparing percentage of distinctive group members in venire to percentage of distinctive group members in community who qualify for jury service). Applicant does not limit his consideration to qualified Hispanics; he considers the *entire* population of Hispanics in Dallas County.

(943) The Court finds that there is a statistically significant number of Hispanic non-citizens who are not eligible for jury service, but are nonetheless included in

applicant's general population count.

(944)   The Court finds that, in 2002, over 40% of Hispanics were foreign born. Among this population, more than half (52.1%) entered the U.S. between 1990 and 2002 and, of these, 92.7% are still non-citizens. Another 25.6% entered the U.S. during the 1980s and, of these, approximately 70% remain non-citizens. Of the Hispanics who entered the U.S. during the 1970s, 46.3% are still non-citizens, and of the Hispanics who entered before 1970, 26.7% remain non-citizens. (State's Writ Ex. A, pp. 3-4). The exclusion of non-citizens cannot form the basis of a fair cross-section complaint, since non-citizens are ineligible for jury service.

(945)   The Court finds that applicant's counting method also fails to take into account individuals born of Hispanic mothers married to non-Hispanic fathers. In such situations, the Hispanic child will most likely have the father's non-Hispanic surname and, if they self-identify as white on their juror cards, they will not be counted as Hispanic. Applicant's method allows for a similar undercount of adopted Hispanic individuals for the same reasons.

(946)   Moreover, the Court finds that the 2000 U.S. census data distinguishes between "race" and "Hispanic origin." (State's Writ Ex. B, pp. 1-2). Persons of Hispanic descent can be of any race. (State's Writ Ex. B, pp. 2, n. 2). Applicant apparently uses the census data on persons of *Hispanic origin*. (Application, p. 201). The juror cards, on the other hand, ask for the juror's *race*. (State's Writ Ex. C). Therefore, discrepancies can and will occur between the juror cards and the census data, and applicant's count of Hispanics on the venire is not reliable.

## B. No Showing of Systematic Exclusion of Hispanics

(947)   The Court finds that, even assuming applicant's statistics evinced an underrepresentation of Hispanics on his venire, he fails to demonstrate that Hispanics were systematically excluded.

(948)   To satisfy this requirement, it must be shown that the alleged underrepresentation was inherent in the particular jury selection process used. *Duren*, 439 U.S. at 366. Applicant must identify a specific systematic defect or operational deficiency that accounts for the alleged underrepresentation. *United States v. Pion*, 25 F.3d 18, 23 (1st Cir. 1994). Because some people are simply less available than others to serve as jurors, a true cross-section is practically unobtainable. *Barber*, 772 F.2d at 997. Thus, the Supreme Court has never required the venire to be, statistically, a substantially true mirror of the community, and courts allow a fair degree of leeway to States in designating jurors, so long as it does not actively prevent people from serving or actively

2269

discriminate, and so long as the system is reasonably open to all. *Barber*, 772 F.2d at 997-98.

(949)   In *Taylor*, for example, the Supreme Court determined that a Louisiana statute preventing a woman from being selected for jury service unless she filed a written declaration of her desire to be subject to jury service violated the fair cross-section requirement. *See Taylor*, 419 U.S. at 523, 531. In *Lacy v. State*, 899 S.W.2d 284, 288 (Tex. App. – Tyler 1995, no pet.), the Tyler Court of Appeals specified that to succeed with a systematic exclusion complaint, a defendant would have to show "some manner whereby [the distinctive groups] were not included in the computer base from which the panel was selected." Therefore, affirmative barriers to *selection* for jury service or different *selection* standards for different groups is the earmark of a Sixth Amendment violation.

(950)   The Court finds that, in Texas, the names on the jury wheel in each county are selected from the names of all persons on the current voter registration lists and the names of all citizens who have a valid Texas driver's license or identification card. TEX. GOV'T CODE ANN. § 62.001 (Vernon Supp. 2005). There is nothing inherently exclusive about this method of selection, and it has been upheld repeatedly against Sixth Amendment attack. *E.g., United States v. James*, 528 F.2d 999, 1022 (5th Cir. 1976). No person, by reason of his Hispanic origin, is prevented by law from obtaining a driver's license or an identification card, or from registering to vote. *United States v. Rioux*, 930 F. Supp. 1558, 1573 (D. Conn. 1995) (and multiple cases cited therein).

(951)   Thus, the Court finds that applicant offers no evidence that the Dallas County venire selection process systematically excludes Hispanics. In fact, the statistical analyses he mentions (but does not provide to this Court for its review) apparently show that Hispanics *are* included in the computer base because, according to applicant, the analyses show that many Hispanics appeared for jury duty.

(952)   This exposes applicant's real complaint, which is that the percentage of Hispanics *who respond to the juror summonses* is not in proportion with the percentage of Hispanics in the general population. Applicant blames this failure to report on Dallas County policies. Specifically, applicant suggests that low daily pay for jury service in Dallas County plus the failure of Dallas County officials to enforce the jury summonses, as a practical matter, results in the underrepresentation of Hispanics in the jury pools.

(953)   The Court finds that applicant's assertion that Dallas County's low juror pay and its failure to enforce summonses cause Hispanics not to report is pure

158

2270

speculation. There could be any number of personal reasons, unrelated to Dallas County policies, explaining why such persons would not report. Summonses might be directed to a bad address, to a child who has since left home, to a politically-motivated conscientious objector, to a disabled person, or to a person simply lacking in civic responsibility.

(954)   The Court finds that such discrepancies resulting from private sector influences rather than affirmative governmental action do not represent a violation of the "fair cross-section" requirement and cannot satisfy *Duren*. Dallas County is not *actively* preventing people from serving or actively discriminating. All people summoned for jury duty get the same pay and suffer the same consequences for non-reporting.

(955)   *Duren* is satisfied so long as the system is reasonably open to all, which it is. *Barber*, 772 F.2d at 997-98. Disparities attributable to personal predilection or wealth imbalances, as opposed to state or locally imposed impediments, cannot form the basis of a cognizable class and evoke sanctions against the judicial system. *See Rioux*, 930 F. Supp. at 1573; *see also United States v. Cecil*, 836 F.2d 1431, 1146-48 (4th Cir. 1987) (upholding use of voter registration list as source for jury selection regardless of fact that it would exclude persons, whatever their race, color, gender, or age, who had not registered to vote) (citing *Foster v. Sparks*, 504 F.2d 805, 816-17 (5th Cir. 1975)). Stated simply, the personal decision by some people not to respond to a juror summons is not a government action subject to sanctions under the Sixth Amendment.

(956)   The Court finds that, even if the law held the State responsible for the personal predilections of those who receive juror summonses, and even if this Court assumed, for applicant's benefit, that Hispanics did not report for jury duty at applicant's trial because of the County's pay policy and the lack of consequences for failing to report, this does not prove that Dallas County's system violates the Sixth Amendment.

(957)   The Court finds that applicant fails to prove that the alleged exclusion of Hispanics is "systematic" because he only claims they were underrepresented on two occasions: during the first week of March 2000 and during jury selection in Rodriguez's trial in 2001.

(958)   In *Duren*, systematic exclusion was proven by showing an underrepresentation of women occurred not just occasionally, but in every weekly venire for the period of *nearly a year*. *See Duren*, 439 U.S. at 366.

(959)   The Court finds that applicant only addresses venires from two different weeks

2271

and spread apart by more than a year. Absent evidence that Hispanics are consistently underrepresented in Dallas County venires over a period of time, applicant cannot prove that the venires from Rodriguez's trial and the first week of March 2000 were not anomalies.

(960) Furthermore, the Court finds applicant offers no evidence to show that Dallas County's pay rate and the decision not to enforce jury summonses were made to exclude Hispanics or any particular group of people from the venire. As stated, the rules are the same for everyone who is summoned. There could be any number of reasons why such policies are carried out by the County. Most notably, a higher pay rate and the enforcement of jury summonses would cost the County substantially more money.

(961) The Court finds applicant has not shown that Hispanics are consistently underrepresented in the venire, relative to the number of such persons in the community who are qualified to serve.

(962) Most importantly, the Court finds that applicant does not assert an operational defect in the County's juror selection process, but only complains that certain segments of the population simply do not participate in that process. This is not "systematic exclusion" by the government and does not qualify as *Duren* error.

(963) The existence of systematic underrepresentation turns on the process of selecting venires, not on the outcome of that process in a particular case. *See e.g., United States v. Jackman*, 46 F.3d 1240, 1248 (2nd Cir. 1995) (finding *Duren* error based on systematic exclusion of certain residents, even though some of the excluded residents were included in venire).

(964) Accordingly, the Court finds that applicant has shown no violation of his constitutional right to a fair cross-section.

(965) Thus, the Court concludes there was no constitutional violation and recommends denial of grounds nine and ten.

### III. COUNSEL RENDERED EFFECTIVE ASSISTANCE

(966) In conjunction with his venire selection complaint, applicant contends that, to the extent this claim should have been raised at trial but was not, trial counsel rendered ineffective assistance.

(967) To prevail on his ineffectiveness claim, applicant must show by a preponderance of the evidence that counsel's decision not to raise this claim was unreasonable by objective professional standards and that it prejudiced his defense.

160

2272

*Strickland*, 466 U.S. at 687; *Thompson*, 9 S.W.3d at 812-13. Furthermore, on habeas review, applicant bears the burden of proving his factual allegations by a preponderance of the evidence. *Adams*, 768 S.W.2d at 287-88.

(968)   The Court finds that applicant fails to sustain this burden of proof.

(969)   As discussed above, the Court finds applicant's contention that his jury was not selected from venire panels that were representative of a fair cross-section of the community is unsubstantiated and groundless.

(970)   Thus, the Court finds that an objection to the racial composition of the venire would have been unsuccessful.

(971)   Defense counsel is not ineffective for failing to lodge a meritless objection. *See Vaughn v. State*, 931 S.W.2d 564, 566 (Tex. Crim. App. 1996) (holding that, to show counsel was ineffective for failing to lodge objection, applicant must show trial court would have erred in overruling such objection).

(972)   Applicant also states that counsel should have claimed that 18 to 34 year-olds were underrepresented. The Court finds that this reference to youth is just a clerical error. Applicant's fair cross-section claim appears to be related to Hispanics only.

(973)   If the reference to youth in this ineffectiveness claim was intentional, then the Court finds that the claim is entirely unsupported by any argument or evidence and, consequently, applicant fails to demonstrate that his counsel was ineffective for not raising it at trial.

(974)   For the foregoing reasons, the Court concludes there was no constitutional violation of applicant's right to effective assistance of counsel, and the Court recommends denial of applicant's eleventh and twelfth grounds for relief.

## GROUNDS 13 & 14: BURDEN OF PROOF ON MITIGATION SPECIAL ISSUE

(975)   Relying on *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), applicant contends the mitigation special issue is unconstitutional because it fails to properly allocate the burden of proof. Specifically, he claims the special issue violates his federal and state constitutional rights to due process and an impartial jury and his rights against cruel and unusual punishment because it does not require the State to disprove the existence of facts warranting a life sentence. *See* U.S. CONST. amends. V, VI, VIII, & XIV; TEX. CONST. art. I, §§ 10 & 19.

2273

## I. CLAIMS PROCEDURALLY BARRED

### A. Sixth Amendment Claim Not Raised at Trial

(976)   The Court finds that applicant forfeited his Sixth Amendment (*Ring* & *Apprendi*) claim because he failed to present the issue to this Court at trial.

(977)   Under Texas law, the failure to object at trial generally waives the error for collateral review. *Pena*, 71 S.W.3d at 338, n.7; *Bagley*, 509 S.W.2d at 333-334 (holding that the appellate rule requiring a trial objection also applies in habeas cases).

(978)   The Court finds that, although this claim was available at the time of his trial, applicant only challenged the mitigation special issue instructions on Eighth and Fourteenth Amendment grounds. (CR: 121-22, 127-28).

(979)   Therefore, the Court concludes that applicant's Sixth Amendment claim is procedurally barred and should be dismissed.

### B. None of the Claims Raised on Direct Appeal

(980)   Furthermore, the Court finds that applicant did not to raise any of these constitutional claims on direct appeal.

(981)   The Court finds that, on direct appeal, applicant attempted to raise his federal constitutional claims in a supplemental brief, but the Court of Criminal Appeals denied his motion to supplement. Applicant subsequently filed a motion for rehearing and an amended motion for rehearing in the Court of Criminal Appeals in which he again attempted to raise his federal claims for review on direct appeal. The Court of Criminal Appeals denied applicant a rehearing.

(982)   The Court finds that applicant never raised his state constitutional claims on direct appeal.

(983)   It is well settled that habeas corpus will not lie as a substitute for direct appeal. *Townsend*, 137 S.W.3d at 81. Even a constitutional claim is forfeited if applicant had the opportunity to raise it on appeal and did not. The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id.*

(984)   The Court finds that nothing prevented applicant from timely raising any of these claims on direct appeal, and he presents no evidence in support of his writ that was not already part of the appellate record.

162

2274

(985)   The Court finds that applicant's thirteenth and fourteenth grounds for relief are an improper attempt to use the writ as a substitute for appeal.

(986)   Therefore, the Court concludes that applicant's thirteenth and fourteenth grounds for relief are procedurally barred and should be dismissed. *Id.*

## II. MITIGATION ISSUE DOES NOT VIOLATE ANY CONSTITUTIONAL RIGHT

(987)   Alternatively, the Court finds that applicant fails to prove any constitutional violation.

(988)   The law imposes no burden of proof on any party, much less the State, on the mitigation issue, and *Ring* and *Apprendi* did not establish a burden where none previously existed.

(989)   The mitigation special issue is and always has been an issue with no assigned burden of proof. *Blue v. State*, 125 S.W.3d 491, 501 (Tex. Crim. App. 2003) (neither legislation nor Constitution places burden of proof upon State to negate existence of mitigating evidence). The weighing of "mitigating evidence" is a subjective determination undertaken by each individual juror. *Colella v. State*, 915 S.W.2d 834, 845 (Tex. Crim. App. 1995). Thus, assigning the State the burden of proving the absence of sufficient mitigating factors is irrational and unworkable.

(990)   The absence of any such burden has withstood repeated constitutional attacks. *See, e.g., Walton v. Arizona*, 497 U.S. 639, 649-51 (1990) (refusing to force State to shoulder burden of disproving mitigating circumstances); *Escamilla v. State*, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004) (rejecting numerous federal and state constitutional attacks on mitigation special issue).

(991)   Moreover, the Court of Criminal Appeals has repeatedly rejected applicant's Sixth Amendment contention, holding that *Ring* and *Apprendi* do not require the State to bear the burden of proving beyond a reasonable doubt that the mitigation issue should be answered negatively. *See, e.g., Perry v. State*, 158 S.W.3d 438, 446-48 (Tex. Crim. App. 2004); *Paredes v. State*, 129 S.W.3d 530, 541 (Tex. Crim. App. 2004).

(992)   In rejecting the Sixth Amendment challenge, the Court noted that *Ring* and *Apprendi* only require proof beyond a reasonable doubt of an aggravating factor necessary for the imposition of the death penalty. *Perry*, 158 S.W.3d at 447-48; *Paredes*, 129 S.W.3d at 541; *see also Ring*, 536 U.S. at 577; *Apprendi*, 530 U.S. at 490. The mitigation issue does not operate to increase the penalty beyond the

statutory maximum. In Texas, the maximum penalty for a capital offense is death. A jury's answer to the mitigation issue does not have the potential to increase that penalty, only to reduce it. Consequently, the Sixth Amendment does not require the State prove the absence of mitigating circumstances beyond a reasonable doubt. *Perry*, 158 S.W.3d at 447; *Paredes*, 129 S.W.3d at 541; *see also Ring*, 536 U.S. at 597 n.4; *Apprendi*, 530 U.S. at 490 n.16 (both noting the distinction between aggravating and mitigating factors).

(993) For these reasons, the Court concludes there was no constitutional violation and recommends denial of applicant's thirteenth and fourteenth grounds for relief.

## GROUNDS 15 & 16: 10/12 RULE

(994) Applicant contends the Texas death penalty sentencing scheme violates his federal and state constitutional rights against cruel and unusual punishment and to due process of law. U.S. CONST. amends. VIII & XIV; TEX. CONST. art. I, §§ 13 & 19. Specifically, he maintains the ten-vote requirement for the jury to return a "no" answer to the first special issue and a "yes" answer to the mitigation issue coerces minority "life" voters to vote with the majority in the belief that their vote is worthless without nine other jurors to join them. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, §§ 2(d)(2), (f)(2) (Vernon Supp. 2010). He also contends, contrary to existing law, that the jury should be informed that the failure to agree with respect to either issue results in a life sentence. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(a)(1) (Vernon Supp. 2010) (requiring jury not be told the effect of a deadlock).

### I. CLAIMS PROCEDURALLY BARRED

(995) The Court finds that applicant did not raise any of these constitutional claims on direct appeal.

(996) The Court finds that, on direct appeal, applicant attempted to raise his federal constitutional claim in a supplemental brief, but the Court of Criminal Appeals denied his motion to supplement. Applicant subsequently filed a motion for rehearing and an amended motion for rehearing in the Court of Criminal Appeals in which he again attempted to raise his federal claims for review on direct appeal. The Court denied applicant a rehearing. In any event, applicant never attempted to raise his state constitutional claims on direct appeal.

(997) It is well settled that habeas corpus will not lie as a substitute for direct appeal. *Townsend*, 137 S.W.3d at 81. Even a constitutional claim is forfeited if applicant

2276

had the opportunity to raise it on appeal and did not. The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id.*

(998)   The Court finds that nothing prevented applicant from timely raising any of these claims on direct appeal, and he presents no evidence in support of his writ that was not already part of the appellate record.

(999)   This Court finds that applicant's fifteenth and sixteenth grounds are an improper attempt to use the writ as a substitute for appeal.

(1000)   Therefore, the Court concludes that applicant's fifteenth and sixteenth grounds are procedurally barred and should be dismissed. *Id.*

## II. No Constitutional Violation

(1001)   Alternatively, the Court finds that applicant fails to prove any constitutional violation.

(1002)   The Court of Criminal Appeals has repeatedly decided these issues against applicant. *See, e.g., Rayford v. State*, 125 S.W.3d 521, 532 (Tex. Crim. App. 2003).

(1003)   In addition, the Supreme Court has held that the Eighth Amendment does not require the jury to be instructed "as to the consequences of a breakdown in the deliberative process." *See Jones v. United States*, 144 L.Ed.2d 370, 382-83 (1999).

(1004)   Applicant complains nonetheless that the 10/12 rule acts as an improper dynamite charge in violation of *Mills v. Maryland*, 486 U.S. 367, 383 (1988).

(1005)   The jury charge in *Mills* was determined to be unconstitutional because it prevented the jury from acting on mitigating evidence unless it unanimously agreed a particular factor was mitigating, thereby essentially allowing a single juror to impose a death sentence. *See Mills*, 486 U.S. at 380. The charge in *Mills* violated the rule that the sentencer may not be prevented from considering, as a mitigating factor, all relevant evidence. *Id.* at 374-75.

(1006)   The legitimacy of Texas's 10/12 rule has already been addressed in relation to *Mills* and upheld. *See Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996). The Texas statute allows a single juror to give effect to any piece of mitigating evidence by voting "no" on any special issue. *Rousseau v. State*, 855 S.W.2d 666, 687 n.26 (Tex. Crim. App. 1993).

2277

(1007)  Moreover, the Court finds that it specifically instructed applicant's jury that they need not agree on what particular evidence supports a negative answer to special issues one and two or an affirmative answer to special issue three. (CR: 38-39).

(1008)  The Court finds that applicant's jury was instructed that they could not answer the special issues in a manner that would result in a life sentence unless ten jurors agree to that answer. (CR: 38). But the charge also informed the jurors that, in order to vote "yes" to special issues one and two and "no" to special issue three, i.e., vote for the death penalty, they had to do so unanimously. (CR: 38-39).

(1009)  The Court finds that, under these facts, applicant's argument that the jurors were misled lacks merit because every juror knew that capital punishment could not be imposed without the unanimous agreement of the jury on both special issues. *See Lawton v. State*, 913 S.W.2d 542, 559 (Tex. Crim. App. 1995). While the jury was not informed of the consequences of a hung jury, each juror knew that, without his or her vote, the death sentence could not be imposed. *Id.*

(1010)  For these reasons, the Court concludes there was no constitutional violation and recommends denial of applicant's fifteenth and sixteenth grounds for review.

## GROUND 17: PROPORTIONALITY REVIEW OF DEATH PENALTY

(1011)  Applicant contends his death sentence is excessive and disproportionate compared to sentences imposed in other capital cases and, thus, violates the Due Process Clause of the Fourteenth Amendment. U.S. CONST. amend. XIV, § 1.

### I. CLAIMS PROCEDURALLY BARRED

### A. Claim Not Raised at Trial

(1012)  The Court finds that applicant failed to present this claim to the Court at trial.

(1013)  The Court finds that applicant argued that the Texas death penalty scheme violated the Fourteenth Amendment because it does not require a proportionality review. (CR: 115). But he never complained that his death sentence was excessive and disproportionate to the sentences in other capital cases. He voiced no such objection to his death sentence at trial or in his motion for new trial.

(1014)  Under Texas law, the failure to object at trial generally waives the error for

166

2278

collateral review. *Pena*, 71 S.W.3d at 338, n.7; *Bagley*, 509 S.W.2d at 333-334 (holding that the appellate rule requiring a trial objection also applies in habeas cases).

(1015)   Thus, the Court concludes that applicant's seventeenth ground is procedurally barred and should be dismissed.

## B. Claim Not Raised on Appeal

(1016)   The Court finds that applicant did not to raise this claim on direct appeal.

(1017)   It is well settled that habeas corpus will not lie as a substitute for direct appeal. *Townsend*, 137 S.W.3d at 81. Even a constitutional claim is forfeited if applicant had the opportunity to raise it on appeal and did not. The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id.*

(1018)   The Court finds that nothing prevented applicant from raising this claim on direct appeal, and he presents no evidence in support of his writ that was not already part of the appellate record.

(1019)   Therefore, this Court finds applicant's seventeenth ground is an improper attempt to use the writ as a substitute for appeal.

(1020)   Therefore, the Court concludes applicant's seventeenth ground is procedurally barred and should be dismissed. *Id.*

## C. Claim Fails to Allege Facts Entitling Applicant to Relief

(1021)   Lastly, the Court finds that applicant's seventeenth ground is not a cognizable habeas claim because he fails to allege facts that, if true, would entitle him to relief.

(1022)   Applicant must allege facts that enable a court to determine, from the face of the application itself, whether the application merits further inquiry. *Staley*, 160 S.W.3d at 63.

(1023)   Applicant contends his sentence is excessive and disproportionate to sentences in other capital cases, but the Court finds that he does not identify any other cases to which his could be compared.

(1024)   Furthermore, as explained below, due process does not require comparative proportionality review of applicant's sentence.

2279

(1025)  Thus, even if applicant had alleged facts showing that his sentence was excessive in comparison to other capital cases, the Court finds that those facts would not establish any right to relief. *See Staley*, 160 S.W.3d at 63-64.

(1026)  Accordingly, the Court concludes that applicant's seventeenth ground is procedurally barred and should be dismissed.

## II. No Constitutional Violation

(1027)  Alternatively, the Court finds that applicant fails to prove any constitutional violation.

(1028)  Applicant concedes the Eighth Amendment does not require comparative proportionality review of his death sentence. *See Pulley v. Harris*, 465 U.S. 37 (1984). Nevertheless, he contends the Due Process Clause of the Fourteenth Amendment requires proportionality review. He argues due process requires such a review in civil cases and, thus, it should be extended to death penalty cases as well. *See Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415 (1994) (holding Due Process Clause requires some form of appellate review of jury awards of punitive damages in civil cases).

(1029)  The Court of Criminal Appeals has previously and repeatedly rejected this very contention. *See, e.g., Bell v. State*, 938 S.W.2d 35, 52 (Tex. Crim. App. 1996); *Janecka v. State*, 937 S.W.2d 456, 474-75 (Tex. Crim. App. 1996); *see also King v. State*, 953 S.W.2d 256, 273 (Tex. Crim. App. 1997); *Hughes v. State*, 897 S.W.2d 285, 294 (Tex. Crim. App. 1994).

(1030)  As explained by the Court of Criminal Appeals, *Honda* held only that the Due Process Clause requires some form of appellate review, not comparative proportionality review in particular. *See Bell*, 938 S.W.2d at 52; *Janecka*, 937 S.W.2d at 474-75. Furthermore, the Court found no evidence that when the Fourteenth Amendment was promulgated, the common law required every capital sentence to be measured on appeal against all other death sentences. *Id.* Absent such a showing, the Court found that no presumption was raised that without a comparative proportionality analysis, appellate review of capital sentences in Texas violates due process. *Id.*

(1031)  The Court finds that applicant asserts no new or different arguments to support his claim that due process requires a comparative proportionality review of his or any death sentence.

(1032)  Accordingly, the Court concludes there is no constitutional violation and

2280

recommends denial of applicant's seventeenth ground.

## GROUND 18: DEFINITION OF MITIGATING EVIDENCE

(1033) Applicant contends the statutory definition of mitigating evidence violates the Eighth and Fourteenth Amendments because it limits the jury's consideration of mitigating factors to those that render a capital defendant less morally blameworthy. U.S. CONST. amends. VIII & XIV, § 1.

### I. CLAIMS PROCEDURALLY BARRED

(1034) The Court finds that applicant did not to raise this claim on direct appeal.

(1035) It is well settled that habeas corpus will not lie as a substitute for direct appeal. *Townsend*, 137 S.W.3d at 81. Even a constitutional claim is forfeited if applicant had the opportunity to raise it on appeal and did not. The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id.*

(1036) The Court finds that nothing prevented applicant from raising this claim on direct appeal, and he presents no evidence in support of his writ that was not already part of the appellate record.

(1037) The Court finds that applicant's eighteenth ground for relief is an improper attempt to use the writ as a substitute for appeal.

(1038) Therefore, the Court concludes applicant's eighteenth ground is procedurally barred and should be dismissed. *Id.*

### II. NO CONSTITUTIONAL VIOLATION

(1039) Alternatively, the Court finds that applicant fails to prove any constitutional violation.

(1040) The Court of Criminal Appeals has repeatedly rejected this very challenge to article 37.071. *See, e.g., Ladd v. State*, 3 S.W.3d 547, 574 (Tex. Crim. App. 1999); *Cantu v. State*, 939 S.W.2d 627, 648-49 (Tex. Crim. App. 1996).

(1041) The Court finds that applicant asserts no new or different arguments in his writ application.

(1042) The Court finds there is no constitutional violation.

2281

### III. NO HARM

(1043) Alternatively, the Court finds that applicant fails to prove he was harmed by any violation.

(1044) On habeas review, applicant bears the burden of proving by a preponderance of the evidence that the alleged error actually contributed to his conviction or punishment. *Ex parte Fierro*, 943 S.W.2d 370, 374-75 (Tex. Crim. App. 1996).

(1045) The Court finds that applicant neither alleges nor refers this Court to any evidence that his jury was precluded from considering because of the alleged defect in article 37.071. He only attacks the statute on its face, not as it is applied to him.

(1046) For the foregoing reasons, the Court concludes that there is no constitutional violation and recommends denial of applicant's eighteenth ground.

### GROUND 20: UNDEFINED PUNISHMENT TERMS

(1047) Applicant contends that the trial court should have submitted punishment instructions defining the terms "probability," "criminal acts of violence," and "continuing threat to society" for the jury. Applicant argues that the failure to define these terms prevented a rational appellate review of the jury's answer to the special issues and, thus, violated his rights under the Sixth, Eighth, and Fourteenth Amendments. U.S. CONST. amends. VI, VIII, XIV.

### I. CLAIMS PROCEDURALLY BARRED

### A. Claims Not Raised at Trial

(1048) At trial, applicant complained generally that the trial court's failure to define "probability" and "the various terms and phrases used in the three special issues" violated the Eighth and Fourteenth Amendments. (CR: 112-14).

(1049) The Court finds that applicant never raised a challenge based on the Sixth Amendment. Moreover, he did not specifically complain about the failure to define the terms "criminal acts of violence" and "continuing threat to society."

(1050) Under Texas law, the failure to object at trial generally waives the error for collateral review. *Pena*, 71 S.W.3d at 338, n.7; *Bagley*, 509 S.W.2d at 333-34 (holding that the appellate rule requiring a trial objection also applies in habeas cases).

2282

(1051) The Court finds that nothing prevented applicant from raising these claims at trial; he simply chose not to.

(1052) Thus, to the extent that applicant's twentieth ground for relief is predicated on the Sixth Amendment and the absence of instructions defining "criminal acts of violence" and "continuing threat to society," the Court concludes that it is procedurally barred and should be dismissed.

## B. Claims Not Raised on Direct Appeal

(1053) The Court finds that applicant also failed to raise any of the claims in his twentieth ground for relief on direct appeal.

(1054) It is well settled that habeas corpus will not lie as a substitute for direct appeal. *Townsend*, 137 S.W.3d at 81. Even a constitutional claim is forfeited if an applicant had the opportunity to raise it on appeal and did not. *Id.* The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id.*

(1055) The Court finds that nothing prevented applicant from raising any of these claims on direct appeal.

(1056) The Court also finds that applicant presents no evidence in support of his writ that was not already part of the appellate record.

(1057) Thus, the Court finds that applicant's twentieth ground for relief is an improper attempt to use the writ as a substitute for appeal.

(1058) Accordingly, the Court concludes that applicant's twentieth ground for relief is procedurally barred and should be dismissed. *Id.*

## II. No Constitutional Violation

(1059) Alternatively, the Court finds that applicant demonstrates no constitutional violation.

(1060) The omission of instructions defining the complained-of terms violated none of applicant's asserted constitutional rights. The Court of Criminal Appeals has repeatedly held that the terms "probability," "criminal acts of violence," and "continuing threat to society" require no special definitions. *See, e.g., Rayford*, 125 S.W.3d at 532. The terms are applied in their usual acceptation in common language. *Feldman*, 71 S.W.3d at 757.

171

2283

(1061)  Furthermore, applicant's complaint is grounded on the incorrect assertion that the special punishment issues in article 37.071 function as aggravating circumstances to circumscribe the class of persons eligible for the death penalty. However, the aggravating circumstances that determine death eligibility are found in penal code section 19.03, including murder of police officer or fireman; murder in the course of certain specified felonies; murder for remuneration; certain murders committed while incarcerated or escaping incarceration; multiple murders; and murder of a child. *See* TEX. PENAL CODE ANN. § 19.03 (Vernon Supp. 2004-05); *Green v. State*, 912 S.W.2d 189, 196 (Tex. Crim. App. 1995) (Baird, J., concurring). These circumstances genuinely narrow the class of death-eligible defendants and pass constitutional muster with respect to the eligibility decision. *Green*, 912 S.W.2d at 197 (Baird, J., concurring).

(1062)  The special punishment issues, on the other hand, permit the fact finder to further make an individualized determination as to the appropriateness of the death penalty. *Id.* The future-dangerousness issue allows the jury to consider the defendant's character and record, as well as the circumstances of the offense, and has been approved by the United States Supreme Court. *Id.* at 197 (citing *Jurek v. State*, 428 U.S. 262, 276 (1976)).

(1063)  The anti-parties special issue allows the jury to determine whether the defendant actually caused, intended to cause, or anticipated that a death would occur; and the mitigation special issue ensures that the jury can give effect to all types of mitigating evidence. *See id.* Thus, the "selection decision" to be made by the jury pursuant to the issues in article 37.071 ensures an individualized determination and passes constitutional muster. *See id.*

(1064)  In sum, the trial court's refusal to provide the requested definitions violates no constitutional law. *See Coble v. State*, 2010 Tex. Crim. App. LEXIS 1297, at *114 (Tex. Crim. App. Oct. 13, 2010).

(1065)  Therefore, the Court concludes that there is no constitutional violation and recommends denial of applicant's twentieth ground for relief.

### GROUNDS 19, 21-22 & 24-25: CALLINS V. COLLINS

(1066)  Applicant contends the Texas death-penalty scheme violates due process of law and the proscription against cruel and unusual punishment because it is impossible to simultaneously restrict the jury's discretion to impose the death penalty while allowing the jury unlimited discretion to consider mitigating evidence. Applicant predicates this claim on both the federal and state constitutions. *See* U.S. CONST. amends. V, VIII, & XIV; TEX. CONST. art. I, §§ 13 &

172

2284

19.

## I. CLAIMS PROCEDURALLY BARRED

(1067)  The Court finds that applicant did not raise these constitutional claims on direct appeal.

(1068)  It is well settled that habeas corpus will not lie as a substitute for direct appeal. *Townsend*, 137 S.W.3d at 81.

(1069)  Even a constitutional claim is forfeited if an applicant had the opportunity to raise it on appeal and did not. The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id.*

(1070)  The Court finds that nothing prevented applicant from raising any of these claims on direct appeal.

(1071)  This Court finds that applicant's nineteenth, twenty-first, twenty-second, twenty-fourth, and twenty-fifth grounds are an improper attempt to use the writ as a substitute for appeal. *Id.*

(1072)  Thus, the Court concludes that applicant's nineteenth, twenty-first, twenty-second, twenty-fourth, and twenty-fifth grounds are procedurally barred and should be dismissed.

## II. DEATH-PENALTY SCHEME CONSTITUTIONAL

(1073)  Alternatively, the Court finds that applicant's federal-law and state-law attacks on the constitutionality of the Texas death-penalty scheme are meritless.

(1074)  Applicant relies on Justice Blackmun's dissent in *Callins v. Collins* and urges this Court to declare the Texas scheme unconstitutional. *See Callins v. Collins*, 510 U.S. 1141 (1994). The Court of Criminal Appeals has repeatedly rejected this precise contention. *See, e.g., Cannady v. State*, 11 S.W.3d 205, 214 (Tex. Crim. App. 2000) (rejecting federal and state constitutional attacks on Texas death-penalty scheme).

(1075)  The Court finds that applicant asserts no new or different arguments in his writ application.

(1076)  Thus, the Court finds that applicant fails to satisfy his burden of proving any constitutional violation.

2285

(1077) The Court concludes that there is no constitutional violation and recommends the denial of applicant's nineteenth, twenty-first, twenty-second, twenty-fourth, and twenty-fifth grounds.

## GROUND 23:  APPELLATE REVIEW OF DEATH PENALTY

(1078) Applicant contends that the Texas death-penalty scheme is unconstitutional under the Eighth and Fourteenth Amendments because it does not afford him meaningful appellate review of the jury's negative answer to the mitigation special issue. U.S. CONST. amends. VIII & XIV.

### I. CLAIM PROCEDURALLY BARRED

(1079) The Court finds that applicant failed to raise this claim on direct appeal.

(1080) It is well settled that habeas corpus will not lie as a substitute for direct appeal. *Townsend*, 137 S.W.3d at 81. Even a constitutional claim is forfeited if an applicant had the opportunity to raise it on appeal and did not. The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id.*

(1081) The Court finds that nothing prevented applicant from raising this claim on direct appeal.

(1082) The Court also finds that applicant presents no evidence in support of his writ that was not already part of the appellate record.

(1083) For these reasons, the Court finds that applicant's twenty-third ground for relief is an improper attempt to use the writ as a substitute for appeal.

(1084) Thus, the Court concludes applicant's twenty-third ground is procedurally barred and should be dismissed. *Id.*

### II. NO CONSTITUTIONAL VIOLATION

(1085) Alternatively, the Court finds that applicant's contention is meritless.

(1086) The Court of Criminal Appeals has previously and repeatedly rejected applicant's contention. *See, e.g., Russell v. State*, 155 S.W.3d 176, 183 (Tex. Crim. App. 2005); *Valle*, 109 S.W.3d at 502-03.

(1087) The Court finds that applicant does not distinguish his case from this precedent, challenge the reasoning in existing case law, or assert any new or different

arguments.

(1088) This Court finds that applicant fails to satisfy his burden of demonstrating any constitutional violation.

(1089) Thus, the Court concludes there is no constitutional violation and recommends denial of applicant's twenty-third ground for relief.

## GROUNDS 26-29: PENRY II CLAIM

(1090) In his twenty-sixth and twenty-seventh grounds, applicant contends that the mitigation issue submitted to the jury violated his federal and state constitutional rights to due course of law and an impartial jury and against cruel and unusual punishment because it sent "mixed signals" to the jury. U.S. CONST. amends. V, VI, VIII, XIV; TEX. CONST. art. I, §§ 10, 13, 19. More specifically, applicant likens the statutorily mandated mitigation special issue to the nullification instruction held unconstitutional by the Supreme Court in *Penry v. Johnson*, 532 U.S. 782 (2001) (*"Penry II"*).

(1091) In his twenty-eighth and twenty-ninth grounds, applicant contends that the mitigation special issue "fails to give full effect and consideration to mitigating circumstances and fails to provide the jury with an adequate vehicle for expressing a 'reasoned response' to all of [his] evidence relevant to his culpability." Applicant argues that because of this alleged deficiency, the mitigation special issue violates his federal and state constitutional rights to "a grand jury determination and an indictment that charges the 'special issue elements' of the death penalty and facts relied upon to support the charge that [he] is guilty of the death penalty." U.S. CONST. amends. VI, VIII, XIV; TEX. CONST. art. I, §§ 3, 10, 13, 19. Applicant argues all four of these grounds for relief together.

### I. CLAIMS PROCEDURALLY BARRED

### A. Claims Not Raised at Trial

(1092) The Court finds that applicant failed to present any of these claims to this Court at trial.

(1093) Under Texas law, the failure to object at trial generally waives the error for collateral review. *Pena*, 71 S.W.3d at 338, n.7; *Bagley*, 509 S.W.2d at 333-34 (holding that the appellate rule requiring a trial objection also applies in habeas cases).

175

2287

(1094) Thus, the Court concludes that applicant's twenty-sixth, twenty-seventh, twenty-eighth, and twenty-ninth grounds for relief are procedurally barred and should be dismissed.

### B. Claims Not Raised on Direct Appeal

(1095) The Court finds that applicant also failed to raise any of these claims on direct appeal.

(1096) It is well settled that habeas corpus will not lie as a substitute for direct appeal. *Townsend*, 137 S.W.3d at 81. Even a constitutional claim is forfeited if an applicant had the opportunity to raise it on appeal and did not. The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id.*

(1097) The Court finds that nothing prevented applicant from raising any of these claims on direct appeal.

(1098) The Court also finds that applicant presents no evidence in support of his writ that was not already part of the appellate record.

(1099) Thus, this Court finds applicant's twenty-sixth, twenty-seventh, twenty-eighth, and twenty-ninth grounds for relief are an improper attempt to use the writ as a substitute for appeal.

(1100) For this reason as well, the Court concludes that applicant's twenty-sixth, twenty-seventh, twenty-eighth, and twenty-ninth grounds for relief are procedurally barred and should be dismissed. *Id.*

## II. NO CONSTITUTIONAL VIOLATION

(1101) Alternatively, the Court finds that applicant's attack on the mitigation special issue is meritless.

(1102) Applicant does not explain how the Court's punishment instructions – much less the mitigation instructions particularly – have any bearing on his right to an impartial jury or "a grand jury determination and an indictment that charges the 'special issue elements' of the death penalty and facts relied upon to support the charge that [he] is guilty of the death penalty." In fact, he makes no mention whatsoever of any of these "rights" purportedly violated.

(1103) To the extent applicant contends that the jury received an unconstitutional nullification instruction, applicant is wrong. The Court finds that the jury did not

2288

receive a nullification instruction or anything akin to one.

(1104)   The Court submitted a separate mitigation special issue as mandated by statute. (CR: 37-44); TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(e)(1) (Vernon Supp. 2004-05). The Court finds that this special issue and the accompanying instructions provided the jurors a vehicle for giving full effect to any mitigating evidence without asking them to change their answers to the other special issues. Thus, the mitigation special issue sent no "mixed signals" to the jury.

(1105)   The Supreme Court has recognized the contrast between Texas's statutorily mandated mitigation instruction and the nullification instruction in *Penry II*, noting the former's "brevity and clarity" and indicating that it passes constitutional muster. *Penry II*, 532 U.S. at 803; *see also Woods v. State*, 152 S.W.3d 105, 121-22 (Tex. Crim. App. 2004) (noting Supreme Court's approving comments on current "clearly drafted catchall" mitigation special issue).

(1106)   Moreover, the Court of Criminal Appeals has previously and repeatedly rejected claims likening the current statutorily mandated mitigation issue to the nullification instructions struck down in *Penry II*. *See, e.g., Woods*, 152 S.W.3d at 121-22; *Escamilla*, 143 S.W.3d at 828.

(1107)   In an apparent attempt to distinguish his claim from this precedent, applicant argues that the mitigation issue in his case is actually "more constitutionally infirm" than the nullification instruction struck down in *Penry II* and *Smith v. Texas*, 125 S. Ct. 400 (2004). In particular, applicant argues that

> [a] comparison of the pertinent sections of applicant's punishment charge with that submitted in *Smith* shows that the *Smith* charge actually provided more information to the jury to decide whether there was mitigating evidence to warrant a negative answer to either special issue no. 1 or 2. In the instruction given to applicant, the jury is informed that the evidence they consider may either mitigate for or against a death sentence. The *Smith* instruction clearly instructed the jury that if they find mitigating evidence, to only consider mitigating evidence in determining whether the defendant should be given a sentence less than death even though they have found evidence beyond a reasonable doubt that the special issue should be answered "Yes."

(Application, p. 247) (set out as written but with clerical and grammatical errors corrected).

177

2289

(1108)  Applicant appears to be arguing that the instructions in *Smith* were better because they limited the jury to considering only mitigating evidence in answering the mitigation issue, while his own jury was instructed to consider both mitigating and non-mitigating evidence. Applicant fails to explain how allowing the jurors to consider both mitigating and non-mitigating evidence in answering the special issues deprived them of a vehicle for giving full effect to any mitigating evidence.

(1109)  Moreover, the constitutional requirement of individualized sentencing necessitates the consideration of all evidence, both mitigating and aggravating, that is relevant to the special issues. Thus, the Court finds that applicant's argument is both poorly reasoned and inconsistent with constitutional authority.

(1110)  In light of the foregoing, the Court finds that applicant has demonstrated no violation of federal or state constitutional law.

(1111)  Thus, the Court concludes that there is no violation of federal or state constitutional law and recommends denial of applicant's twenty-sixth, twenty-seventh, twenty-eighth, and twenty-ninth grounds for relief.

## GROUND 31:  CUMULATIVE CONSTITUTIONAL ERROR

(1112)  Applicant asks this Court to consider the cumulative effect of the multiple constitutional errors claimed above. He asserts that, considered together, they denied him due process of law and due course of law under the federal and state constitutions.

### I. CLAIMS PROCEDURALLY BARRED

### A. Claims Not Raised at Trial

(1113)  The Court finds that applicant failed to present these claims to this Court at trial.

(1114)  Under Texas law, the failure to object at trial generally waives the error for collateral review. *Pena*, 71 S.W.3d at 338, n.7; *Bagley*, 509 S.W.2d at 333-34 (holding that the appellate rule requiring a trial objection also applies in habeas cases).

(1115)  Thus, the Court concludes that applicant's thirty-first ground for relief is procedurally barred and should be dismissed.

2290

## B. Claims Not Raised on Direct Appeal

(1116)  The Court finds that applicant also failed to raise these claims on direct appeal.

(1117)  It is well settled that habeas corpus will not lie as a substitute for direct appeal. *Townsend*, 137 S.W.3d at 81. Even a constitutional claim is forfeited if an applicant had the opportunity to raise it on appeal and did not. The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id.*

(1118)  The Court finds that nothing prevented applicant from raising these claims on direct appeal.

(1119)  The Court also finds that applicant presents no evidence in support of his writ that was not already part of the appellate record.

(1120)  Thus, this Court finds applicant's thirty-first ground for relief is an improper attempt to use the writ as a substitute for appeal.

(1121)  For this reason as well, the Court concludes that applicant's thirty-first ground for relief is procedurally barred and should be dismissed. *Id.*

## II. NO CONSTITUTIONAL VIOLATION

(1122)  Alternatively, the Court finds that applicant fails to prove "cumulative" constitutional error.

(1123)  The Court of Criminal Appeals has recognized the proposition that a number of errors may be found harmful in their cumulative effect. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999).

(1124)  The Court finds, however, that applicant has demonstrated no constitutional violations.

(1125)  Because there are no errors and, thus, no harm to "cumulate," the Court concludes that there was no violation of due process of law or due course of law under the federal or state constitution. *See Rayford*, 125 S.W.3d at 534 (rejecting cumulative constitutional error complaint where no constitutional violations found).

(1126)  Therefore, the Court recommends denial of applicant's thirty-first point of error.

## ORDER

The Court adopts and incorporates the above proposed findings of fact and conclusions of law submitted by the State in *Ex parte Randy Ethan Halprin*.

THE CLERK IS **ORDERED** to prepare a transcript of all papers in cause number W01-000327-Y(A) and to transmit same to the Court of Criminal Appeals as provided by article 11.071 of the Texas Code of Criminal Procedure.

The transcript shall include certified copies of the following documents:

1. Applicant's Original Application for Writ of Habeas Corpus, "Amended" Application for Writ of Habeas Corpus, and any other pleadings filed by applicant in cause number W01-00327-Y(A), including any exhibits;

2. The State's Answer to Applicant's Original Writ Application, including the accompanying exhibits, filed in cause number W01-00327-Y(A);

3. Any other pleadings filed by the State in cause number W01-00327-Y(A);

4. Any proposed findings of fact and conclusions of law filed by the State and applicant in cause number W01-00327-Y(A);

5. This Court's findings of fact and conclusions of law, and order in cause number W01-00327-Y(A);

6. Any and all orders issued by the Court in cause number W01-00327-Y(A);

7. Any and all documentary evidence filed with the Court, including affidavits, answers to interrogatories, and the reporter's records of the hearings conducted on May 22-23, 2008, August 20, 2010, September 30, 2010, November 12, 2010, and January 14, 2011 (recusal hearing).

8. The indictment, judgment, sentence, docket sheet, and appellate record in cause number W01-00327-Y(A), unless they have been previously forwarded to the Court of Criminal Appeals.

THE CLERK IS FURTHER **ORDERED** to send a copy of this Court's findings of fact and conclusions of law, including its order, to applicant's counsel, Gary Udashen & Bruce Anton, attorneys for applicant, at Sorrels & Udashen, 2301 Cedar Springs Road, Suite 400, Dallas, TX 75201, and to counsel for the State, Dallas County Assistant District

2292

Attorney Lisa Smith, at Frank Crowley Courts Bldg., 133 N. Riverfront Blvd., LB-19, Dallas, TX 75207-4399.

SIGNED the _____ day of _____, 2011.

_____
Judge Mike Snipes
Criminal District Court No. 7
Dallas County, TX

2293

# APPENDIX A

2294

## INVENTORY OF EVIDENCE IN HALPRIN WRIT PROCEEDINGS

## Defense Exhibits Filed with Writ on 4/6/05

A   S.O. Woods Affidavit (3/18/05)
B   Cover letter with 192 pgs of certified OIG documents (3/1/05)
C   Anna Lester Affidavit (3/4/05)
D   Kelly Goodness Affidavit (3/31/05) (with Powerpoint presentation, list of material received and psychological instruments used, CV, & psych evaluation of Halprin (5/20/03)
E   Wesley Halprin Affidavit (1/13/05)
F   State's Trial Exhibit 965
G   3 jury notes
H   George Rivas's testimony from his trial and Murphy's trial
I   Defense Trial Exhibit 39
J   FBI interview with Rodriguez (one page of 6 pages of notes regarding interview)
K   Colorado PD report (pages 12 & 13 of 14-page report re: Newbury interview)
L   Edwin King's letter asking for 404(b) notice and 2 notices from State
M   2 defense trial motions ("motion to set aside indictment (unconstitutionality of statute" and "MIL to preclude testimony about violent acts by others")
N   4 defense trial motions (1) special requested charge no. 3 (re: anticipated definition), (2) motion to declare DP unconstitutional and other relief, (3) motion to declare the Texas capital sentencing scheme unconstitutional and to preclude imposition of the death penalty, (4) MIL character of complainant-victim impact
O   Pages 6, 8, 9 of guilt charge
P   Pages 2, 7 of punishment charge

## Defense Exhibits Filed with Amended Writ on 4/25/05

Q   Randy Halprin affidavit (3/14/05)
R   Edwin King affidavit (4/6/05) (also filed separately on 4/7/05)
S   Carey Pelto affidavit (4/8/05) (also filed separately on 4/8/05 and 5/6/05)

2295

## State's Exhibits Filed with Writ Response

| | |
|---|---|
| A | U.S. Census 2002 report on Hispanic population |
| B | U.S. Census 2000 report on Race and Hispanic origin |
| C | Sample juror questionnaire |
| D | Affidavit of Chief Investigator Mike Bosillo |
| E | Affidavit of Investigator K.D. Adley and Anna Lester letters |
| F | Affidavit of Assistant District Attorney Toby Shook |
| H | State Bar information on Edwin H. King |
| I | Judicial Administrative Region's qualifications for capital defense trial counsel |
| J | Medical record regarding applicant's foot wound |
| K | Reporter's record expert from State v. William Earl Rayford |

## Evidence Filed After State Filed Its Response

| | |
|---|---|
| 1. | Whitman affidavit (signed 3/25/08, filed 3/28/08) |
| 2. | D'Amore interrogatories (signed & filed 8/1/08) |
| 3. | Wirskye interrogatories/affidavit (signed 7/30/08, filed 8/1/08) |
| 4. | Shook interrogatories (signed 7/30/08, filed 8/1/08) |
| 5. | Whitman interrogatories (signed 9/?/08, filed 9/30/08) |
| 6. | Ashford interrogatories (signed 5/11/10, filed 9/19/08) |
| 7. | Muhammad interrogatories (signed 9/19/08, no file stamp) |
| 8. | John Davis interrogatories (signed 10/23/08, filed 10/24/08) |
| 9. | Mike Scotten interrogatories (signed 10/24/08, filed 10/28/08) |
| 10. | Ray Cano interrogatories (signed 12/9/08, filed 12/10/08) |

## 5/22/08 and 5/23/08 Hearing Exhibits

| | |
|---|---|
| 11. | TDCJ record of Rodriguez/Halprin visitation **(State's M)** |
| 12. | Halprin's November 2007 online journal **(State's N)** |
| 13. | Patrick Murphy letter (re: confrontation between Murphy and other TX7 Co-defendant's) **(State's Q)** |
| 14. | Patrick Murphy letter to wife Rose (re: getting info to Halprin) **(State's T)** |
| 15. | George Rivas's letter to wife **(State's V)** |
| 16. | Michael Rodriguez affidavit (signed 5/5/07) **(Defense 1)** |
| 17. | George Rivas affidavit (signed 2/16/07) **(Defense 2)** |
| 18. | Patrick Murphy (signed 8/6/07) **(Defense 3)** |

2296

## Evidence Filed by Defense Before 8/20/10 Hearing

19.   Timothy Alan Black affidavit (signed 8/13/08, filed 7/9/10)
20.   Charles Eugene David affidavit (signed /13/08, filed 7/9/10)
21.   David Slocomb affidavit (signed 8/12/08, filed 7/9/10)
22.   George Reames Rogers affidavit (signed 8/14/08, filed 7/9/10)
23.   Bobby Mims affidavit (signed 6/29/10, filed 7/9/10)
24.   Robert Morrow affidavit (signed 7/1/10, filed 7/9/10) (with ranking doc & CCA opinion on Halprin direct appeal)
25.   Mindi Sternblitz affidavit (signed 7/24/10, filed 7/30/10)
26.   Wesley Halprin affidavit (signed 7/22/10, filed 7/30/10)
27.   Billy Waybourn affidavit (signed 7/22/10, filed 7/30/10)
28.   Marian Feld affidavit (signed 7/8/10, filed 7/30/10)
29.   Keith Howard Stern affidavit (signed 7/26/10, filed 7/30/10)
30.   Robin Conley affidavit (signed 7/26/10, filed 7/30/10)
31.   Michael Carter affidavit (signed 7/30/10, filed 8/16/10)

## 8/20/10 Hearing Exhibits

32.   Dr. Kelly Goodness's psychiatric evaluation report re: Halprin (dated 5/20/03) (with list of material received and instruments used) **(Defense 1)**
33.   Halprin's adoption records **(Defense 2)**
34.   SMU Death Penalty Project notebook (Fall 2001) **(State's M)**
35.   SMU Death Penalty Project notebook (Spring 2001) **(State's N)**
36.   Dr. Goodness's note to Edwin King (dated 6/13/08) **(State's O)**

## 9/30/10 Hearing Exhibits

37.   Letter from Bruce Anton to CCA (dated 8/31/04) with attached letter from Halprin (dated 7/21/04) **(State's P)**
38.   Defense's "List of Persons Involved in Ranking Document" with annotations Whitman made during hearing **(State's Q)**
39.   SO Woods 2/13/03 letter to Edwin King; 4 notes re: Wood's phone messages for King; Woods 6/11/03 letter to King w/bill **(State's R)**
40.   Trial Testimony excerpts (Moczygemba, Burgess, King, Woods, Mullen, Ashford, King) **(State's S)**
41.   TDPS Records (given to writ counsel by Whitman) **(Defense 4)**

2297

## Evidence Filed After 9/30/10 Hearing

42. SO Woods interrogatories (signed 10/25/10, filed 10/26/10) (along with (1) 3/31/03 letter from King to Woods; (2) defense trial motion/court order appointing SO Woods as defense expert; (3) King 5/8/03 letter to Woods with order appointing Woods as defense expert; (4) 1/26/05 letter from Gary Udashen to Woods with ranking document; (5) 2/7/05 letter from Udashen to Woods with ex parte order to provide Woods access to TDCJ records re: TX7; (6) 2/14/05 letter from Woods to Udashen re: billing; (7) 3/15/05 letter from Udashen to Woods (thank you))

## 11/12/10 Hearing Exhibits

43. Hammond Affidavit and accompanying CD containing recordings of seven of Halprin's 2010 jail phone calls (dated 11/12/10) (State's 1)

44. Halprin's web journal entry (dated 10/11/10) (State's 2)

## Evidence Filed After 11/12/10 Hearing

45. Goodness affidavit (dated & filed 11/15/10) (along with (1) Dr. Melton psychiatric assessment [Bates stamped 2123-30] & (2) Dr. Cannon psychiatric report dated 1/21/97 [Bates stamped 1868-69])

## 1/14/11 Recusal Hearing Exhibits

46. Hammond Affidavit (State's 1) (same as affidavit filed at 11/12/10 hearing)

47. Halprin affidavit (State's 2) (same affidavit filed with writ application)

2298

Respectfully submitted,

*Lisa Smith*

Lisa Smith (No. 00787131)
Assistant District Attorney
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3630
(214) 653-3643 (FAX)
lbsmith@dallascounty.org

Craig Watkins
Criminal District Attorney
Dallas County, Texas

## Certificate of Service

The State emailed a copy of these proposed findings and order to applicant's writ counsel, Gary Udashen and Bruce Anton, gau@sualaw.com and banton28@aol.com, on April 7, 2011.

*Lisa Smith*

Lisa Smith

183

2299

# SORRELS | UDASHEN | ANTON

*Attorneys and Counselors at Law*

GARY A. UDASHEN
BOARD CERTIFIED-CRIMINAL LAW-TEXAS BOARD OF LEGAL SPECIALIZATION

gau@sualaw.com
2311 Cedar Springs Rd.
Suite 250
Dallas, TX 75201
**214.468.8100**
fax 214.468.8104
www.sualaw.com

September 7, 2011

Honorable Mike Snipes
Criminal District Court No. 7
Frank Crowley Courts Building
133 N. Riverfront Blvd., L.B. 19
Dallas, Texas 75207

RE:     *Ex parte Randy Ethan Halprin*
        No. W01-00237-T(A)

Your Honor:

With the Court's permission, I would like to suggest a manner and order of review of the claims in Randy Halprin's 11.071 writ application.

There are numerous grounds for relief raised. These grounds fall into the following categories:

1.     Grounds that would result in a new trial.

2.     Grounds that would result in a new punishment trial only.

3.     Grounds that would result in a new direct appeal to the Court of Criminal Appeals.

My suggestion would be for the Court to first consider the grounds that would result in a new direct appeal. These grounds raised ineffective assistance on the part of appellate counsel. We have thoroughly briefed these grounds and provided the Court proposed Findings.

If the Court recommends relief be granted by way of a new direct appeal, and if the Court of Criminal Appeals grants the writ application on that basis, then Mr. Halprin would file a new appeal and the other grounds in the writ application would become moot or premature.

2300

Letter to Hon. Mike Snipes
September 7, 2011
Page 2

It seems that it would be a better approach to first decide the appeal issues before expending the Court's time reviewing the other issues.

I will be happy to discuss this with the Court at your convenience.

Yours very truly,


Gary A. Udashen

GAU:ps

cc:   Ms. Lisa Smith
      Assistant District Attorney

2301

NO. W01-00237-T(A)

| | | |
|---|---|---|
| EX PARTE | § | IN THE DISTRICT COURT |
| | § | |
| | § | 283RD JUDICIAL DISTRICT |
| | § | |
| RANDY ETHAN HALPRIN | § | DALLAS COUNTY, TEXAS |

## APPLICANT'S CORRECTED PROPOSED FINDINGS OF FACT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES the Applicant, RANDY ETHAN HALPRIN, and submits the attached

corrected Proposed Findings of Fact, Conclusions of Law and Recommendation of the Trial

Court on Application for Writ of Habeas Corpus Pursuant to Art. 11.071.

I.

The attached corrected Proposed Findings concern all claims raised in Halprin's

Application for Writ of Habeas Corpus pursuant to Art. 11.071.

II.

These corrected Findings correct several typographical errors in the original Proposed

Findings submitted by Applicant on December 13, 2010. Applicant's attorneys filed their

proposed Findings on December 13, 2010, which was the deadline set by the Court for both

Applicant and the State to file their proposed Findings. In attempting to comply with this

deadline, counsel was unable to carefully proofread the proposed Findings. The

typographical errors corrected by these corrected Findings are found at pages 22, 25, 40, 46,

48, 52, 58, 59, 60, 61, 64, 98, 125, 141, 145 and 153.

2302

Respectfully submitted,

GARY A. UDASHEN
State Bar of Texas No. 20369590

BRUCE ANTON
State Bar of Texas No. 01274700

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas 75201
214-468-8100
214-468-8104 fax

ATTORNEYS FOR APPLICANT


## CERTIFICATE OF SERVICE

On this ____ day of September, 2011, a true and correct copy of the foregoing Applicant's Corrected Proposed Findings of Fact was delivered to Lisa Smith, Assistant District Attorney, 133 N. Riverfront Blvd., L.B. 19, Dallas, Texas 75207.

GARY A. UDASHEN

NO. W01-00237-T(A)

| | | |
|---|---|---|
| EX PARTE | § | IN THE DISTRICT COURT |
| | § | |
| | § | 283RD JUDICIAL DISTRICT |
| | § | |
| RANDY ETHAN HALPRIN | § | DALLAS COUNTY, TEXAS |

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND RECOMMENDATION OF THE TRIAL COURT ON APPLICATION FOR WRIT OF HABEAS CORPUS PURSUANT TO ART. 11.071, TEX. CODE CRIM. PROC.

Having considered the amended application for writ of habeas corpus, the State's answer, all the supplemental filings by both parties in this case, the official court documents and records, the evidentiary hearings, and the Court's personal experience and knowledge, the Court makes the following Findings of Fact, Conclusions of Law and Recommendation of the Trial Court on this Application for Writ of Habeas Corpus Pursuant to Article 11.071:

## HISTORY OF THE CASE

Applicant, RANDY ETHAN HALPRIN, is confined pursuant to a judgment and sentence entered by this Court on June 12, 2003. Halprin was convicted of capital murder and sentenced to death. Direct appeal was taken to the Court of Criminal Appeals, which affirmed the conviction and sentence on June 29, 2005. *Halprin v. State*, 170 S.W.3d 111 (Tex. Crim. App. 2005).

Halprin filed an application for writ of habeas corpus on April 6, 2005, raising thirty-one grounds for relief. Halprin filed an amended application for writ of habeas corpus on April 25, 2005 raising the same grounds for relief. The amended application simply corrects citations and stylistic deficiencies and rewrites some sections of the writ to make them more readable and provides the

1

2304

Court with a table of authorities that was not contained in the original application.  The State filed an answer on October 3, 2005.  The Trial Court held evidentiary hearings on May 22, 2008, August 20, 2010, and September 30, 2010, affidavits,  interrogatories, and supplemental briefs were submitted.

At the evidentiary hearing on May 22, 2008, Halprin's co-indictees, Michael Rodriguez, George Rivas and Patrick Murphy testified.

At the evidentiary hearing on August 20, 2010, Halprin's trial counsel, George Ashford and Edwin V. King,  testified.

At the evidentiary hearing on September 30, 2010,  Lt. Henry Lee Whitman with the Texas Rangers testified concerning Defense Exhibit 39, entitled the Ranking of Offenders by Leadership Personality.  The prosecutors in Halprin's trial, Bill Wirskye, Tom D'Amore, and Toby Shook also testified.

In addition to this testimony, the Court has received affidavits from:

| | |
|---|---|
| Anne Lester | Dr. Kelly R. Goodness |
| Michael W. Carter | Mindi Sternblitz-Rubenstein |
| Wesley Doran Halprin | Billy Waybourn |
| Marian Feld | Keith Howard Stern |
| Robin H. Conley | Timothy Alan Black |
| Charles Eugene David | David Slocomb |
| George Reames Rogers | Bobby D. Mims |
| Robert Morrow | Edwin V. King |
| Dr. Carey Thomas Pelto | S.O. Woods |
| K.D. Adley | Michael Bosillo |

The Court has also received answers to interrogatories from:

| | |
|---|---|
| Lt. Hank Whitman | Michael W. Scotten |
| John Lee Davis | Israel Ray Cano |
| Toby Shook | Thomas A. D'Amore |
| Bill Wirskye | Michael Rodriguez |

2

2305

Finally, the Court has received a number of items into evidence, including child protective services records, school records, prison records, medical records, trial motions, jury instructions, trial transcripts, and trial records.

The Court considers all of this evidence.

### GENERAL FINDINGS

1. The Court will consider both the Original Application for Writ of Habeas Corpus as well as the the Amended Application for Writ of Habeas Corpus.

2. The Court finds that the Amended Application for Writ of Habeas Corpus does not raise any new issues or submit any new arguments. It simply corrects citations and stylistic deficiencies and rewrites some sections of the writ to make them more readable.

3. The Court notes that in *Ex Parte Vasquez*, 2005 WL 287504, the Court of Criminal Appeals stated:

> The Court has also reviewed a document entitled "Amended and Supplemental Application for Writ of Habeas Corpus Seeking Relief From Death Penalty and Request for Evidentiary Hearing." Because applicant filed this document after the deadline provided for an initial application for writ of habeas corpus and because he presents a new allegation in it, we find it to be a subsequent application.

The *Vasquez* case clarifies that the purpose of the rule relied upon by the State is to prohibit raising new allegations. That is not the case here.

4. The Court finds, therefore, that the State's contention that the Amended Application should be treated as a subsequent application is incorrect.

### Ground for Relief I & II

Ground for Relief I states:

3

2306

The imposition of the death penalty violates the Eighth Amendment prohibition on cruel and unusual punishment because, under the facts and jury instructions in this case, no reasonable juror could find that Halprin killed Officer Aubrey Hawkins, attempted to kill Officer Hawkins, intended to kill Officer Hawkins, or, as a Major participant in the robbery of the Oshman's, acted in reckless disregard of the life of Officer Hawkins.

Ground for Relief II states:

The imposition of the death penalty violates the Eighth Amendment prohibition on cruel and unusual punishment and Halprin's right to Due Process of Law under the Fifth and Fourteenth Amendments of the United States Constitution because he is actually innocent of the charged offense.

## Background

5.  Halprin submits that he is not death eligible.   The jury instructions submitted at the conclusion of the guilt-innocence phase of the trial charged the jury in accordance with the law of parties as provided in sections 7.01(a) and 7.01(b) of the Texas Penal Code. TEX. PENAL CODE. ANN. §§ 7.01(a), (b). *See* Record Excerpts at O.  He contends that the third and sixth application paragraphs authorized the jury to convict Halprin of capital murder because he conspired with others to commit the felony of robbery, and, during the course of that conspiracy, one or more of his coconspirators caused the death of Aubrey Hawkins. *See* Record Excerpts at O.  He asserts that a possibility exists that he was convicted of capital murder based only on the doctrine of felony murder.  Halprin submits, however, that no reasonable juror could find that he killed, attempted to kill, or intended to kill Officer Hawkins or, as a major participant in the underlying felony, acted in reckless disregard of the life of Officer Hawkins.

## Governing Law: Eighth Amendment

6.  The Court finds that the Eighth Amendment provides that "cruel and unusual punishment [shall

4

2307

not be] inflicted." U.S. CONST. amend. VIII; *Furman v. Georgia*, 408 U.S. 238, 239 (1972) (*per curiam*) (noting provision applicable to States through the Fourteenth Amendment). The Eighth Amendment guarantees individuals the right not to be subjected to excessive sanctions. *Atkins v. Virginia*, 536 U.S. 304, 311 (2002). A sanction is beyond the state's authority to inflict if it makes "no measurable contribution" to acceptable penal goals or is "grossly out of proportion to the severity of the crime." *Id.* A state must genuinely narrow the class of death eligible defendants as well as do this in a way that reasonably justifies the imposition of a more severe sentence on the defendant compared to others found guilty of murder. *Zant v. Stephens*, 462 U.S. 862, 879 (1983). A proper narrowing device insures that, even though some defendants who fall within the restricted class of death-eligible defendants manage to avoid the death penalty, those who receive it will be among the worst murderers–those whose crimes are particularly serious or for which the death penalty is particularly appropriate. *Gregg v. Georgia*, 428 U.S. 153 (1976). This is an ethical judgment about the "moral guilt" of the defendant and the reasoned moral response of the sentencer. *Perry v. Lynaugh*, 492 U.S. 302, 328 (1982).

7.   The Court notes that the Supreme Court has confronted the issue of death eligibility in the context of felony murder. In *Enmund v. Florida*, 458 U.S. 782 (1982), the U.S. Supreme Court held that because the defendant was not present when the shots were fired and the evidence did not indicate that he had any intent to kill, the Court held that Enmund's death sentence was unconstitutional. *Id.* In *Tison v. Arizona*, 481 U.S. 137 (1987), the Supreme Court modified the rule, holding that the major participation in a felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement. *Id.* at 157-58.

8. The Court notes that accordingly the Supreme Court has directed courts to focus on 'relevant facts

5

2308

of the character and record of the individual offender." *Enmund*, 458 U.S. at 798 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)).   This is an individualized determination. Accordingly, courts have considered the following factors pertinent to their analysis: extent of participation in the felony and the type of felony, extent of participation in the acts leading up to the use of lethal force, the use of a weapon, prior offenses, and the impulsive or planned nature of the use of lethal force.

**Applying *Enmund/Tison* Rule: Participation in Felony/ Type of Felony**

9.  The Court finds that the type of felony and extent of the defendant's participation in that felony are critical to a determination of death eligibility.  Robbery is typically a nonviolent felony.  *See Enmund*, 458 U.S. at 800.  In *United States v. Moussaoui*, 282 F.Supp.2d 480, 486 (E.D. Va. 2003), the court noted that mere participation in the conspiracy conflates the concepts of conspiracy liability and death eligibility.

10.  The Court finds that the fact Halprin participated in a typically nonviolent felony militates against death eligibility.

11.  The Court finds that the relative participation of the accused in the underlying felony is a critical component of the analysis.  The *Enmund* Court pinpointed that Enmund was only the getaway driver, assigning to him a relatively minor role in the felony.  *See also Cave v. State*, 727 So.2d 227, 229 (Fla. 1998).

12.  The Court finds that Halprin's role in the robbery was minor.  He was never left alone.  He was instructed to act and complied with instructions.  He exercised no independent judgment.  He did not pull his weapon.  He did not participate in confronting the employees.

    a.  Halprin testified that George Rivas conceived of the idea to rob the Oshman's.

6

2309

(RR 48, p. 10). Rivas was upset with the items taken from a robbery of a Radio Shack in Houston. (RR 48, p. 131). Rivas said they were going to do another robbery, and Halprin told Rivas how he felt. (RR 48, p. 131). He said, "I don't like this. I feel very uncomfortable with this. I'm not going to do it." (RR 48,, p. 131). They argued about it. (RR 48 p. 132). Rivas said, "You are part of the group and you need to do your share." (RR 48, p. 132). Halprin said, "I'm not going to do it." (RR 48, p. 132). Rivas said, "Well, it's something small. We don't have to worry about it. We don't need him." (RR 48, p. 132). Halprin stated he agreed to do it because he felt he did not have a choice. (RR 48, p. 132). Halprin listened to the plans, but he did not have any direct say in what would be done. (RR 48, p. 133). He testified the others thought he might run off or was scared so they had someone with him all the time. (RR 48, 134-35).

b. At the Oshman's, Halprin's role was to act as if he was shopping. (RR 48, p. 11). When the robbery commenced, Halprin was in the apparel section. (RR 48, p. 12). Halprin was not one of the individuals that formed a semi-circles and pulled a gun on someone. (RR 48, p. 14). Halprin was grabbing clothes for everyone, operating off of specific instructions to grab jackets, long-sleeved T-shirts, and the like. (RR 48, p. 15, 145). Rivas marched down the aisle to the back with their hands in front of each other, past Halprin. (RR 48, p. 15). Rivas instructed to go to the front and act as if he were cleaning up. (RR 48, p. 16).

c. While at the front, Halprin heard on the radio, "Get out, get out. Go, leave, leave now." (RR 48, p. 17). Halprin grabbed the bag of clothes and another bag Rivas had placed on the ground and told him to watch and ran to the back. (RR 48, p. 17). Halprin pushed open the fire escape, and Larry Harper came out and ordered him to grab the long sleeping bag that contained rifles. (RR 48, p. 18). Halprin complied. (RR 48, p. 18). He went down the fire exit stairs and dragged the bag and opened the Ford Explorer door. (RR 48, p. 18). Halprin tried to shove the sleeping bag into the Explorer. (RR 48, p. 20).

13. The Court finds that Rodriguez also testified to Halprin's minor role in the robbery:

> Q. Now, when he got into the Oshman's while the robbery's occurring did he do any shopping?
> A. No, sir.
> Q. Did he collect anything?
> A. Nothing, nothing.
> Q. What did he do?
> A. He just walked around. . . I looked up and Randy was just walking down one of the aisles, you know . . It's comical. He wasn't shopping.. . . I said 'Just go over there and help out Rhinox.'"
> [Writ Hearing, May 8, 2010 at 34-36].

14. The Court finds that Halprin does not satisfy the first component of *Tison*–major participation

7

2310

in the underlying felony.  His minor role does not make him death eligible.

15.  The Court finds that the imposition of the death penalty upon Halprin is unconstitutional because of his minor role in the robbery.

### Applying *Enmund/Tison* Rule: Participation in the Killing

16.  The Court notes that capital punishment is limited to those offenders who commit "a narrow category of the most serious crimes and whose extreme culpability makes them the most deserving of execution."  *Roper*,125 S.Ct. at 1194(plurality opinion)).

17.  The Court notes that in *People v. Hein*, 86 Cal.App.4th 683 (2001) (since depublished), the court noted that one of the defendants apparently stood at the door of the victim's establishment while three co-defendants robbed and killed the victim.  The court found the evidence equivocal as to what that defendant was doing but determined that merely standing at the door while the crime was committed insufficient, as a matter of law, to support findings of major participation and reckless indifferent to human life.  In comparison, in *Cordova v. State*, 698 S.W.2d 107 (Tex. Crim. App. 1985), the accused brought his co-indictees to the victim and struck the deceased with a tire iron. *Id.* at 113.  Therefore, the court concluded, the defendant intended or contemplated that a life would be taken.  *Id.*

18.  The Court finds that Halprin played no role in the killing.

19.  The Court finds that Halprin testified repeatedly that he did not shoot Officer Hawkins, intended to shoot Officer Hawkins.  *See* (RR 47, p. 97).  ("I did not shoot Officer Hawkins."  "I never discharged a firearm at the Oshman's."); (RR 47, p. 98).  ("I never pulled my weapon at the Oshman's"); (RR 48, p. 24).  ("Q.  Did you pull your gun and shoot your gun?"  A.  No, sir.");  ("A. Donald Newbury came in and he said, 'What's wrong with you'?  And I said, 'I've been shot in the

8

2311

foot.' And he told me to stop whining and stop crying and he said that George Rivas had been shot and, you know, because I remember him saying he was shot in the car, but I wasn't sure where he was shot at and I asked him where and he goes, 'You know where because you did it.'" "Q. What did you say?" "A. I said, 'What are you talking about?'" "Q. What did he say?" "A. And he said -- he goes, 'You were firing crazy.' And I said, 'I never shot my gun.'" "Q. What happened then?" "A. And he said, 'Well, we'll see. Where's your gun?' And I said, 'It's in a bag somewhere.' I was telling him to, 'Check the gun, check the gun.'" "Q. Did they go check the gun?" "A. Yes, sir." "Q. And had it been fired?" "A. No, sir"); (RR 48, p. 34). ("Q: Was there any conversation among any of y'all in the planning of this Oshman's that if there was a serious confrontation, you were going to kill anybody?" "A: No, sir"); (RR 48, p. 39). ("Q: Did you ever have any intention, yourself, of shooting somebody or killing anyone?" "A: No, sir, never in my life." "Q: Best of your knowledge, was there any discussion by anyone else of shooting anybody or killing anybody during the course of any robbery?" "A: No, sir"); (RR 48, p. 55). ("I can tell all of y'all that I did not intend the death of the officer. I didn't shoot him. I didn't pull my gun. I didn't (phonetic) want to rob the people. Obviously I did, but I didn't anticipate anybody being killed. I didn't know that anybody was going to be killed and then, you know, I live with it every day. Every time I look at my foot I think back to that night and it's something I live with. And I understand the consequences, but I didn't kill him. I didn't want anybody to die or anybody to be hurt"); (RR 48, p. 102). ("Sir, I did not shoot the officer. I did not pull a gun and I think the evidence shows that"); (RR 48, p. 137). ("Q: Do you think that they might have thought about using some of that ammunition?" "A: Absolutely not"); (RR 48, p. 141). ("Q: And Murphy's role was to sit out there and monitor the police channels?" "A: Yes, sir." "Q: Why did you need him to do that?" "A: So we would know

9

2312

if anybody was coming, so we could get out of there"); (RR 48, p. 142). ("Q. Did you miss that meeting where Mr. Murphy was issued that AR-15 and was going to be a sniper-- "A. That was never discussed in my presence."); (RR 48, p. 143-144). ("Q. Apparently Mr. Murphy was anticipating some trouble with the police, wasn't he?" "A. I can't say what he was or what he wasn't." "Q. If you believe his statement where he says, 'I was to initiate the fire fight with pursuing police,' that --" "A. If that's what he says, then he must have." "Q. But you didn't know about that?" "A. I did not." "Q. What was the plan if the police were going to come?" "A. As far as I know, Rivas said that he was going to show them the security badge or something to take them off guard." "Q. Is that what he talked about?" "A. Yeah. He said that he was going to do that, something to take them off guard and they were going to try to subdue them." "Q. And how was he going to subdue the police?" "A. Use the handcuffs." "Q. So it had been talked about if the police did arrive, they going to be subdued?" "A. In a nonlethal way, yes, sir." "Q. You are telling this jury you didn't think anything bad would happen?" "A. I didn't believe anything bad would happen"); (RR 48, p. 39). ("Q: Well, Detective Spivey, do you have any direct evidence that shows this jury beyond a reasonable doubt that Randy Halprin discharged a firearm that night? Any direct evidence?" "A: No"); (RR 42, p. 82). ("Q: Well, in Mr. Murphy's statement he goes back and checks and says that, hey, Randy Halprin's weapon wasn't fired." "A: He does"); (RR 42, p. 88). ("Q: Do you recall during the course of your investigation in reviewing the statements, that Randy Halprin's weapon was checked by the other individuals and it was still fully loaded, the revolver that he was supposedly carrying?" "A: I believe Mr. Murphy makes reference to that." "Q: And his weapon was fully loaded, right?" "A: That's correct." "Q: And hadn't been discharged?" "A: According to Mr. Murphy, that's correct"); (Exhibit 26, Rodriguez's statement) ("Halprin did

10

2313

not shoot. When he was getting out, his gun fell down his pants into his boots"). Thus, the circumstances do not satisfy the *Enmund* constraints.

20. The Court finds that Michael Rodriguez testified that Halprin never shot his gun. Specifically, he testified when the Texas Seven returned from Oshman's,

> A. I got all 14 pistols, put them on the bed, opened the chambers and actually counted how many rounds we had left.
> Q. [H]ow did you know which guns were Randy's guns?
> A. Every gear bag, every pistol, had a color coding. . . Randy Halprin's I believe was green.
> Q. Had Randy's pistols been fired?
> A. No, sir. The pistol that was not taken to the robbery, obviously that was not used. The other one I opened the chamber to check and, no, his weapon had not been fired.
> Q. Is it possible it had been fired and reloaded?
> A. No, sir.

[Writ Hearing, May 8, 2010 at 38-39].

21. The Court finds that George Rivas testified at a hearing on May 8, 2010 that Halprin did not shoot a gun.

> Q. When you got back to the hotel immediately after the shooting what was done with the weapons?
> A. I had Newbury take Randy's 357 which it turns out had fallen down his pants and check the weapon. There were still six rounds in there unfired. Newbury handed me the weapon when I told him to. I checked it myself and I could still smell the fresh oil from the cleaning kit.

[Writ Hearing, May 8, 2010 at 114-15].

22. The Court finds that Patrick Murphy testified at a hearing on May 8, 2010 that Halprin did not fire a weapon.

> Q. When you got back to the hotel did anybody check the weapons?
> A. Yes, sir. I did.
> Q. And did you check Halprin's weapon?
> A. I checked Randy Halprin and Michael Rodriguez' weapon and attempted to check all the weapons but I did check Michael Rodriguez and Randy Halprin's.
> Q. Had Randy Halprin's weapon been fired?
> A. No, sir, it had not.

11

2314

Q. How do you know that?

A. Because I physically examined the weapon. I opened the cylinder, checked the rounds, make sure none of the rounds had been fired. I was very familiar with his weapon and how it's loaded. I know his weapon had not been fired.

Q. Is it possible the weapon had been fired and re-loaded?

A. I don't believe so, sir, because I personally had cleaned the weapons . . .

Q. Is it possible it had been fired at the Oshman's robbery and then re-loaded on the way to the motel?

A. I don't believe so, sir.

Q. Why is that?

A. Because I'm familiar with the ammunition that Randy had in his weapon and what he had been given -- what we had given Randy for ammunition and he only had six bullets.

[Writ Hearing, May 8, 2010 at 163-64].

23. The Court finds that Halprin did not act in reckless disregard of human life.

    a. The Court finds that when the patrol car arrived, he followed instructions:

        Q.     And what happens as Officer Hawkins pulls up in the car?

        A.     George Rivas told me to stay put.

        Q.     And what did you do?

        A.     I stayed put.

    (RR 48, p. 21).

    b. The Court finds that Halprin testified he remembered Rivas reaching for something and he thought it was his security guard identification.

    c. The Court finds that Halprin testified he did not expect violence.

        Q.   What did you think was going to happen at this point in time?

        A.  I thought that he was going to say, hey, you know, I'm a security guard or something to take him off-guard.

        Q.   Okay. What did you think might happen after that?

        A.   That he would just, you know, say, hey, kind of pretty much what had happened in the previous robberies, that you know, you came at us at a bad time, you know, handcuff him or whatever he's going to do and we were going to go on our way.

    (RR 48, p. 22).

    d. The Court finds that he was surprised when shots were fired: "He walked up to the car where the patrol car was and he reached back. I saw him reach back for his, what I thought was his security badge. And then at that time he had said something, I can't remember what he said, and then the next thing you know I just heard gunshots." (RR 48, p. 22-23).

12

2315

e. The Court finds that Halprin testified he ran from the scene:

A. I freaked out and started running around the car. I ran around the Ford Explorer. The first thing in my mind was get across the field.

Q. Okay. Now, had y'all left a car someplace?

A. There was a blue Honda across the field at the apartment complex.

Q. And why had y'all left a car there?

A. In case we had to take off on foot.

Q. And as you ran off, what happened?

A. I heard somebody call my name. I turned around and that's when I felt my foot go numb.

Q. Did you know at that point you had been shot?

A. I felt like I had been shot, yes, sir.

Q. All right. What happened after that? What's the next thing that happened?

A. I had gone down those, like there was like a grassy embankment and I remember going by them. By then, I believe, a lot of people had filed into the car because the car was already moving. I remember Joseph Garcia and Rodriguez doing something and the car, the patrol car, moving back and the car, the Explorer, backing out. And then I heard somebody tell me to, "Get in the car. Get in the car." And I jumped into the front, the right side of the front seat in Newbury's lap.

(RR 48, p. 23-24).

24. The Court finds that Halprin acted neither with extreme culpability or with the degree of force necessary to warrant a penalty of death.

25. The Court finds that Halprin thought Rivas intended to confront the officer with his security badge not with bullets.

26. The Court finds that when shots were fired, Halprin did not participate; instead, he ran.

27. The Court finds that Halprin played no part in the killing, the circumstances leading up to the killing, or the circumstances following the killing.

28. The Court finds that because Halprin did not exhibit reckless indifference the imposition of the

13

2316

death penalty upon him is unconstitutional.

## Applying *Enmund/Tison* Rule: Circumstances Surrounding Any Weapon

29. The Court notes that the presence of a weapon is a factor determinative of death eligibility. The Court in *Tison* emphasized that merely carrying a weapon does not, of itself, indicate reckless indifference.

30. The Court notes that in *White v. State*, 532 So.2d 1207, 1222 (Miss. 1998), the Mississippi Court found that testimony that the accused was carrying a gun as he left the premises was insufficient to satisfy *Enmund* and *Tison*. "Absent some basis for inferring that this gun was the murder weapon, or that [the accused] contemplated prior to the robbery that it be used as an instrument of lethal force, . . . the evidence was legally insufficient to enable a rational trier of fact to find beyond a reasonable doubt that [the accused] killed, attempted to kill, intended that a killing take place, or contemplated that lethal force would be employed." *Id.*

31. The Court finds that Halprin carried a gun during the robbery of the Oshman's but did not use it. (RR 48, p. 11).

32. The Court finds that Halprin testified that he carried the gun because he had no option.

> Q.  Why did you take a gun in there?
> A.  I felt that I didn't have a choice.
> Q.  What do you mean?
> A.  You know, I, before the robbery, I even told them, I'm not going to go in and carry a gun and there was a little argument and they made it very clear that, you know, it was, you know, their way or the highway. And so I told them I wasn't going to pull a gun and they said, fine, just gather clothes, grab a shopping cart, and gather clothes.

(RR 48, p. 14). In response to the question later, "Why did you take a loaded gun?," he responded, "I felt I had no choice. The guns were loaded, you know." (RR 48, p. 136).

33. The Court finds that Michael Rodriguez testified that Randy carried a gun because he had no

14

2317

option.

At the hearing on May 22, 2008, Rivas testified:

> Q.    What was Randy's attitude about carrying a gun?
> A.    Again, you know, we went through this whole - - he and I went through this whole discussion again. "I don't want to hurt anybody." I said, "Randy, just look at the gun as a tool."

[Writ Hearing, May 22, 2008, at 34].

34. The Court finds that George Rivas testified that Halprin told him "he didn't want to carry one [gun]." [Writ Hearing, May 22, 2008 at 120].

35. The Court finds that Patrick Murphy testified that Halprin "argued against being armed whatsoever. He did not want to carry a gun whatsoever." [Writ Hearing, May 22, 2008 at 162].

36. The Court finds that Halprin carried a gun to show intimidate, to show force, not to use force: "to intimidate, to get somebody to cooperate easier." (RR 48, p. 153).

37. The Court finds that the jury could not have found reckless indifference from the mere presence of a gun or guns as *Tison* prohibits this.

38. The Court finds that this factor, circumstances surrounding any weapon, strongly militates against imposition of the death penalty.

**Applying *Enmund/Tison* Rule: Prior Offenses**

39. The Court notes that the circumstances surrounding offenses prior to the one at issue play a role in determining death eligibility.

40. The Court finds that the alleged co-conspirators participated in an escape in which, although some held shanks and took guns, no one was stabbed and no shots were fired. (RR48, p. 4-5,7).

41. The Court finds that the co-conspirators robbed a Radio Shack and a Western Auto without firing a shot. (RR48, p. 8-9).

15

2318

42. The Court finds that these two prior robberies that occurred without a shot would provide the same pattern for the Oshman's robbery to occur without violence, even though some of the participants had weapons.

> Q:    What made you think that somebody wasn't going to get shot and killed during this robbery?
> A.    Basically from the first two robberies.  There were known conflicts and nothing happened..

(RR 48, p. 45).

> Q.    Did you think anyone might get hurt in this escape?
> A.    No, sir.
> Q.    Why not?
> A. Because the whole idea that it was designed for was so nobody would  get hurt.

(RR 48, p. 110).

> A.    Based on the previous robberies, I had no reason to believe that they couldn't handle a situation without violence erupting.
> Q.    You didn't think that was a possibility at all, that someone might get  hurt?
> A.    I didn't think anybody would get hurt.

(RR 48, p. 144)

43. The Court finds that the function of the weapons was to intimidate–precisely so that no one would be injured and firing the weapon would never be necessary.

44. The Court finds that Halprin knew Rivas, the ringleader, was serving seventeen life sentences for aggravated robbery (RR 48, 107), and knew that no one was hurt during the commission of these offenses.  (RR 48, 22).

45. The Court finds that under the above described circumstances, no reasonable juror could find that Halprin acted in reckless disregard for human life. The *modus operandi* of the group was to intimidate victims into submission; use of violence never was part of the plan.

## Applying *Enmund/Tison* Rule: Opportunity to Prevent Killing

16

2319

46. The Court notes that the final factor is opportunity to prevent the killing.

47. The Court notes that in *Jackson v. State*, 575 So.2d 181 (Fla. 1991), the Florida Court found imposition of the death penalty unconstitutional where no evidence indicated the accused personally possessed or fired a weapon during the robbery or that he harmed the victim. *Id.* at 192-93. No evidence indicated the accused expected violence to erupt. *Id.* at 193. No opportunity existed for the accused to prevent the murder, as the crime took only seconds to occur and the sudden, single gunshot was a reflexive reaction to the victim's resistance. *Id.* In *Benedith v. State*, 717 So.2d 472 (Fla. 1998), the Florida court vacated a death sentence. The court emphasized that the accused could not have prevented the use of the firearm while the robbery was being committed. *Id.* at 475.

48. The Court finds that the killing of Officer Hawkins was impulsive, without deliberation, and not pre-meditated.

49. The Court finds that Halprin had no opportunity to prevent the killing.

    a. The Court finds that Halprin could not reason with Rivas – or any of the others who fired shots -- particularly when he assumed Rivas would resolve the situation nonviolently. Nothing he could have done would have prevented the killing.

    b. The Court finds that Halprin did the only thing he knew to do when shots unexpectedly rang out– he ran. He did the only thing he could do – he attempted to flee an intolerable scene.

50. The Court finds that this factor strongly militates against imposing the death penalty.

51. In summary, the Court finds that the imposition of the death penalty upon Halprin is unconstitutional because 1) his role in the robbery was minor, typically not a felony that involves death, 2) he played no part in the killing, the circumstances leading up to the killing, or the circumstances following the killing; 3) he only brought a weapon to intimidate; 4) the two prior robberies did not involve any shots being fired; and 5) he had no opportunity to stop the crime.

17

2320

## The Context: Misleading the Jury

52.  The Court finds that under the charge submitted to the jury at the conclusion of the guilt-innocence phase, the jury could have found Halprin guilty only as a coconspirator, with another coconspirator committing the killing.

> a.    The jury need only have found that Halprin "should have anticipated" the killing, an objective, normative state of mind indicating nothing about Halprin's actual state of mind and not amounting to reckless indifference. (*See* Record Excerpts, Jury Charge on Guilt/Innocence). *See Johnson v. State*, 853 S.W.2d 527 (Tex. Crim. App. 1993) (en banc) (Clinton, J., dissenting)

53.  The Court finds that the jury was instructed on liability as a party under Texas Penal Code §§ 7.01, 7.02.

54.  The Court finds that the law of parties, however, may not apply to the punishment phase of a capital murder trial. *Green v. State*, 682 S.W.2d 271, 287 (Tex. Crim. App. 1984).  The reason for excluding party liability at the punishment phase of a capital trial is that the Eighth and Fourteenth Amendments allow a sentence of death to be imposed only upon a defendant "shown to be culpable due to his own actions, intentions, and expectation and not those of his cohorts." *Green*, 682 S.W.2d at 287.

55.  The Court finds that when the law of parties is presented to the jury in the guilt phase of a trial, the trial court should submit an "anti-parties" charge at punishment when requested. *Belyeu v. State*, 791 S.W.2d 66, 73 (Tex. Crim. App. 1988).

56.  The Court finds that no "anti-parties" instruction was submitted in the punishment charge here.

57.  The Court finds that the jury in this case was not limited, as *Enmund* and *Tison* mandate, to individualized consideration of the accused.

> a.    The charge instructed the jury to "consider all evidence admitted during the guilt or innocence stage and the punishment stage, including evidence of the defendant's

18

2321

background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty."

58.  The Court finds that Special Issue Number 2 further misled the jury.  Special Issue No. 2 asked:

"Do you find from the evidence beyond a reasonable doubt that the defendant, RANDY ETHAN HALPRIN, actually caused the death of the deceased, Aubrey Hawkins, or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken?" (*See* Record Excerpts).

59.  The Court finds that the word  "anticipate" was not defined.

a.    The Court notes that counsel requested a definition by objection to the charge.  *See* Record Excerpts at M.

b.    The Court notes that counsel also filed a pretrial motion alleging that use of "anticipate" rendered the Texas death penalty scheme unconstitutional because it did not satisfy the Enmund/Tison principle and asking that the term be defined as to have expected a circumstance to happen with certainty.  (CR 117-18).

60.  The Court finds that the jury was not informed that the Texas Court of Criminal Appeals judicially interprets "anticipate to suggest "a probability, something more than a mere possibility." *See Walker v. Scott,* 123 F.Supp.2d 1034, 1043 (E.D.Tex. 2000).

61.  The Court finds that the jury could have misinterpreted the term to mean mere possibility, and probably did.

62.  The Court finds that during deliberations the jury proffered a note stating, "We are in disagreement on the definitional difference between 'anticipate that a human life be taken' and should have anticipated." (*See* Record Excerpts).

63.  The Court finds that the note confirms significant juror confusion over the meaning of the word, fatally undermining the penalty phase of the trial.

19

2322

64. The Court finds that the use of the term "anticipate" without definition decreased the State's burden of proof under *In re Winship,* 397 U.S. 358, 364 (1970) and rendered the Texas capital punishment scheme unconstitutional as applied.

65. The Court finds further that any judicial gloss on the term "anticipate" of which the jury was not notified, particularly given the propensity of the term to mislead the jury, violated the decision in *Apprendi v. New Jersey,* 530 U.S. 466 (2000) and its progeny.

66. The Court finds that the error was magnified by the hypotheticals posed to eventual jurors during *voir dire*. The prosecutor posed the following hypothetical to Michael Weidler:

> The example we give, let's say, me, Mr. D'Amore, and Mr. Wirskye want to go rob a bank. Our plan calls for Mr. Wirskye to be the getaway driver and the lookout, and he waits outside. I go in with a gun, Mr. D'Amore goes in to help me fill up the bag. We subdue everyone with threatening, we get the money, and then I start killing people in there.
> Obviously, if we're caught, I could be prosecuted for the death penalty, but the law says that Mr. D'Amore and Mr. Wirskye could, also. If they're actively participating, promoting the crime, they can be held accountable. We call that the law of parties.
> It's the accomplices, can also get the death penalty, and it just depends on the facts.

(RR 9, p. 75-76).

67. The Court finds, therefore, that during *voir dire* jurors were affirmatively misled into thinking that "anticipate" required much less than which the law mandates.

68. The Court finds that this hypothetical poses the precise facts of *Enmund* that the Supreme Court found insufficient to warrant the death penalty.

69. The Court finds that the prosecutor's final argument compounded the problem. The prosecutor argued: "Special Issue No. 2, did he cause the death? Did he intend that someone die? Did he anticipate that a human life would be taken? Most of you told us taking a loaded gun into a store, a robbery, that by itself told you that he knew or anticipated or someone would in that circumstance, they would have to use it." (RR 53, p. 82).

20

2323

70. The Court finds that the prosecutor's final argument in the context of the wholly deficient grossly misled the jury.

## Conclusion

71. The Court finds that here that imposition of the death penalty is purposeless, needless, and unconstitutional, particularly under the misleading jury instructions, voir dire, and closing argument.

72. The Court finds that Halprin was a relatively minor player in the felony, gathering clothes and responding to the orders of others.

73. The Court finds that although Halprin carried a gun, he did so only because he felt he had no option.

74. Alternatively, the Court finds that merely carrying a weapon is not indicative of satisfaction of the *Enmund/Tison* elements.

75. The Court finds further, in the modus operandi of the group, the function of the weapons was to intimidate, not to serve as an instrument of lethal force.  Two prior robberies occurred with the display of weapons and, even with surprises and confrontations, no shot was fired.

76. The Court finds the shooting occurred instantaneously without deliberation and without affording Halprin an opportunity to prevent it.

77. The Court finds that Halprin's gun fell down his pants as he fled the scene.

78. The Court finds that a check indicated that it had not been fired.

79. The Court finds that under these circumstances the death sentence is a cruel and unusual punishment and, therefore, unconstitutional under the Eighth Amendment.

## Actual Innocence

80. The Court finds that to establish actual innocence, petitioner must demonstrate that, "'in light

21

of all the evidence,'" "it is more likely that no reasonable juror could have convicted [the defendant]. *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995). It is important to note in this regard that "actual innocence" means factual innocence, not mere legal insufficiency. *See Sawyer v. Whitley*, 505 U.S. 333, 339 (1992).

81. The Court finds that for the reasons set out in Halprin's habeas petition no reasonable juror could deny that Halprin is actually innocent of the charged offense. The evidence in the record, combined with external evidence, confirms that Halprin was factually innocent of the crime charged.

82. The Court finds that Halprin is not eligible for the death penalty. As such, imposition of the death penalty upon Halprin constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

## GROUND FOR RELIEF III

Ground for Relief III states that Halprin is entitled to a new trial based on state agents suppressing exculpatory evidence. Argument A under the suppression of exculpatory evidence ground argued that the prosecutor withheld the identity of the law enforcement officer who prepared the document entitled "Ranking of Offenders by Leadership/Personality Characteristics.' Argument (B) contends that the prosecution withheld exculpatory evidence of statements from various potential witnesses, including co-defendants, concerning Halprin's role in the offense, his status in the escapee group, and his general character.

### State Withheld the Identity of the Law Enforcement Officer Who Prepared the Document Entitled "Ranking of Offenders by Leadership/Personality Characteristics"

### Introduction/Background

83. The Court finds that the State suppressed exculpatory evidence, Exhibit 39, because state agents knew the source of this material document and withheld this information from the defense and the court at trial.

84. The Court finds that during the investigation of the escape of the Texas Seven, Sergeant

22

2325

Investigator Hank Whitman of the Texas Department of Public Safety Special Crimes Division created a document entitled, "Ranking of Offenders by Leadership/Personality Characteristics." [Def. Ex. 39].

85.   The Court finds that Whitman created this document based upon interviews with civilian witnesses, correctional officers, and several inmates who worked closely with the escapees. [Whitman Aff.].

86.   The Court finds that the document states that based upon this investigation, "it was the unanimous decision that RIVAS was the leader and the weakest was determined to be HALPRIN." [Def. Ex. 39]. Specifically, the document stated Halprin was "quiet and never exhibited leadership qualitites. Was consistently worried about whether his work was acceptable to the civilian workers. Very submissive characteristic. This worrisome attitude was seen to escalate a month before the escape.   One civilian worker speculated whether HALPRIN was undergoing some type of depression." [Def Ex. 39].   This document was stored in the files of the Texas Department of Criminal Justice–Inspector General. [See Cert. Rec. TDCJ–Off. Insp. Gen.].

87.   The Court finds that the jury never had the opportunity to view this document.

88.   The Court finds that the State objected to the admission of Exhibit 39 as hearsay, arguing that defense counsel had not established the source of the document, who prepared it, or why it was prepared despite having provided defense counsel with the document during discovery. Therefore, the trial court excluded the document.   [RR 53, p. 15].

**Governing Law**

89.   The Court finds that under the Due Process Clause of the Fourteenth Amendment, prosecutors

23

2326

have an affirmative duty to turn over all material exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963); *Ex parte Kimes*, 872 S.W.2d 700, 702 (Tex. Crim. App. 1993); *see United States v. Beckford*, 962 F.Supp. 804 (E.D.Va. 1997) (holding that, in a capital case, prosecution required by *Brady* to afford pretrial disclosure to defense of mitigating evidence in its possession).

90.  The Court finds that the prosecution violates the due process clause when it suppresses evidence in its possession favorable to the accused "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; *Thomas v. State*, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992).

91.  The Court finds that withheld evidence is material if its disclosure would have created a reasonable probability of a different outcome in the determination of guilt or punishment if it had been disclosed. *See Thomas*, 841 S.W.2d at 404; *People v. Vilandi*, 76 N.Y.2d 67, 73-77 (1990).

92.  The Court finds that the prosecutor's duty to disclose includes information known to the police or other branches of law enforcement. *Kyles v. Whitley*, 514 U.S. 419, 433 (1995).

93.  The Court finds that knowledge of government agents, such as police officers, of exculpatory evidence is imputed to the prosecution. *Williams v. Whitley*, 940 F.2d 132 (5th Cir. 1991); *United States v. Auten*, 632 F.2d 478 (5th Cir. 1980).   Therefore, if a police officer has exculpatory evidence, this is the same as a prosecutor having it, and it must be turned over to the defense. *Kyles*, 514 U.S. at 433 (stating "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); *O'Rarden v. State*, 777 S.W.2d 455 (Tex. App.–Dallas 1989, pet ref'd) (holding the prosecution team includes investigators).

94.  The Court finds additionally, the duty to disclose exculpatory evidence is ongoing, and the State

24

must disclose it whenever it is discovered. *Flores v. State*, 940 S.W.2d 189, 191 (Tex. App. – San Antonio, 1996, no pet.).

## Exhibit 39 Was Favorable to the Defense and the Author Had to Be Disclosed

95. The Court finds that evidence that is material to a mitigating factor would be material to the defendant's punishment. Such evidence clearly comes within the sweep of *Brady* and must be disclosed with other *Brady* material. *See United States v. Storey*, 956 F.Supp. 934 (D. Kan. 1997) approving pretrial discovery concerning mitigating factors pursuant to *Brady*); *United States v. Beckford*, 962 F.Supp. 804 (E.D.Va. 1997) (holding that, in a capital case, prosecution required by *Brady* to afford pretrial disclosure to defense of mitigating evidence in its possession.

96. The Court finds that the Supreme Court has made it clear that the sentencing authority in a capital case must be permitted to consider any circumstances that might warrant a lesser penalty than death. *See Lockett v. Ohio*, 438 U.S. 586, 604-06 (1978); *Woodson v. North Carolina*, 428 U.S. 280.

97. The Court finds that during the investigation of the escape of the Texas Seven, Sergeant Investigator Hank Whitman of the Texas Department of Public Safety Special Crimes Division created a document entitled, "Ranking of Offenders by Leadership/Personality Characteristics." [Def. Ex. 39].

98. The Court finds that Exhibit 39, prepared by State law enforcement agents in the course of their investigation, demonstrated that Halprin was the least dangerous of the seven and highly submissive. This was strong mitigation evidence that could have affected the outcome of the penalty phase of the trial.

99. The Court finds that Investigator Whitman testified at the hearing on September 30, 2010 that six law enforcement personnel, primarily Texas Rangers and members of Internal Affairs

25

2328

participated in the creation of the Ranking Document in the immediate aftermath of the escape. [Writ Hrg., Sept. 30, 2010, Vol. 3 at 32, 47].

100. The Court finds that Exhibit 39 was the result of information culled from prison records as well as interviews with over twenty different persons, ranging from the sheriff of Karnes County, to prison administrators, to correction officers, to inmates, to civilian officers who oversaw the escapees' daily work. [*See* Ex. 39].

101. The Court finds that Investigator Whitman testified that the Ranking Document represented a "consensus" of the law enforcement personnel who prepared it – Halprin was the weakest, never exhibited leadership qualitites, was submissive and consistently worried about whether his work was acceptable to civilian workers. [*See* Writ Hrg., Sept. 30, 2010, Vol. 3 at 30-32]. Specifically, the following exchange occurred:

> Q.   Your document says a consensus was developed as to which was the leader and which was the weakest.  The consensus – just to be clear, the consensus is exactly what's in the document, correct?
> A.   Correct.
> Q.    Concerning Mr. Halprin the document says he was quiet, never exhibited leadership qualities.  I assume you got that from your interviews with all of these people.
> A.    That's correct.
> Q.    All of the officers involved in this agreed that that's a characteristic of Randy Halprin?
> A.    Yes, sir.
> Q.    And that it says he was consistently worried about whether his work was acceptable to the civilian workers.  I assume you heard that from the civilian workers.
> A.    That's correct.
> Q.    That was a consensus that was a true fact?
> A.    Yes.
> Q.    It says Halprin had a very submissive characteristic.  I assume that came from these same interviews with all of these people you interviewed.
> A.    That's correct.
> Q.    The consensus among all of these officers was he had a submissive characteristic?

26

2329

A.   Yes, sir.

Q.   This worrisome attitude was seen to escalate a month before the escape and one civilian worker speculated as to whether he was undergoing some type of depression. Sounds like statements particular people told you.

A.   That's correct.

Q.   Your put them in the document because your consensus among you and the officers was this was information that was likely correct.

A.   Yes, it is.

[Writ Hrg., Sept. 30, 2010, Vol. 3, at 30-32].

102.   The Court finds that Exhibit 39 was an amalgam or synthesis of everything that the prison system knew about Halprin: Halprin was the least dangerous of the seven escapees and was very submissive. The document, by its very creation, carried the approval of the prison system itself.

103.   The Court finds that the purpose of the document was for gathering intelligence and tactical reasons for hostage negotiations when they captured the individuals. Lieutenant Whitman testified they wanted "to know everything there was about these individuals." [Writ Hrg., Sept. 30, 2010, Vol. 3, at 25].

104.   The Court finds that the admission of Exhibit 39 would have been the most effective means to demonstrate that law enforcement considered Halprin's role to be in the escape and his personality characteristics compared to the other escapees.

105.   The Court finds that this piece of evidence demonstrates that Halprin was a weaker person than his co-actors and that he would likely never attempt an escape or commit murder on his own.

106.   The Court finds that Exhibit 39 also contradicts the prosecution's assertions that Halprin was the "baddest of the bad" and that there was no evidence that sufficiently mitigated against his role in the crime.  [RR 53, p. 77, 85].

107.   The Court finds that the document undercuts the prosecution's theory that Halprin was one of the leaders of the escapees and played a pivotal role in the escape–which law enforcement clearly

27

did not believe. [RR 49, p. 6]; [RR 48, p. 106, 108, 124, 135].

108. The Court finds that Exhibit 39, undermined the State's theory of the punishment phase of the trial – that Halprin's character, background, lack of moral culpability, and crimes required the death penalty and that no mitigating evidence existed. [*See, e.g.* RR 53, p. 77 ("What could possibly be sufficiently mitigating? . . . [W]e told you [in opening arguments] that after you reviewed the evidence in the case and the testimony, that it was our position . . . that that would be no."); p. 84-85 ("His mean evil streak back in August of '96 hasn't ended. It's continued on").

109. The Court finds that Exhibit 39 was mitigating. It was a statement by law enforcement that Halprin was a follower, "with a very submissive characteristic" who "worried about whether his work was acceptable to the civilian workers" and was "the weakest" of the escapees. [Ex. 39].

110. The Court finds that Exhibit 39, particularly when combined with other excluded evidence such as Dr. Goodness's full proposed testimony provided a myriad of reasons why Halprin should have received life imprisonment.

111. The Court finds that Exhibit 39 was not cumulative, contrary to the State's contention. Only two witnesses, Patrick Moczygemba and Mark Burgess, civilian prison officials, made brief statements – Halprin's intelligence was "at the very bottom" of the Texas Seven [RR 49, p. 111, 115]; Halprin was "dumb as a box of rocks;" and that Halprin was not "a leader type." [RR 49, p. 195]. These were brief, unrelated statements made by two of the State's numerous witnesses during the guilt/innocence phase of the trial, not the penalty phase of the trial.

112. The Court finds that Exhibit 39 was the strongest piece of mitigation evidence that could have been presented at trial.

113. The Court finds the exclusion of this evidence was inordinately harmful to Halprin. This

28

2331

evidence could have caused the jury, a jury that took over six hours to deliberate, at the punishment phase[1] to choose life imprisonment instead of the death penalty.

114. The Court finds that criminal law experts have submitted affidavits to this effect.

a.  In his affidavit, Bobby D. Mims, a criminal defense attorney who has defended thirty capital murder cases, opined:

> the information in [Exhibit 39] is mitigating evidence of a quality and quantity that is significantly stronger and more important than that referenced in the opinion of the CCA. The evidence from the TDCJ civilian employees that Halprin was at the low end of intelligence of the group and was not a leader type is significantly less helpful than the ranking document. The ranking document appears . . .to be very persuasive mitigating evidence which at least one juror would probably find to be such a circumstance as would lessen Halprins moral blamworthiness.
> [Mims Aff.].

b.  Robert Morrow, a criminal defense attorney who has tried more than twenty capital cases and represented many more capital clients on appeal, asserted that as a defense attorney:

> you never give up trying to reach a juror and you never can predict what piece of evidence will do that. Defense exhibit 39 could have been that piece of evidence which convinced a juror that Applicant, because of his role and overall limitations, did not deserve the death penalty. There was nothing cumulative about it.

[Morrow Aff.].

c.  Robin Conley, an anthropologist who is completing her dissertation at UCLA focusing on how jurors make decisions during the penalty phase of death penalty trials, echoed these assertions. In her affidavit, she averred that jurors have told her that if the defense can "reduce the defendant's responsibility for the crime somehow, they would consider this [evidence, like Exhibit 39, more than any other] sufficiently mitigating." [Conley Aff.]. For example, when Conley asked if there were hypothetical evidence that would have been mitigating, one juror responded "if you found out that [the co-defendant] was the mastermind and led [the defendant] through the whole thing. . . . God if that comes out it's gonna make it fun to sleep at night." [Id.]. Therefore, Conley maintains that Exhibit 39 "would have potentially

---

[1]At a previous hearing on this writ, state's counsel pointed out that the jury in Halprin's case deliberated longer than in most of the other Texas Seven trials. This fact shows that, despite the state's success in keeping the jury from hearing any of the substantial mitigating evidence available, the jury still had questions about the appropriateness of aa death sentence for Halprin. If the jury had heard any of the mitigating evidence, the outcome would likely have been a life sentence, rather than death. [Hrg. Transcript Aug. 20, 2010 at 97].

been an important piece of mitigating evidence." [*Id.*].

115. The Court finds that Halprin's trial counsel testified that their strategy during the punishment stage of trial was to demonstrate that Halprin was a follower, with no leadership qualities whose role in the crime did not justify a sentence of death. Counsel also agreed that Exhibit 39 would have been important mitigation evidence. [Hrg. Transcr. Aug. 20, 2010 at 254]. The following exchange occurred:

> Q. [I]s it a fair statement that your defense is basically what is from a mitigation standpoint for the death penalty question is basically what was summarized in the ranking document.
> A. Yes, that was part of it.
> Q. What I mean by that is the argument you were trying to make are the same things that the ranking document says?
> A. Yes.
> . . .
> Q. And so as the trial attorney do you feel like having a law enforcement officer testify in support of the facts you were presenting as far as mitigation of punishment would have been a significant factor for the jury.
> A. I think so.

[Hrg. Transcr. Aug. 20, 2010 at 169-170].

116. The Court finds that Exhibit 39 was favorable to the defense and should have been disclosed.

**Prosecution Withheld the Identity of Law Enforcement Officer Who Prepared the Document**

117. The Court finds that the State disclaimed any knowledge of the source of the document, who prepared it, or why it was prepared despite having provided defense counsel with the document during discovery. For example, prosecutor Tom D'Amore stated at trial, "We didn't know who made it, either." [RR 53, p. 15].

118. The Court finds that the State was more than aware that Halprin sought the author of this document in order to introduce it during the punishment stage of trial. The U.S. Supreme Court has suggested that the more specific the request, the broader the State has an obligation to respond.

30

2333

*United States v. Agurs*, 427 U.S. 97, 106 (1976); *United States v. Brooks*, 966 F.2d 1500, 1504 (D.C. Cir. 1992) (noting that where "there is an explicit request for an apparently very easy examination, and a non-trivial prospect that the examination might yield material exculpatory information, we think the prosecution should make the inquiry").

119. The Court finds that because the State knew defense counsel wanted the author of Exhibit 39 the State had a heightened duty to search for the author of Exhibit 39 in order that defense counsel could introduce Exhibit 39 at trial.

120. The Court finds that Halprin's trial counsel testified on August 20, 2010 before this court that they had spoken to the prosecution about the source of the document.  The following exchange occurred:

> [Judge Magnis]:    Okay.  Did you prior to the trial – when I say "the trial" I'm talking about anything after the voir dire stage.  Did you have any discussion with anyone from the State about the source of that document?
> [Attorney King]:    Yes, sir.
> [Judge Magnis]:    Do you recall who?
> [Attorney King]:    I know we did with Tom D'Amore and I know I did with Toby [Shook].  Everybody that was involved on that, we kept asking them where it was and everybody said, "We don't know what it is," hadn't seen that before, don't have a clue.

[Hrg Transcript, Aug. 20, 2010 at 251].  Similarly, Attorney Ashford testified:

> Q.    During the trial did you talk to any of the prosecutors and ask them who the author of this document was?
> A.    Yes.
> Q.    Who did you talk to?
> A.    I can't say specifically but it would had to have been Toby Shook, Tom D'Amore, if not both.
> Q.    What did they tell you?
> A.    They kept saying they didn't know where the document came from?
>
> Q.    Did you ask them to find out where it came from.
> A.    I'm sure I did.
> Q.    What was their response?

31

2334

A.   Just denying that they knew where it came from.
[Hrg. Transcript, Aug. 20, 2010 at 70-71].

121. The Court finds that trial counsel believed that "the State knew where [Exhibit 39] came from all along" and that they "were just being sandbagged." [Hrg. Transcript, Aug. 20, 2010 at 174].

122. The Court finds that an employee of the Texas Department of Criminal Justice Inspector General's Office also claimed to know nothing about the document.

123. The Court finds that the prosecution claimed to have no knowledge even though the material provided had been Bates stamped by the prosecution. [RR 30, p. 60].

124. The Court finds that a search by writ counsel revealed that Exhibit 39 along with the information concerning this document and who prepared it was located in the files of the Texas Department of Criminal Justice–Inspector General. [*See* Woods Aff.].

125. The Court finds that these files identified the author as Hank Whitman, an investigator with the Criminal Intelligence Service of the Texas Department of Public Safety's Criminal Law Enforcement Division. Halprin included this information in his *habeas corpus* writ. [*See* Amnd. Writ Habeas Corpus, at 40-41, 48].

126. The Court finds that after Halprin revealed the author of Exhibit 39, the State abandoned its position that it had no knowledge of Exhibit 39 in its answer.

127. The Court finds that the State obtained an affidavit from Whitman. In this affidavit, Whitman stated he created the ranking list during the course of the State's investigation into the escape of the prisoners. [*See* Whitman Aff.].

128. The Court finds that it would have been easy to determine his authorship. At the hearing on September 30, 2010, the following exchange occurred between Whitman and writ counsel:

32

Q.   So would you agree with me there would be a limited universe of people who could have written these documents that wound up in these law enforcement files?
A.   There would have been a limited amount.  However, there was quite a few people that knew I authored that that are still working for the system.  Ultimately that's why I'm sitting here today.  That's how it was identified.
Q.   Somebody called the Department of Public Safety to the division that handled criminal investigations where you worked, would they have been able to find someone that said Hank Whitman wrote that document.
A.   Yes, sir.
Q.   If somebody called the Office of Inspector General and said, "Who wrote this document," there are people there that would have said, "Hank Whitman wrote this document."
A.   Yes, sir.

[Writ Hearing, Sept. 30, 2010, Vol. 3, at 49-50].  Further, when asked if it would be "pretty easy to find out who wrote [Exhibit 39]," Whitman replied, "It would have been easy, yes."  [*Id.* at 50].

129.  The Court finds that further, the records at the Texas Department of Criminal Justice Office of Inspector General, which contained Exhibit 39, included a fax cover sheet from the Irving Police Department that states "profiles done by Sgt. Investigator Hank Whitman."  [*Id.* at 45].

130.  The Court finds that Whitman worked for the Texas Department of Criminal Justice an essential component of investigative and prosecution team in this case.

131.  The Court finds that Whitman also gave the Ranking Document to an investigator with the Irving Police Department during its investigation of the case.

132.  The Court finds, therefore, that Whitman's knowledge concerning Exhibit 39 can be imputed to the State.  It does not matter whether the prosecution knew or did not know he was the author of Exhibit 39.  *Zule v. State*, 802 S.W.2d 28, 33 (Tex. App.–Corpus Christi 1990, pet. den'd) ("The State is responsible for disclosing favorable evidence known by its agents, including police officers, even if the particular evidence is not known to the prosecuting attorney.").  He was a state agent.  *See Kyles*, 115 S.Ct. at 1566 (stating "the individual prosecutor has a duty to learn of any favorable

33

2336

evidence known to the others acting on the government's behalf in the case, including the police").

133. The Court finds that the First Circuit Court of Appeals reasoning in *United States v. Osorio* is instructive here as to when a law enforcement officer's knowledge should be imputed to the State. *United States v. Osorio*, 929 F.2d 753, 758 (1st Cir. 1991). In *Osorio*, the First Circuit stated that "The government is not a congery of independent hermetically sealed compartments; . . . the prosecution of criminal activity is a joint enterprise." *Id.* at 760. The First Circuit continued on to reason:

> The prosecutor charged with discovery obligations cannot avoid finding out what 'the government' knows, simply by declining to make reasonable inquiry of those in a position to have relevant knowledge. The criminal responsibility of a corporation can be founded on the collective knowledge of its individual employees and agents. There is no reason why similar principles of institutional responsibility should not be used to analyze the actions of individual government attorneys called upon to represent the government as an institution in matters of court-ordered disclosure obligations.

*Id.* at 761.

134. The Court finds that just as the FBI and the U.S. Attorney's Offices are not "independent hermetically sealed compartments," neither are the Irving Police Department, the Texas Department of Criminal Justice, Office of Inspector General, the Texas Department of Public Safety Special Crimes Division and the District Attorney's Office. This is particularly true when all three offices were deeply involved in the investigation and prosecution of this case.

135. The Court finds that *O'Rarden v. State* is also instructive. In *O'Rarden v. State*, the Fifth Court of Appeals held that the prosecution included both "investigative and prosecutorial" persons assigned to the case, including a person who investigated claims of sexual abuse with the Department of Human Resource. *O'Rarden v. State*, 777 S.W.2d 455, 457 (Ct. App.–Dallas 1989, pet. rev. refused). This person knew that a medical doctor had examined the complainant and found

34

2337

that no signs of sexual abuse existed. *Id.* The Court imputed this knowledge to the prosecution team and reversed and remanded the case for a new trial. *Id.* at 457, 460. Similarly, here, knowledge of the authorship of Exhibit 39 should be imputed to the State. The prosecution worked in concert with Whitman's agency and the Irving Police Department to prosecute the case. The Irving Police Department knew the author of Exhibit 39, because it sent a fax that stated "profiles done by Sgt. Investigator Hank Whitman." [Writ Hrg. Sept. 30, 2010, Vol. 3 at 45].

136. The Court finds that the Fifth Circuit's opinion in *United States v. Deutsch,* is also informative. *United States v. Deutsch,* 475 F.2d 55 (5th Cir. 1973), *overruled on other grounds by, U.S. v. Henry,* 749 F.2d 203 (5th Cir. 1984). The *Deutsch* Court held that "there is no suggestion in *Brady* that different 'arms' of the government, particularly when so closely connected as this one for the purpose of the case, are severable entities." *Id.* at 57. It stands to reason that if knowledge possessed by the post office can be imputed to the prosecution so can the law enforcement agencies involved in the investigation and prosecution of the case here. The Court also notes that Whitman testified that a number of persons in the Criminal Investigations section of the Department of Public Safety and the Office of Inspector General would have known he authored Exhibit 39 if a call was placed to these sections. The Irving Police Department also received the Exhibit. His authorship was "readily available" to prosecutors. *Williams,* 940 F.2d at 133.

137. The Court further finds that the item sought was particular in nature – the author of Exhibit 39 so that defense counsel could introduce the exhibit into evidence, thereby heightening the prosecution's duty to provide the document.

138. The Court finds that under *Brady* it did not matter whether the prosecutors knew or did not know the authorship of Exhibit 39. The author of Exhibit 39, Whitman, was a member of the

35

investigative and prosecution team in the Texas Seven case.

## Conclusion

139. The Court finds that Halprin is entitled to post-conviction relief based on the suppression of

exculpatory evidence.

  a. Prosecution withheld or suppressed evidence.
  The Court finds that this has been shown by the prosecution continually disclaiming knowledge of the source of the document, even though this information was without a doubt, known to agents of the State.

  b. The evidence was favorable to the defense.
  Evidence showing that Halprin was the weakest of the seven escapees and had a submissive personality was highly critical on the question of the assessment of the death penalty. In Issue No. 1, for example, Halprin argues imposition of the death penalty was unconstitutional. He was a minor participant in the robbery. Further, the State repeatedly contended that at least five guns were fired and Halprin was one of the five who shot. Exhibit 39 clearly indicates that Halprin was the most passive and, therefore, the least likely to have used a weapon.

  c. The evidence was material to either guilt or punishment.
  Materiality is shown if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Reasonable probability is defined as a probability sufficient to undermine confidence in the outcome. *See Kyles, Richardson, supra.* This was the most important evidence available in mitigation of the punishment in this case. Sgt. Whitman's investigation made clear that Halprin was the least culpable of the seven escapees, had no planning or leadership role and was a passive and submissive person and, therefore, was far more deserving than any other of the escapees of the mercy that the law allows a jury to show in the death penalty phase of a capital murder trial. The materiality is clear when the great efforts the prosecution went through to exclude this evidence are considered. It is clear that the prosecution recognized this evidence as the potential lynchpin to a successful argument against a death sentence for Mr. Halprin. Their efforts to exclude the evidence were successful and their goal of a death sentence was achieved.

140. The Court finds that it is unconscionable that the prosecution pursued and achieved a death

sentence by suppressing Exhibit 39. This conduct cannot be sanctioned, and this death penalty

allowed to stand. These actions undermine confidence in the outcome of this case. The prosecution

36

2339

team's suppression of this evidence caused the jury to assess the death sentence without full knowledge of all the facts and circumstances.

**Prosecution Withheld Exculpatory Evidence of Statements from Potential Witnesses, including Co-Defendants, Concerning Halprin's Role in the Offense, his Status in the Escapee Group, and his General Character.**

141. The Court finds that the prosecution withheld material included an interview with George Rivas at the Teller County Jail in Colorado on January 23, 2001, where he made the following statements regarding Halprin:

> "Uh, the reason I approached NEWBURY is because HALPRIN was getting cold feet. He was jumping in and out, so I was thinking, in case this guy pulls out . . . ah, or he justs balls up in fetal (coughing) position there on the spot when something is happening . . ."
>
> "Ah, I used to leave a lot of misinformation. We lied a lot to HALPRIN, he was our weakest link. (Cough by COBBS) And, uh we lied a lot to him about our plans. He wasn't real into the whole mode. He wanted to go to Israel . . . so, we kind of uh . . . he was Jewish, he's a, he's a . . ."
>
> "Genealogy. He's full parents, Jewish, RODRIGUEZ is half Jewish and uh, I know it sounds like hypocrisy but I really do love the Lord. I just want a new life and I felt the Jewish race, HALPRIN of the Jewish race, I just didn't feel good about leaving HALPRIN by himself. Uh, there's a lot about, lot of talk about leaving HALPRIN behind. Even to this very . . . before we were captured. I just couldn't do that."

142. The Court also finds that the prosecution withheld material included an interview with offender Johnnie Dunning, which stated: "Dunning also reported that he believed that Halprin would be the weak link in the group and was very passive."

143. The Court finds that these statements provided firm evidence that Halprin was a weak follower of Rivas, that he added nothing to the group as far as abilities or motivation to hurt persons to achieve their aims, and that he was weak and fearful and was considered by some of the other escapees as more hindrance than help in the escape and subsequent offenses.

37

2340

144.  The Court finds that the suppression of this evidence satisfies the test for obtaining post-conviction relief.  These favorable statements were withheld or suppressed by the prosecution.  It is clearly favorable to Halprin and was material to the punishment.  Evidence showing his weakness and passivity, as well as the assessment of his dangerous and propensity towards violence by other inmates, including co-defendants, is highly crucial to the ultimate question of Halprin's worthiness for the death penalty.  A trial in which the jury did not hear this crucial and highly exculpatory evidence does not satisfy the basic rudiments of due process.

## GROUND FOR RELIEF IV: INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL

Ground for Relief IV states:

> Halprin is entitled to a new trial concerning his guilt because his trial counsel denied him the effective assistance of counsel guaranteed to him by the Sixth and Fourteen Amendments of the United States Constitution and Texas Constitution, Art. 1, Sect. 10.

## Governing Standard

145.  The Court notes it is well established that a defendant is entitled to the effective assistance of counsel as required by the Sixth and Fourteenth Amendments as well as Tex. Const., art. 1, Sect. 10. *Gideon v. Wainwright,* 372 U.S. 335 (1963).   Effective assistance is denied if, 1) "counsel's representation fell below an objective standard of reasonableness," and 2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668 (1984).  To establish deficient performance, Applicant must show that his counsel's representation "fell below an objective standard of reasonableness." *Jones v. Jones,* 163 F.3d 285, 301 (5th Cir. 1998) (quoting *Strickland,* 466 U.S. at

38

2341

688). To satisfy the prejudice requirement, the record must demonstrate that, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*; *see also Nealy v. Cabana*, 764 F.2d 1173, 1178 (5th Cir. 1985). The question is not whether a defendant would have more likely than not received a different verdict but for counsel's performance, but whether, "he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 454 (1995).

146. The Court notes that in preparing for the defense of a capital murder prosecution, counsel is expected to familiarize himself with the facts of the case and with the applicable standards of law attendant to the various anticipated legal questions which will be presented at trial. *Magill v. Dugger*, 824 F.2d 879, 866 (11th Cir. 1987). Failure to follow up on established leads or known defenses, and failure to be prepared to effectively present such defenses, is not excusable. *See, e.g.*, *Battenfield v. Gibson*, 236 F.2d 1215, 1228 (10th Cir. 2001). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitations on investigation." *Burger v. Kemp*, 483 U.S. 776, 794 (1987). (*citing Strickland*, 466 U.S. at 690-91). The failure to present certain types of critical evidence may not be condoned if it stems from trial counsel's lack of preparation. *Wiggins v. Smith*, 539 U.S. 510, 521-23 (2003). The failure to call witnesses cannot be deemed a strategic choice if counsel had not interviewed the witnesses and was, thus, unprepared. *See also Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991), *cert. denied*, 503 U.S. 952 (1992). The failure to make proper evidentiary objections because of a misunderstanding or ignorance of the rules satisfies the first prong of the *Strickland* test. *See, e.g.*, *Gochicoa v. Johnson*, 118 F.3d 440, 447 (5th Cir. 1997).

39

2342

147. The Court finds that Applicant's trial counsel was ineffective for the specific reasons listed below.

## Failure to Introduce Statements of Co-Indictees that Halprin Was not a Shooter

**Deficiencies**

148. The Court finds that defense counsel was deficient in failing to call law enforcement officers who took statements from the co-indictees that, viewed from Halprin's defense perspective, were exculpatory and would have gainsaid Halprin's role in the shooting.

149. The Court finds that defense counsel failed to present the statement of Donald Newbury to the Colorado Springs Police Department that he (Newbury) shot Rivas to contradict the State's claim that Halprin shot Rivas.

150. The Court finds the defense tried to introduce an FBI statement that Newbury admitted the shooting but the State objected to it as hearsay, an objection which was sustained. (RR 42, p. 87).

151. The Court finds that Newbury's confession qualified as a statement against penal interest and would have been admissible as sponsored by Detective Graham under Texas Rule of Evidence 803(24). Graham was not called as a witness, and, thus, the jury did not learn of the statement. Thus, the State was able to incorrectly claim that Halprin shot Rivas.

152. The Court finds that trial counsel was deficient in failing to present the statements of co-indictees Rodriguez and Murphy to the authorities that Halprin's weapon was not fired.

153. The Court finds that Rodriguez stated in his statement to the FBI that Halprin's weapon was checked and found not to have been fired. (Defense Exhibit 26-A, page 6, Statement to Agents Moen and Aker)

154. The Court finds that Murphy stated to Irving Detective Johnson that Halprin's weapon was

40

2343

checked and found not to have been fired. (Statement of 1-24-01, page 4 of 5).

155. The Court finds that defense counsel attempted to introduce these statements during the testimony of Detective Spivey but the State objected each time as hearsay which was sustained (RR 47, pp. 32-39).

156. The Court finds that Agents Moen and Aker and Detective Johnson were not called to testify at trial, to sponsor these statements. Another of Murphy's statements was admitted (Defense Exhibit 24) but criticized by the State as inaccurate. Likewise, another of Rodriguez's statements was introduced (exhibit 27), but these corroborating witnesses were not called. These statements would have been admitted as a statement against interest under Texas Rule of Evidence 803(24).

157. The Court finds that trial counsel was deficient in failing to present the statement made by co-indictee Rivas to the authorities that Newbury reloaded Rivas' weapon.

158. The Court finds that the State took part of Newbury's statement that he reloaded the guns to infer that he reloaded Halprin's gun. Specifically, the prosecutor asked "Then down at the bottom part of that page, Donald Newbury says that, 'I reloaded everyone's gun in the Honda?'" to which the respondent stated, "Yes, sir." (RR42, p. 100).

159. The Court finds that defense counsel attempted to show that Newbury only reloaded Halprin's gun, by cross-examining Detective Spivey, who took the statement. Defense counsel asked,

> Q.   Okay. Now, included in these notes would there be the notes of the [Rivas] interview?
> MR. KING:  We'll offer Defense [28].
> MR. SHOOK:  Approach the bench?
> (Bench conference)
> MR. KING:  Is there a ruling, Your Honor?
> THE COURT:  On Defense 28, is there an objection?
> MR. SHOOK:  Yes.  Object to hearsay.
> THE COURT:  Sustained.

41

2344

(Entered for record purposes) . . .

MR. SHOOK: Judge, if he's going to be asking questions about that, we're going to be objecting to hearsay.

THE COURT: Well, rule on each question.

Q. (By Mr. King) All right. Having had an opportunity to refresh your recollection from your personal notes of the interview of Mr. Rodriguez (sic) are there some things that Mr. Rodriguez (sic) talked about that are not reflected or not included in the written statement, Defense Exhibit 26?

. . .

Q. All right. In particular, is there anything in Mr. Rivas' statement about being in the vehicle and reloading weapons?

MR. SHOOK: Judge, we'll object to hearsay.

THE COURT: Sustained.

Q. (By Mr. King) Well, during the course of your investigation to ascertain who was involved in the shooting of Officer Hawkins, would information about who had discharged firearms, who had reloaded discharged firearms, would that be relevant in your opinion to determine who may have fired shots at Officer Hawkins?

A. Yes. . . .

Q. Okay. And you obtained information in that regard from the interview with Mr. Rivas as to what had taken place in that regard; is that correct?

A. Yes.

Q. And reloading firearms had taken place; is that correct?

MR. SHOOK: Judge, we object to hearsay.

THE COURT: Overruled. The question doesn't call for hearsay. He may be able to answer from other sources. Please rephrase your question.

Q. (By Defense Counsel) In regards to whether weapons were reloaded or not, did Mr. Rivas give you information orally pertaining to whether or not weapons had been reloaded? MR. SHOOK: Same objection, hearsay, Judge.

THE COURT: Sustained.

Q. (By Defense Counsel) Did Mr. Rivas describe for you how or that each -- everybody in the group had a particular identifying color that they used to mark items?

MR. SHOOK: Judge, I'll object to hearsay.

THE COURT: Sustained.

(RR 47, pp. 32-39).

160. The Court finds that the statement by Rivas to Detective Spivey was a statement against penal interest and would have been admissible if properly offered under Texas Rule of Evidence 803(24).

161. The Court finds that the above cited testimony qualifies under the statement against interest exception to the hearsay rule under Texas Rule of Evidence 803(24).

42

2345

162. The Court finds that Rule 803(4) states that the hearsay rule does not apply even though the declarant is available as a witness: "Statement Against Interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or propriety interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, or to make the declarant an object of hatred, ridicule, or disgrace, that a reasonable person in declarant's position would not have made the statement unless believing it to be true. In criminal cases, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." This exception to the hearsay rule is not limited to cases in which the defendant is the declarant. *Bingham v. State*, 987 S.W.2d 54 (Tex. Crim. App. 1999). The Court must first determine whether the statement in question tends to expose the declarant to criminal liability and then must determine if corroborating circumstances exist that clearly indicate trustworthiness of the statement. *Id.*; *see also Davis v. State*, 872 S.W.2d 743 (Tex. Crim. App. 1994); *Dewberry v. State*, 4 S.W.3d 735 (Tex. Crim. App. 1999); *White v. State*, 982 S.W.2d 642 (Tex. App. - Texarkana 1998).

163. The Court finds that the co-indictees' statements clearly exposed them to criminal liability. The co-indictees admit to involvement in the various criminal offenses involved in their statements. Likewise, sufficient corroborating circumstances exist to indicate the trustworthiness of the statement.

164. The Court finds that several co-indictees, during separate interviews with law enforcement officers, indicated that Halprin did not shoot enhances the credibility of each individual statement. Moreover, evidence exists that one of the escapees by the police vehicle did not shoot, lending credibility to these statements. Halprin's own statement to the law enforcement officers also is

43

2346

consistent with these other statements.

165.   The Court finds that to the extent that the trial court had discretion in the admission or exclusion of mitigating evidence, Supreme Court precedent weighs heaving in favor of admission. *Barefoot v. Estelle*, 463 U.S. 880, 898 (1983); *United States v. Jones*, 132 F.3d 232, 242 (5th Cir. 1998).

**Prejudice Suffered**

166.   The Court finds that the question of whether Halprin was a shooter was one of the key issues in both phases of the trial.  In assessing punishment, the first question a reasonable jury would consider is whether Halprin personally shot at the officer.

167.   The Court finds that to allow the jury to make the death decision without access to this highly probative evidence showing that Halprin did not shoot is unconscionable and clearly undermines confidence in the outcome of this case.

168.   The Court finds that the second prong of *Strickland* is clearly met.

169.   The Court finds that having met the deficiency and prejudice prong the Applicant has established that the failure to properly pursue presentation of this evidence constitutes ineffective assistance of counsel.

**Medical Evidence that Halprin Did Not Shoot Himself**

170.   The Court finds that the defense failed to provide medical evidence that Halprin did not shoot himself.  Hand-in-hand with Rivas' stated belief that Halprin shot him is a similar belief that Halprin shot himself.  However, medical testimony from the treating physician as well as others shows that the wound was not self-inflicted. The bullet entered from the side of the foot, not the top. *See* affidavit of Dr. Pelto (Record Excerpts).

44

2347

171. The Court finds that had the defense presented this testimony, the State would not have been able to insist that Halprin fired his weapon–the main fact the State relies upon to prove lethal intent. Since the wound was clearly not self-inflicted, this was an easily provable fact. However, the defense failed to present evidence in this regard to the jury. The failure to present this evidence satisfies the first prong of *Strickland,* and its importance in refuting the State's thesis that Halprin shot his gun satisfies the second prong.

**Cumulative Error**

172. The Court finds that all of these evidentiary failures coalesced to allow the State to argue that Halprin's role in the offense was greater than the proof demonstrated. The State could only prove five guns were fired. If Rodriguez was the fifth shooter, Halprin was not. If Halprin did not shoot Rivas but Newbury did, then no testimony places a gun in Halprin's hand. Viewed cumulatively, the State's theory that Halprin was a shooter fails. For that reason, discussion of these errors cannot be trisected, but must be considered *in toto* for the cumulative harmful effect.

**Failure to Object to Inadmissible Victim-Impact Testimony**

173. The Court finds that trial counsel failed to object to inadmissible victim-impact testimony.

174. In *Payne v. Tennessee*, 501 U.S. 808 (1991), the United States Supreme Court modified the rule on victim impact testimony. This modified rule permits the finder of fact to hear testimony about the deceased's character as well as the impact his death had on those close to him. While still condemning any *per se* comparison of the lives of the victim and the accused and further prohibiting any testimony concerning the punishment desires of the victim's family, *see Booth v. Maryland*, 482 U.S. 496 (1987), the trial courts were permitted to admit evidence that shed some light on the

45

2348

deceased's uniqueness as an individual. This testimony is strictly limited to the punishment phase of a capital case. *Payne*, 501 U.S. at 825.

175. The Court finds that the Texas Court of Criminal Appeals discussed victim impact statements in *Lane v. State*, 822 S.W.2d 35, 41 (Tex. Crim. App. 1991). The Court of Criminal Appeals mutated the dicta in *Lane* into some redefinition of victim impact testimony that overlooked the still existing prohibition against character and background evidence of the deceased. Given the context in which this issue has developed from *Booth* through *Payne*, clearly the notion that "victim impact testimony" is limited solely to testimony concerning the effects on the victim's family is a misstatement of law. Statements and testimony concerning the victim's character, circumstances, and background, i.e., showing him to be a family man with small children and a dedicated officer, are clearly aimed at developing his uniqueness as an individual and absolutely fall within the purview of testimony still delimited by *Payne v. Tennessee,* regardless of how this rule of law has been misconstrued in the trial court's findings of fact and conclusions of law.

176. The Court finds that prior to trial, trial counsel filed a motion in limine to preclude improper victim impact testimony. Specifically, before the first witness was called, defense counsel stated "Motion in Limine on the character of the complainant and the victim impact." The trial court granted the motion. (*See* RR 41, p. 14).

177. The Court finds that thereafter, in opening statement the prosecution immediately delved into emotional arguments about the victim's family. Specifically,

> At about 5:30 that evening he had arranged to meet his family at the Olive Garden Restaurant, which is located in Irving, Texas, just off Highway 183. On the other side of the highway is the Ashman's Superstore. At the time he met his mother, Jayne Hawkins, who brought her mother, Aubrey Hawkins' grandmother, who was 92 years old. He met his wife, Lori, there with his nine-year-old son, Andrew. And

46

2349

sat down to eat. They were able to spend almost an hour together, but calls backed up, and around 6:25 that evening Aubrey Hawkins had to leave. He had to go answer calls. He said goodbye to his family. They saw him drive off in his squad car, go down the service road next to 183 in the direction of the Ashman's. That's the last time his little boy, Andrew, would see him alive.

(RR 41, pp. 36-37).

178. The Court finds that later testimony from Ms. Hawkins, the victim's mother was developed

as follows:

Q. (The prosecutor) Did he enjoy being a police officer?

A. Oh, yes. It was absolutely his life's dream to become a police officer with a big department.

Q. Now, let me turn your attention to Christmas Eve of 2000. Had you made some plans with your son? . . .

A. Well, I had told Aubrey that -- I'm just tired of doing this -- that my mother was coming and so he said knowing, of course, we were coming from DAW and he would be working in Irving, he said, could we have Christmas Eve dinner because we were going to spend Christmas day at his house. And he wanted to see my mom. And so I said, oh, that would be great, because, you know, normally I didn't get to see Aubrey when he was working. And so we -- my mom and I came from the airport to meet Aubrey, but mother's plane was late, so we were a little bit late and Lori had chosen Olive Garden. And so --

Q. After y'all arrived, did you sit down at the table and have Christmas Eve dinner?

A. Yes.

Q. How was your son dressed?

A. Aubrey had his uniform on. It was only the second time I had ever seen him in it.

Q. And was he in good spirits at that time?

A. Very good spirits. He had just had a health checkup and he said, 'Mom, my triglycerides are down', and he was, uh-huh, happy, and looked very well, you know. And Aubrey scooped up Andrew, you know, I love you. He never left me or Andrew or got off the phone without saying I love you, ever. And he said -- he hugged Andrew and said, you know, '"I love you. See you in the morning.' And, 'Bye, Daddy' and same with Lori. He put them in the car and they went away. And then we got my mom in the car and Aubrey said, 'I want to show you how to get back on the freeway.' He always sort of took care of things that way.

Q. Okay. Now, later that evening did you go back to your home? . . .

A. And then the doorman called upstairs and he said, 'There's some nut down here.' He said, 'Somebody flashing a badge and some woman named Rose.' And I said, 'I don't want to let somebody up here like that,' because I had no idea. I did not think about it at all who that would be. And as it turned out, Rose was Chief Canaday's

47

2350

wife, who I had never met.

Q.   Chief Canaday, was he the Irving Police Chief?

A.   Yes. And the badge, of course, we know what it was. So they really banged on the door, didn't ring the doorbell, just banged and banged. And I went to the door and looked through the peephole and I could see four people standing there, two, I think, in uniform and then like a, I think a chaplain, and so I knew.

Q.   You knew at that time?

A.   And I just said, 'Has something happened to Aubrey?' And they yelled at me and said, 'Well, if you will let us in, we'll tell you.' And I opened --

(RR 41, pp. 54-61).

179. The Court finds that none of this testimony met with any objection, yet none of it was relevant to any issue in the case. The testimony was the exact kind precluded under *Payne*: evidence intended to persuade the jury to weigh the value of Hawkins' life.

180. The Court finds that the trial court's finding regarding the definition of victim impact testimony is directly contrary to established Supreme Court precedent as set forth in *Payne v. Tennessee*. *See Williams v. Taylor,* 529 U.S. 362 (2000).

181. The Court finds that the State used this evidence to persuade the jury to weigh the value of Hawkins' life. Specifically, the prosecutor stated, "He died alone in that cold pavement. Maybe he had some final thoughts. Maybe he thought of his family that he had just left. I hope he did. Randy Halprin must be held accountable for his crime, which is capital murder. On Christmas Eve most men, most fathers are home. They have dinner with their family. Maybe after dinner they sit down and they read a traditional Christmas story to their children. After their children are put to bed, perhaps they build their little boy's bicycle or other toys." (RR 50, pp. 75-76).

182. The Court finds that the motion in limine gainsays that it was trial strategy to let this testimony and argument before the jury. The testimony had no probative value on any issue and was introduced solely so that the jury would weigh the relative value of Halprin's life and Hawkins' life. *Payne*

48

2351

reiterates the philosophy stated in *Booth*, that Halprin cannot be held responsible for the fact that Hawkins had a family and other heart-rending details of Hawkins' life over which Halprin had no control. Moreover, victim impact evidence is clearly not admissible at the guilt-innocence phase.

183. The Court finds that the failure of the defense to pursue a proper objection allowed the State free reign to introduce this inadmissible evidence and incite the jury to consider it in determining Halprin's guilt.

184. The Court finds that under *Strickland*, this failure falls below an objective standard of reasonableness and undermines confidence in the outcome of the case.

185. The Court finds that the guilt/innocence determination is supposed to be based on facts, not emotions, and the failure to object to this testimony allowed this improper evidence to infect this phase of the trial.

## Failure to Request a Charge on the Lesser Included Offense of Felony Murder

186. The Court finds that trial counsel was ineffective for failing to request a charge on the lesser included offense of felony murder.

187. The Court finds that if the shooter did not "intend to kill," then a charge on felony murder under TEX. PENAL CODE §19.02(b)(3) is appropriate. Felony murder is an unintentional murder committed in the course of committing a felony while capital murder includes an intentional murder committed in the course of robbery. To be entitled to an instruction on felony murder, some evidence must exist that would permit a jury rationally to find the defendant had the intent to commit robbery but not to cause the death of the victim. A lesser-included offense instruction will only be merited when "the evidence would permit a jury rationally to find him guilty of the lesser offense

49

and acquit him of the greater." *Jones v. Johnson,* 171 F.3d 270, 274 (5th Cir.), *cert. denied,* 527 U.S. 1059.

188.   The Court finds that constitutional due process considerations are implicated in the determination of entitlement to lesser included offenses, and the failure to properly instruct the jury was found to violate the United States Constitution, Amendments Five and Fourteen.

189.   Further the court notes, that the state law in Texas is to the same effect. *See Feldman v. State,* 71 S.W.3d 738, 750 (Tex. Crim. App. 2002). The first step is to determine whether the offense is actually a lesser-included offense of the offense charged. *Id.* Murder is a lesser-included offense of capital murder. *Id.* The second step of the test requires that the record contain some evidence that would permit a rational jury to find that the defendant is guilty only of the lesser offense. *Id.*

190.   The Court notes that the court in *Marquez v. State,* 2001 WL 520703 (Tex. App. - Houston [14th Dist.] 2001, pet. ref'd) (not designated for publication), found ineffective assistance based on counsel's failure to request an instruction on the lesser included offense of assault in a prosecution for assault on a police officer. In *Waddell v. State,* 918 S.W.2d 91 (Tex. App. - Austin 1996), the court found that defense counsel's failure to request an instruction on criminal trespass in a prosecution for burglary of a building constituted ineffective assistance of counsel.

191.   The Court finds that Rivas' statement, introduced at trial, indicates that he did not intend to kill the officer. (Defense Exhibit 26). Further the prosecutor asked, "And George Rivas only admits to shooting five times. And I guess he was kind of saying that was in self-defense or he was only intending to hit Officer Hawkins in his bulletproof vest?" to which the lead agent Detective Spivey replied, "That's correct." (RR 42, p. 105). Further, the prosecution argued that Rivas had disclaimed an intent to kill. (RR 50, p. 73).

50

2353

192. The Court finds that the evidence in Rivas' statement, confirmed by Detective Spivey and argued by the State, shows a clear entitlement to the lesser included offense of felony murder.

193. The Court finds that had the felony murder charge been requested, the court would have been required to grant it.

194. The Court finds that given the jury's concern, expressed in the note sent out in deliberations, that the shooting was unanticipated, harm is manifest. It is highly likely that under the facts of this case, given the rational alternative of a felony murder verdict, the jury would have chosen that route.

**Failure to Object to Improper Impeachment of Halprin**

195. The Court finds that trial counsel was ineffective for failing to object to the improper impeachment of Halprin. The defense failed to object to the introduction of numerous incidents of bad acts that were not disclosed in the State's 404b notice, and the defense failed to request a limiting instruction of the acts of misconduct used to impeach Halprin. The defense failed to object to lengthy arguments that Halprin be convicted for acting in conformity with proof of prior bad acts that were unrelated to the issues at trial.

196. The Court finds that Halprin took the stand in his own defense at the guilt/innocence phase. Instead of questioning him about his role in the escape and the robbery, however, the State spent the majority of its time impeaching him in three areas that had not been raised on direct examination and were not at issue: 1) whether he had lied in the past; 2) whether he had ever been manipulative; and 3) the details of the conviction for child abuse.

197. The Court finds that at the inception of cross-examination, the prosecutor asked Halprin about his character for lying, beginning with "Now, you have had a long history of lying, have you not?"

to which Halprin admitted.  The prosecutor followed up with "Do you still lie when the situation calls for it?" and a number of other questions about lying.  (RR 48, p. 59-60).  The State then proceeded to read excerpts from some of  Halprin's jail mail wherein he admitted to past lies, including a statement to his brother that he had not committed the assault for which he was imprisoned, a statement to the police denying the assault.  (RR 48, p. 69-106).

198.  The Court finds that trial counsel did not object to this cross-examination about lying, and specific instances of lying.

199.  The Court finds that the State asked Halprin about specific instances of manipulation after Halprin had already admitted to the character trait.  (RR48, p. 74).  After this admission, the State introduced excerpts from more letters that demonstrated specific instances in which Halprin attempted to "con" people.  For example in one letter he said he considered wearing glasses and different outfits to distract the jury and another letter in which he stated that he could get one or two jurors to believe him. The State also questioned him about stealing from some of his teachers who had taken him into their homes. The State introduced a letter in which Halprin stated he might write a book and keep some of the proceeds.  (RR 48, p. 165-167).

200.   The Court finds that defense counsel did not object to this cross-examination about manipulation and specific instances of manipulation.

201.  The Court finds that the State went into great detail about the injuries to Jared Smith and Halprin's statements regarding this offense. The only inconsistency ever mentioned about the assault and injuries was Halprin's recent claim that he was on LSD at the time.  (RR47, p. 102).

202.  The Court finds that defense counsel did not object to this cross examination about the prior offense.

52

2355

203. The Court finds that the evidence of prior acts of misconduct, entered without objection or limitation, became the cornerstone of the State's final argument. The State's theme was that Halprin acted in conformity with the character established by these prior bad acts. For example, the State argued,

> Because they have chosen to put his character in issue, because they have chosen to make the argument that Randy Halprin is of such a character, is such an upstanding person that he wouldn't commit a capital murder, you got to hear a lot of that evidence about character and background up in the first part of the trial. So in that sense, this trial is unique.
> (RR 50, pp. 15-16).

> This was probably the one thing he was truthful about on cross-examination. Mr. Shook asked him when did you stop lying? . . . He always lies. We don't. Good law-abiding people don't always lie. There's just a little glimpse into the sick mind, the sick-to-the-end mind of Randy Halprin.
> Let's talk about his lack of empathy for the victim. Mr. Shook read you those letters. How hard has this man worked to cash in on what happened out there, to cash in on that murder, to cash in on the death of Aubrey Hawkins? Book deals, National Inquirer, blood money. That's what he wants.
> (RR 50, pp 16-17).

> Look at the choices he's made. Everywhere he goes he is surrounded by violence, surrounded by this aura of evil. He leaves a trail of deceit, destruction, devastation, and death everywhere he goes. He leaves a wake of broken bones and broken lives. That's his character, folks. That's his character.
> (RR 50, p. 20)

> Think about what he did. A fractured skull, two broken arms, broken legs, the child can't even get away from him and he's crying for his mother. And then to shut him up because he's sick of hearing him cry, he takes a lit cigarette and tortures the child on the inside of his mouth. That's who you are dealing with. You don't think a person that's capable of that is a person that is capable of this? Of course they are. That's why character is so important.
> (RR 50, p. 22).

> But when you sit through this trial, you hear his lies, you hear the evidence, you see his character, you see his other actions, those all speak as loudly in this courtroom as probably any eyewitness could with respect to what part he

53

2356

played, what role he played, what his active involvement was on Christmas
Eve. You know he's a liar. You know he's violent. You know he's trying to
escape capital murder. Don't let him manipulate you. Don't let him get away
with it.
(RR 50, pp. 26-27).

They want to portray him as this bumbling buffoon, but parts of his letters were
read. I think that you can realize from that, that he's no idiot. He's no
bumbling buffoon. He's a manipulative, pathological liar.
(RR 50, p. 70).

204. The Court finds that Texas Rule of Evidence 404(b) states that evidence of other crimes,

wrongs or acts are not admissible to prove the character of a person in order to show that he acted

in conformity therewith. It may be admissible for other purposes, such as proof of motive,

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX.

R. EVID. 404(b). When prior acts are admitted, a limiting instruction is customary. *Estelle v.*

*McGuire*, 502 U.S. 62, 75 (1991).

205. The Court finds that in the context of reputation evidence of character, that specific instances

of conduct cannot be inquired into on cross-examination except as set out in Rule 609. TEX. R.

EVID. 608. A witness's credibility cannot be impeached with prior acts of misconduct unless the

misconduct resulted in a final conviction of a felony offense or a crime of moral turpitude. *See* TEX.

R. EVID. 608(b), 609(a); *Veteto v. State*, 8 S.W.3d 805, 815 (Tex. App.--Waco 2000, pet. ref'd.).

The State is not permitted to bring before the jury the details of an offense that resulted in a prior

conviction, the existence of which is admitted against the accused. *Mays v. State*, 726 S.W.2d 937,

953 (Tex. Crim. App. 1986). When the witness, during direct examination, leaves a false

impression as to the extent of his prior conduct, which may include arrests, convictions, charges, or

general "trouble", he may be impeached with specific acts of misconduct. *See Delk v. State*, 855

54

2357

S.W.2d 700, 704 (Tex. Crim. App.), *cert. denied*, 510 U.S. 982 (1993). The rebuttal evidence to

correct a false impression, however, may not exceed the scope of the question posed to the witness

or the answer given to it. *Rodriguez v. State*, 974 S.W.2d 364, 368-369 (Tex. App.--Amarillo 1998,

pet. rec'd). Generally, this rule takes effect when the witness leaves a false impression as to the

extent of either his (1) arrests; (2) convictions;(3) charges; or (4) "trouble" with the police. *Prescott*

*v. State*, 744 S.W.2d 128, 131 (Tex. Crim. App. 1988);

206. The Court finds that the State cannot open the door to matters not otherwise admissible and

then prove up the collateral events, unless the events themselves were independently admissible.

*Flannery v. State*, 676 S.W.2d 369 (Tex. Crim. App. 1984).

207. The Court finds that the defendant does not, by testifying, put his general character in issue.

By taking the stand, the defendant elects to be treated as any other witness, *viz.*, he lays his credibility

open to attack.

208. The Court finds that trial counsel's failure to object to the improper impeachment described

above constitutes deficient performance. *Wilson v. State*, 2002 WL 992108, 4 -5 (Tex. App.--

Texarkana 2002, no pet.); *see Gonzales v. State*, 685 S.W.2d 47 (Tex. Crim. App. 1985); *Whitaker*

*v. State*, 909 S.W.2d 259 (Tex. App.--Houston (14th Dist.) 1995, no pet.).

209. The Court finds that failure to object to improper argument satisfies at least the first prong of

*Strickland. Keller v. Bagley*, 81 Fed. Appx. 527, 530 (6th Cir 2003); *United States v. Necoechea*, 986

F.2d 1273, 1281 (9th Cir. 1993) (holding failure to object to egregious argument satisfies first prong

of *Strickland*).

210. Alternatively, the Court finds that even if the impeachment topics were, in part, proper, a

limiting instruction could have prevented the jury from using the evidence as substantive proof of

55

2358

guilt. It is well settled that the failure to request a proper limiting instruction is indicative of a substandard performance. *Buehl v. Vaughn*, 166 F.3d 163, 169-70 (3rd Cir. 1999) (stating that failure to request limiting instruction was a "serious lapse in . . . assistance"); *United States v. Alonzo*, 991 F.2d 1422, 1427 (8th Cir. 1993); *Medford v. Dretke* 2004 WL 2187107, 4 (N.D. Tex. 2004) (holding error not to request instruction, but harmless on this record); *Ex parte Varelas*, 45 S.W.3d 627, 634 (Tex. Crim. App. 2001).

**Prejudice**

211. The Court finds that the strenuous argument from the State that the jury should consider bad character evidence in determining guilty clearly tainted the verdict and the outcome of the trial. In the final analysis, the State asked that Halprin be convicted not as a shooter and not as a planner, but because he had a history of lying on matters unrelated to the case--matters that never should have been admitted. The extraneous acts were not offered in response to any defensive theory.

212. The Court finds that the defense never put Halprin's character into issue. Halprin was asked if he fired a shot, was asked briefly about his background, and was asked to address his attack on the child for which he was convicted. No witness testified about his character for peacefulness, truth, or veracity.

213. The Court finds that the State initiated virtually all the topics involving prior acts of misconduct, and without justification. The question, "Have you ever lied?," if permitted, would allow every single trial to devolve into a searching inquiry of any misstatement made during the life of any witness.

214. Alternatively, the Court finds that Halprin admitted being a liar so further inquiry was not permitted, as he was already impeached. The State cannot introduce a topic, fish around until a

56

2359

favorable answer is obtained, and then spend extended periods of time exploiting the straw man thus erected.

215. The Court finds that Halprin was asked if he ever "conned" people, a question aimed at setting the table for further acts of misconduct. Halprin admitted conning people, which should have foreclosed further inquiry; instead, it allowed that State to enter into such far-reaching topics as Halprin lying to women and his thoughts about writing a book. The State pursued this strategy, to distract the jury from the real issue–Halprin's intent to kill, if any–and to so disparage his character that the State could seek a conviction based upon the jury's personal dislike for Halprin, whether or not he played any role in the shooting.

216. The Court finds that given the invitation by the defense to discuss the facts surrounding Halprin's prior conviction, the State made that crime the centerpiece of the trial, not Hawkins' death. Rather than merely clearing up any discrepancy regarding Halprin's account of the case, the State detailed the injuries with visual evidence, for the purpose of inflaming the minds of the jurors. The State's questions and arguments were well beyond cross-examination acceptable as a response.

217. The Court finds that the State focused on this impermissible testimony to label Halprin as a liar, a manipulator, and a violent person generally. The State argued that Halprin should be convicted because of the violence he committed against Jerod Smith, instead of the murder offense he was on trial for. The State boldly argued that Halprin was guilty because he was of bad character, the one argument that cannot be made under rule 404(b).

218. The Court finds that because his counsel did nothing to ameliorate the damage of these impermissible inquiries, and because Halprin's testimony regarding his lack of intent to kill was the primary issue at trial, the harm is beyond dispute. The strenuous argument from the State that the

57

jury should consider bad character evidence in determining guilt clearly taints the verdict and outcome of the trial.

219.  The Court finds that trial counsel provided ineffective assistance of counsel.

## Failure to Object the Prosecution's Argument to the Jury that Its Verdict on Guilt Did Not Need to be Unanimous Concerning Halprin's Role in the Offense, to wit, as a Principal, Party or Conspirator

220.  The Court finds that defense counsel's failure to object to the prosecution's argument to the jury that its verdict on guilt did not need to be unanimous concerning Halprin's role in the offense, to wit as a principal, party or conspirator.

221.  The Court finds that the trial court charged the jury on three types of criminal liability: principal, party and conspirator.  In final argument, the prosecution made the following statement:

> We went over the different theories.  We can prove him as a principal, a party, or as a co-conspirator.  And, in fact, under the law you don't have to agree, the twelve of you, on which theory to convict him of.  Four of you might think we have proven him as a principal; four might think we may have proven it as party; and four of you might think, well, they have proven him as a co-conspirator, and you can all find him guilty, a unanimous verdict.

> Or you might all think, you know what?  They've proven him all three ways, because that's how strong the evidence is in this case.  So you will never get to the lesser included, because this is an overwhelming case.
> (RR 50, p. 57).

222.  The Court finds that Halprin was entitled under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, as well as article 1, §§10, 13 and 19 and article 5, § 13 of the Texas Constitution to a unanimous guilty verdict.  In *Ngov v. State*, 2005 WL 600353, the Court held that, when the State charges different criminal acts regardless of whether these acts constitute violations of the same or different offenses or statutory provisions, the jury must be instructed that it cannot

58

2361

return a guilty verdict unless it unanimously agrees upon the commission of any of these criminal acts. *See also Richardson v. United States*, 526 U.S. 813 (1999).

223. The Court finds that a unanimous jury verdict ensures that the jury agrees on the factual elements underlying an offense - it is more than mere agreement on a violation of a statute. *United States v. Holley*, 942 F.2d 916 (5th Cir. 1991).

224. The Court finds that the submission in applicant's trial was equivalent to a submission of two offenses because there were two distinct ways of committing the capital murder of Hawkins. The first manner and means is pursuant to §19.03(a) (1), the murder of a peace officer which does not require an intentional murder pursuant to §19.02 (b) (1). That is, the murder may be committed with the lesser "*mens rea*" of knowingly causing the death. The second manner and means is pursuant to §19.03 (a) (2), which specifically requires a "mens rea" of intentionally causing the death pursuant to §19.01(b) (1).

225. The Court notes that other courts have recognized that capital murder is a result of conduct offense which also includes nature of circumstances and/or nature of conduct elements depending upon the underlying conduct which elevates the intentional murder to capital murder. *Patrick v. State*, 906 S.W.2d 481, 491 (Tex. Crim. App. 1995). Thus, under case law, the aggravating "nature of circumstances and/or nature of conduct elements" are elements of the offense of capital murder. *Rodriguez v. State*, 146 S.W.3d 674 (Tex. Crim. App. 2004); *Reyes v. State*, 84 S.W.3d 633, 636 (Tex. Crim. App. 2002).

226. The Court finds that another way to consider the question is that the jury instructions allowed more than one act of Halprin to be considered capital murder. First, the jury was allowed to find him guilty on a theory that he shot Officer Hawkins himself. Secondly, a parties theory was submitted

59

allowing conviction for acting as a party or as a conspirator. These two theories contained different criminal acts. One, that he was a shooter, and two that he was involved in a different way, but was not a shooter. The jury was allowed, without any objection from the defense, to find Halprin guilty without unanimous agreement on the act of which he was guilty.

227. The Court finds that error exists. The law in the jury instructions was incorrect, and the prosecution relied upon it in their pursuit of a guilty verdict. The evidence in this case was not strong on any act argued by the State. No evidence existed that Halprin was a shooter, and evidence that he should have anticipated that a killing would occur was minimal. Under these circumstances, confidence in the outcome of this case is directly undermined.

228. The Court finds that failure of defense counsel to object to the jury instructions and prosecutor's argument satisfies the *Strickland* test.

### GROUND FOR RELIEF V: INEFFECTIVE ASSISTANCE OF COUNSEL AT PUNISHMENT PHASE

Ground for Relief V states:
Halprin was denied his right to the effective assistance of counsel at the punishment phase under United States Constitution Amendments Six and Fourteen and Texas Constitution, Article 1, Section 10.

### Background

Randy Ethan Halprin alleges that he was denied effective assistance of counsel at the punishment phase of his trial. During the punishment phase of Halprin's trial, the jury did not hear mitigating evidence contained in child protective service records, medical records, school records, prison records as well as testimony from relatives. Trial counsel never specifically moved to admit these records and the State objected to the mitigation expert, Dr. Kelly Goodness, referring to these records during her testimony. These records and affidavits paint a sordid picture of the first five

60

2363

years of Halprin's life. Halprin suffered from child abuse, including physical assault, exposure to illegal substances, deplorable living conditions, and a revolving door of care-givers and homes. Halprin also alleges that he was denied effective assistance of counsel when trial counsel 1) failed to object to prosecutors misstatements of law concerning death penalty eligibility under *Enmund v. Florida* and *Tison v. Arizona* during jury selection; 2) failed to call George Rivas as a witness; 3) failed to provide a sponsor for Exhibit 39 (The Ranking Document; 4) failed to request an anti-parties charge at the punishment phase; and 4) failed to object to the prosecutor's misstatements of law in final argument.

## Ineffective Assistance of Counsel Standard

229. The Court finds that to establish ineffective assistance of counsel, petitioner must demonstrate that: (1) counsel's performance fell below an objectively reasonable standard of performance; and (2) this deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

230. The Court finds that in determining whether the applicant suffered prejudice as a result of counsel's deficient performance, the applicant need only demonstrate that a reasonable probability exists that, but for counsel's failures, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

> a. The Court finds that reviewing courts are to evaluate the totality of the available mitigating evidence adduced in the habeas proceeding in re-weighing the mitigating evidence against the evidence in aggravation to determine whether the defendant has demonstrated "a reasonable probability that the result of the sentencing proceeding would have been different if competent counsel had presented and explained the significance of all the available evidence." *Williams*, 529 U.S. at 397-99.

61

2364

b.  The Court finds that in challenging counsel's performance at sentencing, the applicant must demonstrate that, but for counsel's failure to conduct a meaningful investigation, at least one juror would have been swayed by the evidence that was not disclosed and would have rendered the less severe sentence of life imprisonment. *Neal*, 286 F.3d at 244.

## Failure to Present Mitigation Evidence

### Standards

231.  The Court notes that the Eighth Amendment to the U.S. Constitution requires a jury to consider circumstances of the crime and the defendant's background and character during the sentencing phase of a capital trial. U.S. CONST. amend VIII; *Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997), *cert. denied*, 523 U.S. 1079 (1998). In *Williams*, the Supreme Court iterated that "it is undisputed that [a capital defendant has] a right – indeed, a constitutionally protected right to provide the jury with the evidence that his trial counsel either failed to discover or failed to offer." *Williams*, 529 U.S. at 393.

232.  The Court finds that in capital cases, trial counsel has a constitutional obligation and duty to thoroughly investigate mitigating evidence and present this evidence at trial. U.S. CONST. amend. VI; *Wiggins v. Smith*, 539 U.S. 510, 521-23 (2003); *Williams v. Taylor*, 529 U.S. 362, 396 (2000).

233.  The Court finds that Courts consider it "indisputable that, in the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal v. Puckett*, 286 F.3d 230 (5th Cir. 2002) (en banc). Counsel may not abandon "their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003).

234.  The Court notes that the Supreme Court has admonished that *Strickland* does not establish that

62

2365

a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather a reviewing court must consider the reasonableness of the investigation said to support that strategy.

235.  The Court finds that the Supreme Court has made it clear that it is not enough for a defendant to be allowed to develop mitigating evidence, the jury must be allowed to hear and consider mitigating evidence.

236.  The Court finds that the applicant may rely on the ABA Standards in asserting that his counsel's performance was unreasonable in light of prevailing professional norms. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000) (citing the *ABA Standards for Criminal Justice* 4-4.1 in finding that "trial counsel did not fulfill their obligation to conduct a through investigation of the defendant's background").

a.  The *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* direct that at the sentencing phase of a trial, counsel must consider and should present "anything in the life of the defendant which might militate against the appropriateness of the death penalty." *ABA Guidelines for the Performance of Defense Counsel in Death Penalty Cases* §10.7, p. 81 (2003).

b.  Evidence that should be considered includes:

1.  Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);

2.  Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster; . . . failures of government or social intervention (e.g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

3.  Educational history (including achievement, performance, behavior, and

63

2366

activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities[.]

c. The *ABA Guidelines* direct that counsel should consider all potential methods of offering mitigating evidence to the sentencing entity, including witnesses, affidavits, reports, letters, and public records. *ABA Guidelines for the Appointment & Performance of Counsel* § 11.8.6 (1989).

## Jury Did Not Hear the Results of Dr. Goodness's Investigation

237. The Court finds that in preparation for the punishment phase of the trial, the defense employed the services of Dr. Kelly Goodness, a doctor of clinical psychology and an experienced mitigation expert. Dr. Goodness conducted an extensive investigation and was prepared to offer testimony pertaining to Halprin's childhood.

238. The Court finds the jury did not hear the results of Dr. Goodness's investigation because of a constellation of trial errors.

239. The Court finds that after a *sub rosa* hearing as to Dr. Goodness's qualifications and opinions, the prosecution moved to prevent the doctor from "going into hearsay statements in her testimony." [RR 53, p. 3]. Specifically the prosecution stated, "we're not objecting to the opinion. We're objecting to the underlying data, that being the hearsay statements of third parties and the defendant coming in through her, specific statements." The prosecution stated that "[u]nder 705[,] it's within your discretion after conducting a balancing test to exclude the hearsay." [*Id.*].

240. The Court finds that the State further objected to Dr. Goodness providing details of Halprin's abuse because "there's no adoption records before the jury, there's none of that in the CPS records before the jury. Her interviews with Anna Lester, that woman hasn't testified. Mr. Halprin, he did not testify to anything other than he was adopted." [RR 53, p. 4-16].

241. The Court finds that the trial court then read the expert witness Rule 705(d) and told the

64

2367

witness, "You can say I conducted interviews, I reviewed thousands of records, and all this and my conclusion is. But don't volunteer any hearsay." [RR 53, p. 5-6]. The judge conducted no weighing of the evidence to determine if the prejudicial effect of the evidence outweighed the probative value of the evidence as required under Rule 705(d). He did not weigh the evidence.

242. The Court finds that defense counsel never made a proper objection to the exclusion of the facts and data underlying Dr. Goodness's opinion.

243. The Court finds that when Dr. Goodness attempted to give her opinions, she was interrupted by repeated objections. She was never able to substantiate her opinions with details so the opinions simply hovered in the courtroom like balloons, tied to no other testimony.

    a. For example, during Dr. Goodness's testimony, the following occurred:
(Dr. Goodness): Now, both Randy Halprin and Wesley Halprin were adopted by Mr. and Ms. Halprin, Dan and Patricia Halprin. They were -- they did not come from a good home. You do not get placed up for adoption when you are five years old, if you come from a good home. There is -- there was abuse and negligent that was going on --
MR. SHOOK: Judge, we object to her going into facts not before the jury and going into hearsay.
THE COURT: Sustained.
MR. SHOOK: Ask you to instruct the witness not to do that.
THE COURT: Please recall the previous instructions from the Court. Next question.
Q. (By Mr. Ashford) Is it your opinion that abuse and neglect adversely affected his early environment?
A. Yes. It's my opinion that abuse and neglect adversely affected his early environment.
(RR 53, p. 28).

    b. Another example:
A. From speaking with his biological mother and reviewing the records, it is my opinion that his mother and his biological father were drug addicts, as well as --
MR. SHOOK: Judge, again, we object to going into the facts.
THE COURT: Sustained.
Q. (By Mr. Ashford) Do you believe that Mr. Halprin was predisposed to substance abuse?
A. Yes, I do.

65

2368

(RR 53, p. 30).

c. A further example:
Q. Okay. And that's based on what documentation that you reviewed, what tests that you did, what people that you talked to?
A. It's not based on the tests that I did. It's based on information that I gathered from Randy Halprin, Wesley Halprin, Jason Goldberg had some information about that. And a review of the records, his academic records for -- all the academic records that I could access, and a psychological evaluation that was done of him when he was ten.
Q. Okay. Did you see anything unusual in that psychological evaluation?
MR. SHOOK: Judge, we'll object to him going into a document not before the jury.
THE COURT: Sustained.
(RR 53, p. 35).

d. A final example:
A. Mr. Halprin was expelled from the boarding school that he was attending in Kentucky shortly before his eighteenth birthday. When the school called Mr. and Ms. Halprin, from what I can ascertain from the academic records --
MR. SHOOK: Judge, we'll object to going into hearsay issues not before the jury.
THE COURT: Sustained.
(RR 53, p. 39).

244. The Court finds that Rule 705(a) generally allows the expert to disclose the basis for her opinion on direct examination, even if it constitutes hearsay. TEX. R. EVID. 705(a); *see Kramer v. Lewisville Memorial Hosp.*, 831 S.W.2d 46, 49 (Tex. App.–Fort Worth, 1992, writ granted), *aff'd by*, 858 S.W.2d 397 (Tex. 1993), *abrogated on other grounds*, 979 S.W.2d 616 (Tex. 1998).

245. The Court finds that the only limitation is a finding by the court that the evidence is unfairly prejudicial or a danger exists that it will be used for an improper purpose. TEX. R. EVID. 705(d).

246. The Court finds that any balancing test conducted necessarily should have been decided in Halprin's favor–the data at issue was primarily adoption, school, CPS, court, and jail records, the authenticity and reliability of which could not possibly be in issue. Further, the State interviewed all the witnesses that Dr. Goodness spoke to and could have impeached the information she provided if it varied from its discovery. Further, there is a presumption in favor of the disclosure of

66

2369

underlying facts and data.

247. The Court finds that this case is akin to *Love v. State*, 909 S.W.2d 930 (Tex. App.–El Paso 1996, pet ref'd), in which the court permitted the expert to repeat information provided by the appellant's family as the basis for his opinion.

248. The Court finds that this case can be compared to *Austin v. State*, 222 S.W.3d 801, 812 (Tex. App.–Houston [14th Dist.] 2007). In *Austin*, the Court affirmed that admission of summary of an interview with defendant's husband's father by a psychologist was admissible because it showed the basis of the expert's opinion even though it constituted hearsay.

249. The Court finds that to convince the judge that Dr. Goodness's testimony should not be limited or preserve error on the court's prohibition of mitigating facts, all the defense was required to do was lodge one of a myriad of possible objections: an Eighth Amendment objection that the evidence is constitutionally required; an objection to the lack of a balancing test under Rule 705(d); an objection to the "test" performed by the court in not weighing probative value; or an objection that the probative value far outweighed the prejudicial effect.

250. The Court finds that trial counsel was deficient for not making these objections.

## Records to Support Dr. Goodness's Opinions Were Readily Available But Never Offered

251. The Court finds the records were readily available; trial counsel just did not offer them into evidence. In fact, the record affirmatively demonstrates that the adoption records, CPS records, and school records were actually sitting on the defense table:

> Q. Now, when you say you reviewed records, how many pages of records did you review?
> A. I could only guess at the number of pages of records. I have two huge boxes that

67

2370

I brought today that are copier paper boxes.  I'm not sure how many those hold.
Q.   These two boxes here?
A.   Those are the two that I am giving back to you today and I have returned to your office probably at least one more box that size.
(RR 53, p. 45-46).

252.  The Court finds that had the defense simply introduced these documents, the bulk of Dr. Goodness's opinions could have been substantiated immediately.

253.  The Court finds that the defense was unprepared to lay a simple foundation for business records, demonstrating an inadequate grasp of evidentiary rules.

254.  The Court finds that the defense failed to subpoena crucial cooperative witnesses and present their testimony in order to have the records admitted.

255.  The Court finds that lack of preparation is not a litigation strategy.

256.  The Court finds that failure of defense counsel to pursue proper procedures to allow full presentation of Dr. Goodness's findings establishes the first prong, the deficiency prong, of *Strickland.*

257.  The Court finds that prejudice is clearly established since the testimony was ultimately presented in an incompetent and ineffectual manner. [*See* Records Excerpts at D: Goodness Aff.].

**Defense Never Offered the Opinions Subject to the Court's Offer of a Limiting Instruction**

258.  The Court finds that even if the trial court was not prepared to allow introduction of the testimony for the truth of the matter asserted, the court could have admitted some of the testimony subject to a limiting instruction.

259.  The Court finds that when an expert testifies about the facts or data relied upon to formulate opinion or inference and that information is inandmissible, the opponent should request a limiting

68

2371

instruction under Rule 705(d). *Depena v. State*, 148 S.W.3d 461, 470 n.10 (Tex. App.–Corpus Christi 2004, no pet.).

260. The Court finds that a limiting instruction is generally preferable to exclusion as a remedy in non-death penalty cases and, therefore, would be even more favored in capital cases. *Resendiz v. State*, 112 S.W.3d 541, 552 (Tex. Crim. App. 2003).

261. The Court finds that this process would have at least let the jury hear some of the crucial excluded testimony.

262. The Court finds the defense was deficient in never attempting to at least request a limiting introduction.

**Specific Mitigation Evidence Not Presented**

263. The Court finds that during the punishment phase of Halprin's trial, the jury did not hear mitigating evidence contained in child protective service records, medical records, school records, prison records as well as testimony from relatives.

**Child Abuse**

264. The Court finds that at trial, the jury heard no specific evidence concerning Halprin's early childhood.

265. The Court finds that the jury merely heard Dr. Goodness, a mitigation expert conclude that "abuse and neglect adversely affected [Halprin's] early environment." [RR 53, p. 28-30].

266. The Court finds there was no discussion of what this abuse constituted.

267. The Court finds that CPS records, however, detail repeated physical assaults, child neglect, and a revolving door of care-givers and homes beginning at birth. [Hrg. 8/20/2010, Ex. 2: CPS Rec.

69

2372

(hereinafter CPS Rec.)].

268. The Court finds that the jury did not learn that when Halprin was nine months old, Whitfield, his father, physically assaulted him for the first time. [Amend. Habeas Pet., Ex. C: Lester Aff. at 1-2].[2]

269. The Court finds that the jury did not learn that this abuse would continue for the next four years that Lester lived with Whitfield. In an affidavit, Halprin's mother averred that Whitfield "beat [Halprin] several times a week, so badly that [the beatings] would leave visible marks on Randy." [*Id.* at 2]. Halprin regularly developed bruises on his legs, back, and bottom from these beatings. [*Id.*].

270. The Court finds that the jury did not learn that one time Whitfield pushed Halprin out of the apartment building "because Randy got on his nerves." [*Id.*].

271. The Court finds that the jury did not learn that family members became concerned about this physical abuse as well as the boy's living conditions.

272. The Court finds that the jury did not learn that in September 1981, Whitfield's cousin, Cindy Russell, contacted child protective services concerning Wesley and Randy, Jr., who were nine months and four-years old at the time respectively. [CPS Rec. at 5685]. She informed CPS:

> House is "a wreck," children are pale, unhealthy–looking like [they] don't have proper diet. Wesley has round sores on face, about size of a quarter, puffy and scaby around edges–has had them about 2 wks., with no med[ical] treatment. Mo[ther] doesn't change baby's diapers; he lays in dirty diapers for hours. Fa[ther] is "mean" to Randy–he makes him sit & be absolutely silent whenever fa[ther] is around. [Father] sends Randy to bed but won't turn on bathroom light for him, so Randy uses the closet or his bed. When fa[ther] finds it, he "whips" Randy & rubs his nose in it.

---

[2] Lester averred "Randy's father was very abusive to Randy when he was a baby. The abuse started when Randy was about nine months old." [Amend. Habeas Pet., Ex. C: Lester Aff. at 2].

70

2373

Randy's room smells "like a sewer." If Randy doesn't sit down fast enough, comp[lainant] has seen fa[ther] twist Randy's arm, and push him down on the floor. Fa[ther] once had split knuckle from hitting Randy on the head. Once fa[ther] brought Randy to comp[lainant]'s house, showed him in the door & left without checking if comp[lainant] was there or could babysit; comp[lainant] found Randy there when she woke up.
[CPS Rec. at 5687].

273.  The Court finds that the jury did not learn that shortly thereafter, Lester's sister in law, Mary Hammons, also relayed to CPS that "she had observed the four-year-old boy [Randy] covered with bruises because of beatings from parents." [CPS Rec. at 5685].

274.  The Court finds that the jury did not learn that another relative stated that she had witnessed the father "whip" Randy.  She asserted that when Randy's mother complained about the punishment, "the father 'slammed her against the wall.'"[3] [CPS Rec. at 5704].

275.  The Court finds that the jury did not learn that based on these reports, CPS conducted a preliminary investigation and opened an on-going case file in the fall of 1981. [CPS Rec. at 5704]. The CPS investigator's notes intermittently chronicle the next two years of Halprin's life.

276.  The Court finds that the jury did not learn that in May 1982, Lester separated from Whitfield and left the children with relatives.

277.  The Court finds that the jury did not learn that shortly therafter, Lester reclaimed her children and moved in with Jimmy "Jimbo" Ray Willingham, a felon convicted of armed robbery. [CPS Rec. at 5706].

278.  The Court finds that the jury did not learn that family members told CPS that this was a dependent relationship.  Willingham provided Lester with drugs. [CPS Rec. at 5726]. Willingham

---

[3]Mary Hammons was worried about the boy's safety because of a known history of family violence on the father's side. The boy's aunt had beaten her two-year-old to death. [CPS Rec. at 5704].

71

himself abused crystal methamphetamine almost every day. [Amend. Habeas Pet., Ex. C: Lester Aff. at 4].

279. The Court finds that the jury did not learn that in the new living situation with Willingham, the physical abuse and neglect continued. [Amend. Habeas Pet., Ex. C: Lester Aff. at 4]. In her affidavit, Lester stated that Willingham "was extremely abusive, regularly beating all three of us [Lester, Randy, and Wesley] with any object he could grab." [Id. at 4]. She continued on to explain that these beatings "caused injuries and bruises to all three of us." [Id.]. Willingham also would not let Lester seek medical attention for herself or the boys. [Id.].

280. The Court finds that CPS records confirm this abuse.

281. The Court finds that the jury did not learn that on May 24, 1982, Halprin's paternal grandmother called CPS. [CPS Rec. at 5707]. Halprin's mother had left him with his grandparents, stating she "couldn't do anything with him." [CPS Rec. at 5707]. Lester provided no time or date for her return. Later that evening, the grandparents also found bruises on Halprin. [CPS Rec. at 5707]. When asked about the bruises, Halprin told his grandmother that he had acquired them from a spanking with a paddle from Willingham. Halprin stated that he received the spanking because "he got up and got into the refrigerator during the night and was caught by Jimbo." [CPS Rec. at 5707].

282. The Court finds that the jury did not learn about the next major reported incident in July 1982. On July 11, the babysitter for Wesley and Randy reported that two-year-old Wesley was covered with bruises, probably caused by a belt. [CPS Rec. at 5710]. Halprin identified the perpetrator as Willingham to the babysitter. [CPS Rec. at 5710].

283. The Court finds that the jury did not learn that when the caseworker went to the family mobile

72

2375

home to investigate, she found Halprin and Wesley without adult supervision. [CPS Rec. at 5710].

Halprin was covered in "what appeared to be mosquito bites" while his brother was in a diaper that

"had obviously not been changed for quite awhile; he had feces smears on his legs." [CPS Rec. at

5710].

284. The Court finds that the jury did not learn that the caseworker returned later that day with a

Denton police officer to speak with Lester and Willingham about the bruises. [CPS Rec. at 5711].

Lester claimed that she had spanked Wesley but that she had never used a belt on the children. The

caseworker, however, noted that "a leather belt, labeled 'Jimbo,' lay on a nearby table." [CPS Rec.

at 5711]. She reasoned that "Willingham was [likely] the perpetrator and the rather hapless, slow

of thought mother feels it necessary to take the rap." 56. The Court finds that the jury did not learn

that the caseworker predicted further violence. [CPS Rec. at 5711].

285. The Court finds that the jury did not learn that two months later, in September 1982, Wesley

Halprin's doctor contacted CPS as a result of bruises he observed on the child's thighs and backside.

Lester had told the doctor the bruises were the result of the child falling from a swing while in the

care of a sitter – a story the doctor did not believe. [CPS Rec. at 5716]. The doctor stated that the

bruises were approximately two inches by one inch in a lateral fashion, probably administered by a

belt. [CPS Rec. at 5721].

286. The Court finds that the jury did not learn that subsequently, in October 1982, the mother

admitted to administering the beating while on drugs. [CPS Rec. at 5723, 5740]. At that time,

Wesley had new bruises on the back of his legs. Randy also "had sores which appeared to be

scratched mosquito bites." [CPS Rec. at 5723].

287. The Court finds that the jury did not learn that CPS then made the decision to place Wesley in

73

2376

foster care – a decision that Randy did not take well. [CPS Rec. at 5723]. The caseworker noted that Halprin "questioned where his 'baby brother' was going and what a foster home was like." The conversation then quickly turned to monsters. [CPS Rec. at 5724].

288. The Court finds that the jury did not learn that on the two occasions the case worker saw Halprin after Wesley's removal, she related that Halprin expressed grave concern about his [brother's] safety" – something his parents did not do. [CPS Rec. at 5752].

289. The Court finds that the jury did not learn that after Wesley's removal from the home, Halprin stayed with his father and various relatives, including his grandparents throughout the fall of 1982. [CPS Rec. at 5745].

290. The Court finds that the jury did not learn that in January 1983, Whitfield abandoned Halprin with a family in East Texas, where CPS located the boy six months later. [CPS Rec. at 5745].

291. The Court finds that the jury did not learn that CPS had lost track of Randy and not followed his case for nine months.

292. The Court finds that the jury did not learn that at the time of Halprin's abandonment, the family reported Halprin had two teeth missing, an upper front tooth and a lower front tooth. [CPS Rec. at 5478].

293. The Court finds that the jury did not learn that the family believed these injuries were caused by Halprin's father. [CPS Rec. at 5478].

294. The Court finds that the jury did not learn that the family had taken pity on Halprin because his father had called the five-year-old a "bastard" and threatened to leave him along the roadside. [CPS Rec. at 5478].

295. The Court finds that the jury did not learn that the family also expressed its concerns about

74

Halprin's eating habits and loss of family contact. Halprin hoarded food and would eat until he vomited. After vomiting, he would immediately begin to eat again. [CPS Rec. at 5748].

296. The Court finds that the jury did not learn that Halprin also fantasized that he was talking to his brother as well as his aunt and uncle. He would "face the wall and pretend these people [were] present." [CPS Rec. at 5748].

297. The Court finds that the jury did not learn that the family was happy to learn that CPS had been looking for Halprin and that his parents had agreed to give him up for adoption. [CPS Rec. at 5748-49].

298. The Court finds that the jury did not learn that same day, CPS placed Halprin in a foster home with his brother. [CPS Rec. at 5750].

299. The Court finds that the jury did not learn that the caseworker noted that Halprin "was very anxious to see his brother and that upon their arrival Halprin 'hugged Wesley and talked with him.'" [CPS Rec. at 5750].

300. The Court finds that the jury did not learn that Halprin would remain very protective of Wesley throughout their childhood; he would "parent" Wesley. [CPS Rec. at 5750, 5783]. 73. The Court finds that the jury did not learn that in foster care, Halprin continued to exhibit certain fears and anxieties. [CPS Rec. at 5749]. He worried that Willingham would return. Teenage boys also scared him. [CPS Rec. at 5750, 5784]. When the foster mother left the children with a fifteen-year-old babysitter, Halprin misbehaved and "went bananas." [CPS Rec. at 5750]. He had a fear of devils and ghosts. [CPS Rec. at 5784].

301. The Court finds that the jury did not learn that the foster parents also reported that Halprin was educationally behind. He could not recognize any numbers or letters. [CPS Rec. at 5784].

75

2378

**Familial Substance Abuse**

302. The Court finds that at trial the jury only heard Dr. Goodness, a mitigation expert testify that Halprin was "predisposed to substance abuse" because his parents abused drugs. [RR 53 at 30-31]. The jury did not hear the specifics of this drug use or Halprin's broad exposure to these drugs.

303. The Court finds that the jury did not learn that both of Halprin's parents abused crystal methamphetamine and cocaine, drank alcohol, and smoked cigarettes. [Hrg. 8/20/2010, Ex. 2: CPS Rec. at 5708 (hereinafter CPS Rec.)].

304. The Court finds that the jury did not learn that Lester, the boys' mother, indulged in these substances while pregnant with each of her two children. She also reported that she had a mood disorder (Bipolar Disorder). [Goodness Psych Eval. at 8].

305. The Court finds that the jury did not learn that the family alleged Halprin's parents were on drugs in February 1982.

306. The Court finds that the jury did not learn that on March 25, 1982 Halprin's family reported they believed that any assistance provided goes to drugs. [CPS Rec. at 5705].

307. The Court finds that the jury did not learn that when a child protective service investigator visited the Halprin household, she described Halprin's mother as "possibly hungover." She opined that she believed that Halprin's brother's physical problems may be "related to drug use by the mother when she was pregnant with Wesley." [CPS Rec. at 5711].

308. The Court finds that the jury did not learn that Halprin's mother stated that Halprin's father and Willingham, her boyfriend, abused drugs regularly in Halprin's presence. She stated that Willingham abused crystal methamphetamine almost every day. [Amend. Habeas Pet., Ex. C: Lester

76

2379

Aff. at 4].

309. The Court finds that this exposure to drugs and alcohol gave Halprin a genetic vulnerability for substance abuse. [Goodness Psych. Eval. at 14-15].

310. The Court finds that the jury did not learn that Dr. Goodness believed that "the fact that both Randy and his biological brother Wesley grew up to abuse substances, have attention disorders and struggle with mood problems [was] not unexpected given their genetic background" and early childhood. [Goodness Psych. Eval. at 15].

## Effects of Child Abuse on Halprin as a Young Child

311. The Court finds that the jury heard no specific evidence concerning the effects of the child abuse and neglect on Halprin during his early childhood.

312. The Court finds that the jury merely heard Dr. Goodness a mitigation expert conclude that "abuse and neglect adversely affected [Halprin's] early environment. [RR 53, pp. 28-30].

313. The Court finds that CPS records detail how this abuse effected Halprin. Halprin worried about death feared teenage boys, became protective of his brother, and needed constant re-assurance from his adopted parents.

314. The Court finds that the jury did not learn that in her report in June 1982, the case worker noted that this abuse was causing Halprin to misbehave. He had become aggressive toward his younger brother. [CPS Rec. at 5708]. The case worker observed that Halprin "was an extremely engaging child who is literally starved for consistent, warm adult attention." [CPS Rec. at 5708]. She opined that "without doubt, his recent behavioral decline must be interpreted as emotional rebellion against the instability and confusion of his family life." [CPS Rec. at 5708].

77

315. The Court finds that the jury did not learn that the family that took Halprin in for six months reported that Halprin had gained twenty-three pounds with them. Halprin hoarded food and would eat until he vomited. After vomiting, he would immediately begin to eat again. [CPS Rec. at 5747-49].

316. The Court finds that the jury did not learn that the mother of the family stated that Halprin was "obsessed with witches and monsters." [CPS Rec. at 5747-49].

317. The Court finds that the jury did not learn that the family said Halprin would fantasize that he was talking to his brother as well as his aunt and uncle. He would "face the wall and pretend these people [were] present." [CPS Rec. at 5747-49].

318. The Court finds that after adoption by Dan and Pat Halprin, he continued to have some of the same anxieties and fears that he had in foster care. [CPS Rec. at 5815].

319. The Court finds that the jury did not learn that his adopted parents related that Randy was "pre-occupied with death." [CPS Rec. at 5815]. He constantly ask[ed] them if they are going to die or if some other family member or friend is going to die." [CPS Rec. at 5815]. 93. The Court finds that the jury did not learn that Halprin also became "extremely upset when he [was] around teenage boys," covering his face with his hands and crying out when he saw teenagers or violence. He related that "teenagers beat me up." [CPS Rec. at 5815].

320. The Court finds that the jury did not learn that he also feared his natural parents. For example, he once informed his adopted parents that his natural parents loved him and would come back for him. When his adopted parents told that "no" his natural parents would never come back, Halprin was relieved. [CPS Rec. at 5816].

321. The Court finds that the jury did not learn that Halprin had a need to continually hear that his

78

2381

adopted parents were proud of him. [CPS Rec. at 5817]. Abused and neglected children require patience, understanding, absolute acceptance and unconditional love in order to overcome their past and to develop a sense of security. [Goodness Psych. Eval. at 16].

322. The Court finds that the jury did not learn that Halprin's early childhood abuse helps to explain the "cycle of abuse" that led to the physical abuse Halprin inflicted on the child victim of the injury to a child case for which he was originally incarcerated according to Dr. Goodness. [Goodness Psych. Eval. at 14-15]. Indeed, the assault mirrored the abuse he suffered as an infant. [Id.]. "[A] great deal of modeling occurred when the child watched the abusive caregivers . . . regardless of how positive later caregiver experiences may be." [Goodness Psych Eval. at 14].

323. The Court finds that the jury did not learn that children who are "devalued, ignored, beaten, used for adult gratification or treated as pawns in dysfunctional adult relationships suffer deprivation and are left traumatized. . . . Areas that may be negatively impacted include intellectual and academic growth, cognitive and perceptual abilities, aggression level and behavioral dysfunction, psychiatric functioning, and social competence in relationships." [Goodness Psych. Eval. at 14].

**Later Psychological and Academic Problems and Long Lasting Effects of Abuse**

324. The Court finds that the jury did not learn the full extent of Halprin's early abuse and neglect causing other long-lasting effects – effects his adopted parents were unprepared to handle.

325. The Court finds that when he entered kindergarten, Halprin did not know the alphabet and could not count, and, therefore, struggled. [See CPS Rec. at 5784; Hrg. 8/20/2010, Ex. M: Halprin Ltr. (hereinafter Ex. M)]. He eventually learned to read but had difficulties in social studies, language arts, and math. [Ex. M: Arlington Transcripts, Grade 2-6].

79

2382

326. The Court finds that at the age of ten, a private psychologist diagnosed Halprin with Attention Deficit Disorder and learning disabilities in passage comprehension, math calculation, math reasoning, and written expression.

327. The Court finds that the report of this private psychologist was never shared with the jury.

328. The Court finds that Halprin would later suffer from ADHD, depression, and an avoidant personality. A person with an avoidant personality disorder avoids activities that involve significant interpersonal contact because of fear of criticism, disapproval, or rejection. They are unwilling to become involved with people unless they are certain they will like them. [Goodness Psych. Eval. at 6, 13].

329. The Court finds that the Halprins never shared any of these diagnoses with the school, as school records do not indicate that any measures were taken to help Halprin, such as placing him in special education classes or providing extra tutoring. The Halprin's failure to address these psychological needs undermined Halprin's success in school and self-worth. [Goodness Psych. Eval. at 15]. Halprin failed seventh grade and the TAAS standardized test. [Ex. M: TAAS Scores; Arlington Withdrawl from School Form].

330. The Court finds that while struggling in school, Halprin devoted himself to studying for his Bar Mitzvah, which required learning Hebrew and a number of religious stories. [Sternblitz-Rubenstein Aff.]. Halprin's motivation was to please his adopted father, a man from whom he desperately sought approval. [Sternblitz-Rubenstein Aff.; Goodness Psych. Eval. at 6].

331. The Court finds that after Halprin failed seventh grade, Halprin's adoptive parents expelled him from their home. His parents sent him to Oneida Baptist Institute, a reformatory boarding school. He would spend the next three and a half years there. [See generally Ex. M].

80

2383

332. The Court finds that the jury did not learn that school officials at Oneida Baptist Academy initially observed that Halprin was "not a trouble maker. Clean cut guy. When going gets tough he backs off. Main problem is school. Always wants to please. Impulsive behavior. Seldom rebellious." [Ex. M: OBI Application].

333. The Court finds that the jury did not learn that Halprin excelled in his first year but his adoptive parents refused to allow him to come home and visit. [See Ex. M: OBI Transcript]. 25. 105. The Court finds that the jury did not learn that Halprin felt rejected, began to smoke marijuana and to get high on acid in ninth grade, and became increasingly depressed. Acid and ecstacy became his drug of choice, using them every two to three days. He stole a VCR, money, and a teacher's credit card. [Ex. M: OBI Disciplinary Report; Waybourn Aff.; Goodness Psych. Eval.at 7].

334. The Court finds that the jury did not learn that in 1995, Halprin was suspended from school after carving in a bench at school a note to his girlfriend which school authorities interpreted to be suicidal. [Ex. M: OBI Disciplinary Report].

335. The Court finds that Halprin's adopted parents refused to permit Halprin to return home and informed the school of their decision. [Id.]. He was homeless and lacked guidance.

336. The Court finds that the jury did not learn that later, at the age of eighteen, he attempted to reconcile with his parents, but was met on the front steps by the local police chief and denied entrance to the family home. [Waybourn Aff.]. His parents advised acquaintances, including Rabbi Keith Howard Stern, to not speak with Halprin.

337. The Court finds that Halprin became heavily dependent on drugs and alcohol and moved into a homeless shelter in Arlington, Texas. [Goodness Psych. Eval. at 7].

338. The Court finds that the jury did not learn that as a result of his parent's dejection, Halprin

81

2384

lacked guidance and had an unfulfilled need for absolute acceptance and unconditional love. [Goodness Psych. Eval. at 8, 16]. Halprin could not turn to extended family for support. [Goodness Psych. Eval. at 16]. Therefore, Halprin's need to belong and disconnection with the outside world left him vulnerable to leadership figures, such as George Rivas who could exploit Halprin's character as a weak follower. [Goodness Psych. Eval. at 16-17].

339. The Court finds that Defense Exhibit 39, which was excluded because the State withheld exculpatory evidence, reflects this opinion. Exhibit 39, entitled "Ranking of Offenders by Leadership/Personality Characteristics, stated that "it was the unanimous decision that RIVAS was the leader and the weakest was determined to be HALPRIN." [Def. Ex. 39]. Specifically, the document, created by the Texas DPS Special Crimes Division, stated Halprin was "quiet and never exhibited leadership qualities. Was consistently worried about whether his work was acceptable to civilian workers. Very submissive characteristic. This worrisome attitude was seen to escalate a month before the escape. One civilian worker speculated whether HALPRIN was undergoing some type of depression." [Def. Ex. 39].

**Summary of Excluded Evidence**

340. The Court finds that because of a constellation of trial failures, the jury never had the opportunity to learn any of this mitigation evidence – covering Halprin's nightmarish childhood, complete with regular physical violence and neglect, and failure to adapt throughout childhood. The jury did not review Exhibit 39, CPS records, school records, medical records, prison records or hear from Halprin's relatives, including his birth mother and brother.

341. The Court finds that trial counsel was deficient for failing to present all of this mitigating

82

2385

evidence.

342. The Court finds that Halprin was prejudiced by trial counsel's failure to present this mitigating evidence.

343. The Court finds that because the jury did not have the ability to fully consider this mitigating evidence favorable to Halprin, and, therefore, Halprin was denied his constitutional rights. *See, e.g., Simmons v. Luebbers*, 299 F.3d 929, 938-39 (8th Cir. 2002), *cert. denied*, 538 U.S. 923 (2003) ("By the time the state was finished with its case, the jury's perception of Simmons could not have been more unpleasant. Mitigating evidence was essential to provide some sort of explanation for Simmons's abhorrent behavior. Despite the availability of such evidence, however, none was presented. Simmons' attorney's representation was ineffective."); *accord Karis v. Calderon*, 283 F.3d 1117, 1136 (9th Cir. 2002), *cert. denied*, 283 F.3d 1117 (2003) ("Despite his conceded knowledge of this history, counsel failed to present any evidence of Karis's family abuse to the jury.").

## Excluded Mitigation Evidence is Similar to Evidence that Other Courts Have Found Constitutionally Required to Be Presented

344. The Court finds that the evidence excluded from the penalty phase of Halprin's trial presents a classic mitigation argument that makes the death penalty inappropriate here. *See Wiggins*, 539 U.S. at 535 (citation omitted) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse."); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (noting that consideration of the offender's life history is "a part of the process of inflicting the death penalty").

83

2386

345. The Court finds that Halprin's case can be compared to *Williams v. Taylor*, 529 U.S. 362 (2000). In *Williams*, the U.S. Supreme Court overturned the death sentence of the appellant where trial counsel failed to investigate or present mitigating evidence during the penalty phase of the trial. *Williams*, 529 U.S. at 398-99. The available evidence included extensive juvenile, medical, and prison records that graphically described the appellant's childhood, that the appellant was "borderline mentally retarded," and that the defendant had a good record in prison. *Id.* at 395-96.

    a. The Court finds that these records were the same type that were available to trial counsel here and describe a childhood similar to Halprin's. For example, the Supreme Court quoted verbatim from juvenile records to describe the appellant's home:

The home was a complete wreck. . . . There were several places on the floor where someone had had a bowel movement. Urine was standing in several places in the bedrooms. There were dirty dishes scattered over the kitchen, and it was impossible to step any place on the kitchen floor where there was no trash. . . . The children were all dirty and none of them had on under-pants. . . . The children had to be put in Winslow Hospital, as four of them, by that time, were definitely under the influence of whiskey.

*Id.*, at 395 n.19.

    b. Williams, like Halprin, was repeatedly beaten by his parents and was committed to the custody of the State. *Id.* at 395.

    c. Prison officials, also opined that Williams was one of the inmates least likely to act violently and that he thrived in a regimented environment. *Id.* at 396. This is the same evidence that Exhibit 39, the ranking document, would have shown regarding Halprin in relation to the other members of the Texas Seven.

346. The Court finds that as in *Williams*, the jury should have heard the available mitigation evidence and would likely have reached a different conclusion.

347. The Court finds that Halprin's case can be compared to *Canaan v. McBride*, 395 F.3d 376 (7th Cir. 2005) where the Seventh Circuit Court of Appeals vacated the appellant's death sentence. *Canaan*, 395 F.3d at 392. In *Canaan*, the appellant did not present evidence at the penalty phase that

84

2387

his father regularly beat him, of his lifelong struggle with drugs, and emotional abuse as a child. *Id.* at 386-87. The Seventh Circuit held that this account of Canaan's early childhood and substance abuse made clear that Canaan "has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability." *Id.* at 387 (quoting *Wiggins*, 539 U.S. at 535);

348. The Court finds that Halprin's childhood can be compared to *Emerson v. Gramley*, 91 F.3d 898, 907 (7th Cir. 1996), *cert. denied*, 91 F.3d 898 (1997) where the court found prejudice when counsel failed to introduce evidence "of a life that one juror in twelve might find so bleak, so deprived, so harrowing, so full of horrors" as to refuse to recommend death, particularly where the prosecution put forth irrefutable evidence of aggravating circumstances.

349. The Court finds that Halprin's case can be compared to *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001). In *Coleman*, counsel failed to present evidence of defendant's childhood. *Id.* at 449-51. This evidence included the fact that defendant had been abandoned as an infant in a garbage can by his mentally ill mother, was raised in a brothel run by his grandmother where he was exposed to group sex, bestiality and pedophilia. *Id.* at 450-51. Petitioner also suffered from probable brain damage and borderline personality disorder. *Id.* at 449. After detailing this evidence, the Seventh Circuit held that "it is reasonably probable that the presentation of even a substantial subset of the mitigating evidence detailed above 'would have humanized [Petitioner] before the jury such that at least one juror could have found he did not deserve the death penalty.'" *Id.* at 452 (quoting *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000)). Halprin needed to be humanized here, like *Coleman*, — something that child protective service records, medical records, school records, and testimony would have done. Indeed, there is no doubt that this information would have saved Halprin's life.

350. The Court finds that the Texas Court of Criminal Appeals has also found mitigation evidence

85

2388

to be necessary. *See, e.g.*, *Gonzales*, 204 S.W.3d at 399-400. In *Ex Parte Gonzales*, the Court held that the defendant was prejudiced by counsel's failure to present evidence that the defendant suffered from Post-Traumatic Stress Disorder. *Id.* at 399. Gonzales suffered from PTSD because his father subjected him to oral and anal intercourse on a weekly basis beginning when he was seven years old and inflicted severe physical punishment upon him. *Id.* His father also threatened to kill the seven-year-old boy if he told anyone of the abuse. *Id.* An expert would have testified that had Gonzales received proper treatment he may have been a law abiding citizen. *Id.* The Court held that this "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of the applicant's moral culpability," and, therefore, vacated Gonzales death sentence. *Id.* at 400.

351. The Court finds that had the above-described mitigation evidence been presented during the penalty phase of Halprin's trial that evidence might have influenced the jury's appraisal of his moral culpability as the Court of Criminal Appeals found in *Gonzales*.

352. The Court notes that death sentences from nearly every capital jurisdiction have been set aside due to counsel's failure to investigate adequately or present the client's background, character, or mental health to the jury during the penalty phase. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 525 (2003) (Maryland) (counsel failed to present life history evidence, including sexual victimization); *Outten v. Kearney*, 464 F.3d 401, 418-19 (3d Cir. 2006) (Delaware) (counsel was ineffective for failing to investigate the violence committed by petitioner's alcoholic father and the defendant's own substance abuse); *Douglas v. Woodford*, 316 F.3d 1079, 1087-88 (9th Cir. 2003) (California) (counsel was ineffective for failing to investigate and present evidence of petitioner's mental disabilities and evidence that he was abandoned as a child); *Lockett v. Anderson*, 230 F.3d 695, 713-14 (5th Cir. 2000) (Mississippi) (counsel failed to investigate and present defendant's mental

86

disabilities, including temporal lobe lesions, epilepsy, and schizophrenia that would have mitigated even the particularly aggravated crime); *Collier v. Turpin*, 177 F.3d 1184, 1202 (11th Cir. 1999) (Georgia) (counsel was ineffective for failing to delve deeply into petitioner's past as a good family man, upstanding citizen, his impoverished background, and relationship between his diabetes and his impulsive behavior); *Hall v. Washington*, 106 F.3d 742, 752 (7th Cir. 1997) (Illinois) (counsel was ineffective for failing to investigate defendant's good moral character and adaptability to prison); *Loyd v. Whitley*, 977 F.2d 149, 160 (5th Cir. 1992) (Louisiana) (trial counsel failed to investigate defendant's preexisting mental defects); *Mak v. Blodgett*, 970 F.2d 614, 617 (9th Cir. 1992) (Washington) (counsel failed to present testimony of defendant's family "to show Mak's human qualities" and failed to present expert testimony of "the effects of cultural conflict on young Chinese immigrants"); *Harlow v. Murphy*, No. 05-CV-039-B, slip op. 41, 44 (D. Wyo. Feb. 15, 2008) (counsel failed to present evidence of defendant's adaptation to prison and to explain that a prison fight was not because defendant was "a dangerous person, but . . . was in a dangerous place"); *Sanford v. State*, 25 S.W.3d 414, 421 (Ark. 2000) (trial counsel was ineffective for failing to investigate petitioner's school records, medical records, jail records, and family history showing a long-standing history of mental retardation); *Green v. State*, 32 Fla. L. Weekly 619 (Fla. 2007) (counsel was ineffective for failing to investigate and present petitioner's prior juvenile robbery conviction, which would have produced facts disqualifying the incident as an aggravating factor to justify imposition of death); *Doleman v. State*, 921 P.2d 278, 281 (Nev. 1996) (counsel failed to introduce testimony of defendant's childhood and institutional history that "could have effectively humanized Doleman in the eyes of the jury"); *State v. Chew*, 844 A.2d 487, 506 (N.J. 2004) (counsel failed to provide defense experts to testify about defendant's history of child sex abuse;

87

2390

*Marquez-Burrola v. State*, 157 P.3d 749, 764-65 (Okla. Crim. App. 2007) (counsel failed to substantiate mitigation testimony of defendant's family with corroborating evidence from a broad set of sources); *Commonwealth v. Gorby*, 900 A.2d 346, 362 (Pa. 2006) (counsel failed to investigate witnesses and documents substantiating defendant's childhood maltreatment and related indicators of brain injury); *Nance v. Ozmint*, 626 S.E.2d 878, 883 (S.C. 2006) (counsel "failed to reveal that Petitioner was beaten throughout his childhood; . . . he grew up in a family of extreme poverty and physical deprivation" and did not elaborate about the fact that petitioner had "a family history of schizophrenia"); *Goad v. State*, 938 S.W.2d 363, 370-71 (Tenn. 1996) (counsel failed to present testimony that defendant's demeanor had changed since returning from Vietnam and that he suffered Post-Traumatic Stress Disorder ("PTSD")).

353. The Court finds that all of these cases lead to the conclusion that Halprin was prejudiced by counsel's failure to present mitigating circumstances concerning his childhood – the neglect, physical beatings, exposure to illegal substances, deplorable living conditions, and revolving door of care-givers.

354. The Court finds that this mitigating evidence, taken as a whole "might well have influenced the jury's appraisal of Halprin's moral culpability." *Gonzales*, 204 S.W.3d at 400. 129. The Court finds, therefore, there is at least a reasonable probability that, had this mitigating evidence been introduced at the punishment hearing, a different result would have occurred. *Id.* Halprin would have received a sentence of life imprisonment.

## Cumulative Error

355. The Court finds that all of these failures converged to deprive Halprin of his constitutionally protected right to prevent unique individualized sentencing information.

88

356. The Court finds that the mitigation witness discovered important mitigating data and prepared a compelling presentation.

357. The Court finds however, even though this testimony was all but gift wrapped and hand-delivered, defense counsel failed to present it to the jury.

358. The Court finds that defense counsel did not subpoena the witnesses outlined in Dr. Goodness's presentation, did not offer the documents she compiled through readily available records custodians, and did not make the proper legal arguments when their admission was contested.

359. The Court finds that all of these errors are so inter-related that they must be considered together.

**Conclusion**

360. The Court finds that trial counsel acted deficiently under *Strickland v. Washington* and in violation of the U.S. Const., amends. VI and XIV in not introducing the above-described mitigation evidence during the penalty phase of Applicant's trial. The Court finds that the failure to introduce this evidence prejudiced the Applicant. Trial counsel was ineffective. Therefore, this Court recommends that Applicant be granted constitutional relief and that a new penalty phase be held.

**Failure to Object to Prosecutors Misstatements of Law Concerning Death Penalty Eligibility under *Enmund v. Florida* and *Tison v. Arizona* During Jury Selection**

361. The Court finds that for a jury to assess a penalty of death for a non-triggerman under the Texas statutory scheme, the jury must find that the non-triggerman had, at a minimum, a reckless disregard for human life.

362. The Court finds that the special issues in Texas addressing this requirement mandate that the jury make a factual finding that the non-triggerman actually anticipated that death would result. (See

89

2392

special issue number 2.)

363. The Court finds that *Enmund* stands for the proposition that to anticipate death requires more than planning a robbery and carrying a gun.

364. The Court finds that throughout the voir dire of the twelve jurors who were seated, the prosecution continually suggested that a death penalty would be appropriate for a non-triggerman who was armed and helped plan a robbery.

    a. Juror number one was told:

        The law says also that people that assist, the accomplices, the people that help commit a crime, can also be prosecuted for the death penalty. And that's true with any crime, but it's also true for capital murder. In other words, the death penalty in Texas is not just reserved for the triggerman. It can also apply, depending on the facts of the case, to someone that might assist.

        The example we give, let's say, me, Mr. D'Amore, and Mr. Wirskye want to go rob a bank. Our plan calls for Mr. Wirskye to be the getaway driver and the lookout, and he waits outside. I go in with a gun, Mr. D'Amore goes in to help me fill up the bag. We subdue everyone with threatening, we get the money, and then I start killing people in there.

        Obviously, if we're caught, I could be prosecuted for the death penalty, but the law says that Mr. D'Amore and Mr. Wirskye could, also. If they're actively participating, promoting the crime, they can be held accountable. We call that the law of parties.

        It's the accomplices, can also get the death penalty, and it just depends on the facts.

        If two people, me and Mr. D'Amore, agree to commit robbery, let's say. That's one felony. And we go in to commit that and one of us intentionally murders someone in the course of that. Even if I didn't want him to kill him, I could be found guilty of capital murder, because I entered into that. The law says if the evidence shows I should have anticipated that something like that would happen, okay? If that's what the evidence is in that situation.

        Now, that's what we have to prove to get him guilty. Now, once we get to the punishment stage, not only does the evidence have to show that I should have anticipated, but indeed I did anticipate.    (RR 9, p. 79-87)

    b. Juror number two was told:

        And their role in the crime? Now, this is in punishment. Let me back up a little bit. We talked about it a little bit earlier, but I'll give you an example. Mr. Wirskye and I go rob a bank and I'm the one that goes in with the gun. He's the getaway

driver. He helps me, drops me off, he looks for the police, he waits for me out front. I go in and I commit murder and robbery. I'm guilty of capital murder.

The law says if he's on trial, he can be convicted of capital murder if the jury believes that he helped me, he encouraged me, he directed me, tried to help me commit capital murder, knowing that's what is going to happen. And he's -- he can be found guilty, depending on what he did.

Now, maybe in that situation that you heard about there's other evidence, in my example, that shows you he anticipated. For example, maybe he had a gun. Or maybe under intending to kill the evidence would show that he actually fired a shot and missed. Maybe that would also show he intended to kill or anticipated. Or maybe the degree of planning that went into it. I mean, there's a number of different things that could come about. Maybe there's circumstances, circumstantial evidence, that you look at. The totality of the crime that leads you to believe that.

But you see now it's not just should have anticipated. It's actually did anticipate, a little bit higher, or intended to kill somebody.

(RR 12, p. 22-24).

c.   Juror number three was told:

Now, we have to go one step further in punishment and not only prove he should have anticipated, but he actually did anticipate. And the way we do that is, we give you all the evidence and you're entitled to make reasonable deductions from the evidence as to what his role was and maybe what he knew. That maybe how detailed the plan was, how actively involved, were there -- how many weapons were involved, that sort of thing. And then you make that decision.

(RR 14, p. 93-109).

d.   Juror number five was told:

It asked you later on to look at did the person intend, if he didn't pull the trigger, if he's an accomplice, did he intend someone die, or did he anticipate somebody die. Maybe that shows you there, also. Did he fire the gun and miss? Was he armed? Was he unarmed? Was he right there at the murder or was he down the street doing something, but involved in it?

It asked you later on to look at did the person intend, if he didn't pull the trigger, if he's an accomplice, did he intend someone die, or did he anticipate somebody die. Maybe that shows you there, also. Did he fire the gun and miss? Was he armed? Was he unarmed? Was he right there at the murder or was he down the street doing something, but involved in it?

(RR 14, p. 88-93).

e.   Juror number six was told:

Q.   Sure. Let me give you this example. Let's say I decide to rob a bank. I've got a big overcoat on. I've got my gun. I just don't have a way to get to the bank. I go to my friend Mr. Shook. I don't tell him my plan. I just say, hey, I need a ride up

91

2394

to the bank to make a withdrawal. I just don't tell him what kind of withdrawal.

You know, if he drops me off, waits outside, I go in and rob the bank, come back, get rid of my gun, he doesn't know anything. At that point he wouldn't be guilty of anything, because he didn't have any knowledge. He didn't have any intent. He was merely present. Some people call it like guilt by association. Obviously, that's not the way our country works or our system. He wouldn't be guilty of anything. Does that make sense to you?

A. Absolutely.

Q. Okay. But, of course, if he knew about it, the level of planning, maybe whether he had a gun, prepared to use it, something like that. That would be important to you?

A. Uh-huh.

Q. And again, the burden is on us to, you know, prove to you that should be answered yes, okay? A.     Yes.

(RR 22, p. 100).

f.     Juror number seven was told:

Q. Sure. Let me give you this example. Let's say I decide to rob a bank. I've got a big overcoat on. I've got my gun. I just don't have a way to get to the bank. I go to my friend Mr. Shook. I don't tell him my plan. I just say, hey, I need a ride up to the bank to make a withdrawal. I just don't tell him what kind of withdrawal.

You know, if he drops me off, waits outside, I go in and rob the bank, come back, get rid of my gun, he doesn't know anything. At that point he wouldn't be guilty of anything, because he didn't have any knowledge. He didn't have any intent. He was merely present. Some people call it like guilt by association. Obviously, that's not the way our country works or our system. He wouldn't be guilty of anything. Does that make sense to you?

A. Absolutely.

Q. Okay. But, of course, if he knew about it, the level of planning, maybe whether he had a gun, prepared to use it, something like that. That would be important to you?

A. Uh-huh.

Q. And again, the burden is on us to, you know, prove to you that should be answered yes, okay?

A. Yes

(RR 24, p. 156).

g. Juror number eight was told:

Q. Okay. In my example he didn't have a gun, but I could change it and I could put a gun in his hand. Would that change your mind maybe?

A. Probably.

Q. Why is that? What's your thinking?

A. Because he could have just as well have been the one doing the shooting.

92

2395

Q.   But that's the legal question in that situation that he should have anticipated the murder. Now, that means, I guess, to some people, obviously, he was part of the robbery, and maybe, whether or not he was carrying a weapon, maybe he knew I had a gun when I went in there. Maybe there was other evidence that shows you what he thought was going to happen one way or the other.
(RR 27, p. 126).

h.  Juror number nine was told:
Q.   You know, maybe Mr. D'Amore should have anticipated it because he knew I went there with a loaded gun. (RR 30, p. 56)

i.  Juror number ten was told:
Q.   When you get down to punishment, these Special Issues, the law imposes a little bit higher burden on us. Not only do we have to prove he should have anticipated, but that he actually anticipated. And, again, you can go back and look at the facts of the crime. You know, who has a gun? Where were they? You may look at, you know, in our example you may hear Mr. D'Amore has been involved in something like this before. That may help you answer that question.
(RR 35, p. 122).

j.  Juror number eleven was told:
Q.   Okay. Would it -- would it be important to you if, let's say, they both had a gun? They were both carrying guns? And only one or maybe only one caused the death, but they both had a gun?
A.   Yes.
Q.   What would that help you more on, their intent?
A.   Yes.
Q.   Or what they may be planning or the preparation that went into it?
A.   Yes.
Q.   Okay. All right. Would their background be helpful, if they had been in trouble before?
A.   Yes.
Q.   You know, we have people who come in and tell us, well, if he knew you had a loaded gun, that kind of tells me that he should have anticipated that could happen. See how somebody could think that?
A.   Right.
Q.   Or if he had a gun, maybe it would show that. Or maybe the person outside who wasn't around, down the street, the lookout, maybe he should not have anticipated, if something else happened. It just really depends on the evidence.
(RR 35, p. 193-194).

k.  Juror number twelve was told:
Q.   I see you nodding your head. Would it make a difference to you if he went in

93

2396

with a gun, too, a loaded gun?  Do you think that it would be a pretty clear-cut case or clearer case?

A.   It would probably put a little more onto the fact that it's a little more obvious that it's a possibility.  But anytime you are dealing with a loaded weapon and he knows you are carrying in a loaded weapon to rob a bank -- if you are going in with a note to give the teller, that's different.  But if he knows you are toting a loaded firearm, if he's agreed to be part of that, then --

Q.   That's what a lot of people tell us.  Basically, that's only one reason to carry a loaded firearm into a robbery like that.

(RR 38, p. 172).

365.  The Court finds that the failure of defense counsel to object to these misstatements of the law was deficient performance.

366.  The Court finds that the failure of the defense counsel to correct these misstatements of law was clearly prejudicial to Halprin.

367.  The Court finds that the prosecution was able to build on the foundation it laid during jury selection that, contrary to *Enmunds*, a death penalty could be assessed if Halprin merely carried a gun during the robbery.  The State specifically argued that misstatement of law to the jury.

368.  The Court finds that the jury was never informed that to assess a penalty of death, the prosecution had to show Halprin's reckless disregard of human life.

## Failure to Call George Rivas as a Witness

369.  The Court finds that the defense failed to call George Rivas, the leader of the group, as a witness.  Newbury and others called him "The Commander."

370.  The Court finds that Rivas was tried and convicted prior to Halprin's trial, and testified in his own trial.  Rivas also testified at the trial of co-indictee Murphy.

371.  The Court finds that Rivas gave lengthy interviews to law enforcement officers concerning the offense, his role, and the role of the others, including Halprin.

94

2397

372. The Court finds that much of Rivas's statement would mitigate Halprin's role in the offense.

    a. For example, he felt sorry for Halprin because Halprin had no family support and was like a "lost puppy."

    b. Rivas intervened to keep prison gangs away from Halprin.

    c. Newbury was recruited because Halprin had cold feet about the deal, jumping in and out of the deal and "ball(ing) up in a fetal position."

    d. The group lied to Halprin a lot because he was such a weak link.

    e. Rivas confirmed that the group wanted to cut Halprin loose from the group. Rivas also stated that, at the time of the shooting, Halprin panicked and was fearful. He further stated that Halprin really did not do anything.

373. The Court finds that George Rivas testified on May 8, 2010 that

    Q. Now, you talked about his role in the escape, the planning stage, his role at the escape, his role in the robberies, his role after getting show.  What leadership qualities did he show during your entire time with him?
    A. None, sir.
    Q. In terms of his standing in the group where would you put him in the chain of command?
    A. He was at the very bottom.
    [Writ Hearing, May 8, 2010 at 119-20].

374. The Court finds that this testimony would have given credence to Halprin's claims that he was left out of the planning of the offense and therefore had no anticipation of violence, the second special issue.  It was critical to Halprin's Eighth Amendment claim that imposition of the death penalty upon him was unconstitutional.

375. The Court finds that Rivas was not asked to testify, even though he was willing to do so if subpoenaed and did testify at Murphy's trial.  As stated above, counsel has an obligation to investigate readily available sources of information and to fully investigate claims.

376. The Court finds that no justification exists for failure to contact Rivas, much less obtain Rivas

95

as witness.

377. The Court finds that the failure to call Rivas as a witness constitutes ineffective assistance of counsel under *Strickland*.

### Defense Failed to Provide a Sponsoring Witness for Exhibit 39, a TDCJ Ranking of the Escapees that Showed Halprin Was the Least Culpable of the Group

### Background

378. The Court finds that during the investigation of the escape of the Texas Seven, Sergeant Investigator Hank Whitman of the Texas Department of Public Safety Special Crimes Division created a document entitled, "Ranking of Offenders by Leadership/Personality Characteristics." [Def. Ex. 39.

379. The Court finds that Whitman created this document based upon interviews with civilian witnesses, correctional officers, and several inmates who worked closely with the escapees. [Whitman Aff.].

380. The Court finds that the document states that based upon this investigation, "it was the unanimous decision that RIVAS was the leader and the weakest was determined to be HALPRIN." [Def. Ex. 39]. Specifically the document stated Halprin was "quiet and never exhibited leadership qualities. Was consistently worried about whether his work was acceptable to the civilian workers. Very submissive character. This worrisome attitude was seen to escalate a month before the escape. One civilian worker speculated whether HALPRIN was undergoing some type of depression." [Def. Ex. 39]. This document was stored in the files of the Texas Department of Criminal Justice–Inspector General. [*See* Cert. Rec. TDCJ–Off. Insp. Gen.].

381. The Court finds that the jury never had the opportunity to view this document.

96

2399

382. The Court finds that defense counsel attempted to introduce the document at trial but the State objected to its admission as hearsay. [RR 53, pp. 13-16]. The State argued that defense counsel had not established the author of the document. Further, the State disclaimed knowledge of who prepared it, or why it was prepared despite having provided defense counsel with the document during discovery.

383. The Court finds that the trial court found that the document was properly authenticated but it did not fall within one of the hearsay exceptions. The trial court ruled:

> You don't know who the author is, you don't know where the conclusions come from, you can't go back and find out any of the source information that the ultimate opinion comes from. So I have reviewed 39, I understand your objections. No question about its authenticity. It's simply not admissible because of hearsay. [RR 53, p. 15].

384. The Court finds that a search by writ counsel revealed that Exhibit 39 along with the information concerning this document and who prepared it was located in the files of the Texas Department of Criminal Justice–Inspector General.

## Ineffective Assistance of Counsel Standard

385. The Court finds that to establish ineffective assistance of counsel, petitioner must demonstrate that: (1) counsel's performance fell below an objectively reasonable standard of performance; and (2) this deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

386. The Court finds that *Strickland* imposes a duty to conduct a reasonable investigation. *Strickland*, 466 U.S. at 60-91. The reasonableness of counsel's investigation is measured against "prevailing professional norms" including a "context-dependent consideration of the challenged

97

2400

conduct as seen from counsel's perspective at the time of the conduct. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003).

387. The Court finds that in determining whether the applicant suffered prejudice as a result of counsel's deficient performance, the applicant need only demonstrate that a reasonable probability exists that, but for counsel's failures, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

## Counsel's Failure to Find the Author of Exhibit 39 Fell Below an Objective Standard of Reasonableness

388. The Court finds that it would have been easy to determine who authored Exhibit 39. The document was distributed widely after the escape.

389. The Court finds that at a hearing on September 30, 2010, the following exchange occurred between the author of Exhibit 39, Lt. Whitman, and writ counsel:

> Q.   So would you agree with me there would be a limited universe of people who could have written these documents that wound up in these law enforcement files?
> A.   There would have been a limited amount. However, there was quite a few people that knew I authored that that are still working for the system. Ultimately that's why I'm sitting here today. That's how it was identified.
> Q.   Somebody called the Department of Public Safety to the division that handled criminal investigations where you worked, would they have been able to find someone that said Hank Whitman wrote that document.
> A.   Yes, sir.
> Q.   If somebody called the Office of Inspector General and said, "Who wrote this document," there are people there that would have said, "Hank Whitman wrote this document."
> A.   Yes, sir.

[Writ Hearing, Sept. 30, 2010, Vol. 3, at 49-50]. Further, when asked if it would be "pretty easy to

98

2401

find out who wrote [Exhibit 39]," Whitman replied, "It would have been easy, yes." [*Id.* at 50].

Whitman testified that anyone from Office of Inspector General, Internal Affairs would have known

who created the document. He also stated that everyone he sent the document to would have been

able to identify him as the author. [Writ Hearing, Sept. 30, 2010, Vol. 3, at 44].

390. The Court finds that further, the records at the Texas Department of Criminal Justice Office

of Inspector General, which contained Exhibit 39, included a fax cover sheet from the Irving Police

Department that states "profiles done by Sgt. Investigator Hank Whitman." [Writ Hearing, Sept. 30,

2010, Vol. 3 at 50].

391. The Court finds that Whitman also gave the Ranking Document to an investigator with the

Irving Police Department during its investigation of the case.

392. The Court finds that the defense did not even ask its own witness, S.O. Woods, to help them

identify the document prior to the punishment phase. As indicated by his affidavit, Woods readily

could have done so.

393. The Court finds that taking this simple step, notwithstanding the State's attempt to hide the

authorship, cannot be justified as it demonstrates a lack of effort.

## Defense Exhibit 39 Would Have Been Admissible at Trial under the Public Records and Reports Exception to the Hearsay Rule

394. The Court finds that with the testimony of Whitman, the trial court would have to have

admitted Exhibit 39 into evidence under Rule 803(8)(c), the public records and reports exception to

the hearsay rule.

395. The Court finds that this exception is not limited to purely factual findings in a public record

but also encompasses any opinions or conclusions based upon an investigation. *Beech Aircraft*

99

*Corp. v. Rainey*, 488 U.S. 153, 163-64 (1988) (holding, under Federal Rule of Evidence 803(8)(c) which the Texas rule derives from, investigative report of airplane crash that contained investigator's opinion concerning whether pilot error was the cause of the accident was admissible); *Cowan v. State*, 840 S.W.2d 435, 437 (Tex. Crim. App. 1992) (holding U.S. Marine Corps Medical Board report admissible because it reflected the board's opinion based on factual findings as to the defendant's mental condition);

396. The Court notes that the general policy behind the public records exception to the hearsay rule is that "public records and reports are inherently reliable because of the presumptions that officers will perform their duties, that officers lack a motive to make false reports, and that public inspection of the reports will disclose inaccuracies." *Perry v. State*, 957 S.W.2d 894, 898 (Tex. App.–Texarkana 1997); *see* FED. R. EVID. 803(8)(c), advisory committee's note (stating that the "[j]ustification for the [public records and reports] exception is the assumption that a public official will perform his duty properly").

397. The Court finds that Exhibit 39, "Ranking of Offenders by Leadership/Personality Characteristics" meets all of the elements of Rule 803(8)(c) and, therefore, would have been admitted had the defense known the author of the document.

398. The Court finds that first, Exhibit 39 was a report or data compilation created by a public office or agency. TEX. R. EVID. 803(8)(c). Lieutenant Henry L. Whitman, Jr., an investigator with the Criminal Intelligence Service of the Texas Department of Public Safety's Criminal Law Enforcement Division, averred in an affidavit that he created this document in connection with the State's investigation of the escape of the Texas Seven. [Whitman Aff.]. Further, the letter head on the document states "TDCJ CONNALY UNIT," indicating it is a public record. [Def. Ex. 39 (emphasis

100

in original)].

399. Second, the ranking list sets forth factual findings and opinions/conclusions arising from the State's investigation of the Texas Seven's escape made pursuant to authority granted by the law. TEX. R. EVID. 803(8)(c); *Cowan*, 840 S.W.2d at 438.

400. The Court finds that Exhibit 39 is not a pure recital of a witness's statements but is rather based upon the State's investigation of the escape in its first days. *Ramirez v. State*, No. 14-06-00538-CR, 2007 WL 212779, *7-8 (Tex. App.–Houston [14th Dist.] July 26, 2007) (upholding trial court's refusal to admit portions of police report that contained witness's statements to police because these statements "were neither factual findings resulting from an investigation or opinions nor conclusions based on such findings"). Whitman averred and testified that he and two of his colleagues compiled the information in the ranking document from interviews with twenty to thirty civilian workers, correctional officers, and inmates, as well as their review of the escapee's classification records. [Whitman Aff. at 1].

401. The Court finds third, Exhibit 39 has all of the indicia of reliability and trustworthiness that are the foundation of the public records exception to the hearsay rule. Here, an investigator with the Criminal Intelligence Service of the Texas Department of Public Safety created the document "within days" of the Texas Seven's escape from prison to help law enforcement apprehend the escapees. The investigators with the State had no ulterior motive in creating this document.

402. The Court finds, therefore, Exhibit 39 meets all of the requirements of Rule 803(8)(c) and should have been admitted at trial.

403. The Court finds that Exhibit 39 was relevant as required under Rule 401 as to Halprin's role in the crime and as mitigation evidence.

101

2404

## Defense Exhibit 39 Would Have Been Admissible under Business Records Exception

404. The Court finds alternatively, with a sponsor, Exhibit 39 would have been admissible under the business records exception to the hearsay rule, Texas Rule of Evidence 803(6).

405. The Court finds that Rule 803(6) requires that the testifying witness must have knowledge of how the record was prepared. *Canseco v. State*, 199 S.W.3d 437, 440 (Tex. App. –Houston [1st Dist.] 2006, pet. ref'd).

406. The Court notes that courts have held routinely that probation records, prison log books, and radio logs qualify as business records. *See id.; Harris v. State*, 866 S.W.2d 316, 321 (Tex. App.–San Antonio, 1993) ("mug log" of a sheriff's office containing photographs of persons arrested and noting time and date of arrest made in the course of the ordinary operations of the sheriff's office admissible as a business record); 2 WHARTON'S CRIMINAL EVIDENCE § 6:25 (15th ed. Supp. 2009).

407. The Court finds that with the testimony or affidavit of Whitman, defense counsel would have laid the necessary predicate for the admittance of Exhibit 39.

408. The Court finds that defense counsel would have established that Exhibit 39 was made at or near the time of the event it recorded by a person with knowledge of the document's content. TEX. R. EVID. 803(6).

    a. Whitman testified that he and his colleagues compiled the information in the ranking document from interviews with persons who knew the escapees in prison as well as their classification records. [Whitman Aff. at 1].

    b. Whitman also stated that he prepared the document shortly after the prisoner's escape. [*Id.*]

409. The Court finds that defense counsel would have established that Exhibit 39 was made and kept in the course of a regularly conducted business activity with Whitman's testimony. TEX. R.

102

2405

EVID. 803(6).

410. The Court finds that although Whitman did not specify that he was the custodian of records, the rule allows a qualified person, such as the document's creator, to testify to such matters. *See Canseco*, 199 S.W.3d at 440.

411. The Court finds that with Whitman's sponsorship, there could have been no doubt that Exhibit 39 was trustworthy. Exhibit 39 has all of the indicia of reliability and trustworthiness that are the foundation of the business records exception to the hearsay rule. *See Johnston v. State*, 959 S.W.2d 230, 240 (Tex. App.–Dallas 1997).

412. The Court finds accordingly Exhibit 39 was admissible under the business records exception to the hearsay rule.

413. The Court finds further that the trial court has a constitutional duty to allow the defendant to present mitigation evidence at the punishment phase of a capital case. *Williams v. Taylor*, 529 U.S. 362, 393 (2000).

414. The Court finds that trial counsel was deficient for failing to determine the author of Exhibit 39, and then to argue for its admission under the public records exception to the hearsay rule and business records exception to the hearsay rule.

## Defendant Suffered Prejudice from Counsel's Failure to Introduce Exhibit

415. The Court finds that Exhibit 39 was the single most important piece of evidence that explained Halprin's minor role in the escape and crime spree engaged in by the Texas Seven as perceived by law enforcement. Exhibit 39, prepared by State law enforcement agents in the course of their investigation, demonstrated that Halprin was the least dangerous of the seven and highly submissive.

103

2406

416. The Court finds that this document was the result of information culled from prison records as well as interviews with over twenty different persons, ranging from the sheriff of Karnes County, to prison administrators, to correction officers, to inmates, to civilian officers who oversaw the escapees' daily work. [*See* Ex. 39]. In other words, it was an amalgam or synthesis of everything that the prison system knew about Halprin: Halprin was the least dangerous of the seven escapees and was very submissive. The document, by its very creation, carried the approval of the prison system itself. As such, it was much more powerful than the testimony of three witnesses who said little more than Halprin did not possess leadership qualities during the guilt/innocent phase of the trial and not the punishment stage. [Writ Hearing, Sept. 30, 2010, at 26-28].

> a. Lt. Whitman testified that in creating this document "I wanted to know who had the most leadership qualities, personalities from top to bottom. I wanted to know who more than likely had facilitated this scheme and then work downward." [Writ Hearing, Sept. 30, 2010 at 28].

> b. Lt. Whitman further testified:
> Q. Your document says a consensus was developed as to which was the leader and which was the weakest. The consensus – just to be clear, the consensus is exactly what's in the document, correct?
> A. Correct.

[Writ Hearing, Sept. 30, 2010 at 31].

417. The Court finds that the admission of Exhibit 39 would have been the most effective means to demonstrate that law enforcement considered Halprin's role to be in the escape and his personality characteristics compared to the other escapees.

418. The Court finds that Exhibit 39 also contradicts the prosecution's assertions that Halprin was the "baddest of the bad" and that there was no evidence that sufficiently mitigated against his role in the crime. [RR 53, p. 77, 85]. Further, the document undercuts the prosecution's theory that

104

2407

Halprin was one of the leaders of the escapees and played a pivotal role in the escape—which law enforcement clearly did not believe. [RR 49, p. 6]; [RR 48, p. 106, 108, 124, 135].

419. The Court finds further that Exhibit 39, undermined the State's theory of the punishment phase of the trial – that Halprin's character, background, lack of moral culpability, and crimes required the death penalty and that no mitigating evidence existed. [*See, e.g.* RR 53, p. 77 ("What could possibly be sufficiently mitigating? . . . [W]e told you [in opening arguments] that after you reviewed the evidence in the case and the testimony, that it was our position . . . that that would be no."); p. 84-85 ("His mean evil streak back in August of '96 hasn't ended. It's continued on").

420. The Court finds that Exhibit 39 was a statement by law enforcement that Halprin was a follower, "with a very submissive characteristic" who "worried about whether his work was acceptable to the civilian workers" and was "the weakest" of the escapees. [Def. Ex. 39].

421. The Court finds that Exhibit 39 was the strongest piece of mitigation evidence that could have been presented at trial.

422. The Court finds that the exclusion of this evidence was inordinately harmful to Halprin. This evidence could have caused the jury, a jury that took over six hours to deliberate at the punishment phase, to choose life imprisonment instead of the death penalty.

423. The Court finds that criminal law experts have submitted affidavits to this effect.

   a. In his affidavit, Bobby D. Mims, a criminal defense attorney who has defended thirty capital murder cases, opined:
   the information in [Exhibit 39] is mitigating evidence of a quality and quantity that is significantly stronger and more important than that referenced in the opinion of the CCA. The evidence from the TDCJ civilian employees that Halprin was at the low end of intelligence of the group and was not a leader type is significantly less helpful than the ranking document. The ranking document appears . . . to be very persuasive mitigating evidence which at least one juror would probably find to be such a circumstance as would lessen Halprins moral blamworthiness.

105

[Mims Aff.].

b. Robert Morrow, a criminal defense attorney who has tried more than twenty capital cases and represented many more capital clients on appeal, asserted that as a defense attorney:

you never give up trying to reach a juror and you never can predict what piece of evidence will do that. Defense exhibit 39 could have been that piece of evidence which convinced a juror that Applicant, because of his role and overall limitations, did not deserve the death penalty. There was nothing cumulative about it. [Morrow Aff.].

c. Robin Conley, an anthropologist who is completing her dissertation at UCLA focusing on how jurors make decisions during the penalty phase of death penalty trials, echoed these assertions. In her affidavit, she averred that jurors have told her that if the defense can "reduce the defendant's responsibility for the crime somehow, they would consider this [evidence, like Exhibit 39, more than any other] sufficiently mitigating." [Conley Aff.]. For example, when Conley asked if there were was hypothetical evidence that would have been mitigating, one juror responded "if you found out that [the co-defendant] was the mastermind and led [the defendant] through the whole thing. . . . God if that comes out it's gonna make it fun to sleep at night." [Id.]. Therefore, Conley maintains that Exhibit 39 "would have potentially been an important piece of mitigating evidence." [Id.].

424. The Court finds that at the hearing held on August 20, 2010 Halprin's counsel testified that their strategy during the punishment stage of trial was to demonstrate that Halprin was a follower, with no leadership qualities whose role in the crime did not justify a sentence of death. Counsel also agreed that Exhibit 39 would have been important mitigation evidence. [Hrg. Transcr. Aug. 20, 2010 at 254]. The following exchange occurred:

Q. [I]s it a fair statement that your defense is basically what is from a mitigation standpoint for the death penalty question is basically what was summarized in the ranking document.
A. Yes, that was part of it.
Q. What I mean by that is the argument you were trying to make are the same things that the ranking document says?
A. Yes.

. . .

Q. And so as the trial attorney do you feel like having a law enforcement officer testify in support of the facts you were presenting as far as mitigation of punishment

106

2409

would have been a significant factor for the jury.
    A.   I think so.

[Hrg. Transcr. Aug. 20, 2010 at 169-170].

425. The Court finds that Halprin suffered prejudice from the trial court's failure to introduce this mitigating evidence. Had this evidence been admitted there is a strong likelihood that the outcome of the trial would have been different.

## Conclusion

426. The Court finds that trial counsel was deficient for failing to determine the author of Exhibit 39 and to successfully move for its admission with this sponsor.

427. The Court finds that the harm to Halprin's ability to present a mitigation case in opposition to the death penalty was significant and severe. Halprin suffered prejudice.

428. The Court finds that Halprin received ineffective assistance of counsel during the punishment phase of his trial and should receive a new punishment trial.

## Trial Counsel Failed to Request an Anti-Parties Charge at the Punishment Phase of the Trial

429. The Court notes that the Texas Court of Criminal Appeals has stated that:

> The law of parties cannot be applied to the punishment phase of a capital murder trial." *Green v. State*, 682 S.W.2d 271 (Tex. Crim. App. 1984), *cert. denied*, 470 U.S. 1034 (1985); *Johnson v. State*, 853 S.W.2d 527, 536 (Tex. Crim. App. 1992). The law of parties may not be applied to the special issues. *Martinez v. State*, 899 S.W.2d 655, 657 (Tex. Crim. App. 1994). While the law of parties can support a conviction for capital murder, the death penalty may be imposed only by examination of the mitigating and aggravating circumstances concerning the individual defendant. *Green*, 682 S.W.2d at 287 (applying *Enmund v. Florida*, 458 U.S. 782 (1982)).

*Varga v. State*, 2003 WL 21466926, 11 (Tex. Crim. App. 2003)

152. The Court finds, therefore, an anti-parties charge focusing on the conduct of the accused alone

107

2410

is appropriate. For example, a charge instructing the jury "[to] confine yourselves, in answering the following issues, to the conduct and acts of the defendant standing alone is appropriate." *Martinez v. State*, 899 S.W.2d 655, 657 (Tex. Crim. App. 1994) (emphasis supplied).

430. Accordingly, the Court finds that precedent requires that:

> When parties' liability is argued at the guilt/innocence phase of trial, an anti-parties charge is required at the punishment phase. Under Texas law, an accused is entitled to an anti-parties charge, that is, an instruction that the law of parties may not be considered by the jury in assessing punishment or in answering the special issues in a capital case if the accused requests such an instruction. *McCoy v. Lynaugh*, 714 F.Supp. 241, 251 (S.D.Tex.), *aff'd*, 874 F.2d 954 (5th Cir.1988).... An accused is entitled to such an instruction upon request; absent a request, there is no obligation upon the court to so charge. *Nichols*, 754 S.W.2d at 199.
>
> *Chambers v. Cockrell*, 2003 WL 22017036, at *22 (N.D.Tex. 2003); *see also Marquez v. State*, 725 S.W.2d 217, 225 (Tex. Crim. App. 1987).

154. The Court finds that the Court of Criminal Appeals has also stated that

> [I]n cases where a law of parties charge was given during the guilt/innocence phase of a capital case a prophylactic instruction should be given, if requested, which would instruct the jury to limit its consideration of punishment evidence to conduct shown to have been committed by the defendant.
>
> The charge is of critical importance when conspiracy liability is alleged because that charge does not require a specific intent to kill as does the regular parties charge. *Prytash v. State*, 3 S.W.3d 522, 549 n.4 (Tex. Crim. App. 1999).

431. The Court finds that in this case, Halprin was convicted on a charge that allowed conspirator liability.

432. The Court finds that the punishment charge specifically instructed the jury to consider all of the evidence from the guilt or innocence stage of trial as follows:

> You shall consider all evidence admitted during the guilt or innocence stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.
>
> (See Record Excerpts at P).

108

2411

433. The Court finds that at the punishment phase, trial counsel was obliged to ensure that the jury understood its obligation to consider only if Halprin, standing alone, anticipated death as set out in Special Issue No. 2.

437. The Court finds that counsel's failure to request the charge enhanced the possibility that the jury convicted Halprin because other members of the group anticipated death.

438. The Court finds that in fact, the prosecution made that very argument without objection, thus enhancing the harm created by the omission. (RR 53, pp. 135-136).

439. The Court finds that this failure to obtain a proper charge clearly played a major and probably the deciding role in the death sentence.

440. The Court finds therefore, both prongs of Strickland are established.

## Defense Counsel Failed to Object to the Prosecutor's Misstatements of Law in Final Argument

441. The Court finds that in its final argument the prosecutor argued that merely bringing a gun to a robbery was sufficient proof of anticipation of death as required by Special Issue No. 2 contrary to *Enmund*. The prosecutor argued:

> Special Issue No. 2, did he cause the death? Did he intend that someone die? Did he anticipate that a human life would be taken? Most of you told us taking a loaded gun into a store, a robbery, that by itself told you that he knew or anticipated or someone would in that circumstance, they would have to use it. And, you know, you can use that fact by itself to answer that question or you could go back to what Mr. Shook argued earlier about as he went around that car and those gunshots into that squad car from the left front, there's only one person from the evidence who was there. Mr. Halprin.
> Why else do you take loaded weapons? Why else do you have a sniper out front? Why else do you have the police band frequency on? And why else do you take that gun and shoot it?
> See, the simple fact, I believe, from the evidence from what you all heard that they all had this plan, they all were armed, they had a sniper out front that was going to engage the police in a fire fight, tells you Mr. Halprin anticipated, he intended, and

109

it's quite likely he caused the death or participated in that. No. 2, yes, beyond a reasonable doubt, overwhelmingly. Your common sense tells you that.

442. The Court finds that the prosecutor also argued, contrary to *Enmund* and *Tison*, that the special issues could be answered by referring to what the group did, not focusing just on the conduct of Halprin.

443. The Court finds that this argument is entirely contrary to the well-established principle that the death penalty must be imposed only after an examination of individualized conduct. See Ground for Relief I, ante. The prosecutor argued as follows:

> Question No. 2, looking at all the evidence, I think it's clear the State has proven that. We've talked about that at great length. We can prove that he actually caused the death. It's actually very similar to some of the issues we talked about in guilt/innocence. Or if he didn't actually cause the death, but he intended to kill someone.
>
> A few examples we gave, maybe there were several people using guns, maybe he wanted to shoot, maybe his gun misfired, maybe someone murdered the victim before him, as examples of that. What is important is the intent.
>
> And I think the intent is clear from the way Aubrey Hawkins was murdered, that every last one of those individuals, including Patrick Murphy who was out front, wanted Aubrey Hawkins dead. The 47 seconds, how they ambushed him when he came around, how they drug him out of his car, how they were able to get away so quickly.
>
> Their intent was clear. All the different guns used. If anyone got in their way, they were going to take care of them, folks. Remember his letter, 'You haven't heard the last from us.'
>
> Now, clearly from all the evidence from their escape, these violent men, the weapons they are using, from how they murdered Aubrey Hawkins, Special Issue No. 2 should be answered yes. I don't know how you could write a better scenario about anticipating someone might die by the facts of this case.
>
> (RR 53, pp 135-136).

444. The Court finds that each of these two objectionable arguments had the effect of misleading the jury about the quality and quantity of proof necessary to answer special issue number two affirmatively.

110

2413

445.   The Court finds that the failure to object is certainly below an objective standard of reasonableness and is not acceptable as professional representation in a death penalty case.

446.   The Court finds that there was no strategic reason not to object to the State's argument. At the writ hearing on August 20, 2010 the following exchange occurred:

Q.   Was there any strategic reason for not objecting at punishment argument?

A.   No.

[Writ. Hearing, August 20, 2010 at 53].

447.   The Court finds that the prejudice is obvious and egregious.

448.   The Court finds that the jury in this case was asked to, and very likely did, inflict the death penalty on Halprin based on erroneous, improper, and unconstitutional arguments about the law. A death verdict based on these circumstances cannot be allowed to stand.

## Trial Counsel's Failure to Advise him of his Right to Testify at the Punishment Phase of Trial

449.   The Court finds that Halprin did not testify at the punishment phase of the trial because he was unaware that he had the opportunity to do so. *See* Halprin Aff., Record Excerpt at Q.

450.   The Court finds that much of the basis for Dr. Goodness' opinions, the abusive nature of both Halprin's parents, their drug and alcohol abuse, and Halprin's learning problems, could have been supplied by Halprin in his testimony.

451.   The Court finds that counsel's obligations are judged against prevailing professional norms. *See Wiggins*, 539 U.S. at 523. Prime among these are the ABA Standards for Criminal Justice and the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. Under the heading, "The Defense Case Concerning Penalty," the ABA Guidelines provide

111

2414

that , "(c)ounsel should consider, and discuss with the client, the possible consequences of having the client testify or make a statement to the sentencing or reviewing body or individual."  ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases Guideline 10.11 (2003) (emphasis supplied). The ABA's Commentary to Guideline 10.11 reiterates this standard: "Counsel should also consider, in consultation with the client, the possibility of the client expressing remorse for the crime in testimony, in allocution, or in a post-trial statement." Id. Guideline 10.11 cmt. (emphasis supplied) Likewise, in the section on Defense Function, the ABA Standards for Criminal Justice provide that, "(d)efense counsel should alert the accused to the right of allocution" at sentencing.  ABA Standards for Criminal Justice, Defense Function Standard 4-8.1(d) (3d ed. 1993).

452. The Court finds that one of counsel's prime duties is to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution. *Strickland*, 466 U.S. at 688; *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997) (emphasizing that, "(i)n the context of a capital sentencing hearing, it is particularly important that counsel not be allowed to shirk her responsibility").

453. The Court finds that Halprin's need to testify in this case was particularly acute, since the defense adduced no other evidence in mitigation to salvage Dr. Goodness' opinion. *Compare Canaan v. McBride*, 395 F.3d 376, 384 -385 (7th Cir. 2005).

454. The Court finds that Halprin's counsel was ineffective for failing to advise Halprin of his right to testify.

## GROUND FOR RELIEF VI: INEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL

112

2415

Ground VI states:

> Halprin is entitled to a new trial because his appellate counsel denied him the effective assistance of counsel guaranteed to him by the Sixth and Fourteenth Amendments of the U. S. Constitution and Art. 1, Sect. 10 of the Texas Constitution.

## Governing Standard

455. The Court finds that "the effectiveness of appellate counsel is governed by the *Strickland* standard which requires the defendant to show prejudice." *Teague v. Scott*, 60 F.3d 1167, 1174 (5th Cir. 1995). Although appellate counsel is not required to raise every non-frivolous claim and may be selective in inclusion of issues in order to maximize success, counsel has an obligation to raise determinative issues. *See Smith v. Robbins*, 528 U.S. 259 (2000). Several circuits have held that appellate counsel is ineffective if counsel fails to raise a claim that qualifies as a "dead bang" winner. *See e.g., Upchurch v. Bruce*, 333 F.3d 1158 (10th Cir. 2003).

456. The Court notes that the Fifth Circuit has acknowledged that, to establish prejudice, a federal habeas petitioner must show the neglected claim would have had a reasonable probability of success on appeal. *See Duhamel v. Collins*, 955 F2d. 962 (5th Cir. 1992).

457. The Court finds that the Court appointed George C. Ashford as lead counsel on appeal. Ashford assigned the appeal to Attorney Michael Muhammed.

458. The Court finds that appellate counsel testified that Muhammed did not raise all of the issues he wished to on appeal because he ran out of time. Specifically, he testified:

> Now, once he started working on the brief he started at the beginning. He started with the jury selection and he raised all of the issues that he thought he could raise as to the jury selection. And then he kept getting notices from the Court of Criminal Appeals to submit the brief before he was ready to submit the brief. He submitted the issues that he had prepared. He tried to get an extension of time to submit additional issues. He tried to supplement the brief with additional issues and he was denied at the Court of Criminal Appeals.

113

[Writ Hearing, Aug. 20, 2010, Vol. 2, at 38-39].  In essence, appellate counsel testified he ran out of time to address the issue in his appellate brief.  Appellate counsel had five and a half months to file his appeal.  This was no excuse.

459.  The Court finds that appellate counsel's statement that he did not address all issues he wished to on appeal because he ran out of time is deficient.

## Appellate Counsel Failed to Present an Issue Complaining About the Court's Wrongful Exclusion of the Statement of Co-indictee Rodriguez to the Authorities that Rodriguez Shot Officer Hawkins

460.  The Court finds that the State's theory was that if only five weapons were fired and Rodriguez did not shoot the officer, then Halprin did.  The State knew that Rodriguez admitted shooting the officer in a letter to his brother, which was introduced in Rodriguez's trial as a statement against penal interest.

461.  The Court finds that when defense attempted to use the letter in the same manner at trial, the prosecution objected to it as hearsay.  The following exchange occurred:

> MR. SHOOK:  Judge, looking at Defense 30, it appears to be a letter from Michael Rodriguez to his brother.  We would -- we will lodge an objection that this is obviously hearsay, and, therefore, should not be asked of the detective. And we also ask that Mr. King not be allowed to ask questions about it, since it's inadmissible hearsay.
> MR. KING:  We believe that the State offered it, I believe.  I may be incorrect, but my understanding is the State will have offered that against Mr. Rodriguez as a Statement against interest in his trial.  And I might be wrong about that..
> MS. SMITH:  It was nonhearsay.  It was 801 and we offered it against him.  He was the defendant on trial.  It's not being offered against him at this trial.
> MR. SHOOK:  Admission as a party opponent.
> MR. KING:  Certainly a Statement against interest of someone involved in a conspiracy and I certainly feel that that's relevant to the issues of who fired the shots at the officer, because he's admitting in this letter that he did fire one shot

114

2417

at the officer.

MS. SMITH: It's also blame shifting. It's not entirely inculpatory. Blame shifts is certainly not a Statement against his interest.   . . .

MR. KING: If he says that if the bullets are found in the officer that matched his gun, then he shot the officer. That's an admission.

MS. SMITH: If you are offering the entire thing, it's not admissible on 803.24. The statement you are referring to -- well, they are not against his interest.

MR. KING: Saying that if I did -- if the bullets match up coming from my gun, then I did shoot the officer.

MR. SHOOK: He said the gun was dropped. I mean, he's not saying he shot him down right there. He said that gun was dropped. And if a bullet hit the officer, but he's not saying, I did it. I'm a killer. It's all me. He's not blaming himself completely. Under that test I believe that's --

THE COURT: The best evidence is already in before the jury. It's uncontested. Defense Exhibit 30 is not admissible. Bring in the jury.

(RR 47, pp 66-68).

462. The Court finds that the defense made a timely objection to the exclusion of this testimony.

463. The Court finds that the statement was one against penal interest under Texas Rules of Evidence 803

464. The Court notes that statements against penal interest are evaluated under a two prong test: does the statement subject the maker to prosecution and do corroborating circumstances clearly indicate the trustworthiness of the statement. No definitive test exists by which to gauge the existence of corroborating circumstances for purposes of Rule 803(24). *Davis v. State,* 872 S.W.2d 743, 749 (Tex. Crim. App. 1994). A number of factors are relevant to this inquiry: (1) whether the guilt of the declarant is inconsistent with the guilt of the defendant; (2) whether the declarant was so situated that he might have committed the crime; (3) the timing of the declaration; (4) the spontaneity of the declaration; (5) the relationship between the declarant and the party to whom the statement was made; and (6) the existence of independent corroborative facts. Further, the court may consider evidence that undermines the reliability of the statement as well as evidence corroborating

115

2418

its trustworthiness, being careful not to engage in a weighing of the credibility of the in-court witness. *Id.* "The burden lies with the party seeking to admit the statement, and the test is not an easy one; the evidence of corroborating circumstances must clearly indicate trustworthiness." *Id.*

464. The Court finds that under this test, the statements were clearly against penal interest and were reliable.

    a.  If Rodriguez was a shooter and only five guns were used, his guilt was inconsistent with Halprin's.

    b.  Rodriguez had the opportunity to shoot, as he was indisputably present.

    c.  He made the statement to his brother right after his arrest.

    d.  The letter was uncoerced and unsolicited.

    e.  He told his own brother, a family member he was unlikely to deceive and a person whose esteem had presumable value to him, that he shot.

    f.  His testimony was consistent with the statements of co-indictees as well as the physical evidence.

465. The Court finds that the State was required to adduce some evidence that Halprin fired a weapon to even argue that he was guilty as a principal. The operative theory was that since five guns were fired and Halprin was present, he could have fired a gun. The State even suggested that Rodriguez did not fire a gun, which made it more mathematically probable that Halprin did.

466. The Court, therefore, the admission of Rodriguez to his brother that he did fire a gun was of critical importance to the defense.

467. The Court finds that in denying admissibility of this evidence, the trial court committed clear error that would result in reversal on appeal.

468. The Court finds that failing to raise this issue on appeal constitutes ineffective assistance of counsel.

**Failure to Raise Motion to Suppress on Appeal**

116

2419

469. The Court finds that at Halprin's trial, the State called Jeff Spivey as its sole witness. Spivey arrived in Colorado on the evening of January 22, 2001. (RR 30, pp 7-8). Around 9:00 p.m. he interviewed Halprin at the Teller County Jail. (RR 30, pp 8-9).

470. The Court finds that Halprin was given his Miranda admonishments and agreed to speak voluntarily, affirmatively waiving his right to counsel. (RR 30, pp 10-12). Halprin subsequently gave a written statement. Spivey denied knowing that a public defender was attempting to interview Halprin at the same time. (RR 30, p. 19).

471. The Court finds that in support of the arrest, the State offered several federal and state warrants (Exhibits 927-930) as well as the search warrant for the RV (Exhibit 288).

472. The Court finds that both sides stipulated to the testimony obtained from the Rivas trial. (RR 30, pp 38-39). The defense specifically adopted all the motions to suppress made by the co-indictees. (RR 30, pp 33-44).

473. The Court finds that no further argument was made. The court subsequently overruled all of Halprin's motions to suppress without elaboration. (RR41, pp 15-16).

**Choice of Law**

474. The Court finds that the trial court relied on Colorado law to justify the arrest.

475. The Court notes that in *Davis v. State*, 645 S.W.2d 288 (Tex. Cr. App. 1983), the Court found it well settled that "the admissibility and effect of offered evidence which does not affect a substantial right are to be determined by the forum in which such evidence is sought to be introduced." 645 S.W.2d at 291. Thus, the Texas state courts are not bound be federal law in deciding the issue.

476. The Court finds that Art. IV, Sec. 1 of the United States Constitution requires that "Full Faith

117

2420

and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." The Court of Criminal Appeals considered it a basic tenet of conflict of laws jurisprudence, that the law of the forum in which the judicial proceeding is held should determine the admissibility of evidence. 25 S.W.3d at 185.

477.   The Court finds that in *Gonzales v. State*, 45 S.W.3d 101 (Tex.Cr.App. 2001), this Court reiterated the *Davidson* rule and held that the law of the forum state controlled on questions on the admissibility of evidence.  The only exceptions were privileged communications, parol evidence, and the statute of frauds.

478.   The Court finds that even under the constitutional protections of the Full Faith and Credit Clause of Art. IV, Sec. 1, Texas law should be applied, not Colorado law.  By constitutional standards, Texas has the significant aggregation of contacts.  Halprin was a Texas resident.  The offense occurred in Texas.  It was and is the State of Texas that had an immediate interest in enforcing its penal laws. The witnesses lived in Texas.  Colorado's only contact with this case was that it's officers arrested Mr. Rodriguez and housed him in one of its jails briefly.

**Texas Law: Arrest Warrant Lacking in Probable Cause**

479.   The United States and Texas Constitutions protect against unreasonable seizures and prohibit warrants lacking probable cause.  *See* U.S. Const. amend. IV; Tex. Const. art. I, § 22.  Arrests generally must be supported by the same level of probable cause, with or without a warrant.  A detached and neutral magistrate must find probable cause before a warrant for an arrest may be issued.  *Coolidge v. New Hampshire,* 403 U.S. 443, 449 (1971).  An affidavit must provide the magistrate with sufficient factual information to support an independent judgment that probable cause exists to believe that the accused has committed an offense. *McFarland v. State*, 928 S.W.2d

118

482, 509 (Tex. Cr. App. 1996).

480. The Court finds that the underlying arrest warrant affidavit is totally lacking in probable cause. *Green v. State*, 615 S.W.2d 700 (Tex. Cr. App. 1980).

## Texas Law: Territorial Limit of the Texas Arrest Warrant

481. The Court finds that the Irving warrant introduced had force and effect only to the Texas border.

482. The Court finds that Detective Johnson made no effort to comply with Art. 51.13, Subsections 5 or 6 because he failed to submit the Texas arrest warrant to a Colorado magistrate for consideration and issuance of a Colorado warrant. In fact, Detective Johnson and his colleagues did not even know of Halprin's presence in Colorado until after his arrest. *See* Tex. Code Crim. P., art. 15.06; *see O'Hara v. State*, 837 S.W.2d 139 (Tex.Cr.App. 1992) ("Art. 15.06 plainly states that any peace officer to whom a warrant is directed or has been transferred may execute the warrant in any county in the state."

483. The Court finds that the Code of Criminal Procedure has a provision for enforcing a Texas warrant outside the borders of the State. Art. 51.13, Sec. 13.

## Texas Law: Texas warrant was based on an unconstitutional lineup

484. The Court finds that the prosecution failed to object to the attack on the lineup procedures that led to his identification and the issuance of the Irving arrest warrant.

485. The Court finds that in an eyewitness identification there should be only one suspect per lineup.

486. The Court finds here that he lineup in this case contains 7 suspects and 8 fillers. The probability of a person who did not observe the offense in question choosing a suspect from the lineup is 7/15 = .467, nearly one chance in two. This lineup or photospread technique gives little

119

protection to a suspect who may be innocent. This is a serious and egregious departure from recommended practice.

487. The Court finds that there should be at least five adequate fillers. An adequate filler is someone who could be mistaken for the suspect by a witness who did not actually see the offender or who has only a weak memory for the event: a plausible alternative to the suspect.

488. The Court finds that the lineup in this case contains suspects and fillers who are of different visible ethnicities. Hispanics obviously cannot serve as fillers for Anglo suspects, and vice versa. Other suspects cannot serve as fillers.

489. The Court finds that the suspect should not stand out in the lineup from other members. Some of the fillers here were of other identifiable ethnic groups.

490. The Court finds that the memory of the witnesses has a high probability of being contaminated by the wide distribution of the suspect photograph.

491. The Court finds here that some of the identifications were obtained not from a properly constructed lineup but from images broadcast on television. If, as I have been told by Mr. Charlton, the suspects were shown on television after their escape from prison, the high probability of contamination exists.

492. The Court finds that the availability of photographs of the suspect in local/regional media may have provided information to witnesses about the suspects that they assumed was information about the offender.

493. The Court finds that the trial court simply found without any evidence that the lineup was not suggestive despite these problems.

494. The Court finds that the "techniques employed by the Irving Police Department in this case did

120

2423

not even remotely approach nationally accepted techniques.

495. The Court finds that the Texas warrant was illegally used to justify Halprin's arrest. It lacked probable cause, had no territorial effect outside of the Texas borders and was based on a lineup so unduly suggestive as to violate due process.

496. Alternatively, the Court finds that even if the trial court could have relied on Colorado law, it was unavailing. Colorado statute, 16-3-102 has a more restrictive standard than the trial court applied.

497. The Court finds that all the Colorado authorities had in the way of belief, other than the federal warrant was that certain witnesses had seen stories of the Texas Seven on a television show, "America's Most Wanted" and recognized Halprin and the others from that show. They had no independent probable cause.

498. The Federal warrant lacked probable cause. There is nothing in the affidavit to demonstrate that the confidential information was trustworthy.

499. The Court finds that because the arrest was illegal, the resulting confession must be suppressed unless the State establishes that the taint of that illegal arrest was removed. *Brown v. Illinois*, 422 U.S. 590 (1975).

500. The Court finds that the Teller County Sheriff's Office refused to allow a public defender to visit with Halprin immediately after his arrest. Therefore, his confession also was not knowing and voluntary.

## Failure to Raise an Appellate Issue on the Trial Court's Refusal to Define the Term "Anticipate"

501. The Court finds that prior to trial, the defense raised an objection to the vagueness of the Texas

121

statutory scheme in three motions. (*See* Record Excerpts at M). At the punishment phase, the defense revisited this issue in the following manner:

> MR. KING: Judge, we are requesting a charge in regard to Special Issue No. 2 as to the definition of the word "anticipate" as used in Special Issue No. 2. We're asking that to be defined as to have expected a circumstance to happen with certainty.
>
> MS. SMITH: Once again, Your Honor, that word has no legal definition and the jury should be able to give it its common meaning.
>
> MR. KING: We believe that encompasses the common meaning of that, Your Honor. We're just asking to give that definition.
>
> THE COURT: Mr. King, I appreciate the defense's position and wishing me to define these issues outside the guidance of the Court of Criminal Appeals. I appreciate the opportunity to make such rulings and chart a new path in the law, but I'm not going to venture out beyond the statutorily defined and guidance from the Court of Criminal Appeals at this time. I will deny your last motion.

(RR 53, p. 68).

502. The Court finds that the trial testimony strongly indicates that the group planned the robbery in a manner that would ameliorate the risk of violence and that Halprin actually believed that no shooting would occur:

> Q. Were you aware that in all of those previous aggravated robberies, including the ones done immediately after the escape, but before the Ashman's robbery, that there were no shots fired. Are you aware of that?
>
> A. Yes, I was.
>
> Q. Now, were any shots fired at that location?
>
> A. No, sir.
>
> Q. Were there any confrontations between employees, customers, and Mr. Rivas or anybody else who had a weapon?
>
> A. There was actually before we had gone in, somebody had driven up in a van while Rivas was in the process of taking care of the robbery or the employees and putting them in the back. And I just noticed they went into the store with them. And then, you know, later he called us in. When we went in another person showed up at the door and just out of the blue and he told him to go to the back. That was it.
>
> Q. All right. So there were some surprises during the course of the robbery, but they resolved in a manner where no one was shot and no one was hurt?

122

2425

A. Yes, sir.

Q. Was there any conversation among any of y'all in the planning of this Ashman's that if there was a serious confrontation, you were going to kill anybody?

A. No, sir.

Q. Had there been confrontations between Rivas and individuals and Newbury and individuals in the previous two robberies before the Ashman's?

A. There had been confrontations.

Q. Had those been resolved without firing a shot, the best you understood?

A. Yes, sir.

Q. What was Murphy's role in the Ashman's robbery?

A. He was basically a lookout to monitor the scanners and radios and watch the parking lot to see if there were any, you know, patrol cars patrolling through or anything like that.

Q. To the best of your knowledge, is that what he did?

A. To the best of my knowledge.

Q. To the best of your knowledge, did he shoot at anybody?

A. No, sir.

Q. Were you ever told that he was supposed to act as a sniper or get into a fire fight with anybody?

A. No, sir, not in front of my presence that was never discussed.

(RR 48, p. 46).

503. The Court finds that at the punishment phase of trial the State then argued in a manner contrary to *Tison* and *Enmund*. *See* Findings of Fact, Issue I &II.

504. The Court finds that after hearing the State's argument on Special issue number two, the jury sent out a note seeking a clarification of the operative term:

> We are in disagreement on the definitional difference between 'anticipated that a human life would be taken' and 'should have anticipated'
> We recall this from closing statement –definition of 'anticipate'.

(*See* Record Excerpts at G).

**Obligation to provide a definition**

505. The Court finds that whenever a reasonable likelihood exists that a juror will misunderstand a sentencing term, the court must instruct on the meaning of the term. "A trial judge's duty is to give instructions sufficient to explain the law, an obligation that exists independently of any question

123

from the jurors or any other indication of perplexity on their part." *Kelly v. South Carolina*, 534 U.S. 246, 256 (2002)

506. The Court finds that Texas state courts have a duty to narrow the vague term "anticipate" to bring the statute into constitutional compliance. *See Walton v. Arizona*, 497 U.S. 639 (1990).

507. The Court finds that the failure to define the term left the jury free to speculate on its meaning, rendering the term unconstitutionally vague and indefinite.

508. The Court finds that the Texas Court of Criminal Appeals has held that the term means a probability, not a possibility. Only this construction of the term renders it not vague and prevents the wanton assessment of the death penalty. *See Furman v. Georgia*, 408 U.S. at 310. *See also Maynard v. Cartwright*, 486 U.S. 356 (1988).

509. The Court finds that the jury does not know meaning the court ascribes to the word. It is never told.

510. The Court finds that the jury is able to know, without any explanation, that "anticipate" means probability – a definition necessary to make the term constitutional -- is ludicrous.

511. The Court finds that the term is not so common that a legion of case law was not necessary to define it. Yet the jurors, who obviously do not read that case law, somehow are presumed to know its meaning sufficiently to make imposition of capital punishment constitutional. Just how this occurs, the court does not explain. Nor can it.

**Harm**

512. The Court finds that in this case, the jury note supplies the necessary proof of confusion.

513. The Court finds that the factual situation in the case at bar, when viewed in combination with the jury notes, indicates that this was an issue that clearly should have been raised on appeal.

124

2427

514. The Court finds that the failure of appellate counsel to raise an appellate issue concerning the trial court's decision to define the term "anticipate" was ineffective assistance of counsel.

## Failure to Raise an Appellate Issue Concerning the Trial Court's Decision to Allow Evidence of the Escape of Other Inmates

515. The Court finds that during the trial the following occurred:

MR. KING:  Your Honor, if it please the Court, we have previously filed a motion in regard -- a Motion in Limine in regards to the State asking or eliciting testimony in regards to other assaultive conduct involving other individuals, other than Mr. Halprin.  I anticipate that Mr. Shook or Mr. D'Amore or Mr. Wirskye, whomever is going to take Mr. Woods, is going to inquire as to conduct of other inmates and specific instances of conduct of other inmates who have either been on death row or in administrative segregation or in general population.

We would object to that in that it's not relevant to this individual.  It doesn't go to any of the special issues involved and it is just extraneous material that has nothing to do with his conduct in prison, so we would object to the State being allowed to inquire or ask Mr. Woods that type of information.

I think it's going to be, have you heard of the case of so and so who did attack somebody or attacked a nurse or attacked a guard or whatever nature of that.  That wouldn't have anything to do with the defendant.  So it would be the bad acts of somebody completely removed from the circumstances.

We would note there's nothing to show that in the point in time what security conditions existed, what the constraints were on such an individual, and whether or not that's been modified or changed since then.

So we just submit that the prejudicial effect outweighs the probative value and it's not relevant to this defendant and we object.

MR. SHOOK:  Would you like a response, Your Honor?

THE COURT:  Yes, sir.

MR. SHOOK:  I believe you have heard the cross-examination questions with Mr. Woods, actually, and we obviously believe they are very probative.  They presented a picture here of a very secure area that Mr. Halprin will be serving time in.  And I believe it's obviously very relevant for the jury to hear that despite all these secure efforts, they have had many incidents in the past of violence of the rules and infractions.  And so I think it would be very relevant for the jury to hear in response to what they have elicited.

THE COURT:  Motion in Liming shall be denied.

MR. KING:  Note our exception.

125

2428

THE COURT: Noted.

MR. KING: May we have a running objection -- since the Court has heard this line of questioning before, may we have a running objection to it outside the presence of the jury, so we're not required to object to it inside the presence of the jury?

THE COURT: Yes, sir.

(RR 51, pp. 94-95).

516. The Court finds that Witness Woods never addressed the issue of escape, nor did he intimate that Halprin was not a flight risk. Instead, his testimony went exclusively to the difficult restrictions administrative segregation imposes on prisoners alone in a cell for twenty-three hours a day with recreation for one hour (RR 51, p. 62), food loaf (RR 51, p. 64), no good time (RR 51, p. 66), stacked sentences (RR 51, p. 67), no eligibility for parole for 40 years (RR 51, p. 69), no air conditioning (RR 51, p. 86), no privacy (RR 51, p. 88), no jobs (RR 51, p. 79). He also narrated a video of the prison, visually demonstrating to the jury the type of unit and cell Halprin would be incarcerated in. (RR 51, pp. 73-94).

517. The Court finds that the error was compounded by the states argument about these escapes:

> And he told you that, yes, the other inmates will respect Randy Halprin and the other Texas Seven because they did commit these types of acts. And he told you about administrative segregation. And even though they try to watch them all the time and they use all these precautions, they still have murders there, they still have assaults on staff, they still have weapons, and they still have escapes.
>
> He talked about one guy. His name was Robinson, that escaped once, had almost been successful several times, almost did it again a couple of weeks ago. They are watching that guy like a hawk all the time. And he's almost able to do it again and again.
>
> He's told you about one guy who conned his way out of administrative segregation and raped two nurses. They have 24 hours a day, 7 days a week, to watch for weaknesses.
>
> And we know about Randy Halprin's mind, what he thinks about serving time. He got that 30 years and he didn't want to serve it. He didn't think he deserved it and he wanted out. You heard his twisted logic on the stand, but

126

2429

he wanted out.

Now, if he can't do 30 years, can you imagine what he's going to do with a life sentence? Do you know that mind set has changed any? Because that's what is dangerous, his mind looking for opportunities. And when he sees one, he will take it. And that's when people get hurt.

(RR. 53, p. 134).

518.  The Court finds that the trial court erred in overruling Halprin's objection to this line of questioning of S.O. Woods.

519.  The Court finds that the State used this testimony to obtain an affirmative finding on Special Issue Number One (Future Dangerousness).

520.  The Court finds that while the risk of escape by others may have minimal probative value, the prejudicial effect to Halprin clearly preponderates.

    a.  The Court finds that Halprin demonstrated minimal planning skills and no leadership ability. Therefore, while he might join an escape as a follower, he was no independent risk of flight.

521.  The Court finds that punishing Halprin for the conduct of other inmates is as condemnable as the *Enmund* argument that Halprin be punished for his co-indictees' intent.

522.  The Court finds that the assessment of a death penalty necessarily requires a review of Halprin's individual circumstances.

523.  The Court finds that this evidence was highly prejudicial and impermissible under a proper anti-parties charge.

524.  The Court finds that this would have been a meritorious issue for appeal, and appellate counsel rendered ineffective assistance in not raising it.

**Failure to Raise an Appellate Issue Concerning the Trial Court's Admission of Treatises that Belonged to Co-indictees and Were not Tied to the Appellant.**

525.  The Court finds that at trial, the State moved to introduce a treatise found in the trash outside

127

2430

the RV where Halprin was arrested. The defense objected to the documents as follows:

THE COURT: Moving on to State Exhibit 342 and 344, which are two copies in different conditions, entitled "The Ten Commandments of Spec Wars". Now, for my benefit to be sure I'm correct, one of these was found in the trash outside the RV labeled on State 342-A. The one marked 344-A was found in the black bag on site No. 1 inside the RV in the rear bedroom. I also recall the defendants DNA was also found in the trash can outside the RV; is that correct?

MR. SHOOK: You know, Judge, I don't know if that was correct or not from what Dr. Sliter was saying. I think that might have been the motel room in Carrollton. I know the defendant was obviously there. He has testified he was in the RV for days on end, stayed there. So I don't think there's a question of his presence.

Our argument is he's put himself in the RV, that's found outside the RV and inside the RV, and obviously the relevance is obvious from the material, especially when we talk about the law of parties and what was going on after they -- during the escape and also after the escape.

THE COURT: Mr. King, your objections to these two exhibits?

MR. KING: Nothing to tie them to the defendant and not found in any bag that appeared to be marked with his color or anything else, Judge. Certainly finding something in the trash doesn't indicate any desire to keep something and so much that they can tie the defendant. There's no telling how long the document in the trash had been there or who threw it there or how it got there. These may have been documents that were at the location. This is Colorado and this is an area that is full of individuals who believe in certain unusual freedoms in that part of the country. They have a lot of --

THE COURT: Thank you, Mr. King, for your comments on Colorado. Nos. 342-A and 344-A shall be admitted.

(RR 49, pp. 12-13).

526. The Court finds that even though Halprin disavowed any knowledge of the document, it was

read to the jury:

MR. SHOOK: May I publish to the jury, Your Honor?

THE COURT: You may.

Q. (By Mr. Shook) "The Ten Commandments of Spec War, according to Richard Marcinko. I am the War Lord and the wrathful God of Combat and I will always lead you from the front, not the rear. I will teach you all alike-- just like shit. Thou shalt do nothing I will not do first, and thus will you be created Warriors in My deadly image. I shall punish they bodies because the more thou sweatest in training, the less thou bleedest in combat. Indeed, if

thou hurtest in thy efforts and thou suffer painful dings, then thou art Doing It Right. Thou hast not to like it--thou hast just to do it. Thou shalt Keep It Simple, Stupid. Thou shalt never assume. Verily, thou art not paid for thy methods, but for thy results, by which meaneth thou shalt kill thine enemy before he killeth you by any means possible (sic). Thou shalt, in thy Warrior's Mind and Soul, always remember My ultimate and final Commandment: There Are No Rules--thou Shalt Win at All cost."

(RR 46, pp. 16-17).

527. The Court finds that these statements were then argued to the jury as evidence of Halprin's intent:

Then you can look at the creed that was left that they found in the RV. They had one of these found inside the RV and another one in the trash. Of course, he didn't know anything about it. These are the men he hangs around with. They all had guns, loaded guns.

I won't go through it all, but, "Verily thou art not paid for thy methods, but for thy results, by which meaneth thou shalt kill thine enemy before he killeth you by any means available. Thou shall, in thy Warrior's Mind and Soul, always remember My ultimate and final Commandment; There Are No Rules -- thou Shalt Win at all Cost."

He tries to distance himself. I was a follower. I didn't want to be there. They had to have someone watch me. Don't buy it for a second, folks. He was in it all the way.

(RR 53, p. 133).

528. The Court finds that these statements were never shown to be adopted or endorsed by Halprin, but were still used to prove his homicidal intent. But the fact that these treatises were read by others does not show Halprin's mind set any more than a the Bible found in the RV proves that Halprin is Catholic and not Jewish.

529. The Court finds that the trial court erred in allowing admission of this evidence.

530. The Court finds that Halprin received ineffective assistance of counsel on appeal based on the failure of counsel to raise this issue.

**Appellate Counsel Failed to Raise on Appeal the Trial Court's Error in Prohibiting the**

129

2432

**Defense from Presenting to the Jury the Mitigation Facts the Defense Mitigation Expert Used to Support Her Opinion**

531. The Court finds that Applicant's appellate attorney's performance fell below an objective professional standard of reasonableness.

532. The Court finds that attorney George Ashford, who served as lead defense attorney for Applicant at trial, was subsequently appointed as Applicant's attorney for his direct appeal to the Texas Court of Criminal Appeals. The Court finds that Mr. Ashford obtained the assistance of attorney Michael Mohammed in preparing the brief on appeal submitted to the Court of Criminal Appeals in this case. The Court finds that Mr. Ashford delegated the writing and preparation of this Appellate Brief to Mr. Mohammed.

533. The Court finds that, although Mr. Mohammed actually wrote the appellate brief, that Mr. Ashford was the attorney appointed by the Court to represent Applicant on appeal and had a duty to ensure that Applicant received effective assistance of counsel on appeal.

534. Nevertheless, the Court finds that both Mr. Ashford and Mr. Mohammed rendered inadequate representation on appeal in their representation of Applicant.

**Mitigation Evidence Not Presented at Punishment Phase of Trial**

535. The trial court finds that, in preparation for the punishment phase of trial, the defense employed the services of Dr. Kelly Goodness, an experienced mitigation expert and clinical psychologist. Dr. Goodness conducted an extensive evaluation on "how Halprin has come to be before the Court." (RR 53, p. 19). Dr. Goodness interviewed Halprin as well as twelve of his relatives and friends. [Goodness Psychological Eval. at 3-4]. She also reviewed relevant medical, school, prison, and Child Protective Services documents. [*Id.* at 3; RR 52, pp. 97, 105, 111, 122-123].

130

2433

Based on these records and interviews, Dr. Goodness's investigation established that Halprin's natural parents physically and emotionally abused him.[4] [RR 52, pp. 99-102]. His natural father and his mother's subsequent boyfriends at various points beat him, threw him down stairs, and even pushed him out of windows.[5] [Goodness Psych. Eval. at 5; RR 52, pp. 99-102]. His father neglected him and eventually abandoned him.[6] [Goodness Psych. Eval. at 5; *see* RR 52, p. 101]. When CPS found him at the age of five, Halprin had two missing teeth, believed to have been knocked out, and a scar on his wrist. He hoarded food and ate until he was vomited.[7] [Goodness Psych. Eval. at 5; *see* RR 52, pp. 101]. He was also preoccupied with devils and ghosts and was so scared of teenage boys that he would cover his face when he came into contact with one. [Goodness Psych. Eval. at

---

[4]On September 8, 1981, CPS began an investigation based on a complaint made by Cindy Russell, in which she reported:

"House is "a wreck," children are pale, unhealthy–looking like [they] don't have proper diet. Wesley has round sores on face, about size of a quarter, puffy and scaby around edges–has had them about 2 wks., with no med[ical] treatment. Mo[ther] doesn't change baby's diapers; he lays in dirty diapers for hours. Fa[ther] is "mean" to Randy–he makes him sit & be absolutely silent whenever fa[ther] is around. [Father] sends Randy to bed but won't turn on bathroom light for him, so Randy uses the closet or his bed. When fa[ther] finds it, he "whips" Randy & rubs his nose in it. Randy's room smells "like a sewer." If Randy doesn't sit down fast enough, comp[lainant] has seen fa[ther] twist Randy's arm, and push him down on the floor. Fa[ther] once had split knuckle from hitting Randy on the head."
[Hrg. 8/20/2010, Ex. 2: CPS Rec. at 5687]. When CPS visited Halprin's home in July 1982, the case worker reported that the children were playing unsupervised. Halprin was covered "in what appeared to be mosquito bites" while his brother "had feces smears on his legs." The caseworker reported that Halprin's brother had been hit by a belt. [CPS Rec. At 5710-11].

[5]On October 9, 1981, Kim Whitfield called CPS because she observed the father "whip" Randy Jr. And then "slammed [his mother] against the wall" when she complained. [CPS Rec. at 5685; 5704]. On February 9, 1982, Mary Hammon an aunt, relayed, "she had observed the four-year-old boy [Randy] covered with bruises because of beatings." [CPS Rec. at 5685]. Three months later, Halprin's grandmother called CPS and reported Halprin had bruises on his backside. [CPS Rec. at 5707]. CPS removed Halprin's brother from the home after a doctor reported bruises on the child's thighs and backside. [CPS Rec. at 5710-11].

[6]Halprin's father abandoned him with a family in East Texas. The family reported that his father called him a bastard and stated he might leave him on the roadside. [CPS Rec. At 5745-49].

[7]The family that took Halprin in for six months reported that Halprin hoarded food and would eat until he vomited. After vomiting, he would immediately begin to eat again. [CPS Rec. at 5747-49].

131

2434

5-6]. According to Dr. Goodness, his early childhood abuse helps to explain the 'cycle of abuse' that led to the physical abuse Randy Halprin inflicted on the child victim of the injury to a child case for which he was originally incarcerated. [Goodness Psych. Eval. at 14-15]. Indeed, the assault mirrored the abuse he suffered as an infant. [Id.].

Halprin's parents abused drugs, drank alcohol, and smoked cigarettes,[8] thereby giving Halprin a genetic vulnerability to substance abuse. [Id.; RR 52, pp. 99]. His mother even indulged in these substances while pregnant with her son. [Goodness Psych. Eval. at 5; RR 52, pp. 99]. When Halprin was adopted at the age of six, he could not repeat the alphabet or count. He was diagnosed with a learning disability. [Goodness Psych. Eval. at 6]. He later developed a number of other psychological problems, including depression, ADHD, and an avoidant personality. [Goodness Psych. Eval. at 12; see RR 52, pp. 126-27]. His adoptive parents were unprepared to handle these issues and did not address his needs, thereby undermining his success in school and self-worth. [Goodness Psych. Eval. at 16; see RR 52, pp. 130-31].

At an early age, his adoptive parents expelled him from their home. [Goodness Psych. Eval. at 6]. In seventh grade, his parents sent him to boarding school in Kentucky where he excelled in his first year but his adoptive parents refused to allow him to come home and visit. [Goodness Psych. Eval. at 6-7; RR 52, pp. 112-13]. He felt rejected, began to smoke marijuana in ninth grade, and became increasingly depressed. [Goodness Psych. Eval. at 7; RR 52, pp. 113-14, 116]. He was suspended from school in 1995 after carving in a bench at school a note to his girlfriend which

---

[8]His mother told a CPS caseworker that she abused crystal methamphetamine and cocaine. [CPS Rec. at 5708]. Halprin's mother also that Halprin's father and Willingham, her boyfriend, abused drugs regularly in Halprin's presence, including crystal methamphetamine. [Amend. Habeas Pet., Ex. C: Lester Aff. at 5-6].

132

school authorities interpreted to be suicidal. [Goodness Psych. Eval. at 7; RR 52, p. 116]. His

adopted parents refused to permit Halprin to return home. [Goodness Psych. Eval. at 7; RR 52, p.

117]. He was homeless and lacked guidance. [Goodness Psych. Eval. at 7; RR 52, pp. 119-120].

Later, at the age of eighteen, he attempted to reconcile with his parents, but was met on the front

steps by the local police chief and denied entrance to the family home. [Goodness Psych. Eval. at

7; RR 52, p. 118]. He became heavily dependent on drugs and alcohol and moved into a homeless

shelter in Arlington. [RR 52, p. 119]. One night at the shelter, while high on acid, he snapped and

hit his girlfriend's child because the child would not stop crying. [Goodness Psych. Eval. at 7; RR

52, p. 120]. For this crime, he accepted a plea bargain of thirty years in prison. [Goodness Psych.

Eval. at 8]. No one visited Halprin while in prison. [Goodness Psych. Eval. at 17].  As a result,

Halprin had an unfulfilled need for absolute acceptance and unconditional love. [Goodness Psych.

Eval. at 17]. Halprin's need to belong and disconnection with the outside world left him vulnerable

to leadership figures, such as Rivas who could exploit Halprin's character as a weak follower.

[Goodness Psych. Eval. at 17].

The jury learned few of these facts that influenced Dr. Goodness's testimony. The trial judge

permitted Dr. Goodness to testify to her ultimate opinion but did not let her discuss the above

information that formed the basis of this opinion. In her affidavit, Dr. Goodness averred that her

detailed investigation, of Halprin's "entire background history, behavioral patterns, emotional

functioning, [and] character" was "imperative . . . to assist the triers of fact in understanding (to the

extent possible) how the defendant's background and psychological makeup contributed to the

choices that brought him before the court." [Goodness Aff. at 2]. In her opinion, a nexus existed

between "his life experiences and psychological makeup (mitigation) with his involvement in the

133

2436

offense at issue. [*Id.* at 3]. She stated that the jury should have learned of this nexus. She continued on to state:

> It is my professional opinion that Mr. Halprin had a significant array of potentially mitigating factors, many of which could be shown to have a nexus with his role in the offense charged. Thus, unlike many other capital death cases on which I have worked, Mr. Halprin actually had a viable mitigation defense that the jury could have used in considering the Special Issues and which may well have had a significant impact on their decision.

*Id.* at 3.

536. The Court finds that the trial judge who tried this case, who was a different judge than trial judge making these findings, sustained the state's objection to the defense mitigation expert being allowed to testify at the punishment phase as to the underlying basis of her opinions on mitigating factors concerning Applicant.

## Texas Rule of Evidence 705(d) and Counsel's Failure to Raise on Appeal

537. The Court finds that the trial court's ruling prohibiting the defense mitigation expert from testifying to the factual information underlying her opinions concerning mitigation evidence primarily involved an interpretation of Texas Rule of Evidence 705.

538. The Court finds that the question before the trial court when the state objected to the mitigation expert testifying as to the facts underlying her opinions was the application of Tex. R. Evid. 705(d), which states:

> "(d.) Balancing Test; Limiting Instructions.
> When the underlying facts or data would be inadmissible in evidence, the court shall exclude the underlying facts or data if the danger that they will be used as a purpose other than as explanation or support for the expert's opinion outweighs their value as explanation or support or are unfairly prejudicial."

## Failure to Raise on Appeal Was Objectively Unreasonable

134

2437

539. The Court finds that the defense counsel on appeal failed to raise the trial court's ruling on this issue as a ground on appeal.

560. The Court finds that the failure of appellate counsel to brief and argue on appeal that Dr. Goodness should have been permitted to present to the jury the underlying mitigating facts that she used to support her opinions under Texas Rules of Evidence 703 and 705 was objectively unreasonable under *Strickland v. Washington*, 466 U.S. 668 (1984). The Court finds that the appellate counsel's performance in not raising this issue on appeal fell below an objective standard of reasonableness because this was a non-frivolous issue that should have been raised on appeal. *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

The Court finds that this issue, which was not raised on appeal, was clearly stronger than those presented by counsel on appeal. *Smith*, 528 U.S. at 288 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986).

561. The Court finds that the testimony of George Ashford presented at a hearing in connection with this writ application supports a finding that appellate counsel rendered inadequate representation in failing to raise this issue on appeal. Mr. Ashford testified as follows concerning this:

> Q. Well, if you were right on the law that Judge Cunningham erred in not letting Kelly Goodness present the data and the facts supporting her mitigation conclusions, if you were right that the Judge erred in excluding that, then that would have been a good appellate issue, don't you think?
> A. Absolutely.
> Q. Mitigation being one of the hot topics that both the state and federal courts look at in evaluating death penalty review?
> A. Absolutely.
> Q. And so as you sit here there's no strategic reason why that was left out?
> A. No.
>
> . . .
> Q. [D]id you ever have an opportunity as lead counsel to sit down with [Attorney Muhammed] and say, "This issue on the Judge's mitigation ruling really needs to be

135

2438

in the brief?"

A. I know I discussed with him the fact that in a capital murder case mitigation evidence should be admitted even if sometimes the Rules of Evidence have to be scurried. I had read that and researched that and told him that was *a primary issue for our appeal.*

[Writ Hearing, Aug. 20, 2010, Vol. 2, 39-41 (emphasis added)].

Despite being a "primary issue for our appeal," appellate counsel did not raise this issue on appeal. When asked why he did not raise this issue on appeal, Mr. Ashford responded, "I think [Attorney Muhammed] got forced to file a brief before he was fully prepared to submit the brief as to all of the issues that he would have liked to raise." [Writ Hearing, Aug. 20, 2010, Vol. 2, at 39].[9] In essence, appellate counsel testified he ran out of time to address the issue in his appellate brief. Appellate counsel had five and a half months to file his appeal.

562. The Court also finds that co-counsel Michael Mohammed answers to interrogatories submitted do not provide any legitimate basis for counsel to not raise this issue on appeal. Mr. Mohammed's claim that he raised the best issues available on appeal is contradicted by Mr. Ashford's testimony and is objectively unreasonable and factually incorrect.

563. The Court finds that the reason this issue was not raised on appeal has nothing to do with strategy. Rather, it was not raised because appellate counsel failed to complete the brief in the time allotted by the Court of Criminal Appeals and, therefore, did not raise all of the available issues.

564. The Court finds that an evaluation of ineffective assistance of counsel involves two prongs.

---

[9] Appellate counsel further testified:

Now, once he started working on the brief he started at the beginning. He started with the jury selection and he raised all of the issues that he thought he could raise as to the jury selection. And then he kept getting notices from the Court of Criminal Appeals to submit the brief before he was ready to submit the brief. He submitted the issues that he had prepared. He tried to get an extension of time to submit additional issues. He tried to supplement the brief with additional issues and he was denied at the Court of Criminal Appeals.

[Writ Hearing, Aug. 20, 2010, Vol. 2, at 38-39].

136

2439

The first prong, whether counsel's performance fell below an objective professional standard of reasonableness, is clearly met by the failure of appellate counsel to raise this issue on appeal.

566. The Court finds that the second prong of the ineffective assistance of counsel test is whether there is prejudice from this deficient performance by counsel. In the context of ineffective assistance on appeal, a defendant suffers prejudice if there was a "reasonable probability that, but for his counsel's deficient performance, he would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). A reasonable probability "is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Ouber v. Guarino*, 293 F.3d 19, 25 (1st Cir. 2002) (defendant must show that "his attorney's parlous conduct may have altered the outcome of the case.").

567. The Court believes that a conclusion as to whether this issue may have affected the outcome of the case involves a determination as to the strength of the issue before the Court of Criminal Appeals. Since the ultimate ruling on this writ application is to be made by the Court of Criminal Appeals, this Court believes that it would not be appropriate for it to predict how the Court of Criminal Appeals will rule on this issue if raised on direct appeal. Therefore, the Court, having found that the first prong of *Strickland* is met and that appellate counsel performed in a deficient and unprofessional manner in failing to raise this issue on appeal, declines to make any findings or recommendation on the prejudice prong of the *Strickland* test.

568. While not making any specific findings or recommendations on the prejudice prong of *Strickland*, the Court does find that this is a non-frivolous issue that should have been raised on appeal.

137

2440

## Nonfrivolous Issue that Should Have Been Raised on Appeal

569. The reasons that the Court finds this to be a non-frivolous issue that should have been raised on appeal are:

1. Dr. Goodness was qualified as an expert witness.
2. Under Rule 703, Texas Rule of Evidence, an expert witness may base an opinion on facts or data that are not admissible in evidence, provided that the inadmissible facts or data are of a type reasonably relied upon by experts in the particular field. *Morris v. State*, 123 S.W.3d 425, 428 (Tex. App. - San Antonio 2003, pet. ref'd). "Under this rule an expert may base an opinion solely on inadmissible hearsay." *Wood v. State*, 299 S.W.3d 200, 212 (Tex. App. - Austin 2009); *Martinez v. State*, 22 S.W.3d 504, 508 (Tex. Crim. App. 2000); 2 Steven Goode Et. Al., Texas Practice: Guide to the Texas Rules of Evidence §703.3 (3d ed. 2002 and Supp. 2009).

570. The records received by Dr. Goodness and the interviews she conducted constitute the type of information normally relied upon by an expert in the field of forensic psychology. *See, Joiner v. State*, 825 S.W.2d 701, 708 (Tex. Crim. App. 1992); *In Re E.C.L.*, 278 S.W.3d 510, 520 (Tex. App. - Houston [14th Dist.] 2009, pet. denied) (finding psychologists testimony reliable where expert reviewed police records, CPS records, school records, and medical records).

571. Under Texas Rule of Evidence 705, an expert witness may generally disclose on direct examination the facts or data underlying her opinion, even if they constitute hearsay. Tex. R. Evid. 705 (a); *see Kramer v. Lewisville Memorial Hosp.*, 831 S.W.2d 46, 49 (Tex. App. -- Fort Worth 1992, writ granted), *aff'd by*, 858 S.W.2d 397 (Tex. 1993), *abrogated on other grounds*, 979 S.W.2d 616 (Tex. 1998) ("While such supporting evidence is not automatically admissible because it is supporting data to an expert's opinion, neither is it automatically excludable simply because it is hearsay.").

572. There is a presumption in favor of the disclosure of underlying facts and data. John F. Sutton, Jr., Art. VII: Opinions and Expert Testimony, 30 Houston L. Rev. 797, 884 (1993) (stating that "both

138

2441

the direct examiner and cross-examiner normally have complete discretion in explaining the factual basis for the expert's opinion, when they so desire.").

573. Rule 705 does not contemplate that facts and data underlying an opinion should be excluded just because they constitute hearsay. This belief is reflected in Texas case law. For example, in *Love v. State,* 909 S.W.2d 930 (Tex. App.–El Paso 1995), the Court of Appeals upheld the trial court's finding that a doctor could testify to specific hearsay statements made by the defendant's three sisters to explain how he arrived at a diagnosis of antisocial personality disorder. *Id.* at 948-49; *Austin v. State*, 222 S.W.3d 801, 812 (Tex. App.–Houston [14th Dist.] 2007) (affirming admission of summary of interview with defendant's husband's father by a psychologist was admissible because it showed the basis of the expert's opinion even though it constituted hearsay); *cf. Stam v. Mack*, 984 S.W.2d 747, 750-51 (Tex. App.–Texarkana 1999) (stating that evidence of opinion of non-testifying radiologist admissible during the testimony of a testifying expert in medical malpractice case over hearsay objection, as matter upon which doctor's expert based his opinion).

574. A trial judge must conduct a Rule 705(d) balancing test, preferably on the record, before excluding the facts and data underlying an expert's opinion. Failure to find specifically that these facts and data are "unfairly prejudicial" or that the danger "they will be used for a purpose other than as explanation or support outweighs their value as explanation or support" is error. *See* TEX. R. EVID. 705(d); *Walck v. State*, 943 S.W.2d 544, 545 (Tex. App.–Eastland 1997, pet. ref'd) ("Because the testimony was inadmissible for any purpose other than to explain or support [the expert's] opinion, Rule 705(d) mandated that the trial court perform the balancing test provided for in the rule."). *See* TEX. R. EVID. 703. Indeed, Rule 705(d) begins with this premise. TEX. R. EVID. 705(d) ("When the underlying facts or data would be inadmissible in evidence, the court shall exclude the

139

2442

underlying facts or data if . . .").  Therefore, based upon the plain language, the State cannot argue

that the prejudice it will suffer is that it cannot cross-examine the witnesses who Dr. Goodness

interviewed.  *See In re Commitment of Yaw*, No. 09-08-042 CV, 2008 WL 5096511, *1-2 (Tex.

App.–Beaumont, Dec. 4, 2008) (unpublished) (rejecting implicitly that expert cannot read passages

from police and prison records to jury because these records constitute hearsay).  In any event, the

State interviewed all of the witnesses that Dr. Goodness spoke to and reviewed all of the underlying

records.  The State could have impeached the information she provided if it varied from their

discovery.  There were no surprises.  Further, the evidence was not "unfairly prejudicial" and would

not have been used for an improper purpose as argued below.

575.  The facts underlying Dr. Goodness's opinion were inadmissible only if they were "unfairly

prejudicial" or that "there is a danger of the jury using them for an improper purpose.  Evidence is

unfairly prejudicial if it is not directly related to the issue to be decided and is so inflammatory that

it will cause the jury to render a verdict on an improper basis.  *State v. Resendiz*, 112 S.W.3d 541,

544-45 (Tex. Crim. App. 2003) (holding photographs of six other brutal murders perpetrated by

defendant that expert offered to show defendant insane unfairly prejudicial because they did not

answer whether defendant insane at the time he committed this murder and would distract the jury

from the facts of the crime).  Evidence is improper if it will be used as substantive evidence rather

than as an explanation or support for the expert's opinion.  *See Valle v. State*, 109 S.W.3d 500, 505-

06 (Tex. Crim App. 2003).  It is doubtful whether the record shows a possibility of an improper use

of this evidence.

576.  This case is similar to *Love*, in which the trial court permitted the expert to repeat information

provided by the appellant's family as the basis for his opinion that the defendant suffered from

antisocial personality disorder. *Love*, 909 S.W.2d at 948. It also resembles *In re Commitment of Tolleson*, No. 09-08-00338-CV, 2009 WL 1474730 (Tex. App.–Amarillo, May 23, 2009) (not designated for publication) and *Austin*, 222 S.W.2d at 812. In *Tolleson*, an appellate court held that "the trial court acted within its discretion in concluding that the underlying facts and data [presented by an expert witness] were not unfairly prejudicial and that the danger of improper use did not outweigh the value of the facts or data as explanation or support for the expert's opinion." *Id.* at *5. These facts included details about the defendant's prior sexual convictions, juvenile convictions, disciplinary history, and mental well being. *Id.* at *4. These facts were based upon an interviews with Tolleson, psychological tests, medical, court, and prison records. *Id.* at *2. Similarly, in *Austin*, an appellate court affirmed the admission of an expert psychologist's summary of an interview with the defendant's husband's father. This summary showed the basis of the expert's opinion that the defendant suffered from Munchausen Proxy Syndrome. *Austin*, 222 S.W.2d at 812. The expert testified that the defendant lied repetitively, would try to draw attention to herself, and made her child sick to further attract attention – all signs of Munchausen Proxy Syndrome. *Id.* In upholding the admission of these facts, the appellate court stated that "disclosing this information assisted the jury in evaluating the weight to give the [psychologist's] opinions. *Id.* (citing *Ramirez*, 815 S.W.2d at 651). The court rejected the idea that these statements were too prejudicial or that their risk did not outweigh their value as explanation and support for the psychologist's opinion.

577.       The trial court has a constitutional duty to allow the defendant to present mitigation evidence at the punishment phase of a capital case. *Williams v. Taylor*, 529 U.S. 362, 393 (2000). The importance of mitigating evidence stems from "the unique and irreversible penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 287 (1976) (plurality opinion). In *Woodson*, the Court

141

2444

reasoned:

> In capital cases, the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensible part of the process of inflicting the penalty of death.
>
> This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Id.* at 304-05 (citations and quotations omitted).

To the extent that the trial court has discretion in the admission or exclusion of mitigating evidence, precedent weighs heavily in favor of admission. In *Barefoot v. Estelle*, 463 U.S. 880 (1983), the Supreme Court opined that "[t]he rules of evidence generally extant at the federal and state levels anticipate that relevant, unprivileged evidence should be admitted and its weight left to the fact finder, who would have the benefit of cross examination and contrary evidence by the opposing party." *Barefoot*, 463 U.S. at 898; *United States v. Jones*, 132 F.3d 232, 242 (5th Cir. 1998), *aff'd by*, 527 U.S. 373 (1999) ("The Court has recognized that the defendant must be given the opportunity to introduce information regarding mitigating factors, without traditional evidentiary restraints, in order to provide the jury with the fullest possible information about the defendant."). Indeed, in *Green v. Georgia*, 442 U.S. 95 (1979) (per curiam), the Supreme Court held that exclusion of proffered testimony at the sentencing phase under the state hearsay rule violated due process because testimony went to a critical issue and substantial reasons existed to assume its reliability. *Id.* Similarly, in *Wiggins v. Smith*, 539 U.S. 510 (2003), the Court agreed that trial courts should exercise their discretion to admit "any relevant and reliable mitigating evidence, including hearsay

142

2445

evidence that might not be admissible in the guilt-or-innocence phase of the trial." *Id.* at 536-37;

*Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) (rejecting explicitly the argument that the need

for mitigation evidence may be trumped by state rules of evidence).

578.  As a result of this exclusion of evidence, the jury did not have the opportunity to learn the

following critical information: (1) Halprin's assault on a child reflected the physical abuse he

suffered as a child; (2) he was emotionally and physically abused as a child; (3) he had a genetic

vulnerability for mental disorders and substance abuse; (4) he suffered from a number of

psychological disorders as well as untreated depression, and drug abuse; (5) he had an unfulfilled

need for absolute acceptance and unconditional love; (6) there was a complete absence of guidance

in his life, and he had a strong unfulfilled need to belong. [*See generally* Goodness Psych. Eval.].

579.  Had Halprin been able to present a full mitigation defense with all of these details, there is a

strong possibility that a jury would have not rendered a death sentence. *See Neal v. Pucket*, 286 F.3d

230, 244 (5th Cir. 2002), *cert. denied*, 537 U.S. 1104 (2003) (stating "we must assign significant

weight to the quality of additional mitigating evidence" in determining if "there is a reasonable

probability that a jury would not have been able to agree unanimously to impose the death penalty

if this additional evidence had been effectively presented and explained to the jury).

**Conclusion**

580.  The Court finds that appellate counsel acted deficiently under *Strickland v. Washington* and

in violation of the U. S. Const., amends. VI and XIV in not raising on appeal an issue concerning

the trial court's exclusion from evidence the facts and data used by Dr. Goodness in reaching her

conclusions concerning mitigating factors in this death penalty case. The Court makes no specific

143

2446

finding or recommendation as to whether there is a probability that the Court of Criminal Appeals would have reached a different conclusion on the direct appeal of the case had this issue been raised.

**Appellate Counsel Presented an Inadequate Argument in Support of the Claim that the Trial Court Erred in Denying Admissibility of Def. Ex. 39, the Ranking Document**

**Background**

581. The Court finds that during the investigation of the escape of the Texas Seven, Sergeant Investigator Hank Whitman of the Texas Department of Public Safety Special Crimes Division created a document entitled, "Ranking of Offenders by Leadership/Personality Characteristics." [Def. Ex. 39.

582. The Court finds that Whitman created this document based upon interviews with civilian witnesses, correctional officers, and several inmates who worked closely with the escapees. [Whitman Aff.].

583. The Court finds that the document states that based upon this investigation, "it was the unanimous decision that RIVAS was the leader and the weakest was determined to be HALPRIN." [Def. Ex. 39]. Specifically the document stated Halprin was "quiet and never exhibited leadership qualities. Was consistently worried about whether his work was acceptable to the civilian workers. Very submissive character. This worrisome attitude was seen to escalate a month before the escape. One civilian worker speculated whether HALPRIN was undergoing some type of depression." [Def. Ex. 39]. This document was stored in the files of the Texas Department of Criminal Justice–Inspector General. [*See* Cert. Rec. TDCJ–Off. Insp. Gen.].

584. The Court finds that the jury never had the opportunity to view this document.

585. The Court finds that defense counsel attempted to introduce the document at trial but the State

144

2447

objected to its admission as hearsay. [RR 53, pp. 13-16]. The State argued that defense counsel had not established the author of the document. Further, the State disclaimed knowledge of who prepared it, or why it was prepared despite having provided defense counsel with the document during discovery.

586. The Court finds that the trial court excluded the document at trial.

587. The Court finds that on appeal defense counsel argued that the trial court abused its discretion by not admitting the ranking document into evidence.

588. The Court finds that counsel, however, failed to contradict the State's argument that the exclusion of this evidence from the jury's consideration was harmless error.

589. The Court finds that Halprin's appellate counsel failed to file a reply brief addressing the State's argument of harmless error.

## Ineffective Assistance of Counsel Standard

590. The Court finds that to establish ineffective assistance of counsel, petitioner must demonstrate that: (1) counsel's performance fell below an objectively reasonable standard of performance; and (2) this deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

591. The Court finds that in determining whether the applicant suffered prejudice as a result of counsel's deficient performance, the applicant need only demonstrate that a reasonable probability exists that, but for counsel's failures, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

145

2448

**Appellate Counsel's Failure to Contest State's Assertion that Exclusion of Exhibit 39 Was Harmless Error Fell Below an Objective Standard of Reasonableness**

592. The Court finds counsel, however, failed to contradict the State's argument that the exclusion of this evidence from the jury's consideration was harmless error.

593. The Court finds that without a response from appellate counsel, the Court of Criminal Appeals adopted the State's argument that the exclusion of Exhibit 39 was harmless.

594. The Court notes that courts have found that failure to file a reply brief, particularly in a capital case, can constitute deficient performance. In *Baldwin v. Johnson*, 2006 WL 2468779, *5 (M.D.Miss. 2006), the court found that "counsel's performance on direct appeal was deficient for failing to file a reply brief," reasoning that while "there is no requirement for the appellant to file a reply brief under state law, . . . counsel appealing a capital conviction would be prudent to file a reply brief." *Id.*; *Daniels v. Henry*, 2007 WL 424441, *36 (N.D. Cal. 2007) (holding counsel's representation deficient where counsel failed to respond in reply brief to State's arguments among other deficiencies).

595. The Court finds appellate counsel's failure to file a reply brief is particularly egregious here, because counsel believed that the exclusion of the ranking document was the most meritorious issue for direct appeal to the Court of Criminal Appeals.

596. The Court finds that when asked if the exclusion of Exhibit 39 "was basically the most important issue on the direct appeal," appellate counsel responded "I believe it was, yes." [Hrg. Transcr. Aug. 20, 2010 at 154].

597. The Court finds, therefore, it was an unreasonable for counsel to not fully develop this argument. *See Smith v. Robbins*, 528 U.S. 259 (2000) (noting that counsel has an obligation to raise

146

2449

and argue determinative issues); *Jones v. Barnes*, 463 U.S. 745, 751-53 (1983).

### Defendant Suffered Prejudice from Appellate Counsel's Inadequate Argument Concerning Exhibit 39

598. The Court finds that the defendant would have prevailed at the Court of Criminal Appeals had he argued that exclusion of Exhibit 39 was not harmless error.

599. The Court finds that Exhibit 39 was the single most important piece of evidence that explained Halprin's minor role in the escape and crime spree engaged in by the Texas Seven as perceived by law enforcement. Exhibit 39, prepared by State law enforcement agents in the course of their investigation, demonstrated that Halprin was the least dangerous of the seven and highly submissive.

600. The Court finds that had appellate counsel properly briefed the issue on original submission or on rehearing, a substantial probability exists that the Court would have found harm.

601. The Court finds that the Court of Criminal Appeals cited the disparate testimony of three witnesses from the guilt/innocence phase of the trial, including Halprin's own testimony. Two of these three witnesses, Patrick Moczygemba and Mark Burgess, were civilian prison officials who worked in the maintenance department of the Connally Unit and testified for the State. Moczygemba testified that Halprin's intelligence was "at the very bottom" of the Texas Seven and that Halprin was "dumb as a box of rocks." [RR 49, p. 111, 115]. Similarly, Burgess stated that Halprin was not "a leader type." [RR 49, p. 195].

602. The Court finds that these were brief, unrelated statements made by two of the State's numerous witnesses during the guilt/innocence phase of the trial, not the penalty phase of the trial.

603. The Court finds that the testimony of these three witnesses could not possibly have had the same impact as Exhibit 39, the "Ranking of Offenders by Leadership/Personality Characteristics."

147

2450

604. The Court finds that this document was the result of information culled from prison records as well as interviews with over twenty different persons, ranging from the sheriff of Karnes County, to prison administrators, to correction officers, to inmates, to civilian officers who oversaw the escapees' daily work. [*See* Ex. 39]. In other words, it was an amalgam or synthesis of everything that the prison system knew about Halprin: Halprin was the least dangerous of the seven escapees and was very submissive. The document, by its very creation, carried the approval of the prison system itself. As such, it was much more powerful than the testimony of three witnesses who said little more than Halprin did not possess leadership qualities during the guilt/innocent phase of the trial and not the punishment stage.

605. The Court finds that the admission of Exhibit 39 would have been the most effective means to demonstrate that law enforcement considered Halprin's role to be in the escape and his personality characteristics compared to the other escapees.

606. The Court finds that Exhibit 39 also contradicts the prosecution's assertions that Halprin was the "baddest of the bad" and that there was no evidence that sufficiently mitigated against his role in the crime. [RR 53, p. 77, 85]. Further, the document undercuts the prosecution's theory that Halprin was one of the leaders of the escapees and played a pivotal role in the escape–which law enforcement clearly did not believe. [RR 49, p. 6]; [RR 48, p. 106, 108, 124, 135].

607. The Court finds that Exhibit 39, undermined the State's theory of the punishment phase of the trial – that Halprin's character, background, lack of moral culpability, and crimes required the death penalty and that no mitigating evidence existed. [*See, e.g.* RR 53, p. 77 ("What could possibly be sufficiently mitigating? . . . [W]e told you [in opening arguments] that after you reviewed the evidence in the case and the testimony, that it was our position . . . that that would be no."); p. 84-85

148

2451

("His mean evil streak back in August of '96 hasn't ended. It's continued on").

608. The Court finds that Exhibit 39 was a statement by law enforcement that Halprin was a follower, "with a very submissive characteristic" who "worried about whether his work was acceptable to the civilian workers" and was "the weakest" of the escapees. [Def. Ex. 39].

609. The Court finds that Exhibit 39 was the strongest piece of mitigation evidence that could have been presented at trial.

610. The Court finds that the exclusion of this evidence was inordinately harmful to Halprin. This evidence could have caused the jury, a jury that took over six hours to deliberate at the punishment phase, to choose life imprisonment instead of the death penalty.

611. The Court finds that criminal law experts have submitted affidavits to this effect.

    a. In his affidavit, Bobby D. Mims, a criminal defense attorney who has defended thirty capital murder cases, opined:
the information in [Exhibit 39] is mitigating evidence of a quality and quantity that is significantly stronger and more important than that referenced in the opinion of the CCA. The evidence from the TDCJ civilian employees that Halprin was at the low end of intelligence of the group and was not a leader type is significantly less helpful than the ranking document. The ranking document appears . . . to be very persuasive mitigating evidence which at least one juror would probably find to be such a circumstance as would lessen Halprins moral blamworthiness.
[Mims Aff.].

    b. Robert Morrow, a criminal defense attorney who has tried more than twenty capital cases and represented many more capital clients on appeal, asserted that as a defense attorney:
you never give up trying to reach a juror and you never can predict what piece of evidence will do that. Defense exhibit 39 could have been that piece of evidence which convinced a juror that Applicant, because of his role and overall limitations, did not deserve the death penalty. There was nothing cumulative about it.
[Morrow Aff.]. R

    c. Robin Conley, an anthropologist who is completing her dissertation at UCLA focusing on how jurors make decisions during the penalty phase of death penalty trials, echoed these assertions. In her affidavit, she averred that jurors have told her

149

2452

that if the defense can "reduce the defendant's responsibility for the crime somehow, they would consider this [evidence, like Exhibit 39, more than any other] sufficiently mitigating." [Conley Aff.]. For example, when Conley asked if there were was hypothetical evidence that would have been mitigating, one juror responded "if you found out that [the co-defendant] was the mastermind and led [the defendant] through the whole thing. . . . God if that comes out it's gonna make it fun to sleep at night." [*Id.*]. Therefore, Conley maintains that Exhibit 39 "would have potentially been an important piece of mitigating evidence." [*Id.*].

612. The Court finds that at the hearing held on August 20, 2010 Halprin's counsel testified that their strategy during the punishment stage of trial was to demonstrate that Halprin was a follower, with no leadership qualities whose role in the crime did not justify a sentence of death. Counsel also agreed that Exhibit 39 would have been important mitigation evidence. [Hrg. Transcr. Aug. 20, 2010 at 254]. The following exchange occurred:

> Q. [I]s it a fair statement that your defense is basically what is from a mitigation standpoint for the death penalty question is basically what was summarized in the ranking document.
> A. Yes, that was part of it.
> Q. What I mean by that is the argument you were trying to make are the same things that the ranking document says?
> A. Yes.
> . . .
> Q. And so as the trial attorney do you feel like having a law enforcement officer testify in support of the facts you were presenting as far as mitigation of punishment would have been a significant factor for the jury.
> A. I think so.
> [Hrg. Transcr. Aug. 20, 2010 at 169-170].

**Conclusion**

613. The Court finds that appellate counsel was deficient for failing to argue that the exclusion of Exhibit 39 was not harmless.

614. The Court finds that the harm to Halprin's ability to present a mitigation case in opposition to the death penalty was significant and severe. Halprin suffered prejudice.

150

2453

615. The Court finds that Halprin received ineffective assistance of counsel.

## Failure to Allege that Evidence of Anticipation Was Insufficient to Sustain an Affirmative Finding on Special Issue Number Two and Did Not Satisfy the Eight Amendment Requirements of *Enmund v. Florida* – Legal Sufficiency

616. The Court finds that to evaluate a legal sufficiency challenge, the appellate court should view the evidence in the light most favorable to the verdict and decide whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Wilson v. State,* 7 S.W. 3d 136, 141 (Tex. Crim. App. 1999)(citing *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)).

617. The Court finds that appellate counsel abandoned the customary practice of challenging the legal sufficiency of the evidence in a capital case.

618. The Court finds that prejudice is manifest as the court of criminal appeals refuses to review the sufficiency of the evidence in a post-conviction writ. *Ex Parte Grimsby,* 137 S.W.3d 673, 674 (Tex. Crim. App. 2004).

619. The Court finds that because the claim is barred for state review, it is likewise barred for federal review. *Haley v. Cockrell,* 306 F.3d 257, 264 (5th Cir. 2002).

620. The Court finds that, therefore, appellate counsel has foreclosed review under the more favorable standards for legal insufficiency set out above, leaving Halprin to seek relief under the much more strict "actual innocence" standard announced in *Murray v. Carrier,* 477 U.S. 478 (1986).

621. The Court finds in other words, any sufficiency claim now raised allows the State to put on additional evidence, something not possible on appeal. It is impossible to deny the prejudice inherent in this claim.

151

622. The Court finds that appellate counsel was ineffective on appeal for failing to challenge legal sufficiency.

## GROUND FOR RELIEF VII & VIII: STATE'S ARGUMENT CO-INDICTEE RODRIGUEZ WAS NOT A SHOOTER

Ground for Relief VII states:

> The State's argument that co-indictee Rodriguez was not a shooter was objectively untrue and cast the evidence of Halprin's guilt in a false light and violated his Due Process right to a fair trial under the United States and Texas Constitutions.

Ground for Relief VIII states:

> The State's argument that co-indictee Rodriguez was not a shooter knowingly created a false impression, or allowed a false impression to remain uncorrected thereby violating the Fifth and Fourteenth Amendments to the United States Constitution and Article 1, Section 19 of the Texas Constitution.

623. The Court notes that in *Mooney v. Holohan,* 294 U.S. 103, 112 (1935), the Supreme Court held that the knowing use of false testimony by the prosecution violates a defendant's right to due process. *Id.* at 112. The Supreme Court has held that a prosecutor also has a constitutional obligation to correct his witness's perjured testimony, even if he did not know that the witness was going to lie. *Giglio v. United States,* 405 U.S. 150 (1972).

624. The Court notes that the principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence. *Napue v. People of State of Illinios,* 360 U.S. 264, 269 (1959).

625. The Court finds that a petitioner is entitled to relief if: (1) the testimony was false; (2) the State

152

2455

knew the testimony was false; and (3) "there is any reasonable likelihood that the false testimony could have affected the jury's verdict." Napue, 360 U.S. at 269-72; *United States v. Bagley*, 473 U.S. 667, 679 (1985). The *Napue* materiality standard is more favorable to a petitioner than *Brady*.

626. The Court notes that it is well settled that the State is not free to use contradictory theories of prosecution to obtain convictions against co-indictees. *Thompson v. Calderon*, 120 F.3d 1045, 1048 (9th Cir. 1997); Smith v. Groose, 205 F.3d 1045 1051 (8th Cir. 2000) (noting the "State's use of factually contradictory theories constituted 'foul blows'" and "deprived [the defendant] of due process and rendered his trial fundamentally unfair.").

627. The Court notes that several circuits have found or implied that the use of inconsistent, irreconcilable theories to secure convictions against more than one defendant in prosecutions for the same crime violates the due process clause. *See, e.g., Smith v. Groose*, 205 F.3d 1045 (8th Cir. 2000). In *Thompson*, the prosecutor argued at one trial that, based on jailhouse informant testimony, one defendant committed a rape and murder. At a second trial, the prosecutor used different jailhouse informants to argue that the second defendant had the motive and disposition to commit the crimes. A plurality, specifically excluding situations in which new evidence comes to light, found that a prosecutor cannot use inconsistent theories of the same crime to secure multiple convictions. 120 F.3d at 1059.

628. The Court finds that the State intentionally led the jury to believe that Rodriguez did not shoot when the State well-knew, from the trial of Michael Rodriguez, that he had admitted to shooting at the officer.

> Q.  Michael Rodriguez didn't admit to doing any shooting?
> A.  No, he didn't.
> (RR 42, p. 103).

153

2456

629. The Court finds that the prosecutor's final argument perpetuated the deception that Rodriguez did not shoot Officer Hawkins. The prosecutor argued:      "Now, we know it's not Michael Rodriguez [who shot Hawkins], because everyone seems to agree that Michael Rodriguez dropped this gun and it was only fired once, and that bullet went right in behind the speedometer. He obviously wanted to kill Officer Hawkins. And he dropped the gun." (RR 50, p. 60.

630. The Court finds that the State's presentation that Rodriguez did not shoot Officer Hawkins violated due process for knowingly presenting testimony in a false light to the jury.

631.    The Court also finds that the State's presentation that Rodriguez did not shoot Officer Hawkins is likewise a due process violation for pursuing contradictory theories during the trial of co-indictees.

632. The Court finds that the effect of these two due process violations was the same–the State struck a foul blow by hiding the truth from the jury in a blatant attempt to bolster its case against Halprin with tainted testimony.

633. These two errors are so egregious, that the mere possibility that the testimony contributed to the conviction requires a new trial, and the State must prove beyond a reasonable doubt that it does not.

### GROUND FOR RELIEF IX & X: "FAIR CROSS SECTION" REQUIREMENT OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION, ARTICLE I, §§ 10 AND 19 OF TEXAS CONSTITUTION

Ground for Relief IX states:

The State denied Halprin the right to an impartial jury selected from a fair cross-section of the community and equal protection under the law in violation of the Sixth and Fourteen Amendments of the United States Constitution because the venire from which the jury was chosen did not adequately

154

represent the Hispanic population of Dallas County.

Ground for Relief X states:

> "The State denied Applicant the right to an impartial jury selected from a fair cross-section of the community and to due course of law under Article I, Sections 10 and 19, of the Texas Constitution because the venire from which the jury was chosen did not adequately represent the Hispanic population of Dallas County."

634.   The Court notes that the Sixth Amendment affords the defendant in a criminal trial the opportunity to have the jury drawn from venires representative of the community[.]" *Taylor v. Louisiana*, 419 U.S. 522, 537 (1975). The Supreme Court fashioned a three part test in *Duren v. Missouri*, 439 U.S. 357, 364 (1979): 1) group alleged to be excluded is a distinctive group; (2) that representation is not fair and reasonable in relation to the numbers in the community; 3) under-representation is due to systemic exclusion of the group in the jury-selection process. *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

**Facts**

635.   The Court notes that *Halprin* takes his argument from the brief of Michael Rodriguez. Applicant Rodriguez procured the services of Edward T. Rincon, Ph.D., the President of Market Research and Demography, to perform a statistical analysis of the venire members. A true and correct copy of the Dr. Rincon's "Statistical Analysis of Hispanic Representation in Jury Summons Pool" is attached to Rodriguez's brief as Appendix No.5.

636.   The Court finds that Dr. Rincon has calculated the percentage of Hispanics among the jurors in Applicant's venire, giving every conceivable benefit of the doubt to overstating their ultimate number. U

637.   The Court finds that using data from the 2000 census (which likely understated the population

155

2458

of voting-age Hispanics for Dallas County as of December of 2001), Dr. Rincon found that Hispanics made up 26.4 % of the adult population in Dallas County. (Appendix No.5, Table 1, p. 2). According to the census data, 14.1 % of Dallas County consists of Hispanic adults who are also United States citizens. (Appendix No.5, Table 1, p. 2).

638. The Court finds that even by Dr. Rincon's most generous estimates (resolving all possible doubt in favor" of over-inclusion of Hispanic individuals), the proportion of Applicant's venire that was Hispanic was only 12.2 %. (Appendix No.5, Table 2, p. 4).

639. The Court finds that Dr. Rincon used three different methods to identify persons of Hispanic origin: self-identification on the juror information cards, surname (as determined by a Spanish language translator), and surname adjusted for intermarriage rate. (Appendix No.5, pp. 1 3).

a. Only 8.1 % of the prospective jurors identified themselves as Hispanic on the Juror Information Cards. (Appendix No.5, Table 2, p. 2,4).

b. Dr. Rincon identified a slightly higher number, 10.5 %, as Hispanic under the surname method. (Appendix No.5, Table 2, p. 2,4).

c. Finally, when adjusted to exclude the statistically probable number of women with Hispanic surnames due to intermarriage, 12.2 % of the venire panels in Applicant's case were Hispanic. (Appendix No.5, Table 2, p. 2, 4).

**Distinctive Class**

640. The Court finds that persons of Hispanic origin constitute a distinctive group in the community. See *Castandea v. Partida*, 430 U.S. 482, 495 (1977); *see also Aldrich v. State*, 928 S.W.2d 558 (Tex. Crim. App. 1996) ("Hispanics are a distinct group in any community. ...").

**Under-Representation of Hispanics in Dallas County Venires**

641. The Court finds that the degree of under-representation of Hispanics is not unique to Applicant's case. The Court notes that in his analysis of the jury pool in Dallas County, Ted Eads,

156

described a study done by The Dallas Morning News and Southern Methodist University Law Review based on juror summonses for the week of March 6, 2000. EADS, *supra* (Appendix No. 3). The sum and substance of the study - as it is applicable to the case-at-bar - established that in the March, 6, 2000, time frame, which is approximately eighteen months prior to the start of the jury selection in the case at bar, there was, among other things, a substantial under representation in the venire of Hispanic Americans and young adults. Id. at 1815. (Appendix No. 3).

642. The Court finds that the DMN/SMU study found that "Hispanic Americans represent 23 % of the population in Dallas County, but only 9% of the venire[,]" and that "[t]hirty-seven percent of Dallas adults are between the ages of 18 and 34, but only 8% of the prospective jurors are in that age group." Id. (Appendix No.3).

643. The Court finds that the study concluded that "[t]he Dallas County jury system is primed for a constitutional challenge. Although the intent of the officials operating the jury wheel may not be to discriminate, the reality is that at least two distinct groups are being excluded from the weekly venire." Id. at 1826. (Appendix No.3). There can be no doubt that during the time period between March of 2000 and July of 2001, if not more, the venires in Dallas County from which juries were actually chosen did not include a fair representation of either Hispanics or young adults, and that the problem was not the result of happenstance, but of an inherent flaw in the jury selection system. *Id.*, at 26.

**Systemic Exclusion**

644. The Court finds that Dallas County Jury Services Manager Donna Roach testified at a pre-trial hearing in Dallas County on November 13, 2000, in cause numbers F99-02491 and F00-01922, in the case of *State v. Johnny Frank Benton*, in the 292nd Judicial District Court. A true and correct

157

copy of Ms. Roach's affidavit incorporating a transcription of her testimony at this hearing is attached to Rodriguez's application at Appendix No.6.

645. The Court finds that Ms. Roach identified two deficiencies in the system design that cause juror no-shows. One is the low daily pay for jury service, six dollars a day, which is barely enough to cover the cost of parking. *Id.*, Testimony at 6-7; *see also* EADES, supra, at 1816. (Appendices Nos. 3 & 6). The second deficiency is that when someone fails to report without explanation no steps are taken to enforce the summons. *Id.*, Testimony at 5. (Appendix No.6).

646. The Court finds that this testimony remained accurate at least through December of 2002, when Applicant's jury was chosen. *Id.*, Affidavit. (Appendix No.6).

647. The Court finds that the effect of the failure of Dallas County officials to enforce jury summonses is "an exemption for every individual who wants to shirk jury duty, an option which is most often exercised by the poor and hence a disproportionate number of Hispanic people [and those between the ages of 18-34 years of age].

648. The Court finds that in Dallas County, an implicit exemption for all prospective jurors, as a practical matter, results in the under representation of the members of a discrete class on the jury pools.

649. The Court finds that in principle, there is little that distinguishes the system successfully challenged in Duren and the system currently in place in Dallas County." MICK MICKELSEN, A Jury of Your Peers?, VOICE FOR: THE DEFENSE 24, 25 (March 2001).

650. The Court finds that this conclusion is corroborated by the SMU study: "An examination of the weekly venire will show that juries in Dallas County are not drawn from a cross-section of the community. Something in the system is inherently wrong, and is excluding distinct groups from the

158

2461

venire. The rules in Texas, such as paying jurors only $6 per day, make it so financially onerous that low income people [a disproportionate number of whom are Hispanic] cannot afford to fulfill their civic duty."EADES, supra, at 1826. (Appendix' No. 3).

651. The Court finds that Dr. Rincon's statistical analysis bears out that Hispanics are demonstrably under-represented in Dallas County juries, as least for the significant period of time between March of 2000, when the SMU study was conducted, and at the time Applicant's jury was selected.

652. The Court finds that there is systematic exclusion, the direct cause of which is directly attributable to the State of Texas and the County of Dallas.

653. The Court finds that Dallas County officials are under a duty to ensure that everyone is entitled to a jury drawn from a cross section of society, yet the design of the system inherently causes large numbers of people, disproportionately Hispanics and those between the ages of 18-34 years of age, to stay home rather than report for jury service. And Dallas County has taken no steps to rectify the disparity.

## Cognizability

654. The Court notes that ordinarily, even claims of federal constitutional dimension are not cognizable in a post-conviction habeas context unless preserved by a timely trial objection. *Ex parte Crispen*, 777 S.W.2d 103 (Tex. Crim. App. 1989).

655. The Court finds that the contemporaneous objection rule itself, applicable on direct appeal and in habeas proceedings alike, is not immune from exception, based upon the purpose that the rules serves. *E.g.*, *Ex Parte Chambers*, 688 S.W.2d 483, 486 (Tex. Crim. App. 1984) (Campbell, J., concurring, with five judges joining) (claim based upon a right not recognized at the time of trial could be raised for first time in post-conviction writ application despite apparent procedural default

159

at trial).

656. The Court finds that some errors of constitutional dimension do not manifest themselves in such a way as to be susceptible of an ordinary trial objection, and application of the rule would be simply too draconian. Even though the law may be in place, the facts to support the claim may be, for reasons beyond the defendant's control, inaccessible to him. In such instances, the writ of habeas corpus may serve as the first realistic opportunity to raise the claim. *E.g., Ex parte Torres*, 943 S. W.2d 469 (Tex. Crim. App. 1997) (claims which call for development of evidence that is extrinsic to the appellate record, such as ineffectiveness of trial counsel, may be raised for the first time in post-conviction habeas proceedings). That is the case with Applicant's present claim that the under-representation of Hispanics and young adults in his capital venire was statistically significant.

657. The Court finds that Halprin's trial attorneys could not reasonably have been expected to raise this claim and thus preserve it at the time of trial, because they could not realistically have known about it in time.

658. The Court finds that a capital defendant is not legally entitled to receive a list of potential jurors until two days before he is "brought to trial" under the provision of Article 34.04 of the Texas Code of Criminal Procedure. *See also* Article 34.01, Texas Code of Criminal Procedure; *Esquivel v. State*, 595 S.W.2d 516,520-21 (Tex. Crim. App. 1980).

659. The Court find he, thus, is deprived of the raw data to conduct the kind of statistical analyses that Dr. Rincon has now been able to do, over a considerable period of time, to conclude both that Applicant's particular venire significantly under-included Hispanics, and that such under-representation is systematic in Dallas County, at least over a period of some eighteen months.

660. The Court finds that Applicant's lawyers could not have known to undertake a study of the jury

160

2463

selection system in Dallas County (to satisfy the third prong of the Duren test) until they could confirm that Applicant's own venire was significantly under-inclusive. And they simply did not have time before the individual voir dire commenced to obtain a statistical expert and undertake the kind of expert analysis of the raw data that would be necessary to determine that under representation occurred, even in Applicant's own venire, much less systematically in Dallas County.

661.   The Court finds that any objection they might have raised after the individual voir dire commenced would almost surely itself have been construed as untimely, and overruled on that basis.

662.   The Court finds that because Applicant's trial counsel could not reasonably have been expected to raise this claim at the time of trial, it will not apply the contemporaneous objection rule to deny a review of Applicant' claim on the merits.

663.   The Court finds that Applicant was denied an impartial jury selected from a fair cross-section of the community and equal protection under the law because the venire from which his jury was chosen did not adequately represent the Hispanic population of Dallas County.

### GROUND FOR RELIEF XI & XII: FAILURE OF TRIAL COUNSEL TO OBJECT TO RACIAL COMPOSITION OF VENIRE

Ground for Relief XI states:

> If the failure of Halprin's trial counsel to object to the racial composition of the venire waived his right to habeas review of this issue, then this failure denied Halprin the right to the effective assistance of counsel under the Sixth and Fourteenth Amendments of the United States Constitution.

Ground for Relief XII states:

> If the failure of Halprin's trial counsel to object to the racial composition of the venire waived his right to habeas review of this issue, then this failure denied Applicant the right to effective assistance of counsel under Article I, Section 10, of the Texas Constitution.

664.   Alternatively, the Court finds that Halprin's trial counsel provided ineffective assistance in

161

2464

failing to raise a *Duren* claim of under-representation of Hispanics and young adults. Trial counsel should at least have been alerted to the possibility of raising such a claim (assuming they would have time in the two days allowed by Article 34.04 to analyze the make-up of Applicant's own venire).

665. The Court finds that the Dallas Morning News had run a series of articles in October of 2000, about a year before Applicant's jury selection began, raising the specter of under-representation of Hispanics and young adults in the Dallas County jury selection process. *See* Dallas Morning News, "A POOR REFLECTION: Number of minority, lower-income jurors doesn't mirror county population," Sunday, October 22, 2000; "DUTY CALLS, FEW ANSWER: County must fill juries, but many people don't show up or say they can't make it," Monday, October 23, 2000; "NO EXCUSES: New Yorkers who try to avoid jury duty find that system has gotten serious about service," Tuesday, October 24, 2000; "Extra money helps El Paso lure more prospective jurors, County success may spur Legislature to raise statewide pay rate," Tuesday, October 24, 2000. A true and correct copy of these newspaper articles is attached hereto as Appendix No. 7, and incorporated herein as if set out in full.

666. The Court finds that an article had appeared in March of 2001 in a prominent magazine of the criminal defense bar of Texas, specifically drawing attention to the problem in Dallas County. *See* MICKELSEN, supra.

667. The Court finds that, on account of such publicity, Applicant's attorneys should have been poised and ready to make a constitutional challenge to the under-representation in Applicant's own venire, then it should hold them accountable for not being ready. There was no conceivable strategic reason for failing to raise this issue, assuming they could reasonably have been expected to, Article 34.04 notwithstanding.

162

2465

## GROUND FOR RELIEF XIII & XIV: PUNISHMENT SPECIAL ISSUE RELATED TO MITIGATION FAILS TO REQUIRE THAT THE STATE PROVE THE ABSENCE OF SUFFICIENT MITIGATION CIRCUMSTANCES BEYOND A REASONABLE DOUBT

Ground for Relief XIII states:

> The Texas death penalty scheme denied Halprin Due Process of law, an impartial jury, and imposed cruel and unusual punishment, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because the punishment special issue related to mitigation fails to require the State to prove the absence of sufficient mitigating circumstances beyond a reasonable doubt, contrary to *Apprendi* and its progeny.

Ground for Relief XIV states:

> The Texas death penalty scheme denied Halprin due course of law, and impartial jury, and imposed cruel and unusual punishment, in violation of Article I, Sections 10, and 19 of the Texas Constitution because the punishment special issue related to mitigation fails to require that the State prove the absence of sufficient mitigation circumstances beyond a reasonable doubt, contrary to *Apprendi* and its progeny.

668. The Court finds that the current "mitigation" special issue in Texas, and the one applied in this case was as follows:

> Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

(C:I, 259).

669. The Court finds that consistent with current Texas law, the jury charge did not impose any burden of proof as to mitigation on either the State or Applicant.

670. The Court finds that Applicant's Motion on the unconstitutionality of the burden of proof on this special issue was denied by the trial court.

671. The Court notes that in *Ring v. Arizona*, 536 U.S. 584 (2002), the U.S. Supreme Court declared

163

2466

that Arizona's capital sentencing scheme violates the Sixth Amendment's jury trial guarantee because Arizona trial judges determined whether aggravating factors existed which justified imposition of the death penalty. The Supreme Court applied *Jones v. United States*, 526 U.S. 227 (1999) and *Apprendi v. New Jersey*, 530 U.S. 466. The Supreme Court held that, under *Apprendi*, "[b]ecause Arizona's enumerated aggravating factors operate as the functional equivalent of an element of a greater offense, the Sixth Amendment requires that they be found by a jury. *Id.*

672. The Court notes that a distinction must be drawn between the "elements" of a crime and factors that simply influence a criminal sentence. *Harris v. United States*, 122 S.Ct. 2406, 2410 (2002). For example, a finding that only increases a mandatory minimum penalty is not an element of a separate offense, and therefore need not be proven beyond a reasonable doubt. See id. at 2420.

673. The Court finds that here, the jury's guilty verdict would have resulted in a life sentence unless and until the State proved beyond a reasonable doubt that answers to the first two special issues were "yes."

674. The Court finds that this additional requirement of proving the first two special issues, once satisfied, would act to convert a life sentence to that of death.

675. The Court finds that the State's failure to convince the jury that the first two special issues should be answered "yes," or failure of jurors to unanimously agree would have resulted in imposition of the life sentence applicable once a finding of guilt occurred.

676. The Court finds that in this respect, the special issues are factors which are virtually indistinguishable from the aggravating circumstances found to be "the functional equivalent of an element of a greater offense." *Ring v. Arizona*, 122 S.Ct. at 2441 (quoting *Apprendi v. New Jersey*, 530 U.S. at 494 n. 19 (holding that death-eligibility factors "operate as 'the functional equivalent of

164

2467

an element of a greater offense'")).

677.  The Court finds that the Texas special issues constitute death-eligibility factors which are the functional equivalents of elements, and, therefore, must be proven to a jury beyond a reasonable doubt.

678.  The Court finds that because the mitigation special issue fails to require that the State prove lack of sufficient mitigation beyond a reasonable doubt, the Texas death penalty scheme violates the Due Process Clause of the United States Constitution. U.S. CONST., amend XIV.

679.  The Court finds that the trial court's judgment imposing the death sentence should be vacated and remand the cause for a new trial on the issue of punishment.

### GROUND FOR RELIEF XV & XVI: TEXAS DEATH PENALTY SCHEME UNCONSTITUTIONAL BY REQUIRING AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE PUNISHMENT SPECIAL ISSUES

Ground for Relief XV states:

> The Texas death penalty scheme violated Halprin's rights against cruel and unusual punishment and to due process of law under the Eighth and Fourteenth Amendments of the United States Constitution by requiring at least ten "no" votes for the jury to return a negative answer to the punishment special issues.

Ground for Relief XVI states:

> The Texas death penalty scheme violated applicant's rights against cruel and unusual punishment and to due course of law under Article I, Sections 13 and 19, of the Texas Constitution by Requiring at least ten "no" votes for the jury to return a negative answer to the punishment special issues.

680.  The Court notes that all twelve jurors must answer the future dangerousness issue affirmatively before the trial court may impose the death penalty; a life sentence, on the other hand, requires that at least ten jurors answer a special issue negatively.  *See* TEX. CODE. CRIM. PROC. ART. 37.071 §

165

2468

2(d)(2). Unanimity must also exist for the jury to enter a negative finding on the mitigation issue, while only ten jurors must vote to grant leniency. *See id.* § 2(f)(2).

681. The Court finds that the trial court here instructed the jury accordingly. (CR.I-254 55).

682. The Court notes that the failure of a capital jury to garner the requisite number of votes either way results in a life sentence. *See id.*

683. The Court finds the fact that neither the trial court, parties, nor counsel may disclose to the jury members that their failure to agree on an answer to any special issue results in a life sentence creates the potential for considerable confusion among reasonable jurors. *See id.* § 2(a).

**"Majority Rules" Harm Analsys**

684. The Court finds that Texas's 12/10 Rule generates the danger that confused jurors otherwise predisposed to hold-out on voting for a death sentence will conform to a "majority-rules" mentality.

685. The Court finds that potential holdout jurors may reasonably believe that their votes in favor of a life sentence are worthless unless nine others join them, if a majority of other jurors are firmly voting "yes," holdouts may feel obliged to vote "yes" since there would appear to be no possibility of a life sentence and the jury has been instructed to return a verdict. *See Mills v. Maryland*, 486 U.S. 367, 383 (1988) ("common sense. . . suggest[s] that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation [citation omitted] unless they are expressly instructed to do so. ").

686. Accordingly, the Court finds that Texas's 12/10 Rule is a built-in impermissible "dynamite charge," which has been recognized as a possible Eighth Amendment violation in the capital sentencing context. *See Lowenfield v. Phelps*, 484 U.S. at 240-41.

687. The Court finds that support for this argument regarding minority juror "coercion" is found in

166

2469

Supreme Court cases criticizing the practice by trial courts of inquiring into the numerical division of deadlocked juries prior to sending the jury back for further deliberations. *See, e.g., Lowenfield v. Phelps*, 484 U.S. at 239-40; *Brasfield v. United States*, 272 U.S. 448, 450 (1926).

688. The Court finds that Article 37.071's 12/10 Rule injects arbitrariness into the proceedings and creates the potential for unreliable sentencing determinations -- a constitutional violation of the highest order in the capital sentencing context. *See State v. Williams*, 392 So.2d 619, 631 (La. 1980) (on rehearing). In Williams, the court held that a risk of speculation and confusion was a constitutional violation. *Id.*

## The Mills Principle

689. The Court finds that the 12/10 Rule also violates the Eighth Amendment principle in *Mills v. Maryland* that it is unconstitutional to instruct capital sentencing jurors in a manner leaving reasonable jurors to believe that their individual vote in favor of returning a life sentence based on particular mitigating factors is worthless unless some threshold number of jurors agree that particular mitigating factors exist. That is, a constitutional violation occurs if a reasonable juror could interpret the jury charge to instruct the jury that there must be a meeting of the minds among some threshold number of jurors as to whether the mitigating evidence offered by the capital defendant warrants a negative answer to a least one special issue, thus resulting in the imposition of a life sentence. *Mills v. Maryland*, 486 U.S. at 373.

670. The Court finds that unless jurors are informed of the result of a deadlock in such a situation, the risk that one or more jurors will cave into a "majority rules" mentality is too great under the Eighth Amendment.

671. The Court finds that under *Mills* a constitutional violation would occur under the Texas

167

2470

scheme if reasonable jurors who were instructed pursuant to Article 37.071 were led to believe that their votes in favor of a life sentence based on particular mitigating factors would be worthless unless at least nine other jurors joined them.

672.  The Court finds that this case is comparable to *Kubat v. Thierot*, 867 F .2d 351, 369-73 (7th Cir.), *cert. denied*, 493 U.S. 874 (1989).  In *Kubat*, while finding a Mills violation, the Seventh Circuit was faced with a capital sentencing scheme virtually identical to the one at issue in the present case:

> Kubat's jurors were never expressly informed in plain and simple language that even if one juror believed that the death penalty should not be imposed, Robert Kubat would not be sentenced to death. [T]here is a substantial possibility that one or more of Kubat's jurors might have been precluded from granting mercy to Kubat because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.

*Id.* at 373.

673.  The Court finds that reasonable jurors could have believed that they had no ability to give mitigating effect to any and all types of mitigating circumstances unless at least nine other jurors also voted for life.

674.  The Court finds that because "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevent[ed] the consideration of constitutionally relevant [mitigating] evidence," *Boyde v. California*, 494 U.S. 370, 380 (1990), Halprin was sentenced to death in an unconstitutional manner.

675.  The Court recommends that for these reasons, the judgment of the trial court should be set aside and a new trial ordered.

## GROUND FOR RELIEF XVII: DUE PROCESS CLAUSE REQUIRES PROPORTIONALITY REVIEW

168

Ground for Relief XVII states:

> The Due Process clause of the Fourteenth Amendment to the United States Constitution requires this Court to engage in proportionality review in death penalty cases."

676. The Court finds that the Court of Criminal Appeals, based on statutory language of the *Penry* special issue should engage in some type of meaningful proportionality review of death penalty verdicts to consider the "death worthiness" of a particular defendant in view of the totality of mitigating and aggravating evidence in a given case.

    a.    The Court notes that the Court of Criminal Appeals has refused to do this.

677.    The Court finds that the review should consider whether Applicant's death sentence is "excessive" or "disproportionate" as compared to "sentences imposed in similar capital cases" in Texas, at least post-Furman.

    a.    The Court recognizes that the United States Supreme Court has held that the Eighth Amendment does not require a "comparative proportionality review." *Pulley v. Harris*, 465 U.S. 37 (1984). The Court also recognizes that in *Hughes* the Court of Criminal Appeals has likewise rejected such an argument.

678. The Court notes that it is ironic that due process requires that courts engage in a proportionality review in civil cases, *e.g. Honda Motor Co., Ltd v. Oberg*, 512 U.S. 415 (1994), while not in death penalty cases. "It is inconceivable that a punitive verdict of death is not entitled to the same due process as applies to dollar-amount verdicts." *State v. Pinnell*, 877 P. 2d 635 (Oreg. 1994).

679.    The Court finds that due process requires proportionality review in death penalty cases to determine whether a particular death sentence is "excessive" or "disproportionate."

**GROUND FOR RELIEF XVIII: TEXAS CAPITAL SENTENCING STATUTE'S DEFINITION OF "MITIGATING EVIDENCE" IS UNCONSTITUTIONAL BECAUSE IT LIMITS THE EIGHTH**

169

## AMENDMENT CONCEPT OF MITIGATION

Ground for Relief XVIII states:

> The Texas capital sentencing statute's definition of "mitigating evidence" is unconstitutional because it limits the Eighth Amendment concept of "mitigation" to factors that render a capital defendant less morally "blameworthy" for commission of the capital murder.

680. The Court finds that at the punishment phase, the trial court instructed the jury, pursuant to Texas Criminal Procedure Code, Article 37.071 §2(f)(4) that "mitigating evidence is evidence that a juror might regard as reducing the defendant's blameworthiness."

681. The Court notes that as presently written, the Texas capital sentencing statute defines "mitigating evidence" as "evidence that a juror might regard as reducing the defendant's moral blameworthiness." TEX. CRIM. PROC. CODE Art. 37.071, §§3(f)(3)(Vernon Supp. 1997).

682. The Court finds that the statutory definition is unconstitutionally narrow under the Eighth and Fourteenth Amendments to the United States Constitution.

683. The Court notes in support of this finding that the Supreme Court has held that constitutionally relevant mitigating evidence is not simply that type of mitigating evidence that relates to a capital defendant's moral culpability or blameworthiness for the crime, but also includes any mitigating evidence relevant to a defendant's character, history, or circumstances of the crime that militates in favor of a life sentence. *Skipper v. South Carolina*, 476 U.S. 1

684. The Court finds that evidence about a defendant's background and character is relevant because of the belief, held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse. *California v. Brown*, 479 U.S. at 545 (J. O'Connor concurring,

170

2473

1987).

685.  The Court finds that it is not enough "simply to allow the defendant to present mitigating evidence to the sentencer, rather there must not be any impediment through evidentiary rules, jury instructions or prosecutorial argument to the sentencer's full consideration and ability to give effect to mitigating evidence." *Penry*, 492 U.S. at 327.

686.  The Court finds that numerous types of constitutionally relevant mitigating evidence have nothing to do with a capital defendant's moral culpability or blameworthiness -- such as a history of positive character traits, kindness shown toward children, or artistic talent.

687.  The Court finds that although the statutory *Penry* special issue speaks of "the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant," Article 37.071, § 2 (e), the statute's limited definition of "mitigating evidence," violates the Eighth and Fourteenth Amendments to the United States Constitution.

## GROUND FOR RELIEF XIX: STATUTE ALLOWS TOE JURY TOO MUCH DISCRETION TO DETERMINE WHO WOULD LIVE AND WHO SHOULD DIE BECAUSE IT LACKS THE MINIMAL STANDARDS AND GUIDANCE FOR THE JURY TO AVOID ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY

Ground for Relief XIX states:

> This statute under which Halprin was sentenced to death is unconstitutional in violation of the cruel and unusual punishment prohibition of the Eighth Amendment because it allows the jury too much discretion to determine who would live and who should die and because it lacks the minimal standards and guidance necessary for the jury to avoid the arbitrary and capricious imposition of the death penalty.

688.  The Court finds that the fundamental respect for humanity underlying the Eight Amendment requires that consideration of the character and record of the individual offender and the

171

2474

circumstances of the particular offense are constitutionally indispensable parts of the process on inflicting the death penalty. *See, e.g., Woodson v. North Carolina*, 428 U.S 280, 304-05 (1976).

689.  The Court finds that under the present Texas statue applied to Halprin, the jury has again been given unfettered discretion that both invites and permits arbitrary application of the ultimate penalty. *Cf. Gregg v. Georgia*, 428 U.S. 153, 189 (1976)(plurality op.)

690.  The Court finds that in its current formulation the Texas scheme does not insure a reasonably consistent application of the ultimate penalty.   Therefore, the statute should be found unconstitutional.

691.  The Court finds that the very nature of the mitigation special issue allows the jury to decide, without any guidance, who should live and who should die.

692.  The Court finds that the mitigation special issue allows juries to decide what, if anything, is "mitigation" and to completely disregard any such mitigation evidence if they so choose.

693.  The Court finds that the instruction allows juries to kill a defendant simply because they are afraid of a person who is different, whether that difference is race, unsightliness, mental illness, or a difference relating to a host of other improper considerations.

694.  The Court finds that the arbitrariness and capriciousness that results from this unfettered discretion renders the present scheme unconstitutional. *See Gregg, 428* U.S. at 189.

695.  The Court finds that under these circumstances, the Court of Criminal Appeals should declare the statutory scheme under which Appellant was convicted and sentenced to death unconstitutional in violation of the Eighth Amendment and vacate his death sentence.

### GROUND FOR RELIEF XX: VAGUE, UNDEFINED TERMS IN JURY INSTRUCTIONS AT PUNISHMENT PHASE THAT EFFECTIVELY DETERMINE DIFFERENT BETWEEN A LIFE SENTENCE

172

2475

AND THE IMPOSITION OF THE DEATH PENALTY

Ground for Relief XX states :

> The Texas death penalty scheme violated Halprin's rights against cruel and unusual punishment, an impartial jury and due process of law under the Sixth, Eighth and Fourteenth Amendments of the United States Constitution because of vague, undefined terms in the jury instructions at the punishment phase of the trial that effectively determine the difference between a life sentence and the imposition of the death penalty.

696.  The Court finds that at the conclusion of the punishment phase, the trial court submitted to the jury the three statutory special issues (see Tex. Code Crim. Proc. Ann. art. 37.071, §3(b)(1), (b)(2), (e):

> ISSUE NUMBER ONE
> Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?
> ANSWER: Yes.
>
> ISSUE NUMBER TWO
> Do you find from the evidence beyond a reasonable doubt that the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken?
> ANSWER: Yes.
>
> ISSUE NUMBER THREE
> Do you find, taking into consideration all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a life sentence be imposed?
> ANSWER: - No.

697.  The Court finds that the trial court did not define certain critical terms appearing in these questions, namely; "probability," "continuing threat to society," and "criminal acts of violence," which terms are so vague and indefinite as to be violative of Appellant's fundamental constitutional

173

2476

rights.

698. The Court finds that the jury was deprived of any instructions concerning the meaning of these crucial terms in the special issues.

699. The Court finds that the failure to define the operative words and phrases violated the constitutional requirement that each statutory aggravating circumstance genuinely narrow the class of persons eligible for the death penalty and reasonably justify the imposition of the death penalty. This is raised as a fundamental error since no objection appears in the record. *See Godfrey v. Georgia*, 466 U.S. 420, (1980).

700. The Court finds that because the trial court failed to charge the jury in a constitutionally -adequate manner so that its determinations are rationally reviewable, there was no rational process justifying the imposition of the death penalty upon this Appellant in comparison to other cases in which other defendants received a life sentence. T

701. The Court finds that this failure to properly instruct the jury violated Appellant's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

702. The Court finds that because the Texas special issues contain terms that are unconstitutionally vague, any of the special issues are unconstitutional as applied to Halprin, and his death sentence must, therefore, be vacated. *See Walton v. Arizona*, 497 U.S. 639 (1990); *Lewis v. Jeffers*, 497 U.S. 766 (1990).

703. The Court notes that in Texas, the Court of Criminal Appeals has held that the special issues perform the function of narrowing the class of death eligible defendants, and thereby comprise aggravating circumstances under the Constitution: "[T]he function of Article 31.071 [is] to further narrow the class of death-eligible offenders to less than all those who have been found guilty of

174

2477

(capital murder) as defined under § 19.03 (capital murder statute)." *Smith v. State*, 779 S.W.2d 417,419 (Tex. Crim. App. 1988).

704. The Court finds that the Texas special issues cannot suffice as a framework for the imposition of the death penalty if the special issues themselves contain crucial terms that are undefined and inherently vague.

705. The Court notes that the Texas Court of Criminal Appeals has refused to apply any limiting construction to the unconstitutionally vague terms in the special issues.

706. The Court finds that Texas allows its capital juries virtually unfettered discretion in construing the statutory aggravating circumstances without the aid of specific definitions of crucial terms contained in the special issues. *Roney v. State*, 632 S.W.2d at 603.

707. The Court finds that the special issue questions, which employ broad terms result in standardless capital sentencing determinations.

708. The Court finds that such a result runs directly counter to the Eighth Amendment's requirement that there be a rational process for juries and appellate courts to decide who lives and who dies.

709. The Court finds that in the first special issue, the word "probability" has no common or uniform meaning.

710. The Court finds that Jurors in the instant case were left to apply any possible interpretations of the word, including: about fifty percent; a substantial likelihood; or, technically, any chance at all.

711. The Court finds additionally, jurors were denied any meaning for the phrase "criminal acts of violence" or "continuing threat to society." In *Jurek v. Texas*, 428 U.S. at 272, a plurality of the Supreme Court noted that "the Texas Court of Criminal Appeals has yet to define precisely the meanings of such terms as "criminal acts of violence" or continuing threat to society. Twenty years

175

2478

later, the Court of Criminal Appeals still has not defined these vague terms.

712. The Court finds that the various words and phrases in the special issues, viewed individually or as a whole, did not provide the jury any uniform guidance in how to apply terms crucial to the decision to impose the ultimate sentence.

713. The Court finds that such failure has rendered the first special issue unconstitutional.

714. The Court finds that Halprin's death sentence should be modified to life.

### GROUND FOR RELIEF XXI & XXII: IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING JURY'S DISCRETION TO IMPOSE DEATH PENALTY WHILE ALLOWING JURY UNLIMITED DISCRETION TO CONSIDER ALL EVIDENCE MITIGATING AGAINST IMPOSITION OF DEATH PENALTY

Ground for Relief XXI states:

> The Texas death penalty scheme denied Halprin due process of law, and imposed cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution because of the impossibility of simultaneously restricting the jury's discretion to impose the death penalty while also allowing the jury unlimited discretion to consider all evidence militating against imposition of the death penalty.

Ground for Relief XXII states

> The Texas death penalty scheme denied Halprin due course of law, and imposed cruel and unusual punishment in violation of article I, §§ 13 and 19, of the Texas Constitution because of the impossibility of simultaneously restricting the jury's discretion to impose the death penalty while also allowing the jury unlimited discretion to consider all evidence militating against imposition of the death penalty.

715. The Court finds that Justice Blackmun of the United States Supreme Court concluded that the death penalty as currently administered in this country, is unconstitutional. *See Callins v. Collins*, 510 U.S. 1141 (1994) (Blackmun, J. dissenting).

716. The Court finds that the Texas capital sentencing scheme fails to adhere to principled

176

guidelines in weighing punishment evidence.

717. The Court finds that the focus upon aggravating circumstances, to the exclusion of mitigating evidence, clearly violates the constitutional mandate of individualized sentencing. *See Penry v. Lynough*, 492 U.S. 302, 319 (1989).

718. The Court finds that the federal and state constitutions prohibit the imposition of the death penalty until a scheme is employed which eliminates the sentencer's total discretion to inflict death while simultaneously permitting unrestricted consideration of mitigating evidence. Therefore, this Court should commute Appellant's death sentence to imprisonment for life.

## GROUND FOR RELIEF XXIII: TEXAS CAPITAL SENTENCING SCHEME UNCONSTITUTIONAL BECAUSE IT DOES NOT PERMIT MEANINGFUL APPELLATE REVIEW

Ground for Relief XXIII states that "Texas statutory capital sentencing scheme is unconstitutional under the Eighth and Fourteenth Amendments because it does not permit meaningful appellate review."

719. The Court finds that the "Penry" special issue requires Texas juries to perform the same functions that other states' post-Furman capital sentencing juries perform: (I) the threshold finding of particular aggravating and mitigating circumstances; and (ii) the balancing process, whereby jurors determine whether the mitigating factors outweigh aggravating factors. *Cf. Gregg v. Georgia*, 428 U.S. 153 (1976) (discussing Georgia's post- Furman's statute).

720. The Court finds that Texas' unstructured sentencing scheme is unconstitutional because it does not permit meaningful appellate review, which is not only required by a Texas statute but also is a prerequisite to a constitutionally implemented capital sentencing scheme.

721. The Court finds that because the second statutory special issue is open-ended and unstructured, not enumerating a list of mitigating and aggravating factors and not requiring jurors to make specific

177

"findings" in this regard - the Court of Criminal Appeals has no way to know which aggravating and mitigating factors that jurors considered. Thus, the appellate court has no way to know how, and indeed whether, the jury considered all of the constitutionally relevant mitigating evidence offered at trial.

722. Therefore, the Court finds that meaningful appellate review is impossible. The Supreme Court has recognized that an appellate court is in a virtually impossible position to review a jury's consideration of mitigating and aggravating evidence without knowing which factors the jury in fact considered. *See Sawyer v. Whitley*, 112 S. Ct. 2514, 2522-23 (1992).

723. The Court finds that because the Court of Criminal Appeals is required by statute and by the Constitution to review the sufficiency of the evidence supporting a jury's negative answer to the statutory "Penry" special issue, the open-ended and unstructured nature of Arts. 37.071 and 37.0711, which prevents meaningful appellate review, renders the Texas capital sentencing stature unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution.

## GROUND FOR RELIEF XXIV & XXV: DEATH PENALTY IS CRUEL AND UNUSUAL PUNISHMENT

Ground for Relief XXIV states:

> The Texas death penalty is cruel and unusual punishment under Art. 1, § 13 of the Texas Constitution.

Ground for Relief XXV states:

> The death penalty as administered in Texas is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution."

724. The Court finds that in his dissent in *Callins v. Collins*, 510 U.S. 491 (1994) Justice Blackmun contended that capital sentencing procedures employed in the post-Furman era are per se

178

2481

unconstitutional because they are the product of paradoxical constitutional commands: on the one hand, jurors must be free to consider any and all types of constitutionally relevant mitigating evidence, while, on the other hand, there must be "structured discretion in sentencing, as required by Furman."

725. The Court finds that the Texas "Penry" special issue is unconstitutional because it permits the very type of open-ended discretion condemned by the United States Supreme Court in Furman.

726. The Court finds that Halprin's Eighth and Fourteenth Amendment rights to the United States Constitution were violated.

727. Accordingly the Court finds that the trial court's judgment should be reversed and be remanded for resentencing under proper instructions or, alternatively, commute Halprin's death sentence to imprisonment for life.

## GROUNDS FOR RELIEF XXVI, XXVII, XXVIII, XXXIX

Ground for Relief XXVI states

The "nullification instruction" mandated in Art. 37.071(e) Texas Code Criminal Procedure denied Halprin due course of law, an impartial jury and imposed cruel and unusual punishment, violating the provisions of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because it is a sentencing factor that fails to give full effect and consideration to mitigating circumstances and fails to provide the jury with an adequate vehicle for expressing a "reasoned response" to all of Halprin's evidence relevant to his culpability.

Ground for Relief XXVII states

The sentencing procedure mandated in Art. 37.071(e) of the Texas Code of Criminal Procedure denied Halprin due course of law, an impartial jury and imposed cruel and unusual punishment violating the provisions of Article I, Sections 10, 13 and 19, of the Texas Constitution because it is a sentencing factor that fails to give full effect and consideration to mitigating circumstances

179

2482

and fails to provide the jury with an adequate vehicle for expressing a "reasoned response" to all of

Ground for Relief XXVIII states that

> Halprin was denied his federal constitutional right to a grand jury determination and an indictment that charges the "special issue elements" of the death penalty and facts relied upon to support the charge that Halprin is "guilty" of the special issues in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because Article 37.071(e) is a sentencing factor which fails to give full effect and consideration to mitigating circumstances and fails to provide the jury with an adequate vehicle for expressing a "reasoned response" to all of Halprin's evidence relevant to his culpability.

Ground for Relief XXIX states:

> Halprin was denied his state constitutional right to a grand jury determination and an indictment that charges the "special issue elements" of the death penalty and facts relied upon to support the charge that Halprin is "guilty" of the special issues in violation of Article I, Sections 3, 10, 13, and 19 of the Texas Constitution because Art. 37.071(e) is a sentencing factor that fails to give full effect and consideration to mitigating circumstances and fails to provide the jury with an adequate vehicle for expressing a "reasoned response" to all of Halprin's evidence relevant to his culpability.

728. The Court finds that in the recent case of *Smith v. Texas*, 125 S.Ct. 400 (2004), the Supreme

Court held that a nullification instruction was constitutionally inadequate under *Penry v. Johnson*,

532 U.S. 782 (2001) (*Penry II*). That opinion held: that the *Penry II* "nullification instruction" was

constitutionally inadequate because it did not allow the jury to give "full consideration and full effect

to mitigating circumstances" in choosing the defendant's appropriate sentence. The "nullification

instruction" in Smith directed the jury to give effect to mitigation evidence, but allowed the jury to

do only by negating what would otherwise be affirmative responses to two special issues relating to

deliberateness and future dangerousness.

729. The Court finds that Halprin argues that the mitigating instruction provided in his trial contains

180

2483

the same constitutional defects and those held unconstitutional in *Penry II* and *Smith*.

730. The Court notes that Art. 37.071, "Procedure in capital case," contains the current Texas legislative scheme for the imposition of a death sentence.

731. The Court finds that the jury charge submitted at Halprin's punishment trial contained three special issues. *See* Record Excerpts at P.

732. The Court finds that the first issue the jury answered in the affirmative inquired from the jurors whether they found from the evidence beyond a reasonable doubt that there is a substantial probability that applicant would commit criminal acts of violence that would constitute a continuing threat to society. (CR: II, 301).

733. The Court finds that the second special issue also answered in the affirmative, inquires from the jury whether they found beyond a reasonable doubt that applicant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken. (CR: II, 302).

734. The Court finds that the third special issue, which was considered by the jury only after they unanimously answered special issues no. 1 and 2 yes, was the "nullification instruction: pursuant to Art. 37.071(e)(1). The instruction for the juror's consideration was whether they find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed? (CR: II, 303).

735. The Court finds that the jury was instructed that in deliberating on special issues no. 1 and no. 2 that the State has the burden of proving beyond a reasonable doubt that those issues should be

181

2484

answered yes. *See* Record Excerpts at P.

736. The Court finds further, the jurors were instructed that they shall consider all evidence admitted during the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that mitigate for or mitigates against the imposition of the death penalty. *See* Record Excerpts at P.

737. The Court finds that in deliberation on their answers to special issue no. 3, the jurors were instructed that they may not answer special issue no. 3 "No" unless the jury agrees unanimously, and they may not answer "Yes" unless 10 or more jurors agree. The members of the jury need not agree on what particular evidence supports an affirmative answer to special issue no. 3. "In arriving at your answer, you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." *See* Record Excerpts at P.

738. The Court finds that the instructions did not define the term "mitigating evidence" beyond instructing the jury that such evidence to be that a juror might regard as reducing applicant's role blameworthiness.

739. The Court finds that in *Tennard v. Dretke*, 124 S.Ct. 2562 (2004), the United States Supreme Court reversed the Fifth Circuit's refusal to grant a certificate of appealability (COA) to a defendant who was sentenced under the Texas capital sentencing scheme prior to the legislative revisions which took place in the aftermath of *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989) (*Penry I*).

740. The Court finds that the Supreme Court held in *Tennard* that the jury must be given an effective vehicle with which to weigh mitigating evidence so long as the defendant has met a "low threshold for relevance," which is satisfied by "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." 124

182

2485

S.Ct. at 2570 (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990)).

741. The Court finds that the Texas Court of Criminal Appeals has demonstrated its awareness of the Texas Legislature's inadequate attempt to provide a constitutionally acceptable "nullification instruction." *See Ex parte Smith*, 132 S.W.3d 407, 427 (Tex. Crim. App. 2004) (Hervey, J. concurring).

742. The Court finds that the statutory language of Art. 37.071, that was submitted in applicant's trial, contains some minor distinctions from the "nullification instructions" held unconstitutional in *Penry II* and *Smith*.

743. The Court finds that one of the main distinctions is the "nullification issue" was submitted as a separate special issue no. 3, and did not require the jury to negate an affirmative finding by inserting a "No" answer to either special issues no. 1 or 2.

744. The Court finds that change by itself did not cure the constitutional defects in the charge.

In particular the Court instruction the jury;

745. The Court finds that the trial court instructed the jury:

> Three special issues, numbered one, two, and three, are included in this charge. You are instructed to answer the first two special issues either "Yes" or "No" in accordance with the instructions given in this charge. Special Issue No.3 should be answered only if you have answered "Yes" to both Special Issue No. I and Special Issue No.2. If you have not answered "Yes" to both Special Issue No. 1 and Special Issue No. 2, then you shall not proceed to answer Special Issue No. 3.
>
> In deliberating on your answers to both Special Issue No.1 and Special Issue No.2, you are instructed that the state has the burden of proving beyond a reasonable doubt that Special Issue No.1 and Special Issue No.2 should be answered "Yes."
>
> You shall consider all evidence admitted during the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for

183

or mitigates against the imposition of the death penalty.

You may not answer either Special Issue No. 1 or Special Issue No.2 "Yes" unless the jury agrees unanimously, and you may not answer either Special Issue No. 1 or Special Issue No.2 "No" unless 10 or more members of the jury agree. The members of the jury need not agree on what particular evidence supports a negative answer to either Special Issue No.1 or Special Issue No. 2.

If you do not find and believe from the evidence beyond a reasonable doubt that the answer to either Special Issue No.1 or Special Issue No.2 should be "Yes," or if you have a reasonable doubt thereof, then you shall answer that special issue "No."

If you have answered either Special Issue No. 1 or Special Issue No.2, or both, "No," then you shall cease your deliberations. If you have found beyond a reasonable doubt that the answers. to both Special Issue No. 1 and Special Issue No.2 are "Yes," then you shall next consider Special Issue No.3.

In deliberating on your answer to Special Issue No. 3, you are instructed that you may not answer Special Issue No.3 "No" unless the jury agrees unanimously, and you may not answer Special Issue No.3 "Yes" unless 10 or more members of the jury agree. The members of the jury need not agree on what particular evidence supports an affirmative answer to Special Issue No. 3. In arriving at your answer, you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

You are further instructed that if the jury returns an affirmative finding on both Special Issue No. 1 and Special Issue No. 2 and a negative finding on Special Issue No. 3, the Court shall sentence the defendant to death. If the jury returns a negative finding on either Special Issue No.1 or Special Issue No.2 or an affirmative finding on Special Issue No.3, the Court shall sentence the defendant to confinement in the Institutional Division of the Texas Department of Criminal Justice for life.

If the jury's answers are unanimous to the special issues answered, then the Foreman may sign each special issue for the entire jury. If any answer or answers, are not unanimous, but agreed to by at least 10 members of the jury, as set out above, then the 10 or more jurors who agree shall individually sign the special issue.

You are instructed that, if there is any testimony before you in this case regarding the defendant having committed offenses or acts other than the offense alleged against him in the indictment, you cannot consider said testimony, unless you first find and believe beyond a reasonable doubt that the defendant committed such other offenses or acts, if any were committed; but if you do not so believe, or if you have a reasonable doubt thereof, you will not consider such testimony for any purpose.

You are instructed that if the jury answers that a circumstance or circumstances warrant that a sentence of life imprisonment rather than a death

184

2487

sentence be imposed, the court will sentence the defendant to imprisonment in the institutional division of the Texas Department of Criminal Justice for life.

Under the law applicable in this case, if the defendant is sentenced to imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life, the defendant will become eligible for release on parole, but not until the actual time served by the defendant equals 40 years, without consideration of any good conduct time. It cannot accurately be predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted.

You are instructed that the defendant may testify in his own behalf if he chooses to do so, but if he elects not to do so, that fact cannot be taken by you as a circumstance against him or prejudice him in any way. The defendant has elected not to testify, and you are instructed that you cannot and must not refer to or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever.

Mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling should not play a part in your deliberations.

Your verdict must be by a unanimous vote of all members of the jury. In arriving at your verdict, it will not be proper to fix the same by lot, chance, or any other method than by a full, fair, and free exercise of the opinion of the individual jurors under the evidence admitted before you.

You are the exclusive judges of the facts proved, of the credibility of the witnesses, and of the weight to be given to the testimony, but you are bound to receive the law from the Court, which is given you, and be governed thereby.

(CR:II,296-300)

746. The Court finds that a comparison of the pertinent sections of applicant's punishment charge with that submitted in Smith shows that the Smith charge actually provided more information to the jury to decide whether there was mitigating evidence to warrant a negative answer to either special issue no. 1 or 2.

747. The Court finds that in the instruction given to applicant, the jury is informed that the evidence they consider may either mitigate for or against a death sentence.

748. The Court finds that the Smith instruction clearly instructed the jury that if they find mitigating

185

2488

evidence, to only consider mitigating evidence in determining whether the defendant should be given a sentence less than death even though they have found evidence beyond a reasonable doubt that the special issue should be answered "Yes."

749.  The Court finds that a close comparison between the two instructions leads to no other conclusion other than that the legislative instruction mandated by Art. 37.071(e)(1) is even more constitutionally infirm that the one held unconstitutional in *Ex parte Smith*.

### GROUND FOR RELIEF XXX: APPELLATE REVIEW BY COURT OF CRIMINAL APPEALS WHICH NARROWS DEFINITION OF ANTICIPATE IS DENIAL OF RIGHT TO TRIAL BY JURY

Ground for Relief XXX states that

> Appellate review by the court of criminal appeals which narrows the definition of anticipate to mean a "probability" and not a mere "possibility" is a denial of the right to trial by jury required by *Ring v. Arizona* because the appellate court, not the jury, finds the aggravating factor necessary to impose a penalty of death under the Texas statutory scheme.

750.  The Court finds that the evidence does not show a "probability of death."

751.  The Court finds that the problem on review, however, is that the Court of Criminal Appeals may not now review the verdict an d apply a definition of "anticipate" that was not provided to the jury without violation *Ring v. Arizona*, 536 U.S. 584 (2002).  Ring requires that the jury, and not the judge  make this finding.  *Id.* at 609.

752.  The Court finds that the jury was never informed that "anticipate" required a probability of death.

753.   The Court finds that no definition was given and the State led the jury to believe that a possibility was sufficient. *See* Ground for Relief I, above.

754.  The Court finds that the Court of Criminal Appeals cannot clarify this vague term without

186

2489

violating the rule of *Apprendi v. New Jersey*, 530 U.S. 466, which requires the finder of fact to make all factual determinations pertinent to enhancement of punishment.

## GROUND FOR RELIEF XXXI

Ground for Relief XXXI states:

> Halprin is entitled to relief under the cumulative doctrine of the Due Process clause of the United States and the Due Course of Law clause of the Texas Constitution because his entire trial was infected with prejudicial error.

755. The Court finds that the cumulative error doctrine applies when the errors themselves involve matters of constitutional dimension and "so infected the entire trial that the resulting conviction violates due process." *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir.1992) (en banc).

756. The Court notes that to determine whether the cumulative error doctrine applies to a set of facts, the record as a whole must show that the errors more likely than not caused a suspect verdict." *Spence v. Johnson*, 80 F.3d 989, 1001 (5th Cir.1996) (internal quotation marks omitted). The Texas Court of Criminal Appeals likewise acknowledges that a cumulation of constitutional errors can justify relief. *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999)

757. The Court finds that the jury was never properly informed and never given appropriate guidance on the quantum of proof necessary to impose the death penalty on a co-conspirator.

758. The Court finds that in fact, the prosecutor's misstatement of the case was never challenged by defense counsel.

759. The Court finds that from opening statement on, the State objected to admissible evidence and presented misleading if not outright false testimony regarding Halprin's role in the offense.

760. The Court finds that the State made improper emotional appeals via victim-impact testimony at the guilt/innocence phase and then chose to attack Halprin on cross-examination with improper

187

character evidence further aimed at inflaming the jury and by asking the jury to focus on the prior assault case instead of the instant offense.

761. The Court finds that these evidentiary errors were compounded when the State emphasized all of the improper evidence in final argument.

762. The jury was not properly charged on a lesser included offense raised by the evidence that fit precisely within the defense's purported trial strategy.

763. The Court finds that at the punishment phase of trial, a lack of case preparation prevented the jury from hearing all the compelling and constitutionally significant mitigation evidence that had been provided by the defense's mitigation expert.

764. The Court finds that the worst errors occurred in the punishment charge and subsequent arguments when the jury was not given proper guidance concerning the quantum of proof necessary to make an affirmative finding on special issue number two and the State was allowed to make arguments that flew in the face of the controlling supreme court precedent.

765. The Court finds that not one of these errors was raised on appeal.

766. The Court finds that instead appellate counsel chose to pursue frivolous errors.

767. The Court finds that Halprin's entire trial was infected with error from start to finish.

768. The Court finds that a new trial is required in order to avoid the injustice of executing a man who did not receive a fair trial, and to ensure that Halprin's trial is one in which the community can be confident in the propriety of the outcome.

## ORDER

The Clerk of the Court is hereby ordered to transmit to the Court of Criminal Appeals

188

2491

these Findings of Fact and Conclusions of Law and Recommendation of the Trial Court on

Application for Writ of Habeas Corpus Pursuant to Art. 11.071, Tex. Code Crim. Proc. The

Clerk is also ordered to send a copy to counsel for Applicant, Gary A. Udashen and Bruce

Anton, at 2311 Cedar Springs Road, Suite 250, Dallas, Texas 75201 and to counsel for the

State, Assistant District Attorney Lisa Smith, 133 N. Riverfront Blvd., L.B. 19, Dallas, Texas

75207.

SIGNED this _____ day of _____, 2010.


_____
Rick Magnis, Judge
283rd Judicial District Court
Dallas County, Texas

189

2492

# SORRELS | UDASHEN | ANTON

*Attorneys and Counselors at Law*

GARY A. UDASHEN
BOARD CERTIFIED-CRIMINAL LAW•TEXAS BOARD OF LEGAL SPECIALIZATION

gau@sualaw.com
2311 Cedar Springs Rd.
Suite 250
Dallas, TX 75201
214.468.8100
fax 214.468.8104
www.sualaw.com

September 13, 2011

Mr. Craig Watkins
District Attorney
Frank Crowley Courts Building
133 N. Riverfront Blvd., L.B. 19
Dallas, Texas 75207

Mr. Mike Casillas
Assistant District Attorney
Frank Crowley Courts Building
133 N. Riverfront Blvd., L.B. 19
Dallas, Texas 75207

Ms. Lisa Smith
Assistant District Attorney
Frank Crowley Courts Building
133 N. Riverfront Blvd., L.B. 19
Dallas, Texas 75207

RE:  *Ex Parte Randy Ethan Halprin*
Writ No. W01-00237-T(A)

Dear Mr. Watkins, Mr. Casillas, and Ms. Smith:

As you know, Bruce Anton and I represent Randy Halprin on his Application for Writ of Habeas Corpus Under Tex. Code Crim. Proc. 11.071. Mr. Halprin is currently on death row and his writ application is pending before Judge Mike Snipes.

As we have continued to work on this case, it has occurred to us that the District Attorney's Office has taken a position on some of Mr. Halprin's writ issues that is contrary to the well defined role of a prosecuting attorney of pursuing justice rather than just seeking a victory in court. Specifically, I am referring to the District Attorney's opposition at trial, carried through the writ process, to the jury being allowed to hear the substantial mitigating evidence available in this case.

2493

Letter dated September 13, 2011
Page 2

I do not bring this up as a simple complaint that the prosecuting attorneys have vigorously defended their position at trial and in these writ proceedings. This is certainly a proper position for a prosecutor to take. Rather, I bring up this issue based on an apparent conflict between prosecutors dual duty to vigorously argue for their position and, at the same time, to see that justice is achieved. At times these two goals become mutually exclusive.

At trial, Mr. Halprin's defense counsel attempted to introduce a substantial amount of mitigating evidence concerning his background as well as his relative culpability in the actions of the Texas Seven escapees. The state through effective lawyering, and with a receptive trial judge, was able to prohibit the jury from hearing the vast majority of this mitigating evidence. The result of the state's effectiveness in this regard was the return of a death sentence by a jury that did not have a full picture of Mr. Halprin's background and character.[1] As the Supreme Court stated in *Eddings v. Oklahoma*, 455 U.S. 104 (1982), "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." In Mr. Halprin's case, the jury was precluded from hearing the relevant mitigating evidence and the death sentence was imposed by a jury ignorant of this important information.

As Mr. Halprin's writ attorneys, we have raised several grounds related directly to an attempt to achieve a new sentencing hearing where a jury could assess a proper sentence after a full consideration of the available mitigating evidence. We have also raised a writ issue complaining of the ineffective assistance of Mr. Halprin's counsel in not even raising an issue on appeal concerning the trial court's improper limitations on presentation of the mitigating case. It is in regards to these issues that it appears that the District Attorney's zealous defense of the death sentence in this case runs contrary to the even more important duty to see that justice is served.

As you know, Art. 2.01, Tex. Code Crim. Proc. states that:

"It shall be the primary duty of all prosecuting attorneys, including any special prosecutors, not to convict, but to see that justice is done."

In *Berger v. United States*, 295 U.S. 78 (1935), Justice Sutherland stated:

"The [prosecuting attorney] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, [the prosecutor] is in a peculiar and very definite sense the servant of the law,

---

[1] A complete discussion of the substantial mitigating evidence the jury did not hear is contained in Applicant's Additional Briefing on Mitigating Evidence Jury Did Not Hear, a copy of which is attached to this letter.

Letter dated September 13, 2011
Page 3

the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction, as it is to use every legitimate means to bring about a just one. It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."

Additionally, the American Bar Association Guidelines on the Prosecution Function states the following:

**"Standard 3-6.2  Information Relevant to Sentencing**
(a)     The prosecutor should assist the court in basing its sentence on complete and accurate information for use in the presentence report. The prosecutor should disclose to the court any information in the prosecutor's files relevant to the sentence. If incompleteness or inaccurateness in the presentence report comes to the prosecutor's attention, the prosecutor should take steps to present the complete and correct information to the court and to defense counsel.
(b)     The prosecutor should disclose to the defense and to the court at or prior to the sentencing proceedings all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal."

The question we are raising is separate from that of the propriety of the trial court's evidentiary rulings and the questions of ineffective assistance of counsel and suppression of exculpatory evidence. Rather, the question we are raising here is whether a prosecutor should use their powers of persuasion with a court to keep a jury from hearing relevant and material mitigating evidence. It certainly appears to be contrary to the above cited authorities for the prosecutor to do so. The questionable propriety of this is further amplified when a convicted defendant is facing a death sentence assessed by a jury that did not have the benefit of the available mitigating evidence.

It appears that the duty of the prosecutor to ensure that justice is served, combined with a specific duty to see that the trier of fact knows of the available mitigating evidence at a sentencing hearing, would be achieved by an agreement in Mr. Halprin's case that he should receive a new sentencing hearing. At the very least, an agreement that Mr. Halprin should have the right to present these arguments to the Court of Criminal Appeals by the granting of a new direct appeal would be appropriate.

We have suggested to Judge Snipes that, in his review of Mr. Halprin's Application for Writ of Habeas Corpus, that he first review the issue concerning ineffective assistance on appeal. If Judge

2495

NO. W01-00237-T(A)

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | **283RD JUDICIAL DISTRICT** |
| | § | |
| **RANDY ETHAN HALPRIN** | § | **DALLAS COUNTY, TEXAS** |

2011 SEP 13  PM 3: 36

## SUPPLEMENTAL AUTHORITY IN SUPPORT OF ARGUMENT ON INEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL IN APPLICATION FOR WRIT OF HABEAS CORPUS

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES** the Applicant, RANDY ETHAN HALPRIN, and submits this Supplemental Authority in Support of Argument on Ineffective Assistance of Counsel on Appeal in Application for Writ of Habeas Corpus and would show the following:

I.

On his direct appeal, Halprin's appellate counsel failed to raise an issue concerning whether Dr. Kelly Goodness should have been permitted to present to the jury mitigation facts that she used to support her opinions under Tex. Rules of Evidence 703 and 705. This issue has been thoroughly briefed by Halprin.

II.

In support of this argument, Halprin submits the following case:

*Rivas v. Thaler*, 2010 WL 1223130 (not designed for publication) (copy attached). In this opinion, Magistrate Judge Stickney found against George Rivas on his claim that Rivas' defense counsel rendered ineffective assistance by failing to object at Rivas' sentencing hearing to the prosecutor's use of a statement made by Randy Halprin to law

Supplemental Authority in Support of Argument on Ineffective Assistance of Counsel on Appeal in Application for Writ of Habeas Corpus - Page 1

2495

enforcement that supported the state's death penalty argument against Rivas.  Magistrate

Judge Stickney said the following:

> "At sentencing, hearsay concerns carry less weight. The Confrontation Clause
> does not apply, rather the admissibility of hearsay evidence is governed by the
> Due Process Clause, which merely 'requires that some minimal indicia of
> reliability accompany a hearsay statement.' *Fields*, 483 F.3d at 337-338
> (quoting *United States v. Petty*, 982 F.2d 1365, 1369 (9th Cir. 1993)."
> (Opinion, p. 11).

The importance of this discussion to Halprin's writ issue is to demonstrate that the

Court of Criminal Appeals would almost certainly find error in the trial court's refusal, in

Halprin's case, to allow Dr. Goodness to testify as to the information underlying her

opinions, even if that information constitutes hearsay.  Since the state was allowed to use

hearsay against another of the Texas Seven defendants at his trial, certainly the Court of

Criminal Appeals would find error in the trial court's refusal to accept hearsay from Dr.

Goodness, especially when the proposed testimony was admissible under the Texas Rules

of Evidence.

Moreover, Magistrate Judge Stickney recognized that the hearsay rules carry less

weight in a capital sentencing proceeding than in other types of legal hearings.  It would

certainly be contrary to basic notions of due process and fundamental fairness for these

relaxed evidentiary rules to be applied against one of the Texas Seven defendants but not

when it works in ones favor.

Supplemental Authority in Support of Argument on Ineffective Assistance of Counsel on Appeal in Application for Writ of Habeas Corpus - Page 2

2496

Respectfully submitted,

GARY A. UDASHEN
State Bar of Texas No. 20369590

BRUCE ANTON
State Bar of Texas No. 01274700

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas  75201
214-468-8100
214-468-8104 fax

ATTORNEYS FOR APPLICANT

## CERTIFICATE OF SERVICE

On this 13th day of September, 2011, a true and correct copy of the foregoing Supplemental Authority in Support of Argument on Ineffective Assistance of Counsel on Appeal in Application for Writ of Habeas Corpus was delivered to Lisa Smith, Assistant District Attorney, 133 N. Riverfront Blvd., L.B. 19, Dallas, Texas 75207.

GARY A. UDASHEN

Supplemental Authority in Support of Argument on Ineffective Assistance of Counsel on Appeal in Application for Writ of Habeas Corpus - Page 3

2497

Rivas v. Thaler | Westlaw Next   Case 3:13-cv-01535-L   Document 17-136   Filed 08/21/14   Page 410 of 470   PageID 17969   9/12/11 11:41 AM

WestlawNext

RELATED TOPICS

Habeas Corpus

Jurisdiction, Proceedings, and Relief
  Scope of Federal Habeas Review of
  State Court Fact Findings

Rivas v. Thaler
United States District Court, N.D. Texas, Dallas Division.   January 22, 2010   Not Reported in F.Supp.2d

2010 WL 1223130
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

Return to History

Dallas Division.

George RIVAS, Petitioner,

v.

Rick THALER, Director, Texas Department of Criminal Justice Correctional Institutions Division, Respondent.

Civil Action No. 3:06-CV-344-B.   Jan. 22, 2010.

## Attorneys and Law Firms

Mick Mickelsen, Broden & Mickelsen, Dallas, TX, Robert J Herrington, Law Office of Robert J. Herrington, Plano, TX, for Petitioner.

Leslie K. Kuykendall, Office of the Texas Attorney General, Austin, TX, for Respondent.

## Opinion

### FINDINGS, CONCLUSIONS AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

PAUL D. STICKNEY, United States Magistrate Judge.

**\*1** This case has been referred to the United States Magistrate Judge pursuant to Title 28 United States Code section 636(b). The Findings, Conclusions and Recommendation of the Magistrate Judge are as follows:

Before the Court is a petition for writ of habeas corpus filed under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254 by Petitioner George Rivas ("Rivas"), a prisoner sentenced to death for capital murder. For the reasons discussed, the Court finds that Rivas's petition is without merit and should be DENIED.

### I. PROCEDURAL HISTORY

On August 29, 2001, after a trial before a Dallas County jury, Rivas was convicted of the capital murder of Irving police officer Aubrey Hawkins ("Hawkins") and sentenced to death by lethal injection. (Clerk's Record ("CR") 257-59.) On June 23, 2004, the Texas Court of Criminal Appeals ("TCCA" and "state habeas court") affirmed Rivas's conviction and sentence on direct appeal.[1] *Rivas v. State,* slip op. No. 74,143

2498

(Tex.Crim.App. June 23, 2004); [2] see also (Petitioner's Appendix ("Pet.App.") 2. [3]) The TCCA denied Rivas's petition for rehearing, and the U.S. Supreme Court denied his petition for certiorari. (Pet.App.1); *Rivas v. Texas.* 543 U.S. 1166, 125 S.Ct. 1342, 161 L.Ed.2d 142 (2005).

On September 12, 2003, while his direct appeal was pending before the TCCA, Rivas filed his state application for writ of habeas corpus in the state trial court. (1 State Habeas Transcript ("SHTr") 2.) The trial court entered findings of fact and conclusions of law recommending that Rivas's appeal be denied. On February 15, 2006, the TCCA issued an unpublished order denying Rivas's writ and adopting the trial court's findings of fact and conclusions of law with the exception of finding numbers 269-93. (*Ex parte Rivas,* No. WR-63286-01, 2006 WL 367474 (Tex.Crim.App. Feb.15, 2006) (per curiam); (7 SHTr 2138-2229; *see also* Pet.App. 3.) On February 13, 2007, Rivas timely filed a federal petition for writ of habeas corpus in this Court. (Petition (Doc. # 23); Petition Brief ("Pet.Br.") (doc. # 24).)

## II. *STATEMENT OF FACTS*

### A. *Guilt/Innocence Phase*

The evidence presented during the guilt/innocence stage of Rivas's trial established the following facts. On December 13, 2000, a group later known as the "Texas Seven," comprised of Rivas and six of his fellow inmates, escaped from the Conally Prison Unit of the Texas Department of Criminal Justice. (32 Reporter's Record ("RR") 102-04.) The group included Rivas, Joseph Garcia ("Garcia"), Randy Halprin ("Halprin"), Larry Harper ("Harper"), Patrick Murphy ("Murphy"), Donald Newbury ("Newbury"), and Michael Rodriguez ("Rodriguez"). (*Id.*)

On December 24, 2000, just prior to the closing of the Oshman's Superstore ("Oshman's") in Irving, Texas, the Texas Seven initiated a robbery of the store armed with weapons and two-way radios. Garcia, Halprin, Newbury and Rodriguez entered the store pretending to be customers while Rivas and Harper masqueraded as Oshman's security guards. Murphy, the seventh member of the group, sat in a truck parked outside the Oshman's watching and checking police radio frequencies. (28 RR 42, 56-57, 67, 71; State's Trial Exhibits ("SE") 1 at 1-3, 12.) Rivas and Harper explained to the store managers that they were investigating thefts at another Oshman's and asked that a manager bring the store's employees together to look at a photo spread. (29 RR 42-45, 50-61, 98-99, 106-107, 30 RR 30, 34 RR 109.) Meanwhile, other men went throughout the store stealing merchandise. (29 RR 102-07.) Once the employees had gathered together, Rivas brandished his gun and told them of his intent to rob the store. (28 RR 62-69, 123, 29 RR 107-109, 114-15, 30 RR 31-32, 43, 34 RR 110.) During the robbery, Rivas warned store manager Wesley Ferris ("Ferris") not to try anything or he and the other employees would be shot. (28 RR 65-66, 123, 29 RR 115-17.) Rivas instructed the other men in his group to bring the Oshman's employees to the store's breakroom and tie them up, and Rivas told Ferris to open the store's gun vault, safe and cash registers. (28 RR 74-83, 85-90, 117, 29 RR 45, 59-60, 146, 33 RR 35, 176; SE 1.) Rivas left Ferris with the other employees in the breakroom, took his car keys from him, exited the Oshman's and drove Ferris's Ford Explorer around the store to the loading dock located in the back. (28 RR 80, 90-91, 127, 30 RR 20-23; SE 1.) Altogether, the Texas Seven stole over $70,000 in cash as well as forty-four firearms, ammunition and various equipment from the Oshman's. (28 RR 83, 108-11.)

**\*2** During the robbery, Misty Wright, a girlfriend of one of the Oshman's employees, waited in her car outside the store and observed the employees inside raising their hands over their heads. Wright telephoned a friend who joined her in her car. The two saw Rivas exiting the Oshman's, and they witnessed Rivas driving Ferris's Ford

Explorer to the back of the store. Wright and her friend fled the parking lot and called the police from a nearby restaurant. Meanwhile, Rivas used his two-way radio to warn the other robbers and told them to get to the back of the store. Within a few minutes, Murphy radioed the group that he saw a police car entering the store parking lot. (30 RR 12-16, 22-23; SE 1.)

In response to the reported robbery, the police dispatcher initially sent four officers to the Oshman's. Hawkins was the first to arrive, and he drove through the parking lot directly to the back of the store, where he was shot eleven times by various members of the Texas Seven. (28 RR 141-42, 30 RR 22-23; SE 1.) Evidence at trial established that at least five different guns fired at Hawkins from at least two directions in less than a minute and that he died immediately. (31 RR 56-73, 32 RR 72-88, 34 RR 56-80, 30 RR 98, 33 RR 112; SE 74.) Some of the robbers then took Hawkins out of the police vehicle and laid him on the ground. Rivas subsequently ran over Hawkins in Ferris's Ford Explorer, dragging him approximately ten feet. (30 RR 145-47, SE 1.) According to Rivas, he did not realize he had run over Hawkins until he heard the evidence at trial. (43 RR 75, 79.)

During his trial, Rivas testified that as he approached Hawkins's vehicle, he thought he saw the officer reaching for his gun and initially shot him in an attempt to subdue him. Rivas stated that he shot Hawkins in the chest on purpose because he knew Hawkins would be wearing a bulletproof vest. (33 RR 192; SE 1.) Rivas testified that he fired another shot at Hawkins's chest and then fired three more shots in response to what he thought were shots fired by Hawkins. (43 RR 75, 79.) The evidence demonstrated that Rivas was also shot during that time period. (SE 1.)

Following the robbery, the Texas Seven escaped to Colorado where someone identified them and notified the Federal Bureau of Investigation ("FBI"). (32 RR 110-15.) All of the men were arrested, except Harper, who committed suicide before authorities could apprehend him. (32 RR 118-21, 161-64, 170-78, 197-98.) On the day of his arrest, Rivas waived his *Miranda*[4] rights during his police interview and signed a written confession. (SE 1.) During searches of an RV and another vehicle the Texas Seven had been using, authorities recovered Hawkins's gun as well as guns and merchandise stolen from the Oshman's in Irving, Texas. (33 RR 32-104.)

Following the close of the evidence, a jury convicted Rivas of capital murder.

## B. *Punishment Phase*

The evidence presented during the punishment phase of Rivas's trial established the following facts. Rivas was serving seventeen life sentences, some concurrent, when he escaped from prison. Rivas had prior convictions for aggravated robbery of an Oshman's in El Paso, Texas, aggravated kidnapping and burglary. (36 RR 10-19, 39 RR 76-79; SE 498.) Evidence from both the State as well as the defense established that Rivas was the ringleader of the Texas Seven, and that he had planned their escape from the Connally Unit as well as the robbery of the Irving Oshman's. (36 RR 28-29, 34-38, 42-43, 42 RR 51-73, 104-13, 43 RR 7-36.) The State introduced evidence that Rivas and the other escapees assaulted and threatened prison employees during their escape. (36 RR 56-70, 82-83, 104-18, 42 RR 74-105, 37 RR 95-104.) Additionally, the State solicited the testimony of Rivas's half sister, who claimed that he had sexually abused her from the age of six through sixteen. (38 RR 36-42.) Finally, the State presented expert testimony from criminal forensic psychiatrist Dr. Richard Coons ("Coons"), who testified that based upon his review of Rivas's history, it was his opinion that Rivas would probably commit criminal acts of violence and continue to threaten society. (41 RR 35-48.)

*3 Rivas testified in his own defense and admitted to committing numerous crimes as

well as to planning the group's escape from prison and the robbery of the Oshman's in Irving. In his own defense, he told the jury that he tried to be polite and minimize the pain he inflicted on those he robbed. He also testified that he did not intend to kill Hawkins, nor had he planned to commit additional robberies. Rivas denied his half sister's allegations of abuse. (38 RR 117-28, 42 RR 25-31, 51-76, 81-82, 86, 103, 43 RR 30-31, 36-87, 149-50, 159-63, 44 RR 30, 35-36.) Ultimately, Rivas testified that he would rather die than be sent back to prison. (44 RR 34-36.)

### III. STANDARD OF REVIEW

The standard of review in death penalty cases is set forth in AEDPA, which governs all federal petitions for habeas corpus filed on or after its effective date that were previously adjudicated on the merits in state court. *Lindh v. Murphy,* 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Under the AEDPA, a petitioner is only entitled to federal habeas relief with respect to any claim that was actually adjudicated on the merits in state court proceedings if the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;
>
> or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d) (2009).

A claim has been adjudicated or resolved "on the merits" if the state court's decision was substantive rather than procedural. *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir.2000) (citing *(Ricky Lee) Green v. Johnson,* 116 F.3d 1115, 1121 (5th Cir.1997)). The state habeas court's denial of Rivas's state writ in this case constitutes an adjudication on the merits for purposes of section 2254(d). *See Ex parte Thomas,* 953 S.W.2d 286, 288-89 (Tex.Crim.App.1997).

Section 2254(d)(1) governs pure questions of law as well as mixed questions of law and fact. *Martin v. Cain,* 246 F.3d 471, 475-76 (5th Cir.2001). Federal district courts reviewing state habeas court decisions may only grant relief if the state court reaches a conclusion on a question of law opposite that of the U.S. Supreme Court or if the state court comes to a different decision than the U .S. Supreme Court in a case where the facts are materially indistinguishable. *Williams v. Taylor,* 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court has also unreasonably applied clearly established federal law if the court correctly identifies the governing legal principle from the Supreme Court's decisions but unreasonably applies the principle to the facts of the case. *Id.* at 413; *accord Penry v. Johnson,* 532 U.S. 782, 792, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001). Finally, a state court acts unreasonably for purposes of section 2254(d)(1) if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Reed v. Quarterman,* 504 F.3d 465, 471 (2007) (quoting *Williams,* 529 U.S. at 407). Federal courts deciding federal habeas appeals determine whether "the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409; *accord Penry,* 532 U.S. at 793.

*4 Questions of fact are governed by section 2254(d)(2). *Moore v. Johnson,* 225 F.3d 495, 501 (5th Cir.2000). Federal courts analyzing habeas claims under section 2254(d)(2) must presume that the state court's factual findings are correct unless the findings were "based on an unreasonable determination of the facts in light of the

2501

evidence presented in the state court proceeding." *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir.2000). In order to overcome this presumption, a petitioner such as Rivas must offer clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1).

## IV. ANALYSIS

Rivas moves this Court for habeas relief, claiming nine separate violations of his federal Constitutional rights:

### Guilt/Innocence Phase of Trial

*Claim A-1:* Rivas was denied effective assistance of counsel under the Sixth and Fourteenth Amendments of the U.S. Constitution when his trial counsel failed to object to the State's improper argument regarding the necessary intent required to convict Rivas of capital murder under Texas law. (Pet. Br. at 5.)

*Claim A-2:* Rivas was denied effective assistance of counsel under the Sixth and Fourteenth Amendments of the U.S. Constitution when his trial counsel failed to object to a jury venire that did not adequately reflect a fair cross-section of the community. (*Id.*)

### Punishment Phase of Trial

*Claim B-1:* Rivas was denied due process of law when the trial court erroneously admitted expert witness testimony regarding future dangerousness. (*Id.*)

*Claim B-2:* Rivas was denied effective assistance of counsel under the Sixth and Fourteenth Amendments of the U.S. Constitution when his trial counsel failed to object to the prosecution's reading of unsworn out-of-court statements made by Rivas's co-defendants. (*Id.*)

*Claim B-3:* Texas's lethal injection scheme violates Rivas's Eighth Amendment guarantee against cruel and unusual punishment. (*Id.* at 6.)

*Claim B-4:* Rivas's due process rights were violated by of the trial court's improper allocation of the burden of proof on the issue of mitigation in its instructions to the jury. (*Id.*)

*Claim B-5:* Rivas's due process rights were violated because of the trial court's use of vague terms in its instructions to the jury regarding "special issues." (*Id.*)

*Claim B-6:* Rivas's due process rights were violated by the trial court's issuance of jury instructions requiring ten "no" votes on special issue number three. (*Id.*)

*Claim B-7:* Rivas's due process rights were violated by the trial court's jury instruction, which prevented the jury from considering the unlikelihood of his release on parole. (*Id.*)

The Court will address each of Rivas's claims below.

## A. Errors at the Guilt/Innocence Phase of Trial

Rivas makes two claims for relief based upon alleged violations of his Constitutional rights during the guilt/innocence phase of his trial. Both claims are based on the alleged ineffective assistance of Rivas's trial counsel. The Sixth Amendment of the U.S. Constitution guarantees criminal defendants the right to reasonably effective assistance of counsel at trial and on appeal. *Cuyler v. Sullivan*, 446 U.S. 335, 344-45, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Thomas v. Lynaugh*, 812 F.2d 225, 229 (5th Cir.1987). A petitioner seeking habeas relief on the basis of ineffective assistance of counsel must satisfy the two-prong test set forth by the U.S. Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In

2502

*Strickland,* the Court held that a petitioner such as Rivas must demonstrate by a preponderance of the evidence first that his counsel's performance was deficient and second that the deficient performance prejudiced his defense. *Id.* at 687. A federal court reviewing an ineffective assistance of counsel claim must consider the totality of the evidence, and there is a strong presumption that the petitioner's counsel's conduct falls within the range of reasonable assistance. *Id.* at 669. The federal court must evaluate defense counsel's conduct from counsel's perspective at the time. *Id.* at 689. To overcome the strong presumption that his counsel acted reasonably, a petitioner such as Rivas must produce clear and convincing evidence that there is a "reasonable probability" that but for his counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 669. "Reasonable probability" is defined as sufficient to undermine confidence in the outcome. *Id.* A federal court may only find that defense counsel was deficient if counsel's performance was such that it "renders the result of the trial unreliable or the proceeding fundamentally unfair." *Williams.* 529 U.S. at 393, n. 17 (citations and internal quotation marks omitted).

### 1. Ineffective Assistance of Counsel for Failing to Object to the Prosecutor's Argument Concerning "Intent" Under Texas Law (Claim A-1).

*5 In his first ground for relief, Rivas claims that his trial counsel failed to provide effective assistance of counsel at the guilt/innocence phase of the trial when he did not object to the prosecutor's allegedly erroneous closing argument. Rivas complains that the prosecutor's argument was flawed because the prosecutor did not discuss the specific intent required of Rivas's co-conspirator for a capital murder conviction. (Pet. Br. at 17, 23-30.) Rivas's claim arises from the following portion of the prosecutor's argument highlighted in bold text as follows:

> The evidence in this case is overwhelming. It is a case which you-it has been explained to you that the State can prove one of two ways, or both, and I submit to you that we have done both. We can prove to you that [Rivas] intentionally killed Aubrey Hawkins because he was a police officer and he knew that. We can prove to you that he killed Aubrey Hawkins because he murdered him during the course of a robbery. **Or we can prove to you that he entered into this conspiracy, and even if he didn't have the intent-let's just take for a moment that ludicrous explanation in his confession that he didn't have the intent to kill anyone out there. If you agree with that, he is still guilty under the law because he entered into a conspiracy to commit robbery and he should have anticipated that someone would die.** And this is a plan destined to fail, folks.

(35 RR 58-59.)

Specifically, Rivas claims that the prosecutor misled the jury regarding the specific intent required to convict Rivas of capital murder. According to Rivas, the State did not establish beyond a reasonable doubt that either Rivas or any of his co-conspirators shot at Hawkins with the specific intent to cause his death. (Pet. Br. at 23.) The State erred, Rivas claims, in failing to explain this requirement to the jury, and Rivas's counsel erred in failing to object to the prosecutor's argument containing the omission.

Texas law allows prosecutors arguing to a jury to discuss four topics: "(1) summation of the evidence; (2) reasonable deductions from the evidence; (3) responses to opposing counsel's argument; and, (4) pleas for law enforcement." *Coble v. State,* 871 S.W.2d 192, 204 (Tex.Crim.App.1993). This list is expanded in the Texas Code of Criminal Procedure to include evidence pertaining to a defendant's character and reputation. TEX.CODE CRIM. PROC. ANN. art 37.07 § 3(a) (Vernon 1981 & Supp.2005).

2503

The trial court correctly instructed the jury that the State could prove Rivas's guilt by proving either (1) that Rivas killed Hawkins with knowledge that Hawkins was a police officer, or (2) that Rivas entered into a conspiracy to commit robbery and that one of Rivas's co-conspirators intentionally and knowingly killed Hawkins in furtherance of that conspiracy. (Pet. Br. at 23; TEX. PENAL CODE ANN. § 7.02(b) (Vernon 2003); CR 245-246.)

The evidence at trial established that it could not be clearly determined who was responsible for firing the shot that actually killed Hawkins. (31 RR 58-73, 89; DE 9). Rivas himself admitted to shooting at Hawkins four times. (29 RR 34-35; SE 1). The record also demonstrates that Hawkins was shot eleven times by at least two guns and that at least three of those shots fatally wounded Hawkins. (31 RR 58-73, 89; DE 9). Additionally, the other prosecutor, not the one giving the speech Rivas complains of, explained to the jury that the co-conspirator who actually killed Hawkins had to have acted intentionally and knowingly." (44 RR 51; 7 SHTr 2191 (# 254); 7 SHTr 2131.)

*6 Rivas's claim is based on the premise that his trial counsel was ineffective for failing to object to conduct by the prosecutor that violated Texas law. The first step Rivas must undertake to establish a *Strickland* violation for failure to object is to demonstrate that any objection his trial counsel allegedly should have made would have been meritorious under Texas law. A meritorious objection is one that would have been sustainable if it had been properly made. *See (Norman Evans) Green v. Johnson,* 160 F.3d 1029, 1037 (5th Cir.1998) (holding that counsel's failure to make a frivolous objection is not unreasonable).

Reviewing this claim on appeal, the state habeas court rejected it and held that any objection Rivas's trial counsel could have made would have been meritless. The court found that Rivas had misinterpreted the prosecutor's argument, and moreover held that the argument itself was not in error because the prosecutor was "simply focusing on [Rivas's] mental state." The state habeas court found that the prosecutor's "silence on the matter of the killing co-conspirator's mental state" did not equate to telling the jury that proof of intent was not required. (7 SHTr 2190-91 (internal citations omitted).)

The state habeas court went on, noting that trial counsel's informed strategic decisions rarely constitute grounds for a claim of ineffective assistance of counsel, and the court found that Rivas's trial counsel was making a strategic decision in not objecting to the prosecutor's argument. (7 SHTr 2192 (citing RR 40-44; *(Ricky Lee) Green v. Johnson,* 116 F.3d at 1122).) The state habeas court held that Rivas's "counsel's decision not to object was consistent with the reasonable trial strategy of not objecting during closing argument absent egregious error." (RR 40-44)

Rivas has not and cannot demonstrate that an objection would have been meritorious had it been made, and thus the state habeas court's finding was not contrary to, or an unreasonable application of, clearly established federal law.

Even assuming, *arguendo,* that Rivas's trial counsel erred in failing to object to the prosecutor's argument as set forth above, his claim nevertheless fails because Rivas has failed to establish that his counsel's conduct prejudiced his case in light of the trial court's correct instructions to the jury. Addressing the question of prejudice, the state habeas court held that Rivas had failed to "rebut the presumption that counsel's decision not to object was a sound one, much less demonstrate how he was prejudiced by it." (7 SHTr 2192) (internal citations omitted). It is well established that jurors are presumed to follow the trial court's instructions. *Galvan v. Cockrell,* 293 F.3d 760, 765 (5th Cir.2002).

Accordingly, the Court finds that the state habeas court's conclusion that Rivas's trial counsel did not render ineffective assistance by failing to object to the prosecutor's argument was not an unreasonable application of the *Strickland* standard. Moreover, in light of the voluminous evidence of Rivas's guilt, the Court finds that Rivas has not demonstrated that, even if his counsel's performance was deficient, that the performance prejudiced Rivas. Rivas is not entitled to any relief on this claim of ineffective assistance of counsel, and the Court recommends it be denied.

### 2. Failure to Preserve An Objection Regarding Jury Composition (Claim A-2)

*7 In claim A-2, Rivas claims that his counsel failed to protect his rights under the Sixth and Fourteenth Amendments to a fair cross-section of the community which was violated by the under-representation of Hispanics, persons 18 to 34 years old, and persons from households with incomes under $35,000 within the jury pool. (Pet. Br. at 31-43.) Rivas's trial counsel did not make a fair-cross-section objection. Thus this Court must determine whether the fair-cross-section claim would have had merit, since it would not be deficient to withhold a meritless objection. *See Turner v. Quarterman*, 481 F.3d 292, 298 (5th Cir.2007); *(Norman Evans) Green*, 160 F.3d at 1037.

In support of his claim, Rivas cites the U.S. Supreme Court's decision in *Taylor v. Louisiana*, 419 U.S. 522, 537, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), in which the Court held that a defendant has the right to a fair trial by a jury selected from a cross-section of the community. To establish a *prima facie* violation of this right, Rivas must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which Dallas County juries are selected is not fair and reasonable in relation to a number of such persons within the community, and (3) that this resulting under-representation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 363-64, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). Rivas must establish each of these elements to established a prima facie violation of the Sixth Amendment's fair cross-section requirement. *Timmel v. Phillips*, 799 F.2d 1083, 1086 (5th Cir.1986). In his state habeas appeal, Rivas presented expert analysis from Dr. Harold J. Hietala ("Hietala") to support his claim.

Analyzing the "distinctive group" requirement set forth in *Taylor*, the state habeas court correctly noted that although Hispanics qualify as a distinctive group in Dallas County, persons 18 to 34 in fact persons of any particular age group-have not been found to be a distinctive group. (7 SHTr at 2143 (citing *Aldrich v. State*, 928 S.W.2d 558, 560 (Tex.Crim.App.1996).) The Court finds that the state habeas court's decision on whether persons aged 18 to 34 qualify as a distinctive group is not contrary to clearly established federal law.

Next, the state habeas court found that Rivas had failed to demonstrate that the representation of Hispanics is not fair and reasonable in relation to the number of Hispanics in Dallas County. (7 SHTr at 2146.) Although Rivas presented U.S. census figures demonstrating that the population percentages of Hispanics is well above the population percentage of Hispanics on Rivas's venire, he introduced no evidence establishing that the representation of Hispanics "on Dallas County venires is not fairly and reasonably related to the number of such persons in the community *who are qualified to sit on a jury." Id.* (emphasis in original) (citing *Pondexter v. State*, 942 S.W.2d 577, 580-81 (Tex.Crim.App.1996) (holding that whether representation of a distinctive group is reasonable is based upon comparison to percentage of those who qualify for jury service)). The state habeas court noted its disagreement with Hietala's assumption that the results of his analysis would be the same using either the population as a whole or the jury-qualified population (Applicant's Exhibit 1, Hietala Aff., § 10.2), citing an exhibit attached to the State's writ application showing high

2505

percentages of foreign persons and non-citizens in the U.S. Hispanic population. (7 SHTr at 2146-2147.) The state habeas court also commented on other discrepancies in Hietala's data. (*Id.*). Ultimately, the court found that Rivas failed to satisfy the second prong of *Duren*, requiring proof of violation of the fair cross-section requirement. (*Id.*)

*8 *Duren* does not require that the "juries actually chosen must mirror the community" but that they must be drawn from a source that is fairly representative of the community. *Taylor*, 419 U.S. at 538. "The fair-cross-section requirement does not guarantee jur[ies] of any particular composition. Rather, it only guarantees that the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups." *Paredes v. Quarterman*, 574 F.3d 281, 289 (5th Cir.2009) (internal quotations and citations omitted). Moreover, the Constitution assures due process in the summoning of a fair cross section of jurors, not in the response of those properly summoned. The Court finds that the state habeas court's decision on this issue is not contrary to or an unreasonable interpretation of clearly established federal law.

Finally, the state habeas court analyzed *Duren* 's "systematic exclusion" requirement and found that Rivas failed to demonstrate that under-representation of Hispanics "was inherent in the particular jury selection process used." (7 SHTr at 2148 (citing *Duren*, 439 U.S. at 366.) In order to show that Hispanics were systematically excluded, Rivas must demonstrate that the underrepresentation was inherent in Dallas County's jury selection process. *Duren*, 439 U.S. at 366. To do so Rivas must identify a specific systematic defect or operational deficiency responsible for the underrepresentation. *United States v. Pion*, 25 F.3d 18, 23 (1st. Cir.1994). The state habeas court held that "affirmative barriers to selection for jury service or different selection standards for different groups is the earmark of a Sixth Amendment violation." (7 SHTr at 2148-49 (citing *Barber v. Ponte*, 772 F.2d 982, 997-98 (1st Cir.1985) ("The Supreme Court has never gone so far as to hold that the Constitution requires venires to be, statistically, a substantially true mirror of the community."); *Taylor*, 419 U.S. at 523, 531 (holding that a Louisiana statute requiring women to file a written declaration of desire to be subject to jury service before being eligible for selection violated the fair cross-section requirement); *Lacy v. State*, 899 S.W.2d 284, 288 (Tex.App.-Tyler 1995, no pet.) (holding that a successful cross-section claim must demonstrate "some manner whereby [the distinctive groups] were not included in the computer base from which the panel was selected.")).) Noting that jurors in each county in Texas are selected from the names of all persons on current voter registration lists and from those who have valid Texas driver's licenses or identification cards, the state habeas court found that "there is nothing inherently exclusive about this method of selection, and it has been upheld repeatedly against Sixth Amendment attack." (7 SHTr at 2150 (citing TEX. GOV'T CODE ANN. § 62.001 (Vernon Supp.2004) and *United States v. James*, 528 F.2d 999, 1022 (5th Cir.1976).) Moreover, the court noted that Rivas failed to assert an operational defect in Dallas County's juror selection process. (7 SHTr at 2154.)

*9 Ultimately, the state habeas court found that Rivas "failed to prove any violation of the fair cross-section requirement." (SHTr 2142.) Citing the U.S. Supreme Court's decision in *Ramdass v. Angelone*, 530 U.S. 156, 172, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000), the state habeas court held that Rivas's "mere citation of newspaper articles ... does not suffice to introduce into evidence the truth of the hearsay or so-called scientific conclusion contained within them." (SHTr at 2142-43.) Furthermore, it held that even if the newspaper articles were adequate, the articles combined with evidence Rivas presented from Hietala in the form of a statistical analysis nevertheless failed to establish that Rivas's right to a fair cross-section of the community on his jury was violated. (*Id.* at 2143.)

Since Rivas's allegations evince no violation of *Duren,* there could be no ineffective assistance for failing to raise the *Duren* claim. *See Turner,* 481 F.3d at 298. The Court finds that the state habeas court's decision denying Rivas's claim for relief is not contrary to, nor is it an unreasonable interpretation of, clearly established federal law. Accordingly, this claim is without merit and the Court recommends that it be denied.

## B. *Errors at the Punishment Phase of Trial*

### 1. *Improper Admittance of Expert Testimony on the Issue of Future Dangerousness (Claim B-1)*

In his first complaint pertaining to the punishment phase of his trial, Rivas alleges that the trial court violated his due process rights by allowing improper expert testimony from the State's expert, Coons, regarding future dangerousness. (Pet. Br. at 44.) Rivas claims that the state failed to satisfy the test for reliability of expert witness testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rivas argues that "[d]espite the fact that the *Daubert* discussion of reliability in expert testimony was in the context of a federal civil case, its standard of reliability should be a model for death penalty determinations." (Pet. Br. at 46.) Rivas's argument, however, is foreclosed by Fifth Circuit and U.S. Supreme Court precedent.

In *United States v. Fields,* 483 F.3d 313, 341-46 (2007), the Fifth Circuit, noting that *Daubert* does not apply to sentencing (including capital sentencing), held that a "jury could benefit from the opinion of a psychological expert[5] on [future dangerousness]." *Id.* at 345. That court further noted that reliability of such testimony is not of constitutional concern because "[e]xpert testimony about a defendant's 'future dangerousness' to determine his eligibility for the death penalty, *even if wrong 'most of the time,' is routinely admitted." Id.* at 345 n. 6 (quoting *United States v. Scheffer,* 523 U.S. 303, 334, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (Stevens, J., dissenting)). Because Dr. Coons's testimony was constitutionally permissible, the Court recommends that this claim be denied.

Moreover, even if Coons's testimony was improperly admitted, Rivas's claim nevertheless fails because he cannot demonstrate prejudice. Analyzing this claim on appeal, the TCCA found that the jury's decision could not have been significantly influenced by Coons's testimony because Rivas "had demonstrated a continuing propensity for violent behavior which was unlikely to change." *Rivas v. State,* No. 74,143, slip op. at 7-8. The TCCA specifically focused on evidence introduced at trial that Rivas was serving "seventeen stacked life sentences" at the time he and the other men escaped from the Connally Unit, and on the fact that Rivas and the other men "continued to acquire weapons" after escaping to Colorado. The court also considered the testimony of Rivas's half-sister regarding his sexual abuse of her during her childhood. *Id.* Rivas has not and cannot demonstrate that Coons's testimony significantly influenced the jury's decision in light of the other evidence presented at trial. [6] Rivas has failed to establish a Fourteenth Amendment claim under U.S. Supreme Court precedent and the law of this Circuit. The Court recommends this claim be denied. [7]

### 2. *Ineffectiveness of Counsel–Failure to Object to Prosecutor's Reading of Out-of-Court Statements Made by Rivas's Co-Defendants (Claim B-2).*

*10* In his third ineffective assistance of counsel claim, Rivas asserts that his trial counsel was ineffective during the punishment phase of trial for failing to object to the prosecutor's use of statements from Rivas's non-testifying co-defendants used to impeach him. (Pet. Br. at 53-66.) Rivas claims that the prosecutor's statements were inadmissible hearsay statements never properly admitted into evidence and were also in violation of Rivas's Sixth Amendment confrontation clause rights as set forth in the

**2507**

U.S. Supreme Court's decision, *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

Specifically, Rivas complains about the prosecutor's use of statements made by Rivas's co-defendant, Randy Halprin, to impeach Rivas's testimony regarding his lack of intent to kill Officer Hawkins when firing his gun. (43 RR 109.) According to the statement read by the prosecutor, Halprin stated that Rivas "went up and shot the cop four times[,]" which, in the State's estimation, indicated that Rivas intended to "execute" Officer Hawkins, rather than merely subdue him as Rivas claimed. (43 RR 109-110.) In addition to Halprin's statement, the prosecutor stated that Murphy, Rivas's co-defendant, told authorities that the group of robbers brought weapons taken during their escape from prison with them in the lookout vehicle, and that Murphy claimed that his job was to initiate a "firefight" with the police. (43 RR 117-23.) Again, the prosecutor argued that Rivas's co-defendant's statements discredited Rivas's claims about lacking specific intent to kill and indicated that the group intended to "hurt [somebody] out there that day." (43 RR 115, 117.) Finally, attempting to contradict Rivas's claims that the sole purpose of the robbery was to obtain money, the prosecutor read a portion of co-defendant Rodriguez's statement to the police that one of the group's reasons for robbing the Oshman's was to obtain firearms. (43 RR 124-25.)

Rivas complains that his attorney failed to make an objection to the prosecution's reading of his absent co-defendants hearsay statements during his trial as none of the men were present to allow Rivas to cross examine. (Pet. Br. at 55-56.) According to Rivas, the statements of his co-defendants which were read or paraphrased by the prosecutor "had a critical bearing on the jury's resolution of the second special issue at punishment, that is, whether [Rivas] actually caused the death of the victim, or at least anticipated that a life would be taken, as contemplated by Article 37.071, Section 2(b) (2) of the Texas Code of Criminal Procedure." (Pet. Br. at 55 (citing CR 264; 44 RR 96-97.))

At sentencing, hearsay concerns carry less weight. The Confrontation Clause does not apply, rather the admissibility of hearsay evidence is governed by the Due Process Clause, which merely "requires that some minimal indicia of reliability accompany a hearsay statement." *Fields,* 483 F.3d at 337-338 (quoting *United States v. Petty,* 982 F.2d 1365, 1369 (9th Cir.1993). However, confessions by accomplices that incriminate the defendant are "presumptively unreliable." *Lilly v. Virginia,* 527 U.S. 116, 130-31, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). On this record, whether the testimonial hearsay would have been admissible is a close question. However, the Court need not decide this question because, as the state habeas court noted on review, even if the testimony was objectionable, Rivas's counsel made a strategic decision not to object to this evidence during the punishment phase. The Fifth Circuit, analyzing a claim of deficient performance under *Strickland,* stated, "We compare counsel's performance to an objective standard of reasonableness, mindful of the strong presumption of adequacy. We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices." *(Ricky Lee) Green,* 116 F.3d at 1122. At Rivas's state writ hearing, his counsel testified that it was his strategy to object as little as possible in order to appear open and honest to the jury. (SH RR 50-51, 103-05, 127.) Because Rivas had testified that he did not intend to kill Officer Hawkins, it was important to try to appear honest so that at least one juror might believe him and vote against a sentence of death. (*Id.*) Rivas's counsel testified that he thought the prosecutor was intentionally trying to bait him into objecting and abandoning that strategy. (*Id.* at 54, 57.) The state habeas court found that Rivas failed to overcome the strong presumption that his counsel's decision not to object constituted a valid trial strategy. (SHTr at 2200-01) (citing *Rylander v. State,* 101

2508

S.W.3d 107, 110 (Tex.Crim.App.2003)). The Court finds that the state habeas court's decision on this issue was not contrary to nor an unreasonable application of federal law, and thus Rivas's claim fails on this basis.

*11 Finally, even assuming, *arguendo*, that Rivas has established a confrontation clause violation, he is not entitled to habeas relief unless he can demonstrate that his attorney's error in failing to object "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). To do this, Rivas is required to have "successfully established ... grave doubt as to whether the assumed wrongfully admitted hearsay testimony influenced the conviction." *Cupit v. Whitley*, 28 F.3d 532, 538-39 (5th Cir.1994). Rivas has failed to make a showing that the admission of hearsay evidence met this standard. Given the abundance of evidence pertaining to each of the special issues presented to the jury at the punishment phase, the Court finds that Rivas cannot demonstrate prejudice under the standards set forth in *Strickland* and his claim likewise fails on this basis.

Under the U.S. Supreme Court precedent supporting the state habeas court's decision to deny this ineffective assistance of counsel claim, the Court find that the state habeas court's decision is not contrary to clearly established federal law. Rivas's claim is without merit, and the Court recommends it be denied.

### 3. *Objection to the State's Lethal Injection Method (Claim B-3)*
In his fifth claim for relief, Rivas claims that the State's lethal injection protocol violates the Eighth Amendment's guarantees against cruel and unusual punishment. (Pet. Br. at 68-73.) Rivas describes a number of specific cases in Texas where executions were allegedly "botched." (*Id.* at 68.) Following these descriptions, Rivas specifically alleges that Texas's lethal injection protocol creates "a substantial and unacceptable possibility that [Rivas's] own death will be similarly prolonged and will cause wanton and unnecessary pain ..." (*Id.* at 71.)

Rivas's claim that the manner of execution in Texas violates his Eighth Amendment guarantees against cruel and unusual punishment is precluded by the U.S. Supreme Court's decision in *Baze v. Rees*, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008). The Court in *Baze* addressed Kentucky's three-drug protocol for lethal injection and held that it was constitutional, finding that the petitioner in *Baze* failed to demonstrate that Kentucky's lethal injection procedure creates a substantial risk of serious harm that would be reduced by the use of an alternative protocol. *Id.* at 1532. Like Kentucky's protocol, Texas's uses three chemical agents and the process is similar to that utilized by other states. (Pet. Br. at 38-39 (citing *Abdur' Rhaman v. Bredesen*, 181 S.W.3d 292, 302 (Tenn.2005)); *Reid v. Johnson*, 333 F.Supp.2d 546-47, 553-54 (E.D.Va.2004); *State v. Webb*, 252 Conn. 128, 750 A.2d 448, 450 n. 5, 451 (Conn.2000).) Moreover, as was the case in *Baze*, Rivas alleges a number of issues with Texas's current protocol, but he fails to demonstrate that the drug protocol creates a substantial risk of serious harm and has not offered an alternative drug protocol that would reduce the risk, if any, of serious harm. Accordingly, under the U.S. Supreme Court's decision in *Baze*, Rivas's claim of cruel and unusual punishment is without merit and should therefore be denied.

### 4. *Improper Allegations of Burden of Proof in Jury Instructions (Claim B-4)*
*12 Next, Rivas claims that his Sixth and Fourteenth amendment rights were violated by the trial court's failure to instruct the jury as to the burden of proof regarding the mitigating factors contained in the jury charge. (Pet. Br. at 74-75.) Specifically, Rivas claims that the State should bear the burden of proving beyond a reasonable doubt that there were not sufficient mitigating circumstances to warrant imposition of life imprisonment rather than the death penalty. (*Id.*) To support his claim, Rivas attempts

to rely on U.S. Supreme Court precedent set forth in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). But Rivas acknowledges that Fifth Circuit precedent forecloses Rivas's claim. (*Id.* at 75 (citing *Rowell v. Dretke*, 398 F.3d 370 (5th Cir.2005) (holding that there is no burden of proof regarding mitigating evidence at the punishment phase.) The Fifth Circuit has specifically addressed and dismissed Rivas's argument on more than one occasion. *See, e.g., Scheannette v. Quarterman*, 482 F.3d 815, 828 (5thCir.2007); *Granados v. Quarterman*, 455 F.3d 529, 536 (5th Cir.2006); *Rowell*, 398 F.3d at 379. In *Scheannette*, the court reiterated its previous holdings, stating that "the Texas death penalty scheme [does] not violate either *Apprendi* or *Ring* by failing to require the state to prove beyond a reasonable doubt the absence of mitigating circumstances." *Scheannette*, 482 F.3d at 828. Noting that death is the maximum penalty under Texas law, the court reasoned that Texas's scheme, which requires the state to prove each and every prerequisite to a sentence of capital punishment beyond a reasonable doubt before imposing the maximum state penalty of death does not increase a defendant's sentence. *Id.* Rather, a finding that sufficient mitigating circumstances exist would reduce a defendant's punishment from death to life imprisonment. *Id.* (citing *Granados*, 455 F.3d at 537).

The TCCA adopted the trial court's conclusions on habeas review, finding that Rivas failed to raise this particular claim at trial, instead objecting only on Eighth Amendment grounds, and held that Rivas's claim was procedurally barred for that reason. (SHTr 02207 at # 332-345.) In the alternative, the state habeas court held that even if his claim were subject to review, it lacked merit because neither *Ring* nor *Apprendi* "require the state to bear the burden of proving beyond a reasonable doubt that the mitigation issue should be answered negatively." (*Id.* at # 339-345 (internal citations omitted).) Under the Fifth Circuit precedent discussed previously, the Court finds that the state habeas court's decision denying Rivas's claim is not contrary to clearly established federal law. Accordingly, this claim is without merit, and the Court recommends it be denied.

### 5. Due Process Violation As a Result of the Court's Refusal to Submit Certain Jury Instructions (Claim B-5)

*13 Rivas next claims that his due process rights were violated by the trial court's instructions to the jury with special issues that contained allegedly vague and undefined terms. (Pet. Br. at 79-84.) Specifically, Rivas complains of the trial court's failure to define the terms "probability," "criminal acts of violence," and "continuing threat to society." (*Id.*) Rivas acknowledges the trial court submitted to the jury the special issues statutorily mandated by the Texas Code of Criminal Procedure at the conclusion of the punishment phase of his trial. As with his previous claim, Rivas admits that this claim is barred by Fifth Circuit precedent.

The special issues submitted to the jury in Rivas's trial included:

#### Special Issue No. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, George Rivas, would commit criminal acts of violence that would constitute a continuing threat to society?

#### Special Issue No. 2

Do you find from the evidence beyond a reasonable doubt that the defendant, George Rivas, actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken?

#### Special Issue No. 3

2510

Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

(44 RR 51-52); *see* TEX.CODE CRIM. PROC. ANN. art. 37.071 § § 2(b)(1), (e)(1) (Vernon 1981 & Supp.2005).

Rivas argues that because the jury did not receive specific instructions regarding the meaning of the terms "probability," "criminal acts of violence" or "continuing threat to society," the trial court's jury charge "violated the constitutional requirement that each statutory aggravating circumstance genuinely narrow the class of persons eligible for the death penalty and reasonably justify the imposition of the death penalty." (Pet. Br. at 81 (citing *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).) According to Rivas, the special issues functioned as aggravating circumstances because they "circumscribe[d] the class of persons eligible for the death penalty." (Pet. Br. at 81 (quoting *Zant v. Stephens,* 462 U.S. 862, 878, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).) Citing the U.S. Supreme Court's decision in *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), Rivas argues that a death sentence may not be imposed using a vaguely defined aggravating factor unless that factor is accompanied by "a valid limiting construction, thereby providing the sentencer specific and detailed guidance concerning its scope," and that no such limiting construction was given. (Pet. Br. at 81.) Because the jury charge in his case was constitutionally inadequate, Rivas claims, "there was no rational process justifying the imposition of the death sentence upon [Rivas] in comparison to other cases in which other defendants received a life sentence," and this violated Rivas's rights under the Sixth, Eighth and Fourteenth Amendments. (*Id.*)

*\*14* In *Tuilaepa v. California,* 512 U.S. 967, 971-73, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994), the U.S. Supreme Court discussed the capital punishment decision-making process, distinguishing the eligibility phase from the selection phase. The Court explained that in determining a defendant's eligibility for capital punishment, the trier of fact must both "convict the defendant of murder" and then must also "find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase." *Id.* Continuing, the Court held that it is only after the trier of fact makes the determination that the defendant is eligible for capital punishment that it then considers the factors used to determine the appropriate punishment for the defendant. *Id.* at 979. Subsequently, in *Buchanan v. Angelone,* 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998), the Supreme Court again addressed the issue, noting that its previous decisions "suggest that complete jury discretion is constitutionally permissible." As for the specific terms Rivas complains of–"probability," "criminal acts of violence" and "continuing threat to society"–Fifth Circuit precedent has established that those terms are not unconstitutionally vague and that their meanings may be readily understood. *See, e.g., Woods v. Johnson,* 75 F.3d 1017, 1033-34 (5th Cir.1996); *James v. Collins,* 987 F.2d 1116, 1119-20 (5th Cir.1993); *Nethery v. Collins,* 993 F.2d 1154, 1162 (5th Cir.1993).

Rivas raised this claim as his twelfth point of error in his direct appeal, and it was rejected by the TCCA. *Rivas,* No. 74,143, slip. op. at 9. Under the well-established Fifth Circuit precedent supporting this decision, the Court finds that the state habeas court's decision to deny Rivas's claim for relief is not contrary to clearly established federal law. Thus this claim is without merit, and the Court recommends it therefore be denied.

**6. Claim that the Texas Death Penalty Scheme is Unconstitutional for Requiring**

2511

*at Least Ten "No" Votes for the Jury to Return a Negative Answer to the Punishment Special Issues (Claim B-6)*

Rivas's next claim is that Texas's death penalty scheme, which prohibits instructing a capital jury of the consequences of its failure to agree on a punishment-phase special issue, is unconstitutional. (Pet. Br. at 85-90.) As with his previous claim, Rivas admits it is foreclosed by Fifth Circuit precedent previously addressing this issue and deciding it adversely to his case. *See, e.g., Alexander v. Johnson,* 211 F.3d 895, 897 & n. 5 (5th Cir.2000).

Rivas claims that the death penalty scheme set forth in Texas Code of Criminal Procedure Article 37.071, and in the trial court's jury instructions given in conformity with that law are unconstitutional because the court's instructions did not inform jurors that a failure to reach a unanimous verdict on punishment would result in Rivas receiving a sentence of life imprisonment. According to Rivas, this failure violated his Eighth and Fourteenth Amendment rights.

**\*15** Upon completion of the punishment phase of Rivas's trial, the court instructed the jury as mandated by TEX.CODE CRIM. PROC. ANN . art. 37.071 §§ 2(d)(2), (f)(2) (Vernon 1981 & Supp.2005), which specifically prohibits the trial court, the parties, counsel or any other person from informing the jury that their failure to reach a verdict results in a life sentence. The jurors in Rivas's case were required to answer two special issues pertaining to future dangerousness and to mitigation. They were instructed not to answer "yes" to the future dangerousness issue or "no" to the mitigation issue unless all twelve jurors were unanimous in that decision. Finally, the court instructed the jurors that they could not answer "no" to the future dangerousness special issue or "yes" to the mitigation special issue unless at least ten jurors agreed with that answer, and that if they did answer in this manner, Rivas would then receive in a life sentence. (44 RR at 51-52.) These scheme is known as the "12-10" rule. As stated above, the jurors were not informed that their failure to reach a decision regarding either special issue would result in Rivas receiving a life sentence. Because the Texas Code of Criminal Procedure prohibits such instruction. TEX.CODE CRIM. PROC. ANN. art 37.071 § 2(a)(1), (g) (Vernon 1981 & Supp.2005).

Rivas argues that this law "creates the potential for considerable confusion among reasonable jurors." (Pet. Br. at 85-89.) Citing *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), Rivas claims that this rule "violates the Eighth Amendment principle in [*Mills* ] that it is unconstitutional to instruct capital sentencing jurors in a manner leaving reasonable jurors to believe that their individual vote for a life sentence is worthless unless some threshold number of jurors agree that particular mitigating factors exist." (Pet. Br. at 88 (citing *Mills,* 486 U.S. at 374).) Furthermore, Rivas claims that "[u]nless jurors are informed of the result of a deadlock in such a situation, the risk that one or more jurors will give a 'majority rules' mentality is too great under the Eighth Amendment, particularly in a capital case." (Pet. Br. at 88-89.) Rivas cites the Seventh Circuit's decision in *Kubat v. Thieret,* 867 F.2d 351, 369-73 (7th Cir.1989), for the proposition that "reasonable jurors could have believed that they had no ability to give mitigating effect to any and all types of mitigating circumstances unless at least nine other jurors also voted for life." (Pet. Br. at 89.)

Rivas's argument fails, however, as the U.S. Supreme Court directly addressed this issue in the context of a federal death penalty case in *Jones v. United States,* 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). In *Jones,* the Court examined whether a defendant's Eighth Amendment rights had been violated by the trial court's failure to instruct jurors regarding the consequences of a jury deadlock at punishment. Under the applicable federal statute, the jury was required to consider the aggravating and mitigating factors and then to decide whether those factors outweighed the mitigating factors. *Id.* at 385-86. While in a federal death penalty case aggravating factors must

2512

be proven beyond a reasonable doubt, a mitigating circumstance may be considered even where as few as one juror finds that its existence has been established by a preponderance of the evidence. *Id.* at 377. The jury in *Jones* unanimously determined that two statutory and two non-statutory aggravating factors were proven beyond a reasonable doubt, and certain various members of the jury found that ten mitigating factors had been established. Weighing the factors as instructed, the jury unanimously agreed that Jones should receive a death sentence. The defense in *Jones* had requested an instruction informing the jurors that a failure to reach an unanimous decision as to the appropriate sentence would result in the judge sentencing the defendant to life imprisonment without possibility of parole. *Jones*, 527 U.S. at 375-80.

*\*16* In analyzing the facts presented in *Jones,* the Supreme Court found that Jones's Eighth Amendment rights were not violated in Jones's case as a result of failing to inform the jury regarding the consequences of a deadlock on the issue of punishment. *Id.* at 382. The Court based its decision on a number of factors, including: 1) that Jones's jury was not misled about its role at punishment; 2) that one purpose of the jury system is to secure unanimity by a dialogue among the jurors; and 3) that the government has a strong interest in a capital case in having the jury express the conscience of the community which might otherwise be undermined if the court were to inform the jury regarding the consequences of a deadlock. *Id.*

Since *Jones,* the Fifth Circuit has found that the "12-10" rule in Texas does not violate a capital murder defendant's Eighth and Fourteenth Amendment rights. *Alexander,* 211 F.3d at 897 & n .5. And the Fifth Circuit has repeatedly held that any decision holding that Texas's "10-12" rule violated the federal constitution would be a new constitutional rule of criminal procedure as defined by the U.S. Supreme Court in *Teague,* and that it would not be a "watershed" rule, and therefore could not form the basis for federal habeas corpus relief. *See Teague,* 489 U.S. at 311-13; *Hughes v. Dretke,* 412 F.3d 582, 2005 WL 1384580 (5th Cir. June 10, 2005); *Alexander,* 211 F.3d at 897; *Webb v. Collins,* 2 F.3d 93 (5th Cir.1993).

Rivas asserted his claim as point of error thirteen on direct appeal, and the state habeas court denied his claim. *Rivas,* No. 74,143, slip op. at 9. Because the court's ruling was neither unreasonable nor contrary to U.S. Supreme Court precedent, the Court recommends that Rivas's claim for relief be denied.

### 7. *Violation of Due Process as a Result of Jury Instruction Preventing Defendant From Showing Unlikelihood of Release on Parole*

Finally, Rivas claims that his due process rights were violated by the trial court's instruction to the jury at the punishment phase that the jury was not to consider how long Rivas might serve in prison if sentenced to life. (Pet. Br. at 91-98.) This instruction accords with Texas Code of Criminal Procedure article 37.071, § 2(e) (2)(B). As with a number of his previous claims, Rivas admits that this claim is foreclosed by Fifth Circuit precedent. (Pet. Br. at 92 .)

The trial court instructed the jury as follows:

> During your deliberations, you are not to consider or discuss the possible action of the Board of Pardons and Paroles or the Governor, nor how long a defendant would be required to serve on a sentence of life imprisonment, nor how the parole laws would be applied to this defendant. Such matters come within the exclusive jurisdiction of the Board of Pardons and Paroles and are of no concern of yours.

(44 RR at 50.)

Rivas asserted this claim on direct appeal as his tenth point of error, and it was denied

by the TCCA. *Rivas,* No. 74,143 slip op. at 8. The court reasoned that, consistent with state law, "this part of the charge instructed the jury not to consider how long a life-sentenced juror would serve after becoming eligible for parole," rather than instructing them not to consider the defendant's eligibility for parole. *Id.* Rivas claims that the trial court's instructions violated his due process rights because jurors were told not to consider how long he might serve in prison if sentenced to life, even though they were informed that he would be eligible for parole in forty years. (Pet. Br. at 91-98.) According to Rivas, allowing a jury to consider the forty-year minimum is essential to the jury's deliberation on the issue of future dangerousness. *Id.* Rivas argues that "the trial court's instruction that the jury could not consider parole, or the low likelihood of his ever being released on parole, denied [Rivas] due process of law" in violation of the holding in the U.S. Supreme Court's decision in *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (plurality opinion). (Pet. Br. at 96-97.) Essentially, Rivas claims that *Simmons* requires trial courts to instruct the jury regarding the actual duration of the defendant's period of incarceration because the time period is necessarily relevant to a determination of future dangerousness. *Simmons,* however, only applies to defendants who are not eligible for parole. *See Ramdass v. Angelone,* 530 U.S. 156, 166-169, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000) (plurality opinion) (declining to extend *Simmons* 's rationale to cases such as Rivas's, where the defendant would be eligible for parole). [8]

*\*17* The Court finds that the state habeas court did not unreasonably apply clearly established federal Supreme Court law in holding that *Simmons* does not apply in the instant case, in which Rivas would have been eligible for parole if given a life sentence. Thus, the Court recommends that Rivas's claim for relief on this point be denied.

## V. *Separation of Powers*

In addition to his petition for writ of habeas corpus filed on February 13, 2007, on January 29, 2008, Rivas filed a separate brief entitled "Argument in Support of Petition for Writ of Habeas Corpus Asserting that 28 U.S.C. § 2254 Violates the Separation of Powers Doctrine." (Separation of Powers Brief ("Sep. Powers Br.") (doc. # 34).) The State filed its response to Rivas's brief on February 13, 2008. (doc. # 35.) Essentially, Rivas argues that the standard of review set forth in the AEDPA-that district courts review the state court's disposition of claims under the "objectively reasonable" test-violates the separation of powers doctrine. (Sep. Powers Br. at 1.) The State has already responded to Rivas's original petition, and Rivas has not sought leave to amend to add an additional argument, thus the court need not address this additional argument. Out of an abundance of caution, however, the Court examines the merits of Rivas's argument and finds that Rivas's claim is precluded under Fifth Circuit law. The Fifth Circuit Court of Appeals has expressly stated that the AEDPA does not violate the principle of separation of powers. *See, e.g., Dufrene v. Brazoria County DA Office,* 146 Fed. Appx. 715, 717 (5th Cir.2005); *Corwin v. Johnson,* 150 F.3d 467, 472 (5th Cir.1998); *Hughes v. Johnson,* 191 F.3d 607, 612 (5th Cir.1999). As the Fifth Circuit has explained, the AEDPA does not preclude Rivas from receiving a favorable result, nor do its provisions prohibit Rivas from filing required legal documents or having access to the courts. *See, e.g ., Dufrene,* 146 Fed. Appx. at 717. Rivas's argument thus fails and the Court thus recommends that any claim he makes based on the separation of powers doctrine be denied.

## VI. *Conclusion*

For the reasons discussed, the Court recommends that Rivas's petition for writ of habeas corpus be **DENIED.**

**SO ORDERED.**

2514

## Footnotes

1    Under Texas law, trial courts review habeas petitions and make recommendations to the TCCA, which then determines whether habeas relief should be granted. *Hatten v. Quarterman,* 570 F.3d 595, 599 n. 3 (5th Cir.2009) (citations omitted). The Court will therefore refer to the "state habeas court" as a single tribunal.

2    This opinion may also be found online on the official website for the TCCA at: http://www. cca.courts.state.tx.us/opinions/HTMLOpinionInfo.asp?OpinionID=12568.

3    Although Petitioner's Brief and the table of contents contained in Petitioner's Appendix list *Rivas,* slip. op. No. 74,143 as Tab. 1, Tab 1 is actually the state court's order denying rehearing, and the opinion is actually located in Tab 2.

4    *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5    Notably, the testimony of Dr. Coons, the expert in this case, was also at issue in *Fields. See Fields,* 483 F.3d at 341.

6    To the extent that Rivas claims Dr. Coons's testimony was inadmissible because he did not interview Rivas himself, his claim is without merit. *See, e.g. Barefoot v. Estelle,* 463 U.S. 880, 896-906, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983) (holding that whether a psychiatric expert interviews a defendant affects the weight of his or her testimony, but not its admissibility). Likewise any claim that Rivas attempts to make alleging that *Daubert* has somehow altered admissibility of expert testimony after *Barefoot* also fails under the law of this Circuit. *See, e.g., Johnson v. Cockrell,* 306 F.3d 249, 255 (5th Cir.2002). (holding that a capital murder defendant's trial counsel had not erred in employing strategy not to object to expert testimony regarding future dangerousness at trial because such an objection would have been futile under *Barefoot* ) (citing *Tigner v. Cockrell,* 264 F.3d 521, 526-27 (5th Cir.2001) and *Little v. Johnson,* 162 F:3d 855, 862-63 (5th Cir.1998).

7    As his eighth point of error in his direct appeal, Rivas challenged the admissibility of Coons's testimony under Texas Rule of Evidence 702 and *Kelly,* and his claim was overruled by the TCCA, noting that Coons's testimony "could not have significantly influenced the jury's decision because [Rivas] himself had demonstrated a continuing propensity for violent behavior which was unlikely to change." *Rivas,* slip op. No. 74,143 at 8.

8    In September 2005, the Texas legislature changed the law on parole eligibility in cases such as Rivas's. Effective September 1, 2005, in any case in which the prosecution has sought the death penalty, a defendant who has been found guilty of a capital felony and sentenced to life imprisonment is no longer entitled to parole. *See* TEX. PENAL CODE ANN. § 12.31(a) (Vernon Supp.2005). The legislature also amended the Texas Code of Criminal Procedure to require courts charging juries in capital cases to instruct them "that a defendant sentenced to confinement for life without parole under this article is ineligible for release from the department on parole." *Id. See* TEX.CODE CRIM. PROC. ANN. art. 37.071 § 2(e)(2)(B) (Vernon 1981 & Supp.2005).

2515

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

Preferences      My Contacts      Getting Started      Help      Sign Off

WestlawNext. © 2011 Thomson Reuters   Privacy   Accessibility · Contact Us   1-800-REF-ATTY (1-800-733-2889)   Improve WestlawNext

THOMSON REUTERS

2516

NO. W01-00237-T(A)

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | **283RD JUDICIAL DISTRICT** |
| | § | |
| **RANDY ETHAN HALPRIN** | § | **DALLAS COUNTY, TEXAS** |

## TIME LINE OF ACTIVITY ON
## APPLICATION FOR WRIT OF HABEAS CORPUS

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES the Applicant, RANDY ETHAN HALPRIN, and submits this Time Line of Activity on Application for Writ of Habeas Corpus.

### Time Line of Activity on Application for Writ of Habeas Corpus

April 2005          Writ Application Filed, including request for hearing

October 2005       State files Answer, opposes a hearing

October 2005 through January 2007

> No action by 283rd District Court. No ruling on whether Halprin's request for hearing will be granted.

January 2007 through Summer of 2010

> Multiples conferences held between Judge Magnis and counsel regarding necessity for a hearing. Halprin's attorneys consistently request a hearing. State consistently opposes a hearing. Trial court declines to set a hearing. During this time period, court agrees to order some witnesses to respond to interrogatories. Interrogatories prepared and served. Some witnesses respond, others do not respond. Court allows depositions of George Rivas, Michael Rodriguez and Patrick Murphy. Depositions conducted.

Summer 2010       Five years after Halprin's counsel first requested an evidentiary hearing, state writ counsel changes position, in part, and agrees to an

2517

evidentiary hearing concerning Halprin's trial counsel, George Ashford and Edwin King. Based on state's agreement, trial court schedules hearing. Hearing held August 20, 2010.

Summer 2010    Halprin's counsel continue to request a hearing where the state's trial attorneys, Toby Shook, Tom D'Amore, and Bill Wirske and Sgt. Hank Whitman will testify. State continues to oppose a hearing with these witnesses. Trial court defers decision on whether to hold a hearing with these witnesses.

Fall 2010    State agrees to hearing where state's trial attorneys, Toby Shook, Tom D'Amore, Bill Wirske and Texas Ranger Hank Whitman will testify. Based on state's agreement, trial court schedules hearing.

September 30, 2010    Hearing held with state's trial attorneys and Ranger Whitman

December 13, 2010    Due date for parties to file their proposed Findings of Fact and Conclusions of Law.

December 13, 2010    Halprin files his proposed Findings of Fact and Conclusions of Law.

April 7, 2011    State files proposed Findings of Fact and Conclusions of Law.

September 7, 2011    Halprin files objections to state's proposed Findings of Fact and Conclusions of Law.

Respectfully submitted,

GARY A. UDASHEN
State Bar of Texas No. 20369590

BRUCE ANTON
State Bar of Texas No. 01274700

2518

Tim Line of Activity on Application for Writ of Habeas Corpus - Page 2

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas  75201
214-468-8100
214-468-8104 fax

ATTORNEYS FOR APPLICANT

## CERTIFICATE OF SERVICE

On this 29th day of September, 2010, a true and correct copy of the foregoing Time Line of Activity on Application for Writ of Habeas Corpus was delivered to Lisa Smith, Assistant District Attorney, 133 N. Riverfront Blvd., L.B. 19, Dallas, Texas 75207.

GARY A. UDASHEN

2519



CRAIG WATKINS

CRIMINAL DISTRICT ATTORNEY

October 3, 2011

Honorable Michael Snipes, Presiding Judge
Criminal District Court No. 7
Frank Crowley Courts Building
133 N. Riverfront Blvd.
Dallas, Texas 75207-4399

RE:  *Ex parte Randy Ethan Halprin* (W01-00327-Y(A))

Judge Snipes:

A couple of weeks ago, Randy Halprin's defense counsel asked our office to agree to
relief in these writ proceedings. In particular, they requested that we agree to a new
direct appeal so that Mr. Halprin can raise a new claim regarding the exclusion of
certain punishment evidence through the defense expert, Dr. Kelly Goodness.

As you know, we declined the request. Our office believes that Halprin was not
deprived of the opportunity to present mitigating evidence to the jury. He was
simply prohibited from offering it in the form of hearsay.

The State's position is consistent with U.S. Supreme Court precedent. "States are free
to structure and shape consideration of mitigating evidence 'in an effort to achieve a
more rational and equitable administration of the death penalty.'" *Oregon v. Gusek*,
546 U.S. 517, 526 (2006). Due Process requires only that Halprin be allowed to
present the substance of his mitigation defense; it does not give him the right to
present it in any form he desires. *See Valle v. Quarterman*, 2008 U.S. App. LEXIS
22165, at *11-16 (5th Cir. 2009), *cert. denied*, 129 S.Ct. 2054, 173 L.Ed.2d 1135,
2009 U.S. LEXIS 3288 (2009); *State ex. rel. Watkins v. Creuzot*, 2011 Tex. Crim. App.
LEXIS 1029, at *27 n.50 (Tex. Crim. App. July 27, 2011).

The only exception to this rule of law is where exclusion would render the
sentencing hearing fundamentally unfair. *Green v. Georgia*, 442 U.S. 95, 95-96
(1979); *Valle*, 2008 U.S. App. LEXIS, at *15. This exception clearly does not apply in
Halprin's case.

The substance of Halprin's mitigation defense was presented to his jury. They learned of his removal from his biological parents' custody and his subsequent adoption at the age of five. They heard that he was abused and neglected in his early years, that his biological mother and father were drug addicts, that he suffered from untreated learning disorders, ADHD, and depression in his childhood and adolescence, and that his adoptive parents did not meet his emotional or psychological needs, that his adoptive father was rigid and unyielding, and that his adoptive parents ultimately abandoned him when he was eighteen years old.

The jury heard all of this information from the defense expert, Dr. Goodness. Moreover, she told the jury that she obtained this information from her conversations with certain relatives and friends as well as a review of three boxes of records, which included adoption records, CPS records, school records, and a childhood psychological evaluation.

In short, Halprin had a fair sentencing hearing. He was not deprived of the opportunity to present his mitigation defense; the jury simply rejected it. Thus, affording Halprin a new appeal to litigate this claim would be pointless. *See Jackson v. State*, No. AP-75,707, 2010 Tex. Crim. App. LEXIS 30, at *25-31 (Tex. Crim. App. Jan 13, 2010) (holding defendant's constitutional right to present mitigation defense not violated by exclusion of CPS records relied upon by defense expert where defendant presented substance of mitigating circumstances to jury by other means); *see also Simmons v. Epps*, 2011 U.S. App. LEXIS 18056, at *42-46 (5th Cir. Aug 30, 2011); *Edwards v. Scroggy*, 849 F.2d 204, 212 (5th Cir. 1988).

Halprin's request for a new direct appeal should be denied and findings should be issued on all of the claims raised in his writ application. Under Article 11.071, the trial court's findings and recommendations are due no later than 15 days from the date the parties filed their proposed findings. If calculated from September 8, 2011 – the date the defense filed their final set of proposed findings – that deadline was September 23, 2011. We ask that you issue findings and recommendations as soon as possible.

As the defense notes in their "Time Line of Activity," these writ proceedings have been quite protracted. Under state law, the process should take no more than one year from the date the application is filed. Halprin's application has now been pending for over 6 years and is currently before its fourth judge.

The previous presiding judges took no action on the application for two years, until our office requested an execution date for Rodriguez, one of Halprin's co-

defendants. Although we agreed to a hearing to preserve testimony from Rodriguez given his impending execution, our office has always maintained that a hearing was not necessary to resolve Halprin's writ claims. Our office still believes this. In the end, we agreed to multiple hearings only because we believed further opposition would needlessly delay this Court's disposition of the application. Then, when Judge Magnis was poised to dispose of the application, defense counsel successfully moved to recuse him.

Needless to say, we are hopeful that an end is finally in sight.

Respectfully,

*Lisa Smith*

Lisa Smith
Assistant District Attorney
Dallas County, Texas

NO. W01-00237-T(A)

2011 OCT -4  AM 8:40

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | **283RD JUDICIAL DISTRICT** |
| | § | |
| **RANDY ETHAN HALPRIN** | § | **DALLAS COUNTY, TEXAS** |

## APPLICANT'S SUPPLEMENTAL AUTHORITY CONCERNING INEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES the Applicant, RANDY ETHAN HALPRIN, and submits this Supplemental Authority Concerning Ineffective Assistance of Counsel on Appeal and would show the following:

I.

In *Kyles v. Whitley*, 514 U.S. 419 (1995), the court recognized the harm question in ineffective assistance cases is similar to the materiality question in exculpatory evidence cases. The court stated: "Four aspects of materiality under *Bagley* bear emphasis. Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). *Id.* at 682, 105 S.Ct. at 3383-3384 (opinion of Blackmun, J.) (adopting formulation announced in *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984)); *Bagley, supra*, 473 U.S. at 685, 105 S.Ct. at 3385 (White, J., concurring in part and concurring in judgment) (same); *see*

2522

473 U.S. at 680, 105 S.Ct. at 3382-3383 (opinion of Blackmun, J.) (*Agurs* "rejected a standard that would require the defendant to demonstrate that the evidence if disclosed probably would have resulted in acquittal"); *cf. Strickland, supra*, 466 U.S. at 693, 104 S.Ct. at 2068 ("[W]e believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"); *Nix v. Whiteside*, 475 U.S. 157, 175, 106 S.Ct. 988, 998, 89 L.Ed.2d 123 (1986) ("[A] need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under *Strickland*"). *Bagley*'s touchstone of materiality is a "reasonably probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381."

## II.

A good summary of correct legal analysis concerning ineffective assistance of counsel on appeal is found in *Gray v. Greer*, 800 F.2d 644 (7th Cir. 1986) where the court stated:

> "The right to appellate counsel is now firmly established. *Evitts v. Lucey*, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) established the standard for ineffective assistance of counsel, and though it is phrased in terms of ineffective assistance of trial counsel, it can be used as a basis for establishing a standard for effective assistance of appellate counsel. *Accord Bowen v. Foltz*, 763 F.2d 191, 195 (6th Cir. 1985) (Coutie, J. dissenting); *Schwander v. Blackburn*, 750 F.2d 494, 502 (5th Cir. 1985); *Mitchell v. Scully*, 746 F.2d

2523

951, 954 (2d Cir. 1981). Under *Strickland*, ineffective assistance of counsel will be found when 'counsels' conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' *Strickland*, 104 S.Ct. at 2064. The *Strickland* standard envisions a two-prong analysis. First, counsel's performance must have been deficient, and second, the deficiency must have prejudiced the defense. *Id.* Had appellate counsel failed to raise a significant and obvious issue, the failure could be viewed as deficient performance. If an issue which was not raised may have resulted in a reversal of the conviction, or an order for a new trial, the failure was ineffective assistance of counsel on appeal solely because we found it improper to review appellate counsel's choice of issues, the right to effective assistance of counsel on appeal would be worthless. When a claim of ineffective assistance of counsel is based on failure to raise viable issues, the district court must examine the trial court record to determine whether appellate counsel failed to present significant and obvious issues on appeal. Significant issues which could have been raised should then be compared to those which were raised. Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome."

Respectfully submitted,

GARY A. UDASHEN
State Bar of Texas No. 20369590

BRUCE ANTON
State Bar of Texas No. 01274700

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas 75201
214-468-8100
214-468-8104 fax

ATTORNEYS FOR APPLICANT

2524

## CERTIFICATE OF SERVICE

On this ___4th___ day of October, 2011, a true and correct copy of the foregoing Applicant's Supplemental Authority Concerning Ineffective Assistance of Counsel on Appeal was delivered to Lisa Smith, Assistant District Attorney, 133 N. Riverfront Blvd., L.B. 19, Dallas, Texas 75207.

GARY A. UDASHEN

2525

NO. W01-00237-T(A)

| EX PARTE | § | IN THE DISTRICT COURT |
| | § | |
| | § | 283RD JUDICIAL DISTRICT |
| | § | |
| RANDY ETHAN HALPRIN | § | DALLAS COUNTY, TEXAS |

## APPLICANT'S ALTERNATIVE PROPOSED FINDINGS OF FACT CONCERNING INEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES the Applicant, RANDY ETHAN HALPRIN, and submits the attached Alternative Proposed Findings of Fact Concerning Ineffective Assistance of Counsel on Appeal.

I.

These Amended Proposed Findings present alternative findings number 16 and 17 (pages 9-10). All of the proposed findings are the same.

Respectfully submitted,

GARY A. UDASHEN
State Bar of Texas No. 20369590

BRUCE ANTON
State Bar of Texas No. 01274700

2526

Applicant's Alternative Proposed Findings of Fact Concerning Ineffective Assistance of Counsel on Appeal - Page 1

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas  75201
214-468-8100
214-468-8104 fax

ATTORNEYS FOR APPLICANT

## CERTIFICATE OF SERVICE

On this ⟨4/h⟩ day of October, 2011, a true and correct copy of the foregoing Applicant's Alternative Proposed Findings of Fact Concerning Ineffective Assistance of Counsel on Appeal was delivered to Lisa Smith, Assistant District Attorney, 133 N. Riverfront Blvd., L.B. 19, Dallas, Texas 75207.

_____
GARY A. UDASHEN

Applicant's Alternative Proposed Findings of Fact Concerning Ineffective Assistance of Counsel on Appeal - Page 2

NO. W01-00237-T(A)

| | | |
|---|---|---|
| EX PARTE | § | IN THE DISTRICT COURT |
| | § | |
| | § | 283RD JUDICIAL DISTRICT |
| | § | |
| RANDY ETHAN HALPRIN | § | DALLAS COUNTY, TEXAS |

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND RECOMMENDATION OF THE TRIAL COURT ON APPLICATION FOR WRIT OF HABEAS CORPUS PURSUANT TO ART. 11.071, TEX. CODE CRIM. PROC.

The following are the Findings of Fact, Conclusions of Law and Recommendation of the Trial Court on this Application for Writ of Habeas Corpus Pursuant to Art. 11.071.

### History of the Case

Applicant, RANDY ETHAN HALPRIN, was convicted of capital murder and sentenced to death. Direct appeal was taken to the Court of Criminal Appeals, which affirmed the conviction and sentence. This Application for Writ of Habeas Corpus Pursuant to Art. 11.071 was filed and is pending before this Court and the Court of Criminal Appeals. Numerous grounds were raised in the Application for Writ of Habeas Corpus. Several evidentiary hearings were held and affidavits and interrogatories were submitted. The Court finds that the record in this case has been fully and adequately developed.

### Ground Addressed In These Findings

These findings address Ground for Relief VI(F). Ground VI states:

Halprin is entitled to a new trial because his appellate counsel denied him the effective assistance of counsel guaranteed to him by the Sixth and Fourteenth Amendments of the U. S. Constitution and Art. 1, Sect. 10 of the Texas

Findings of Fact, Conclusions of Law and Recommendation of the Trial Court on Application for Writ of Habeas Corpus Pursuant to Art. 11.071, Tex. Code Crim. Proc. - Page 1

2528

Constitution.

Argument (F) under the ineffective assistance of counsel on appeal ground argued that appellate counsel rendered ineffective assistance of counsel by failing to raise on appeal the trial court's error in prohibiting the defense from presenting to the jury the mitigation facts the defense mitigation expert used to support her opinion.

## Findings of Fact and Conclusions of Law

1.     The Court finds that it is appropriate to address this issue concerning ineffective assistance on appeal prior to addressing the numerous remaining issues in this writ application.  If the Court of Criminal Appeals finds that Applicant received ineffective assistance on appeal in this case, the result will be that Applicant will receive a new appeal, making a decision on the additional issues in this writ application premature.  It would preserve judicial resources to abate and withhold any ruling on these additional issues until the question of whether Applicant is to receive a new appeal is resolved.  *See, Ex parte Torres*, 943 S.W.2d 469 (Tex. Crim. App. 1997).

2.     The Court finds that Applicant's appellate attorney's performance fell below an objective professional standard of reasonableness.

3.     The Court finds that attorney George Ashford, who served as lead defense attorney for Applicant at trial, was subsequently appointed as Applicant's attorney for his direct appeal to the Texas Court of Criminal Appeals.  The Court finds that Mr. Ashford obtained the assistance of attorney Michael Mohammed in preparing the brief on appeal submitted to the Court of Criminal Appeals in this case.  The Court finds that Mr. Ashford delegated the

writing and preparation of this Appellate Brief to Mr. Mohammed.

4.      The Court finds that, although Mr. Mohammed actually wrote the appellate brief, that Mr. Ashford was the attorney appointed by the Court to represent Applicant on appeal and had a duty to ensure that Applicant received effective assistance of counsel on appeal.

5.      Nevertheless, the Court finds that both Mr. Ashford and Mr. Mohammed rendered inadequate representation on appeal in their representation of Applicant.

6.      The trial court finds that, in preparation for the punishment phase of trial, the defense employed the services of Dr. Kelly Goodness, an experienced mitigation expert and clinical psychologist. Dr. Goodness conducted an extensive evaluation on "how Halprin has come to be before the Court." (RR 53, p. 19). Dr. Goodness interviewed Halprin as well as twelve of his relatives and friends. [Goodness Psychological Eval. at 3-4]. She also reviewed relevant medical, school, prison, and Child Protective Services documents. [Id. at 3; RR 52, pp. 97, 105, 111, 122-123].

Based on these records and interviews, Dr. Goodness's investigation established that Halprin's natural parents physically and emotionally abused him. [RR 52, pp. 99-102]. His natural father and his mother's subsequent boyfriends at various points beat him, threw him down stairs, and even pushed him out of windows. [Goodness Psych. Eval. at 5; RR 52, pp. 99-102]. His father neglected him and eventually abandoned him. [Goodness Psych. Eval. at 5; see RR 52, p. 101]. When CPS found him at the age of five, Halprin had two missing teeth, believed to have been knocked out, and a scar on his wrist. He hoarded food and ate until he was vomited. [Goodness Psych. Eval. at 5; see RR 52, pp. 101]. He was also

preoccupied with devils and ghosts and was so scared of teenage boys that he would cover his face when he came into contact with one. [Goodness Psych. Eval. at 5-6]. According to Dr. Goodness, his early childhood abuse helps to explain the 'cycle of abuse' that led to the physical abuse Randy Halprin inflicted on the child victim of the injury to a child case for which he was originally incarcerated. [Goodness Psych. Eval. at 14-15]. Indeed, the assault mirrored the abuse he suffered as an infant. [Id.].

Halprin's parents abused drugs, drank alcohol, and smoked cigarettes, thereby giving Halprin a genetic vulnerability to substance abuse. [Id.; RR 52, pp. 99]. His mother even indulged in these substances while pregnant with her son. [Goodness Psych. Eval. at 5; RR 52, pp. 99]. When Halprin was adopted at the age of six, he could not repeat the alphabet or count. He was diagnosed with a learning disability. [Goodness Psych. Eval. at 6]. He later developed a number of other psychological problems, including depression, ADHD, and an avoidant personality. [Goodness Psych. Eval. at 12; see RR 52, pp. 126-27]. His adoptive parents were unprepared to handle these issues and did not address his needs, thereby undermining his success in school and self-worth. [Goodness Psych. Eval. at 16; see RR 52, pp. 130-31].

At an early age, his adoptive parents expelled him from their home. [Goodness Psych. Eval. at 6]. In seventh grade, his parents sent him to boarding school in Kentucky where he excelled in his first year but his adoptive parents refused to allow him to come home and visit. [Goodness Psych. Eval. at 6-7; RR 52, pp. 112-13]. He felt rejected, began to smoke marijuana in ninth grade, and became increasingly depressed. [Goodness Psych.

Findings of Fact, Conclusions of Law and Recommendation of the Trial Court on Application for Writ of Habeas Corpus Pursuant to Art. 11.071, Tex. Code Crim. Proc. - Page 4

253

Eval. at 7; RR 52, pp. 113-14, 116]. He was suspended from school in 1995 after carving in a bench at school a note to his girlfriend which school authorities interpreted to be suicidal. [Goodness Psych. Eval. at 7; RR 52, p. 116]. His adopted parents refused to permit Halprin to return home. [Goodness Psych. Eval. at 7; RR 52, p. 117]. He was homeless and lacked guidance. [Goodness Psych. Eval. at 7; RR 52, pp. 119-120]. Later, at the age of eighteen, he attempted to reconcile with his parents, but was met on the front steps by the local police chief and denied entrance to the family home. [Goodness Psych. Eval. at 7; RR 52, p. 118]. He became heavily dependent on drugs and alcohol and moved into a homeless shelter in Arlington. [RR 52, p. 119]. One night at the shelter, while high on acid, he snapped and hit his girlfriend's child because the child would not stop crying. [Goodness Psych. Eval. at 7; RR 52, p. 120]. For this crime, he accepted a plea bargain of thirty years in prison. [Goodness Psych. Eval. at 8]. No one visited Halprin while in prison. [Goodness Psych. Eval. at 17]. As a result, Halprin had an unfulfilled need for absolute acceptance and unconditional love. [Goodness Psych. Eval. at 17]. Halprin's need to belong and disconnection with the outside world left him vulnerable to leadership figures, such as Rivas who could exploit Halprin's character as a weak follower. [Goodness Psych. Eval. at 17].

The jury learned few of these facts that influenced Dr. Goodness's testimony. The trial judge permitted Dr. Goodness to testify to her ultimate opinion but did not let her discuss the above information that formed the basis of this opinion. In her affidavit, Dr. Goodness averred that her detailed investigation, of Halprin's "entire background history, behavioral patterns, emotional functioning, [and] character" was "imperative . . . to assist the

Findings of Fact, Conclusions of Law and Recommendation of the Trial Court on Application for Writ of Habeas Corpus Pursuant to Art. 11.071, Tex. Code Crim. Proc. - Page 5

2532

triers of fact in understanding (to the extent possible) how the defendant's background and psychological makeup contributed to the choices that brought him before the court." [Goodness Aff. at 2]. In her opinion, a nexus existed between "his life experiences and psychological makeup (mitigation) with his involvement in the offense at issue. [*Id.* at 3]. She stated that the jury should have learned of this nexus. She continued on to state:

> It is my professional opinion that Mr. Halprin had a significant array of potentially mitigating factors, many of which could be shown to have a nexus with his role in the offense charged. Thus, unlike many other capital death cases on which I have worked, Mr. Halprin actually had a viable mitigation defense that the jury could have used in considering the Special Issues and which may well have had a significant impact on their decision.

*Id.* at 3.

7.    The Court finds that the trial judge who tried this case, who was a different judge than trial judge making these findings, sustained the state's objection to the defense mitigation expert being allowed to testify at the punishment phase as to the underlying basis of her opinions on mitigating factors concerning Applicant.

8.    The Court finds that the trial court's ruling prohibiting the defense mitigation expert from testifying to the factual information underlying her opinions concerning mitigation evidence primarily involved an interpretation of T. R. Evid. 705.

9.    The Court finds that the question before the trial court when the state objected to the mitigation expert testifying as to the facts underlying her opinions was the application of T. R. Evid. 705(d), which states:

> "(d)    Balancing Test; Limiting Instructions.
> When the underlying facts or data would be inadmissible in evidence, the court shall exclude the underlying facts or data if the danger that they will be used

as a purpose other than as explanation or support for the expert's opinion outweighs their value as explanation or support or are unfairly prejudicial."

10.    The Court finds that the defense counsel on appeal failed to raise the trial court's ruling on this issue as a ground on appeal.

11.    The Court finds that the failure of appellate counsel to brief and argue on appeal that Dr. Goodness should have been permitted to present to the jury the underlying mitigating facts that she used to support her opinions under Texas Rules of Evidence 703 and 705 was objectively unreasonable under *Strickland v. Washington*, 466 U.S. 668 (1984). The Court finds that the appellate counsel's performance in not raising this issue on appeal fell below an objective standard of reasonableness because this was a non-frivolous issue that should have been raised on appeal. *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

The Court finds that this issue, which was not raised on appeal, was clearly stronger than those presented by counsel on appeal. *Smith*, 528 U.S. at 288 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986).

12.    The Court finds that the testimony of George Ashford presented at a hearing in connection with this writ application supports a finding that appellate counsel rendered inadequate representation in failing to raise this issue on appeal. Mr. Ashford testified as follows concerning this:

> Q. Well, if you were right on the law that Judge Cunningham erred in not letting Kelly Goodness present the data and the facts supporting her mitigation conclusions, if you were right that the Judge erred in excluding that, then that would have been a good appellate issue, don't you think?

> A. Absolutely.

Findings of Fact, Conclusions of Law and Recommendation of the Trial Court on Application for Writ of Habeas Corpus Pursuant to Art. 11.071, Tex. Code Crim. Proc. - Page 7

2534

Q. Mitigation being one of the hot topics that both the state and federal courts look at in evaluating death penalty review?

A. Absolutely.

Q. And so as you sit here there's no strategic reason why that was left out?

A. No.

. . .

Q. [D]id you ever have an opportunity as lead counsel to sit down with [Attorney Muhammed] and say, "This issue on the Judge's mitigation ruling really needs to be in the brief?"

A. I know I discussed with him the fact that in a capital murder case mitigation evidence should be admitted even if sometimes the Rules of Evidence have to be scurried. I had read that and researched that and told him that was *a primary issue for our appeal*.

[Writ Hearing, Aug. 20, 2010, Vol. 2, 39-41 (emphasis added)].

Despite being a "primary issue for our appeal," appellate counsel did not raise this issue on appeal. When asked why he did not raise this issue on appeal, Mr. Ashford responded, "I think [Attorney Muhammed] got forced to file a brief before he was fully prepared to submit the brief as to all of the issues that he would have liked to raise." [Writ Hearing, Aug. 20, 2010, Vol. 2, at 39].[1] In essence, appellate counsel testified he ran out of time to address the issue in his appellate brief. Appellate counsel had five and a half months

---

[1] Appellate counsel further testified:
Now, once he started working on the brief he started at the beginning. He started with the jury selection and he raised all of the issues that he thought he could raise as to the jury selection. And then he kept getting notices from the Court of Criminal Appeals to submit the brief before he was ready to submit the brief. He submitted the issues that he had prepared. He tried to get an extension of time to submit additional issues. He tried to supplement the brief with additional issues and he was denied at the Court of Criminal Appeals.
[Writ Hearing, Aug. 20, 2010, Vol. 2, at 38-39].

Findings of Fact, Conclusions of Law and Recommendation of the Trial Court on Application for Writ of Habeas Corpus Pursuant to Art. 11.071, Tex. Code Crim. Proc. - Page 8

2535

to file his appeal.

13.    The Court also finds that co-counsel Michael Mohammed answers to interrogatories submitted do not provide any legitimate basis for counsel to not raise this issue on appeal. Mr. Mohammed's claim that he raised the best issues available on appeal is contradicted by Mr. Ashford's testimony and is objectively unreasonable and factually incorrect.

14.    The Court finds that the reason this issue was not raised on appeal has nothing to do with strategy. Rather, it was not raised because appellate counsel failed to complete the brief in the time allotted by the Court of Criminal Appeals and therefore did not raise all of the available issues.

15.    The Court finds that an evaluation of ineffective assistance of counsel involves two prongs. The first prong, whether counsel's performance fell below an objective professional standard of reasonableness, is clearly met by the failure of appellate counsel to raise this issue on appeal.

16.    The Court finds that the second prong of the ineffective assistance of counsel test is whether there is prejudice from this deficient performance by counsel. In the context of ineffective assistance on appeal, a defendant suffers prejudice if there was a "reasonable probability that, but for his counsel's deficient performance, he would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). A reasonable probability "is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Ouber v. Guarino*, 293 F.3d 19, 25 (1st Cir. 2002) (defendant must show that "his attorney's parlous conduct may have altered

Findings of Fact, Conclusions of Law and Recommendation of the Trial Court on Application for Writ of Habeas Corpus Pursuant to Art. 11.071, Tex. Code Crim. Proc. - Page 9

2536

the outcome of the case."). In the context of a prejudice determination on an ineffective assistance of counsel claim, a defendant is not required to show that counsel's deficient conduct more likely than not altered the outcome of the case. *Nix v. Whiteside*, 475 U.S. 157, 175 (1986). Rather, the question is whether there was a fair trial, or fair appeal, where the result is worthy of confidence.

17.    The Court finds that the second prong of *Strickland* has been established. The record supports a finding that Halprin was prejudiced by the failure of counsel to raise this issue on appeal. The Court has compared this issue that was not raised on appeal and finds that it is clearly stronger than those issues that were raised on appeal. The Court also finds that the failure of counsel to raise this appeal undermines confidence in the outcome of the appeal. *See*, *Gray v. Greer*, 800 F.3d 644 (7th Cir. 1986).

18.    The Court also finds find that this is a non-frivolous issue that should have been raised on appeal.

19.    The reasons that the Court finds this to be a non-frivolous issue that should have been raised on appeal are:

1.    Dr. Goodness was qualified as an expert witness.

2.    Under Rule 703, T. R. Evid., an expert witness may base an opinion on facts or data that are not admissible in evidence, provided that the inadmissible facts or data are of a type reasonably relied upon by experts in the particular field. *Morris v. State*, 123 S.W.3d 425, 428 (Tex. App. - San Antonio 2003, pet. ref'd). "Under this rule an expert may base an opinion solely on inadmissible hearsay." *Wood v. State*, 299 S.W.3d 200, 212 (Tex.

App. - Austin 2009); *Martinez v. State*, 22 S.W.3d 504, 508 (Tex. Crim. App. 2000); 2 Steven Goode Et. Al., Texas Practice: Guide to the Texas Rules of Evidence §703.3 (3d ed. 2002 and Supp. 2009).

3.    The records received by Dr. Goodness and the interviews she conducted constitute the type of information normally relied upon by an expert in the field of forensic psychology. *See, Joiner v. State*, 825 S.W.2d 701, 708 (Tex. Crim. App. 1992); *In Re E.C.L.*, 278 S.W.3d 510, 520 (Tex. App. - Houston [14th Dist.] 2009, pet. denied) (finding psychologists testimony reliable where expert reviewed police records, CPS records, school records, and medical records).

4.    Under Rule 705, T. R. Evid., an expert witness may generally disclose on direct examination the facts or data underlying her opinion, even if they constitute hearsay. T. R. Evid. 705 (a); *see, Kramer v. Lewisville Memorial Hosp.*, 831 S.W.2d 46, 49 (Tex. App. - Fort Worth 1992, writ granted), aff'd by, 858 S.W.2d 397 (Tex. 1993), abrogated on other grounds, 979 S.W.2d 616 (Tex. 1998) ("While such supporting evidence is not automatically admissible because it is supporting data to an expert's opinion, neither is it automatically excludable simply because it is hearsay.").

5.    There is a presumption in favor of the disclosure of underlying facts and data. John F. Sutton, Jr., Art. VII: Opinions and Expert Testimony, 30 Houston L. Rev. 797, 884 (1993) (stating that "both the direct examiner and cross-examiner normally have complete discretion in explaining the factual basis for the expert's opinion, when they so desire.").

6.    Rule 705 does not contemplate that facts and data underlying an opinion should

be excluded just because they constitute hearsay. This belief is reflected in Texas case law. For example, in *Love v. State,* 909 S.W.2d 930 (Tex. App.–El Paso 1995), the Court of Appeals upheld the trial court's finding that a doctor could testify to specific hearsay statements made by the defendant's three sisters to explain how he arrived at a diagnosis of antisocial personality disorder. *Id.* at 948-49; *Austin v. State*, 222 S.W.3d 801, 812 (Tex. App.–Houston [14th Dist.] 2007) (affirming admission of summary of interview with defendant's husband's father by a psychologist was admissible because it showed the basis of the expert's opinion even though it constituted hearsay); *cf. Stam v. Mack*, 984 S.W.2d 747, 750-51 (Tex. App.–Texarkana 1999) (stating that evidence of opinion of non-testifying radiologist admissible during the testimony of a testifying expert in medical malpractice case over hearsay objection, as matter upon which doctor's expert based his opinion).

7.     A trial judge must conduct a Rule 705(d) balancing test, preferably on the record, before excluding the facts and data underlying an expert's opinion. Failure to find specifically that these facts and data are "unfairly prejudicial" or that the danger "they will be used for a purpose other than as explanation or support outweighs their value as explanation or support" is error. *See* TEX. R. EVID. 705(d); *Walck v. State*, 943 S.W.2d 544, 545 (Tex. App.–Eastland 1997, pet. ref'd) ("Because the testimony was inadmissible for any purpose other than to explain or support [the expert's] opinion, Rule 705(d) mandated that the trial court perform the balancing test provided for in the rule.").

*See* TEX. R. EVID. 703. Indeed, Rule 705(d) begins with this premise. TEX. R. EVID. 705(d) ("When the underlying facts or data would be inadmissible in evidence, the court shall

exclude the underlying facts or data if . . ."). Therefore, based upon the plain language, the State cannot argue that the prejudice it will suffer is that it cannot cross-examine the witnesses who Dr. Goodness interviewed. *See In re Commitment of Yaw*, No. 09-08-042 CV, 2008 WL 5096511, *1-2 (Tex. App.–Beaumont, Dec. 4, 2008) (unpublished) (rejecting implicitly that expert cannot read passages from police and prison records to jury because these records constitute hearsay). In any event, the State interviewed all of the witnesses that Dr. Goodness spoke to and reviewed all of the underlying records. The State could have impeached the information she provided if it varied from their discovery. There were no surprises. Further, the evidence was not "unfairly prejudicial" and would not have been used for an improper purpose as argued below.

8.    The facts underlying Dr. Goodness's opinion were inadmissible only if they were "unfairly prejudicial" or that "there is a danger of the jury using them for an improper purpose. Evidence is unfairly prejudicial if it is not directly related to the issue to be decided and is so inflammatory that it will cause the jury to render a verdict on an improper basis. *State v. Resendiz*, 112 S.W.3d 541, 544-45 (Tex. Crim. App. 2003) (holding photographs of six other brutal murders perpetrated by defendant that expert offered to show defendant insane unfairly prejudicial because they did not answer whether defendant insane at the time he committed this murder and would distract the jury from the facts of the crime). Evidence is improper if it will be used as substantive evidence rather than as an explanation or support for the expert's opinion. *See Valle v. State*, 109 S.W.3d 500, 505-06 (Tex. Crim App. 2003). It is doubtful whether the record shows a possibility of an improper use of this evidence.

9.    This case is similar to *Love*, in which the trial court permitted the expert to repeat information provided by the appellant's family as the basis for his opinion that the defendant suffered from antisocial personality disorder. *Love*, 909 S.W.2d at 948. It also resembles *In re Commitment of Tolleson*, No. 09-08-00338-CV, 2009 WL 1474730 (Tex. App.–Amarillo, May 23, 2009) (not designated for publication) and *Austin*, 222 S.W.2d at 812. In *Tolleson*, an appellate court held that "the trial court acted within its discretion in concluding that the underlying facts and data [presented by an expert witness] were not unfairly prejudicial and that the danger of improper use did not outweigh the value of the facts or data as explanation or support for the expert's opinion." *Id.* at *5. These facts included details about the defendant's prior sexual convictions, juvenile convictions, disciplinary history, and mental well being. *Id.* at *4. These facts were based upon an interviews with Tolleson, psychological tests, medical, court, and prison records. *Id.* at *2. Similarly, in *Austin*, an appellate court affirmed the admission of an expert psychologist's summary of an interview with the defendant's husband's father. This summary showed the basis of the expert's opinion that the defendant suffered from Manchurian Syndrome. *Austin*, 222 S.W.2d at 812. The expert testified that the defendant lied repetitively, would try to draw attention to herself, and made her child sick to further attract attention – all signs of Manchurian Syndrome. *Id.* In upholding the admission of these facts, the appellate court stated that "disclosing this information assisted the jury in evaluating the weight to give the [psychologist's] opinions. *Id.* (citing *Ramirez*, 815 S.W.2d at 651). The court rejected the idea that these statements were too prejudicial or that their risk did not outweigh their value

Findings of Fact, Conclusions of Law and Recommendation of the Trial Court on Application for Writ of Habeas Corpus Pursuant to Art. 11.071, Tex. Code Crim. Proc. - Page 14

2541

as explanation and support for the psychologist's opinion.

10.     The trial court has a constitutional duty to allow the defendant to present mitigation evidence at the punishment phase of a capital case. *Williams v. Taylor*, 529 U.S. 362, 393 (2000).   The importance of mitigating evidence stems from "the unique and irreversible penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 287 (1976) (plurality opinion).  In *Woodson*, the Court reasoned:

> In capital cases, the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensible part of the process of inflicting the penalty of death.
>
> This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Id.* at 304-05 (citations and quotations omitted).

To the extent that the trial court has discretion in the admission or exclusion of mitigating evidence, precedent weighs heavily in favor of admission. In *Barefoot v. Estelle*, 463 U.S. 880 (1983), the Supreme Court opined that "[t]he rules of evidence generally extant at the federal and state levels anticipate that relevant, unprivileged evidence should be admitted and its weight left to the fact finder, who would have the benefit of cross examination and contrary evidence by the opposing party." *Barefoot*, 463 U.S. at 898; *United States v. Jones*, 132 F.3d 232, 242 (5th Cir. 1998), *aff'd by*, 527 U.S. 373 (1999) ("The Court has recognized that the defendant must be given the opportunity to introduce

information regarding mitigating factors, without traditional evidentiary restraints, in order

to provide the jury with the fullest possible information about the defendant."). Indeed, in

*Green v. Georgia*, 442 U.S. 95 (1979) (per curiam), the Supreme Court held that exclusion

of proffered testimony at the sentencing phase under the state hearsay rule violated due

process because testimony went to a critical issue and substantial reasons existed to assume

its reliability. *Id.* Similarly, in *Wiggins v. Smith*, 539 U.S. 510 (2003), the Court agreed that

trial courts should exercise their discretion to admit "any relevant and reliable mitigating

evidence, including hearsay evidence that might not be admissible in the guilt-or-innocence

phase of the trial." *Id.* at 536-37; *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986)

(rejecting explicitly the argument that the need for mitigation evidence may be trumped by

state rules of evidence).

11.     As a result of this exclusion of evidence, the jury did not have the opportunity

to learn the following critical information: (1) Halprin's assault on a child reflected the

physical abuse he suffered as a child; (2) he was emotionally and physically abused as a

child; (3) he had a genetic vulnerability for mental disorders and substance abuse; (4) he

suffered from a number of psychological disorders as well as untreated depression, and drug

abuse; (5) he had an unfulfilled need for absolute acceptance and unconditional love; (6)

there was a complete absence of guidance in his life, and he had a strong unfulfilled need to

belong. [*See generally* Goodness Psych. Eval.].

13.     Had Halprin been able to present a full mitigation defense with all of these

details, there is a strong possibility that a jury would have not rendered a death sentence. *See*

*Neal v. Pucket*, 286 F.3d 230, 244 (5th Cir. 2002), *cert. denied*, 537 U.S. 1104 (2003) (stating "we must assign significant weight to the quality of additional mitigating evidence" in determining if "there is a reasonable probability that a jury would not have been able to agree unanimously to impose the death penalty if this additional evidence had been effectively presented and explained to the jury).

## CONCLUSION

The Court finds that appellate counsel acted deficiently under *Strickland v. Washington* and in violation of the U. S. Const., amends. VI and XIV in not raising on appeal an issue concerning the trial court's exclusion from evidence the facts and data used by Dr. Goodness in reaching her conclusions concerning mitigating factors in this death penalty case. The Court makes no specific finding or recommendation as to whether there is a probability that the Court of Criminal Appeals would have reached a different conclusion on the direct appeal of the case had this issue been raised.

## ORDER

The Clerk of the Court is hereby ordered to transmit to the Court of Criminal Appeals these Findings of Fact and Conclusions of Law and Recommendation of the Trial Court on Application for Writ of Habeas Corpus Pursuant to Art. 11.071, Tex. Code Crim. Proc. The Clerk is also ordered to send a copy to counsel for Applicant, Gary A. Udashen and Bruce Anton, at 2311 Cedar Springs Road, Suite 250, Dallas, Texas 75201 and to counsel for the State, Assistant District Attorney Lisa Smith, 133 N. Riverfront Blvd., L.B. 19, Dallas, Texas 75207.

Findings of Fact, Conclusions of Law and Recommendation of the Trial Court on Application for Writ of Habeas Corpus Pursuant to Art. 11.071, Tex. Code Crim. Proc. - Page 17

2644

SIGNED this _____ day of _____, 2010.


_____
JUDGE MICHAEL SNIPES

Findings of Fact, Conclusions of Law and Recommendation of the Trial Court on Application for Writ of
Habeas Corpus Pursuant to Art. 11.071, Tex. Code Crim. Proc. - Page 18

FILED

NO. W01-00237-T(A)   2010 OCT 21  AM .:50

|  |  |  |
|---|---|---|
| EX PARTE | § | IN THE DISTRICT COURT |
|  | § | DISTRICT CLERK |
|  | § | DALLAS CO., TEXAS |
|  | § | 283RD JUDICIAL DISTRICT |
|  | § | by Deputy |
| RANDY ETHAN HALPRIN | § | DALLAS COUNTY, TEXAS |

## APPLICANT'S ADDITIONAL BRIEFING
## ON MITIGATING EVIDENCE JURY DID NOT HEAR

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES the Applicant, RANDY ETHAN HALPRIN,  and submits this

Additional Briefing on Mitigating Evidence Jury Did Not Hear.

### MITIGATION EVIDENCE

Randy Ethan Halprin, Applicant in the above-captioned cause, submits this brief in support

of his amended application for writ of habeas corpus.  During the punishment phase of Halprin's

trial, the jury did not hear mitigating evidence contained in child protective service records, medical

records, school records, prison records as well as testimony from relatives.  These records and

affidavits paint a sordid picture of the first five years of Halprin's life.  Halprin suffered from child

abuse and neglect, including physical assault.  This brief compares the evidence contained in these

records to what the jury heard.  The contrast is startling.  The jury did not have most of the mitigating

evidence available before it during the punishment stage of the trial.  Had the jury heard this

mitigating evidence the jury likely would have refused to impose the death sentence.

1

2546

Letter dated September 13, 2011
Page 4

Snipes finds, and the Court of Criminal Appeals agrees, that Mr. Halprin should receive a new appeal, it would make the other issues either moot or premature. Since a new direct appeal to the Court of Criminal Appeals may solve the injustice in this case of Mr. Halprin having been sentenced to death by a jury that was deprived of the substantial mitigating evidence that was available, I would ask that the District Attorney's Office consider agreeing with us on that ground for relief.

Thank you for your attention to this.

Yours very truly,

Gary A. Udashen

GAU:ps

cc: Honorable Mike Snipes

2547

# CHILD ABUSE

At trial, the jury heard no specific evidence concerning Halprin's early childhood. They merely heard Dr. Goodness, a mitigation expert conclude that "abuse and neglect adversely affected [Halprin's] early environment." [RR 53 p. 28-30]. There was no discussion of what this abuse constituted. CPS records, however, detail repeated physical assaults, child neglect, and a revolving door of care-givers and homes. [Hrg. 8/20/2010, Ex. 2: CPS Rec. (hereinafter CPS Rec.)]. Halprin's birth mother, Anne Lester, has also provided an affidavit, stating that Halprin's birth father physically assaulted him, beginning when Halprin was nine months old. [Amend. Habeas Pet., Ex. C: Lester Aff. at 1-2 (hereinafter Lester Aff.)].

| Mitigation Evidence Presented at Trial | Available Mitigation Evidence |
|---|---|
| **Testimony by Dr. Goodness:**<br>A.  Yes.  It's my opinion that abuse and neglect adversely affected his early environment.<br><br>. . .<br><br>Q. From birth to approximately age six?<br>A.  Yes.<br><br>. . .<br><br>Q.  Now, to establish your opinion about his adverse early environment, you are basing that on specifically what? . . .<br>A.  . . . I reviewed adoption records, CPS records from the time when he was young and that went along with the adoption records, as well.  Certainly interviewed Mr. Halprin and he had some small memories of that time.  And I interviewed his biological mother who provided data to me, as well, about what his life was like at that time.<br>Q. Okay. Did what his biological mother tell you seem to be consistent with the records that you reviewed?<br>A.  Yes, it was.  That's equally poor.<br>[RR 53, pp. 28-30] | **CPS Records**<br>**Sept. 8, 1981:** CPS begins an investigation based on complaint made by Cindy Russel:<br><br>"House is "a wreck," children are pale, unhealthy–looking like [they] don't have proper diet. Wesley has round sores on face, about size of a quarter, puffy and scaby around edges–has had them about 2 wks., with no med[ical] treatment. Mo[ther] doesn't change baby's diapers; he lays in dirty diapers for hours. Fa[ther] is "mean" to Randy–he makes him sit & be absolutely silent whenever fa[ther] is around. [Father] sends Randy to bed but won't turn on bathroom light for him, so Randy uses the closet or his bed. When fa[ther] finds it, he "whips" Randy & rubs his nose in it. Randy's room smells "like a sewer." If Randy doesn't sit down fast enough, comp[lainant] has seen fa[ther] twist Randy's arm, and push him down on the floor. Fa[ther] once had split knuckle from hitting Randy on the head."<br>[CPS Rec. at 5687].<br><br>**Oct. 9, 1981:** Kim Whitfield called CPS because she observed the father "whip" Randy Jr. and then "slammed |

[his mother] against the wall" when she complained." The complainant was "concerned because sister of fa[ther] supposedly beat her 2 yr old baby to death." [CPS Rec. at 5685; 5704].

**Feb. 9, 1982:** Mary Hammons, an aunt, relayed "she had observed the four-year-old boy [Randy] covered with bruises because of beatings." [CPS Rec. at 5685].

**May 24-25, 1982:** Grandmother called CPS after Halprin's mother left him at her house stating, she "couldn't do anything with him" – a practice the grandmother characterized as common. Halprin had bruises on his backside. Halprin stated he received the spanking because "he got up and got into the refrigerator during the night and was caught by Jimbo [his step-father]." Halprin also characterized Jimbo as "mean" and "reported that he had to stand in the corner a lot." Halprin's grandmother further stated that Halprin's mother "didn't keep the boys clean." [CPS Rec. at 5707].

**July 11, 1982:** Babysitter reported Halprin's brother was covered with bruises caused by a belt [CPS Rec. at 5710]

**July 12, 1982:** CPS visited home. Parents were asleep. The children were playing unsupervised. Halprin was covered "in what appeared to be mosquito bites" while his brother "had feces smears on his legs." The CPS caseworker reasoned that Willingham had hit Wesley with a belt. She predicted further violence. [CPS Rec. at 5710-11].

**Sept. 16, 1982:** Wesley Halprin's doctor reported bruises he had observed on the child's thighs and backside. The caseworker believed the bruises warranted removal. Wesley was removed from the house. Halprin's mother provided several different versions of how the bruises originated. [CPS Rec. at 5716-23].

**Jan. 1983:** Halprin's father abandoned him with a family in East Texas. The family reported that Halprin had two teeth missing, believed to be caused by Halprin's father. His father also called him a bastard and stated he might leave him on the roadside. [CPS Rec. at 5745-49].

3

2549

| | |
|---|---|
| | **June 1983**: CPS located Halprin with this family, having lost contact for over six months. Halprin is placed in a foster home. [CPS Rec. at 5747-49].<br><br>**Lester Affidavit**<br>Lester averred that Halprin's father first assaulted him when he was nine months old and that this abuse continued for the next four years. She stated that Halprin's father would "beat [Halprin] several times a week, so badly that [the beatings] would leave visible marks on Randy." She also stated that her boyfriend, Willingham, "was extremely abusive, regularly beating [Halprin] with any object he could grab." [Lester Aff. at 1-4]. |

## EFFECTS OF CHILD ABUSE ON HALPRIN AS A YOUNG CHILD

At trial, the jury heard no specific evidence concerning the effects of the above-described child abuse and neglect on Halprin during his early childhood. They merely heard Dr. Goodness, a mitigation expert conclude that "abuse and neglect adversely affected [Halprin's] early environment." [RR 53, pp. 28-30]. CPS records detail how this abuse effected Halprin. Halprin worried about death, feared teenage boys, became protective of his brother, and needed constant re-assurance from his adopted parents.

| Mitigation Evidence Presented at Trial | Available Mitigation Evidence |
|---|---|
| **Testimony by Dr. Goodness:**<br>A. Yes. It's my opinion that abuse and neglect adversely affected his early environment.<br>. . .<br>Q. From birth to approximately age six?<br>A. Yes.<br>. . .<br>Q. Okay. Did you find that that affected his self-esteem?<br>A. Yes. Adverse experiences and adventive environment, especially early on in those first five years, can lead to disruptions in childhood | **CPS Records**<br>**June 18, 1982**: The CPS caseworker noted that the child abuse had caused Halprin to misbehave and to become aggressive towards his younger brother. She stated that "without doubt, his recent behavioral decline must be interpreted as emotional ebellion against the instability and confusion of his family life."<br>[CPS Rec. at 5708].<br><br>**June 1983**: The family that took Halprin in for six months reported that Halprin had gained twenty-three pounds with them. She stated that Halprin hoarded food and would eat until he vomited. After vomiting, he |

2550

| | |
|---|---|
| development and in later adult functioning as well.<br>A. . . . They are learning that abusive behavior or violent behavior is okay.<br>[RR 53, p. 28-29]. | would immediately begin to eat again. She reported that he was "obsessed with witches and monsters." He also fantasized that he was talking to his brother as well as his aunt and uncle. He would "face the wall and pretend these people [were] present."<br>[CPS Rec. at 5747-49].<br><br>**June 1983:** The foster mother stated that Halprin had expressed fears of Willingham. He was also excited to be reunited with his brother and "hugged Wesley." He was very protective of his brother and would "parent" Wesley." He had a fear of devils and ghosts. [CPS Rec. at 5749-50, 5783-84].<br><br>**Jan. 17, 1984:** Halprin's adopted parents related that Halprin was "pre-occupied with death." He "ask[ed] them if they are going to die or if some other family member or friend is going to die." He also became "extremely upset when he [was] around teenage boys, covering his face and crying out when he saw teenagers or violence. He related that "teenagers beat me up." He also related that his natural father loved him and would come back for him. When his adopted parents told him "no," Halprin was relieved. He also had a need to continually hear that his adopted parents were proud of him. [CPS Rec. at 5815-17]. |

## FAMILIAL SUBSTANCE ABUSE

At trial, the jury heard Dr. Goodness, a mitigation expert testify that Halprin was "predisposed to substance abuse" because his parents abused drugs, particularly methamphetamine and cocaine. [RR 53 at 30-31]. The jury did not hear the specifics of this drug use or Halprin's early broad exposure to these drugs. His extended family reported his parents drug use to CPS. [*See, e.g.*, CPS Rec. at 5705, 5708]. His mother also admitted her drug use to CPS and described in an affidavit that her husband and subsequent boyfriend indulged daily in Halprin's presence. [Lester Aff. at 5-6].

5

2551

| Mitigation Evidence Presented at Trial | Available Mitigation Evidence |
|---|---|
| **Testimony by Dr. Goodness:**<br>Q.   Do you believe that Mr. Halprin was predisposed to substance abuse?<br>A.   Yes, I do.<br>Q.   Okay. Which particular individuals that you talked to led you to that conclusion?<br>A.   His biological mother would be the main person. Other people said that his parents were drug addicts, but since they did not know them at that time, of course that is not as weighty to me.<br>Q.   Was that supported by any particular records that your reviewed?<br>A.   Yes, the adoption records and the CPS records.<br>[RR 53, p. 30-31]. | **CPS Records**<br>**Feb. 9, 1982:** Family alleges parents on drugs. [CPS Rec. at 5705].<br><br>**Mar. 25, 1982:** Family believes any assistance provided goes to drugs.<br>[CPS Rec. at 5705].<br><br>**June 11, 1982:** Mother told CPS caseworker that she had abused crystal methamphetamine and cocaine. [CPS Rec. at 5708].<br><br>**July 15, 1982:** The caseworker described Halprin's mother as "possibly hungover" and opined that she believes that Halprin's brothers physical problems may be "related to drug use by the mother when she was pregnant with Wesley." [CPS Rec. at 5711].<br><br>**Aug. 23, 1982:** Trailer park owner told caseworker that Willingham, the mother's boyfriend, had been picked up by the police for "possession of dope." [CPS Rec. at 5714].<br><br>**May 1983:** Father told CPS caseworker that he had "been busted for drugs." [CPS Rec. at 5747].<br><br>**Lester Affidavit:**<br>Halprin's mother stated that Halprin's father and Willingham, her boyfriend, abused drugs regularly in Halprin's presence. She stated that Willingham "us[ed] crystal meth almost every day." [Lester Aff. at 5-6]. |

## UNTREATED DISORDERS IN CHILDHOOD AND ADOLESCENCE

At trial, the jury learned that Halprin was diagnosed with Attention Deficit Disorder and learning disabilities in passage comprehension, math calculation, math reasoning and written expression as well as depression and an avoidant personality. The jury also heard Dr. Goodness state that she believed that Halprin's disabilities were not treated properly. [*See* RR 53, pp. 32-38]. The

6

2552

jury, however, did not hear the specifics of these diagnoses as they related to Halprin and how they effected Halprin during his school age years.

| Mitigation Evidence Presented at Trial | Available Mitigation Evidence |
|---|---|
| **Testimony by Dr. Goodness:**<br>Q. . . . [I]t's your opinion that he had untreated disorders in childhood and adolescence that affected him, correct?<br>A. Yes.<br>Q. And what type of disorders?<br>A. Specifically, Mr. Halprin had learning disorders. At that time he had a disorder in written expression, which means his writing skills were not up to the level that it should have been. He had a reading disorder and he had a mathematics disorder. He also had attention deficit disorder, which is an inability to sustain attention. . . . Children with attention deficit disorder find it difficult to sustain focus, especially in a school setting . . . And in addition, if you have a learning disorder combined with the attention deficit disorder, then certainly your ability to learn what you need to learn in school lessens.<br>He also in my opinion has had struggles with depression, which he is biologically predisposed to . . . [RR 53, p. 31-32].<br><br>Q. So what are the effects of untreated attention deficit disorder?<br>A. Again, you are setting a child up to fall further and further behind academically and socially, if you don't take care of these disorders when they are a problem or when they begin to manifest as a problem. For some children they are not as problematic as for others. . . .<br>. . .<br>Q. And is it your opinion that Randy's disorders were not treated adequately?<br>A. That is my opinion.<br>[RR 53, p. 34-35]. | **Report of Private Psychologist**<br>This report details a private psychologist's diagnosis of Halprin at the age of ten with Attention Deficit Disorder and learning disabilities in passage comprehension, math calculation, math reasoning, and written expression.<br><br>**Arlington Public School Records**<br>School records show that the diagnoses by the private psychologist were never shared with the school. They also show the effects of the Halprin's failure to address these psychological needs on Halprin and Halprin's struggles in school. Halprin failed seventh grade and the TAAS standardized test. [Ex. M: TAAS Scores; Arlington Withdrawl from School Form].<br><br>**Oneida Baptist Institute Records**<br>School officials initially observed that Halprin was "not a trouble maker. Clean cut guy. When going gets tough he backs off. Main problem is school. Always wants to please. Impulsive behavior. Seldom rebellious." [Ex. M: OBI Application]. He succeeded for his first year at OBI but then struggled. On July 10, 1995, Halprin was suspended from school for carving a note in a school bench that was considered suicidal. Halprin's parents refused to let him return home. [Ex. M: OBI Disciplinary record]. |

2553

| |
|---|
| Q.   And it's your opinion that Randy exhibited a real severe need for acceptance?<br>A.   Yes. It is my opinion that he had a great need for acceptance and did not appear to find that.<br>[RR 53, p. 37].<br><br>A.   . . . From the description of the Halprins that I gathered . . . it appears to me that they had - - they were a bit rule bound, that - - . . . they didn't quite know how to react when they were thrown a curve ball by Randy, and would, perhaps, overreact in their parenting. . . . They likely did the best they knew how to do. But that may not have been the best for a child that had special needs, coming from the circumstances with Randy's particular psychology. [RR 53, p. 38-39]. | |

## OTHER TESTIMONY

At trial, the jury heard testimony from Mindi Sternblitz, Jason Goldberg, and Terri Goldberg that Halprin constantly aimed to please his father in his young adult life. The jury did not hear the specifics of Halprin's rejection by his adopted parents. When he attempted to reconcile with his parents, he was refused entrance to the family home. The jury also did not learn the Department of Public Safety's evaluation of Halprin in comparison to the other Texas Seven escapees.

| Mitigation Evidence Presented at Trial | Available Mitigation Evidence |
|---|---|
| **Mindi Sternblitz**<br>Sternblitz testified that Halprin tried to please his father, particularly by completing a bar mitzvah.<br><br>A.  I kind of felt sometimes that anything that he would do, he was trying to just get his father's approval for things.<br>. . . | **Waybourn**<br>In an affidavit, Waybourn averred that at the age of eighteen, Halprin was homeless and lacked guidance. He attempted to reconcile with his parents, but was met on the front steps by the local police chief and denied entrance to the family home. [Waybourn Aff.]. |

8

2554

Q. What appeared to be the reason that Randy was so interested in doing the bar mitzvah?

A. It was part of being jewish and maybe he was just trying to follow in his father's footsteps.

Q. . . . [D]id you think that he was doing it a lot just to please his dad?

A. I think most of it was.

[RR 52, p. 8-10].

**Jason Goldberg**

Jason Goldberg was a friend of Halprin's as a child. Goldberg testified that Halprin could never please his father.

Q. Did [Randy] get in quite a bit of trouble?

A. Not to my knowledge. [RR 52, p. 37].

Q. Can you think of anything really bad that he was doing or involved in at that time that might have got him sent away [to boarding school]?

A. No. [RR 52, p. 38].

**Terri Goldberg**

Terri Goldberg was the father of one of Halprin's childhood friends. He spoke of helping Halprin to complete his bar mitzvah. He also stated that Halprin's adopted father would drop Halprin off at their house whenever Halprin and his brother fought. Goldberg also described a situation where Halprin and his son told him they saw a UFO. Halprin's father became concerned and took Halprin to see a psychiatrist. [RR 52, p. 62]. He testified that Halprin tried to please his adopted father. [RR 52, p. 55].

Q. Did you see any problems in his relationship with his parents?

A. With his father, yes. . . . I felt in my heart that Randy did not feel, no matter what he did, that it would please his father.

[RR 52, p. 66].

**Defense Exhibit 39**

Defense Exhibit 39, entitled "Ranking of Offenders by Leadership/Personality Characteristics," stated that "it was the unanimous decision that RIVAS was the leader and the weakest was determined to be HALPRIN." The document stated Halprin was "quiet and never exhibited leadership qualities. Was consistently worried about whether his work was acceptable to civilian workers. Very submissive characteristic. This worrisome attitude was seen to escalate a month before the escape. One civilian worker speculated whether HALPRIN was undergoing some type of depression."

9

2555

Respectfully submitted,

GARY A. UDASHEN
State Bar of Texas No. 20369590

BRUCE ANTON
State Bar of Texas No. 01274700

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas  75201
214-468-8100
214-468-8104 fax

ATTORNEYS FOR APPLICANT

## CERTIFICATE OF SERVICE

On this 21st day of October, 2010, a true and correct copy of the foregoing Applicant's Additional Briefing on Mitigating Evidence Jury Did Not Hear was delivered to Lisa Smith, Assistant District Attorney, 133 N. Industrial Blvd., L.B. 19, Dallas, Texas 75207.

GARY A. UDASHEN

2556

# C L E R K ' S    C E R T I F I C A T I O N

**THE STATE OF TEXAS** §
§
**COUNTY OF DALLAS** §

I, GARY FITZSIMMONS, CLERK OF THE DISTRICT COURTS WITHIN AND FOR THE STATE AND COUNTY AFORESAID, DO HEREBY CERTIFY THAT THE RECORD ON THE APPLICATION FOR WRIT OF HABEAS CORPUS TO THE COURT OF CRIMINAL APPEALS OF TEXAS, AUSTIN, TEXAS IN WRIT NO. **W01-00327-Y (A),**

**RANDY ETHAN HALPRIN    v    THE STATE OF TEXAS.**

AS SHOWN IN **VOLUME  5,  PAGES 2094-2557**  INCLUSIVE, TO WHICH THIS CERTIFICATION IS ATTACHED THERETO AND MADE A PART THEREOF, CONTAINS A TRUE AND CORRECT TRANSCRIPT OF ALL THE MATTERS AND PROCEEDINGS HAD AND DONE IN SAID CAUSE.

GIVEN  UNDER  MY  HAND  AND  SEAL  OF  OFFICE  IN  DALLAS  COUNTY, TEXAS, THIS **2nd** day  of **FEBRUARY,  2012.**

GARY FITZSIMMONS
CLERK OF THE DISTRICT COURTS
DALLAS COUNTY, TEXAS

By: _A. M̲c̲D̲a̲_____
Deputy ANA MCDANIEL

2557