# CCA Scanning Cover Sheet



2475025

CaseNumber: WR-77,175-01
EventDate: 02/13/2012
Style 1: HALPRIN, RANDY ETHAN
Style 2:
Event code: 11.071 ADD'L VOLUME

EventID: 2475025
Applicant first name: RANDY ETHAN
Applicant last name: HALPRIN
Offense: 19.03
Offense code: Capital Murder
Trial court case number: W01-00327-Y(A)
Trial court name: Criminal District Court 7 of Dallas County
Trial court number: 330570007
County: Dallas
Trial court ID: 1462
Event map code: GENERIC
Event description: Habeas Corpus - Capital Death
Event description code: 11.071
Remarks: VOL. 7 OF 7 VOLS. OF CR

☐ *Document Scanned*                    ☐ *Created or*
                                        ☐ *Appended*

_____     _____
*Scanned by*           *date*          *Image ID*

*Comment*
_____

_____

EX PARTE:

RANDY ETHAN HALPRIN
Applicant

CAUSE NO.:        W01-00327-Y (A)

IN THE CRIMINAL DISTRICT COURT

NO. 7  OF DALLAS COUNTY, TEXAS


* * * * *   DEATH  PENALTY   * * * * *


Volume  7

---

## POST CONVICTION WRIT OF HABEAS CORPUS
### (ART. 11.07, V. A. C. C. P. )

---

ATTORNEY FOR APPLICANT:

Gary Udashen

2301 Cedar Spring Road, #400

Dallas, TX  75201

ATTORNEY FOR STATE:

Honorable Craig Watkins

Frank Crowley Courthouse

Dallas, Texas    75207-4313


GARY FITZSIMMONS
District Clerk
Frank Crowley Courthouse
133 N. Riverfront Blvd., LB 12
Dallas, TX  75207

RANDY ETHAN HALPRIN                                          PAGE   1

W01-00327-Y (A)

=================================================   ==========

Applicant's Objections to Findings of Fact and Conclusions of          Vol. 7-2730
Law Regarding Ineffective Assistance of Counsel and
Suppression of Exculpatory Evidence at Punishment Phase of
Trial and Request that Court of Criminal Appeals Set Issues
For Submission and Consideration     (24 Jan 12)

Applicant's Objections to Trial Court's Findings on Issue Raising      Vol. 7-2802
Ineffective Assistance of Counsel on Appeal and Request that
Court set Issue for Submission and Consideration     (24 Jan 12)

Exhibit A   (24 Jan 12)                                                Vol. 7-2837

Applicant's Objections to the Court of Criminal Appeals               Vol. 7-3011
Considering the Trial Court's Findings of Fact and Conclusions
Of Law   (24 Jan 12)

True Bill of Indictment    (08 Feb 01)                                Vol. 7-3053

Trial Docket                                                          Vol. 7-3055

Judgment on Plea of Not Guilty Before Jury Punishment by             Vol. 7-3056
Jury – No Community Supervision     (12 Jun 03)

Subpoenas                                                            Vol. 7-3058

Clerk's Certificate                                                 Vol. 7-3066

NO. W01-00237-T(A)

| | | |
|---|---|---|
| EX PARTE | § | IN THE CRIMINAL DISTRICT |
| | § | |
| | § | COURT NUMBER SEVEN |
| | § | |
| RANDY ETHAN HALPRIN | § | DALLAS COUNTY, TEXAS |

### APPLICANT'S OBJECTIONS TO FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING INEFFECTIVE ASSISTANCE OF COUNSEL AND SUPPRESSION OF EXCULPATORY EVIDENCE AT PUNISHMENT PHASE OF TRIAL AND REQUEST THAT COURT OF CRIMINAL APPEALS SET ISSUES FOR SUBMISSION AND CONSIDERATION

**TO THE HONORABLE JUDGES OF SAID COURT:**

Applicant's sentencing hearing was tainted by Suppression of Exculpatory Evidence and Ineffective Assistance of Counsel. For this reason, Applicant, RANDY ETHAN HALPRIN, submits these Objections to Findings of Fact and Conclusions of Law Regarding Ineffective Assistance of Counsel and Suppression of Exculpatory Evidence at Punishment Phase of Trial and Request that Court of Criminal Appeals Set Issues for Submission and Consideration and would show the Court the following:

### I.

### Introduction

Through a combination of suppression of exculpatory evidence by the state and ineffective assistance of counsel by Applicant's trial counsel, the state was able to significantly circumscribe the evidence heard by the jury in the sentencing phase of this trial.

The result was the assessment of a death sentence by a jury who was unaware of the substantial amount of mitigating evidence available concerning Applicant, his background and his role in this offense. This is violative of Applicant's constitutional rights under the U. S. Const., amends. V, VI, VIII and XIV. It is also offensive to basic notions of decency and fairness.

## II.

## <u>What The Jury Did Not Hear</u>

The evidence that the jury did not hear prior to assessing the death sentence falls into two major categories. First is Applicant's role in the offense and the group known as the Texas Seven. The second is the substantial mitigating evidence concerning his childhood and difficult personal history.

### A.     The Ranking Document

At trial, Halprin unsuccessfully attempted to admit into evidence a critical piece of evidence–Exhibit 39, "Ranking of Offenders by Leadership/Personality Characteristics." [1] The State objected to the admission of Exhibit 39 as hearsay, arguing that defense counsel had not established the author of the document. [RR 53, pp. 13-16]. Further, the State disclaimed knowledge of the source of the document, who prepared it, or why it was

---

[1] Exhibit 39 states, "After conducting interviews with civilian workers, correctional officers, and several inmates who worked closely with the escapees, a consensus was developed of which offender was the leader and which one may be the weakest." Exhibit 39, continued on to maintain that "it was the unanimous decision that RIVAS was the leader and the weakest was determined to be HALPRIN." [Def. Ex. 39]. Specifically, the document noted Halprin was "quiet and never exhibited leadership qualitites. Was consistently worried about whether his work was acceptable to the civilian workers. Very submissive characteristic. This worrisome attitude was seen to escalate a month before the escape. One civilian worker speculated whether HALPRIN was undergoing some type of depression." [Def Ex. 39].

Applicant's Objection to Findings of Fact and Conclusions of Law Regarding Ineffective Assistance of Counsel and Suppression of Exculpatory Evidence at Punishment Phase of Trial and Request that Court of Criminal Appeals Set Issues for Submission and Consideration - Page 2

prepared despite having provided defense counsel with the document during discovery. The trial court, therefore, excluded this document. [RR 53, p. 15].

During its investigation, writ counsel discovered the location and author of the document. The document was stored in the files of the Texas Department of Criminal Justice–Inspector General and its author was Sergeant Investigator Hank Whitman of the Texas Department of Public Safety Special Crimes Division. [*See* Cert. Rec. TDCJ–Off. Insp. Gen.]. At a hearing on September 30, 2010, Whitman testified as to his knowledge, concerning the creation of the Ranking Document and the ease of determining his authorship. [Writ Hrg., Sept. 30, 2010, Vol. 3, pp. 18-85].

Whitman's testimony highlighted the importance of this document as exculpatory evidence. He stated that six law enforcement personnel, primarily Texas Rangers and members of Internal Affairs participated in the creation of the Ranking Document[2] in the immediate aftermath of the escape. [Writ Hrg., Sept. 30, 2010, Vol. 3, at 28, 32, 47]. He further testified that the Ranking Document represented a "consensus" of this group – Halprin was the weakest, never exhibited leadership qualties, was submissive, and consistently worried about whether his work was acceptable to civilian workers. [*Id.* at 28, 30-32].[3] The purpose of the document was for gathering intelligence" and tactical reasons

---

[2]These persons included Ranger Lt. Ray Cano, Ranger Sgt. Andy Lopez, John Davis, Mike Scotten, Charles Mann, and Chris Koenig. [Writ Hrg., Sept. 30, 2010, Vol. 3, at 47].

[3]Specifically, the following exchange occurred:

Q.   Your document says a consensus was developed as to which was the leader and which was the weakest. The consensus – just to be clear, the consensus is exactly what's in the document, correct?
A.   Correct.
Q.   Concerning Mr. Halprin the document says he was quiet, never exhibited leadership qualities.
     I assume you got that from your interviews with all of these people.

for hostage negotiations when they captured the individuals. [*Id.* at 25]. Indeed, he stated they wanted "to know everything there was about these individuals." [*Id.* at 25].

The document was given to persons within the Department of Public Safety, the Texas Rangers, prison officials, the FBI, and the Irving Police Department. [*Id.* at 33, 35]. Whitman testified that shortly after the murder of Officer Aubrey Hawkins, he attended a meeting in Irving Texas, concerning the Irving Police Department's investigation. [*Id.* at 35]. At this meeting, he personally gave a copy of the Ranking Document to a homicide detective from the Irving Police Department investigating the crime. [*Id.* at 35-36]. His captain had directed him to provide the Irving Police Department with this information. He stated that other persons at the meeting, such as Chief Bill Lazenby and Deputy Inspector John Moriante, and his Assistant Terry Cobb knew about the Ranking Document. [*Id.* at 37].

Whitman testified that it would have been easy to determine his authorship. He

---

| | |
|---|---|
| A. | That's correct. |
| Q. | All of the officers involved in this agreed that that's a characteristic of Randy Halprin? |
| A. | Yes, sir. |
| Q. | And that it says he was consistently worried about whether his work was acceptable to the civilian workers. I assume you heard that from the civilian workers. |
| A. | That's correct. |
| Q. | That was a consensus that was a true fact? |
| A. | Yes. |
| Q. | It says Halprin had a very submissive characteristic. I assume that came from these same interviews with all of these people you interviewed. |
| A. | That's correct. |
| Q. | The consensus among all of these officers was he had a submissive characteristic? |
| A. | Yes, sir. |
| Q. | This worrisome attitude was seen to escalate a month before the escape and one civilian worker speculated as to whether he was undergoing some type of depression. Sounds like statements particular people told you. |
| A. | That's correct. |
| Q. | Your put them in the document because your consensus among you and the officers was this was information that was likely correct. |
| A. | Yes, it is. |

[Writ Hrg., Sept. 30, 2010, Vol. 3, at 30-32].

agreed that every officer or agency that he sent the document to personally knew he was the author. At the hearing on September 30, 2010, the following exchange occurred:

Q. So would you agree with me there would be a limited universe of people who could have written these documents that wound up in these law enforcement files?

A. There would have been a limited amount. However, there was quite a few people that knew I authored that that are still working for the system. Ultimately that's why I'm sitting here today. That's how it was identified.

Q. Somebody called the Department of Public Safety to the division that handled criminal investigations where you worked, would they have been able to find someone that said Hank Whitman wrote that document.

A. Yes, sir.

Q. If somebody called the Office of Inspector General and said, "Who wrote this document," there are people there that would have said, "Hank Whitman wrote this document."

A. Yes, sir.

[Writ Hearing, Sept. 30, 2010, Vol. 3, at 49-50]. Moreover when asked if it would be "pretty easy to find out who wrote [Exhibit 39]," Whitman replied, "It would have been easy, yes." [*Id.* at 50]. Further, the records at the Texas Department of Criminal Justice Office of Inspector General, which contained Exhibit 39, included a fax cover sheet from the Irving Police Department that states "profiles done by Sgt. Investigator Hank Whitman." [*Id.* at 45].

## 1. State Suppression Exculpatory Evidence Concerning Who Authored the Document

Under the Due Process Clause of the Fourteenth Amendment, the State has an

affirmative duty to turn over all material exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963); *Ex parte Kimes*, 872 S.W.2d 700, 702 (Tex. Crim. App. 1993). This duty to disclose is ongoing. *Flores v. State*, 940 S.W.2d 189, 191 (Tex. App.–San Antonio, 1996, no pet.). The State's duty to disclose includes information known to the police or other branches of law enforcement. *Kyles v. Whitley*, 514 U.S. 419, 433 (1995); *Ex Parte Adams*, 768 S.W.2d 281, 292 (Tex. Crim. App. 1989) ("It is of no consequence that the facts pointed to may support only knowledge of the police because such knowledge will be imputed to state prosecutors." (quotation omitted)); *see also United States v. Thornton*, 1 F.3d 149, 158 (3d Cir. 1993) (noting that "prosecutors have an obligation to make a through inquiry of all enforcement agencies" that have "a potential connection" with the case); *Williams v. Whitley*, 940 F.2d 132, 133 (5th Cir. 1991) ("[T]he prosecution is deemed to have knowledge of information readily available to it."); *Martinez v. Wainwright*, 621 F.2d 184, 186-87 (5th Cir. 1980) (finding no suggestion in Brady "that different arms of the government are severable entities").

Here, Whitman participated in the investigation of the Texas Seven. He worked for the Texas Department of Criminal Justice, an essential component of investigative and prosecution team in this case. He also gave the Ranking Document to the Irving Police Department during its investigation of the case. Therefore, Whitman's knowledge concerning Exhibit 39 can be imputed to the State. Additionally, the knowledge of the Irving Police Department Detective that Whitman gave the document to can be imputed to the State. It does not matter whether the prosecution knew or did not know he was the author of Exhibit

39. *Zule v. State*, 802 S.W.2d 28, 33 (Tex. App.–Corpus Christi 1990, pet. den'd) ("The State is responsible for disclosing favorable evidence known by its agents, including police officers, even if the particular evidence is not known to the prosecuting attorney.").

The First Circuit Court of Appeals reasoning in *United States v. Osorio* is instructive here as to when a law enforcement officer's knowledge should be imputed to the State. *United States v. Osorio*, 929 F.2d 753, 758 (1st Cir. 1991). In *Osorio*, the First Circuit stated that "The government is not a congery of independent hermetically sealed compartments; . . . the prosecution of criminal activity is a joint enterprise." *Id.* at 760. The First Circuit continued on to reason:

> The prosecutor charged with discovery obligations cannot avoid finding out what 'the government' knows, simply by declining to make reasonable inquiry of those in a position to have relevant knowledge. The criminal responsibility of a corporation can be founded on the collective knowledge of its individual employees and agents. There is no reason why similar principles of institutional responsibility should not be used to analyze the actions of individual government attorneys called upon to represent the government as an institution in matters of court-ordered disclosure obligations.

*Id.* at 761. Just as the FBI and the U.S. Attorney's Offices are not "independent hermetically sealed compartments," neither are the Irving Police Department, the Texas Department of Criminal Justice, Office of Inspector General, the Texas Department of Public Safety Special Crimes Division and the District Attorney's Office. This is particularly true when all three offices were deeply involved in the investigation and prosecution of this case.

Texas courts have recognized similar reasoning. In *O'Rarden v. State*, the Fifth Court of Appeals held that the prosecution included both "investigative and prosecutorial" persons

assigned to the case, including a person who investigated claims of sexual abuse with the Department of Human Resource. *O'Rarden v. State*, 777 S.W.2d 455, 457 (Ct. App.–Dallas 1989, pet. rev. refused). This person knew that a medical doctor had examined the complainant and found that no signs of sexual abuse existed. *Id.* The Court imputed this knowledge to the prosecution team and reversed and remanded the case for a new trial. *Id.* at 457, 460. Similarly, here, knowledge of the authorship of Exhibit 39 should be imputed to the State. The prosecution worked in concert with Whitman's agency and the Irving Police Department to prosecute the case. The Irving Police Department knew the author of Exhibit 39, because it sent a fax that stated "profiles done by Sgt. Investigator Hank Whitman." [Writ Hrg. Sept. 30, 2010, Vol. 3 at 45].

The Fifth Circuit's opinion in *United States v. Deutsch,* is also informative. *United States v. Deutsch,* 475 F.2d 55 (5th Cir. 1973), *overruled on other grounds by, U.S. v. Henry*, 749 F.2d 203 (5th Cir. 1984). In *Deutsch*, the Fifth Circuit addressed the implications of *Brady* where a postal employee who allegedly had accepted payment from the defendant in exchange for credit cards stolen from the mail was the government's key witness. *Deutsch,* 475 F.2d at 56-57. When the defense requested the employee's personnel file, the prosecutor responded that id did not possess the file. *Id.* The *Deutsch* Court, however, held that "there is no suggestion in *Brady* that different 'arms" of the government, particularly when so closely connected as this one for the purpose of the case, are severable entities." *Id.* at 57. It stands to reason that if knowledge possessed by the post office can be imputed to the prosecution so can the law enforcement agencies involved in the investigation and

prosecution of the case here.  Moreover, Whitman testified that a number of persons in the Criminal Investigations section of the Department of Public Safety and the Office of Inspector General would have known he authored Exhibit 39 if a call was placed to these sections.  The Irving Police Department also received the Exhibit.  His authorship was "readily available" to prosecutors. *Williams*, 940 F.2d at 133.  Indeed, he agreed that "[i]t would have been easy" to trace his authorship.

Finally, the item sought was particular in nature – the author of Exhibit 39 so that defense counsel could introduce the exhibit into evidence.  The State was more than aware that Halprin sought the author of this document in order to introduce it during the punishment stage of trial.  The U.S. Supreme Court has suggested that the more specific the request, the broader the State has an obligation to respond. *United States v. Agurs*, 427 U.S. 97, 106 (1976); *United States v. Brooks*, 966 F.2d 1500, 1504 (D.C. Cir. 1992) (noting that where "there is an explicit request for an apparently very easy examination, and a non-trivial prospect that the examination might yield material exculpatory information, we think the prosecution should make the inquiry").  Therefore, the State had a heightened duty to search for the author of Exhibit 39 in order that defense counsel could introduce Exhibit 39 at trial.

Accordingly, the knowledge of Whitman's authorship can be imputed to State prosecutors.  Under *Brady*, it did not matter whether the prosecutors knew or did not know the authorship of Exhibit 39.  The author of Exhibit 39, Whitman, was a member of the investigative and prosecution team in the Texas Seven case.  Further, as Whitman testified his authorship and knowledge were "readily available."  Moreover, the Irving Police

Department, which was intimately involved in this prosecution, had direct knowledge and possession of the document and this knowledge is imputed to the State.

It is unconscionable that the prosecution pursued and achieved a death sentence by not providing the authorship of Exhibit 39 in order for defense counsel to present the Ranking Document during the punishment stage of the trial. As a result, the jury never had the opportunity to view this critical document that would likely have caused the jury to refuse to impose a sentence of death on Halprin.

### 2.   Trial Court's Findings on *Brady* Claim

The trial court's findings on this *Brady* claim are numbers 92-160. These findings are nothing more than a regurgitation of the state's proposed findings on this issue. In fact, the trial court simply accepted and copied the state's proposed findings, making minor and insignificant changes in 4 out of 68 of the state's proposed findings.

That the trial court relied upon the state's guidance in resolving this issue explains the failure of the findings to treat this *Brady* violation with the seriousness it deserves.

First, the court's finding 102 stated that, "none of the prosecutors who participated in Halprin's trial knew that Whitman participated in preparing the ranking document nor did they try to hide his identity from Halprin's trial counsel." The trial court apparently accepted, at face value, the state's claims that they had no idea who wrote this document. In accepting this, the trial court ignores the significant facts showing otherwise. Halprin's trial was the fifth of the six trials of the Texas Seven escapees. The District Attorney's Office had devoted an unprecedented amount of resources to these prosecutions with several attorneys

working full time on these cases. It is simply unbelievable that no member of the District Attorney's trial team knew who authored the ranking document.

At the very least, the trial court should consider the significant circumstantial evidence that, even if these prosecutors did not know who the author was, they deliberately avoided the knowledge. In other words, it is clear that the identity of the author of the document was information readily available to the prosecutors. It is also clear that the prosecutors knew that defense counsel did not know who the author was and would therefore have a hard time having the document admitted into evidence. Therefore, even if the prosecutors did not know who the author was, then that lack of knowledge was the result of a strategy of deliberate ignorance. By making themselves unaware of this information and deliberately avoiding taking the easy steps that would have given them this knowledge, the prosecutors were able to claim ignorance to defense counsel and the court. Although the weight of the credible evidence and the reasonable deductions from the evidence show that the prosecutors knew Whitman wrote the document, nevertheless their claims of lack of knowledge are further refuted since they are based on deliberate ignorance. This type of gamesmanship should not be tolerated in the sentencing phase of a capital murder trial.

In finding number 125, 126 and 127, the trial court finds that the ranking document was hearsay and not admissible in evidence. As argued elsewhere in this document, this finding is incorrect. In fact, had Applicant's counsel knew who the author of the document was, they would have been able to lay the foundation for its admission.

Most disturbing is the trial court's blind acceptance of the state's spurious claim that

the ranking document is insignificant and cumulative. This was a document prepared by highly experienced law enforcement officers that contained their conclusion about the role of the seven escapees within their group and how the group would operate. These law enforcement officers ranked Halprin at the very bottom, concluding he was the weakest and exhibited no leadership qualities. The document further described him as submissive. In order for this document to be insignificant, these qualities would need to be characterized as not mitigating. Clearly, the trial court's finding that Applicant's relative standing in a group engaging in criminal activities is irrelevant and not mitigating is clearly erroneous. Yet, by adopting the state's finding, that is precisely what the trial court has found.

Equally misguided is the trial court's adoption of the state's argument that this evidence is cumulative. In finding 147, the court, copying the state's proposed finding, cites testimony from two TDCJ employees who said that Applicant was unintelligent, dumb as a box of rocks and not a leader. This testimony is in an entire different universe from the conclusions reached in the ranking document. Certainly, a jury would find a synthesis of information, comparing the relative culpability of the seven escapees, prepared by experienced law enforcement officers, more convincing than the few random comments cited by the state.

The trial court also adopted the state's argument that Applicant's own testimony made the admission of this document cumulative and unnecessary. Finding 149 states,

> "The court also finds that Applicant testified at length that he was a follower and that his participation in the escape and the victim's murder was minimal."

In this finding, the trial court is placing equal weight on Applicant's claim to be a follower, with the opinion of the law enforcement officer's in the ranking document. This is an indefensible conclusion and the trial court appears to have simply accepted this proposed finding without a comparison between the difference in the evidence that came from Applicant as opposed to the substance of the ranking document. This same problem exists in the state's suggestion, adopted by the trial court, that the fact that some of the "codefendants characterized him as a follower, rather than a leader," (Finding, 149), makes the ranking document cumulative.

The state continued with this theme in findings 150 by suggesting that defense counsel's arguments that Applicant had low intelligence and was a follower with a diminished role in the offense made the admission of evidence establishing this unecessary. Clearly, the jury will make their decision based on evidence and not argument by counsel.

In findings 152, 153 and 154, the trial court violates well established law in using statements allegedly made by jurors to counsel after trial as a basis for finding the failure of this document to be admitted in evidence as harmless. The trial court has made a finding that these comments by jurors, after the trial, concerning their deliberations, are legitimate evidence in this writ proceeding. Certainly, if the Court of Criminal Appeals wishes to join the trial court in this bold step and overrule T. R. Evid. 606(b), a written opinion on this issue would be appropriate.[4]

---

[4]**T. R. Evid. 606(b). Inquiry Into Validity of Verdict or Indictment**. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror concerning any matter

The trial court's finding that defense counsel's questions to witnesses and attempts to have the document admitted were more helpful to the Applicant than the document itself (finding 155) denigrates the intelligent and fidelity of the jury. This finding suggests that this jury ignored the court's instruction and their oath and based their verdict, not on the evidence they heard, but on the evidence they did not hear. The fact that the trial court signed off on this type of finding is further evidence that the state's findings were simply accepted without ever a modicum of vetting.

Finding number 156 is that if the document had been admitted into evidence, the state would have responded by having Whitman rewrite the documents conclusions and say that Applicant was not really number seven, rather that the bottom three were interchangeable. Thus, the trial court has found that the state would have had their witness disavow his own document, testify it did not mean what it said, and ask the jury to accept the revision conveniently made to fit the facts of Halprin's trial. The trial court, like the state, fails to appreciate the fact that a jury would easily see through this type of shenanigans and would be highly unlikely to allow the prosecutors to get away with such conduct.

In summary, the trial court's findings on this issue are tainted by the fact that they are, in reality, the state's findings. They are replete with misstatements, incorrect analysis and poorly reasoned conclusions. The Court of Criminal Appeals should reject them in their entirety.

---

about which the juror would be precluded from testifying be admitted in evidence for any of these purposes. However, a juror may testify: (1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve.

### 3. Ineffective Assistance of Counsel for Failure of Trial Counsel to Discover the Identity of the Author of the Ranking Document and Have It Introduced Into Evidence

It is well established that a defendant is entitled to the effective assistance of counsel as required by the Sixth and Fourteenth Amendments as well as Tex. Const., art. 1, Sect. 10. *Gideon v. Wainwright,* 372 U.S. 335 (1963). Effective assistance is denied if, 1) "counsel's representation fell below an objective standard of reasonableness," and 2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668 (1984). To establish deficient performance, Applicant must show that his counsel's representation "fell below an objective standard of reasonableness." *Jones v. Jones,* 163 F.3d 285, 301 (5th Cir. 1998) (quoting *Strickland,* 466 U.S. at 688). To satisfy the prejudice requirement, the record must demonstrate that, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.; see also Nealy v. Cabana,* 764 F.2d 1173, 1178 (5th Cir. 1985). The question is not whether a defendant would have more likely than not received a different verdict but for counsel's performance, but whether, "he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley,* 514 U.S. 419, 454 (1995). 146. The Court notes that in preparing for the defense of a capital murder prosecution, counsel is expected to familiarize himself with the facts of the case and with the applicable standards of law attendant to the various anticipated legal questions which will

be presented at trial. *Magill v. Dugger*, 824 F.2d 879, 866 (11th Cir. 1987). Failure to follow up on established leads or known defenses, and failure to be prepared to effectively present such defenses, is not excusable. *See, e.g., Battenfield v. Gibson*, 236 F.2d 1215, 1228 (10th Cir. 2001). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitations on investigation." *Burger v. Kemp*, 483 U.S. 776, 794 (1987). (*citing Strickland*, 466 U.S. at 690-91). The failure to present certain types of critical evidence may not be condoned if it stems from trial counsel's lack of preparation. *Wiggins v. Smith*, 539 U.S. 510, 521-23 (2003). The failure to call witnesses cannot be deemed a strategic choice if counsel had not interviewed the witnesses and was, thus, unprepared. *See also Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991), *cert. denied*, 503 U.S. 952 (1992). The failure to make proper evidentiary objections because of a misunderstanding or ignorance of the rules satisfies the first prong of the *Strickland* test. *See, e.g., Gochicoa v. Johnson*, 118 F.3d 440, 447 (5th Cir. 1997).

In determining whether the applicant suffered prejudice as a result of counsel's deficient performance, the applicant need only demonstrate that a reasonable probability exists that, but for counsel's failures, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

    a. The Court finds that reviewing courts are to evaluate the totality of the available mitigating evidence adduced in the habeas proceeding in re-weighing the mitigating evidence against the evidence in aggravation to determine whether the defendant has

demonstrated "a reasonable probability that the result of the sentencing proceeding would have been different if competent counsel had presented and explained the significance of all the available evidence." *Williams*, 529 U.S. at 397-99.

b. The Court finds that in challenging counsel's performance at sentencing, the applicant must demonstrate that, but for counsel's failure to conduct a meaningful investigation, at least one juror would have been swayed by the evidence that was not disclosed and would have rendered the less severe sentence of life imprisonment. *Neal*, 286 F.3d at 244.

The Eighth Amendment to the U.S. Constitution requires a jury to consider circumstances of the crime and the defendant's background and character during the sentencing phase of a capital trial. U.S. CONST. amend VIII; *Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997), *cert. denied*, 523 U.S. 1079 (1998). In *Williams,* the Supreme Court iterated that "it is undisputed that [a capital defendant has] a right – indeed, a constitutionally protected right to provide the jury with the evidence that his trial counsel either failed to discover or failed to offer." *Williams*, 529 U.S. at 393.

In capital cases, trial counsel has a constitutional obligation and duty to thoroughly investigate mitigating evidence and present this evidence at trial. U.S. CONST. amend. VI; *Wiggins v. Smith*, 539 U.S. 510, 521-23 (2003); *Williams v. Taylor*, 529 U.S. 362, 396 (2000).

The courts consider it "indisputable that, in the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a reasonably substantial, independent investigation' into potential mitigating circumstances." *Neal v. Puckett*, 286 F.3d 230 (5th Cir. 2002) (en banc). Counsel may not abandon "their investigation of petitioner's background after having acquired only rudimentary knowledge of his history

from a narrow set of sources." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003).

The Supreme Court has admonished that *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather a reviewing court must consider the reasonableness of the investigation said to support that strategy. The Supreme Court has made it clear that it is not enough for a defendant to be allowed to develop mitigating evidence, the jury must be allowed to hear and consider mitigating evidence.

Additionally, applicant may rely on the ABA Standards in asserting that his counsel's performance was unreasonable in light of prevailing professional norms. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000) (citing the *ABA Standards for Criminal Justice* 4-4.1 in finding that "trial counsel did not fulfill their obligation to conduct a through investigation of the defendant's background").

a. The *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* direct that at the sentencing phase of a trial, counsel must consider and should present "anything in the life of the defendant which might militate against the appropriateness of the death penalty." *ABA Guidelines for the Performance of Defense Counsel in Death Penalty Cases* §10.7, p. 81 (2003).

b. Evidence that should be considered includes:

1. Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);

2. Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a

natural disaster; . . . failures of government or social intervention (e.g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

3. Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities[.]

c. The *ABA Guidelines* direct that counsel should consider all potential methods of offering mitigating evidence to the sentencing entity, including witnesses, affidavits, reports, letters, and public records. *ABA Guidelines for the Appointment & Performance of Counsel* § 11.8.6 (1989).

Defense counsel attempted to introduce the document at trial but the State objected to its admission as hearsay. [RR 53, pp. 13-16]. The State argued that defense counsel had not established the author of the document. Further, the State disclaimed knowledge of who prepared it, or why it was prepared despite having provided defense counsel with the document during discovery. The trial court found that the document was properly authenticated but that it did not fall within one of the hearsay exceptions. The trial court ruled:

You don't know who the author is, you don't know where the conclusions come from ,you can't go back and find out any of the source information that the ultimate opinion comes from. So I have reviewed 39, I understand your objections. No question about its authenticity. It's simply not admissible because of hearsay. [RR 53, p. 15].

As stated previously, a search by writ counsel revealed that Exhibit 39 along with the information concerning this document and who prepared it was located in the files of the Texas Department of Criminal Justice–Inspector General. Yet, trial counsel failed to follow this obvious lead and find the author of the document.

The record developed in these writ proceedings established that it would have been easy to determine who authored Exhibit 39. The document was distributed widely after the escape. If fact, at a hearing on September 30, 2010, the following exchange occurred between the author of Exhibit 39, Lt. Whitman, and writ counsel:

Q.   So would you agree with me there would be a limited universe of people who could have written these documents that wound up in these law enforcement files?
A.     There would have been a limited amount. However, there was quite a few people that knew I authored that that are still working for the system. Ultimately that's why I'm sitting here today. That's how it was identified.
Q.   Somebody called the Department of Public Safety to the division that handled criminal investigations where you worked, would they have been able to find someone that said Hank Whitman wrote that document.
A.     Yes, sir.
Q.   If somebody called the Office of Inspector General and said, "Who wrote this document," there are people there that would have said, "Hank Whitman wrote this document."
A.     Yes, sir.

[Writ Hearing, Sept. 30, 2010, Vol. 3, at 49-50]. Further, when asked if it would be "pretty easy to find out who wrote [Exhibit 39]," Whitman replied, "It would have been easy, yes." [Id. at 50]. Whitman testified that anyone from Office of Inspector General, Internal Affairs would have known who created the document. He also stated that everyone he sent the document to would have been able to identify him as the author. [Writ Hearing, Sept. 30, 2010, Vol. 3, at 44].

The writ evidence also established that the records at the Texas Department of Criminal Justice Office of Inspector General, which contained Exhibit 39, included a fax cover sheet from the Irving Police Department that states "profiles done by Sgt. Investigator

Hank Whitman." [Writ Hearing, Sept. 30, 2010, Vol. 3 at 50]. Whitman also gave the Ranking Document to an investigator with the Irving Police Department during its investigation of the case.

However, defense counsel did not even ask its own witness, S.O. Woods, to help them identify the document prior to the punishment phase. As indicated by his affidavit, Woods readily could have done so.

The failure of defense counsel to take this simple step, notwithstanding the State's attempt to hide the authorship, cannot be justified as it demonstrates a lack of effort.

In addition to the failure of trial counsel to determine the authorship of the ranking document, appellate counsel failed to properly argue the issue at the Court of Criminal Appeals. To the extent that the Court of Criminal Appeals' opinion on direct appeal affects the Court's review of this issue, that opinion was the direct result of ineffective assistance on appeal.

**B.** **Appellate Counsel's Failure to Contest State's Assertion that Exclusion of Exhibit 39 Was Harmless Error Fell Below an Objective Standard of Reasonableness**

Appellate counsel's failure to respond to the State's argument that the exclusion of Exhibit 39 was harmless error fell below an objective standard of reasonableness. Without a response from appellate counsel, the Criminal Court of Appeals adopted wholesale the State's argument that the exclusion of Exhibit 39 was harmless. *Compare Halprin*, 170 S.W.3d at 116 *with* [State Brief (CCA) at 12-15]. Courts have found that failure to file a reply brief, particularly in a capital case, can constitute deficient performance. In *Baldwin*

*v. Johnson*, 2006 WL 2468779, *5 (M.D.Miss. 2006), the court found that "counsel's performance on direct appeal was deficient for failing to file a reply brief," reasoning that while "there is no requirement for the appellant to file a reply brief under state law, . . . counsel appealing a capital conviction would be prudent to file a reply brief." *Id.*; *Daniels v. Henry*, 2007 WL 424441, *36 (N.D. Cal. 2007) (holding counsel's representation deficient where counsel failed to respond in reply brief to State's arguments among other deficiencies); *see also State v. Jones*, 612 P.2d 404 (Wash. 1980) (commenting that failure to file a reply brief and waiver of oral argument constituted a sufficient reason to question counsel's commitment to his client's defense).

Appellate counsel's failure to file a reply brief is particularly egregious here, because counsel believed that the exclusion of the ranking document was the most meritorious issue for direct appeal to the Court of Criminal Appeals. Indeed, when asked if the exclusion of Exhibit 39 "was basically the most important issue on the direct appeal," appellate counsel responded "I believe it was, yes." [Hrg. Transcr. Aug. 20, 2010 at 154]. Therefore, it was an unreasonable for counsel to not fully develop this argument. *See Smith v. Robbins*, 528 U.S. 259 (2000) (noting that counsel has an obligation to raise and argue determinative issues); *Jones v. Barnes*, 463 U.S. 745, 751-53 (1983). Indeed, counsel's failure to respond to the State's argument that the exclusion of the ranking document was harmless sabotaged Halprin's chance of prevailing on this argument.

### C. Defendant Suffered Prejudice from Appellate Counsel's Inadequate Argument Concerning Exhibit 39.

Exhibit 39 was the single most important piece of evidence that explained Halprin's relatively minor role in the escape and crime spree engaged in by the Texas Seven as

perceived by law enforcement. Moreover, it was admissible under the public records exception or alternatively business records exception to the hearsay rule, particularly during the punishment stage of a death penalty case.

### 1. Exclusion of Ranking Document Was Not Harmless Error

Contrary to the Court of Criminal Appeals holding, the trial court's exclusion of the ranking document was not harmless error. In fact, had appellate counsel properly briefed the issue on original submission or on rehearing, a substantial probability exists that the Court would have found harm. Exhibit 39 was hardly cumulative. Rather, it was the single most important piece of evidence that could have been introduced at the punishment phase of Halprin's trial. In fact, it is difficult to imagine a more pertinent and convincing piece of mitigating evidence in the context of a multi-defendant capital murder case. Exhibit 39, prepared by State law enforcement agents in the course of their investigation, demonstrated that Halprin was the weakest of the seven and highly submissive and thus the least dangerous individual. This was strong mitigation evidence that could have affected the outcome of the penalty phase of the trial.

To support its finding that Exhibit 39 was cumulative, the Court cited the disparate testimony of three witnesses from the guilt/innocence phase of the trial, including Halprin's own testimony. Two of these three witnesses, Patrick Moczygemba and Mark Burgess, were civilian prison officials who worked in the maintenance department of the Connally Unit and testified for the State. At one point during cross-examination, Moczygemba agreed with defense counsel that he would rank Halprin's intelligence "at the very bottom" of the Texas

Seven and that Halprin was "dumb as a box of rocks." [RR 49, p. 111, 115]. Similarly, Burgess stated that Halprin was not "a leader type." [RR 49, p. 195]. But these were brief, unrelated statements made by two of the State's numerous witnesses during the guilt/innocence phase of the trial, not the penalty phase of the trial. The third piece of testimony the Court cited came from Halprin himself. He testified that he was a follower and not a leader – testimony a jury could consider self-serving without proof from other sources to verify it.[5]

The testimony of these three witnesses could not possibly have had the same impact as Exhibit 39, the "Ranking of Offenders by Leadership/Personality Characteristics." This document was the result of information culled from prison records as well as interviews with over twenty different persons, ranging from the sheriff of Karnes County, to prison administrators, to correction officers, to inmates, to civilian officers who oversaw the escapees' daily work. [See Ex. 39]. In other words, it was an amalgam or synthesis of everything that the prison system and law enforcement knew about Halprin: Halprin was the

---

[5]In its appellate brief, the State also contended that defense exhibits 24, 25, 26, 27, 53, 55, and 56 further "establish[ed Halprin's] subordinate personality and comparative intelligence level." [State's Brief (CCA) at 14]. The Court of Criminal Appeals did not cite to these exhibits in its decision.

It is simply untrue that these exhibits would have had the same mitigation effect as Exhibit 39. Exhibits 24, 25, 26, and 27 are the written statements of Patrick Murphy, Donald Newbury, George Rivas, and Michael Rodriguez respectively. These documents are about the offenses committed and not the ranking of the offenders. Exhibit 53 is a case summary compiled by the Texas Department of Criminal Justice Institutional Division that describes the crime Halprin was in prison for. While it lists Halprin's IQ, it does not discuss his personality or contain any information as to his comparative intelligence or role in the escape. The focus of this document is a description of Halprin's underlying crime.

Exhibit 55 (the escapees individual TDCJ files) and Exhibit 56 (Dept. of Public Safety Inspector G.W. Hildabrand Investigation Report) were admitted for recorded purposes only. The jury did not see them, and, therefore, they cannot be considered on appeal. [RR 52, p. 80]. Indeed, after defense counsel offered Exhibits 55 and 56 for record purposes only, the trial judge stated, "Nos. 55 and 56 for record only. That means the jury will not look at them." [RR 52, p. 80]. By citing these documents as examples of why the omission of Exhibit 39 was harmless, the Dallas District Attorney's Office improperly asked the Court of Criminal Appeals to consider things not in evidence in front of the jury.

weakest of the seven escapees and was very submissive. The document, by its very creation, carried the approval of the prison system and law enforcement itself. As such, it was much more powerful than the testimony of three witnesses, one of whom was Halprin himself, who said little more than Halprin did not possess leadership qualities during the guilt/innocent phase of the trial and not the punishment stage.

Indeed, the admission of Exhibit 39 would have been the most effective means to demonstrate that law enforcement considered Halprin's role to be in the escape and his personality characteristics compared to the other escapees. This piece of evidence demonstrates that Halprin was a weaker person than his co-actors and that he would likely never attempt an escape or commit murder on his own. Exhibit 39 also contradicts the prosecution's assertions that Halprin was the "baddest of the bad" and that there was no evidence that sufficiently mitigated against his role in the crime. [RR 53, p. 77, 85]. Further, the document undercuts the prosecution's theory that Halprin was one of the leaders of the escapees and played a pivotal role in the escape–which law enforcement clearly did not believe. [RR 49, p. 6]; [RR 48, p. 106, 108, 124, 135]. The prosecution could not have readily impeached this document because it was prepared by an agency of the State. It was incontestible.[6]

Perhaps, more importantly, Exhibit 39, undermined the State's theory of the punishment phase of the trial – that Halprin's character, background, lack of moral

---

[6]In fact, Exhibit 39 was a statement by law enforcement that strongly supported Halprin's argument against the imposition of death and directly contradicted the prosecution's argument. It is because of the crucial importance of this piece of evidence that the prosecutors went to such lengths to ensure it was not admitted in evidence.

culpability, and crimes required the death penalty and that no mitigating evidence existed. [*See, e.g.* RR 53, p. 77 ("What could possibly be sufficiently mitigating? . . . [W]e told you [in opening arguments] that after you reviewed the evidence in the case and the testimony, that it was our position . . . that that would be no."); p. 84-85 ("His mean evil streak back in August of '96 hasn't ended.  It's continued on").   Exhibit 39 was mitigating.   It was a statement by law enforcement that Halprin was a follower, "with a very submissive characteristic" who "worried about whether his work was acceptable to the civilian workers" and was "the weakest" of the escapees.  [Ex. 39].  Exhibit 39, particularly when combined with other excluded evidence, such as Dr. Goodness's full proposed testimony, provided a myriad of reasons why Halprin should have received life imprisonment.

In sum, Exhibit 39 was the strongest piece of mitigation evidence that could have been presented at trial.  The exclusion of this evidence was inordinately harmful to Halprin.  This evidence could have caused the jury, a jury that took over six hours to deliberate,[7] to choose life imprisonment instead of the death penalty.  Indeed, several criminal law experts have submitted affidavits to this effect.  In his affidavit, Bobby D. Mims, a criminal defense attorney who has defended thirty capital murder cases, opined:

> the information in [Exhibit 39] is mitigating evidence of a quality and quantity that is significantly stronger and more important than that referenced in the opinion of the CCA.  The evidence from the TDCJ civilian employees that Halprin was at the low end of intelligence of the group and was not a leader

---

[7]At a previous hearing on this writ, state's counsel pointed out that the jury in Halprin's case deliberated longer than in most of the other Texas Seven trials.  This fact shows that, despite the state's success in keeping the jury from hearing any of the substantial mitigating evidence available, the jury still had questions about the appropriateness of the death sentence for Halprin.  If the jury had heard any of the mitigating evidence, the outcome would likely have been a life sentence, rather than death.  [Hrg. Transcript Aug. 20, 2010 at 97].

> type is significantly less helpful than the ranking document. The ranking
> document appears . . .to be very persuasive mitigating evidence which at least
> one juror would probably find to be such a circumstance as would lessen
> Halprins moral blamworthiness.

[Mims Aff.]. Similarly, Robert Morrow, a criminal defense attorney who has tried more than

twenty capital cases and represented many more capital clients on appeal, asserted that as a

defense attorney:

> you never give up trying to reach a juror and you never can predict what piece
> of evidence will do that. Defense exhibit 39 could have been that piece of
> evidence which convinced a juror that Applicant, because of his role and
> overall limitations, did not deserve the death penalty. There was nothing
> cumulative about it.

[Morrow Aff.]. Robin Conley, an anthropologist who is completing her dissertation at

UCLA focusing on how jurors make decisions during the penalty phase of death penalty

trials, echoed these assertions. In her affidavit, she averred that jurors have told her that if

the defense can "reduce the defendant's responsibility for the crime somehow, they would

consider this [evidence, like Exhibit 39, more than any other] sufficiently mitigating."

[Conley Aff.]. For example, when Conley asked if there were was hypothetical evidence that

would have been mitigating, one juror responded "if you found out that [the co-defendant]

was the mastermind and led [the defendant] through the whole thing. . . . God if that comes

out it's gonna make it fun to sleep at night." [Id.]. Therefore, Conley maintains that Exhibit

39 "would have potentially been an important piece of mitigating evidence." [Id.].

At the hearing held on August 20, 2010 before this Court, Halprin's trial and appellate

counsel echoed these beliefs. Counsel testified that their strategy during the punishment

stage of trial was to demonstrate that Halprin was a follower, with no leadership qualities whose role in the crime did not justify a sentence of death.  Counsel George Ashford also agreed that Exhibit 39 would have been important mitigation evidence.  [Hrg. Transcr. Aug. 20, 2010 at 254].  The following exchange occurred:

> Q.   [I]s it a fair statement that your defense is basically what is from a mitigation standpoint for the death penalty question is basically what was summarized in the ranking document.
> A.  Yes, that was part of it.
> Q.  What I mean by that is the argument you were trying to make are the same things that the ranking document says?
> A.  Yes.
> . . .
> Q.  And so as the trial attorney do you feel like having a law enforcement officer testify in support of the facts you were presenting as far as mitigation of punishment would have been a significant factor for the jury.
> A.   I think so.

[Hrg. Transcr. Aug. 20, 2010 at 169-170].  Counsel Edwin King said:

> "The ranking document is law enforcement's perception of who Randy Halprin is.  That's completely different.  That's of different value."

In sum, the exclusion of Exhibit 39 was not harmless error.  (Hrg. Transcript, August 25, 2010, at 238).

### 2.   Defense Exhibit 39 Would Have Been Admissible at Trial under the Public Records and Reports Exception to the Hearsay Rule

With the testimony of Whitman, the trial court would have admitted Exhibit 39 into evidence under Rule 803(8)(c), the public records and reports exception to the hearsay rule.  Under Rule 803(8)(c), "records, reports, statements, or data compilations . . . of public offices or agencies" setting forth "factual findings resulting from an investigation made

pursuant to authority granted by law" are admissible against the state "unless the sources of information or other circumstances indicate lack of trustworthiness." TEX. R. EVID. 803(8)(c).[8] This exception is not limited to purely factual findings in a public record but also encompasses any opinions or conclusions based upon an investigation. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 163-64 (1988) (holding, under Federal Rule of Evidence 803(8)(c) which the Texas rule derives from, investigative report of airplane crash that contained investigator's opinion concerning whether pilot error was the cause of the accident was admissible); *Cowan v. State*, 840 S.W.2d 435, 437 (Tex. Crim. App. 1992) (holding U.S. Marine Corps Medical Board report admissible because it reflected the board's opinion based on factual findings as to the defendant's mental condition); *August v. State,* No. 2-04-484-CR, 2006 WL 1174213 (Tex. App.–Fort Worth, May 4, 2006) (not designated for publication) (holding that factual findings resulting from an officer's investigation of a witness were admissible even though the offense report in its entirety was not admissible); *Perry v. State*, 957 S.W.2d 894, 898 (Tex. App.–Texarkana 1997).[9]

Rule 803(8)(c) presumes that public records tendered at trial are accurate and trustworthy, and, therefore, the burden rests upon the opponent of the record to demonstrate that it is untrustworthy. *Johnson v. City of Pleasanton*, 982 F.2d 350, 352 (9th Cir. 1992); *Moss v. Ole S. Real Estate, Inc.*, 933 F.2d 1300, 1305 (5th Cir. 1991). Indeed, the general

---

[8] The State, unlike the defendant, is not covered by the public records exception in Rule 803(8)(C) and would be barred by Rule 802 from entering reports into evidence. *Perry*, 957 S.W.2d at 898.

[9] When interpreting Rule 803(8)(c), courts may look to federal case law because the Texas rule was modeled after and worded almost identically to the federal rule. *Perry*, 957 S.W.2d at 897; *see Cowan*, 840 S.W.2d at 439 n.13.

policy behind the public records exception to the hearsay rule is that "public records and reports are inherently reliable because of the presumptions that officers will perform their duties, that officers lack a motive to make false reports, and that public inspection of the reports will disclose inaccuracies." *Perry*, 957 S.W.2d at 898; *see* FED. R. EVID. 803(8)(c), advisory committee's note (stating that the "[j]ustification for the [public records and reports] exception is the assumption that a public official will perform his duty properly").

Here, Exhibit 39, "Ranking of Offenders by Leadership/Personality Characteristics" meets all of the elements of Rule 803(8)(c) and, therefore, would have been admitted had the defense known the author of the document. First, Exhibit 39 was a report or data compilation created by a public office or agency. TEX. R. EVID. 803(8)(c). Lieutenant Henry L. Whitman, Jr., an investigator with the Criminal Intelligence Service of the Texas Department of Public Safety's Criminal Law Enforcement Division, averred in an affidavit that he created this document in connection with the State's investigation of the escape of the Texas Seven. [Whitman Aff.]. Further, the letter head on the document states "TDCJ CONNALY UNIT," indicating it is a public record. [Def. Ex. 39 (emphasis in original)].

Second, there is no doubt that the ranking list sets forth factual findings and opinions/conclusions arising from the State's investigation of the Texas Seven's escape made pursuant to authority granted by the law. TEX. R. EVID. 803(8)(c); *Cowan*, 840 S.W.2d at 438. Exhibit 39 is not a pure recital of a witness's statements but is rather based upon the State's investigation of the escape in its first days. *Ramirez v. State*, No. 14-06-00538-CR, 2007 WL 212779, *7-8 (Tex. App.–Houston [14th Dist.] July 26, 2007) (upholding trial

court's refusal to admit portions of police report that contained witness's statements to police because these statements "were neither factual findings resulting from an investigation or opinions nor conclusions based on such findings"). In his affidavit, Whitman averred that he and two of his colleagues compiled the information in the ranking document from interviews with twenty to thirty civilian workers, correctional officers, and inmates, as well as their review of the escapee's classification records. [Whitman Aff. at 1]. Indeed, the purpose of their investigation was to rapidly put together information that would help law enforcement to apprehend the escapees. [*Id.*]. Therefore, the ranking list met the second requirement of Texas Rule of Evidence 803(8)(c). *Cowan*, 840 S.W.2d at 438 (holding report prepared by the U.S. Marine Corp Medical Board that reflected findings as to appellant's mental condition admissible);*see United States v. Lewis*, No. 00-10239, 2001 WL 1313786 (9th Cir. 2001) (holding it was reversible error to exclude shooting review board report which analyzed whether defendant acted in a manner consistent with California department of corrections policy in shooting a prison inmate while on duty); *McRae v. Echols*, 8 S.W.3d 797, 800 (Tex.App.–Waco 2000, pet. denied) (stating officer's report containing opinions as to cause of accident admissible under Rule 803(8)(c)); *Clement v. Texas Dep't of Pub. Safety*, 726 S.W.2d 579, 581 (Tex. App.–Fort Worth 1986, no pet.) (holding that a police officer's affidavit on the driving behavior of a motorist admissible under 803(8)(c)).

Third, Exhibit 39 has all of the indica of reliability and trustworthiness that are the foundation of the public records exception to the hearsay rule. The State cannot establish

Applicant's Objection to Findings of Fact and Conclusions of Law Regarding Ineffective Assistance of Counsel and Suppression of Exculpatory Evidence at Punishment Phase of Trial and Request that Court of Criminal Appeals Set Issues for Submission and Consideration - Page 31

2760

that Exhibit 39 was not sufficiently trustworthy.   To determine whether a report is trustworthy, courts have considered: (1) the timeliness of the investigation upon which the report is based; (2) the special skill or experience of the investigators; (3) whether the agency held a hearing; and (4) possible motivational problems. *Cowan*, 840 S.W.2d at 439 n.13 (quoting *Perrin v. Anderson*, 784 F.2d 1040, 1047 (10th Cir. 1986)).   Here, an investigator with the Criminal Intelligence Service of the Texas Department of Public Safety created the document "within days" of the Texas Seven's escape from prison to help law enforcement apprehend the escapees. [Whitman Aff.].   The investigators with the State had no ulterior motive in creating this document.

Accordingly, Exhibit 39 meets all of the requirements of Rule 803(8)(c) and should have been admitted at trial.   More importantly, it was relevant as required under Rule 401 as to Halprin's role in the crime and as mitigation evidence.

### 3.   Defense Exhibit 39 Would Have Been Admissible under Business Records Exception

Alternatively, with a sponsor, Exhibit 39 would have been admissible under the business records exception to the hearsay rule.   Texas Rule of Evidence 803(6), the business records exception to the hearsay rule, permits a party to introduce:

> [a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

TEX. R. EVID. 803(6). Rule 803(6) requires that the testifying witness must have knowledge of how the record was prepared. *Canseco v. State*, 199 S.W.3d 437, 440 (Tex. App. –Houston [1st Dist.] 2006, pet. ref'd). Courts have held routinely that probation records, prison log books, and radio logs qualify as business records. *See id.*; *Harris v. State*, 866 S.W.2d 316, 321 (Tex. App.–San Antonio, 1993) ("mug log" of a sheriff's office containing photographs of persons arrested and noting time and date of arrest made in the course of the ordinary operations of the sheriff's office admissible as a business record); 2 WHARTON'S CRIMINAL EVIDENCE § 6:25 (15th ed. Supp. 2009).

With the testimony or affidavit of Whitman, defense counsel would have laid the necessary predicate for the admittance of Exhibit 39. Defense counsel would have established that Exhibit 39 was made at or near the time of the event it recorded by a person with knowledge of the document's content. TEX. R. EVID. 803(6). In his affidavit, Whitman averred that he and two of his colleagues compiled the information in the ranking document from interviews with persons who knew the escapees in prison as well as their classification records. [Whitman Aff. at 1]. He also stated that he prepared the document shortly after the prisoner's escape. [*Id.*]. Additionally, defense counsel would have established that Exhibit 39 was made and kept in the course of a regularly conducted business activity with Whitman's testimony. TEX. R. EVID. 803(6). Although Whitman did not specify that he was the custodian of records, the rule allows a qualified person, such as the document's creator, to testify to such matters. *See Canseco*, 199 S.W.3d at 440.

With Whitman's sponsorship, there could have been no doubt that Exhibit 39 was

trustworthy.  Exhibit 39 has all of the indicia of reliability and trustworthiness that are the foundation of the business records exception to the hearsay rule.  *See Johnston v. State*, 959 S.W.2d 230, 240 (Tex. App.–Dallas 1997) (upholding admission of medical record as business record where record rendered a rendition of the facts as to when, how, and where nurse withdrew defendant's blood); FED. R. EVID. 803(6), advis. comm. notes (stating that "the element of unusual reliability of business records is said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation").  An investigator with the Criminal Intelligence Service of the Texas Department of Public Safety created this document to help law enforcement apprehend the escapees.  It was not put together in preparation for trial.  The investigators with the State had no ulterior motive in creating this document.

Accordingly, Exhibit 39 was admissible under the business records exception to the hearsay rule.

### 4.    Trial Court Has Constitutional Duty to Allow Defendant to Present Mitigation Evidence at Punishment Phase of a Capital Case

Finally, and perhaps more importantly, the trial court has a constitutional duty to allow the defendant to present mitigation evidence at the punishment phase of a capital case. *Williams v. Taylor*, 529 U.S. 362, 393 (2000).  The U.S. Supreme Court has held repeatedly that a sentence of death is qualitatively different and unique from any other sentence.  *See Monge v. California*, 524 U.S. 721, 732 (1998) (stating death penalty unique in both severity

and finality); *Furman v. Georgia*, 408 U.S. 238, 310 (1972) (per curiam) (describing death

penalty as "unique").   For this reason, precedent weighs heavily in favor of the admission

of mitigation evidence during the penalty phase of a death penalty trial.   *See Barefoot v.*

*Estelle*, 463 U.S. 880, 898 (1983) (opining that "[t]he rules of evidence generally extant at

the federal and state levels anticipate that relevant, unprivileged evidence should be admitted

and its weight left to the fact finder, who would have the benefit of cross examination and

contrary evidence by the opposing party"); *United States v. Jones*, 132 F.3d 232, 242 (5th

Cir. 1998), *aff'd by*, 527 U.S. 373 (1999)   ("The Court has recognized that the defendant

must be given the opportunity to introduce information regarding mitigating factors, without

traditional evidentiary restraints, in order to provide the jury with the fullest possible

information about the defendant.").   Indeed, in *Wiggins v. Smith*, 539 U.S. 510 (2003), the

Court affirmed that trial courts should exercise their discretion to admit "any relevant and

reliable mitigating evidence, including hearsay evidence that might not be admissible in the

guilt-or-innocence phase of the trial." *Id.* at 536-37; *Skipper v. South Carolina*, 476 U.S. 1,

4-5 (1986) (rejecting explicitly the argument that the need for mitigation evidence may be

trumped by state rules of evidence).

        Against this background, the trial court could not have even questioned admitting

Exhibit 39 with the sponsorship of Whitman as a public record or business record.   Due

process and the Eighth Amendment favor their admission.   As stated above, Exhibit 39 was

created by Texas Rangers during the first days of their investigation into the escape of the

"Texas Seven."   The document was created to help law enforcement capture the escapees.

Applicant's Objection to Findings of Fact and Conclusions of Law Regarding Ineffective Assistance of Counsel and Suppression of
Exculpatory Evidence at Punishment Phase of Trial and Request that Court of Criminal Appeals Set Issues for Submission and
Consideration - Page 35

The evidence would have come in under the public record or business record exceptions to the hearsay rule, if not the Eighth Amendment to the U.S. Constitution.

**D.     Trial Court's Findings Regarding Ineffective Assistance of Counsel for Failure to Find and Produce The Author of the Ranking Document**

In finding numbers 567, 568, 569, and 570, the trial court recognizes that Applicant's trial counsel failed to identify the author of the ranking document.  Nevertheless, the trial court skirts the question of whether this was deficient representation.  As the record shows, the identity of the author of the document was readily available to trial counsel and they acted deficiently in not determining who it was.

The trial court continues in finding 571, 572, and 573 in concluding that the document would still have been inadmissible hearsay even if Whitman had been present and testified that he prepared the document.  As argued previously, this is a clearly erroneous legal conclusion.  With the proper sponsoring witness, the document would have been admissible.

The trial court's findings 575-577 contain conclusions that the exclusion of the document did not prejudice Applicant's defense.  Contrary to this conclusion, this document was the single most important piece of mitigating evidence available.  It showed his role in the group and would very likely have persuaded the jury to return a life sentence, rather than death.

Finding 579 is an acceptance of the state's contention that, if the document had been admitted into evidence, the state would have responded by having Whitman rewrite the document and say that the bottom three, Garcia, Murphy and Applicant, were actually equal

in rank. However, it is unlikely that an attempt to change the document during Halprin's trial in order to meet the state's needs regarding Halprin would have been successful. A jury is very unlikely to fall for such an obvious attempt to revise history.

In finding 580, the trial court concludes that the state could have presented additional evidence to neutralize the effect of the ranking document. However, the court should decide this writ based on the evidence in the record, not some speculation as to what could have happened.

### E.   Evidence From Applicant's Mitigation Expert

The failure of the jury to hear all of the mitigating evidence from Applicant's mitigation expert can be directly traced to ineffective assistance of counsel.

During the punishment phase of Halprin's trial, the jury did not hear mitigating evidence contained in child protective service records, medical records, school records, prison records as well as testimony from relatives. Trial counsel never specifically moved to admit these records and the State objected to the mitigation expert, Dr. Kelly Goodness, referring to these records during her testimony.[10] But these records and affidavits paint a sordid picture of the first five years of Halprin's life. Halprin suffered from child abuse, including physical assault, exposure to illegal substances, deplorable living conditions, and

---

[10]Specifically, during the punishment phase of the trial, the State argued that Dr. Kelly Goodness could not refer to the facts and data underlying Dr. Goodness's Report, citing Texas Rule of Evidence 705(d). The State contended these facts and data were hearsay. The State also objected to the admission of Exhibit 39, a document entitled the "Ranking of Offenders by Leadership/ Personality Characteristics" prepared by the Texas DPS Special Crimes Division, as hearsay. The State's goal through these technical objections appears to have been to keep the jury from considering any mitigating evidence – a goal antithetical to a prosecutor's duty to pursue justice. American Bar Association, *Criminal Justice Section Standards: Prosecution Function* §3.1.2(c)(stating that "[t]he duty of the prosecutor is to seek justice, not merely to convict"). The ABA directs that at sentencing, "[t]he prosecutor should assist the court in basing its sentence on complete and accurate information." *Id.* §3.6.2

a revolving door of care-givers and homes.  This early childhood abuse and neglect had

lasting effects on Halprin and was compounded by his adopted parent's inability to address

these issues.  Had the jury heard this mitigating evidence the jury likely would have refused

to impose the death penalty.

Applicant's Objection to Findings of Fact and Conclusions of Law Regarding Ineffective Assistance of Counsel and Suppression of
Exculpatory Evidence at Punishment Phase of Trial and Request that Court of Criminal Appeals Set Issues for Submission and
Consideration - Page 38

### 1.    Governing Standard

The Eighth Amendment to the U.S. Constitution requires a jury to consider the circumstances of the crime and the defendant's background and character during the sentencing phase of a capital trial. U.S. CONST. amend VIII; *Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997), *cert. denied*, 523 U.S. 1079 (1998). Therefore, in capital cases, trial counsel has a constitutional obligation and duty to thoroughly investigate mitigating evidence and present this evidence at trial. U.S. CONST. amend. VI; *Wiggins v. Smith*, 539 U.S. 510, 521-23 (2003); *Williams v. Taylor*, 529 U.S. 362, 396 (2000). In *Williams*, the Supreme Court iterated that "it is undisputed that [a capital defendant has] a right – indeed, a constitutionally protected right to provide the jury with the evidence that his trial counsel either failed to discover or failed to offer." *Williams*, 529 U.S. at 393. The importance of mitigating evidence arises from "the unique and irreversible penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 287 (1976) (plurality opinion). In *Woodson*, the Supreme Court warned that "[a] process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of human kind." *Id.* at 304.

The *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* direct that at the sentencing phase of a trial, counsel must consider and should present "anything in the life of the defendant which might militate against the

appropriateness of the death penalty." *ABA Guidelines for the Performance of Defense Counsel in Death Penalty Cases* §10.7, p. 81 (2003).  Evidence that should be considered includes:

> 1.  Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);
>
> 2.  Family and social history (including physical, sexual or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one or a natural disaster; . . . failures of government or social intervention (e.g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);
>
> 3.  Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities[.]

*Id.* at 81-82.  In attempting to admit this evidence, the *ABA Guidelines* direct that counsel should consider all potential methods of offering mitigating evidence to the sentencing entity, including witnesses, affidavits, reports, letters, and public records. *ABA Guidelines for the Appointment & Performance of Counsel* § 11.8.6 (1989).

Moreover, the U.S. Supreme Court has made it clear that it is not enough for a defendant to be allowed to develop mitigating evidence, the jury must be allowed to hear and consider mitigating evidence.  Further, the sentencer must be in a position to use the mitigating evidence when deciding whether or not to impose the death sentence.  As the Court explained in *Penry v. Johnson*, 532 U.S. 782 (2001):

> *Penry I* did not hold that the mere mention of mitigating circumstances

> to a capital sentencing jury satisfies the Eighth Amendment. Nor does it stand
> for the proposition that it is constitutionally sufficient to inform the jury that
> it may "consider" mitigating circumstances in deciding the appropriate
> sentence. Rather, the key under *Penry I* is that the jury be able to consider and
> *give effect to* [a defendant's mitigating] evidence in imposing sentence. For it
> is only when the jury is given a vehicle for expressing its "reasoned moral
> response" to that evidence in rendering its sentencing decision, that we can be
> sure that the jury has treated the defendant as a "uniquely individual human
> being" and has made a reliable determination that death is the appropriate
> sentence.

*Penry*, 532 U.S. at 797 (internal citations and quotations omitted) (emphasis in original).

Here, the jury did not have the ability to fully consider mitigating evidence favorable to

Halprin, and, therefore, Halprin was denied his constitutional rights. *See, e.g., Simmons v.*

*Luebbers*, 299 F.3d 929, 938-39 (8th Cir. 2002), *cert. denied*, 538 U.S. 923 (2003) ("By the

time the state was finished with its case, the jury's perception of Simmons could not have

been more unpleasant. Mitigating evidence was essential to provide some sort of explanation

for Simmons's abhorrent behavior. Despite the availability of such evidence, however, none

was presented. Simmons' attorney's representation was ineffective."); *accord Karis v.*

*Calderon*, 283 F.3d 1117, 1136 (9th Cir. 2002), *cert. denied*, 283 F.3d 1117 (2003) ("Despite

his conceded knowledge of this history, counsel failed to present any evidence of Karis's

family abuse to the jury.").

## 2.   Unheard Mitigating Evidence

Randy Ethan Halprin was born on September 13, 1977 in McKinney, Texas to Bob

Randall Whitfield and Anna Marie Hammons [hereinafter Anna Lester] who were twenty

and eighteen years of age respectively. [Goodness Psych. Eval. at 5]. His brother Wesley

was born three years later. [*Id.*]. Both of Halprin's parents abused drugs, particularly crystal methamphetamine and cocaine, drank alcohol, and smoked cigarettes. [Hrg. 8/20/2010, Ex. 2: CPS Rec. at 5708 (hereinafter CPS Rec.)]. Lester, the boys' mother, indulged in these substances while pregnant with each of her two children. She also reported that she had a mood disorder (Bipolar Disorder). [Goodness Psych Eval. at 8]. A child protective service investigator believed that this drug and alcohol abuse may have caused brain damage and other physical problems.[11] [CPS Rec. at 5711]. At the very least, this exposure to drugs and alcohol gave Halprin a genetic vulnerability for substance abuse. [Goodness Psych. Eval. at 14-15].

The child abuse began during Halprin's first year of life. When Halprin was nine months old, Whitfield, his father, physically assaulted him for the first time. [Amend. Habeas Pet., Ex. C: Lester Aff. at 1-2].[12] This abuse would continue for the next four years that Lester lived with Whitfield. In an affidavit, Halprin's mother averred that Whitfield "beat [Halprin] several times a week, so badly that [the beatings] would leave visible marks on Randy." [*Id.* at 2]. Halprin regularly developed bruises on his legs, back, and bottom from these beatings. [*Id.*]. Even worse, one time Whitfield pushed Halprin out of the apartment building "because Randy got on his nerves." [*Id.*].

Family members became concerned about this physical abuse as well as the boy's

---

[11]On July 15, 1982, a CPS caseworker stated that [Wesley] is to be seen by a neurologist; it is possible that he may be brain damaged–and at least possible that his physical problems are related to drug use by the mother . . ." Wesley suffered from a droopy eyelid, numerous ear infections, and neurofibromatosis. [CPS Rec. at 5711].

[12]Lester averred "Randy's father was very abusive to Randy when he was a baby. The abuse started when Randy was about nine months old." [Amend. Habeas Pet., Ex. C: Lester Aff. at 2].

Applicant's Objection to Findings of Fact and Conclusions of Law Regarding Ineffective Assistance of Counsel and Suppression of Exculpatory Evidence at Punishment Phase of Trial and Request that Court of Criminal Appeals Set Issues for Submission and Consideration - Page 42

living conditions. In September 1981, Whitfield's cousin, Cindy Russell, contacted child protective services concerning Wesley and Randy, Jr., who were nine months and four-years old at the time respectively. [CPS Rec. at 5685]. She informed CPS:

> House is "a wreck," children are pale, unhealthy–looking like [they] don't have proper diet. Wesley has round sores on face, about size of a quarter, puffy and scaby around edges–has had them about 2 wks., with no med[ical] treatment. Mo[ther] doesn't change baby's diapers; he lays in dirty diapers for hours. Fa[ther] is "mean" to Randy–he makes him sit & be absolutely silent whenever fa[ther] is around. [Father] sends Randy to bed but won't turn on bathroom light for him, so Randy uses the closet or his bed. When fa[ther] finds it, he "whips" Randy & rubs his nose in it. Randy's room smells "like a sewer." If Randy doesn't sit down fast enough, comp[lainant] has seen fa[ther] twist Randy's arm, and push him down on the floor. Fa[ther] once had split knuckle from hitting Randy on the head. Once fa[ther] brought Randy to comp[lainant]'s house, showed him in the door & left without checking if comp[lainant] was there or could babysit; comp[lainant] found Randy there when she woke up.

[CPS Rec. at 5685]. Shortly thereafter, Lester's sister in law, Mary Hammons, also relayed to CPS that "she had observed the four-year-old boy [Randy] covered with bruises because of beatings from parents." [CPS Rec. at 5685]. Another relative stated that she had witnessed the father "whip" Randy. She asserted that when Randy's mother complained about the punishment, "the father 'slammed her against the wall.'"[13] [CPS Rec. at 5704]. Based on these reports, CPS conducted a preliminary investigation and opened an on-going case file in the fall of 1981. [CPS Rec. at 5704]. The CPS investigator's notes intermittently chronicle the next two years of Halprin's life.

In May 1982, Lester separated from Whitfield and left the children with relatives.

---

[13]Mary Hammons was worried about the boy's safety because of a known history of family violence on the father's side. The boy's aunt had beaten her two-year-old to death. [CPS Rec. at 5704].

Shortly therafter, Lester reclaimed her children and moved in with Jimmy "Jimbo" Ray

Willingham, a felon convicted of armed robbery. [CPS Rec. at 5706]. Family members told

CPS that this was a dependent relationship. Willingham provided Lester with drugs. [CPS

Rec. at 5726]. Willingham himself abused crystal methamphetamine almost every day.

[Amend. Habeas Pet., Ex. C: Lester Aff. at 4]. In her report, Dr. Goodness opined that "the

fact that both Randy and his biological brother Wesley grew up to abuse substances, have

attention disorders and struggle with mood problems [was] not unexpected given their

genetic background" and early childhood. [Goodness Psych. Eval. at 15]. She further noted

that research has shown there is a genetic link between many mental disorders and substance

abuse problems. [Goodness Psych. Eval. at 15].

In the new living situation with Willingham, the physical abuse and neglect continued.

[Amend. Habeas Pet., Ex. C: Lester Aff. at 4]. In her affidavit, Lester stated that Willingham

"was extremely abusive, regularly beating all three of us [Lester, Randy, and Wesley] with

any object he could grab." [Id. at 4]. She continued on to explain that these beatings "caused

injuries and bruises to all three of us." [Id.]. Willingham also would not let Lester seek

medical attention for herself or the boys. [Id.].

CPS records confirm this abuse. On May 24, 1982, Halprin's paternal grandmother

called CPS. [CPS Rec. at 5707]. Halprin's mother had left him with his grandparents,

stating she "couldn't do anything with him." [CPS Rec. at 5707]. Lester provided no time

or date for her return. Later that evening, the grandparents also found bruises on Halprin.

[CPS Rec. at 5707]. When asked about the bruises, Halprin told his grandmother that he had

acquired them from a spanking with a paddle from Willingham.  Halprin stated that he

received the spanking because "he got up and got into the refrigerator during the night and

was caught by Jimbo." [CPS Rec. at 5707].  In her report, the case worker noted that this

abuse was causing Halprin to misbehave.  He had become aggressive toward his younger

brother. [CPS Rec. at 5708].  The case worker observed that Halprin "was an extremely

engaging child who is literally starved for consistent, warm adult attention." [CPS Rec. at

5708].  She opined that "without doubt, his recent behavioral decline must be interpreted as

emotional rebellion against the instability and confusion of his family life." [CPS Rec. at

5708].

The next major reported incident occurred in July 1982. On July 11, the babysitter for

Wesley and Randy reported that two-year-old Wesley was covered with bruises, probably

caused by a belt. [CPS Rec. at 5710].  Halprin identified the perpetrator as Willingham to

the babysitter. [CPS Rec. at 5710].  When the caseworker went to the family mobile home

to investigate, she found Halprin and Wesley without adult supervision. [CPS Rec. at 5710].

Halprin was covered in "what appeared to be mosquito bites" while his brother was in a

diaper that "had obviously not been changed for quite awhile; he had feces smears on his

legs." [CPS Rec. at 5710].  The caseworker returned later that day with a Denton police

officer to speak with Lester and Willingham about the bruises. [CPS Rec. at 5711].  Lester

claimed that she had spanked Wesley but that she had never used a belt on the children.  The

caseworker, however, noted that "a leather belt, labeled 'Jimbo,' lay on a nearby table."

[CPS Rec. at 5711].  She reasoned that "Willingham was [likely] the perpetrator and the

rather hapless, slow of thought mother feels it necessary to take the rap." She predicted further violence. [CPS Rec. at 5711].

Two months later, in September 1982, Wesley Halprin's doctor contacted CPS as a result of bruises he observed on the child's thighs and backside. Lester had told the doctor the bruises were the result of the child falling from a swing while in the care of a sitter – a story the doctor did not believe. [CPS Rec. at 5716]. The doctor stated that the bruises were approximately two inches by one inch in a lateral fashion, probably administered by a belt. [CPS Rec. at 5721]. Subsequently, in October 1982, the mother admitted to administering the beating while on drugs. [CPS Rec. at 5723, 5740]. At that time, Wesley had new bruises on the back of his legs. Randy also "had sores which appeared to be scratched mosquito bites." [CPS Rec. at 5723]. CPS then made the decision to place Wesley in foster care – a decision that Randy did not take well. [CPS Rec. at 5723]. The caseworker noted that Halprin "questioned where his 'baby brother' was going and what a foster home was like." The conversation then quickly turned to monsters. [CPS Rec. at 5724]. On the two occasions the case worker saw Halprin after Wesley's removal, she related that Halprin expressed grave concern about his [brother's] safety" – something his parents did not do. [CPS Rec. at 5752].

After Wesley's removal from the home, Halprin stayed with his father and various relatives, including his grandparents throughout the fall of 1982. [CPS Rec. at 5745]. In January 1983, Whitfield abandoned Halprin with a family in East Texas, where CPS located the boy six months later. [CPS Rec. at 5745]. CPS had lost track of Randy and not followed

his case for nine months. At the time of his abandonment, the family reported Halprin had

two teeth missing, an upper front tooth and a lower front tooth. [CPS Rec. at 5478]. The

family believed these injuries were caused by Halprin's father. [CPS Rec. at 5478]. The

family had taken pity on Halprin because his father had called the five-year-old a "bastard"

and threatened to leave him along the roadside. [CPS Rec. at 5478]. The family also

expressed its concerns about Halprin's eating habits and loss of family contact. Halprin

hoarded food and would eat until he vomited. After vomiting, he would immediately begin

to eat again. [CPS Rec. at 5748]. Halprin also fantasized that he was talking to his brother

as well as his aunt and uncle. He would "face the wall and pretend these people [were]

present." [CPS Rec. at 5748]. The family was happy to learn that CPS had been looking for

Halprin and that his parents had agreed to give him up for adoption. [CPS Rec. at 5747-49].

That same day, CPS placed Halprin in a foster home with his brother. [CPS Rec. at

5749]. The caseworker noted that Halprin "was very anxious to see his brother and that upon

their arrival Halprin 'hugged Wesley and talked with him.'" [CPS Rec. at 5750]. Halprin

would remain very protective of Wesley throughout their childhood; he would "parent"

Wesley. [CPS Rec. at 5750, 5783]. In foster care, Halprin continued to exhibit certain fears

and anxieties. [CPS Rec. at 5749]. He worried that Willingham would return. Teenage boys

also scared him. [CPS Rec. at 5750, 5784]. When the foster mother left the children with

a fifteen-year-old babysitter, Halprin misbehaved and "went bananas." [CPS Rec. at 5750].

He had a fear of devils and ghosts. [CPS Rec. at 5784]. The foster parents also reported that

Halprin was educationally behind. He could not recognize any numbers or letters. [CPS

Applicant's Objection to Findings of Fact and Conclusions of Law Regarding Ineffective Assistance of Counsel and Suppression of
Exculpatory Evidence at Punishment Phase of Trial and Request that Court of Criminal Appeals Set Issues for Submission and
Consideration - Page 47

Rec. at 5784].

The boys were eventually adopted together by Dan and Pat Halprin. Halprin continued to have the same anxieties and fears that he had in foster care. [CPS Rec. at 5815]. His adopted parents related that Randy was "pre-occupied with death." [CPS Rec. at 5815]. He constantly ask[ed] them if they are going to die or if some other family member or friend is going to die." [CPS Rec. at 5815]. He also became "extremely upset when he [was] around teenage boys," covering his face with his hands and crying out when he saw teenagers or violence. He related that "teenagers beat me up." [CPS Rec. at 5815]. He also feared his natural parents. For example, he once informed his adopted parents that his natural parents loved him and would come back for him. When his adopted parents told that "no" his natural parents would never come back, Halprin was relieved. [CPS Rec. at 5816]. Finally, he had a need to continually hear that his adopted parents were proud of him. [CPS Rec. at 5817]. Abused and neglected children require patience, understanding, absolute acceptance and unconditional love in order to overcome their past and to develop a sense of security. [Goodness Psych. Eval. at 16].

According to Dr.Goodness, Halprin's early childhood abuse helps to explain the "cycle of abuse" that led to the physical abuse Halprin inflicted on the child victim of the injury to a child case for which he was originally incarcerated. [Goodness Psych. Eval. at 14-15]. Indeed, the assault mirrored the abuse he suffered as an infant. [Id.]. "[A] great deal of modeling occurred when the child watched the abusive caregivers . . . regardless of how positive later caregiver experiences may be." [Goodness Psych Eval. at 14]. In her report,

Dr. Goodness further explained children who are "devalued, ignored, beaten, used for adult gratification or treated as pawns in dysfunctional adult relationships suffer deprivation and are left traumatized. . . . Areas that may be negatively impacted include intellectual and academic growth, cognitive and perceptual abilities, aggression level and behavioral dysfunction, psychiatric functioning, and social competence in relationships." [Goodness Psych. Eval. at 14].

Halprin's early abuse and neglect had other long-lasting effects – effects his adopted parents were unprepared to handle. When he entered kindergarten, Halprin did not know the alphabet and could not count, and, therefore, struggled. [*See* CPS Rec. at 5784; Hrg. 8/20/2010, Ex. M: Halprin Ltr. (hereinafter Ex. M)]. He eventually learned to read but had difficulties in social studies, language arts, and math. [Ex. M: Arlington Transcripts, Grade 2-6]. At the age of ten, a private psychologist diagnosed Halprin with Attention Deficit Disorder and learning disabilities in passage comprehension, math calculation, math reasoning, and written expression. He would later suffer from ADHD, depression, and an avoidant personality. A person with an avoidant personality disorder avoids activities that involve significant interpersonal contact because of fear of criticism, disapproval, or rejection. They are unwilling to become involved with people unless they are certain they will like them. [Goodness Psych. Eval. at 6, 13].

The Halprins, however, never shared any of these diagnoses with the school, as school records do not indicate that any measures were taken to help Halprin, such as placing him in special education classes or providing extra tutoring. The Halprin's failure to address these

psychological needs undermined Halprin's success in school and self-worth. [Goodness Psych. Eval. at 15]. Indeed, Halprin failed seventh grade and the TAAS standardized test. [Ex. M: TAAS Scores; Arlington Withdrawl from School Form]. Interestingly, while struggling in school, Halprin devoted himself to studying for his Bar Mitzvah, which required learning Hebrew and a number of religious stories. [Sternblitz-Rubenstein Aff.]. Halprin's motivation was to please his adopted father, a man from whom he desperately sought approval. [Sternblitz-Rubenstein Aff.; Goodness Psych. Eval. at 6].

Nevertheless, after Halprin failed seventh grade, Halprin's adoptive parents expelled him from their home. His parents sent him to Oneida Baptist Institute, a reformatory boarding school. He would spend the next three and a half years there. [*See generally* Ex. M]. School officials initially observed that Halprin was "not a trouble maker. Clean cut guy. When going gets tough he backs off. Main problem is school. Always wants to please. Impulsive behavior. Seldom rebellious." [Ex. M: OBI Application]. Halprin excelled in his first year but his adoptive parents refused to allow him to come home and visit. [*See* Ex. M: OBI Transcript]. Halprin felt rejected, began to smoke marijuana and to get high on acid in ninth grade, and became increasingly depressed. Acid and ecstacy became his drug of choice, using them every two to three days. He stole a VCR, money, and a teacher's credit card. [Ex. M: OBI Disciplinary Report; Waybourn Aff.; Goodness Psych. Eval.at 7]. In 1995, he was suspended from school after carving in a bench at school a note to his girlfriend which school authorities interpreted to be suicidal. [Ex. M: OBI Disciplinary Report]. His adopted parents refused to permit Halprin to return home and informed the school of their

decision. [*Id.*]. He was homeless and lacked guidance. Later, at the age of eighteen, he attempted to reconcile with his parents, but was met on the front steps by the local police chief and denied entrance to the family home. [Waybourn Aff.]. His parents advised acquaintances, including Rabbi Keith Howard Stern, to not speak with Halprin. He became heavily dependent on drugs and alcohol and moved into a homeless shelter in Arlington, Texas. [Goodness Psych. Eval. at 7].

As a result of his parent's dejection, Halprin lacked guidance and had an unfulfilled need for absolute acceptance and unconditional love. [Goodness Psych. Eval. at 8, 16]. Halprin could not turn to extended family for support. [Goodness Psych. Eval. at 16]. Therefore, Halprin's need to belong and disconnection with the outside world left him vulnerable to leadership figures, such as George Rivas who could exploit Halprin's character as a weak follower. [Goodness Psych. Eval. at 16-17]. Indeed, Defense Exhibit 39, which was excluded because the State withheld exculpatory evidence, reflects this opinion. Exhibit 39, entitled "Ranking of Offenders by Leadership/Personality Characteristics, stated that "it was the unanimous decision that RIVAS was the leader and the weakest was determined to be HALPRIN." [Def. Ex. 39]. Specifically, the document, created by the Texas DPS Special Crimes Division, stated Halprin was "quiet and never exhibited leadership qualities. Was consistently worried about whether his work was acceptable to civilian workers. Very submissive characteristic. This worrisome attitude was seen to escalate a month before the escape. One civilian worker speculated whether HALPRIN was undergoing some type of depression." [Def. Ex. 39].

Because of a constellation of trial failures, the jury never had the opportunity to learn any of this mitigation evidence – covering Halprin's nightmarish childhood, complete with regular physical violence and neglect, and failure to adapt throughout childhood. The jury did not review Exhibit 39, CPS records, school records, medical records, prison records or hear from Halprin's relatives, including his birth mother and brother. No doubt exists, given the guidance of Supreme Court precedent, that the information contained in these records and interviews would have saved Halprin's life.

3.    **Mitigation Evidence Excluded in Halprin's Case is Similar to Evidence that Other Courts Have Found Constitutionally Required to Be Presented**

The evidence excluded from the penalty phase of Halprin's trial presents a classic mitigation argument that makes the death penalty inappropriate here. *See Wiggins*, 539 U.S. at 535 (citation omitted) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse."); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (noting that consideration of the offender's life history is "a part of the process of inflicting the death penalty"). Halprin's case can be compared to: *Williams v. Taylor*, 529 U.S. 362 (2000); *Canaan v. McBride*, 395 F.3d 376 (7th Cir. 2005); *Coleman v. Mitchell*, 268 F.3d 417 (2001); and *Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006), among others.

In *Williams*, the U.S. Supreme Court overturned the death sentence of the appellant where trial counsel failed to investigate or present mitigating evidence during the penalty

phase of the trial. *Williams*, 529 U.S. at 398-99. The available evidence included extensive juvenile, medical, and prison records that graphically described the appellant's childhood, that the appellant was "borderline mentally retarded," and that the defendant had a good record in prison. *Id.* at 395-96. These records were the same type that were available to trial counsel here and describe a childhood similar to Halprin's. For example, the Supreme Court quoted verbatim from juvenile records to describe the appellant's home:

> The home was a complete wreck. . . . There were several places on the floor where someone had had a bowel movement. Urine was standing in several places in the bedrooms. There were dirty dishes scattered over the kitchen, and it was impossible to step any place on the kitchen floor where there was no trash. . . . The children were all dirty and none of them had on under-pants. . . . The children had to be put in Winslow Hospital, as four of them, by that time, were definitely under the influence of whiskey.

*Id.*, at 395 n.19. Williams, like Halprin, was repeatedly beaten by his parents and was committed to the custody of the State. *Id.* at 395. Prison officials, also opined that Williams was one of the inmates least likely to act violently and that he thrived in a regimented environment. *Id.* at 396. This is the same evidence that Exhibit 39, the ranking document, would have shown regarding Halprin in relation to the other members of the Texas Seven. As in *Williams*, the jury should have heard the available mitigation evidence and would likely have reached a different conclusion.

Further, Halprin's case can be compared to *Canaan*, where the Seventh Circuit Court of Appeals vacated the appellant's death sentence. *Canaan*, 395 F.3d at 392. In *Canaan*, the appellant did not present evidence at the penalty phase that his father regularly beat him, of his lifelong struggle with drugs, and emotional abuse as a child. *Id.* at 386-87. Specifically,

the jury did not hear that:

> Canaan's father often beat him until his mother or brother intervened. After
> Canaan's father caught him sniffing paint, he spray-painted the entire left side
> of Canaan's body. On several occassions, Canaan's mother forced him and his
> siblings into the family's car and drove recklessly towards their house,
> threatening to kill everyone because "her nerves had about had it." When
> Canaan was later placed in a juvenile facility, he was diagnosed as "dangerous
> to self and others," and had to go through "reality therapy." Canaan's
> testimony also chronicled a lengthy history of substance abuse.

*Id.* at 386-87. The Seventh Circuit held that this account of Canaan's early childhood and

substance abuse made clear that Canaan "has the kind of troubled history we have declared

relevant to assessing a defendant's moral culpability." *Id.* at 387 (quoting *Wiggins*, 539 U.S.

at 535); *see also Emerson v. Gramley*, 91 F.3d 898, 907 (7th Cir. 1996), *cert. denied*, 91 F.3d

898 (1997) (finding prejudice when counsel failed to introduce evidence "of a life that one

juror in twelve might find so bleak, so deprived, so harrowing, so full of horrors" as to refuse

to recommend death, particularly where the prosecution put forth irrefutable evidence of

aggravating circumstances).

Similarly, the excluded mitigation evidence here can be compared to that excluded in

*Coleman. Coleman*, 268 F.3d 417.   In *Coleman*, counsel failed to present evidence of

defendant's childhood. *Id.* at 449-51. This evidence included the fact that defendant had

been abandoned as an infant in a garbage can by his mentally ill mother, was raised in a

brothel run by his grandmother where he was exposed to group sex, bestiality and pedophilia.

*Id.* at 450-51. Petitioner also suffered from probable brain damage and borderline personality

disorder. *Id.* at 449.   After detailing this evidence, the Seventh Circuit held that "it is

Applicant's Objection to Findings of Fact and Conclusions of Law Regarding Ineffective Assistance of Counsel and Suppression of
Exculpatory Evidence at Punishment Phase of Trial and Request that Court of Criminal Appeals Set Issues for Submission and
Consideration - Page 54

reasonably probable that the presentation of even a substantial subset of the mitigating evidence detailed above 'would have humanized [Petitioner] before the jury such that at least one juror could have found he did not deserve the death penalty.'" *Id.* at 452 (quoting *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000)). Halprin needed to be humanized here, like *Coleman,* – something that child protective service records, medical records, school records, and testimony would have done. Indeed, there is no doubt that this information would have saved Halprin's life.

The Texas Court of Criminal Appeals has also found mitigation evidence to be necessary. *See, e.g.*, *Gonzales*, 204 S.W.3d at 399-400. In *Ex Parte Gonzales*, the Court held that the defendant was prejudiced by counsel's failure to present evidence that the defendant suffered from Post-Traumatic Stress Disorder. *Id.* at 399. Gonzales suffered from PTSD because his father subjected him to oral and anal intercourse on a weekly basis beginning when he was seven years old and inflicted severe physical punishment upon him. *Id.* His father also threatened to kill the seven year old boy if he told anyone of the abuse. *Id.* An expert would have testified that had Gonzales received proper treatment he may have been a law abiding citizen. *Id.* The Court held that this "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of the applicant's moral culpability," and, therefore, vacated Gonzales death sentence. *Id.* at 400. The Court should do the same here based on similar evidence excluded from the penalty phase of Halprin's trial.

These four cases are not disparate cases. Death sentences from nearly every capital jurisdiction have been set aside due to counsel's failure to investigate adequately or present

the client's background, character, or mental health to the jury during the penalty phase. *See,*

*e.g., Wiggins v. Smith*, 539 U.S. 510, 525 (2003) (Maryland) (counsel failed to present life

history evidence, including sexual victimization); *Outten v. Kearney*, 464 F.3d 401, 418-19

(3d Cir. 2006) (Delaware) (counsel was ineffective for failing to investigate the violence

committed by petitioner's alcoholic father and the defendant's own substance abuse); *Douglas*

*v. Woodford*, 316 F.3d 1079, 1087-88 (9th Cir. 2003) (California) (counsel was ineffective

for failing to investigate and present evidence of petitioner's mental disabilities and evidence

that he was abandoned as a child); *Lockett v. Anderson*, 230 F.3d 695, 713-14 (5th Cir. 2000)

(Mississippi) (counsel failed to investigate and present defendant's mental disabilities,

including temporal lobe lesions, epilepsy, and schizophrenia that would have mitigated even

the particularly aggravated crime); *Collier v. Turpin*, 177 F.3d 1184, 1202 (11th Cir. 1999)

(Georgia) (counsel was ineffective for failing to delve deeply into petitioner's past as a good

family man, upstanding citizen, his impoverished background, and relationship between his

diabetes and his impulsive behavior); *Hall v. Washington*, 106 F.3d 742, 752 (7th Cir. 1997)

(Illinois) (counsel was ineffective for failing to investigate defendant's good moral character

and adaptability to prison); *Loyd v. Whitley*, 977 F.2d 149, 160 (5th Cir. 1992) (Louisiana)

(trial counsel failed to investigate defendant's preexisting mental defects); *Mak v. Blodgett*,

970 F.2d 614, 617 (9th Cir. 1992) (Washington) (counsel failed to present testimony of

defendant's family "to show Mak's human qualities" and failed to present expert testimony

of "the effects of cultural conflict on young Chinese immigrants"); *Harlow v. Murphy*, No.

05-CV-039-B, slip op. 41, 44 (D. Wyo. Feb. 15, 2008) (counsel failed to present evidence

of defendant's adaptation to prison and to explain that a prison fight was not because defendant was "a dangerous person, but . . . was in a dangerous place"); *Sanford v. State*, 25 S.W.3d 414, 421 (Ark. 2000) (trial counsel was ineffective for failing to investigate petitioner's school records, medical records, jail records, and family history showing a long-standing history of mental retardation); *Green v. State*, 32 Fla. L. Weekly 619 (Fla. 2007) (counsel was ineffective for failing to investigate and present petitioner's prior juvenile robbery conviction, which would have produced facts disqualifying the incident as an aggravating factor to justify imposition of death); *Doleman v. State*, 921 P.2d 278, 281 (Nev. 1996) (counsel failed to introduce testimony of defendant's childhood and institutional history that "could have effectively humanized Doleman in the eyes of the jury"); *State v. Chew*, 844 A.2d 487, 506 (N.J. 2004) (counsel failed to provide defense experts to testify about defendant's history of child sex abuse); *Marquez-Burrola v. State*, 157 P.3d 749, 764-65 (Okla. Crim. App. 2007) (counsel failed to substantiate mitigation testimony of defendant's family with corroborating evidence from a broad set of sources); *Commonwealth v. Gorby*, 900 A.2d 346, 362 (Pa. 2006) (counsel failed to investigate witnesses and documents substantiating defendant's childhood maltreatment and related indicators of brain injury); *Nance v. Ozmint*, 626 S.E.2d 878, 883 (S.C. 2006) (counsel "failed to reveal that Petitioner was beaten throughout his childhood; . . . he grew up in a family of extreme poverty and physical deprivation" and did not elaborate about the fact that petitioner had "a family history of schizophrenia"); *Goad v. State*, 938 S.W.2d 363, 370-71 (Tenn. 1996) (counsel failed to present testimony that defendant's demeanor had changed since returning

from Vietnam and that he suffered Post-Traumatic Stress Disorder ("PTSD")).

All of these cases lead to the conclusion that Halprin was prejudiced by counsel's failure to present mitigating circumstances concerning his childhood – the neglect, physical beatings, exposure to illegal substances, deplorable living conditions, and revolving door of care-givers. This mitigating evidence, taken as a whole "might well have influenced the jury's appraisal of Halprin's moral culpability." *Gonzales*, 204 S.W.3d at 400. Therefore, there is at least a reasonable probability that, had this mitigating evidence been introduced at the punishment hearing, a different result would have occurred. *Id.* Halprin would have received a sentence of life imprisonment.

**4.    Comparison of Evidence Jury Heard With Evidence Jury Did Not Hear**

### CHILD ABUSE

At trial, the jury heard no specific evidence concerning Halprin's early childhood. They merely heard Dr. Goodness, a mitigation expert conclude that "abuse and neglect adversely affected [Halprin's] early environment." [RR 53 p. 28-30]. There was no discussion of what this abuse constituted. CPS records, however, detail repeated physical assaults, child neglect, and a revolving door of care-givers and homes. [Hrg. 8/20/2010, Ex. 2: CPS Rec. (hereinafter CPS Rec.)]. Halprin's birth mother, Anne Lester, has also provided an affidavit, stating that Halprin's birth father physically assaulted him, beginning when Halprin was nine months old. [Amend. Habeas Pet., Ex. C: Lester Aff. at 1-2 (hereinafter Lester Aff.)].

| Mitigation Evidence Presented at Trial | Available Mitigation Evidence |
|---|---|
| **Testimony by Dr. Goodness:**<br>A. Yes. It's my opinion that abuse and neglect adversely affected his early environment.<br><br>. . .<br><br>Q. From birth to approximately age six?<br>A. Yes.<br><br>. . .<br><br>Q. Now, to establish your opinion about his adverse early environment, you are basing that on specifically what? . . .<br>A. . . . I reviewed adoption records, CPS records from the time when he was young and that went along with the adoption records, as well. Certainly interviewed Mr. Halprin and he had some small memories of that time. And I interviewed his biological mother who provided data to me, as well, about what his life was like at that time.<br>Q. Okay. Did what his biological mother tell you seem to be consistent with the records that you reviewed?<br>A. Yes, it was. That's equally poor. [RR 53, pp. 28-30] | **CPS Records**<br>**Sept. 8, 1981**: CPS begins an investigation based on complaint made by Cindy Russel:<br><br>"House is "a wreck," children are pale, unhealthy–looking like [they] don't have proper diet. Wesley has round sores on face, about size of a quarter, puffy and scaby around edges–has had them about 2 wks., with no med[ical] treatment. Mo[ther] doesn't change baby's diapers; he lays in dirty diapers for hours. Fa[ther] is "mean" to Randy–he makes him sit & be absolutely silent whenever fa[ther] is around. [Father] sends Randy to bed but won't turn on bathroom light for him, so Randy uses the closet or his bed. When fa[ther] finds it, he "whips" Randy & rubs his nose in it. Randy's room smells "like a sewer." If Randy doesn't sit down fast enough, comp[lainant] has seen fa[ther] twist Randy's arm, and push him down on the floor. Fa[ther] once had split knuckle from hitting Randy on the head."<br>[CPS Rec. at 5687].<br><br>**Oct. 9, 1981**: Kim Whitfield called CPS because she observed the father "whip" Randy Jr. and then "slammed [his mother] against the wall" when she complained." The complainant was "concerned because sister of fa[ther] supposedly beat her 2 yr old baby to death." [CPS Rec. at 5685; 5704].<br><br>**Feb. 9, 1982**: Mary Hammons, an aunt, relayed "she had observed the four-year-old boy [Randy] covered with bruises because of beatings." [CPS Rec. at 5685]. |

**May 24-25, 1982**: Grandmother called CPS after Halprin's mother left him at her house stating, she "couldn't do anything with him" – a practice the grandmother characterized as common. Halprin had bruises on his backside. Halprin stated he received the spanking because "he got up and got into the refrigerator during the night and was caught by Jimbo [his step-father]." Halprin also characterized Jimbo as "mean" and "reported that he had to stand in the corner a lot." Halprin's grandmother further stated that Halprin's mother "didn't keep the boys clean." [CPS Rec. at 5707].

**July 11, 1982**: Babysitter reported Halprin's brother was covered with bruises caused by a belt
[CPS Rec. at 5710]

**July 12, 1982**: CPS visited home. Parents were asleep. The children were playing unsupervised. Halprin was covered "in what appeared to be mosquito bites" while his brother "had feces smears on his legs." The CPS caseworker reasoned that Willingham had hit Wesley with a belt. She predicted further violence. [CPS Rec. at 5710-11].

**Sept. 16, 1982**: Wesley Halprin's doctor reported bruises he had observed on the child's thighs and backside. The caseworker believed the bruises warranted removal. Wesley was removed from the house. Halprin's mother provided several different versions of how the bruises originated. [CPS Rec. at 5716-23].

**Jan. 1983**: Halprin's father abandoned him with a family in East Texas. The family reported that Halprin had two teeth missing,

|  | believed to be caused by Halprin's father. His father also called him a bastard and stated he might leave him on the roadside. [CPS Rec. at 5745-49].<br><br>**June 1983**: CPS located Halprin with this family, having lost contact for over six months. Halprin is placed in a foster home. [CPS Rec. at 5747-49].<br><br>**Lester Affidavit**<br>Lester averred that Halprin's father first assaulted him when he was nine months old and that this abuse continued for the next four years. She stated that Halprin's father would "beat [Halprin] several times a week, so badly that [the beatings] would leave visible marks on Randy." She also stated that her boyfriend, Willingham, "was extremely abusive, regularly beating [Halprin] with any object he could grab." [Lester Aff. at 1-4]. |
|---|---|

## EFFECTS OF CHILD ABUSE ON HALPRIN AS A YOUNG CHILD

At trial, the jury heard no specific evidence concerning the effects of the above-described child abuse and neglect on Halprin during his early childhood. They merely heard Dr. Goodness, a mitigation expert conclude that "abuse and neglect adversely affected [Halprin's] early environment." [RR 53, pp. 28-30]. CPS records detail how this abuse effected Halprin. Halprin worried about death, feared teenage boys, became protective of his brother, and needed constant re-assurance from his adopted parents.

| Mitigation Evidence Presented at Trial | Available Mitigation Evidence |
|---|---|

| Testimony by Dr. Goodness: | CPS Records |
|---|---|
| A. Yes. It's my opinion that abuse and neglect adversely affected his early environment.<br><br>. . .<br><br>Q. From birth to approximately age six?<br>A. Yes.<br><br>. . .<br><br>Q. Okay. Did you find that that affected his self-esteem?<br>A. Yes. Adverse experiences and adventive environment, especially early on in those first five years, can lead to disruptions in childhood development and in later adult functioning as well.<br>A. . . . They are learning that abusive behavior or violent behavior is okay. [RR 53, p. 28-29]. | **June 18, 1982**: The CPS caseworker noted that the child abuse had caused Halprin to misbehave and to become aggressive towards his younger brother. She stated that "without doubt, his recent behavioral decline must be interpreted as emotional ebellion against the instability and confusion of his family life." [CPS Rec. at 5708].<br><br>**June 1983**: The family that took Halprin in for six months reported that Halprin had gained twenty-three pounds with them. She stated that Halprin hoarded food and would eat until he vomited. After vomiting, he would immediately begin to eat again. She reported that he was "obsessed with witches and monsters." He also fantasized that he was talking to his brother as well as his aunt and uncle. He would "face the wall and pretend these people [were] present." [CPS Rec. at 5747-49].<br><br>**June 1983**: The foster mother stated that Halprin had expressed fears of Willingham. He was also excited to be reunited with his brother and "hugged Wesley." He was very protective of his brother and would "parent" Wesley." He had a fear of devils and ghosts. [CPS Rec. at 5749-50, 5783-84].<br><br>**Jan. 17, 1984**: Halprin's adopted parents related that Halprin was "pre-occupied with death." He "ask[ed] them if they are going to die or if some other family member or friend is going to die." He also became "extremely upset when he [was] around teenage boys, covering his face and crying out when he saw teenagers or violence. He related that "teenagers beat me up." He also related that his natural father loved him and would come |

|  | back for him.  When his adopted parents told him "no," Halprin was relieved.  He also had a need to continually hear that his adopted parents were proud of him.  [CPS Rec. at 5815-17]. |
|---|---|

## FAMILIAL SUBSTANCE ABUSE

At trial, the jury heard Dr. Goodness, a mitigation expert testify that Halprin was "predisposed to substance abuse" because his parents abused drugs, particularly methamphetamine and cocaine. [RR 53 at 30-31]. The jury did not hear the specifics of this drug use or Halprin's early broad exposure to these drugs.  His extended family reported his parents drug use to CPS. [*See, e.g.*, CPS Rec. at 5705, 5708].  His mother also admitted her drug use to CPS and described in an affidavit that her husband and subsequent boyfriend indulged daily in Halprin's presence.  [Lester Aff. at 5-6].

| Mitigation Evidence Presented at Trial | Available Mitigation Evidence |
|---|---|
| **Testimony by Dr. Goodness:**<br>Q.   Do you believe that Mr. Halprin was predisposed to substance abuse?<br>A.   Yes, I do.<br>Q.   Okay.  Which particular individuals that you talked to led you to that conclusion?<br>A.   His biological mother would be the main person.  Other people said that his parents were drug addicts, but since they did not know them at that time, of course that is not as weighty to me. | **CPS Records**<br>**Feb. 9, 1982**: Family alleges parents on drugs. [CPS Rec. at 5705].<br><br>**Mar. 25, 1982**: Family believes any assistance provided goes to drugs. [CPS Rec. at 5705].<br><br>**June 11, 1982**: Mother told CPS caseworker that she had abused crystal methamphetamine and cocaine. [CPS Rec. at 5708].<br><br>**July 15, 1982**: The caseworker described |

| | |
|---|---|
| Q. Was that supported by any particular records that your reviewed? A. Yes, the adoption records and the CPS records. [RR 53, p. 30-31]. | Halprin's mother as "possibly hungover" and opined that she believes that Halprin's brothers physical problems may be "related to drug use by the mother when she was pregnant with Wesley." [CPS Rec. at 5711].<br><br>**Aug. 23, 1982**: Trailer park owner told caseworker that Willingham, the mother's boyfriend, had been picked up by the police for "possession of dope." [CPS Rec. at 5714].<br><br>**May 1983**: Father told CPS caseworker that he had "been busted for drugs." [CPS Rec. at 5747].<br><br>**Lester Affidavit:** Halprin's mother stated that Halprin's father and Willingham, her boyfriend, abused drugs regularly in Halprin's presence. She stated that Willingham "us[ed] crystal meth almost every day." [Lester Aff. at 5-6]. |

## UNTREATED DISORDERS IN CHILDHOOD AND ADOLESCENCE

At trial, the jury learned that Halprin was diagnosed with Attention Deficit Disorder and learning disabilities in passage comprehension, math calculation, math reasoning and written expression as well as depression and an avoidant personality. The jury also heard Dr. Goodness state that she believed that Halprin's disabilities were not treated properly. [*See* RR 53, pp. 32-38]. The jury, however, did not hear the specifics of these diagnoses as they related to Halprin and how they effected Halprin during his school age years.

| Mitigation Evidence Presented at Trial | Available Mitigation Evidence |
|---|---|

**Testimony by Dr. Goodness:**

Q. . . . [I]t's your opinion that he had untreated disorders in childhood and adolescence that affected him, correct?

A. Yes.

Q. And what type of disorders?

A. Specifically, Mr. Halprin had learning disorders. At that time he had a disorder in written expression, which means his writing skills were not up to the level that it should have been. He had a reading disorder and he had a mathematics disorder. He also had attention deficit disorder, which is an inability to sustain attention. . . . Children with attention deficit disorder find it difficult to sustain focus, especially in a school setting . . . And in addition, if you have a learning disorder combined with the attention deficit disorder, then certainly your ability to learn what you need to learn in school lessens.

He also in my opinion has had struggles with depression, which he is biologically predisposed to . . . [RR 53, p. 31-32].

Q. So what are the effects of untreated attention deficit disorder?

A. Again, you are setting a child up to fall further and further behind academically and socially, if you don't take care of these disorders when they are a problem or when they begin to manifest as a problem. For some children they are not as problematic as for others. . . .

. . .

**Report of Private Psychologist**

This report details a private psychologist's diagnosis of Halprin at the age of ten with Attention Deficit Disorder and learning disabilities in passage comprehension, math calculation, math reasoning, and written expression.

**Arlington Public School Records**

School records show that the diagnoses by the private psychologist were never shared with the school. They also show the effects of the Halprin's failure to address these psychological needs on Halprin and Halprin's struggles in school. Halprin failed seventh grade and the TAAS standardized test. [Ex. M: TAAS Scores; Arlington Withdrawl from School Form].

**Oneida Baptist Institute Records**

School officials initially observed that Halprin was "not a trouble maker. Clean cut guy. When going gets tough he backs off. Main problem is school. Always wants to please. Impulsive behavior. Seldom rebellious." [Ex. M: OBI Application]. He succeeded his first year at OBI but then struggled. On July 10, 1995, Halprin was suspended from school for carving a note in a school bench that was considered suicidal. Halprin's parents refused to let him return home. [Ex. M: OBI Disciplinary record].

Q. And is it your opinion that Randy's disorders were not treated adequately?
A. That is my opinion.
[RR 53, p. 34-35].

Q. And it's your opinion that Randy exhibited a real severe need for acceptance?
A. Yes. It is my opinion that he had a great need for acceptance and did not appear to find that.
[RR 53, p. 37].

A. . . . From the description of the Halprins that I gathered . . . it appears to me that they had - - they were a bit rule bound, that - - . . . they didn't quite know how to react when they were thrown a curve ball by Randy, and would, perhaps, overreact in their parenting. . . . They likely did the best they knew how to do. But that may not have been the best for a child that had special needs, coming from the circumstances with Randy's particular psychology. [RR 53, p. 38-39].

## OTHER TESTIMONY

At trial, the jury heard testimony from Mindi Sternblitz, Jason Goldberg, and Terri Goldberg that Halprin constantly aimed to please his father in his young adult life. The jury did not hear the specifics of Halprin's rejection by his adopted parents. When he attempted to reconcile with his parents, he was refused entrance to the family home. The jury also did not learn the Department of Public Safety's evaluation of Halprin in comparison to the other Texas Seven escapees.

| Mitigation Evidence Presented at Trial | Available Mitigation Evidence |
|---|---|
| **Mindi Sternblitz**<br>Sternblitz testified that Halprin tried to please his father, particularly by completing a bar mitzvah.<br><br>A. I kind of felt sometimes that anything that he would do, he was trying to just get his father's approval for things.<br><br>. . .<br><br>Q. What appeared to be the reason that Randy was so interested in doing the bar mitzvah?<br>A. It was part of being jewish and maybe he was just trying to follow in his father's footsteps.<br>Q. . . . [D]id you think that he was doing it a lot just to please his dad?<br>A. I think most of it was.<br>[RR 52, p. 8-10].<br><br>**Jason Goldberg**<br>Jason Goldberg was a friend of Halprin's as a child. Goldberg testified that Halprin could never please his father.<br>Q. Did [Randy] get in quite a bit of trouble?<br>A. Not to my knowledge. [RR 52, p. 37].<br><br>Q. Can you think of anything really bad that he was doing or involved in at that time that might have got him sent away [to boarding school]?<br>A. No. [RR 52, p. 38].<br><br>**Terri Goldberg**<br>Terri Goldberg was the father of one of Halprin's childhood friends. He spoke of helping Halprin to complete his bar | **Waybourn**<br>In an affidavit, Waybourn averred that at the age of eighteen, Halprin was homeless and lacked guidance. He attempted to reconcile with his parents, but was met on the front steps by the local police chief and denied entrance to the family home. [Waybourn Aff.].<br><br>**Defense Exhibit 39**<br>Defense Exhibit 39, entitled "Ranking of Offenders by Leadership/Personality Characteristics," stated that "it was the unanimous decision that RIVAS was the leader and the weakest was determined to be HALPRIN." The document stated Halprin was "quiet and never exhibited leadership qualities. Was consistently worried about whether his work was acceptable to civilian workers. Very submissive characteristic. This worrisome attitude was seen to escalate a month before the escape. One civilian worker speculated whether HALPRIN was undergoing some type of depression." |

| | |
|---|---|
| mitzvah. He also stated that Halprin's adopted father would drop Halprin off at their house whenever Halprin and his brother fought. Goldberg also described a situation where Halprin and his son told him they saw a UFO. Halprin's father became concerned and took Halprin to see a psychiatrist. [RR 52, p. 62]. He testified that Halprin tried to please his adopted father. [RR 52, p. 55].<br><br>Q.   Did you see any problems in his relationship with his parents?<br>A.   With his father, yes. . . . I felt in my heart that Randy did not feel, no matter what he did, that it would please his father.<br>[RR 52, p. 66]. | |

## 5.   Trial Court's Findings Regarding Ineffective Assistance of Counsel in Presentation of Dr. Goodness's Testimony

In Finding 463, the trial court stated that counsel's efforts to present Dr. Goodness's testimony was not deficient and that the omission of this evidence did not have any bearing on the outcome of his trial. As fully explained elsewhere in this document, defense counsel failed to properly argue the admissibility issue. Likewise to conclude that these significant limitations on Dr. Goodness's testimony had no bearing on the jury's ultimate assessment of a death sentence is to blink at the reality of this case. Dr. Goodness's testimony was the key evidence designed to ensure the jury knew of Applicant's background and problems. A jury fully briefed on these issues very likely would have returned a life sentence rather than death. The effect of the limitations on Dr. Goodness's testimony was that she gave conclusions but was not allowed to explain the basis for these conclusions. The suggestion that this made no

difference defies common sense. Clearly a jury that knew why she reached her conclusion would have been more likely to give those conclusions weight in their deliberations.

Additionally, finding 465 is an incomplete and misleading statement of how the Eighth Amendment affects that admissibility of mitigating evidence, in light of state evidentiary rules. This is fully briefed elsewhere in this document.

Moreover, throughout the findings on this issue, the trial court, adopting the state's language, treats the underlying data that Dr. Goodness reviewed in support of her testimony as inadmissible hearsay. In fact, under Rule 705, the evidence was not inadmissible hearsay. The state's simplistic formulation of the rules is misleading and incorrect.

For instance, finding 469 states:

"The Court finds that these communications constituted hearsay for which Applicant identifies no exception."

In order to make this statement, it is necessary to ignore the hundreds of pages of the record in this case discussing Rule 705 and when otherwise inadmissible testimony is admissible in support of an expert's testimony.

Additionally, finding number 473 is based on the state's incorrect reading of the record. The state says that the court did not "foreclose the possibility that some hearsay might become admissible during the course of the doctor's testimony." However, the reality is that the court ruled the testimony inadmissible. The state's contention is that a defendant must continue to argue with the court over its ruling and try to find ways to circumvent the ruling. This is another clearly erroneous finding.

In finding 474 and 475, the state, and court, find that under the balancing test the trial court legitimately found that there was "a danger existed that the jury would consider the hearsay statements about Applicant's purported abuse, psychological problems, etc. as substantive evidence." Notably the state fails to identify in what way this evidence would be used by the jury for an improper purpose. The evidence was admissible as explanation for Dr. Goodness's expert opinion and there is no other conceivable basis for which the jury could consider it.

In finding 476, 477 and 478, the state argues that there was not a strong need for Applicant to present the excluded evidence and that the jury knew some of the basis for Dr. Goodness's opinion without her being allowed to explain the facts and information she relied upon to reach it. This finding also completely ignores the constitutional right of a capital murder defendant to present all mitigating evidence to a jury.

Moreover, finding 479 is clearly erroneous in stating that the probative value of any hearsay was minimal. Of course at trial the prosecutors recognized the probative value of the excluded evidence was substantial and that is why they fought so vigorously to exclude it. Additionally, the probative value of a mitigation expert presenting the type of evidence at issue here has been recognized numerous times by the U. S. Supreme Court.

The state also finds that the underlying documents would not have been admissible and therefore there was no ineffective assistance in not presenting them. As previously argued, these documents would have been admissible if trial counsel offered them in evidence. The state's contention, in finding 489, that the admission of the letters and records

"would have compounded, not eradicated, the prejudice to the state," demonstrates a profound misunderstanding of the role of mitigating evidence. It is not a question of what is prejudicial to the state. It is a question of what a jury should know about a defendant in deciding whether to assess a death sentence.

In finding 490-495, the court makes unsubstantiated findings that Applicant's family members would not have testified and that their testimony would not have made a difference. Of course, a subpoena can be issued for any witness, thus compelling their testimony. Additionally, a claim that their testimony would have made no difference shows that the state and court are either unaware or have chosen to ignore the plethora of case law that recognizes abuse early in life as a significant mitigating factor. The contention in finding 500, that Ms. Lester would have testified to bad acts by Applicant as a very young child, is akin to saying that the jury would fail to understand that the abuse by the adults in his life is what caused Applicant to become the person he is.

In findings 511-533, the court finds that there was no ineffective assistance in counsels' presentation of Dr. Goodness's testimony. This is discussed in detail elsewhere in this document. In short, defense counsel inadequately argued the admissibility of Dr. Goodness's testimony and, when the underlying data was excluded, counsel failed to offer the underlying data into evidence.

## CONCLUSION

Applicant did not receive a fair, just and constitutionally adequate punishment hearing. The jury did not hear significant, important and compelling mitigating evidence that

very likely would have resulted in a sentence of life, rather than death. For these reasons, the relief requested in the Application for Writ of Habeas Corpus should be granted and Applicant be granted a new sentencing hearing.

Respectfully submitted,

GARY A. UDASHEN
State Bar of Texas No. 20369590

BRUCE ANTON
State Bar of Texas No. 01274700

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas  75201
214-468-8100
214-468-8104 fax

ATTORNEYS FOR APPLICANT

## CERTIFICATE OF SERVICE

On this _25_ day of January, 2012, a true and correct copy of the foregoing Applicant's Objections to the Court of Criminal Appeals Considering the Trial Court's Findings of Fact and Conclusions of Law was delivered to Lisa Smith, Assistant District Attorney, 133 N. Riverfront Blvd., L.B. 19, Dallas, Texas 75207.

GARY A. UDASHEN

NO. W01-00237-T(A)

| | | |
|---|---|---|
| EX PARTE | § | IN THE CRIMINAL DISTRICT |
| | § | |
| | § | COURT NUMBER SEVEN |
| | § | |
| RANDY ETHAN HALPRIN | § | DALLAS COUNTY, TEXAS |

## APPLICANT'S OBJECTIONS TO TRIAL COURT'S FINDINGS ON ISSUE RAISING INEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL AND REQUEST THAT COURT OF CRIMINAL APPEALS SET ISSUE FOR SUBMISSION AND CONSIDERATION

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES the Applicant, RANDY ETHAN HALPRIN, and submits these objections to the trial court's findings on ineffective assistance of counsel on appeal and request that the Court of Criminal Appeals set this issue for submission and consideration and would show the following:

### I.

This request is concerned with the ground on the writ application regarding ineffective assistance on appeal. The request made here is not intended to waive any other grounds raised on the writ application and the other grounds will be addressed in separate objections to be filed to the trial court's findings.

### II.

In Ground for Relief VI, Applicant argued that he received ineffective assistance of counsel on appeal. As part of this argument, Applicant contended that his appellate counsel

rendered ineffective assistance of counsel on appeal by failing to raise an argument that the trial court erred in severely limiting the testimony of his mitigation expert, Dr. Kelly Goodness.[1]

This issue was further explored in an evidentiary hearing and additional briefing. Ultimately, the trial court adopted, without any change,[2] the entirety of the state's proposed findings on this issue.

## III.

### Importance of the Issue

The specific question raised in this issue is whether a trial court can refuse to allow a mitigation expert to testify as to the underlying basis for her opinions on the grounds that her testimony includes hearsay. This involves an interpretation of the Chapter VII of the Texas Rules of Evidence, as well as constitutional rights to present mitigating evidence. In fact, the question of whether expert witnesses are allowed to testify as to hearsay is one that involves more than capital cases. This is an issue that occurs with some regularity in Texas courts and on which other courts routinely take a position opposite of that taken by the trial court here. However, this is an issue of particular importance in the sentencing phase of a capital murder trial since the Supreme Court has recognized that the constitutional imperative that a jury hear all mitigating evidence may overrule a mechanistic application of state

---

[1] Both the state's proposed findings and the trial court's findings accept the proposition that this issue was preserved for appeal.

[2] The only change made by the trial court to the state's proposed findings was in the trial court's finding no. 823, the first word is "Notably," whereas the state's proposed finding begins with the words, "In particular." The reason for this change is unclear.

evidentiary rules.

## IV.

### Trial Court's Clearly Erroneous Conclusion of Law

In the State's proposed finding no. 831, the following is stated:

> (831) As previously noted in relation to applicant's attack on his trial counsel's presentation of Dr. Goodness's testimony, the Eighth Amendment requires that applicant be afforded the opportunity to present mitigating evidence, but it does not relieve him of the obligation of presenting it in an admissible form. *See Smith*, 2010 Tex. Crim. App. LEXIS 582, at *69; *Lewis*, 815 S.W.3d at 568; *see also Romano*, 512 U.S. at 10-12; *but see Green*, 442 U.S. 95.

The trial court adopted this proposed finding verbatim as the Trial Court's Finding Number 815, which stated:

> (816) As previously noted in relation to applicant's attack on his trial counsel's presentation of Dr. Goodness's testimony, the Eighth Amendment requires that applicant be afforded the opportunity to present mitigating evidence, but it does not relieve him of the obligation of presenting it in an admissible form. *See Smith*, 2010 Tex. Crim. App. LEXIS 582, at *69; *Lewis*, 815 S.W.3d at 568; *see also Romano*, 512 U.S. at 10-12; *but see Green*, 442 U.S. 95.

While the finding made a passing reference to *Green v. Georgia*, 422 U.S. 95 (1979), the Court's actual finding ignored the holding of *Green* and other cases following it. In *Green*, the court found that even if evidence may have been inadmissible under the Georgia hearsay rule, its exclusion violated the due process clause.

In fact, as cited in Applicant's pleadings, there are numerous cases that hold that, in a death penalty prosecution, a mechanistic application of state evidentiary evidence rules may be violative of due process, as well as Eighth Amendment considerations. *See United States*

*v. Jones*, 132 F.3d 232, 242 (5th Cir. 1998), *aff'd by*, 527 U.S. 373 (1999) ("The Court has

recognized that the defendant must be given the opportunity to introduce information

regarding mitigating factors, without traditional evidentiary restraints, in order to provide the

jury with the fullest possible information about the defendant."). Indeed, in *Green v.*

*Georgia*, 442 U.S. 95 (1979) (per curiam), the Supreme Court held that exclusion of

proferred testimony at the sentencing phase under the state hearsay rule violated due process

because testimony went to a critical issue and substantial reasons existed to assume its

reliability. *Id.* Similarly, in *Wiggins v. Smith*, 539 U.S. 510 (2003), the Court agreed that trial

courts should exercise their discretion to admit "any relevant and reliable mitigating

evidence, including hearsay evidence that might not be admissible in the guilt-or-innocence

phase of the trial." *Id.* at 536-37; *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986)

(rejecting explicitly the argument that the need for mitigation evidence may be trumped by

state rules of evidence); *Boyd v. French*, 147 F.3d 319 (4th Cir. 1998) (due process clause

of the 14th Amend. may require the admission of mitigating evidence in a capital sentencing

proceeding, even if state law rules of evidence would exclude it).

The following cases demonstrate the application of this constitutional rule in practice:

*Brown v. Luebbers*, 344 F.3d 770 (8th Cir. 2003) (The exclusion of mitigating
hearsay testimony at the penalty phase of a death penalty case violates the Due
Process Clause of the Fourteenth Amendment, where the excluded testimony
is highly relevant to a critical issue in the punishment phase of the trial, and
substantial reasons exist to assume its reliability).

*Montgomery v. Bagley*, 581 F.3d 440 (6th Cir. 2009) (The exclusion of hearsay
testimony at the penalty phase of a death penalty case violates the Due Process
Clause of the Fourteenth Amendment where the excluded testimony was
highly relevant to a critical issue in the punishment phase of the trial, and

Applicant's Objections to Trial Court's Findings on Issue Raising Ineffective Assistance of Counsel on Appeal and
Request That Court of Criminal Appeals Set Issue for Submission and Consideration - Page 4

2805

substantial reasons existed to assume its reliability).

*Paxton v. Ward*, 199 F.3d 1197 (10th Cir. 1999) (A state court may not apply a state rule of evidence in a per se or mechanistic manner so as to infringe upon a defendant's constitutional right to a fundamentally fair trial and to present mitigating evidence in a capital proceeding).

As these cases demonstrate, there is a substantial amount of case law, both from the U. S. Supreme Court and other courts, that stands for the proposition that under some circumstances an application of state evidentiary rules must give way to a defendant's due process rights to present mitigating evidence. The trial court's findings concerning the failure of appellate counsel to raise this issue on direct appeal (Findings, 813-827), were a verbatim copy of the state's proposed findings on this issue (State's Proposed Findings, 827-843).[3]

The state's proposed findings sidestepped the issue of whether applicant's constitutional right to present mitigating evidence was violated by a mechanistic application or state evidentiary rules. Likewise, the trial court followed the state's lead and failed to address this question. Since this is an issue squarely presented in Applicant's writ application, the failure to address it leaves the Court of Criminal Appeals in a position of approaching this question in a *de novo* fashion without receiving the assistance from the trial court contemplated by Art. 11.071, Tex. Code Crim. Proc.

Essentially, the state's findings, as accepted by the trial court, reach a conclusion of law that is incomplete, inaccurate and misleading. It ignores the relevant case law and takes

---

[3]The Court made one change in the state's findings. In finding No. 823, the court began the finding with the word "Notably". The state's finding which the court otherwise accepted began the finding with the words, "In particular." It is unclear why the court changed this one word in these findings on this issue.

a complicated issue and boils it down to a simplistic and ultimately incorrect conclusion. This "legal conclusion" is then presented as the totality of the court's response to the complex question of whether Applicant had a constitutional right to make a full presentation of his mitigating evidence. The ultimate result is that the court has issued findings and conclusions that are clearly erroneous.

The Court's acceptance of this state's finding results in a legal conclusion that is contrary to the law. A correct statement of the law would be as stated in the cases cited by Applicant.

## V.

## Trial Court's Clearly Erroneous Fact Finding

In the State's Proposed Findings of Fact and Conclusions of Law, No. 659, the following is proposed as a finding:

> (659) The Court finds that Mr. Ashford was lead appellate counsel. He delegated most of the research and all of the writing responsibilities to Mr. Muhammad. Mr. Ashford and Mr. Muhammad discussed which issues should be raised and strategically selected those they believed had the greatest likelihood of success on appeal (8/20/10 Hrg) RR: 8-9, 38, 42, 149-51, 154, 157-59, 173; Ashford Interrogatory Answers; Muhammad Interrogatory Answers.

In the Court's Findings of Fact and Conclusions of Law, No. 646, the Court made the following finding:

> (646) The Court finds that Mr. Ashford was lead appellate counsel. He delegated most of the research and all of the writing responsibilities to Mr. Muhammad. Mr. Ashford and Mr. Muhammad discussed which issues should be raised and strategically selected those they believed had the greatest likelihood of success on appeal (8/20/10 Hrg) RR: 8-9, 38, 42, 149-51, 154, 157-59, 173; Ashford Interrogatory Answers; Muhammad Interrogatory Answers.

Applicant's Objections to Trial Court's Findings on Issue Raising Ineffective Assistance of Counsel on Appeal and Request That Court of Criminal Appeals Set Issue for Submission and Consideration - Page 6

2807

In this finding, the Court accepted, in its entirety, the State's proposed finding that Mr. Ashford and Mr. Muhammad, made a strategic decision not to include in the brief on appeal a challenge to the trial court's limitation on Dr. Kelly Goodness's testimony. However, the State's finding, now the Court's finding, completely fails to acknowledge or address the following testimony presented by lead appellate attorney George Ashford at the evidentiary hearing in this case.

> Q. Well, if you were right on the law that Judge Cunningham erred in not letting Kelly Goodness present the data and the facts supporting her mitigation conclusions, if you were right that the Judge erred in excluding that, then that would have been a good appellate issue, don't you think?
>
> A. Absolutely.
>
> Q. Mitigation being one of the hot topics that both the state and federal courts look at in evaluating death penalty review?
>
> A. Absolutely.
>
> Q. And so as you sit here there's no strategic reason why that was left out?
>
> A. No.
>
> . . .
>
> Q. [D]id you ever have an opportunity as lead counsel to sit down with [Attorney Muhammed] and say, "This issue on the Judge's mitigation ruling really needs to be in the brief?"
>
> A. I know I discussed with him the fact that in a capital murder case mitigation evidence should be admitted even if sometimes the Rules of Evidence have to be scurried. I had read that and researched that and told him that was *a primary issue for our appeal*.

[Writ Hearing, Aug. 20, 2010, Vol. 2, 39-41 (emphasis added)].

The State's proposed finding, adopted by the Court, is clearly erroneous in concluding that, "Mr. Ashford and Mr. Muhammad discussed which issues should be raised and strategically selected those they believed had the greatest likelihood of success on appeal." In fact, Mr. Ashford, lead counsel, instructed Mr. Muhammad that this was "a primary issue for our appeal." There was no strategic decision by counsel not to raise this issue.

It is crucial to a fair determination of this ground in the writ application that the Findings of Fact comport with the evidence and the record. In this case, the State's proposed findings was directly contrary to the evidence. By adopting this clearly erroneous Finding, the trial court sent to the Court of Criminal Appeals a fact finding that is demonstrably incorrect.

The question of whether a defense attorney chooses a certain course of conduct for strategic reasons is an important inquiry in an ineffective assistance of counsel claim. Obviously, the State wants the Court to find that appellate counsel was not ineffective because they made a strategic decision not to raise this issue. However, there was no strategic decision made, the State's proposed finding was incorrect and, the trial court's adoption of it is equally incorrect.

## VI.

## <u>Argument</u>

Halprin was denied effective assistance of counsel on appeal. Appellate counsel failed to argue that Dr. Kelly Goodness should have been permitted to present to the jury mitigation facts that she used to support her opinions under Texas Rules of Evidence 703 and

705[4] and that constitutional consideration under the U. S. Const., amends. VIII and XIV required the trial court to admit the testimony. Appellate counsel's failure to raise this issue, an issue he testified was a "good issue" and "a primary issue for our appeal," was objectively unreasonable.[5] Further, Halprin suffered prejudice because he likely would have prevailed on this argument at the Court of Criminal Appeals and have received a new penalty phase trial.

a)     **Background**

A jury found Halprin, one of the "Texas Seven," guilty of the capital murder of police officer Aubrey Hawkins. The jury then sentenced Halprin to death without the opportunity of hearing mitigating evidence, such as the physical and emotional abuse he suffered as a child, his psychological problems, and need to belong.

In preparation for the punishment phase of trial, the defense employed the services of Dr. Kelly Goodness, an experienced mitigation expert and clinical psychologist. Dr. Goodness conducted an extensive evaluation on "how Halprin has come to be before the Court." (RR 53, p. 19). Dr. Goodness interviewed Halprin as well as twelve of his relatives and friends. [Goodness Psychological Eval. at 3-4]. She also reviewed relevant medical, school, prison, and Child Protective Services documents. [Id. at 3; RR 52, pp. 97, 105, 111,

---

[4]Additionally, the trial court erroneously found that Applicant's argument that the question of whether Rule 705, T. R. Evid. was violated should have been raised on appeal is a subsequent writ. The state's findings, and the trial court's subsequent adoption, ignore the fact that Applicant's argument in his writ application under ineffective assistance of counsel specifically referred the reader to another section of the writ application where Rule 705 was discussed in detail. There is no subsequent writ question on this issue.

[5]George Ashford was appointed by the court to represent Halprin on appeal. He associated Michael Mohammed as co-counsel on appeal and delegated the preparation of the appellate brief to Mohammed.

122-123].

Based on these records and interviews, Dr. Goodness's investigation established that Halprin's natural parents physically and emotionally abused him. [RR 52, pp. 99-102]. His natural father and his mother's subsequent boyfriends at various points beat him, threw him down stairs, and even pushed him out of windows. [Goodness Psych. Eval. at 5; RR 52, pp. 99-102]. His father neglected him and eventually abandoned him. [Goodness Psych. Eval. at 5; *see* RR 52, p. 101]. When CPS found him at the age of five, Halprin had two missing teeth, believed to have been knocked out, and a scar on his wrist. He hoarded food and ate until he was vomited. [Goodness Psych. Eval. at 5; *see* RR 52, pp. 101]. He was also preoccupied with devils and ghosts and was so scared of teenage boys that he would cover his face when he came into contact with one. [Goodness Psych. Eval. at 5-6]. According to Dr. Goodness, his early childhood abuse helps to explain the 'cycle of abuse' that led to the physical abuse Randy Halprin inflicted on the child victim of the injury to a child case for which he was originally incarcerated. [Goodness Psych. Eval. at 14-15]. Indeed, the assault mirrored the abuse he suffered as an infant. [*Id.*].

Halprin's parents abused drugs, drank alcohol, and smoked cigarettes, thereby giving Halprin a genetic vulnerability to substance abuse. [*Id.*; RR 52, pp. 99]. His mother even indulged in these substances while pregnant with her son. [Goodness Psych. Eval. at 5; RR 52, pp. 99]. When Halprin was adopted at the age of six, he could not repeat the alphabet or count. He was diagnosed with a learning disability. [Goodness Psych. Eval. at 6]. He later developed a number of other psychological problems, including depression, ADHD, and an

avoidant personality. [Goodness Psych. Eval. at 12; *see* RR 52, pp. 126-27]. His adoptive parents were unprepared to handle these issues and did not address his needs, thereby undermining his success in school and self-worth. [Goodness Psych. Eval. at 16; *see* RR 52, pp. 130-31].

At an early age, his adoptive parents expelled him from their home. [Goodness Psych. Eval. at 6]. In seventh grade, his parents sent him to boarding school in Kentucky where he excelled in his first year but his adoptive parents refused to allow him to come home and visit. [Goodness Psych. Eval. at 6-7; RR 52, pp. 112-13]. He felt rejected, began to smoke marijuana in ninth grade, and became increasingly depressed. [Goodness Psych. Eval. at 7; RR 52, pp. 113-14, 116]. He was suspended from school in 1995 after carving in a bench at school a note to his girlfriend which school authorities interpreted to be suicidal. [Goodness Psych. Eval. at 7; RR 52, p. 116]. His adopted parents refused to permit Halprin to return home. [Goodness Psych. Eval. at 7; RR 52, p. 117]. He was homeless and lacked guidance. [Goodness Psych. Eval. at 7; RR 52, pp. 119-120]. Later, at the age of eighteen, he attempted to reconcile with his parents, but was met on the front steps by the local police chief and denied entrance to the family home. [Goodness Psych. Eval. at 7; RR 52, p. 118]. He became heavily dependent on drugs and alcohol and moved into a homeless shelter in Arlington. [RR 52, p. 119]. One night at the shelter, while high on acid, he snapped and hit his girlfriend's child because the child would not stop crying. [Goodness Psych. Eval. at 7; RR 52, p. 120]. For this crime, he accepted a plea bargain of thirty years in prison. [Goodness Psych. Eval. at 8]. No one visited Halprin while in prison. [Goodness

Psych. Eval. at 17]. As a result, Halprin had an unfulfilled need for absolute acceptance and unconditional love. [Goodness Psych. Eval. at 17]. Halprin's need to belong and disconnection with the outside world left him vulnerable to leadership figures, such as Rivas who could exploit Halprin's character as a weak follower. [Goodness Psych. Eval. at 17].

But the jury learned few of these facts that influenced Dr. Goodness's testimony. The trial judge permitted Dr. Goodness to testify to her ultimate opinion but did not let her discuss the above information that formed the basis of this opinion, thereby essentially gutting her testimony. *Id.* In her affidavit, Dr. Goodness averred that her detailed investigation, of Halprin's "entire background history, behavioral patterns, emotional functioning, [and] character" was "imperative . . . to assist the triers of fact in understanding (to the extent possible) how the defendant's background and psychological makeup contributed to the choices that brought him before the court." [Goodness Aff. at 2]. In her opinion, a nexus existed between "his life experiences and psychological makeup (mitigation) with his involvement in the offense at issue. [*Id.* at 3]. The jury should have learned of this nexus. She continued on to state:

> It is my professional opinion that Mr. Halprin had a significant array of potentially mitigating factors, many of which could be shown to have a nexus with his role in the offense charged. Thus, unlike many other capital death cases on which I have worked, Mr. Halprin actually had a viable mitigation defense that the jury could have used in considering the Special Issues and which may well have had a significant impact on their decision.

*Id.* at 3.

**b)   Ineffective Assistance of Counsel Standard**

Criminal defendants are guaranteed effective assistance of counsel under both the

United States and Texas Constitutions.  U.S. CONST. amend. VI; TEX. CONST. art I, § 10;

TEX. CODE CRIM. PROC. ANN. art. 1.051 (Vernon Supp. 2009); *Strickland v. Washington*, 466

U.S. 668 (1984); *see also Gideon v. Wainwright*, 372 U.S. 335 (1963) (extending

constitutional protections to the States via the Fourteenth Amendment).  In order to prove

ineffective assistance of counsel on appeal, the petitioner must establish that: (1) counsel's

performance fell below an objective professional standard of reasonableness; and (2) this

deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687-88; *Thompson v.*

*State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).  A counsel's performance falls below an

objective standard if counsel unreasonably failed to discover non-frivolous issues and to raise

them on appeal. *Smith v. Robbins,* 528 U.S. 259, 285 (2000).  A defendant suffers prejudice

if there was a "reasonable probability, that, but for his counsel's deficient performance, he

would have prevailed on his appeal." *Id.* at 285; *Jackson v. State*, 973 S.W.2d 954, 956 (Tex.

Crim. App. 1998) (en banc) (per curiam).  A reasonable probability "is a probability

sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Ouber v.*

*Guarino*, 293 F.3d 19, 25 (1st Cir. 2002) (defendant must show that "his attorney's parlous

conduct *may* have altered the outcome of the case.").

### c)   Appellate Counsel's Failure to Raise the Exclusion of Mitigation Evidence Fell Below an Objective Standard of Reasonableness

Appellate counsel's failure to brief or argue on appeal that Dr. Kelly Goodness should

have been permitted to present to the jury mitigation facts that she used to support her

opinions under Texas Rules of Evidence 703 and 705 was objectively unreasonable.  This

ineffective assistance was also evident in the failure of appellate counsel to argue that the

Eighth and Fourteenth Amendments required admission of this evidence.  A counsel's performance falls below an objective standard if counsel unreasonably failed to discover non-frivolous issues and to raise them on appeal. *Smith,* 528 U.S. at 285.  Appellate counsel is not obligated to raise and brief every issue but should raise those issues which are believed to have the best chance of success on appeal.[6] *Jones v. Barnes,* 463 U.S. 745, 751-53 (1983).  The presumption of effective assistance of counsel will be overcome when the ignored issues are clearly stronger than those presented by counsel on appeal. *See Smith,* 528 U.S. at 288 (quoting *Gray v. Greer,* 800 F.2d 644, 646 (7th Cir. 1986)); *see also Upchurch v. Bruce,* 333 F.3d 1158, 1164 n.3 (10th Cir.), *cert. denied,* 540 U.S. 1050 (2003) (stating that appellate counsel's omission of a "dead bang winner" argument can be a sufficient basis for claim of ineffective assistance of counsel, but omission of such an argument is not necessary to prevail on ineffective assistance claim).

That the trial court erred by excluding the mitigation facts that Dr. Kelly Goodness relied upon to support her opinion was not a frivolous issue.  Rather, it was one of the best issues for appeal-- an issue on which the defendant could have prevailed. *See infra* § IV.  Indeed, appellate counsel George Ashford testified at a hearing held before this Honorable Court on August 20, 2010 that this was a "primary issue for our appeal" and that there was no strategic reason for not raising it on appeal. [Writ Hearing, Aug. 20, 2010, Vol. 2, at 41].  Specifically, the following exchange occurred:

---

[6]Michael Mohammed filed responses to interrogatories concerning his representation of Halprin on appeal. He claimed he raised the best issues available on appeal.  This claim is obviously incorrect and is contradicted by George Ashford's testimony.

Q. Well, if you were right on the law that Judge Cunningham erred in not letting Kelly Goodness present the data and the facts supporting her mitigation conclusions, if you were right that the Judge erred in excluding that, then that would have been a good appellate issue, don't you think?

A. Absolutely.

Q. Mitigation being one of the hot topics that both the state and federal courts look at in evaluating death penalty review?

A. Absolutely.

Q. And so as you sit here there's no strategic reason why that was left out?

A. No.

. . .

Q. [D]id you ever have an opportunity as lead counsel to sit down with [Attorney Muhammed] and say, "This issue on the Judge's mitigation ruling really needs to be in the brief?"

A. I know I discussed with him the fact that in a capital murder case mitigation evidence should be admitted even if sometimes the Rules of Evidence have to be scurried. I had read that and researched that and told him that was *a primary issue for our appeal.*

[Writ Hearing, Aug. 20, 2010, Vol. 2, 39-41 (emphasis added)]. This argument was clearly

better than appellate counsel's assertions that the trial court erred in denying appellant's

challenge for cause as to various venire members. [*See* Tex. Ct. Crim. App. Brief, at 13-45].

In her affidavit, Dr. Goodness affirmed this belief that appellate counsel should have

appealed this issue. The jury should have learned of the facts and data underlying her

opinion. She averred:

I have been retained to conduct mitigation evaluations in more than 25 death penalty cases. Mr. Halprin's case was the first and only case, before or since, in which my testimony was so severely limited such that I was prevented from

giving meaningful or informative testimony. If this ruling is allowed to stand, all manner of experts will be prevented from providing testimony that is helpful to the triers of fact–which is contrary to my understanding of the spirit of the law in general and of death penalty law, in particular. The rulings in this case appeared to dismiss the importance of psychological jurisprudence. To do so only in this case and/or only in death penalty mitigation testimony as a whole, is the ultimate unfairness in my opinion.

[Goodness Aff. at 6].

Despite being a "primary issue for our appeal" and a winnable argument, appellate counsel did not raise this issue on appeal. When asked why he did not raise this issue on appeal, appointed appellate counsel responded, "I think [Attorney Muhammed] got forced to file a brief before he was fully prepared to submit the brief as to all of the issues that he would have liked to raise." [Writ Hearing, Aug. 20, 2010, Vol. 2, at 39].[7] In essence, appellate counsel testified he ran out of time to address the issue in his appellate brief. Appellate counsel had five and a half months to file his appeal. This was no excuse. His failure to raise this winning issue because he did not have enough time to address it is equivalent to filing no appeal at all. *See Roe v. Flores-Ortega*, 528 U.S. 470, 478-79 & 488 (2000) (holding counsel acts in a professionally unreasonable matter if movant asks counsel to file an appeal and counsel ignores this instruction).

In sum, it was objectively unreasonable for appellate counsel to not argue this "great"

---

[7] Appellate counsel further testified:
Now, once he started working on the brief he started at the beginning. He started with the jury selection and he raised all of the issues that he thought he could raise as to the jury selection. And then he kept getting notices from the Court of Criminal Appeals to submit the brief before he was ready to submit the brief. He submitted the issues that he had prepared. He tried to get an extension of time to submit additional issues. He tried to supplement the brief with additional issues and he was denied at the Court of Criminal Appeals.
[Writ Hearing, Aug. 20, 2010, Vol. 2, at 38-39].

issue. Moreover, the defendant had a better chance of winning this argument on appeal than the other issues he raised.

**d)   Defendant Suffered Prejudice from Appellate Counsel's Failure to Argue on Appeal that the Mitigation Expert Should have Been allowed to Present the Facts and Background Underlying her Opinion. Defendant Likely Would Have Prevailed on this Argument at the Court of Criminal Appeals and Have Been Granted a New Penalty Phase Trial.**

### A.   Defense Counsel Preserved Objection to Exclusion of Facts and Background Underlying Expert's Opinion

Defense counsel preserved his objection to the exclusion of the facts and background underlying the expert's opinion. To preserve an issue for appellate review, trial counsel must state the grounds with "sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A); *Reyna v. State*, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005). Trial counsel must also obtain a ruling from the trial court, either express or implicit, or a refusal by the trial court to rule on the request, objection or motion. *See* TEX. R. APP. P. 33.1.

After a *sub rosa* hearing to test Dr. Goodness's qualifications and opinions, the prosecution moved to prevent the doctor from "going into hearsay statements in her testimony." [RR 53, p.3]. The prosecution explained, "we feel that it would be prejudicial to the State for her to be allowed to go into all the details of this." [RR 53, p.4]. The prosecution continued, "Under 705[,] it's within your discretion after conducting a balancing test to exclude the hearsay." [RR 53, p.4]. The trial court then read the expert witness Rule 705(d) and told the witness, "You can say I conducted interviews, I reviewed thousands of records, and all this and my conclusion is. But don't volunteer any hearsay . . ." [RR 53,

p. 5-6]. In response, defense counsel stated:

> She's giving basically a kind of history and background of this particular defendant which kind of gives a guideline as to how he got to court today. And it's based on the interviews that she did with individuals and based on all the documents that she reviewed. And I mean, I'm sure if I asked her if she has an opinion as to whether he exhibits any psychopathic or sociopathic tendencies, she can give me that based on the tests that she's done and the interviews she's done. I'm going to ask her, you know, what is his personality like? What is that based on? I'm going to ask her if he had any significant problems early on in his life? What is that based on? Those types of questions, just kind of a history.

[RR 53, pp.7-8]. The prosecution's hearsay objection to defense counsel's proposed questions and presentation of Dr. Goodness's testimony was sustained. [RR 53, p. 8].

Defense counsel's statement clearly informed the court of the proposed testimony and was a specific objection to the exclusion of the facts or data underlying Dr. Goodness's opinion on direct examination under Rule 705, particularly when viewed in the context of the trial court's and prosecution's statements. *Cf. Montgomery v. State*, 810 S.W.2d 372, 387 (Tex. Crim. App. 1991) (stating that an objection to Rule 403 evidence "that such evidence is not 'relevant' . . . although not as precise as it could be, ought ordinarily to be sufficient under the circumstances to apprise the trial court of the nature of the complaint"). There is no question that defense counsel, through his statement, objects to the exclusion of all evidence underlying the expert's opinion. He states precisely what questions he plans to ask and how he plans to ask them. These questions go to the expert's opinion as well as the facts and data underlying her opinion. He is implicitly objecting to the trial court not applying Rule 703 and Rule 705 here. From the record, it is clear that neither the State nor trial court is at loss to understand that defense counsel is objecting to the exclusion of the facts and data

underlying the expert's opinion.

**B.    Trial Court Committed Reversible Error when It Barred Dr. Goodness from Presenting the Underlying Facts and Data upon which her Opinion Was Based.**

The trial court committed reversible error when it barred Dr. Goodness from presenting the underlying facts and data upon which her opinion was based.  In excluding these underlying facts and data, the trial court did not specifically apply the 705(d) balancing test.  Further, no court could have found that these facts and data, which originated from medical, CPS, school, adoption and prison records, as well as interviews, were "unfairly prejudicial" or that they would be used for "a purpose other than as explanation or support for the expert's opinion."  *See* TEX. R. EVID. 705(d).

The trial court qualified Dr. Goodness to testify during the punishment phase of the trial as an expert witness.  As an expert witness, she could testify in the form of an opinion as to any specialized knowledge she had gleaned that could "assist the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702.  Under Rule 703, an expert witness may base an opinion on facts or data that are not admissible in evidence, provided that the inadmissible facts or data are of a type reasonably relied upon by experts in the particular field. TEX. R. EVID. 703; *Morris v. State*, 123 S.W.3d 425, 428 (Tex. App.–San Antonio 2003, pet. ref'd.).  "Under this rule, an expert may base an opinion solely on inadmissible hearsay." *Wood v. State*, 299 S.W.3d 200, 212 (Tex. Ct. App.–Austin 2009); *see Martinez v. State*, 22 S.W.3d 504, 508 (Tex. Crim. App. 2000); 2 STEVEN GOODE ET AL., TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE § 703.3 (3d ed. 2002 & Supp.

2009).

Dr. Goodness based her opinion on interviews conducted with the defendant, defendant's family members and friends, as well as medical records, child protective services documents, adoption records, school records, court records, and prison records. [*See* Goodness Psych. Eval.; RR 52, pp. 89-138]. She also performed a number of psychological tests, such as the Weschler *Adult Intelligence Scale–Third Edition and the Repeatable Battery for the Assessment of* Neurophyschological Status. [Goodness Psych. Eval.; RR 52, pp. 122-23]. These records and tests are the type normally relied upon by an expert in the field of forensic psychology. *See Joiner v. State*, 825 S.W.2d 701, 708 (Tex. Crim. App. 1992); *In re E.C.L.*, 278 S.W.3d 510, 520 (Tex. Ct. App.–Houston [14th Dist.] 2009, pet. denied) (finding psychologist's testimony reliable where expert reviewed police records, CPS records, school records, and medical records). It did not matter whether or not they constituted hearsay. *Wood*, 299 S.W.3d at 212. Therefore, she should have been allowed to disclose them under Rule 703 just as she should have under Rule 705.

### 1.   Trial Court Erred in Not Applying Rule 705(d) or Stating Its Reasons to Exclude the Facts and Data Underlying Her Opinion

Under Rule 705, an expert witness may generally disclose on direct examination the facts or data underlying her opinion, even if they constitute hearsay. TEX. R. EVID. 705(a); *see Kramer v. Lewisville Memorial Hosp.*, 831 S.W.2d 46, 49 (Tex. App.–Fort Worth 1992, writ granted), *aff'd by*, 858 S.W.2d 397 (Tex. 1993), *abrogated on other grounds,* 979 S.W.2d 616 (Tex. 1998) ("While such supporting evidence is not automatically admissible because it *is* supporting data to an expert's opinion, neither is it automatically excludable

simply because it is hearsay." (emphasis in original)).  A disclosure of this information "enables the jury to evaluate the expert's opinion and ascertain the weight it wishes to attach to such testimony." *Ramirez v. State*, 815 S.W.2d 636, 650 (Tex. Crim. App. 1991) (noting this disclosure is extremely helpful and required on cross-examination).  The only limitation to an expert's disclosure is a finding by the court that the evidence is unfairly prejudicial or a danger exists that it will be used for an improper purpose.  TEX. R. EVID. 705(d). Specifically, Rule 705(d) states:

> When the underlying facts or data would be inadmissible in evidence, the court shall exclude the underlying facts or data if the danger that they will be used for a purpose other than as explanation or support for the expert's opinion outweighs their value as explanation or support or are unfairly prejudicial.  If otherwise inadmissible facts or data are disclosed before the jury, a limiting instruction by the court shall be given upon request.

TEX. R. EVID. 705(d).

There is a presumption in favor of the disclosure of underlying facts and data.  John F. Sutton, Jr., *Article VII: Opinions and Expert Testimony*, 30 HOUSTON L. REV. 797, 884 (1993) (stating that "both the direct examiner and cross-examiner normally have complete discretion in exploring the factual basis for the expert's opinion when they so desire").

Here, the trial court made no specific finding on the record that Dr. Goodness's proposed presentation of the facts and data underlying her opinion was unfairly prejudicial or that they would be used for "a purpose other than as explanation or support for the expert's opinion." *See* TEX. R. EVID. 705(d).  The trial court merely read Rule 705 to Dr. Goodness, declared that all of the documents she reviewed and interviews she conducted constituted

hearsay, and prohibited Dr. Goodness from discussing them during her testimony.[8] Rule 705, however, does not contemplate that facts and data underlying an opinion should be excluded just because they constitute hearsay. This belief is reflected in Texas case law. For example, in *Love v. State,* 909 S.W.2d 930 (Tex. App.–El Paso 1995), the Court of Appeals upheld the trial court's finding that a doctor could testify to specific hearsay statements made by the defendant's three sisters to explain how he arrived at a diagnosis of antisocial personality disorder. *Id.* at 948-49; *Austin v. State*, 222 S.W.3d 801, 812 (Tex. App.–Houston [14th Dist.] 2007) (affirming admission of summary of interview with defendant's husband's father by a psychologist was admissible because it showed the basis of the expert's opinion even though it constituted hearsay); *cf. Stam v. Mack*, 984 S.W.2d 747, 750-51 (Tex. App.–Texarkana 1999) (stating that evidence of opinion of non-testifying radiologist admissible during the testimony of a testifying expert in medical malpractice case over hearsay objection, as matter upon which doctor's expert based his opinion).

A trial judge must conduct a Rule 705(d) balancing test, preferably on the record, before excluding the facts and data underlying an expert's opinion. Failure to find specifically that these facts and data are "unfairly prejudicial" or that the danger "they will be used for a purpose other than as explanation or support outweighs their value as

---

[8]Specifically, the trial court stated:
Dr. Goodness, let me read you the law so you can begin to understand what they're talking about. The 705[(d)], balancing test. Limiting instructions. When the underlying facts or data would be inadmissible in evidence - - that's what they're talking about - - the Court shall exclude the underlying facts and data if the danger that they would be used for a purpose other than the explanation or support for the expert opinions outweighs their value and explanation for support or are unfairly prejudicial. Otherwise, inadmissible facts or data are disclose before the jury a limiting instruction by the Court shall be given.
[RR 53, p. 3].

explanation or support" is error. *See* TEX. R. EVID. 705(d); *Walck v. State*, 943 S.W.2d 544,

545 (Tex. App.–Eastland 1997, pet. ref'd) ("Because the testimony was inadmissible for any

purpose other than to explain or support [the expert's] opinion, Rule 705(d) mandated that

the trial court perform the balancing test provided for in the rule."). The trial court erred here

by making no specific finding that Dr. Goodness's proposed presentation of the facts and

data underlying her opinion was unfairly prejudicial or that they would be used for "a

purpose other than as explanation or support for the expert's opinion." *See* TEX. R. EVID.

705(d).

This error can be compared to a trial court's failure to conduct a Rule 403 balancing

test on the record. In *Montgomery*, the Court of Criminal Appeals held that "the trial judge

has no discretion as to whether or not to engage in the [Rule 403] balancing process."

*Montgomery*, 810 S.W.2d at 389 (quotation omitted). Under Rule 403, the trial court must

weigh whether the prejudice of the objected to evidence substantially outweighs the

probativeness of it. *Id.* at 388-89; TEX. R. EVID. 403. While *Montgomery* did not address

whether a trial court must conduct the Rule 403 balancing test on the record, federal case law

requires district courts to articulate all considerations that governed its decision on the record,

on pain of remand. *United States v. Zabaneh*, 837 F.2d 1249, 1263-65 (5th Cir. 1988);

*United States v. Robinson*, 700 F.2d 205, 213 (5th Cir. 1983), *cert. denied*, 465 U.S. 1008

(1983); *see Montgomery*, 810 S.W.2d at 393 n.4 (agreeing that "[a]ppellate review of the trial

court's balancing under Rule 403 would be facilitated by on-the-record articulation of the

considerations that governed the trial court's decision"). *But see Poole v. State*, 974 S.W.2d

892, 897 (Tex.App.–Austin 1998, pet. ref'd) (stating that Rule 403 does not require that the trial court perform a Rule 403 balancing test on the record).  The trial court here made no specific findings on the record that Dr. Goodness's proposed presentation of facts and data underlying her opinion was unfairly prejudicial or that they would be used for "a purpose other than as explanation or support for the expert's opinion."  Indeed, it does not appear that he even applied Rule 705(d).  This is reversible error.

### 2. The State Has Offered No Legitimate Reason Why The Facts and Data Underlying Dr. Goodness's Opinion Should Have Been Excluded

At no stage in this case has the State offered any reason why there was a danger that the facts and data underlying Dr. Goodness's opinion were "unfairly prejudicial" or that they would be used for an improper purpose.  The State has just repetitively asserted that this evidence which originates from adoption, school, CPS, court, and prison records as well as interviews constitutes hearsay.  At trial, prosecutor Shook referred to these records and interviews.[9] [RR 53, pp. 3-4].  He then argued:

> So I know under the rules she can rely and review all these documents and relying on hearsay documents to form an opinion, but we feel that it would be prejudicial to the State for her to be allowed to go into all the details of this

---

[9]  Specifically, Prosecutor Shook stated:
> Judge, obviously we object to her report, but we also object to the doctor going into hearsay statements in her testimony. Obviously, she can give opinions on things, but stuff, all her details about Mr. Halprin's abuse, there's no adoption records before the jury, there's none of that in the CPS records before the jury. Her interviews with Ann Lester, that woman hasn't testified. Mr. Halprin, he did not testify anything other than he was adopted.
>   And so we would object to any of those, that information coming before the jury because that would be hearsay, as well as other persons who have not testified. I believe she listed a few more family members, that sort of thing, or friends or relatives which obviously would be hearsay what she is relying on.
>   And also there are prison records she relies on in her evaluation and opinions that she cites and much of that is not before the jury and it's hearsay.
RR 53, pp. 3-4.

Applicant's Objections to Trial Court's Findings on Issue Raising Ineffective Assistance of Counsel on Appeal and Request That Court of Criminal Appeals Set Issue for Submission and Consideration - Page 24

2825

hearsay, since obviously we don't get an opportunity to cross-examine hearsay and flush out those issues. . . .

[RR 53, p. 4]. Prosecutor Smith then followed up with the assertion:

> Under 705 it's within your discretion after conducting a balancing test to exclude the hearsay for the reasons Mr. Shook just spoke of. We have no opportunity to confront those other parties that she has spoken to and supposedly made these statements to her. It's highly prejudicial and unfair to the State. They should call those witnesses, if they want to elicit that testimony and shouldn't do it through the doctor.[10]

[RR 53, p. 4]. In the State's Answer to the Original Application for Writ of Habeas Corpus, the State provided no further elaboration. [State's Answer to Orig. Appl. Writ Habeas Corpus, at 107]. The State asserted that the evidence constituted hearsay and, therefore, "the Court could have reasonably concluded:" 1) "a danger existed that the jury would consider the hearsay statements about applicant's purported abuse, psychological problems, etc. as substantive evidence;" or 2) "applicant did not have a strong need to present any hearsay evidence to the jury." [Id.].

The State's arguments offer no real reason why this evidence should be excluded. As previously stated, an expert can testify to hearsay to explain the facts and data underlying her opinion. See TEX. R. EVID. 703. Indeed, Rule 705(d) begins with this premise. TEX. R. EVID. 705(d) ("When the underlying facts or data would be inadmissible in evidence, the court shall exclude the underlying facts or data if . . ."). Therefore, based upon the plain language, the State cannot argue that the prejudice it will suffer is that it cannot cross-examine the witnesses who Dr. Goodness interviewed. See In re Commitment of Yaw, No.

---

[10]To the extent that the state is relying on a confrontation right to exclude this evidence, it should be noted that the U. S. Constitution right to confrontation does not apply to the state.

09-08-042 CV, 2008 WL 5096511, *1-2 (Tex. App.–Beaumont, Dec. 4, 2008) (unpublished) (rejecting implicitly that expert cannot read passages from police and prison records to jury because these records constitute hearsay). In any event, the State interviewed all of the witnesses that Dr. Goodness spoke to and reviewed all of the underlying records. The State could have impeached the information she provided if it varied from their discovery. There were no surprises. Further, the evidence was not "unfairly prejudicial" and would not have been used for an improper purpose as argued below. If the State has a real reason why it believed the facts and data underlying Dr. Goodness's opinion should be excluded, now would be a good time to state this reason.

3. **No Trial Court Could Have Found Facts and Data Underlying Dr. Goodness's Opinion "Unfairly Prejudicial" or that They Would Be Used for an Improper Purpose under Rule 705(d)**

The trial court could not have found that the facts and data underlying Dr. Goodness's opinion were "unfairly prejudicial" or that "the danger that they will be used for a purpose other than as explanation or support for the expert's opinion outweighs their value as explanation or support." TEX. R. EVID. 705(d). Evidence is unfairly prejudicial if it is not directly related to the issue to be decided and is so inflammatory that it will cause the jury to render a verdict on an improper basis. *State v. Resendiz*, 112 S.W.3d 541, 544-45 (Tex. Crim. App. 2003) (holding photographs of six other brutal murders perpetrated by defendant that expert offered to show defendant insane unfairly prejudicial because they did not answer whether defendant insane at the time he committed this murder and would distract the jury from the facts of the crime). Evidence is improper if it will be used as substantive evidence

rather than as an explanation or support for the expert's opinion. *See Valle v. State*, 109 S.W.3d 500, 505-06 (Tex. Crim App. 2003).

Here, the facts and data underlying Dr. Goodness's opinion were not unfairly prejudicial. These facts and data included primarily adoption, school, CPS, court, and prison records as well as interviews with the defendant and the defendant's relatives and friends – the authenticity and reliability of which could not possibly be at issue. Indeed, these are the type of records upon which forensic psychologists typically rely. *See Joiner*; 825 S.W.2d at 708; *In re E.C.L.*, 278 S.W.3d at 518 (same). More importantly, they were not inflammatory. Distinct from the photographs of six different murder scenes offered in *Resendiz* to show the defendant was mentally insane, the testimony Dr. Goodness proposed to offer would not confuse or mislead the jury about the issue at hand. *Resendiz*, 112 S.W.3d at 544-45. Rather, these records and interviews spoke directly to the issue to be decided during the punishment phase of Halprin's trial: whether any mitigating factors existed militating a sentence of life imprisonment rather than death. The jury could not misinterpret this evidence and or use it for an improper purpose.

Similarly, the defense did not propose to offer parts of these interviews and records as more than explanation or support for the expert's opinion. This case is distinct from *Davis v. State*, 268 S.W.3d 683 (Tex.App.–Fort Worth 2008 ), where the trial court upheld the exclusion of the defendant's hearsay statements to a detective that he received a gash to his neck while defending himself from the murder victim. *Id*. at 701-02. In *Davis*, the defendant admitted that the value of his statement was not to "expla[in] or support" the detective's

opinion that the defendant had inflicted the gash himself but rather to advance his own self-defense claim. *Id.* at 702. Rather, here the facts and data that Dr. Goodness proposed to present were meant to support her opinion that mitigating factors existed as to why Halprin did not deserve to die.

The State cites *Valle v. State*, 109 S.W.3d 500 (Tex. Crim. App. 2003) and *Walck v. State*, 934 S.W.2d 544 (Tex. App.–Eastland 1997, pet ref'd) to justify the exemption of the facts and data underlying Dr. Goodness's opinion. These cases, however, are not comparable to the case at bar. In *Valle*, the Texas Court of Criminal Appeals held that the trial court did not abuse its discretion in ruling a mitigation expert could not play a videotaped interview with the defendant's mother as a basis for his expert opinion under Rule 705(d). *Valle*, 109 S.W.3d 505-07. The Court's concern was that the jury would have considered the interview as substantive evidence and not as the basis of the expert's opinion. *Id.* at 506. Here, Dr. Goodness did not attempt to introduce any video recordings of interviews with the defendant's friends or relatives. Dr. Goodness just tried to explain the facts and data underlying her opinion. In *Valle*, the expert was able to present "significant information" conveyed by his mother concerning the defendant's childhood in Cuba in the interview. *Id.* The mitigation expert testified that the defendant as a child in Cuba:

> (1) was exposed to a mother who had multiple sex partners, (2) witnessed abuse of his mother by various men . . . , (3) witnessed her being forced into various sexual acts, (4) was beaten multiple times and was forced to kneel on sharp objects, (5) suffered from severe poverty, (6) suffered severe anxiety attacks after overhearing his mother being sodomized by one of the men, (7) began to have behavioral problems after his father left Cuba, (8) wet his bed until the age of eleven or twelve, and (9) desperately wanted to come to the United States to be reunited with his father.

*Id.* at 506-07. The mitigation expert also was allowed to play the videotaped interview without sound so that the jury could witness the defendant's living conditions in Cuba. *Id.* at 507. As in *Valle,* the mitigation expert here should have been allowed to present the facts and data underlying her opinion that she gleaned from interviews with the defendant's relatives and friends and from reliable records. There was no concern that the jury would consider these facts as substantive evidence and not as the basis of the expert's opinion. They also were not unfairly prejudicial because they were nothing more than evidence of Halprin's childhood, the abuse and neglect he suffered, and psychological condition at trial.

This case is also distinct from *Walck.* In *Walck,* an appellate court held that the trial court acted within its discretion in excluding the defendant's hearsay statements to a psychological expert about his version of the murder. *Walck,* 943 S.W.2d at 544-46. The psychologist would have testified that in his opinion the defendant "killed the victim while acting in response to sudden passion provoked by adequate cause." *Id.* at 544. The court found this testimony to be "self-serving," particularly because the defendant did not testify at trial. This case does not relate to the instant case. *Id.* at 545. In comparison, here Halprin testified at trial about the offense and was subject to cross-examination. Further, Dr. Goodness did not rely upon any *ex parte* description of the offense by Halprin in reaching her opinion. Her proposed testimony spoke to how the defendant's background and psychological makeup contributed to the choices that brought him before the court. [*See* RR 53, p. 19].

This case is similar to *Love,* in which the trial court permitted the expert to repeat

Applicant's Objections to Trial Court's Findings on Issue Raising Ineffective Assistance of Counsel on Appeal and Request That Court of Criminal Appeals Set Issue for Submission and Consideration - Page 29

2830

information provided by the appellant's family as the basis for his opinion that the defendant

suffered from antisocial personality disorder. *Love,* 909 S.W.2d at 948.  It also resembles

*In re Commitment of Tolleson,* No. 09-08-00338-CV, 2009 WL 1474730 (Tex.

App.–Amarillo, May 23, 2009) (not designated for publication) and *Austin,* 222 S.W.2d at

812. In *Tolleson,* an appellate court held that "the trial court acted within its discretion in

concluding that the underlying facts and data [presented by an expert witness] were not

unfairly prejudicial and that the danger of improper use did not outweigh the value of the

facts or data as explanation or support for the expert's opinion." *Id.* at *5.  These facts

included details about the defendant's prior sexual convictions, juvenile convictions,

disciplinary history, and mental well being. *Id.* at *4.  These facts were based upon an

interviews with Tolleson, psychological tests, medical, court, and prison records. *Id.* at *2.

Similarly, in *Austin,* an appellate court affirmed the admission of an expert psychologist's

summary of an interview with the defendant's husband's father.  This summary showed the

basis of the expert's opinion that the defendant suffered from Manchurian Syndrome. *Austin,*

222 S.W.2d at 812.  The expert testified that the defendant lied repetitively, would try to

draw attention to herself, and made her child sick to further attract attention – all signs of

Manchurian Syndrome. *Id.*  In upholding the admission of these facts, the appellate court

stated that "disclosing this information assisted the jury in evaluating the weight to give the

[psychologist's] opinions. *Id.* (citing *Ramirez,* 815 S.W.2d at 651).  The court rejected the

idea that these statements were too prejudicial or that their risk did not outweigh their value

as explanation and support for the psychologist's opinion.

No court could have found that the facts and data underlying Dr. Goodness's opinion were unfairly prejudicial or that their risk outweighed their value as explanation. They would have added value to Dr. Goodness's testimony and have helped the jury to understand Halprin. A presentation of an expert's opinion absent context is uninformative and cannot meaningfully assist the triers of fact in understanding the evidence. Likewise, a mere accounting of facts absent a framework in which to understand their importance is equally unhelpful. A trier of fact must be entrusted with the bases for an expert's opinion in order that he may judge the validity and relative weight of that opinions. An expert's assertion without foundation flies in the face of the law and, in fact, transforms expert testimony into the ultimate hearsay. Without awareness of this foundation, triers of fact are left with little choice but to assign trivial weight to the expert's opinions or disregard the opinion altogether.

Even if the trial court had some misguided concern that Dr. Goodness's testimony to the facts and data underlying her opinion might be "unfairly prejudicial" or would be used for an improper purpose, the court could have given a limiting instruction. Indeed, Rule 705(d) contemplates a limiting instruction. *See* Tex. R. Evid. 705(d) ("If otherwise inadmissible facts or data are disclosed before the jury, a limiting instruction by the court shall be given upon request."); *Depena v. State,* 148 S.W.3d 461, 470 n.10 (Tex. App. – Corpus Christi 2004, no pet.). Courts generally find a limiting instruction preferable to exclusion. "Usually . . . a limiting instruction will suffice to negate the danger that the jury will improperly consider the inadmissible hearsay for its substantive purposes and . . . Rule

705(d) requires that one be given upon timely request." *Resendiz*, 112 S.W.3d at 552.

Finally, the trial court has a constitutional duty to allow the defendant to present mitigation evidence at the punishment phase of a capital case. *Williams v. Taylor*, 529 U.S. 362, 393 (2000). The importance of mitigating evidence stems from "the unique and irreversible penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 287 (1976) (plurality opinion). In *Woodson*, the Court reasoned:

> In capital cases, the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensible part of the process of inflicting the penalty of death.
>
> This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Id.* at 304-05 (citations and quotations omitted).

To the extent that the trial court has discretion in the admission or exclusion of mitigating evidence, precedent weighs heavily in favor of admission. In *Barefoot v. Estelle*, 463 U.S. 880 (1983), the Supreme Court opined that "[t]he rules of evidence generally extant at the federal and state levels anticipate that relevant, unprivileged evidence should be admitted and its weight left to the fact finder, who would have the benefit of cross examination and contrary evidence by the opposing party." *Barefoot*, 463 U.S. at 898; *United States v. Jones*, 132 F.3d 232, 242 (5th Cir. 1998), *aff'd by*, 527 U.S. 373 (1999) ("The Court has recognized that the defendant must be given the opportunity to introduce

information regarding mitigating factors, without traditional evidentiary restraints, in order to provide the jury with the fullest possible information about the defendant."). Indeed, in *Green v. Georgia*, 442 U.S. 95 (1979) (per curiam), the Supreme Court held that exclusion of proferred testimony at the sentencing phase under the state hearsay rule violated due process because testimony went to a critical issue and substantial reasons existed to assume its reliability. *Id.* Similarly, in *Wiggins v. Smith*, 539 U.S. 510 (2003), the Court agreed that trial courts should exercise their discretion to admit "any relevant and reliable mitigating evidence, including hearsay evidence that might not be admissible in the guilt-or-innocence phase of the trial." *Id.* at 536-37; *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) (rejecting explicitly the argument that the need for mitigation evidence may be trumped by state rules of evidence).

Against this background, the trial court should not have even questioned admitting the facts and data underlying the expert's opinion. Due process and the Eighth Amendment favor their admission. As stated above, the facts and data underlying Dr. Goodness's opinion came from adoption, CPS, school, jail, and legal records that all were all in the possession of the State and many of which the State provided the defense in discovery. Other evidence came from witnesses who both Dr. Goodness and the State interviewed. The State did not argue at trial this evidence was unreliable or untrustworthy. This evidence should have come in at trial under Rule 705(d), if not the Eighth Amendment to the U.S. Constitution.

The defendant suffered prejudice because the trial court did not allow the expert to explain the facts and data underlying her opinion. Her testimony was gutted. The jury did

not have the opportunity to learn the following critical information: (1) Halprin's assault on a child reflected the physical abuse he suffered as a child; (2) he was emotionally and physically abused as a child; (3) he had a genetic vulnerability for mental disorders and substance abuse; (4) he suffered from a number of psychological disorders as well as untreated depression, and drug abuse; (5) he had an unfulfilled need for absolute acceptance and unconditional love; (6) there was a complete absence of guidance in his life, and he had a strong unfulfilled need to belong. [*See generally* Goodness Psych. Eval.]. Without a full presentation of this evidence, the mitigation defense that the Court allowed Mr. Halprin was gravely inadequate and represents a judicial nullification. Had Halprin been able to present a full mitigation defense with all of these details, there is a strong possibility that a jury would have not rendered a death sentence. *See Neal v. Pucket,* 286 F.3d 230, 244 (5th Cir. 2002), *cert. denied,* 537 U.S. 1104 (2003) (stating "we must assign significant weight to the quality of additional mitigating evidence" in determining if "there is a reasonable probability that a jury would not have been able to agree unanimously to impose the death penalty if this additional evidence had been effectively presented and explained to the jury).

e)      **Conclusion**

Appellate counsel provided constitutionally deficient representation because he failed to raise the trial court's exclusion of mitigation evidence on appeal. Because the Court of Criminal Appeals would have found that the trial court wrongly excluded mitigation evidence, there can be no confidence in the outcome of Halprin's appeal. This is an important issue that deserves a full review by this court. For this reason, Halprin requests

that the court set this issue for submission and full consideration by the court.

Respectfully submitted,

GARY A. UDASHEN
State Bar of Texas No. 20369590

BRUCE ANTON
State Bar of Texas No. 01274700

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas  75201
214-468-8100
214-468-8104 fax

ATTORNEYS FOR APPLICANT

## CERTIFICATE OF SERVICE

On this _____ day of January, 2012, a true and correct copy of the foregoing Applicant's Objections to Trial Court's Findings and Request That Court of Criminal Appeals Set Issue for Submission and Consideration was delivered to Lisa Smith, Assistant District Attorney, 133 N. Riverfront Blvd., L.B. 19, Dallas, Texas 75207.

GARY A. UDASHEN

Applicant's Objections to Trial Court's Findings on Issue Raising Ineffective Assistance of Counsel on Appeal and Request That Court of Criminal Appeals Set Issue for Submission and Consideration - Page 35

2836

NO. W01-00237-T(A)

EX PARTE

§
§
§
§
§

IN THE CRIMINAL DISTRICT

COURT NUMBER SEVEN

RANDY ETHAN HALPRIN

DALLAS COUNTY, TEXAS

## EXHIBIT A

This exhibit is a copy of the Findings of Fact and Conclusions of Law signed by the

trial court with handwritten notations showing the differences between the trial court's

findings and the state's Proposed Findings of Fact and Conclusions of Law.

Respectfully submitted,

GARY A. UDASHEN
State Bar of Texas No. 20369590

BRUCE ANTON
State Bar of Texas No. 01274700

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas  75201
214-468-8100
214-468-8104 fax

ATTORNEYS FOR APPLICANT

2837

## CERTIFICATE OF SERVICE

On this ___27___ day of January, 2012, a true and correct copy of the foregoing Exhibit A was delivered to Lisa Smith, Assistant District Attorney, 133 N. Riverfront Blvd., L.B. 19, Dallas, Texas 75207.

GARY A. UDASHEN

2838

W01-00327-Y(A)

| EX PARTE | § | IN THE CRIMINAL DISTRICT |
|---|---|---|
| | § | |
| | § | COURT NUMBER SEVEN |
| | § | |
| RANDY ETHAN HALPRIN | § | DALLAS COUNTY, TEXAS |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having considered (1) the original application for writ of habeas corpus, (2) the "amended" application for writ of habeas corpus, (3) numerous supplemental defense pleadings, (4) the State's response to the original application, (5) the State's objection to the amended application for writ of habeas corpus, (6) affidavits and interrogatory answers of numerous individuals, (7) testimony and documentary evidence offered at writ hearings conducted on May 22-23, 2008, August 20, 2010, September 30, 2010, November 12, 2010, and January 14, 2011, (8) official court documents and records, and (9) the Court's personal experience and knowledge, the Court makes the following findings of fact and conclusions of law:

## BACKGROUND FACTS

(1)  The Court finds that Applicant escaped from the Connally Prison Unit on December 13, 2000 with six other inmates: George Rivas, Donald Newbury, Michael Rodriguez, Joseph Garcia, and Patrick Murphy. In the escape, the group assaulted several guards and civilian prison employees, stole numerous firearms, and fled to Dallas, Texas, committing two armed robberies along the way to finance their flight. (RR44: 118-23; RR48: 7-10).

(2)  The Court finds that, on Christmas Eve 2000, Applicant and his fellow escapees robbed the employees of the Oshman's store in Irving, Texas, stealing firearms, ammunition, and other merchandise, as well as $70,000 in cash. While fleeing from the Oshman's robbery, the escapees shot and killed Irving Police Officer Aubrey Hawkins, stole his firearm, pulled him from his squad car, and then ran him over as they fled in a Ford Explorer they stole from one of the store's employees. (RR41: 63-123, 163-79; RR43: 3-19; RR44: 34-60).

(3)  The Court finds that, nearly a month later, all seven escapees were discovered in Colorado. Six of them, including Applicant, were apprehended; the seventh escapee committed suicide to avoid recapture. Applicant and four of the other surviving escapees gave written statements to police upon capture. (RR42: 28-43, 84-85; RR45: 7-19, 47-62).

1

2839

(4)     At the time of the escape, Applicant was serving a 30-year sentence for the offense of injury to a child. Applicant savagely beat the toddler son of a woman he was dating. (RR 47: 100-02, 105, 108; RR 48: 78-83; RR 49: 197-98, 205; RR 50: 126-29; State's Exs. 941-949).

## PROCEDURAL HISTORY

(5)     The Court finds that, on June 12, 2003, Applicant was sentenced to death for the December 24, 2000, capital murder of Irving Police Officer Aubrey Hawkins. (CR: 48).[1] On June 29, 2005, the Court of Criminal Appeals affirmed Applicant's conviction and sentence on direct appeal. *Halprin v. State*, 170 S.W.3d 111 (Tex. Crim. App. 2005). On September 14, 2005, the Court denied Applicant's motion for rehearing, and on September 21, 2005, the Court issued its mandate.

(6)     The Court finds that, on April 6, 2005, Applicant timely filed his original application for writ of habeas corpus. This Court granted the State one statutorily authorized 90-day extension of time, and the State timely filed its answer on October 3, 2005.

(7)     In the fall of 2007, the Court determined that some controverted, previously unresolved factual issues material to the legality of Applicant's confinement existed. Between the fall of 2007 and October 2010, the Court ordered additional evidence gathered on Applicant's *Brady* and ineffective assistance claims by way of written interrogatories of numerous individuals and testimony from three of Applicant's codefendants, his trial and appellate counsel, the trial prosecutors, and a Texas Ranger.[2]



(8)     **The Court incorporates into these findings an inventory of the extrinsic evidence presented to the Court in the course of these writ proceedings. *See* Appendix A.**

## SUBSEQUENT WRITS

(9)     The Court finds that Applicant filed a pleading entitled, "Amended Application for Writ of Habeas Corpus Pursuant to Art. 11.071 Tex. Code Crim. Proc. (Supersedes Previous Application)" on April 27, 2005.

---

[1] Former Presiding Court Judge Vickers Cunningham presided over Applicant's trial and these writ proceedings until 2006, when he left the bench.

[2] Current Presiding Judge Rick Magnis presided over these writ proceedings from 2007 until his recusal in January 2011. *See* (1/14/11 Hrg) RR: 4-148; Recusal Order (dated 1/20/11).

2

2840 

(10)    The Court finds that Applicant also filed numerous other pleadings, including the following:

    (a)    "Supplemental Authority in Support of Application for Writ of Habeas Corpus" (filed 6/24/05);

    (b)    "Supplemental Brief in Support of Amended Application for Writ of Habeas Corpus Pursuant to Art. 11.071 Tex. Code Crim. Proc." (filed 10/7/05);

    (c)    "Additional Arguments in Support of Ineffective Assistance of Counsel and Suppression of Exculpatory Evidence Arguments in Application for Writ of Habeas Corpus" (filed 8/20/10);

    (d)    "Brief in Support of Argument on Ineffective Assistance of Counsel on Appeal in Application for Writ of Habeas Corpus" (filed 9/14/10);

    (e)    "Brief in Support of Argument that Exclusion of the Ranking Document Was Harmful to Halprin's Mitigation Defense" (filed 9/27/10);

    (f)    "Brief in Support of Argument Concerning Ineffective Assistance of Counsel for Failure to Present Mitigating Evidence" (filed 9/30/10);

    (g)    "Applicant's Additional Brief on Mitigating Evidence Jury Did Not Hear" (filed 10/21/10);

    (h)    "Brief in Support of Argument Concerning Exculpatory Evidence" (filed 11/3/10); and

    (i)    "Brief in Support of Argument Concerning Officer's Knowledge of Exculpatory Evidence" (filed 2/22/11).

(11)    Under article 11.071, section 5(f), any amended or supplemental application not filed by the due date for the original writ application must be treated as a subsequent writ application. TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5(f) (Vernon Supp. 2010).

(12)    The Court finds that any amendment or supplement to Applicant's original application was due by April 7, 2005, the deadline for filing the original application.

(13)    To the extent Applicant's "Amended Application" and other supplemental pleadings raise a claim not alleged in the original writ application filed on April

2841

7, 2005, the Court finds and notes that those pleadings constitute a subsequent application under article 11.071, section 5, and the Court forwards the same to the Court of Criminal Appeals for its determination of whether Applicant has met section 5's requirements for issuance of a subsequent writ. TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5(a) & (b) (Vernon Supp. 2010).

## Grounds 1 & 30: Enmund/Tison

(14) Relying on *Enmund v. Florida*, 458 U.S. 782 (1982) and *Tison v. Arizona*, 481 U.S. 137 (1987), Applicant claims his death sentence is disproportionate to his crime and, thus, violates his Eighth Amendment right against cruel and unusual punishment because no reasonable juror could find he possessed a culpable mental state sufficient to render him death eligible. Specifically, he claims the evidence did not support a finding that he either intended Officer Hawkins' death or exhibited a reckless disregard for human life and played a major role in the crime. Furthermore, he claims a finding by the jury on the second special issue[3] that he anticipated a human life would be taken does not constitute a finding that he acted with a reckless disregard for human life. Therefore, Applicant claims he is not eligible for the death penalty.

### I. CLAIMS PROCEDURALLY BARRED

### A. Claims Not Raised at Trial

(15) The Court finds that Applicant failed to present these claims to the Court at trial.

(16) Under Texas law, the failure to object at trial generally waives the error for collateral review. *Ex parte Pena*, 71 S.W.3d 336, 338, n.7 (Tex. Crim. App. 2002); *Ex parte Bagley*, 509 S.W.2d 332, 333-334 (Tex. Crim. App. 1974) (holding that the appellate rule requiring a trial objection also applies in habeas cases).

(17) The Court finds that, at trial, Applicant only facially challenged the constitutionality of the anti-parties special issue, arguing that a finding that an accused anticipated the taking of a human life was not a mental state sufficient to warrant a death sentence. Applicant never raised the claim that the evidence is insufficient to show that *he* possessed the requisite mental state to render him death eligible under the Eighth Amendment. Likewise, he never raised the claim that the anti-parties special issue was unconstitutional as applied to him.

---

[3] The second or "anti-parties" special issue, as set out in article 37.071, § 2(b)(2) in the criminal procedure code, reads as follows: "whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken." TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(b)(2) (Vernon Supp. 2010).

2842

Applicant could have raised both of these claims in a motion for new trial, but did not. (CR: 60).

(18)   Because Applicant did not avail himself of the prior opportunity to present his claims to this Court, the Court concludes that collateral review of Applicant's first and thirtieth grounds for relief are procedurally barred and should be dismissed.

## B. Claims Not Raised on Direct Appeal

(19)   The Court finds that Applicant also failed to raise these claims on direct appeal.

(20)   Habeas corpus will not lie as a substitute for direct appeal. *Ex parte Townsend*, 137 S.W.3d 79, 81 (Tex. Crim. App. 2004). Even a constitutional claim is forfeited if Applicant had the opportunity to raise it on appeal and did not. The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id.*

(21)   The Court finds that nothing prevented Applicant from raising these claims on direct appeal, and that Applicant presents no evidence in support of these claims that was not already part of the appellate record.

(22)   The Court finds that Applicant's first and thirtieth grounds for relief are an improper attempt to use the writ as a substitute for appeal.

(23)   Therefore, the Court concludes that Applicant's first and thirtieth grounds for relief are procedurally barred and should be dismissed. *Id.*

## II. APPLICANT IS DEATH ELIGIBLE UNDER THE EIGHTH AMENDMENT

(24)   Alternatively, the Court finds that Applicant's contentions are meritless and should be denied.

(25)   The Court finds that Applicant's death sentence is not disproportionate to his crime. Thus, the Court concludes Applicant's sentence does not constitute cruel and unusual punishment.

(26)   Furthermore, the Court finds that, by their affirmative answer to the second special issue, the jury found that Applicant possessed a culpable mental state sufficient to render him death eligible.

(27)   Under the Eighth Amendment, a party to a felony during which a murder is committed is eligible for the death penalty if he himself killed, attempted to kill, intended to kill or intended that lethal force be used, or acted with a reckless indifference to human life and was a major participant in the underlying felony.

5

2843

*Tison*, 481 U.S. at 158; *Enmund*, 458 U.S. at 797.

(28)   Applicant contends a reasonable juror could only conclude from the evidence that he had no involvement in the shooting of Officer Hawkins, that he played a minor role in the Oshman's robbery, and that he justifiably believed no one would be hurt.

(29)   The Court finds the evidence shows that Applicant was a major participant in the robbery and the murder. The record is replete with evidence that reflects Applicant's intent to kill and his reckless indifference to Officer Hawkins's life. There is even evidence from which the jury could conclude that Applicant himself fired a lethal shot.

## A. Evidence Sufficient to Prove Requisite Culpability

(30)   The Court finds the evidence shows that a lethal confrontation with Officer Hawkins in the loading dock behind the Oshman's was fully expected and planned for by every member of the Texas Seven, including Applicant. When Applicant escaped from prison, he and the other escapees became the subject of a massive police manhunt, making a future confrontation with police virtually inevitable. (RR42: 27; RR44: 119; RR48: 3-6). They prepared for such confrontation before they even left the Connally Unit by stealing a small arsenal of firearms and ammunition. (RR44: 119-23; Defense Exs. 24-27). By arming themselves in this manner and by using physical violence and threatening to kill their prison hostages, all of them, including Applicant, evinced their willingness to use lethal force to avoid recapture. Moreover, by his own admission, Applicant left a threatening note on his prison bunk ("Believe me, you have not heard the last of us."), indicating that he personally planned to commit some future act of violence. (RR48: 123-27; State's Ex. 955).

(31)   The Court finds that Applicant and the others also tactically prepared for a confrontation with police by equipping themselves with two-way radios, a police scanner, and police frequency publications. They used this equipment during the Oshman's robbery to monitor the response of the Irving Police Department and warn each other of the arrival of Officer Hawkins, giving themselves a lethal advantage. (RR46: 27-30, 45-46; RR48: 8, 13, 16-17; State's Ex. 341-A; Defense Exs. 24-27). The use of lethal force during the robbery was clearly contemplated by everyone. Applicant and five of his fellow escapees entered the store, each carrying a loaded gun, and drew them on the employees. (RR41: 86-87; RR48: 14, 136). Murphy, the group's lookout, did not enter the store, but was armed with several weapons and planned to initiate a firefight if necessary. (Defense Ex. 24). Moreover, they all loaded their weapons with ammunition that they had modified so that it would inflict greater injury. (RR46: 86-89).

2844

(32)     At trial and in his application, Applicant insists that none of the escapees wanted or planned for anyone's death. He claims their preparations were intended to prevent a lethal confrontation, not guarantee one. He notes that no one was injured or killed by any of them in the two robberies they committed before the Oshman's robbery. He also notes that, before his incarceration, Rivas had committed numerous robberies in which he injured no one.

(33)     Alternatively, Applicant attempts to set himself aside from the other escapees. He denied violently assaulting and threatening prison employees Allen Camber and Mark Burgess and maintained the note he left behind was not a threat of future violence. He also denies any lethal intent behind carrying the loaded gun into the Oshman's, claiming he reluctantly armed himself on the night of the shooting, that the lethal force used against Officer Hawkins was unforeseen by him, and that he never pulled his weapon, much less fired it at Hawkins.

(34)     The Court finds Applicant's assertions are not credible. They are predicated in large part on his own trial testimony, the credibility of which was severely impeached on cross-examination. (RR48: 58-168; RR49: 3-24, 50-52). Moreover, other facts and circumstances also significantly impugn Applicant's denials of an intent to kill and knowledge that lethal force would be used.

(35)     The record reflects that all of the escapees were convicted felons, most of whom were convicted for committing violent offenses. Rodriguez and Garcia were convicted murderers, Rivas and Newbury were convicted robbers, and Harper and Murphy were convicted rapists. Applicant admits he was aware of the criminal history of some of these men before the escape, and learned of the others afterwards. (RR48: 109-10, 119-21). Moreover, he witnessed them violently assault several prison employees during the escape. (RR48: 114-15, 119-20). Thus, if Applicant had any doubts about their violent nature before the escape, he could have had none afterwards. Yet, he voluntarily stayed with them and participated in the Radio Shack and Oshman's robberies. (RR48: 118-19, 134-36).

(36)     The record also reflects Applicant's own capacity to use lethal force. Applicant was an admitted child abuser who viciously kicked and beat a toddler, breaking both his arms and legs, fracturing his skull, rupturing his eardrum, severely bruising his eye, and burning his tongue with a cigarette. (RR48: 77-93; RR49: 123, 134-35, 161, 168-72; State's Exs. 941-947).

(37)     Even if the prior conduct of Applicant and the other escapees could be interpreted as supporting Applicant's denials of lethal intent, the Court finds that their conduct following Officer Hawkins's arrival in the loading dock can only be subject to one interpretation. The escapees killed Hawkins in a barrage of gunfire, firing at least five, maybe more, guns at him and inflicting eleven

2845

gunshot wounds, several of which were lethal. (RR44: 42-53, 59-60). As Applicant acknowledged during his trial testimony, the clear intent of the shooting was to kill Hawkins. (RR48: 162-63).

(38)   The Court finds Applicant did nothing to disassociate himself with the killing. Although the opportunity arose, he did not flee before Hawkins's arrival in the loading dock. Instead, he remained with the other escapees for three more weeks, during which time he took his share of the proceeds from the robbery and continued to arm himself. At trial, Applicant testified that the others kept watch over him after the shooting, never leaving him alone. But he denied that he was kept against his will and insisted that he planned to leave once he obtained a fake I.D. *Deleted last part of sentence of ST FoF; p.12 #39*

(39)   The Court finds that Applicant did not attempt to surrender without a fight. (RR48: 149). And although armed and present in the loading dock when Hawkins arrived, he did not say or do anything to prevent the shooting. (RR48: 21-22, 154). Instead, the evidence showed that he joined in Hawkins's murder. *Reworded STS FoF #40*

(40)   Applicant maintains he never drew his weapon, much less fired it, but the Court finds the evidence shows otherwise.

(41)   The Court finds the physical evidence definitively linked five of the stolen TDCJ guns to the shooting. However, the escapees stole several other guns from TDCJ, and the police recovered numerous unidentifiable bullet fragments at the scene, any one of which could have been fired from a sixth gun. (RR46: 94-95, 99, 126). None of the six escapees present in the loading dock was armed with more than one gun, and Officer Hawkins never fired a shot. (RR42: 26-27; RR43: 66-67; RR47: 59). Thus, fragments from a sixth gun would mean Applicant had to have fired his own weapon during the shooting.

(42)   The Court finds that even if only five guns were fired during the shooting, the evidence supports the conclusion that Applicant fired one of them. In particular, the evidence shows it was Applicant who fired the handful of shots into the passenger side of Hawkins's patrol car. By his own testimony, Applicant put himself on the passenger side of the patrol car during the shooting. At trial, Applicant drew a diagram depicting the location of the patrol car in relation to the stolen Ford Explorer and the stairs to the store's rear exit. (State's Ex. 965). Using this diagram to explain his and his codefendants' movements, Applicant testified that, once the shooting started, he ran around or behind the Explorer and headed for the field behind the store, stopping at a "grassy embankment" where he was shot in the foot. (RR47: 19-24; RR48: 154-60). Applicant could not have run around or behind the Explorer and into the "grassy embankment" he described without also running to the passenger side of the patrol car.

8

2846

(43)   Applicant claims such an interpretation of his testimony can only be accomplished by taking liberties with the trial record, which he claims is ambiguous. While a live record of Applicant's testimony may depict his location during the shooting with greater clarity, the Court finds that the record is not ambiguous on this point.

(44)   The record reflects that Officer Stephen Hazard documented the location of Hawkins's patrol car, the Explorer, and the grassy areas behind the store. Although there is more than one grassy area behind the store, Hazard's photographs and diagram of the scene clearly show that all of these grassy areas were located on the passenger side of the patrol car. (State's Exs. 56-57, 73, 173). Furthermore, as Hazard documented, the patrol car and Explorer were facing the same direction. (RR43: 37-46; State's Exs. 174, 174-B, 187, 864). Thus, if as Applicant testified, he was initially standing on the driver's side of the Explorer and then ran around or behind it – i.e., ran to the passenger side of the Explorer – then he necessarily ran to the passenger side of the patrol car as well. (RR47: 20-23).

(45)   The Court finds that, at the moment he fired into the passenger compartment of the patrol car, Applicant evinced his intent to kill Officer Hawkins. And by firing directly into the patrol car where Hawkins sat, Applicant significantly increased his odds of wounding and possibly killing him.

(46)   While the evidence does not definitively establish who fired the shots that killed Officer Hawkins, the Court finds it does demonstrate that Applicant, like the other escapees, expected and intended to use lethal force and did use it. Deleted Last sentence of ST. FOF # 47, p. 14

(47)   Thus, the Court finds that Applicant fails to prove the evidence of his culpability is insufficient to satisfy the Eighth Amendment.

### B. The Jury Found Applicant Acted with Reckless Indifference

(48)   Applicant contends that even if the evidence is sufficient to prove he acted with reckless indifference to Officer Hawkins's life, his jury never made this finding. Applicant acknowledges that by their affirmative answer to the second special issue, the jurors found that he "anticipated that a human life would be taken." (CR: 43). But he claims this finding does not satisfy the dictates of *Tison* because in their deliberations on this special issue (1) the jury did not limit its consideration to Applicant's conduct and (2) they probably interpreted the term "anticipated" to mean the "mere possibility" that someone would be killed.

(49)   The Court finds that Applicant fails to prove either of these allegations.

9

2847

### *(1) Answer to Special Issue Based on Applicant's Individual Liability*

(50)   "While the law of parties can apply to *convict* an accused of capital murder, the death penalty may be imposed only by examination of the mitigating and aggravating circumstances concerning the *individual* defendant." *Green v. State*, 682 S.W.2d 271, 287 (Tex. Crim. App. 1984) (emphasis in original). Consequently, the punishment special issues must focus the jury's deliberations on the conduct of the individual defendant. *Id.*

(51)   Applicant maintains the Court's punishment instructions allowed the jury to answer the second special issue based on evidence of the conduct of his "cohorts" because the Court generally instructed the jury to "consider all evidence admitted during the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty." (CR: 38).

(52)   The Court finds that, on its face, this instruction does not tell the jury to consider evidence of the conduct of other parties to the crime. Moreover, the second special issue equated to an "anti-parties" instruction because it required the jury to base its answer on Applicant's individual liability.

(53)   In particular, the instruction asked, "[D]o you find from the evidence beyond a reasonable doubt that *the defendant, Randy Ethan Halprin*, actually caused the death of the deceased, Aubrey Hawkins, or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken?" (CR: 43) (emphasis added).

(54)   The Court finds that this instruction plainly instructed the jury to consider Applicant's behavior alone. Thus, in answering this issue, the jury made a finding about Applicant's individual liability for Officer Hawkins's death. *See Ramirez v. Dretke*, 398 F.3d 691, 696-97 (5th Cir. 2005) (holding that trial court's general punishment instruction to "consider all evidence submitted . . . in whole trial" did not permit jury to impose death on Ramirez based on other party's conduct because second special-issue instruction explicitly limited jury's consideration to Ramirez's individual liability); *see also McFarland v. State*, 928 S.W.2d 482, 516-17 (Tex. Crim. App. 1996) (holding that statutorily required second special issue specifically instructs jury to consider the defendant's behavior alone).

### *(2) The Jury Correctly Interpreted the Term "Anticipate"*

(55)   In addition, the Court finds the jury found that Applicant possessed a culpable mental state high enough to satisfy the Eighth Amendment's proportionality

requirement. By affirmatively answering the second special issue, the jury found that Applicant actually caused Officer Hawkins's death, intended to kill him or another, or anticipated that a human life would be taken. (CR: 43).

(56)   Assuming the jury found only that he anticipated a human life would be taken, Applicant contends the jury's answer to this special issue does not satisfy the Eighth Amendment because the jury probably misconstrued the term "anticipate" to mean the "mere possibility" that someone would be killed. According to Applicant, a finding that he anticipated someone would be killed satisfies the dictates of *Tison* only if the jury construed "anticipate" to mean "expect to happen with certainty."

(57)   The Court finds that Applicant misinterprets *Tison*. In *Tison*, the Supreme Court equated the mental state of reckless indifference to a subjective appreciation that one's acts were *likely* to result in the taking of an innocent life. *Tison*, 481 U.S. at 152. Thus, contrary to Applicant's contention, *Tison* only requires that Applicant was aware of a likelihood or probability, not the certainty, that someone would die.[4]

(58)   The Court finds that, by finding under the second special issue that Applicant "anticipated that a human life would be taken," the jury necessarily made a finding that Applicant was aware of the probability or likelihood that someone would die.

(59)   Contrary to Applicant's contention, the term "anticipate" denotes an expectation that something will likely or probably occur, not that it is merely possible. *See* ENCARTA® WORLD ENGLISH DICTIONARY© (2009), HTTP://UK.ENCARTA.MSN.COM/ENCNET/FEATURES/DICTIONARY/DICTIONARYRES ULTS.ASPX?LEXTYPE=3&SEARCH=ANTICIPATE;[5] DICTIONARY.COM UNABRIDGED. Random House, Inc. (2011), http://dictionary.reference.com/browse/anticipation.[6] And the manner in which

---

[4] Elsewhere in this ground and other grounds in his application, Applicant apparently concedes that this is the correct interpretation of *Tison*. (Application, pp. 32-33, 248).

[5] Defining "anticipate" to mean to "expect something: to think or be fairly sure that something will happen," or to "look forward to something: to feel excited, hopeful, or eager about something that is going to happen."

[6] Defining "anticipation" to mean "*expectation or hope*" and defining "expect" to mean "to . . . regard as *likely* to happen . . ." (http://dictionary.reference.com/browse/expect) (emphasis added). *See also* BLACK'S LAW DICTIONARY 93 (6th ed. 1990) (noting that in the law of negligence, anticipation "means probability, not possibility, as applied to duty to anticipate consequences of conduct attacked as negligent").

2849  ✓

the term is used in the second special issue does not suggest otherwise. *See Walker v. Scott*, 123 F.Supp. 1034, 1043-44 (E.D. Tex. 2000) (adopting holding of Court of Criminal Appeals in unpublished opinion on Walker's direct appeal that anticipation that a life would be taken suggests to a rational juror, at the very least, a probability, not just the theoretical possibility, that a life would be taken); *Ladd v. State*, 3 S.W.3d 547, 573 (Tex. Crim. App. 1999) (holding that a finding under the second special issue that the accused anticipated a human life would be taken equates to a finding of reckless indifference to human life under *Tison*).

(60)   Applicant nonetheless contends that his jury misconstrued the term and cites the note the jury sent out during its punishment deliberations as proof. (CR: 45).

(61)   The Court finds, however, that the note does not reflect that any juror believed "anticipate that a human life would be taken" to mean something less than an awareness of the *likelihood* that someone would be killed. On its face, the note reflects only a disagreement about the meaning of "anticipated" versus "should have anticipated."[7] In other words, the jurors were discussing the difference between the subjective use of the term, i.e., whether Applicant actually anticipated someone's death, and the objective use of the term, i.e., whether a reasonable person in Applicant's position would have anticipated someone's death.

(62)   Furthermore, the Court finds that the State did nothing to encourage the jury to construe "anticipate" to mean anything less than a probability. In fact, only defense counsel discussed the meaning of the term during closing arguments, and he told the jury to construe the term to mean "expect with a certainty."[8] As

---

[7] The note reads: "Evidence: We are in disagreement on the definitional difference between 'anticipated that a human life would be taken' and 'should have anticipated.' We recall this from closing statements – definition of 'anticipate.'" (CR: 45).

[8] Defense counsel argued as follows:

Special Issue No. 2, did he actually cause the death beyond a reasonable doubt? No. The State hasn't proved that to you. If he didn't do that, did he actually cause the death of the deceased, but intended to kill the deceased? No, they didn't prove that to you either, not him.

And that's why we spent so much time talking to you about anticipated. That's why they spent so much time about parties and conspiracy and anticipated. The question is, what does that mean? Anticipated that a life would be taken.

And, you know, we live in a world of advertising and people try to sell us stuff all the time. And I'm sitting at home last night and I'm trying to think about how I can get this to you, how I can get you to understand what it really means.

2850

previously discussed, *Tison* does not require such a finding. *Tison*, 481 U.S. at 152.

(63)   The Court finds that defense counsel made this improper argument to the jury without objection or rebuttal by the State, effectively increasing the State's burden of proof on the second special issue. Thus, if anything, the jury probably construed the term to mean something more than required by *Tison*.

## C. Trial Court Can Find Applicant Possessed Requisite Culpability

(64)   Even if the jury had not found that Applicant was a major participant who acted with reckless indifference (i.e., was aware of the likelihood or probability that a life would be taken), this Court could make that finding in this habeas proceeding. In *Cabana v. Bullock*, 474 U.S. 376 (1986), the Supreme Court held that the culpability finding required by *Enmund* and *Tison* may be made by a trial court or an appellate court. *Id.* at 389; *see also Hopkins v. Reeves*, 524 U.S. 88, 99-100 (1998) (applying holding in *Cabana v. Bullock* that state can comply with *Enmund*'s requirement at sentencing or on appeal); *Foster v. Quarterman*, 466 F.3d 359, 369-71 (5th Cir. 2006) (holding Texas Court of Criminal Appeals' findings on direct appeal that showed that Foster was at least a major participant who acted with reckless indifference to human life satisfied *Enmund*'s requirements); *Clark v. Johnson*, 227 F.3d 273, 280-81 (5th Cir. 2000) (holding findings by Texas Court of Criminal Appeals on direct appeal satisfied *Enmund*'s requirements).

---

And then it dawned on me. And I thought, that's just so stupid, you can't hardly say that. And it's the Heinz Ketchup commercial. It's the person sitting there with a plate of food and a ketchup bottle that's full, turned upside down. And the ketchup is in the bottle, they know it's there, and they are going to enjoy it. And they are going to get it on the plate.

Now, what's the sales pitch? Anticipation of something that you *expect to happen with a degree of certainty*. What's the proof beyond a reasonable doubt that he *expected with certainty* that Officer Hawkins or any other police officer would be killed? They didn't try to kill any of the employees, even though there were some attempts apparently made by some people to act brave. They tied them up. They did the same consistent thing over and over again.

And while it's certainly -- you are able to say, yeah, he should have thought that through and should have been able to see that probably or possibly somebody might get hurt ultimately, can you say beyond a reasonable doubt that he actually anticipated, he expected a life that night to be taken? And the answer to that is no, not with the evidence that you have. Not beyond a reasonable doubt.

(RR53: 105-06) (emphasis added).

2851

(65)     As discussed above, the Court finds that the evidence overwhelmingly proves that Applicant possessed the culpability required for imposition of the death penalty.

(66)     Applicant claims this Court is precluded from making such a finding by *Ring v. Arizona*, 536 U.S. 584 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000).[9] In *Apprendi*, the Supreme Court held a New Jersey hate crime statute violated the Due Process Clause of the Fourteenth Amendment because it provided for an enhanced sentence based upon the judge's fact finding of racial motivation by a preponderance of the evidence. The Supreme Court held any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury, and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490. Subsequently, *Ring* extended *Apprendi* to capital cases, holding that aggravating factors necessary for the imposition of a death sentence must also be submitted to a jury and proved beyond a reasonable doubt. *Ring*, 536 U.S. at 577.

(67)     Appellant reads *Ring* and *Apprendi* too broadly. Neither case applies to Texas death penalty cases. *Apprendi* only applies to facts that increase the penalty beyond the "prescribed statutory maximum." *Apprendi*, 530 U.S. at 490. Under the Texas Penal Code, the prescribed statutory maximum for capital murder is fixed at death. TEX. PENAL CODE ANN. §§ 12.31 & 19.03 (Vernon Supp. 2010). Nothing a jury or judge decides during the punishment phase could enhance an appellant's sentence beyond the prescribed range. *See Allen v. State*, 108 S.W.3d 281, 285 (Tex. Crim. App. 2003). There are no statutory enhancements. *Resendiz v. State*, 112 S.W.3d 541, 549-50 (Tex. Crim. App. 2003).

(68)     Moreover, the heightened culpability required by *Enmund* and *Tison* is not an element of capital murder or an aggravating factor that increases Applicant's authorized punishment beyond that allowed by the jury's verdict. Rather, *Enmund* and *Tison* imposed a categorical rule that was intended to be a substantive limitation on death sentences. *Cabana*, 474 U.S. at 386. *Enmund* and *Tison* do not require that a jury enforce this limitation. In fact, they impose no particular form of procedure on the States for complying with their dictates.

(69)     The Eighth Amendment is satisfied as long as the death penalty is not imposed upon an ineligible defendant and an Eighth Amendment violation can be adequately remedied by any court with the power to find facts and vacate a sentence. *Cabana*, 474 U.S. at 386. If this Court has the power to find facts establishing a violation, as Applicant asks it to do, then it also has the power to

---

[9] Applicant presents this argument twice in his application. He incorporates it into his first ground for relief and argues it separately in his thirtieth ground for relief. (Application, pp. 33, 247-48).

2852

find facts establishing that no violation exists. *See Palmer v. Clarke*, 408 F.3d. 423, 441-42 (8th Cir. 2005), *reh'g denied*, 2005 U.S. App. LEXIS 13114 (June 30, 2005) (relying on *Cabana* and holding Nebraska Supreme Court's determination that the trial record showed Palmer alone killed victim established constitutionality of his death sentence under *Enmund*). *But cf. Gongora v. Quarterman*, 2008 U.S. App. Lexis 22164, at * 20-22 n.4 (5th Cir. 2008) (noting that the Fifth Circuit has yet to consider issue of whether the jury rather than a judge "must make the factual determinations under *Tison*").

(70)     In light of all the foregoing, the Court finds Applicant has failed to prove his death sentence violates the Eighth Amendment.

(71)     Furthermore, the Court finds and concludes that Applicant's death sentence does not violate the Eighth Amendment and recommends denial of Applicant's first and thirtieth grounds for relief.

## GROUND 2:  ACTUAL INNOCENCE

(72)     Relying on *Schlup v. Delo*, 513 U.S. 298 (1995), Applicant contends he is actually innocent. Specifically, he contends that, "in light of all the evidence . . . it is more likely than not that no reasonable juror would have convicted him." (Application, p. 36).

(73)     The Court finds that Applicant misplaces his reliance on *Schlup* and, thus, incorrectly states the burden of proof on his actual innocence claim.

(74)     Moreover, the Court finds that Applicant fails to allege facts that would entitle him to relief.

(75)     There are two types of actual innocence claims cognizable on collateral review: (1) procedural or "*Schlup*" claims and (2) substantive or "*Herrera*" claims. Unlike a substantive innocence claim, procedural claims do not alone constitute a basis for relief. Procedural claims are "gateway" claims that are used to reach the merits of constitutional claims otherwise barred from collateral review. *Schlup*, 513 U.S. at 315 (citing *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

(76)     The Court finds that Applicant does not assert his actual innocence claim to bypass a procedural bar to collateral review of some constitutional claim. He asserts actual innocence in itself as a basis for habeas relief. Thus, his claim is substantive in nature and governed by a higher burden of proof. Specifically, Applicant must show by clear and convincing evidence that no reasonable juror would have convicted him in light of new or previously unavailable evidence. *Ex parte Thompson*, 153 S.W.3d 416, 417 (Tex. Crim. App. 2005) (citing *Ex parte Elizondo*, 947 S.W.2d 202, 205 (Tex. Crim. App. 1996)). In other words, he must

15

2853

show that some newly discovered evidence unquestionably establishes his innocence. *Thompson*, 153 S.W.3d at 417.

(77)   The Court finds that Applicant fails to meet this burden of proof.

(78)   In his first ground for relief, which Applicant purportedly briefed together with his innocence claim, he makes a reference in a footnote to evidence "not before the jury." The Court finds, however, that Applicant does not specifically identify any new piece of evidence, a requisite of both procedural and substantive actual innocence claims. *See Schlup*, 513 U.S. at 314 (claim that constitutional error at trial prevented defendant from presenting fact finder with critical evidence of innocence); *Herrera*, 506 U.S. 390 (bare claim of innocence based on newly discovered or previously unavailable evidence); *Elizondo*, 947 S.W.2d at 208.

(79)   Consequently, Applicant fails to state specific, particularized facts that, if proven true, would entitle him to habeas relief. *Ex parte Staley*, 160 S.W.3d 56, 63 (Tex. Crim. App. 2005) (holding Applicant must allege facts sufficient to enable a court to determine, from the face of the application itself, whether the application merits further inquiry).

(80)   The Court finds that Applicant's second ground for relief is tantamount to a legal insufficiency claim, which is not cognizable on state habeas review. *See Ex parte Cantrell*, 112 S.W.3d 753, 755 (Tex. App. – Beaumont 2003, pet. ref'd) (noting that a claim that merely challenges the sufficiency of the evidence at trial is not an actual innocence claim and, thus, not cognizable on collateral review).

(81)   Thus, the Court concludes that Applicant's second ground for relief is procedurally barred and should be dismissed.

(82)   In his "amended" application, Applicant adds that his actual innocence claim is based on "external evidence," and in footnotes 7, 8, and 9, he refers generally to the evidence which is the subject of his *Brady* claim in Ground Three. "Amended Application for Writ of Habeas Corpus Pursuant to 11.071 Tex. Code Crim. Proc.," pp. 11-12, 16, 35) (filed 4/25/05).

(83)   The Court finds this *Brady* related "actual innocence" claim constitutes a subsequent writ application and should be dismissed as procedurally barred. *See* TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5.

(84)   Alternatively, the Court finds that this claim is meritless.

(85)   First, the Court finds that Applicant presents no new evidence to support this claim.

2854

(86)   As set out below in the Court's findings on Applicant's related *Brady* claim, the State gave Applicant's prison expert, S.O. Woods, access to the evidence upon which Applicant bases his claim, on May 19, 2003. Thus, the evidence Applicant characterizes as new was actually available to the defense team before trial.

(87)   Second, the Court finds that the evidence Applicant presents does not establish his innocence. More specifically, he fails to show that he would not have been convicted or assessed a death sentence but for a *Brady* violation.

(88)   The Court notes that Applicant also altered his actual innocence allegation in his "amended" application for habeas relief by inserting the following italicized language, "For the reasons set out above *and below*, no reasonable juror could deny that Halprin is actually innocent of the charged offense." *See* "Amended Application for Writ of Habeas Corpus Pursuant to 11.071 Tex. Code Crim. Proc.," p. 35 (filed 4/25/05) (emphasis added).

(89)   If by this additional language Applicant intended to allege that he is actually innocent because of a constitutional violation alleged in any and/or all of the grounds for relief that followed, i.e., a *Schlup* innocence claim based on Grounds 3-31, then the Court finds these claims procedurally barred as a subsequent writ application. *See* TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5.

(90)   Alternatively, the Court finds Applicant fails to prove he is actually innocent under *Schlup* because, as reflected in the findings below, he fails to prove any constitutional violation.

(91)   For all the foregoing reasons, the Court concludes Applicant is not actually innocent under *Herrera* or *Schlup*.

## GROUND 3: *BRADY* CLAIM

(92)   In his original application, Applicant contends the State violated his constitutional right to due process by failing to disclose exculpatory evidence. *See* U.S. CONST. amend. XIV; *Brady v. Maryland*, 373 U.S. 83 (1963). In particular, he claims the State withheld (1) evidence of the identity of the person who prepared Defense Exhibit 39, a document entitled, "Ranking of Offenders by Leadership/Personality Characteristics" (hereinafter referred to as the "ranking document"); (2) statements by his codefendant George Rivas, and (3) statements by a former fellow inmate named Johnnie Dunning. *See* Application, pp. 37-54.

(93)   Applicant claims the State also withheld exculpatory information given to law enforcement after the escape by five fellow inmates: (1) Michael W. Carter, (2) Timothy Alan Black, (3) Charles Eugene David, (4) David Slocomb, and (5) George Reames Rogers. *See* "Additional Argument in Support of Ineffective

17

2855

Assistance of Counsel and Suppression of Exculpatory Evidence Arguments in Application for Writ of Habeas Corpus," pp. 2-3 (filed 8/20/10).

(94)   The Court finds these untimely filed *Brady* claims constitute a subsequent writ application that should be dismissed as procedurally barred. *See* Tex. Code Crim. Proc. Ann. art. 11.071, § 5(a) (Vernon Supp. 2010).



*deleted "including those not timely filed"*

(95)   Alternatively, the Court finds that all of Applicant's *Brady* claims are meritless.

(96)   Applicant's due process right prohibits the State from withholding material, favorable evidence from him. *Brady*, 373 U.S. at 87. As previously noted, a habeas Applicant bears the burden of proving facts that would entitle him to relief. *Chappell*, 959 S.W.2d at 628.

*p.23*

(97)   Thus, to prevail on his due process claim, Applicant must establish the following by a preponderance of the evidence: (1) the prosecution failed to disclose evidence; (2) the evidence was favorable to him; and (3) the evidence was material. *Lagrone v. State*, 942 S.W.2d 602, 615 (Tex. Crim. App. 1997) (holding that the burden of showing materiality rests on the defendant); *see also Spence v. Johnson*, 80 F.3d 989, 994 (5th Cir. 1996).

(98)   The Court finds that Applicant fails to sustain this burden of proof.

## I. State's Knowledge of Evidence

### A. Author of Ranking Document & Rivas/Dunning Interview Statements

(99)   The Court finds the former DPS Special Crimes Investigator Hank Whitman prepared the ranking document on December 13 or 14, 2000, the day of or the day after the escape, with the assistance of a handful of other law enforcement agents employed by DPS and TDCJ's Internal Affairs Division (now known as the Office of Inspector General or OIG). (9/30/10 Hrg) RR: 18-24, 32-33, 47, 63-69, 71, 82-83; Whitman Affidavit; Whitman Interrogatory Answers.

(100)   The Court finds that the ranking document reflects the opinions of those law enforcement agents. It also reflects information obtained (1) from the prison "travel files" of Applicant and the other escapees, (2) from interviews of the individuals taken hostage during the escape, and (3) from interviews of others who interacted with Applicant and the other escapees while they were incarcerated. (9/30/10 Hrg) RR: 26-29, 63-66.

(101)   The Court finds that the ranking document does not reflect any information obtained by law enforcement later than a day or two after the escape. (9/30/10 Hrg) RR: 32, 71.

18

2856

(102)   The Court finds that, until these writ proceedings, none of the prosecutors who participated in Halprin's trial knew that Whitman participated in preparing the ranking document nor did they try to hide his identity from Halprin's trial counsel. (5/22/08 Hrg) RR: 216-17; (9/30/10 Hrg) RR: 92-93, 99-104, 114-55; Whitman Affidavit; Shook Affidavit; D'Amore Affidavit; Wirskye Affidavit. Therefore, to the extent Applicant is alleging intentional prosecutorial misconduct in the State's alleged failure to disclose Whitman's identity as the drafter of the ranking document, the Court finds that his claim is unsubstantiated.

*merged i.FOF # 104 into this elected meritless"*



*deleted "meritless"*

(103)   The Court finds that S.O. Woods, Applicant's prison expert at trial and in these writ proceedings, deduced Whitman's identity from Woods' review of records in possession of TDCJ's Office of Inspector General (OIG). S.O. Woods Interrogatory Answers (filed 10/26/10).

(104)   Nevertheless, the State is responsible for disclosing favorable evidence known by its agents, including law enforcement officials and others working on their behalf, even if the particular evidence is not known to the prosecuting attorney. *See Kyles v. Whitley*, 514 U.S. 419, 437-438 (1995).

(105)   The Court finds that those law enforcement officers who participated in the preparation of the ranking document and obtained the complained-of interview statements of Rivas and Dunning were agents of the State and part of the prosecution team. *See, e.g., Ex parte Mitchell*, 853 S.W.2d 1, 4 (Tex. Crim. App. 1993) (noting that members of Sheriff's office are agents of the State).

(106)   Therefore, the Court finds those officers' knowledge about who participated in the preparation of the ranking document and what Rivas and Dunning said in the complained-of interviews is imputed to the State.

## B. Statements of Former Fellow Inmates

(107)   The Court finds Applicant fails to prove that the State possessed knowledge of the information provided by his former fellow inmates Michael Carter, Timothy Alan Black, Charles Eugene David, David Slocomb, or George Reames Rogers.

(108)   In support of this claim, Applicant presents an affidavit from each respective inmate. Carter Affidavit, Black Affidavit, David Affidavit, Slocomb Affidavit, and Rogers Affidavit.

(109)   While Applicant claims the information contained in these affidavits was relayed by these inmates to agents of the State during interviews conducted after the escape, the Court finds that the affidavits do not substantiate that allegation. *See* "Additional Arguments in Support of Ineffective Assistance of Counsel and Suppression of Exculpatory Evidence Arguments in Application for Writ of

19

Habeas Corpus," p. 3.

(110)   The Court finds that, with the exception of Slocomb, none of the inmates aver that they relayed the information in their affidavit to any law enforcement official or other agent of the State. Carter, Black, and David make no mention of speaking to any officials. Indeed, Rogers stated that he did not want to talk to investigators. Carter Affidavit, Black Affidavit, David Affidavit, Rogers Affidavit.

(111)   Thus, with the exception of Slocomb, the Court finds Applicant fails to show that any of these inmates relayed the information in their affidavits to anyone, much less an agent of the State and member of the prosecution team.

(112)   Even if the Court were to assume these inmates did relay information to a law enforcement official, none of the inmates, including Slocomb, indicates when, if ever, they did so. Carter Affidavit, Black Affidavit, David Affidavit, Slocomb Affidavit, and Rogers Affidavit.

(113)   Thus, the Court finds that Applicant fails to show that, if any of these inmates relayed the complained-of information to a state agent, they did so before Applicant's trial.

## II. TDCJ-OIG DISCLOSED DOCUMENTS TO APPLICANT'S EXPERT BEFORE TRIAL

(114)   The Court finds that the Rivas interview transcript, the Dunning interview summary, and the documents from which Applicant's expert, S.O. Woods, deduced Whitman's identity were all in the possession of TDCJ-OIG (formerly the Internal Affairs Division of TDCJ) before Applicant's trial.

(115)   The Court finds that, in May 2003, Woods reviewed over twenty boxes of TDCJ-OIG records related to Applicant. At trial, Woods identified the ranking document as a TDCJ-OIG record. He recalled seeing it during his review of TDCJ-OIG records and bringing it to trial defense counsel's attention before trial. (RR51: 48-50, 120); (8/20/10 Hrg) RR: 67-68, 76-77, 80-81, 208); Woods's Interrogatory Answers & Attachments.

(116)   The Court finds that Woods re-examined the same TDCJ-OIG records in 2005, at the request of Applicant's writ counsel, to determine who authored the ranking document. During this re-examination, Woods located and requested certified copies of the documents in TDCJ-OIG's records from which he identified Whitman, as well as copies of the Rivas transcript and the Dunning interview summary. Applicant's Writ Ex. A; Woods's Interrogatory Answers & Attachments.

20

2858 ✓

(117)   The Court finds that Applicant presents no evidence that the documentation used to identify Whitman, as well as the Rivas transcript and the Dunning interview summary, were not among the TDCJ-OIG records disclosed to Woods back in May 2003.

(118)   Although Woods may not have identified Whitman as the drafter of the ranking document until 2005, the Court finds that TDCJ-OIG first disclosed the documentation from which he gleaned that information, as well as the Rivas transcript and the Dunning interview summary, back in May 2003.

(119)   Thus, the Court finds the State disclosed the complained-of documentation to Applicant before trial. *See Jackson v. State* 552 S.W.2d 798, 804 (Tex. Crim. App. 1976) (holding affidavits in social welfare caseworker's file were not "undisclosed" in violation of *Brady* where caseworker testified defendant subpoenaed her entire file and if he had taken advantage of his subpoena, he would have obtained them).

### III. EVIDENCE IS IMMATERIAL

(120)   The Court also finds Applicant fails to prove that the identity of the document's author or that the statements Rivas, Dunning, Carter, Black, Slocomb, David, and Rogers made about Applicant constitute material evidence.

(121)   Evidence is material if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Ex parte Adams*, 768 S.W.2d 281, 290 (Tex. Crim. App. 1989). A reasonable probability that a different result would have occurred is shown when the suppression of evidence undermines confidence in the verdict. *Id.* To make this determination, the alleged suppression must be examined in the context of the entire record and considering the overall strength of the State's case. *Thomas v. State*, 841 S.W.2d 399, 404-05 (Tex. Crim. App. 1992).

### A. Evidence Not Admissible

(122)   Evidence that is inadmissible can not affect the outcome of trial and, thus, is immaterial. *Ex parte Kimes*, 872 S.W.2d 700, 703 (Tex. Crim. App. 1993) (citing *Iness v. State*, 606 S.W.2d 306, 310 (Tex. Crim. App. 1980)). To prove the materiality of the documents he claims the State withheld, Applicant must first demonstrate their admissibility.

(123)   The Court finds that Applicant fails to prove their admissibility.

21

2859

### *(1) Ranking Document*

(124)   The Court finds that Applicant received the ranking document before trial from the State in response to his discovery request. It was admitted for record purposes at trial as Defense Exhibit 39.

(125)   The Court finds that the ranking document constituted hearsay, a fact Applicant does not dispute. At trial, Applicant offered the document under the business records exception to the hearsay rule. (RR53: 12-16); *See* TEX. R. EVID. 803(6).

(126)   At trial, the Court found that Applicant failed to establish that the ranking document qualified for admission under the business records exception.

(127)   On direct appeal, the Court of Criminal Appeals upheld that ruling, stating, "There is no evidence showing who prepared the document or whether it is a record of regularly conducted business." *Halprin v. State*, 170 S.W.3d 111, 116 (Tex. Crim. App. 2005).

(128)   Applicant contends the identity of the author of the ranking document was material because it would have rendered the document admissible. He claims the document itself is material because it shows he was "a minor participant in the robbery" and "the most passive and, therefore, the least likely to have used a weapon."

(129)   Applicant contends he could have used Whitman to demonstrate the document's admissibility under both the business and public records exceptions to the hearsay rule. TEX. R. EVID. 803(6) & (8).

(130)   Even assuming the State had a duty to disclose evidence that would render other evidence admissible, the Court finds Applicant fails to prove that identifying Whitman would have rendered the ranking document admissible under the business or public records exception to the hearsay rule.

(131)   "When a business receives information from a person who is outside the business and who has no business duty to report or to report accurately, those statements are not covered by the business records exception." *Garcia v. State*, 126 S.W.3d 921, 926 (Tex. Crim. App. 2004). The admissibility of such a document depends on a showing that each statement contained within it qualifies for admission under its own hearsay exception. *See, e.g., Id.* (holding hearsay statements made by defendant's wife to employee of battered women's shelter not admissible under business records exception just because employee had a business duty to record wife's statements accurately).

(132)   Likewise, under the public records exception, hearsay statements contained within a public record are not rendered admissible merely because they are

22

2860

included in the record. *See Kratz v. Exxon Corp.*, 890 S.W.2d 899, 905-06 (Tex. App. – El Paso 1994, no writ) (upholding exclusion of eyewitness statements contained in police report under Rule 803(8)).

(133)    On its face, the ranking document states that the information it contains was obtained from interviews with "civilian workers, correctional officers, and several inmates who worked closely with the escapees . . ." (Defense Ex. 39; Applicant's Ex. B). Thus, the document is composed largely of the hearsay statements of several unidentified individuals.

(134)    Applicant contends the State's trial files show that sixty-seven individuals contributed to the ranking document. *See* "List of Persons Who Provided Information or Assisted in Preparation of Ranking Document as Determined by Writ Counsel Upon Open File Review of District Attorney's Files on Texas Seven" (filed 8/20/10).

(135)    The Court finds that only a fraction of those individuals on Applicant's list may have contributed anything to the document. *See* (9/30/10 Hrg) RR: 61-63; State's Ex. Q.

(136)    The Court finds that Applicant fails to show definitively who contributed to the document, much less which individuals provided which information in the ranking document.

(137)    Moreover, the Court finds that at least some of that information was received from inmates who had no business duty to report what they knew, much less report it accurately.

(138)    The Court finds that even if Whitman's opinion about Applicant's rank was admissible, the interviewee's hearsay statements contained within the ranking document were inadmissible. Consequently, at a minimum, the Court would have excluded the hearsay portions of the document. *deleted in a significant portion* P-28 St. PDF

### (2) Statements of Rivas, Dunning, and Fellow Inmates

(139)    The Court finds that any statements Rivas, Dunning, Carter, Black, Slocomb, David, or Rogers made to law enforcement officials about Applicant also constitute inadmissible hearsay.

(140)    The Court finds that the complained-of statements, if made, were made out-of-court and, would have been offered for the truth of what they asserted, i.e., that he was the weakest member of the Texas Seven. These statements do not qualify under any hearsay exception.]  *Reworded last sentence of #142 St. PDF P.29*

23

2861

(141) Moreover, Applicant fails to demonstrate that Dunning, Carter, Black, Slocomb, David, or Rogers would have testified to the same information if called to the stand. Applicant also fails to prove they would have testified at all.

(142) Thus, the Court finds Applicant fails to prove that the Rivas interview transcript, the Dunning interview summary, or any statements made by Carter, Black, Slocomb, David, or Rogers were material.

## B. Evidence is Insignificant and Cumulative

(143) Even if admissible, the Court finds that all of the complained-of evidence (the ranking document, the Rivas interview transcript, the Dunning interview summary, and the statements of Applicant's former fellow inmates) is cumulative of other evidence admitted at trial.

(144) Applicant argues that the complained-of evidence shows he is a weak-willed follower and the least intelligent of the group and, thus, his culpability was insufficient to warrant the death penalty.

(145) The Court finds that the qualitative and quantitative value of the complained-of evidence is not significant. Furthermore, a plethora of other, similar evidence came before the jury.

(146) On direct appeal, the Court of Criminal Appeals found the exclusion of the ranking document harmless because the information it contained was already before the jury by other means. *Halprin*, 117 S.W.3d at 116 (holding Applicant "presented from other sources a significant amount of mitigating evidence that was cumulative of the mitigating evidence contained in the document"). The record supports that determination.

(147) In particular, the record reflects that Patrick Moczygemba, one of the civilian employees who worked with Applicant in the Connally Unit Maintenance department, testified that Applicant was the least intelligent of the escapees and that his role was to follow orders. (RR49: 112, 116). Moreover, he described Applicant as "dumb as a box of rocks" and as a person who "had to be told time after time how to complete a task." (RR49: 112; Defense Ex. 38). Similarly, Mark Burgess, another TDCJ civilian employee familiar with Applicant, testified that Applicant "was not a leader type." (RR49: 195).

(148) The Court finds these civilian prison employees were more credible witnesses than Rivas, Dunning, Carter, Black, Slocomb, David, and Rogers, and that their testimony carried greater weight than any statements Applicant's codefendant and fellow inmates may have made.

24

2862

(149)   The Court also finds Applicant testified at length that he was a follower and that his participation in the escape and the victim's murder was minimal. (RR48: 4-55; 131-45; RR49: 17-22, 30-31). And in their confessions, some of Applicant's codefendants characterized him as a follower, rather than a leader. (Defense Exs. 24-27).

(150)   Moreover, throughout punishment closing arguments, defense counsel emphasized Applicant's lower intelligence, follower mentality, and diminished role in the offense. (RR53: 91, 95-98, 104-118).

(151)   Thus, the Court finds that the jurors did not convict Applicant and assess the death penalty without the benefit of knowing others generally regarded him as weaker willed and weaker minded than his codefendants. The jury was presented with a substantial amount of evidence attesting to the same.

(152)   The Court also finds that, even though the ranking document itself was not admitted into evidence, the jury was aware of its nature and contents. During his numerous attempts to offer the document through a variety of witnesses, Applicant's trial counsel repeatedly injected this information into his questions before the jury. (8/2/10 Hrg) RR: 132-33, 239; (9/30/10 Hrg) RR: 96, 125, 128-29.

(153)   The Court finds the jury verified to Applicant's counsel after trial that they had gleaned this information during the proceedings despite the document's exclusion. Specifically, Applicant's trial counsel testified, "I asked every single witness who testified individually as to the accounts they had given if they had been asked to do a ranking, I believe. I started asking each one of them or tried to introduce it through each one of them and in the end the jury told us they got it. They knew what the deal was." (8/20/10 Hrg) RR: 132.

(154)   The Court finds that, notwithstanding the exclusion of the document itself, the jurors believed law enforcement had ranked Applicant as the least dangerous, weakest, and least intelligent of the Texas Seven escapees.

(155)   The Court finds that the information Applicant's trial counsel injected through its repeated attempts to admit the ranking document was actually more beneficial to Applicant than the document itself. In particular, counsel left the jury with the misimpression that law enforcement had ranked Applicant as the least dangerous, rather than merely the least likely to lead. Defense Ex. 39; Whitman Affidavit; Whitman Interrogatory Answers; (9/30/10 Hrg) RR: 54-55, 69-70, 87-88.

(156)   Moreover, the Court finds that if the document had been admitted with Whitman's sponsorship, Whitman would have testified that he and the other law enforcement officers who contributed to the ranking document considered the

2863

last three on the list (Garcia, Murphy, and Applicant) "interchangeable." Thus, in actuality, none of the officers who contributed to the document opined or believed that, among all seven escapees, Halprin was distinguishable as the very weakest. Whitman Affidavit; Whitman Interrogatory Answers; (9/30/10 Hrg) RR: 54-55, 69-70, 87-88.

(157) The Court finds that the jury's guilty verdict and its answers to the special issues are strongly supported by the record.

(158) The Court finds that the lack of additional evidence of the same character traits and law enforcement's leadership ranking of the escapees is insufficient to undermine confidence in the jury's verdict at guilt or punishment.

(159) In light of all the foregoing, the Court concludes there was no constitutional violation.

(160) Consequently, this Court recommends the denial of Applicant's third ground for relief. And if not dismissed, the Court also recommends the denial of the due process allegation alleged in the subsequent writ application Applicant filed on August 20, 2010.

## GROUNDS 4 & 5: EFFECTIVE ASSISTANCE OF TRIAL COUNSEL

(161) Applicant contends his trial counsel rendered ineffective assistance in both the guilt and punishment phases of his trial.

(162) Counsel may be deemed ineffective only if Applicant demonstrates by a preponderance of the evidence some deficiency in counsel's performance that prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Thompson v. State*, 9 S.W.3d 808, 812-13 (Tex. Crim. App. 1999). To prove counsel was deficient, Applicant must rebut the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Thompson*, 9 S.W.3d at 812-13. To prove prejudice, Applicant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.*

(163) Ineffectiveness claims may not be built on retrospective speculation; the record must affirmatively demonstrate the alleged ineffectiveness. *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002). Moreover, in a habeas proceeding, the Applicant bears the burden of proving his factual allegations by a preponderance of the evidence. *Ex parte Morrow*, 952 S.W.2d 530, 534 (Tex. Crim. App. 1997).

(164) When the record is silent on the motivations underlying counsel's tactical decisions, an Applicant alleging ineffective assistance usually cannot overcome

the strong presumption that counsel's conduct was reasonable. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001). In the absence of direct evidence of counsel's reasons for the challenged conduct, an appellate court will assume a strategic motivation, if one can be imagined. *Garcia v. State*, 57 S.W.3d 432, 441 (Tex. Crim. App. 2001).

(165) Moreover, if a reviewing court can speculate about the existence of further mitigating evidence, then it just as logically might speculate about the existence of further aggravating evidence. *Bone*, 77 S.W.3d at 835-36.

(166) The Court finds Applicant fails to rebut the presumption that his trial counsel acted consistent with reasonable trial strategy.

(167) The Court finds that Applicant also fails to prove that any alleged deficiency prejudiced his defense.

(168) Therefore, the Court finds that Applicant fails prove his trial counsel rendered ineffective assistance.

## I. QUALIFICATIONS OF TRIAL COUNSEL

(169) The Court finds that Applicant is contesting the strategic choices of two highly qualified death-penalty counsel, Edwin King and George Ashford.

(170) The Court finds that, at the time of Applicant's trial, both counsel were qualified and approved for first-chair appointment to death penalty cases in the First Administrative Judicial District as required by article 26.052 of the criminal procedure code. TEX. CODE CRIM. PROC. ANN. art. 26.052 (Vernon Supp. 2010-11). (8/20/10 Hrg) RR: 85, 222.

(171) To qualify for appointment to a death penalty case at the time of Applicant's trial, counsel had to meet the following standards:

(1) both first and second chair counsel must be members of the State Bar of Texas;

(2) the first chair counsel must exhibit proficiency and commitment to providing quality representation to defendants in death penalty cases, including five years experience in litigation of serious felony matters and experience in at least one capital case;

(3) the second chair counsel must have experience in felony matters;

(4) the first chair counsel must have tried to a verdict as lead defense counsel a significant number of felony cases, including homicide trials and other trials for offenses punishable as first or second degree felonies or capital felonies;

(5) the first chair counsel must have trial experience in the use of and challenge to mental health or forensic expert witnesses and in investigating and presenting mitigating evidence at the penalty stage of a death penalty trial; and

(6) counsel must have successfully completed the minimum continuing legal education requirements of the State Bar of Texas and must have participated in courses or other training relating to criminal defense in death penalty cases.

(State's Writ Ex. I).

(172)   The Court finds that Edwin King is an experienced and highly qualified criminal trial attorney. He has been licensed since 1979 and has been board certified in criminal law since 1985. He is admitted to practice in the Fifth Circuit Court of Appeals, the Texas Eastern District Court, and the Texas Northern District Court. He served four years as the presiding judge of Criminal District Court No. 2 of Dallas County, Texas, during which he presided over one death penalty trial. During his career, Mr. King has tried numerous criminal cases. Before Applicant's trial, he represented one other defendant (Gayland Bradford) in a death-penalty trial, preserving error that resulted in a subsequent reversal. After Applicant's trial, he represented another capital murder defendant (Paul Emilien) facing a death-penalty prosecution and successfully negotiated a life sentence for him. He currently represents two other defendants (Michael Turner and Charles Payne) against whom the State is seeking the death penalty. (State's Writ Ex. H); (8/20/10 Hrg) RR: 220-23.

(173)   The Court finds that George Ashford is also an experienced and highly qualified criminal trial attorney. He has been licensed since 1985 and has tried numerous criminal cases and has also handled numerous criminal appeals. In 2000, a year before he was appointed to represent Applicant, Mr. Ashford represented William Rayford in a death-penalty trial. (State's Writ Ex. K); (8/20/10 Hrg) RR: 22-23, 85-87.

(174)   The Court finds that based on their extensive experience, Mr. Ashford and Mr. King were qualified to formulate and execute an effective trial strategy.

2866 ✓

(175)   The Court finds that Mr. Ashford and Mr. King were appointed to represent Applicant at trial shortly after his capture in January 2001 and immediately began working on the case. Furthermore, over the next two and half years, Mr. Ashford and Mr. King devoted a significant amount of time and effort to developing a defense. Moreover, they ably presented that defense throughout both phases of Applicant's trial.

## II. COUNSEL RENDERED EFFECTIVE ASSISTANCE IN GUILT PHASE

### A. Codefendants' Oral Statements to Other Law Enforcement Agencies

(176)   Applicant argues that trial counsel were ineffective for failing to call certain law enforcement officers who took "statements from the co-indictees that, viewed from Halprin's defense perspective, were exculpatory and would have gainsaid Halprin's role in the shooting." (Application, p. 59).

(177)   The Court finds that Applicant's trial counsel introduced the written confessions of codefendants Patrick Murphy (Defense Ex. 24), Donald Newbury (Defense Ex. 25), George Rivas (Defense Ex. 26), and Michael Rodriguez (Defense Ex. 27) through lead detective Jeff Spivey. Codefendant Joseph Garcia did not give a written statement.

(178)   Applicant argues that defense counsel should also have called: (1) Detective Graham of the Colorado Springs police department to testify (in accordance with his interview notes) that Newbury told him he accidentally shot Rivas; (2) FBI agent Moen or Aker to testify (in accordance with their interview notes) that Rodriguez told them that Halprin did not fire his weapon at Oshman's; and (3) Detective Spivey to testify that his handwritten notes of his interview with Rivas provide: "Newbury reloaded Rivas gun 5 rounds."[10]

(179)   Applicant asserts that evidence of the oral statements made by Applicant's codefendants would have been admitted under Rule of Evidence 803(24) if his trial counsel had "properly pursue[d] presentation of this evidence." (Application, p. 71). In particular, Applicant argues that the challenged statements would have been admissible if his trial counsel had tried to introduce the statements through different sponsoring witnesses.

---

[10] Applicant does not specify what statement of Rivas's to which he is referring. The Court has looked through the related documents and surmises that this is the relevant statement. (Defense Ex. 29 at 0170). Additionally, the Court assumes that Applicant misspeaks when he argues that "[t]he defense attempted to show that Newbury only reloaded Halprin's gun" and that he meant to say that Newbury only reloaded Rivas's gun. (Application, p. 65).

2867

(180)    The Court finds that although Detective Graham or the FBI agents would have been able to authenticate the exhibits and eliminate one layer of hearsay, the challenged statements still would have been inadmissible hearsay.

(181)    Alternatively, Applicant argues that even if the statements were technically inadmissible under Rule 803(24), they should have been admitted into evidence because "[i]mportantly, the court must keep in mind what was at stake in this trial. In asking a jury to make a death determination, it is highly improper to deny relevant important evidence." (Application, p. 71). Applicant advocates that the rules of evidence are more relaxed in death penalty cases. (Application, p. 70-71 n. 16).

(182)    The Court finds that the cases Applicant relies on to support this argument discuss the balance between state rules of evidence and any mitigating evidence that a defendant might introduce in the *punishment* phase of his trial. These cases have no affect on the issue of the admissibility of hearsay evidence in the *guilt* phase.

(183)    Rule 803(24) provides that a statement against a declarant's penal interest may be admissible if corroborating circumstances clearly indicate the statement's reliability. TEX. R. EVID. 803(24). In order for a declaration against interest to be admissible under Rule 803(24), the statement must be self-inculpatory with corroborating circumstances to indicate the trustworthiness of the statements. *Dewberry v. State*, 4 S.W.3d 735, 751 (Tex. Crim. App. 1999); *Davis v. State*, 872 S.W.2d 743, 747 (Tex. Crim. App. 1994). There is no definitive test for assessing reliability, but when such a statement is offered to exculpate an accused, the following factors may be considered: whether the guilt of the declarant is inconsistent with the guilt of the accused; whether the declarant was so situated that he might have committed the crime; the timing of the statement and its spontaneity; the relationship between the declarant and the party to whom the statement was made; and the existence of independent corroborating facts. *Davis*, 872 S.W.2d at 749.

(184)    Even *assuming arguendo* that each of the three statements Applicant wanted his trial counsel to introduce is seemingly self-inculpatory standing on its own, each statement must be examined in the broader context of the statement. *Mendez*, 56 S.W.3d at 887, 889 ("A statement that is broadly self-inculpatory may nevertheless be inadmissible if it is blame shifting).

(185)    The Court finds that the overall purpose of Newbury's, Rivas's, and Murphy's verbal and written statements was to shift blame and minimize their involvement. (8/20/10 Hrg) RR: 138-39.

2868

(186) Thus, the Court finds Applicant fails to prove that the three statements are self-inculpatory.

(187) The Court also finds that the circumstances surrounding the statements do not clearly indicate their trustworthiness.

(188) Statements are considered more trustworthy if made (1) spontaneously; (2) in a non-custodial setting; or (3) to a person who is not engaged in law enforcement. *Mendez v. State*, 56 S.W.3d 880, 887 (Tex. App.—Austin 2001, pet. ref'd) (citing *Dewberry*, 4 S.W.3d at 751-52). In the instant case, none of these conditions existed.

(189) The Court finds that the statements made by Applicant and his codefendants to the various law enforcement agencies were made in custody after they had escaped and fled prison, robbed two Auto Zones, committed capital murder, and been captured. The statements were the product of interrogation and made with the knowledge that they were possibly facing the death penalty; thus, the timing and the spontaneity of the statements are questionable at best.

(190) The Court finds, as Detective Spivey emphasized several times during trial, that each of the codefendants' written statements minimized their involvement, contained lies about certain facts, and/or were self-serving in varying degrees. (RR42: 96; RR47: 14, 63-64; RR49: 14-15).

(191) The Court finds that each of the escapees had motives other than the truth for many of the statements they made to law enforcement. For instance, evidence was adduced at trial that Newbury and Murphy were good friends and that Murphy was covering for Newbury by claiming in his written statement that Newbury's weapon was unfired (when Newbury himself admitted to firing three times). (RR48: 65; Defense Exs. 24, 25).

(192) Thus, the Court finds that the codefendants' written statements were shown to be unreliable, as were the codefendants' statements to other agencies, such as the Colorado Springs detectives and the FBI.

(193) The Court finds that Applicant fails to prove the codefendant's statements were admissible. Thus, he fails to prove his trial counsel were deficient for not offering them into evidence.

(194) Moreover, the Court finds trial counsel's decision not to call additional law enforcement agents constituted reasonable trial strategy. *changed from "pluck out"*

(195) The Court finds that trial counsel's strategy was to extract one or two sentences from certain codefendants' statements to other law enforcement agencies (that supported Applicant's defensive theory) and get them in front of the jury without *St. FOF P.37*

31

2869

offering the entire statements (which in their entirety did not necessarily support the defensive theory). Defense counsel accomplished this by asking leading and artfully worded questions. (8/20/10 Hrg) RR: 188, 238-40.

(196)   For example, even though defense counsel did not call Detective Graham to testify to Newbury's alleged admission to shooting Rivas, he nonetheless asked: "[I]n the police reports, isn't it true, that there's an indication that one of these individuals [Rodriguez or Garcia] shot Mr. Rivas?" (RR42: 87). The State immediately objected, defense counsel moved on to the next question, and Detective Spivey never answered the question.

(197)   Likewise, defense counsel elicited the following testimony:

> [DEFENSE COUNSEL]:   All right.   Now, did you have any information in regard to who Mr. Newbury may have shot out there at the scene?
>
> STATE:   Judge, we'll object to hearsay, if he's going outside the statements that are in evidence.
>
> COURT:  Please rephrase your question.
>
> Q.   Well, would it be a correct statement to say that when interviewed by law enforcement, Mr. Newbury consistently – gave a consistent statement as to who he thought he was shooting at?
>
> A.   [SPIVEY]: A. He never wavered in his statement to me at who he thought he was shooting at.
>
> Q.   Okay.   During your review of the Colorado Springs Police Department report of that interview, do you recall any information pertaining to that particular subject matter?
>
> A.  No, not today, I don't.
>
>                    * * *
>
> Q.  [W]hat I marked as Defense 31, does that refresh your memory at all from just your review of the material of the other interviews of the suspects, in particular Mr. Newbury?
>
> A.  Yes, it does.
>
> Q.  *And Mr. Newbury indicates, does he not, that he may have shot George Rivas?*

32

2870

STATE:  Judge, I object to hearsay.

COURT:  Sustained.

(RR47: 9-81) (emphasis added).

(198)  And although defense counsel did not call FBI agents Moen or Aker to testify to Rodriguez's statement to them that Halprin's weapon was not fired, defense counsel elicited the following testimony:

> [DEFENSE COUNSEL]: Q. [I]n Mr. Murphy's statement he goes back and checks and says that, hey, Randy Halprin's weapon wasn't fired.

> [SPIVEY]: A. He does. He also states that Mr. Newbury's weapon wasn't fired.

> Q. Isn't it also true that Mr. Murphy told the FBI and other law enforcement individuals and . . . others, Mr. Rivas and the other individuals, stated that Randy Halprin never fired or discharged a weapon?

> [The Court sustains the State's hearsay objection.]

(RR42: 88).

(199)  The Court finds that by the above methods, defense counsel got the intended information in front of the jury, but the State was unable to introduce the remaining portion of the statements and was unable to impeach the information. This tactic allowed Applicant to receive the best of both worlds—getting the defensive theory (and thought process) in front of the jury while disallowing the State an opportunity to discredit the witnesses through cross-examination.

(200)  The Court finds that if defense counsel had called these suggested agents to testify to these isolated statements by the codefendants, the State would have been allowed to introduce the entire report or statement under the rule of optional completeness. TEX. R. EVID. 107 (permitting the introduction of otherwise inadmissible evidence when that evidence is necessary to fully and fairly explain a matter "opened up" by the adverse party). (8/20/10 Hrg) RR: 140, 187.

(201)  Applicant fails to acknowledge that if Applicant's trial counsel had called Detective Graham to testify, he *may* have testified to what was written in his report, but he may also have testified to its inaccuracies. Additionally, the State

33

2871 ✓

most likely would have elicited on cross-examination much testimony that would have been detrimental to Applicant. (8/20/10 Hrg) RR: 139, 187.

(202) The Court finds that defense counsel asked leading questions that elicited hearsay objections from the State and yet conveyed to the jury that, if permitted to respond, the witness's answer would aid the defense. (8/20/10 Hrg) RR: 187, 237-40). This is especially true in light of the fact that defense counsel got Detective Spivey to agree that if defense counsel said "something in the form of a statement or question that's not correct, I trust that you are going to correct me on it." (RR47: 7).

(203) In fact, defense counsel was so skilled at this tactic that the State lodged objections and tried to curb this practice. After one specific instance in which this Court found a defense exhibit inadmissible, the State pleaded, "Judge, can we—we want a Motion in Limine or at least ask that [defense counsel] not be allowed to ask those questions, since it's not going to be admissible in front of the jury." (RR47: 68).

(204) The State similarly objected at another point: "We'll ask the Court to instruct counsel not to go and try to elicit hearsay questions or put hearsay in his questions, which is inadmissible." (RR47: 81).

(205) The purposefulness of defense counsel's questions is borne out by this Court's warning to counsel, "[Y]ou know how to properly phrase your questions." (RR47: 81).

(206) Moreover, by not calling any law enforcement agents to testify regarding the escapee's statements, the Court finds that defense counsel also created the impression that the State had something to hide. Defense counsel achieved the intended effect when the State would vehemently object to the questions, thereby leaving the impression that the answer to defense counsel's question would have been favorable to Applicant. For instance:

> [DEFENSE COUNSEL]: Q. [A]s the jury is probably aware by now and you are certainly aware, [the Colorado Springs Police Department, the FBI, and the Teller County Sheriff's Office] produce reports in regards to their activities and their responsibilities and generate those reports for purposes of review should the cases come to trial so they do not have to keep in their memories everything that happened, since they investigate a variety of cases over long periods of time?
>
> [SPIVEY]: A. That's correct.

* * *

34

2872

Q. All right. Now, certainly when law enforcement individuals from a variety of agencies, such as the FBI or Colorado Springs Police Department, if they have interviewed one of the Texas Seven, then they certainly would have memorialized that in a report?

A. Yes, sir.

Q. Okay. And that is essentially standard procedure for virtually everybody that's in law enforcement, correct?

A. Correct.

(RR47: 8-10).

(207)   Defense counsel similarly elicited the following testimony from FBI agent James Mahoney:

[DEFENSE COUNSEL]: Q. Okay. Are you familiar with Special Agent Dean Aker and Special Agent Robert Moen?

[Mahoney]: A. Yes, I am.

Q. Who are they?

A. They are assigned to our Colorado Springs office.

*  *  *

Q. You know if Special Agent Dean Aker or Special Agent Robert Moen had been asked to come down by the Dallas County District Attorney's Office to testify in this trial regarding the facts and circumstances surrounding the shooting of Officer Aubrey Hawkins at the Oshman's store in Dallas, Texas?

A. I personally am not aware that they've been coming down for the trial.

Q. Well, what trials have you testified in?

A. I testified in the trials of Mr. Rivas, Mr. Rodriguez, Mr. Newbury, and Mr. Garcia.

Q. Well, if law enforcement interviewed one of those suspects and obtained a statement from them, do you think that might be relevant to their role in the offense?

35

2873

STATE:   Judge, we'll object.   The question calls for a legal conclusion and it is also irrelevant with this particular witness.

COURT: Sustained.

(RR46: 58-62).

(208)    Defense counsel made many similar references to the involvement of these other agencies in the investigation and prosecution of the escapees and the absence from the trial of other law enforcement agents. (RR42: 45, 94). Thus, the Court finds that defense counsel capitalized on the fact that Detective Spivey was the only law enforcement agent to testify for the State regarding the escapees' statements and used that to suggest to the jury that the State was hiding other statements that were more favorable to Applicant.

(209)    Furthermore, by not calling any additional law enforcement agents to testify besides Detective Spivey, defense counsel was able to argue in closing statements:

> [The State has] had three years to go and scour the countryside, which you know they have.  They have gone to the far reaches of the corners of Colorado and Texas to bring you witnesses, run down witnesses.  You know Detective Spivey went to great lengths to go take statements.  We had the FBI, the ATF, the Colorado Springs Police Department, the Pueblo City Police Department, the Teller County Sheriff's Office, the El Paso County Sheriff's Office, and all the king's horses and all the king's men, and what did they bring you?
>
> They want you to infer.  That's what they want you to do.  They want you to guess.  That's what they want you to do.  And that's what you do when you can't prove something.  You try to stampede a group of folks into guessing and inferring something from the evidence when it's not there.

(RR50: 28-29).

(210)    Thus, the Court finds that defense counsel effectively wove a consistent theme throughout the guilt phase that hinted at beneficial codefendants' statements to other law enforcement agencies that were concealed by the State.

36

2874

(211)   Nonetheless, Applicant argues that his trial counsel's decision not to admit the suggested statements prejudiced his case because it allowed the jury "to make the death decision without access to this highly probative evidence showing that Halprin did not shoot." (Application, p. 72).

(212)   The Court finds that the omitted testimony was cumulative of other evidence that was introduced to the jury.

*[handwritten margin note: ?leted was & euvorded st· PDF # 215, p. 43]*

(213)   Applicant asserts that his trial counsel should have called Detective Graham to testify that his interview notes reflect that, when he interviewed Newbury, Newbury told him that he accidentally shot Rivas because he thought Rivas was a cop. (Applicant's Record Excerpt K). Applicant argues that this would have counterbalanced the State's argument that Halprin shot Rivas (which Applicant alleges was based on Newbury's written statement in which he stated he thought *Garcia* was a cop and that he fired three rounds at him). (Defense Ex. 25). This distinction is without merit because Rivas was shot twice, "the first time in the stomach and then the second time he's back up actually getting into the vehicle and he gets shot from behind." (RR42: 107-08).

*[handwritten margin note: deleted "For example"]*

(214)   Likewise, Patrick Murphy's written statement provides: "Rivas was shot twice. Once in the stomach and once in the leg." (RR47: 75; Defense Ex. 24).

(215)   Thus, the Court finds that just because Newbury says in one statement he shot Rivas does not mean that Applicant did not also shoot Rivas.

(216)   Furthermore, although Applicant argues that his defense counsel should have called FBI agents to testify that Rodriguez and Murphy told them that Halprin's weapon was not fired, he also admits that Rodriguez's and Murphy's written statements containing the same information were introduced into evidence and read to the jury. (Application, p. 65).

(217)   Indeed, defense counsel specifically questions Detective Spivey on this exact subject:

> [DEFENSE COUNSEL]: Q.  Do you recall during the course of your investigation in reviewing the statements, that Randy Halprin's weapon was checked by the other individuals and it was still fully loaded, the revolver that he was supposedly carrying?
>
> [SPIVEY]: A. I believe Mr. Murphy makes reference to that.
>
> Q.  And his weapon was fully loaded, right?
>
> A.  That's correct.

2875

Q. And hadn't been discharged?

A. According to Mr. Murphy, that's correct.

(RR42: 91-92).

(218)   Spivey also acknowledged on cross-examination that Rodriguez's written statement similarly provides: "Halprin did not shoot." (Defense Ex. 27). Defense counsel specifically pointed out this statement to the jury. (RR47:58). Yet, Applicant argues that his counsel were ineffective for not calling "corroborating witnesses." (Application, p. 65).

(219)   The Court finds that the fact Rodriguez and Murphy told additional law enforcement agents that Halprin did not shoot would not have affected the jury's verdict. The questionable reliability of any of the escapees' statements regarding this issue would have paled in light of the extensive physical evidence and Applicant's own testimony which allowed the State to argue during closing arguments that Applicant was "the only one, by his own admission, that puts himself on the passenger side of that car. And we know from looking at the photos, that there are four bullets going in on that side of the car, coming from that side of the vehicle." (RR50: 60)

(220)   Likewise, Applicant claims that his defense counsel failed to elicit testimony from Detective Spivey that Rivas told him orally that Newbury reloaded *only* Rivas's weapon. Applicant argues that this would have countered a portion of Newbury's written statement in which Newbury stated he reloaded *everyone's* gun, thereby suggesting he loaded Applicant's gun and, consequently, that Applicant shot his gun.

deleted "imprecise"

(221)   As far as the Court can determine from Applicant's argument, Applicant is relying on Spivey's handwritten notes of his interview with Rivas, which contain the notation: "Newbury reloaded Rivas gun 5 rounds." (Defense Trial Exhibit 29). Notably, Applicant provides no evidence to support his argument that the "defense attempted to show that Newbury only reloaded Halprin's gun." (Application, p. 65).

(222)   Because the statement at issue does not say that Newbury reloaded *only* Rivas's gun, this statement would not have changed the outcome of the trial. Rivas's statement to Spivey that Newbury reloaded *Rivas's* gun does not mean that Newbury did not reload Applicant's gun.

(223)   For all of the above reasons, the Court finds Applicant fails to prove that the result of the proceeding would have been different if these statements had been admitted. *Strickland*, 466 U.S. at 687.

38

2876

(224)   The Court finds that counsel was not deficient for not offering the codefendant's statements and that the omission of the statements was not prejudicial to Applicant's defense.

(225)   Therefore, the Court concludes counsel's decision not to offer the codefendant's statements did not violate Applicant's constitutional right to effective assistance of counsel.

## B. Evidence of Applicant's Foot Wound

(226)   Applicant asserts that his trial counsel were ineffective for failing to introduce medical evidence that he did not shoot himself. (Application, p. 72). In support of this argument, Applicant presents this Court with an affidavit from Dr. Carey Thomas Pelto, the Colorado physician who evaluated Applicant and the wound to his left foot after Applicant was arrested. (Applicant's Record Excerpt S).

(227)   Dr. Pelto states in part:

> As I testified to the FBI officers on January 29, 2001, I asked Mr. Halprin whether the gunshot wound of his foot was self-inflicted. He replied that it was not; he said that he was shot by a handgun during a cross-fire involving his group and unnamed others. The direction of the wound, with a low transverse entrance wound through the great toe, exiting through the second toe, is, in my opinion, consistent with this scenario. A self-inflicted shooting would be difficult to achieve at the angle of this specific wound. Furthermore, there were no powder burns in the surrounding skin.

(Applicant's Record Excerpt S).

(228)   Applicant argues, "Had the defense presented this testimony, the State would not have been able to insist that Halprin fired his weapon—the main fact the State relies upon to prove lethal intent." (Application, p. 72).

(229)   The Court finds that defense counsel did introduce evidence regarding this issue.

(230)   After the Teller County Sheriff, Frank Fehn, testified to his involvement in the capture of the Texas Seven, defense counsel cross-examined him as follows:

> [DEFENSE COUNSEL]: Q.  Now you testified that you pretty much have an obligation to see to a prisoner's medical needs once he's in your custody?
> [FEHN]: A.  Correct.

39

2877

Q. Okay. And for that reason you allowed Mr. Halprin to be treated?

A. That's correct.

Q. And where was he taken?

A. Langstaff Brown, which is a local emergency center which is affiliated with the Penrose Hospital in Colorado Springs.

&ast; &ast; &ast;

Q. Okay. Have you seen the FBI summary of his medical information?

A. No, sir, I have not.

Q. I'll show you this exhibit marked as Defense Exhibit No. 25 and ask you to take a look at it, and looking at it, can you identify what it appears to be?

A. It's a patient report from Langstaff Brown.

Q. All right. Is there a picture on it?

A. There's a drawing of two toes on the foot.

Q. And Langstaff Brown is the hospital that you said Randy Halprin was taken to?

A. It's a medical center affiliated with the hospital.

Q. Okay. You see Mr. Halprin's name on these anywhere?

A. Yes, sir, I do.

(RR45: 24-25).

(231)   This Court admitted Defense Exhibit 25[11], and defense counsel published it to the jury. (RR45: 25); (State's Writ Ex. J). This exhibit contains notes and a drawing of Applicant's injuries. The drawing is of Applicant's toes and depicts an entrance wound on the great toe, which could be described as being on the side

_this is State's #12_

---

[11] Two exhibits were numbered as Defense Exhibit 25: Donald Newbury's written statement and Applicant's medical record regarding his foot.

40

2878

of the toe rather than on the top.

(232) Additionally, defense counsel elicited the following information from lead detective Spivey on cross-examination:

> [DEFENSE COUNSEL]: Q. You took photographs of Randy Halprin's foot, did you not?
>
> [SPIVEY]: A. Yes, I did.
>
> * * *
>
> Q. Okay. You don't have those photographs that you took at a later date, once he was returned to the state of Texas, you don't have those with you today, do you?
>
> A. No, sir, I don't.
>
> Q. Okay. And I know I've asked you just today, I saw you in passing asked you when you had an opportunity to bring those to the courtroom with you and you told me you would be glad to do that; is that correct?
>
> A. Certainly.

(RR42: 95).

(233) Later in trial, defense counsel cross-examined Detective Spivey about the photographs:

> [DEFENSE COUNSEL]: Q. Let me show you what has been marked as Defense Exhibit 32, which is a series of five photographs. And would you look at that, please, and do you recall, are these the photographs that you took?
>
> [SPIVEY]: A. Yes, they are.
>
> [Defense Exhibit 32 was admitted with no objection and published to the jury].

(RR47: 84-85).

(234) During defense counsel's direct examination of Applicant, the following dialogue occurred:

> [DEFENSE COUNSEL]: Q. There are some photographs that have

41

2879

been introduced and you are aware of the medical record. Where did you get hit in the foot?

[APPLICANT]: A.  I got hit – it was actually the first four toes.  It went through on the side, went clear through, and messed this toe up completely. And then it kind of grazed under the second toe like this (demonstrating) and it broke, it snapped the bone, and then it started going out like this, and it came out like that on the third toe and just nicked the fourth toe.

(RR48: 43).

(235)   The Court finds that all of the above evidence allowed defense counsel Edwin King to argue in closing statements:

[N]obody really wanted to know what kind of injury Randy Halprin really had. That's why they don't really go and get any medical records and see what the doctor's initial statement is and see whether or not there's a hole on the side of the toe that leads over and goes across. Because, see, if you do that, then you didn't shoot yourself. Somebody else shot you, you know. If you put your foot up and you have a hole over here and it exits on the other side and hits your other toe, then the bullet came from over here, right?  That's what Brett Mills explained to us about trajectory and straight line.

* * *

But, see, this doesn't lend itself to the State's theory, because the State's theory is what? Randy must have shot Rivas. He shot himself. He was discharging a gun, you see.

(RR50: 40).

(236)   Co-counsel George Ashford expounded on this during his portion of the argument:

If [Applicant] had had one of those big ole revolvers, .357s out there at the scene, he shot hisself in the foot, he wouldn't have a toe now. The entry wound is from the side, consistent with somebody else shooting. It's consistent, folks.

(RR50: 50).

(237)   Thus, the Court finds that trial counsel thoroughly discounted any argument by the State that Halprin's foot wound indicated that he shot his gun.

42

2880

(238)   Additionally, the Court finds that defense counsel more directly addressed this issue by asking Detective Spivey on cross-examination: "[D]o you have any direct evidence that shows this jury beyond a reasonable doubt that Randy Halprin discharged a firearm that night?" To which Detective Spivey replied, "No." (RR42: 82).

(239)   The Court finds that even without the aid of Dr. Pelto's testimony, Applicant's trial counsel made it clear to the jury that the State failed to prove Applicant's wound was self-inflicted.

(240)   The fact that another attorney might have made a different choice in addressing this issue does not suffice to prove ineffective assistance of counsel. *Miniel v. State*, 831 S.W.2d 310, 325 (Tex. Crim. App. 1992).

(241)   Thus, the Court finds that Applicant fails in his burden of rebutting the presumption that his trial counsel acted reasonably.

(242)   Furthermore, the Court finds Applicant fails to prove that he was prejudiced by his trial counsel's decisions regarding this issue.

(243)   The Court finds the State's theory that Applicant was a shooter was not dependent on whether Applicant shot himself in the foot. Instead, the State relied on the extensive physical evidence and Applicant's own testimony to argue during closing arguments that Applicant was "the only one, by his own admission, that puts himself on the passenger side of that car. And we know from looking at the photos, that there are four bullets going in on that side of the car, coming from that side of the vehicle." (RR50: 60).

(244)   More significantly, the Court finds that defense counsel's tactic influenced lead prosecutor Toby Shook to seemingly concede this issue during closing arguments:

> [Applicant] was in that store and was actively participating in that robbery and he was out back when Officer Hawkins was coming and he knew Officer Hawkins was coming around. He had been informed of that by the lookout, Patrick Murphy. And he was back there close enough, just like George Rivas was close enough, *to get hit in the cross fire.*

(RR50: 59) (emphasis added).

(245)   Thus, Applicant fails to prove that, but for his trial counsel's actions, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687.

43

2881

(246)   The Court finds that counsel's decision not to present Dr. Pelto's testimony was not deficient and did not prejudice Applicant's defense.

(247)   Therefore, the Court concludes counsel's decision not to present Dr. Pelto's testimony did not violate Applicant's constitutional right to effective assistance of counsel.

## C. Victim Impact Evidence

(248)   Applicant asserts that his trial counsel rendered ineffective assistance of counsel when they failed to object to what Applicant characterizes as victim-impact testimony elicited by the State during the guilt-phase testimony of Officer Hawkins's mother, Jayne Hawkins.

(249)   In *Payne v. Tennessee*, 501 U.S. 808 (1991), the United States Supreme Court rejected a per se rule excluding victim character and impact evidence from the punishment phase of a capital murder trial. In *Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998), the Court of Criminal Appeals held that "[b]oth victim impact and victim character evidence are admissible, in the context of the mitigation special issue, to show the uniqueness of the victim, the harm caused by the defendant, and as rebuttal to the defendant's mitigating evidence." The Court of Criminal Appeals discussed the meaning of "victim impact" and "victim character." *Mosley*, 983 S.W.2d at 261. The Court explained that "victim impact evidence" is evidence that is "generally recognized as evidence concerning the effect that the victim's death will have on others, particularly the victim's family members." *Mosley*, 983 S.W.2d at 261. The Court defined "victim character" as evidence that is "generally recognized as evidence concerning good qualities possessed by the victim." *Id.*

(250)   Jayne Hawkins was the State's first guilt-phase witness, and she testified: that Aubrey Hawkins was her son; that he was a police officer with the Irving Police Department; that it was her son's "life's dream" to become a police officer with a big department; that on Christmas Eve of 2000, she and her mother met Aubrey and his wife and son for dinner; that Aubrey was wearing his uniform at the restaurant because he was on duty; that Aubrey was in good spirits that evening; and that when dinner was over, Aubrey hugged his son and said, "I love you. See you in the morning." (RR41: 54-58).

(251)   Jayne Hawkins also testified about returning home that evening and having the Chief of the Irving Police Department come to her house around 9:00 p.m. to tell her that something had happened to her son. (RR41: 58-62).

(252)   The Court finds that Applicant fails to specify which portion of Ms. Hawkins's testimony was objectionable. Instead, he argues globally that "none of [the eight

44

2882 ✓

pages of testimony] was relevant to any issue in the case." (Application, p. 79). Applicant argues that the "testimony had no probative value on any issue and was introduced solely so that the jury would weigh the relative value of Halprin's life and Hawkins's life." (Application, p. 80).

(253)   The Court finds Applicant fails to prove that Jayne Hawkins's guilt-phase testimony constituted impact or victim character evidence.

(254)   The Court finds that through Jayne Hawkins's testimony, the State established certain elements of the offense, including the identification of Aubrey Hawkins as being born alive and as the murder victim. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2003) (a person commits an offense if he intentionally or knowingly causes the death of an individual); TEX. PENAL CODE ANN. § 1.07(26) (Vernon 2003) (defining "individual" at time of trial as a human being who has been born and is alive).

(255)   Furthermore, the Court finds that Ms. Hawkins established that Aubrey was a peace officer who was acting in the lawful discharge of his official duty at the time he was killed, one of the manner and means alleged in the indictment. (CR: 65); TEX. PENAL CODE ANN. § 19.03(a)(1) (Vernon Supp. 2010). Indeed, the State introduced a map showing the short distance between the restaurant where the Hawkins family ate dinner and the Oshman's Sporting Goods store where Aubrey drove immediately and directly after leaving dinner. (RR41: 59).

(256)   The Court finds that Ms. Hawkins also properly testified to some general background information about her son, including that he had a wife named Lori and a nine-year-old son named Andrew. (RR41: 54-55).

(257)   The Court of Criminal Appeals has held that evidence of the victim's personal background in a murder case does not amount to victim impact evidence. *Matchett v. State*, 941 S.W.2d 922, 931 (Tex. Crim. App. 1996) (holding that a widow's identification of the victim, her husband, in a photograph with friends and her testimony that she had been married to him for twenty-five years, that they had five children, and that the victim was home alone on the night of his murder during the guilt phase of trial did not constitute victim impact evidence); *Washington v. State*, 771 S.W.2d 537, 539 (Tex. Crim. App. 1989); *see Delarue v. State*, 102 S.W.3d 388, 402-04 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (holding that recitation of basic facts surrounding how victim's mother learned of her daughter's death did not constitute victim-impact testimony).

(258)   Applicant acknowledges *Matchett* but argues that it "overlooked the still existing prohibition against character and background evidence of the deceased." (Application, p. 75). The Court finds, however, that Applicant fails to cite any case law or authority in support of his assertion.

45

2883

(259)   The Court finds that Jayne Hawkins did not testify about the crime or its emotional impact on her. *See Lane v. State*, 822 S.W.2d 35, 41 (Tex. Crim. App. 1991) (no victim impact testimony where no evidence given regarding the physical, psychological, or physical effect of the crime on victims or their families); *cf. Ford v. State*, 919 S.W.2d 107, 112-13 (Tex. Crim. App. 1996) (holding relevant and admissible victim's father's punishment-phase testimony, "I miss my boy a lot, and it's affected me in many ways . . . .").

(260)   Likewise, the Court finds that Jayne Hawkins did not testify about her son's character. *Cf. Armstrong v. State*, 718 S.W.2d 686, 695 (Tex. Crim. App. 1985) (holding it was error for the victim's widow to testify that the deceased was peaceable and inoffensive). The fact that her son enjoyed being a police officer is not a direct reflection of his character.

(261)   Because Jayne Hawkins's testimony was proper, the Court finds that Applicant's trial counsel had no basis to object.

(262)   A failure to object to admissible evidence does not constitute ineffective assistance of counsel. *Ortiz v. State*, 93 S.W.3d 79, 93 (Tex. Crim. App. 2002); *Vaughn v. State*, 931 S.W.2d 564, 566 (Tex. Crim. App. 1996) (holding that, to show counsel was ineffective for failing to lodge an objection, Applicant must show the trial court would have erred in overruling such objection).

(263)   Additionally, the Court finds that defense counsel made a strategic decision not to object because objecting to the testimony of the victim's mother might offend the jurors and counsel did not want to risk alienating them. (8/20/10 Hrg) RR: 58-59, 61, 143-45.

(264)   The Court finds that consistent with that strategy, trial counsel broached the topic with the State and this Court before Ms. Hawkins testified and outside the presence of the jury. (RR41: 14—where defense counsel asked for a motion in limine on the character of the complainant and the victim impact, which the trial court granted).

(265)   The Court finds the strategic decision not to object to Ms. Hawkins' testimony constituted reasonable professional judgment. *See Hathorn v. State*, 848 S.W.2d 101, 119-120 (Tex. Crim. App. 1992) (holding that trial counsel can decide to forego objecting to evidence in the exercise of reasonable trial strategy).

(266)   Additionally, the Court finds that trial counsel could have reasonably concluded from this Court's comments in granting the motion in limine that the Court would most likely overrule any objection from defense counsel. (RR41: 14—where trial court stated: "If it wasn't the fifth time, I would instruct the witness myself. But she understands where she can go").

2884

(267)   It is reasonable trial strategy not to object where the objection would ultimately be futile. *Hathorn*, 848 S.W.2d at 119.

(268)   Therefore, the Court finds Applicant fails to rebut the presumption that counsel's actions were reasonable.

(269)   Moreover, Applicant fails to prove that, but for his trial counsel's omission, the outcome of the proceeding would have been different.

(270)   Jayne Hawkins was the very first witness to testify in the week-long guilt-phase of the trial, in which twenty-seven witnesses testified, and her testimony occupied merely eight pages of the 1400-page transcript of the guilt phase. (RR41: 54-61). *cf. Cantu v. State*, 939 S.W.2d 627, 637-38 (Tex. Crim. App. 1997) (improperly admitted victim impact evidence was harmless where it occupied only a few pages in the record).

(271)   Applicant argues that he was prejudiced by his counsel's failure to object to the testimony because it allowed the State to improperly rely on such testimony in its closing argument:

> [Officer Hawkins's] last thought, his last vision, was of this man and his friends swarming on him in a murderous fury. And he was outnumbered and they had the jump on him and he died. He died alone in [sic] that cold pavement. Maybe he had some final thoughts. Maybe he thought of his family that he had just left. I hope he did.
>
> Randy Halprin must be held accountable for his crime, which is capital murder. On Christmas Eve most men, most fathers are home. They have dinner with their family. Maybe after dinner they sit down and they read a traditional Christmas story to their children. After their children are put to bed, perhaps they build their little boy's bicycle or other toys.
>
> But Aubrey Hawkins couldn't do that because he was on duty. He was out there guarding me. He was out there guarding you. And he answered his call. And they had the drop on him that day.

(RR50: 76).

(272)   The Court finds, however, that the above argument could also have been based on Detective Spivey's testimony about the written statement of codefendant Donald Newbury. As Spivey testified, Newbury's statement included the following sentiment: "My heart goes out to the little boy who lost his dad on

47

2885

Christmas Eve and his wife and his mother. They are the ones that got the loss." (RR47: 43; Defense Ex. 25).

(273) Thus, Applicant fails in his burden of proving that his trial counsel's failure to object to Ms. Hawkins's testimony prejudiced his case.

(274) Moreover, the Court finds that the State's jury argument was proper.

(275) Proper jury argument includes four areas: (1) summation of the evidence presented at trial, (2) reasonable deduction drawn from the evidence, (3) answer to the opposing counsel's argument, or (4) a plea for law enforcement. *Jackson v. State*, 17 S.W.3d 664, 673 (Tex. Crim. App. 2000). To constitute reversible error, the argument must be manifestly improper or inject new, harmful facts into the case. *Id.* Common knowledge is an exception to the prohibition against arguing facts outside the record. *Nenno v. State*, 970 S.W.2d 549, 559 (Tex. Crim. App. 1998), *overruled in part on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999).

(276) The Court finds that the indictment in Applicant's case reflected that this offense occurred on December 24, 2000. It is common knowledge that this date is Christmas Eve. It is also common knowledge that people spend time with their families during the Christmas holiday. The defendants in this case had to have reasonably known that if they robbed a store on Christmas Eve, that this holiday would forever be tied to the circumstances of the offense. Even Halprin acknowledges this in one of his letters to a friend: "I blamed [Rivas] for the Christmas Eve incident because I told him it was wrong, too many kids and all that." (RR48: 125; State's Ex. 956).

(277) Additionally, the Court finds that by its argument, the State was not trying to get the jury to "weigh the relative value of Halprin's life and Hawkins's life." Instead, the State was merely emphasizing that Aubrey Hawkins was working as a police officer on Christmas Eve (instead of being home with his family) when he was gunned down by Applicant and his cohorts. This was a reasonable deduction from the evidence. *See generally Black v. State*, 26 S.W.3d 895, 901 (Tex. Crim. App. 2000) (Meyers, J., concurring) (stating that peace officers are rendered vulnerable to a criminal offender when they are acting in the lawful discharge of their official duty); *Rodriguez v. State*, 146 S.W.3d 674, 676 (Tex. Crim. App. 2004) (explaining that the Legislature's inclusion of the elements of section 19.02(b)(1) in the capital murder statute by reference was an expression of the Legislature's desire to limit capital murder only to intentional and knowing murders that are committed in circumstances that the legislature found particularly egregious).

48

2886

(278)  The Court finds that the State's references to Christmas and Aubrey Hawkins' status as a peace officer were not new and harmful facts that caused the jury to abandon their objectivity. The State's argument did not influence the jury to determine Applicant's guilt in an irrational way. The State's evidence overwhelmingly proved that, at the very least, Applicant was guilty as a party conspirator to capital murder. (RR50: 58-59, 61, 64, 75).

*deleted paragraphs + rate's argument for 50*

(279)  [Based on the foregoing] the Court finds that Applicant was not prejudiced by trial counsel's decision not to object to Ms. Hawkins's testimony. *See Wilson v. State*, 15 S.W.3d 544, 554-55 (Tex. App.—Dallas 1999, no pet.) (holding that Wilson failed to show prejudice from his lawyer's failure to object to inadmissible victim impact testimony where the evidence establishing his guilt was overwhelming); *Marci v. State*, 12 S.W.3d 505, 509 (Tex. App.—San Antonio 1999, pet. ref'd) (holding that Marci failed to show prejudice from his counsel's failure to object to inadmissible victim impact testimony where the jury would naturally know of the negative effects of the crime on one of the victims).

(280)  Therefore, the Court concludes counsel's decision not to object to Ms. Hawkins's testimony did not violate Applicant's constitutional right to effective assistance of counsel.

### D. Felony-Murder Instruction

(281)  Applicant asserts that his trial counsel were ineffective for failing to request a charge on the lesser-included offense of felony murder. Applicant argues that, because there was evidence in codefendant George Rivas's written statement that Rivas did not intend to kill Officer Hawkins, and because "the intent of a party is inexorably tied to the intent of the shooter," Applicant was entitled to a felony-murder instruction. (Application, pp. 81-82).

(282)  Foregoing a charge on a lesser-included offense can be a reasonable trial strategy. *Davis v. State*, 930 S.W.2d at 768; *Wood v. State*, 4 S.W.3d 85, 87 (Tex. App.—Fort Worth 1999, pet. ref'd). Applicant bears the burden of overcoming the presumption that counsel's decision not to request the instruction could be considered sound trial strategy. *See Jackson v. State*, 877 S.W.2d 768, 771-72 (Tex. Crim. App. 1994). Applicant may not build ineffective assistance claims on retrospective speculation. *Bone*, 77 S.W.3d at 835-36. The standard under which the Court of Criminal Appeals has evaluated trial strategy requires only "'the possibility that the conduct could have been legitimate trial strategy.'" *Murphy v. State*, 112 S.W.3d 592, 601 (Tex. Crim. App. 2003).

(283)  The Court finds that Applicant fails to rebut the presumption that his counsel's decision not to request a lesser-included offense instruction on felony-murder constituted sound trial strategy.

49

2887



(284) Applicant provided the Court with no evidence as to why one of his trial counsel, Mr. King, chose not to request a felony-murder instruction. Thus, the record is silent as to Mr. King's reasons for this omission.

(285) In his answer to an interrogatory on the issue, Applicant's other trial counsel, Mr. Ashford, stated that he did not request such an instruction because he "did not believe that felony murder applied when all involved admitted that they intended to commit an aggravated robbery." Ashford Interrogatory Answers, p. 2. Furthermore, during a hearing in these writ proceedings, Mr. Ashford testified that requesting such an instruction would have been inconsistent with the defensive theory that Applicant was guilty only of aggravated robbery. (8/20/10 Hrg) RR: 145.

(286) In asserting that his trial counsel should have asked for a felony-murder instruction, Applicant ignores his counsel's defensive tactic of minimizing his involvement with Hawkins's death and arguing that, if Applicant were guilty of any offense, it was aggravated robbery.

(287) Defense counsel argued in opening statements to the jury: "The evidence is going to show you that Mr. Halprin participated in an aggravated robbery, but did not participate in the capital murder, in the death of Officer Hawkins." (RR41: 54). Defense counsel reiterated this argument in closing arguments, saying: "[W]e started out this case from voir dire . . . but certainly on opening statement telling you that Randy Halprin participated in an aggravated robbery." (RR50: 45).

(288) Thus, the Court finds Applicant's defensive theory emphasized that he only conspired to commit an aggravated robbery at the Oshman's, that he reluctantly took a gun, that he never drew or shot his gun, and that he could not have anticipated that anyone would be killed.

(289) The Court finds a felony-murder instruction, by contrast, would have emphasized that Applicant was active in causing the death of the victim.

(290) Specifically, a person commits felony murder if he:

> . . . commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE ANN. § 19.02(b)(3) (Vernon 2003).

2888

(291)   Thus, the Court finds that the felony-murder language would have been disadvantageous to Applicant.

(292)   Applicant testified at trial that the only reason he even carried a gun into Oshman's was because he did not have a choice. Specifically, Applicant testified:

> You know, I, before the robbery, I even told them, I'm not going to go in and carry a gun and there was a little argument and they made it very clear that, you know, it was, you know, their way or the highway. And so I told them I wasn't going to pull a gun and they said, fine, just gather clothes, grab a shopping cart, and gather clothes.

(RR48: 14).

(293)   Regarding the offense, Applicant testified that, once he heard one of his cohorts repeating "get out" over the radio, he headed toward the back exit and opened the back door when Larry Harper ordered him to "grab the long sleeping bag" that had "a bunch of rifles" in it. (RR48: 17-18). Applicant testified that he dragged the bag and began trying to load it into the backseat of the Ford Explorer they were using to escape. George Rivas was in the front driver's seat with the door open when Applicant saw the patrol car pull up. (RR48: 21). As Rivas approached the patrol car, he told Applicant to "stay put." Applicant testified that he stayed put and that:

> A. [Rivas] walked up to the car where the patrol car was and he reached back. I saw him reach back for his, what I thought was his security badge. And then at that time he had said something, I can't remember what he said, and then the next thing you know I just heard gunshots.
>
> [DEFENSE COUNSEL]. Q. What did you do?
>
> A. I freaked out and started running around the car. I ran around the Ford Explorer. The first thing in my mind was get across the field.
>
> \* \* \*
>
> Q. All right. What happened after that? What's the next thing that happened?
>
> A. I had gone down those, like there was like a grassy embankment and I remember going by them. By then, I believe a lot of people had filed into the car because the car was already moving. I remember

51

2889

Joseph Garcia and Rodriguez doing something and the car, the patrol car, moving back and the car, the Explorer, backing out. And then I heard somebody tell me to, "Get in the car. Get in the car." And I jumped into the front, the right side of the front seat in Newbury's lap.

\* \* \*

Q. Now, was there any other gunshots that you heard, other than Rivas?

A. Um, everybody that was out there was firing. I mean, it was – as soon as Rivas had shot, there was a brief pause and then it was just like just nonstop shots.

Q. Did you pull your gun and shoot your gun?

A. No, sir.

Q. Where was your gun?

A. At some point in time it fell down my pants.

\* \* \*

Q. Were there any shots fired as y'all drove off?

A. When I got into Newbury's – when I jumped into Newbury's lap, there were a couple more shots, yes, sir.

Q. Who fired those shots?

A. Newbury.

(RR48: 22-25).

(294)    The Court finds that the absence of a felony-murder instruction did not preclude Applicant from presenting a viable defense.

(295)    Furthermore, the Court finds that the inclusion of the instruction would have contradicted his defensive theory.

(296)    The Court finds that Applicant received jury instructions on the lesser-included offense of aggravated robbery, and the second application paragraph of that lesser-included offense embodies completely Applicant's defensive theory. (CR: 32).



2890

(297) Moreover, Applicant's trial counsel requested (but was denied) instructions on attempted capital murder and attempted murder, which would have better fit with their theory than a felony murder instruction. (RR49: 212). *See* TEX. PENAL CODE ANN. § 15.01 (Vernon 2003) (defining criminal attempt as doing "an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended").

(298) Based on the foregoing, the Court finds that defense counsel's decision not to request a lesser-included offense instruction on felony murder constituted a sound strategic decision. *Posey v. State*, 966 S.W.2d 57, 66 n. 3 (Tex. Crim. App. 1998) (Mansfield, J., concurring) (explaining that often counsel may not request certain defensive issues for strategic reasons such as that the jury may be confused by the instructions).

(299) In any event, in order to show that his counsel were ineffective in failing to request a lesser-included offense instruction, Applicant must establish that he was entitled to the instruction. *Cardenas v. State*, 30 S.W.3d 384, 392 (Tex. Crim. App. 2000).

(300) The Court finds that Applicant fails to prove he was entitled to a lesser-included offense instruction on felony murder.

(301) An offense is a lesser-included offense if:

> (1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

> (2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

> (3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

> (4) it consists of an attempt to commit the offense charged or an otherwise included offense.

TEX. CODE CRIM. PROC. ANN. art. 37.09 (Vernon 2006).

(302) A lesser-included-offense instruction should be given if there is some evidence that would permit the jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser-included offense. *See Moore v. State*, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998). In other words, there must be some evidence from which a rational jury could acquit the defendant of the greater offense while still

53

2891

convicting him of the lesser-included offense. *Threadgill v. State*, 146 S.W.3d 654, 665 (Tex. Crim. App. 2004).

(303)   The indictment in this case charged Applicant with the capital murder of Officer Hawkins under two different theories: (1) the intentional or knowing murder of a peace officer who was acting in the lawful discharge of an official duty; and (2) an intentional murder committed in the course of committing or attempting to commit a robbery. (CR: 65). *See* TEX. PENAL CODE ANN. § 19.03(a)(1)-(2) (Vernon Supp. 2010).

(304)   Felony murder is a lesser-included offense of capital murder committed in the course of a robbery. *See e.g.*, *Salinas v. State*, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005). The two offenses differ only in the culpable mental state of the offender: capital murder requires the existence of an intent to cause death, while in felony murder, the culpable mental state for the act of murder is supplied by the mental state accompanying the underlying felony. *Salinas*, 163 S.W.2d at 741 (citing *Rodriquez v. State*, 548 S.W.2d 26, 29 (Tex. Crim. App. 1977)).

(305)   But the inquiry does not end with the determination that felony murder is a lesser-included offense under one of the theories of capital murder charged in Applicant's case. The jury returned a general verdict of guilty after being instructed on both theories of capital murder alleged in the indictment. (CR: 36). When an indictment alleges alternative theories of capital murder, "the defendant is entitled to a requested lesser-included offense charge if a rational jury could convict him only on the lesser-included offense after considering *each* of the alternative theories of commission." *Feldman v. State*, 71 S.W.3d 738, 752 (Tex. Crim. App. 2002) (op. on reh'g) (citing *Arevalo v. State*, 970 S.W.2d 547, 548-49 (Tex. Crim. App. 1998)). In other words, there must be some evidence negating the defendant's guilt under every theory of capital murder alleged in the indictment.

(306)   Thus, Applicant's contention that he was entitled to a jury instruction on felony murder if there was evidence that he did not intend to kill Officer Hawkins is not entirely accurate. The Court finds that under the indictment in this case, the jury could still convict Applicant of capital murder if it found that he, either as a principal or a party, *knowingly* killed the officer. (CR: 65). Accordingly, Applicant was not entitled to a jury instruction on felony murder unless there was some evidence that he and the other escapees did not knowingly cause Officer Hawkins's death.

(307)   The Court finds that Applicant does not point to evidence in the record showing that he and his cohorts were not at least aware that, by unleashing a hail of gunfire on Officer Hawkins as he sat in his patrol car, they were reasonably certain to cause his death. *See* TEX. PENAL CODE ANN. § 6.03(b) (Vernon 2003)

2892

(defining "knowingly").

(308)    Because Applicant fails to identify evidence that could negate both theories of capital murder alleged in the indictment, the Court finds that he was not entitled to a lesser-included offense instruction on murder. *See Feldman*, 71 S.W.3d 752-53 (holding Feldman not entitled to lesser-included offense instruction on murder where did not negate both alternative theories of capital murder alleged in the indictment).

(309)    The Court finds that even if murder in the course of robbery was the only indicted theory, Applicant was not entitled to an instruction on the lesser-included offense of felony murder.

*Added*

(310)    Applicant further asserts that "the intent of a party is inexorably tied to the intent of the shooter" and that "if the shooter did not 'intend to kill,' then a charge on felony murder is appropriate." Applicant then argues that evidence was introduced during his trial that Rivas did not intend to kill the officer. (Application, pp. 81-82). Specifically, he relies on Rivas's written statement in which he says: "I never intended to hurt anyone . . . ." (Defense Ex. 26).

(311)    The Court finds that Applicant fails to acknowledge the parties and co-conspirator application paragraphs in the jury charge on capital murder and that there were five other men at the scene of the crime besides Rivas and Applicant. If the State's evidence demonstrated an intent to kill the officer by any of the accomplices, then Applicant was not entitled to an instruction on felony-murder.

(312)    The Court finds that Applicant's own testimony establishes the intent of his cohorts:

> [DEFENSE COUNSEL]: Q. So Michael Rodriguez says he shot [the officer] twice in the head?
>
> A. That's what he had said at first, yes.
>
> Q. And Rivas said he shot him how many times?
>
> A. He initially said four times.
>
> Q. Obviously, Officer Hawkins was shot a lot more than that, wasn't he?
> A. Yes, sir.
>
> Q. *The intent out there, obviously, was to kill Aubrey Hawkins, wasn't it?*

55

2893

A. *Yes, sir.*

Q. Shot 11 times?

A. Yes, sir.

Q. His bulletproof vest was hit?

A. Yes, sir.

Q. His car was surrounded and fired at from several angles?

A. Yes, sir.

Q. And the intent was clear to murder him?

A. Yes, sir.

(RR48: 161-62) (emphasis added).

Indeed, the Court finds that the evidence shows nothing less than an intentional murder: the escapees ambushed the officer, shooting him eleven times with several different guns. (RR47: 98-99, 119-20, 131, 139-40).

(313) The Court finds no rational juror could conclude that at the moment they started shooting, it was not the escapees' conscious objective and desire to kill Officer Hawkins. *See* TEX. PENAL CODE ANN. § 6.03(a) (Vernon 2003) (defining "intentionally"); *Rousseau*, 855 S.W.2d at 672 (holding "the possibility that initially or at some point during the commission of the robbery the offender did not have an intent to cause death does not amount to evidence that the offender did not intend to cause the victim's death when the murder was committed).

(314) Thus, the Court finds that Applicant was not entitled to an instruction on felony-murder. *Salinas*, 163 S.W.3d at 742 (holding that the evidence did not raise any issue of felony murder when it showed that the defendant dragged the victim from the car and shot him in the head at close range with a shotgun); *Threadgill*, 146 S.W.3d at 665-66 (holding that there was no evidence that would permit a jury to rationally find that the defendant did not intend to cause the victim's death when he leaned into the car in which the victim was sitting and fired two shots); *Fuentes*, 991 S.W.2d at 273 (holding that there was no evidence that the defendant lacked intent to kill when he ran up to the victim, shot him twice in the chest, and fled as the victim fell into a ditch and died).

56

2894

(315)    Because Applicant was not entitled to a felony-murder instruction, the Court finds that his trial counsel did not render a deficient performance by not requesting it. *Cardenas*, 30 S.W.3d at 392.

(316)    The Court also finds that Applicant fails to prove he was prejudiced by counsel's decision not to request a lesser-included offense instruction on felony murder.

(317)    The Court finds that Applicant's jury did not find itself in a *Beck v. Alabama*, 447 U.S. 625 (1980) dilemma. That is, the jury did not have to decide "whether to convict on the greater inclusive offense about which it harbors a reasonable doubt, or to acquit a defendant it does not believe to be wholly innocent." *See Saunders v. State*, 913 S.W.2d 564, 571, 573 (Tex. Crim. App. 1995).

(318)    The Court finds that Applicant's jury had a logically valid alternative to capital murder—aggravated robbery, a first-degree felony with a punishment range from 5 to 99 years to life. *See* TEX. PENAL CODE Ann. § 29.03 (Vernon 2003). If the jury had a reasonable doubt about the first six theories, they had a viable out. The jury's deliberation was quick, and they had an alternative choice. (CR: 17—demonstrating that the jury retired to deliberate at 10:48 a.m. and returned a verdict at 12:50 p.m.).

(319)    Relying on the following jury note, Applicant argues that "[g]iven the jury's concern expressed in the note sent out in deliberations . . . harm is manifest."

> Evidence:                                       6/11/03
>
> We are in disagreement on the definitional difference between 'anticipated that a human life would be taken' and 'should have anticipated.'
>
> We recall this from closing statements – definition of 'anticipate.'
>
>                                       Larry G. French

(CR: 45; Applicant's Writ Ex. G).

(320)    The Court finds that Applicant's reliance on this jury note is misleading. The jury sent this note out during their *punishment* deliberations, not their guilt deliberations.

(321)    Additionally, as acknowledged by the note, the Court finds that the jury's question was prompted by the following punishment-phase argument by defense counsel:

57

2895

That's why they spent so much time about parties and conspiracy and anticipated. The question is, *what does that mean? Anticipated that a life would be taken.*

. . . And I'm sitting at home last night and I'm trying to think about how I can get this to you, how I can get you to understand what it really means.

And then it dawned on me . . . . it's the Heinz Ketchup commercial. It's the person sitting there with a plate of food and a ketchup bottle that's full, turned upside down. And the ketchup is in the bottle, they know it's there, and they are going to enjoy it. And they are going to get it on the plate.

Now, what's the sales pitch? Anticipation of something that you expect to happen with a degree of certainty. What's the proof beyond a reasonable doubt that he expected with certainty that Officer Hawkins or any other police officer would be killed? They didn't try to kill any of the employees, even though there were some attempts apparently made by some people to act brave. They tied them up. They did the same consistent thing over and over again.

And while it's certainly – you are able to say, yeah, he should have thought that through and should have been able to see that probably or possibly somebody might get hurt ultimately, can you say beyond a reasonable doubt that he actually anticipated, he expected a life that night to be taken? And the answer to that is no, not with the evidence that you have. Not beyond a reasonable doubt.

(RR53: 105-06) (emphasis added).

(322)   The Court finds that Applicant fails to demonstrate how this note has anything to do with the exclusion of a felony-murder instruction ("commits an act clearly dangerous clearly dangerous to human life that causes the death of an individual").

(323)   The Court finds that Applicant fails in his burden of proving his assertion that "[i]t is highly likely . . . given the rational alternative of a felony murder verdict, the jury would have chosen that route." (Application, p. 87).

(324)   Thus, the Court finds that Applicant was not prejudiced by his counsel's decision not to request a lesser-included offense instruction on felony murder.

2896

(325)    Based on the foregoing, the Court concludes counsel's decision not to request a lesser-included offense instruction on felony murder did not violate Applicant's constitutional right to effective assistance of counsel.

### E. Impeachment and Character Evidence

(326)    Applicant asserts his trial counsel were ineffective in failing to object to the State's use of—and arguments regarding—certain impeachment and character evidence.

(327)    In that regard, Applicant initially argues that his trial counsel were ineffective for failing to object to the introduction of "numerous incidents of bad acts that were not disclosed in the State's 404(b) notice." (Application, p. 87). Although it is not entirely clear, Applicant seems to argue that the State failed to give notice of its intent to introduce certain jail correspondence of Applicant (and, according to Applicant, the letters raised "misconduct"). Applicant argues, therefore, that his trial counsel should have objected to the State's use of the letters at trial. (Application, p. 102).

(328)    The Court finds that Applicant fails to prove counsel was deficient for not objecting to the State's use of Applicant's letters.

(329)    The Court finds that the State introduced the challenged letters during its cross-examination of Applicant.

(330)    A defendant is not entitled to notice by the State of its intent to use extraneous bad acts that are introduced during cross-examination. *Jaubert v. State*, 74 S.W.3d 1, 3-4 (Tex. Crim. App. 2002); TEX. R. EVID. 404(b).

(331)    Also, the Court finds that the State *did* give notice of the letters. Included in the discovery documents that the State provided the defense were copies of letters obtained by the State that Applicant had either written or received. (8/20/10 Hrg) RR: 126-27, 193. Thus, *assuming arguendo* that the State had a duty to provide notice, the State satisfied the notice requirement. *See Hayden v. State*, 66 S.W.3d 269, 271-73 (Tex. Crim. App. 2001) (holding that delivery to the defense of witness statements detailing extraneous offense may satisfy the notice requirements of 404(b)).

(332)    For these reasons, the Court finds that an objection based on lack of notice would have been meritless. Applicant's trial counsel cannot be ineffective for failing to make a frivolous objection. *See Vaughn v. State*, 931 S.W.2d 564, 567 (Tex. Crim. App. 1996).

2897

(333)   Applicant also alleges that his trial counsel were ineffective for failing to object to the State's "improper impeachment" of him during his testimony. (Application, pp. 87, 102). Specifically, Applicant contends that his trial counsel should have objected to the State's questioning of him regarding his character for veracity, his "character for manipulation," certain letters he wrote to family and friends, and his conviction for injury to a child. (RR49: 59-61).

(334)   The Court finds that trial counsel's decision not to object to these various aspects of the State's questioning of Applicant constituted reasonable trial strategy. (8/20/10 Hrg) RR: 61-62, 119-20, 190-93, 196, 230-36.

(335)   As set out in more detail below, the Court finds that Applicant put his general character into issue in the guilt phase of trial in order to advance his defensive theory that he was weaker willed and weaker minded than his codefendants and that he played a diminished role in the offense. Defense counsel wanted the jury to see Applicant as a pathetic and sympathetic person, who was forthright in admitting to his past transgressions, but who was completely incapable of shooting or intending to shoot a police officer. (8/20/10 Hrg) RR: 119-20, 123-25, 230-36.

(336)   In furtherance of this theory, defense counsel elicited evidence throughout trial that Applicant was a coward, a buffoon, and a braggart. In fact, the State pointed out this tactic to the jury: "And then Randy Halprin in the way that he's described by defense counsel, he's just this reluc[tant] buffoon that's there. Don't believe that for a second. He's just as valuable a member of his team as anyone else." (RR50: 68, 70).

(337)   The Court finds that in addition to placing his general character in issue, Applicant placed his character for veracity in issue when he decided to testify. *Davis v. State*, 961 S.W.2d 156, 160 (Tex. Crim. App. 1998) (Baird, J., concurring); *Hammett v. State*, 713 S.W.2d 102, 105 (Tex. Crim. App. 1986); *Turner v. State*, 4 S.W.3d 74, 78 (Tex. App.—Waco 1999, no pet.).

(338)   Once a defendant voluntarily takes the witness stand, he may be cross-examined, impeached, contradicted, made to give evidence against himself, and treated in every respect as any other witness except where there are overriding constitutional or statutory provisions. *Sanchez v. State*, 707 S.W.2d 575, 577 (Tex. Crim. App. 1986). Thus, the Court finds that the State could properly question Applicant's veracity.

(339)   Although Applicant admits that "a prosecutor may bring in evidence as to the truth and veracity of a defendant upon cross-examination," he argues that the State should not have been allowed to ask him if he "had a long history of lying," and that, once Applicant admitted to being a liar, the questioning on this topic

60

2898

should have ended. (Application, pp. 99, 101).

(340)   The Court finds that Applicant fails to cite any authority or case law that prohibits the State from questioning Applicant about his own opinion of his own character for truthfulness. *See* TEX. R. EVID. 608(a).

(341)   Further, the Court finds Applicant is incorrect in suggesting that he "admitted to being a liar." In fact, Applicant gave equivocal and contradictory answers during the State's questioning. (RR48: 59-61).

(342)   Thus, the Court finds that had the defense objected it would have been proper for the Court to overrule the objection.

(343)   Furthermore, the Court finds that counsel made a sound and reasonable strategic decision not to object in order to avoid the appearance that the defense was trying to hide something. (8/20/10 Hrg) RR: 62, 190-91.

(344)   Additionally, Applicant had already testified on direct examination that he had lied to his family and law enforcement officials in the past (mostly due to being a teenager and the use of drugs). (RR47: 106, 108).

(345)   Thus, the Court finds that evidence elicited from the State that Applicant lied and manipulated people would not have unfairly prejudiced Applicant's defense.

(346)   The Court finds Applicant's argument that his trial counsel should have objected to the State's cross-examination about some of his jail mail is similarly without merit.

(347)   To the extent Applicant's testimony on direct examination created a false impression about his character for truthfulness and non-violence, the law permitted the State's use of prior specific instances of conduct to rebut that impression. *See Pyles v. State*, 755 S.W.2d 98, 115 (Tex. Crim. App. 1988) (upholding admission of defendant's writings showing hatred of and violent tendencies toward police to rebut impression, created by defendant's testimony, that he harbored no animosity toward police and had only acted in self-defense). *See also* Cathy Cochran, *Texas Rules of Evidence Handbook* at 598 (7th Ed. 2007-08) ("[W]hen a witness affirmatively creates a false impression about some aspect of his character, other rules may permit the opponent to use prior specific instances of conduct to rebut that false impression.").

(348)   The Court finds that counsel was not deficient for not objecting to the State's use of specific instances of conduct to the extent they rebutted false impressions created by Applicant.

61

2899

(349)   Moreover, the Court finds that counsel had a reasonable strategic motive for not objecting to the State's questioning about Applicant's jail mail.

(350)   The Court finds that trial counsel reasonably concluded that objecting to questioning about the letters might leave a bad impression with the jury, namely, that the defense was trying to hide something. (8/20/10 Hrg) RR: 62, 190.

(351)   Furthermore, the Court finds that trial counsel employed a sound alternative to objecting to the State's questioning about the letters. Indeed, counsel used the letters to further the defensive theory that Applicant was a harmless buffoon and braggart. (8/20/10 Hrg) RR: 190-91, 234.

(352)   Specifically, defense counsel introduced *all* the letters written and received by Applicant that the State turned over in discovery to illustrate this point. (RR49: 40; Defense Exs. 34-37, each a "Book of Letters").

(353)   For instance, regarding the State's cross-examination of Applicant regarding issues of lying and certain letters he wrote, Applicant's trial counsel elicited the following testimony from Applicant:

> [DEFENSE COUNSEL]: Q. [Since you've been in custody] what do you do to pass the time?
>
> [APPLICANT]: A. I write letters and read.
>                         * * *
> Q. And it gives you something to do, doesn't it?
>
> A. Yes, sir.
>
> Q. And had you had any contact with – in the five years you were in prison with any woman?
>
> A. No contact. I mean, I have had a pen pal, but it never turned into anything. Wrote a couple of times and, you know.
>                         * * *
> Q. You ever fantasize on paper about being with somebody?
>
> A. Yeah.
>
> Q. Do you ever write those kind of letters?
>
> A. Yes, sir.
>
> Q. *And certainly you might have made yourself appear to be*

62

2900

*something that you aren't –*

A. *Yes, sir.*

(RR49: 28, 29).

(354)   The Court finds that, in this way, Applicant's trial counsel minimized the prejudicial impact of the letters by explaining them away as the creation of a bored and lonely inmate who expressed his fantasies and wishful thinking in letters.

(355)   Moreover, the Court finds that Applicant's trial counsel dealt effectively with the extraneous offense evidence through direct and re-direct examination (rather than objecting). This is a valid trial strategy. *See Timmons v. State*, No. 05-93-012942-CR, 1996 Tex. App. LEXIS 469 (Tex. App.—Dallas, pet. ref'd) (not designated for publication) (citing *Ashcraft v. State*, 900 S.W.2d 817, 835 (Tex. App.—Corpus Christi 1995, pet. ref'd)).

(356)   The Court finds that defense counsel skillfully addressed and neutralized the issues on his redirect examination of Applicant. In that regard, defense counsel elicited the following testimony from Applicant:

> [DEFENSE COUNSEL]: Q. Let me show you what has been marked as 954, which was the letter that was introduced by the State. And, once again, this is a letter you wrote; is that correct?
>
> [APPLICANT]: A. Yes, sir.
>
> Q. You wrote it to Dawn and in here it says – you talking about being in prison and being scared and in regard to the Blacks and the Mexicans and, "The just pick the jews [sic] to blame everything on. They never tried that crap with me. I had a lot of respect from one of the leaders of one of the Arian gangs over there named Batman who didn't really like me, so to speak, and I didn't like him. *He knew I didn't put up with that antisemitic* [sic] *crap.*"
>
> So you might have been picked on because you were jewish [sic], but you at least tried to stand up for yourself being jewish [sic]?
>
> A. Yes, sir.

(RR49: 46-47).

63

2901

(357)  The Court finds that, in this way, Applicant's trial counsel effectively fostered the defensive theory that Applicant was a pathetic figure who overcompensated for his cowardice with stories and delusions of grandeur.

(358)  Regarding Applicant's assertion that his trial counsel should have objected when the State began questioning him about "a letter to a girlfriend in which he claimed to have fathered a child by another girl," the Court finds that trial counsel more effectively addressed the issue on redirect as follows:

> [DEFENSE COUNSEL]. Q.  In regard to Ms. Roe, Ms. Roe has had a child recently, has she not?
>
> [APPLICANT]:  A.  Yes, sir.
>
> Q.  How many children does she have?
>
> A.  She has two children now.
>
> Q.  You have letters, do you not, that you have written where you describe yourself as the father of the children, so to speak?
>
> A.  Yes, sir.
>
> Q.  And the reality of that is you are not the father of any of her children, are you?
>
> A.  No, sir.
>
> Q.  That doesn't keep you from having some type of fantasy in that regard or trying to describe yourself in those terms, does it?
>
> A.  No, sir.

(RR49: 39-40).

(359)  The Court finds Applicant's claim that his trial counsel should have objected to the State's detailed questioning of him regarding his injury to a child case also lacks merit.

(360)  The Court finds that once Applicant took the stand, the fact that he had been convicted for injury to a child would have been admissible against him on cross-examination. *See* TEX. R. EVID. 609.

64

2902

(361)   The Court finds that defense counsel gained a tactical advantage by eliciting testimony on direct examination about the circumstances surrounding the prior offense.

(362)   The Court finds that, consistent with the defensive strategy of appearing forthright, trial counsel immediately asked Applicant on direct examination about this conviction. In this way, trial counsel strategically elicited from Applicant that he was only 18 at the time of the offense and that he had been homeless and on drugs at the time. (RR47: 101, 108).

(363)   The Court finds that trial counsel's intent was to minimize the significance of the offense by blaming it on age and drugs, and thereby demonstrating that the injury to a child conviction was so dissimilar from the charged offense as to be irrelevant. Once the State began questioning Applicant about the offense, any objection from Applicant's trial counsel would have given the jury the wrong impression (i.e., that the defense had something to hide) and given the conviction more credence. (8/20/10 Hrg) RR: 119-22, 232-33.

(364)   The Court finds that this strategic decision constituted sound, reasonable professional judgment.

(365)   The Court finds that, although the State's cross-examination of Applicant regarding the offense elicited unpleasant details, the jury had already heard Applicant admit on direct that he had been convicted of striking and kicking an 18-month-old child and that the child had received numerous injuries, including two broken arms, two broken legs, and a fractured skull. (RR47: 101, 108).

(366)   Thus, the Court finds that the impact of the State's cross-examination would not have affected the jury's verdict.

(367)   Applicant also asserts that his trial counsel were ineffective for failing to object to what he characterizes as the State's improper closing arguments that Applicant "be convicted for acting in conformity with proof of prior bad acts." (Application, pp. 86, 102).

(368)   Applicant's argument is based on the flawed premise that "the defense never put Halprin's character into issue." (Application, p. 101).

(369)   As the record reveals, the Court finds that in addition to putting his character for veracity in issue by testifying, Applicant put his general character for specific pertinent character traits in issue at both phases of the trial.

(370)   Thus, the Court finds Applicant's assertion that "[t]he State initiated virtually all the topics involving prior acts of misconduct and without justification" is untrue. (Application, p. 101).

65

2903

(371)   Rule 404(a) of the Rules of Evidence provides in part:

> (a) Character Evidence Generally.  Evidence of a person's character or a
> trait of his character is not admissible for the purpose of proving action in
> conformity therewith on a particular occasion, except:
>
> *(1) Character of accused.*  Evidence of a pertinent trait of his character
> offered:
>
>> (A) by an accused in a criminal case, or by the prosecution to rebut
>> the same . . . .

> TEX. R. EVID. 404(a)(1)(A).

(372)   Thus, under this rule, a criminal defendant may "put his character in issue" by
offering evidence of his general good character for a specific pertinent character
trait.

(373)   "Character" as used in rules 404 and 405 is a generalized personal trait or a
propensity to behave in a certain manner. *Wheeler v. State*, 67 S.W.3d 879, 882
n. 2 (Tex. Crim. App. 2002) (defining character as "'a generalized description of
a person's disposition, or of the disposition in respect to a general trait, such as
honesty, temperance or peacefulness'") (citing Charles McCormick, Evidence §
195 (4th ed. 1992); *see also* 1A  John Wigmore, Evidence § 52, at 1148 (Tillers
rev. 1983)). This type of character evidence is offered as indirect proof that the
character trait is inconsistent with the offense charged and therefore makes it
more probable that he did not commit the crime. Cathy Cochran, *Texas Rules of
Evidence Handbook* at 237 (7th Ed. 2007-08).

(374)   The Court finds that Applicant's general character was an integral part of the
defensive theory.

(375)   Applicant suggests that his character was never put into issue because "[t]he
general character of a defendant is put in issue only when he calls witnesses to
testify to his reputation in general." (Application, p. 99).

(376)   The Court notes, however, that a defensive theory can be raised in an opening
statement and on cross-examination. *Powell v. State*, 63 S.W.3d 435, 439 (Tex.
Crim. App. 2001).

(377)   Furthermore, it cannot be the case that a defendant's improper introduction of
character evidence precludes the State from rebutting such evidence. Indeed, the
Court finds that Applicant benefited from his counsel's tactics because, by not
calling his own character witnesses, he was less exposed to damaging cross-

66

2904

examination of those witnesses by the State.

(378)   The Court finds that defense counsel immediately placed Applicant's general character into issue during opening statements. Specifically, Applicant's defense argued in opening statements to the jury:

> You will learn that consistent with his character, consistent with his personality, he stayed pretty much to himself. Didn't get in any trouble. Didn't join any gangs. But you will learn that in order to help him get through the system, in order to help him learn how to survive in such a tough place, he had kind of a mentor, kind of big brother, and that individual was George Rivas.
>
> * * *
>
> [E]verybody had a role to play in the Oshman's robbery. But consistent with his character, consistent with his personality, he had the gofer role. Get this. Gather that. His role was to gather clothing from the outdoor section that would be used to go to Colorado.
>
> * * *
>
> You are going to learn that going to Colorado, the plan was to stay there a few days, get IDs, naively go their separate ways . . . And you are going to learn that as these other individuals went out into the community, interfaced with people, consistent with his character and personality, Mr. Halprin stayed isolated in that trailer, avoiding any kind of confrontation, avoiding any type of potential danger.

(RR41: 51-53) (emphasis added).

(379)   The Court finds that Applicant also put his character into issue through his trial counsel's cross-examination of many of the State's witnesses. For instance, defense counsel elicited on cross-examination of Detective Spivey that Applicant was the youngest of the group by at least 10 years and that he had been in the penitentiary on much less serious charges when compared, for example, to Rivas's ten life sentences for eighteen aggravated robberies and Rodriguez's 99 year sentence for capital murder. (RR42: 52-54).

(380)   Applicant himself testified at length that he was a follower and that his participation in the escape and the victim's murder was minimal. (RR48: 4-55, 131-45; RR49: 17-22, 30-31). Specifically, Applicant testified on direct examination by defense counsel that at the time of the offense, he did not have any particular skills, he had never been in the military, he had never owned a firearm or a pistol, he had never even gone hunting, there were no guns in his home growing up, he did not graduate from high school, and the only jobs he had

67

2905

ever held were at fast food restaurants. (RR48: 48-49).

(381)   Applicant further testified that, unlike a couple of his codefendants, he was never accepted to the Naval Academy or the United States military, and he was never an honor student like Rivas. (RR49: 26-27). Applicant testified that his nickname was "Junior," and Detective Spivey had previously testified that Rivas' nickname was "CO" for commanding officer and that Harper's nickname was "XO" for executive officer. (RR42: 52; RR49: 47).

(382)   Moreover, in their confessions, some of Applicant's codefendants also characterized him as a follower rather than a leader. (Defense Ex. 24-27). For example, in his statement, Rodriguez states: "Blue team bought the RV. Blue team was XO, that's Harper; CO, that's Rivas, and Newbury. Red team was Garcia—me, Garcia, and Murphy. Halprin was floater." (RR47: 60; Defense Ex. 27).

(383)   Likewise, Texas Department of Criminal Justice (TDCJ) personnel familiar with the escapees testified regarding Applicant's personality and intelligence. (RR49: 111-13, 115, 195). Assistant maintenance supervisor Patrick Moczygemba testified on cross-examination by the defense that Applicant was "dumb as a box of rocks and had to be told time after time how to complete a task." (RR49: 111; Defense Trial Ex. 38). Moczygemba testified that Applicant was a follower, and his role was "to follow orders." (RR49: 112, 116). Moczygemba further testified that, if he were to rank Applicant "in terms of intelligence with all the rest of the [codefendants], he would rank Applicant "right at the very bottom." (RR49: 116). Moczygemba testified that Rivas was clearly the leader of the group during the prison escape and that Applicant's part was merely to mop up the floor, which was "pretty consistent" with what Moczygemba knew about him. (RR49: 116). Defense counsel elicited from Mark Burgess, a carpenter supervisor employed by TDCJ, that Applicant "was not a leader type." (RR49: 195).

(384)   In closing argument, defense counsel argued:

> [Regarding the prison escape], Rivas would tell [Applicant] to go do something, he would go do that. Rivas [would] tell him to do something else, he would go do that. Rivas told him to do this, he would go do that. *That's the kind of guy this is.*
>
> * * *
>
> Who is this guy? This is the guy who's not part of the red team, he's not part of the blue team, he's not really part of it.
>
> * * *
>
> [Regarding the events inside the Oshman's] . . . . You know, he's not doing nothing without somebody telling him the simplest thing.

2906

What did Burgess tell you? Well, he's dumb as a bag of rocks. You have to tell him to do everything twice. He's fine. You tell him to do something and he does that thing. And then you have to tell him to do the next thing.

(RR50: 30, 33, 37).

(385)   After pointing out that none of the Oshman's employees picked Applicant out of a photo lineup, defense counsel further argued:

[I] told you *consistent with his character and with the role that he played, he was staying out of all that controversy and all the confrontation.*

You know, it's kind of like, you know, when your kids, you tell them not to get the cookies out of the cookie jar and you put it up high. One of them goes up there and climbs up there and gets it out. He may be handing it down to the others, but you know the person at the bottom of the line in that naïve mentality is thinking, well, as long as I'm not the one up there getting them, I'm not in it. And that's naïve, okay? *But that's just the mentality of who you are dealing with.* Okay?

* * *

Now, consistent with that is going to be not pulling your weapon. May sound stupid. He had it. He never pulled it out. He never confronted anybody. What did he do? He put on a shirt, went up to the front with the broom, acting like he was doing something. Everybody can't be the shooter on the basketball team. Everybody can't be the pitcher on the baseball team. Everybody can't be the lead attorney in a big case. Everybody has a role. You kind of wonder, why do they have this guy? Because they need this kind of guy. They need a gofer guy. They need a guy just to do the dumb stuff. And it's consistent with everything that you have heard.

* * *

[Applicant] came out of the RV [in Colorado], he came out without incident, he came out unarmed, and he came out afraid. That's consistent with everything that you have heard. He's not part of the red team. He's not part of the blue team. He's not ex-military, he doesn't know anything about military operations. He told you he's not a gun person. They've never had guns in their family.

* * *

[F]or comparison purposes, is [Applicant] different than the rest of those guys? Sure. . . .

69

2907

... I agree if you had seven rattle snakes down there, you couldn't pick which one was not dangerous. But if you had six rattle snakes and a garden snake, then you could. Everything that you heard in this case is consistent with the fact that he's not like them.

(RR50: 47-49, 52).

(386)   Thus, the Court finds that Applicant put his general character into issue in the guilt phase by portraying himself as weaker willed and weaker minded than his codefendants and as having lower intelligence, fewer skills, a non-confrontational personality, a follower mentality, and a diminished role in the offense.

(387)   Because Applicant placed his general character into issue, the State could (and did) properly offer evidence to rebut this evidence. Cathy Cochran, *Texas Rules of Evidence Handbook* at 238 & 598 (7th Ed. 2007-08).

(388)   Because Applicant's general character was an integral part of the guilt phase of trial, because both the State and the defense elicited testimony regarding such, and because Applicant put his character for veracity in issue by testifying, the Court finds that Applicant fails to prove that any of the State's closing arguments were improper.

(389)   Although Applicant sets out lengthy portions of the State's closing statements, he italicizes the following portion: "You don't think a person that's capable of [brutally injuring a child] is a person that is capable of this? Of course they are. That's why character is so important." (RR50: 22).

(390)   The Court finds that this argument is proper because Applicant put into issue his character as being non-confrontational and non-violent, and therefore, the State could properly rebut that theory, which it did through its questioning of Applicant regarding his conviction for injury to child.

(391)   Thus, because the State's arguments were proper, the Court finds Applicant's trial counsel were not ineffective for not objecting to them.

(392)   Applicant further asserts that his trial counsel were ineffective for failing to request a limiting instruction.

(393)   The Court finds a limiting instruction would have been inconsistent with the defensive strategy. Defense counsel wanted the jury to feel free to consider Applicant's character; to feel sorry for this pathetic liar and manipulator, who is completely incapable of shooting or intending to shoot a police officer.

70

2908

(394)    Also, the Court finds that to the extent that the evidence did not fit in with the defense strategy, it was more effective for the defense to forego the instruction so as not to highlight the evidence to the jury.

(395)    Moreover, the Court finds that Applicant was not prejudiced by the omission of a limiting instruction because his prior conviction for injury to a child and bad acts of lying and manipulating others were dissimilar enough from the charged offense so as not to encourage the jury to convict Applicant "on the perception of a past pattern of conduct, instead of on the facts of the charged offense." *Theus v. State*, 845 S.W.2d 874, 881 (Tex. Crim. App. 1992); *cf. Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996) (holding that an extremely similar extraneous offense always carries the potential to impress upon the jury a defendant's character conformity).

(396)    The Court finds that the extraneous acts were not related to the pivotal issue at trial—whether Applicant was a shooter, or whether he should have anticipated that someone would get killed.

(397)    Thus, the Court finds Applicant fails to prove that the jury would have used the unrelated prior conviction or bad act evidence to prove an element of the offense.

(398)    In fact, the Court finds defense counsel ably used these facts to claim that the State could *not* prove the only contested issue at guilt, whether Applicant was liable for capital murder. As defense counsel explained to the jury:

> [Applicant] broke out of prison. He sure did. And he had a gun. He sure did. But he didn't shoot this good man. He didn't do that.

> And they can call him a liar and they can say he's a child beater and they can say all that kind of stuff, but that don't make this true. And your job here is not to guess him into something. It is to be convinced beyond a reasonable doubt that he either shot this man or had the same intent to shoot this man or if it was a conspiracy and he agreed to commit an aggravated robbery, that he should have anticipated this man would be shot.

> That's their burden. That's what they told you they would do in this case. And they haven't done that.

(RR50: 43).

(399)    Thus, the Court finds Applicant's counsel were not deficient for not requesting a limiting instruction and the absence of such an instruction did not prejudice Applicant's defense.

71

2909

(400)   Overall, the Court finds defense counsel's response to the State's impeachment of Applicant on cross-examination was not deficient.

(401)   The Court finds, and the record demonstrates, that defense counsel acted strategically in their handling of the letters and the impeachment evidence and that the strategy counsel employed was sound and within reasonable professional judgment.

(402)   The Court finds that, at most, Applicant has shown that other defense counsel might have handled the issue differently.

(403)   Furthermore, the Court finds that the battles regarding this aspect of the guilt case were far removed from the central issue of Applicant's guilt, and the evidence establishing his guilt of capital murder was ironclad and overwhelming.

(404)   The Court finds that Applicant fails to prove that, but for his trial counsel's actions, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687.

(405)   Thus, the Court concludes that Applicant's constitutional right to effective assistance of counsel was not violated by the manner in which defense counsel chose to respond to the State's efforts to impeach Applicant on cross-examination.

## F. General Verdict

(406)   Applicant asserts that his trial counsel were ineffective for failing to recognize that the Court's jury instructions and a portion of the State's closing jury argument violated his constitutional rights to a unanimous jury verdict.

(407)   The State indicted Applicant for the capital murder of Aubrey Hawkins under two nonexclusive theories: the murder of a peace officer and murder in the course of robbery. *See* TEX. PENAL CODE ANN. §§ 19.03(a)(1)-(2) (Vernon Supp. 2010); (CR: 65).

(408)   The Court's charge instructed the jurors that they could find Applicant guilty under either theory as a principal, party, or party-conspirator. (CR: 29-31). The jury returned a general verdict of guilty of capital murder. (CR: 36).

(409)   Applicant insists that the general verdict was improper because "[t]he jury was allowed, without any objection from defense counsel, to find Halprin guilty without unanimous agreement on the act of which he was guilty." In this regard, Applicant argues:

72

2910

> [T]he [jury charge] submission in Applicant's trial was equivalent to a submission of two offenses because two distinct ways of committing the capital murder of Hawkins existed. The first manner and means . . . the murder of a peace officer, which does not require an intentional murder . . . That is, the murder may be committed with the lesser mens rea of knowingly causing the death. The second manner and means . . . which specifically requires a mens rea of intentionally causing the death . . . .

(Application, p. 103).

(410)   Applicant complains that the jury was also improperly allowed to find him guilty as a principal, party, or party-conspirator because these theories contain two different criminal acts: shooter and non-shooter. (Application, p. 104).

(411)   Applicant insists, therefore, that his trial counsel rendered ineffective assistance by failing to object to the court's charge and by failing to object to the State's closing argument to the jurors that "[f]our of you might think we have proven him as a principal; four might think we may have proven it as a party; and four of you might think, well, they have proven him as a co-conspirator, and you can all find him guilty, a unanimous verdict." (RR50: 57).

(412)   Applicant relies on *Ngo v. State*, 175 S.W.3d 738 (Tex. Crim. App. 2005) and *Richardson v. United States*, 526 U.S. 813 (1999) in support of his arguments.

(413)   The *Ngo* opinion was issued almost two years *after* Applicant's trial.

(414)   The Court finds that, at the time of Applicant's trial, the settled and applicable law governing general verdicts was *Kitchens v. State*, 823 S.W.2d 256, 257-58 (Tex. Crim. App. 1991). In *Kitchens*, the indictment alleged two alternative means of committing capital murder, namely, that Kitchens committed murder in the course of aggravated sexual assault and murder in the course of robbery. The trial court submitted these alternative means of committing capital murder in the disjunctive and provided a general verdict form. Kitchens complained that the verdict would not be unanimous because some jurors could have found him guilty of murder in the course of aggravated sexual assault and others could have found him guilty of murder in the course of robbery. The Court rejected this argument, holding that a trial court does not err in submitting to the jury alternative theories of committing capital murder, which had been alleged in separate paragraphs of the indictment, without requiring the verdict to be unanimous on a single theory.

(415)   The Court finds that both the jury charge and the State's arguments were proper under *Kitchens* and, thus, counsel was not deficient for choosing not to object to

73

2911

either. *See Ybarra v. State*, 890 S.W.2d 98, 113 (Tex. App.--San Antonio 1994, pet. ref'd) (citing *McFarland v. State*, 845 S.W.2d 824, 844 (Tex. Crim. App. 1992)).

(416)   Applicant's trial counsel cannot be found ineffective for following the settled and applicable law at the time of trial. *See Vaughn v. State*, 931 S.W.2d 564, 567 (Tex. Crim. App. 1996).

(417)   Furthermore, the Court finds that *Ngo* did not change the law regarding general verdicts in Texas, and it did not overrule the well-established *Kitchens* case. *Kitchens*, 823 S.W.2d at 257-58. In fact, the *Ngo* court specifically referred to *Kitchens* in footnote 27 of the opinion, thereby dispelling any notion that *Ngo* affected *Kitchens* or its progeny. *Ngo*, 175 S.W.3d at 746 n. 27. Thus, *Kitchens* is still the applicable law, and Applicant's reliance on the *Ngo* case is misplaced. *See also David v. State*, 313 S.W.3d 317, 342 (Tex. Crim. App. 2010) ("For capital murder prosecutions in particular, we have held that a jury charge may disjunctively allege different capital murder theories with respect to the same victim").

(418)   In *Ngo*, the Court of Criminal Appeals addressed the requirement of unanimity in jury verdicts under state and federal law. The State prosecuted Ngo for credit card abuse. The single count indictment contained three paragraphs, alleging three separate criminal acts: stealing a credit card, receiving a stolen credit card, and fraudulently presenting a credit card to pay for goods or services. The three application paragraphs in the jury charge permitted the jury to convict Ngo if some of the jurors found he stole the credit card, others believed he received a stolen credit card, and still others thought he used it. *Ngo*, 175 S.W.3d at 744.

(419)   The Court of Criminal Appeals held that error existed in the jury charge because it allowed for a non-unanimous jury verdict. *Ngo*, 175 S.W.3d at 749. Specifically, the Court explained:

> Stealing a credit card on Monday is not the same specific criminal offense as receiving a stolen credit card on Tuesday or presenting a stolen credit card to a bartender on Wednesday. Indeed, stealing a credit card at 9:00 a.m. on Monday is not the same specific criminal offense as receiving a stolen credit card at 9:00 a.m. on Monday. These are all credit card abuse offenses, to be sure, but they are not the same, specific credit card abuse criminal acts committed at the same time or with the same *mens rea* and the same *actus reus*.

*Ngo*, 175 S.W.3d at 745.

74

2912

(420) The Court held that unanimity means that each and every juror agrees that the defendant committed the same, single, specific criminal act. *Id.*

(421) In *Ngo,* the State alleged three different criminal acts, occurring at three different times, and in three different ways. Additionally, the three acts alleged conflicting theories of commission.

(422) In contrast, the Court finds that the State indicted Applicant for only one criminal act—the capital murder of Aubrey Hawkins. The alternative paragraphs in the jury charge simply alleged different theories for the commission of that one capital murder.

(423) The penal code requires that a defendant commit murder as defined under section 19.02(b)(1) as a predicate to capital murder. *Graham,* 19 S.W.3d at 853 (citing TEX. PENAL CODE ANN. § 19.03(a) (Vernon Supp. 2010)). The predicate murder is aggravated to capital murder where any one of eight additional circumstances are present. *Graham,* 19 S.W.3d at 853 (citing TEX. PENAL CODE ANN. §§ 19.03(a)(1)-(8)).

(424) The Court of Criminal Appeals has further explained that the legislature's inclusion of the elements of section 19.02(b)(1) in the capital murder statute by reference was an expression of the legislature's desire to limit capital murder to only intentional and knowing murders that are committed in circumstances that the legislature found particularly egregious. *Rodriguez v. State,* 146 S.W.3d 674 (Tex. Crim. App. 2004).

(425) In *Rodriguez,* the Court also quoted the following language from one of its earlier cases:

> In proving capital murder, the State must prove that the accused intentionally or knowingly caused the death of an individual and also that the accused engaged in other criminal conduct (i.e., kidnapping, robbery, aggravated sexual assault, escape from a penal institution) or had knowledge of certain circumstances (i.e., that the victim was a peace officer).

*Rodriguez,* 146 S.W.2d at 674 (quoting *Patrick v. State,* 906 S.W.2d 481 (Tex. Crim. App. 1995)).

(426) In *Ngo,* the Court held that "[t]he crucial distinction is thus between a fact that is a specific *actus reus* element of the crime and one that is 'but the means' to the commission of a specific actus reus element." *Ngo,* 175 S.W.3d at 747.

75

2913

(427) The Court finds that the *actus reus* of Applicant's offense was the murder of Officer Hawkins. As long as Applicant's jurors unanimously agreed that he knowingly or intentionally committed murder under section 19.02(b)(1) of the penal code, it is irrelevant which one (or more) of the eight enumerated aggravated factors they found under section 19.03. The jurors did not have to agree on the statutory means by which Hawkins's murder was aggravated to capital murder. *Kitchens*, 823 S.W.2d at 257-58.

(428) Further, the Court finds that, unlike in *Ngo*, the alternative theories submitted to the jury regarding how the instant capital murder was committed are not mutually exclusive and do not conflict with one another.

(429) Finally, the Court finds that, unlike in *Ngo*, the indictment ultimately alleges only one offense of capital murder because there is only one victim, while *Ngo* involved three separate offenses improperly alleged in one count.

(430) Regarding Applicant's argument that the trial court should have required the jury to specify unanimity in finding him guilty as a principal, party, or party conspirator, a jury charge that allows the jury to find a defendant guilty based on either his own actions or the actions of another (liability as a party) does not violate the law regarding jury unanimity. *Goff v. State*, 931 S.W.2d 537, 544-45 (Tex. Crim. App. 1995); *see Hanson v. State*, 55 S.W.3d 681, 694 (Tex. App.—Austin 2001, pet. ref'd). The *Ngo* case neither discussed these cases nor overruled them.

(431) The Court finds that Applicant's reliance on the Supreme Court's *Richardson* case is also misplaced. *See Richardson v. United States*, 526 U.S. 813 (1999).

(432) First, Applicant fails to even discuss *Richardson* or explain how it applies in this case.

(433) Second, the question faced by the *Richardson* court was whether a federal statute—not the United States Constitution—required juror unanimity. *See Kessro v. State*, No. 14-99-01325-CR, 2001 Tex. App. LEXIS 4353 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (not designated for publication) (citing *Richardson*, 526 U.S. at 817-18).

(434) Third, the Court of Criminal Appeals' interpretation of *Richardson* supports the State's general verdict and closing argument in Applicant's case. Specifically, the Court has concluded that *Richardson* stands for the proposition that "'jury unanimity is required on the essential elements of the offense' but is 'generally not required on the alternate modes or means of commission.'" *Pizzo v. State*, 235 S.W.3d 711, 714 n. 12 (Tex. Crim. App. 2007); *see also Bagheri v. State*, 119 S.W.3d 755, 762 n. 5 (Tex. Crim. App. 2003); *Sanchez v. State*, 23 S.W.3d

76

2914

30, 39 n. 29 (Tex. Crim. App. 2000).

(435) Moreover, the Supreme Court has expressly rejected Applicant's argument that a jury must agree unanimously on the means by which a defendant committed a particular crime. *See, e.g., Schad v. Arizona*, 501 U.S. 624, 633 (1991) (plurality op.) (criticizing dissent's "inflexible rule of maximum verdict specificity" which would require a jury to indicate on which alternative means it based the defendant's guilt whenever a statute provided more than one means of committing a crime).

(436) For all of the above reasons, the Court finds that the jury charge was not erroneous for failure to instruct the jury that it must agree unanimously on the manner of Hawkins's murder.

(437) Moreover, the Court finds that the State's jury argument was proper.

(438) The Court finds that had the defense objected it would have been proper for the Court to overrule the objection.

(439) Thus, Applicant has failed to prove by a preponderance of the evidence that his trial counsel were deficient for failing to object to the court's proper jury instructions or for failing to object to the State's proper jury argument regarding the unanimity of the jury's verdict. *See Vaughn*, 931 S.W.2d at 566 (holding that counsel is not ineffective for failing to lodge a meritless objection).

(440) Further, Applicant fails to prove that the result of the proceeding would have been different if defense counsel had objected to the jury charge and the State's argument. *Strickland*, 466 U.S. at 687.

(441) The Court finds that counsel was not deficient for not objecting to the jury charge and the State's closing argument.

(442) Also, the Court finds that Applicant's defense was not prejudiced by counsel's decision not to object to the jury charge and the closing argument.

(443) Based on the foregoing, the Court concludes counsel's decision not to object to the jury charge and the State's closing argument did not violate Applicant's constitutional right to effective assistance of counsel.

### III. COUNSEL RENDERED EFFECTIVE ASSISTANCE IN PUNISHMENT PHASE

(444) Applicant contends his trial counsel rendered ineffective assistance in the punishment phase based on numerous deficiencies. In particular, he claims trial counsel should have (1) objected to the prosecutor's voir dire remarks concerning a party conspirator's eligibility for the death penalty; (2) prevented

77

2915

the exclusion of the data Dr. Kelly Goodness relied on in forming her expert opinion; (3) called Applicant's codefendant George Rivas to testify on his behalf; (4) presented a sponsoring witness for the TDCJ "Ranking" document (Defense Ex. 39); (5) requested an "anti-parties" instruction; (6) objected to the prosecutor's closing argument about Applicant's guilt as a party conspirator; and (7) advised Applicant of his right to testify in the punishment phase.

(445)   Counsel's performance in the punishment phase was not constitutionally deficient for any of the reasons Applicant alleges. Applicant fails to prove any deficiency in counsel's representation, much less a deficiency that altered the outcome of his trial.

*[handwritten margin note: Deleted "As in his attack on Counsel's performance in the guilt phase" from st. # 454 st. for p. part 2]*

### A. Prosecutors' Voir Dire Remarks

(446)   Applicant claims that, throughout the voir dire examination of all twelve jurors, the prosecution "continually suggested" that a non-triggerman who was armed and helped plan a robbery could be sentenced to death. Citing *Enmund* and *Tison*, Applicant argues the Eighth Amendment prohibits imposing the death penalty on a person based on these facts alone and, thus, his trial counsel should have objected that the prosecutor was misstating the law.

(447)   The Court finds that Applicant fails to substantiate this attack on his trial counsel because, even assuming he has correctly interpreted *Enmund* and *Tison*, he fails to prove the prosecutor misstated the law.

(448)   Applicant cites the Court to portions[12] of the voir dire examination of eleven of the twelve jurors.[13] But the Court finds that Applicant either misinterprets or misrepresents the prosecutor's remarks.

(449)   The Court finds that all of the cited remarks generally relate to the concept of party conspiracy,[14] but they do not all relate to a conspirator's eligibility for the death penalty. Some of the remarks relate only to the issue of a conspirator's guilt (i.e., should the defendant have anticipated someone would die). Indeed, the excerpts from the examination of jurors nine and twelve relate entirely to the

---

[12] In addition to the record excerpts actually set out in his application, Applicant occasionally cites generally to several other pages of voir dire testimony. Applicant does not identify with any particularity what, if any, remarks on these other pages he finds objectionable. Furthermore, in four of the excerpts he sets out in his application, he fails to identify omissions. *See* Excerpts for Jurors 1, 2, 8, & 11.

[13] Apparently, Applicant found no objectionable remarks in the voir dire examination of the fourth juror.

[14] Applicant erroneously sets out the exact same excerpt for the sixth and seventh jurors. The excerpt actually pertains to the sixth juror. For the seventh juror, Applicant apparently intended to refer to the prosecutor's remarks found at (RR24: 156).

78

2916

issue of guilt. *See* (RR9: 75-76, 87; RR12: 22; RR22: 101; RR27: 126; RR30: 56; RR35: 194: RR38: 171). In this respect, the cited remarks provide no support for Applicant's contention.

(450)  Furthermore, to the extent the prosecutor's remarks did relate to a party conspirator's eligibility for the death penalty, the Court finds that Applicant misconstrues them.

(451)  The Court finds that in the excerpted remarks about the concept of "actual anticipation," the prosecutors were merely identifying examples of facts from which a juror might infer that a defendant actually anticipated that someone would die. These examples neither explicitly nor implicitly told the jurors that the evidence a conspirator was armed and helped plan the robbery was, by itself, sufficient to prove actual anticipation.

(452)  In fact, the Court finds that throughout their examinations of the jurors on the matter, the prosecutors referred to several other factors from which the jurors might infer anticipation, such as how many others were armed, how detailed the plan was, how actively involved the defendant was in the robbery, whether he was present during murder or down the street in a getaway vehicle, whether he was prepared to use his weapon, and whether he committed the offense with others who had a criminal history.[15]

---

[15] Prosecutor to juror two: "Or maybe the degree of planning that went into it. I mean, there's a number of different things that could come about. Maybe there's circumstances, circumstantial evidence, that you look at. The totality of the crime that leads you to believe that." (RR12: 24)

Prosecutor to juror three: "That maybe how detailed the plan was, how actively involved, were there – how many weapons were involved, that sort of thing . . ." (RR14: 109).

Prosecutor to juror five: "Did he fire the gun and miss? Was he armed? Was he unarmed? Was he right there at the murder or was he down the street doing something, but involved in it?" (RR19: 88).

Prosecutor to juror six: "But of course, if he knew about it, the level of planning, maybe whether he had a gun, prepared to use it, something like that." (RR22: 100).

Prosecutor to juror seven: "And you can go back and look at the facts and circumstances of the offense, you know, who had a gun, was it planned. Or you may have heard about that criminal history or something in the punishment phase." (RR24: 156).

Prosecutor to juror eight: "Now, that means, I guess, to some people, obviously, he was part of the robbery, and maybe, whether or not he was carrying a weapon, maybe he knew I had a gun when I went in there. Maybe there was other evidence that shows you what he thought was going to happen one way or the other." (RR27: 126). And, "And again, that's just probably requires you to look at the crime again, to see what his role was, what he did. Maybe some of the things we discussed earlier helping that, was he armed, was he not armed, his background, if he was with other people, what about them do you know?" (RR27: 135).

79

(453)    The Court finds that the prosecutors' remarks were a proper explanation of the law.

(454)    Thus, the Court finds that Applicant's trial counsel was not deficient for not objecting to them.

(455)    Likewise, the Court finds that counsel's failure to object to the remarks did not prejudice Applicant's defense.

(456)    Consequently, the Court concludes Applicant's constitutional right to effective assistance of counsel was not violated by defense counsel's decision not to object to the complained-of remarks by prosecutors during voir dire.

### B. Dr. Kelly Goodness

(457)    Applicant contends trial counsel presented the testimony of his expert, Dr. Kelly Goodness, Ph.D., in an incompetent and unprofessional manner resulting in the exclusion of mitigating evidence that would have warranted a life sentence.

(458)    First, Applicant intimates that counsel was deficient for not providing the doctor with the equipment necessary to present her PowerPoint presentation.

(459)    The Court finds that Applicant fails to establish this "equipment failure" was the fault of counsel. Moreover, the record reflects that the doctor effectively modified her presentation into a slide show using other available equipment. (RR53: 26-40; Applicant's Ex. D). Thus, Applicant fails to demonstrate any prejudice.

(460)    Second, Applicant contends counsel failed to prevent a limitation on the scope of Dr. Goodness's testimony.

(461)    Dr. Goodness, a clinical and forensic psychologist, personally evaluated Applicant, reviewed a plethora of documents and interviewed some of

---

Prosecutor to juror nine: "You know, maybe Mr. D'Amore should have anticipated it because he knew I went there with a loaded gun. You know, if the evidence shows that he told me before we went in, hey, if something goes wrong, take care of business, just shoot them and kill them, then obviously, that would be a situation where he actually anticipated it." (RR30: 56).

Prosecutor to juror ten: "And, again, you can go back and look at the facts of the crime. You know, who has a gun? Where were they? You may look at, you know in our example you may hear Mr. D'Amore has been involved in something like this before. That may help you answer the question." (RR35: 122).

Prosecutor to juror eleven: "Would it be important to you if, let's say, they both had a gun . . . Or what they may be planning or the preparation that went into it . . . . Would their background be helpful, if they had been in trouble before?" (RR35: 192-93).

2918

Applicant's relatives and friends. (Applicant's Ex. D). Based on this data, Dr. Goodness formulated an opinion on "how [Applicant] has come to be before the Court today." (RR53: 19). The Court allowed Dr. Goodness to testify to that opinion but limited her testimony about the data underlying it. In particular, under evidence rule 705(d), which governs the admission of the facts or data underlying an expert's opinion, the Court prohibited Dr. Goodness from testifying to any inadmissible hearsay communications upon which her opinion was based. (RR53: 3-12).

(462)    Applicant alleges the Court erroneously limited Dr. Goodness's testimony and that his trial counsel failed to properly object or remedy the Court's exclusion of the data she relied upon. As a result, Applicant claims, information about the abuse and neglect he suffered as a young child while in the care of his biological parents, his placement in foster care, his psychological problems, his learning disabilities, and the child-rearing mistakes made by his adoptive parents were kept from the jury. (Application, pp. 119-20).

(463)    The Court finds Applicant fails to prove that his counsel's efforts to present the doctor's hearsay testimony to the jury were deficient or that the omission of the hearsay testimony had any bearing on the outcome of his trial.

(464)    Applicant insists trial counsel should have argued that the Eighth Amendment required admission of the doctor's hearsay testimony because it was mitigating. U.S. CONST. VIII.

(465)    While the Eighth Amendment ensures Applicant's right to present mitigating evidence, it does not exempt him from compliance with the rules of evidence. If Applicant wishes to present a mitigating fact to the jury, he must offer it in an admissible form. *See Smith v. State*, AP-75,793, 2010 Tex. Crim. App. LEXIS 582, at *69 (Tex. Crim. App. Sept. 29, 2010) ("[T]he United States Constitution does not require admission of mitigating evidence when it is inadmissible under state law, even when the evidence meets the test of "constitutional relevancy.") (not designated for publication); *Lewis v. State*, 815 S.W.2d 560, 568 (Tex. Crim. App. 1991) (holding Eighth Amendment may entitle Lewis to present evidence of his remorse over killing, but "it must be presented in a form acceptable to the law of evidence before he is entitled to insist that it be received over objection."); *see also Romano v. Oklahoma*, 512 U.S. 1, 10-12 (1994) (holding Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules in capital sentencing proceedings); *but see Green v. Georgia*, 442 U.S. 95 (1979) (per curiam) (holding that exclusion of proffered testimony at sentencing phase under state hearsay rule violated due process because testimony went to critical issue and substantial reasons existed to assume its reliability).

81

2919

(466)   The Court finds that Applicant was not precluded from offering testimony about abuse and neglect he suffered as a young child while in the care of his biological parents, his placement in foster care, his psychological problems, his learning disabilities, and child-rearing mistakes made by his adoptive parents. He was simply prohibited from offering it in the form of inadmissible hearsay.

(467)   Applicant does not dispute that the "data" about which the doctor planned to testify constituted inadmissible hearsay. The record reflects and Applicant acknowledges that Dr. Goodness would have testified to the substance of out-of-court oral and written communications, including statements made to the doctor by Applicant, his friends, and his family members, and statements contained in CPS records, academic records, adoption records, criminal records, and letters authored by Applicant.

(468)   Moreover, the Court finds that the doctor planned to offer these statements for the truth of the matters they asserted, i.e., that Applicant was abused, had psychological problems, etc. TEX. R. EVID. 801(d) (defining hearsay).

(469)   The Court finds that these communications constituted hearsay for which Applicant identifies no exception. TEX. R. EVID. 802 (general rule that hearsay is inadmissible absent an exception). Thus, they were excludable under evidence rule 705(d) if the danger that they would be used for a purpose other than as explanation or support for Dr. Goodness's opinion outweighed their value as explanation or support or they were unfairly prejudicial. TEX. R. EVID. 705(d).

(470)   Applicant argues trial counsel should have complained that the Court excluded any and all hearsay testimony without conducting this balancing test, but the Court finds that such a complaint would have been groundless.

(471)   As the excerpts Applicant sets out in his application show, the State objected to the admission of any inadmissible hearsay statements, informed the Court that it was required to conduct the balancing test found in rule 705(d), and argued that, under that test, any inadmissible hearsay statements should be excluded. In the lengthy exchange that followed, the Court explicitly acknowledged the balancing test, even reading it aloud to Dr. Goodness. (RR52: 140-42; RR53: 3-6).

(472)   The record also shows that the Court conducted a lengthy hearing over a two-day period during which Dr. Goodness detailed her opinions and the hearsay information on which it was based. Thus, the Court had an opportunity to preview all of the hearsay that the defense might elicit from her.

(473)   Moreover, the Court did not, as Applicant alleges, foreclose the possibility that some hearsay evidence might become admissible during the course of the doctor's testimony. After deliberating the issue overnight, the Court instructed

82

2920

the doctor to refrain from offering hearsay testimony before the jury unless it was elicited by defense counsel and the Court ruled that it was admissible. (RR52: 89-122; RR 53: 3-16). Clearly, the Court was aware of its duty to conduct the balancing test and did not shirk it.

(474)    Alternatively, Applicant argues that trial counsel should have challenged the Court's application of the balancing test, arguing that the Court should have concluded the probative value of the hearsay far outweighed any prejudicial effect. The Court finds that such a complaint would also have been meritless.

(475)    From the doctor's testimony at the hearing and before the jury, the Court found a danger existed that the jury would consider the hearsay statements about Applicant's purported abuse, psychological problems, etc. as substantive evidence.

(476)    The Court also found that Applicant did not have a strong need to present any hearsay evidence to the jury.

(477)    As the doctor's trial testimony shows, she was allowed to testify with particularity that she formed her opinion in large part on information relayed to her by certain friends, family members, records, and letters. In particular, Dr. Goodness testified before the jury that her opinion was based on: (1) her conversations with Jason and Terri Goldberg (childhood family friends), Rabbi Stern (his childhood rabbi), Rhonda Halprin (his aunt), Mindi, Steven, and Shelly Sternblitz (childhood family friends), Anna Lester (Applicant's biological mother), Wesley Halprin (Applicant's biological brother), and Applicant, and (2) her review of three boxes of documents which included adoption records, CPS records, school records, a childhood psychological evaluation of Applicant, criminal records, and letters authored by Applicant. (RR53: 22-23, 29-31, 35, 37-40, 42-46).

(478)    Thus, the Court finds that even without the excluded hearsay evidence, Dr. Goodness was able to demonstrate a basis for her opinion about Applicant.

(479)    Because the probative value of any hearsay was negligible while the risk that it would be improperly used as substantive evidence was substantial, the Court acted within its discretion in excluding otherwise inadmissible hearsay through Dr. Goodness. *See Valle v. State*, 109 S.W.3d 500, 506 (Tex. Crim. App. 2003) (holding trial court acted within its discretion in excluding Valle's mother's hearsay statements to defense expert regarding her medical problems, Valle's difficulties in TYC, his desire to leave Cuba, his lack of legal difficulties in Cuba, and abuse he suffered at hands of his stepfather); *Walck v. State*, 943 S.W.2d 544, 545-46 (Tex. App. – Eastland 1997, pet. ref'd) (holding trial court acted within its discretion in excluding Walck's self-serving hearsay statements

83

to defense's psychological expert about circumstances of murder).

(480)   Applicant contends that, at the very least, trial counsel should have asked the Court to give the jury a limiting instruction instead of excluding the hearsay testimony.

(481)   Rule 705(d) requires the Court to give a limiting instruction upon request, but the instruction is not provided as an alternative to exclusion. TEX. R. EVID. 705(d) ("If otherwise inadmissible facts or data are disclosed before the jury, a limiting instruction by the court shall be given upon request."). The rule only contemplates such an instruction when the Court has concluded that exclusion of the evidence is unwarranted, i.e., that the danger it will be used improperly is insufficient to warrant its exclusion.

(482)   As noted above, the Court found that the danger Dr. Goodness's hearsay testimony would be used improperly was sufficient to warrant its exclusion. Thus, the Court found that the danger posed by the testimony was too great for a limiting instruction to overcome, making any request for a limiting instruction pointless.

(483)   Finally, Applicant proposes that trial counsel could have rendered the doctor's hearsay testimony admissible if they had (1) introduced the records she reviewed and (2) called Applicant's mother and other, unidentified family members to testify on his behalf. The Court finds that Applicant fails to substantiate either of these allegations.

(484)   The Court finds that Applicant's letters were already in evidence, so counsel did not fail to introduce them as Applicant alleges. (Defense Exs. 34-37). Moreover, Applicant fails to show that his CPS, adoption, or school records would have been admissible.

(485)   In support of this claim, Applicant presented some documentation to the Court for its review at the August 20, 2010, writ hearing. (8/20/10 Hrg) RR: Defense Ex. 2. Applicant claims these documents would have been admissible as business records, but he presents no sponsoring witness or business record affidavit with any of these records.

(486)   Even if sponsored, however, the Court finds that the records would not have been admissible in their entirety. (8/20/10 Hrg) RR: 104.

(487)   "When a business receives information from a person who is outside the business and who has no business duty to report or to report accurately, those statements are not covered by the business records exception." *Garcia*, 126 S.W.3d at 926. The admissibility of such a document depends on a showing that each statement

84

2922

contained within it qualifies for admission under its own hearsay exception. *See, e.g., id.* (holding hearsay statements made by defendant's wife to employee of battered women's shelter not admissible under business records exception just because employee had a business duty to record wife's statements accurately).

(488)    The Court finds that much, if not all, of the information Applicant cites to in these records was properly excluded hearsay. *See* "Applicant's Additional Briefing on Mitigating Evidence Jury Did Not Hear" (filed 10/21/10).

(489)    More importantly, the records and Applicant's letters would not, as Applicant claims, have tipped the scales in favor of admitting Dr. Goodness's testimony. The letters and records posed the same danger as her testimony would have; they would have presented the jury with otherwise inadmissible hearsay which the jury would likely have considered as substantive evidence. Thus, the Court finds that admission of the letters and records would have compounded, not eradicated, the prejudice to the State.

(490)    In support of his claim that counsel should have subpoenaed family members to testify to the information relied on by Dr. Goodness, Applicant presents the affidavits of his biological mother, Anna Lester, and his brother, Wesley Halprin. (Applicant's Exs. C, E); Wesley Halprin Affidavit (filed 7/30/10).

(491)    There is no evidence that any other family member would corroborate the information relied on by Dr. Goodness. The Court finds that Applicant's adoptive family refused to assist in his defense. (RR53: 22-23); (8/20/10 Hrg) RR: 100-01.

(492)    The Court finds Ms. Lester's affidavit confirms that Applicant was physically abused, but it does not unquestionably establish Ms. Lester's availability as a witness at Applicant's trial. In the affidavit, Ms. Lester states that she was not subpoenaed to testify and that she would *now* be willing to testify if called. She does not state, however, that she would have appeared at Applicant's trial if subpoenaed. (Applicant's Ex. C).

(493)    Wesley Halprin states in his recent affidavit that he was available and would have testified if subpoenaed, but the Court finds this statement lacks credibility. *changed to "incredible"*

(494)    The Court finds that both Ms. Lester and Wesley Halprin purposely avoided testifying at trial. Although both were cultivated as witnesses, they became uncooperative right before trial, avoiding contact with the defense. (Applicant's Ex. D, p. 5); (8/20/10 Hrg) RR: 21, 99. Moreover, in his recent affidavit, Wesley Halprin states that he is currently "unsure of [his] willingness to testify on Randy's behalf." Wesley Halprin Affidavit (filed 7/30/10).

85

(495)   Thus, the Court finds that neither Ms. Lester nor Wesley Halprin were available to testify on Applicant's behalf at trial.

(496)   Even assuming counsel could have secured their testimony, the Court finds Applicant fails to rebut the presumption that counsel's decision not to call them constituted reasonable trial strategy.

(497)   The Court finds that presenting Ms. Lester and Wesley Halprin as witnesses posed certain risks. Defense counsel had good reason to believe that both were reluctant to testify and, consequently, made a strategic choice not to subpoena them. The Court finds that counsel reasonably concluded that, given their reluctance, Ms. Lester and Wesley Halprin would not make good defense witnesses. (8/20/10 Hrg) RR: 24-25, 35-36, 99-100.

(498)   Moreover, the Court finds that Ms. Lester would likely have disputed some accounts of abuse. For example, she wrote a letter to Applicant while he was awaiting trial in which she states that the scar on his wrist was the result of a fall he took while carrying his infant brother, not physical abuse as Applicant avers in his own affidavit (i.e., "I was shoved down some steps as I was carrying a glass baby bottle . . ."). (State's Writ Exs. D & E; Applicant's Ex. Q); (8/20/10 Hrg) RR: 101-03.

(499)   The Court finds, at the very least, Ms. Lester would likely have minimized some of the abuse. She informed the prosecutor before trial that Applicant was pushed out of a window, but he suffered no serious injury because the window was on the ground floor, not higher as Applicant's affidavit suggests, i.e., "I remember being shoved out a window at age three or four. I am not sure how far I fell, but I do remember laying on hard grass writhing from having the wind knocked out of me." (State's Writ Ex. F; Applicant's Ex. Q); (8/20/10 Hrg) RR: 101-03.

(500)   Also, the Court finds that Ms. Lester would likely have testified to bad acts committed by Applicant as a very young child. During her interview with the prosecutor, she reported that during the time Applicant was in her care, he "became meaner and harder to control," he set his aunt's couch on fire with matches, and she caught him "shoving pennies down Wesley's throat." (State's Writ Ex. F); (8/20/10 Hrg) RR: 101-03.

(501)   The Court finds that, at most, presenting Ms. Lester as a witness might have resulted in the admission of her own hearsay statements to Dr. Goodness. While at the same time, her testimony would have resulted in the contradiction of some mitigating evidence and, possibly, the admission of aggravating facts not already before the jury. Thus, counsel reasonably concluded that any benefit from calling Ms. Lester did not outweigh the risks.

86

2924

had the greatest likelihood of success on appeal (8/20/10 Hrg) RR: 8-9, 38, 42, 149-51, 154, 157-59, 173; Ashford Interrogatory Answers; Muhammad Interrogatory Answers.

While the finding made a passing reference to *Green v. Georgia*, 422 U.S. 95 (1979), the Court's actual finding ignored the holding of *Green* and other cases following it. In *Green*, the court found that even if evidence may have been inadmissible under the Georgia hearsay rule, its exclusion violated the due process clause.

In fact, as cited in Applicant's pleadings, there are numerous cases that hold that, in a death penalty prosecution, mechanistic application of state evidentiary evidence may be violative of due process. *See United States v. Jones*, 132 F.3d 232, 242 (5th Cir. 1998), *aff'd by*, 527 U.S. 373 (1999) ("The Court has recognized that the defendant must be given the opportunity to introduce information regarding mitigating factors, without traditional evidentiary restraints, in order to provide the jury with the fullest possible information about the defendant."). Indeed, in *Green v. Georgia*, 442 U.S. 95 (1979) (per curiam), the Supreme Court held that exclusion of proferred testimony at the sentencing phase under the state hearsay rule violated due process because testimony went to a critical issue and substantial reasons existed to assume its reliability. *Id.* Similarly, in *Wiggins v. Smith*, 539 U.S. 510 (2003), the Court agreed that trial courts should exercise their discretion to admit "any relevant and reliable mitigating evidence, including hearsay evidence that might not be admissible in the guilt-or-innocence phase of the trial." *Id.* at 536-37; *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) (rejecting explicitly the argument that the need for mitigation evidence may be trumped by state rules of evidence).

2925

(502)   The Court finds that counsel reasonably reached the same conclusion about calling Applicant's biological brother, Wesley, as a witness. As Investigator Bosillo attests, Wesley reported to the State before trial that his and Applicant's adoptive parents did everything possible to support both of them and that his and Applicant's troubles were their own fault and not the result of any failing of their adoptive parents. (State's Writ Ex. D). Wesley Halprin attests to the same in his recent affidavit. Wesley Halprin Affidavit (filed 7/30/10).

(503)   The Court finds that this testimony would have directly contradicted Dr. Goodness's opinion that Applicant's adoptive parents failed to adequately address his needs and provide him with proper emotional support.

(504)   In light of the foregoing, the Court also finds that the strategic decision not to present Ms. Lester's and Wesley Halprin's testimony was not prejudicial to Applicant's defense.

(505)   The Court notes that Applicant has also presented the affidavit of Dalworthington Gardens Police Chief Bill Waybourn. Waybourn Affidavit (filed 7/30/10). Applicant did not allege in his original writ application that counsel should have called Waybourn.

(506)   To the extent Applicant intended to incorporate such a claim into his ineffective assistance grounds for relief, the Court finds that it is procedurally barred as a subsequent writ application. TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5.

(507)   Alternatively, the Court finds the failure to present Chief Waybourn's testimony was not deficient or prejudicial to Applicant's defense.

(508)   The Court notes that Applicant presents no evidence of counsel's reasons for not calling Waybourn to testify. Thus, he fails to rebut the presumption that the decision constituted reasonable trial strategy.

(509)   The Court finds Waybourn's testimony would have corroborated aggravating evidence elicited by the State, i.e., stealing, forging, expulsion from school, etc. Thus, counsel could have decided not to present Waybourn's testimony because it would be more prejudicial than helpful to the defensive theory, a sound strategic choice.

(510)   To the extent Waybourn's testimony may have supported the defensive theory, the court finds that it was cumulative of other evidence before the jury. Thus, it would not have altered the trial's outcome.

(511)   Likewise, the Court finds that the exclusion of hearsay testimony through Dr. Goodness was not prejudicial to Applicant's defense.

87

2926

(512)   Applicant maintains that the Court's limitation on Dr. Goodness's testimony kept the following "critical information" about him from the jury:

> (1) his assault on Jerrod Smith mirrored the abuse he suffered at the hands of his biological parents and his mother's boyfriend;
>
> (2) he was emotionally abused as well as beaten, thrown down stairs, and pushed out of a window;
>
> (3) he was abandoned and put in foster care;
>
> (4) he had a learning disability when adopted at six years of age;
>
> (5) he has had psychological problems, including depression, ADHD, and avoidant personality;
>
> (6) his adoptive parents were "overly rigid" and did not address his needs, including his learning disabilities; and
>
> (7) he was "expelled" from his home at an early age and lacked guidance in his teenage years, making him vulnerable to individuals like Rivas.

(Application, pp. 119-20).

(513)   The Court finds, however, that this information was not kept from the jury. Indeed, most of it came in through Dr. Goodness's testimony.

(514)   During her testimony before the jury, Dr. Goodness opined that "abuse and neglect adversely affected [Applicant's] early environment." In particular, she testified that Applicant and his brother Wesley "did not come from a good home. You do not get placed up for adoption when you are 5 years old, if you come from a good home." (RR53: 28-30).

(515)   Furthermore, Dr. Goodness opined that Applicant learned abusive behavior from witnessing it as a child, intimating that the assault on Jerrod Smith was a byproduct of Applicant's own earlier abuse. (RR53: 29).

(516)   Dr. Goodness also stated her opinion that Applicant was genetically predisposed to substance abuse because his biological mother and father were "drug addicts," and that Applicant's own drug abuse led him to make "bad decisions." (RR53: 30-31, 39).

88

2927

(517)   Dr. Goodness then stated her opinion that Applicant suffered from certain learning disorders, ADHD, and depression. She testified that these disorders went untreated in his childhood and adolescence and that his depression disrupted the development of his social skills. (RR53: 31-32). She then criticized the efforts of Applicant's adoptive parents, stating that they failed to meet his psychological and emotional needs or adequately treat his learning disorders and ADHD. (RR53: 33-35).

(518)   Dr. Goodness further criticized Applicant's adoptive parents, opining that they were "rigid" in their parenting of him and that they overreacted to his "curve balls." (RR53: 38-39). At the same time, the doctor testified that Applicant did not receive the necessary guidance in his childhood and that he was expelled from boarding school just before his eighteenth birthday. Lastly, she opined that Applicant suffers from avoidant personality disorder, explaining that he has a strong need to belong, is socially inept, and fears social rejection. (RR53: 39-41).

(519)   In addition to Dr. Goodness's testimony, the Court finds that much of the purportedly omitted evidence came in through other testimony. (8/20/10 Hrg) RR: 104-09, 179-81.

(520)   Terri Goldberg characterized Applicant's adoptive father as unyielding and reactionary. (RR52: 53-71). She, her son Jason, and Mindi Sternblitz all testified that Applicant struggled to win his adoptive father's approval. (RR52: 8-10, 41-42, 53-55). Applicant, himself, testified to his adoption at the age of five, his academic struggles, being sent away to boarding school, and his subsequent expulsion. (RR47: 103-05). Moreover, Applicant, Terri Goldberg, and Mindi Sternblitz all testified that Applicant's adoptive parents and Ms. Goldberg refused to let him stay with them after his expulsion. (RR47: 105-07; RR52: 13-14, 64-66).

(521)   In addition, counsel elicited evidence from several witnesses that, in contrast to his codefendants, Applicant was not a leader and not very intelligent. (RR49: 103-04, 112-13, 116, 144-45, 187, 196). Applicant, himself, testified that Rivas was in charge and that he just followed the orders of his codefendants. (RR47: 4-36, 47-48; RR48: 131-36; RR49: 30-31, 41). And counsel introduced the confessions of Applicant's codefendants which also characterize Rivas as the leader and Applicant as a follower. (Defense Exs. 24-27).

(522)   The Court finds that the~~, deleted "all told,~~ only information the jury did not receive concerned the specific nature of some of the abuse Applicant suffered and the fact that he was abandoned and placed in foster care before his adoption. Assuming there was some admissible evidence of these facts that could have been presented, Applicant fails to show that their admission would have altered his sentence.

(523)    As previously noted, the jury was told, without dispute from the State, that Applicant suffered abuse and neglect in the first five years of his life and that he was adopted when he was five or six years old. Furthermore, Dr. Goodness repeatedly referred to the existence of Applicant's CPS records. The Court finds from this evidence, the jury must have inferred that the abuse and neglect Applicant suffered was so severe that state officials permanently removed him from his biological parents' custody.

(524)    The Court finds that the details of the abuse Applicant suffered, i.e., being beaten by his father and stepfather and pushed out of a window, would have lent little additional mitigating value to this evidence. At most, it would have been cumulative of other evidence already before the jury and, thus, would not have altered the jury's punishment verdict.

(525)    The Court finds this fact distinguishes Applicant's case from those cases he cites in comparison. *See Williams v. Taylor*, 529 U.S. 362, 395-99 (2000) (jury heard no evidence of defendant's abusive childhood, borderline intelligence, or good prison record); *Canaan v. McBride*, 395 F.3d 376, 385 (7th Cir. 2005) (defendant's "attorneys presented *no* mitigating evidence at the sentencing hearing")(emphasis in original); *Coleman v. Mitchell*, 268 F.3d 417, 444-53 (2001) (mitigation case limited to defendant's unsworn statement); *Ex parte Gonzales*, 204 S.W.3d 391, 398-400 (Tex. Crim. App. 2006) (jury heard no evidence of defendant's extensive sexual and physical abuse by father and no evidence of defendant's borderline intelligence, PTSD, and chemical dependence). *See* "Brief in Support of Argument Concerning Ineffective Assistance of Counsel for Failure to Present Mitigating Evidence" (filed 9/30/10).

(526)    The Court also finds that the admission of Applicant's own hearsay statements to Dr. Goodness may have resulted in the admission of other, possibly harmful, statements made by him to the State's psychological expert, Dr. Thomas Allen, who evaluated Applicant before trial. (8/20/10 Hrg) RR: 109-10. *See Lagrone v. State*, 942 S.W.2d 602, 611 (Tex. Crim. App. 1997) (holding a defendant executes a limited waiver of the Fifth Amendment's protection by constructively testifying through an expert on the issue of future dangerousness, the trial court may order that defendant to submit to a state-sponsored future dangerousness examination and admit into evidence his statements to the state's expert).

(527)    The Court ordered Dr. Allen's report sealed, its release to the State contingent on whether Applicant subsequently waived his Fifth Amendment right by presenting the statements he made to his own expert, Dr. Goodness. (RR40: 20-27; CR: 212-16, 350). Thus, the Court finds that whatever benefit Applicant derived from the admission of his own hearsay statements would have been negated by the admission of other detrimental evidence.

90

2929

(528)    In fact, the Court finds that the more evidence of abuse, etc. the defense presented, the more likely the State would have elected to present additional aggravating evidence. (8/20/10 Hrg) RR: 110-11.

(529)    In particular, the State would have called Applicant's ex-girlfriend, Theresa Dancy, to testify to his mistreatment of her. As the transcript of Investigator Mike Bosillo's telephone interviews of Ms. Dancy shows, she was available and willing to testify (1) that Applicant was a convincing and accomplished pathological liar, (2) that as their relationship deteriorated, he sent her a drawing of a cartoon character saying he "wanted her dead," and (3) during an argument at the bus stop, Applicant grabbed her, held her out into oncoming traffic, and threatened, "Die, bitch." (State's Writ Exs. D & G). Also, Ms. Dancy described Applicant's poor treatment of his brother Wesley while they were both away at boarding school. (State's Writ Exs. D & G).

(530)    Furthermore, the Court finds that if the CPS records had been admissible, the State would have introduced evidence they contained refuting Applicant's attack on his adoptive parents' treatment of him and his brother. The records would have shown the lengths to which Applicant's adoptive parents went to provide for all of Applicant's needs, both physical and emotional. (8/20/10 Hrg) RR: Defense Ex. 2 (see pages stamped 5491-5535 & 5753-5756).

(531)    In sum, the Court finds that the State would have countered any additional evidence of abuse Applicant might have offered with evidence of equal or greater aggravating value. To the extent this additional evidence related to Applicant's more recent, adult behavior, its influence would have been especially significant.

(532)    Based on the foregoing, the Court finds that trial counsel's presentation of mitigating evidence through Dr. Goodness was not deficient and did not prejudice Applicant's defense. Rather, it was a laudable effort to portray Applicant as a victim himself. Additional efforts in that regard would have likely been fruitless or would have afforded Applicant little, if any, benefit; in fact, ultimately, they probably would have proved detrimental.

(533)    Thus, the Court concludes that trial counsel's presentation of mitigating evidence in Applicant's case was not constitutionally deficient.

## C. Codefendants' Testimony

(534)    In his original application, Applicant contends his trial counsel should have called his codefendant George Rivas to testify on his behalf. Applicant maintains Rivas was willing to testify and would have "given credence to [Applicant's] claims that he was left out of the planning of the offense and therefore had no anticipation of the violence." (Application, p. 135).

2930

(535)   In a subsequent application, Applicant contends his trial counsel should also have called his codefendants Patrick Murphy and Michael Rodriguez. *See* Defense's "Additional Arguments in Support of Ineffective Assistance of Counsel and Suppression of Exculpatory Evidence Arguments in Application for Writ of Habeas Corpus," p. 2. Applicant does not specify in which phase of his trial counsel should have presented Murphy and Rodriguez.

(536)   In support of these contentions, Applicant presents an affidavit from each codefendant. In addition, this Court conducted a hearing on May 22 and 23, 2008 at which each of the three codefendants testified. (5/22/08 Hrg) RR: Defense Exs. 1-3).

(537)   The Court finds that Applicant's contentions about counsel's failure to call Murphy and Rodriguez are procedurally barred and should be dismissed. *See* TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5 (Vernon Supp. 2010).

(538)   Alternatively, the Court finds Applicant fails to prove that counsel was deficient for not calling these three codefendants to testify. Nor does he prove that the omission of their testimony prejudiced his defense.

(539)   The Court finds Rivas demonstrated a willingness to testify at his codefendants' trials by testifying at Murphy's trial. However, Murphy and Rodriguez showed no such willingness before these writ proceedings. They did not even testify at their own trials, much less anyone else's trial.

(540)   Furthermore, at the time of Applicant's trial, both Murphy and Rodriguez had strong incentives not to take the stand and waive their constitutional right against self-incrimination. Murphy had yet to be tried for the capital murder, and Rodriguez was appealing his conviction and sentence to the Court of Criminal Appeals. (5/22/08 Hrg) RR: 95, 184-85.

(541)   Also, the Court finds that the "religious conversion" Rodriguez claims ultimately motivated his decision to testify on Halprin's behalf did not occur until after Applicant's trial. (5/22/08 Hrg) RR: 50.

(542)   Consequently, the Court finds Murphy's and Rodriguez's assertions that they would have testified in Halprin's trial on his behalf lacks credibility.  *changed to "incredible"*

(543)   Because Murphy and Rodriguez would not have testified for Applicant, the Court finds that defense counsel was not deficient for not calling them as witnesses.

(544)   Even if they had been willing, the Court finds that trial counsel made a strategic decision not to ask any of Applicant's codefendants to testify on his behalf because they believed it would be detrimental to Applicant's defense. That decision constituted reasonable professional judgment.

92

2931

(545)   In particular, counsel believed that calling the codefendants would leave a bad impression on the jurors and might anger them. At the time of Applicant's trial, the "Texas Seven" were "the most hated men in America," and they each had "horrible" criminal records. Ashford Interrogatory Answers, p. 2; (8/20/10 Hrg) RR: 54-55, 135-36, 185.

(546)   Counsel also believed that the codefendants lacked credibility. There was a strong likelihood that the State would impeach them with prior inconsistent statements. And having personally observed Rivas testify at his own trial, counsel saw firsthand that he did not perform well on the stand and would not be a credible witness. (8/20/10 Hrg) RR: 54-55, 135-37, 185-86, 238.

(547)   Also, the Court finds that calling the codefendants would have been inconsistent with counsel's trial strategy of distancing Applicant from his codefendants. (8/20/10 Hrg) RR: 136, 238.

(548)   The Court finds counsel's concerns were legitimate and valid.

(549)   The record supports counsel's negative opinion of Rivas's, Murphy's, and Rodriguez's testimony.

(550)   The Court judicially notices Rivas's testimony from his own trial and Murphy's trial. See TEX. R. EVID. 201.

(551)   The Court finds that Rivas's credibility was severely impugned in both his own and Murphy's trials, and both juries rejected his account of the offense.

(552)   The testimony from both of those trials shows that Rivas is an acknowledged career criminal and pathological liar. Moreover, Rivas gave conflicting testimony at his own and Murphy's trials, materially altering his account of the offense (i.e., whether Officer Hawkins fired any shots, whether Murphy's assigned role was to act as a sniper, etc.). (Rivas RR42: 11-113; RR43: 6-172; RR44: 6-37); (Murphy RR48: 6-98).

(553)   In addition, the Court finds that the credibility of Rivas, Rodriguez, and Murphy was impeached during the May 2008 writ hearing.

(554)   The Court finds that each had a bias and motive to testify untruthfully on Applicant's behalf. All four remained friends and continued to communicate in person on death row, and by agreeing to testify, Rivas, Rodriguez, and Murphy got a trip away from the restrictive and monotonous death row environment. Furthermore, Rivas admittedly felt responsibility for Applicant's death sentence, and Murphy was Applicant's father-in-law at the time of the writ hearing. (5/22/08 Hrg) RR: 85-89, 142, 152-53, 188-90.

93

2932

(555)   Thus, the Court finds Rivas, Rodriguez, and Murphy were not credible witnesses.

(556)   Even if Rivas, Murphy, and Rodriguez were credible witnesses, the Court finds that the testimony they gave in the May 2008 writ hearing would not have altered the jury's verdict on guilt or punishment.

(557)   The Court finds any testimony from Rivas, Murphy, and Rodriguez that Applicant was regarded by his codefendants as a "weak link" who played a minor role in the offense would have been cumulative of other evidence admitted at trial.

(558)   As reflected in the Court's previous findings, the jury had already heard an inordinate amount of evidence that Applicant played a diminished role in the offense and was regarded as weak-willed and weak-minded by others, including Rivas and the other codefendants.

(559)   Moreover, the Court finds that the testimony of these three codefendants was not weighty or persuasive evidence of Applicant's purported weak nature. In particular, their testimony showed Applicant was more trustworthy than some of his codefendants and more valuable to the group than others.

(560)   According to the codefendant's testimony, Rivas handpicked Applicant for the escape long before many of the others. And unlike his codefendants, Halprin never leaked news of the escape in prison; nor was it his actions that led to their detection and capture. (5/22/08 Hrg) RR: 55, 59, 79-80, 125-26, 134, 169-70. During the escape, Applicant acted as a lookout and he tackled at least one of the guards. (5/22/08 Hrg) RR: 60-61, 65, 171. During the extraneous robberies, Applicant was either unarmed or relegated to menial tasks, but he was not alone in that regard; some of his codefendants were treated similarly. (5/22/08 Hrg) RR: 68-69. By contrast, during the Oshman's robbery, it was Murphy that Rivas assigned as lookout in the parking lot. Applicant was inside the store and armed like everyone else, and Rivas trusted him with important tasks, such as handling the weapons and answering the store phone. (5/22/08 Hrg) RR: 71-73, 130-35, 139. Lastly, the codefendants' testimony showed that there was general dissension among all the escapees, rather than a group animosity aimed entirely at Applicant. (5/22/08 Hrg) RR: 81, 184.

(561)   In addition, the Court finds all three codefendants gave testimony that would have damaged Applicant's defensive theory at trial.

(562)   In the May 2008 writ hearing, Rodriguez testified that Applicant thought someone would get hurt if he carried a gun during the Radio Shack and Oshman's robberies. (5/22/08 Hrg) RR: 25-26, 34. The Court finds this testimony supports the State's theory that Applicant actually anticipated Officer

94

2933

Hawkins's murder. It also shows Applicant contemplated that he, personally, might shoot someone.

(563)   Also, all three codefendants testified that after the Oshman's robbery, Rivas and other codefendants thought it was Applicant who shot Rivas. And Murphy confirmed that everyone thought Halprin capable of shooting Rivas. (5/22/08 Hrg) RR: 37, 114, 164, 182. The Court finds that, contrary to Applicant's trial testimony, this testimony supported the State's theory that Applicant fired his weapon during the shooting in the loading dock behind the Oshman's.

(564)   And lastly, the Court finds that Rivas's and Murphy's testimony shows Applicant was carrying extra ammunition in his pockets during the Oshman's robbery and that there may have been extra ammunition in the Honda. (5/22/08 Hrg) RR: 149, 179-81, 193-94. This testimony would have provided the State with an alternative explanation for why Applicant's weapon was fully loaded when checked by his codefendants at the hotel after the murder, i.e., Applicant reloaded after firing his weapon in the loading dock.

(565)   For all the foregoing reasons, the Court finds counsel was not deficient for not calling Rivas, Murphy, or Rodriguez to testify in either phase of trial, and Applicant's defense was not prejudiced by its absence.

(566)   Thus, the Court concludes that trial counsel did not violate Applicant's constitutional right to effective assistance by not calling Rivas, Murphy, or Rodriguez to testify at trial.

### D. Sponsoring Witness for Ranking Document

(567)   Referring back to his third ground for relief, Applicant contends his trial counsel should have ascertained the identity of the person who prepared the ranking document (Defense Ex. 39) and that the failure to do so kept material, favorable evidence from the jury. He claims counsel should have asked their expert S.O. Woods to help them determine the author's identity and that the failure to "take even this simple step" constituted ineffective assistance.

(568)   The Court finds that trial counsel went to great pains to convince the Court to allow the document into evidence. Counsel repeatedly challenged the document's exclusion and attempted to establish a predicate for its admission through several different witnesses. Then, in the middle of trial, counsel subpoenaed additional records from TDCJ-OIG and called the office's records custodian as a witness, all in an effort to establish the document's authenticity and admissibility under the business records exception. (RR49: 112-14; RR51: 118-20; RR52: 75-88; RR53: 12-16); Ashford Interrogatory Answers; Woods Interrogatory Answers; (8/20/10 Hrg) RR: 65-70, 78, 132-35, 201-10, 239, 247.

95

2934

(569)   The Court finds that counsel did not identify Whitman as the drafter of the document before or at the time of trial. As previously found in response to Applicant's related *Brady* claim, Applicant's prison expert, S.O. Woods, identified Sergeant Whitman as the drafter of the ranking document after trial, when he re-examined TDCJ-OIG's records at the request of writ counsel. Woods Interrogatory Answers; (Applicant's Exs. A & B).

(570)   Nevertheless, the Court finds Applicant fails to prove counsel was deficient for not identifying Whitman as the drafter of the document.

(571)   As previously found in response to Applicant's related *Brady* claim, the ranking document would not have been admissible in its entirety even if Whitman had been identified and subpoenaed to testify.

(572)   The Court finds that the ranking document reflects information Whitman and his colleagues obtained from other individuals, including inmates. The out-of-court statements of these individuals constitute hearsay for which there is no exception to exclusion. *See Garcia*, 126 S.W.3d at 926 (holding hearsay statements made by defendant's wife to employee of battered women's shelter not admissible under business records exception just because employee had a business duty to record wife's statements accurately); *Kratz*, 890 S.W.2d at 905-06 (upholding exclusion of eyewitness statements contained in police report under Rule 803(8)).

(573)   Thus, even if portions of the document would have been admissible, the Court would still have excluded much of the hearsay contained in the document.

(574)   Because Whitman was not the key to the ranking document's admissibility, counsel was not deficient for failing to identify and subpoena him as its sponsoring witness.

(575)   The Court also finds that Applicant fails to prove the exclusion of the ranking document prejudiced his defense.

(576)   As previously found in response to Applicant's related *Brady* claim, counsel repeatedly injected information about the document into their questions to several witnesses and through these efforts, succeeded in conveying to the jury the nature and content of the document. (8/20/10 Hrg) RR: 132-35, 239.

(577)   Moreover, as set out more specifically in the findings on Applicant's related *Brady* claim, the ranking document was cumulative of other evidence before the jury.

(578)   Lastly, if Whitman had testified and the document had been admitted in part or in its entirety, the State would have responded with additional, damaging evidence.

96

2935

(579)   In particular, the Court finds the State would have elicited Whitman's testimony that the law enforcement officers who contributed to the ranking document actually considered the last three on the list – Garcia, Murphy, and Applicant – interchangeable in rank. Whitman also would have testified that he was trained as a hostage negotiator, not a criminal profiler, and that he had never before prepared a criminal profile. Furthermore, Whitman would have testified that he would not have ranked Applicant at the bottom if he had been aware of Texas Ranger G.W. Hilderbrand's subsequent profile of Applicant. Whitman Affidavit; Whitman Interrogatory Answers; (9/30/10 Hrg) RR: 54-55, 64, 72, 75, 81-83, 131-32.

(580)   The Court finds that the State would also have offered Hilderbrand's damaging profile of Applicant. Unlike Whitman and the other officers who contributed to the ranking document, Hilderbrand was trained and experienced in profiling. Moreover, his profile was based on information about Applicant that was unavailable to Whitman and his colleagues. Hilderbrand's profile was significantly prejudicial to Applicant and would have effectively neutralized whatever benefit Applicant might have obtained from the admission of the ranking document. (9/30/10 Hrg) RR: 75-82; 144-45 (Defense Ex. 56.)

(581)   Based on the foregoing, the Court finds that counsel was not deficient for failing to identify and subpoena Whitman and that the document's exclusion did not prejudice Applicant's defense.

(582)   Therefore, the Court concludes that Applicant's trial counsel did not violate his constitutional right to effective assistance by not identifying and presenting Whitman as the ranking document's sponsoring witness.

### E. Anti-Parties Instruction

(583)   Applicant contends his trial counsel should have asked the Court to include an "anti-parties" instruction in the punishment charge. Specifically, he claims counsel should have asked the Court to instruct the jury to limit their deliberations on the second special issue to evidence of "the conduct and acts of the defendant standing alone." (Application, p. 136). Applicant argues that the failure to request this limiting instruction "enhanced the possibility that the jury convicted [him] because other members of the group anticipated death." (Application, p. 138).

(584)   The Court finds that Applicant fails to prove counsel was deficient for not requesting the complained-of instruction or that the failure to make the request prejudiced his defense.

97

2936

(585)   The Court finds that counsel reasonably concluded that such a request was unnecessary. (8/20/10 Hrg) RR: 244.

(586)   The Court finds that while trial counsel did not request an instruction such as the one Applicant now proposes, the Court did instruct the jury as mandated by article 37.071, section 2(b)(2) of the code of criminal procedure.[16]

(587)   The Court of Criminal Appeals has held that the instruction mandated by section 2(b)(2) requires the jury to focus exclusively on the defendant's conduct and, thus, essentially, is an "anti-parties" charge. *See Ladd v. State*, 3 S.W.3d 547, 570 (Tex. Crim. App. 1999)(citing *McFarland v. State*, 928 S.W.2d 482, 516-17 (Tex. Crim. App. 1996))(both holding second special issue is an "anti-parties" instruction); *see also Wood v. State*, 18 S.W.3d 642, 649 (Tex. Crim. App. 2000) (describing second special issue as an "anti-parties" issue and holding that it is constitutional because it specifically instructs the jury to consider the defendant's behavior alone).

(588)   The Fifth Circuit Court of Appeals has held the same. *See Ramirez v. Dretke*, 398 F.3d 691, 696-97 (5th Cir. 2005) (holding that trial court's general punishment instruction to "consider all evidence submitted . . . in whole trial" did not permit jury to impose death on Ramirez based on other party's conduct because second special-issue instruction explicitly limited jury's consideration to Ramirez's individual liability).

(589)   Because the Court's instruction already contained an anti-parties charge, the Court finds that trial counsel was not deficient and could not have prejudiced Applicant's defense by not requesting one. *See Ladd*, 3 S.W.3d at 570 (rejecting ineffectiveness claim based on decision not to request "anti-parties" charge in second special issue instructions).

(590)   Based on the foregoing, the Court concludes that Applicant's trial counsel did not violate his constitutional right to effective assistance by not requesting another anti-parties instruction.

### F. Prosecutor's Closing Argument

(591)   Applicant contends his trial counsel should have objected to the prosecutors' closing punishment arguments. More specifically, he claims the prosecutors made arguments contrary to *Enmund* and *Tison* that misled the jury "about the

---

[16] The second special issue reads:  Do you find from the evidence beyond a reasonable doubt that the defendant, RANDY ETHAN HALPRIN, actually caused the death of the deceased, Aubrey Hawkins, or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken?  (CR: 43).

98

2937

quality and quantity of proof necessary to answer special issue number two affirmatively."

### First Argument

(592)   Citing the argument below, Applicant alleges the prosecutor argued contrary to *Enmund* that "merely bringing a gun to a robbery" was sufficient to prove anticipation of death:

> Special Issue No. 2, did he cause the death? Did he intend that someone die? Did he anticipate that a human life would be taken? *Most of you told us taking a loaded gun into a store, a robbery, that by itself told you that he knew or anticipated or someone would in that circumstance, they would have to use it. And, you know, you can use that fact by itself to answer that question* or you could go back to what Mr. Shook argued earlier about as he went around that car and those gunshots into that squad car from the left front, there's only one person from the evidence who was there. Mr. Halprin.
>
> Why else do you take loaded weapons? Why else do you have a sniper out front? Why else do you have the police band frequency on? And why else do you take that gun and shoot it?
>
> See, the simple fact, I believe, from the evidence from what you all heard that they all had this plan, they all were armed, they had a sniper out front that was going to engage the police in a fire fight, tells you Mr. Halprin anticipated, he intended, and it's quite likely he caused the death or participated in that. No. 2, yes, beyond a reasonable doubt, overwhelmingly. Your common sense tells you that.

(RR53: 82) (emphasis supplied by Applicant).

(593)   The Court finds that Applicant fails to prove counsel was deficient for not objecting to this argument or that the lack of an objection prejudiced his defense.

(594)   The Court finds that the argument was not improper.

(595)   The Court finds he prosecutor was arguing what the jury could deduce from the evidence in Applicant's case, a proper area of jury argument. *See Jackson v. State*, 17 S.W.3d 664, 673 (Tex. Crim. App. 2000) (noting that proper jury argument includes four areas: summation of evidence presented at trial, reasonable deduction drawn from that evidence, answer to opposing counsel's argument, and plea for law enforcement).

99

2938



(596)   Moreover, the Court finds the prosecutor was not arguing that every person who walks into a store with a loaded gun to commit robbery anticipates that a life will be taken. He was arguing that such conduct was sufficient to prove that under the circumstances of this case, Applicant, in particular, expected someone would be killed.

(597)   The Court finds that even if the prosecutor's argument could be construed as Applicant suggests, no law holds that taking a loaded gun into a store to commit a robbery is insufficient to prove anticipation that a life would be taken.

(598)   Applicant contends *Enmund* stands for this proposition. *Enmund*, however, only defined the level of culpability required to impose the death penalty, not what evidence is required to prove that culpability. *Tison*, 481 U.S. at 158; *Enmund*, 458 U.S. 797.

(599)   Also, *Enmund* did not address whether anticipation is a sufficiently culpable mental state to warrant death. *Enmund*, 458 U.S. at 797 (holding a party to a felony in the course of which a murder is committed is ineligible for the death penalty unless he himself killed, attempted to kill, or intended to kill or that lethal force be used).

(600)   Furthermore, Enmund did not carry a loaded gun into a store to commit robbery; he was parked outside while his two codefendants robbed and killed an elderly couple in their farmhouse nearby. *Enmund*, 458 U.S. at 784. Thus, *Enmund* does not explicitly or implicitly address whether taking a loaded gun inside a store to commit robbery is sufficient to prove anticipation.

(601)   Consequently, the Court finds Applicant's trial counsel could have reasonably concluded that an objection to this argument would have been fruitless. (8/20/10 Hrg) RR: 146-47, 167, 198-200, 245. Therefore, Applicant was not prejudiced by counsel's failure to object.

(602)   The Court finds that there was a multitude of other facts surrounding Applicant's conduct from which his expectation that someone would die could be inferred, including the violent nature of the escape, the violent criminal histories of Applicant and his codefendants, the threatening note Applicant left behind in prison, the concerted efforts made to detect and respond to the arrival of police at the Oshman's, and Applicant's continued participation in the gang after the murder. It would test the bounds of reason to conclude that the jury considered none of this substantial and persuasive evidence of Applicant's "anticipation" in answering the second special issue.

100

2939

*Second Argument*

(603)   Applicant also argues the State improperly told the jury that it could answer the special issues "by referring to what the group did, not focusing just on the conduct of [Applicant]." In support of this contention, Applicant cites the following argument:

> Question No. 2, looking at all the evidence, I think it's clear the State has proven that. We've talked about that at great length. We can prove that he actually caused the death. It's actually very similar to some of the issues we talked about in guilt/innocence. Or if he didn't actually cause the death, but he intended to kill someone.

> A few examples we gave, maybe there were several people using guns, maybe he wanted to shoot, maybe his gun misfired, maybe someone murdered the victim before him, as examples of that. What is important is the intent.

> And I think the intent is clear from the way Aubrey Hawkins was murdered, that every last one of those individuals, including Patrick Murphy who was out front, wanted Aubrey Hawkins dead. The 47 seconds, how they ambushed him when he came around, how they drug him out of his car, how they were able to get away so quickly.

> Their intent was clear. All the different guns used. If anyone got in their way, they were going to take care of them, folks. Remember his letter, "You haven't heard the last from us."

> Now, clearly from all the evidence from their escape, these violent men, the weapons they are using, from how they murdered Aubrey Hawkins, Special Issue No. 2 should be answered yes. I don't know how you could write a better scenario about anticipating someone might die by the facts of this case.

(RR53: 135-36).

(604)   The Court finds that Applicant fails to prove counsel was deficient for not objecting to this argument or that the lack of an objection prejudiced his defense.

(605)   The Court finds that the argument was not improper.

(606)   The prosecutor argued that Applicant, like his codefendants, was an escaped violent felon who exhibited an intent to kill Officer Hawkins by ambushing him 

101

*noted*
*isrs*
*sentences of*
*f.s # 616 –*
*p. 27, part 2*

2940

and shooting to kill. Moreover, he referenced the ominous threat Applicant made in the note he left behind in prison. Thus, the argument focused on Applicant's individual culpability for the murder.

(607)   Applicant suggests that no mention whatsoever of his cohorts may be made by the State in punishment phase arguments, but the law does not preclude the State from placing Applicant's conduct in context. Thus, to the extent the actions of Applicant's codefendants put his own conduct in context, the State may comment on it.

(608)   Furthermore, the Court finds defense counsel invited the above argument when he asked the jury to compare Applicant to his codefendants and argued that he was one of the last of the "Texas Seven" to be tried because he was less "complicit" than his codefendants. (RR53: 90-91, 107). The above argument characterizing Applicant and his codefendants as equally culpable merely responded to this defense argument. *See Ripkowski v. State*, 61 S.W.3d 378, 393 (Tex. Crim. App. 2001) (holding that defendant cannot complain of improper prosecutorial argument if he invited the argument).

(609)   Taken in context, the Court finds that the preceding argument was not an attempt to persuade the jury that Applicant deserved death because of the conduct of his codefendants.

(610)   Moreover, the Court finds counsel's decision not to object to this argument was consistent with reasonable trial strategy. (8/20/10 Hrg) RR: 146-47, 167, 198-200, 245.

(611)   The Court finds that the second special issue, which equates to an "anti-parties" instruction, focused the jury on Applicant's conduct alone.

(612)   The Court finds counsel could have reasonably concluded that the jury would, in keeping with their oath, follow this instruction, and, thus, an objection was unnecessary.

(613)   Indeed, the law presumes the jury followed the Court's instructions. *See Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998) (holding that jury is presumed to have followed trial court's instructions as given).

(614)   Absent any evidence that the jury did not follow the "anti-parties" instruction, the Court finds Applicant fails to prove counsel's decision not to object to the second argument was unsound or prejudicial to his defense.

(615)   In sum, the Court finds that neither of the prosecutor's arguments were contrary to *Enmund* and *Tison*; nor did they mislead the jury "about the quality and quantity of proof necessary to answer special issue number two affirmatively."

102

2941

(616)   Based on the foregoing, the Court finds that counsel was not deficient for not objecting to these two arguments and that the decision not to object did not prejudice Applicant's defense.

(617)   Thus, the Court concludes that Applicant's trial counsel did not violate his constitutional right to effective assistance by not objecting to the preceding two arguments.

## G. Advice on Applicant's Right to Testify

(618)   Applicant contends his trial counsel failed to inform him of his right to testify in the punishment phase. As a result, Applicant claims he was prevented from testifying about his abusive biological parents, their drug and alcohol abuse, and his learning problems.

(619)   In support of this contention, Applicant offers his own affidavit in which he states that counsel did not tell him he had a right to testify in the punishment phase and that he would have testified in that phase if he had known he could. (Applicant's Ex. Q).

(620)   The Court finds that Applicant fails to prove counsel did not properly admonish him or that the alleged failure prejudiced his defense.

(621)   The Court finds that Applicant is not a credible witness. (RR48: 59-168; RR49: 3-24, 50-52); (11/12/11 Hrg) RR: 4-7; (State's Hrg Exs. 1-2).

(622)   Furthermore, the Court specifically finds Applicant's sworn assertion that he was not advised of his right to testify at punishment not to be credible. [changed from "not to be credible" to "is incredible"]

(623)   During their testimony in these habeas proceedings, both of Applicant's trial counsel testified that they advised Applicant of his right to testify at punishment and that Applicant chose not to testify in that phase. (8/20/10 Hrg) RR: 115, 191, 229-30.

(624)   The Court finds counsel's testimony on this matter true and credible.

(625)   The Court finds the record supports counsel's assertions that Applicant was properly admonished about his right to testify at punishment.

(626)   Applicant testified in the guilt phase of his trial and, before taking the stand, he acknowledged on the record that he had been fully admonished by trial counsel regarding his right to testify:

103

2942

THE COURT: Let the record reflect the jury has been retired for a brief hearing. Mr. King, do you have anything you wish to put on the record?

MR. KING: Your Honor, we have discussed with Mr. Halprin his rights in regards to testifying in his own behalf. We have explained to him that he has a right to testify, if he wishes to do so and no one can keep him from the witness stand. We have explained to him he has the right not to testify and if he chooses not to do so, then the jury will be instructed that the fact that he did not testify cannot be considered as any evidence against him whatsoever.

We have discussed with him the pro's [sic] and con's [sic] of testifying in this case and it is the wishes of Mr. Halprin to testify in his own behalf. And we intend to call him as our next witness.

But, if I may, Your Honor, Mr. Halprin, would that be a correct representation of what I have just talked about, about your understanding of the law and your rights?

THE DEFENDANT: Yes, sir.

MR. KING: You understand that you don't have to testify, if you don't want to?

THE DEFENDANT: Yes, sir.

MR. KING: And you wish to testify in your behalf; is that correct?

THE DEFENDANT: Yes, sir

MR. KING: We'll be calling Randy Halprin, Your Honor.

(RR47: 93-94).

(627)   The Court finds the above exchange shows that trial counsel conscientiously advised Applicant of his constitutional right to testify and its attendant risks. These efforts render Applicant's assertion that counsel failed to fully admonish him, i.e., inform him that his right to testify extended to the punishment phase (to be lacking credibility.)   — *Changed from " inherently suspect"*   *St #637, P39 part 2*

(628)   Furthermore, the Court finds Applicant's assertion that he was unaware he had a right to testify in the punishment phase, when he knowingly and voluntarily

104

2943

exercised that right in the guilt phase to be without merit. *" strains the bounds of reason"*

(629)  The Court finds Applicant elected not to retake the stand in the punishment phase for strategic and personal reasons. (8/20/10 Hrg) RR: 115, 230.

As his testimony in the guilt phase shows, Applicant did not perform well on the stand. The prosecutor subjected him to withering cross-examination. He confronted Applicant with a plethora of lies and several extraneous bad acts, including his assault on toddler Jerrod Smith. He also attacked Applicant's account of the escape, robbery, and murder, severely impugning his claims that he was a minor participant who never intended or anticipated that anyone would be injured or killed. (RR48: 58-168; RR49: 3-8, 15-24, 52-53).

*deleted to #641*
*30,*
*x 2*
*change from*
*direct exam.*

*Deleted "in any event"*

(630)  The Court finds that Applicant's absence from the witness stand did not alter the punishment verdict. *See Johnson v. State*, 169 S.W.3d 223, 239-41 (Tex. Crim. App. 2005) (holding defense counsel not ineffective for denying Johnson the right to testify where his testimony would have been cumulative of other evidence already before jury, he could have been impeached with other incriminating or inconsistent statements he made, with his prior convictions, and with his continued refusal to share any blame for what happened); *Moreno v. State*, No. 13-04-195-CR, 2005 Tex. App. LEXIS 5202, at * 15 (Tex. App. – Corpus Christi 2005, no pet.) (not designated for publication) (holding counsel not ineffective even if he did deny Moreno the opportunity to testify where his testimony would have been duplicitous and would have resulted in the admission of his extraneous criminal conduct).

(631)  Applicant claims he would have testified about his parents' abusive nature, their drug and alcohol abuse, and his own learning disabilities. (Application, p. 141). According to his affidavit, Applicant could have testified about his recollection of particular acts of physical abuse and neglect, his placement in foster care, his "visual" exposure to drugs and alcohol, and the fact that he did not learn his ABC's or how to count until he was five-and-a-half years old. (Applicant's Ex. Q).

(632)  The Court finds that this testimony would have had little impact on the jury's punishment deliberations.

(633)  As previously addressed, evidence that Applicant was abused and neglected by his biological parents and put up for adoption at the age of five was already before the jury through Dr. Goodness. (RR53: 28). Moreover, Dr. Goodness testified to the deleterious effect this "poor" environment had on Applicant's development and character. (RR53: 29-30). Testimony that Applicant's parents were drug addicts also came in through Dr. Goodness. (RR53: 30-31). And Dr. Goodness, Mindi Sternblitz, and the Goldbergs all testified to Applicant's

105

2944

academic struggles. (RR52: 6, 48-49, 67; RR53: 31-35). In fact, Dr. Goodness testified that, as a child, Applicant suffered from learning disabilities, ADHD, and depression, none of which were adequately treated. (RR53: 31-32).

(634)   The Court finds that the State could have impeached the credibility of at least one account of the abuse Applicant claimed to recall, i.e., being shoved down the steps while carrying a baby bottle and cutting his wrist on the broken bottle. As previously discussed, Applicant's biological mother, Anna Lester, wrote Applicant a letter in which she explained that the scar on his wrist was the result of an accidental fall he took while trying to help carry his infant brother, Wesley. (State's Writ Ex. E).

(635)   Furthermore, the Court finds that if Applicant had put specific examples of abuse and neglect before the jury, the State could and would have countered with additional aggravating evidence, such as evidence of Applicant's mistreatment of his ex-girlfriend, Theresa Dancy, and his biological mother's claims that he became meaner and harder to control, that he set fire to her sister's couch, and that she caught him shoving pennies down his brother Wesley's throat. (State's Writ Ex. E, F, G).

(636)   In short, the Court finds that the State's response to Applicant's testimony would have negated whatever negligible benefit Applicant could have gained from it.

(637)   Consequently, the Court finds that counsel's advice regarding Applicant's right to testify was sound and did not prejudice Applicant's defense.

(638)   Based on the foregoing, the Court concludes Applicant's constitutional right to effective assistance of counsel was not violated by trial counsel's advice to Applicant about his right to testify at punishment.

## GROUND 6: EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

(639)   Applicant contends his appellate counsel rendered ineffective assistance because he failed to raise numerous claims on direct appeal.

(640)   On appeal, as at trial, Applicant has a constitutional right to effective assistance of counsel. A complaint that appellate counsel was constitutionally deficient is governed by the standard enunciated in *Strickland v. Washington. Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Ex parte Butler*, 884 S.W.2d 782, 783 (Tex. Crim. App. 1994). The decision about which claims to raise on direct appeal is a strategic one, and under *Strickland*, appellate counsel is afforded the presumption that his representation is consistent with reasonable trial strategy.

106

2945

(641)   Thus, where counsel's decision not to raise a particular complaint on appeal is at issue, it must be determined (1) whether reasonable appellate counsel would have raised it, i.e., whether it was available and meritorious, and (2) whether there is a reasonable probability that raising the issue would have led to a different outcome in the appeal, i.e., reversal. *Butler*, 884 S.W.2d at 783.

(642)   As with any ineffectiveness claim, Applicant bears the burden of proving counsel's ineffectiveness by a preponderance of the evidence. *Strickland*, 466 U.S. at 687. Moreover, as Applicant is seeking habeas relief, he bears the burden of proving his factual allegations by a preponderance of the evidence. *Ex parte Morrow*, 952 S.W.2d 530, 534 (Tex. Crim. App. 1997).

(643)   The Court finds Applicant fails to prove that any of the claims discussed below had merit or would have resulted in reversal. Consequently, he fails to prove that his appellate counsel was constitutionally deficient.

## I. QUALIFICATIONS OF APPELLATE COUNSEL

(644)   The Court finds Applicant was represented on appeal by George Ashford, and Michael Muhammad, both of whom were and are experienced appellate attorneys.

(645)   Mr. Ashford's experience is set out in the Court's findings above. Mr. Muhammad was licensed in 1993. At the time of Applicant's direct appeal, Mr. Muhammad had handled numerous criminal appeals, and he had won appellate relief for several of his clients. Furthermore, he had prior experience working on death penalty appeals in affiliation with a Texas university's capital defense project. He is licensed to practice in the Fifth Circuit Court of Appeals, the Texas Northern District Court, and the Texas Southern District Court/Bankruptcy Court. (8/20/10 Hrg) RR: 148-49; Ashford Interrogatory Answers.

(646)   The Court finds that Mr. Ashford was lead appellate counsel. He delegated most of the research and all of the writing responsibilities to Mr. Muhammad. Mr. Ashford and Mr. Muhammad discussed which issues should be raised and strategically selected those they believed had the greatest likelihood of success on appeal. (8/20/10 Hrg) RR: 8-9, 38, 42, 149-51, 154, 157-59, 173; Ashford Interrogatory Answers; Muhammad Interrogatory Answers.

(647)   The Court finds that Mr. Muhammad promptly notified the Court of Criminal Appeals of his representation of Applicant on the appeal. Moreover, Mr. Muhammad filed a brief on direct appeal, an amended brief, a motion for rehearing, and an amended motion for rehearing. Mr. Muhammad timely filed all of these pleadings and where necessary, properly requested leave to file. (8/20/10 Hrg) RR: 149-53; Ashford Interrogatory Answers; Muhammad Interrogatory

107

2946

Answers.

(648)   The Court finds that, at the time of appointment, Applicant had no objection to Mr. Ashford or Mr. Muhammad representing him on appeal.

(649)   Applicant voiced no complaint until the summer of 2004, when his writ counsel complained about the quality of the direct appeal brief to this Court. Satisfied with appellate counsel's performance, this Court rejected the complaint. (8/20/10 Hrg) RR: 154-56.

(650)   This Court finds that in the fall of 2004, Applicant and his writ counsel wrote the Court of Criminal Appeals asking the Court to remove Mr. Ashford from the direct appeal. (State's Writ Ex. P). The Court apparently denied the request.

## II. COUNSEL RENDERED EFFECTIVE ASSISTANCE ON APPEAL

### A. Exclusion of Rodriguez's Letter

(651)   Applicant contends appellate counsel should have complained about the Court's exclusion of Defense Exhibit 30, a letter Applicant's codefendant, Michael Rodriguez, wrote to his brother. Applicant claims exclusion of the letter constituted reversible error because it was admissible under evidence rule 803(24) as a statement against penal interest and it refuted the State's theory of prosecution.

(652)   The Court finds that Applicant fails to prove either of these allegations.

(653)   Rule 803(24) provides for the admission of statements that would subject the declarant to criminal liability, but in criminal cases, such statements are inadmissible "unless corroborating circumstances *clearly* indicate the trustworthiness of the statement." TEX. R. EVID. 803(24) (emphasis added).

(654)   The burden of presenting evidence that clearly indicates trustworthiness is a difficult one, and it fell to Applicant because he was party offering the statement into evidence. *Davis v. State*, 872 S.W.2d 743, 749 (Tex. Crim. App. 1994).

(655)   The Court finds that Applicant failed to meet this burden.

(656)   There is no definitive test for assessing trustworthiness, but when such a statement is offered to exculpate an accused, there are several factors that may be considered, including the following: (1) whether the guilt of the declarant is inconsistent with the guilt of the accused; (2) whether the declarant was so situated that he might have committed the crime; (3) the timing of the statement and its spontaneity; (4) the relationship between the declarant and the party to whom the statement was made; and (5) the existence of independent

108

2947

corroborating facts. *Davis*, 872 S.W.2d at 749.

(657)  Applicant argues these factors weighed in favor of admitting Rodriguez's letter; the Court finds that they do not.

(658)  Applicant claims the letter is inconsistent with his guilt because Rodriguez admits, "I fired once but I don't know if my shot was any good." (RR47: 66-68; Defense Ex. 30).

(659)  The Court finds this claim is premised on the false assumption that Applicant's guilt hinged on whether he himself fired any shots. Proof of Applicant's guilt did not depend on whether he fired a shot. The evidence showed his guilt as a party whether he fired or not.

(660)  Even if Applicant's guilt hinged on whether he fired his gun, the Court finds that Rodriguez's statement does not negate the possibility that he did fire it. As previously discussed, the evidence shows that both Rodriguez and Applicant fired shots at the officer. The State theorized that Applicant fired the four shots into the passenger side of the patrol car's windshield because, by his own testimony, Applicant was on that side of the car. In furtherance of this theory, the State did not argue, as Applicant alleges, that Rodriguez never fired a shot at the officer. Rather, the State argued that Rodriguez only fired the one shot that struck behind the speedometer and, thus, he could not have been the person who fired the passenger side shots. Thus, Rodriguez's statement admitting that he "fired once" actually supports the State's theory of the case.

(661)  The Court finds that the letter was self-serving. Throughout the letter, Rodriguez attempts to minimize his own conduct and that of his codefendants. He repeatedly denies he wanted to hurt anyone, and he suggests the shooting was simply the product of bad timing rather than a pre-planned assault. He also states that he does not know if his shot "did any good."

*elcted rst 2 menues g ʒ ≠ 674 d enoror 35, part 2*

(662)  Rodriguez made these statements to his brother, but he did so while he was incarcerated and knew he would be returning to Texas to face a capital murder charge and the death penalty. Thus, the Court finds that he had a motive to deny culpability and minimize his role in the offense.

*deleted "in Light of the foregoing"*

(663)  The Court acted within its discretion in excluding the letter. *See Clark v. State*, 947 S.W.2d 650, 653-54 (Tex. App. – Fort Worth 1997, no pet.) (holding trial court acted within its discretion in refusing to admit codefendant's written confession, which Clark offered to support his defense that shooting was unintentional because codefendant's statement regarding lack of intent were not against penal interest); *Jefferson v. State*, 909 S.W.2d 247, 251-52 (Tex. App. – Texarkana 1995, pet. ref'd) (holding trial court did not abuse its discretion in

2948

refusing to admit codefendant's hearsay statements under rule 803(24) where statements regarding robbery were made to an investigator with the district attorney's office while codefendant was in jail facing charges for his involvement in the robbery and they tended to improve his situation, not worsen his predicament).

deleted "Moreover"

(664)  ∧Even if the letter should have been admitted, the Court finds that its exclusion was harmless. TEX. R. APP. P. 44.2(b) (harmless error standard for trial error).

(665)  Applicant claims its exclusion denied him of evidence refuting the State's theory about whether Rodriguez fired his weapon.  But as explained above, Rodriguez's statement that he "fired once" actually supported the State's theory.

(666)  Thus, the Court finds that, if anything, its exclusion was beneficial to Applicant.

(667)  Moreover, as the Court noted at trial, there was already other evidence before the jury that the revolver left at the scene belonged to Rodriguez, that it had only been fired once, and that the bullet was found lodged behind the patrol car's speedometer. (RR47: 66-67). Consequently, the Court finds that the letter would have been cumulative of other evidence showing he fired a shot.

(668)  The Court finds that given the propriety of the Court's ruling and the likelihood that its exclusion was harmless, counsel's decision not to raise this claim was reasonable and did not alter the outcome of the appeal.

(669)  Based on the foregoing, the Court concludes that appellate counsel did not violate Applicant's right to effective assistance by not raising this claim on direct appeal.

### B. Suppression Claims

(670)  Applicant contends appellate counsel should have complained about the Court's refusal to suppress his confession and the evidence seized in the search of the Jeep Cherokee. At trial, Applicant presented both his own and Rodriguez's motions to suppress. (CR: 82-85; Defense Exs. 5, 7). Applicant claims appellate counsel should have made the arguments raised on direct appeal by his codefendant Michael Rodriguez. Applicant sets out the arguments from Rodriguez's direct appeal brief verbatim. (Application, pp. 150-72).

(671)  Rodriguez argued that his confession was taken in violation of his right to counsel. He also argued that his confession and the fruits of the search of the Jeep were the product of an illegal arrest.

(672)  The Court finds that these arguments had no merit in Rodriguez's appeal and that Applicant fails to prove they would have been meritorious in his own.

110

2949

*(1) No Violation of Right to Counsel*

(673)   Applicant alleges that his confession was the product of an illegal arrest because it was obtained in violation of his right to counsel. In particular, he claims Sergeant Spivey failed to inform him during his interview that public defender Deborah Grohs was attempting to meet with him.

(674)   The Court finds that, at trial, Applicant presented no evidence of any efforts by Ms. Grohs to meet with him.

(675)   Applicant and the State offered testimony from Rivas's trial as a joint exhibit, and Applicant presented testimony from the trials of Rodriguez and Newbury. But none of these records reflected anything about Ms. Grohs's or any other public defender's attempts to meet with Applicant. In addition, Applicant presented Sergeant Spivey's testimony denying any knowledge that a public defender was attempting to meet with Applicant.

(676)   The Court finds that, if the appellate record failed to substantiate the factual allegations upon which this claim was based, i.e., it did not show that Ms. Grohs tried to meet with Applicant before or during his interview with Sergeant Spivey, the claim could not have succeeded on appeal, regardless of its merits.

(677)   Moreover, even if the record had substantiated the factual allegations upon which this claim was based, the Court finds that the claim still would have failed on appeal.

(678)   Under both the United States and Texas Constitutions, the police had to inform Applicant of his right to counsel and his right to appointed counsel if he was indigent. If Applicant requested counsel, the police had to cease interviewing him until counsel was provided or Applicant reinitiated a conversation. But as long as Applicant knowingly and voluntarily waived his right to counsel, his confession was admissible. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *Dinkins v. State*, 894 S.W.2d 330, 350-51 (Tex. Crim. App. 1995).

(679)   The Court finds that Applicant received the requisite warnings and agreed to speak to officers without counsel. (RR33: 11-15; State's Ex. 931). Even Applicant acknowledges these facts. (Application, p. 153).

(680)   Under both federal and state law, events occurring outside of the suspect's presence and entirely unknown to him can have no bearing on his capacity to comprehend and knowingly waive that right. A suspect's waiver is valid so long as he voluntarily decides to waive his right to counsel, and he is fully aware of and comprehends the information conveyed to him in the *Miranda* warnings. Thus, the State may interview a suspect once he waives his right to counsel even

111

2950

though, unknown to him, an attorney, retained or appointed, was seeking access to him. *Moran v. Burbine*, 475 U.S. 412, 418-20 (1986); *Goodwin v. State*, 799 S.W.2d 719, 729-30 (Tex. Crim. App. 1990).

(681) The Court finds that because Applicant received the requisite warnings, comprehended them, and voluntarily waived his rights, his confession was admissible notwithstanding any unsuccessful attempts by Ms. Grohs to meet with him before he confessed. *See Goodwin*, 799 S.W.2d at 729-30 (holding Texas murder confession admissible despite failure to inform defendant during interview that Iowa counsel appointed to represent him on Iowa charges was waiting to meet with him).

(682) Applicant acknowledges that federal jurisprudence is not in his favor. Nonetheless, he argues the Texas Constitution affords him greater protection. In support of this contention, Applicant cites *Dunn v. State*, 696 S.W.2d 561 (Tex. Crim. App. 1985).

(683) In *Dunn*, the Court of Criminal Appeals held that a defendant's constitutional rights to counsel under the Fifth Amendment and article I, section 10 of the Texas Constitution were violated because he was not informed that attorneys hired by his wife to represent him were at the police station and trying to meet with him during his interrogation by police. *Dunn*, 696 S.W.2d at 569-70.

(684) *Dunn*'s interpretation of the Fifth Amendment right to counsel has been overturned. *See Goodwin*, 799 S.W.2d at 729-30.

(685) Moreover, contrary to Applicant's contention, *Dunn* does not support his proposition that his state right to counsel is broader than his federal right.

(686) In *Dunn*, the Court of Criminal Appeals did not separately address the state constitutional right to counsel. The Court centered its analysis on federal precedent. Thus, as the Court of Criminal Appeals has since noted, the holding in *Dunn* "does not represent an independent and adequate state ground." *Goodwin*, 799 S.W.2d at 729. Furthermore, the Court of Criminal Appeals has more recently held that the state constitutional right to counsel affords no more protection than its federal counterpart. *Hernandez v. State*, 988 S.W.2d 770, 772 (Tex. Crim. App. 1999).

(687) The Court finds that, consistent with its own authority, the Court of Criminal Appeals would have overruled Applicant's claimed deprivation of his right to counsel and upheld the trial court's admission of his confession.

(688) Thus, the Court finds that appellate counsel did not violate Applicant's constitutional right to effective assistance of counsel by not raising this claim on

112

2951

direct appeal.

## (2) *Legality of Arrest*

(689)   Applicant contends, as Rodriguez argued, that his confession and the evidence recovered in the search of the Jeep Cherokee were the product of his illegal arrest. (Application, pp. 150-72).

(690)   The Court notes that Applicant makes no argument regarding the fruits of the search of the RV, although the findings presented here would apply equally to that evidence.

(691)   Applicant specifically claims his arrest was not predicated on a valid warrant that had any force and effect in Colorado. He claims the federal warrant for flight from prosecution and the Texas warrant for capital murder were not based on probable cause and, thus, invalid. (State's Exs. 928, 929).

(692)   The Court finds that these were not the only warrants issued for Applicant's arrest, however. The State presented two additional arrest warrants in response to his suppression motion:  a federal warrant for possession of firearms by a convicted felon and a Texas warrant for escape.  (State's Exs. 927, 930).

(693)   Thus, the Court finds that even if the attacks on the Texas capital murder warrant and the federal flight from prosecution warrant had merit, there were other warrants upon which Applicant's arrest could have been made.

(694)   The Court finds that Applicant never questioned, much less disproved, the validity of either of these warrants. Moreover, regardless of whether or not the Texas escape warrant had any force and effect in Colorado, the federal warrant did.

(695)   The Court finds that even if these additional warrants did not exist, Applicant fails to prove that his arrest was illegal.

(696)   The Court finds that Applicant does not prove the capital murder and flight from prosecution warrants were not based on probable cause, that the warrants lacked force and effect in Colorado, or that his warrantless arrest would have been illegal.

(697)   Also, the Court finds Applicant fails to disprove the attenuation of any taint from an illegal arrest.

(698)   Consequently, the Court finds Applicant fails to prove his attack on the legality of his arrest would have succeeded on direct appeal.

113

2952

(a) Warrants Based on Probable Cause

(699)   The Fourth Amendment requires probable cause to arrest. U.S. CONST. amend. IV.

(700)   Applicant perfunctorily cites article I, section nine of the Texas Constitution in support of his illegal arrest claim and presents this Court with no separate argument or authorities supporting it. Thus, the Court finds that Applicant is not contending that the Texas Constitution affords him any greater protection than the federal constitution.

(701)   An arrest warrant affidavit must set out sufficient facts to permit the magistrate to make an independent judgment that probable cause for arrest exists. *Knox v. State*, 586 S.W.2d 504, 505-06 (Tex. Crim. App. 1979). Probable cause exists where the police have reasonably trustworthy information sufficient to warrant a prudent person to believe a particular person has committed or is committing an offense. *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Guzman*, 955 S.W.2d at 87. Probable cause deals with probabilities; it requires more than mere suspicion but far less evidence than that needed to support a conviction or even that needed to support a finding by a preponderance of the evidence. *Guzman*, 955 S.W.2d at 87. It contemplates "a fair probability." *Illinois v. Gates*, 462 U.S. 213, 246 (1983).

(702)   Whether an affidavit underlying a warrant establishes probable cause is determined by reviewing the information contained within the affidavit's four corners. *Jones v. State*, 833 S.W.2d 118, 123 (Tex. Crim. App. 1992). The test is whether, under the totality of the circumstances, the affidavit provided the issuing magistrate with a substantial basis for concluding that probable cause existed. *Illinois v. Gates*, 462 U.S. at 236; *Ramos v. State*, 934 S.W.2d 358, 362-63 (Tex. Crim. App. 1996).

(703)   A substantial basis may be established through the affiant's direct personal observations or hearsay information. *Jones v. State*, 568 S.W.2d 847, 854 (Tex. Crim. App. 1978). The magistrate is permitted to draw reasonable inferences from the facts and circumstances alleged, and a magistrate's determination that probable cause exists is entitled to great deference. *Gates*, 462 U.S. at 236; *Ramos*, 934 S.W.2d at 362-63.

(704)   When reviewed, an affidavit should be interpreted in a commonsense, not hypertechnical, manner. *Gates*, 462 U.S. at 236. The informant's credibility and the basis of his knowledge are highly relevant factors. It is not imperative, however, that the affidavit reveal both that the informant is credible and that he has a substantive basis for his assertions. Compelling evidence of one prong will make up for a deficiency in the other, and a magistrate is not required to find

114

2953

both before finding probable cause. *Id.* at 233.

### (i) Texas Capital Murder Warrant

(705)   The Court finds that the affidavit underlying the Texas capital murder warrant established probable cause, i.e., it provided the issuing magistrate with a substantial basis for concluding a fair probability existed that Applicant participated in the capital murder of Officer Hawkins.

(706)   The affiant, Irving Police Detective Randal Johnson, stated his belief that Applicant committed capital murder on Christmas Eve 2000 based on the following information that: (1) Wesley Ferris, a manager of the Oshman's store in Irving, was robbed at gunpoint by George Rivas, (2) Applicant, along with Rivas, Donald Newbury, Randy Halprin, Patrick Murphy, Larry Harper, and Joseph Garcia, produced handguns and robbed the employees, including Mr. Ferris, (3) Officer Hawkins responded to the back of the store while Applicant, Rivas, and the others were fleeing, (4) other officers found Officer Hawkins at the scene and the Irving Fire Department transported him to the hospital were he was pronounced dead from gunshot wounds, and (5) employees positively identified Applicant, Rivas, and the others in a photographic lineup. (State's Ex. 929).

(707)   Applicant suggests that Detective Johnson's affidavit does not demonstrate the basis of his knowledge of these facts.

(708)   The Court finds that this suggestion is supported only by a hypertechnical interpretation of the affidavit. A commonsense interpretation indicates otherwise.

(709)   The Court finds the magistrate could have reasonably inferred from Detective Johnson's sworn statements that he had obtained the information about the robbery and Applicant's participation in it from Wesley Ferris and the other employees. Furthermore, the magistrate could have reasonably inferred that Detective Johnson learned from other Irving police officers and Irving firemen the information regarding Officer Hawkins's response to the scene and subsequent death.

(710)   Therefore, the Court finds that Detective Johnson's sworn statements do support the magistrate's probable cause determination. *Cf. Jones*, 568 S.W.2d at 855 (holding affidavit for arrest warrant sufficient for magistrate to infer affiant's personal knowledge that defendant's prints matched to prints on evidence found at murder scene, and affidavit obviously based on the statements of the victim of an offense to the affiant as well as the affiant's personal knowledge of offense as investigating officer).

2954

(711)    Applicant also claims Detective Johnson's affidavit is deficient because it is predicated on an unconstitutional lineup.

(712)    The Court finds that such an attack goes beyond the four corners of the affidavit.

(713)    A defendant may attack the accuracy of the underlying affidavit only by establishing that the affiant intentionally, knowingly, or recklessly made false statements that were material to the probable cause determination. *See Franks v. Delaware*, 438 U.S. 154, 156 (1978).

(714)    The Court finds that the constitutionality of the lineup has no bearing on the veracity of Detective Johnson's sworn statements. Thus, it has no bearing on the validity of the capital murder warrant either.

### *(ii) Federal Flight-From-Prosecution Warrant*

(715)    As for the federal warrant, the Court finds that the sworn statements of FBI Agent Laurie Gibbs established probable cause, i.e., it provided the federal magistrate with a substantial basis for concluding a fair probability existed that Applicant had fled from prosecution.

(716)    The federal offense of flight to avoid prosecution is codified at 18 U.S.C.A. § 1073 (West 2011). A person commits this offense if he "moves or travels in interstate or foreign commerce with intent either (1) to avoid prosecution, or custody or confinement after conviction, under the laws of the place from which he flees, for a crime, or an attempt to commit a crime, punishable by death or which is a felony under the law of the place from which the fugitive flees . . . ."

(717)    Agent Gibbs stated that she had personally reviewed the Texas arrest warrants issued for Applicant, Rivas, Newbury, Halprin, Harper, Murphy, and Garcia and determined that they were charged with capital murder. She also averred that on December 27, 2000, TDCJ Investigator Bruce Tony told her he had received information from a confidential source that Applicant, Garcia, Rivas, Newbury, Halprin, Murphy, and Harper had fled from Texas to Mexico. (State's Exhibit 1).

(718)    Agent Gibbs also stated that Michael Carnes, First Assistant District Attorney in the Dallas County District Attorney's Office, wrote Assistant U.S. Attorney Lynn Hastings asking for the FBI's assistance under the Unlawful Flight to Avoid Prosecution, Title 18, Section 1073 of the United States Code. (State's Exhibit 1).

(719)    The Court finds that the affidavit sets out the underlying basis for the confidential source's information, i.e., his personal knowledge. The affidavit states that the source told Investigator Tony he spent the night with Halprin and

116

2955

Newbury on December 26, 2000. The source asserted that, during this visit, Halprin admitted to the source his involvement in the Christmas Eve robbery of the Oshman's store and the shooting, and that "the group" was fleeing to Mexico via El Paso. Furthermore, the affidavit reflects that the source advised Halprin "the group" should flee to Mexico via Arizona and settle in Puerto Penasco.

(720)   Applicant does not dispute that Agent Gibbs possessed personal knowledge of the facts sworn to in the affidavit. He claims the sworn facts do not establish probable cause because they do not state a basis for concluding that the confidential source was credible.

(721)   Rodriguez also argued that the affidavit did not establish probable cause because Applicant's statements to the source do not identify Rodriguez as a member of "the group" to which he referred. Although Applicant recites this argument in his application, it is clearly inapplicable to an attack on the federal flight from prosecution warrant issued for his own arrest. The Court finds that, if anything, the fact that the confidential informant specifically mentions Applicant helps establish the validity of this warrant.

(722)   Since *Illinois v. Gates*, an affidavit need not specifically show why an informant is credible if the underlying basis of the informant's information sets out probable cause.

(723)   The Court finds that the confidential source's statements to Investigator Tony were not conclusory assertions. Rather, they reflected specific information based on personal knowledge, namely, that only two days after Officer Hawkins's murder, the source obtained information from Applicant himself about the Oshman's robbery, the shooting, and future interstate flight plans.

(724)   The Court finds that because the basis of the information provided by the confidential source was identified with specificity, the affidavit established a substantial basis for crediting the source's hearsay statements. *See Gates*, 462 U.S. at 233 (informant's explicit and detailed description of alleged wrongdoing, along with a statement that event was observed firsthand, entitles his tip to greater weight than might otherwise be the case).

(725)   Thus, the Court finds that Agent Gibbs's sworn statements support the federal magistrate's probable cause determination and, Applicant's arrest on the federal warrant was legally justified.

*[handwritten:]* deleted " like the Irving warrant"
from Cts # 738-
page 44,
part 2

117

2956

(b) Authority to Arrest Applicant Outside of Texas

*(i) On Federal Warrant*

(726)   The Court finds that the authorities could have arrested Applicant in Colorado based on the federal warrant alone. It had full force and effect in every state in the Union. *See United States v. Bowdach*, 561 F.2d 1160, 1167-68 (5th Cir. 1977) (federal warrant may be issued anywhere in United States and may be executed by state officers).

*(ii) Under Uniform Criminal Extradition Act*

(727)   Furthermore, the Court finds that the authorities in Colorado could have arrested Applicant without a warrant under the Uniform Criminal Extradition Act. This act has been adopted by both Texas and Colorado. *See* TEX. CODE CRIM. PROC. ANN. art. 51.13 (Vernon 2006); COLO. REV. STAT. §§ 16-19-101 through 16-19-132 (West 2010). It authorizes the arrest of a fugitive "without a warrant, upon reasonable information that the accused stands charged in the courts of a State with a crime punishable by death or imprisonment for a term exceeding one year." TEX. CODE CRIM. PROC. art. 51.13, § 14; COLO. REV. STAT. § 16-19-1151.

(728)   The record reflects that the officers who arrested Applicant in Colorado had reasonable information that he was charged in another state with a crime punishable by death or a prison term of more than a year.

(729)   The testimony of Sheriff Frank Fehn and Sergeant Todd Evans, which was offered by the State at the suppression hearing, shows that Applicant and the other escapees were the subjects of a nationwide manhunt. The media widely publicized their offenses and identities. (State's Ex. 932, pp. 221-22, 239, 258).

(730)   Furthermore, while they were at large, nationwide bolos ("be on the lookout" notices) for Applicant and the other escapees were broadcast to law enforcement authorities; the bolos contained the names, descriptions, and offenses of each escapee. (RR42: 221-22, 239-40).

(731)   On the evening of January 21, 2001, about a month after Officer Hawkins's murder, some "citizens," including Wade Holder, the owner of the Coachlight Motel and RV Park located in Woodland Park, Colorado, told Sheriff Fehn that they had seen Applicant and some of the other escapees in the Coachlight Motel & RV Park located in Woodland Park, Colorado. That night, Sheriff Frank Fehn and one of his deputies drove through the park in Sheriff Fehn's RV and from a distance surveilled the campsite where the escapees had been seen. He then returned to his office and contacted the El Paso County Sheriff's Office, the Colorado Springs Police Department, and the FBI for assistance. Working

118

2957

together, these agencies captured Applicant and the other escapees the next morning, January 22, 2001. Applicant surrendered himself at the RV park. (State's Ex. 932, pp. 220-59).

(732)   All of the deputies who participated in Applicant's arrest knew he was an escaped convict charged with capital murder in Texas. In addition to the media bulletins publicizing Applicant's photograph and crimes, they received information in the form of bolos and in department briefings long before the day of Applicant's capture. (State's Ex. 932, pp. 239-40, 259).

(733)   In addition, Sergeant Evans, one of the team leaders, confirmed that the SWAT team and the federal agents acted on information that had been confirmed through proper channels by Texas authorities. (State's Ex. 932, pp. 255-56, 259). He also specifically noted their knowledge of the existence of the flight from justice warrant and an escape warrant. (State's Ex. 932, p. 254).

(734)   The Court finds that the information the arresting officers received from federal and Texas authorities was sufficient to justify Applicant's arrest under the Extradition Act. *See Morales v. State*, 513 S.W.2d 869, 870 (Tex. Crim. App. 1974)(holding officers' warrantless arrest of defendant justified under section 14 of extradition act where officers acted on information obtained from NCIC computer that there was an outstanding warrant for defendant's arrest in California for murder and attempted robbery); *Maestas v. State*, 963 S.W.2d 151, 158 (Tex. App. – Corpus Christi 1998), *aff'd*, 987 S.W.2d 59 (Tex. Crim. App. 1999) (holding faxed wanted notice to Texas officer from Colorado probation officer indicating defendant was wanted on felony escape warrant in Colorado constituted reasonable basis for defendant's warrantless arrest in Texas under section 14 of extradition act); *see also People v. Thompson*, 793 P.2d 1173 (Colo. 1990); *compare with Roeder v. State*, 768 S.W.2d 745, 751 (Tex. App. – Houston [1st Dist.] 1988, no pet.)(holding warrantless arrest for Colorado offense unjustified under section 14 of extradition act where Houston police officer knew no charges had been filed and no arrest warrant issued).

*(iii) Under Colorado Statute § 16-3-102*

(735)   The Court finds that even if no valid arrest warrant existed at the time of Applicant's arrest, the authorities in Colorado could have arrested him under Section 16-3-102 of the Colorado Revised Statutes.

(736)   This statute authorizes a Colorado peace officer to arrest without a warrant where he "has probable cause to believe that an offense was committed and has probable cause to believe that the offense was committed by the person to be arrested." COLO. REV. STAT. § 16-3-102 (West 2010).

119

2958

(737)   In effecting an arrest under this provision, an officer may rely on the information relayed to him by fellow officers provided that the other officer or department as a whole has information sufficient to constitute probable cause to make the arrest. *People v. Nanes*, 483 P.2d 958, 962 (1971).

(738)   As previously noted, the record reflects that the authorities in Colorado acted upon the information furnished to them by Texas authorities.

(739)   The Court finds the record also establishes that, notwithstanding the validity of the Texas warrant, the Texas authorities had probable cause to believe Applicant had committed robbery and capital murder.

(740)   The police report prepared by Irving Police Department Investigator Randal Johnson, which was introduced into evidence at the pretrial proceeding by the defense, shows that on the night of December 24, 2000, seven escaped convicts, including Applicant, robbed the Oshman's employees at gunpoint and, while fleeing, shot and killed Officer Hawkins in the loading dock behind the store. In the hours immediately following the robbery and murder, some of the Oshman's employees gave statements to the police that they were robbed at gunpoint by several men. At least one of the employees identified Applicant in a photographic lineup as one of robbers. Mr. Ferris personally related his account of the offense to Irving Police Detective Randal Johnson, dictating his statement to the detective at the scene and giving him a guided account in the store later that same night. Armed with this information, Detective Johnson obtained a warrant for Applicant's arrest for capital murder on Christmas Day. (Defense Exhibit 2).

(741)   Given that Texas authorities had probable cause to believe Applicant had committed both robbery and capital murder, Applicant's arrest by Colorado authorities was legal under section 16-3-102. *See, e.g., Nanes*, 483 P.2d at 962 (upholding legality of defendant's arrest by Golden police officer based on radio dispatches where Boulder police possessed information sufficient to constitute probable cause to arrest defendant for robbery).

*(iv) Under Article 14.04 of Texas Criminal Procedure Code*

(742)   Applicant argues that Colorado law does not govern the legality of his arrest.

(743)   The Court finds that even under Texas law, Applicant's warrantless arrest would have been justified.

(744)   Notwithstanding Texas's general warrant requirement, article 14.04 of the Texas Code of Criminal Procedure authorizes a warrantless arrest where "it is shown by satisfactory proof to a peace officer, upon the representation of a credible person,

120

2959

that a felony has been committed, and that the offender is about to escape . . . ." TEX. CODE CRIM. PROC. ANN. art. 14.04 (Vernon 2005).

(745) Communications from fellow officers, even those from out-of-state, may provide a basis for arrest under article 14.04. *Crane v. State*, 786 S.W.2d 338, 346 (Tex. Crim. App. 1990). As under Colorado law, probable cause for an arrest under this statute is determined by the information in possession of the officer who made the broadcast or otherwise communicated with the arresting officer. *Crane*, 786 S.W.2d at 346.

(746) Again, the Court finds that the Texas authorities possessed information establishing probable cause for Applicant's arrest for robbery and capital murder. *Id.* at 346 (holding information in possession of Texas officer who responded to murder scene and spoke with eyewitness to murder established probable cause for defendant's warrantless arrest by Oklahoma authorities under article 14.04).

(747) Furthermore, the Court finds that the information Colorado authorities had constituted satisfactory proof that Applicant was about to escape.

(748) Article 14.04 does not require a showing the offender was, in fact, about to escape or that, in fact, there was no time to procure a warrant. It only requires credible representations of such. *Id.* at 347.

(749) The Court finds that information from Texas authorities that Applicant was an escaped convict satisfied article 14.04. *See Fry v. State*, 639 S.W.2d 463, 476 (Tex. Crim. App. 1982) (holding victim's report to police that defendant and others who robbed him stated intent to flee to California was sufficient to constitute representations by a credible person that defendant was about to escape and there was no time to procure a warrant).

(750) Thus, regardless of which state's law applied, the Court finds that Applicant's arrest was legal even without a valid warrant.

### (c) Any Taint Of Illegality Attenuated

(751) The Court finds that even if Applicant's arrest was illegal, his confession and the evidence seized from the RV and Jeep were still admissible.

(752) The Court finds that the confession and search were so attenuated from the arrest that the taint from any illegality was dissipated. *See Brown v. Illinois*, 422 U.S. 590, 603-04 (1975); *Johnson v. State*, 871 S.W.2d 744, 751 (Tex. Crim. App. 1994). Therefore, exclusion of this evidence was unwarranted. *See Johnson*, 871 S.W.2d at 750 (evidence sufficiently attenuated from violation of law not considered to be obtained in violation of law under article 38.23); *see also* TEX.

121

2960

CODE CRIM. PROC. ANN. art. 38.23 (Vernon 2005) (Texas statutory exclusionary rule).

(753)   Determining whether a confession is sufficiently attenuated from an illegal arrest requires a four-part inquiry: (1) whether *Miranda* warnings were given, (2) the temporal proximity of the arrest and the confession, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct. *Id.* The purpose of this four-part analysis is to determine whether the causal chain between an illegal detention or arrest and the statement at issue has been broken so that the confession is shown to be the product of free will. *Bell v. State*, 724 S.W.2d 780, 788 (Tex. Crim. App. 1986) (adopting four-part analysis enunciated in *Brown v. Illinois*).

(754)   Major consideration should be given to the extent to which the officers' conduct violated the law and the extent to which their purpose in doing so was to obtain the confession. *See* 40 GEORGE E. DIX & ROBERT O. DAWSON, TEXAS PRACTICE: CRIMINAL PROCEDURE AND PRACTICE § 4.103, p. 240 (2nd ed. 2001).

(755)   The Court finds that the four factors weigh strongly in favor of the admission of Applicant's confession.

(756)   Before he confessed, Applicant was repeatedly given *Miranda* warnings, orally and in writing, by Sergeant Spivey. He demonstrated a full understanding of his rights and voluntarily waived them on each occasion. (RR33: 11-15, 28). Thereafter, he dictated his confession to Detective Spivey, never once halting the interview or invoking his right to silence or counsel. (RR33: 13-15).

(757)   The temporal proximity of Applicant's confession to his arrest was about twelve hours. The Court finds that this was not an insignificant delay. Applicant surrendered to authorities shortly after Rivas, Garcia, and Rodriguez were captured at 11:30 a.m. Applicant confessed during an interview that began shortly after 12:50 a.m., when Rivas confessed. (RR33: 7-9; Defense Ex. 26). Spivey's testimony and Applicant's confession indicated that the interview with Applicant lasted only a couple of hours. (RR33: 13; State's Ex. 931).

(758)   Although an illegal custody becomes more oppressive as it continues uninterrupted, generally, the longer the time between an arrest and confession, the more likely any taint would be attenuated. *Juarez v. State*, 758 S.W.2d 772, 781 (Tex. Crim. App. 1988).

(759)   Although there were no intervening circumstances, the Court finds that there was no flagrant misconduct by the officers. They did not arrest Applicant knowing they had no legal basis for doing so or for the sole purpose of obtaining inculpatory evidence. *See Miller v. State*, 736 S.W.2d 643, 651 (Tex. Crim. App.

122

1987) (upholding consent to search obtained after illegal arrest where arrest was not a subterfuge to achieve consent).

(760)   The Court finds that the officers made the arrest believing it was proper, namely that multiple valid warrants for Applicant's arrest existed. *See id.* at 650 (holding officers arrest pursuant to warrant they believed to be valid "cannot be classified as misconduct").

(761)   The Court finds that overall, any illegality was statutory, not constitutional, and the officers had no illicit purpose in making the arrest.

(762)   Thus, notwithstanding any illegality, the Court acted within its discretion in admitting the confession. *See Self v. State*, 709 S.W.2d 662, 665-67 (Tex. Crim. App. 1986) (holding any taint attenuated from illegal arrest where defendant repeatedly given *Miranda* warnings orally and in writing and voluntarily waived rights, two-hour lapse between arrest and confession, and arrest based on probable cause and not for sole purpose of obtaining evidence against defendant).

(763)   Likewise, the Court finds the evidence seized from the Jeep was sufficiently attenuated from any illegality. This search was not conducted incident to Applicant's arrest. Rather, it was authorized by a search warrant applied for and issued after Applicant's arrest. (Defense Ex. 3, Defense Ex. 4, p. 7; State's Ex. 288).

(764)   At trial, the court properly overruled Applicant's attacks on the validity of this warrant. (RR41: 15-16). Given the existence of this valid search warrant, the Court acted within its discretion in admitting the evidence seized from the Jeep. *See Christian v. State*, 592 S.W.2d 625, 631 (Tex. Crim. App. 1980) (holding evidence seized from defendant's car attenuated from illegal stop where evidence seized pursuant to valid search warrant).

(765)   The Court finds that the Court of Criminal Appeals would have upheld the Court's admission of his confession and the evidence seized from the Jeep.

(766)   Consequently, the Court finds that appellate counsel was not deficient for not raising these suppression claims on direct appeal; nor did their omission alter the outcome of Applicant's appeal.

(767)   Based on the foregoing, the Court concludes that appellate counsel did not violate Applicant's constitutional right to effective assistance by not raising these suppression claims on direct appeal.

123

2962

## C. INSTRUCTION DEFINING "ANTICIPATE"

(768)  Applicant contends appellate counsel should have complained about the Court's refusal to define "anticipate" for the jury in the punishment instructions.

(769)  As Applicant notes, trial counsel asked the Court to instruct the jury that the term anticipate meant "expected a circumstance to happen with a certainty," and the Court refused.  (CR: 98; RR53: 68).

(770)  The Court finds Applicant fails to prove that this refusal constituted reversible error.

(771)  As a general rule, terms need not be defined in the charge if they are not statutorily defined. *Middleton v. State*, 125 S.W.3d 450, 454 (Tex. Crim. App. 2003).

(772)  Applicant contends, however, that the Court should have defined "anticipate" as he requested because a reasonable likelihood existed that his jury would misunderstand or misinterpret the term to mean the "possibility" rather than "probability" that an event would occur.

(773)  The Court finds Applicant does not demonstrate that absent an instruction defining "anticipate," the jury would have interpreted it to mean a "mere possibility."

(774)  As previously discussed, the common meaning or understanding of "anticipate" suggests a probability or likelihood, rather than a mere possibility. *See* ENCARTA WORLD ENGLISH DICTIONARY (North American Ed. 2005); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000).

(775)  The Court finds that only defense counsel discussed the meaning of the term during closing arguments, and he told the jury to construe the term to mean "expect with a certainty." (RR53: 105-06).  Defense counsel made this argument to the jury without objection or rebuttal by the State, effectively increasing the State's burden of proof on the second special issue. (8/20/10 Hrg) RR: 147.

(776)  Thus, that Court finds that, if anything, the jury probably construed the term to mean something more than required by *Tison*, rendering the Court's refusal to submit Applicant's requested definition harmless.

(777)  The Court finds appellate counsel was not deficient for not raising this claim on direct appeal and that its omission did not alter the outcome of Applicant's appeal.

124

2963

(778)    Based on the foregoing, the Court concludes that appellate counsel did not violate Applicant's constitutional right to effective assistance by not raising this claim on direct appeal.

### D. EVIDENCE OF OTHER PRISON ESCAPES

(779)    Applicant contends appellate counsel should have complained about the admission of evidence of the escapes of other TDCJ prisoners. Applicant claims the evidence was inadmissible because it was irrelevant and highly prejudicial.

(780)    The Court finds Applicant fails to prove that raising this claim on direct appeal would have resulted in a reversal.

(781)    The Court finds Applicant fails to prove that evidence of prison escapes by other inmates was inadmissible.

(782)    Applicant does not cite to or otherwise specifically identify the testimony about which he is complaining, but it appears he is referring to the following information the State elicited from his prison expert, S.O. Woods, on cross-examination:

>    – in September of 2001, inmate Harold Laird, who was serving a life sentence for capital murder, escaped from administrative segregation (RR51: 105-06);

>    – in February of 2001, an inmate named Nelson, who was housed in administrative segregation, faked an illness and when taken to the hospital for treatment, took two nurses hostage and sexually assaulted them; moreover, he had committed a similar act once before (RR51: 106);

>    – on March 16, 2000, inmate Antonio Lara, who was housed in administrative segregation, got out of his cell and murdered another inmate (RR51: 106);

>    – on February 17, 2002, an inmate named Roland, who was serving a life sentence for capital murder, beat a guard, stole his uniform, and escaped (RR51: 106-07);

>    – an inmate named Russell has escaped once and made numerous other attempts to escape, conning his jailers and either defeating or taking advantage of failures in the prison security systems (RR51: 107-08);

125

2964

– in 1998, several inmates attempted to escape, one of whom made it over the wire fencing but was found dead of a gunshot wound (RR51: 109).

(783)   The State also elicited the following evidence of violence, but not escape, by death-row inmates:

– on January 21, 2000, two death-row inmates held a fifty-seven year-old female guard hostage (RR51: 109);

– on June 9, 2000, a death-row inmate nearly severed the arm of a seventy-eight year-old chaplain (RR51: 109); and

– in February of 2003, a general population inmate murdered a prison shop superintendent. (RR51: 109).

(784)   The Court finds that whether appellate counsel had limited his complaint to evidence of escapes by other inmates or had challenged the admission of all of the above evidence, his claim would have failed on the merits.

(785)   The Court finds that all of the above evidence was relevant. As the prosecutor argued to the Court at trial, this evidence was probative of whether administrative segregation was secure enough to prevent any escape or future violence by Applicant. (RR51: 96).

(786)   Applicant claims that, on direct examination, Woods did not address the issue of escape or intimate that Applicant was not a flight risk.

(787)   The record reflects, however, that Applicant made considerable efforts to convince the jury that if he were incarcerated in administrative segregation, he would not be a future danger to anyone.

(788)   On direct examination of Woods, Applicant elicited extensive testimony from Woods portraying the security measures in administrative segregation as modern, more restrictive, and more difficult to circumvent than the security measures used in general population and in the former death-row unit.

(789)   Applicant also established through Mr. Woods that security measures in administrative segregation had been further improved since Applicant's escape. (RR51: 56-63, 66-67, 71-94; Defense Ex. 54).

(790)   The Court finds that evidence of the escapes and violent acts of other inmates, most of whom were housed in administrative segregation, established that no security measures, even the most modern and restrictive, are foolproof against

126

2965

inmates who have nothing to do but watch and wait for a human mistake or system failure.

(791) Because this evidence helped refute Applicant's suggestion that he would pose no future danger if housed in administrative segregation, the Court finds that it was probative of a fact at issue in the punishment phase and, thus, admissible. *See* TEX. R. EVID. 401 (defining relevant evidence).

(792) Indeed, the admission of similar evidence has been upheld by the Court of Criminal Appeals. *See, e.g., Canales v. State,* 98 S.W.3d 690, 699 (Tex. Crim. App. 2003) (holding that testimony about other inmates defeating locking mechanisms on prison doors was relevant and not unfairly prejudicial where testimony, admitted at punishment phase during State's cross-examination of defense witness, responded to defensive theory that a life-sentenced Canales might not be dangerous if housed in "administrative segregation" and showed that he could still commit violent acts).

(793) Applicant claims that even if evidence of escapes by other inmates is relevant, its probative value was minimal and it was highly prejudicial.

(794) The Court finds that the probative value of all of the evidence of escapes and violent acts by other inmates directly and affirmatively refutes the defensive theory that Applicant would not pose a future danger in administrative segregation. Thus, its probative value was substantial, not minimal.

(795) Furthermore, the Court finds that there was no danger of unfair prejudice from the admission of this evidence. There was no risk that it would inflame the minds of the jury or be used for any improper purpose. It pertained directly to a defensive theory raised by Applicant on direct examination of Woods. *See Canales,* 98 S.W.3d at 699. Moreover, it did not relate to Applicant personally, but to other inmates.

(796) The Court finds that Applicant's own infamous escape, during which he violently assaulted one hostage and threatened others, was far more detrimental to his case than evidence of escapes and violence committed by other inmates. Several witnesses, including Applicant, testified in great detail regarding Applicant's violent escape, and the State presented the letter Applicant left behind on his bunk in which he threatened future violence. (RR47: 112-19; RR48: 3-10, 108-19, 122-27, 129-31; RR49: 69-87, 121-28, 148-54, 167-72; State's Ex. 955).

(797) The Court finds that this evidence was so substantial and compelling that it rendered any error in the admission of Mr. Woods's testimony about the acts of other inmates harmless. *See* TEX. R. APP. P. 44.2(a).

127

2966

(798)   Thus, the Court finds that appellate counsel was not deficient for not raising this claim on appeal and that omission of the claim did not alter the outcome of the appeal.

(799)   Based on the foregoing, the Court concludes that appellate counsel did not violate Applicant's constitutional right to effective assistance by not raising this complaint on direct appeal.

### E. "THE TEN COMMANDMENTS OF SPEC WAR" EXHIBIT

(800)   Applicant contends his appellate counsel should have argued on direct appeal that the trial court erroneously admitted copies of a document entitled "The Ten Commandments of Spec War." (State's Exs. 342-A & 344-A).

(801)   One copy of the document was found in the trash outside of the RV and the other copy was found inside the RV. The State offered the documents into evidence in the guilt phase during Applicant's testimony and confronted Applicant with them. Applicant's trial counsel objected to their admission, arguing that they had not been linked to Applicant. (RR49: 11-13, 15-17).

(802)   The document reads as follows:

THE TEN COMMANDMENTS
OF SPEC WAR

According to Richard Marcinko

I am the War Lord and the wrathful God of Combat and I will always lead you from the front, not the rear.

I will treat you all alike – just like shit.

Thou shalt do nothing I will not do first, and thus will you be created Warriors in My deadly image.

I shall punish thy bodies because the more thou sweatest in training, the less thou bleedest in combat.

Indeed, if thou hurteth in thy efforts and thou suffer painful dings, then thou art Doing It Right.

Thou hast not to like it – thou hast just to do it.

Thou shalt Keep It Simple, Stupid.

128

2967

Thou shalt never assume.

Verily, thou art not paid for thy methods, but for thy results, by which meaneth thou shalt kill thine enemy before he killeth you by any means available.

Thou shalt, in thy Warrior's Mind and Soul, always remember My ultimate and final Commandment:   There Are No Rules – Thou Shalt Win at All Cost.

(State's Exs. 342-A, 344-A).

(803)   Applicant contends appellate counsel failed to present trial counsel's objection as a point of error on direct appeal. He argues the State used the document to prove his homicidal intent without ever linking it to him or demonstrating that he had adopted the beliefs and attitudes expressed in it.

(804)   Applicant's contention seems to be that the document was irrelevant, but the Court finds its relevance was plain even if neither copy belonged to Applicant.

(805)   The Court finds that Applicant's intent was not the only intent in issue at his trial. He was not prosecuted solely as a principle, but as a party and a party conspirator as well. (CR: 22-35). Thus, the intent of the other members of the Texas Seven was also in issue.

(806)   The Court finds it was undisputed that the document belonged to someone in the group, and one could reasonably infer that the person it belonged to shared the beliefs and attitudes expressed in it. To the extent those beliefs and attitudes supported an inference of homicidal intent of at least one of the group's members, the document was certainly probative of a fact in issue. *See* TEX. R. EVID. 401 & 402. Thus, the document was properly admitted.

(807)   Moreover, the Court finds appellate counsel could not have demonstrated that admission of the document affected any substantial right of Applicant's. *See* TEX. R. APP. P. 44.2(b) (harmless error standard).

(808)   The Court finds little, if any, mention of the document was made after its admission.

(809)   Moreover, the Court finds that there was a great deal of evidence, outside of the document, from which the requisite intent could be inferred, the most striking of which was the fact that Officer Hawkins was shot eleven times.

→ Deleted "Thus, it could hardly be said that but for the document the jury would have rendered a different verdict."   129

from StS # 825, p. 57, part 2

2968

(810)   Based on the foregoing, the Court finds that Applicant fails to prove that appellate counsel was deficient for not raising this complaint on direct appeal. Nor does he prove that raising this complaint would have altered the outcome of the appeal.

(811)   The Court finds that appellate counsel was not deficient for not raising this claim and that its omission did not alter the outcome of the appeal.

(812)   Thus, this Court concludes appellate counsel did not violate Applicant's constitutional right to effective assistance by omitting this claim on direct appeal.

### F. EXCLUSION OF DR. GOODNESS'S HEARSAY TESTIMONY

(813)   Applicant contends his appellate counsel should have argued on direct appeal that the exclusion of Dr. Goodness's hearsay testimony violated his Eighth Amendment right to present mitigation evidence.

(814)   The Court finds that Applicant fails to prove appellate counsel's performance was deficient or that it affected the outcome of his appeal.

(815)   As previously noted in relation to Applicant's attack on his trial counsel's presentation of Dr. Goodness's testimony, the Eighth Amendment requires that Applicant be afforded the opportunity to present mitigating evidence, but it does not relieve him of the obligation of presenting it in an admissible form. *See Smith*, 2010 Tex. Crim. App. LEXIS 582, at *69; *Lewis*, 815 S.W.2d at 568; *see also Romano*, 512 U.S. at 10-12; *but see Green*, 442 U.S. 95.

(816)   Moreover, as this Court found on Applicant's related claim attacking trial counsel's performance, Applicant was not precluded from offering evidence of his abuse, psychological problems, etc. He was simply prohibited from offering it in the form of inadmissible hearsay through the doctor.

(817)   Appellate counsel cannot be deemed ineffective for failing to raise a claim that has no merit.

(818)   In his recently filed "Brief in Support of Argument on Ineffective Assistance of Counsel on Appeal in Application for Writ of Habeas Corpus," Applicant asserts that appellate counsel should have complained that exclusion of hearsay testimony from Dr. Goodness violated evidence rule 705. Specifically, Applicant claims counsel should have argued on appeal that the trial court failed to conduct the requisite balancing test, failed to make specific fact findings on the record, and should have admitted the evidence under the balancing test.

(819)   The Court finds that these allegations constitute a subsequent writ application that should be dismissed as procedurally barred. *See* TEX. CODE CRIM. PROC.

2969

ANN. art. 11.071, § 5.

(820)   Alternatively, the Court finds that Applicant fails to show these allegations would have been meritorious on appeal.

(821)   Applicant's trial counsel did not object that the Court failed to conduct the balancing test or dictate its findings on the record. Thus, these allegations were not preserved for appeal.

(822)   Even if preserved, however, the allegation would have failed. As set out in the Court's findings on Applicant's related challenge to trial counsel's handling of the limitation on Dr. Goodness's testimony, these allegations have no merit.

*hanged* *rom* *n particular*

(823)   [Notably,] the Court did conduct the balancing test and had no duty to state its findings on the record with any greater particularity than it did.

(824)   Moreover, the Court acted within its discretion under rule 705 in excluding Dr. Goodness's testimony about hearsay statements made to her and contained in the documentation she reviewed.

(825)   Plus, the Court finds that any error in the exclusion of such testimony was harmless given its cumulative nature.

(826)   Based on the foregoing, the Court finds that counsel was not deficient for not raising any of the above claims on appeal.

(827)   Thus, the Court concludes that appellate counsel's performance was not rendered constitutionally deficient for not raising any of the above claims on appeal.

### G. ADMISSIBILITY OF DEFENSE EXHIBIT 39

(828)   Applicant contends his appellate counsel failed to adequately brief the point of error regarding the exclusion of the ranking document (Defense Ex. 39).

(829)   More specifically, Applicant claims counsel should have argued that a "relaxed view of the rules of evidence" was warranted because the exhibit was being offered in the punishment phase of a capital murder trial. Also, he claims appellate counsel should have argued that the exhibit's exclusion was harmful because it was pivotal to his theory that he was less culpable than his codefendants.

(830)   In pleadings filed after the deadline for his original writ application, Applicant claims his appellate counsel should have argued on appeal that the document was admissible under both the business record and public record exceptions to the hearsay rule. Also, he claims appellate counsel should have filed a reply brief

131

2970

responding to the State's harmless error argument. *See* "Brief in Support of Argument that Exclusion of the Ranking Document Was Harmful to Halprin's Mitigation Defense" (Filed 9/27/10).

(831)   The Court finds that the claims raised in Applicant's "Brief in Support of Argument that Exclusion of the Ranking Document Was Harmful to Halprin's Mitigation Defense" constitute a subsequent writ and should be dismissed as procedurally barred. *See* TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5.

(832)   In any event, the Court finds Applicant fails to prove that appellate counsel's challenge to the exclusion of the ranking document was deficient in any way or that additional or different briefing would have altered the outcome of the appeal.

(833)   As previously noted, the Eighth Amendment only ensures Applicant's right to present mitigating evidence, it does not relieve him of the obligation of presenting that evidence in an admissible form. *See Lewis*, 815 S.W.2d at 568; *see also Romano*, 512 U.S. at 10-12. *But cf. Green v. Georgia*, 442 U.S. at 97. Thus, the Court finds that such an argument would have failed.

(834)   Furthermore, the Court finds that in the direct appeal brief and motion for rehearing, appellate counsel argued that the exhibit was significant to the defensive theory. Muhammad Interrogatory Answers, p. 3.

(835)   Appellate counsel contended that the exhibit "gave weight and credence" to Applicant's mitigation theory that "he was not the leader of the Texas Seven; he was not a principal in the decision to break out of prison, and he was not a principal in the decision to robb [sic] Oshmans." (Direct Appeal Brief, p. 8).

(836)   Moreover, appellate counsel framed his complaint as an Eighth Amendment violation, arguing that the exhibit constituted mitigating evidence which Applicant had a constitutional right to present. (Direct Appeal Brief, pp. 8-10).

(837)   The Court finds that the claim did not fail because appellate counsel's arguments were deficient or lacking in any way. It failed because, even if the exhibit supported the defensive theory, it was cumulative.

(838)   As the Court of Criminal Appeals held on direct appeal, the Court finds that Applicant was able to present "from other sources a significant amount of mitigating evidence that was cumulative of the mitigating evidence contained in the document." *See Halprin*, 170 S.W.3d at 116. Deleted "The ranking document simply was not crucial to applicant's defense." Cts #854

(839)   The Court also finds any argument that the document was admissible under the business record or public record exceptions to the hearsay rule would have failed on appeal.

P. 60, Part 2

132

2971

(840)   First, the Court of Criminal Appeals considered and rejected the document's admissibility under the business record exception. *Halprin*, 170 S.W.3d 114-16.

(841)   Second, the Court finds that trial counsel did not proffer the document under the public record exception and, thus, did not preserve this contention for appeal.

(842)   Moreover, the record did not support the admission of the document in its entirety under either hearsay exception. Given that the document contained multiple levels of hearsay, at best, appellate counsel could have shown that a portion or redacted version of the document was admissible. *See Garcia*, 126 S.W.3d at 926 (holding hearsay statements made by defendant's wife to employee of battered women's shelter not admissible under business records exception just because employee had a business duty to record wife's statements accurately); *Kratz*, 890 S.W.2d at 905-06 (upholding exclusion of eyewitness statements contained in police report under Rule 803(8)). And any contention that the Court should have admitted a redacted version of the document would have failed on appeal because defense counsel never attempted to offer only part of the document.

(843)   Based on the foregoing, the Court finds that appellate counsel did adequately brief the claim and that additional briefing would not have altered the outcome of the appeal.

(844)   Thus, this Court concludes Applicant's constitutional right to effective assistance of counsel on appeal was not violated by the omission of additional briefing on this claim.

### H. ENMUND/TISON & SECOND SPECIAL ISSUE SUFFICIENCY CLAIMS

(845)   Finally, Applicant contends appellate counsel should have complained (1) that the evidence is insufficient to prove Applicant's death eligibility under *Enmund* and *Tison* and (2) that the evidence is legally and factually insufficient to support the jury's finding that Applicant anticipated a human life would be taken. By reference to his first ground for relief, Applicant argues that both of these contentions were meritorious and would have resulted in reversal.

(846)   As set out in the findings on Applicant's first ground for relief, the Court finds the evidence is sufficient to prove that Applicant actually killed the officer, intended to kill him, and anticipated that a human life would be taken.

(847)   Thus, the Court finds that the evidence is sufficient to support the jury's affirmative answer to the second special issue and demonstrate Applicant's eligibility for the death penalty under *Enmund* and *Tison*.

133

2972

(848)   The Court finds that appellate counsel could not have successfully demonstrated otherwise, which makes his decision not to raise either of these claims a sound one. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983) (holding appellate counsel not ineffective for making professional judgment to forgo weak claims on appeal).

(849)   Thus, the Court finds that Applicant fails to prove his appellate counsel was deficient for not raising these complaints on appeal, much less that they would have altered the outcome of his appeal.

(850)   The Court finds that counsel was not deficient for not raising these complaints on appeal and that their omission did not alter the outcome of Applicant's appeal.

(851)   This Court concludes Applicant's constitutional right to effective assistance of counsel on appeal was not violated by the omission of these claims on appeal.

## GROUNDS 7 & 8: "FALSE IMPRESSION" & CONTRADICTORY THEORIES

(852)   Applicant contends the State violated his federal and state constitutional rights to due process by knowingly presenting testimony in a false light and by pursuing contradictory theories in his trial and the trial of his codefendant Michael Rodriguez. U.S. CONST. amends. V & XIV; TEX. CONST. art. I, § 19. Specifically, Applicant claims the State misled his jury to believe that Rodriguez did not shoot at Officer Hawkins, when the State had previously prosecuted Rodriguez on the theory that he did shoot at the officer.

### I. CLAIMS PROCEDURALLY BARRED

#### A. Claims Not Raised at Trial

(853)   The Court finds that Applicant failed to present these claims to this Court at trial.

(854)   Under Texas law, the failure to object at trial generally waives the error for collateral review. *Ex parte Pena*, 71 S.W.3d 336, 338, n.7 (Tex. Crim. App. 2002); *Ex parte Bagley*, 509 S.W.2d 332, 333-334 (Tex. Crim. App. 1974) (holding that the appellate rule requiring a trial objection also applies in habeas cases).

(855)   Thus, the Court concludes that grounds seven and eight are procedurally barred and should be dismissed.

#### B. Claims Not Raised on Direct Appeal

(856)   The Court finds that Applicant also failed to raise these claims on direct appeal.

134

2973

(857) It is well settled that habeas corpus will not lie as a substitute for direct appeal. *Townsend*, 137 S.W.3d at 81. Even a constitutional claim is forfeited if Applicant had the opportunity to raise it on appeal and did not. The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id.*

(858) The Court finds that nothing prevented Applicant from raising these claims on direct appeal, and he presents no evidence in support of his writ that was not already part of the appellate record.

(859) The Court finds that grounds seven and eight are an improper attempt to use the writ as a substitute for appeal.

(860) Therefore, the Court concludes grounds seven and eight are procedurally barred and should be dismissed. *Id.*

## II. NO CONSTITUTIONAL VIOLATION

(861) Alternatively, the Court concludes there was no constitutional violation.

(862) Applicant does not allege or prove that his state constitutional right to due process affords him any greater protection than his federal constitutional right to due process.

(863) The Court concludes Applicant's state due process right is coextensive with its federal counterpart.

### A. No False Impression Created

(864) Due process prohibits the State from knowingly using testimony that leaves a false impression. *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (citing *Mooney v. Holohan*, 294 U.S. 103 (1935) and *Pyle v. Kansas*, 317 U.S. 213 (1942)); *Burkhalter v. State*, 493 S.W.2d 214, 218 (Tex. Crim. App. 1973) (holding due process prohibits use of both false testimony and testimony that leaves a false impression). To successfully establish a violation of that right, Applicant must prove 1) that the prosecution actually left a false impression; 2) that the prosecution knew it left a false impression; and 3) that the false impression was material. *See Tucker v. Johnson,* 242 F.3d 617 626 (5th Cir. 2001); *see also Vasquez v. State*, 67 S.W.3d 229, 239 (Tex. Crim. App. 2002); *Duggan v. State*, 778 S.W.2d 465, 468 (Tex. Crim. App. 1989).

(865) Because Applicant raises this claim on collateral review, he bears the burden of proving these factors by a preponderance of the evidence. *Ex parte Morrow*, 952 S.W.2d 530, 534-35 (Tex. Crim. App. 1997).

135

2974

(866)   The Court finds Applicant makes no showing that the State left the jury with the impression that Rodriguez did not shoot at Officer Hawkins.

(867)   Applicant claims the State left such an impression through Sergeant Jeff Spivey's testimony that Rodriguez did not admit in his written confession to firing any shots. (RR42: 103-05).

(868)   The Court notes that the absence of such an admission from Rodriguez is not evidence that Rodriguez did not fire any shots at Hawkins.

(869)   Moreover, whether Rodriguez omitted such an admission from his confession was a fact evidenced by the confession itself, which Applicant, not the State, had previously offered into evidence. (RR42: 83-85). Thus, if a false impression was left by Rodriguez's confession, the Court finds that impression was generated by Applicant himself.

(870)   Furthermore, the Court finds, based on the highlighted portions of the excerpt below, that Sergeant Spivey told the jury that he believed Rodriguez did shoot at Officer Hawkins:

> Q.   [PROSECUTOR] Michael Rodriguez, he gave a statement, also. He didn't admit in his confession to shooting a weapon at Officer Hawkins, did he?
>
> A.   [SPIVEY] No, he did not.
>
> Q.   *Now, the gun left at the scene, that was fired one time?*
>
> A.   *Yes, it was.*
>
> Q.   *And you believe it was Michael Rodriguez that dropped that weapon?*
>
> A.   *Yes, I do.*

(RR42: 103).

*Deleted*
*STS #887*
*→*
*.LA,*
*art 2*

(871)   Thus, the Court finds that the State refuted any false impression left by the confession that Applicant himself had put before the jury.

(872)   In further support of his claim, Applicant cites the following excerpt from the prosecutor's closing argument at guilt:

136

2975

Now, we know it's not Michael Rodriguez, because everyone seems to agree that Michael Rodriguez dropped this gun and it only fired once, and that bullet went right in behind the speedometer. He obviously wanted to kill Officer Hawkins. And he dropped the gun.

(RR50: 60). Applicant claims this argument "perpetuated the deception" that Rodriguez fired no shots at Officer Hawkins.

*Deleted 1st sentence. See # 73 # 840 p. of part 2*

(873) The Court finds that the argument reflects the State's belief that Rodriguez fired a shot at Officer Hawkins in an effort to kill him and then dropped his gun at the scene.

(874) The Court finds that both Spivey's testimony and the prosecutor's closing argument reflect that the State's theory of prosecution actually rested in part on Rodriguez having fired a shot at Officer Hawkins.

*Deleted 5ts # 891 892 893*

(875) Thus, the Court finds Applicant's claim that the State left a contrary impression is without merit.

### B. Conflicting Theories of Prosecution

(876) The Court also finds no merit to Applicant's contention that the State violated his due process rights by advancing conflicting theories in his and Rodriguez's trials.

(877) In substance, Applicant claims the State is collaterally estopped from prosecuting him as a shooter because it had already prosecuted and convicted Rodriguez on that theory.

(878) Contrary to Applicant's contention, due process does not proscribe the State's prosecution of codefendants based on conflicting theories. No Texas court has addressed the issue, much less recognized such a right. The Supreme Court has acknowledged the issue but expressly declined to address whether pursuit of conflicting prosecution theories amounts to a due process violation. *Bradshaw v. Stumpf*, 125 S.Ct. 2398, 2408 (2005) (holding "it would be premature for this Court to resolve the merits of Stumpf's sentencing claim, and we therefore express no opinion on whether the prosecutor's actions amounted to a due process violation . . . ."). Moreover, those concurring Justices who did confront the issue (Thomas and Scalia) insist no such right exists, "This Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories." *Stumpf*, 125 S.Ct. at 2409-10.

(879) The Fifth Circuit Court of Appeals has decided the issue against Applicant's position. The Court has held that the only constitutionally based right of collateral estoppel is founded in the Double Jeopardy Clause, not due process.

137

2976

*Nichols v. Scott*, 69 F.3d 1255, 1269-72 (5th Cir. 1995). This jeopardy-based estoppel right only bars relitigation of an ultimate fact between "the same parties." Thus, a determination of fact in the State's earlier prosecution of one defendant will not estop the State in its subsequent prosecution of a different defendant because the cases do not involve the same parties. *Id.* at 1270 (citing *United States v. Mollier*, 853 F.2d 1169, 1176 (5th Cir. 1988)).

(880) Applicant argues that several federal circuit courts of appeals have "found, or implied" a due process right against the State's use of factually contradictory theories in the prosecution of separately tried codefendants. In support of this contention, Applicant cites the following cases: *Stumpf v. Mitchell*, 367 F.3d 594 (6th Cir. 2004); *United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003); *Smith v. Groose*, 205 F.3d 1045 (8th Cir. 2000); *Thompson v. Calderon*, 120 F.3d 1045 (9th Cir. 1997); *Drake v. Kemp*, 762 F.2d 1449 (11th Cir. 1985) (Clark, J., concurring).

*Added* (881) The Court notes that Federal circuit court opinions are at most persuasive, not controlling authority, in Applicant's case. *See Moseley v. State*, 983 S.W.2d 249, 256 n.13 (Tex. Crim. App. 1999) (noting that federal circuit cases may be persuasive, but are not binding authority). 

*Deleted last sentence of B # 900 p.67, part 2* (882) Thus far, only a plurality of the Ninth Circuit Court of Appeals has recognized such a right. *See Thompson*, 120 F.3d at 1070 (Kozinski, J., dissenting) (noting that portion of opinion addressing prosecutorial misconduct "does not command a majority" and "is more in the nature of ruminations by some of our judges"). And only one judge on the Eleventh Circuit Court of Appeals has opined that such a right exists. *See Drake*, 762 F.2d at 1472 (Clark, J., concurring).

(883) Furthermore, to the extent that any circuit courts of appeals have recognized such a right, they have held that it precludes only the pursuit of *fundamentally inconsistent* theories. *See Smith*, 205 F.3d at 1052 ("To violate due process, an inconsistency must exist at the core of the prosecutor's cases against defendants for the same crime."); *Haynes v. Cupp*, 827 F.2d 435, 438-39 (9th Cir. 1987). Only the underlying theory of the case must remain consistent throughout each trial. The fact that certain details may come into evidence differently at each codefendant's trial does not implicate a violation. *See Nguyen v. Lindsey*, 232 F3d 1236, 1240-41 (9th Cir. 2000).

(884) Applicant claims the State inconsistently prosecuted him and Rodriguez as shooters. 

*Deleted to F 904 p. 68, part 2* *Deleted "Alternatively"* (885) The Court sua sponte judicially notices the Rodriguez proceedings and finds no conflict between the two trials. The Court is aware that during Rodriguez's trial the State argued Rodriguez did shoot at Officer Hawkins. As discussed above in

138

2977

response to Applicant's "false impression" claim, the State did not argue otherwise in Applicant's trial.

*Deled "Induced"*

(886)   The Court finds that the State prosecuted Applicant and all of his codefendants on the same underlying theory. At the State's request, the Court judicially notices the records of all the codefendants' trials and finds that the State theorized that all seven escapees were guilty of capital murder, all seven intended to kill Officer Hawkins, six of them – Applicant, Rivas, Rodriguez, Newbury, Harper and Garcia – fired shots at Hawkins when he drove into the loading dock behind the Oshman's store, and one or more of them fired the shots that killed him. *See Nguyen*, 232 F.3d at 1240-41 (holding no fundamental conflict existed in theories between codefendants' trials where main thrust of prosecution's argument was that both defendants were equally responsible for death of innocent bystander); *Haynes*, 827 F.2d at 439-39 (holding no fundamental conflict existed in prosecution's theory in trials of three codefendants where underlying theory throughout trials was that all three defendants were equally culpable); *see also Nichols*, 69 F.3d at 1270-71 (holding no conflict on an ultimate issue of fact existed where evidence at each trial showed that both codefendants acted together to rob victim, that both fired at victim, and that it is unclear which bullet killed victim).

(887)   Based on the foregoing, the Court finds that Applicant fails to establish a violation of his due process rights.

(888)   Because there was no constitutional violation, the Court recommends denial of grounds seven and eight.

## GROUNDS 9-12: FAIR CROSS-SECTION

(889)   Applicant contends Dallas County's venire selection process violated his federal and state constitutional rights to a venire consisting of a fair cross-section of the community. U.S. CONST. amend. VI; TEX. CONST., art. I, § 10. Particularly, he claims the venire from which his jury was selected did not adequately represent the Hispanic population of Dallas County. Alternatively, Applicant argues that, should this Court find his fair cross-section complaint procedurally barred, counsel's failure to object to the venire's composition at trial constituted ineffective assistance.

### I. CLAIMS PROCEDURALLY BARRED

#### A. Claims Not Raised at Trial

(890)   The Court finds that Applicant did not raise his venire selection complaint at trial.

139

2978



(891)  Under Texas law, the failure to object at trial generally waives the error for collateral review. *Pena*, 71 S.W.3d at 338, n.7; *Bagley*, 509 S.W.2d at 333-34 (holding that the appellate rule requiring a trial objection also applies in habeas cases).

(892)  Applicant acknowledges that his right to a fair cross-section existed at the time of his trial, but he suggests that counsel did not have sufficient time to determine the merits of asserting a violation of that right.

(893)  The Court finds that Applicant presents no evidence to substantiate this claim.

(894)  Citing article 34.04 of the Texas Code of Criminal Procedure, Applicant supposes that he could not have obtained the list of persons summoned for his trial until two days before trial began and that no one could confirm an infirmity in that amount of time. *See* TEX. CODE CRIM. PROC. ANN. art. 34.04 (Vernon 2006) (requiring defense receive notice of list of persons summoned for his venire).

(895)  The Court finds, however, that Applicant received his venire list on December 31, 2002, more than two weeks before the special venire was summoned to appear and much sooner than the statutorily mandated deadline. (CR: 357).

(896)  Applicant fails to establish that whatever amount of time counsel did have to review the list was insufficient to conduct the necessary analysis of his own venire.

(897)  Moreover, the Court finds that Applicant's counsel had access to the results of the Dallas Morning News (DMN) study. The results of that study were published almost two years before Applicant's trial began. *See* Ted M. Eades, *Revisiting the Jury System in Texas: A Study of the Jury Pool in Dallas County*, 54 SMU L. Rev. 1813, 1821 (2001) (Application, pp. 202-03, 208-09). Around that same time, another article claiming the Dallas County venires did not constitute a fair cross-section of the community was also published in a criminal defense magazine. Mick Mickelsen, *A Jury of Your Peers?* VOICE FOR THE DEFENSE 24, 25 (March 2001).

(898)  In short, the Court finds Applicant fails to demonstrate that his fair cross-section complaint was unavailable to him at the time of his trial for any reason.

(899)  Therefore, the Court concludes that Applicant's attack on the constitutionality of the Dallas County venire selection process is procedurally barred and should be dismissed.

140

2979

**B. Claims Not Raised on Direct Appeal**

(900)   The Court finds that Applicant also failed to raise these claims on direct appeal.

(901)   It is well settled that habeas corpus will not lie as a substitute for direct appeal. *Townsend*, 137 S.W.3d at 81. Even a constitutional claim is forfeited if Applicant had the opportunity to raise it on appeal and did not. The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id.*

(902)   The Court finds that nothing prevented Applicant from raising these claims on direct appeal, and he presents no evidence in support of these claims that was not already part of the appellate record. In fact, as discussed below, Applicant presents no evidence in support of these claims.

(903)   The Court concludes grounds nine through twelve are an improper attempt to use the writ as a substitute for appeal.

(904)   Therefore, the Court concludes grounds nine through twelve are procedurally barred and should be dismissed. *Id.*

**C. Applicant Fails to Allege Facts that Entitle Him to Relief**

(905)   The Court finds that Applicant's fair cross-section claim and related ineffective assistance claim fail to state specific, particularized facts that, if proven true, would entitle him to habeas relief.

(906)   The facts alleged must be sufficient to enable a court to determine, from the face of the application itself, whether the application merits further inquiry. *Staley*, 160 S.W.3d 63.

(907)   The Court finds that Applicant fails to allege any facts from which this Court could determine that his venire was not constitutionally composed. Applicant's fair cross-section claim depends on whether the percentage of Hispanics in his venire was not fair and reasonable in relation to the number of Hispanics in the community. *See Duren v. Missouri*, 439 U.S. 357, 364 (1979). Applicant predicates his claim entirely on factual assertions related to the venire of one of his codefendants, Michael Rodriguez. In particular, he presents this Court with arguments purportedly taken from "the brief of Michael Rodriguez," and he simply asserts that the facts from Rodriguez's trial are "similar" to the facts of his own trial. (Application, p. 199).

(908)   The Court finds that Applicant fails to establish any right of relief personal to Applicant. While the composition of other Dallas County venires is certainly pertinent to Applicant's claim of systematic exclusion, Applicant, himself, would

*Handwritten margin notes: "Deleted Sentence from Sts #928 p.71, part 2" (right margin); "Deleted Sts → #929 p.72, part 2" (left margin); "Deleted 1st sentence of Sts #930, p.72, part 2"*

141

2980

only be entitled to relief if Hispanics were underrepresented on his own venire. Applicant alleges no such facts related to his own venire.

(909)   Thus, the Court concludes that Applicant's attack on the constitutionality of the Dallas County venire selection process and his related ineffective assistance claim are barred for failure to allege sufficient facts that, if true, would entitle him to habeas relief. *Staley*, 160 S.W.3d at 66.

(910)   For this reason, the Court recommends dismissal of grounds nine through twelve.

## II. NO VIOLATION OF RIGHT TO FAIR CROSS-SECTION

(911)   Alternatively, the Court finds that Applicant's fair cross-section claim fails on the merits.

(912)   In a writ of habeas corpus, Applicant bears the burden to prove his factual allegations by a preponderance of the evidence. *Ex parte Adams*, 768 S.W.2d 281, 287-88 (Tex. Crim. App. 1989).

*deleted ⟶ "Applicant fails woefully short of meeting this burden." From sts # 934 p.72, part 2*

(913)   The Court finds that Applicant offers no evidence related to the composition of his own venire. He presents no documentation pertaining to the race of those summoned for jury service, no expert analysis of a venire, and no testimony or affidavit from the Dallas County Jury Services Manager.

*deleted at 3 sentences Jb sts #935 p.72, part 2*

(914)   But even if the factual allegations Applicant makes had been related to his own venire and had been accompanied by some evidentiary support, the Court finds that he fails to prove a violation of his right to a fair cross-section.

(915)   The Sixth Amendment requires that the panel from which a petit jury is selected represent a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 528-29 (1975). To establish a prima facie violation of this fair cross-section requirement, a defendant must show the following: (1) the group allegedly excluded is a "distinctive group" in the community, (2) the group is not fairly represented on jury panels from which the petit juries are chosen, and (3) the underrepresentation results from a systematic exclusion of the group in the jury selection process. *Duren*, 439 U.S. at 364.

(916)   Applicant neither alleges nor demonstrates that his state constitutional right to a fair cross-section varies from his federal constitutional right. Consequently, the Court assumes Applicant's state and federal constitutional rights are coextensive.

(917)   Assuming the factual allegations pertaining to the Rodriguez venire pertained to Applicant's venire and were supported by some evidence, the Court finds that they do not establish a prima facie violation.

142

2981

### A. No Showing Hispanics are Underrepresented on Venires

(918)  Hispanics are undisputedly a distinctive group in Dallas County. *See Aldrich v. State*, 928 S.W.2d 558, 560 (Tex. Crim. App. 1996).

(919)  But the Court finds that Applicant does not demonstrate that Hispanics are underrepresented on Dallas County venires.

(920)  To prove Hispanics are underrepresented, Applicant must show that the number of Hispanics on the venires is not fairly and reasonably related to the number of Hispanics in the community *who are qualified to sit on a jury. See Pondexter v. State*, 942 S.W.2d 577, 580-81 (Tex. Crim. App. 1996) (explaining that the reasonableness of distinctive group's representation on venire is determined by comparing percentage of distinctive group members in venire to percentage of distinctive group members in community who qualify for jury service). Applicant does not limit his consideration to qualified Hispanics; he considers the *entire* population of Hispanics in Dallas County.

(921)  The Court finds that there is a statistically significant number of Hispanic non-citizens who are not eligible for jury service, but are nonetheless included in Applicant's general population count.

(922)  The Court finds that, in 2002, over 40% of Hispanics were foreign born. Among this population, more than half (52.1%) entered the U.S. between 1990 and 2002 and, of these, 92.7% are still non-citizens. Another 25.6% entered the U.S. during the 1980s and, of these, approximately 70% remain non-citizens. Of the Hispanics who entered the U.S. during the 1970s, 46.3% are still non-citizens, and of the Hispanics who entered before 1970, 26.7% remain non-citizens. (State's Writ Ex. A, pp. 3-4). The exclusion of non-citizens cannot form the basis of a fair cross-section complaint, since non-citizens are ineligible for jury service.

(923)  The Court finds that Applicant's counting method also fails to take into account individuals born of Hispanic mothers married to non-Hispanic fathers. In such situations, the Hispanic child will most likely have the father's non-Hispanic surname and, if they self-identify as white on their juror cards, they will not be counted as Hispanic. Applicant's method allows for a similar undercount of adopted Hispanic individuals for the same reasons.

(924)  Moreover, the Court finds that the 2000 U.S. census data distinguishes between "race" and "Hispanic origin." (State's Writ Ex. B, pp. 1-2). Persons of Hispanic descent can be of any race. (State's Writ Ex. B, pp. 2, n. 2). Applicant apparently uses the census data on persons of *Hispanic origin*. (Application, p. 201). The juror cards, on the other hand, ask for the juror's race. (State's Writ Ex. C).

143

2982

Therefore, discrepancies can and will occur between the juror cards and the census data, and Applicant's count of Hispanics on the venire is not reliable.

### B. No Showing of Systematic Exclusion of Hispanics

(925)   The Court finds that, even assuming Applicant's statistics evinced an underrepresentation of Hispanics on his venire, he fails to demonstrate that Hispanics were systematically excluded.

(926)   To satisfy this requirement, it must be shown that the alleged underrepresentation was inherent in the particular jury selection process used. *Duren*, 439 U.S. at 366. Applicant must identify a specific systematic defect or operational deficiency that accounts for the alleged underrepresentation. *United States v. Pion*, 25 F.3d 18, 23 (1st Cir. 1994). Because some people are simply less available than others to serve as jurors, a true cross-section is practically unobtainable. *Barber*, 772 F.2d at 997. Thus, the Supreme Court has never required the venire to be, statistically, a substantially true mirror of the community, and courts allow a fair degree of leeway to States in designating jurors, so long as it does not actively prevent people from serving or actively discriminate, and so long as the system is reasonably open to all. *Barber*, 772 F.2d at 997-98.

(927)   In *Taylor*, for example, the Supreme Court determined that a Louisiana statute preventing a woman from being selected for jury service unless she filed a written declaration of her desire to be subject to jury service violated the fair cross-section requirement. *See Taylor*, 419 U.S. at 523, 531. In *Lacy v. State*, 899 S.W.2d 284, 288 (Tex. App. – Tyler 1995, no pet.), the Tyler Court of Appeals specified that to succeed with a systematic exclusion complaint, a defendant would have to show "some manner whereby [the distinctive groups] were not included in the computer base from which the panel was selected." Therefore, affirmative barriers to *selection* for jury service or different *selection* standards for different groups is the earmark of a Sixth Amendment violation.

(928)   The Court finds that, in Texas, the names on the jury wheel in each county are selected from the names of all persons on the current voter registration lists and the names of all citizens who have a valid Texas driver's license or identification card. TEX. GOV'T CODE ANN. § 62.001 (Vernon Supp. 2005). There is nothing inherently exclusive about this method of selection, and it has been upheld repeatedly against Sixth Amendment attack. *E.g., United States v. James*, 528 F.2d 999, 1022 (5th Cir. 1976). No person, by reason of his Hispanic origin, is prevented by law from obtaining a driver's license or an identification card, or from registering to vote. *United States v. Rioux*, 930 F. Supp. 1558, 1573 (D. Conn. 1995) (and multiple cases cited therein).

144

2983

(929)  Thus, the Court finds that Applicant offers no evidence that the Dallas County venire-selection process systematically excludes Hispanics.

(930)  Applicant also complains that the percentage of Hispanics *who respond to the juror summonses* is not in proportion with the percentage of Hispanics in the general population. Applicant blames this failure to report on Dallas County policies. Specifically, Applicant suggests that low daily pay for jury service in Dallas County plus the failure of Dallas County officials to enforce the jury summonses, as a practical matter, results in the underrepresentation of Hispanics in the jury pools.

(931)  The Court finds that Applicant's assertion that Dallas County's low juror pay and its failure to enforce summonses cause Hispanics not to report is not supported by extrinsic evidence. There could be any number of personal reasons, unrelated to Dallas County policies, explaining why such persons would not report. Summonses might be directed to a bad address, to a child who has since left home, to a politically-motivated conscientious objector, to a disabled person, or to a person simply lacking in civic responsibility.

(932)  The Court finds that such discrepancies resulting from private sector influences rather than affirmative governmental action do not represent a violation of the "fair cross-section" requirement and cannot satisfy *Duren*. Dallas County is not *actively* preventing people from serving or actively discriminating. All people summoned for jury duty get the same pay and suffer the same consequences for non-reporting.

(933)  *Duren* is satisfied so long as the system is reasonably open to all, which it is. *Barber*, 772 F.2d at 997-98. Disparities attributable to personal predilection or wealth imbalances, as opposed to state or locally imposed impediments, cannot form the basis of a cognizable class and evoke sanctions against the judicial system. *See Rioux*, 930 F. Supp. at 1573; *see also United States v. Cecil*, 836 F.2d 1431, 1146-48 (4th Cir. 1987) (upholding use of voter registration list as source for jury selection regardless of fact that it would exclude persons, whatever their race, color, gender, or age, who had not registered to vote) (citing *Foster v. Sparks*, 504 F.2d 805, 816-17 (5th Cir. 1975)). Stated simply, the personal decision by some people not to respond to a juror summons is not a government action subject to sanctions under the Sixth Amendment.

(934)  The Court finds that, even if the law held the State responsible for the personal predilections of those who receive juror summonses, and even if this Court assumed, for Applicant's benefit, that Hispanics did not report for jury duty at Applicant's trial because of the County's pay policy and the lack of consequences for failing to report, this does not prove that Dallas County's system violates the Sixth Amendment.

145

2984

(935)   The Court finds that Applicant fails to prove that the alleged exclusion of Hispanics is "systematic" because he only claims they were underrepresented on two occasions: during the first week of March 2000 and during jury selection in Rodriguez's trial in 2001.

(936)   In *Duren*, systematic exclusion was proven by showing an underrepresentation of women occurred not just occasionally, but in every weekly venire for the period of *nearly a year. See Duren*, 439 U.S. at 366.

(937)   The Court finds that Applicant only addresses venires from two different weeks and spread apart by more than a year. Absent evidence that Hispanics are consistently underrepresented in Dallas County venires over a period of time, Applicant cannot prove that the venires from Rodriguez's trial and the first week of March 2000 were not anomalies.

(938)   Furthermore, the Court finds Applicant offers no evidence to show that Dallas County's pay rate and the decision not to enforce jury summonses were made to exclude Hispanics or any particular group of people from the venire. As stated, the rules are the same for everyone who is summoned. There could be any number of reasons why such policies are carried out by the County. Most notably, a higher pay rate and the enforcement of jury summonses would cost the County substantially more money.

(939)   The Court finds Applicant has not shown that Hispanics are consistently underrepresented in the venire, relative to the number of such persons in the community who are qualified to serve.

(940)   Most importantly, the Court finds that Applicant does not assert an operational defect in the County's juror selection process, but only complains that certain segments of the population simply do not participate in that process. This is not "systematic exclusion" by the government and does not qualify as *Duren* error.

(941)   The existence of systematic underrepresentation turns on the process of selecting venires, not on the outcome of that process in a particular case. *See e.g., United States v. Jackman*, 46 F.3d 1240, 1248 (2nd Cir. 1995) (finding *Duren* error based on systematic exclusion of certain residents, even though some of the excluded residents were included in venire).

(942)   Accordingly, the Court finds that Applicant has shown no violation of his constitutional right to a fair cross-section.

(943)   Thus, the Court concludes there was no constitutional violation and recommends denial of grounds nine and ten.

146

2985

### III. COUNSEL RENDERED EFFECTIVE ASSISTANCE

(944)   In conjunction with his venire selection complaint, Applicant contends that, to the extent this claim should have been raised at trial but was not, trial counsel rendered ineffective assistance.

(945)   To prevail on his ineffectiveness claim, Applicant must show by a preponderance of the evidence that counsel's decision not to raise this claim was unreasonable by objective professional standards and that it prejudiced his defense. *Strickland*, 466 U.S. at 687; *Thompson*, 9 S.W.3d at 812-13. Furthermore, on habeas review, Applicant bears the burden of proving his factual allegations by a preponderance of the evidence. *Adams*, 768 S.W.2d at 287-88.

(946)   The Court finds that Applicant fails to sustain this burden of proof.

(947)   As discussed above, the Court finds Applicant's contention that his jury was not selected from venire panels that were representative of a fair cross-section of the community is unsubstantiated and groundless.

(948)   Thus, the Court finds that an objection to the racial composition of the venire would have been unsuccessful.

(949)   Defense counsel is not ineffective for failing to lodge a meritless objection. *See Vaughn v. State*, 931 S.W.2d 564, 566 (Tex. Crim. App. 1996) (holding that, to show counsel was ineffective for failing to lodge objection, Applicant must show trial court would have erred in overruling such objection).

(950)   Applicant also states that counsel should have claimed that 18 to 34 year-olds were underrepresented. The Court finds that this reference to youth is just a clerical error. Applicant's fair cross-section claim appears to be related to Hispanics only.

(951)   If the reference to youth in this ineffectiveness claim was intentional, then the Court finds that the claim is entirely unsupported by any argument or evidence and, consequently, Applicant fails to demonstrate that his counsel was ineffective for not raising it at trial.

(952)   For the foregoing reasons, the Court concludes there was no constitutional violation of Applicant's right to effective assistance of counsel, and the Court recommends denial of Applicant's eleventh and twelfth grounds for relief.

## GROUNDS 13 & 14: BURDEN OF PROOF ON MITIGATION SPECIAL ISSUE

(953)   Relying on *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), Applicant contends the mitigation special issue is

147

2986

unconstitutional because it fails to properly allocate the burden of proof. Specifically, he claims the special issue violates his federal and state constitutional rights to due process and an impartial jury and his rights against cruel and unusual punishment because it does not require the State to disprove the existence of facts warranting a life sentence. *See* U.S. CONST. amends. V, VI, VIII, & XIV; TEX. CONST. art. I, §§ 10 & 19.

## I. CLAIMS PROCEDURALLY BARRED

### A. Sixth Amendment Claim Not Raised at Trial

(954)    The Court finds that Applicant forfeited his Sixth Amendment (*Ring & Apprendi*) claim because he failed to present the issue to this Court at trial.

(955)    Under Texas law, the failure to object at trial generally waives the error for collateral review. *Pena*, 71 S.W.3d at 338, n.7; *Bagley*, 509 S.W.2d at 333-334 (holding that the appellate rule requiring a trial objection also applies in habeas cases).

(956)    The Court finds that, although this claim was available at the time of his trial, Applicant only challenged the mitigation special issue instructions on Eighth and Fourteenth Amendment grounds. (CR: 121-22, 127-28).

(957)    Therefore, the Court concludes that Applicant's Sixth Amendment claim is procedurally barred and should be dismissed.

### B. None of the Claims Raised on Direct Appeal

(958)    Furthermore, the Court finds that Applicant did not to raise any of these constitutional claims on direct appeal.

(959)    The Court finds that, on direct appeal, Applicant attempted to raise his federal constitutional claims in a supplemental brief, but the Court of Criminal Appeals denied his motion to supplement. Applicant subsequently filed a motion for rehearing and an amended motion for rehearing in the Court of Criminal Appeals in which he again attempted to raise his federal claims for review on direct appeal. The Court of Criminal Appeals denied Applicant a rehearing.

(960)    The Court finds that Applicant never raised his state constitutional claims on direct appeal.

(961)    It is well settled that habeas corpus will not lie as a substitute for direct appeal. *Townsend*, 137 S.W.3d at 81. Even a constitutional claim is forfeited if Applicant had the opportunity to raise it on appeal and did not. The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate

148

2987

remedy at law. *Id.*

(962)   The Court finds that nothing prevented Applicant from timely raising any of these claims on direct appeal, and he presents no evidence in support of his writ that was not already part of the appellate record.

(963)   The Court finds that Applicant's thirteenth and fourteenth grounds for relief are an improper attempt to use the writ as a substitute for appeal.

(964)   Therefore, the Court concludes that Applicant's thirteenth and fourteenth grounds for relief are procedurally barred and should be dismissed. *Id.*

## II. MITIGATION ISSUE DOES NOT VIOLATE ANY CONSTITUTIONAL RIGHT

(965)   Alternatively, the Court finds that Applicant fails to prove any constitutional violation.

(966)   The law imposes no burden of proof on any party, much less the State, on the mitigation issue, and *Ring* and *Apprendi* did not establish a burden where none previously existed.

(967)   The mitigation special issue is and always has been an issue with no assigned burden of proof. *Blue v. State*, 125 S.W.3d 491, 501 (Tex. Crim. App. 2003) (neither legislation nor Constitution places burden of proof upon State to negate existence of mitigating evidence). The weighing of "mitigating evidence" is a subjective determination undertaken by each individual juror. *Colella v. State*, 915 S.W.2d 834, 845 (Tex. Crim. App. 1995).

[handwritten: Deleted]

[handwritten: 'Thus, assuming the state the burden of proving the absence of sufficient mitigating]

(968)   The absence of any such burden has withstood repeated constitutional attacks. [handwritten: factors is irrational & unworkable"] *See, e.g., Walton v. Arizona*, 497 U.S. 639, 649-51 (1990) (refusing to force State to shoulder burden of disproving mitigating circumstances); *Escamilla v. State*, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004) (rejecting numerous federal and state constitutional attacks on mitigation special issue).

(969)   Moreover, the Court of Criminal Appeals has repeatedly rejected Applicant's [handwritten: from ct's # 989 p. 80, part 2] Sixth Amendment contention, holding that *Ring* and *Apprendi* do not require the State to bear the burden of proving beyond a reasonable doubt that the mitigation issue should be answered negatively. *See, e.g., Perry v. State*, 158 S.W.3d 438, 446-48 (Tex. Crim. App. 2004); *Paredes v. State*, 129 S.W.3d 530, 541 (Tex. Crim. App. 2004).

(970)   In rejecting the Sixth Amendment challenge, the Court noted that *Ring* and *Apprendi* only require proof beyond a reasonable doubt of an aggravating factor necessary for the imposition of the death penalty. *Perry*, 158 S.W.3d at 447-48; *Paredes*, 129 S.W.3d at 541; *see also Ring*, 536 U.S. at 577; *Apprendi*, 530 U.S.

149

2988

at 490. The mitigation issue does not operate to increase the penalty beyond the statutory maximum. In Texas, the maximum penalty for a capital offense is death. A jury's answer to the mitigation issue does not have the potential to increase that penalty, only to reduce it. Consequently, the Sixth Amendment does not require the State prove the absence of mitigating circumstances beyond a reasonable doubt. *Perry*, 158 S.W.3d at 447; *Paredes*, 129 S.W.3d at 541; *see also Ring*, 536 U.S. at 597 n.4; *Apprendi*, 530 U.S. at 490 n.16 (both noting the distinction between aggravating and mitigating factors).

(971)   For these reasons, the Court concludes there was no constitutional violation and recommends denial of Applicant's thirteenth and fourteenth grounds for relief.

### GROUNDS 15 & 16:  10/12 RULE

(972)   Applicant contends the Texas death penalty sentencing scheme violates his federal and state constitutional rights against cruel and unusual punishment and to due process of law. U.S. CONST. amends. VIII & XIV; TEX. CONST. art. I, §§ 13 & 19. Specifically, he maintains the ten-vote requirement for the jury to return a "no" answer to the first special issue and a "yes" answer to the mitigation issue coerces minority "life" voters to vote with the majority in the belief that their vote is worthless without nine other jurors to join them. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, §§ 2(d)(2), (f)(2) (Vernon Supp. 2010). He also contends that the jury should be informed that the failure to agree with respect to either issue results in a life sentence. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(a)(1) (Vernon Supp. 2010) (requiring jury not be told the effect of a deadlock).

### I. CLAIMS PROCEDURALLY BARRED

(973)   The Court finds that Applicant did not raise any of these constitutional claims on direct appeal.

(974)   The Court finds that, on direct appeal, Applicant attempted to raise his federal constitutional claim in a supplemental brief, but the Court of Criminal Appeals denied his motion to supplement. Applicant subsequently filed a motion for rehearing and an amended motion for rehearing in the Court of Criminal Appeals, in which he again attempted to raise his federal claims for review on direct appeal. The Court denied Applicant a rehearing.

*Deleted*
" *In any event, applicant never attempted to raise his state constitutional claims on direct appeal.*"

(975)   It is well settled that habeas corpus will not lie as a substitute for direct appeal. *From Sts #* *Townsend*, 137 S.W.3d at 81. Even a constitutional claim is forfeited if Applicant *996* had the opportunity to raise it on appeal and did not. The writ of habeas corpus is *p. 82,* an extraordinary remedy that is available only when there is no other adequate *part 2* remedy at law. *Id.*

150

2989

(976)   The Court finds that nothing prevented Applicant from timely raising any of these claims on direct appeal, and he presents no evidence in support of his writ that was not already part of the appellate record.

(977)   This Court finds that Applicant's fifteenth and sixteenth grounds are an improper attempt to use the writ as a substitute for appeal.

(978)   Therefore, the Court concludes that Applicant's fifteenth and sixteenth grounds are procedurally barred and should be dismissed. *Id.*

## II. NO CONSTITUTIONAL VIOLATION

(979)   Alternatively, the Court finds that Applicant fails to prove any constitutional violation.

(980)   The Court of Criminal Appeals has repeatedly decided these issues against Applicant. *See, e.g., Rayford v. State*, 125 S.W.3d 521, 532 (Tex. Crim. App. 2003).

(981)   In addition, the Supreme Court has held that the Eighth Amendment does not require the jury to be instructed "as to the consequences of a breakdown in the deliberative process." *See Jones v. United States*, 144 L.Ed.2d 370, 382-83 (1999).

(982)   Applicant complains nonetheless that the 10/12 rule acts as an improper dynamite charge in violation of *Mills v. Maryland*, 486 U.S. 367, 383 (1988).

(983)   The jury charge in *Mills* was determined to be unconstitutional because it prevented the jury from acting on mitigating evidence unless it unanimously agreed a particular factor was mitigating, thereby essentially allowing a single juror to impose a death sentence. *See Mills*, 486 U.S. at 380. The charge in *Mills* violated the rule that the sentencer may not be prevented from considering, as a mitigating factor, all relevant evidence. *Id.* at 374-75.

(984)   The legitimacy of Texas's 10/12 rule has already been addressed in relation to *Mills* and upheld. *See Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996). The Texas statute allows a single juror to give effect to any piece of mitigating evidence by voting "no" on any special issue. *Rousseau v. State*, 855 S.W.2d 666, 687 n.26 (Tex. Crim. App. 1993).

(985)   Moreover, the Court finds that it specifically instructed Applicant's jury that they need not agree on what particular evidence supports a negative answer to special issues one and two or an affirmative answer to special issue three. (CR: 38-39).

151

2990

(986)   The Court finds that Applicant's jury was instructed that they could not answer the special issues in a manner that would result in a life sentence unless ten jurors agree to that answer. (CR: 38). But the charge also informed the jurors that, in order to vote "yes" to special issues one and two and "no" to special issue three, i.e., vote for the death penalty, they had to do so unanimously. (CR: 38-39).

(987)   The Court finds that, under these facts, Applicant's argument that the jurors were misled lacks merit because every juror knew that capital punishment could not be imposed without the unanimous agreement of the jury on both special issues. *See Lawton v. State*, 913 S.W.2d 542, 559 (Tex. Crim. App. 1995). While the jury was not informed of the consequences of a hung jury, each juror knew that, without his or her vote, the death sentence could not be imposed. *Id.*

(988)   For these reasons, the Court concludes there was no constitutional violation and recommends denial of Applicant's fifteenth and sixteenth grounds for review.

## GROUND 17: PROPORTIONALITY REVIEW OF DEATH PENALTY

(989)   Applicant contends his death sentence is excessive and disproportionate compared to sentences imposed in other capital cases and, thus, violates the Due Process Clause of the Fourteenth Amendment. U.S. CONST. amend. XIV, § 1.

### I. CLAIMS PROCEDURALLY BARRED

#### A. Claim Not Raised at Trial

(990)   The Court finds that Applicant failed to present this claim to the Court at trial.

(991)   The Court finds that Applicant argued that the Texas death penalty scheme violated the Fourteenth Amendment because it does not require a proportionality review. (CR: 115). But he never complained that his death sentence was excessive and disproportionate to the sentences in other capital cases. He voiced no such objection to his death sentence at trial or in his motion for new trial.

(992)   Under Texas law, the failure to object at trial generally waives the error for collateral review. *Pena*, 71 S.W.3d at 338, n.7; *Bagley*, 509 S.W.2d at 333-334 (holding that the appellate rule requiring a trial objection also applies in habeas cases).

(993)   Thus, the Court concludes that Applicant's seventeenth ground is procedurally barred and should be dismissed.

#### B. Claim Not Raised on Appeal

(994)   The Court finds that Applicant did not to raise this claim on direct appeal.

152

2991

(995) It is well settled that habeas corpus will not lie as a substitute for direct appeal. *Townsend*, 137 S.W.3d at 81. Even a constitutional claim is forfeited if Applicant had the opportunity to raise it on appeal and did not. The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id.*

(996) The Court finds that nothing prevented Applicant from raising this claim on direct appeal, and he presents no evidence in support of his writ that was not already part of the appellate record.

(997) Therefore, this Court finds Applicant's seventeenth ground is an improper attempt to use the writ as a substitute for appeal.

(998) The Court concludes Applicant's seventeenth ground is procedurally barred and should be dismissed. *Id.*

### C. Claim Fails to Allege Facts Entitling Applicant to Relief

(999) Lastly, the Court finds that Applicant's seventeenth ground is not a cognizable habeas claim because he fails to allege facts that, if true, would entitle him to relief.

(1000) Applicant must allege facts that enable a court to determine, from the face of the application itself, whether the application merits further inquiry. *Staley*, 160 S.W.3d at 63.

(1001) Applicant contends his sentence is excessive and disproportionate to sentences in other capital cases, but the Court finds that he does not identify any other cases to which his could be compared.

(1002) Furthermore, as explained below, due process does not require comparative proportionality review of Applicant's sentence.

(1003) Thus, even if Applicant had alleged facts showing that his sentence was excessive in comparison to other capital cases, the Court finds that those facts would not establish any right to relief. *See Staley*, 160 S.W.3d at 63-64.

(1004) Accordingly, the Court concludes that Applicant's seventeenth ground is procedurally barred and should be dismissed.

## II. NO CONSTITUTIONAL VIOLATION

(1005) Alternatively, the Court finds that Applicant fails to prove any constitutional violation.

153

2992

(1006) Applicant concedes the Eighth Amendment does not require comparative proportionality review of his death sentence. *See Pulley v. Harris*, 465 U.S. 37 (1984). Nevertheless, he contends the Due Process Clause of the Fourteenth Amendment requires proportionality review. He argues due process requires such a review in civil cases and, thus, it should be extended to death penalty cases as well. *See Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415 (1994) (holding Due Process Clause requires some form of appellate review of jury awards of punitive damages in civil cases).

(1007) The Court of Criminal Appeals has previously and repeatedly rejected this very contention. *See, e.g., Bell v. State*, 938 S.W.2d 35, 52 (Tex. Crim. App. 1996); *Janecka v. State*, 937 S.W.2d 456, 474-75 (Tex. Crim. App. 1996); *see also King v. State*, 953 S.W.2d 256, 273 (Tex. Crim. App. 1997); *Hughes v. State*, 897 S.W.2d 285, 294 (Tex. Crim. App. 1994).

(1008) As explained by the Court of Criminal Appeals, *Honda* held only that the Due Process Clause requires some form of appellate review, not comparative proportionality review in particular. *See Bell*, 938 S.W.2d at 52; *Janecka*, 937 S.W.2d at 474-75. Furthermore, the Court found no evidence that when the Fourteenth Amendment was promulgated, the common law required every capital sentence to be measured on appeal against all other death sentences. *Id.* Absent such a showing, the Court found that no presumption was raised that without a comparative proportionality analysis, appellate review of capital sentences in Texas violates due process. *Id.*

(1009) The Court finds that Applicant asserts no new or different arguments to support his claim that due process requires a comparative proportionality review of his or any death sentence.

(1010) Accordingly, the Court concludes there is no constitutional violation and recommends denial of Applicant's seventeenth ground.

## GROUND 18: DEFINITION OF MITIGATING EVIDENCE

(1011) Applicant contends the statutory definition of mitigating evidence violates the Eighth and Fourteenth Amendments because it limits the jury's consideration of mitigating factors to those that render a capital defendant less morally blameworthy. U.S. CONST. amends. VIII & XIV, § 1.

### I. CLAIMS PROCEDURALLY BARRED

(1012) The Court finds that Applicant did not to raise this claim on direct appeal.

(1013) It is well settled that habeas corpus will not lie as a substitute for direct appeal. *Townsend*, 137 S.W.3d at 81. Even a constitutional claim is forfeited if Applicant

154

2993

had the opportunity to raise it on appeal and did not. The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id.*

(1014)  The Court finds that nothing prevented Applicant from raising this claim on direct appeal, and he presents no evidence in support of his writ that was not already part of the appellate record.

(1015)  The Court finds that Applicant's eighteenth ground for relief is an improper attempt to use the writ as a substitute for appeal.

(1016)  Therefore, the Court concludes Applicant's eighteenth ground is procedurally barred and should be dismissed. *Id.*

## II. No Constitutional Violation

(1017)  Alternatively, the Court finds that Applicant fails to prove any constitutional violation.

(1018)  The Court of Criminal Appeals has repeatedly rejected this very challenge to article 37.071. *See, e.g., Ladd v. State*, 3 S.W.3d 547, 574 (Tex. Crim. App. 1999); *Cantu v. State*, 939 S.W.2d 627, 648-49 (Tex. Crim. App. 1996).

(1019)  The Court finds that Applicant asserts no new or different arguments in his writ application.

(1020)  The Court finds there is no constitutional violation.

## III. No Harm

(1021)  Alternatively, the Court finds that Applicant fails to prove he was harmed by any violation.

(1022)  On habeas review, Applicant bears the burden of proving by a preponderance of the evidence that the alleged error actually contributed to his conviction or punishment. *Ex parte Fierro*, 943 S.W.2d 370, 374-75 (Tex. Crim. App. 1996).

(1023)  The Court finds that Applicant neither alleges nor refers this Court to any evidence that his jury was precluded from considering because of the alleged defect in article 37.071. He only attacks the statute on its face, not as it is applied to him.

(1024)  For the foregoing reasons, the Court concludes that there is no constitutional violation and recommends denial of Applicant's eighteenth ground.

155

2994

## GROUND 20: UNDEFINED PUNISHMENT TERMS

(1025) Applicant contends that the trial court should have submitted punishment instructions defining the terms "probability," "criminal acts of violence," and "continuing threat to society" for the jury. Applicant argues that the failure to define these terms prevented a rational appellate review of the jury's answer to the special issues and, thus, violated his rights under the Sixth, Eighth, and Fourteenth Amendments. U.S. CONST. amends. VI, VIII, XIV.

### I. CLAIMS PROCEDURALLY BARRED

#### A. Claims Not Raised at Trial

(1026) At trial, Applicant complained generally that the trial court's failure to define "probability" and "the various terms and phrases used in the three special issues" violated the Eighth and Fourteenth Amendments. (CR: 112-14).

(1027) The Court finds that Applicant never raised a challenge based on the Sixth Amendment. Moreover, he did not specifically complain about the failure to define the terms "criminal acts of violence" and "continuing threat to society."

(1028) Under Texas law, the failure to object at trial generally waives the error for collateral review. *Pena*, 71 S.W.3d at 338, n.7; *Bagley*, 509 S.W.2d at 333-34 (holding that the appellate rule requiring a trial objection also applies in habeas cases).

(1029) The Court finds that nothing prevented Applicant from raising these claims at trial.

*[handwritten: deleted " he simply chose not to" From Sts # 1051, p. 88, part 2]*

(1030) To the extent that Applicant's twentieth ground for relief is predicated on the Sixth Amendment and the absence of instructions defining "criminal acts of violence" and "continuing threat to society," the Court concludes that it is procedurally barred and should be dismissed.

#### B. Claims Not Raised on Direct Appeal

(1031) The Court finds that Applicant also failed to raise any of the claims in his twentieth ground for relief on direct appeal.

(1032) It is well settled that habeas corpus will not lie as a substitute for direct appeal. *Townsend*, 137 S.W.3d at 81. Even a constitutional claim is forfeited if an Applicant had the opportunity to raise it on appeal and did not. *Id.* The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id.*

156

2995

(1033)  The Court finds that nothing prevented Applicant from raising any of these claims on direct appeal.

(1034)  The Court also finds that Applicant presents no evidence in support of his writ that was not already part of the appellate record.

(1035)  Thus, the Court finds that Applicant's twentieth ground for relief is an improper attempt to use the writ as a substitute for appeal.

(1036)  Accordingly, the Court concludes that Applicant's twentieth ground for relief is procedurally barred and should be dismissed. *Id.*

## II. NO CONSTITUTIONAL VIOLATION

(1037)  Alternatively, the Court finds that Applicant demonstrates no constitutional violation.

(1038)  The omission of instructions defining the complained-of terms violated none of Applicant's asserted constitutional rights. The Court of Criminal Appeals has repeatedly held that the terms "probability," "criminal acts of violence," and "continuing threat to society" require no special definitions. *See, e.g., Rayford,* 125 S.W.3d at 532. The terms are applied in their usual acceptation in common language. *Feldman,* 71 S.W.3d at 757.

(1039)  Furthermore, Applicant's complaint is grounded on the incorrect assertion that the special punishment issues in article 37.071 function as aggravating circumstances to circumscribe the class of persons eligible for the death penalty. However, the aggravating circumstances that determine death eligibility are found in penal code section 19.03, including murder of police officer or fireman; murder in the course of certain specified felonies; murder for remuneration; certain murders committed while incarcerated or escaping incarceration; multiple murders; and murder of a child. *See* TEX. PENAL CODE ANN. § 19.03 (Vernon Supp. 2004-05); *Green v. State,* 912 S.W.2d 189, 196 (Tex. Crim. App. 1995) (Baird, J., concurring). These circumstances genuinely narrow the class of death-eligible defendants and pass constitutional muster with respect to the eligibility decision. *Green,* 912 S.W.2d at 197 (Baird, J., concurring).

(1040)  The special punishment issues, on the other hand, permit the fact finder to further make an individualized determination as to the appropriateness of the death penalty. *Id.* The future-dangerousness issue allows the jury to consider the defendant's character and record, as well as the circumstances of the offense, and has been approved by the United States Supreme Court. *Id.* at 197 (citing *Jurek v. State,* 428 U.S. 262, 276 (1976)).

157

2996

(1041) The anti-parties special issue allows the jury to determine whether the defendant actually caused, intended to cause, or anticipated that a death would occur; and the mitigation special issue ensures that the jury can give effect to all types of mitigating evidence. *See id*. Thus, the "selection decision" to be made by the jury pursuant to the issues in article 37.071 ensures an individualized determination and passes constitutional muster. *See id*.

(1042) In sum, the trial court's refusal to provide the requested definitions violates no constitutional law. *See Coble v. State*, 2010 Tex. Crim. App. LEXIS 1297, at *114 (Tex. Crim. App. Oct. 13, 2010).

(1043) Therefore, the Court concludes that there is no constitutional violation and recommends denial of Applicant's twentieth ground for relief.

## GROUNDS 19, 21-22 & 24-25:  CALLINS V. COLLINS

(1044) Applicant contends the Texas death-penalty scheme violates due process of law and the proscription against cruel and unusual punishment because it is impossible to simultaneously restrict the jury's discretion to impose the death penalty while allowing the jury unlimited discretion to consider mitigating evidence. Applicant predicates this claim on both the federal and state constitutions. *See* U.S. CONST. amends. V, VIII, & XIV; TEX. CONST. art. I, §§ 13 & 19.

### I. CLAIMS PROCEDURALLY BARRED

(1045) The Court finds that Applicant did not raise these constitutional claims on direct appeal.

(1046) It is well settled that habeas corpus will not lie as a substitute for direct appeal. *Townsend*, 137 S.W.3d at 81.

(1047) Even a constitutional claim is forfeited if an Applicant had the opportunity to raise it on appeal and did not. The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id*.

(1048) The Court finds that nothing prevented Applicant from raising any of these claims on direct appeal.

(1049) This Court finds that Applicant's nineteenth, twenty-first, twenty-second, twenty-fourth, and twenty-fifth grounds are an improper attempt to use the writ as a substitute for appeal. *Id*.

(1050) Thus, the Court concludes that Applicant's nineteenth, twenty-first, twenty-second, twenty-fourth, and twenty-fifth grounds are procedurally barred and

158

2997

should be dismissed.

## II. DEATH-PENALTY SCHEME CONSTITUTIONAL

(1051)   Alternatively, the Court finds that Applicant's federal-law and state-law attacks on the constitutionality of the Texas death-penalty scheme are meritless.

(1052)   Applicant relies on Justice Blackmun's dissent in *Callins v. Collins* and urges this Court to declare the Texas scheme unconstitutional. *See Callins v. Collins*, 510 U.S. 1141 (1994). The Court of Criminal Appeals has repeatedly rejected this precise contention. *See, e.g.*, *Cannady v. State*, 11 S.W.3d 205, 214 (Tex. Crim. App. 2000) (rejecting federal and state constitutional attacks on Texas death-penalty scheme).

(1053)   The Court finds that Applicant asserts no new or different arguments in his writ application.

(1054)   Thus, the Court finds that Applicant fails to satisfy his burden of proving any constitutional violation.

(1055)   The Court concludes that there is no constitutional violation and recommends the denial of Applicant's nineteenth, twenty-first, twenty-second, twenty-fourth, and twenty-fifth grounds.

## GROUND 23:  APPELLATE REVIEW OF DEATH PENALTY

(1056)   Applicant contends that the Texas death-penalty scheme is unconstitutional under the Eighth and Fourteenth Amendments because it does not afford him meaningful appellate review of the jury's negative answer to the mitigation special issue. U.S. CONST. amends. VIII & XIV.

## I. CLAIM PROCEDURALLY BARRED

(1057)   The Court finds that Applicant failed to raise this claim on direct appeal.

(1058)   It is well settled that habeas corpus will not lie as a substitute for direct appeal. *Townsend*, 137 S.W.3d at 81. Even a constitutional claim is forfeited if an Applicant had the opportunity to raise it on appeal and did not. The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id.*

(1059)   The Court finds that nothing prevented Applicant from raising this claim on direct appeal.

159

2998

(1060)  The Court also finds that Applicant presents no evidence in support of his writ that was not already part of the appellate record.

(1061)  For these reasons, the Court finds that Applicant's twenty-third ground for relief is an improper attempt to use the writ as a substitute for appeal.

(1062)  Thus, the Court concludes Applicant's twenty-third ground is procedurally barred and should be dismissed. *Id.*

## II. NO CONSTITUTIONAL VIOLATION

(1063)  Alternatively, the Court finds that Applicant's contention is meritless.

(1064)  The Court of Criminal Appeals has previously and repeatedly rejected Applicant's contention. *See, e.g., Russell v. State*, 155 S.W.3d 176, 183 (Tex. Crim. App. 2005); *Valle*, 109 S.W.3d at 502-03.

(1065)  The Court finds that Applicant does not distinguish his case from this precedent, challenge the reasoning in existing case law, or assert any new or different arguments.

(1066)  This Court finds that Applicant fails to satisfy his burden of demonstrating any constitutional violation.

(1067)  Thus, the Court concludes there is no constitutional violation and recommends denial of Applicant's twenty-third ground for relief.

## GROUNDS 26-29:  PENRY II CLAIM

(1068)  In his twenty-sixth and twenty-seventh grounds, Applicant contends that the mitigation issue submitted to the jury violated his federal and state constitutional rights to due course of law and an impartial jury and against cruel and unusual punishment because it sent "mixed signals" to the jury. U.S. CONST. amends. V, VI, VIII, XIV; TEX. CONST. art. I, §§ 10, 13, 19. More specifically, Applicant likens the statutorily mandated mitigation special issue to the nullification instruction held unconstitutional by the Supreme Court in *Penry v. Johnson*, 532 U.S. 782 (2001) ("*Penry II*").

(1069)  In his twenty-eighth and twenty-ninth grounds, Applicant contends that the mitigation special issue "fails to give full effect and consideration to mitigating circumstances and fails to provide the jury with an adequate vehicle for expressing a 'reasoned response' to all of [his] evidence relevant to his culpability." Applicant argues that because of this alleged deficiency, the mitigation special issue violates his federal and state constitutional rights to "a grand jury determination and an indictment that charges the 'special issue

160

2999

elements' of the death penalty and facts relied upon to support the charge that [he] is guilty of the death penalty." U.S. CONST. amends. VI, VIII, XIV; TEX. CONST. art. I, §§ 3, 10, 13, 19. Applicant argues all four of these grounds for relief together.

## I. CLAIMS PROCEDURALLY BARRED

### A. Claims Not Raised at Trial

(1070) The Court finds that Applicant failed to present any of these claims to the Court at trial.

(1071) Under Texas law, the failure to object at trial generally waives the error for collateral review. *Pena*, 71 S.W.3d at 338, n.7; *Bagley*, 509 S.W.2d at 333-34 (holding that the appellate rule requiring a trial objection also applies in habeas cases).

(1072) Thus, the Court concludes that Applicant's twenty-sixth, twenty-seventh, twenty-eighth, and twenty-ninth grounds for relief are procedurally barred and should be dismissed.

### B. Claims Not Raised on Direct Appeal

(1073) The Court finds that Applicant also failed to raise any of these claims on direct appeal.

(1074) It is well settled that habeas corpus will not lie as a substitute for direct appeal. *Townsend*, 137 S.W.3d at 81. Even a constitutional claim is forfeited if an Applicant had the opportunity to raise it on appeal and did not. The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id.*

(1075) The Court finds that nothing prevented Applicant from raising any of these claims on direct appeal.

(1076) The Court also finds that Applicant presents no evidence in support of his writ that was not already part of the appellate record.

(1077) Thus, this Court finds Applicant's twenty-sixth, twenty-seventh, twenty-eighth, and twenty-ninth grounds for relief are an improper attempt to use the writ as a substitute for appeal.

(1078) The Court concludes that Applicant's twenty-sixth, twenty-seventh, twenty-eighth, and twenty-ninth grounds for relief are procedurally barred and should be dismissed. *Id.*

161

3000

## II. NO CONSTITUTIONAL VIOLATION

(1079) Alternatively, the Court finds that Applicant's attack on the mitigation special issue is meritless.

(1080) Applicant does not explain how the Court's punishment instructions or the mitigation instructions have any bearing on his right to an impartial jury or "a grand jury determination and an indictment that charges the 'special issue elements' of the death penalty and facts relied upon to support the charge that [he] is guilty of the death penalty."

*deleted "much less"*

*From sts #1102, p.93, part 2*

*Deleted "In fact, he makes no mention whatsoever of any of these "rights" purportedly violated."*

(1081) To the extent Applicant contends that the jury received an unconstitutional nullification instruction, the Court finds that the jury did not receive a nullification instruction or anything akin to one.

*deleted*

*"applicant is wrong" from ss #1103, p. 93, part 2*

(1082) The Court submitted a separate mitigation special issue as mandated by statute. (CR: 37-44); TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(e)(1) (Vernon Supp. 2004-05). The Court finds that this special issue and the accompanying instructions provided the jurors a vehicle for giving full effect to any mitigating evidence without asking them to change their answers to the other special issues.

*deleted "Thus, the mitigation special issue sent no "mixed signals" to the jury."*

*From sts #1104 p. 94 part 2*

(1083) The Supreme Court has recognized the contrast between Texas's statutorily mandated mitigation instruction and the nullification instruction in *Penry II*, noting the former's "brevity and clarity" and indicating that it passes constitutional muster. *Penry II*, 532 U.S. at 803; *see also Woods v. State*, 152 S.W.3d 105, 121-22 (Tex. Crim. App. 2004) (noting Supreme Court's approving comments on current "clearly drafted catchall" mitigation special issue).

(1084) Moreover, the Court of Criminal Appeals has previously and repeatedly rejected claims likening the current statutorily mandated mitigation issue to the nullification instructions struck down in *Penry II*. *See, e.g., Woods*, 152 S.W.3d at 121-22; *Escamilla*, 143 S.W.3d at 828.

(1085) In an apparent attempt to distinguish his claim from this precedent, Applicant argues that the mitigation issue in his case is actually "more constitutionally infirm" than the nullification instruction struck down in *Penry II* and *Smith v. Texas*, 125 S. Ct. 400 (2004). In particular, Applicant argues that

> [a] comparison of the pertinent sections of Applicant's punishment charge with that submitted in *Smith* shows that the *Smith* charge actually provided more information to the jury to decide whether there was mitigating evidence to warrant a negative answer to either special issue no. 1 or 2. In the instruction given to Applicant, the jury is informed that the evidence they consider may either mitigate

·162

3001

for or against a death sentence. The *Smith* instruction clearly instructed the jury that if they find mitigating evidence, to only consider mitigating evidence in determining whether the defendant should be given a sentence less than death even though they have found evidence beyond a reasonable doubt that the special issue should be answered "Yes."



(Application, p. 247) → *deleted " set out as written but with clerical & grammatical errors."* P.94 part 2

(1086) Applicant appears to be arguing that the instructions in *Smith* were better because they limited the jury to considering only mitigating evidence in answering the mitigation issue, while his own jury was instructed to consider both mitigating and non-mitigating evidence. Applicant fails to explain how allowing the jurors to consider both mitigating and non-mitigating evidence in answering the special issues deprived them of a vehicle for giving full effect to any mitigating evidence.

(1087) Notably, the constitutional requirement of individualized sentencing necessitates the consideration of all evidence, both mitigating and aggravating, that is relevant to the special issues. *From St's #1109 P.95, part 2*

*Deleted → Thus, the Court finds that applicant's argument is both poorly reasoned & inconsistent with constitutional authority."*

(1088) In light of the foregoing, the Court finds that Applicant has demonstrated no violation of federal or state constitutional law.

(1089) Thus, the Court concludes that there is no violation of federal or state constitutional law and recommends denial of Applicant's twenty-sixth, twenty-seventh, twenty-eighth, and twenty-ninth grounds for relief.

### GROUND 31: CUMULATIVE CONSTITUTIONAL ERROR

(1090) Applicant asks this Court to consider the cumulative effect of the multiple constitutional errors claimed above. He asserts that, considered together, they denied him due process of law and due course of law under the federal and state constitutions.

### I. CLAIMS PROCEDURALLY BARRED

#### A. Claims Not Raised at Trial

(1091) The Court finds that Applicant failed to present these claims to this Court at trial.

(1092) Under Texas law, the failure to object at trial generally waives the error for collateral review. *Pena*, 71 S.W.3d at 338, n.7; *Bagley*, 509 S.W.2d at 333-34 (holding that the appellate rule requiring a trial objection also applies in habeas cases).

163

3002

(1093) Thus, the Court concludes that Applicant's thirty-first ground for relief is procedurally barred and should be dismissed.

## B. Claims Not Raised on Direct Appeal

(1094) The Court finds that Applicant also failed to raise these claims on direct appeal.

(1095) It is well settled that habeas corpus will not lie as a substitute for direct appeal. *Townsend*, 137 S.W.3d at 81. Even a constitutional claim is forfeited if an Applicant had the opportunity to raise it on appeal and did not. The writ of habeas corpus is an extraordinary remedy that is available only when there is no other adequate remedy at law. *Id.*

(1096) The Court finds that nothing prevented Applicant from raising these claims on direct appeal.

(1097) The Court also finds that Applicant presents no evidence in support of his writ that was not already part of the appellate record.

(1098) Thus, this Court finds Applicant's thirty-first ground for relief is an improper attempt to use the writ as a substitute for appeal.

(1099) For this reason as well, the Court concludes that Applicant's thirty-first ground for relief is procedurally barred and should be dismissed. *Id.*

## II. NO CONSTITUTIONAL VIOLATION

(1100) Alternatively, the Court finds that Applicant fails to prove "cumulative" constitutional error.

(1101) The Court of Criminal Appeals has recognized the proposition that a number of errors may be found harmful in their cumulative effect. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999).

(1102) The Court finds, however, that Applicant has demonstrated no constitutional violations.

(1103) Because there are no errors and, thus, no harm to "cumulate," the Court concludes that there was no violation of due process of law or due course of law under the federal or state constitution. *See Rayford*, 125 S.W.3d at 534 (rejecting cumulative constitutional error complaint where no constitutional violations found).

(1104) Therefore, the Court recommends denial of Applicant's thirty-first point of error.

164

3003

## ORDER

THE CLERK IS **ORDERED** to prepare a transcript of all papers in cause number W01-000327-Y(A) and to transmit same to the Court of Criminal Appeals as provided by article 11.071 of the Texas Code of Criminal Procedure.

The transcript shall include certified copies of the following documents:

1. Applicant's Original Application for Writ of Habeas Corpus, "Amended" Application for Writ of Habeas Corpus, and any other pleadings filed by Applicant in cause number W01-00327-Y(A), including any exhibits;

2. The State's Answer to Applicant's Original Writ Application, including the accompanying exhibits, filed in cause number W01-00327-Y(A);

3. Any other pleadings filed by the State in cause number W01-00327-Y(A);

4. Any proposed findings of fact and conclusions of law filed by the State and Applicant in cause number W01-00327-Y(A);

5. This Court's findings of fact and conclusions of law, and order in cause number W01-00327-Y(A);

6. Any and all orders issued by the Court in cause number W01-00327-Y(A);

7. Any and all documentary evidence filed with the Court, including affidavits, answers to interrogatories, and the reporter's records of the hearings conducted on May 22-23, 2008, August 20, 2010, September 30, 2010, November 12, 2010, and January 14, 2011 (recusal hearing).

8. The indictment, judgment, sentence, docket sheet, and appellate record in cause number W01-00327-Y(A), unless they have been previously forwarded to the Court of Criminal Appeals.

165

3004

THE CLERK IS FURTHER **ORDERED** to send a copy of this Court's findings of fact and conclusions of law, including its order, to Applicant's counsel, Gary Udashen & Bruce Anton, attorneys for Applicant, at Sorrels & Udashen, 2301 Cedar Springs Road, Suite 400, Dallas, TX 75201, and to counsel for the State, Dallas County Assistant District Attorney Lisa Smith, at Frank Crowley Courts Bldg., 133 N. Riverfront Blvd., LB-19, Dallas, TX 75207-4399.

SIGNED the _18_ day of December, 2011.

Judge Mike Snipes
Criminal District Court No. 7
Dallas County, TX

166

3005

# APPENDIX A

167

3006

## INVENTORY OF EVIDENCE IN HALPRIN WRIT PROCEEDINGS

### Defense Exhibits Filed with Writ on 4/6/05

A    S.O. Woods Affidavit (3/18/05)
B    Cover letter with 192 pgs of certified OIG documents (3/1/05)
C    Anna Lester Affidavit (3/4/05)
D    Kelly Goodness Affidavit (3/31/05) (with Powerpoint presentation, list of material received and psychological instruments used, CV, & psych evaluation of Halprin (5/20/03)
E    Wesley Halprin Affidavit (1/13/05)
F    State's Trial Exhibit 965
G    3 jury notes
H    George Rivas's testimony from his trial and Murphy's trial
I    Defense Trial Exhibit 39
J    FBI interview with Rodriguez (one page of 6 pages of notes regarding interview)
K    Colorado PD report (pages 12 & 13 of 14-page report re: Newbury interview)
L    Edwin King's letter asking for 404(b) notice and 2 notices from State
M    2 defense trial motions ("motion to set aside indictment (unconstitutionality of statute" and "MIL to preclude testimony about violent acts by others")
N    4 defense trial motions (1) special requested charge no. 3 (re: anticipated definition), (2) motion to declare DP unconstitutional and other relief, (3) motion to declare the Texas capital sentencing scheme unconstitutional and to preclude imposition of the death penalty, (4) MIL character of complainant-victim impact
O    Pages 6, 8, 9 of guilt charge
P    Pages 2, 7 of punishment charge

### Defense Exhibits Filed with Amended Writ on 4/25/05

Q    Randy Halprin affidavit (3/14/05)
R    Edwin King affidavit (4/6/05) (also filed separately on 4/7/05)
S    Carey Pelto affidavit (4/8/05) (also filed separately on 4/8/05 and 5/6/05)

3007

**State's Exhibits Filed with Writ Response**

| | |
|---|---|
| A | U.S. Census 2002 report on Hispanic population |
| B | U.S. Census 2000 report on Race and Hispanic origin |
| C | Sample juror questionnaire |
| D | Affidavit of Chief Investigator Mike Bosillo |
| E | Affidavit of Investigator K.D. Adley and Anna Lester letters |
| F | Affidavit of Assistant District Attorney Toby Shook |
| H | State Bar information on Edwin H. King |
| I | Judicial Administrative Region's qualifications for capital defense trial counsel |
| J | Medical record regarding applicant's foot wound |
| K | Reporter's record expert from State v. William Earl Rayford |

---

**Evidence Filed After State Filed Its Response**

1. Whitman affidavit (signed 3/25/08, filed 3/28/08)
2. D'Amore interrogatories (signed & filed 8/1/08)
3. Wirskye interrogatories/affidavit (signed 7/30/08, filed 8/1/08)
4. Shook interrogatories (signed 7/30/08, filed 8/1/08)
5. Whitman interrogatories (signed 9/?/08, filed 9/30/08)
6. Ashford interrogatories (signed 5/11/10, filed 9/19/08)
7. Muhammad interrogatories (signed 9/19/08, no file stamp)
8. John Davis interrogatories (signed 10/23/08, filed 10/24/08)
9. Mike Scotten interrogatories (signed 10/24/08, filed 10/28/08)
10. Ray Cano interrogatories (signed 12/9/08, filed 12/10/08)

---

**5/22/08 and 5/23/08 Hearing Exhibits**

11. TDCJ record of Rodriguez/Halprin visitation **(State's M)**
12. Halprin's November 2007 online journal **(State's N)**
13. Patrick Murphy letter (re: confrontation between Murphy and other TX7 Co-defendant's) **(State's Q)**
14. Patrick Murphy letter to wife Rose (re: getting info to Halprin) **(State's T)**
15. George Rivas's letter to wife **(State's V)**
16. Michael Rodriguez affidavit (signed 5/5/07) **(Defense 1)**
17. George Rivas affidavit (signed 2/16/07) **(Defense 2)**
18. Patrick Murphy (signed 8/6/07) **(Defense 3)**

---

3008

**Evidence Filed by Defense Before 8/20/10 Hearing**

19.  Timothy Alan Black affidavit (signed 8/13/08, filed 7/9/10)
20.  Charles Eugene David affidavit (signed /13/08, filed 7/9/10)
21.  David Slocomb affidavit (signed 8/12/08, filed 7/9/10)
22.  George Reames Rogers affidavit (signed 8/14/08, filed 7/9/10)
23.  Bobby Mims affidavit (signed 6/29/10, filed 7/9/10)
24.  Robert Morrow affidavit (signed 7/1/10, filed 7/9/10) (with ranking doc & CCA opinion on Halprin direct appeal)
25.  Mindi Sternblitz affidavit (signed 7/24/10, filed 7/30/10)
26.  Wesley Halprin affidavit (signed 7/22/10, filed 7/30/10)
27.  Billy Waybourn affidavit (signed 7/22/10, filed 7/30/10)
28.  Marian Feld affidavit (signed 7/8/10, filed 7/30/10)
29.  Keith Howard Stern affidavit (signed 7/26/10, filed 7/30/10)
30.  Robin Conley affidavit (signed 7/26/10, filed 7/30/10)
31.  Michael Carter affidavit (signed 7/30/10, filed 8/16/10)

**8/20/10 Hearing Exhibits**

32.  Dr. Kelly Goodness's psychiatric evaluation report re: Halprin (dated 5/20/03) (with list of material received and instruments used) **(Defense 1)**
33.  Halprin's adoption records **(Defense 2)**
34.  SMU Death Penalty Project notebook (Fall 2001) **(State's M)**
35.  SMU Death Penalty Project notebook (Spring 2001) **(State's N)**
36.  Dr. Goodness's note to Edwin King (dated 6/13/08) **(State's O)**

**9/30/10 Hearing Exhibits**

37.  Letter from Bruce Anton to CCA (dated 8/31/04) with attached letter from Halprin (dated 7/21/04) **(State's P)**
38.  Defense's "List of Persons Involved in Ranking Document" with annotations Whitman made during hearing **(State's Q)**
39.  SO Woods 2/13/03 letter to Edwin King; 4 notes re: Wood's phone messages for King; Woods 6/11/03 letter to King w/bill **(State's R)**
40.  Trial Testimony excerpts (Moczygemba, Burgess, King, Woods, Mullen, Ashford, King) **(State's S)**
41.  TDPS Records (given to writ counsel by Whitman) **(Defense 4)**

3009

**Evidence Filed After 9/30/10 Hearing**

42. SO Woods interrogatories (signed 10/25/10, filed 10/26/10)
(along with (1) 3/31/03 letter from King to Woods; (2) defense trial motion/court order appointing SO Woods as defense expert; (3) King 5/8/03 letter to Woods with order appointing Woods as defense expert; (4) 1/26/05 letter from Gary Udashen to Woods with ranking document; (5) 2/7/05 letter from Udashen to Woods with ex parte order to provide Woods access to TDCJ records re: TX7; (6) 2/14/05 letter from Woods to Udashen re: billing; (7) 3/15/05 letter from Udashen to Woods (thank you))

**11/12/10 Hearing Exhibits**

43. Hammond Affidavit and accompanying CD containing recordings of seven of Halprin's 2010 jail phone calls (dated 11/12/10) (State's 1)
44. Halprin's web journal entry (dated 10/11/10) (State's 2)

**Evidence Filed After 11/12/10 Hearing**

45. Goodness affidavit (dated & filed 11/15/10) (along with (1) Dr. Melton psychiatric assessment [Bates stamped 2123-30] & (2) Dr. Cannon psychiatric report dated 1/21/97 [Bates stamped 1868-69])

**1/14/11 Recusal Hearing Exhibits**

46. Hammond Affidavit (State's 1) (same as affidavit filed at 11/12/10 hearing)
47. Halprin affidavit (State's 2) (same affidavit filed with writ application)

3010

NO. W01-00237-T(A)

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE CRIMINAL DISTRICT** |
| | § | |
| | § | **COURT NUMBER SEVEN** |
| | § | |
| **RANDY ETHAN HALPRIN** | § | **DALLAS COUNTY, TEXAS** |

### APPLICANT'S OBJECTIONS TO THE
### COURT OF CRIMINAL APPEALS CONSIDERING
### THE TRIAL COURT'S FINDINGS OF FACT
### AND CONCLUSIONS OF LAW

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES** the Applicant, RANDY ETHAN HALPRIN, and submits these

Objections to the Court of Criminal Appeals Considering the Trial Court's Findings of Fact

and Conclusions of Law and would show the Court the following:

### I.

### Applicable Law

Art. 11.071, Sect. 9(e) states:

> (e)     The parties shall file proposed findings of fact and conclusions of law
> for the convicting court to consider on or before a date set by the court that is
> not later than the 30th day after the date the transcript is filed.  If the court
> requests argument of counsel, after argument the court shall make written
> findings of fact that are necessary to resolve the previously unresolved facts
> and make conclusions of law not later than the 15th day after the date the
> parties file proposed findings or not later than the 45th day after the date the
> court reporter files the transcript, whichever occurs first.

Under this provision, the parties are allowed to submit proposed findings of fact and

conclusions of law for the convicting court to consider.  However, the convicting court is

required to make an independent determination of the facts and law and make its own

findings. It is not proper under 11.071 for the convicting court to abdicate its responsibility to make this independent determination and simply accept, adopt and copy the state's proposed findings.

## II.

## Argument

The trial of this case was presided over by Judge Vickers Cunningham, the presiding Judge of the 283rd Judicial District Court. Judge Cunningham left office and was replaced by Judge Becky Gregory. No action was taken on the writ application during the time period Judge Gregory presided over the court. Judge Gregory later left office and was replaced by Judge Rick Magnis. Judge Magnis presided over this matter for several years, including conducting several days of evidentiary hearings and presiding over depositions. He also heard argument from counsel on numerous occasions and reviewed the substantial pleadings filed in this case.

Unfortunately, Judge Magnis was recused from this case prior to entering any findings of fact or conclusions of law. The Administrative Judge appointed Judge Mike Snipes of Criminal District Court No. 7 of Dallas County to preside over this case.

The parties submitted proposed findings and on December 18, 2011, Judge Snipes signed Findings of Fact and Conclusions of Law.

An examination of the Proposed Findings of the Applicant and the state, as well as the Findings of Fact and Conclusions of Law signed by the trial court show the following:

1.    Applicant submitted 191 pages of proposed findings, with 775 individual proposed

findings.

2.    The state submitted 181 pages of proposed findings, with 1126 individual proposed findings.

3.    The trial court's Findings of Fact and Conclusions of Law were 166 pages long with 1104 individual findings.

4.    The trial court's Findings of Fact and Conclusions of Law did not accept or adopt a single one of Applicant's proposed findings.

5.    The trial court's Findings of Fact and Conclusions of Law, with some minor changes, are simply a verbatim adoption and copying of the state's findings.

6.    The following is a summary of the changes made by the court in the state's proposed findings prior to the trial court adopting and copying them.   The court eliminated the following findings proposed by the state:

37, 182, 247, 319, 329, 641, 646, 774, 787, 887, 891, 892, 893, 904, 918, 929,

1102, 1109

Thus, the trial court deleted 18 out of 1126 proposed findings submitted by the state. A comparison of the state's proposed findings and these signed by the trial court will show that the deleted findings were unnecessary to the conclusions to be reached and their deletion effected no substantive change in the state's findings.

The trial court also made other minor changes in some of the state's findings, such as changing some of the wording or combining some of the findings. The findings where these minor changes were made are,

Applicant's Objection to the Court of Criminal Appeals Considering the Trial Court's Findings of Fact and Conclusions of Law - Page 3

3003

38, 39, 47, 87, 95, 102, 138, 140, 195, 212, 221, 279, 284, 310, 445, 493, 595,

596, 601, 606, 627, 638, 725, 775, 809, 823, 838, 873, 881, 882, 885, 893,

896, 907, 908, 913, 914, 929, 930, 967, 975, 1029, 1080, 1081, 1082, 1085,

1087

While these changes may obscure the fact that the trial court simply copied the state's findings, a review of what changes were made show that these were not independent judicial findings. Typically, these changes are nothing more than removing duplicative sentences, and changing some words that do not change the meaning of the sentence. For the court's convenience in reviewing this, a copy of the Findings of Fact and Conclusions of Law signed by the trial court with handwritten notations of the changes made from the state's findings is attached to this document as Exhibit A.

In reality, the findings signed by the trial court are nothing more than the state's findings with a few minor changes. Going through the state's findings and making these minor changes, as the trial court did, does not make these independent judicial findings.

Moreover, upon a close examination of the trial court's findings, there is no indication that the trial court actually considered the voluminous record developed in this case prior to making these findings. This was a lengthy capital murder trial, followed by writ proceedings lasting years, where evidentiary hearings and depositions were held to develop the record. There are numerous complex and highly contentious issues raised. It is certainly unlikely that, upon a full and fair review of this writ record, the trial judge would find himself in such complete agreement with the state's position, on every detail of every issue as reflected in

Applicant's Objection to the Court of Criminal Appeals Considering the Trial Court's Findings of Fact and Conclusions of Law - Page 4

301-4

the findings.

The purpose of 11.071, as well as 11.07 of the Code of Criminal Procedure, is to standardize the procedure for review and determination of Applications for Writ of Habeas Corpus. The trial court plays a crucial role in this process. When the trial court simply accepts, adopts and copies the state's proposed findings, that duty has not been fulfilled.

Under 11.071, the Court of Criminal Appeals is the ultimate fact finder and arbiter of the law. Under the circumstances presented in this case, which sadly is replicated frequently by trial courts around the state, the trial court has not provided the Court of Criminal Appeals the assistance contemplated by the code in reaching an ultimate decision on this writ application. Nevertheless, the burden rests upon the Court of Criminal Appeals to make a final just and fair determination of the writ application and, when the trial court has failed in its responsibility, the Court of Criminal Appeals must, itself, perform all of the judicial review needed in order to make a correct determination of the issues in this case.

## CONCLUSION

Based on the foregoing, Applicant prays that the Court of Criminal Appeals reject the trial court's Findings of Fact and Conclusions of Law. Applicant prays that his right to a full and fair judicial review of his writ and allegations be preserved by the Court of Criminal Appeals, by completely reviewing this writ record and rendering findings and conclusions that are consistent with the record.

Respectfully submitted,

GARY A. UDASHEN
State Bar of Texas No. 20369590


BRUCE ANTON
State Bar of Texas No. 01274700


SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas  75201
214-468-8100
214-468-8104 fax

ATTORNEYS FOR APPLICANT


## CERTIFICATE OF SERVICE

On this 24 day of January, 2012, a true and correct copy of the foregoing Applicant's Objections to the Court of Criminal Appeals Considering the Trial Court's Findings of Fact and Conclusions of Law was delivered to Lisa Smith, Assistant District Attorney, 133 N. Riverfront Blvd., L.B. 19, Dallas, Texas 75207.


GARY A. UDASHEN


Applicant's Objection to the Court of Criminal Appeals Considering the Trial Court's Findings of Fact and Conclusions of Law - Page 6

3016

NO. W01-00237-T(A)

| EX PARTE | § | IN THE CRIMINAL DISTRICT |
| | § | |
| | § | COURT NUMBER SEVEN |
| | § | |
| RANDY ETHAN HALPRIN | § | DALLAS COUNTY, TEXAS |

**OBJECTIONS TO THE DISTRICT COURT'S
FINDINGS OF FACT AND CONCLUSIONS OF LAW
(DEATH PENALTY CASE)**

**TO THE HONORABLE JUDGES OF SAID COURT:**

COMES NOW RANDY ETHAN HALPRIN, by and through undersigned counsel, and files these Objections to the District Court's Findings of Fact and Conclusions of Law and would show as follows:

### SUBSEQUENT WRITS

The Court finds that Applicant's Amended Application for Writ of Habeas Corpus Pursuant to Art. 11.071 Tex. Code Crim. Proc., along with Applicant's subsequent pleadings constitute a subsequent application under article 11.071, section 5. The aforementioned pleadings were filed after the original application was due on April 7, 2005. However, the pleadings raise the very claims alleged in the original writ application and are therefore not subsequent applications. The pleadings relate back to the original application and are in accord with the cases originally cited. *See* Court's Findings 9-13. Therefore, the District Court is incorrect in its conclusion that the subsequent pleadings are subject to Article 11.071, Section 5(f) of the Code of Criminal Procedure.

3017

## GROUNDS 1 & 30: ENMUND/TISON

These issues have been addressed in separately filed objections.

## GROUND 2: ACTUAL INNOCENCE

The court found that *Schlup v. Delo*, 513 U.S. 298 (1995), is not applicable, stating that Applicant's claim of actual innocence is substantive in nature and governed by the standard set forth in *Herrera v. Collins*, 506 U.S. 390, 435 (1993). The court relies on *Ex parte Thompson*, 153 S.W.3d 416 (Tex.Crim.App.,2005) to find that Applicant failed to meet the burden of proof showing that "newly discovered evidence unquestionably establishes his innocence." Court Findings 72-77.

Contrary to the court's findings, there exists new evidence which was specifically detailed in Applicant's pleadings in accordance with *Schlup*, 513 U.S. at 314. As the State acknowledged, Halprin has identified new evidence in support of his actual innocence. *See* State's Findings of Fact and Conclusions of Law (83). The evidence in support of the ranking document is new evidence since the State concealed this material evidence which detailed Halprin's role in the offense and therefore made him ineligible for the death penalty.

It was not until the discovery process was permitted that the identities of the individuals interviewed and their statements used in preparation for the Ranking Document were revealed. Such information did not come about with ease, but after an engaging process without the State's assistance. The discovery indicates that Sgt. Investigator Hank Whitman ("Whitman") of the Texas Department of Public Safety Special Crimes Division authored this document and that had the State performed a thorough investigation, the identities of the author and the parties interviewed would have been apparent. *See Carey v. Duckworth*, 738

3018

F.2d 875 (7th Cir. 1984) (stating prosecution cannot evade *Brady* requirements by keeping itself ignorant of information). Since these identities and statements had never been revealed and were crucial to the determination of how culpable Halprin was and how likely it was that he fired a weapon, it should be considered new evidence. Furthermore, the discovery revealed that Halprin had no planning or leadership role and was a passive and submissive person. Therefore, there is no question that Halprin is entitled to habeas relief.

Halprin has presented evidence which is critical to his innocence and the court has failed to acknowledge that said evidence warrants further inquiry. According to Section 5 of Article 11.071 of the Code of Criminal Procedure, a court may not consider a subsequent claim unless it is established that the factual or legal basis for the claim was unavailable on the date of the previous application. Such is the case here. *See* Tex. Code Crim. Pro. art. 1.071 §5(a)(1); *see also Ex parte Staley*, 160 S.W.3d 56, 62 (Tex. Crim. App. 2005).

Furthermore, the District Court's finding that the aforementioned evidence was available to Halprin at the time of trial is not supported by the record. Court's Finding 86. The court found hat because Halprin's prison expert, S.O. Woods, had access to the evidence in question prior to trial that there is no "new" evidence. However, as argued in Halprin's *Brady* claim this evidence was not accessible prior to trial and the State made no effort to disclose the identities of the individuals involved with the Ranking Document. In fact, the record actually shows that the state made efforts to ensure that Halprin would not discover the identity of the author of the ranking document.

## GROUND 3: *BRADY* CLAIM

Other objections have been filed dealing with this issue. These objections are in

3019

addition to the other objections. The State has concealed evidence and incorrectly required the defense to discover said evidence. Now, the District Court finds that this does not constitute a violation of Halprin's due process rights. Such a finding is improper under the facts and law. *Banks v. Dretke*, 540 U.S. 668 (2004).

The instant matter establishes either ineffective assistance of counsel in defense counsel failing to discover the information or suppression of exculpatory evidence based on the state's suppression of the information. The court cannot find that neither one is established.

## I. STATE'S KNOWLEDGE OF EVIDENCE

### A. Author of Ranking Document & Rivas/Dunning Interview Statements

The court found that until the instant writ proceedings, the prosecutors who participated in Halprin's trial were not aware that Sgt. Whitman participated in the preparation of the ranking document. Court Findings (102). The court also found that the prosecutors did not attempt to hide Whitman's identity as the author of Exhibit 39 from Halprin's trial counsel. *Id.* This finding is inconsistent with the court's subsequent conclusion of law that "the State is responsible for disclosing favorable evidence known by its agents, including law enforcement officials and others working on their behalf, even if the particular evidence is not known to the prosecuting attorney." Court Findings (103).

The court is correct in its finding that the law enforcement officers who participated in the preparation of the ranking document were, for all intents and purposes, agents of the State and a part of the prosecution team. Court Findings (105). However, what is not correct is the court's determination that none of the prosecution team knew that Whitman prepared

3020

the document. On its face, this appears to be a correct finding, but in reality it is a mere technicality that cannot be upheld. The prosecution team was not aware of the author of the document by choice, not because the information was not available. It defies common sense and the practice of law to build proof on a document produced by an unknown author who gleaned information from unknown sources. In essence, this was the position of the prosecution team and such duplicitous practices should not be upheld.

It was necessary to introduce Exhibit 39 during the punishment phase of Halprin's trial as it would have likely inhibited the jury from imposing the death penalty. Therefore, the District Court is incorrect in its finding as not only was the concealment a *Brady* violation, but the evidence was relevant and crucial to Halprin's defense.

## B. Statements of Former Fellow Inmates

The court incorrectly found that Halprin failed to show that the State was aware of the information provided by his former fellow inmates prior to his trial.[1] Court Findings (107). The information provided in the interviews was available to the Texas Department of Criminal Justice - Inspector General. *See* S. O. Woods Affidavit and Certified Record from the Texas Department of Criminal Justice - Office of Inspector General.

The court found that, with the exception of Slocomb, none of Halprin's former fellow inmates stated that they provided any of the information contained in their affidavits to law enforcement or any other member of the prosecution team. Court Finding (110). However, the court is relying on the assumption that none of the inmates relayed the information to the

---

[1] The former fellow inmates include Michael Carter, Timothy Alan Black, Charles Eugene David, David Slocomb, and George Reames Rogers.

3021

prosecution team prior to trial. There is no evidence supporting this finding.

## II. TDCJ-OIG FAILED TO DISCLOSE DOCUMENTS BEFORE TRIAL

The court found that the Rivas interview transcript, the Dunning interview summary, and the documents relied on by Halprin's expert, S.O. Woods, revealed Whitman's identity and were in the possession of TDCJ-OIG before Halprin's trial. Court Findings (114). However, this finding fails to take into consideration the fact that the State attempted to secrete Whitman's identity. A review of the discovery material provided to the defense by the State indicates that someone associated with the State took apart documents which were intended to be together and spread them throughout the discovery documents. Such attempts to obstruct the defense in preparing for trial cannot be upheld. Therefore, finding that the State disclosed the complained of documentation prior to trial is without support when the authorship, a vital piece of information, has been concealed and made nearly impossible to discover. The defense should not have to fight against such unjust odds.

## III. EVIDENCE IS MATERIAL

Contrary to the District Court's findings, the statements of Rivas, Dunning, Carter, Black, Slocomb, David and Rogers constituted material evidence which would have likely caused a different result had they been admitted. Court Findings (120-21). Halprin stands on his contention raised below and the following.

### A. Evidence Was Admissible

The court found that Halprin failed to prove that identifying Whitman as the author of the the ranking document would have rendered it admissible under the business or public records exception to the hearsay rule. Court Findings (130). However, as determined by the

3022

trial court, Exhibit 39 is clearly a TDCJ document, "[n]o question about its authenticity." (RR 53, p. 12-16). It can be assumed that the protocol of law enforcement after an escape is to glean information for all who may have encountered the escapees.

Had the State provided the defense with the name of the author of Exhibit 39, the defense would have been provided with a sponsoring witness for the document, one who could testify to the conclusions made. The trial court never fully addressed whether the document was a business record, but stated that it "may" be a business record. (RR 53, p. 16). Whitman could not have testified to the truth of the statements given during the interviews, but he could have testified to his own conclusions drawn from the interviews.

The court also found that the statements of Rivas, Dunning, Carter, Black, Slocomb, David and Rogers amounted to inadmissible hearsay because their statements would have been offered for the truth the assertion that Halprin was the weakest member of the Texas Seven. Court Findings (139-140). The court further found that there was no proof that these individuals, except Rivas, would have testified to the same information at trial or that they would have testified at all. Court Findings (141).

The court has failed to consider the fact that the aforementioned statements were highly significant to the determination of whether Halprin should be sentenced to death and the U. S. Constitution, amends. VIII and XIV require their admission.

### B. The Evidence is Significant and Not Cumulative

The State's actions in concealing the pertinent information surrounding the ranking document is evidence of its relevance. Although the court found that the information

3023

contained in the documents was before the jury by other means, this conclusion is contrary to the record.  Court Findings (143).

Furthermore, the court's finding that Halprin's trial counsel "repeatedly injected this information [from the ranking document] into his questions before the jury," does not automatically translate into the jury being aware of its nature and contents.  Court Findings (152).  The court is relying on questions asked by Halprin's trial attorney, which was not part of the evidence before the jury. *See Johnston v. State*, 230 S.W.3d 450, 456 n. 6 (Tex. App. - Fort Worth 2007, no pet.)(question regarding statement posed by defense counsel not included in court's analysis); *Kercho v. State*, 948 S.W.2d 34, 37 (Tex. App. - Houston [14th Dist.] 1997, pet. ref'd)(citing *Sendejo v. State*, 841 S.W.2d 856, 859 (Tex. App. - Corpus Christi 1992, no pet.)("Questions do not amount to evidence.").  Exhibit 39 was not admitted and therefore any attempts to place the contents of the document before the jury would have failed as a jury is instructed to disregard anything not admitted into evidence, particularly when an objection is sustained.  On appeal, and in this writ, Halprin cannot use these questions as proof of his role in the offense and the state is likewise prohibited from relying upon them.  In no way do unanswered questions minimize the harm.

Therefore the court's finding that the jury's guilty verdict and its answers to the special issues is strongly supported by the record is incorrect.  Without the ranking document, confidence in the jury's verdict has been undermined.  As a result, Halprin is entitled to relief since a constitutional violation did occur and he was denied due process of law.

## GROUNDS 4 & 5: EFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Other objections have been filed concerning this issue.  These objections are in

3024

addition to the other objections. Halprin has proved that his trial counsel's performance fell below that of a reasonable trial strategy and as a result, Halprin suffered prejudice and ineffective assistance of counsel.

## I. QUALIFICATIONS OF TRIAL COUNSEL

The court correctly recites the qualifications of trial counsel Edwin King and George Ashford. Court Findings (172-75). Nevertheless, even good lawyers can be ineffective and there is no doubt that this case reveals that trial counsel was ineffective.

## II. INEFFECTIVE ASSISTANCE IN GUILT PHASE

The court found that the statements given by Newbury, Rivas, and Murphy were not self-inculpatory, but blame shifting and lacked trustworthiness. Court Findings (185-87). However, simply because the individuals were in custody at the time of their statements does not automatically warrant a finding of untrustworthiness. The court concludes that all statements given by the co-defendants were unreliable; however, these are the same statements relied on by the court to support its subsequent findings. Court's Findings (192).

The court admits that Detective Graham and the FBI agents could have authenticated the exhibits in question. Court Findings (180). Therefore, trial counsel was ineffective for not properly bringing the evidence before the jury as it was admissible. These statements were crucial to Halprin's defense in that they established that he was a reluctant participant in the conspiracy, did not fire his weapon, and had an avowed aversion to the use of firearms.

The court relies on *Mendez v. State*, 56 S.W.3d 880, 887, 889 (Tex.App.– Austin 2001), to find that the statements were not reliable. It is particularly peculiar that the statement given by Rivas was deemed to be against his penal interests in his own trial, but

3025

was not deemed so in Halprin's trial. However, *Mendez* actually supports the admission of the co-defendants' statements. In *Mendez*, the appellate court reversed the conviction and noted that the co-defendant's statement was unreliable, self-serving and blame shifting when the statement was admitted as result of the co-defendant not answering questions when called as a witness. *Id.* There is no rhyme or reason to the court's finding in the instant case that a co-defendant's confession of guilt can be admissible at his own trial, but becomes inadmissible at the defendant's trial. The court cites to no authority which permits such a commons sense contradiction in fairness.

As argued below, the oral statements made by Halprin's co-defendants should have been admitted under Rule of Evidence 803(24). There can be no substitution for appropriately calling a witness, not even "leading and artfully worded questions." Court Findings (195). Such a finding assumes that the jury did not follow the charge to disregard any information not admitted into evidence. The court also found that had Detective Graham testified that he "*may* have testified to what was written in his report, but he may also have testified to its inaccuracies." Court Findings (201). The court concluded that such testimony would have been detrimental to Halprin. However, how the jury would have weighed the evidence is not part of the *Strickland* analysis for ineffective assistance of counsel.[2] *See Melancon v. State*, 66 S.W.3d 375, 399 (Tex. App . Houston [14 Dist.] 2001)("The Supreme Court has explained that the 'reasonable probability' standard under the second prong is not an 'outcome-determinative' test: that is, a defendant need not show that it is more probable

---

[2] *Strickland v. Washington*, 466 U.S. 668 (1984).

Applicant's Objections to the District Court's Findings of Fact and Conclusions of Law (Death Penalty Case) - Page 10

than not that the jury would have arrived at a different verdict had the errors not occurred.)(citing *Strickland*, 466 U.S. at 693; *Snow v. State*, 697 S.W.2d 663, 668 (Tex.App. Houston [1st Dist].1985) pet. dism'd 794 S.W.2d 371 (Tex. Crim. App. 1987) ("A probability may be reasonable even though it does not constitute a preponderance of the evidence.").

In the same way, the court excuses counsel's failure to call witnesses by finding that he was subsequently permitted to make a closing argument in Halprin's favor. Such reasoning is again without merit as a closing argument is not part of evidence.

Finally, the court found that the statements would have been cumulative. Court Findings (212). The court found that the co-defendants' statements would not have changed the outcome of the trial. Court Findings (219, 222, 223). Again, a determination of ineffective assistance of counsel is not dependant on a favorable outcome at trial. *See Nealy v. Cabana*, 764 F.2d 1173, 1178–1179 (5th Cir. 1985) (The Supreme Court found the "outcome determinative" standard was too heavy a burden on defendants and that its use was not appropriate).

## B. Evidence of Applicant's Foot Wood

The court found that defense counsel did introduce evidence regarding Halprin's foot wound. Court Findings 229. However the instant case does not involve a question of strategic preference, but one of ineffectiveness. Once again, the court relies on an incorrect *Strickland* standard. Court Findings (245). The court concluded that Halprin failed to prove that the result of the proceeding would have been different. *See Melancon*, supra.; *Nealy*, supra. Defense counsel's decision not to present Dr. Pelto's testimony denied Halprin effective assistance of counsel.

3027

## C. Victim Impact Evidence

The court found that Jayne Hawkins, the victim's mother, did not testify about the crime, its emotional impact on her or about her son's character. Court Findings (259-260). Therefore, the court concluded that Halprin's trial counsel had no reason to object to her testimony and that any failure to do so was a strategic decision. Court Findings (261-63). The court implies that because Ms. Hawkins testimony only encompassed eight pages of the voluminous transcripts that it somehow carries less weight. Court Findings (270). The fact that the State improperly relied on this testimony makes plain its impact on the guilt-phase of the trial. (RR50:76). The presentation of Ms. Hawkins testimony and the State's final argument improperly tugged at the emotions of the jury and caused the jury to abandon their objectivity and determine Halprin's guilt in an irrational way. Therefore, Halprin was denied effective assistance of counsel by his trial counsel's failure to object to the testimony and closing argument and he suffered great prejudice.

## D. Felony-Murder Instruction

The court found that Halprin failed to rebut the presumption that his trial counsel's decision not to request a lesser-included offense instruction on felony-murder constituted sound strategy. Court Findings (283). Contrary to the court's theory, an instruction on an applicable lesser-included offense would not have contradicted Halprin's defensive theory. Court Findings (295).

Halprin was legally entitled to the instruction on the lesser included offense of felony murder. The testimony and statement of Rivas clearly indicate that he did not intend to kill the officer. (Application, pp. 81-82)(Defense Ex. 26). Such evidence entitled Halprin to the

3028

lesser-included instruction. Halprin was therefore entitled to the instruction.

The record makes clear the fact that Halprin's trial counsel did not request the lesser-included instruction of felony murder because he did not believe he was entitled to it. The failure to understand the law has never been considered a trial strategy. Furthermore, the court's reasoning that such an instruction would contradict the defensive theory defies common sense. The fact that an officer was killed during the robbery in a manner that Halprin could not and did not anticipate, is not inconsistent with an aggravated robbery or the felony/murder rule.

Furthermore, Halprin's trial attorney requested instructions on attempted capital murder and attempted murder. Court Findings 302. These are the requests which contradict the defensive theory. Trial counsel would have to argue for an attempted murder instruction while his client denied any intent to kill. It is plain to see that Halprin's trial counsel did not request the instruction because he misunderstood the law, not because of a trial strategy.

### E. Impeachment and Character Evidence

The court found that Halprin received proper notice of the letters used during the State's cross-examination and concluded that any objection regarding notice would have been meritless. Court Findings (331-32). A document dump however, fails to constitute fair notice. Contrary to these findings, this Court should not condone a discovery practice in which the State presents the defense with a haystack and faults the defense for not finding the needles within. As such, an objection to the use of the letters would have been viable.

Furthermore, the testimony given by Halprin was not impeachable. Halprin admitted that he had lied in the past on direct examination and therefore could not be impeached by

3029

the lies contained in the letters. If anything, the letters were cumulative evidence that should have been excluded.

The court also finds that Halprin put his general character into issue in the guilt phase of trial in order to advance his defensive theory that he was the weakest amongst the group. Court Findings (335). However, this finding misstates the law of Rule of Evidence 405(a), which addresses a defendant placing his "good" character into issue. Here, the court has not cited to any reference to Halprin placing his "good" character into issue.

Furthermore, the court is incorrect in its finding that Halprin placed his character for veracity in issue when he decided to testify. The court relies on *Sanchez v. State*, 707 S.W.2d 575 (Tex. Crim. App. 1986), however, *Sanchez* addressed impeachment of a defendant with the use of his post-arrest silence. *Id. Sanchez* is wholly distinguishable from the instant case and therefore inapplicable.

Here, the State went beyond the permissible question of Halprin's opinion regarding his own reputation for truth and veracity. Once that opinion is rendered, the State cannot then bootstrap the answer to open the door on cross to inadmissible extraneous bad acts. The State focused its cross examination on letters Halprin wrote that have nothing to do with the escape or charged offense. While the court found that Halprin had not admitted to being a liar (341), it also found that he had lied to his family and law enforcement officials in the past. Court Findings (344). Such findings are clearly contradictory. As found by the court, Halprin's direct examination made it clear that Halprin had lied on prior occasions; therefore, the subsequent finding that Halprin's direct examination created a false impression about his

3030

character for truthfulness and non-violence is not substantiated by the record.

There could have been no strategic decision not to object to the impermissible line of questioning. There exist no justification for the State to use prior specific instances of conduct to rebut a false impression that was never created by Halprin's testimony. Therefore, the court's reliance on *Pyles v. State*, 755 S.W.2d 98 (Tex. Crim. App. 1988) is misplaced. In light of the fact that the bulk of the cross-examination of Halprin related to improper impeachment character evidence, the harm is manifest, far outweighing any "bad impression" the jury may have been left with. Court Findings (350). In the same way, the failure to request a limiting instruction created undue prejudice which cannot be overcome by the slim possibility that it would negatively highlight the evidence before the jury. Contrary to the court's finding, the evidence encouraged the jury to convict Halprin on "the perception of a past pattern of conduct, instead of on the facts of the charged offense." *Theus v. State*, 845 S.W.2d 874, 881 (Tex. Crim. App. 1992). In fact, the evidence went to the heart of the issue of whether Halprin was a shooter or whether he should have anticipated that someone would get killed.

## F. General Verdict

The court found that *Kitchens v. State*, 823 S.W.2d 256 (Tex. Crim. App. 1991) applied at the time of Halprin's trial, instead of *Ngo v. State*, 175 S.W.3d 738 (Tex. Crim. App. 2005). Court Findings (413-14). Regardless of these findings, Halprin was entitled under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, as well as article 1, §§10, 13 and 19 and article 5, § 13 of the Texas Constitution to a unanimous guilty verdict. Therefore, error exists as the jury was permitted to convict Halprin as the

3031

shooter or based on his involvement. Such theories precluded, without any objection from the defense, a unanimous agreement on the act of which Halprin was guilty.

The failure of defense counsel to object to the jury instructions and prosecutor's argument satisfies the *Strickland* test. The law in the jury instructions was incorrect, and the prosecution relied upon it in their pursuit of a guilty verdict. The evidence in this case was not strong on any act argued by the State. No evidence existed that Halprin was a shooter, and no evidence that he should have anticipated that a killing would occur. Under these circumstances, confidence in the outcome of this case is directly undermined.

## III.  COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN THE PUNISHMENT PHASE

Other objections have been filed on this issue. These objections are in addition to those other objections. The court found that trial counsel's performance in the punishment phase was not constitutionally deficient. Court Findings (445).

### A.  Prosecutors' Voir Dire Remarks

This issue is dealt with in other separately filed objections that discuss the *Enmund/Tison* issue.

### B.  Dr. Kelly Goodness

The court found that trial counsel's efforts to present Dr. Kelly Goodness' hearsay testimony regarding the data on which she relied to form her opinion was not deficient and that the omission did not have any bearing on the outcome of Halprin's trial. Finding (463).

As detailed in previously filed briefs, Halprin was not permitted to present all of the

existing mitigating evidence, the prejudicial effect of the omitted evidence, and the lack of a trial strategy to justify the omission. These briefs are incorporated herein.

Dr. Goodness would have provided pertinent testimony regarding the abuse and neglect that Halprin suffered as a young child in the care of his biological parents, his placement in foster care, his psychological problems which were not properly treated, and his learning disabilities which were not properly treated. The court somehow assumes that Halprin desired to offer evidence that highlighted his adoptive parents' mistakes in child-rearing; however, this is clearly not the case. Court Findings (466). Dr. Goodness specifically stated that she was not testifying that Dan and Patricia Halprin were bad parents. RR53:35, 38.

The court incorrectly found that the trial court conducted a proper balancing test under rule 705(d). *See* Tex. R. Evid. 705; Court Findings (471). However, contrary to rule 705(d), the trial court made a blanket prohibition against hearsay. Rule 705(a) allows the expert to disclose the basis for her opinion on direct examination. The only limitation is a finding by the court that the evidence is unfairly prejudicial or a danger exists that it will be used for an improper purpose. Furthermore, the Texas Rules of Evidence provide that an expert may base his opinion upon facts or data that are not admissible in evidence if they are of a type reasonably relied upon by experts in the particular field. Tex. R. Evid. 703; *Morris v. State*, 123 S.W.3d 425, 428 (Tex.App. - San Antonio, 2003, pet. ref'd.). Had the trial court conducted a proper balancing test, it would have considered adoption, school, cps, court, and jail records which would have resulted in a determination in Halprin's favor.

3033

The court also concluded that the probative value of the hearsay far outweighed any prejudicial effect; therefore, any objection by trial counsel would have been meritless. Court Findings (474). Furthermore, the court relies on *Valle v. State*, 109 S.W.3d 500, 506 (Tex. Crim. App. 2003), to support its finding that any probative value of the hearsay was negligible, while the risk that it would be improperly used as substantive evidence was substantial. Court Findings (479). Although, *Valle* pronounced that the trial court acted within its discretion in excluding Valle's mother's hearsay statements to the defense expert regarding her medical problems, Valle's difficulties in TYC, his desire to leave Cuba, his lack of legal difficulties in Cuba, and abuse he suffered at hands of his stepfather, the language must be read in context. Valle tried to admit his mother's videotaped interview at trial without the mother being present. It was that procedure that was objectionable.

In the same way, in *Walck v. State*, 943 S.W.2d 544, 545-546 (Tex. App .- Eastland 1997, pet ref'd), a murder case, the defense called Dr. Mark Cunningham who attempted to relate defendant's version of the murder to support his opinion that defendant committed murder under sudden passion from adequate cause. This testimony was struck as self-serving from defendant, who did not testify. Further, there, the trial court performed a proper 705 balancing test.

Neither of the aforementioned cases relied on by the court support the wholesale exclusions undertaken here. Trial counsel could have remedied any hearsay issues by introducing the records and calling witnesses to substantiate the records.

The court finds that the testimony of Chief Waybourn was procedurally barred as a

3034

subsequent writ application.  Court Findings (506).  Again, there is no authority for this proposition, and as set out above, the State is attempting to argue that discovery in a writ application is pointless because it can't be used.  Such is not the law.

As acknowledged by the court, the jury did not receive evidence concerning the specific nature of the abuse Halprin suffered and the fact that he was abandoned and placed in foster care before his adoption.  This evidence, along with the other aforementioned testimony would have altered Halprin's sentence.   Court Findings (522).  Trial counsel's presentation of mitigating evidence was constitutionally deficient.

### C. Codefendants' Testimony

Again, the court incorrectly finds that portions of this argument are procedurally barred; however, the court provides no authority which bars the discovery process.  Court Findings (537).  The court found that the Halprin failed to prove that his trial counsel was deficient in not calling his co-defendants George Rivas, Patrick Murphy and Michael Rodriguez.  Court Findings (538).  The court also finds that Murphy and Rodriguez did not show a willingness to testify.   Court Findings (539).

The court incorrectly concludes that Rodriguez and Murphy would not have testified on Halprin's behalf.  Court Findings (543).  However, the testimony of Halprin's co-defendant was pertinent as they provided insight into Halprin's role and they were willing to testify.  Such evidence was far from cumulative.  Without even speaking with the co-defendants or conducting an adequate investigation, trial counsel made an unreasonable strategic decision not to call them.  Such deficiency resulted in prejudice and a violation of Halprin's constitutional right to effective assistance of counsel. *Williams v. Taylor*, 529 U.S.

362 (U.S. 2000)(Defendant was denied his constitutionally guaranteed right to effective assistance of counsel when his attorneys failed to investigate and present substantial mitigating evidence during sentencing phase of capital murder trial).

### D. Sponsoring Witness for Ranking Document

As argued in Halprin's *Brady* claim, identifying Whitman as the author of the ranking document was highly relevant to his trial. Therefore, it follows that trial counsel was ineffective for not providing a sponsoring witness for the ranking document. As previously argued, exclusion of the ranking document was prejudicial, therefore, trial counsel's failure to identify and subpoena Whitman was not reasonable.

### E. Anti-Parties Instruction

The court found that it was reasonable for trial counsel not to request an "anti-parties" instruction during the punishment phase. Court Findings (583). Although the trial court provided an instruction in accordance with article 37.071, section 2(b)(2) of the Code of Criminal Procedure, this cannot be counted as an "anti-parties" charge. Therefore, it remains that trial counsel was ineffective for not requesting the charge and that prejudice resulted because it shored up the possibility that the jury convicted Halprin based on the anticipation of other members in the group. *See Buehl v. Vaughn,* 166 F.3d 163, 169-70 (3rd Cir. 1999) (stating that failure to request limiting instruction was a "serious lapse in . . . assistance").

### F. Prosecutor's Closing Argument

These issues are addressed in a separate document that discusses the *Enmund/Tison* argument.

## G. Advice on Applicant's Right to Testify

Contrary to the court's findings, Halprin was not properly advised of his right to testify during the punishment phase. Court Findings (620). The court assumes that Halprin was admonished by trial counsel; however, the record does not support this assumption. While the court attempts to extend the trial counsel's admonishment during the guilt phase, the truth is that there is no proof that Halprin was aware that he had a right to testify during the punishment phase. Court Findings 627. Accordingly, Halprin was denied the effective assistance of counsel and suffered great prejudice from his inability to testify from his perspective. Halprin could have provided additional evidence regarding his upbringing that was not before the jury due to limitations on the testimony of Dr. Goodness. Such a result had a grave impact on Halprin's sentence.

## GROUND 6: EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Other objections have been filed on these issues. These objections are in addition to those objections. The court finds that Halprin failed to prove that the claims against appellate counsel are without merit and would not have resulted in reversal.

### I. QUALIFICATIONS OF APPELLATE COUNSEL

Although the court finds that Halprin did not object to his appellate counsel at the time of appointment, this does not mean that a subsequent ineffectiveness claim cannot be raised. Court Findings (648).

### II. COUNSEL RENDERED INEFFECTIVE ASSISTANCE ON APPEAL

#### A. Exclusion of Rodriguez's Letter

The court found that appellate counsel was not ineffective in the failure to challenge

3037

the trial court's exclusion of the letter written by Michael Rodriguez to his brother.   Court Findings (668). However, this was a viable issue that appellate counsel, to Halprin's detriment, failed to raise.

The letter written by Rodriguez was not intended for public disclosure. Therefore, the court's finding that Rodriguez's letter was not trustworthy is unfounded. Court Findings (661). Rodriguez's statement is against penal interest. He admits intentionally shooting at the officer but simply says he thinks he missed.

The court confuses the issue, which was whether there was any merit to the argument that Rodriguez's letter supported the contention that Halprin did not fire a shot. If Halprin did not fire a shot, the State's proof under special issue number two is significantly weakened.

## B. Suppression Claims

The court finds that Halprin received the appropriate warnings and agreed to speak to the officers without counsel.   Court Findings (679).   However, the court also acknowledges the uncertainty surrounding whether an attorney was attempting to meet with Halprin prior to his confession. Court Findings (676). Such information supported a viable appellate issue that should have been pursued by appellate counsel.  Thus, Halprin was deprived of his constitutional right to effective assistance of counsel.

## C. INSTRUCTION DEFINING "ANTICIPATE"

This issue is addressed in separately filed objections that address the *Enmund/Tison* issue.

3038

## D. EVIDENCE OF OTHER PRISON ESCAPES

The prejudicial effect of this testimony far outweighed any probative value. While the testimony did not involve Halprin personally, it was still inappropriate as Halprin had a very minimal role, if any, in the planning process of the escape. Therefore, while he might join an escape as a follower, he was no independent risk of flight. The trial court incorrectly determined that the probative value of the evidence of other unrelated prison escapes outweighed the resulting prejudice. (RR 51, pp. 94-95). As such, appellate counsel rendered ineffective assistance in not raising it.

## E. "THE TEN COMMANDMENTS OF SPEC WAR" EXHIBIT

The court finds that the document recovered inside and outside the RV, "The Ten Commandments of Spec War," was relevant to establish the intent of the other members of the Texas Seven. Court Findings (804-05). However, appellate counsel should have argued that the admission of the document deprived Halprin of a fair trial as the document had nothing to do with Halprin's intent. These statements were never shown to be adopted or endorsed by Halprin, but were still used to prove his homicidal intent. Such use should have been challenged and appellate counsel was ineffective for overlooking this issue.

## F. EXCLUSION OF DR. GOODNESS'S TESTIMONY

The court finds that this argument, which is merely additional briefing on the issue of the exclusion of the mitigation evidence, constitutes a new claim. Finding (819). Such a finding is incorrect and Halprin is not procedurally barred since it does not constitute a subsequent writ application.

As previously argued, the exclusion of Dr. Goodness's testimony was a violation of

3039

Halprin's Eighth Amendment right to present quality mitigation evidence. Therefore, appellate counsel was ineffective for not raising this claim.

## G. ADMISSIBILITY OF DEFENSE EXHIBIT 39

As previously argued, exhibit 39 was a highly critical piece of evidence that unequivocally demonstrated the significantly diminished culpability Halprin possessed in connection with the other escapees. Therefore, the courts's finding that this evidence is cumulative in nature and would not have altered the outcome is incorrect. Findings (837, 843).

## H. ENMUND/TISON & SECOND SPECIAL ISSUE SUFFICIENCY CLAIMS

These issues are covered in separately filed objections.

## GROUNDS 7 & 8: "FALSE IMPRESSION" & CONTRADICTORY THEORIES

The State intentionally led the jury to believe that Rodriguez did not shoot when the State well-knew, from the trial of Micheal Rodriguez, that he had admitted to shooting at the officer. (RR 42, p. 103; RR 50, p.60). Therefore, the court is incorrect in its finding that there was no conflict between the trials of Rodriquez and Halprin. Finding (885).

## GROUNDS 9-12: FAIR CROSS-SECTION

The court hangs its findings on the exclusion of non-citizens from jury duty. Finding (922). As shown in Halprin's previous arguments, Hispanics are under represented on Dallas County venires in such a way that violates the Sixth Amendment. Halprin stands on his previous arguments.

## GROUNDS 13 & 14: BURDEN OF PROOF ON MITIGATION SPECIAL ISSUE

The court finds that Halprin has failed to prove any constitutional violation. Court

3040

Finding (965). This finding is based on the current "mitigation" special issue in Texas, the precise issue challenged by Halprin. (C:I, 259). As noted by the court, attacks on this issue have not survived. Court Finding (968). However, the court is incorrect in its reading of *Ring* and *Arizona*, which requires the State to bear the burden of proving beyond a reasonable doubt that the mitigation issue should be answered negatively. Because the mitigation special issue fails to require that the State prove lack of sufficient mitigation beyond a reasonable doubt, the Texas death penalty scheme violates the Due Process Clause of the United States Constitution. U.S. CONST., amends. VIII and XIV.

### GROUNDS 15 & 16: 10/12 RULE

The court finds that the Texas 10/12 rule is constitutionally sound. Finding (988). However, Halprin incorporates his previous arguments to support the contention that this finding is incorrect. The 10/12 rule fails to dispel a juror from his/her "majority rules" mentality and creates the likelihood that a juror who believed that Halprin should have received a life sentence felt obligated to sentence him to death. *See Mills* v. *Maryland,* 486 U.S. 367, 383, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384, - (1988) ("common sense. . . suggest[s] that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation [citation omitted] unless they are expressly instructed to do so.").

### GROUND 17: PROPORTIONALITY REVIEW OF DEATH PENALTY

If there were ever a case which called for the Court to review the proportionality of the death penalty, it is the instant case. As previously acknowledged, the Courts are not required to conduct a review, but Halprin, relying on the unique set of facts in his case, urges

3041

that his Fourteenth Amendment Due Process right requires such an appellate review. In light of the circumstances, Halprin's sentence is disproportionate and excessive.

## GROUND 18: DEFINITION OF MITIGATING EVIDENCE

Halprin relies on his previous argument to support the contention that the statutory definition of "mitigating evidence," violates the Eighth and Fourteenth Amendments to the United States Constitution. As the definition currently stands, it prohibits an individual juror from considering a mitigating factor, regardless of whether other members of the jury agree as to its existence. *Mills v. Marvland*, 486 U.S. 367 (1988); *McKov v. North Carolina*, 494 U.S. 433 (1990) (each juror must be permitted to consider and give effect to mitigating evidence). Such a violation of Halprin's constitutional right must not be upheld.

## GROUND 20: UNDEFINED PUNISHMENT TERMS

Halprin relies on his previous argument to object to the court's finding that the terms "probability," "criminal acts of violence," and "continuing threat to society" do not require special definitions. Court Finding (1038). It would be a grave mistake to uphold a verdict that is the result of vague terms which fail to provide any uniform guidance in how to apply terms crucial to the decision to impose the ultimate sentence. Therefore, it is time for this Court to "define precisely the meanings of such terms as 'criminal acts of violence' or 'continuing threat to society.'" *Jurek v. Texas,* 428 U.S. 262 (1976).

## GROUNDS 19, 21-22 & 24-25: CALLINS V. COLLINS

The court finds that this very argument has repeatedly been rejected by the Court of Criminal Appeals. Court Finding (1052). However, this Court is urged to consider *Callins v. Collins*, 510 U.S. 1141, 1144-46 (1994) (Blackmun, J.. dissenting), particularly Justice

3042

Blackmun's dissent where he discussed the "narrowing" of death-eligible offenders according to objective, fact-bound criteria; and the jury's subsequent discretion to consider relevant mitigating evidence. *Id.* at 1152. Such consideration of Justice Blackmun's insight would led this Court to the determination that the Texas capital sentencing scheme fails to adhere to principled guidelines in weighing punishment evidence. Therefore, this Court should commute Appellant's death sentence to imprisonment for life.

### GROUND 23: APPELLATE REVIEW OF DEATH PENALTY

Texas' unstructured sentencing scheme is unconstitutional because it does not permit meaningful appellate review, which is not only required by a Texas statute[3] but also is a prerequisite to a constitutionally implemented capital sentencing scheme.[4] In spite of the court's finding that Halprin has not demonstrated any constitutional violation, a violation does exists where there is no distinction between which aggravating and/or mitigating factors were considered by the jury. Thus, the appellate court has no way to know how, and indeed whether, the jury considered all of the constitutionally relevant mitigating evidence offered at trial. Any meaningful appellate review is therefore impossible. Thus, the appellate court has no way to know how, and indeed whether, the jury considered all of the constitutionally relevant mitigating evidence offered at trial. Arts. 37.071 and 37.0711, therefore prevent meaningful appellate review and render the Texas capital sentencing stature unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution.

---

[3] See TEX. CODE CRIM. PROC. Art. 44.251 (Vernon 1994).

[4] See *Gregg v. Georgia*, 428 U.S. 153, 195, 206 (1976); *Parker v. Dugger*, 498 U.S. 308, 321 (1991); *Jurek v. Texas*, 428 U.S. 262, 278 (1976); see also *Stringer v. Black*, 112 S.Ct. 1130, 1136 (1992).

3043

## GROUNDS 26-29: PENRY II CLAIM

The court found that the jury did not receive a nullification instruction or anything akin to one. Finding (1081). However, the court's instructions did not define the term "mitigating evidence" beyond instructing the jury that such evidence to be that a juror might regard as reducing applicant's role blameworthiness. The instruction given in Halprin's case unconstitutionally precluded the jury from considering and giving effect to his mitigating evidence. As previously argued, the instruction in the instant matter can be compared with that given in *Ex parte Smith*, 132 S.W.3d 407, 427 (Tex. Crim. App. 2004) and *Penry v. Johnson*, 532 U.S. 782 (2001). Upon comparison, there are only minor differences between the "nullification instruction" given in Halprin's case and that of *Smith* and *Penry*. However, these minor changes did not cure the obvious constitutional violation in the instruction. It seems abundantly clear that if the instruction in *Smith*, which provided more information to the jury to decide whether there was mitigating evidence to warrant a negative answer to either special issue no. 1 or 2, was held unconstitutional, then the same result should persist in the instant matter under the legislative instruction mandated by Art. 37.071(e)(1).

## GROUNDS 31: CUMULATIVE CONSTITUTIONAL ERROR

In spite of the court's findings, there exists a number of constitutional errors resulting from Halprin's trial, as argued below. It remains Halprin's contention that the cumulative effect of such errors denied him of due process of law and due course of law under the federal and state constitutions. *Derden v. McNeel,* 978 F.2d 1453, 1454 (5th Cir.1992) (en banc)(cumulative error doctrine applies when the errors themselves involve matters of constitutional dimension and "so infected the entire trial that the resulting conviction violates

3044

due process"); *Stahl v. State,* 749 S.W.2d 826, 832 (Tex. Crim. App. 1988); *Chamberlain v. State,* 998 S.W.2d 230, 238 (Tex. Crim. App. 1999). Therefore, a new trial is required in order to avoid the injustice of executing a man who did not receive a fair trial, and to ensure that Halprin's trial is one in which the community can be confident in the propriety of the outcome.

## CONCLUSION

Based on the above, Applicant prays that the Court reject the trial court's Findings of Fact and Conclusions of Law and grant the requested relief.

Respectfully submitted,

GARY A. UDASHEN
State Bar of Texas No. 20369590

BRUCE ANTON
State Bar of Texas No. 01274700

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas  75201
214-468-8100
214-468-8104 fax

ATTORNEYS FOR APPLICANT

3045

## CERTIFICATE OF SERVICE

On this _____ day of January, 2012, a true and correct copy of the foregoing Applicant's Objections to the District Court's Findings of Fact and Conclusions of Law (Death Penalty Case) was delivered to Lisa Smith, Assistant District Attorney, 133 N. Riverfront Blvd., L.B. 19, Dallas, Texas 75207.

_____
GARY A. UDASHEN

3046

NO. W01-00237-T(A)

| | | |
|---|---|---|
| EX PARTE | § | IN THE CRIMINAL DISTRICT |
| | § | |
| | § | COURT NUMBER SEVEN |
| | § | |
| RANDY ETHAN HALPRIN | § | DALLAS COUNTY, TEXAS |

## OBJECTIONS TO FINDINGS OF FACT AND CONCLUSIONS OF LAW ON *ENMUND/TYSON* AND REQUEST THAT COURT SET ISSUE FOR SUBMISSION AND CONSIDERATION

*2012 JAN 24  AM 8:42*
*GARY FITZSIMMONS*
*DISTRICT CLERK*
*DALLAS CO. TEXAS*
*FILED*
*DEPUTY*

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COMES NOW** RANDY ETHAN HALPRIN, by and through undersigned counsel, and files these objections to the court's findings of fact and conclusions of law on claims 1 and 30: *Enmund/Tyson*.

### Overview

As noted in previous and contemporaneous filings, the trial court adopted the state's proposed findings of fact and conclusions of law wholesale, deleting only irrelevant and duplicitous comments contained in the state's proposal. Halprin has previously filed extensive objections to the state's proposed findings, as well as submitting proposed findings on Halprin's behalf. Given that the court has adopted the state's proposed findings, Halprin's previous objections and submissions are still equally valid and applicable. Therefore, they are incorporated herein as if set out at length.

### The Jury Was Misled from Start to Finish on the Second Special Issue

The Texas death penalty scheme contemplates that the jury will make a finding

*3047*

supported by the evidence of a probability that Halprin thought Officer Hawkins's life would be taken.  The scheme requires more than that Halprin was possibly aware that death could result.

Unfortunately, in Texas, the term "anticipate" is not a term of legal art.  Therefore, juries are free to give that term whatever common meaning they assign.  Hence, it is incumbent upon both the trial court and the reviewing court to ensure that Halprin be assessed a death penalty on a showing that he was more than merely aware of the possibility that a death could result.  Specifically, in applying this standard, the courts have required more than a showing that Halprin was in the company of other armed individuals.  In order to find that he anticipated death, as set out in the special issue, the evidence had to show that Halprin actually understood the probability of Hawkins's demise.

Unfortunately, these concepts were never properly clarified for the jury.  Even during jury selection, the state was allowed to infer to the jury that a second special issue could be answered affirmatively if Halprin was merely present with armed co-actors. (RR9.75-76) As noted above, the jury charge did not give the jury any further definition of anticipate.  An anti-parties charge, which should have been required under the circumstances, was not presented.  *See Belyeu v. State*, 791 S.W.2nd 66, 73 (Tex. Crim. App. 1988).  Also, the charge allowed the jury to consider all of the evidence submitted at the guilt/innocence phase of trial, and not just the evidence related to Halprin's participation in the event.  Further, in final argument, the prosecutor echoed the misleading definition of anticipate used in voir dire by arguing that merely carrying the gun was sufficient to warrant the death penalty.

Applicant's Objections to Findings of Fact and Conclusions of Law on *Enmund/Tyson* and Request That A Set Issue
For Submission and Consideration - Page 2

3048

(RR53.82).   Utterly confused by these misstatements of the law, the jury sent out a note which clearly indicated that they did not understand the degree of anticipation necessary to answer the special issue affirmatively.

The court's findings adopt the position that because the defense attempted to correctly state the burden of proof in final argument, the egregious misstatements of law made by the prosecution were somehow nullified.   This conclusion is an unreasonable determination of the trial record.   The record as a whole establishes that throughout the trial the state was allowed to reduce the burden of proof as to the second special issue.   (See findings 55-63)

### Halprin's Role in the Offense

The *Enmund/Tyson* analysis involves consideration of a number of factors, most of which are ignored by the trial court in its findings.

The primary consideration should be the nature of the felony undertaken and Halprin's role in the offense.   In the court's findings, emphasis is placed upon the conduct of the other co-conspirators involved, but without reference to Halprin's individual conduct.   (See findings 30-47).   Although, there was ample planning done by the other members of the conspiracy, Halprin's role was quite limited primarily because he was the weakest link of the group and was distrusted by his co-conspirators.   The court places great emphasis on a note Halprin left behind wherein Halprin stated "you have not heard the last of us."   Halprin testified at great length explaining the meaning of that note and that it did not constitute a threat.   His explanation went unrebutted.   (RR48: 123-127)

Significantly, the court found that Halprin anticipated death in that he fired his

Applicant's Objections to Findings of Fact and Conclusions of Law on *Enmund/Tyson* and Request That Court Set Issue For Submission and Consideration - Page 3

300449

weapon. Of course, this finding (Finding 41) is immediately contradicted by finding 42 in which the court notes that only five guns were fired. There is no proof of a sixth gun, only proof that some bullet fragments were incapable of being matched to any weapon. As set out in previous filings at great length, if Halprin was the shooter, that means Rodriguez was not a shooter. The state took the position in Rodriguez's trial that he fired the fifth weapon. Now the court makes a finding that Halprin fired the fifth weapon. As noted below, the court ultimately denies taking any position that Rodriguez was not a shooter. The attempt to cast Halprin as a shooter under these circumstances, is objectively unreasonable and duplicitous. There is no credible evidence that Halprin was the shooter and the court has found that only five guns were fired, meaning Halprin was not a shooter.

Therefore, if Halprin actually anticipated the death, it had to be because he was present when the robbery occurred and because he had previous been convicted of injury to a child. (Finding 36). Finding that Halprin anticipated Hawkins's shooting because he had previously been convicted of child abuse, is a patently unreasonable determination. Finding that Halprin anticipated the death because he voluntarily engaged in the conspiracy to rob the Oshman's and then failed to disassociate himself from the group, is contrary to the requirements of *Enmund/Tyson*.

Although the court asserts that Halprin joined in Hawkins's murder (Finding 39), that finding is unsupported by the record. Although the trial court faults Halprin for not preventing the shooting, the record is devoid of any indication that Halprin was in a position to prevent Rivas from shooting Hawkins. Instead the record indicates that Rivas's actions

were a surprise to most of the co-conspirators.

## Summary

This trial record justifies an affirmative finding under the second special issue only if Halprin was a shooter. Otherwise, the record establishes that Halprin's co-conspirators had engaged in two other robberies, neither of which resulted in death. (RR48.8-9)   The record indicates that Halprin took a gun to the Oshman's robbery but did not fire it.  The record does not establish any means by which Halprin could have prevented the killing.  These criteria, which are part and parcel of a proper *Enmund/Tyson* analysis, are largely ignored in the court's findings.

Given Halprin's limited culpability, a properly instructed jury would have answered the second special issue "no." This jury was misled from voir dire through jury charge and into final summation, as set out above. Because the jury was affirmatively misinformed about the degree of foresight necessary to find that Halprin anticipated the killing, Halprin's right to be free of cruel and unusual punishment was denied him on this record.

## Postscript

The trial court found that these *Enmund/Tyson* issues were not ripe for appeal because no proper objections were made in the lower court.  Of course, Halprin has argued in the alternative that trial and appellate counsel were ineffective for not preserving these claims. The trial court then found that counsel was not ineffective because the errors in failing to make these objections was harmless.  For the reasons set out above, the errors are not harmless and Halprin was denied his Eight Amendment right to be free of cruel and unusual

Applicant's Objections to Findings of Fact and Conclusions of Law on *Enmund/Tyson* and Request That Court Set Issue For Submission and Consideration - Page 5

305

punishment due to the ineffective assistance of trial and appellate counsel.

WHEREFORE, PREMISES CONSIDERED, Applicant prays that the Court reject the trial court's findings and grant the requested relief.

Respectfully submitted,

GARY A. UDASHEN
State Bar of Texas No. 20369590

BRUCE ANTON
State Bar of Texas No. 01274700

SORRELS, UDASHEN & ANTON
2311 Cedar Springs Road
Suite 250
Dallas, Texas  75201
214-468-8100
214-468-8104 fax

ATTORNEYS FOR APPLICANT

## CERTIFICATE OF SERVICE

On this 2nd day of January, 2012, a true and correct copy of the foregoing Applicant's Objections to Findings of Fact and Conclusions of Law on *Enmund/Tyson* and Request That Court Set Issue For Submission and Consideration was delivered to Lisa Smith, Assistant District Attorney, 133 N. Riverfront Blvd., L.B. 19, Dallas, Texas 75207.

GARY A. UDASHEN

Applicant's Objections to Findings of Fact and Conclusions of Law on *Enmund/Tyson* and Request That Court Set Issue For Submission and Consideration - Page 6

3062

DEFENDANT __Jae__ HALPRIN, RANDY ETHAN   WM 09131977 _____ CHARGE __CAP MUR PO__
                      AKA: _____ REINDICTMENT OF F-0134010
ADDRESS __TEXAS DEPARTMENT OF CORRECTIONS, HUNTSVILLE, TX__ LOCATION __UNKNOWN__

FILING AGENCY __TX0571500__ _____ DATE FILED __February 7, 2001__ _____ COURT _____

COMPLAINANT __HAWKINS, AUBREY__ _____   F-0100327
C/C   GEORGE RIVAS,  MICHAEL ANTHONY RODRIGUEZ,  DONALD KEITH NEWBURY,
C/C _____ JOSEPH C. GARCIA,  PATRICK HENRY MURPHY JR. _____

## TRUE BILL OF INDICTMENT

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS: The Grand Jury of Dallas County,

State of Texas, duly organized at the _____ JANUARY _____ Term, A.D. 20 ___01___ of the

__282ND JUDICIAL__ District Court _____ , Dallas County, in said court at said

Term, do present that one            HALPRIN, RANDY ETHAN                    , defendant,

on or about the __24TH___ day of __DECEMBER___ A.D. 20 __00___ in the County of Dallas and said State, did

unlawfully then and there knowingly and intentionally cause the death of AUBREY HAWKINS,
an individual, hereinafter called deceased, by shooting the said deceased with a
firearm, a deadly weapon, and the said deceased was a peace officer, namely: a City of
Irving Police Officer, then and there acting in the lawful discharge of an official
duty, and the said defendant then and there knew the said deceased to be a peace
officer,

And further unlawfully then and there intentionally cause the death of AUBREY
HAWKINS, an individual, hereinafter called deceased, by shooting the said deceased with
a firearm, a deadly weapon, and the defendant was then and there in the course of
committing and attempting to commit the offense of robbery of WESLEY FERRIS,

against the peace and dignity of the State.

BILL HILL
_____
Criminal District Attorney of Dallas County, Texas.

_____
Foreman of the Grand Jury.

3053

COURT



3054

TRIAL DOCKET — CRIMINAL DISTRICT COURT — DALLAS COUNTY, TEXAS

No. F01-00327-ST

BAIL STATUS: UNAPP

| STATE OF TEXAS | ATTORNEYS | OFFENSE | DATE OF FILING |
|---|---|---|---|
| RANDY ETHAN HALPRIN | GEORGE ASHFORD, JR 214.74.5120<br>EDWARD KING 214.871.8800 | CAPITAL MURDER, A CAPITAL FELONY OFFENSE AS CHARGED IN THE INDICTMENT/FO/REINDICTMENT<br><br>CC: GEORGE RIVAS<br>MICHAEL ANTHONY RODRIGUEZ<br>DONALD KEITH NEWBURY<br>JOSEPH C. GARCIA<br>PATRICK HENRY MURPHY JR | FEBRUARY 8, 2001 |

| DATE OF ORDER | ORDERS OF COURT |
|---|---|
| 3-31-03 | INDIVIDUAL VOIR DIRE |
| 5-13-03 | JURY SELECTION FINAL WITH 12 + 2 ALTERNATES |
| 6-2-03 | INDICTMENT PRESENTED TO JURY |
| 6-9-03 | JURY FIND DEFENDANT GUILTY OF CAPITAL MURDER AS CHARGED IN INDICTMENT |
| 6-12-03 | JURY ANSWERS SPECIAL ISSUES: 1 = YES; 2 = YES; 3 = NO |
| 6-12-03 | DEFENDANT SENTENCED TO DEATH BY LETHAL INJECTION |
| 6-12-03 | NOTICE OF APPEAL FILED |
| 6-12-03 | MOTION FOR NEW TRIAL — OVERRULED Aug 28, 2003 |
| 10-10-03 | REPORTERS RECORD FILED WITH COURT OF CRIMINAL APPEALS |

3055

## CAUSE NUMBER F01-00327-T

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 283ᴿᴰ JUDICIAL |
| | § | |
| | § | DISTRICT COURT OF |
| VS. | § | |
| | § | DALLAS COUNTY, TEXAS |
| RANDY ETHAN HALPRIN | § | |

### JUDGMENT ON PLEA OF NOT GUILTY BEFORE JURY
### PUNISHMENT BY JURY - NO COMMUNITY SUPERVISION

JANUARY TERM, 2003

**JUDGE PRESIDING:** Vickers L. Cunningham, Sr.

**ATTORNEY FOR STATE:** Toby Shook

**OFFENSE CONVICTED OF:** Capital Murder

**DEGREE:** A Capital Felony

**CHARGING INSTRUMENT:** Indictment

**VERDICT:** GUILTY AS CHARGED

**DATE OF JUDGMENT:** 12 June, 2003

**ATTORNEY FOR DEFENDANT:** George Ashford, III

**COMMITTED ON:** 24 December, 2000

**PLEA:** NOT GUILTY

**FOREMAN:** Larry P. French

**DEADLY WEAPON FINDING:** The jury finds that Defendant herein used or exhibited a deadly weapon during the commission of said offense, to wit: a firearm

**PUNISHMENT ASSESSED BY:** Jury - see special issues attached hereto and incorporated by reference

**DATE SENTENCE IMPOSED:** 12 June, 2003

**COSTS:** YES

**PUNISHMENT AND PLACE OF CONFINEMENT:** Death by lethal injection; confinement in the Institutional Division of the Texas Department of Criminal Justice until execution

**DATE TO COMMENCE EXECUTION:** To be determined at a later date

**CREDIT FOR TIME SERVED:** 22 January, 2001 – 12 June, 2003

On this day set forth above, the above styled and numbered cause came to trial. The state of Texas and defendant appeared by and through the above-named attorneys and announced ready for trial. Defendant appeared in person in open court. Defendant in open court was duly arraigned, and entered the above shown plea. The defendant was admonished by the court of the consequences of the said plea and defendant persisted in entering said plea, and it plainly appearing to the court that defendant is mentally competent and said plea is free and voluntary, the said plea was accepted by the court and is now entered of record as the plea herein of defendant. Thereupon a jury was duly selected, impaneled and sworn, who having heard the indictment presented and defendant's plea thereto, and having heard the evidence submitted, and, having been duly charged by the court as to their duty to determine the guilt or innocence of the defendant, and after having heard the arguments of counsel retired in charge of the proper officer to consider their verdict. Afterward the jury was brought into open court by the proper officer, defendant and his counsel being present, and in due form of law returned into open court the above shown verdict which was received and accepted by the court, and is here and now entered upon the minutes of the court.

VOLUME 435, PAGE 117

3056

Thereupon, the defendant having previously elected to have punishment assessed by the jury, and, after hearing evidence relative to the question of punishment. Thereafter, the jury retired to consider such question, and, after having deliberated, the jury was brought back into open court by the proper officer, the defendant, defendant's attorney, and the State's attorney being present, and being asked if the jury had agreed upon a verdict, the jury answered it had, and returned to the Court their verdict as shown above. Said verdict was read aloud, received by the Court, and is now entered upon the minutes of the Court.

When it is shown above the defendant is guilty of the offense set forth above, it is considered by the court that said defendant is adjudged to be guilty of the offense set forth above and that defendant committed the offense on the date set forth above as charged in the indictment and that said defendant be punished as has been determined by the jury, said punishment being determined by the jury's answers to the Special Issues submitted to them, and that the defendant be confined in the place of confinement shown above until such time as the sentence of death can be carried out. It is ordered that the State of Texas have and recover of the said defendant all costs in this prosecution expended for which let execution issue. The Court further makes its finding as to deadly weapon as set forth above based upon the jury's verdict.

When it is shown above that restitution has been ordered but the court determines that the inclusion of the victim's name and address in the judgment is not in the best interest of the victim the person or agency whose name and address is set out in this judgment will accept and forward the restitution payments to the victim.

And when it is shown below that payment of the costs of legal services provided to the defendant in this cause has been ordered, the court finds that the defendant has the financial resources to enable the defendant to offset said costs in the amount ordered.

Thereupon the said defendant was asked by the court whether he had anything to say why said sentence should not be pronounced against him and he answered nothing in bar thereof, and it appearing to the court that the defendant is mentally competent and understanding of the proceedings, the Court proceeded to pronounce sentence upon said defendant.

It is therefore, considered and ordered by the court in the presence of defendant and his attorney, that said judgment as set forth above is hereby in all things approved and confirmed, and that defendant, who has been adjudged guilty of the above named offense, as shown above, and whose punishment has been assessed as shown above, be punished in accordance with the punishment set forth above and that defendant shall be delivered by the sheriff to the director of the Institutional Division of the Texas Department of Criminal Justice, or other person legally authorized to receive such convicts for the punishment assessed herein and said defendant shall be confined until such time as the sentence of death can be carried out in accordance with the provisions of law governing such punishments. It is further ordered that the defendant pay the court costs, costs and expenses of legal services provided by the court appointed attorney in this cause, if any, and restitution or reparation, as set forth herein, for which let execution issue.

Defendant is hereby ordered remanded to jail until said sheriff can obey the directions of this judgment.

Following the disposition of this cause the defendant's fingerprint was in open court, placed upon a certificate of fingerprint. Said certificate is attached hereto and is incorporated by reference as a part of this judgment.

Defendant excepts and gives notice of appeal.

Court costs in the amount of $242.25

Signed and entered this Thursday, 12 June, 2003.

VICKERS L. CUNNINGHAM, SR., JUDGE
283RD JUDICIAL DISTRICT COURT
DALLAS COUNTY, TEXAS

VOLUME 435, PAGE 117

3057

THE STATE OF TEXAS

TO ANY SHERIFF OR ANY CONSTABLE OR ANY PEACE OFFICER
OF THE STATE OF TEXAS – GREETINGS:
YOU ARE HEREBY COMMANDED TO SUMMON

GEORGE ASHFORD / ATTORNEY
325 N. ST. PAUL STE., #475
DALLAS, TX

To be and appear before the JUDICIAL District Court 283RD of Dallas County, Texas at the courthouse of said County, in the City of Dallas, on the 13TH day of AUGUST, 20 10 , at 9:00 o'clock P. M., Then and there to testify as a witness in behalf of the STATE in a criminal Action pending in said court, wherein THE STATE OF TEXAS is Plaintiff, and HALPRIN, RANDY E. Defendant No. W01-00237-T(A).

☐ NOT APPLICABLE

DUECES TECUM (IF APPLICABLE)
and that he bring with him and produce in said Court, at said time and place,

ALL DOCUMENTS IN THEIR POSSESSION RELATED TO THEIR REPRESENTATION OF RANDY HALPRIN

desired as evidence in said Criminal action, to-wit: in a certain suit pending in said court.

and there remain from day to day and from term to term until discharged by the Court HEREIN FAIL NOT, But of this Writ make due return, showing how you have executed the same.

☒ NOT APPLICABLE

OUT OF COUNTY (IF APPLICABLE)
A DISOBEDIENCE OF this Subpoena is punishable by fine not exceeding $500, to be collected as fines and costs in other criminal cases.

WITNESS MY OFFICIAL SIGNATURE, THIS 16TH day of JULY, 20 10

GARY FITZSIMMONS
Clerk, District Courts
Dallas, County Texas

By _____
B. BOWSER

Deputy

NO. W01-00237-T(A)

JUDICIAL DISTRICT COURT 283RD
DALLAS COUNTY, TEXAS

THE STATE OF TEXAS
vs
HALPRIN, RANDY E.

PEN WRIT

SUBPOENA

ISSUED
This 16TH day of JULY, 20 10
GARY FITZSIMMONS
Clerk, District Courts
Dallas County, Texas
By B. BOWSER Deputy

ATTORNEY:
GARY UDASHEN
2311 CEDAR SPRINGS RD. STE.,#250
DALLAS, TX 75201
214/468-8100

REPORT TO:
FRANK CROWLEY COURTS BLDG.
133 N. INDUSTRIAL BLVD.
DALLAS, TEXAS 75207

7201 S. POLK ST.
DALLAS, TEXAS

2010 JUL 20 AM 11:48

3058

Friday, July 30, 2010.max

*Rec @ 11.48a*

## OFFICER'S RETURN

CAME TO HAND on the ...... day of **JUL 3 0 2010** ................. 20 ..... and executed by delivering a copy of the within Subpoena to the following within named witnesses, all of whom were summoned in ... *Dallas* ... County, on the dates and at the places hereinafter set forth, as follows:

| NAME | | DATE | WHERE | COURSE | | DISTANCE |
|---|---|---|---|---|---|---|
| *George Wetford - Attorney* | | *Subpoena* | .....miles | from .....South | | ..... miles |
| *414 So. Rd. Strington* | | | .....miles | @ 2 from 4p | | ..... miles |
| *Dallas County, TX* | | | .....miles | from | | ..... miles |
| | | | .....miles | from | | ..... miles |

I actually and necessarily traveled ...... ? ... miles in the service of this Subpoena, in addition to any other mileage I may have traveled in the service of other Subpoenas, or Attachments, in this or any other case during the same trip.

AMOUNT OF MONEY FURNISHED ABOVE NAMED WITNESS...................

$ *10.10*
$
$

TOTAL ...........

The following named witnesses not summoned for the reasons set opposite their names:

To total amount of money furnished ..................
witnesses ......................... $...........
For summoning ............. Witnesses
at ............. each ..............
Mileage ........... miles at ........... 
TOTAL ........... $.....................
Subscribed and sworn to before me, this ............... day of ............... 20.........

**DERICK EVANS, CONSTABLE**
Dallas County Precinct 1
Sheriff ............................................... County, Texas
By ....................................................... Deputy

## ATTEMPTED SERVICE

| DATE | TIME | REMARKS | DEPUTY |
|---|---|---|---|
| *7/13* | *8:42a* | *No Contact* | *130* |
| | | *Front Door Locked* | |
| *7/20* | *10:55a* | *No Contact* | *130* |
| *7/26* | *10:50a* | *No Recpt* | *130* |
| | | *Not Sealed Office* | |

3059

THE STATE OF TEXAS

NO.W01-00237-T(A)

JUDICIAL DISTRICT COURT 283RD
DALLAS COUNTY, TEXAS

TO ANY SHERIFF OR ANY CONSTABLE OR ANY PEACE OFFICER
OF THE STATE OF TEXAS – GREETINGS:

YOU ARE HEREBY COMMANDED TO SUMMON

GEORGE ASHWORD
125 ST. PAUL STREET   SUITE 2475
DALLAS, TX 75201

To be and appear before the JUDICIAL District Court   283RD of Dallas County, Texas
County, in the City of Dallas, on the 20TH day of AUGUST, 20 10, at 9:00 o'clock A. M., Then and there to
testifies as a witness in behalf of the DEFENDANT in a criminal Action pending in said court, wherein THE STATE
TEXAS is plaintiff, and RANDY ETHAN HALPRIN Defendant No. W01-00237-T(A)

RANDY ETHAN HALPRIN
CAP MUR PO (PEN WRIT)

VS.

THE STATE OF TEXAS

SUBPOENA

052915

DUCES TECUM (IF APPLICABLE)                                    ☐ NOT APPLICABLE

and that the bring with him and produce in said Court, at said time and place,

BRING ALL DOCUMENTS IN THEIR POSSESSION RELATED TO THEIR REPRESENTATION
OF RANDY HALPRIN.

desired as evidence in said Criminal action, to-wit: in a certain suit pending in said court,

and there remain from day to day and from term to term until discharged by the Court
HEREIN FAIL NOT; But of this Writ make due return, showing how you have executed the same.

ISSUED
This 4TH day of AUGUST, 20 10
GARY FITZSIMMONS
Clerk, District Courts
Dallas County, Texas
By M. BROADWAY Deputy

ATTORNEY:
GARY A. UDASHEN, DEFENSE ATTY
2311 CEDAR SPRINGS RD, SUITE 250
DALLAS, TX 75207
214-468-8100

REPORT TO:
FRANK CROWLEY COURTS BLDG.
133 N. RIVERFRONT BLVD.
DALLAS, TEXAS 75207

OUT OF COUNTY (IF APPLICABLE)                                  ☒ NOT APPLICABLE
A DISOBEDIENCE OF this Subpoena is punishable by fine not exceeding $500, to be collected as
F   and costs in other criminal cases.

WITNESS MY OFFICIAL SIGNATURE, THIS   4TH day of AUGUST, 2010
GARY FITZSIMMONS
Clerk, District Courts
Dallas County, Texas

By _____
M. BROADWAY

Deputy

3060

## OFFICER'S RETURN

*Rec'd @ 11:10am*

AUG 06 2010

CAME TO HAND on the ........ day of ............................. 20 ...... and executed by delivering a copy of the within Subpoena to the following within named witnesses, all of whom were summoned in ................................. County, on the dates and at the places hereinafter set forth, as follows:

| NAME | NAME | DATE | WHERE | COURSE | DISTANCE |
|------|------|------|-------|--------|----------|
| | | | ........miles | ........from | ........miles |
| | | | ........miles | ........from | ........miles |
| | | | ........miles | ........from | ........miles |
| | | | ........miles | ........from | ........miles |
| | | | ........miles | ........from | ........miles |
| | | | ........miles | ........from | ........miles |

I actually and necessarily traveled ................... miles in the service of this Subpoena, in addition to any other mileage I may have traveled in the service of other Subpoenas, or Attachments, in this or any other case during the same trip.

AMOUNT OF MONEY FURNISHED ABOVE NAMED WITNESS.................................... $ ........

$ ........

$ ........

TOTAL ..........

The following named witnesses not summoned for the reasons set opposite their names:

*Returned to Court unexecuted Aug 23 2010 at 9:45am court date by prior person to location Amy George Washford at her place of Business. 335 Austin St St... 2678 Dallas County, TX 95-3678*

To total amount of money furnished ......... $ *10.00*

witnesses

For summoning ............... Witnesses    *Attempt*    Sheriff ............ *Dallas* County, Texas

at ................. each ..................    *Service*    By *P. Clark / 30*   DERICK EVANS, **MS. CONSTABLE**

Mileage ............ miles at .........    *free*                          **Precinct 1**

TOTAL ............... $ ..........

Subscribed and sworn to before me, this ................. day of ...................................... 20 ..........

ATTEMPTED SERVICE

| DATE | TIME | REMARK |
|------|------|--------|
| 8/9 | 11:15 | Left Bus Card /30 Attach to Door |
| 8/12 | 1:00p | Left Bus Card w/asst B/m /30 |
| 8/18 | 11:40 | No Contact /30 |
| 8/19 | 12:40p | No Contact /30 Left Bus Card attached |

3061

NO. W01-0237-T(A)

JUDICIAL DISTRICT COURT 283RD
DALLAS COUNTY, TEXAS

THE STATE OF TEXAS

VS.

RANDY ETHAN HALPRIN

CAP MUR PO (PEN WRIT)

3062

**THE STATE OF TEXAS**

**TO ANY SHERIFF OR ANY CONSTABLE OR ANY PEACE OFFICER**
**OF THE STATE OF TEXAS – GREETINGS:**
**YOU ARE HEREBY COMMANDED TO SUMMON**

*GEORGE ASHFORD*
*3250 ST. PAUL STREET.  SUITE 2475*
*DALLAS, TX 75201*

To be and appear before the JUDICIAL District Court   283RD of Dallas County, Texas at the courthouse of said County, in the City of Dallas, on the 20TH day of AUGUST, 20 10, at 9:00 o'clock A. M., Then and there to testify as a witness in behalf of the DEFENDANT  in a criminal Action pending in said court, wherein THE STATE OF TEXAS is plaintiff, and RANDY ETHAN HALPRIN Defendant No. W01-0237-T(A)

**DUCES TECUM** (IF APPLICABLE)
and that he bring with him and produce in said Court, at said time and place,
***BRING ALL DOCUMENTS IN THEIR POSSESSION RELATED TO THEIR REPRESENTATION***
***OF RANDY HALPRIN.***
desire as evidence in said Criminal action, to-wit: in a certain suit pending in said court.

and there remain from day to day and from term to term until discharged by the Court
HEREIN FAIL NOT, But of this Writ make due return, showing how you have executed the same.

**OUT OF COUNTY** (IF APPLICABLE)
A DISOBEDIENCE OF this Subpoena is punishable by fine not exceeding $500, to be collected as
Fines and costs in other criminal cases.

☐ NOT APPLICABLE          ☒ NOT APPLICABLE

WITNESS MY OFFICIAL SIGNATURE, THIS  4TH  day of  AUGUST , 2010

**GARY FITZSIMONS**
Clerk, District Courts
Dallas, County Texas

By _____
M. BROADWAY

_____
Deputy

ATTORNEY:
GARY A. UDASHIN, DEFENSE ATTY
2311 CEDAR SPRINGS RD. SUITE 250
DALLAS, TX 75207
214-468-8100

REPORT TO:
FRANK CROWLEY COURTS BLDG.
133 N. RIVERFRONT BLVD.
DALLAS, TEXAS  75207

This 4TH day of AUGUST , 20__

ISSUED AT THIS
GARY FITZSIMONS
Clerk, District Courts
Dallas County Texas
M. BROADWAY   Deputy

SUBPOENA

THIS PROCESS NOT EXECUTED BY ME THIS 4TH DAY

## OFFICER'S RETURN

CAME TO HAND on the ...... day of ............................................ 20 ...... and executed by delivering a copy of the within Subpoena to the following within named witnesses, all of whom were summoned in ...................................... County, on the dates and at the places hereinafter set forth, as follows:

| NAME | NAME | DATE | WHERE | COURSE | DISTANCE |
|------|------|------|-------|--------|----------|
| .......... | .......... | .......... | ..... miles | ..... from | ..... miles |
| .......... | .......... | .......... | ..... miles | ..... from | ..... miles |
| .......... | .......... | .......... | ..... miles | ..... from | ..... miles |
| .......... | .......... | .......... | ..... miles | ..... from | ..... miles |
| .......... | .......... | .......... | ..... miles | ..... from | ..... miles |

I actually and necessarily traveled ...................... miles in the service of this Subpoena, in addition to any other mileage I may have traveled in the service of other Subpoenas, or Attachments, in this or any other case during the same trip.

AMOUNT OF MONEY FURNISHED ABOVE NAMED WITNESS ...................................... ........................................ $ ..............
........................................ ........................................ $ ..............
........................................ ........................................ $ ..............

TOTAL ..........

The following named witnesses not summoned for the reasons set opposite their names:

........................................................................................................
........................................................................................................
........................................................................................................
........................................................................................................
........................................................................................................
........................................................................................................

To total amount of money furnished ..........................
witnesses ........................ $ ..............

For summoning ................ Witnesses .................. Sheriff .................................... County, Texas
at ................ each .................. By .................................... Deputy
Mileage ............ miles at ..........
TOTAL .............................. $ ..............

Subscribed and sworn to before me, this .................. day of ................................................ 20 ..........
........................................................................................................

3063

NO. W01-00237-T

JUDICIAL DISTRICT COURT 283RD
DALLAS COUNTY, TEXAS

THE STATE OF TEXAS

VS

RANDY ETHAN HALPRIN
1107 PEN WRIT

SUBPOENA

ISSUED
This 15TH day of SEPTEMBER, 20 10
Gary Fitzsimmons Clerk, District Courts
Dallas County, Texas

By F.LILLEY Deputy

ATTORNEY:

GARY A. UDASHEN
2311 CEDAR SPRINGS ROAD STE. 250
DALLAS, TX 75201
214-468-8100

REPORT TO:

FRANK CROWLEY COURTS BLDG.
133 N. RIVERFRONT BLVD.
DALLAS, TEXAS 75207

3064

---

THE STATE OF TEXAS
TO ANY SHERIFF OR ANY CONSTABLE OR ANY PEACE OFFICER
OF THE STATE OF TEXAS – GREETINGS:
YOU ARE HEREBY COMMANDED TO SUMMON

TOND'AMORE
414 N. CENTRAL EXPRESSWAY STE.250
DALLAS, TX 75204
214-821-1919

To be and appear before the JUDICIAL District Court, 283RD of Dallas County, Texas at the courthouse of said County, in the City of Dallas, on the 30TH day of SEPTEMBER, 2010, at 09:00 o'clock A. M. Then and there to testify as a witness in behalf of the STATE in a criminal Action pending in said court, wherein THE STATE OF TEXAS is Plaintiff, and RANDY ETHAN HALPRIN is Defendant in cause No. W01-00237-T

DUCES TECUM (IF APPLICABLE)
and at let he/she bring with him/her and produce in said Court, at said time and place,

TO BRING ALL FILES,RECORDS,NOTES OR OTHER PAPERWORK CONCERNING THE TEXAS SEVEN. desired as evidence in said Criminal action, to-wit: in a certain suit pending in said court.

and here remain from day to day and from term to term until discharged by the Court HEREIN FAIL NOT, But of this Writ make due return, showing how you have executed the same.

☒ NOT APPLICABLE

OUT OF COUNTY (IF APPLICABLE)
DISOBEDIENCE OF this Subpoena is punishable by fine not exceeding $500, to be collected as and costs in other criminal cases.

☒ NOT APPLICABLE

WITNESS MY OFFICIAL SIGNATURE, THIS 15TH day of SEPTEMBER, 20 10.

Gary Fitzsimmons Clerk, District Courts
Dallas, County, Texas

By F.LILLEY

_____
Deputy

## OFFICER'S RETURN

CAME TO HAND on the _15_ day of _Sept_ .................................... 20 _10_ and executed by delivering a copy _AT 10:46 AM_

of the within Subpoena to the following within named witnesses, all of whom were summoned in _DALLAS_ ...................
County, on the dates and at the places hereinafter set forth, as follows:

| NAME | NAME | DATE | WHERE | COURSE | DISTANCE |
|------|------|------|-------|--------|----------|
| TOM D'AMORE | AT 4144 N. CENTRAL EXPWY | 20 SEPT 10 AT 2:03 PM | #200 | | miles |
| TELEPHONICALLY | DALLAS TX 73204 | | miles | from | miles |
| | | | miles | from | miles |
| | | | miles | from | miles |
| | | | miles | from | miles |

I actually and necessarily traveled .................... miles in the service of this Subpoena, in addition to any other mileage I
may have traveled in the service of other Subpoenas, or Attachments, in this or any other case during the same trip.
AMOUNT OF MONEY FURNISHED ABOVE NAMED WITNESS..................................

.................................................... ............................ $ ............................
.................................................... ............................ $ ............................
.................................................... ............................ $ ............................

TOTAL ............................

The following named witnesses not summoned for the reasons set opposite their names:

....................................................................................................................
....................................................................................................................
....................................................................................................................
....................................................................................................................
....................................................................................................................

To total amount of money furnished ................
  witnesses ........................................ $........................
For summoning ................ Witnesses
  at ............., each ............................
Mileage ............, miles at ............ ........................
  TOTAL ................................ $.._30_²

Subscribed and sworn to before me, this .................. day of ........................................................ 20........

Sheriff .......................................................... County, Texas
By ........A. Lee const PS7................................ Deputy

................................................................................................
................................................................................................


BETH VILLARREAL, CONSTABLE PCT 5
DALLAS COUNTY, TEXAS

3065

## C L E R K ' S     C E R T I F I C A T I O N

**THE STATE OF TEXAS**                    §
                                          §
**COUNTY OF DALLAS**                      §

I, GARY FITZSIMMONS, CLERK OF THE DISTRICT COURTS WITHIN AND FOR
THE STATE AND COUNTY AFORESAID, DO HEREBY CERTIFY THAT THE RECORD ON
THE APPLICATION FOR WRIT OF HABEAS CORPUS TO THE COURT OF CRIMINAL
APPEALS OF TEXAS, AUSTIN, TEXAS IN WRIT NO. **W01-00327-Y (A),**

**RANDY ETHAN HALPRIN    v    THE STATE OF TEXAS.**

AS SHOWN IN **VOLUME  7,  PAGES 2730-3066** INCLUSIVE, TO WHICH THIS
CERTIFICATION IS ATTACHED THERETO AND MADE A PART THEREOF, CONTAINS A
TRUE AND CORRECT TRANSCRIPT OF ALL THE MATTERS AND PROCEEDINGS HAD
AND DONE IN SAID CAUSE.

GIVEN UNDER MY HAND AND SEAL OF OFFICE IN  DALLAS COUNTY,
TEXAS, THIS **2nd** day of **FEBRUARY,  2012.**

GARY FITZSIMMONS
CLERK OF THE DISTRICT COURTS
DALLAS COUNTY, TEXAS

By: _A. McDaniel_____

Deputy/ANA MCDANIEL

3066